# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ANWAR, *et al.*,<br><br>                              Plaintiffs,<br><br>     -against-<br><br>FAIRFIELD GREENWICH LIMITED, *et al.*,<br><br>                              Defendants.<br><br>This Document Relates To:  All Actions | Master File No. 09-cv-118 (VM) |

Dated:  April 24, 2009

**CONSOLIDATED AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

*U.S. DISTRICT COURT S.D.N.Y.   09 APR 24  PH 8: 37  RECEIVED*

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200

David A. Barrett
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Stuart H. Singer
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, #1200
Ft. Lauderdale, Florida 33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022

Robert C. Finkel
Carl L. Stine
James A. Harrod
E. Elizabeth Robinson
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Telephone:  (212) 759-4600

Christopher Lovell
Victor E. Stewart
LOVELL STEWART HALEBIAN LLP
61 Broadway
New York, NY 10006
Telephone:  (212) 608-1900

*Interim Co-Lead Counsel for Plaintiffs*

**Volume I of IV**
**(Complaint and Exhibits 1 - 4)**

INTER-AMERICAN TRUST; ELVIRA 1950 TRUST;
BONAIRE LIMITED; PACIFIC WEST HEALTH
MEDICAL CENTER INC. EMPLOYEES RETIREMENT
TRUST; LOANA, LTD; WALL STREET SECURITIES,
S.A.; BANCO GENERAL S.A.; HARVEST DAWN
INTERNATIONAL INC.; EL PRADO TRADING;
OMAWA INVESTMENT CORPORATION; CARMEL
VENTURES LTD.; TRACONCORP; HAREL
INSURANCE INVESTMENTS AND FINANCIAL
SERVICES LTD.; BLYTHEL ASSOCIATED CORP.;
MARREKESH RESOURCES; SECURITIES &
INVESTMENT COMPANY (SICO) BAHRAIN;
CENTRO INSPECTION AGENCY; KALANDAR
INTERNATIONAL; LANDVILLE CAPITAL
MANAGEMENT S.A.; 20/20 INVESTMENTS; CARLOS
GAUCH; ALEXANDER RICHARDSON; PAOLO
PAOLONI REMIA; ENRIQUE DESCAMPS; EMERSON
SANCHEZ; ALEJANDRO LOPEZ DE HARO; PETER
ANTHONY BAINES; JANINE LANNELONGUE;
KERRY PIESCH; HECTOR CASTRO; AXA PRIVATE
MANAGEMENT; ST. STEPHEN'S SCHOOL;
DIVERSIFIED INCOME ASSOCIATES CLASS A
UNITS; MARTIN AND SHIRLEY BACH FAMILY
TRUST; ABR CAPITAL FIXED OPTION/INCOME
STRATEGIC FUND LP; PASHA S. ANWAR; JULIA
ANWAR; LARRY CENTRO; and NATALIA HATGIS,
on behalf of themselves and all others similarly situated,

Plaintiffs,

   -against-

BERNARD L. MADOFF; FAIRFIELD GREENWICH
GROUP; FAIRFIELD GREENWICH LIMITED;
FAIRFIELD GREENWICH (BERMUDA) LTD.;
FAIRFIELD GREENWICH ADVISORS LLC;
FAIRFIELD RISK SERVICES LTD; FAIRFIELD
HEATHCLIFF CAPITAL LLC; FAIRFIELD
GREENWICH (UK) LIMITED;  LION FAIRFIELD
CAPITAL MANAGEMENT LTD; WALTER M. NOEL,
JR.; JEFFREY TUCKER; ANDRES PIEDRAHITA;
AMIT VIJAYVERGIYA; YANKO DELLA SCHIAVA;
PHILIP TOUB; LOURDES BARRENECHE;

[caption continues on next page]

CORNELIS BOELE; VIANNEY D'HENDECOURT;
JACQUELINE HARARY; DAVID HORN; RICHARD
LANDSBERGER; DANIEL LIPTON; MARK
MCKEEFRY; MARIA TERESA PULIDO MENDOZA;
SANTIAGO REYES; ANDREW SMITH; JULIA
LUONGO; CHARLES MURPHY; HAROLD
GREISMAN; CORINA NOEL PIEDRAHITA; ROBERT
BLUM; JAN R. NAESS; PETER P. SCHMID; BRIAN
FRANCOUER; IAN PILGRIM; CITCO BANK
NEDERLAND, N.V. DUBLIN BRANCH; CITCO
GLOBAL CUSTODY N.V.; CITCO FUND SERVICES
(EUROPE) B.V.; CITCO FUND SERVICES
(BERMUDA) LIMITED; CITCO (CANADA) INC.; and
GLOBEOP FINANCIAL SERVICES, LLC;

Defendants.

# TABLE OF CONTENTS

Page

GLOSSARY ............................................................................................. v

NATURE OF THE ACTION .................................................................... 1

JURISDICTION AND VENUE ................................................................ 3

PARTIES .................................................................................................. 3

    A.    Plaintiffs ....................................................................................... 3

        1.    Fairfield Sentry Limited Investors ................................. 3

        2.    Fairfield Sigma Limited Investors .................................. 7

        3.    Greenwich Sentry, L.P. Investors ................................... 7

        4.    Greenwich Sentry Partners, L.P. Investor ...................... 8

    B.    Defendants .................................................................................. 8

        1.    Fairfield Defendants ..................................................... 10

        2.    Citco Defendants .......................................................... 26

        3.    GlobeOp Defendant ...................................................... 28

ALLEGATIONS OF FACT .................................................................... 29

    A.    Bernard Madoff's Ponzi Scheme ............................................ 29

    B.    The Fairfield Greenwich Group Funneled Investments to Madoff .... 30

    C.    The Nature and Structure of the Fairfield Greenwich Group ............ 33

D.     The Fairfield Defendants Falsely Represented the Fairfield Funds' Investments With Madoff and the Absence of Due Diligence and Oversight of Madoff's Operations ...................................................... 35

E.     Defendants' False Representations Concerning Performance ........... 36

F.     Defendants' False Representations of Due Diligence and Oversight ......................................................................................... 36

G.     Defendants' Failure to Disclose or Investigate "Red Flags" Concerning Madoff ...................................................................... 38

H.     Madoff's Secretive Operations............................................... 39

I.     Madoff's Custody of Assets ................................................... 39

J.     Madoff's Unknown Auditing Firm ...................................... 40

K.     Madoff's Paper Trading Records ......................................... 41

L.     Madoff's Consistent Investment Returns ............................. 41

M.     Defendants Recognized the Importance of Due Diligence and Oversight, but Failed to Take Such Actions ...................................... 42

N.     Defendants' False Representations of Access to Madoff .................. 45

O.     Defendants' False Representations Concerning Monitoring of Madoff ........................................................................................ 47

P.     Defendants' False Assurances to Investors ........................................ 51

Q.     Defendants Assisted Madoff in Thwarting an SEC Investigation ..... 59

R.     Defendants Attempted to Raise Money to Keep Madoff Afloat in Late 2008 ................................................................................. 60

S.     FGG and its Partners Earned Massive Fees from Funneling Plaintiffs' Assets into the Madoff Fraud ............................................ 61

CLASS ACTION ALLEGATIONS ........................................................................ 67

      a.   Numerosity. ...................................................................... 68

      b.   Typicality. ........................................................................ 68

      c.   Common Questions. ......................................................... 68

      d.   Adequate Representation. ................................................. 72

      e.   Superiority. ....................................................................... 72

CLAIMS FOR RELIEF ..................................................................................... 72

Count 1
Fraud Against Bernard Madoff .......................................................................... 72

Count 2
Fraud Against Certain Fairfield Defendants (Purchaser Claims) .......................... 73

Count 3
Fraud By Fairfield Defendants (Holder Claims) .................................................. 75

Count 4
Negligent Misrepresentations By Fairfield Defendants (Purchaser Claims) .......... 78

Count 5
Negligent Misrepresentations By Fairfield Defendants (Holder Claims) .............. 80

Count 6
Breach Of Fiduciary Duty Against Fairfield Defendants ...................................... 83

Count 7
Imposition of Constructive Trust Against Fairfield Fee Claim Defendants ........... 86

Count 8
Third-Party Beneficiary Contract Claims ............................................................ 87

Count 9
Gross Negligence (Against Fairfield Defendants) ................................................ 89

Count 10
Breach Of Fiduciary Duty By Fund Directors ........................................................... 91

Count 11
Breach of Fiduciary Duty By Francoeur, Pilgrim and Citco Fund Services
(Bermuda) Limited ................................................................................................... 92

Count 12
Breach Of Fiduciary Duty By Citco Fund Services (Europe) ................................. 93

Count 13
Breach of Fiduciary Duty by Citco Bank, Citco Global .......................................... 96

Count 14
Breach of Fiduciary Duty By GlobeOp and Citco Canada ...................................... 98

Count 15
Third-Party Contract Claims Against Citco Defendants ........................................ 101

Count 16
Gross Negligence (Against Citco Fund Services) ................................................... 106

Count 17
Gross Negligence (Against GlobeOp Financial Services) ...................................... 108

JURY TRIAL DEMANDED ................................................................................... 110

PRAYER .................................................................................................................. 110

# GLOSSARY OF DEFINED TERMS

| Defined Term | Definition |
|---|---|
| AICPA | American Institute of Certified Public Accountants |
| Barreneche | Defendant Lourdes Barreneche |
| BLM or BMIS | Bernard L. Madoff Investment Securities, Inc. |
| Blum | Defendant Robert Blum |
| Boele | Defendant Cornelis Boele |
| BVI | Territory of the British Virgin Islands |
| CFSB | Defendant Citco Fund Services (Bermuda) Limited |
| Citco Bank | Defendant Citco Bank Nederland, N.V., Dublin Branch |
| Citco Canada | Defendant Citco (Canada) Inc. |
| Citco Defendants | Defendants CFSB, Citco Bank, Citco Canada, Citco Fund Services, Citco Global, |
| Citco Fund Services | Defendant Citco Fund Services (Europe) B.V. |
| Citco Global | Defendant Citco Global Custody N.V. |
| Class | All shareholders in Fairfield Sentry, Fairfield Sigma, Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P., as of December 10, 2008 |

| **Defined Term** | **Definition** |
| --- | --- |
| COM | Confidential Offering Memoranda/Memorandum |
| Corina Piedrahita | Defendant Corina Noel Piedrahita |
| Della Schiava | Defendant Yanko Della Schiava |
| d'Hendecourt | Defendant Vianney d'Hendecourt |
| FΣ PPM | Fairfield Sigma December 1, 2008 PPM |
| F&H | Friehling & Horowitz |
| Fairfield Defendants | FGG, FGL, FGBL, FGA, FRS, FHC, FGL UK, LFCM, Noel, Tucker, Piedrahita, Vijayvergiya, Lipton, McKeefry, Horn, Landsberger, Pulido Mendoza, Smith, Murphy, and Blum |
| Fairfield Fee Claim Defendants | Della Schiava, Toub, Barreneche, Boele, Brown, d'Hendencourt, Harary, Reyes, Luongo, Greisman and Corina Piedrahita |
| Fairfield Fraud Claim Defendants | FGG, FGL, FGBL, FGA, FRS, Noel, Tucker, Piedrahita, Vijayvergiya, Lipton and McKeefry |
| Fairfield Sentry | Fairfield Sentry Limited |
| Fairfield Sigma | Fairfield Sigma Limited |
| FGA | Defendant Fairfield Greenwich Advisors LLC |
| FGBL | Defendant Fairfield Greenwich (Bermuda) Ltd. |

| **Defined Term** | **Definition** |
| --- | --- |
| FGG | Defendant Fairfield Greenwich Group |
| FGG Partners | All FGG entities, including FGBL, FGL, and FGA, and its individual partners including Defendants Noel, Tucker, and Piedrahita, the individual Fairfield Defendants and Fairfield Fee-Sharing Defendants |
| FGL | Defendant Fairfield Greenwich Limited |
| FGL UK | Defendant Fairfield Greenwich (UK) Limited |
| FHC | Defendant Fairfield Heathcliff Capital LLC |
| Francoeur | Defendant Brian Francoeur (Director of FGBL) |
| FRS | Defendant Fairfield Risk Services Ltd. |
| FS PPM-10/1/04 | Fairfield Sentry October 1, 2004 Private Placement Memorandum |
| FS PPM-7/1/03 | Fairfield Sentry July 1, 2003 Private Placement Memorandum |
| FS PPM-8/14/06 | Fairfield Sentry PPM, dated August 14, 2006 |
| Funds | Fairfield Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry, L.P., Greenwich Sentry Partners, L.P. |
| GlobeOp | Defendant GlobeOp Financial Services, LLC |

| **Defined Term** | **Definition** |
| --- | --- |
| Greenwich Sentry | Greenwich Sentry, L.P. |
| Greenwich Sentry Partners | Greenwich Sentry Partners, L.P. |
| Greisman | Defendant Harold Greisman |
| GS COM- 5/2006 | Greenwich Sentry May 2006 Confidential Offering Memorandum |
| GS COM- 8/2006 | Greenwich Sentry August 2006 Confidential Offering Memorandum |
| GS COM-1994 | Greenwich Sentry 1994 Confidential Offering Memorandum |
| GSP | Greenwich Sentry Partners, L.P. |
| GSP COM-8/2006 | Greenwich Sentry Partners August 2006 Confidential Offering Memorandum |
| Harary | Defendant Jacqueline Harary |
| Horn | Defendant David Horn |
| Landsberger | Defendant Richard Landsberger |
| LFCM | Defendant Lion Fairfield Capital Management Ltd. |
| Lipton | Defendant Daniel E. Lipton |
| Luongo | Defendant Julia Luongo |
| Madoff | Defendant Bernard L. Madoff |
| McKeefry | Defendant Mark McKeefry |

| **Defined Term** | **Definition** |
| --- | --- |
| Murphy | Defendant Charles Murphy |
| Naess | Defendant Jan R. Naess (Director Fairfield Sentry, Fairfield Sigma) |
| NASD | National Association of Securities Dealers |
| NAV | Net Asset Value |
| NNI | Northern Navigation International Limited |
| Noel | Defendant Walter M. Noel, Jr. |
| Piedrahita | Defendant Andres Piedrahita |
| Pilgrim | Defendant Ian Pilgrim (former director FGBL) |
| PPM | Private Placement Memoranda/ Memorandum |
| Pulido Mendoza | Defendant Maria Teresa Pulido Mendoza |
| Pwc | Price Waterhouse Coopers |
| Reyes | Defendant Santiago Reyes |
| Schmid | Defendant Peter P. Schmid (Director Fairfield Sentry, Fairfield Sigma) |
| SIPC | Securities Investor Protection Corporation |
| Smith | Defendant Andrew Smith |
| SSC | Split-strike conversion/Split-strike conversion strategy |

| **Defined Term** | **Definition** |
|---|---|
| Toub | Defendant Philip Toub |
| Tucker | Defendant Jeffrey H. Tucker |
| Vijayvergiya | Defendant Amit Vijayvergiya |

# INDEX OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | August 14, 2006 - Fairfield Sentry Private Placement Memorandum |
| 2 | December 1, 2008 - Fairfield Sigma Private Placement Memorandum |
| 3 | August 2006 - Greenwich Sentry Confidential Offering Memorandum |
| 4 | August 2006 - Greenwich Sentry Partners Confidential Offering Memorandum |
| 5 | September 2008 - Brochure: "Fairfield Greenwich Group – the Firm and Its Capabilities" |
| 6 | July 1, 2003 - Fairfield Sentry Private Placement Memorandum |
| 7 | October 1, 2004 - Fairfield Sentry Private Placement Memorandum |
| 8 | May 2006 - Greenwich Sentry Confidential Offering Memorandum |
| 9 | 1994 - Greenwich Sentry Confidential Offering Memorandum |
| 10 | October 2008 - Fairfield Sentry Limited, Update |
| 11 | April 2008 - Fairfield Greenwich Group, Due Diligence and Risk Monitoring |
| 12 | April 2006 - Fairfield Greenwich Group, Investment Process and Risk Management Overview |

| **Exhibit No.** | **Description** |
| --- | --- |
| 13 | May 2006 - Fairfield Greenwich Group:  Fairfield Sentry Limited Presentation |
| 14 | December 2008 - Fairfield Sentry Limited Standardized Responses |
| 15 | October 2007 - Fairfield Sentry Limited Due Diligence Questionnaire |
| 16 | October 2008 - Fairfield Greenwich Group:  Fairfield Sentry Limited Presentation |
| 17 | October 2, 2008 BLM Operational Due Diligence |
| 18 | Fairfield Sentry Directors' Report and Financial Statements for the year ended December 31, 2003 |
| 19 | Fairfield Sentry Directors' Report and Financial Statements for the year ended December 31, 2005 |
| 20 | Fairfield Sentry Directors' Report and Financial Statements for the years ended December 31, 2007 and 2006 |
| 21 | Fairfield Sentry Directors' Report and Financial Statements for the period January 1, 2008 to June 30, 2008 |
| 22 | Investment Management Agreement between Fairfield Sentry Limited and Fairfield Greenwich (Bermuda) Limited dated October 1, 2004 |
| 23 | Fairfield Sigma Limited Financial Statements for the years ended December 31, 2007 and 2006 |
| 24 | Greenwich Sentry, L.P., Financial Statements for the years ended December 31, 2007 and 2006 |

| **Exhibit No.** | **Description** |
| --- | --- |
| 25 | Administration Agreement between Fairfield Sentry Limited and Citco Fund Services (Europe) B.V. dated February 20, 2003 |
| 26 | Custodian Agreement between Fairfield Sentry Limited, Citco Bank Nederland N.V. Dublin Branch, and Citco Global Custody N.V. dated July 3, 2006 |

Plaintiffs, through undersigned Co-Lead Interim Counsel, pursuant to the Case Management Order, hereby sue Defendants, upon personal knowledge as to matters relating to themselves and upon information obtained during the course of their attorneys' investigation and upon information and belief as to all other matters, and allege as follows:

## NATURE OF THE ACTION

1.     This suit arises out of the largest and longest running "Ponzi scheme" in history – a fraud orchestrated by Bernard Madoff, and facilitated by the reckless, grossly negligent, and fraudulent conduct of others, that cost investors many billions of dollars. This class action seeks recovery on behalf of investors in the largest group of so-called "feeder funds" into Madoff's fraudulent operations, the funds marketed and operated by the Fairfield Greenwich Group ("FGG"), which channeled over $7 billion to Madoff.

2.     Plaintiffs and class members in this action are all shareholders and/or equity holders in the four FGG/Madoff feeder funds – Fairfield Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P. (collectively, the "Funds" or "Fairfield Funds"). They bring this class action on behalf of all shareholders and/or equity holders in those funds as of December 11, 2008, the date when Madoff's fraud was revealed.

1

3.     The Defendants in this action – who solicited Plaintiffs' investments, oversaw and controlled these investments that were then funneled into Madoff's hands, reported account values to investors, and purportedly investigated and monitored Madoff – are all responsible for Plaintiffs' massive losses.  Defendants directly owed duties to Plaintiffs, including fiduciary duties, to conduct due diligence and provide accurate and complete information to Plaintiffs about their investments in the Funds, both before and after the initial investment; to exercise care with Plaintiffs' investments, and to monitor Madoff and others who Defendants chose to carry out the Funds' investment strategy and safeguard their investors' assets.  The loss of Plaintiffs' assets in the Madoff Ponzi scheme is a direct and proximate result of Defendants' false representations and failure to fulfill their duties to Plaintiffs.

4.     Moreover, certain of the Defendants wrongfully collected hundreds of millions of dollars in unearned fees based on the fictitious assets supposedly managed by, and profits supposedly generated by, Madoff for FGG's investors. These fees were wrongly paid out of the Funds, as a result of false representations and breaches of fiduciary duties owed by Defendants.  The fees must be returned to Plaintiffs, and a constructive trust imposed on those funds and against those who hold them.

2

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this dispute pursuant to the Class Action Fairness Act of 2005, codified at 28 U.S.C. § 1332(d)(2)(B).  The amount in controversy exceeds $5,000,000.  Plaintiffs' class consists of more than 100 individuals; at least one Plaintiff is a citizen of a foreign state and one Defendant is a citizen of New York.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(3), as one or more of the Defendants resides in this District and the principal place of business of one or more Defendants is in this District.

## PARTIES

7.     Due to the activities alleged herein, the Plaintiffs identified below have lost all, or substantially all, of their investments in the Funds as of December 11, 2008, and also have paid substantial investment, placement, management, and performance fees that were wrongfully imposed based on fraudulent investment returns.

**A.**     **Plaintiffs**

1.     Fairfield Sentry Limited Investors

8.     Plaintiff **Inter-American Trust** is a Cayman Islands settlor-directed trust that invested assets in Fairfield Sentry Limited beginning October 8, 2002.

9.     Plaintiff **Elvira 1950 Trust** is a Cayman Islands settlor-directed trust that invested assets in Fairfield Sentry Limited beginning March 6, 2002.

10.    Plaintiff **Bonaire Limited** is a Cayman Islands private investment holdings company that invested assets in Fairfield Sentry Limited beginning May 5, 2006.

11.    Plaintiff **Pacific West Health Medical Center Inc. Employees Retirement Trust** is located in Los Angeles, California, and invested its assets in Fairfield Sentry Limited in approximately January 2008.

12.    Plaintiff **Loana Ltd.** is a Cayman Islands settlor-directed trust that invested assets in Fairfield Sentry Limited beginning January 12, 2000.

13.    Plaintiff **Wall Street Securities, S.A.,** is a Panamanian corporation that invested assets in Fairfield Sentry Limited beginning April 1, 2000.

14.    Plaintiff **Banco General S.A.** is a Panamanian institution that invested assets in Fairfield Sentry beginning September 26, 2002.

15.    Plaintiff **Harvest Dawn International Inc.** is a Panamanian corporation that invested assets in Fairfield Sentry Limited in approximately 2007.

16.    Plaintiff **El Prado Trading** is a British Virgin Islands company that invested assets in Fairfield Sentry Limited beginning August 28, 2006.

17.    Plaintiff **Omawa Investment Corporation** is a Panamanian company that invested assets in Fairfield Sentry Limited beginning May 25, 2005.

4

18.     Plaintiff **Carmel Ventures Ltd.** is a British Virgin Islands corporation that invested assets in Fairfield Sentry Limited on September 14, 2005.

19.     Plaintiff **Traconcorp** is a Panamanian corporation that invested assets in Fairfield Sentry Limited in approximately 2000.

20.     Plaintiff **Harel Insurance Investments and Financial Services Ltd.** is an Israeli company that invested assets in Fairfield Sentry Limited in approximately September 2003.

21.     Plaintiff **Blythel Associated Corp.** is a Panamanian corporation that invested in Fairfield Sentry Limited beginning October 1, 2004.

22.     Plaintiff **Marrekesh Resources** is a Panamanian company that invested assets in Fairfield Sentry Limited beginning November 1, 2006.

23.     Plaintiff **Securities & Investment Company (SICO) Bahrain** is a Bahraini institution that invested assets in Fairfield Sentry Limited in approximately June 2002.

24.     Plaintiff **Centro Inspection Agency** is a New Jersey Defined Benefit Plan that invested assets in Fairfield Sentry Limited beginning September 12, 2006.

25.     Plaintiff **Kalandar International** is British Virgin Islands company that invested assets in Fairfield Sentry Limited beginning August 26, 2008.

26.     Plaintiff **Landville Capital Management S.A.** is a Panamanian corporation that invested assets in Fairfield Sentry Limited beginning October 27, 2006.

27.     Plaintiff **20/20 Investments** is a Panamanian company which invested assets in Fairfield Sentry Limited beginning November 27, 2002.

28.     Plaintiff **Carlos Gauch** is an individual residing in Mexico who invested assets in Fairfield Sentry Limited beginning June 27, 2005.

29.     Plaintiff **Alexander Richardson** is an individual residing in Bahrain who invested assets in Fairfield Sentry Limited in approximately September 2000.

30.     Plaintiff **Paolo Paoloni Remia** is an individual residing in Mexico who invested assets in Fairfield Sentry Limited in approximately June 2005.

31.     Plaintiff **Enrique Descamps** is an individual residing in Guatemala who invested assets in Fairfield Sentry Limited beginning October 23, 2006.

32.     Plaintiff **Emerson Sanchez** is an individual residing in Brazil who invested assets in Fairfield Sentry Limited beginning March 1, 2007.

33.     Plaintiff **Alejandro López de Haro** is an individual residing in Spain who invested assets in Fairfield Sentry Limited beginning August 18, 2005.

34.     Plaintiff **Peter Anthony Baines** is an individual residing in Brazil who invested assets in Fairfield Sentry Limited beginning April 4, 2008.

35.     Plaintiff **Janine Lannelongue** is an individual residing in Mexico who invested assets in Fairfield Sentry Limited beginning August 1, 1997.

36.     Plaintiff **Kerry Piesch** is an individual and citizen of Australia who invested assets in Fairfield Sentry Limited in approximately March 1999.

37.     Plaintiff **Hector Castro** is an individual residing in Argentina who invested assets in Fairfield Sentry Limited in approximately July 2001.

## 2.     Fairfield Sigma Limited Investors

38.     Plaintiff **AXA Private Management** is a Belgian institution that invested assets in Fairfield Sigma beginning July 1, 2005.

39.     Plaintiff **St. Stephen's School** is a co-educational, non-denominational boarding and day school located in Rome, Italy, that invested assets in Fairfield Sigma beginning in approximately December 2005.

## 3.     Greenwich Sentry, L.P. Investors

40.     Plaintiff **Diversified Investments Associates Class A Units** is a New York company that invested assets in Greenwich Sentry, L.P. beginning March 15, 2000.

41.     Plaintiff **Martin and Shirley Bach Family Trust** is an Arizona family trust that invested assets in Greenwich Sentry, L.P., beginning February 15, 2002.

42.     Plaintiff **ABR Capital Fixed Option/Income Strategic Fund LP** is a fund incorporated under the laws of Delaware that invested assets in Greenwich Sentry, L.P., beginning February 1, 2008.

43.     Plaintiff **Pasha S. Anwar** is an individual residing in Illinois who has an equity interest in Greenwich Sentry, L.P., which was purchased in approximately May 2007.  Plaintiff Pasha S. Anwar previously owned an equity interest in Fairfield Sentry Limited.

44.     Plaintiff **Julia Anwar** is an individual residing in Illinois who has an equity interest in Greenwich Sentry, L.P., which was purchased in approximately May 2007.

45.     Plaintiff **Larry Centro** is an individual residing in New Jersey who invested assets in Greenwich Sentry, L.P., beginning August 1, 2006.

4.      Greenwich Sentry Partners, L.P. Investor

46.     Plaintiff **Natalia Hatgis** is an individual residing in New York who invested assets in Greenwich Sentry Partners, L.P., beginning December 1, 2006.

**B.      Defendants**

47.     Defendant **Bernard Madoff** ("Madoff") directed and orchestrated the fraudulent activities of Bernard Madoff Investment Securities, Inc. ("BMIS"). Madoff is a resident of New York City.  He is now incarcerated in the

Metropolitan Correctional Center following his guilty plea to multiple counts of
fraud and other crimes.

48.     Defendants **Jan R. Naess and Peter P. Schmid** ("Naess" and
"Schmid") are directors of Fairfield Sentry and Fairfield Sigma.  As members of
Fairfield Sentry's Board of Directors, Naess and Schmid have overall management
responsibility for that Fund, including establishing investment, dividend and
distribution policy.  They also have the authority to select and replace Fairfield
Sentry's investment managers, administrator, registrar and transfer agent,
custodian, sub-custodians and officers of Fairfield Sentry and other persons or
entities with management or administrative responsibilities to Fairfield Sentry.
The Fairfield Sigma board had similar responsibilities for that Fund.

49.     According to the Fairfield Sentry Private Placement Memorandum
("FS PPM") of August 14, 2006, Naess is a Vice President of Northern Navigation
International Limited ("NNI"), a Liberian corporation, which is in the business of
investing in and managing shipping assets.  Although undisclosed in the PPM,
Naess and NNI have a significant business relationship with FGG.  According to
information available on its website, the NFC Shipping Funds is a joint venture of
DVB Bank AG, a leading transportation bank and NNI
(http://www.nfcshipping.com).  The website also states that "Jan Naess is currently
a Director of Northern Navigation International Ltd., which comprises various

9

equity funds managed by the Fairfield Greenwich Group" (http://www.
Nfcshipping.com/board.html).  According to that same PPM, Peter R. Schmid has
been an independent investment adviser since April 1986.  Even after the Madoff
fraud was revealed, Naess and Schmid have failed to take action to recover lost
assets, including the fees paid to the other defendants herein.

50.    Defendant **Brian Francoeur** is a director of Defendant Fairfield
Greenwich (Bermuda) Limited ("FGBL").  Mr. Francoeur joined Citco Fund
Services (Bermuda) Limited ("CFSB") in 2001 and served as of August 2006 as its
Managing Director.  (Ex. 1, FS PPM- 8/14/2006, at 8.)  Francoeur served as a
director of FGBL as part of his duties and responsibilities as an employee and
officer of CSFB.

51.    Defendant **Ian Pilgrim** was a director of FGBL from 2003 to 2005.
Pilgrim was an employee of CFSB, which he joined in 2001.

1.    Fairfield Defendants

52.    Defendant **Fairfield Greenwich Group** ("FGG") is a de facto
partnership or partnership by estoppel.  FGG's partners include the other Fairfield
entities and individual persons, as set forth below.  The FGG partners intended to
act as partners, held themselves out to Plaintiffs and other investors as partners,
and conducted business under the name Fairfield Greenwich Group without regard
to corporate structure and formalities.  (*See* infra ¶¶ 103-106.)

10

53.    Defendant **Fairfield Greenwich Limited** ("FGL"), a company incorporated under the laws of the Cayman Islands, is a member of the National Futures Association, and is registered with the Commodity Futures Trading Commission as a commodity pool operator. FGL is the Placement Agent for Fairfield Sentry and Fairfield Sigma, and oversees the marketing of Fairfield Sentry's shares. Prior to 2003, FGL also served as the Investment Manager of Fairfield Sentry. FGL was also the General Partner of Greenwich Sentry, L.P., from July 2003 to February 2006.

54.    Defendant **Fairfield Greenwich (Bermuda) Ltd.** ("FGBL") is an SEC-registered, exempted corporation organized under the laws of Bermuda on June 13, 2003. FGBL is a wholly-owned subsidiary of FGL and was marketed as a member of FGG. FGBL is registered with the SEC as an investment advisor under the Investment Advisers Act of 1940, as amended, effective April 20, 2006.

55.    FGBL is the Investment Manager for Fairfield Sentry and the Investment Manager and Investment Advisor for Fairfield Sigma. As Investment Manager for Fairfield Sentry and Fairfield Sigma, FGBL exercised broad discretion in the management of the Funds' investment activities, the selection and monitoring of the Funds' investments, and maintaining the relationship between the Funds and their respective custodians, sub-custodians, administrators, registrars and transfer agents. FGBL was responsible for reviewing and approving the

parameters and operating guidelines of the purported split-strike conversion strategy, conducting investment oversight, evaluating market risk and monitoring investment compliance to the guidelines. In addition, the finance group of FGBL was responsible for reviewing and verifying the monthly NAV calculated by Defendant Citco Fund Services.

56.     FGBL is also the General Partner of Greenwich Sentry, L.P., and has held that role since March 1, 2006, and the General Partner of Greenwich Sentry Partners, L.P., since the Fund's organization on April 11, 2006. FGBL also serves on FGG's Risk Management team.

57.     Defendant **Fairfield Greenwich Advisors LLC** ("FGA") is a Delaware limited liability company, incorporated on December 12, 2001. FGA was held out as a member of FGG. FGA assists FGBL with its fund manager selection and due diligence process, and provides Fairfield Sentry, Fairfield Sigma, Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P., with administrative services and back-office support. FGA also provides Fairfield Sigma with investment advisory services.

58.     Defendant **Fairfield Risk Services Ltd.** ("FRS") is incorporated under the laws of Bermuda. It is a wholly owned subsidiary of FGL and shares office space with FGBL in Hamilton, Bermuda. FRS was held out and marketed as a member of FGG. Along with FGBL, FRS serves on FGG's Risk Management

12

team.  FRS is responsible for analyzing and monitoring FGG's hedge fund managers, monitoring market risk, analyzing asset allocation decisions, creating and disseminating fund-specific risk reports, and maintaining a risk infrastructure to support these activities.

59.    Defendant **Fairfield Heathcliff Capital LLC** ("FHC") is incorporated under the laws of Delaware, is registered as a foreign corporation in New York, is registered with the SEC as a broker-dealer, and is a member of the Financial Industry Regulatory Authority.  It is a wholly-owned subsidiary of FGL and an affiliate of FGBL.  FHC served as the U.S. placement agent for the FGG funds.  FHC also provided investment advisory services for Fairfield Sigma's securities offerings in the United States.  FHC is a broker-dealer and member of the National Association of Securities Dealers ("NASD") and the Securities Investor Protection Corporation ("SIPC").  FHC maintains offices at 55 East 52nd Street, New York, New York and transacted business relating to Fairfield Sigma in New York.

60.    Defendant **Fairfield Greenwich (UK) Limited** ("FGL UK"), a wholly-owned subsidiary of FGL, is a private limited company incorporated under the United Kingdom Companies Act of 1985.  FGL UK is authorized and regulated by the Financial Services Authority.  FGL UK provides investment advisory services for Fairfield Sigma's securities offerings in Europe.  FGL UK maintains

13

its principal place of business in London, England, United Kingdom, and is listed

on the Luxembourg Stock Exchange.

61.     Defendant **Lion Fairfield Capital Management Ltd.** ("LFCM") is,

upon information and belief, incorporated under the laws of the Republic of

Singapore. LFCM is the hedge fund management and client-servicing platform in

Asia for FGG. LFCM was created by a joint venture between FGG and Lion

Capital Management Limited (formerly Straits Lion Asset Management Limited)

in 2004. FGG owns 35% of LFCM, and Lion Capital Management Limited owns

the remaining 65%. LFCM holds a capital markets services license issued by the

Monetary Authority of Singapore under the provisions of the Securities and

Futures Act. Lion Capital Management is one of the largest asset management

companies in Southeast Asia, and maintains offices in Singapore. Upon

information and belief, LFCM sold shares of Fairfield Sentry. LFCM was

formerly known as Fairfield Straits Lion Asset Management Limited.

62.     Defendant **Walter M. Noel, Jr.** ("Noel") is an American citizen and

maintains residences in Connecticut and New York. Noel is a Founding Partner of

FGG, which he established in 1983. Since founding FGG, Noel has been a director

or general partner of a variety of its funds, including Fairfield Sentry and Fairfield

Sigma, and continues to oversee all of FGG's activities. As a founding partner and

senior officer of FGG, Noel was compensated with placement, management and

performance fees derived from the Funds' investments with Madoff. Mr. Noel received a Bachelor of Arts from Vanderbilt University in 1952, a Master of Arts in Economics from Harvard in 1953, and an LL.B. from Harvard Law School in 1959.

63.    Defendant **Jeffrey H. Tucker** ("Tucker") is an American citizen and is a resident of New York. Tucker is a Founding Partner of FGG. In 1989, Tucker introduced the Madoff relationship to FGG. FGG's relationship with Madoff later became the basis for Fairfield Sentry. At all relevant times, Tucker oversaw the business and operational activities of several FGG management companies and funds. As of July 2006, Tucker was one of four individuals who could authorize movement of cash into and out of the investment accounts the Funds maintained at BMIS. As a founding partner and senior officer of FGG, Tucker was compensated with placement, management and performance fees derived from the Funds' investments with Madoff. Mr. Tucker received a B.A. from Syracuse University in 1966 and a J.D. from Brooklyn Law School in 1969.

64.    Defendant **Andres Piedrahita** ("Piedrahita") is one of defendant Noel's sons-in-law. He is a Colombian citizen and a resident of London, England, Madrid, Spain, and New York, New York. Piedrahita is a Founding Partner of FGG, and is Director and President of FGBL, the Investment Manager of Fairfield Sentry and Fairfield Sigma, and the General Partner of Greenwich Sentry and

15

Greenwich Sentry Partners. As of July 2006, he was one of four individuals who could authorize movement of cash into and out of the investment accounts that the Funds maintained at BMIS. Piedrahita has overall management responsibility over FGG and is directly involved in its decision-making. As a founding partner and senior officer of FGG, Piedrahita was compensated with placement, management and performance fees derived from the Funds' investments with Madoff. Mr. Piedrahita holds a Bachelor's degree from Boston University.

65.    Defendant **Amit Vijayvergiya** ("Vijayvergiya") is a partner in FGG and serves as the firm's Chief Risk Officer and President of FGBL. He has been employed by FGBL since 2003, and focuses on manager selection and risk management for Greenwich Sentry. Vijayvergiya had direct responsibility for monitoring and assessing the past and ongoing performance of the Funds' assets entrusted to Madoff. As of July 2006, Vijayvergiya was one of four individuals who could authorize movement of cash into and out of the investment accounts that the Funds maintained at BMIS. Vijayvergiya resides in New York City, and also works in FGG's Bermuda office. Mr. Vijayvergiya holds an M.B.A. from Schulich School of Business at York University, a B.S. in Statistics from the University of Manitoba, and a B.A. in Economics from the University of Western Ontario; he is a Chartered Financial Analyst and has a Financial Risk Manager certification. As a partner and senior officer of FGG, Vijayvergiya was

compensated with placement, management, and performance fees derived from the Funds' investments with Madoff.

66.     Defendant **Yanko Della Schiava** ("Della Schiava") is one of defendant Noel's sons-in-law.  According to published reports, Della Schiava helped raise funds for Fairfield in southern Europe from bases in Milan and Lugano.  As a partner and senior officer of FGG, Della Schiava was compensated with placement, management, and performance fees derived from the Funds' investments with Madoff.

67.     Defendant **Philip Toub** ("Toub") is one of defendant Noel's sons-in-law.  Toub was identified in FGG's marketing brochures as a partner in the Client Group at FGG.  Toub is also a member of FGG's Executive Committee.  Toub marketed FGG's funds in Brazil and the Middle East.  As a partner and senior officer of FGG, Toub was compensated with placement, management, and performance fees derived from the Funds' investments with Madoff.  Toub is based in New York.  Toub holds a B.A. from Middlebury College.

68.     Defendant **Lourdes Barreneche** ("Barreneche") is a partner in the Client Group at FGG.  Barreneche  was described in FGG's marketing materials as an international sales specialist with more than 15 years of experience in the investment management business.  Barreneche coordinated FGG's sales efforts and played a leading role in developing FGG's practices for marketing and business

17

development of FGG funds to offshore clients in Latin America, Europe and the

Far East. Barreneche also played an important role in supporting FGG's

relationships with non-profit organizations. Barreneche holds FINRA Series 7 and

63 licenses, and is based in FGG's New York office. As a partner and senior

officer of FGG, Barreneche was compensated with placement, management, and

performance fees derived from the Funds' investments with Madoff. Ms.

Barreneche received a Master's degree in Politics and Economics from New York

University.

69.     Defendant **Cornelis Boele** ("Boele") is a partner in the Client Group

within FGG. Boele oversaw the marketing efforts of the offshore funds of FGG in

the Benelux region and markets throughout Europe. FGG's marketing materials

describe Boele as having over 15 years of marketing experience in the investment

management business. Boele holds a B.A. from Clark University, as well as

FINRA Series 7 and 63 licenses, and is based in FGG's New York office. As a

partner and senior officer of FGG, Boele was compensated with placement,

management, and performance fees derived from the Funds' investments with

Madoff.

70.     Defendant **Vianney d'Hendecourt** ("d'Hendecourt") is a partner in

FGG. FGG's marketing materials describe d'Hendecourt as a partner who

"markets FGG's offshore funds throughout Europe," including France, Belgium,

18

and Luxembourg. D'Hendecourt has over 19 years experience in capital markets and holds a Bachelor of Business Administration degree from European University in Antwerp (Belgium). D'Hendecourt is based in FGG's London office. As a partner and senior officer of FGG, D'Hendecourt was compensated with placement, management and performance fees derived from the Funds' investments with Madoff.

71.     Defendant **Jacqueline Harary** ("Harary") is a partner in the Client Group at FGG. Based in FGG's New York office, Harary marketed FGG funds worldwide, with a focus on Latin America. Her role combined sales responsibilities with manager selection/product development projects. Ms. Harary holds a B.A. from Oglethorpe University, and FINRA Series 7 and 63 licenses. Harary was compensated as a partner in FGG and was paid portions of the placement, management and performance fees derived from the Funds' investments with Madoff.

72.     Defendant **David Horn** ("Horn") was a partner in FGG, based in the New York office. FGG's marketing materials described Horn as a Partner and Chief Global Strategist who served on the firm's Board of Directors. Horn holds a B.A. from Stanford University and a J.D. with honors from Kent College of Law, Chicago, and has extensive financial experience and sophistication in attracting potential investors for FGG's investment funds. He was founder CEO of Grey

Home Partners, a $4.4 billion hedge fund that was acquired by Morgan Stanley in 1999. Therefore, Horn was a managing director who headed global private client marketing at Morgan Stanley. As a partner and senior officer of FGG, Horn was compensated with placement, management and performance fees from the Funds' investments with Madoff. Horn holds FINRA Series 7, 63, and 65 licenses and is based in FGG's New York office.

73. Defendant **Richard Landsberger** ("Landsberger") is a partner in FGG's Client Group and a member of its Executive Committee. Having joined FGG in 2001, Landsberger was responsible for business development in Europe and Asia and directly marketed products to a global institutional client base. With over 20 years of experience in capital markets, Landsberger was Managing Director of Fixed Income Sales at PaineWebber and Citicorp Securities. As a partner and senior officer of FGG, Landsberger was compensated with placement, management, and performance fees derived from the Funds' investments with Madoff. Landsberger is based in FGG's London office. Landsberger received a B.A. from Boston University and M.B.A. from Cornell University.

74. Defendant **Daniel E. Lipton** ("Lipton") is FGG's Chief Financial Officer and a partner in the Operations Group. As of July 2006, Lipton was one of four individuals who could authorize movement of cash into and out of the Funds' accounts that FGG maintained at BMIS. Lipton received a B.A. in Economics

from Tufts University and M.B.A. dual degrees in Accounting and Finance from New York University's Stern School of Business; he is a Certified Public Accountant. Lipton spent nine years at Ernst & Young as a Senior Manager, with responsibility for auditing and consulting engagements, specializing in alternative assets, private equity, venture capital, and domestic and offshore funds. As a partner and senior officer of FGG, Lipton was compensated with placement, management and performance fees derived from the Funds' investments with Madoff. Lipton is based in FGG's New York office.

75.    Defendant **Mark McKeefry** ("McKeefry") is FGG's Chief Operating Officer and General Counsel and a partner in the Operations Group. He holds FINRA Series 7, 24, 63, and 65 licenses and is admitted to the bars of California and New York. Prior to joining FGG's New York office in 2003, McKeefry spent eight years in private law practice advising broker-dealers and investment advisors on regulatory and compliance matters related to onshore and offshore funds and is also the author of several articles on hedge fund compliance issues and investment advisor trading practices. As a partner and senior officer of FGG, McKeefry was paid placement, management and performance fees derived from the Funds' investments with Madoff. McKeefry holds a B.S. from Carnegie Mellon University and a J.D. from Fordham University, where he was a member of the Law Review.

76.     Defendant **Maria Teresa Pulido Mendoza** ("Pulido Mendoza") is a

partner in FGG.  Pulido Mendoza is FGG's Head of Global Sales, with

responsibility for managing FGG's global sales force and developing new markets.

FGG's marketing materials touted Pulido Mendoza's 17 years of experience in

private banking, investment banking and management consulting at Citi Private

Bank, Bankers Trust/Deutsche Bank, James D. Wolfensohn, Inc. and McKinsey.

Pulido Mendoza received a B.A. in economics, cum laude, from Columbia, and an

M.B.A., magna cum laude, from MIT Sloan School of Management.  As a partner

and senior officer of FGG, Pulido Mendoza was compensated with placement,

management and performance fees derived from the Funds' investments with

Madoff.

77.     Defendant **Santiago Reyes** ("Reyes") is a partner in FGG's Client

Group within FGG.  Reyes headed FGG's Miami office and marketed FGG's

offshore funds worldwide.  Reyes holds a B.A. from the University of Texas and a

Master of Economic History from the London School of Economics, as well as

FINRA Series 7 and 63 licenses.  As a partner and senior officer of FGG, Reyes

was paid placement, management and performance fees derived from the Funds'

investments with Madoff.

78.     Defendant **Andrew Smith** ("Smith") is a partner in FGG's

Investments Group and a member of its Executive Committee.  Smith was FGG's

Chief Risk Officer and President of FGB and is based in FGG's New York office.

Mr. Smith is a graduate of Dartmouth College and holds FINRA Series 7 and 63

licenses.  As a partner and senior officer of FGG, Smith was paid placement,

management, and performance fees derived from the Funds' investments with

Madoff.

79.     Defendant **Julia Luongo** ("Luongo") is a partner in FGG's New York

office and serves as FGG's Assistant General Counsel – Tax Director.  Luongo

received a B.B.A. in Accounting from Loyola College, a J.D. from Seton Hall

University, magna cum laude, where she was a law review editor, and an L.L.M. in

Taxation from New York University.  She is a Certified Public Accountant and is

admitted to the bars of New Jersey and New York.  Before joining FGG, Luongo

worked as a certified public accountant in charge of auditing, consulting and tax

engagements.  As a partner and senior officer of FGG, Luongo was paid

placement, management and performance fees derived from the Funds'

investments with Madoff.

80.     Defendant **Charles Murphy** ("Murphy") is a partner in FGG's New

York office, a member of FGG's Executive Committee, responsible for strategy

and capital markets business.  Mr. Murphy holds a J.D. from Harvard Law School,

an M.B.A. from MIT's Sloan School, and a B.A. from Columbia College.  As a

partner and senior officer of FGG, Murphy was paid placement, management and performance fees derived from the Funds' investments with Madoff.

81.     Defendant **Harold Greisman** ("Greisman") is a partner in FGG, who focuses on evaluating alternative asset investments and managers. He is based in FGG's New York and London offices. Mr. Greisman received a B.A. from Tufts University and an M.B.A. from NYU's Stern School of Business. As a partner and senior officer of FGG, Greisman was compensated with placement, management and performance fees derived from the Funds' investments with Madoff.

82.     Defendant **Corina Noel Piedrahita** ("Corina Piedrahita") is a partner in FGG's Client Group. Together with her husband Defendant Andres Piedrahita, she was responsible for marketing the FGG's funds throughout Europe and South America; she also oversees trade confirmations for FGG's funds. Ms. Piedrahita is a graduate of Yale University and has worked for FGG since 1985. As a partner and senior officer of FGG, Corina Piedrahita was compensated with placement, management and performance fees derived from the Funds' investments with Madoff.

83.     Defendant **Robert Blum** ("Blum") was a Managing Partner and Chief Operating Officer of FGG from 2000 to 2005. He was responsible for overseeing or assisting in all aspects of FGG's activities, and co-led the build out of FGG's

capabilities to a diversified hedge fund management firm and co-managed FGG's

hedge fund business. Blum holds a B.A. from the University of Pennsylvania and

his J.D. from the University of Chicago Law School. After leaving FGG, Blum

continued to share in FGG's profits subsequent to leaving the firm. As a managing

partner and senior officer of FGG, Blum was compensated with placement,

management and performance fees derived from the Funds' investments with

Madoff.

84. The persons identified above in paragraphs 62 through 83 are referred

to collectively as the "Individual Defendants."

85. By virtue of their education, business experience and sophistication,

and the dominant role that the Madoff relationship played in the business of FGG,

each of the Individual Defendants either knew or should have known of the "red

flags" associated with Madoff's business and either knew or should have known

the true facts alleged herein with regard to FGG's false representations and lack of

due diligence with respect to the Madoff relationship.

86. Defendants FGG, FGL, FGBL, FGA, FRS, FHC, FGL UK, LFCM,

Noel, Tucker, Piedrahita, Vijayvergiya, Lipton, McKeefry, Horn, Landsberger,

Pulido Mendoza, Smith, Murphy, and Blum are referred to collectively as the

"Fairfield Defendants."

25

87. A subset of the Fairfield Defendants group, comprised of FGG, FGL, FGBL, FGA, FRS, Noel, Tucker, Piedrahita, Vijayvergiya, Lipton and McKeefry are referred to collectively as the "Fairfield Fraud Claim Defendants." These are the only Fairfield Defendants against which fraud claims are brought.

88. Defendants Della Schiava, Toub, Barrenche, Boele, d'Hendencourt, Harary, Reyes, Luongo, Greisman and Corina Piedrahita are referred to collectively as the "Fairfield Fee Claim Defendants." These are the Fairfield Defendants against which only fee-related claims are brought.

>    2. Citco Defendants

89. Defendant **Citco Bank Nederland, N.V., Dublin Branch** ("Citco Bank") is incorporated in the Netherlands and is registered as a branch of an external company in the Republic of Ireland. Since July 3, 2006, Citco Bank has provided custodial services to Fairfield Sentry. As Custodian, Citco Bank was responsible for monitoring any sub-custodians used by Fairfield Sentry, including BMIS. Upon information and belief, Citco Bank engaged with and transferred Fund assets to Fund sub-custodian BMIS in New York.

90. Defendant **Citco Global Custody N.V.** ("Citco Global") is incorporated in the Netherlands. Since at least July 3, 2006, Citco Global served as the Depositary for Fairfield Sentry. As Depositary, Citco Global had the responsibility of holding securities on behalf of the Fund, and received instructions

from the Fund through the Custodian, Citco Bank. From September 20, 1994, to July 3, 2006, Citco Global served as the Custodian of Fairfield Sentry. Upon information and belief, Citco Global had the same responsibilities as custodian to Fairfield Sentry that Citco Bank currently has, including monitoring any sub-custodians used by Fairfield Sentry, including BMIS. Citco Global also served as Custodian to Fairfield Sigma. Upon information and belief, Citco Global engaged with and transferred Fund assets to Fund sub-custodian BMIS in New York, New York.

91. **Defendant Citco Fund Services (Europe) B.V.** ("Citco Fund Services"), is incorporated in the Netherlands. Citco Fund Services was the administrator, registrar, and transfer agent for Fairfield Sentry and Fairfield Sigma, and since at least August 2006, has acted as the administrator for Greenwich Sentry and Greenwich Sentry Partners. As fund administrator, Citco Fund Services had the responsibility for furnishing administrative services to the Funds, including accounting services; maintaining the Funds' books and records; preparation of reports and accounts; calculation of Net Asset Values ("NAV") and fees; communications with shareholders; communications with governmental bodies; paying the Funds' expenses; providing suitable facilities and procedures for handling dividends and distributions and the orderly liquidation and dissolution of the Fund, if required. In addition, Citco Fund Services was responsible for

27

independently calculating the monthly performance and NAVs/equity of the Fairfield Funds as well as individual investor accounts. As Fund Administrator, Citco Fund Services received information from, and relayed information to, BMIS in New York, New York.

92. Defendant **Citco Fund Services (Bermuda) Limited** ("CFSB") is a corporation organized under the laws of Bermuda with its principal place of business in Hamilton, Bermuda. CFSB employed Ian Pilgrim and Brian Francoeur and directed both employees to serve as directors of FGBL within the scope of their employment. CFSB instructed its employees to serve as directors of FGBL, and in return, FGBL paid CFSB for these services. As their employer, CFSB is legally responsible for the actions of Pilgrim and Francoeur as directors of FGBL.

93. Defendant **Citco (Canada) Inc.** ("Citco Canada") is a corporation organized under the laws of Canada with its principal place of business in Toronto, Ontario. Citco Canada serves as the Sub-Administrator of Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P., and is responsible for the Partnerships' accounting, registrar, and transfer services.

3.   GlobeOp Defendant

94. Defendant **GlobeOp Financial Services, LLC** ("GlobeOp") is a Delaware limited liability company that served as the administrator of Greenwich Sentry, L.P., from January 1, 2004 to August 2006. As Administrator of

28

Greenwich Sentry, L.P., GlobeOp was responsible for preparing and distributing monthly reports that contain the amount of the Partnership's net assets, the amount of any distributions from the Partnership and Performance Allocation, accounting and legal fees, and all other fees and expenses of the Partnership. GlobeOp's principal office is located at One South Road, Harrison, New York 10528.

## ALLEGATIONS OF FACT

### A.   Bernard Madoff's Massive Ponzi Scheme

95.   Madoff founded BMIS in 1960, and eventually expanded the firm to a worldwide client base. Since at least 1990, Madoff perpetrated a massive Ponzi scheme through the investment advisor services of BMIS, whereby Madoff and BMIS fraudulently distributed new investors' assets to prior investors to create the illusion of profits. BMIS's account statements, which purported to set forth trades in equities and options, as well as trading gains and losses and securities holdings, including U.S. Treasury bills, were entirely fictitious, and no trades of securities were executed for years.

96.   The size of Madoff's global fraud has been estimated at $64.8 billion, based upon the reported value of approximately 4,800 BMIS client accounts as of November 30, 2008. On December 11, 2008, Bernard L. Madoff was arrested and charged in a criminal complaint after admitting to his sons that his money management operations were "all just one big lie" and "basically, a giant Ponzi

29

scheme." On March 12, 2009, Madoff pleaded guilty to an 11-count criminal complaint, including fraud, perjury, theft from an employee benefit plan, and two counts of international money laundering.

**B.     The Fairfield Greenwich Group Funneled Investments to Madoff**

97.     Fairfield Greenwich Group ("FGG") was started in 1983 by its original founders and partners, Defendants Walter Noel and Jeffrey Tucker. Defendant Piedrahita, who has been a principal and partner of FGG since 1997, was named a "founding" partner in 2007. FGG began its relationship with Madoff and BMIS when Tucker and another founding partner of FGG, Fred Kolber, introduced Noel to Madoff. At around the same time, FGG launched the funds Fairfield Sentry Limited ("Fairfield Sentry") and Greenwich Sentry, L.P. ("Greenwich Sentry") in 1990. FGG used Madoff and BMIS as the investment advisor for Fairfield Sentry and Greenwich Sentry, and marketed a supposed strategy of "buying a basket of equities hedged by puts and calls," called a "split-strike conversion method." In contravention of standard risk management practice, BMIS also served as the custodian or sub-custodian for the assets of these funds, thus allowing Madoff to perpetrate his fraud.

98.     Fairfield Sentry was incorporated in 1990 as an international business company in the Territory of the British Virgin Islands ("BVI"). Shares of Fairfield Sentry are listed on the Irish Stock Exchange. In contravention of standard

30

management practice, substantially all of Fairfield Sentry's assets were held by

BMIS, which served as the execution agent and sub-custodian for Fairfield Sentry;

again, this enabled Madoff to perpetrate his fraud.  Fairfield Sentry was primarily

marketed to foreign investors, and investments in Fairfield Sentry were made from

outside New York.

99.     In furtherance of its global expansion, FGG launched Fairfield Sigma

Limited ("Fairfield Sigma") in 1997, which offered three classes of shares based

on three foreign currencies (Euro, Singapore Dollar, and Yen).  Fairfield Sigma

was incorporated under the laws of the BVI.  Fairfield Sigma's stated business

objective was "to obtain capital appreciation of its assets by purchasing shares in

Fairfield Sentry Limited."  (Ex. 2, Fairfield Sigma Private Placement

Memorandum ("FΣ PPM") of December 1, 2008, at 2, 9.)  Because Fairfield

Sigma was a conduit for funneling funds into Fairfield Sentry, BMIS also held

substantially all of Fairfield Sigma's assets.  Fairfield Sigma was marketed to

investors outside the United States, and the investments were made from outside

New York.  Several other FGG funds, such as Fairfield Lambda, also fed into

Fairfield Sentry.

100.   Greenwich Sentry is a Delaware limited partnership organized

December 27, 1990, under the name Aspen/Greenwich Limited Partnership.  Its

name was changed to Greenwich Sentry, L.P., on December 4, 1992, and

31

operations commenced under the new name on January 1, 1993. Greenwich

Sentry's stated investment objective is to "obtain capital appreciation of its assets

principally through the utilization of a nontraditional options trading strategy."

(Ex. 3, Greenwich Sentry, L.P. Confidential Offering Memorandum ("GS COM")

of August 2006, at 8.)  In contravention of standard risk management practices,

substantially all of Greenwich Sentry's assets were held by BMIS, which served as

the execution agent and custodian for Greenwich Sentry; this enabled Madoff to

perpetrate his fraud.  Greenwich Sentry was marketed to United States investors.

     101.   In 2006, FGG moved some of its original Greenwich Sentry investors

into a fourth fund, Greenwich Sentry Partners, L.P. ("Greenwich Sentry Partners"

or "GSP").  Greenwich Sentry Partners is a Delaware limited partnership,

organized on April 11, 2006, which commenced operations on May 1, 2006.

Greenwich Sentry Partners' stated investment objective is to "obtain capital

appreciation of its assets principally through the utilization of a nontraditional

option trading strategy."  (Ex. 4, Greenwich Sentry Partners, L.P. Confidential

Offering Memorandum ("GSP COM") of August 2006, at 7.)  In contravention of

standard risk management practices, substantially all of Greenwich Sentry

Partners' assets were held by BMIS, which served as the execution agent and

custodian for Greenwich Sentry Partners; as with the other Funds, this enabled

Madoff to perpetrate his fraud.  Like Greenwich Sentry, Greenwich Sentry Partners was marketed to United States investors.

102.   The funds identified in paragraphs 100 through 103 are collectively referred to herein as the "Funds."

## C.   The Nature and Structure of the Fairfield Greenwich Group

103.   FGG holds itself out to the public as a partnership between several corporate entities and individuals, and operates as a de facto partnership.  FGG's corporate partners include Defendants FGBL, FGL, and FGA, and its individual partners include Defendants Noel, Tucker, and Piedrahita, and the other Fairfield Defendants and Fairfield Fee-Sharing Defendants ("FGG Partners").

104.   The FGG Partners (i) shared, on a pro rata basis, the profits and losses realized by FGG and the other FGG entities; (ii) made pro rata contributions to the capital of FGG and the other FGG entities; (iii) intended to carry on as co-owners of FGG with the common goal of earning a profit; and (iv) participated in the management of FGG.

105.   FGG and its Partners held themselves out as "partners" in FGG by their words and actions. Defendants' identification of the operating entity as FGG and themselves as "partners" was intended by defendants to induce Plaintiffs and other members of the Class to invest in Fairfield Sentry and Greenwich Sentry, and did induce such investment.

33

106.   Business activities of the partners are ascribed to FGG and to each other.  A representative brochure prepared in September 2008, entitled "Fairfield Greenwich Group – the Firm and Its Capabilities," describes FGG as consisting of "Partners": "Under the leadership of its Partners, FGG has built a team of professionals who specialize in product development, risk management, marketing, operations, compliance, and client services on a global basis." (*See* Ex. 5, at 20.) The August 14, 2006, Fairfield Sentry PPM states, in the Uniform Application for Investment Adviser Registration attached thereto, that the due diligence conducted by defendants on behalf of the Fairfield Sentry Fund and its investors was conducted by FGG rather than FGBL, the purported Investment Manager: "[Fairfield Risk Services] primarily conducts both the pre- and post- investment quantitative analyses of hedge fund managers, monitors the market risk and investment compliance of these managers, and provides the quantitative analyses supporting the asset allocation decisions across the firm's multi-strategy funds." (Ex. 1, FS PPM-8/14/06, Appendix A, Items 4.A.(5) and 4.B.(8).)  Defendants' identification of the operating entity as FGG and themselves as "partners" was intended by defendants to induce Plaintiffs and other members of the Class to invest in the Funds.  The perception that the Individual Defendants were personally responsible for the operation of the Funds was critical to the success of FGG.

34

**D.     The Fairfield Defendants Falsely Represented the Fairfield
        Funds' Investments With Madoff and the Absence of Due
        Diligence and Oversight of Madoff's Operations**

107.    Beginning in 1990 and continuing up to December 11, 2008, the

Fairfield Defendants marketed the Fairfield Funds on the basis of false and

misleading representations and omissions.  Each of the PPMs and COMs issued by

the Fairfield Defendants consistently described the investment strategy of the

Fairfield Funds as seeking to obtain capital appreciation of its assets principally

through a "split-strike conversion" strategy.  For example, the Fairfield Sentry

PPMs consistently stated that:  "The establishment of a typical position entails (i)

the purchase of a group or basket of equity securities that are intended to highly

correlate to the S&P 100 Index, (ii) the sale of out-of-the-money S&P 100 Index

call options in an equivalent contract value dollar amount to the basket of equity

securities, and (iii) the purchase of an equivalent number of out-of-the-money S&P

100 Index put options."  (Ex. 6, FS PPM-7/1/03, at 9-10; Ex. 7, FS PPM-10/1/04,

at 8; Ex. 1, FS PPM-8/14/06, at 9.)  The offering memoranda for Fairfield Sigma

and the Greenwich Sentry Funds made similar claims.  (Ex. 2, FΣ PPM- 12/1/08, at

2; Ex.3, GS COM- 8/2006, at 1, 8; Ex. 8, GS COM- 5/2006, at 7; Ex. 9, GS COM-

1994, at 6; Ex. 4, GSP COM-8/2006, at 8.)  In reality, this investment strategy was

not being pursued because investors' assets were being placed in a Ponzi scheme in

which no legitimate securities transactions whatsoever were conducted.

E.   **Defendants' False Representations Concerning Performance**

108.   The Fairfield Defendants touted a historical track record of

profitability based on this supposed "split-strike conversion" strategy.  For

example, PPMs for Fairfield Sentry purported to "set[] forth … the prior trading

results" of the particular fund, and provided a table representing a rate of return

that was positive in virtually all prior months of the fund's operation.  (Ex.6, FS

PPM-7/1/03, at 23; Ex. 7, FS PPM-10/1/04, at 21-22; Ex. 10, Fairfield Sentry Ltd.

October 2008 Update.)  These monthly representations showed substantial,

consistent annualized rates of return for the Funds.  This represented "historical

track record" of investment returns was false.  Based upon government

investigations to date, defendant Madoff had not made any securities transactions

in the thirteen years prior to his arrest.  There were thus no profitable months for

the Funds, because their assets were not invested.  Instead, the Plaintiffs' assets

were handed over to Madoff, who simply used them to fund his admittedly

fraudulent Ponzi scheme.

F.   **Defendants' False Representations of Due Diligence and
     Oversight**

109.   During the time the Ponzi scheme was operated, the Fairfield

Defendants represented to investors that they conducted thorough due diligence of

Madoff's operations, including the Funds into which Plaintiffs' assets were

purportedly invested.  For example, the Fairfield Defendants represented to

36

Plaintiffs that assets of the Funds would be subject to fund guidelines that would protect Plaintiffs' investment against risk:  "The Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ("BLM"), a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Fund at that firm.  The accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market capitalization of the equities in the basket, the minimum correlation of the basket against the S&P 100 Index, and the permissible range of option strike prices."  (Ex. 1, FS PPM-8/14/06, at 9-10; Ex. 3, GS COM- 8/2006, at 8-9; Ex. 8, GS COM- 5/2006, at 7-8; Ex. 4, GSP COM-8/2006, at 8.)  This representation was false because the monies invested by Plaintiffs were in fact turned over by the Fairfield Defendants to Madoff without any actual enforcement or monitoring of the represented investment restrictions. In reality, and contrary to the representations that Madoff "implemented" the split-strike conversion strategy, Madoff exercised total dominance and control over the monies invested as soon as he received them from the Fairfield Defendants, without any oversight, advice, or consent from them.  When Madoff operated outside Fund guidelines, the Fairfield Defendants failed to take action to assure that Madoff operated within the Fund guidelines, while at the same time assuring the Funds' investors that Madoff had never operated outside the Funds' guidelines.

110.   In the 2006 PPM for Fairfield Sentry, the Fairfield Defendants represented that they monitored Fund managers, including through oversight of the split-strike conversion strategy purportedly employed by Madoff.  The Fairfield Defendants represented that "FGBL's core product business model is the investment management and oversight of the split-strike conversion strategy [and] FGBL conducts a detailed manager selection and due diligence process, analyzing such important issues as liquidity management, market and credit risks, management quality (which includes on-site visit(s), background, and reference checks), and operational, compliance, and regulatory risks."  (Ex. 1, FS PPM-8/14/06, Appendix A, Item 4.C.(7).)  These representations were false because in fact the Fairfield Defendants failed to conduct any remotely credible or plausible "investment management and oversight."

111.   The Fairfield Defendants failed to disclose to Plaintiffs that the Fairfield Defendants were in fact not engaging in customary, or any other meaningful, due diligence to verify that their assets were being properly invested and managed by Madoff, or that the assets that had been entrusted to Madoff even still existed.

**G.     Defendants' Failure to Disclose or Investigate "Red Flags" Concerning Madoff**

112.   The Fairfield Defendants also failed to disclose in the PPMs, or otherwise, the existence of numerous "red flags" regarding the conduct of

38

Madoff's business.  These included the lack of any transparency into Madoff's actual operations, the lack of segregation of duties, inadequate auditing, and the consistently profitable returns for a fund pursuing the stated strategy.

### H.    Madoff's Secretive Operations

113.   The misrepresentations and omissions of the Fairfield Defendants are even more egregious when viewed against the backdrop of these red flags they ignored, but which put them on notice that Madoff's operations were a sham, particularly because they violated some of the basic investment tenets that Defendants represented to Plaintiffs were observed.  For example, Madoff refused to answer even basic questions about BMIS and its operations, let alone to permit the kind of due diligence and supervision that the Fairfield Defendants and Defendant Citco Bank represented was necessary, was being undertaken, and that they should have undertaken.  Madoff maintained excessive secrecy concerning the trading of the Funds' accounts, and Madoff family members controlled key positions at the firm.  This secrecy was a clear warning sign to the Defendants that a fraud was being perpetrated, yet this fact was ignored and concealed from Plaintiffs by them.

### I.    Madoff's Custody of Assets

114.   Another red flag ignored by the Fairfield Defendants was that Madoff failed to trade through an independent broker and, instead, self-cleared all Fund

activities through his wholly-owned company BMIS. He also served as custodian

or sub-custodian for the Funds' assets. As Defendants acknowledged in a Fairfield

Sentry PPM (Ex. 1, FS PPM-8/14/06, at 22-23), the lack of involvement by

unaffiliated entities greatly increased the risk of Madoff perpetrating a fraud – yet

Defendants simply ignored this threat. In fact, the Fairfield Defendants acquiesced

to the unusual arrangement by which Madoff served as both the sub-custodian of

the Funds' assets and the executing broker, which they recognized was a "risk

factor."

### J.   **Madoff's Unknown Auditing Firm**

115.   Another warning flag was Madoff's use of Friehling & Horowitz

("F&H"), an unknown accounting firm that was plainly unequipped to audit a

company of BMIS's size. The firm had only three employees – a retired partner

living in Florida, a secretary, and one active certified public accountant. While

F&H was a member of the American Institute of Certified Public Accountants

("AICPA"), it had not been subjected to a peer review since 1993 – a requirement

of membership of AICPA – because F&H represented to the AICPA, in writing,

that it did not perform any audits. Not only was this information ignored by

Defendants, but, as detailed below, the Fairfield Defendants actually falsely touted

F&H's audits as a check against fraud by Madoff.

### K.   Madoff's Paper Trading Records

116.   While Madoff claimed his operation to be technologically advanced, and the Fairfield Defendants claimed transparency to Madoff and his operation, Madoff only used paper tickets for his trades, and copies of the tickets were given to Defendants only 3-5 days after the trades supposedly occurred. The use of delayed paper trade records, which are susceptible to manipulation, was another red flag ignored by the Fairfield Defendants.

### L.   Madoff's Consistent Investment Returns

117.   In addition, had the Fairfield Defendants scrutinized Madoff's purported investment returns as they represented they did, they would have discovered that the purported results were unattainable. In fact, anyone who applied a critical and knowledgeable understanding of the split-strike conversion strategy that Madoff claimed to employ – which understanding Defendants represented to have – would have recognized that: (1) Madoff bought near daily lows and sold near highs with uncanny consistency; (2) Madoff always invested in treasury bills at the end of each quarter, even though the strategy supposedly took weeks to execute; and (3) Madoff's reported results were inconsistent with the split-strike strategy, which might reduce volatility but would not produce gains in a declining stock market.

### M.   Defendants Recognized the Importance of Due Diligence and Oversight, but Failed to Take Such Actions

118.   At the same time they were ignoring these red flags, the Fairfield Defendants understood the importance of assuring Plaintiffs that they were conducting meaningful due diligence and oversight.  For example, in a marketing document entitled "Due Diligence and Risk Monitoring:  FGG's Value-Added Investment Process," the Fairfield Defendants represented that "FGG employs an in-depth, multi-faceted due diligence and risk monitoring process which is designed to uncover" risk from "faulty or incomplete due diligence by investors or their advisors," and recognized that "lack of regular and comprehensive follow-up risk monitoring are often revealed as the reasons why [investors or their advisors] were not aware of and/or did not react to risks or behavior that eventually became the cause of a fund's unexpectedly high level of losses."  (Ex. 11, Fairfield Greenwich Group, Due Diligence and Risk Monitoring, at 2.)

119.   The Fairfield Defendants also recognized the importance of assuring investors that there would be verification of a Fund's assets and stock trades.  For example, the Fairfield Defendants falsely represented to Plaintiffs that they conducted an "[a]nalysis of portfolio composition, portfolio stress testing, risk management, asset verification, peer group comparison, operational procedures, information technology, and a review of offering documents and financial statements are among the areas of examination."  Defendants further falsely

42

represented that "[i]ndependent prime broker trading records are examined" and

"an attempt is made to confirm assets under management." (Ex. 11, Fairfield

Greenwich Group, Due Diligence and Risk Monitoring, at 4), when in fact they did

no such thing.

120.   The Fairfield Defendants similarly misrepresented their due diligence

and oversight process in an April 2006 marketing presentation entitled "Fairfield

Greenwich Group, Investment Process and Risk Management Overview, April

2006." (Ex. 12, at 4-5.) In that piece, the Fairfield Defendants represented that,

among the qualities they "look[ed] for in managers," were "strong risk

management"; "solid investment process"; "operational procedures"; "legal

compliance"; and "transparency." They further represented that their manager

selection process involved verification of "portfolio analysis"; "financial

statements"; "backoffice procedures"; and "regulatory/legal procedures." They

represented to Plaintiffs that their due diligence process involved "check[ing] for a

'reputable' auditor"; an "understand[ing]...of explanation of valuation methods

used [and] trade execution process." When it came to Madoff, these

representations were knowingly false.

121.   The Fairfield Defendants' false representations about their oversight,

monitoring, and other risk management processes were so pervasive that they

actually set themselves apart from other investment advisors by representing to

43

Plaintiffs that their exhaustive due diligence would have caused them not to invest assets in another fund that turned out to be a fraud. In the April 2006 marketing piece, the Fairfield Defendants represented to investors that they would never have invested in that fraudulent fund because they would have "[v]isit[ed][the potential fund manager's] office, have [had] several face-to-face meetings" and "[w]atch[ed] for inconsistent answers, refusal to give information," in addition to "[v]erif[ying] assets under management for all funds directly with the prime broker/ administrator" and conducting an "independent, third party confirmation of assets." (Ex. 12, Fairfield Greenwich Group, Investment Process and Risk Management Overview, April 2006, at 21-22.) These representations were false when made because the Fairfield Defendants failed to conduct due diligence or otherwise monitor Madoff and his operations in the manner set forth above.

122.   In another effort to set themselves apart from the competition, the Fairfield Defendants represented to Plaintiffs that they understood the risks of the hedge fund business and knew how to avoid "blow ups" by applying principles which, in actuality, they ignored: "When one reads about a hedge fund 'blow-up' in the media, it is most likely the result of operational failure or fraud...**Operational failures, including misrepresentation of valuations and outright fraud, constitute a majority of instances where massive investor losses occur**...The inadequacy or lack of independence or transparency of

44

valuation procedures, contingency plans, and other trading and settlement

procedures may cause FGG to reject an otherwise appealing manager." (Ex. 11,

Fairfield Greenwich Group, Due Diligence and Risk Monitoring, at 5) (emphasis in

original).  In reality, the Fairfield Defendants knowingly disregarded all of these

operating principles, including manager oversight and asset verification, in their

blind commitment of billions of dollars of investor funds to defendant Madoff and

BMIS.

## N.    **Defendants' False Representations of Access to Madoff**

123.    The Fairfield Defendants touted their access to the operations of the

fund managers, in particular Madoff, as adding value to their services.  For

example, in an April 2008 marketing piece, the Fairfield Defendants falsely

represented that their "business model enables the firm to have privileged access to

all aspects of a manager's operation and investment process, including security

level transparency which is employed on a confidential basis." (Ex. 11, Fairfield

Greenwich Group, Due Diligence and Risk Monitoring, at 2.)  The Fairfield

Defendants further falsely represented that, "[f]or risk monitoring purposes, FGG

obtains portfolio transparency from all managers which are included in its multi-

strategy funds," (Ex. 10, Fairfield Sentry Ltd. October 2008 Update) and,

specifically, that Fairfield "maintain[s] full transparency to [Madoff] accounts."

(Ex. 13, Fairfield Greenwich Group:  Fairfield Sentry Limited Presentation, May

2006, at 17.) These representations were knowingly false when made because there was no transparency (much less "full"), and no access (much less "privileged") to Madoff's operations. On the contrary, the Fairfield Defendants never even visited the floor on which Madoff allegedly executed trades for his split-strike conversion strategy; nor could senior Fairfield personnel even describe the proprietary models and algorithms that Madoff supposedly used to run the strategy. Indeed, it appears that the only attempt to confirm that Madoff was actually making trades was a 2001 visit to Madoff's office by Jeffrey Tucker during which Madoff superficially showed him purported, limited records of trading in a single stock. (*See In re Fairfield Greenwich Advisors, LLC*, No. 2009-0028, Compl. ¶¶ 185-199 (Mass. Sec'y of Commw. Sec. Div. Apr. 1, 2009.)

124.    Although Madoff stated to the Fairfield Defendants that he "maintained accurate records as to voting of ... proxies that will enable the investment advisor to periodically review ... actions taken on individual voting situations" with respect to the purported assets, the Fairfield Defendants never received or reviewed any proxy materials from Madoff in connection with the equities he was supposedly holding. Had they done so as part of the represented due diligence, they would have discovered that Madoff was not, in fact, buying and selling the securities he claimed to be trading. Keeping track of proxies was yet

another basic, normal-course-of-dealing due diligence step that the Fairfield

Defendants failed to undertake, contrary to their representations.

**O.     Defendants' False Representations Concerning Monitoring of Madoff**

125.   The Fairfield Defendants repeatedly represented that they conducted

daily monitoring of Madoff's activities. For example, they represented that they

conducted "detailed daily compliance monitoring of portfolio activity against all

risk limits" and "daily positions-based risk measurement, performance attribution

and other quantitative analytics." (Ex. 14, Fairfield Sentry Limited Standardized

Responses, Dec. 2008 ¶¶ 54, 69.) They also represented that "portfolio holdings

are reconciled daily. Proprietary software is used." (Ex. 15, Fairfield Sentry

Limited Due Diligence Questionnaire, Oct. 2007, at 21.) They further represented

that: "The Investment Manager monitors compliance of the SSC strategy against

these risk limits and guidelines each day." (Ex. 14, Fairfield Sentry Limited

Standardized Responses, Dec. 2008, ¶ 77.) The Fairfield Defendants, however, did

not tell Plaintiffs that the "daily" monitoring of positions and risk profiles had a

three to five day time lag because they did not receive trade confirmations from

Madoff until three to five days after the trade had been purportedly executed. This

time lag, which was not disclosed to Plaintiffs, further allowed Madoff time to

concoct his fake trading records.

126.   The Fairfield Defendants further falsely represented that they maintained "deep, ongoing joint venture relationships" with their fund managers and would review on an ongoing basis "audited financials and auditor's management letter comments"; "accounting controls: from trade execution; to trade capture; to trade reconciliation with the Street, administrator, and fund; to fund's books and records"; "bank reconciliations for irregular or outstanding items"; and "broker reconciliations to ensure completeness and existence of all securities." (Ex. 11, Fairfield Greenwich Group, Due Diligence and Risk Monitoring, at 7; Ex. 5, Fairfield Greenwich Group: The Firm and Its Capabilities, Sept. 2008, at 18.) These representations were also knowingly false when made because, as the Fairfield Defendants knew, they conducted no such review and, in fact, the auditing work being done on behalf of the Fairfield Funds did not provide the necessary information from which it would be possible for them to substantiate proper performance or to identify any "irregular or outstanding items" with respect to Madoff's operations.

127.   The Fairfield Defendants also knew and intended that potential investors would be reassured that the Fairfield Defendants recognized the importance of consistently and closely monitoring the operations of the Funds, and falsely represented to Plaintiffs that they so monitored Madoff's management of the Funds: "[o]nly by receiving full transparency from its managers can FGG

assure itself and its clients that every FGG fund continues to act according to the principles, agreements, and strategies that are specified to FGG and investors." (Ex. 11, Fairfield Greenwich Group, Due Diligence and Risk Monitoring, at 2.) Fairfield specifically represented the transparency with which it would monitor Madoff's investments, touting that the "Value Added by FGG" included Fairfield's ability to "[m]aintain full transparency to [Madoff] accounts" and to provide "[i]ndependent verification of prices and account values." (Ex. 16, Fairfield Greenwich Group Fairfield Sentry Limited Presentation, Oct. 2008, at 8.)  These representations were false because, as the Fairfield Defendants knew, they had never monitored any of Madoff's activities, in a transparent manner or otherwise, and they had no basis to represent that Madoff would ever permit such "full transparency" (which, of course, he never would have so as to continue his fraudulent scheme).

128.   The Fairfield Defendants further told Plaintiffs that they would examine "[i]ndependent prime broker trading records" – a "key aspect" to transparency.  (Ex. 5, Fairfield Greenwich Group: The Firm and Its Capabilities, Sept. 2008, at 15-16; Ex. 11, Fairfield Greenwich Group, Due Diligence and Risk Monitoring, at 4.)  In fact, the Fairfield Defendants represented to Plaintiffs that it independently verified prices and account values.  (Ex. 13, Fairfield Greenwich Group:  Fairfield Sentry Limited Presentation, May 2006, at 17.)  These

representations were false because, as the Fairfield Defendants knew, they had never been permitted to examine "prime broker trading records" in a manner that would permit verification that transactions were even made by Madoff, much less the transaction price or account value, and they had no basis to represent that Madoff would change his manner of doing business with them so as to allow verification of transactions.

129.   Further, contrary to their representations that they verified trading records and asset values, the Fairfield Defendants never engaged in any meaningful effort to determine whether Madoff was actually holding the assets he said he was holding on behalf of the Fairfield Funds and whether Madoff was actually making the trades he said he was making.  In fact, the Fairfield Defendants acquiesced to the unusual arrangement by which Madoff served as both the sub-custodian of the Fund assets and the executing broker, which meant that any verification of the custodian's records against the broker's records was in reality a check of information received from Madoff against other information received from Madoff – or, in reality, no check at all.  Moreover, the Fairfield Defendants never once contacted any of Madoff's purported counterparties to verify that trades supposedly made by Madoff had in fact occurred.

130.   In a due diligence questionnaire dated October 2007 and intended for investors, the Fairfield Defendants asserted that, with respect to Madoff's

50

operations, "regular on-site visits are conducted by a number of senior members of

FGG's legal, operations, and risk teams. [PricewaterhouseCoopers], the Fund's

Auditor, has also conducted periodic on-site checks." (Ex. 15, Fairfield Sentry

Limited Due Diligence Questionnaire, Oct. 2007, at 16.) Like the others, this

representation was knowingly false.

131.   The foregoing are but examples of the continuing false

representations, both written and oral, and of the material omissions, made by the

Fairfield Defendants to Plaintiffs. Contrary to these false representations and

omissions, the Fairfield Defendants had not conducted due diligence, monitoring,

or verification of Madoff's operations and Plaintiffs' assets, nor did the Fairfield

Defendant intend to fulfill their promises and duties to exercise oversight over

Madoff, and in fact did not monitor and verify the investments made with Madoff.

**P.     Defendants' False Assurances to Investors**

132.   When members of the Plaintiff Class raised questions about Madoff,

the Fairfield Defendants repeatedly – and falsely – assured them that they had

nothing to worry about. For example, the Fairfield Defendants kept a database of

responses to questions frequently asked by their clients. In those responses, the

Fairfield Defendants falsely represented that controls existed to ensure the

legitimacy of Madoff's operations, including the handling of the Fairfield Funds'

assets, such as (i) annual reports by F&H, the purported independent auditors, with

51

respect to Madoff's internal controls; (ii) bi-annual audits by

PricewaterhouseCoopers ("PwC"), the Fairfield Funds' auditors, of Madoff's

"controls and systems at BLM, the front-office and trading practices, procedures in

respect to supervision and monitoring, procedures in respect of stock

reconciliation, procedures in respect to trade allocation of bunched orders, error

handling and a number of other items"; and (iii) the Fairfield Defendants' own

"periodic[] ... on-site due diligence visits to BLM [to] independently assess the

suitability of operational controls, systems and procedures." (E-mail from D.

Attavar to Sentry Team, Nov. 14, 2008.) These statements were knowingly false.

133.   For example, the Fairfield Defendants knew or should have known

that F&H, the three-person auditing firm that was operating out of a strip mall in

New City, New York, was not conducting proper audits of Madoff's operation, and

the Fairfield Defendants had no basis to represent that F&H was so doing. At least

as early as 2005, the Fairfield Defendants knew that the accounting firm had only

one employee. In response to the failure of another fund, a Fairfield client asked

with respect to the Fairfield Sentry fund "who supervises that everything is in

order?" In order to respond to this basic question, the Fairfield Defendants

scrambled to find out information about F&H and discovered that "[i]t appears

Friehling is the only employee." (E-mail from G. McKenzie to J. Tucker, D.

Lipton & C. Castillo, Sept. 14, 2005.) Yet, with absolutely no basis, Defendant

Lipton, the FGG CFO, stated to those scheduled to speak to the inquiring client that F&H is "a small to medium size financial services audit and tax firm, specializing in broker-dealers and other financial services firms," and that the firm had "100's of clients and are well respected in the local community." (E-mail from D. Lipton to C. Castillo & J. Tucker, Sept. 12, 2005.)

134. When, after Madoff's arrest, the Fairfield Defendants inquired about the auditing firm they had touted earlier, they confirmed that F&H only had one employee and approximately $180,000 in annual revenues. Despite its representations about the accounting firm, it appears none of the Fairfield Defendants had ever spoken to F&H, other than in a purported five- to ten-minute conversation with a partner at F&H in 2005. This total lack of due diligence and knowledge about the accounting firm is apparent from an e-mail to Defendant Vijayvergiya on August 20, 2008, in which Defendant Lipton asked, "Do we know any of the other client (sic) of BLM's auditors? Or how big they are? I remember we called over there a while ago." The Fairfield Defendants' representations that F&H had the ability to properly and independently monitor an operation the size of Madoff's were false and without basis.

135. Although, contrary to their representations, the Fairfield Defendants failed to conduct any due diligence of the firm responsible for auditing Madoff's operation (and failed to disclose that fact to Plaintiffs), they represented to

Plaintiffs that they conducted such due diligence. For example, in an April 2006 marketing piece titled, "Fairfield Greenwich Group, Investment Process and Risk Management Overview April 2006," FGG recognized that due diligence requires "check[ing] for 'reputable' auditor," and even noted that it would not have invested in another fund which had been found to be fraudulent because it would have "question[ed]" the fund's "obscure auditing firm." (*See* Ex. 12, at 14, 21.) These representations were knowingly false when made because, as the Fairfield Defendants knew, they had never attempted to conduct any manner of credible due diligence on Madoff's purported auditors, and had no intention of doing so at the time the representations were made.

136.   Although they represented to the contrary, the Fairfield Defendants were aware that they had not conducted the represented due diligence, monitoring, and verification of Madoff's operations and that, consequently, they knew virtually nothing about the actual workings of his operations. For example, in response to a May 2008 client request, the Fairfield Defendants were unable to provide basic information such as account segregation, audits, and trade confirmations; recognizing that "[u]nfortunately there are certain aspects of [Madoff's] operations that remain unclear," they had to turn to Madoff for answers they should have already known and independently verified before they made their representations

to Plaintiffs. (E-mail from A. Vijayvergiya to C. Murphy, Piedrahita, Toub,

Tucker, the Executive Committee and others, Aug. 19, 2008.)

137. Because the Fairfield Defendants obviously were aware that they had

not conducted the represented due diligence and oversight, in 2008 they

acknowledged that "[t]he biggest single counterparty risk exposure we have at

FGG is [Madoff]" and admitted there existed what they euphemistically referred to

as "gaps" in their knowledge of Madoff's operations.

138. Yet, the Fairfield Defendants continued to falsely represent to

investors that they knew the particulars of Madoff's operations and that the

investors' assets were safely invested.

139. On October 2, 2008, defendants Noel, Tucker, McKeefry and

Vijayvergiya (by telephone) finally attended a due diligence meeting at BMIS with

Madoff and Frank Di Pascali. (Ex. 17, BLM Operational Due Diligence, Oct. 2,

2008.) During that meeting, Madoff refused to answer many of the central

questions that FGG had proposed to him in a questionnaire. For example, he

refused to supply the names of key personnel involved in the implementation of the

split-strike conversion strategy and would not identify the persons responsible for

placing trade orders or their supervisors. Despite the fact that they had received

numerous customer inquiries regarding counterparty risk and the identities of those

counterparties, the Fairfield Defendants did not press Madoff for this and other
important information or otherwise follow up with any due diligence.

140.    Notwithstanding Madoff's refusal to provide information about his
operations, the Fairfield Defendants continued to pump their clients with the same
unsubstantiated assurances about the Madoff operations. For example, on
September 16, 2008, defendant Vijayvergiya sent an email to Fairfield Sentry
investors stating that Fairfield Sentry had dodged the market meltdown over the
Lehman Brothers bankruptcy because "[c]urrently the [split-strike conversion]
portfolio of Sentry is fully invested in short date U.S. Treasury bills." And, in an
effort to dissuade a client from redeeming over 10,000 shares in one of the funds,
on October 20, 2008, Defendant Barreneche assured the client that "the Fund has
protected capital this year through Sept'08 and has in fact been in US T-bills since
September 16, 2008 to date, when the S&P 100 has dropped close to 20% for the
same period." As for the client's concerns about counterparty risk, Defendant
Barreneche assured it that the Fund "has not had any exposure to Lehman Bros,
Merrill Lynch or AIG. Sentry's executing broker uses derivatives dealers and
international banks for the majority of the OTC options trades and counterparty
risk is diversified amongst approximately 20 dealers in order to reduce exposure to
any single counterparty. These counterparties are highly rated and maximum
exposure to a single counterparty is currently 10%." These representations were

56

false and the Fairfield Defendants knew they had no basis upon which to make them, particularly in view of their failure to conduct the represented due diligence and oversight of Madoff.

141.   Yet, the Fairfield Defendants continued to misrepresent their due diligence, even after Madoff failed to provide the information they belatedly requested. For example, on October 21, 2008, defendant Barreneche emailed a prospective client and boasted that "Fairfield Greenwich (Bermuda) has been facilitating rigorous and very thorough investment and operational due diligence on Fairfield Sentry Ltd. in response to our clients' requests and in line with institutional demand." At the time when Defendant Barreneche made that representation, she had no basis in fact to assert that the recent Madoff due diligence expedition had been anything else but an abject failure.

142.   Thus, during the fall of 2008, while the Fairfield Defendants were finally asking basic questions regarding Madoff and his operations—ones they should have asked some seventeen years earlier—and getting no answers, they continued to falsely represent that they were in complete control over the operations of the Funds and had complete transparency into all operations being conducted on behalf of those Funds by Madoff. In the face of their lack of due diligence and, thus, lack of information about Madoff, and in furtherance of their fraudulent scheme, the Fairfield Defendants developed over a long period of time a

set of standardized responses specifically for use by any FGG employee who might be asked questions regarding the operation of the Fairfield Sentry Fund. The final codification of these "talking points" took the form of a document entitled "Fairfield Sentry Limited – Standardized Responses" and was dated December 2008, the same month Madoff admitted his fraud and was arrested. Even as of that late date, the Fairfield Defendants continued to falsely represent: that trade confirmations were "reconciled immediately"; that they had "full position transparency" and "granular position transparency" which allowed them to conduct "detailed daily compliance monitoring of portfolio activity against all risk limits"; that they "monitor[ed] compliance of the SSC strategy against these risk limits and guidelines each day"; that "[t]he portfolio is priced daily by the broker and the Investment Manager – Fairfield Greenwich (Bermuda) Ltd."; and that "[t]he Fund trades in highly liquid, large cap stocks all of which are members of the S&P 100 Index. These stocks are amongst the most well traded, liquid issues in US equity markets." (Ex. 14, Fairfield Sentry Limited Standardized Responses, Dec. 2008, ¶¶ 24, 27, 59, 69, 89.) Like the other representations made by them, these representations were false and the Fairfield Defendants had no basis upon which to make them.

**Q.**     **Defendants Assisted Madoff in Thwarting an SEC Investigation**

143.    Not only did the Fairfield Defendants make false representations about their oversight and monitoring of Madoff's operations, the nature of Madoff's investment strategy, and the existence of the Funds' assets, in 2005 they knowingly assisted Madoff in thwarting an SEC investigation into his operations. Knowing that FGG would be a key witness in the SEC's investigation, the Fairfield Defendants sought and followed Madoff's instructions on how to approach their upcoming testimony.  In a telephone conversation that began with Madoff telling Vijayvergiya and McKeefry that "this conversation never happened," Madoff proceeded to instruct the Fairfield Defendants in what to say and what not to say to the SEC.  Rather than taking the SEC investigation as an opportunity to acquire valuable knowledge about Madoff's operations – to which Plaintiffs had committed billions of dollars in reliance on the Fairfield Defendants' representations – the Fairfield Defendants took the opposite course and aided Madoff in deceiving the SEC and, ultimately, Plaintiffs.  The Fairfield Defendants then compounded this betrayal of trust by citing to the inconclusive result of the SEC investigation in their public statements to Plaintiffs as proof that Madoff and BMIS could be trusted as a capable of faithfully holding and managing the Fairfield Funds' assets.

### R. Defendants Attempted to Raise Money to Keep Madoff Afloat in Late 2008

144. In addition to covering up for Madoff, the Fairfield Defendants tried to prop him up. In 2008, the Fairfield Defendants learned that Madoff desperately needed new infusions of cash. Rather than question how this could be, given the $7.0 billion in assets from the Fairfield Funds purportedly invested with Madoff, the Fairfield Defendants redoubled their efforts to raise new capital to be channeled to Madoff through a newly-created "Emerald Fund" and other leveraged versions of the Fairfield Funds. This effort continued until December 11, 2008, when Madoff's fraud was revealed.

145. Following the revelation of Madoff's Ponzi scheme on December 11, 2008, the Fairfield Defendants have refused to honor redemption requests by Plaintiffs for return of their funds. They failed to repay compensation that they received which was calculation on the basis of Madoff's fraudulent investment returns. They have suspended calculation of net asset values for the Fairfield Funds, and continue to claim that they are owed tens of millions of dollars in fees from the few tangible assets that remain. While the Fairfield Defendants continue to maintain their shock and innocence about what has transpired, the many investors in the Fairfield Funds face the loss of their entire investments, amounting to billions of dollars.

S.    **FGG and its Partners Earned Massive Fees from Funneling Plaintiffs' Assets into the Madoff Fraud**

146.   During the entire period from the Fairfield Funds' inception until December 2008, the Fairfield Defendants collected enormous fees in return for services ostensibly provided.  These fees were calculated on the basis of Madoff and BMIS's fictional profits that were never actually earned, and on the continuing existence of billions of dollars of assets that had been stolen long before. Hundreds of millions of dollars in fees were distributed among both the Fairfield Defendants and the Fairfield Fee Claim Defendants.  These fees took a number of forms.

147.   Placement Fees.  In 2006, the Fairfield Sentry PPM specified that FGL, the Fund's Placement Agent, could charge placement fees not to exceed 3% of the shareholder's investment. (Ex. 1, FS PPM-8/14/06, at 2, 8.)  In 2003 and 2004, the PPMs specified that placement fees not to exceed 3% could be charged by FGBL (which was the Fund's Investment Manager) or an affiliate.  (Ex. 7, FS PPM-10/1/04, at 2, 10; Ex. 6, FS PPM-7/1/03, at 2, 8.)

148.   Performance Fees.  As Placement Agent, FGL received "for each calendar quarter, a performance fee (the "Performance Fee") in an amount equal to 20% of the net realized and net unrealized appreciation in the Net Asset Value of each Share in such calendar quarter ("Net Profits")."  (Ex. 1, FS PPM-8/14/06, at 4, 15.)  In earlier years, the PPMs specified that FGBL, the investment manager,

would receive the performance fee. (Ex. 7, FS PPM-10/1/04, at 4, 13; FS PPM-7/1/03, at 4, 15.)

| "Performance Fees" Paid by Fairfield Sentry ||
| Year | Fee |
| --- | --- |
| 2002 | $ 83,591,000 |
| 2003 | $ 80,515,000 |
| 2004 | $ 81,278,000 |
| 2005 | $ 87,225,000 |
| 2006 | $ 107,779,000 |
| 2007 | $ 61,063,000 |
| 2008 (through June 30) | $ 46,070,000 |

(Ex. 18, Fairfield Sentry Directors' Report and Financial Statements for the year ended December 31, 2003 Auditor's Report, at 8; Ex. 19, Fairfield Sentry Directors' Report and Financial Statements for the year ended December 31, 2005 Auditor's Report, at 8; Ex. 20, Fairfield Sentry Directors' Report and Financial Statements for the years ended December 31, 2007 and 2006 Auditor's Report, at 8; Ex. 21, Fairfield Sentry Directors' Report and Financial Statements for the period January 1, 2008 to June 30, 2008 Auditor's Report, at 7.) FGL and FGBL calculated these fees based on the fraudulent information from BMIS that, notwithstanding the Fairfield Defendants' representations of performing extensive due diligence, they never verified was accurate.

149. Management Fees. In 2006, the Fairfield Sentry PPM stated that FGL (the Placement Agent) "will receive for each month a management fee (the 'Management Fee') in an amount equal to one-twelfth of one percent (0.0833%) (approximately 1% per annum) of the Net Asset Value of the Fund before

Performance Fees." It further provides that "FGL may pay a portion of the Management Fee to an affiliate of FGL and the Investment Manager....," and that "FGL will pay the Investment Manager [FGBL] a fixed fee for providing certain managerial services to the Fund...." (Ex. 1, FS PPM-8/14/06, at 4, 14, 15.) In earlier years, the PPMs stated that "the Manager" (FGBL) would receive the above-mentioned fee. (Ex. 7, FS PPM-10/1/04, at 4, 13; Ex. 6, FS PPM 7/1/03, at 4, 14.)

| "Management Fees" Paid by Fairfield Sentry | |
|---|---|
| Year | Fee |
| 2002 | $ 3,884,000 |
| 2003 | $ 5,221,000 |
| 2004 | $ 21,549,000 |
| 2005 | $ 51,127,000 |
| 2006 | $ 50,465,000 |
| 2007 | $ 32,393,000 |
| 2008 (through June 30) | $ 36,134,000 |

(Ex. 18, Fairfield Sentry Directors' Report and Financial Statements for the year ended December 31, 2003 Auditor's Report, at 8; Ex. 19, Fairfield Sentry Directors' Report and Financial Statements for the year ended December 31, 2005 Auditor's Report, at 8; Ex. 20, Fairfield Sentry Directors' Report and Financial Statements for the years ended December 31, 2007 and 2006 Auditor's Report, at 8; Ex. 21, Fairfield Sentry Directors' Report and Financial Statements for the period January 1, 2008 to June 30, 2008 Auditor's Report, at 7.) Again, FGL and FGBL calculated these fees based on the fraudulent data provided by BMIS that,

notwithstanding the Fairfield Defendants' representations of performing extensive due diligence, they never verified.

150.   Fees for Administrative Services and Back Office Support by Fund Affiliates.  In 2003, Fairfield Sentry's PPM stated that "[t]he Fund pays an annual expense reimbursement to Fairfield Greenwich Advisors LLC, an affiliate of the Manager, on a quarterly basis in an amount equal to one-fortieth of one percent (0.025%) of the Net Asset Value in the last day of each calendar quarter (ten basis points per annum) of the Fund for providing certain administrative services and back-office support to the Fund." (Ex. 6, FS PPM-7/1/03, at 15.)  In addition, FGBL was to pay FGL an "expense reimbursement" equaling 15% of its own management fee for "bearing certain of the Fund's internal accounting and operational expenses." (Ex. 22, Investment Management Agreement between Fairfield Sentry Limited and Fairfield Greenwich (Bermuda) Limited dated October 1, 2004 ("Investment Management Agreement") ¶ 9.)  FGBL and FGA calculated these fees based on fraudulent data provided by BMIS that, notwithstanding the Fairfield Defendants' representations of performing extensive due diligence, they never verified.

151.   Fairfield Sigma's assets were invested in Fairfield Sentry, and therefore, Fairfield Sigma investors were subject to the Fairfield Sentry fee structure.  The Fairfield Sigma PPM ("FΣ PPM") discussed the fee schedule

64

established by Fairfield Sentry and the means by which FGBL and Citco Fund Services would be compensated.  (Ex. 2, FΣ PPM-12/1/08, at 2, 4, 15, 18, 20.)  It also established the expense reimbursement that would be received by FGA and certain directors:  "Fairfield Greenwich Advisors LLC, an affiliate of the Investment Manager, will receive an annual expense reimbursement from the Fund, payable quarterly, in an amount equal to 0.0375% of the Fund's Net Asset Value (0.15% on an annual basis) as of the last day of each calendar quarter, for providing certain administrative services and back-office support to the Fund." (Ex. 2, FΣ PPM-12/1/08, at 4, 15.)

152.   Fairfield Sigma investors paid the following fees:

| Expense Reimbursement and Administration Fees for Fairfield Sigma | |
|---|---|
| Year | Fee |
| 2006 | 693,441 Euro |
| 2007 | 1,174,665 Euro |

(Ex. 23, Fairfield Sigma Limited Financial Statements for the years ended December 31, 2007 and 2006, at 6).

153.   Incentive/Performance Fees.  The Greenwich Sentry Confidential Offering Memoranda ("GS COMs") specified that "at the end of each fiscal quarter, 20% of the Partnership's realized and unrealized net capital appreciation allocable to the capital accounts of the Limited Partners will be allocated to the General Partner [FGBL] (the "Performance Fee")" (Ex. 3, GS COM- 8/2006, at 3, 13; Ex. 8, GS COM-5/2006, at 3-4, 12; Ex. 9, GS COM-1994, at 3, 9, 14; Ex. 4,

GSP COM-8/2006, at 3, 13.) "Since the [performance fee] is calculated on a basis

that includes unrealized appreciation of assets, such allocation may be greater than

if it were based solely on realized gains." (Ex. 3, GS COM- 8/2006, at 14; Ex. 8,

GS COM-5/2006, at 14; Ex. 4, GSP COM-8/2006, at 15.)  FGBL calculated these

fees based on false data provided by BMIS that, notwithstanding the Fairfield

Defendants' representations of performing extensive due diligence, they never

verified.

154.   <u>Management Fees</u>.  In 2006, the COMs stated that "the General

Partner generally receives a monthly management fee calculated at the annual rate

of approximately 1% (0.0833% per month) of each Limited Partner's Capital

Account (the "Management Fee").  (Ex. 3, GS COM- 8/2006, at 19; Ex. 8, GS

COM-5/2006, at 17; Ex. 4, GSP COM-8/2006, at 18.)  The General Partner began

charging these fees on May 1, 2006. (Ex. 24, Greenwich Sentry, L.P., Financial

Statements for the years ended December 31, 2007 and 2006, at 10.)  The General

Partner collected $282,277 in 2006 and $987,153 in 2007.  (*Id.*)  FGBL calculated

these fees based on fraudulent data provided by BMIS that, notwithstanding the

Fairfield Defendants' representations of performing extensive due diligence, they

never verified.

155.   <u>Fees for Administrative Services and Back Office Support by Fund</u>

<u>Affiliates</u>.  In 2006, the COMs stated that "the Partnership may pay Fairfield

Greenwich Advisors LLC, an affiliate of the General Partner, an amount equal to
one-fortieth of one percent (0.025%) of the value of the Limited Partners' Capital
Accounts as of the first day of each fiscal quarter (10 basis points per annum) for
providing certain administrative services and back-office support to the Partnership
(the "Expense Reimbursement")" (Ex. 3, GS COM- 8/2006, at 19; Ex. 8, GS
COM-5/2006, at 18; Ex. 4, GSP COM-8/2006, at 18.)  FGBL and FGA calculated
these fees based on fraudulent data provided by BMIS that, notwithstanding the
Fairfield Defendants' representations of performing extensive due diligence, they
never verified.

156.   Because the BMIS investments were stolen upon receipt and no
longer existed at the time of any accounting, FGBL was not entitled to any such
fees.

## CLASS ACTION ALLEGATIONS

157.   Plaintiffs bring this action as a class action pursuant to Rules 23(a)
and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all shareholders
in Fairfield Sentry, Fairfield Sigma, Greenwich Sentry, L.P., and Greenwich
Sentry Partners, L.P., as of December 10, 2008 (the "Class").  Excluded from the
Class are the Defendants herein, and any entity in which the Defendants have a
controlling interest, and the officers, directors, affiliates, legal representatives,

immediate family members, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

158.   Plaintiffs seek to designate four subclasses, one for the investors in each of the four Funds managed by FGG: Fairfield Sentry, Fairfield Sigma, Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P.

159.   The Class satisfies the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

a.   *Numerosity*.  During the Class Period, shares in the Funds were sold to thousands of investors.  The membership of the Class is so numerous as to render joinder impracticable.  The precise number of Class members remains indeterminate and can only be ascertained through discovery, but Plaintiffs believe it is in the thousands.

b.   *Typicality*.  The losses suffered by the named Plaintiffs were caused by the same events, patterns of practice, and courses of conduct that give rise to the claims of the other members of the Class.  The named Plaintiffs are members of the Class and the losses to the named Plaintiffs are based on the same legal theories.

c.   *Common Questions*.  Among the numerous predominant questions of law and fact that are common to the Class are:

i.     Whether the Fairfield Defendants are liable for fraud in making statements through private placement memoranda regarding the investment strategy for the Fairfield Funds and historical results achieved by such Funds without regard to their truth or falsity;

ii.     Whether such statements were, alternatively, negligent misrepresentations;

iii.     Whether the Fairfield Defendants recklessly or negligently misrepresented, *inter alia*, the investment services that would be provided by the Fairfield Defendants; the extent and quality of the due diligence, ongoing risk monitoring, and transaction verification that would be performed by the Fairfield Defendants on Madoff and BMIS; the Fairfield Defendants' transparency to Madoff and BMIS; the split-strike conversion method ostensibly used by Madoff and BMIS; each Funds' appreciation; and BMIS's qualifications to serve as a sub-custodian to the Funds;

iv.     Whether the Fairfield Defendants breached their fiduciary duty to investors;

v.     Whether and to what extent Plaintiffs were damaged by the Fairfield Defendants' misrepresentations and breaches of fiduciary duty;

vi.     Whether the Fairfield Defendants were grossly negligent in:

(A)    failing to perform adequate due diligence before selecting BMIS as each Fund's execution agent for the purported split-strike conversion strategy, and before allowing BMIS to serve as sub-custodian for the Funds;

(B)    failing to monitor Madoff and BMIS on an ongoing basis to any reasonable degree; and

(C)    failing to take adequate steps to confirm BMIS's purported account statements, transactions and holdings of each Funds' assets;

vii.    Whether Plaintiffs are entitled to the imposition of a constructive trust on all monies and other property in the possession of the Fairfield Defendants and Fairfield Fee Claim Defendants which derive from their compensation in the form of management and performance and other fees based on fraudulent Madoff investments;

viii.    Whether Plaintiffs are entitled to an accounting of:  (1) the actual investments and transactions done on Plaintiffs' behalf, (2) the actual calculation used to determine each management and performance fee, and (3) the amounts taken in management and performance fees;

ix.    Whether Citco Bank breached its fiduciary duty, as described in Count 13, by:

(A)     failing to exercise due care and diligence in the selection and supervision of BMIS as the Funds' sub-custodian;

(B)     failing to make appropriate inquiries to confirm BMIS's obligations were being competently discharged;

(C)     failing to take proper steps to confirm information received from Madoff and BMIS;

(D)     misrepresenting that BMIS was a qualified sub-custodian and misrepresenting the care Citco Bank had taken with respect to BMIS's selection and supervision;

(E)     permitting the Funds' execution agent to serve as sub-custodian;

(F)     carelessly entrusting Plaintiffs' assets to BMIS; and

(G)     profiting at Plaintiffs' expense;

x.     Whether Citco Fund Services breached its fiduciary duties to Plaintiffs, as described in Count 12, by:

(A)     failing to perform adequate due diligence of BMIS;

(B)     failing to monitor Madoff and BMIS on an ongoing basis to any reasonable degree;

71

(C)     failing to take adequate steps to confirm the

accuracy and plausibility of the data received from BMIS and recklessly creating

and disseminating to Class members' purported account statements, transactions

and holdings of Fund assets based upon such unsubstantiated data; and

(D)     publishing monthly statements and net asset value

calculations that it did not independently verify.

xi.     Similar questions of fact and law are common with

respect to Plaintiffs' claims against the other Defendants.

d.     *Adequate Representation.*  The representative Plaintiffs will

fairly and adequately protect the interests of the Class.  Plaintiffs have retained

experienced counsel qualified in class action litigation who are competent to assert

the interests of the Class.

e.     *Superiority.*  A class action in superior to other methods for the

fair and efficient adjudication of this controversy involving thousands of similarly

situated investors.

## CLAIMS FOR RELIEF

### Count 1
### Fraud By Bernard Madoff

160.   Paragraphs 1 - 159 are realleged herein.

161.   Bernard Madoff orchestrated and implemented a fraudulent scheme

by which he intentionally defrauded Plaintiffs out of their funds by operating a

Ponzi scheme, whereby instead of implementing a "split-strike conversion strategy," he simply took the assets when received and used them to pay off already-existing fund investors who were demanding redemptions on their previous investments.

162. Plaintiffs have been damaged and are entitled to recover their losses.

163. Because of the outrageous nature of the Madoff's willful and wanton conduct, Plaintiffs are entitled to punitive damages.

### Count 2
### Fraud By Fairfield Fraud Claim Defendants (Purchaser Claims)

164. Paragraphs 1 - 159 are realleged herein.

165. The Fairfield Fraud Claim Defendants falsely represented to Plaintiffs in connection with their purchase of shares and/or equity interests in the Fairfield Funds that: (i) the Funds would invest their monies into a legitimate fund, principally relying upon the SSC investment strategy involving the purchase of equities and options; (ii) that by using this strategy, the Funds historically had consistent profitable returns since inception; (iii) the Fairfield Fraud Claim Defendants would conduct due diligence into, monitor, and verify the investments made by them in the Funds operated by Madoff to confirm that the Funds were operated legitimately, using the stated investment strategy, and in accordance with the required legal and regulatory requirements.

166.   The Fairfield Fraud Claim Defendants failed to disclose the following material information, among other things, which rendered their other representations false and misleading: (i) that the Fairfield Fraud Claim Defendants were in fact not engaging in customary, or even minimal, due diligence to verify that the Funds' assets were being properly invested and managed by Madoff and BMIS, or that the assets even still existed; (ii) the existence of numerous "red flags" regarding the Funds including, among others, the lack of transparency into Madoff's actual operations, the lack of segregation of duties, inadequate auditing of Madoff, and the attainability of consistently profitable returns for a fund pursuing the stated strategy.

167.   The Fairfield Fraud Claim Defendants made these false and misleading representations and omissions knowing, recklessly, without regard for their truth or falsity, and with the intent to induce Plaintiffs to rely upon them by investing assets in the Funds.

168.   Plaintiffs justifiably relied upon the false representations made by the Fairfield Fraud Claim Defendants by investing their assets in the Fund.

169.   As a direct and proximate result of their reliance upon the false representations and omissions of the Fairfield Fraud Claim Defendants, Plaintiffs have suffered damages, namely the loss of their investments in the Funds, and the

Fairfield Fraud Claim Defendants, in turn, have wrongfully taken substantial assets

belonging to the Plaintiffs in the form of improper and unearned fees.

170.    Because of the outrageous nature of the Fairfield Fraud Claim

Defendants' willful and wanton conduct, Plaintiffs are entitled to punitive

damages.

## Count 3
### Fraud By Fairfield Fraud Claim Defendants (Holder Claims)

171.    Paragraphs 1 - 159 are realleged herein.

172.    The Fairfield Fraud Claim Defendants induced purchasers to hold

their positions in the Fairfield Funds by falsely representing to Plaintiffs that: (i)

the Fairfield Fraud Claim Defendants had conducted thorough due diligence and

exercised oversight of Madoff's operations and had determined that those

operations were legitimate, utilized the SSC investment strategy, and had a long

track record of achieving positive investment returns; (ii) Plaintiffs' assets invested

in the Funds operated by the Fairfield Fraud Claim Defendants would, in turn, be

invested in the legitimate funds operated by Madoff that utilized the SSC

investment strategy; (iii) the Fairfield Fraud Claim Defendants would monitor the

investments made by them in the funds operated by Madoff to confirm that the

Funds were operated legitimately, using the SSC investment strategy, and in

accordance with all legal and regulatory strictures, and further that the Fairfield

Fraud Claim Defendants would verify Fund transactions, including that the Madoff

funds actually made the represented trades and held the represented assets; (iv) the

due diligence and oversight process employed by the Fairfield Defendants was so

thorough as to be privileged in providing total transparency to all aspects of

Madoff's operations, which allowed the Fairfield Fraud Claim Defendants to

assure that the Funds invested with Madoff were being actually and legitimately

invested; and (v) Madoff's operations and accounts were audited by reputable,

independent auditors utilizing appropriate and accepted accounting and auditing

procedures, which provided further assurance that Madoff's accounts actually held

the represented assets and were otherwise operated lawfully.

173.   The Fairfield Fraud Claim Defendants made the representations

knowing that they were false in that:  (i) the Fairfield Fraud Claim Defendants did

not, in fact, conduct thorough or appropriate due diligence of, or exercise oversight

over Madoff and his operations and had not determined that Madoff actually

invested assets utilizing the SSC investment strategy, with a long track record of

achieving positive investment returns; (ii) the Fairfield Fraud Claim Defendants

did not invest Plaintiffs' assets in legitimate funds that utilized the SSC investment

strategy; (iii) the Fairfield Fraud Claim Defendants did not intend to monitor the

investments in the Funds operated by Madoff to confirm that the Funds were

operated legitimately using the SSC investment strategy and in accordance with all

legal and regulatory structures, and did not intend to verify Fund transactions,

including that Madoff actually made the represented trades and that the Funds held the represented assets; (iv) the due diligence and oversight processes employed by the Fairfield Fraud Claim Defendants were non-existent, much less so thorough as to be privileged in providing total transparency to all aspects of Madoff's operations, and thus did not allow the Fairfield Fraud Claim Defendants the ability to assure that the assets provided to Madoff were actually and legitimately invested; and (v) Madoff's operations and accounts were not audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, and thus did not provide any assurance that the Fairfield Funds actually held the represented assets and were otherwise operated lawfully.

174.   The Fairfield Fraud Claim Defendants made the false representations knowing of their falsity and with the intent to induce Plaintiffs to rely upon the false representations by holding assets in the Funds.

175.   Plaintiffs justifiably relied upon the false representations made by the Fairfield Fraud Claim Defendants in holding their assets in the Funds.

176.   As a direct and proximate result of their reliance upon the false representations and omissions of the Fairfield Fraud Claim Defendants, Plaintiffs have suffered damages, namely the loss of their investments in the Funds, and the Fairfield Fraud Claim Defendants, in turn, have wrongfully taken substantial assets belonging to the Plaintiffs in the form of improper and unearned fees.

177. Because of the outrageous nature of the Fairfield Fraud Claim Defendants' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

**Count 4**
**Negligent Misrepresentation By Fairfield Defendants (Purchaser Claims)**

178. Paragraphs 1 - 159 and 196 - 204 are realleged herein.

179. Based on their unique or special expertise with respect to investments generally and the Madoff funds in particular, the Fairfield Defendants had a special relationship of trust or confidence with Plaintiffs, which created a duty on the part of the Fairfield Defendants to impart full and correct information to Plaintiffs.

180. The Fairfield Defendants falsely represented to Plaintiffs in connection with their purchase of shares in the Fairfield Funds that: (i) the Funds would invest their monies into a legitimate fund, principally relying upon a SSC involving the purchase of equities and options; (ii) that by using this strategy, the Funds historically had achieved consistent profitable returns and had a long track record of achieving positive investment returns; (iii) the Fairfield Defendants would monitor the investments made by them in the Funds operated by Madoff to confirm that the Funds were operated legitimately, using the stated investment strategy, and in accordance with all legal and regulatory strictures.

181. The Fairfield Defendants failed to disclose the following material information, among other things, which rendered their other representations false

78

and misleading: (i) that the Fairfield Defendants were in fact not engaging in customary, or any other meaningful, due diligence to verify that the Funds' assets were being properly invested and managed by the fund manager, or that the assets even existed; (ii) the existence of numerous "red flags" regarding the Fairfield Funds including, among others, the lack of transparency into Madoff's actual operations, the lack of segregation of duties, inadequate auditing of Madoff, and the unattainability of consistently profitable returns for a fund pursuing the stated strategy.

182.    The Fairfield Defendants made the false representations and material omissions knowing that Plaintiffs would use and rely upon the representations and omissions for the particular purpose of determining where and how to invest their assets and, in particular, to decide to invest their assets in the Funds.

183.    Plaintiffs justifiably relied upon the false representations and material omissions made by the Fairfield Defendants in furtherance of that particular purpose by investing their assets in the Funds.

184.    The Fairfield Defendants knew that Plaintiffs were investors and understood that they would rely upon the false statements and material omissions for the particular purpose of investing their assets in the Funds.

185.    As a result of their reliance upon the false representations and material omissions of the Fairfield Defendants, Plaintiffs have suffered damages, namely

the loss of their investments in the Funds, and the Fairfield Defendants, in turn, have derived substantial profits.

186. Because of the outrageous nature of the Fairfield Defendants' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## Count 5
## Negligent Misrepresentation By Fairfield Defendants (Holder Claims)

187. Paragraphs 1 - 159 and 196 - 204 are realleged herein.

188. Based on their unique or special expertise with respect to investments generally and the Madoff funds in particular, the Fairfield Defendants had a special relationship of trust or confidence with Plaintiffs, which created a duty on the part of the Fairfield Defendants to impart correct information to Plaintiffs.

189. The Fairfield Defendants induced purchasers to hold their positions in the Fairfield Funds by falsely representing to Plaintiffs that: (i) the Fairfield Defendants had conducted thorough due diligence and exercised oversight of Madoff's operations and had determined that those operations were legitimate, utilized the SSC investment strategy, and had a long track record of achieving positive investment returns; (ii) Plaintiffs' assets invested in the funds operated by the Fairfield Defendants would, in turn, be invested in a legitimate manner by Madoff that utilized the SSC investment strategy; (iii) the Fairfield Defendants would monitor the investments made by Madoff to confirm that the Funds were operated legitimately, using the SSC investment strategy, and in accordance with

80

all legal and regulatory strictures, and further that the Fairfield Defendants would verify Fund transactions, including that the Madoff funds actually made the represented trades and that the Funds held the represented assets; (iv) the due diligence and oversight process employed by the Fairfield Defendants was so thorough as to be privileged in providing total transparency to all aspects of Madoff's operations, which allowed the Fairfield Defendants to assure that the funds invested with Madoff were being actually and legitimately invested; and (v) Madoff's operations and accounts were audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, which provided further assurance that the Fairfield Funds actually held the represented assets and were otherwise operated lawfully.

190.    The representations made by the Fairfield Defendants were false in that, among other things: (i) the Fairfield Defendants did not, in fact, conduct thorough due diligence of, or exercise oversight over, Madoff and his operations and had not determined that Madoff actually invested assets utilizing the SSC investment strategy, with a long track record of achieving positive investment returns; (ii) the Fairfield Defendants did not invest Plaintiffs' assets in legitimate funds that utilized the SSC investment strategy; (iii) the Fairfield Defendants did not intend to monitor the investments in the Funds operated by Madoff to confirm that the funds were operated legitimately using the SSC investment strategy and in

accordance with all legal and regulatory structures, and did not intend to verify

Fund transactions, including that Madoff actually made the represented trades and

that the Funds actually held the represented assets; (iv) the due diligence and

oversight process employed by the Fairfield Defendants was non-existent, much

less so thorough as to be privileged in providing total transparency to all aspects of

Madoff's operations, and thus did not allow the Fairfield Defendants the ability to

assure that the assets provided to Madoff were actually and legitimately invested;

and (v) Madoff's operations and accounts were not audited by reputable,

independent auditors utilizing appropriate and accepted accounting and auditing

procedures, and thus did not provide any assurance that the Fairfield Funds

actually held the represented assets and were otherwise operated lawfully.

191.   The Fairfield Defendants made the false representations knowing that

Plaintiffs would use and rely upon the representations for the particular purpose of

determining whether to hold their assets in the Funds.

192.   Plaintiffs justifiably relied upon the false representations made by the

Fairfield Defendants in furtherance of that particular purpose by continuing to hold

their assets in the funds operated by the Fairfield Defendants.

193.   The Fairfield Defendants knew that Plaintiffs were investors in the

funds and understood that Plaintiffs would rely upon the false statements for the

particular purpose of continuing to hold their assets in the Funds.

194. As a result of their reliance upon the false representations made by the Fairfield Defendants, Plaintiffs have suffered damages, namely the loss of their investments in the Funds, and the Fairfield Defendants, in turn, have derived substantial profits.

195. Because of the outrageous nature of the Fairfield Defendants' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## Count 6
## Breach of Fiduciary Duty By Fairfield Defendants

196. Paragraphs 1 - 159 are realleged herein.

197. The Fairfield Defendants had substantial discretion and control over Plaintiffs' assets in the Madoff feeder funds, the marketing of those Funds, and communications to Plaintiffs.

198. This discretion and control gave rise to a fiduciary duty and duty of care on the part of the Fairfield Defendants to the Plaintiffs.

a. The Fairfield Defendants occupied a superior position over Plaintiffs with respect to their management and control over their assets in the Funds, and had superior access to confidential information about the investment of the assets and about Madoff and BMIS.

b. The Fairfield Defendants' superior position necessitated that Plaintiffs repose their trust and confidence in the Fairfield Defendants to fulfill their duties, and Plaintiffs did so by investing in the Funds.

83

c.    The Fairfield Defendants held themselves out as providing superior client investment services, and evinced an understanding that they were the fiduciaries of the investors.  Plaintiffs reasonably and foreseeably relied on such representations, and trusted in the Fairfield Defendants' purported expertise and skill.

199.   FGBL has served as the General Partner of Greenwich Sentry since March 1, 2006, and as the General Partner of Greenwich Sentry Partners, since its organization in April 2006.  As the General Partner, FGBL is responsible for directing the Funds' investment and trading activities and owed fiduciary duties to the Plaintiffs.

200.   From January 1998 to February 2006, FGL served as the General Partner of Greenwich Sentry.  From January 1, 1993, the date of inception of the Partnership, to January 1998, Walter Noel and Jeffrey Tucker were the General Partners of Greenwich Sentry.  FGG recognized in its publications to shareholders that "the General Partner has a fiduciary duty to the Partnership to exercise good faith and fairness in all of its dealings with it." (Ex. 3, GS COM- 8/2006, at 21; Ex. 8, GS COM-5/2006, at 20; Ex. 4, GSP COM-8/2006, at 20.)  The General Partner is responsible for the supervision of the Administrator and Sub-Administrator in the completion of their duties.  (Ex. 3, GS COM- 8/2006, at 11; Ex. 4, GSP COM-8/2006, at 10.)

201.   FRS serves on the Risk Management team for FGG, and provides risk management services to Fairfield Sentry and to the other Funds.

a.      FRS was responsible for conducting "both the pre-and post-investment quantitative analyses of hedge fund managers, monitors the market risk and provides the quantitative analyses supporting the asset allocation decisions across the firm's multi-strategy funds." (Ex. 1, FS PPM-8/14/06, Appendix A, Items 4.A.(5) and 4.(B).(8), Mar. 27, 2008, at 7.)

b.      FRS was also responsible for generating monthly reports on the Funds, including an analysis of "Exposures, Sensitivities, Scenarios and Stress Tests, VaR, Correlations Analysis, and Attribution Analysis." (*Id.*) This suite of reports was for review and discussion at "FGG's Investment Committee at a formal monthly risk meeting." (*Id.*)

202.   The Fairfield Defendants breached their fiduciary duties to Plaintiffs by failing to conduct adequate due diligence and monitoring with respect to the Funds' investments, by failing to follow-up on "red flags" that would have caused them to discover that Madoff was conducting Ponzi scheme, and by pocketing hundreds of millions of dollars in fees based on fraudulent asset values and investment returns.

203. Plaintiffs have been damaged as a proximate result of these breaches of fiduciary duty and are entitled to damages, and appropriate equitable relief, including accounting and imposition of a constructive trust.

204. Because of the outrageous nature of the Fairfield Defendants' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

### Count 7
### Imposition of Constructive Trust Against Fairfield Fee Claim Defendants

205. Paragraphs 1 - 159 are realleged herein.

206. The Fairfield Fee Claim Defendants had a fiduciary relationship with Plaintiffs which included an obligation to invest Plaintiffs' assets in legitimate investments, and perform adequate due diligence and monitoring as set forth in the Private Placement Memoranda and Confidential Offering Memoranda.

207. The Fairfield Fee Claim Defendants were compensated by Plaintiffs with management and performance fees that were calculated based on the "Net Profits" and current assets of the Funds.

208. The Fairfield Fee Claim Defendants were unjustly enriched by the retention of management and performance fees that were predicated on fictitious profits and assets.

209. Plaintiffs are entitled to have a constructive trust imposed on the amount of all monies and other property in the possession of the Fairfield Fee

Claim Defendants which relate to their compensation in the form of management and performance fees, the amount of which is yet to be determined.

## Count 8
### Third-Party Beneficiary Contract Claims for Breach of Contracts By Fairfield Defendants and Fairfield Fee Claim Defendants

210.    Paragraphs 1 - 159 are realleged herein.

211.    Plaintiffs are third-party beneficiaries of contracts entered by certain Fairfield Defendants with the Funds, including the Investment Management Agreements executed by FGBL and the Funds.  The Investment Management Agreements evince a clear intent to benefit shareholders by requiring the FGBL to seek "suitable investment opportunities" for the Funds (Ex. 22, Investment Management Agreement ¶ 2) to "obtain capital appreciation" and return on Plaintiffs' investments (Ex. 1, FS PPM-8/14/06, at 9.)

212.    The benefits to Plaintiffs under the Investment Management Agreements between the Funds and FGBL were immediate, not simply incidental, in that the Funds' only motivations for executing the Investment Management Agreements were to provide investors with capital appreciation and returns on their investments in the Funds.

213.    FGBL has been Fairfield Sentry's Investment Manager since 2003, and in that capacity, controlled the assets of both the Fairfield Sentry and Fairfield Sigma investors.  (Ex. 22, Investment Management Agreement ¶ 1.)

      a.     FGBL's duties include "management of the Fund's investment activities, the selection of the Fund's investments, monitoring its investments and maintaining the relationship between the Fund and its custodian, administrator, registrar and transfer agent." (Ex. 1, FS PPM-8/14/06, at 7; Ex. 22, Investment Management Agreement ¶ 1.)

      b.     FGBL was to use "best efforts to (a) seek suitable investment opportunities and manage the investment portfolio of the Fund; (b) perform or oversee the day-to-day investment operations of the Fund; (c) act as investment adviser for the Fund in connection with investment decisions; (d) provide information in connection with the preparation of all reports to the Fund's shareholders described in the Memorandum; and (e) arrange for and oversee the services of the Fund's administrator, custodian(s), auditors and counsel to act on behalf of the Fund; provided, however, that the Investment Manager is not authorized to enter into agreements in the name of the Fund with such providers of services." (Ex. 22, Investment Management Agreement ¶ 2.)

      c.     FGBL was obligated to "send to the Fund weekly and monthly valuations of the [split-strike conversion] Investments." (*Id.* ¶ 3.) FGBL was to be "available at all times" for consultation regarding this information. (*Id.*)

88

d.    FGBL agreed that it would execute its duties in the absence of "willful misfeasance, bad faith or gross negligence" or a "reckless disregard of their obligations and duties." (*Id.* ¶ 10(a).)

214.   Before FGBL assumed the role of investment manager for Fairfield Sentry in 2003, FGL served as the Investment Manager, and upon information and belief, had similar contractual obligations as FGBL does today.

215.   FGBL and FGL both breached their investment management contracts by grossly failing to meet the obligations of these agreements to provide competent investment management services to the Funds. They also breached their contracts by receiving and holding fees based on fictitious profits and for services not properly performed. Both are liable to Plaintiffs as third party beneficiaries of those contracts.

**Count 9**
**Gross Negligence By Fairfield Defendants**

216.   Paragraphs 1 - 159 are realleged herein.

217.   The Fairfield Defendants, as investment advisors, managers, and placement agents with discretionary control over Fund assets, had a special relationship with Plaintiffs that gave rise to a duty to exercise due care in the management of Plaintiffs' assets invested in the Funds, and in the selection and monitoring of Fund managers and sub-custodians. The Fairfield Defendants knew or should have known that Plaintiffs were relying on the Fairfield Defendants to

89

manage the investments entrusted to the Funds with reasonable care, and Plaintiffs did reasonably and foreseeably rely on the Fairfield Defendants to exercise such care by entrusting their assets to their Fund.

218.   The Fairfield Defendants grossly failed to exercise due care, and acted in reckless disregard of their duties, and thereby injured Plaintiffs.  The Fairfield Defendants failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.  The Fairfield Defendants failed to perform adequate due diligence before selecting BMIS as the Funds' execution agent for its SSC method, and before allowing BMIS to serve as sub-custodian for the Funds; failed to monitor Madoff and BMIS on an ongoing basis to any reasonable degree; failed to take adequate steps to confirm BMIS's purported account statements, transactions and holdings of Fund assets.

219.   If the Fairfield Defendants had not been grossly negligent with respect to Plaintiffs' assets invested in the Funds, they would have discovered that Madoff was a fraud, and would not have entrusted Plaintiffs' assets invested in the Funds to Madoff and BMIS.

220.   As a direct and proximate result of the Fairfield Defendants' gross negligence with respect to Plaintiffs' assets invested in the Fairfield Funds, Plaintiffs have lost all, or substantially all, their investment in the Funds.

221.   By reason of the foregoing, the Fairfield Defendants are jointly and severally liable to Plaintiffs.

222.   Because of the outrageous nature of the Fairfield Defendants' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

### Count 10
### Breach of Fiduciary Duty By Fund Directors

223.   Paragraphs 1 - 159 are realleged herein.

224.   Defendants Naess and Schmid are directors of Fairfield Sentry and Fairfield Sigma. Fairfield Sentry's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy. It also has authority to replace the Fund's administrator, registrar and transfer agent, custodian, and officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. The Fairfield Sigma board had similar responsibilities.

225.   Defendants Naess and Schmid each earned $25,000 per annum as Directors of Fairfield Sentry, and $5,000 per annum as Directors of Fairfield Sigma.

226.   Defendants Naess and Schmid breached their fiduciary duties by failing to supervise the Funds' managers and investments that were entrusted to Madoff and in failing to pursue red flags that should have alerted them to the presence of unlawful activity.

91

227.   Plaintiffs have been damaged as a proximate result of the breaches of fiduciary duty by these defendants and are entitled to damages.

228.   Because of the outrageous nature of the Fund Directors' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## Count 11
## Breach of Fiduciary Duty By Francoeur, Pilgrim and Citco Fund Services (Bermuda) Limited

229.   Paragraphs 1 - 159 are realleged herein.

230.   Brian Francoeur began his employment for Citco Fund Services (Bermuda) Ltd. ("CFSB") in 2001.  As part of his employment with CFSB, Francouer was appointed by CFSB as a director of FGBL.

231.   Ian Pilgrim began his employment for CFSB in 2001.  As part of his employment with CFSB, Pilgrim was appointed by CFSB as a director of FGBL.

232.   FGBL's Board of Directors has day-to-day management responsibility for the Funds, including selecting the Fund's investments, monitoring those investments, and maintaining relationships between the Funds and their custodians, administrators, and transfer agents.

233.   Defendants Francoeur and Pilgrim breached their fiduciary duties by failing to supervise the Funds' managers and investments that were entrusted to Madoff and in failing to pursue red flags that should have alerted them to the presence of unlawful activity.

234. As a direct and proximate result of the tortious conduct perpetrated by Francoeur and Pilgrim in the course and scope of performing their duties as employees of CFSB, and in particular their service as directors of FGBL, as described above, Plaintiffs have suffered damages, including the loss of all, or substantially all, of their investments.

235. Because of the outrageous nature of Francoeur and Pilgrim's willful and wanton conduct, Plaintiffs are entitled to punitive damages.

236. At the time the tortious conduct that injured Plaintiffs was committed by Francoeur and Pilgrim as described above, Francoeur and Pilgrim were acting within the course and scope of their employment with CFSB, and CFSB was paid for the services provided by Francouer and Pilgrim to FGBL, and their tortious conduct is thus imputable to CFSB under the doctrine of respondeat superior.

## Count 12
## Breach of Fiduciary Duty By Citco Fund Services (Europe)

237. Paragraphs 1 - 159 are realleged herein.

238. Citco Fund Services had discretion regarding all Plaintiffs' assets in Fairfield Sentry and Fairfield Sigma, Greenwich Sentry Partners, and Greenwich Sentry, including the calculation of the Funds' net asset value ("NAV"), and communications to the Plaintiffs about their investments.

239. This discretion and control gave rise to a fiduciary duty and duty of care on the part of the Citco Fund Services to all Fairfield Sentry, Fairfield Sigma,

Greenwich Sentry Partners Plaintiffs, and to all Greenwich Sentry Plaintiffs since August 2006.

240.   Citco Fund Services occupied a superior position over Plaintiffs with respect to its discretionary responsibilities, and had superior access to confidential information about the investment of the assets.  Citco Fund Services' superior position as to all Plaintiffs necessitated that these Plaintiffs repose their trust and confidence in the Citco Fund Services to fulfill its duties, and these Plaintiffs did so by investing in the Funds.  Moreover, Citco Fund Services held itself out as providing superior administrative services.  Plaintiffs reasonably and foreseeably relied on such representations, and trusted in Citco Fund Services' purported expertise and skill.

241.   Citco Fund Services breached its fiduciary duties by, among other omissions, failing to properly discharge its responsibilities as administrators in calculating the Funds' NAVs.

242.   In addition, Citco Fund Services collected substantial fees in return for the services they were ostensibly providing – fees that were calculated on the basis of Madoff and BMIS's fictional profits that were never actually earned.

243.   As Administrator for Fairfield Sentry, Citco Fund Services received "a monthly fee based on the Net Asset Value of the Fund as of the last business day of each month at a commercially reasonable rate." (Ex. 1, FS PPM-8/14/06, at

94

17; Ex. 7, FS PPM-10/1/04, at 15; Ex. 6, FS PPM-7/1/03, at 17.) The

Administration Agreement set the rate at "5 basis points per annum." (Ex. 25,

Administration Agreement between Fairfield Sentry Limited and Citco Fund

Services (Europe) B.V. dated February 20, 2003 ("Administration Agreement")

Sched. 3, Part 1.) These fees were calculated based on fraudulent data. Because

the BMIS investments never existed, and Citco Fund Services did not perform its

obligations, Citco Fund Services did not earn such fees.

244.   Administrative Fees.  As Administrator for Greenwich Sentry, Citco

Fund Services received "a monthly fee based on the beginning monthly net asset

value ... of the Partnership." (Ex. 24, Greenwich Sentry, L.P. Financial

Statements For the Years Ended December 31, 2007 and 2006, at 11.) In 2006 and

2007, Greenwich Sentry paid $113,953.00 and $71,333.00 in Administration Fees,

respectively. (*Id.* at 4.) Upon information and belief, Citco Fund Services also

received fees as Administrator to Greenwich Sentry Partners. Because the BMIS

investments never existed, and Citco Fund Services did not perform its obligations,

it did not earn such fees.

245.   Plaintiffs have been damaged as a proximate result of the Citco Fund

Services' breach of fiduciary duties, and are entitled to a constructive trust on fees

received, damages, and appropriate equitable relief.

246. Because of the outrageous nature of Citco Fund Service's willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## Count 13
### Breach of Fiduciary Duty By Citco Bank, Citco Global

247. Paragraphs 1 - 159 are realleged herein.

248. Citco Bank had discretion and control, at various times, regarding Fairfield Sentry Plaintiffs' assets in Fairfield Sentry, including monitoring of Madoff as a sub-custodian and representing to investors that he was qualified as such.

249. Citco Global also had discretion and control, at various times, regarding Fairfield Sentry and Fairfield Sigma Plaintiffs' assets in Fairfield Sentry and Fairfield Sigma, including monitoring of Madoff as a sub-custodian and representing to investors that he was qualified as such.

250. Citco Bank and Citco Global had discretion regarding Plaintiffs' assets in the Fairfield Sentry and Fairfield Sigma funds, including monitoring of Madoff as a sub-custodian and representing to investors that he was qualified as such.

251. This discretion and control gave rise to a fiduciary duty and duty of care on the part of Citco Bank and Citco Global to the Fairfield Sentry and Fairfield Sigma Plaintiffs. Citco Bank and Citco Global occupied a superior position over the Fairfield Sentry and Fairfield Sigma Plaintiffs with respect to

96

their discretionary responsibilities, and had superior access to confidential information about the investment of Plaintiffs assets in the Funds. Citco Bank and Citco Global's superior position as to the Fairfield Sentry and Fairfield Sigma Plaintiffs necessitated that these Plaintiffs repose their trust and confidence in Citco Bank and Citco Global to fulfill their duties, and Fairfield Sentry and Fairfield Sigma Plaintiffs did so by investing in the Funds. The Fairfield Sentry and Fairfield Sigma Plaintiffs reasonably and foreseeably relied on such representations, and trusted in Citco Bank and Citco Global's purported expertise and skill.

252.   Citco Bank and Citco Global breached their fiduciary duties by, among other omissions, failing to supervise the sub-custodians chosen for Fairfield Sentry and Fairfield Sigma.

253.   In addition, Citco Bank and Citco Global collected substantial fees in return for the services they were ostensibly providing – fees that were calculated on the basis of Madoff's and BMIS's fictional profits that were never actually earned.

254.   Citco Custodial Fees.  In exchange for its services as Custodian, Citco Bank received a payment "rate of 0.01% (1 basis point) per annum of the average holdings over the preceding three months, with a minimum of US$ 1,250.00 per quarter." (Ex. 26, Custodian Agreement between Fairfield Sentry Limited, Citco

97

Bank Nederland N.V. Dublin Branch, and Citco Global Custody N.V. dated July 3, 2006 ("Custodian Agreement") Sched. 1.)  Moreover, Citco Bank received a fee of $25.00 for each transaction.  (*Id.*)  Plaintiffs believe that Citco Global received similar payments.  These fees were calculated based on fraudulent data.  Because the BMIS investments never existed, and Citco Bank and Citco Global did not perform their obligations, they did not earn such fees.

255.   Fairfield Sentry and Fairfield Sigma Plaintiffs have been damaged as a proximate result of the breaches of fiduciary duty by Citco Bank and Citco Global, and are entitled to a constructive trust on fees received, damages, and appropriate equitable relief.

256.   Because of the outrageous nature of Citco Bank and Citco Global's willful and wanton conduct, Fairfield Sentry and Fairfield Sigma Plaintiffs are entitled to punitive damages.

## Count 14
## Breach of Fiduciary Duty By GlobeOp and Citco Canada

257.   Paragraphs 1 - 159 are realleged herein.

258.   GlobeOp had discretion regarding all Plaintiffs' assets invested in Greenwich Sentry prior to August 2006, including the calculation of the Funds' NAV, and communications to the Plaintiffs about their investments.

259.   As Administrator of Greenwich Sentry, L.P., prior to August 2006, GlobeOp was responsible for preparing and distributing "monthly reports that contain the amount of the Partnership's net assets, the amount of any distributions from the Partnership and Performance Allocation, accounting and legal fees, and all other fees and expenses of the Partnership." (Ex. 8, GS COM-5/2006, at 10.) GlobeOp directly sent investors monthly accounting statements which indicated the value of their holdings in Greenwich Sentry Limited.  Investors relied on these valuations from GlobeOp Financial Services when deciding whether to retain or sell their holdings in Greenwich Sentry, L.P.

260.   Citco (Canada) Inc. ("Citco Canada") has served as the Sub-Administrator for Greenwich Sentry and Greenwich Sentry Partners since August 2006. Citco Canada had discretion regarding all Plaintiffs' assets in Greenwich Sentry and Greenwich Sentry Partners, including communications to the Plaintiffs about their investments.

261.   This discretion and control gave rise to a fiduciary duty and duty of care on the part of GlobeOp to all Greenwich Sentry Plaintiffs prior to August 2006 and a duty of care on the part of Citco Canada to all Greenwich Sentry and Greenwich Sentry Partners Plaintiffs.

262.   GlobeOp and Citco Canada occupied superior positions over Greenwich Sentry and Greenwich Sentry Partners Plaintiffs with respect to their

discretionary responsibilities, and had superior access to confidential information about the investment of the assets. GlobeOp and Citco Canada superior positions as to Greenwich Sentry and Greenwich Sentry Partners Plaintiffs necessitated that these Plaintiffs repose their trust and confidence in GlobeOp and Citco Canada to fulfill their duties, and these Plaintiffs did so by investing in the Greenwich Sentry and Greenwich Sentry Partners. Moreover, GlobeOp and Citco Canada held themselves out as providing superior administrative services. Plaintiffs reasonably and foreseeably relied on such representations, and trusted in GlobeOp and Citco Canada's purported expertise and skill.

263. GlobeOp and Citco Canada breached their fiduciary duties by, among other omissions, failing to properly discharge their responsibilities as administrators in calculating the Funds' NAVs and in communicating those fictitious valuations directly to limited partners.

264. GlobeOp and Citco Canada calculated their administration fees based on fraudulent data provided by BMIS that, notwithstanding their representations of due diligence, they never verified. Because the BMIS investments never existed, FGBL was not entitled to any such fees.

265. Greenwich Sentry and Greenwich Sentry Partners Plaintiffs have been damaged as a proximate result of breach of fiduciary duties by GlobeOp and Citco

Canada and are entitled to a constructive trust on fees received, damages, and appropriate equitable relief.

266.    Because of the outrageous nature of GlobeOp and Citco Canada's willful and wanton conduct, Greenwich Sentry and Greenwich Sentry Partners Plaintiffs are entitled to punitive damages.

## Count 15
## Third-Party Contract Claims for Breach of Contracts By Citco Defendants

267.    Paragraphs 1 - 159 are realleged herein.

268.    Citco Fund Services entered contracts with all of the Funds, and it breached its obligations to the Plaintiffs as third party beneficiaries of those contracts.

a.      The Administration Agreements executed by Citco Fund Services with Fairfield Sentry and Fairfield Sigma each represent valid contracts binding on both Citco Fund Services and those Funds.

b.      The Administration Agreements evince a clear intent to benefit shareholders by affirmatively recognizing Citco's obligation to keep Fund shareholders informed of the status and performance of their investments in furtherance of the Fund's goal of seeking "capital appreciation of its assets" for the benefit of shareholders (Ex. 25, Administration Agreement Sched. 1).

c.      The benefits to Plaintiffs under the Administration Agreements between the Funds and Citco Fund Services were immediate, not simply incidental,

in that the Funds' only motivations for entering the Administration Agreement were to provide investors with capital appreciation and returns on their investments in the Funds.

        d.     Citco Fund Services agreed to act in good faith in the performance of its services as Fund Administrator.  (Ex. 25, Administration Agreement ¶ 6.2.)  Citco Fund Services' duties that required good faith, due care and diligence in their execution included the following: "reconciliation of cash and other balances at brokers"; "reconciliation of bank accounts"; "calculation of income and expense accruals"; "calculation of management and performance/performance fees with supporting schedules"; "independent reconciliation of the Fund's portfolio holdings"; "calculation of the Net Asset Value and the Net Asset Value per Share on a monthly basis in accordance with the Fund Documents"; "Preparation of monthly financial statements, in conformity with the International Accounting Standards," including "Statement of Assets and Liabilities," "Statement of Operations," "Statement of Changes in Net Assets," "Statement of Cash Flows (if desired)," and "Portfolio listings"; "Preparation of books and records (including specific schedules and analysis) to facilitate external audit, and liaising with the Fund's auditors in their review and preparation of the annual financial statements"; "Provision of accounting or accounting related reports and/or support schedules as agreed between the Administrator and the

Investment Manager"; and "Disbursement of payments for third party fees and expenses incurred by the Fund." (Ex. 25, Administration Agreement Sched. 2, Part 1.)

   e. Citco Fund Services agreed to make the following communications directly to shareholders in Fairfield Sentry and Fairfield Sigma: "publishing the Net Asset Value per Share (of each class if appropriate) as requested by the Fund"; "reconciliation of information provided by the Fund's prime broker and custodian with information provided by the Investment Manager"; "dealing with and replying to all correspondence and other communications addressed to the Fund in relation to the subscription, redemption, transfer (and where relevant, conversion) of Shares"; "despatching to Shareholders notices, proxies and proxy statements prepared by or on behalf of the Fund in connection with the holding of meetings of Shareholders"; "despatching to Shareholders and anyone else entitled to receive the same in accordance with the Fund Documents and any applicable law copies of the audited financial statements." (Ex. 25, Administration Agreement Sched. 2, Part 2.)

   f. Citco Fund Services was only permitted to rely on information it received without making further inquiries if that information demonstrated an "absence of manifest error." (Ex. 25, Administration Agreement ¶ 6.2(c).)

269.   Citco Fund Services also serves as the administrator of both Greenwich Sentry and Greenwich Sentry Partners.  Pursuant to an Administration Agreement and under the general supervision of the General Partner, as administrator, Citco Fund Services (Europe) B.V. is responsible for "communicating with Limited Partners; maintaining the record of accounts; processing subscriptions and withdrawals; preparing and maintaining the Partnership's financial and accounting records and statements; calculating each Limited Partner's capital account balance (on a monthly basis); preparing financial statements; arranging for the provision of accounting, clerical and administrative services; and maintaining corporate records." (Ex. 3, GS COM- 8/2006, at 12; Ex. 4, GSP COM-2006, at 11).

270.   Citco Fund Services breached its Administration Agreements, by, among other omissions, failing to discharge its responsibility to calculate accurately the Funds' NAVs.

271.   Citco Bank and Citco Global entered Custodian Agreements with Fairfield Sentry and Fairfield Sigma and breached their obligations to the Fairfield Sentry and Fairfield Sigma Plaintiffs as third party beneficiaries of those contracts.

272.   Under the Custodian Agreements, Citco Bank was responsible for holding the Plaintiffs' assets in Fairfield Sentry and Fairfield Sigma and, if a sub-custodian was appointed, ensuring that the sub-custodian properly performed its

104

duties.  Plaintiffs believe that Citco Global had similar responsibilities when it was custodian.  Specifically:

a.      Citco Bank committed to use its "best efforts and judgment and due care in performing its obligations and duties" as Custodian.  (Ex. 26, Custodian Agreement ¶ 8.2.)  Citco Bank represented that it would act in good faith and reasonable care in its execution of its duties.  (*Id.*)

b.      One of Citco Bank's duties was to maintain an "ongoing appropriate level of monitoring" of any sub-custodian for Fairfield Sentry.  (Ex. 26, Custodian Agreement ¶ 4.3.)

c.      Citco Bank had the authority to "act without first obtaining instructions from the Fund" if such action were necessary "in order to preserve or safeguard the Securities or other assets of the Fund."  (Ex. 26, Custodian Agreement ¶ 6.3.)  Citco Bank did not need the Fund's approval to safeguard investors' money from the fraudulent activity of others.

d.      Citco Bank agreed to employ "financial or other experts" in execution of its duties as Custodian.  (Ex. 26, Custodian Agreement ¶ 6.1.6.)  Thus, Citco Bank had discretionary responsibilities that called for the use of financial experts where necessary.

e.      Under the Custodian Agreement, Citco Bank was only able to "rely on the genuineness of any document," to the extent Citco Bank believed in

"good faith" that the document was "validly executed by or on behalf of the Fund." (Ex. 26, Custodian Agreement ¶ 8.6.)

273.  In addition, as Depositary, Citco Global has the responsibility of holding securities on behalf of the Fund. Under the Custodian Agreement, Citco Global received instructions from the Fund through the Custodian. Along with Citco Bank, Citco Global was authorized to "enter into further agreements for the appointment" of sub-custodians. (Ex. 26, Custodian Agreement ¶ 4.1.) Citco Global agreed to perform its services as Depositary without "willful misfeasance, bad faith, fraud or negligence." (Ex. 26, Custodian Agreement ¶ 6.8.)

274.  Citco Bank and Citco Global both breached their respective agreements to serve as the Funds' Custodian and Depositary (for Citco Global) by grossly failing to meet the obligations of these agreements by selecting Madoff and BMIS as sub-custodians and failing to monitor their performance. Both are liable to Plaintiffs as third party beneficiaries of those contracts.

### Count 16
### Negligence and Gross Negligence By Citco Fund Services

275.  Paragraphs 1 - 159 are realleged herein.

276.  Citco Fund Services, as the Funds' administrator, had a special relationship with Plaintiffs that gave rise to a duty to exercise due care in the management of Plaintiffs' assets invested in the Funds. Citco Fund Services knew or should have known that Plaintiffs were relying on Citco Fund Services to

manage the investments entrusted to the Funds with reasonable care, and Plaintiffs did reasonably and foreseeably rely on Citco Fund Services to exercise such care by entrusting their assets to their Funds.

277.   Citco Fund Services grossly failed to exercise due care, and acted in reckless disregard of its duties, and thereby injured Plaintiffs. Citco Fund Services failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional. Despite its responsibility for monitoring and "independently reconciling" the Funds' holdings, Citco Fund Services recklessly selected and failed to monitor Madoff and BMIS on an ongoing basis to any reasonable degree and failed to take adequate steps to confirm BMIS's purported account statements, transactions and holdings of the Funds' assets. Given the obvious warning signals that a fraud was being perpetrated, there was a "manifest error" in information provided to Citco Fund Services. This obvious, manifest error in the data submitted by BMIS obligated the Administrator to make further inquiry regarding BMIS. Had such further inquiry been made, the losses could have been avoided.

278.   If Citco Fund Services had not been grossly negligent with respect to Plaintiffs' assets invested in Fairfield Sentry, Fairfield Sigma, Greenwich Sentry and Greenwich Sentry Partners, Citco Fund Services would have discovered that Madoff was a fraud.

279.   As a direct and proximate result of Citco Fund Services' gross negligence with respect to Plaintiffs' assets invested in Fairfield Sentry and Fairfield Sigma, Plaintiffs have lost all, or substantially all, their investment in the Funds.

280.   By reason of the foregoing, Citco Fund Services is liable to Plaintiffs.

281.   Because of the outrageous nature of the Citco Fund Services' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## Count 17
## Negligence and Gross Negligence By GlobeOp Financial Services

282.   Paragraphs 1 - 159 are realleged herein.

283.   GlobeOp Financial Services, as Partnership administrator for Greenwich Sentry, had a special relationship with Plaintiffs that gave rise to a duty to exercise due care in the management of Plaintiffs' assets invested in that partnership.  GlobeOp Financial Services knew or should have known that Plaintiffs were relying on GlobeOp Financial Services to manage the investments entrusted to the partnership with reasonable care, and Plaintiffs did reasonably and foreseeably rely on GlobeOp Financial Services to exercise such care by entrusting their assets in the Partnership to GlobeOp Financial Services.

284.   GlobeOp Financial Services grossly failed to exercise due care, and acted in reckless disregard of its duties, and thereby injured Plaintiffs.  GlobeOp

Financial Services failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional. Despite its responsibility for monitoring and "independently reconciling" the Greenwich Sentry's holdings, GlobeOp Financial Services recklessly failed to monitor Madoff and BMIS on an ongoing basis to any reasonable degree and failed to take adequate steps to confirm BMIS's purported account statements, transactions and holdings of Partnership assets. Given the obvious warning signals that a fraud was being perpetrated, there was a "manifest error" in information provided to GlobeOp Financial Services. This obvious, manifest error in the data submitted by BMIS obligated the Administrator to make further inquiry regarding BMIS's financial condition. Had such further inquiry been made, the losses could have been avoided.

285.   If GlobeOp Financial Services had not been grossly negligent with respect to Plaintiffs' assets invested in Greenwich Sentry, GlobeOp Financial Services would have discovered that Madoff was a fraud.

286.   As a direct and proximate result of GlobeOp Financial Services' gross negligence with respect to Plaintiffs' assets invested in Greenwich Sentry, Plaintiffs have lost all, or substantially all, their investment in Greenwich Sentry.

287.   By reason of the foregoing, GlobeOp Financial Services is liable to Plaintiffs.

288.    Because of the outrageous nature of the GlobeOp Financial Services'
willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

## PRAYER

WHEREFORE, Plaintiffs request the following:

a)    Certification of this class action as proper and maintainable pursuant
to Rule 23(b)(3) of the Federal Rules of Civil Procedure and
declaration of the proposed named Plaintiffs as proper Class
representatives;

b)    Such preliminary and permanent injunctive relief, including
imposition of a constructive trust, as is appropriate to preserve the
assets wrongfully taken from Plaintiffs;

c)    Compensatory, consequential, and general damages in an amount to
be determined at trial;

d)    Disgorgement and restitution of all earnings, profits, compensation
and benefits received by Defendants as a result of their unlawful acts
and practices;

e)     Rescission of all contractual relationships between Plaintiffs and Defendants and a return of all principal payments made by Plaintiffs to Defendants;

f)     Punitive damages on account of Defendants' willful and wanton disregard of Plaintiffs' rights;

g)     Costs and disbursements of the action;

h)     Pre- and post-judgment interest;

i)     Reasonable attorneys' fees; and

j)     Such other and further relief as this Court may deem just and proper.

Dated:  April 24, 2009

Respectfully submitted,

By: _David G. Barrett_

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

David A. Barrett
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Stuart H. Singer
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, #1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Robert C. Finkel
Carl L. Stine
James A. Harrod
E. Elizabeth Robinson
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Telephone: 212.759.4600
Facsimile: 212.486.2093

Christopher Lovell
Victor E. Stewart
LOVELL STEWART HALEBIAN LLP
61 Broadway
New York, NY 10006
212-608-1900

*Interim Co-Lead Counsel for
Plaintiffs*

Of Counsel:

David A. Gehn
GUSRAE, KAPLAN, BRUNO &
NUSBAUM PLLC
120 Wall Street
New York, NY 10005
212-269-1400

ANWAR, *et al.*,

                           Plaintiffs,

        -against-

FAIRFIELD GREENWICH LIMITED, *et al.*,

                          Defendants.

This Document Relates To:  All Actions

Master File No. 09-cv-118 (VM)

AFFIDAVIT OF SERVICE

State of New York    )
                     ) ss.:
County of New York )

        MARK ANTHONY LEBRON, being duly sworn, deposes and says:

        1.  I am not a party to this action and I am over 18 years of age.

        2.  I am employed by the law firm of Boies, Schiller & Flexner LLP, 575 Lexington Avenue, New York, New York 10022, attorneys for the Plaintiff.

        3.  On April 24, 2009, I served a true copy of the Consolidated Amended Complaint by depositing said copies in a first class postage-paid, sealed envelope in a depository under the exclusive care and custody of the United States Postal Service addressed to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
*Attorneys for Fairfield Greenwich Ltd.,*
*Fairfield Greenwich Group,*
*Fairfield Greenwich (Bermuda) Ltd.,*
*Fairfield Greenwich Advisors L.L.C.,*
*Yanko Dellaw Schiava, Philip Toub,*
*Lourdes Barreneche, Vianney D'hendecourt,*
*Charles Murphy, Santiago Reyes,*
*Richard Landsberger, David Lipton,*
*Julia Luongo, Maria Teresa Pulido Mendozo,*
*Mark Mckeefry, Harold Greisman,*
*Jacqueline Harary*

White & Case LLP
1155 Ave of the Americas
New York, NY 10036
*Attorneys for Walter M. Noel, Jr.*

Andres Piedrahita
Fairfield Greenwich Group
55 East 52nd Street, 33rd Floor
New York, NY 10055

Kasowitz, Benson, Torres &
Friedman LLP
1633 Broadway
New York, NY 10019
*Attorneys for Jeffrey Tucker*

Law Offices of Kenneth A. Zitter
260 Madison Avenue
New York, NY 10016
*Attorneys for Brian Francouer*

Gilbridge Heller & Brown P.A
2 South Biscayne Blvd,
One Biscayne Tower - Suite 1570
Miami, FL 33131
*Attorneys for CITCO Fund Services
(Europe) B.V., CITCO Bank Nederland
N.V. Dublin Branch*

Cornelis Boele
9190 Third Ave
12th Floor
New York, NY 10022

Mayer Brown LLP
1675 Broadway
New York, NY 10019-5820
*Attorneys for Andrew Smith*

Debevoise & Plimpton, LLP
919 Third Avenue, 31st Floor
New York, NY 10022
*Attorneys for Amit Vigayvergia*

Curtis, Mallet-Prevost, Colt & Mosle
LLP (NYC)
101 Park Avenue
New York, NY 10178
*Attorneys for CITCO Fund Services
(Europe) B.V., CITCO Bank
Nederland N.V. Dublin Branch*

Morvillo, Abramowitz, Grand, Iason,
Anello & Bohrer, P.C
565 Fifth Avenue
New York, NY 10017
*Attorneys for David Horn*

MARK ANTHONY LEBRON

Sworn to before me this
24th day of April, 2009

Notary Public

JOHN A. PASTERICK
NOTARY PUBLIC, STATE OF NEW YORK
NO.01PA6082750
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES 11/04/2010