# Exhibit B

DATED 20th February 2003

FAIRFIELD SIGMA LIMITED

and

CITCO FUND SERVICES (EUROPE) B.V.

---

ADMINISTRATION AGREEMENT

---

AGREEMENT dated 20th February 2003 and made

BETWEEN:

(1) **FAIRFIELD SIGMA LIMITED**, a company incorporated under the laws of the British Virgin Islands and having its registered office at Citco Building, Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands (the "**Fund**"); and

(2) **CITCO FUND SERVICES (EUROPE) B.V.**, a company incorporated under the laws of the Netherlands and having its registered office at Telestone 8- Teleport, Naritaweg 165, Amsterdam, The Netherlands (the "**Administrator**").

RECITALS:

(A) The Fund is an exempted company incorporated to carry on the business of an open-ended investment company, the principal features of which are specified in Schedule 1.

(B) The Fund wishes to engage the Administrator to perform the Services, and the Administrator has agreed to perform the Services, on the terms and conditions set out in this Agreement.

NOW IT IS HEREBY AGREED as follows:

1. **DEFINITIONS AND INTERPRETATION**

1.1 **Definitions**

In this Agreement including the recitals, unless the context otherwise requires, the following words shall have the following meanings:

| | |
|---|---|
| **Business Day** | has the meaning ascribed to such expression in the Offering Documents; |
| **Citco Group** | means The Citco Group Limited, a company incorporated in the Cayman Islands, and its subsidiaries and affiliates for the time being including the Administrator; |
| **Citco Officer** | means any member of the Citco Group or any director, officer, employee, agent or representative of any member of the Citco Group serving as a Director or other officer or in any other like capacity of the Fund; |
| **Constitutive Documents** | means the Memorandum and Articles of Association and such other documents (if any) under or pursuant to which the Fund is constituted, as the same may be amended, supplemented or superseded from time to time; |
| **Directors** | means the directors of the Fund for the time being; |
| **Fund Documents** | means the Constitutive Documents and the Offering Documents; |

1

**Indemnified Parties** means the Administrator and its subsidiaries, affiliates, directors and other officers, shareholders, servants, employees, agents and permitted delegates under this Agreement;

**Investment Manager** means Fairfield Greenwich Limited or such other person or entity from time to time appointed by the Fund to provide management, investment management, investment advisory or any other similar services to the Fund in connection with its management and/or the investment of its assets;

**Material Agreement** means any agreement (other than this Agreement) entered into between a service provider and the Fund, including without limitation any agreement entered into between the Investment Manager and the Fund;

**Offering Document** means any prospectus, offering memorandum, private placement memorandum, information memorandum, circular, listing particulars, notice or other similar document issued by the Fund from time to time relating to the Fund and/or the offering of its Shares, including without limitation the Subscription Documents attached thereto or provided therewith to prospective investors, in each case as the same may be amended, supplemented or superseded from time to time;

**Records** means all books, records and other documents pertaining to the Fund and its Shareholders maintained by the Administrator in relation to the provision of the Services;

**Services** means the accounting, administrative, registrar and transfer agency and other services specified in Schedules 2 and 4 to be performed by the Administrator under and in accordance with this Agreement;

**Shares** means the common shares of the Fund of par value $0.01 each;

**Shareholder** means a holder of Shares;

**Subscription Application** means an application by a prospective Shareholder to subscribe for Shares pursuant to any Subscription Documents; and

**Subscription Documents** means at any time the subscription agreement or other subscription application from a prospective Shareholder to subscribe for Shares in the form required under the Fund Documents applicable at that time.

## 1.2 Interpretation

In this Agreement:

(a) the singular includes the plural and vice versa and the male gender includes the feminine and neuter genders;

(b) clause headings are for convenience only and shall not affect the interpretation of this Agreement;

(c) references to Schedules are to Schedules of this Agreement;

(d) references to persons shall include individuals, bodies corporate, unincorporated associations and partnerships and their respective successors and assigns;

(e) references to this Agreement shall include any variation or replacement hereof; and

(f) references to any statute, ordinance, code or other law includes regulations and other instruments under it and consolidations, amendments, re-enactments or replacement of any of them.

## 2. APPOINTMENT/DOCUMENTS

### 2.1 Appointment

The Fund appoints the Administrator to provide the Services, and the Administrator accepts such appointment, on the terms and conditions set out in this Agreement.

### 2.2 Documents

The Fund:

(a) has delivered to the Administrator :

(i) copies of each Fund Document and executed copies of each Material Agreement;

(ii) a copy of the resolutions of the Directors of the Fund approving the appointment of the Administrator as the Fund's administrator and registrar and transfer agent, and authorizing the execution of this Agreement on behalf of the Fund;

(b) represents and warrants to the Administrator that the documents delivered to it pursuant to paragraph (a) above are true, complete and accurate in all material respects;

(c) agrees to deliver to the Administrator promptly any future amendment or supplement to any Fund Document or Material Agreement provided that the Fund shall not make any changes to any Fund Document or to any Material Agreement which might reasonably be expected to affect the Administrator or the performance by it of the Services under this Agreement without giving the Administrator prior notification of any such proposed amendment or supplement and a reasonable opportunity to review any such amendment or supplement prior to it becoming effective; and

(d)     agrees to provide, and cause any agent appointed by it and any other service provider to the Fund to provide, to the Administrator such other documents and information as the Administrator may from time to time reasonably require to enable it to perform the Services and comply with its duties and obligations under this Agreement; provided, however, that the Fund shall not be required to to provide any information which would, in the determination of counsel to the Fund, result in a waiver of any evidentiary privilege.

## 2.3   Facilities

The Administrator shall at its own expense provide or procure the provision of such office accommodation, staffing and other facilities as may be required to enable it to perform the Services, provided that the Fund shall not be entitled to the exclusive use of any such accommodation or to the exclusive services of any particular member of the Administrator's staff.

## 2.4   Delegation

The Administrator may delegate or sub-contract any duties or functions it deems necessary in order to perform the Services to any member of the Citco Group on such terms and conditions as the Administrator reasonably thinks fit with the prior written consent of the Fund or the Investment Manager, which consent shall not be unreasonably withheld. Unless otherwise agreed between the Fund, the Administrator and any such delegate or sub-contractor, any fees and expenses payable to any delegate or sub-contractor shall be borne by the Administrator, and the Administrator shall remain primarily liable to the Fund for the performance of any duties or functions so delegated or sub-contracted by the Administrator. The Administrator may delegate any of the functions under this agreement to an entity outside the Citco Group with the written permission of the Fund, which may be withheld in the sole and exclusive discretion of the Fund.

## 3.   <u>PERFORMANCE OF THE SERVICES</u>

## 3.1   Observance of Fund Documents

In performing the Services, the Administrator shall:

(a)     comply with the applicable provisions of the Fund Documents, the Material Agreements and all resolutions of the Directors of the Fund of which the Administrator has notice; and

(b)     at all times exercise its powers and perform its duties in connection with the provision of the Services under this Agreement subject to the orders, instructions, directions of the Directors,

provided that nothing contained in this Agreement shall be construed to require the Administrator to perform any service that could cause the Administrator to be deemed an investment manager or adviser or that could cause the Fund, the Administrator or any permitted delegate of the Administrator or sub-contractor to act in contravention of any Fund Document, Material Agreement or any provision of applicable law in any jurisdiction.

## 3.2 Selling Criteria relating to the Shares

(a) The responsibility of the Administrator with respect to the issuance of Shares to a prospective Shareholder in any jurisdiction and for the registration of Shares is solely limited to:

    (i) determining by review of Subscription Documents whether or not a prospective Shareholder is permitted to invest in the Fund based solely upon applicable purchasing criteria specified in the Fund Documents;

    (ii) not recording transactions for the sale of Shares if the prospective Shareholder does not meet applicable purchasing criteria (except in cases where the Directors of the Fund have waived the minimum subscription amount or subscription notice period in accordance with the provisions relating thereto set out in the Fund Documents) provided however that anti-money laundering compliance will be the responsibility of the Administrator as provided herein and in Schedule 4 hereof; and

    (iii) reporting actual sale transactions to the Fund.

(b) The Administrator shall have no obligation, when recording the issuance of Shares, to recognise or otherwise have regard to any laws relating to the offer, issue or sale of Shares to any persons or entity, which functions shall be the sole responsibility of the Fund.

## 3.3 Subscriptions

The Administrator shall, on behalf of the Fund, issue Shares in accordance with the applicable Fund Documents only upon receipt of:

(a) original (or fax copies where the original is to be forwarded thereafter), duly completed and authorized Subscription Documents;

(b) the full amount of the subscription monies payable in respect of the Shares being subscribed in available funds; and

(c) documents or evidence satisfactory to the Administrator that all applicable anti-money laundering regulations in any applicable jurisdiction have been complied with, and that the provisions of Schedule 4 hereof are applied in relation to the prospective Shareholder and the subscription.

## 3.4 Redemptions

The Administrator shall, on behalf of the Fund, redeem Shares in accordance with the provisions and procedures set out in the applicable Fund Documents only upon receipt of:

(a) an original (or fax copies where the original will follow thereafter), duly completed and authorized redemption instruction directing redemption of Shares in the Fund containing such information or undertakings as may be approved by the Fund and the Administrator; and

(b)     sufficient monies to satisfy the redemption proceeds payable from the Fund in available funds.

## 3.5     Transfers

The Administrator shall, on behalf of the Fund, register transfers of Shares in accordance with the provisions and procedures set out in the applicable Fund Documents only upon receipt of original (fax copy where original to follow thereafter), duly completed and authorized documentation relating to the transfer, including any Share certificates (which must be submitted for cancellation).

## 3.6     Trade Confirmations

The Administrator shall, on behalf of the Fund, issue to Shareholders trade confirmations with respect to subscriptions, redemptions and transfers in accordance with the applicable Fund Documents.

## 3.7     Powers of the Administrator

In performing the Services under this Agreement, the Administrator may:

(a)     use the name of the Fund and sign any necessary letters or other documents for and on behalf of the Fund as administrator and/or registrar and transfer agent of the Fund;

(b)     act as administrator and/or registrar and transfer agent for any other person on such terms as may be agreed with that person and shall not be deemed to be affected with notice of or to be under any duty to disclose to the Fund or the Investment Manager any fact or thing which may come to the knowledge of the Administrator or of any delegate or agent of the Administrator in the course of so doing or in any manner whatever otherwise than in the course of performing the Services; and

(c)     acquire, hold or deal with for its own account or for any client or other person and in its own name or in the name of such client or person or of a nominee any shares or securities for the time being issued by the Fund or any investment in which the Fund is authorized to invest, and shall not be required to account to the Fund for any profit arising therefrom.

3.8     The parties agree that in performing the Services for the Fund, the Administrator shall observe and comply with the provisions set out in Schedule 4 relating to anti-money laundering policies and procedures applicable to the Fund. The parties hereto agree to amend and supplement Schedule 4 to the extent necessary to reflect any changes to, or the introduction of, any anti-money laundering rules or regulations in any jurisdiction that are, on the advice of legal counsel to the Fund, applicable to the Fund and/or its Investment Manager, including any laws and regulations relating to the adoption and implementation by the Fund of an anti-money laundering program for the Fund as contemplated under the Patriot Act (as defined in Schedule 4). The supplement to Schedule 4 shall be executed on behalf of the parties and affixed to this Agreement.

## 4.     FEES AND EXPENSES

## 4.1     Fees

For the Services to be provided by the Administrator to the Fund under this Agreement, the Fund shall pay to the Administrator fees in the amounts, at the times and otherwise in the manner specified in Schedule 3. The fees payable to the Administrator under this Agreement are subject to review from time to time by the Administrator to reflect demonstrable changes in the operational costs of the Administrator. If any amendments to the fees payable hereunder are agreed between the Administrator and the Fund, such amended fees shall be recorded in a revised Schedule 3 which shall be executed by the parties and affixed to this Agreement.

### 4.2 Expenses

The Administrator shall pay all of its own expenses arising from the performance of the Services under this Agreement. The Administrator shall not be required to incur on its own account and shall be reimbursed by the Fund for any costs or expenses incurred on behalf of the Fund including, but not limited to, formation costs, consultantcy fees, interest charges, fees and expenses of independent attorneys and auditors, taxes and governmental fees, any expenses (including clerical expenses) of issue, redemption or transfers of Shares, pricing services, expenses of printing and distributing reports, notices, proxy materials and other documents for Shareholders, all charges for courier services, postage, telephone, telex, faxing and cable incurred by the Administrator in the proper performance of its duties under this Agreement, costs of attending Directors' or Shareholders' meetings, expenses of printing and distributing Offering Documents, expenses of convening and holding Shareholders' meetings, insurance premiums and any other expenses which may be properly payable by the Fund. The Fund shall pay all such expenses to the Administrator on a monthly basis within 10 Business Days' following receipt by the Fund of an invoice from the Administrator in respect of such expenses.

### 4.3 Withholding

All amounts payable by the Fund to the Administrator hereunder shall be paid together with all applicable sales and other goods and services taxes but otherwise free and clear of and without deduction or set-off of any amount in respect of taxes or any other amount whatsoever.

## 5. REPRESENTATIONS, WARRANTIES AND COVENANTS

### 5.1 Representations and Warranties by the Fund

The Fund represents and warrants to the Administrator that:

(a) it has full power and authority to enter into this Agreement, and it has taken all necessary corporate action and has obtained all necessary authorisations and consents, to authorise the execution of this Agreement and appoint the Administrator to provide the Services in accordance with the terms of this Agreement, and that this Agreement will constitute legal, valid and binding obligations of the Fund enforceable against it in accordance with its terms;

(b) to the best of its knowledge, information and belief as of the date of this Agreement, the Fund is not engaged or about to engage in any litigation, enforcement or administrative proceeding or arbitration of any material importance and no such litigation, enforcement or administrative proceeding or arbitration is pending or threatened against it; and

(c) to the best of its knowledge, information and belief, the Fund is not in default under any contractual or statutory obligations whatsoever (including the payment of any tax) which materially and adversely affects, or is likely to materially and adversely affect, the business or financial condition of the Fund.

## 5.2 Covenant by the Fund

The Fund covenants with the Administrator that during the continuance of this Agreement the Fund shall not unreasonably stop, countermand, restrict or seek to restrain or otherwise interfere with any arrangements, instructions, procedures or authority pursuant to which the Administrator has taken action hereunder to the extent the Administrator has acted in good faith and in accordance with the terms of this Agreement.

## 5.3 Representations and Warranties by the Administrator

The Administrator represents and warrants to the Fund that it has full power and authority, and it has taken all necessary corporate action and has obtained all necessary authorisations and consents to authorise the execution of this Agreement and to perform its obligations and duties and provide the Services under this Agreement and that this Agreement will constitute legal, valid and binding obligations of the Administrator enforceable against it.

## 6. <u>LIMITATION OF LIABILITY</u>

## 6.1 Limitation of Liability

(a) In the absence of material breach of this Agreement by the Administrator due to the negligence, bad faith, fraud or dishonesty in the performance of its duties under this Agreement, neither the Administrator nor any other Indemnified Party shall be liable to the Fund, any Shareholder, the Investment Manager or any other person on account of anything done, omitted or suffered by the Administrator or any other Indemnified Party in good faith pursuant to this Agreement in the performance of the Services.

(b) Subject to paragraph (a) above, neither the Administrator nor any other Indemnified Party shall be liable to the Fund, any Shareholder, the Investment Manager or any other person for any loss, liability, claim, demand or expense which may be suffered, sustained or incurred by any of them to the extent that the loss, liability, claim, demand or expense was suffered, sustained or incurred:

(i) by the use of leverage, in the purchase, holding or sale of any investment or other asset by the Fund;

(ii) by the acquisition of any investment or entry into of any arrangements by the Fund or any Shareholder (including without limitation any spot or forward currency contract) in connection with hedging any currency or other financial exposure of the Fund or that Shareholder, whether the acquisition of such investment or the entry into such arrangements is based on any information regarding the Fund's portfolio of investments or a Shareholder's holding of Shares in the Fund or any other information or reports regarding the Fund or that Shareholder provided by the Administrator or otherwise;

8

(iii)    as a result of loss, delay or mis-delivery or error in transmission of any telexed, telecopied, facsimiled, telegraphic, electronic or other communication or by any party other than the Administrator or its agents for any loss arising as a result of any forged transfer or request for redemption of Shares; or

(iv)    as a result of any inaccuracy of any report, computation or other document or information produced or prepared by the Administrator which is based on inaccurate or incomplete information provided to the Administrator pursuant to this Agreement.

(c)    Neither the Administrator nor any other Indemnified Party shall, under any circumstances whatsoever, be liable for indirect damages. Each party shall have the duty to mitigate damages for which the other party may become responsible.

## 6.2    Reliance

Notwithstanding Clause 6.1, neither the Administrator nor any other Indemnified Party shall be liable to the Fund, any Shareholder, the Investment Manager or any other person for any action taken or failure to act in good faith (i.e., without negligence, bad faith, fraud or dishonesty) in the performance of the Services pursuant to this Agreement:

(a)    in accordance with or pursuant to any oral or written instruction, request or advice of the Fund, the Investment Manager or their duly authorised agent(s) or delegate(s); or

(b)    in accordance with any legal opinion or reasonable legal advice received from any reputable law firm chosen by the Administrator, the Investment Manager or the Fund; or

(c)    in reliance upon any opinion, advice or any information obtained from any broker, valuer, surveyor, auctioneer or other expert competent to give such opinion, advice or information whether reporting to the Fund, the Investment Manager or the Administrator, upon which such opinion, advice or information the Administrator may, in the absence of manifest error, rely without enquiry,

and neither the Administrator nor any other Indemnified Party shall be under any duty or obligation to inquire as to the validity or invalidity or authority or lack thereof of any statement, oral or written instruction, resolution, signature, request, letter of transmittal, certificate, opinion of counsel, instrument, report, notice, consent, order, or any other document or instrument which the Administrator reasonably believes in good faith to be genuine.

## 6.3    Third Party Services

Neither the Administrator nor any other Indemnified Party shall be liable for the performance, errors or omissions of unaffiliated, nationally or regionally recognized third parties such as, by way of example and not limitation, courier companies, national postal services and other delivery, telecommunications and other companies not under the Administrator's reasonable control, and third parties not under the Administrator's reasonable control providing services to the financial industry generally, such as, by way of example and not limitation, companies and other entities providing processing and settlement services, custody services and third party pricing services.

## 6.4    Compliance with Laws

The Administrator shall have no liability or responsibility for the Fund's compliance with laws or regulations governing the offer and sale of the Shares. Further, the Fund shall be solely responsible for the preparation, contents and distribution of the Fund Documents as to compliance with all applicable requirements of any laws, rules, and regulations of governmental authorities having jurisdiction of the Fund and the offering and sale of its Shares.

## 7. INDEMNITIES

### 7.1 Indemnities by the Fund

(a) The Fund agrees to indemnify and keep indemnified the Administrator and each other Indemnified Party from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, claims, demands, suits, costs, expenses or disbursements of any kind or nature whatsoever (for the purposes of this Clause 7 a **"Claim"**) which may be imposed on, incurred by or asserted against any of them howsoever arising (other than by reason of negligence, bad faith, fraud or dishonesty on the part of the Administrator or any other Indemnified Party or the breach of this Agreement by the Administrator) in connection with the provision of the Services under this Agreement.

(b) Notwithstanding any other indemnification, either at law or contained in this Agreement, to which the Administrator or any other Indemnified Party may be entitled (which shall be in addition to, and not in substitution for, the following), the Fund agrees to indemnify and keep indemnified the Administrator and each other Indemnified Party from and against any Claim, except as prohibited by law, which may be imposed on, incurred by or asserted against any of them arising from any inaccuracy or incompleteness of any information supplied by or on behalf of the Fund to the Administrator.

(c) The Fund agrees and undertakes:

(i) that no Citco Officer shall, in the absence of fraud or dishonesty, be liable for any loss or damage that the Fund may sustain or suffer as a result or in the course of the discharge by that Citco Officer of its duties to the Fund; and

(ii) to indemnify each and every Citco Officer from and against any Claim (other than a Claim resulting from fraud or dishonesty on the part of the Citco Officer in the performance of his or her duties) which may be imposed on, incurred by or asserted against any Citco Officer in performing its, his or her duties to the Fund.

### 7.2 Indemnity by the Administrator

Subject to the limitations set out in Clause 6, the Administrator shall indemnify the Fund and keep the Fund indemnified from and against any Claim which may be imposed on, incurred by or asserted against the Fund arising directly from the negligence, bad faith, fraud or dishonesty of its obligations on the part of the Administrator in connection with the provision of the Services under this Agreement.

### 7.3 Notification of Claims

In order that the indemnification provisions contained in this Clause 7 shall apply, upon the assertion of a Claim for which one party (the "Indemnifier") may be required to indemnify the

other party (the "Indemnitee"), the Indemnitee must notify the Indemnifier of such assertion, and shall keep the Indemnifier advised with respect to all developments concerning such Claim. The Indemnifier shall have the option to participate with the Indemnitee in the defence of such Claim or to defend against the Claim in its own name or in the name of the Indemnitee. The Indemnitee shall in no case admit any Claim or make any compromise in any case in which the Indemnifier may be required to indemnify it except with the Indemnifier's prior written consent.

### 7.4 Legal Actions

The Administrator shall not be required to take any legal action unless fully indemnified to its reasonable satisfaction for all costs and liabilities likely to be incurred or suffered by the Administrator. If the Fund requires the Administrator in any capacity to take any action which in the opinion of the Administrator might make the Administrator, as agent, liable for the payment of money or liable in any other way, the Administrator shall be indemnified by the Fund and remain indemnified by the Fund for any reasonable amount and form satisfactory to it as a pre-requisite to taking such action.

## 8. BOOKS AND RECORDS

### 8.1 Ownership

All Records received or prepared by the Administrator in connection with performance of the Services shall be the exclusive property of the Fund. Except as otherwise authorised by the Directors, all such Records (other than those which are not of a material nature) shall be preserved by the Administrator for a period of at least seven years from the end of the period to which they relate or until they are delivered to duly appointed successors to the Administrator upon termination of this Agreement.

### 8.2 Inspection

If the Administrator receives any request or demand for the inspection of any Records, the Administrator will endeavor to notify the Fund and the Investment Manager to secure instructions from the Fund or the Investment Manager as to such inspection. Unless in the reasonable opinion of the Administrator, abiding with any such instructions received from the Fund or the Investment Manager would result in a breach of any applicable law, order or regulation to which the Administrator and/or the Fund is subject, the Administrator shall abide by the Fund's or the Investment Manager's instructions for granting or denying the inspection, provided that the Administrator may grant the inspection without instructions or in contravention of specific instructions if the Administrator is advised by legal counsel to the Administrator or the Fund that failure to do so would result in the Administrator or the Fund incurring any liability or being in breach of any applicable law, order or regulation to which the Fund and/or the Administrator is subject.

## 9. CONFIDENTIALITY

### 9.1 Confidential Information

The Administrator agrees to treat and maintain all information pertaining to the investments, ownership, business affairs and financial condition of the Fund in its possession as confidential and shall not, except as contemplated by this Agreement or as otherwise required by any

applicable law, order or regulation to which the Administrator and/or the Fund is subject or with the prior written consent of the Fund, either before or after the termination of this Agreement, disclose any such information to any person (other than a Director, officer, legal counsel, auditor or accountant of the Fund) not authorised by the Fund to receive the same.

### 9.2 Shareholder Information

The Administrator acknowledges that the Register of Shareholders of the Fund or any Shareholder list and all information related to the Shareholders provided to the Administrator by the Fund or a Shareholder in connection with this Agreement (collectively, "Shareholder Information") constitute proprietary information of substantial value to the Fund, and the Administrator agrees to treat all Shareholder Information as proprietary to the Fund and further agrees that it shall not divulge any Shareholder Information to any person or organization except as contemplated by this Agreement or as otherwise required by any applicable law, order or regulation to which the Administrator and/or the Fund is subject or with the prior written consent or instructions of the Fund and the Shareholder(s) concerned.

## 10. TERM AND TERMINATION

### 10.1 Termination

This Agreement shall continue in full force and effect unless and until terminated by either party giving to the other not less than 90 days' prior written notice (or such shorter notice as that other party may agree to accept) provided that this Agreement may be terminated forthwith by notice in writing by either party:

(a) if the other party commits any material breach of its obligations under this Agreement and fails to remedy such breach (if capable of remedy) within thirty days of receipt of notice from the non-defaulting party requiring it to do so; or

(b) if the other party goes into liquidation (except a voluntary liquidation for the purpose of reconstruction or amalgamation upon terms previously approved in writing by the other party) or if a receiver is appointed over any assets of the other party.

The provisions of Clauses 4, 6, 7 and 9 and the parties' respective obligations thereunder shall survive any termination of this Agreement. Termination of this Agreement does not affect the rights of the parties accrued prior to such termination.

### 10.2 Rights and Obligations on Termination

(a) On the termination of this Agreement under this Clause 10, the Administrator shall be entitled to receive all fees and other monies accrued due up to the date of such termination.

(b) In addition, the Fund must pay all reasonable costs and expenses of the Administrator performing its obligations under Clause 10.3. The amount payable by the Fund for the Administrator to perform the services and obligations provided for under Clause 10.3 is an amount equal to all expenses and liabilities reasonably incurred by the Administrator in performing those services and obligations and includes the costs of closing the Records.

The amounts payable under this paragraph (b) shall be payable within 7 Business Days or receipt of an invoice from the Administrator.

## 10.3  Records

Subject to receipt by the Administrator of all fees, expenses and other moneys accrued under Clause 10.2(a) in full, the Administrator shall deliver to the Fund or as it may direct all Records and shall take all necessary steps to vest in the Fund's custodian or in any new administrator any assets previously held in the name of or to the order of the Administrator on behalf of the Fund. The services provided by the Administrator on termination may include copying and moving or shipping Records and material to any successor service provider(s) to the Fund and providing any reasonable assistance to any such successor service provider(s).  Pending payment of any outstanding fees, expenses and other moneys due to the Administrator under this Agreement, the Administrator shall have a lien over, and shall be entitled to retain, all such books and records of the Fund as security for all such outstanding fees and other moneys due to the Administrator.

## 11.  **FORCE MAJEURE**

Notwithstanding any other provision contained in this Agreement, neither party shall be liable for any action taken, delay or any failure to take any action required to be taken hereunder or otherwise to fulfil its obligations hereunder (including without limitation the failure to receive or deliver securities or the failure to receive or make any payment) in the event and to the extent that the taking of such action, delay or such failure arises out of or is caused by or directly or indirectly due to war, act of terrorism, insurrection, riot, labour disputes, civil commotion, act of God, accident, fire, water damage, explosion, any law, decree, regulation or order of any government or governmental body (including any court or tribunal), or any other cause (whether similar or dissimilar to any of the foregoing) whatsoever beyond its reasonable control or the reasonable control of any delegate or securities system.  The non-performing party shall use all reasonable efforts to minimise the effect of any force majeure. In any such event, the non-performing party shall be excused from any further performance and observance of the obligations so affected only for so long as such circumstances prevail and such party continues to use commercially reasonable efforts to recommence performance or observance as soon as practicable.

## 12.  **GENERAL**

## 12.1  **Amendments and Waivers**

No provisions of this Agreement may be waived, amended or modified in any manner except by a written agreement properly authorized and executed by both parties hereto.

## 12.2  **Choice of Law/Submission to Jurisdiction**

This Agreement shall be governed by and construed in accordance with the laws of the British Virgin Islands and the parties hereby submit to the non-exclusive jurisdiction of the courts of the British Virgin Islands.

## 12.3  **Entire Agreement**

This Agreement constitutes the entire agreement between the parties hereto and supersedes any prior agreement with respect to the subject matter hereof whether oral or written.

## 12.4 Counterparts

This Agreement may be executed in any number of counterparts, all of which, taken together, shall constitute one and the same instrument and any party may enter into this Agreement by executing a counterpart.

## 12.5 Severability

If a provision of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, that shall not affect:

(a)     the validity or enforceability in that jurisdiction of any other provision of this Agreement; or

(b)     the validity or enforceability in other jurisdictions of that or any other provision of this Agreement.

## 12.6 Notices

(a)     All notices and other communications under or in connection with this Agreement shall be given in writing, by facsimile or by e-mail. Any such notice will be deemed to be given as follows:

   (i)     if in writing, when delivered by overnight courier service;

   (ii)    if by facsimile, on production of a transmission report by the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the number of the recipient; when received; and

   (iii)   if by e-mail, on production of an e-mail receipt from the recipient to the sender which indicates that the e-mail was sent to the e-mail address of the recipient and has been opened by the recipient.

However, a notice given in accordance with the above but received on a day which is not a Business Day or after business hours in the place of receipt will only be deemed to be given on the next Business Day in that place.

(b)     The address, facsimile number and e-mail address of each party for the service of notices are as follows:

If to the Administrator:

Citco Fund Services (Europe) B.V
Telestone 8- Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

Facsimile No. : +31 205 722 600

Attention         : Anuschka Cova
E-mail address: acova@citco.com


If to the Fund:

Citco Building
Wickhams Cay
P.O. Box 662
Road Town
Tortola
British Virgin Islands

Facsimile No. : +1 284 494 2217
Attention         : Kapil Dhar
E-mail address: kdhar@citco.com

with a copy to the Investment Manager

919 Third Avenue, 11th Floor
New York, New York 10022
U.S.A.

Facsimile No. : +1 212 319 0450
Attention         : Robert Blum
E-mail address: rob@fggus.com

## 12.7 Assignment

This Agreement shall be binding on and inure for the benefit of the parties and their respective successors and permitted assigns. Neither party may assign its rights under this Agreement without the prior written consent of the other.

## 12.8 Non-exclusivity

The nature of the duties of the Administrator under this Agreement shall not preclude the Administrator from providing similar services to any other person.

**IN WITNESS WHEREOF** the parties hereto have caused this Agreement to be executed the day and year first above written.

**FAIRFIELD SIGMA LIMITED**

By: _____

Name: _____

Title: *DIRECTOR*

**CITCO FUND SERVICES (EUROPE) B.V.**

By: _____

Name: *R. Wagener A. Wraff*

Title: *AUTHORISON SIGNATURES*

# SCHEDULE 1

## Principal Features of the Fund

# SCHEDULE 2

## The Services

### Part 1
### Financial and Accounting Services

(a)  Maintenance of the Fund's customary financial and accounting books and records including, but not limited to:

- processing of trade-related transactions and corporate actions;
- processing of non-trade related transactions (cash movements, etc.);
- monitoring and processing of capital subscriptions/redemptions;
- reconciliation of cash and other balances at brokers;
- reconciliation of bank accounts;
- calculation of income and expense accruals;
- calculation of management and incentive/performance fees with supporting schedules;
- independent reconciliation of the Fund's portfolio holdings;
- calculation of the Net Asset Value and the Net Asset Value per Share on a monthly basis in accordance with the Fund Documents.

(b)  Preparation of monthly financial statements, in conformity with the International Accounting Standards, such financial statements to include:

- Statement of Assets and Liabilities;
- Statement of Operations;
- Statement of Changes in Net Assets;
- Statement of Cash Flows (if desired); and
- Portfolio listings.

(c)  Preparation of books and records (including specific schedules and analysis) to facilitate external audit, and liaising with the Fund's auditors in their review and preparation of the annual financial statements.

(d)  Provision of accounting or accounting related reports and/or support schedules as agreed between the Administrator and the Investment Manager.

(e)  Disbursement of payments for third party fees and expenses incurred by the Fund.

### Part 2
### Administrative and Registrar and Transfer Agency Services

In accordance with the applicable provisions of the Fund Documents:

(a)  subject to Clause 3 of this Agreement, processing subscription, transfer, redemption and conversion (if applicable) documentation in compliance with applicable anti-money laundering regulations;

(b) processing p ayments in respect o f subscriptions and r edemptions of Shares and a ny d ividends declared by the Directors on the Shares;

(c) assisting in the establishment and maintenance of bank, custodial and brokerage and other accounts as may be necessary or advisable for the Fund;

(d) forthwith on receipt and subject to appropriate verification, paying to or depositing in accounts of the Fund all monies, bills, notes and securities received on behalf of the Fund;

(e) publishing the Net Asset Value per Share (of each class if appropriate) as requested by the Fund;

(f) reconciliation of information provided by the Fund's prime broker and custodian with information provided by the Investment Manager;

(g) disbursement of the management and incentive/performance fees, as the case may be, to the Investment Manager;

(h) establishment and maintenance of a register or registers of the holders of the Shares (the "Register");

(i) issuing and canceling share certificates (if provided for under the Fund Documents);

(j) dealing with and replying to all correspondence and other communications addressed to the Fund in relation to the subscription, redemption, transfer (and where relevant, conversion) of Shares;

(k) despatching to Shareholders notices, proxies and proxy statements prepared by or on behalf of the Fund in connection with the holding of meetings of Shareholders;

(l) despatching to Shareholders and anyone else entitled to receive the same in accordance with the Fund Documents and any applicable law copies of the audited annual financial statements; and

(m) supplying to the Directors and/or the Investment Manager, upon request, such information in connection with the Fund in its possession or which may reasonably be obtained or provided by it.


**Part 3**
**Corporate Services**

(a) Maintaining the register of Directors and Officers of the Fund.

(b) Filing any statutory returns by the Fund required under the laws of the jurisdiction of incorporation of the Fund, provided always that the requisite information to enable the Administrator to do so is available.

(c) When requested to do so by the Fund, convening, attending and conducting meetings of the Directors, and taking, drafting and circulating minutes thereof and providing copies of the same to the Fund's Investment Manager.

(d)     Providing a boardroom and other support facilities for Directors' and/or Shareholders' meetings (subject to the Administrator's office space limitations).

(e)     Maintaining the principal corporate and administrative records of the Fund, including the Fund's minute book, which shall include minutes of meetings of shareholders, and provide copies of the foregoing to the Fund's Investment Manager.

(f)     Conduct annual meetings of the Fund's shareholders every year and solicit shareholder proxies in connection therewith.


## Part 4
## Registered Office/Directors and Officers

(a)     Providing the registered office of the Fund.

(b)     Providing the services of individuals or corporations to serve as Directors and other Officers of the Fund as the Fund may request.

## Part 1
### Administration and Accounting Fees

The Fund shall pay to the Administrator for the performance of the Services specified in Parts 1, 2 and 3 of Schedule 2 a monthly administration fee (the "Administration Fee") based on the month-end net assets of the Fund at the relevant basis points per annum rate as follows:

| Month-end net assets | Basis Points per annum |
|---|---|
| On assets up to US$50,000,000 | 6bp |
| On assets in excess of US$50,000,000 | 3bp |

For the purposes of this Agreement, "month-end net assets" of the Fund shall mean its total assets less total liabilities, including unrealized profits and losses on open positions, accrued income and expenses (before any accrual for management or incentive/performance fees/allocations), as calculated and determined in accordance with United States Generally Accepted Accounting Principles consistently applied, as more fully set out and described in the Fund Documents.

The Administration Fee:

(a)     shall be calculated and payable monthly in arrears and shall be taken as a percentage of the Fund's month-end net assets as of the close of business on the last Business Day of each month, or if applicable, shall be the minimum monthly fee specified above;

(b)     shall be paid by the Fund in US Dollars within 10 Business Days of receipt by the Fund of the Administrator's invoice in respect thereof;

(c)     shall begin to accrue on the later of the date of this Agreement and the date of commencement of operations by the Fund; and

(d)     shall, if the Administration Fee begins to accrue during a month or if this Agreement terminates before the end of a month, be pro rated for the relevant period.

## Part 2

### Other Fees

**Registered Office/Director's and other Officer's fees**

The Fund shall pay the following fees in respect of the provision of the registered office of the Fund and the provision of Citco Officers as Directors and/or other officers of the Fund:

(a)     If the Administrator provides the services of any Citco Officer as a Director of the Fund, the Fund shall pay to the Administrator directors' fees in respect of each such Citco Officer at the rate of US$2,500 per annum. Any such directors' fees shall be payable annually in advance in respect of each calendar year within 10 Business Days of receipt by the Fund of the Administrator's invoice

in respect thereof. Any such directors' fees shall accrue on a day to day basis, and if any Citco Officer serves as a Director of the Fund for any part of a calendar year, the director's fees shall be pro rated accordingly.

(b)     The Fund shall pay the Administrator fees at the rate of US$1,000 per annum in respect of the provision of the Fund's registered office. Such fees shall be payable annually in advance in respect of each calendar year within 10 Business Days of receipt by the Fund of the Administrator's invoice in respect thereof.

(c)     The Fund shall pay the Administrator fees at the rate of US$750 per annum in respect of the provision of the Fund's corporate secretary. Such fees shall be payable annually in advance in respect of each calendar year within 10 Business Days of receipt by the Fund of the Administrator's invoice in respect thereof.

**Anti-Money Laundering Policies and Procedures**

1. **Definitions**

For the purposes of this Schedule 4, unless the context otherwise requires, the following words shall have the following meanings:

| | |
|---|---|
| **Administrator's AML Policies** | means anti-money laundering policies and procedures adopted by the Administrator that c omply with the requirements of the anti-money l aundering l aws a nd r egulations i n t he Netherlands o r the British Virgin Islands applicable to the Administrator in the provision of the Services to the Fund under this Agreement; |
| **Central Query Database** | means the database of persons maintained by the Administrator which combines the lists published by the American Banker, Bahamas Financial Intelligence Unit, Central Bank of Ireland, Control List Law Enforcement, European Commission regulation 1996/2001, European Commission regulation 2199/2001, FBI Most Wanted L ist, M onaco Government, Bank o f England, which l ists may be amended or supplemented from time to time as to be agreed between the Administrator and Investment Manager. |

**High Risk Investor** means:

(a) a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation, including any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure;

(b) an immediate family member of a s enior foreign political figure which typically includes the political figure's parents, siblings, spouse, children and in-laws;

(c) a close associate of a senior foreign political figure being a person who is widely and publicly known internationally to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure; or

(d) a person or entity resident in or whose subscription monies originate from a Non-Cooperative Jurisdiction;

23

| | |
|---|---|
| **Non-Cooperative Jurisdiction** | means any country which has been designated as non-cooperative with international anti-money laundering principles or procedures by the Financial Action Task Force on Money Laundering; |
| **Patriot Act** | means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 of the United States, which includes the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001 of the United States; |
| **Physical Presence** | means in relation to a bank, a place of business that is maintained by a bank and is located at a fixed address, other than solely a post office box or an electronic address, in a country in which the bank is authorized to conduct banking activities, at which location the bank: (1) employs one or more individuals on a full-time basis; (2) maintains operating records related to its banking activities; and (3) is subject to inspection by the banking authority that licensed the bank to conduct banking activities. |
| **Shell Bank** | means an organization that (i) is organized under the laws of a non-United States country (ii) engages in the business of banking, (iii) is recognized as a bank by the bank supervisory or monetary authority of the country of its organization or principal banking operations, (iv) receives deposits to a substantial extent in the regular course of its business, and (v) has the power to accept demand deposits, but does not include the United States branches or agencies of a non-United States bank and which does not have a Physical Presence in any country; and |
| **Statement of AML Policies** | means the Administrator's Statement of KYC Policies & Procedures set out in the Appendix to this Schedule 4 to this Agreement, as the same may be modified or amended from time to time, and which shall be part of this Agreement. |
| **Qualified Financial Institution** | means a financial institution which is: |

(a)  established in a European Union member state and subject to the European Commission Money Laundering Directives, or

(b)  established in one of the countries which make up the Financial Action Task Force ("FATF") and/or is subject to regulation which complies with the 40 recommendations by the FATF, such countries being the 15 European Union countries, being Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, Sweden and the United

Kingdom, together with Australia, Canada, Channel Islands, Hong Kong, Iceland, Isle of Man, Japan, New Zealand, Norway, Singapore, Switzerland and the United States and Turkey;

**OFAC**            means the U.S. Department of Treasury's Office of Foreign Assets Control; and

**OFAC Lists**        means (i) the List of Specially Designated Terrorists, (ii) the List of Specially Designated Nationals and Blocked Persons, and (iii) the List of Specially Designated Narcotics Traffickers, maintained by OFAC.

## 2.   Anti-Money Laundering Policies and Procedures

(a)    The Administrator represents and warrants to the Fund that the Administrator's AML Policies comply with the requirements of the anti-money laundering laws and regulations in the Netherlands and British Virgin Islands applicable to the Administrator in the provision of the Services to the Fund under this Agreement and that it will observe and comply with the Administrator's AML Policies in the performance of its duties and obligations to the Fund under this Agreement.

(b)    A document describing the Administrator's AML Policies applicable as at the date of this Agreement is attached as the Appendix to this Agreement (and which shall be part of this Agreement) and the Administrator agrees to provide the Fund and the Investment Manager with any material amendments thereto promptly following any such amendments. The Administrator further agrees to provide such information and make such further representations and assurances as the Fund shall reasonably request for the purposes of assessing the Administrator's AML Policies and its compliance therewith, and further agrees that any such representations and assurances shall form part of, and be governed by, the provisions of this Agreement.

(c)    Subject as provided in paragraph (d) below and in accordance with the Administrator's AML Policies, the Administrator will verify the identities of, and conduct due diligence with regard to, all prospective investors in the Fund. Where applicable, the Administrator will hold evidence of the identities of each investor in accordance with the Administrator's AML Policies and maintain such evidence for at least seven years following an investor's final redemption of all Shares in the Fund.

(d)    The Administrator and the Fund agree that, absent any suspicious circumstances and in accordance with the Administrator's AML Policies, the Administrator may rely upon the due diligence procedures performed with respect to prospective investors whose subscription monies are transmitted by a Qualified Financial Institution, or where the investor is acting as an intermediary and that investor intermediary is itself a Qualified Financial Institution, and in either of such circumstances the Administrator shall not be required to verify the identities of, and conduct due diligence with regard to, such prospective investor.

(e)    The Administrator will take all reasonable and practicable steps to ensure that the Fund does not accept or maintain subscription funds from:

    (i)    a Shell Bank; or

    (ii)    a person or entity whose name appears on an OFAC List or the Central Query Database

(f)    The Administrator shall, and shall be entitled to, rely on the accuracy of any representations and warranties given by a prospective investor in the Subscription Documents completed by that prospective investor as to whether or not that prospective investor is a High Risk Investor. Prior to processing or accepting any subscription application from a High Risk Investor, the Administrator shall perform additional or enhanced due diligence on the background of any such High Risk Investor and the source of funds of such High Risk Investor and after disclosing the results of such enhanced due diligence to the Investment Manager, the Administrator shall consult with and obtain instructions from the Investment Manager whether or not to accept the subscription. The Administrator will monitor any such High Risk Investor which is invested in the Fund and notify the Investment Manager of any unusually high volume of subscription or redemption requests by such High Risk Investor.