NO._____

GREENWICH SENTRY, L.P.
c/o GlobeOp Financial Services, LLC
One South Road
Harrison, New York 10528
Telephone: (646) 827-1950

## CONFIDENTIAL OFFERING MEMORANDUM

GREENWICH SENTRY, L.P., is a private investment limited partnership which seeks to obtain capital appreciation of its assets through the utilization of a nontraditional options trading strategy described as "split strike conversion."  This Confidential Offering Memorandum (the "Memorandum") relates to the offering of limited partnership interests (the "Interests").  Prospective Limited Partners should carefully read and retain this Memorandum.

**THE INTERESTS OF GREENWICH SENTRY, L.P. ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK.  THESE SECURITIES HAVE NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER STATE OR FEDERAL GOVERNMENTAL AGENCY OR ANY NATIONAL SECURITIES EXCHANGE, NOR HAS ANY SUCH AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM OR THE MERITS OF AN INVESTMENT IN THE INTEREST OFFERED HEREBY.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS.  THE SECURITIES ARE SUBJECT TO RESTRICTION ON TRANSFER AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER APPLICABLE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  INVESTORS MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

Dated:  May 2006

Dockets.Justia.com

## SECURITIES RISK DISCLOSURE

PROSPECTIVE INVESTORS SHOULD NOTE THAT THE INVESTMENT STRATEGY EMPLOYED ON BEHALF OF THE PARTNERSHIP INVOLVES SIGNIFICANT RISKS AS DESCRIBED UNDER "RISK FACTORS" IN THIS MEMORANDUM.

THE LIMITED PARTNERSHIP INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), SINCE THEY WILL BE OFFERED ONLY TO A LIMITED NUMBER OF QUALIFIED INVESTORS.  IT IS ANTICIPATED THAT THE OFFERING AND SALE OF SUCH INTERESTS WILL BE EXEMPT FROM REGISTRATION PURSUANT TO REGULATION D OF THE ACT.

THESE INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THESE OFFERING MATERIALS.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THESE OFFERING MATERIALS.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH AN OFFER OR SOLICITATION IS NOT AUTHORIZED.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN OR THE TAX CONSEQUENCES FROM AN INVESTMENT IN THE PARTNERSHIP.  NO ASSURANCE CAN BE GIVEN THAT EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED

ADVERSELY TO THE PARTNERSHIP OR THE PARTNERS. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL AND ACCOUNTANT FOR ADVICE CONCERNING THE VARIOUS LEGAL, TAX AND ECONOMIC CONSIDERATIONS RELATING TO HIS OR HER INVESTMENT.

NO PERSON OTHER THAN THE GENERAL PARTNER HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THESE LIMITED PARTNERSHIP INTERESTS, EXCEPT THE INFORMATION CONTAINED HEREIN, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR OTHERWISE SUPPLIED BY THE GENERAL PARTNER IN WRITING MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PARTNERSHIP OR ANY OF ITS PARTNERS. ANY FURTHER DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS PROHIBITED.

A PROSPECTIVE INVESTOR SHOULD NOT SUBSCRIBE FOR LIMITED PARTNERSHIP INTERESTS UNLESS SATISFIED THAT THE PROSPECTIVE INVESTOR ALONE OR TOGETHER WITH HIS OR HER INVESTMENT REPRESENTATIVE HAVE ASKED FOR AND RECEIVED ALL INFORMATION WHICH WOULD ENABLE THE INVESTOR OR BOTH OF THEM TO EVALUATE THE MERITS AND RISKS OF THE PROPOSED INVESTMENT.

THE PARTNERSHIP WILL MAKE AVAILABLE TO EACH INVESTOR OR HIS OR HER AGENT, DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY INTERESTS, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM REPRESENTATIVES OF THE GENERAL PARTNER CONCERNING ANY ASPECT OF THE PARTNERSHIP AND ITS PROPOSED BUSINESS AND TO OBTAIN ANY ADDITIONAL RELATED INFORMATION TO THE EXTENT THE PARTNERSHIP POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

WHENEVER THE MASCULINE OR FEMININE GENDER IS USED IN THIS MEMORANDUM, IT SHALL EQUALLY, WHERE THE CONTEXT PERMITS, INCLUDE THE OTHER, AS WELL AS INCLUDE ENTITIES.

SPECIAL NOTICE TO FLORIDA INVESTORS:

THE FOLLOWING NOTICE IS PROVIDED TO SATISFY THE NOTIFICATION REQUIREMENT SET FORTH IN SUBSECTION 11(A)(5) OF SECTION 517.061 OF THE FLORIDA STATUTES, 1987, AS AMENDED:

UPON THE ACCEPTANCE OF FIVE (5) OR MORE FLORIDA INVESTORS, AND IF THE FLORIDA INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940, A PENSION OR PROFIT-SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT OF 1933), THE FLORIDA INVESTOR ACKNOWLEDGES THAT ANY SALE OF AN INTEREST TO THE FLORIDA INVESTOR IS VOIDABLE BY THE FLORIDA INVESTOR EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE FLORIDA INVESTOR TO THE ISSUER, OR AN AGENT OF THE ISSUER, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE FLORIDA INVESTOR, WHICHEVER OCCURS LATER.

CONFIDENTIAL OFFERING MEMORANDUM
GREENWICH SENTRY, L.P.
c/o GlobeOp Financial Services, LLC
One South Road
Harrison, New York 10528
Telephone: (646) 827-1950
Fax: (914) 729-9500

Greenwich Sentry, L.P. (the "Partnership") is organized as a Delaware limited partnership and operates as a private investment partnership. The Partnership's investment objective seeks to obtain capital appreciation of its assets through the utilization of a nontraditional options trading strategy described as "split strike conversion."

The Partnership commenced operations on January 1, 1993.

The minimum initial capital contribution of a Limited Partner is $1,000,000 (subject to the discretion of the General Partner to accept lesser amounts). There will be no sales charges upon subscriptions for the Interests.

Interests will be offered on a continuous basis. Interests will generally be sold only to qualified investors who are "accredited investors" under Rule 501 of Regulation D of the Securities Act of 1933, as amended, and "qualified purchasers" within the meaning of Section 2(a)(51) of the Investment Company Act of 1940, as amended. Additional capital contributions shall generally be accepted as of the first business day of each calendar month. The maximum amount of capital contributions which may be accepted by the Partnership is $500,000,000.

A Limited Partner, upon 15 days' prior written notice to the General Partner and the Administrator, may, at the end of any calendar month, withdraw all or any portion of its capital account. (See "OUTLINE OF PARTNERSHIP AGREEMENT - Limited Partner Withdrawals of Capital".)

There will be no withdrawal charges. The General Partner may, in its sole discretion, require any Partner to terminate its entire interest in the Partnership. (See "OUTLINE OF PARTNERSHIP AGREEMENT - Required Withdrawals".)

Prospective Limited Partners should carefully read this Confidential Offering Memorandum (the "Memorandum"). However, the contents of this Memorandum should not be considered to be legal or tax advice and each prospective Limited Partner should consult with its own counsel and advisers as to all matters concerning an investment in the Partnership.

There will be no public offering of the Interests. No offer to sell (or solicitation of an offer to buy) is being made in any jurisdiction in which such offer or solicitation would be unlawful.

This Memorandum has been prepared solely for the information of the person to whom it has been delivered by or on behalf of the Partnership, and should not be reproduced or used for any other purpose.

The Partnership is not presently, and does not intend in the future to become, registered as an investment company under the Company Act. (See "PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940".) Effective April 20, 2006, the General Partner registered as an investment adviser under the Investment Advisers Act of 1940, as amended. (See "GENERAL PARTNER".)

**Greenwich Sentry, L.P.**
**Table of Contents**

**Page**

SUMMARY ..........................................................................................................................1
USE OF PROCEEDS ...........................................................................................................7
INVESTMENT PROGRAM ..................................................................................................7
GENERAL PARTNER............................................................................................................8
ADMINISTRATOR ..............................................................................................................10
BROKERAGE .......................................................................................................................11
ALLOCATION OF GAINS AND LOSSES ........................................................................12
CERTAIN RISK FACTORS ................................................................................................13
MANAGEMENT FEE AND EXPENSES ...........................................................................17
POTENTIAL CONFLICTS OF INTEREST........................................................................19
PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF
INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT
COMPANY ACT OF 1940 ..................................................................................................20
TAX ASPECTS ....................................................................................................................22
OUTLINE OF PARTNERSHIP AGREEMENT...................................................................32
LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS...................36
PURCHASES BY EMPLOYEE-BENEFIT PLANS - ERISA CONSIDERATIONS.................37
ANTI-MONEY LAUNDERING REGULATIONS....................................................................37
PROXY VOTING POLICY ..................................................................................................38
COUNSEL.............................................................................................................................39
ADDITIONAL INFORMATION..........................................................................................39
SUBSCRIPTION FOR INTERESTS ...................................................................................39

EXHIBIT 1 – FORM OF LIMITED PARTNERSHIP AGREEMENT
EXHIBIT 2 – SUBSCRIPTION DOCUMENTS

# SUMMARY

The following summary is qualified in its entirety by the more detailed information set forth herein and by the items and conditions of the Amended and Restated Limited Partnership Agreement (the "Partnership Agreement"), each of which should be read carefully by prospective investors.

THE PARTNERSHIP — Greenwich Sentry, L.P. (the "Partnership") is a Delaware limited partnership which was organized on December 27, 1990 under the name Aspen/Greenwich Limited Partnership. Its name was changed to Greenwich Sentry, L.P. on December 4, 1992. Its office is located c/o GlobeOp Financial Services, LLC, One South Road, Harrison, New York 10528; telephone: (646) 827-1950; fax: (914) 729-9500.

INVESTMENT OBJECTIVE — The Partnership seeks to obtain capital appreciation of its assets through the utilization of a nontraditional options trading strategy described as "split strike conversion." (See "INVESTMENT PROGRAM").

The Partnership commenced operations in January 1993.

GENERAL PARTNER — Effective March 1, 2006, Fairfield Greenwich (Bermuda) Ltd., a corporation organized under the laws of Bermuda on June 13, 2003 became the general partner of the Partnership (the "General Partner"). The General Partner is responsible for directing the Partnership's investment and trading activities. It is the wholly-owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands ("FGL"), which served as the general partner of the Partnership from July 2003 to February 2006. Walter M. Noel, Jr., Jeffrey H. Tucker and Andres Piedrahita are the main principals of FGL. Messrs. Noel and Tucker served as the Partnership's general partners

from its inception in 1990 until January 1998.

ADMINISTRATOR

GlobeOp Financial Services, LLC, a Delaware limited liability company, serves as the Partnership's administrator and will perform certain administrative and accounting services for the Partnership.

BROKER-DEALER; CUSTODIAN

The Partnership's brokerage account is maintained at Bernard L. Madoff Investment Securities LLC, which also serves as the custodian of the Partnership's assets.

TERM

Through December 31, 2112. However, the General Partner may terminate the Partnership at any time and for any reason.

INITIAL CAPITAL CONTRIBUTIONS

$1,000,000 minimum, subject to the discretion of the General Partner to accept lesser amounts.

SALES COMMISSIONS

There will be no sales commissions charged or paid on sales of limited partnership interests (the "Interests") to the Limited Partners.

ADMISSION OF NEW PARTNERS

The Partnership will offer the Interests on a continuous basis.

ADDITIONAL CAPITAL CONTRIBUTIONS

Subscriptions or additional capital contributions by Partners received at least three (3) business days before the end of any month will ordinarily be accepted as of the opening of business of the first day of the following month, i.e., subscriptions or additional capital contributions received between December 29 and January 28 will be accepted as of February 1. The General Partner may, in its discretion, accept any subscription or additional capital contribution prior to such first day of the month. Additional capital contributions may be made in increments of $25,000. The

maximum amount of capital contributions which may be accepted by the Partnership is $500,000,000.

**FISCAL YEAR**

December 31 of each year.

**WITHDRAWALS**

At the end of each calendar month, a Limited Partner may withdraw all or any portion of its capital account upon 15 days' prior written notice to the General Partner and the Administrator. The General Partner may withdraw all or any portion of its capital account at the end of any calendar month upon 15 days' prior written notice to the Partnership and the Administrator. (See "OUTLINE OF PARTNERSHIP AGREEMENT - Limited Partner Withdrawals of Capital".) The General Partner has the right to require any Limited Partner to withdraw from the Partnership at any time and for any reason.

**MANAGEMENT FEE**

The General Partner generally receives a monthly management fee calculated at the annual rate of approximately 1% (0.0833% per month) of each Limited Partner's capital account (the "Management Fee"). The Management Fee is paid in arrears, based on the value of each Limited Partner's capital account, as of the end of each month. The General Partner, in its sole discretion, may waive or modify the Management Fee for Limited Partners that are members, employees or affiliates of the General Partner, relatives of such persons, and for certain large or strategic investors.

**ALLOCATION OF GAINS AND LOSSES**

At the end of each fiscal quarter, 20% of the Partnership's realized and unrealized net capital appreciation allocable to the capital accounts of the Limited Partners will be allocated to the General Partner as provided by the Partnership Agreement (the "Incentive Allocation"). The remaining 80% of the Partnership's realized and unrealized

3

net capital appreciation and 100% of the Partnership's realized and unrealized net capital depreciation will be allocated to all of the Partners (including the General Partner and/or its principals) in proportion to their respective capital accounts. If there is no net capital appreciation in a given fiscal quarter, there will be no Incentive Allocation made to the General Partner. If the Partnership sustains net capital depreciation in any fiscal quarter, no Incentive Allocation will be made until the loss is recouped. If a Limited Partner makes capital contributions or withdraws capital during a fiscal quarter, the above allocations shall be adjusted to take into account such interim quarter event.

Allocations for income tax purposes generally will be made among the Partners so as to reflect equitably amounts credited or debited to each Partner's capital account for the current and prior fiscal years. (See "TAX ASPECTS".)

## OPERATING EXPENSES

The General Partner shall bear all continuing offering costs and all expenses in maintaining the Partnership's offices and administration fees. The Partnership shall bear all other expenses incurred in the operation of the Partnership, if any, including, the Management Fee, taxes, the ordinary and necessary expenses directly related to the Partnership's investment and trading activities, including transactional costs (e.g., brokerage commissions and interest expense), escrow and custodial fees, registrar, transfer agent and administration fees, all legal, accounting and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Partnership; but excluding any legal fees incurred in the continuation of the offering of interests in the Partnership. (See

4

"EXPENSES"). The Partnership may pay Fairfield Greenwich Advisors LLC ("FGA"), an affiliate of the General Partner, an amount equal to one-fortieth of one percent (0.025%) of the value of the Limited Partners' capital accounts as of the first day of each fiscal quarter for providing certain administrative services and back-office support to the Partnership (the "Expense Reimbursement"). To the extent a Limited Partner is charged the Management Fee, such Limited Partner will not be charged his pro-rata share of the Expense Reimbursement.

RISK FACTORS

The specialized investment program of the Partnership involves significant risks. In addition, the Partnership Agreement contains limitations on withdrawals. (See "CERTAIN RISK FACTORS".)

CONFLICTS OF INTEREST

The General Partner and its principals are the principals of other investment funds with similar investment objectives and policies as the Partnership. Certain inherent conflicts of interest will arise from the fact that the General Partner and its principals will carry on substantial investment activities through other investment funds of which they are principals and/or their own accounts in which the Partnership has no interest. The directors of the General Partner will not devote their full time to the activities of the Partnership. See "CERTAIN RISK FACTORS" and "POTENTIAL CONFLICTS OF INTEREST".

REGULATORY MATTERS

The Partnership is not presently, and does not intend in the future to become, registered as an investment company under the Investment Company Act of 1940 ( the "Company Act"), as amended and, therefore, will not be required to adhere to certain investment policies under the Company Act. (see "PARTNERSHIP

POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940".) Effective April 20, 2006, the General Partner registered as an investment adviser under the Investment Advisers Act of 1940, as amended. (See "GENERAL PARTNER".)

## SUITABILITY

Interests will generally be sold only to qualified investors who are "accredited investors" under Rule 501 of Regulation D of the Securities Act of 1933, as amended, and "qualified purchasers" within the meaning of Section 2(a)(51) of the Company Act. (See "LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS".)

## LIMITED PARTNER REPORTS

The Partnership's certified public accountants will prepare, and the Partnership will mail to each Partner, following the end of each fiscal year, an audited financial report setting forth a balance sheet of the Partnership, a profit and loss statement showing the results of operations of the Partnership and its net capital appreciation or net capital depreciation, a statement of such Partner's closing capital account and the manner of its calculation and the Partner's opening capital account and partnership percentage for the then current fiscal year. At the end of each fiscal year, each Partner will be furnished with the required tax information for preparation of their respective tax returns. Within 30 days following the end of each month, each Limited Partner shall receive unaudited financial information setting forth, inter alia, a statement of its net capital appreciation of net capital depreciation.

## USE OF PROCEEDS

The entire net proceeds from the sale of the limited partnership interests (the "Interests") will be available to the Partnership. The General Partner does not intend to pay any commissions or fees to broker-dealers in connection with the offering. However, in the event any fees or commissions are paid, they will be paid by the General Partner rather than the Partnership.

The Partnership will not make any loans to affiliated entities nor will it invest in any foreign government securities.

## INVESTMENT PROGRAM

The Partnership seeks to obtain capital appreciation of its assets through the utilization of a nontraditional options trading strategy described as "split strike conversion." Set forth below is a description of the "split strike conversion" strategies.

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index. The basket typically consists of between 35 to 50 stocks in the S&P 100 Index.

The primary purpose of the long put options is to limit the market risk of the stock basket at the strike price of the long puts. The primary purpose of the short call options is to largely finance the cost of the put hedge and to increase the stand-still rate of return.

This position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) defines a range of potential market gain or loss, depending on how tightly the options collar is struck.

The degree of bullishness of the strategy can be expressed at implementation by the selection of the strike prices in the S&P 100 Index put and call options. The farther away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy.

The Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ("BLM"), a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Partnership at that firm. The accounts are

7

subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market capitalization of the equities in the basket, the minimum correlation of the basket against the S&P 100 Index, and the permissible range of option strike prices. Subject to the guidelines, BLM is authorized to determine the price and timing of stock and option transactions in the account. The services of BLM and its personnel are essential to the continued operation of the Partnership, and its profitability, if any.

The options transactions executed for the benefit of the Partnership may be effected in the over-the-counter market or on a registered options exchange.

In the sole and exclusive discretion of the General Partner, the Partnership may at times invest in money market mutual funds and short term bond funds when it is not otherwise fully invested.

THERE CAN BE NO ASSURANCE THAT THE INVESTMENT OBJECTIVES OF THE PARTNERSHIP WILL BE ACHIEVED. THE PARTNERSHIP'S INVESTMENT PROGRAM IS SPECULATIVE AND ENTAILS SUBSTANTIAL RISKS. MARKET RISKS ARE INHERENT IN ALL SECURITIES TO VARYING DEGREES. NO ASSURANCE CAN BE GIVEN THAT THE PARTNERSHIP'S INVESTMENT OBJECTIVE WILL BE REALIZED. (SEE "CERTAIN RISK FACTORS".)

## GENERAL PARTNER

The General Partner

Effective March 1, 2006, Fairfield Greenwich (Bermuda) Ltd., a corporation organized under the laws of Bermuda on June 13, 2003 became the general partner of the Partnership (the "General Partner"). The General Partner is responsible for directing the Partnership's investment and trading activities. The General Partner maintains offices at 37 Reid Street, 1st Floor, Hamilton, Bermuda HM12; telephone number; 441-292-5401; fax: 441-292-5413. It is the wholly-owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands, which also previously served as the Partnership's general partner. Its main principals are Walter M. Noel, Jr., Jeffrey H. Tucker and Andres Piedrahita. Effective April 20, 2006, the General Partner registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

The Fairfield Greenwich Group ("FGG"), of which the General Partner is an affiliate, was established in 1983 and has, as of April 1, 2006, more than $9 billion employed in alternative asset management funds. Throughout its history, FGG has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a managerial and distribution partner.

The General Partner and its affiliates currently serve as investment or administrative manager to more than twenty funds, and have exclusive distribution arrangements with several others. FGG maintains its principal office in New York, with a significant presence in London

and Bermuda. Marketing and client support offices are located elsewhere in the United States, Europe, and Latin America. FGG's London entity is licensed and subject to the supervision of the United Kingdom Financial Services Authority, and another FGG-affiliated entity is registered as a broker-dealer in the United States.

Following is biographical information on the founders, principal officers and certain other key employees of FGG:

**Walter M. Noel, Jr.** co-founded FGG in 1983. Mr. Noel has over 30 years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its offshore private banking business. Since founding FGG, Mr. Noel has been a director or general partner for a variety of its funds. Mr. Noel graduated from Vanderbilt University in 1952, received a Master of Arts in Economics from Harvard University in 1953, and graduated from Harvard Law School in 1959.

**Andres Piedrahita** founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs the Group's European and Latin American activities. Mr. Piedrahita has over 15 years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc., in New York (1981-1987). He received his Bachelor of Arts degree from Boston University's School of Communications.

**Jeffrey Tucker** has over 30 years of experience in investment related businesses. Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the Securities and Exchange Commission's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner at the law firm Tucker, Globermand & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & co. ("Kolber"), a broker dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's affiliated private investment funds. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout Mr. FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds. Mr. Tucker is the President of Heathcliff Capital Corp., a registered broker-dealer and an affiliate of the General Partner, which will serve as a non-exclusive placement

agent in the offering of the Partnership's Interests. Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.

The backgrounds of the Directors and key officers of the General Partner are set forth below:

**Andres Piedrahita** is a Director and the President of the General Partner. His background is set forth above under "GENERAL PARTNER".

**Brian Francoeur** is a Director of the General Partner. Mr. Francoeur is the Managing Director of Citco Fund Services (Bermuda) Limited ("Citco Bermuda"), having joined Citco Bermuda in 2001. From 1999 to 2001, Mr. Francoeur was the Chief Financial Officer of CCS Group Limited, a computer cabling and network company based in Hamilton, Bermuda, and, from 1997 to 1999, a Senior Portfolio Manager with Olympia Capital (Bermuda) Limited, a fund administration company in Bermuda. Mr. Francoeur qualified as a chartered accountant in 1994 and was employed by Ernst & Young in Bermuda from 1995 to 1997.

**Amit Vijayvergiya** is Managing Director of the General Partner and focuses on manager selection and risk management for the Partnership. He has been employed by the General Partner since 2003. Mr. Vijayvergiya has over 12 years of experience in asset management, risk management and operations research. Prior to joining the General Partner, from 2000 to 2003, Mr. Vijayvergiya managed MAV Hedge Advisors, a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

## ADMINISTRATOR

GlobeOp Financial Services (the "Administrator") serves as the administrator of the Partnership pursuant to an administration agreement (the "Administration Agreement"). The Administrator's principal office is located at One South Road, Harrison, New York 10528; telephone number: (646) 827-1950; fax: (914) 729-9500.

The Administrator is responsible for performing certain day-to-day administrative services for the Partnership. The Administrator will prepare and distribute monthly reports that will contain the amount of the Partnership's net assets, the amount of any distributions from the Partnership and Incentive Allocation (as defined below), accounting and legal fees and all other fees and expenses of the Partnership.

Pursuant to the Administration Agreement, the Partnership pays fees to the Administrator and reimburses the Administrator for certain out-of-pocket expenses incurred by the Administrator on behalf of the Partnership. The Partnership believes that that the Administrator's expenses are competitive with those of other third-party service providers that provide services of the type and quality provided to the Partnership by the Administrator.

The Administration Agreement provides that neither the Administrator nor any of its officers, directors, members, shareholders, employees, affiliates or agents, or any of their successors and assigns (each of the foregoing an "Administrator Party") shall be liable to the Partnership or any of its Partners for any action taken or omitted by any of them in connection with the Administration Agreement or the business and affairs of the Partnership, unless such act or omission is found by a final determination of an arbitrator, mediator or court of competent jurisdiction, as the case may be, to have resulted solely from such Administrator Party's fraud, negligence or willful misconduct in connection with the performance of its duties and obligations under the Administration Agreement.

The Administration Agreement also provides that the Partnership shall indemnify and hold harmless all Administrator Parties from and against all losses, claims, judgments, liabilities, costs, expenses (including, without limitation, attorneys' fees) and amounts paid in settlement (provided that such settlement is approved in writing by the General Partner, which approval shall not be unreasonably withheld or delayed) of any claims arising out of, or in connection with, any action taken or omitted by any Administrator Party in connection with the Administration Agreement or the business, actions and affairs of the General Partner and/or the Partnership and/or arising out of, or in connection with any delay or failure by the General Partner and/or the Partnership to perform its obligations under the Administration Agreement on a timely basis, unless such act or omission is found by a final determination of an arbitrator, mediator or court of competent jurisdiction, as the case may be, to have resulted solely form an Administrator party's fraud, gross negligence or willful misconduct in connection with the performance of its duties and obligations under the Administration Agreement.

In addition to the Administrator, Fairfield Greenwich Advisors LLC, an affiliate of the General Partner, provides the Partnership with certain administrative services and back-office support.

BROKERAGE

It is expected that the General Partner will generally allocate brokerage business on the basis of best available execution and in consideration of such brokers' provision of brokerage and research services.

In selecting brokers or dealers to execute transactions, the General Partner typically will not solicit competitive bids and will not have an obligation to seek the lowest available commission cost. It generally will not be the practice of the General Partner to negotiate "execution only" commission rates, and thus the Partnership may be deemed to be paying for research and other services provided by the broker which are included in the commission rate.

11

Research furnished by brokers may include, but is not limited to, written information and analyses concerning specific securities, companies or sectors; market, financial and economic studies and forecasts; financial publications; statistic and pricing services, as well as discussions with research personnel, along with hardware, software, data bases and other technical and telecommunication services and equipment utilized in the investment management process. Research services obtained by the use of commissions arising from such transactions may be used by the General Partner in its other investment activities.

The General Partner may also be paying for services other than research that are included in the commission rate. These other services may include, without limitation, office space, facilities and equipment; administrative and accounting support; supplies and stationery; telephone lines, usage and equipment and other items which might otherwise be treated as an expense of the General Partner. To the extent the General Partner utilizes commissions to obtain items which would otherwise be an expense of the General Partner, such use of commissions in effect constitutes additional compensation to the General Partner. Certain of the foregoing commission arrangements are outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended which permits the use of commissions or "soft dollars" to obtain "research and execution" services. Finally, since commission rates are generally negotiable, selecting brokers on the basis of considerations which are not limited to applicable commission rates may result in higher transaction costs than would otherwise be obtainable.

## ALLOCATION OF GAINS AND LOSSES

"Net Capital Appreciation" means the increase in the value of the Partnership's net assets from the beginning of each fiscal quarter to the end of such fiscal quarter. "Net Capital Depreciation" means the decrease in the value of the Partnership's net assets from the beginning of each fiscal quarter to the end of such fiscal quarter.

At the end of each fiscal quarter of the Partnership, any Net Capital Appreciation earned by the Partnership's will be tentatively allocated to all Partners (including the General Partner) in proportion to each Partner's opening capital account (the "Capital Account") for such quarter. Thereafter, 20% of any Net Capital Appreciation from the Partnership's activities tentatively allocated to the Capital Accounts of the Limited Partners for such quarterly period will be reallocated to the Capital Account of the General Partner (the "Incentive Allocation".)[1] If there is no net capital appreciation in a given fiscal quarter, there will be no Incentive Allocation made to the General Partner. If the Partnership sustains net capital depreciation in any fiscal quarter, no Incentive Allocation will be made until the loss is recouped. In the event a Limited Partner

---

[1] The Partnership's allocations to its General Partner may result in substantially higher payments than alternative compensatory arrangements with other managers. As the Securities and Exchange Commission (the "SEC") noted in its Institutional Investor Study Report (1971), "... In most instances the compensation arrangements provided by unregistered hedge funds are far more favorable to the investment manager per dollar of assets managed than the compensation provided for similar services by registered investment companies or other classes of accounts."

makes a capital contribution to or withdraws capital from the Partnership during a fiscal quarter, the above allocations shall be adjusted to take into account such interim quarterly event.

For purposes of determining the Incentive Allocation allocable to the General Partner for each quarterly period, the Net Capital Appreciation from the Partnership's activities allocable to such Limited Partner will be deemed reduced by the unrecovered balance, if any, in its loss recovery account (the "Loss Recovery Account"). The Loss Recovery Account is a memorandum account, established for each Limited Partner upon its admission to the Partnership, the opening balance of which will be zero. At the end of each quarter, the balance in each Limited Partner's Loss Recovery Account will be charged with any Net Capital Depreciation or credited with any Net Capital Appreciation from the Partnership's activities. In the event that a Limited Partner with an unrecovered balance in its Loss Recovery Account withdraws all or a portion of its capital in the Partnership, the unrecovered balance in such Limited Partner's Loss Recovery Account will be proportionately reduced. Additional capital contributions will not affect any Limited Partner's Loss Recovery Account.

The General Partner will have no obligation to pay to or otherwise compensate a Limited Partner for the amount of the unrecovered balance (if any) in its Loss Recovery Account, but shall receive no additional Incentive Allocation with respect to such Limited Partner's Capital Account until the unrecovered balance in such Limited Partner's Loss Recovery Account is recovered. Since the Incentive Allocation is calculated on a basis which includes unrealized appreciation of the Partnership's assets, such allocation may be greater than if it was based solely on realized gains. (See "EXPENSES".)

The General Partner, in its sole discretion, may waive or modify the Incentive Allocation for Limited Partners that are members, employees or affiliates of the General Partner, relatives of such persons, and for certain large or strategic investors.

## CERTAIN RISK FACTORS

Among the substantial risk factors involved in a purchase of Interests in the Partnership are the following:

1.     Trading Risks.  Substantial risks are involved in the trading of equity securities and options.  Market movements can be volatile and are difficult to predict.  U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affect securities and options prices as well as the liquidity of such markets.  Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities.  A variety of possible actions by various government agencies also can inhibit the profitability of the Partnership's business or can result in losses.  Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Partnership.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategy utilized by or on behalf of the Partnership. The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution. Thus, substantial risk remains that the techniques employed by the Partnership cannot always be implemented or effective in reducing losses. At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities or options at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile. The volume and volatility of trading in the market depend in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by market-makers and specialists. The liquidity of the market may also be affected by a halt in trading on a particular securities exchange or exchanges. Illiquid markets may make it difficult to get an order executed at a desired price.

2.    Trading Strategies May Not be Successful. There can be no assurance that any trading method employed on behalf of the Partnership will produce profitable results, and the past performance of the Partnership is not necessarily indicative of the future profitability of the Partnership.

Profitable trading is often dependent on anticipating trends or trading patterns. In addition, markets experiencing random price fluctuations, rather than defined trends or patterns, may generate a series of losing trades. There have been periods in the past when the markets have been subject to limited and ill-defined price movements, and such periods may recur. Any factor which may lessen major price trends (such as governmental controls affecting the markets) may reduce the prospect for future trading profitability. Any factor which would make it difficult to execute trades, such as reduced liquidity or extreme market developments resulting in prices moving the maximum amount allowed in a single day, could also be detrimental to profits or cause losses.

3.    Dependence Upon the Principals and Key Employees of the General Partner and BLM. The services of the General Partner's principals and key employees and BLM are essential to the continued operations of the Partnership. If their services were no longer available, their absence would have an adverse impact upon an investment in the Partnership.

4.    Incentive Allocation. The allocation of a percentage of the Partnership's net profits to the General Partner from the Limited Partners may create an incentive for the General Partner to cause the Partnership to make investments that are riskier or more speculative than would be the case if this allocation were not made. Since the allocation is calculated on a basis that includes unrealized appreciation of assets, such allocation may be greater than if it were based solely on realized gains.

In addition, in the event that a Limited Partner makes a complete or partial withdrawal from its Capital Account, or is required to retire at any time other than at the end of a quarter, the Incentive Allocation may be computed and charged to such partner as though the date of such partner's withdrawal of capital or retirement was the last day of a quarter. This may result

14

in the Limited Partner being charged an Incentive Allocation during the quarter even though the Limited Partner does not have net profits based on the entire quarter's performance (i.e., due to losses that occur after the withdrawal).

     5.    Custodian/Clearing Firm Loss or Insolvency. If a custodian or clearing firm utilized in connection with accounts maintained on behalf of the Partnership were to become insolvent, the Partnership could have some or all of these positions closed out without its consent. In addition, all of the Partnership's positions may not be closed out under these circumstances, yet delays or other difficulties may be experienced in attempting to close out or exercise options positions. Widespread insolvency among clearing firms that clear securities options could also impair the ability of the Options Clearing Corp. (the "OCC") to honor all exercises, in spite of the system of safeguards which the OCC has in place. Such widespread insolvency, or of a particular custodian, could result in substantial losses to the Partnership.

     6.    Competition. The securities industry is highly competitive in the United States. Competition from other persons or entities involved in activities similar to those of the Partnership can restrict the ability of the Partnership to acquire positions at the prices deemed most beneficial to its overall trading strategies. Many such competing persons or entities are better capitalized and have more experience in trading than the Partnership. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Partnership.

     7.    Over-the-Counter Options Transactions. A significant portion of the options transactions effected on behalf of the Partnership utilizes the over-the-counter market for their execution. Trading equity and index options in the over-the-market is subject to contra-party risk and is without the protections afforded by transactions effected through the Options Clearing Corporation, a registered clearing facility.

     8.    Option Buyer's Risk of Loss of Entire Investment. An option is a wasting asset which becomes worthless when the option expires. As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration. This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

     9.    Arbitrage Transactions. Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction. Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination. Consequently, a substantial favorable price movement may be required before a profit can be realized.

     10.    Combination Transactions. At various times, the Partnership may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations. Such transactions are considerably more complex than the purchase or writing of a single option. The following are among the many risks of

combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding. Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination. This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

11. <u>Trading Decisions Based on Trend Analysis</u>. Certain of the trading decisions of the Partnership are based on the use of computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm. In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends. Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities. This latter risk is likely to materialize when numerous traders use similar analyses, all of which dictate the desirability of executing identical or similar contracts. In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur. Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow. Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

12. <u>Assignment of Puts or Calls</u>. Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put or short call portion of the hedged position. Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes. Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses. The same would be true given an illiquid market such as that of October 1987.

13. <u>Prohibition of Exercise Rights</u>. The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

14. <u>Restrictions on Transfers and Withdrawals</u>. An investment in the Partnership provides limited liquidity since the Interests are not freely transferable and the Limited Partners have limited rights of withdrawal. A Limited Partner may, at the end of a calendar month, withdraw all or a portion of its Capital Account, upon 15 days' prior written notice to the General Partner and the Administrator. In light of these restrictions, an investment in the Partnership is suitable only for sophisticated investors who have no need for more immediate

liquidity in this investment. (See "LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS.")

The right of any Partner to withdraw monies from the Partnership is subject to the provision by the General Partner for (i) Partnership liabilities in accordance with generally accepted accounting principles and (ii) reserves for contingencies.

15.    Non-Disclosure of Positions. In an effort to protect the confidentiality of its positions, the Partnership generally will not disclose all of its positions to Limited Partners on an ongoing basis, although the General Partner, in its sole discretion, may permit such disclosure on a select basis to certain Limited Partners, if it determines that there are sufficient confidentiality agreements and procedures in place.

16.    Unrelated Business Taxable Income for Certain Tax-Exempt Investors. Pension and profit-sharing plans, Keogh plans, individual retirement accounts and other tax-exempt investors may realize "unrelated business taxable income" as a result of an investment in the Partnership since the Partnership may employ leverage. See "TAX ASPECTS." Any tax-exempt investor should consult its own tax adviser with respect to the effect of an investment in the Partnership on its own tax situation.

17.    Absence of Regulatory Oversight. While the Partnership may be considered similar to an investment company, it does not intend to register as such under the Investment Company Act of 1940, as amended (the "Company Act") (in reliance upon an exemption available to privately offered investment companies), and, accordingly, the provisions of that Act (which, among other matters, require investment companies to have a majority of disinterested directors, require securities held in custody to at all times be individually segregated from the securities which are the property of such investment company and regulate the relationship between the adviser and the investment company) will not be applicable.    Effective April 20, 2006, the General Partner registered as an investment adviser under the Advisers Act. (See "PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940" and "GENERAL PARTNER".)

THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING. POTENTIAL INVESTORS SHOULD READ THE ENTIRE CONFIDENTIAL OFFERING MEMORANDUM (THE "MEMORANDUM") BEFORE DETERMINING TO INVEST IN THE PARTNERSHIP.

## MANAGEMENT FEE AND EXPENSES

The General Partner generally receives a monthly management fee calculated at the annual rate of approximately 1% (0.0833% per month) of each Limited Partner's Capital Account (the "Management Fee"). The Management Fee is paid in arrears, based on the value of each Limited Partner's Capital Account, as of the end of each month. The General Partner, in its sole discretion,

may waive or modify the Management Fee for Limited Partners that are members, employees or affiliates of the General Partner, relatives of such persons, and for certain large or strategic investors.

The General Partner shall bear all continuing offering costs and all expenses in maintaining the Partnership's offices and administration fees. The Partnership shall bear all other expenses incurred in the operation of the Partnership, if any, including, the Management Fee, taxes, the ordinary and necessary expenses directly related to the Partnership's investment and trading activities, including transactional costs (e.g., brokerage commissions and interest expense), escrow and custodial fees, registrar, transfer agent and administration fees, all legal, accounting and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Partnership; but excluding any legal fees incurred in the continuation of the offering of interests in the Partnership.

The Partnership may pay Fairfield Greenwich Advisors LLC, an affiliate of the General Partner, an amount equal to one-fortieth of one percent (0.025%) of the value of the Limited Partners' Capital Accounts as of the first day of each fiscal quarter (10 basis points per annum) for providing certain administrative services and back-office support to the Partnership (the "Expense Reimbursement"). To the extent a Limited Partner is charged the Management Fee, such Limited Partner will not be charged his pro-rata share of the Expense Reimbursement.

The Partnership Agreement provides that the General Partner may elect to have the Partnership pay any normal and recurring operating expenses required to be borne by the General Partner and to charge such amounts to the General Partner's Capital Accounts. No such expenses have been paid by the Partnership and the General Partner does not contemplate having the Partnership pay such expenses.

As noted under "ALLOCATION OF GAINS AND LOSSES" the General Partner receives an incentive allocation on a quarterly basis in an amount equal to 20% of any Net Capital Appreciation allocated to the Capital Accounts of the Limited Partners for such quarterly period, subject to a loss carryforward provision described herein. Investors should note that any such allocations will result in the General Partner receiving an amount of Net Capital Appreciation which may be greater than its proportionate shares thereof and may thereby result in the General Partner receiving a disproportionate share of the Partnership's profits. The Capital Account of a Limited Partner will be assessed the Incentive Allocation only if there is new Net Capital Appreciation allocated to such Limited Partner's Capital Account in such fiscal quarter.

The General Partner does not receive any compensation, directly or indirectly, with respect to the brokerage and clearance charges incurred in connection with the Partnership's account at BLM.

## POTENTIAL CONFLICTS OF INTEREST

Because of the role of an affiliate of the General Partner as sponsor and organizer of the Partnership, the terms of the Partnership's governing documents were not the result of arms-length negotiation between such sponsor, on the one hand, and the Partnership on the other hand.

In addition, the General Partner and its related persons will be subject to significant conflicts of interest in managing the business and affairs of the Partnership and in making investment and trading decisions for the Partnership. Certain of these conflicts are described elsewhere in this Memorandum and will not be repeated here. Others are described below. While the conflicts described in this Memorandum are fairly typical of "hedge fund" managers, the General Partner wishes to call attention to them.

The Partnership's governing documents do not require the General Partner to devote its full time or any material portion of its time to the Partnership. The General Partner and its related persons are currently involved in, and may in the future become involved in, other business ventures, including other investment funds whose investment objectives, strategies and policies are the same as or similar to those of the Partnership. The Partnership will not share in the risks or rewards of such other ventures, and such other ventures will compete with the Partnership for the time and attention of the General Partner and its related persons and might create additional conflicts of interest, as described below.

The General Partner and its related persons invest and trade and may continue to invest and trade in securities and other financial instruments for the accounts of clients other than the Partnership and for their own accounts, even if such securities and other financial instruments are the same as or similar to those in which the Partnership invests and trades, and even if such trades compete with, occur ahead of or are opposite those of the Partnership. They will not, however, knowingly trade for the accounts of clients other than the Partnership or for their own accounts in a manner that is detrimental to the Partnership, nor will they seek to profit from their knowledge that the Partnership intends to engage in particular transactions.

The General Partner and its related persons might have an incentive to favor one or more of their other clients over the Partnership, for example with regard to the selection of certain investments for those clients because those clients might pay the General Partner more for its services than the Partnership. The General Partner and its related persons will act in a fair and reasonable manner in allocating suitable investment opportunities among their client and proprietary accounts. No assurance can be given, however, that (i) the Partnership will participate in all investment opportunities in which other client or proprietary accounts of such persons participate, (ii) particular investment opportunities allocated to client or proprietary accounts other than the Partnership will not outperform investment opportunities allocated to the Partnership, or (iii) equality of treatment between the Partnership, on the one hand, and other client and proprietary accounts of such persons, on the other hand, will otherwise be assured.

Subject to the considerations set forth above, in investing and trading for client and proprietary accounts other than the Partnership, the General Partner and its related persons may

make use of information obtained by them in the course of investing and trading for the Partnership, and they will have no obligation to compensate the Partnership in any respect for their receipt of such information or to account to the Partnership for any profits earned from their use of such information.

The Partnership may engage other placement agents from time to time, to market Interests. If Interests are acquired through an agent engaged by the Partnership, the investor should not view any recommendation of such agent as being disinterested, as the agent will be paid for the introduction by the investor and/or by the General Partner. Also, agents should be regarded as having an incentive to recommend that Limited Partners remain investors in the Partnership, since the agents may receive fees for all periods during which a Limited Partner remains an investor.

The General Partner has a fiduciary duty to the Partnership to exercise good faith and fairness in all its dealings with it and will take such duties into account in dealing with all actual and potential conflicts of interest. If a Limited Partner believes that the General Partner has violated its fiduciary duty, it may seek legal relief under applicable law, for itself and other similarly situated Limited Partners or on behalf of the Partnership. However, it may be difficult for Limited Partners to obtain relief because of the changing nature of the law in this area, the vagueness of standards defining required conduct, the broad discretion given the General Partner under the Partnership Agreement, and the exculpatory and indemnification provisions therein.

The legal counsel to the Partnership was retained by the General Partner and does not represent the interests of the investors in the Partnership.

## PRIOR TRADING RESULTS

The prior trading results for the Partnership and other entities managed by the General Partner and its affiliates are available upon request.

## PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940

The Partnership does not currently or in the future propose to be registered as an investment company under the Company Act. Nevertheless, for discussion purposes the Partnership may be compared with an investment company. Since Limited Partners may generally withdraw from the Partnership at the end of any calendar month, the Partnership may be regarded as similar to a "non-diversified open-end investment company" i.e., a mutual fund, although such a company is usually prepared to redeem its securities at any time upon demand at net asset value.

Registered investment companies are required, under applicable SEC forms relating to the registration of their shares, to state definite policies with respect to certain enumerated types

20

of activities, some of which may not be changed without shareholder approval.[2] The following discussion summarizes the Partnership's currently anticipated policies with respect to such activities through its securities trading activities, but it is important to note that changes in the Partnership's policies set forth below may be made by the General Partner, without the consent of the Limited Partners, to the extent consistent with the Partnership Agreement. (See "INVESTMENT PROGRAM" and "CERTAIN RISK FACTORS".)

(a)     The types of investments which the Partnership may make.     The Partnership Agreement authorizes the Partnership to invest and trade on margin or otherwise, in capital stock of U.S. or foreign corporations, preorganization certificates and subscriptions, warrants, bonds, notes, debentures, whether subordinated, convertible or otherwise, rights, options, money market funds, commercial paper, certificates of deposit, brokers' acceptances, trust receipts, obligations of the United States, or any state thereof and instrumentalities of any of them, obligations of foreign governments, and other obligations and instruments or evidences of indebtedness commonly referenced to as securities. As part of its investment program, the Partnership may also write or buy options, purchase forward and futures contracts relating to stock indices or other indices, financial instruments and commodities and commodity contracts and other securities and instruments and invest in fixed income securities and, as opportunities are available, engage in convertible arbitrage transactions in merger and tender arbitrage.

(b)     The issuance of senior securities. The Partnership will not issue classes of senior debt securities, except to the extent that it may be deemed to do so if engages in short selling, options writing and repurchase transactions.[3]

(c)     The use of leverage.  The Partnership may trade in securities on margin or borrow, pledge, mortgage, lend or hypothecate securities or other assets.     (See "TAX ASPECTS".) The Partnership may use leverage by borrowing funds from banks and brokerage firms.  The Partnership maintains no policy limiting the amount of borrowing in which it will engage to any fixed percentage of its assets.  Under market conditions deemed appropriate by the

---

2     Such policies are considered to be "fundamental" policies with respect to security investments, i.e., policies which the registered investment company deems to be fundamental or policies which may not be changed without the approval of a majority of the registered investment company's shareholders.

3     Effecting short sales, writing put and call options and engaging in repurchase transactions may be deemed to give rise to indebtedness of, and the issuance of a senior security by, a registered investment company. With respect to short sales, a registered investment company is required to collateralize such sales by depositing in a segregated account cash in an amount, or United States Government securities having a value equal to, the difference between (i) the greater of (a) the market value of the securities sold short at the time of the short sale, or (b) the market value of the securities sold short (marked to market daily) and (ii) the amount of cash or United States Government securities deposited with the broker to collateralize the obligation to replace the borrowed securities. Similar requirements exist with respect to collateralizing uncovered options and the SEC has indicated that such requirements may also apply when a registered investment company engages in repurchase transactions. The Partnership is not required to follow such requirements, and will not collateralize such obligations, except to the extent of applicable margin and bank regulations and creditors' practices. Registered investment companies can borrow only from banks and must maintain 300% asset coverage for such borrowings. However, the Partnership may borrow from brokers, banks and others that have no such asset coverage requirements.

General Partner, the Partnership may borrow up to the limit of the applicable margin requirements and applicable regulations relating to bank loans.

(d)     The underwriting of securities of other issuers. The Partnership will not underwrite securities of other issuers (except to the extent it may technically be deemed an "Underwriter" in connection with distributions of securities).

(e)     The making of loans to other persons.  The Partnership may lend its portfolio securities on terms customary to the securities industry, provided that cash collateral at least equal in value to the market value of the loaned securities is deposited by the borrower with the broker-dealer with which the Partnership maintains its account.  The interest received on such loans is typically a percentage of the broker's call rate.

(f)     The purchase and sale of real estate. The Partnership does not intend to purchase or sell interests in real estate or real estate mortgage loans nor does it intend to utilize money managers engaging in such loan transactions.

(g)     The purchase and sale of commodities or commodity contracts.  The Partnership Agreement authorizes the Partnership to engage in transactions involving forward and futures contracts (and options thereon) relating to stock indices and other indices, financial instruments and commodities and commodity contracts.  However, such transactions would not be effected without compliance with the applicable regulatory requirement.

(h)     Investment in companies for the purpose of exercising control of management. The Partnership will not ordinarily invest in companies for the purpose of exercising control of management but may do so in situations in which it believes it appropriate as an investment.

(i)     Policy with respect to portfolio turnover. The Partnership has no definite policy with respect to portfolio turnover.  The Partnership expects that its portfolio turnover will exceed the portfolio turnover of other types of investment vehicles, since the Partnership's investment strategies include active trading of the portfolio and short sales.[4]

## TAX ASPECTS

The following is a summary of certain aspects of the income taxation of the Partnership and its partners which should be considered by a prospective Limited Partner.  Except as indicated below, it applies only to Limited Partners who are citizens or residents of the United States for Federal income tax purposes, and who are taxed as individuals.  The Partnership has not sought a ruling from the Internal Revenue Service (the "IRS") or any other Federal, state or

---

[4]    Turnover refers to the dollar value of securities purchased or sold, as compared to average assets.  For example, a 100% turnover ratio means that the value of securities purchased or sold during the year (whichever is less) equals the average value of the Partnership's securities portfolio (excluding United States Government securities and cash items) for the year.

local agency with respect to any of the tax issues. Each prospective Limited Partner is urged to consult his own counsel regarding the acquisition of Interests.

This summary of certain aspects of the Federal income tax treatment of the Partnership is based upon the Internal Revenue Code of 1986, as amended (the "Code") or regulations promulgated thereunder, judicial decisions, Treasury Regulations (the "Regulations") and rulings in existence on the date hereof, all of which are subject to change.

EACH PROSPECTIVE LIMITED PARTNER SHOULD CONSULT WITH ITS OWN TAX ADVISER IN ORDER TO FULLY UNDERSTAND THE FEDERAL, STATE AND LOCAL INCOME TAX CONSEQUENCES OF AN INVESTMENT IN THE PARTNERSHIP.

1.    Tax Treatment of Partnership Operations

Classification of the Partnership. The Partnership will elect to be treated as a partnership for Federal income tax purposes. As a partnership, the Partnership will not itself be subject to Federal income tax. The Partnership files an annual partnership information return with the IRS which reports the results of operations. Each partner is required to report separately on his income tax return his distributive share of the Partnership's net long-term capital gain or loss, net short-term capital gain or loss and all other items of ordinary income or loss. Each partner will be taxed on his distributive share of the Partnership's taxable income and gain regardless of whether he has received or will receive a distribution of assets from the Partnership.

Publicly Traded Partnership. Under Section 7704 of the Internal Revenue Code of 1986, as amended (the "Code"), a partnership that meets the definition of a "publicly traded partnership" may be taxable as a corporation. It is expected that the Partnership will not be treated as a "publicly traded partnership". If the Partnership were taxed as a corporation, the Partnership's taxable income would be subject to corporate income tax, which would significantly reduce the return that an investor would derive from the Partnership.

Allocation of Profits and Losses. Under the Partnership Agreement, the Partnership's net capital appreciation or net capital depreciation for each fiscal year will be allocated among the Partners and to their Capital Accounts without regard to the amount of income or loss actually realized by the Partnership for Federal income tax purposes. For each fiscal year, under the Partnership Agreement, items of income, deduction, gain, loss or credit actually realized by the Partnership are to be allocated for income tax purposes in such a manner so as to reflect the amount so allocated to each partner's Capital Account for the current and prior fiscal years unless an allocation under the Partnership Agreement does not have "substantial economic effect." The General Partner believes that the allocations provided by the Partnership Agreement comply with the regulations under the Code defining substantial economic effect. If the allocations provided by the Partnership Agreement were determined not to have "substantial economic effect", and therefore, were not recognized for federal income tax purposes, the amount of income or loss allocated to Partners under the Partnership Agreement might be increased or reduced. A Limited Partner admitted to the Partnership on a date other than as of

23

January 1 of a fiscal year will be allocated its distributive share of Partnership tax items at the end of its year of admission based in its pro rata share of the Partnership's capital.

Regulations issued with respect to Section 704(b) of the Code provide rules to govern a situation, like the Partnership, where capital accounts of partners are adjusted to reflect changes in the fair market value of a partnership's assets without regard to the actual tax results for the year. Under these Regulations, gain recognized for tax purposes upon the sale of securities held during more than one fiscal year generally would be allocated among those partners who were partners during each of the fiscal years in question, based on the actual allocation to the capital accounts of such partners of the changes in the fair market value of such securities each fiscal year. However, the Regulations also provide for a "ceiling rule" which requires that the partners should not report gains or losses which are not actually realized by the Partnership. Under this rule of the Regulations, it is possible under certain circumstances (e.g., the contribution of new capital after Partnership securities have appreciated in value, and a subsequent decline in the value of such securities) that the allocations of the Partnership's tax result among the partners will not reflect allocations of net capital appreciation and net capital depreciation which have been made to the partner's capital accounts.

Tax Elections; Returns; Tax Audits. The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death) provided that a partnership election has been made pursuant to Section 754. Under the Partnership Agreement, at the request of a partner, the General Partner, in its sole discretion, may cause the Partnership to make such election. Any such election, once made, cannot be revoked without the IRS's consent.

The General Partner is designated as the "Tax Matters Partner" and it decides how to report the Partnership items on the Partnership's tax returns, and all Partners will be required under the Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event the income tax returns of the Partnership are audited by the IRS, the tax treatment of Partnership income and deductions generally are determined at the Partnership level in a single proceeding rather than by individual audits of the Partners. The "Tax Matters Partner" will have considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners. In addition, the "Tax Matters Partner" has the right on behalf of all Partners to extend the statute of limitations relating to the Partners' tax liabilities with respect to partnership items.

Under certain circumstances, the Partnership (depending on the nature of the transactions entered into by the Partnership) and certain Limited Partners (depending on the size of such Limited Partner's interest in the Partnership) will be required to disclose to the Internal Revenue IRS (and to its office of Tax Shelter analysis) their participation in certain transactions. To the extent any Limited Partner is required to report information regarding the Partnership's transactions, the Partnership will provide such Limited Partner with the specific information needed to make such filing.

2    Jobs and Growth Tax Relief Reconciliation Act of 2003

On May 28, 2003, the Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "Act") was enacted. The Act reduced the maximum marginal tax rate to 35%, the maximum long-term capital gains tax rate to 15%, and the maximum tax rate on "qualified dividend income" to 15%, for individuals and certain non-corporate taxpayers. "Qualified dividend income" is defined under the Act to mean dividends received from domestic corporations and "qualified foreign corporations" if a taxpayer has held the stock for 60 days during the 120-day holding period beginning 60 days before the ex-dividend date (or, in the case of stock having a preference in dividends, 90 days during the 180-day period beginning 90 days before the ex-dividend date). In general, periods in which the taxpayer has diminished his risk of loss with respect to stock by holding options to sell, short selling and other positions do not count toward meeting the holding period requirement. "Qualified foreign corporations" include foreign corporations that are eligible for benefits under a comprehensive tax treaty and foreign corporations the stock of which is readily tradeable on an established securities market in the United States. However, dividends that are received from a foreign corporation that was a foreign investment company, passive foreign investment company, or a foreign personal holding company in either the taxable year of distribution or the preceding taxable year are not "qualified dividend income."

"Qualified dividend income" also does not include dividends on any share of stock to the extent that the taxpayer is under an obligation to make related payments with respect to positions in substantially similar or related property. In the case of brokers and dealers who engage in securities lending transactions, short sales, or similar transactions on behalf of their customers in the normal course of business, the IRS intends to waive penalties associated with the failure to comply with the reporting requirements due to the time period necessary to conform their information reporting systems to the rate reductions under the Act. It is expected that a taxpayer who receives payments in lieu of dividends from these transactions may treat the payments as dividend income to the extent the payments are reported as dividends on Forms 1099-DIV unless the taxpayer knows or has reason to know that the payments are in lieu of dividends rather than actual dividends.

Special rules apply under the Act (i) to losses associated with stock with respect to which a taxpayer has received an "extraordinary dividend" and (ii) in determining a taxpayer's foreign tax credit limitation in the case of qualified dividend income. The reduced tax rates generally apply to taxable years beginning after December 31, 2002, through December 31, 2008.

3    Tax Treatment of Partnership Investments

In General. The Partnership expects to act as a trader or investor, and not as a dealer, with respect to its securities transactions. A trader and an investor are persons who buy and sell securities for their own accounts. A dealer, on the other hand, is a person who purchases securities for resale to customers rather than for investment or speculation.

Generally, the gains and losses realized by a trader or investor on the sale of securities are capital gains and losses. Thus, the Partnership expects that its gains and losses from its securities transactions typically will be capital gains and capital losses. These capital gains and losses may

be long-term or short-term depending, in general, upon the length of time the Partnership maintains a particular investment position and, in some cases, upon the nature of the transaction. Property held for more than one year generally will be long-term capital gain or loss. The application of certain rules relating to short sales, to so-called "straddle" and "wash sale" transactions and to "Section 1256 Contracts" may serve to alter the manner in which the Partnership's holding period for a security is determined or may otherwise affect the characterization as long-term or short-term, and also the timing of the realization of certain gains or losses.

Gains on the sale of property held for more than 12 months are considered long-term capital gains. Long-term capital gains are taxed at a 5% rate for taxpayers in the 15% brackets (zero in 2008) and at a 15% rate for taxpayers in the higher brackets. The excess of capital losses over capital gains may be offset against the ordinary income of a noncorporate taxpayer, subject to an annual deduction limitation of $3,000. For corporate taxpayers, capital losses may be offset only against capital gains, but unused capital losses may be carried back three years (subject to certain limitations) and carried forward five years.

Section 1256 Contracts. Under the Code, all positions in "Section 1256 contracts" held by the Partnership at the end of its taxable year will be marked to their market value, and any unrealized gain or loss on those positions will be included in the income of the Partners as if each position had been sold for its fair market value on the last day of the Partnership's taxable year. A "Section 1256 contract" includes a "regulated futures contract," a "foreign currency contract," a "nonequity option" and a "dealer equity option". A "regulated futures contract" is a futures contract which is traded on or subject to the rules of a "qualified board or exchange" (that is, a national securities exchange which is registered with the SEC, a domestic board of trade designated as a contract market by the CFTC or any other board of trade, exchange or other market designated by the Secretary of the Treasury) and which is "marked-to-market" to determine the amount which must be deposited as margin or may be withdrawn. A "foreign currency contract" is a contract which requires delivery of, or the settlement of which depends upon the value of, a foreign currency which is a currency in which positions are also traded through regulated futures contracts, which are traded in the interbank market and which are entered into at arms' length at a price determined by reference to the price in the interbank market. (The Secretary of the Treasury is authorized to issue regulations excluding certain currency forward contracts from marked-to-market treatment). A "nonequity option" means an option which is traded on a qualified board or exchange and the value of which is not determined directly or indirectly by reference to any stock (or group of stocks) or stock index unless there is in effect a designation by the CFTC of a contract market for a contract based on such group of stock or stock index. A "dealer equity option" means, with respect to an options dealer, any listed option which is an equity option, is purchased or granted by such options dealer in the normal course of his activity of dealing in options, and is listed on the qualified board or exchange on which such options dealer is registered.

After positions in Section 1256 contracts held by the Partnership at the end of its taxable year are marked to market, the resulting gain or loss will be combined with any gain or loss realized by the Partnership from positions in Section 1256 contracts closed during that year.

Provided such positions were held as capital assets and were not part of a "hedging transaction", nor part of a "straddle" (see below), 60% of the resulting net gain or loss will be treated as a long-term capital gain or loss and 40% of such net gain or loss will be treated as a short-term gain or loss, regardless of the period of time particular positions were actually held by the Partnership. (However, gain or loss from positions treated as Section 1256 contracts under the Code Section 988 election provisions would be treated entirely as a short-term capital gain or loss). In addition, gain or loss in dealer equity options allocable to the Limited Partners are treated as short-term gains or losses and are not subject to the "60-40" rule. Section 1256(a) provides that gains or losses from transactions in nonequity options, dealer equity options, regulated futures and foreign currency contracts shall be treated as short-term capital gain or loss, to the extent of 40 percent of the gain or loss, and 60 percent of the gain or loss shall be treated as long-term capital gain or loss. However, Section 1256(f)(4) provides that gain or loss from transactions in dealer equity options allocable to Limited Partners shall be treated as short-term capital gains or losses. Consequently, Limited Partners will not be subject to the "60-40" rule in dealer equity options.

Straddles. If the Partnership incurs a loss upon the disposition of any position which is part of a "straddle" (i.e., two or more offsetting positions), recognition of that loss for tax purposes will be deferred until the Partnership recognizes the gain in the offsetting position of the straddle. This rule would apply to all of the positions in a straddle which includes one or more Section 1256 contracts but which does not consist entirely of Section 1256 contracts (a "mixed straddle"), but not to a straddle all of the positions of which are Section 1256 contracts. (Depending upon whether the Partnership makes certain elections, the Section 1256 contract components of a mixed straddle may be treated as not subject to the mark-to-market rules). This provision would also apply to the Partnership's positions in futures contracts on most foreign exchanges and in forward contracts on foreign currency (other than interbank contracts), which could result in the deferral of deductions for losses resulting from the disposition of such positions or from the disposition of Section 1256 contracts which offset those positions. The Partnership can specifically identify particular positions as being components of a straddle, in which case a realized loss would be allowable only upon the liquidation of all of the components of the identified straddle. The Partnership's trading strategies may include the use of spreads or straddles, with or without making such identifications.

Interest and other carrying charges allocable to positions which are part of a straddle must be capitalized, rather than deducted currently.

Wash and Short Sale Rules. The "short-sale" rules may apply to positions held by the Partnership so that what might otherwise be characterized as long-term capital gain would be characterized as short-term capital gain or potential short-term capital loss as long-term capital loss. Furthermore, "wash sale" rules, which prevent the recognition of a loss from the sale of a security where a substantially identical security is (or has been) acquired within a prescribed time period, also apply where certain offsetting positions (other than identified straddle positions) are entered into within the prescribed period.

Section 988. Currency gain or loss from transactions in (i) bank forward contracts not traded in the interbank market, (ii) currency futures contracts traded on a foreign exchange and (iii) other futures contracts traded on a foreign exchange may be treated as ordinary income or loss under Code Section 988. Partners in the Partnership may elect on an individual basis, in effect, to recognize gain or loss from instruments described in clauses (i) and (ii) of the preceding sentence under the mark-to-market rules of Code Section 1256. Pursuant to that election gain or loss from such positions would be treated entirely as short-term capital gain or loss. Such an election would cause a partner's share of foreign currency gain or loss from the Partnership's Section 1256 contracts to be treated as ordinary income or loss, rather than 60% long-term and 40% short-term Capital gain or loss.

Partner-Partnership Positions. It is unclear to what extent the loss deferred, short sale, capitalization and wash sale rules would apply to straddles consisting of Partnership transactions and transactions by a partner in his individual capacity. Each prospective Limited Partner should review the application of these rules to his own particular tax situation, with special regard to the potential interaction between Partnership operations and commodities transactions entered into by the prospective Limited Partner in his individual capacity.

Short Sales. Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the hands of the money manager or joint account trader utilized by the Partnership. Except with respect to certain situations where the property used by the money manager or joint account trader to close a short sale has a long-term holding period on the date of the short sale, special rules would generally treat the gains on short sales as short-term capital gains. These rules may also terminate the running of the holding period of "substantially identical property" held by the money manager or joint account trader. Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the money manager or joint account trader for more than one year.

Effect of Straddle Rules on Partners' Securities Positions. The IRS may treat certain positions in securities held (directly or indirectly) by a partner and its indirect interest in similar securities held by the money manager as "straddles" for Federal income tax purposes. The application of the "straddle" rules in such a case could affect a partner's holding period for the securities involved and may defer the recognition of losses with respect to such securities.

Limitation on Deductibility of Interest. For noncorporate taxpayers, Section 163(d) of the Code limits the deduction for "investment interest" (i.e., interest or shortsale expenses for "indebtedness incurred or continued to purchase or carry property held for investment"). Pursuant to amendments to the Code enacted by the Tax Reform Act of 1986, investment interest is not deductible to the extent that it exceeds the taxpayer's net gain and ordinary income derived from investments.

Conversion Transactions. Pursuant to the Omnibus Budget Reconciliation Act of 1993, Section 1258 was added to the Code, the effect of which is to recharacterize what was capital gain from a "conversion transaction" as ordinary income, with certain limitations. Conversion

transactions are defined as transactions in which substantially all of the anticipated return is attributable to the time value of money and where the transaction either (i) consists of the acquisition of property by the taxpayer coupled with a substantially contemporaneous agreement to use the same or substantially identical property in the future; (ii) qualifies as a "straddle" (within the meaning of Section 1092 of the Code); (iii) was marketed or sold to the taxpayer on the basis that it possessed the characteristics of a loan, but that the interest-like return would be taxed as a capital gain; or (iv) is described as a conversion transaction in Treasury regulations. The amount of gain recharacterized as ordinary income will not exceed the amount of interest that would have accrued on the taxpayer's net investment for the relevant period at a yield equal to 12% of the "applicable rate" prescribed by the Code.

For purposes of this provision, the Partnership's activities will be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a Limited Partner's share of the interest and short sale expenses attributable to the Partnership's operation. In such case, a Limited Partner would be denied a deduction for all or part of that portion of its distributive share of the Partnership's ordinary losses attributable to interest expense unless it had sufficient investment income from all sources including the Partnership. A Limited Partner who could not deduct losses currently as a result of the application of Section 163(d) would be entitled to carry forward such losses to future years, subject to the same limitation. The investment interest limitation would also apply to interest paid by a partner on money borrowed to finance its investment in the Partnership. Potential investors are advised to consult with their own tax advisers with respect to the application of the investment interest limitation in their particular tax situations.

Deductibility of Partnership Investment Expenditures by Individual Partners. Under the Tax Reform Act of 1986, investment expenses (e.g., investment advisory fees) of an individual are deductible only to the extent they exceed 2% of his adjusted gross income. Pursuant to Temporary Regulations issued by the Treasury Department, this limitation on deductibility may apply to an individual Limited Partner's share of the investment expenses of the Partnership. Although the Partnership intends to treat the Incentive Allocation to the General Partner as not being subject to the foregoing rule, there can be no assurance that the IRS may not treat such allocations as investment expenses which are subject to this rule.

The consequences of this limitation will vary depending upon the personal tax situation of each taxpayer. Accordingly, individual Limited Partners should consult their tax advisers with respect to the application of this limitation.

Application of Rules for Income and Losses from Passive Activities. The Tax Reform Act of 1986 restricts the deductibility of losses from a "passive activity" against certain income which is not derived from a passive activity. This restriction applies to individuals, personal service corporations and closely held corporations.

Pursuant to Temporary Regulations issued by the Treasury Department, income or loss from the Partnership generally will not constitute income or loss from a passive activity.

Therefore, passive losses from other sources generally could not be deducted against a Limited Partner's share of income and gain from the Partnership.

4. Broker Reporting and Backup Withholding

The subscription documents require each prospective investor in the Partnership to furnish the investor's "taxpayer identification number." If the number furnished is not correct, the investor may be subject to penalties imposed by the IRS and payments to the investor in redemption of Interests (and, possibly, other Partnership distributions) may become subject to 20% backup withholding.

Under currently proposed regulations, the Partnership is not required to treat either its securities transactions or redemptions of Interests as requiring separate reporting to investors under Code section 6045, since the information required to be furnished by that section is identical to that furnished to each investor on Schedule K-1 of Form 1065. The same information will be furnished to the IRS on Form 1065. Accordingly, investors will not receive separate Forms 1099-B with respect to such transactions.

5. Unrelated Business Taxable Income

Tax-exempt entities should review with their tax advisers the discussion above regarding unrelated business taxable income and debt-financed income and any tax and/or filing obligation they may have with respect to unrelated business taxable income. Tax-exempt entities should also consult their tax advisers with regard to the unrelated business taxable income issues that may arise upon the disposition of their interest in the Partnership. In a private ruling, the IRS has taken the position that a portion of the gain realized from the sale (e.g., withdrawal) of a partnership interest by a tax-exempt entity is debt-financed income when the partnership uses borrowed funds to purchase property even though the tax-exempt entity did not use borrowed funds to purchase its partnership interest.

6. Certain Issues Pertaining to Specific Exempt Organizations

Private Foundations. Private foundations and their managers are subject to excise taxes if they invest "any amount in such a manner as to jeopardize the carrying out of any of the foundation's exempt purposes." This rule requires a foundation manager, in making an investment, to exercise "ordinary business care and prudence" under the facts and circumstances prevailing at the time of making the investment, in providing for the short-term and long-term needs of the foundation to carry out its exempt purposes. The factors which a foundation manager may take into account in assessing an investment include the expected rate of return (both income and capital appreciation), the risks of rising and falling price levels, and the needs for diversification within the foundation's portfolio.

In order to avoid the imposition of an excise tax, a private foundation may be required to distribute on an annual basis its "distributable amount," which includes, among other things, the private foundation's "minimum investment return," defined as 5% of the excess of the fair market value of its non-functionally related assets (assets not used or held for use in carrying out

the foundation's exempt purposes), over certain indebtedness incurred by the foundation in connection with such assets. It appears that a foundation's investment in the Partnership would most probably be classified as a nonfunctionally related asset. A determination that an interest in the Partnership is a nonfunctionally related asset could conceivable cause cash flow problems for a prospective Limited Partner which is a private foundation. Such an organization could be required to make distributions in an amount determined by reference to unrealized appreciation in the value of its interest in the Partnership. Of course, this factor would create less of a problem to the extent that the value of the investment in the Partnership is not significant in relation to the value of other assets held by a foundation.

In some instances, an investment in the Partnership by a private foundation may be prohibited by the "excess business holding" provisions of the Code. For example, if a private foundation (either directly or together with a "disqualified person") acquires more than 20% of the capital interest or profits interest of the Partnership, the private foundation may be considered to have "excess business holdings". If this occurs, such foundation may be required to divest itself of its interest in the Partnership in order to avoid the imposition of an excise tax.

A substantial percentage of investments of certain "private operating foundations" may be restricted to assets directly devoted to their tax-exempt purposes. Otherwise, generally, rules similar to those discussed above govern their operations.

Endowment Funds. Investment managers of endowment funds should consider whether the acquisition of an Interest is legally permissible. This is not a matter of Federal law, but is determined under state statutes. It should be noted, however, that under the Uniform Management of Institutional Funds Act, which has been adopted, in various forms, by a large number of states, participation in investment partnership or similar organizations in which funds are commingled and investment determinations are made by persons other than the governing board of the endowment fund is allowed.

7.    Tax Shelters. In February 2003, the IRS released final Treasury Regulations expanding previously existing information reporting, record maintenance and investor list maintenance requirements with respect to certain "tax shelter" transactions (the "Tax Shelter Regulations"). The Tax Shelter Regulations may potentially apply to a broad range of investments that would not typically be viewed as tax shelter transactions, including investments in investment partnerships and portfolio investments of investment partnerships. Under the Tax Shelter Regulations, if the Partnership engages in a "reportable transaction," the Partnership and, under certain circumstances, a Limited Partner would be required to (i) retain all records material to such "reportable transaction"; (ii) complete and file IRS Form 8886, "Reportable Transaction Disclosure Statement" as part of its Federal income tax return for each year it participates in the "reportable transaction"; and (iii) send a copy of such form to the IRS Office of Tax Shelter Analysis at the time the first such tax return is filed. The scope of the Tax Shelter Regulations may be affected by further IRS guidance. Non-compliance with the Tax Shelter Regulations may involve significant penalties and other consequences. Each Limited Partner should consult his own tax advisers as to his obligations under the Tax Shelter Regulations.

8.    State and Local Taxation

   In addition to the Federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Partnership. State and local laws often differ from Federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Partnership will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which he is a resident.

## OUTLINE OF PARTNERSHIP AGREEMENT

   The following outline summarizes the material provisions of the Partnership Agreement which are not discussed elsewhere in this Memorandum. This outline is not definitive, and each prospective Limited Partner should carefully read the Partnership Agreement in its entirety. References herein to "Partners" unless otherwise indicated refer to General Partner and Limited Partners.

   Limited Liability. A Limited Partner will be liable for debts and obligations of the Partnership only to the extent of its interest in the Partnership in the fiscal year (or portion thereof) to which such debts and obligations are attributable. In order to meet a particular debt or obligation, a Limited Partner or former Limited Partner shall, in the discretion of the General Partner, be required to make additional contributions or payments up to, but in no event in excess of, the aggregate amount of returns of capital and other amounts actually received by it from the Partnership during or after the fiscal year to which such debt or obligation is attributable.

   Term. The Partnership will terminate on the earlier of a) December 31, 2112; or (b) a determination by the General Partner(s) that the Partnership should be dissolved or (c) upon the withdrawal, death, insolvency, adjudication of incompetency or bankruptcy of any General Partner, the Partnership shall dissolve unless (i) there are one or more remaining General Partners who agree to continue the Partnership. In the event that the remaining General Partners determine not to continue the Partnership, the remaining General Partners, or if there is no remaining General Partner, one or more persons selected by a majority in interest of the Limited Partners, shall terminate and wind up the affairs of the Partnership.

   Capital Accounts. Each Partner will have a Capital Account established on the books of the Partnership which will be credited with its capital contributions. A "Partnership Percentage" will be determined for each Partner for each month, by dividing its Capital Account as of the beginning of such month by the aggregate Capital Accounts of all Partners as of the beginning of such month. The Partnership Percentages will be subject to adjustment by the General Partner to reflect interim monthly additions and withdrawals, if any.

   Each Partner's Capital Account will be increased to reflect any additional capital contributions made by it and its share of the Partnership's Net Capital Appreciation, and will be

decreased to reflect withdrawals of capital, distributions and such Partner's share of Net Capital Depreciation.

Additional Capital Contributions. Additional contributions may be made by Partners as of the opening of business on the first day of any month, subject to the approval of the General Partner.

Management. The management of the Partnership will be vested exclusively in the General Partner. The Limited Partners will have no part in the management of the Partnership and will have no authority or right to act on behalf of the Partnership in connection with any matter. Nothing will preclude the General Partner from exercising investment responsibility for its own account, or for the accounts of individual members of their family, friends, or other business relationships. Neither the Partnership nor the Partners shall have any first refusal, co-investment or other rights in respect of the investments for such accounts or in any fees, profits or other income earned otherwise derived therefrom.

Salaries or Other Payments or Allocations to the General Partner. The Partnership will make no payments to the General Partner other than the allocation of Net Capital Appreciation (if any) to the General Partner in respect of its Partnership Percentage, the Management Fee, the Incentive Allocation and the reimbursement of certain expenses.

Valuation of Partnership Assets. The Partnership's assets will be valued by the General Partner in accordance with the terms of the Partnership Agreement. All matters concerning valuation of assets, as well as allocation among the Partners and accounting procedures not expressly provided by the Partnership Agreement, may be determined by the General Partner, whose determination will be final and conclusive as to all Partners. The General Partner may, from time to time, also establish or abolish reserves for estimated or accrued expenses and for unknown or contingent liabilities.

Withdrawals in General. No Partner shall be entitled to (i) receive distributions from the Partnership, except as provided in the Partnership Agreement; or (ii) withdraw any amount from his Capital Account other than upon his withdrawal from the Partnership except as provided in the Partnership Agreement.

Required Withdrawals. The General Partner may, at the end of any calendar month and for any reason, terminate the interest of any Limited Partner in the Partnership, upon at least 10 days' prior written notice to the Limited Partner. If the General Partner determines that the continued participation of any Limited Partner would cause the Partnership or any Partner to violate any law, or any litigation is commenced or threatened against the Partnership or any of its Partners arising out of such Limited Partner's participation in the Partnership, such Limited Partner's interest may be discontinued at any time upon five days' prior notice.

Withdrawal, Death, etc. of a Limited Partner. Each Limited Partner has the right to withdraw all or any portion of its Capital Account at the end of a calendar month upon 15 days' prior written notice to the General Partner and the Administrator.

In the event of the death, disability, incompetency, termination, bankruptcy, insolvency or dissolution of a Limited Partner, the interest of such Limited Partner will continue at the risk of the Partnership business until (i) the last day of the calendar month in which such event takes place (herein called the "month of determination") or (ii) the earlier termination of the Partnership.

A Limited Partner who withdraws from the Partnership will be paid at least 97% of his estimated Capital Account within 20 business days after the last day of the month of determination. The balance of such Limited Partner's Capital Account will be paid (subject to audit adjustments) to such Limited Partner (with interest) within 30 days after completion of the Partnership's annual audit.

Withdrawal of a General Partner. A General Partner may withdraw all or any portion of its Capital Account or from the Partnership at the end of any calendar month upon 15 days' prior written notice to the Partnership and the Administrator from the end of such calendar month or withdraw from the Partnership with the consent of the other General Partners, if any.

Limitations on Withdrawals. The right of any Partner to receive amounts withdrawn is subject to the provision by the General Partner for all Partnership liabilities in accordance with generally accepted accounting principles and for reserves for contingencies.

Transfers of Interests of Partners. No mortgage, hypothecation, transfer, sale, assignment or other disposition, whether voluntary or otherwise, of all or a part of the Partners Interest in the Partnership may be effected except with the consent of the General Partner.

Admission of New Partners. Partners may, with the consent of the General Partner, be admitted as of the beginning of each calendar month or at such other times as permitted by the General Partner in its sole discretion. Each new Partner will be required to execute an agreement pursuant to which it becomes bound by the terms of the Partnership Agreement.

Amendments to Partnership Agreement. The Partnership Agreement may be modified or amended at any time with the written consent of the Partners having in excess of 50% of the Partnership Percentages of the Partners and the written consent of the General Partner insofar as is consistent with the laws governing the Partnership Agreement, provided, however, that without the specific consent of each Partner affected thereby, no such modification or amendment shall (i) reduce its Capital Account or rights of contribution or withdrawal; or (ii) amend provisions of the Partnership Agreement relating to amendments; or (iii) amend Sec. 3.05 of the Partnership Agreement. However, without the consent of the Partners, the General Partner may (i) amend the Partnership Agreement or Schedule thereto to reflect changes validly made in the membership of the Partnership and the capital contributions and Partnership Percentages of the Partners; (ii) reflect a change in the name of the Partnership or the effective date of the Partnership; (iii) make a change that is necessary or, in the opinion of the General Partners, advisable to qualify the Partnership as a limited partnership or a partnership in which the Limited Partners have limited liability under the laws of any state, or ensure that the Partnership will not

34

be treated as an association taxable as a corporation for Federal income tax purposes; (iv) make a change that does not adversely affect the Partners in any material respect or that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in the Partnership Agreement that would be inconsistent with any other provision in the Partnership Agreement, or to make any other provision with respect to matters or questions arising under the Partnership Agreement that will not be inconsistent with any other provisions of the Partnership Agreement, in each case so long as such change does not adversely affect the Limited Partners, (v) make a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state statute, so long as such change is made in a manner which minimizes any adverse effect on the Partners, or that is required or contemplated by this Agreement; (vi) make a change in any provision of the Partnership Agreement that requires any action to be taken by or on behalf of the General Partner or the Partnership pursuant to the requirements of applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required; or (vii) make any other amendments similar to the foregoing.

Reports to Partners. The Partnership's independent certified accountants (selected by the General Partner) will audit the Partnership's books and records as of the end of each fiscal year. Within 90 days after the end of each fiscal year the Partnership will mail to the Limited Partners the Annual Report prepared by its independent certified public accountants setting forth a balance sheet of the Partnership, a profit and loss statement showing the results of operations of the Partnership and its Net Capital Appreciation or Net Capital Depreciation, a statement of such Partner's Capital Account and the manner of its calculation and the Partnership Percentage as of the end of the prior fiscal year. At the end of each fiscal year, each Partner will be furnished the required tax information for preparation of their respective tax returns. Within 30 days following the end of each fiscal quarter in each fiscal year, each Partner will be mailed unaudited financial information setting forth, inter alia, a statement of its Net Capital Appreciation or Net Capital Depreciation; provided, however, that the General Partner may send out reports on a more frequent basis and has elected to provide monthly reports within 30 days following the end of each month.

Exculpation. The Partnership Agreement provides that neither the General Partner or any officer, director, employee or other agent of any of them ("Affiliates of the General Partner") will be liable to any Partner or the Partnership for mistakes of judgment or for action or inaction which said person reasonably believed to be in the best interests of the Partnership, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any employee, broker, money manager or other agent of the Partnership, provided that such employee, broker, money manager or agent was selected, engaged or retained by the Partnership with reasonable care. The General Partner and the Affiliates of the General Partner may consult with counsel, advisers (investment and otherwise) and accountants in respect of Partnership affairs and shall be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel, advisers or accountants, provided that they were selected with reasonable care. The foregoing provisions (as well as the indemnification provisions described below), however, shall not be construed to relieve the

35

General Partner or any Affiliates of the General Partner of any liability to the extent that such liability may not be waived, modified or limited under applicable law.

Indemnification of General Partner. The Partnership Agreement provides that the Partnership is to indemnify and hold harmless each General Partner, former General Partner, Affiliate of the General Partner and/or the legal representatives of any of them, from and against any loss or expense suffered or sustained by him by reason of the fact that he is or was a General Partner of the Partnership or an Affiliate of the General Partner, including without limitation any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding, provided, such loss or expense resulted from a mistake of judgment on the part of such person, or from action or inaction taken in good faith for a purpose which said person reasonably believed to be in the best interest of the Partnership. The Partnership Agreement also provides that the Partnership will, in the sole discretion of the General Partner, advance to any General Partner and to any Affiliates of the General Partner reasonable attorney's fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arises out of such conduct. In the event that such an advance is made by the Partnership, the General Partner will agree to reimburse the Partnership to the extent that it is determined that it or he was not entitled to indemnification.

## LIMITATIONS ON TRANSFERABILITY;
## SUITABILITY REQUIREMENTS

Each purchaser of an Interest must bear the economic risk of its investment for an indefinite period of time (subject to its right to withdraw capital from the Partnership) because the Interests have not been registered under the Securities Act of 1933, as amended, and, therefore, cannot be sold unless they are subsequently registered under that Act or an exemption from such registration is available. It is not contemplated that any such registration will ever be effected or that certain exemptions provided by rules promulgated under that Act (such as Rule 144) will be available. The Partnership Agreement provides that a Partner may not assign or pledge its Interest (except by operation of law) nor substitute another person as a Partner, without prior consent of the General Partner, which may be withheld for any reason. Limited Partners may withdraw from the Partnership without the consent of the General Partner upon 15 days prior written notice, at the end of any month. The foregoing restrictions on transferability must be regarded as substantial and will be clearly reflected in the Partnership's record.

Each purchaser of an Interest will be required to represent that the Interest is being acquired for its own account, for investment, and not with a view to resale or distribution. The Interests are suitable investments only for sophisticated investors and financial institutions for which an investment in the Partnership does not constitute a complete investment program and who fully understand, are willing to assume, and who have the financial resources necessary to withstand, the risks involved in the Partnership's specialized investment program and to bear the potential loss of their entire investment in the Interest (See "CERTAIN RISK FACTORS" and "TAX ASPECTS".)

Each prospective purchaser is urged to consult with its own advisers to determine the suitability of an investment in the Partnership and the relationship of such an investment to the purchaser's overall investment program and financial and tax position. Each purchaser of an Interest will be required to further represent that after all necessary advice and analysis, its investment in an Interest is suitable and appropriate, in light of the foregoing considerations.

## PURCHASES BY EMPLOYEE-BENEFIT PLANS - ERISA CONSIDERATIONS

The Partnership may accept capital contributions from individual retirement accounts ("IRAs"), Keogh plans, pension or profit-sharing plans, governmental plans, entities that invest the assets of such accounts or plans and/or other benefit plan investors (all such entities are herein referred to as "Benefit Plan Investors"). The General Partner does not anticipate that the assets of the Partnership will be subject to ERISA, because the General Partner intends to limit the investments in the Partnership by Benefit Plan Investors to less than 25% of the value of any class of equity interests of the Partnership, excluding from this calculation any non-Benefit Plan Investor interest of that class held by the General Partner or persons affiliated with the General Partner or their employees. Generally, no subscriptions for Partnership interests made by Benefit Plan Investors will be accepted and no transfers of Partnership interests will be permitted to the extent that the investment or transfer would result in the Partnership exceeding this 25% limit. In addition, because the 25% limit is to be calculated upon every contribution to or withdrawal (in whole or in part) from the Partnership, the General Partner has the authority to require the retirement or withdrawal (in whole or in part) of any Partnership interest if the continued holding of such interest, in the opinion of the General Partner, could result in the Partnership being subject to ERISA.

The Subscription Agreement requires that in the event that the General Partner determines that the Partnership's assets constitute "plan assets" within the meaning of ERISA or that the transactions contemplated in this Memorandum constitute "prohibited transactions," and no exemption from the prohibited transactions penalties has been obtained, then each employee-benefit plan must withdraw its Interest upon notice from the General Partner.

Each Limited Partner will be furnished with monthly statements and annual reports which include the Net Asset Value per Interest. The General Partner believes that these statements will be sufficient to permit plan fiduciaries to provide an annual valuation of plan investments as required by ERISA; however, fiduciaries should note that they have the ultimate responsibility for providing such valuation. Accordingly, plan fiduciaries should consult with their attorneys or other advisors regarding their obligations under ERISA with respect to making such valuations.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Partnership's or Administrator's responsibility for the prevention of money laundering, the Partnership and/or the Administrator may require a detailed verification of a Limited Partner's identity, any beneficial owner underlying the nominal Limited Partner and the source of the payment.

The General Partner and the Administrator reserve the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or Limited Partner's interest in the Partnership. In the event of delay or failure by the subscriber or Limited Partner to produce any information required for verification purposes, the General Partner and/or the Administrator may refuse to accept a subscription or may cause the redemption of any such Limited Partner from the Partnership. The Partnership, without notice, may suspend the withdrawal rights of such Limited Partner if the General Partner reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Partnership, the General Partner or any of the Partnership's other service providers.

Each subscriber and Limited Partner shall be required to make such representations to the Partnership as the Partnership and the General Partner shall require in connection with such anti-money laundering programs, including without limitation, representations to the Partnership that such subscriber or Limited Partner is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Such Limited Partner shall also represent to the Partnership that amounts contributed by it to the Partnership were not directly or indirectly the proceeds of criminal conduct or derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

## PROXY VOTING POLICY

The Partnership invests a portion of its assets in equity securities offered by publicly traded entities. From time to time, such entities may ask their investors to vote their interests in the entities with regard to corporate governance and other matters. The General Partner has authority to vote such proxies and other securities on behalf of the Partnership and may delegate such authority to custodians or sub-custodians of the Partnership's assets.

The General Partner has developed a proxy voting policy which it believes ensures that proxy proposals, amendments, consents or resolutions relating to the Partnership's securities (collectively, "proxies") are voted in a manner that best serves the interests of the Partnership. The General Partner has also have reviewed the proxy voting policies of the custodians and sub-custodians of the Partnership's assets. The following factors are elements of the proxy voting policies of each of the foregoing:

- the impact on short-term and long-term value;

- the preservation and increase in capital of the Partnership;

- the costs and benefits associated with the proposal;

- the effect on the liquidity of the Partnership; and

- the customary industry and business practices.

With respect to proxies, the General Partner will:

- maintain accurate records as to voting proxies;

- with the Partnership, periodically review voting procedures employed and actions taken on individual voting situations;

- have procedures in place for reconciling proxies;

- take reasonable steps to ensure that proxies for which it is responsible are received and, where appropriate, voted; and

- . comply with all current applicable proxy laws, rules and regulations.

## COUNSEL

The Law Offices of Andrew E. Goldstein, 488 Madison Avenue, 16th Floor, New York, New York 10022, have acted as counsel to the Partnership in connection with this offering of the Interests. Mr. Goldstein is a Limited Partner of the Partnership.

## ADDITIONAL INFORMATION

The Partnership will make available to any proposed Limited Partner any additional information, which the Partnership possesses, or which it can acquire without unreasonable effort or expense, necessary to verify or supplement the information set forth herein.

## SUBSCRIPTION FOR INTERESTS

Persons interested in becoming Limited Partners will be furnished the Partnership Agreement and a Subscription Agreement to be completed by them and returned to the General Partner and the Administrator.

EXHIBIT 1

FORM OF LIMITED PARTNERSHIP AGREEMENT

EXHIBIT 2

SUBSCRIPTION DOCUMENTS

## ADDITIONAL SUBSCRIPTION FORM

Greenwich Sentry Partners, L.P.
c/o GlobeOp Financial Services LLC
1 South Road
Harrison, New York 10528
Attn: Investor Relations Dept.

(914) 729-9500 FAX


Dear Sir or Madam:

The undersigned hereby wishes to contribute additional capital to the fund specified below. The undersigned shall contribute such capital by making a payment by wire pursuant to the instructions provided upon acceptance of this subscription.

Fund Name:_____ _____ ____ _____ _____ _____ _____ _____

Amount to be invested: _____ _____ _____ _____ _____ _____

Date of Additional Investment: ____ _____ ___ ___ ___ ____ ____

| | |
|---|---|
| Bank: | JP Morgan Chase Bank |
| | 4 Metrotech Center, 8th Floor |
| | Brooklyn, NY 11245 |
| ABA: | 021000021 |
| Swift: | CHASUS33 |
| A/C: | GlobeOp Financial Services Cayman Limited FBO Partnership |
| A/C#: | 304148148 |
| Ref: | FFC: (Greenwich Sentry Partners, L.P.)/(957-266669) |


THE UNDERSIGNED AGREES TO NOTIFY THE ADMINISTRATOR PROMPTLY SHOULD THERE BE ANY CHANGE IN ANY OF THE FOREGOING INFORMATION.

Dated:_____, _____

For Corporations, Partnerships, Trusts, Limited
Liability Companies, Pension Plans or IRAS,
Other Entity (s):

For Individuals:

_____
(Print Name of Entity)

_____
(Signature)

By: _____
    (Signature)

Print: _____

Print Name: _____

_____

Title: _____

_____

Phone:_____

Phone #:_____

Fax #:_____

Fax #:_____

E-Mail:_____

E-Mail: _____

11

GREENWICH SENTRY, L.P.

AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

Dated as of April 30, 2006

GREENWICH SENTRY, L.P.
AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT
INDEX

| | | |
|---|---|---|
| **ARTICLE I** | GENERAL PROVISIONS .................................................................1 | |
| Sec. 1.01. | Partnership Name.........................................................................1 | |
| Sec. 1.02. | Fiscal Year ...................................................................................1 | |
| Sec. 1.03. | Liability of Partners .....................................................................1 | |
| Sec. 1.04. | Purposes of Partnership................................................................3 | |
| Sec. 1.05. | Assignability of Interest ...............................................................4 | |
| | | |
| **ARTICLE II** | MANAGEMENT OF PARTNERSHIP..........................................4 | |
| Sec. 2.01. | Management Generally..................................................................4 | |
| Sec. 2.02. | Authority of the General Partner...................................................4 | |
| Sec. 2.03. | Reliance by Third Parties..............................................................6 | |
| Sec. 2.04. | Activity of the General Partner .....................................................6 | |
| Sec. 2.05. | Exculpation ..................................................................................6 | |
| Sec. 2.06. | Indemnification of General Partner ...............................................7 | |
| Sec. 2.07. | Payment of Costs and Expenses ....................................................7 | |
| | | |
| **ARTICLE III** | CAPITAL ACCOUNTS OF PARTNERS AND | |
| | OPERATIONS THEREOF...............................................................8 | |
| Sec. 3.01. | Definitions....................................................................................8 | |
| Sec. 3.02. | Capital Contributions....................................................................8 | |
| Sec. 3.03. | Capital Accounts...........................................................................9 | |
| Sec. 3.04. | Partnership Percentages ................................................................9 | |
| Sec. 3.05. | Allocation of Net Capital Appreciation or Net Capital | |
| | Depreciation..................................................................................9 | |
| Sec. 3.06. | Loss Recovery Account...............................................................10 | |
| Sec. 3.07. | Valuation of Assets......................................................................10 | |
| Sec. 3.08. | Liabilities ...................................................................................11 | |
| Sec. 3.09. | Allocation for Tax Purposes .......................................................11 | |
| Sec. 3.10. | Determination by General Partner of Certain Matters...................12 | |
| Sec. 3.11. | Adjustments to Take Account of Interim Accounting | |
| | Period Events ..............................................................................12 | |
| | | |
| **ARTICLE IV** | WITHDRAWALS AND DISTRIBUTIONS OF CAPITAL ...........12 | |
| Sec. 4.01. | Withdrawals and Distributions in General....................................12 | |
| Sec. 4.02. | Withdrawals. ...............................................................................12 | |
| Sec. 4.03. | Limitation on Withdrawals ..........................................................13 | |
| Sec. 4.04. | Salaries or Other Payments or Allocations to the General | |
| | Partner.........................................................................................13 | |

i

303006.1

ARTICLE V        ADMISSION OF NEW PARTNERS ................................................................13
  Sec. 5.01.     New Partners ...............................................................................................13

ARTICLE VI       WITHDRAWAL, DEATH OR INSANITY OF PARTNERS ........................14
  Sec. 6.01.     Withdrawal, Death, etc ..............................................................................14
  Sec. 6.02.     Withdrawal, Death, etc ..............................................................................15
  Sec. 6.03.     Required Withdrawals ...............................................................................15
  Sec. 6.04.     Effective Date of Withdrawal ....................................................................16
  Sec. 6.05.     Limitations on Withdrawal of Capital Account ........................................16

ARTICLE VII      DURATION AND TERMINATION OF PARTNERSHIP ...........................16
  Sec. 7.01.     Duration .....................................................................................................16
  Sec. 7.02.     Termination ................................................................................................16
  Sec. 7.03.     Method of Distribution ..............................................................................17

ARTICLE VIII     REPORTS TO PARTNERS ..........................................................................17
  Sec. 8.01.     Independent Auditors .................................................................................17
  Sec. 8.02.     Filing of Tax Returns .................................................................................17
  Sec. 8.03.     Reports to Partners .....................................................................................17
  Sec. 8.04.     Reports to Partners and Former Partners ..................................................18
  Sec. 8.05.     Tax Matters Partner ...................................................................................18

ARTICLE IX       MISCELLANEOUS ......................................................................................18
  Sec. 9.01.     General .......................................................................................................18
  Sec. 9.02.     Power of Attorney ......................................................................................19
  Sec. 9.03.     Amendments to Partnership Agreement .....................................................19
  Sec. 9.04.     Adjustment of Basis of Partnership Property .............................................20
  Sec. 9.05.     Choice of Law ............................................................................................20
  Sec. 9.06.     Inspection of Books and Records ...............................................................20
  Sec. 9.07.     Notices .......................................................................................................20
  Sec. 9.08.     Goodwill .....................................................................................................20
  Sec. 9.09.     Headings .....................................................................................................21

303006.1

GREENWICH SENTRY, L.P.

_____

AMENDED AND RESTATED
LIMITED PARTNERSHIP AGREEMENT

Dated as of April 30, 2006

_____

This AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP dated as of April 30, 2006 (herein called the "Agreement") among the undersigned (herein called the "Partners", which term shall include any persons hereafter admitted to the Partnership pursuant to Article V of this Agreement and shall exclude any persons who cease to be Partners pursuant to Article VI of this Agreement) pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act (6 Del. C. Sec. 17101, et seq.) (the "Act").

ARTICLE I

GENERAL PROVISIONS

Sec. 1.01. Partnership Name. The Partnership shall do business under the name of Greenwich Sentry, L.P. (herein called the "Partnership").

Sec. 1.02. Fiscal Year. The fiscal year of the Partnership (herein called the "fiscal year") shall end on December 31 of each year or on such other date as the General Partner of the Partnership shall from time to time determine.

Sec. 1.03. Liability of Partners. The names and addresses of all of the Partners and the amounts of their respective contributions to the Partnership (herein called "Capital Contributions") are set forth in a schedule entitled "Schedule of Capital Contributions" (herein called the "Schedule") which shall be filed with the books and records of the Partnership and is hereby incorporated by reference and made a part of this Agreement.

Those Partners who are designated in Part I of the Schedule as General Partner (herein called the "General Partner" or "General Partners") and former General Partners shall have unlimited liability for the repayment and discharge of all debts and obligations of the Partnership attributable to any fiscal year during which they are or were General Partners of the Partnership.

Those Partners who are designated in Part II of the Schedule as Limited Partners and, former Limited Partners shall be liable for the repayment and discharge of all debts and obligations of the Partnership attributable to any fiscal year (or relevant portion thereof) during

which they are or were Limited Partners of the Partnership to the extent of their respective interests in the Partnership in the fiscal year (or relevant portion thereof) to which any such debts and obligations are attributable.

The Partners and all former Partners shall share all losses, liabilities or expenses suffered or incurred by virtue of the operation of the preceding paragraphs of this Sec. 1.03 in the proportions of their respective Partnership Percentages (determined as provided in Sec. 3.04 hereof, as adjusted pursuant to Sec. 3.11, if appropriate) for the fiscal year (or relevant portion thereof) to which any debts or obligations of the Partnership are attributable. A Limited Partner's or former Limited Partner's share of all losses, liabilities or expenses shall not be greater than its respective interests in the Partnership for such fiscal year (or relevant portion thereof). The General Partner and all former General Partners shall share all losses, liabilities or expenses suffered or incurred by virtue of the operation of the second paragraph of this Sec. 1.03 in excess of their respective interests in the Partnership in the fiscal year (or relevant portion thereof) to which any debts or obligations are attributable either in the proportions of their respective Partnership Percentages for such fiscal year (or relevant portion thereof) or in such proportions as have been agreed to by such General Partners.

As used in this Sec. 1.03, the terms "interests in the Partnership" and "interest in the Partnership" shall mean with respect to any fiscal year (or relevant portion thereof) and with respect to each Partner (or former Partner) the amount in the Capital Account of such Partner on the last day of such fiscal year (or relevant portion thereof) as determined under Article III hereof; provided, however, that if such Partner (or former Partner) shall have ceased to be a Partner of the Partnership pursuant to Article VI hereof as of the end of or during such fiscal year, the terms "interests in the Partnership" and "interest in the Partnership" shall mean the Capital Account of such Partner (or former Partner), prior to any adjustments to the Capital Account of such Partner for such fiscal year (or relevant portion thereof) pursuant to Article III hereof.

Notwithstanding any other provision in this Agreement, in no event shall any Limited Partner or former Limited Partner be obligated to make any additional contribution or payment, respectively, whatsoever to the Partnership, or have any liability for the repayment and discharge of the debts and obligations of the Partnership (apart from his or its interest in the Partnership), except that a Limited Partner (or former Limited Partner) may be required, for purposes of meeting his obligations under this Sec. 1.03, to make additional contributions or payments, respectively, up to, but in no event in excess of, the aggregate amount of returns of capital and other amounts actually received by him from the Partnership during or after the fiscal year to which any debt or obligation is attributable.

As used in this Agreement, the terms "former General Partners," "former Limited Partners," and "former Partners" refer to such persons or entities as hereafter from time to time cease to be General Partners, Limited Partners and Partners respectively pursuant to the terms and provisions of this Agreement.

2

Sec. 1.04. <u>Purposes of Partnership</u>. The Partnership is organized for the purposes of realizing capital appreciation by allocating its assets to securities trading accounts and engaging in all activities and transactions the General Partner may deem necessary or advisable in connection therewith, including, without limitation:

(a)     to invest and trade in capital stock of U.S. or foreign corporations, preorganization certificates and subscriptions, warrants, bonds, notes, debentures (whether subordinated, convertible or otherwise), rights, options, money market funds, commercial paper, certificates of deposit, bankers' acceptances, trust receipts, obligations of the United States, or any State thereof, and instrumentalities of any of them, and any other obligations and instruments or evidences of indebtedness commonly referred to as securities of whatever kind or nature of any person, corporation, government or entity whatsoever, whether readily marketable or not, in rights and options relating thereto including forward and futures contracts (and options thereon) relating to stock indices or other indices, financial instruments and commodities and commodity contracts, and put and call options written by the Partnership or by others (all such items being called herein a "Security" or "Securities"), to sell Securities short and cover such sales, and to lend funds or properties of the Partnership, either with or without security; and

(b)     to enter into, make and perform, all contracts and other undertakings, and engage in all activities and transactions, as the General Partner may deem necessary or advisable to the carrying out of the foregoing objects and purposes, including without limitation:

(i)     to purchase, hold, sell, exchange, transfer, mortgage, pledge and otherwise acquire and dispose of and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Securities owned by the Partnership;

(ii)    to borrow or raise moneys, and, from time to time without limit as to amount or manner and time of repayment, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any thereof (and of the interest thereon) by mortgage upon, or pledge, conveyance or assignment in trust of, the whole or any part of the property or funds of the Partnership, whether at the time owned or thereafter acquired and to sell, pledge or otherwise dispose of promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other instruments or evidences of indebtedness of the Partnership;

3

(iii)    to lend any of its Securities, provided that collateral at least equal in value to the market value of such Securities is deposited by the borrower thereof with the Partnership or its Agent;

(iv)    to maintain for the conduct of Partnership affairs one or more offices and in connection therewith rent or acquire office space, engage personnel, whether part-time or full-time, and do such other acts as the General Partner may deem necessary or advisable in with the maintenance and administration of such office or offices; and

(v)    to engage attorneys, independent accountants, other investment advisers, management companies or such other persons as the General Partner may deem necessary or advisable.

Sec. 1.05. Assignability of Interest. Without the prior written consent of the General Partner, a Partner may not (i) pledge or assign its interest in whole or in part to any person except by operation of law, or (ii) substitute for itself as a Partner any other person. Any attempted pledge, assignment or substitution not made in accordance with the preceding sentence shall be void.

## ARTICLE II

## MANAGEMENT OF PARTNERSHIP

Sec. 2.01. Management Generally. The power to make all decisions with regard to the management of the Partnership, unless otherwise specified, shall be vested exclusively in the General Partner. The Limited Partners shall have no part in the management of the Partnership, and shall have no authority or right to act on behalf of the Partnership in connection with any matter.

Sec. 2.02. Authority of the General Partner. Except as otherwise expressly provided in this Agreement, the General Partner shall have full, exclusive and complete discretion in the management of the Partnership and the power on behalf and in the name of the Partnership to take any action on behalf of the Partnership hereunder, to carry out any and all of the purposes of the Partnership set forth in Sec. 1.04, and to perform all acts and enter into and perform all contracts and other undertakings which it may deem necessary or advisable or incidental thereto, including, without limitation, the power to:

(a)    effect transactions in Securities utilizing such investment strategies and techniques as shall be determined by the General Partner; provided however, that such strategies and techniques shall be consistent with those described in any documents utilized in connection with the offer and sale of interests in the Partnership;

4

(b) open, conduct and close accounts, including margin accounts, with brokers, members of various options exchanges and money managers for the purpose of investing in Securities; which powers shall include, without limitation, the authority to pay, or authorize the payment of, brokerage commissions, management and incentive and/or performance fees (which may be in excess of the lowest commission rates or fee schedules available) and a portion of the Partnership's trading profits to, respectively (i) brokers which execute transactions for the account of the Partnership are, (ii) money managers receiving allocations of the Partnership's assets;

(c) open, maintain and close bank accounts and draw checks or other orders for the payment of moneys;

(d) lend, with or without security, any of the funds or properties of the Partnership and, from time to time without limit as to amount, borrow or raise funds and secure the payment of obligations of the Partnership by mortgage upon, or pledge or hypothecation of, all or any part of the property of the Partnership;

(e) do any and all acts on behalf of the Partnership, and exercise all rights of the Partnership, with respect to its interest in any person, firm, corporation or other entity, including without limitation the voting of Securities, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters;

(f) organize one or more corporations to hold record title, as nominee for the Partnership, to Securities or funds of the Partnership;

(g) act for and on behalf of the Partnership, and authorize any General Partner, employee or other agent of the Partnership to act in all matters incidental to the foregoing;

(h) act as investment adviser to the Partnership and provide research and analysis and direct the formulation of investment policies and strategies for the Partnership;

(i) to represent the Partnership and to make decisions affecting tax treatment of the Partnership, and Fairfield Greenwich (Bermuda) Ltd., the General Partner, is hereby designated as the Tax Matters Partner; and

(j) to exercise its discretion to waive for any Limited Partner any provision of this Partnership Agreement which imposes a requirement on a Limited Partner, whether it be for making an investment, withdrawing capital or

otherwise, if and so long as such waiver does not adversely affect the rights of any other Limited Partner.

Sec. 2.03. Reliance by Third Parties. Persons dealing with the Partnership are entitled to rely conclusively upon the certificate or representation of the General Partner to the effect that they are then acting as General Partner and upon the power and authority of the General Partner as herein set forth.

Sec. 2.04. Activity of the General Partner. The General Partner shall devote so much of its time to the affairs of the Partnership as in the judgment of the General Partner the conduct of the Partnership's business shall reasonably require, and the General Partner shall not be obligated to do or perform any act or thing in connection with the business of the Partnership not expressly set forth herein. Nothing herein contained shall be deemed to preclude the General Partner, or its affiliates, from engaging directly or indirectly, in any other business, irrespective of whether any such business is similar to the business of the Partnership or shall otherwise involve purchasing, selling or holding securities or allocating assets to money managers; and nothing herein contained shall be deemed to preclude the General Partner or its affiliates from directly or indirectly purchasing, selling and holding securities or investing with money managers for the account of any such other business, or for its or their own accounts irrespective of whether any securities or interests in money managers are purchased, sold or held for the account of the Partnership, either directly or through an investment in a money manager. No Limited Partner shall by reason of being a Partner in the Partnership have any right to participate in any manner in any profits or income earned or derived by or accruing to any General Partner from the conduct of any business other than the business of the Partnership, from any transaction in Securities or any interest purchased in a money manager effected by any General Partner or an affiliate thereof for any account other than that of the Partnership.

Sec. 2.05. Exculpation. No General Partner or any officer, director, employee or other agent of any of them ("Affiliates of the General Partner") shall be liable to any Partner or the Partnership for mistakes of judgment or for action or inaction which said person reasonably believed to be in the best interests of the Partnership, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any employee, broker, money manager or other agent of the Partnership, provided that such employee, broker, money manager or agent was selected, engaged or retained by the Partnership with reasonable care. The General Partner and the Affiliates of the General Partner may consult with counsel, advisers (investment and otherwise), and accountants in respect of Partnership affairs and shall be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel, advisers or accountants, provided that they shall have been selected with reasonable care. Notwithstanding any of the foregoing to the contrary, the provisions of this Sec. 2.05 shall not be construed so as to relieve (or attempt to relieve) any General Partner or any Affiliates of the General Partner of any liability, to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Sec. 2.05 to the fullest extent permitted by law.

6

Sec. 2.06. <u>Indemnification of General Partner</u>. To the fullest extent permitted by law, the Partnership shall indemnify and hold harmless each General Partner and former General Partner, Affiliates of the General Partner and/or the legal representatives, of any of them from and against any loss or expense suffered or sustained by him, by reason of the fact that he is or was a General Partner of the Partnership or an Affiliate of the General Partner, including without limitation any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding provided, such loss or expense resulted from a mistake of judgment on the part of such person, or from action or inaction taken in good faith for a purpose which said person reasonably believed to be in the best interests of the Partnership. The Partnership shall, in the sole discretion of the General Partner, advance to any General Partner and to any of the Affiliates of the General Partner, and/or the legal representatives of any of them, reasonable attorney's fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arises out of such conduct. The General Partner and the Affiliates of the General Partner, and the legal representative of any of them, shall agree, that in the event that he or it receives any such advance, such person shall reimburse the Partnership for such fees, costs and expenses to the extent it shall be determined that he or it was not entitled to indemnification under this section.

Sec. 2.07. <u>Payment of Costs and Expenses</u>. The Partnership shall be responsible for all legal, accounting and other organizational fees and expenses incurred in connection with the formation of the Partnership and the offering and sale of the limited partnership interests, such amounts were amortized among the Partners during the period of five years after the Partnership commenced operations; provided that offering expenses in excess of $25,000 were borne by the General Partner.

The General Partner shall bear all continuing offering costs and all expenses in maintaining the Partnership's offices and administration fees (collectively, the "Offering and Office Expenses"). The Partnership shall bear, for each Accounting Period, all other expenses incurred in the operation of the Partnership, if any, including, the Management Fee, taxes, the ordinary and necessary expenses directly related to the Partnership's investment and trading activities, including transactional costs (e.g., brokerage commissions and interest expense), escrow and custodial fees, registrar, transfer agent and administration fees, all legal, accounting and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Partnership; but excluding any legal fees incurred in the continuation of the offering of interests in the Partnership. The Partnership will pay the General Partner or its designee, an amount equal to one-fortieth of one percent (0.025%) of the Beginning Value allocable to the Capital Accounts of the Limited Partners to reimburse the General Partner for providing administrative services and back-office support to the Partnership (the "Expense Reimbursement"). To the extent a Limited Partner is charged the Management Fee, such Limited Partner will not be charged his pro-rata share of the Expense Reimbursement.

7

The General Partner may elect to have the Partnership pay any operating expenses required to be borne by the General Partner and to charge the amount paid to the General Partner's Capital Account (as defined in Sec. 3.03).

Sec. 2.08. The General Partner will receive a monthly management fee calculated at the annual rate of approximately 1% (.0833% per month) of each Limited Partner's capital account (the "Management Fee"). The Management Fee will be paid monthly in arrears based on the value of each Limited Partner's capital account as of the last day of each calendar month (adjusted for contributions made during the quarter). The General Partner, in its sole discretion, may waive or modify the Management Fee for Limited Partners that are members, employees or affiliates of the General Partner, relatives of such persons, and for certain large or strategic investors.

## ARTICLE III

## CAPITAL ACCOUNTS OF PARTNERS AND OPERATIONS THEREOF

Sec. 3.01. <u>Definitions</u>. For the purposes of this Agreement, unless the context otherwise requires:

(a)     The term "Accounting Period" shall mean a fiscal quarter of the Partnership.

(b)     The term "Beginning Value" shall, with respect to any Accounting Period or month, mean the value of the Partnership's Net Assets at the beginning of such Accounting Period or month.

(c)     The term "Ending Value" shall, with respect to any Accounting Period or month, mean the value of the Partnership's Net Assets at the end of such Accounting Period or month (before giving effect to withdrawals).

(d)     The term "Net Assets" shall mean the excess of the Partnership's assets over its liabilities.

(e)     The term "Net Capital Appreciation" shall, with respect to any Accounting Period, mean the excess, if any, of the Ending Value over the Beginning Value;

(f)     The term "Net Capital Depreciation" shall, with respect to any Accounting Period, mean the excess, if any, of the Beginning Value over the Ending Value.

Sec. 3.02. <u>Capital Contributions</u>.    Each Partner has made an initial cash contribution to the Partnership in the amount set forth opposite such Partner's name in Parts I or II of the Schedule (the "Initial Capital Contribution"). The General Partner has made Initial

8

Capital Contributions and may make such additional Capital Contributions in the future and each Limited Partner's Initial Capital Contribution has been in an amount not less than $1,000,000, subject to authority of the General Partner, in its sole discretion, to accept Initial Capital Contributions of less than $1,000,000. Additional capital contributions may be made by Partners only in accordance with provisions of Sec. 3.03. Capital Contributions to the Partnership shall not bear interest.

Sec. 3.03. <u>Capital Accounts</u>. A capital account (herein called the "Capital Account") shall be established on the books of the Partnership for each Partner. The Capital Account of each Partner shall be in an amount equal to such Partner's Initial Capital Contribution, adjusted as hereinafter provided. At the beginning of each Accounting Period, the Capital Account of each Partner shall be increased or decreased by the amount of any capital contribution to, or withdrawal from, the Partnership made by such Partner as of the first day of such Accounting Period. At the end of each Accounting Period, the Capital Account of each Partner shall be increased or decreased by the amount credited or debited to the Capital Account of such Partner pursuant to Sec. 3.05. In the event a Partner has either contributed or withdrawn capital during an Accounting Period, the adjustments and allocations set forth in Secs. 3.03 and 3.05 shall be made in accordance with Sec. 3.11.

Additional contributions to the Partnership may be made by Partners as of the first day of any calendar month, by notifying the General Partner of his or its desire to do so. The General Partner shall have the right to accept or decline any such additional contributions.

Sec. 3.04. <u>Partnership Percentages</u>. A partnership percentage (herein called the "Partnership Percentage") shall be determined for each Partner for each Accounting Period by dividing the amount of each Partner's Capital Account at the beginning of such Accounting Period by the sum of the aggregate Capital Accounts of all Partners at the beginning of such Accounting Period. The sum of the Partnership Percentages shall equal 100 percent. The Partnership Percentages shall be set forth in the Schedule.

Sec. 3.05. Allocation of Net Capital Appreciation or Net Capital Depreciation.

(a)     At the end of each Accounting Period, the Capital Account of each Partner (including the General Partner) for such Accounting Period shall be adjusted by crediting (in the case of Net Capital Appreciation) or debiting (in the case of Net Capital Depreciation) all Net Capital Appreciation or all Net Capital Depreciation (including the General Partner) in proportion to their respective Partnership Percentages. Such allocations shall be tentative and subject to readjustment as provided in Sec. 3.05(b).

(b)     At the end of each Accounting Period, (i) 20% of the Net Capital Appreciation allocated to a Limited Partner's Capital Account for such Accounting Period pursuant to Sec. 3.05(a) shall be reallocated to the Capital Account of the General Partner (the "Incentive Allocation"); provided, however, that such reallocations shall only be made to the extent

9

that aggregate Net Capital Appreciation for the Accounting Period exceeds the unrecovered balance remaining in the Loss Recovery Account (defined below) maintained on the books and records of the Partnership for such Limited Partner.

Sec. 3.06. <u>Loss Recovery Account</u>. There shall be established on the books of the Partnership for each Limited Partner a memorandum account (herein called the "Loss Recovery Account"), the opening balance of which shall be zero. At the end of each Accounting Period, the balance in each Limited Partner's Loss Recovery Account shall be adjusted as follows: (i) if there is Net Capital Depreciation for such Accounting Period, an amount equal to the Net Capital Depreciation allocated to such Limited Partner's Capital Account shall be charged to and increase such Limited Partner's Loss Recovery Account; or (ii) if there is Net Capital Appreciation for such Accounting Period, an amount equal to the Net Capital Appreciation before any Incentive Allocation to the General Partner, allocated to such Limited Partner's Capital account shall be credited to and reduce any unrecovered balance in such Limited Partner's Loss Recovery Account, but not below zero.

In the event that a Limited Partner with an unrecovered balance in his or its Loss Recovery Account withdraws all or a portion of his or its capital in the Partnership, the unrecovered balance in such Limited Partner's Loss Recovery Account shall be reduced as of the beginning of the next Accounting Period by an amount equal to the product obtained by multiplying the balance in such Limited Partner's Loss Recovery Account by a fraction, the numerator of which is the amount of the withdrawal made by such Limited Partner as of the last day of the prior Accounting Period and the denominator of which is the balance in such Limited Partner's Capital Account on the last day of the prior Accounting Period (prior to the withdrawal made by the Limited Partner as of the last day of the Accounting Period). Additional capital contributions shall not affect any Limited Partner's Loss Recovery Account.

Sec. 3.07. <u>Valuation of Assets</u>.

(a)     Securities which are listed on a national securities exchange shall be valued at their last sales prices on the date of determination on the largest national securities exchange on which such securities shall have traded on such date, or if trading in such Securities on the largest national securities exchange on which such Securities shall have traded on such date was reported on the consolidated tape, their last sales prices on the consolidated tape (or, in the event that the date of determination is not a date upon which a national securities exchange was open for trading, on the last prior date on which such securities was open not more than 10 days prior to the date of determination). If no such sales of Securities occurred on either of the foregoing dates, such Securities shall be valued at the "bid" price for long positions and "asked" price for short positions on the largest national securities exchange on which such securities are traded, on the date of determination, or, if "bid" prices for long positions

10

and "asked" prices for short positions in such Securities on the largest national securities exchange on which such Securities shall have traded on such date were reported on the consolidated tape, the "bid" price for long positions and "asked" price for short positions on the consolidated tape (or, if the date of determination is not a date upon which such securities exchange was open for trading, on the last prior date on which such a national securities exchange was so open not more than 10 days prior to the date of determination). Securities which are not listed shall be valued at representative "bid" quotations if held long by the Partnership and representative "asked" quotations if held short by the Partnership, unless included in the NASDAQ National Market System, in which case they shall be valued based upon their last sales prices (if such prices are available). Securities for which no such market prices are available shall be valued at such value as the General Partner may reasonably determine.

(b)     All other assets of the Partnership including any investments in Securities not capable of valuation pursuant to subparagraph (a) of this Sec. 3.07 (except good will, which shall not be taken into account), shall be assigned such value as the General Partner may reasonably determine.

(c)     If the General Partner determines that the valuation of any Securities or other property pursuant to Sec. 3.07 (a) does not fairly represent market value, the General Partner shall value such Securities or other property as they reasonably determine and shall set forth the basis of such valuation in writing in the Partnership's records.

(d)     All values assigned to Securities and other assets by the General Partner pursuant to this Article III shall be final and conclusive as to all of the Partners.

Sec. 3.08. Liabilities.    Liabilities shall be determined in accordance with generally accepted accounting principles, applied on a consistent basis, provided, however, that the General Partner in its discretion may provide reserves for contingencies.

Sec. 3.09. Allocation for Tax Purposes. For each fiscal year, items of income, deduction, gain, loss or credit shall be allocated for income tax purposes among the Partners in such manner as to reflect equitably amounts credited or debited to each Partner's Capital Account pursuant to Sec. 3.05 for the current and prior fiscal years. Such allocations shall be made pursuant to the principles of Section 704(c) of the Internal Revenue Code of 1986, as amended (the "Code"), and in conformity with Regulations Secs. 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(4)(i) promulgated thereunder, or the successor provisions to such Section and Regulations. Notwithstanding anything to the contrary in this Agreement, there shall be allocated to the Partners such gain or income as shall be necessary to satisfy the "qualified income offset" requirements of Regulation Sec. 1.704-1(b)(2)(ii)(d).

11

Sec. 3.10. <u>Determination by General Partner of Certain Matters</u>. All matters concerning the valuation of Securities and other assets of the Partnership, the allocation of profits, gains and losses among the Partners including taxes thereon, and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner, whose determination shall be final and conclusive as to all of the Partners.

Sec. 3.11. <u>Adjustments to Take Account of Interim Accounting Period Events</u>. If a Partner shall make additional capital contributions to the Partnership, withdraw from the Partnership or make a withdrawal from his or its Capital Account as of a date other than the last day of an Accounting Period, the General Partner shall make such adjustments in the determination and allocation among the Partners of Net Capital Appreciation, Net Capital Depreciation, Capital Accounts, Partnership Percentages, items of income, deduction, gain, loss or credit for tax purposes and accounting procedures as shall equitably take into account such interim Accounting Period event and applicable provisions of law, and the determination thereof by the General Partner shall be final and conclusive as of all of the Partners.

ARTICLE IV

WITHDRAWALS AND DISTRIBUTIONS
OF CAPITAL

Sec. 4.01. <u>Withdrawals and Distributions in General</u>. No Partner shall be entitled (i) to receive distributions from the Partnership, except as provided in Sec. 7.02; or (ii) to withdraw any amount from his or its Capital Account other than upon his or its withdrawal from the Partnership, except as provided in Sec. 4.02.

Sec. 4.02. Withdrawals.

(a)     Subject to Secs. 4.02(b) and 4.03, at the end of each calendar month, a Partner will have the right, upon fifteen (15) calendar days' prior written notice to the General Partner and the Partnership's administrator, if any, to withdraw all or any portion of his or its Capital Account. The Capital Account of a withdrawing Limited Partner shall be determined as of the effective date of his or its withdrawal, including deductions for accrued expenses, accrued Management Fee and any accrued Incentive Allocation. Payment of any amount withdrawn at the end of any accounting period pursuant to this Sec. 4.02 shall be made within 20 business days after the end of the calendar month in which such withdrawal is made.

(b)     With respect to the Capital Account of any foreign Partner, and notwithstanding any provision of this Agreement to the contrary, the General Partner shall withhold and pay over to the Internal Revenue Service, pursuant to Section 1441 of the Code, or any successor provision, at such times as required by such Section, such amounts as the Partnership

12

is required to withhold under such Section 1441, as from time to time in effect, on account of such foreign Partner's distributive share of the Partnership's items of gross income which are subject to withholding tax pursuant to such Section. To the extent that a foreign claims to be entitled to a reduced rate of, or exemption from, U.S. withholding tax pursuant to an applicable income tax treaty, or otherwise, the foreign Partner shall furnish the General Partner with such information and forms as it may require and are necessary to comply with the regulations governing the obligations of withholding tax agents. Each foreign Partner represents and warrants that any such information and forms furnished by it shall be true and accurate and agrees to indemnify the Partnership and each of the Partners from any and all damages, costs and expenses resulting from the filing of inaccurate or incomplete information or forms relating to such withholding taxes.

Any amount of withholding taxes withheld and paid over by the General Partner with respect to a foreign Partner's distributive share of the Partnership's gross income shall be treated as a distribution to such foreign Partner and shall be charged against the Capital Account of such foreign Partner.

Sec. 4.03. <u>Limitation on Withdrawals</u>. The right of any Partner to withdraw any amount from his or its Capital Account pursuant to the provisions of Sec. 4.02 is subject to the provision by the General Partner for (i) Partnership liabilities in accordance with generally accepted accounting principles, and (ii) reserves for contingencies, all in accordance with Sec. 3.08. The unused portion of any reserve shall be distributed, with interest at the prevailing savings bank rate for unrestricted deposits from time to time in effect in New York, New York, as determined by the General Partner, after the General Partner has determined that the need therefor shall have ceased.

Sec. 4.04. <u>Salaries or Other Payments or Allocations to the General Partner</u>. Except for the Incentive Allocation, the Management Fee, and the Expense Reimbursement, the Partnership shall not make any payments or allocations to the General Partner other than the allocation of Net Capital Appreciation (if any) to the General Partner in respect of its Partnership Percentage pursuant to Sec. 3.05(a), and reimbursement for certain allocable expenses.

ARTICLE V

ADMISSION OF NEW PARTNERS

Sec. 5.01. <u>New Partners</u>. Partners may, with the consent of the General Partner, be admitted to the Partnership as of the beginning of each calendar month or at such other times as permitted by the General Partner in its sole discretion. Each new partner will be required to execute an agreement pursuant to which he or it becomes bound by the terms of this Agreement. Admission of a new Partner shall not be cause for dissolution of the Partnership.

13

303006.1

## ARTICLE VI

## WITHDRAWAL, DEATH OR INSANITY OF PARTNERS

Sec. 6.01. <u>Withdrawal, Death, etc. of a General Partner</u>. A General Partner may, upon 15 calendar days' prior written notice to the Partnership and the Partnership's administrator, if any, withdraw from the Partnership at the end of any calendar month with the consent of each of the other General Partners, if any. Upon the withdrawal, death, disability, adjudication of incompetency, bankruptcy or insolvency of any General Partner, the Partnership shall dissolve unless there are one or more remaining General Partners who agree to continue the Partnership. In the event that the remaining General Partners determine not to continue the Partnership, the remaining General Partners, or if there is no remaining General Partner, one or more persons selected by a majority in interest of the Limited Partners, shall terminate and wind up the affairs of the Partnership in accordance with Sec. 7.02.

In the event of the death, disability, adjudication of incompetency, bankruptcy or insolvency of a General Partner or the giving of notice of withdrawal by a General Partner, the interest of such General Partner shall continue at the risk of the Partnership business until (i) the last day of the fiscal year in which such event takes place (or such earlier date as shall be determined by the General Partners) (herein called the "determination date") or, (ii) the earlier termination of the Partnership. If the Partnership is continued after the expiration of the determination date, such General Partner or his legal representatives shall be entitled to receive within 90 days of the determination date, in accordance with Sec. 6.02, the Capital Account of such General Partner as of the effective date of such General Partner's withdrawal as determined pursuant to Sec. 6.04 hereof. The General Partners may withhold from such balance an amount equal to the legal, accounting and administrative costs associated with the General Partner's withdrawal, if it determines that such costs should not be borne by the Partnership. A General Partner who serves notice of withdrawal, dies, or becomes disabled, incompetent, bankrupt, or insolvent or a General Partner's legal representative who serves such notice, shall have no right to take part in the management of the business of the Partnership and the interest or Partnership Percentage of such General Partner shall not be included in calculating the interests of the Partners or General Partners, respectively, required to take action under any provision of this Agreement.

If a General Partner shall become disabled, and such disability shall continue for a period of six consecutive months, the General Partners (or if the disabled General Partner is the sole remaining General Partner, one or more persons selected by a majority in interest of the Limited Partners) may require such General Partner to withdraw from the Partnership as of the last day of the fiscal year in which the six month period shall expire in which case the Partnership shall be terminated and its affairs wound up in accordance with Sec. 7.02. A General Partner required to withdraw pursuant to this paragraph of Sec. 6.01 shall be treated for all purposes and in all respects as a General Partner who withdraws involuntarily due to death or insanity.

14

A General Partner shall be deemed to be "disabled" if, by reason of physical or mental disease, illness or injury, he is rendered unable to perform, or to supervise the performance of, his functions as a General Partner hereunder for a period of not less than 45 consecutive days.

Sec. 6.02. <u>Withdrawal, Death, etc. of Limited Partner</u>. A Limited Partner may, upon fifteen (15) calendar days' prior notice, withdraw from the Partnership at the end of any calendar month of the Partnership. The withdrawal, death, disability, incompetency, bankruptcy, insolvency, termination or dissolution of a Limited Partner shall not dissolve the Partnership.

In the event of the death, disability, incompetency, bankruptcy, insolvency, termination or dissolution of a Limited Partner or the giving of notice of withdrawal by a Limited Partner, the interest of such Limited Partner shall continue at the risk of the Partnership business until (i) the last day of the calendar month in which such event takes place (or such earlier date as shall be determined by the General Partner) (herein called the "month of determination") or (ii) the earlier termination of the Partnership. If the Partnership is continued after the expiration of the month of determination, such Limited Partner or his legal representatives shall be entitled to receive within 90 days of the end of such calendar month (or earlier withdrawal date), the amount of the Capital Account of such Limited Partner as of the effective date of withdrawal as determined under Sec. 6.04. The interest of a Limited Partner who serves notice of withdrawal, dies or becomes disabled, incompetent, bankrupt, insolvent or is terminated or dissolved, or a Limited Partner's legal representative who serves such notice shall have no right to be included in calculating the Partnership Percentages of the Limited Partners required to take any action under this Agreement.

A Limited Partner who withdraws from the Partnership shall be paid at least 97% of his estimated Capital Account within 20 business days after the last day of the month of determination. The balance of such Limited Partner's Capital Account shall be paid (subject to audit adjustments and with interest) within 30 days after completion of the audit of the Partnership's books for the fiscal year of the quarter of determination pursuant to Sec. 8.01. The interest of a Limited Partner withdrawing pursuant to this paragraph shall not be included in calculating Partnership Percentages of the Limited partners required to take any action under this Agreement.

Sec. 6.03. <u>Required Withdrawals</u>. The General Partner may (i) terminate the interest of any Limited Partner in the Partnership at the end of any calendar month, upon at least 10 days' prior written notice and (ii) terminate the interest of any Limited Partner at any time upon at least five days' prior written notice, if, among other reasons, the General Partner determines that the continued participation of such Limited Partner in the Partnership might cause the Partnership or any Partner to violate any law, or if any litigation is commenced or threatened against the Partnership or any Partner arising out of, or relating to, the participation of such Limited Partner in the Partnership. A notice of termination pursuant to this Sec. 6.03 shall have the same effect as a notice of withdrawal by such Limited Partner pursuant to Sec. 6.02 and

15

the Limited Partner receiving such notice shall be treated for all purposes and in all respects as a Limited Partner who has given notice of withdrawal.

Sec. 6.04. <u>Effective Date of Withdrawal</u>. The Capital Account of a withdrawing Limited Partner shall be determined as of the effective date of his or its withdrawal, including deductions for accrued expenses (including the Expense Reimbursement), accrued Management Fee and any accrued Incentive Allocation. For purposes of this Sec. 6.04, the effective date of a Limited Partner's withdrawal shall mean (as the case may be): (i) the last day of the calendar month in which such Partner shall cease to be a Partner pursuant to Sec. 6.02 or clause (i) of Sec. 6.03; or (ii) the date specified in the written notice referred to in clause (ii) of Sec. 6.03 if such Partner shall be required to withdraw from the Partnership pursuant to such clause. In the event the effective date of a Limited Partner's withdrawal shall be a date other than the last day of a calendar month of the Partnership, the effective date of such Limited Partner's withdrawal shall be deemed to be the last day of a calendar month for purposes of adjusting the Capital Account of the withdrawing Limited Partner pursuant to Sec. 3.05.

Sec. 6.05. <u>Limitations on Withdrawal of Capital Account</u>. The right of any withdrawn, deceased, disabled, incompetent, bankrupt, insolvent, terminated or dissolved partner or his legal representative to have distributed the Capital Account of such Partner pursuant to this Article VI is subject to the provision by the General Partner for all Partnership liabilities and for reserves for contingencies. The unused portion of any reserve shall be distributed, with interest at the prevailing savings bank rate for unrestricted deposits from time to time in effect in New York City, as determined by the General Partner, after the General Partner shall have determined that the need therefor shall have ceased.

## ARTICLE VII

## DURATION AND TERMINATION OF PARTNERSHIP

Sec. 7.01. <u>Duration</u>. The Partnership shall continue until December 31, 2112, unless sooner terminated pursuant to Sec. 6.01 or at any time, by decision of the General Partner.

Sec. 7.02. <u>Termination</u>. On termination of the business of the Partnership, the General Partner, or in the event of a termination pursuant to Sec. 6.01, the persons representing the Limited Partners shall, promptly after completion of a final audit of the Partnership's books and records (which shall be performed within 90 days of such termination) make distributions out of the Partnership assets, in the following manner and order:

(a)     to payment and discharge of the claims of all creditors of the Partnership who are not Partners;

(b)     to payment and discharge pro rata of the claims of all creditors of the Partnership who are Partners; and

(c)     to the Partners in the relative proportions that their respective Liquidating Shares bear to each other.

In the event that the Partnership is terminated on a date other than the last day of a fiscal year, the date of such termination shall be deemed to be the last day of an Accounting Period for purposes of adjusting the Capital Accounts of the Partners pursuant to Sec. 3.05. For purposes of distributing the assets of the Partnership upon termination, the General Partner shall be entitled to a return, on a pari passu basis with the Limited Partners, of the amounts standing to their credit in their respective Capital Accounts, and, with respect to their share of profits, based upon their Partnership Percentages.

Sec. 7.03. Method of Distribution. Distributions made pursuant to subparagraphs (a) and (b) of Sec. 7.02 shall be made solely in cash.

## ARTICLE VIII

## REPORTS TO PARTNERS

Sec. 8.01. Independent Auditors. The Partnership shall maintain true and complete books of account and records which shall be audited as of the end of each fiscal year by independent certified public accountants selected by the General Partner.

Sec. 8.02. Filing of Tax Returns. The General Partner shall prepare and file, or cause the accountants of the Partnership to prepare and file, a federal information tax return in compliance with Section 6031 of the Code and any required state and local income tax and information returns for each tax year of the Partnership.

Sec. 8.03. Reports to Partners. Within 90 days after the end of each fiscal year, the Partnership shall prepare, or cause to be prepared, and mail to each Partner, together with the report thereon of the independent certified public accountants selected by the General Partner, a financial report setting forth as of the end of each fiscal year:

(a)     a profit and loss statement showing the results of operations of the Partnership together with the Net Capital Appreciation or Net Capital Depreciation of the Partnership;

(b)     such Partner's Capital Account and the manner of its calculation; and

(c)     such Partner's Partnership Percentage as of the end of such fiscal year.

Within 30 days following the end of each of the first Accounting Periods in each fiscal year, or at more frequent intervals as determined in the sole and exclusive discretion of the General Partner, the Partnership shall prepare and mail to each Partner a report setting forth, as of the end of such Accounting Period, the information described in sub-paragraphs (a) and (b) above for such Accounting Period.

17

Sec. 8.04. <u>Reports to Partners and Former Partners</u>. In addition, the independent certified public accountants selected by the General Partner shall prepare and mail (i) to each Partner and (ii) to each former Partner (or his legal representatives) to the extent necessary a report setting forth in sufficient detail such transactions effected by the Partnership during such fiscal year as shall enable such Partner or former Partner (or his legal representatives) to prepare their respective federal income tax returns in accordance with the laws, rule and regulations then prevailing. The Partners (and each employee, representative or other agent of a Partner) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of Partnership transactions and all materials of any kind (including opinions and tax analyses) that are provided to any such Partner relating to such tax treatment and tax structure.

Sec. 8.05. <u>Tax Matters Partner</u>. The General Partner shall at all times constitute, and have full powers and responsibilities as, the Tax Matters Partner of the Partnership with respect to such return for purposes of Section 6231(a)(7) of the Code. Each person (herein called a "Pass-Thru Partner") that holds or controls an interest as a Limited Partner on behalf of, or for the benefit of another person or persons, or which Pass-Thru Partner is beneficially owned (directly or indirectly) by another person or persons shall, within 30 days following receipt from the Tax Matters Partner of any notice, demand, request for information or similar document, convey such notice or other document in writing to all holders of beneficial interests in the partnership holding such interests through such Pass-Thru Partner. In the event the Partnership shall be the subject of an income tax audit by any federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership.

ARTICLE IX

MISCELLANEOUS

Sec. 9.01. <u>General</u>. This Agreement: (i) shall be binding on the executors, administrators, estates, heirs, and legal successors and representatives of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the State of Delaware; and (iii) may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written, provided, however, that each separate counterpart shall have been executed by at least one of the General Partners, if there is more than one General Partner, and that the several counterparts, in the aggregate, shall have been signed by all the Partners. Except as otherwise provided herein, whenever any action is to be taken by the General Partners, it shall be authorized by a majority of the General Partners.

18

Sec. 9.02. Power of Attorney. Each of the undersigned does hereby constitute and appoint the General Partner, acting individually, as his true and lawful representative and attorney-in-fact, in his name, place and stead to make, execute, sign and file:

      (a)      a Certificate of Limited Partnership of the Partnership and all amendments thereto as may be required under the Act or otherwise including, without limitation, any such filing for the purpose of admitting the undersigned and others as Limited Partners and describing their initial or any increased Capital Contributions;

      (b)      all amendments or modifications to the Partnership Agreement to the extent provided in the last paragraph of this Sec. 9.02;

      (c)      any and all instruments, certificates, and other documents which may be deemed necessary or desirable to effect the winding-up and termination of the Partnership (including, but not limited to, a Certificate of Cancellation of the Certificate of Limited Partnership); and

      (d)      any business certificate, fictitious name certificate, amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Partnership, or required by any applicable federal, state or local law.

The power of attorney hereby granted by each of the Partners is coupled with an interest, is irrevocable, and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of such Limited Partner.

Such representative and attorney-in-fact shall not have any right, power or authority to amend or modify this Agreement when acting in such capacity, except in the case of an amendment or modification permitted without the approval of the Partners pursuant to Sec. 9.03 or approved by the requisite Partnership Percentages of the Partners.

Sec. 9.03. Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the written consent of Partners having in excess of 50% of the Partnership Percentages of the Partners and the written consent of the General Partner insofar as is consistent with the laws governing this Agreement, provided, however, that, without the specific consent of each Partner affected thereby, no such modification or amendment shall (i) reduce the Capital of any Partner or his rights of contribution or withdrawal with respect thereto; (ii) amend Sec. 3.05; or (iii) amend this Sec. 9.03, and provided, further, that without the consent of the Partners the General Partner may (i) amend the Agreement or Schedule hereto to reflect changes validly made in the membership of the Partnership and the Capital Contributions and Partnership Percentages of the partners; (ii) reflect a change in the name of the Partnership or the effective date of the Partnership; (iii) make a change that is necessary or, in the opinion of the General Partner, qualify the Partnership as a

19

limited partnership or a partnership in which the Limited Partners have limited liability under the laws of any state, or ensure that the Partnership will not be treated as an association taxable as a corporation for federal income tax purposes; (iv) make a change that does not adversely affect the Partners in any material respect, or that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with any other provisions of this Agreement, in each case so long as such change does not adversely affect the Partners; (v) make a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state statute, so long as such change is made in a manner which minimizes any adverse effect on the Partners, or that is required or contemplated by this Agreement; (vi) make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the General Partner or the Partnership pursuant to the requirements of applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required; or (vii) make any other amendments similar to the foregoing.

Sec. 9.04. Adjustment of Basis of Partnership Property. In the event of a distribution of Partnership property to a Partner or an assignment or other transfer (including by reason of death) of all or part of the interest of a Limited Partner in the Partnership, the General Partner, in their discretion, may cause the Partnership to elect, pursuant to Section 754 of the Code, or the corresponding provision of subsequent law, to adjust the basis of the Partnership property as provided by Sections 734 and 743 of the Code.

Sec. 9.05. Choice of Law. Notwithstanding the place where the Agreement may be executed by any of the parties thereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of Delaware and, without limitation thereof, that the Act as now adopted or as may be hereafter mended shall govern the partnership aspects of this Agreement.

Sec. 9.06. Inspection of Books and Records. The Partnership's books of account and records shall be available for inspection by any Partner during reasonable business hours at the office of the Partnership.

Sec. 9.07. Notices. Each notice relating to this Agreement shall be in writing and delivered in person or by registered or certified mail. All notices to the Partnership shall be addressed to its principal office and place of business. All notices addressed to a Partner shall be addressed to such Partner at the address set forth in the Schedule. Any Partner may designate a new address by notice to that effect given to the Partnership. Unless otherwise specifically provided in this Agreement, a notice shall be deemed to have been effectively given when mailed by registered or certified mail to the proper address or delivered in person.

Sec. 9.08. Goodwill. No value shall be placed on the name or goodwill of the Partnership, which shall belong exclusively to the General Partner.

20

Sec. 9.09. <u>Headings</u>. The titles of the Articles and the headings of the Sections of this Agreement are for convenience of reference only and are not to be considered in construing terms and provisions of this Agreement.

IN WITNESS WHEREOF, the undersigned have hereto set their hands and seals as of the day and year first above written.

GENERAL PARTNER:                          LIMITED PARTNERS:
FAIRFIELD GREENWICH (BERMUDA)
LTD.
    A Bermuda Corporation

By:_____        _____
    Director                          Fairfield Greenwich (Bermuda) Ltd., by Amit
                                  Vijayvergiya, Vice President,
                                  Attorney-in-Fact, pursuant to Power of
                                  Attorney in Sec. 9.02 of the Amended and
                                  Restated Limited Partnership Agreement

21

GREENWICH SENTRY, L.P.

<u>SCHEDULE OF CAPITAL CONTRIBUTIONS</u>

22

**Uniform Application for Investment Adviser Registration**

OMB APPROVAL

| | |
|---|---|
| OMB Number: | 3235-0049 |
| Expires: | July 31, 2008 |
| Estimated average burden hours per response..... | 9.402 |

Name of Investment Adviser:
**Fairfield Greenwich (Bermuda) Ltd.**

| Address: (Number and Street) | (City) | (State) | (Zip Code) | Area Code    Telephone Number |
|---|---|---|---|---|
| **Armoury Bldng. 37 Reid St., FL 1   Hamilton, Bermuda** | | | **HM12** | **(441    ) 292-5401** |

This part of Form ADV gives information about the investment adviser and its business for the use of clients. The information has not been approved or verified by any governmental authority.

## Table of Contents

| Item Number | Item | Page |
|---|---|---|
| 1 | Advisory Services and Fees ................................................... | 2 |
| 2 | Types of Clients ............................................................. | 2 |
| 3 | Types of Investments ........................................................ | 3 |
| 4 | Methods of Analysis, Sources of Information and Investment Strategies ......................... | 3 |
| 5 | Education and Business Standards ........................................... | 4 |
| 6 | Education and Business Background ......................................... | 4 |
| 7 | Other Business Activities .................................................... | 4 |
| 8 | Other Financial Industry Activities or Affiliations ............................................ | 4 |
| 9 | Participation or Interest in Client Transactions .............................................. | 5 |
| 10 | Conditions for Managing Accounts .......................................... | 5 |
| 11 | Review of Accounts .......................................................... | 5 |
| 12 | Investment or Brokerage Discretion ......................................... | 6 |
| 13 | Additional Compensation .................................................... | 6 |
| 14 | Balance Sheet .............................................................. | 6 |
| | Continuation Sheet .......................................................... | Schedule F |
| | Balance Sheet, if required .................................................. | Schedule G |

(Schedules A, B, C, D, and E are included with Part I of this Form, for the use of regulatory bodies, and are not distributed to clients.)

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

Copyright © 2004 National Regulatory Services (Portions of Software Only)

**1.  A.  Advisory Services and Fees.** (check the applicable boxes)

For each type of service provided, state the approximate % of total advisory billings from that service. (See instruction below.)

**Applicant:**

| | | | |
|---|---|---|---|
| ☐ | (1) | Provides investment supervisory services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | _____ % |
| ☒ | (2) | Manages investment advisory accounts not involving investment supervisory services . . . . . . . . . . . . . . . . . . . . . . . . . | **100** % |
| ☐ | (3) | Furnishes investment advice through consultations not included in either service described above . . . . . . . . . . . . . . . . . | _____ % |
| ☐ | (4) | Issues periodicals about securities by subscription . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | _____ % |
| ☐ | (5) | Issues special reports about securities not included in any service described above . . . . . . . . . . . . . . . . . . . . . . . | _____ % |
| ☐ | (6) | Issues, not as part of any service described above, any charts, graphs, formulas, or other devices which clients may use to evaluate securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | _____ % |
| ☐ | (7) | On more than an occasional basis, furnishes advice to clients on matters not involving securities . . . . . . . . . . . . . . . . . | _____ % |
| ☐ | (8) | Provides a timing service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | _____ % |
| ☐ | (9) | Furnishes advice about securities in any manner not described above . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | _____ % |

(Percentages should be based on applicant's last fiscal year. If applicant has not completed its first fiscal year, provide estimates of advisory billings for that year and state that the percentages are estimates.)

**B.**  Does applicant call any of the services it checked above financial planning or some similar term? . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Yes ☐  No ☒

**C.**  Applicant offers investment advisory services for: (check all that apply)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | (1) | A percentage of assets under management | ☐ | (4) | Subscription fees |
| ☐ | (2) | Hourly charges | ☐ | (5) | Commissions |
| ☒ | (3) | Fixed fees (not including subscription fees) | ☒ | (6) | Other |

**D.**  For each checked box in A above, describe on Schedule F:
- the services provided, including the name of any publication or report issued by the adviser on a subscription basis or for a fee
- applicant's basic fee schedule, how fees are charged and whether its fees are negotiable
- when compensation is payable, and if compensation is payable before service is provided, how a client may get a refund or may terminate an investment advisory contract before its expiration date

**2.  Types of Clients** — Applicant generally provides investment advice to: (check those that apply)

| | | | | | |
|---|---|---|---|---|---|
| ☐ | A. | Individuals | ☐ | E. | Trusts, estates, or charitable organizations |
| ☐ | B. | Banks or thrift institutions | ☐ | F. | Corporations or business entities other than those listed above |
| ☐ | C. | Investment companies | ☒ | G. | Other (describe on Schedule F) |
| ☐ | D. | Pension and profit sharing plans | | | |

---

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

Copyright © 2004 National Regulatory Services (Portions of Software Only)

**3.** **Types of Investments.** Applicant offers advice on the following: (check those that apply)

A.  Equity securities

☒ (1) exchange-listed securities
☒ (2) securities traded over-the-counter
☒ (3) foreign issuers

☒ B.  Warrants

☒ C.  Corporate debt securities (other than commercial paper)

☒ D.  Commercial paper

☒ E.  Certificates of deposit

☐ F.  Municipal securities

G.  Investment company securities:

☐ (1) variable life insurance
☐ (2) variable annuities
☒ (3) mutual fund shares

☒ H.  United States government securities

I.  Options contracts on:

☒ (1) securities
☒ (2) commodities

J.  Futures contracts on:

☒ (1) tangibles
☒ (2) intangibles

K.  Interests in partnerships investing in:

☐ (1) real estate
☐ (2) oil and gas interests
☐ (3) other (explain on Schedule F)

☒ L.  Other (explain on Schedule F)

**4.** **Methods of Analysis, Sources of Information, and Investment Strategies.**

A.  Applicant's security analysis methods include: (check those that apply)

(1) ☐ Charting
(2) ☐ Fundamental
(3) ☐ Technical

(4) ☐ Cyclical
(5) ☒ Other (explain on Schedule F)

B.  The main sources of information applicant uses include: (check those that apply)

(1) ☐ Financial newspapers and magazines
(2) ☐ Inspections of corporate activities
(3) ☐ Research materials prepared by others
(4) ☐ Corporate rating services

(5) ☐ Timing services
(6) ☐ Annual reports, prospectuses, filings with the Securities and Exchange Commission
(7) ☐ Company press releases
(8) ☒ Other (explain on Schedule F)

C.  The investment strategies used to implement any investment advice given to clients include: (check those that apply)

(1) ☐ Long term purchases (securities held at least a year)
(2) ☐ Short term purchases (securities sold within a year)
(3) ☐ Trading (securities sold within 30 days)
(4) ☐ Short sales

(5) ☐ Margin transactions
(6) ☐ Option writing, including covered options, uncovered options, or spreading strategies
(7) ☒ Other (explain on Schedule F)

Copyright © 2004 National Regulatory Services (Portions of Software Only)

**5.** **Education and Business Standards.**

Are there any general standards of education or business experience that applicant requires of those involved in determining or giving investment advice to clients? ............................................................................................. Yes ☒ No ☐

*(If yes, describe these standards on Schedule F.)*

**6.** **Education and Business Background.**

For:

- each member of the investment committee or group that determines general investment advice to be given to clients, or
- if the applicant has no investment committee or group, each individual who determines general investment advice given to clients (if more than five, respond only for their supervisors)
- each principal executive officer of applicant or each person with similar status or performing similar functions.

On Schedule F, give the:

- name
- year of birth
- formal education after high school
- business background for the preceding five years

**7.** **Other Business Activities.** (check those that apply)

- ☐ A. Applicant is actively engaged in a business other than giving investment advice.
- ☐ B. Applicant sells products or services other than investment advice to clients.
- ☐ C. The principal business of applicant or its principal executive officers involves something other than providing investment advice.

*(For each checked box describe the other activities, including the time spent on them, on Schedule F.)*

**8.** **Other Financial Industry Activities or Affiliations.** (check those that apply)

- ☐ A. Applicant is registered (or has an application pending) as a securities broker-dealer.
- ☐ B. Applicant is registered (or has an application pending) as a futures commission merchant, commodity pool operator or commodity trading adviser.
- C. Applicant has arrangements that are material to its advisory business or its clients with a related person who is a:

| | | | | | |
|---|---|---|---|---|---|
| ☒ | (1) | broker-dealer | ☐ | (7) | accounting firm |
| ☐ | (2) | investment company | ☐ | (8) | law firm |
| ☒ | (3) | other investment adviser | ☐ | (9) | insurance company or agency |
| ☐ | (4) | financial planning firm | ☐ | (10) | pension consultant |
| ☒ | (5) | commodity pool operator, commodity trading adviser or futures commission merchant | ☐ | (11) | real estate broker or dealer |
| ☐ | (6) | banking or thrift institution | ☐ | (12) | entity that creates or packages limited partnerships |

*(For each checked box in C, on Schedule F identify the related person and describe the relationship and the arrangements.)*

D. Is applicant or a related person a general partner in any partnership in which clients are solicited to invest? .......................... Yes ☒ No ☐

*(If yes, describe on Schedule F the partnerships and what they invest in.)*

---

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

Copyright © 2004 National Regulatory Services (Portions of Software Only)

**9.** **Participation or Interest in Client Transactions.**

Applicant or a related person: (check those that apply)

- ☐ A. As principal, buys securities for itself from or sells securities it owns to any client.

- ☐ B. As broker or agent effects securities transactions for compensation for any client.

- ☐ C. As broker or agent for any person other than a client effects transactions in which client securities are sold to or bought from a brokerage customer.

- ☒ D. Recommends to clients that they buy or sell securities or investment products in which the applicant or a related person has some financial interest.

- ☒ E. Buys or sells for itself securities that it also recommends to clients.

(For each box checked, describe on Schedule F when the applicant or a related person engages in these transactions and what restrictions, internal procedures, or disclosures are used for conflicts of interest in those transactions.)

Describe, on Schedule F, your code of ethics, and state that you will provide a copy of your code of ethics to any client or prospective client upon request.

**10.** **Conditions for Managing Accounts.** Does the applicant provide investment supervisory services, manage investment advisory accounts or hold itself out as providing financial planning or some similarly termed services *and* impose a minimum dollar value of assets or other conditions for starting or maintaining an account? ................................................................

Yes ☒  No ☐

(If yes, describe on Schedule F.)

**11.** **Review of Accounts.** If applicant provides investment supervisory services, manages investment advisory accounts, or holds itself out as providing financial planning or some similarly termed services:

A. Describe below the reviews and reviewers of the accounts. **For reviews**, include their frequency, different levels, and triggering factors. **For reviewers**, include the number of reviewers, their titles and functions, instructions they receive from applicant on performing reviews, and number of accounts assigned each.

Accounts are reviewed at the individual security level in Bermuda and discussed among members of the Applicant's team several times each month. Applicant also utilizes a number of independent, sophisticated quantitative measurement tools to monitor the performance of its accounts (as well as those accounts managed by an affiliated New York-based registered adviser), compliance with investment guidelines, and risk analysis. Applicant's personnel review changes in a variety of factors, including changes in organization, investment process, the manager's view of the relevant markets, and their portfolio's position with respect to those views. The findings are discussed at regular investment committee meetings.

B. Describe below the nature and frequency of regular reports to clients on their accounts.

Investors will receive audited financial statements of the applicable fund annually, and unaudited performance reports at least monthly. In addition, investors may also receive quarterly or semi-annual letters regarding their investments.

Copyright © 2004 National Regulatory Services (Portions of Software Only)

**12. Investment or Brokerage Discretion.**

A. Does applicant or any related person have authority to determine, without obtaining specific client consent, the:

|  |  | Yes | No |
|---|---|---|---|
| (1) | securities to be bought or sold? | ☒ | ☐ |
| (2) | amount of the securities to be bought or sold? | ☒ | ☐ |
| (3) | broker or dealer to be used? | ☒ | ☐ |
| (4) | commission rates paid? | ☒ | ☐ |

B. Does applicant or a related person suggest brokers to clients? .......................................... ☒ Yes ☐ No

For each yes answer to A describe on Schedule F any limitations on the authority. For each yes to A(3), A(4) or B, describe on Schedule F the factors considered in selecting brokers and determining the reasonableness of their commissions. If the value of products, research and services given to the applicant or a related person is a factor, describe:

- the products, research and services

- whether clients may pay commissions higher than those obtainable from other brokers in return for those products and services

- whether research is used to service all of applicant's accounts or just those accounts paying for it; and

- any procedures the applicant used during the last fiscal year to direct client transactions to a particular broker in return for products and research services received.

**13. Additional Compensation.**

Does the applicant or a related person have any arrangements, oral or in writing, where it:

A. is paid cash by or receives some economic benefit (including commissions, equipment or non-research services) from a non-client in connection with giving advice to clients? .......................................... ☒ Yes ☐ No

B. directly or indirectly compensates any person for client referrals? .......................................... ☒ Yes ☐ No

(For each yes, describe the arrangements on Schedule F.)

**14. Balance Sheet.** Applicant must provide a balance sheet for the most recent fiscal year on Schedule G if applicant:

- has custody of client funds or securities (unless applicant is registered or registering only with the Securities and Exchange Commission); or

- requires prepayment of more than $500 in fees per client and 6 or more months in advance
Has applicant provided a Schedule G balance sheet? .......................................... ☐ Yes ☒ No

---

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

Copyright © 2004 National Regulatory Services (Portions of Software Only )

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br>**Fairfield Greenwich (Bermuda) Ltd.** | | IRS Empl. Ident. No.: |
| --- | --- | --- |

| Item of Form<br>(identify) | Answer |
| --- | --- |
| **Items 1.D. and 2.G.** | Fairfield Greenwich (Bermuda) Ltd. ("FGB" or "Applicant"), an exempted company incorporated under the laws of Bermuda on June 13, 2003, provides managerial and/or administrative services to five (5) private investment funds established in the British Virgin Islands and the Cayman Islands (the "Offshore Funds"), and serves as the general partner to two (2) private investment funds established in the U.S., (the "Onshore Funds"), (collectively, the "FGB Funds"). Applicant is a wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL"), an exempted company incorporated in the Cayman Islands on October 24, 2001.  FGL serves as placement agent for the Offshore Funds and generally is paid by the applicable Offshore Fund (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) a performance fee of 20% of the net annual profits subject to adjustment for unrecouped losses.  FGL pays Applicant a fixed fee for providing managerial services to the Offshore Funds.<br><br>Another wholly-owned subsidiary of FGL, Fairfield Heathcliff Capital LLC ("FHC"), a limited liability company incorporated in the state of Delaware, and an affiliate of Applicant, serves as placement agent for the Onshore Funds. Applicant does not provide tailored investment advice to individual investors for a fee. Rather, as indicated, Applicant and certain related persons have organized two limited partnerships, three international business companies, and two limited liability companies, and Applicant serves as general partner, manager, or investment manager to those entities. The limited partnerships, international business companies, and limited liability companies are themselves Applicant's clients.<br><br>Similar to the Offshore Funds, Applicant generally is paid by the Onshore Funds (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) an incentive allocation of 20% of net annual profits, subject to adjustment for unrecouped losses. Some or all of such fees can be waived at the discretion of the General Partner.<br><br>Investors in the FGB Funds generally have the right to redeem all or a portion of their investment in an FGB Fund at the end of any month, subject to applicable advance notice requirements.  If an investor redeems or withdraws from an FGB Fund, the investor will be entitled to any unearned, prepaid portion of the management fee.<br><br>To the extent required under the Investment Advisers Act, performance-based compensation payable to Applicant will be in compliance with Rule 205-3 under such Act. |
| **Item 3.L.** | Applicant offers advice to certain of the FGB Funds on the allocation of assets to other funds managed by non-affiliated Portfolio Managers (the "Single Manager Funds"). The Single Manager Funds invest in a variety of markets and their assets may be deployed in whatever investment strategies are deemed appropriate under prevailing economic and market conditions.  The FGB Fund's assets, therefore, may be invested in (either directly or by allocation to a Single Manager Fund), among other things, domestic and foreign equity securities and equity-related instruments, fixed income and other debt-related |

Copyright © 2004 National Regulatory Services (Portions of Software Only

| Applicant: **Fairfield Greenwich (Bermuda) Ltd.** | SEC File Number: 801- 139882 | Date: 4-27-2006 |

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: **Fairfield Greenwich (Bermuda) Ltd.** | IRS Empl. Ident. No.: |

| Item of Form (identify) | Answer |
| --- | --- |
| | instruments (including convertible debt), options, warrants, futures and other commodities, currencies, over-the-counter derivative instruments and other financial instruments. Excess cash may be invested directly by Applicant on behalf of the FGB Funds in money market investments, including U.S. government securities and money market funds. |
| **Items 4.A.5. and 4.B.8.** | While certain of the Portfolio Managers hired by Applicant may use charting or technical analysis, Applicant does not. Rather, Applicant's manager selection process combines qualitative and quantitative elements. Single Manager Funds are generally required to use a common fund administrator and provide Applicant with full transparency down to individual securities level.

Applicant has retained RiskMetrics to provide risk aggregation and decomposition services, to calculate Value-at-Risk metrics, and to run a number of stress tests and scenario analyses. Monthly position level data feeds from the prime brokers used by the Portfolio Managers hired by the Applicant are collected, processed, reconciled and modeled by RiskMetrics. Position level transparency enables Applicant to quantify portfolio risk from the bottom up using advanced risk modeling tools to capture the components of market risk. These baseline reports are reviewed and interpreted by in-house risk professionals and allow Applicant to formulate focused and meaningful lines of dialogue with its managers. Risk reports are produced both internally and via the risk engine and enable Applicant to monitor compliance to operating guidelines, monitor concentration and exposure patterns of each portfolio over time (by asset class, currency, sector, region, strategy, etc.), conduct VaR analytics (including marginal and incremental VaR), and stress portfolios under predefined risk factor shocks. Risk reporting is organized along the following dimensions: Exposures, Sensitivities, Scenarios and Stress Tests, VaR, and Attribution Analysis.

Applicant also conducts daily portfolio oversight and monitors investment compliance using an automated portfolio tool called CAI. This system complements the monthly risk analyses with intra-month, daily portfolio analyses. Applicant can access this system on a daily basis to inspect key portfolio statistics, exposures at different levels of aggregation (for example, gross, long, short, net by instrument type, market cap, sector etc.), and check portfolio composition and activity against pre-agreed yellow and red limit levels.

Applicant also uses other systems to maintain its database of managers, conduct selected quantitative analyses of historical performance, conduct asset allocation, style analyses, optimization studies, prepare peer group comparisons and run other ad-hoc analyses.

Applicant also subscribes to a number of hedge fund databases and indices and maintains its own proprietary database of tracked managers. |

Copyright © 2004 National Regulatory Services (Portions of Software Only)

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br>**Fairfield Greenwich (Bermuda) Ltd.** | IRS Empl. Ident. No.: |

| Item of Form<br>(identify) | Answer |
|---|---|
| | In addition, Applicant also utilizes a number of in-house models to analyze the historical performance of managers. The analyses conducted include examinations of manager value-added alpha vs. beta, risk factor decomposition, performance persistence, style fidelity, peer group and index comparisons, liquidity and leverage, and risk attribution. |
| **Item 4.C.7.** | Applicant's core product business model is the investment management and oversight of the split strike conversion strategy, implemented through an Offshore Fund (with two currency feeder funds), and two Onshore Funds. The Offshore Fund also utilizes a small portion of its assets (up to 5%) away from the split strike conversion strategy to seed a small number of experienced hedge fund management groups with varying and diverse investment methodologies. Applicant conducts a detailed manager selection and due diligence process, analyzing such important issues as liquidity management, market and credit risks, management quality (which includes on-site visit(s), background, and reference checks), and operational, compliance, and regulatory risks. At the conclusion of the manager selection process, allocation of assets from the Offshore Fund to a successful hedge fund manager candidate will be determined based on a qualitative and quantitative analysis of each manager's potential for long-term risk-adjusted performance, relationship with other manager's previously seeded, and expected contribution to the targeted risk/return profile. |
| **Item 5.** | Applicant requires a college degree and preferably an advanced degree for its professional personnel. Along with these educational requirements, Applicant prefers relevant securities industry experience. |
| **Item 6.** | Andres Piedrahita, Founding Partner (born 1959)<br>Education: Boston University School of Communication, BA, 1980<br>Business Background: Fairfield Greenwich Group, 1997-present<br><br>Amit Vijayvergiya, Managing Director (born 1969)<br>Education: University of Western Ontario, BA, 1990<br>University of Manitoba, BS, 1996<br>York University, MBA, 1994<br>GARP's Financial Risk Analyst, 2002<br>Chartered Financial Analyst, 1999<br>Business Background: Fairfield Greenwich Group, 2003-present<br>MAV Hedge Advisors, 2000-2003<br>LOM Asset Management, 1998-2000<br>Canadian National Railways, 1994-1998<br><br>Charles Oddy, Vice President (born 1972)<br>Education: Edinburgh University, BS, 1995<br>Liverpool JM University, M.Sc., 1997 |

Copyright © 2004 National Regulatory Services (Portions of Software Only)

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: **Fairfield Greenwich (Bermuda) Ltd.** | IRS Empl. Ident. No.: |
|---|---|

| Item of Form (identify) | Answer |
|---|---|
| | GARP's Financial Risk Manager, 2002<br>Chartered Financial Analyst, 2003<br>Business Background: Fairfield Greenwich Group, 2004-present<br>Coronation Fund Managers, 2001-2002<br>The Helios Group, 1997-2001 |
| **Items 8.C. and D.** | An affiliate of Applicant, Fairfield Heathcliff Capital LLC ("FHC"), is registered with the Securities and Exchange Commission as a broker-dealer and is a member of the National Association of Securities Dealers, Inc. FHC's license is limited to selling limited partnership interests. FHC serves as U.S. placement agent for Applicant's Onshore Fund, and certain other onshore funds of affiliates of Applicant, and will bear its costs associated with such activities.<br><br>Applicant, Fairfield Greenwich (UK) Limited ("FGUK"), and Fairfield Greenwich Advisors LLC ("FGA"), are each wholly-owned subsidiaries of Fairfield Greenwich Limited ("FGL", and collectively the Fairfield Greenwich Group, or "FGG"). FGA is based in the U.S. and is registered with the Securities and Exchange Commission as a registered investment adviser. FGG has also entered into a joint venture with Straits Lion Asset Management Limited to create Lion Fairfield Capital Management Limited ("LFC"), a hedge fund management and client servicing platform in Asia. LFC is regulated by the Monetary Authority of Singapore. FGUK is authorized and regulated by the Financial Services Authority, and serves as Investment Manager to a Luxembourg-registered SICAV and an offshore fund-of-funds. FGA serves as Investment Manager or Manager to twenty one offshore funds, and as General Partner to four U.S. funds.<br><br>FGL is registered with the Commodity Futures Trading Commission as a commodity pool operator and is a member of the National Futures Association. |
| **Item 9.D.** | Applicant and its affiliates may solicit clients to invest in the FGB Funds, or those funds of Applicant's affiliates (collectively, the "FGG Funds"). Applicant and certain of its affiliates and their officers may have financial interests as general partners, limited partners, shareholders, investment managers, administrative manager, investment adviser or otherwise in such FGG Funds. Management and/or performance fees for such individuals may be waived in certain instances. |
| **Item 9.E.** | Applicant and its affiliates may purchase or sell shares or interests of a Single Manager Fund for the accounts of Multi-Strategy Funds on the FGG platform. Applicant and certain of its affiliates and other Multi-Strategy Funds may have a position in such Single Manager Fund. With respect to Single Manager Funds where investment decisions are made by the officers or employees of Applicant or its affiliates, such persons are prohibited from trading in a particular security if trades of that security are being considered for the account of such Single Manager Fund until all orders or positions of such security have been completed. Further, such persons are required to provide FGG |

Copyright © 2004 National Regulatory Services (Portions of Software Only)

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br>**Fairfield Greenwich (Bermuda) Ltd.** | IRS Empl. Ident. No.: |
| --- | --- |

| Item of Form<br>(identify) | Answer |
| --- | --- |
| | with personal securities account information and are thus required to provide FGG with duplicate copies of confirmations and statements of any personal trading activity. Moreover, certain persons are not free to trade without having pre-cleared trades with FGG. In all cases, FGG will attempt to resolve any conflicts of interest by exercising the good faith required of fiduciaries.<br><br>With respect to standards of professional conduct, a Code of Ethics (the "Code") has been adopted by the Applicant in order to comply with Rule 204A-1 (the "Rule") promulgated under the Investment Advisers Act of 1940, as amended. Rule 204A-1 requires every Investment Adviser registered with the Securities and Exchange Commission to adopt and enforce a written code of ethics applicable to its supervised persons. The Rule was designed to prevent fraud by reinforcing fiduciary principles that must govern the conduct of advisory firms and their personnel. The Code contains provisions reminding employees of their obligations to clients as well as provisions requiring the reporting of personal securities transactions and holdings. In order to ensure that Applicant's employees are made aware of its standards, the Rule requires Applicant to obtain (and keep) a written acknowledgement from each employee confirming that he or she received a copy of the Code and any amendments.<br><br>Further, pursuant to the Rule, Applicant has deemed certain of its employees to be "Access Persons." And "Access Person" is an employee of the Applicant who has access to nonpublic information regarding any clients' purchase or sale of securities, or nonpublic information regarding the portfolio holdings of any reportable fund, or who is involved in making securities recommendations to clients, or who has access to such recommendation that are nonpublic.<br><br>Applicant reviews the personal investment activities of its Access Persons to ensure that the following general fiduciary principles are met:<br><br>    (a) the duty at all times to place the interests of clients of the Applicant first;<br>    (b) the duty to prevent the misuse of material nonpublic information which includes client securities holdings and transactions;<br>    (c) the requirement that all personal securities transactions be conducted in such a manner as to avoid any actual or potential conflict of interest or any abuse of an individual's position of trust and responsibility; and<br>    (d) the fundamental standard that Applicant personnel may not take inappropriate advantage of their position.<br><br>Lastly, Applicant makes a copy of its Code available to any client who requests it. |
| **Item 10.** | The FGG Funds impose various initial minimum investment amounts, ranging between US$2,500,000 and US$100,000, and in equivalent amounts in different currencies |

Copyright © 2004 National Regulatory Services (Portions of Software Only

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br>**Fairfield Greenwich (Bermuda) Ltd.** | IRS Empl. Ident. No.: |
| --- | --- |

| Item of Form<br>(identify) | Answer |
| --- | --- |
| | including Euro and Swiss Franc. The FGG Funds may accept investment in lesser amounts. Generally, investors are required to have a net worth of at least US$1,500,000. |
| **Item 12.** | For certain of the FGG Funds, Applicant or an affiliate has full discretion and authority to make all investment decisions with respect to the types of securities to be bought and sold, and the amount of securities to be bought or sought for such Fund, and there are no limitations as to which broker dealer is used or as to the commission rates paid. However, portfolio transactions will be allocated to brokers on the basis of best execution and in consideration of brokerage and research services (e.g., research ideas, investment strategies, special execution and block positioning capabilities, clearance, settlement and custodial services), financial stability, reputation and efficiency of such broker-dealers. Broker-dealers providing such services may be paid commissions in excess of those that other broker-dealers not providing such services might charge. |
| **Items 13.A. and 13.B.** | From time to time Applicant or an affiliate may enter into agreements which comply with Rule 206(4)-3 and other requirements of the Investment Advisers Act, providing for cash compensation for securing clients. |

Copyright © 2004 National Regulatory Services (Portions of Software Only)