SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

————————————————————————————— x

DAVID I. FERBER SEP IRA,

                   Plaintiff,

     vs.

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD
GREENWICH (BERMUDA) LTD., FAIRFIELD
GREENWICH ADVISORS LLC, GLOBEOP
FINANCIAL SERVICES LLC, CITCO FUND
SERVICES (EUROPE) BV, CITCO (CANADA)
INC., WALTER M. NOEL, JR., JEFFREY TUCKER,
ANDRES PIEDRAHITA, BRIAN FRANCOEUR,
AMIT VIJAYVERGIYA,
PRICEWATERHOUSECOOPERS LLP, and
PRICEWATERHOUSE COOPERS
ACCOUNTANTS N.V.,

                   Defendants,

     and

GREENWICH SENTRY, L.P.,

                 Nominal Defendant.

————————————————————————————— x

Index No.:             0 9 6 0 0 4 6
Date Purchased: 2/13/2009

Plaintiff designates New York
County as the place of trial.

The basis of the venue is
Plaintiff's and Defendants'
Residence

**SUMMONS**

Plaintiff resides in New York,
NY

County of New York



TO THE ABOVE NAMED DEFENDANTS:

    **YOU ARE HEREBY SUMMONED TO** answer the complaint in this action and to

serve a copy of your answer, or, if the complaint is not served with this summons, to serve a

notice of appearance on the Plaintiff's Attorneys **within 20 days** after the service of this

summons, exclusive of the day of service (or within 30 days after the service is complete if this

summons is not personally delivered to you within the State of New York); and in case of your

SCANNED ON 2/13/2009

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the complaint.

Dated: February 13, 2009

Defendants' Addresses:
**(SEE ATTACHED SCHEDULE A)**

Attorneys for Plaintiff:

**MILBERG LLP**
By:
          Sanford Dumain
          Matthew Gluck
          Brad Friedman
          Andrei V. Rado
          Kristi Stahnke McGregorOne
Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300

Stephen A. Weiss
Christopher M. Van de Kieft
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
Telephone: (212) 584-0700

# SCHEDULE A

**FAIRFIELD GREENWICH GROUP**
c/o Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE  19808

**FAIRFIELD GREENWICH LIMITED**
Att: Mark McKeefry, Esq.
55 East 52nd Street, 33rd Floor
New York, NY  10055

**FAIRFIELD GREENWICH (BERMUDA) LTD.**
12 Church Street, Suite 606
Hamilton, Bermuda  HM11

**FAIRFIELD GREENWICH ADVISORS LLC**
c/o Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE  19808

**GLOBEOP FINANCIAL SERVICES LLC**
450 Mamaroneck Avenue
Harrison, NY  10528

**CITCO FUND SERVICES (EUROPE) BV**
Telestone 8, Teleport, Naritaweg 165
1043 BW Amsterdam
The Netherlands

**CITCO (CANADA) INC.**
2 Bloor Street East, Suite 2700
Toronto, Ontario  M4W 1A8  Canada

**WALTER M. NOEL, JR.**
175 Round Hill Rd.
Greenwich, CT  06831-3724

400 Park Ave., Apt. 2B
New York, NY  10021-2759

400 First Neck Ln.
Southhampton, NY  11968-4710

**JEFFREY TUCKER**
662 Stonebridge Rd.
Schuylerville, NY 11968-4710

**ANDRES PIEDRAHITA**
2433 Fisher Island Dr. 5303
Miami Beach, FL 33109-0120

**BRIAN FRANCOEUR**
c/o Fairfield Greenwich (Bermuda) Ltd.
12 Church Street, Suite 606
Hamilton, Bermuda HM11

**AMIT VIJAYVERGIYA**
c/o Fairfield Greenwich (Bermuda) Ltd.
12 Church Street, Suite 606
Hamilton, Bermuda HM11

**PRICEWATERHOUSECOOPERS LLP**
Royal Trust Tower, Suite 3000
Toronto-Dominion Centre
77 King Street West
Toronto, Ontario M5K 1G8 Canada

**PRICEWATERHOUSECOOPERS ACCOUNTANTS N.V.**
Thomas R. Malthusstraat 5 1066 JR
AMSTERDAM

**GREENWICH SENTRY, L.P.**
c/o Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————— x
                  :

DAVID I. FERBER SEP IRA,

           Plaintiff,

      vs.                        **LIMITED PARTNERS DERIVATIVE COMPLAINT**

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD
GREENWICH (BERMUDA) LTD., FAIRFIELD        **JURY TRIAL DEMANDED**
GREENWICH ADVISORS LLC, GLOBEOP
FINANCIAL SERVICES LLC, CITCO FUND
SERVICES (EUROPE) BV, CITCO (CANADA)
INC., WALTER M. NOEL, JR., JEFFREY TUCKER,
ANDRES PIEDRAHITA, BRIAN FRANCOEUR,
AMIT VIJAYVERGIYA,
PRICEWATERHOUSECOOPERS LLP, and
PRICEWATERHOUSE COOPERS
ACCOUNTANTS N.V.,

          Defendants,

    and

GREENWICH SENTRY, L.P.,

          Nominal Defendant.

———————————————————————— x

## <u>LIMITED PARTNER'S DERIVATIVE COMPLAINT</u>

      Plaintiff, by his undersigned attorneys, for his complaint against defendants alleges the

following upon information and belief, except as to information about himself, which is alleged

upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, the

investigation conducted by Plaintiff's counsel, including a review of Fairfield Greenwich

Group's publicly issued press releases, interviews with its former employees, the Confidential Offering Memorandum for Greenwich Sentry L.P and press articles.

## NATURE OF THE CASE

1.     This is a derivative action brought by Plaintiff who is now and at all relevant times has been a Limited Partner of Greenwich Sentry, L.P. ("Greenwich Sentry" or the "Fund"). This action has been brought in the name of and for the benefit of Greenwich Sentry and its Limited Partners (the "Limited Partners") against defendants Fairfield Greenwich Group ("FGG"), Fairfield Greenwich Limited, Fairfield Greenwich (Bermuda) Ltd., Fairfield Greenwich Advisors LLC, GlobeOp Financial Services LLC, Citco Fund Services (Europe) BV, Citco (Canada) Inc., Walter M. Noel, Jr., Jeffrey Tucker, Andres Piedrahita, Brian Francoeur and Amit Vijayvergiya ("the Fund Defendants") for breaches of their fiduciary duties owed to Greenwich Sentry and the Limited Partners and for aiding and abetting breaches of fiduciary duty.  This action is also brought against PricewaterhouseCoopers LLP and PricewaterhouseCoopers Accountants N.V. for professional negligence, breach of contract, and negligent misrepresentation in connection with purported auditing services performed for Greenwich Sentry.  (PricewaterhouseCoopers LLP and PricewaterhouseCoopers Accountants N.V. are referred to collectively herein as "PwC".)

2.     Greenwich Sentry is a "feeder fund" which placed almost all of the monies invested by its Limited Partners in the Fund with Bernard Madoff and his firm Bernard L. Madoff Investment Securities, LLC ("BMIS").  On December 10, 2008, it was disclosed that Madoff, acting through BMIS, had been running a Ponzi scheme so that assets and profits reported to investors for years were in fact nonexistent, and the payment of such "profits" to earlier investors were in fact being made from the capital of newer investors.

- 2 -

3. On December 11, 2008, the FBI arrested Madoff for violating the federal securities laws. Upon arrest, he told the agents that "there is no innocent explanation" for the scheme and confessed that he "paid investors with money that wasn't there." On that same day, the United States Attorney brought criminal charges against Madoff, alleging that he admitted to running a $50 billion Ponzi scheme. *United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y. filed Dec. 11, 2008).

4. On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BMIS. *SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

5. Greenwich Sentry had approximately $220 million in assets, all or almost all of it invested with Madoff and BMIS. FGG is an umbrella fund company intimately involved with many aspects of the Fund's operations, acting in multiple capacities, as both agent and principal of the Fund. FGG, like many of the entity defendants, was controlled by the same people who controlled the Fund. FGG, and its other related entities, marketed the Fund to investors and purported to conduct due diligence on behalf of the Fund. FGG posted on its website a letter dated January 8, 2009 to its investors, stating that as of November 1, 2008, FGG had total assets under management of approximately $14.1 billion, of which approximately $6.9 billion was invested in vehicles connected to BMIS. Plaintiff believes that nearly all of Greenwich Sentry's assets invested with BMIS have been lost.

- 3 -

6.      In documents issued in connection with its funds, FGG represented that it conducted "deeper and broader" due diligence and performed continued risk monitoring of its fund managers, which include Madoff and BMIS. This was untrue. The Madoff story bristled with red flags that a financial professional performing due diligence in good faith could not have missed. Indeed, other investment advisors advised their clients not to invest with Madoff or BMIS after performing due diligence.

7.      The Fund Defendants were paid hefty management, incentive, and administrator fees, amounting to hundreds of millions of dollars over the years and at least tens of millions a year, for their expertise and professional experience in selecting and monitoring fund managers. While touting their "higher level" of due diligence over their competitors, the Fund Defendants, in fact, allowed Madoff and BMIS to go unchecked, while issuing false reports to investors presenting nonexistent, or, at the very least, highly inflated, profits, and collecting fees based on such fictitious profits.

8.      The Fund Defendants breached their fiduciary duties and aided and abetted the breach of fiduciary duties to the Fund and the Limited Partners by failing to conduct adequate due diligence, as they were required to do in their roles as fiduciaries, and further breached those duties by falsely touting their supposed due diligence, and collecting hundreds of millions of dollars in fees on fictitious assets and profits.

9.      The Funds' administrators breached their fiduciary duties and aided and abetted the breach of fiduciary duties to the Fund and the Limited Partners by failing to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, and distribute accurate monthly reports to the Limited Partners, while collecting fees on inflated net asset value.

- 4 -

Supreme Court Records OnLine Library - page 8 of 69

10.     PwC, as the Fund's independent auditor, failed to perform its audits of the Fund in accordance with generally accepted auditing standards ("GAAS") and issued false audit opinions. PwC had a heightened duty to go behind the mere numbers generated by the Fund's single manager who held all of the Fund's assets, lacked transparency, was riddled with conflicts of interest, and miraculously was able to consistently generate positive results even in down markets.

## VENUE AND JURISDICTION

11.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims herein occurred in New York County and all of the defendants are subject to personal jurisdiction in New York County.

12.     This Court has jurisdiction over the defendants pursuant to CPLR §§ 301 and 302(a). Defendants either reside in or transact business within the State, have committed tortious acts within the State and/or have committed tortious acts outside the State that have caused injury to persons and property within the State. Also, Greenwich Sentry, Fairfield Greenwich Group and Fairfield Greenwich Advisors LLC maintain their principal place of business within the State of New York, New York County.

## THE PARTIES

### Plaintiff

13.     Plaintiff David I. Ferber SEP IRA ("Plaintiff") is a Limited Partner of Greenwich Sentry. In November 2001, David I. Ferber, a resident of New York, invested his SEP IRA in Greenwich Sentry. David I. Ferber SEP IRA held its limited partnership interest in Greenwich Sentry during the wrongdoing alleged herein and continues to hold such interest. David I. Ferber SEP IRA is not a General Partner of Greenwich Sentry. According to David I. Ferber SEP

- 5 -

IRA's October 2008 statement, the last month for which a Fund statement was received, David I. Ferber SEP IRA's capital account balance with Greenwich Sentry was $431,215.

**The Fund Defendants**

14.     Nominal Defendant Greenwich Sentry is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business at 55 East 52nd Street, 33rd Floor, in New York County, New York.

15.     Defendant FGG, founded in 1983, is a limited liability company organized under the laws of Delaware and registered to do business in New York. FGG has its principal place of business at 55 East 52nd Street, 33rd Floor, New York City, in New York County, New York. FGG describes itself as "a global family of companies" that offers a variety of single manager funds, multi-strategy funds and fund-of-funds to investors and had assets under management of over $14.16 billion as of November 1, 2008, of which approximately $6.9 billion was invested in vehicles connected to BMIS. FGG acted as both agent and principal of the Fund, was controlled by defendants Noel, Tucker and Piedrahita, the same individuals that controlled the Fund's general partners. Defendants Noel and Tucker were the original general partners of the Fund from 1993 to 1998. The Fund delegated due diligence to FGG and FGG marketed the Fund to investors.

16.     Defendant Fairfield Greenwich Limited ("FG Limited") is an exempted company organized under the laws of the Cayman Islands registered to do business in New York and is an affiliate of FGG. FG Limited served as the General Partner of Greenwich Sentry from January 1998 until March 1, 2006. The General Partner is responsible for directing the Fund's investment and trading activities. Defendants Noel, Tucker and Piehrahita are the main principals of FG Limited.

- 6 -

Supreme Court Records OnLine Library - page 10 of 69

17.     Defendant Fairfield Greenwich (Bermuda) Ltd. ("FG Bermuda") was organized as a corporation under the laws of Bermuda on June 13, 2003 and is an affiliate of FGG listed as one of FGG's "[l]ocal operating entities" on FGG's website. FG Bermuda is a wholly-owned subsidiary of FG Limited of which defendants Noel, Tucker and Piedrahita are the main principals. FG Bermuda is registered as an investment advisor under the Investment Advisers Act of 1940, as amended, effective April 20, 2006, and became the General Partner of Greenwich Sentry effective March 1, 2006.

18.     Defendant Fairfield Greenwich Advisors LLC ("FG Advisors") is a limited liability company organized under the laws of Delaware and registered to do business in New York. FG Advisors has its principal offices at 55 East 52nd Street, 33rd Floor, New York City, New York County, New York. FG Advisors is an affiliate of FGG and FG Bermuda, and listed as one of FGG's "[l]ocal opperating entities" on FGG's website. FG Advisors provides Greenwich Sentry with certain administrative services and back-office support.

19.     Defendant GlobeOp Financial Services LLC ("GlobeOp"), is a limited liability company organized under the laws of Delaware and registered to do business in New York. GlobeOp has its principal place of business at 450 Mamaroneck Ave., Harrison, Westchester County, New York, and was the Fund's Administrator prior to September 1, 2006. GlobeOp describes itself as a leading independent financial technology specialist providing automated, integrated middle- and back-office, administration and risk reporting services to hedge funds and asset management firms.

20.     Defendant Citco Fund Services (Europe) BV ("Citco Europe") is a limited liability company formed under the laws of the Netherlands with its principle place of business

- 7 -

Supreme Court Records OnLine Library -  page 11 of 69

in Amsterdam, The Netherlands. Citco Europe has been the Fund's Administrator since September 1, 2006.

21.     Defendant Citco (Canada) Inc. ("Citco Canada") is a Canadian corporation with its principal place of business is in Ontario, Canada. Citco Canada, by delegation of Citco Europe, acted as a sub-administrator of Greenwich Sentry since September 1, 2006.

22.     Citco Europe and Citco Canada are wholly owned subsidiaries of Citco Group, a self-described global organization of financial services companies and pre-eminent hedge fund administrators. Citco Europe, Citco Canada and Citco Group are referred to herein collectively as "Citco." For funds of funds, according to its website, Citco offers "a complete outsourced solution which combines fund administration, banking, financing, trade execution and custody, using an on-line research-enabling trading platform, middle office services and centralized dedicated pricing services and reporting."

23.     As the Fund's Administrators, Citco Europe and GlobeOp were responsible respectively for performing certain day-to-day administrative services for the Fund, including preparing and distributing monthly reports to the Limited Partners containing the amount of the Fund's net assets, the amount of any distributions from the Fund and incentive fees, accounting and legal fees and all other fees and expenses of the Partnership. The Administrator is also responsible for maintaining the financial books and records, calculating the net asset value, handling shareholder communications and supervising the payment of expenses by the Fund. The Fund paid the Administrators a monthly service fee, in advance, based on the beginning net asset value, after subscriptions and redemptions.

24.     Defendant Walter M. Noel, Jr. ("Noel") is a founding partner of FGG, and according to FGG's own description, continues to oversee all of FGG's activities together with

- 8 -

Supreme Court Records OnLine Library -  page 12 of 69

defendants Tucker and Piedrahita. Noel is a member of the Board of Directors of FGG and serves as a Director for many FGG funds and management company entities. Defendant Noel was a general partner of the Fund together with defendant Tucker from 1993 to 1998. Defendant Noel resides in New York and Connecticut.

25.     Defendant Jeffrey Tucker ("Tucker") is a founding partner of FGG and is a member of the Board of Directors of FGG. According to FGG's own description, Tucker directs FGG's business and operations activities and also serves as a Director for many FGG funds and management company entities. Defendant Tucker was a general partner of the Fund together with defendant Noel from 1993 to 1998. Defendant Tucker resides in New York.

26.     Defendant Andres Piedrahita ("Piedrahita") is a founding partner of FGG. Piedrahita is a member of the Executive Committee of FGG and serves as a Director for many FGG funds and management company entities. He also serves as President and Director of the Fund's General Partner, FG Bermuda. Defendant Piedrahita resides in Miami, Florida; London, England; and Madrid, Spain.

27.     Defendant Brian Francoeur ("Francoeur") is a Director of FG Bermuda, the General Partner of the Fund. Francoeur is the Managing Director of Citco Fund Services (Bermuda) Limited, an affiliate of the Fund's administrator, Citco Europe. Francoeur qualified as a chartered accountant in 1994 and was employed by Ernst & Young in Bermuda from 1995 to 1997.

28.     Defendant Amit Vijayvergiya ("Vijayvergiya") is Managing Director of FG Bermuda, the General Partner of the Fund, and, according to the Fund's Offering Memorandum, focuses on manager selection and risk management for the Fund. Vijayvergiya is a Chartered Financial Analyst and certified Financial Risk Manager.

- 9 -

Supreme Court Records OnLine Library - page 13 of 69

29. Defendants FGG, FG Limited, FG Bermuda, FG Advisors, Citco Europe, GlobeOp, Noel, Tucker, Piedrahita, Francoeur and Vijayvergiya are referred to collectively herein as the "Fund Defendants."

**PricewaterhouseCoopers LLP**

30. Defendant PricewaterhouseCoopers LLP ("PwC Canada") is a limited liability partnership organized under the laws of the province of Ontario, Canada with its principal place of business in Ontario, Canada. PwC Canada was the accountant and auditor of the Fund for 2006-2008.

31. Defendant PricewaterhouseCoopers Accountants N.V. ("PwC Netherlands") is a public limited liability company incorporated in The Netherlands with its principal place of business in Rotterdam, The Netherlands. PwC Netherlands was the accountant and auditor of the Fund for 2006.

32. PwC Canada and PwC Netherlands are member firms of PricewaterhouseCoopers International Limited ("PwC Int'l"). PwC Int'l and all of its member firms operate as a self-described network of inter-connected member firms providing auditing and accounting services across an international platform by which means they are globally operational. PwC Int'l and its member firms maintain centralized control over training, standards of care, marketing, and quality of accounting and auditing work throughout the world. PwC Int'l and its member firms hold themselves out as and operate as a unified business entity.

33. PwC Int'l's member firms are engaged in the business of providing auditing, accounting and other investment and advisory services. As of December 2006, PwC Int'l touted its member firms publically as serving "70 of the top 100 asset managers around the world."

- 10 -

34.     As is described further herein, PwC reported upon the financial statements and results of operations of Greenwich Sentry and issued unqualified reports thereon for the years 2005-2007.

## SUBSTANTIVE ALLEGATIONS

35.     Throughout the 1990's and up until the present, FGG and the Fund Defendants raised large sums of money from investors to invest with Madoff and BMIS. In exchange, FGG and its affiliates earned millions of dollars in fees. *Bloomberg News* reported on December 15, 2008 that if not for the revelation of Madoff's fraud, FGG and its affiliates would have collected about $135 million in fees in 2008 from its funds invested with BMIS.

36.     FGG operates several so-called "feeder funds" which invest directly with BMIS. A feeder fund is a fund that takes investor money and gives it to another fund to manage and invest. One such feeder fund is Greenwich Sentry, which began operations in 1993 and had assets of approximately $221 million as of December 31, 2007.

37.     Greenwich Sentry describes itself as "a private investment limited partnership which seeks to obtain capital appreciation of its assets through utilization of a nontraditional options trading strategy described as a 'split strike conversion.'" The Confidential Offering Memorandum for the Fund dated May 2006 (the "Offering Memorandum") describes the split-strike conversion strategy as follows:

> The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities. * * * The basket typically consists of between 35 to 50 stocks in the S&P 100 Index.

- 11 -

Supreme Court Records OnLine Library - page 15 of 69

The primary purpose of the long put options is to limit the market risk of the stock basket at the strike price of the long puts. The primary purpose of the short call options is to largely finance the cost of the put hedge and to increase the stand-still rate of return.

This position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) defines a range of potential market gain or loss, depending on how tightly the options collar is struck.

The degree of bullishness of the strategy can be expressed at implementation by the selection of the strike prices in the S&P 100 Index put and call options. The farther away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy.

38.     FGG and its affiliates touted as a selling point for the Fund, and its other funds, that it conducted "deeper and broader" pre-investment due diligence and post-investment "multifaceted risk monitoring" of its managers and fund assets than its competitors. FGG's website states that FGG "probe[s] deeply into all key elements of risk" and "employs a significantly higher level of due diligence work than typically performed by most fund of funds and consulting firms."

39.     According to FGG's website and a marketing brochure provided to potential investors and also available on its website, FGG's "deeper and broader" due diligence included: (1) Portfolio Evaluation, Investment Performance, and Financial Risks; (2) Structural and Operational Risks; (3) Legal, Compliance, and Regulatory Risk; and (4) Personal Background Investigations. Once a relationship with a fund manager is established the "due diligence process evolves into a similarly multi-faceted risk monitoring function." The FGG brochure goes on to say that "the purpose of this ongoing activity is to ensure that the fund continues to

- 12 -

follow its investment methodology - and constraints - and otherwise acts in accordance with the operational and risk framework that was approved during the due diligence phase."

40.      According to the Uniform Application For Investment Advisor Registration ("ADV") completed by the Fund's General Partner, FG Bermuda, and dated March 27, 2008, an affiliate of FG Bermuda, Fairfield Risk Services Ltd., serves as "FGG's Risk Management team," which includes FG Bermuda. Defendant Vijayvergiya manages FGG's Risk Management team. Fairfield Risk Services Ltd. is a wholly owned subsidiary of FG Limited, of which defendants Noel, Tucker and Piedrahita are the main principals, and shares office space with FG Bermuda.

### Portfolio Evaluation, Investment Performance, and Financial Risks

41.      Under the first prong of FGG's due diligence and risk monitoring strategy, "Portfolio Evaluation, Investment Performance, and Financial Risks," FGG claimed to "seek to dissect a candidate manager's investment performance, how they generate alpha, and what risks are taken in doing so." FGG further claimed to "apply both qualitative and quantitative measures in this process," adding that "[p]articular focus is given to identifying and understanding various elements of the manager's investment process and strategy-specific financial risk." FGG also claimed to "attempt[] to understand the return attribution for individual securities in the portfolio, and conduct[] a full suite of VaR analysis and stress tests to model the loss distribution function under extreme market scenarios."

42.      However, had FGG and the other Fund Defendants actually applied the touted due diligence and risk-monitoring strategy to understand how Madoff and BMIS produced the results they claimed, they would have realized that those results were impossible. Madoff's split-strike conversion strategy might tend to reduce volatility, but it would not produce gains in a declining

- 13 -

Supreme Court Records OnLine Library - page 17 of 69

stock market. Nevertheless, Madoff and BMIS reported small, steady gains each month, including gains in sharply declining markets.

43. Other investment advisors and financial publications had publically stated that BMIS's trading results could not be replicated based on the model Madoff was purportedly using. The trading results reported by BMIS were not consistent with publicly traded funds that followed the same trading strategy, all of which had much lower returns and greater volatility than reported by BMIS.

44. For example, Aksia, LLC, an independent hedge fund research and advisory firm, identified as early as 2007, red flags which prompted Aksia to advise its clients against investing with Madoff or any of his "feeder funds," such as Greenwich Sentry. Aksia reported the red flags it had found back in 2007, in a letter to its clients dated December 15, 2008 (the "Aksia Letter"). One red flag reported in the Aksia Letter was that "[t]he Madoff feeder funds marketed a purported 'Split-strike Conversion' strategy that is remarkably simple; however, its returns could not be nearly replicated by our quant analyst."

45. In May 2001, *Barron's* reported in the article *"Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum"* that certain option strategists for major investment banks could not understand how BMIS and Madoff achieved the results that they claimed from using the split strike conversion strategy. Madoff responded to *Barron's* questions regarding how he achieved consistently high returns stating that "It's a proprietary strategy. I can't go into great detail." When *Barron's* asked defendant Tucker about the returns FGG had received he stated, "It's a private fund. And so our inclination has been not to discuss its returns."

- 14 -

46.      Similarly, in May 2001, *MAR/Hedge* — a hedge fund newsletter — reported that the Fairfield Sentry Fund, a sister fund to Greenwich Sentry, had "reported losses of no more than 55 basis points in just four of the past 139 consecutive months, while generating highly consistent gross returns of slightly more than 1.5% a month and net annual returns roughly in the range of 15%." *MAR/Hedge* reported that "expert skeptics ... express[ed] bewilderment and indicated they were ... grappling to understand how such results had been achieved for so long."

47.      One basic technique to test the validity of a trading strategy in the securities industry is to reverse engineer the trading strategy purportedly employed to see if alleged performance results can be replicated.  According to a December 18, 2008 article in *The Wall Street Journal*, Harry Markopolos, who worked for a BMIS rival in Boston, was asked by his bosses in 2000 why he couldn't get the same results as BMIS.  Markopolos tried to reconstruct Madoff's purported strategy, but was unable to achieve the same results.  Markopolos concluded Madoff must be a fraud.  Markopolos's bosses told him to check his math, given that Madoff was such a renowned trader.  Markopolos enlisted the help of Daniel DiBartolomeo, a top financial mathematician in Boston.  DiBartolomeo spent hours pouring through Markopolos's data and came to the same conclusion: the strategy Madoff said he used could not have achieved the results he reported.  Despite claiming to employ quantitative measures in evaluating a manager's performance, had FGG and the Fund Defendants reverse engineered Madoff's trading strategy, they would have seen that the results were impossible.

48.      Indeed, several accounts confirm that the Fund Defendants did not understand Madoff's trading strategy.  For example, according to a December 19, 2008 article in *The Wall Street Journal*, David Giampaolo, chief executive of Pi Capital, a money-management firm, attended a meeting with defendant Piedrahita about 18 months earlier in London during which

- 15 -

Supreme Court Records OnLine Library -  page 19 of 69

defendant Piedrahita "stressed [at the meeting] the fund's years of steady and attractive performance," but "the performance was thin on details about the investment strategy." Piedrahita's answers, according to the news story, were "fluff." "When pressed to articulate how the fund generated the performance [t]here was no deep scientific or intellectual response."

49.     According to another account reported in *The Wall Street Journal* on February 5, 2009, Neil Chelo, a portfolio manger at Benchmark Plus, upon being contacted by a marketing person who suggested that he invest with FGG via another fund, questioned FGG representatives about BMIS. In response to questions about how much money Madoff managed total, a FGG risk manager said he wasn't sure. Chelo was surprised that the head of risk management wouldn't even know this. FGG also could not provide an adequate explanation as to why Madoff would hire FGG to bring money into BMIS rather than hiring his own team, in which case Madoff could keep all the management fees himself. When asked why nobody could duplicate Madoff's strategy, FGG representatives told Chelo, "people don't have [sic] proprietary model to know when to enter" and exit from trades. When asked how dealers hedged themselves, a FGG manager told Chelo he "had no answer and had never thought about it." In the end, Chelo concluded FGG knew little about Madoff or BMIS. Indeed, generally, if investors questioned Madoff's investment methodology, he would threaten them with removal from the Madoff programs.

50.     Moreover, had the Fund Defendants evaluated the options positions Madoff claimed to have open using the split-strike conversion strategy, they also would have seen that the positions were in excess of the actual open interest in the entire S&P put and call market in those securities. In addition, according to BMIS's ADV Report filed with the SEC, BMIS had over $17 billion of assets under management in 23 accounts. The entry and exit of over $17

- 16 -

billion would have overwhelmed the S&P 100 put and call market. Indeed, Aksia caught this red flag, stating in the Aksia Letter that "[i]t seemed implausible that the S&P100 options market that Madoff purported to trade could handle the size of the combined feeder funds' assets which we estimated to be $13 billion."

51.     Under the first prong of FGG's due diligence and risk monitoring strategy, FGG also claimed that "[i]ndependent trading records are examined." As part of FGG's ongoing oversight it claimed to review the individual securities in each portfolio and have discussions with the fund manager personnel several times each month. FG Bermuda's ADV explains the quantitative analyses performed and monthly risk meetings with fund managers as follows:

> FRS [Fairfield Risk Services Ltd.] primarily conducts both the pre- and post-investment quantitative analyses of hedge fund managers, monitors the market risk and provides the quantitative analyses supporting the asset allocation decisions across the firm's multi-strategy funds. The risk infrastructure at FRS supporting these activities incorporates a number of systems and tools — including internally developed systems, off the shelf vendor solutions, and some customized applications built to meet FGG's business needs. *An important component of the FGG product platform is the position level transparency that we receive from all single managers which are included in our multi-strategy funds. Position information is transmitted via secure channels to our systems.*

> FRS's core risk management engine utilizes the flexible ASP version of the RiskManager product from RiskMetrics. This system is populated by detailed position information and further supplemented by an extensive market and terms and conditions database. The FRS team regularly evaluates the market risk of its single and multi-strategy funds by producing strategy and fund specific risk reports. These reports are customizable to present risk measures and tests most appropriate to each portfolio's strategy. *The FRS team prepares a monthly suite of reports using RiskManager that are carefully reviewed and discussed by FGG's Investment Committee at a formal monthly risk meeting.* The reports organized along the following dimensions: Exposures, Sensitivities, Scenarios and Stress Tests, VaR, Correlations Analysis and Attribution Analysis. The review includes the full suite of VaR analytics (including marginal, incremental and relative VaR) and careful evaluation of the sensitivity of our

- 17 -

> managers to important risk factors (such as increasing or
> decreasing equity markets, volatilities, interest rate shocks/twists,
> FX movements and other factors).

(Emphasis added.)

     52.    However, there were no independent trading records for Madoff and BMIS,

because Madoff self-cleared the Fund's trades through his own broker-dealer, BMIS. Moreover,

BMIS generated paper trade tickets despite claiming to have an automated order and execution

process for the strike-split conversion strategy and that Madoff's reputation was made as an early

and enthusiastic proponent of electronic trading. As stated in the Aksia Letter:

> Madoff's website claimed that the firm was technologically
> advanced ("the clearing and settlement process is rooted in
> advanced technology") and the feeder managers claimed 100%
> transparency. But when we asked to see the transparency during
> our onsite visits, we were shown paper tickets that were sent via
> U.S. mail daily to the managers. The managers had no
> demonstrated electronic access to their funds accounts at Madoff.
> Paper copies provide a hedge fund manager with the end of the day
> ability to manufacture trade tickets that confirm the investment
> results.

    53.    Furthermore, BMIS refused outsiders, including the Fund Defendants and PwC,

access to its trading computer. The Fund Defendants were fully aware of the red flag Madoff's

lack of transparency caused, since, according to a December 19, 2007 article in *The Wall Street

Journal*, in 2007 FGG attempted to capitalize on its successes by selling a stake in the firm.

However, in conducting due diligence on FGG, "several" private-investment firms requested

access to BMIS's trading records and "were told that Mr. Madoff wouldn't allow prospective

investors to view his books."

    54.    Had Defendants conducted due diligence and risk monitoring into the trades

reported by BMIS, they would have discovered that many of the individual trades reported by

Madoff would have shown that they could not have taken place as represented in that many were

- 18 -

at reported prices higher than the price that the security in question traded at for the entire day the trade was claimed to have been executed.

55.     When Aksia tried to independently confirm the existence of Madoff feeder fund securities, it was unable to do so:

> There was at least $13 billion in all the feeder funds, but our standard 13F review showed scatterings of small positions in small (non-S&P100) equities. The explanation provided by the feeder fund managers was that the strategy is 100% cash at every quarter end.

Form 13(f) is the reporting form filed by institutional investment managers, pursuant to Section 13(f) of the Securities Exchange Act of 1934, reporting the securities holdings of institutional investors.

56.     It is now apparent that the positions in securities represented by BMIS to its customers, including Greenwich Sentry, simply did not exist. The Financial Industry Regulatory Authority ("FINRA") has suggested that there is no record of trades through the Madoff Firm for the fund accounts: "Our exams showed no evidence of trading on behalf of the investment advisor, no evidence of any customer statements being generated by the broker-dealer," said Herb Perone, spokesman for FINRA.

### *Structural and Operational Risks*

57.     FGG's website and marketing brochure explain that **"Operational failures, including misrepresentation of valuations and outright fraud, constitute the vast majority of instances where massive investor losses occur."** (Emphasis in original.) Operational risk, according to FGG, "refers to the risk of loss resulting from inadequate or failed internal processes, human resources, or systems or from external events." FGG's website and brochure go on to explain:

- 19 -

Supreme Court Records OnLine Library - page 23 of 69

> FGG seeks a sound understanding of whether a hedge fund possesses key controls in the areas of portfolio management, *conflicts of interest, segregation of duties,* and compliance. FGG carefully assess the controls and procedures that managers have in place and seek to determine actual compliance with those procedures, often suggesting modifications, *separations of responsibilities*, and remedial staff additions.

(Emphasis added.)

58.    In detailing the procedures FGG performs to monitor operational risk, FGG's website describes reviewing not only audited financials but also the auditor's management letter comments. It further describes reviewing accounting controls and broker reconciliations in an effort to ensure the existence of the securities. Some of the procedures FGG details include the following:

> - Review audited financials and auditor's management letter comments; look for affiliated party loans and pledged assets or collateralized loans
>
> - Review accounting controls: from trade execution; to trade capture; to trade reconciliation with the Street, administrator, and fund; to funds books and records
>
> * * *
>
> - Review broker reconciliations to ensure completeness and existence of all securities.
>
> - Infrastructure Adequacy Evaluation and disaster recovery plans.

59.    The Fund Defendants could not have conducted the structural and operational due diligence and risk monitoring described on FGG's website and in FGG's marketing brochure, because, if they had, they would have observed blatantly inadequate controls, conflicts of interest, and lack of separation of duties at BMIS. They would also have had cause to question the existence of securities transactions allegedly made by BMIS on behalf of the Fund, because a comparison of transactions reported by BMIS against publicly available trade data for the

- 20 -

Supreme Court Records OnLine Library -  page 24 of 69

securities, which were all publicly traded, would have shown that the transactions could not have been executed on the dates and/or prices reported by BMIS.

60.    As mentioned above, Madoff failed to trade through an independent broker, and, instead, self-cleared all Fund activities through his wholly-owned company, BMIS. In well-managed investment programs, in order to create an independent basis for confirming transaction executions and compliance with program criteria, the fund manager processes the transactions through an independent broker. Madoff failed to follow this standard industry practice. Indeed, Andy Berg, CEO of Homrich & Berg Inc., one of Atlanta's largest independent investment advisors, told *The Atlanta Business Chronicle* in a February 5, 2009 article that BMIS's failure to use a third-party custodian firm was "a black flag" for them. Berg advised a client who brought an existing relationship with BMIS to him to sell its investments with BMIS immediately. Aksia also told its clients that BMIS's initiation and execution of trades, and custody of feeder fund assets, "seemed to be a clear conflict of interest and a lack of segregation of duties is high on our list of red flags."

61.    A further operational and structural red flag is that BMIS's entire internal audit function, as well as its external independent auditor function, was being conducted by the three person firm of Friehling & Horowitz ("F&H"), only one member of which appears to have been a full time accountant. As explained in the Aksia Letter:

> The feeder funds had recognized administrators and auditors but substantially all of the assets were custodied with Madoff Securities. This necessitated Aksia checking the auditor of Madoff Securities, Friehling & Horowitz (not a fictitious audit firm). After some investigating, we concluded that Friehling & Horowitz had three employees, of which one was 78 years old and living in Florida, one was a secretary, and one was an active 47 year old accountant (and the office in Rockland County, NY was only 13ft x 18ft large). This operation appeared small given the scale and scope of Madoff s activities.

- 21 -

Supreme Court Records OnLine Library - page 25 of 69

62.    Under the regulations of the American Institute of Certified Public Accountants ("AICPA"), every accounting firm that does auditing work is required to enroll in the AICPA's peer review program under which experienced auditors assess such firm's audit quality yearly. While F&H was a member of the AICPA, it had not been subjected to a peer review since 1993 because F&H had represented to the AICPA, in writing, that it did not perform any audits. Whether a firm has been subject to a peer review, and the results of that review, are on public file at the AICPA.

63.    Also disturbing was the fact that BMIS was controlled by Madoff family members. Close family relations within a business make it less likely that wrongdoing will be exposed from within the entity, as it would require family members blowing the whistle on each other. As explained in the Aksia Letter:

> Conversations with former employees indicated a high degree of secrecy surrounding the trading of these feeder fund accounts. Key Madoff family members (brother, daughter, two sons) seemed to control all the key positions at the firm. Aksia is consistently negative on firms where key and control positions are held by family members.

64.    The failure to use an independent third party broker to clear the Fund's trades, reliance on a blatantly inadequate auditor, and the concentration of family control within BMIS should have stopped FGG's investment of Fund assets with Madoff and BMIS in its tracks.

### Legal, Compliance, and Regulatory Risk

65.    In connection with the third prong of FGG's due diligence and risk monitoring strategy, "FGG's legal, compliance, and accounting teams specialize in investment management regulation, securities compliance, corporate operations, and tax issues." According to FGG, "[t]he role of this part of the diligence exam is to determine the seriousness of any deficiencies in this area which may cause risk of sanction, loss, or reputational embarrassment."

- 22 -

Supreme Court Records OnLine Library - page 26 of 69

66.     Had FGG and the other Fund Defendants conducted due diligence and risk monitoring of Madoff and BMIS they would have learned of numerous regulatory actions involving Madoff and/or BMIS:

a.     In 1992, the SEC investigated two accountants, Frank Avellino and Michael Bienes, who had illegally raised money in Florida for BMIS and Madoff promising guaranteed returns of 13.5% to 20%. These two accountants sold unregistered securities to unsophisticated investors raising $440 million. Through its investigation, the SEC discovered that Avellino and Bienes transferred their clients' funds to Madoff, who then purportedly invested the money. Yet, when investigators sought documents regarding those transactions, they discovered that Avellino and Bienes kept few if any records. According to an SEC complaint, Mr. Avellino began raising money for Madoff in 1962. Indeed, Avellino had been connected to Mr. Madoff for his entire career. After graduating from the City University of New York in 1958, Mr. Avellino began working as an accountant at a firm run by Saul Alpern, Mr. Madoff's father-in-law, where Mr. Madoff also once ran his operations. Bienes joined Avellino in raising funds for Madoff in 1965. The SEC charged Avellino and Bienes with operating an unregistered investment company and selling unregistered securities. These facts, including Madoff's involvement, were publically reported in a December 16, 1992 *Wall Street Journal* article.

b.     In January 2006, the SEC began an investigation into Madoff and BMIS, finding that Madoff had personally "misled the examination staff about the nature of the strategy" used by the FGG funds and other hedge fund accounts, and also "withheld from the examination staff information about certain of these customers' accounts," according to SEC documents in connection with the investigation. The SEC also found that neither Madoff nor the

- 23 -

Supreme Court Records OnLine Library - page 27 of 69

FGG funds disclosed to investors in the FGG funds that Madoff was the investment advisor. The SEC further found that Madoff had violated rules requiring investment advisors to register with the SEC, which makes them subject to inspections and examinations. FGG and the Fund Defendants were aware of the allegations against Madoff and the contents of the SEC investigation, since the SEC interviewed an official from FGG and another FGG entity employee during its investigation and received documents from FGG entities. The SEC ultimately closed the investigation in 2008 after Madoff agreed to register his investment advisory business and FGG agreed to disclose information about Madoff to investors. Nonetheless, Madoff's multiple violations and purposeful misleading of SEC staff should have been a red flag to FGG and the Fund Defendants.

        c.      FINRA also reported five regulatory actions against BMIS, the first dating back to 1963: (1) In 1963, the National Association of Securities Dealers, Inc.("NASD") fined and censured BMIS for violation of NASD Rule 2230; (2) In 1975, the NASD again fined BMIS (the details of the violation are no longer available because of the age of the complaint); (3) In 2005, the NASD censured and fined BMIS for violation of SEC Rule 11AC1-4; (4) In 2007, the NASD censured and fined BMIS for violation of SEC Rule 604, NASD Rule 2110, and Interpretative Material 2110-2; and (5) In 2008, FINRA censured and fined BMIS for violation of NASD Ruled 8211 and 8213.

    67.     Had FGG and the other Fund Defendants conducted due diligence and risk monitoring of Madoff and BMIS, these numerous SEC, NASD and FINRA actions would have raised red flags warranting further investigation into whether a manager such as Madoff/BMIS that repeatedly acts in blatant disregard of regulations in place to protect investors should be managing the Fund's assets.

- 24 -

*Personal Background Investigation*

68.     The fourth and final prong of FGG's due diligence and risk monitoring strategy involves an examination of "the abilities and personalities of the individuals involved in managing the fund." The background check included, among other things, extensive interviews and litigation and regulatory checks. However, as discussed above, since Madoff generally refused to answer questions about how he achieved such high returns and the Fund Defendants had an apparent lack of understanding of Madoff's business, it is clear that FGG and the Fund Defendants did not conduct a substantive interview of Madoff. Moreover, a background check of his litigation and regulatory background would have turned up the various regulatory problems discussed above.

69.     Instead of conducting adequate due diligence and risk monitoring of Madoff and BMIS, the Fund Defendants were content to tout Madoff's results and collect hefty fees in exchange for handing the Fund's assets over to Madoff to manage. The Fund Defendants never questioned, at least publicly, why Madoff would let feeder funds, such as those operated by or through FGG, charge fees of 20% of profits, while BMIS simply charged a commission on trades allegedly executed. According to a December 19, 2008 article in *The Wall Street Journal*, "[t]his is an unusual arrangement that raised suspicions among rival money managers, some of whom doubted that it could generate sufficient fee income."

70.     Indeed, numerous other investment professionals who advised investors about potential investments with Madoff or BMIS warned clients not to invest with Madoff. As noted above, in a letter issued to clients on December 15, 2008, Aksia, LLC, an independent hedge fund research and advisory firm, discussed the red flags it had previously identified as early as 2007, which prompted Aksia to advise its clients against investing with Madoff or any of his feeder funds, such as Greenwich Sentry. Aksia explained that "[a]s a research firm we are forced

- 25 -

Supreme Court Records OnLine Library - page 29 of 69

to make difficult judgments about the hedge funds we evaluate for clients. *This was not the case with the Madoff feeder funds. Our judgment was swift given the extensive list of red flags.*" (Emphasis added.) In other words, this was a no brainer.

71.     According to a news account published by *Bloomberg News* on January 7, 2009, representatives of FGG were present at a meeting in 2000 with Bernard Madoff and representatives of Credit Suisse Group AG, including Oswald Gruebel, who at the time headed Credit Suisse's private-banking unit. According to *Bloomberg*, "Gruebel and two other Credit Suisse executives at the meeting with Madoff raised concern about his use of a little-known auditor who had just one client.... The bank also worried about why Madoff served as the custodian of his clients' assets.... Madoff wouldn't tell Gruebel how much money he managed, saying only that he had 12 people working with him to manage the strategy, along with six senior traders...." After the fifth or sixth query, Madoff ended the session, according to people who were at the meeting, reported *Bloomberg* on January 27, 2009. *Bloomberg* reported, Credit Suisse "urged customers ... to withdraw cash from his firm because the bank couldn't determine how he made money." The article stated that the Credit Suisse clients "proceeded to redeem about $250 million from Madoff-run funds."

72.     In 2003, a team from Société Générale's investment bank was sent to New York to perform routine due diligence of Madoff and BMIS. The *New York Times* reported in a December 17, 2008 article on the team's findings:

> What it found that March was hardly routine: Mr. Madoff's numbers simply did not add up. Société Générale immediately put Bernard L. Madoff Investment Securities on its internal blacklist, forbidding its investment bank from doing business with him, and also strongly discouraging wealthy clients at its private bank from his investments.

- 26 -

> The red flags at Mr. Madoff's firm were so obvious, said one
> banker with direct knowledge of the case, that Société Générale
> "didn't hesitate. It was very strange."

73.     The Fund Defendants had responsibilities to establish due diligence procedures

and performance guidelines for all fund managers with whom it invested client assets. These

procedures were to be applied in creating general oversight and transparency regarding how

Greenwich Sentry assets were being invested. The Fund Defendants were also responsible for

seeing that these procedures and guidelines, if any, were in fact being performed. However, as is

evident from the Fund Defendants' failure to heed the numerous red flags discussed above, the

Fund Defendants failed to perform even a minimum level of due diligence regarding Madoff and

BMIS.

74.     Indeed, according to a former employee of FGG during 2006 and 2007, that

employee was told not to worry about due diligence when it came to the Sentry funds, because it

is an "internal fund." A former accountant with FGG in New York from 2004 to 2008 stated that

s/he was not aware of any due diligence done of the Sentry funds and none of the accountants in

New York were involved in due diligence of the Sentry funds.

75.     Sticking their heads even further in the sand, FGG and its affiliates actively

worked to assure they would not learn the truth about Madoff and BMIS. Harry Markopolos, a

Madoff whistleblower, testified before Congress on February 4, 2009 that FGG embarked on a

three-year auditor shopping spree in 2004, switching auditors three times in three years.

Berkow, Schechter & Co. audited FGG and its funds through 2004. PwC Netherlands audited

FCC funds for 2005 and then PwC Canada took over in 2006. The switching of auditors was

done by the Fund Defendants with the hope that the lack of continuity would make it difficult for

the auditor to dig too deep into Madoff and BMIS.

- 27 -

Supreme Court Records OnLine Library -  page 31 of 69

76. To add insult to injury, not only did the Fund Defendants not perform due diligence and risk monitoring, the General Partner and FGG lied to the Limited Partners about having performed a "higher level" of "deeper and broader" due diligence and risk monitoring.

77. The Fund Defendants received large fees to choose managers and perform due diligence and risk monitoring. As Brad Alford, who runs Alpha Capital Management LLC in Atlanta, which helps clients choose hedge funds, was quoted by *Bloomberg News* on December 15, 2008 as saying: "It's mind-boggling that people like ... Fairfield Greenwich had been doing this for so long.... It's the job of these funds of funds to be doing due diligence. That's why they get paid."

**Obligations of the Fund Defendants**

78. By reason of their positions and because of their ability to control the business of the Fund, the Fund Defendants owed the Fund and the Limited Partners fiduciary obligations of fidelity, trust, loyalty, candor and due care, and were and are required to use their utmost ability to control the Fund in a fair, just and equitable manner and to act in furtherance of the best interests of the Fund and the Limited Partners so as to benefit all the Limited Partners proportionately and not in furtherance of their personal interest. In addition, each of the Fund Defendants owed to the Fund and the Limited Partners, the fiduciary duty to exercise due care, loyalty, good faith, candor and diligence in the management and administration of the Fund and in the use and preservation of its assets.

*The General Partners' Culpable Conduct*

79. Pursuant to the Offering Memorandum, the General Partner is responsible for directing the Fund's investment and trading activities. Similarly, the Amended and Restated Limited Partnership Agreement dated April 30, 2006 provides that the General Partner has the exclusive power to make all decisions with regard to the management of the Fund.

- 28 -

80.     By operation of law, as the General Partner of a limited partnership, the General Partner owed duties of care, loyalty and candor to the Limited Partners and the Fund.

81.     Each of the General Partners here completely abdicated its responsibilities to the Limited Partners and the Fund by failing to perform even minimal due diligence into the Fund's single manager and custodian of the Fund's assets, BMIS, let alone perform the "higher level" of "deeper and broader" due diligence and continued monitoring that the General Partner and FGG promised investors.

82.     Among other things, the General Partner utterly failed to:

a.      safely manage the Fund's assets;

b.      perform, or supervise those tasked with performing, adequate due diligence of the Fund's single manager and custodian of assets, BMIS;

c.      investigate various red flags apparent regarding BMIS, some of which was reported in the mainstream media;

d.      provide the Fund and Limited Partners with accurate financial statements and reports; and

e.      warn the Fund and the Limited Partners of the risks involved in their investments.

83.     To make matters worse, not only did the General Partners fail to conduct due diligence and risk monitoring of BMIS, each of the General Partners falsely represented to the Limited Partners and the Fund that it had in fact performed and was continuing to perform these duties, in violation of the General Partners' duties of candor and loyalty.

84.     The General Partners collected substantial fees for performing duties it did not fulfill. The General Partners collected a Management Fee of 1% (0.0833% per month) of each

- 29 -

Supreme Court Records OnLine Library -  page 33 of 69

Limited Partner's capital account and an Incentive Allocation of 20% of the capital appreciation after expenses allocated to each Limited Partner's capital account. According to the Fund's financial statements, the Management Fees and Incentive Allocations paid were as follows:

| Year | Management Fee | Incentive Allocation |
| --- | --- | --- |
| 2005 | None (General Partner began charging Management Fee in 2006) | $2,451,275 |
| 2006 | $282,277 | $2,928,945 |
| 2007 | $785,421 | $3,054,146 |

Upon information and belief, the General Partner also received eleven months of Management Fees and Incentive Allocations prior to the Madoff ponzi scheme being revealed on December 10, 2008.

85.     In addition to receiving fees over $9.5 million in fees during the last three years alone (not including those for the eleven months of 2008), for duties not performed, the Management Fees and Incentive Allocations paid to the General Partners were calculated based on inflated capital accounts and appreciation thereof.

***The Individual Defendants' Culpable Conduct***

<u>*Defendants Noel, Tucker and Piedrahita*</u>

86.     Defendants Noel, Tucker and Piedrahita controlled the General Partners and are the founding partners of FGG. Defendants Noel and Tucker served as the Fund's General Partners from its organization in 1993 until January 1998. Defendants Noel, Tucker and Piedrahita are the main principals of FG Limited, which, upon information and belief, served as the Fund's General Partner from January 1, 1998 until April 30, 2006. FG Bermuda, a wholly owned subsidiary of FG Limited, of which defendants Noel, Tucker and Piedrahita are the main principals, has served as the Fund's General Partner since March 1, 2006.

- 30 -

87. Defendants Noel and Tucker controlled the general partners of the Fund when the Fund began investing its assets with BMIS, and therefore, were responsible for performing and/or supervising the initial pre-investment due diligence of BMIS.

88. Defendants Noel, Tucker and Piedrahita, through their control of the various General Partners and FGG, were responsible for the continued risk monitoring of BMIS and the Fund's assets.

89. Defendants Noel, Tucker and Piedrahita were aware, or should have been aware had they exercised the appropriate duty of care and loyalty, of the many red flags described above.

90. Defendants Noel, Tucker and Piedrahita violated their duties of care and loyalty by failing to, *inter alia*:

      a.    safely manage the Fund's assets;

      b.    perform, or supervise those tasked to perform, adequate due diligence of the Fund's single manager and custodian of assets, BMIS;

      c.    investigate various red flags apparent regarding BMIS, some of which was reported in the mainstream media;

      d.    provide the Fund and Limited Partners with accurate financial statements and reports; and

      e.    warn the Fund and the Limited Partners of the risks involved in their investments.

91. Defendants Noel, Tucker and Piedrahita further violated their duties of candor and loyalty by themselves falsely representing, and causing the other General Partners and FGG to

- 31 -