falsely represent, that they had performed due diligence and continued risk monitoring of the

Fund's manager and sole custodian, BMIS.

92.     Defendants Noel, Tucker and Piedrahita each personally benefited from the

breaches by being the ultimate recipients of the Management Fees and Incentive Allocations paid

to the General Partners.

### Defendants Francoeur and Vijayvergiya

93.     Defendants Francoeur and Vijayvergiya, as directors of the Fund's General

Partner, FG Bermuda, owed the Fund and Limited Partners duties of care, loyalty and candor.

Defendants Francoeur and Vijayvergiya breached these duties by failing to, *inter alia*:

      a.     safely manage the Fund's assets;

      b.     perform, or supervise those tasked to perform, adequate due diligence of

the Fund's single manager and custodian of assets, BMIS;

      c.     investigate various red flags apparent regarding BMIS, some of which was

reported in the mainstream media;

      d.     provide the Fund and Limited Partners with accurate financial statements

and reports; and

      e.     warn the Fund and the Limited Partners of the risks involved in their

investments.

94.     Defendant Vijayvergiya, in addition to his role as manger of FG Bermuda, as

manager of FGG's Risk Management team, owed a duty to the Fund and the Limited Partners to

perform adequate due diligence and continued monitoring of the Fund's single manager and

custodian of assets, BMIS.  Vijayvergiya breached his duties to the Fund and Limited Partners

by failing to perform any due diligence or continued monitoring of BMIS.

- 32 -

Dockets.Justia.com

95.     Defendants Francoeur and Vijayvergiya benefited from the breaches of fiduciary duties by sharing in the Management Fees and Incentive Allocations paid to the General Partners from the Limited Partners' capital accounts.

### *FGG's Culpable Participation*

96.     FGG, through its control of its affiliates, exercised control over the General Partners, FG Limited, FG Bermuda, and FG Advisors. FGG used its alleged "higher level" of "deeper and broader" due diligence and continued risk monitoring of its funds' managers as a marketing tool to lure investors to its funds. The duties of due diligence and continued risk monitoring of the Fund's assets and manager were delegated to FGG's Risk Management Team.

97.     FGG owed duties of care, loyalty and candor to the Fund and its Limited Partners by way of its control of the Fund's General Partners, its representations to investors, and the delegation of due diligence and continued monitoring of fund managers to FGG's Risk Management team. FGG breached these duties and/or aided and abetted the General Partners' breaches of these duties, by failing to, *inter alia*:

      a.     safely manage the Fund's assets;

      b.     perform, or supervise those tasked to perform, adequate due diligence of the Fund's single manager and custodian of assets, BMIS;

      c.     investigate various red flags apparent regarding BMIS, some of which was reported in the mainstream media;

      d.     provide the Fund and Limited Partners with accurate financial statements and reports; and

      e.     warn the Fund and the Limited Partners of the risks involved in their investments.

- 33 -

98.     FGG violated its duties of candor and loyalty to the Fund and Limited Partners by falsely representing that it performed a "higher level" of "deeper and broader" pre-investment due diligence and post-investment multifaceted risk monitoring of its managers than its competitors.

99.     FGG benefited from the breaches of fiduciary duties by sharing in the Management Fees and Incentive Allocations paid to the General Partners from the Limited Partners' capital accounts, as well as the inflated expense reimbursements paid to FG Advisors discussed below.

### The Administrators' Culpable Participation

100.     The Administrator of the Fund is responsible for performing day-to-day administrative services for the Fund, including preparing and distributing monthly reports to the Limited Partners containing the amount of the Fund's net assets, the amount of any distributions from the Fund and Incentive Allocations.  The Administrator is also responsible for maintaining the financial books and records, calculating the net asset value, handling shareholder communications and supervising the payment of expenses by the Fund.

101.     Prior to September 1, 2006, the Fund's Administrator was GlobeOp.  Citco Europe has been the Funds' Administrator and Citco Canada its sub-administrator since September 1, 2006.  Defendant Francoeur, a director of FG Bermuda, is also the Managing Director of Citco Fund Services (Bermuda) Limited, an affiliate of Citco Europe and Citco Canada.

102.     The Administrators had a duty to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, and distribute accurate monthly reports to the Limited Partners.  The Administrators failed in all three duties.

- 34 -

Supreme Court Records OnLine Library -  page 38 of 69

103.    Despite their failures to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, and distribute accurate monthly reports to the Limited Partners, the Administrators were paid a monthly service fee, in advance, based on beginning monthly net asset value of the Fund, after subscriptions and redemptions. According to the Fund's financial statements, the Administration Fees paid were as follows:

| Year | Administration Fee |
|------|--------------------|
| 2005 | $8,680             |
| 2006 | $25,251            |
| 2007 | $19,732            |

104.    The Administration Fees paid to the Administrators were also inflated, because the net asset value of the Fund calculated by the Administrator was inflated.

105.    FG Advisors provides the Fund with certain administrative services and back-office support. FG Advisors received expense reimbursements from the Fund payable quarterly based on the beginning quarterly net asset value, after subscriptions and redemptions, computed at the rate of 0.10% per annum. According to the Fund's financial statements, expense reimbursement paid were as follows:

| Year | Expense Reimbursement |
|------|-----------------------|
| 2005 | $30,878               |
| 2006 | $67,050               |
| 2007 | $19,732               |

106.    The expense reimbursements paid to FG Advisors were inflated, because the Fund's net asset value was inflated.

## PwC Violated GAAS & GAAP

107.    The PwC Int'l member firms describe themselves as having:

> The knowledge and experience necessary to help [clients] with complex financial accounting issues….Our member firms audit many of the world's best-known companies and thousands of other organizations both large and small. Our audit approach, at the

- 35 -

Supreme Court Records OnLine Library -  page 39 of 69

leading edge of best practice, is tailored to suit the size and nature of [the clients'] organization and draws upon our extensive industry knowledge.

http://www.PwC.com/extweb/service.nsf/docid/87737d18d5e2913885256e6d0062a0f6

108.    PwC is subject to regulations by various accounting bodies, including, but not limited to, the American Institute of Certified Public Accountants ("AICPA") which promulgates national auditing standards known as Generally Accepted Auditing Standards ("GAAS"). These standards set the minimum level of performance and quality that auditors are expected to meet. Under GAAS, the auditor has an overall responsibility to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud. AU § 110.02

109.    PwC was engaged by the General Partner of the Fund to provide independent auditing and accounting services. Pursuant to such engagement, PwC agreed and undertook a duty to provide professional services to audit the annual statements sent to the Limited Partners in accordance with GAAS and to render an opinion as to whether those financial statements were fairly presented in conformity with Generally Accepted Accounting Principles ("GAAP") in the US.

110.    Among other things, PwC was required to opine that the Fund's Statement of Assets, Liabilities & Partners' Capital, including the Schedule of Investments and related Statements of Operations, Changes in Partners Capital and Cash Flows, presented in all material respects, the financial position of the Fund at December 31, 2007, 2006, and 2005. This included verifying that the investments included in the Statement of Assets , Liabilities & Partners' Capital of $223,148,625, $148,788,428 and $120,866,796 as of December 31, 2007, December 31, 2006 and December 31, 2005 respectively, existed and were appropriately valued.

- 36 -

Supreme Court Records OnLine Library - page 40 of 69

111.    On April 18, 2008, PwC Canada issued an unqualified ("clean") opinion for the

year ended December 31, 2007 as follows:

> In our opinion, the accompanying statement of assets, liabilities
> and partners' capital, including the schedule of investments, and
> the related statements of operations, changes in partners' capital
> and cash flows present fairly, in all material respects, the financial
> position of **Greenwich Sentry, L.P.** (the "Partnership") as at
> December, 31, 2007 and the results of its operations, the changes
> in its partners' capital and its cash flows for the year then ended in
> conformity with accounting principles generally accepted in the
> United States of America. These financial statements are the
> responsibility of the Partnership's management; our responsibility
> is to express an opinion on these financial statements based on our
> audit. We conducted our audit of these financial statements in
> accordance with auditing standards generally accepted in the
> United States of America. Those standards require that we plan
> and perform the audit to obtain reasonable assurance about
> whether the financial statements are free of material misstatement.
> An audit includes examining, on a test basis, evidence supporting
> the amounts and disclosures in the financial statements, assessing
> the accounting principles used and significant estimates made by
> the Partnership's management, and evaluating the overall financial
> statement presentation. We believe that our audit provides a
> reasonable basis for our opinion.

112.    PwC Canada also issued an unqualified audit opinion for the year ended

December 31, 2006. On June 26, 2006, PwC Netherlands issued a unqualified opinion for the

year ended December 31, 2005 as follows:

> In our opinion, the accompanying balance sheet and the related
> statements of operations, partners' capital and cash flows present
> fairly, in all material respects, the financial position of Greenwich
> Sentry L.P. as at December 31, 2005, and the results of its
> operations and its cash flows for the year then ended in conformity
> with accounting principles generally accepted in the United States
> of America. These financial statements are the responsibility of the
> Partnership's management; our responsibility is to express an
> opinion on these financial statements based on our audit. We
> conducted our audit of these statements in accordance with
> auditing standards generally accepted in the United States of
> America, which require that we plan and perform the audit to
> obtain reasonable assurance about whether the financial statements
> are free of material misstatement. An audit includes examining, on

- 37 -

Supreme Court Records OnLine Library - page 41 of 69

a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statements presentation. We believe that our audit provides a reasonable basis for our opinion. The financial statements of the Partnership as at December 31, 2004 and for the year then ended were audited by other auditors whose report dated February 21, 2005 expressed an unqualified opinion on those statements.

113.    Additionally, the Fund's financial statements identified investments as a significant accounting policy from 2005 to 2007:

> Investments in listed securities are valued at the last reported sales or bid as determined on the exchange on which such securities are principally traded. Investment transactions are accounted for on a trade-date basis.

114.    In issuing these opinions, PwC asserted that the Fund's financial statements were presented in conformity with GAAP and that its audit was performed in accordance with GAAS. As part of those financial statements, PwC also asserted that the Fund's investments existed and were properly valued in accordance with GAAS and GAAP.

115.    PwC's audit was negligently conducted. PwC knew its audit opinions would be disseminated to the Fund and its Limited Partners. Had PwC performed its audit in accordance with GAAS and GAAP, the fact that the Fund's investments did not exist or were not appropriately valued would have been known to the Fund and its Limited Partners.

***PwC was required by GAAS to Obtain Sufficient Audit Evidence***

116.    GAAS requires that an auditor must obtain sufficient audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit. AU § 326.01. Audit evidence is all the information used by the auditor in arriving at the conclusions on which the audit opinion is based and includes the information

- 38 -

Supreme Court Records OnLine Library - page 42 of 69

contained in the accounting records underlying the financial statements and other information. AU § 326.02.

117.    The auditor should obtain audit evidence by testing the accounting records, for example, through analysis and review, re-performing procedures followed in the financial reporting process and reconciliations. AU § 326.04. Other information that the auditor may use as audit evidence includes minutes of meetings, **confirmations from third parties**, controls manuals and information obtained by the auditor from such audit procedures as inquiry, observation, and inspection. AU § 326.05. In the case of a third party investment manager, a typical audit procedure to verify the existence of investments is to send a confirmation request of the investments balance as of the balance sheet date.

*PwC was required by GAAS to Exercise Due Professional Care and Professional Skepticism*

118.    GAAS also requires that auditors must exercise due professional care in performing the audit and preparing the audit report. AU § 230.01. Due professional care concerns what the auditor does and how well he does it. AU § 230.04.

119.    Additionally, due professional care requires the auditor to exercise professional skepticism. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence. AU § 230.07.

120.    Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process. AU § 230.08. Additionally, in exercising professional skepticism, the auditor should

- 39 -

Supreme Court Records OnLine Library - page 43 of 69

not be satisfied with less than persuasive evidence because of a belief that management is honest.

AU § 230.09.

121.    As stated above, confirmation requests are a typical audit procedure to audit

investments held be third party investment managers. Statement of Auditing Standard ("SAS")

No. 67, *The Confirmation Process*, requires the auditor to exercise an appropriate level of

professional skepticism throughout the confirmation process. AU § 330.15.

122.    SAS No. 67 states that:

> The auditor's understanding of the client's arrangements and
> transactions with third parties is key to determining the
> information to be confirmed. The auditor should obtain an
> understanding of the substance of such arrangements and
> transactions to determine the appropriate information to include on
> the confirmation request.

123.    More importantly, SAS No. 67 highlights the need for auditors to exercise a

higher degree of professional skepticism in certain circumstances:

> If information about the respondent's competence, knowledge,
> **motivation**, ability, or willingness to respond, or about the
> **respondent's objectivity and freedom from bias** with respect to
> the audited entity comes to the auditor's attention, the auditor
> should consider the effects of such information on designing the
> confirmation request and evaluating the results, including
> determining whether other procedures are necessary. In addition,
> there may be circumstances (such as for significant, unusual year-
> end transactions that have a material effect on the financial
> statements or **where the respondent is the custodian of a
> material amount of the audited entity's assets) in which the
> auditor should exercise a heightened degree of professional
> skepticism relative to these factors about the respondent**. In
> these circumstances, the auditor should consider whether there is
> sufficient basis for concluding that the confirmation request is
> being sent to a respondent from whom the auditor can expect the
> response will provide **meaningful and appropriate audit
> evidence**.

(Emphasis added.)

- 40 -

124.    PwC failed in its duties to obtain sufficient competent audit evidence and exercise

the appropriate degree of professional skepticism and due professional care during the audit of

the financial statements of the Fund. This was particularly true with respect to confirmation of

the Fund's investments for the following reasons:

      a.     BMIS was the ONLY third party investment manager of the Fund;

      b.     BMIS was also the SOLE custodian of the Fund's assets; and

      c.     The Fund invested ALL of its investments with BMIS.

125.    One of these facts alone should have caused PwC to heighten its professional

skepticism during its audit testing of the Fund's investments. With all of these factors present

and the additional red flags described previously, PwC's failure to obtain appropriate audit

evidence concerning the Fund's investments was astounding.

126.    PwC failed to exercise due professional care because it failed to obtain sufficient

evidence to support the assertions of the existence of the Fund's investments, maintain an

attitude of professional skepticism; and render an accurate audit report on behalf of the Fund as

required by GAAS.

***PwC was required by the AICPA Investment Guide & Alternative Investments Practice
Aid to Perform "Look-Through Audits" into BMIS***

127.    The AICPA *Investment Company Audit & Accounting Guide* (the "Guide") is an

industry standard when it comes to auditing public or private investment companies. It describes

the objectives of auditing investments in other funds. Section 5.84 specifically addresses the

audit risk associated with funds of funds or feeder funds and establishes a "look-through" duty

for auditors of funds of funds. It states that significant audit risks may exist if management does

not use strong procedural controls in selecting and monitoring a fund's investments in investee

companies and determining the investments fair value. In highlighting this audit risk, the Guide

- 41 -

Supreme Court Records OnLine Library - page 45 of 69

states that the auditors approach to an investor fund's investments in investee funds (i.e. funds of funds) might focus on:

> a.  Evaluating the investor and investee funds' control environments; and

> b.  Substantiating the fair value attributed to investments in the investee

funds.

128.  Additionally, Section 5.85 of the Guide suggests the following audit tests for investments in non public funds.

> Participation in management site visits or telephone calls to investee funds….Participation in management site visits would be more appropriate if the investee funds represented a **significant investment by the investor fund** or if **serious concerns as to the management controls at the investee fund** existed.

(Emphasis added.)

129.  The AICPA *Alternative Investments - Audit Considerations Practice Aid* ("Practice Aid") provides similar guidance as to the valuation and existence of investments of funds of funds.  It states that an auditor should confirm investments with the fund manager as of the balance sheet date and should exercise considerable judgment in performing alternative procedures towards assessing the existence of investments.  This judgment should include the following audit tests:

> a.  Observing management sites;

> b.  Reviewing executed partnership, trust or similar agreements;

> c.  Inspecting other documentation supporting the investor's interest in the

fund;

> d.  Reviewing periodic statements of the fund and comparing activity with

amounts recorded by the investor; and

> e.  Vouching relevant cash receipts and disbursements.

- 42 -

Supreme Court Records OnLine Library -  page 46 of 69

130.    Such testing suggested by the AICPA in the Guide and the Practice Aid is critical in the case of a single third party investment manager and a sole custodian of investments of ALL of the Fund's investments such as BMIS. In this situation, PwC should, for all intents and purposes, have performed a full scope audit of the underlying fund, *i.e.* BMIS, including an assessment of BMIS' control environment.

131.    The alternative to this would have been for PwC to issue a reliance report stating that the auditor of the underlying fund, *i.e.* F&H, is responsible for the audit. It did not do that. However, where the underlying auditor is a three person audit firm with no recent Peer Review, is a related party to BMIS and has no other known audit clients, PwC was obligated to have performed significant audit testing on BMIS.

132.    PwC's audit "look-through" testing should have at a minimum included a robust assessment of BMIS' control environment, visiting BMIS' offices, interviewing BMIS management, reviewing cash receipts and payments details and inspecting other relevant information including legal agreements, trading tickets etc. PwC knowingly failed to do this and as a result issued an audit opinion which was in violation of GAAS.

***PwC was required by GAAS to obtain an Understanding of the Fund's Internal Controls***

133.    GAAS states that the auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements, whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures. AU § 314.01.

134.    Obtaining an understanding of the entity and its environment is an essential aspect of performing an audit in accordance with GAAS. In particular, that understanding establishes a frame of reference within which the auditor plans the audit and exercises professional judgment

- 43 -

Supreme Court Records OnLine Library - page 47 of 69

about assessing risks of material misstatement of the financial statements and responding to those risks throughout the audit. AU § 314.04.

135. Additionally, GAAS requires that auditors consider the existence of an internal audit function in determining the nature, timing and extent of audit procedures to be performed. AU § 332.01. Auditors are also required to assess the internal auditors' competence, including factors such as the educational level and professional experience and also assess the internal auditors' objectivity.

136. Given the facts surrounding the custody and management of the Fund's investments by BMIS described above, PwC had a "look-through" audit responsibility to assess BMIS' control environment and internal auditors. PwC knowingly failed to do this. Had PwC carried out its responsibilities, it would have concluded that:

a. There was a lack of transparency into BMIS' investment strategy and activities;

b. BMIS' trades for the Fund were not supported by an automated order and execution process but were supported by manual trading tickets;

c. The Fund performed little or no due diligence on BMIS and did not test the validity of the Fund's performance or strategy;

d. The Fund changed its auditor three times from 2004 to 2006 from Berkow, Schecter & Co. in 2004 to PwC Netherlands in 2005 to PwC Canada in 2006;

e. BMIS' internal audit function was performed by its external auditors, F&H, who were the external auditors of BMIS for many years and lacked any objectivity to properly carry out this function;

- 44 -

f.    F&H was not experienced or qualified to perform an internal audit function as it was only a three person auditing firm (of which only one appears to have been a full time accountant) with no other known audit or internal audit clients. It also had not had any Peer Reviews conducted on it as outlined by the AICPA; and

g.    F&H did not have the appropriate level of access to BMIS' accounting or operational information.

137.    Knowing these facts, PwC failed to appropriately assess the Fund and BMIS' internal controls and control environment in designing and executing its audit plan. It also failed to consider the objectivity and qualifications of BMIS' internal auditors as part of its annual audit of the Fund in violation of GAAS.

***PwC was required by GAAS to Assess Audit Risk and the Risk of Material Misstatement to Fraud or Error***

138.    GAAS states that audit risk and materiality, among other matters, need to be considered together in designing the nature, timing, and extent of audit procedures and in evaluating the results of those procedures. AU § 312.01.

139.    GAAS also requires that risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors. AU § 316.02. In addition, the auditor should use professional judgment in determining whether a risk factor is present and should be considered in identifying and assessing the risks of material misstatement due to fraud. AU § 316.32.

140.    The auditor also has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by fraud or error. AU § 316.12. SAS No. 99, *Consideration of Fraud in a*

- 45 -

*Financial Statement Audit.* In performing the audit, the auditor is concerned with matters that, either individually or in the aggregate, could be material to the financial statements.

141. Furthermore, because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. AU § 316.13 states that:

> The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and **regardless of the auditor's belief about management's honesty and integrity**. Furthermore, professional skepticism requires an **ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred**. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

(Emphasis added.)

142. PwC was required under GAAS to actively consider whether there was a risk that the financial statements it was auditing contained material misstatements due to fraud, to identify the risks thereof and to communicate those concerns, if any, to the management of the Fund.

143. However, PwC knowingly ignored the numerous fraud risk factors during its audit of the Fund. These factors included but were not limited to:

a. Unusual year after year steady profitability, especially compared to that of other companies in the same industry;

b. Managements' personal financial situation was threatened by the Fund's financial performance, including significant portions of their compensation being contingent upon fees paid by BMIS;

c. Ineffective monitoring by the Fund of BMIS as outlined above;

- 46 -

d. Ineffective oversight over the financial reporting process and internal
controls; and

e. Inadequate segregations of duties.

144. In addition to the above fraud risk factors, PwC also ignored the numerous red flags that existed at the Fund and BMIS as outlined previously in violation of GAAS.

***PwC was required by GAAS & GAAP to Audit Investments***

145. SAS No. 92 *Auditing Derivative Instruments, Hedging Activities, and Investments in Securities* provides guidance to auditors in planning and performing auditing procedures for assertions about derivative instruments, hedging activities, and investments in securities that are made in an entity's financial statements. AU § 332.01. It states the auditor may need special skill or knowledge to plan and perform auditing procedures for certain assertions about derivatives and securities, including:

> Obtaining an understanding of an **entity's information system for derivatives and securities, including services provided by a service organization,** which may require that the auditor have special skill or knowledge with respect to computer applications when significant information about derivatives and securities is transmitted, processed, maintained, or accessed electronically; and

> **Identifying controls placed in operation by a service organization that provides services to an entity that are part of the entity's information system** for derivatives and securities, which may require that the auditor have an understanding of the operating characteristics of entities in a certain industry.

(Emphasis added.) AU § 332.05

146. SAS No. 92 also states that the understanding of an entity's information system may include controls over securities transactions from their initiation to their inclusion in the financial statements. It also states that this may encompass controls placed in operation by the entity and by service organizations whose services are part of the entity's information system.

- 47 -

AU § 332.11. The Fund's investments were required to be reported in accordance with GAAP and FAS 115, *Accounting for Certain Investments in Debt and Equity Securities*, (May 1993).

147. PwC was required by GAAS to obtain an appropriate understanding of the Fund's information systems for investments, including those systems at BMIS. PwC failed to do this. This failure represented a complete and systematic breakdown of PwC's audit responsibilities under GAAS. Additionally, PwC's audit failures caused the Fund's investments to be reported in violation with GAAP.

### PwC Failed in its Duty As the Independent Auditor of the Fund

148. PwC failed in its duty as the independent auditor of the Fund as follows:

a. PwC failed to exercise due professional care and professional skepticism in its audit of the Fund. PwC should have exercised heightened care and professional skepticism in light of the facts and red flags discussed previously;

b. PwC failed to obtain sufficient audit evidence with respect to existence of the Fund's investments;

c. PwC failed to appropriately perform "look-through audits" into the underlying fund, *i.e.* BMIS, and assess the impact of its findings on its audit of the Fund's financial statements;

d. PwC failed to obtain an understanding of the Fund's internal controls and assess the qualifications and competency of internal auditors;

e. PwC failed to appropriately assess audit risk and the risk of material misstatement due to fraud or error; and

f. PwC failed to audit investments in accordance with GAAS and GAAP.

149. PwC knowingly ignored the GAAS and GAAP requirements and numerous facts and red flags discussed above which should have led it to either:

- 48 -

a.     disclaim or issue an adverse opinion on the Fund's 2007, 2006 and 2005 financial statements; or

b.     withdraw, correct or modify its opinion to recognize the Fund's improper accounting and financial reporting as stated above.

### DEMAND FUTILITY

150.    Plaintiff will fairly and adequately represent the interests of nominal defendant Greenwich Sentry and its Limited Partners in prosecuting the wrongs detailed herein.

151.    Plaintiff has not made demand on the General Partner or any other partner of the Fund, or on any manager of the Fund, to bring these derivative claims since such demand would be a futile and useless act that is excused by governing law, as shown below.

152.    Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the General Partner and are not subject to the protection of any independent business judgment, since it would undoubtedly be to the benefit of the Fund to recover the damages caused by the General Partner's wrongdoing and to assert these derivative claims.

153.    Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by the General Partner to the Limited Partners and the Fund. The General Partner is subject to liability for breaching its fiduciary duties to the Fund by, *inter alia,* causing the Fund's assets to be invested with Madoff or BMIS without performing due diligence or continued monitoring, causing or permitting the reckless investment practices alleged herein, failing to adequately monitor BMIS's financial reporting, and failing to detect, prevent, or halt the misstatements and omissions of material fact alleged herein.

154.    Demand is excused because the General Partner exercises ultimate authority over the Fund and profited at the expense of the Fund by receiving monthly Management Fees and Incentive Allocations from the Fund and Limited Partners.

- 49 -

155.    Demand is excused because the General Partner faces a substantial likelihood of liability in this action because of its acts and omissions alleged herein. The dramatic breakdowns and gaps in those controls were so widespread and systematic that the General Partner faces substantial exposure to liability, under the "Caremark doctrine," for total abrogation of its duty of oversight. *See In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996). The General Partner either knew or should have known that the Fund's assets were employed as part of a massive Ponzi scheme and took no steps in a good faith effort to prevent or remedy that situation, proximately causing billions of dollars of losses and possible complete collapse of the Fund.

156.    In addition, demand is also excused because the General Partner has ratified the egregious actions outlined herein, and the General Partner cannot be expected to prosecute claims against itself, and persons or entities with whom it has extensive inter-related business, professional and personal entanglements, if Plaintiff demanded that it do so. The General Partner, because of these relationships, has developed debilitating conflicts of interest that prevent it from taking the necessary and proper action on behalf of the Fund.

157.    Demand is also excused because the General Partner participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly or negligently disregarded them, and is therefore not a disinterested party and lacks sufficient independence to exercise business judgment as alleged herein.

158.    Demand is also excused because insurance policies covering the liability of a fund's General Partner generally purport to exclude legal claims asserted directly by the Fund against such persons. Thus, there was, and is, a substantial disincentive for the Fund to bring any action directly against the General Partner. Generally, under the terms of such insurance

- 50 -

policies, a partnership would be required by the carriers to cooperate in the defense of any

claims, such as the present action, which seek to impose liability upon the General Partner for

misconduct and mismanagement. Thus, if the policy or policies which the Fund maintains

contain the foregoing provision, the insurance carriers would argue that the Fund and its General

Partner are thereby contractually disabled from complying with any demand that would cause the

Fund to institute, or prosecute any action against the General Partner for such misconduct and

mismanagement; because to do so could result in the loss to the Fund of its insurance coverage.

Similarly, the Fund would be disabled from pursuing the General Partner, as it would not benefit

from any insurance they may have.

159.    Demand is also excused because the General Partner participated in, approved, or

permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly, or

negligently disregarded them, and is therefore not a disinterested party and lacks sufficient

independence to exercise business judgment as alleged herein.

160.    Given the size, scope, and blatancy of the wrongdoing and the misrepresentations

alleged above, the General Partner either knew of the financial risks or turned a blind eye to

them. Such conduct is also not protected by the business judgment rule and exposes the General

Partner to a substantial threat of liability in this action.

161.    The General Partner lacks the sufficient independence with which to render a

disinterested decision on whether to pursue the derivative claims alleged herein against

Defendants.

162.    In addition, demand would be futile and useless for the additional following

reasons:

- 51 -

Supreme Court Records OnLine Library -  page 55 of 69

a.      The General Partner, because of its inter-related business, professional and personal relationships, has developed debilitating conflicts of interest that prevent it from taking the necessary and proper action on behalf of the Fund as requested herein;

b.      The General Partner, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Fund's Limited Partners or recklessly and/or negligently disregarded the wrongs complained of herein, and is therefore not a disinterested party. The General Partner exhibited a sustained and systemic failure to fulfill its fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

c.      In order to bring this suit, the General Partner would be forced to sue itself and persons with whom it has extensive business and personal entanglements, which it will not do, thereby excusing demand;

d.      The acts complained of constitute violations of the fiduciary duties owed by the General Partner and these acts are incapable of ratification; and

e.      The Fund has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the General Partner has not filed any lawsuits against itself or the Fund Defendants for breach of fiduciary duties or others who were responsible for that wrongful conduct to attempt to recover for the Fund any part of the damages the Fund suffered and will suffer thereby.

163.    Finally, Plaintiff has not made any demand on the Limited Partners to institute this action since such demand would be a futile and useless act for the following reasons:

a.      The Fund has a large number of Limited Partners; and

- 52 -

Supreme Court Records OnLine Library - page 56 of 69

b.    Making demand on all the Limited Partners would force Plaintiff to incur huge expenses, assuming all the Limited Partners could be individually identified.

164.    Demand is excused because the General Partner still has not sued PwC despite its failure to find during its audit that the Fund's assets did not exist and that the Fund lacked adequate internal controls.

## FIRST CAUSE OF ACTION

### Grossly Negligent, Willful and Reckless Breach of Fiduciary Duties
### Against the Fund Defendants

165.    Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

166.    The Fund and the Limited Partners have suffered damages due to the Fund Defendants' conduct as detailed above. The claims asserted herein against the Fund Defendants are asserted on behalf of Greenwich Sentry to recover from the Fund Defendants the damages sustained and to be sustained by the Fund and the Limited Partners due to the gross, willful and wrongful mismanagement of the Fund's assets.

167.    The conduct detailed above was not due to an honest error of judgment but to the Fund Defendants' gross, reckless, bad faith and/or willful disregard of their duties and of the rights and interests of the Fund and the Limited Partners. The Fund Defendants' conduct cannot be justified as valid acts of business judgment because they engaged in systematic, gross mismanagement and materially misled the Fund and the Limited Partners in order to enrich themselves personally.

168.    The Fund Defendants have individually or in concert breached fiduciary duties of loyalty, care, candor and good faith owed to the Fund and its Limited Partners because they:

- 53 -

a.    failed to establish and implement an adequate and functioning system of internal financial and accounting controls to ensure the existence of the Fund's assets;

b.    failed to accurately perform, or to supervise others who performed, due diligence and continued risk monitoring of the Fund's manager and portfolio;

c.    enriched themselves at the expense of the Limited Partners by collecting management fees, incentive payments, and/or administrative fees based upon the artificially inflated capital accounts of the Limited Partners and/or net asset value of the Fund;

d.    at a minimum, failed to supervise the preparation and filing of audits, reports or other information which was sent to the Limited Partners and to examine and evaluate any reports of examination, audits, or other financial information concerning the Fund; and

e.    made false statements to the Fund and Limited Partners regarding the due diligence and risk monitoring they purported to perform.

169.    By reason of the foregoing, the Fund has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

170.    Plaintiff has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Breaches of
### Fiduciary Duties Against the Fund Defendants

171.    Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

172.    Each of the Fund Defendants breached the fiduciary duties owed to the Fund and the Limited Partners in a grossly negligent, willful and reckless manner, as detailed above.

- 54 -

Supreme Court Records OnLine Library -  page 58 of 69

173.    Each of the Fund Defendants knowingly gave substantial assistance and
encouragement to each other in committing the grossly negligent, willful and reckless breach of
fiduciary duties alleged above.

174.    Each of the Fund Defendants acted in concert with at least one other Fund
Defendant to commit the breaches of fiduciary duties detailed above.

175.    Plaintiff, and all Limited Partners, were injured as a result of the Fund
Defendants' conduct.

## THIRD CAUSE OF ACTION

### Negligent Misrepresentation Against the Fund Defendants

176.    Plaintiff repeats and realleges each and every allegation contained in the
foregoing paragraphs as if fully set forth herein.

177.    The Fund Defendants owed to the Fund and the Limited Partners a duty: (a) to act
with reasonable care in preparing and disseminating the Offering Memorandum and other
representations relied upon by the Fund and the Limited Partners in deciding to purchase their
limited partnership investment interests in the Fund; and (b) to use reasonable diligence in
determining the accuracy of and preparing the information contained in the Offering
Memorandum.

178.    Defendants breached their duties to the Fund and the Limited Partners by failing
to investigate, confirm, prepare and review with reasonable care the information contained in the
Offering Memorandum and other representations, including the audited annual financial
statements.

179.    Neither the Offering Memorandum nor any other statements made to the Fund or
Limited Partners ever disclosed that the Fund Defendants had not conducted due diligence of

- 55 -

Supreme Court Records OnLine Library - page 59 of 69

Madoff or BMIS, or that they did not conduct the post-investment multifaceted risk monitoring described in various FGG and Fund documents. As a direct, foreseeable and proximate result of this negligence, the Fund and Limited Partners have sustained damages, suffered mental and emotional distress and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

180. By reason of the foregoing, Defendants are jointly and severally liable to the Fund and Limited Partners.

181. Defendants' fraudulent acts were willful and wanton and the Fund and Limited Partners are entitled to punitive damages.

## FOURTH CAUSE OF ACTION

### Professional Negligence (Malpractice)
### Against PwC Canada and PwC Netherlands

182. Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

183. As previously set forth, PwC Canada and PwC Netherlands were retained by the Fund to ensure that the financial information conveyed by the Fund to the Limited Partners was presented in conformity with GAAP. To that end, PwC Canada and PwC Netherlands undertook to perform audits pursuant to GAAS and was substantially compensated therefor.

184. PwC Canada and PwC Netherlands accepted the engagement and undertook to discharge their duties in a proper, skillful and diligent manner and in accordance with accepted professional standards.

185. In complete disregard of their duties, PwC Canada and PwC Netherlands failed to adhere to and carry out their duties in accordance with GAAS and other accepted professional standards.

- 56 -

Supreme Court Records OnLine Library - page 60 of 69

186.    As a result of the aforementioned failure to discharge their duties in a proper,

skillful and diligent manner, PwC Canada and PwC Netherlands negligently, carelessly and

unskillfully failed to discover and/or advise the Fund of the materiality of various internal control

problems and reporting errors.

187.    PwC Canada and PwC Netherlands' deviation from the standards of care in the

industry proximately caused the Fund's and the Limited Partners' pecuniary injuries.

188.    As a result of PwC Canada and PwC Netherlands' professional negligence, the

Fund and its Limited Partners suffered extensive monetary damages in an amount to be

determined at trial.

## FIFTH CAUSE OF ACTION

### Breach of Contract
### Against PwC Canada and PwC Netherlands

189.    Plaintiff repeats and realleges the foregoing allegations as though fully set forth

herein.

190.    As previously set forth, the Fund retained PwC as its external auditor.

191.    PwC Canada and PwC Netherlands were retained by the Fund to ensure that the

financial information conveyed by the Fund to the Limited Partners was presented in conformity

with GAAP.

192.    PwC Canada and PwC Netherlands accepted the engagement and in connection

therewith, PwC Canada and PwC Netherlands provided the Fund with one or more engagement

letter(s) confirming the parameters of the engagement.

193.    AU 311.09 states that an understanding with the client regarding an audit of the

financial statements includes the following auditor responsibilities:

- 57 -

Supreme Court Records OnLine Library - page 61 of 69

- The auditor is responsible for conducting the audit in accordance with generally accepted auditing standards. Those standards require that the auditor obtain reasonable rather than absolute assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.

- An audit includes obtaining an understanding of the entity and its environment, including its internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify significant deficiencies. However, the auditor is responsible for ensuring that those charged with governance are aware of any significant deficiencies that come to his or her attention.

194. PwC Canada and PwC Netherlands breached their contracts with the Fund, because they did not perform their audits of the Fund in accordance with GAAS by failing to obtain reasonable assurance that the financial statement were free of material misstatement. They also failed to obtain an appropriate understanding of internal control and permitted the financial statements of the Fund for 2005-2007 to be issued in violation of GAAP and GAAS.

195. Specifically, as alleged herein, at least for the years ending December 31, 2007, December 31, 2006 and December 31, 2005, PwC Canada and PwC Netherlands failed to apprise the Fund or its Limited Partners, among other things, that:

a. The Fund's internal controls were virtually nonexistent, at least with respect to the asset confirmation function, which was critical to the Fund and the Limited Partners;

b. The Fund was disregarding its stated due diligence and continued monitoring policies; and

c. As a direct result of PwC Canada and PwC Netherlands' breach of contract, the Fund and its Limited Partners suffered damages in an amount to be determined at trial.

- 58 -

Supreme Court Records OnLine Library - page 62 of 69

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation
### Against PwC Canada and PwC Netherlands

196.  Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

197.  PwC Canada and PwC Netherlands owed a direct duty to the Fund to provide the Fund with correct, accurate and complete audit opinions.

198.  PwC Canada and PwC Netherlands knew that the audit opinions they provided to the Fund were crucially important to the Fund's business and that the Fund intended to, and did, rely on the audit opinion(s) by, among other things, including the audit opinion(s) in the annual reports which were sent to the Limited Partners.

199.  PwC Canada and PwC Netherlands knew that if the audit opinions were false or erroneous, the Fund would suffer significant pecuniary damages.

200.  PwC Canada and PwC Netherlands breached their duty to the Fund because their audit opinions were false and/or erroneous and/or because the Fund's financial reports, which were used internally and/or disseminated to investors, were similarly impaired. Said breaches of PwC Canada and PwC Netherlands' duties resulted from PwC Canada and PwC Netherlands' negligence and carelessness.

201.  The Fund suffered pecuniary damages as a direct and proximate result of PwC Canada and PwC Netherlands' breach of its duty to provide to the Fund correct and accurate information.

- 59 -

Supreme Court Records OnLine Library -  page 63 of 69

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment

202.     Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

203.     The General Partners (FG Limited from January 1, 1993 to April 30, 2006, FG Bermuda since March 1, 2006) have received as compensation Management Fees of 1% (0.0833% per month) of each Limited Partner's artificially capital account and Incentive Allocations of 20% of the net capital appreciation after expenses allocated to each Limited Partner's capital account of the Fund.  The General Partners were paid these fees to perform certain duties which it did not perform, and has been unjustly enriched thereby.  The fees paid to the General Partners were also inflated because they were based on inflated capital accounts, which inflation the General Partner was responsible for via the wrongful conduct as alleged above, and have been unjustly enriched thereby.

204.     The Administrators (GlobeOp prior to September 1, 2006 and Citco Europe effective September 1, 2006) received a monthly service fee, in advance, based on a beginning monthly net asset value, after subscriptions and redemptions.  The sub-administrator, Citco Canada, shared in those fees.  The Administrators and sub-administrator were paid these fees to perform certain duties, which duties the Administrators and sub-administrator did not perform accurately, and were unjustly enriched thereby.  The Administration Fees were also inflated, because the net asset value of the Fund was inflated, which inflation the Administrators and sub-administrator were responsible for via the wrongful conduct as alleged above, and have been unjustly enriched thereby.

205.     FG Advisors received an expense reimbursement from the Fund payable monthly based on the beginning monthly net asset value, after subscriptions and redemptions, computed

- 60 -

Supreme Court Records OnLine Library -  page 64 of 69

at the rate of 0.10% per annum. The expense reimbursements were inflated, because such expense reimbursements were based on inflated net asset value of the Fund.

206. Such enrichment came at the Fund's and the Limited Partners' expense, as such payments were taken directly out of the Fund assets.

207. Under these circumstances, FG Bermuda, FG Limited, FG Advisors, GlobeOp, Citco Europe and Citco Canada have been unjustly enriched and, in equity and good conscience, should be made to return their unjustly gained monies.

## EIGHTH CAUSE OF ACTION

### Accounting from the Fund Defendants

208. Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

209. During the relevant time Plaintiff and the other Limited Partners had, and continue to have, an interest in the assets of the Fund.

210. The Fund Defendants owed fiduciary duties to Plaintiff and the other Limited Partners and, by their above-described conduct, the Fund Defendants have grossly breached such duties with respect to, among other things, the Fund assets in which Plaintiff and the other Limited Partners have an interest.

211. Plaintiff and the other Limited Partners are entitled to an accounting from the Fund Defendants concerning the Fund's assets.

- 61 -

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including preliminary and permanent injunctive relief, in Plaintiff's favor and in favor of Greenwich Sentry, as appropriate, against all Defendants as follows:

a. authorizing the maintenance of this action as a derivative action, with the Plaintiff as derivative plaintiff;

b. declaring that the Fund Defendants have violated their fiduciary duties to the Fund and its Limited Partners and/or aided and abetted each other in breaching those duties;

c. declaring that PwC Canada and PwC Netherlands committed professional negligence, negligent misrepresentation and breach of contract in rendering its services to the Fund, which proximately damaged the Fund and its Limited Partners;

d. declaring that the Fund Defendants have been unjustly enriched by their wrongful and grossly inequitable conduct;

e. awarding restitution of the monies paid to the Fund Defendants based on artificially inflated capital accounts of the Limited Partners;

f. ordering that PwC Canada and PwC Netherlands return any fees which it was paid by the Fund for alleged auditing services;

g. ordering the imposition of a constructive trust over the monies received by FG Bermuda, FG Limited and/or each of the other Fund Defendants as Management Fees and/or Incentive Allocations calculated based on the artificially inflated capital accounts of the Limited Partners;

h. the appointment of a receiver to oversee and manage the constructive trust;

- 62 -

Supreme Court Records OnLine Library - page 66 of 69

     i.  alternatively, awarding compensatory damages against Defendants, individually and severally in an amount to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

     j.  awarding Plaintiff the costs and disbursements of this action, including reasonable allowances for Plaintiff's attorneys' and experts' fees and expenses; and

     k.  granting such other or further relief as may be just and proper under the circumstances.

Supreme Court Records OnLine Library - page 67 of 69

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

February 13, 2009

**MILBERG LLP**
By: _____

     Sanford Dumain
     Matthew Gluck
     Brad Friedman
     Andrei V. Rado
     Kristi Stahnke McGregor
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
sdumain@milberg.com
mgluck@milberg.com
bfriedman@milberg.com
arado@milberg.com
kmcgregor@milberg.com

Stephen A. Weiss
Christopher M. Van de Kieft
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
(212) 584-0700
sweiss@seegerweiss.com
cvandekieft@seegerweiss.com

*Attorneys for Plaintiff*

- 64 -

Index No.              Year 20   09

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DAVID I. FERBER SEP IRA,         Plaintiff,

v.

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD GREENWICH
(BERMUDA) LTD., FAIRFIELD GREENWICH
ADVISORS LLC, GLOBEOP FINANCIAL SERVICES
LLC, CITCO FUND SERVICES (EUROPE) B.V, CITCO
(CANADA) INC., WALTER M. NOEL, JR., JEFFREY
TUCKER, ANDRES PIEDRAHITA, BRIAN
FRANCOEUR, AMIT VIJAYVERGIYA,
PRICEWATERHOUSECOOPERS LLP, and
PRICEWATERHOUSE COOPERS ACCOUNTANTS
N.V.,
                                  Defendants,

            and

GREENWICH SENTRY, L.P.,   ~~Nominal Defendant~~

SUMMONS AND LIMITED PARTNERS
DERIVATIVE COMPLAINT

**MILBERG LLP**
*Attorneys for  **Plaintiffs***

*Office and Post Office Address, Telephone*

One Pennsylvania Plaza
New York, NY  10119
(212) 594-5300

To

Attorney(s) for

Service of a copy of the within
                    is hereby admitted.

Dated,

Attorney(s) for

Supreme Court Records OnLine Library -  page 69 of 69