# **EXHIBIT R**

Dockets.Justia.com

**Hercules Managements Ltd., Guardian Finance of
Canada Ltd. and Max Freed**                          *Appellants*
                                                     (*Plaintiffs/
                                                     R e s p o n d e n t s*)

and

**Friendly Family Farms Ltd., Woodvale Enterprises Ltd.,
Arlington Management Consultants Ltd., Emarjay Holdings Ltd.
and David Korn**                                     (*Plaintiffs*)

*v.*

**Ernst & Young and Alexander Cox**                  *Respondents*
                                                     (*Defendants/
                                                     Applicants*)

and

**Max Freed, David Korn and Marshall Freed**         (*Third Parties*)

and

**The Canadian Institute of Chartered Accountants**  *Intervener*

**Indexed as:  Hercules Managements Ltd. *v*. Ernst & Young**

File No.:  24882.

1996:  December 6; 1997:  May 22.

Present:  La Forest, Sopinka, Gonthier, Cory, McLachlin, Iacobucci and Major JJ.

on appeal from the court of appeal for manitoba

*Negligence -- Negligent misrepresentation -- Auditors' report prepared for company -- Report required by statute -- Individual investors alleging investment losses and losses in value of existing shareholdings incurred because of reliance on audit reports -- Whether auditors owed individual investors a duty of care with respect to the investment losses and the losses in the value of existing shareholdings -- Whether the rule in Foss v. Harbottle affects the appellants' action.*

Northguard Acceptance Ltd. ("NGA") and Northguard Holdings Ltd. ("NGH") carried on business lending and investing money on the security of real property mortgages.  The appellant Guardian Finance of Canada Ltd. ("Guardian") was the sole shareholder of NGH and it held non-voting class B shares in NGA.  The appellants Hercules Managements Ltd. ("Hercules") and Max Freed were also shareholders in NGA.  At all relevant times, ownership in the corporations was separated from management.  The respondent Ernst & Young was originally hired by NGA and NGH in 1971 to perform annual audits of their financial statements and to provide audit reports to the companies' shareholders.  The partner in charge of the audits for the years 1980 and 1981, Cox, held personal investments in some of the syndicated mortgages administered by NGA and NGH.

In 1984, both NGA and NGH went into receivership.  The appellants, and a number of other shareholders or investors in NGA, brought an action against the respondents in 1988 alleging that the audit reports for the years 1980, 1981 and 1982 were negligently prepared and that in reliance on these reports, they suffered various

financial losses. They also alleged that a contract existed between themselves and the respondents in which the respondents explicitly undertook to protect the shareholders' individual interests in the audits as distinct from the interests of the corporations themselves.

The respondents brought a motion for summary judgment in the Manitoba Court of Queen's Bench seeking to have the plaintiffs' claims dismissed. The grounds for the motion were (a) that there was no contract between the plaintiffs and the respondents; (b) that the respondents did not owe the individual plaintiffs any duty of care in tort; and (c) that the claims asserted by the plaintiffs could only properly be brought by the corporations themselves and not by the shareholders individually. The motions judge granted the motion with respect to four plaintiffs, including the appellants, and dismissed their actions on the basis that they raised no genuine issues for trial. By agreement, the claims of the remaining plaintiffs were adjourned *sine die*. An appeal to the Manitoba Court of Appeal was unanimously dismissed with costs.

At issue here are: (1) whether the respondents owe the appellants a duty of care with respect to (a) the investment losses they incurred allegedly as a result of reliance on the 1980-82 audit reports, and (b) the losses in the value of their existing shareholdings they incurred allegedly as a result of reliance on the 1980-82 audit reports; and (2) whether the rule in *Foss v. Harbottle* (which provides that individual shareholders have no cause of action in law for any wrongs done to the corporation) affects the appellants' action.

*Held*:  The appeal should be dismissed.

Four preliminary matters were addressed before the principal issue.  Firstly, the question to be decided on a motion for summary judgment under rule 20 of the Manitoba *Court of Queen's Bench Rules* is whether there is a genuine issue for trial. Although a defendant who seeks dismissal of an action has an initial burden of showing that the case is one in which the existence of a genuine issue is a proper question for consideration, it is the plaintiff who must then, according to the rule, establish his claim as being one with a real chance of success.   Thus, the appellants (who were the plaintiffs-respondents on the motion) bore the burden of establishing that their claim had "a real chance of success".   Secondly, no contract existed between the appellant shareholders and the respondents and, in any event, the contract claim was not properly before this Court.  Consequently, the appellants' submissions in this regard must fail. Thirdly, the independence requirements set out in s. 155 of the Manitoba *Corporations Act* do not themselves give rise to a cause of action in negligence.  Similarly, breach of those independence requirements could not establish a duty of care in tort.   Finally, it was not necessary to inquire into whether the appellants actually relied on the audited reports prepared by the respondents because the finding of an absence of a duty of care rendered the question of actual reliance inconsequential.

The existence of a duty of care in tort is to be determined through an application of the two-part *Anns/Kamloops* test (*Anns v. Merton London Borough Council*; *Kamloops (City of) v. Nielsen*).  That approach should be taken here.  To create a "pocket" of negligent misrepresentation cases in which the existence of a duty of care is determined differently from other negligence cases would be incorrect.  Whether the respondents owe the appellants a duty of care for their allegedly negligent preparation

of the audit reports, therefore, depends on (a) whether a *prima facie* duty of care is owed, and (b) whether that duty, if it exists, is negated or limited by policy considerations.

The existence of a relationship of "neighbourhood" or "proximity" distinguishes those circumstances in which the defendant owes a *prima facie* duty of care to the plaintiff from those where no such duty exists.  In the context of a negligent misrepresentation action, deciding whether a *prima facie* duty of care exists necessitates an investigation into whether the defendant-representor and the plaintiff-representee can be said to be in a relationship of proximity or neighbourhood. The term "proximity" itself is nothing more than a label expressing a result, judgment or conclusion and does not, in and of itself, provide a principled basis on which to make a legal determination.

"Proximity" in negligent misrepresentation cases pertains to some aspect of the relationship of reliance.  It inheres when (a) the defendant ought reasonably to foresee that the plaintiff will rely on his or her representation, and (b) reliance by the plaintiff would, in the particular circumstances of the case, be reasonable.

Looking to whether reliance by the plaintiff would be reasonable in determining whether a *prima facie* duty of care exists (as opposed to looking at reasonable foreseeability alone) is not to abandon the basic tenets underlying the first branch of the *Anns/Kamloops* test.   While specific inquires into the reasonableness of the plaintiff's expectations are not normally required in the context of physical damage cases (since the law has come to recognize implicitly that plaintiffs are reasonable in expecting that defendants will take reasonable care of their persons and property), such an inquiry is necessary in the negligent misrepresentation context.  This is because reliance by a plaintiff on a defendant's representation will not always be reasonable.

Only by inquiring into the reasonableness of the plaintiff's reliance will the *Anns/Kamloops* test be applied consistently in both contexts.

The reasonable foreseeability/reasonable reliance test for determining a *prima facie* duty of care is somewhat broader than the tests used both in the cases decided before *Anns* and in those that have rejected the *Anns* approach. Those cases typically require (a) that the defendant know the identity of either the plaintiff or the class of plaintiffs who will rely on the statement, and (b) that the reliance losses claimed by the plaintiff stem from the particular transaction in respect of which the statement at issue was made. In reality, inquiring into such matters is nothing more than a means by which to circumscribe -- for reasons of policy -- the scope of a representor's potentially infinite liability. In other words, adding further requirements to the duty of care test provides a means by which concerns that are extrinsic to simple justice -- but that are, nevertheless, fundamentally important -- may be taken into account in assessing whether the defendant should be compelled to compensate the plaintiff for losses suffered.

In light of this Court's endorsement of the *Anns/Kamloops* test, enquiries concerning (a) the defendant's knowledge of the identity of the plaintiff (or of the class of plaintiffs) and (b) the use to which the statements at issue are put may now quite properly be conducted in the second branch of that test when deciding whether policy considerations ought to negate or limit a *prima facie* duty that has already been found to exist. Criteria that in other cases have been used to define the legal test for the duty of care can now be recognized as policy-based ways by which to curtail liability and they can appropriately be considered under the policy branch of the *Anns/Kamloops* test.

The fundamental policy consideration that must be addressed in negligent misrepresentation actions centres around the possibility that the defendant might be

exposed to "liability in an indeterminate amount for an indeterminate time to an indeterminate class".  While the criteria of reasonable foreseeability and reasonable reliance serve to distinguish cases where a *prima facie* duty is owed from those where it is not, these criteria can,  in certain types of situations, quite easily be satisfied and, absent some means by which to circumscribe the ambit of the duty, the prospect of limitless liability will loom.  The general area of auditors' liability is a case in point.  Here, the problem of indeterminate liability will often arise because the reasonable foreseeability/reasonable reliance test for ascertaining a *prima facie* duty of care may be satisfied in many, even if not all, such cases.

While policy concerns surrounding indeterminate liability will serve to negate a *prima facie* duty of care in many auditors' negligence cases, there may be particular situations where such concerns do not inhere.  The specific factual matrix of a given case may render it an "exception" to the general class of cases, in that while considerations of proximity might militate in favour of finding that a duty of care inheres, the typical policy considerations stemming from indeterminate liability do not arise.

This concept can be articulated within the framework of the *Anns/Kamloops* test.  Under this test, factors such as (1) whether the defendant knew the identity of the plaintiff (or the class of plaintiff) and (2) whether the defendant's statements were used for the specific purpose or transaction for which they were made ought properly to be considered in the "policy" branch of the test once the first branch concerning "proximity" has been found to be satisfied.  The absence of these factors will normally mean that concerns over indeterminate liability inhere and, therefore, that the *prima facie* duty of care will be negated.  Their presence, however, will mean that worries stemming from indeterminacy should not arise since the scope of liability is sufficiently delimited.

In such cases, policy considerations will not override a positive finding on the first branch of the *Anns/Kamloops* test and a duty of care will quite properly be found to exist.

On the facts of this case, the respondents clearly owed a *prima facie* duty of care to the appellants. Firstly, the possibility that the appellants would rely on the audited financial statements in conducting their affairs and that they might suffer harm if the reports were negligently prepared must have been reasonably foreseeable to the respondents. Secondly, reliance on the audited statements by the appellant shareholders would, on the facts, be reasonable given both the relationship between the parties and the nature of the statements themselves. The first branch of the *Anns*/*Kamloops* test is therefore satisfied.

As regards the second branch of this test, it is clear that the respondents knew the identity of the appellants when they provided the audit reports. In determining whether this case is an "exception" to the generally prevailing policy concerns regarding auditors, the central question is therefore whether the appellants can be said to have used the audit reports for the specific purpose for which they were prepared. The answer will determine whether policy considerations surrounding indeterminate liability ought to negate the *prima facie* duty of care owed by the respondents.

The respondent auditors' purpose in preparing the reports was to assist the collectivity of shareholders of the audited companies in their task of overseeing management. The respondents did not prepare the audit reports in order to assist the appellants in making personal investment decisions or, indeed, for any purpose other than the standard statutory one. The only purpose for which the reports could have been used so as to give rise to a duty of care on the part of the respondents, therefore, is as a guide for the shareholders, as a group, in supervising or overseeing management.

In light of this finding, the specific claims of the appellants could each be assessed. Those claims were in respect of: (1) moneys injected into NGA and NGH by Hercules and Freed, and (2) the devaluation of existing equity caused by the appellants' alleged inability (a) to oversee personal investments properly, and (b) to supervise the management of the corporations with a view to protecting their personal holdings.

As regards the first claim, the appellants alleged that they relied on the respondents' audit reports for the purpose of making individual investments. Since this was not a purpose for which the reports were prepared, policy concerns surrounding indeterminate liability are not obviated and these claims must fail. Similarly, the first branch of the appellants' second claim must fail since monitoring existing personal investments is likewise not a purpose for which the audited statements were prepared.

With respect to the second branch relating to the devaluation of appellants' equity, the appellants' position may at first seem consistent with the purpose for which the reports were prepared. In reality, however, their claim did not involve the purpose of overseeing management *per se*. Rather, it ultimately depended on being able to use the auditors' reports for the individual purpose of overseeing their own investments. Thus, the purpose for which the reports were used was not, in fact, consistent with the purpose for which they were prepared. The policy concerns surrounding indeterminate liability accordingly inhered and the *prima facie* duty of care was negated in respect of this claim as well.

The absence of a duty of care with respect to the appellant's alleged inability to supervise management in order to monitor their individual investments is consistent with the rule in *Foss v. Harbottle* which provides that individual shareholders have no

cause of action for wrongs done to the corporation. When, as a collectivity, shareholders oversee the activities of a corporation through resolutions adopted at shareholder meetings, they assume what may be seen to be a "managerial" role. In this capacity, they cannot properly be understood to be acting simply as individual holders of equity. Rather, their collective decisions are made in respect of the corporation itself. Any duty owed by auditors in respect of this aspect of the shareholders' functions is owed not to shareholders *qua* individuals, but rather to all shareholders as a group, acting in the interests of the corporation. Since the decisions taken by the collectivity of shareholders are in respect of the corporation's affairs, the shareholders' reliance on negligently prepared audit reports in taking such decisions will result in a wrong to the corporation for which the shareholders cannot, as individuals, recover. A derivative action would have been the proper method of proceeding with respect to this claim.

**Cases Cited**

**Considered:** *Fidkalo v. Levin* (1992), 76 Man. R. (2d) 267; *Caparo Industries plc. v. Dickman*, [1990] 1 All E.R. 568; *Anns v. Merton London Borough Council*, [1978] A.C. 728; *Kamloops (City of) v. Nielsen*, [1984] 2 S.C.R. 2; *Canadian National Railway Co. v. Norsk Pacific Steamship Co.*, [1992] 1 S.C.R. 1021; *Hedley Byrne & Co. v. Heller & Partners Ltd.*, [1964] A.C. 465; *Haig v. Bamford*, [1977] 1 S.C.R. 466; *Ultramares Corp. v. Touche*, 174 N.E. 441 (1931); *Glanzer v. Shepard*, 135 N.E. 275 (1922); **referred to:** *Foss v. Harbottle* (1843), 2 Hare 460, 67 E.R. 189; *Hercules Management Ltd. v. Clarkson Gordon* (1994), 91 Man. R. (2d) 216; *R. in right of Canada v. Saskatchewan Wheat Pool*, [1983] 1 S.C.R. 205; *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87; *Murphy v. Brentwood District Council*, [1991] 1 A.C. 398; *Sutherland Shire Council v. Heyman* (1985), 60 A.L.R. 1; *B.D.C. Ltd. v. Hofstrand Farms Ltd.*, [1986] 1 S.C.R. 228; *London Drugs Ltd. v. Kuehne & Nagel International*

*Ltd.*, [1992] 3 S.C.R. 299; *Winnipeg Condominium Corporation No. 36 v. Bird Construction Co.*, [1995] 1 S.C.R. 85; *Edgeworth Construction Ltd. v. N. D. Lea & Associates Ltd.*, [1993] 3 S.C.R. 206; *Scott Group Ltd. v. McFarlane*, [1978] 1 N.Z.L.R. 553; *Donoghue v. Stevenson*, [1932] A.C. 562; *Candler v. Crane, Christmas & Co.*, [1951] 2 K.B. 164; *H. Rosenblum (1983), Inc. v. Adler*, 461 A.2d 138 (1983); *Roman Corp. Ltd. v. Peat Marwick Thorne* (1992), 11 O.R. (3d) 248; *Roman Corp. v. Peat Marwick Thorne* (1993), 12 B.L.R. (2d) 10; *Prudential Assurance Co. v. Newman Industries Ltd. (No. 2)*, [1982] 1 All E.R. 354; *Goldex Mines Ltd. v. Revill* (1974), 7 O.R. (2d) 216.

## Statutes and Regulations Cited

*Business Corporations Act*, R.S.O. 1990, c. B.16.

*Companies Act 1985* (U.K.), 1985, c. 6.

*Corporations Act*, R.S.M. 1987, c. C225, ss. 149(1), 155(1), (2), (6), 163(1), 232.

*Court of Queen's Bench Rules*, Man. Reg. 553/88, Rule 20.03(1).

## Authors Cited

Cheffins, Brian R. "Auditors' Liability in the House of Lords: A Signal Canadian Courts Should Follow" (1991), 18 *C.B.L.J.* 118.

Cherniak, Earl A., and Kirk F. Stevens. "Two Steps Forward or One Step Back? *Anns* at the Crossroads in Canada" (1992), 20 *C.B.L.J.* 164.

Feldthusen, Bruce. *Economic Negligence*, 3rd ed. Scarborough: Carswell, 1994.

Fleming, J. G. "The Negligent Auditor and Shareholders" (1990), 106 *L.Q. Rev.* 349.

Ivankovich, Ivan F. "Accountants and Third-Party Liability -- Back to the Future" (1991), 23 *Ottawa L. Rev.* 505.

McHugh, M. H. "Neighbourhood, Proximity and Reliance". In P. D. Finn, ed., *Essays on Torts*. Sydney: Law Book Co., 1989.

Sexton, J. Edgar, and John W. Stevens. "Accountants' Legal Responsibilities and Liabilities". In Meredith Memorial Lectures 1983-84, *Professional Responsibility in Civil Law and Common Law*. Faculty of Law, McGill University. Don Mills, Ont.: Richard De Boo, 1985, 88.

Stapleton, Jane. "Duty of Care and Economic Loss: a Wider Agenda" (1991), 107 *L.Q. Rev.* 249.

Wiener, Howard B. "Common Law Liability of the Certified Public Accountant for Negligent Misrepresentation" (1983), 20 *San Diego L. Rev.* 233.

APPEAL from a judgment of the Manitoba Court of Appeal (1995), 102 Man. R. (2d) 241, 93 W.A.C. 241, 125 D.L.R. (4th) 353, 19 B.L.R. (2d) 137, 24 C.C.L.T. (2d) 284, dismissing an appeal from judgment by Dureault J. Appeal dismissed.

*Mark M. Schulman*, *Q.C.*, and *Brian A. Crane*, *Q.C.*, for the appellants.

*Robert P. Armstrong*, *Q.C.*, and *Thor J. Hansell*, for the respondents.

*W. Ian C. Binnie*, *Q.C.*, and *Geoff R. Hall*, for the intervener.

The judgment of the Court was delivered by

1          LA FOREST J. -- This appeal arises by way of motion for summary judgment. It concerns the issue of whether and when accountants who perform an audit of a corporation's financial statements owe a duty of care in tort to shareholders of the corporation who claim to have suffered losses in reliance on the audited statements. It also raises the question of whether certain types of claims against auditors may properly be brought by shareholders as individuals or whether they must be brought by the corporation in the form of a derivative action.

Facts

2      Northguard Acceptance Ltd. ("NGA") and Northguard Holdings Ltd. ("NGH") carried on business lending and investing money on the security of real property mortgages. The appellant Guardian Finance of Canada Ltd. ("Guardian") was the sole shareholder of NGH and it held non-voting class B shares in NGA. The appellants Hercules Managements Ltd. ("Hercules") and Max Freed were also shareholders in NGA. At all relevant times, ownership in the corporations was separated from management. The respondent Ernst & Young (formerly known as Clarkson Gordon) is a firm of chartered accountants that was originally hired by NGA and NGH in 1971 to perform annual audits of their financial statements and to provide audit reports to the companies' shareholders. The partner in charge of the audits for the years 1980 and 1981 is the respondent William Alexander Cox. Mr. Cox held personal investments in some of the syndicated mortgages administered by NGA and NGH.

3      In 1984, both NGA and NGH went into receivership. The appellants, as well as Friendly Family Farms Ltd. ("F.F. Farms"), Woodvale Enterprises Ltd. ("Woodvale"), Arlington Management Consultants Ltd. ("Arlington"), Emarjay Holdings Ltd. ("Emarjay") and David Korn (all of whom were shareholders or investors in NGA) brought an action against the respondents in 1988 alleging that the audit reports for the years 1980, 1981 and 1982 were negligently prepared and that in reliance on these reports, they suffered various financial losses. More specifically, the appellant Hercules sought damages for advances totalling $600,000 which it made to NGA in January and February of 1983, and the appellant Freed sought damages for monies he added to an investment account in NGH in 1982. All the plaintiffs claimed damages in tort for the losses they suffered in the value of their existing shareholdings. In addition to their tort claims, the plaintiffs also alleged that a contract existed between themselves and the respondents in which the

respondents explicitly undertook, as of 1978, to protect the shareholders' individual interests in the audits as distinct from the interests of the corporations themselves.

4     After a series of amendments to the initial statement of claim, over 40 days of discovery, and numerous pre-trial conferences and case management sessions, the respondents brought a motion for summary judgment in the Manitoba Court of Queen's Bench seeking to have the plaintiffs' claims dismissed.  The grounds for the motion were (a) that there was no contract between the plaintiffs and the respondents; (b) that the respondents did not owe the individual plaintiffs any duty of care in tort; and (c) that the claims asserted by the plaintiffs could only properly be brought by the corporations themselves and not by the shareholders individually.  The motions judge granted the motion with respect to the plaintiffs Hercules, F.F. Farms, Woodvale, Guardian and Freed and dismissed their actions on the basis that they raised no genuine issues for trial.  By agreement, the claims of the remaining plaintiffs were adjourned *sine die*.  An appeal to the Manitoba Court of Appeal by Hercules, Guardian and Freed was unanimously dismissed with costs.  Leave to appeal to this Court was granted on March 7, 1996 and the appeal was heard on December 6, 1996.

Judicial History

*Manitoba Court of Queen's Bench*

5     Dureault J. began his reasons by noting that only the claims of Hercules, F.F. Farms, Woodvale, Guardian and Freed had to be addressed since, by agreement, the claims of the other plaintiffs had been adjourned.  He then proceeded to set out the appropriate test to be applied in summary judgment motions.  Referring to Rule 20.03(1) of the Manitoba *Court of Queen's Bench Rules*, Reg. 553/88, (which governs summary judgment

motions) and citing *Fidkalo v. Levin* (1992), 76 Man. R. (2d) 267 (C.A.), he explained that while the defendant bears the initial burden of proving that the case is one where the question whether there exists a genuine issue for trial can properly be raised, the plaintiff bears the subsequent burden of establishing that his claim has a real chance of success.

6    After rejecting the claim of the plaintiff F.F. Farms on the ground that it failed from the outset to establish any cause of action, Dureault J. turned to the more substantive issues in the motion. He began by addressing the question whether the plaintiffs *qua* shareholders may properly bring an action for the devaluation in their shareholdings in NGA and NGH, and held that

> . . . shareholders have no cause of action in law for any wrongs which may have been inflicted upon a corporation. This principle of law is often referred to as "the rule in *Foss v. Harbottle*". The plaintiff shareholders are trying to get around this principle. At best, if any wrong was done in the conduct of the defendants' audits, it was done to [NGA] and [NGH] and cannot be considered an injury sustained by the shareholders.

Dureault J. found on this basis that the claims of Hercules, Guardian, Woodvale and Freed did not disclose any genuine issue for trial since they ought to have been brought by the corporations and not by the plaintiffs as individual shareholders.

7    The motions judge next addressed the question whether any duty of care in tort was owed by the defendants to the plaintiffs in their capacities as either shareholders or investors in the audited corporations. He noted that

> [g]enerally speaking, the law requires more than foreseeability and reliance. Actual knowledge on the part of the accountant/auditor of the limited class that will use and rely on the statements, referred to as the "proximity test", is also required.

Adopting the defendants' submissions on this issue, Dureault J. found that no duty of care was owed the plaintiffs because the audited statements were not prepared specifically for the purpose of assisting them in making investment decisions.

8      Finally, Dureault J. addressed the plaintiffs' claim that their losses stemmed from a breach of contract by the defendants.  He recognized that the engagement of the auditors by the corporations is a contractual relationship, but rejected the contention that this relationship can be extended to include the shareholders so as to permit them to bring personal actions against the auditors in the event of breach.  Finding that none of the plaintiffs' claims raised a genuine issue for trial, Dureault J. granted the motion with costs.

*Manitoba Court of Appeal* (1995), 102 Man. R. (2d) 241 (Philp, Lyon and Helper JJ.A.)

9      An appeal was brought to the Manitoba Court of Appeal by Hercules, Guardian and Freed.  Helper J.A., writing for the court, began her reasons by finding that the learned motions judge had correctly applied the *Fidkalo* test for summary judgment motion under Rule 20.03(1)  She also distinguished that test from that applicable on a motion to strike pleadings on the ground that, unlike the situation on a motion to strike, a Rule 20 motion requires an examination of the evidence in support of the plaintiff's claim.

10     Turning to the question whether the respondents owed a duty of care in tort to the appellants, Helper J.A. noted the latter's two alternative submissions.  The first (at p. 244) was that

> . . . a common law duty of care arose . . . because the respondents knew or ought to have known:  i) that the appellants were relying on the audited statements and the services and advice provided by the respondents; ii) the

purpose for which the appellants would rely upon the respondents' services and statements; iii) that the appellants did so rely upon those audited statements for investment and other purposes; and iv) that the respondents breached their duties to the appellants thereby causing them a financial loss.

In response to this claim, Helper J.A. explained, the respondents contended that the appellants were simply trying to avoid the rule in *Foss v. Harbottle* (1843), 2 Hare 460, 67 E.R. 189 (H.L.), by asserting their claims as individual shareholders rather than by way of derivative action. The respondents also argued that they had no knowledge that investments would be made on the basis of the audited statements and that there was no evidence to support the contention that they ought to have known that their reports would be relied upon in this manner. Finally, Helper J.A. noted, the respondents asserted that there was no evidence demonstrating that the appellants had, in fact, relied on the audited statements at issue.

11     In analysing this first main submission, Helper J.A. undertook a thorough review of *Caparo Industries plc. v. Dickman*, [1990] 1 All E.R. 568, where the House of Lords considered the question of the scope of the duty of care owed by auditors to shareholders and investors. After reviewing the Canadian case law on the matter, she concluded, at p. 248, that

> [t]he appellants were unable to direct this court to any evidence in support of their position which was ignored by the motions judge. Nor am I persuaded that the order dismissing the appellants' claims is contrary to the existing jurisprudence.
>
> The evidence showed that the auditors had prepared the annual reports to comply with their statutory obligations. There was a total absence of evidence to indicate the respondents knew the appellants would rely upon the reports for any specific purpose or that the appellants did rely upon the reports before infusing more capital into their companies. The appellants were content to allow management to continue running the companies despite a drop in profitability reflected in the 1982 audited report and invested more capital in the face of that report. The evidence filed in opposition to the motion did not support the appellants' claim on this issue.

In the view of the Manitoba Court of Appeal, then, the first of the appellants' submissions regarding the existence of a duty of care could not succeed.

12    The appellants' second main submission concerning the existence of a duty of care consisted in an allegation that the respondent auditors contravened the statutory independence requirements set out in s. 155 of the Manitoba *Corporations Act*, R.S.M. 1987, c. C225, and that this in itself gave rise to a cause of action in the individual shareholders.  The relevant portions of s. 155 are as follows:

> **155(1)**  Subject to subsection (5), a person is disqualified from being an auditor of a corporation if he is not independent of the corporation, all of its affiliates, and the directors or officers of the corporation and its affiliates.
>
> **155(2)**  For the purposes of this section,
>
>> (a) independence is a question of fact; and
>>
>> (b) a person is deemed not to be independent if he or his business partner
>>
>>> (i) is a business partner, a director, an officer or an employee of the corporation or any of its affiliates, or a business partner of any director, officer or employee of the corporation or any of its affiliates, or
>>>
>>> (ii) beneficially owns or controls, directly or indirectly, a material interest in the securities of the corporation or any of its affiliates, or
>>>
>>> (iii) has been a receiver, receiver-manager, liquidator or trustee in bankruptcy of the corporation or any of its affiliates within two years of his proposed appointment as auditor of the corporation.
>
> . . .
>
> **155(6)**  The shareholders of a corporation may resolve to appoint as auditor, a person otherwise disqualified under subsections (1) and (2) if the resolution is consented to by all the shareholders including shareholders not otherwise entitled to vote.

Specifically, the appellants alleged that because s. 155(6) of the Act allows a single shareholder to exercise a veto power over the appointment of the auditors, each

shareholder also has a right of action against the auditors where damage has been occasioned by a breach of the independence requirement in s. 155(2).  Helper J.A. rejected this submission both on the ground that it was unsupported by authority and on the basis that the wording of s. 155 as a whole does not suggest the interpretation urged by the appellants.

13     Finally, Helper J.A. addressed the appellants' contractual claim and held that the respondents' engagement to audit the financial statements of NGA and NGH  in accordance with the Act did not give rise to a contractual relationship between them and the appellants.  Similarly, she found the appellants could not sue on the contract between the corporations and the respondent Ernst & Young because of the lack of privity.  Finding no evidence to support the existence of the requisite contractual relationship, Helper J.A. rejected the appellants' claim in this regard.  For all these reasons, the Court of Appeal unanimously dismissed the appeal with costs.

Issues

14     The issues in this case may be stated as follows:

(1) Do the respondents owe the appellants a duty of care with respect to

(a) the investment losses they incurred allegedly as a result of reliance on the 1980-82 audit reports; and

(b) the losses in the value of their existing shareholdings they incurred allegedly as a result of reliance on the 1980-82 audit reports?

(2) Does the rule in *Foss v. Harbottle* affect the appellants' action?

<u>Analysis</u>

*Preliminary Matters*

15    Four preliminary matters should be addressed before turning to the principal issues in this appeal.  The first concerns the procedure to be followed in a motion for summary judgment brought under Rule 20.03(1) of the Manitoba *Court of Queen's Bench Rules*. That rule provides as follows:

> **20.03(1)**  Where the court is satisfied that there is no genuine issue for trial with respect to a claim or defence, the court shall grant summary judgment accordingly.

I would agree with both the Court of Appeal and the motions judge in their endorsement of the procedure set out in *Fidkalo*, *supra*, at p. 267, namely:

> The question to be decided on a rule 20 motion is whether there is a genuine issue for trial.  Although a defendant who seeks dismissal of an action has an initial burden of showing that the case is one in which the existence of a genuine issue is a proper question for consideration, it is the plaintiff who must then, according to the rule, establish his claim as being one with a real chance of success.

In the instant case, then, the appellants (who were the plaintiffs-respondents on the motion) bore the burden of establishing that their claim had "a real chance of success". They bear the same burden in this Court.

16    The second preliminary matter concerns the appellants' claim that as a result of a meeting in the summer of 1978 between David Korn, Max Freed and the respondent Cox and in light of an engagement letter sent by the respondents to NGA and NGH in 1981, a contract was formed between the shareholders of the audited corporations, on the one hand, and the respondents, on the other. This purported contract ostensibly required the respondents to conduct their audits for the benefit of the shareholders themselves and not merely for the benefit of the corporations. I have reviewed the portions of the record upon which the appellants base this submission and I am unable to find that the requisite elements of contract formation inhere on the facts. In any event, as the respondents pointed out, the appellants' request to amend their pleadings before trial to include a claim for breach of contract was denied by Kennedy J. and no appeal was brought from that decision. (See: *Hercules Management Ltd. v. Clarkson Gordon* (1994), 91 Man. R. (2d) 216 (Q.B.).) I would find, therefore, that the claim in breach of contract is not properly before this Court and that the appellants' submissions in this regard must fail.

17    Thirdly, the appellants allege that the respondent Cox's investments in certain syndicated mortgages administered by NGA and NGH constituted a breach of the statutory independence requirements set out in s. 155 of the Manitoba *Corporations Act* and that such a breach either gives rise to a private law cause of action or, alternatively, that it provides an independent basis for finding a duty of care in a tort action. Assuming without deciding that the respondent Cox was in breach of the independence requirements set out in that section, I would agree with Helper J.A. in finding that the section does not, in and of itself, give rise to a cause of action in negligence; see: *R. in right of Canada v. Saskatchewan Wheat Pool*, [1983] 1 S.C.R. 205. Similarly, I cannot see how breach of the independence requirements could establish a duty of care in tort. This does not mean, of course, that the statutory audit requirements set out in the Manitoba *Corporations Act* are entirely irrelevant to the appellants' claim. Rather, it

simply means that a breach of the independence provisions does not, by itself, give rise either to an independent right of action or to a duty of care.

18    The final preliminary matter concerns whether or not the appellants actually relied on the 1980-82 audited reports prepared by the respondents. More specifically, the appellants allege that the Court of Appeal erred in finding, at p. 248, that

> [t]here was a total absence of evidence to indicate the respondents knew the appellants would rely upon the reports for any specific purpose <u>or that the appellants did rely upon the [1980-82] reports before infusing more capital into their companies</u>. The appellants were content to allow management to continue running the companies despite a drop in profitability reflected in the 1982 audited report and invested capital in the face of that report. The evidence filed in opposition to the motion did not support the appellants' claim on this issue. [Emphasis added.]

Needless to say, actual reliance is a necessary element of an action in negligent misrepresentation and its absence will mean that the plaintiff cannot succeed in holding the defendant liable for his or her losses; see: *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87, at p. 110. In light of my disposition on the duty of care issue, however, it is unnecessary to inquire into this matter here -- the absence of a duty of care renders inconsequential the question of actual reliance. Having dealt with all four preliminary matters, then, I can now turn to a discussion of the principal issues in this appeal.

*Issue 1:  Whether the Respondents owe the Appellants a Duty of Care*

    (i) <u>Introduction</u>

19    It is now well established in Canadian law that the existence of a duty of care in tort is to be determined through an application of the two-part test first enunciated by Lord

Wilberforce in *Anns v. Merton London Borough Council*, [1978] A.C. 728 (H.L.), at pp. 751-52:

> First one has to ask whether, as between the alleged wrongdoer and the person who has suffered damage there is a sufficient relationship of proximity or neighbourhood such that, in the reasonable contemplation of the former, carelessness on his part may be likely to cause damage to the latter -- in which case a prima facie duty of care arises. Secondly, if the first question is answered affirmatively, it is necessary to consider whether there are any considerations which ought to negative, or to reduce or limit the scope of the duty or the class of person to whom it is owed or the damages to which a breach of it may give rise. . . .

While the House of Lords rejected the *Anns* test in *Murphy v. Brentwood District Council*, [1991] 1 A.C. 398, and in *Caparo*, *supra*, at p. 574, *per* Lord Bridge and at pp. 585-86, *per* Lord Oliver (citing Brennan J. in *Sutherland Shire Council v. Heyman* (1985), 60 A.L.R. 1 (H.C.), at pp. 43-44), the basic approach that test embodies has repeatedly been accepted and endorsed by this Court. (See, e.g.: *Kamloops (City of) v. Nielsen*, [1984] 2 S.C.R. 2; *B.D.C. Ltd. v. Hofstrand Farms Ltd.*, [1986] 1 S.C.R. 228; *Canadian National Railway Co. v. Norsk Pacific Steamship Co.*, [1992] 1 S.C.R. 1021; *London Drugs Ltd. v. Kuehne & Nagel International Ltd.*, [1992] 3 S.C.R. 299; *Winnipeg Condominium Corporation No. 36 v. Bird Construction Co.*, [1995] 1 S.C.R. 85.)

20     In *Kamloops*, *supra*, at pp. 10-11, Wilson J. restated Lord Wilberforce's test in the following terms:

> (1)  is there a sufficiently close relationship between the parties (the [defendant] and the person who has suffered the damage) so that, in the reasonable contemplation of the [defendant], carelessness on its part might cause damage to that person? If so,

(2) are there any considerations which ought to negative or limit (a) the scope of the duty and (b) the class of persons to whom it is owed or (c) the damages to which a breach of it may give rise?

As will be clear from the cases earlier cited, this two-stage approach has been applied by this Court in the context of various types of negligence actions, including actions involving claims for different forms of economic loss. Indeed, it was implicitly endorsed in the context of an action in negligent misrepresentation in *Edgeworth Construction Ltd. v. N. D. Lea & Associates Ltd.*, [1993] 3 S.C.R. 206, at pp. 218-19. The same approach to defining duties of care in negligent misrepresentation cases has also been taken in other Commonwealth courts. In *Scott Group Ltd. v. McFarlane*, [1978] 1 N.Z.L.R. 553, for example, a case that dealt specifically with auditors' liability for negligently prepared audit reports, the *Anns* test was adopted and applied by a majority of the New Zealand Court of Appeal.

21 I see no reason in principle why the same approach should not be taken in the present case. Indeed, to create a "pocket" of negligent misrepresentation cases (to use Professor Stapleton's term) in which the existence of a duty of care is determined differently from other negligence cases would, in my view, be incorrect; see: Jane Stapleton, "Duty of Care and Economic Loss: a Wider Agenda" (1991), 107 *L.Q. Rev.* 249. This is not to say, of course, that negligent misrepresentation cases do not involve special considerations stemming from the fact that recovery is allowed for pure economic loss as opposed to physical damage. Rather, it is simply to posit that the same general framework ought to be used in approaching the duty of care question in both types of case. Whether the respondents owe the appellants a duty of care for their allegedly negligent preparation of the 1980-82 audit reports, then, will depend on (a) whether a *prima facie* duty of care is owed, and (b) whether that duty, if it exists, is negatived or

limited by policy considerations.  Before analysing the merits of this case, it will be useful to set out in greater detail the principles governing this appeal.

### (ii) The *Prima Facie* Duty of Care

22    The first branch of the *Anns/Kamloops* test demands an inquiry into whether there is a sufficiently close relationship between the plaintiff and the defendant that in the reasonable contemplation of the latter, carelessness on its part may cause damage to the former.  The existence of such a relationship -- which has come to be known as a relationship of "neighbourhood" or "proximity" -- distinguishes those circumstances in which the defendant owes a *prima facie* duty of care to the plaintiff from those where no such duty exists.  In the context of a negligent misrepresentation action, then, deciding whether or not a *prima facie* duty of care exists necessitates an investigation into whether the defendant-representor and the plaintiff-representee can be said to be in a relationship of proximity or neighbourhood.

23    What constitutes a "relationship of proximity" in the context of negligent misrepresentation actions?  In approaching this question, I would begin by reiterating the position I took in *Norsk*, *supra*, at pp. 1114-15, that the term "proximity" itself is nothing more than a label expressing a result, judgment or  conclusion; it does not, in and of itself, provide a principled basis on which to make a legal determination.  This view was also explicitly adopted by Stevenson J. in *Norsk*, *supra*, at p. 1178, and McLachlin J. also appears to have accepted it when she wrote, at p. 1151, of that case that "[p]roximity may usefully be viewed, not so much as a test in itself, but as a broad concept which is capable of subsuming different categories of cases involving different factors"; see also: M. H. McHugh, "Neighbourhood, Proximity and Reliance", in P. D. Finn, ed., *Essays on Torts* (1989), 5, at pp. 36-37; and John G. Fleming, "The Negligent Auditor and

Shareholders" (1990), 106 *L.Q. Rev.* 349, at p. 351, where the author refers to proximity as a "vacuous test". While *Norsk*, *supra*, was concerned specifically with whether or not a defendant could be held liable for "contractual relational economic loss" (as I called it, at p. 1037), I am of the view that the same observations with respect to the term "proximity" are applicable in the context of negligent misrepresentation. In order to render "proximity" a useful tool in defining when a duty of care exists in negligent misrepresentation cases, therefore, it is necessary to infuse that term with some meaning. In other words, it is necessary to set out the basis upon which one may properly reach the conclusion that proximity inheres between a representor and a representee.

24     This can be done most clearly as follows. The label "proximity", as it was used by Lord Wilberforce in *Anns*, *supra*, was clearly intended to connote that the circumstances of the relationship inhering between the plaintiff and the defendant are of such a nature that the defendant may be said to be under an obligation to be mindful of the plaintiff's legitimate interests in conducting his or her affairs. Indeed, this idea lies at the very heart of the concept of a "duty of care", as articulated most memorably by Lord Atkin in *Donoghue v. Stevenson*, [1932] A.C. 562, at pp. 580-81. In cases of negligent misrepresentation, the relationship between the plaintiff and the defendant arises through reliance by the plaintiff on the defendant's words. Thus, if "proximity" is meant to distinguish the cases where the defendant has a responsibility to take reasonable care of the plaintiff from those where he or she has no such responsibility, then in negligent misrepresentation cases, it must pertain to some aspect of the relationship of reliance. To my mind, proximity can be seen to inhere between a defendant-representor and a plaintiff-representee when two criteria relating to reliance may be said to exist on the facts: (a) the defendant ought reasonably to foresee that the plaintiff will rely on his or her representation; and (b) reliance by the plaintiff would, in the particular circumstances of the case, be reasonable. To use the term employed by my colleague, Iacobucci J., in

*Cognos*, *supra*, at p. 110, the plaintiff and the defendant can be said to be in a "special relationship" whenever these two factors inhere.

25    I should pause here to explain that, in my view, to look to whether or not reliance by the plaintiff on the defendant's representation would be reasonable in determining whether or not a *prima facie* duty of care exists in negligent misrepresentation cases as opposed to looking at reasonable foreseeability alone is not, as might first appear, to abandon the basic tenets underlying the first branch of the *Anns/Kamloops* formula.  The purpose behind the *Anns/Kamloops* test is simply to ensure that enquiries into the existence of a duty of care in negligence cases is conducted in two parts:  The first involves discerning whether, in a given situation, a duty of care would be imposed by law; the second demands an investigation into whether the legal duty, if found, ought to be negatived or ousted by policy considerations.  In the context of actions based on negligence causing physical damage, determining whether harm to the plaintiff was reasonably foreseeable to the defendant is alone a sufficient criterion for deciding proximity or neighbourhood under the first branch of the *Anns/Kamloops* test because the law has come to recognize (even if only implicitly) that, absent a voluntary assumption of risk by him or her, it is always reasonable for a plaintiff to expect that a defendant will take reasonable care of the plaintiff's person and property.  The duty of care inquiry in such cases, therefore, will always be conducted under the assumption that the plaintiff's expectations of the defendant are reasonable.

26    In negligent misrepresentation actions, however, the plaintiff's claim stems from his or her detrimental reliance on the defendant's (negligent) statement, and it is abundantly clear that reliance on the statement or representation of another will not, in all circumstances, be reasonable.  The assumption that always inheres in physical damage cases concerning the reasonableness of the plaintiff's expectations cannot, therefore, be

said to inhere in reliance cases.  In order to ensure that the same factors are taken into account in determining the existence of a duty of care in both instances, then, the reasonableness of the plaintiff's reliance must be considered in negligent misrepresentation actions.  Only by doing so will the first branch of the *Kamloops* test be applied consistently in both contexts.

27    As should be evident from its very terms, the reasonable foreseeability/reasonable reliance test for determining a *prima facie* duty of care is somewhat broader than the tests used both in the cases decided before *Anns*, *supra*, and in those that have rejected the *Anns* approach.  Rather than stipulating simply that a duty of care will be found in any case where reasonable foreseeability and reasonable reliance inhere, those cases typically require (a) that the defendant know the identity of either the plaintiff or the class of plaintiffs who will rely on the statement, and (b) that the reliance losses claimed by the plaintiff stem from the particular transaction in respect of which the statement at issue was made. This narrower approach to defining the duty can be seen in a number of the more prominent English decisions dealing either with auditors' liability specifically or with liability for negligent misstatements generally.  (See, e.g.: *Candler v. Crane, Christmas & Co.*, [1951] 2 K.B. 164 (C.A.), at pp. 181-82 and p. 184, *per* Denning L.J. (dissenting); *Hedley Byrne & Co. v. Heller & Partners Ltd.*, [1964] A.C. 465; *Caparo*, *supra*, *per* Lord Bridge, at p. 576, and *per* Lord Oliver, at pp. 589.)  It is also evident in the approach taken by this Court in *Haig v. Bamford*, [1977] 1 S.C.R. 466.

28    While I would not question the conclusions reached in any of these judgments, I am of the view that inquiring into such matters as whether the defendant had knowledge of the plaintiff (or class of plaintiffs) and whether the plaintiff used the statements at issue for the particular transaction for which they were provided is, in reality, nothing more than

a means by which to circumscribe -- for reasons of policy -- the scope of a representor's potentially infinite liability. As I have already tried to explain, determining whether "proximity" exists on a given set of facts consists in an attempt to discern whether, as a matter of simple justice, the defendant may be said to have had an obligation to be mindful of the plaintiff's interests in going about his or her business. Requiring, in addition to proximity, that the defendant know the identity of the plaintiff (or class of plaintiffs) and that the plaintiff use the statements in question for the specific purpose for which they were prepared amounts, in my opinion, to a tacit recognition that considerations of basic fairness may sometimes give way to other pressing concerns. Plainly stated, adding further requirements to the duty of care test provides a means by which policy concerns that are extrinsic to simple justice -- but that are, nevertheless, fundamentally important -- may be taken into account in assessing whether the defendant should be compelled to compensate the plaintiff for losses suffered. In other words, these further requirements serve a policy-based limiting function with respect to the ambit of the duty of care in negligent misrepresentation actions.

29    This view is confirmed by the judgments themselves. In *Caparo*, *supra*, at p. 576, for example, Lord Bridge refers to the criteria of knowledge of the plaintiff (or class of plaintiffs) and use of the statements for the intended transaction as a " '<u>limit or control mechanism</u> . . . imposed on the liability of the wrongdoer towards those who have suffered some economic damage in consequence of his negligence'" (emphasis added). Similarly, in *Haig*, *supra*, at p. 476, Dickson J. (as he then was) explicitly discusses the policy concern arising from unlimited liability before finding that the statements at issue in *Haig* were used for the very purpose for which they were prepared and that the appropriate test for a duty of care in the case before him was "actual knowledge of the limited class that will use and rely on the statement". (See also *Candler*, *supra*, at p. 183, *per* Denning L.J. (dissenting).) Certain scholars have adopted this view of the case

law as well. (See, e.g.: Bruce Feldthusen, *Economic Negligence* (3rd ed. 1994), at pp. 93-100, where the author explains that the approach taken in both *Haig*, *supra*, and *Caparo*, *supra*, toward defining the duty of care was motivated by underlying policy concerns; see also: Earl A. Cherniak and Kirk F. Stevens, "Two Steps Forward or One Step Back? *Anns* at the Crossroads in Canada" (1992), 20 *C.B.L.J.* 164, and Ivan F. Ivankovich, "Accountants and Third-Party Liability -- Back to the Future" (1991), 23 *Ottawa L. Rev.* 505, at p. 518.)

30      In light of this Court's endorsement of the *Anns/Kamloops* test, however, enquiries concerning (a) the defendant's knowledge of the identity of the plaintiff (or of the class of plaintiffs) and (b) the use to which the statements at issue are put may now quite properly be conducted in the second branch of that test when deciding whether or not policy considerations ought to negate or limit a *prima facie* duty that has already been found to exist. In other words, criteria that in other cases have been used to define the legal test for the duty of care can now be recognized for what they really are -- policy-based means by which to curtail liability -- and they can appropriately be considered under the policy branch of the *Anns/Kamloops* test. To understand exactly how this may be done and how these criteria are pertinent to the case at bar, it will first be useful to set out the prevailing policy concerns in some detail.

(iii) <u>Policy Considerations</u>

31      As Cardozo C.J. explained in *Ultramares Corp. v. Touche*, 174 N.E. 441 (N.Y.C.A. 1931), at p. 444, the fundamental policy consideration that must be addressed in negligent misrepresentation actions centres around the possibility that the defendant might be exposed to "liability in an indeterminate amount for an indeterminate time to an indeterminate class". This potential problem can be seen quite vividly within the

framework of the *Anns/Kamloops* test. Indeed, while the criteria of reasonable foreseeability and reasonable reliance serve to distinguish cases where a *prima facie* duty is owed from those where it is not, it is nevertheless true that in certain types of situations these criteria can, quite easily, be satisfied and absent some means by which to circumscribe the ambit of the duty, the prospect of limitless liability will loom.

32     The general area of auditors' liability is a case in point. In modern commercial society, the fact that audit reports will be relied on by many different people (e.g., shareholders, creditors, potential takeover bidders, investors, etc.) for a wide variety of purposes will almost always be reasonably foreseeable to auditors themselves. Similarly, the very nature of audited financial statements -- produced, as they are, by professionals whose reputations (and, thereby, whose livelihoods) are at stake -- will very often mean that any of those people would act wholly reasonably in placing their reliance on such statements in conducting their affairs. These observations are consistent with the following remarks of Dickson J. in *Haig*, *supra*, at pp. 475-76, with respect to the accounting profession generally:

> The increasing growth and changing role of corporations in modern society has been attended by a new perception of the societal role of the profession of accounting. The day when the accountant served only the owner-manager of a company and was answerable to him alone has passed. The complexities of modern industry combined with the effects of specialization, the impact of taxation, urbanization, the separation of ownership from management, the rise of professional corporate managers, and a host of other factors, have led to marked changes in the role and responsibilities of the accountant, and in the reliance which the public must place upon his work. The financial statements of the corporations upon which he reports can affect the economic interests of the general public as well as of shareholders and potential shareholders.

(See also: Cherniak and Stevens, *supra*, at pp. 169-70.) In light of these considerations, the reasonable foreseeability/reasonable reliance test for ascertaining a *prima facie* duty

of care may well be satisfied in many (even if not all) negligent misstatement suits against auditors and, consequently, the problem of indeterminate liability will often arise.

33      Certain authors have argued that imposing broad duties of care on auditors would give rise to significant economic and social benefits in so far as the spectre of tort liability would act as an incentive to auditors to produce accurate (i.e., non-negligent) reports. (See, e.g.:  Howard B. Wiener, "Common Law Liability of the Certified Public Accountant for Negligent Misrepresentation" (1983), 20 *San Diego L. Rev.* 233.)  I would agree that deterrence of negligent conduct is an important policy consideration with respect to auditors' liability.  Nevertheless, I am of the view that, in the final analysis, it is outweighed by the socially undesirable consequences to which the imposition of indeterminate liability on auditors might lead.  Indeed, while indeterminate liability is problematic in and of itself inasmuch as it would mean that successful negligence actions against auditors could, at least potentially, be limitless, it is also problematic in light of certain related problems to which it might give rise.

34      Some of the more significant of these problems are thus set out in Brian R. Cheffins, "Auditors' Liability in the House of Lords:  A Signal Canadian Courts Should Follow" (1991), 18 *C.B.L.J.* 118, at pp. 125-27:

>           In addition to providing only limited benefits, imposing widely drawn duties of care on auditors would probably generate substantial costs. . . .
>
>           One reason [for this] is that auditors would expend more resources trying to protect themselves from liability.  For example, insurance premiums would probably rise since insurers would anticipate more frequent claims.  Also, auditors would probably incur higher costs since they would try to rely more heavily on exclusion clauses.  Hiring lawyers to draft such clauses might be expensive because only the most carefully constructed provisions would be likely to pass judicial scrutiny. . . .
>
>           Finally, auditors' opportunity costs would increase.  Whenever members of an accounting firm have to spend time and effort preparing for litigation,

they forego revenue generating accounting activity. More trials would mean that this would occur with greater frequency.

. . .

The higher costs auditors would face as a result of broad duties of care could have a widespread impact. For example, the supply of accounting services would probably be reduced since some marginal firms would be driven to the wall. Also, because the market for accounting services is protected by barriers to entry imposed by the profession, the surviving firms would pass [*sic*] at least some of the increased costs to their clients.

Professor Ivankovich describes similar sources of concern. While he acknowledges certain social benefits to which expansive auditors' liability might conduce, he also recognizes the potential difficulties associated therewith (at pp. 520-21):

. . . [expansive auditors' liability] is also likely to increase the time expended in the performance of accounting services. This will trigger a predictable negative impact on the timeliness of the financial information generated. It is equally likely to increase the cost of professional liability insurance and reduce its availability, and to increase the cost of accounting services which, as a result, may become less generally available. Additionally, it promotes "free ridership" on the part of reliant third parties and decreases their incentive to exercise greater vigilance and care and, as well, presents an increased risk of fraudulent claims.

Even though I do not share the discomfort apparently felt by Professors Cheffins and Ivankovich with respect to using an *Anns*-type test in the context of negligent misrepresentation actions (See: Cheffins, *supra*, at pp. 129-31, and Ivankovich, *supra*, at p. 530), I nevertheless agree with their assessment of the possible consequences to both auditors and the public generally if liability for negligently prepared audit reports were to go unchecked.

35    I should, at this point, explain that I am aware of the arguments put forth by certain scholars and judges to the effect that concerns over indeterminate liability have sometimes been overstated. (See, e.g.:   J. Edgar Sexton and John W. Stevens,

"Accountants' Legal Responsibilities and Liabilities", in *Professional Responsibility in Civil Law and Common Law* (Meredith Memorial Lectures, McGill University, 1983-84) (1985), 88, at pp. 101-2; and *H. Rosenblum (1983), Inc. v. Adler*, 461 A.2d 138 (N.J. 1983), at p. 152, *per* Schreiber J.)   Arguments to this effect rest essentially on the premise that actual <u>liability</u> will be limited in so far as a plaintiff will not be successful unless both negligence and reliance are established in addition to a duty of care.   While it is true that damages will not be owing by the defendant unless these other elements of the cause of action are proved, neither the difficulty of proving negligence nor that of proving reliance will preclude a disgruntled plaintiff from bringing an action against an auditor and such actions would, we may assume, be all the more common were the establishment of a duty of care in any given case to amount to nothing more than a mere matter of course.   This eventuality could pose serious problems both for auditors, whose legal costs would inevitably swell, and for courts, which, no doubt, would feel the pressure of increased litigation.   Thus, the prospect of burgeoning negligence suits raises serious concerns, even if we assume that the arguments positing proof of negligence and reliance as a barrier to liability are correct.   In my view, therefore, it makes more sense to circumscribe the ambit of the duty of care than to assume that difficulties in proving negligence and reliance will afford sufficient protection to auditors, since this approach avoids both "indeterminate liability" and "indeterminate litigation".

36      As I have thus far attempted to demonstrate, the possible repercussions of exposing auditors to indeterminate liability are significant.    In applying the two-stage *Anns/Kamloops* test to negligent misrepresentation actions against auditors, therefore, policy considerations reflecting those repercussions should be taken into account.   In the general run of auditors' cases, concerns over indeterminate liability will serve to negate a *prima facie* duty of care.   But while such concerns may exist in most such cases, there may be particular situations where they do not.   In other words, the specific factual

matrix of a given case may render it an "exception" to the general class of cases in that while (as in most auditors' liability cases) considerations of proximity under the first branch of the *Anns/Kamloops* test might militate in favour of finding that a duty of care inheres, the typical concerns surrounding indeterminate liability do <u>not</u> arise. This needs to be explained.

37      As discussed earlier, looking to factors such as "knowledge of the plaintiff (or an identifiable class of plaintiffs) on the part of the defendant" and "use of the statements at issue for the precise purpose or transaction for which they were prepared" really amounts to an attempt to limit or constrain the scope of the duty of care owed by the defendants. If the purpose of the *Anns/Kamloops* test is to determine (a) whether or not a *prima facie* duty of care exists and then (b) whether or not that duty ought to be negated or limited, then factors such as these ought properly to be considered in the second branch of the test once the first branch concerning "proximity" has been found to be satisfied. To my mind, the presence of such factors in a given situation will mean that worries stemming from indeterminacy should not arise, since the scope of potential liability is sufficiently delimited. In other words, in cases where the defendant knows the identity of the plaintiff (or of a class of plaintiffs) and where the defendant's statements are used for the specific purpose or transaction for which they were made, policy considerations surrounding indeterminate liability will not be of any concern since the scope of liability can readily be circumscribed. Consequently, such considerations will not override a positive finding on the first branch of the *Anns/Kamloops* test and a duty of care may quite properly be found to exist.

38      As I see it, this line of reasoning serves to explain the holding of Cardozo J. (as he then was) in *Glanzer v. Shepard*, 135 N.E. 275 (N.Y.C.A. 1922). There, the New York Court of Appeals held that the defendant weigher was liable in damages for having negligently

prepared a weight certificate he knew would be given to the plaintiff, who relied upon it for the specific purpose for which it was issued. In reaching his decision, Cardozo J. explicitly noted that the weight certificate was used for the very "end and aim of the transaction" and not for any collateral or unintended purpose (*Glanzer*, *supra*, at p. 275). On the facts of *Glanzer*, *supra*, then, the scope of the defendant's liability could readily be delimited and indeterminacy, therefore, was not a concern.

39     The same idea serves to explain the rationale underlying the seminal judgment of the House of Lords in *Hedley Byrne*, *supra*. While that case did not involve an action against auditors, similar concerns about indeterminate liability were, nonetheless, clearly relevant. On the facts of *Hedley Byrne*, *supra*, the defendant bank provided a negligently prepared credit reference in respect of one of its customers to another bank which, to the knowledge of the defendants, passed on the information to the plaintiff for a stipulated purpose. The plaintiff relied on the credit reference for the specific purpose for which it was prepared. The House of Lords found that but for the presence of a disclaimer, the defendants would have been liable to the plaintiff in negligence. While indeterminate liability would have raised some concern to the Lords had the plaintiff not been known to the defendants or had the credit reference been used for a purpose or transaction other than that for which it was actually prepared, no such difficulties about indeterminacy arose on the particular facts of the case.

40     This Court's decision in *Haig*, *supra*, can be seen to rest on precisely the same basis. There, the defendant accountants were retained by a Saskatchewan businessman, one Scholler, to prepare audited financial statements of Mr. Scholler's corporation. At the time they were engaged, the accountants were informed by Mr. Scholler that the audited statements would be used for the purpose of attracting a $20,000 investment in the corporation from a limited number of potential investors. The audit was conducted

negligently and the plaintiff investor, who was found to have relied on the audited statements in making his investment, suffered a loss. While Dickson J. was clearly cognizant of the potential problem of indeterminacy arising in the context of auditors' liability (at p. 476), he nevertheless found that the defendants owed the plaintiff a duty of care. In my view, his conclusion was eminently sound given that the defendants were informed by Mr. Scholler of the class of persons who would rely on the report and the report was used by the plaintiff for the specific purpose for which it was prepared. Dickson J. himself expressed this idea as follows, at p. 482:

> The case before us is closer to *Glanzer* than to *Ultramares*. The very end and aim of the financial statements prepared by the accountants in the present case was to secure additional financing for the company from [a Saskatchewan government agency] and an equity investor; the statements were required primarily for these third parties and only incidentally for use by the company.

On the facts of *Haig*, then, the auditors were properly found to owe a duty of care because concerns over indeterminate liability did not arise. I would note that this view of the rationale behind *Haig*, *supra*, is shared by Professor Feldthusen. (See Feldthusen, *supra*, at pp. 98-100.)

41     The foregoing analysis should render the following points clear. A *prima facie* duty of care will arise on the part of a defendant in a negligent misrepresentation action when it can be said (a) that the defendant ought reasonably to have foreseen that the plaintiff would rely on his representation and (b) that reliance by the plaintiff, in the circumstances, would be reasonable. Even though, in the context of auditors' liability cases, such a duty will often (even if not always) be found to exist, the problem of indeterminate liability will frequently result in the duty being negated by the kinds of policy considerations already discussed. Where, however, indeterminate liability can be

shown not to be a concern on the facts of a particular case, a duty of care will be found to exist. Having set out the law governing the appellants' claims, I now propose to apply it to the facts of the appeal.

### (iv) Application to the Facts

42    In my view, there can be no question that a *prima facie* duty of care was owed to the appellants by the respondents on the facts of this case. As regards the criterion of reasonable foreseeability, the possibility that the appellants would rely on the audited financial statements in conducting their affairs and that they may suffer harm if the reports were negligently prepared must have been reasonably foreseeable to the respondents. This is confirmed simply by the fact that shareholders generally will often choose to rely on audited financial statements for a wide variety of purposes. It is further confirmed by the fact that under ss. 149(1) and 163(1) of the Manitoba *Corporations Act*, it is patently clear that audited financial statements are to be placed before the shareholders at the annual general meeting. The relevant portions of those sections read as follows:

> **149(1)**  The directors of a corporation shall place before the shareholders at every annual meeting
>
> . . .
>
>    (b) the report of the auditor, if any; and
>
> . . .
>
> **163(1)**  An auditor of a corporation shall make the examination that is in his opinion necessary to enable him to report in the prescribed manner on the financial statements required by this Act to be placed before the shareholders, except such financial statements or part thereof as relate to the period referred to in sub-clause 149(1)(a)(ii).

In my view, it would be untenable to argue in the face of these provisions that some form of reliance by shareholders on the audited reports would be unforeseeable.

43 Similarly, I would find that reliance on the audited statements by the appellant shareholders would, on the facts of this case, be reasonable. Professor Feldthusen (at pp. 62-63) sets out five general *indicia* of reasonable reliance; namely:

> (1) The defendant had a direct or indirect financial interest in the transaction in respect of which the representation was made.

> (2) The defendant was a professional or someone who possessed special skill, judgment, or knowledge.

> (3) The advice or information was provided in the course of the defendant's business.

> (4) The information or advice was given deliberately, and not on a social occasion.

> (5) The information or advice was given in response to a specific enquiry or request.

While these *indicia* should not be understood to be a strict "test" of reasonableness, they do help to distinguish those situations where reliance on a statement is reasonable from those where it is not. On the facts here, the first four of these indicia clearly inhere. To my mind, then, this aspect of the *prima facie* duty is unquestionably satisfied on the facts.

44 Having found a *prima facie* duty to exist, then, the second branch of the *Anns/Kamloops* test remains to be considered. It should be clear from my comments above that were auditors such as the respondents held to owe a duty of care to plaintiffs in all cases where the first branch of the *Anns/Kamloops* test was satisfied, the problem of indeterminate liability would normally arise. It should be equally clear, however, that in certain cases,

this problem does not arise because the scope of potential liability can adequately be circumscribed on the facts. An investigation of whether or not indeterminate liability is truly a concern in the present case is, therefore, required.

45     At first blush, it may seem that no problems of indeterminate liability are implicated here and that this case can easily be likened to *Glanzer*, *supra*, *Hedley Byrne*, *supra*, and *Haig*, *supra*. After all, the respondents knew the very identity of all the appellant shareholders who claim to have relied on the audited financial statements through having acted as NGA's and NGH's auditors for nearly 10 years by the time the first of the audit reports at issue in this appeal was prepared. It would seem plausible to argue on this basis that because the identity of the plaintiffs was known to the respondents at the time of preparing the 1980-82 reports, no concerns over indeterminate liability arise.

46     To arrive at this conclusion without further analysis, however, would be to move too quickly. While knowledge of the plaintiff (or of a limited class of plaintiffs) is undoubtedly a significant factor serving to obviate concerns over indeterminate liability, it is not, alone, sufficient to do so. In my discussion of *Glanzer*, *supra*, *Hedley Byrne*, *supra*, and *Haig*, *supra*, I explained that indeterminate liability did not inhere on the specific facts of those cases not only because the defendant knew the identity of the plaintiff (or the class of plaintiffs) who would rely on the statement at issue, but also because the statement itself was used by the plaintiff <u>for precisely the purpose or transaction for which it was prepared</u>. The crucial importance of this additional criterion can clearly be seen when one considers that even if the specific identity or class of potential plaintiffs is known to a defendant, use of the defendant's statement for a purpose or transaction other than that for which it was prepared could still lead to indeterminate liability.

47    For example, if an audit report which was prepared for a corporate client for the express purpose of attracting a $10,000 investment in the corporation from a known class of third parties was instead used as the basis for attracting a $1,000,000 investment or as the basis for inducing one of the members of the class to become a director or officer of the corporation or, again, as the basis for encouraging him or her to enter into some business venture with the corporation itself, it would appear that the auditors would be exposed to a form of indeterminate liability, even if they knew precisely the identity or class of potential plaintiffs to whom their report would be given.  With respect to the present case, then, the central question is whether or not the appellants can be said to have used the 1980-82 audit reports for the specific purpose for which they were prepared.  The answer to this question will determine whether or not policy considerations surrounding indeterminate liability ought to negate the *prima facie* duty of care owed by the respondents.

48    What, then, is the purpose for which the respondents' audit statements were prepared?  This issue was eloquently discussed by Lord Oliver in *Caparo*, *supra*, at p. 583:

>     My Lords, the primary purpose of the statutory requirement that a company's accounts shall be audited annually is almost self-evident. . . . The management is confided to a board of directors which operates in a fiduciary capacity and is answerable to and removable by the shareholders who can act, if they act at all, only collectively and only through the medium of a general meeting.  Hence the legislative provisions requiring the board annually to give an account of its stewardship to a general meeting of the shareholders.  This is the only occasion in each year on which the general body of shareholders is given the opportunity to consider, to criticise and to comment on the conduct by the board of the company's affairs, to vote the directors' recommendation as to dividends, to approve or disapprove the directors' remuneration and, if thought desirable, to remove and replace all or any of the directors.  <u>It is the auditors' function to ensure, so far as possible, that the financial information as to the company's affairs prepared by the directors accurately reflects the company's position in order first, to protect the company itself from the consequences of undetected errors or, possibly, wrongdoing . . . and, second, to provide shareholders with reliable intelligence for the purpose of enabling them to scrutinise the conduct of the company's affairs and to exercise their collective powers to reward or</u>

- 42 -

control or remove those to whom that conduct has been confided. [Emphasis added.]

Similarly, Farley J. held in *Roman Corp. Ltd. v. Peat Marwick Thorne* (1992), 11 O.R. (3d) 248 (Gen. Div.), at p. 260 (hereinafter *Roman I*) that

> as a matter of law the only purpose for which shareholders receive an auditor's report is to provide the shareholders with information for the purpose of overseeing the management and affairs of the corporation and not for the purpose of guiding personal investment decisions or personal speculation with a view to profit.

(See also: *Roman Corp. v. Peat Marwick Thorne* (1993), 12 B.L.R. (2d) 10 (Ont. Gen. Div.).) Lord Oliver was referring to the relevant provisions of the U.K. *Companies Act 1985* (U.K.), 1985, c. 6, in making his pronouncements, and Farley J. rendered his judgment against the backdrop of the statutory audit requirements set out in the Ontario *Business Corporations Act*, R.S.O. 1990, c. B.16.

49    To my mind, the standard purpose of providing audit reports to the shareholders of a corporation should be regarded no differently under the analogous provisions of the Manitoba *Corporations Act*. Thus, the directors of a corporation are required to place the auditors' report before the shareholders at the annual meeting in order to permit the shareholders, as a body, to make decisions as to the manner in which they want the corporation to be managed, to assess the performance of the directors and officers, and to decide whether or not they wish to retain the existing management or to have them replaced. On this basis, it may be said that the respondent auditors' purpose in preparing the reports at issue in this case was, precisely, to assist the collectivity of shareholders of the audited companies in their task of overseeing management.

50      The appellants, however, submit that, in addition to this statutorily mandated purpose, the respondents further agreed to perform their audits for the purpose of providing the appellants with information on the basis of which they could make personal investment decisions.  They base this claim largely on a conversation that allegedly took place at the 1978 meeting between Mr. Cox, Mr. Freed and Mr. Korn, as well as on certain passages of the engagement letter sent to them by the respondents.  I have read the relevant portions of the record on this question and I am unable to accept the appellants' submission.  Indeed, on examination for discovery, Mr. Freed discussed the engagement letter of the respondents and stated as follows:

> Q    It is this that you say is the document that says, it will speak for itself, but you interpret it to mean that they [the respondents] will look after your interests specifically [*sic*]? . . .
>
> A    I am saying that I took for granted that that was their duty.
>
> Q    I see.  All right.  Was there ever anything in writing specifically that says that is your duty, is to look after my interests, I am away all the time?
>
> A    I am not aware.
>
> Q    Either, from you, or to you in that respect?
>
> A    I am not aware of any.
>
> Q    This letter happens to say, "We are always prepared upon instruction to extend our services beyond these required procedures."  Did you ever give them any additional instructions?
>
> A    No.  I never saw them.
>
> Q    Nor did you communicate with them in writing, or otherwise?  Is that right?
>
> A    Not that I recall.

Similarly, the transcript of Mr. Korn's examination for discovery reveals the following exchange:

Q   You emphasized [at the 1978 meeting] you say to Mr. Cox that because you were no longer in the management stream or chain, you would be relying more on the audited statements?

A   Yes, and that -- well, I wanted a sort of commitment that he understood that he was the shareholders' auditor and I did refer to the fact that he had [a] close personal association with Mr. Morris and he said no, he fully understood, have no fear.

Q   Did you consider that to be a change from the normal kind of audit engagement, or were you just emphasizing something that was part of the normal audit engagement?

A   I just pointed out the change.  As a matter of fact, he already knew about the change.

. . .

Q   But my question was whether you considered that to be any kind of alteration from the usual audit engagement process.

A   Well, that's what happened.  That's the fact that I said it to him and those are the words I said, and however he took it, that's however he took it.

Q   But I'm asking you if you considered that to be a change from a normal audit engagement.

A   Well, I'm not -- whether that was -- whether those words were some sort of special instructions, those were the words and I guess there will be experts to say what consequences should have flown [*sic*] from them, and I'm not here as an expert on audit --

Q   I'm entitled to know what you consider to be the case.

A   Well, I made it clear that he should remember that he's the shareholders' auditor, that Clarkson was the shareholders' auditor, notwithstanding his personal relationship with Murray Morris.

Q   Auditors are always the shareholders' auditors, are they not?

A   And that's what I -- if they are, they are.

Q   And that's in fact what they are always?

A   Well, that's good, I'm glad to hear that, glad to hear you say it.

Q   Do you agree?

A   That the auditors are the shareholders' auditors?

Q   Yes.

A    I agree precisely.

To my mind, these passages serve to demonstrate that despite the appellants'
submissions, the respondents did not, in fact, prepare the audit reports in order to assist
the appellants in making personal investment decisions or, indeed, for any purpose other
than the standard statutory one. This finding accords with that of Helper J.A. in the Court
of Appeal, and nothing in the record before this Court suggests the contrary.

51    It follows from the foregoing discussion that the only purpose  for which the 1980-82
reports could have been used in such a manner as to give rise to a duty of care on the part
of the respondents is as a guide for the shareholders, as a group, in supervising or
overseeing management.  In assessing whether this was, in fact, the purpose to which the
appellants purport to have put the audited reports, it will be useful to take each of the
appellants' claims in turn.  First, the appellant Hercules seeks compensation for its
$600,000 injection of capital into NGA over January and February of 1983 and the
appellant Freed seeks damages commensurate with the amount of money he contributed
in 1982 to his investment account in NGH.  Secondly, all the appellants seek damages
for the losses they suffered in the value of their existing shareholdings.

52    The claims of Hercules and Mr. Freed with respect to their 1982-83 investments can be
addressed quickly.  The essence of these claims must be that these two appellants relied
on the respondents' reports in deciding whether or not to make further investments in the
audited corporations.  In other words, Hercules and Mr. Freed are claiming to have relied
on the audited reports for the purpose of making personal investment decisions.  As I
have already discussed, this is not a purpose for which the respondents in this case can
be said to have prepared their reports.  In light of the dissonance between the purpose for
which the reports were  actually prepared and the purpose for which the appellants assert

they were used, then, the claims of Hercules and Mr. Freed with respect to their investment losses are not such that the concerns over indeterminate liability discussed above are obviated; *viz*., if a duty of care were owed with respect to these investment transactions, there would seem to be no logical reason to preclude a duty of care from arising in circumstances where the statements were used for any other purpose of which the auditors were equally unaware when they prepared and submitted their report. On this basis, therefore, I would find that the *prima facie* duty that arises respecting this claim is negated by policy considerations and, therefore, that no duty of care is owed by the respondents in this regard.

53    With respect to the claim concerning the loss in value of their existing shareholdings, the appellants make two submissions. First, they claim that they relied on the 1980-82 reports in monitoring the value of their equity and that, owing to the (allegedly) negligent preparation of those reports, they failed to extract it before the financial demise of NGA and NGH. Secondly, and somewhat more subtly, the appellants submit that they each relied on the auditors' reports in overseeing the management of NGA and NGH and that had those reports been accurate, the collapse of the corporations and the consequential loss in the value of their shareholdings could have been avoided.

54    To my mind, the first of these submissions suffers from the same difficulties as those regarding the injection of fresh capital by Hercules and Mr. Freed. Whether the reports were relied upon in assessing the prospect of further investments or in evaluating existing investments, the fact remains that the purpose to which the respondents' reports were put, on this claim, concerned individual or personal investment decisions. Given that the reports were not prepared for that purpose, I find for the same reasons as those earlier set out that policy considerations regarding indeterminate liability inhere here and, consequently, that no duty of care is owed in respect of this claim.

55     As regards the second aspect of the appellants' claim concerning the losses they suffered in the diminution in value of their equity, the analysis becomes somewhat more intricate. The essence of the appellants' submission here is that the shareholders would have supervised management differently had they known of the (alleged) inaccuracies in the 1980-82 reports, and that this difference in management would have averted the demise of the audited corporations and the consequent losses in existing equity suffered by the shareholders.  At first glance, it might appear that the appellants' claim implicates a use of the audit reports which is commensurate with the purpose for which the reports were prepared, i.e., overseeing or supervising management.  One might argue on this basis that a duty of care should be found to inhere because, in view of this compatibility between actual use and intended purpose, no indeterminacy arises.  In my view, however, this line of reasoning suffers from a subtle but fundamental flaw.

56     As I have already explained, the purpose for which the audit reports were prepared in this case was the standard statutory one of allowing shareholders, <u>as a group</u>, to supervise management and to take decisions with respect to matters concerning the proper overall administration <u>of the corporations</u>.  In other words, it was, as Lord Oliver and Farley J. found in the cases cited above, to permit the shareholders to exercise their role, <u>as a class</u>, of overseeing the <u>corporations</u>' affairs at their annual general meetings. The purpose of providing the auditors' reports to the appellants, then, may ultimately be said to have been a "collective" one; that is, it was aimed not at protecting the interests of individual shareholders but rather at enabling the shareholders, acting as a group, to safeguard the interests of the corporations themselves.  On the appellants' argument, however, the purpose to which the 1980-82 reports were ostensibly put was not that of allowing the shareholders as a class to take decisions in respect of the overall running of the corporation, but rather to allow them, as <u>individuals</u>, to monitor management so

as to oversee and protect their own personal investments. Indeed, the nature of the appellants' claims (i.e. personal tort claims) <u>requires</u> that they assert reliance on the auditors' reports *qua* individual shareholders if they are to recover any personal damages. In so far as it must concern the interests of each individual shareholder, then, the appellants' claim in this regard can really be no different from the other "investment purposes" discussed above, in respect of which the respondents owe no duty of care.

57    This argument is no different as regards the specific case of the appellant Guardian, which is the sole shareholder of NGH. The respondents' purpose in providing the audited reports in respect of NGH was, we must assume, to allow Guardian to oversee management for the better administration of the corporation itself. If Guardian in fact chose to rely on the reports for the ultimate purpose of monitoring its own investment it must, for the policy reasons earlier set out, be found to have done so at its own peril in the same manner as shareholders in NGA. Indeed, to treat Guardian any differently simply because it was a sole shareholder would do violence to the fundamental principle of corporate personality. I would find in respect of both Guardian and the other appellants, therefore, that the *prima facie* duty of care owed to them by the respondents is negated by policy considerations in that the claims are not such as to bring them within the "exceptional" cases discussed above.

*Issue 2:  The Effect of the Rule in Foss v. Harbottle*

58    All the participants in this appeal -- the appellants, the respondents, and the intervener -- raised the issue of whether the appellants' claims in respect of the losses they suffered in their existing shareholdings through their alleged inability to oversee management of the corporations ought to have been brought as a derivative action in conformity with the rule in *Foss v. Harbottle* rather than as a series of individual actions. The issue was also

raised and discussed in the courts below. In my opinion, a derivative action -- commenced, as required, by an application under s. 232 of the Manitoba *Corporations Act* -- would have been the proper method of proceeding with respect to this claim. Indeed, I would regard this simply as a corollary of the idea that the audited reports are provided to the shareholders as a group in order to allow them to take collective (as opposed to individual) decisions. Let me explain.

59     The rule in *Foss v. Harbottle* provides that individual shareholders have no cause of action in law for any wrongs done to the corporation and that if an action is to be brought in respect of such losses, it must be brought either by the corporation itself (through management) or by way of a derivative action. The legal rationale behind the rule was eloquently set out by the English Court of Appeal in *Prudential Assurance Co. v. Newman Industries Ltd. (No. 2)*, [1982] 1 All E.R. 354, at p. 367, as follows:

> The rule [in *Foss v. Harbottle*] is the consequence of the fact that a corporation is a separate legal entity. Other consequences are limited liability and limited rights. The company is liable for its contracts and torts; the shareholder has no such liability. The company acquires causes of action for breaches of contract and for torts which damage the company. No cause of action vests in the shareholder. When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortunes of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting. The law confers on him the right to ensure that  the company observes the limitations of its memorandum of association and the right to ensure that other shareholders observe the rule, imposed on them by the articles of association. If it is right that the law has conferred or should in certain restricted circumstances confer further rights on a shareholder the scope and consequences of such further rights require careful consideration.

To these lucid comments, I would respectfully add that the rule is also sound from a policy perspective, inasmuch as it avoids the procedural hassle of a multiplicity of actions.

60    The manner in which the rule in *Foss v. Harbottle*, *supra*, operates with respect to the appellants' claims can thus be demonstrated.  As I have already explained, the appellants allege that they were prevented from properly overseeing the management of the audited corporations because the respondents' audit reports painted a misleading picture of their financial state.  They allege further that had they known the true situation, they would have intervened to avoid the eventuality of the corporations' going into receivership and the consequent loss of their equity.  The difficulty with this submission, I have suggested, is that it fails to recognize that in supervising management, the shareholders must be seen to be acting <u>as a body</u> in respect of the corporation's interests rather than as individuals in respect of their own ends.  In a manner of speaking, the shareholders assume what may be seen to be a "managerial role" when, as a collectivity, they oversee the activities of the directors and officers through resolutions adopted at shareholder meetings.  In this capacity, they cannot properly be understood to be acting simply as individual holders of equity.  Rather, their collective decisions are made in respect of the corporation itself.  Any duty owed by auditors in respect of this aspect of the shareholders' functions, then, would be owed not to shareholders *qua* individuals, but rather to all shareholders as a group, acting in the interests of the corporation.  And if the decisions taken by the collectivity of shareholders are in respect of the corporation's affairs, then the shareholders' reliance on negligently prepared audit reports in taking such decisions will result in a wrong to the corporation for which the shareholders cannot, as individuals, recover.

61    This line of reasoning finds support in Lord Bridge's comments in *Caparo*, *supra*, at p. 580:

> The shareholders of a company have a collective interest in the company's proper management and in so far as a negligent failure of the auditor to report accurately on the state of the company's finances deprives the

shareholders of the opportunity to exercise their powers in general meeting to call the directors to book and to ensure that errors in management are corrected, the shareholders ought to be entitled to a remedy.  <u>But in practice no problem arises in this regard since the interest of the shareholders in the proper management of the company's affairs is indistinguishable from the interest of the company itself and any loss suffered by the shareholders . . . will be recouped by a claim against the auditor in the name of the company, not by individual shareholders.</u>  [Emphasis added.]

It is also reflected in the decision of Farley J. in *Roman I*, *supra*, the facts of which were similar to those of the case at bar.  In that case, the plaintiff shareholders brought an action against the defendant auditors alleging, *inter alia*, that the defendant's audit reports were negligently prepared.  That negligence, the shareholders contended, prevented them from properly overseeing management which, in turn, led to the winding up of the corporation and a loss to the shareholders of their equity therein.  Farley J. discussed the rule in *Foss v. Harbottle* and concluded that it operated so as to preclude the shareholders from bringing personal actions based on an alleged inability to supervise the conduct of management.

62     One final point should be made here.  Referring to the case of *Goldex Mines Ltd. v. Revill* (1974), 7 O.R. (2d) 216 (C.A.), the appellants submit that where a shareholder has been directly and individually harmed, that shareholder may have a personal cause of action even though the corporation may also have a separate and distinct cause of action.  Nothing in the foregoing paragraphs should be understood to detract from this principle.  In finding that claims in respect of losses stemming from an alleged inability to oversee or supervise management are really derivative and not personal in nature, I have found only that shareholders cannot raise individual claims in respect of a wrong done <u>to the corporation</u>.  Indeed, this is the limit of the rule in *Foss v. Harbottle*.  Where, however, a separate and distinct claim (say, in tort) can be raised with respect to a wrong done to

a shareholder *qua* individual, a personal action may well lie, assuming that all the requisite elements of a cause of action can be made out.

63     The facts of *Haig*, *supra*, provide the basis for an example of where such a claim might arise. Had the investors in that case been shareholders of the corporation, and had a similarly negligent report knowingly been provided to them by the auditors for a specified purpose, a duty of care separate and distinct from any duty owed to the audited corporation would have arisen in their favour, just as one arose in favour of Mr. Haig. While the corporation would have been entitled to claim damages in respect of any losses it might have suffered through reliance on the report (assuming, of course, that the report was also provided for the corporation's use), the shareholders in question would also have been able to seek personal compensation for the losses they suffered *qua* individuals through their personal reliance and investment. On the facts of this case, however, no claims of this sort can be established.

Conclusion

64     In light of the foregoing, I would find that even though the respondents owed the appellants (*qua* individual claimants) a *prima facie* duty of care both with respect to the 1982-83 investments made in NGA and NGH by Hercules and Mr. Freed and with respect to the losses they incurred through the devaluation of their existing shareholdings, such *prima facie* duties are negated by policy considerations which are not obviated by the facts of the case. Indeed, to come to the opposite conclusion on these facts would be to expose auditors to the possibility of indeterminate liability, since such a finding would imply that auditors owe a duty of care to any known class of potential plaintiffs regardless of the purpose to which they put the auditors' reports. This would amount to an unacceptably broad expansion of the bounds of liability drawn by this

Court in *Haig*, *supra*.  With respect to the claim regarding the appellants' inability to oversee management properly, I would agree with the courts below that it ought to have been brought as a derivative action.  On the basis of these considerations, I would find under Rule 20.03(1) of the Manitoba *Court of Queen's Bench Rules* that the appellants have failed to establish that their claims as alleged would have "a real chance of success".

65    I would dismiss the appeal with costs.

*Appeal dismissed with costs.*

*Solicitors for the appellants:  Schulman & Schulman, Winnipeg.*

*Solicitors for the respondents:  Aikins, MacAulay, Thorvaldson, Winnipeg.*

*Solicitors for the intervener:  McCarthy, Tétrault, Toronto.*