# Tab 1

# ROD S. ATTRIDE-STIRLING

**Senior Partner**
**Attride-Stirling & Woloniecki**
rod.attride-stirling@aswlaw.com
Direct Tel: 441 296 8314

**Professional Education**
University of Maryland (A.S., 1987); University of Buckingham (LL.B. Hons,1989);
College of Law , UK Solicitors' Finals (1991).

**Admitted**
Barrister & Attorney, Bermuda (1992); Justice of the Peace; Notary Public and
Commissioner for Oaths, Bermuda.

**Member**
Bermuda Bar Association, International Bar Association, American Trial Lawyers
Association, ARIAS (US), AIDA (US) (Association Internationale de Droit des
Assurances), Chartered Institute of Arbitrators and Member of the International Court of
Arbitration for Sports (CAS).

**Specialisation**
Complex Civil Litigation, Corporate and Commercial Arbitration, Insurance and
Reinsurance. His experience includes: Litigating and arbitrating controversial claims,
including claims involving insurance and reinsurance companies (including captives,
retrocessionaires, managers, and brokers); substantial telecoms company disputes,
including disputes arising in transnational insolvency proceedings; advising in relation to
policy wording and design for insurance and reinsurance companies

**Languages**
Spanish (fluent), French (working knowledge).

**Publications and Presentations Include**
- International Commercial Arbitration in Bermuda. Problems that can arise when
  captive insurance companies dispute (or should dispute) claims made by their parent.
- Author of the Bermuda Chapter of "International Insurance Law and Regulation "
  published by Oceana Publications.
- Panel Speaker at numerous Arbitration and Insurance/Reinsurance Conferences,
  including ARIAS, AIDA, American Bar Association Tort & Insurance Conference,
  International Bar Association, Kaplan Hawkesmere International Reinsurance
  Congress, Falconbury Ltd International Reinsurance Summit and Insurance Day
  Conference.

**Reported Cases Include:**
Starr Excess Liability Insurance Co Ltd v. General Reinsurance Corporation (2007) Bda LR 34; Discover Reinsurance Co Ltd v. PEG Reinsurance Co Ltd (2007) Bda LR 20; Discover Re v. PEG Re (2006) Bda LR 88; Re Ipoc Capital Partners Ltd et al (2007 Bda LR 33; Re ICO Global Communications (Holdings) Limited [1999] Bda LR 69 ; Golden Accumulator Ltd and others v. Bermuda Monetary Authority [2004] Bda LR 67; OAO "CT-Mobile" v. IPOC International Growth Fund Limited [2006] Bda LR 53; Universal Reinsurance Co. Ltd v. Holden & Co Inc and Employers OneSource Inc (2006) Bda LR 26.

**Miscellaneous**
Mr. Attride-Stirling is listed in the Euromoney Expert Guide to the World's Leading Insurance and Reinsurance Lawyers (www.expertguides.com). He is: a member of the Insurance Advisory Committee, the US/Bermuda Tax Convention Advisory Committee, the International Business Forum (all three are Bermuda Government advisory bodies) and Chairman of the Mental Health Tribunal (Bermuda). He is a Board Member of AIDA (US) (Association Internationale de Droit des Assurances). He was formerly Chairman of the Bermuda Human Rights Commission and Chairman of the Investment Business Act Review Committee.  In April of 2009 he retired as President of the Bermuda Bar Association.



**Tab 2**

IN THE COURT OF APPEAL FOR BERMUDA

Civil Appeal No. 23 of 1992

LANCE MURRAY CROCKWELL                     Appellant

and

THERESA E. HALEY & THOMAS F. HALEY         Respondents

Before:    da Costa JA., P.Ag.
           Henry JA.
           Georges JA.

Date of hearing: 11th & 12th March 1993
Date of judgment: 29th June, 1993

---

JUDGMENT

---

da Costa JA., P.Ag.

In August 1955 the respondent Mrs. Haley while on vacation in Bermuda was struck on a pedestrian crossing near the Inverurie Hotel by a motor cycle driven by the appellant. She suffered serious injuries which have effected the whole course of her life. At the time of the accident she was a school teacher in Philadelphia. She was then 49 years of age. She has been forced by her injuries to abandon her career as a teacher.

She claimed damages for pain, suffering and loss of amenities, loss of earnings past and future and medical expenses past and prospective. Ward J. assessed the past loss of earnings in the sum of $225,078.78 and the future loss in the sum of $263,900. These were gross figures. The appellant does not contest these figures, but contends that tax should be deducted from these gross figures with the result that the award should be based on the net figures. In short the appellant submits that the principle established by the decision of the House of Lords in British Transport Commission v. Gourley (1956) AC 185 should be applied in Bermuda.

The learned judge examined the question of whether he ought to take into account the tax position in assessing the part of the damages attributable to loss of earnings actual or prospective and concluded:

> "In Russell v Van Galen Civil Appeal No. 21 of 1984 the Court of Appeal for Bermuda considered the question of the possible tax liability in assessing damages for loss of earnings and concluded that the reduction of damages under that head so as to take account of a possible tax liability should not have been made because the matter involved a consideration of foreign law which must be pleaded and proved by expert evidence. The Court also held that loss of earning capacity was a capital asset and not subject to income tax. The Court adopted the reasoning advanced in the dissenting speech of Lord Keith in British Transport Commission v Gourley (1955) 3 All E.R. 796.
>
> Mr. Cooper sought to distinguish Russell's case from the one at bar and suggested that anything which might have been said by the learned Justices of Appeal which was not strictly necessary for the decision in Russell was obiter and should not be followed. I disagree. Bermuda has long prided itself on having no income tax and Bermudian Courts should not concern themselves with the application of income tax rules and regulations in other jurisdictions particularly when such application would yield no direct benefit to the foreign state."

The first question that arises for consideration is whether the observations made in Gourley's case were part of the ratio decidendi or were obiter.

In Russell v Van Galen (1985) 36 WIR 144 at 176 I said:

> "The interesting question of the application of Gourley's rule in the present context almost emerged in this case, but in reality does not and for a very good reason. The principle that in a court in Bermuda, as in England, foreign law is a matter of fact is well established and it has two important practical consequences. In the first place, the foreign law must be pleaded: the general rule is that if a party wishes to rely on a foreign law he must plead it in the same way as any other fact (King of Spain v. Machado (1827) 4 Russ 225). Secondly, the foreign law must be proved as the court will not take judicial notice of foreign law; and, further, it must be proved in each case."

After some further observations I added:

> "Accordingly, in my judgment, it is the defendant who relies on foreign law and he was therefore obliged to plead and prove it. This he has failed to do. The consequence is that it is not open to him to contend that United Kingdom tax should be deducted from the plaintiff's loss of earnings under the rule in Gourley's case.

While I fully realise that any comment of mine on the rule in Gourley's case must hereafter be held to be strictly obiter I nevertheless would add a few observations."

The learned President, Sir **Alastair** Blair-Kerr too after an examination of the views expressed in Gourley's case concluded at p.166: "But any views expressed by me concerning the decision in Gourley's case should be treated as obiter." He then gave his reasons why the views he expressed should be so regarded.

My brother Henry **JA** did not expressly state that his views on the Gourley case were obiter, but a perusal of his judgment shows that they obviously were (see pp. 180-181).

The vital question therefore which arises for consideration on this appeal is whether the views expressed in Russell v. Van **Galen** (1985) 36 WIR 144 by this Court on the Gourley case are correct. Mr. **Ashworth** for the appellant submits that in the circumstances of this case the Court is bound by, or alternatively ought to follow Gourley; in the further alternative, irrespective of Gourley, the general principles governing the assessment of damages in cases of negligence require that tax be deducted.

I turn therefore to consider the issue as to whether this Court is bound by the decision of the House of Lords in Gourley's case. I have had the privilege of reading in draft the judgment of my brother Georges. I am in entire agreement with the views expressed therein. I particularly endorse his views at pp. 4-7 of his judgment on the authority of the decisions of the House of Lords, expressed as they are with consummate clarity. With some diffidence I venture to add a few observations on this aspect of the case.

The orthodox theory of the position of colonial courts is stated by Sir Kenneth Roberts-Wray as follows:

"In the first place, there appears in the past to have been a tendency, possibly unintended, to view the judicature overseas as if their authority was in some way inferior. In some quarters, it may have been fostered by their own judges, though the unquestioning readiness with which they often relied upon English decisions need be attributed to no more than the respect with which the English Judiciary have always been held and the dearth of other precedents. However that may be, this tendency probably flowed from the subordinate states of the Executive and the Legislature. If so, the analogy, though understandable was unsound; for Colonial Courts are not, and never have been, subordinate to English Courts, or anymore subordinate to the United Kingdom Parliament or Government than the English Courts themselves" (Sir Kenneth Roberts-Wray, Commonwealth & Colonial Law pp. 569-570).

Those words were written in 1966. Since then there have been many judicial pronouncements on the subject. In de Lasala v. de Lasala (1980) AC 546; 557-558 Lord **Diplock** said:

"It has become generally accepted at the present day that the common law is not unchanging but develops to meet the changing circumstances and patterns of society in which it is applied. In Australian Consolidated Press Ltd. v. Uren [1969] 1 AC 590 it was accepted by this Board that the common law as to the right to punitive damages for tort had of recent years developed in different ways in England and in New South Wales and that neither Australian courts themselves nor this Board sitting on an appeal from an Australian court were bound by the decision of the House of Lords in Rookes v. Barnard [1964] A.C. 1129 which limited the categories of cases in which punitive damages could be awarded in England. So too in Hong Kong, where the reception of the common law and the rules of equity is expressed to be "so far as they are applicable to the circumstances of Hong Kong or its inhabitants" and "subject to such modifications as such circumstances may require" a decision of the House of Lords on a matter which in Hong Kong is governed by the common law by virtue of the Application of English Law Ordinance is not ipso facto binding upon a Hong Kong court although its persuasive authority must be very great, since the Judicial Committee of the Privy Council, whose decisions on appeals from Hong Kong are binding on all Hong Kong courts, shares with the Appellate Committee of the House of Lords a common membership. This Board is unlikely to diverge from a decision which its members have reached in their alternative capacity, unless the **decision** is in a field of law in which the circumstances of the colony or its inhabitants make it inappropriate that the common law in that field should have developed on the same lines in Hong Kong as in England."

This passage from the judgment of Lord **Diplock** was cited with apparent approval by Lord Ackner in Franklin v The Queen (1987) AC 576, 593-594. In Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. (1986) AC 80, 108 Lord **Scarman** said:

"It is, or course, open to the Judicial Committee to depart from a House of Lords' decision in a case where, by reason of custom, statute, or for other reasons peculiar to the jurisdiction where the matter in dispute arose, the Judicial Committee is required to determine whether English law should or should not apply. Only if it be decided or accepted (as in this case) that English law is the law to be applied will the Judicial Committee consider itself bound to follow a House of Lords' decision."

It would seem to follow therefore that the Judicial Committee of the Privy Council would uphold a decision of a colonial court differing from a decision of the House of Lords when the conditions stated by Lord Scarman prevailed. (See for example, Australian Press Ltd. v Uren (1969) 1 AC 590, 641).

Whatever may be the position in strict theory the reality of the situation is summed up by Lord Diplock in these words:

"Since the House of Lords as such is not a constituent part of the judicial system of Hong Kong it may be that in juristic theory it would be more correct to say that the authority of its decision on any question of law, even the interpretation of recent common legislation, can be persuasive only: but looked at realistically its decisions on such a question will have the same practical effect as if they were strictly binding, and courts in Hong Kong would be well advised to treat them as being so." (de Lasala v de Lasala (1980) AC 554, 558).

In short, whatever may be the orthodox theory of the doctrine of precedents, any decision of the House of Lords will be treated with the greatest respect having regard to the reputation and distinction of that august body as the highest legal tribunal of the United Kingdom, and will as a general rule be followed by a court in Bermuda. Should the rare occasion arise where it is thought that local conditions dictate a path different from that charted by the House of Lords, then the local court must be at liberty to adopt such a course leaving it to the Judicial Committee to decide as ultimate arbiter whether such a course was justified.

In matters of commerce uniformity-is of course highly desirable and this court in J.E.L. Lightbourne & Co. Ltd. v Test

Freres (1980-80) LRC (Comm) 463 readily followed the decision of the House of Lords in the Advocaat case (1980) RPC 31 as being "the most authoritative pronouncement on the law of passing off in England." The President of the Court took the view that there was no reason why the Common Law on this subject as applied in these island should be any different.

I think it is appropriate at this stage of my judgment to face my locus poenitentiae. As stated above I was a party to the decision in Russell v Van Galen (1985) 36 WIR 144 and expressed certain views. Faced with an expression of an opinion that was clearly obiter but which is no longer sustainable one must recant with as much grace as possible. One can take some comfort that at least the renunciation of an obiter dictum is not as mortifying as the abandonment of a ratio decidendi previously enunciated. In the very case that is at the heart of this matter we find Lord Tucker saying:

> "My Lords, having heard this point argued three times -
> twice in your Lordships' House and once in the Court of
> Appeal - I am persuaded that the decision in Billingham
> v Hughes, to which I was a party in the Court of
> Appeal, was erroneous." (Gourley's case 1955 AC
> 185,215).

Perhaps, like the trial judge I was overly impressed by the fact that Bermuda had no income tax, Mr. Ashworth has however demonstrated that his fact is really irrelevant. It is not the lex fori, that is the determinant for the deduction of tax in the assessment of compensation for loss of earnings. English courts always look at the factual basis, and if and only if, the earnings would in fact (because of the law of his domicile or the state where he was working) have been subject to taxation do English courts deduct tax in the assessment of compensation f-or their loss.

I come now to consider the rule in Gourley's case and to give my reasons why after hearing the case fully argued I have resiled from the view expressed in the Van Galen case.

Few decisions of the House of Lords have been more controversial and the debate on its merits have been vigorous and sustained. In fact it rests upon a simple, but fundamental proposition of law that damages for negligence are intended to be purely compensatory. The case for the Appellant in the House of Lords was put with striking simplicity by their counsel thus:

> "The object of awarding damages for personal injuries is to compensate the injured person for what he has lost in the past and is likely to lose in the future. All that the plaintiff has lost in the past and all that he will lose in the future is the amount of his earnings less tax. The true way to compensate him is to give him the sum equivalent to what he would have enjoyed from his earnings after paying the liabilities attached to those earnings. To do otherwise would be to enable him to make a profit out of his injuries."
> (per Sir Andrew Clarke Q.C. (1956) AC 185, 190).

The compensatory principle, if I may so call it, was accepted by the Law Lords in Gourley's case ((1956) AC. 185: see for example per Earl Jowett at pp.197-198; per Lord Goddard at 206; per Lord Reid at 212). Even Lord Keith the lone dissentient did not express a contrary view, but addressed himself to the "serious difficulties and complications" that would arise if tax was to be deducted from the gross earnings.

In Hodgson v Trapp (1989) 807, 819 Lord Bridge reaffirmed the principle in these terms:

> "My Lords, it cannot be emphasised too often when considering the assessment of damages for negligence that they are intended to be purely compensatory. Where the damages claimed are essentially financial in character, being the measure on the one hand of the injured plaintiff's consequential loss of earnings, profits or other gains which he would have made if not injured, or on the other hand, of consequential expenses to which he has been and will be put which, if not injured, he would not have needed to incur, the basic rule is that-it is the net consequential loss and expense which the court must measure. If, in consequence of the injuries sustained, the plaintiff has enjoyed receipts to which he would not otherwise have been entitled, prima facie, those receipts are to be set against the aggregate of the plaintiff's losses and expenses in arriving at the measure of his damages. All this is elementary and has been said over and over again."

The principle is also accepted in Australia. In Skelton v. Collins (1965-66) 115 CLR 94, at 128, Windeyer J. gave eloquent expression to this axiomatic principle when he said:

> "The one principle which is absolutely firm, and which controls all else, is that damages for the consequences of mere negligence are compensatory. They are not punitive. They are given to compensate the injured person for what he has suffered and will suffer in mind body or estate. Only so far as they can do so is he entitled to have them."

Even **Barwick** C.J. an avowed opponent of the decision in Gourley's case accepts the proposition that damages are only compensatory as fundamental (see Atlas Tiles Ltd. v. Briers (1976-78) 144 CLR 202 at 208).

There are however two prerequisites for the application of the decision in Gourley's case: in the words of McGregor they are:

> "(1) the sums for the loss of which the damages awarded constitute compensation would have been subject to tax; and (2) the damages awarded -to the plaintiff would not themselves be subject to tax. For there cannot be any reason for taking tax into account in calculating damages given in compensation for a loss which would never itself have been taxed: this would let in a taxation where no taxation would have been, which would be unfair to the plaintiff. Equally there cannot be any reason for taking tax into account in calculating the damages if the damages themselves will then be taxed: this would result in a double taxation, equally unfair to the plaintiff." (McGregor on Damages, 15th edn. **pp.**335-6).

Gourley was a decision in Tort, but the principle upon which it rested also applies in other branches of the law where the function of damages is compensatory and not punitive. Commenting on its application in the realm of contract the authors of a leading text-book on the faw of Contract observe: "The logic of the principle may be impeccable, but the difficulties involved-in its application are formidable" (Cheshire, Fifoot & Furmiston's, Law of Contract, 12th edn. p. 610).

The alleged difficulties involved in the application of the principle in Gourley's case is one of the main grounds on which

the opponents of the principle rely. But can the objection really be sustained? Admittedly there are elements of uncertainty in the assessment of tax payable. But there is often a considerable element of uncertainty in an award of damages, but that does not prevent a court from doing the best it can in the circumstances. In assessing pecuniary damages for the loss of earnings there are many imponderables to be taken into account, e.g. the likely duration of the plaintiff's incapacity, his chances for promotion or increase in **earnings,** and the future rates of inflation and return on invested capital. Again when a court comes to deal with non-pecuniary damages the difficulties are even more formidable. As Dickson **J.** observed in Andrews et al v Grand & Toy Alberta Ltd. et al (83 D.L.R. (3d) 452 at **475-476**):

> "There is no medium of exchange for happiness. There is no market for expectation of life. The monetary evaluation of non-pecuniary losses is a philosophical and policy exercise more than a legal or logical one. The award must be fair and reasonable, fairness being gaged by earlier decisions; but the award must also of necessity be arbitrary or conventional. No money can provide true restitution. . . . The sheer fact is that there is no objective yardstick for translating non-pecuniary losses, such as pain and suffering and loss of amenities, into monetary terms."

Despite the inherent difficulties courts do not shrink from the task of assessing damages. One is tempted to observe that the difficulties of application envisaged by the opponents of the Gourley principle appear largely in the theoretical cases raised by learned judges and authors rather than in the practical application of the principle. In the Queen (In the Right of Ontario) v Jennings (57 D.L.R. 92d) 644 at 657) Judson J. a notable opponent of the Gourley principle enumerated some of the practical difficulties that would arise from an application of the principle. The final sentence in the potential catalogue of woes asked: "What will be done with the foreign plaintiff and the foreign system of taxation?" The case before us is just that case and one could not justifiably say that the tax aspect has presented any practical difficulties. In fact the parties have

found it possible to agree the tax element, thus dispensing even with the necessity to call evidence on the matter.

As Kemp & Kemp have observed:

> "Many of the problems it was predicted would arise as a result of Gourley's case were premised on plaintiffs who were "people of affairs", and who had complex tax liabilities. In truth the overwhelming majority of plaintiffs are employed people subject to the PAYE scheme, most of whom are not even liable to the higher rates of tax, and it is usually straight forward in such cases to apply Gourley's rule simply by looking at the plaintiff's earnings." (Kemp & Kemp, The Quantum of Damages, (1992) edn. Vol. 1 p. 9-005-006).

The result is that "in practice, at least in personal injury litigation, the rule in Gourley's case has been applied for over a quarter of a century without creating too many difficulties or an abundance of case law" (Kemp & Kemp ibid p.9-005)

The opponents of Gourley further say: "The plaintiff has been deprived of his capacity to earn income.  It is the value of that capital asset which is to be assessed."  In Atlas Tiles Ltd. v Briers (1976-1978) 144 CLR 202 at 210 **Barwick** C.J. a leading protagonist of this school said:

> "Some have thought the distinction I have drawn between loss of earnings and loss of earning capacity is illusory or insubstantial.  But, in my opinion, it is real and radical. . . . In my opinion, the distinction I make is not a matter of semantics but basically conceptual."

In my judgment the answer of Salmond & Heuston to their criticism is complete:

> "Another criticism is that a person whose earning capacity is wholly or partially destroyed thereby loses a capital asset, and-as it is a fundamental principle of English revenue law that a capital asset is not taxable, it should follow that the compensation which replaces that asset is also tax-free.  But while it is true that a man's skill and experience are in the nature of capital assets, all that was done in Gourley was to value those assets by the income which they are likely to produce, and that income was affected by the predictable factor of taxation.  In short, the Law Lords in Gourley faced the realities of life and refused to be misled by maxims such as res inter alios acta.  There is no reason why someone who has lost a net sum should receive a gross sum." (Salmond & Heuston, Law of Torts, 18th edn. p.638).

There is however, an interesting decision of Denning M.R. in which he seeks to distinguish the two concepts. In Farley v John Thompson Ltd. (1973) 2 Lloyd's Rep. 41, 42 he said:

"It is important to realize that there is a difference between an award for loss of earnings as distinct from loss of earning capacity. Compensation for loss of future earnings is awarded for real assessable loss proved by evidence. Compensation for diminution in earning capacity is awarded as part of general damages."

**Scarman** L.J. (as he then was) was a member of the Court and he obviously agreed with the distinciton Lord Denning M.R. made. At p. 43 **Scarman** L.J. said:

"Before the accident he could get his living as a steel or steelwork erector. After the accident he cannot. There is no evidence that actually it is causing or will cause him any loss of future earnings. Yet there is a disability. I think, with my Lord, that it has to be considered as an element in general damages."

It appears therefore from the above case that if a steel erector was earning E40 per week, but as a result of an accident he could only do a job in which he earned £30 per week he would be awarded compensation on the basis of £10 per week for loss of future earnings. If on the other hand he suffered no loss of earnings then all he would have suffered was a loss of earning capacity for which he would be entitled to general damages.

This principle was applied by the Court of Appeal in Moeliker v Reyrolle & Co. (1977) WLR 132, a case where the plaintiff had suffered serious but not incapacitating injury. At p.140 Browne L.J. observed:

"As I have said. this problem generally arises in cases where a plaintiff is in employment at the date of trial. If he is then earning as much as he was earning' before the accident and injury (as in the present case), or more, he has no claim for los of future earnings. If he is earning less than he was earning before the accident, as in Nicholls v. National Coal Board [1976] l.C.R. 266, he has a claim for loss of future earnings which is assessed on the ordinary multiplier/multiplicand basis. But in either case he may also have a claim, or an additional claim for loss of earning capacity if he should ever lose his present job."

One can of course appreciate the distinction made by Lord Denning M.R. & Browne L.J.. On the other hand the view of the Pearson Commission was that loss of earning capacity should be regarded simply as a factor to be taken into consideration when assessing damages for future loss of earnings (Salmond & Heuston op. at pp.635-6).

In the final analysis however the fact of the matter is, as my brother Georges has observed, in estimating a lump sum value of the loss of earning capacity, the most sensible starting point is an estimate of the annual earnings converted to a lump sum over a number of years.

In calculating the damages for future loss of earnings the learned judge used the same method that is employed in England. It is agreed that this is the usual practice in Bermuda.

In Cookson v Knowles (1979) A.C. 556 the House of Lords approved practical guidelines which have been confirmed and applied in subsequent decisions, notably in Pickett v British Rail Engineering Ltd. (1980) A.C. 136 and in Lim Poh Choo v Camden and Islington Area Health Authority (1980) A.C. 174 in which Lord Scarman delivered the leading speech.

In Hodgson v. Trapp (1989) A.C. 807, 826 Lord Oliver after emphasising "the unpredictable consequences" inherent in making an assessment of future income loss said:

> "Such an assessment cannot, therefore, by its nature be a precise science. The presence of so many imponderable factors-necessarily renders the process a complex and imprecise one and one which is incapable of producing anything better than an approximate result. Essentially what the court has to do is to calculate as best it can the sum of money which will on the one hand be adequate, by its capital and income, to provide annually for the injured person a sum equal to his estimated annual loss over the whole of the period during which that loss is likely to continue, but which, on the other hand, will not, at the end of that period, leave him in a better financial position than he would have been apart from the accident. Hence the conventional approach is to assess the amount

notionally required to be laid out in the purchase of
an annuity which will provide the annual amount needed
for the whole period of loss."

His Lordship then went on to observe that the process cannot
be better described than it was by Lord Diplock in Cookson v
Knowles (1979) A.C. 556 and although that case was concerned with
a claim under the Fatal Accidents Act 1846-1959 "his description
of the approach to and the method of assessment of damages, is
equally applicable to claims for future loss of earnings and
future expenses by the injured party himself." His Lordship then
went on to cite two well known passages from the speech of Lord
Diplock in Cookson v Knowles at pp.567-568 & 571-572.

At p.571 of his speech in Cookson & Knowles Lord Diplock
said:

"Quite apart from the prospects of future inflation,
the assessment of damages in fatal accidents can at
best be only rough and ready because of the conjectural
nature of so many of the other assumptions upon which
it has to be based. The conventional method of
calculating it has been to apply to what is found upon
the evidence to be a sum representing "the dependency,"
a multiplier representing what the judge considers in
the circumstances particular to the deceased to be the
appropriate number of years' purchase. In times of
stable currency the multipliers that were used by
judges were appropriate to interest rates of 4 per
cent. to 5 per cent. whether the judges using them were
conscious of this or not. For the reasons I have given
I adhere to the opinion Lord Pearson and I had
previously expressed which was applied by the Court of
Appeal in Young v. Percival [1975] 1 W.L.R. 17, 27-29,
that the likelihood of continuing inflation after the
date of trial should not affect either the figure for
the dependency or the multiplier used. Inflation is
taken care of in a rough and ready way by the higher
rates of interest obtainable as one of the consequences
of it and no other practical basis of calculation has
been suggested that is capable of dealing with so
conjectural a factor with greater precision."

Indeed as Lord Oliver said in Hodgson v. Trapp (1988) 807,
828:

"In an area in which, as Lord Diplock observed, the
conjectural nature of the exercise necessarily renders
the computation at best rough & ready, it is not to be
expected that the process will or can be precise or
entirely logical."

- 13 -

Be that as it may, the courts have evolved a particular method for assessing the amount of damages for future loss of earnings. This amount as appears from the cases is calculated by ascertaining the annual sum that represents the plaintiff's loss of earnings at the date of trial, and multiplying this by a figure which, while based upon the number of years during which the loss of earning power will last, is discounted so as to allow for the fact that a lump sum is being awarded now instead of periodical payments over the years. This latter figure is referred to as the multiplier; the former figure has come to be called the multiplicand.

As Lord Fraser of Tullybelton observed in **Cookson** v. Knowles (1979) AC 556, 576:

> "The multipliers which are generally adopted in practice are based on the assumption (rarely mentioned and perhaps rarely appreciated) that the principal sum of damages will earn interest at about 4 or 5 per cent. which are rates that would be appropriate in **times** of stable currency, as **my** noble & learned friend Lord **Diplock** pointed out in Mallett v **McMonagle** (1970) AC 166,1761 D.

This method of assessment is not without its critics. (See for example Kemp & Kemp, The Quantum of Damages (1979) 6-005 & 7-010); but this is perhaps not the place to pursue such criticism. It is however the practice almost invariably adopted by the court.

Again to quote Lord Oliver:

> "The **system** of multipliers & multiplicands conventionally employed in the assessment takes account of a variety of factors, none of which is or, indeed, is capable of being-worked out scientifically, but which are catered for by allowing a reasonably generous margin in the assumed rate of interest on which the **multiplier** is based" (Hodgson v Trapp (1989) AC 807, 834).

Their Lordships in Hodgson v Trapp were also of the view that "the incidence of taxation in the future should ordinarily be assumed to be satisfactorily taken care of in the conventional

assumption of an interest rate applicable to a stable currency and the selection of a multiple appropriate to that rate" (p.835). This reasoning would normally apply to inflation though:-

> "Both in **Cookson** v. Knowles (1979) AC 556 and in Lim's case (1980) AC 174 this House was prepared to envisage that there might be very exceptional cases, where it could be positively shown by evidence that justice required it, in which special allowance might have to be made for inflation and, inferentially for tax" (per Lord Oliver at p.835).

The "**Diplock** approach" has been consistently followed in assessing damages in Bermuda. As I have observed it has its critics. It is not a perfect system but then it operates in a realm in which perfection must remain beyond the wit of man. On the whole however it produces results that are substantially just. There does not appear to be any valid reason why Bermuda should seek to depart from it a system of assessment that has become well established here.

On the whole despite criticisms the decision in Gourley's case has gained favourable reception in many Common Law jurisdictions. In Atlas Tiles Ltd. v. Briers (1976/78) 144 CLR 202 the High Court of Australia by a majority rejected the doctrine; however, eighteen months later, in **Cullen** v Trappell 1979/80) 146 CLR the full court by a majority overruled its previous decision thus establishing the principle in Australia.

The legendary acceptance of things British by Barbados found another illustration in the reception of the Gourley principle. In Johnson v. Browne 1972) 19 WLR 382 Douglas CJ followed the Gourley case without comment.

The situation in Canada presents a strange picture. In the Queen v. Jennings (1966) 57 DLR (3d) 64 the Supreme Court rejected the principle stated in Gourley, expressing agreement with the dissenting opinion of Lord Keith and the minority views

- 15 -

of the 7th Report of the Law Reform Committee. The rejection was largely on the basis that the plaintiff has been deprived of his capacity to earn income and that was a capital asset. (See per Judson J. at page 656). It would appear however that the decision applies only to damages for future loss of earnings. In Keiser v. Hanna (1978) 82 DLR 3(d) 449 the Supreme Court held that in assessing damages in Fatal Accident cases income tax must be deducted. In Andrews v. Grand & Toy Alberta Ltd. (1978) 83 DLR 3(d) 452 the Supreme court affirmed both Jennings and Hanna v. Keiser distinguishing them on the ground that in the case of prospective income of a living plaintiff it is "earning capacity and not lost earnings which is the subject of compensation", whereas in a fatal accident case the "support payments could only come out of take home pay" (p. 774) It appears that in Canada tax is deducted from pre-trial loss of earnings but not from future loss of earnings.

In Smiths v. Wellington Wool Mfg. Co. Ltd. (1956) NZLR 491 the Court of Appeal of New Zealand followed Gourley. However, in North Island Groceries Ltd. v. Hewin (1982) 2 NZLR 176 the Court of Appeal by a majority declined to follow Gourley in a wrongful dismissal case. The majority expressly declined to reconsider the application of Gourley in a personal injury case because by then the question had become an academic one in New Zealand.

The position in South Africa is interesting as it appears that even before the decision in Gourley income tax was taken into consideration in the awarding of damages for the loss of earning: Thus in Pitt v. Economic Insurance Co. Ltd. [1957 (3)] SALR 284 Holmes J. said: "I would add as a matter of interest, that this is now the accepted view in England", as a result of the Gourley case.

In the United States the practice varies from state to state. However, in Norfolk and Western Railway Co. v. Liepelt

(1980) 100 S.C.R. 755 Stevens J. in delivering the judgement of the Supreme Court said at p.757:

> "The amount of money that a wage earner is able to contribute to the support of his family is unquestionably affected by the amount of the tax he must pay to the Federal Government. It is his **after-**tax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family. It follows inexorably that the wage earner's income tax is a relevant factor in calculating the monetary loss suffered by his dependents when he dies".

It is not possible to ascertain the precise method of their calculation of damages in as much as in the United States damages are awarded by juries. Again practice in various States appear confused. Apparently in matters governed by state law rather than federal law the state courts pursue their own policy without regard to pronouncements of the Supreme Court.

It would thus appear that so far as the common law jurisdictions are concerned although the decision in Gourley is not supreme over palm and pine it has nevertheless gained considerable acceptance.

As I said near the beginning of this judgment like the learned trial judge, I was overly impressed by the argument that Bermuda has no income tax. But clearly this factor is irrelevant. The Bermudian plaintiff will continue to be untouched by the Gourley principle for Bermuda has no income tax. Indeed, if a Bermudian goes to England and has the misfortune to be involved in an accident and sues there he will still enjoy his freedom from the demand of income tax. The Gourley principle will only apply here in the few exceptional cases, where foreign plaintiffs who sue for injuries suffered here come from countries in which income tax is payable. In such cases questions of foreign tax law will arise. They must be proved unless agreed, as indeed happened in this case.

In the result, I would hold like my brother Georges, that while this Court is not bound to follow the Gourley case, there does not appear to be any valid reason in the context of the Bermuda situation why we should refuse to follow that decision, based as it is on a proposition that is universally accepted in common law jurisdictions. The learned judge should accordingly have taken the Gourley principle into consideration in assessing the actual and future loss of earnings.

Before the trial the parties had actually agreed that the plaintiffs past and future earnings (had she not been injured) would have been subject to federal and state income taxes at the rate of 25 per cent., and that her damages will not be taxable. The agreement was confirmed on appeal.

The parties have submitted the following agreed figures:

## SUPREME COURT JUDGMENT

| | | |
|---|---|---|
| (a) Medical Expenses | $30,456.51 | Total (a) & (b) |
| (b) Part loss of earnings | $225,078.78 | $255,535.29 |
| | | Total (b) & (c) |
| (c) Future loss of earnings | $263,900.00 | $488,978.78 |
| (d) General damages | $65,000.00 | |
| (e) Interest on (a) & (b) | | $62,973.69 |
| (f) Interest on (d) | | $4,581.16 |
| | | |
| TOTAL JUDGMENT | $651,990.14 | |

IF APPEAL SUCCEEDS:

FIRSTLY:      Reduce (b) and (c) by 25%

$25/100 \times \$488,978.79 = \$122,244.70$

SECONDLY:      Reduce (e) as follows

$\$62,973.69 \times \dfrac{\$225,078.78}{\$255,535.29} \times \dfrac{25}{100}$

$= \$13,867.00$

| | | |
|---|---|---|
| DEDUCTIONS (1) | | $122,244.70 |
| (2) | + | $13,867.00 |
| TOTAL | | $136,111.70 |
| | | |
| TOTAL JUDGMENT | | $651,990.14 |
| LESS: DEDUCTIONS | ~ | $136,111.70 |
| TOTAL | | $515,878.44 |

Accordingly, I would allow the appeal and applying the Gourley principle I would substitute the amounts of $515,878.44 agreed by the parties as correct for the award of damages made by the trial judge under the heads of loss of earnings and loss of future earnings. Accordingly there will be judgment for the plaintiff - respondent in the sum of $515,878.44.

H.L. da Costa

Piers **Ashworth** Q.C. and John Cooper for the Appellant

Kieron Unwin for the Respondent

1

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO 23 of 1992

Lance Murray Crockwell          Appellant

v

Theresa E. Haley & Thomas F. Haley    Respondent

Date of hearing: 11th March, 1993

Date of judgment: 29th June, 1993

Before          da Costa JA (Ag. P)
                Henry JA
                Georges JA

-----------------------

JUDGMENT

GEORGES JA

The question arising for decision in this appeal is whether in assessing damages for loss of earning capacity claimed in an action for personal injuries, the judge should take into account and deduct the tax the plaintiff would have had to pay on the lost earnings.

The respondent, Mrs. Haley, was struck on a pedestrian crossing near a local hotel by a motor cycle driven by the

2

appellant. She was at the time of the accident 49 years old and employed as a school teacher in Philadelphia. The injuries she sustained effectively disabled her from resuming her employment. The trial judge discussed the issue as to whether or not income tax should be deducted before arriving at the figure on which Mrs. Haley's loss of earnings would be **capitalised.** He concluded -

> "In Russell v Van Galen Civ. App. No.21 of 1984, the Court of Appeal for Bermuda considered the question of the possible tax liability assessing damages for loss of earnings and concluded that the reduction of damages under that head so as to take account of a possible tax liability should not have been made because the matter involved a consideration of foreign law which must be pleaded and proved by expert evidence. The Court also held that loss of earning capacity was a capital asset and not subject to income tax. The Court adopted the reasoning advanced in the dissenting **speech** of Lord Keith in British Transport Commission v Gourley [1955] 3 All E.R. 796
>
> Mr. Cooper sought to distinguish Russell's case from the one at the bar and suggested that anything which might have been said by the learned Justices of Appeal which was not strictly necessary for the decision in Russell was obiter and should not be followed. I disagree. Bermuda has long prided itself on having no income tax and Bermudian courts should not concern themselves with the application of income tax rules and regulations in other jurisdictions particularly when such application would yield no direct benefit to the foreign state."

A perusal of  Russell v Van Galen (1985) 36 W.I.R. 144 shows that the comments by the learned Justices of Appeal were clearly obiter.   The President,  Sir Alastair Blair-Kerr,  critically reviewed Gourlev's case between pages 164 and 166 of the report and concluded -

> "But any views expressed by me concerning the decision in Gourlev's should be treated as obiter.  The defendant argues that the award of damages should be reduced by 30%. That involves a consideration of foreign law.  He relies on that law. The onus was on him to prove it as a matter of fact.  He has not pleaded it;   and  even  if he had,  such evidence as emerged in one way or another was wholly inadequate.  The relevant foreign law was neither pleaded nor proved; and it is for those reasons that, in my view, grounds of appeal 7 must fail and grounds 3 and 4 of the cross-appeal must succeed."

Ground 7 of the notice of appeal  and grounds 3 and 4 of the respondent's notice dealt with the manner in which the trial judge had ruled on the issue of income tax deductibility from loss earnings.

DaCosta JA reviewed Gourlev's case at pp 174-175 concluding -

> "While ‾I fully realise that any comments  of mine  on  the rule in Gourlev's case must hereafter be

**4**

> held to be strictly _obiter_ I
> nevertheless would add a few
> observations . . . . . ."

He went on to state that he found the views of the minority as
stated in the 7th report of the Law Reform Committee on the effect
of tax liability on damages convincing.

Henry JA did not specifically state as did his brethren that
the views he expressed on Gourley were obiter but in the context it
was patently obvious that they were.   He stated at p. 180 -

> "It is the submission of counsel for
> the defendant that the trial judge
> (who held that the rule in Gourley's
> case applied) ought to have reduced
> the amount he awarded by 30% and not
> 15% in order to make allowance for
> the plaintiff's tax liability where
> she now resides.   In my view, the
> short answer to this issue is that
> the incidence of taxation arises
> under the English Finance Act, a
> foreign law which has not been
> pleaded by the defendant and it was
> not therefore open to him to lead
> any evidence as to the law or to
> rely on it by way of **defence** for the
> purpose of reducing the amount of
> damages payable by him. However, it
> may be of assistance for the future
> to express some views as to the
> applicability of   the   rule   in
> **Gourley's** case."

He went on at p.181 to state that he was

> "inclined to agree with the views
> expressed by Lord Keith and Judson
> J.   In my opinion, the rule in
> Gourley's case should not be applied
> in Bermuda."

These statements even though strictly _obiter_ could properly

177 <sup></sup>

have been regarded by a trial judge as strongly indicative of the course that should be followed in decisions in that area in the future. The approach to be taken by this Court must clearly be different. The statements, being <u>obiter,</u> are not binding. The issue is open for re-examination though clearly much deference will need to be given to the considered opinions forcefully expressed.

Against that background the first issue which arises is whether this Court is free to depart from the views of the law expressed by 6 of the 7 members of the House of Lords who decided **Gourley's** case.

It should be emphasised that although Bermuda is technically not an independent country and retains colonial linkages the hierarchy of its courts is no more subordinate to courts in England than are the courts of independent countries which maintain the Judicial Committee of the Privy Council as the final appellate tribunal. As Sir Kenneth Roberts-Wray states in <u>Commonwealth and Colonial Law</u> at pp. 563-4 -

> "English decisions are treated as authoritative much more in the Courts of Colonies than in independent countries: but (though this is understandable) there appears to be no sound reason for saying they ought to be. It seems sometimes to be overlooked that the general jurisdiction of Superior Courts, even in the smallest territories, is the same as that of the Courts of Westminster: local statutes commonly so provide in express terms. If, therefore, there

6

> is an obligation upon such courts to
> regard English decisions as binding,
> it cannot rest upon any theory of
> inferior status."

Statements of the principles which should be applied in determining the binding effect of English authority on Commonwealth Courts reflect the inherently irreconcilable goals which are being pursued. There is the desire for almost seamless uniformity in the development of the common law as a dynamic mechanism assisting in the regulation of human affairs but this survival is only possible where there is creative adaptation to local conditions.

It must be conceded that the common law of Bermuda now being applied in the courts of Bermuda derives from the common law of England. The ultimate authority for the declaration of that law is the House of Lords. In that sense even though the courts of Bermuda are not hierarchically subordinate to the House of Lords as they are to the Judicial Committee of the Privy Council, there exists compelling reason to accept declarations of the common law by the House of Lords as binding. Further, in practical terms as Lord **Diplock** has pointed out in <u>de Lasala</u> v <u>de Lasala</u> **[1980]** A.C.546 at p.538 since the Judicial Committee of the Privy Council shares a common membership with the Appellate Committee of the House of Lords it is to be expected that the Judicial Committee sitting as the final appellate tribunal for any particular Commonwealth Country is hardly likely to disagree with views which its members have expressed as the Appellate Committee **of the** House

of Lords.

Finally there is the fact that the practical experience and legal scholarship of the Appellate Committee of the House of Lords are such as to sustain a generally admirable reputation for soundness. The consequence is that views which they propound are usually reasoned and persuasive and easy to adopt quite apart from any dictate of the doctrine of precedents.

When all these factors are given full weight, there nonetheless remain areas in which there can be room for reasoned disagreement - often arising from conflicting views as to the purpose to be served by a rule - though necessarily formulated in the language of conceptual analysis and of an examination of the practical consequences flowing from the choice of a particular alternative. Not many disputes will fall within this range. Generally then it can be said that the Courts of Bermuda will accept as binding decisions of the House of Lords in common law matters. Where, however, a problem does fall within this range and the Courts are satisfied that the social conditions of Bermuda make inappropriate the particular path of development chosen by the House of Lords against the background of British conditions, then the Courts of Bermuda must be at liberty to map their own particular path making clear their reasons for so doing. Should the issue eventually reach their Lordships in their role as members of the Judicial Committee and as such the final **appellate tribunal**

for Bermuda, it will be possible for them to weigh and assess the reasons underlying the divergence and thereupon decide whether it should be nonetheless affirmed.

In my view, the method of determining the damages to which a plaintiff is entitled in an action for damages for negligence does permit of differences of approach springing from societal values. In this regard it clearly differs from the law relating to passing Off in relation to which Sir **Alastair** Blair-Kerr **P.** speaking for the Court in ~~J.T. Lightbourne & Co~~ Ltd and another v ~~Testut~~ [1980-84] **LR(Comm)463** at 473 stated that there was no reason why the Common law on that subject in the ~~Advocaat~~ case **[1980]** R.P.C.31 should be any different in Bermuda.

It was stressed on behalf of the appellants that **once** the law being applied in the assessment of damages for personal injuries was English law, then there was an obligation to apply the entire bundle of rules. I find the proposition unacceptable. **Gourley's** case was not itself decided until 1956. Until then damages would have been assessed without regard to the plaintiff's tax liability.

One comes then to decide the issue whether the rule in **Gourley's** case should be adopted in Bermuda. Controversy over the adoption of the rule has been intense and proponents on one side and the other have seldom changed their views so deeply do convictions run.

On all sides, however, it is agreed that damages in a personal injury action are intended to compensate the plaintiff for losses incurred. **Barwick** CJ, an early opponent of the rule accepted this. He stated in Atlas Tiles Ltd v Briers [1978] 144 CLR 202 at **p.208**

> "**Gourley's** case and cases such as
> ........... ' which have followed and
> applied **Gourley's** case are said to
> be founded upon the proposition that
> damages are only compensatory, a
> principle which may at once be
> accepted as fundamental.....-..It is
> for that of which the plaintiff has
> been deprived by the defendant's act
> that the award of damages must
> compensate."

**Barwick** CJ then went on to state that the important issue was "the identification of that for which compensation is to be assessed." Jurists who reject the Gourley approach emphasize that the process of assessment requires an assessment of the lump sum value of loss of earning capacity - a capital asset which is quite different from actual loss of earnings. Though earnings are usually liable to tax, the capital sum representing the assessed value of earning capacity, like most capital sums, should be reached without reference to income tax considerations.

In his dissent in Gourley Lord Keith of Avonholme did not stress the conceptual issue of the identification of that for which compensation was being assessed. Rather, he elaborated the inequities which could result if damages were to be assessed in circumstances in which two plaintiffs had near identical gross

incomes but one plaintiff had so arranged his affairs that his tax liability had been minimized while the other had not so arranged his affairs.  He made no explicit reference to the compensatory principle underlying the assessment of a plaintiff's damages.

I find difficulty in accepting as compelling the contention that what is being assessed is not loss of earnings but loss of earning capacity and that this distinction makes it juristically improper to take income tax into account.  The distinction appears to me semantic.  I can conceive of no sensible method of estimating a lump sum value of loss of earning capacity which could start from a point other than an estimate of annual earnings converted to a lump sum over a number of years.  Even if the individual with respect to whom the assessment is being made is unemployed and earning nothing, a potential earning capacity will have to be estimated from past earnings, or if there are none, from the earnings of persons comparably placed.  A building or a plot of land does have an objective value apart from the income which may be derived therefrom, though where this exists it will be a factor to be taken into account in assessing its value.  Earning capacity can have no meaning except in terms of income earned.

**Gourley's** case was decided in 1956. In the argument before us no instance was cited to illustrate an anomalous situation which arose from the application of the rule.  This must mean that the difficulties foreshadowed by Lord Keith of Avonholme have not yet

materialised.

The essential nature of the process of assessment of damages in personal injuries claims should be borne in mind. It is inherently speculative. Judgments must be made in relation to the future about which there can be no evidence — only informed projections. The legal rules provide guidelines for the assessor in the exercise of judgment, but the use of somewhat differing approaches in the method of calculation **may** well lead to surprisingly similar final figures.

The approach of the majority in _Gourley_ does not appear, in my view, to be flawed in logic and appeals to practical common sense. Generally the incidence of income tax is a fact of life. Anyone in evaluating the financial terms of an offer of employment must inevitably take into account the impact of income taxation on the earnings received. Efforts will be made so to arrange benefits as to minimise the incidence of tax. To the person earning income his net receipts after tax are his realistic emoluments and those should be the basis of assessing loss of earning capacity, if the purpose of the damages is to compensate for loss and no more.

The method of calculation used in Bermuda (and the method used by the trial judge in this case) has been described by Lord **Diplock** in **Cookson** v _Knowles_ [1979] AC.556 at p.571 —

> "Quite apart from the prospects of
> future inflation, the assessment of
> damages in fatal accidents can at
> best be only rough and ready because
> of the conjectural nature of so many
> of the other assumptions upon which
> it has to be based. The
> conventional method of calculating
> it has been to apply what is found
> upon the evidence to be a sum
> representing "the dependency", a
> multiplier representing what the
> judge declared to be the appropriate
> number of years purchase. In times
> of stable currency the multipliers
> that were used by judges were
> appropriate to interest rates of 4
> percent to 5 per-cent whether the
> judges using them were conscious of
> this or not. For the reasons I have
> given I adhere to the opinion Lord
> Pearson and I had previously
> expressed which was applied by the
> Court of Appeal in Young v Percival
> [1975] 1WLR.27- 29, that the
> likelihood of continuing inflation
> after the date of trial should not
> affect either the figure for the
> dependency or the multiplier used.
> Inflation is taken care of in a
> rough and ready way by the higher
> rates of interest obtainable as one
> of the consequences of it and no
> other practical basis of calculation
> has been suggested that is capable
> of dealing with so conjectural a
> factor with greater precision."

This passage was cited by Lord Oliver in Hodgson v Trapp [1989]

A.C. 807 to emphasise the "conjectural nature of the exercise"

which necessarily rendered "the computation at best rough and

ready." It was not to be expected that the process would be or

could be "precise or entirely logical" - p.828.


This lack of precision and dearth of logic were used to base

the rejection of the argument that where a large award was made and interest on the invested amount could be expected to attract income tax at a significant rate then, applying the ~~Gourley~~ principle in reverse, the multiplier should be increased to offset the effect of tax. Lord Oliver agreed at p.828 -

> "that it may fairly be said that the tax paying plaintiff suffers tax twice, first by having the notional tax deducted from his earnings for the purpose of computing the award and then again by suffering the actual tax which is deducted from the income earned by the award."

To pursue this course would in his Lordship's view be

> "a further illustration of the complications and difficulties which arise if one seeks to take account, as if the computation were an exact science, of individual factors which are themselves imponderable."

Their Lordships held that there was no need to apply ~~Gourley~~ in reverse. The use of the **"Diplock** approach" which required the multiplier to be based on low interest rates generally obtaining in periods of stable money and low inflation would compensate for the reduction of the income earned on the lump sum by reason of tax. It served to take into account both inflation and tax.

While the approach may be **criticised** for lack of logic, it is by no means devoid of practical sense. In arriving at an estimate of reduction of income by reason of tax, there will be evidence

14

available once the parties wish to present it, on which to reach a sensible estimate of the existing net income. Any attempt, however, to calculate the tax burden over a period of 11-12 years - a not infrequent multiplier - could only be conjectural.

Whatever its imperfections, the **"Diplock** approach" has been consistently applied in Bermuda in assessing damages. It was the view of Lord Oliver that that approach had "been found over the years to produce a substantially just result." By this I understand a result which over a broad range has been accepted as satisfactory compensation by litigants. I would not, therefore, seek to tinker with it on the basis of lack of elegance or logic.

In rejecting <u>Gourlev</u> the trial judge placed much emphasis on the fact that Bermuda had no income tax and was proud that this was so. The Courts of Bermuda should not, therefore, enmesh themselves in the income tax laws of foreign countries when Bermuda itself had no tax.

The argument is attractive but, in my view, not persuasive. As far as Bermudian plaintiffs are concerned the application of the <u>Gourlev</u> principle would have no effect. There is no income tax here. It will have effect on plaintiffs who sue for injuries suffered here and who come from jurisdictions in which income tax is payable. Evidence of what the tax payable would be would have to be proved in each case. Where no evidence is led, no tax will

15

be deducted as in <u>Russell</u> v <u>Van Galen</u>. In some cases no doubt there will be agreement - as was the case on the hearing of this appeal. I would not think that the possible lengthening of the hearing process in some cases could be a proper basis for rejecting the rule in <u>Gourley</u> based as it is on the overriding principle that damages are purely compensatory.

I am grateful for the thorough comparative analysis undertaken by Mr. Ashworth. It was useful and instructive. I do not think I should increase the length of the judgment by reviewing what has been done elsewhere. The fundamental arguments remain unchanged and it is necessary only to consider them and to reach a conclusion.

In the result I would hold that while this Court would not be bound to follow the decision in <u>British Transport Commission</u> v <u>Gourley</u> I see no compelling reason in the Bermuda situation why it should not do so. The principle should have been applied by the trial judge in this case leading to a reduction in the actual loss of earnings by 25% and in the future loss of earnings by a like percentage - the agreed tax deduction.

The parties have submitted agreed figures setting out the consequence of these changes.

I would allow the appeal and substitute for the award of

16

damages made by the trial judge under the heads of loss of earnings'
and loss of future earnings the amounts submitted by the parties as
the correct amounts if the rule in <u>Gourley</u> **is applied.**

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO. 23 of 1992

| | |
|---|---|
| LANCE MURRAY CROCKWELL | Appellant |
| and | |
| THERESA E. HALEY<br>THOMAS F. HALEY | Respondents |

<u>JUDGMENT</u>

Henry J.A.

On August 20, 1985 while on a visit to Bermuda the First Respondent was injured by a motor cycle ridden by the Appellant. Judgment was entered for her on December 3, 1990 with damages to be assessed, and on October 2, 1992 the learned trial judge entered judgment for the Second Respondent also and proceeded to assess damages for both. He assessed those damages in respect of the First Respondent at $651,990.14 and in respect of the Second Respondent at $500. This is an appeal against the assessment in respect of the First Respondent

Two grounds of appeal were argued. The substance of those grounds is that the learned trial judge in assessing damages for the loss of past and prospective earnings erred by failing to take into account the liability of the First Respondent to pay income tax on those earnings. This, it was submitted, ought to have been done in the light of the decision of the House of Lords in <u>British Transport Commission V. Gourley</u> (1956) A.C. 185.

One of the blessings of Bermuda is that the legislature has not so far found it necessary to introduce legislation providing for the-imposition of income tax. The courts in Bermuda have not therefore been called upon to deal with the esoteric principles of that branch of the law. Those principles would not arise for consideration in the assessment of damages for a Bermudian plaintiff even if what is referred to as the rule in Gourley's case is applied in Bermuda. It seems to me therefore that this appeal turns on whether the courts in Bermuda are bound by the decision in that case. The decisions on the matter are by no means clear.

*190*

In <u>Robins v. National Trust Co. Ltd.</u> (1927) A.C. 515 at
519 Viscount Dunedin in giving the advice of the Privy Council
stated:

> "...when an appellate Court in a colony which
> is regulated by English law differs from an
> appellate Court in England, it is not right
> to assume that the Colonial Court is wrong.
> It is otherwise if the authority in England
> is that of the House of Lords.   That is the
> supreme tribunal to settle English law, and
> that being settled, the Colonial Court, which
> is bound by English law, is bound to follow it."

A somewhat less positive statement was made by Lord
Diplock in <u>DeLasala v. DeLasala</u> (1980) A.C. 546 when at p.558A
he said:

> "...a decision of the House of Lords on a matter
> which in Hong Kong is governed by the common law
> by virtue of the Application of English Law Ordinance
> is not upso facto binding upon a Hnog Kong court
> although its persuasive authority must be very great,
> since the Judicial Committee of the Privy Council,
> whose decisions on appeals from Hong Kong <u>are</u>
> binding on all Hong Kong courts, shares with the
> Appellate Committee of the House of Lords a common
> membership."

Lord Diplock then went on to say:

> "The Board is unlikely to diverge from a decision
> which its members have reached in their alternative
> capacity, unless the decision is in a field of law
> in which the circumstances of the colony or its
> inhabitants make it inappropriate that the common
> law in that field should have developed on the
> same lines in Hong Kong as in England."

This latter concept would appear to have influenced the
decision of the Privy Council in <u>Hart v. O'Connor</u> (1985) A.C.
1000 when in overruling a decision of the New Zealand Court of
Appeal Their Lordships observed that they would have taken a
different view if that court's decision had been based on
"considerations peculiar to New Zealand".

In the light of the several authorities I have concluded
that decisions of the House of Lords while highly persuasive
are not absolutely binding on this court, particularly where
circumstances or considerations peculiar to Bermuda make it
inappropriate for the courts in Bermuda to follow those
decisions.    Accordingly in the present case in circumstances
where no income tax is payable in Bermuda it is my respectful
view that the decision in Gourley's case which requires income

tax to be taken into account in assessing damages for loss of earnings is not binding in Bermuda.

Counsel for the Appellant also submitted that the courts in Bermuda have adopted English law in following the multiplier and multiplicand method of assessment developed by Lord Diplock in **Cookson** v. Knowles (1979) A.C. 556; that method took into account the liability to income tax and the courts in Bermuda ought not to adopt a part only of English law in this regard. It seems to me that the answer to this submission is that the English courts use this method of assessment irrespective of whether the plaintiff is subject to English income tax laws or to some other income tax law or indeed, as would be the case of a Bermudian plaintiff injured in England, to no income tax law at all.

In Russell v. van **Galen** (1985) 36 W.I.R. 144 at 180 I observed:

> "[Gourley's] case has been followed in New Zealand but not in Canada where in R v. Jennings (1966) 57 D.L.R (2nd) 644, the Supreme Court of Canada agreed with the dissenting opinion of Lord Keith in Gourley's case. In his dissenting opinion Lord Keith pointed to the anomalies, difficulties and complications arising from the application of the principle approved by the majority. He also pointed out that in Britain income tax was an annual tax imposed by Parliament and that 'to assess damages de futuro on the basis of existing taxation savours of legislation by the judiciary'. In his judgment in the Jennings case Judson J. also pointed to the difficulties arising from the application of the principle. He also expressed the view that income tax is not an element of cost in earning income but a disposition of a portion of earned income required by law. In his view, if the State did not elect to demand payment of tax on damages awarded, the courts should not transfer this benefit to the defendant. I am inclined to agree with the views expressed by Lord Keith-and by Judson J. In my opinion the rule in Gourley's case ought not to be applied in Bermuda."

I remain of the same view. I would dismiss the appeal.

Dated the 29th June, 1993



**Tab 3**

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL No.1 of 1977

GEORGE C. T. REMINGTON  Appellant

v

CLIFFORD G. REMINGTON  Respondent

DECISION

By a Writ of Summons dated 17th May 1972 the appellant sought $ 332,804.35 from the respondent in respect of a judgment debt obtained in the State of Pennsylvania.

An appearance to this Writ was entered on 23rd May 1972. Therafter there was delay, apparently whilst awaiting the outcome of proceedings in the United States of America.

By a summons dated the 7th October 1976 the respondent sought:-

(1) that the Writ of Summons and subsequent proceedings be set aside because the subject matter was not within the jurisdiction of the court, as the Defendant was not domiciled or ordinarily resident within the jurisdiction and the action was not founded on a breach of a contract within the jurisdiction or of a contract to be performed within the jurisdiction; and/or

(2) that the writ be struck out as disclosing no reasonable course of action and

(3) that the action be dismissed.

On the 29th November 1976 the learned Puisne Judge dismissed the action because he thought it was brought:-

"not bona fide for the purpose of obtaining justice,
but for the purpose of harrassing and annoying the
(respondent); not for the purpose of obtaining
some advantage which a trial in this country will
give the (appellant) but for purposes entirely
foreign to that legitimate purpose".

By a Notice of Appeal dated the 10th January 1977 the
appellant sought to reverse or set aside that decision but the
respondent has taken a preliminary objection that since the
order of the 29th November 1976 was an interlocutory order leave
to appeal was necessary and none was obtained and that the Notice
was in any event filed out of time.

In a closely knit argument supporting this objection,
Mrs. Kemp, counsel for the respondent, deployed an array of
English cases indicating that the distinction between a final and
an interlocutory order has for long exercised the courts in
England and has been the subject of much controversy; indeed to
such an extent that, in the recent case of Salter Rex and Co. v.
Ghosh (1971) 2 Q.B. p.599, Lord Denning, Master of the Rolls, said
that "Most orders have now been the subject of decision".

There were, in England, at least two conflicting schools
of thought, one of which held that the test was the nature of the
application to the court and not the nature of the order
eventually made whilst the other said that the test was the
nature of the order as made. The former school, which maintained
that an application was interlocutory unless it was of such a
nature that irrespective of which side was successful the order
made on it would finally determine the proceedings in the lower
court, was exemplified by the decisions in Standard Discount
Company v. La Grange (1877) 3 C.P.D. 67 and Salaman v. Warner
(1891) 1 Q.B. 734. The leading case on the other side was

Bozson v. Altrincham Urban District Council (1903) 1 K.B. 547, where Lord Alverstone C.J. said that "...the test is whether the judgment or order as made finally disposed of the rights of the parties".

Mrs. Kemp submitted that the English courts had now, in the Salter Rex case, finally come down in favour of the Salaman v Warner test.

In the judgment, with which the other members of the Court of Appeal agreed, Lord Denning M.R. said that "Lord Alverstone was right in logic, but Lord Esher was right in experience" and that "Lord Esher's test had always been applied in practice" in the English courts. The authors of the 1976 English Annual Practice in their Note No.59/4/2 query the latter statement and, indeed, had gone so far as to say on p.853 that the other was the "preferred view". Moreover Lord Denning may have resiled, in some measure, from his own pronouncement when he went on to say:-

> "This question of "final" or "interlocutory" is so uncertain that the only thing for practitioners to do is to look up the practice books and see what has been decided on the point".

This may not always be easy for those practising outside London, which led us to seek from counsel further argument as to whether, if, having regard to these uncertainties, we came to the conclusion that the Bozson test was more logical, easier to operate and less likely to cause mistakes, it would be open to this court to take a view differing from that of the English court of Appeal in the Salter Rex case and to hold that, for the purpose of appeals to the Court of Appeal in Bermuda, the Bozson test should be followed.

In response to that challenge counsel produced a formidable array of authority to indicate that this court should follow Salter Rex and should apply in Bermuda the principles which that case prescribed for the courts in England, with the result, she said, that, both on principle and by reference to specific cases, this court would be led inevitably to find that the decision in the present case was an interlocutory order and that, consequently, the present application by the appellant was both out of time and misconceived.

She took us first to section 13 of the Bermuda Supreme Court Act 1905 which prescribes that, subject to local legislation, the common law, the Doctrines of Equity and the Acts of Parliament of England of general application which were in force in England on the 11th day of July 1612 shall be enforced within Bermuda. As exemplifying the close adherence to English practice and procedure, she directed attention to O.2 R.35 of the Court of Appeal Rules which prescribed that where no other provisions were made the English practice would apply and to Rule 3 (Interpretation) of the Rules of the Supreme Court 1952 which adopted en masse the Appendices to the Rules of the Supreme Court of Judicature in England as set out in Vol. 2 of the Annual Practice 1949.

The intention to tie us closely to the practice and procedure of the English courts was, she said, not only manifest but entirely desirable as it was only in this way that practitioners could benefit from the guidance available in that great body of precedent readily accessible and adequately indexed which was produced in England. Any departure from it would be, she said, most dangerous as it would create grave uncertainty in

Bermuda where there were no text books dealing with local practice and no ready means of ascertaining what precisely had been done in previous cases.

Having drawn attention to the close similarity of the provisions for appeal against final and interlocutory orders in Bermuda (s.12 of the Court of Appeal Act 1964) and in England (S.32(1)(i) of the Supreme Court of Judicature Act 1925) she referred to a number of cases unearthed from the archives of the Bermuda Supreme Court and Court of Appeal (including Appeals Nos. 5/66, 4/68, 10/69 and Supreme Court judgments Nos.4/40 and 16/77), where the judges in Bermuda had virtually treated English decisions as being directly applicable or at least highly persuasive.

The matter was indeed, she said, almost put beyond argument by the decision of the Privy Council in Trimble v. Hill (1879-80) 5 A.C. 342; an appeal from the Supreme Court of New South Wales in which that Court had under consideration an Act of the Colony in terms identical with an Imperial Act but declined to follow a decision of the English Court of Appeal on the meaning of the latter.

The Privy Council said:-

> "Their Lordships think the Court in the Colony might well have taken this decision as an authoritative construction of the statutes. It is the judgment of the Court of Appeal, by which all the Courts in England are bound, until a contrary determination has been arrived at by the House of Lords. Their Lordships think that in colonies where a like enactment has been passed by the legislature, the Colonial Courts should also govern themselves by it ..........
> .................in their view it is of the utmost importance that in all parts of the Empire where English law prevails, the interpretation of that law by the Courts should be as nearly as possible the same".

This decision was considered in the later case of Hunt v. Tripp (1898) 1 CH. 675, 679, where Byrne J. had before him factual evidence as to the law of Victoria. The evidence was given by an advocate from a neighbouring state who was also an expert in the law of Victoria. It said that although decisions of the English Courts were not in the strict sense binding on the courts of Victoria they were regarded with the "greatest respect".

Byrne J. went on to say that Trimble v. Hall "applied" which must raise some question whether he gave sufficient weight to the distinction between a question of law and a question of fact.

More recently, however, in the case of Medarajan Chattiar v. Walauwa Mahatmee (1950) A.C. 481, 492, on an appeal from Ceylon, the Privy Council gave a qualified approval to the passage from Trimble when they said:-

> "This in their Lordships view is a sound rule, though there may be in any particular case local conditions which make inappropriate."

The context implies that in the latter event the Privy Council would not necessarily expect the English court's interpretation to be followed and to this extent modified the earlier statement.

Mrs. Kemp also referred at this point in her argument to Egerton v. Shirley 1945, 1 K.B. 107, although at a later stage she was disposed to regard it as providing a 3rd and possibly fairer form of test. In it the English Court of Appeal was concerned with a stay imposed by Emergency legislation where a plaintiff was given leave under Order 14 to sign a final judgment for possession of land and, inter alia, mesne profits. They held that a

subsequent order          removing the stay was interlocutory and
in doing so referred to Blakey v. Fulham 43 Ch. B. 23, 25 where
Cotton L.J. said:-

> "Any order, in my opinion, which does not deal with
> the final rights of the parties, but merely
> directs how the declarations of right already
> given in the final judgment are to be worked out
> is interlocutory......"

As examples of orders being treated as interlocutory when
they dismissed actions after statements of claim had been struck
out as being frivolous and vexatious or disclosed no reasonable
cause of action, Mrs. Kemp referred us to In re Page, Hill v.
Fladgate 1910 1 Ch. 489, and Hunt v. Allied Bakeries Ltd. 1956
3 A.E.R. 513, Stewart v. Royds 118 L.T. Jour. 176 where the
dismissal was for failure to provide security for costs was also
mentioned.

Mr. Cox, on the other side, maintained that the order was
a final order, which on the face of it disposed of the claim by
dismissing it, thus finally resolving the rights of the parties.

Relying on paragraphs 1606 and 1609 of Halsbury's Laws
of England (3rd Ed. Vol.22) and the cases there mentioned, more
particularly those in Note (a) to the former, he submitted that
an order could be final for one purpose and interlocutory for
another; that it was open to this court to decide whether the
order was final or interlocutory but that the appeal could be
entertained and determined without necessarily deciding whether
the order was one or the other.

He went on to refer to the note from the 21st/edition of
(1975)
Odgers Pleading and Practice (p.328) which reads:-

"The decisions as to whether any given order is interlocutory or final are numerous and conflicting. The test sometimes applied is whether the application is of such a nature that whatever order is made thereon it must finally dispose of the matter in dispute; another test is whether the order as made finally disposes of the rights of the parties (See Egerton v. Shirley (1943) 1 K.B. 107)......... The 'application' test was preferred by the Court of Appeal in Salter Rex v. Ghosh (1971) 2 Q.B. 597".

From this and the note (a) in Halsbury already mentioned, which said that four different tests had been propounded, he deduced that the English decisions led to no settled view of authority but disclosed a certain disarray. In any event, he submitted, Bermuda's geographical position as a small island with much legal work for overseas clients presented those local considerations which would justify a departure from the view expressed in Salter Rex so as to avoid any injustice to his client.

He also relied on the Court's power under O.3 R.5 to depart from the rules when justice so required.

Turning first to the question whether the decision in Salter Rex binds this court one must, I think, treat with a measure of caution the dictum from Trimble. Quite apart from the question whether developments since 1879 have so altered the situation as to necessitate or justify a different approach, since it is an obiter dictum in a case dealing not with the law of Bermuda but the law of New South Wales it is, strictly speaking, not binding on this court.

Moreover, the reference to English law "previously" makes one wonder whether sight had been lost of the distinction between those areas or matters in respect of which English law was directly

applicable and instances where another legislature had merely
enacted legislation in the same terms as an English statute.

Many overseas legislatures have followed English
precedents in their enactments but it could hardly have been
practical to expect conformity of interpretation and application
in each territory over that large field of litigation which
remained untrodden by the Privy Council.

In any event, although the language might be identical,
regard would, presumably, still have to be paid to the context
and background of the individual enactments including, inter alia,
the historical setting and the mischief to be cured.   Room for
these considerations might no doubt,be found in determining what
is and what is not a "like enactment" but in Chelliar the need
for some qualification of the earlier broad language was clearly
recognised and the evidence in Hunt v. Tripp does not indicate
that in the neighbouring colony of Victoria the dictum in Trimble
had been accorded the finality which Mrs. Kemp was disposed to
ascribe to it.

A penetrating and helpful analysis of this whole question
appears at p.566 et seq of Commonwealth and Colonial Law by Sir
Kenneth Roberts-Wray where he refers to Robins v. National Trust
Co. 1927 A.C. 515, 519 as indicating a change of attitude in the
Privy Council between 1879 and 1927.   In that case, Lord Dunedin,
delivering the judgment of the Board said:-

> "When an appellate court in a colony which is regulated
> by English law differs from an appelate court in England,
> it is not right to assume that the colonial court is
> wrong. It is otherwise if the authority in England is
> that of the House of Lords.   That is the supreme
> tribunal to settle English law, and that being settled,
> the colonial court, which is bound by English law, is
> bound to follow it".

This pronouncement appears on the face of it to be directed to instances where English law is directly applicable but if, in such a field, the colonial courts enjoy in their own territory no lesser status than English courts their capacity when interpreting their own colonial law can certainly be no less.

Nevertheless whilst recognising that, apart from the Privy Council, the English courts are normally no part of the judicial hierarchy in an overseas territory, I have little doubt that this and any court similarly placed would pay great respect to the English Court of Appeal's construction of a statute and seek to benefit from the guidance thus provided. In the absence of cogent reasons to the contrary the tendency would, I think, almost certainly be to follow the English decision, particularly in matters where English law or practice is applicable, such as those mentioned in O.2 R.28 and R.35.

Moreover, practical convenience and expediency lends much weight to Mrs. Kemp's submission that by adhering as closely as circumstances permit to the patterns traced by the English courts in matters such as this we have the advantage of being able to use their text books and experience and thus attaining a greater measure of certainty and uniformity in the application of the law than would be possible if we pursue a course of our own, since we cannot hope to cover anything like an equivalent area with the authoritative guidance of decided cases.

Consequently due regard should, I think be paid to Salter Rex, but, even if the latest, I doubt if it can as yet be regarded as the last word on the subject in England. It was an ex tempore

173

judgment
/that may have owed something to the measure of misapprehension already mentioned. It has indeed been suggested that whichever test was applied in it the result of the case, where the defendant was seeking a re-trial, would have been the same (See note in No. 59/4/2 in the 1976 Annual Practice ), which would remove into the realm of obiter dictum the broader statements in it, already qualified perhaps to some extent by the reference of Lord Denning to the practice books, which appears open to more than one interpretation

In the earlier case of Page (supra) Cozens-Hardy M.R. said he would not attempt to formulate a general test as to what was an interlocutory order. Buckley L.J. said, in the same case, that the decisions were so conflicting he was unable to arrive at a conclusion satisfactory to his own mind and merely deferred to the views of his colleagues.

The doubts of Buckley L.J. were substantially endorsed by Evershed M.R. in the later case of Hunt (supra p.514) and whilst Salter Rex seems to swing the balance of authority more decisively towards the Salamon Warner test it can probably be put no higher that the latest and strongest of the group of cases which would make that test the normal rule.

In Hunt, however, the Master of the Rolls went on to say that after considerable research and consultation with his colleagues he was satisfied that:-

> "rightly or wrongly, orders dismissing actions — either because they are frivolous and vexatious, or on the ground of disclosure of no reasonable cause of action — have for a very long time been treated as interlocutary"

It seems that the order in the present case falls into that category and that it would be right to follow Hunt's case and treat it as interlocutory. In so doing we would have the support of the very cogent reasons advanced by Cozens-Hardy M.R. in the Page case (supra at p.493) when he said:-

> "It is, on public grounds and on grounds of good sense, a matter of extreme importance that an appeal from an order dismissing an action as being frivolous and vexatious should be disposed of by the Court of Appeal, if disposed of at all, in the shortest possible time, and if there was no authority to assist us I should be disposed to come to the conclusion that an order of this kind ought to be treated as an interlocutory order"

On reflection I think, quite apart from authority, these considerations outweigh Mr. Cox's argument, with which initially I felt much sympathy, that mistakes are less likely if orders which appear on their face to be final are treated as such.

Consequently, I would hold that the order of the 29th November 1976 was an interlocutory order and would dismiss the appeal with costs because the Notice of Appeal filed on the 10th January 1977 did not comply with the Rules of Court.

............................

MICHAEL HOGAN, P.

*Judgment delivered on 30th Nov. 1977.*

delivered
35/11 '77

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO: 1 of 1977

Between

GEORGE C.T. REMINGTON       Appellant

and

CLIFFORD G. REMINGTON       Respondent

- - - - - - - - - - - - - - - - - - - -

## J U D G M E N T

On 28th April 1972, in the Court of Common Pleas, Montgomery, Pennsylvania, the appellant entered judgment by default for $U.S.361,325.68 against the respondent, who is his son.

On 17th May 1972, the appellant instituted proceedings in Bermuda (action no. 95 of 1972) for the recovery of B$ 332,804.35 being the equivalent in Bermuda currency of U.S.$ 361,325.68, the alleged cause of action being the judgment debt arising from the default judgment of the Pennsylvania court. The writ in action no. 95 was served on the respondent in Bermuda on 19th May 1972; and, on 23rd May 1972, he entered an unconditional appearance.

In July 1972, the parties agreed to take no further steps in the Bermuda action pending the outcome of the respondent's appeal against the Pennsylvania judgment. That appeal having been dismissed by the United States appellate court, on 25th August 1976 the appellant gave notice of his intention to proceed with the Bermuda action; whereupon the respondent made an application, founded on the inherent jurisdiction of the Court and O.25 r.4, for an order that

(1) the writ and all subsequent proceedings be set aside on the ground that the subject matter of the action is not within the jurisdiction of the Court;

176

(2) the writ be struck out as disclosing no cause
of action;  and
(3) the action be dismissed.

In support of his application, the respondent filed
an affidavit from which it appears that he and the appellant
are citizens of, and domiciled in, the United States of
America, having lived there during the whole of their lives;
that during his entire lifetime, he (the respondent) has
visited Bermuda on only three occasions for a few days on
each occasion, the last occasion being from 16th to 19th
May 1972;  that he does not, nor has he ever, possessed any
assets in Bermuda, and that he has never owned, or had any
interest in, any place of business in these Islands.

It also appears from the respondent's affidavit
that the appellant's claim in the Pennsylvania action was
for money allegedly lent by the appellant to the respondent;
that the respondent's defence to the claim was that the
appellant gave him the money as a gift;  that the alleged
cause of action arose in the United States;  and that the
Pennsylvania action has proceeded as far as legally possible
in the United States.

The appellant did not file an affidavit in opposition;
and although his counsel stated from the Bar that he had been
instructed that the Pennsylvania judgment had not been
satisfied, this was not verified by the appellant on oath.

Having considered the decision in Egbert v Short [1]
and In re Norton's Settlement [2] on 29th November 1976 the
learned judge ordered that action no. 95 of 1972 be dismissed.
This is an appeal against that decision.

The respondent took a preliminary objection to the
appeal being heard on the ground that the learned judge's
decision was in respect of an interlocutory matter and that
the procedure prescribed by Order 2 rr. 2, 3 and 36 of the

(1) [1907] 2 Ch. 205
(2) [1908] 1 Ch. 471

Rules of the Court of Appeal for Bermuda had not been followed.

Section 12(2) of the Court of Appeal Act 1964

provides that

>"(2) No appeal shall lie to the Court of Appeal -
>>(a) against the decision in respect of
>>any interlocutory matter..........
>>except with leave of the Supreme
>>Court or of the Court of Appeal".

Order 2, rule 3(1), so far as relevant, reads:-

>"Where an appeal lies only by leave of the Court
>or of the Supreme Court, any application to
>either Court shall be made by notice of motion
>ex parte in the first instance and the following
>provisions shall apply:
>>(a) where the application is made to the
>>Supreme Court, the notice of motion
>>shall be filed.........not later
>>than fourteen days after the date of
>>the decision of the Supreme Court;
>>(b) if the application is refused by the
>>Supreme Court and the intending
>>appellant desires to apply to the
>>Court for leave to appeal, he shall
>>file his notice of motion with the
>>Registrar not later than seven days
>>after such refusal;.........."

Order 2, rule 36 provides that

>"Whenever an application may be made either to
>the Supreme Court or to the Court, it shall be
>made in the first instance to the Supreme Court
>but, if the Supreme Court refuses the application,
>the applicant shall be entitled to have the
>application determined by the Court."

Order 2, rule 2 provides that appeals shall be brought by

notice of appeal filed within the following periods:-

>"(a) in the case of an appeal from an interlocutory
>order, seven days from the date on which
>leave to appeal is granted;  and
>(b) in any other case, six weeks calculated from
>the date on which the judgment or order
>appealed against was signed, entered, or
>otherwise perfected."

Finally, Order 1 rule 5 provides as follows:-

>"The Court may enlarge the time provided by these
>Rules for the doing of anything to which these
>Rules apply, or may direct a departure from these
>Rules in any other way when this is required in
>the interests of justice."

The appellant filed his notice of appeal on 10th

January 1977 - exactly six weeks after the judge gave his
decision;  and it is common ground that if the decision was
in respect of an interlocutory matter, the notice was filed
out of time and without leave.

The question whether a judgment, order or other
decision is final or interlocutory has been considered on
many occasions by the English court, and, over the years,
various tests for ascertaining the finality of a judgment
or order have been suggested.  In those cases which came
before the  Courts in the latter decades of the 19th century,
the question frequently turned upon the construction  which
the Court put upon the then Order 58 r.15 which provided that

> "no appeal from any interlocutory order shall,
> except by special leave of the Court of Appeal,
> be brought after the expiration of 21 days, and
> no other appeal shall, except by such leave, be
> brought after the expiration of one year."

Those periods were subsequently reduced to 14 days and 6 weeks
respectively;  but in the days when a litigant could appeal
from a final order at any time up to one year, it was import-
ant that the Courts should not treat as final an order which
was truly interlocutory in character, otherwise litigation
would tend to become unduly protracted.

The first decision of the English Court of Appeal
to which we were referred was Salaman v Warner [3].  In that
case the defendants raised a point of law that the statement
of claim did not disclose any cause of action.  It was ordered
that the point be argued and disposed of before trial.  The
Divisional Court, after argument, ordered, under O.25 r.3,
that the action should be dismissed.

On appeal, the question whether this order was
final or interlocutory was discussed; and the Court of Appeal

(3) [1891] 1 Q.B. 734

held that the order was interlocutory, not final. Lord

Esher M.R. said (p 735):-

> "Taking into consideration all the consequences
> that would arise from deciding in one way or the
> other respectively, I think the better conclusion
> is that the definition which I gave in Standard
> Discount Co. v La Grange [4] is the right test for
> determining whether an order for the purpose of
> giving notice of appeal under the rules is final
> or not. The question must depend on what would
> be the result of the decision of the Divisional
> Court, assuming it to be given in favour of either
> of the parties. If their decision, whichever
> way it is given, will, if it stands, finally
> dispose of the matter in dispute, I think that
> for the purposes of these rules it is final.
> On the other hand, if their decision, if given
> in one way, will finally dispose of the matter
> in dispute, but, if given in the other, will
> allow the action to go on, then I think it is
> not final, but interlocutory."

Lord Esher then proceeded to analyse the consequences of

taking the opposite view in these words:-

> "....take the case where an order is made staying
> or dismissing an action as frivolous or vexatious;
> if that is a final order, the period during which
> an appeal may be brought is a year. In this case
> the Divisional Court allowed what is really
> equivalent to a demurrer to the statement of
> claim, and, as long as that decision stands, it
> is no doubt final in one sense; but, if they
> had disallowed the point taken, then the action
> must have gone to trial. If in such a case the
> order were final, there would be a year to appeal
> in, and the case might have to go on after that
> lapse of time........."

Twelve years later, Bozson v Altrincham Urban District Council [5]

came before the Court of Appeal. The action was for damages

for breach of contract. A judge in chambers made the follow-

ing order: "Questions of liability and breach of contract

only to be tried. Rest of case (if any) to go to official

Referee". Wills J. held that there was no binding contract;

and on 6th March 1902, he made an order dismissing the action.

The plaintiff gave notice of appeal on 3rd May 1902;

(4) [1877] 3 C.P.D. at p 71
(5) [1903] 1 K.B. 547

and the defendants objected to the appeal being heard on
the ground that the order was interlocutory and that the
notice of appeal was filed out of time. Counsel relied on
Salaman v Warner. His submission reads:

> ".......the decision of Wills J. as given did in
> fact put an end to the litigation; but it would
> have been otherwise if the decision had been in
> favour of the plaintiff, because then the case
> would have had to go before the official referee.
> The order of Wills J. was therefore, according
> to the rule enunciated in Salaman v Warner, an
> interlocutory order."

Counsel however drew the court's attention to an earlier
decision (Shubrook v Tufnell[6]) which was not cited in
Salaman v Warner and which, counsel said, appeared to be
in conflict with it. Lord Halsbury L.C. gave no reasons
for the view he expressed. He simply said:

> "......I prefer to follow the earlier decision".
> (i.e. Shubrook) "I think the order appealed from
> was a final order......."

Lord Alverstone C.J. agreed; but he suggested a test for
ascertaining the finality, or otherwise, of a judgment or
order which differs from the test formulated by Lord Esher
in Salaman v Warner. He said:

> "It seems to me that the real test for determining
> this question ought to be this: Does the judgment
> or order, as made, finally dispose of the rights
> of the parties? If it does, then I think it
> ought to be treated as a final order; but if it
> does not, it is then, in my opinion, an inter-
> locutory order".

In other words, in Bozson the Court of Appeal said that the
test was the nature of the order as made, and not the nature
of the application to the court.

As Lord Halsbury said that he preferred to follow
Shubrook, it is of interest to see what that case actually
did decide because, as Swinfen Eady L.J. said in Isaacs and
Sons v Solbstein[7], the decision in Shubrook appears to be
difficult to reconcile with the decision in Bozson.

(6) [1882] 9 Q.B.D. 621
(7) [1916] 2 KB at 147

<u>Shubrook v Tufnell</u>[6] was an action by a lessee of two houses against a lessor to recover damages for structural damage caused by the defendant's making a drain through adjoining land. The action was referred to arbitration; and, under the order of reference, the arbitrator, if requested by either party, was required to state a case for the opinion of the Court before giving his final award. The arbitrator stated a case in which he sought the opinion of the Court on a question of law. The case stated provided that if the opinion of the Court should be in the affirmative, the matter should be referred back to the arbitrator; but if the Court's opinion should be in the negative, then judgment should be entered for the defendant. In other words, if the Court answered the question of law in favour of the defendant, that would be the end of the action; but if the Court answered the question in favour of the plaintiff, the case would proceed before the arbitrator.

The Court answered the question in the affirmative i.e. in favour of the plaintiff, and ordered that the case be referred back to the arbitrator.

On appeal, the plaintiff submitted that the order was interlocutory. The Court of Appeal held that the order was final. Jessel M.R. said:

> ".........if we differ from the court below, final
> judgment has to be entered for the defendant and
> there is an end of the action. I am of the opinion
> that this is to be treated as a final order....."

The decision in <u>Shubrook</u> was reviewed in the <u>Isaacs</u> case. Swinfen Eady L.J. said (p 147) that the effect of the decision was that

> ".....if the result of the order appealed from would
> be a final judgment for either party, it is a final
> order."

and Pickford L.J. said (p 148):-

> "It was decided in Shubrook v Tufnell that if
> the decision of the Court of Appeal was a final
> decision, it made the order under appeal a final
> order. But Salaman v Warner decided that it was
> only final if it put an end to the litigation
> whichever way it was decided. In (Bozson) the
> Court of Appeal declined to follow (Salaman) and
> said they preferred (Shubrook), but although Lord
> Halsbury L.C. said he preferred it I do not think
> he altogether followed it. He followed it in so
> far as to say that (Salaman) was not right in
> saying that an order was final if it would, which-
> ever side won, finally determine the litigation."

The Court in the Isaacs case preferred the test

formulated by Lord Alverstone in the Bozson case. Swinfen

Eady L.J. said (p 147) that it "puts the matter on the true

foundation that what must be looked at is the order under

appeal".

In Re Page, Hill v Fladgate[8], the Court of first

instance ordered that the statement of claim should be struck

out and that the action should be dismissed as being frivolous

and vexatious (O.25 r.4). The appeal was out of time if the

order appealed from was an interlocutory order within the

meaning of O.58 r. 15. The Court of Appeal held that the

order was an interlocutory order.

Although Bozson and Salaman v Warner were cited

in argument by counsel, those decisions were not referred

to by any member of the Court. Indeed, Cozens-Hardy M.R.

made it clear that he would not attempt to formulate, or

follow, any general test as to finality, or otherwise, of

interlocutory orders in general. He began by saying:-

> "I have no intention of attempting the task of
> defining exhaustively or accurately the meaning
> of an interlocutory order. I leave that to others.
> The only point we have to decide here is whether
> the order in this particular case is an order
> which must be appealed against within the time
> limited for appeals from interlocutory orders......
> In my opinion this is an interlocutory order for
> the purpose of appeal.........it has been the
> practice to treat these appeals as interlocutory
> appeals."

(8) [1910] 1 Ch. 489

And, after reviewing the decisions in <u>Price v Phillips</u>[9],
<u>Stewart v Royds</u>[10] and <u>Hind v Marquis of Hartington</u>[11],
Cozens-Hardy M.R. said:-

> "It is, on public grounds and on grounds of good
> sense, a matter of extreme importance that an
> appeal from an order dismissing an action as
> being frivolous and vexatious should be disposed
> of by the Court of Appeal, if disposed of at all,
> in the shortest possible time, and if there were
> no authority to assist us I should be disposed
> to come to the conclusion that an order of this
> kind ought to be treated as an interlocutory
> order. But......having regard to the course of
> practice, to the decision of Chitty J. in a case
> precisely like this" (<u>Price v Phillips</u>), "and
> to the strictly analogous and scarcely distinguishable
> case of <u>Stewart v Royds</u> in this Court, I agree
> with the contention of the respondents that this
> appeal is out of time and ought to be dismissed."

Fletcher Moulton L.J. said that he was of the same opinion
for the same reasons. However, Buckley L.J., was not so
confident. He said:

> "The rules are so expressed and the decisions are
> so conflicting that I confess that I am unable to
> arrive at any conclusion satisfactory to my own
> mind as to whether this is an interlocutory or
> final order. It is plain that many orders which
> prima facie are final are not final but are inter-
> locutory for the purpose of appeal.........This....
> is an order in favour of the defendants and it
> brings this action altogether to an end. To my
> mind it would be reasonable to say that this is
> a final order. But I do not think I am entitled
> to found myself on that, because there have been
> many decisions in which orders apparently final
> have been treated as interlocutory.......I am not
> prepared to differ from the view taken by the
> other members of the Court. I yield my judgment
> to theirs without saying that I am completely
> satisfied with the reasons given for the view
> that this is an interlocutory order. A decision
> to that effect is certainly the more desirable,
> because if the order is reversed the action will
> have to go on and if it is to go on it ought to
> go on at once."

Buckley L.J. concluded his judgment by expressing the hope
that the proper authority would "lay down plain rules as to
what are interlocutory orders."

(9) 11 T.L.R. 86,87
(10) 118 L.T. Journal 176
(11) 6 T.L.R. 267

So far as I am aware, the proper authorities in England have not yet attempted to "lay down plain rules as to what are interlocutory orders."

Coming to more modern times, s.31(1) of the Supreme Court of Judicature (Consolidation) Act 1925 provides that -

> "No appeal shall lie ............................
>       (i) without the leave of a judge or of the
>           Court of Appeal from any interlocutory
>           order or interlocutory judgment made or
>           given by a judge"

except in certain circumstances.  The section refers specially to orders made under Order 14.  Section 31(1)(c) provides that no appeal shall lie

> "(c) from an order of a judge giving unconditional
>      leave to defend an action".

and s.31(2) provides that

> "(2) an order refusing unconditional leave to defend
>      an action shall not be deemed to be an inter-
>      locutory order within the meaning of this
>      section."

Apart from that, the Legislature did not attempt to define the terms "final" and "interlocutory".  Instead, the job of defining, or at any rate classifying, final and interlocutory orders was left in the hands of the Court of Appeal.  Section 68(2) of the Act provides that

> "any doubt that may arise as to what orders or
> judgments are final, and what are interlocutory,
> shall be determined by the Court of Appeal."

The nature of an order made pursuant to an application under O. 25 r.4 was again the issue before the Court of Appeal in Hunt v Allied Bakeries Ltd.[12].  The subject matter of certain paragraphs in the statement of claim had been set down for hearing as a special point of law;  and, on that aspect of the case, the plaintiff succeeded.  The defendants then applied to have the remainder of the statement of claim and the prayers struck out as disclosing no cause of action.

(12) [1956] 3 AER 513

Upjohn J. made an order striking out the whole of the rest of the statement of claim and ordered that all further proceedings in the action be stayed. The Court of Appeal (Evershed. M.R., Birkett L.J., and Romer L.J.) held that, as a general rule, an order for striking out a statement of claim under O.25 r.4 was an interlocutory order.

The Court endorsed the decision in Re Page, Hill v Fladgate. Lord Evershed said (p 514):-

> "In that case, the statement of claim was struck out and the action dismissed, not in terms because it disclosed no reasonable cause of action, but because it was frivolous and vexatious......
> The plaintiff has, however, raised the point whether a distinction should be drawn between the two kinds of case. After consulting with the Chief Registrar and looking at the cases, and also after consulting with my colleagues, I am left in no doubt at all that, rightly or wrongly, orders dismissing actions - either because they are frivolous and vexatious, or on the ground of disclosure of no reasonable cause of action - have for a very long time been treated as interlocutory. In Re Page that is stated as having been the fact in 1910."

The Master of the Rolls added that in his view the judgment of Buckley L.J. is

> ".....particularly worth reading because it is plain that he felt difficulty, at any rate in the logic of the matter, since beyond a peradventure, if the order stood, it was an end altogether of the case."

Lord Evershed concluded his judgment thus:-

> "For these reasons (and this decision will now necessarily govern other cases) I hold that orders under R.S.C. Ord. 25 r.4 striking out the whole or part of a claim on the ground that it discloses no reasonable cause of action, or is frivolous and vexatious, or both, and staying all further proceedings, must be treated as interlocutory. It is possible that there may be cases............ in which the facts would be of so special a character as to create an exception to the rule. The general rule, however, is as I have stated it."

The last case cited to us was Salter Rex & Co. v Ghosh [13]. This was an appeal from the refusal of an application for a new trial. If the order made refusing a new trial was

(13) [1971] 2 Q.B. 597

interlocutory, the notice of appeal was filed out of time.

All the cases discussed in this judgment were cited to the Court of Appeal; and Denning M.R., expressed his view thus:-

> "Lord Alverstone was right in logic but Lord Esher was right in experience. Lord Esher's test has always been applied in practice. For instance, an appeal from a judgment under O.14 (even apart from the new rule) has always been regarded as interlocutory; and notice of appeal has to be lodged within 14 days."

Having referred, with apparent approval, to the decision in Hunt, the Master of the Rolls continued:-

> ".....I would apply Lord Esher's test to an order refusing a new trial. I look to the application for a new trial, and not to the order made. If the application for a new trial were granted, it would clearly be interlocutory. So equally, when it is refused, it is interlocutory. It was so held in Anglo - Auto Finance (Commercial) Ltd. v Dick(14) and we should follow it today.
> This question of 'final' or 'interlocutory' is so uncertain that the only thing for practitioners to do is to look up the practice books and see what has been decided on the point. Most orders have now been the subject of decision. If a new case should arise, we must do the best we can with it. There is no other way."

Looking at the English authorities as a whole, I do not think that Salter Rex can be regarded as the last word on the subject in England; and I do not think that this Court should attempt to formulate a test for ascertaining the finality, or otherwise, of a judgment or order. Of all the authorities to which reference has been made in this appeal, I find Hunt and Re Page most helpful. I find myself in complete agreement with what Lord Evershed said in Hunt, namely that, generally speaking

> "......... orders under (O.25 r.4) striking out the whole or part of a claim on the ground that it discloses no reasonable cause of action, or is frivolous and vexatious ........must be treated as interlocutory......"

(14) December 4th 1967 C.A.; Bar Library Transcript No. 320A

For these reasons, I agree that the order of 29th November 1976 was an interlocutory order;  and I too would dismiss this appeal with costs.

I would add that as regards the more general questions on which we were addressed, by Mrs. Kempe, I agree with the views which have just been expressed by the learned President.

.................................................
ALASTAIR BLAIR-KERR, J.A.

DATED: 30th. November, 1977.

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO: 1 of 1977

GEORGE C. REMINGTON        Appellant

and

CLIFFORD G. REMINGTON        Respondent

---

EXTRACT FROM PRESIDENT'S NOTES

---

Judgment of Hogan P. read.

Judgment of Blair-Kerr J.A. read.

President states that Telford Georges J.A. has informed him that the J.A. agrees the appeal should be dismissed and his judgment is in the post.

Appeal dismissed with costs for reasons given.


MICHAEL HOGAN, P.


DATED:     30th November 1977

**Tab 4**




**421** Percival v. Wright.

[1901 P. 1375.]

Chancery Division
Ch D
Swinfen Eady J.
1902 June 20, 21, 23.

Company--Directors--Fiduciary Position--Purchase of Shares--Negotiations for Sale of Undertaking--Obligation to Disclose.

The directors of a company are not trustees for individual shareholders, and may purchase their shares without disclosing pending negotiations for the sale of the company's undertaking.

WITNESS ACTION.

This was an action to set aside a sale of shares in a limited company, on the ground that the purchasers, being directors, ought to have informed their vendor shareholders of certain pending negotiations for the sale of the company's undertaking.

In and prior to October, 1900, the plaintiffs were the joint registered owners of 253 shares of 10l. each (with 9l. 8s. paid up) in a colliery company called Nixon's Navigation Company, Limited.

The objects of the company, as defined by the memorandum of association, included the disposal by sale of all or any of the property of the company. The board of directors were empowered to exercise all powers not declared to be exercisable by general meetings; but no sale of the company's collieries could be made without the sanction of a special resolution.

The shares of the company, which were in few hands and **422** were transferable only with the approval of the board of directors, had no market price and were not quoted on the Stock Exchange.

On October 8, 1900, the plaintiffs' solicitors wrote to the secretary of the company asking if he knew of any one disposed to purchase shares.

On October 15, 1900, in answer to the secretary's inquiry as to what price they were prepared to accept, the plaintiffs' solicitors wrote stating that the plaintiffs would be disposed to entertain offers of 12l. 5s. per share. This price was based on a valuation which the plaintiffs had obtained from independent valuers some months previously.

On October 17, 1900, the chairman of the company wrote to the plaintiffs' solicitors stating that their letter of October 15 had been handed to him, and that he would take the shares at 12l. 5s.

On October 20, 1900, the plaintiffs' solicitors having taken a fresh valuation, replied that the plaintiffs were prepared to accept 12l. 10s. per share.

On October 22, 1900, the chairman wrote accepting that offer, and stating that the shares would be divided into three lots.

On October 24, 1900, the chairman wrote stating that eighty-five shares were to be transferred to himself and eighty-four shares apiece to two other named directors.

The transfers having been approved by the board, the transaction was completed.

The plaintiffs subsequently discovered that, prior to and during their own negotiations for sale, the chairman and the board were being approached by one Holden with a view to the purchase of the entire undertaking of the company, which Holden wished to resell at a profit to a new company. Various prices were successively suggested by Holden, all of which represented considerably over 12l. 10s. per share; but no firm offer was ever made which the board could lay before the shareholders, and the negotiations ultimately proved abortive. The Court

was not in fact satisfied on the evidence that the board ever intended to sell.

**\*423** The plaintiffs brought this action against the chairman and the two other purchasing directors, asking to have the sale set aside on the ground that the defendants as directors ought to have disclosed the negotiations with Holden when treating for the purchase of the plaintiffs' shares.

*Eve, K.C.*, and *Vaughan Hawkins*, for the plaintiffs. There is no suggestion of unfair dealing or purchase at an undervalue; but the defendants as directors were in a fiduciary position towards the plaintiffs, and ought to have disclosed the negotiations for sale of the undertaking, in which case the plaintiffs would have retained their shares, on the chance of that sale going through.

The prima facie obligation of directors purchasing shares to disclose all information as to the shares is, no doubt, tacitly released as to information acquired in the ordinary course of management. The defendants, for instance, would not have been bound to disclose a large casual profit, the discovery of a new vein, or the prospect of a good dividend. But that release did not relieve them from disclosing the special information acquired during their negotiations for the sale of the entire undertaking. At the commencement of those negotiations they became trustees for sale for the benefit of the company and the shareholders, and could not purchase the interest of an ultimate beneficiary without disclosing those negotiations: Fox v. Mackreth [FN1]; Ex parte Lacey. [FN2]

FN1 (1791) 2 W. & T. 7th ed. p. 709; 2 Cox, 320; 2 Bro. C. C. 400; 4 Bro. P. C. 258; 2 R. R. 55.

FN2 (1802) 6 Ves. 625 ; 6 R. R. 9.

[SWINFEN EADY J. Assuming that directors are, in a sense, trustees for the company, are they trustees for individual shareholders?]

They are trustees both for the company and for the shareholders who are the real beneficiaries. No

question of privity can arise in the case of trusts: Lindley on Companies, 5th ed. p. 364; Buckley on Companies, 8th ed. p. 560; York and North Midland Ry. Co. v. Hudson [FN3]; Ferguson v. Wilson [FN4]; Wilson v. Lord Bury [FN5]; In re German Mining Co. [FN6]

FN3 (1853) 16 Beav. 485, 491, 496.

FN4 (1866) L. R. 2 Ch. 77, 90.

FN5 (1880) 5 Q. B. D. 518, 527.

FN6 (1853) 4 D. M. & G. 19.

**\*424** Now, "a share in a company, like a share in a partnership, is a definite proportion of the joint estate, after it has been turned into money, and applied as far as may be necessary in payment of the joint debts": Lindley on Companies, 5th ed. p. 449; Watson v. Spratley. [FN7] The undertaking of the company is, therefore, merely the sum of the shares. No doubt at law it belongs to the company, but in equity it belongs to the shareholders, and the directors as trustees for sale of the undertaking cannot purchase the interest of a beneficiary without giving him full information. In this respect the shareholders inter se are in the same position as partners, or shareholders in an unincorporated company. If managing partners employ an agent to sell their business, he cannot purchase the share of a sleeping partner without disclosing the fact of his employment. Incorporation cannot affect this broad equitable principle. It does not alter the rights of the shareholders inter se, though it affects their relations to the external world.

FN7 (1854) 10 Ex. 222.

In the present case the plaintiffs knew that the directors were managing the business, but not that they were negotiating a sale of the undertaking, and the non-disclosure of the latter fact entitles them to set aside the sale of their shares.

*Hon. E. C. Macnaghten, K.C.*, and *Mark Romer*, for the defendants. Even if the directors were trustees

for sale of the undertaking, they were not trustees for sale of the plaintiffs' shares. The suggested equity has never been applied between a director and a shareholder, although a director purchasing shares must always purchase from a shareholder. The company is a legal entity quite distinct from the shareholders: Salomon v. Salomon & Co. [FN8]; so that a sale by a mortgagee to a company in which he is a shareholder is neither in form or substance a sale to himself: Farrar v. Farrars, Limited [FN9]; and a sale by a company to a shareholder cannot be impeached on the ground that the resolution authorizing that sale was carried by the votes of that shareholder: North Western Transportation Co. v. Beatty. [FN10] The principle underlying these decisions is quite inconsistent with the plaintiffs' contention.

FN8 [1897] A. C. 22, 42, 51.

FN9 (1888) 40 Ch. D. 395.

FN10 (1887) 12 App. Cas. 589.

*Eve, K.C.*, in reply.

**\*425** SWINFEN EADY J.

The position of the directors of a company has often been considered and explained by many eminent equity judges. In Great Eastern Ry. Co. v. Turner [FN11] Lord Selborne L.C. points out the twofold position which directors fill. He says: "The directors are the mere trustees or agents of the company-- trustees of the company's money and property--agents in the transactions which they enter into on behalf of the company." In In re Forest of Dean Coal Mining Co. [FN12] Jessel M.R. says: "Again, directors are called trustees. They are no doubt trustees of assets which have come into their hands, or which are under their control, but they are not trustees of a debt due to the company. The company is the creditor, and, as I said before, they are only the managing partners." Again, in In re Lands Allotment Co. [FN13], Lindley L.J. says:

FN11 (1872) L. R. 8 Ch. 149, 152.

FN12 (1878) 10 Ch. D. 450, 453.

FN13 [1894] 1 Ch. 616, 631.

"Although directors are not properly speaking trustees, yet they have always been considered and treated as trustees of money which comes to their hands or which is actually under their control; and ever since joint stock companies were invented directors have been held liable to make good moneys which they have misapplied upon the same footing as if they were trustees, and it has always been held that they are not entitled to the benefit of the old Statute of Limitations because they have committed breaches of trust, and are in respect of such moneys to be treated as trustees."

It was from this point of view that York and North Midland Ry. Co. v. Hudson [FN14] and Parker v. McKenna [FN15] were decided. Directors must dispose of their company's shares on the best terms obtainable, and must not allot them to themselves or their friends at a lower price in order to obtain a personal benefit. They must act bona fide for the interests of the company.

FN14 16 Beav. 485, 491, 496.

FN15 (1874) L. R. 10 Ch. 96.

The plaintiffs' contention in the present case goes far beyond this. It is urged that the directors hold a fiduciary position as trustees for the individual shareholders, and that, where negotiations for sale of the undertaking are on foot, they are **\*426** in the position of trustees for sale. The plaintiffs admitted that this fiduciary position did not stand in the way of any dealing between a director and a shareholder before the question of sale of the undertaking had arisen, but contended that as soon as that question arose the position was altered. No authority was cited for that proposition, and I am unable to adopt the view that any line should be drawn at that point. It is contended that a shareholder knows that the directors are managing the business of the company in the ordinary course of management, and im-

© 2009 Thomson Reuters.

pliedly releases them from any obligation to disclose any information so acquired. That is to say, a director purchasing shares need not disclose a large casual profit, the discovery of a new vein, or the prospect of a good dividend in the immediate future, and similarly a director selling shares need not disclose losses, these being merely incidents in the ordinary course of management. But it is urged that, as soon as negotiations for the sale of the undertaking are on foot, the position is altered. Why? The true rule is that a shareholder is fixed with knowledge of all the directors' powers, and has no more reason to assume that they are not negotiating a sale of the undertaking than to assume that they are not exercising any other power. It was strenuously urged that, though incorporation affected the relations of the shareholders to the external world, the company thereby becoming a distinct entity, the position of the shareholders inter se was not affected, and was the same as that of partners or shareholders in an unincorporated company. I am unable to adopt that view. I am therefore of opinion that the purchasing directors were under no obligation to disclose to their vendor shareholders the negotiations which ultimately proved abortive. The contrary view would place directors in a most invidious position, as they could not buy or sell shares without disclosing negotiations, a premature disclosure of which might well be against the best interests of the company. I am of opinion that directors are not in that position.

There is no question of unfair dealing in this case. The directors did not approach the shareholders with the view**\*427** of obtaining their shares. The shareholders approached the directors, and named the price at which they were desirous of selling. The plaintiffs' case wholly fails, and must be dismissed with costs.

**Representation**

Solicitors: Eyre, Dowling & Co.;Ince, Colt & Ince.

(G. R. A.)

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

**Tab 5**



1999 WL 1556536 (Privy Council), [2000] 2 NZLR 1, (2000) 144 S.J.L.B. 81, [2000] 1 W.L.R. 594, [2000] BCL 498, 23 TCL 2/2
**(Cite as: [2000] 1 W.L.R. 594)**

C

***594** Arklow Investments Ltd. and Another v. Ian Duart Maclean and Others
[Appeal from the Court of Appeal of New Zealand]

Privy Council
PC (NZ)
Lord Steyn　, Lord Lloyd　of Berwick, Lord Hobhouse　of
Woodborough, Sir Andrew Leggatt　and Henry J.
1999 Oct. 11, 12, 13, 14; Dec. 1

Confidential Information--Breach of confidence--Recipient's duty--Potential client disclosing to merchant bankers confidential information concerning proposed scheme for purchasing island--Bankers not retained to assist in raising finance--Bankers brokering acquisition by other purchasers--Whether breach of fiduciary duty--Whether breach of duty not to misuse confidential information

The second plaintiff was interested in purchasing an island, intending to develop the land for residential, recreational and resort uses. He formed the first plaintiff company for that purpose. On behalf of the plaintiffs F., a group of companies which operated a merchant banking business, was approached with a view to it giving possible assistance in obtaining finance for the project. Confidential information about the project was disclosed to F. A proposal was sent by F. to the plaintiffs setting out the terms on which F. would provide services for them. Those terms were not acceptable and the plaintiffs tried to find alternative sources of financial assistance. F. subsequently withdrew its offer and negotiated arrangements with others for the purchase of the island leading to its eventual sale. The plaintiffs instituted proceedings against F. and others involved in the subsequent acquisition of part of the assets. On trial of preliminary issues the judge held that F. had acted in breach of a fiduciary duty owed to the plaintiffs, and in breach of its duty not to misuse confidential information received from the plaintiffs. The Court of Appeal of New

Zealand, by a majority, reversed that decision holding that no actionable breach of either duty had been established.

On the plaintiff's appeal to the Judicial Committee:-

*Held*　, dismissing the appeal, (1) that the only relationship between the plaintiffs and F. was that created by the giving and receipt of confidential information, which the plaintiffs had not relied upon as being sufficient by itself to create a relationship of trust and confidence; and that, since F. had not expressly or impliedly undertaken any obligation to act on behalf of the plaintiffs and had no authority to do so, and since there had been no informal arrangement or continuing course of conduct between them, there was no mutuality which could give rise to the undertaking or imposition of a fiduciary duty of loyalty to the plaintiffs not to promote or become involved in a competitive acquisition of the island (post, p. 600A-D　).

Dicta of Millett L.J. in Bristol and West Building Society v. Mothew [1998] Ch. 1, 18, C.A. applied　.

(2) That the plaintiffs had failed to prove that F. had used confidential information received from the plaintiffs and such use could not be inferred; that, even if F.'s knowledge that the plaintiff's scheme was at a relatively advanced stage had stimulated F. into negotiating the arrangements which had resulted in the eventual sale of the island, the plaintiff's prospects ***595**　of purchasing the island had not been shown to have been adversely affected by F.'s use of that knowledge, and so the plaintiff's claim for misuse of confidential information failed (post, pp. 601H-602A　).

Decision of the Court of Appeal of New Zealand [1998] 3 N.Z.L.R. 680 affirmed　.

**The following cases are referred to in the judgment of their Lordships:**

1999 WL 1556536 (Privy Council), [2000] 2 NZLR 1, (2000) 144 S.J.L.B. 81, [2000] 1 W.L.R. 594, [2000] BCL 498, 23 TCL 2/2
**(Cite as: [2000] 1 W.L.R. 594)**

Attorney-General v. Blake [1998] Ch. 439; [1998] 2 W.L.R. 805; [1998] 1 All E.R. 833, C.A.

Bristol and West Building Society v. Mothew [1998] Ch. 1; [1997] 2 W.L.R. 436; [1996] 4 All E.R. 698, C.A.

Coco v. A.N. Clark (Engineers) Ltd. [1969] R.P.C. 41

LAC Minerals Ltd. v. International Corona Resources Ltd. (1989) 61 D.L.R. (4th) 14

Saltman Engineering Co. Ltd. v. Campbell Engineering Co. Ltd. (1948) 65 R.P.C. 203, C.A.

**The following additional cases were cited in argument:**

Albert (Prince) v. Strange (1849) 1 H. & T. 1

Aquaculture Corporation v. New Zealand Green Mussel Co. Ltd. [1990] 3 N.Z.L.R. 299

Attorney-General v. Guardian Newspapers Ltd. (No. 2) [1990] 1 A.C. 109; [1988] 3 W.L.R. 776; [1988] 3 All E.R. 545, H.L.(E.)

Attorney-General for Hong Kong v. Reid [1994] 1 A.C. 324; [1993] 3 W.L.R. 1143; [1994] 1 All E.R. 1, P.C.

Bolkiah (Prince Jefri) v. KPMG [1999] 2 A.C. 222; [1999] 2 W.L.R. 215; [1999] 1 All E.R. 517, H.L.(E.)

British Franco Electric Pty. Ltd. v. Dowling Plastics Pty. Ltd. [1981] 1 N.S.W.L.R. 448

Canadian Aero Services Ltd. v. O'Malley (1973) 40 D.L.R. (3d) 371

Clark Boyce v. Mouat [1994] 1 A.C. 428; [1993] 3 W.L.R. 1021; [1993] 4 All E.R. 268, P.C.

Guerin v. The Queen (1984) 13 D.L.R. (4th) 321

Indata Equipment Supplies Ltd. (t/a Autofleet) v. ACL Ltd. [1998] 1 B.C.L.C. 412, C.A.

Industrial Development Consultants Ltd. v. Cooley [1972] 1 W.L.R. 443; [1972] 2 All E.R. 86

James, Ex parte (1803) 8 Ves. 337

Keech v. Sandford (1726) Sel.Cas.Ch. 61

Marshall (Thomas) (Exports) Ltd. v. Guinle [1979] Ch. 227; [1978] 3 W.L.R. 116; [1978] 3 All E.R. 193

Morison v. Moat (1851) 9 Hare 241

Phipps v. Boardman [1967] 2 A.C. 46; [1966] 3 W.L.R. 1009; [1966] 3 All E.R. 721, H.L.(E.)

Queensland Mines Ltd. v. Hudson (1978) 18 A.L.R. 1, P.C.

Rae v. International Insurance Brokers (Nelson Marlborough) Ltd. [1998] 3 N.Z.L.R. 190

Rangatira Ltd. v. Commissioner of Inland Revenue [1997] 1 N.Z.L.R. 129

Reading v. The King [1949] 2 K.B. 232 ; sub nom. In re Reading's Petition of Right [1949] 2 All E.R. 68, C.A.

Schering Chemicals Ltd. v. Falkman Ltd. [1982] Q.B. 1; [1981] 2 W.L.R. 848; [1981] 2 All E.R. 321, C.A.

Standard Investments Ltd. v. Canadian Imperial Bank of Commerce (1985) 22 D.L.R. (4th) 410

© 2009 Thomson Reuters.

[2000] 1 W.L.R. 594

1999 WL 1556536 (Privy Council), [2000] 2 NZLR 1, (2000) 144 S.J.L.B. 81, [2000] 1 W.L.R. 594, [2000] BCL 498, 23 TCL 2/2

(Cite as: [2000] 1 W.L.R. 594)

Page 3

Watson v. Dolmark Industries Ltd. [1992] 3 N.Z.L.R. 311

**\*596** APPEAL (No. 17 of 1999) with leave of the Court of Appeal of New Zealand by the plaintiffs, Arklow Investments Ltd. and Christopher Mark Wingate, from the judgment of the Court of Appeal of New Zealand [1998] 3 N.Z.L.R. 680 (Richardson P., Gault, Keith and Blanchard JJ., Thomas J. dissenting) given on 16 July 1998 allowing an appeal by the defendants, Ian Duart Maclean, Ian Wilson Smith, Frank Clifford Graham, Donald Edmund Walkington, Murray Charles Radford, FAR Financial Consultants Ltd., Finance and Resources Ltd., FAR Forestry Investments Ltd., Ernslaw One Ltd., ITT Rayonier Ltd., Caldora Holdings Ltd., Ngai Terangi Iwi Inc. Society, Te Kotuktuku Corporation Ltd., Matakana Island Trust Inc., Matakana Island Ltd., Minuteman Holdings Ltd. and Blakely Pacific Ltd., from the judgment of Temm J. delivered on 5 May 1997 in the High Court of New Zealand on trial of preliminary issues. Temm J. had ruled that (1) the sixth defendant, FAR Financial Consultants Ltd., owed a fiduciary duty to the plaintiffs and had breached that duty; and (2) the sixth defendant had received the information which the plaintiffs claimed to have conveyed, that information was confidential, the sixth defendant was in breach of an obligation not to use the information other than for the purposes for which it had been conveyed, and the plaintiffs had suffered loss or damage and hence detriment as a result of the actions of the sixth defendant.

At the close of the hearing Lord Steyn announced that their Lordships would recommend that the appeal should be dismissed for reasons to be delivered later.

The facts are stated in the judgment of their Lordships.

**Representation**

Nicholas Underhill Q.C. , Jim Evans (of the New Zealand Bar) and Philippa

Hamilton for the plaintiffs.

John Eichelbaum (of the New Zealand Bar) for the second, third and sixth to eighth defendants.

John Moody (of the New Zealand Bar) for the tenth defendant.

Alan Galbraith Q.C. , Julie Maxton and David Abbott (all of the New Zealand Bar) for the eleventh to fourteenth and sixteenth defendants.

The other defendants did not appear and were not represented.

*Cur. adv. vult.*

Henry J.

1 December. The judgment of their Lordships was delivered by

On 14 October 1999 at the conclusion of the hearing their Lordships agreed humbly to advise Her Majesty that the appeal should be dismissed and that they would give their reasons later. This they now do.

The appeal is from a judgment of the Court of Appeal of New Zealand delivered on 16 July 1998: Maclean v. Arklow Investments Ltd. [1998] 3 N.Z.L.R. 680 . It raises issues relating to the concept of fiduciary duty, and results from the sale of Matakana Island, which lies across the entrance to Tauranga Harbour on the eastern coast of the North Island of New Zealand. A forest, consisting mainly of radiata pine, extends over much of the area of the island, which approximates 4,300 hectares. The vendor of the sale in question was Matakana Forest Ltd., which had been placed in receivership in October 1990. The receivers put the island up for sale in February 1991, and it remained on the market until the sale was negotiated in late 1992. During that year milling of the mature trees was in operation.

[2000] 1 W.L.R. 594                                                                                                Page 4

1999 WL 1556536 (Privy Council), [2000] 2 NZLR 1, (2000) 144 S.J.L.B. 81, [2000] 1 W.L.R. 594, [2000] BCL
498, 23 TCL 2/2
**(Cite as: [2000] 1 W.L.R. 594)**

**\*597** The relevant facts are fully set out in the majority judgment of Richardson P., Gault and Keith JJ. delivered by Gault J., and need not be repeated in detail. They are also reviewed comprehensively by Thomas J. in his dissenting judgment. The background to the proceedings can be stated quite briefly. The appellant plaintiff Mr. Wingate had become interested in the purchase of Matakana Island in July 1991, his intention being to develop the land for residential, recreational and resort uses. Arklow Investments Ltd. was to be the vehicle for this venture. On 15 June 1992, the FAR group of companies, which operated a merchant banking business, were approached on behalf of Mr. Wingate with a view to obtaining the group's assistance in raising finance to enable the proposal to proceed. Mr. Wingate had previously employed another merchant banker, Fay Richwhite & Co. Ltd., for that purpose but their relationship had been terminated. On 16 June 1992, in response to that approach FAR made a written proposal setting out the terms on which it would accept appointment. Those terms were not acceptable to Mr. Wingate, and on 15 July 1992 FAR gave written notice of withdrawal of its mandate offer. FAR proceeded to broker arrangements with other parties for the purchase of the island, which ultimately led to the February 1993 sale now in question. The transaction initially comprised a composite arrangement, under which ITT Rayonier Ltd. had acquired the forestry right to the mature standing timber, Ernslaw One Ltd. acquired the land, the remaining timber and some associated assets, and a FAR group member company acquired the balance of the assets, particularly the mill and the mill land. The total purchase price was $20.7m., of which $50,000 was paid by the FAR interests. This transaction, originally negotiated in November 1992, was restructured to overcome statutory requirements governing acquisition by overseas interests. There has also been a subsequent rearrangement of interests which are not relevant to matters now in issue. In broad terms the plaintiffs, for convenience referred to as Arklow, contend that in taking the actions it did leading to the November 1992 transaction, FAR breached its fiduciary duties

to Arklow. Two separate causes of action were pleaded in that respect.

In an interim judgment delivered in the High Court on 5 May 1997, Temm J. answered a series of specific questions governing the issue of liability. They were framed:

"1. In relation to the cause of action of breach of fiduciary duty owed by FAR to Arklow/Wingate: (a) whether the FAR interests owed a fiduciary duty to the plaintiffs and (b) if there was a fiduciary duty, did FAR breach any fiduciary duties.

"2. In relation to the cause of action of misuse of confidential information: (a) as to whether FAR Financial and/or other of the FAR interests received confidential information: (i) whether those defendants received the information which the plaintiffs claim to have conveyed; (ii) whether such information as they did receive was confidential; (b) whether the FAR interests were under an obligation not to use the information received by them other than for the purposes for which it was conveyed; (c) if the FAR interests received confidential information, and were under an obligation not to use it other than for the purposes for which it was conveyed, whether they did use it other than for the purposes for which it was conveyed; (d) if detriment to the plaintiff is a relevant ingredient of a cause of action founded in breach of confidence-- whether or not Arklow/Wingate **\*598** suffered any loss or damage, and hence any detriment, as a result of the FAR actions."

1999 WL 1556536 (Privy Council), [2000] 2 NZLR 1, (2000) 144 S.J.L.B. 81, [2000] 1 W.L.R. 594, [2000] BCL
498, 23 TCL 2/2
**(Cite as: [2000] 1 W.L.R. 594)**

Temm J. answered all questions in the affirmative. In the Court of Appeal, the majority judgment delivered by Gault J. considered the separate issues of breach of fiduciary duty not to promote or become involved in a competitive acquisition of Matakana Island, and of breach of the duty not to misuse confidential information. They held that the evidence did not establish that there was an actionable breach of either duty. Blanchard J. held that there were breaches of those or similar duties, but that they were relatively minor and not causative of any loss to Arklow. In his dissenting judgment, Thomas J. took the view that FAR owed Arklow a duty not to act contrary to Arklow's interests, that it had done so in breach of that duty, and further that FAR had misused information which was confidential to Arklow.

Although their Lordships heard extensive argument on both the nature and extent of fiduciary duties and the facts of the case, they have reached the conclusion that the real issues on appeal fall within a rather narrow compass which can be resolved without the need for either a comprehensive or detailed consideration of the law or a close review of the evidence. In the course of his argument, Mr. Underhill for Arklow stressed that in this case there was a considerable overlap between the duty "not to be disloyal" and the duty to respect confidence. It was clear however, that as in the Court of Appeal and in the High Court, a major plank in Arklow's case was that FAR did have a fiduciary duty which was wider than the duty not to misuse confidential information, and extended in the circumstances to that described by Gault J. as one not to promote or become involved in a competitive acquisition of Matakana Island whether or not confidential information had been used. It is immediately apparent that protection of confidential information may be involved in or form an integral part of such a duty, and misuse may be evidence of a breach of that duty. But as the case was pleaded and argued on the basis that there was a duty which was actionable for breach in the absence of any misuse of confidential information, it is necessary to consider that conten-

tion. The first issue therefore is whether FAR owed a fiduciary duty of that nature to Arklow.

*Duty of loyalty*

The description of the duty under consideration as being one of loyalty was not seen by Mr. Underhill as being the most appropriate one, but for present purposes it is convenient to label it in that way. In the present context, the concept encaptures a situation where one person is in a relationship with another which gives rise to a legitimate expectation, which equity will recognise, that the fiduciary will not utilise his or her position in such a way which is adverse to the interests of the principal. An example of the obligation relevant to the present case is not to exploit or take advantage of the position of fiduciary at the expense of the principal. The existence and the extent of the duty will be governed by the particular circumstances. It is therefore essential at the outset to turn to the circumstances which it is said gave rise to FAR's duty of loyalty. The basic facts are not in dispute. They do not require any critical consideration of Temm J.'s findings on any of the primary facts, and can be summarised quite briefly.

**\*599** The first communication between FAR and Arklow was at a meeting held in Wellington on 15 June 1992. A Mr. Bailey was chief executive of the Economic Development Office for the Western Bay of Plenty, an entity established by local authorities in the region which includes Matakana Island. By that time he had become closely associated with Mr. Wingate and his plans to purchase and develop the island. Mr. Bailey had previously had dealings with Mr. Graham, one of the FAR directors. At the meeting Mr. Bailey told Mr. Graham he wished to discuss a confidential project in which he, Mr. Bailey, was involved. The proposal which by then Mr. Wingate had drawn up was outlined. Two other FAR directors joined the meeting, which lasted at the most 1 1/2 hours, probably less. Mr. Wingate's (Arklow's) proposal was to purchase the island for $20- $20.5m., being the price believed to be acceptable to the receivers, by pre-selling the rights to the

[2000] 1 W.L.R. 594                                                                                            Page 6

1999 WL 1556536 (Privy Council), [2000] 2 NZLR 1, (2000) 144 S.J.L.B. 81, [2000] 1 W.L.R. 594, [2000] BCL
498, 23 TCL 2/2

(Cite as: [2000] 1 W.L.R. 594)

mature forest to a Japanese corporation (Kanematsu) which would provide most of the purchase money, with a balance of $4-$5m. being required by way of funding. Assets included in the purchase would be the mill, the immature pine forest, and the eucalyptus trees which if disposed of at their estimated value would result in Arklow being left owning the land, at no cost to it and available for development. At the meeting a copy of the investment document prepared by Fay Richwhite was made available to and left with the FAR directors.

On 16 June FAR wrote to Mr. Bailey enclosing its "Letter of Mandate" setting out the terms of an agreement for services to be provided by FAR to Arklow for the purposes of implementing the proposed purchase. The terms included an immediate payment by Arklow of a commitment fee of $5,000 plus GST (Goods and Services Tax). Although as Mr. Wingate made clear in his evidence the proposal was not acceptable to Arklow, with one exception there was no further communication of substance between FAR and Arklow until 15 July 1992 when FAR wrote to Mr. Bailey formally withdrawing its mandate offer. The exception concerns an investment brochure compiled by Arklow, based in part on the Fay Richwhite document, which was distributed by Arklow over a short period commencing at the end of June to some 24 parties, including FAR. This brochure sought participation in the scheme by way of investment. It is clear that between 16 June and 15 July 1992 Arklow was taking steps to pursue avenues of possible financial assistance or involvement from sources other than FAR.

In these circumstances did FAR owe a duty of loyalty to Arklow? The dictum of Millett L.J. in Bristol and West Building Society v. Mothew [1998] Ch. 1 , 18 is apposite:

"A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr. Finn pointed out in his classic work *Fiduciary Obligations* (1977), p. 2, he is not subject to *600 fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary"

Their Lordships are unable to see an evidential basis for finding that a relationship of trust and confidence, in this sense of undertaking an obligation of loyalty, arose in these circumstances. In considering this question it is essential not to confuse the claimed duty with the separate duty to respect confidential information. This distinction does not appear to have been made sufficiently clear in the High Court, and has probably led to what was described as Temm J.'s conflation of the two issues. Here FAR did not undertake any obligation, either expressly or impliedly, to act on behalf of Arklow. It had made an offer to do so, which from its receipt was effectively treated by Arklow as unacceptable. FAR had no authority, actual or ostensible, to act on behalf of Arklow. Arklow never accepted the

[2000] 1 W.L.R. 594

Page 7

1999 WL 1556536 (Privy Council), [2000] 2 NZLR 1, (2000) 144 S.J.L.B. 81, [2000] 1 W.L.R. 594, [2000] BCL 498, 23 TCL 2/2

**(Cite as: [2000] 1 W.L.R. 594)**

existence of a relationship, the benefits of which it now claims for itself. Neither had the stage been reached whereby it could be said that either an informal arrangement had come into existence or a continuing course of conduct between the parties had been undertaken which could give rise to the fiduciary relationship. Put shortly, there was no mutuality giving rise to the undertaking or imposition of a duty of loyalty. The relationship of these parties never extended beyond one created by and limited to the giving and receipt of confidential information.

In reaching this conclusion, their Lordships have not overlooked the evidence of Mr. Pryke, an experienced economist and financial adviser, whose opinion as to standard practice in this field supported the duty of loyalty claim. Evidence of practice and accepted standards of professional conduct may be of assistance in determining what is essentially a question of law, but it cannot be determinative. It must be said however that the obligations defined by Mr. Pryke as applying in this case were expressed in surprisingly wide terms and do not in their Lordship's respectful view equate to the law.

Whether or not the obligation not to misuse confidential information is properly classed as a fiduciary duty ( Attorney-General v. Blake [1998] Ch. 439 , 454; LAC Minerals Ltd. v. International Corona Resources Ltd. (1989) 61 D.L.R. (4th) 14 ) does not require consideration. Recognition by equity of the existence of a particular obligation, such as the obligation of loyalty which Arklow relies upon in the present case, will depend upon the particular facts. To repeat the words of Millett L.J. in Bristol and West Building Society v. Mothew [1998] Ch. 1 , 18, it is the obligation and duty which makes the obligor a fiduciary. Characterising the duty to respect confidential information as fiduciary does not create particular duties of loyalty, which are imposed as a result of the nature of the particular relationship and the circumstances giving rise to it. It is not the label which defines the duty.

*Misuse of confidential information*

The second issue is whether FAR breached its obligation of confidentiality.

It is common ground that the obligation not to use confidential information attaches only to information which has the necessary element of confidentiality and continues only so long as the information remains confidential: Saltman Engineering Co. Ltd. v. Campbell Engineering Co. Ltd. (1948) R.P.C. 203 ; Coco v. A.N. Clark (Engineers) Ltd. [1969] R.P.C. **\*601** 41. In the High Court Temm J. identified six items of information which he held were confidential and had wrongly been used by FAR. They were:

> "( *a* ) That all the assets available for sale by the receivers could be bought for $20m. ( *b* ) That the mature forest (aged 17 years and over) could be sold for $13m. (and maybe more if [an] estimate of value at $15.75m. could be sustained). ( *c* ) That the immature forest could be sold for $3m. to $4m. for the radiata trees, and the eucalyptus trees could fetch up to $3m. in addition depending on market forces. ( *d* ) That the mill had a break up value of $1m. to $1.5m. ( *e* ) That [Arklow] had a buyer for the mature forest which was willing to provide $15.75m. in cash. ( *f* ) That [Arklow's] scheme was practicable and feasible if suitable financial arrangements could be made"

The sources of the information were the discussion Mr. Bailey had with the FAR directors on 15 June, the Fay Richwhite document, and the Arklow brochure distributed as from the end of June. The

[2000] 1 W.L.R. 594

Page 8

1999 WL 1556536 (Privy Council), [2000] 2 NZLR 1, (2000) 144 S.J.L.B. 81, [2000] 1 W.L.R. 594, [2000] BCL 498, 23 TCL 2/2

**(Cite as: [2000] 1 W.L.R. 594)**

scheme referred to was described by Temm J. as one by which Arklow could acquire the whole of the assets without putting up cash of its own, providing approximately $5m. could be raised on the security of assets other than the mature forest. Some observations as to the confidential nature of this information can be made.

First, the price of $20m. This was the figure set by the receivers in March 1992 as the minimum acceptable, and as such originally would have been confidential to them. Whether this information was received by Arklow in confidence is unclear, but what the evidence did show was: the receivers were prepared to disclose it to parties believed to be in serious negotiation to purchase (it was in fact disclosed by them to FAR by August 1992); $21m. was seen by Mr. Olsen, a forestry consultant, as a price likely to be acceptable to the receivers, and he had told FAR shortly before the meeting of 15 June that the value of all assets was in the range of $21-$27m.; and Arklow's own brochure of June 1992 disclosed to all recipients the contemplated purchase price of approximately $20m. Secondly, the forest valuation. As Temm J. expressly recognised, the value of the forest (and the mill) may well have been known to other experts if appraisals had been undertaken by them. That must be so. As an example Mr. Olsen, with whom FAR had had previous dealings, had been involved with Matakana Island since 1971. In 1991 his company had been consulted concerning the establishment of a joint venture between a real estate developer and a forestry partner, and his then estimate of $21m. as a likely acceptable price for land and trees obviously required an assessment of the value of the forest. Nothing unique or unusual in the valuations made available by Arklow was identified. Thirdly, the scheme. Mr. Wingate's interest in Matakana Island and its development was public knowledge. Development of this nature obviously involved disposal of the mature forest, which in 1992 was in the process of being milled. The perceived value placed on the assets by the receivers, and the availability of a purchaser (Kanematsu) for the mature forest

would seem to be the only possibly significant features of the scheme.

Accepting there was a receipt by FAR of confidential information, the crucial issue is whether Temm J.'s conclusion that FAR misused it is supported by the evidence. That conclusion was expressed very shortly in general terms, but without any specific findings as to how or when the use occurred. The relevant evidence possibly going to use has been comprehensively analysed in the judgment delivered by Gault J. The **\*602** analysis revealed that there was neither evidence of actual use of the identified items of information, whether individually or in combination, nor that there was any basis for the inference that there had been use. It was not suggested that the two participants in the FAR transaction (ITT Rayonier and Ernslaw) had been given or used information received by FAR. Both these parties had had previous dealings with FAR, the former had already undertaken its own research into Matakana Island in 1991. In essence the evidence showed that the transaction which FAR had put together resulting in the purchase did not utilise the Arklow forest valuation, did not involve Kanematsu, did not involve any resort development of the island, and did not result in FAR obtaining ownership of the land without expenditure of its own. Even if FAR was "galvanised" into other action by reason of its knowledge that Arklow was in a relatively advanced stage of implementing its scheme, it is not possible to translate that into actionable misuse, particularly when regard is had to the considerable time lapse down to November 1992 when the FAR transaction was finally negotiated. As the majority of the Court of Appeal held, supported by Blanchard J., there is no basis upon which Arklow could be entitled to relief. Its prospects of successfully concluding an agreement with the receivers was not shown to have been adversely affected by FAR's use of that knowledge. Any possible advantage it may have obtained had dissipated by November 1992. Without further elaboration or unnecessary repetition, their Lordships would respectfully adopt the reasoning of the

© 2009 Thomson Reuters.

1999 WL 1556536 (Privy Council), [2000] 2 NZLR 1, (2000) 144 S.J.L.B. 81, [2000] 1 W.L.R. 594, [2000] BCL 498, 23 TCL 2/2
**(Cite as: [2000] 1 W.L.R. 594)**

majority in concluding that no actionable misuse of confidential information was established. On this head too, the claim must therefore fail.

**Representation**

Solicitors: Simons Muirhead & Burton          ; Alan Taylor & Co.          .

S. S.

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT