# Tab 6

Dockets.Justia.com

A

# CASES

determined by the

## CHANCERY DIVISION

B

and the

## COURT OF PROTECTION

and on appeal therefrom in the

C

## COURT OF APPEAL

———

D

[COURT OF APPEAL]

## BRISTOL AND WEST BUILDING SOCIETY v. MOTHEW

1996   May 21, 22;                            Staughton, Millett and Otton L.JJ.
      July 24

E   *Solicitor—Negligence—Incorrect advice or information—Mortgage
    transaction—Solicitor acting for borrowers and lender—Solicitor
    negligently giving lender incorrect information—Lender suffering
    loss—Whether lender merely having to prove reliance on
    information—Whether necessary to show loss attributable to
    negligence—Whether breach of trust or fiduciary duty*

F        In 1988 the defendant solicitor acted for a husband and wife
in the purchase of a house for £73,000 and also for the plaintiff
to whom the purchasers had applied for a loan of £59,000 to
finance the purchase. The plaintiff offered to advance the money
on the express condition that the balance of the purchase price
was provided by the purchasers without resort to further
borrowing, and it instructed the solicitor to report, prior to
completion, any proposal that the purchasers might create a
second mortgage or otherwise borrow in order to finance part of

G   the purchase price. The solicitor knew that the purchasers were
arranging for an existing bank debt of £3,350 to be secured by a
second charge on the new property but, due to an oversight, he
stated in his report to the plaintiff that the balance of the
purchase price was being provided by the purchasers without
resort to further borrowing. The plaintiff advanced the loan and
the purchase was completed. When the purchasers defaulted on

H   their mortgage repayments the plaintiff enforced its security and
the house was sold at a loss. The plaintiff sought to recover the
whole of its loss on the transaction from the solicitor, alleging
breach of contract, negligence and breach of trust. The district
judge gave the plaintiff summary judgment for damages to be

assessed for breach of contract and negligence and for damages  A
of £59,000 less the amount received on the sale of the property
for breach of trust. The judge affirmed those decisions.

On appeal by the solicitor:—

*Held,* allowing the appeal, (1) that, where a client sued his
solicitor for negligently giving him incorrect advice or information,
the client did not have to show that he would not have acted as
he did if he had been given the proper advice or correct
information but merely that he had relied on the incorrect advice  B
or information; that the evidence showed that the plaintiff had
relied on the solicitor's report in advancing the loan and,
therefore, the necessary causal link between the solicitor's
negligence and the loan was proved; but that the plaintiff had still
to establish what, if any, loss was attributable to the solicitor's
negligence and, as there was an issue as to what loss was
occasioned by the existence of the second charge and the  C
purchasers' indebtedness to the bank, damages remained to be
assessed (post, pp. 11D–E, F–H, 13B–C, 24E–F, 25E–F, 28A).

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co.
Ltd.* [1997] A.C. 191, H.L.(E.) and *Downs v. Chappell* [1997]
1 W.L.R. 426, C.A. applied.

(2) That the solicitor's conduct in providing the plaintiff with
the wrong information, although a breach of duty, was neither
dishonest nor intentional but due to an oversight and was  D
unconnected to the fact that he was also acting for the purchasers;
that, accordingly, his conduct and subsequent application of the
money advanced by the plaintiff to complete the purchase was
not a breach of trust or fiduciary duty; and that the order for
damages for breach of trust would therefore be set aside (post,
pp. 15H–16A, 19E, 20G, 22A–C, 24E–F, 25E–F, 26C–E, 28A).

Decision of Chadwick J. reversed.

E

The following cases are referred to in the judgments:

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997]
A.C. 191; [1996] 3 W.L.R. 87; [1996] 3 All E.R. 365, H.L.(E.)
*Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R.
801
*Clark Boyce v. Mouat* [1994] 1 A.C. 428; [1993] 3 W.L.R. 1021; [1993] 4 All  F
E.R. 268, P.C.
*Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453
*Coomber, In re; Coomber v. Coomber* [1911] 1 Ch. 723, C.A.
*Downs v. Chappell* [1997] 1 W.L.R. 426; [1996] 3 All E.R. 344, C.A.
*El Ajou v. Dollar Land Holdings Plc.* [1993] 3 All E.R. 717
*Girardet v. Crease & Co.* (1987) 11 B.C.L.R. (2d) 361
*Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145; [1994] 3 W.L.R. 761;  G
[1994] 3 All E.R. 506, H.L.(E.)
*Kelly v. Cooper* [1993] A.C. 205; [1992] 3 W.L.R. 936, P.C.
*LAC Minerals Ltd. v. International Corona Resources Ltd.* (1989) 61 D.L.R.
(4th) 14
*Lewis v. Hillman* (1852) 3 H.L.Cas. 607, H.L.(E.)
*Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992]
4 All E.R. 512, H.L.(E.)  H
*Moody v. Cox and Hatt* [1917] 2 Ch. 71, C.A.
*Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836, C.A.
*Nocton v. Lord Ashburton* [1914] A.C. 932, H.L.(E.)
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109

A        *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113;
           [1970] 3 W.L.R. 273; [1970] 2 All E.R. 471, C.A.
         *Target Holdings Ltd. v. Redferns* [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995]
           3 All E.R. 785, H.L.(E.)
         *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*
           [1996] A.C. 669; [1996] 2 W.L.R. 802; [1996] 2 All E.R. 961, H.L.(E.)

B        The following additional cases were cited in argument:

         *Alliance & Leicester Building Society v. Edgestop Ltd.* (unreported), 18 January
           1991, Hoffmann J.
         *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465, P.C.
         *Canson Enterprises Ltd. v. Boughton & Co.* (1991) 85 D.L.R. (4th) 129
         *Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653
         *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1
C        *Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.)
         *Wan v. McDonald* (1992) 105 A.L.R. 473
         *Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141

         The following cases, although not cited, were referred to in the skeleton
         arguments:

D        *Attorney-General for Hong Kong v. Reid* [1994] 1 A.C. 324; [1993] 3 W.L.R.
           1143; [1994] 1 All E.R. 1, P.C.
         *Bishopsgate Investment Management Ltd. v. Maxwell (No. 2)* [1994] 1 All
           E.R. 261, C.A.
         *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981]
           Ch. 105; [1980] 2 W.L.R. 202; [1979] 3 All E.R. 1025
         *Dawson, decd., In re; Union Fidelity Trustee Co. Ltd. v. Perpetual Trustee Co.
           Ltd.* [1966] 2 N.S.W.R. 211
E        *Farrington v. Rowe McBride & Partners* [1985] 1 N.Z.L.R. 83
         *McPherson v. Watt* (1877) 3 App.Cas. 254, H.L.(Sc.)
         *Miller's Deed Trusts, In re* (1978) 75 L.S.G. 454
         *Nelson v. Rye* [1996] 1 W.L.R. 1378; [1996] 2 All E.R. 186
         *Nestlé v. National Westminster Bank Plc.* [1993] 1 W.L.R. 1260; [1994] 1 All
           E.R. 118, C.A.

F        INTERLOCUTORY APPEAL from Chadwick J.
           On 21 June 1995 Deputy District Judge Raskin granted the plaintiff,
         Bristol and West Building Society, summary judgment pursuant to R.S.C.,
         Ord. 14 of its claims against the defendant solicitor, Anthony Paul
         Mothew (trading as Stapley & Co.), for damages to be assessed for breach
         of contract and negligence and damages for breach of trust. On 27 July
G        1995 Chadwick J. dismissed the defendant's appeal against that order.
           Pursuant to leave granted by Nourse L.J. on 29 December 1995 and
         by a notice of appeal dated 5 January 1996 the defendant sought to set
         aside the orders and be granted unconditional leave to defend on the
         grounds that the judge had erred in holding (1) that money paid to the
         defendant by the plaintiff was impressed with a constructive trust in
         favour of the plaintiff; (2) that the money was paid to the defendant under
H        a mistake of fact or had been induced by the defendant's misrepresentation,
         when no such allegations were made in the statement of claim; (3) that it
         was not necessary for the plaintiff to establish that it had sustained loss
         and damage as a result of the defendant's alleged breach of trust; (4) that

the defendant had no arguable defence to the claim for breach of trust    A
based upon acquiescence or affirmation by the plaintiff; and (5) that the
defendant had no arguable defence to the allegation that the plaintiff had
sustained loss and damage as a result of the breach of contract and
negligence.

By a respondent's notice dated 25 January 1996 the plaintiff contended
that it was entitled to judgment for the sum claimed in respect of its
claims for breach of contract and negligence.                              B

The facts are stated in the judgment of Millett L.J.


*Jonathan Sumption Q.C.* and *Glenn Campbell* for the defendant.
A breach of a solicitor's conveyancing duty which makes no difference to
the lender's decision and has no impact on the value of the security cannot
result in the solicitor becoming the underwriter of the transaction when    C
the security is later sold at a loss: see *Target Holdings Ltd. v. Redferns*
[1996] A.C. 421. Although a solicitor has a number of fiduciary obligations
to his client, not every duty which is owed in the context of a fiduciary
relationship is a fiduciary duty: see *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362; *LAC Minerals Ltd. v. International Corona
Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 and *In re Coomber; Coomber    D
v. Coomber* [1911] 1 Ch. 723, 728. A solicitor's duty to report to his client
the outcome of conveyancing and allied inquiries is the ordinary
contractual duty of a professional to comply with his instructions and to
do so with reasonable skill.

*Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465 does
not assist the plaintiff as it was concerned only with a breach by a
fiduciary of his obligation to disclose to his principal his own personal    E
interest in the transaction. [Reference was also made to *Nocton v. Lord
Ashburton* [1914] A.C. 932.] The principle that relief is granted for such a
breach, without regard to what the plaintiff would have done if disclosure
had been made reflects the rule of equity that where a fiduciary has dealt
personally with the plaintiff without full disclosure to him the latter's
relief is not compensatory at all. He has, irrespective of his loss, an      F
absolute right to set aside the transaction or to claim an account of
profits. The compensation awarded to him is simply the financial
equivalent of setting aside: see *Gray v. New Augarita Porcupine Mines Ltd.*
[1952] 3 D.L.R. 1, 12–15. Compensation cannot be awarded for breach of
a duty as to the manner in which work should be carried out: see
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 164–165.
[Reference was also made to *Canson Enterprises Ltd. v. Boughton & Co.*      G
(1991) 85 D.L.R. (4th) 129; *Wan v. McDonald* (1992) 105 A.L.R. 473;
*Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141 and *Target Holdings Ltd.
v. Redferns* [1996] A.C. 421.]

There is no distinction between a solicitor who breaches his duty by
failing to report in accordance with his instructions before the mortgage
advance cheque is received and a solicitor who fails to deal with the
advance in accordance with his instructions after it is received. In neither    H
case does the breach of duty have the effect of terminating the solicitor's
retainer and his authority to complete the transaction. Equally, the
argument that the solicitor held the advance as soon as it was received on

A  a constructive trust to return it forthwith to the plaintiff cannot be supported. There cannot be a constructive trust inconsistent with the existing express trust to apply the loan moneys in completing the transaction, unless the solicitor's authority and obligation to complete the transaction are first brought to an end. [Reference was made to *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669; *Sinclair v. Brougham* [1914] A.C. 398 and *Lipkin Gorman*

B  *v. Karpnale Ltd.* [1991] 2 A.C. 548.]

If the plaintiff is to be awarded the amount of the advance money (less actual recoveries) it must be on the basis that that money has been misapplied. If the defendant had no authority to pay out the money to the vendor the payment was a breach of trust: see *Target Holdings Ltd. v. Redferns* [1996] A.C. 421 and *Alliance & Leicester Building Society v.*

C  *Edgestop Ltd.* (unreported), 18 January 1991.

The plaintiff's loss on the loan transaction is due to the default of the purchasers and the fact that the security was not sufficient to cover the loan when it came to be realised, neither of which is the responsibility of the solicitor. The loss is not due to the existence or non-disclosure of a second mortgage.

D  *Nicholas Patten Q.C.* and *Timothy Higginson* for the plaintiff. The relationship between a solicitor and his client gives rise to fiduciary obligations on the part of the solicitor in the handling of his client's affairs. A failure to perform those obligations gives rise to a remedy in equity regardless of whether the acts complained of also constitute a breach of contract with a right to damages: see *Nocton v. Lord Ashburton* [1914] A.C. 932, 956–957. The underlying contractual relationship between

E  the parties cannot dictate or limit the scope of the concurrent fiduciary duties, as the defendant was expressly required to report any proposal for further borrowing before releasing the plaintiff's mortgage advance: see *Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145, 205–206.

A solicitor who acts for both lender and borrower in the same transaction has an unrestricted obligation to each client to act in his own best interests, including an obligation to disclose to the lender information

F  about the borrower which is material to the transaction: see *Clark Boyce v. Mouat* [1994] 1 A.C. 428, 437. [Reference was also made to *Lewis v. Hillman* (1852) 3 H.L.Cas. 607; *Kelly v. Cooper* [1993] A.C. 205; *Moody v. Cox and Hatt* [1917] 2 Ch. 71 and *Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R. 801, 817–818.]

The non-disclosure of the proposed further borrowing was a breach of

G  trust. In addition, the release of the advance by the defendant when he had failed to disclose the proposed further borrowing in breach of his express instructions was made without authority and was itself a breach of trust. The right of the plaintiff to recover its advance is unaffected by *Target Holdings Ltd. v. Redferns* [1996] A.C. 421 because the payment of the advance to the defendant (and therefore the creation of his agency to hold the money for the purpose of the intended transaction) was the direct

H  result of the reliance by the plaintiff upon the contents of the defendant's report on title. Therefore the defendant's ability to utilise the payment for the benefit of the borrowers in breach of trust was caused by the report on title.

Breaches of trust or fiduciary duty must cause the loss complained of     A
but the test of causation is not the common law test. The inquiry is not to
determine what position the plaintiff would have been in had the contract
been performed but rather whether the loss would have been sustained
but for the breach of trust. The non-disclosure in the report on title caused
the loss because it induced the plaintiff to advance the funds in reliance
on the report. To inquire as to what the plaintiff would have done had
disclosure been made is to apply the common law test and is wrong in     B
principle: see *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R.
465, 469; *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1,
15; *Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453 and
*Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653.
      *Sumption Q.C.* replied.

                                                                          C
                                                    *Cur. adv. vult.*

July 24.   The following judgments were handed down.

MILLETT L.J.   This is an appeal brought by the defendant with the
leave of the single Lord Justice from an order for summary judgment
given initially by the district judge and affirmed (for different reasons) by     D
Chadwick J. It raises important questions of principle in relation to a
claim by a mortgagee to recover from the solicitor who was acting for
both mortgagor and mortgagee the loss arising from the mortgagor's
subsequent default.
      The collapse in the property market which accompanied the recession
at the beginning of the present decade caused mortgage lenders to suffer     E
serious losses. Unable to recover their advances from the borrowers or by
the enforcement of their security they have sought to recover them from
the valuers or solicitors on whose valuations or advice they have relied. In
some cases they have been the victims of a fraud to which the valuers and
solicitors have been parties. In other cases, such as the present, they have
been unable to accuse their solicitor of anything more serious than
negligence. Believing that the common law rules of causation and     F
remoteness of damage might not enable them to recover the whole amount
of their loss they have turned to equity and alleged breach of trust or
fiduciary duty. We have thus been concerned to decide just what is
involved in these concepts.

*The facts*                                                               G
      The facts are not in dispute. The defendant is a solicitor. In August
1988 he acted for a Mr. and Mrs. Towers in the purchase of 17, Thameshill
Avenue, Romford for £73,000. In accordance with the usual practice he
also acted for the Bristol and West Building Society ("the society") to
which the purchasers had applied for an advance of £59,000 in order to
finance the purchase. (This was the Cheshunt Building Society, but its
rights have since vested in the society.) In their application form the     H
purchasers had stated that the balance of the purchase price of £14,000
was being provided by them personally and that they were not applying
elsewhere for financial assistance towards the purchase price.

7

Ch.         Bristol and West Building Society v. Mothew (C.A.)         Millett L.J.

A      The society offered to advance to the purchasers £59,000 on the security of a first mortgage of the property on the express condition that unless otherwise agreed in writing the balance of the purchase price was to be provided by the purchasers personally without resort to further borrowing and that no second mortgage or other loan was being arranged or contemplated in connection with the purchase. The defendant was provided with the offer of advance (but not with the purchasers'

B      application).
      The society's standing instructions to solicitors acting for the society required them to report to the society prior to completion, inter alia:

      "(viii) Any proposal that the applicant may create a second mortgage or enter into a promissory note or otherwise borrow in order to finance part of the purchase price. (ix) Any incorrect information

C      given in the solicitor's instructions. (x) Any other matters which ought to be brought to the notice of the society . . ."

The solicitor was required to submit a report on title and request for advance cheque to the society at least five clear working days before the cheque was required. This was done on a form by which the solicitor was asked to confirm, inter alia, that the title was good and marketable and

D      might safely be accepted by the society, that to the best of his knowledge and belief the balance of the purchase money was being provided by the applicant personally without resort to further borrowing, and that the special conditions attached to the offer of advance had been, or would be, complied with.
      Mr. and Mrs. Towers intended to provide the balance of the purchase

E      price from the net proceeds of sale of their existing property after discharging a subsisting mortgage. As it happens, they owed money to Barclays Bank which was secured by a second charge on that property. They arranged with the bank to allow a small part of the debt (£3,350) to remain outstanding after the sale of the existing property and to be secured by a second charge on the new property. The defendant was informed of these arrangements and gave an undertaking to the bank to

F      hold the title deeds to its order pending registration. Unfortunately, he either failed to appreciate that, although they related to old borrowing, they were a matter which he was required to report to the society, or he had forgotten or overlooked them when he made his report.
      By his report dated 2 August 1988 the defendant confirmed that to the best of his knowledge and belief the balance of the purchase money was

G      being provided by the applicants personally without resort to further borrowing and that the special conditions attached to the offer of advance had been or would be complied with. He failed to disclose the fact that Mr. and Mrs. Towers were making arrangements for a second mortgage in connection with the purchase.
      It is conceded by the defendant that his statements were untrue and that his failure to report the purchasers' arrangements for a second

H      mortgage was a breach of his instructions. The society alleges that the defendant acted negligently and in breach of contract, and this is admitted. There is no allegation of dishonesty or bad faith, and if any such allegation were made it would be strongly resisted. The society does not allege that

the defendant made the statements in question knowing them to be untrue. It alleges only that he "knew or ought to have known" that they were untrue, and this is consistent with oversight.

Following the receipt of the report the society forwarded a cheque for the amount of the advance to the defendant in readiness for completion on 30 August. Completion took place on that date when the mortgage advance was released to the vendor's solicitors as part of the purchase price for the property. Mr. and Mrs. Towers executed a first charge in favour of the society and a second charge in favour of the bank. On 25 November the defendant applied to the society for its consent to the registration of the second charge in favour of the bank. The society granted its consent on 10 March 1989. It does not appear that the society was aware of the date of the bank's charge (and so was aware that it constituted a breach of the conditions of the advance) when it gave its consent, but it is alleged that the society must have learnt of it shortly afterwards and nevertheless took no action.

The purchasers defaulted after making only small repayments and the society enforced its security. The property was sold on 6 February 1991 and realised net proceeds of a little under £53,000. The society claimed to recover the whole of its net loss on the transaction from the defendant, alleging breach of contract, negligence and breach of trust. As I have already indicated, breach of contract and negligence are admitted; breach of trust is denied.

It has always been the defendant's case that the society would not have been concerned by the purchasers' proposal to grant a second charge to the bank if this had been disclosed to it in August 1988, that it would still have proceeded with the transaction and that it would have suffered precisely the same loss in that event. It is alleged that, in the heady days of 1988, when the property market was at its height and mortgage lenders were falling over themselves to advance money to house purchasers, the society would not have been concerned by a proposal to grant a second charge to secure a relatively trivial indebtedness which did not even represent fresh borrowing; and it is contended that this is demonstrated by the lack of concern shown by the society when it was asked to give its consent to the registration of a second charge in March 1989. Despite the submissions of the society to the contrary, I am satisfied that, if legally relevant, these allegations raise a triable issue.

### The course of the proceedings below

It was common ground below that no damages would be recoverable at common law for breach of contract or tort unless the society could show that it would not have proceeded with the transaction if it had been informed of the facts. The society, however, submitted that the position was different in equity. It alleged that the defendant had committed a breach of trust or fiduciary duty, and submitted that common law principles of causation and remoteness of damage have no application in such a case so that it was not necessary for the society to show that it would not have proceeded with the transaction if it had been informed of the facts.

9

Ch.                Bristol and West Building Society v. Mothew (C.A.)            Millett L.J.

A    The district judge accepted these arguments. In respect of the common law claims for breach of contract and negligence she gave summary judgment for damages to be assessed. This was apparently on the basis that the judgment would leave it open to the defendant to contend that no loss was caused by the breach.

The district judge also gave summary judgment for the society for breach of trust for the sum of £59,000 less the sums received by the society
B    on the sale of the property, and this was affirmed by the judge, who was satisfied that there was no question or issue to be tried in the action and dismissed the appeal.

*The course of the appeal*

C    In the course of the appeal the defendant submitted that, by consenting to the registration of the second charge, the society waived the breaches of which complaint is made; and that this raises a triable issue on liability which entitles him to unconditional leave to defend in relation to all the pleaded causes of action. In the absence of any evidence or reason to suppose that the society was aware of the date of the second charge when it gave its consent to its registration, I am not persuaded that there is a
D    triable issue on waiver, and I would not disturb the order below on this ground.

When the appeal was first argued before us it was still conceded by the society that it could not recover damages at common law for breach of contract or negligence unless it could show that it would not have proceeded with the mortgage advance if it had been informed of the facts.
E    The society, however, maintained that it could escape this principle because the defendant was also guilty of a breach of trust and that common law rules of causation and remoteness of damage have no application in such a case. The critical questions, therefore, appeared to be whether the defendant was guilty of a breach of trust or fiduciary duty and if so whether the society needed to prove that it would not still have proceeded with the transaction if it had been told of the facts.
F    After we had reserved judgment on the appeal, however, the society informed us that it wished to resile from its concession. Relying on the recent decision of this court in *Downs v. Chappell* [1997] 1 W.L.R. 426, the society submitted that it was entitled to recover the whole of its net loss on the transaction by way of damages for negligence at common law without having to establish that it would not have proceeded with the
G    transaction if it had been informed of the facts. If correct, it submitted, this would be determinative of the case, and it would not be necessary for the society to rely on any breach of trust or fiduciary duty. Before the defendant's advisers could respond to this, speeches were delivered in the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. These were relevant to the common law position. For the reasons given by Staughton L.J., however, we decided that it was
H    not necessary to restore the appeal for further argument. This was because the assessment of damages at common law is still pending. They will have to be assessed in conformity with the decision of the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* and not

with any gloss which, in the absence of argument, we may inadvertently     A
have put upon that decision.

*The claims at common law*

The society has served a respondent's notice, in which it contends that
it is entitled to judgment for the sum claimed, and not merely for damages
to be assessed, in respect of its common law claims. If this is correct, then     B
the society does not need to establish that the defendant was guilty of a
breach of trust or fiduciary duty.

This question depends upon an alleged difference between the tests of
causation and remoteness of damage at common law and in equity. In a
case of the present kind, however, two different questions of causation are
involved and it is necessary to distinguish between them. Where a plaintiff
claims that he has suffered loss by entering into a transaction as a result     C
of negligent advice or information provided by the defendant, the first
question is whether the plaintiff can establish that the defendant's
negligence caused him to enter into the transaction. If he cannot his claim
must fail. But even if he can, it is not sufficient for him to establish that
the transaction caused him loss. He must still show what (if any) part of
his loss is attributable to the defendant's negligence. This is usually treated     D
as a question of the measure of damages rather than causation, and for
convenience I shall so treat it in this judgment, but it must be
acknowledged that it involves questions of causation.

In *Downs v. Chappell* [1997] 1 W.L.R. 426 the plaintiffs bought a small
business in reliance on trading figures contained in a letter from
the vendor's accountants which was forwarded to them by the vendor.
The vendor knew that the figures contained in the letter were false. The     E
plaintiffs sued the vendor for deceit and the accountants for negligence.
The judge accepted the plaintiffs' evidence that they would not have
contracted to purchase the business without verification of the figures by
the accountants. But he was not satisfied that they would not still have
bought the business even if the correct figures had been supplied, and
dismissed the action against both defendants.

This court allowed the plaintiffs' appeal against both defendants.     F
Hobhouse L.J. gave the only reasoned judgment. In relation to the vendor,
he pointed out that for a plaintiff to succeed in the tort of deceit it was
necessary for him to prove (1) a fraudulent representation, (2) materiality
and (3) inducement. All three elements had been proved. The judge had
found that the representations did induce the plaintiffs to enter into the
transaction: they would not have done so without them. This was sufficient     G
proof of causation. Whether the plaintiffs would have entered into the
transaction if they had been told the truth was irrelevant.

We are not concerned with this part of the decision, since the present
case is not one of fraud. But Hobhouse L.J. held that the position was the
same in relation to the accountants, who were charged with negligence
only. Here the question was not inducement but reliance. The relevant
question was simply whether the plaintiffs had entered into the contract     H
in reliance upon the figures contained in the accountants' letter. The judge
had answered that question in the affirmative: the plaintiffs would not
have entered into the contract if they had not been provided with the

11

Ch.          **Bristol and West Building Society v. Mothew (C.A.)**          Millett L.J.

A    letter. The causal relationship between the accountants' negligence and the plaintiffs' purchase was established. It was not necessary to consider whether the plaintiffs would have purchased the business if they had been supplied with the correct figures.

In the present case the society's claim is not for misrepresentation. Accordingly, questions of inducement and materiality are not relevant. Its claim lies in negligence, and the relevant concept is reliance. In considering
B    the issue of causation in an action for negligence brought by a client against his solicitor it appears from *Downs v. Chappell* that it is necessary to distinguish between two different kinds of case.

Where a client sues his solicitor for having negligently failed to give him proper advice, he must show what advice should have been given and (on a balance of probabilities) that if such advice had been given he would
C    not have entered into the relevant transaction or would not have entered into it on the terms he did. The same applies where the client's complaint is that the solicitor failed in his duty to give him material information. In *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113, which was concerned with a failure to give proper advice, the plaintiff was unable to establish this and his claim to damages for negligence failed. In *Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836,
D    which was concerned with a failure to convey information, the plaintiff was able to establish that if it had been given the information it would have withdrawn from the transaction and its claim succeeded.

Where, however, a client sues his solicitor for having negligently given him incorrect advice or for having negligently given him incorrect information, the position appears to be different. In such a case it is
E    sufficient for the plaintiff to prove that he relied on the advice or information, that is to say, that he would not have acted as he did if he had not been given such advice or information. It is not necessary for him to prove that he would not have acted as he did if he had been given the proper advice or the correct information. This was the position in *Downs v. Chappell* [1997] 1 W.L.R. 426.

In the present case the society makes complaints of both kinds. It
F    alleges that the defendant negligently and in breach of his instructions failed to report the purchasers' proposed arrangements with the bank prior to completion. This is a claim of the first kind, and if it were all the society would have to establish that if it had been informed of those arrangements it would not have proceeded with the mortgage advance. But the defendant went further than this. He did not merely fail to report
G    the arrangements to the society; he expressly represented to the society that no such arrangements existed. That brings the case within the second category. It follows from the decision of this court in *Downs v. Chappell* that it is sufficient for the society to prove that it relied on the representations in the report. Although the judge spoke in terms of inducement, he plainly found reliance. The society's procedures were designed to ensure that no cheque would be issued in the absence of a
H    satisfactory report from its solicitor.

In my judgment we are bound by the decision in *Downs v. Chappell* to hold that the necessary causal link between the defendant's negligence and the mortgage advance was proved.

*Measure of damages*                                                   A

It does not, however, follow from the fact that the defendant's negligent statements caused the society to make the mortgage advance that the whole of the society's loss is attributable to his negligence. Having regard to the date of the advance, some part at least of the society's loss may well be attributable to the fall in property values which had occurred by the time that it was able to sell the property.                B

In *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191 the House of Lords ruled definitively on the correct measure of damages for the negligent provision of information on which the plaintiff relied in entering into a transaction from which loss resulted. The only speech was delivered by Lord Hoffmann. He distinguished between the measure of damages for (1) breach of a contractual warranty and (2) breach of a duty (whether contractual or tortious) to take care    C (i) to give proper advice and (ii) to provide accurate information.

In the case of breach of warranty, the comparison is between the plaintiff's position as a result of entering into the transaction and what it would have been if the facts had been as warranted. The measure of damages is the extent to which the plaintiff would have been better off if the information had been right. In the case of a breach of duty to take    D care the measure of damages is the extent to which the plaintiff is worse off because the information was wrong. Since he entered into the transaction in reliance on the advice or information given to him by the defendant, the starting point is to compare his position as a result of entering into the transaction with what it would have been if he had not entered into the transaction at all.

But that is only the starting point. Lord Hoffmann distinguished    E between a duty to advise someone as to what course of action he should take and a duty to provide information for the purpose of enabling someone else to decide upon his course of action. In the former case, the defendant is liable for all the foreseeable consequences of the action being taken. In the latter case, however, he is responsible only for the consequences of the information being wrong. The measure of damages is    F not necessarily the full amount of the loss which the plaintiff has suffered by having entered into the transaction but only that part if any of such loss as is properly attributable to the inaccuracy of the information. If the plaintiff would have suffered the same loss even if the facts had actually been as represented the defendant is not liable.

Accordingly, in this class of case the plaintiff must prove two things: first, that he has suffered loss; and, secondly, that the loss fell within the    G scope of the duty he was owed. In the present case the society must prove what (if any) loss was occasioned by the arrangements which the purchasers had made with the bank.

The society was told that Mr. and Mrs. Towers had no other indebtedness and that no second charge was contemplated. The existence of the second charge did not affect the society's security. The absence of any indebtedness to the bank would not have put money in the purchasers'    H pocket; it would merely have reduced their liabilities. Whether their liability to the bank affected their ability to make mortgage repayments to the society has yet to be established, but given the smallness of the liability

13

Ch.        **Bristol and West Building Society v. Mothew (C.A.)**        Millett L.J.

A  its effect on the purchasers' ability to meet their obligations to the society
may have been negligible. It may even be, for example, that the purchasers
made no payments at all to the bank at the relevant time, and if so it is
difficult to see how any part of the loss suffered by the society can be
attributable to the inaccuracy of the information supplied to it by the
defendant. It would have occurred even if the information had been
correct.

B

### Conclusion

The society has proved the causal link between the defendant's
negligence and the making of the mortgage advance but it has not yet
established the amount of its loss (if any) which is properly attributable
C  to the defendant's negligence. Damages remain to be assessed. We are
bound by the decision of this court in *Downs v. Chappell* [1997] 1 W.L.R.
426 to hold that the society will not have to prove that it would not have
made the mortgage advance if it had known the true facts; but it will be
required to establish what it has lost as a result of the existence of the
second charge and the purchasers' indebtedness to the bank. It can
maintain the money judgment which it has obtained below only if it can
D  invoke equitable principles.

### The claims in equity

#### The judge's reasoning

The judge found that, in the events which happened, the defendant
E  committed a breach of trust by applying the mortgage advance in the
purchase of the property, that he was accordingly liable to restore the
trust property, viz. the £59,000 with interest less receipts, that no question
of damages at common law or of compensation for loss arose, and that it
was irrelevant whether, had it been told of the position, the society might
still have chosen to make the advance notwithstanding the arrangements
F  which had been made with the bank. Accordingly the judge concluded
that there was no question or issue to be tried in the action and gave
summary judgment for the whole of the society's claim.

The judge's conclusion that the defendant had committed a breach of
trust in applying the mortgage advance in the purchase of the property
was based on the fact that he had obtained payment of the mortgage
advance by misrepresentation. The judge said:
G

"it seems to me beyond argument that [the defendant] received the
cheque ... for £59,000 as a direct result of the misleading report
which he had supplied to the society on 2 August 1988. The money
was paid to the defendant ... as a result of a misrepresentation
made to the society by the defendant. ... *The effect, in my judgment,
was that from the moment when [the] cheque for £59,000 was received
H  by [the defendant] he held it upon a constructive trust to return it
forthwith to the society, unless authorised by the society to retain, or
dispose of, it after a full knowledge of the facts had been disclosed.*"
(My emphasis.)

In the judge's opinion it necessarily followed that the defendant's      A
subsequent application of the mortgage money in the purchase of the
property constituted a breach of trust. He said:

> "In making that payment there is, in my view, no doubt that the
> defendant acted in breach of the trust which had been imposed upon
> him by the circumstances in which he had received the society's
> cheque. That trust required him to return the £59,000 to the society.      B
> Any payment of that £59,000 to a third party, albeit to the vendors
> of the property, was a breach of that trust."

The judge dismissed the submission that the society had to establish that
it would not have made the advance if it had known the facts. He said:

> "But that point affords no defence to the [society]'s claim. It is
> nihil ad rem that if the true position had been disclosed to the society,      C
> the society might or might not have issued an amended offer of
> advance. Liability to repay arises in this case because [the defendant]
> received money from the society as a result of his own
> misrepresentation. He cannot be heard to say that he could retain
> that money against the society, or dispose of it to the vendors,
> because, in other circumstances, the society might have chosen to
> make the advance notwithstanding the borrowing from [the bank]."      D

The judge did not explain why the consequence of the defendant's
misrepresentation was that he held the mortgage advance on a constructive
trust for the society, or why the defendant's authority to apply the money
in accordance with the society's instructions was determined, but he took
the opportunity to do so when he revisited these questions a few months
later in *Bristol and West Building Society v. May May & Merrimans* [1996]      E
2 All E.R. 801 after two county court judges had declined to follow his
decision in the present case. The later case involved a number of
transactions in which the same society had made mortgage advances and
suffered loss when the borrowers defaulted which it sought to recover
from the solicitors who had acted for both parties to the lending
transactions. In some cases the solicitor knew nothing, prior to the receipt      F
of the cheque for the mortgage advance, which ought to have led him to
qualify his report, though he discovered the facts afterwards and before
he disbursed the money on completion. In other cases the solicitor's
breach of his instructions preceded his receipt of the mortgage advance,
as it did in the present case.

The judge distinguished between the two groups of cases. In relation
to the first group he reluctantly felt compelled by the decision in *Target*      G
*Holdings Ltd. v. Redferns* [1996] A.C. 421 to conclude that, at least for the
purpose of an application for summary judgment, it was necessary for the
society to show that it would not have proceeded with the transaction if it
had known the facts. In relation to the second group, however, where the
society paid the cheque for the mortgage advance to the solicitor in
response to a request based upon a warranty or representation which (as
the judge put it) the solicitor "knew or must be taken to have known" to      H
be misleading, he confirmed his previous decision in the present case. He
held that the society was entitled to succeed in such cases whether or not
it would have still made the advance if it had known the facts.

15

Ch.        Bristol and West Building Society v. Mothew (C.A.)        Millett L.J.

A    In the course of his judgment the judge explained how the constructive trust in question arose. It was, he said, because the solicitor had given misleading information to his client. This constituted a breach of fiduciary duty which enabled the court to impose a constructive trust on the property acquired as a result of the breach of duty. He said [1996] 2 All E.R. 801, 818:

B    "where moneys have been received by the solicitor from the society following a request based upon a warranty or representation which he knew, or must be taken to have known, to be misleading in some material respect, equity will give a remedy in respect of any loss which the society may suffer as a result of its payment in reliance upon that request. That will be a remedy based upon breach of fiduciary duty and may, where necessary, take the form of the

C    imposition of a constructive trust on those moneys to enforce the solicitor's obligation to return them to the society forthwith. The constructive trust imposed by equity to enforce the obligation to make immediate restitution overrides any express or implied trust which might otherwise arise out of any instructions given by [the society] when the money is paid to the solicitor. No reliance can be

D    placed on ... those instructions, because they are vitiated by the breach of duty by which they were obtained. ... In the absence of some fresh instructions, given by the society after full disclosure of the matters in respect of which it has been misled, the only course properly open to the solicitor is to repay the moneys to the society with interest."

E    The judge evidently considered himself to be imposing a remedial constructive trust as the appropriate remedy for a prior breach of fiduciary duty.
    The judge's references to the solicitor having made a representation which "he knew, or must be taken as having known" to be misleading is not an accurate description of the facts of the present case. It is not alleged that the defendant "knew or must be taken to have known" the

F    facts, but only that he "knew or ought to have known" them, which is a very different matter. In explaining his decision in the present case the judge said that the defendant's misrepresentation could not be described as innocent because he "clearly had the knowledge which made the representation false:" see [1996] 2 All E.R. 801, 832. That confuses knowledge with the means of knowledge. On the society's pleaded case

G    the defendant must be taken to have known the facts at one time but to have forgotten or overlooked them so that they were not present to his mind when he came to complete his report to the society.
    It is not alleged that the defendant deliberately concealed the arrangements which the purchasers had made with their bank from the society or that he consciously intended to mislead it. Nothing in this judgment is intended to apply to such a case. My observations are

H    confined to the case like the present where the provision of incorrect information by a solicitor to his client must be taken to have been due to an oversight. In such a case his breach of duty is unconscious; he will ex hypothesi be unaware of the fact that he has committed a breach of his

instructions; and if this means that his subsequent application of the          A
mortgage money constitutes a breach of trust then it will be a breach of a
trust of which he is unaware. I would not willingly treat such conduct as
involving a breach of trust or misapplication of trust money unless
compelled by authority to do so, and in my judgment neither principle
nor authority compels such a conclusion.

Before us the defendant submits that, while he was guilty of negligence
and breach of contract, he was not guilty of a breach of trust or fiduciary          B
duty. It is convenient to take first the question of fiduciary duty, and then
to consider the question of breach of trust.

### Breach of fiduciary duty

Despite the warning given by Fletcher Moulton L.J. in *In re Coomber;
Coomber v. Coomber* [1911] 1 Ch. 723, 728, this branch of the law has          C
been bedevilled by unthinking resort to verbal formulae. It is therefore
necessary to begin by defining one's terms. The expression "fiduciary
duty" is properly confined to those duties which are peculiar to fiduciaries
and the breach of which attracts legal consequences differing from those
consequent upon the breach of other duties. Unless the expression is so
limited it is lacking in practical utility. In this sense it is obvious that not          D
every breach of duty by a fiduciary is a breach of fiduciary duty. I would
endorse the observations of Southin J. in *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362:

> "The word 'fiduciary' is flung around now as if it applied to all
> breaches of duty by solicitors, directors of companies and so
> forth. . . . That a lawyer can commit a breach of the special duty [of
> a fiduciary] . . . by entering into a contract with the client without          E
> full disclosure . . . and so forth is clear. But to say that simple
> carelessness in giving advice is such a breach is a perversion of
> words."

These remarks were approved by La Forest J. in *LAC Minerals Ltd. v.
International Corona Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 where
he said: "not every legal claim arising out of a relationship with fiduciary          F
incidents will give rise to a claim for breach of fiduciary duty."

It is similarly inappropriate to apply the expression to the obligation
of a trustee or other fiduciary to use proper skill and care in the discharge
of his duties. If it is confined to cases where the fiduciary nature of the
duty has special legal consequences, then the fact that the source of the
duty is to be found in equity rather than the common law does not make          G
it a fiduciary duty. The common law and equity each developed the duty
of care, but they did so independently of each other and the standard of
care required is not always the same. But they influenced each other, and
today the substance of the resulting obligations is more significant than
their particular historic origin. In *Henderson v. Merrett Syndicates Ltd.*
[1995] 2 A.C. 145, 205 Lord Browne-Wilkinson said:

> "The liability of a fiduciary for the negligent transaction of his duties          H
> is not a separate head of liability but the paradigm of the general
> duty to act with care imposed by law on those who take it upon
> themselves to act for or advise others. Although the historical

17

Ch.                    Bristol and West Building Society v. Mothew (C.A.)            Millett L.J.

A    development of the rules of law and equity have, in the past, caused different labels to be stuck on different manifestations of the duty, in truth the duty of care imposed on bailees, carriers, trustees, directors, agents and others is the same duty: it arises from the circumstances in which the defendants were acting, not from their status or description. It is the fact that they have all assumed responsibility for the property or affairs of others which renders them liable for the careless performance of what they have undertaken to do, not the description of the trade or position which they hold."

B

I respectfully agree, and endorse the comment of Ipp J. in *Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 157:

C    "It is essential to bear in mind that the existence of a fiduciary relationship does not mean that every duty owed by a fiduciary to the beneficiary is a fiduciary duty. In particular, a trustee's duty to exercise reasonable care, though equitable, is not specifically a fiduciary duty . . ."

Ipp J. explained, at p. 158:

D    "The director's duty to exercise care and skill has nothing to do with any position of disadvantage or vulnerability on the part of the company. It is not a duty that stems from the requirements of trust and confidence imposed on a fiduciary. In my opinion, that duty is not a fiduciary duty, although it is a duty actionable in the equitable jurisdiction of this court. . . . I consider that Hamilton owed P.B.S. a duty, both in law and in equity, to exercise reasonable care and skill, and P.B.S. was able to mount a claim against him for breach of the legal duty, and, in the alternative, breach of the equitable duty. For the reasons I have expressed, in my view the equitable duty is not to be equated with or termed a 'fiduciary' duty."

E

I agree. Historical support for this analysis may be found in Viscount Haldane L.C.'s speech in *Nocton v. Lord Ashburton* [1914] A.C. 932, 956. Discussing the old bill in Chancery for equitable compensation for breach of fiduciary duty, he said that he thought it probable that a demurrer for want of equity would always have lain to a bill which did no more than seek to enforce a claim for damages for negligence against a solicitor.

F

In my judgment this is not just a question of semantics. It goes to the very heart of the concept of breach of fiduciary duty and the availability of equitable remedies.

G    Although the remedy which equity makes available for breach of the equitable duty of skill and care is equitable compensation rather than damages, this is merely the product of history and in this context is in my opinion a distinction without a difference. Equitable compensation for breach of the duty of skill and care resembles common law damages in that it is awarded by way of compensation to the plaintiff for his loss. There is no reason in principle why the common law rules of causation, remoteness of damage and measure of damages should not be applied by analogy in such a case. It should not be confused with equitable compensation for breach of fiduciary duty, which may be awarded in lieu of rescission or specific restitution.

H

A

This leaves those duties which are special to fiduciaries and which attract those remedies which are peculiar to the equitable jurisdiction and are primarily restitutionary or restorative rather than compensatory. A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets.

B

A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr. Finn pointed out in his classic work *Fiduciary Obligations* (1977), p. 2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary.

C

(In this survey I have left out of account the situation where the fiduciary deals with his principal. In such a case he must prove affirmatively that the transaction is fair and that in the course of the negotiations he made full disclosure of all facts material to the transaction. Even inadvertent failure to disclose will entitle the principal to rescind the transaction. The rule is the same whether the fiduciary is acting on his own behalf or on behalf of another. The principle need not be further considered because it does not arise in the present case. The mortgage advance was negotiated directly between the society and the purchasers. The defendant had nothing to do with the negotiations. He was instructed by the society to carry out on its behalf a transaction which had already been agreed.)

D

E

The nature of the obligation determines the nature of the breach. The various obligations of a fiduciary merely reflect different aspects of his core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore, connotes disloyalty or infidelity. Mere incompetence is not enough. A servant who loyally does his incompetent best for his master is not unfaithful and is not guilty of a breach of fiduciary duty.

F

In the present case it is clear that, if the defendant had been acting for the society alone, his admitted negligence would not have exposed him to a charge of breach of fiduciary duty. Before us counsel for the society accepted as much, but insisted that the fact that he also acted for the purchasers made all the difference. So it is necessary to ask: "Why did the fact that the defendant was acting for the purchasers as well as for the society convert the defendant's admitted breach of his duty of skill and care into a breach of fiduciary duty?" To answer this question it is necessary to identify the fiduciary obligation of which he is alleged to have been in breach.

G

It is at this point, in my judgment, that the society's argument runs into difficulty. A fiduciary who acts for two principals with potentially conflicting interests without the informed consent of both is in breach of the obligation of undivided loyalty; he puts himself in a position where his duty to one principal *may* conflict with his duty to the other: see *Clark*

H

19

Ch.          Bristol and West Building Society v. Mothew (C.A.)          Millett L.J.

A  *Boyce v. Mouat* [1994] 1 A.C. 428 and the cases there cited. This is sometimes described as "the double employment rule." Breach of the rule automatically constitutes a breach of fiduciary duty. But this is not something of which the society can complain. It knew that the defendant was acting for the purchasers when it instructed him. Indeed, that was the very reason why it chose the defendant to act for it. The potential conflict was of the society's own making: see *Finn, Fiduciary Obligations*, p. 254
B  and *Kelly v. Cooper* [1993] A.C. 205.

It was submitted on behalf of the society that this is irrelevant because the defendant misled the society. It did not know of the arrangements which the purchasers had made with their bank, and so could not be said to be "fully informed" for the purpose of absolving the defendant from the operation of the double employment rule. The submission is
C  misconceived. The society knew all the facts relevant to its choice of solicitor. Its decision to forward the cheque for the mortgage advance to the defendant and to instruct him to proceed was based on false information, but its earlier decision to employ the defendant despite the potentially conflicting interest of his other clients was a fully informed decision.

D  That, of course, is not the end of the matter. Even if a fiduciary is properly acting for two principals with potentially conflicting interests he must act in good faith in the interests of each and must not act with the intention of furthering the interests of one principal to the prejudice of those of the other: see *Finn*, p. 48. I shall call this "the duty of good faith." But it goes further than this. He must not allow the performance of his obligations to one principal to be influenced by his relationship with
E  the other. He must serve each as faithfully and loyally as if he were his only principal.

Conduct which is in breach of this duty need not be dishonest but it must be intentional. An unconscious omission which happens to benefit one principal at the expense of the other does not constitute a breach of fiduciary duty, though it may constitute a breach of the duty of skill and
F  care. This is because the principle which is in play is that the fiduciary must not be inhibited by the existence of his other employment from serving the interests of his principal as faithfully and effectively as if he were the only employer. I shall call this "the no inhibition principle." Unless the fiduciary is inhibited or believes (whether rightly or wrongly) that he is inhibited in the performance of his duties to one principal by
G  reason of his employment by the other his failure to act is not attributable to the double employment.

Finally, the fiduciary must take care not to find himself in a position where there is an *actual* conflict of duty so that he cannot fulfil his obligations to one principal without failing in his obligations to the other: see *Moody v. Cox and Hatt* [1917] 2 Ch. 71; *Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453. If he does, he may have no
H  alternative but to cease to act for at least one and preferably both. The fact that he cannot fulfil his obligations to one principal without being in breach of his obligations to the other will not absolve him from liability. I shall call this "the actual conflict rule."

In the present case the judge evidently thought that the defendant was   A
in breach of both the duty of good faith and the actual conflict rule. In
*Bristol and West Building Society v. May May & Merrimans* [1996] 2 All
E.R. 801, 817–818 he said:

> "there can be no doubt that the requirement of unconscionable
> conduct is present where a solicitor who is acting for both borrower
> and lender misrepresents to the lender some fact *which he knows, or*   B
> *must be taken to know,* will or may affect the lender's decision to
> proceed with the loan. In those circumstances the solicitor *is abusing*
> *his fiduciary relationship with one client, the lender, to obtain an*
> *advantage for his other client, the borrower.* It is as much 'against the
> dictates of conscience' for a solicitor *knowingly to prefer the interests*
> *of one client over those of another client* as it is for him to prefer his
> own interests over those of his client." (My emphasis.)                 C

I respectfully agree; but no such allegation is made in the present case.
  As to the actual conflict rule, the judge said, at p. 832:

> "First, in *Mothew,* the 'agent' was a fiduciary who had put himself in
> a position in which his duty to the lender *was* in conflict with the
> interests of his other client, the borrower." (My emphasis.)            D

I do not accept this. By instructing him to act for them, the purchasers
must be taken to have authorised the defendant to complete the report
without which the mortgage advance would not have been forthcoming;
and to complete it truthfully. The defendant was required by the society
to report on the purchasers' title as well as to confirm the absence of any
further borrowing. The two stood in exactly the same case. The defendant   E
would not have been in breach of his duty to the purchasers if he had
disclosed the facts to the society any more than if he had reported a defect
in their title.
  This proposition can be tested by considering what the defendant's
position would have been if he had acted for the purchasers and another
solicitor had been instructed to act for the society. He would have been
required to deduce the purchasers' title to the satisfaction of the society's   F
solicitor, and to confirm to him that no further borrowing or second
charge was in contemplation. His duty to the purchasers would have
required him to ascertain the facts from them and to report them to
the society. Unless they told him the facts and instructed him to lie to the
society, instructions which he would be bound to refuse, his duty to the
purchasers would not inhibit him in providing full and truthful information   G
to the solicitor acting for the society.
  In my judgment, the defendant was never in breach of the actual
conflict rule. It is not alleged that he acted in bad faith or that he
deliberately withheld information because he wrongly believed that his
duty to the purchasers required him to do so. He was not guilty of a
breach of fiduciary duty.
  The judge relied on *Nocton v. Lord Ashburton* [1914] A.C. 932 and   H
*Commonwealth Bank of Australia v. Smith*, 102 A.L.R. 453 to hold that a
party who pays money to his solicitor in reliance on a representation
*known* by the solicitor to be false has a remedy for breach of fiduciary

21

Ch.          Bristol and West Building Society v. Mothew (C.A.)          Millett L.J.

A  duty. Neither case is authority for the proposition (though its correctness is not in issue); certainly neither is authority for the proposition that a party who pays money to a solicitor in reliance on a representation which the solicitor *ought to have known* to be false has such a remedy.

In *Nocton v. Lord Ashburton* [1914] A.C. 932 a solicitor had an undisclosed personal interest in a transaction on which he gave his client advice which was to his own advantage and the disadvantage of his client.

B  The plaintiff pleaded breach of the duty of good faith. In fact this was unnecessary; the existence of the defendant's undisclosed interest was enough: see *Lewis v. Hillman* (1852) 3 H.L.Cas. 607. The plaintiff was entitled to receive, and thought that he was receiving, the disinterested advice of a solicitor with no other interest in the transaction. *Commonwealth Bank of Australia v. Smith,* 102 A.L.R. 453 involved a

C  breach of the actual conflict rule. The defendant, who was acting for both parties to a proposed transaction, placed himself in an impossible position by undertaking to advise one of them on the merits of the transaction.

In *Moody v. Cox and Hatt* [1917] 2 Ch. 71 a solicitor, who was acting for both vendor and purchaser, was in possession of valuations which showed that the property was not worth the price which the purchaser had agreed to pay. He did not disclose them to the purchaser, and claimed

D  that his duty to the vendor precluded him from doing so. The purchaser was allowed to rescind. The case bears a superficial resemblance to the present but there are two crucial differences: (i) the vendor was under no obligation to disclose the valuations to the purchaser and did not wish his solicitor do so; and (ii) the vendor and the solicitor tacitly agreed to

E  conceal the valuations from the purchaser. The solicitor was in breach of both the duty of good faith and the actual conflict rule; his defence fell foul of the no inhibition principle.

That was a case of deliberate concealment. Non-disclosure and concealment are two very different things. This has been a truism of the law from the time of Cicero (De Officiis, lib. 3, c. 12, 13 citing Diogenes

F  of Babylon). It is even enshrined, like other such truisms, in a Latin tag: aliud est celare, aliud tacere.

The society placed much reliance on a dictum by Lord Jauncey of Tullichettle in *Clark Boyce v. Mouat* [1994] 1 A.C. 428, 437 where he said:

"Another case of breach [of fiduciary duty] is where a solicitor acts for both parties to a transaction without disclosing this to one of

G  them *or where having disclosed it he fails, unbeknown to one party, to disclose to that party material facts relative to the other party of which he is aware.*" (My emphasis.)

But I do not think that Lord Jauncey meant to include an inadvertent failure which owes nothing to the double employment. Where such failure

H  is to the advantage of the other party, the court will jealously scrutinise the facts to ensure that there has been nothing more than inadvertence, but there can be no justification for treating an unconscious failure as demonstrating a want of fidelity.

In my judgment the distinction drawn by Ipp J. in *Permanent Building*    A
*Society v. Wheeler,* 14 A.C.S.R. 109 is sound in principle and is decisive
of the present case. On the society's pleaded case the fact that the
defendant was acting for the purchasers played no part in his failure to
report the true state of affairs to the society. It did not inhibit him from
fulfilling his obligations to the society. It is consistent with its pleaded case
that the defendant would have done so but for a negligent oversight. It
would have been exactly the same if he had failed to notice and report the    B
existence of a defect in the purchasers' title. To characterise either such
failure as a breach of fiduciary duty because he was acting for both parties
in a situation where that fact did not contribute to his failure is, in my
opinion, to substitute a verbal formula for principle.

In my judgment the judge's conclusion that the defendant was in
breach of fiduciary duty cannot be supported. It follows that it cannot be    C
sustained as a ground for holding the defendant in breach of a constructive
trust of the mortgage money.

### Breach of trust

It is not disputed that from the time of its receipt by the defendant the
mortgage money was trust money. It was client's money which belonged    D
to the society and was properly paid into a client account. The defendant
never claimed any beneficial interest in the money which remained
throughout the property of the society in equity. The defendant held it in
trust for the society but with the society's authority (and instructions) to
apply it in the completion of the transaction of purchase and mortgage of
the property. Those instructions were revocable but, unless previously
revoked, the defendant was entitled and bound to act in accordance with    E
them.

The society's instructions were not revoked before the defendant acted
on them, and in my judgment there was no ground upon which the judge
could properly conclude that his authority to apply the money in
completing the transaction had determined.

If his judgment in the present case is considered without the benefit of    F
his later explanation in *Bristol and West Building Society v. May May
& Merrimans* [1996] 2 All E.R. 801, it would appear that the judge was of
opinion that the defendant's authority to deal with the money was
automatically vitiated by the fact that it (and the cheque itself) was
obtained by misrepresentation. But that is contrary to principle.
Misrepresentation makes a transaction voidable not void. It gives the
representee the right to elect whether to rescind or affirm the transaction.    G
The representor cannot anticipate his decision. Unless and until the
representee elects to rescind the representor remains fully bound. The
defendant's misrepresentations merely gave the society the right to elect to
withdraw from the transaction on discovering the truth. Since its
instructions to the defendant were revocable in any case, this did not
materially alter the position so far as he was concerned, though it may
have strengthened the society's position in relation to the purchasers.    H

The right to rescind for misrepresentation is an equity. Until it is
exercised the beneficial interest in any property transferred in reliance on
the representation remains vested in the transferee. In *El Ajou v. Dollar*

23

Ch.    **Bristol and West Building Society v. Mothew (C.A.)**    Millett L.J.

A  *Land Holdings Plc.* [1993] 3 All E.R. 717, 734 I suggested that on rescission the equitable title might revest in the representee retrospectively at least to the extent necessary to support an equitable tracing claim. I was concerned to circumvent the supposed rule that there must be a fiduciary relationship or retained beneficial interest before resort may be had to the equitable tracing rules. The rule would have been productive of the most extraordinary anomalies in that case, and its existence continually threatens B  to frustrate attempts to develop a coherent law of restitution. Until the equitable tracing rules are made available in support of the ordinary common law claim for money had and received some problems will remain incapable of sensible resolution.

But all that is by the way. Whether or not there is a retrospective vesting for tracing purposes it is clear that on rescission the equitable title C  does not revest retrospectively *so as to cause an application of trust money which was properly authorised when made to be afterwards treated as a breach of trust.* In *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548 Lord Goff of Chieveley said, at p. 573:

> "Of course, 'tracing' or 'following' property into its product involves a decision by the owner of the original property to assert his title to D  the product in place of his original property. This is sometimes referred to as ratification. I myself would not so describe it, but it has, in my opinion, at least one feature in common with ratification, that it cannot be relied upon so as to render an innocent recipient a wrongdoer (cf. *Bolton Partners v. Lambert* (1889) 41 Ch.D. 295, 307, *per* Cotton L.J.: 'an act lawful at the time of its performance [cannot] be rendered unlawful, by the application of the doctrine of E  ratification.')"

In *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669 Lord Browne-Wilkinson expressly rejected the possibility that a recipient of trust money could be personally liable, regardless of fault, for any subsequent payment away of the moneys to third parties even though, at the date of such payment, he was ignorant F  of the existence of any trust. He said, at p. 705:

> "Since the equitable jurisdiction to enforce trusts depends upon the conscience of the holder of the legal interest being affected, he cannot be a trustee of the property if and so long as he is ignorant of the facts alleged to affect his conscience, i.e. until he is aware that he is intended to hold the property for the benefit of others in the case G  of an express or implied trust or, in the case of a constructive trust, of the factors which are alleged to affect his conscience."

Mutatis mutandis that passage is directly applicable in the present case. The defendant knew that he was a trustee of the money for the society; but he did not realise that he had misled the society and could not know that his authority to complete had determined (if indeed it had). He could H  not be bound to repay the money to the society so long as he was ignorant of the facts which had brought his authority to an end, for those are the facts which are alleged to affect his conscience and subject him to an obligation to return the money to the society.

Before us the society put forward a more sophisticated argument. The A defendant's instructions, it pointed out, expressly required him to report the arrangements in question "to the society prior to completion." This, it was submitted, made it a condition of the defendant's authority to complete that he had complied with his obligation. Whether he knew it or not, he had no authority to complete. It was not necessary for the society to revoke his authority or withdraw from the transaction. I do not accept this. The society's standing instructions did not clearly make the B defendant's authority to complete conditional on having complied with his instructions. Whether they did so or not is, of course, a question of construction, and it is possible that the society could adopt instructions which would have this effect. But it would in my judgment require very clear wording to produce so inconvenient and impractical a result. No solicitor could safely accept such instructions, for he could never be C certain that he was entitled to complete.

In my judgment the defendant's authority to apply the mortgage money in the completion of the purchase was not conditional on his having first complied with his contractual obligations to the society, was not vitiated by the misrepresentations for which he was responsible but of which he was unaware, had not been revoked, and was effective to prevent his payment being a breach of trust. Given his state of knowledge (and, D more importantly, that his authority had not been revoked), he had no choice but to complete.

### Conclusion

In my judgment the defendant was not guilty of breach of trust or fiduciary duty. This makes it unnecessary to consider what the E consequences of such a breach would have been. I would allow the appeal and set aside the money judgment. I would leave undisturbed the judgments for damages to be assessed for breach of contract and negligence, but make it clear that it does not follow that the society will establish any recoverable loss.

OTTON L.J.  I have read with advantage the judgments of Staughton F and Millett L.JJ. I agree with the analysis and reasoning regarding breach of trust and of fiduciary duty. I wish only to add a few words on the extant common law claims.

I am satisfied that there was sufficient evidence before the judge to establish negligence on the part of the defendant. There was the requisite proximity between the parties, and there was foreseeability of damage. G Thus a duty of care arose. This duty included answering correctly such questions as were posed by the proposed lender and which it was reasonable for him to be required to answer. The answer sought was one of fact and not opinion. The fact sought could have been supplied accurately by information which was within his knowledge. If it was not at his fingertips the information was either on file or could easily have been obtained by direct inquiry of the intending purchaser. His breach of H duty occurred when he conveyed the inaccurate information to the plaintiff. The duty was not simply a duty not to act carelessly; it was a duty not to inflict damage carelessly. Damage is the gist of the action.

25

Ch.          Bristol and West Building Society v. Mothew (C.A.)          Otton L.J.

A    The more complex issues are whether the inaccurate information given was causative of damage, and if so what measure. To my mind it is not necessary to adopt a particular procedural path to find the answer. I appreciate that Lord Hoffmann suggests that it is first necessary to decide the kind of loss to which the plaintiff is entitled. This may be appropriate in most cases where negligence/causation is involved. From a practical point of view in some cases it may be more expedient to establish

B    the causal link between the negligent act or omission and the reliance by the plaintiff or the course of action which he was induced to take. The judge may find as a fact that there was no reliance or that the plaintiff would have behaved in the same or substantially the same manner if he had been given accurate information; in either event the negligence had no causative potency. That is the end of the matter. The chain is broken,

C    there is no loss at all and there is no need to consider or determine the kind of loss.

In other cases it may be appropriate to identify the type or particular head of damage claimed. This may identify damage which is too remote and for which no remedy lies (e.g. economic loss), and the claim in respect of it fails in limine. As I concur that the damages award must now be set aside the issue of the measure of damage, if any, is now at large. I regard

D    the evidence (in particular the hearsay evidence of Ms Samantha Bennett at paragraph 29 of Mr. Prees's affidavit) as falling short of resolving the issues of causation or damage. It does not (for example) address the possibility of a revised offer if the accurate and full position had been explained to the plaintiff.

I do not think it necessary to conclude whether there was a breach of

E    contract. This cause of action probably adds nothing to the case in negligence. It is unlikely that there is any practical difference between a breach of the duty of care and a breach of contract, or in the issues arising on causation, or the measure of damages. If there is any issue it can be determined by the trial judge. I also consider that there was no waiver.

For these reasons I consider that there are triable issues and they should be determined by a judge at first instance.

F    I would therefore allow the appeal and remit the assessment of damages as proposed by Staughton L.J. and dismiss the respondent's notice.

STAUGHTON L.J. Mr. Mothew made his report to the Cheshunt

G    Building Society on 2 August 1988. In it he answered one of the questions asked as follows:

"Q. Please confirm that (to the best of your knowledge and belief) the balance of the purchase money is being provided by the applicant(s) personally without resort to further borrowing. If not please give details. A. Confirmed."

H    That was untrue. There were other aspects of the same error, but I need not go into them in detail. Although Mr. Mothew had the means of knowledge in his possession, which could have brought the error to his attention, it is not said that he acted fraudulently or in bad faith.

The ordinary remedy of a client who has received wrong information    A
or advice from his solicitor is to claim damages for negligence, whether as
a breach of contract or as a tort. For such a claim to give rise to
substantial damages the building society would have to show that the
breach of contract or negligence caused them loss. By their respondent's
notice they seek to say that, if they had known the true facts, they would
not have lent any money to Mr. and Mrs. Towers.

The judge regarded that point as immaterial, since the building society    B
succeeded on other grounds. If it is material, in my opinion it raises a
triable issue. According to Samantha Bennett of the society's advances
department, the offer of advance would have immediately been withdrawn
if the society had known that even £3,350 was being borrowed elsewhere.
In the nature of things Mr. Mothew is unlikely to have evidence which
directly controverts that statement. But there are grounds for supposing    C
that it may be open to question. I would not give judgment under R.S.C.,
Ord. 14 on the basis that it is true. If it is critical, the case must go to
trial, perhaps with the aid of interrogatories and discovery of documents.

However in this particular case the building society were not the sole
clients of Mr. Mothew; he was also the solicitor acting for Mr. and
Mrs. Towers. That is said to make all the difference, because Mr. Mothew    D
then became under a fiduciary duty to the building society. And the
argument is that for breach of fiduciary duty the remedy does not depend
on causation or remoteness; all that is necessary is that the loss would not
have occurred *but for* the breach of duty.

It seems to me wrong that a breach of contract or tort should become
a breach of fiduciary duty in that way. I am glad to find that the
authorities relied on by Millett L.J. show that it is wrong. In my judgment    E
Mr. Mothew was in breach of a duty of care and nothing more. True he
was in a situation where he owed duties to two clients, and those duties
might conflict with each other. But he did not prefer the interest of one
client to that of another; at most he was guilty of negligence which had
that unintended effect.

Alternatively it is said that Mr. Mothew was in breach of trust because    F
he paid away the trust fund contrary to his instructions. He did indeed
hold the £59,000 in trust; it was not his own money. There was in my
opinion an express or implied trust, and not (as the judge held) a
constructive trust. But he did not pay it away contrary to the society's
instructions. The cheque reached Mr. Mothew with a letter dated
23 August 1988, which in effect instructed him to use it for completion of    G
the proposed purchase. That was what he did.

There being in my opinion no breach of fiduciary duty or breach of
trust, it is unnecessary to consider what remedy such a breach might have
afforded.

Thus far the appeal succeeds, but there remains judgment on the cause
of action at common law for damages to be assessed. Mr. Sumption says
that even that must go, since there is a triable issue as to waiver by the    H
building society. The problem that he faces is that, although the building
society readily agreed when they were asked to consent to the registration
of the second charge, they are not shown to have known that the second

27

Ch.        Bristol and West Building Society v. Mothew (C.A.)        Staughton L.J.

A  charge was contemplated and intended at the time of Mr. Mothew's report. There has been ample opportunity to produce evidence that they knew, if indeed they did. In my judgment there was no waiver.

When the argument before us was concluded on 21 May that was all that we had to decide. But we have since been asked to consider the judgment of Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426 and
B  the speech of Lord Hoffmann in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. Such has been the volume of litigation on the topic of loss to lenders following negligent professional advice and the collapse of the property market that judges risk being overtaken by new authority.

The Court of Appeal in the *Banque Bruxelles* case began with a reference to the well known principle that damages should be as nearly as
C  possible the sum which would put the plaintiff in the position in which he would have been if he had not been injured. That would lead to two possible answers in the present case. (1) If there had been no report from Mr. Mothew to the building society, the money would not have been lent; the society would still have their £59,000. There would have been no transaction, a phrase which I use not as a label for anything but as a
D  description of the fact. (2) If Mr. Mothew had provided an accurate report to the building society, then they might have been content to proceed on the terms previously proposed, or they might have made a revised offer, or they might have proceeded as in (1) above. There is a triable issue as to that. Left to myself, I would have ruled that (2) was the appropriate situation for the judge to consider in assessing the damages.
E  But I have to acknowledge that Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426, with the agreement of Butler-Sloss and Roch L.JJ., preferred method (1), both for fraudulent misrepresentation and for negligence.

Lord Hoffmann, in the *Banque Bruxelles* case [1997] A.C. 191, 211, as it seems to me, considered that either method was the wrong place to
F  begin:

"Before one can consider the principle on which one should calculate the damages to which a plaintiff is entitled as compensation for loss, it is necessary to decide for what kind of loss he is entitled to compensation."

G  There follows an exposition of the problem and the answer to it, as set out in the judgment of Millett L.J.

For my part I feel that we should not at this stage purport to instruct the judge who has to assess the damages by a paraphrase or interpretation of that decision, for a number of reasons. First, we have not heard argument on it, and our judgment is already long delayed by intervening
H  material. I am told it would be impractical for us to have a further hearing before October. Secondly, the judge has yet to find the facts relating to the assessment of damages. Thirdly, the judge must be guided by what Lord Hoffmann has said and not by any gloss of ours.

I would allow the appeal and remit the assessment of damages, either
to Chadwick J. or to another judge of the Chancery Division as the
exigencies of business may require. The cross-appeal should be dismissed.

*Appeal allowed.*
*Cross-appeal dismissed.*

*Solicitors: Wansbroughs Willey Hargrave; Osborne Clarke, Bristol.*

[Reported by JILL SUTHERLAND, Barrister]

———————

[COURT OF APPEAL]

# TURNER v. STEVENAGE BOROUGH COUNCIL

1997   March 6      Staughton, Pill and Mummery L.JJ.

*Arbitration—Arbitrator—Misconduct—Application to remove arbitra-
tor—Lengthy correspondence and preliminary proceedings—Arbitra-
tor proposing interim payment of fees and expenses—Payment
by one party only—Subsequent return of payment—Whether
misconduct—Whether arbitrator to be removed—Arbitration Act
1950 (14 & 15 Geo. 6, c. 27), s. 23*

In February 1993 an arbitrator was appointed to conduct
arbitration proceedings relating to a rent review between the
council, as landlords of a shop, and the tenant. The arbitrator's
terms of appointment contained no express provision for payment
of interim fees or expenses. The parties contemplated that the
arbitration would be concluded within about three months and
the arbitrator stated that the award would be made by 30 June
1993. In May 1994, after lengthy correspondence and five
preliminary hearings, the arbitration had still not concluded and
the arbitrator wrote to both parties suggesting a timetable for the
hearing and requesting payment by each party of half his interim
fees and expenses. The tenant objected and asked whether, if
payment were not made, the arbitrator would not hear the
arbitration. The arbitrator replied that the first priority was to fix
the hearing and to resolve the dispute, but that he hoped the
parties would agree that it was reasonable that he should receive
interim payment for time expended on the matter. The council
paid the sum to the arbitrator, but three months later, after
taking legal advice, he returned it. The tenant applied for the
arbitrator to be removed for misconduct under section 23 of the
Arbitration Act 1950[1] on the ground that he had no power to

———

[1] Arbitration Act 1950, s. 23: "(1) Where an arbitrator or umpire has misconducted
himself or the proceedings, the High Court may remove him."



**Tab 7**

**In The Supreme Court of Bermuda**

**Commercial Jurisdiction 2004 No. 257**

**BETWEEN:**

**1. ALLEN WALSH**
**2. HANS TAAL**
**3. BOOMER TRADING COMPANY LIMITED**          Plaintiffs

v

**HORIZON BANK INTERNATIONAL LIMITED (IN LIQUIDATION)**      Defendant

Dated the 31st March 2008

Mr N Hargun and Mr C Luthi for the Plaintiffs

Mr J Woloniecki and Ms S Subair for the Defendant

**Fraud - Beneficial ownership of offshore bank - Tracing claim - Scope of investment authority - Breach of fiduciary duty - Conspiracy**

The following cases were referred to in the judgment:

*AIC Ltd v ITS Testing Services Ltd ("The Kriti Palm")* [2007] 1 Lloyds Rep 555
*Bristol and West Building Society v Mothew* [1998] Ch 1
*Arklow Investments Ltd v Maclean* [2000] 1 WLR 594
*El Ajou v Dollar Holdings plc* [1994] 2 All ER 685
*Stolzenberg and others v Mellon Trust Co. Ltd* [2006] EWCA Civ 827
*Wai Yu-Tsang v R* [1992] 1 AC 269
*Belmont Finance Corporation v Williams Furniture Ltd (No. 2)* [1980] 1 All ER 393
*Re H (restraint order: realisable property)* [1996] 2 BCLC 500
*Re Hallett's Estate* (1879) 13 Ch D 696

**JUDGMENT of KAWALEY, J**

**Introductory**

1.      Although this is a case with a strong Caribbean flavour, the narrative which unfolded through the evidence begins in Toronto, and also features Bermuda and New York. The Plaintiffs claim to have been defrauded by individuals based in Ontario operating through companies incorporated principally in Antigua and Barbuda, The Bahamas, and Saint Vincent and the Grenadines. The Defendant, now in liquidation, called no positive evidence in answer to the various serious allegations made against the company's former management. However, it was contended that for illegality and various other reasons, the Plaintiffs should be denied relief.

2.      The trial of this action was originally scheduled to last for ten days. In the event, largely due to exemplary party-driven case management in which the Defendant responded pragmatically to the Plaintiffs' Notices to Admit Facts, the trial only consumed less than seven full days of court time. Although a range of technical legal issues were canvassed by counsel, it appeared to me that there were few (if any) significant differences of pure legal principle. Rather, controversy turned on how principles, the substance of which was common ground, should properly be applied to the relevant facts. The trial was ably and eloquently argued on both sides, making it necessary for the Court to attempt to follow the advice recently given by a retiring English Commercial Court judge:

"One of the problems in the commercial court is that the quality of advocates is such that you could read one side's argument and think that it was clearly right, then read the other's and think it was clearly right too. In those

situations all you can do is explain that the decision was a difficult one to make
and be very clear in your justifications."[1]

3.      After describing the history of the litigation and the highlights of the pleadings, the
        agreed and contentious facts will be listed and the findings on all contentious issues
        will lastly be set out. Much of the history is taken from earlier interlocutory rulings.

**History of the proceedings**

4.      On August 19, 2004, the Bermuda Commercial Bank ("BCB") issued an Originating
        Summons seeking directions with respect to the disbursement of funds it held, the
        ownership of which was disputed. Horizon Bank International Limited ("HBI")
        was joined as 1st Defendant, and various HBI depositors and the 1st-2nd Plaintiffs in the
        present action were joined in the proceedings. The 1st-2nd Plaintiffs had already
        commenced proceedings in the Superior Court of Justice in Ontario (the "Ontario
        Court") against DBM Financial Group Inc., Jerry Prucha, Mark Edwards, William
        Presnail and Daniel O'Connor (the "Toronto Defendants")[2] alleging they have been the
        victims of fraud. On 19th July 2004, the 1st-2nd Plaintiffs were granted by the Ontario
        Court an Order for interim preservation of assets which orders the Toronto
        Defendants, inter alia, as the directing minds of HBI/Extant Management Limited
        ("Extant") to freeze assets held in HBI or Extant up to $10 million.

5.      At this juncture HBI's beneficial ownership was unclear and its regulatory status
        created anxieties amongst several of its depositors as to whether they would be able
        to retrieve their deposits. The 1st-2nd Plaintiffs ("Walsh and Taal"), however, were
        convinced that all monies held by BCB represented the proceeds of their property. On
        February 7, 2005 I found that these Plaintiffs had an arguable tracing claim for monies
        held by BCB for the account of HBI (based on the lowest intermediate balance
        principle) and that US $5,631,439.84 should be preserved until trial. I further ordered
        a trial of the preliminary issue of whether or not Walsh and Taal had a tracing claim for
        monies in excess of this amount, observing that I found it improbable that all the
        funds in HBI's accounts with BCB were linked to the transaction of which the 1st-2nd
        Plaintiffs complained[3].

6.      On April 5, 2005, when I declined an application by the Defendant's then attorneys for
        payment of their fees out of the Bermuda monies, I indicated that the information then
        before the Court suggested that independent management should be appointed
        because of the actual or contingent insolvency of the Defendant. On or about April 21,
        2005 Marcus Wide of PricewaterhouseCoopers Toronto was appointed Provisional
        Liquidator of the Defendant in St. Vincent and the Grenadines ("SVG"), and fresh
        lawyers were retained in Bermuda. At a hearing on October 6, 2005 with attempts still
        being made to finalize an order giving effect to the February 7, 2005 Ruling, Mr.
        Woloniecki for the Provisional Liquidator placed before the Court his client's First
        Report. This indicated that: (a) the Plaintiffs appeared to have a good proprietary
        claim; and (b) that the Defendant was clearly insolvent with additional unsecured
        creditors not before the Bermuda Court. Counsel further stated that the only live issue
        was the extent of the proprietary claim. The matter was adjourned to a date to be
        fixed for further arguments on the terms of the February 7, 2005 Order, and further
        evidence was directed to be filed within 14 days. This First Report gave credence to
        the earlier view that the existence of the proprietary claim might not need to be
        adjudicated by this Court.

7.      However, on October 6, 2005, ancillary liquidation proceedings were commenced in
        respect of the Defendant in Bermuda, and Messrs. Peter Mitchell and Marcus Wide
        were, on or about November 10, 2005, appointed Joint Provisional Liquidators ("JPLs")
        by this Court in Companies (Winding-Up) 2005: 359. The application was granted by

---

[1] Sir Desmond Langley in 'How to… be a Judge', Times Online, February 11, 2008.
[2] Unless the context otherwise requires, this term will generally refer to the four individual Toronto Defendants.
[3] *Bermuda Commercial Bank Ltd. v Horizon Bank International Ltd. and others* [2005] Bda LR 5

me primarily on the jurisdictional ground that the Defendant was carrying on business through an agent, the BCB, in Bermuda. The JPLs subsequently consented to the liquidation stay being lifted to permit the Plaintiffs to pursue the present claim. The other depositors, as unsecured creditors, were now prevented by the liquidation stay from further participating in the Bermuda proceedings.

8.     By Summons dated April 7, 2006, the JPLs sought orders (a) directing the exchange of pleadings and trial of the Plaintiffs' proprietary claim, and (b) payment out to them of monies in excess of the lowest intermediate balance. On April 26, 2006, by way of response, Walsh and Taal issued a Summons seeking orders that: (a) the issue of whether or not the Defendant was through Kevin Coombes ("Coombes") fixed with knowledge of the Toronto Defendants' fraud when it received the Plaintiffs' monies should be tried in Toronto, which was the natural and most appropriate forum, (b) that tracing issues should only be determined after that adjudication, and (c) that the JPLs should not in the interim have recourse to the monies in excess of the lowest intermediate balance amount, which latter amount should be paid out to the Walsh and Taal forthwith.

9.     On April 26, 2006, the two Summonses were argued. Mr. Woloniecki opposed trial of the issue of whether the Defendant was a constructive trustee in Ontario because that forum was not a competent jurisdiction. Written submissions on jurisdiction were filed on both sides. The JPLs' position on the fraud issue was tentatively revised to the position that (a) the Plaintiffs' loss was essentially an investment loss, and (b) accordingly, the Defendant did not receive the monies with notice that they were stolen. I encouraged the parties to consider whether, in light of the discovery and the pleadings which I ordered on that date, agreement on the fraud issue could be reached so that only tracing issues need be actually tried in the present proceedings. Such a compromise would obviously save time and costs, and also avoid this Court trying any issues which overlapped with matters likely to be determined in the Ontario action. Pleadings were ordered to be exchanged on the entirety of the proprietary claim, but the Plaintiffs' application for a cross-jurisdictional split trial, as it were, was adjourned, together with the JPLs' application for (a) full discovery, and (b) a permanent injunction restraining the Plaintiffs from seeking to join them as defendants in the Ontario action. The matter was adjourned for a further directions hearing after the exchange of pleadings, which hearing took place before me on September 22, 2006.

10.    On September 27, 2006, I refused Walsh and Taal's application for a stay of the present action on forum grounds, principally because I felt it would be unjust to lift the litigation stay against the Defendant to permit the Defendant as a company in liquidation to be joined in the Ontario Proceedings as defendants alongside the Toronto Defendants. Appreciating the undesirability in adjudicating the existence of the proprietary claim in Bermuda as against HBI and in Ontario as against the Toronto Defendants, I again encouraged (perhaps somewhat unrealistically) the parties to seek to agree the existence of the proprietary claim for the purposes of the present action[4]. Such a compromise was, in hindsight, unrealistic because the Defendant's liquidator had previously assisted the 1st-2nd Plaintiffs to investigate, in a preliminary way, their proprietary claim and HBI's unsecured creditors would be unlikely to view charitably any apparent concession on the Liquidator's part. Moreover, both those unsecured creditors and Walsh and Taal had all demonstrated, from their initial involvement with the interpleader action commenced by BCB, a disposition which was inconsistent with a consensual resolution of the opposing claims.

11.    For the greater part of the present proceedings, I envisaged that this Court would only be deciding whether or not Walsh and Taal had a valid equitable tracing claim in respect of monies held for the account of HBI in Bermuda and, if so, to what extent. However, the primary liquidation court in SVG decided (Madam Justice Gertel Thom, Ruling dated February 15, 2007), that justice would be served by having the related

---

[4] Walsh and Taal-v-Horizon Bank International Ltd-in liquidation [2006] Bda LR 42.

personal claims for damages tried before this Court together with the trial of the proprietary claims. This decision, it must be said, made eminent sense in terms of rational cross-border case management directed at saving the costs which both sides, not simply the insolvent company, would likely incur if essentially one broad dispute were to be adjudicated in two separate forums, because the same evidence which fell to be considered in relation to the existence of the proprietary claims was central to the personal claims.

12.    Pre-trial directions were ordered on May 25, 2007, dealing with amendments to pleadings, letters of request for the examination of overseas witnesses, discovery, expert evidence, and witness statements. On July 2, 2007, the Points of Claim were amended to add, for the first time, claims for damages, for fraud and/or breach of fiduciary duty. Amended Points of Defence were filed by the Defendant on July 23, 2007. On December 7, 2007 and January 25, 2008, further amendments to the pleadings were authorised by this Court.

13.    At the commencement of the trial, the Plaintiffs applied for leave to re-re-amend their Points of Claim to add Boomer Trading Company Limited ("Boomer") as the Third Plaintiff. This was to meet the point, first explicitly advanced in the Defendant's Skeleton Argument, served shortly before trial, that the original individual Plaintiffs lacked the standing to sue because the causes of action they asserted could only properly be asserted by Boomer. Unless the offshore structure was a sham and a fraud on the Canadian tax authorities, assets held by Boomer could not be beneficially owned by the individual Plaintiffs. Although the Defendant on the pleadings had not formally admitted the individual Plaintiffs' title to sue, it seemed to me to be inconsistent with the whole purpose of pleadings for the Defendant not to have been expected to explicitly plead a legal point capable of defeating the claims altogether. Accordingly, I granted the Plaintiffs' application for leave to re-re-amend. The Plaintiffs sought relief in respect of their purported proprietary claims against the Defendant in 2004. It is a matter of record in this Court that the individual Plaintiffs filed proofs of debt in the St. Vincent liquidation proceedings, which were rejected on July 18, 2006[5]. The grounds of rejection essentially cross-referred to the Points of Defence filed in the present action. Nowhere was it explicitly asserted that the individual Plaintiffs' claims were liable to be dismissed because the title to the assets in question belonged to Boomer and not to them. The albeit legally dubious plea in paragraph 22 of the Points of Claim to the effect that they retained beneficial ownership of the assets held offshore was simply responded to as follows:

"No admissions are made as to the legal effect of transactions entered into with Boomer which are referred to in paragraph 22 of the Amended Statement of Claim."

14.    The Overriding Objective in Order 1A of this Court's Rules requires the parties to assist the Court to actively manage cases in a just way, which implies a duty to assist the court to identify key issues at an early stage. But the far older Order 18 rule 8(1) provides as follows:

"(1)    A party must in any pleading subsequent to a statement of claim plead specifically any matter, for example, performance, release, any relevant statute of limitation, fraud or any fact showing illegality—

(a)    which he alleges makes any claim or defence of the opposite party not maintainable; or

(b)    which, if not specifically pleaded, must take the opposite party by surprise; or

(c)    which raises issues of fact not arising out of the preceding pleading."

---

[5] Tenth Affidavit of Allen Walsh dated October 24, 2006, Exhibit "AW-10", page 13.

15.     In my judgment the matters raised by the Defendant for the first time in its February 13, 2008 Skeleton Argument should have been explicitly pleaded, because they (a) constituted an allegation that the individual Plaintiffs' claims were not maintainable by them and/or (b) must, in all the circumstances, take the individual Plaintiffs by surprise (having regard to the history of these proceedings and the SVG liquidation proceedings) if raised for the first time at trial. Order 18 rule 8(1) must also be read with Order 15 rule 691) which provides that "*no cause or matter shall be defeated by reason of the misjoinder or nonjoinder of any party*". When the standing point was belatedly raised, justice clearly required that the application to join Boomer be granted.

16.     It was suggested that if leave to add Boomer was granted, an adjournment would be required to enable the Defendant to meet the entirely new case asserted on behalf of Boomer. I refused the Defendant's application for an adjournment in the form of a complete vacation of the trial scheduled for two weeks. Instead I granted seven days to file Re-re-Amended Points of Defence. It was impossible for me to identify any major changes to the case that the Defendant had to meet if the case was considered from the perspective of Boomer rather than the two individual claimants. Having regard to standard joinder principles and the nature of the claims asserted in this case, I could identify no fundamental shift of emphasis if the fraud complaints were being advanced by two individuals or by a company which was ultimately beneficially owned by those same individuals; save that the Defendant would be deprived of the ability to succeed based on a standing point which could and should have been explicitly pleaded from the outset, the core allegations remained the same.

17.     It was suggested that the Defendant's decision not to call Coombes might have to be reconsidered because he was a key actor as regards a claim by Boomer. This suggestion seemed wholly artificial as the individual Plaintiffs' pleaded case had, from the outset, very clearly engaged the conduct of Coombes as the individual who executed the key transactions of which complaint was made. The Defendant's counsel was unable to clearly articulate any genuine prejudice which would flow from not vacating the trial and no evidence was filed to suggest that it was intended to call Mr. Coombes but that he was unavailable for the duration of the two weeks allotted for the trial. The suggestion that the attribution of knowledge issues would be different also lacked substance. Boomer was joined as the victim of the fraud. The original attribution issues, essentially what knowledge could be attributed to HBI, would continue unchanged.

18.     Having regard to the circumstances in which Boomer became a party to these proceedings, however, this Court must clearly exercise care to ensure that the Defendant is not unfairly found to be liable to Boomer on any materially different basis than the case brought by Walsh and Taal which the Defendant came to trial to meet. Having reserved judgment, it became apparent the issue of whether or not Coombes was liable for breach of a fiduciary duty to Boomer raised factual and legal issues which had not been fully explored.

**Plaintiffs' pleaded case**

19.     With respect to who controlled and managed HBI, the Plaintiffs alleged primarily as follows:

"7.      HBI was at all material times the alter ego of the Toronto Defendants and /or alternatively they, along with Kevin Coombes were its controlling and/ or directing minds. The Plaintiffs rely upon the matters set out in ¶9 below in support of their averment that Coombes and the Toronto Defendants were the controlling and/or directing minds of HBI and, as a consequence, their knowledge and acts, as set out below, are to be attributed to HBI.

8.       Before the appointment of the Liquidators of HBI, its senior operating officer was Kevin Coombes of Nassau, Bahamas ("Coombes"), who was employed as its Vice-President Operations and was responsible for HBI's day

to day management and operations. Mr. Coombes is a former resident of Canada and is a close business associate of the Toronto Defendants.

9.      At all relevant times prior to the appointment of the Controller and the Liquidator,

> (a)      HBI's registered directors were in the first instance, Daniel O'Connor, William F Presnail, William Cooper and William Cooper when it was first incorporated in Antigua on 28 April 1995.

> (b      )HBI carried on business in Toronto, Ontario, Canada through its representative and agent resident in Toronto, Jerry Prucha ("Prucha"). Prucha is one of the Toronto Defendants;

> (c)      HBI also carried on business under Coombes' supervision and management offices located in Nassau, Bahamas and in St. Vincent and the Grenadines. Coombes had previously worked with Presnail at BP Financial Corp.;

> (d)      HBI, Coombes, and Prucha carried on business for HBI under the control and direction of the Toronto Defendants, William F. Presnail ("Presnail"), Mark Edwards ("Edwards") and Daniel O'Connor ("O'Connor");

> (e)      Beneficial ownership of HBI was controlled by Presnail, Edwards and O'Connor;

> (f)      Edwards is an accountant who acted effectively as the senior financial officer at HBI and directed and controlled its financial books, records and affairs with assistance from Coombes and the other Toronto Defendants;

> (g)      Presnail and O'Connor were the founding officers and directors of HBI and exercised primary control over all its activities and business affairs through the actions of Coombes, Edwards and Prucha;

> (h)      O'Connor supervised and controlled HBI's investment activities for its own account and for the accounts of HBI's customers and investors;

> (i)      HBI provided financial services to North American customers, which included offshore investment planning, financial management and securities trading supervised and conducted under the primary direction and control of Presnail and O'Connor;

> (j)      Prucha's role as HBI's Toronto representative and agent was to offer its services as a financial advisor and investment manager to Canadian customers interested in offshore investment opportunities. Prucha and Presnail are/were brothers-in-law.

> (k)      HBI maintained its own call accounts and fixed term deposits in its name with, inter alia, Bermuda Commercial Bank ("BCB") of Hamilton, Bermuda. Those accounts and deposits were operated and managed by Coombes for HBI under the control and direction of Presnail, Edwards, and O'Connor..."

20.     The following allegations were made about the offshore structure through which the fraud complained of was perpetrated:

> "10.      In Spring 1997, the First and Second Plaintiffs were introduced to Prucha, who identified himself as the Toronto agent and representative for HBI and as a principal of DBM Financial Group Inc. ("DBM"). At this meeting, Mr. Prucha gave Mr. Walsh and Mr. Taal his business card which showed him as a representative of HBI.

11.     At all relevant times, DBM was a company incorporated under the laws of Ontario, operating its business of providing financial advice and services for offshore investments made by its clients from its offices located in the Greater Toronto Area in Markham, Ontario. DBM and Prucha's activities for DBM were controlled and directed at all relevant times by Presnail, Edwards and O'Connor.

12.     During the period Spring of 1997 to August 1997, Mr. Prucha represented to Mr. Walsh either at meetings or in correspondence that:-

(a)     Mr. Prucha was an authorised agent of HBI and was representing HBI in respect of the investment services offered by HBI.

(b)     HBI was in the business of providing structures for offshore investments for investors like the First and Second Plaintiffs.

(c)     HBI was an offshore bank which, through its affiliated companies, could incorporate offshore vehicles required for any offshore investments to be made by the First and Second Plaintiffs.

(d)     To the extent that the First and Second Plaintiffs required any banking services, HBI could provide those banking services.

(e)     HBI through Prucha and other Toronto Defendants had presence in Ontario and the First and Second Plaintiffs could deal with HBI through Mr. Prucha and the other Toronto Defendants.

(f)     HBI was associated with DBM and provided offshore investment services in conjunction with DBM. Whilst DBM could not hold any assets invested by the First and Second Plaintiffs in its own name, DBM would provide investment management advice for any investments made by the First and Second Plaintiffs.

(g)     Any investments made by the First and Second Plaintiffs would be in the hands of and under the control of the senior operating officer of HBI, Mr. Coombes.

(h)     HBI would be responsible for the establishment of the corporate structure required for the offshore investments to be made by the First and Second Plaintiffs including the incorporation of the offshore corporate vehicles to be used for the investments and the provision of its senior operating officer (Mr. Coombes) as a director of such corporate vehicle.

13.     By letter dated 11 July 1997, HBI proposed the following corporate structure for offshore investments for the First and Second Plaintiffs:-

(a)     The First and Second Plaintiffs shall each incorporate an IBC in the Bahamas.

(b)     Each IBC shall have a nominee shareholder and a nominee director, the former of which shall execute the standard model of Declaration of Trust indicating the usual submission to direction and recognition of the beneficial owner of each company.

(c)     Each IBC shall open bank accounts as well as trading accounts with HBI.

(d)     HBI shall utilise Decker Fagen McDonough of New York ("DFM"), acting through its designated representative, to transact the trades, on a fully disclosed basis, through Lehman Brothers in New York.

(e)     Each IBC shall then cause to be incorporated a new Bahamian IBC to act as the trading entity. The shares of the trading entity shall be held, in separate classes, by each of the holding IBCs in proportion

to the value of each IBC's balance in its trading account with HBI. Each holding IBC shall then issue instructions to HBI to use the cash in each trading account to repurchase, in the name of the trading entity, Microsoft shares at the current price.

(f)     The trading entity shall enter into a renewable contract, for a period of minimum of two years, with a Bahamian IBC to be incorporated as the Trading Manager of trading entities shares. The Trading Manager shall be owned by HBI.

14.     HBI's proposals, made in its letter of 11 July 1997, were accepted by the First and Second Plaintiffs in the letter addressed from their attorneys, Hindle & Associates to HBI dated 21 July 1997.

15.     Accordingly, throughout 1997 and 1998, Prucha, acting as an agent for HBI, persuaded the First and Second Plaintiffs to invest their assets worth in excess of US $20 million in a corporate structure for offshore investments that was initially created (and then restructured) by HBI, DBM, Coombes and the Toronto Defendants. The primary corporate vehicle created to hold the First and Second Plaintiffs' assets offshore was the Third Plaintiff, Boomer Trading Co. Ltd. ("Boomer"), incorporated at the instructions of HBI.

16.     In accordance with the agreement pleaded in ¶s 13 and 14 above, HBI incorporated an investment company for Mr. Walsh (Allington Investments Ltd. ("Allington")) and an investment company for Mr. Taal (Wooden Shoe Holdings Ltd ("Wooden Shoe")). By letters dated ~~15~~ 28 August 1997 and addressed to HBI in Antigua, the First and Second Plaintiffs, at the urging of Prucha, agreed to appoint Coombes as the duly designated representative of the respective investment companies with instructions to Coombes to cause the investment companies to:-

(a)     Enter into loan agreements with the First and Second Plaintiffs to be evidenced by a duly executed agreement of loan, in order for the investment companies to borrow from the First and Second Plaintiffs the net proceeds from the exercise of options to purchase 95,000 common shares of Microsoft ("the Shares").

(b)     To open a bank account with HBI.

(c)     To open a trading account with HBI.

(d)     To proceed with the incorporation of the trading company (Boomer).

(e)     Authorise HBI to sell the shares through DFM clearly on a fully disclosed basis through Lehman Brothers of New York and to deposit the full net proceeds of such sale into the respective company's trading account at HBI.

(f)     Pay 1½% of the above-mentioned net proceeds to HBI in full payment of all unpaid costs associated with this transaction.

(g)     Loan the full amount remaining thereafter, on an interest free basis to the Third Plaintiff trading company (Boomer) which shall have a bank account and trading account, as well, at HBI.

(h)     Cause the Third Plaintiff trading company (Boomer) to pay forthwith the first quarterly instalment of annual fees to the trading manager (Extant).

(i)     Thereafter, cause the Third Plaintiff trading company, Boomer, to instruct HBI, acting through DFM and Lehman Brothers, to utilise the full balance in this account to repurchase common shares of Microsoft.

(j)      Cause the Third Plaintiff trading company (Boomer) to instruct the trading manager (Extant) to arrange to leverage the trading company's Microsoft shareholding, again through DFM and Lehman Brothers, in order to realise a loan from Lehman Brothers to its authorised banking affiliate, which shall then be used to purchase and trade US Government treasury bills on a daily basis, the whole more fully in accordance with the trading instructions which the Third Plaintiff trading company (Boomer) shall issue to the trading manager (Extant) and upon the terms and conditions already agreed upon with HBI."

17.     At all material times, Extant was a company incorporated pursuant to the laws of the Bahamas and was managed day-to-day by Coombes, the senior operating officer of HBI, as its senior operating officer. Boomer and Extant (and Coombes' actions on their behalf) were directed and controlled at all material times by the Toronto Defendants."

21.     The primary fraud allegation pleaded, in substance from the outset, provides as follows:

"18.By persuading the First and Second Plaintiffs (i) to adopt Prucha's financial advice and (ii) to transfer their assets to the Third Plaintiff Boomer as part of the offshore investment structure, and (iii) to approve Extant's trading program, Prucha, Coombes, HBI and DBM, acting acted at all material times under the control and direction of the Toronto Defendants, conspired to defraud the First and Second Plaintiffs from the outset (or alternatively by, in or around, November 1998) of the First and Second Plaintiffs' assets, and/or conspired to defraud the Third Plaintiff of the Third Plaintiff's assets."

22.     The basis for the breach of fiduciary duty claim was pleaded, also in substance from the outset, as follows:

"20.The First and Second Plaintiffs gave Coombes (through Prucha), who were both at all material times was acting on behalf of HBI, Extant and the other Toronto Defendants or under their direction and control, limited authority to act as their nominee officer and director for the Third Plaintiff, Boomer. His Coombes' authority to borrow against the Third Plaintiff Boomer's assets was confined to raising funds to be held in the Third Plaintiff Boomer's name for investment in the approved T- Bills day-trading program at Lehmans in New York City. Prucha, Coombes, HBI, Boomer and Extant had no authority to borrow funds against the Third Plaintiff Boomer's assets for any other purpose.

21.     In that manner, the First and Second Plaintiffs, and/or the Third Plaintiff, entrusted their assets to the care of HBI, Coombes, Boomer, Extant and the Toronto Defendants in a manner that left the First and Second Plaintiffs, and/or the Third Plaintiff, in a position of vulnerability and dependence and which gave rise to a fiduciary duty owed to the First and Second Plaintiffs, and/or the Third Plaintiff, to act solely in the First and Second Plaintiffs', and/or the Third Plaintiff's, best interest in the management of their assets in the offshore investment structure and its subsequent revisions or amendments."

23.     The amendments have been reproduced in full in the above extract because they do reveal that, to some extent at least, the original pleading did seem to blur the distinction between Boomer as a victim of the fraud and a participant in the fraud. In paragraph 20 it was originally alleged that Boomer had no authority to borrow; in paragraph 21 it was asserted that the Plaintiffs entrusted their assets to Boomer. This was consistent with the plea made in paragraph 22 that legal title to the assets passed to Boomer with beneficial interest remaining with the first two Plaintiffs. The amendments made on the first day of the trial deleted these references to Boomer, but in my judgment, these were changes of form and not substance. The main allegation of substance being made from the outset was the persons the individual

Plaintiffs had entrusted with managing their affairs (and Boomer's) (a) were under a fiduciary duty, and (b) had limited authority to deal with Boomer's assets. The principal change made by way of re-re-amendment was as follows:

"22A.   In the alternative, and in the event that the Court concludes (contrary to paragraph 22 above) that legal and equitable title to the First and Second Plaintiffs' assets was technically transferred to the Third Plaintiff, Boomer, the First and Second Plaintiffs will say that:

(a)the First and Second Plaintiffs, and/or Allington and Wooden Shoe, have impliedly or expressly rescinded the loan agreement(s) with the Third Plaintiff, thereby giving rise to an equitable, proprietary interest on the part of the First and Second Plaintiffs in the assets that were transferred to the Third Plaintiff, Boomer; and/or

(b)the First and Second Plaintiffs, and all other parties to the transactions, including the Defendant, mutually assented and agreed, at all material times, to the proposition that the First and Second Plaintiffs retained an equitable, proprietary interest in the assets that were transferred to the Third Plaintiff, Boomer, such that the Defendant is now estopped, both by convention and/or by the representations of itself and/or its agents, and/or by the express or implied admissions contained in paragraphs 47, 48, 50, 56, 59, and 60 of the Re-Amended Points of Defence, from seeking to advance any argument to the contrary; and/or

(c) in circumstances where the First and Second Plaintiffs are, and were at all material times, majority shareholders in the Third Plaintiff (who is a party to these proceedings), the distinction between the First and Second Plaintiffs' and/or the Third Plaintiff's legal and/or beneficial interests in the assets that were transferred to the Third Plaintiff is immaterial for the purposes of this action."

24.     The Plaintiffs' case that their assets were fraudulently pledged to obtain loans which were invested in two entities owned and/or controlled by the Toronto Defendants is then set out in detail. The effect of these transactions, and the tracing remedy which is said to arise as a result, is then pleaded as follows:

"32.     As set out in paragraph 7 of the Harloff Report, the proceeds of assets stolen from the First and Second, and/or Third Plaintiffs can be traced in the total amount of US$16,808,298.00 to the accounts of HBI maintained by BCB in Hamilton, Bermuda. Part of those stolen proceeds remain frozen in those accounts today by order of this Honourable Court and the entire amounts received by HBI are held on constructive trust for the First and Second, and/or Third Plaintiffs.

33.     Following November 27, 1998, Edwards forwarded to the First and Second, and/or Third Plaintiffs (through their accountant) bank account statements and other financial information which had been fraudulently prepared to conceal the said pledges of the assets and their investment at Irwin and Hamilton Securities respectively and give the false impression that the First and Second, and/or Third Plaintiffs' assets remained safely on deposit in the Third Plaintiff Boomer's name at Lehmans in New York City and to hide their fraudulent actions. Edwards began forwarding the fraudulent bank account statements in January 1999. The Irwin trading activities, funded by the stolen monies, did not begin to suffer losses until Summer 2000. Those acts formed part of the common design of the Coombes, HBI and Toronto defendants to fraudulently convert the First and Second, and/or Third Plaintiffs' assets to their own use and to hide their wrongdoing from the First and Second, and/or Third Plaintiffs.

34.     All assets transferred by the <u>First and Second</u> Plaintiffs to <u>the Third Plaintiff</u> Boomer have since been sold into the public market or otherwise utilised to pay down Extant's loans with Lehmans and LBFSA.

35.     In that manner, the Toronto Defendants<u>, Coombes and HBI</u> converted and stole value from the <u>First and Second, and/or Third</u> Plaintiffs' assets for their own use and deposited <s>US$12,927.008.59</s> <u>US$16,808,298.00</u> of the stolen proceeds for their financial benefit into HBI's accounts at BCB."

25.     The Defendants, in a nutshell, (a) denied that the Plaintiffs were defrauded of their assets or had been the victims of breach of fiduciary duty, (b) admitted that the Toronto Defendants and Coombes were involved in a fraudulent conspiracy to cover up investment losses, and (c) denied that HBI owed any fiduciary obligations to the Plaintiffs or was involved in any way in providing investment advice, but (d) admitted that Coombes acted under the instructions of the Toronto Defendants. The principal new pleas sought to be made in response to the principal re-re-amendments to the points of Claim were as follows:

"22.   No admissions are made as to the legal effect of transactions entered into with Boomer which are referred to in paragraph 22 of the <u>[Re]-Re-</u>Amended Points of Claim. <u>[If, which is not admitted, the First and Second Plaintiffs remained the beneficial owners of the assets transferred to the Third Plaintiff by Allington and Wooden Shoe, as they allege:</u>

<u>(a)........it is averred the First and Second Plaintiffs were party to an illegal tax evasion scheme designed to defraud the Canadian tax authorities by using that scheme to disguise the retention of their beneficial interest in the assets which (if retained) should have been (but was not) declared to the Canadian tax authorities.</u>

<u>(b)........In order for the offshore investment program to be effective as a legitimate tax avoidance scheme under Canadian law, the First and Second Plaintiffs could not lawfully retain such beneficial interest. They would have had to have transferred both the legal and beneficial interest in the assets to Allington and Wooden Shoe.</u>

<u>(c)........Accordingly, if the First and Second Plaintiffs retained beneficial ownership of the assets, as they allege, the entirety of the tracing claims of the First and Second Plaintiffs must fail, as this Court will not assist in an action to pursue a beneficial interest in assets held for the purpose of defrauding the tax authorities of a friendly country.</u>

<u>(d)........Further, this Court will not award damages in respect of the alleged breach of obligations which were assumed pursuant to an illegal tax evasion scheme.</u>

<u>Full particulars of the relevant Canadian tax law are contained in the first affidavit of Raymond Garnet Adlington sworn on 20 February 2008]</u>

<u>22A......Without prejudice to the Defendant's case that this paragraph should be struck out as vexatious, embarrassing or for disclosing no cause of action, the Defendant pleads as follows:</u>

<u>(a)........Paragraph 22A(a) - it is admitted that loan agreements were entered into between Allington and Wooden Shoe and the Third Plaintiff. It is denied that these loan agreements, or any of them (or any other contract relied upon as rescinded by the Plaintiffs), were impliedly or expressly rescinded. It is denied that if they had been rescinded, this would have given rise to any equitable proprietary interest on the part of the First and Second Plaintiffs in the assets that were transferred to the Third Plaintiff, as alleged by the First and Second Plaintiffs, or at all.</u>

(b).......As to paragraph 22A(b), paragraph 22 of this Re-Re-Amended Points of Defence is repeated. Accordingly, paragraph 22A(b) of the Re-Re-Amended Points of Claim is denied.

(c).......As to paragraph 22A(c):

(i).......It is denied that the First and Second Plaintiffs were the majority shareholders in the Third Plaintiff or that they owned any shares at all in the Third Plaintiff. The First and Second Plaintiffs owned shares respectively in Allington and Wooden Shoe.

(ii).......Further and in the alternative if, which is denied, the First and Second Plaintiffs were majority shareholders in the Third Plaintiff, it is denied that such shareholding gave rise, as a matter of law, to any proprietary interest of the First and Second Plaintiffs in the assets of the Third Plaintiff; and

(iii)......It is denied that the distinction between the First and Second Plaintiffs' and/or the Third Plaintiff's legal and/or beneficial interests in the assets that were transferred to the Third Plaintiff is immaterial for the purposes of this action."

26.    On the fourth day of the trial, I refused the Defendant leave to re-re-amend paragraph 22 at all on the grounds that the proposed new plea of illegality did not fairly arise from the re-re-amendments introduced by the Plaintiffs on the first day of the trial. The changes which were rejected buttressed the new defence alluded to in the Defendant's Skeleton Argument by way of response to the Plaintiffs' original case that the individual Plaintiffs had the right to sue. It was not responsive to the addition of Boomer. It was also grossly unfair to require the Plaintiffs to meet an illegality defence which could have been raised earlier in the midst of a trial which was taking place over three years after the commencement of the present proceedings.

## Admitted facts

27.    A substantial body of facts were agreed. It is admitted that Walsh and Taal are both businessmen and investors resident in Oakville, Ontario, Canada who while employed with Microsoft Canada Inc. were granted stock options for common shares in Microsoft Corporation, which they exercised thus acquiring "the Shares". The Shares were worth millions of dollars by early 1997. HBI was initially incorporated in Antigua but was later continued under the laws of St. Vincent and the Grenadines where it was licensed to operate on May 17, 1999. Prucha advised Walsh and Taal in 1997 that he worked for DBM Financial Group Inc. ("DBM"), an Ontario corporation owned or controlled by William F. Presnail ("Presnail") and Daniel O'Connor ("O'Connor"). Jerry Prucha ("Prucha") was the brother-in-law of Presnail, and they together with Mark Edwards ("Edwards") and O'Connor all lived in or around the city of Toronto, Canada.

28.    Coombes was a former resident of Canada who had previously worked with Presnail. At all material times, and since October 3, 1997, Coombes was Vice-President of HBI and responsible for its daily operations. Coombes' actions were directed and controlled by the Toronto Defendants with respect to HBI, Extant and Boomer. Coombes managed and supervised HBI through offices in Nassau, Bahamas and in St. Vincent and the Grenadines.

29.    Walsh and Taal transferred the Shares owned by them to Allington Investment Ltd. ("Allington") and Wooden Shoe Holdings Ltd. ("Wooden Shoe") respectively. These companies were Bahamian holding companies who were to be managed for Walsh and Taal by nominees resident in The Bahamas. Allington and Wooden Shoe were to transfer the Shares and their other assets to Boomer, which was also incorporated in The Bahamas and to be managed by nominees resident there. Boomer's shares were mostly beneficially owned by Allington and Wooden Shoe. Boomer was to be the principal corporate vehicle to hold the assets of Walsh and Taal offshore. On Prucha's recommendation, Extant was appointed as Boomer's trading manager for the

recommended daily trading programme in US T-bills. After August, 1997, Coombes acted as nominee officer and director in respect of Walsh and Taal's companies, Allington, Wooden Shoe, and Boomer.

30.     Although the scope of authority to invest conferred on Extant by Boomer is hotly disputed, the terms and effect of the transactions which the Plaintiffs contend were fraudulent and/or in breach of fiduciary duty were essentially admitted. Assets placed into the offshore structure by Walsh and Taal were held in Boomer's name in an account with Lehman Brothers in New York on November 9, 1998. At the request of Coombes, a Swiss affiliate of Lehman Brothers, Lehman Brothers Finance S.A. ("LBFSA") agreed to loan US$15 million to Extant on November 27, 1998 ("the First Extant Loan"). The agreement was signed by Coombes, and the loan secured by a pledge of Boomer's assets under a Pledge Agreement also signed by Coombes. Coombes entered into these agreements at the direction of the Toronto Defendants and without informing Walsh and Taal. On November 30, 1998, Boomer's assets were transferred from its second Lehman Brothers account (into which they had been transferred on November 25, 1998) into a Collateral Account reference the First Extant Loan.

31.     All of these assets were subsequently sold on the public market or otherwise utilised to discharge Extant's indebtedness under the First Extant Loan and the Pledge Agreement. By November 30, 1998, Boomer's initial Lehman Brothers account had a nil value, and the second account as at December 31, 1998 had a net value of $2.10. It is admitted that these transactions (the loan advance and pledge of Boomer's assets) took place "*without knowledge consent or authorisation of either Walsh or Taal.*"[6] The US$15 million proceeds of the First Extant Loan, received by Extant on or about November 30, 1998, were paid to the account of Irwin Government Arbitrage Fund Ltd. ("Irwin") to its account with the Bank of Bermuda in Hamilton, Bermuda. (The Defendant did not plead to the allegation that this $15 million was seed money for Irwin's establishment). Presnail advised Irwin that he owned or controlled the monies received by Irwin on December 1, 1998. Of these monies, some $4.1 million was lost in trading in the winter and spring of 2000, and more than $1.5 million was expended in fees and other expenses. After returning sums totalling US$9,262,612.85 to Extant's account with HBI maintained at the Bermuda Commercial Bank Ltd. ("BCB") in Bermuda, Irwin commenced voluntary dissolution proceedings. The monies received by HBI for the account of Extant in Bermuda were mixed with other HBI monies. HBI's accounts with BCB in Bermuda were operated and managed by Coombes under the direction of Presnail, Edwards and O'Connor.

32.     It is also admitted that in February 1999, Coombes was directed to apply for a further LBFSA loan in favour of Extant in the amount of $5 million secured by assets furnished by Boomer held in Lehman's Collateral Account ("the Second Extant Loan"). These loan proceeds were wired to Extant on February 22, 1999, again without informing Walsh and Taal. $3,665,000 was lent by Extant to Hamilton Securities Group LLC, a company established by, *inter alia*, Presnail in 1998 ("Hamilton"). Between December 2001 and July 2004, US$3,665,395.74 was transferred by Hamilton to HBI for the account of Extant in Bermuda Government.

33.     The contents of an affidavit provided by Timothy Irwin ("the Irwin Affidavit") are admitted as regards matters of which he has personal knowledge. Thus, it is also admitted as follows. Irwin received US$15 million, which was transferred by Extant from Lehman Brothers in New York on or about December 2, 1998. Approximately US$9-10 million was wire transferred to Extant's accounts with HBI between January 1999 and May 2000 on the verbal instructions of Presnail confirmed by instructions from Coombes written on Extant's letterhead. From December 1998 until May 1999, Extant was Irwin's sole shareholder. The precise amounts transferred as set out in the

---

[6] Notice to Admit Facts, paragraph 176,as read with the second paragraph on page 6 of Attride-Stirling letter dated September 25, 2007 to Conyers Dill and Pearman.

Irwin Affidavit, as well as the amount Irwin charged for services rendered (and, by implication, the amount of the trading losses), were also admitted.

34.     Finally, it is admitted that the Toronto Defendants conspired to conceal from Walsh and Taal the Irwin trading losses and to give the false impression that the Boomer assets remained in the initial Lehman's account after December 1998. This conspiracy entailed, *inter alia*, (a) furnishing doctored Lehman Brothers statements, (b) providing periodic cash returns to Walsh, and included (c) HBI making false representations to its auditors and the St. Vincent and Grenadines Offshore Finance Authority ("OFA", predecessor of the International Financial Services Authority, "IFSA"). These representations were to the effect that Boomer's assets were secure at Lehman's and would be returned to Walsh and Taal and were made by HBI at a time (between 2001 and 2003) when they were known to have been sold.

**Controversial liability issues and burden of proof**

35.     The most important liability-related factual disputes concern (a) the scope of investment authority given to Coombes on behalf of Boomer and Extant under various letters exchanged in July and August 1997, and related documentation, most significantly the Trading Services Agreement, (b) whether, depending on how these documents are construed, the Plaintiffs were defrauded of their assets by virtue of (i) any conspiracy to defraud or (ii) any breach of fiduciary duty, (c) even if (b) is answered in the affirmative as regards the Toronto Defendants, or any of them, can the requisite knowledge of any such fraud or breach of fiduciary duty be attributed to HBI.

36.     These issues must be considered from the perspective of the claims asserted by Walsh and Taal individually as well as from the perspective of Boomer. The standing of Walsh and Taal to seek relief as the owner of the allegedly stolen assets is a controversial legal issue, which requires consideration of whether either (a) they were entitled to rescind the establishment of the entire offshore structure by virtue of fraudulent misrepresentations at the outset, (b) they were entitled to rescind by agreement after discovering the fraud, and/or (c) Whether these technicalities are irrelevant because the Court may properly pierce the corporate veil. Finally, whether the Court should of its own motion decline relief on illegality grounds must be considered.

37.     I accept Mr. Woloniecki's submission that proof of allegations as grave as fraud requires particularly cogent evidence or, to put it another way, requires clearer evidence than would be required to prove less improbable or controversial matters: *AIC Ltd.-v-ITS Testing Services Ltd. ('The Kriti Palm')* [2007] 1 Lloyd's Rep 555. Mr. Hargun did not dissent from this well recognised general principle. In the present case however, it seems to me that for practical reasons the force that this guiding principle would ordinarily have is diluted somewhat. This is because the Defendant has elected to call no positive evidence in support of its case on liability, effectively putting the Plaintiffs to strict proof of their case. The Defendant has suggested innocent explanations or alternative bases on which the crucial facts may be understood; but the Court is not required to decide between conflicting witnesses and decide where the truth lies. The Court is required to decide whether the Plaintiffs have proved their case on a balance of probabilities, and whether their interpretation of the largely uncontested primary facts is sufficiently cogent to justify concluding that individuals not before the Court were guilty of fraud and/or breaches of fiduciary duty. The Court does not have to weigh in the scales against the Plaintiffs' case the oral evidence of Coombes and the Toronto Defendants in support of the Defendant's pleaded case.

**Findings: were the First and Second Extant Loans and the Pledge Agreement authorised or unauthorised transactions?**

38.     A threshold question is whether or not Coombes was entitled, on behalf of Boomer and its ultimate beneficial owners, to enter into the Pledge Agreement to secure the Extant Loans. These transactions ultimately led to the loss of which the Plaintiffs complain in the present action. Boomer's assets were admittedly used to secure loans obtained by Extant, and apparently invested on behalf of Extant. Were these transactions, which

admittedly took place without Walsh and Taal's knowledge or specific authority, consistent with the general authority conferred by them in relation to the offshore structure they established in the summer of 1997?

39.     Walsh and Taal both deny that these transactions were authorised, but I place little or no reliance on this fact standing by itself. Even though the other persons involved have not contradicted these assertions by way of evidence, the best available evidence in my judgment is the contemporaneous documentary record of what transpired when the relevant transactions were entered into. The first important document is a July 21, 1997 letter sent by the Plaintiffs' Canadian tax lawyer, Robert Hindle of Hindle & Associates ("Hindle") to Prucha at HBI in Antigua. This letter provides as follows:

"Montreal, July 21st 1997

**Mr. Jerry Prucha**                                **BY FAX: 809-462-9215**

**Horizon Bank International**

P.O. Box 1407

Woods Centre, Suite 5

Friars Hill Road

St-John's, Antigua W.I.

**Re: Proposed Trading Company**

Dear Jerry,

We have reviewed your proposal for the abovementioned structure as detailed in your letter of July 11th 1997, with our clients. In general, and subject to the technical modifications detailed hereafter, the clients have accepted this proposal and have mandated us to finalize the arrangements with you in order to put the structure in place and operating prior to the end of August, 1997.

As agreed, the simpler structure of a private trading company which would be active in the trading business is the model of choice to be employed.

In order, we shall now address the stages of your proposal:

1.      Currently, there are three Canadian individuals who have either exercised options or shall exercise options to acquire shares in the company Microsoft. The clients have or shall have paid Canadian tax applicable to the exercise of these options and the clients shall transfer the shares to their holding companies in the Bahamas.

2.      Each client has or shall incorporate an IBC in the Bahamas. Each IBC shall have a nominee shareholder and a nominee director, the former of which shall execute the standard model of Declaration of Trust indicating the usual submission to direction of and recognition of the beneficial owner of each company. Each IBC shall open bank accounts as well as trading accounts with your bank. Horizon shall utilize DFM, acting through its designated representative, to transact the trades, on a fully disclosed basis, through Lehman Brothers in New York. Each IBC shall issue a consideration to the transferor, in exchange for the transferred shares to the IBC, of a security for full value. Each IBC shall then instruct Horizon to sell such shares at the current market price and hold the cash equivalent in each IBC's trading account.

3.      Each IBC shall then cause to be incorporated a new Bahamian IBC to act as the trading entity. The shares of this trading entity shall be held, in separate classes, by each of the holdings IBC's in proportion to the value of each IBC's balance in its trading account with Horizon. Each holding IBC shall then issue instructions to Horizon to use the cash in each trading account to

repurchase, in the name of the trading entity, Microsoft shares at the current price.

4.      The trading entity shall enter into a renewable contract, for a period of a minimum of two years, with a Bahamian IBC to be incorporated as the Trading Manager of the trading entity's shares. The Trading Manager shall be owned by Horizon and legally represented by Mr. Donald Bain. Subject to addendum 1 of your July 11th letter, the trading entity's contract with the trading manager IBC shall stipulate that:

> 1.      The Trading Manager has the authority to trade in the Microsoft shares as well as any additional stock which might be stipulated by the trading company.
>
> 2.      The Trading Manager has the authority to leverage the Microsoft equity portfolio in order to enter into daily trading of United States Government Treasury Bills.
>
> 3.      The Trading Manager shall charge a fee equivalent to one (1) percent of the market value of the trading entity's assets, calculated and payable quarterly in advance, for management and administrative duties.
>
> 4.      The set-up an brokerage fees, with modifications as agreed, are acceptable to the clients, with the expectation that the set-up fees shall likely be lower than estimated due to the simplicity of incorporating the trading entity as opposed to the procedures which would be required to establish a private mutual fund.
>
> 5.      Brokerage fees for execution of trades, which shall be incurred by the trading manager on behalf of the trading entity, shall be charged to the trading entity and paid, as incurred, with the stipulation that such charges shall be within norms as established by reference to industry practice in similar matters.

The legal work required in order to establish the foregoing shall be mandated, according to the applicability of jurisdiction and expertise, to our firm, a Bahamian legal firm to be chosen by the clients and a Canadian tax expert to be chosen jointly by the trading entity and Horizon. All accounting work shall be performed by the firm of Koivu and Hutchings through the direction of one of its principals, Mr. Bill Hutchings, C.A.

With respect to Addendum 1 to your July 11th letter, the text as you have stated it is accepted by the clients with the following additions:

1.      The trading manager will formally contract to follow the sole and exclusive instructions of either the trading company or the individuals as contractual consultants to the trading company, with respect to the trading activity of the trading company's holdings at any time.

2.      The profit split, as you have outlined in Addendum 1, shall be established contractually with respect to the consideration, provided by Horizon, of full indemnity against any losses incurred on the trading activity of the United States Government Treasury Bills.

The clients envisage that this structure shall be formulized by way of letter of instructions to each IBC nominee shareholder. Each such letter shall contain precise instructions to put into effect all that is required to fulfill each element of the proposal outlined above. The clients shall receive a draft of these instructions in the near future and it is anticipated that these letters of instructions shall be signed on or about August 15th 1997. Thereafter, these letters of instructions will be delivered to Mr. Donald Bain, as nominee shareholder of each IBC. Following the execution of these instructions, the next few steps will be in the hands of Horizon in order to incorporate the

trading entity and to establish the trading accounts and lines of communication with the trading manager and the New York broker. By such time, all of the Microsoft shares involved in this matter shall have been transferred to the respective IBC's and be available for the process of sale and repurchase as agreed. It is envisaged that the trading entity should be in full operation by the end of August, 1997.

Thanking you for your usual cooperation in this matter and waiting your confirmation of the foregoing, we remain,

Yours very truly,

HINDLE & ASSOC."

40.    This letter evidences the acceptance in principle by Hindle of HBI's proposal to set up an offshore investment structure along the lines which broadly occurred. Each client (i.e. Walsh and Taal[7]) was to incorporate an IBC in the Bahamas, which would open accounts with HBI. Each IBC would establish a new IBC to act as the trading entity in relation to trading through Lehman Brothers in New York on a fully disclosed basis. The shares of the trading entity would be held by each client's IBC in proportion to their trading assets held by HBI. The trading entity would contract with a "Trading Manager" which would be owned by HBI. Hindle accepted the terms of the Addendum to Prucha's July 11, 1997 letter subject to two qualifications: (a) the Trading Manager should contract to follow "*the sole or exclusive instructions of either the trading company or the individuals as contractual consultants*", and (b) the profit split should be established contractually, with HBI providing a "*full indemnity against losses incurred on the trading activity of the United States Government Treasury Bills.*"

41.    By letters dated August 28, 1997 addressed to Prucha at HBI, Walsh and Taal gave instructions with respect to Allington and Wooden Shoe, respectively. Although the complete detail of these instructions was not completely followed subsequently, the Trading Company was mandated to instruct the Trading Manager to "*purchase and trade US Government Treasury Bills on a daily basis, the whole more fully in accordance with trading instructions which the Trading Company shall issue to the Trading Manager and upon the terms and conditions already agreed upon with HBI.*" These instructions contemplated pledging the Shares owned by Boomer to raise a loan, the proceeds of which would be used to purchase T-bills. It is agreed that what in fact happened was that portions of the Shares were sold and the sale proceeds used to acquire T-bills, which were traded on a daily basis. But the only form of investment activity contemplated, according to these letters dated July 11 and August 28, 1997, was daily trading in T-bills through Lehman's. This position was confirmed when the Trading Services Agreement between Boomer and Extant was executed in Nassau, The Bahamas, on September 15, 1997 ("the TSA").

42.    The first recital in the Preamble to the TSA states: "*WHEREAS the trading Company wishes to carry out active trading of U.S. Government Treasury instruments*". The first paragraph of section 2 ("MANDATE") provides as follows:

"The Trading Company hereby mandates the Trading Manager to use …the Shares…forming the assets of the trading Company, according to reasonable standards and practices of the industry, to obtain the cash collateral resulting from the leveraging of such assets with Lehman Brothers in order to trade into and out of the US Treasury Market (hereinafter called the 'Treasuries') on behalf of the Trading Company."

43.    The Trading Manager was to be remunerated on two bases. Firstly, section 4 provides that it should receive 90% of profits and the Trading Company only 10% of trading profits. In addition, an annual fee of 1% of the net asset value of the Trading Company (subject to an upper limit of $250,000) was payable under section 5. Under section 7a-7b, the Trading Manager acknowledges that it has proposed the investment

---

[7] This letter was also written on behalf of a third client, Barnaby, who is not relevant for present purposes.

structure and is solely responsible for all trading decisions (based on the advice of two consultants with combined experience of 45 years) "*exclusively in fixed income U.S. Government bonds*". The Trading Manager agrees (under section 7d) to post a deposit of $1 million to guarantee its obligations on the basis that "*the amount of this deposit well exceeds any individual trading loss ever incurred by either or both of the two (2) expert advisers in their combined experience of fixed income trading of Government Bonds…*" The final clause of the agreement states that neither party may assign its rights and obligations under the TSA.

44.    In 1998, the Echo Restructuring partially took place. This apparently involved changing the offshore structure through the creation of a limited partnership vehicle which was seemingly never actually fully utilised for its intended purpose. The Defendant submitted that the Echo Restructuring had not been pleaded and was irrelevant. The documentary evidence in relation to the summer 1998 Echo Restructuring is only relevant in my judgment as confirming that the scope of investment activity which was contemplated remained substantially unchanged. The main way in which the TSA regime appears to have been departed from is that the monies to purchase the T-bills to be traded daily by Extant on Boomer's behalf were in fact raised by selling portions of the Shares, not by pledging them and raising loans for this purpose. But the Defendant's counsel did not point to any other documentation which it was contended was directly relevant to the scope of investment activity Extant was authorised to carry out on Boomer's behalf. And in my judgment no credible grounds for construing the evidence in a way which would support a finding that the Extant Loans were authorised by the Plaintiffs was ever advanced. It was, after all, admitted on the pleadings, that Walsh and Taal were not informed of the impugned transactions at all.

45.    Finally, it also clear that the primary rationale of the offshore investment structure was to avoid liability for Canadian taxes through transferring the Shares to companies incorporated in tax neutral jurisdictions and engaging in investment activity which qualified for favourable Canadian tax treatment. It was believed to be essential for this tax treatment that the entity holding the Shares be engaged in active business. This is reflected in Hindle's July 21, 1997 letter (reproduced above) and in Hindle's July 24, 1998 letters to Walsh in relation to the seemingly aborted "Echo Restructuring". This is why the mandate letters sent to HBI by Walsh and Taal on August 28, 1997 each referred in paragraph 10) to purchasing and trading "*U.S. Government Treasury Bills on a daily basis.*" And this is why the TSA refers at the very beginning to Boomer's wish to "*carry out active trading*". The contemporaneous documentary record thus corroborates the testimony of Walsh and Taal that the offshore investment programme was designed by them as part of an estate planning exercise to reduce the exposure of their capital assets to Canadian taxes. The documentation also strongly supports the view that the trading activities were to be carried out on behalf of Boomer and in the name of Boomer and in respect of Boomer's assets (indirectly owned by Allington and Wooden Shoe, Walsh and Taal). Extant was merely intended to play a managerial role.

46.    According the note at the bottom of the chart sent by Prucha on behalf of HBI to Bill Hutchings on August 26, 1997: "*Trading Manager HAS FULL CONTROL OVER FIXED INCOME TRADING, NOT OVER EQUITY SIDE OF THE TRADING COMPANIES*". The TSA cannot sensibly be read otherwise than as reflecting an agreement for Extant to carry out trading in respect of Boomer's assets on Boomer's behalf and in Boomer's name. This interpretation is supported by the fact that accounts were opened in the name of Boomer at Lehman's in respect of the assets placed into the offshore programme. The TSA itself contemplated daily trading "*upon a fully disclosed basis*" (section 3a). And in September 1997, the Shares were initially held by Lehman's in HBI accounts "*for the benefit of*" Allington and Wooden Shoe respectively. This supports the otherwise highly credible oral evidence of Walsh which suggested that he was from the outset extremely anxious about the security of his valuable capital assets. While the assets were owned for tax reasons by entities offshore, it was no doubt reassuring to Walsh that they were located in the bosom of a well respected financial institution based in New York.

47.    In my judgment, neither the First and Second Extant Loans, nor the related Pledge Agreement, were authorised under the TSA and the related agreements and/or understandings between Walsh and Taal, any or all of the Toronto Defendants and HBI in relation to the trading activities to be carried out by Extant on Boomer's behalf. Extant was not authorised to invest the assets in its own name without the knowledge of Walsh and Taal in passive investments such as occurred with respect to the acquisition of shares in Irwin and the loan to Hamilton, which entailed risks of an entirely different order to those involved in trading in comparatively low-risk US T-bills in Boomer's name with trading losses at Irwin exceeding US$4 million and a single put option loss of some US$1.3 million being incurred in relation to most of the balance of the proceeds of the Second Extant Loan which were not funds invested by way of a loan to Hamilton. In the event, all of Boomer's pledged assets had to be sold to discharge Extant's loan obligations to Lehman Brothers, so Walsh and Taal effectively suffered a 100% investment loss.

48.    It remains to consider whether the impugned transactions were fraudulent and/or entailed any actionable breach of fiduciary duty on HBI's part giving rise to both proprietary equitable tracing claims and common law claims for damages in favour of the Plaintiffs. Although the Plaintiffs advanced the fraud claim as their primary claim, it seems to me to be more helpful to analyse the breach of fiduciary duty claim first.

**Findings: did HBI breach or knowingly assist in the breach of fiduciary duties owed to the Plaintiffs?**

49.    The starting point is to consider whether and if so to what extent and by whom fiduciary duties were assumed towards the Plaintiffs in relation to the offshore investment structure and, in particular, the investment of Boomer's assets. Mr. Hargun in his Opening Submissions cited the following legal propositions found in Burrows, 'The Law of Restitution' (2nd Edition) at page 93:

"Nevertheless it is worth stressing, at the outset, that the traditional difference drawn between common law and equitable tracing rules is posited on the notion that only a claimant with equitable title to the original property (or, as it has sometimes been expressed, the Claimant was someone to whom a fiduciary duty was owed in respect of the property) can invoke equity's tracing rules. For example, Lord Green MR in *Re Diplock* said that it was a "right of property recognised by equity" that triggered equity's tracing rules. He said, "Lord Parker and Viscount Haldane [in *Sinclair v Brougham*] both predicate the existence of a right of property recognised by equity which depends on their having existed at some stage a fiduciary relationship of some kind (though not necessarily a positive duty of trusteeship) sufficient to give rise to the equitable right of property. Exactly what relationships are sufficient to bring such an equitable right into existence for the purpose of the rule which we are considering is a matter which has not been precisely laid down. Certain relationships are clearly included, eg. trustee (actual or constructive) and *cestui que* trust, and "fiduciary" relationships such as that of principal and agent".

50.    The Plaintiffs case as to the facts which support the finding of the existence of a fiduciary relationship capable of supporting a tracing claim apply, it seems to me, with equal force to whether or not fiduciary duties were owed for the purposes of the damages claim. In their Opening Submissions, the following case was advanced:

"71.1    The Plaintiffs relied upon Mr. Prucha's representations and advice and accepted Mr. Prucha's proposal. Mr. Prucha acted throughout as investment advisor and financial advisor to the Plaintiffs for this offshore investment programme from the spring of 1997 forward. Mr. Walsh understood by early 1998 that Mr. Prucha acted with the knowledge, authority and assistance of HBI, DBM, Mr. Presnail, Mr. O'Connor and Mr. Edwards.

71.2    Boomer was to be managed as a trading company by nominees resident in Nassau, Bahamas who would act as officers, directors and

registered shareholders of Boomer for the benefit of the Plaintiffs. This is admitted by HBI.

71.3    On Mr. Prucha's recommendation, Boomer appointed Extant as its trading manager for the recommended day trading programme for the US T-bills.

71.4    The Plaintiffs had verbal assurances from Mr. Prucha that none of their shares would be sold without their knowledge and consent.

71.5    The Plaintiffs had assurances from Mr. Prucha that the trading of US T-bills would be done in the name of the proposed trading company so that it could qualify as an "active business" for the offshore tax exemption that the Plaintiffs were seeking under Canadian tax law.

71.6    At a meeting in August 1997, Mr. Prucha recommended to the Plaintiffs and persuaded them, that they should direct him to appoint Mr. Coombes of HBI as a nominee officer and director for each of Allington, Wooden Shoe and Boomer.

71.7    At that meeting, Mr. Prucha recommended that the Plaintiffs instruct Mr. Coombes as their nominee (i) to implement the offshore investment programme according to a specific written mandate; (ii) to borrow money for Boomer on margin loans from Lehmans secured against the Plaintiffs shares and assets held in Boomer's name in the offshore investment programme; and (iii) to use the margin loans to fund the day trading programme in US T-bills held in Boomer's name.

71.8    Mr. Prucha assured the Plaintiffs that the shares and assets invested by the Plaintiffs would be segregated and separately tracked in the offshore investment programme even though they would be invested in a common trading programme.

71.9    Mr. Prucha agreed to provide separate financial reporting and accounting on a monthly basis on the trading programme and the status of the Plaintiffs investments in the offshore investment programme, including Boomer's trading profits, losses and expenses and on matter governing shares, T-bills and on other investments in the programme.

71.10   Mr. Prucha assured the Plaintiffs that they could remove their shares, T-bills or other assets from Boomer and the offshore investment programme on request at any time and in any event, all assets would be returned to them when the trading programme ended in the summer of 2003.

71.11   Any verbal authority which the Plaintiffs gave to Mr. Prucha, Mr. Coombes or Extant to borrow against Boomer's assets was confined to raising funds on margin loans made by Lehmans to Boomer for the sole purpose of investing in the T-bill day trading programme in Boomer's name at Lehman Brothers in New York City. The Toronto Defendants and Mr. Coombes were not authorised by the Plaintiffs to borrow funds against shares or assets held in Boomer's name for any other purpose.

71.12   In relation to the offshore investment programme, Mr. Walsh understood that Mr. Coombes would always act directly under Mr. Prucha's direction and control and would always act solely in the best interests of the Plaintiffs.

71.13   HBI admits that the Plaintiffs gave Mr. Coombes limited authority to act as their nominee officer and director in respect of Boomer."

51.     The Defendant's case in their opening submissions on the existence of any fiduciary duty was essentially as follows. It was contended that no primary facts were pleaded capable of supporting a plea that HBI was a fiduciary. Clearly this argument was responsive to the case that HBI was a primary actor in breaching a fiduciary duty it

owed to the Plaintiffs. The wider case that HBI played a secondary role in knowingly assisting a breach of fiduciary duty primarily owed by Prucha and/or the Toronto Defendants pleaded from the outset (Points of claim, paragraph 40) was not directly addressed. In fact the Plaintiffs' pleading, from the outset (the later amendments not affecting the substance), contained the following knowing assistance plea:

"21.    In that manner, the <u>First and Second</u> Plaintiffs<u>, and/or the Third Plaintiff,</u> entrusted their assets to the care of HBI, Coombes, ~~Boomer,~~ Extant and the Toronto Defendants in a manner that left the <u>First and Second</u> Plaintiffs<u>, and/or the Third Plaintiff,</u> in a position of vulnerability and dependence and which gave rise to a fiduciary duty owed to the <u>First and Second</u> Plaintiffs<u>, and/or the Third Plaintiff,</u> to act solely in the <u>First and Second</u> Plaintiffs'<u>, and/or the Third Plaintiff's,</u> best interest in the management of their assets in the offshore investment structure and its subsequent revisions or amendments."

52.    In terms of the legal test for deciding who is a fiduciary, the Defendant relied upon a *dictum* of Millet LJ in *Bristol and West Building Society v Mothew* [1998] Ch 1 at page 18, approved by the Privy Council in *Arklow Investments Ltd. v Maclean* [2000] 1 WLR 594 at 599G:

"A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr. Finn pointed out in his classic work Fiduciary Obligations (1977), p. 2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary."

53.    Before approving that passage however, Henry J ( at page 598, giving the judgment of the Board) opined more concisely as follows:

"The description of the duty under consideration as being one of loyalty was not seen by Mr. Underhill as being the most appropriate one, but for present purposes it is convenient to label it in that way. In the present context, the concept encaptures a situation where one person is in a relationship with another which gives rise to a legitimate expectation, which equity will recognise, that the fiduciary will not utilise his or her position in such a way which is adverse to the interests of the principal. An example of the obligation relevant to the present case is not to exploit or take advantage of the position of fiduciary at the expense of the principal. The existence and the extent of the duty will be governed by the particular circumstances."

54.    In his closing submissions, Mr. Woloniecki contended that (a) Prucha was merely a messenger, and (b) that an investment advisor was not a fiduciary. However no or no coherent answer was put forward to the following factual propositions which I find that the Plaintiffs have proved. Walsh and Taal authorised Prucha, who held himself out as acting on behalf of HBI, to establish an offshore corporate structure into which the two Plaintiffs would place their valuable assets. This offshore structure would be controlled by nominee directors, most notably Coombes, who served as an officer of the key companies Boomer (which held the assets formerly owned by Walsh and Taal) and Extant (the trading advisor, owned and/or controlled by HBI). Coombes was an officer of HBI and admittedly received his directions in managing all three companies from Prucha and/or the Toronto Defendants.

55.    It follows that (a) Walsh and Taal placed considerable trust in Prucha and/or HBI in placing their assets under their control, subject to specific guidelines; (b) Prucha and/or the Toronto Defendants and/or HBI, in instructing Coombes with respect to the management of Boomer (as distinct from Extant), placed themselves in a position in which there was a conflict of interest between their own commercial interests (personally and/or through HBI and Extant) and those of Boomer and Walsh and Taal as Boomer's ultimate beneficial owners. This was manifestly a situation in which Walsh and Taal expected the persons who they entrusted with managing their assets to loyally follow their principals' key mandates; (c) Coombes as an officer of Boomer owed duties to Boomer which were distinct from and which potentially conflicted with his duties to Extant and HBI. In my judgment Coombes clearly owed fiduciary duties to Boomer as its officer and principal agent.

56.    I further find as a fact that HBI owed fiduciary duties to Walsh and Taal flowing from its role as their actual or de facto agent in establishing the entire offshore structure and, in particular, Walsh and Taal's assets and the companies created to hold such assets. Of course, HBI may not have assumed fiduciary obligations when providing ordinary banking services, nor indeed when indirectly controlling ordinary corporate administration functions. But in agreeing to establish an offshore structure which entailed Walsh and Taal placing their assets into companies which HBI would control on their behalf (i.e by providing its own manager, Coombes, to be the manager of Boomer), HBI in my judgment became a fiduciary of Walsh and Taal to the extent that it was trusted to ensure that Boomer would be managed consistently with the interests of Walsh and Taal and, most importantly, within the parameters of the mandate Walsh and Taal gave HBI (through the July 23, 1997 and August 28, 1997 letters from Hindle and the Plaintiffs themselves), unless otherwise agreed.

57.    It was argued by the Defendant that HBI played no role save as a banker opening accounts and receiving and disbursing funds. The mere fact that at an initial meeting with Prucha he presented an HBI card is not conclusive. What is more persuasive, to my mind, is the fact Hindle and Walsh and Taal communicated with Prucha at HBI's address. When Prucha on August 26, 1997 sent a chart showing the offshore structure, he did so using HBI's letterhead which displays what appears to be HBI's Antigua address. Hindle's letter confirming what was agreed and the Allington and Wooden Shoe mandate letters, respectively, expressly contemplated that (a) HBI was responsible for establishing and managing the offshore structure, and (b) that the basis of the T-bill trading had been "*agreed with HBI*". The suggestion that Prucha was not, at this stage at least, acting as HBI's agent would be inconsistent with all the available evidence. And Prucha was not called as a witness to advance any positive case as to how this evidence could be interpreted in an alternative manner. When Walsh was cross-examined, it is true, the impression he conveyed (very credibly) was that he was unsure at the time as to whether or not he had contracted with HBI:

"Q.     Yes. Well, in any event, the trading structure that was put in place, which Mr. Hindle put in place, does not contain any contract between you and Horizon. That's correct, isn't it?

A.     That's correct.

Q.     Yes. Now --

A.     Actually, Mr. Woloniecki, can I step back for one moment on that answer?

Q.     Well --

JUSTICE KAWALEY: I think the witness should be allowed to --

Q.     If there's something you want to say, then please say it.

A.     ell, I guess when I -- the structure that was proposed by Mr. Prucha and the -- I believe this letter is to Mr. Prucha at HBI Bank, so, I mean, I'm -- I believe that the structure that we were proposing and the structure that we

agreed upon in the agreements that we signed all went to HBI Bank. So I don't know if this is -- if this is a contractual agreement with HBI Bank.

Q.      I'm not going to pursue that."

58.     But Walsh's own tentativeness on what is essentially a legal issue was consistent with his general fuzziness about the technicalities of the corporate arrangements and his adamant testimony that he trusted Hindle and Hutchings to exercise their minds about such details. It is also true that confusion may have been created because Prucha also at some early juncture produced business cards for two other Toronto-based companies, one of which was DBM. But the fact that Prucha had links with other corporate entities yet corresponded with the Walsh and Taal on the apparent basis that he was acting for HBI merely strengthens the inference that Prucha was in fact acting at all material times on HBI's behalf. As Mr. Hargun rightly submitted, under traditional agency principles, when a principal permits someone to hold themselves out as their agent without dissent, the apparent principal will be bound. And the contemporaneous documents all clearly suggest that HBI played a pivotal role in (a) proposing the offshore structure, (b) assuming responsibility at the outset for creating the offshore structure, and (c) giving instructions to Coombes (initially at least) as to carrying out the investment mandate of Walsh and Taal.

59.     In my judgment, HBI entered into a fiduciary relationship with Walsh and Taal and Boomer because it agreed to manage their assets, which were to be kept separate from HBI and Extant's assets, subject to certain broad guidelines through a structure over assets of which Walsh and Taal had relinquished operational legal control. The position might well have been different if Walsh and Taal were to serve as directors of Allington, Wooden Shoe and Boomer, and placed no real trust in HBI at all. Although it was contemplated at one stage that the Shares would be beneficially owned by Walsh and Taal and merely loaned to Allington and Wooden Shoe, I am satisfied that in the event the Shares were actually transferred to these entities. HBI in substance agreed to manage the corporate entities holding Walsh and Taal's assets according to their specific mandate. It is obvious that Walsh and Taal were extremely anxious about the security of their capital and were extremely risk averse. In these circumstances HBI's implied agreement to follow their instructions with respect to the type of investment activity they authorized in the August 28, 1997 mandate letters was a fiduciary obligation.

60.     Even if HBI did not assume any fiduciary duties towards Walsh and Taal, and Prucha, in promoting and implementing the creation of the scheme, was merely operating as a free-wheeling marketing consultant (the only job description with which he is identified as regards HBI), I would in any event (and more decisively) find as follows. It is clear that he and the Toronto Defendants collectively (who it is admitted gave instructions to Coombes in his capacity as officer of HBI and Boomer) owed Walsh and Taal and/or Boomer a fiduciary obligation to act in the Plaintiffs' interests as opposed to their own. One would ordinarily expect the ultimate beneficial owners of a closely held company to give instructions to nominee shareholders and directors and/or officers. Walsh and Taal chose to give a clear mandate as to what activities their companies were to engage in, and agreed that Prucha (if not HBI) should give operational instructions on their behalf. Prucha and/or the Toronto defendants (if not HBI) assumed a position similar (in practical, if not technical terms) to an agent or trustee managing assets they do not beneficially owned on behalf of a principal or beneficiary. It may be right that the investment advisory services provided gave rise to no fiduciary obligations, but this is an entirely different matter.

61.     I find that Prucha and the Toronto Defendants as regards their express and/or implied agreement to give instructions to Coombes with respect to Boomer and its assets on behalf of Walsh and Taal (but not otherwise) were even more clearly than HBI itself "*in a relationship with another which gives rise to a legitimate expectation, which equity*

*will recognise, that the fiduciary will not utilise his or her position in such a way which is adverse to the interests of the principal."*[8]

**Findings: did HBI breach or knowingly assist in the breach of a fiduciary duty owed to the Plaintiffs or any of them?**

62.     Having found that (a) the First and Second Extant Loans were not authorised by the TSA and/or Walsh and Taal, and (b) that fiduciary duties were owed to the Plaintiffs by HBI and/or Prucha and/or the Toronto Defendants, and by Coombes to Boomer, it follows logically that some breach of fiduciary duty occurred. The Defendant's broad contention is that even if Prucha and/or the Toronto Defendants knew that these transactions were unauthorised, their knowledge cannot be attributed to HBI. It was further contended that there is no basis for any finding that Coombes, in his capacity as an officer of either Boomer or HBI, knew that any breach of fiduciary duty occurred.

63.     It is, however, first necessary to determine what breaches of fiduciary duty occurred before one can determine the somewhat difficult question of whose knowledge can be attributed to whom.

**The position of Prucha and/or the Toronto Defendants**

64.     I find that the decision to enter into the Pledge Agreement and the First and Second Loan Agreements, raising monies which were invested on behalf of Extant in passive investments with Irwin and Hamilton, reached without Walsh and Taal's express or implied consent, involved a breach of the fiduciary duty assumed when the offshore structure was created only to invest Boomer's assets in Boomer's name and in daily trading in T-bills through Lehman Brothers. It is admitted that this decision was made by the Toronto Defendants and/or Prucha who instructed Coombes to execute the various documents required for these transactions on Boomer's and Extant's behalf, without informing Walsh and Taal. So Prucha and/or the Toronto Defendants clearly breached their fiduciary duty to Boomer and/or Walsh and Taal only to invest Boomer's assets in accordance with the agreed investment scheme. Having regard to the formality with which the scope of authority to invest was defined (the mandate letters backed up by the TSA), such a dramatic change of course should not have been embarked upon without Walsh and Taal's written instructions. This duty subsisted after Walsh and Taal's assets were placed into the offshore structure because it arose from the implicit decision of Walsh and Taal to trust Prucha and the Toronto Defendants to operationally control not only their own company (Extant) but also the companies controlled by Walsh and Taal both indirectly (Boomer) and directly (Allington and Wooden Shoe) as well.

**The position of HBI as a primary actor**

65.     There is no or no clear evidence that HBI was involved in allegedly illicit investment decisions or indeed that Prucha, after promoting and directing the establishment of the offshore structure, was acting on behalf of HBI in giving ongoing instructions to Coombes in relation to Boomer. The decision to invest Boomer's assets for the benefit of Extant was not, on the evidence, a decision made *by* HBI even though HBI's ultimate beneficial owners apparently stood to benefit through their interests in Irwin and Hamilton. If HBI did make the operative decision, it would have been in breach of its own fiduciary obligation to comply with the terms of the mandate given by Walsh and Taal on August 28, 1997. But there is no cogent evidence HBI played a primary role in this regard.

66.     It is clear that HBI was involved in establishing the offshore structure, but far less clear that HBI ought properly to have been deemed to have been giving instructions to Coombes in his capacity as a director of Boomer. It is admitted that Prucha and/or the Toronto Defendants instructed Coombes at all material times; it does not follow that Prucha was in this respect acting as HBI's agent. No evidence, for instance, of instructions being received from Prucha on HBI letterhead in November 1998 and

---

[8] *Arklow Investments Ltd.-v- Maclean* [2000] 1 WLR 594 at 598 (PC).

subsequently was seemingly found or, in any event, produced. Executing the November 1998 transactions and the subsequent Extant Loans did not constitute any actionable breach of fiduciary duty on HBI's part.

67.     Nevertheless, for the reasons set out in my findings as to the knowledge of Coombes set out below, and subject to one important *caveat*, it is clear that HBI breached its fiduciary duty to Walsh and Taal and/or Boomer to ensure that Boomer's assets were invested in a particular manner after the impugned transactions took place by (a) assisting in the dissipation of the proceeds of the Extant Loans, and (b) concealing the fact that Boomer's assets had been pledged to LBSA and subsequently lost. This breach of duty only clearly occurred if the requisite knowledge can be imputed to HBI, so the position of HBI as a primary actor or as a party providing knowing assistance is (in terms of the seriously contested facts) effectively the same.

**The position of Coombes**

68.     Did the impugned transactions constitute a breach of fiduciary duty on Coombes' part? Subject to the implications of any bye-law indemnity which may have operated in the director's favour, this question must be answered decisively in the affirmative. Although any such breach of fiduciary duty may not fairly be relied upon by the Plaintiffs, his knowledge is relevant for the purposes of Walsh and Taal's initially pleaded claims.

69.     I find that Coombes knew or ought to have known that the November 1998 transactions constituted a breach of the TSA which he executed on behalf of Boomer. Paragraph 20 of the Re-re-Amended Defence states as follows: "*It is admitted that the First and Second Plaintiffs gave Coombes limited authority to act as their nominee officer and director in respect of Boomer.*" I find that the scope of this limited authority was defined, to Coombes' personal knowledge, by the TSA which he executed on behalf of Boomer. When Coombes was instructed by the Toronto Defendants or Prucha to execute the First and Second Loan Agreements and the Pledge Agreement, he must have known either actually or constructively that Boomer's assets were being used for purposes beyond the scope of the TSA. If Coombes had been a witness, he might have been able to displace the *prima facie* case raised by the evidence against him that he acted in breach of his fiduciary duties to Boomer as, apparently, its sole director. This would have been a difficult task, because he would have to explain on what objectively reasonable grounds he believed any representations made to him by the Toronto Defendants (or any of them) to the effect that Walsh and Taal wished Boomer to modify the terms of the TSA in such a significant manner.

70.     I find that Coombes knew or must have known by November 1998, if not earlier, that the ultimate clients of Boomer were Walsh and Taal, through Allington and Wooden Shoe. It seems highly improbable that Coombes would have not have been privy to the August 28, 1997 mandate letters which on their face gave HBI and Prucha "*a formal mandate to instruct (according to what follows hereafter) Mr. Kevin Coombes, as the designated representative of the Nominee Shareholder of the abovementioned Company* [Allington/Wooden Shoe] *on behalf of the undersigned as the beneficial owner of all the authorized and issued shares of the Company*". Coombes knew or must be deemed to have known that there was a potential conflict between the interests of HBI, which was managing the offshore structure for reward, and the interests of Walsh and Taal who had entrusted Coombes as their nominee to manage their investment vehicles within clearly defined guidelines. HBI was providing ordinary banking services to Walsh and Taal's companies, but Extant was earning trading fees as well. The mandate letters most significantly contemplated that Coombes would use the Shares "*to purchase and trade U.S. Government Treasury Bills on a daily basis, the whole more fully in accordance with the trading instructions which* [Boomer] *shall issue to* [Extant] *and upon the terms and conditions already agreed upon with HBI*". It was envisaged from the outset that Coombes would be the operational agent for both the Trading Company and the Trading Manager.

71.     Coombes in his capacity as a nominee director of Boomer in any transactions with Extant (of which he was also a director) should have taken scrupulous care to ensure that he acted at all material times within the best interests of Boomer. Since the implicit purpose of Coombes' mandate, as spelt out in the August 28, 1997 letters and the TSA itself, was to resolve any potential conflicts between his duties as an officer and/or director of Boomer and Extant respectively (broadly speaking, if the mandate was honoured, no substantial conflicts would likely arise), his primary duty to Boomer was to ensure that he dealt with Boomer's assets in accordance with the terms of the mandate. The contractual arrangements even reduced the possibility of conflicts over fees, because the formula was based on the value of assets which would primarily be determined by statements issued by an independent third party, Lehman Brothers. Assuming Bahamian law to be the same as Bermuda law, Coombes owed the following fiduciary duties to Boomer as a matter of statute and/or common law:

"97     (1)     Every officer of a company in exercising his powers and discharging his duties shall —

(a)     act honestly and in good faith with a view to the best interests of the company; and

(b)     exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances." [9]

72.     In my judgment, it is clear that Coombes was at the very least negligent in personally executing the Pledge Agreement together with the First and Second Extant Loan Agreements on behalf of both Boomer and Extant and making the subsequent investments in Irwin and Hamilton without obtaining written confirmation from Walsh and Taal that they wished to modify the investment restrictions embodied in the TSA and the earlier mandate letters. If, as the evidence suggests, he simply followed Prucha's and/or the Toronto Defendants' routine instructions in departing from the mandated investment regime in such a dramatic way, this constituted a breach of his fiduciary duty to Boomer.

73.     Mr. Woloniecki complained that the Defendant was not afforded an opportunity, by the late joinder of Boomer, to consider the implications of Bahamian law and any possible bye-law indemnity granted to Boomer's directors and operating in Coombes' favour. It seems to me that the effect of any indemnity is essentially the same irrespective of whether the breach of fiduciary claimant is Boomer or Walsh and Taal. However, before the re-re-amendments at trial, no plea that Coombes breached a fiduciary duty owed to Boomer was explicitly made. Accordingly, this point did not receive the benefit of full argument.

74.     I am bound to assume that Bahamian law, like Bermuda law, permits companies to grant bye-law indemnities in respect of all breaches of duty by directors and officers falling short of deliberate dishonesty in the absence of contrary evidence of foreign law. Section 98 of the Bermudian Companies Act provides as follows:

"98     (1)     Subject to subsection (2), a company may in its bye-laws or in any contract or arrangement between the company and any officer, or any person employed by the company as auditor, exempt such officer or person from, or indemnify him in respect of, any loss arising or liability attaching to him by virtue of any rule of law in respect of any negligence, default, breach of duty or breach of trust of which the officer or person may be guilty in relation to the company or any subsidiary thereof.

(2)     Any provision, whether contained in the bye-laws of a company or in any contract or arrangement between the company and any officer, or any person employed by the company as auditor, exempting such officer or person from, or indemnifying him against any liability which by virtue

---

[9] Companies Act 1981.

of any rule of law would otherwise attach to him in respect of any fraud or dishonesty of which he may be guilty in relation to the company shall be void."

75.     Assuming Boomer's domiciliary law to permit such indemnities to be given, I am unable (in the absence of positive evidence to this effect) to find that Boomer's bye-laws do not in fact limit the liability of directors in a manner which is standard under most Bermudian bye-laws. Accordingly, an ordinary breach of fiduciary duty involving negligence or even deliberation but falling short of fraud or dishonesty would not give rise to any director liability for Coombes in his capacity as a director of Boomer. The true position may very well be that Bahamian law permits bye-law indemnities which excuse only ordinary breaches of duty involving no more than negligence, and does not permit companies to exclude liability for deliberate breaches of duty falling short of fraud and dishonesty. But, in the absence of evidence as to Bahamian law, I am bound to presume that it is the same as Bermuda law.

76.     Mr. Hargun made the highly persuasive argument that if Coombes in his capacity as a director of Extant or HBI knew that Boomer was being defrauded, such knowledge would properly be attributable to him in his capacity as a director of Boomer. Because a director of Boomer who learned that Boomer was being defrauded would have a duty to report this fact to the company. But this does not adequately meet the complaint that the question of whether or not Coombes acted dishonestly in his capacity as an officer of Boomer is not an issue which the Defendant had a fair opportunity to meet and, accordingly, has been adequately addressed by the evidence placed before the Court. Further, for the reasons which will hopefully become apparent below, the complexities of the legal relations between HBI and Boomer make it difficult to conclude that it is clear that Coombes acted dishonestly as a director of Boomer in any event.

77.     So any claim for breach of a fiduciary duty owed by Coombes as a director to Boomer in my judgment has not been proved to the high standard required for proving allegations of fraud or dishonesty.

**Did HBI knowingly assist Prucha and/or the Toronto Defendants in his/their breach of fiduciary duty?**

78.     On the facts it is clear that HBI actually assisted Prucha and/or the Toronto Defendants in breaching the fiduciary duties owed to Walsh and Taal with respect to how Boomer's assets would be invested. HBI did this principally by providing banking services to Extant which facilitated its deployment of the funds obtained through the First and Second Extant Loans and the Pledge Agreement. What HBI hotly disputes is whether, principally for legal reasons, it is permissible to attribute to it the requisite knowledge of any such breaches of fiduciary duty in which it was not primarily involved. The crucial question which arises, in law and on the facts, is whether HBI knowingly assisted Prucha and/or the Toronto Defendants in their breach of fiduciary duty.

79.     The central area of factual enquiry has two dimensions to it. Firstly, did Coombes as an officer of HBI know that Prucha and/or the Toronto Defendants had breached their fiduciary duties to the Plaintiffs at any material time? And, secondly, may Prucha's and/or the Toronto Defendants' knowledge that he/they was/were breaching his/their fiduciary obligations to Walsh and Taal and/or Boomer by placing Boomer's assets into unauthorised investments properly be attributed to HBI as respects HBI's own admitted dealings with (or simply receipt of) the proceeds of the unauthorised transactions? It is accepted that Coombes was at all material times an agent of HBI, and that any knowledge he acquired as an agent of HBI may be attributed to HBI. It is disputed that the knowledge of Prucha and the Toronto Defendants is attributable to HBI merely because they gave instructions to Coombes as the chief operating officer of the Defendant.

80.     The Plaintiffs allege that the Toronto Defendants are the directing or guiding minds of HBI and that their knowledge is attributable to HBI as a result. The Defendant submits that this analysis is simply illogical, because (a) it is based on the premise that

Coombes and HBI are the Toronto Defendants' agents, and (b) the knowledge of an agent can be imputed to his principal, but not vice versa. In the Defendant's Skeleton argument, the following submissions are advanced:

"67.     The admitted facts are that all material times:

(1)     Mr Coombes was an officer of HBI.

(2)     Mr Coombes was the "guiding or controlling mind" of HBI (the precise legal meaning of that expression will be explained immediately below).

(3)     Mr Coombes acted in relation to the various transactions that gave effect to the scheme at the direction of Mr Prucha and Mr Edwards.

68.     The expression "guiding or controlling mind" is a paraphrase of "directing mind and will" (Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd. [1915] A.C. 705, 713, per Viscount Haldane LC). As Lord Hoffmann explains in Meridian Global Funds Management Asia Ltd. v. Securities Commission [1995] A.C. 500, at 506-507, the casual use of that expression tends to obscure the true legal nature of the rules of attribution of the acts of individuals to corporations. The rules of attribution, which Lord Hoffmann identifies, are of two kinds: primary rules (which are derived from the company's constitution), and secondary rules (the principles of agency and vicarious liability).

69.     Lord Hoffmann says (Meridian Global at pp. 506H-507B, emphasis added):

"… a reference to a company 'as such' might suggest that there is something out there called the company of itself which one can meaningfully say that it can or cannot do something. <u>There is in fact no such thing as the company as such, no ding an sich, only the applicable rules</u> … The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient to enable one to determine its rights and obligations."

70.     Following an analysis of Lennard's case, and subsequent authorities, Lord Hoffmann concluded as follows (Meridian Global at p. 511B-C):

'Their Lordships … think … that the difficulty has been caused by concentration on that particular phrase rather than the purpose for which Viscount Haldane L.C. was using it. It will often be the most appropriate description of the person designated by relevant attribution rule, but it might be better to acknowledge that not every such […] rule has to be forced into the same formula.'

71.     It is clear from Lord Hoffmann's analysis of the authorities that, in each case, the court was considering the question whether or not, for the purpose of some statute imposing liability, the acts of a particular natural person were to be attributed to the company in accordance with the rules of attribution. Once the Court has concluded that the acts of that person are attributable to the company, he may then be described as the 'directing mind and will' of the company', but that is a convenient label which may be attached to the person after the fact. There is no legal concept or doctrine of 'directing mind or will', independent of the rules of attribution. Indeed, as Lord Hoffmann has pointed out, the use of the label serves only to obscure the legal analysis, which involves the application of the rules of attribution to the particular facts and the statute under consideration. As Lord Hoffmann puts it, it is important to appreciate that, 'the question is one of construction rather than metaphysics …' (Meridian Global at p. 511C)"

72.     The Defendant's admission that Mr Coombes was the "guiding or controlling mind" of HBI, is no more than a shorthand statement of the legal conclusion that as an officer, and hence agent, of HBI, the acts of Mr Coombes (when he is acting in the capacity of an officer/agent of HBI) and his knowledge (insofar as it has been acquired in his capacity as an officer/agent of HBI) are attributable in law to HBI.

73.     The Plaintiffs' pleaded assertion that Messrs Prucha and Edwards were the "guiding or controlling minds" of HBI because they directed the actions of Mr Coombes with respect to the scheme is fallacious as a matter of logic and of law. Mr Coombes was the officer/agent of HBI, his acts (and his knowledge) when acting in that capacity are therefore attributable to HBI under the principles of corporate attribution / agency law: (see Meridian Securities, above).

74.     The fact that Mr Coombes acted, in relation to the execution of the scheme, under the direction of Mr Prucha or Mr Edwards, does not make them the agents of either Mr Coombes or HBI. Even if the Court concludes that Mr Coombes was acting, in effect, as the agent of Messrs Prucha and Edwards in giving effect to the scheme, agency law imputes the knowledge of the agent to his principal, not vice versa. "The general rule of agency law is that any knowledge acquired by an agent whose business it is to receive information during the course of transaction effected on behalf of his principal, is deemed to be known by the principal." (O'Neill & Woloniecki, The Law of Reinsurance in England and Bermuda 2nd Ed., para 9-10 – cited with approval by Kawaley J in *Leisure Time Ltd v Cox Hallett Wilkinson* [2005] Bda L.R. 61, at p. 9)"

81.     The Skeleton Argument proceeded to make the additional point that unless the entire corporate structure was found to be a sham from the outset so that the Court could pierce the corporate veil, mere control by the Toronto Defendants was insufficient to warrant imputing their knowledge to HBI by virtue of fundamental principles of separate legal personality between a corporation and those who own or control it. These submissions appeared on their face to be sound. But the Plaintiffs' Closing Submissions provided an equally cogent alternative view of the applicable legal landscape:

"42. In its written submissions (¶68), HBI continues to advance an argument that the rules relating to attribution of knowledge are exclusively of two kinds: primary rules (which are derived from company's constitution) and secondary rules (the principles of agency and vicarious liability). For this proposition, HBI relies upon Meridian Global Funds (HBI's authorities, Tab 16). However, as the Meridian case itself shows, the primary and secondary rules are not exhaustive. The headnote itself says "But that, in exceptional, case, where the application of those principles would defeat the intended application of a particular provision to companies, it was necessary to devise a special rule of attribution to determine who's act or knowledge or state of mind was for the purpose of that provision to be attributed to the company". At page 507, Lord Hoffmann, stated:-

'The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient to enable one to determine its rights and obligations. In exceptional cases, however, they will not provide an answer… In such a case, the Court must fashion a special rule of attribution for the particular substantive rule"…"

82.     The correct legal position, in my judgment, may be summarised as follows. I find that that primary source for determining whose knowledge may be attributed to a company is the company's constitution, and that where a company is managed by one or two individuals without Board formalities, such individuals may be treated as the directing mind and will of the Company. The secondary source is the general law of agency and/or vicarious liability. Thirdly (in exceptional cases where the ends of justice would

be defeated by the inapplicability of the primary and secondary rules-e.g where a criminal statute applies to a company or where a company is in reality being controlled by an individual who is neither an officer nor an agent), the alter ego or guiding and directing mind principle may come into play by way of default in respect such persons as well. Whose knowledge is attributed to what corporate vehicle primarily turns upon an analysis of the facts and, in particular, which actor played what role in relation to the relevant transactions.

### The knowledge of Coombes

83.   I have already found that Coombes knew or ought to have known when he pledged Boomer's assets that the Extant Loans fell outside of the scope of (a) the initial mandate provided by Walsh and Taal to Allington and Wooden Shoe, and (b) the mandate agreed between Boomer and Extant under the TSA. I also find that he probably knew in November 1998 that Prucha and/or the Toronto Defendants and/or HBI had breached his/their fiduciary obligations to Walsh and Taal by unilaterally deciding without Walsh and Taal's consent or even knowledge to (a) invest Boomer's assets otherwise than in daily trading of T-bills, (b) to invest otherwise through Lehman's in entities over which they had some control, and (c) to invest otherwise than on a "*fully disclosed basis*" in Boomer's own name.

84.   Irwin Government Arbitrage Fund Ltd. ("Irwin") was capitalised with the US$ 15 million dollars raised by the First Extant Loan. According to the Irwin affidavit, the deponent believed based on discussions with Presnail that these monies belonged to or were controlled by that Toronto Defendant. After executing the November 1998 documents, including the November 18, 1998 subscription agreement in respect of Extant's US$15 million cash investment in Extant, Coombes in his capacity as an officer of Extant made written requests (confirming earlier verbal requests to Irwin from Presnail) for nearly US$10 million to be transferred from Irwin to Extant's account with HBI, between 1999 and 2000. According to Irwin's January 13, 2000 Performance letter, the return since inception on the investment was 8.08%. It is unclear precisely when the Irwin trading losses occurred in the winter and spring of 2000, but Coombes signed a liquidation agreement on behalf of Extant with Irwin on April 6, 2000. Extant was initially from December 1998 a 100% shareholder of Irwin, but from May 1999 until its liquidation in 2000 Extant was a 97% shareholder.

85.   Irwin addressed its correspondence to Coombes as an officer of Extant to a Bahamian address with the facsimile number "242-328-5155", the same number appearing on the Extant letterhead used by Coombes in corresponding with Irwin. It appears that during 1999, commencing January 24, 1999, doctored Lehman Brothers statements (for periods ending December 31, 1998 to December 31, 1999) purporting to show that Boomer's assets were intact and had not been pledged were faxed from this same number to Walsh and Taal's advisors. Coombes' instructions on behalf of Boomer for Lehman Brothers to move the assets out of the investment account and into the Collateral Account was sent by Coombes on November 30, 1998 from the same fax number. The true value of Boomer's account with Lehman's was $2.10 at year end 1998; the admittedly doctored statements showed a net value of nearly US$23 million.

86.   On February 18, 1999, Coombes faxed on behalf of Extant instructions to Lehman Brothers to transfer $3,665,000 (part proceeds of the Second Lehman Loan) to Hamilton using this same fax number, which I find was a fax number used by him generally during the period 1998 to 1999. A similar sum was admittedly deposited with HBI in Bermuda for the account of Extant between December 27, 2001 and July 2004. Further smaller loans were taken out in or about 2000, seemingly using the same pledged assets as security. By 2001, however, it appears that Coombes was using a different fax number. He gave the following fax number as part of his contact details to the SVG OFA in his capacity of Vice-President of HBI on July 17, 2001: "242-323-3975". An admittedly doctored Lehman's statement was apparently sent from this same fax number on August 13, 2002. It is formally admitted that Edwards sent these doctored statements to Walsh and Taal, but the evidence suggests that Coombes knew or must have known that these statements were being sent. On October 28, 1998,

Coombes had written BCB requesting that all HBI bank statements be sent to his Bahamian address. So on behalf of HBI he would have had notice of the various deposits made into HBI's BCB account.

87.    By June 2001, it is admitted that LBSA had sold off all Boomer's pledged assets. Coombes, in his capacity as director of Extant and Boomer and the person with whom Lehman's communicated reference the loans, must have known of this fact. As part of the Pledge Agreement, Boomer apparently had to satisfy Extant's lender that Boomer was receiving consideration for pledging its assets. On November 27, 1998, Coombes signed on behalf of both Boomer and Extant a one- page "Reimbursement Agreement". This agreement provided for (a) Extant to pay Boomer an incentive fee, (b) to reimburse Boomer if the pledged assets (or any of them) were liquidated by the lender, and (c) purported to grant Boomer a first in priority security interest in the loan proceeds. So Coombes knew as a director of both Boomer and Extant by June 2001 that (a) Walsh and Taal were being deceived by Edwards as to the security of their investment since 1999, and (b) that save by taking recovery action against the loan proceeds primarily held by HBI with BCB in Bermuda, the entirety of their original capital (and Boomer's assets) had been lost. And, as soon as Coombes executed the Reimbursement Agreement in November 1998 (assuming it was not a sham agreement), he knew or must be deemed to have known that, until Boomer's obligations under the Pledge Agreement had been discharged, Boomer had a security interest in the loan proceeds.

88.    Coombes was at all material times the Vice-President of HBI responsible, *inter alia*, for filing the licensed bank's financial statements. Its audited statements for the period ending September 30, 1998 revealed a $20 million loan to an investment company incorporated in The Bahamas which was secured by that company's assets[10]. The loan was shown as having been reduced by sum $3 million in the following year's accounts, it being stated that the security was worth over $24 million. It is unclear what involvement Coombes had with these particular filings. However, on April 16, 1999, having seemingly received draft quarterly statements from Edwards that day, Coombes requested someone else to "*file HBI Quarterly Report by Monday*". The largest item under "Assets" in the balance sheet in the un-audited financials was a "Loan Receivable" of $21.2 million out of total assets of $22.37 million. Prior to the First Extant Loan and until September 30, 2000, HBI appears to have had cash and deposits of little more than $1 million according to its audited financial statements. However, by financial year end 2001, these deposits had risen to $2.2 million. By financial year end 2002, "cash resources" had risen to $6.5 million. According to the audited accounts for 2003, the cash was up to $6.7 million, and the loans down to less than $2.7 million. On June 27, 2001, by which time Coombes must have known as an officer of Boomer and/or Extant that Boomer's pledged assets had been sold by LBSA to settle Extant's loan obligations, Coombes on behalf of HBI wrote the bank's auditors representing that Boomer still owned over 250,000 Microsoft shares worth nearly $15 million[11]. Similar correspondence was sent to the auditors in December 2002.

89.    Meanwhile Coombes was personally certifying HBI's financial position to the OFA and certified the accuracy of quarterly asset and liability reports for years 1999, 2001, 2002 and 2003[12]. Boomer was identified as the debtor in respect of the loan which constituted the majority of HBI's assets from 1999. This purported loan by HBI to Boomer was certified by Coombes as being secured by 250,000 Microsoft Shares in December 1999 by which time all of Boomer's Microsoft shares were, to Coombes knowledge, pledged to LBSA to secure the various loans by LBSA to Extant. A similar certification was made for the year ending 2000, with the forms seemingly being faxed to Coombes by Edwards for Coombes' signature. Coombes further certified for the 2000 year that there were no "unsatisfactory assets". For the quarter ending June 30, 2001, by which time it is admitted LBSA had enforced its security against Boomer's

---

[10] B2 TAB-2, page 2.
[11] G2 TAB 4.
[12] B2 TABS 12 *et seq*.

assets including all its Microsoft shares, Coombes continued to certify that HBI's principal asset, a loan to Boomer, was secured by 250,000 Microsoft shares. Similar certifications were made until December 31, 2002. By September 2003, however, the OFA filings omitted any reference to the Boomer loan or to the Microsoft shares. This financial fancy footwork was seemingly achieved, with Walsh and Taal enquiries about the state of their investment intensifying, by Echo Ventures LP purportedly agreeing on June 26, 2003 "*to accept the loan receivable of Boomer Trading Company Ltd. with any and all underlying security attached thereto as full redemption value for the 300 Class 1 Preferred Shares of Horizon Bank International Ltd.*"[13] Coombes signed the "Redemption Agreement" on behalf of both HBI and Echo Ventures LP, the vehicle that was intended to be used for the post-1998 modified offshore structure created for Walsh and Taal but which was seemingly never actually used for its intended purpose.

90.     It is possible that as part of the Echo Restructuring in the summer of 1998 in which Coombes played an active part, HBI loaned Boomer approximately $20 million in return for HBI preference shares which were sold as units in the limited partnership[14]. It is possible that this loan was not expected to be actually repaid save through a share redemption agreement as actually occurred. It was envisaged by Walsh and Taal that the active trading would still continue in accordance with the TSA. As early as March 16, 2001 in a letter to DBM for the attention of Prucha and Edwards, which makes reference to charges purportedly levied in respect of the "*Echo Ventures trading activity*", Hindle complained about continuing breaches of the TSA. So Coombes as an officer of HBI from the summer of 1998 knew that Boomer's assets, in particular the valuable Microsoft shares, were (a) notionally at least, valuable security for HBI's loan to Boomer, and (b) in real terms central to the investment activity to be carried out for the benefit of Boomer and its shareholders, in accordance with the TSA as modified (if at all) by the Echo Restructuring. Once he executed the Pledge Agreement and the Reimbursement Agreement on behalf of Boomer, as an officer of Boomer (as HBI's debtor) he clearly had a duty to inform HBI that the assets which were being relied upon by HBI as security for its loan were (a) now pledged to LBSA, in consideration for (b) a security interest in the Extant loan proceeds. HBI had an interest in knowing not only that the Pledge Agreement had been entered into, but also what happened to the Extant Loan proceeds.

91.     All of this evidence shows not just that Coombes was aware that Walsh and Taal were being deceived while Boomer's assets were being invested with his active participation in Irwin and Hamilton. Coombes himself in his capacity as Vice –President of HBI participated in deceiving HBI's auditors and the OFA by falsely representing that Boomer's assets were safe when he (a) knew that they were not and (b) must have known that a breach of fiduciary duty owed to Walsh and Taal by the persons whose instructions he followed had occurred or was occurring. Thus HBI assisted Prucha and the Toronto Defendants in their breach of fiduciary duty by (a) concealment while the proceeds of the Boomer assets were being dissipated, and (b) by providing banking services through which that dissipation occurred. Coombes' knowledge must in these circumstances be imputed to HBI, because HBI's conduct involving himself as its primary *de jure* and *de facto* agent makes any other conclusion almost perverse.

92.     It also seems probable that the references to the Microsoft shares still being held by Boomer when in fact they had been sold were not simply included in the financial statements to bolster HBI's accounts for regulatory purposes. If the Echo Restructuring involved issuing preference shares to an investment vehicle in which Walsh and Taal had an interest, as appears to have been the case, they would most likely have received copies of HBI's audited financial statements. So HBI was clearly an active participant in seeking to conceal, not just the investment losses as is admitted, but any prior and ongoing breaches of fiduciary duty as well.

---

[13] H2 TAB 1.
[14] See Patterson Palmer April 1, 2003 letter to Walsh and Barnaby: A2 TAB 69.

93.   In these circumstances, and irrespective of whatever the position may be as between HBI's liquidator and its former director, I find that there is no justification, in the context of the present proceedings, for holding that Coombes' knowledge should not be imputed to HBI on the grounds that HBI was itself a victim of the breaches of duty complained of. As between Walsh and Taal on the one hand and HBI on the other, HBI was a perpetrator and they were victims. HBI was involved at the outset in August 1997 in agreeing with Walsh and Taal how their assets would be invested if they placed them into an offshore structure which HBI would create and manage. HBI's involvement was not just to provide banking services, but to provide a nominee director (Coombes, its own principal employee) who would exercise legal control (through Boomer) over the Shares. In addition HBI was involved (through its affiliate, Extant, also operated by Coombes) in managing trading activities for (ultimately) Walsh and Taal in accordance with both the August 28, 1997 letter (actually dated August 15, 1997) and the TSA. In 1998, as part of the Echo Restructuring, HBI apparently issued preference shares to Boomer in consideration for a notional loan. In addition, Coombes was given further authority over Walsh and Taal's offshore investments through the new limited partnership structure which Coombes seemingly also managed.

94.   Putting aside the somewhat technical rules on the attribution of knowledge, in commonsense terms HBI clearly knew that it was assisting Prucha and/or the Toronto Defendants to breach their fiduciary duty to Walsh and Taal by receiving the proceeds of the Extant Loans and concealing them from its own auditors and the SVG OFA the true status of Boomer's principal assets. If HBI itself assumed a fiduciary duty to Walsh and Taal and/or Boomer, it clearly knew that it was breaching these duties as well. It was involved in promoting, creating and managing the offshore structure and there can be no credible suggestion that Coombes (as effectively the sole officer of HBI, Extant and Boomer) was expected to keep the knowledge that he acquired when exercising these multiple agency roles in watertight compartments. On the contrary, Walsh and Taal set up the offshore structure on the basis that HBI would be involved in managing their corporate vehicles. The practical realities must form part of the factual framework within which the technical rules of attribution must be applied.

95.   As far as Coombes' knowledge is concerned, paragraph 10(d) of the Re-re-Amended Points of Defence provides as follows: "*It is admitted and averred that at all material times Kevin Coombes was the controlling and/or directing mind of HBI who acted upon the instructions of the other individual Toronto Defendants.*" The Court would have been bound to reach this conclusion in any event because it is clear from all the available evidence that Coombes was effectively HBI's sole officer who acted, seemingly without board of directors approval, on the instructions of one or more of the Toronto Defendants. In *El Ajou v Dollar Holdings plc* [1994] 2 All ER 685, Hoffman LJ (as he then was) gave a famous analysis of the rules of attribution in the context of a case where the central issue was whether a director's knowledge could be imputed to a company in relation to a transaction in which he was not solely acting for that company. He held that the fact that a director was merely "*acting on offstage instructions*"[15] did not mean that he was not the directing mind of the company. Because of the finding that the director was the directing mind and will of the company in relation to the relevant transaction, no need to impute knowledge on the more complex agency rules arose. As Hoffman LJ stated at the beginning of his analysis:

"There are two ways in which Mr. Ferdnand's knowledge can be attributed to DLH. The first is that as agent of DLH his knowledge can be imputed to the company. The second is that for this purpose he was DLH and his knowledge was its knowledge."[16]

96.   The trial judge in *El Ajou* found that Ferdnand had acquired knowledge of the fraud in 1986 in his capacity as a director of another company while he was a director of DHL.

---

[15] Page 702c.
[16] Page 701j.

At this stage DHL merely received certain monies to invest for a company called Yulara. As the relevant transaction in which DHL was involved occurred two years later, when he was no longer a director, the knowledge he had previously acquired in a different capacity could not be imputed to DHL: [1993] 3 All ER 717 at 740c-743b. The Court of Appeal unanimously rejected this finding, with Hoffman LJ holding:

"Once his knowledge is treated as being the knowledge of the company for a given transaction, I think that the continues to be affected with that knowledge for subsequent stages of the same transaction…And in my judgment the subsequent acquisition of Yulara's interest was sufficiently connected with the original investment to be affected by the same knowledge."[17]

97.    The reasoning appears to be that once a person is found to be the directing mind of a company, any knowledge they possess while acting in a relevant transaction on behalf their company will be imputed to the company, irrespective of what capacity the information was acquired in. I am fortified in this conclusion by the lucid summary of the principles to be extracted from the *El Ajou* and related cases set out in Arden LJ's judgment in *Stolzenberg and others v Mellon Trust Co. Ltd* [2006] EWCA Civ 827 :

"So if the same man be secretary or director of two companies, knowledge as secretary or director of the one company is not necessarily notice to the other company. In order to make it notice it must be shown that it was his duty to the first company to communicate the fact to the second and that he was authorised by (or owed a duty to) the second company to receive it. However, even if, because he has no duty to the first company to communicate the fact to the second, his knowledge is not on this basis notice to the second, it will be otherwise if, in relation to the transaction concerned, his mind and will are the directing mind and will of the second company. For this purpose different persons may for different purposes satisfy the requirements of being the company's directing mind and will."[18]

98.    Based on this analysis, I find that Coombes' knowledge (acquired in his capacity as a director of Boomer and/or Extant) that the monies received by HBI for the account of Extant from Irwin and Hamilton represented the proceeds of a breach of fiduciary duty may be imputed to HBI in respect of its receipt and disbursement of the various monies, as well as HBI's misrepresentations to its auditors and the OFA. Accordingly the Plaintiffs' claim that HBI knowingly assisted a breach of fiduciary duty by Prucha and/or the Toronto Defendants succeeds in terms of both (a) supporting their tracing claim, and (b) supporting a claim for damages.

99.    In case these primary findings on Coombes' knowledge are held to be wrong, I will indicate the conclusions I would have reached if I was required to apply traditional agency principles. Applying traditional agency principles to a factual matrix in which a single officer appears to be the directing mind of all of the key corporate actors seems, to my mind, highly artificial. Nevertheless, the crucial questions in these circumstances would be, applying Lord Hoffman's analysis in *El Ajou* (at pages 702-703), as follows. The Court would have to enquire whether: (a) HBI as Coombes' principal had a duty to investigate or make inquiry about either (i) the status of Boomer's assets or (ii) the source of the Extant deposits, and employed Coombes to make such inquiries; or (b) Coombes had actual or apparent authority to receive communications including those containing information about the relevant breaches of fiduciary duty.

100.   There is no or no clear evidence that Coombes in his capacity as an officer of HBI received any communications containing information about the pledging and ultimate sale of Boomer's assets. However, there is substantial evidence (summarized above) indicating that Coombes was employed by HBI to report to its auditors and the regulatory authorities on what the assets and liabilities of HBI were. Coombes was

---

[17] Pages 706j-707a.
[18] Transcript page 25.

specifically engaged to instruct the bank's auditors and the OFA with respect to Boomer's assets which were purportedly securing the loan from HBI which constituted HBI's largest asset. Accordingly, if Coombes knew (as he undeniably did) that (a) Boomer's assets had by year-end 1998 been pledged to secure a loan to Extant, and (b) by June 2001 had been sold, these were matters which he might be expected to have informed HBI of so that HBI could discharge its duty to disclose the true position to its auditors and the OFA. Or, to put it another way, although Coombes did not acquire knowledge about the true status of Boomer's assets in his capacity as an agent of HBI, he was impliedly engaged by HBI to investigate the status of those assets for accounting and regulatory purposes. He could only ascertain the status of Boomer's assets by reviewing Boomer's relevant records (the Pledge Agreement, the Reimbursement Agreement and the Lehman's statements), and this was information that Boomer (as, notionally, a substantial borrower) would have been expected to provide to HBI on request. There is no real basis for concluding that, absent the duty to investigate which has just been described, HBI had any discrete duty to investigate the source of the various Extant deposits, however.

101.   So applying agency principles, I would have reached the same conclusion that Coombes' knowledge of the relevant breaches of fiduciary duty should be attributed to HBI in any event.

## Prucha's and/or the Toronto Defendants' knowledge

102.   Having regard to the above findings that (a) the pledging of Boomer's assets was unauthorised and constituted a breach of fiduciary duty by Prucha and/or the Toronto Defendants and/or HBI, and (b) the Toronto Defendants admittedly instructed Coombes to execute the various impugned transactions, it follows that the Toronto Defendants themselves had the requisite knowledge. But on what basis can this knowledge be imputed to HBI? The Plaintiffs rely on the directing mind principle, and alternatively submit that Prucha was HBI's agent.

103.   Mr. Hargun heavily relied upon the following dictum of Nourse LJ in *El Ajou v Dollar Holdings plc* [1994] 2 All ER 685 at 699, which I adopt. After reviewing various authorities, he opined:

"There are, it seems to me, two points implicit, if not explicit, in each of these passages. First, the directors of a company are, prima facie, likely to be regarded as its directing mind and will whereas particular circumstances may confer that status on non-directors. Secondly, a company's directing mind and will may be found in different persons for different activities of the company. It follows that Millet J's unchallenged conclusion that Stern, although neither a director nor an employee, was the 'moving force' behind the company's activities does not preclude a finding that Ferdnand was the company's directing mind and will in relations to some activities."

104.   Based on the evidence, Prucha was the directing mind of HBI as regards (a) marketing and "public relations" matters generally and, in particular (b) communications with Walsh and Taal and their Toronto-based advisors and (c) instructing Coombes. Edwards was the directing mind of HBI as regards the financial and accounting matters, and instructing Coombes in this regard. Prucha contracted with Walsh and Taal on behalf of HBI as to the operating guidelines and structure of the offshore investment regime, so he was also HBI's agent, although his status later on is not necessarily so clear. The status of O'Connor and Presnail (their likely beneficial interest in HBI apart) is less clear, as is the question of whether Edwards' participation by telephone in a 2003 meeting with the OFA suggests that he was at any material time HBI's agent.

105.   As far as any breach of fiduciary duty by Prucha himself and/or HBI is concerned, the area of factual enquiry as to Prucha's knowledge is almost indistinguishable from that involved in determining whether a fiduciary relationship exists at all. The mandate letters dated August 15, 1997 and sent to Prucha on August 28, 1997 are admitted to reflect the contractual arrangements reached in respect of the offshore structure,

although it is denied that HBI was a party to them. The documentary record confirms the evidence of Walsh that Prucha knew or ought to have known that he was being entrusted with overseeing the management of Walsh and Taal's assets within the specific trading guidelines eventually reflected in the TSA. What is the evidence that Prucha knew that a breach of fiduciary duty either on his own part or on behalf of HBI had occurred?

106.    It is admitted that Coombes acted on the instructions of "*the individual Toronto Defendants*" (paragraphs 8, 10(d), re-Re-Amended Points of Defence). Prucha is one of the Toronto Defendants. In a May 28, 2002 letter to BCB, Coombes described Edwards as HBI's owner and stated that Edwards employed Prucha as one of two "*full time marketing representatives*"[19]. This is consistent with Prucha occasionally describing himself as an HBI "marketing consultant" in his earlier dealings with HBI. It is also consistent with Prucha being a full-time HBI employee that he typically signed his name on HBI letterhead with no job title, as was the case with his HBI business card. Under cross-examination by Mr. Woloniecki, Walsh confirmed for the purposes of this trial the truth of evidence he had tendered to the Ontario Court concerning representations made by Prucha in August 1997:

"Q.     Yes. Thank you. And I'm going to move on to paragraph 24, Coombes' role as nominee. At a meeting in August 1997, and this is a meeting that's also referred to in your witness statement, and we'll look at your witness statement in a moment, I just want to concentrate on what you tell the Ontario court about this meeting in April 2004.

A       At a meeting in 1997, Prucha recommended to Hans and I and persuaded us that we should direct him to appoint Coombes of HBI as our nominee officer and director for each of Allington, Wooden Shoe and Boomer. Prucha persuaded us and assured us that, A, we should direct Prucha to instruct Coombes, as our nominee, to implement the offshore structure according to a specific written mandate; two, to borrow money from Boomer on margin loans from Lehman's, secured against our shares and assets held in Boomer's name in the offshore  structure.

Q.      As far as I can tell, that's the first time in this description that you describe these as our shares held in Boomer's name. We'll come to that in a minute.

A       And three, to use the margin loans to fund the day trading program in US T bills held in Boomer's name.

B, Presnail and O'Connor were trading experts and would direct and manage the T bill trading program and own profits in Boomer's name financed by the margins loans.

C, the shares and assets invested by Hans and I would be segregated and separately tracked in the offshore structure even though they would be invested in a common trading program.

D, Hans and I would each receive separate financial reporting and accounting on the performance of assets that we each invested in the offshore structure.

E, we could remove our shares, T bills or other assets, from the offshore structure on request at any time. And in any event, all assets would be returned to us when the trading program in the summer of -- ended in the summer of 2003.

F, on a regular basis, we would receive separate financial reporting and accounting on matters concerning the shares, T bills and other assets that we each held in Boomer and the offshore structure and on Boomer's trading profits, losses and its expenses.

_____

[19] H1 TAB 2 page 4.

Q       Now, is that a full and accurate   reflection of what you recalled Mr. Prucha saying in August 1997 at the time you swore this affidavit?

A.      Yes."

107.    There is no reason to doubt, having regard to the terms of the mandate letters Walsh referred to in his above testimony as read with the earlier Hindle letter and the subsequent TSA, that Prucha undertook a fiduciary duty to instruct Coombes to act as nominee director of Boomer in accordance with terms of Walsh and Taal's written mandate. If a nominee director who acts on instructions is a fiduciary, as was assumed in the *El Ajou* case, then a non-director or any other person who instructs the nominee on behalf of the ultimate beneficial owners of the company must equally be a fiduciary owing a duty of loyalty to the beneficial owners. Since Prucha was clearly holding himself out as acting on behalf of HBI when he assumed this fiduciary role, and his apparent authority was never at any material time questioned by HBI, Prucha's knowledge of the existence of the fiduciary obligation is attributable to HBI either on agency principles or applying the directing mind principle.

108.    What is the basis for finding that Prucha had any knowledge of the breach of the fiduciary obligation he and/or HBI assumed with respect to the scope of permitted investment activity? Prucha was clearly involved with the Echo Restructuring in the summer of 1998, and continued to represent HBI after the impugned transactions had taken place and Boomer's assets were being dissipated. On May 2, 2001, he wrote to Peter Dickson in Bermuda signing as a "consultant" to reassure Dickson that his concerns about HBI's beneficial ownership were being addressed. But it matters not whether Prucha personally was involved with the impugned transactions or even left HBI. Following *El Ajou-v-Dollar Holdings plc* [1994] 2 All ER 685 at 706-707, his knowledge in relation to the scope of mandate given by Walsh and Taal at the outset should, on the directing mind or simple agency principles, be imputed to HBI for the purpose of all related transactions. And in my judgment all of HBI's dealings (be they acts or omissions) with the assets of Boomer in breach of the mandate Prucha promised would be honoured were related to that initial understanding which resulted in the assets being transferred to Boomer through Allington and Wooden Shoe.

109.    I find that Edwards was a directing mind of HBI for the purposes its financial affairs, including the financial affairs of the offshore structure established for Walsh and Taal. It is unclear whether he or any of the other individual Toronto Defendants assumed a fiduciary duty towards Walsh and Taal. But I am satisfied that Edwards knew that a fiduciary obligation had been assumed by either Prucha or HBI to Walsh and Taal and/or Boomer in respect of how the funds would be invested. Paragraph 33 of the Re-Re-Amended Points of Defence provides in material part as follows:

"It is admitted that between about December 1998 and June 2002 Edwards forwarded certain bank statements and financial information to the Plaintiffs which had been prepared fraudulently. As pleaded in paragraph 52 below the individual Toronto Defendants conspired to conceal from the First and Second Plaintiffs the Irwin trading losses and to give the false impression that the Plaintiffs' assets remained safely on deposit in Boomer's name at Lehmans."

110.    What appears to have happened is that, consistent with other evidence of Edwards instructing Coombes to forward false financial information to HBI's auditors and the OFA, Edwards doctored the Lehman's statements and instructed Coombes to forward them to Walsh and Taal. It is true that the Court should be cautious in placing reliance on any part of a forged document, and that what appears to be evidence that these documents were sent from Coombes' fax number in The Bahamas from early 1999 should not be accepted at face value. In my judgment it seems more probable that the fax transmission details are accurate and that the doctored statements were sent to Walsh and Taal (or their Canadian advisers) before the Irwin losses occurred. If the true monthly statements had in fact been forwarded before the Irwin losses occurred, the two investors would have discovered that Boomer's assets had been removed the accounts they were in prior to the Pledge Agreement in early 1999. Walsh and Taal

would not have still believed (as they clearly did as late as 2003) that Boomer's assets were intact. Indeed it makes no sense that Edwards would have first sent doctored statements suggesting the assets were still in the same Lehman's account after the losses occurred (in or about 2000 at the earliest) since there would be no reason to suppose that Walsh and Taal had not been receiving genuine statements in the ordinary course throughout 1999. I reject the notion that Edwards and the others were only trying to conceal trading losses for a perfectly legitimate investment on Boomer's behalf. This interpretation of the evidence does not withstand careful scrutiny.

111. All of these acts of concealment by Edwards are only explicable on the basis that he knew that Prucha and/or HBI's fiduciary obligations to Walsh and Taal and/or Boomer had been breached, and wished to assist in the dissipation of the proceeds of the Boomer assets. As a directing mind of HBI in respect of its financial affairs (including the financial affairs of the entities in the offshore structure, he was the company), and his knowledge is attributable to HBI.

112. As far as O'Connor and Presnail are concerned, their primary role was to act as trading advisors on behalf Extant. I make no finding as to whether or not their knowledge is attributable to HBI for present purposes.

## Summary: breach of fiduciary duty/knowing assistance of breach of fiduciary duty

113. For the above reasons, I find that (subject to the important question of their title to sue which will be dealt with separately below) Walsh and Taal have proved their claims against the Defendant for breach of fiduciary duty by HBI and/or HBI knowingly assisting a breach of fiduciary duty owed by Prucha. In addition, this claim may be relied upon to support their tracing remedy.

## Conspiracy claim

## Legal elements of claim

114. The only legal and factual disputes raised were essentially two sides of the same coin. The Defendant contended that both legally and factually, the Plaintiffs' allegations of fraud were misconceived because (a) the alleged fraudsters had no intention to "take the money and run", but panicked when they made investment losses and fraudulently sought to cover these up, and (b) in any event, no fraudulent intent which any relevant individual might be shown to have possessed could be attributed to HBI. The finding that the Extant Loan transactions were not authorised and constituted a breach of fiduciary duty does not exclude the possibility that Walsh and Taal have not proved a conspiracy to defraud, either legally or factually.

115. As a matter of first impression, however, the notion that this tort would not be constituted by an agreement to use someone else's property entrusted to one's care for unauthorised purposes merely because it was hoped that the property would be restored to its true owner appeared to be a dubious proposition. But the Defendant's primary position was that the Pledge Agreement was not unauthorised and that if the relevant individuals reasonably believed it was authorised, they could not properly be held to be dishonest. This submission was a valid one. In addition, it was contended that (a) no theft or conversion occurred, and/or (b) that it had not been proved that company had conspired with any other person.

116. It was conceded that treating someone else's property as your own combined with dealing with such property in an unauthorised manner may constitute the criminal offence of stealing and /or the tort of conversion. However it was submitted that neither proof of stealing nor conversion was relevant to the pleaded claim. Whether as a matter of law and fact HBI may be said to have conspired with others not before the Court to defraud Walsh and Taal remains to be determined. The Plaintiff relied on the legal principles set out in 'Clerk & Lindsell on Torts' (19th Edition) at pages 1609 – 1630. The tort of conspiracy is defined as "*the agreement of two or more to do an unlawful act, or to do a lawful act by unlawful means*": paragraph 25-116. However, the action only arises "*when damage is caused or threatened by the combination.*" It is also clear that the tort may take two broad forms: (a) unlawful means conspiracy, in

which case an intention to injure the plaintiff must be proved, and (b) conspiracy to injure, in which case the predominant purpose of the agreement or combination must be to injure the plaintiff. In the present case, the Plaintiffs have assumed the burden of proving the existence of a conspiracy coupled with an intention to defraud them. Whether this must be shown to have been an intention or the predominant intention depends on whether the Court finds the relevant conspiracy to have been a category (a) or (b) conspiracy.

117.   I find that the pleaded conspiracy is an unlawful means conspiracy so that a bare intention to defraud is all that need be proved. The Plaintiffs do not have to prove that the predominant purpose of the conspiracy was to injure the Plaintiffs' economic interests.

118.   It is not immediately obvious what is meant, as a matter of Bermuda law, by a plea that the Defendant conspired "*to defraud*" the Plaintiffs. The Plaintiffs' submissions focussed on the elements of a conspiracy, the issue of knowledge and assumed that the requisite knowledge was fraudulent intent. A conspiracy to steal is not alleged as the Defendant pointed out. However, "*conspiracy to defraud*" is a criminal offence under section 393 of the Criminal Code, as it is under the English common law. The old term "*defraud*" is still retained in section 393 of the Criminal Code even though the modern law of theft has now replaced the older concepts of fraudulent conversion. These are matters of legal nicety rather than of real substance, because in the context of a civil case little (if anything) is likely to turn on a distinction between the older concept of acting "*fraudulently*" and the modern concept of acting "*dishonestly*". Nevertheless, as a matter of strict analysis, the Plaintiff's claim appears to be grounded on the tortious equivalent of the criminal offence of conspiracy to defraud, which in broad brush terms requires the proof of fraudulent intent or the intention to defraud, combined with economic damage. I am assisted by the following passage in the Privy Council 's decision in the criminal case of *Wai Yu-Tsang v R* [1992] 1 AC 269 :

"The question whether particular facts reveal a conspiracy to defraud depends upon what the conspirators have dishonestly agreed to do, and in particular whether they have agreed to practise a fraud on somebody. For this purpose it is enough for example that, as in *Reg. v. Allsop* and in the present case, the conspirators have dishonestly agreed to bring about a state of affairs which they realise will or may deceive the victim into so acting, or failing to act, that he will suffer economic loss or his economic interests will be put at risk. It is however important in such a case, as the Court of Appeal stressed in *Reg. v. Allsop*, to distinguish a conspirator's intention (or immediate purpose) dishonestly to bring about such a state of affairs from his motive (or underlying purpose). The latter may be benign to the extent that he does not wish the victim or potential victim to suffer harm; but the mere fact that it is benign will not of itself prevent the agreement from constituting a conspiracy to defraud."

119.   In the present case, the Plaintiffs case very simply is that the Defendant by its agents dishonestly placed their assets at risk of loss by covertly investing them in an unauthorised manner which did in fact result cause the Plaintiffs financial loss. Acting dishonestly does not, in this context, literally require proof of an intention to permanently deprive the Plaintiffs of their assets, as a reference to the modern definition of stealing in section 332 of the Criminal Code and the old definition of fraudulent conversion in the version of this statutory provision which was probably in force when the material conduct occurred serves to illustrate[20]. The definition of stealing is not wholly irrelevant because the definition of dishonesty for the purposes of the offence of theft is at least illustrative (if not determinative) of what amounts to dishonesty in other contexts. In addition it is the expressly pleaded case that the main

---

[20] Section 332 was modernised by the Criminal Code Amendment (No.2) Act 2005 with effect from July 27, 2005.

purpose and design of the conspirators was, in old section 332 terms, to "*fraudulently convert*" the Plaintiffs' assets "*to their own use*".

120.    Thus under the old section 332(2)(c)-(d), "*fraudulently*" included an intent "*to use the thing as a pledge or security*" and "*to part with the thing on a condition as to its return which the person taking or converting it may be unable to perform.*" Under the modern formulation of the offence of theft under the Bermudian Criminal Code where the intention to permanently deprive the owner of the stole property is an essential element of dishonesty, section 336 provides as follows:

"With the intention of permanently depriving the other of it

10      336      (1)      A person appropriating property belonging to another without meaning the other permanently to lose the thing itself is nevertheless to be regarded as having the intention of permanently depriving the other of it if his intention is to treat the thing as his own to dispose of regardless of the other's rights; and a borrowing or lending of it may amount to so treating it if but only if the borrowing or lending is for a period and in circumstances making it equivalent to an outright taking or disposal.

        (2)      Without prejudice to the generality of subsection (1) where a person, having possession or control (lawfully or not) of property belonging to another, parts with the property under a condition as to its return which he
20      may not be able to perform, this (if done for purposes of his own and without the other's authority) amounts to treating the property as his own to dispose of regardless of the other's rights.

121.    It is clear on the face of the pleadings that it is contended that the conspiracy was an unlawful means conspiracy, even though an allegation of conspiracy to "steal" was deleted from paragraph 18 when the Points of Claim were amended. Nevertheless, it is explicitly alleged in paragraph 23 as follows:

"It is averred HBI, Extant, Coombes, the Toronto Defendants and the Other Companies ~~formed a common intent~~ conspired from the outset (or
30      alternatively by, in or around, November 1998) to defraud the First and Second Plaintiffs and/or the Third Plaintiff of their assets and to breach their fiduciary duties to the First and Second Plaintiffs and/or the Third Plaintiff and to conceal the fraud from them for as long as possible. At all material times, their main design and purpose was to fraudulently convert the First and Second Plaintiffs' and/or the Third Plaintiff's assets to their own use."

122.    Accordingly, the Plaintiffs must prove that the Defendant was party to a conspiracy the object of which at least included the purpose of fraudulently converting the Plaintiffs assets. As a matter of law, this need not have been the predominant purpose of the conspiracy if an intention to use unlawful means is proved. The pleaded case requires the Court to determine as a matter of fact (a) what the conspiracy or combination was
40      (if any), (b) who the conspirators were and what were there respective roles, and (c) whose knowledge can be imputed to the Defendant. I accept the Plaintiffs' following submissions to the effect that no formal agreement need be proved:

"107.    Whilst it is common to speak of conspiracy in terms of agreement between two or more parties, the tort does not in fact require an agreement in the contractual sense. All that is required is an assent to an arrangement either expressly or by conduct...

108.    Furthermore, the conspirators need not all join in at the same time, nor need they have exactly the same aim in mind. The question is how far the defendant was aware of the plan and then "joined in the execution" of it". See
50      paragraph 25-120 of Clerk & Lindsell (supra)."

**<u>Was there a tortious conspiracy to defraud the Plaintiffs?</u>**

123.    There can be little doubt that, subject to the issue of Walsh and Taal's title to sue and the position of Boomer (all of which will be dealt with separately below) an arrangement was made between two or more persons in or about November 1998 to (a) pledge Boomer's assets, (b) enable Extant to obtain loans totalling approximately $20 million on the security of these assets, and (c) to invest the loan proceeds in Extant's name (i) with Irwin, and (ii) with Hamilton. I have already found that these transactions were (a) not authorised by Walsh and Taal, (b) (as is admitted) carried out without their knowledge, (c) in breach of fiduciary duties owed to Walsh and Taal by Prucha and/or HBI, and (d) was facilitated by the admitted transmission of doctored Lehman's statements to Walsh and Taal which concealed the fact that the relevant assets had been pledged, before admittedly fraudulent steps were taken to conceal investment losses and the resultant sale of the pledged assets.

124.    In my view, there is no clear evidence that this arrangement was first conceived when Walsh and Taal were being encouraged to consider placing their assets into the offshore structure that HBI was involved in marketing to them. However there is clear evidence that Prucha and/or the Toronto Defendants in or about November 1998 knew or must have known that (a) Walsh and Taal had not authorised the allegedly fraudulent dealings with Boomer's assets, (b) in instructing Coombes to execute the Pledge Agreement, take out the Extant Loans and invest the loan proceeds in Extant's name with affiliated entities, they were (1) treating Boomer's assets (in which Walsh and Taal were ultimately beneficially interested) as their own to dispose of regardless of Boomer's rights, and/or (2) parting with the assets subject to conditions as to their return which they might be unable to fulfil, and/or (3) pledging the assets or using them for security. This is the only reasonable inference to draw from the facts which I have found to be proved, and this conclusion supports the formation of a combination the object of which was to fraudulently convert Boomer's assets to the use of Extant and/or the Toronto Defendants.

125.    The principal argument raised at trial against the existence of any conspiracy was the authority issue. If the dealings with Boomer's assets were authorised by Walsh and Taal and/or under the TSA, the impugned transactions could not be characterised as the product of an agreement to fraudulently convert the Plaintiffs' assets. Once the authority defence is rejected, there is little credible basis on which the proposition that these transactions evidence a conspiracy to defraud could be rejected.

**Who were the conspirators and what were their respective roles?**

126.    On the basis that it is admitted that Coombes acted at all material times under instructions from the Toronto Defendants in executing the Pledge Agreement and the Extant Loans, it is clear that at least two of the Toronto Defendants must have been parties to the conspiracy. They conceived and directed the plan, phase one of which (the raising of cash phase) was implemented through the instrumentality of Coombes, Boomer and Extant, with Prucha, Edwards and HBI later playing a leading role in phase 2 (dissipating the assets and concealing the true position from Walsh and Taal). The Toronto Defendants clearly hoped to generate additional income through investing the loan proceeds in affiliated entities, particularly Irwin, which itself hoped to also attract third party investors. The precise nature of their commercial motives need not be proved.

127.    It is less clear that Coombes had full knowledge of the nature of the conspiracy at the outset, but sufficiently clear that he at least played a supporting role in the fraudulent concealment phase. This follows logically from the above findings that he knowingly participated in a breach of Prucha's and/or HBI's breach of fiduciary duty to Walsh and Taal. While Boomer was clearly a passive participant and victim of the conspiracy, Extant was probably an active participant in that it benefited from the impugned transactions. But no findings are required as far as Extant's participation is concerned. The Plaintiffs need only prove a combination between at least two persons including HBI, and it is HBI's participation which is in controversy.

128.   It is clear that (subject to the attribution of knowledge issue) HBI played a significant though subsidiary role in (a) providing banking services which were important in enabling the Toronto Defendants to dissipate the proceeds of the Extant Loans, and (b) concealing the fact that Boomer's assets had been executed upon by LBSA under the Pledge Agreement.

**Whose knowledge can be imputed to HBI?**

129.   The same findings recorded in respect of the breach of fiduciary duty claims are potentially applicable here, subject to the need to take into account (a) the requisite intent which must be attributed to HBI for the purposes of this particular claim, and (b) the higher standard of proof required for a fraud claim.

130.   The Plaintiffs relied upon the following *dicta* in *Belmont Finance Corporation v Williams Furniture Ltd. (No.2)* [1980] 1 All ER 393 at 404,412 :

"Moreover, Mr. James knew perfectly well what the objects of the agreement were. He was a director of both Williams and City. Mr. Harris and Mr. Foley, who also knew the objects of the agreement, were a director and the secretary respectively of City. Mr. Foley was also the secretary of Williams. Their knowledge must, in my opinion, be imputed to the companies of which they were directors and secretary, for an officer of a company must surely be under a duty, if he is aware that a transaction into which his company or a wholly owned subsidiary is about to enter is illegal or tainted with illegality, to inform the board of that company of the fact. Where an officer is under a duty to make such a disclosure to his company, his knowledge is imputed to the company (*Re David Payne & Company Limited* [1904] 2 Ch. 608, *Re Fenwick, Stobart & Co. Ltd.* [1902] 1 Ch. 507) [per Buckley LJ].... Then did City know, or ought to have known, of the misfeasance or breach of trust? In my judgment, the answer to that question must plainly be yes, for they are fixed with all the knowledge that Mr. James had. Now, he had actual knowledge of all the facts which made the agreement illegal and his belief that the agreement was a good commercial proposition for Belmont can be no more a defence to City's liability as constructive trustee than in conspiracy [per Goff LJ]."

131.   As far as Coombes is concerned, therefore, the critical question is whether it is clear that "*he had actual knowledge of all the facts which made the agreement illegal*" in his capacity as the directing mind of HBI. The crucial facts were that (a) Walsh and Taal's limited authority with respect to the investment of the assets they placed into the offshore structure had been exceeded by the transactions which resulted in the Extant Loans, and (b) that the true position in relation to the assets was to be concealed from them while the proceeds of those assets were used at the direction of the Toronto Defendants for an unlimited period of time. I have already held that his knowledge about the Pledge Agreement and related transactions is attributable to HBI because he was engaged to report on Boomer's assets to HBI's auditors and the OFA. I have also found, applying the ordinary standard of proof with respect to the breach of fiduciary duty claims, that he knew or must have known that the Extant investments were unauthorised because (a) the doctored Lehman's statements were sent to Walsh and Taal from his office, and (b) he was involved in making false representations about the relevant assets to HBI's auditors and the OFA at Edwards' prompting, while HBI was receiving the proceeds of the Extant loans on behalf of Extant. However for the purposes of the breach of fiduciary duty claims, there is no question that constructive knowledge or wilful blindness is sufficient.

132.   Having regard to the high standard of proof required for allegations of fraud combined with the requirement based on Mr. Hargun's own authorities that actual knowledge of all the facts which made the agreement illegal is required, I am not satisfied that Coombes had actual knowledge that Walsh and Taal (who did not ordinarily give him their instructions directly) had not authorised the relevant transactions. I am not satisfied that, as a matter of law, constructive knowledge suffices. For these reasons

Coombes' knowledge which may undoubtedly be attributed to HBI has not been clearly shown to reach the necessary threshold to implicate HBI as a participant in the conspiracy to defraud that has been clearly made out.

**The knowledge of Prucha, Edwards and/or the Toronto Defendants**

133.    It is clear on the basis of all the evidence before the Court, albeit in a trial in which the individual Toronto Defendants have not participated, that Prucha "*had actual knowledge of all the facts which made the transaction illegal.*" This flows from (a) my acceptance of the evidence of Walsh and Taal that they gave no verbal instructions to Prucha to vary the scope of their earlier mandates combined with (b) the fact that he is the only one of Toronto Defendants positively indicated to have been routinely involved both in acting for and/or giving instructions to Coombes in his capacity as officer of HBI and dealing with Walsh and Taal and their representatives about their offshore investment generally.

134.    It is also clear that Edwards "*had actual knowledge of all the facts which made the transaction illegal.*" This finding flows from (a) the admitted fact that Edwards was involved in sending doctored Lehman's statements to Walsh and Taal combined with my finding that this occurred from early 1999 long before any investment losses had been sustained, (b) my finding that Edwards instructed Coombes to make false regulatory filings on behalf of HBI with the OFA and false representations to HBI's auditors, together with (c) the fact that Edwards is admitted (as one of the Toronto Defendants) to have instructed Coombes to execute the Pledge Agreement and the Extant Loan Agreements, and to make the subsequent investments (Re-Re-Amended Points of Defence, paragraph 25 et seq). There is no reason to doubt that Edwards, unlike Coombes, clearly more than a mere functionary, would have actually known that Walsh and Taal had not authorised the impugned transactions.

135.    Is it clear to the requisite standard of proof that Prucha's and Edwards' knowledge of the conspiracy may properly be attributed to HBI in respect of its role in the conspiracy of acting as Extant's banker and actively assisting the other conspirators in concealing the fraud from the victims through maintaining the fiction in HBI's accounts that Boomer's assets were intact while they were being and after they had been dissipated? In my judgment it is clear because in this respect both Prucha and Edwards were obviously both acting in all material respects as the agent (Prucha) and directing minds (Prucha and Edwards) of HBI.

136.    I have regard to the general admission (on the pleadings) that all of the individual Toronto Defendants gave instructions to Coombes in relation to HBI, and the contested admissions made in the various liquidator's reports in which the Toronto Defendants are referred to as the "guiding minds" of HBI. I am not satisfied, however, for the purposes of proving allegations of fraud (as opposed to the breach of fiduciary duty claims), that such admissions form a sufficiently clear basis for proof of the very particular allegations relied upon by the Plaintiffs in this regard as against HBI. The role of O'Connor and Presnail was mainly to serve as advisors to Boomer on behalf of Extant, although it is true that Presnail was involved with the Irwin investment. But their demonstrated connections with HBI were insufficient to encourage me to attribute their knowledge to HBI even for the purposes of the lesser breach of fiduciary duty claim.

**Summary: conspiracy to defraud claim**

137.    For the above reasons, Walsh and Taal (subject to the important title to sue issue which I deal with separately below) have proved their claim for damages for the tort of conspiracy to defraud. In addition, this claim may be relied upon to support their tracing remedy.

**Other damages claims: knowing receipt, breach of contract, tort of deceit**

138.    The Plaintiffs' pleaded damages claims were limited to damages for fraud and/or breach of fiduciary duty. In their Opening Submissions, however, for the first time additional claims were purportedly raised for the Court's consideration.

Understandably, Mr. Woloniecki vigorously objected to this attempt to expand the scope of the Plaintiffs' claims on the eve of the trial to advance un-pleaded causes of action.

139.    For the Court to entertain these additional claims raised by way of argument would be contrary to all rational notions of judicial case management, and the invitation to consider these additional claims is accordingly firmly rejected.

**Do Walsh and Taal have the standing to sue in respect of Boomer's assets?**

140.    Although the Defendant never explicitly admitted that Walsh and Taal had the standing to advance their claims, it was not apparent on the face of the Defendant's pleaded case that the assertion would be made at trial that their claims should be dismissed irrespective of the merits on the grounds that title to the assets in question was vested in Boomer and that they accordingly lacked any standing to assert their claims. This potentially dispositive point was first raised in the Defendant's Skeleton Argument which was served shortly before the trial, over three years after Walsh and Taal first asserted their proprietary claims against HBI and almost two years after the Points of Claim were initially served.

141.    The standing point must in my judgment be considered, despite the fact that there is no justification for such an important point not being explicitly pleaded by way of defence, because the Plaintiff's pleaded case on standing is itself fundamentally flawed. The individual Plaintiffs contended from the outset that they retained beneficial ownership of the assets they placed into the offshore structure. The evidence suggests that it was initially envisaged that Walsh and Taal would retain ownership of their Microsoft Shares, and merely lend them to the offshore entities. Based on Mr. Walsh's oral evidence, I am satisfied that he genuinely believed that this was the case. However, I am also satisfied that he had, at all material times, only a limited appreciation of the legal niceties of the offshore structure as it evolved from concept design to implementation, and simply left the details to his tax adviser lawyer and accountant. And the Plaintiffs must be permitted to raise by way of argument an answer to an important point of law which was not explicitly taken against them on the pleadings.

142.    I am bound to accept the Defendant's submission that the assets in question at all material times belonged to Boomer and not Walsh and Taal. I also accept the Defendant's submission that Walsh and Taal cannot claim that title to the assets reverted to them on the grounds that they are entitled to rescind the arrangements under which the assets were transferred to Boomer on the grounds of fraudulent misrepresentation. I have rejected on the evidence the claim that the entire arrangements were vitiated by fraud at the outset. However I do consider the Plaintiffs' alternative argument that title to Boomer's assets was re-vested in them on the basis of rescission by agreement to have greater merit.

143.    This argument was supported by reference to Notices of Rescission dated February 10, 2003 issued by Walsh and Taal on February 14, 2003 to the Bahamian management company which apparently provided corporate administration services to Allington, Wooden Shoe and Boomer[21] These instruments gave notice of rescission by Walsh and Taal in their personal capacity and through their beneficial ownership of Allington and Wooden Shoe respectively "*of all agreements to which we are a party with the Trading Company*". They were expressed to be without prejudice to any common law or equitable claims, *inter alia*, in their personal capacity, in respect of losses flowing from breaches of the TSA by Boomer and Extant. Their Canadian lawyers also gave notice of termination of the Echo Ventures Partners LLP on the same date. There is no suggestion that Boomer (which they ultimately controlled in any event) did not agree to accept that the arrangements under which it was to invest assets on behalf of Allington and Wooden Shoe had been brought to an end. The Notices do not, however, purport to rescind all agreements entered into between Walsh and Taal with Allington

---

[21] A2-TAB 56.

and Wooden Shoe respectively, leaving it unclear whether title to any assets they each transferred to these companies has re-vested in them personally.

144.    In my judgment an agreement to rescind any such agreements so as to permit Walsh and Taal to sue personally for all losses, whether equitable or sounding in damages, arising from the breaches of the TSA by Extant may properly implied in all the circumstances of the present case. It is clear that Walsh and Taal several years ago decided to abandon the offshore entities altogether and to seek relief in their personal capacity. To suggest that the right to sue is still vested in Allington and Wooden Shoe because no formal rescission agreement has been produced by Walsh and Taal in respect of companies wholly owned by them would be legal technicality of the highest order. This point was not, in any event, expressly taken by the Defendant's counsel. Moreover, it is artificial to view the rescission agreements as operating to re-vest title to the Boomer assets in Allington and Wooden Shoe as the global investment concept which was implemented in the summer of 1997 never anticipated the latter two corporate entities as being more than a conduit through which Walsh and Taal's assets would be passed to Boomer. Once the investment project as a whole was rescinded, the rationale for Allington and Wooden Shoe's continued existence melts away.

145.    But if such technicalities were an objection to Walsh and Taal obtaining relief in respect of fraud, I would in the alternative be willing to pierce the corporate veil. This would not in substance be on the grounds that the corporate structure the Defendant encouraged Walsh and Taal to create under the nominal control of the Defendant's principal officer had been used as a façade to conceal the fraud which has been proved to have occurred. It is entirely understandable that the Plaintiffs should decide not use these corporate vehicles to assert their present claims, and did not consider it necessary (with no positive standing issue being pleaded against them) to formalise a legal basis for their decision to sue in their personal capacity. In these circumstances the Court should look at the realities of the position, namely that the individual Plaintiffs personally are the true victims and claimants, and should not be denied relief on artificial grounds. This would not be for the purposes of fixing the persons behind the companies with liability as is often the case in veil-piercing, but primarily to prevent a Defendant which has been found to have been a party to a fraudulent conspiracy from escaping liability by reliance on the corporate structure in circumstances where it has belatedly raised an un-pleaded and wholly technical standing point on the eve of the trial.

146.    I reject Mr. Woloniecki's submission that the ability of the court to lift the corporate veil is restricted to rigid categories, such as cases where a corporate structure was from the outset established for fraudulent purposes. Mr. Hargun referred the Court to *Re H (restraint order: realisable property)* [1996] 2 BCLC 500. This criminal case provides some support for the view that the courts may legitimately resort to veil-lifting on pragmatic case-management grounds. Rose LJ observed (at 511h-i):

"The more complex commercial activities become, the more vital it is for prosecuting authorities to be selective in whom and what they charge, so that issues can be presented in as clear and short a form as possible."

147.    This was arguably the substantive rationale for lifting the veil in *Re H* although an attempt was made to justify doing so on traditional "*façade*" grounds. This rationale is not dissimilar to the principles underlying modern commercial dispute resolution. The English '*Commercial Court Guide*' provides for both brevity and clarity in pleading, followed by a list of issues (both legal and factual) important to the case to be prepared by the parties after pleadings have closed. According to the introduction to the Guide, in commercial litigation "*the interests of efficiency and justice are paramount*" [22] These dual objectives would in my judgment be defeated in the present case if Walsh and Taal's claims were to be refused on the grounds of a standing point which was never positively pleaded and was only raised in a skeleton argument on the eve of the trial. Of course, standing points may affect the substantive justice of the

_____
[22] 7th Edition, 2006, page ii.

outcome of a case. But in the present case Walsh and Taal at all material times both owned and controlled Allington and Wooden Shoe, respectively, and had it within their power to either (a) rescind any transfers of property which may have occurred, or (b) assign the benefit of any relevant claims such entities possessed against HBI to themselves had the need to do so been formally raised. In the peculiar circumstances of the present case, it seems to me that that common sense requires that any legal technicalities surrounding title to sue should be ignored.

148.   The position of Allington and Wooden Shoe was not, of course, the subject of argument. Leave to add Boomer was granted at the beginning of the trial, so that the Plaintiffs invited the Court to consider Boomer's case in the alternative if Walsh and Taal's claims failed on standing grounds. I must proceed to consider the case of Boomer in case I am held to be wrong in concluding that Walsh and Taal are entitled to maintain their claims herein.

149.   In my judgment Boomer's position would not be materially different to that of Walsh and Taal as it was a corporate extension of them on the offshore plane. Prucha on behalf of HBI agreed to both establish and nominally manage Boomer within the parameters of the mandate conferred by Walsh and Taal and the TSA. Prucha (and any other of the Toronto Defendants who instructed Coombes as a director of Boomer) assumed a fiduciary obligation towards Boomer (as well as Walsh and Taal) to manage Boomer in the interests of its beneficial owners (Allington and Wooden Shoe). HBI breached this fiduciary duty by both assisting in the dissipation of the Extant Loans and in concealing the true position about Boomer's assets from its own Auditors and the OFA. This was motivated by a desire to conceal the true position from the ultimate beneficial owners of Boomer. Alternatively, HBI knowingly assisted Prucha (and any other of the Toronto Defendants, notably Edwards) to breach the corresponding fiduciary duty they owed to Boomer.

150.   As far as the conspiracy to defraud claim is concerned, HBI would be liable to Boomer on substantially the same basis as it would be to Walsh and Taal. The scope of the conspiracy, the conspirators and their respective roles and the attribution of knowledge would, in my judgment be the same; save that Boomer would be the primary victim, instead of Walsh and Taal. Walsh and Taal's case has always been based on the proposition that Boomer legally owned the relevant assets in any event.

151.   So Boomer would be entitled to the same tracing remedies and damages as would Walsh and Taal. For the reasons submitted by the Plaintiffs in their Closing Submissions, no limitation defence properly arises in respect of Boomer's claim.

**Should the Court of its own motion decline relief because the Plaintiffs' claims are tainted by illegality?**

152.   The Defendant raised the un-pleaded argument that the Court should of its own motion decline to grant relief on the grounds that, in light of the Plaintiffs' case that they retained beneficial ownership in Boomer's assets and/or were entitled to receive capital returns without reporting them, this was an obvious violation of Canadian revenue laws and the entire offshore structure was a fraud on the Canadian revenue.

153.   I accept the Defendant's argument that the Court does possess a residual jurisdiction to decline to grant relief on illegality grounds, even in the absence of (a) a plea of illegality by the Defendant, and (b) expert evidence as to foreign law. However I also accept the Plaintiffs' submission that it would be grossly unfair for them to have to meet, at trial, an illegality argument which they have not had a reasonable opportunity to meet and which has not been very clearly pleaded. And to the extent that the illegality argument is grounded in foreign laws which have no local equivalent, it would be highly unusual to conclude that a breach of foreign law has occurred in the absence of expert evidence.

154.   It the present case it does seem fairly obvious that it would probably be a fraud on the Canadian revenue for an offshore structure to be created which purported that offshore entities (notably Boomer) owned assets held in Boomer's name when the true

position was that those assets were beneficially owned by Walsh and Taal. However, in my judgment this is not what appears to have occurred at all. Equally, it does seem fairly obvious that Walsh and Taal would have to report to the Canadian revenue any income which was remitted to them from offshore. They admit that they did not report such income and have now made certain disclosures to the Canadian revenue authorities based on the fact that they have since received advice that the arrangements made by their original advisors may well have offended applicable rules. But it is far from clear, based on the oral evidence of Walsh and his answer to questioning on this issue from the Court that Walsh and Taal either (a) knew that they were breaking the law at the time, or (b) knew of facts which constituted an illegality. I believe Walsh when he said as follows:

"THE WITNESS: Well, the way he worded it to me was it what was a repatriation of capital, that I could either loan, take loans from -- from the offshore program. I believe he said it was from Boomer. That I could either take a loan or I could repatriate capital, and he indicated that he and Mr. Hutchings would do the necessary paperwork to ensure I was compliant. And I simply, my Lord, I haven't done my tax returns in 20 years. I depended on Bill and Mr. Hindle to ensure that they were both being paid, I believe, to ensure that this was properly managed."

155. In other words, it is not even obvious that Walsh knew that he was receiving what constituted "income" (which likely had to be reported) as opposed to a loan (which, perhaps, did not). So this is very far removed from the sort of case where the Court could properly of its own motion make a finding of illegality. In my judgment when someone that has been invited to invest their assets in an offshore structure which has been used to defraud them, by a course of conduct which touches Bermuda, the Bahamas and Saint Vincent and the Grenadines, there is a strong public policy interest for the courts in all offshore financial centres concerned to grant the victims of a proven fraud substantive relief. Legitimate tax avoidance structures are a significant feature of international business activities which form the mainstay of Bermuda's economy. This Court should be slow to leap to a view which could result in the perception that legitimate international business clients cannot gain judicial protection if they are defrauded when they have decided to invest offshore. This does not mean that the Court will be unsympathetic to formal pleas of illegality based on alleged infringement of foreign revenue laws. Nor does it mean that offshore courts should not, when required to do so, enforce any relevant legislation designed to assist overseas criminal or regulatory investigations into suspected tax fraud. But very rarely will an illegality which is not raised by way of formal defence be so obvious as to justify this Court of its own motion refusing an otherwise deserving plaintiff substantive relief.

**The Plaintiffs' tracing remedy**

156. It is accepted based on Mr. Harloff's expert evidence that the individual Plaintiffs are entitled to a maximum of $3,520,392 (Walsh) + $437,687 (Taal) = $3,958,079. Because this excludes Barnaby's interest, Boomer's claim would be larger at $4,359,080. However there is a dispute as to whether two items should be deducted, one $835,000 amount and one $100,000 amount.

157. Mr. Harloff under cross-examination accepted that of the $5 million Second Extant Loan, $3,665,000 was lent to Hamilton as a subordinated loan. It was essentially put to him that the $835,000 which went out of Extant's account to Hamilton was counted twice because when a $850,000 capital repayment was made by Hamilton on November 27, 2003, it was clear that $835,000 of the same money had been paid out to an affiliate of Hamilton (Hamilton Properties) on December 1, 2003. Mr. Harloff denied that the later debits should be deducted on the grounds that the balance in the HBI account was sufficient to pay out the $835,000 and still leave a balance of in excess of $1million. He explained that applying the principle in *Re Hallett's Estate*(1879) 13 Ch.D. 696, the $835,000 debit was presumed to be HBI's money notwithstanding the fact that it was clearly linked to the $850,000 previously received.

The Defendant did not call Mr. Pomeroy to orally proffer a different opinion. In the Third Pomeroy Affidavit, a calculation showing the traceable total the Defendant's expert contended for after deducting $835,000 is set out without a positive case for the deduction being made.

158.    There was no dispute (the Plaintiffs' contention that all monies in the accounts were held on constructive trust apart) that the *Re Hallett's Estate* principle applied as the usual rule. The essence of this principle is that when trust monies are mixed with a trustee's own monies, any payments out should be presumed to be out of the trustee's founds rather than the trust monies. It was argued by the Defendant that this rule is displaced where it may be shown that the money paid out is in fact the equitable claimant's money. The application of the usual rule on the facts of the present case is unjust. I reject this submission. It is right that the Court has, to some extent at least, the discretion to apply the tracing rules most likely to do justice in the circumstances of each case. The position the Defendant contended for might well apply in the case of an ordinary banker. But the facts of the present case are completely different.

159.    In the present case HBI has been held to have received the monies in circumstances where it was acting in furtherance of a conspiracy to defraud, as well as either in breach of or knowingly assisting the breach of a fiduciary duty. It can be hardly be just for HBI in these circumstances to be rewarded for disposing of the Plaintiffs' money. The *Re Hallett's Estate* rule is in fact designed to prevent this very result. As Jessel MR observed in that case (at page 730): "*No human being ever gave credit to a man on the theory that he would misappropriate trust money, and thereby increase his assets.*" In the case of money paid into an account, these rules have been developed because it is often impossible to identify, *in specie*, what represents the claimant's traceable property. It is doubtful whether Hamilton Properties were *bona fide* purchasers for value without notice, but even if they were, this would in the present context be irrelevant to a claim against HBI.

160.    In paragraph 29 of the Defendant's Closing Submissions, the following additional argument is advanced in response to paragraph 7.4 Harloff's Expert Report in which he opines (without contradiction by Mr. Pomeroy) that the $100,000 payable to the SVG Financial Authority represents the traceable proceeds of the Plaintiffs' assets:

> "The claim for the $100,000 deposit has not been pleaded and is plainly rubbish as a matter of SVG law. The money which an offshore bank is required to pay as a deposit to the ISA is the property of the SVG Government once the bank goes into liquidation to be made available to pay the costs of the liquidation See: Affidavit of Mr. Bollers dated 12 February 2008, which has not been challenged by the Plaintiffs."

161.    The details of the Plaintiffs' tracing claim in terms of numbers did not require pleading and were the subject of expert evidence. Mr. Harloff was not cross-examined on this issue on the grounds that it was a matter for legal argument. Mr. Hargun agreed that I could refer to the expert evidence filed without leave as to the status of the deposit under St. Vincent and Grenadines law. It is obvious that the Plaintiffs would not be able to recover the deposit in a claim against the regulatory body. But they are not asserting a claim against that body. They are claiming against HBI and invoking the presumption that when the $100,000 deposit was paid after traceable monies were paid into HBI's account, there were sufficient monies in the account (excluding trust monies) out of which HBI should be deemed to have made the relevant payment. The $100,000 payment should therefore be treated as having been paid out of the Defendant's own funds.

162.    For these reasons, I find that the Plaintiffs' proprietary claim has been made out in the amount of US$ 3,520,392 (Walsh) + $437,687 (Taal) = $3,958,079 (my primary finding) or $4,359,080 (if my primary finding is held to be wrong and my alternative findings in favour of Boomer are upheld). It remains to consider the question of interest. I reject the submission that justice requires, in the circumstances of the present case, that a more generous approach to tracing should be adopted than the

lowest intermediate balance ("LIB") principle. I accept that the LIB principle is very arguably not an inflexible tracing rule, as Mr. Hargun contended, but see no need to consider any alternative approaches in the present case.

163.    Mr. Harloff's interest calculations were not challenged. He calculated that interest to from September 14, 2000 (the lowest intermediate balance date) until January 18, 2008 at the rate of 7% (the statutory rate) was payable as follows: (a) *simple interest*: Walsh $1,216,560 + Taal $163,818 = $1,380,378; (b) *compound interest*: Walsh $1,469,456 +Taal $197,871= $1,667,327. As a result of his evidence, these figures were marginally reduced as set out in schedule C to the Plaintiffs' Closing Submissions. Mr Woloniecki, however, submitted that the most appropriate rate was that rate which was payable on the funds from the date that they were frozen. That argument has some merit to it, although it overlooks the fact that the monies should not have been stuck in that account at all. It is however true that the Plaintiffs assets were to be invested conservatively, and that their main concern was preserving their capital for estate planning purposes. Also, because of the competing claims and the subsequent liquidation of HBI, this was not a straightforward case where the Plaintiffs' claims could be settled on ordinary commercial terms.

164.    I am unable to assess the justice, however, of applying the rate the Defendant's counsel contended for to the period before the traced funds were frozen at BCB (a period of some four years). It seems to me to be most just, to avoid further potential complications, to award simple interest at the statutory rate as calculated by Mr. Harloff for the period September 14, 2000 until January 18, 2008 (instead of compound interest which I might otherwise have been minded to award) in the amount of US$ 1,215,550.33 (Walsh) + US$163,681.81 (Taal) = US$1,379,232.14. Thereafter, the Plaintiffs are entitled to simple interest at the same rate until payment.

165.    The same approach would apply to a judgment made in favour of Boomer in relation to the total traceable amounts; (a) judgment for US$4,359,080, and (b) simple interest at 7% from September 14, 2000 to January 18, 2008 in the amount of US$1,630,167, and thereafter at the same rate until payment.

**Damages claims**

166.    The damages claimed for conspiracy to defraud and breach of fiduciary duty are both sought on the same basis. There was no dispute at trial on the numbers claimed, it being agreed that the gross figures set out at page 3 of Appendix C to the Plaintiffs' Closing submissions (and pages 112-113 of their Opening Submissions) would be subject to reduction to give credit for any amount received in respect of the proprietary claims. The gross amounts that I award (subject the *caveat* which follows) are as follows: (a) Walsh: US$19, 252,003.09; (b) Taal: US$ 953,792.83; alternatively (c) Boomer: US$25,437,908.96. These amounts consist of gross principal amounts (less sums received independently of these proceedings) together with simple interest at the rate of 7% from November 27, 1998 until October 6, 2005 (the Bermuda Liquidation date). In my judgment interest should stop running as at April 21, 2005, the liquidation date in the principal liquidation proceedings where the relevant claims have been filed. This Court should, for these purposes, exercise its common law discretionary power to recognise the effects of the SVG winding-up order.

167.    Subject to the same deduction so that interest runs only to April 21, 2005, and credit being given for any payment received in respect of its proprietary claim, Boomer would in the alternative be awarded the gross sum of US$25, 437,908.96.

**Summary**

168.    The First-Second Plaintiffs' proprietary claims succeed as do their claims for common law damages for breach of fiduciary duty and/or knowingly assisting a breach of fiduciary duty and their claims for conspiracy to defraud. The prior claims succeed on the basis that equity attached to the proceeds of their assets which were misapplied fraudulently or in breach of fiduciary duty. They are entitled to recover by way of equitable tracing US$3,520,392 (Walsh) + $437,687 (Taal) = $3,958,079, together

with simple interest at the statutory rate from September 14, 2000 (the LIB date) until January 18, 2008 in the computed amount of US$ 1,215,550.33 (Walsh) + US$163,681.81 (Taal) = US$1,379,232.14. Thereafter, the Plaintiffs are entitled to simple interest at the same rate until payment. By way of damages, and giving credit for the monies received through tracing, they are entitled to receive the gross sum of US$19, 252,003.09 (Walsh) and US$ 953,792.83 (Taal), in each case less such amount as is required to reflect the fact that simple interest is only awarded (at the rate of 7%) until April 21, 2005 (the SVG liquidation date), and not the later October 6, 2005 date of the commencement of the ancillary proceedings in this Court.

10    169.    If my primary finding that the individual Plaintiffs have standing to maintain the relevant claims is held to be wrong, the corresponding claims of the Third Plaintiff would succeed. The Third Plaintiff's proprietary award would be US$4,359,080, and simple interest at 7% from September 14, 2000 to January 18, 2008 in the amount of US$1,630,167 and thereafter at the same rate until payment. Subject to the same credits and interest reduction as referred to above, damages would be awarded in the amount of US$25, 437,908.96.

       170.    I will hear counsel as to costs.