# Tab 8

Dockets.Justia.com



# The Court Of Appeal for Bermuda

## CIVIL APPEAL No. 4 of 2008

Between:

### HORIZON BANK INTERNATIONAL LTD.

Appellant

-V-

### ALLEN WALSH
### HANS TAAL and
### BOOMER TRADING CO. LTD.

Respondent

---

**Before:**    Hon. Justice Zacca, President
Hon. Justice Nazareth, JA
Hon. Justice Evans, JA

**Date of Hearing:**    13 & 14 November 2008
**Date of Judgment:**    19th March 2009

**Appearances:**    Mr. Fenwick, Q.C. with Ms. Bell for the Appellant
Mr. Hargun and Mr. Luthi for the Respondent

## JUDGMENT

EVANS, JA:

1. The Bermuda Commercial Bank holds a large sum for the account of Horizon Bank International Ltd. ("HBI"), a privately owned bank which was incorporated in Antigua and is now being wound up both in Bermuda and in St. Vincent and the Grenadines. HBI's entitlement to this money is challenged by two Canadians, Allen Walsh and Hans Taal ("the Investors"). On 31 March 2008 Mr. Justice Kawaley held that they are entitled to trace i.e. exercise proprietary remedies to the extent of about US$4 million, plus interest totalling about US$1.4 million, and he further awarded them damages against HBI of about US$20 million, subject to deducting any monies traced. The Joint Provisional Liquidators of HBI now appeal.

2. The third plaintiff, and the third respondent to the appeal, is a Bahamian company, Boomer Trading Company Ltd. ("Boomer"), which was incorporated by the Investors in 1997 in the circumstances described below. We shall refer to the Investors and Boomer either separately or collectively as "the Respondents" as it is appropriate to do so.

3. The Investors allege that about US$14 million of the sums held by BCB for the account of HBI represent the proceeds of a large number of Microsoft Inc. shares worth in excess of US$20 million which they entrusted to HBI (and others) for the specific purposes of an Offshore Investment Programme in about September 1997. They say that from about November 1998 the Bank and others used the shares for their own purposes, acting dishonestly and in breach of fiduciary duties they owed to the Investors and/or to Boomer. They also claim damages for the tort of conspiracy.

2

## History

4. The story began in the early part of 1997. Mr. Walsh was about to retire from his employment with Microsoft Canada Inc. He held a large number of Microsoft Inc. shares and share options. He was advised by his accountant in Toronto, Mr. Hutchings, that if he continued to hold the shares at the time of his death, his estate would become liable to pay capital gains tax, not only in Canada but also in the United States, where Microsoft is based. The combined level of taxes could amount to 70% of the value of the shareholding at that time.

5. Mr. Walsh instructed Mr. Hutchings to advise him what options were available to him so as to avoid this exposure to the double tax liability. They consulted Mr. Robert Hindle, described as a legal specialist in offshore estate and tax planning structures, based in Montreal. Mr. Hindle's advice was that relief from the Canadian tax would be obtained if the shares were transferred to an offshore company, provided that the company was carrying on an "active business" abroad. Transfer to an offshore holding company or to a bank account, of itself, would not have that result.

6. This advice led to a breakfast meeting in Markham, Ontario, in late May 1997. Mr. Walsh, together with Mr. Hutchings and Mr. Hindle, met Mr. Prucha who introduced himself as a financial adviser to, and the Toronto representative of, HBI. Also present were Mr. Taal, the second plaintiff, and a Mr. Michael Barnaby, who is not concerned in these proceedings.

7.    At the meeting, Mr. Prucha outlined the scheme which later became the Offshore Investment Programme, following an exchange of letters dated 11 July 1997 (Mr. Prucha's proposal, which he signed on behalf of HBI) and 21 July 1997 (Mr. Hindle's acceptance on behalf of the Investors). Essentially, the scheme required the Investors to transfer their Microsoft shares and options ("the Shares") to companies known as IBCs (International Business Corporations) which each of them would form in the Bahamas. The two IBCs would then incorporate a third Bahamian company ("the trading company") which would undertake daily trading in US Treasury Bills ("T Bills") through Lehman Brothers in New York, utilising the services of another Bahamian company as its trading manager. It was specified that the two IBCs would open bank accounts and trading accounts with HBI, that the trading manager would be owned by HBI, and that whilst any trading profits would be split between the Investors and HBI, the latter would indemnify them against any trading losses that might be incurred.

8.    A further meeting between the Investors and Mr. Prucha took place on 28 August 1997. He recommended that they should appoint Mr. Kevin Coombes as their nominee officer and director of each of the IBCs and of the trading company which was to be formed, and they agreed to do so. Mr. Coombes was a director and effectively the only officer of HBI. Mr. Prucha also recommended that the Investors should give him a written mandate to instruct Mr. Coombes (1) to open the necessary accounts with HBI, (2) to authorise HBI to sell the Shares and to loan the proceeds to the trading company, after deducting 1.5% in respect of HBI's costs. Mr. Coombes would then be required to cause the trading company (a) to use the loan proceeds (less the first instalment of fees due to the trading

manager) to purchase Microsoft shares at the current market price, (b) to use the shares as security for a loan to be obtained from Lehman Brothers, and (c) to use the loan to finance trading in T Bills on a daily basis. The Investors each signed a letter giving Mr. Prucha this mandate, on about 28 August 1997.

9. The two IBCs and the trading company were duly incorporated, the two former being called Allington Investments Ltd. (for Mr. Walsh) and Wooden Shoe Holdings Ltd. (for Mr. Taal). The trading company, now the third plaintiff, was Boomer (ref. paragraph 2 above). The trading manager was Extant Management Ltd. a wholly owned subsidiary of HBI of which Mr. Coombes was a director. On 15 September 1997 Boomer and Extant entered into a Trading Services Agreement which authorised ("mandated") Extant as trading manager to use the shares forming the assets of the trading company (Boomer) to obtain cash collateral from Lehman Brothers in order to trade in and out of the US Treasury market on behalf of Boomer. Clause 7(b) provided that trading decisions would be made by two expert advisors who between them had 45 years of experience in that market.

10. The Investors had been told by Mr. Prucha that they could remove their shares, T Bills or other assets from Boomer and the Investment Programme at any time and, in any event, all assets would be returned to them when the trading programme ended in the summer of 2003.

11. These arrangements were implemented, and the trading programme operated "broadly as envisaged" and with some success until November 1998. During this period, some of Mr. Walsh's shares were sold at his

request, the proceeds were invested in T Bills and $1,350,000 was paid out to him when they were realised.

**The November 1998 transactions**

12.	In this month, however, the Shares were pledged to Lehman Brothers as security for a loan which was made by a Lehman associate, Lehman Brothers Finance S.A. ("LBFSA"), a Swiss company, to Extant, not to Boomer as had occurred previously. The Shares and T Bills held by Lehman Brothers were removed from the account maintained in Boomer's name, first, to a second account also in Boomer's name, then to a third account which was opened in the name of "LBS and Pledgee of Extant Management".

13.	The loan made to Extant was covered by a Loan Agreement dated 27 November 1997 and it amounted to US$15 million. Boomer's assets consisting of 110,290 Microsoft shares and a T Bill of US$7,695,000 were pledged as security pursuant to a Pledge Agreement of the same date. The loan proceeds were used by Extant to subscribe for shares in a newly formed investment fund, Irwin Arbitrage, in its own name. It was the only subscriber.

14.	A second loan was made by LBFSA to Extant in February 1999, in the amount of US$5 million, again against the security of Boomer's assets. US$3.665 million was transferred by Extant to another investment company, Hamilton Securities Group LLC.

15.	The loan made to Hamilton was later repaid to Extant in the same amount ($3.665 million). Irwin Arbitrage, however, incurred substantial trading losses and expended more than $1.5 million on fees and other expenses.

In the result, only US$9,262,612 was repaid. These repayments were made to an account with the Bermuda Commercial Bank operated by HBI in the name of Extant. No repayment was made to the lender, and the assets pledged to Lehman Brothers were later sold on the market and the proceeds used to repay the loans.

**The authority issue**

16. Much of the judgment was concerned with the question whether the 1998 transactions described above, where the Shares were pledged to Lehman Brothers as security, not for loans to Boomer to support trading in T Bills, but for loans to Extant which were used to establish and support investment funds managed by Irwin and Hamilton, were within the authority given by the Investors under Investment Programme. Unsurprisingly, the Judge held that they were unauthorised, and this part of his judgment is not appealed. However, the Appellants do contend that they were authorised by Boomer, because Mr. Coombes' undoubted participation in them should be attributed to Boomer, with the result, they say, that the Investors are entitled to claim only against him. This is just one example of the Appellants' main submission on the central issues, which is that a detailed consideration of the parts played by the different individuals, and of their respective corporate roles, shows that no liability attaches to HBI, whether for breach of duty or any other unlawful conduct. It is appropriate, therefore, at this stage to identify the various individuals involved.

**Individual actors**

17. The Investors were approached by Mr. Prucha who held himself out as acting on behalf of HBI. That of itself does not make HBI liable as his

principal, but he corresponded on HBI writing paper and the Investors' replies were addressed to him at HBI. That too would not necessarily be decisive on the issue of agency, but the Investment Programme was implemented by HBI which, as the Judge found, agreed to establish the offshore structure which Mr. Prucha had proposed, ostensibly on its behalf. The Appellants maintain their contention that HBI did not, in the circumstances, owe the Investors any fiduciary duty in relation to the assets which they entrusted to the programme, but on the question of agency there is no room for doubt. HBI clearly ratified the arrangements made by Mr. Prucha ostensibly on its behalf, whether his initial approach was authorised, or not.

18. Mr. Prucha was one of a group of four Canadian business men and financiers who together are known as 'the Toronto defendants', by reference to other proceedings which have been commenced there. The others are William F. Presnail, Daniel O'Connor and Mark Edwards. Each of these was closely involved in what the Judge described as the offshore structure established pursuant to the Investment Programme. Presnail and O'Connor were the initial directors and (through trusts) the owners of HBI, which was incorporated in 1996. They were the two experienced traders who the Investors were assured would conduct T Bill trading operations on behalf of Extant, the trading manager (a wholly owned subsidiary of HBI), and Boomer (the trading company indirectly owned by the Investors through their two SBIs). Presnail it appears had a significant beneficial interest in Irwin Arbitrage. Mark Edwards was the owner of a management consulting and marketing company located in Toronto, and HBI stated, in a letter dated 28 May 2002 to the Bermuda Commercial Bank, that he "provides administrative and accounting

assistance to [HBI] on a daily basis". The same letter stated that Mr. Jerry Prucha was employed by that company and was "responsible for marketing the services of [HBI] worldwide......... mainly to Canadian lawyers and tax professionals". Mark Edwards was also the permanent managing director of Hamilton Securities, and he owned or controlled at least 25% of its shares.

19. The individual most directly involved in the implementation of the Investment Programme, however, was Mr. Coombes. He was a director and senior vice-president both of HBI and of its subsidiary, Extant. He conducted the day-to-day operations of HBI in the Bahamas, with the assistance of one administrative-level employee. He was appointed the sole director of Boomer and he conducted the business of that company, as the Investors, on the recommendation of Mr. Prucha, had agreed that he should (paragraph 8 above).

20. In the November 1998 transactions, Mr. Coombes played the central role. He pledged the Boomer assets to Lehman Brothers as security for LBFSA's loans which he agreed on behalf of Extant, and he caused the proceeds of the loans to be transferred to Irwin Arbitrage and to Hamilton Securities, respectively. When repayments were made to Extant, he directed that the proceeds should be directed to HBI, not used to repay LBFSA. He was president of a company which owned 75% of the shares in Hamilton Securities and therefore had or may have had a beneficial interest in that company. It is admitted by the Appellants that he acted in these respects on the instructions of the Toronto Defendants.

21. It is also admitted that Mr. Coombes was "at all material times ... the controlling and/or directing mind of HBI who acted upon the instructions

of the other individual Toronto Defendants" (judgment paragraph 95), and specifically that HBI's accounts with BCB in Bermuda were operated and managed by him under the direction of Presnail, Edwards and O'Connor (judgment para.31).

22. It is further admitted that the Investors were not informed of the November 1998 transactions and the subsequent dealings with Irwin Arbitrage and Hamilton Securities, and they remained unaware that the Shares and other Boomer assets were pledged to Lehman Brothers as security for loans to Extant and were sold to repay those loans, until long after the event.

**Subsequent false representations**

23. To complete the relevant history, reference must be made to three occasions when false representations were made as to the state of Boomer's account with Lehman Brothers after the November 1998 transactions took place. The effect of transferring Boomer's assets to a second and then a third Lehman Brothers account (paragraph 12 above) was to leave the first account with a nil or a nominal balance. In order to conceal this from the Investors, Mark Edwards forged Lehman Brothers account statements purporting to show that Boomer's assets remained in the first account, covering the period from December 1998 until 30 June 2002. He sent the forged statements to Coombes at Boomer for onward transmission to the Investors or their professional advisers.

24. Secondly, the following facts were admitted –

"242. After the Shares were sold by LBFSA by June 2001, HBI continued to make representations both to its auditors and to the

[Offshore Finance Authority] in St. Vincent & the Grenadines that it held the Shares as security for loans. These representations were false and HBI knew they were false. In particular... [there followed references to (a) filings with the OFA for the period 30 June 2001 through to January 2003 which Coombes certified gave a true and fair view of the bank's position, (b) audited financial statements dated 1 September 2002 and thereafter, and (c) a letter dated 20 December 2002 signed by Coombes]."

25. Thirdly, on 14 January 2003 Coombes signed a document for HBI that was filed with the same OFA, which stated that 250,000 Microsoft shares had been pledged by Boomer in support of a multi-million loan granted by HBI to Boomer (Admitted Fact No.240). This was entirely false.

**The judgment**

26. The Judge noted in paragraph 37, first, the submission made for the liquidators, which he accepted (as we do), that "proof of allegations as grave as fraud requires particularly cogent evidence or, to put it another way, requires clearer evidence than would be required to prove less improbable or controversial matters: *AIC Ltd. v. ITS Testing Services Ltd. ('The Kriti Palm')* [2007] 1 Lloyd's Rep.555; and secondly, that in the present case the Defendants had elected to call no positive evidence in support of their case on liability, effectively putting the Plaintiffs to strict proof of their case. "....the Court is not required to decide between conflicting witnesses and decide where the truth lies.......[but to decide] whether the Plaintiffs have proved their case on a balance of probabilities, and whether their interpretation of the largely uncontested primary facts is sufficiently cogent to justify concluding that individuals

not before the Court were guilty of fraud and/or breaches of fiduciary duty." It appeared that Mr. Coombes had agreed to be available to give evidence, but the liquidators elected not to call him as a witness; certainly, there was no evidence that they were unable do so.

27. The judge considered 'The knowledge of Coombes' in some detail in different parts of the judgment, and he concluded that he was "at the very least negligent in personally executing the Pledge Agreement together with the First and Second Extant Loan Agreements on behalf of both Boomer and Extant.......without obtaining written confirmation from [the Investors] that they wished to modify the investment restrictions in departing from the investment restrictions embodied in the TSA and the earlier mandate letters" (paragraph 72). He also held that Mr. Coombes had the requisite degree of knowledge which, attributed to HBI, constituted a breach of fiduciary duty owed by that company (this is the overall effect of paragraphs 83, 98, 101 and 113 of the judgment). However, he declined to hold that Mr. Coombes was proved to have acted fraudulently or dishonestly (paragraph 77 and, in relation to the conspiracy allegation, paragraph 132).

28. The Respondents challenge this finding, contending that the Judge should have found that "the breaches of fiduciary duty committed by Coombes were indeed dishonest" (Respondents` Notice para.1.3).

29. The Judge further found that two of the Toronto Defendants, Prucha and Edwards, knew that the 1998 transactions involved breaches of fiduciary duties owed to the Investors (paragraphs 64 and 102) and that they were parties to the unlawful conspiracy (paragraphs 133-4). He was uncertain,

however, about the parts played by the other two, Presnail and O'Connor (paragraphs 112 and 136). These findings are not challenged by the liquidators, though they dispute the further findings that Prucha's and Edwards` knowledge can be attributed to HBI.

## The grounds of appeal

30.   These can be grouped as follows, in the order in which they were argued before us –

  (A) Illegality (section II in the Notice of Appeal).

  It is contended that the Offshore Investment Programme was unlawful under the revenue laws of Canada, and that the claims are barred by the maxim *ex turpi causa non oritur actio.*

  (B) Neither the Investors nor Bloomer is entitled to claim against HBI (the *locus standi* issue) (section III in the Notice of Appeal).

  (C) Breach of fiduciary duty by HBI (section IV).

  (D) Knowing assistance by HBI (section V).

  (E) Conspiracy (section VI)

  (F) Procedural Unfairness (application for a new trial) (Section I in the Notice of Appeal).

  (G) Quantum, and other issues (paragraphs 13 and following in the Notice of Appeal).

31.   Of these, (C) to (E) are substantive issues, and (B) (*locus standi*) is closely related to them, on the facts. We therefore will consider them first, beginning with a reference to the Appellants` submission regarding the need to distinguish carefully between the concepts, first, of attributing

an individual person's knowledge to a company in connection with an allegation that the company itself has acted unlawfully or in breach of duty, and secondly, of holding a company vicariously liable for a wrong committed by its servant or agent in the course of his employment. The Appellants contend that the Judge wrongly conflated the two concepts throughout his reasoning (skeleton argument, para.53). We do not believe that the Judge failed to distinguish between them, but we bear in mind the importance of doing so.

32. We also make the following general observations before considering the substantive issues concerned with the alleged breaches of fiduciary duty. Three times in the course of his judgment, the Judge reminded himself of the need to exercise commonsense when applying the relevant legal principles in the circumstances of a particular case. Thus –

> "*Coombes' knowledge must in these circumstances be attributed to HBI, because HBI's conduct involving himself as its primary de jure and de facto agent makes any other conclusion almost perverse.*" *(para.91)*
>
> "*Putting aside the somewhat technical rules on the attribution of knowledge, in commonsense terms HBI clearly knew that it was assisting Prucha and/or the Toronto Defendants to breach their fiduciary duty to Walsh and Taal by receiving the proceeds of the Extant Loans and concealing them from its own auditors and [from] the SVG OFA the true status of Boomer's principal assets………The practical realities must form part of the factual framework within which the technical rules of attribution must be applied.*" *(para.94)*

> *"Applying traditional agency principles to a factual matrix in which a single officer appears to be the directing mind of all the key corporate actors seems, to my mind, highly artificial." (para.99)*

We agree with this approach, doubting only whether the rules are indeed 'technical' if that means that they operate without regard to the business realities of the situations in which they are applied.

33. The relevant legal principles include these –

    (a) a fiduciary duty is owed in the circumstances described by Millet LJ in *Bristol and West Building Society v, Mothew* [1998] Ch.1, approved by the Privy Council in *Arklow Investments Ltd. v. Maclean* [2000] 1 WLR 594. Only one sentence need be quoted here - "The distinguishing obligation of a fiduciary is the obligation of loyalty".

    (b) Liability for "knowing assistance" in the breach of a fiduciary duty owed by another person requires proof of dishonesty, not merely actual or constructive knowledge of the relevant facts : *Royal Brunei Airlines v. Tan* [1995] 2 AC 378, and *Barlow Clowes etc. v. Eurotrust International Ltd. and others* [2005] UK PC 37;

    (c) A person's knowledge may be attributed to a company when acquired in the course of his employment as a servant (or *mutates mutandis* as agent), or when he is the "directing mind and will" of the company, or in other "exceptional cases" where it

is appropriate to do so and the ends of justice so require (judgment para.82, citing Lord Hoffman's speech in *Meridan Global etc. v. Securities Commission* [1995] AC 500).

(d) Vicarious liability cannot be established unless "all the features of the wrong which are necessary to make the employee liable .. have occurred in the course of the employment";

*Dubai Alumimium Co. Ltd. v. Salaam* [2003] 2 AC 366.

The Appellants do not criticise the Judge's statements of these principles, apart from their submission that he wrongly "conflated" the two concepts of attribution and vicarious liability (paragraph 31 above).

34.   Finally, in relation to the judgment overall, we note that the Judge applied the rigorous standard of proof to which he referred (paragraph 26 above), as is demonstrated by his findings (1) that there was no unlawful conspiracy when the Offshore Investment Programme was agreed and implemented (para.124), and (2) that Coombes was not proved to have acted dishonestly in relation to the November 1998 transactions, for the purposes of the conspiracy allegation (paragraph 132). The second of these findings is challenged by the Respondents by their Counter-Notice, but the first is not.

**(C) Breach of fiduciary duty by HBI?**

   **(a) Duty**

35.   The first question is whether HBI owed a fiduciary duty to the Investors. The Judge held that it did. He concluded as follows –

"56. I further find as a fact that HBI owed fiduciary duties to [the Investors] flowing from its role as their actual or de facto agent in establishing the entire offshore structure and, in particular, [the Investors'] assets and the companies created to hold such assets. Of course, HBI may not have assumed fiduciary obligations when providing ordinary banking services, nor indeed when indirectly controlling ordinary corporate administration functions. But in agreeing to establish an offshore structure which entailed [the Investors] placing assets into companies which HBI would control on their behalf (i.e. by providing its own manager, Coombes, to be the manager of Boomer), HBI in my judgment became a fiduciary of [the Investors] to the extent that it was trusted to ensure that Boomer would be managed consistently with the interests of [the Investors] and, most importantly, within the parameters of the mandate [they] gave HBI (through the July 23, 1997 and August 28, 1997 letters ......), unless otherwise agreed."

The Judge added –

"59. In my judgment, HBI entered into a fiduciary relationship with [the Investors] and Boomer because it agreed to manage their assets, which were to be kept separate from HBI and Extant's assets, subject to certain broad guidelines through a structure over assets of which [the Investors] had relinquished operational control.......HBI in substance agreed to manage the corporate entities holding [the Investors'] assets according to their specific mandate. It is obvious that [they] were extremely anxious about the security of their capital and were extremely risk averse. In these circumstances HBI's implied agreement to follow their instructions

with respect to the type of investment activity they authorised in the August 28, 1997 mandate letters was a fiduciary obligation."

36. This conclusion is challenged by the Appellants on the ground that Prucha was not acting on behalf of HBI when he negotiated and agreed the scheme with the Investors, and they seek support from a passage in Mr. Walsh's cross-examination where he initially agreed that there was no contract between himself and HBI. This second point is worthless, not least because Mr. Walsh himself immediately qualified his answer –

> ".. I believe this letter is to Mr. Prucha at HBI Bank, so I mean, I'm – I believe that the structure that we're proposing and the structure that we agreed upon in the agreements that we signed all went to HBI Bank. So I don't know if this is – if this is a contractual agreement with HBI Bank." (ref. judgment para. 57).

Counsel for HBI responded "I'm not going to pursue that". Nevertheless, the Appellant's Skeleton Argument asserts that the Investors did not regard themselves as entrusting their assets to HBI. This is clear from Walsh's own evidence that he was unsure as to whether he and Taal had contracted with HBI" (para.69a). We disagree. It is clear, even from that passage in his evidence, and certainly from the whole story of the Investors' negotiations and agreement with Prucha, that they did regard themselves as entrusting their assets to him and to HBI, whilst the question whether they contracted with HBI was not for them to say. That is a question of law to which in our view only one sensible answer can be given. It depends upon, first, whether Prucha had authority to act on behalf of HBI, or more precisely, whether HBI was a party to the arrangements made pursuant to the exchange of letters in July/August

18

1998, and secondly, whether HBI as a party undertook the express and implied obligations described by the Judge.

37.  As regards the first (agency), to which we have already referred, we are content to adopt the Judge's single sentence – "The suggestion that Prucha was not, at this stage at least, acting as HBI's agent would be inconsistent with all the available evidence" (para.57). We add only that HBI clearly ratified the agreement by participating in the Programme as it did.

38.  With regard to HBI's participation, the Programme described in the letters included the following –

> (a) each of the IBCs and Boomer, the trading company they were to incorporate, were to open bank accounts and trading accounts with HBI;
>
> (b) the trading entity would be owned by HBI and would hold bank and trading accounts with HBI;
>
> (c) HBI would be involved in selling and repurchasing the Shares and would receive 1 ½ per cent. of their value on that account;
>
> (d) the T Bill trading would be conducted by HBI through its brokers in New York;
>
> (e) trading profits would be shared between the trading company and the trading manager, HBI's subsidiary, and HBI undertook to provide a full indemnity against losses incurred on T Bill trading activity; and
>
> (f) the Investors mandated Prucha to instruct Coombes, who conducted the day to day operations of HBI in

the Bahamas, *inter alia* to conduct the business of the IBCs and the trading companies on their behalf.

39.    In these circumstances, together with other factors mentioned by the Judge (paragraph 35 above), the Appellant' submissions that "HBI's role in the offshore structure.... was extremely limited and peripheral", and that HBI was "a mere peripheral actor in [the Investor's] offshore scheme" (Skeleton Argument paras. 14 and 98) in our view are wholly unrealistic and, in the Judge's words already quoted, simply "inconsistent with all the evidence".

40.    The Judge's holding that HBI owed a fiduciary duty to the Investors, to safeguard their assets by ensuring that the Offshore Programme was implemented and managed in accordance with their written mandates, was undoubtedly correct.

**(b) Breach**

41.    The Judge addressed the question whether HBI's duty to the Investors was broken, in paragraphs 62 and following, which were also concerned with the claim that HBI "knowingly assisted" in a breach or breaches of duties owed by others "to the Plaintiffs or any of them" i.e. to Boomer as well as the Investors. He also took account of the duty which undoubtedly Coombes owed to Boomer, in his capacity as a director and officer of that company. If we concentrate on the issue whether HBI's duty to the Investors was broken, we can identify the following findings.

42.    First, the decision to enter into the 1998 transactions was made by Prucha and/or the Toronto Defendants, and "such a dramatic change of course

should not have been embarked upon without [the Investors'] written instructions" (paragraph 64).

43. Secondly, the November 1998 transactions were carried out by Coombes, in his capacity as a director of Boomer (and sc. of Extant also), acting on their instructions (paragraph 66).

44. Thirdly, "Coombes was aware that [the Investors] were being deceived while Boomer's assets were being invested with his active participation in Irwin and Hamilton.Coombes himself in his capacity as Vice-President of HBI participated in deceiving HBI's auditors and the OFA by falsely representing that Boomer's assets were safe when (a) he knew that they were not and (b) must have known that a breach of fiduciary duty owed to [the Investors] by the persons whose instructions he followed had occurred or was occurring. This HBI assisted Prucha and the Toronto Defendants in their breach of fiduciary duty by (a) concealment while the proceeds of the Boomer assets were being dissipated, and (b) by providing banking services through which the dissipation occurred. Coombes' knowledge must in these circumstances be imputed to HBI, because HBI's conduct involving himself as its primary *de jure* and *de facto* agent makes any other conclusion almost perverse." (para.91).

45. Finally, as regards the Toronto Defendants, Prucha and Edwards both knew that the November 1998 transactions were unauthorised by the Investors and were in breach of fiduciary duties owed to them, and their knowledge was attributable to HBI under the directing mind principle and, in Prucha's case, on agency principles also (paras.107-109).

46.	It was on the basis of these findings that the Judge found that the Investors "proved their claims against [HBI] for breach of fiduciary duty by HBI and/or HBI knowingly assisting a breach of fiduciary duty owed by Prucha" (para.113). Combining the two issues of 'breach' and 'knowing assistance' in this way was consistent with his earlier observation that a breach of duty "only clearly occurred if the requisite knowledge can be imputed to HBI, so the position of HBI as a primary actor or as a party providing knowing assistance is (in terms of the seriously contested facts) effectively the same" (para.67). By this, as we understand it, the judge meant that the issue as to a breach of duty by HBI depended on the knowledge of Coombes and/or Prucha and/or the Toronto Defendants being attributed to it.

47.	The Appellants contend that there was no breach of duty by HBI, because—

	"a………………..

	b. The Learned Judge expressly found that there was no or no clear evidence that HBI itself participated in any investment decisions (illegitimate or otherwise) or that Prucha was acxting on behalf of HBI in giving ongoing instructions to Coombes (para.65-66 of the Judgment).

	c. The Learned Judge found that HBI was providing ordinary banking services to Walsh and Taal's companies (paragrah 70 of the Judgment)." (Appellant's Skeleton para.71)

48.	Paragraphs 65 and 66 of the Judgment under the heading "The position of HBI as a primary actor" contain statements to the effect that HBI was not involved in allegedly illicit investment decisions (sc. the November 1998

transactions) nor was Prucha acting on its behalf in giving instructions to Coombes. He said this –

> "The decision to invest Boomer's assets for the benefit of Extant was not, on the evidence, a decision made *by* HBI…..there is no cogent evidence HBI played a primary role in this regard……Executing the November 1998 transactions and the subsequent Extant Loans did not constitute any actionable breach of fiduciary duty on HBI's part."

49.    It is not surprising that the Appellants rely upon these "findings", but they have to be read in conjunction with other parts of the judgment, referred to above. If, as the Judge found, Coombes knew that the Investors were being deceived, and his knowledge must be imputed to HBI (paragraph 91), there was a breach of duty by HBI, and the exculpation of "HBI" in paragraphs 65-66 clearly means "otherwise than through Coombes", and Prucha and/or the Toronto Defendants likewise.

50.    The reference in paragraph 70 to HBI "providing ordinary banking services", upon which the Appellants also rely, does not purport to say that HBI's involvement was limited in that way. If it did, it would be wrong.

51.    The grounds of appeal, therefore, provide no basis for contending that the Judge's finding, that there was a breach of the fiduciary duty owed by HBI to the Investors, was wrong. We are satisfied that it is correct, indeed that it was inevitable, given the basic facts concerning the Investment Programme, the offshore structure which implemented it, the parts played by individuals particularly Coombes, Prucha and Edwards,

the blatant disregard of the Investor's mandate in November 1998 and the subsequent fraudulent activities for which the Bank was certainly liable (ref, the judgment, para. 67).

52. So far we have been concerned only with the fiduciary duty owed by HBI to the Investors. We will consider the alternative claim by Boomer, below.

### (c) Remedies

53. As the Judge observed, the above finding of a breach of fiduciary duty owed by HBI to the Investors supports their claim for a tracing remedy, as well as for damages (paragraph 113).

### (d) Knowing assistance

54. We say no more, at this stage, about the claim for "knowing assistance" given by HBI to breaches of fiduciary duties owed by others i.e. Coombes and/or Prucha and/or the Toronto Defendants, to the Investors and/or to Boomer.

### (e) Conspiracy

55. The Judge directed himself, correctly, that what is alleged is an 'unlawful means' conspiracy, requiring proof that HBI with others conspired to defraud the Investors, in consequence of which damage has been suffered. He found that there was undoubtedly an unlawful conspiracy in respect of the November 1998 transactions and the subsequent fraudulent misrepresentations made on behalf of HBI, but there was "no clear evidence that this arrangement [to make unauthorised use of the Shares] was first conceived when [the Investors] were being encouraged to

consider placing assets into the offshore structure that HBI was involved in marketing to them" (para.124). He had already rejected the contention that the Investors had authorised the November 1998 dealings (para.125).

56. He held that at least two of the Toronto Defendants were parties to the unlawful combination (para.126) and that they had "actual knowledge of all the facts which made the transaction illegal" and that their fraudulent intent had been proved (paras.133-4). Furthermore, their knowledge could properly be attributed to HBI (para.1335). On this basis, HBI was liable to the Investors for the tort of conspiracy to defraud.

57. Coombes on the other hand had received his instructions from the Toronto Defendants, and the Judge was not satisfied that he had actual knowledge that the Investors had not authorised the relevant transactions (para.132). He had found "applying the ordinary standard of proof with respect to the breach of fiduciary duty claims, that [Coombes] knew or must have known that the Extant instruments were unauthorised", and for the purposes of the breach of fiduciary claims "there is no question that constructive knowledge or wilful blindness is sufficient" (para. 131). But "having regard to the high standard of proof required for allegations for fraud, combined with the requirement .......that actual knowledge of all the facts which made the agreement illegal is required, I am not satisfied that Coombes had actual knowledge that [the Investors] (who did not ordinarily give him their instructions directly) had not authorised the relevant transactions directly. I am not satisfied that, as a matter of law, constructive knowledge suffices". He concluded –

"For these reasons Coombes' knowledge which may undoubtedly be attributed to HBI has not been clearly shown to reach the

necessary threshold to implicate HBI as a participant in the conspiracy to defraud that has been clearly made out." (para.132)

58. The Appellants raise a number of points. They say that the Judge was wrong to attribute Prucha and Edwards' knowledge to HBI, because they had no authority to act on behalf of HBI in these respects. Moreover, they assert that the Judge found that the misapplication of the Shares was "actually concealed from HBI" (Skeleton Argument para.81.b.iii). Alternatively, if there was an unlawful conspiracy, the relevant loss was suffered by Boomer, and even if that company could sue (which it could not, because Coombes' knowledge of the transactions should be attributed to it), the Investors, even if its shareholders, could not.

59. First, however, it is necessary to consider the Respondents' contention that the Judge ought to have found that Coombes had the necessary fraudulent intent for the purposes of the conspiracy claim. The Judge concluded, in the passages quoted above, that the evidence did not prove that Coombes had actual knowledge of a material fact, namely, that the Investors had not authorised the relevant (November 1998) transactions. This was on the basis, apparently, that the Investors might have given oral (or perhaps other written) instructions, of which he was unaware.

60. The Respondents rely primarily on the difficulty of reconciling this conclusion with the express findings earlier in the judgment, relating to the breach of fiduciary duty claim. The opening sentence of paragraph 91 has been quoted above (paragraph 44). There, the evidence satisfied the Judge that Coombes knew that the Investors were being deceived. He

also found that Coombes "probably knew in November 1998 that Prucha and/or the Toronto Defendants and/or HBI had breached his/their fiduciary obligations to [the Investors] by unilaterally deciding without [their] consent or even knowledge" to undertake the unauthorised transactions (paragraph 83).

61. An important consideration is that the November 1998 transactions involved, not only pledging the Shares as security for a loan to Extant, not to Boomer, and placing them in a fresh Lehman Brothers account whilst keeping open the existing account, but also using the proceeds of the loan to provide initial capital for an investment fund newly formed by or on behalf of one or more of the Toronto Defendants, not for T Bill trading. It is inconceivable, in our judgment, that Coombes might have believed that the Investors, without reference to him as their nominee and director of their trading company, had informally authorised this departure from the terms of their written mandate. In paragraph 64 he held that "such a dramatic change of course should not have been embarked upon without [their] written instructions".

62. The Judge's findings as to Coombes' actual knowledge in paragraph 91 of the judgment are amply supported, in our view, by the evidence which, on this issue like many others, is entirely documentary. In our judgment, even if some higher standard of proof is required for the conspiracy than for the breach of duty claim (we need not decide whether it is), the evidence satisfies that standard also. We therefore hold that Coombes was a party to the unlawful conspiracy, and it follows that HBI is liable accordingly, whether on the basis that his knowledge is attributed to HBI, or vicariously.

63. It follows also that his knowledge is not attributed to Boomer, which was a victim or intended victim of the fraud (*In re Hampshire Land Company* [1896] 2 Ch.743). As with the breach of duty claim, we will revert to the question of Boomer's rights after considering the *locus standi* issue.

## (B) Locus standi

64. The Judge gave leave to the Plaintiffs at the commencement of the trial to add Boomer as the Third Plaintiff. The application was made because the Defendants in their Skeleton Argument served shortly before the trial advanced an argument that the Investors as individual Plaintiffs lacked the standing to sue. The causes of action they relied upon could only be raised, it was contended, by Boomer (judgment para.13).

65. The Defendants previously had never disputed the Plaintiffs' right to sue, but neither had they formally admitted it. The Judge rightly observed that the point ought to have been explicitly pleaded. He was also correct, in our view, to give leave to join Boomer and to refuse the Defendants' application to adjourn the trial, which followed (judgment para.16). He bore in mind throughout that the late joinder of Boomer meant that factual and legal issues relating to its claim were not fully explored (paragraphs 18 and 73). So far as legal issues are concerned, this deficiency has not persisted on the hearing of the appeal. All legal aspects of Boomer's claim have been addressed in detail by both parties. This has made the number and the complexity of the issues considerably greater than they were before.

66. Notwithstanding Mr. Walsh's belief that he and Mr. Taal had retained beneficial ownership of the Shares throughout, the Judge held that the assets in question belonged to Boomer and not the Investors, when the Programme was implemented (paras.141-2). Nor could the Investors rescind the arrangements *ab initio* on the ground that they were induced by fraudulent misrepresentations, because he rejected the claim that they were vitiated by fraud from the outset (para. 142). These findings are not challenged on appeal.

67. The Investors claimed, however, that the arrangements were rescinded by notices given 14 February 2003 to the managers of Boomer and of the two IBCs rescinding "all agreements to which we are a party with [Boomer]". The notices were not expressly accepted, but neither were they disputed by any of the companies. The Investors contend that they were effective to revest in them the right to bring these proceedings in their own names. The Judge accepted this contention (para. 144).

68. The Appellants submit that he was wrong to do so. First, because there was no express rescission of the agreements between the Investors and their respective IBCs. Secondly, because the parties could not be restored to their original i.e. pre-contract positions. Thirdly, because "the Learned Judge seems to have had in mind something more akin to an assignment; but this too could not operate to give [the Investors] any better right than that possessed by Boomer" (Skeleton Argument para. 42a).

69. We hold, first, that there is no requirement that the parties shall be restored to their original pre-contract positions, except when a party seeks to rescind the contract *ab initio*, in other words, to set it aside

altogether, as in the case where it was induced by a fraudulent misrepresentation. As the Judge observed, that does not arise here, in the light of his finding that there was no initial fraud.

70. Secondly, the phrase "rescission by agreement" uses "rescission" in a different sense. "Termination" might be more accurate. The Judge found that there was an agreement to that effect, in consequence of which the Investors became entitled to make "any common law or equitable claims, *inter alia*, in their personal capacity, in respect of losses flowing from breaches of the TSA by Boomer and Extant" (judgment para.143, quoting from the Notices of Rescision). The effect of terminating the arrangements was to restore to the Investors the rights to which Boomer and/or the IBCs were entitled as the previous owners of the Shares.

71. The Appellants' objection to this analysis is that the Notices did not expressly terminate the existing arrangements between the Investors and the IBCs. It is unclear whether this is an implied suggestion that the IBCs should be added as parties, but that possibility has not been canvassed (cf. judgment para.148). If they had become Plaintiffs, the Appellants presumably would have raised the same time bar defences as they did against Boomer. But the point stands as a defence to the claims made by the Investors.

72. The short answer to it is that the Judge was entitled to take account, not merely of the terms in which the Notices were expressed, but also of the circumstances in which they were given. "In my judgment an agreement to rescind any such agreements so as to permit [the Investors] to sue personally for all losses, whether equitable or sounding in damages,

arising from the breaches of the TSA by Extant may properly implied in all the circumstances of the present case. It is clear that [they] several years ago decided to abandon the offshore entities altogether and to seek relief in their personal capacity" (judgment para.144). We add that the rights thus released or restored to them included the claims for equitable and common law relief they assert in these proceedings (cf. *Shalson v. Russo* [2005] Ch.281).

73. We would also go further, though it is not necessary for us to do so. By their conduct, including the Notices of Rescission but also by commencing proceedings in their personal capacities both in Toronto and in Bermuda, the Investors gave clear notice that they were claiming to set aside the whole of the Investment Programme and the offshore structure which resulted from it, including the creation of the IBCs as well as Boomer.

74. Moreover, it appears to us that grounds exist for holding that the present Appellants accepted that that was the Investors' position. They consented to the lifting of the statutory stay of proceedings against HBI (in liquidation) without suggesting that the Investors had no right to pursue the claims. They admitted that the relevant assets were the First and Second Plaintiffs' at all material times (Re-Amended Points of Defence paras.47 to 60 *passim*.). They did not demur when it was asserted that all parties, including the two IBCs, accepted and affirmed that the agreements giving rise to the offshore investment programme had been rescinded.

75. A possible objection to the finding that there was "rescission by agreement" is that there was no express acceptance of what was, on this analysis, the Investors' offer to terminate the arrangements. But if overall there was an implied agreement to that effect, the point does not arise. Another interpretation of the facts is that the other parties to the arrangements, including HBI, had wrongfully repudiated them, and the Investors were entitled to "rescind" i.e. bring them to an end, unilaterally. We need not pursue this further.

76. The Respondents' second submission under this head was that the Courts should "pierce the corporate veils" worn by the two IBCs so as to enable the Investors to sue in their stead. The Judge was prepared to do so in order to overcome what he called a "legal technicality of the highest order" (para.144). We sympathise with his approach, but the Appellants contend that, were the Courts to adopt it, the consequences could be far-reaching. It is not necessary for us to decide this issue, and we do not do so.

77. We hold, therefore, that the Investors have *locus standi* in respect of their claims. We will consider Boomer's position below.

## (A) Illegality

78. This issue too was raised at a late stage by the Appellants. They had not pleaded it as a defence or given any other forewarning to the Respondents. It became their primary ground of appeal both in the Notice of Appeal and at the hearing. On the fourth day of the trial, the Judge refused their application for leave to raise the issue in their pleadings and

to call an expert in Canadian tax laws as a witness. The history of the matter was relevant to his decision.

79. At the hearing of the Originating (Interpleader) Summons, some creditors raised the issue whether the scheme was in breach of Canadian revenue laws. The Judge did not rule upon it, and the proceedings thereafter became an action between the Investors and the liquidators. The latter did not raise the issue in their Points of Defence, filed on 4 July 2006, and they could perhaps be said to have elected not to do so. It was raised for the first time in the Skeleton Argument served by counsel one week before the trial. At the trial, counsel for the Investors submitted that it should have been pleaded, and that there was no evidence to support it. That led to the application on day four which was refused. Nevertheless, the Judge accepted that the Court might have to rule on the issue of its own volition, and he did so, on that basis (para.152).

80. He summarised the Appellants' contention as follows –

> "......the Court should of its own motion decline to grant relief on the grounds that, in the light of the Plaintiff's case that they retained beneficial ownership in Boomer's assets and/or were entitled to receive capital returns without reporting them, this was an obvious violation of Canadian revenue laws and the entire structure was a fraud on the Canadian revenue" (para.152).

81. He held that that was not the nature of the scheme and that "it is far from clear, based on the oral evidence of Walsh......that Walsh and Taal either (a) knew that they were breaking the law at the time, or (b) knew of facts which constituted an illegality" (para.154). He noted a "strong public policy interest for the courts in all offshore financial centres concerned to

grant the victims of a proven fraud substantive relief" and he held that this is not a case where the Court of its own motion would be justified in refusing an otherwise deserving plaintiff substantive relief" (para.155).

82. The Appellants contend that, because the Investors had pleaded that they remained the beneficial owners, their claims "ought on a proper analysis to have been barred by virtue of the maxim *ex turpi causa non oritur action.*" (Skeleton Argument para.31), and that the Judge "ought to have found that the scheme was indeed a fraud on the Revenue" (para.32c). Moreover, their knowledge was irrelevant (para.32d) and their action "is based on, arises out of and/or is inextricably linked with a scheme which they sought to put in place for the purpose of avoiding disclosures and payments to the Canada Revenue Agency" (para.34).

83. These submissions are not easy to follow, nor do they sit comfortably alongside other grounds of appeal. The Judge held that what became Boomer's assets were <u>not</u> beneficially owned by the Investors (judgment para.154, not challenged by the Appellants overtly, but perhaps impliedly in para.32c). For the purposes of their defence to the substantive claims, specifically the conspiracy allegation, they rely on the Judge's finding that there was no wrongdoing when the arrangements were first conceived i.e. in 1997 (Skeleton Argument para.81a; judgment para.124).

84. We can express our conclusions shortly. First, the Investors received qualified professional advice throughout, to the effect that the scheme was a form of lawful tax (estate duty) avoidance; they relied upon that advice, and had no reason to believe otherwise. Second, their belief that they retained a beneficial interest in the Shares was in fact wrong, but

that does not disqualify them from succeeding in their claims on the correct basis. Third, they had no intention of deceiving or defrauding the Revenue, nor was that the reason why they entered into the arrangements (thus distinguishing *Regazzoni v. K C Sethia [1944] Ltd.* [1958] AC 301 and later authorities, on which the Appellants rely). Fourth, their claims are not "based upon" the offshore scheme, but upon their pre-scheme ownership of the Shares and the rights which they regained when it was terminated; nor do they "arise out of" or are "inextricably linked" with the scheme, save in a narrow historical sense. In no way are their claims dependent upon it, and in our judgment *Tinsley v. Milligan* [1994] 1 AC 340 is direct authority in their favour.

85. For these reasons, we agree with the Judge that the claims are not barred by any defence of illegality and that this is not a case where the Court would be justified in refusing relief on such grounds. It would indeed be strange if the Court was required to refuse relief in a case where the claimants were the innocent victims of what they understandably describe as a massive fraud, and where they have consistently sought to obtain relief independently of it, ever since it came to their knowledge. In one sense it is the Appellants who rely upon the scheme, by asserting that only Boomer and/or the two IBCs, both creatures of it, might be entitled to sue in respect of their (HBI's) breaches of it.

**Procedural Unfairness**

86. The essence of the Appellants' contention (ground I in the Notice of Appeal but last in their Skeleton Argument) is that the late joinder of Boomer as Third Plaintiff deprived the parties and the Court of a full opportunity to consider the factual and legal issues which arose from it. It

was, however, the inevitable consequence of the Appellants' own failure to challenge the Investors' *locus standi* until the very last moment before the trial. The Judge was clearly entitled to make the Rulings that he did, and we would hold that he was correct to do so. In the result, it has not been necessary for this Court to give separate consideration to Boomer's claim, because the Investors' claim succeeds. One look at the comprehensive judgment shows, first, that the Judge made allowances for the fact that issues relating to Boomer alone might not have been fully canvassed, and secondly, that the introduction of Boomer's claim, made necessary by the Appellant's late challenge, had the effect of widening and complicating the scope of the proceedings enormously. This ground of appeal is rejected

## Conclusion

87. For the reasons given above, we dismiss the appeal against the judgment given in the Investors' favour. There remain a number of issues raised under the heading 'Quantum'. Before considering them, however, we should indicate that, were it necessary to do so, we would uphold the Judge's rulings –

   (i) that HBI is liable to the Investors for giving "knowing assistance" to breaches of fiduciary duty owed by others, namely, by Prucha and/or the Toronto Defendants and/or Coombes to the Investors, and so far as relevant, by Coombes to Boomer; and

   (ii) that Boomer is entitled to succeed against the Defendants, if the Investors do not have *locus standi* to do so.

## Quantum

### (a) Tracing remedy

88.     The Appellants contended that the amount which the Investors are entitled to trace into the sums held by BCB in should be reduced by $835,000 for the reasons set out in paragraphs 156 and following of the judgment. Briefly, Hamilton made a capital payment to Extant of $850,000 on 27 November 2003, but shortly thereafter $835,000 was paid out of the account to Hamilton Properties, an affiliate of Hamilton. Later, Extant and Hamilton Securities, another Hamilton affiliate, accounted to the Investors for that sum, under a Settlement Agreement between them dated 21 September 2005. It was accepted that the two payments were linked, and the Appellants' contention was that the payment out by HBI ($835,000) should be regarded as having been made out of the $850,000 it received. That sum had been repaid to them, and they should not be allowed to recover it again.

89.     However, there was a credit balance in the account even after the payment out. Therefore, applying the principle of *Re Hallet's Estate*, the payment out was not attributable to the monies for which HBI must account to the Investors. The Appellants submitted that applying the usual rule on the facts of the present case is unjust. The Judge disagreed, and so do we. There is no good reason for departing from the usual rule, in favour of HBI, and it might be added that HBI's payment out to Hamilton Properties was a further breach of the duty it owed to the Investors.

90.     Similarly, the Judge was correct to hold that a payment of $100,000 made by HBI to the SVG Financial Authority should be treated as having been

made out of HBI's own funds, notwithstanding that after payment it became the Authority's own property (judgment paras.160-1).

91. The Appellant's third contention in respect of the tracing remedy was that the Judge was wrong to include interest to the date of judgment in the amounts which could be traced. The effect of doing so, of course, is to increase the amounts in respect of which the Investors have priority over HBI's other depositors. They say that any recovery of interest should be limited to "whatever bank interest was in fact earned at BCB on the capital sums into which he held the Plaintiffs could trace" (Notice of Appeal para.16). The Respondents say "Not only is interest awarded on the traceable monies, ordinarily a court would award compound interest", citing *El Ajou v.Dollar Land Holdings plc and another (No.2)* [1995] 2 All ER 213 where interest was included in the amount of the order, apparently without objection, after Robert Walker J. had considered in some details "the general principles that underlie tracing in equity" (p.221e). Nor was it objected to before the Judge in the present case.

92. The Appellants raise a question of principle. "The purpose of interest is essentially compensatory and there is no good reason or logical basis for giving such an award the same status as traceable monies and thereby artificially inflating the amounts ring-fenced as traceable" (Skeleton Argument para.88).

93. However, we note that in his *El Ajou* judgment, Robert Walker J. went on to consider what rate of interest should be awarded, and he did so on a principled basis –

"The rate of interest should mirror, so far as possible, the income which the plaintiff might have earned had the principal sum been paid to him in March 1988" (page 224g).

Thus the purpose of the equitable relief is to put the plaintiff in the same position financially as if the equitably duty had been performed. Thus there is a "good reason and logical basis" for including interest, and this, together with the considerable authority of Robert Walker J.'s judgment, leads us to conclude that the Appellant's contention must be rejected.

### (b) Damages

94. The Judge recorded that there was no dispute as to the numbers claimed and he awarded total damages of US$19,252,003.09 to Mr. Walsh and $953,792.83 to Mr. Taal, subject to a reduction for interest claimed in respect of the period after the date of the Bermuda winding up (para.166). The Plaintiffs were also required to give credit for sums received in respect of their tracing remedies.

95. The Appellants contend that the damages should be further reduced by the amounts of payments which had already been made to the Respondents, as listed in paragraph 15 of the Notice of Appeal. However, it appears from the Respondents' Skeleton Argument that these payments were taken into account in the calculated figures, which were not challenged at the trial. We have not looked into these calculations, and we have no record that the Respondent's contention was disputed at the hearing of the appeal. If this is wrong, the Appellants have liberty to apply (in writing) for the calculations to be reviewed.

### (c) Costs

96.    On 15 April 2008 (the judgment was handed down on 31 March 2008), the Judge awarded the Plaintiffs their costs of the proceedings, on the standard basis, to be taxed if not agreed). The Appellants submit that he was wrong to do so, because their claims were "fundamentally flawed" until the Points of Claim were amended on the first day of the trial. The amendment followed the Defendant's late assertion of the *locus standi* issue. Its significance, for present purposes, is that until that date the Investors claimed on the basis that they had retained beneficial ownership of the Shares (ref. judgment paras.13 and 142).

97.    The award of costs was a matter for the Judge's discretion, and this Court is not entitled to vary it unless he misdirected himself or made a clearly wrong decision. It is an outlandish suggestion that he should have ordered the Plaintiffs to pay the Defendant's costs of the proceedings down to the date of the amendment (Appellant's Skeleton Argument para. 89). In the result, and after a lengthy and detailed examination of all the evidence, documentary as well as oral, the Investors succeeded in their claims. The addition of Boomer as Third Plaintiff enlarged the scope and complexity of the proceedings, and in the event it was unnecessary. That was as the result of the *locus standi* objection which the Defendant took so late in the day, after appearing to concede the Investors' title to sue. We uphold the Judge's order, with which we entirely agree.

## The Respondent's Counter Notice

98.    The Respondents raised four issues –

(1) The Dishonesty of Coombes.

We have considered this above.

(2) Knowing receipt.

> The Judge held that this was not pleaded (para.138) and refused to entertain it. It was not separately argued, and it seems that it is unnecessary for us to consider it further.

(3) Tracing Remedy: Alternative approach to lowest intermediate balance

> It was contended that the Judge ought to have held that the entire amount in the name of HBI at BCB was charged with the amounts that could be traced by the Respondents, and that those amounts totalled $14,142,073.15. We have no record that this was argued before us, and again it seems unnecessary for us to consider it further.

[If we are wrong in thinking that items (2) and (3)] above were not pursued, the Respondents have liberty to apply, in writing, to this Court.

(4) Costs – Priority

(i)     At a further hearing on 15 May 2008, the Judge was asked to rule that the costs awarded against the company in liquidation should have priority in the liquidation over pre-liquidation creditors. But it appeared that the assets within the jurisdiction of the Bermuda Court are insufficient to respond to the Costs order, and the costs will have to be paid out of SVG assets (Ruling dated 21 May 2008, para.1).

(ii)    There was an issue as to whether the Bermuda Court has jurisdiction to make an order as to priorities in the SVG liquidation, but the Judge ruled that, even if such jurisdiction exists, no such order should be made in the present case. He rightly observed that the order would have no force, in any

event, unless it was recognised and enforced by the SVG Court, and that "on balance it would be excessive for this Court to make any order with respect to priorities in a foreign liquidation save at the request of the foreign court"(para.4). He could see no basis for concluding that the SVG Court, by permitting the Plaintiffs to pursue their claims in Bermuda, had impliedly authorised the Bermuda Court to make the order sought.

(iii) He did, however, anticipate a request for a ruling by the SVG Court, and indicated that, if requested, he "would order that the post-liquidation litigation costs awarded in favour of the Plaintiffs should be paid on a priority basis ranking equally with all other liquidation expenses, in accordance with what appears to be the usual rule" (para.6). He added a footnote to the effect that he could see no specific basis for awarding that the costs should have priority over all other liquidation expenses, though "seemingly" such an order might be made.

(iv) The Respondents by their Counter Notice contended that the Judge not only had jurisdiction to make the order, but he ought to have done so. Moreover, the costs should have priority over the costs and expenses of the liquidators, as well as the claims of general creditors (para.5.2).

(v) They rely upon authorities including the judgment of Lawrence Collins LJ in *Dolphin Quays Developments Ltd. v. Mills* [2008] EWCA Civ.385 and they invite the Court "to include a provision for costs in these terms in order to avoid

further unnecessary litigation and further depletion in the assets of HBI" (Skeleton Argument para.210).

(vi)   The Appellants accept that the Judge had a broad discretion with regard to costs, and that "had he been dealing with questions of priority in the Bermuda jurisdiction, he would have had to take into account the authorities cited" by the Respondents. However, the Judge was correct to hold that he should not make an order as to priorities, except at the request of the foreign Court (Written Submissions para.21).

(vii)  We hold that the Judge struck a correct balance in holding that he should not make an order regarding the priority of assets in the SVG liquidation. It was also sensible and realistic for him to indicate what the position might be, if a ruling were requested by the SVG Court. But we go no further than to say that, given the authorities relied upon by the Respondents, and the Appellants' muted response to them, quoted above, it seems likely that the Bermuda Court would award the costs priority over the costs and expenses of the liquidators. Our hope is that no further costs will be incurred in arguing this priority issue in any court.

## Conclusion

99.   For the reasons given above, the Appeal is dismissed. The issues raised by the Respondents' Counter Notice are resolved in their favour as regards the 'Dishonesty of Coombes'. These conclusions, so far as we are aware, do not require any alteration to the terms of the Judgment ordered by Kawaley J.

100. The Appellants attacked the judgment on practically every front. The attack has failed. Both parties have liberty to apply with regard to their costs of the appeal. Our provisional view, subject to any such application, is that the Appeal should be dismissed, with costs.

_____
Evans, JA

_____
Zacca, President

_____
Nazareth, JA

**Tab 9**


[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 **(Cite as: [1985] 2 Lloyd's Rep. 313)**

### Tai Hing Cotton Mill Ltd v Liu Chong Hing Bank Ltd (No.1)

The Judicial Committee of the Privy Council

Lord Scarman, Lord Roskill, Lord Brandon of Oakbrook, Lord Brightman, and Lord Templeman

Mar. 19, 20, 21, 25, 26, 27 and 28, 1985; July 3, 1985

Banking — Duty of care — Forged cheques — Extent of duty owed by customer to bank — True effect of bank's rules for current accounts — Whether bank entitled to debit forged cheques to customers' account.

The plaintiff was a modern sized and reasonably successful textile company which had been in business in Hong Kong since 1957. In September, 1957, the plaintiff opened an account with the third defendant, Chekiang First Bank Ltd. Cheques were authorized to be signed by the managing director, Mr. Chen, or by any two of four nominated signatories.

In November, 1961, the plaintiffs opened another account with the second defendant, the Bank of Tokyo Ltd. There was a similar arrangement for the drawing of cheques. In November, 1962, a third account was opened with the first defendant, the Liu Chong Hing Bank Ltd. again with similar provisions for the signing of cheques.

The three banks imposed express conditions upon the operation of current accounts, one of which was that the customer was to notify the bank without delay if there was any error in the monthly statement which the bank sent to the plaintiff.

The plaintiffs' banking arrangements operated smoothly until 1972 when they took into employment the fourth defendant Mr. Leung. He was given responsibility for the books of two divisions of the

company, divisions whose accounts were kept to a greater extent with the third and second defendants. Mr. Leung either obtained cheques from Mr. Chen by way of forged documents or got Mr. Chen to sign cheques on which the words "or bearer" had not been deleted. Mr. Leung then paid these cheques into accounts which he had opened. In 1977 Mr. Leung's superior retired and Mr. Leung took over similar responsibility with regard to the first defendants. By this time Mr. Leung was simply forging Mr. Chen's signature.**314**

In May, 1978, Mr. Leung's dishonesty was exposed. He had made away with $7,000,000. The claim brought by the plaintiff was in respect of the forged cheques which amounted to $5,500,000. The main issue for decision was how far did a customer who maintained a current account with a bank owe a duty of care to the bank with regard to the operation of the account. Was that duty limited to the circumstance not to draw a cheque in such a manner as might facilitate fraud by a third party; or was it a more general duty to take such precautions as a reasonable customer in his position would take to prevent forged cheques being presented to his bank for payment (the wider duty); or was it at least to take such steps to check his monthly statement as a reasonable customer in his position would take to enable him to notify the bank of any items debited therefrom which were not or might not have been authorized by him (the narrower duty).

— — — by — — — Mantell, J. — — — , that there was nothing in principal to support the existence of both duties but if there were such duties then on the particular facts of this case the plaintiff was in breach of both duties in relation to all three banks.

The plaintiff appealed and the defendants cross-appealed.

— — — by Court of Appeal of Hong Kong ( — — — Cons — — — and — — — Fuad, JJ.A. and — — — Hunter, J. — — — ), that — — (1)

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 **(Cite as: [1985] 2 Lloyd's Rep. 313)**

the appeal would be dismissed and the cross-appeal allowed.

On appeal by the plaintiffs:

by P.C. (Lord Scarman, Lord Roskill, Lord Brandon of Oakbrook, Lord Brightman and Lord Templeman), that     (1)

the relationship between banker and customer was contractual and its incidents, in the absence of express agreement, were such as must be implied into the contract because they could be seen to be obviously necessary (     *see* p. 320, cols. 1 and 2);

— London Joint Stock Bank Ltd. v. Macmillan and Arthur, [1918] A.C. 777, considered. (2)

the business of banking was the business not of the customer but of the bank; they offered a service which was to honour their customer's cheques when drawn upon an account in credit or within an agreed overdraft limit; if they paid out on a cheque which was not his, they were acting outside their mandate and could not plead his authority in justification of their debit to his account; this was a risk of the service which it was their business to offer; a customer must obviously take care in the way he drew his cheques and must obviously warn his bank as soon as he know that a forger was operating the account; the submission that a wider duty must be implied into the contract would therefore be rejected (     *see* p. 321, cols. 1 and 2; p. 322, col. 1 ); (3)

in the absence of express terms to the contrary the customer's duty was in relation to forged cheques, to exercise due care in drawing his cheque so as not to facilitate fraud or forgery and he must inform his bank at once of any unauthorized cheques of which he became aware; if no wider duty could be implied into the banking contract in the absence of express terms to that effect, the de-

fendants could not rely on the law to provide them with greater protection than that for which they had contracted (     *see* p. 322, col. 1 ); (4)

the terms of business were contractual in effect but in no case did they constitute "conclusive evidence clauses"; their terms were not such as to bring home to the customer either the intended importance of the inspection he was being expressly or impliedly invited to make or that they were intended to have conclusive effect against him if he raised no query or failed to raise a query in time upon his bank statements; clear and unambiguous provision was needed if the banks were to introduce into the contract such a binding obligation (     *see* p. 323, cols. 1 and 2 ); (5)

since the plaintiff was not in breach of any duty owed by it to the bank it was not possible to establish an estoppel arising from mere silence, omission or failure to act (     *see* p. 323, col. 2; p. 324, col. 1 ); (6)

the trial Judge was right in rejecting the submission that because the sums wrongly detailed were in non-interest bearing accounts interest was not recoverable; the plaintiff had lost the opportunity of placing the money at interest as a result of the unauthorized debits made by the banks to the respective current accounts; interest was therefore payable from May 15, 1978, the date the plaintiffs issued their writ; the judgment of the Court of Appeal would be reversed and that of the trial Judge set aside in part and there would be judgment entered for the plaintiff (     *see* p. 324, cols. 1 and 2 ).

The following cases were referred to in the judgment of the Board:

Anns v. Merton London Borough Council, (H.L.) [1978] A.C. 728 ;
Asien-Pazifik Merchant Finance Ltd. v. Shanghai Commercial Bank Ltd., [1982] H.K.L.R. 273 ;

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 **(Cite as: [1985] 2 Lloyd's Rep. 313)**

Commonwealth Trading Bank of Australia v. Sydney Wide Stores Pty. Ltd., [1981] 55 A.L.J.R. 574              ;

Greenwood v. Martins Bank Ltd., (H.L.) [1933] A.C. 51              ;

Hart v. O'Connor, (P.C.) [1985] 3 W.L.R. 214              ;

Joachimson v. Swiss Bank Corporation, (C.A.) [1921] 3 K.B. 110              ;

Junior Books Ltd. v. Veitchi Co. Ltd., (H.L.) [1983] A.C. 520              ;

Karak Rubber Co. Ltd. v. Burden (No. 2), [1972] 1 W.L.R. 602              ;

Kepitigalla Rubber Estate Ltd. v. the National Bank of India Ltd., [1909] 2 K.B. 1010              ;

**\*315** Lam Yin-Fei Trading AS Wah Shing Garment Manufacturing Co. and Another v. Hang Lung Bank Ltd., [1982] H.K.L.R. 215              ;

Lister v. Romford Ice and Cold Storage Co. Ltd., [1956] 2 Lloyd's Rep. 505; [1957] A.C. 555              ;

Liverpool City Council v. Irwin, (H.L.) [1977] A.C. 239              ;

London Joint Stock Bank Ltd. v. Macmillan and Arthur, (H.L.) [1918] A.C. 777              ;

National Bank of New Zealand v. Walpole and Patterson Ltd., [1975] 2 N.Z.L.R. 7              ;

Selangor United Rubber Estates Ltd. v. Cradock (No. 3), [1968] 1 W.L.R. 1555              ;

Wagon Mound, The (P.C.) [1961] 1 Lloyd's Rep. 1; [1961] A.C. 728              ;

Wealden Woodlands (Kent) Ltd. v. National Westminster Bank Ltd., Mar. 11, 1983              unreported;

Young v. Grote, (1827) 4 Bing. 253              .

This was an appeal by the plaintiff Tai Hing Cotton Mill Ltd. from the decision of the Court of Appeal of Hong Kong whereby its action to recover from the defendants, Liu Chong Hing Bank Ltd., the Bank of Tokyo Ltd. and Chekiang First Bank Ltd., sums of money alleged to have been wrongfully debited against its current account with each, was dismissed.Sir Patrick Neill, Q.C.              ,              Mr. Nich-

olas Bratza              and              Mr. Robert Tang              (of the Hong Kong Bar) (instructed by              Messrs. Kingsford Dorman              ) for the plaintiff;              Mr. Andrew Morritt, Q.C.              and              Mr. Oswald Cheung, Q.C.              (of the Hong Kong Bar) and              Mr. Andrew Li              (of the Hong Kong Bar) (instructed by              Messrs. Linklaters & Paines              ) for the Liu Chong Hing Bank Ltd.;              Mr. Neville Thomas, Q.C.              and              Mr. John Jarvis              (instructed by              Messrs. Cameron Markby              ) for the Bank of Tokyo Ltd.;              Mr. Peter Horsfield, Q.C.              and              Doreen Le Pichon              (of the English and Hong Kong Bars) (instructed by              Messrs. Maxwell Batley & Co.              ) for the Chekiang First Bank Ltd.

The further facts are stated in the judgment of the Board which was delivered by Lord Scarman.

Judgment was reserved.

Wednesday, July 3, 1985JUDGMENTLord SCARMAN:

      This is an appeal by a company against a decision of the Court of Appeal in Hong Kong whereby its action to recover from three banks sums of money alleged to have been wrongfully debited against its current account with each was dismissed (              See [1984] 1 Lloyd's Rep. 555              ). The appeal raises a question of general principle in the law governing the relationship of banker and customer. Additionally, the appeal calls for consideration of a number of questions arising from the particular circumstances of the appellant company's business relationship with each of the three respondent banks.

The company was a customer of the banks, and maintained with each of them a current account. The banks honoured by payment on presentation some 300 cheques totalling approximately H.K.$5.5 million which on their face appeared to have been drawn by the company and to bear the signature of Mr. Chen, the company's managing director who was one of the company's authorized signatories to

Copr. © West 2009 No Claim to Orig. Govt. Works

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 (Cite as: [1985] 2 Lloyd's Rep. 313)

its cheques. The banks in each instance debited the company's current account with the amount of the cheque. These cheques, however, were not the company's cheques. They were forgeries. On each the signature of Mr. Chen had been forged by an accounts clerk employed by the company, Leung Wing Ling. The central issue in the appeal is upon whom the loss arising from Leung's forgeries is to fall, the company or the banks. The question of general principle is as to the nature and extent of the duty of care owed by a customer to his bank in the operation of a current account.

Very briefly, the company's submission is that, unless banker and customer agree otherwise, the customer's duty is limited to two sets of circumstances. First, the customer must exercise reasonable care in drawing his cheque. If a breach of this duty causes the bank to pay on the cheque, the customer bears the loss. Otherwise, if the signature on the cheque is forged, it is not his cheque and the bank has no authority to pay it or to debit it to the customer's account. The loss falls on the bank. Secondly, the customer must notify the banks of any forgery of which the customer becomes aware so as to enable the bank to take adequate precautions against future loss.

Put with equal brevity, the submission of the respondent banks on the general question is that the relationship of banker and customer gives rise in contract and in tort to a duty owed by the customer to the bank to exercise such precautions as a reasonable customer in his position would take to prevent forged cheques being presented to the bank ("the wider duty"); or, if that be too wide, at the very least to check his monthly (or other periodic) bank statements so as to be able to notify the bank of any items **\*316** which were not, or may not have been, authorized by him ("the narrower duty"). Both the appellant and the respondent banks accept that Hong Kong law on the point is the same as English law: but they differ fundamentally as to what the law of England is.

If the banks fail on the general point of principle,

they have submissions to make which arise from the particular circumstances of their respective relationships with the company. They rely on their banking contracts with the company and, if they cannot escape by contract, they seek protection by way of estoppel, submitting that the company is estopped by its own conduct from asserting that the various current accounts were incorrectly debited.

Finally, if the company succeeds in obtaining an order for the repayment of any of the sums debited to its account by any of the banks, there is an issue as to whether the bank is liable to pay interest on the sums so debited.The facts

The appellant company, Tai Hing Cotton Mill Ltd., is a textile manufacturer carrying on business in Hong Kong. The managing director is Mr. Chen who came from Shanghai and started the company in Hong Kong in 1957. The company was described by the trial Judge, Mr. Justice Mantell, as medium-sized and reasonably successful. It showed a profit on its trading for every year but one between 1957 and 1978, the year in which the forgeries were exposed.

The company conducts its business in divisions. During the period 1957 to 1978 the company included five manufacturing divisions. The appeal concerns three of them: — the garment division, which used the company's current account with the Dah Sing Bank (Dah Sing not being a party to the litigation) and later the current account with the Chekiang First Bank ("Chekiang"), the third respondent; the texturizing division, which used the current account with the Bank of Tokyo ("Tokyo"), the second respondent; and the spinning and weaving divisions which used the current account with the Liu Chong Hing Bank ("Liu Chong Hing"), the first respondent.

Towards the end of 1972 the company took into its employment Leung Wing Ling as an accounts clerk. Leung was dishonest: but he was trusted until 1978 when he was exposed. At first he was given responsibility for the books of account of the gar-

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 **(Cite as: [1985] 2 Lloyd's Rep. 313)**

ment and texturizing divisions. Almost at once he began to steal from the company. He opened bank accounts in names similar to those of real suppliers to the company and persuaded Mr. Chen to sign cheques in their favour by producing to him forged documents as evidence of transactions with these fictitious suppliers. The trial Judge, Mr. Justice Mantell, records that between Dec. 4, 1972 and Jan. 31, 1974, Leung stole H.K.$317,068.04 from the company's bank account with Dah Sing. He stole also from the company's accounts with Tokyo and Chekiang during the same period and by the same method.

There came a time when he adopted another, and he may have thought a safer, method of stealing his employer's money, that of forging the signature of Mr. Chen on cheques purporting to be drawn by the company. It is with this method of stealing, and these forged cheques, that the appeal is concerned. At first, he passed forged cheques through the company's accounts with Tokyo and Chekiang. In November, 1977, Leung's superior, Mr. Wang, retired through ill-health and Leung assumed the additional responsibility of managing the current account with Liu Chong Hing used by the spinning and weaving division. He immediately began to draw forged cheques for substantial sums upon this account.

Between 1972 and 1978 Leung made away with some H.K.$7 million by fraud and forgery. The forged cheques accounted for some H.K.$5.5 million of the loss. The trial Judge summarized his defalcations in a few simple words:

. . . the defalcations remained undetected for over five years. They involved approximately 500 cheques of which about 300 were forged. The total face value of the cheques was approximately H.K.$7 million. The trial Judge then asked himself this question: how was Leung able to get away with it for so long? The Judge's answer to his own question is now accepted. Leung was trusted. He was in a position to manipulate the accounts for which he was responsible; and the company's sys-

tem of internal control was ill-adapted either to prevent fraud or to find out about it afterwards. There was no division of function, Leung being responsible for, and in almost sole control of, the receipts and payments made through the accounts for which he was responsible; and there was substantially no supervision. Specifically, the Judge found that there was a failure to check or supervise Leung's reconciliation of the monthly bank statements with the cash books of the company. Mr. Wang, until ill health forced him to retire in November, 1977, was supposed to undertake the task of checking and supervising but did not. After Wang retired, Leung assumed sole control of the accounts for which he was responsible. The Judge summed up his view of the company's **\*317** system of internal financial control as unsound and, from the point of view of preventing or detecting fraud, inadequate.

The frauds were uncovered in May, 1978, when a newly appointed accountant entered upon the simple, though tedious, task which had not previously been undertaken, of reconciling bank statements with the company's account books. He realized almost at once that something was seriously wrong. He reported to Mr. Chen. Leung was interrogated and admitted the frauds.The litigation

The company now acted with some alacrity. On May 15, 1978, it issued a writ against the three banks, Leung, and his wife Wance Cheng in which it claimed repayment of sums totalling approximately H.K.$7 million. A modest recovery has been obtained from the wife by a negotiated settlement. Leung has fled to Taiwan, leaving the company and the banks to fight out who of the innocent victims of his crimes are to bear the financial loss. The litigation is, so far as it concerns the banks, limited to the cheques bearing the forged signature of Mr. Chen, the total of which is of the order of H.K.$5.5 million.

The trial Judge, Mr. Justice Mantell, basing himself on the fundamental premise that a forged cheque is no mandate to pay and that, prima facie, the cus-

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 **(Cite as: [1985] 2 Lloyd's Rep. 313)**

tomer is entitled to be relieved of the loss arising from a bank's payment upon a forged cheque, held that the banks must establish affirmatively that in this case they were entitled to debit their customer's current account with the amounts of the forged cheques. The Judge negatived a defence that the company was vicariously liable for Leung's fraud: and that point is no longer pursued.

On the question of general principle the Judge accepted the company's submission and rejected both of the two alternative formulations of duty put forward by the banks. He held that English law had been settled as submitted by the company as long ago as 1918 by the decision of the House of Lords in London Joint Stock Bank Ltd. v. Macmillan and Arthur, [1918] A.C. 777 and that it was not for him at first instance to reject law ascertained and settled for so long a time. He considered a submission made on behalf of the banks that, even if their formulation of the customer's duty could not be implied into the banking contract, it could nevertheless arise in tort and held that, where parties are in a contractual relationship, their rights and duties as between themselves cannot be more extensive in tort than they are in contract.

Turning to the particular defences raised by the banks, he rejected the submissions of the respondent banks that their terms of business, which he accepted were contractual and to which their Lordships will refer as "the banking contracts", should be construed as ousting the common law rule which he had held to be as submitted by the company.

The Judge then turned to the defence of estoppel raised by each bank. This defence had been put to him in two ways: first, that the company was estopped by its negligence in the management of its bank accounts from asserting that the accounts had been wrongly debited; and secondly, that the company was estopped by a representation to be implied from its course of conduct that the periodic bank statements were correct. He rejected estoppel by negligence but held that in the case of each bank the company, by failing to challenge the debits

shown on the bank statements, had represented to each bank that the debits had been correctly made. He held that Tokyo and Chekiang had acted in reliance upon the representations so made by their willingness to continue operating their respective accounts and to expose themselves to the risk of paying out on forged cheques. He did not find the same prejudice had been suffered by Liu Chong Hing as it only became exposed to the fraud in November, 1977, the first representation to it not being made until the company's failure to query the December, 1977, statement of account. The Judge found that the chance of recovery from Leung had not been substantially diminished during the period (December, 1977 to May, 1978) during which it could be said that the estoppel was operative.

The Judge accordingly gave the company judgment against Liu Chong Hing but dismissed its claims against the other two banks. The company appealed, and Liu Chong Hing cross-appealed. The Court of Appeal differed from the trial Judge on the general question. Cons, J.A. and Mr. Justice Hunter delivered judgments, with which Fuad, J.A. agreed, to the effect that the banker/customer relationship is such as to give rise to a general duty of care in the operation of its banking accounts. They held that the company was in breach of the duty which they held it owed to the banks and must bear the loss. The duty they held arose in tort as well as in contract. The Judges were not, however, agreed as to the true effect of the banking contracts. Cons, J.A. construed the contracts as meaning that if the customer did not object within the time specified in the contracts the bank statements were "final" as between customer and banks; in other words, that the statements became conclusive evidence of the correctness of the debits recorded therein.   **\*318**

Mr. Justice Hunter, with whom Fuad, J.A. agreed, held that none of the banking contracts could be construed as including a term requiring the monthly statements to be treated after a period of time or at all as conclusive evidence of the state of the account. All three Judges, however, agreed that the company was estopped by its own negligence

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 (Cite as: [1985] 2 Lloyd's Rep. 313)

from challenging the correctness of the bank statements.

The banks, therefore, emerged from the Court of Appeal with total success. The company suffered total defeat, and now appeals to Her Majesty in Council. The company submits that, save in respect of the estoppel point, the judgment of the trial Judge was correct in law and, save on estoppel, should be restored. The respondent banks seek to hold the judgment which they obtained in the Court of Appeal for the reasons, which they submit are sound, developed in the judgments of Cons, J.A. and Mr. Justice Hunter. The question of general principle

The question can be framed in two ways. If put in terms of the law's development, it is whether two House of Lords' decisions, one in 1918 and the other in 1933, represent the existing law. If put in terms of principle, the question is whether English law recognizes today any duty of care owed by the customer to his bank in the operation of a current account beyond, first, a duty to refrain from drawing a cheque in such a manner as may facilitate fraud or forgery, and, secondly, a duty to inform the bank of any forgery of a cheque purportedly drawn on the account as soon as he, the customer, becomes aware of it. The first duty was clearly enunciated by the House of Lords in London Joint Stock Bank Ltd. v. Macmillan, sup., and the second was laid down, also by the House of Lords, in Greenwood v. Martins Bank Ltd., [1933] A.C. 51.

The respondent banks accept, of course, that both duties exist and have been recognized for many years to be part of English law. Their case is that English law recognizes today, even if it did not in 1918 or 1933, an altogether wider duty of care. This is, they submit, a duty upon the customer to take reasonable precautions in the management of his business with the bank to prevent forged cheques being presented to it for payment. Further, and whether or not they establish the existence of this wider duty, they contend that the customer owes a duty to take such steps to check his periodic (in this case, monthly) bank statements as a reasonable customer in his position would take to enable him to notify the bank of any debit items in the account which he has not authorized. They submit that, given the relationship of banker and customer and the practice of rendering periodic bank statements, the two duties for which they contend are "necessary incidents" of the relationship. The source of obligation, they say, is to be found both in the contract law as an implied term of the banking contract and in the tort law as a civil obligation arising from the relationship of banker and customer.

They accept that the reasoning to be found in Macmillan's case appears at first sight to negative the existence of both the duties for which they contend: but they offer the explanation that the law of contract and the tort law were significantly different in 1918 from the state of the relevant modern law. In particular, they point to developments in the law relating to the circumstances in which the Courts will now imply a term into a contract, and to the changes in tort law both as to the range of relationships giving rise to liability in tort and as to the circumstances in which loss or damage will be held to result from breach of a duty of care. Their implied term point they base on the decision of the House of Lords in Liverpool City Council v. Irwin, [1977] A.C. 239; and their two tort points on decisions of the House in The Wagon Mound, [1961] 1 Lloyd's Rep. 1; [1961] A.C. 388 and Anns v. Merton London Borough Council, [1978] A.C. 728.

The Court of Appeal accepted the respondent banks' submissions. Cons, J.A., was led "after a great deal of hesitation" to conclude:

. . . that in the world in which we live today it is a necessary condition of the relation of the banker and customer that the customer should take reasonable care to see that in the operation of the account the bank is not injured. He, therefore, held that, in the absence of express agreement to the

Copr. © West 2009 No Claim to Orig. Govt. Works

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 (Cite as: [1985] 2 Lloyd's Rep. 313)

contrary, the duty would be implied into the banking contract as a necessary incident of the relationship between customer and banker. Turning to tort, he based himself on the now famous passage in the speech of Lord Wilberforce in Anns v. Merton London Borough Council, sup., at p. 751:

Through the trilogy of cases in this House — Donoghue v. Stevenson, [1932] A.C. 562, Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd., [1964] A.C. 465, and Dorset Yacht Co. Ltd. v. Home Office, [1970] A.C. 1004, the position has now been reached that in order to establish that a duty of care arises in a particular situation, it is not necessary to bring the facts of that situation within those of previous situations in which a duty of care has been held to exist. Rather the question has to be approached in two stages. First one has to ask whether, as between the alleged wrongdoer and the person who has suffered damage there *319 is a sufficient relationship of proximity or neighbourhood such that, in the reasonable contemplation of the former, carelessness on his part may be likely to cause damage to the latter — in which case a prima facie duty of care arises. Secondly, if the first question is answered affirmatively, it is necessary to consider whether there are any considerations which ought to negative, or to reduce or limit the scope of the duty or the class of person to whom it is owed or the damages to which a breach of it may give rise: see Dorset Yacht case [1970] A.C. 1004, per Lord Reid at p. 1027. He held that in the relationship of banker and customer there was a sufficient degree of proximity to give rise to the duty for which the banks contend.

Mr. Justice Hunter, in the course of an elaborate and learned judgment, drew heavily on the law of tort in concluding that the duty contended for by the banks exists in the modern law. He expressed the opinion that the source of the obligation

was not so important as the recognition of its existence and scope: and he referred to a comment by Lord Roskill in Junior Books Ltd v. Veitchi Co. Ltd., [1983] A.C. 520, at p. 545, that the issue is not "whether the proper remedy should lie in contract or in tort" but depends upon the answer to the two questions posed by Lord Wilberforce in the passage already quoted from his speech in Anns' case.

If the Court of Appeal was correct in law to rule as it did, the appeal must be dismissed. For there is no challenge to the finding of the trial Judge that, if either of the two duties for which the banks contend exist, the appellant company was in breach of its obligations to the banks.

First, it is necessary to determine what Macmillan's case decided. Upon this point their Lordships are in no doubt. The House held that the customer owes his bank a duty in drawing a cheque to take reasonable and ordinary precautions against forgery.

The duty . . . is to draw the cheques with reasonable care to prevent forgery, and if, owing to neglect of this duty, forgery takes place, the customer is liable to the bank for the loss . . . [per Lord Finlay, L.C. at p. 793]. In so formulating the duty the House excluded as a necessary incident of the banker-customer relationship any wider duty, though of course it is always open to a banker to refuse to do business save upon express terms including such a duty. Lord Finlay, L.C., expressly excluded any such duty, saying at p. 795:

Of course the negligence must be in the transaction itself, that is, in the manner in which the cheque is drawn. It would be no defence to the banker, if the forgery had been that of a clerk of a customer, that the latter had taken the clerk into his service without sufficient inquiry as to his character. And the House approved the judgment of Mr. Justice Bray in Kepitigalla Rubber Estate Ltd. v. the National Bank of India Ltd., [1909] 2 K.B. 1010. In that case the learned

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 (**Cite as: [1985] 2 Lloyd's Rep. 313**)

Judge held that, while it is the duty of a customer in issuing his mandates (i.e. his cheques) to his bank to take reasonable care not to mislead the bank, there is no duty on the part of the customer to take precautions in the general course of carrying on his business to prevent forgeries on the part of his servants. Put in terms of the banks' submission in this case, Mr. Justice Bray negatived the existence of the two duties for which the respondent banks contend, and the House of Lords in Macmillan's case agreed with him.

So far as English law is concerned, Macmillan's case has until now been accepted as a binding precedent on the question under consideration, though it would be true to say that leading writers on banking law, notably Sir John Paget, and many of the banking community have never extended it a very warm welcome. The trial Judge, correctly in their Lordships' view, held himself bound to follow the decision. He noted that it had been followed as recently as Mar. 11, 1983, by Mr. Justice McNeill at first instance in the unreported case of Wealden Woodlands (Kent) Ltd. v. National Westminster Bank Ltd., that it had been cited with approval in the High Court of Australia, and followed by the Court of Appeal in New Zealand: Commonwealth Trading Bank of Australia v. Sydney Wide Stores Pty. Ltd., [1981] 55 A.L.J.R. 574 ; National Bank of New Zealand Ltd. v. Walpole and Patterson Ltd., [1975] 2 N.Z.L.R. 7 . In the New Zealand case Mr. Justice Richmond, who delivered the judgment of the Court, summarized the law as settled in 1918 in succinct terms on p. 19:

The Kepitigalla case was cited with approval by Lord Finlay, L.C., in the Macmillan case and also by Viscount Haldane in the passage which I have already cited. I know of no sufficient reason why we should not retain, in New Zealand, the principle so clearly laid down by the House of Lords that the only type of negligence on the part of a customer which will remove from the banker the

risk of paying on a forged cheque is negligence in or immediately connected with the drawing of the cheque itself. **\*320** It appears also that the Courts of Hong Kong took the same view of the law prior to the decision of the Court of Appeal now under review: Asien-Pazifik Merchant Finance Ltd. v. Shanghai Commercial Bank Ltd., [1982] H.K.L.R. 273 , and Lam Yin-Fei Trading AS Wah Shing Garment Manufacturing Co. and Another v. Hang Lung Bank Ltd., [1982] H.K.L.R. 215 .

The respondent banks seek to attack the authority of the Macmillan ruling in a number of ways. Their Lordships take first their least plausible attack: the submission that the decision can be reviewed because it proceeded on a now outmoded and rejected view of the nature of the causal link which the law requires to be proved between breach of duty and damage if a plaintiff is to recover damages in an action based on the tort of negligence. It is, of course, true that Macmillan's case was decided before the House of Lords in The Wagon Mound , sup., substituted "foreseeability" for "direct cause" as the test of liability in such cases. But, in their Lordships' view, it is a travesty of the House's reasoning in Macmillan's case to suggest that causation in the law of tort had anything to do with their limiting the duty of care of the customer to the transaction of drawing the cheque. Indeed their Lordships read the speeches in Macmillan's case as proceeding upon the basis, which their Lordships have no doubt is correct, that the relationship between banker and customer is contractual and that its incidents, in the absence of express agreement, are such as must be implied into the contract because they can be seen to be obviously necessary .

Their Lordships turn now to the weightier submissions advanced by the banks on the general question. There are two: that a wider duty (a term which in this context covers both of the duties for which the respondent banks contend) must be implied into

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 **(Cite as: [1985] 2 Lloyd's Rep. 313)**

the contract, alternatively that such a duty arises in tort from the relationship between banker and customer.Implied term

Their Lordships agree with Cons, J.A., that the test of implication is necessity. As Lord Fraser of Tullybelton put it in Liverpool City Council v. Irwin , sup., at p. 254—

. . . such obligation should be read into the contract as the nature of the contract implicitly requires, no more, no less: a test of necessity. Cons, J.A., went on to quote an observation by Lord Salmon in the Liverpool case to the effect that the term sought to be implied must be one without which the whole transaction would become "futile, inefficacious, and absurd" (p. 262).

Their Lordships accept as correct the approach adopted by Cons, J.A. Their Lordships prefer it to that suggested by Mr. Justice Hunter which was to ask the question:—does the law impose the term? Implication is the way in which necessary incidents come to be recognized in the absence of express agreement in a contractual relationship. Imposition is apt to describe a duty arising in tort, but inept to describe the necessary incident arising from a contractual relationship.

Their Lordships, however, part company with Cons, J.A., in his conclusion (reached only after great hesitation, he said) that it is necessary to imply into the contract between banker and customer a wider duty than that formulated in Macmillan's case. Macmillan's case itself decisively illustrates that it is not a *necessary* incident of the banker-customer relationship that the customer should owe his banker the wider duty of care.

The relationship between banker and customer is a matter of contract. The classic, though not necessarily exhaustive, analysis of the incidents of the contract is to be found in the judgment of Lord Justice Atkin in Joachimson v. Swiss Bank Corporation,

[1921] 3 K.B. 110          at p. 127:

I think that there is only one contract made between the bank and its customer. The terms of that contract involve obligations on both sides and require careful statement. They appear upon consideration to include the following provisions. The bank undertakes to receive money and to collect bills for its customer's account. The proceeds so received are not to be held in trust for the customer, but the bank borrows the proceeds and undertakes to repay them. The promise to repay is to repay at the branch of the bank where the account is kept, and during banking hours. It includes a promise to repay any part of the amount due against the written order of the customer addressed to the bank at the branch, and as such written orders may be outstanding in the ordinary course of business for two or three days, it is a term of the contract that the bank will not cease to do business with the customer except upon reasonable notice. The customer on his part undertakes to exercise reasonable care in executing his written orders so as not to mislead the bank or to facilitate forgery. Lord Justice Atkin clearly felt no difficulty in analysing the relationship upon the basis of the limited duty enunciated in Macmillan's case. **\*321** And in Macmillan's case itself the protracted discussion, which is now only of historical interest, as to the true ratio decidendi of Young v. Grote, (1827) 4 Bing. 253 reveals vividly that the House was aware of the possibility of a wider duty but rejected it.

The argument for the banks is, when analysed, no more than that the obligations of care placed upon banks in the management of a customer's account which the Courts have recognized have become with the development of banking business so burdensome that they should be met by a reciprocal increase of responsibility imposed upon the customer: and they cite Selangor United Rubber Estates Ltd. v. Cradock (No. 3), [1968] 1 W.L.R. 1555 (Mr. Justice Ungoed-Thomas) and Karak Rubber Co. Ltd. v. Burden (No.

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 (Cite as: [1985] 2 Lloyd's Rep. 313)

2), [1972] 1 W.L.R. 602 (Mr. Justice Brightman). One can fully understand the comment of Cons, J.A., that the banks must today look for protection. So be it. They can increase the severity of their terms of business, and they can use their influence, as they have in the past, to seek to persuade the legislature that they should be granted by statute further protection. But it does not follow that because they may need protection as their business expands the necessary incidents of their relationship with their customer must also change. The business of banking is the business not of the customer but of the bank. They offer a service, which is to honour their customer's cheques when drawn upon an account in credit or within an agreed overdraft limit. If they pay out upon cheques which are not his, they are acting outside their mandate and cannot plead his authority in justification of their debit to his account. This is a risk of the service which it is their business to offer. The limits set to the risk in the Macmillan and Greenwood cases can be seen to be plainly necessary incidents of the relationship. Offered such a service, a customer must obviously take care in the way he draws his cheque, and must obviously warn his bank as soon as he knows that a forger is operating the account. Counsel for the banks asked rhetorically why, once a duty of care was recognized, should it stop at the Macmillan and Greenwood limits. They submitted that there was no rational stopping place short of the wider duty for which they contended. With very great respect to the ingenious argument addressed to the Board their Lordships find in certain observations of Mr. Justice Bray in Kepitigalla's case a convincing statement of the formidable difficulties in the way of this submission. Mr. Justice Bray said, at p. 1025:

I think Mr. Scrutton's contention equally fails when it is considered apart from authority. It amounts to a contention on the part of the bank that its customers impliedly agreed to take precautions in the general course of carrying on their business to prevent forgeries on the part of their servants. Upon what is that based? It cannot be said to be necessary to make the contract effective. It cannot be said to have really been in the mind of the customer, or, indeed, of the bank, when the relationship of banker and customer was created. What is to be the standard of the extent or number of the precautions to be taken? Applying it to this case, can it be said to have been in the minds of the directors of the company that they were promising to have the pass-book and the cash-book examined at every board meeting, and to have a sufficient number of board meetings to prevent forgeries, or that the secretary should be supervised or watched by the chairman? If the bank desire that their customers should make these promises they must expressly stipulate that they shall. I am inclined to think that a banker who required such a stipulation would soon lose a number of his customers. The truth is that the number of cases where bankers sustain losses of this kind are infinitesimal in comparison with the large business they do, and the profits of banking are sufficient to compensate them for this very small risk. To the individual customer the loss would often be very serious; to the banker it is negligible. Their Lordships reject, therefore, the implied term submission. Tort

Their Lordships do not believe that there is anything to the advantage of the law's development in searching for a liability in tort where the parties are in a contractual relationship. This is particularly so in a commercial relationship. Though it is possible as a matter of legal semantics to conduct an analysis of the rights and duties inherent in some contractual relationships including that of banker and customer either as a matter of contract law when the question will be what, if any, terms are to be implied or as a matter of tort law when the task will be to identify a duty arising from the proximity and character of the relationship between the parties, their Lordships believe it to be correct in principle and necessary for the avoidance of confusion in the law to adhere to the contractual analysis:

[1985] 2 Lloyd's Rep. 313      Page 12

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 **(Cite as: [1985] 2 Lloyd's Rep. 313)**

on principle because it is a relationship in which the parties have, subject to a few exceptions, the right to determine their obligations to each other, and for the avoidance of confusion because different consequences do follow according to whether liability arises from contract or tort, e.g. in the limitation of action. Their Lordships **\*322** respectfully agree with some wise words of Lord Radcliffe in his dissenting speech in Lister v. Romford Ice and Cold Storage Co. Ltd., [1956] 2 Lloyd's Rep. 505; [1957] A.C. 555. After indicating that there are cases in which a duty arising out of the relationship between employer and employee could be analysed as contractual or tortious Lord Radcliffe said, at pp. 522 and 587:

Since, in any event, the duty in question is one which exists by imputation or implication of law and not by virtue of any express negotiation between parties, I should be inclined to say that there is no real distinction between the two possible sources of obligation. But it is certainly, I think, as much contractual as tortious. Since in modern times the relationship between master and servant, between employer and employed, is inherently one of contract, it seems to me entirely correct to attribute the duties which arise from that relationship to implied contract.

Their Lordships do not, therefore, embark on an investigation as to whether in the relationship of banker and customer it is possible to identify tort as well as contract as a source of the obligations owed by the one to the other. Their Lordships do not however, accept that the parties' mutual obligations in tort can be any greater than those to be found expressly or by necessary implication in their contract. If, therefore, as their Lordships have concluded, no duty wider than that recognized in Macmillan and Greenwood can be implied into the banking contract in the absence of express terms to that effect, the respondent banks cannot rely on the law of tort to provide them with greater protection than that for which they have contracted.

For these reasons their Lordships answer the general question by accepting the submission of the appellant company that in the absence of express terms to the contrary the customer's duty is in English law as laid down in Macmillan and Greenwood. The customer's duty in relation to forged cheques is, therefore, twofold: he must exercise due care in drawing his cheques so as not to facilitate fraud or forgery and he must inform his bank at once of any unauthorized cheques of which he becomes aware.

Their Lordships cannot leave the general question without making some comment on a matter of some importance which was discussed in argument before them.

It was suggested, though only faintly, that even if English Courts are bound to follow the decision in Macmillan's case the Judicial Committee is not so constrained. This is a misapprehension. Once it is accepted, as in this case it is, that the applicable law is English, their Lordships of the Judicial Committee will follow a House of Lords' decision which covers the point in issue. The Judicial Committee is not the final judicial authority for the determination of English law. That is the responsibility of the House of Lords in its judicial capacity. Though the Judicial Committee enjoys a greater freedom from the binding effect of precedent than does the House of Lords, it is in no position on a question of English law to invoke the Practice Statement of July, 1966, pursuant to which the House has assumed the power to depart in certain circumstances from a previous decision of the House: [1966] 1 W.L.R. 1234. and their Lordships note, in passing, the Statement's warning against the danger of disturbing retrospectively the basis on which contracts have been entered into. It is, of course, open to the Judicial Committee to depart from a House of Lords' decision in a case where, by reason of custom, statute,

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 **(Cite as: [1985] 2 Lloyd's Rep. 313)**

or for other reasons peculiar to the jurisdiction where the matter in dispute arose, the Judicial Committee is required to determine whether English law should or should not apply. Only if it be decided or accepted (as in this case) that English law is the law to be applied will the Judicial Committee consider itself bound to follow a House of Lords' decision. An illustration of the principle in operation is afforded by the recent New Zealand appeal,

Hart v. O'Connor                    (judgment delivered on May 22, 1985), in which the Board reversed a very learned judgment of the New Zealand Court of Appeal as to the contractual capacity of a mentally disabled person, holding that because English law applied, the duty of the New Zealand Court of Appeal was not to depart from what the Board was satisfied was the settled principle of that law.   The express terms of business

The appellant company, it is now accepted, operated its current account with each bank pursuant to the bank's printed terms and conditions.

*Chekiang*                    . The company opened an account with the bank in September, 1957. Chekiang was authorized to pay cheques on behalf of the company if signed by Mr. Chen or by any two of four named signatories. By his request to open the account Mr. Chen agreed on behalf of the company to comply with the bank's "rules and procedures in force from time to time governing the conduct of the account". Mr. Chen had notice of the rules current when he made the request. Rule 7 provided, so far as material:

A monthly statement for each account will be sent by the bank to the depositor by post or            **\*323**            messenger and the balance shown therein may be deemed to be correct by the bank if the depositor does not notify the bank in writing of any error therein within ten days after the sending of such statement . . .
From the opening of the account until March, 1978, the company returned, upon receipt of its periodic bank statement, a confirmation slip signed by two authorized signatories. No cleared cheques were

ever returned to the company.

*Tokyo*                    . The company opened an account with the bank in November, 1961. By letter of Nov. 17, 1961, Mr. Chen agreed on behalf of the company to observe the provisions of an agreement appearing on the back of the bank's pro-forma letter. The company accordingly undertook to hold the bank free from any loss resulting from a failure by it to abide by the provisions of the agreement. Clause 10 provided:

The bank's statement of my/our account will be confirmed by me/us without delay. In case of absence of such confirmation within a fortnight, the bank may take the said statement as approved by me/us.            The bank was authorized to pay the company's cheques if signed by Mr. Chen or two authorized signatories. Periodic bank statements were rendered by the bank, but cleared cheques were not returned. No bank statement relevant to this case was ever confirmed by the company.

*Liu Chong Hing*                    . The company opened an account with the bank in November, 1962. By his letter of request dated Nov. 8, 1962, Mr. Chen stated that the company wished to open the account subject to the bank's rules and regulations. Rule 13 provided:

A statement of the customer's account will be rendered once a month. Customers are desired: (1) to examine all entries in the statement of account and to report at once to the bank any error found therein. (2) to return the confirmation slip duly signed. In the absence of any objection to the statement within seven days after its receipt by the customer, the account shall be deemed to have been confirmed.            The bank was authorized to pay cheques if signed by Mr. Chen or by any two authorized signatories. The bank never did send any confirmation slips to the company; nor did it return cleared cheques. The company never sent the bank any confirmation slip.

Their Lordships agree with the views of the

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 **(Cite as: [1985] 2 Lloyd's Rep. 313)**

trial Judge and Mr. Justice Hunter as to the interpretation of these terms of business. They are contractual in effect, but in no case do they constitute what has come to be called "conclusive evidence clauses". Their terms are not such as to bring home to the customer either "the intended importance of the inspection he is being expressly or impliedly invited to make", or that they are intended to have conclusive effect against him if he raises no query, or fails to raise a query in time, upon his bank statements. If banks wish to impose upon their customers an express obligation to examine their monthly statements and to make those statements, in the absence of query, unchallengeable by the customer after expiry of a time limit, the burden of the obligation and of the sanction imposed must be brought home to the customer. In their Lordships' view the provisions which they have set out above do not meet this undoubtedly rigorous test. The test is rigorous because the bankers would have their terms of business so construed as to exclude the rights which the customer would enjoy if they were not excluded by express agreement. It must be borne in mind that, in their Lordships' view, the true nature of the obligations of the customer to his bank where there is no express agreement is limited to the Macmillan and Greenwood duties. Clear and unambiguous provision is needed if the banks are to introduce into the contract a binding obligation upon the customer who does not query his bank statement to accept the statement as accurately setting out the debit items in the accounts. Estoppel

Their Lordships having held that the company was not in breach of any duty owed by it to the banks, it is not possible to establish in this case an estoppel arising from mere silence, omission, or failure to act.

Mere silence or inaction cannot amount to a representation unless there be a duty to disclose or act: Greenwood's

case, sup., p. 57. and their Lordships would reiterate that unless conduct can be interpreted as amounting to an implied representation, it cannot constitute an estoppel: for the essence of estoppel is a representation (express or implied) intended to induce the person to whom it is made to adopt a course of conduct which results in detriment or loss: Greenwood's case, sup.

The company, it is accepted, did not know of the forgeries until the exposure of Leung in May, 1978. Had the company been under either of the duties (the "wider" or the "narrower") for which the banks contend, it is plain that the company would have been in breach of such duty during substantially the whole period covered by Leung's frauds, in which event an estoppel could have arisen. But in that event the **\*324** estoppel question would have been of academic interest only. For the breach of duty by the customer and the resultant loss of the banks would have afforded the banks a defence by way of set-off or counterclaim.

For the same reason the banks gain nothing from their submission that an estoppel arises from their terms of business. The trial Judge clearly thought that two of the banks could show that they had suffered loss by relying on the failure of the company to raise objection to the debit items shown in the bank statements. He held that, while their terms of business could not be construed so as to impose a contractual duty upon the company to accept in the absence of objection the monthly statements as accurate in so far as they related to debit items, their contractual effect was "to turn failure to respond into a representation" that the bank statements were correct. Their Lordships cannot agree. The contractual effect of the terms of business was that on the expiry of the time limit without objection raised by the company either the bank statements became conclusive as to the correctness of the debit items or they did not. Once it is held that they were not conclusive, silence, i.e. in this case failure to object, cannot be interpreted as a representation that the statements

[1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 [1986] A.C. 80 [1985] 3 W.L.R. 317 [1985] 2 All E.R. 947 [1985] 2 Lloyd's Rep. 313 [1986] F.L.R. 14 (1985) 82 L.S.G. 2995 (1985) 135 N.L.J. 680 (1985) 129 S.J. 503 **(Cite as: [1985] 2 Lloyd's Rep. 313)**

were correct for the simple reason that the company was not precluded by the terms of business from asserting that they were incorrect                        .

The same position is therefore reached. Either                        there was a duty to accept that bank statements to which no objection had been raised were correct in which event failure to object could be relied on either as a breach of duty causing loss or as an implied representation of their correctness estopping the company from asserting otherwise; or there was no such duty, in which event failure to object could not be interpreted as a representation that they were correct .

For these reasons their Lordships hold that, if                        the banks fail to establish either of the two duties of care for which they contend, they have no fall-back defence in the doctrine of estoppel                        . Interest

Their Lordships respectfully agree with the trial Judge in his rejection of the submission that because the sums wrongly debited were in non-interest bearing accounts interest is not recoverable. The company has lost the opportunity of placing the money at interest as a result of the unauthorized debits made by the banks to the respective current accounts. Interest is, therefore, payable. In the circumstances of this case interest should run from                        May 15, 1978: for by issuing its writ on that day the company required the banks to eliminate the unauthorized debits from the relevant current                        accounts and to repay what was due.

For these reasons their Lordships will humbly advise Her Majesty that the appeal should be allowed and an order made in the following                        terms:

1. (i) The judgment of the Court of Appeal of Hong Kong dated Jan. 27, 1984, ought to be reversed; (ii) The judgment of the High Court of Hong Kong dated July 12, 1983, ought to be set aside save in relation to the sum of $187,195.74 thereof; (iii) Judgment ought to be entered for the appellant for declarations that the respondents were not entitled to debit the appellant's account with the following sums and that the respondents ought to pay to the appellant such sums, namely: *First respondent*                        — H.K. $3,082,214.30; *Second respondent* — H.K. $809,804.80; *Third repondent* — H.K. $1,599,070.20; together with interest on the above sums at the rate of 1½ per cent. over the prime rate in force in Hong Kong from time to time, to be calculated from May 15, 1978, to the date of payment.

2. As against each of the respondents (i) the costs of the action, the costs of the appeal to the Court of Appeal and the costs of the appeal to the Judicial Committee of the Privy Council to be taxed and paid by the respondents to the appellant; (ii) the orders for costs in favour of the 1st, 2nd and 3rd respondents made by the High Court on July 12, 1983 and by the Court of Appeal on Jan. 27, 1984, to be set aside and such costs, if any, paid by the appellant to the respondents, or any of them, to be repaid to the appellant together with interest, if any, earned thereon.

3. Certificate for three Counsel.
END OF DOCUMENT

Copr. © West 2009 No Claim to Orig. Govt. Works

**Tab 10**



1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

C

**\*637** National Bank of Greece S.A. Appellant v. Pinios Shipping Co. No. 1 and Another Respondents

[1989] 3 W.L.R. 1330

House of Lords

HL

Lord Bridge of Harwich, Lord Brandon of Oakbrook, Lord Griffiths, Lord Goff of Chieveley and Lord Jauncey of Tullichettle

1989 Oct. 3, 4, 5; Nov. 30

O'Connor, Lloyd and Nicholls L.JJ.

1988 Jan. 19, 20, 21, 25; March 2

Banking--Interest--Compound interest--Implied agreement to charge interest with periodic rests--Usage or custom of bankers--Default by customer--Closure of account--Whether compound interest payable after account closed

Ships' Names--Maira

The plaintiff bank guaranteed the first six of 14 promissory notes issued by the first defendant P. to the first mortgagee of a vessel built for P., amounting to 70 per cent. of her cost, in yen, and payable at half-yearly intervals. The bank was secured by a contemporaneous second mortgage and by a personal guarantee of P.'s obligations, given by the second defendant. Each mortgage provided that P. should keep the vessel insured, in U.S. dollars, for not less than 130 per cent. of the total balance of the mortgage debt remaining unpaid plus interest thereon. P. complied at the outset by insuring the vessel for $10m.

On the dishonour of the first note, and at the bank's insistence, P., the bank, and G. entered into a tripartite management agreement, under which G. undertook, inter alia, (a) to act as P.'s sole and exclusive agent to manage the activities of the vessel, in G.'s absolute discretion and in accordance with any instructions the bank might issue to G., performing

its duties in the best interests of P. and the bank; (b) to keep the vessel insured in U.S. dollars for not less than 130 per cent. of the total balances, including interest, currently due under both mortgages. The bank proceeded to send P. four quarterly statements, each of which revealed, without objection by P., addition of the previous quarter's interest to capital.

Meanwhile a rapid deterioration of the dollar against the yen had led to 130 per cent. of the balances due under the first and second mortgages rising to $9.6m. and $2.3m., respectively, by 1 April 1978, on which date, to the knowledge of the bank (but not of P.) G. renewed the vessel's insurance at only $10m. Nine days later the vessel was lost: the insurance proceeds satisfied the first mortgage but were insufficient to satisfy the second. On 13 November 1978 the bank demanded repayment of the balance then due to it from both P. and the second defendant; writs against each followed, and in due course both actions were consolidated. P. brought a claim in arbitration against G. in respect of G.'s under-insurance of the vessel. The claim succeeded; but G. failed to pay the damages awarded against it.

**\*638** In the consolidated action, the defendants counterclaimed damages against the bank in respect of its failure to ensure that G. had adequately insured the vessel. The judge held that the counterclaim failed and that the bank was entitled to compound interest on the balance due, after, as well as before, 13 November 1978. On appeal by the defendants, the Court of Appeal allowed the appeal in part, holding that the bank's entitlement to compound interest ceased on 13 November 1978.

On appeal by the bank:-

Held, allowing the appeal, that the bank was entitled to the principal sum due to it with interest thereon as agreed until payment or judgment in the usual way, and that the agreement included the

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

term, implied by the usage of bankers, that the bank was entitled to capitalise interest, which in the present case (by concession) was at quarterly rests; and that such entitlement continued until judgment (post, pp. 672C-E, 685C-G).

Yourell v. Hibernian Bank Ltd. [1918] A.C. 372, H.L.(I.) applied.

*Per curiam.* A bank's entitlement to capitalise interest is not dependent on whether or not the account can be categorised as a mercantile account current for mutual transactions (post, pp. 672C-E, 678A-B, 684A-B, 685F).

Paton v. Inland Revenue Commissioners [1938] A.C. 341, H.L.(E.) and Inland Revenue Commissioners v. Oswald [1945] A.C. 360, H.L.(E.) applied.

Fergusson v. Fyffe (1841) 8 Cl. & Fin. 121, H.L.(Sc.); Crosskill v. Bower (1863) 32 Beav. 86 and Deutsche Bank v. Banque des Marchands de Moscou (1931) 4 L.D.B. 293, C.A. considered.

Decision of the Court of Appeal, post, p. 641B; [1989] 3 W.L.R. 185; [1989] 1 All E.R. 213 reversed in part.

The following cases are referred to in the opinion of Lord Goff of Chieveley:

Bevan, Ex parte (1803) 9 Ves.Jun. 223

Boddam v. Ryley (1783) 1 Bro.C.C. 239; (1785) 2 Bro.C.C. 2; (1787) 4 Bro.P.C. 561

Clancarty (Lord) v. Latouche (1810) 1 Ball & B. 420

Crosskill v. Bower (1863) 32 Beav. 86

Deutsche Bank v. Banque des Marchands de Moscou (1931) 4 L.D.B. 293, C.A..

Eaton v. Bell (1821) 5 B. & Ald. 34

Fergusson v. Fyffe (1840) 8 Cl. & Fin. 121,

H.L.(Sc.).

Inland Revenue Commissioners v. Holder [1931] 2 K.B. 81, C.A..

Inland Revenue Commissioners v. Lawrence Graham & Co. [1937] 2 K.B. 179, C.A..

Inland Revenue Commissioners v. Oswald [1945] A.C. 360, H.L.(E.).

Palmer & Co.'s Assignees v. Glas (1835) 13 Shaw & D. 308

Parr's Banking Co. Ltd. v. Yates [1898] 2 Q.B. 460, C.A..

Paton v. Inland Revenue Commissioners [1938] A.C. 341, H.L.(E.).

Reddie v. Williamson (1863) 1 Macph. 228

Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80; [1985] 3 W.L.R. 317; [1985] 2 All E.R. 947, P.C..

Williamson v. Williamson (1869) L.R. 7 Eq. 542

Yourell v. Hibernian Bank Ltd. [1918] A.C. 372, H.L.(I.)

**\*639** The following additional cases were cited in argument in the House of Lords:

Allied Marine Transport Ltd. v. Vale do Rio Doce Navigacao S.A. [1985] 1 W.L.R. 925; [1985] 2 All E.R. 796, C.A..

Barfield v. Loughborough (1872) L.R. 8 Ch.App. 1

Bruce v. Hunter (1813) 3 Camp. 467

Caliot v. Walker (1794) 2 Anst. 495

Cruickshank v. British Linen Co. (1834) 13 Shaw & D. 91

Great Western Railway Co. v. London and County Banking Co. Ltd. [1901] A.C. 414, H.L.(E.).

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122
**(Cite as: [1990] 1 A.C. 637)**

Joachimson v. Swiss Bank Corporation [1921] 3 K.B. 110, C.A..

Minories Finance Ltd. v. Mohan Wassiamal Daryanani, The Times, 14 April 1989; Court of Appeal (Civil Division) Transcript No. 495 of 1989, C.A..

Morgan v. Mather (1792) 2 Ves.Jun. 15

Mosse v. Salt (1863) 32 Beav. 269

Newal v. Jones (1830) 1 M. & M. 449

Ossulton (Lord) v. Lord Yarmouth (1707) 2 Salk. 449

Rekstin v. Severo Sibirsko Gosudarstvennoe Ackionernoe Obschestro Komserputj and Bank for Russian Trade Ltd. [1933] 1 K.B. 47, C.A..

Rufford v. Bishop (1829) 5 Russ. 346

Stacpoole v. Stacpoole (1816) 4 Dow. 209

Waring v. Cunliffe (1790) 1 Ves.Jun. 99

The following cases are referred to in the judgments of the Court of Appeal:

American Express International Banking Corporation v. Hurley [1985] 3 All E.R. 564

Anns v. Merton London Borough Council [1978] A.C. 728; [1977] 2 W.L.R. 1024; [1977] 2 All E.R. 492, H.L.(E.).

Bevan, Ex parte (1803) 9 Ves.Jun. 223

Boorman v. Brown (1842) 3 Q.B. 511; sub nom. Brown v. Boorman (1844) 11 Cl. & Fin. 1, H.L.(E.).

Clancarty (Lord) v. Latouche (1810) 1 Ball & B. 420

Crosskill v. Bower (1863) 32 Beav. 86

Cuckmere Brick Co. Ltd. v. Mutual Finance Ltd. [1971] Ch. 949; [1971] 2 W.L.R. 1207; [1971] 2 All E.R. 633, C.A..

Deutsche Bank v. Banque des Marchands de Moscou (1931) 4 L.D.B. 293, C.A..

Dorset Yacht Co. Ltd. v. Home Office [1970] A.C. 1004; [1970] 2 W.L.R. 1140; [1970] 2 All E.R. 294, H.L.(E.).

Economic Life Assurance Society v. Usborne [1902] A.C. 147, H.L.(I.)

Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B. 801; [1976] 2 W.L.R. 583; [1976] 2 All E.R. 5, C.A..

Fergusson v. Fyffe (1841) 8 Cl. & Fin. 121, H.L.(Sc.).

Glafki Shipping Co. S.A. v. Pinios Shipping Co. No. 1 (The "Maira") (No. 2) [1984] 1 Lloyd's Rep. 660; [1985] 1 Lloyd's Rep. 300, C.A.; [1986] 2 Lloyd's Rep. 12, H.L.(E.).

Greenwood v. Martins Bank Ltd. [1933] A.C. 51, H.L.(E.).

Liverpool City Council v. Irwin [1976] Q.B. 319; [1975] 3 W.L.R. 663; [1975] 3 All E.R. 658, C.A.; [1977] A.C. 239; [1976] 2 W.L.R. 562; [1976] 2 All E.R. 39, H.L.(E.).

London Joint Stock Bank Ltd. v. Macmillan [1918] A.C. 777, H.L.(E.).

**\*640** Paton v. Inland Revenue Commissioners [1938] A.C. 341, H.L.(E.).

Smith v. Littlewoods Organisation Ltd. [1987] A.C. 241; [1987] 2 W.L.R. 480; [1987] 1 All E.R. 710, H.L. (Sc.)

Standard Chartered Bank Ltd. v. Walker [1982] 1 W.L.R. 1410; [1982] 3 All E.R. 938, C.A..

Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80; [1985] 3 W.L.R. 317; [1985] 2 All E.R. 947, P.C..

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

Williamson v. Williamson (1869) L.R. 7 Eq. 542

Yourell v. Hibernian Bank Ltd. [1918] A.C. 372, H.L.(I.)

The following additional cases were cited in argument in the Court of Appeal:

Bank of Nova Scotia v. Hellenic Mutual War Risks Association (Bermuda) Ltd. [1988] 1 Lloyd's Rep. 514

Banque Keyser Ullmann S.A. v. Skandia (U.K.) Insurance Co. Ltd. [1990] 1 Q.B. 665; [1987] 2 W.L.R. 1300; [1987] 2 All E.R. 923

Inland Revenue Commissioners v. Holder [1931] 2 K.B. 81, C.A..

Northwestern Utilities Ltd. v. London Guarantee & Accident Co. Ltd. [1936] A.C. 108, P.C..

Panchaud Frères S.A. v. Établissements General Grain Co. [1970] 1 Lloyd's Rep. 53, C.A..

Peabody Donation Fund (Governors of) v. Sir Lindsay Parkinson & Co. Ltd. [1985] A.C. 210; [1984] 3 W.L.R. 953; [1984] 3 All E.R. 529, H.L.(E.).

Shell International Petroleum Co. Ltd. v. Transnor (Bermuda) Ltd. [1987] 1 Lloyd's Rep. 363

Stansbie v. Troman [1948] 2 K.B. 48; [1948] 1 All E.R. 599, C.A..

APPEAL from Leggatt J.

By a writ dated 31 March 1980 and amended points of claim, the plaintiff, National Bank of Greece S.A., claimed against the defendant, George Dionysios Tsitsilianis, U.S.$598,107.70 due in respect of moneys advanced and accommodation given as bankers to Pinios Shipping Co. No. 1 ("Pinios") in consideration of a guarantee in writing dated 12 January 1987 given by him. By a writ dated 8 July 1981 and amended points of claim, the plaintiff claimed against the defendant, Pinios, the same sum due to it, under a letter of agreement dated 5 February 1977. The defendants counterclaimed damages and an indemnity against the plaintiff's claim. The actions were consolidated by an order of Parker J. dated 28 April 1983. Leggatt J. dismissed the counterclaim and entered judgment for the plaintiff in the sum of U.S.$2,118,213.03, with costs.

By a notice of appeal dated 17 March 1987 the defendants appealed on the grounds, inter alia, that the judge erred in law (1) in finding that there was no implied term in the management agreement obliging the plaintiff to take steps to ensure that the level of insurance approved by it was sufficient; (2) in finding that the plaintiff did not have a special relationship with Pinios whereby it owed Pinios a legal duty to intervene and prevent its security and Pinios's equity from being impaired or eliminated by under-insurance; (3) in holding that the account between the plaintiff and Pinios had not ceased to be "an account current for mutual transactions" when the plaintiff demanded payment by Pinios of the balance then due.

**\*641** The facts are stated in the judgment of Lloyd L.J.

**Representation**

Adrian Hamilton Q.C. and Geraldine Andrews for the defendants.

Murray Pickering Q.C. and David C. Owen for the plaintiff bank.

*Cur. adv. vult.*

2 March. The following judgments were handed down

**LLOYD L.J.**

This is another chapter in the protracted litigation arising out of the total loss of the *Maira* nearly ten years ago on 10 April 1978. At the time of her loss the vessel was insured for U.S.$10m. The proceeds of insurance, when paid, were insufficient to enable the vessel's owner, Pinios Shipping Company No. 1 ("Pinios"), to repay the National Bank of Greece

© 2009 Thomson Reuters.

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988]
2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711,
(1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times
624,122

**(Cite as: [1990] 1 A.C. 637)**

S.A. ("the bank") under an agreement dated 8 February 1977. On 13 November 1978 the bank wrote to Pinios demanding payment of the amount then due under the agreement. By a letter before action dated 28 January 1980 the bank calculated the amount due at 29 January 1980 as $894,224, including interest. A statement of account was enclosed with the letter. On 8 July 1980 the bank issued a writ. The writ was amended by leave on 30 June 1983. By their points of claim indorsed on the amended writ, the bank claimed $598,109 plus interest to 30 June 1983 amounting to $734,979. Although the interest is not described as such, it was in fact compound interest, calculated with quarterly rests. On 29 January 1987 Leggatt J. gave judgment in favour of the bank. The amount for which he gave judgment, including compound interest to the date of his judgment, amounts to $2,118,213. There is now an appeal to this court. One of the two questions in the appeal is whether the judge was right to award compound interest to the date of judgment.

The second question in the case arises as follows. The *Maira* was built in Japan, under a shipbuilding contract dated 28 July 1975. The price was payable in yen. Thirty per cent. of the price was payable on or before delivery. Seventy per cent. of the price was deferred. It was secured by a first preferred mortgage, in favour of the builders, and by 14 promissory notes signed by Pinios payable at six-monthly intervals. The first six promissory notes were guaranteed by the bank under a letter of guarantee. The bank was secured by a second preferred mortgage, and by a personal guarantee given by Mr. Tsitsilianis, the second defendant in the action.

The ship was delivered on 19 February 1977. The first promissory note fell due on 9 August 1977. It was dishonoured. The bank thereupon paid the amount of the promissory note under its letter of guarantee, and debited Pinios.

The bank, on payment under the letter of guarantee, could have declared Pinios in default under article 11(18)B of the second preferred mortgage. But instead of exercising its rights under that clause, the bank entered into a tri-partite agreement dated 6 September 1977 with Pinios and a company called Glafki Shipping Co. S.A. ("Glafki"). By virtue of that agreement Glafki was appointed sole and exclusive agent to manage **\*642** and conduct the activities of the vessel. Under clause 2 of the agreement Glafki was obliged to manage the vessel in the best interests of Pinios and the bank. Under clause 3 Glafki was obliged to exercise due diligence to protect and safeguard the interests of Pinios and the bank in various specific respects. The effect of the management agreement was to transfer the entire management of the vessel to Glafki, subject to the directions of the bank under clause 13.

Under article 1(15) of the second preferred mortgage, it was Pinios's obligation to insure the vessel for not less than 130 per cent. of the total amount secured by the mortgage. There was a similar, though not identical provision in the first preferred mortgage. Under clause 3(g) of the management agreement, it became Glafki's duty to place all insurances "in accordance with the respective insurance clauses of this mortgage." When the vessel was delivered on 9 February 1977 she was insured by Pinios for $10 million. This was then sufficient to comply with Pinios's obligations under both mortgages. But as time went on, and the dollar depreciated against the yen, the margin narrowed. The insurance was renewed on the instructions of Glafki on 9 February 1978 and again on 1 April 1978. The April renewal worked out at less than 130 per cent. of the total amount due under both mortgages, with the consequence that Pinios was unable to repay the bank. Accordingly Pinios brought a claim against Glafki for damages for breach of duty under the management agreement. The claim was referred to arbitration. On 9 February 1982 the arbitrator issued his award in favour of Pinios. His award was reversed by Hobhouse J. Glafki Shipping Co. S.A. v. Pinios Shipping Co. No. 1 (The Maira) (No. 2) [1984] 1 Lloyd's Rep. 660. But Pinios were successful in the Court of Appeal [1985] 1 Lloyd's Rep. 300 and in the House of Lords [1986] 2

© 2009 Thomson Reuters.

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122
**(Cite as: [1990] 1 A.C. 637)**

Lloyd's Rep. 12. Unfortunately their success has proved fruitless. Glafki have failed or refused to pay. So Pinios now seeks to recover by counter-claim from the bank what they have failed to recover from Glafki.

The case is put in a number of different ways. But in essence Pinios say that the bank was under a duty of care to see to it that Glafki did not under-insure the vessel. They say that that duty arose either as an implied term of the contract, or in tort. The judge has decided, on orthodox lines, that the bank was under no such duty. The second question in the appeal is whether he was right.

We were told that the first question is one of considerable general importance to bankers. But it is logical, and convenient, to consider the second question first, as did the judge.

At the end of his speech in Smith v. Littlewoods Organisation Ltd. [1987] A.C. 241, 280, Lord Goff of Chieveley epitomised the judicial function as an educated reflex to facts. I have to confess that in the present case my immediate reflex was that the bank must succeed. I could see no ground for implying a contractual duty of care in favour of Pinios. At the conclusion of the argument, my reflex, though much better educated, remains the same.

The judge dealt with the question shortly [1988] 2 Lloyd's Rep. 126, 130: **\*643**

"Since in this matter the parties have expressly provided for the insurance of the ship, it is not necessary to imply any further duty of supervision. Had the officious bystander inquired whether the bank were under a duty to see to it in the interest of Pinios that Glafki insured the ship for the full sum required under the mortgages, it is by no means obvious that all the parties would have acknowledged that they were. No doubt it was commercially prudent for the bank to ensure that the insurance was sufficient to cover their own interest, but it does not follow that they were bound to go further and determine whether Pinios's interest too was

properly protected. It would in the circumstances be unreasonable to impose upon the bank a duty to re-inforce the obligation which Glafki assumed under the agency agreement."

From this it would appear that the argument in the court below was that the implication of a term in favour of Pinios was necessary in order to give the contract business efficacy. Both parties, it must have been argued, would readily have agreed to such a term had they been asked.

The notice of appeal and the appellants' skeleton argument reflect this approach. Thus in paragraph 8(2) of the skeleton argument it is said:

"The existence of Glafki's obligations did not in itself make it unreasonable or unnecessary for there to be an independent duty on the bank to take steps to prevent Glafki from under-insuring the vessel and thereby causing damage to Pinios."

The basis for the implication is set out in paragraph 8(6):

"The judge gave insufficient weight to the fact that the bank, by insisting on a management agreement which deprived Pinios of all rights to safeguard its own interests and which required the managers, Glafki, to regard the bank's interests as paramount, had arrogated to themselves the exclusive power to intervene with the managers in the protection of the respective interests of the bank and Pinios in the insurance moneys."

The conclusion is set out in paragraph 8(8):

"The implication of the term that the bank did owe such a duty to Pinios is necessary to give effect to the intentions of the parties and the duty is both fair and reasonable."

The argument was put concisely and forcefully by Mr. Hamilton at the outset of his submissions as follows:

"There was nobody to look after Pinios's interests, once the management agreement had been entered into. The bank owed a duty of care to those that they had deprived of the opportunity of protect-

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

ing themselves."

But in the course of developing his submissions, Mr. Hamilton shied away from the "officious bystander" test. In this he was wise. For so far from it being obvious that the bank would have agreed to the suggested **\*644** implied term, it seems to me quite obvious that they would not. Why should they?

Mr. Hamilton made much of the fact that the management agreement was forced on Pinios. He relied on the observation of Lord Brandon of Oakbrook in Glafki Shipping Co. S.A. v. Pinios Shipping Co. No. 1 (The Maira) (No. 2) [1986] 2 Lloyd's Rep. 12, 14, that the bank had "insisted" on Pinios entering into the management agreement, an observation which Leggatt J. has adopted as a finding of fact. It is true that the bank had every reason not to exercise its power of sale under article 11(18) of the second preferred mortgage, since the market value of the vessel was already far less than the amount due under the combined mortgages. But Pinios also had much to gain from entering into the management agreement. For so long as they remained the owners of the vessel, even if only in name, there was always the possibility that the market would improve and their fortunes recover. Why, in those circumstances, should the bank have agreed to exercise care on Pinios's behalf? If the bystander had asked "What happens if Glafki fail or refuse to insure for the full 130 per cent.?" the bank's answer would have been simple and straightforward. If Glafki were to refuse to insure for the full sum, Pinios could arrange their own insurance for the balance. It would make no difference to their pocket whether Glafki insured for 100 per cent. and Pinios for 30 per cent., or Glafki for the full 130 per cent. If, on the other hand, Pinios were only to learn of the under-insurance too late, as in the present case, Pinios could recover their loss as damages from Glafki. It would hardly have entered into the parties' consideration that Glafki might refuse to honour an award. In those circumstances the judge was, if anything, understating the position when he said that it was by no means obvious that the bank

would have agreed to act as "guarantor" for Glafki, more especially as Glafki was Pinios's own nominee to act as manager. To my mind it is obvious that they would not. So Mr. Hamilton was, as I say, wise to abandon the officious bystander. No term can be implied on that ground.

But that is by no means the end of the story. Mr. Hamilton submits that this is a case where the law imposes a duty of care, irrespective of what the parties must have intended or agreed. To adopt the terminology of *Treitel, The Law of Contract,* 7th ed. (1987), p. 158, Mr. Hamilton relies on a term implied by law as distinct from a term implied in fact. He puts the case in two ways. It is important to keep them separate. In the first place he submits that the relationship between the parties is such that the law imposes on the bank a generalised duty of care towards Pinios. Secondly, he submits that the law imposes a duty of care arising out of the particular facts, namely, that the bank actively intervened in the process of arranging the insurance. I will take each of these two ways of putting the case in turn.

That there is a distinction beween a term implied in a contract because it is what the parties must have agreed, and a term implied by law is now well established even if, as Lord Wilberforce preferred to put it in Liverpool City Council v. Irwin [1977] A.C. 239, 254, the distinction only represents two ends of a "continuous spectrum." When Liverpool **\*645** City Council v. Irwin was before the Court of Appeal, Lord Denning M.R. [1976] Q.B. 319, 329-330, in a dissenting judgment, said that it was time to get rid of the old clichés about "necessary to give business efficacy" and the "officious bystander." The law, he said, implies a term whenever it is reasonable to do so, and that is an end of it. He gave, as examples, terms implied in a contract for the sale of goods and many others. Nobody asks in such cases whether the term is one which the parties must have intended or agreed. When the case reached the House of Lords[1977] A.C. 239 the decision of the Court of Appeal was reversed. But there was no support for the broad principle

© 2009 Thomson Reuters.

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

stated by Lord Denning M.R. in the Court of Appeal. Lord Wilberforce, at pp. 253-254, described Lord Denning's principle as going a long way beyond sound authority. The point is put very clearly by Lord Cross of Chelsea, at pp. 257-258:

"When it implies a term in a contract the court is sometimes laying down a general rule that in all contracts of a certain type - sale of goods, master and servant, landlord and tenant and so on - some provision is to be implied unless the parties have expressly excluded it. In deciding whether or not to lay down such a prima facie rule the court will naturally ask itself whether in the general run of such cases the term in question would be one which it would be reasonable to insert. Sometimes, however, there is no question of laying down any prima facie rule applicable to all cases of a defined type but what the court is being in effect asked to do is to rectify a particular - often a very detailed - contract by inserting in it a term which the parties have not expressed. Here it is not enough for the court to say that the suggested term is a reasonable one the presence of which would make the contract a better or fairer one; it must be able to say that the insertion of the term is necessary to give - as it is put - 'business efficacy' to the contract and that if its absence had been pointed out at the time both parties - assuming them to have been reasonable men - would have agreed without hesitation to its insertion. The distinction between the two types of case was pointed out by Viscount Simonds and Lord Tucker in their speeches in Lister v. Romford Ice and Cold Storage Co. Ltd. [1957] A.C. 555, 579, 594, but I think that Lord Denning M.R. in proceeding - albeit with some trepidation - to 'kill off' MacKinnon L.J.'s 'officious bystander' [Shirlaw v. Southern Foundries (1926) Ltd. [1939] 2 K.B. 206, 227] must have overlooked it."

So there is no doubt that there are, in the words of Lord Cross, contracts of a defined type in which the law will imply a term, unless the parties have expressly excluded it. Can the present case be brought within any defined type? If we were concerned in the present case with the ordinary relationship of

banker and customer, the law would imply certain obligations on the part of the bank, and a limited duty of care on the part of the customer: see Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80. But we are not here concerned with the ordinary relationship of banker and customer. We are concerned with a carefully drawn "one off" contract between three parties, made for a **\*646** particular purpose in special circumstances, and apparently making full provision for that purpose. I cannot imagine a contract which it would be more difficult to fit into a "defined type."

But there is a further difficulty. Even if one could conjure up and define a type of contract into which the present contract could be fitted, there would remain the question whether the term on which Mr. Hamilton seeks to rely should be implied. In the passage I have quoted from Lord Cross's speech in Liverpool City Council v. Irwin [1977] A.C. 239, 257-258, he appears to have accepted that where the court is laying down a general rule for all contracts of a certain type (sale of goods, master and servant, landlord and tenant and so on) the court asks whether the term is one which it would be *reasonable* to insert in the general run of such cases. But Lord Wilberforce took a rather different line. In his view only such obligations should be read into the contract "as the nature of the contract itself implicitly requires, no more, no less: a test in other words, of necessity": see p. 254F. It was Lord Wilberforce's test that the Privy Council adopted in Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80, 104H. If, in that case, the Privy Council found it unnecessary to imply into an ordinary contract between banker and customer a duty wider than the duties recognised in London Joint Stock Bank Ltd. v. Macmillan [1918] A.C. 777 and Greenwood v. Martins Bank Ltd. [1933] A.C. 551, I can see no necessity for implying any duty of care on the part of the bank in the present case. For if we were to imply a duty of care on the part of the bank to see that Glafki did not under-insure the vessel, should we not also have to imply a duty of care to see that Glafki fulfilled its other spe-

© 2009 Thomson Reuters.

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

cific duties under clause 3 of the management agreement? Should we not have to imply a duty to see that Glafki purchased all necessary stores and bunkers at the best price? Should we not have to imply a duty in relation to the supervision of repairs? Clearly not. Such an implication would not only be unnecessary, but wholly unreasonable. So I see no necessity to imply a duty of care in relation to the procuring of insurance, assuming, contrary to my view, that this is the type of case in which the court would imply a term irrespective of the parties' presumed intentions.

Mr. Hamilton returned over and over again in the course of his argument to the close relationship which existed between the bank and Pinios. But the closeness of the relationship does not in itself justify the implication of a contractual term.

So I turn to the second way in which the case is put. It is said that the bank owed Pinios a duty of care because it actively intervened in the procuring of the insurance. Here Mr. Hamilton is on firmer legal ground. But he is in difficulty on the facts.

The authorities on which Mr. Hamilton relies for this part of his argument are Cuckmere Brick Co. Ltd. v. Mutual Finance Ltd. [1971] Ch. 949; Standard Chartered Bank Ltd. v. Walker [1982] 1 W.L.R. 1410 and American Express International Banking Corporation v. Hurley [1985] 3 All E.R. 564. In Cuckmere Brick Co. Ltd. v. Mutual Finance Ltd. it was held that a mortgagee, in exercising his power of sale, owes a duty of care to the mortgagor to obtain the best or "proper" price. In Standard Chartered Bank Ltd. v. Walker it was held, in interlocutory *647 proceedings, that a receiver, realising assets under a debenture, owes a duty of care to the borrower to obtain the best price that circumstances permit. In American Express International Banking Corporation v. Hurley [1985] 3 All E.R. 564 it was submitted that the Standard Chartered Bank case, being an appeal under R.S.C., Ord. 14, established no more than that the point was arguable. Mann J. refused to accept that submission. After quoting extensive passages from the Cuckmere Brick Co. and

Standard Chartered Bank cases, he summarised the law, at p. 571:

"(i) The mortgagee when selling mortgaged property is under a duty to a guarantor of the mortgagor's debt to take reasonable care in all the circumstances of the case to obtain the true market value of that property. (ii) A receiver is under a like duty. (iii) The mortgagee is not responsible for what a receiver does whilst he is the mortgagor's agent unless the mortgagee directs or interferes with the receiver's activities. (iv) The mortgagee is responsible for what a receiver does whilst he is the mortgagee's agent and acting as such."

Mr. Pickering does not dispute these propositions. He accepts that if, in the words of Mann J., the bank had directed or interfered with Glafki's activities in relation to the insurance, the bank would have owed Pinios a duty of care. Similar language to that used by Mann J. is to be found in the Standard Chartered Bank case [1982] 1 W.L.R. 1410, 1416, where Lord Denning M.R. said:

"The debenture holder, the bank, is not responsible for what the receiver does except in so far as it gives him directions or interferes with his conduct of the realisation. If it does so, then it too is under a duty to use reasonable care towards the company and the guarantor."

So the question is whether the bank directed or interfered with Glafki's activities when arranging the insurance. That the bank was *entitled* to direct or interfere is clear enough. Clause 13 of the management agreement provides:

"*Directions and approvals* - In acting under this agreement the agent must in so far as this proves possible or realisable accept and rely upon directions instructions consent or approvals made or given on behalf or with the consent of the bank after having received written notice from the bank by any officer of the bank or by any other person designated in writing by the bank to give such directions approvals or consent . . ."

But whether the bank in fact directed or interfered

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

is less clear. Neither side is appealing on fact, so we are bound by the findings of the judge in the court below. Owing to the way in which the case was argued before him, his findings are rather less precise than they might be. He said [1988] 2 Lloyd's Rep. 126, 129:

"Although for its own protection it would no doubt have been prudent for the bank to check whether the amount of the insurance continued to cover their debt, they did not regard their responsibility **\*648** as going further than that. All decisions about the management and operation of the ship were left to Glafki, including the renewal of the insurance."

The reference to "renewal of the insurance" presumably includes the renewal in April 1978.

Later on in his judgment the judge refers to the evidence of Mr. Theodoropoulos, the manager of the London branch of the bank. On 16 July 1980 Mr. Theodoropoulos signed a statement which was intended for use by Glafki in the arbitration proceedings between Glafki and Pinios. In paragraph 4 he said: "I was fully aware and approved of the continuation of the insurance of the *Maira* at a total of $10 million in February and April 1978." In a subsequent statement, prepared for the present proceedings, Mr. Theodoropoulos said that he never discussed the amount of the insurance cover with anybody. He had asked for paragraph 4 of his earlier statement to be deleted, as it was not true. But this had not been done.

Mr. Theodoropoulos gave evidence at the trial. The judge disbelieved him. But the only finding that the judge makes is in terms of paragraph 4 of the earlier statement, namely that "when the insurance was renewed Mr. Theodoropoulos on behalf of the bank knew and approved of what was done."

This finding places us in some difficulty, since it was common ground before us that Mr. Theodoropoulos left the London branch of the bank very shortly after the renewal of the insurance in February, to take up a new position as general manager of an associated insurance company in Athens. It seems unlikely that he would have been asked to approve the April insurance in that capacity. That would have been a task for his successor in London. Moreover it was never pleaded by Pinios that Pinios would rely on paragraph 4 of Mr. Theodoropoulos's earlier statement in relation to the April renewal. It was relied on in relation to the February renewal only. Mr. Hamilton tells us that that was a simple oversight on the part of the pleader.

So the position on the facts is not altogether satisfactory. But since neither side is appealing on the facts, we need only concern ourselves with the findings made by the judge. What is meant when it is said that Mr. Theodoropoulos, on behalf of the bank, "knew and approved" of what was done? Does it mean that the bank actively intervened? Does it mean that the bank "directed and interfered" with Glafki's activities, so as to give rise to a duty of care, which, if that is the meaning, Mr. Pickering concedes? Or does it mean simply that the bank did not object?

In my view it means the latter. I form that view for two reasons. First, it is more consistent with the judge's earlier finding that "all decisions about the management and operation of the ship were left to Glafki, including the renewal of the insurance." Secondly, it is more consistent with the contemporary correspondence. Both parties were content that we should look at the correspondence, presumably as some sort of aid to construing the judge's findings.

**\*649** Starting with the February renewal, the previous cover was due to expire on 8 February 1978. The first the bank heard of the matter was a telex dated 9 February from Messrs. Frank B. Hall, the New York brokers, confirming that they had already placed 10 per cent. of the insurance in New York. When the bank inquired about the remaining 90 per cent. they were informed that this had already been placed by Messrs. Colburn French & Kneen in London. So the correspondence does not support any suggestion of prior intervention by the

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

bank. As for the April renewal, the first reference in the correspondence is a letter from the bank dated 12 April to the two brokers asking whether the insurance had been renewed. This was not only long after the renewal date; it was also after the vessel had become a total loss. No doubt the bank was relieved to hear that the insurances had indeed been renewed. Again the correspondence does not suggest that there had been any active intervention before the April renewal.

The only support which Mr. Hamilton could derive from the correspondence is a letter from the brokers to the bank dated 10 February 1978 confirming that the insurances had been effected, and undertaking, inter alia:

"to advise you immediately of any material changes which are proposed to be made in the terms of the insurances and following an application received from you not later than 1 March 1978 . . ."

But at best this letter points only to advance knowledge on the part of the bank of the proposed terms of renewal, coupled with an opportunity to intervene. There is a world of difference between an opportunity to intervene and active intervention. As Lord Goff of Chieveley pointed out in Smith v. Littlewoods Organisation Ltd. [1987] A.C. 241, 271, the law is always slow to impose liability for what he called pure omissions. In that case he was concerned with tort. But the same must apply when the court is considering whether to imply a term in a contract.

There is one further small pointer as to what the judge had in mind when he used the phrase "knew and approved of what was done." When stating his conclusion, in the passage which I have already cited, the judge said that it was not necessary to imply any further duty of supervision. If the judge had already found as a fact that there had been active intervention by the bank, then "supervision" is surely not the word he would have used to describe the alleged duty.

So I would hold that in finding that the bank "knew and approved," the judge meant no more than that the bank did not disapprove, or, in other words, that the bank acquiesced. The words fall short of a finding of active intervention, which is the finding which Mr. Hamilton needs if he is to succeed on this part of his argument. In the absence of that finding, I would hold that Pinios have failed to establish a duty of care arising on the particular facts of the case, just as they have failed to establish a generalised duty applying to all contracts of this "type."

For completeness I should add one last point. Mr. Hamilton did not seek to argue that the bank is vicariously liable for the shortcomings of Glafki. In American Express International Banking Corporation v. Hurley [1985] 3 All E.R. 564, 568, Mann J. held that the receiver became the **\*650** bank's agent, after the company had gone into liquidation. He therefore held the bank liable for the receiver's negligence on ordinary agency principles. Such an argument would not have been open here.

Turning from contract to tort, Mr. Hamilton argues strenuously that even if he fails in contract he is entitled to succeed in tort. He relies on Dorset Yacht Co. Ltd. v. Home Office [1970] A.C. 1004, and the much discussed and increasingly precarious dictum of Lord Wilberforce in Anns v. Merton London Borough Council [1978] A.C. 728, 751. But those were cases where there was no contract between the parties. So it was tort, or nothing. Here there is a contract, and a most elaborate contract at that.

Now I accept that in a large class of cases it always was, and maybe still is, possible for the plaintiff to sue either in contract or tort. The obvious example would be actions against innkeepers and the like, and those exercising a common calling. In Boorman v. Brown (1842) 3 Q.B. 511, 525-526, Tindall C.J., delivering the judgment of the Court of Exchequer Chamber, said:

"That there is a large class of cases in which the foundation of the action springs out of privity of

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

contract between the parties, but in which, nevertheless, the remedy for the breach, or non-performance, is indifferently either assumpsit or case upon tort, is not disputed. Such are actions against attorneys, surgeons and other professional men, for want of competent skill or proper care in the service they undertake to render . . . The principle in all these cases would seem to be that the contract creates a duty, and the neglect to perform that duty, or the non-feasance is a ground of action upon a tort."

In the House of Lords, Lord Campbell said (1844) 11 Cl. & Fin. 1, 44:

"wherever there is a contract, and something is to be done in the course of the employment which is the subject of that contract, if there is a breach of duty in the course of that employment, the [party injured] may either recover in tort or in contract."

See also Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B. 801, 819, *per* Lord Denning M.R.

But so far as I know it has never been the law that a plaintiff who has the choice of suing in contract or tort can fail in contract yet nevertheless succeed in tort; and, if it ever was the law, it has ceased to be the law since Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80. In that case the bank advanced very much the same argument as has been advanced by Mr. Hamilton. But the argument was rejected. Lord Scarman said, at p.107:

"Their Lordships do not believe that there is anything to the advantage of the law's development in searching for a liability in tort where the parties are in a contractual relationship. This is particularly so in a commercial relationship. Though it is possible as a matter of legal semantics to conduct an analysis of the rights and duties inherent in some contractual relationships including that of banker and customer either as a matter of contract law when the question will be what, if any, terms are to be implied or as a matter *651 of tort law when the task will be to identify a duty arising from the proximity and character of the relationship between the parties, their Lordships believe it to be correct in

principle and necessary for the avoidance of confusion in the law to adhere to the contractual analysis: on principle because it is a relationship in which the parties have, subject to a few exceptions, the right to determine their obligations to each other, and for the avoidance of confusion because different consequences do follow according to whether liability arises from contract or tort, e.g. in the limitation of action."

A little later, Lord Scarman said:

"Their Lordships do not, therefore, embark on an investigation as to whether in the relationship of banker and customer it is possible to identify tort as well as contract as a source of the obligations owed by one to the other. Their Lordships do not, however, accept that the parties' mutual obligations in tort can be any greater than those to be found expressly or by necessary implication in their contract."

Nothing in the subsequent cases at first instance on which Mr. Hamilton relied throws any doubt on the appropriateness of Lord Scarman's observations to the present case. I would hold without hesitation that if, in a case such as the present, the plaintiff fails in contract, he must necessarily fail in tort.

The position would be different if the contract and the tort lay in different fields. Thus, if, to take a simple example, I give my employee a lift home, and injure him by my careless driving, then obviously he will not be prevented from recovering from me in tort, because of the existence between us of a contract of employment. But that is not this case.

I return now to consider the bank's claim for compound interest. I start by setting out the relevant provisions of the agreement between Pinios and the bank dated 8 February 1977. The agreement provides that in consideration of the bank agreeing to issue a letter of credit in favour of the builders, Pinios would execute a second preferred mortgage as security for the payment on demand of all sums which the bank might be called on to pay under the letter of guarantee. Clause 8 provides:

© 2009 Thomson Reuters.

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

"(A) We shall pay interest on the amount payable and paid by you under your said letter of guarantee at the rate (hereinafter called 'the agreed interest rate') of two per cent. per annum above the rate at which three or six months deposits of amounts in United States dollars equivalent to the amount of each promissory note payable under the said letter of guarantee are offered to you by first class banks in the London Interbank Eurodollar Market with a minimum rate of interest of eight per cent. per annum.

"(B) If you shall at any time determine that by reason of changes affecting the London Inter Bank Euro Dollar Market adequate and fair means do not exist for ascertaining the agreed interest rate you may give notice of such fact to us and we shall **\*652** discuss with you an alternative basis for securing the amount paid under the said letter of guarantee on the basis that the return to you shall be the same as that provided for in this agreement. If no agreement is reached upon an alternative basis for securing the amount paid under the said letter of guarantee before the next succeeding interest payment date after such notice shall have been given, then the amount paid by you under the said letter of guarantee shall become repayable and if not repaid shall bear interest at the amount provided in subclause (C) below for interest in default.

"(C) If any interest shall be due and unpaid four working days after the relevant interest payment date the amount of interest shall be recalculated from the interest payment date until the date of payment at the rate of two per cent. per annum above the agreed interest rate.

"(D) Each determination under this clause shall be conclusive."

The second preferred mortgage provides for the vessel to stand as security:

"for the payment by the shipowner on demand of the total amount of its said liability . . . and also the payment of interest thereon at the rate of two per cent. above the current London Euro Dollar Market

rate in respect of three or six months deposits whichever be the higher rate for the time being with a minimum of eight per cent. . . . ."

A little later the mortgage provides:

"In case of default in paying any amount due hereunder within four days of the same having been demanded the shipowner will pay interest after the expiration of the aforesaid period of four days at the rate of two per cent. per annum above the rate hereinbefore provided until repayment to the mortgagee in full."

It will be noticed that, although the mortgage is annexed to the agreement, there are some differences in the language of the two interest provisions. Thus in the mortgage it is provided that the rate of interest should be the higher of the three or six months deposit rate, plus 2 per cent., whereas in the agreement the words "whichever be the higher" are omitted. Another difference is that the default rate of interest in the mortgage applies when an amount due has not been paid within four days of the same having been demanded; whereas by clause 8(c) of the agreement the default rate is payable if any interest remains unpaid four working days after "the relevant interest payment date. " There is a further reference to "interest payment date" in clause 8(B).

The judge regarded the compound interest question as simple. Having set out the terms of the mortgage which I have just quoted, he continued:

"The effect of this was to entitle the bank to charge compound interest on the outstanding debt. The relationship governed by the mortgage never came to an end; but even if it were not so and the **\*653** right to charge compound interest is to be founded on implied agreement, the conclusion would be the same."

I find this hard to follow. The judge seems to have thought that there was an express provision in the mortgage entitling the bank to charge compound interest. But I can find no such provision. There is a provision for an increase in the rate of interest in the event of default. But there is no reference anywhere to compound interest; nor is there any provi-

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

sion for periodic rests. Mr. Pickering submitted that the reference to the three or six month deposit rate whichever be the higher imports periodic rests. But why should it? It fixes the *rate* of interest, not the frequency with which interest is capitalised.

Mr. Pickering relies also on the reference to "interest payment date" in clause 8(B) and (C). But again it is impossible to spell out from these references any right to capitalise the interest. So I would reject the submission that there is any express agreement to pay compound interest.

Then was there an implied agreement to pay compound interest? Mr. Hamilton concedes that the bank was entitled to charge compound interest with quarterly rests during the currency of the banker/ customer relationship. But once the account was closed the banker/customer relationship ceased. According to Mr. Hamilton that occurred on 13 November 1978 when the bank demanded payment. Thereafter the bank was in the same position as any other creditor, and became entitled to simple interest only.

Mr. Pickering on the other hand says that the account was never closed, and the banker/customer relationship never ceased. It continued until judgment. On that view the bank was entitled, he says, to continue to charge compound interest, and the judge was right to give judgment on that basis.

That being the issue between the parties, it is unnecesary to consider whether Mr. Hamilton was right to concede that the bank was entitled to charge compound interest up to 13 November 1978. It could be said, as O'Connor L.J. has pointed out, that the relationship between the parties was not the ordinary relationship of banker and customer; and that in any event the express right to charge a higher rate of interest in the event of default, and the provision for re-calculating the interest "until the date of payment" are fundamentally inconsistent with any implied right to charge compound interest. Be that as it may, I am content to assume that the bank was entitled to charge compound interest up

to 13 November 1978. On what basis was it so entitled? Why should the law imply a right to charge compound interest in favour of the bank, when the parties have abstained from expressing any such right for themselves?

As with so much else in our law, the explanation is historical. A convenient point to start is the beginning of the 19th century when the Usury Acts were still in force. An Act of 1545 (37 Hen. 8, c. 9) had fixed the maximum rate of interest which could lawfully be charged on money lent at 10 per cent. per annum. The rate of interest was gradually **\*654** reduced in successive reigns because, as is stated in the preamble to an Act of 1713 (12 Anne c. 16):

"the reducing of interest to ten, and from thence to eight, and thence to six in the hundred, hath, from time to time, by experience been found very beneficial to the advancement of trade . . ."

By the beginning of the 19th century the maximum lawful rate of interest stood at 5 per cent. per annum. Any contract reserving a higher rate of interest was "utterly void." If therefore a contract between banker and customer provided for compound interest at 5 per cent. per annum with half-yearly rests, the contract was void; for the true rate of interest would be more than 5 per cent. But bankers found a way round this difficulty. At the end of six months the parties were presumed to settle their account, without any previous agreement. Instead of the customer paying the amount of interest then due, it was added to the principal. The banker forbore to sue for principal and interest, since he was content to charge interest on the new principal over the next six months.

The practice was upheld as lawful by Lord Eldon in Ex parte Bevan (1803) 9 Ves.Jun. 223, 224:

"So this is legal between merchants; where there is no agreement to lend to either; but they stipulate for mutual transactions; each making advances; and that, if at the end of six months the balance is with A., he will lend to B., and vice versa."

The principle was re-stated by Lord Cottenham

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

L.C. in Fergusson v. Fyffe (1841) 8 Cl. & Fin. 121, 140:

"Generally a contract or promise for compound interest is not available in England, as was decided in Ex parte Bevan, except perhaps as to mercantile accounts current for mutual trans- actions . . ."

Mr. Pickering argued that once the Usury Acts had been repealed, as they were in 1854 by The Usury Laws Repeal Act (17 & 18 Vict., c. 90), Fergusson v. Fyffe ceased to have any relevance: cessante ratione legis, cessat lex ipsa. But, with respect, that argument was hopeless. It is only necessary to refer to the decision of a strong Court of Appeal in Deutsche Bank v. Banque des Marchands de Moscou [1931] 4 L.D.B. 293. Scrutton L.J. clearly regarded Fergusson v. Fyffe as being good law when he said, at p. 295:

"The House of Lords in Fergusson v. Fyffe treated compound interest as not payable, except perhaps on mercantile accounts current for mutual transactions."

Greer L.J. said, at pp. 295-296:

"I regard the law as stated in Ex parte Bevan and Fergusson v. Fyffe as laying down two propositions, first, that there can be no title to compound interest without a contract express or implied between the debtor and creditor; and, secondly, that it is never implied except as to mercantile accounts current for mutual transactions."

**\*655** The corollary of the rule in Fergusson v. Fyffe, 8 Cl. & Fin. 121 is that once the account has ceased to be "a mercantile account current for mutual transactions" - in other words, once the account has been closed, and the relationship of banker and customer brought to an end - the bank is entitled to simple interest only. This is clear from Fergusson v. Fyffe itself, where, as it happens, the balance of account was in favour of the customer. It was held that the bank was liable for compound interest up to the date of the customer's death but not thereafter. Lord Cottenham L.C. said, at p. 139:

"From that time there was no party with whom any account current could be carried on, there not having been any representative of [the customer] for many years afterwards."

The point was put very clearly, long after the Usury Acts had been repealed, by Sir W. M. James V.-C. in Williamson v. Williamson (1869) L.R. 7 Eq. 542, 546. That was another case of banker and customer. It was held that the bank was entitled to charge compound interest up to the date of the customer's death, but not thereafter:

"With regard to the interest accruing after the testator's death, I should take some time before assenting to the proposition that the account did not bear simple interest, but I have not to decide this point. I am bound, however, by the authority of the House of Lords to hold that compound interest is incidental to the continuance of the relation of banker and customer. From the testator's death, therefore, only simple interest at 5 per cent. will be allowed on the account."

But the death of the customer is not the only event which will bring the relationship of banker and customer to an end. In Crosskill v. Bower (1863) 32 Beav. 86 the customer, who was heavily overdrawn, executed two deeds whereby he assigned his entire estate to trustees for the benefit of his creditors. Thereafter he ceased to carry on business. He neither paid into nor drew on his bank account, and "the account was virtually closed." Sir John Romilly M.R. said, at p. 93:

"But this stoppage of interest is not confined to the case of death; a customer may say to his banker 'I close my account with you, and I shall have no further dealings with you from this day,' thereupon the balance of the account, whichever way it may be, would have to be ascertained at that period, and then all interest would cease. It depends on the pleasure of the bankers, either to enforce payment of the balance due to them or to abstain from doing so, or to obtain such security for it as they may be able. If the last course were adopted, a new contract

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122
**(Cite as: [1990] 1 A.C. 637)**

would be entered into, which would regulate the matter of interest."

In the Deutsche Bank case, 4 L.D.B. 293, to which I have already referred, the plaintiff bank advanced over £100,000 to the defendant bank before the first World War. In 1930 the plaintiffs issued a writ for the recovery of the sum lent together with compound interest. Rowlatt J. held that the relation of banker and customer continued despite the war. After referring to Fergusson v. Fyffe, he said, at p. 294: *656

"I cannot see why the mere allowing an account to become dormant, as opposed to an active account, affects it as from the moment of the last transaction. The account does not become dormant tomorrow, because you have had a transaction today . . . It seems to me I must find something analogous to the death of the party to effect a termination of the relationship or contract, of whatever you like, which governs this matter."
A little later he said, at p. 295:

"What am I to lay my finger on for saying when they stopped the currency of this system of half-yearly rests? I do not find anything that stopped it, and therefore I must hold it has gone on . . ."
But Rowlatt J.'s decision on compound interest was reversed in the Court of Appeal. Scrutton L.J., after referring to Fergusson v. Fyffe in the sentence I have already quoted, continued, at p. 295:

"In my opinion, after 31 December 1914, this was not such an account; Germany was at war with Russia, and there were no mutual dealings between the Deutsche Bank and the Moscow Merchants Bank, only debits of interest and credits for securities sold by the English Government. I should be of the opinion, if it were necessary to decide the question, that compound interest should stop after the account of 31 December 1914; or that, at any rate, it should stop after the order for winding up in 1918 . . ."
Greer L.J. said, at p. 296:

"It seems to me that upon the facts stated in the case there was a contract implied from the transactions between the parties that compound interest would be allowed on one side or the other on the current account so long as it was a current account; but that when War broke out, and it became impossible for the Russian bank to keep the account going by payments into it to set off against withdrawals, it ceased to be a current account, and the fact that the amount due on the loan account and interest was transferred to current account is not sufficient to show that by not objecting to the interest then due being added to the principal, the defendants agreed that when placed in the current account it should carry further compound interest. In my opinion, though it appeared in the bank's books as a current account, there was nothing proved in the case sufficient to found a decision that the Russian bank agreed that once it was placed in the current account it should carry compound interest, whether that account continued to be in reality a current account or not."
Romer L.J. said, at p. 297:

"In these circumstances it seems plain that the defendants must be taken to have agreed to be charged with compound interest. It is, however, established by several authorities that this implied agreement must be taken to be limited in its operation to the time during which the relation of banker and customer existed between the parties. The plaintiffs cannot justify the charge of compound *657 interest after the mercantile account current for mutual transactions had been closed and the relations between the parties had become merely that of creditor and debtor (see Fergusson v. Fyffe; Croskill v. Bower; Williamson v. Williamson)."
The law is well summarised in *Paget's Law of Banking,* 9th ed. (1982), p. 116:

"The indorsement of a statement of claim must show how the claim is based. Where the customer has acquiesced in the charging of interest, that would justify the claim. Such acquiescence will justify the charging compound interest or interest with

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

periodical rests, so long as the relation of banker and customer exists, and the relationship is not changed into that of mortgagee and mortgagor."

Mr. Pickering relied on certain tax cases which are cited on the following page of *Paget,* and on an Irish case, Yourell v. Hibernian Bank Ltd. [1918] A.C. 372. That decision appeared, at first sight, to lend some assistance to his argument. The case is complicated on the facts. But the key to understanding the case is that the account remained, in the words of Lord Atkinson, at p. 389, a "living mercantile account" right down to and, indeed, beyond the issue of the writ in 1913: see also the observations of Viscount Finlay at p. 380. The bank was in truth seeking to "re-write" the account, as Mr. Hamilton submitted, in order to maximise its security. This it was not entitled to do.

With that brief résumé of the law, I turn to the point for decision. Mr. Hamilton conceded, as I have said, that the bank is entitled to compound interest down to 13 November 1978, when the bank demanded repayment. The point for decision is whether, once the bank had demanded repayment, the relation of banker and customer ceased. Did the relationship change into that of mortgagee and mortgagor, as Mr. Hamilton submits, in which case the bank would be entitled to simple interest only? Or did it remain a relationship of banker and customer?

The judge dealt with the matter [1988] 2 Lloyd's Rep. 126, 133:

"The relationship governed by the mortgage never came to an end; but even if it were not so and the right to charge compound interest is to be founded on implied agreement, the conclusion would be the same. The account on which the bank is suing is indisputably a mercantile account. There is no evidence that the account was closed nor that it had ceased to be current for mutual transactions. The fact that Pinios has not used the account does not mean that it is not current. Both Pinios and the account have continued in being, as has the bank.

Nothing has occurred to render the operation of the account impossible. The relationship between the parties is unchanged. Neither the mortgage nor any ancillary agreement relating to the account was ever superseded or supplanted by any subsequent agreement between the parties. The bank's right to charge compound interest has therefore remained unimpaired."

The difficulty with this passage is that it treats the relationship created by the mortgage as the crucial relationship for determining whether the bank is entitled to compound interest. This, with respect, was erroneous. **\*658** It goes without saying that the mortgage, as a security, has not been determined or affected in any way. But the mortgage is not "an account current for mutual transactions" as that phrase has been understood since Fergusson v. Fyffe. The only account which could perhaps be regarded as an "account current for mutual transactions" is the bank account. The question is whether the bank account remained open; or, in other words, whether the relationship of banker and customer continued after the demand for repayment. That question is not answered by asking whether the mortgage continued as the bank's security. It obviously did. So, with great respect, the judge's findings in the passage I have quoted seem to be based on the wrong premise.

But that is only the start of our difficulties. For the judge only allowed the compound interest point to be taken at all on the footing that it could be argued as a point of law. His reason was that the point was only taken by Pinios at a late stage before him, and had not been pleaded. That may be so. But it is the bank who ought to have pleaded the basis of its claim for compound interest in the first place. That it never did. So I do not think that the failure to take the point until a late stage can be blamed entirely on Pinios.

But, wherever the blame may lie, the fact remains that we are required to determine whether the relationship of banker and customer continued, as a question of law, with very few facts to go on. Al-

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

most all we have is the account submitted with the letter before action, and the final account submitted shortly before the trial.

These show that interest was charged, with value date 15 September 1977, on the amount of the first promissory note paid by the bank under its letter of guarantee on 16 August 1977. Thereafter interest was charged at quarterly intervals, with value dates of 15 December 1977, 15 March, 15 June and 15 September 1978. We do not know how often Pinios received bank statements during the currency of the account. But in the light of the quarterly interest charges to which I have referred, Mr. Hamilton was sensible to concede that Pinios had "acquiesced" in the charging of compound interest.

If so, then an agreement to pay compound interest can be implied. As Lord Manners L.C. said in the Irish case of Lord Clancarty v. Latouche (1810) 1 Ball & B. 420, 429:

"From the acquiescence of Mr. Connolly I ought to presume an agreement at the end of every year, that the interest then due, should become principal and carry interest, which, according to Ex parte Bevan, this court will admit of, and that was a case of half-yearly rests."

But did the acquiescence continue beyond 13 November 1978 when the bank demanded repayment? There is nothing in the letter itself which indicates that the bank would go on charging compound interest, assuming that that would be sufficient to establish a continuing entitlement; and we were told that once the bank demanded repayment it ceased to send bank statements. True there is no evidence to that effect. But it would have been odd if the bank had continued to send statements once it had called in the loan, and even odder once it had *659 commenced proceedings. Pinios only learned for certain that the bank had continued to charge compound interest when it received the bank's final account shortly before the trial commenced in 1987. So far as we know there were no statements in the intervening eight years. In those circumstances it could not be right to infer that Pinios knew it was being charged compound interest, and without knowledge there could be no continuing acquiescence.

Then can the bank rely on prior acquiescence to justify a claim for compound interest continuing after 13 November 1978? I do not think so. It is difficult to see how the relationship of banker and customer could be said to have continued after the bank had commenced proceedings. But I would go further. In my judgment the correct inference and, indeed, the only possible inference is that the relationship ceased when the bank demanded repayment. The account was then closed. A line was drawn. Instead of banker and customer, the relationship became that of creditor and debtor, without the superadded rights and obligations imported by the banker/customer relationship. It is true that certain payments are shown as having been made into the account after the bank had demanded repayment. I need not go into details. They are equally consistent with payments having been made in reduction of the mortgage debt. They do not show a continuing relationship of banker and customer in any true sense.

For the reasons I have given, I would hold that the bank is entitled to simple interest only after 13 November 1978. I would summarise those reasons as follows. (i) There is no right to compound interest save by agreement, express or implied, or custom binding on the parties; (ii) there was no express agreement to pay compound interest in the present case; (iii) an agreement to pay compound interest may be implied by virtue of acquiescence (Lord Clancarty v. Latouche); but (iv) such an agreement is not normally implied except as to "mercantile accounts current for mutual transactions" (Deutsche Bank v. Banque des Marchands de Moscou, 4 L.D.B. 293, 296, *per* Greer L.J.; (v) it is open to question whether the agreement between the bank and Pinios dated 8 February 1977 was an account current for mutual transactions; but, even if it was, it ceased to be such an account when the bank closed the account and demanded repayment

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

on 13 November 1978; (vi) the bank never pleaded or proved a custom entitling it to continue to charge compound interest after the account had been closed, or, a fortiori, after it had issued proceedings for the recovery of debt.

We were told by Mr. Pickering that a decision to the above effect would cause dismay and consternation among bankers. If so, the remedy lies in their own hands. They should make express provisions for compound interest in their contracts. Since the repeal of the Usury Acts there has been nothing to stop them. Why they have not done so I do not know. But it may be that the explanation is to be found in the mordant observations of Lord Atkin in Paton v. Inland Revenue Commissioners [1938] A.C. 341, 347:

"It is obvious that the system adopted by banks, which seems to have been common practice in Lord Eldon's time, is for the purpose *660 of giving them compound interest without perhaps flaunting that fact before their customers."

As for the rate of simple interest, Mr. Hamilton argued that interest is recoverable under section 35A of the Supreme Court Act 1981. But I see no reason why the bank should not receive simple interest at the rate stipulated in the agreement dated 8 February 1977 which provides, as does the mortgage, for interest to continue until payment.

So I would allow the appeal on the compound interest point, but dismiss it on all other points.

**NICHOLLS L.J.**

I agree that an order should be made in the terms proposed by Lloyd L.J. I add some observations of my own because we are differing from the judge on one point of general importance, and out of deference to the arguments of counsel.

*The bank's duty*

Neither party sought to challenge any of the judge's conclusions of fact. So I consider first what were the judge's relevant conclusions of fact. This is ne-

cessary, because counsel put different interpretations on the judge's finding that "when the insurance was renewed Mr. Theodoropoulos on behalf of the bank knew and approved of what was done."

We were referred to some of the evidential material which was before the judge, so as to enable us the better to appreciate the setting against which the judge reached his conclusions. In my view, read in its context in the judgment, the phrase "knew and approved" does not mean that before renewing the insurance in April 1978 Glafki was given instructions by the bank on the amount of the insurance which the bank required or wished to be effected, nor does it mean even that at the time the bank's approval of the amount was communicated to Glafki. In the crucial sentence the judge made a finding as to Mr. Theodoropoulos's state of mind: he knew what was being done by Glafki regarding the insurance and, for his part, he approved of what was being done. We have been shown nothing which would justify giving to the word "approved" in the judge's finding any wider meaning than that.

Of course, the pattern of dealings between two parties may be such that the failure of one to object to a course proposed by the other is fairly to be understood by the other as assent. But there is no finding of fact to this effect by the judge in the present case.

The second factual point to be noted is this. The judge said that both Mr. Demetracopoulos, the loan officer, and Mr. Theodoropoulos, manager of the main London branch, would have known "if they had thought about it" that the 1978 insurance was likely to have been a breach of the obligation to keep the ship insured for not less than 130 per cent. of the amount secured by the mortgage (which must be a reference to both mortgages). The judge also found that they (the officers of the bank) did not regard their responsibility as going further "than that," namely, checking, for the bank's own protection, that the amount of the insurance continued to cover the bank's debt. The judge's *661 findings, thus, do not go so far as to find that, at the time

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

when the bank through Mr. Theodoropoulos approved of the April 1978 insurance, he or any other officer in the bank appreciated that, or even considered whether, the amount of the cover fell short of the 130 per cent. figure.

The third point to be noted is the judge's finding that "all decisions about the management and operation of the ship were left to Glafki, including the renewal of the insurance."

Those being the facts as found, it follows that this is not a case where the bank intervened in the carrying out by Glafki of its duties in the way it considered fit. The bank did not instruct Glafki on the amount of insurance cover to be effected. Had it done so, I think that - depending on the particular facts - there might well have been a liability on the bank in respect of the under-insurance. Glafki's obligations under clauses 1 and 2 of the management agreement required it to insure for the 130 per cent. figure. Take, therefore, by way of hypothetical example, a case where without reference to Pinios and without the knowledge of Pinios the bank intervenes and exercises its powers under the management agreement by directing Glafki to insure for a much lower sum than 130 per cent., or not to insure at all, even though such an instruction is not in accordance with the way in which any reasonably prudent shipowner would operate, and even though (depending on the amount of the insurance) that might be an event of default under the first mortgage and under the bank's own mortgage. I would have no doubt that such an instruction would be a breach of the duty of care which in my view this agreement implicitly requires shall be exercised by the bank in giving instructions to Glafki regarding insurance. I confine my observation to insurance, because the field over which the bank might give directions is so wide that generalisation in respect of all directions would be unwise and, in my view, unjustified. I am not persuaded that either there is a duty of care in respect of all directions given by the bank or there is a duty of care in respect of none. There may be matters where there would be a con-

flict between the interest of the bank and the owners, and in respect of which the bank would not owe a duty of care to the owners when giving instructions to Glafki. However, it is not necessary to explore these points further, because this is not a case in which the bank actively intervened at all.

What the bank did was that, knowing of the amount of the 1978 insurance, it failed to object. Its officers were content to leave unaltered the amount of the insurance Glafki had effected or was effecting, because that amount was thought sufficient to cover the bank's indebtedness. Thus to succeed in this appeal Pinios has to go much further than establishing an obligation on the bank to use reasonable care in the exercise of its powers under the management agreement. To succeed Pinios must show that under this agreement there was imposed on the bank an obligation positively to take action to check that Glafki was not committing a breach of its duty under the management agreement regarding insurance.

I do not think that there was any such obligation on the bank. In the absence, at any rate, of actual knowledge or suspicion by the bank of misconduct on the part of Glafki, I consider that the bank was entitled **\*662** to do what it did, viz., leave to Glafki, the appointed agent, all decisions about the management and operation of the ship, including renewal of the insurance. By the agreement the bank was expressly given wide powers to override Glafki, and conversely Pinios was expressly excluded from interfering with the ship. But I do not think that these two elements in the parties' relationship lead to the conclusion that the management agreement of its nature implicitly required the imposition on the bank of an obligation to the effect I have mentioned. I take the test of "implicitly required" from the speech of Lord Wilberforce in Liverpool City Council v. Irwin [1977] A.C. 239, 254F. The bank is a bank, not a shipowner or operator. The management of the vessel had been put in the hands of a mutually-agreed agent. The agent was required to report monthly to the bank and

© 2009 Thomson Reuters.

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

Pinios. The agent Glafki, and not the bank, was the party required to insure. If (as here) the agent was in breach of one of its duties, Pinios would have a remedy against it. I see no good reason for impliedly importing into this relationship an obligation on the bank, even in respect of insurance, to check that Glafki was duly performing its obligations.

We heard much learned argument in support of a submission that Pinios has a cause of action in tort, as distinct from a cause of action based on the breach of an implied term of the management agreement. In my view this argument is misconceived. If the nature of the management agreement between the parties is not such as implicitly to require that the bank should be under an obligation to the effect I have mentioned, I do not see how it can be right nonetheless for the law of tort to impose such a requirement. Pinios entered into a written agreement with the bank and, echoing the words of Lord Scarman in Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80, 107, Pinios cannot rely on the law of tort to provide it with a greater protection against the bank than that for which, expressly or impliedly, it has contracted with the bank.

*Compound interest*

The bank sought to establish an entitlement to compound interest in two ways. First, it relied on the terms of the documents. As to that, neither the loan agreement nor the mortgage contains an express provision authorising the bank to charge compound interest. Nor is such a provision implicit in the documents. Clause 8(A) of the loan agreement, and the corresponding provision in the mortgage, are concerned only to fix a rate of interest: "the agreed interest rate," as it is described in the agreement. Clause 8(C), with its reference to "interest payment date," does contemplate that the interest will be due and payable from time to time whilst the principal is still outstanding. But this does not assist the bank because, if anything, this provision is inconsistent with the charging of compound interest. The provi-

sion does not envisage that unpaid interest will be capitalised and itself bear interest along with the principal. What it seems to envisage (the drafting is not wholly clear) is that the effect of non-payment of interest will be that the interest will remain payable but, from the date when it ought to have been paid until **\*663** the date when it is actually paid, interest on the principal sum will be payable at a higher rate.

Secondly, the bank relied on the practice or custom of bankers. Mr. Hamilton did not challenge the bank's entitlement to charge compound interest on this footing until payment was demanded in November 1978, but he disputed its right to do so thereafter.

I confess that when the argument was first advanced I found it surprising. Interest on a debt, of course, ceases to accrue after the principal sum has been repaid. And there is the familiar principle that upon judgment being given an agreement to pay interest which is merely incidental to the agreement to pay the principal sum will merge in the judgment to pay the principal sum: see Earl of Halsbury L.C. in Economic Life Assurance Society v. Usborne [1902] A.C. 147, 149. But if the arrangement between two parties is such that, impliedly, compound interest *is* agreed to be payable on a loan of money, it seemed to me at first sight very odd if compound interest should cease to be payable as soon as the creditor asks for his money back, even though it may be months or years before he gets the money. Unassisted by authority I would not have expected to find that the law today was that if a bank is, by implication, entitled to charge compound interest on an overdraft, its entitlement continues only so long as it is prepared to leave the money outstanding and that its entitlement ceases when it demands immediate repayment. So that, so far as interest is concerned, the customer's position improves when the bank makes such a demand: thenceforth, unlike previously, interest which is due but not paid does not itself bear interest.

I turn to the authorities. These establish clearly that

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

the practice relied on by the bank in this case is one of long standing. To facilitate the use of compound interest by banks despite the usury laws, which were not finally repealed until 1854, the courts resorted to the fiction that a fresh agreement for the payment of interest was made on the occasion of each rest in a customer's account. An agreement, express or implied, to pay compound interest made when a customer opened an account with a bank would have been unlawful. But if on each occasion when a bank charged or credited interest to an account, the parties were to enter into a new agreement that the balance then struck would bear interest, that agreement would be lawful, because it would provide only for the payment of simple interest on an agreed sum. Thus, on this analysis, over a period of years there would be a series of separate agreements between banker and customer, made at intervals of one year or six months or whenever, depending upon the manner in which the bank kept its accounts. That notion, of each debiting or crediting of interest being the subject of a separate, fresh agreement, was fundamental to the lawfulness of this practice. There was a succession of agreements, implied from the customer's acquiescence in the practice of the bank regarding the debiting and crediting of interest.

Thus Lord Eldon, in 1803, in Ex parte Bevan, 9 Ves.Jun. 223, 224, said:

"it is clear, you cannot a priori agree to let a man have money for twelve months, settling the balance at the end of six months; and *664 that the interest shall carry interest for the subsequent six months; that is, you cannot contract for more than 5 per cent.; agreeing to forbear for six months. But, if you agree to settle accounts at the end of six months, that not being part of the prior contract, and then stipulate, that you will forbear for six months upon those terms, that is legal."

In 1938, in Paton v. Inland Revenue Commissioners [1938] A.C. 341, 357, Lord Macmillan commented on that principle and its survival despite the repeal of the usury laws:

"On this principle it was held in Eaton v. Bell (1821) 5 B. & Ald. 34 that the bankers who, with the knowledge of and without objection by their customers, debited them with interest with half-yearly rests in accordance with their general practice, did not offend against the usury laws. This method of dealing with loan accounts, which became common form among bankers, survived the abolition of the usury laws and is well established as the ordinary usage prevailing between bankers and customers who borrow from them and do not pay the interest as it accrues."

Although this rationale of the arrangements between banker and customer, with a succession of separate agreements, was (as it seems to me) essentially fictitious, the courts did not apply the artificiality beyond the point at which, on the facts in a particular case, it was possible to spell out from the parties' relationship the necessary fresh agreement for the payment of interest on an agreed balance. Thus compound interest ceased to be payable, by virtue of this practice, on the death of a customer (Fergusson v. Fyffe (1841) 8 Cl. & Fin. 121) or of the banker (Crosskill v. Bower (1863) 32 Beav. 86, 93); on the bankruptcy of either (Crosskill v. Bower); on the winding up of the banker (Deutsche Bank v. Banque des Marchands de Moscou (1931) 4 L.D.B. 293); and on the customer's announcement to a banker that he is closing his account and having no further dealings with him: per Sir John Romilly M.R. in Crosskill v. Bower, 32 Beav. 86, 93.

This being the underlying principle it follows, in my view, that once a banker or customer has unequivocally demanded immediate payment of what is due to him from the other, with the intention of being paid in full and ending their relationship, compound interest normally will cease to be payable. The usual formal letter, written by a bank before proceedings are started, would be typical of such a demand. Compound interest will cease to be payable in that event because there will no longer be the factual basis on which to found the implication of a fresh agreement to pay interest on an

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122
**(Cite as: [1990] 1 A.C. 637)**

agreed balance. Such a demand, as much as the other events I have mentioned, will end the relationship in which alone the making of a fresh agreement to pay interest on an agreed balance is to be implied. This relationship, that of banker and customer, is to be contrasted with the position after an account has been closed "and the relations between the parties . . . become merely that of creditor and debtor ": *per* Romer L.J. in the Deutsche Bank case, at p. 297).

**\*665** In the present case the bank's letter to Pinios of 13 November 1978, sent by registered post, was such a demand. The letter read:

"We refer to your account showing the amount of U.S.\$784,959.11 due to us, being the balance of the amount paid by us to the Dai Ichi Kangyo Bank Ltd., Tokyo in accordance with the terms of our letter of guarantee No: 926335 dated 9 February 1977.

"We now write to demand payment of the amount due to us. A statement of account will follow in due course."

It may be thought anachronistic that the law in this field is still shaped by a fiction adopted to circumvent laws that were repealed in the middle of the last century. But the banks are not without a remedy. Express intimation to all their customers of the manner in which interest will be charged on overdrafts and loans, and that this will continue until payment, would not seem to be impractical or particularly expensive nowadays.

Before us some argument was directed at how expressions such as "mercantile accounts current for mutual transactions" (Fergusson v. Fyffe, 8 Cl. & Fin. 121, 139) and "a living mercantile account" ( *per* Lord Atkinson in Yourell v. Hibernian Bank Ltd. [1918] A.C. 372, 389) are to be understood today and whether they exclude deposit accounts or loan accounts from the ambit of the bankers' practice. However, those questions, and the further question of what was the true nature of the bank's account with Pinios, do not call for determination

on this appeal, because (as I have said) Mr. Hamilton expressly did not challenge the bank's right to charge compound interest until payment was demanded in November 1978.

For these reasons, I agree that the bank was not entitled to charge compound interest after making that demand.

### O'CONNOR L.J.

I agree with the order proposed by Lloyd L.J. for the reasons given by him.

On the issue of compound interest I add a few words of my own. Lloyd L.J. has traced the history of the way in which capitalisation of interest was permitted at periodical rests in order to achieve a payment of compound interest which would otherwise have been illegal by virtue of the usury laws. In my judgment clause 8 of the loan agreement is in clear terms; it provides for payment of interest at an agreed rate. By its terms it envisages that interest is to be charged periodically: see the reference to an "interest payment date." In paragraph (C) express provision is made for what is to happen if interest is not paid on "a relevant interest payment date"; for convenience I set out that paragraph:

"(C) If any interest shall be due and unpaid four working days after the relevant interest payment date the amount of interest shall be recalculated from the interest payment date until the date of payment at the rate of two per cent. per annum above the agreed interest rate."

For my part I see no ambiguity in this provision. If interest due on a payment date remains unpaid for four days then as from that payment **\*666** date the rate of interest is to be increased by 2 per cent. That is a clear simple interest provision.

By reason of the authorities considered by Lloyd and Nicholls L.JJ. in their judgments Pinios have accepted throughout that they were liable to pay compound interest after the first default. I must not be taken as agreeing that the cases required that concession to be made. The bank account in this

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

case does not seem to me to qualify as a "mercantile account current for mutual transactions": see Ferguson v. Fyffe, 8 Cl. & Fin. 121, 140. I am very doubtful that the requisite banker-customer relationship was created by either the guarantee agreement or the second mortgage. I see no reason why a bank should be in any different category to any other surety. The account was not opened until the bank made the first payment under the guarantee on 16 August 1977. From that time down to the demand letter of 13 November 1978 the account records interest at quarterly rests from 15 September 1977, the payment of the second bill under the guarantee and the receipt of insurance moneys in 1978 after the loss of the ship. There is one payment to Glafki, $12,116.82 in September 1977 when the agency agreement was made.

However, in view of the concession, we heard no argument on the matter and I express my doubt so that bankers do not take this decision as authority for saying that a contract of guarantee of itself creates the banker-customer relationship needed to enable them to recover compound interest where no express provision in that behalf has been made.

For the reasons given by Lloyd L.J. I agree that the bank is entitled to recover simple interest at the contracted rate from 13 November 1978.

*Appeal allowed. No order for costs in Court of Appeal; costs below to stand. Leave to appeal. ([Reported by EDWARD JACKSON ESQ., Barrister-at-Law] )*

**Representation**

Solicitors: Elborne Mitchell; Thomas Cooper & Stibbard.

APPEAL from the Court of Appeal.

This was an appeal by the plaintiff, National Bank of Greece S.A., from the judgment dated 2 March 1988 of the Court of Appeal (O'Connor, Lloyd and Nicholls L.JJ.) allowing in part an appeal by the first defendant, Pinios Shipping Co. No. 1, and the

second defendant, George Dionysios Tsitsilianis, from the judgment dated 29 January 1987 of Leggatt J. The Court of Appeal dismissed the defendants' appeal on the issue of liability, but allowed their appeal on the issue pertaining to quantum, which was whether the defendants were liable to pay compound interest to the plaintiff on the outstanding indebtedness from 13 November 1978 until judgment.

**\*667** The Court of Appeal gave leave to appeal on the compound interest issue and there was no further appeal on the issue of liability.

The facts are stated in the opinion of Lord Goff of Chieveley.

*Murray Pickering Q.C.* and *David C. Owen* for the plaintiff bank. The bank's primary submission is that there is a well recognised usage of bankers which permits them to capitalise unpaid interest for a period or periods.

Reliance is placed on the following propositions: (i) the practice of bankers under which unpaid interest is capitalised periodically has been recognised and accepted by the courts for at least 150 years and that practice has been implied in all contracts between banker and customer. (ii) Acquiescence on the part of the customer to capitalisation of interest was necessary until the repeal of the Usury Acts in 1854. (iii) If contrary to the second proposition there is still a requirement for the bank to obtain consent on behalf of the customer then such acquiescence need only be shown at the outset - it does not have to be of a continuing nature.

The doctrine of acquiesence was devised by the courts to circumvent the Usury Acts. Thus in Ex parte Bevan (1803) 9 Ves.Jun. 223 it was held by Lord Eldon L.C. that an agreement in advance to lend at 5 per cent. per annum, with the balance to be settled at 6 months, but with the agreement of the creditor to forbear from enforcing the agreement of the interest due at 6 months, would be an agreement which would give the creditor interest

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

upon interest and would be illegal under the Usury Laws. The underlying reasoning appears to have been that any agreement providing for interest upon interest would, in due course produce an interest charge on the original principal sum in excess of the statutory maximum. Nevertheless it was stated by Lord Eldon that the same agreement made at the end of the 6 month period would be legal. In effect the debtor could be taken to have agreed with the lender to increase the principal sum at that stage on the basis of acquiesence by the debtor and forbearance by the lender.

For an earlier example of the court's endeavour to mitigate the effect of the Usury Acts: see Lord Ossulton v. Lord Yarmouth (1707) 2 Salk. 449. At one time an agreement in a mortgage to capitalise interest in arrear was being usurious but in that case it was held that upon interest becoming due, the parties could agree to turn it into principal. The first of the banking cases proper is Lord Clancarty v. Lord Latouche (1810) 1 Ball & B. 430. This is a much cited decision and contains a classical enunciation of the right of bankers to charge compound interest. On its facts there was held to be a series of deemed acquiesences. That decision was followed in Eaton v. Bell (1821) 5 B. & Ald. 34. It is to be observed that in none of the foregoing cases was there any express provision allowing the bank to capitalise interest.

In the Court of Appeal Lloyd and O'Connor L.JJ. accepted the defendants' contention that banks can only be entitled to charge compound interest on accounts for their customers which are and continue to be "mercantile accounts current for mutual transactions." Lloyd L.J. doubted if the loan account in the present case satisfied that requirement but, eliding the requirement with the issue as to the ending of the banker customer relationship, he held that the account ceased to satisfy that **\*668** requirement after the plaintiffs' demand for payment on 13 November 1978. O'Connor L.J. held that the account did not seem to "qualify" as a "mercantile account current for mutual transactions, " apparently

at any stage. Nicholls L.J. did not have to decide any question with reference to this issue. The authority which was relied upon to establish this as a requirement of banking law was the decision of this House in Fergusson v. Fyffe (1841) 8 Cl. & Fin. 121. On appeal to this House only two issues remained to be decided in this complex case, namely, (i) at what rate interest should be computed on the balance owed by the bank from 1810; and (ii) whether that interest should be charged with, or without, annual capitalisation.

In 1812 the bank had prepared a final account of the amount owing to Dr. Fyffe in 1810 at the date of his death. The statement was accompanied by a memorandum stating that the account was to bear interest at 9 per cent. per annum. It was held on the first issue that the bank was not at liberty to withdraw from that promise to pay and that interest at 9 per cent. was due on the balance from 1810 until the date of final decree. On the second issue it was held that the account and memorandum contained no agreement as to capitalisation after 1810, and appeared to exclude it: see *per* Lord Cottenham L.C., at p. 139. The Lord Chancellor also pointed out, at p. 139, that the account had ceased to exist as from 1810 on the death of Dr. Fyffe as "from that time there was no party with whom any account current could be carried on . . ." A claim to compound interest had to be founded on "a contract, expressed, or implied from the mode of dealing with former accounts, or custom. " It followed that "the absence of any party with whom any such contract can have been made, must have been fatal to the claim."

The plaintiffs accept and rely upon the actual decision on the two issues dealt with by this House. In particular, reliance is placed upon the fact that capitalisation of interest was upheld throughout the period of Dr. Fyffe's insanity of and inactivity on the account.

Lord Cottenham, however, elaborated upon the decision on the second issue in terms which have since given rise to uncertainty and which should be

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

reviewed in this appeal. He said, at p. 140, "generally a contract or promise for compound interest is not available in England, as was decided in Ex parte Bevan, 9 Ves.Jun. 223 except perhaps as to mercantile accounts current for mutual transactions . . ."

The following are the grounds upon which reliance is placed for seeking a review of this statement: (i) it was not a formulation of the basis for the decision of this House in Fergusson v. Fyffe but was a tentative aside, not intended to lay down any new rule of law; (ii) it is not clear whether it was intended merely to paraphrase the view that periodic agreements to capitalise interest at the end of each interest period as between merchants were legal under the Usury Laws, or whether it contemplated that, as an exception to the general rule, prior contracts for the capitalisation of interest might be legal provided they were made with reference to the type of account specified; (iii) whatever **\*669** meaning was intended it is clearly aimed to apply in the context illegality created by the Usury Laws, and on their repeal in 1854 the need for a purpose of such a formulation disappeared; (iv) its lack of utility as a rule of law is evidenced by the fact that it has not been applied as the ground for the decision of any subsequent reported case; (v) it was considered obiter in Deutsche Bank v. Banque des Merchands de Moscou (1931) 4 L.D.B. p. 293. All three members of the Court of Appeal in that case sought to apply it to the same question and reached three different answers. It was considered by the Court of Appeal in the present case also, but without any consensus as to its application. These two decisions of the Court of Appeal appear to have confirmed that the statement is still being treated as good law but they highlight the difficulties of giving it any meaning in relation to contemporary banking transactions; (vi) the uncertainties which surround any attempt to apply the statement in the context of modern banking practice originate from the fact that its constituent terms, "mercantile account," "account current " and "mutual transactions" have never been defined except perhaps in

Ex parte Bevan, 9 Ves.Jun. 223, where it is described in terms which are irrelevant for this purpose.

There are Scottish cases of the last century which recognise that capitalisation of interest can apply without an express agreement: see Cruickshank v. British Linen Co. (1834) 13 Shaw & D. 91 and Palmer & Co.'s Assignees v. Glas (1835) 13 Shaw & D. 308. See especially Reddie v. Williamson (1863) 1 Macph. 228 which is strongly relied on for the proposition that it is the usage of bankers to capitalise interest periodically. As to whether interest is charged on any outstanding debt on the death of a customer the position appears to be that banks continue to charge interest after the death of the customer, until repayment by the personal representatives. Crosskill v. Bower (1863) 32 Beav. 86, is the only case in the books where the question of acquiesence has been tested and the bank on the evidence produced failed to prove that it was entitled to capitalise interest. The unilateral closure of an account by a customer cannot deprive the banker of further interest until he obtains judgment or repayment of the debt. Dicta to the contrary in Crosskill v. Bower are strong.

To return to the English cases, it is to be noted that the observations of Sir William James V.-C. in Williamson v. Williamson (1869) L.R. 7 Eq. 542, 546 in relation to a bank's entitlement to charge compound interest make no reference to it being limited to "a mercantile account current for mutual transactions." His judgment is more in line with the approach of the modern cases.

As to the method of keeping the account, the right to capitalise interest may be founded on express terms together with the practice the parties adopt in implementing those terms: Barfield v. Loughborough (1872) L.R. 8 Ch.App. 1, 6- 7. In the case of a bank account, capitalisation of interest is an aspect of the system adopted by banker and customer for operating an account. If the banker and the customer carry on the account according to some specific system it will be assumed that there is a binding

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

agreement as to that method of keeping **\*670** the account: Mosse v. Salt (1863) 32 Beav. 269, 274, *per* Sir John Romilly M.R.

There are a number of tax cases which deal tangentially with the question of compound interest. In Inland Revenue Commissioners v. Holder [1931] 2 K.B. 81, 96, Lord Hanworth M.R. referred to "a practice which has been adopted by bankers for over a century." See also *per* Romer L.J., at p. 98. The observations in that case are similar to those of Vaughan Williams L.J. in Parr's Banking Co. Ltd. v. Yates [1898] 2 Q.B. 460, 467, a case which is relied on strongly for the proposition that it is not necessary to rely on an express agreement to enable a bank to capitalise interest.

As to Inland Revenue Commissioners v. Lawrence Graham & Co. [1937] 2 K.B. 179, it is there correctly stated that it was not bankers who devised contracts to circumvent the Usury Acts but that it was the courts who devised a method so to do. Paton v. Inland Revenue Commissioners [1938] A.C. 341 is of great importance for what was said by Lord Macmillan, at p. 357, and Lord Maugham at p. 364, on the practice of bankers in relation to the capitalisation of interest is contrary to what was stated by the Court of Appeal in the present case. Moreover, in Inland Revenue Commissioners v. Oswald [1945] A.C. 360, 379, Lord Porter referred to Paton v. Inland Revenue Commissioners as being a case in which the contract, under which compound interest was charged, as one "constituted by the custom of bankers." This expression encapsulates the present submission.

As to the authorities which support the defendants, the high water mark of the cases would appear to be Waring v. Cunliffe (1790) 1 Ves. Jun 99. See also Morgan v. Mather (1792) 2 Ves.Jun. 15 and Caliot v. Walker (1794) 2 Anst. 495. [Reference was made to Bruce v. Hunter (1813) 3 Camp. 467; Stacpoole v. Stacpoole (1816) 4 Dow. 209; Rufford v. Bishop (1829) 5 Russ. 346 and Newal v. Jones (1830) 1 M. & M. 449.]

As to acquiescence, there should be no requirement of acquiescence to enable a banker to capitalise interest. On the authorities acquiescence was required prior to the repeal of the Usury Acts in 1854: see Eaton v. Bell, 5 B. & Ald. 34. After 1854 the requirement for acquiescence was often referred to but emphasis was more and more placed on the custom of bankers. This is found from Crosskill v. Bower, 32 Beav. 86 to Paton v. Inland Revenue Commissioners [1938] A.C. 341. It is not clear from the cases whether periodic acquiescence was required or only an initial acquiescence or something between these two limits. There is nothing in Fergusson v. Fyffe, 8 Cl. & Fin. 121, which is of assistance on this question because that case was concerned with Indian law. As previously stated, if the banker and the customer carry on the account according to some specific system it would be assumed that there is a binding agreement as to that method of keeping the account: see Mosse v. Salt, 32 Beav. 269, 274.

It is not clear from the authorities what constitutes a requisite agreement enabling a bank to capitalise interest. It is the plaintiffs' submission that a term to that effect is to be implied into the contract by the usage of bankers. In the present case, the Court of Appeal held that **\*671** a pre-requisite was a contractual acquiescence. But if that is so, is the customer deemed to make an agreement? Is it, in other words, a fictional agreement? But the law does not recognise agreements of that nature: see Allied Marine Transport Ltd. v. Vale do Rio Doce Navegacao S.A. [1985] 1 W.L.R. 936, 937, *per* Goff L.J.

If the reasoning of the Court of Appeal in the present case is upheld it would appear that the House would be over-ruling Reddie v. Williamson, 1 Macph. 228, and Scottish banking law and practice would have to be revised.

In conclusion on acquiescence, this concept is otiose in the modern law. It had a purpose up to the repeal of the Usury Acts in 1854. The decision of the Court of Appeal has the extraordinary consequence that it has the opposite effect to that which the doc-

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

trine of acquiescence originally had. Moreover it is otiose in practice for the custom is unreal and its application leads to a continuing state of uncertainty. True it is that the banks could enter into express agreements but this would entail major changes and expense.

It is a remarkable feature of all the authorities that none of them except the present state that for there to be capitalisation of interest it must be by way of express agreement. In Reddie v. Williamson, 1 Macph. 228, 236 Lord Justice-Clerk Inglis stated that it was the invariable practice of bankers to capitalise outstanding interest. Subsequent to that case courts more and more have relied on usage as enabling interest to be capitalised: see Paton v. Inland Revenue Commissioners [1938] A.C. 341. It is emphasised that after the repeal of the Usury Acts the courts have relied on custom: see, for example, Barfield v. Loughborough, L.R. 8 Ch.App. 1.

As to the ending the banker-customer relationship, in general, neither the banker nor the customer can end the relationship unilaterally. The relationship can only end when all indebtedness of the bank has been discharged. The existence of a banker-customer relationship is established by the existence of an account: Great Western Railway Co. v. London and County Banking Co. Ltd. [1901] A.C. 414. There are unresolved questions as to whether, apart from death or insolvency, an account can be closed at any time. A bank can only close an account in credit by giving a reasonable notice to the customer. It is not clear whether a bank can close an account in debit forthwith.

In conclusion, in the present case the loan account was kept consistently with 3 monthly rests from 15 September 1977 up until judgment. There was no evidence adduced at trial specifically directed to the sending and receipt of bank statements or communications about the manner of keeping the account. The defendants nevertheless accept that the first defendant acquiesced in the practice of quarterly debiting of interest up to at least 13 November 1978. This is consistent with the documentary evidence

immediately prior to the demand of that date. In accepting this method of accounting the first defendant became bound by it: Yourell v. Hibernian Bank Ltd. [1918] A.C. 372. A proper inference to be drawn from the express and implied terms of the loan agreement and second preferred mortgage and from the method of accounting adopted was that the capitalisation of interest would continue *672 so long as interest and principal remained unpaid as debit items in the loan account. Accordingly, the plaintiffs' entitlement to capitalise interest did not end with the making of a demand on 13 November 1978. It continued while the banker-customer relationship between the plaintiffs and the first defendant remained in existence until judgment. [Reference was also made to Joachimson v. Swiss Bank Corporation [1921] 3 K.B. 110; Rekstein v. Severo Sibirsko Co. and Bank for Russian Trade Ltd. [1933] 1 K.B. 47; Paget, The Law of Banking, 9th ed. (1982), pp. 245, 274; Holden, The Law and Practice of Banking, vol. 1, 4th ed. (1986), paras. 321-325 and Minories Finance Ltd. v. Mohan Wassiamal Daryanani, The Times, 14 April 1989; Court of Appeal (Civil Division) Transcript No. 495 of 1989.]

The defendants did not appear and were not represented.

Their Lordships took time for consideration. 30 November. LORD BRIDGE OF HARWICH.

My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Goff of Chieveley. I agree with it and for the reasons he gives I would allow this appeal.

LORD BRANDON OF OAKBROOK.

My Lords, for the reasons given in the speech of my noble and learned friend, Lord Goff of Chieveley, I would allow this appeal.

LORD GRIFFITHS.

My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend,

© 2009 Thomson Reuters.

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122
**(Cite as: [1990] 1 A.C. 637)**

Lord Goff of Chieveley. I agree with it and for the reasons he gives I would allow this appeal.

## LORD GOFF OF CHIEVELEY.

My Lords, this appeal is concerned with a claim by a bank to compound interest. The appellants, the National Bank of Greece ("the bank"), sought to recover the balance owing on an account maintained by it for the first respondents, Pinios Shipping Company No. 1 ("Pinios"). The amount so claimed included interest, capitalised with quarterly rests, up to the date of judgment. The issue on the appeal before your Lordships' House is whether the bank ceased to be entitled to capitalise interest from the date when it demanded repayment, with the effect that it was entitled only to simple interest from the date of the demand until the date of judgment.

The matter has arisen in the following way. Pinios agreed to purchase a ship, the m.v. *Maira*, under a shipbuilding contract dated 28 July 1975. The ship was delivered in February 1977, at which time 70 per cent. of the purchase price was outstanding. Pinios had agreed with the shipbuilders that the balance would be paid by 14 half-yearly instalments, secured by a first preferred mortgage on the ship. The bank provided a guarantee for the payment by Pinios of the first six of these instalments. The bank in its turn was secured by a second preferred mortgage on the ship, and by a personal guarantee by the second respondent ("Mr. Tsitsilianis"). In the event, Pinios was unable to pay any of the **\*673** instalments due to the shipbuilders, and the bank was called on to pay two of the instalments under its guarantee, the first payment being made on 16 August 1972. The ship sank at sea on 10 April 1978. The insurance proceeds were insufficient to enable Pinios to repay the bank under the second preferred mortgage.

On 13 November 1978, the bank wrote to Pinios and Mr. Tsitsilianis demanding repayment of the amount outstanding, including compound interest. These demands met with no response. In 1980 the bank commenced proceedings against Mr.

Tsitsilianis and, in 1981, against Pinios, claiming principal and interest. By that time, Pinios was pursuing a claim against the managers of the ship claiming damages arising from the under-insurance of the ship. The trial of the bank's action was delayed, mainly because the two respondents wished to postpone the hearing until after the arbitration proceedings against the managers had come to an end. Pinios obtained an award against the managers, but the managers failed to honour the award. The bank's action then came on for hearing before Leggatt J. in January 1988. At the trial, Pinios denied liability on the basis of an alleged breach of duty by the bank, and raised a number of accounting issues. All but one of these accounting points were abandoned during the trial. Leggatt J. [1988] 2 Lloyd's Rep. 126 held that the bank had committed no breach of duty, and that one adjustment should be made to the account.

However, after the bank had closed its case at the trial, the two respondents raised a new issue relating to the entitlement of the bank to capitalise outstanding interest after the demand made on 13 November 1978. Despite objection from the bank, Leggatt J. gave leave for the point to be argued "in so far as it was capable of being taken as a point of law and not dependent on evidence." After hearing argument, he rejected the submission of the two respondents, holding that the bank was entitled to continue to capitalise interest up to the date of judgment, either upon the express words of the second preferred mortgage, or because the relationship between the parties remained unchanged after November 1978. The two respondents then appealed to the Court of Appeal, ante, p. 641, both on the point relating to breach of duty, and on the point on compound interest. On the former point, they again lost; but on the latter point, they succeeded. As before Leggatt J., the two respondents accepted liability to pay compound interest from August 1977 until the date of demand in November 1978. However, the Court of Appeal held that the bank's entitlement to capitalise interest came to an end on that date, with the effect that the bank was

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

entitled only to simple interest from 13 November 1978 until the date of judgment, over nine years later, on 2 March 1988. It is against the decision of the Court of Appeal on the compound interest point that the bank now appeals to your Lordships' House.

In the event, your Lordships heard argument only from counsel for the bank; neither respondent was represented, it seems because they had run out of funds. It follows that success in the appeal could be of no direct financial assistance to the bank. It has however pursued the appeal as a matter of principle, considering that the point is one of importance affecting not only itself, but the whole banking community. I **\*674** must confess to having felt concern at being asked to consider a question of principle without assistance from counsel for the respondent, and furthermore in the absence of any evidence of the practice of bankers. However, having regard in particular to the concession made by the respondents below that the bank was entitled to charge compound interest with quarterly rests during the currency of the bank/customer relationship, I have come to the conclusion that your Lordships' House is able to decide the particular point under appeal, though not perhaps in a position to deal as fully with the point of principle as might have been wished.

I start with the reasoning of the Court of Appeal. They first disagreed with the view of Leggatt J., that the bank was entitled to compound interest on the express terms of the mortgage. The Court of Appeal could find no such term in the mortgage; as to that, I find myself in agreement with the Court of Appeal, and I do not find it necessary to consider the point further.

The question then arose before the Court of Appeal whether there was an implied agreement to pay compound interest which continued after the date of demand. Lloyd L.J., ante, p. 659, approached the matters as follows. He considered that an agreement to pay compound interest might be implied by virtue of acquiescence, but that such an agreement

is not normally implied except as to "mercantile accounts current for mutual transactions." He thought it open to question whether the agreement between the bank and Pinios was an account current for mutual transactions; but, even if it was, he held, ante, p. 659, that it ceased to be such an account when the bank "closed the account and demanded repayment on 13 November 1978." He rejected an argument by the bank founded upon the custom or practice of bankers, because the bank never pleaded or proved a custom entitling it to continue to charge compound interest after the account had been closed. Nicholls L.J. found it surprising that, if compound interest is impliedly agreed to be payable on a loan of money, it should cease to be payable as soon as the creditor asks for his money back; but he considered it to be established by the authorities, ante, p. 664, that

"once a banker or customer has unequivocally demanded immediate payment of what is due to him from the other, with the intention of being paid in full and ending their relationship, compound interest normally will cease to be payable."

I shall refer later to the authorities upon which Nicholls L.J. relied for that proposition. O'Connor L.J. agreed, while expressing doubt whether there was, in the present case, the necessary "mercantile account current for mutual transactions" to give rise to a right in the bank to charge compound interest - a point which he did not have to decide, in the light of the concession made by the respondents.

Before your Lordships' House, Mr. Pickering assisted your Lordships with a full review of all the material authorities (including any authorities which might have been relied on by the respondents, if they had been represented). I have no doubt that your Lordships have had the benefit of a more complete citation of authority than was available to the Court **\*675** of Appeal. Among the submissions advanced by Mr. Pickering on behalf of the bank was one that the bank's entitlement to compound interest arose by virtue of a term to be implied into the contract between the parties by reason of a custom or practice of bankers. I, for my part, can see

© 2009 Thomson Reuters.

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

no reason for excluding any such argument on the ground that it was not pleaded by the bank. The bank's statement of claim was specially endorsed upon the writ. It simply recited the agreement between the parties, and the sum outstanding including interest. It was obvious from an up-to-date statement sent by the bank's solicitors to the respondents' solicitors that the sum outstanding was calculated on the basis of continuing to capitalise interest with quarterly rests; indeed the respondents conceded the bank's entitlement so to capitalise interest. The respondents did not challenge the bank's entitlement to compound interest after the date of demand until after the bank closed its case at the trial. In these circumstances, I cannot think it right to preclude the bank from relying upon a custom or practice of bankers, in so far as it could do so without calling evidence (which it was precluded by the judge's order from calling).

The earliest authorities on the subject of a bank's entitlement to charge compound interest date from the days when the usury laws were still in force, under which contracts for the lending of money with interest were lawful only if a maximum rate of interest was not exceeded, that rate being fixed in 1714 (12 Anne Stat. 2, c. 16) at 5 per cent. per annum. It was accepted that any prior agreement charging compound interest, leading to interest being charged in excess of 5 per cent., was contrary to the usury laws. However, in Ex parte Bevan (1803) 9 Ves.Jun. 223, 224 Lord Eldon L.C. succeeded in circumventing this difficulty by holding that:

"if you agree to settle accounts at the end of six months, that not being part of the prior contract, and then stipulate, that you will forbear for six months upon those terms, that is legal."

On this basis it came to be held that, if there was "acquiescence" by a customer in his banker's capitalising interest at annual rests, an agreement could be presumed each year on the basis proposed by Lord Eldon: see Lord Clancarty v. Latouche (1810) 1 Ball & B. 420, in which Lord Manners L.C. said, at pp. 429-430:

"From the acquiescence of Mr. Connolly I ought

to presume an agreement at the end of every year, that the interest then due, should become principal and carry interest, which, according to Ex parte Bevan, this court will admit of, and that was a case of half-yearly rests."

A similar conclusion was reached in Eaton v. Bell (1821) 5 B. & Ald. 34. This approach, which presupposed what Mr. Pickering rightly described as a series of staccato agreements, was obviously a fiction: Lord Macmillan was later to characterise it as "an agreeable fiction:" see Paton v. Inland Revenue Commissioners [1938] A.C. 341, 357. Its function was only to circumvent the usury laws; once those laws had been repealed in 1854, there was no sensible basis on which it should **676** have been allowed to survive. The decision of the Court of Appeal in the present case is, so far as I am aware, the only case since 1854 in which the right to capitalise interest has been held to depend on a series of periodic agreements deemed to be made between banker and customer at the end of each interest period.

The need for a "mercantile account current for mutual transactions," upon which stress was laid by Lloyd and O'Connor L.JJ. in the Court of Appeal, appears to have derived from Fergusson v. Fyffe (1840) 8 Cl. & F. 121 - a decision of your Lordships' House on appeal from the Court of Session. In that case, a Dr. Charles Fyffe (a Scotsman resident in India) had opened an account with a banking house in India in 1786. That account had been operated by him until 1793, when he became insane. At that date there was a balance in his favour of 4,207 rupees. Interest at various rates was accumulated in the account with annual rests; when Dr. Fyffe died in 1810, the sum shown to his credit in the account was 17,346 rupees. By his will, the moneys in his account were bequeathed to David Fyffe. No proceedings were brought to claim repayment of the money for more than 20 years. Eventually, two sons of David Fyffe commenced proceedings for that purpose in Scotland against John Fergusson, who had been a partner in the Indian banking house. Although the proceedings were brought in Scotland, it

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

was recognised that the relevant transactions, having taken place in India, were governed by English law.

The issues before the House of Lords concerned (apart from a point on the Statute of Limitations) liability to interest on the account of Dr. Fyffe. Lord Cottenham L.C. held, first, that the banking house was, on the facts of the case, precluded from relying upon Dr. Fyffe's insanity as relieving it from withholding from its customer any benefit which had hitherto been accorded to him by its mode of keeping his account, and second, that it was now too late for it to be suggested that too high a rate of interest was allowed up to 30 April 1810 (the date of the last account before Dr. Fyffe's death on 9 May 1810). He further held that the applicable rate of simple interest thereafter was 9 per cent., being the figure specified in a memorandum of 5 July 1812. There remained however the question of "accumulation," i.e. of compound interest. As to this, Lord Cottenham L.C. said, at pp. 139-140:

"The question of accumulation stands upon a very different footing. Upon that subject the memorandum contains no agreement for the future; indeed it may be considered as excluding all that it does not provide for; and what it does provide for, is only payment of interest at a certain rate. It is true that practically the account had ceased to be an account current from the year 1793; but up to that time it had been, in the most correct sense, an account current, and it ceased to be so, not by any act or agreement of the parties, but by the cessation of all transactions, arising probably from the situation of Mr. Fyffe. The account, however, continued to be carried on in the same manner as before until 30 April 1810; and when that account was made up Mr. Fyffe was dead, he having died on 9 May 1810. From that time there was no party with whom any account current could be carried on, there not having been any *677 representative of Mr. Fyffe for many years afterwards. The accounting parties made up their account to his death, stating their intention to pay 9 per cent. upon the balance: and from such mode of making up the account, and

such promise to pay 9 per cent. upon the balance, the firm are not at liberty to withdraw. But then the inquiry is, whether the accounting parties are to be liable beyond what they have so undertaken, and are to be charged with compound interest? The first question which occurs is, can there be a title to compound interest without a contract expressed, or implied from the mode of dealing with former accounts, or custom? and if not, the absence of any party with whom any such contract can have been made, must have been fatal to the claim. Generally a contract or promise for compound interest is not available in England, as was decided in Ex parte Bevan, 9 Ves.Jun. 223, except perhaps as to mercantile accounts current for mutual transactions: a character which this account had lost from at least the death of Charles Fyffe. How then can compound interest be chargeable upon any account closed?"

He then referred, at p. 141, to Boddam v. Ryley (1783) 1 Bro. C.C. 239, (1785) 2 Bro. C.C. 2 and (1787) 4 Bro. P.C. 561, a case of considerable complexity concerned primarily with the accounts of a partnership business in India, in which the question arose whether Indian (or compound) interest should be charged. At the hearing of that case, Lord Thurlow L.C. said, 1 Bro. C.C. 239:

"Spencer's representative claims 9 per cent. interest, from year to year, upon the ground that the books were so made up. But I think no such interest can be allowed; for although, where there are cross accounts, interest is as fair to one as to the other, yet it is not fair after closing the trade."

Lord Thurlow's decision was affirmed by the House of Lords, 4 Bro. P.C. 561, before whom the point of compound interest was raised. Lord Cottenham L.C. then observed that the present case was a much stronger case than that, since Dr. Fyffe had died in 1810 and so was no longer available to give his consent. He then proceeded to distinguish the Scottish case of Palmer & Co.'s Assignees v. Glas (1835) 13 Shaw 308 as being founded upon imperfect information about English law. He concluded that interest at 9 per cent. ought to be calculated on the balance of 17,346 rupees shown in the account

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988]
2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711,
(1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times
624,122

**(Cite as: [1990] 1 A.C. 637)**

of 30 April 1810, from that date up to the date of the decree, but without any compound interest at annual rests; a declaration was made to that effect, and the cause was remitted to the Court of Session with the declaration.

It follows that the decision turned entirely upon the effect of Dr. Fyffe's death on the banking house's liability to pay compound interest, any question of the effect of Dr. Fyffe's insanity, or of the banking house's liability to pay compound interest before their customer's death, having been disposed of on the special facts of the case. But two matters emerge from the Lord Chancellor's speech. The first is that, although he put the point in the form of a question, he appears to have doubted whether there could be any title to compound interest "without a **\*678** contract expressed, or implied from the mode of dealing with former accounts, or custom:" 8 Cl. & F. 121, 140. Second, he expressed the opinion that a contract or promise for compound interest was not available in England, referring to Ex parte Bevan, 9 Ves.Jun. 223 - doubtless a reference to the impact of the usury laws; and he then qualified that statement with the words "except perhaps as to mercantile accounts current for mutual transactions." This may have been derived from Boddam v. Ryley, 1 Bro. C.C. 239, the case concerned with partnership accounts on which he was to place specific reliance. At all events, this tentative dictum can only have referred to the state of affairs in England when the usury laws applied; it should have been of little relevance after the repeal of those laws. Even so, Lord Cottenham L.C. relied upon the analogy of Boddam v. Ryley to support his conclusion that, after the death of Dr. Fyffe, compound interest ceased to be payable, there being then no party to consent to the mode of stating the banking house's accounts.

Despite the limited effect of Fergusson v. Fyffe, 8 Cl. & F. 121, considerable reliance appears to have been placed upon it by Sir John Romilly M.R. in Crosskill v. Bower (1863) 32 Beav. 86. A customer (Mr. Crosskill) had two accounts with his bankers, who kept their accounts at £5 per cent. per annum, making annual rests. In 1847, both accounts were considerably overdrawn, and the customer mortgaged property to the bankers, securing payment to the bankers of all moneys then due or thereafter to become due to them. In January 1855 the customer executed deeds transferring his real and personal estate for the benefit of creditors. The central question in the case was whether the customer's accounts with his bankers should continue to bear compound interest after the date of the execution of the deeds. Sir John Romilly's conclusions can be summarised as follows. (1) It was the custom of the bankers to keep their accounts charging 5 per cent. interest capitalised with annual rests, and the customer's accounts had been so kept and had been assented to by him. As long as he carried on business, this was the proper mode of keeping the accounts. (2) On the execution of the deeds, "he ceased to pay any moneys into or to draw any moneys out of the bank, his account ceased as an ordinary mercantile current account, and the final balance due to the bank was then ascertained:" p. 92. (3) The situation was the same as if the customer had died:

"if, in that case, no fresh account had been opened by his executor, all that the bankers could have claimed against his estate would have been, the balance due at his death, which would be a mere simple contract debt and not carrying interest at all:" p. 92.

So, if a customer says to his banker, "'I close my account with you, and I shall have no further dealings with you from this day,' thereupon the balance of the account, whichever way it may be, would have to be ascertained at that period, and then all interest would cease:" p. 93. (4) In the latter event, it would be up to the bankers to obtain such security for the balance as they might be able to obtain. If so, a new contract would be entered into which would regulate the matter of interest. Here, the deed of mortgage supplied such an agreement, **\*679** providing that the balance so ascertained would bear simple interest at 5 per cent., making no direction as to compound interest and no reference to any custom of bankers.

© 2009 Thomson Reuters.

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

There are certain aspects of this decision which I find disquieting. First, the reference to an "ordinary mercantile current account" is plainly drawn from Fergusson v. Fyffe, 8 Cl. & F. 121, in which Sir John Romilly M.R. considered it to have been "distinctly laid down" (32 Beav. 86, 95) that no title to compound interest would exist without a contract or custom, and to have been held that "a valid custom for compound interest could not exist, except in mercantile accounts for mutual transactions:" p. 95. For reasons I have already given, this, in my opinion, overstates the effect of that case. Second, whatever may be the effect of the death of a customer on his banker's entitlement to charge interest, I am troubled by the conclusion that, by way of analogy with the situation arising upon death, upon a customer closing his account with his banker all interest will, ipso facto, cease. Sir John Romilly M.R. suggested that it was then open to the bankers "to obtain such security for it as they may be able," (p. 93) but did not explain how, if the customer is unwilling to agree, the bankers are to obtain his consent to their charging him interest thereafter.

It is however right to observe that Sir John Romilly M.R. himself recognised that no question arose in the case before him about the closure of the customer's account,

"for it is the common case that, in the sense in which I have explained the term, the account was closed with the execution of the deed of 24 January 1855, after which time, it is regulated by the mortgage deed, which gives simple and not compound interest at £5 per cent. per annum:" p. 94.

That must be regarded as the basis for the decision in the case. No more should, in my opinion, be read into it. Indeed in Yourell v. Hibernian Bank Ltd. [1918] A.C. 372, in which Crosskill v. Bower was distinguished, Lord Atkinson, at pp. 389-390, treated it as a case in which, by reason of the execution of the deed, there was "a complete termination between the banker and his customer of all mercantile dealings between them."

The point arose again briefly in Williamson v. Wil-

liamson (1869) L.R. 7 Eq. 542, in which it was held by Sir William Milbourne James V.-C. that a bank's entitlement to charge compound interest, if such entitlement existed, terminated with the death of the customer. The Vice-Chancellor said, at p. 546:

"With regard to the interest accruing after the testator's death, I should take some time before assenting to the proposition that the account did not bear simple interest, but I have not to decide this point. I am bound, however, by the authority of the House of Lords to hold that compound interest is incidental to the continuance of the relation of banker and customer. From the testator's death therefore, only simple interest at 5 per cent. will be allowed on the account."

For present purposes, it is of interest to observe that there is no reference to the existence of "a mercantile account current for mutual **\*680** transactions;" we find only a reference to the continuance of the relationship of banker and customer, which is not necessarily the same thing.

The point next surfaced 62 years later in Deutsche Bank v. Banque des Marchands de Moscou, a case decided by the Court of Appeal in 1931, but not reported until 1949 in 4 L.D.B. p. 293 - a delay which can at least partially be explained by the fact that the passages there reported from the Court of Appeal's judgments (passages concerned with the Deutsche Bank's entitlement to charge compound interest) consisted entirely of obiter dicta. The Deutsche Bank, under a facility opened by it at its London branch, advanced £100,000 to the Moscow Bank before the outbreak of war. The loan was never repaid. After the outbreak of war between Germany and Russia, the Moscow Bank ceased to be able to operate its account with the Deutsche Bank; later, on 15 July 1918, an order was made by the Board of Trade in this country winding up the business of the Deutsche Bank's London agency. After the revolution in Russia, the Moscow Bank was nationalised by the Soviet Government. In these proceedings, the Deutsche Bank claimed the amount outstanding from the Moscow Bank, together with compound interest. The Court of Appeal, reversing

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

the decision of the judge below, held that the Moscow Bank no longer existed, and that no other question therefore fell to be decided. However they went on to express opinions on the question whether, if the Deutsche Bank had been entitled to recover the loan, it would also have been able to charge compound interest. Differing on this point from Rowlatt J. below, they held that the Deutsche Bank's right to compound interest ceased after 31 December 1914 when the war stopped any current account continuing (*per* Scrutton and Greer L.JJ.) or after 15 July 1918 when the order was made for winding up the business of the Deutsche Bank London agency, when the account was closed and the relation of banker and customer ceased to exist (*per* Romer L.J. and also *per* Scrutton L.J. as an alternative basis). In expressing their varying opinions, all members of the Court of Appeal placed reliance on Fergusson v. Fyffe, 8 Cl. & F. 121. Greer L.J. in particular considered that that case laid down the proposition that a contract for compound interest is never implied between debtor and creditor except as to mercantile accounts current for mutual transactions - a statement which, in my opinion, for the reasons I have already given, derives too much from that decision.

Such is the slender line of authority which provides the basis for the reasoning of the Court of Appeal in the present case. Before I consider that reasoning further, however, I wish to return to the basis on which the original case of Ex parte Bevan, 9 Ves.Jun. 223 was decided.

In that case, as I have said, it was decided that the usury laws might be circumvented by the fiction of a series of staccato agreements whereby, at each rest, it was presumed to have been agreed that the interest then due could "become principal and carry interest." The practical effect was, of course, that bankers did indeed capitalise interest in this way. After the repeal of the usury laws in 1854, they continued, as they had done in the past, to follow what had become a practice of bankers. In Inland Revenue Commissioners v. Lawrence Graham &

Co. **681** [1937] 2 K.B. 179, Romer L.J. (delivering the judgment of the Court of Appeal) said, at p. 192, that the practice was:

"an old one dating back to long before the repeal of the usury laws, and could not, therefore, have been legal unless it was consistent with those laws. Now before the repeal of those laws a contract to allow the charging of compound interest was illegal. The legality of the practice of bankers was, however, upheld by the courts by treating the bank as making a fresh advance to its customer at the end of each year or half-year as the case might be: see (e.g.) Lord Clancarty v. Latouche, 1 Ball & B. 420. There is nothing contrary to the usury laws in such an arrangement: see Ex parte Bevan, 9 Ves.Jun. 223. It is plain that upon the repeal of those laws an agreement to pay compound interest became lawful in Holder's case [1932] A.C. 624, however, there was no agreement to pay it. The bank had merely pursued an old practice of bankers upon which an interpretation had been put by the courts. The fact that this had been done at a time when the laws against usury were in force appeared to this court to be immaterial. The practice continued after the repeal of those laws and the repeal could not affect the nature of the practice."

At first, after the repeal of the usury laws there was a tendency to look for actual acquiescence by the customer in the practice as the ground for holding that the practice was binding upon him. Thus in Crosskill v. Bower, 32 Beav. 86, 100, Sir John Romilly M.R. looked for knowledge of the customer that accounts were so kept by his bankers, and acquiescence by him in there being so kept, as a basis for an implied agreement. Such a basis could never be very satisfactory. It does not presuppose an antecedent agreement governing the initial period of a banker/customer relationship. It apparently presupposes that the customer has examined the relevant accounts, which he is under no duty to examine (see Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80), and may not in fact have examined. Presumably also the customer could unilaterally bring the arrangement to an end at any time. However it was not long before the

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

practice became recognised as a usage of bankers and as such implied into the relevant contract. The first case in which this appears to have been done was the Scottish case of Reddie v. Williamson (1863) 1 Macph. 228, decided in the same year as Crosskill v. Bower. Lord Justice-Clerk Inglis expressed the matter as follows, at p. 236:

"The parties must of course have had in view that this account-current would be kept in the way, in which bankers always keep such accounts, balancing the account at the end of the year; and, in the event of the interest accruing during the past year not being otherwise paid or provided for, placing the amount of such interest as the last item to the debit of the account, and accumulating such interest along with the principal sum due on the account, and bringing down the balance thus ascertained, consisting partly of principal, and partly of interest, to the new account for the ensuing year, and placing the accumulated balance as the first article of **\*682** debit in that new account. Where an account is kept in this way consistently throughout its whole course, the interest thus accumulated with principal, at the end of each year not only becomes principal, but never thereafter ceases to be dealt with as principal."

He later said, at p. 237:

"The privilege of a banker to balance the account at the end of the year, and accumulate the interest with the principal, is founded on this plain ground of equity, that the interest ought then to be paid, and, because it is not paid, the debtor becomes thenceforth debtor in the amount as a principal sum itself bearing interest."

In 1898, in Parr's Banking Co. Ltd. v. Yates [1898] 2 Q.B. 460, a case concerned with compound interest being charged by bankers with half-yearly rests, Vaughan Williams L.J. said, at p. 467: "According to the ordinary practice of bankers the interest due is from time to time added to the principal, and becomes itself part of the principal due." Rigby L.J. said, at pp. 466-467, that the account in the case was made out:

"in the manner usual as between banker and customer. Such a mode of making out the account is so

far usual that I do not think the customer, or a guarantor of the customer, could object to it. I think one must assume that the understanding of all parties was that the account would be kept as between the person guaranteed and the bank on the usual principle with regard to such accounts - that is to say, by treating moneys paid in from time to time by the customer as a deduction from the general amount due from the customer in respect of the loan and interest thereon, and at the end of each half-year carrying over the debit balance to the next half-year as principal."

In Yourell v. Hibernian Bank Ltd. [1918] A.C. 372, Lord Atkinson said, at p. 385:

"Interest was calculated from day to day on the mortgagor's overdraft on his current account. On the balancing of this account each half-year the amount of this interest was entered on the debit side of the account, a balance was then struck, and interest was charged during the next half-year upon that balance. The bank, by taking the account with these half-yearly rests, secured for itself the benefit of compound interest. This is a usual and perfectly legitimate mode of dealing between banker and customer."

Likewise, in Inland Revenue Commissioners v. Holder [1931] 2 K.B. 81, Lord Hanworth M.R. referred, at p. 96, to "a practice which has been adopted by bankers for over a century;" and Romer L.J. said, at p. 98:

"it is to be observed that the relations between the company and the bank were regulated, not by any special agreement, but by the ordinary usage prevailing between bankers and their customers as to the method of keeping accounts. In accordance with this usage the balance of principal and interest was struck at the end of each **\*683** half-year and the aggregate sum was introduced as the first item in the subsequent half-yearly account and interest calculated upon it."

In some cases there is nevertheless a reference to acquiescence by the customer in the practice: see, for example, Inland Revenue Commissioners v.

© 2009 Thomson Reuters.

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

Graham [1937] 2 K.B. 179, 192, *per* Romer L.J. and the Deutsche Bank case, 4 L.D.B. pp. 293, 295, *per* Scrutton L.J. But the status of the usage was put beyond all doubt by the House of Lords in Paton v. Inland Revenue Commissioners [1938] A.C. 341. In that case, Lord Atkin, at pp. 349-350, cited with approval the second passage which I have quoted from the judgment of Lord Justice-Clerk Inglis in Reddie v. Williamson, 1 Macph. 228. Lord Macmillan referred to the decision of Lord Eldon L.C. in Ex parte Bevan, 9 Ves.Jun. 223, and said, at p. 357:

"On this principle it was held in Eaton v. Bell, 5 B. & Ald. 34, that bankers who, with the knowledge of and without objection by their customers, debited them with interest with half-yearly rests in accordance with their general practice, did not offend against the usury laws. This method of dealing with loan accounts, which became common form among bankers, survived the abolition of the usury laws and is well established as the ordinary usage prevailing between bankers and customers who borrow from them and do not pay the interest as it accrues."

Lord Maugham, referring to the Finance Act 1915, said, at p. 364:

"I would observe that the legislature must be taken in 1915 to have been fully conversant with the usual practice of banks in the United Kingdom in relation to short loans and overdrafts."

Subsequently, in Inland Revenue Commissioners v. Oswald [1945] A.C. 360, 379, Lord Porter referred to Paton v. Inland Revenue Commissioners as being a case in which the contract, under which capitalisation of interest took place, was a contract "constituted by the custom of bankers," and Lord Simonds referred, at p. 382, to Paton v. Inland Revenue Commissioners as a case where interest was added to capital with half-yearly rests "according to the practice of bankers."

It is of importance to observe that no case, in which this usage has been recognised, appears to have been cited to the Court of Appeal in the Deutsche Bank case, 4 L.D.B. p. 293. Furthermore, there is no reference in these cases to the usage being re-

stricted to mercantile accounts current for mutual transactions. On the contrary, one of the earliest cases to which I have referred, Parr's Bank Co. Ltd. v. Yates [1898] 2 Q.B. 460, appears to have been concerned with an ordinary customer's overdraft; and in Paton v. Inland Revenue Commissioners [1938] A.C. 341, as I have already indicated, Lord Macmillan referred to the usage as prevailing as "between bankers and customers who borrow from them and do not pay the interest as it accrues:" see p. 357. Having regard in particular to the statement of principle by Lord Justice-Clerk Inglis in Reddie v. Williamson, 1 Macph. 228, and the "equity" upon which he based the usage, I can see no good reason for restricting the usage any more narrowly than is set out in Lord Macmillan's simple **\*684** statement. I have already indicated my doubts concerning the restriction to mercantile accounts current for mutual transactions, tentatively advanced by Lord Cottenham L.C. in Fergusson v. Fyffe, 8 Cl. & F. 121, and in particular concerning its more positive acceptance in Crosskill v. Bower, 32 Beav. 86, and in the Deutsche Bank case. In my opinion, having regard to the later authorities to which I have referred and, in particular, to Paton v. Inland Revenue Commissioners [1945] A.C. 341, and Inland Revenue Commissioners v. Oswald [1938] A.C. 360, that restriction (whatever its meaning) has no application to the usage of bankers now well recognised by English law.

I have yet to consider whether the usage to which I have referred ceases to apply where the banker makes a demand upon his customer for repayment, as held by the Court of Appeal in the present case. The suggestion that a bank ceases upon demand to be entitled to continue to capitalise interest rests entirely upon the authority of Crosskill v. Bower, 32 Beav. 86 and the dicta of Scrutton and Greer L.JJ. in the Deutsche Bank case. The reasoning of Sir John Romilly M.R. in Crosskill v. Bower was undoubtedly affected by the fact that he understood the bank's entitlement to capitalise interest to be limited to an "ordinary mercantile current account;" accordingly, in the case before him, he considered

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

(Cite as: [1990] 1 A.C. 637)

that, on the execution by the customer of deeds for the benefit of his creditors, his account ceased to be an ordinary mercantile current account, and the final balance due to his bank was then ascertained. On that basis, he reached the conclusion that, in the absence of any special agreement between the bank and his customer, the effect of the customer closing his account was that the bank ceased to be entitled to charge any interest. In my opinion this conclusion (which has no regard to any custom or usage of bankers) is inconsistent with the "equity" upon which Lord Justice-Clerk Inglis stated the banker's privilege to rest. Furthermore, if it be equitable that a banker should be entitled to capitalise interest at, for example, yearly or half-yearly rests because his customer has failed to pay interest on the due date, there appears to be no basis in justice or logic for terminating that right simply because the bank has demanded payment of the sum outstanding in a customer's account. There is no reason to suppose that such a demand should of itself bring to an end the relationship of banker and customer, see: *Holden the Law and Practice of Banking*, vol. 1, 4th ed. (1986), pp. 90-94. Indeed the customer might then gradually pay off his debt by instalments, following upon the demand, during which period the relationship would surely continue. The inequity of the supposed rule is amply demonstrated by the facts of the present case, in which the bank has had to wait for over nine years after its demand for payment until Leggatt J. gave judgment in its favour. In my opinion, there is no such rule in English law.

For these reasons, I am, with all respect, unable to uphold the reasoning of the Court of Appeal in the present case; and I cannot help feeling that, if they had had the benefit of the citation of authority provided for the assistance of your Lordships, they would not have reached the conclusion which they felt driven to reach on the authorities cited to them.

*685 I have already referred to the fact that no evidence was called (or indeed permitted to be called) in the present case on the scope of the usage. The cases which I have cited show the usage to

be applicable to cases of both annual and half-yearly rests. There is, however, so far as I am aware, no case which shows it to be applicable to cases of quarterly rests, into which category the present case falls; though equally there is nothing to indicate that it does not so apply, and it may well do so. Again, the respondents' account with the appellant bank was not concerned with a simple borrowing, but with an amount outstanding in an account with the bank following a payment by the bank under its guarantee to the shipbuilders. However, in view of the concession made by the respondents in the courts below, neither of these points need trouble your Lordships. That concession was that the bank was entitled to charge compound interest with quarterly rests during the banker/customer relationship. This is not a suitable case, in my opinion, for your Lordships' House to establish any general criteria for the circumstances in which such a relationship comes to an end. But I can see no reason why that relationship should not, in the present case, have continued until repayment of the debt, or judgment, whichever first occurred, with the effect that, so long as the contractual interest was payable, the bank continued to be entitled to capitalise it. The only earlier event relied upon by the respondents as terminating the relationship was the bank's demand for payment; I have already expressed the opinion that that submission was not well-founded. In Yourell v. Hibernian Bank Ltd. [1918] A.C. 372, your Lordships' House appears to have approved of the bank continuing to capitalise interest after commencing proceedings against its customer. In the present case, the bank has claimed the principal sum due to it with interest thereon as agreed until payment or judgment, in the usual way. Such agreement included the term, implied by the usage of bankers, that the bank was entitled to capitalise interest, it being conceded that the bank was entitled so to do at quarterly rests. The sum for which Leggatt J. entered judgment for the bank (viz. U.S.$2,118,213.03) was so calculated. I would allow the bank's appeal from the decision of the Court of Appeal and direct that the order of Leggatt J. be restored.

© 2009 Thomson Reuters.

1988 WL 624122 (HL), [1990] 1 A.C. 637, [1990] 1 All E.R. 78, [1990] C.C.L.R. 18, [1988] Fin. L.R. 249, [1988] 2 F.T.L.R. 9, [1990] 1 Lloyd's Rep. 225, [1989] 3 W.L.R. 1330, (1990) 87(4) L.S.G. 33, (1989) 139 N.L.J. 1711, (1990) 134 S.J. 261, 12-01-1989 Times 624,122, 12-06-1989 Independent 624,122, 12-05-1989 Financial Times 624,122

**(Cite as: [1990] 1 A.C. 637)**

LORD JUANCEY OF TULLICHETTLE.

My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Goff of Chieveley. For the reasons given therein I would allow this appeal.

**Representation**

Solicitors: Thomas Cooper & Stibbard.

Appeal allowed. (J. A. G. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT