# Tab 11

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO. 31 OF 1993

ARTHUR WHITE        Appellant

**and**

CONYERS, DILL **& PEARMAN**    Respondents
(sued as a firm of attorneys
practicing law in Bermuda)

Date of Hearing:    14 March 1994
Date of Judgement: 18 March 1994
Date of Delivery of Reasons:12 May 1994

Before: da Costa P. (Atg)
       Astwood, J.A.
       Kempster, J.A.

Reasons for Judgement

da Costa P. (Atg)

On the 18th March 1994 we dismissed the appeal with costs
and intimated that we would give our reasons in due course. We
now do so.

On the 25th day of September 1993 Ground J. struck out the
writ and the Statement of Claim herein as vexatious and an abuse
of the process, and dismissed the action with costs to the
defendants. The basis for the learned judge's decision was that
the Amended Statement of Claim failed to state a cause of-action
which was not clearly statuted barred under the Limitation Act
1984. He further held that any cause of action would have been
completely overtaken and expunged by the novation of the original
note in July 1989 with which the defendants were not involved.

The appellant has appealed from the learned judge's
decision.  The Statement of Claim alleges that in or about 1980
Mr. White, the plaintiff (the "appellant") retained the services
of Mr. **Maddocks** a partner of the defendant firm, Conyers, Dill **&**
**Pearman (C.D.&P).**  In 1981 Mr. White wished to make a loan of
**US$200,000** to York Hannover (Bermuda) Ltd. **("YHB")** who were about
to embark on a time sharing development project in St.Georges.
According to Mr. White the loan was to be secured by certain
leasehold properties in St. Georges and by a pledge of shares in
YHB: and so in 1981 Mr. White entered into an oral agreement with
Mr. Kirsten von Wersebe, an executive officer of YHB.
Accordingly he informed Mr. **Maddocks** of the terms of his oral
agreement with Mr. von Wersebe and provided Mr. **Maddocks** with a
copy of the Loan Agreement which he had obtained directly from
YHB.  Mr. White further stated that he retained Mr. **Maddocks** to
review the Loan Agreement to ensure that it adequately
represented the terms of the oral agreement which he had reached
with Mr. von Wersebe.  Mr. **Maddocks** made certain changes to the
execution clauses of the Loan Agreement and it is alleged that he
subsequently informed Mr. White that the loan agreement was in
order.  The Loan Agreement with Mr. **Maddocks'** amendment was
executed by all parties on the 12th July 1981.  It is to be noted
that Mr. White did not personally enter into the Loan Agreement
The lender under the Loan Agreement is a Netherlands Antilles'
Corporation called Anjili Realty (N.V.) **("Anjili").**  That company
in fact acted as trustee and/or agent for Mr. White as the lender
under the agreement.  In the event, nothing turns on the
personality of the lender.

The gravamen of Mr. White's complaint is that a loan that
was to be protected by adequate security turned out to be an
unsecured loan.  The Loan Agreement clearly does not make any
provision to secure leasehold property in st. Georges in favor of
Anjili the lender.  Again the Loan Agreement does not pledge or
secure any YHB shares or any other shares in favor of Anjili.

Although clause 4.02 of the Loan Agreement, entitled "Enforcement of Security" makes an anomalous reference to **"the shares placed hereunder"** there is no further language in the Loan Agreement identifying the shares pledged or the terms of the pledge. In fact the only **"security"** provided to Anjili under the Loan Agreement was a promissory note given by YHB to Anjili in the amount of **US$200,000** which contained a provision for interest of the same terms as the Loan Agreement

Clause 1.02 of the Loan Agreement stated that the term of the loan was to be for a period of six years i.e. from 12th July 1981 until 12th July 1987. Clause 1.04 provided for annual interest at the rate of 15% per annum payable by YHB to Anjili.

It is plain on the evidence that after the execution of the Loan Agreement in July 1981 **CD&P's** involvement in the YHB loan transaction came to an end.

From the record it appears that the outstanding loan remained unpaid until 1st July 1989 when YHB executed a promissory note in favor of Mr. White in the sum of **CDN$580,000** together with accrued interest of **CDN$229,680** up to 1st July 1992. The note was guaranteed by York Hannover Holdings A.G., **YHB's** then parent company. Again on the evidence CD&P had no involvement whatsoever in respect of the 1989 promissory note.

On the 1st July 1992 the sum of **CDN$757,680** payable to Mr. White under the 1989 promissory note fell due, but YHB failed to meet it's obligation. On the 28th August 1992 Mr. White issued a Statutory Demand to YHB demanding payment of the sum due on the 1989 promissory note. YHB failed to comply with the demand and Mr. White successfully petitioned the court for **YHB's** compulsory liquidation.

Mr. White's complaint is that despite his instructions no enforceable security was ever provided or arranged. Further the lease of the St.Georges club property was at some time unknown to the plaintiff, and without his knowledge, transferred to another member of the York Hannover Group that was not a party to the Loan Agreement

Mr. White having failed to collect from the borrower now seeks to make CD&P liable for his loss. His writ and Statement of Claim herein was issued on the 8th July 1993; and on the 4th August 1993 an Amended Statement of Claim was served on CD&P. Mr. White's claim was for the Bermuda dollar equivalent of **CDN$528,000** together with accrued and outstanding interest at 14% per annum to the date of Judgement; he further claimed damages and costs in the action.

**CD&P's** reaction to the claim was to make an application to strike out the Amended Statement of Claim on two grounds:- (A) that the Statement of Claim failed to state a cause of action which was not clearly statuted barred under the Limitation Act 1984; and (B) the Amended Statement of Claim complained about the manner in which CD&P acted in connection with the Loan Agreement but that the latter was **novated** by the 1989 promissory note which had nothing to do with CD&P. In the circumstances Mr. White could not have suffered any loss or damage as a result of any negligence on the part of CD&P in connection with the Loan Agreement.

There was in fact an additional ground for striking out the amended Statement of Claim but this was not pursued either below or before us.

In England it appears to be still the law that a solicitor may be liable to his client both in contract and in tort for negligence in failing to exercise a reasonable amount of skill,

diligence and knowledge. (See **Halsbury's** Laws of England, 4th Edn., vol 44, **para** 135; Bell v Peter Browne & Co. (1990) 2 Q.B. 495; Moore v Ferrier (1988) 1 All E.R. 400; Forster v **Outred** (1982) **1WLR** 86, (1982) 2All ER 753).

In Lee & Another v Thompson (1989) 40 E.G. 13, 17 Lloyd Learned Judge said:

> "Before leaving the case, I should make clear that it has been assumed throughout that a client's cause of action against his solicitors lies in tort as well as in contract. In the well-known case of Groom v **Crocker** (1938) 2 All ER 394 it was decided by the Court of Appeal that this was not the law and that a client's cause of action against his solicitor arises in contract only.
>
> In Midland Bank Trust Co **Ltd** v Hett, Stubbs & Kemp (1979) **Ch** 384, (1978) 3 All ER 571, Oliver J (as he then was) held that the authority of Groom v **Crocker** had been shaken by the subsequent decision of the House of Lords in Hedley Byrne & Co Ltd v Heller & Partners **Ltd** (1963) 2 All ER 575. In Foster v **Outred** Dunn LJ said that he found the reasoning of Oliver J wholly convincing. But as Stephenson LJ pointed out, the point was conceded in Forster v **Outred.**
>
> so far as I know and so far as Mr. Stevenson knows Groom v **Crocker** has never been overruled. It may be that the time is now ripe for Groom v **Crocker** and Oliver **J's** decision in Midland Bank Trust Co **Ltd** v Hett, Stubbs & Kemp to be looked at together in the light of subsequent cases and in particular the decision of the Privy Council in Tai Hing v Liu Chong Hing Bank (1986) AC 80, (1985) 2 All ER **947."**

In our view however so far as Bermuda is concerned, the point has now been settled by the decision of the Privy Council in Tai Hing v Liu Chong Hing Bank (1986) **A.C.** 80. In giving the opinion of the Privy Council in that case Lord **Scarman** said at p. 107:

> "**Their** Lordships do not believe that there is anything to the advantage of the law's development in searching for a liability in tort where the parties are in a contractual relationship. This is particularly so in a commercial relationship. Though it is possible as a matter of legal semantics to conduct an analysis of the rights and duties inherent in some contractual relationships including that of banker and customer either as a matter of contract law when the question will be what, if any, terms are to be implied or as a matter of tort law when the task will be to identify a duty arising from the proximity and character of the relationship between the parties, their Lordships believe it to be correct in principle and necessary for the avoidance of confusion in the law to adhere to the

contractual analysis: on principle because it is a
relationship in which the parties have, subject to a
few exceptions, the right to determine their
obligations to each other, and for the avoidance of
confusion because different consequences do follow
according to whether liability arises from contract or
tort, e.g. in the limitation of action. . . . Their
Lordships do not, therefore, embark on an investigation
as to whether in the relationship of banker and
customer it is possible to identify tort as well as
contract as a source of the obligations owed by the one
to the other. Their Lordships do not! however, accept
that the parties' mutual obligations in tort can be any
greater than those to be found expressly or by
necessary implication in their **contract."**

While it is true that the Privy Council were there dealing

with the relationship between banker & customer, the language

employed, with its reference to the different dates when an

action may become barred in tort and contract, would appear to be

equally appropriate to the case of solicitor and client. Further

the decision of the Board must also be viewed against the

background that the Court of Appeal in Hong Kong had considered

that the relationship between banker and customer was governed

both by the law of contract and tort. Accordingly therefore in

Bermuda a claim against an attorney for failing to exercise due

care and skill in the performance of his duties to his client

lies solely in contract.

The plaintiff's case was pleaded in tort. Before the

learned judge however there was argument as to whether the cause

of action was in tort (in negligence) or in contract and whether

the time when the cause of action accrued was different as

between the two. At p.2 of the judgement the learned judge said:

"I think that the authorities sufficiently establish
that the cause of action for negligence by a legal
advisor is properly in Contract, but even if it were -in
Tort it makes no difference, as the cause of action in
negligence accrues when the damage occurs, and in the
case of negligent legal advice that is when the injured
party acted upon it to his detriment: see Foster v
Outred & Co. (1982) 2 All ER 753, CA: and Bell v Peter
Browne & Co. (1990) 2 QB 495, CA. In the case before
me that would mean that the cause of action arose when
CD&P failed to put in place some security over the
lease, or, at the latest, allowed their client to make
the loan without such security being established. In
other words the cause of action on which the plaintiff
sues arose at the time of the loan agreement of 12th
July 1981, and the time for bringing an action in
respect of it would have expired on 12th July **1987."**

The stark fact was that whether Mr. **McMillan,** who appeared
for the appellant, pitched his case in contract or in tort he
faced the obstacle of the statute dealing with the limitation of
actions.   To surmount this hurdle Mr. **McMillan** sought to allege
that in the circumstances of this case Mr. White's attorneys were
under a continuing duty to his client in respect of their
negligent advice or negligent omission.

Thus is **para.** 15 of the Amended Statement of Claim it is
pleaded:

> "Notwithstanding the said legal **representation** and
> unknown to the Plaintiff, no properly enforceable
> security was ever arranged or provided on behalf of the
> Plaintiff.   Moreover, without the knowledge and/or
> consent of the Plaintiff, Mr. **Maddocks as attorney**
> represented the York Hannover group of companies
> throughout the said transaction.   <u>Until the winding-up</u>
> <u>of York Hannover (Bermuda) ltd. in 1992 the Defendants</u>
> <u>continued to represent the said company and were</u>
> <u>accordingly apprised of the said company's financial</u>
> <u>status and the transfer of the lease to the Plaintiff's</u>
> <u>detriment and, there being in law no right of</u>
> <u>confidentiality as between joint clients the Defendants</u>
> <u>should have informed the Plaintiff of all material</u>
> <u>changes to the said status and the said lease under a</u>
> <u>continuing professional duty, as reflected inter alia</u>
> <u>in sections 9, 13, 17 and 27 of the Bermuda Bar Rules</u>
> <u>of Professional Conduct.</u>"

The fact is, and this is common ground, Mr. White obtained
the original draft of the Loan Agreement from YHB and presented
it to Mr. **Maddocks** for his approval.   There is no suggestion that
CD&P acted on behalf of YHB in respect of the Loan Agreement
According to Mr. White he gave Mr. **Maddocks** certain instructions
to secure his loan which he failed to carry out.   The deficient
Loan Agreement was executed in July 1981.   So far as any claim in
contract is concerned as of that date CD&P would have been in
breach for failure to carry out Mr. White's instructions.
Equally under the Loan Agreement Mr. White's position was far
less satisfactory than it should have been because his chose of
action against YHR was far less valuable than it should have
been.   Accordingly Mr. White's cause of action in tort accrued in
1981 and his claim would have become statute barred in 1987.

- 7 -

The authorities are quite clear on the point. In Foster v Outred & Co (1982) 2 All ER 753, 765 Dunn Learned Judge said:

> "I would hold that in cases of financial or economic loss the damage crystalises and the cause of action is complete at the date when the plaintiff, in reliance or negligent advice, acts to his determent."

In Moore v Ferrier (1988) 1 All ER 400, 410 in a case where an agreement had been negligently drafted by solicitors Bingham Learned Judge observed:

> "It seems to me clear beyond argument that from the moment of executing each agreement the plaintiffs suffered damage because instead of receiving a potentially valuable chose of action they received one that was valueless."

So far as any claim in contract is concerned the courts in England have steadfastly ruled that there is no such creature as an implied general retainer that continues on indefinitely after an attorney has completed the task contemplated by the specific retainer. Such a proposition was emphatically rejected by Mustill Learned Judge in Bell v Peter Browne (1990) 2 Q.B. 495, 512-513) If Mr. White was entering into an unusual contract whereby CD&P would be required to continually monitor changes affecting his proposed securities one would certainly expect it to be pleaded in express terms (see Intercontinental Resources Ltd v Dill et al Civil Appeal no. 14; 1981). Such an obligation certainly cannot be implied from the facts of the present case.

In his attempt to bolster his argument Mr. McMillan sought to rely on rules 9, 13, 17 & 27 of the Bermuda Barristers' Code of Professional Conduct as establishing a continuing duty on the part of CD&P. The learned judge dealt fully with this argument at pp.3-4 of his judgement. We adopt and endorse the learned judge's ruling on this issue. It is sufficient to say that these rules when analyzed, whatever might be their effect in law, do not create the ongoing duty for which Mr. McMillan contends.

In Bell v Peter Browne (1990) 2 QB. 495 the Court of Appeal considered the question of the persistence of a duty of care in tort. The court was of the opinion that the breach of duty in tort occurred at the same time as the breach of contract, that once damage had occurred as a result time began to run even if the damage could still be mitigated (see per Nicholls Learned Judge ubi sup. p. 502).

We agree with Mr. Riihiluoma's submission, on behalf of the respondents, that in England, a long line of authorities culminating in Bell v Peter Browne (ubi sup.) establish that so far as damage in tort is concerned –

(i)   causes of action for breach of duty accrue the moment there is any quantifiable loss, even if the actual task of quantification would be difficult.

(ii)  Where a document is executed as a result of a breach of duty which but for the breach would not have been executed or would not have been executed in that form loss is generally sustained at the moment of execution.

Finally in our judgement the arguments against the concept of a continuing duty in the realm of contract are of equal force in claims in tort.

In view of the conclusion to which we have arrived it is unnecessary to deal at length with the question of novation. It is enough for us to say that we agree and endorse the learned judge's analysis and concur in the result in which he has arrived on this question.

For the above reasons the appeal was dismissed.

Harvey DaCosta, P.Ag.    Sir James Astwood, J.A.    Michael Kempster, J.A.

Mr. McMillan for the appellants

Mr. Riihiluoma for the respondents

- 9 -

**Tab 12**



[1995] 2 A.C. 145                                                          Page 1
1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

C

*145 Henderson and Others Respondents v. Merrett Syndicates Ltd. and Others
Appellants
Hallam-Eames and Others Respondents v. Merrett Syndicates Ltd. and Others
Appellants
Hughes and Others Respondents v. Merrett Syndicates Ltd. and Others Appellants
Feltrim Underwriting Agencies Ltd. and Others Appellants v. Arbuthnott and
Others Respondents
Gooda Walker Ltd. (In Liquidation) and Others Appellants v. Deeny and Others
Respondents
[1994] 3 W.L.R. 761

House of Lords
HL
Lord Keith of Kinkel, Lord Goff of Chieveley, Lord
Browne-Wilkinson, Lord
Mustill and Lord Nolan
1994 March 15, 16, 17, 22, 23, 24, 25, 28; July 25
[Conjoined Appeals]

Insurance--Lloyd's--Managing agent--Agency and
sub-agency agreements with Names--Conduct and
management of underwriting--Whether agents ow-
ing duty of care in tort--Whether members' agent li-
able for default of managing agent-- Lloyd's
Agency Agreement (byelaw No. 1 of 1985)

Negligence--Duty of care to whom?--Lloyd's agent-
-Liability to Names--Whether concurrent liability in
tort and contract

The plaintiffs, underwriting members ("Names") at
Lloyd's, brought proceedings against the defendant
underwriting agents, who were members' agents,
managing agents or combined agents, in which they
alleged that the defendants were negligent in their
conduct of the Names' underwriting affairs and in
breach of their legal obligations. In order to simpli-
fy and shorten the trial and preparation of the ac-

tions Saville J. ordered, with the consent and co-
operation of the parties, determination of a number
of preliminary issues of principle common to many
of the actions, relating to the existence, nature and
scope of the alleged legal *146 obligations of un-
derwriting agents. Until 1990 each Name entered
into one or more underwriting agency agreements
with either a members' agent or a combined agent
governing the relationship between the Name and
the members' agent, or between the Name and the
combined agent in the capacity of members' agent.
If the Name became a member of a syndicate which
was managed by the combined agent, the agreement
also governed the relationship between the Name
and the combined agent acting in the capacity of
managing agent. In such a case the Name was
known as a direct Name. If the Name became a
member of a syndicate which was managed by an-
other managing agent, the Name's underwriting
agent (whether or not a combined agent) entered in-
to a sub-agency agreement appointing the managing
agent as sub-agent to act in relation to the Name. In
such a case the Name was known as an indirect
Name. Before 1 January 1987, there were no pre-
scribed forms of underwriting agency or sub-
agency agreements, but standard clauses were in
common use, and forms of agreement used by un-
derwriting agents were similar, if not identical.
Agreements of that nature related to the Merrett ac-
tions. By the Lloyd's Act 1982, byelaw No. 1 of
1985 forms were prescribed for the agency agree-
ment and the sub-agency agreement which were
made compulsory as from 1 January 1987, and
those were the relevant forms in the Feltrim actions
and the Gooda Walker actions.

In the Merrett actions there were three groups of
actions brought by Names who were members of
syndicate 418/417. In all three groups of actions
there were complaints of negligent closure of one
or more years of account; in one of them there was
also a complaint as to the writing of specific con-
tracts of insurance, in relation to which an issue of

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

limitation also arose.

In the Feltrim actions indirect Names brought actions against the managing agents and about 40 members' agents alleging negligent underwriting during the years 1987-1989 arising out of their syndicates' participation in the London market excess of loss business.

In the Gooda Walker actions the Names alleged against their members' agents that they were contractually liable for failure by the managing agents of the syndicates of which the Names were members, to which the members' agents had delegated the function of underwriting, to exercise reasonable care and skill in relation to such underwriting.

On the hearing of the preliminary issues Saville J. found in favour of the Names. The Court of Appeal affirmed his decision. In the Merrett appeals the issue was the liability either in tort or for breach of fiduciary duty of the managing agents, whether to direct Names (where the appellants were combined agents), or to indirect names. In the Gooda Walker appeals the sole issue arose in relation to the agency agreements entered into between Names and the members' agents. In the Feltrim appeals issues arose both as to the liability of the managing agents, either in tort or as fiduciary to the indirect Names who were members of the syndicates in 1987-1989, and as to the members' agents' liability in relation to the agency agreements entered into between them and Names, as in the Gooda Walker appeals.

On the appeals:-

Held, dismissing the appeals, (1) that a duty of care was owed by managing agents in tort both to direct Names and indirect Names, and that the existence of such a duty of care was not **147** excluded by virtue of the relevant contractual regime either under the pre-1985 agreements, or under the terms of the agreement prescribed by the 1985 byelaw, and that the Names were free to pursue their remedy either in contract or in tort (post, pp. 169F, 182E-G,

194C-F, 204C-D, 206H-207A).

Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465, H.L. (E.) and Midland Bank Trust Co. Ltd. v. Hett, Stubbs & Kemp [1979] Ch. 348 applied.

Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80, P.C. considered.

(2) That on the true construction of the prescribed agency agreement the members' agents had agreed to underwrite on behalf of the Name at Lloyd's, and the fact that they delegated that task to the managing agents did not alter their implicit promise that reasonable care and skill would be exercised in carrying out that agreement; that the circumstances that the managing agents themselves were under a similar, though non-contractual, duty to the Name did not alter the obligations which the members agents had agreed to assume by their bargain (post, pp. 169F, 197B-C, 203C-H, 204C-D, 206H-207A).

De Bussche v. Alt (1878) 8 Ch.D. 286; Powell & Thomas v. Evan Jones & Co. [1905] 1 K.B. 11, C.A. and Tarn v. Scanlan [1928] A.C. 34, H.L.(E.) distinguished.

Decision of the Court of Appeal affirmed.

The following cases are referred to in their Lordships' opinions:

Aluminium Products (QLD.) Pty. Ltd. v. Hill [1981] Qd.R. 33

Arenson v. Arenson [1977] A.C. 405; [1975] 3 W.L.R. 815; [1975] 3 All E.R. 901, H.L.(E.).

Bagot v. Stevens Scanlan & Co. Ltd. [1966] 1 Q.B. 197; [1964] 3 W.L.R. 1162; [1964] 3 All E.R. 577

Batty v. Metropolitan Property Realisations Ltd. [1978] Q.B. 554; [1978] 2 W.L.R. 500; [1978] 2 All E.R. 445, C.A..

Bean v. Wade (1885) 2 T.L.R. 157, C.A..

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

Bell v. Peter Browne & Co. [1990] 2 Q.B. 495;
[1990] 3 W.L.R. 510; [1990] 3 All E.R. 124, C.A..

Boorman v. Brown (1842) 3 Q.B. 511; sub nom.
Brown v. Boorman (1844) 11 Cl. & F. 1, H.L.(E.).

Braconnot (J.) et Cie. v. Compagnie des Messager-
ies Maritimes [1975] 1 Lloyd's Rep. 372

Candler v. Crane, Christmas & Co. [1951] 2 K.B.
164; [1951] 1 All E.R. 426, C.A..

Cann v. Willson (1888) 39 Ch.D. 39

Caparo Industries Plc. v. Dickman [1990] 2 A.C.
605; [1990] 2 W.L.R. 358; [1990] 1 All E.R. 568,
H.L.(E.).

Central Trust Co. v. Rafuse (1986) 31 D.L.R. (4th)
481

Cook v. Swinfen [1967] 1 W.L.R. 457; [1967] 1 All
E.R. 299, C.A..

De Bussche v. Alt (1878) 8 Ch.D. 286

Donoghue v. Stevenson [1932] A.C. 562, H.L.(Sc.).

Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B.
801; [1976] 2 W.L.R. 583; [1976] 2 All E.R. 5,
C.A..

Finlay v. Murtagh [1979] I.R. 249

Forster v. Outred & Co. [1982] 1 W.L.R. 86; [1982]
2 All E.R. 753, C.A..

Grant v. Australian Knitting Mills Ltd. [1936] A.C.
85, P.C..

Groom v. Crocker [1939] 1 K.B. 194; [1938] 2 All
E.R. 394, C.A..

Hawkins v. Clayton (1988) 164 C.L.R. 539

*148 Hedley Byrne & Co. Ltd. v. Heller & Partners
Ltd. [1964] A.C. 465; [1963] 3 W.L.R. 101; [1963]
2 All E.R. 575, H.L.(E.).

Heywood v. Wellers [1976] Q.B. 446; [1976] 2
W.L.R. 101; [1976] 1 All E.R. 300, C.A..

Howell v. Young (1826) 5 B. & C. 259

Junior Books Ltd. v. Veitchi Co. Ltd. [1983] 1 A.C.
520; [1982] 3 W.L.R. 477; [1982] 3 All E.R. 201,
H.L.(Sc.).

Kelly v. Cooper [1993] A.C. 205; [1992] 3 W.L.R.
936, P.C..

Lister v. Romford Ice and Cold Storage Co. Ltd.
[1957] A.C. 555; [1957] 2 W.L.R. 158; [1957] 1
All E.R. 125, H.L.(E.).

MacPherson & Kelly v. Kevin J. Prunty & Asso-
ciates [1983] 1 V.R. 573

Manby and Hawksford, In Re (1856) 26 L.J.Ch.
313

Matthews v. Kuwait Bechtel Corporation [1959] 2
Q.B. 57; [1959] 2 W.L.R. 702; [1959] 2 All E.R.
345

McClaren Maycroft & Co. v. Fletcher Development
Co. Ltd. [1973] 2 N.Z.L.R. 100

Midland Bank Trust Co. Ltd. v. Hett, Stubbs &
Kemp [1979] Ch. 384; [1978] 3 W.L.R. 167; [1978]
3 All E.R. 571

Murphy v. Brentwood District Council [1991] 1
A.C. 398; [1990] 3 W.L.R. 414; [1990] 2 All E.R.
908, H.L.(E.).

National Bank of Greece S.A. v. Pinios Shipping
Co. No. 1 [1990] 1 A.C. 637; [1989] 3 W.L.R.
1330, H.L.(E.).

Nocton v. Lord Ashburton [1914] A.C. 932,
H.L.(E.).

Powell & Thomas v. Evan Jones & Co. [1905] 1
K.B. 11, C.A..

Punjab National Bank v. de Boinville [1992] 1

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

Lloyd's Rep. 7; [1992] 1 W.L.R. 1138; [1992] 3 All E.R. 104; [1992] 1 Lloyd's Rep. 7, 28, C.A..

Robinson v. National Bank of Scotland Ltd. , 1916 S.C. (H.L.) 154

Sawyer v. Goodwin (1867) 36 L.J.Ch. 578

Simaan General Contracting Co. v. Pilkington Glass Ltd. (No. 2) [1988] Q.B. 758; [1988] 2 W.L.R. 761; [1988] 1 All E.R. 791, C.A..

Smith v. Eric S. Bush [1990] 1 A.C. 831; [1989] 2 W.L.R. 790; [1989] 2 All E.R. 514, H.L.(E.).

Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80; [1985] 3 W.L.R. 317; [1985] 2 All E.R. 947, P.C..

Tarn v. Scanlan [1928] A.C. 34, H.L.(E.).

Youell v. Bland Welch & Co. Ltd. (No. 2) [1990] 2 Lloyd's Rep. 431

The following additional cases were cited in argument:

Anns v. Merton London Borough Council [1978] A.C. 728; [1977] 2 W.L.R. 1024; [1977] 2 All E.R. 492, H.L.(E.).

Ashmore v. Corporation of Lloyd's (No. 2) [1992] 2 Lloyd's Rep. 620

Balsamo v. Medici [1984] 1 W.L.R. 951; [1984] 2 All E.R. 304

Barlee Marine Corporation v. Mountain [1987] 1 Lloyd's Rep. 471

Boobyer v. David Holman & Co. Ltd. [1993] 1 Lloyd's Rep. 96

Calico Printers Association v. Barclays Bank Ltd. (1930) 36 Com.Cas. 71

Cheshire & Co. v. Vaughan Bros. & Co. [1920] 3 K.B. 240, C.A..

Clark v. Kirby-Smith [1964] Ch. 506; [1964] 3 W.L.R. 239; [1964] 2 All E.R. 835

Coupland v. Arabian Gulf Oil Co. [1983] 1 W.L.R. 1136; [1983] 2 All E.R. 434; [1983] 3 All E.R. 226, Hodgson J. and C.A..

Dorset Yacht Co. Ltd. v. Home Office [1970] A.C. 1004; [1970] 2 W.L.R. 1140; [1970] 2 All E.R. 294, H.L.(E.).

**\*149** Dutton v. Bognor Regis Urban District Council [1972] 1 Q.B. 373; [1972] 2 W.L.R. 299; [1972] 1 All E.R. 462, C.A..

Ecossaise Steamship Co. (Ltd.) v. Lloyd, Low and Co. (1890) 7 T.L.R 76, C.A..

Forsikringsaktieselskapet Vesta v. Butcher [1989] A.C. 852; [1988] 3 W.L.R. 565; [1988] 2 All E.R. 43, C.A..

Gran Gelato Ltd. v. Richcliff (Group) Ltd. [1992] Ch. 560; [1992] 2 W.L.R. 867; [1992] 1 All E.R. 865

Greater Nottingham Co-Operative Society Ltd. v. Cementation Piling and Foundations Ltd. [1989] Q.B. 71; [1988] 3 W.L.R. 396; [1988] 2 All E.R. 971, C.A..

Iron Trade Mutual Insurance Co. Ltd. v. J. K. Buckenham Ltd. [1989] 2 Lloyd's Rep. 85; [1990] 1 All E.R. 808

Jarvis v. Moy, Davis, Smith, Vandervell & Co. [1936] 1 K.B. 399, C.A..

Lancashire and Cheshire Association of Baptist Churches v. Howard & Seddon Partnership [1993] 3 All E.R. 467

Mackersy v. Ramsays (1843) 9 Cl. & F. 818

Norwich City Council v. Harvey [1989] 1 W.L.R. 828; [1989] 2 All E.R. 1180, C.A..

Pacific Associates Inc. v. Baxter [1990] 1 Q.B. 993;

© 2009 Thomson Reuters.

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

[1989] 3 W.L.R. 1150; [1989] 2 All E.R. 159, C.A..

Peabody Donation Fund (Governors of) v. Sir Lindsay Parkinson & Co. Ltd. [1985] A.C. 210; [1984] 3 W.L.R. 953; [1984] 3 All E.R. 329, H.L.(E.).

Pirelli General Cable Works Ltd. v. Oscar Faber & Partners [1983] 2 A.C. 1; [1983] 2 W.L.R. 6; [1983] 1 All E.R. 65, H.L.(E.).

Rich (Marc) & Co. A.G. v. Bishop Rock Marine Co. Ltd. [1994] 1 W.L.R. 1071

Robertson v. Fleming (1861) 4 Macq. 167, H.L.(Sc.).

Ross v. Caunters [1980] Ch. 297; [1979] 3 W.L.R. 605; [1979] 3 All E.R. 580

Royal Products Ltd. v. Midland Bank Ltd. [1981] 2 Lloyd's Rep. 194

Scally v. Southern Health and Social Services Board [1992] 1 A.C. 294; [1991] 3 W.L.R. 778; [1991] 4 All E.R. 563, H.L.(N.I.).

Societe Commerciale de Reassurance v. Eras (International) Ltd. (Formerly Eras (U.K.)) [1992] 1 Lloyd's Rep. 570; [1992] 2 All E.R. 82n., C.A..

Trevor Ivory Ltd. v. Anderson [1992] 2 N.Z.L.R. 517

White v. Jones [1995] 2 A.C. 207, 216; [1993] 3 W.L.R. 730; [1993] 3 All E.R. 481, C.A..

**THE MERRETT ACTIONS**

APPEAL from the Court of Appeal.

This was an appeal by leave dated 28 February 1994 of the House of Lords (Lord Keith of Kinkel, Lord Mustill and Lord Nolan) by the appellants, who included Merrett Syndicates Ltd. and Merrett Underwriting Agency Ltd., from the judgment dated 13 December 1993 and order dated 6 January 1994 of the Court of Appeal (Sir Thomas Bingham M.R., Hoffmann and Henry L.JJ.) dismissing the

appeal of the appellants from the judgment dated 12 October 1993 and order dated 8 November 1993 of Saville J., in favour of the respondents, who included Ian McIntosh Henderson, William Hallam-Eames, and Elise Heckman Hughes, Names at Lloyd's. The respondents and other Names at Lloyd's had brought actions for damages against the appellants who included the Names' underwriting agents, some being members' agents, some managing agents, and some both. The judge ordered that certain preliminary issues *150 of principle mainly directed to deciding whether underwriting agents (and if so, which) owed a duty of care to their Names, should be determined before the trial of the actions and it was the determination of those issues which was the subject of the appeal.

The facts are stated in the opinion of Lord Goff of Chieveley.

**THE FELTRIM ACTIONS**

**THE GOODA WALKER ACTIONS**

APPEALS from the Court of Appeal.

These appeals by leave dated 28 February 1994 of the House of Lords (Lord Keith of Kinkel, Lord Mustill and Lord Nolan) arose from the judgment dated 13 December 1993 of the Court of Appeal (Sir Thomas Bingham M.R., Hoffmann and Henry L.JJ.) dismissing the appeals of the appellants from the judgments dated 12 October 1993 of Saville J. in favour of the respondents. In the appeal in the Feltrim actions, the appellants were Feltrim Underwriting Agencies Ltd., who were managing agents only, and a number of other underwriting agents, called in the proceedings the Feltrim members' agents. In the appeal in the Gooda Walker actions, the appellants were a number of members' agents called in the proceedings the Gooda Walker members' agents. The respondents were, or had been at all relevant times, Names at Lloyd's, or were the personal representatives of deceased persons who had been Names at Lloyd's at the relevant times. The Gooda Walker managing agents took no part in

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

the proceedings.

The facts are stated in the opinion of Lord Goff of Chieveley.

*Anthony Temple Q.C., John Rowland* and *Aidan Christie* for the appellants in the Merrett actions. As to the question expressed by the Court of Appeal as question 1, relating to indirect Names, namely, "Did managing agents (who were not also members' agents) owe Names a duty under the pre-1985 forms of agreement to carry out their underwriting functions with reasonable care and skill?" the first sub-issue is whether the law of tort imposes any duty on the managing agents not to cause purely economic loss to the Names. A written contractual chain was deliberately created: Name - members' agent - managing agent. The agreement was in terms directed to the creation of a sub-agency. The test for estab- lishing a duty of care in tort has three requirements: (i) foreseeability of damage, (ii) proximity and (iii) whether it is "fair, just and reasonable" for there to be a duty of care.

Foreseeability is not an issue. Negligent conduct by the managing agent of underwriting (in the sense of subscribing to a risk) will forseeably give rise to economic damage to a Name.

As to proximity, which represents the degree of closeness of the relationship required before a court will find a duty in tort (see Governors of Peabody Donation Fund v. Sir Lindsay Parkinson & Co. Ltd. [1985] A.C. 210, 240), the necessary relationship of proximity does not arise, given that (a) the parties regulated their relationship by contract and (b) this is a pure economic loss case. The relevant relationship has to be sufficiently close and direct. In the case of an indirect Name, *151 the relationship is neither close nor direct; on the contrary, an intervening party has been deliberately and contractually imposed.

As to the fair, just and reasonable requirement, where the parties have chosen to express their relationship in a written agreement, that is a compelling fact against there being a duty in tort. This is particularly so in commercial contracts.

A duty of care in tort can only arise from a relationship. The relationship between the appellants and the indirect Names had the following features. (a) Each indirect Name chose to become a contracting party with a members' agent, and chose not to contract directly with the managing agent. (b) Each contract between the indirect Name and the members' agent expressly contemplated and authorised the delegation by the members' agent to the managing agent of the underwriting which is the subject of the complaint. (c) The contract was in writing, comprehensive and professionally drafted. (d) The contractual scheme itself gave remedies in contract to the Names for the very matters of which they now complain and was wholly inconsistent with any duty of care being owed in tort: see Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Ltd. [1986] A.C. 80, 107B-108G. In so far as the Names have lost their remedies, that arises because of Parliamentary enactments, the Limitation Act 1980 and Latent Damage Act 1986. (e) The venture as between each Name, members' agent and managing agent was commercial. It was not a case of a member of the public necessarily having to consult a professional person, such as a solicitor or barrister.

The principle to be adopted is expressed in the maxim pacta sunt servanda. A finding of an independent duty of due skill and care in tort is unfair because it deprives the managing agents of the bargain, and the consequences of the bargain, they made. Such a finding substitutes new and potentially different rights and obligations. It would potentially give rise to joint liability as between joint tortfeasors, and the spreading of that tortious liability given the substitution of a tripartite tortious relationship in place of the contractual chain. If, for instance, managing agents were liable to indirect Names in tort and if, in addition, members' agents were to owe a concurrent duty to the indirect Names in tort as well as in contract, it would be open to Names to contend that members' agents and

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

the managing agents were joint tortfeasors in respect of the same damage. In this way solvent managing agents and members' agent would or might become liable as joint tortfeasors in respect of liabilities for the same damage to which they would never be exposed if only the chosen contractual route was adopted. Thus if one group is not financially viable the other, for instance, the managing agents, would become 100 per cent. liable for the alleged defaults of the members' agent. The creation of joint liability in tort is precisely where, in practice, the decision in Anns v. Merton London Borough Council [1978] A.C. 728 fell into error. It remains to be seen what limitation or other defences would arise in respect of each members' agent, and each element of loss claimed by each respective members' agent.

As to limitation, the contractual scheme itself gave rise to remedies to the Names for the matters in relation to which they sue. They had contractual remedies. In some cases these are likely to be barred by the **\*152** operation of the Limitation Act 1980. If indirect Names are entitled to sue in tort they may well avoid the limitation periods. It is impermissible for the Names to pray in aid different results derived from the application of the Limitation Acts as a reason for finding a duty of care in tort. To find such a duty in tort (a) deprives the parties of their contractual expectation, and (b) avoids the policy of Parliament which is that there are different limitation regimes for contract and tort.

As to latent damage, see Iron Trade Mutual Insurance Co. Ltd. v. J. K. Buckenham Ltd. [1989] 2 Lloyd's Rep. 85; Lancashire and Cheshire Association of Baptist Churches v. Howard & Seddon Partnership [1993] 3 All E.R. 467, 475; Scally v. Southern Health and Social Services Board [1992] 1 A.C. 294, 301H et seq.; Société Commerciale Réassurance v. Eras (International) Ltd. (Formerly Eras (U.K.)) (the Eras EIL Actions) [1992] 1 Lloyd's Rep. 570, 597-600.

The question arises whether the case falls within an existing category of tortious liability which is clearly established. Punjab National Bank v. de Boinville [1992] 1 W.L.R. 1138 does not establish a category within which managing agents fall. An increase in the ambit of the duty of care requires an incremental approach and justification by the plaintiff or plaintiffs concerned. The Punjab case is no authority for the proposition that insurance brokers generally owe a duty of care to third parties. [Reference was made to Ross v. Caunters [1980] Ch. 297; Caparo Industries Plc. v. Dickman [1990] 2 A.C. 605, 616-618, 619B and Youell v. Bland Welch & Co. Ltd. (No. 2) [1990] 2 Lloyd's Rep. 431.]

A finding of tort liability to indirect Names gives rise to the prospect of a massive increase in tort liability on a far wider basis than concerns managing agents. If the Names' proposed incremental increase were to be accepted it would thereby be established that in cases of sub-agency, absent privity of contract or a specific assumption of responsibility, the sub-agent would be liable directly in tort to the principal. If this were to be adopted Calico Printers Association v. Barclays Bank Ltd. (1930) 36 Com.Cas. 71, Royal Products Ltd. v. Midland Bank Ltd. [1981] 2 Lloyd's Rep. 194 and Balsamo v. Medici [1984] 1 W.L.R. 951 would have to be distinguished or overruled. Further, liability would be imposed on a basis as wide as, if not wider than, that imposed in Junior Books Ltd. v. Veitchi Co. Ltd. [1983] 1 A.C. 520. But that decision should be regarded as an authority confined to a unique set of facts. Alternatively, it should not be followed.

The so-called "contract fallacy," that is, the idea that if there is no liability in contract there can be none in tort, does not arise. In Donoghue v. Stevenson [1932] A.C. 562 the plaintiff was never in contractual relationship with the manufacturer but that did not prevent a successful claim in tort. In the present case the plaintiff is part of the contractual chain.

As to whether employees are liable in tort for economic loss, see an analogous New Zealand case of a one-man company: Trevor Ivory Ltd. v. Anderson

[1995] 2 A.C. 145                                                                Page 8

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

[1992] N.Z.L.R. 517, 520, 526. [Reference was also made to Simaan General Contracting Co. v. Pilkington Glass Ltd. (No. 2) [1988] Q.B. 758, 781-786.]

**\*153** In the present case the managing agent employs an active underwriter who accepts or rejects the risks. This is a pertinent factor for consideration under the just and reasonable heading: see Greater Nottingham Co-Operative Society Ltd. v. Cementation Piling and Foundations Ltd. [1989] Q.B. 71, 109A and Pacific Associates Inc. v. Baxter [1990] 1 Q.B. 993. The Names do not consult the managing agent or the underwriter. It should be noted Barlee Marine Corporation v. Mountain (the Leegas) [1987] 1 Lloyd's Rep. 471, 475 was concerned not with the general duty of care in the conduct and management of the underwriting for the syndicate but with a situation outside the contractual framework, where one underwriter took on the role of leading underwriter. There was clearly scope for an assumption of duty by the leading underwriter to other syndicates (even to each of the Names on the syndicates) not to commit them to something negligently. It was the antithesis of the present case since it presumed that there was no contractual framework within which to regulate the underwriter's conduct.

The second issue is: did managing agents (who were also members' agents) owe Names a non-contractual duty under the pre-1985 forms of agreement to carry out their underwriting functions with reasonable care and skill?

No court has previously held that underwriting agents owe concurrent duties of due skill and care in contract and tort. There is no justification for the further increase in the categories of concurrent duties. On the contrary, the guidance of the Privy Council in Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80 should be given practical effect by restricting the existence and scope of concurrent duties in tort in pure economic loss cases. In favour of concurrent duties are Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B. 801;

Midland Bank Trust Co. Ltd. v. Hett, Stubbs & Kemp [1979] Ch. 384 ; Pirelli General Cable Works Ltd. v. Oscar Faber & Partners [1983] 2 A.C. 1; Youell v. Bland Welch & Co. Ltd. (No. 2) [1990] 2 Lloyd's Rep. 431, 459; Smith v. Eric S. Bush [1990] 1 A.C. 831; Caparo Industries Plc. v. Dickman [1990] 2 A.C. 605 and Punjab National Bank v. de Boinville [1992] 1 W.L.R. 1138. Against concurrent duties are Jarvis v. Moy, Davis, Smith, Vandervell & Co. [1936] 1 K.B. 399; Groom v. Crocker [1939] 1 K.B. 194; Bagot v. Stevens Scanlan & Co. Ltd. [1966] 1 Q.B. 197; Cook v. Swinfen [1967] 1 W.L.R. 457; Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80, 107; Simaan General Contracting Co. v. Pilkington Glass Ltd. (No. 2) [1988] Q.B. 758; Norwich City Council v. Harvey [1989] 1 W.L.R. 828; Greater Nottingham Co-Operative Society v. Cementation Piling and Foundations Ltd. [1989] Q.B. 71 and Pacific Associates Inc. v. Baxter [1990] 1 Q.B. 993.

The present state of the law relating to architects, brokers, solicitors, and the like provides no warrant for a finding that in the case of managing agents concurrent duties of due skill and care are owed in contract and in tort. [Reference was made to Bagot v. Stevens Scanlan & Co. Ltd. [1966] 1 Q.B. 197 and Jarvis v. Moy, Davis, Smith, Vandervell & Co. [1936] 1 K.B. 399.] Medical practitioners are a special case. Historically they were considered to be liable in tort as the damage suffered was physical. The doctor also often did not have a contract. The position of solicitors **\*154** is of fundamental importance. It is necessary to distinguish between a solicitor's liability to his client (with whom he has a contractual relationship) and his liability to third parties (with whom he has no contractual relationship). In the latter case, any duty of care must necessarily arise in tort. In the former, the issue is whether in addition to the contractual duty of care, a free-standing and independent duty of care in tort also arises.

There are two principal conflicting decisions on the

question of whether a solicitor owes his client a duty of care in both contract and in tort. The Court of Appeal in Groom v. Crocker [1939] 1 K.B. 194 held that a solicitor's duty to his client arose only in contract, and not in tort. That decision was followed in the Bagot case [1966] 1 Q.B. 197; Cook v. Swinfen [1967] 1 W.L.R. 457; Clark v. Kirby-Smith [1964] Ch. 506 and Heywood v. Wellers [1976] Q.B. 446. However, Oliver J. in Midland Bank Trust Co. Ltd. v. Hett, Stubbs & Kemp [1979] Ch. 384 discerned a line of authorities based upon Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465 and Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B. 801 that permitted him to depart from the rule in Groom v. Crocker [1939] 1 K.B. 194 and to impose concurrent duties of care in contract and tort. Oliver J.'s interpretation of Hedley Byrne and Esso Petroleum v. Mardon was incorrect and he was wrong to introduce into the solicitor's relationship with his client a free-standing and independent duty of care in tort. Those cases were concerned with a duty of care arising in situations where there was no contractual relationship. Oliver J. sought to establish that Groom v. Crocker [1939] 1 K.B. 194 was inconsistent with older authorities. There was a long analysis of the cases beginning with Howell v. Young (1826) 5 B. & C. 259, but Oliver J. confused the historical importance placed upon the technicalities of the forms of action with the emergence during this century of a free-standing independent duty of care in tort. That a person could bring an action in assumpsit or in case based on a breach of a contractual duty did not mean that there was a duty of care arising independently of the contract. Brown v. Boorman (1844) 11 Cl. & F. 1 established the existence of a concurrent tort, not a tort independent of the contract. In modern parlance such tort would be described as contractual negligence: a negligent breach of contract or breach of contract simpliciter. [Reference was also made to Robertson v. Fleming (1861) 4 Macq. 167; Bean v. Wade (1885) 2 T.L.R. 157; Nocton v. Lord Ashburton [1914] A.C. 932, 945, 955, 956, 958, 964 and J. M. Kaye, "The Liability of Solicitors in Tort" (1984) 100 L.Q.R. 680 et

seq.]

None of the leading cases on duty of care in tort requires the conclusion that a duty of care in tort arises whether or not there is a contract Donoghue v. Stevenson [1932] A.C. 562; Hedley Byrne & Co. v. Heller & Partners Ltd. [1964] A.C. 465; Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B. 801 and others all involved cases where there was no contractual relationship. Nevertheless, in many cases since Midland Bank Trust Co. Ltd. v. Hett, Stubbs & Kemp [1979] Ch. 384 it was assumed or conceded that there were concurrent duties: see Pirelli General Cable Works Ltd. v. Oscar Faber & Partners [1983] 2 A.C. 1; Forsikringsaktieselskape Vesta v. Butcher [1989] A.C. 852; Youell v. Bland Welch & Co. Ltd. (No. 2) [1990] 2 Lloyd's Rep. 431; Smith v. Eric S. Bush [1990] A.C. 831; Caparo Industries Plc. v. Dickman [1990] 2 A.C. 605 and Punjab National Bank v. de Boinville [1992] 1 Lloyd's Rep. 7. The respondents in their printed **\*155** case rely on, inter alia, Lister v. Romford Ice and Cold Storage Co. Ltd. [1957] A.C. 555, but that is a case of master and servant and is equivocal. Thus Lord Radcliffe's observations, at p. 587, are referable as much to a contractual as to a tortious situation.

The second sub-issue is whether the "absolute discretion" conferred on the managing agents as to the acceptance of risks precludes the implication of any duty other than a duty to act honestly, rationally, and loyally. There is an unbroken line of authority for the proposition that "absolute discretion" in the context of a private law agreement means that the exercise of the power given by the agreement to the recipient of the power cannot be challenged by the donor or beneficiary of the power unless: (a) the power has been exercised in bad faith or (b) (arguably) the exercise of the power is totally unreasonable. The phrase is inconsistent with, and operates to preclude, the imposition of a tortious duty to take reasonable care. Similarly, it is inconsistent with, and operates to preclude, an implied contractual duty of reasonable care. [Reference was made

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

to Ashmore v. Corporation of Lloyd's (No. 2) [1992] 2 Lloyd's Rep. 620, 627.]

The Names' contention on this issue is inconsistent with the decision of Saville J. in Boobyer v. David Holman & Co. Ltd. [1993] 1 Lloyd's Rep. 96. The judgment of Saville J. in the present case is not consonant with that decision and the judge did not attempt to reconcile the two decisions.

This agreement has to be seen in the context of a risk business. The implication is that "we the Names, will not complain if there is a loss unless you the underwriter are dishonest or act in an irrational manner."

The assertion of a fiduciary relationship gives rise to the question whether that relationship creates certain duties characteristically associated with a fiduciary relationship, for example, a duty not to delegate discretions or place fetters on discretions.

The categories of existing fiduciary relationships are reasonably clearly defined and do not include a fiduciary obligation of due skill and care equivalent to the common law duty of due skill and care arising in negligence. The facts of a given case may fall within a common law duty of skill and care but that is a duty derived from the relationship but is not a fiduciary relationship. [Reference was made to *Finn, Fiduciary Obligations* (1977), pp. 15, 16 and Powell & Thomas v. Evan Jones & Co. [1905] 1 K.B. 11.] A contention for a freestanding fiduciary duty of due skill and care involves a radical change in the law. The law draws a distinction between the concept of due skill and care in tort and fiduciary duties of due skill and care. They are not coterminous: see Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465, 486, 502, 509, 523. Fiduciary duties can co-exist and arise from a contract. On the supposition that in the present case there is no duty arising in tort, there is no fiduciary duty equating to a common law duty of due skill and care in negligence.

The 1985 byelaw form of agreement did not come

into force until 1 January 1987. The byelaw pursuant to which it was introduced did not and was not intended to impose the 1985 byelaw form of agreement in respect of underwriting years of account prior to the year 1987. Although the closing of the 1984 year of account into the 1985 year of account occurred on 21 May 1987, it did not involve the 1987 year of account. The closing of the 1984 year into the 1985 year took place under the **\*156** agreements in force prior to the introduction of the 1985 byelaw form on 1 January 1987.

The byelaw introducing the 1985 byelaw form of agreement expressly permitted an underwriting agent to run off the insurance business of an underwriting member, underwritten for a year of account prior to 1 January 1987, in pursuance of the existing agency agreements applicable to years of account prior to 1 January 1987. It is logical for the byelaw to have done so because otherwise Names on the same syndicate for the same year could have differing contractual arrangements with their members' agents depending upon whether or not they continued underwriting as a Name after 1 January 1987. Clearly that would be an unsatisfactory position both for the Names and for the underwriting agents appointed by them.

On a true and proper construction of Lloyd's byelaw No. 1 of 1985 the contractual relationship between (a) the Names on syndicate 418/417 for the 1985 year of account and their respective underwriting agent, and (b) (if applicable) between such underwriting agents (on the one part) and the managing agents of syndicate 418/417 (on the other part) in relation to the acceptance by (or for) that syndicate in about June 1987 of the reinsurance to close syndicate 418/417 for the 1984 underwriting year of account was governed by the pre-1985 byelaw forms of agency and sub-agency agreements.

*Anthony Boswood Q.C., Stephen Moriarty* and *Marcus Smith* for the respondents. There are four issues. The first two issues raise respectively the question whether a managing agent of a syndicate

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

at Lloyd's for the years in question owed a duty of care in tort to "indirect" Names and "direct" Names to conduct the underwriting for the account of those Names with reasonable care and skill. The third issue raises the question whether a managing agent, as fiduciary, owes Names (whether "direct" or "indirect") a duty to conduct the underwriting for the account of those Names with reasonable care and skill. The fourth issue, one of far less importance, is concerned with whether the "closing" of the syndicate's 1984 underwriting year of account into its 1985 year of account was governed by the 1985 form of agreement, or by the pre-1985 form of agreement.

The existence of a duty of care involves a three-stage test: (i) foreseeability of damage, which is not in issue; (ii) proximity, which is in issue in that the existence of a contract or contractual chain is said to exclude it; (iii) whether it is fair, just and reasonable to impose the duty. Contract does not *automatically* exclude a tortious duty of care in any class of case. There is accordingly no difference in principle between bipartite, tripartite or multi-party contracts, or (in the present case) between the positions of direct and indirect Names. Although the diversity of situations with which the tort of negligence has to cope means that there is no singular formula or touchstone for establishing the existence of a duty of care, the fact still remains that, at the most basic level of principle, there is *one* tort of negligence with underlying principles common to the whole field of that tort: see Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465, 517 and Murphy v. Brentwood District Council [1991] 1 A.C. 398, 485E-H. Whether or not a duty of care **\*157** arises is a question considered by reference to the *type* of loss the plaintiff is seeking to recover. There are traditionally said to be three types of loss: (i) personal injury, (ii) loss following physical damage to property and (iii) "economic loss." "Economic loss " is, however, too broad and sloppy a definition; at least two different kinds of loss must be distinguished: "expectation loss" (see White v. Jones [1995] 2 A.C. 207, 216) and "subtraction loss," i.e.,

loss resulting in a diminution of the plaintiff's assets, as in the present case. Subtraction loss is akin to loss of the value of damaged property.

A duty to avoid personal injury will almost always arise when the injury is reasonably foreseeable. A duty to avoid reasonably foreseeable physical loss to property will generally arise (but not where the plaintiff does not own the property or have a proprietary interest in it, so that his loss is purely economic). A duty to avoid economic loss will *seldom* arise, especially if the loss is an expectation loss rather than a subtraction loss. The reasons for this are, inter alia, that recovery of economic loss may impose unreasonable burdens on people and contracts exist to regulate peoples' economic affairs and expectations. Nevertheless, the fundamental principle *must* be the same in each class of case: see Marc Rich & Co. A.G. v. Bishop Rock Marine Co. Ltd. [1994] 1 W.L.R. 1071 .

Any argument that the existence of a contract (whether a direct contract between A and B or a contractual chain or network) *automatically* and *without more* excludes a tortious duty of care runs immediately into the impossible difficulties posed by, inter alia, Donoghue v. Stevenson [1932] A.C. 562, 609-610 and Grant v. Australian Knitting Mills Ltd. [1936] A.C. 85, 102-104. To say that contract *automatically* excludes tort is to embrace the fallacy partly articulated in the dissenting speech of Lord Buckmaster in Donoghue v. Stevenson [1932] A.C. 562, 577-578. It is for this reason that, as a matter of principle, the decisions and dicta to the effect that a duty of care is, absent anything in the terms of engagement to the contrary, owed by a professional man to his client both in contract and tort must be correct: see Midland Bank Trust Company Ltd. v. Hett, Stubbs and Kemp [1979] Ch. 384, 403-433 and Caparo Industries Plc. v. Dickman [1990] 2 A.C. 605, 619, *per* Lord Bridge of Harwich.

For a long period before and after the enunciation of a more generalised principle of negligence in Donoghue v. Stevenson [1932] A.C. 562, the ques-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

tion of whether a person could be liable in tort was approached on a category by category basis. During that period, therefore, it would not necessarily follow from the fact that a surgeon or an innkeeper would owe an independent duty in tort quite apart from any contract (which could be sued upon in tort even if there was a contract) that the same thing would be true of a solicitor, a broker or some other professional person. To found a criticism, however, of a judgment given in 1979 by reference to historical categories of tortious duty recognised pre-Donoghue v. Stevenson is to analyse a 20th century case through 19th century spectacles. Whatever the position may have been before the decision in the Hedley Byrne case, Oliver J. in the Midland Bank case was plainly right to recognise that the question of whether a solicitor owed a concurrent duty in tort to his client required revisiting in the light of the duty of care not to cause economic loss acknowledged by the House of *158 Lords in the Hedley Byrne case. There is no warrant for confining the Hedley Byrne principle to non-contractual situations: see [1964] A.C. 465, 486, 488-489, 494-495, 502, 509, 514, 523, 528-529, 531- 532, 538. It would defy both common sense and legal principle if the Hedley Byrne principle did apply where there was no contract, but did not apply where there was. This raises the question: is the law really that a person who satisfies all the conditions in Hedley Byrne, but who is also charged a nominal fee for the credit reference, deprived of a cause of action in tort (and therefore reliance upon the Latent Damage Act 1986) just because he happens to have a contract? [Reference was made to Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B. 801, 818F-820E; Lister v. Romford Ice and Cold Storage Co. Ltd. [1957] A.C. 555; Matthews v. Kuwait Bechtel Corporation [1959] 2 Q.B. 57 and Coupland v. Arabian Gulf Oil Co. [1983] 1 W.L.R. 1136 .]

If Oliver J.'s reasoning was correct in 1979, it is even more difficult to believe that it has been proved wrong by subsequent developments. Anns v. Merton London Borough Council [1978] A.C.

728 may have been displaced by Murphy v. Brentwood District Council [1991] 1 A.C. 398 since the decision in the Midland Bank case [1979] Ch. 384, but neither that case nor Dutton v. Bognor Regis Urban District Council [1972] 1 Q.B. 373 were anything like central to Oliver J.'s analysis: see [1979] Ch. 384, 427B-428B. What were central to his analysis were the Hedley Byrne case and his view that it was not limited to non-contractual situations. Not only was that a correct view at the time, it is an interpretation actually confirmed by the observations of Lord Keith of Kinkel in the Murphy case itself. Although it is true that cases that proceed upon an assumption, without argument, are of little weight in terms of strict precedent, it is somewhat striking that in several subsequent cases on solicitors' liabilities to have reached the Court of Appeal no one has thought fit even to argue that the solicitors' duties are contractual alone because the Midland Bank case was wrong: see Forster v. Outred & Co. [1982] 1 W.L.R. 86, 99A and Bell v. Peter Browne & Co. [1990] 2 Q.B. 495.

As for the distinction between "positive" and "negative" obligations, the law of tort, ordinarily at least, imposes no positive obligation to act. But if the defendant *does* voluntarily act, he *may* (if the relevant conditions are satisfied) come under an obligation to do so carefully: see the Hedley Byrne case [1964] A.C. 465, 495.

The next question to be considered is the "incremental" approach, and the criticism that has been made of the decision of the Court of Appeal in Punjab National Bank v. de Boinville [1992] 1 W.L.R. 1138.

The appellants get off on the wrong tack by even talking of the "incremental " approach in terms of narrow and hard and fast categories like "broker, " "managing agent," "innkeeper," "solicitor," and then suggesting that there is some burden of proof upon the plaintiff to show that a duty owed by an insurance broker should be extended to an insurance underwriter as well. If this is taken literally "incrementalism" runs the risk of developing into a

© 2009 Thomson Reuters.

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

sterile debate about correctly identifying the precise category: are insurance brokers, commodity brokers and stockbrokers three categories or one? The great value of the incremental approach is the discipline it provides in requiring courts to look carefully **\*159** for a good analogy before recognising a duty of care on the facts of a particular case. But what is a good analogy? Can it be divorced from a consideration (i) of what the material factors were which give rise to a duty of care in one situation where it has been recognised, and (ii) of whether there is any material distinction between that situation and the new one which is said to be analogous. The incremental approach is no more than convenient shorthand for the process of reasoning by analogy described by Lord Diplock in Dorset Yacht Co. Ltd. v. Home Office [1970] A.C. 1004, 1058- 1061. As such, it is a useful tool of analogical reasoning, not a factual straightjacket.

Far from being an unjustified increment to recognise the duty of care recognised in the Punjab case [1992] 1 W.L.R. 1138, it would have been extremely surprising to have denied its existence. There was ample authority, and every reason in principle, to recognise that an insurance broker owed a client a duty of care in tort as much as in contract: see Forsikringsaktieselskapet Vesta v. Butcher [1989] A.C. 852, 860 and the other cases cited in Youell v. Bland Welch & Co. Ltd. (No. 2) [1990] 2 Lloyd's Rep. 431.

Once the duty of care recognised in the Punjab case is recognised for the legitimate "increment" that it is, the case does provide a compelling analogy with the present case. In the light of the Punjab case, one is bound to ask: what possible justification in principle can there be for saying that, for example, an accountant or surgeon owes a duty in tort as much as in contract to his client, but that a solicitor or insurance broker does not? If an insurance broker does, what rational distinction is there between an insurance broker and an insurance underwriter? Nor, despite the fact that the duty extends beyond the contractual client, is the category recognised in the Punjab case even a very wide one. It is limited by the requirements that (a) it be for reward (which in this case the Names were effectively funding); (b) the services be provided to the other party (in this case not only would the actual identity of each of the Names be known to the managing agent, but the underwriting was expressly being done "for and on behalf of" the Names to whom the service was thereby being provided; (c) the person must rely (and be known to rely) upon the special skill and expertise of the professional. Indeed, the present case is even a stronger one for a duty of care, given the presence of the (admitted) direct fiduciary relationship between managing agency and all Names, and the fact that the managing agent enters into contracts with third parties which bind the Name directly and irrevocably.

Alternatively, if the category which Punjab establishes is a category of "insurance broker," then there can be no material distinction between the circumstances which gave rise to the duty of care owed by the insurance broker, and the circumstances relied upon by the Names in the present case. For this purpose, the distinction between an insurance underwriter and an insurance broker cannot be material. Accordingly, the analogy is so compelling, the increment is more than justified.

The next question for consideration is: why does contract sometimes exclude tort, and sometimes not? There are readily identifiable criteria which determine whether the existence of a contract, or of a contractual chain or network, does or does not exclude a tortious duty of care, and **\*160** these can be shown to be of general application, so that a coherent set of rules can be laid down. Perhaps the most important positive criterion is that the relationship between the parties is "akin" or "equivalent" to contract: see the Hedley Byrne case [1964] A.C. 465, 528-529; Junior Books Ltd. v. Veitchi Co. Ltd. [1983] 1 A.C. 520, 533 and Smith v. Eric S. Bush [1990] 1 A.C. 831, 846. That is certainly the position here.

However, the "akin to contract" terminology risks

© 2009 Thomson Reuters.

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

begging the question what *is* "akin to contract?" The underlying idea could perhaps better be expressed by a "who for?" test: who is the defendant acting for, or who is his "client?" If his client is the plaintiff that is a strong reason for finding a duty of care, albeit that the defendant's contract is with someone else: see Smith v. Eric S. Bush and Punjab National Bank v. de Boinville [1992] 1 W.L.R. 1138. In the present case, if one asked the active underwriter at Merrett's box "who are you doing this underwriting for?" the answer would be, "the Names on my syndicate, of course." The underwriter would be unlikely to add, "who are either direct Names in contract with Merrett managing agency or indirect Names in contract with many members' agents who have themselves concluded sub-contracts with the Merrett agency." But, if he did, it would not alter the fact that he was doing the underwriting for all his Names.

There are six categories of cases that demonstrate negative criteria, that is, cases pointing away from the existence of a duty of care.

(i) A duty of care will not be imposed where the parties must be taken to have intended their rights and obligations to be governed exclusively by the contract or contracts into which they have entered. Most obviously this will be the case where there is an express provision in an agreement which says so in terms. However, even where there is no such express provision in a contract, the parties may have deliberately created themselves a network or chain of contracts whose risk allocation would be altered by allowing a direct cause of action in tort to cut across those contracts: see The Eras EIL Actions [1992] 1 Lloyd's Rep. 570, 597-598; Simaan General Contracting Co. v. Pilkington Glass Ltd. (No. 2) [1988] Q.B. 758, 782D-E; Greater Nottingham Co-Operative Society Ltd. v. Cementation Piling & Foundations Ltd. [1989] Q.B. 71, 106A-B, 109A-C and Pacific Associates Inc. v. Baxter [1990] 1 Q.B. 993, 1020C-1022C, 1023C-1024C, 1028G-1033B, 1039B-D. Similarly, the parties may have contracted against the background of a carefully worked

out scheme of liabilities whose risk allocation would again be altered by allowing a direct cause of action in tort: see Marc Rich & Co. A.G. v. Bishop Rock Marine Co. Ltd. [1994] 1 W.L.R. 1071. But whereas voluntary participation in the network of contracts may be a strong indication that the direct cause of action is excluded, this is certainly not *always* the case: see the Vesta case [1989] A.C. 852. For the duty of care owed by the leading underwriter to the following market in operating a leading underwriter's clause, see Barlee Marine Corporation v. Mountain [1987] 1 Lloyd's Rep. 471.

(ii) Where there is a potential mismatch between either (a) obligations sought to be imposed extra-contractually on a defendant and the obligations of the contract itself, or (b) the obligations imposed in contracts between different parties, a duty of care will again ordinarily not be imposed. As to (a), see Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80 **\*161** , where the extent of any obligation in tort is limited by reference to the contract. As to (b), the most obvious example is where a sub-contract between A and B contains an exclusion clause, so that to give C a right in tort to sue A deprives A of the benefit of his exclusion clause in the contract with B: see Junior Books Ltd. v. Veitchi Co. Ltd. [1983] 1 A.C. 520, 537A-E, 551E-552C and Norwich City Council v. Harvey [1989] 1 W.L.R. 828, 836H-837A.

(iii) For purposes of the counter-party cases, a counter-party is a person on whom a plaintiff seeks to impose a non-contractual duty of care in circumstances where the party has an actual or potential divergent interest to that of the plaintiff. Thus, the bank in Hedley Byrne [1964] A.C. 465 was not a counter-party, whereas the petrol company in Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B. 801 was. In order for the law to impose a duty of care on a counter-party, specific facts must exist which indicate that the counter-party is acting for the plaintiff, in view of the normal presumption that the plaintiff should look after his own interests and not be urged to say that he has relied upon the counter-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

party or the counter-party's agent. [Reference was made to Smith v. Eric S. Bush [1990] 1 A.C. 831 and Gran Gelato Ltd. v. Richcliff (Group) Ltd. [1992] Ch. 560, 571H-572B.]

(iv) In Anns v. Merton London Borough Council [1978] A.C. 728 and Murphy v. Brentwood District Council [1991] 1 A.C. 398, there were significant socio-economic reasons for not making a local authority liable when its responsibility for the defects causing loss was, at best, peripheral, and when the effect of imposing liability was to render it in effect the insurer of negligent but insolvent builders.

(v) This category excludes cases where the purpose of the defendant's work was not that the plaintiff should rely on it, but something else altogether. If the work was not done, or the advice was not given, for the benefit of the plaintiff (or for the specific purpose for which the plaintiff actually used or relied upon it), but for some other purpose, the duty of care may be excluded. It is, in a sense, the obverse of the "who for?" test and provides a separate explanation for, for example, Murphy v. Brentwood District Council, where the purpose of the functions performed by the local authority was to ensure that builders did not erect dangerous houses, and not the avoidance of the financial consequences to house buyers of acquiring such houses: see Candler v. Crane, Christmas & Co. [1951] 2 K.B. 164 and the Caparo case [1990] 2 A.C. 605, 621-623.

(vi) The willingness of the law of tort to recognise the duty of care in a particular case may be influenced by the nature of the loss itself, so that a duty of care not to cause personal injury will be imposed on a party in circumstances where a similar duty not to cause some kind of financial loss will not. In the case of pure economic loss, although it is frequently treated as only one kind of loss, there is in fact a range of losses which might be sued for. At one extreme, are "expectation loss" claims: see Scally v. Southern Health and Social Services Board [1992] 1 A.C. 294. At the other extreme, however, are cases of genuine financial loss, where the kind of interest thus affected is at its closest to

damage to property: see Hedley Byrne [1964] A.C. 465.

**\*162** Generally speaking, the tortfeasor (or alleged tortfeasor) will in any given case be obvious. Whether or not a duty of care is in fact owed will depend upon the foregoing criteria. In some cases, however, matters will be complicated by the involvement of more than one actual or potential tortfeasor, giving rise to an additional question of attribution between defendants. The question of attributions raises no new positive or negative criteria, indicating whether or not a duty of care arises. It is simply that the application of those criteria must be considered discretely in relation to the point of view and position of each individual defendant: see Punjab National Bank v. de Boinville [1992] 1 Lloyd's Rep. 7, 18, 19. This approach is just as relevant in the context of sub-agents. It is certainly not the case that the sub-agency cases relied on by the appellants would have to be overruled. On their facts Calico Printers Association v. Barclays Bank Ltd., 36 Com.Cas. 71 and Royal Products Ltd. v. Midland Bank Ltd. [1981] 2 Lloyd's Rep. 194 were correctly decided.

As to the relevance of the managing agent's fiduciary position, it has never been disputed that the managing agent stands as fiduciary qua the Names, and owes the ordinary duties of a fiduciary. A fiduciary, consistently with the "who for?" test owes a non-contractual duty of care to those in relation to whom he stands as fiduciary. This can either be regarded as a paradigm example of a relationship where the common law imposes such a duty, or, if necessary, as a free-standing duty imposed by equity (although this equitable duty to compensate may arise only on breach of what are *strictly* fiduciary duties): see Nocton v. Lord Ashburton [1914] A.C. 932, 945-946, 955-958, 962-965, 972 and Hedley Byrne [1964] A.C. 465, 486, 502, 509, 520-521, 523, 536. There is nothing remarkable in this: it would surely be extraordinary if a fiduciary did *not* owe a duty of care.

The argument based on joint and several liability is

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

wholly fallacious. There certainly are cases (see Anns v. Merton London Borough Council [1978] A.C. 728) where the results of imposing a duty of care may, because of joint and several liability, impose a disproportionate burden on a defendant who may be only peripherally responsible for the plaintiff's loss. This may have unacceptable socio-economic consequences and encourage litigation against "deep pocket" defendants. In such cases, the duty of care will be excluded by the existence of one or more of the negative criteria.

All this, however, has nothing to do with the present case. These are claims arising from allegedly negligent underwriting done *solely* by the managing agent, for which (as between it and the members' agents) it is one hundred per cent. responsible.

As to the issue of limitation, it is said by the appellants that to allow a non-contractual duty of care would in terms of limitation (a) deprive the parties of thir "contractual expectations" and (b) avoid the policy of Parliament which is that there are different limitation regimes for contract and tort. The first point appears simply circular; the parties' expectations would be that contractual limitation periods would apply only if they were advised and believed that they could not also be liable in tort. But that is the question for decision; and, in any event, the belief of the market was to the opposite effect. The second point is more serious. In the first place, **\*163** the premise of the argument is unsound. It is, of course, difficult to argue that section 14(A) of the Limitation Act 1980 (inserted by the Latent Damage Act 1986) applies to actions framed in contract: see The Eras EIL Actions [1992] 1 Lloyd's Rep. 570, 601-603. But this is *not* because Parliament intended that plaintiffs claiming for breach of a contractual duty of care should be worse off, in terms of limitation, than those claiming in tort. On the contrary, Parliament assumed that those to whom a contractual duty of care was owed would *also* be able to sue in tort, so that the provisions of the Act of 1986 would be available to

them also: see The Twenty-Fourth Report of the Law Reform Committee (Latent Damage) (Cmnd. 9390), paras. 1.2, 2.1, 2.3. In the second place, the reasoning of Judge Kershaw Q.C. in Lancashire and Cheshire Baptist Churches Inc. v. Howard & Seddon Partnership [1993] 3 All E.R. 467, 475D-J is correct. If a new right that the liability of members' agent to their Names for negligent underwriting (or rather default for which they are not personally responsible) by their sub-agent is in contract only, so that the Names have lost their causes of action before they knew they had it, then it is unfair, unjust and unreasonable to hold that the effect of the contract is, without more, to deprive the Names of a claim in tort against the person truly responsible for the loss.

[LORD KEITH OF KINKEL. Their Lordships do not wish to hear argument on the question of absolute discretion.]

The third issue, duty as fiduciary, can be dealt with briefly, because it follows from the reliance already placed upon a fiduciary relationship as a core instance of the "special relationship" which gives rise to a duty of care in tort. (i) Although the high authority relied upon in Hedley Byrne for that proposition was Nocton v. Lord Ashburton [1914] A.C. 932, the House of Lords appears in that case to have treated the fiduciary relationship as generating its own obligation to compensate a "client:" see pp. 945-948, 955- 958, 964-965. (ii) In any event, whether the position is that the relationship between the fiduciary and the "client" for whom he acts simply generates a common law duty of care, or whether it can also give rise to a parallel obligation in equity, the duty is aptly owed by the managing agent of a syndicate when acting for and on behalf of its Names (whether direct or indirect).

*Bernard Eder Q.C.* and *David Foxton* for the appellants, the members' agents in the Feltrim appeal, and *Bernard Eder Q.C.* and Christopher Butcher for the appellants, the members' agents, in the Gooda Walker appeal. It is important to emphasise that the managing agent is acting on behalf of each and

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

every Name in his syndicate. There is not a chain of contracts. The managing agent is the agent who binds each Name in the syndicate. This factual situation relates to the issues of duty of care in tort, in contract or, indeed, to the existence of a fiduciary duty. The question of whether a members' agent owes a duty of care to the Names does not arise.

An agent will be liable for breach of any promise which he has undertaken. But in each case it is necessary to identify what promise he has undertaken. The fact that an agent has sought to perform his promise through another party is not relevant to the agent's liability to his own principal, assuming always that the agent has undertaken the relevant **\*164** contractual responsibility. It may be that an agent will be prohibited from delegating the performance as a matter of general law or under a specific term of his contract and that any delegation of performance will be impermissible and a breach of the agent's contract with his principal. But even when delegation is contemplated or permitted it will not absolve the agent from his own contractual duties. The issue, therefore, which arises is whether the members' agents have contracted to perform or to undertake responsibility for the "entire transaction." They have not. Whatever their liability may be for personal acts of negligence, they are not contractually responsible for any negligence on the part of the managing agents because there are no clauses to this effect, or to require this conclusion, in the agency agreement prescribed by Lloyd's byelaw No. 1 of 1985. Moreover, the managing agents owe legal duties to, and not on behalf of, the respondents.

The agency and sub-agency agreements must be construed against a background of the Lloyd's Act 1982, the byelaws thereunder regulating the role of members' agents and managing agents at Lloyd's, and the market at Lloyd's. The most important of the byelaws is byelaw No. 4 of 1984, under which the committee was required to maintain a register of all underwriting agents permitted to act and to specify whether an underwriting agent was permit-

ted to act as a managing or a members' agent or as both. Under the definitions in that byelaw, it is the managing agent who performs the functions of underwriting contracts of insurance at Lloyd's and reinsuring such contracts.

The Court of Appeal held that the members' agents did undertake to underwrite on behalf of the Names and that this undertaking was to be found in clause 2(a) of the agreement. But there is nothing in this clause which indicates that the members' agents undertook either to do the underwriting, or to be responsible for it. Clause 2(a) is concerned with status, and not with obligations. The clause does no more or less than appoint the agent to act "as the underwriting agent . . . for the Name for the purpose of underwriting at Lloyd's" and identifies the class of business in respect of which the members' agent is to act. The clause, however, is wholly silent on the question of what type of "underwriting agent" the members' agent has agreed to act as, and what functions he has agreed to perform or in relation to which he has agreed to accept responsibility. There is no definition of "underwriting agent" in byelaw No. 1 of 1985 but, significantly, the term is defined in byelaw No. 4 of 1984 as "a managing agent or a members' agent or a managing agent which is also a members' agent . . ." For the alternative meanings of the expression "underwriting agent," see section 1(c) of the Interpretation Byelaw No. 1 of 1983 as amended on 9 April 1994. Section 2 of the Lloyd's Act 1982 defines an "underwriting agent" as "a person permitted by the Council to act as an underwriting agent at Lloyd's."

Clause 2(a) has to be read together with clause 2(b). This clause is important for two reasons. (i) It confirms the legitimacy - and necessity - of construing the agency agreement against the background of the regulatory framework at Lloyd's. The agent is obliged at all times "to comply with the byelaws, regulations and requirements for the time being of the Council affecting the Name as an underwriting member of Lloyd's." **\*165** But the byelaws which impose obligations relating to the actual conduct of

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

the underwriting impose these obligations specifically on managing agents and not on underwriting agents or members' agents. (ii) For the members' agents to have contracted to perform the underwriting for the Names would have constituted a non-compliance with byelaw No. 4 of 1984. If this would otherwise have been the effect of the agreement, the relevant provision(s) would be modified by clause 2(b).

The Court of Appeal in coming to its decision referred also to clauses 4(a) and (b)(G) of the agreement. However, clause 4(a) concerns *powers* and not *duties* placed upon the agent. As to clause 4(b)(G), a proper analysis of it demonstrates the fallacy of the construction adopted by Saville J. and the Court of Appeal. Having accepted that the members' agent could not perform the underwriting, and yet held that the members' agents had undertaken a contractual responsibility to do so, the Court of Appeal held that the power to appoint or delegate the underwriting "in effect becomes a duty." Yet clause 4(b)(G) is wholly permissive and contains no words of obligation.

So far as the members' agents duties (as distinct from powers) are concerned, these are set out in clause 5. There is nothing in any of the provisions set out under it to indicate that the members' agents contracted to underwrite or be responsible for the underwriting in the sense advanced by the Names. The purpose and effect of such a clause are simply to prevent the Name from interfering in the way in which the underwriting business is carried on. Alternatively, if the effect of the clause is to impose any obligations on the members' agent the only obligation that could be imposed is one as to *control and management* of the underwriting business. Control and management here cannot mean the carrying on of the day-to-day underwriting business because that is something which the members' agents themselves cannot do by reason of byelaw No. 4 of 1984. Moreover, clause 5(a) is *inconsistent* with an obligation to the effect that the members' agents are contractually responsible for the actual

underwriting in the sense advanced by the Names.

The sub-agency agreement is plainly entered into between the agent and the sub-agent. That general position is qualified by clause 8(c). The structure of the agreement is that the sub-agent is given an authority to act to enter into contracts of insurance and reinsurance for the Names. The question is therefore whether the sub-agent in carrying out that particular task is acting for the agent or the Name. There is sufficient privity of contract in agency for present purposes. The Names have a remedy in tort against the managing agent.

It is of no consequence that the obligations for the proper conduct of the underwriting are found in tort and not in contract: Punjab National Bank v. de Boinville [1992] 1 Lloyd's Rep. 7, 16. In each case, the duty will be the same, i.e., to exercise proper skill and care in carrying out the actual underwriting. Indeed, the reality which underlies the Merrett appeal is that Names who are owed duties in tort are better placed than Names owed duties in contract, so far as limitation is concerned.

In any event, the Court of Appeal erred in law in holding that there was no contract between the managing agents and the Names pursuant to which the managing agents were contractually responsible for the proper **\*166** performance of the underwriting for the Names in that (i) it is clear that under the agency agreement the members' agents had authority to enter into a contract with the managing agents on behalf of the Names (clauses 4(a), 4(b)(B)); (ii) it is also clear that the members' agents appoint the managing agent to act as the agent of the Names and not the agent of the members' agent. [Reference was made to Tarn v. Scanlan [1928] A.C. 34, 47-48, 56; De Bussche v. Alt (1878) 8 Ch.D. 286, 310-311; Powell & Thomas v. Evan Jones & Co. [1905] 1 K.B. 11, 17, 22-23; Calico Printers Association v. Barclays Bank Ltd. (1930) 36 Com.Cas. 71 and *Bowstead on Agency*, 15th ed. (1985), p. 133.]

*Anthony Boswood Q.C.* and *Stephen Moriarty* for

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

the respondents in the Feltrim actions, adopting the argument of the respondents in the Merrett actions. The underwriting agent expressly undertakes by clause 2(a) of the agency agreement to act as the underwriting agent of the Name, is given by clause 5(a) sole control and management of the underwriting business, is given the necessary powers by clause 4, and is by clause 4(b)(G) expressly granted the power to delegate the powers, authorities and discretions conferred by the agreement. It is an ordinary implied term of the agency agreement that the obligations which the underwriting agent thereby assumes will be carried out with reasonable care and skill. Accordingly, where the underwriting agent performs the underwriting through another (by delegating it to the managing agent of a given syndicate as its sub-agent) the underwriting agent remains responsible for any breach of that implied term. In accordance with ordinary contractual principles, the fact that the breach arises from the negligent acts of the sub-agent is nihil ad rem: see Chitty on Contracts, 26th ed. (1989), vol. 1, pp. 899-900, 901, paras. 1432, 1434.

The members' agents argued in the courts below that in clause 4(b)(G) of the agency agreement the expression "appoint or employ" was presented as an *alternative* to "delegate or confer upon." But clause 4(b)(G) is a composite provision, and these words simply echo the concepts in clauses 2 and 4 of the agreement, and in clauses 2 and 5(a) of the sub-agency agreement. The construction ventured by the members' agents does end up giving different meanings to the words in the agency agreement depending on whether the agent is also acting as a managing agent or not, or, at the very least, making great tracts of the agreement redundant where the agent is only acting as a members' agent, including clause 4(a) where the power to carry on the underwriting business (which is the whole purpose and point of the agreement) is spelled out. If the members' agents are right, then *no one* undertook any contractual commitment to underwrite for the Names. As was pointed out in both courts below this cannot have been intended.

It is perhaps to meet this point that the members' agents have argued that under the agency agreement and the sub-agency agreement the Name and the sub-agent were put into a direct contractual relationship. But, once again, this simply flies in the face of the words used in the sub-agency agreement, especially clause 2. If this had been the draftsman's intention he would, as the courts below pointed out, not have conferred the relevant tasks and discretions on the agent with power to delegate, but rather have authorised the agent (when acting as members' agent) to give **\*167** the necessary powers and discretions to the managing agent of the syndicate concerned. That is precisely what the Council of Lloyd's did when it enacted the agency agreements byelaw No. 8 of 1988, whereby, with effect from 1 January 1990, Names were put, for the first time, into a direct contractual relationship with the managing agents of each of the syndicates of which they were members, and the different functions of members and managing agents respectively were defined.

*Geoffrey Vos Q.C., Jonathan Gaisman* and *David Lord* for the respondents in the Gooda Walker action, adopting the argument of the respondents in the Feltrim actions, on the contract point. A number of arguments may be advanced in answer to the members' agents' construction of the standard agency agreement. (i) There is nothing in byelaw No. 4 of 1984 which prevents members' agents from contracting to perform the underwriting as opposed to actually performing the underwriting. (ii) The terms of both the standard agency agreement and the standard sub-agency agreement clearly support the Names' construction. (iii) There is no direct contract between the Names and the managing agents. (iv) The Names' construction gives effect to the plain intention of the draftsman. (v) The standard agency agreement was entered into by both members' agents and combined agents. A combined agent must be responsible to the Name for the underwriting. The standard agency agreement cannot have one result if entered into by a combined agent, and another result if entered into by a members'

[1995] 2 A.C. 145                                                                                      Page 20

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

agent. (vi) It was generally known that managing agents (and not members' agents) actually performed the underwriting. That knowledge has no bearing on the contractual obligations undertaken.

The members' agents rely on the prohibition in paragraph 4 of byelaw No. 4 of 1984 that "no person may act as managing agent . . . unless it is a body registered as such under this byelaw." Since members' agents were not registered under that byelaw to perform the underwriting functions reserved for managing agents (and therefore could not actually themselves perform those functions), it is argued that members' agents cannot have contracted to do so. But, as the courts below held, byelaw No. 4 of 1984 only prohibits a members' agent from personally conducting the underwriting, not from contracting to do it, or from undertaking contractual responsibility for it. The members' agents make the further point that clause 2(b) of the standard agency agreement provides that the agent should comply with all byelaws. That does not assist their argument because they are not violating the prohibition against conducting underwriting by agreeing to conduct it, so long as they delegate that function to an authorised managing agent. In fact, the definition of "members' agent" in byelaw No. 4 of 1984 supports the Names' case, for this definition emphasises the Names' contention that privity of contract is between the Name and the members' agent, and not between the Name and the managing agent.

The theory underlying the agreements is that the contracting agents will have responsibility for the underwriting, and will have power to appoint or employ others and to delegate: see clause 2 and clause 4(b)(G) of the standard agency agreement and clause 2 and clause 5 of the standard sub-agency agreement.

***168** The members' agent cannot delegate any duty or responsibility that it does not itself have. Accordingly, since the members' agents had the power to delegate the actual conduct of the underwriting it would be remarkable if they had no responsibility to the Names for it.

There is no power for the agent to create contractual privity between a Name and a managing agent (or, if the agent, is a combined agent, another managing agent). The terms employed are to be contrasted with those later introduced by byelaw No. 8 of 1988, which, by clause 2(2)(b), gave the members' agent express authority, *on behalf of the Name*, to enter into a direct agreement with the managing agent. [Reference was also made to the standard agency agreement, clauses 2(a), 3, 4, 5, 9(a), 11, 13(a), 19.]

The standard sub-agency agreement is precisely what it is said to be, namely, a sub-agency agreement: see clauses 1(a), 2, 3, 4, 5, 8, 12(a), (b), 21. It does not create any privity of contract between Names and managing agents. The managing agents are contractually responsible to the members' agents, who in turn are contractually responsible to Names.

The introduction to the code of practice for underwriting agents and active underwriters at Lloyd's issued 9 December 1985 affirms the application of ordinary principles of agency to all underwriting agents at Lloyd's. The general principles applicable to the question of whether or not there is privity between a principal and a sub-agent were well expressed by Wright J. in Calico Printers Association v. Barclays Bank Ltd., 36 Com.Cas. 71, 77- 79. [Reference was also made to *Bowstead on Agency*, 15th ed., p. 131, art. 36(3).]

The members' agent rely on three cases for the proposition that a direct contract can be created between a principal and sub-agent: De Bussche v. Alt (1878) 8 Ch.D. 286; Powell & Thomas v. Evan Jones & Co. [1905] 1 K.B. 11 and Tarn v. Scanlan [1928] A.C. 34, 47, 55, 56. Those cases do not lay down any general principle, but turned on their particular facts.

The fact that the members' agent may delegate (pursuant to clause 4(b)(G)) some of his contractual responsibilities does not absolve him from liability: see *Bowstead on Agency,* pp. 130-135, art. 36;

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

Mackersy v. Ramsays (1843) 9 Cl. & F. 818, 845 and Calico Printers Association v. Barclays Bank Ltd., 36 Com.Cas. 71, 77-79.

The position in the present case is no different from that of any other main contractor (the members' agent), who remains liable for the acts of his sub-contractor (the managing agent) to whom he has delegated his contractual responsibilities: see *Chitty on Contracts,* 26th ed., vol. 1, pp. 899-901, paras. 1432-1434.

Since it is clear both as a matter of construction and on authority that the agency agreement byelaw No. 1 of 1985 did not create privity between an indirect Name and the managing agent, the members' agents' argument leads to the unacceptable conclusion that nobody bears contractual responsibility for the underwriting conducted for an indirect Name. Byelaw No. 8 of 1988 introduced an entirely new scheme. The draftsman of that scheme plainly intended to make the managing agent (for both direct and indirect Names) contractually responsible to the Names for the **\*169** underwriting: see clause 2.2(b). Had the 1985 byelaw intended so to do, it would have been simple to achieve that result.

As to the application of the standard agency agreement to direct and indirect Names, Saville J. rightly found this to be a key point and the Court of Appeal agreed. There can be no doubt that the standard agency agreement effectively imposes upon a combined agent full contractual responsibility for the underwriting. Once that is accepted, it is impossible for the agreement to mean something different when entered into by a members' agent with an indirect Name.

The standard agency agreement specifically allows for some agents to delegate their contractual underwriting responsibilities, whilst others may not. Whether or not Names generally or the respondents knew that managing agents (and not their members' agent) actually conducted the underwriting, is irrelevant. The standard agency agreement has to be construed objectively on its natural and ordinary

meaning in its commercial context. It cannot matter who actually undertook the underwriting: the only queston is who contracted to undertake responsibility for it to the Name.

*John Rowland* and *Kirsten Houghton* for the appellants, the managing agents in the Feltrim appeal, adopted the argument of the appellants in the Merrett actions in relation to the first and second issues and the arguments of all the respondents in relation to the third issue.

*Rowland,* in reply on behalf of the appellants in the Merrett actions and the managing agents in the Feltrim appeal, referred to Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80; Grant v. Australian Knitting Mills Ltd. [1936] A.C. 85; Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465; Murphy v. Brentwood District Council [1991] 1 A.C. 398 and Punjab National Bank v. de Boinville [1992] 1 Lloyd's Rep. 7.

*Eder Q.C.* in reply, referred to Calico Printers Association v. Barclays Bank Ltd., 36 Com.Cas. 71; Ecossaise Steamship Co. (Ltd.) v. Lloyd, Low and Co. (1890) 7 T.L.R. 76; Cheshire & Co. v. Vaughan Bros. & Co. [1920] 3 K.B. 240 and Mackersy v. Ramsays, 9 Cl. & F. 818.

Their Lordships took time for consideration. 25 July. LORD KEITH OF KINKEL.

My Lords, for the reasons set out in the speech of my noble and learned friend, Lord Goff of Chieveley, which I have read in draft and with which I agree, I would dismiss these appeals.

LORD GOFF OF CHIEVELEY.

My Lords,

*Introduction*

The appeals now before your Lordships' House arise out of a number of actions brought by underwriting members (known as Names) of Lloyd's against their underwriting agents, in an attempt to

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

recoup at least part of the great losses which they have suffered following upon recent catastrophic events, mainly in the United States of America, which have led to unprecedented claims being made upon Lloyd's underwriters.

**\*170** The actions in question form part of a large number of actions of this kind, which are now approaching trial in the Commercial Court. At the root of many of these actions lie questions of law, upon the resolution of which depends the nature of the legal responsibility which rested upon underwriting agents towards the Names for whom they acted. Accordingly, with the co-operation of the parties to the actions out of which the present appeals arise, Saville J. ordered that certain issues of principle should be decided as preliminary issues. Having heard argument upon these issues, he gave judgment on 12 October 1993, his rulings being favourable to the contentions advanced on behalf of the Names. On 13 December 1993, the Court of Appeal unanimously affirmed the decision of Saville J., for the reasons given by him. The matter now comes before your Lordships' House, with the leave of the House; and the hearing of the appeals has been expedited, in the hope that the fact that the appeals have come before the House will result in as little disturbance as possible to the programme now established for the hearing of the various Lloyd's actions in the Commercial Court.

It is necessary for me now to identify, and place in their context, the various issues which fall for consideration on these appeals. But before I do so, it is desirable that I should first set out certain basic facts about the structure of Lloyd's, with special reference to the relationship between Names and their underwriting agents.

Every person who wishes to become a Name at Lloyd's and who is not himself or herself an underwriting agent must appoint an underwriting agent to act on his or her behalf, pursuant to an underwriting agency agreement. Underwriting agents may act in one of three different capacities. (1) They may be members' agents, who (broadly speaking) advise

Names on their choice of syndicates, place Names on the syndicates chosen by them, and give general advice to them. (2) They may be managing agents, who underwrite contracts of insurance at Lloyd's on behalf of the Names who are members of the syndicates under their management, and who reinsure contracts of insurance and pay claims. (3) They may be combined agents, who perform both the role of members' agents, and the role of managing agents in respect of the syndicates under their management.

Until 1990, the practical position was as follows. Each Name entered into one or more underwriting agency agreements with an underwriting agent, which was either a members' agent or a combined agent. Each underwriting agency agreement governed the relationship between the Name and the members' agent, or between the Name and the combined agent in so far as it acted as a members' agent. If however the Name became a member of a syndicate which was managed by the combined agent, the agreement also governed the relationship between the Name and the combined agent acting in its capacity of managing agent. In such a case the Name was known as a direct Name. If however the Name became a member of a syndicate which was managed by some other managing agent, the Name's underwriting agent (whether or not it was a combined agent) entered into a sub-agency agreement under which it appointed the managing agent its sub-agent to act as such in relation to the Name. In such a case the Name was known as an indirect Name.

**\*171** Before 1 January 1987, no forms of underwriting agency or sub-agency agreements were prescribed at Lloyd's; but standard clauses were in common use, and forms of agreement used by underwriting agents were similar, if not identical. For the purposes of the first group of actions now under appeal (the Merrett actions), which were concerned with that period, specimen agreements were placed before Saville J. for use by him in respect of those actions. These are to be found annexed to his judg-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

ment. However, pursuant to the Lloyd's Act 1982, byelaw No. 1 of 1985 was made which prescribed forms of agency agreement and sub-agency agreement. These forms became compulsorily applicable as from 1 January 1987, and are the relevant forms in the other two groups of actions which are the subject of the present appeals, the Feltrim actions and the Gooda Walker actions. A subsequent byelaw, No. 8 of 1988, prescribed new standard forms of agreement for use in 1990 and subsequent years of account. With these forms, which swept away the distinction between direct and indirect Names, your Lordships are not directly concerned in the present appeals.

I turn to the appeals now before your Lordships' House. These are (1) the Merrett appeals, and (2) the conjoined Feltrim and Gooda Walker appeals.

### (1) The Merrett appeals

The appellants in these appeals (referred to as "Merretts") are in fact Merrett Syndicates Ltd. ("M.S.L.") and Merrett Underwriting Agency Management Ltd. ("M.U.A.M."). Up to 1 January 1986, M.S.L. was a combined agent. It was the managing agent of Syndicate 418/417, and was also a members' agent. From 1 January 1986, M.U.A.M. became the Managing Agent of Syndicate 418/417, and M.S.L. operated solely as a members' agent. There are three groups of Merrett actions brought by Names who were members of Syndicate 418/417. In all three groups of actions, there are complaints of negligent closure of a year or years of account into subsequent years by reinsurance to close ("R.I.T.C."). In one of them, there is also a complaint as to the writing of certain contracts of insurance; and in this case there is also an issue of limitation.

### (2)(a) The Feltrim appeals

The appellants are (i) Feltrim Underwriting Agencies Ltd. ("Feltrim"), which acted as a managing agent only; and (ii) about 40 members' agents ("the Feltrim members' agents"), which are in fact unre-

lated to Feltrim. In the actions which are the subject of these appeals, Names who were members of syndicates managed by Feltrim sue Feltrim as managing agents, and also sue the Feltrim members' agents as their members' agents. All the Names are indirect Names. The Names allege against Feltrim negligent underwriting during the years 1987-1989 arising out of their Syndicates' participation in the London market excess of loss ("L.M.X.") business, it being alleged that the underwriters assumed greatly excessive aggregate liabilities, and took out far too little reinsurance. The Feltrim members' agents are sued on the basis that they are contractually liable for the defaults of Feltrim as managing agents to whom the underwriting was delegated. There is no limitation issue.

### *172 (2)(b) The Gooda Walker appeals

The appellants are 65 members' agents ("the Gooda Walker members' agents "), against which it is alleged by Names that they are contractually liable to the Names for failure by the managing agents of the syndicates of which the Names were members, to which the Gooda Walker members' agents had delegated the function of underwriting, to exercise reasonable care and skill in relation to such underwriting.

It might have been expected that, in all three groups of appeals, there would be appeals by both the members' agents and the managing agents, and that in each case issues would arise whether there was liability on their part in contract, or in tort, or for breach of fiduciary duty. But that is not in fact the case. In the case of the Merrett appeals, there is no issue before your Lordships between the Names and their members' agents acting as such. Except for one entirely distinct issue concerned with R.I.T.C., the appeals are concerned only with the issue of liability, either in tort or for breach of fiduciary duty, of Merretts as managing agents, whether to direct Names (where Merretts were combined agents) or to indirect Names. By way of contrast, in the Gooda Walker appeals the Gooda Walker managing agents are not appealing to this House against

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

the decision of the Court of Appeal, with the result that the ruling of the Court of Appeal that they owed a contractual duty to direct Names, and a duty of care in tort to indirect Names, will remain binding as between them and the Names in question. The only issue now before your Lordships on the Gooda Walker appeals arises in relation to the agency agreements entered into between Names and the Gooda Walker members' agents. So far as the Feltrim appeals are concerned, however, issues arise both as to Feltrim's liability as managing agents, viz. whether Feltrim owed a duty of care in tort, or as fiduciary, to the indirect Names who were members of the Feltrim syndicates in the years 1987-1989, and as to the Feltrim members' agents' liability as such in relation to the agency agreements entered into between them and Names, as in the Gooda Walker appeals.

In the result, the following issues have been identified as arising for the decision of your Lordships' House on these appeals.

*Issue 1*

*(A) Merrett appeals: liability of managing agents to Names under the forms of agreement in force before 1987*

(1) Duty of care - indirect Names.Did managing agents (who were not also members' agents) owe indirect Names a duty under the pre-1985 byelaw form of underwriting agency agreement to carry out their underwriting functions with reasonable care and skill for the 1979 to 1985 years of account inclusive? (a) Does the law of tort impose any duty upon managing agents not to cause purely economic loss to Names? (b) Does the "absolute discretion" conferred upon managing agents under the pre-1985 byelaw form of underwriting agency agreement preclude the implication of any duty other than duties to act honestly, rationally and loyally?

**\*173** (2) Duty of care - direct Names.Did Merretts as managing agents who were also members' agents owe direct Names a non-contractual duty under the

pre-1985 byelaw forms of underwriting agency agreement to carry out their underwriting functions with reasonable care and skill for the 1979 to 1985 years of account inclusive?

(3) Fiduciary duty.Did Merretts as managing agents (whether they were also members' agents or not) owe Names as fiduciary a duty to conduct the underwriting for the account of the Names with reasonable care and skill for the 1979 to 1985 years of account (inclusive) equivalent to the alleged duty of care in tort?

*(B) Feltrim appeals: liability of managing agents to Names under the forms of agreement in force between 1987 and 1989*

(1) Duty of care - indirect Names.In tort - did Feltrim, a managing agent only, owe a duty of care in tort to the (indirect) Names on the Feltrim syndicates to carry out the conduct and management of the underwriting business of the Feltrim syndicates with reasonable care and skill at any material time between 1987 and 1989?

(2) Fiduciary duty.As fiduciary - did Feltrim owe Names a fiduciary duty equivalent to a duty of care in tort as described above?

*Issue 2*

*Feltrim and Gooda Walker appeals: liability of members' agents to Names under the forms of agreement in force during the period 1987 to 1989*

Whether, in relation to, and on the true construction of, agency agreements entered into between Names and members' agents in the standard form provided for by Lloyd's byelaw No. 1 of 1985: (1) It was a term of the said agency agreements that the actual underwriting would be carried on with reasonable care and skill, so that the members' agents remained directly responsible to their Names for any failure to exercise reasonable care and skill by the managing agents of any particular syndicate to whom such underwriting had been delegated. (2) There was a term of the said agreements that the members'

© 2009 Thomson Reuters.

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

agent was only required to exercise reasonable care and skill in relation to such activities and functions as members' agents by custom and practice actually perform for their Names personally. (3) There was a direct contractual relationship of principal and agent between Names and the managing agents of syndicates in which the Names participated.

*Issue 3*

*Merrett appeals: reinsurance to close*

Whether for Names who executed the new pre-scribed 1985 byelaw form of underwriting agency agreement the contractual relationship between such Names for the 1985 underwriting year of ac-count and their members' agents and between their members' agents and the managing agent in relation to the acceptance in about June 1987 by the syndic-ate for the 1985 underwriting year of account of the reinsurance to close the **\*174** 1984 underwriting year of account was governed by the 1985 byelaw form of agreement or by the pre-1985 byelaw form of agreement.

For the purpose of considering these various issues, I shall for convenience organise them a little differ-ently, as will appear hereafter.

*I. Merrett and Feltrim appeals*

*A. Duty of care - Liability of managing agents to Names (both direct and indirect Names) in tort*

*1. Introduction*

I turn now to the tortious issues which arise in the Merrett and Feltrim appeals. The first issue, in the order in which they are stated, is concerned with the question whether managing agents, which were not also members' agents, owed to indirect Names a duty of care in tort to carry out their underwriting functions with reasonable care and skill. The second issue is concerned with the question wheth-er managing agents, which were also members' agents, owed such a duty to direct Names.

The first of these issues, relating to indirect Names, arises in both the Merrett appeals and the Feltrim appeals. However the issue in the Merrett appeals arises in the context of the pre-1985 byelaw forms of agency and sub-agency agreements, whereas that in the Feltrim appeals does so in the context of the forms of agreement prescribed under the 1985 byelaw. The second of these issues, relating to dir-ect Names, arises only in the Merrett appeals, in the context of the pre-1985 byelaw forms.

It is desirable that I should at once identify the reas-ons why Names in the Merrett and Feltrim actions are seeking to establish that there is a duty of care owed to them by managing agents in tort. First, the direct Names in the Merrett actions seek to hold the managing agents concurrently liable in contract and in tort. Where, as in the case of direct Names, the agents are combined agents, there can be no doubt that there is a contract between the Names and the agents, acting as managing agents, in respect of the underwriting carried out by the managing agents on behalf of the Names as members of the syndicate or syndicates under their management, the only ques-tion being as to the scope of the managing agents' contractual responsibility in this respect. Even so, in the Merrett actions, Names are concerned to es-tablish the existence of a concurrent duty of care in tort, if only because there is a limitation issue in one of the actions, in which Names wish therefore to be able to take advantage of the more favourable date for the accrual of the cause of action in tort, as opposed to that in contract. Second, the indirect Names in both the Merrett and the Feltrim actions are seeking to establish the existence of a duty of care on the part of the managing agents in tort, no doubt primarily to establish a direct liability to them by the managing agents, but also, in the case of the Merrett actions, to take advantage of the more advantageous position on limitation. Your Lordships were informed that there is no limitation issue in the Feltrim actions.

I turn next to the forms of agreement which provide the contractual context for these issues. I have

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

already recorded that, so far as the pre-1985 byelaw forms are concerned, no form was prescribed, but those in use were substantially similar if not identical, and that specimen forms of **175** agency and sub-agency agreement were agreed for the purposes of these preliminary issues and are scheduled to the judgment of Saville J. The most relevant provisions of the specimen forms are the following.

*(1) Agency agreement*

"1. The Agent shall act as the underwriting agent for the Name for the purposes of underwriting at Lloyd's for the account of the Name policies and contracts of insurance reinsurance and guarantee relating to all classes of insurance business which with the sanction of the Committee of Lloyd's may be transacted at Lloyd's by the syndicate."

"4. The agent shall have full power and authority to appoint and employ the sub-agent to carry on or manage the underwriting and to delegate to or confer upon the sub-agent all or any of the powers authorities discretions and rights given to the agent by this agreement."

"6. (a) The agent shall have the sole control and management of the underwriting and absolute discretion as to the acceptance of risks and settlement of claims whether such claims shall in the opinion of the agent be legally enforceable or not. . . . (d) The Name shall not in any way interfere with the exercise of the aforesaid control or management or discretion."

"7. The following provisions shall apply concerning the accounts of the underwriting:- . . . (e) The syndicate account of any calendar year shall not be closed before the expiration of the two calendar years next following the calendar year in question and in order to close the syndicate account of any year the agent may:- (i) reinsure all or any outstanding liabilities in such manner and by debiting such account with such sum as the agent shall in the absolute discretion of the agent think fit as a premium for reinsurance and crediting the reinsurance premium to the syndicate account of the next succeeding year or (ii) reinsure all or any outstand-

ing liabilities of such account into the account of any other year then remaining open or in any other manner which the agent thinks fit or (iii) allow the whole or part of a syndicate account of any year to remain open until its outstanding liabilities shall have run off . . ."

"12.(a) The agent may from time to time retain out of the profits of the underwriting which would otherwise be payable to the Name any moneys which the agent may in the absolute discretion of the agent (subject to any requirements prescribed by Lloyd's) think desirable to carry to reserve and such moneys may be placed on deposit at any bank or discount house of public or local authorities or building society or may be invested in such stocks funds shares or securities (including bearer securities) in any part of the world as the agent may determine and the agent shall not be responsible for any loss of principal or interest on such deposits or investments. Interest or dividends earned on any such deposits or investments shall be credited to the Name in respect to the Name's due proportion thereof."

**176** *(2) Sub-agency agreement*

"2. The sub-agent agrees and is retained and authorised to act as underwriting sub-agent for the agent for the purpose of underwriting at Lloyd's in the names and for the account of each of the Names policies and contracts of insurance reinsurance and guarantee relating to all classes of insurance business which with the sanction of the Committee of Lloyd's may be transacted as insurance business and of carrying on for each of the Names the business of marine underwriter at Lloyd's and the appointment of the sub-agent shall take effect in respect of each of the Names on and from the date specified in the second column of the schedule hereto opposite the name of each of the Names."

"5. The agent delegates to the sub-agent the exercise of all such powers authorities discretions and rights conferred upon the agent by the underwriting agency agreement as it may be in any way necessary for the sub-agent to have to enable the sub-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

agent or any underwriter or agent appointed by the sub-agent to carry on the underwriting for the Names and to close the accounts of the Names."

"6. Subject to the provisions of clause 7 hereof the underwriting shall be conducted and the accounts thereof shall be kept and made up and the profits ascertained in such manner as the sub-agent may for the time being think fit and the sub-agent shall have the sole control and management of the underwriting and sole discretion as to the acceptance of risks and the compromise or settlement of claims."

"8. All questions relating to the investment of premiums and other monies not required for the current service of the underwriting and to the time and manner of paying over profits and the placing of sums to a reserve shall be decided by the sub-agent and subject as aforesaid the sub-agent shall pay over the profits of the underwriting to the agent for distribution to the Names."

Turning to the forms of agency and sub-agency agreements prescribed by the 1985 byelaw, I will set out the material provisions below when considering Issue 2, concerned with the liability of members' agents. These provisions will therefore be available for reference, and I do not propose to repeat them here.

In the result, in neither the specimen agreements nor the agreements prescribed by the 1985 byelaw is there any express provision imposing on the agent a duty to exercise care and skill in the exercise of the relevant functions under the agreement; but I understand it not to be in dispute that a term to that effect must be implied into the agreements. It is against that background that the question falls to be considered whether a like obligation rested upon the managing agents in tort, so that the managing agents which were also members' agents owed such a duty of care in tort to direct Names, with the effect that the direct Names had alternative remedies, in contract and tort, against the managing agents; and whether managing agents which were not also members' agents owed such a duty of care in tort to

indirect Names, so that the indirect Names had a remedy in tort against the managing agents, notwithstanding the **\*177** existence of a contractual structure embracing indirect Names, members' agents and managing agents, under which such a duty was owed in contract by the managing agents to the members' agents, and by the members' agents to the indirect Names. Furthermore, the question also arises whether, under the pre-1985 forms of agreement, the absolute discretion as to the acceptance of risks (and settlement of claims) vested in agents under clause 6(a) of the agency agreement, and delegated by them to sub-agents (the managing agents) under clauses 5 and 6 of the sub-agency agreement, was effective to exclude any duty of care which might otherwise have been imposed upon the managing agents, either in contract or in tort.

Saville J. resolved all these issues in favour of the Names. He held that a duty of care was owed by managing agents in tort both to direct Names and to indirect Names, and that the existence of such a duty of care was not excluded by reason of the relevant contractual regime, whether under the pre-1985 specimen agreements, or under the forms of agreement prescribed by the 1985 byelaw. In particular, he held that the absolute discretion conferred on the agent under clause 6(a) of the pre-1985 byelaw specimen agency agreement, and delegated to the managing agent under clauses 5 and 6 of the related sub-agency agreement, did not exclude any such duty of care. On all these points Saville J.'s decision was, as I have recorded, affirmed by the Court of Appeal.

### 2. The argument of the managing agents

The main argument advanced by the managing agents against the existence of a duty of care in tort was that the imposition of such a duty upon them was inconsistent with the contractual relationship between the parties. In the case of direct Names, where there was a direct contract between the Names and the managing agents, the argument was that the contract legislated exclusively for the rela-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

tionship between the parties, and that a parallel duty of care in tort was therefore excluded by the contract. In the case of indirect Names, reliance was placed on the fact that there had been brought into existence a contractual chain, between Name and members' agent, and between members' agent and managing agent; and it was said that, by structuring their contractual relationship in this way, the indirect Names and the managing agents had deliberately excluded any direct responsibility, including any tortious duty of care, to the indirect Names by the managing agents. In particular, the argument ran, it was as a result not permissible for the Names to pray in aid, for limitation purposes, the more favourable time for accrual of a cause of action in tort. To do so, submitted the managing agents, would deprive them of their contractual expectations, and would avoid the policy of Parliament that there are different limitation regimes for contract and tort.

Such was the main argument advanced on behalf of the managing agents. Moreover, as appears from my summary of it, the argument is not precisely the same in the case of direct Names and indirect Names respectively. However, in any event, I think it desirable first to consider the principle upon which a duty of care in tort may in the present context be imposed upon the managing agents, assuming that to impose such a *178 duty would not be inconsistent with the relevant contractual relationship. In considering this principle, I bear in mind in particular the separate submission of the managing agents that no such duty should be imposed, because the loss claimed by the Names is purely economic loss. However the identification of the principle is, in my opinion, relevant to the broader question of the impact of the relevant contract or contracts.

*3. The governing principle*

Even so, I can take this fairly shortly. I turn immediately to the decision of this House in Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465. There, as is of course well known, the question arose whether bankers could be held liable in tort in respect of the gratuitous provision of a negligently favourable reference for one of their customers, when they knew or ought to have known that the plaintiff would rely on their skill and judgment in furnishing the reference, and the plaintiff in fact relied upon it and in consequence suffered financial loss. Your Lordships' House held that, in principle, an action would lie in such circumstances in tort; but that, in the particular case, a duty of care was negatived by a disclaimer of responsibility under cover of which the reference was supplied.

The case has always been regarded as important in that it established that, in certain circumstances, a duty of care may exist in respect of words as well as deeds, and further that liability may arise in negligence in respect of pure economic loss which is not parasitic upon physical damage. But, perhaps more important for the future development of the law, and certainly more relevant for the purposes of the present case, is the principle upon which the decision was founded. The governing principles are perhaps now perceived to be most clearly stated in the speeches of Lord Morris of Borth-y-Gest (with whom Lord Hodson agreed) and of Lord Devlin. Lord Morris said, at pp. 502-503:

"My Lords, I consider that it follows and that it should now be regarded as settled that if someone possessed of a special skill undertakes, quite irrespective of contract, to apply that skill for the assistance of another person who relies upon such skill, a duty of care will arise. The fact that the service is to be given by means of or by the instrumentality of words can make no difference. Furthermore, if in a sphere in which a person is so placed that others could reasonably rely upon his judgment or his skill or upon his ability to make careful inquiry, a person takes it upon himself to give information or advice to, or allows his information or advice to be passed on to, another person who, as he knows or should know, will place reliance upon it, then a duty of care will arise."

Lord Devlin said, at p. 526:

[1995] 2 A.C. 145

Page 29

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824

**(Cite as: [1995] 2 A.C. 145)**

"The respondents in this case cannot deny that they were performing a service. Their sheet anchor is that they were performing it gratuitously and therefore no liability for its performance can arise. My Lords, in my opinion this is not the law. A promise given without consideration to perform a service cannot be enforced as a **\*179** contract by the promisee; but if the service is in fact performed and done negligently, the promisee can recover in an action in tort."

He then cited a number of authorities, and continued, at pp. 528-529:

"I think, therefore, that there is ample authority to justify your Lordships in saying now that the categories of special relationships which may give rise to a duty to take care in word as well as in deed are not limited to contractual relationships or to relationships of fiduciary duty, but include also relationships which in the words of Lord Shaw in Nocton v. Lord Ashburton [1914] A.C. 932, 972 are 'equivalent to contract,' that is, where there is an assumption of responsibility in circumstances in which, but for the absence of consideration, there would be a contract. Where there is an express undertaking, an express warranty as distinct from mere representation, there can be little difficulty. The difficulty arises in discerning those cases in which the undertaking is to be implied. In this respect the absence of consideration is not irrelevant. Payment for information or advice is very good evidence that it is being relied upon and that the informer or adviser knows that it is. Where there is no consideration, it will be necessary to exercise greater care in distinguishing between social and professional relationships and between those which are of a contractual character and those which are not. It may often be material to consider whether the adviser is acting purely out of good nature or whether he is getting his reward in some indirect form. The service that a bank performs in giving a reference is not done simply out of a desire to assist commerce. It would discourage the customers of the bank if their deals fell through because the bank had refused to testify to their credit when it was good.

"I have had the advantage of reading all the opinions prepared by your Lordships and of studying the terms which your Lordships have framed by way of definition of the sort of relationship which gives rise to a responsibility towards those who act upon information or advice and so creates a duty of care towards them. I do not understand any of your Lordships to hold that it is a responsibility imposed by law upon certain types of persons or in certain sorts of situations. It is a responsibility that is voluntarily accepted or undertaken, either generally where a general relationship, such as that of solicitor and client or banker and customer, is created, or specifically in relation to a particular transaction."

He said, at pp. 531-532:

"Since the essence of the matter in the present case and in others of the same type is the acceptance of responsibility, I should like to guard against the imposition of restrictive terms notwithstanding that the essential condition is fulfilled. If a defendant says to a plaintiff: 'Let me do this for you; do not waste your money in employing a professional, I will do it for nothing and you can rely on me;' I do not think he could escape liability simply because he belonged to no profession or calling, had no qualifications or special skill and did **\*180** not hold himself out as having any. The relevance of these factors is to show the unlikelihood of a defendant in such circumstances assuming a legal responsibility, and as such they may often be decisive. But they are not theoretically conclusive and so cannot be the subject of definition. It would be unfortunate if they were. For it would mean that plaintiffs would seek to avoid the rigidity of the definition by bringing the action in contract as in De la Bere v. Pearson Ltd. [1908] 1 K.B. 280 and setting up something that would do for consideration. That, to my mind, would be an undesirable development in the law; and the best way of avoiding it is to settle the law so that the presence or absence of consideration makes no difference."

From these statements, and from their application in Hedley Byrne, we can derive some understanding of the breadth of the principle underlying the case. We can see that it rests upon a relationship

© 2009 Thomson Reuters.

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

between the parties, which may be general or specific to the particular transaction, and which may or may not be contractual in nature. All of their Lordships spoke in terms of one party having assumed or undertaken a responsibility towards the other. On this point, Lord Devlin spoke in particularly clear terms in both passages from his speech which I have quoted above. Further, Lord Morris spoke of that party being possessed of a "special skill" which he undertakes to "apply for the assistance of another who relies upon such skill." But the facts of Hedley Byrne itself, which was concerned with the liability of a banker to the recipient for negligence in the provision of a reference gratuitously supplied, show that the concept of a "special skill" must be understood broadly, certainly broadly enough to include special knowledge. Again, though Hedley Byrne was concerned with the provision of information and advice, the example given by Lord Devlin of the relationship between solicitor and client, and his and Lord Morris's statements of principle, show that the principle extends beyond the provision of information and advice to include the performance of other services. It follows, of course, that although, in the case of the provision of information and advice, reliance upon it by the other party will be necessary to establish a cause of action (because otherwise the negligence will have no causative effect), nevertheless there may be other circumstances in which there will be the necessary reliance to give rise to the application of the principle. In particular, as cases concerned with solicitor and client demonstrate, where the plaintiff entrusts the defendant with the conduct of his affairs, in general or in particular, he may be held to have relied on the defendant to exercise due skill and care in such conduct.

In subsequent cases concerned with liability under the Hedley Byrne principle in respect of negligent misstatements, the question has frequently arisen whether the plaintiff falls within the category of persons to whom the maker of the statement owes a duty of care. In seeking to contain that category of persons within reasonable bounds, there has been some tendency on the part of the courts to criticise the concept of "assumption of responsibility" as being "unlikely to be a helpful or realistic test in most cases" (see Smith v. Eric S. Bush [1990] 1 A.C. 831, 864-865, *per* Lord *181 Griffiths; and see also Caparo Industries Plc. v. Dickman [1990] 2 A.C. 605, 628, *per* Lord Roskill). However, at least in cases such as the present, in which the same problem does not arise, there seems to be no reason why recourse should not be had to the concept, which appears after all to have been adopted, in one form or another, by all of their Lordships in Hedley Byrne [1964] A.C. 465 ( see, e.g., Lord Reid, at pp. 483, 486 and 487; Lord Morris (with whom Lord Hodson agreed), at p. 494; Lord Devlin, at pp. 529 and 531; and Lord Pearce at p. 538). Furthermore, especially in a context concerned with a liability which may arise under a contract or in a situation "equivalent to contract," it must be expected that an objective test will be applied when asking the question whether, in a particular case, responsibility should be held to have been assumed by the defendant to the plaintiff: see Caparo Industries Plc. v. Dickman [1990] 2 A.C. 605, 637, *per* Lord Oliver of Aylmerton. In addition, the concept provides its own explanation why there is no problem in cases of this kind about liability for pure economic loss; for if a person assumes responsibility to another in respect of certain services, there is no reason why he should not be liable in damages for that other in respect of economic loss which flows from the negligent performance of those services. It follows that, once the case is identified as falling within the Hedley Byrne principle, there should be no need to embark upon any further enquiry whether it is "fair, just and reasonable" to impose liability for economic loss - a point which is, I consider, of some importance in the present case. The concept indicates too that in some circumstances, for example where the undertaking to furnish the relevant service is given on an informal occasion, there may be no assumption of responsibility; and likewise that an assumption of responsibility may be negatived by an appropriate disclaimer. I wish to add in parenthesis that, as Oliver J. recognised in Midland Bank Trust

© 2009 Thomson Reuters.

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

Co. Ltd. v. Hett, Stubbs & Kemp [1979] Ch. 384, 416F-G (a case concerned with concurrent liability of solicitors in tort and contract, to which I will have to refer in a moment), an assumption of responsibility by, for example, a professional man may give rise to liability in respect of negligent omissions as much as negligent acts of commission, as for example when a solicitor assumes responsibility for business on behalf of his client and omits to take a certain step, such as the service of a document, which falls within the responsibility so assumed by him.

*4. The application of the principle to managing agents at Lloyd's*

Since it has been submitted on behalf of the managing agents that no liability should attach to them in negligence in the present case because the only damage suffered by the Names consists of pure economic loss, the question arises whether the principle in Hedley Byrne is capable of applying in the case of underwriting agents at Lloyd's who are managing agents. Like Saville J. and the Court of Appeal, I have no difficulty in concluding that the principle is indeed capable of such application. The principle has been expressly applied to a number of different categories of person who perform services of a professional or quasi-professional nature, such as bankers (in Hedley Byrne itself); solicitors (as foreshadowed by Lord Devlin in Hedley Byrne, and as held in the leading **\*182** case of Midland Bank Trust Co. Ltd v. Hett, Stubbs & Kemp [1979] Ch. 384, and other cases in which that authority had been followed); surveyors and valuers (as in Smith v. Eric S. Bush [1990] 1 A.C. 831); and accountants (as in Caparo Industries Plc. v. Dickman [1990] 2 A.C. 605). Another category of persons to whom the principle has been applied, and on which particular reliance is placed by the Names in the courts below and in argument before your Lordships, is insurance brokers. As Phillips J. pointed out in Youell v. Bland Welch & Co. Ltd. (No. 2) [1990] 2 Lloyd's Rep. 431, 459, it has been accepted, since before 1964, that an insurance broker owes a duty

of care in negligence towards his client, whether the broker is bound by contract or not. Furthermore, in Punjab National Bank v. de Boinville [1992] 1 Lloyd's Rep. 7 it was held by the Court of Appeal, affirming the decision of Hobhouse J., that a duty of care was owed by an insurance broker not only to his client but also to a specific person whom he knew was to become an assignee of the policy. For my part I can see no reason why a duty of care should not likewise be owed by managing agents at Lloyd's to a Name who is a member of a syndicate under the management of the agents. Indeed, as Saville J. and the Court of Appeal both thought, the relationship between Name and managing agent appears to provide a classic example of the type of relationship to which the principle in Hedley Byrne applies. In so saying, I put on one side the question of the impact, if any, upon the relationship of the contractual context in which it is set. But, that apart, there is in my opinion plainly an assumption of responsibility in the relevant sense by the managing agents towards the Names in their syndicates. The managing agents have accepted the Names as members of a syndicate under their management. They obviously hold themselves out as possessing a special expertise to advise the Names on the suitability of risks to be underwritten; and on the circumstances in which, and the extent to which, reinsurance should be taken out and claims should be settled. The Names, as the managing agents well knew, placed implicit reliance on that expertise, in that they gave authority to the managing agents to bind them to contracts of insurance and reinsurance and to the settlement of claims. I can see no escape from the conclusion that, in these circumstances, prima facie a duty of care is owed in tort by the managing agents to such Names. To me, it does not matter if one proceeds by way of analogy from the categories of relationship already recognised as falling within the principle in Hedley Byrne [1964] A.C. 465 or by a straight application of the principle stated in the Hedley Byrne case itself. On either basis the conclusion is, in my opinion, clear. Furthermore, since the duty rests on the principle in Hedley Byrne, no problem arises from the fact that

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

the loss suffered by the Names is pure economic loss.

This conclusion is, however, subject to the impact, if any, of the contractual context. In argument before your Lordships this was regarded as constituting the main basis for the managing agents' challenge to the conclusion on this point of the courts below. To this point I must therefore turn; but before I do so I propose to consider briefly, if only to put it on one side, the question whether, under the pre-1985 forms of agreement, a duty of care on the part of the managing agents was excluded **\*183** by the absolute discretion vested in them under their contract with the direct Names, or with the members' agents in cases involving indirect Names.

*5. Absolute discretion*

I can deal with this point briefly because, like the Court of Appeal, I agree with Saville J. that there is no substance in it. It was the submission of the managing agents in the Merrett appeals before your Lordships, as it had been before Saville J., that there was an unbroken line of authority supporting the proposition that the expression "absolute discretion" in the context of a private law agreement meant that the exercise of the power given by the agreement to the recipient of the power cannot be challenged by the donor or beneficiary of the power unless (a) the exercise of the power is in bad faith, or (b) (arguably) the exercise of the power is totally unreasonable. It followed, so the argument ran, that a duty to exercise due skill or care, whether contractual or extra-contractual, was inconsistent with the bargain and so must be excluded. However, it appears to me, as it did to the judge, that in the present context the words used cannot have the effect of excluding a duty of care, contractual or otherwise. Clear words are required to exclude liability in negligence; and in the present case the words can, and in my opinion should, be directed towards the scope of the agents' authority. No doubt the result is that very wide authority has been vested in the agents; but the suggestion that the agent should as a result be under no duty to exercise due skill and

care in the exercise of his function under the agreement is, in the present context, most surprising. I am content to adopt the following passage from the judgment of Saville J. as my own:

"As I have said in other cases, Lloyd's could not exist as an insurance and reinsurance market unless the business is conducted by professionals who must be given the widest possible powers to act on behalf of the Names. Thus the underwriting agency agreement makes absolutely clear that the Name must leave it exclusively to the underwriting agents actually to run the business. The standard of behaviour to be expected of the underwriting agents in carrying out this task is an entirely different matter. The underwriting agency agreement contains no express provisions in this regard, but I do not find this in the least surprising, since it seems to me literally to go without saying that the underwriting agents must act with reasonable care and skill in exercising their authority and carrying on the underwriting business on behalf of the Name. The very fact that the agents are given the widest possible authority to act on behalf of the Name, together with the fact that the Name's potential liability for the actions of the agents is unlimited and the further fact that the agents receive remuneration for exercising their professional skills on behalf of the Name, seem to me to point irresistibly to the conclusion that in such a relationship the law does (as a matter of common sense it should) impose a duty of reasonable care and skill upon the underwriting agents of the kind alleged by the Names, which could only be modified or excluded by clear agreement between the parties. I can find nothing in the underwriting agency agreement which **\*184** indicates that this duty (the ordinary one owed by any professional person) is in any way modified or excluded in the present cases, nor to my mind is there anything of relevance in this context in the sub-agency agreement."

For these reasons I am, like both courts below, unable to accept the managing agents' argument on this point. With this point out of the way I can turn to the main argument on this part of the case, relating to the impact of the contractual context.

© 2009 Thomson Reuters.

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

*6. The impact of the contractual context*

All systems of law which recognise a law of contract and a law of tort (or delict) have to solve the problem of the possibility of concurrent claims arising from breach of duty under the two rubrics of the law. Although there are variants, broadly speaking two possible solutions present themselves: either to insist that the claimant should pursue his remedy in contract alone, or to allow him to choose which remedy he prefers. As my noble and learned friend, Lord Mustill, and I have good reason to know (see J. Braconnot et Cie. v. Compagnie des Messageries Maritimes (the Sindh) [1975] 1 Lloyd's Rep. 372), France has adopted the former solution in its doctrine of non cumul, under which the concurrence of claims in contract and tort is outlawed (see Tony Weir in XI *Int.Encycl.Comp.L.,* ch. 12, paras. 47-72, at paragraph 52). The reasons given for this conclusion are (1) respect for the will of the legislator, and (2) respect for the will of the parties to the contract (see paragraph 53). The former does not concern us; but the latter is of vital importance. It is however open to various interpretations. For such a policy does not necessarily require the total rejection of concurrence, but only so far as a concurrent remedy in tort is inconsistent with the terms of the contract. It comes therefore as no surprise to learn that the French doctrine is not followed in all civil law jurisdictions, and that concurrent remedies in tort and contract are permitted in other civil law countries, notably Germany (see paragraph 58). I only pause to observe that it appears to be accepted that no perceptible harm has come to the German system from admitting concurrent claims.

The situation in common law countries, including of course England, is exceptional, in that the common law grew up within a procedural framework uninfluenced by Roman law. The law was categorised by reference to the forms of action, and it was not until the abolition of the forms of action by the Common Law Procedure Act 1852 (15 & 16 Vict. c. 76) that it became necessary to reclassify the law

in substantive terms. The result was that common lawyers did at last segregate our law of obligations into contract and tort, though in so doing they relegated quasi-contractual claims to the status of an appendix to the law of contract, thereby postponing by a century or so the development of a law of restitution. Even then, there was no systematic reconsideration of the problem of concurrent claims in contract and tort. We can see the courts rather grappling with unpromising material drawn from the old cases in which liability in negligence derived largely from categories based upon the status of the defendant. In a sense, we must not be surprised; for no **\*185** significant law faculties were established at our universities until the late 19th century, and so until then there was no academic opinion available to guide or stimulate the judges. Even so, it is a remarkable fact that there was little consideration of the problem of concurrent remedies in our academic literature until the second half of the 20th century, though in recent years the subject has attracted considerable attention.

In the result, the courts in this country have until recently grappled with the problem very largely without the assistance of systematic academic study. At first, as is shown in particular by cases concerned with liability for solicitors' negligence, the courts adopted something very like the French solution, holding that a claim against a solicitor for negligence must be pursued in contract, and not in tort (see, e.g., Bean v. Wade (1885) 2 T.L.R. 157); and in Groom v. Crocker [1939] 1 K.B. 194, this approach was firmly adopted. It has to be said, however, that decisions such as these, though based on prior authority, were supported by only a slender citation of cases, none of great weight; and the jurisprudential basis of the doctrine so adopted cannot be said to have been explored in any depth. Furthermore when, in Bagot v. Stevens Scanlan & Co. Ltd. [1966] 1 Q.B. 197, Diplock L.J. adopted a similar approach in the case of a claim against a firm of architects, he felt compelled to recognise (pp. 204-205) that a different conclusion might be reached in cases "where the law in the old days re-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

cognised either something in the nature of a status like a public calling (such as common carrier, common innkeeper, or a bailor and bailee) or the status of master and servant." To this list must be added cases concerned with claims against doctors and dentists. I must confess to finding it startling that, in the second half of the 20th century, a problem of considerable practical importance should fall to be solved by reference to such an outmoded form of categorisation as this.

I think it is desirable to stress at this stage that the question of concurrent liability is by no means only of academic significance. Practical issues, which can be of great importance to the parties, are at stake. Foremost among these is perhaps the question of limitation of actions. If concurrent liability in tort is not recognised, a claimant may find his claim barred at a time when he is unaware of its existence. This must moreover be a real possibility in the case of claims against professional men, such as solicitors or architects, since the consequences of their negligence may well not come to light until long after the lapse of six years from the date when the relevant breach of contract occurred. Moreover the benefits of the Latent Damage Act 1986, under which the time of the accrual of the cause of action may be postponed until after the plaintiff has the relevant knowledge, are limited to actions in tortious negligence. This leads to the startling possibility that a client who has had the benefit of gratuitous advice from his solicitor may in this respect be better off than a client who has paid a fee. Other practical problems arise, for example, from the absence of a right to contribution between negligent contract-breakers; from the rules as to remoteness of damage, which are less restricted in tort than they are in contract; and from the availability of the opportunity to obtain leave to serve proceedings out of the jurisdiction. It can of course be argued that the principle established in respect of concurrent **\*186** liability in contract and tort should not be tailored to mitigate the adventitious effects of rules of law such as these, and that one way of solving such problems would no doubt be to rephrase such

incidental rules as have to remain in terms of the nature of the harm suffered rather than the nature of the liability asserted (see Tony Weir, XI *Int.Encycl.Comp.L.* ch.12, para. 72). But this is perhaps crying for the moon; and with the law in its present form, practical considerations of this kind cannot sensibly be ignored.

Moreover I myself perceive at work in these decisions not only the influence of the dead hand of history, but also what I have elsewhere called the temptation of elegance. Mr. Tony Weir (XI *Int.Encycl.Comp.L.* ch.12, para. 55) has extolled the French solution for its elegance; and we can discern the same impulse behind the much-quoted observation of Lord Scarman when delivering the judgment of the Judicial Committee of the Privy Council in Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd. [1986] A.C. 80, 107:

"Their Lordships do not believe that there is anything to the advantage of the law's development in searching for a liability in tort where the parties are in a contractual relationship. This is particularly so in a commercial relationship. Though it is possible as a matter of legal semantics to conduct an analysis of the rights and duties inherent in some contractual relationships including that of banker and customer either as a matter of contract law when the question will be what, if any, terms are to be implied or as a matter of tort law when the task will be to identify a duty arising from the proximity and character of the relationship between the parties, their Lordships believe it to be correct in principle and necessary for the avoidance of confusion in the law to adhere to the contractual analysis: on principle because it is a relationship in which the parties have, subject to a few exceptions, the right to determine their obligations to each other, and for the avoidance of confusion because different consequences do follow according to whether liability arises from contract or tort, e.g. in the limitation of action."

It is however right to stress, as did Sir Thomas Bingham M.R. in the present case, that the issue in the Tai Hing case was whether a tortious duty of

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

care could be established which was more extensive than that which was provided for under the relevant contract.

At all events, even before the Tai Hing case we can see the beginning of the redirection of the common law away from the contractual solution adopted in Groom v. Crocker [1939] 1 K.B. 194, towards the recognition of concurrent remedies in contract and tort. First, and most important, in 1963 came the decision of your Lordships' House in Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465. I have already expressed the opinion that the fundamental importance of this case rests in the establishment of the principle upon which liability may arise in tortious negligence in respect of services (including advice) which are rendered for another, gratuitously or otherwise, but are negligently performed - viz., an assumption of responsibility coupled with reliance by the plaintiff which, in all the circumstances, makes it appropriate that a *187 remedy in law should be available for such negligence. For immediate purposes, the relevance of the principle lies in the fact that, as a matter of logic, it is capable of application not only where the services are rendered gratuitously, but also where they are rendered under a contract. Furthermore we can see in the principle an acceptable basis for liability in negligence in cases which in the past have been seen to rest upon the now outmoded concept of status. In this context, it is of particular relevance to refer to the opinion expressed both implicitly by Lord Morris of Borth-y-Gest (with whom Lord Hodson agreed) and expressly by Lord Devlin that the principle applies to the relationship of solicitor and client, which is nearly always contractual: see pp. 465, 497-499 (where Lord Morris approved the reasoning of Chitty J. in Cann v. Willson (1888) 39 Ch.D. 39), and p. 529 ( per Lord Devlin).

The decision in Hedley Byrne, and the statement of general principle in that case, provided the opportunity to reconsider the question of concurrent liability in contract and tort afresh, untrammelled by the ancient learning based upon a classification of

defendants in terms of status which drew distinctions difficult to accept in modern conditions. At first that opportunity was not taken. Groom v. Crocker [1939] 1 K.B. 194 was followed by the Court of Appeal in Cook v. Swinfen [1967] 1 W.L.R. 457, and again in Heywood v. Wellers [1976] Q.B. 446; though in the latter case Lord Denning M.R., at p. 459, was beginning to show signs of dissatisfaction with the contractual test accepted in Groom v. Crocker - a dissatisfaction which crystallised into a change of heart in Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B. 801. That case was concerned with statements made by employees of Esso in the course of precontractual negotiations with Mr. Mardon, the prospective tenant of a petrol station. The statements related to the potential throughput of the station. Mr. Mardon was persuaded by the statements to enter into the tenancy; but he suffered serious loss when the actual throughput proved to be much lower than had been predicted. The Court of Appeal held that Mr. Mardon was entitled to recover damages from Esso, on the basis of either breach of warranty or (on this point affirming the decision of the judge below) negligent misrepresentation. In rejecting an argument that Esso's liability could only be contractual, Lord Denning M.R. dismissed Groom v. Crocker [1939] 1 K.B. 194 and Bagot v. Stevens Scanlan & Co. Ltd. [1966] 1 Q.B. 197 as inconsistent with other decisions of high authority, viz. Boorman v. Brown (1842) 3 Q.B. 511, 525-526, *per* Tindal C.J., and (1844) 11 Cl. & F. 1, 44, *per* Lord Campbell; Lister v. Romford Ice and Cold Storage Co. Ltd. [1957] A.C. 555, 587, *per* Lord Radcliffe; Matthews v. Kuwait Bechtel Corporation [1959] 2 Q.B. 57 and Nocton v. Lord Ashburton [1914] A.C. 932, 956, *per* Viscount Haldane L.C. He then held that, in addition to its liability in contract, Esso was also liable in negligence. The other members of the Court of Appeal, Ormrod and Shaw L.JJ., agreed that Mr. Mardon was entitled to recover damages either for breach of warranty or for negligent misrepresentation, though neither expressed any view about the status of Groom v. Crocker [1939] 1 K.B. 194. It was however implicit in their decision that,

© 2009 Thomson Reuters.

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

as Lord Denning M.R. held, concurrent remedies were available to Mr. Mardon in contract and tort. For present purposes, I do not find it necessary to **\*188** comment on the authorities relied upon by Lord Denning as relieving him from the obligation to follow Groom v. Crocker; though I feel driven to comment that the judgments in Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B. 801 reveal no analysis in depth of the basis upon which concurrent liability rests. That case was however followed by the Court of Appeal in Batty v. Metropolitan Property Realisations Ltd. [1978] Q.B. 554, in which concurrent remedies in contract and tort were again allowed.

The requisite analysis is however to be found in the judgment of Oliver J. in Midland Bank Trust Co. Ltd. v. Hett, Stubbs & Kemp [1979] Ch. 384, in which he held that a solicitor could be liable to his client for negligence either in contract or in tort, with the effect that in the case before him it was open to the client to take advantage of the more favourable date of accrual of the cause of action for the purposes of limitation. In that case, Oliver J. was much concerned with the question whether it was open to him, as a judge of first instance, to depart from the decision of the Court of Appeal in Groom v. Crocker [1939] 1 K.B. 194. For that purpose, he carried out a most careful examination of the relevant authorities, both before and after Groom v. Crocker, and concluded that he was free to depart from the decision in that case, which he elected to do.

It is impossible for me to do justice to the reasoning of Oliver J., for which I wish to express my respectful admiration, without unduly prolonging what is inevitably a very long opinion. I shall therefore confine myself to extracting certain salient features. First, from his study of the cases before Groom v. Crocker, he found no unanimity of view that the solicitor's liability was regarded as exclusively contractual. Some cases (such as Howell v. Young (1826) 5 B. & C. 259) he regarded as equivocal. In others, he understood the judges to regard contract

and tort as providing alternative causes of action (see In Re Manby and Hawksford (1856) 26 L.J.Ch. 313, 317 and Sawyer v. Goodwin (1867) 36 L.J.Ch. 578, 582, in both cases *per* Stuart V.-C., and most notably Nocton v. Lord Ashburton [1914] A.C. 932, 956, *per* Viscount Haldane L.C.). However Bean v. Wade (1885) 2 T.L.R. 157, briefly reported in the Times Law Reports and by no means extensively referred to, provided Court of Appeal authority that the remedy was exclusively contractual; and it was that case which was principally relied upon by the Court of Appeal in Groom v. Crocker [1939] 1 K.B. 194 when reaching the same conclusion. Oliver J. put on one side those cases, decided for the purpose of section 11 of the County Courts Act 1915, under which a different statutory test had to be complied with, viz. whether the action was one "founded on a contract" or "founded on a tort."

It is evident that the early authorities did not play a very significant part in Oliver J.'s decision (see [1979] Ch. 384, 411C-D). He loyally regarded Groom v. Crocker as prima facie binding upon him. His main concern was with the impact of the decision of this House in Hedley Byrne [1964] A.C. 465, and of subsequent cases in the Court of Appeal in which Hedley Byrne had been applied. As he read the speeches in Hedley Byrne, the principle there stated was not limited to circumstances in which the responsibility of the defendant had been gratuitously assumed. He referred in particular to the statement of principle by Lord Morris of **\*189** Borth-y-Gest, at pp. 502-503, which I have already quoted, and said, at p. 411:

"The principle was stated by Lord Morris of Borth-y-Gest as a perfectly general one and it is difficult to see why it should be excluded by the fact that the relationship of dependence and reliance between the parties is a contractual one rather than one gratuitously assumed, in the absence, of course, of contractual terms excluding or restricting the general duties which the law implies."

Oliver J. went on, at p. 412, to quote from the dissenting judgment of Denning L.J. in Candler v. Crane, Christmas & Co. [1951] 2 K.B. 164,

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

179-180 (a passage approved by Lord Pearce in Hedley Byrne [1964] A.C. 465, 538) and said, at p. 413:

"Now, in that passage, I think that it is abundantly clear that Denning L.J. was seeking to enunciate a general principle of liability arising from the relationship created by the assumption of a particular work or responsibility, quite regardless of how the relationship arose. . . . The inquiry upon which the court is to embark is 'what is the relationship between the plaintiff and defendant?' not 'how did the relationship, if any, arise?' That this is so appears, I think, with complete clarity from subsequent cases."

Later he said, at p. 415:

"The matter becomes, in my judgment, even clearer when one looks at the speech of Lord Devlin in the Hedley Byrne case [1964] A.C. 465, for he treats the existence of a contractual relationship as very good evidence of the general tortious duty which he is there discussing. He said, at pp. 528-529: 'I think, therefore, that there is ample authority to justify your Lordships in saying now that the categories of special relationships which may give rise to a duty to take care in word as well as in deed are not limited to contractual relationships or to relationships of fiduciary duty, but include also relationships which in the words of Lord Shaw in Nocton v. Lord Ashburton [1914] A.C. 932, 972, are "equivalent to contract," that is, where there is an assumption of responsibility in circumstances in which, but for the absence of consideration, there would be a contract.' "

He expressed his conclusion concerning the impact of Hedley Byrne on the case before him in the following words, at p. 417:

"The case of a layman consulting a solicitor for advice seems to me to be as typical a case as one could find of the sort of relationship in which the duty of care described in the Hedley Byrne case [1964] A.C. 465 exists; and if I am free to do so in the instant case, I would, therefore, hold that the relationship of solicitor and client gave rise to a duty in the defendants under the general law to exercise that care and skill upon which they must have

known perfectly well that their client relied. To put it another way, their common law duty was not to injure their client by failing to do that which they had undertaken to do and which, at their invitation, he relied upon them to do. That *190 duty was broken, but no cause of action in tort arose until the damage occurred; and none did occur until 17 August 1967. I would regard it as wholly immaterial that their duty arose because they accepted a retainer which entitled them, if they chose to do so, to send a bill to their client."

I wish to express my respectful agreement with these passages in Oliver J.'s judgment.

Thereafter, Oliver J. proceeded to consider the authorities since Hedley Byrne, in which he found, notably in statements of the law by members of the Appellate Committee in Arenson v. Arenson [1977] A.C. 405 and in the decision of the Court of Appeal in Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B. 801, the authority which relieved him of his duty to follow Groom v. Crocker [1939] 1 K.B. 194. But I wish to add that, in the course of considering the later authorities, he rejected the idea that there is some general principle of law that a plaintiff who has claims against a defendant for breach of duty both in contract and in tort is bound to rely upon his contractual rights alone. He said, at p. 420:

"There is not and never has been any rule of law that a person having alternative claims must frame his action in one or the other. If I have a contract with my dentist to extract a tooth, I am not thereby precluded from suing him in tort if he negligently shatters my jaw: Edwards v. Mallan [1908] 1 K.B. 1002; . . ."

The origin of concurrent remedies in this type of case may lie in history; but in a modern context the point is a telling one. Indeed it is consistent with the decision in Donoghue v. Stevenson [1932] A.C. 562 itself, and the rejection in that case of the view, powerfully expressed in the speech of Lord Buckmaster (see, in particular, pp. 577-578), that the manufacturer or repairer of an article owes no duty of care apart from that implied from contract or imposed by statute. That there might be co-existent

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

remedies for negligence in contract and in tort was expressly recognised by Lord Macmillan in Donoghue v. Stevenson, at p. 610, and by Lord Wright in Grant v. Australian Knitting Mills Ltd. [1936] A.C. 85, 102-104. Attempts have been made to explain how doctors and dentists may be concurrently liable in tort while other professional men may not be so liable, on the basis that the former cause physical damage whereas the latter cause pure economic loss (see the discussion by Christine French in (1981-84) 5 Otago L.R. 236, 280-281). But this explanation is not acceptable, if only because some professional men, such as architects, may also be responsible for physical damage. As a matter of principle, it is difficult to see why concurrent remedies in tort and contract, if available against the medical profession, should not also be available against members of other professions, whatever form the relevant damage may take.

The judgment of Oliver J. in the Midland Bank Trust Co. case [1979] Ch. 384 provided the first analysis in depth of the question of concurrent liability in tort and contract. Following upon Esso Petroleum Co. Ltd. v. Mardon [1976] Q.B. 801, it also broke the mould, in the sense that it undermined the view which was becoming settled that, where there is an alternative liability in tort, the claimant must pursue his remedy in *191 contract alone. The development of the case law in other common law countries is very striking. In the same year as the Midland Bank Trust Co. case, the Irish Supreme Court held that solicitors owed to their clients concurrent duties in contract and tort: see Finlay v. Murtagh [1979] I.R. 249. Next, in Central Trust Co. v. Rafuse (1986) 31 D.L.R. (4 th) 481, Le Dain J., delivering the judgment of the Supreme Court of Canada, conducted a comprehensive and most impressive survey of the relevant English and Canadian authorities on the liability of solicitors to their clients for negligence, in contract and in tort, in the course of which he paid a generous tribute to the analysis of Oliver J. in the Midland Bank Trust Co. case. His conclusions are set out in a series of propositions at pp. 521-522; but his general conclusion

was to the same effect as that reached by Oliver J. He said, at p. 522:

"A concurrent or alternative liability in tort will not be admitted if its effect would be to permit the plaintiff to circumvent or escape a contractual exclusion or limitation of liability for the act or omission that would constitute the tort. Subject to this qualification, where concurrent liability in tort and contract exists the plaintiff has the right to assert the cause of action that appears to be the most advantageous to him in respect of any particular legal consequence."

I respectfully agree.

Meanwhile in New Zealand the Court of Appeal had appeared at first, in McLaren Maycroft & Co. v. Fletcher Development Co. Ltd. [1973] 2 N.Z.L.R. 100, to require that, in cases where there are concurrent duties in contract and tort, the claimant must pursue his remedy in contract alone. There followed a period of some uncertainty, in which differing approaches were adopted by courts of first instance. In 1983 Miss Christine French published her article on "The Contract/Tort Dilemma" in (1981-84) 5 Otago L.R. 236, in which she examined the whole problem in great depth, with special reference to the situation in New Zealand, having regard to the "rule" in McLaren Maycroft. Her article, to which I wish to pay tribute, was of course published before the decision of the Supreme Court of Canada in the Central Trust case. Even so, she reached a conclusion which, on balance, favoured a freedom for the claimant to choose between concurrent remedies in contract and tort. Thereafter in Rowlands v. Callow [1992] 1 N.Z.L.R. 178 Thomas J., founding himself principally on the Central Trust case and on Miss French's article, concluded that he was free to depart from the decision of the New Zealand Court of Appeal in the McLaren Maycroft case and to hold that a person performing professional services (in the case before him an engineer) may be sued for negligence by his client either in contract or in tort. He said, at p. 190:

"The issue is now virtually incontestable; a per-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

son who has performed professional services may
be held liable concurrently in contract and in negli-
gence unless the terms of the contract preclude the
tortious liability."

In Australia, too, judicial opinion appears to be
moving in the same direction, though not without
dissent: see, in particular, Aluminum Products
(QLD.) Pty. Ltd. v. Hill [1981] Qd.R. 33 ( *192 a
decision of the Full Court of the Supreme Court of
Queensland) and MacPherson & Kelley v. Kevin J.
Prunty & Associates [1983] 1 V.R. 573 ( a decision
of the Full Court of the Supreme Court of Victoria).
A different view has however been expressed by
Deane J. in Hawkins v. Clayton (1988) 164 C.L.R.
539, 585, to which I will return later. In principle,
concurrent remedies appear to have been accepted
for some time in the United States (see Prosser's
Handbook on the Law of Torts, 7th ed. (1984), p.
444), though with some variation as to the applica-
tion of the principle in particular cases. In these cir-
cumstances it comes as no surprise that Professor
Fleming, writing in 1992, should state that "the last
ten years have seen a decisive return to the 'concur-
rent' approach" (see *The Law of Torts*, 8th ed.
(1992), p. 187).

I have dealt with the matter at some length because,
before your Lordships, Mr. Temple, for the man-
aging agents, boldly challenged the decision of
Oliver J. in the Midland Bank Trust Co. case [1979]
Ch. 384, seeking to persuade your Lordships that
this House should now hold that case to have been
wrongly decided. This argument was apparently not
advanced below, presumably because Oliver J.'s
analysis had received a measure of approval in the
Court of Appeal: see, e.g., Forster v. Outred & Co.
[1982] 1 W.L.R. 86, 99, *per* Dunn L.J. Certainly
there has been no sign of disapproval, even where
the Midland Bank Trust Co.case has been distin-
guished: see Bell v. Peter Browne & Co. [1990] 2
Q.B. 495.

Mr. Temple adopted as part of his argument the
reasoning of Mr. J. M. Kaye in an article "The Li-
ability of Solicitors in Tort" (1984) 100 L.Q.R. 680.

In his article, Mr. Kaye strongly criticised the reas-
oning of Oliver J. both on historical grounds and
with regard to his interpretation of the speeches in
the Hedley Byrne case [1964] A.C. 465. However,
powerful though Mr. Kaye's article is, I am not per-
suaded by it to treat the Midland Bank Trust Co.
case [1979] Ch. 384 as wrongly decided. First, so
far as the historical approach is concerned, this is
no longer of direct relevance in a case such as the
present, having regard to the development of the
general principle in Hedley Byrne. No doubt it is
correct that, in the 19th century, liability in tort de-
pended upon the category of persons into which the
defendant fell, with the result that in those days it
did not necessarily follow that, because (for ex-
ample) a surgeon owed an independent duty of care
to his patient in tort irrespective of contract, other
professional men were under a similar duty. Even
so, as Mr. Boswood for the Names stressed, if the
existence of a contract between a surgeon and his
patient did not preclude the existence of a tortious
duty to the patient in negligence, there is no reason
in principle why a tortious duty should not co-exist
with a contractual duty in the case of the broad duty
of care now recognised following the generalisation
of the tort of negligence in the 20th century.

So far as Hedley Byrne itself is concerned, Mr.
Kaye reads the speeches as restricting the principle
of assumption of responsibility there established to
cases where there is no contract; indeed, on this he
tolerates no dissent, stating (at p. 706) that "unless
one reads [Hedley Byrne] with deliberate intent to
find obscure or ambiguous passages" it will not
bear the interpretation favoured by Oliver J. I must
confess however that, having *193 studied yet
again the speeches in Hedley Byrne [1964] A.C.
465 in the light of Mr. Kaye's critique, I remain of
the opinion that Oliver J.'s reading of them is justi-
fied. It is, I suspect, a matter of the angle of vision
with which they are read. For here, I consider, Oliv-
er J. was influenced not only by what he read in the
speeches themselves, notably the passage from
Lord Devlin's speech at pp. 528-529 (quoted
above), but also by the internal logic reflected in

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

that passage, which led inexorably to the conclusion which he drew. Mr. Kaye's approach involves regarding the law of tort as supplementary to the law of contract, i.e. as providing for a tortious liability in cases where there is no contract. Yet the law of tort is the general law, out of which the parties can, if they wish, contract; and, as Oliver J. demonstrated, the same assumption of responsibility may, and frequently does, occur in a contractual context. Approached as a matter of principle, therefore, it is right to attribute to that assumption of responsibility, together with its concomitant reliance, a tortious liability, and then to inquire whether or not that liability is excluded by the contract because the latter is inconsistent with it. This is the reasoning which Oliver J., as I understand it, found implicit, where not explicit, in the speeches in Hedley Byrne. With his conclusion I respectfully agree. But even if I am wrong in this, I am of the opinion that this House should now, if necessary, develop the principle of assumption of responsibility as stated in Hedley Byrne to its logical conclusion so as to make it clear that a tortious duty of care may arise not only in cases where the relevant services are rendered gratuitously, but also where they are rendered under a contract. This indeed is the view expressed by my noble and learned friend, Lord Keith of Kinkel, in Murphy v. Brentwood District Council [1991] 1 A.C. 398, 466, in a speech with which all the other members of the Appellate Committee agreed.

An alternative approach, which also avoids the concurrence of tortious and contractual remedies, is to be found in the judgment of Deane J. in Hawkins v. Clayton, 164 C.L.R. 539, 582-586, in which he concluded, at p. 585:

"On balance, however, it seems to me to be preferable to accept that there is neither justification nor need for the implication of a contractual term which, in the absence of actual intention of the parties, imposes upon a solicitor a contractual duty (with consequential liability in damages for its breach) which is coextensive in content and concurrent in operation with a duty (with consequential liability in damages for its breach) which already exists under the common law of negligence."

It is however my understanding that by the law in this country contracts for services do contain an implied promise to exercise reasonable care (and skill) in the performance of the relevant services; indeed, as Mr. Tony Weir has pointed out (XI *Int.Encycl.Comp.L.,* ch. 12, para. 67), in the 19th century the field of concurrent liabilities was expanded "since it was impossible for the judges to deny that contracts contained an implied promise to take reasonable care, at the least, not to injure the other party." My own belief is that, in the present context, the common law is not antipathetic to concurrent liability, and that there is no sound **\*194** basis for a rule which automatically restricts the claimant to either a tortious or a contractual remedy. The result may be untidy; but, given that the tortious duty is imposed by the general law, and the contractual duty is attributable to the will of the parties, I do not find it objectionable that the claimant may be entitled to take advantage of the remedy which is most advantageous to him, subject only to ascertaining whether the tortious duty is so inconsistent with the applicable contract that, in accordance with ordinary principle, the parties must be taken to have agreed that the tortious remedy is to be limited or excluded.

In the circumstances of the present case, I have not regarded it as necessary or appropriate to embark upon yet another detailed analysis of the case law, choosing rather to concentrate on those authorities which appear to me to be here most important. I have been most anxious not to overburden an inevitably lengthy opinion with a discussion of an issue which is only one (though an important one) of those which fall for decision; and, in the context of the relationship of solicitor and client, the task of surveying the authorities has already been admirably performed by both Oliver J. and Le Dain J. But, for present purposes more important, in the instant case liability can, and in my opinion should, be founded squarely on the principle established in Hedley Byrne itself, from which it follows that an

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
(Cite as: [1995] 2 A.C. 145)

assumption of responsibility coupled with the con-
comitant reliance may give rise to a tortious duty of
care irrespective of whether there is a contractual
relationship between the parties, and in con-
sequence, unless his contract precludes him from
doing so, the plaintiff, who has available to him
concurrent remedies in contract and tort, may
choose that remedy which appears to him to be the
most advantageous.

### 7. Application of the above principles in the present case

I have already concluded that prima facie a duty of
care was owed in tort on the Hedley Byrne prin-
ciple by managing agents both to direct Names and
indirect Names. So far as the direct Names are con-
cerned, there is plainly a contract between them and
the managing agents, in the terms of the pre-1985
byelaw form of agency agreement, in which a term
falls to be implied that the agents will exercise due
care and skill in the exercise of their functions as
managing agents under the agreement. That duty of
care is no different from the duty of care owed by
them to the relevant Names in tort; and, having re-
gard to the principles already stated, the contract
does not operate to exclude the tortious duty, leav-
ing it open to the Names to pursue either remedy
against the agents.

I turn to the indirect Names. Here there is, as I see
it, no material distinction between the claims of the
Names in the Merrett actions, and those of the
Names in the Feltrim actions. True, the former arise
in the context of the pre-1985 byelaw forms of
agency and sub-agency agreements, whereas the
latter arise in the context of the forms of agreement
prescribed by the 1985 byelaw. However in both
cases there must be implied into the sub-agency
agreements a duty upon the managing agents to ex-
ercise due skill and care. A similar responsibility
must rest upon the members' agents under the 1985
byelaw form of agency agreement, and I will as-
sume that the same applies under the pre-1985
byelaw form (though the point does not arise for
decision by your *195 Lordships). In neither case,

however, is there any material difference between
the relevant contractual duty and any duty which is
owed by the managing agents to the relevant Names
in tort. It is however submitted on behalf of the
managing agents that the indirect Names and the
managing agents, as parties to the chain of con-
tracts contained in the relevant agency and sub-
agency agreements, must be taken to have thereby
structured their relationship so as to exclude any
duty of care owed directly by the managing agents
to the indirect Names in tort.

In essence the argument must be that, because the
managing agents have, with the consent of the in-
direct Names, assumed responsibility in respect of
the relevant activities to another party, i.e. the
members' agents, under a sub-agency agreement, it
would be inconsistent to hold that they have also
assumed responsibility in respect of the same activ-
ities to the indirect Names. I for my part cannot see
why in principle a party should not assume respons-
ibility to more than one person in respect of the
same activity. Let it be assumed (unlikely though it
may be) that, in the present case, the managing
agents were in a contractual relationship not only
with the members' agents under a sub-agency
agreement but also directly with the relevant
Names, under both of which they assumed respons-
ibility for the same activities. I can see no reason in
principle why the two duties of care so arising
should not be capable of co-existing.

Of course I recognise that the present case presents
the unusual feature that claims against the man-
aging agents, whether by the members' agents un-
der the sub-agency agreement or by the indirect
Names in tort, will in both cases have the purpose,
immediate or ultimate, of obtaining compensation
for the indirect Names. In these circumstances, con-
current duties of care could, in theory at least, give
rise to problems, for example in the event of the in-
solvency of the managing agents or the members'
agents. Furthermore, as Mr. Temple suggested in
the course of his submissions on behalf of the man-
aging agents, questions of contribution might, at

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468,
[1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

least in theory, arise. But your Lordships' task, like that of the courts below, is to answer the questions of principle raised by the issues presented for decision; and in these circumstances it would be quite wrong to embark upon the examination of questions which do not arise on those issues, and indeed may never arise in practice. For myself, I am all the more reluctant to do so since, because the liability (if any) of the managing agents will in each case flow from claims by the indirect Names, it may well be that practical problems such as these will, if they arise, find a practical solution.

I wish however to add that I strongly suspect that the situation which arises in the present case is most unusual; and that in many cases in which a contractual chain comparable to that in the present case is constructed it may well prove to be inconsistent with an assumption of responsibility which has the effect of, so to speak, short circuiting the contractual structure so put in place by the parties. It cannot therefore be inferred from the present case that other sub-agents will be held directly liable to the agent's principal in tort. Let me take the analogy of the common case of an ordinary building contract, under which main contractors contract with the building owner for the construction of the **196** relevant building, and the main contractor subcontracts with sub-contractors or suppliers (often nominated by the building owner) for the performance of work or the supply of materials in accordance with standards and subject to terms established in the sub-contract. I put on one side cases in which the sub-contractor causes physical damage to property of the building owner, where the claim does not depend on an assumption of responsibility by the sub-contractor to the building owner; though the sub-contractor may be protected from liability by a contractual exemption clause authorised by the building owner. But if the sub-contracted work or materials do not in the result conform to the required standard, it will not ordinarily be open to the building owner to sue the sub-contractor or supplier direct under the Hedley Byrne principle, claiming damages from him on the basis that he has been

negligent in relation to the performance of his functions. For there is generally no assumption of responsibility by the sub-contractor or supplier direct to the building owner, the parties having so structured their relationship that it is inconsistent with any such assumption of responsibility. This was the conclusion of the Court of Appeal in Simaan General Contracting Co. v. Pilkington Glass Ltd. (No. 2) [1988] Q.B. 758. As Bingham L.J. put it, at p. 781:

"I do not, however, see any basis on which [the nominated suppliers] could be said to have assumed a direct responsibility for the quality of the goods to [the building owners]: such a responsibility is, I think, inconsistent with the structure of the contract the parties have chosen to make."

It is true that, in this connection, some difficulty has been created by the decision of your Lordships' House in Junior Books Ltd. v. Veitchi Co. Ltd. [1983] 1 A.C. 520. In my opinion, however, it is unnecessary for your Lordships to reconsider that decision for the purposes of the present appeal. Here however I can see no inconsistency between the assumption of responsibility by the managing agents to the indirect Names, and that which arises under the sub-agency agreement between the managing agents and the members' agents, whether viewed in isolation or as part of the contractual chain stretching back to and so including the indirect Names. For these reasons, I can see no reason why the indirect Names should not be free to pursue their remedy against the managing agents in tort under the Hedley Byrne principle.

*B. Fiduciary duty*

The question arising under this issue is whether Merretts acting as managing agents (whether or not they are also members' agents) owed the Names a fiduciary duty to conduct the underwriting for the account of the Names with reasonable skill for the 1979 to 1985 underwriting years of account (inclusive) equivalent to the alleged duty of care in tort.

Both Saville J. and the Court of Appeal declined to

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

address this question since having regard to the manner in which they decided the issue on the tortious duty of care, the question did not arise. Having *197 regard to the conclusion which I have reached on the tortious duty, I likewise do not think it necessary for your Lordships' House to address the question of fiduciary duty.

*II. Feltrim and Gooda Walker appeals: liability of members' agents to Names during the period 1987-1989*

Saville J. held that this issue should be decided against the members' agents, and his decision was affirmed by the Court of Appeal, for the same reasons. As a result it was held that, under agency agreements in the form prescribed by Lloyd's byelaw No. 1 of 1985, members' agents are responsible to the Names for any failure to exercise reasonable skill and care on the part of managing agents to whom underwriting has been delegated by the members' agents; and that the members agents are not required to exercise skill and care only in relation to those activities and functions which members' agents by custom and practice actually perform for the Names personally.

This issue raises a question of construction of the prescribed form of agency agreement. Since however the prescribed forms of agency and sub-agency agreements together constitute the contractual regime established by the byelaw, it follows that the agency agreement should not be considered in isolation, but as forming, together with the sub-agency agreement, a coherent whole which, in a case concerned with indirect Names, regulates the contractual relationship between Name, members' agent and managing agent. Furthermore it is not to be forgotten that, in a case concerned with a combined agent, the agency agreement may fulfil the dual function of regulating the functions of the combined agent both in its role as members' agent, and in its role as managing agent in respect of any syndicate under its management of which the Name is a member.

In order to consider this question of construction I think it desirable that I should, like Sir Thomas Bingham M.R., first set out the terms of the most relevant provisions of the prescribed forms of agency and sub-agency agreements. These are as follows.

"THE AGENCY AGREEMENT

"1. *Definitions*. In this agreement the under mentioned expressions shall where the context so requires or admits have the following meanings: - (a) The expression 'the syndicate' shall mean the syndicate or, if more than one, each of the respective syndicates of which the Name is for the time being a member under the provisions of this agreement, being the syndicate or syndicates specified in the schedule(s) attached hereto. . . ."

"2. *Appointment of the Name's agent at Lloyd's*. (a) The agent shall act as the underwriting agent for the Name for the purpose of underwriting at Lloyd's for the account of the Name such classes and descriptions of insurance business, other than those prohibited by the Council, as may be transacted by the syndicate (hereinafter referred to as 'the underwriting business'). (b) In acting as underwriting agent for the Name the agent shall at all times comply with the byelaws, regulations and requirements for the time being of the Council affecting the Name as an underwriting member of Lloyd's. Provided *198 that if and to the extent that any provision of this agreement shall be inconsistent with any such byelaw, regulation or requirement such inconsistent provision shall be deemed to be modified or cancelled so far as may be necessary or appropriate to the intent that the byelaw, regulation or requirement in question shall prevail and have full effect."

"4. *Powers of the agent*. (a) The agent is authorised . . . to exercise such powers as the agent may consider to be necessary or desirable in connection with or arising out of the underwriting business, including without prejudice to the generality of the foregoing: (i) the acceptance of risks and the effecting of reinsurance, including reinsurance for the purpose of clause 5(g) hereof: . . . (b) Without prejudice to the generality of the provisions of sub-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

clause (a) of this clause, the agent shall have the following customary and/or special powers in connection with the conduct and winding-up of the underwriting business: . . . (G) Delegation of agent's powers: Power, subject to any requirements of the Council, to appoint to employ any person, firm or body corporate to carry on or manage the underwriting business or any part thereof, and to delegate to or confer upon any person, firm or body corporate all or any of the powers, authorities and discretions given to the agent by this agreement including this power of delegation and the other powers contained in this paragraph.

"5. *Control of underwriting business*. (a) The agent shall have the sole control and management of the underwriting business and the Name shall not in any way interfere with the exercise of such control or management. . . . (g) In order to close the underwriting account of any year the agent may: (i) reinsure all or any outstanding liabilities in such manner as the agent shall think fit, including the debiting of such account and the crediting of the underwriting account of the next succeeding year with such reinsurance premium as the agent in its absolute discretion (subject to any requirements of the Council) thinks fair or (ii) reinsure all or any outstanding liabilities into the underwriting account of any other year then remaining open or in any other manner which the agent (subject as aforesaid) thinks fair."

"8. *Remuneration*. (a) The Name shall pay to the agent as remuneration for the services of the agent a fee at the rate per annum specified in the syndicate schedule."

"9. *Undertaking by the Name to pay all liabilities and outgoings*. (a) The Name shall keep the agent at all times in funds available for the payment of the liabilities, expenses and outgoings of the underwriting business."

"THE SUB-AGENCY AGREEMENT

"Whereas the agent is the underwriting agent at Lloyd's for certain underwriting members of Lloyd's and it has been arranged between the agent and the sub-agent that the sub-agent shall act as the sub-underwriting agent for one or more of such underwriting members upon the terms hereinafter mentioned.

**\*199** "Now it is hereby agreed and declared between the parties hereto as follows:-

"2. The sub-agent shall act as sub-agent for the agent for the purpose of conducting in the names and for the account of each of the agent's Names that part of the underwriting business as defined in clause 2(a) of the agency agreement which is to be transacted by such Name as a member of the syndicate (hereinafter called 'the syndicate underwriting business'): . . ."

3.(a) The sub-agent shall underwrite for the agent's Names as part of the syndicate . . . (b) The individual premium income limit to be allocated to the syndicate in respect of each of the agent's Names shall be agreed from time to time between the sub-agent and the agent . . ."

"5.(a) The agent delegates to the sub-agent the performance of all such duties and the exercise of all such powers, authorities and discretions imposed or conferred upon the agent by the agency agreement (including without prejudice to the generality of the foregoing the power of delegation contained in that agreement) as it may be appropriate or necessary for the sub-agent to perform or exercise for the purpose of carrying on the syndicate underwriting business."

"7.(a) The sub-agent shall conduct the syndicate underwriting business in such manner as to comply with the provisions of the agency agreement and Lloyd's byelaws and regulations and is to have regard for Lloyd's Codes of Conduct or similar forms of guidance for the Lloyd's market."

"12.(a) The agent undertakes to put and keep the sub-agent at all times in funds to such extent as the sub-agent shall in its sole discretion determine to be requisite for payment of all liabilities, expenses and outgoings from time to time payable in connection with the syndicate underwriting business but (subject to any supplementary provision) only to the extent that the agent shall be able to enforce against a Name the provisions of the agency agreement."

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

The rival contentions of the parties centred upon the construction to be placed upon clause 2(a) of the agency agreement. For the Names in the Feltrim actions, it was submitted by Mr. Boswood that clause 2(a) contains an express undertaking by the underwriting agent to act as the underwriting agent of the Name, with the effect that (except to the extent that, where the agent is a combined agent, it acts as managing agent of a syndicate of which the Name is a member) members' agents are as such bound to underwrite insurance business for the Name. It was conceded that, if that submission was correct, there was an implied term that such underwriting should be carried out with reasonable care and skill. Mr. Boswood's argument on this point was supported by Mr. Vos for the Names in the Gooda Walker actions.

This argument was accepted by the courts below. But before the Appellate Committee it was subjected to a powerful attack by Mr. Eder for the members' agents. The argument ran as follows.

*200 (1) Mr. Eder began with clause 2(a) of the agency agreement, under which it is provided that the agent shall act as 'underwriting agent' for the Name. He then drew upon the definitions of "underwriting agent" in byelaw No. 4 of 1984, and in paragraph 1(c) of the Interpretation Byelaw No. 1 of 1983 (as amended), as showing that an underwriting agent may be either a member's agent or a managing agent, and submitted that appointment under clause 2(a) as "underwriting agent" did not of itself indicate in which capacity the agent was agreeing to act.

(2) Next he turned to clause 2(b). Here again he invoked byelaw No. 4 of 1984, and the definitions in Part A of both "managing agent" and "members' agent" which show (1) that a managing agent performs for an underwriting member the function of (inter alia) underwriting contracts of insurance at Lloyd's and (2) that a members' agent does not perform any of the functions of a managing agent. Further, under paragraph 4(a) of Part B of the byelaw, there is a prohibition against any person acting as a managing agent who is not registered as such under the byelaw. Building on this prohibition, Mr. Eder developed an argument to the effect that, on a true construction of clause 2(a), members' agents could not as such have agreed to do underwriting on behalf of the Names, when that was a prohibited activity under the relevant Lloyd's legislation.

(3) Turning to clause 4 of the agency agreement, he stressed that the clause is concerned not with duties but with powers conferred upon the agent, specifying powers the exercise of which the agent may consider to be "necessary or desirable." It followed from the fact that a member's agent is prohibited from acting as a managing agent that the exercise, in particular, of the power to accept risks and effect reinsurances could not properly be regarded as necessary or desirable for a members' agent. Furthermore, clause 4(b)(G) falls into two parts, the former being concerned with a power to appoint another person to carry on or manage the underwriting business, and the latter with a power to delegate or confer upon another the powers, etc., given to the agent. It was the submission of Mr. Eder that the effect of this sub-clause was, first, that the members' agent can appoint a managing agent to carry on the actual underwriting for the Name, even though the members' agent has itself no power to do so; and that the delegation of the broad authority conferred by clause 4(a) on the members' agent would have the effect of authorising the managing agent to underwrite on the Name's behalf. In his submission, clause 4(b)(G) envisaged that the person so appointed would be acting directly on behalf of the Name.

(4) There was nothing in the agency agreement, and in particular nothing in clause 5, to indicate that the members' agents contracted to underwrite or to be responsible for the underwriting in the sense advanced by the Names.

Impressed though I was by Mr. Eder's argument, in the end I feel unable to accept it.

I start, like him, with clause 2(a). This is the central provision, which makes available to Names the op-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

portunity of participating in underwriting at Lloyd's. Consistently with that evident object, it does not merely appoint the agent as "the underwriting agent" for the Name, but does so "for the purpose of underwriting at Lloyd's for the account of the Name *201 such classes and descriptions of insurance business . . . as may be transacted by the Syndicate (hereinafter referred to as 'the underwriting business')." Next, I have in the forefront of my mind the fact that, as I have already pointed out, the agency agreement is designed to enable it to perform a dual purpose so that it may apply not only to the functions of a members' agent as such, but also to the functions performed by a combined agent when it acts as managing agent in respect of a syndicate of which the Name is a member. I have a feeling that this duality of function may lie at the root of the somewhat elliptical language in which clause 2(a) is expressed. However it follows in my opinion that appointment of the agent as underwriting agent under clause 2(a) must, in the case of a combined agent, impose upon it the duty of carrying out underwriting on behalf of the Name if entered as a member of a syndicate of which the agent is the managing agent. Furthermore, I find it very difficult to see how the same words in clause 2(a) can impose any different obligation on the members' agent when the relevant syndicate is not managed by it, either because it is a pure members' agent, or because the syndicate in question is managed by some other managing agent. Here, I draw attention to the definition of "the syndicate" in clause 1(a) of the agency agreement, under which no distinction is drawn in this context between syndicates managed by a combined agent in its capacity as managing agent, and syndicates managed by some other managing agent, in which the Name is entered as member pursuant to a sub-agency agreement with the members' agent.

That the same obligation is in such circumstances imposed on the members' agent is, in my opinion, made clear beyond doubt when we read the agency agreement together with the sub-agency agreement, and discover from clause 2 of the latter that the managing agent acts as sub-agent for the members' agent in conducting the relevant part of the underwriting business as defined in clause 2(a) of the agency agreement. The position under clause 2(a) is therefore that the obligation imposed on the members' agent under the clause with regard to underwriting is the same, whether it is acting as members' agent or is a combined agent acting as managing agent in respect of a syndicate of which the Name is a member. The only difference is that in the former case it carries out the underwriting through the agency of a managing agent, under the terms of the prescribed form of sub-agency agreement, whereas in the latter case it carries it out itself.

Furthermore, like Saville J., I cannot see that such performance of its obligations by a members' agent can constitute any breach of the prohibition in paragraph 4 of Part B of the underwriting agents byelaw, since in each case the function of managing agent will always be performed by a managing agent; indeed, on my understanding of the position, this is precisely what was intended by the draftsman of the agency and sub-agency agreements, who plainly intended that there should be no breach of the byelaw.

There is another consideration which strongly supports the conclusion that clause 2(a) of the agency agreement must be read as imposing responsibility on the members' agent in respect of underwriting for the Name. It is plain from the two prescribed forms of agreement that, in a *202 case involving an indirect Name, they create no contractual relationship between the Name and the managing agent. On the contrary, as I have already indicated, there is a clear structure by virtue of which, under clause 2(a) of the agency agreement, the members' agent is appointed the Name's underwriting agent for the purpose set out in the sub-clause; and, under clause 2 of the sub-agency agreement, it is provided (here mirroring the recital to that agreement) that the sub-agent (the managing agent) shall act as sub-agent for the agent (the members' agent). Consist-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

ently with these provisions, under clause 4 of the agency agreement all the necessary powers are vested in the underwriting agent (the members' agent), including the power to delegate contained in clause 4(b)(G); and clause 5(a) of the sub-agency agreement provides for the delegation by the agent (the members' agent) to the sub-agent (the managing agent) of the performance of all duties and the exercise of all powers, authorities and discretions imposed or conferred upon the agent by the agency agreement as may be appropriate or necessary.

It was submitted by Mr. Eder on behalf of the members' agents before Saville J. and the Court of Appeal, and again before the Appellate Committee, that in cases involving indirect Names there was indeed a contractual relationship between the Names and the managing agents, under which the managing agents were contractually responsible for the proper performance of the underwriting for the Names. In this connection, Mr. Eder relied in particular upon the fact that the recital to the sub-agency agreement recites that it has been arranged between the agent and the sub-agent that the sub-agent shall act as the sub-underwriting agent for the Names.

However, the substantive provisions of the sub-agency agreement (in particular, clauses 2, 3, and 5) make it perfectly clear that, although the sub-agent has power to underwrite for the agent's names, i.e. to bind the Names to contracts of insurance, nevertheless there is no contractual relationship between the sub-agent and the Names, the only relevant contractual relationship of the sub-agent being with the agent. In this connection the true position in law is, in my opinion, accurately stated by Professor F. M. B. Reynolds in article 36(3) *Bowstead on Agency*, 15th ed. (1985), p. 131, as follows:

"But there is no privity of contract between a principal and a sub-agent as such, merely because the delegation was effected with the authority of the principal; and in the absence of such privity the rights and duties arising out of any contracts

between the principal and the agent, and between the agent and the sub-agent, respectively, are only enforceable by and against the immediate parties to those contracts. However, the sub-agent may be liable to the principal as a fiduciary, and possibly in other respects."

Of the three authorities cited by Mr. Eder in support of his submission on this point De Bussche v. Alt (1878) 8 Ch.D. 286, Powell & Thomas v. Evan Jones & Co. [1905] 1 K.B. 11 and Tarn v. Scanlan [1928] A.C. 34, the first two were concerned with the accountability of a sub-agent for secret profits, and the third with liability for income tax. Each was a decision on its own specific facts, and none provides Mr. Eder with **\*203** assistance in the form of general guidance on the circumstances in which a contractual relationship may come into existence between a principal and a sub-agent. I am satisfied that no such relationship came into existence between the Names and their sub-agents in the present case.

In these circumstances, Mr. Eder's argument leads to the extraordinary conclusion that, under the prescribed forms of agency and sub-agency agreements, neither members' agents nor managing agents assumed any contractual responsibility to the Names for the underwriting which was the principal purpose of these agreements. Such a conclusion is, in my opinion, so improbable that it adds considerable support for the view that Mr. Eder's argument cannot be right, and that the true position must be that, on a true construction of clause 2(a) of the agency agreement, members' agents did indeed undertake to carry out underwriting for the Names, as was held by both courts below.

I recognise, of course, that it might have been thought right to structure the agreements differently, so that the managing agents were put into a direct contractual relationship with indirect Names who are members of syndicates under their management. This was what was in fact done under the new forms of agreement brought into force as from 1 January 1990. But it is plain that this was not the

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

intention under the forms of agreement now under consideration under which, in cases involving indirect Names, the managing agent acts as sub-agent of the members' agent, and all the necessary powers, etc., are vested in the members' agent which then delegates the performance of them to the managing agent.

In truth, once it is appreciated that the obligation to underwrite under clause 2(a) of the agency agreement may be performed by the underwriting agent either by itself in a case involving direct Names, or otherwise through a managing agent under the terms of the sub-agency agreement, everything falls into place. This is particularly true of clause 4 of the agency agreement, when read in conjunction with clauses 2 and 5 of the sub-agency agreement. As far as clause 4(b)(G) of the agency agreement is concerned, on which Mr. Eder placed such reliance, this can be seen to reflect precisely the position under clauses 2(a) and 4(a); the effect of the sub-clause is, as obviously contemplated by the draftsman of the two agreements, that under the first part the members' agent will appoint the managing agent to act as its sub-agent for the purpose of conducting the relevant part of the underwriting business, under clause 2 of the sub-agency agreement, and under the second part delegate to it under clause 5(a) the performance of the relevant powers, etc., which, significantly, are vested in the members' agent under clause 4(a) of the agency agreement. The vesting of these powers in the members' agent is, in my opinion, a strong pointer against the construction of the agreements for which Mr. Eder contends. Had that construction represented the draftsman's intention, he would surely, in this respect at least, have drafted the agreements differently.

For these reasons, which I understand to be the same as those given by Saville J., which were accepted by the Court of Appeal, I would on this issue accept the argument advanced on behalf of the Names, and reject that advanced on behalf of the members' agents.

**\*204** *III. Merrett appeals*

*Reinsurance to close*

On this issue, I can see no answer to the conclusion reached by Saville J. and the Court of Appeal. I agree with the submission advanced by Mr. Boswood on behalf of the Names in the Merrett appeals that when Names on the 1985 underwriting year reinsured Names on the 1984 year, although the 1984 Names were running off their business, the 1985 Names were writing new insurance business which could only be done pursuant to the 1985 byelaw form of agreement in force as from 1 January 1987, as held by the courts below.

*Conclusion*

For these reasons, I would answer all the questions in the same manner as Saville J. and the Court of Appeal, and I would dismiss the appeals of the members' agents and the managing agents with costs.

LORD BROWNE-WILKINSON.

My Lords, I have read the speech of my noble and learned friend, Lord Goff of Chieveley, with which I am in complete agreement. I add a few words of my own on the relationship between the claim based on liability for negligence and the alternative claim advanced by the Names founded on breach of fiduciary duty.

The decision of this House in Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465, was, to a substantial extent, founded on the earlier decision of this House in Nocton v. Lord Ashburton [1914] A.C. 932. In that case, Lord Ashburton sought to be relieved from the consequences of having loaned money to, amongst others, his solicitor Nocton. Lord Ashburton's pleadings were based primarily on an allegation of fraud; in particular, there was no allegation on the pleadings either of breach of contract by Nocton or of negligence. The lower courts treated the case as being wholly dependent on proof of fraud. But in this House Nocton was held liable for breach of a fiduciary ob-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

ligation owed by him as solicitor to his client. However, although the decision was based on breach of fiduciary duty, both Viscount Haldane L.C. and Lord Shaw expressed such fiduciary duty as being but one example of a wider general principle, viz., that a man who has voluntarily assumed to act on behalf of, or to advise, another in law assumes a duty to that other to act or to advise with care. Viscount Haldane said, at p. 948:

"Although liability for negligence in word has in material respects been developed in our law differently from liability for negligence in act, it is nonetheless true that the man may come under a special duty to exercise care in giving information or advice. I should accordingly be sorry to be thought to lend countenance to the idea that recent decisions have been intended to stereotype the cases in which people can be held to have assumed such a special duty. Whether such a duty has been assumed must depend on the relationship of the parties, *205 and it is at least certain that there are a good many cases in which that relationship may be properly treated as giving rise to a special duty of care in statement."

Viscount Haldane L.C. gave a further explanation of the decision in Nocton v. Lord Ashburton in Robinson v. National Bank of Scotland Ltd. [1916] S.C. (H.L.) 154, 157:

". . . I wish emphatically to repeat what I said in advising this House in the case of Nocton v. Lord Ashburton, that it is a great mistake to suppose that, because the principle in Derry v. Peek (1889) 14 App.Cas. 337 clearly covers all cases of the class to which I have referred, therefore the freedom of action of the courts in recognising special duties arising out of other kinds of relationship which they find established by the evidence is in any way affected. I think, as I said in Nocton's case, that an exaggerated view was taken by a good many people of the scope of the decision in Derry v. Peek. The whole of the doctrine as to fiduciary relationships, as to the duty of care arising from implied as well as expressed contracts, as to the duty of care arising from other special relationships which the courts may find to exist in particular cases, still remains,

and I shall be very sorry if any word fell from me which suggests that the courts are in any way hampered in recognising that the duty of care may be established when such cases really occur."

It was these passages from the speeches of Viscount Haldane L.C., and others, which this House in Hedley Byrne took up and developed into the general principle there enunciated as explained by my noble and learned friend, Lord Goff of Chieveley.

This derivation from fiduciary duties of care of the principle of liability in negligence where a defendant has by his action assumed responsibility is illuminating in a number of ways. First, it demonstrates that the alternative claim put forward by the Names based on breach of fiduciary duty, although understandable, was misconceived. The liability of a fiduciary for the negligent transaction of his duties is not a separate head of liability but the paradigm of the general duty to act with care imposed by law on those who take it upon themselves to act for or advise others. Although the historical development of the rules of law and equity have, in the past, caused different labels to be stuck on different manifestations of the duty, in truth the duty of care imposed on bailees, carriers, trustees, directors, agents and others is the same duty: it arises from the circumstances in which the defendants were acting, not from their status or description. It is the fact that they have all assumed responsibility for the property or affairs of others which renders them liable for the careless performance of what they have undertaken to do, not the description of the trade or position which they hold. In my judgment, the duties which the managing agents have assumed to undertake in managing the insurance business of the Names brings them clearly into the category of those who are liable, whether fiduciaries or not, for any lack of care in the conduct of that management.

*206 Secondly, in my judgment, the derivation of the general principle from fiduciary duties may be instructive as to the impact of any contractual rela-

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

tionship between the parties on the general duty of care which would otherwise apply. The phrase "fiduciary duties" is a dangerous one, giving rise to a mistaken assumption that all fiduciaries owe the same duties in all circumstances. That is not the case. Although, so far as I am aware, every fiduciary is under a duty not to make a profit from his position (unless such profit is authorised), the fiduciary duties owed, for example, by an express trustee are not the same as those owed by an agent. Moreover, and more relevantly, the extent and nature of the fiduciary duties owed in any particular case fall to be determined by reference to any underlying contractual relationship between the parties. Thus, in the case of an agent employed under a contract, the scope of his fiduciary duties is determined by the terms of the underlying contract. Although an agent is, in the absence of contractual provision, in breach of his fiduciary duties if he acts for another who is in competition with his principal, if the contract under which he is acting authorises him so to do, the normal fiduciary duties are modified accordingly: see Kelly v. Cooper [1993] A.C. 205, and the cases there cited. The existence of a contract does not exclude the co-existence of concurrent fiduciary duties (indeed, the contract may well be their source); but the contract can and does modify the extent and nature of the general duty that would otherwise arise.

In my judgment, this traditional approach of equity to fiduciary duties is instructive when considering the relationship between a contract and any duty of care arising under the Hedley Byrne principle (of which fiduciary duties of care are merely an example). The existence of an underlying contract (e.g. as between solicitor and client) does not automatically exclude the general duty of care which the law imposes on those who voluntarily assume to act for others. But the nature and terms of the contractual relationship between the parties will be determinative of the scope of the responsibility assumed and can, in some cases, exclude any assumption of legal responsibility to the plaintiff for whom the defendant has assumed to act. If the common

law is not to become again manacled by "clanking chains" (this time represented by causes, rather than forms, of action), it is in my judgment important not to exclude concepts of concurrent liability which the courts of equity have over the years handled without difficulty. I can see no good reason for holding that the existence of a contractual right is in all circumstances inconsistent with the co-existence of another tortious right, provided that it is understood that the agreement of the parties evidenced by the contract can modify and shape the tortious duties which, in the absence of contract, would be applicable.

For these reasons, in addition to the much wider considerations addressed by Lord Goff of Chieveley, I would dismiss the appeals.

LORD MUSTILL.

My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Goff of Chieveley, and for the reasons which he gives, I, too, would dismiss the appeals of the members' agents and the managing agents with costs.

**\*207** LORD NOLAN.

My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Goff of Chieveley, and for the reasons which he gives, I, too, would dismiss these appeals with costs.

**Representation**

Solicitors: Reynolds Porter Chamberlain; More Fisher Brown; Elborne Mitchell & Co.; Clifford Chance; Richards Butler; Elborne Mitchell & Co.; Wilde Sapte.

Appeals dismissed with costs. (J. A. G. )

(c) Incorporated Council of Law Reporting For England & Wales

© 2009 Thomson Reuters.

1994 WL 1060824 (HL), [1995] 2 A.C. 145, [1994] 3 All E.R. 506, [1994] C.L.C. 918, [1994] 2 Lloyd's Rep. 468, [1994] 3 W.L.R. 761, (1994) 144 N.L.J. 1204, 7-26-1994 Times 1060,824, 8-03-1994 Independent 1060,824
**(Cite as: [1995] 2 A.C. 145)**

END OF DOCUMENT

© 2009 Thomson Reuters.

**Tab 13**

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO. 15 OF 1992

FOCUS INSURANCE COMPANY LIMITED          Plaintiff

-and-

| | |
|---|---|
| MARK GREGORY HARDY | 1st Defendant |
| DAVID ARTHUR THIRKILL | 2nd Defendant |
| DOUGLAS HARVEY PULLEN | 3rd Defendant |
| CAREDEED LTD. | 4th Defendant |
| STARBOOK INVESTMENTS LTD. | 5th Defendant |
| VILLAROSA ANSTALT | 6th Defendant |
| MAGNOLIA TRADING SA | 7th Defendant |
| BERMUDA TRUST COMPANY LTD. | |
| (as Trustee of Forum Trust) | 8th Defendant |
| JUDY MARY HARDY | 9th Defendant |

-----

Before:   Roberts, P.
          da Costa, J.A.
          Henry, J.A.

Dates of Hearing:   2nd. 3rd. 4th and 5th November, 1992.
Date of Judgment:   25th November, 1992.

-----

J U D G M E N T

Roberts, P.

History of Proceedings

On 5th July, 1991, a statement of claim was issued by the plaintiff, an insurance company, duly incorporated by registration , under the Companies (Incorporation by Registration) Act, 1970.   The plaintiff was, at the date of such issue, in liquidation and proceedings were taken on behalf of the liquidator.

At that stage, there were three defendants. who appear above as the first (D1), second (D2) and third (D3) defendants.

A summons was filed by D3 on 26th July 1991, seeking the striking out of the plaintiff's writ and statement of claim.

A similar summons was issued on 27th July, 1991 on behalf of D2, seeking the same relief.

Although the summons of D2 was returnable on 31st July 1991, there is nothing in the record which suggests that this was pursued.

On 7th November, 1991. the statement of claim was amended. The original statement of claim had alleged that, by reason of their acts or omissions as directors or officers of the plaintiff,

**D1,** D2 and D3 were liable for losses caused thereby to the plaintiff. The amended statement of claim on 7th November, 1991 alleged wilful negligence and default by the three defendants.

A summons dated 5th March,' 1992 was issued by **D1** seeking the striking out of the amended statement of claim, on the ground that it disclosed "no reasonable cause of action" against **D1.** The summons was to be heard on 6th April, 1992.

On the same date, 6th April, 1992. the plaintiff sought to amend its statement of claim so as to add the fourth to ninth defendants (D4 to **D9)** for the first time, as well as to make other amendments.

## Hearing Before Chief Justice

It was agreed by all parties that the application to strike out should proceed on the basis of the reamended statement of claim. There were before the Chief Justice applications by **D1,** D2 and D3 to strike out and by the plaintiff to **reamend** its statement of claim.

The applications to strike out were brought on the ground that the pleadings, as reamended, disclosed no reasonable cause of action.

In his judgment, delivered on 11th May, the Chief Justice set out what were, in his view, the important parts of the statement of claim, concluding that the material particulars given by the plaintiff were in sufficient conformity with the rules of pleading to enable the **defendants** to meet the plaintiff's claim and be able to plead to it.

He commented that there was no allegation of fraud or dishonesty, only that the defendants acted with wilful negligence and default arising from their acts and omissions. He found that the facts given in the statement of claim would, if proved, show a wilful disregard of their duties by the directors and would be evidence that they had acted in a negligent manner. He was thus satisfied that the plaintiff had pleaded the material facts on which it relied to show the state of mind of the defendants.

There were submissions to the Chief Justice as to the

effect of bye-law 108 of the plaintiff company which confers protection upon directors of the plaintiff for the neglect or. default of another director. This bye-law should, he said. be considered in conjunction with other bye-laws and sections 97 and 98 of the Companies Act. He also commented that he was only concerned as to whether the plaintiff had properly pleaded its case and found that it had, with the exception of paragraph 8 of the reamended statement of claim. which he struck out.

With regard to the joinder of D4 to **D9**, the Chief Justice found that 0.15 r.6 gives the necessary authority to join and that the plaintiff had discharged the burden of satisfying him that they were necessary parties to the dispute raised in the action. He therefore ordered that they be joined and allowed service of notice of the writ out of the jurisdiction.

He refused to strike out the writ and reamended statement of claim (save that he struck out paragraph 8) and allowed the plaintiff to **reamend** its statement of claim in terms of the draft put before him.

Applications for leave

An application for leave to appeal was heard, inter partes, by the Chief Justice on 24th June, 1992. All defendants sought leave to appeal. This was refused by the Chief Justice, on the ground that there was "no arguable point to be reviewed".

The applications were renewed before us, ex parte, on behalf of all the **defendants on** 20th July, 1992.

After hearing argument that leave should be given, we decided that we should hear the application for leave at the next sitting of the Court. At that sitting, all parties should be ready to argue the merits of the appeal and all documents should be before the Court which would be required as if the hearing were an **appeal,** and not merely an **application** for leave.

Grounds of Appeal

The grounds of appeal put forward on behalf of **D1** can be summarized as follows -

**(1)** The Chief Justice was wrong in finding that, because of the wording of section 97 and 98 of the Companies Act, the defendants could be held liable for mere negligence if they did not "exercise the care, diligence and skill that a reasonably prudent person would exercise in **comparable** circumstances".

**(2)** The Chief Justice was wrong in law in stating that "at this stage I am concerned only to see whether the plaintiff has properly pleaded their case".

(3) The Chief Justice erred in holding that the plaintiff, except for paragraph **(8)**, had properly pleaded its case.

(4) D4 and **D9** were improperly joined as they were made parties only for purposes of discovery.

(5) No cause of action was made out in pleadings against D4 to **D9.**

(6) Amendments to the statement of claim, so far as D4 to **D9** are concerned, were not necessary to determine the real question between existing parties to the action.

(7) Service of the amended statement of claim was in breach of 0.11 R.S.C.

D2 and D3 put forward their grounds of appeal.

Paragraph **(1),** (2) and (3) raise, in essence, the same issues as **D1.**

In **(4),** it is said that the Chief Justice incorrectly failed to distinguish D2 and D3 from **D1** and to consider how the pleadings applied to their separate circumstances.

(5) The Chief Justice misapplied the principles of pleading set out in Bermuda Civil Appeal No. 14 of 1981, Intercontinental Natural Resources Ltd. v. Dill and others. (see **para.** 3(e) of Dl's grounds).

**(6)** The pleadings are in breach of 0.18 and 12(1)(b) R.S.C. (see **para.** 3(a) of Dl's grounds).

(7) A proper distinction was not drawn as to distinction between primary and conclusory facts. (see **para.** 3(g) of Dl's grounds).

**(8)** The Chief Justice was wrong to conclude that an allegation of the existence of a duty and failure to perform it are sufficient to establish wilful neglect. (see **para.** 3(c) of Dl's grounds)..

**(9)** The Chief Justice was wrong to reject the principles of **Lipkin** Gorman v. Karpnale Ltd. (198**7**) 1 W.L.R. 1340, to the effect that a plea of "ought to have known" is equivocal and an unacceptable plea.

**(10)** That the Chief Justice was wrong in law in failing to hold that the reamended statement of claim was an abuse of process.

The defendants contend, for the reasons given above, that the reamended statement of claimshould be struck out against all

the defendants.

## Backsround

The plaintiff was originally incorporated in Bermuda by registration on 8th August, 1979, under the name of the Trenwick Insurance Company Ltd. Its principal objects were, among other things, to engage in all types of insurance and reinsurance business.

The plaintiff underwrote insurance of various kinds unitl 1986 when it ceased active underwriting and went into "run-off".

**D1** and D3 were directors and officers of the plaintiff at all material times. D2 was such a director and officer from December 1987 to September 1989 and from May **1990** to September 1990.

The plaintiff went into voluntary liquidation on 19th September 1990. Joint provisional liquidators were subsequently appointed by order of the Supreme Court on 8th November, 1990. The plaintiff went into compulsory liquidation by order of that Court on 5th February, 1991.

Forum Reinsurance Co. Ltd. ("Forum Re") was incorporated by registration about 4th July 1985. Its principal objects were to engage in all types of insurance and reinsurance business. **D1,** D2 and D3 were at all material times directors of Forum Re.

Forum Re was ordered to be wound up by the Supreme Court on 8th March, 1991, by reason of its inability to pay its debts.

By a written agreement on 24th December, 1987 between Forum Re and Trenwick **Services** Ltd., Forum Re agreed to buy the shares of Trenwick Reinsurance Company Ltd. In accordance with the terms of that agreement, the name of Trenwick Reinsurance Co. was changed to Focus Insurance Co. Ltd. about 25th January 1988.

## General liability of a director

A director can only be guilty of negligence if it is proved that he has failed to perform some duty which he is obliged to discharge.

In determining whether a director has been guilty of negligence, "the court will take into account the character of the

business, the number of directors, the provisions of the articles, the normal course of the management and practice of directors, the extent of their knowledge and experience and any special circumstances which apply." See In Re City Equitable Fire Insurance Company Limited (1925) 1 Ch. 407 at p. 426 per Romer J. and Palmer's Company Law, 25th Edition, page 8093.

The same approach applies in considering whether a director was guilty of wilful neglect or default. The difference between ordinary and wilful neglect must be established by the pleadings. Are these sufficient to show that a breach of duty by a director was such as to amount to wilful neglect or default?

It must be recognized that persons are employed as directors for their skills in some particular field, perhaps in finance, marketing, advertising, exporting etc., see Pennington's Modern Company Law. 6th Edition, page 581.

In the case of the plaintiff, D1 was a chartered accountant, D2 a reinsurance specialist and D3 a corporate lawyer. The plaintiff does not, however, purport to plead any matters which D2 and D3 were employed to perform as directors. Each is alleged to have been obliged to carry out the general duties of a director which are set out in paragraph 11.

There is no allegation that D2 and D3 had any reason not to trust D1, who was their colleague. If such an allegation had been made, it would have been necessary to plead matters which did, or ought, to have given rise to such mistrust.

Before the Chief Justice, counsel for the plaintiff argued that there was dishonesty by D1. This submission was presumably based on paragraph 12 of the reamended statement of claim. Before us, however, counsel submitted that he was making no allegation of dishonesty in the pleadings but was relying on section 97(4) of the Act, which states that in certain circumstances a director is "deemed not to be acting honestly and in good faith".

If counsel is correct and there was no suggestion of dishonesty on the part of D1, there would have been no reason why D2 and D3 should have supervised what D1 did or omitted to do. As

Lord Halsbury commented in <u>Dovey v. Carey</u> (1901) AC 477 at p. 486 -

> "The business of life would not go on if people
> could not trust those who are in a position of trust
> for the express purpose of attending to details of
> management."

He later pointed out that there is no such duty of

detecting fraud. The same should apply to dishonesty.

A director is not the watchdog of another director. A

duty of care could only arise if one director had reason to suspect

that his fellow director was acting dishonestly.

If there is an allegation of dishonesty on the part of **D1**,

the breaches of duty of D2 and D3, of a nature which would make

them liable, would have to be set out in detail in the pleadings.

Nor is it pleaded, as it should have been, that if D2 and

D3 had discharged properly the duties which lay upon them, the

alleged losses would not have occurred.

In paragraph 11 there is set out a series of duties which

a director must perform. Counsel for the plaintiff submitted that

this is sufficient in a case of **wilful** default, relying on the

dissenting judgment of Griffiths C.J. in <u>Gould v. Mount Oxide Mines</u>

<u>Ltd. (in liquidation) and others</u> (1916) 22 D.L.R. 490. at p. 502 -

> "After alleging the proceedings for winding up the
> plaintiff Company, the statement of claim in **para.** 62
> charged that the appellants were guilty of breaches
> of duty as directors of the company and grossly
> negligent in relation to the Company's affairs 'in
> the following amongst other respects'. It then
> enumerated 25 separate instances of acts of omission
> on the part of the 'appellants. One of them was that
> they consented to the insertion in the agreement of
> the 23rd December of the provision for payment of the
> £20,000 to the.Herman Company and neglected to see to
> its application. Another, with which I deal
> separately, was that they improperly issued
> certification for shares."

These illustration make it clear that, although Griffiths

C.J. described them as acts of omission, they were not properly so

called. Both the giving **of consent** and the issue of shares were

positive acts by the directors. These were specifically pleaded.

The plaintiff did not rely upon a general allegation of breaches of

duty.

In a later passage, on the same page, Griffiths C.J. comments -

> "It wound up by an allegation that the appellants were puppets of Herman and Herman Company, and acted under their direction, without exercising any independent judgment or discretion, and delegated to them the exercise of their powers and duties as directors."

This is, in essence, the plaintiff's case against D2 and D3, who are, in effect, said to have abrogated their duties, and left it to their fellow director D1 to run the company as he wished.

But it is not sufficient for a plaintiff to allege that the defendant acted negligently and caused him damage. He must set out the particular breach of duty - see <u>West Rand Central Gold Mining Company v. R.</u> (1905) 2 K.B. 391 at p. 400.

<u>The Companies Act, 1981 ("the Act")</u>

In his judgment of 11th May. 1992, the Chief Justice considered the effect of sections 97 and 98 of the Act and of bye-laws 108 and 109 of the plaintiff.

This is of importance, since a decision as to the validity of these bye-laws would mean that the directors of a company, if they are valid, could be held liable only for "wilful negligence, wilful default, fraud and dishonesty". If the bye-laws are not valid, the directors could be held liable for negligence or default.

The Chief Justice, however, made no finding as to whether or not the relevant bye-laws of the plaintiff were valid, though he expressed the opinion that the defendants "could be held liable for mere negligence in performing their duties if they did not exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances."

The relevant sections of the Act are as follows -

> "97. (1) Every officer of a company in exercising his powers and discharging his duties shall -
>
> > (a) act honestly and in good faith with a view to the best interests of the company; and
> >
> > (b) exercise the care, diligence and skill that

a reasonably prudent person would exercise in comparable circumstances.

(2) Every officer of a company shall comply with this Act, the regulations, and the bye-laws of the company.

(3) Subject to section 98, no provision in a contract, the bye-laws or a resolution relieves an officer from the duty to act in accordance with this Act or the regulations or relieves him from liability for a breach thereof.

(4) Without in any way limiting the generality of sub-section (1) an officer of a company shall be deemed not to be acting honestly and in good faith if -

    (a) he fails on request to make known to the auditors of the company full details of -

        (i) any emolument, pension or other benefit that he has received or it is agreed that he should receive from the company or any of the company's subsidiaries; or

        (ii) any loan he has received or is to receive from the company or any its subsidiaries;

    (b) he fails to disclose at the first opportunity at a meeting of directors or by writing to the directors -

        (i) his interest in any material contract or proposed material contract with the company or any of its subsidiaries;

        (ii) his material interest in any person that is a party to a material contract or proposed material contract with the company or any of its subsidiaries.

(5) For the purposes of this section -

    (a) a general notice to the directors of a company by an officer of the company declaring that he is an officer of or has a material interest in a person and is to be regarded as interested in any contract with that person is a sufficient declaration of interest in relation to any such contract;

    (b) the word material in relation to a contract or proposed contract shall be construed as relating to the materiality of that contract or proposed contract in relation to the business of the company to which disclosure must be made;

    (c) an interest occurring by reason of the ownership or direct or indirect control of not more than ten per centum of the capital of a person shall not be deemed material.

(5A) An officer is not liable under subsection (1) if he relies in good faith upon -

    (a) financial statements of the company repre-

10

**sented** to him by another officer of the company; or

(b) a report of an attorney, accountant, engineer, appraiser or other person whose profession lends credibility to a statement made by him.

(6) Any officer of a company who fails to make known a matter he is required to make known under subsection (4) shall be liable to a fine of one thousand dollars.

(7) Nothing in this section shall be taken to prejudice any rule of law or any bye-law restricting officers of a company from having any interest in contracts with the company.

98. Subject to the provisions of this section and section **98A**, any provision, whether contained in the bye-laws of a company or in any contract or arrangement between the company and any officer, or any person employed by the company as auditor, exempting such officer or person from, or indemnifying him against any liability which by virtue of any rule of law would otherwise attach to him in respect of any wilful negligence, wilful default, fraud or dishonesty of which he may be guilty in relation to the company shall be void:

Provided that -

**(a)** nothing in this section shall operate to deprive any person of any exemption or right to be indemnified in respect of anything done or ommitted to be done by him while any such provision was in force; and

(b) notwithstanding anything in this section, a company may, in pursuance of any such provision as aforesaid indemnify any such officer or auditor against any liability incurred by him in defending any proceed-**ings,** whether civil or criminal in which judgment is given in his favour or in which he is acquitted or when relief is granted to him by the Court under section 281.

The bye-laws **of Trenwick** Reinsurance Company Limited, which was the former name of the plaintiff, contain the following' ▪

"108. Subject to the provisions of Bye-Law 109, no Director, Secretary or other officer of the Company shall be liable for the acts, receipts, neglects, or defaults of any other Director or officer or any person involved in the formation of the Company, or for any loss or expense incurred by the Company through the insufficiency or deficiency of title to any property acquired by order of the Directors for or on behalf of the Company, or for the insufficiency or deficiency of any security in or upon which any of the monies of the Company shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any monies. securities, or effects shall be deposited. or for any loss occasioned by any error of judgment, omission. default, or oversight on his **part,** or for any other loss. damage or misfortune

whatever which shall **happan** in relation to the execution of the duties of his office or in relation thereto, unless the same happens through his own dishonesty.

109. Neither the indemnities contained in Bye-Laws 102 and 103, nor the right to make advances contained in Bye-Law 106, nor the relief from liability contained in Bye-Law 108 shall extend to any matter which would render the same void pursuant to the Companies Acts.

As will be seen, section 98 of the Act does not adopt the U.K. wording, which makes illegal any provision intended to relieve directors of liability for any negligence, default, breach of duty or breach of trust (see Section 310 of the U.K. Companies Act, 1989).

Section 98 of the Act retains the previous common law concept that releasing provisions are to be ineffective only in respect of "wilful negligence, wilful default, fraud or dishonesty."

We note in passing that "wilful negligence" and "wilful default" must indicate conduct which is not, and so falls short of, fraud or dishonesty. If it were not **so,** the references to fraud and dishonesty would be redundant.

"Wilful negligence" and wilful default imply conduct which is more serious in nature than mere negligence and mere default.

The defendants' argument was that an act or omission can be said to be "wilful" only if there is a conscious recognition by the wrongdoer that he was acting in breach of his duties or that he does not care whether he is so acting.

It is not in dispute that a bye-law which seeks to exempt directors from liability for wilful negligence, wilful default, fraud or dishonesty can be of no effect.

Bye-law 108 provides that a director shall not be liable for the acts, neglects or defaults of any other director and for various other acts, other than his own dishonesty. This bye-law is expressly made subject to bye-law 109, which itself, in terms specifies that bye-law 108 shall not extend to any matter which would "be void under the Companies Acts".

Thus bye-law 108 does not extend to wilful negligence,

wilful default, fraud or dishonesty.  This, the defendants argue, is the purpose of bye-law 109.

When these two bye-laws are read together, it is apparent that bye-law 109 limits the application of bye-law 108 to conduct for the consequences of which the Act provides that a director may be relieved by the bye-laws.

If there were any conflict between the bye-laws and the Act, the latter would prevail, as must be the case whenever a statute conflicts with subordinate legislation.

The plaintiff has argued that the defendants may not rely on bye-law 108 because of section **97(2)** of the Act.  This does not seem to us to be correct.

Sections **97(1)** and **97(2)** impose duties on directors. Section **97(3)** provides that subject to section 98, by-laws cannot relieve directors of their duty to conduct themselves in accordance with the Act.

Section 98 of the Act permits a company to exempt a director from liability from a breach of sections 97(1)(b) or section **97(2)** provided that the conduct falls short of wilful negligence, wilful default, fraud or dishonesty.

The position in Bermuda is not complicated.  Sections **97(1)** and (2) impose duties on directors.  By section **97(3),** they cannot be relieved of liability, subject to section 98.  This permits a director to be relieved, so long as his breach of duty does not amount to the conduct described in section 98.

Bye-laws 108 and 109 seem to us to be valid and effective so as to relieve the directors of Focus from liability for acts or omissions which fall short of the prohibition contained in section 98 of the Act.

It must follow from this that the plaintiff can only succeed against the second (D2) and third (D3) defendants if he pleads and proves a cause of action based on wilful negligence or wilful default, as no fraud or dishonesty is alleged against them.

## The Intercontinental Case

During the hearing of the application for leave to appeal,

a large number of cases were cited to us. Many of these. since
they depended upon the facts before the Court, were of little
assistance. However, frequent reference was made to a Bermuda
appeal. This considered the principles of pleading which apply.
We should follow it, unless satisfied that the Court was in error.
This was Intercontinental Natural Resources Limited v. Sir Bayard
Dill and others (Bermuda Civil Appeal No. 14 of 1981), in which the
authorities applicable were examined in detail.

The relief sought against D2, D3. D4 and D5 in that action
was for damages for breach of contract and breach of duty whilst
they were acting as directors of the plaintiff company.   D1 and D5
sought to have the action dismissed as disclosing no reasonable
cause of action and as embarrassing and an abuse of the process of
the  Court.

The duties of directors were set out in paragraphs 9 and
10 of the Statement of Claim.  Paragraph 11 averred that D2 and D5
were aware of their duties, were aware that they were acting in
breach of them and that such breaches were wilful "as hereinafter
pleaded".

Paragraph 12 stated that the company sustained substantial
losses by reason of improvident management and unwise transactions
entered into by the company.

Paragraph 13 alleged that the directors took no part in
the management or conduct of business of the company.  Paragraph 14
alleged various failures by the directors, which were said to have
caused the losses pleaded in paragraph 12.

The President of the Court of Appeal for Bermuda reviewed
the various authorities cited to him.  His conclusions can be
summarized as follows -

> (a) Directors are not obliged personally to take
> every decision but must entrust some tasks to others.
> See Romer J. in In re City Equitable Fire Ins. Co.
> Ltd. (1925) 1 Ch. D. 407 at p. 426.

> (b) The acts which cause loss had to be
> identified. so that the Court could decide if the
> directors were at fault in leaving the managers to
> perform those acts in order to make out any cause of
> action against the directors.

(c) The general and unparticularized allegations in the Statement of Claim were not material facts within the meaning of 0.19 r.4. "Breach of contract", "breach of duty", "wilful default" are conclusions which may or may not be drawn from material facts.

(d) The onus lies on the plaintiff to prove wilful default.

(e) By 0.18 **r.12(1)(a)** particulars of a claim of wilful default must be given in the pleadings. In the case of an allegation of any condition of mind other than knowledge, particulars must be given in the pleadings or if they are not, the court may order them to be given.

(f) Paragraphs 11 and 16 failed. not because of any lack of particularity as to wilfullness, but because there was no particularity as to the alleged default.

(g) There must be particulars of default from which the defendants can know that a transaction was contrary to their duty to authorize.

(h) The liquidator could not succeed because it could not be inferred, from the statement of claim, that the directors were guilty of any default, let alone wilful default.

(i) The power to strike out should only be used if there is no reasonable cause of action (other phrases are also quoted from the White Book at paragraph 18/19/3).

(j) The Statement of Claim was devoid of the necessary material particulars to the extent that it was an embarrassing pleading.

(k) it is not sufficient merely to allege that "the directors abdicated responsibility to others".

da Costa J.A., agreeing with the conclusion of the President, first sets out what he describes as the gravamen of the charge against the directors as -

(a) The directors had duties to manage the business of the company and a duty to monitor or supervise others.

(b) The directors abdicated responsibility for the management and conduct of the business.

(c) They gave a free hand to run the business to others whom they did not monitor.

(d) The company's loss was caused by the negligence and breach of duty of the directors as aforesaid.

He came to the conclusion that the case depended **upon** a narrow point of pleading and made the following findings -

(a) By 0.19 r.4, a pleading must contain a statement of the material facts on which a party relies. As to the meaning of material, he quotes Scott L.J. in <u>Bruce v. Odhams Price</u> (1936) 1 K.B. 697

**at** p. 712.

(b) It is not the function of particulars to fill in gaps or make good an inherently bad pleading.

(c) Every material fact necessary to constitute a complete cause of action must be pleaded. Phillips v. Phillips (1878) 4 Q.B.D. 127 at p. 133.

(d), In the case of wilful default 0.19 r.4 requires "particulars to be stated in the pleadings". This means that full particulars of the facts constituting wilful default must be given, though it is sufficient to plead a mental element as a fact without setting out the circumstances from which it is to be inferred.

(e) The company would succeed only if it could show that the directors had acted in breach of their duties by a wrongful delegation and that the breach occasioned loss. This must be pleaded by the company.

(f) Because the directors did carry out some of the company's business, it was necessary to indicate which matters were entrusted to others which the board of directors should have undertaken and the facts which show that they knew it was a breach of duty should also be pleaded.

(g) There is a distinction between primary and conclusory facts. A statement of **claim** based largely on a series of conclusory facts does not inform the defendant of the case he has to meet and offends 0. 19 r.4. If it fails to do so, the pleading is vexatious.

In their two extensive judgments in the Intercontinental **appeal,** the President and da Costa J.A. considered both the facts before them and the various principles of pleading which applied. We do not consider it necessary to examine these again. We have set out above what seem to us to be the relevant findings of the Court. We shall apply these, where appropriate, to this appeal.

<u>Summary of Statement of Claim</u>

The original statement of **claim** was dated 5th July, 1991. It was amended on 7th November, 1991 and reamended. with leave of the Chief Justice, on 7th April, 1992. It will be convenient to deal with the reamended statement of claim of 7th April, 1992, in determining whether leave to appeal should be given and whether that pleading should be struck out, as the defendants ask.

Paragraphs 1 and 2(a), 2(b) and 2(k) recite the history of the plaintiff. Paragraphs 2(c), **2(d),** 2(e), 2(f) and 2(g) relate to D7, **D8, D6,** D5 and D4 respectively. It is said that each of

16

them was used as a device by **D1** to protect his assets from the claims of creditors.

Paragraph 2 is narrative only. It sets out various businesses which are said to **be owned** or controlled by **D1** and used by him to conceal his assets. They do not, of themselves, make allegations of misconduct (to use a neutral term) against any of the defendants.

Paragraph 2 is narrative only. It sets out various businesses which are said to be owned or controlled by **D1** and used by him to conceal his assets. They do not, of themselves, make allegations of misconduct (to use a neutral term) against any of the defendants.

Paragraph 3 describes only the change of name of the plaintiff, from "Trenwick Reinsurance Company Ltd.", to Focus Insurance Company Ltd. (the plaintiff) on 29th January, 1988.

Paragraph 4 is an untidy paragraph in that it alleges that as a result of the wilful negligence and default arising .from the acts and omissions of each of the defendants as directors or officers of the plaintiff, the latter suffered loss and damage, as particularized in paragraph 11.

D4 to **D9** never were directors of the plaintiff. In relation to them, therefore, this paragraph cannot be said to **apply.** No doubt its untidy nature can be ascribed to the manner in which the statement of claim was prepared. In the first version, there was no **allegation of** "wilful" conduct by the defendants nor any reference to paragraph 11. Both these allegations appeared for the first time in the second version of the pleading. No doubt when the third version, which introduced D4 to **D9** for the first time, was prepared, the need to amend paragraph 4 to accord with the status of the newly joined defendants was overlooked.

Taken by itself, this paragraph contains no facts upon which a claim for loss by the plaintiff can be based. It asserts merely that the acts or omissions resulting in the wilful negligence is to be found in paragraph 11.

It does not matter if, taken by, itself, the paragraph does

not contain any matter to which the defendants can properly plead. Nor does it matter that this paragraph itself offends the rules against pleading, provided that any such deficiences are made up by paragraph 11, to which paragraph 4 specifically refers.

Paragraph 5 is directed at a sales agreement, whereby Forum Re was to pay US$4.8 million to Trenwick Services Ltd., as consideration for the transfer of the shares, payment to be deferred till 1997. The payment was secured by a promissory note executed by Forum Re in favour of Trenwick Services. There was a release agreement whereby money standing to the credit of the plaintiff was to be paid to Trenwick Services Ltd. in satisfaction of Forum Re's obligations under the promissory note.

It is said that the use of the plaintiff's funds for this purpose was contrary to section 39 of the Act, as D1, D2 and D3 knew or ought to have known.

The plaintiff is said to have suffered loss and damage as a result of the wrongful use of US$3.7 million of the plaintiff's assets.

D1 was alleged to be in breach of his duties as a director in procuring the signing of the note and the payment by the plaintiff.

Paragraph 5(e) does not plead actual knowledge by D2 and D3. It says that it is to be inferred, from the fact that the transactions were substantial. that D2 and D3 knew that the plaintiff had signed the promissory note and was going to apply the plaintiff's funds,. in the discharge of Forum Re's obligations under the release agreement.

It is important to note, however, that there is no mention of the plaintiff in paragraph 5(a) as a signatory of the promissory note.

The final sentence of paragraph 5 contains a plea of wilful negligence or default. D2 and D3 are said to have been in breach of their duties as directors in permitting the note to be signed.

There are, however, no facts pleaded in support of this.

D2 and D3 are not alleged to have signed the note or to have known
that somebody else was to sign it.

0.19 **r.12(1)** (see the 'President's view at (e) of the
Intercontinental case above) requires that particulars of a claim
of wilful default must be given.   The same applies to an
allergation of wilful negligence.

## Paragraph 6

It must first be noted that there is no suggestion in the
pleadings that D2 and D3 was employed to take any part in the
financial management of the company, save of course, in so far as
such activity was a necessary part of the duties of a director.

It is asserted that D2 and D3 authorized **D1** to exercise
sole signing rights over various bank accounts of the plaintiff.
But no reason is pleaded as to why they should not have done so and
it is not suggested that they should&have harboured any suspicion
as to the honesty of **D1.**

No facts are alleged as to how such a duty arose, since
there is, in the absence of them, nothing which obliges a director
to supervise, monitor and control the activities of a fellow
director.   (See above)

The allegations contained in this paragraph are that **D1,**
D2 and D3, as the plaintiff's board, were guilty of wilful neglect
and default by failing to supervise properly, by not delegating
authority to a management committee or other person.   D2 and D3
were present at Board Meetings at which resolutions were passed
authorizing **D1** to **sign** various bank accounts, but it cannot be said
that. by itself, this amounted to wilful neglect or default.

## Paragraph 7

This paragraph sets out 24 payments which are alleged to
have been made improperly from the plaintiff's bank account,
without the Board of Directors being informed of this.

The loss suffered by the plaintiff is said to be
US$13,274,542, incurred as a result of the wilful default and
negligence of **D1,** D2 and D3.   It is said that **D1,** D2 and D3 "knew
or ought to have known" of these payments.   In each case. the

transaction can be identified from the particulars given and sufficient facts are pleaded to enable the defendants to know what is alleged against them.

As in paragraph 6, however, there can be liability of D2 and D3 only if their conduct amounts to wilful negligence or default. It is again not alleged that D2 and D3 had any reason to doubt the honesty of D1, such as might have put them on notice and obliged them to supervise and control what he did. In the absence of any such warning, no such duty lies on a director - see Dovey v. Carev (1901) A.C. 477.

In view of the opinion which we have expressed as to the bye-laws of the Company, the plaintiff could only succeed if it could show that there was wilful negligence and default by D2 and D3, so far as the case against them is concerned.

Before this can be established there must be pleaded primary facts from which it can be said that D2 and D3 were guilty of misconduct which amounted to wilful negligence or default.

It is not sufficient, in our view, merely to assert that D2 and D3 were guilty of wilful negligence or default because they knew or ought to have known that these payments listed in paragraph 7 had been made by D1, when he had been authorized by a meeting of the Board, as specified in paragraph 6, to sign cheques on behalf of the company without reference to them.

We do not consider that it is possible per se for a director to be held guilty of wilful neglect or default by reason of any failure to supervise the acts of a fellow director, especially when he has been authorized so to act by the Board.

He can only be found to be so liable if he knew of the improper conduct of D1 or was reckless as to whether or not he had behaved improperly. We are satisfied that in this case facts have not been pleaded from which such a finding is possible as against D2 and D3.

**Paragraph 9. Liquidator's Fees**

This is an allegation that D1 committed the plaintiff to pay £250,000 to a voluntary liquidator, with the knowledge of D2

and D3, and that the sum was excessive and not in the plaintiff's interest. This payment is said to have been made as a result of breaches of duty of **D1,** D2 and D3 and of their wilful neglect and default.

It is a matter of opinion as to whether or not the fee charged was excessive. It is said that the payment of it was due to the wilful neglect or default of the defendants, though paragraph 9 does not specify the breach of duty or wilful neglect and default concerned. Nor is there any allegation of what a proper fee may be.

Paragraph 10.  Novation

D1 is said to have signed a contract of novation on 19th September, 1990, on behalf of the plaintiff, transferring various reinsurance agreements from Forum Re to Channel.  D2 is said to have signed the contract on behalf of, From Re, but not on behalf of the plaintiff.  There is no suggestion that. at the time of the signature, D2 and D3 had any reason to suspect that Channel would not meet its obligations.

It **is** said that this has caused loss to the plaintiff, as the result of the wilful neglect and default of **D1,** D2 and D3, though no facts are pleaded to show that any loss caused thereby was due to the wilful neglect or default of D2 or D3.

Paragraph 11.  Director's duties

Paragraph **11(1)** sets out the manner in which **D1,** D2 and D3 were in breach of their statutory or common law duties as directors.  By its reference to the wilful negligence and default mentioned in paragraphs 4 to 10, it is presumed that the acts of wilful negligence or default mentioned in those paragraphs were constituted by the failure of directors to observe the duties of directors set out in this sub-paragraph.

This is however, a general allegation and it cannot be said that, in relation to the various matters specified in those paragraphs, the duties of the directors are the same.  If the plaintiff is correct, D2 and **D3** have been guilty of conduct for which they must answer.  But if they are liable, the breaches

concerned must differ in relation to each act or omission pleaded. There has not been any setting out of the different breaches involved in each act of misconduct.

In paragraph **11(1)** are set out 15 duties which should have been performed by D2 and D3. If it is accepted that the matters set out in this sub-paragraph form part of the duties of a director, it is not sufficient merely to list them, in order to render D2 and D3 liable for loss incurred by the plaintiff.

We accept that, in some respects, it is unavoidable that a pleader should be forced to aver a negative, if his complaint is that a director failed to take the steps which he is obliged to take by law. This sub-paragraph, however, does no more than specify a list of duties, without any indication of which of them was breached in any individual case, in which improper payment on the part of **D1** is alleged.

Nothing is said, in the pleading, as to the origin of the various duties, other than a general reference to statute and common law.

Paragraphs **11(3)** and (4) contain allegations that D2 and D3 failed to bring an infomred and independent mind to bear on the plaintiff's transactions. It is said that this amounts to wilful default and neglect but this allegation is not supported by any pleaded primary facts.

Paragraphs 12 to 15 deal only with the acts of **D1.** In each of them, sufficient facts are pleaded to enable **D1** to know what the case against him is.

Liability of D4 to **D9**

The reamended statement of claim asserts that -

    (a) Magnolia Trading SA (D7) owned 7% of the issued share capital of Forum Re and sold it to Magnolia Trading Ltd. **D1** was said to be the only shareholder of Magnolia Trading SA.

    (b) **D1** controlled and directed the business of **D7,** which was used as a device by **D1** for preserving his assets.

    (c) Magnolia Trading was owned by The Forum Trust, formed by **D1** in 1988, of which Bermuda Trust Co. Ltd. (D8) was sole trustee and in which **D1** was the Protector.

(d) Villarosa Establishment (D6) was a private company incorporated in Liechtenstein. It was owned by the Forum Trust.

(e) Starbrook Investments Ltd. (D5) is a private company incorporated in England on 16th February, 1990. It is owned by Villarosa (D6) and controlled by **D1**.

**(f) Caredeed** Ltd. (D4) is a private company limited by guarantees of D5 and **D9** incorporated in England on 21st October, 1991.

**(g) D9,** the wife of **D1,** holds various assets on behalf of **D1.**

In paragraphs 16 and 17. combined with paragraph 18(v) and (vi) are set out assertions that D4 to **D9** are, in effect, vehicles controlled by **D1,** which he used for the dispersal of assets which he had obtained improperly from the plaintiff.

What is sought against D4 to **D9** is no more than a declaration that the assets held by them are in reality those of **D1.**

Two or more persons may be joined in one action as defendants with the leave of the court, provided that the right to relief arises from the same transactions and there is a common question of law or fact under 0.15 r.4 and **r.6(2).**

Persons who have an interest in the subject matter of the claim, as D4 to **D9** are alleged to have, may be made defendants, though it is not proper to join a person who has no connection with the alleged wrongdoing merely for the purpose of securing discovery.

It is pleaded here that each of the defendants is the recipient of Dl's assets and that anything found due from him to the plaintiff which has come into the hands of D4 and **D9** should be made available, if the appropriate declaration is made, for the payment of sums found due to the plaintiff.

The defendants D4 to D8, added by the plaintiff in its third statement of claim, are companies controlled by **D1.** We see no objection to joining these companies as parties, since it is open to the Court to enquire as to the control of a company and to ascertain to what extent it was controlled by **D1;** this is called "lifting the corporate veil". It is also alleged that **D9** holds a

23

a title to a property in the U.K., though she is alleged to be a person of no independent means.

    We agree with the reasoning and conclusions of the Chief Justice with respect to the joinder of D4 to **D9.**

Conclusion

    It follows from the above comments that -

    (a) As regards **D1,** we consider that the pleadings, though in some respects open to criticism, are sufficient to show what is alleged against him.

    (b) As regards D2 and **D3,** we do not find that the plaintiff. on whom must be the burden of showing that a case has been made out, has pleaded facts of such a nature as to call upon them to answer the allegations.

    (c) That the joinder of D4 to **D9** should be maintained.
We therefore strike out the action against D2 and D3 and dismiss the appeal by **D1** and D4 to **D9.**

    It follows that we have given leave to appeal to all defendants and having heard the merits, have ordered as above.

*Denys Roberts*

SIR DENYS ROBERTS, **P.**

| | |
|---|---|
| Julian Hall | for **D1** and D4 to **D9** |
| **Coles Diel** | for D2 |
| Richard Aitkens Q.C. | for D3 |
| John Cooper | for D3 |
| Saul Froomkin Q.C. | for the Company |

**Tab 14**



**City Equitable Fire Insurance Co Ltd, Re**

[NO. 0048 of 1922.]

Court of Appeal

Pollock, Warrington, Sargant, and Romer M.R.

1924 July 3, 4, 7, 8, 9, 10, 11.

Company—Winding Up—Misfeasance—Directors and Auditors—Duties—Investments—Loans—Signing Cheques—Inspection and Safe Custody of Securities—Declaration of Dividends—Fraud of Managing Director—Clause in Articles exempting Directors and Auditors from Liability—"Wilful Neglect or Default"—Companies (Consolidation) Act, 1908 (8 Edw. 7, c. 69), ss. 113, 215, 279 .

In the winding up by the Court of the above mentioned company an investigation of its affairs disclosed a shortage in the funds, of which the company should have been possessed, of over 1,200,000l., due in part to depreciation of investments, but mainly to the instrumentality of the managing director and largely to his deliberate fraud, for which he had been convicted and sentenced.

Art. 150 of the company's articles of association provided (inter alia) that none of the directors, auditors, secretary or other officers for the time being of the company should be answerable for the acts, receipts, neglects or defaults of the others or other of them, or for any bankers or other persons with whom any moneys or effects belonging to the company should or might be lodged or deposited for safe custody, or for insufficiency or deficiency of any security upon which any moneys of or belonging to the company should be placed out or invested, or for any other loss, misfortune, or damage which might happen in the execution of their respective offices or trusts, or in relation thereto, unless the same should happen by or through their own wilful neglect or default respectively.

On a misfeasance summons under s. 215 of the Companies (Consolidation) Act, 1908 , the Official Receiver as liquidator sought to make the respondent directors, all of whom (except the managing director) had admittedly acted honestly throughout, liable for negligence in respect of losses occasioned by investments and loans, and of payment of dividends out of capital.**408**

In determining the questions of the liability of the respondent directors raised by the summons, Romer J. enunciated and adopted the following principles relative to the duties of directors and to the meaning to be attached to the words "wilful neglect or default" in art. 150.

*Duties of Directors* . - The manner in which the work of a company is to be distributed between the board of directors and the staff is a business matter to be decided on business lines. The larger the business carried on by the company the more numerous and the more important the matters that must of necessity be left to the managers, the accountants, and the rest of the staff.

In ascertaining the duties of a director of a company, it is necessary to consider the nature of the company's business and the manner in which the work of the company is, reasonably in the circumstances and consistently with the articles of association, distributed between the directors and the other officials of the company.

Copr. © West 2009 No Claim to Orig. Govt. Works

In discharging those duties, a director (a) must act honestly, and (b) must exercise such degree of skill and diligence as would amount to the reasonable care which an ordinary man might be expected to take, in the circumstances, on his own behalf. But, (c) he need not exhibit in the performance of his duties a greater degree of skill than may reasonably be expected from a person of his knowledge and experience; in other words, he is not liable for mere errors of judgment; (d) he is not bound to give continuous attention to the affairs of his company; his duties are of an intermittent nature to be performed at periodical board meetings, and at meetings of any committee to which he is appointed, and though not bound to attend all such meetings he ought to attend them when reasonably able to do so; and (e) in respect of all duties which, having regard to the exigencies of business and the articles of association, may properly be left to some other official, he is, in the absence of grounds for suspicion, justified in trusting that official to perform such duties honestly.

Overend & Gurney Co. v. Gibb (1872) L. R. 5 H. L. 480 ; Lagunas Nitrate Co. v. Lagunas Syndicate [1899] 2 Ch. 392 ; In re National Bank of Wales [1899] 2 Ch. 629 ; [1901] A. C. 477 (sub nom. Dovey v. Cory ); and In re Brazilian Rubber Plantations and Estates, Ld. [1911] 1 Ch. 425, applied .

A director who signs a cheque that appears to be drawn for a legitimate purpose is not responsible for seeing that the money is in fact required for that purpose, or that it is subsequently applied for that purpose, assuming, of course, that the cheque comes before him for signature in the regular way, having regard to the usual practice of the company. A director must of necessity trust to the officials of the company to perform properly and honestly the duties allocated to them.

Before any director signs a cheque, or parts with a cheque signed by him, he should satisfy himself that a resolution has been passed by the board, or committee of the board (as the case may be), authorizing the signature of the cheque; and where a cheque has to be signed between meetings, he should obtain the confirmation of the board subsequently to his signature.

The authority given by the board or committee should not be for the signing of numerous cheques to an aggregate amount, but a proper **\*409** list of the individual cheques, mentioning the payee and the amount of each, should be read out at the board or committee meeting and subsequently transcribed into the minutes of the meeting.

Joint Stock Discount Co. v. Brown (1869) L. R. 8 Eq. 381 distinguished .

It is the duty of each director to see that the company's moneys are from time to time in a proper state of investment, except so far as the articles of association may justify him in delegating that duty to others.

Before presenting their annual report and balance sheet to their shareholders, and before recommending a dividend, directors should have a complete and detailed list of the company's assets and investments prepared for their own use and information, and ought not to be satisfied as to the value of their company's assets merely by the assurance of their chairman, however apparently distinguished and honourable, nor with the expression of the belief of their auditors, however competent and trustworthy.

It is not the duty of a director of a big insurance company to supervise personally the safe custody of the securities of the company. It would be impracticable, on every purchase of securities, for actual delivery thereof to be made to the directors, or, on every sale, for the delivery to the brokers of the securities sold to await a meeting of the board or of a committee of directors. The duty of seeing that the securities are in safe custody must of necessity be left to some official of the company in daily attendance at the office of the company, such as the manager, accountant, or secretary.

A director is not responsible for declaring a dividend unwisely. He is liable if he pays it out of capital, but the onus of proving that he has done so lies upon the liquidator who alleges it.

Copr. © West 2009 No Claim to Orig. Govt. Works

*Wilful Neglect or Default* . - An act, or an omission to do an act, is wilful where the person who acts, or omits to act, knows what he is doing and intends to do what he is doing, but if that act or omission amounts to a breach of that person's duty, and therefore to negligence, he is not guilty of wilful neglect or default unless he knows that he is committing, and intends to commit, a breach of his duty, or is recklessly careless in the sense of not caring whether his act or omission is or is not a breach of his duty.

Lewis v. Great Western Ry. Co. (1877) 3 Q. B. D. 195 ; Forder v. Great Western Ry. Co. [1905] 2 K. B. 532 ; and Leeds City Brewery, Ld. v. Platts, post, p. 532n., applied .

This statement of the meaning of "wilful neglect or default" was subsequently approved by Warrington and Sargant L.JJ. in the Court of Appeal on the Official Receiver's appeal against Romer J.'s decision exonerating the auditors:- (1.)

Following In re Brazilian Rubber Plantations and Estates, Ld. [1911] 1 Ch. 425 , that the immunity afforded by art. 150 was one of the terms upon which the directors held office in the company, and availed them as much on a misfeasance summons by the Official Receiver under s. 215, as it would have done in an action by the company against them for negligence; and(2.)

Upon the evidence and in accordance with the principles enunciated above, that none of the respondent directors (other than the managing **\*410** director) was liable for the losses covered by the points of claim, and that in those instances in which all or some of the directors had been guilty of negligence, such negligence was not wilful and art. 150 applied to exonerate them from liability.

On the same misfeasance summons the Official Receiver sought to make the respondent auditors liable for negligence and breach of duty with respect to the audit by them of the balance sheets for the three years immediately previous to the winding up.

In determining the question of liability of the respondent auditors raised by the summons, Romer J. applied the principles enunciated by Lindley L.J. in In re London and General Bank (No. 2) [1895] 2 Ch. 673 and also the following further principles relative to the duties of auditors.

An auditor is not ever justified in omitting to make personal inspection of securities that are in the custody of a person or company with whom it is not proper that they should be left, whenever such personal inspection is practicable.

A company's stockbrokers, however respectable and responsible they may be, are not proper persons to have the custody of its securities except on such occasions when, for short periods, securities must of necessity be left with them; but immediately such necessity ceases the securities should be lodged in the company's strong room or with its bank, or placed in other proper and usual safe keeping.

Whenever an auditor discovers that securities of the company are not in proper custody, it is his duty to require that the matter be put right at once, or, if his requirement is not complied with, to report the fact to the shareholders, and this whether he can or cannot make a personal inspection:-

on the evidence and in accordance with the principles enunciated above: (1.) that the auditors were not guilty of any breach of duty as auditors -

(a) In describing, after a full investigation in which they were misled and deceived, and their reports to the

Copr. © West 2009 No Claim to Orig. Govt. Works

board suppressed, by the chairman of the company, large sums of money left in the hands of the company's stock-brokers and lent to the general manager of the company as "Loans at call or short notice," "Loans" or "Cash at hand and in bank"; or

(b) In failing to discover that the company's stockbrokers, in order to reduce their indebtedness to the company for the purposes of the audit, made purchases, on behalf of the company, immediately before the close of the company's financial year, of Treasury Bills which in fact never came into the possession of the company and were sold immediately the new financial year had opened.

(2.) That the auditors committed a breach of duty in not personally inspecting the securities of the company in the hands of the stockbrokers of the company, and in accepting from time to time the certificate of the brokers that they held large blocks of such securities, and in not either insisting upon those securities being put in proper custody or in reporting the matter to the shareholders; but that inasmuch as throughout the audit the auditors honestly and care-fully discharged what they conceived to be the whole of their duty to the company, **\*411** such negligence was not wilful, and art. 150 applied to exonerate them from liability.

On the appeal of the Official Receiver from the above decision so far only as it affected the respondent auditors,

The Court (Pollock M.R., Warrington and Sargant L.JJ.), in affirming as a whole the decision of Romer J.:-(1.)

That s. 215 was a procedure section only and created no new or additional liability.(2.)

That the measure of the auditor's responsibility depends upon the terms of his engagement. There may be a special contract defining the duties and liabilities of the auditors. If there is, then that contract governs the question. The articles will, however, be looked at if there is no special agreement, because the auditors will presumably have taken their duties upon the terms (among others) set out in the articles. That is not to say that auditors can set aside a statu-tory obligation. No agreement or article of association can remove an imperative or statutory duty.(3.)

Sect. 113 does not lay down a rigid code. The duty imposed on the auditors by it is not absolute, but depends upon the information given and explanations furnished to them, so that there is abundant scope for discretion. Art. 150 is not in conflict with the section. The onus lies upon the auditors, who would not be excused for total omission to comply with any of the requirements of the section, or for any consequences of deliberate or reckless indifferent failure to ask for information on matters which call for further explanation.(4.)

Auditors should not be content with a certificate that securities are in the possession of a particular company, firm, or person unless the company, etc., is trustworthy, or, as it is sometimes put, respectable, and further is one that in the ordinary course of business keeps securities for its customers. In all these cases the auditor must use his judg-ment.

The definition of "wilful misconduct" by Lord Alverstone C.J. in Forder v. Great Western Ry. Co. [1905] 2 K. B. 532, 536, adopted by Pollock M.R.

*Quaere* , whether in the particular circumstances of the case, apart from art. 150, there was negligence on the part of the auditors (as held by Romer J.) in not personally inspecting the securities which were in the possession of the company's stockbrokers and in accepting their certificate instead.

ADJOURNED SUMMONS.

The City Equitable Fire Insurance Company, Ld. (hereinafter referred to as "the company"), was incorporated on December 17, 1908, under the Companies Acts, 1862 to 1907, and the objects of the company were to carry on every kind of insurance and reinsurance business other than life assurance and employers' liability insurance. The

Copr. © West 2009 No Claim to Orig. Govt. Works

original capital of the company was 50,000l., divided into 10,000 ordinary shares of 5l. each, but this was subsequently increased to **\*412** 375,000l. by the creation of 300,000 preference shares and additional 25,000 ordinary shares of 1l. each respectively.

The objects for which the company was established included also power: (12.) to lend deposit or advance money on securities and property to or with such persons and on such terms as might be expedient; (14.) to amalgamate or enter into partnership or any arrangement for sharing profits, union of interests, joint adventure, reciprocal concessions or co-operation with any person or company carrying on or engaged in or about to carry on or engage in any business or transactions which the company was authorized to carry on or engage in; (15.) generally to purchase, take on lease, or in exchange, hire or otherwise acquire any real or personal property; and (18.) to accumulate capital for the purposes of the company and to invest and deal with the moneys of the company upon such stocks, funds, shares, securities and investments and in such manner as might from time to time be determined.

The articles of association of the company so far as material for the purposes of this report provided as follows:-

Art. 106.

"All moneys, bills and notes belonging to the company shall be paid to or deposited with the company's bankers to an account to be opened in the name of the company. Cheques on the company's bankers, unless and until the directors shall otherwise from time to time resolve, shall be signed by at least two directors and countersigned by the secretary."

Art. 120.

"The directors or any committee of directors may meet together for the despatch of business, adjourn and otherwise regulate their meetings as they think fit, and determine the quorum necessary for the transaction of business. Until otherwise determined two shall be a quorum. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote."

Art. 123.

"The directors may delegate any of their powers, other than the powers to borrow and make calls, to committees consisting of such members of their body as they think fit. **\*413** Any committee so formed shall in the exercise of the power so delegated conform to any regulations that may from time to time be imposed upon them by the Board."

Art. 139.

"A balance sheet shall be made out in every year and laid before the company in general meeting. Such balance sheet shall be made up to a date not more than three months before such meeting, and shall be accompanied by a report of the directors as to the state of the company's affairs and the amounts (if any) which they recommend to be paid in dividend or propose to carry to reserve. ...."

Art. 140.

"Once at least in every year the accounts of the company shall be examined, and the correctness of the profit and loss account and balance sheet ascertained by one or more auditor or auditors."

Art. 141.

"The appointment, powers, rights, remuneration and duties of the auditors shall be regulated by <u>ss. 112 and 113 of the Companies (Consolidation) Act, 1908</u> , and any statutory modification, extension or re-enactment thereof for the time being in force."

Art. 150.

"The directors, auditors, secretary and other officers for the time being of the company, and the trustees (if any) for the time being acting in relation to any of the affairs of the company, and every of them, and every of their heirs, executors and administrators, shall be indemnified and secured harmless out of the assets and profits of the company from and against all actions, costs, charges, losses, damages and expenses which they or any of them their or any of their heirs, executors or administrators shall or may incur or sustain by or by reason of any act done, concurred in or omitted in or about the execution of their duty, or supposed duty, in their respective offices or trusts, except such (if any) as they shall incur or sustain by or through their own wilful neglect or default respectively, and none of them shall be answerable for the acts, receipts, neglects or defaults of the other or others of them, or for joining in any receipts for the sake of conformity, or for any bankers or other persons with whom any moneys or effects belonging to the **\*414** company shall or may be lodged or deposited for safe custody, or for insufficiency or deficiency of any security upon which any moneys of or belonging to the company shall be placed out or invested, or for any other loss, misfortune or damage which may happen in the execution of their respective offices or trusts, or in relation thereto, unless the same shall happen by or through their own wilful neglect or default respectively."

The constitution of the directorate of the company; the appointment of a finance committee with power to make or sell investments on behalf of the company; and the causes which on February 14, 1922, necessitated the making of an order upon the petition of the company for the winding up of the company by the Court, are set out in the following judgment of Romer J.

This was a summons by the liquidator under <u>s. 215 of the Companies (Consolidation) Act, 1908</u> , against the respondent directors and auditors.

The allegations against the respondent directors, were misfeasance, negligence, breach of trust and breach of duty for:-(1.)

The investment of 701,739l. of the company's moneys in certain investments set forth in the points of claim but confined at the hearing to a sum of 228,813l. invested in shares in Claridge's Hotel, Paris, which had, so far as realized, produced 67,557l., the estimated value of those unrealized being 24,000l., and to a sum of 70,970l. invested in shares of the United Brass Founders and Engineers, Ld., the estimated value of which was 1185l.;(2.)

The investment of 445,374l. in a ranch in Brazil;(3.)

Permitting E. G. Mansell, the general manager, and now a bankrupt, to become indebted to the company for 110,000l., the whole of which was lost to the company;(4.)

Lending to or allowing to remain in the hands of Ellis & Co., the company's brokers and now bankrupt, the sum of 350,000l., the greater part of which was lost to the company;(5.)

Lending to G. L. Bevan, the chairman of the company **\*415** and senior partner in Ellis & Co., who had since been adjudicated bankrupt and had been convicted and sentenced for his frauds on the company, the sum of 9329l., which was lost to the company;(6.)

Lending to the Saskatoon Grain Company a sum of 9329l., which had been wholly lost;(7.)

Copr. © West 2009 No Claim to Orig. Govt. Works

Paying dividends out of capital in respect of the financial year ending February 28, 1921, and(8.)

Paying an interim dividend out of capital in respect of the financial year ending February 28, 1922.

The allegations against the respondent auditors were that as auditors of the company they were guilty of negligence and breach of duty with respect to the audit by them of the balance sheets of the company for the years ended February 28, 1919; February 29, 1920; and February 28, 1921, in that -

(a) They failed to verify the existence in fact of any of the securities of which the company was therein stated to be possessed;

(b) They failed to see that the balance sheets respectively disclosed the indebtedness of Ellis & Co. to the company;

(c) They included moneys due from Ellis & Co. and from Mansell amongst the loans at call or short notice;

(d) They failed to see that the balance sheets respectively pointed out to the shareholders the fact that Ellis & Co. and Mansell were indebted to the company and the manner in which such indebtedness arose;

(e) They included as cash at the bank and in hand debts due from Ellis & Co. and moneys which were not the moneys of the company alone, and

(f) They failed to call attention to the fact that securities appearing in the balance sheets respectively as the property of the company were in fact hypothecated. This last allegation was withdrawn at an early stage of the hearing.

The Official Receiver claimed compensation from the auditors for the loss sustained by the company through their alleged negligence in respect of the above-mentioned matters.

The summons came on for hearing before Romer J. on February 4, 1924.**416**

*Topham K.C.* , *C. A. Bennett K.C.* and *Harold Christie* for the Official Receiver as liquidator. No fraud is alleged against any of the respondents, except Bevan. The allegation against them is purely one of negligence, and the common law principle applies - namely, that where a person undertakes an operation which requires a certain amount of skill, he will be responsible for damaging results from his not exercising the amount of skill which a reasonable person, who is competent to carry out that transaction, would make use of. For example, a person acting as a director of a large insurance company is bound to exercise the skill that a reasonable person, competent to act in that way, would exercise, and he is not entitled to say that he knew nothing about business; that he was not a business man at all, and that he was there for some quite subsidiary purpose.

In the case of an insurance company the investment of the funds of the company is a most important matter, and we submit that the directors ought to ascertain from time to time what the investments are in which the funds under their control are invested, that they should provide some system for the care and custody of the investments which they hold, and that they ought to see that the investments are reasonably proper for the class of company of which they are directors.

Where directors take so little part in the management of the business of the company as to make it perfectly easy, without inquiry, for one of their number to dissipate the funds of the company then they ought to be liable for the consequences.

Copr. © West 2009 No Claim to Orig. Govt. Works

Directors are always held to be trustees of moneys in their hands or under their control: In re Lands Allotment Co. , and misapplication of those moneys through mistake or carelessness is a breach of trust for which they are liable quite apart from any question of misfeasance.

When a director undertakes a certain transaction requiring any special skill, he must exercise the skill ordinarily used by persons who are transacting that particular thing: **417** Jones v. Bird. Even if these directors were not expected to exercise special skill, the disastrous result would not have occurred if they had exercised the ordinary care of an ordinary man in his own business. They left the investment of the funds of the company in the hands of one man, Bevan, and in so doing were guilty of negligence: Charitable Corporation v. Sutton.

Where a director signs a cheque under a provision in the articles saying that two directors must sign, he is prima facie liable to see that he has signed for a proper purpose; but if it is signed in pursuance of a resolution of the Board, that would throw the responsibility on to those who passed the resolution; Joint Stock Discount Co. v. Brown. Payment of dividends is another specific act which shifts the burden of proof on to the directors of showing that they were in fact paid out of profits: Leeds Estate, Building and Investment Co. v. Shepherd.

The duty of an auditor, as stated by Lindley L.J. in In re London and General Bank (No. 2) , is to "check the cash, examine vouchers for payments, see that the bills and securities entered in the books were held by the bank, and take reasonable care to ascertain their value." The auditors in this case have fallen far short of that standard.

Then art. 150 limits the liability of directors except in cases of their own wilful neglect or default. Wilful default was defined by Bowen L.J. in In re Young and Harston's Contract ; it means, not that a man deliberately refrains from doing anything, but that, being a free agent and knowing what he is doing, he does not do something. It excludes, we submit, such a case as this. The strongest case against the liquidator's contentions is to be found in dicta in In re National Bank of Wales , which went to the House of Lords sub nomine Dovey v. Cory , and the result of which appears to be that where a director does not go into matters of detail but **418** delegates details to his subordinates, and they defraud, then he cannot be held liable. Neville J. also in In re Brazilian Rubber Plantations and Estates, Ld. , stated certain principles relative to a director's duty which, we submit, were merely dicta. The judgments in Lewis v. Great Western Ry. Co. do not help in determining whether there is any difference between negligence and wilful negligence.

*Maugham K.C.* and *Lionel Cohen* for the respondent the Earl of March. On behalf of the respondent directors, we seek to establish five propositions with regard to the liability of directors:-(1.)

Directors are bound to act honestly: Lagunas Nitrate Co. v. Lagunas Syndicate ; In re National Bank of Wales ; affirmed in the House of Lords sub nom. Dovey v. Cory , Prefontaine v. Grenier.(2.)

Directors, subject to certain qualifications hereinafter mentioned, are bound to use fair and reasonable care and diligence in the discharge of their duties, and subject to any special article absolving them, will be liable as for negligence if they substantially fail in this respect. That is in the nature of an admission, but is subject to certain qualifications which appear in the following propositions: In re Cardiff Savings Bank ; Lagunas Nitrate Co. v. Lagunas Syndicate ; In re National Bank of Wales ; Dovey v. Cory.(3.)

Directors' duties, however, are of a somewhat special kind. Their attention to the company's affairs is only of an intermittent nature, namely at periodical board meetings. They are not bound to attend except at board meetings, nor are they bound to attend all board meetings. They are not bound to inquire into matters which are not brought before the board, unless, indeed, they are put upon inquiry by facts being brought to their attention which call for explanation; in other words, directors are not managers and do not contract to manage the affairs of the company: **419** Overend andGurney Co. v. Gibb ; In re Denham & Co. ; In re Cardiff Savings Bank ; In re Lands Allotment Co.

Directors who do no more than attend board meetings, act honestly at them, and abstain from probing into matters into which they are able to probe, but to which their attention has not been directed, are relieved from liability in such a case as the present: In re National Bank of Wales , affirmed in the House of Lords sub nomine Dovey v. Cory ; Prefontaine v. Grenier ; Leeds Estate, Building and Investment Co. v. Shepherd , explained by Lord Davey in Dovey v. Cory.(4.)

Directors do not in any way warrant that they are skilful or competent, and they may be much the reverse without incurring liability. Accordingly, they are not liable for errors of judgment, and the care and diligence for which they contract are only such as are reasonably to be expected from them having regard to their personal capacity and experience: Turquand v. Marshall ; Overend & Gurney Co. v. Gibb ; In re Denham & Co. ; Lagunas Nitrate Co. v. Lagunas Syndicate ; In re National Bank of Wales.(5.)

Directors cannot be held liable for being defrauded, and are not called upon to distrust or to guard against the possibility of fraud being committed by employees of the company, or by any of their co-directors: Land Credit Co. of Ireland v. Lord Fermoy ; Joint Stock Discount Co. v. Brown , both cases dealing with the signing of cheques, but in circumstances very different from the present case, and in the former case involving a transaction ultra vires: In re Denham & Co. ; Dovey v. Cory ; Prefontaine v. Grenier.

Those five propositions represent the liability of directors apart from the provisions of s. 279 of the Companies(Consolidation) Act, 1908 , **420** and apart from any articles of association. We submit that this respondent cannot be held liable in respect of any of the matters covered by those propositions.

Charitable Corporation v. Sutton was the case of a charitable trust managed by persons who although called directors were in fact trustees, and is not any authority upon the duties of directors of a limited liability company.

Having regard to art. 150 it is not possible for the applicants to succeed without attacking the good faith of the directors. Except by striking the word "wilful" out of that article, this respondent cannot be held liable. "Wilful" connotes a neglect or default committed by the director of which the director is guilty, but knowing well at the moment that he is guilty of a neglect or default in regard to his duty. He knows what his duty is, and does something short of it. In Dovey v. Cory there was no such article as this. Under a somewhat analogous clause, trustees of a debenture deed were held not to have committed a breach of trust wilfully: Leeds City Brewery, Ld. v. Plats.In re Young and Harston's Contract is very far from this case, which is much nearer to In re Brazilian Rubber Plantations and Estates, Ld. , where Neville J. decided that directors might well be excused under a similar article.

If we are wrong on all our contentions, then we submit that s. 279 of the Companies (Consolidation) Act, 1908, applies with especial force to this respondent, and that he ought fairly to be excused for any negligence or breach of duty.

Barrington-Ward K.C. and H. du Parcq for the respondent Peter Haig Thomas, adopted the preceding argument, and addressed the Court on the evidence.

Sir Walter Schwabe K.C. , G. D. Johnston and J. A. Reid for the respondent director, H. R. Grenside.

Upon the true construction of art. 150 this respondent is not liable. He has not been guilty of wilful neglect or default within the meaning of those terms as explained by **421** Leeds City Brewery Ld. v. Platts ; Lewis v. Great Western Ry. Co. ; Forder v. Great Western Ry. Co. ; In re Young and Harston's Contract.

In the matter of the cheques drawn to Ellis & Co., the members of the finance committee and the directors were entitled to rely upon the officials of the company to carry out their directions: In re National Bank of Wales ; Dovey v. Cory ; and there was nothing ultra vires in handing moneys to the company's brokers for investment in securities.

Copr. © West 2009 No Claim to Orig. Govt. Works

The cheques to Mansell were signed at well regulated intervals, and by different directors, and the evidence shows that they did not know that Mansell was being overpaid. The ultimate agreement with Mansell was obtained by the trickery of Bevan, and by suppressing information which he ought to have disclosed.

Directors who pay dividends, as the respondents did, under an honest and reasonable belief in a state of facts which would justify the payments, are not liable to replace those funds if it turns out that in fact the payments were ultra vires: In re Kingston Cotton Mill Co. (No. 2) ; In re National Bank of Wales.

We submit that this respondent has not been guilty of culpable or gross negligence, nor of wilful default.

*Gover K.C.* and *H. J. Wallington* for the respondent Lord Ribblesdale referred to In re Denham & Co. ; Leeds City Brewery, Ld. v. Platts ; In re Young and Harston's Contract ; In re Mayor of London and Tubbs' Contract ; Elliott v. Turner ; In re Johnson ; Sheffield and South Yorkshire Permanent Building Society v. Aizlewood ; Leeds Estate, Building and Investment Co. v. Shepherd.

*Sir John Simon K.C.* , *Sir Malcolm Macnaghten K.C.* and **\*422** *R. J. T. Gibson* for the respondent Sir Douglas Dawson; and *Wilfrid Greene K.C.* and *W. P. Spens* for the respondent Milligan, adopted the previous arguments, and addressed the Court on the evidence on behalf of these respective respondent directors.

*Stuart Bevan K.C.* and *George Phillips* for the respondent auditors. We desire to reserve the point that the auditors are not officers of the company within the meaning of s. 215 of the Companies (Consolidation) Act, 1908 . It is not open to us to argue that question here, inasmuch as in In re London and General Bank it was held by the Court of Appeal that an auditor was an officer within the meaning of the corresponding section in the earlier Act, but in the later case of In re Kingston Cotton Mill Co. Lord Herschell expressed no opinion upon the question whether the earlier case was rightly decided but left that question open, although the Court of Appeal in the later case felt themselves bound by the decision in In re London and General Bank.

The evidence shows that Mr. Lepine displayed extraordinary care and accuracy in his work and figures. He fully maintained the standard of duty which, apart from agreement, he had to the company - namely, to exhibit the care and skill which an accountant of standing should exercise, but that is not the only standard to be considered, for, by virtue of art. 150, he can only be liable if any neglect or default on his part was of the wilful character dealt with by Lord Sterndale M.R. and Warrington L.J. in Leeds City Brewery Ld. v. Platts. There has, we submit, been no wilful neglect or default on the part of Mr. Lepine. With regard to the Treasury Bills, there was nothing in the books to show that there was any window dressing. He obtained verification certificates of the existence of the securities, and we submit that he was not negligent because he did not inspect them, relying, in common with other people of standing in the City of London, upon the word of Ellis & Co. There is no rigid rule with regard to the inspection of documents, **\*423** and it is purely a matter for the discretion of the auditor in each particular case. If Mr. Lepine had pressed to inspect the securities it is inconceivable in the circumstances that Bevan would not have managed to produce them.

The auditors had no duty to disclose in the balance sheets the names of Ellis & Co. or of Mansell as debtors. The reports of the auditors drew attention to these debts, but those reports were suppressed by Bevan and never reached the directors. Further it was no part of the auditors' duty to consider the agreement with Mansell, authorized as it was by the directors. These debts were rightly called "loans at call or short notice"; they were payable on demand, loans terminable within a short period or short loans; De Peyer v. The King. Moneys in the hands of Ellis & Co. were moneys held by them as agents for the company and were rightly described as "cash at bank or in hand"; they did not include debts, properly so called, from Ellis & Co. The principles relating to an auditor's duty are clearly laid down in In re London and General Bank (No. 2) and in In re Kingston Cotton Mill Co. (No. 2) and are applicable to the present case, and if applied to the facts of this case, absolve the respondent auditors from all liability.

*Topham K.C.* in reply. This is a case in which one unscrupulous person took advantage of the opportunities for fraud which were quite innocently provided by his too trusting colleagues on the board, who misapprehended their duties. They deliberately and intentionally did certain things and omitted certain things, and left things to others, not realizing in most, if not all, cases that it was their duty to look after those things themselves. They allowed vast sums to remain in the hands of Ellis & Co. without any control of any kind with a consequent heavy loss to the company. If directors do not take as much care in looking after the funds of the company as a reasonable and prudent man would in like circumstances take in his own affairs, they are liable for the consequences. If that is the true **\*424** standard, then for the purposes of this case s. 279 of the Companies (Consolidation) Act, 1908, does not carry the matter any further: Lewis v. Great Western Ry. Co. ; Forder v. Great Western Ry. Co. ; and Leeds City Brewery, Ld. v. Platts , are not relevant to the consideration of art. 150, the latter part of which is really a reproduction of s. 24 of the Trustee Act, 1893 , which repeated s. 31 of Lord St. Leonard's Act, and those sections only stated the existing law relative to trustees: In re Brier ; Dix v. Burford ; Mucklow v. Fuller. The rights given by s. 215 of the Companies (Consolidation) Act, 1908 , are independent of and cannot be modified by any such provisions as those of art. 150, and I submit that in this respect In re Brazilian Rubber Plantations and Estates, Ld. was wrongly decided.

*Cur. adv. vult.* May 22. ROMER J.

On June 27, 1916, Gerrard Lee Bevan became a director of the City Equitable Fire Insurance Company, Ld. The company at that time was carrying on successfully the business of reinsurance of fire and marine risks, and was in a sound financial condition. On February 14, 1922, an order was made for the winding up of the company by the Court. A searching investigation of the affairs of the company was then made, and this investigation disclosed a shortage in the funds of which the company should have been possessed of over 1,200,000l. This deplorable state of affairs was in no way due to the company's trading operations as a reinsurance company. From the year 1916 onwards to February 28, 1921, which is the date of the company's last published balance sheet, there was a steady and most remarkable increase in the premium income of the company, due principally to the fact that it had been able to secure a large part of the business of the Munich Reinsurance Company, who, before the outbreak of war, had done most **\*425** of the reinsurance business in this country. For the year ending February, 1916, the company's premium income from all classes of insurance was 363,000l. For the year ending February, 1919, the premium income on fire and general account was 613,483l., and on marine account was 1,351,000l. For the year ending February, 1920, the corresponding figures were 1,189,759l. and 1,422,471l., and for the year ending February, 1921, they were 2,071,515l. and 1,469,197l. In each of the years 1919, 1920 and 1921 there was a large and progressive trading profit. The collapse of the company was not, therefore, due to its reinsurance business. It was entirely due to the following causes. Various industrial investments of the company, of which the net cost to the company had been 701,739l., have realized or are estimated to realize 202,373l., representing a loss of close upon 500,000l. Over 445,000l. of the company's funds had been applied in acquiring an interest in certain lands in Brazil, and this interest is estimated at the present time to be worth about 100,000l. only. No less a sum than 110,000l. had found its way into the hands of the company's manager in circumstances to be detailed hereafter, and none of that money is recoverable. A sum of 385,000l. odd was due from Ellis & Co., the company's brokers, of which firm Bevan was the senior partner, and against this indebtedness the company held collateral security that has realized under 31,000l. In respect of the balance it is estimated that only about 14,000l. will ultimately be received as dividend in the bankruptcy of that firm. Bevan himself had misappropriated other moneys of the company amounting to nearly 7000l., and some 9000l. had been lent by Bevan or Ellis & Co. to a company known as the Saskatoon Grain Company without any authority whatever. Little, if anything, will ever be recovered in respect of these two sums. Nearly the whole of these enormous losses were brought about through Bevan's instrumentality, and a large part of them by his deliberate fraud. For that fraud he has been tried, and convicted, and is now suffering the just penalty. But the question not unnaturally arises as to whether, during the period **\*426** covered by Bevan's nefarious activities, the other directors and the auditors of the company were properly discharging the duties that they owed to the company's shareholders. The Official Receiver, as the liquidator of the company, alleges that they were not. He has accordingly included them, or such of them as are still living, as respondents to the summons which he issued against Bevan under s. 215 of the Companies Act; and whilst admitting, and rightly admitting, that they have acted honestly throughout,

Copr. © West 2009 No Claim to Orig. Govt. Works

he claims that they have been guilty of such negligence as to render themselves liable to the company in damages. Whether they are, or are not so liable, is the question that I have to determine. It will be convenient to consider the case of the directors and the case of the auditors separately, and I propose to begin with the directors. But before investigating the facts it will be convenient to consider the law applicable to the case.

It has sometimes been said that directors are trustees. If this means no more than that directors in the performance of their duties stand in a fiduciary relationship to the company, the statement is true enough. But if the statement is meant to be an indication by way of analogy of what those duties are, it appears to me to be wholly misleading. I can see but little resemblance between the duties of a director and the duties of a trustee of a will or of a marriage settlement. It is indeed impossible to describe the duty of directors in general terms, whether by way of analogy or otherwise. The position of a director of a company carrying on a small retail business is very different from that of a director of a railway company. The duties of a bank director may differ widely from those of an insurance director, and the duties of a director of one insurance company may differ from those of a director of another. In one company, for instance, matters may normally be attended to by the manager or other members of the staff that in another company are attended to by the directors themselves. The larger the business carried on by the company the more numerous, and the more important, the matters that must of necessity **\*427** be left to the managers, the accountants and the rest of the staff. The manner in which the work of the company is to be distributed between the board of directors and the staff is in truth a business matter to be decided on business lines. To use the words of Lord Macnaghten in Dovey v. Cory :

"I do not think it desirable for any tribunal to do that which Parliament has abstained from doing - that is, to formulate precise rules for the guidance or embarrassment of business men in the conduct of business affairs. There never has been, and I think there never will be, much difficulty in dealing with any particular case on its own facts and circumstances; and, speaking for myself, I rather doubt the wisdom of attempting to do more."

In order, therefore, to ascertain the duties that a person appointed to the board of an established company undertakes to perform, it is necessary to consider not only the nature of the company's business, but also the manner in which the work of the company is in fact distributed between the directors and the other officials of the company, provided always that this distribution is a reasonable one in the circumstances, and is not inconsistent with any express provisions of the articles of association. In discharging the duties of his position thus ascertained a director must, of course, act honestly; but he must also exercise some degree of both skill and diligence. To the question of what is the particular degree of skill and diligence required of him, the authorities do not, I think, give any very clear answer. It has been laid down that so long as a director acts honestly he cannot be made responsible in damages unless guilty of gross or culpable negligence in a business sense. But as pointed out by Neville J. in In re Brazilian Rubber Plantations and Estates, Ld. , one cannot say whether a man has been guilty of negligence, gross or otherwise, unless one can determine what is the extent of the duty which he is alleged to have neglected. For myself, I confess to feeling some difficulty in understanding the difference between negligence and gross negligence, except in so far as the expressions are used for **\*428** the purpose of drawing a distinction between the duty that is owed in one case and the duty that is owed in another. If two men owe the same duty to a third person, and neglect to perform that duty, they are both guilty of negligence, and it is not altogether easy to understand how one can be guilty of gross negligence and the other of negligence only. But if it be said that of two men one is only liable to a third person for gross negligence, and the other is liable for mere negligence, this, I think, means no more than that the duties of the two men are different. The one owes a duty to take a greater degree of care than does the other: see the observations of Willes J. in Grill v. General Iron Screw Collier Co. If, therefore, a director is only liable for gross or culpable negligence, this means that he does not owe a duty to his company, to take all possible care. It is some degree of care less than that. The care that he is bound to take has been described by Neville J. in the case referred to above as "reasonable care" to be measured by the care an ordinary man might be expected to take in the circumstances on his own behalf. In saying this Neville J. was only following what was laid down in Overend & Gurney Co. v. Gibb as being the proper test to apply, namely: "Whether or not the directors exceeded the powers entrusted to them, or whether if they did not so exceed their powers they were cognisant of circumstances of such a character, so plain, so manifest, and so simple of appreciation, that no men with any ordinary degree of prudence, acting on their own behalf, would

have entered into such a transaction as they entered into?"

There are, in addition, one or two other general propositions that seem to be warranted by the reported cases: (1.) A director need not exhibit in the performance of his duties a greater degree of skill than may reasonably be expected from a person of his knowledge and experience. A director of a life insurance company, for instance, does not guarantee that he has the skill of an actuary or of a physician. In the words of Lindley M.R.: "If directors act within their powers, **\*429** if they act with such care as is reasonably to be expected from them, having regard to their knowledge and experience, and if they act honestly for the benefit of the company they represent, they discharge both their equitable as well as their legal duty to the company": see Lagunas Nitrate Co. v. Lagunas Syndicate. It is perhaps only another way of stating the same proposition to say that directors are not liable for mere errors of judgment. (2.) A director is not bound to give continuous attention to the affairs of his company. His duties are of an intermittent nature to be performed at periodical board meetings, and at meetings of any committee of the board upon which he happens to be placed. He is not, however, bound to attend all such meetings, though he ought to attend whenever, in the circumstances, he is reasonably able to do so. (3.) In respect of all duties that, having regard to the exigencies of business, and the articles of association, may properly be left to some other official, a director is, in the absence of grounds for suspicion, justified in trusting that official to perform such duties honestly. In the judgment of the Court of Appeal in In re National Bank of Wales, Ld. , the following passage occurs in relation to a director who had been deceived by the manager, and managing director, as to matters within their own particular sphere of activity: "Was it his duty to test the accuracy or completeness of what he was told by the general manager and the managing director? This is a question on which opinions may differ, but we are not prepared to say that he failed in his legal duty. Business cannot be carried on upon principles of distrust. Men in responsible positions must be trusted by those above them, as well as by those below them, until there is reason to distrust them. We agree that care and prudence do not involve distrust; but for a director acting honestly himself to be held legally liable for negligence, in trusting the officers under him not to conceal from him what they ought to report to him, appears to us to be laying too heavy a burden on honest business men." That case went to the House of Lords, and is reported there under **\*430** the name of Dovey v. Cory. Lord Davey, in the course of his speech to the House, made the following observations:

"I think the respondent was bound to give his attention to and exercise his judgment as a man of business on the matters which were brought before the board at the meetings which he attended, and it is not proved that he did not do so. But I think he was entitled to rely upon the judgment, information and advice, of the chairman and general manager, as to whose integrity, skill and competence he had no reason for suspicion. I agree with what was said by Sir George Jessel in Hallmark's Case , and by Chitty J. in In re Denham & Co. , that directors are not bound to examine entries in the company's books. It was the duty of the general manager and (possibly) of the chairman to go carefully through the returns from the branches, and to bring before the board any matter requiring their consideration; but the respondent was not, in my opinion, guilty of negligence in not examining them for himself, notwithstanding that they were laid on the table of the board for reference."

These are the general principles that I shall endeavour to apply in considering the question whether the directors of this company have been guilty of negligence. But in order to determine whether any such negligence, if established, renders the directors liable in damages, it is necessary to consider the provisions of art. 150 of the company's articles of association. That article is in these terms. [His Lordship read the article and continued:] The earlier part of this article appears to be concerned with actions and claims against the directors brought or made by persons other than the company itself. The importance of the article for the present purpose is to be found in the later part, which provides that the directors are not to be answerable for insufficiency or deficiency of any security or for any other loss, misfortune, or damage which may happen in the execution of their respective offices or trusts or in relation thereto "unless the same shall happen by or through their own wilful neglect or default **\*431** respectively." In opening the case for the liquidator, Mr. Topham treated this article as in no way modifying the general law relating to directors. He contented himself with citing a passage from the judgment of Bowen L.J. in In re Young and Harston's Contract. That was a case in which the Court of Appeal had to consider whether a vendor of real estate had been guilty of wilful default within the meaning of a condition of sale which imposed upon the purchaser a liability to pay interest on his purchase money from the date fixed for completion until actual payment if the completion were delayed from

Copr. © West 2009 No Claim to Orig. Govt. Works

any cause whatever other than wilful default on the part of the vendor. Bowen L.J. expressed himself as follows:

"Default is a purely relative term, just like negligence. It means nothing more, nothing less, than not doing what is reasonable under the circumstances - not doing something which you ought to do, having regard to the relations which you occupy towards the other persons interested in the transaction. The other word which it is sought to define is 'wilful.' That is a word of familiar use in every branch of law, and although in some branches of the law it may have a special meaning, it generally, as used in Courts of law, implies nothing blameable, but merely that the person of whose action or default the expression is used, is a free agent, and that what has been done arises from the spontaneous action of his will. It amounts to nothing more than this, that he knows what he is doing, and intends to do what he is doing, and is a free agent." If these words of Bowen L.J. be read without reference to the facts of the case in which they were used, I should agree that the word "wilful" in art. 150 was superfluous, and qualifies in no way a director's liability for negligence. For a director acting under compulsion, or at a time when his mind was no longer functioning, could hardly be said to be guilty of negligence or default - words that by themselves surely connote free agency and spontaneous action of the will. It is, however, to be observed that in In re Young and Harston's Contract the vendor left this country on **432** the very day on which the sale should have been completed without even leaving an address to which the conveyance could be sent to him for execution. Sir James Hannen says this :

"The cardinal point in the case appears to be this, whether where a person has entered into a contract to be completed upon a particular day - in this case the 8th September - and he, knowing that, goes away upon the 6th to take his autumn holiday, he has been guilty of wilful default thereby causing the non-completion of the contract. It seems to me a very plain case, and I really can entertain no doubt whatever as to what any jury would have thought, and we, in the position of the jury, come to the conclusion that he made default in not being in the position to complete the contract so far as it lay with him upon the 8th of September; and that was default of an intentional character on his part, and therefore wilful." Then a little lower down:

"Our judgment, therefore, is that where a man knowing that some act has to be done by him on the particular day, goes away in disregard of that obligation, he is guilty of default; and doing it intentionally, it is wilful within the terms of a contract of this kind." It was a case, therefore, where the vendor's default consisted not merely of an omission to do an act which it was his duty to do, but of an omission to do an act which he knew it was his duty to do. This is the view of the case that was taken in the later decision of the Court of Appeal in In re Mayor of London and Tubbs' Contract. That also was a case arising under a contract between vendor and purchaser of real estate, and again the Court had to consider whether the vendor had been guilty of wilful default within the meaning of a condition similar to that in the earlier case. The default of the vendor consisted of an innocent misstatement as to his title contained in the contract. Lindley L.J. in his judgment said :

"I am aware that in Elliott v. Turner Vice-Chancellor Shadwell expressed the opinion that forgetfulness might amount to wilful default. The case before him was, however, of a very different kind **433** from the present. I confess that I am more disposed to concur with Lord Bramwell's observations on the term 'wilful misconduct' in Lewis v. Great Western Ry. Co. They are, in my opinion, quite consistent with Lord Bowen's observations in In re Young and Harston's Contract , if it be borne in mind that Lord Bowen presupposed knowledge of what was done, and intention to do it, and was not addressing himself to a case of an honest mistake or oversight. No doubt the statements contained in the 4th condition were deliberate, and to that extent 'wilful'; but the misstatement was not 'wilful.'" Lopes L.J. said , in speaking of the judgment of Bowen L.J. in In re Young and Harston's Contract :

"I do not think the learned judge was contemplating an honest oversight. He was dealing with a different case, where, two days before the time fixed for completion, the vendor left England without having executed the conveyance which was ready for his execution in the afternoon of the day fixed." Then, after quoting a passage from the judgment of Sir James Hannen, cited above, he added: "What the vendor did there was not regarded as a mistake, much less an honest or unintentional oversight. That case, in my judgment, is distinguishable from the present, and expressions applicable to that case are inapplicable here. In Lewis v. Great Western Ry. Co. Lord Justice Bramwell says - defining 'wilful' in connection with misconduct - "wilful misconduct" means misconduct to which the will is a

Copr. © West 2009 No Claim to Orig. Govt. Works

party, something opposed to accident or negligence; the misconduct, not the conduct, must be wilful.' This, to my mind, is a more accurate definition of 'wilful' than that given by Vice-Chancellor Shadwell in Elliott v. Turner , where he says, 'In my opinion the word "wilful" can have no other meaning than "spontaneous": and, if the neglect or default in this case arose from the voluntary act of the parties, either awake or asleep with reference to their rights and interests, and did not at all arise from the pressure of external circumstances over which they could have no control, **434** I apprehend that the neglect or default was wilful.' It is difficult to lay down any general definition of 'wilful.' The word is relative, and each case must depend on its own particular circumstances."

If I may say so with respect, the difficulty is not so much in ascertaining the meaning of the adjective "wilful," as in ascertaining precisely what is the noun to which the adjective is to be applied. An act, or an omission to do an act, is wilful where the person of whom we are speaking knows what he is doing and intends to do what he is doing. But if that act or omission amounts to a breach of his duty, and therefore to negligence, is the person guilty of wilful negligence? In my opinion that question must be answered in the negative unless he knows that he is committing, and intends to commit, a breach of his duty, or is recklessly careless in the sense of not caring whether his act or omission is or is not a breach of duty. This conclusion appears to me to be warranted by at least three authorities, one of which was referred to in the passage quoted above from the judgment of Lopes L.J. In Lewis v. Great Western Ry. Co. the question arose as to the meaning of the phrase "wilful misconduct" in a contract for the carriage by the defendant company of goods of the plaintiff. The goods had admittedly been damaged owing to the conduct of the defendants' servants. Under the terms of the contract, however, the defendants were not liable unless the damage was occasioned by the wilful misconduct of their servants. Bramwell L.J. said : "Was this damage caused by the wilful misconduct of the defendants' servants? Mr. Powell's argument, when analysed, is to this effect: 'The conduct of which we complain was their conduct, and that conduct was misconduct, and it was not accidental, therefore it was wilful.' So that, in the result, unless a thing is a pure accident, it is wilful. If a man were walking along and tripped over some goods which he did not happen to see, it would be said that the tripping was the result of his conduct, which was misconduct - not accidental but wilful - and that the **435** wilfulness was in not looking out. I do not, however, think that the question can be thus dealt with. There is such a mass of authorities to show what 'wilful misconduct' is, that we should hardly be justified, as a Court of Appeal, in departing from them, even if we thought them to be wrong. 'Wilful misconduct' means misconduct to which the will is a party, something opposed to accident or negligence; the *mis* conduct, not the conduct, must be wilful." Brett L.J. said : "In a contract where the term wilful misconduct is put as something different from and excluding negligence of every kind, it seems to me that it must mean the doing of something, or the omitting to do something, which it is wrong to do or to omit, where the person who is guilty of the act or the omission knows that the act which he is doing, or that which he is omitting to do, is a wrong thing to do or to omit; and it involves the knowledge of the person that the thing which he is doing is wrong; I think that if he knows that what he is doing will seriously damage the goods of a consignor, then he knows that what he is doing is a wrong thing to do; and also, as my Lord has put it, if it is brought to his notice that what he is doing or omitting to do, may seriously endanger the things which are to be sent, and he wilfully persists in doing that against which he is warned, careless whether he may be doing damage or not, then I think he is doing a wrong thing, and that that is misconduct, and that, as he does it intentionally, he is guilty of wilful misconduct; or if he does, or omits to do something which everybody must know is likely to endanger or damage the goods, then it follows that he is doing that which he knows to be a wrong thing to do. Care must be taken to ascertain that it is not only misconduct but wilful misconduct, and I think that those two terms together import a knowledge of wrong on the part of the person who is supposed to be guilty of the act or omission." Cotton L.J. delivered judgment to the same effect. Both Brett L.J. in the passage I have just read, and Cotton L.J. in his judgment, draw, no doubt, a distinction between wilful misconduct and negligence of every kind. But I cannot **436** assent to the argument of Mr. Topham that these judgments afford no assistance in determining whether or not there be any difference between negligence and wilful negligence. The case seems to me to be an authority for the proposition that a wilful act, which act amounts to negligence, is not wilful negligence unless there be a will to be negligent.

In Forder v. Great Western Ry. Co. , the question of the meaning of wilful misconduct again came up for consideration before a Divisional Court. Lord Alverstone C.J. in giving judgment said :

"I am quite prepared to adopt, with one slight addition, the definition of wilful misconduct given by Johnson J. in Graham v. Belfast and Northern Counties Ry. Co. , where he says: 'Wilful misconduct in such a special condition means misconduct to which the will is party as contradistinguished from accident, and is far beyond any negligence, even gross or culpable negligence, and involves that a person wilfully misconducts himself who knows and appreciates that it is wrong conduct on his part in the existing circumstances to do, or to fail or omit to do (as the case may be), a particular thing, and yet intentionally does, or fails or omits to do it, or persists in the act, failure, or omission regardless of consequences.' The addition which I would suggest is, 'or acts with reckless carelessness, not caring what the results of his carelessness may be.'"

The third of the authorities to which I have referred is a recent decision of the Court of Appeal in Leeds City Brewery, Ld. v. Platts. The case does not appear to be reported , but I have been furnished with a transcript of the judgments of the members of the Court, consisting of Lord Sterndale M.R. and Warrington and Younger L.JJ. The question that had to be decided was as to the liability of a trustee of a debenture trust deed for the loss occasioned by an investment that had been made by him. The investment was an unauthorized one, and, in making it, the trustee was admittedly guilty of a breach of trust. It was, however, **437** held by the Court of Appeal that the trustee was absolved from liability by virtue of two clauses in the trust deed. Those two clauses when read together went a good deal further than the 150th article of association of the City Equitable Fire Insurance Company, and the actual decision has little, if any, bearing upon the question of the liability of the respondents in the present case. But both Lord Sterndale and Warrington L.J. in delivering judgment made certain observations that are of general application. By one of the clauses it was provided that the trustees of the deed and each of them should be kept indemnified from and against all actions, proceedings, costs, charges, claims and demands whatsoever that might arise or be brought or made against them or him in respect of any matter or thing done or omitted without their or his own wilful default. In referring to this clause, Lord Sterndale said: "With regard to those words about their or his own wilful default, I think Mr. Maugham is right in saying that they are not used in the technical way when you are speaking of taking an account on the basis of wilful default, but I think they are used as meaning - unless they have failed to do their duty purposely and wilfully, unless there is some wilful misconduct." Then, after stating that the other clause relied upon by the trustee was not meant to protect him against a wilful doing wrong, he added: "Therefore the question to my mind which has to be decided to settle this appeal is whether Mr. Beevers was to be held to have done this wilfully and intentionally knowing that what he was doing was wrong. The learned judge has found that he did. It was wilful neglect, as he calls it, which I take to mean wilfully doing what was wrong, and wilfully doing what he knew it was his duty not to do, or not doing what he knew it was his duty to do." Warrington L.J., after referring to one of the clauses in question, said: "The learned judge, and here I agree with his view, has held that assuming that the trustee was guilty of wilful breach of trust, he would not be protected by that clause. I am inclined to agree with him there. But then it becomes important to consider what is meant by a wilful breach of trust, or wilful **438** negligence or wilful failure to perform his duty. I think it means this. I think it means deliberately and purposely doing something which he knows, when he does it, is a breach of trust, consisting in a failure to perform his duty as trustee."

Mr. Topham, in his reply, urged that these authorities were not relevant to the consideration of art. 150. The later part of that article, he said, was substantially a reproduction of s. 24 of the Trustee Act, 1893 , which in turn was a repetition of s. 31 of Lord St. Leonard's Act, and he contended that these sections had always been regarded as doing little more than stating the existing law in relation to trustees. In support of this contention he cited In re Brier ; Dix v. Burford ; and Mucklow v. Fuller. In In re Brier the question to be decided was whether or not certain trustees should be charged with a sum of money collected by their agent, which sum had been lost, owing to the agent's subsequent insolvency. The passage in Lord Selborne's judgment relied upon by Mr. Topham is as follows: "I think that in this case the burden of proof is upon the respondents who seek to charge the executors with this money. The statute 22 & 23 Vict. c. 35, s. 31, provides, in effect, that trustees shall not be responsible for any banker, broker, or other person with whom trust moneys have been deposited (which I understand to mean properly deposited) unless it can be shown that that loss happened through their own wilful fault. The statute incorporated, generally, into instruments creating trusts the common indemnity clause which was usually inserted in such instruments. It does not substantially alter the law as it was administered by Courts of equity, but gives it the authority and force of statute law,

Copr. © West 2009 No Claim to Orig. Govt. Works

and appears to me to throw the onus probandi on those who seek to charge an executor or trustee with a loss arising from the default of an agent, when the propriety of employing an agent has been established. In the present case, the learned judge in the Court below has virtually decided that this was a case of proper employment of an agent for a proper purpose, **\*439** and, as far as I can judge, the nature of the case justifies that view." But when the whole of the judgment is read, it is, I think, reasonably clear that Lord Selborne, when referring to the law as it was administered by Courts of equity, was referring to the law as to the employment of agents by trustees. He had not to consider, and he expressed no opinion as to, the meaning of the expression "wilful default." This sufficiently appears from a later part of his judgment, which is in these words:

"Then if a person seeks to charge the executors with a loss arising from the default of an agent whom it is admitted to have been reasonable to employ, does it not lie on him to inform the Court of the circumstances under which the loss arose, the time during which the money was in the agent's hands, the time at which the insolvency took place? This having been done, the executors, on the other hand, would have an opportunity of shewing what efforts they had made and what means they had used for getting in the money and what, if any, were the difficulties in their way. Now, it appears to me here, that the person on whom the onus probandi lies has failed to inform the Court of the circumstances which it was absolutely necessary for the Court to know, before it could come to the conclusion that the loss by the agent's insolvency was due to some wilful default on the part of the executors."

In Dix v. Burford a trustee was held liable for the loss occasioned by reason of his omission to procure himself to be admitted tenant to certain copyholds upon the security of which the trust fund of 400l. was invested. In consequence of this omission his co-trustee had been enabled to obtain possession of the trust fund and convert it to his own use. The will creating the trust contained a direction that the trustees should not be chargeable, but only for their respective receipts, payments, acts and wilful defaults and not otherwise, nor with any sum or sums of money other than such as should come to their or his own hands respectively by virtue of the will, nor with any loss or damage which might happen to the said sum of 400l. in consequence of its remaining on security **\*440** as therein directed, unless the same should happen by or through his or their respective wilful default. Sir John Romilly, in holding the trustee liable, said:

"I think Yells is not exonerated by the indemnity clause. All the testator has said is, that if by remaining on the security any loss or damage should arise, the trustees shall not be liable, unless it should happen by their default. Thus, if the estate had become of less value, or the mortgagor had become unable to pay, the trustees were to incur no liability. The ordinary trustee indemnity clause affords no security to a trustee who neglects to take the steps necessary to secure the fund." The decision therefore was that the trustee was not exonerated by the particular indemnity clause in that case. The construction which Sir John Romilly put upon the clause did not necessitate a determination of the meaning of the words "wilful default." He did no doubt make a general observation as to the ordinary trustee indemnity clause, but it would, I think, be wrong to infer from what he said that he considered every trustee who neglected to secure the trust fund to be necessarily guilty of "wilful default."

In Mucklow v. Fuller a testatrix by her will, reciting that one Mucklow was indebted to her in a sum of 500l., directed her executors and trustees to get in and place the 500l. on Government stock or security at interest within three years after her decease and appointed Mucklow and the defendant Fuller to be her executors. The 500l. was never got in or invested, as directed by the will, and was ultimately lost owing to Mucklow's insolvency. The question to be decided was whether Fuller was liable for the loss. The will contained a clause declaring that Mucklow and Fuller were to be chargeable with or accountable for such moneys only as they should actually receive, and not to be answerable or accountable for each other, but each for his own acts, receipts, payments, neglects, or defaults only, and not for any moneys for which they should join in any transfer or sign any receipt for conformity; and they were not to be answerable for any banker with whom they might deposit **\*441** the trust moneys, or for any other loss, unless it should happen through their wilful default. It seems that Fuller, although he had proved the will, had, except for two small transactions, entirely neglected his duties. Lord Eldon, in holding him to be liable, said, in reference to the indemnity clause, "I cannot but think it most dangerous to lay it down, that with such a clause as this, he can prove the will, and then say that some one else may perform the trusts." Lord Eldon had treated the defendant

Copr. © West 2009 No Claim to Orig. Govt. Works

as acting bona fide and as holding the opinion that he had nothing to do with the trusts. But I do not think that Lord Eldon was in any way considering what was the meaning of the expression "wilful default" as applied to a person acting in a trust. His decision appears to have merely been that the ordinary indemnity clause has no application at all to a man who neglects the trust altogether. It only applies to an acting trustee; it never begins to apply to one who does not act at all.

There is not, so far as I know, an authority in which the meaning of "wilful default" in the ordinary trustee indemnity clause has been determined or even considered. I am therefore at liberty to place upon art. 150 the construction which appears to me to be warranted by the authorities in which the meaning of "wilful default," "wilful neglect" and "wilful misconduct" has been determined in other connections. Before leaving this article, however, there is another matter to which I ought to refer. In the case of In re Brazilian Rubber Plantations and Estates, Ld. , to which reference has already been made, it was sought to make directors liable for negligence. The articles of association contained a clause exonerating a director from liability for loss or damage unless the same happened through his own dishonesty. Neville J. acquitted the directors of negligence, but he also held that this clause in the articles of association was also a fatal objection to the application of the liquidator which was made, as is the present application, under s. 215 of the Companies (Consolidation) Act, 1908 . Referring to the clause in question he said: "I do not see how to escape **\*442** from the conclusion that this immunity was one of the terms upon which the directors held office in this company. I do not think that it is illegal for a company to engage its directors upon such terms. I do not think, therefore, that an action by this company against its directors for negligence, where no dishonesty was alleged, could have succeeded. It appears to me that an application under s. 215 of the Companies (Consolidation) Act, 1908, stands on the same footing." He then referred to certain observations of Lord Macnaghten and Lord Herschell in Cavendish Bentinck v. Fenn as warranting this conclusion. Mr. Topham did not feel justified in asking me to decline to follow this decision, but he reserved to himself the right to question it in the Court of Appeal, and to ask that Court to hold that the rights given by s. 215 of the Act are independent of and cannot be modified by any provision contained in the articles of association. In these circumstances I propose to follow the decision of Neville J. upon this point without expressing any opinion of my own.

I must now turn to the facts of the case for the purpose of ascertaining first, whether in any of the matters charged against them the respondents have been guilty of negligence, and secondly, whether any such negligence was wilful, negligence and default meaning for all practical purposes one and the same thing. That Bevan was guilty not merely of wilful negligence but also of fraud will appear quite clearly. The real question that I have to decide is with reference to his co-directors. These co-directors are Mr. Peter Haig Thomas, Mr. Henry Ralph Grenside, the Earl of March, Lord Ribblesdale, Sir Douglas Dawson, Mr. David Macbeth Moir Milligan, and Sir Henry Grayson. Of these gentlemen Mr. Grenside became a director on March 31, 1915, Lord March, Lord Ribblesdale, and Sir Douglas Dawson on April 21, 1915, Mr. Haig Thomas on June 27, 1916, Mr. Milligan on August 27, 1916, and Sir Henry Grayson on December 4, 1917. They all continued to be directors down to the date of the liquidation of the company, with the exception of Lord March, who retired **\*443** from the board on January 3, 1922. A Mr. C. T. Barclay was also a director of the board during part of Bevan's directorship, but he resigned on October 5, 1920, and died soon afterwards, and his position need not be further considered except in so far as it affected his co-directors. All the others that I have mentioned were made respondents to the summons. By arrangement between the Official Receiver and Sir Henry Grayson, however, all further proceedings against him have been stayed. I am accordingly relieved of the task of considering any question as to his liability. In these circumstances, whenever in this judgment I refer to the respondent directors, I intend to exclude the respondents Bevan and Sir Henry Grayson, and, of course, Mr. C. T. Barclay. The Official Receiver in these proceedings sought to make the respondent directors liable for the losses occasioned to the company by (1.) Investing or permitting to be invested moneys of the company amounting to 701,739l. in the investments set forth in para. 12 of the points of claim. (2.) Investing or permitting to be invested 445,374l. in a ranch in Brazil. (3.) Authorizing or permitting the manager Mansell to become indebted to the company in the sum of 110,000l. (4.) Lending or allowing to remain in the hands of Ellis & Co., the company's brokers, large sums of money amounting at the date of the winding up to some 350,000l. (5.) Making or permitting to be made a loan to Bevan of 6952l. (6.) Lending to a company called the Saskatoon Grain Company a sum of 9329l. (7.) Paying dividends in respect of the financial year ending February 28, 1921, and (8.) Paying an interim dividend in

Copr. © West 2009 No Claim to Orig. Govt. Works

respect of the financial year ending February 28, 1922. The claims in respect of these dividends, alleged by the Official Receiver to have been paid out of capital, are, however, in the nature of alternative claims. There are one or two other matters referred to in the points of claim, in respect of which the Official Receiver sought to make the respondent directors liable, but they were abandoned by his counsel during the hearing before me and need not be mentioned further.

I propose, so far as is possible, to consider each of these *444 matters separately, and in the order in which I have mentioned them; and to consider, wherever it becomes necessary to do so, the position of each of the respondent directors individually in relation to the particular matter in question. Before doing so, however, I desire to make one general observation. Cases have not been unknown in which a director has lent his name to a company for what may be called window dressing purposes, and has treated himself as having thereby given ample consideration for his remuneration and as being absolved from any further effort towards promoting the welfare of the company. This cannot be said of any one of the respondent directors. It was not possible for them all to attend to the company's affairs with equal regularity. Lord March, for instance, owing to serious illness resulting in grave physical incapacity, was unable, except for two occasions in 1918, to attend any board meetings until the summer of 1920. He offered indeed to resign his directorship in the year 1917, but he was persuaded by his colleagues to remain. Mr. Milligan, who resides and carries on business in Aberdeen, was for that reason unable to attend at meetings of the board as often as he could have wished. But I am satisfied from the evidence adduced before me that each one of the respondent directors was willing and anxious to give of his best to the company and at all times took as active a part in the work of the board as circumstances would reasonably permit.

Turning now to the claims made by the Official Receiver, I come first to that in respect of the investments mentioned in para. 12 of the points of claim. During the hearing before me, the claim of the Official Receiver under this heading was ultimately confined to two investments - namely, the investment of a sum of 228,813l. in shares in Claridge's Hotel, Paris, and the investment of a sum of 70,970l. in shares in the United Brass Founders and Engineers, Ld. In so limiting his claim, the Official Receiver in no way admitted that the remainder of the investments specified in para. 12 of the points of claim were proper investments for the funds of an insurance company. It was, however, reasonably clear that *445 if he could not succeed in respect of the two particular investments mentioned he was not likely to succeed in respect of the remainder; while if he did succeed in respect of these two investments and the other matters included in the other heads of claim to which reference has been made, the combined wealth of the respondent directors would not be sufficient to make good the losses that had been thereby occasioned to the company.

Before considering the circumstances of the two investments thus selected by the Official Receiver for attack, it is necessary to refer to the setting up of the finance committee of the board. This was done by a resolution passed at a board meeting held on July 25, 1916, at which Bevan, Haig Thomas, Lord Ribblesdale, Grenside and Sir Douglas Dawson were present. The minute recording this resolution is in these terms: "Mr. Bevan, Mr. Thomas and Mr. Grenside were appointed a finance committee with power to make or sell investments on behalf of the company not exceeding 5000l. in any one security." In passing this resolution the directors were exercising the power of delegation conferred upon them by art. 123 of the company's articles of association. That article is in these terms:

"The directors may delegate any of their powers, other than the powers to borrow and make calls, to committees consisting of such members of their body as they think fit. Any committee formed shall in the exercise of the power so delegated conform to any regulations that may from time to time be imposed upon them by the Board." But not only was it within the powers of the directors to set up the finance committee. It was, judged in the light of what was then known to the directors, a most reasonable thing to do. Bevan, who had been elected chairman of the board on July 11, 1916, was one of the greatest authorities on finance in the City of London. In reputation and in credit he stood second to none. His advice on questions of investment was eagerly sought and readily followed. Later events have indeed proved him to be a rogue. But it is, I think, impossible to form a just estimate of the conduct of the respondent directors, not only in respect of the finance *446 committee and its doings, but also in respect of all the matters with which I have to deal, unless a clear picture can be formed of Bevan as he must have appeared to his

colleagues at the time. Mr. Haig Thomas was also a man of great business experience. He had, before joining the board of the City Equitable, been chairman and managing director respectively of two of the largest colliery companies in South Wales, whose combined capitals amounted to about three million pounds. Mr. Grenside for his part brought into the finance committee the legal knowledge and the more general business experience of a solicitor. In October, 1916, Mr. C. T. Barclay became an additional member of the board and of the finance committee, and remained so until he retired in October, 1920. He was the senior partner in the firm of Messrs. Sheppard, Pelley & Co., a firm of stockbrokers of the highest reputation. To a committee thus constituted the other respondent directors might well delegate the duties of investing the funds of the company. I cannot help regretting that Mr. Milligan was not added to the committee, as he had had a greater practical experience of the business of an insurance company than the remainder of the board. I feel sure that he would have prevented one or two investments made by the finance committee which, whatever else may be said of them, were not prudent investments for an insurance company to make. Mr. Milligan, however, was, as already stated, resident in Aberdeen.

It will have been observed that, according to the minute recording the appointment of the finance committee, their powers of investment in any one security were limited to 5000l. Strangely enough, no director who gave evidence before me retains any recollection of this restriction having been imposed. Certainly it was never observed by the finance committee, and this must have been known to the board from an early date. At a board meeting held on November 14, 1916, a report of the finance committee of that date was read and approved, and such report informed the board of the purchase of 7000 Commercial Bank of London shares at a price of 3l. each, and of 25,000l. British Government three **\*447** months' Treasury Bills. At this board meeting the only director present who was not a member of the finance committee was Sir Douglas Dawson. It was, however, the practice of the secretary to forward to each director a copy of the minutes of the board meetings. The other directors were, therefore, made aware about this time of the fact that the 5000l. limit was being disregarded by the committee. The truth is that the restriction was forgotten both by the finance committee and by the board. It was not until May 4, 1920, that the attention of the board was called to it by Mansell, the general manager, who said that he had found in an old minute that there was a limit of 5000l. At a board meeting of that date it was accordingly resolved, on the proposal of Lord Ribblesdale, seconded by Sir Douglas Dawson: "That the finance committee be authorised to deal with securities to an unlimited amount, this resolution superseding that passed on the 25th July, 1916." I think that, in the circumstances, it must be taken that at all material times the limit imposed by the resolution of July 25, 1916, had been at first tacitly, and afterwards expressly, revoked by the board. It has been necessary to deal at this length with the constitution and authority of the finance committee, because it was the finance committee that resolved upon the investment of moneys of the company in Claridge's Hotel, Paris, and in the United Brass Founders. [His Lordship then dealt in detail with the facts and evidence concerning these investments and the investment of 150,000l. in the Brazilian ranch authorized by the finance committee, and although he considered that as members of the finance committee Mr. Grenside and Mr. Haig Thomas had been guilty of negligence in connection with the investment in the Brazilian ranch, yet he was of opinion that their negligence was not wilful and that art. 150 afforded an answer to any claim against either of them in that respect, and his Lordship came to the conclusion that he was not prepared to find them, either as members of the finance committee or as directors, or any other of the respondent directors, liable in respect of any of the three investments above mentioned. His Lordship continued:] **\*448** I must now deal with the claim of the liquidator in respect of the loan of 110,000l. to Mansell. As already stated, Mansell was the general manager of the company. He had held that post from the date of the formation of the company in the year 1908, and appears to have been a man of great ability and experience in all matters connected with insurance. The respondent directors put the greatest trust in him, and, for all that they knew to the contrary, were at all material times justified in so doing. Subsequently to the liquidation of the company, Mansell was put upon his trial for fraud in connection with the affairs of the company and was acquitted. So far, therefore, as he was concerned in the matters now to be related, he is entitled to be absolved from all suspicion of fraud. But unquestionably he betrayed the trust and confidence reposed in him by the respondent directors. He was remunerated by a salary of 2000l. a year and a commission on profits, the commission amounting to something between 6000l. and 7000l. a year. His salary was paid by regular instalments, and need not be further mentioned. The trouble has arisen out of the payments made to him on account of, or in anticipation of, his commission. By January 3, 1919, Mansell had received 6100l. on account of his commission for the year ending February 28, 1919, and he was paid two further sums of 2000l. and 3000l. on January 7 and 21, 1919, respectively. The sum due to Mansell for commission and expenses for the whole year ending February 28, 1919, was

4875l. It was therefore obvious by January 3 that Mansell's commission account would be considerably overdrawn by the end of the financial year, especially if, as I cannot doubt was the case, Mansell knew that he would obtain the two further sums to which I have referred. In those circumstances, at a meeting of the finance committee held on January 3, 1919, at which Bevan, Barclay, Grenside and Mansell were present, the chairman, according to the minute of that meeting, stated "that he had received an application from the general manager for an advance of 15,000l. at 5 per cent. interest for the purchase of a freehold residential farm property repayable by instalments and **\*449** the same was approved." On March 13 a further sum of 9000l. was paid to Mansell, making, with the 6225l. then due from Mansell on his overdrawn commission account, a sum of 15,225l. There was nothing wrong in making a loan to Mansell on proper security. As a matter of fact, however, the company never obtained any security for the loan on his "freehold residential farm." From what happened afterwards, it would appear that the approval of the advance was obtained by Bevan from the finance committee for the purpose of concealing from his co-directors the fact that Mansell was being overpaid on his commission account. Nothing was said to the finance committee about these overpayments at the time, for Grenside was unaware of the fact that Mansell was ever overpaid until the month of March, 1921. The other respondent directors were also in ignorance of this fact, Mr. Haig Thomas down to February, 1921, and the others down to shortly before the liquidation of the company. Whether this ignorance of the respondent directors as to the Mansell overpayments was consistent with the proper discharge of their duties to the company I shall have to consider. For the moment I merely state as a finding of fact that this ignorance existed. Down to March 13 then, Mansell had received some 15,000l. in excess of what was due to him for commission, and if the attention of any director had been called to this indebtedness of his to the company, the minute of the finance committee of January 3, 1919, could be referred to as affording a satisfactory explanation. The overpayments however continued. During the year ending February, 1920, Mansell received from the company further sums amounting in all to 44,000l., his commission for that year amounting only to 6797l. His indebtedness to the company was thus increased to 54,427l. by February 20, 1920, this sum including, of course, the 15,000l. sanctioned by the finance committee. In this state of affairs, Mr. Lepine, of the firm of Messrs. Langton & Lepine, the auditors of the company, when conducting the audit for the year ending in February, 1920, sent a report to Mr. Bevan dealing with various questions that remained to be settled **\*450** before the audit could be completed. One of these questions concerned the indebtedness of Mansell, and, as to this, Mr. Lepine wrote in his report as follows: "With regard to the loan to Mr. Mansell we would remind you that the only minute is one dated the 3rd January, 1919, authorising a sum of 15,000l. We understand that a further minute is to be recorded at the next board meeting. We would also draw your attention to the fact that no interest has yet been charged in respect of this loan. We, however, are informed that a formal agreement is to be prepared with reference to the loan generally." I shall have to deal with this report more fully, and with certain letters addressed both by Bevan and Mansell to Mr. Lepine in connection with the loan when I have to deal with the claims made by the Official Receiver against the auditors. For the moment I shall confine myself to such facts as affect the respondent directors. It is perhaps needless to say that this report was never communicated by Bevan to any of his co-directors, and that when once Mr. Lepine had closed his audit, relying upon the assurance of Bevan as to the recording of a further minute, and the preparation of a formal agreement, Bevan, for the time being, took no further steps in the matter. The overpayments, however, continued, and by the end of February, 1921, Mansell's indebtedness had increased to 96,233l. Now another audit was approaching, and something would have to be done to satisfy Mr. Lepine. Some minute must be recorded and some agreement must be prepared. What followed affords a striking example of Bevan's methods. [His Lordship then dealt with the minute, the entry of which in the minute book, he found on the facts, was fraudulently made by Bevan, and with the agreement which was subsequently made with Mansell for a loan to him of 110,000l. (inclusive of the 96,233l.), the board's sanction to which his Lordship also found was fraudulently obtained by Bevan, and he came to the conclusion that he could not hold the respondent directors liable for any loss occasioned by the agreement, although, in his Lordship's opinion, it was impossible to acquit Mr. Grenside of carelessness of such a degree as might well have constituted **\*451** negligence; but as he had acted in complete good faith, he could not be held guilty of wilful negligence, and having regard to art. 150, his Lordship could not hold him liable for any loss occasioned by the agreement. His Lordship then continued:] I must now consider the question of the responsibility of the respondent directors for the overpayments to Mansell. Every payment made to him on account or in anticipation of commission was made by a cheque drawn in his favour signed, as required by the articles of association, by two directors and also by Mansell himself, or, in I think four instances, by the accountant Mr. Lock. The dates and amounts of the cheques so drawn in favour of Mansell between April 2, 1918, and November 17, 1921, which, after deducting the sums due to him in respect of

commission and expenses during that period, amounted to the 110,000l., are set out in certain particulars delivered by the liquidator on March 29, 1923, and are bound up with the pleadings. These cheques are fifty-four in number. A document handed up to me during the trial and numbered 19a gives in each case, with the exception of the cheque on December 9, 1919, for 3000l., the names of the directors by whom the cheque was signed. This document includes, however, by mistake a cheque for 5000l. dated September 27, 1921, which has nothing to do with the matter. The Official Receiver contends that each respondent director is at all events liable for the sums received by Mansell by means of the cheques signed by that director. In support of this contention Mr. Topham relied upon the decision of James V.-C. in Joint Stock Discount Co. v. Brown. In that case directors had expended money of their company in payment for certain shares which the company had no power to acquire. One of the directors named Bravo only joined the board after the transaction had been resolved upon by the board, but he had subsequently signed a cheque for 5000l., part of the moneys in question. In holding him liable James V.-C. said: "Mr. Bravo's case is somewhat different in this respect, that Mr. Bravo was not a party to the original resolution. Mr. Bravo, however, **\*452** signed a cheque for 5000l., part of the moneys in question. He says he signed that cheque as a matter of form. It has been repeated with reference to him and some other of the defendants here that signing cheques in that way is a mere ministerial act. I am startled at hearing any such statement. A company for its own protection against the misapplication of its funds requires that cheques should be signed by certain persons. Of course it is quite clear that no company of this kind could be carried on if every director were obliged to sign every cheque, and it is therefore required that the cheques should be signed by a certain number of persons for the safety of the company. That implies, of course, that every one of those persons takes care to inform himself, or if he does not take care to inform himself is willing to take the risk of not doing so, of the purpose for which and the authority under which the cheque is signed; and I cannot allow it to be said for a moment that a man signing a cheque can say: 'I signed that cheque as a mere matter of form; the secretary brought it to me; a director signed it before me; two clerks have countersigned it; I merely put my name to it.' Most of us have been obliged to trust in the course of our lives to a great number of persons when we have had to sign deeds and things of that kind; but if we trust, of course we must take the consequences of our so trusting. Mr. Bravo in this instance signed the 5000l. cheque probably relying that it was all right; but, of course, relying that it was all right, he must be responsible for so trusting that it was all right." In that particular case, if the director had inquired as to the purpose for which the cheque was required, he would have ascertained that it was for a purpose which he must have known or be deemed to know was ultra vires. But a director who signs a cheque that appears to be drawn for a legitimate purpose is not responsible for seeing that the money is in fact required for that purpose or that it is subsequently applied for that purpose, assuming, of course, that the cheque comes before him for signature in the regular way having regard to the usual practice of the company. If this were not so, the business of a large company **\*453** could not be carried on. In the case of an insurance company, for instance, the cheques to be signed at the board meeting would often include cheques in payment of insurance claims. If a claim appears to have been examined into and passed by the manager or other proper official for the purpose, a director who signs the necessary cheque in payment of the claim (the cheque being brought before him in the customary way) cannot be expected to investigate the whole matter over again, for the purpose of satisfying himself that the claim is well founded. A director must of necessity trust to the officials of the company to perform properly and honestly the duties allocated to those officials. In many large companies - it was so in the case of the City Equitable - it is the duty of the manager to pay the salaries and wages of the staff. For that purpose cheques are drawn by the directors in his favour, the exact amounts required being calculated by him. So long as there is nothing suspicious about the amount, the directors are justified in trusting him to calculate it correctly, and to use the proceeds of the cheque for the purpose for which it was drawn. The fact, therefore, that a respondent director signed cheques in favour of Mansell for or on account of commission does not necessarily make him responsible to the company for any payments so made to Mansell in excess of what was really due to him. In order to determine whether any respondent director can be made so liable, I must consider the circumstances in which he signed the cheques in question for the purpose of seeing whether there was anything that should have put him on inquiry, either by reason of the amounts for which the cheques were drawn, or of any irregularity in the method in which they were presented to him for payment.

The practice as to the drawing, authorizing, and signing of cheques in the City Equitable was as follows: the cheque books were normally in the custody of Mr. Lock, the accountant, and it was in his department and under his supervision that the cheques for signature by the directors were, or ought to have been, filled up. The request for the drawing of any particular cheque would come from Mr. Mansell or **\*454** Mr. Bevan. Mr. Lock himself drew up about 5

per cent. of the company's cheques, the balance being drawn by members of his staff. The counterfoil was filled up by the person who drew the cheque. Any cheque placed before the board ought, therefore, in the ordinary course, to have passed the scrutiny of the company's accountant. It turns out in fact that in some cases Mr. Mansell got cheques filled up by a member of Mr. Lock's staff without in any way communicating with Mr. Lock. But this could not be known to the directors. In respect of each cheque drawn, except in respect of insurance losses, there was also prepared in the accountant's office a slip, on which was stated the amount of the cheque and the purpose for which it was drawn, and this slip was stamped "Authorised for payment at Board Meeting" - a space being left for the date of the meeting. Before the meeting of the board, or committee of the board, at which cheques were to be signed, a list of them was prepared in the accountant's department. Up to the end of the year 1918 this list stated, in respect of each cheque, the name of the payee, the amount of the cheque, and the purpose for which it was required. But early in the year 1919 the practice was altered without the knowledge of any director, except possibly Mr. Bevan, and for the future the list merely gave the amount of the cheque without disclosing the name of the payee or the purpose for which the money was required. Neither Mr. Lock nor Mr. Witts, the secretary of the company, could state upon whose authority the change was made. But it seems probable that it was made upon the instructions of Mr. Mansell. The list, both before and after this change in practice, was sent from the accountant's department to that of the secretary to enable him to prepare the agenda for the directors' meeting. The list was not however transcribed in the agenda book, but merely the total amount for which cheques were required. The list itself never came before the directors. At the directors' meeting the cheque books were on the table together with the slips to which I have referred, and, in the case where insurance losses were to be paid, the papers relating to the claim. The meeting **\*455** would resolve that cheques be drawn to the amount stated in the agenda book, and each cheque would be signed by any two directors that happened to be present. In the case of the cheques with which I have particularly to deal, and also no doubt in other cases, the cheque had as a rule been previously signed by Mr. Mansell or Mr. Lock, and the counterfoils initialled by the latter. When the directors had signed a cheque they initialled the relevant slip and the cheque was complete. Except in one respect, to which I will call attention later, this practice in relation to the company's cheques is not open to criticism. Every director who signed a cheque at a directors' meeting would see from the slip and the counterfoil the purpose for which the cheque was required. He was, moreover, entitled to assume that the cheque had been passed by the general manager, the accountant and the secretary. He would therefore have done all that could reasonably be required of him as to satisfying himself both as to the purpose and as to the authority for signing the cheque. There were certain occasions upon which a cheque had to be signed between the directors' meetings, but inasmuch as none of the Mansell cheques were signed in this way I need not investigate that matter further. All the Mansell cheques were signed by meetings of the board or a committee of directors in the manner which I have described. So far as procedure was concerned, there was no irregularity of which any respondent director had notice, nor was there anything about the amount for which any cheque was drawn that ought to have excited suspicion. No single cheque in favour of Mr. Mansell exceeded 3000l. with the exception of one for 9000l. drawn on March 13, 1919. This cheque, however, which was drawn in consequence of the resolution of the finance committee of January 3, 1919, was not signed by any respondent director other than Mr. Grenside, and he had been a party to, and therefore knew of, the resolution. No single cheque, therefore, with the exception that I have mentioned, exceeded what a director might reasonably consider to be properly payable to Mansell on account of or in anticipation of his commission.**\*456**

The real difficulty arises by reason of the frequency and the total amount of such cheques signed by some of the respondent directors. In the cases of Lord March and Mr. Milligan there can be no criticism in this respect. The former only signed three Mansell cheques in the year 1920, totalling 7000l., and two in 1921, totalling 4000l. The latter only signed two in 1919 and two in 1920, the total amounts being 4000l. and 6000l. respectively. Having regard to the large sums being earned by Mansell in commission, there was nothing in these figures that ought to have excited suspicion. The two cheques signed by Mr. Milligan in 1919 were indeed signed upon the same day - namely, August 5. But they were drawn upon different banks and would, therefore, be in different books, and Mr. Milligan did not realize when signing the second that he had already signed one for a similar amount. The same thing happened upon two other occasions in the case of others of the respondent directors. It would appear that the device of drawing two cheques in Mansell's favour on the same day was resorted to whenever it was desired that he should be paid at one time more than 3000l. on account of his commission. It will be observed by a reference to the particulars of the points of claim that with the exception of the cheque for 9000l. already mentioned the Mansell cheques during 1919

were usually for 2000l. and in 1920 were usually for 3000l. This increase would not arouse any suspicion, for the profits of the company were steadily increasing. But if Mansell required at one time 4000l., as he did on August 5, 1919, and September 16, 1919, or 5000l., as he did on November 4, 1919, two cheques were prepared in the accountant's office, each of which was drawn for half the amount required and upon different banks. Seeing that the number of cheques drawn at the directors' meetings was usually anything between 60 and 100, it might well happen that a director would fail to notice that he was signing two cheques for Mansell on the same day, and this indeed happened on each of the occasions referred to. But had any director when signing the cheques in one book recollected that he had already **\*457** signed one in Mansell's favour in the other, I cannot help thinking that, as was suggested by Sir John Simon, the existence of two cheques would have been readily explained as being due to the carelessness of some official in the accountant's office. It is impossible not to feel some sympathy for the respondent directors, hoodwinked as they were by a fraudulent chairman and not receiving proper protection from the officials in whom they placed their trust.

To return, however, to the particular cases of Lord March and Mr. Milligan, I cannot find them guilty of any breach of duty merely because the amounts for which they signed cheques in Mansell's favour did not make them suspect that he was being overpaid. In the case of all the other respondent directors, however, there is to be found a circumstance that is absent from the cases of Lord March and Mr. Milligan. For each one of them signed in the course of one or both of the financial years 1919 and 1920 cheques for more than it was reasonable to suppose could be due or accruing due to Mansell in respect of his commission. This was more particularly so in the case of Mr. Grenside. For the financial year ending February, 1920, he signed cheques in Mansell's favour for no less than 21,000l. exclusive of the 9000l. cheque on March 31, 1919, given to complete the loan to Mansell of 15,000l. For the financial year ending February, 1921, the cheques so signed by him amounted to 26,000l. That he did not in fact realize what was the aggregate amount of cheques signed by him in each of those years is, in my judgment, perfectly clear. But was this ignorance on his part consistent with a proper discharge of his duty to the company? This question must, I think, be answered in the affirmative unless it was his duty to the company to keep, and from time to time to check, a list of all the cheques he signed, or unless it was his duty to the company to possess a better memory than that with which nature had endowed him. Let me take the financial year ending in February, 1921. During this year he signed cheques for the following amounts: 2000l. on March 2, and another 2000l. on March 16 - 3000l. on May 4, a like sum on June 15, July 6, July 20, **\*458** September 17, November 2 - 1000l. on December 7 and 3000l. on February 1. Now, although it was his duty to satisfy himself as to each Mansell cheque as to the purpose for which and the authority under which he was signing it, when once he had done this, there was nothing in the amount of any individual cheque to impress upon his mind the fact of his having signed it. It would appear to him to be a perfectly proper thing to sign a cheque for 2000l. on March 16 in respect of, or on account of, commission, and the fact that he had signed this cheque among a hundred others might not unreasonably escape his memory when signing another equally innocent looking and apparently regular cheque a fortnight later. Even more excusable might be his failure to remember the signing of both these cheques when he signed the cheque for 3000l. on May 4. Wisdom after the event shows that he could have detected the fraud that was being practised upon him by somebody by keeping a list of all the cheques that he signed in Mansell's favour. But there was no ostensible reason for doing this in the case of these cheques in particular, and to keep a list of all cheques that he signed would have been quite impracticable and far outside any duty that a director owes his company. Nor can I think that a director fails in his duty by reason of lapses of memory that are in the circumstances reasonably excusable. He only undertakes to bring to the service of the company a memory of the normally imperfect nature, and Mr. Grenside's memory would appear to have been of this order. His greatest lapse in this respect occurred on January 20, 1920, when he was the victim of the two cheque trick. But I am not prepared to treat his failure to realize that he was signing two cheques for Mansell on the same day as inexcusable. I think that Sir John Simon was justified in saying that even now we do not know all that took place in connection with the obtaining of the signatures of the directors to the Mansell cheques. There are one or two incidents, such as the alteration in one case of the entry on the counterfoil from "Loan Account" to "Contingent Commission," and the discrepancy in two other cases between the date borne by the cheque **\*459** and that inserted in the counterfoil which gives rise to the suspicion that Mr. Bevan and any accomplice he may have had were possibly employing artifices more intricate than those we know of for the purpose of deceiving his co-directors. Most assuredly his colleagues were deceived, and I can find nothing to suggest that they were more gullible than the majority of mankind.

Copr. © West 2009 No Claim to Orig. Govt. Works

What I have said about Mr. Grenside applies with even greater force to Mr. Haig Thomas, Sir Douglas Dawson, and Lord Ribblesdale. The last named was not himself in a position to give evidence in explanation of his conduct. As a matter of fact he only signed cheques to the aggregate amount of 11,000l. in the year 1919, and 9000l. in the year 1920 - figures that would not of themselves call for much explanation on his behalf. On two occasions, however, in 1919 he was a party to signing two Mansell cheques on the same day. But in view of the evidence given by his co-directors as to the diligence and interest that they ordinarily displayed in the discharge of his duties I cannot doubt his complete innocence. He was successfully tricked, but cannot, in the circumstances, be blamed on this account. But while freeing all the respondent directors from liability for their individual signing of the Mansell cheques, there is one matter connected with their general practice in relation to cheques that provokes adverse criticism. Before any director actually signs, or at any rate parts with a cheque signed by him, he should satisfy himself that a resolution has been passed by the board, or committee of the board, as the case may be, authorizing the signature of the cheque. In the case where a cheque has to be signed between meetings, he must, of course, obtain the confirmation of the board subsequently to his signature. Such cases are, however, exceptional, and need not be further considered. But, in the ordinary case, the precedent authority of the board or committee ought always to be obtained, and, in the case of the City Equitable, this authority was in truth always obtained, but it was obtained in a way that rendered the precaution practically useless. For, as already pointed out, the authority given **\*460** was merely one for the signing of cheques to an aggregate amount, neither the payee nor the amount of the individual cheques being mentioned. In my opinion this practice was wrong in principle, and, in its result, rendered possible the over-payments to Mansell. For if a proper list of the cheques were read out at the meeting, and were subsequently transcribed into the minutes of the meeting (copies of which were circulated, at any rate, in the case of board meetings), every director would have had brought to his attention, not merely the Mansell cheques that he himself had to sign, but all the Mansell cheques that were being authorized by the directors, and it seems almost certain that one or more of the directors would in that case have been struck by the frequency with which Mansell's name appeared in the list as a payee of large sums, and his overpayments would have been summarily stopped. Whether the omission of the respondent directors to follow the proper practice in giving authority for the signing of cheques constituted negligence on their part may be a question of some difficulty. But if it was negligence it was not wilful negligence as I understand that phrase, so that I need not pursue that matter further. There is, however, one more matter to be mentioned before parting with the question of the Mansell overpayments. In each of the balance sheets for the year ending the last day of February, 1919, 1920 and 1921, the sums then due from Mansell were in fact included. On February 28, 1919, the sum due from him was 6255l., on February 29, 1920, 52,427l., and on February 28, 1921, 96,233l. His name, however, did not appear in these balance sheets, nor did these particular sums. They were merely included in the total sum appearing in the balance sheets for 1919 and 1920 as loans at call or short notice, and as loans in that for 1921. Any director, therefore, who inquired, or whose duty it was to inquire as to the loans owing to the company would have discovered, or must be deemed to have discovered, the existence of Mansell's indebtedness. I shall, however, have to consider the whole position of the respondent directors in the matter **\*461** of loans when I deal with the question of their liability for the much larger sums that were extracted from the company by Bevan for his own benefit. My conclusions upon that question will govern the question of their liability for the smaller sums extracted for the benefit of Mansell, so far as that liability depends upon the knowledge that they ought to have obtained by inquiring into the state of the company's loans, whether at call, short notice, or otherwise.

I must now turn to the claim made by the Official Receiver in respect of moneys lent to, or left in the hands of, Ellis & Co., the company's brokers. The story of these moneys begins with a resolution of the finance committee of January 30, 1917: "To grant to Messrs. Ellis & Co. a loan of 30,000l. against securities with a 10 per cent. margin to be lodged by that firm with the company." There were present at this meeting Messrs. Bevan, Haig Thomas, and Grenside, and the secretary. According to Mr. Haig Thomas, the finance committee subsequently sanctioned an increase of this loan to 100,000l., though, according to Mr. Grenside's recollection, the total amount of the loan ultimately sanctioned by the finance committee was 200,000l. There was nothing inherently wrong in such loan, whether it was for the larger or the smaller amount, so long as the security lodged with the company by Ellis & Co. was ample, as it, in fact, was at all times material to the consideration of the present question. At the dates of the balance sheets for 1919, 1920 and 1921 the estimated value of the collateral security held by the company was always largely in excess

Copr. © West 2009 No Claim to Orig. Govt. Works

of 220,000l. This security, after the liquidation of the company, realized under 31,000l., but there is no evidence before me that the estimates of the value at the dates mentioned were in any way too large. The amount of the loan was, however, largely increased by Ellis & Co. without the authority or knowledge of either Mr. Thomas or Mr. Grenside. This was rendered possible by the fact that Ellis & Co. had from time to time enormous sums of the company's money in their hands over which, so far as I have been able to ascertain, no one of the respondent directors exercised any control, and **462** in respect of which no account was ever asked for or seen by him. These moneys were derived from the sale of investments carried out by Messrs. Ellis & Co. as the brokers of the company, and by cheques drawn on the company's banking accounts in their favour. What purported to be accounts of the dealings of Ellis & Co. with moneys and securities of the company were indeed sent by them to the company, but these accounts never seem to have got further than the accountants' department, and were never seen by any respondent director. Out of the moneys so received by them, Messrs. Ellis & Co. from time to time paid for the more permanent investments that were authorized by the finance committee. This committee, however, except on rare occasions, never concerned itself with the short-dated securities, or with temporary investments such as loans at call on the Stock Exchange or elsewhere. In consequence of this, Mr. Bevan, through his firm, was enabled to deal practically as he thought fit with the available cash of the company that was not required for the investments decided upon by the finance committee. There were two accounts kept by Mr. Lock, the accountant, in the investment ledger in the name of Messrs. Ellis & Co. - namely, a loan account and an investment account, and the entries in these accounts were made by Mr. Lock in accordance with the instructions of Bevan given by him verbally, or through the medium of the monthly accounts. If Bevan required, for his own purposes, a few more thousands of pounds of the company's money reposing in the hands of Messrs. Ellis & Co. he had only to direct Mr. Lock to debit his firm's loan account with the sum required, and the thing was done. In these circumstances it is not surprising that the debit to Messrs. Ellis& Co. on loan account was increased at first to 250,000l., and in February, 1921, to 350,000l. The balances in their hands on investment account continued to grow meanwhile, and at times were enormous. It will be sufficient to take the year 1921. On January 14 there was due from Ellis& Co. the sum of 123,055l. on investment account. At a meeting of the finance committee held on January 18 at **463** which Messrs. Bevan, Thomas, and Grenside were present, in addition to the general manager, it was agreed to reduce the company's aggregate holding in industrial securities, and Bevan was authorized to sell certain holdings at his discretion, the proceeds to be invested in Government Bills in due course. Various sales were accordingly carried out by Ellis & Co. during the month of January, with the result that at the end of that month the balance of cash in their hands on investment account was over 550,000l. By means of the entry of a perfectly fictitious purchase of Treasury Bills and National War Bonds, purporting to have been made on February 25, and by an unauthorized transfer to loan account of 100,000l. on February 28, the balance shown by the books of the company was reduced as at that date to 73,650l. But in point of fact this sum of 550,000l. in substance remained uninvested in their hands down to the date of liquidation. The National War Bonds and Treasury Bills purporting to have been bought on February 25 were never delivered or intended to be delivered, as will appear later on in this judgment. The pretended purchase was entered in the accounts merely for the purpose of misleading the auditors and the respondent directors and others who might be concerned with the balance sheet of February 28. When, therefore, this date was passed Bevan pretended to sell the bonds and bills, and the balance shown in the books to the debit of Ellis & Co. on investment account would once more have been swollen by the amount supposed to have been realized by this fictitious sale had not Bevan taken steps to avoid it. The steps he took were simple. Of the securities sold by Ellis & Co. in pursuance of the resolution of the finance committee of January 18, 1921, nearly 320,000l. worth had been sold to a syndicate of which Bevan was certainly a member, and possibly the sole member. It was, at any rate, clearly under his control. So in the first few days of March Messrs. Ellis & Co., without any authority whatsoever from anyone but Bevan, purported to resell these securities to the company, thus purporting to reduce their debit balance by 319,517l. As a matter of fact the proceeds **464** of this pretended resale were not actually credited to Ellis& Co. in the company's books until December 31, 1921, that being the date of the first monthly account of Ellis& Co. in which the resale was recorded. It would seem as if the resale were something that Bevan only intended to put forward in case any of his co-directors should discover the amount of the balance due from Ellis & Co. In the meantime further moneys continued to come in by reason of sales of investments and an occasional cheque from the company, and the balance due from Ellis & Co., even if they were credited with the proceeds of the resale, remained during the months of April, May and June at about the sum of 50,000l. It was only kept down to this comparatively moderate sum by Bevan taking 190,000l. and more for the purposes of the Brazilian ranch, and investing some 40,000l. in shares of the United Brass Founders, in both

Copr. © West 2009 No Claim to Orig. Govt. Works

cases without the knowledge or authority of any of his co-directors, as mentioned in an earlier part of this judgment. Finally, when in December, 1921, it had become obvious to Bevan that the amount of his firm's indebtedness could no longer be concealed, Messrs. Ellis & Co. proceeded to unload upon the company a number of doubtful securities, and to debit the company with a further large contribution to the Brazilian ranch. By these means, and by certain cash payments to the company obtained, I know not how, from Ellis & Co. in October, November and December the balance due from them to the company had, according to the company's books, disappeared both on loan and investment account, and a balance was actually shown due to them of 13,950l. This balance was, of course, wholly fictitious. If Ellis & Co. were debited, as they should be, with the sale price of the securities purporting to be resold to the company in March, 1921, and the cost at which they had unloaded other securities on the company in the month of December, 1921, the balance due from them on December 31, 1921, amounted with interest to 385,469l., as shown by exhibit "F.G.L. 1" prepared by the late Mr. Van de Linde. To this, however, must be added the cost price of certain securities, referred to in the **\*465** exhibits, which were bought by Ellis & Co., but were never delivered by them to the company, amounting to 47,890l., and for the purpose of estimating the loss occasioned by moneys of the company being left in Ellis & Co.'s hands there should also be added the sums expended by Mr. Bevan without any authority upon the Brazilian ranch and the United Brass Founders, amounting together to another 318,375l. The collateral security held by the company as against Ellis & Co.'s loan realized 30,859l. The total loss to the company in respect of the loan to Ellis & Co. and by reason of the company's moneys being left in their hands amounted, therefore, to over 720,000l., and I must now consider whether this loss has been occasioned by the wilful negligence or default of any of the respondent directors.

So far as it was due to the loan sanctioned by the finance committee, little remains to be said. The advancing to members of the Stock Exchange of moneys of the company not immediately required for current business purposes, or for permanent investment, if made upon adequate security, was a legitimate method of employing the company's funds, and there was no reason why such an advance should not be made to Messrs. Ellis & Co. merely because Mr. Bevan was a member of that firm. Owing to a serious fall in the value of the securities deposited with the company as cover for the loan, it was, in the end, inadequately secured. But there is no evidence before me to show that any of the respondent directors was aware, or should have been aware, that there was insufficient cover for the loan at any time when intervention on his part could have served any useful purpose. I cannot find that any respondent director was guilty of any negligence in the matter of the loan sanctioned by the finance committee. But the loss that was due to the unfettered control that Ellis & Co. were permitted to exercise over moneys of the company left in their hands gives rise to more difficult questions. The undoubted fact that Ellis & Co. did have this unfettered control was due to the following circumstances. The respondent directors, other than Mr. Haig Thomas and Mr. Grenside, were under the impression **\*466** that it was the duty of the finance committee to see to the proper investment of all the funds of the company not immediately required for the purpose of the company's business. Mr. Thomas and Mr. Grenside, however, thought that the finance committee were only concerned with the permanent investments, and that the temporary investment of the company's funds on loans at call or in short-dated securities was a matter that had been left to the chairman and general manager to arrange. [His Lordship then referred in detail to the evidence of Lord March, Sir Douglas Dawson and Mr. Milligan on this question, and continued:] Now these passages that I have read from the evidence of Lord March, Sir Douglas Dawson and Mr. Milligan certainly seem to indicate that they did not ever seriously bring their minds to bear upon the question as to how and by whom the temporary investments were being made. They appear to have assumed that such matters were being attended to by the finance committee. But such assumption was justified in the case of Sir Douglas Dawson and Mr. Milligan by the terms of the resolution of July 25, 1916; for, in my opinion, the duty delegated to the finance committee by that resolution was to act as a finance committee generally in relation to temporary as well as to permanent investments. There is no evidence as to Lord Ribblesdale's views upon the matter. He was, however, present at the board meeting of July 25, 1916, and I cannot doubt that he too must have been under the impression that the finance committee was attending to the investments generally. Any other conclusion would be inconsistent with the evidence given by his co-directors as to his general conduct in discharging his duties as a director. It is also to be observed that in the early days of the finance committee's existence, the board of directors themselves approved certain transactions of the finance committee, which included temporary as well as permanent investments. On November 14, 1916, the board approved the purchase by the finance committee of Treasury Bills; on February 6, 1917, it approved the loan of 30,000l. to Ellis & Co.; on April 3, 1917, a loan up to 50,000l. to Messrs. Sheppard, **\*467** Pelley & Co. Lord March did not know the

Copr. © West 2009 No Claim to Orig. Govt. Works

terms of the resolution appointing the finance committee, but he knew, of course, of the existence of this committee, and it was not unreasonable for him to assume (even if he did not know of what had taken place at the board meetings just referred to) that they had been appointed to attend to the company's investments generally. I am not in the circumstances prepared to find any one of these four gentlemen guilty of negligence for omitting to make inquiries as to who were looking after the temporary investments of the company, though, had any inquiries of his been addressed to Mr. Grenside or Mr. Haig Thomas, he would have discovered that they took a very different view as to the precise functions of the finance committee. [His Lordship then reviewed the evidence of Mr. Grenside and Mr. Haig Thomas, showing that they considered and understood that the duty of seeing to permanent investments only, and not also to temporary investments, had been delegated to the finance committee, and continued:] This evidence discloses a truly astonishing state of things. It is the duty of each director to see that the company's moneys are from time to time in a proper state of investment, except in so far as the company's articles of association may justify him in delegating that duty to others. So far as the respondent directors, other than Mr. Haig Thomas and Mr. Grenside, are concerned, they were justified in delegating this general duty to the finance committee, and thought that they had done so. The position of Mr. Thomas and Mr. Grenside was, however, very different. They knew that neither the board nor the finance committee were attending to the temporary investments and were content to leave the duty of doing so to Mr. Bevan and Mr. Mansell. In this they were wrong. Thinking, as they did, that the duty had not been delegated to the finance committee, they should have regarded it as being still reposed in the board as a whole. That Bevan and Mansell were persons enjoying the highest reputation is beside the mark. If the shareholders had desired to leave hundreds of thousands of pounds of the company's money under the sole control **\*468** of Bevan, they would have done so. But the shareholders had preferred to have associated with Bevan a board of six or seven other directors, and it was not for these other directors to leave Bevan to discharge one of the most important of the duties that had been entrusted to the board as a whole, however reasonable and however safe it might have seemed to the directors to do so. Still less would it be permissible to leave the control of the company's temporary investments to the general manager. It is not any part of the functions of a manager of an insurance company to decide upon the method of investment of the company's cash resources. His advice and assistance will no doubt be sought. But the responsibility for the ultimate decision as to investment must rest with the directors or, when the articles permit, with a committee of the directors, and none the less that the investment is only a temporary one. In my judgment, Mr. Haig Thomas and Mr. Grenside were guilty of a breach of their duty as directors in failing to control and safeguard the moneys of the company that were not in a state of permanent investment. If, therefore, they were responsible for losses sustained by their mere negligence, I could not acquit them of responsibility for the whole of the money due from Ellis & Co. at the date of the liquidation in excess of the loan to that firm sanctioned by the finance committee, not merely because that money was allowed to remain in Ellis & Co.'s hands, but on the broader and more general ground that I have mentioned. I should have had to find them responsible for the loss occasioned by any and every temporary investment made by Bevan or Mansell. But this breach of duty on the part of Mr. Thomas and Mr. Grenside was due to nothing more than ignorance of what their duty was in the matter. It is clear that it never occurred to either of them that it was his duty to keep under his own control the matter of the temporary investments. But further than this, it is established to my satisfaction that each of them in fact honestly thought that he did not owe any such duty to the company. In these circumstances, unless I have arrived at a wrong conclusion as to the meaning **\*469** of the expression "wilful negligence or default," both of them must be absolved by reason of the 150th article of association from liability for this breach of their duty.

The question of liability for the loss occasioned by leaving money in the hands of Ellis & Co. does not, however, end there, either as regards these two gentlemen or as regards the rest of the respondent directors. For though, as I have already held, none of them is liable merely on the ground that the disposition of the moneys of the company not in a state of permanent investment was left in the control of Bevan or Mansell, he might yet be responsible for the losses occasioned by the improper way in which Bevan in fact disposed of those moneys, so far as such disposition came to his notice or would have come to his notice had he made proper inquiries. In considering this aspect of the case, it is not necessary to draw any distinction between those respondent directors who were and those who were not members of the finance committee. For although the members of the finance committee did, in my opinion, owe a higher duty to the company than the other directors, in the matter of the periodical investigation of the investments of the company, both permanent and temporary, yet as regards the latter class of investment Mr. Thomas and Mr. Grenside did not think that their position was in any way different from that of an ordinary director, and the

question of any liability they may have incurred for acting upon this assumption has already been dealt with. In these circumstances, I must treat them as though for the purpose of temporary investments the finance committee consisted of Bevan and Mansell. Treating then all the respondent directors for this purpose as being on the same footing, the question arises as to whether any of them in fact knew of the improper use that was being made by Bevan of the control that had so unfortunately been left in his hands, and secondly, whether they would have known of it had they made all such inquiries as it was their duty to make. As to their knowledge in fact there is no difficulty. Each one was at all material times in complete ignorance that moneys of the company *470 were left in the hands of Ellis & Co. It was, of course, known to the directors that moneys of the company were being paid to Ellis & Co., for a large number of cheques were from time to time drawn in their favour and signed by two directors, and on a sale of investments the proceeds would in the first instance be received by them. But the directors were justified in signing the cheques in favour of the company's brokers, seeing that these cheques were placed before them for signature by the responsible officials of the company in what appeared to be the ordinary course and for purposes that appeared to be proper. If, for instance, certain investments had been decided upon by the finance committee, money would necessarily have to be paid to the company's brokers for the purpose; and it was not, in my opinion, the duty of any director who was asked to sign a cheque in favour of the brokers on investment account, that cheque being placed before him by the officials whose duty it was to see that the directions of the finance committee were being carried into effect, to inquire into the question whether the money was really required for the purposes of investment, or to see that the money was in fact applied for such purpose. Nor would a director be liable for allowing proceeds of sale of investments to be received by the brokers. They would only be liable if such proceeds were to their knowledge left in the brokers' hands for a longer time than was necessary. And that this was being done was just the fact of which they were ignorant. [His Lordship referred to the evidence on this point and continued:] But the more difficult question arises as to whether this ignorance of the respondent directors was consistent with a proper discharge of their duties to the company. The answer to this question depends upon how far it was the duty of a director of the City Equitable, not being a member of the finance committee, to ascertain from time to time the manner in which the money of the company had been invested. This question arises not only in connection with the moneys in the hands of Ellis & Co. but also in connection with the overpayments to Mansell. In my opinion, it could not reasonably be expected of such *471 a director that he should keep himself acquainted at all times with the details of the company's investments. Speaking generally, he would be justified in trusting to the finance committee to perform properly the duties delegated to them. But the duty of making a report to the company in general meeting as to the state of the company's affairs and the amount recommended to be paid in dividend, as required by the 139th article of association, was the duty of the board of directors as a whole and not of the finance committee. For the purposes of enabling them to make such report it was, in my judgment, essential that there should be prepared for the use and information of the directors a complete list of the company's assets. It would be impracticable for every director to go through the list and satisfy himself as to the maintenance of the book values of each security. This task might properly be left to a small committee of directors, upon whose report the others would be justified in acting. But in the present case no such list was ever before the board or was ever called for by any individual director. Mr. Haig Thomas indeed was supplied on two occasions with what purported to be a list of investments, one at some date early in 1919 and the other in April, 1920. The second of these two lists purported to show the investments as they existed on February 29, 1920, Mr. Haig Thomas being told upon the telephone by some individual at the company's office who has never been identified that there had been no change in the investments since that date. This, as a matter of fact, was wholly untrue. Nor were the lists complete lists. The first one, a copy of which was also sent to Mr. Grenside, contained no mention whatever of any loan to or indebtedness of Ellis & Co., and the second one showed a sum of no more than 4690l. as due from them on investment account. It seems probable that Mr. Grenside also saw this list. In point of fact, a comparison of the total amount of the assets set out in those lists with the total set out in the balance sheets for these two years would have shown Mr. Haig Thomas and Mr. Grenside that the lists were inaccurate. But they made no such comparison, nor indeed were the lists *472 obtained by them for the purposes of the balance sheets at all. These two lists are not in truth relevant to the point that I am considering, but they do provide another illustration of the difficulties with which the respondent directors had to contend by reason of the untrustworthiness of the officials of the company. The list of investments which, in my opinion, the directors should have obtained in connection with and for the purposes of the balance sheet in each year would have been a list that showed in detail all the investments that were lumped together in the balance sheet under general headings, in order that the directors might form some idea for themselves as to whether the total sum brought in as the value of the

investments under each general heading was justified for the purpose of the balance sheet and of the dividend that they were recommending. No such list was however called for by any of the respondent directors, in any one of the relevant years, 1919, 1920 and 1921. Had they done so, they would have discovered that Mansell was indebted to the company in 6225l. in 1919, 52,427l. in 1920 and 96,233l. in 1921. They would also have discovered that their brokers owed the company 51,423l. in 1919, 15,690l. in 1920 and 423,650l. in 1921. These three last-mentioned sums were a long way short of a true statement of Ellis & Co.'s indebtedness, but this was due to the fact that in 1919 and 1920, just as in 1921, fictitious purchases of Treasury Bills for a large amount were entered in Ellis & Co.'s accounts for the purpose of reducing their indebtedness as shown by the company's books. The directors, therefore, would not have ascertained the true state of affairs as regards Ellis & Co., and so far as the years 1919 and 1920 were concerned there would not have appeared to them that there was any cause for criticism or inquiry as to the indebtedness of that firm, seeing that the company held abundant security, and that the debt in each year fell a long way short of the 100,000l. that the finance committee had sanctioned. But they would have ascertained that their general manager was indebted to the company in large sums in respect of which the company held no security, and that in the month of February, 1921, *473 Ellis & Co. had increased the amount of their loan to 350,000l. without any authority and held in their hands without security moneys of the company amounting to 73,650l. It is therefore reasonable to suppose that had the directors made or caused to be made inquiries as to the items that went to make up the total sums appearing in the balance sheets under the heading of loans at call or short notice in the balance sheets for the years 1919 and 1920, under which headings the debts of Mansell and the loan to Ellis& Co. were included, or as to the items that went to make up the sum appearing in the balance sheet of 1921 under the heading of "Cash at bank and in hand," under which heading the 73,650l. due from Ellis & Co. was included, a considerable sum might have been saved to the company. In not making or causing to be made these inquiries the respondent directors, in my opinion, failed to come up to the strict standard of their duty. They appear to have contented themselves with making general inquiries of Bevan on the occasions when the balance sheets came before them for approval, and were satisfied with his assurances, that were no doubt readily forthcoming. For the rest, they seem to have relied upon the certificate of the auditors, which contained a statement that in the belief of the auditors the assets set forth in the balance sheet were in the aggregate fully of the value as stated therein. Having regard to the high reputation that Bevan possessed in the City of London and elsewhere it is not difficult to understand how the respondent directors allowed themselves to be satisfied with the assurances given by him, fortified by the certificate of the auditors. As it turned out, the respondent directors were being tricked and defrauded by Bevan and so were the auditors themselves, and neither these directors nor the auditors received from the officials of the company the protection and assistance that they were entitled to expect. For the moment, however, I am only concerned with the respondent directors, and, though I feel considerable sympathy with them in being surrounded by officials whom events have shown to be unreliable, and in being led by a chairman *474 whom events have shown to be a daring and unprincipled scoundrel, I also feel bound to express my opinion that in the particular matter that I am now considering they did less than the law required of them. When presenting their annual report and balance sheet to their shareholders, and when recommending the declaration of a dividend, directors ought not to be satisfied as to the value of their company's assets merely by the assurances of their chairman, even as distinguished and honourable as Bevan appeared at the time to be, nor with the expression of the belief of an auditor as competent and trustworthy as Mr. Lepine was and still is. As I have already stated, a list of the company's assets should have been prepared, and this was never done. But for the 150th of the articles of association, I should, in my judgment, have to hold the respondent directors (other than Lord March) liable in varying degrees for the loss to the company that might have been prevented had such a list been called for on the occasion of the approval by the board of the balance sheets for the years 1919, 1920 and 1921 respectively. Lord March would have to be excepted, inasmuch as he was not present on any one of these occasions. The other respondent directors, however, are relieved from any such liability by reason of the article, for I am quite satisfied that they erred in perfect good faith and in ignorance of what was their duty to the company in this respect.

One more matter has to be dealt with before leaving the subject of the indebtedness of Ellis & Co. At all material times during the years 1919, 1920 and 1921 securities of the company were left in the hands of that firm. In view of what is now known of Bevan's character, it is not surprising to find that he pledged these securities for his own purposes. The larger number of them were by good fortune sold subsequently and the proceeds in due course credited to the company. But at the date of the company's liquidation and Ellis & Co.'s bankruptcy, the securities to which I

have already referred, and of which the book value was 47,890l., still remained in their hands and were wholly lost to the company. The Official Receiver accordingly seeks to charge the respondent *475 directors in any case with this sum upon the ground that it was a breach of their duty to allow securities of the company to be retained by their brokers. Had any one of the respondent directors been aware of the fact that securities were left in the hands of Ellis & Co. for safe custody he would have been guilty of breach of duty if he had not insisted on the practice being summarily stopped. But in fact they were all ignorant that this was being done. The Official Receiver contends, however, that this ignorance does not protect them, as they ought to have initiated some system of safeguarding the company's securities under which it would have been impossible for Ellis & Co. to obtain possession of them. This object could, no doubt, have been attained if the directors had taken the securities to the bank in person or had personally supervised the locking up of the securities in a safe, retaining sole control of the key. But it is not the duty of a director of such a company as the City Equitable to see in person to the safe custody of securities. That is one of the matters which the directors must almost of necessity leave to some official who is at the office daily, such as the manager, accountant or secretary. When an investment is made through the brokers, it would be quite impracticable for the directors to receive actual delivery of the securities. So too when investments are sold, delay and great inconvenience would result if the delivery of the securities to the brokers had to await a meeting of the board or of a committee of directors. The respondent directors would therefore be justified in trusting to Mr. Mansell, their general manager, or Mr. Lock, their accountant, to perform the duty of putting into safe custody the securities of the company. And this is what in fact the respondent directors appear to have done. [His Lordship referred to the evidence in support of this statement and also the evidence of Mr. Lock, the company's accountant, showing that in point of fact and without the knowledge of the respondent directors, but with the connivance of Bevan and Mansell, Ellis & Co. had almost complete control of the company's securities, and continued:] No system could protect the securities against this sort of thing short of *476 personal supervision of the securities by the respondent directors themselves, and such supervision they are not bound to give. I cannot hold them liable for any loss sustained by reason of the company's securities being retained by Messrs. Ellis & Co.

The next charge against the respondent directors with which I have to deal is in respect of a sum of 6952l. 19s. 7d., which has been generally referred to in these proceedings as a loan to Bevan, but which is more accurately described as moneys of the company misappropriated by him. It can be dealt with comparatively shortly. [His Lordship reviewed the evidence, and held that the "loan to Bevan" was founded on a minute fraudulently forged and entered by Bevan, and that none of the respondent directors was liable for this loan or for the Saskatoon loan, and continued:] Only two matters remain to be considered, so far as the respondent directors are concerned. These are the two payments of dividends in the year 1921. Of these, one was recommended by the directors at the Board meeting of May 20, 1921, and declared at the annual general meeting of the company in June, 1921, in respect of the year ending February 28, 1921. The other, which was an interim dividend, was declared by the directors at a board meeting held on November 1, 1921, in respect of the half year ending on August 31, 1921, and is stated in the points of claim to have been paid on November 18. It is alleged by the Official Receiver that both these dividends were paid out of capital. All that I need say about this allegation is that there is no sufficient evidence to support it. If the assets comprised in the balance sheet of 1921 were on February 28 of the value, or even somewhere near the value, therein stated, the first dividend was most assuredly not paid out of capital. Nor was the interim dividend, unless by the month of November those assets had depreciated considerably in value. But no evidence was adduced before me as to the value of the assets at the critical times. It does indeed seem probable that some of the assets, and notably the debt due from Ellis & Co., had depreciated considerably in value by November. But *477 I do not know that it is even probable that the depreciation had been so great as to render improper a payment of the small interim dividend amounting only to some 15,000l. In any case I cannot hold the respondent directors guilty of a payment of dividend out of capital on mere probability. The onus of proving his case is upon the Official Receiver, and this onus he has not discharged. It is not for the respondent directors to prove, especially after this lapse of time, that the dividends were in fact paid out of profits. There is certainly some ground for suggesting that, having regard to a certain shortness of cash at the company's disposal in the month of November, 1921, the declaration of the interim dividend was somewhat unwise. The payment of the dividend, however, was only resolved on after a very full discussion by the directors then present, and after hearing from Mr. Mansell personally, or through Bevan, a satisfactory account of the condition of the company's insurance business. I am satisfied that, at the time, it appeared to the directors to be a safe and prudent thing to do. In any case a director is not responsible for declaring a dividend unwisely. He would

only be liable for paying the dividend out of capital, and I am unable to find that the directors did so in the present case.

The result is that the case of the Official Receiver fails against all the respondent directors. He is, however, entitled to relief against Bevan in respect of many of the transactions to which I have referred. So far as the investment in Claridge's Hotel is concerned, I have not sufficient evidence to justify me in making him responsible for the loss thereby occasioned. But I am satisfied that in the matter of the investments in the United Brass Founders and in the Brazilian ranch, Bevan acted fraudulently, as he did too in the matter of the loan of 110,000l. to Mansell and his own misappropriation of the sum of 6952l. I propose therefore to declare that in these four matters he was guilty of a fraudulent breach of trust, and to direct an inquiry as to the damages sustained by the company by reason of the two investments, and to order him to repay to the company the sums of 110,000l. and 6952l. with interest. In respect of the moneys *478 owing from Ellis & Co. at the date of the liquidation it would not be right, in the circumstances, to treat him as having acted improperly in making the loan to Ellis & Co. that was sanctioned by the finance committee, which I propose to treat as having been 200,000l. The collateral security deposited by Ellis & Co. realized 30,859l. 2s. 10d., so that the loss to the company in respect of the loan was 160,149l. 17s. 2d. He is, however, liable to make good the difference between this sum and the sum of 407,604l. 13s. 11d. shown as due from Ellis & Co. in the exhibit "F.G.L. 1," and I accordingly make an order against him for payment of 238,454l. 16s. 9d. As, in calculating this sum, he has been charged with the cost price to the company of such of the shares in the United Brass Founders as were never delivered, this fact must be taken into account in ascertaining the damage sustained by the investment in that company. There must be added, however, to the sum I have ordered him to pay 9329l. 14s. 5d. in respect of what has been called the Saskatoon loan.

It remains for me to deal with the charges made against the respondents, Messrs. Langton and Lepine, the auditors of the company. By para. 4 of the claiming part of the points of claim, the Official Receiver asks for a declaration that these respondents were guilty of negligence in respect of the audit by them of the balance sheets of the company for the years ending February 28, 1919, February 29, 1920, and February 28, 1921, respectively, and are liable to pay to the liquidator compensation for the loss sustained by the company by reason of such negligence and breach of duty. The Official Receiver also asked for a declaration that such compensation included the dividends paid in respect of the year ending February 28, 1921, as having been paid out of capital. Mr. Topham, at the end of his reply, however, stated that he did not press for any separate relief in respect of these dividends, but merely for a general inquiry as to the damage sustained by the company by reason of the auditors' negligence. But in any case, as I have already pointed out, the Official Receiver has not proved that the dividends were in fact paid out of capital. Now the negligence and breach *479 of duty charged at the Bar against the auditors in respect of their audit of the three balance sheets in question come under three heads: (1.) Their misdescriptions in the balance sheets of the debts of Ellis & Co. and Mansell by including them under "Loans at call or short notice" or "Loans" or in the case of part of Ellis & Co.'s debt under the heading of "Cash at bank and in hand," and their consequent failure to disclose to the shareholders the existence of those debts. (2.) Their failure to detect the fact that much larger sums were in the hands of Ellis & Co. at the date of each of the balance sheets than were so included. (3.) Their failure to detect and report to the shareholders the fact that a number of the company's securities, which were in the custody of Ellis & Co., were being pledged by that firm to its customers. I will deal presently with each of these matters in turn, but, before doing so, there are one or two general observations about the auditors that must be made.

The audit in each of the three years was, in fact, conducted by Mr. Lepine alone. His partner, Mr. Langton, had conducted the audits of the accounts of the company from the date of its incorporation until the completion of the balance sheet for the year ending February 28, 1917, but from that time ceased to take any active part in the audits. In the discharge of his duties in the three years, 1919 to 1921, Mr. Lepine, speaking generally, displayed great skill, care and industry. Eloquent testimony of this is furnished by the numerous accounts, memoranda, and reports which he prepared in connection with the three audits, and which were produced by him in the course of his evidence. Each audit took from six to eight weeks to complete, and during that time two or three clerks of the auditors would be in continuous attendance at the company's offices. The work of these clerks would of course be done under the direction of Mr. Lepine who, during the latter part of the audit, was himself in fairly continuous attendance. The late Mr.

Van de Linde, who was himself an accountant of great experience, and who, after the company went into liquidation, made an able and thorough examination of the company's *480 affairs, testified as to the care and accuracy displayed by Mr. Lepine in the audits. The following passage is taken from his cross-examination by Mr. Stuart Bevan: "Q. 1409. I am quite aware of what the complaints are with regard to Messrs. Langton & Lepine, but putting those on one side, because they have to be investigated to see whether there is any foundation for them at all, does your investigation shew that these audits were very carefully conducted by Mr. Lepine? He was always calling for documents, checking entries and so forth? - Yes. Q. 1410. It must have involved a great deal of work? - Yes, a great deal I think. Q. 1411. And extraordinary accuracy in his figures? - Yes. I think the figures are accurate right through. Q. 1412. I have not yet heard or read, and I have been here all the time, that there is any suggestion that there is any wrong figure? - As far as the figures are concerned, I think there is great accuracy right through. Q. 1413. In fact, throughout, always putting aside these matters we have to address ourselves to, speaking generally, throughout, the greatest care shewn and accuracy achieved? - Yes. Q. 1414. Involving, as you say, a very large amount of investigation and labour? - Yes, I think so." But if in the course of these long and arduous audits Mr. Lepine has in even one instance fallen short of the strict duty of an auditor, he cannot, I apprehend, be excused merely because in general he displayed the highest degree of care and skill. As to what that duty is, there is not much authority to be found in the books. But in In re London and General Bank (No. 2) Lindley L.J. dealt at some length with the duties of the auditor of a company. He says this: "It is no part of an auditor's duty to give advice, either to directors or shareholders, as to what they ought to do. An auditor has nothing to do with the prudence or imprudence of making loans with or without security. It is nothing to him whether the business of a company is being conducted prudently or imprudently, profitably or unprofitably. It is nothing to him whether dividends are properly or improperly declared, provided he discharges his own duty to the shareholders. *481 His business is to ascertain and state the true financial position of the company at the time of the audit, and his duty is confined to that. But then comes the question, How is he to ascertain that position? The answer is, By examining the books of the company. But he does not discharge his duty by doing this without inquiry and without taking any trouble to see that the books themselves shew the company's true position. He must take reasonable care to ascertain that they do. Unless he does this his audit would be worse than an idle farce. Assuming the books to be so kept as to shew the true position of a company, the auditor has to frame a balance sheet shewing that position according to the books and to certify that the balance sheet presented is correct in that sense. But his first duty is to examine the books, not merely for the purpose of ascertaining what they do shew, but also for the purpose of satisfying himself that they shew the true financial position of the company. This is quite in accordance with the decision of Stirling J. in Leeds Estate, Building and Investment Co. v. Shepherd. An auditor, however, is not bound to do more than exercise reasonable care and skill in making inquiries and investigations. He is not an insurer; he does not guarantee that the books do correctly shew the true position of the company's affairs; he does not even guarantee that his balance sheet is accurate according to the books of the company. If he did, he would be responsible for error on his part, even if he were himself deceived without any want of reasonable care on his part, say, by the fraudulent concealment of a book from him. His obligation is not so onerous as this. Such I take to be the duty of the auditor; he must be honest - i.e., he must not certify what he does not believe to be true, and he must take reasonable care and skill before he believes that what he certifies is true. What is reasonable care in any particular case must depend upon the circumstances of that case. Where there is nothing to excite suspicion very little inquiry will be reasonably sufficient, and in practice I believe business men select a few cases at haphazard, see *482 that they are right, and assume that others like them are correct also. Where suspicion is aroused more care is obviously necessary; but, still, an auditor is not bound to exercise more than reasonable care and skill, even in a case of suspicion, and he is perfectly justified in acting on the opinion of an expert where special knowledge is required. Mr. Theobald's evidence satisfies me that he took the same view as myself of his duty in investigating the company's books and preparing his balance sheet. He did not content himself with making his balance sheet from the books without troubling himself about the truth of what they shewed. He checked the cash, examined the vouchers for payments, saw that the bills and securities entered in the books were held by the bank, took reasonable care to ascertain their value, and in one case obtained a solicitor's opinion on the validity of an equitable charge. I see no trace whatever of any failure by him in the performance of this part of his duty. It is satisfactory to find that the legal standard of duty is not too high for business purposes, and is recognized as correct by business men." I must now inquire whether, in the matters complained of, Mr. Lepine fell short of the duty of an auditor as so explained and defined.

On February 28, 1919, Ellis & Co., according to the books of the company, owed the sum of 51,423l. 19s. 4d. and Mansell the sum of 622 5l. Both these sums were included by Mr. Lepine in the balance sheet as of that date under the description "Loans at call or short notice 177,648l. 19s. 4d." Now it is said that neither of these sums was a loan at call or short notice. Mansell's debt certainly was not. Ellis & Co.'s probably was. But I do not propose to decide this question, for I cannot see that any human being has been misled by these debts being referred to as "Loans at call or short notice," rather than as "Loans." If the description of them in the balance sheet as "Loans" would have induced any director or shareholder to make some inquiry as to their nature, which he was induced to refrain from making by reason of their description as "Loans at call or short notice," the matter would be different. But not only is this inherently **\*483** improbable, there is actual evidence that it was not so. For in the balance sheet of February 28, 1921, the description was altered for a reason that will hereafter appear. No longer was there any sum brought in under the former description. The loan to Ellis & Co. and the debt of Mansell were, with some other loans, lumped together in the balance sheet under the generic description "Loans." And just as, in the two preceding years, no director or shareholder made any inquiry as to how the sum brought in under the description of "Loans at call or short notice" was made up, no inquiry was made as to the items going to make up the sum brought in under the heading of "Loans" in 1921. The alteration in the heading did indeed attract the attention of Mr. Milligan. But the only inquiry he made was as to the reason for having so large a sum out on loan, as to which he received a very plausible explanation from Bevan. He made no inquiry as to how the sum was arrived at. The truth is, that the ignorance of the respondent directors and of the shareholders as to the indebtedness of Ellis & Co. and Mansell, so far as it was contributed to by Mr. Lepine, was due to his omission to call specific attention to this indebtedness in the balance sheet by mentioning both the debtors by name. But if the directors choose to lend money to their brokers, or their general manager, there is no reason why they should not do so, nor can I see any reason why the auditor should call the attention of the shareholders specifically to the fact of their having done so. In the words of Lindley L.J. an auditor has nothing to do with the prudence or imprudence of making loans with or without security. He must, of course, take care that he does not bring into his balance sheet at face value a debt that is not a good one. The credit of Ellis & Co., however, was above suspicion, and, in addition, the company held collateral security against their indebtedness to the value of over 286,000l. Nor was there any reason to suppose that the debt of Mansell was not good. It was, however, unsecured, and accordingly Mr. Lepine, in his report addressed to Bevan in his capacity of the chairman of the company, called attention to the fact in these terms: "The loans **\*484** 177,648l. 19s. 4d. include a sum of 622 5l. due from your general manager, and for which the company do not hold any security." Mr. Lepine, of course, intended this report to be placed before the board of directors, and was justified in supposing that this had been done. Bevan, in fact, suppressed it, but I cannot see how Messrs. Langton and Lepine can be held responsible for this. Mr. Lepine in this matter did, I think, all that it was reasonable for him to do in the circumstances.

Much of what I have said about the 1919 balance sheet applies to that of 1920. According to the books of the company there was no balance due from Ellis & Co. on loan account on February 29, having regard to the fact that it had all been transferred to investment account. But after this transfer had been made, the books showed a balance due from them on this latter account of 4690l. 16s. 6d., in respect of which the company held collateral security to the value of over 275,000l. But in January of that year Ellis & Co. had debited the company with 161,000l. in respect of the Brazilian branch. Now, as already stated, the only sum that the finance committee had authorized in respect of this investment was 150,000l., and this fact Mr. Lepine, with his usual care and industry, had discovered. Having noted it in one of his memoranda of queries, he had an interview with Bevan upon the matter. As a result of this interview, Messrs. Ellis & Co. addressed to the company a letter in the following terms: "Re Ranch Account. You will doubtless remember that in all you have been debited in this connection 161,000l., and the matter was discussed between Mr. Lepine and Mr. Bevan a few days ago. The amount has now been adjusted to your actual participation, namely, 150,000l., so we have credited you the sum of 11,000l. with interest from the 31st December, 1919, to the 30th instant, and the amount will appear in your statement of the 30th June." The result of recrediting the company with the 11,000l. was, of course, to increase the indebtedness of Ellis & Co. by that amount, and whether it was treated as due from them on loan account or on investment account was not very material. **\*485** In the meantime Mansell's debt had increased to 52,427l. 14s. 5d. In the balance sheet this sum, and the 11,000l. due from Ellis & Co., are included in a sum of 387,564l. 5s. 9d. brought in under the description of "Loans at call or short notice." The balance due from Ellis & Co. on investment account is included in a sum of 270,000l. odd described as being "Cash at bank and in hand." Mr. Lepine seems to have thought that this sum in the hands of the company's brokers

Copr. © West 2009 No Claim to Orig. Govt. Works

was as much cash in hand as if it had been in the hands of one of the company's officials. In this I think that he was wrong, but it would have made no difference to any one had it been included, as it could have been, under the heading of "Loans" or "Sundry debtors." But as regards the debt due from Mansell, the balance sheet is open to a criticism in no way connected with the question whether the debt ought to have been included under the heading "Loans at call or short notice." For the only advance to Mansell that had been sanctioned was one of 15,000l. approved of at the meeting of the finance committee on January 3, 1919. Mr. Lepine accordingly looked up this minute, and made inquiries of Mr. Bevan about this and numerous other matters as to which he was not satisfied after making his examination of the books and documents of the company. These inquiries were made at an interview he had with Bevan on June 2, 1920. This interview is dealt with as follows in Mr. Lepine's examination: "Q. Will you tell my Lord what took place between you and Bevan on the 2nd of June? - So far as I remember, Bevan informed me that although the amount authorized by the minute of January, 1919, had been exceeded, it was perfectly in order; that the directors were fully cognisant of the loan which had been made to Mansell in connection with his property, and that but for his absence from London a minute would have been passed at a board meeting by the time I had come to do the audit. Q. That is Bevan's absence? - Yes. Q. Did he say what would be done in the future? - He told me that a minute would be passed at the next board meeting, and some agreement entered into with regard to the matter **\*486** generally. I asked him to confirm that, as to the deeds being in his possession. I asked him to confirm that by letter. Q. One of the queries you raised was as to the security? - Yes. Q. Was anything said about security? - Yes, he told me he held the deeds in his office. Q. What deeds? - The deeds of the property which Mansell had purchased. Q. I see there is a letter from Mr. Bevan about this matter on the 2nd June, 1920, the same day? - It was written on the same day. Q. Was it written after the interview? - Yes. Q. 'I write to say in connection with the loan made by the City Equitable to the manager, Mr. Mansell, we hold certain deeds representing the properties he has purchased in Kent, which, of course, also cover the stock and any other assets on the property.' Mr. Bevan having told you that, and having confirmed it in writing in this way, had you any reason to suppose that it was untrue? - No, not at all. Q. I see you wrote in answer to that on p. 702 a letter of the 3rd of June to Mr. Bevan: 'I am obliged by your four letters of the 2nd instant with reference to various investments made by the above company up to 29th February last. With regard to the loan to Mr. Mansell, this amounted to 52,427l. 14s. 3d. as at 29th February last, which figure has been arrived at after deducting the amount due to him for profit commission for the past year; you will recollect that the only minute with regard to a loan is that of the 3rd January, 1919, which only authorized a sum of 15,000l.; I, however, understand that a further minute will be passed at the next meeting of the Board. I will also remind you that Mr. Mansell has not been charged with any interest up to 29th February last, but that you are now giving instructions as to this'? - Yes. Q. Did you accept Mr. Bevan's explanation and believe that a minute would be passed confirming these advances? - Yes." Following this interview, Mr. Lepine made a report to the chairman as in the preceding year, and this report contains the following passage: "With regard to the loan to Mr. Mansell, we would remind you that the only minute is one dated 3rd January, 1919, authorizing a sum of 15,000l.: we understand that a further **\*487** minute is to be recorded at the next board meeting. We would also draw your attention to the fact that no interest has yet been charged in respect of this loan: we, however, are informed that this matter is now having your attention, and, further, that a formal agreement is to be prepared with reference to the loan generally." Mr. Lepine thereupon allowed the debt to be included in the balance sheet without insisting upon a minute being passed or a formal agreement prepared. Having regard to what we now know, it is no doubt easy to criticize Mr. Lepine's action in doing this. But putting one's self into his place, and looking at the matter as it appeared to him at the time, his action was reasonable, and, except for one qualification, to which I will call attention presently, was not inconsistent with his duty as an auditor. For he had seen the slips that had been initialled by the directors who had signed the cheques in Mansell's favour, and these would seem to confirm the statement of Bevan, if confirmation were required, that the directors were fully cognisant of the loan which had been made to Mansell. The absence of a formal minute recording their approval would not, therefore, be a reason for delaying the completion of the balance sheet, or the issue of the auditor's certificate, especially as he had taken the precaution of referring to the matter specifically in the report that he thought would be shown to the board. But, as usual, this report was suppressed by Bevan, and, as usual, Bevan had lied. Not only had he lied as to the directors' knowledge. He had also lied as to there being any security. And in this lie he was ably supported by Mansell himself. For Mr. Lepine, in accordance with his practice where loans were concerned, had required an acknowledgment of the loan from the debtor. Mansell had accordingly signed a letter addressed to the company in these terms: "Dear Sirs, I beg to confirm that as at the 28th February last the total sum which has been advanced to me on loan account in connection with my property at Pennybridge, Wad-

hurst, Sussex, is 52,427l. 14s. 3d. I am, yours faithfully, E. G. Mansell, General Manager." The words **\*488** "in con-
nection with my property" were the words that Bevan had used at the interview of June 2 for the purpose of convey-
ing the idea that the loan was secured on Mansell's property, and though Mansell did not say in terms that the loan
was so secured, he obviously intended Mr. Lepine to believe that it was. His reference to his property was otherwise
meaningless. But it is just in connection with this non-existent security that the qualification to which I referred
above must be added to the statement, otherwise well founded, that Mr. Lepine performed his duty as an auditor in
this matter. For Mr. Lepine did not insist on inspecting the deeds of the property himself. He accepted the assurance
of Bevan that the deeds were in Bevan's office. The whole question as to the duty of an auditor to make personal
inspection of securities is, however, dealt with later in connection with the other charges made against Messrs.
Langton and Lepine, and need not be further discussed at present.

On February 28, 1921, the position, even as shown in the books of the company, had changed considerably for the
worse. There was then, according to the investment ledger, a sum of 350,000l. owing by Ellis & Co. on loan ac-
count, and 73,650l. owing on investment account, while Mansell's indebtedness had increased to 96,233l. As regards
the latter, Bevan had not caused a minute to be passed or an agreement to be entered into, although, as has already
appeared in the part of this judgment that deals with the charge against the respondent directors in connection with
Mansell's loan, Bevan was already engaged in the fraudulent device which resulted in the execution of the Mansell
agreement. In the balance sheet Mansell's debt and Ellis & Co.'s debt of 350,000l. were included in an entry of
"Loans 514,633l." The securities held by the company as collateral security for the 350,000l. were, on February 28,
1921, worth only 247,570l. This, of course, did not satisfy Mr. Lepine, who raised a query upon it which was thus
described in his evidence: "The query I did raise was that on the bank certification as to the collateral security the
collateral security did not come anywhere near **\*489** the amount of the loan. I referred that fact to Mr. Lock, and he
informed me that further collateral security had been lodged during, I think, the first week in March, and produced
to me the bank's green slip acknowledging those further securities. The bank obviously could not confirm having
held them on the 28th February, when they were not lodged until, I think, the 2nd or 3rd March, but I obtained from
Mr. Lock, and he showed me, the bank's green slip on which they used to enter securities as they were lodged, or as
they were withdrawn, and I think there is a note on the account somewhere to that effect." The note in question
shows that the market price of the further securities was 104,000l. From Mr. Lepine's point of view the 350,000l.
was still properly described as a "Loan at call or short notice." But the Mansell agreement had been produced and
carefully read by Mr. Lepine in the course of the audit for 1921. In view of this agreement, it was obviously impos-
sible to describe the loan to Mansell as being at call or short notice, and so the general heading was altered to
"Loans." This was admittedly a proper description of the 350,000l., and of the sum due from Mansell, unless it was
Mr. Lepine's duty to refer to the debtors by name. There was, however, no particular reason why he should have
done so. He had again inspected the slips initialled by the directors, who signed the Mansell cheques, and he saw the
agreement of March 4, 1921, and the minute of the board meeting at which it purported to have been approved. He
had satisfied himself that the 350,000l. was secured. It was no part of his duty to criticize or call attention to trans-
actions that were well within the powers of the board, and were, on the face of them, perfectly regular. He had care-
fully studied the Mansell agreement and had taken the trouble to prepare a fairly full abstract of its contents. He
had required that the agreement should be stamped, and had made a note that the policy on Mansell's life was to be as-
signed to the company. Both of these requirements of his were complied with. I cannot see that his duty required
him to do any more. It may at first sight seem somewhat strange that Mr. Lepine **\*490** should not have made some
inquiries as to the provision contained in cl. 9 of the agreement under which Mansell was freed from all further li-
ability in case the company ceased to carry on business before the loan had been repaid out of his commission. But
in February, 1921, the possibility of such an event happening must have seemed to Mr. Lepine to be so remote a
contingency as not to warrant serious consideration. It is indeed to be observed that in the abstract of the agreement
that he made he did not think it worth while to include that provision. The abstract does take note of the provision
under which the loan was to be cancelled if Mansell ceased to be manager. But, notwithstanding this, Mr. Lepine
thought that the loan was well secured. The following passage in his cross-examination in relation to the Mansell
agreement and the loan indicates his reasons for so thinking. He was asked this: "Did you think it was quite an ordi-
nary kind of agreement? - I thought that the directors had considered it was in the interests of the company that Mr.
Mansell should have this money, and I left it at that, I think. Q. You left it at that? - Yes, except that I wanted to see
that the policy referred to, the short-term policy, had been assigned to the company, and I took steps to see that that

was done. Q. You realised, of course, that if Mr. Mansell left the service of the company the liability to pay ceased? - Yes. Q. Did not you consider that that was such an extraordinary matter that you should have called the attention of the shareholders to that? - No, I did not. It was the policy of the directors. Q. Of course, you saw that it was only payable out of future commissions? - Yes, I think I did, and I think I worked it out to see if, on the new basis, there was a probability of his paying those. Q. How long did you calculate it would take him to pay them? - I think the instalments are referred to in the agreement. Q. You said you worked it out? - Yes, to see whether his remuneration approximately, on the past basis, as far as one could see, would in any way amount to the instalments referred to in the agreement. Q. From that calculation did you find out how long it would take for him to repay that loan? **\*491** - I found at the time on the past basis - unfortunately I have not got my note here, but I think there was some considerable sum over. Q. You put that debt in as an asset of the company for its full value? - Yes, at that time. Q. It depended, did it not, upon whether Mr. Mansell continued in the employment of the company? - Yes; but at that time he was in the employ of the company, and the company was a going concern, and I knew how highly the directors valued his services. At that time it was a going concern, and, in my opinion, it was a perfectly good amount of expenditure." In my opinion Mr. Lepine was guilty of no breach of duty in connection with any one of the three balance sheets in the way he dealt with the indebtedness of Ellis & Co., or the indebtedness of Mansell, subject only, as to the latter, to the qualification to which I have already referred in connection with the balance sheet of 1920, and subject, as to the former, to the following observation. The 73,650l. shown by the company's books to be due from Ellis & Co. on investment account was included in the balance sheet in a sum of 188,000l. odd stated to be cash at bank and in hand. In my opinion it was not cash in hand. It was merely money owing to the company by the brokers, and the company held no security to cover it. But Mr. Lepine had seen a letter of March 1, 1921, written by Ellis & Co. to Mr. Lock for the purposes of the audit, in which it was stated that 50,000l. of this money had been earmarked to the company's American account (that is, for the purposes of the company's American business) for remittance during the month of May. There appeared therefore nothing to call for special remark in so large a sum being in Ellis & Co.'s hands, and, having regard to the credit and reputation of that firm, neither Mr. Lepine nor any one else would have felt any anxiety about the money being forthcoming whenever it might be required. Mr. Lepine was cross-examined as to his justification in describing this sum as cash in hand as follows: "Q. Do you seriously say - I want you to consider this answer - that it is proper when you are preparing the balance sheet of the company to whom **\*492** the money is due to describe the money in the hands of the brokers as being cash at bank and in hand? - Yes. The only other alternative, I suggest, is that it might be put as 'Cash at bank and in hand, and on other accounts': that is the only suggestion that I can make as to that heading. Q. Why 'cash' at all? - Because it was the balance of cash in their hands. There was 50,000l. which they were retaining, according to their certificate to me, to send to America. I knew they did act as agents in connection with the American business. Q. The expression 'cash' is meant to convey something that is quite liquid? - Yes, absolutely, I quite agree. Q. Do you suggest that this sum of 73,000l. was quite liquid? - Yes, I do at that time. My view was then that if the company had asked Ellis & Co. for a cheque for 73,000l. on the 1st March they would have got it. Q. Is that still your view? - No, not to-day; one has to judge at the time of the audit. Q. Do you not see now, quite seriously, that this was, in the light of the facts, a serious misdescription? - As I know the facts to-day, yes, certainly, I agree. Q. And you never have described such a sum as this before as cash in hand? - No, because I have never had such a case." There was, therefore, a misdescription, but I should hesitate long before holding Mr. Lepine to be guilty in this respect. I need not, however, pursue this matter further, because, even if the misdescription did amount to negligence, it caused no damage to the company. Had Mr. Lepine in fact included the money under the heading "Cash at bank and in hand and on other accounts" he would not, in my opinion, have laid himself open to legitimate criticism, and the subsequent course of events would have been in nowise altered.

I now turn to the second head under which the auditors are charged with negligence in the preparation of the three balance sheets. The negligence alleged against them under this head is, in effect, that they did not detect the operation carried out annually by Bevan, and euphemistically referred to in the proceedings before me as the operation of "window dressing." A passing reference to it has already been made **\*493** in this judgment. It was an operation that consisted of a pretended purchase by Ellis & Co. of Treasury Bills shortly before, and a pretended resale of the Bills soon after the close of the financial year. The effect of the operation was to reduce to comparatively insignificant proportions the sum shown by the books to be due from Ellis & Co. on investment account at that date. The Bills were never delivered by Ellis & Co., and indeed were never even received by them. The operation was intended,

Copr. © West 2009 No Claim to Orig. Govt. Works

amongst other things, to deceive the auditors as to the extent of the firm's indebtedness to the company, and it succeeded in doing so. The question to be decided is, whether Mr. Lepine was guilty of negligence in allowing himself to be deceived. Now the facts relating to these pretended purchases and sales are, so far as material, as follows: On February 27, 1919, Ellis & Co. ostensibly purchased on their own behalf through Messrs. Kleinworts, an eminent firm of brokers, 200,000l. Treasury Bills for 198,576l. Messrs. Ellis & Co., of course, had no intention of parting with this sum of cash, so they got Messrs. Kleinworts to make them an advance against the Bills of 198,000l. carrying interest at 5 per cent. to March 3, when it had been arranged that Messrs. Kleinworts should sell them. On February 28 accordingly Messrs. Kleinworts, who in their turn sent a cheque to Messrs. Ellis & Co. for 198,000l. On March 3 Messrs. Kleinworts sold the Bills for Ellis & Co.'s account for 198,600l. and sent Ellis & Co. their cheque for this amount. On the same day Ellis & Co. repaid to Messrs. Kleinworts the 198,000l. and interest. In the meantime Ellis & Co. had, by letter of February 27, informed Mr. Lock that they had purchased for the company 200,000l. Treasury Bills at a cost of 198,576l. and had debited that sum to the company in their accounts. On March 3 they credited the company in the accounts with 198,600l. as on a sale of such Bills. The result of all this was that in the balance sheet for the year ending February 28, 1919, there appears amongst the investments of the company 200,000l. Treasury Bills, and the debt of Ellis & Co. is brought in as 51,423l. In *494 truth the company never had such an investment, and the debt of Ellis & Co. should have been increased by 198,576l. It should be stated, in fairness to Messrs. Kleinworts, that they acted quite innocently in the matter, and did not know that the company was concerned in any way with the transaction. A similar operation was carried out in February, 1920, the amount of the Treasury Bills bought from Messrs. Kleinworts on February 26 being 390,000l., the price 386,420l., Messrs. Kleinworts' loan 385,000l., and the proceeds of the sale of the Bills on March 5 being 386,856l. In February, 1921, the operation was repeated. Treasury Bills for 240,000l. were bought from Messrs. Kleinworts as on February 25 for 237,513l., Messrs. Kleinworts' loan was for the same amount, and the Bills were sold on March 3 for 237,744l. In 1920 and 1921 Messrs. Kleinworts retained the Bills in their own possession as security for the loans to Ellis & Co. In 1919 they would have done so had there been any Bills to keep. But there were not. In the year 1921 there was, in addition, an alleged purchase and resale by Ellis & Co. of 200,000l. National War Bonds. In point of fact both purchase and resale took place on March 4, through Messrs. Hopkins, Blake & Co., a firm of brokers. Notwithstanding this, Bevan sent to Mr. Lock a bought note recording the purchase as having taken place on February 25 at a net cost of 191,501l., and this sum was credited to Ellis & Co.'s investment account as on that date.

Now, these being the facts, it is said on the part of the Official Receiver, first, that Mr. Lepine ought to have discovered the fraud that was being perpetrated by Bevan merely from an examination of the company's books, and, secondly, that if he could not discover it in this way he ought to have discovered it by insisting upon an inspection of the Bills. Now, Mr. Van de Linde, who gave evidence on behalf of the Official Receiver upon these points, agreed, as I understand his evidence, that when Mr. Lepine was conducting the audits for the three years in question there was nothing in the books themselves from which Mr. Lepine ought to have discovered the window-dressing transactions. But, as I gather that *495 the Official Receiver asks me to put a different construction upon Mr. Van de Linde's evidence upon this point, I propose, instead of considering that evidence in detail, to deal with the entries in the books themselves. The essential thing to be borne in mind in considering these entries is that, at the time the audit was taking place, the books had only been made up to the close of the financial year. When, therefore, Mr. Lepine in the months of April and May was conducting the audit for the year ending February 28, 1921, he would see recorded in the investment ledger a purchase on February 25 of 240,000l. Treasury Bills. But the sale of these Bills on March 3 would not be so recorded, for the entry of the sale would not be made until after the audit was closed. There would, of course, also be recorded in the ledger the sale in March, 1920, of the 390,000l. Treasury Bills, and the Treasury Bills account in the ledger would show that between then and February, 1921, no further transactions in Treasury Bills had taken place. There would be nothing, however, in this circumstance to make Mr. Lepine suspicious unless he happened to remember that he had observed something similar when he was conducting the audits of 1919 and 1920. But to suggest that he was guilty of negligence because in 1921 he failed to recollect what he had seen in 1920 is, I think, to lack a sense of proportion. If Mr. Lepine's duty had been confined to the audit of the Treasury Bills account I could understand the suggestion. But when the magnitude of his task in each year is really understood, the suggestion of negligence in this respect cannot be sustained for one moment. It is, however, pointed out that when conducting the audit for the year 1921 Mr. Lepine had before him in one and the same folio of the

investment ledger Treasury Bills account, the records of the sale in March, 1919, the purchase in February, 1920, the sale in March, 1920, and the purchase in February, 1921, and that, apart from all question of memory he was negligent, when conducting the 1921 audit, in not seeing all these four entries, and drawing from them the obvious conclusion. When looking at this folio merely for the purposes of this case, I agree that the **\*496** entries, which are few, do plainly lead to the conclusion that window dressing was taking place. But I cannot see that Mr. Lepine, when looking at the folio for the purposes of his 1921 audit, was in any way negligent in not arriving at the same conclusion. In conducting the audit for one year, he had enough to do in all conscience without looking again at the entries that he had examined, checked and ticked off in the books in the audit of the year before. I cannot hold the auditors guilty of negligence because Mr. Lepine did not discover Bevan's fraud in the matter of window dressing from his inspection of the company's books. Ought he then to have discovered it by insisting on an inspection of the Treasury Bills and, in the case of the year 1921, of the National War Bonds? What he did in fact in each of the three years in question was to accept a certificate from Ellis & Co. that on February 28 or 29, as the case might be, they held, on account of the company, the Treasury Bills and National War Bonds, as well as various other securities of the company that were or were supposed to be in their possession. Mr. Lepine did not insist on a personal inspection of these various securities. Had he done so, he would have discovered that the bills and bonds had been sold soon after the date of the purchase, and the window-dressing nature of the transaction would have been made clear. The question of whether he was justified in accepting these certificates from Ellis & Co. instead of inspecting the bills and bonds personally raises the whole question as to the duty of an auditor in relation to inspection, and must be considered in connection with the third head under which Messrs. Langton & Lepine are charged with negligence. The charge under that head is, in effect, that the auditors are responsible for the damage occasioned to the company, amounting to some 47,000l., by reason of the pledging by Ellis & Co. to their customers and the consequent loss of various securities of the company, in the possession of that firm. It is said by the Official Receiver that this loss would not have occurred had Mr. Lepine insisted on personally inspecting the securities instead of accepting Ellis & Co.'s **\*497** certificates, and the Official Receiver makes the charge that, in not undertaking this personal inspection, Mr. Lepine was guilty of negligence. With this charge I must now deal.

That it is the duty of a company's auditor in general to satisfy himself that the securities of the company in fact exist and are in safe custody cannot, I think, be gainsaid. If authority for the proposition be required, it may be found in the passage from Lindley L.J.'s judgment in the <u>London and General Bank</u> case , which has already been referred to. The auditor in that case, amongst other things, "saw that the bills and securities entered in books were held by the bank," and this the Lord Justice plainly treated as being part of an auditor's "legal standard of duty," though he did not of course mean that in all cases the bills and securities should be lodged with the bank. He meant "with the bank or in other proper custody." Nor is it at all clear whether the Lord Justice meant that in all cases the securities should be personally inspected by the auditor. For an auditor may "see" that the bank holds the securities in the sense that he satisfies himself of the fact. In the case of a responsible and reputable bank this, according to the evidence of Mr. Van de Linde, would seem to be the custom of auditors. But I think that it is a pity that there should be any such custom. It would be an invidious task for an auditor to decide as to any particular bank whether its certificate should be accepted in lieu of personal inspection. The custom, too, at once raises the question, much debated in the course of the evidence before me, whether the courtesy of accepting a certificate should be extended to an insurance company or a safe deposit company. Indeed, if once it be admitted that, in lieu of inspecting the securities personally, the auditor may rely upon the certificate of the person in whose custody the securities have properly been placed, the auditor would be justified in accepting the certificate of any official of the company who happened to be in charge of the safe in which the securities are placed, supposing such official to be a reputable and responsible person. At some time or **\*498** another it will, I think, have to be considered seriously whether it is not the duty of an auditor to make a personal inspection, in all cases where it is practicable for him to do so, whatever may be the standing and character of the person or company in whose possession the securities happen to be. I do not, however, propose to investigate this question further upon the present occasion. For an auditor is not, in my judgment, ever justified in omitting to make personal inspection of securities that are in the custody of a person or company with whom it is not proper that they should be left, whenever such personal inspection is practicable. And whenever an auditor discovers that securities of the company are not in proper custody, it is his duty to require that the matter be put right at once, or, if his requirement be not complied with, to report the fact to the shareholders, and this whether he can or cannot make a personal inspection. The securities retained in the hands of Ellis & Co. for periods long beyond the few

Copr. © West 2009 No Claim to Orig. Govt. Works

hours in which securities must necessarily be from time to time in the possession of the company's stockbrokers were not in proper custody. That Ellis & Co. were at all material times regarded, and reasonably regarded, by Mr. Lepine as a firm of the highest integrity and financial standing is not to the point. A company's brokers are not the proper people to have the custody of its securities, however respectable and responsible those brokers may be. There are, of course, occasions when, for short periods, securities must of necessity be left with the brokers, but the moment the necessity ceases the securities should be lodged in the company's strong room or with its bank, or placed in other proper and usual safe-keeping. In my judgment, not only did Mr. Lepine commit a breach of his duty in accepting, as he did, from time to time the certificate of Ellis & Co. that they held large blocks of the company's securities, but he also committed a breach of his duty in not either insisting upon those securities being put in proper custody or in reporting the matter to the shareholders. This was negligence, and, but for art. 150, it would be my duty so to declare and to order Messrs. Langton & Lepine to make **\*499** compensation for all the damages that such negligence caused to the company, directing an inquiry to ascertain what those damages were. For it is settled, by authorities that are binding upon me, that an auditor is an officer of the company within the meaning of s. 215 of the Companies (Consolidation) Act, 1908 , though Mr. Stuart Bevan, while admitting that it was not open to him to argue the contrary in this Court, reserved to his clients the right to contest the point in a superior one. But art. 150 in express terms includes the auditors of the company in the protection that it gives, and it must be taken to be one of the terms upon which the auditors were employed and gave their services. They are, therefore, protected, unless the negligence of Mr. Lepine in the matter was wilful. This it certainly was not, unless I am mistaken as to the true meaning of the phrase "wilful negligence." I have heard Mr. Lepine's evidence in the witness box, and I have inspected many of the numerous documents prepared by him for the purposes of the audits that he conducted. I am convinced that throughout the audits that he conducted he honestly and carefully discharged what he conceived to be the whole of his duty to the company. If in certain matters he fell short of his real duty, it was because, in all good faith, he held a mistaken belief as to what that duty was. As against him and his partner, the application of the Official Receiver must accordingly be dismissed.

It only remains to deal with the costs of this application. As against the respondent Bevan, the Official Receiver is entitled to an order for payment of his costs, except in so far as they have been increased by reason of the joinder of the claims against the other respondents. As regards the costs of the other respondents I order the Official Receiver to pay them out of the assets, and also to retain out of the assets his own costs, so far as he does not recover them from Bevan. I am aware that there have been cases in which the Court, while unable to fix a director with liability for breach of duty, has, nevertheless, left him to pay his own costs as a penalty for conduct in his capacity of director of which the Court did **\*500** not approve. In the present case, both the auditors and the respondent directors failed in some matters to perform their strict duty, and, but for the provisions of art. 150, I should have had, in respect of those matters, to grant some relief to the Official Receiver. But it would not, in my opinion, be right on this ground to refuse to give them their costs. If I were to do so in such a case as the present, I should, in effect, be depriving them to a material extent of the protection which that article affords, and for which they must be deemed to have stipulated as a condition of the service that they undertook to render.

*(R. M.)*

The Official Receiver appealed from this decision so far as it affected the auditors, Messrs. Langton & Lepine. The appeal was heard on July 3, 4, 7, 8, 9, 10 and 11, 1924.

*Topham K.C.* , *C. A. Bennett K.C.* and *Harold Christie* for the appellant repeated in substance the arguments used by them in the Court below and referred to the following authorities: In re London and General Bank (No. 2) ; In re Kingston Cotton Mill Co. (No. 2) ; In re Owens ; Mucklow v. Fuller ; Fenwick v. Greenwell ; Drosier v. Brereton ; Dix v. Burford ; Chapman v. Browne ; In re Brier ; Robinson v. Harkin ; Dovey v. Cory ; In re Young and Harston's Contract ; In re Mayor of London and Tubbs' Contract ; Bennett v. Stone ; Lewis v. Great Western Ry. Co. ; Forder v. Great Western Ry. Co. ; Leeds City Brewery Ld. v. Platts ; Davidson's Precedents in Conveyancing, 3rd ed., vol. iii., Part I., p. 247.

*Stuart Bevan K.C.* and *George Phillips* for the respondents were not called upon to argue.**\*501** POLLOCK M.R.

This case is important in the sense that it has arisen in the course of the liquidation of a notable reinsurance company with many and considerable liabilities. The company was at one time prosperous, and in a short time it was brought to a tragic end by the fraud of its chairman, who was later convicted and sentenced to a term of imprisonment. Its downfall has involved many persons in its ruin and consequent suffering to them. But no development of the law is involved in its termination and the problems raised can be solved by the application of principles already well ascertained. In the course of the liquidation of the City Equitable Company a summons for misfeasance under s. 215 of the Companies (Consolidation) Act, 1908 , was taken out by the liquidator against the directors of the company and Messrs. Langton & Lepine, who had for some years acted as auditors of the company. Messrs. Langton & Lepine are auditors of good standing in the City of London, and the appeal is in respect of a judgment given by Romer J. upon the case as presented against them. The learned judge after a long and careful trial came to the conclusion that the liquidator was not entitled to recover from the directors, and the result of his judgment was the same as against the auditors. But the liquidator has appealed before us claiming that the judgment, so far as it has held that the auditors were not liable, ought to be reversed.

I do not propose to restate all the facts. Romer J., in a judgment which deserves more than a passing word of appreciation for its grasp of the details of a long and complicated case, and its co-ordination of the facts, as well as its application of the law to them, has fully presented the facts, and I do not think that his conclusions upon them have been challenged by Mr. Topham on this appeal. I shall therefore not endeavour to recapitulate the facts, but I shall merely refer to such of them as may be necessary.

Before dealing however with the claim against the auditors I must, in order to make my judgment intelligible, first refer to certain features which have been the subject more **\*502** particularly of discussion in this Court. The balance sheets of the City Equitable Fire Insurance Company for the years 1919, 1920 and 1921, were all audited by Messrs. Langton & Lepine, and they all contain the proper statement: "We have obtained all the information and explanations we have required. In our opinion such balance sheet is properly drawn up so as to exhibit a true and correct view of the state of the company's affairs according to the best of our information and the explanations given us as shown by the books of the company." But it is said as against Messrs. Langton & Lepine that they were guilty of a dereliction of their duty as auditors, and that if they had fulfilled that duty the disaster which overtook the company would not have occurred, or, at any rate, would not have been of such magnitude, and some of the losses incurred by the company would have been avoided. It is, I think, important to mention one or two of the features of these balance sheets. We have before us a very careful and helpful summary of the errors in the balance sheets, and it appears that in each of the balance sheets a course was adopted whereby it was made to appear that there were a larger number of investments in British Government securities than was in fact the case. It is also said that a larger amount was represented as being loans at call or short notice than was the fact, that instead of securities being available in the hands of the company itself or of its bankers, some of them were in the hands of Ellis & Co., and in fact had been pledged by them, and that if the auditors had been more careful they would have discovered these discrepancies between the real facts and those which were presented in the balance sheets. Passing to the balance sheet for 1920 it appears to me that in that there was included in the loans at call or short notice a sum of 52,000l., which was due from Mr. Mansell, the general manager of the City Equitable Company, and also a sum of 11,000l., which was due from Ellis & Co. There were also the same features with regard to apparent investments in Government securities which were not truly made, and there was a considerable **\*503** and increased sum due from Ellis & Co. in 1921 was over 73,000l., but was included in "Cash at bank or in hand," and there was, contrary to the fact, a very much larger representation of investments in Government securities.

Now when one approaches this case, quite apart from the question of law with which I shall have to deal later, it is of the first importance to remember that one is looking into facts which have been subjected to the scrutiny and have

been explained by the ability of accountants who have come in to look at all the books, and not only the books of the City Equitable Company but also the books of Ellis & Co. It is not easy to reconstruct the true position as it stood before the auditors when they were called upon to do their duty in the three successive years in which their conduct is challenged. It is also proper to remember that when a big disaster has occurred, such as the failure of this company, which, as I have said, was a notable company in its day, there is, on the part of some, a desire to find a scapegoat who can be made responsible, and possibly make good some of the losses which have occasioned disaster to so many. But it is the duty of the Court, as far as possible, to endeavour to ascertain what was the problem presented to the auditors, and what was the knowledge available to them at the time. It is right, and this is fully recorded in Romer J.'s judgment, to say that the audit in these three successive years, which was carried out by Mr. Lepine, the partner entrusted with it, was carried out with diligence and care. It occupied something like from six to eight weeks, and in a passage in his judgment Romer J. gives a striking testimony from the evidence, to which he adds his own authority, to show that he was quite satisfied that Mr. Lepine had been both diligent and discriminating and had endeavoured to **\*504** bring the very best of his abilities to bear on the problem before him. Romer J. cites a passage from the evidence of Mr. Van de Linde, who testified to the care and accuracy displayed by Mr. Lepine in the audit. Mr. Van de Linde says this: "As far as the figures are concerned, I think there is great accuracy right through," and then in reply to this question: "In fact, throughout, always putting aside these matters we have to address ourselves to, speaking generally, throughout, the greatest care was shown and accuracy achieved?" he answered: "Yes." The learned judge at the close of his judgment says that he is convinced "that throughout the audits Mr. Lepine conducted, he honestly and carefully discharged what he conceived to be the whole of his duty to the company." That judgment was delivered after the learned judge had had an opportunity of hearing a great number of cases cited to him, a good number of addresses from counsel, and after he had spent many days in the hearing and trial of the case. I should like myself to add that upon the facts presented to us, it appears that Mr. Lepine did discover and ask for explanations which do him credit, for it must be remembered that he had to overcome - if he was to succeed in the task which it is now suggested he ought to have succeeded in - the cunning of a dishonest chairman, and he had to circumvent the ingenuity of the general manager, who was concerned at the same time in obtaining for himself an agreement which I should describe as a fraudulent agreement on the face of it. Mr. Lepine had, therefore, set before him a task which must be a difficult one at any time, but one about which, if he failed in it, there would only have been recorded of him that he failed to do what would have been a very signal achievement if he had succeeded; because we are to remember not only what was the position of the City Equitable Company, its directors and its chairman, but the position of Ellis & Co. Ellis & Co., of which the chairman of the company, Mr. Gerard Lee Bevan, was the senior partner, was a firm of stockbrokers of good standing and large business on the London Stock Exchange. Mr. Bevan was a man **\*505** credited with very great ability and of great reputation as a financier. Mr. Lepine did discover in the course of his inquiries three points which I desire to mention. With regard to the loan to Mansell he pointed out in 1920 that it had reached a figure of 52,000l., whereas the only minute he could find relating to it authorized a sum of 15,000l. and not more to be advanced to Mansell. He made inquiries, and he received the answer from Mr. Bevan himself that a minute would be duly recorded authorizing the loan up to the amount at which it stood - namely, 52,000l. It appeared to be regular to Mr. Lepine from this fact, that all the cheques by which the loan had been made, and some slips attached to them, if I read the evidence rightly, bore the signatures of directors, so that it was not a case in which the manager appeared to be helping himself to the money of the company, but one in which the directors were placing in the manager's hands, for some reason which Mr. Lepine may or may not have appreciated, sums which totalled up to 52,000l. But Mr. Lepine did discover the discrepancy between the amount of the authorized loan and the amount of the actual loan, and he required and was promised that the matter should be regularized in due course by a minute. Again in 1920 he discovered a matter which he also desired to put right. There was an investment in which the City Equitable Company was concerned in some ranch in Brazil, and payments were made, apparently through Ellis & Co., for the development of that ranch, but it appeared that in the course of 1920, or at the time the balance sheet of 1920 was produced, a sum of 161,000l. had been paid through Ellis & Co. to the account or for the purposes of the development of the ranch, and Mr. Lepine discovered that the actual amount authorized according to the minute was 150,000l. and no more. We are told that Ellis & Co. in some way, or the partners of Ellis & Co., or Mr. Bevan, or, at any rate, one of what I may call the group of persons concerned, who would be in touch with Mr. Lepine, were also interested in this adventure. When Mr. Lepine called attention to the fact that 161,000l. had been sent or dispatched or placed in **\*506** Ellis & Co.'s hands for the purpose of the ranch, and he pointed out that it exceeded the authorized amount by 11,000l., he was then told either by Mansell

or by Mr. Bevan that under the circumstances Ellis & Co. would debit it to their account. I suppose in business that meant this, that it was not a matter of very great concern, if all had gone well, whether this money was advanced to the ranch by Ellis & Co. or a partner in Ellis & Co., or one of the persons concerned in it. The sum of 11,000l. was comparatively not a very large one, and whether it was debited to one account or another was a matter of little moment. As a matter of fact, in consequence of the information Mr. Lepine received, it was debited to Ellis & Co., and at that time I think there is no doubt from the evidence that Ellis & Co. could have drawn, or certainly were supposed to be able to draw, a cheque at any time for 11,000l., and that 11,000l. is found included in the sums at call or short notice. But it is due to Mr. Lepine to say that his diligence did bring him to discover what at any rate was not presented to him in a light which made it easy to discover, and which must have required some accuracy or persistence on his part, first of all to discover, and then to put right. I will mention another matter. There were these so-called "window-dressing" schemes. Here I think one has to be very careful, because at the end of each year the auditor would discover what had happened down to February 28, the date at which the accounts closed, but he would not necessarily know what had happened in that part of the subsequent year during which he was making up the balance sheet, or rather conducting the audit. It is true that if you take the three balance sheets together and cast them in the form of a chart, you can see that an increasing amount of window-dressing was going on, and on the chart you will find that there is a rise in the figures which are manipulated for the purpose of window-dressing, and therefore it is easy to read a danger signal from such a chart. No such chart was available to Mr. Lepine, and we have to take the books singly which were before him and the books, be it remembered, of the City Equitable Company only. **\*507** It is not right to treat the evidence which is now before us and its significance as being plain in the years 1919, 1920 and 1921 to Mr. Lepine. For my part, I desire to accept the admirable summary which the learned judge has given of the facts. I have only referred to those two or three outstanding features because they are the salient points in charges which are now made against the auditors.

Now the claim is brought in accordance with the procedure which is rendered available by s. 215 of the Companies (Consolidation) Act, 1908 , and as an argument was presented to us for which some foundation could be suggested based in substance upon s. 215, I desire to say, though this is not the first time that it has been said, that section deals only with procedure and does not give any new rights. It provides a summary mode of enforcing existing rights; and I think that is abundantly shown by Coventry and Dixon's Case ; In re Brazilian Rubber Plantations and Estates, Ld. ; and Cavendish Bentinck v. Fenn. In Cavendish Bentinck v. Fenn Lord Macnaghten gives in a sentence or so the principle of which the other cases are illustrations. He says: "That section creates no new offence, and .... it gives no new rights, but only provides a summary and efficient remedy in respect of rights which apart from that section might have been vindicated either at law or in equity." Then he goes on: "It has been settled that the misfeasance spoken of in that section is not misfeasance in the abstract, but misfeasance in the nature of a breach of trust resulting in a loss to the company." It is also true that the shareholders of the company are entitled to the protection which is given them by statute. Mr. Topham tried to suggest, if I properly understood him, that some protection is to be found in s. 215, and that for the purposes of the article, which I shall have to deal with in a moment, protection which is given by statute cannot be overcome by an article. There is no doubt that shareholders are entitled to protection, and illustrations of the protection **\*508** to which they are entitled may be found in In re Peveril Gold Mines, Ld. ; Payne v. The Cork Co. ; and Newton v. Birmingham Small Arms Co. Taking that last case, as to which I desire to say a word or two, it was there attempted by means of an article to prevent a disclosure being made of a reserve fund to which a portion of the profits of the company was transferred, and it was held that this could not be done by resolutions or by articles, because any such resolution or article would be inconsistent with the obligations imposed upon the auditors by s. 23 of the Companies Act, 1900 , which was then the section in force. No doubt, therefore, we must take it, as in these cases and in a number of other illustrations, that the shareholders are entitled to receive the protection given to them by statute in the particular facts and by the particular section referred to in those cases.

I come therefore to consider what is the protection in relation to auditors which is given by statute, and that is to be found in s. 113, sub-s. 2 , of the present Companies Act. By that sub-section it is provided that "The auditors shall make a report to the shareholders on the accounts examined by them, and on every balance sheet laid before the company in general meeting during their tenure of office, and the report shall state - (a) whether or not they have obtained all the information and explanations they have required; and (b) whether, in their opinion, the balance sheet

Copr. © West 2009 No Claim to Orig. Govt. Works

referred to in the report is properly drawn up so as to exhibit a true and correct view of the state of the company's affairs according to the best of their information and the explanations given to them, and as shown by the books of the company." Now the balance sheets for the three successive years I have referred to in form complied with that section. They all contain the usual statement made by auditors, so that prima facie the auditors here have discharged their duty.

It is said that these auditors have failed, and failed particularly in their duty in respect of three matters charged **\*509** against them. Those three matters are set out by the learned judge in his judgment. They are: "(1.) Their misdescriptions in the balance sheets of the debts of Ellis & Co. and Mansell by including them under 'Loans at call or short notice' or 'Loans,' or in the case of part of Ellis & Co.'s debt under the heading of 'Cash at bank and in hand,' and their consequent failure to disclose to the shareholders the existence of those debts. (2.) Their failure to detect the fact that much larger sums were in the hands of Ellis & Co. at the date of each of the balance sheets than were so included. (3.) Their failure to detect and report to the shareholders the fact that a number of the company's securities, which were in the custody of Ellis & Co., were being pledged by that firm to its customers."

What is the standard of duty which is to be applied to the auditors? That is to be found, and is sufficiently stated, I think, in In re Kingston Cotton Mill Co. (No. 2). As I have already said it is quite easy to charge a person after the event and say: "How stupid you were not to have discovered something which, if you had discovered it, would have saved us and many others from many sorrows." But it has been well said that an auditor is not bound to be a detective or to approach his work with suspicion or with a foregone conclusion that there is something wrong. "He is a watchdog, but not a bloodhound." That metaphor was used by Lopes L.J. in In re Kingston Cotton Mill Co. (No. 2). Perhaps, casting metaphor aside, the position is more happily expressed in the phrase used by my brother Sargant L.J., who said that the duty of an auditor is verification and not detection. The Kingston Cotton Mill case is important, because expansion is given to those rather epigrammatic phrases. Lindley L.J. says :

"It is not sufficient to say that the frauds must have been detected if the entries in the books had been put together in a way which never occurred to any one before suspicion was aroused. The question is whether, no suspicion of anything **\*510** wrong being entertained, there was a want of reasonable care on the part of the auditors in relying on the returns made by a competent and trusted experts relating to matters on which information from such a person was essential." The judgment of Lopes L.J. as well as that of Kay L.J. may be looked at in support of the words of Lindley L.J., and also in support of what I have called the epigrammatic way of putting the auditors' duty. Now let us apply that to the present case. Mr. Lepine went in and spent six or eight weeks with his clerks upon these books. In many ramifications of the City Equitable Company he finds, on the whole, that all the entries are properly made and all the accounts are in order. He finds in particular that a larger sum has been lent to Mansell than was authorized, but he finds that apparently it was the practice of the directors to pay cheques to him. He finds that the amounts of the cheques which were drawn in his favour were entered up. It is not a case in which the cheques had been drawn and not entered or found in the books in which they ought to have been found, but the sum was not the sum authorized, though it was all there in the books, and he turns for guidance and advice to those persons from whom he is entitled to receive guidance and advice. He turns to the chairman, whose position at that time I have described, and he turns to Mansell, who is obviously a man of commanding position, and on all occasions on which he does so he gets from them satisfactory answers or satisfactory promises, and then one applies this test at a time when no suspicion of anything wrong was entertained - was there a want of reasonable care on the part of the auditors in relying on facts given by competent and trusted experts relating to matters in respect of which information from such persons was essential? I think you can put it interrogatively in this way: Who could be trusted, who could give the information, where would you seek for it more authoritatively than from Mr. Bevan and Mansell? It seems to me that when you apply the standard of care to be exercised, you find that in the course of the audit Mr. Lepine has prima facie applied or conformed to the right standard as laid down **\*511** by the Court of Appeal, a standard to which, on the facts, Romer J. says he did conform. His diligence is undoubted, and for my part, as I have said, I think that you ought to give weight to what Mr. Lepine in fact did discover as indicating that he was on the path to discover, if he possibly could, anything that was awry, and that so far from showing negligence or carelessness or not caring how the thing was done and simply trusting wholly to the books, and to Mansell and to Mr. Bevan, you do find in the

Copr. © West 2009 No Claim to Orig. Govt. Works

cases where he was successful in detecting something that was awry, illustration of his diligence and determination to discover what was discoverable.

Now, dealing therefore with the first two claims - that is the claim in respect of the loans at call or short notice - Mr. Lepine had, it seems to me, information which would justify him in putting down those items as loans, and I agree with the learned judge that the putting in of the words "at call or short notice" really was not misleading, and did not cause any wrong result. The learned judge says: "If the description of them in the balance sheet as 'loans' would have induced any director or shareholder to make some inquiry as to their nature, which he was induced to refrain from making by reason of their description as 'loans at call or short notice,' the matter would be different. But not only is this inherently improbable, there is actual evidence that it was not so." Then he points out that there was a variation between "loans at call or short notice" and "loans," and that the attention of Mr. Milligan, one of the respondent directors, was called to it, and he made some inquiries about it upon which some plausible explanation was received from Mr. Bevan merely on the point as to why the loans were so large, not as to what their character was, and whether they were at call or short notice, because be it remembered at that time the company was in good credit, and I do not suppose that the idea that they would ever be pressed or be in any embarrassment if they required money, and had to turn outside their own circle for it, would have created any difficulty at all in the minds of those who either were directors or were constantly dealing **\*512** with them. It seems to me, therefore, that the learned judge is quite right in the way he deals with the first claim. Then I come to the second. "Their failure to detect the fact that much larger sums were in the hands of Ellis & Co. at the date of the balance sheet than were so included." I will come to the question of the signed certificates in a moment, but the mere fact that Ellis & Co. at that time owed 73,000l., or that they put down 11,000l. to Ellis & Co. does not seem to me to indicate a danger signal at all. So far as any answers were to be received, or likely to be received, they would be favourable both to Ellis & Co. and to the City Equitable Company, but where you have an atmosphere of complete confidence, indeed of a confidence based on success up to that time in financial matters, it seems to me that there is no reason to hesitate about accepting the view which the company at that time presented to them in their draft balance sheet, that this was a way, and a legitimate way of dealing with the over-plus of money due on the Brazilian ranch account, or money due at that time from Ellis & Co., and the fact that Mr. Lepine was unsuccessful in detecting the cunning is quite another matter from saying that he failed to use competence and intelligence in conducting his duties.

Now I come to the last point, part of which is contained in the third charge, and that is the failure to detect that much larger sums were in the hands of Ellis & Co. at the date of the balance sheet, and the failure to detect and report that the securities were in the hands of Ellis & Co. Upon that matter I wish to say a word or two as to the evidence. In fact Mr. Lepine inquired of the bank and obtained a certificate from it that a certain number of securities were in its hands, and he then turned to Ellis & Co., and he received from them, under the signature of Ellis & Co., a certificate attached to the document, apparently not by Mr. Bevan, but by one of the partners, that a number of securities were in the hands, of the stockbrokers. It is said it was quite wrong to accept the certificate of the stockbrokers, and we are asked to accept the evidence of Mr. Cash and Mr. Van de Linde as meaning this, that you may accept the certificate of a bank apparently **\*513** in all cases, but you may never accept the certificate of stockbrokers. I cannot agree that the evidence is to be so read, or was intended by the witnesses to be so understood. What I think the witnesses meant to express was this: Banks in ordinary course do hold certificates of securities for their customers; it is part of their business to do so, and therefore certificates in the hands of bankers are in their proper custody, and if a bank is a reputable bank, you may legitimately accept the certificate of that bank, because it is a business institution in whose custody you would expect both to find securities, and also it is respectable; but the fact that it calls itself a bank does not seem to me to conclude the matter, either one way or the other. On the other hand, it may be said that it is the duty of an auditor not to take a certificate as to possession of securities, except from a person who is not only respectable - I should prefer to use the word "trustworthy" - but is also one of that class of persons who in the ordinary course of their business do keep securities for their customers. It may be said that a stockbroker does not in the ordinary course of his business keep securities for his customers, and therefore he is ruled out because the auditor ought not to accept from a person of that class, whether he be respectable or not, a certificate that he has securities in his hands. Now, accepting the rule as so stated, that it is right to find the securities in the hands of a bank, whose business it is to hold securities, and applying the proviso that the bank must be one that is trustworthy, it

Copr. © West 2009 No Claim to Orig. Govt. Works

seems to me that the rule may prima facie be a right one to follow; but it is going too far to say that under no cir-cumstances may you be satisfied with a certificate that securities are in the hands of a stockbroker, because it seems to me that in the ordinary course of business you must from time to time, and you legitimately may, place in the hands of stockbrokers securities for the purpose of their dealing with them in the course of their business. With a large institution like the City Equitable Company, having a very considerable number of investments to make and securities to sell, it may well be that for the convenience of all parties it may have been a useful **\*514** method of business even if examined with the most exiguous care, for the directors to have decided that they would in the in-terests of their business leave securities of a considerable amount in the hands of their stockbrokers, who, I suppose, at that time held a position not less trustworthy or respected than the City Equitable Company itself. I do not wish in any way by anything that I say to discharge the auditors from their duties as laid down in the Kingston Cotton Mill case , far less do I wish to discharge them from their duty of seeing that securities are held and accepting the certifi-cate that they are so held only from a respectable, trustworthy and responsible person, be that person a bank or an individual; but in applying my mind to the facts of this case I am not content to say that simply because a certificate was accepted otherwise than from a bank therefore there was necessarily so grave a dereliction of duty as to make the auditors responsible. In my opinion it is for the auditor to use his discretion and his judgment, and his discrimi-nation as to whom he shall trust; indeed, that is the right way to put a greater responsibility on the auditors.

If you merely discharge him by saying he accepted the certificate of a bank because it was a bank you might lighten his responsibility. In my view he must take a certificate from a person who is in the habit of dealing with and hold-ing securities, and whom he, on reasonable grounds, believes to be, in the exercise of the best judgment, a trustwor-thy person to give such a certificate. Therefore I by no means derogate from the responsibility of the auditor, I rather throw a greater burden upon him; but at the same time, I throw a burden upon him in respect of which the test of common sense and business habits can be applied, rather than impose on him a rigid rule which is not based on any principle either of business or common sense.

So we come to the responsibility which the learned judge finds, and I think rightly, falls upon Mr. Lepine. Now what is that? He finds that in respect of these securities Mr. Lepine did what he ought not to have done by accepting **\*515** from Ellis & Co. a statement of the securities which they, at that time, declared that they held. The learned judge says: "In my judgment, not only did Mr. Lepine commit a breach of his duty in accepting, as he did, from time to time the certificate of Ellis & Co. that they held large blocks of the company's securities, but he also committed a breach of his duty in not either insisting upon those securities being put in proper custody, or in reporting the matter to the shareholders." As I have said, the learned judge also finds that in what he did Mr. Lepine acted honestly and in all good faith, "holding the mistaken belief as to what his duty was." I agree with the learned judge. It seems to me that Mr. Lepine has made a mistake, and a grave mistake. In justification of him it may be said that every artifice was brought into play in order to deceive him, and to maintain the apparent responsibility and trustworthiness of Ellis & Co. But that does not discharge him from having put aside what I described to Mr. Topham as the rule of the road applied with the proviso as to business rules and common sense. Mr. Lepine would, prima facie, be liable in respect of that dereliction of duty. But then we find that art. 150 contains important words limiting the responsibility of the officers of the company, including the auditors, who are not to be liable for any "loss, misfortune, or damage which may happen in the execution of their respective offices or trusts, or in relation thereto, unless the same shall happen by or through their own wilful neglect or default respectively." I do not agree with the argument that that article is ultra vires. It does not, in my opinion, offend at all against s. 113 in the sense that it is a contradiction of it. Sect. 113 in laying statutory duties upon the auditors calls on them to exercise those duties, according to the best of their information and the explanations given to them and as shown in the books of the company. Once you have any duty to be performed according to the information given, and explanations offered, you obviously have introduced matters in which discretion is to have play, and it seems to me that the article may quite properly be valid in the sense that it is to discharge **\*516** the auditor from what may be called technical errors, defaults for which he may be held liable in law, but which he may unconsciously have committed.

Now what do the words of the article mean? First of all it is to be observed they are in respect of neglects or de-faults, and it is not unimportant to observe that the words are not "acts or omissions," but they are "neglects and de-

faults," and the observations of Bramwell L.J. in Lewis v. Great Western Ry. Co. ought to be borne in mind, where he deals with the case of wilful misconduct, calling attention to the fact that it is not wilful conduct, but wilful misconduct. We have here to deal with a case where there has been neglect or default, and then to see whether or not it is wilful. I come, therefore, to consider the meaning of the word "wilful." Now in In re Young and Harston's Contract there is a well-known passage in the judgment of Bowen L.J., in which he says:

"It (i.e., the word 'wilful') generally, as used in Courts of law, implies nothing blameable, but merely that the person of whose action or default the expression is used, is a free agent, and that what has been done arises from the spontaneous action of his will. It amounts to nothing more than this, that he knows what he is doing, and intends to do what he is doing, and is a free agent." There are numerous other cases to which we have been referred, but in In re Lord Mayor of London and Tubbs' Contract it is to be observed that Lindley L.J. says:

"I confess that I am more disposed to concur with Lord Bramwell's observations on the term 'wilful misconduct' in Lewis v. Great Western Ry. Co. They are, in my opinion, quite consistent with Lord Bowen's observations in In re Young and Harston's Contract , if it be borne in mind that Lord Bowen presupposed knowledge of what was done, and intention to do it, and was not addressing himself to a case of an honest mistake or oversight." Lopes L.J.   in dealing with In re Young and Harston's Contract and **\*517** Lewis v. Great Western Ry. Co. says:

"It is difficult to lay down any general definition of 'wilful.' The word is relative, and each case must depend on its own particular circumstances" ; and he also says:

"If the neglect or default in this case arose from the voluntary act of the parties, either awake or asleep with reference to their rights and interests, and did not at all arise from the pressure of external circumstances over which they could have no control, I apprehend that the neglect or default was wilful." He is there quoting from the judgment of Shadwell V.-C. in Elliott v. Turner. Lord Alverstone in Forder v. Great Western Ry. Co. , a later case, adopting the definition given in an Irish case, with which he expressed his agreement, says:

"'Wilful misconduct in such a special condition means misconduct to which the will is party as contradistinguished from accident, and is far beyond any negligence, even gross or culpable negligence, and involves that a person wilfully misconducts himself who knows and appreciates that it is wrong conduct on his part in the existing circumstances to do, or to fail or omit to do (as the case may be), a particular thing, and yet intentionally does, or fails or omits to do it, or persists in the act, failure or omission regardless of consequences.' The addition which I would suggest is, 'or acts with reckless carelessness, not caring what the results of his carelessness may be.'" For my own part, I agree with that definition quoted by Lord Alverstone, with the addition he proposes to make to it. It seems to me in close accord with the previous decisions to which I have already referred, and to give a proper meaning to the words which are before us.

I then come to consider whether or not within that meaning of "wilful," the conduct of Mr. Lepine was wilful so as to render him responsible, or is he relieved by the terms of art. 150? The auditor was confronted with a lot of deceit. Year by year he fulfils his duty in a manner which has certainly received the praise of those who have given evidence about it, and of the learned judge who heard the whole of the facts. **\*518** On a number of occasions he was successful in putting what was wrong, or attempting to put what was wrong, right, and therefore so far as his will and volition went, he was attempting to do his duty. In those circumstances, when you find a default which has been made, and an error of judgment in accepting as trustworthy what is now proved to be untrustworthy, can you say, within the definition, that he has been guilty of wilful neglect or default? For my part, for the reasons I have indicated, and upon the evidence to which I have called attention, it seems to me impossible so to characterise Mr. Lepine's conduct. He did not, to my mind, shut his eyes to conduct which he thought needed criticism; what he did was that, in common with a great number of other persons, he thought the persons with whom he was dealing were trustworthy, and, as pointed out again and again in the cases cited to us, in such circumstances he was entitled to accept the statements which were made to him by those whom he was entitled to trust when he had no reason or call for suspicion. In my opinion the learned judge has quite rightly and accurately applied the law to the facts when he

Copr. © West 2009 No Claim to Orig. Govt. Works

says: "If in certain matters he fell short of his real duty, it was because in all good faith, he held a mistaken belief as to what that duty was." He committed an error of judgment, an error the avoidance of which might have caused the company, or its directors, to take a different course, and might have possibly saved some portion of the disaster, but in what he did I cannot find he was guilty of wilful misconduct. Therefore it appears to me art. 150 protects him.

In those circumstances I am of opinion that the learned judge was right in the judgment which he has given, and that this appeal ought to be dismissed with costs.WARRINGTON L.J.

This is an appeal from an exceedingly clear, careful and thorough judgment of Romer J., and as I agree with the conclusions at which he has arrived, it is unnecessary to deal in detail with many of the features that have been the subject of discussion here, but there is at least **\*519** one question of general interest and importance on which I think it is desirable in deference to the arguments which have been addressed to us that I should express my own views in as few words as possible, and that question is the construction of art. 150, which is to say the least of it not uncommonly found in articles of association, and its effect (if any) in modifying or otherwise the ordinary legal obligations of an auditor, especially having regard to s. 113 and s. 215 of the Companies (Consolidation) Act, 1908 .

The ordinary duties and obligations of an auditor without reference to this or any other special article or stipulation as to the terms of his employment are stated by Lindley L.J. in full in In re London General Bank (No. 2). It is unnecessary to read the whole of that part of his judgment which deals with the point, but I think it is perhaps desirable to read the following passage:

"It is no part of an auditor's duty to give advice, either to directors or shareholders, as to what they ought to do. An auditor has nothing to do with the prudence or imprudence of making loans with or without security. It is nothing to him whether the business of the company is being conducted prudently or imprudently, profitably or unprofitably. It is nothing to him whether dividends are properly or improperly declared, provided he discharges his own duty to the shareholders. His business is to ascertain and state the true financial position of the company at the time of the audit, and his duty is confined to that." He then proceeds to discuss in what way he is to perform that duty in reference to examining the books of the company and verifying the statements contained therein in order that he may be able truly to certify that which he has to certify under the Companies Acts. Then he goes on to point out that an auditor is not an insurer; that he is not bound to do more than exercise reasonable care and skill in making inquiries and investigations, and further that what is reasonable care in any particular case must depend upon the circumstances of that case.

Again in In re Kingston Cotton Mill Co. (No. 2)**\*520** Lindley L.J. in dealing with one particular point that arose in that case says:

"It was further pointed out that what in any particular case is a reasonable amount of care and skill depends on the circumstances of that case; that if there is nothing which ought to excite suspicion, less care may properly be considered reasonable than could be so considered if suspicion was or ought to have been aroused. These are the general principles which have to be applied to cases of this description. I protest, however, against the notion that an auditor is bound to be suspicious as distinguished from reasonably careful." In that case it was accordingly held that the auditor was entitled to accept the certificate of the company's manager, though on subsequent investigation it turned out that the manager had been for some years defrauding the company and that his certificate was intended to cover up those frauds. The duty of the auditor is to verify the facts which it is proposed to state in the balance sheet, and in doing so to use reasonable and ordinary skill. I need say no more about the general duties of an auditor.

The next question is to consider what is the true construction of art. 150, and whether that article bears upon or modifies what would, in the ordinary course, be his prima facie duty and responsibilities - not so much his duty as his responsibilities. The article, so far as it is material, is in these terms. I am not going to read the first part of it, which provides for the indemnity, but the last paragraph only. "None of them" - that is, certain directors and officers

Copr. © West 2009 No Claim to Orig. Govt. Works

who have been enumerated, including the auditors - "shall be answerable for" - amongst other things - "any other loss, misfortune or damage which may happen in the execution of their respective offices or trusts, or in relation thereto, unless the same shall happen by or through their own wilful neglect or default respectively." In the first place, I think that that article, as the learned judge has held expressly in the case of the directors and impliedly, if not expressly, in the case of the auditors, does in such a case as the present form part of the contract between the company and the **\*521** auditors, and for the reason that auditors are engaged without any special terms of engagement. When that is the case, then if the articles contain provisions relating to the performance by them of their duties and to the obligations imposed upon them by the acceptance of the office, I think it is quite plain that the articles must be taken to express the terms upon which the auditors accept their position. Of course, if the terms of their employment are expressed in a separate document, then that document must be taken to define the conditions of their engagement, and it would not be proper to assume any implied terms either from the provisions of the articles or elsewhere. But in the present case I think it is quite plain that the terms of art. 150 do, according to their proper construction, whatever that may be, effect a modification in what would prima facie be, but for that article, the obligation and liability of the auditors. What, then, is the effect of the article? It is, I think, plainly in some way, whatever that may be, when you ascertain its true construction, to excuse the auditors from being answerable for loss occurring in relation to their office, except in the particular events which are therein specified - namely, those which happen by or through their own wilful neglect or default - and that it would be improper to describe as a misfeasance any act or omission of the auditors which, having regard to that article, would not result in their being answerable for the loss which may be occasioned thereby. That last remark becomes important when one has to deal with the argument addressed to us on the construction of s. 215 . What then is the meaning of a loss which happens by or through their own wilful neglect or default? Bear in mind that the words are not "by or through their own wilful act or omission." We have, therefore, not merely to look at the act or omission in itself and see whether there was a conscious will impelling the person in question to commit that act or to omit to do the thing which is suggested to be wrongly omitted, but we have to consider whether the neglect or default was or was not wilful. In saying that, I am only really repeating what was said in much better language **\*522** than I can find to use by Bramwell L.J. in Lewis v. Great Western Ry. Co. He was there dealing with a case of wilful misconduct with reference to a business document - a contract by a railway company for the carriage of goods by railway - and he says:

"'Wilful misconduct' means misconduct to which the will is a party, something opposed to accident or negligence; the *mis*conduct, not the conduct, must be wilful. It has been said, and, I think, correctly, that, perhaps, one condition of 'wilful misconduct' must be that the person guilty of it should know that mischief will result from it. But to my mind there might be other 'wilful misconduct.' I think it would be wilful misconduct if a man did an act not knowing whether mischief would or would not result from it. I do not mean when in a state of ignorance, but after being told, 'Now this may or may not be a right thing to do.' He might say, 'Well I do not know which is right, and I do not care; I will do this.' I am much inclined to think that that would be 'wilful misconduct,' because he acted under the supposition that it might be mischievous, and with an indifference to his duty to ascertain whether it was mischievous or not. I think that would be wilful misconduct." Then he goes on at the end of his judgment to deal with the facts of the case, and says :

"I cannot think that there was evidence in this case to shew, or on which the learned judge could properly find, that the men who packed these cheeses - who were in London, a place from which much Cheshire cheese is probably not exported - knew that they were doing wrong, or, at all events, that they were aware that mischief might result, and that they, improperly, failed to inform themselves as to whether mischief would or would not result from it." Then Brett L.J. says :

"In a contract where the term 'wilful misconduct' is put as something different from and excluding negligence of every kind, it seems to me that it must mean the doing of something, or the omitting to do something, which it is wrong to do or to omit, where the person who is **\*523** guilty of the act or the omission knows that the act which he is doing, or that which he is omitting to do, is a wrong thing to do or to omit; and it involves the knowledge of the person that the thing which he is doing is wrong; I think that if he knows that what he is doing will seriously damage the goods of a consignor, then he knows that what he is doing is a wrong thing to do; and also, as my Lord has put it,

if it is brought to his notice that what he is doing, or omitting to do, may seriously endanger the things which are to be sent, and he wilfully persists in doing that against which he is warned, careless whether he may be doing damage or not, then I think he is doing a wrong thing, and that that is misconduct, and that, as he does it intentionally, he is guilty of wilful misconduct; or if he does, or omits to do something which everybody must know is likely to endanger or damage the goods, then it follows that he is doing that which he knows to be a wrong thing to do. Care must be taken to ascertain that it is not only misconduct but wilful misconduct, and I think that those two terms together import a knowledge of wrong on the part of the person who is supposed to be guilty of the act or omission." Now Romer J. dealing with that point says:

"But if that act or omission amounts to a breach of his duty, and therefore to negligence, is the person guilty of wilful negligence? In my opinion that question must be answered in the negative unless he knows that he is committing and intends to commit a breach of his duty, or is recklessly careless in the sense of not caring whether his act or omission is or is not a breach of duty."

With that summary of the result of the authorities I agree. It is said that that view of the meaning of the words "wilful neglect or default" is inconsistent with what has been decided by the Courts in certain cases with reference to the duties of trustees, and also with the judgment, or what is supposed to be the true effect of the judgment, of Bowen L.J. in a vendor and purchaser's case: In re Young and Harston's Contract. With all respect to counsel who cited those trustee cases to us, I think there is great danger of being **\*524** misled if we attempt to apply decisions as to the duties of trustees to a case as to the conduct of persons in the position of the auditors in this case. In the case of trustees there are certain definite and precise rules of law as to what a trustee may or may not do in the execution of his trust, and it is no answer for a trustee to say, if, for example, he invests the trust property in his hands in a security which the law regards as an unauthorized security: "I honestly believed that I was justified in doing that." No honest belief will justify him in committing that which is a breach of such a rule of law, and therefore the question which we have to determine in expressing a view on the construction of such words in a contract like the present is not solved by seeing how the question has been determined in a case relating to the duties of a trustee. With regard to In re Young and Harston's Contract , when the judgment of Bowen L.J. is read in connection with the facts of that case it seems to me that it is not inconsistent either with the decision in Lewis v. Great Western Ry. Co. or with that at which Romer J. has arrived in the present case, and for this reason: in In re Young and Harston's Contract the default in question was that the vendor being under an obligation to execute, on September 8, a conveyance of property which he had agreed to sell to the purchasers, went abroad two days before, leaving no address, so that it was impossible for him to execute the conveyance on that day. Now it was plainly a default not proceeding from ignorance, but plainly a wilful default, because the vendor had himself put it out of his power, and apparently deliberately, to do that which he was bound to do on that day, and that was held to be wilful default. Then the words of Bowen L.J. must be read with reference to the facts before him, and there is nothing in his analysis of the meaning of the word "default" and the meaning of the word "wilful" which in any way conflicts with what I venture to think is the true mode of dealing with the construction, not of either word by itself, but of the entire expression "wilful neglect or default." I think, **\*525** therefore, that Romer J. was quite right in arriving at the conclusion that a person is not guilty of "wilful neglect or default" unless he is conscious that in doing the act which is complained of, or in omitting to do the act which it is said he ought to have done, he is committing a breach of his duty, and also, as he said, recklessly careless whether it is a breach of duty or not.

But then it is said that if the article has that effect, and if, as I think it does, it modifies the prima facie obligation of the auditors, it is contrary to the provisions of s. 113 and s. 215 of the Companies (Consolidation) Act, 1908 . With all respect I cannot agree. Sect. 113 does not lay down any rule at all as to the amount of care, or skill, or investigation, or anything of that kind, which is to be brought to bear by the auditors in performing the duties which are imposed upon them. All that the section imposes upon the auditors is the duty of making a report to the shareholders upon the accounts which they examine, and upon every balance sheet laid before the company in general meeting during their tenure of office, and to state in their report whether or not they have obtained all the information and explanations which they have required, and whether, in their opinion, the balance sheet referred to in the report is properly drawn up so as to exhibit a true and correct view of the state of the company's affairs, according to the best

of their information and explanations given to them and as shown by the books of the company. It says nothing as to what they are to do in order to form that opinion, or to ascertain the truth of the facts to which they are to certify. That is left to be determined by the general rules which, in point of law, are held to govern the duties of the auditors, whether those rules are to be derived from the ordinary law, or from the terms under which the auditors are to be employed. Art. 150, therefore, in no way conflicts with s. 113 of the Act.

Then with regard to s. 215, if I am right in what I have already said, it is quite plain that nothing is referred to in that section as a misfeasance, except an act or default which would, having regard to the relations between the auditors **\*526** and the company, be a misfeasance or a breach of trust, causing a loss to the assets of the company, and if therefore there is some act or omission on the part of the auditors which, having regard to the provisions of art. 150 in the present case, or to a similar article in any other case, does not give rise to any liability to the company, then in my opinion it gives rise to no liability under s. 215. I think that is made perfectly plain, especially by the speech of Lord Macnaghten in Cavendish Bentinck v. Fenn. I need not read it again, it has been read very often, and it has already been accepted as stating, and accurately stating, what was the settled law with regard to the construction of the section corresponding to s. 215 of the present Act. It seems to me, therefore, that art. 150 has such effect as, according to its true construction, it ought to have on the obligations and liabilities of the auditors, and that Romer J. was quite right in the conclusion at which he arrived in that respect.

That being the true construction and the actual effect of art. 150 was there anything which the auditors in the present case either did, or omitted to do, which was such an act or omission, wilful default or neglect on their part? I do not propose to go through the evidence upon that point. It is enough for me to read what Romer J. says and to say that I thoroughly agree with his conclusion. He says: "I have heard Mr. Lepine's evidence in the witness box, and I have inspected many of the numerous documents prepared by him for the purposes of the audits which he conducted. I am convinced that throughout the audits that he conducted he honestly and carefully discharged what he conceived to be the whole of his duty to the company. If in certain matters he fell short of his real duty it was because, in all good faith, he held a mistaken belief as to what that duty was." It seems to me that, agreeing with that view, I must agree with the conclusion at which Romer J. has arrived, that the application of the Official Receiver against the auditors fails.**\*527**

I only desire to add this. Romer J. came to the conclusion that, but for art. 150, he would have held, and did hold, that there was negligence on the part of the auditors in regard to the inspection of the securities which were, in fact, in the possession, or ought to have been in the possession of Ellis & Co., and as to which that firm gave a certificate which was accepted by the auditors. With regard to that, I will only say this: We have not heard Mr. Stuart Bevan on that point, and it is at least arguable, I will not say more than that, that in the particular circumstances of the present case there was not, in fact, negligence on the part of the auditors, even without reference to art. 150. I do not say that I differ from Romer J., I only think it fair to Mr. Lepine to say that, Mr. Stuart Bevan not having been heard on that point, the matter is one which is at least worthy of argument.

On the whole, therefore, I agree that the appeal must be dismissed with costs.SARGANT L.J.

I will examine the questions here in a different order from that in which they were presented to us. I will take first the question whether the terms of art. 150 are effective to limit or restrict the extent of the prima facie liability of the auditors. As to this the decisions in Coventry and Dixon's Case and Cavendish Bentinck v. Fenn conclusively established that s. 215 of the Companies (Consolidation) Act, 1908 , which corresponds in almost precise words with the old s. 165 of the Act of 1862, is a procedure section only, and merely provides a summary remedy for enforcing in the liquidation of a company such liabilities as might have been enforced by the company itself, or by its liquidator, by means of an ordinary action. It is not immaterial to observe that in view of the fact that this principle had been clearly laid down in the Court of Appeal in the year 1880 with reference to s. 165 of the Companies Act, 1862 , the provisions of that section with no substantial change are re-enacted by s. 215 of the Companies **\*528** (Consolidation) Act, 1908. In so re-enacting this section it is impossible to suppose that the Legislature meant to give to the re-enacted section a meaning different from that so authoritatively attributed to the similar section which it replaced.

We have therefore to consider whether if the company here had brought an action against the auditors for neglect or default the defendants would have been entitled to avail themselves of the protection given to them by the article in question. I can see no reason why they should not do so. The article does not limit the nature or extent of the auditor's duties under s. 113. It is in no way contrary to the scheme of the Act, and such cases as In re Peveril Gold Mines, Ld. and Payne v. The Cork Co. seem to me to have no application whatever to this case. The article merely operates to limit the liability of the officers of the company by relieving them from the consequences of certain kinds of neglect or default. It might as well be said that a clause of this kind in trust deeds should be inoperative, because it would tend to induce trustees to be negligent of the interests of their cestuis que trust. The truth is that such restrictions on liability may, and I think often do, operate to protect rather than harm beneficiaries, because they prevent honest and responsible persons from being frightened away from accepting an office which might otherwise involve them in various unmerited and unexpected losses notwithstanding perfect honesty on their part.

That being so, we have to consider how the matter would stand if the company itself was suing the auditors, and for this purpose we must deal with the question as to what is the extent of the protection given to the auditors by reason of the latter half of art. 150. What is the meaning of the exception "wilful neglect or default" in that article? Romer J. has analysed with great care the cases on the subject, and in my opinion he has, as a result of that analysis, come to a correct conclusion. I think that **\*529** the word "wilful" in this phrase is of importance, and means that the officer in question is consciously acting, or failing to act, in a reprehensible manner. It may no doubt be for him to show that this is not so, and I do not think he would be protected if he simply failed to give any consideration at all to the question of his duties, if he acted recklessly and without caring whether he was fulfilling them or not. But, in my judgment, these words excuse an officer if through mere inadvertence or error of judgment, and while endeavouring honestly to carry out his duty he does or omits to do something which apart from these words might have rendered him liable. I need not carry the definition further, for as will be seen this is enough, having regard to the view I take of the facts.

As to the facts it seems to me that there is little, if any, dispute. They have been most carefully and exhaustively stated by Romer J. in his admirable judgment, and it is unnecessary to recapitulate them. But there are two circumstances on which special stress should be laid. The first is the very great care exercised by Mr. Lepine in the performance of his duties, a circumstance to which marked attention is drawn in the judgment of the learned judge. There was obviously on the part of the auditors an honest and diligent performance of their duties to the best of their ability, and that is a fact of the utmost importance. The second is this, that in this particular case Mr. Lepine was in fact dealing with a most unusual state of things, a combination in Mr. Bevan of exceptional ability, exceptional reputation and quite exceptional roguery. Mr. Bevan had succeeded in deceiving not only all the other directors of the company, but all his numerous partners in the firm of Ellis & Co., and he was able on behalf of Ellis & Co. to cause corroboration to be given to statements made by the company, independent corroboration by innocent persons, his own partners, although those persons had in fact derived their information from Mr. Bevan himself.

Mr. Bennett in his concise argument, none the less meritorious because of its conciseness, suggested that the **\*530** statements in the balance sheet made a gradual and increasing divergence from the truth, and in so doing were inspired by some one in the background who was trying more and more to conceal the real state of things. I suppose he meant Mr. Bevan, or possibly Mr. Mansell. But I think that this circumstance is rather in favour of the auditors than against them. If these statements had been made on the initiative of the auditors themselves there might have been some ground for some suspicion; but when what they do is to adopt the phraseology of a rogue and fail to detect the implications arising from that phraseology, it seems to me that the circumstance that that is all they are doing is one very definitely in their favour.

Now the heads under which the auditors were sought to be rendered liable are summarised very clearly by Romer J. in his judgment. As regards the first two heads I do not propose to say anything. I only deal with the last head - namely, that connected with the leaving of the securities in the custody of the brokers. In the first place, I think that the strict rules as to trustees do not necessarily apply to limited companies in all their rigour. Trustees are dealing

with other persons' property. Limited companies are dealing with their own funds. It may well be that certain companies may find it advantageous to allow brokers or agents to hold or to have free access to securities which trustees are not entitled to do. That is a matter, in my opinion, for the internal regulation of a company, having regard to the character of its business. Speaking generally, I should have thought it was inadvisable to leave marketable securities with brokers or other persons not accustomed, like bankers or safe deposit companies, to hold and keep securities as part of their ordinary business; and in any ordinary case I think it would be desirable that auditors should call attention to and require some justification for a practice of this kind. But the matter seems to me to be essentially one of degree, and one which is not regulated by the definite and strict rules which govern the conduct of trustees in such matters.**531**

In the next place, I desire to say this, that in my opinion it would not be right that auditors should deliberately adopt a standard of verification below the ordinary standard, because the persons with whom they are dealing are persons of specially high reputation. It would be dangerous to adopt any such lower standard on account of that circumstance. But I cannot find that the auditors here did deliberately adopt any lower standard of that kind. Mr. Lepine was, in my view, adopting the standard which he thought was the proper standard, and one which was not definitely below any standard to which he was accustomed in ordinary transactions. Here I wish to express my opinion, that undue stress was laid by counsel for the appellant on the effect of the evidence of Mr. Van de Linde and Mr. Cash. They seemed to treat the practice of those persons as if it had been embodied in a written or printed code. I think that is to treat the matter altogether too rigidly, and even taking the practice of Mr. Van de Linde and Mr. Cash as they stated it before the Court, there was a considerable borderline of undefined territory, in which the auditor had to be guided by his own personal view of what was sufficient in all the circumstances of the case. In my judgment, therefore, it is impossible to treat Mr. Lepine as having gone contrary to a well defined or well recognized practice in such a way as could only have been justified in most exceptional circumstances.

I desire to add this on a matter to which Warrington L.J. has referred. I do not wish definitely to say that I agree with the view that has been taken by Romer J., that apart from art. 150 the auditors would have been liable. We have not heard on that point any argument on behalf of the auditors, and I can quite see that an argument of considerable force might be addressed to us to prevent our holding that they were neglectful or were in default apart from the special provisions of that article. But having regard to the provisions of that article, and having come to the conclusion that the very most that can be said against Mr. Lepine is that he committed an honest error of judgment, I am clearly of **532** opinion that he is protected, even if he were otherwise liable, by the special and concluding words of art. 150.Appeal dismissed. (W. I. C.)

END OF DOCUMENT

**Tab 15**

**In The Supreme Court of Bermuda**

**Civil Jurisdiction 2000 No. 124**

**BETWEEN:**

CHINA NORTH INDUSTRIES INVESTMENT MANAGEMENT LTD          Plaintiff

v

CHINA NORTH INDUSTRIES INVESTMENT LTD          Defendant

Dated the 24th February 2004

Mr. N Hargun for the Plaintiff

Mr. J Pachai for the Defendant

**Termination of management agreement - Whether lawful - Under-payment of fees - Investment fund - Failure to provide administrative services – Audit - Whether proper procedures were followed - Whether claim for debt or for damages - Counterclaim for recovery of documents, losses or potential losses - Indemnity provisions - Meaning of "gross negligence" and "misconduct"**

The following cases were referred to in the judgment:

*Lockland Builders Ltd v Rickwood* (1995) 77 BLR 38
*Hyundai Heavy Industries Co Ltd v Papadopoulos* [1980] 1 WLR 1129
*Re City Equitable Fire Insurance Co Ltd* [1925] 1 Ch 407
*Austin v Manchester, Sheffield & Lincolnshire Railway* Co (1852) 10 CB 454
*Beal v South Devon Railway* (1864) 3 H & C 337
*Grill v General Iron Screw Collier Co.* (1866) 35 LJ CP 321
*Pentecost v London District Auditor* [1951] 2 All ER 330
*Lord v Midland Railway* LR 2 CP 344
*Lewis v Great Western Railway* Co (1877) 3 QBD 195
*Gordon v Great Western Railway* 8 QBD 44
*Porter v Magill* [2000] 2 WLR 1420
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896
*Red Sea Tankers v Papchristidis (The Hellespont Ardent)* [1997] 2 Lloyds Rep 547

**JUDGMENT of STORR, AJ**

**Mr. Narinder Hargun for the Plaintiff.**

**Mr. Jai Pachai for the Defendant.**

**The Parties**

The Plaintiff, China North Industries Investment Management Limited ("the Investment Manager") is a company incorporated in and under the laws of the British Virgin Islands (BVI). Its business is the provision of investment advice, management and administrative services.

The Defendant, China North Industries Investment Limited ("the Investment Company") is an exempt company incorporated with limited liability in Bermuda. It is a closed-end investment company. Its initial objectives were to identify and invest in investments in the People's Republic of China (PRC). The investment opportunities which were to be selected were ventures which were controlled and managed by China North Industries Group ("China North"). The investments were to be of medium term, that is, from between five to seven years, and were to be minority investments made with a view to capital appreciation within that medium term.

China North is in the nature of a department of state. It is a vast organization owning some 160 medium to large enterprises and having, at the relevant time, over 800,000 employees.

**The Background**

Up to the late 1980s, the economy of the People's Republic of China was closed to non-Chinese investors. This economy was controlled centrally by the State and run by a number of departments at State level. In the late 1980s and early 1990s it became apparent that the State was becoming more amenable to foreign investment and it was felt that there might be the opportunity for foreign investments to "get in on the ground floor".

**The Background to the Investment Company**

10    In or about 1990 a number of people in Hong Kong and PRC, with experience of dealing with Chinese institutions, were exploring the possibilities of making investments in China. Amongst these persons were a Mr. Bernard Ho, who had been involved in the establishment of a closed-end investment fund called China Aeronautical Technology Fund Limited; Mr. Tony Wong, who was involved in the construction industry in Hong Kong; and Mr. Ronald Chum, who was experienced in trading in China and who had particular knowledge of China North.

Accordingly, between 1991 and 1994, there were extensive discussions between these three people and representatives of China North investigating the possibility of non-Chinese investments in enterprises owned by China North. As negotiations proceeded, it was decided that the best way to achieve the desired objectives would be to form a closed-end investment
20    fund which would purchase minority interests in various subsidiaries or elements of China North. The fund itself would not directly invest in those enterprises but, in respect of each one so identified, a BVI company would be formed to make the relevant investment. That BVI company would not participate in any way with the day-to-day management and running of the enterprise in which it had bought an interest. Management would remain the responsibility of the individual enterprise.

**The Raising of Capital by the Investment Company**

China North was to be the vehicle for raising funds for these investments. Accordingly, it wished to make an Initial Public offering of its shares. The financial advisor and placing agent to the offer of shares to the public was HG (Asia) Limited. China North made application to the
30    Committee of the Irish Stock Exchange for primary listing on that exchange and in connection with that application and, on the 28th September 1994, it produced an Information Memorandum for prospective investors. This document was apparently drafted by lawyers in Hong Kong in consultation with the Investment Company's PRC lawyers, Haiwan & Partners in Beijing. Reference will be made later in this judgment to the content of that Information Memorandum which was intended to set out, in great detail, the relevant information about the company and about its prospects. In particular, the Information Memorandum outlined the role of China North in the proposals. It gave a general overview of China and PRC equity joint ventures. It outlined the expected timetable of events and gave details of the risk factors involved, it summarised the provisional joint venture agreements, touching on taxation
40    considerations. The Information Memorandum advised potential investors that the "Investment Manager" to the Investment Company would be the Plaintiff Investment Manager.

**The Placement**

The placement attracted considerable interest and the offer was oversubscribed by two and a-half times. There is no dispute between the parties that the Investment Manager's annual fee entitlement of 2 % of the aggregate subscription price of class A shares amounts to US$ 3,700,000.00 dollars per annum from 1994 onwards.

**The Appointment of the Investment Manager**

The appointment of the Plaintiff as Investment Manager was effected by the execution of a Management Agreement, dated 5th September 1994, between the Investment Company and
50    the Investment Manager ("the Management Agreement"). Again, reference will be made later in this judgment to various parts of that agreement, but the general provisions of the Management Agreement were that the Investment Manager would, unlike many Investment Managers, administer the making of investments identified by the Investment Committee only

in accordance with the directions of that committee. The Management Agreement provided that the Investment Company would not appoint any other Investment Manager during the lifetime of the Management Agreement. The fee payable by the Investment Company to the Investment Manager, for each year of the agreement after 1994, was to be paid half-yearly in advance on the 1st of January and the 1st of July in each year. The Management Agreement also contained provisions as to the termination of the agreement, and this will also be expanded upon later in this judgment.

**The Investment Manager's Claim**

By its Statement of Claim dated the 19th April 2000, which was subsequently amended, then
10 re-amended on the 9th July 2003, the Investment Manager asserted that the Investment Company had wrongly purported to terminate the Management Agreement and had underpaid fees which were properly due to it. The assertion was that there had been an underpayment of fees due in advance on the 1st July 1998, on the 1st January 1999, and subsequently for non-payment for the period 1st July 1999 to 11th October 1999, the date on which the agreement was to be deemed to terminate in the absence of any prior termination. The total sum claimed by the Investment Manager is $2,244,109.97. Interest is claimed on that sum.

**The Defendant's Defence**

By its defence dated 15th June 2000, which was amended and then re-amended on the 7th July 2003, the Investment Company set out the following provisions of the Management
20 Agreement which it alleged that the Investment Manager had breached:

(i)   Section 2(B) which provided, inter alia, as follows:-

'The [Plaintiff] shall use all reasonable efforts and diligence, and devote such time as is reasonably needed, to perform the duties and obligations contemplated by this Agreement and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. The [Plaintiff] shall employ officers, directors, employees, attorneys and agents who shall have such skills and devote such time as are reasonably needed to enable the
30     [Plaintiff] to perform the duties and obligations contemplated by this Agreement.'

(ii)   Section 3, which provided as follows:-

(A) The Plaintiff shall:

(i)   administer in accordance with directions of the Investment Committee the making of the Investments and the [Plaintiff] shall have full authority (i) to make Initial Investments to the extent made substantially in accordance with the terms of the applicable Provisional Joint Venture Agreement and

(ii)   to place sums in cash deposits, with maturities not exceeding one year, in the name of [the Defendant] with banks or other Persons approved
40     from time to time by the Investment Committee …,

(iii)   develop a continuing and appropriate overall investment strategy for the  investments in the Joint Ventures and consistent with the investment objectives and policies of the [Defendant], as specified in the Information Memorandum,

(iv)   monitor each Investment in the Joint Ventures, report to the Investment Committee upon any developments or potential problems with respect to any Investment in the Joint Ventures, provide quarterly reports to the Investment Committee (within sixty days of the end of each quarter) and a semi-annual report to the Shareholders (within four months of the end of the
50     semi-annual period) on the status of each of the Investments in the Joint Ventures, and, to the extent reasonably necessary and permitted by applicable law, provide information concerning the [Defendant] to financial analysts,

(v)      designate one or more persons to act as members of the board of directors of each of the Joint Ventures, who shall be appointed by the [Defendant] and its subsidiaries, and in such capacity to offer to the management of the Joint Ventures the benefit of commercial expertise in the creation of additional value in such Joint Venture and/or in the pubic offering and/or listing of such Joint Venture,

(vi)     cooperate with the Board and the Auditors in connection with any valuations of the [Defendant] to be conducted from time to time in accordance with the Bye-Laws or otherwise,

(vii)    advise the Investment Committee on possible and appropriate methods of realizing the Investments (whether by means of public offerings, disposals of strategic interests, exchanges or otherwise) and use its best efforts to assist the [Defendant] in implementing such realizations ...,

(viii)   negotiate, on behalf of the [Defendant] in accordance with directions of the Investment Committee, with [China North Industries Group] and the relevant enterprises in respect of any changes in the terms of any Investment in a Joint Venture and the realization of any Investment in a Joint Venture ...,

(ix)     provide to the Investment Committee general information on relevant economic and political developments in the PRC,

(x)      provide general administrative services to the [Defendant] in accordance with Section 9 below,

(xi)     upon completion of the International Placement, designate one or more officers or employees to be primarily responsible for performing the duties and obligations of the [Plaintiff] contemplated by this Agreement and shall promptly notify the Investment Committee of any change in such designation, and

(xii)    advise the Investment Committee on possible and appropriate methods to create additional value in each of the Investments and actively pursue the creation of additional value in each of the Investments ...'

(iii)    Section 9, which provided as follows:-

(A)      Except as herein provided, the [Plaintiff] shall provide the [Defendant] with the general administrative services required by it in connection with its business and operation.

(B)      Without prejudice to the generality of the foregoing, the general administrative services to be provided by the [Plaintiff] shall (other than to the extent to be provided by others ...) include:

(i)       ...

(ii)      keeping the accounts of the [Defendant] and such books and records as are required by any applicable law or otherwise for the proper conduct of the affairs of the [Defendant]; providing the [Defendant], the Auditors and such other persons as may be authorized for the purpose by an Officers' Certificate with access to all books and records kept by the [Plaintiff] relating to the [Defendant] and its affairs; preparing for forwarding to Shareholders by or on behalf of the [Defendant] all Company Documents, statements and notices which the Board is required to issue, send or serve in accordance with the Company Documents and/or the practices of any stock exchange on which the Shares or any other securities issued by the [Defendant] may be listed and managing the [Defendant]'s routine tax affairs on its behalf;

(iii)     preparing for publication and/or delivery by or on behalf of the [Defendant] to the shareholders semi-annual reports on the status of investments and, in co-operation with the Auditors, semi-annual financial

statements of the [Defendant] and such notices and other required written material as may be requested from time to time by the Board.'

(iv)      Section 14, which provided as follows:-

"The [Defendant] shall cause its books and accounts to be audited with the co-operation of the [Plaintiff] at least once each year by the Auditors, who shall render a report to the Shareholders."

The Investment Company went on to allege that, in the alternative, the Investment Manager owed the Investment Company a duty in tort akin to that set out in Section 2(B) of the Management Agreement.

10      The Investment Company identified the alleged breaches as follows:-

7(i)      Failure to assign sufficient staff and/or sufficient staff with the requisite skill and knowledge to the performance of the Plaintiff's duties and obligations to the Defendant;

8(ii)     Failure to devote any or any sufficient time to the performance of the Plaintiff's duties and obligations to the Defendant;

9(iii)    Failure to provide any or any proper administrative services to the Defendant;

10(iv)   Failure, by improper exercise of its control over the Defendant's wholly owned subsidiaries, acting without the knowledge and/or authority of the Defendant's Investment Committee and otherwise, to develop and implement a prudent investment strategy consistent with the objectives and policies of the Defendant.

20

Particulars of the allegation of failure to assign sufficient staff were given as follows:-

(a)      From about mid 1998 the Plaintiff failed and/or refused meaningfully to communicate with the Defendant and with the Defendant's Investment Committee and/or the Defendant's consultants. Telephone calls from and on behalf of the Defendant's Vice Chairman and the Chairman of the Defendant's Investment Committee were left unanswered for months; communications by facsimile and letter were similarly ignored;

30      (b)      Requests that representatives of the Plaintiff attend the Defendant's Board meetings in order to report on and answer questions relating to the Defendant's investments were ignored;

(c)      A number of staff who had been involved in the Defendant's affairs resigned from the Plaintiff in or around June 1997 and to the Defendant's knowledge were not replaced;

(d)      Despite concerns raised both orally and in writing by members of the Defendant's Board of Directors that the Plaintiff was under-staffed and was not attending on the Joint Ventures with sufficient frequency, the Plaintiff did not employ more staff and/or did not increase its visits to the joint ventures.

40      Particulars of the allegation of failure to devote adequate time were:-

(a)      The Defendant repeats the particulars set out under paragraph 7 above;

(b)      The Defendant will also rely on the matters pleaded under paragraphs 9 and 10 below;

(c)      The Plaintiff did not attend on the Joint Ventures with the frequency required and only attended on them once or twice per year.

The allegations of failure to provide administrative services were:-

(a)      From September 1998 the Plaintiff failed to provide any semi-annual reports to Shareholders on the status of each of the Defendant's investments;

(b)      From September 1998 the Plaintiff failed to provide any quarterly reports to the Defendant's Investment Committee either within the timescale set out in the Management Agreement or at all;

(c)      The Plaintiff failed and/or refused to cooperate with and/or assist the Defendant's auditors, Messrs PriceWaterhouse Coopers and failed and/or refused to supply the Defendant or its said auditors with the information required to complete the audit of the Defendant's 1997 and 1998 accounts;

(d)      Despite repeated requests from the Defendant's Board of Directors the Plaintiff failed and/or refused to return to the Defendant's registered office minutes, written resolutions and other corporate documents of the Defendant;

(e)      Despite repeated requests from the Defendant's Board of Directors the Plaintiff has, since October 1998 persistently refused to allow the Defendant access to its books and records, and furthermore, since the termination of the Management Agreement has refused to return the Defendant's books and records to the Defendant;

(f)      The Plaintiff has failed and/or refused to supply the Defendant with documents relating to the Defendant's investments thereby enabling the Defendant to monitor and review the structure and performance of those investments.

Allegations of failure to develop a satisfactory investment strategy and of acting outside the authority of the Investment Committee or without that Committee's knowledge relates to three investments made by the Investment Manager on behalf of the Investment Company, namely Chang An, Zongbei, and Jialing. The allegations are as follows:-

(a)      **Chang An**

(i)      On 24th April 1995 the Defendant approved an investment in Chongqing Changan Automobile Company Limited ('Chang An');

(ii)     By July 1995 the Defendant had invested US$ 30 million by way of a loan to Chang An through one of its wholly owned subsidiaries, Auto (No 4) Company Limited;

(iii)    The Plaintiff failed fully and adequately to document the terms of the Defendant's significant investment and caused Auto (No 4) Limited to execute a mere one page loan agreement which provided insufficient protection for the Defendant, for example, it did not provide for repayment of the loan with interest and did not provide a (sic) made no provision for governing law, dispute resolution mechanism, a default mechanism or negative covenants and contained no representations or warranties relating to the enforceability of the said agreement;

(iv)     Furthermore the Plaintiff failed to obtain the necessary registrations and approvals for the loan from the relevant authorities in the People's Republic of China; (sic) The Plaintiff fully failed to ensure that Chang An completed mandatory approval formalities for the loan by the State Administration for Exchange Control as required under The Measures for the Administration of the Taking Out of International Commercial Loans by Organisations within China prior to remitting foreign exchange to Chang an, and, as a consequence, the loan was in breach of PRC laws and regulations and was not enforceable in accordance with its own terms;

(v)      The Plaintiff repeatedly missed opportunities to convert the loan into shares in Chang An in the event which occurred (sic) that Chang An was floated and listed on a recognized stock exchange;

(vi)    The Plaintiff arranged for the loan to be made in local currency and/or converted into local currency, thereby making the loan irrecoverable (insofar as it was not already irrecoverable due to the matters particularized at (iv) above) at least until the People's Republic of China adopted (sic) adopts a convertible currency, which it has not;

(vii)   To date the loan has only been partially repaid. Due to the matters particularized under (iii) and (iv) and (vi) above, the Defendant has had no bargaining or other power to enforce repayment beyond the settlement it achieved with Chang An;

10

(viii)  The Plaintiff failed at the time of the loan, or at any time afterwards during the subsistence of the Management Agreement, to bring the shortcomings in the documentation and in the investment generally to the attention of the Defendant.

(b)    **Zhongbei Joint Venture**

(i)    The Plaintiff arranged an investment in Beijing Zhongbei Telecommunications Company Limited ('Zhongbei') that was in breach of PRC telecommunications decrees and regulations as well as PRC foreign investment regulations including:

20
- the Opinion of the Ministry of Posts and Telecommunications on Further Strengthening Control of the Telecommunications Services Market;

- the Provisional Measures for Administration of the Examination and Approval of Engagement in Previously Restricted Telecommunications Business;

- the Provisional Regulations for the Administration of the Market of Previously Restricted Telecommunications Business;

- the Provisional Regulations for Guiding the Direction of Foreign Investment;

30
- the Catalogue for Guiding the Direction of Foreign Investment in Industry.

(ii)   Zhongbei was not a company identified by the Defendant in its Information Memorandum as a potential investment;

(iii)  The Defendant invested the sum of approximately US$23 million by way of a loans through a (sic) on behalf of its wholly owned subsidiary, Telecom (No 1) Service Ltd ('TSI') of approximately US$17 million to the Joint Venture company, Dalian Tianli Telecommunication Company Limited ('Dalian Tianli'); a capital injection of approximately US$3 million into Dalian Tianli and a loan of approximately US$3 million to Zhongbei;

(iv)   The sums referred to at (iii) above were disbursed without the
40     approval of the Defendant and/or the Defendant's Investment Committee;

(va)   The Plaintiff procured the Defendant on behalf of TSI to loan funds to Zhongbei (via Dalian Tianli) for Zhongbei's investment in Dalian Tianli in a manner that was in breach of the Detailed Implementation Rules for the Law of the PRC on Sino-Foreign Corperative (sic) Joint Ventures and in breach of PRC foreign exchange loan regulations such as the Regulation of the PRC for the Administration of Foreign Financial Institutions and the General Principles of Loan (For Trial Implementations). The Plaintiff then permitted Zhongbei to inject such funds into Dalian Tianli as Zhongbei's capital investment in breach of the said Implementing Rules;

50

(vb)   The Plaintiff caused the Defendant on behalf of TSI to loan funds to Dalian Tianli to such an extent that Dalian Tianli was in breach of the

Provisional Regulations of the State Administration for Industry and Commerce Concerning the Ratio Between the Registered Capital and Total Amount of Investment of Joint Ventures using Chinese and Foreign Investment;

(vc)     The Plaintiff permitted loan agreements to be executed between Dalian Tianli and companies associated with Zhongbei that contain arbitration and governing law provisions that did not comply with the Foreign Economic Contract Law and the Economic Contract Law of the PRC (thus rendering the said provisions unenforceable as a matter of PRC law). Further, the loans themselves constituted a misappropriation of the registered capital of Dalian Tianli in breach of the laws of the PRC set out in sub-paragraph (va) above;

(vd)     The Defendant was provided with a report by the Plaintiff on this investment only after approximately US$10 million had already been disbursed with no regard by the Plaintiff to Chinese law, responsible corporate practice or to its duties and obligations to the Defendant;

(via)     Funds were disbursed The (sic) Plaintiff caused the Defendant on behalf of TSI to remit funds to Zhongbei and to its equipment suppliers with no or no (sic) adequate supporting documentation;

(vib)     The Plaintiff caused TSI to enter into agreements with Zhongbei and Naylor Enterprises Limited ('Naylor') for the amendment of the constituent documents of Dalian Tianli and failed to obtain and/or failed to ensure that Zhongbei obtained the requisite governmental approvals for the effectiveness of such amendments as required by the Law on Sino-Foreign Cooperative Joint Ventures and the Detailed Rules for the Implementation of the Law on Sino-Foreign Cooperative Joint Ventures;

(vic)     The Plaintiff caused TSI to enter into a loan agreement with Naylor whereby TSI as lender agreed to loan the sum of US$512,000 to Naylor as its capital contribution to Dalian Tianli without authorization from or notice to the Defendant's Investment Committee;

(vid)     The Plaintiff procured TSI to stipulate a scope of business for Dalian Tianli in which foreign investment was prohibited as pleaded at sub-paragraph (b)(i) above;

(vie)     The Plaintiff set up a Sino-foreign equity joint venture in Beijing, namely Beijing Zhongbei Tele Communications (sic) Company Limited through TSI and with Zhongbei as a PRC shareholder and Naylor as a second foreign investor, without the authorisation from or notice to the Defendant's Investment Committee;

(vii)     The report referred to in sub-paragraph (vd) above suggested that the investment was worthy of 'further study' by the Defendant's Board of Directors and did not indicate the level or manner of investment which had already been made;

(viii)     The Plaintiff failed to ensure that it exercised the Defendant's exercise (sic) TSI's rights to appoint officers to Zhongbei and it subsidiaries two directors and a general manager to Dalian Tianli and to audit Zhongbei Dalian Tianli;

(ix)     Without the approval of the Defendant and/or the Defendant's Investment Committee the Plaintiff arranged a restructuring of the said loans whereby the funds invested in Dalian Tianli, both by way of loan and capital injection, were loaned in turn by Dalian Tianli to Zhongbei and such loans were in breach of PRC laws and regulations such as:

- the Regulations of the PRC for the Administration of Foreign Financial Institutions;

- the General Principles of Loan (For Trial Implementations);

- the Civil Code of the PRC;

- the Regulations of the PRC Concerning the Administration of the Registration of Enterprises with the Status of a Legal Person;

- the Detailed Implementing (sic) Rules for the Regulations of the PRC Concerning the Administration of the Regulation of Enterprises with the Status of a Legal Person; and

- the Reply of the Supreme People's Court to Several Questions Concerning the Actual Application of the Economic Contract Law in Hearing Cases Involving a Dispute Over an Economic Contract;

10   (x)    As a consequence of the Plaintiff's actions, the repayment of the Defendant's funds by Dalian Tianli is now conditional on the recovery of those funds by Dalian Tianli from Zhongbei;

(xi)    Furthermore the Plaintiff failed to ensure that the Defendant, through TSI, could force Dalian Tianli to take steps to recover the funds from Zhongbei in the event that Zhongbei failed to make repayment;

(xii)    Zhongbei has to date refused to effect repayment of the sums to Dalian Tianli;

(xiii)    The entire transaction and structure is illegal under Chinese (sic) the laws of the PRC cited under this paragraph 10, it being an attempt to
20   circumvent a specific industry prohibition that could not be circumvented. Furthermore, the Plaintiff's actions raised the possibility that a PRC court might 'pierce the corporate veil' of Dalian Tianli and hold TSI and/or the Defendant itself liable for Dalian Tianli's breach of PRC laws and regulations as set out in:

- the Official Reply of the Supreme People's Court to a Question concerning the Assumption of Civil Liability After an Enterprise Established by an Enterprise has been Closed Down or Gone Out of Business; and

- the Detailed Implementing (sic) Rules for the Regulations of the People's Republic of China Concerning the Administration of the
30   Registration of Enterprises with the Status of a Legal Person.

(xiv)    The Plaintiff failed to report to the Investment Committee meeting which was held on 5 July 1997 for the purpose, inter alia, of considering and approving an additional investment of US$9 million into the Zhongbei project, the advice which it had received from Messrs D.S. Cheung & Co. dated 14 June 1997, that under the then structure the money provided by the Defendant of US$11 million was exposed to a very high risk and that it would not be desirable for the Defendant to suffer such a risk.

(c)    **Zhongbei Co-operation Agreement**

(i)    On 15 December 1995 the Plaintiff arranged for a co-operative
40   agreement to be entered into between a wholly owned subsidiary of the Defendant namely TSI and Naylor Enterprises Limited and Zhongbei;

(ia)    the agreement did not comport with the Provisional Regulations for Guiding the Direction of Foreign Investment;

(ii)    The agreement outlined investment from Telecom (No 1) Services Limited to Zhongbei. Zhongbei undertook to make fixed payments to a separate entity together with a guaranteed amount from Zhongbei's profit share;

(iii)    The Agreement (sic) was entered into without the consent and approval of the Defendant and/or of the Defendant's Investment Committee;

(iv)     In November 1996 the Plaintiff caused a joint venture contract to be executed by the same parties;

(v)      The Plaintiff has failed and/or refused to disclose to the Defendant information as to the ownership of Naylor Enterprises Limited;

(vi)     The Plaintiff has failed and/or refused to explain to the Defendant the reason why Naylor Enterprises Limited is a party to the joint venture arrangements;

(vii)    The Plaintiff has failed to explain, if indeed a proper explanation could be given, why it procured TSI to make payments of approximately US$6.1 million were made (sic) to entities other than Zhongbei;

(viii)   The Plaintiff failed to report to the Investment Committee meeting which was held on 5 July 1997 for the purpose, inter alia, of considering and approving an additional investment of US$9million to the Zhongbei project, the advice which it had received from Messrs D.S. Cheung & Co. dated 14 June 1997, that under the then structure the money provided by the Defendant of US$11 million was exposed to a very high risk and that it would not be desirable for the Defendant to suffer such a risk.

(d)      **Jialing**

(i)      The Plaintiff arranged for two cooperation agreements to be entered into between the relevant Defendant's wholly owned subsidiary subsidiaries of the Defendant Auto No 7 Co Ltd and Auto No 77 Co Ltd and Jialing Company ('Jialing');

(ii)     The Plaintiff failed to ensure that the agreements was (sic) were properly executed in accordance with its (sic) their terms; the agreements were in breach of PRC foreign investment regulations requiring approval by the PRC government as a mandatory precondition for the assignment of an equity interest in the Jialing joint ventures as set out in the Detailed Rules for the Implementation of the Law on Sino-foreign Cooperative Joint Ventures and the Notice of the Ministry of Foreign Trade and Economic Cooperation concerning Legal Questions Raised during the Course of Operating a Sino-Foreign Joint Venture; the agreements were unenforceable as they required the discretionary approval of the PRC government and such discretionary approval was not in the power of the parties;

(iii)    The agreements was (sic) were intended to give Auto No 7 Co Ltd and Auto No 77 Co Ltd a "put" option in respect of the sums invested in Jialing, this being the exit strategy approved by the Defendant, such option to be guaranteed by Jialing's parent company;

(iv)     The sum of approximately US$25 million has been disbursed by the Defendant;

(v)      The Plaintiff failed to ensure that the proper parties enterd into the agreements: the agreements states (sic) that Norico Southwest is Jialing's parent company. This is not correct;

(vi)     The Plaintiff failed to obtain the necessary registrations and approvals from the relevant authorities in the People's Republic of China including MOFTEC thereby rendering the transaction and the option unlawful and unenforceable.

The Investment Company then concluded its defence as follows:-

11.      The Defendant will aver that the conduct of the Plaintiff referred to above amounts to gross negligence and willful misconduct on the part of the Plaintiff;

China North Industries Investment Management Ltd
v China North Industries Investment Ltd.

[2004] Bda L.R. 8
page 11

12.     Further or alternatively the Defendant will aver that the conduct of the Plaintiff referred to above was such that the Defendant received nothing of what it bargained for under the Management Agreement;

13.     Further or alternatively the conduct of the Plaintiff has been such that the consideration for which the Plaintiff has been paid fees pursuant to the terms of the Management Agreement has wholly failed;

14.     The Defendant will further aver that the said conduct amounted to a repudiation by the Plaintiff of the Management Agreement, which repudiation was accepted by the Defendant at the latest on 18 February 1999.

**Was the Management Agreement terminated by the Investment Company?**

It will first be convenient to consider whether or not the Management Agreement was lawfully terminated by the Investment Company. The answer to this question will determine the amount, if any, of the Investment Manager's claim against the Investment Company.

The appropriate provision of the Management Agreement is to be found at Section 17 which is set out below:-

17. DURATION AND TERMINATION OF AGREEMENT

(B)     Notwithstanding any other provisions of this Agreement, this Agreement may be terminated immediately upon notice being given by one party to the other (in the case of the Company in accordance with the vote of at least 75% of the Disinterested Directors) if the other:

(i) shall become insolvent or bankrupt or go into liquidation or any other analogous proceedings…

(ii) shall commit any material breach of its duties or obligations under this Agreement and shall fail to remedy the same within ninety days after receipt of notice served upon it by the other party requiring such remedy.

(C) …

(D)     This Agreement is not subject to termination other than pursuant to this Section 17.

The Investment Company contends that it properly terminated the Management Agreement in accordance with the provisions of Section 17 of the Management Agreement and accordingly denies that any management or other fees are due to the Investment Manager under such Management Agreement.

**The purported termination**

Any purported termination, prior to the termination of the Management Agreement by effluxion of time, was required to be "in accordance with the vote of at least 75% of the Disinterested Directors". In the event that such purported termination was in consequence of insolvency, bankruptcy, liquidation or any other analogous proceedings, such termination could be made immediately. However, where the allegation was one of a material breach of its duties or obligations under the Management Agreement, the terminating party was required to give notice giving the other party the opportunity to remedy any material breach of duty or obligation within ninety days after receipt of such notice.

For the Investment Manager, Mr. Hargun urged that it was necessary for the Investment Company to comply strictly with the procedure which was laid down in the Management Agreement. As authority for this proposition, he quoted Chitty on Contract (28th Edition Volume 1 at 23–047). The principle there expressed is:

"Where reliance is placed on the procedure laid down in the contract, it is necessary to comply strictly with the procedure which has been laid down. *The Mihalis Angelos* [1971] 1 Q.B. 164."

He also cited Hirst L.J. in the case of *Lockland Builders Ltd. v John Kim Rickwood* [1995] 77 B.L.R. 38 at page 42. This was a case in which a building contract contained, inter alia, the following provision:

> "If the Owner shall at any time during the progress of the said works be
>
> dissatisfied with the rate of progress the quality of the materials used or of the workmanship he may apply to the President for the time being of the Southend-on-Sea District Law Society to appoint a qualified Architect or a qualified Surveyor to inspect the works and should such Architect or Surveyor certify in writing that the rate of progress and materials used or the workmanship or any or all of these are unsatisfactory ...."

Mr. Rickwood took the view that the work was indeed unsatisfactory and unilaterally appointed a surveyor to carry out inspection, without referring the matter to the President for the time being of the Southend-on-Sea District Law Society. Having lost his case at first instance, he appealed against that decision. In dismissing the appeal, Hirst L.J. said:

> "In my judgment, this clause 2 did impliedly preclude Mr. Rickwood from terminating the contract on the facts of the present case otherwise than by the exercise of his rights under clause 2 since the complaints made fell squarely within the scope of clause 2, i.e. complaints as to the quality of materials and workmanship...."
>
> "In the present case,...Mr. Rickwood did in fact attempt to invoke clause 2 but,...did so ineffectively as he appointed surveyors unilaterally and without the requisite application to the President of the local Law Society to make the appointment. I also would dismiss this appeal."

I accept that proposition and hold that, in order to take advantage of the provisions of Section 17(B) of the Management Agreement, the Investment Company must show that it has complied strictly with the procedures therein laid down.

**Did the Investment Company conform to Section 17(B) of the Management Agreement?**

What the Investment Company did was this. Apparently, without the authority of a meeting of the Board of Directors, someone, on behalf of the Investment Company, instructed the Investment Company's lawyers to write to the Investment Manager in the following terms:

> "18th February 1999
>
> Dear Sirs
>
> CHINA NORTH INDUSTRIES INVESTMENT LIMITED
>
> We are instructed by China North Industries Investment Limited in connection with a Management Agreement entered into between your company and our client dated 5th September 1994.
>
> This letter constitutes notice pursuant to clause 17 (B)(ii) of the agreement that material breaches of your duties and obligations under the Agreement have been committed. Those breaches are as follows:
>
> 1. failure to provide documents when requested and in particular failure to provide quarterly reports to the Investment Committee.
>
> 2. failure to maintain contact with our client.
>
> 3. failure to respond to and return telephone calls.
>
> 4. failure to devote any or any sufficient time and/or any or a sufficient number of personnel to our client's needs and to the performance of your obligations and duties.
>
> 5. failure to respond to requests by our client for documentation to be provided to third parties.

    6.    failure to comply with the directions of the Investment Committee.

    7.    failure to exercise and act with the requisite care, skill, prudence and diligence.

You are required to remedy the above breaches within 90 days after the receipt of this notice.

This notice is served without prejudice to our client's contention that you have repudiated the Agreement in its entirety and that its terms no longer bind the parties.

Yours faithfully".

10    As to whether or not there was authority from the Board of Directors for the dispatch of the letter of the 18th February 1999, the documentary situation is unsatisfactory. Amongst the documents which were identified by way of discovery by the Investment Company and which appear in the official bundle of documents before the Court, there is a copy minute of the Board of Directors which took place on the 2nd February 1999 at the Park Hyatt Hotel, Tokyo, Japan. This copy minute has been heavily edited and much of the text is obscured so that it can not be read. As edited, this minute of the Board meeting contain no reference whatever to the dispatch of a letter complaining of breaches of the Management Agreement. However, for some reason, the Investment Company subsequently produced another binder of documents entitled "Defendant's Documents" which contained a further copy of the minutes of that

20    meeting, but this had been edited differently. This showed a resolution that "AS&K be and is hereby authorised to draft a letter to Haldanes (the Plaintiff's lawyers) regarding the Investment Manager's breaches and remedy within 90 days." These minutes were obviously in the possession of the Investment Company when discovery was made and one would have thought that this item was of such significance that it ought properly to have been brought to the attention of the Investment Manager's lawyers at the earliest possible moment. In any event, I find that the authority given is merely to draft the letter, not to send it.

Despite a request from solicitors acting on behalf of the Investment Manager asking for particulars of the allegations in order that it would consider what steps, if any, were necessary to remedy any alleged breach, no such particulars were supplied. It is my view that, in order

30    to enable the Investment Manager to remedy any breaches complained of, the letter of the 18th February 1999 should have contained such particulars of the Investment Company's allegations as would enable the Investment Manager to act appropriately. The Investment Manager was never given such particulars despite a subsequent request from its lawyers. Furthermore, the effect of the final paragraph of the first letter claiming that the Management Agreement had come to an end, effectively prevented the Investment Managers from remedying any alleged breaches of the Management Agreement.

Despite their claim that the terms of the Management Agreement no longer bound the parties, in their letter of the 7th June 1999, the Investment Company's lawyers wrote:

"7th June 1999

40    Dear Sirs

CHINA NORTH INDUSTRIES INVESTMENT LIMITED

We refer to our letter of the 18th February 1999 and confirm that we continue to act on behalf of the above company.

This letter constitutes notice, in accordance with clause 17(B) of the Management Agreement dated 5th September 1994 ("the Agreement") that as a result of your failure to remedy the material breaches of your duties and obligations which were particularized in our letter of 18th February 1999 the Agreement is terminated immediately.

We would remind you of the obligations which arise upon the termination

50    pursuant to clause 18(C) of the Agreement and expect you to comply with those obligations. As before, the notice is served without prejudice to our client's contention that the Agreement is no longer in effect.

Yours faithfully."

There was a telephone conference meeting of the Directors of the Investment Company on 8th June 1999 at 8:30 p.m. Hong Kong time at which the Disinterested Directors were present or represented. Ms. Arebella di Iorio of the Investment Company's lawyers reported that a termination letter to the Investment Manager's lawyers "went out yesterday, and she would circulate a final version to all Directors". The Board thereupon passed the following resolution: "It was RESOLVED that the termination letter to CNIIML (the Plaintiff) be dispatched."

They themselves had effectively put it out of the ability of the Investment Manager to take any remedial action by failing to give the particulars of the alleged breaches and by claiming that the Management Agreement was at an end. More importantly that letter should have been sent "in accordance with the vote of at least 75% of the Disinterested Directors". The meeting of Directors in fact took place the day after the letter had been sent and purported to ratify the actions of the lawyers. I hold that this does not satisfy the requirements of Section 17(B) of the Management Agreement and that, accordingly, the purported determination of the Management Agreement by the letter of the 7th June 1999 was ineffective. A resolution of the Disinterested Directors should have been in existence before the letter was sent and, in the absence of prior authority, the letter was not sent "in accordance with the vote of at least 75% of the Disinterested Directors."

**Was there an alternative method of determination?**

Was it possible to determine the Management Agreement in some other way, for example, under common law? Mr. Hargun urges that it was not. He cites as the authority for that proposition the case of *Lockland Builders –v- John Kim Rickwood* (*supra*) in which case Russell L.J. said :-

> "My own view – returning to the facts of the instant case – is that Clause 2 and the common law rights to accept a repudiatory breach can exist side by side, but only in circumstances where the contractor displays a clear intention not to be bound by his contract, for example, by walking off the site long before completion (as suggested during the course of argument by Hirst L.J.) or, by way of further illustration, failing to comply with plans in a very fundamental way, for example, by not building a third storey when contractually bound to do so. But such cases are far removed from the instant one.

> On the facts of this case, I, for my part, would be prepared to hold that Clause 2 created the only effective way in which Mr. Rickwood could determine this agreement. It is difficult to understand why the clause should be there at all if that were not the true position."

In my view, the Investment Company has not established that the conduct of the Investment Manager demonstrates an unequivocal intention not to be bound by the contract. Accordingly, there is no common law right to determine the Management Agreement.

I believe this to be the intention of the parties as Section 17(D) of the Management Agreement provides:-

> "This agreement is not subject to termination other than pursuant to this Section 17."

I hold, therefore, that the only way to bring this Management Agreement to an end, before it expired by effluxion of time, was to conform strictly to the procedure laid down in Section 17(B) of the Management Agreement. The Investment Company should have complied strictly with the requirements of that section. It did not do so and accordingly, it did not determine the contract under this provision. The contract therefore continued in existence until it determined automatically on the 11th October 1999.

**The Defence**

Can the matters pleaded by the Investment Company amount in law to a defence to the claim by the Investment Manager? In urging that they cannot, Mr. Hargun quoted from <u>Chitty on Contracts</u> (28th Edition) Volume 1, para 27 – 008 which says:-

> "There is an important distinction between a claim for payment of a debt and a claim for damages for breach of contract. A debt is a definite sum of money fixed by the agreement of the parties as payable by one party in return for the performance of a specified obligation by the other party or upon the occurrence of some specified event or condition; damages nearly claimed from a party who has broken his contractual obligation in some way, other then a failure to pay such a debt (It is also possible that, in addition to a claim for a debt, there may be a claim for damages in respect of consequential loss caused by the failure to pay a debt at the due date. The relevance of this distinction is that rules on damages do not apply to a claim for a debt, e.g. the claimant who claims payment of a debt need not prove anything more than his performance or the occurrence of the event or condition; there is no need for him to prove any actual loss suffered by him as a result of the defendant's failure to pay; the whole concept of the remoteness of damage is therefore irrelevant; the law on penalties does not apply to the agreed sum; the claimant's duty to mitigate his loss does not generally apply; and the claimant will usually be able to seek summary judgment."

Mr. Hargun also relied on *Hyundai Heavy Industries Co. Ltd. v Papadopoulos* [1980] 1 WLR 1129 in which case Viscount Dilhorne approved a passage from *Hudson's Building and Engineering Contracts 10th Edition (1970) p. 255* in the following terms:

> "Where the contractor has become entitled to an instalment payment, he will not normally forfeit his right to such payment by a subsequent abandonment or repudiation of the contract, but will be entitled to sue for any unpaid instalment, if he has satisfied the conditions for it to become due, subject, of course, to the employer's right to counterclaim for damages for breach of contract."

Hudson then cites the following passage from *Salmond and Winfield, The Law of Contract (1927) page 286:*

> "Every obligation which has accrued due between the parties before the rescission of the contract, and which so creates a then existing cause of action, remains unaffected by the rescission and can still be enforced. It makes no difference in this respect whether such accrued obligation and existing cause of action is one in favour of the party rescinding the contract or is one in favour of the other party."

He cited the judgment of Dixon J. in *MacDonald v Dennys Lascelles Ltd*. {1933} 48 CLR 457 as follows:

> "When a party to a simple contract, upon a breach by the other contracting party of a condition of the contract, elects to treat the contract as no longer binding upon him, the contract is not rescinded as from the beginning. Both parties are discharged from the further performance of the contract, but rights are not divested or discharged which have already been unconditionally acquired. Rights and obligations which arise from the partial execution of the contract and causes of action which have accrued from its breach alike continue unaffected."

This was approved by the House of Lords in *Johnson v Agnew* [1980] AC 367.

Mr. Hargun drew the Court's attention to a further provision of the Management Agreement which he said supported his position in relation to his assertion that the matters pleaded did not afford a defence to the Investment Company. This was Section 18 of the Management Agreement which reads as follows:-

> 18. LIABILITY FOLLOWING TERMINATION OF AGREEMENT.

> *The Investment Manager shall be entitled to keep all fees and other money paid and to receive all fees and other amounts due notwithstanding any termination of this agreement. . . . . Any termination of this agreement shall be without prejudice to any antecedent liability of the Investment Manager or the Company..*

I accede to the proposition put forward by Mr. Hargun and I hold that the Investment Manager's claim is for a debt and not for damages. The events which occurred to entitle the Investment Manager to its fees were the continued existence of the Management Agreement on 1st July 1998, 1st January 1999, and through the ensuing period up to 11th October 1999. Evidence was given, on behalf of the Investment Company, which sought to persuade the Court that the Investment Manager had agreed to a variation of or reduction in the amount of its fee. This was not accepted by the Investment Manager. Having considered the evidence, I do not find that the Investment Company has satisfied me that there was any said variation or reduction. Additionally Section 21 of the Management Agreement provides:-

> 21. ENTIRE AGREEMENT: AMENDMENTS.
>
> *This Agreement governs the entire agreement between the parties hereto with respect to the matters contemplated hereby, and no amendment, change, or modification or waiver of any provision hereof shall be valid unless in writing, and signed by the party to be bound.*

No such writing exists. I am therefore satisfied that the Investment Manager has shown this to be the case and it is therefore entitled to judgment in the sum of $2,244,109.97 as prayed for in its Writ of Summons. There will also be interest on this sum at the statutory rate.

**The Counterclaim**

By its Counterclaim, re-amended on the 7th July 2003, the Investment Company repeats the allegations made to support its defence and in addition claims that the Investment Manager has failed to deliver up books, records, and other documents belonging to the Investment Company.

The gist of the Investment Company's allegations of material breach of the Investment Manager's duties and obligations under the Management Agreement concern investments made by the Investment Manager on the instructions of the Investment Committee of the Investment Company, which failed to provide the capital growth which had been hoped and indeed resulted in a capital loss by the Investment Company. Dealings in the Investment Company's shares were suspended by the First Stock Exchange on 26th February 1999, and were cancelled on 13th September 1999, in consequence of the Investment Company's inability to comply with the rules of the Exchange. The Investment Company's listing on the Singapore Stock Exchange was also cancelled.

The Investment Company's complaints relate to transactions with Chang An. The Investment Manager's invested US$ 30 million by way to loan to this company through one of its wholly owned subsidiaries Auto (No 4) Company Limited. The Investment Company complains that the Investment Manager failed to take the necessary steps to ensure that the loan was secure and that the loan would be recoverable. In particular, the Investment Company asserts that the only documentation obtained in support of the transaction was a one page loan agreement which did not provide for the repayment of the loan with interest, made no provisions for governing law for dispute resolution mechanism and contained no representations or warranties relating to the enforceability of the agreement. The Investment Company also alleges that the Investment Manager failed to obtain the necessary registrations and approvals for the loan from the relevant PRC Authorities. In particular the Investment Company asserts that the Investment Manager fully failed to ensure that Chang An obtained necessary approvals from the State of Administration for Exchange Control and that, in consequence, the loan was in breach of PRC laws and regulations, and was not enforceable. The Investment Company also asserted that the Investment Manager arranged for the loan to be made in local currency or converted into local currency thereby making the loan irrecoverable. In fact Chang An has made a partial repayment of the loan but the balance has not been recovered.

The second investment of which the Investment Company complains is a telecommunications company known as Zhongbei. It asserts that the investment was in breach of PRC telecommunications decrees and regulations and was contrary to PRC foreign investment regulations. The Investment Manager invested the sum of approximately US$23 million by way of loans, the sum US$17 million going to the Joint Venture Company which was created and called Dalian Tianli. A further capital injection of US$3,000,000.00 was made to the same company and a loan of approximately US$3,000,000.00 to Zhongbei itself. The Investment Company alleges that the Investment Manager permitted loan agreements to be executed which did not comply with Foreign Economic Contract Law and the Economic Contract Law of the PRC thus rendering the agreements unenforceable. There is a further allegation that the Investment Manager arranged a restructuring of the loans whereby the funds invested in Dalian Tianli were loaned by Dalian Tianli to Zhongbei, such loans being in breach of PRC laws and regulations. Of the funds invested the Investment Company says this:

> "As a consequence of the Plaintiff's actions, the repayment of the Defendant's funds by Dalian Tianli is now conditional on the recovery of those funds by Dalian Tianli from Zhongbei."

That assertion is followed by the allegation that the Investment Manager failed to ensure that the Investment Company could compel Dalian Tianli to take steps to recover the money from Zhongbei. Zhongbei has to date refused to make the required repayment.

The Investment Company also asserts that the entire transaction and structure of the investment in Zhongbei is illegal under the laws of the PRC. The final assertion in relation to that transaction was added by the re-amendment of the defence on 7th July 2003 and is as follows:

> "The Plaintiff failed to report the Investment Committee meeting which was held on 5th July 1997 for the purpose, inter alia, of considering or approving an additional investment of US$9 million into the Zhongbei project, the advice which they had received from DS Cheung Co. dated 14th June 1997 that under the then structure the money provided by the Defendant of US$11million was exposed to a very high risk and that it would not be desirable for the Defendant to suffer such a risk."

The third transaction of which substantial complaint is made relates to an investment in an enterprise known as Jialing. The allegation here is that the Investment Manager arranged for two co-operation agreements to be entered into by the Investment Company's wholly owned subsidiaries, with subsidiaries of Jialing Auto No7 Co Ltd and Auto No 77 Co Ltd. These agreements were intended to give Auto No7 Co Ltd and Auto No 77 Co Ltd a "put" option in respect of sums invested in Jialing. Of this arrangement the Investment Company alleges the Investment Manager failed to ensure that the co-operation agreements were properly executed in accordance with their terms. It further asserts that the co-operation agreements were in breach of PRC foreign investment regulations requiring approval by the PRC government as a mandatory pre-condition for the assignment of equity interest in the Jialing Joint Ventures as set out in the Detailed Rules of the Implementation of the Law on Sino-Foreign Cooperative Joint Ventures and the notice of The Ministry of Foreign Trade and Economic Corporation concerning Legal Questions Raised during the Course of Operating a Sino-Foreign Joint Venture. It further alleges that the agreements were unenforceable as they required the discretionary approval of the PRC government and that such discretionary approval was un-obtainable.

The Investment Company also alleges that the Investment Manager failed to obtain the necessary registrations and approvals from the relevant authorities in the PRC including Ministry of Foreign Trade Exchange Control MOFTEC.

The Investment Company asks for an award equivalent to the loans or advances which the Investment Manager made on the Investment Company's behalf without the knowledge or consent of the Investment Company insofar as such monies are not recoverable from the various entities in the PRC. It claims payment for management fees incurred in attempting to secure repayment of money and/or in investigating or rectifying the purported acts of the

admissions of the Investment Manager and it claims damages to reimburse it for amounts advanced to various Chinese entities which cannot be recovered.

In its reply to the Investment Company's Counterclaim the Investment Manager prays in aid the following sections of the Management Agreement:

"7. CONTROL OVER AND RESTRICTIONS ON INVESTMENT MANAGER.

(A) The [Plaintiff] shall act hereunder (insofar as it is reasonably able to do so) in accordance with each Officers' Certificate given to it, with the Bye-Laws, with the overall policies and direction in the Investment Committee of which it is informed and with the investment objectives, policies and restrictions of the [Defendant] as expressed from time to time by Board resolution, but initially as stated in the Information Memorandum.

(B) All duties and obligations of the [Plaintiff] under the Management Agreement shall be subject to the overall policies and directions of the Investment Committee, which may by Officers' Certificates give to the [Plaintiff] general or specific directions relating to the services specified in Sections 3 (A) or 3 (B) [of the Management Agreement]. The [Plaintiff] shall be required to act or refrain from acting, (and shall be fully protected in so acting or refraining from acting) with respect to such matters upon the instruction of the Investment Committee and such instructions shall be binding upon the Board and all shareholders."

"8. RESPONSIBILITY OF [PLAINTIFF] AND INDEMINITY BY THE COMPANY

(A) No representation or warranty is given by the [Plaintiff] as to the performance or profitability of any Investment or with respect to any property, rights or obligations of the [Defendant].

(B) The [Plaintiff], acting in good faith, shall not be liable for any act or omission of any person by or through whom transactions are effected for the [Defendant].

(C) None of the [Plaintiff] or any affiliate of the [Plaintiff] nor any of their respective officers, directors, employees, attorneys or agents shall be liable to the [Defendant] or to any Shareholder for any act or omission in the course of or in connection with the services rendered, or to be rendered, by the [Plaintiff] [t]hereunder or for any loss however arising from errors of fact or judgement or any action taken (or omitted to be taken by it) or for any decline in the value of assets of the [Defendant], or any loss of opportunity whereby the value of the [Defendant] could have been increased or any loss whatsoever that may result to the [Defendant] as a result of the exercise or performance of the duties, obligations, powers and rights of the [Plaintiff] [t]hereunder or the failure to exercise or perform (whether by the [Plaintiff] or any person to whom the [Plaintiff] has delegated, or by or through whom the [Plaintiff] may perform, the same under Section 5 of the [Management Agreement]) the duties, obligations, powers and rights of the [Plaintiff] [t]hereunder, provided, however, that no Person shall be relieved of any liability for its own gross negligence or wilful misconduct."

17. DURATION AND TERMINATION OF AGREEMENT

(A)

(B)

(C)

(D) This Agreement is not subject to termination other than pursuant to this Section 17.

18. LIABILITY FOLLOWING TERMINATION OF AGREEMENT

> The [Plaintiff] shall be entitled to keep all fees and other money paid, and to receive all fees and other amounts due, notwithstanding any termination of the [Management Agreement]. . . . . . .

The Reply to the Defence and Counterclaim then deals with the various allegations made against it in the Defence and Counterclaim but, it is not necessary to particularise those responses at this stage of my ruling. In general terms however, the Investment Manager denies that it had been the practice of the Investment Company to require quarterly reports but instead had called upon the Investment Manager to provide reports on an ad-hoc basis. It claimed a lien for unpaid fees over such of the Investment Company's documents as it had retained.

As to the Chang An transaction the Investment Manager avers that the supporting documentation was prepared by the Investment Company's lawyers in the PRC, a firm known as Haiwan & Partners. It further avers that the documentation was approved by the Investment Company's financial advisors, by the Investment Committee and by the full Board of the Investment Company prior to execution. As to the allegation that the Investment Manager fully failed to ensure completion of mandatory approvals the Investment Manager avers that it was the obligation of Chang An or Haiwan & Partners to obtain any relevant government approvals and that the Investment Manager, under the terms of the Management Agreement, was entitled to rely upon them to obtain such necessary approvals. The Defence also points out that this loan has been recovered in full.

As to the Zhongbei Joint Venture the Investment Manager case is that the Investment Company's Investment Board authorised its Investment Committee to approve an investment in Zhongbei in the maximum sum permitted under the Investment Company's bye-laws namely $27,700,000.00. The Investment Manager further asserts that, if the investment is contrary to Chinese law, then the Investment Committee, its Board, its Audit Committee and its Financial Advisor were aware of this when the Investment Company initially made the investment in 1995 and increased it in 1997. Generally, the Investment Manager's case is that the Investment Company was fully aware of the nature of the transaction and of the implications thereof.

As to the investment in Jialing, again the Investment Manager points out that the agreements for this transaction were drafted by the Investment Company's own lawyers Haiwan & Partners and asserts that the Investment Manager relied upon them as it was entitled to do under the Management Agreement.

The Investment Manager then relies upon the indemnities provided to it in Sections 8 (B), (C), (D), and (E) of the Management Agreement.

**The Indemnity Provision of the Management Agreement**

Before going to discuss whether or not the Investment Manager's alleged failures could be grounds to support the Investment Company's Counterclaim, it is necessary to consider in detail the indemnity provisions of the Management Agreement. Section 8 is set out below.

RESPONSIBILITY OF INVESTMENT MANAGER AND INDEMNITY BY THE COMPANY

> No representation or warranty is given by the Investment Manager as to the performance or profitability of any Investment or with respect to any property, rights or obligations of the Company.

> The Investment Manager, acting in good faith, shall not be liable for any act or omission of any Person by or through whom transactions are effected for the Company.

> None of the Investment Manager or any Affiliate of the Investment Manager nor any of their respective officers, directors, employees, attorneys or agents shall be liable to the Company or to any Shareholder for any act or omission in the course of or in connection with the services rendered, or to be rendered, by the Investment Manager hereunder or for any loss however arising from errors of fact or judgment or any action taken (or omitted to be taken by it) or

for any decline in the value of the assets of the Company, or any loss of opportunity whereby the value of the Company could have been increased or any loss whatsoever that may result to the Company as a result of the exercise or performance of the duties, obligations, powers and rights of the Investment Manager hereunder or the failure to exercise or perform (whether by the Investment Manager or any Person to whom the Investment Manager had delegated, or by or through whom the Investment Manager may perform, the same under Section 5 above) the duties, obligations, powers and rights of the Investment Manager hereunder, provided, however, that no Person shall be relieved of any liability for its own gross negligence or willful misconduct.

The Company agrees to indemnify the Investment Manager and each of its Affiliates and each of their respective officers, directors, employees, attorneys and agents (collectively the "Indemnities") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, but not limited to, fees and disbursements of legal counsel and other experts retained by such Indemnitee), which may be imposed on, incurred by or asserted against such Indemnitee as a result of or in connection with the exercise, performance of, or failure to exercise or perform, (whether by the Investment Manager or any Person to whom the Investment Manager has delegated, or by or through whom the Investment Manager may perform, the same under Section 5 above) the duties, obligations, powers and rights of the Investment Manager hereunder, provided, however, the Company shall have no obligation to an Indemnitee hereunder with respect to matters resulting primarily from the gross negligence or willful misconduct of such Indemnitee. Each Indemnitee undertakes to give prompt notification to the Company in any case where it proposes to seek an indemnity under this Sub-section and not to settle any legal action or proceedings in respect of which it is entitled to an indemnity under this Sub-section without the consent of the Company. With respect to any one such claim or action or series of common claims or actions, the Company shall not be obligated to pay the fees and expenses of more than one counsel to Indemnitees.

This sub-section relates only to indemnities in relation to the Information Memorandum.

Mr. Pachai did not seek to argue that the alleged shortcomings of the Investment Manager were not covered by the words of Section 8. What he sought to do was to aver that the Investment Manager was not entitled to the benefit of this indemnity in consequence of its own gross negligence or wilful misconduct. In support of this proposition he argued that the use of the expression gross negligence is always misleading. He said that it should never be used in connection with any matter to which the common law relates and, because negligence is a breach of duty and if there is such a breach which causes loss, it matters not whether it is a venial breach or a serious breach. Any breach of duty which causes loss is actionable. In support of his proposition Mr. Pachai referred to the 3rd edition of "Words and Phrases Legally Defined" at page 211 in the 3rd volume.

Stroud cites an extract from *Austin v Manchester, Sheffield & Lincolnshire Rly Co* (1852) 10 CB 454 at 474 as follows:

"The terms gross negligence and culpable negligence, cannot alter the nature of the thing omitted; nor can they exaggerate such omission into an act of misfeasance, or renunciation of the character in which the defendants received the horses to be carried."

It cites Crompton J. in *Beal v South Devon Rly* (1864) 3 H & C 337 at 341 as follows:

"The authorities are numerous, and the language of the judgments various, but for all practical purposes the rule may be stated to be, that the failure to exercise reasonable care, skill and the diligence is gross negligence."

China North Industries Investment Management Ltd
v China North Industries Investment Ltd.

[2004] Bda L.R. 8
page 21

It then cites Willes J. in *Grill v General Iron Screw Collier Co. (1866) 35 LJCP 321 at 330.*

> "I entirely agree with the dictum of Lord Cranworth in Wilson –v- Brett [1843]
> 11 M & W 113 that gross negligence is ordinary negligence with a vituperative
> epithet."

A more recent authority was the case of *Pentecost v London District Auditor* [1951] 2 All ER
330 at 333 were Lord Goddard said:

> "The use of the expression "gross negligence" is always misleading. Except in
> the one case when the law relating to manslaughter is being considered, the
> words "gross negligence" should never be used in connection with any matter
> to which the common law relates because negligence is a breach of duty, and,
> if there is a duty and there has been a breach of it which causes loss, it
> matters not whether it is a venial breach or a serious breach. A breach of legal
> duty in any degree which causes loss is actionable."

In the same case Lynskey J. said:

> "Epithets applied to negligence, so far as the common law is concerned, are
> meaningless. Negligence is well known and well defined. A man is either guilty
> of negligence or he is not. Gross negligence is not known to the English
> common law so far as civil proceedings are concerned, and one has only to
> consider the phrase in criminal cases, particularly in cases of manslaughter."

Mr. Pachai then drew the Court's attention to sixth edition of Stroud's Judicial Dictionary of
Words and Phrases, Volume 2, at page 1107. The definition contained therein of the
expression of gross negligence quotes from *Lord v Midland Railway* (L.R. 2 C.P. 344) were
Willes J. said:

> "Any negligence is gross in one who undertakes a duty and fails to perform it.
> The term 'gross negligence' is applied to the case of a gratuitous bailee who is
> not liable unless he fails to exercise the degree of skill which he possess."

Finally Mr. Pachai referred to the case of In *re City Equitable Fire Insurance Company Limited*
[1925] 1 Ch 407 in which case Romer J. said:

> "If, therefore, a director is only liable for gross or culpable negligence, this
> means that he does not owe a duty to his company, to take all possible care.
> It is some degree of care less than that. The care that he is bound to take has
> been described by Neville J. in the case referred to above as "reasonable care"
> to be measured by the care and ordinary man might be expected to take in
> the circumstances on his own behalf."

He then moved on to the matter of wilful misconduct.

In defining this expression Mr. Pachai referred the court once again to the Third edition of
Words and Phrases Legally Defined at page 437. The definition there cited is that wilful
"misconduct" means misconduct to which the will is a party, something opposed to accident or
negligence; the misconduct, not the conduct, must be wilful. Bramwell L.J. in *Lewis v Great
Western Railway Company Rly* (1877) 3 Q.B.D. 195 said:

> "But to my mind there might be other wilful misconduct. I think it would be
> wilful misconduct if a man did an act not knowing whether mischief would or
> would not result from it. I do not mean when in a state of ignorance, but after
> being told, "Now this may or may not be a right thing to do." He might say
> "Well, I do not know which is right, and I do not care. I will do this." I am
> much inclined to think that that would be "wilful misconduct" because he acted
> under the supposition that it might be mischievous, and with an indifference to
> his duty to ascertain whether it was mischievous or not. I think that that would
> be wilful misconduct."

Later in the same judgment Bramwell, L.J. said this:

"In *Norris v Great Central Railways* (1915) 85 LJKB 285 which was heard in this Court a short time ago, Mr. Justice Lush and I adopted the definition of "wilful misconduct" given by Mr. Justice Johnson in *Graham v Belfast and Northern Counties Railway* [1901] 2 Ir R 13 namely, that "wilful misconduct" in such a special condition means misconduct to which the will is party as contradistinguished from accident, and is far beyond any negligence, even gross or culpable negligence, and involves that a person wilfully misconducts himself who knows and appreciates that it is wrong conduct on his part in the existing circumstances to do, or to fail, or omit to do (as the case may be) a particular thing, and yet intentionally does, or fails or omits to do, it, or persists in the act, failure, or omission, regardless of consequences."

Mr. Pachai then referred to Stroud's Judicial Dictionary of Words and Phrases 6th Edition, at page 2916 where the judgment of Grove, J. in *Gordon v. Great Western Railway* 8 Q.B.D. 44 was cited as follows:-

"Wrong conduct, wilful in the sense of being intended, but induced by mere honest forgetfulness or genuine mistake, does not amount to wilful misconduct".

Bramwell, L.J., is also cited in *Lewis v Great Western Railway* 3 Q.B.D. 195 as follows:-

"What is meant by "wilful misconduct" is misconduct to which the will is a party; it is something opposed to accidental or negligent; the 'mis' part of it, not the conduct, must be wilful."

Mr. Pachai then cited from *Porter v Magill* [2000] 2 W.L.R. 1420. In that case Kennedy, L.J. said:-

"Wilful misconduct was defined by Webster J. in *Graham v Teasdale* [1981] 81 L.G.R. 117 as "deliberately doing something which is wrong, knowing it to be wrong or with reckless indifference as to whether it is wrong or not." In this case that definition has received universal support …."

For the Investment Manager it was argued that the Court is not construing the expression "gross negligence" in the context of an action for tort, but is construing that phrase as part of an agreement which was entered into voluntarily by both parties. Mr. Hargun therefore says that the way to construe such a provision is to give it ordinary commercial meaning. He argues that in using the expression "gross negligence" or "wilful misconduct" the parties must be deemed to have intended something more than ordinary negligence. He cites as authority for this proposition a case of *Investors' Compensation Scheme Limited v West Bromwich Building Society* [1998] 1 W.L.R. 896 at 912. In that case Lord Hoffman identified the principles by which contractual documents are construed and said this:-

"I do not think that the fundamental change which has overtaken this branch of the law, particularly as a result of the speeches of Lord Wilberforce in *Prenn –v- Simmons* [1971] 1 W.L.R. 1381, 1384 to 1386 and *Reardon Smith Line v Yngvar Hansen-Tangen* [1976] 1 W.L.R. 989, is always sufficiently appreciated.

The result has been, subject to one important exception, to assimilate the way in which such documents are interpreted by judges to the common sense principles by which any serious utterance would be interpreted in ordinary life. Almost all the old intellectual baggage of "legal" interpretation has been discarded. The principles may be summarised as follows:

1.      Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

2.      The background was famously referred to by Lord Wilberforce as the "matrix of fact", but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should

have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

3.      The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of this exception are in some respects unclear. But this is not the occasion on which to explore them.

4.      The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those wrong words against the relevant background would reasonably have been understood to mean. The background may not merely enable a reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax: see *Mannai Investments Co. Ltd v Eagle Star Life Assurance Co. Ltd* [1997] A.C. 749.

5.      The "rule" that words should be given their "natural and ordinary meaning" reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. Lord Diplock made this point more vigorously when he said in *Antaios Compagnia Naviea S.A., v Saian Rederierna A.B* [1985] A.C. 191, 201:

"if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense."

Mr. Hargun emphasized principle number 5 saying that this principle should be applied in construing the phrases to which attention has been drawn.

Mr. Hargun also referred to the case of *Red Sea Tankers & Others –v- Papachristidis & Others* ("*The Hellespont Ardent*"). This was a case concerning the contract for the purchase of a ship and the contract contained the following clause.

2. The Corporation will….. indemnify and hold harmless the Commercial Advisor and its officers, directors… from any …. claim ….. which ….. arises out of , relate to or is in connection with the performance of its duties….. except for any Indemnified Damages that are found…. to have resulted from bad faith, gross negligence or wilful misconduct of … the persons seeking indemnification.

During his judgment Mance J. said this:

"There are numerous authorities describing gross negligence in the context of exculpatory clauses as "conduct that evinces a reckless disregard for the rights of others or "smacks" of intentional wrongdoing." I start with a case pre-dating them *Hong Kong Export Credit Insurance Corporation v Dun & Bradstreet* 414 F. Supp 153 (S.D.N.Y. 1975). In that case a Federal District Court applying New York law held that –

Gross negligence means that the defendant has not only acted carelessly in making a mistake, but that it was so extremely careless that it was equivalent to recklessness.

China North Industries Investment Management Ltd
v China North Industries Investment Ltd.

[2004] Bda L.R. 8
page 24

Later it repeated that:-

> gross negligence… implies great negligence and the want of even scant care. It has been defined as a disregard of the consequences which may ensue from the act and indifference to the rights of others."

Mance, J. then discusses other New York authorities and concludes his review by saying:-

> In Colnaghi the Court was concerned with a failure to wire a skylight in an art gallery through which thieves made entry to steal 20 paintings.

> Citing Sommer the Court said:-

> New York Law generally enforces contractual provisions absolving a party from its own negligence (*Sommer v Federal Signal Corp*. 79 NY 2d, at 53, supra: …Public policy, however, forbids a party's attempts to escape liability, through a contractual clause, for damages occasioned by "grossly negligent conduct" (*Sommer v Federal Signal Corp*. supra). Used in this context, "gross negligence" differs in kind, not only degree, from terms of ordinary negligence. It is conduct that evinces a reckless disregard for the rights of others or "smacks" of intentional wrong doing (*Sommer v Federal Signal Corp*. supra).

At page 586 of his judgment Mance, J. summarises his conclusions concerning the definition of gross negligence as follows:

> "Viewing the particular words of the present contracts, four concepts are separately identified. They may overlap (e.g. in the case of wilful misconduct and fraud), but the draftsman has recognised a distinction, to which I have already pointed, between acts or omissions resulting from gross negligence and acts or omissions constituting wilful misconduct, fraud or bad faith. Whether one looks to the authorities decided and the principles identified in the context of New York public policy or to the simple meaning of the words without attributing to them any special meaning under New York law at all, the concepts of "gross negligence" here appears to me to or embrace serious negligence amounting to reckless disregard, without any necessary implication of consciousness of the high degree of risk or the likely consequences of the conduct on the part of the person acting or omitting to act.

> If the matter is viewed according to purely English principles or construction, I would reach the same conclusion. "Gross" negligence is clearly intended to represent something more fundamental than failure to exercise proper skill and/or care constituting negligence. But, as a matter of ordinary language and general impression, the concept of gross negligence seems to me capable of embracing not only conduct undertaken with actual appreciation of the risks involved, but also serious disregard of or indifference to an obvious risk."

Having considered the submissions in this regard, it is my view that, whilst the submissions made by Mr. Pachai are correct in the context of an action for tort the proper approach to the construction of the contract is to give commercial reality to the words chosen by the parties to the agreement. In my view, it is clear that in choosing the phrase "gross negligence or wilful misconduct" the parties intended to identify conduct over and above ordinary negligence. I therefore adopt the definition given by Mance, J. in "*The Hellespont Ardent*" *(supra)* namely that the concept of gross negligence embraces serious negligence amounting to reckless disregard, without any necessary implication of consciousness of the high degree of risk or the likely consequences of the conduct on the part of the person acting or omitting to act. It also includes the concept of acting in serious disregard of or indifference to an obvious risk. I therefore, conclude that unless the Investment Company can show on the balance of probabilities, the Investment Manager acted in such a way, the Investment Manager is entitled to take advantage of the benefit of the indemnity given to it by Section 8 of the Management Agreement.

**Did the Investment Manager act with gross negligence or wilfully misconduct itself?**

Turning now to consider whether there is evidence that the Investment Manager did so act, it is necessary to review the responsibilities which were placed upon the Investment Manager in order to determine whether or not it could be said to have carried out those duties in a grossly negligent manner or wilfully mis-conducted itself in carrying out its tasks.

I have recited the provisions of the Management Agreement in detail and it is only necessary for me at this stage, to remind myself that the duties of the Investment Manager were to carry out the directions of the Investment Committee and/or the Board of the Investment Company. The Investment Manager had no discretion in this area, the actual investment decisions were those of the Investment Company. Furthermore, Section 5(C) of the Management Agreement provides:

> 5.      DELEGATION OF DUTIES
>
> *(A) ……..*
>
> *(B) ……..*
>
> *(C) The Investment Manager may act or rely upon the opinion or advice or any information obtained from any broker, lawyer, auditor, valuer, surveyor, auctioneer or other expert whether reporting to the Company or to the Investment Manager and the Investment Manager shall not be liable for any loss occasioned because of it so acting or relying in good faith.*

As the case developed it became clear that the main thrust of the counterclaim was the recovery of losses or potential losses which had occurred or might occur in relation to the three investments namely Chang An, Zhongbei and Jialing. It is to be remembered that in the early 1990s Messrs. Bernard Ho, Tony Wong and Ronald Chum together with the Chief Executive of HG Asia Limited, Anthony Lo had sifted through the details of a hundred subordinate enterprises of China North and settled on eighteen of those as potential investments for the Investment Company.

Those proposed joint ventures were listed in Appendix I to the Information Memorandum produced for the purpose of listing on the Irish Stock Exchange. Jialing and Chang An were two of those eighteen proposed joint ventures. The subsequent investment in Zhongbei, which was not individually named in the Information Memorandum, was possible as the company was authorised to invest up to 15% of the Aggregate Subscription Price in joint ventures which were not specifically named in the Information Memorandum.

That there were risks attached to the proposed transactions was acknowledged and accepted by the Investment Company from the outset. The following extracts from the Information Memorandum are relevant to this question: -

### Restrictions on the Realisation of Investments

In order to achieve its investment objective, as stated under "Particulars of the Company – Investment Objective" below, the Company intends to realize (sic) capital gains through various means of exit from the Joint Ventures after they have reached an appropriate stage of development. However, any transfer of the Company's registered capital in a joint venture will require the approval of a unanimous resolution of the board of directors of the joint venture company and the approval of MOFTEC or its local branch office and in certain cases will require the examination and approval of other governmental authorities including but not limited to the State Council…..

### Foreign Currency Considerations

The Company's assets (other than a limited amount of cash or other liquid assets) will be invested solely in direct investments in Chinese enterprises and substantially all income received from the Company's investments will be in Renminbi. However, the Company will compute and distribute its income in US dollars, and the computation of income will be made on the date that the income is earned by the Company at the foreign exchange rate in effect on that date. Therefore, if the value of the Renminbi falls relative to the US dollar

between the earning of the income and the time at which Renminbi is converted to US dollars, the value of the investment disposed of by the Company may fall.

It was also accepted from the outset that the Chinese legal system had not been developed sufficiently to offer full protection in respect of general and foreign investment. The relevant extract from the Information Memorandum acknowledging this is set out below

**Chinese Legal System**

China has a civil law system which is based on written statutes and in which decided legal cases have no significant precedental value. Since 1979, many laws and regulations dealing with economic matters in general and foreign investment in particular have been enacted in China. In December 1982, the National People's Congress amended the Constitution of China to authorize foreign investment and to guarantee the "lawful rights and interests" of foreign investors in China. Despite all the efforts to develop the Chinese legal system, China does not have a comprehensive and consolidated body of laws governing foreign investment enterprises. Laws regarding fiduciary duties of officers and directors of a company, and the protection of investors and shareholders, are undeveloped. Interpretation of Chinese laws may be subject to policy changes reflecting domestic political changes and the administration of laws and regulations by government agencies may be subject to considerable discretion. In addition, courts in China, even in major urban areas, do not have substantial experience with matters relating to foreign investment. The interpretation and application of many laws are untested in Chinese courts. Even in circumstances where adequate laws exist, it may not be possible to obtain swift and equitable enforcement of the laws or to obtain enforcement of a judgment by a court of another jurisdiction.

Disclosure and regulatory standards may, in many respects, be less stringent than that of the more developed markets. Chinese companies are subject to accounting, auditing and financial standards and requirements that differ, in some cases significantly, from those generally applicable international standards and requirements. In particular, the assets and profit appearing on the financial statements of a Chinese company may not reflect its financial position or results of operations in the way such information would be presented in financial statements prepared in accordance with the internationally generally accepted accounting principles. Notable differences are found in areas such as provision for inventory obsolescence, preparation of consolidated accounts, valuation of properties and other assets, accounting for depreciation, deferred taxation and contingencies and treatment of exchange differences. There is substantially less publicly available information about Chinese companies than there is about companies in more developed markets. The Company may be unable to evaluate adequately the creditworthiness of these companies. These factors expose the Company to significant risks as an investor in China.

As the Chinese legal system develops, the promulgation of new laws, changes to existing laws and the preemption of local regulations by national laws may adversely affect foreign investors. The trend of legislation over the past fifteen years has significantly enhanced the protection afforded foreign investment and allowed for more active control by foreign parties of foreign investment enterprises in China. There can be no assurance, however, that the current trend in economic legislation towards promoting market reforms as well as further "opening to the outside world" policy will not be slowed, curtailed or reversed, especially in the event of change in leadership, social disruption or other circumstances affecting China's political, economic or social life. See "Appendix IV – China Overview".

With this background it is now necessary to determine whether or not the Investment Manager was entitled to rely upon the indemnity given to it by Sections 8(C) and 8(D) of the Management Agreement or whether it had lost the benefit of that indemnity in consequence of gross negligence or wilful misconduct.

It is significant that, in purporting to terminate the agreement, the Investment Company's lawyers identified a considerable number of reasons for such termination but made no mention at all of any alleged deficiencies in relation to the three investments in joint venture companies. However, at the hearing of this matter, those three investments were the focus of the Investment Company's case. It is therefore, in relation to those three investments that the Court should determine whether there has been gross negligence or wilful misconduct.

In considering this matter, it is to be noted that the Information Memorandum indicates that it is the Directors who are responsible for investment decisions, and that the Management Agreement identifies the duties of the Investment Manager as administering in accordance with the direction of the Investment Committee, the making of investments etc.

The Bye-laws of the Company provide as follows: (*inter alia*)

> "The Investment Committee shall follow the Investment Objectives established by the Board of Directors and shall supervise the activities of the Investment Manager. Subject to the approval of the Board, the Investment Committee may approve investment recommendations in respect of the investments by the Investment Manager."

There was no evidence from the Investment Company to suggest that the Investment Manager had acted without authority of the Investment Committee and/or the Board or had acted outside the scope of any such authority. This was certainly so in the case of the Chang An and Jialing and was certainly so in relation to the initial investment in Zhongbei. However, there came a time when a further investment was in contemplation by the Investment Company, and it is of the circumstances in which this further investment was made that the Investment Company complains of conduct by the Investment Manager which the Investment Company avers amounts to wilful misconduct. It is necessary to consider this assertion separately from the other matters.

In respect of the initial investment in Zhongbei the original legal framework was created by Haiwan & Partners who were the Investment Company's lawyers. I hold that the Investment Manager was entitled to rely upon that documentation by virtue of Section 5(C) of the Management Agreement. That same sub-section also provides that the Investment Manager should not be liable for any loss occasioned because of its so acting or relying in good faith. There is no evidence to show anything other than good faith in relation to this transaction.

However, in the middle of July 1997, it seems that further capital was required to enable Zhongbei to expand its business namely the provision of pager services. At a meeting of the Investment Committee of the Investment Company held on the 5th July 1997, when the provision of such additional funding was being discussed, Mr. Murray, of that committee, instructed the Investment Manager to review again the existing agreements with Zhongbei in order to ensure that the Fund's interest was properly secured. Accordingly, on the advice of the Financial Adviser to the committee the Investment Manager sought a second opinion on the documentation from a Hong Kong law firm by the name of DS Cheung & Co. DS Cheung & Co did not provide a formal advice or opinion but produced a Memorandum for discussion with Haiwan & Partners, the Investment Company's lawyers, at a meeting in Beijing. That Memorandum expressed the view that the existing documentation did not clearly identify the nature of the $11,000,000 injection of funds. DS Cheung & Co were unable to determine whether there had been an attempt to make a direct investment into the company which would have been illegal or whether it was by way of loan. They expressed the following view:-

> "For the reasons aforesaid, under the present structure, the money provided by the funds is exposed to a very high risk."

The Memorandum then went on to propose a reorganization of the investment structure in the following terms:

"In order to resolve the above-mentioned problem and to provide certain protection to the money provided by the Fund, the first we have to do is to discuss how to reorganize the present structure and the route that the money would be provided. We now propose the following structure for discussion purposes".

The Memorandum then identified additional documentation which would be necessary in order to create a "new structure". It is right to say that the principle witness for the Investment Manager, Mr. Tony Wong, did not have the opportunity of giving considered evidence about this matter. Whilst certain documents were put to him in cross examination the DS Cheung & Co Memorandum had not previously been produced by the Investment Company by way of discovery and Mr. Wong had not had the opportunity of considering the document. This is despite the fact that those documents had clearly been in the possession of the Investment Company and its London lawyers since July 1998. This is regrettable.

The proposed additional investment in Zhongbei was considered by the Investment Committee on 5th July 1997. The Investment Manager briefed the committee on the proposal. Having considered its report, the committee unanimously approved in principle, subject to a full report from its Investment Manager that the fund should invest an additional US $9,000,000.00 in Zhongbei by instalments . . . .

The thrust of Mr. Pachai's case in this regard is that the Investment Manager well knew, but kept to itself, the fact that DS Cheung & Co had expressed reservations about the existing documentation in relation to the enforceability of the loan. The assertion which was made by Mr. Mayer, giving evidence on behalf of the Investment Company, was that had he known of these reservations he would not have voted for the approval of the loan by the Board of Directors which was held on the 21st July 1997.

The terms in which that approval was given are as follows:-

"10.     Additional investment in Zhongbei United Communication Corp. Ltd. ("Zhongbei").

The Manager tabled before the Meeting the analysis of the investment in Zhongbei and the comparison with its competitors. The Manager reported that the growth of Zhongbei had been very fast amongst the other competitors and had a leading position in the telecommunications industry in China. Since the competition was very keen, Zhongbei needed more funds to support its expansion and retain its current leading position. Mr. Anthony Lo advised the Board that although the rules and regulations in China were relaxing, foreign funds were not allowed to invest directly in this industry. The competitors of Zhongbei were also supported by other investors indirectly. The Board considered the proposal and concurred that it would in the interests of the company and approved a further investment of US$9,000,000 into Zhongbei.

All the members of the Investment Committee, Mr. Simon Berry, Mr. Ronald Chum and Mr. Anthony Lo were present at this Board meeting. Despite the fact that the approval of the Investment Committee at its meeting of 5th July 1997 was conditional, none of the members of the Investment Committee expressed any concerns to the full Board that the pre-conditions may not have been complied with and, accordingly, the approval of the full Board was unconditional.

I should say, in passing, that both Mr. Pachai and Mr. Hargun dealt with the relevant two paragraphs of the Investment Committee's minute as though they were conjunctive. I do not necessarily take this view and believe that the two paragraphs make equal sense if read disjunctively. The expression "subject to a full report from the Investment Manager" contained in the second paragraph of the Investment Committee's report can just as easily refer to a report as to the success or failure of the proposed joint venture as it might to whether or not the funds interest was properly secured. This would accord with the presentation which the Investment Manager made to the Board meeting relating to the analysis of the investment in Zhongbei and the comparison with its competitors.

Be that as it may, the uncontroverted evidence of Mr. Wong is that he kept the members of the Investment Committee informed as to the progress of the negotiations with DS Cheung & Co and Haiwan & Partners. It was also his evidence that supplemental loan agreements were executed and registered. This again brings the Investment Manager within the protection afforded by Section 5(C) of the Management Agreement.

Whilst Mr. Pachai continued to press the suggestion that the contents of DS Cheung's Memorandum were withheld from the Investment Committee, nonetheless Mr. Lo and Mr. Chum signed a cheque for the first instalment on 1st September 1997. They signed a cheque for $3,000,000, the second instalment, on 16th December, 1997 and Mr. Lo signed a cheque for the third instalment of $4,000,000 on 2nd February 1998. In my view, these experienced businessmen would not have signed cheques for a total of $9,000,000 unless they were satisfied that the payment had been properly authorised. This is consistent with the disjunctive reading of the two paragraphs of the Investment Committee's minute. I am therefore satisfied that the Board of Directors of the Investment Company had all the necessary information when giving unconditional authority for the payment to be made. Indeed this is consistent with the Investment Company 's own pleadings which admit that the content of the DS Cheung & Co memorandum was at some time communicated to the Investment Company.

If any further confirmation were needed that the Investment Company, at that time, was satisfied with the investment one has only to look to the Investment Company's annual report for 1997, which reads (*inter alia*) as follows:

INVESTMENT ACTIVITIES

In addition, the Company also approved and committed an additional US$9 million capital injection to the telecommunication project of which US$2 million was injected in 1997 and the balance of US$7 million was injected in February 1998. With this additional capital, being the Company's indirect investment, China North United Communication Company Limited, is expecting to expand its nation-wide paging network to 60 stations with a total of one million subscribers by the end of 1998.

PRINCIPLE ACTIVITIES AND REVIEW OF THE BUSINESS

The 1996 Annual Report and Accounts indicated that the Company had invested approximately US$14 million indirectly, in a telecommunications project. The Company's investment rose to US$16.3 million by December 31, 1997, and the Company has since invested a further US$7 million in the project. Currently, the project is progressing smoothly. At present there are 42 local paging stations and approximately 900,000 subscribers.

Because of legal requirements in the People's Republic of China (the "PRC"), which bar direct investment by foreign companies in telecommunications businesses, the Company's investment was not structured as a pure equity investment. Instead, it was structured primarily as a loan having equity characteristics and entitling the Company to certain fees. The investment was made through a series of indirect loans to China North United Communications Company Limited ("CNUC") and a 46% indirect equity interest in Dalian Tianli Communications Technology Company Limited ("Dalian Tianli").

Apart from the restriction on foreign investment in telecommunications in China, there are inherent economic and legal risks as well as potential benefits in relation to making any investment. Before the Company made this investment, the Board considered the risks and potential liabilities, including the legal uncertainties associated with such an investment. The Board, after thorough consideration of the risks, took the view that it would be in the Company's commercial interests to make this investment. The Investment Managers also obtained advice from their professional advisers in Hong Kong on the structure of the investment. It is our view, shared by the Investment

Managers, that there is no reason to believe that CNUC will fail to honour its obligations to the Company under the various loan agreements.

I therefore find that it was the Investment Company which authorised the investments to be made and that the Investment Manager acted in accordance with the instructions given to it by either the Investment Company or its Investment Committee. I do not find that the Investment Manager acted with gross negligence or wilfully misconducted itself. It is therefore entitled to the protection given to it by Sections 8(C) and (D) of the Management Agreement. The Investment Company's counterclaim against the Investment Manager therefore fails.

Even if I am not correct in this finding the Investment Manager is entitled to seek protection by virtue of Section 5(C) of the Management Agreement in respect of each and every investment, as the Investment Company has had the benefit of advice from its own legal advisors Haiwan & Partners. It is they who have prepared the documents and, by implication, have led the Investment Company to believe that its investment and its interests were being adequately protected by such documentation. The Investment Manager, for its part, was entitled to rely upon the fact that the Investment Company's lawyers had not advised the Investment Company that its investment was at risk or was probably illegal. It was not for the Investment Manager to doubt or to query such advice and indeed, Section 7(B) of the Management Agreement confirms that all duties and obligations of the Investment Manger are subject to the overall policies and directions of the Investment Committee. By that same section the Investment Manager is required to act or refrain from acting with respect to such matters on instructions of the Investment Committee. This is what it did. I find therefore that the Investment Manager is also entitled to the protection given by Section 5(C) of the contract.

I therefore dismiss the Investment Company's counterclaim.

I will hear the parties on costs if they so wish but unless there are representations, the Investment Company will pay the Investment Manager's costs.

**Tab 16**


**c**

### Red Sea Tankers Ltd v Papachristidis (The Hellespont Ardent)

Queen's Bench Division (Commercial Court)

Mr. Justice Mance

Apr. 17, 18, 22, 23, 24, 25, 29, 30, May 1, 2, 7, 8, 9, 13, 14, 15, 16, 20, 21, 22, 23, June 4, 5, 6, 7, 10, 11, 12, 13, Oct. 2, 3, 1996; Apr. 30, 1997

Contract - Ship's purchase - Gross negligence - Contributory negligence - Plaintiffs entered into commercial and technical advisory agreements with defendants in relation to acquisition of oil tanker - Whether defendants owed duty of care to plaintiffs - Whether defendants grossly negligent and or guilty of wilful misconduct in recommending tanker for purchase - Whether officers of defendants owed duties personally to plaintiffs - Whether plaintiffs' directors and bankers contributorily negligent.

The first plaintiff (Red Sea) was a fund incorporated in the Cayman Islands on Mar. 10, 1989 for the purpose of investment in oil tankers. The second to fifth plaintiffs were the first plaintiff's wholly owned subsidiaries incorporated to serve as one-ship companies owning the four tankers including *Hellespont Ardent* (*Ardent* ) acquired in the summer of 1989.

The second (PL) and the third defendants (PSMSL) were English companies which offered service to persons engaged or interested in engaging in the shipping market. In June, 1989 PL entered a commercial advisory agreement (CAA) and PSMSL entered into a technical advisory agreement (TAA) with Red Sea subject to New York law. PSMSL was a wholly owned subsidiary of PL and PL's entire share capital was beneficially owned by the first defendant Mr. Papachristidis. The fourth defendant (Mr. Anderson) and the fifth defendant (Mr. Dunn) were managing directors and directors of PL and PSMSL respectively.

The fund originated in discussions between the National Commercial Bank of Saudi Arabia (NCB) and the Chase Manhattan Bank of New York (Chase) and the first and second third parties, Mr. Bouckley and Mr. Baarma were officers of NCB who became directors of Red Sea. The third party Mr. Henderson was an independent director of Red Sea.

Red Sea raised for the purchase of second-hand tankers some U.S.$71,588,000. These moneys appeared to have been wholly or largely spent and lost in the repair, upgrading and operation of the four vessels following their eventual sales at dates in the early 1990s when the market stood much lower than in 1989. Red Sea sought to attribute responsibility for its losses to the five defendants.

Red Sea alleged that each of the five defendants were grossly negligent and/or guilty of wilful misconduct in failing to arrange for adequate inspection of *Ardent's* class records and/or adequate survey of her condition, in recommending her for purchase without adequate basis and/or misrepresenting her condition, in giving cost estimates and time scale projections without proper basis, in failing to warn of the risks of acquiring *Ardent* and in negotiating her purchase without any discount properly reflecting her condition.

Red Sea submitted that each of the defendants, Mr. Papachristidis, Mr. Dunn and Mr. Anderson owed a personal duty of care to the plaintiffs in respect of his acts or omissions and that Red Sea relied on the special expertise which they held themselves out as possessing. PL, PSMSL, Mr. Papachristidis, Mr. Dunn and Mr. Anderson denied liability and sought to rely on cll. 2 and 7.9 of the CAA and TAA to negative or exempt them from any tortious liability. Those clauses provided inter alia:

2. The Corporation will. . .indemnify and hold harmless the Commercial Advisor and its officers, directors. . .from any. . .claim. . .which. . .arise out of, relate to or are in connection with the performance of its duties. . .except for any Indemnified Damages that are found. .

Copr. © West 2009 No Claim to Orig. Govt. Works

.to have resulted from the bad faith, gross negligence or wilful misconduct of. . .the person seeking indemnification.

7.9 Neither the Commercial Advisor nor its officers directors. . .shall be liable. . .to the Corporation for any losses, claims. . .suffered. . .by the Corporation. . .arising out of, relating to or in connection with any action taken within the scope of duties of the Commercial Advisor under this Agreement or omitted to be taken by the Commercial Advisor. . .except. . .Damages resulting from acts or omissions of the Commercial Advisor which (a) were the result of gross negligence, (b) constituted wilful misconduct . . .

The defendants alleged that the third parties were contributorily negligent.

The issues for decision were: (1) whether any of the first to fifth defendants owed a duty of care to the plaintiffs in contract, tort or otherwise in relation to the acquisition of *Ardent* and if so the nature and scope of such duty or duties; (2) whether the first to fifth defendants acted in breach of duty to the plaintiffs in relation to the acquisition of *Ardent* ; (3) whether the first to third parties acted in breach of duty to the plaintiff in relation to the acquisition of *Ardent* and were liable to make contribution pursuant to the Civil Liability (Contribution) Act, 1978 .

by Q.B. (Com. Ct.) (Mance , J.), that(1)

on the evidence it did not appear that the thoroughness of any pre-purchase investigation and inspection of vessels was in focus or discussed before the acquisition of *Ardent* ; but general representations were made by Mr. Anderson and Mr. Papachristidis about PL's and PSMSL's capabilities as prospective advisers which would necessarily include their capability to identify and recommend the purchase of second-hand vessels; **\*548** but it was clear that they were at the relevant time in 1989 unaware of any significant risks that vessels would be acquired on a basis which might involve major uncertainty about their actual condition or might lead to the discovery after their acquisition of a need for major unbudgeted repairs (*see* p. 559, cols. 1 and 2 ; p.

560, col. 1 );(2)

it was for the Papachristidis organization to identify any such risk within their knowledge if it was unavoidable or to avoid it if it was reasonably avoidable, whereas the bankers who dealt with the Papachristidis organization, some of whom became directors of Red Sea, were entitled to believe that there were no such significant risks or none that could not and would not be avoided by proper exercise of their functions by PL and PSMSL ( *see* p. 560, col. 1 );(3)

the figure of U.S.$2 m. given for repair costs was an overall assessment and was also intended to allow for general overhauling; it was not the result or object of any process of detailed calculation or breakdown (*see* p. 571, cols. 1 and 2 );(4)

on the evidence, although the market was hot and still rising the price paid for *Ardent* was in excess of any market price which could be deduced from other sales or objective information, if it was assumed that the vessel would incur repair costs of anything like U.S. $2 m. on top of the price paid (*see* p. 578, col. 1 );(5)

the concept of gross negligence appeared to embrace serious negligence amounting to reckless disregard without any necessary implication of consciousness of the high degree of risk or the likely consequences of the conduct on the part of the person acting or omitting to act; the conclusion applied under New York and English law (*see* p. 586, col. 2 );(6)

"Gross" negligence was clearly intended to represent something more fundamental than failure to exercise proper skill and/or care constituting negligence; but as a matter of ordinary language and general impression the concept of gross negligence seemed to be capable of embracing not only conduct undertaken with actual appreciation of the risks involved but also serious disregard of or indifference to an obvious risk; the difference in the way in which the concepts in cll. 7.9 and 7.10 were expressed appeared entirely consistent with the phrase receiving its ordinary meaning and embracing acts or omissions resulting from gross negligence and acts or omissions constituting wilful misconduct (*see* p.

586, col. 2 );(7)

in circumstances falling within the scope of cll. 7.9 and 7.10 respectively PL and PSMSL were under no contractual liability in the absence of wilful misconduct or gross negligence; and to the extent that they were under any parallel liability in tort in the same circumstances, it was subject to similar qualification (*see* p. 588, cols. 1 and 2 );(8)

it was for PL and PSMSL to identify, investigate, evaluate and make appropriate recommendations to Red Sea in respect of vessels for acquisition by Red Sea; all the criticisms of PL and PSMSL related to the alleged acts or omissions within the scope of the duties with respect to the management or conduct of the affairs of Red Sea and of the business or affairs of PL or PSMSL relating to Red Sea; the last sentences of cll. 7.9 and 7.10 did not suggest any limitation on the scope of the earlier language of the clause; they simply introduced a limited immunity in cases where professional advice was followed, conditional on the exercise of "extreme care" in the choice of professional advisers (*see* p. 588, col. 2 );(9)

under the CAA and TAA Red Sea obtained by contract undertakings of PL and PSMSL within their respective spheres; Red Sea never at any time sought express collateral undertakings from the personal defendants in the handling of the matters entrusted to PL and PSMSL; the personal liability sought to be imposed on the individual defendants as officers of PL and/or PSMSL was in respect of matters falling within PL's and PSMSL's responsibility under CAA and/or TAA; and although all three principal officers of PL and PSMSL were criticized as negligent the roles they played did not cover the whole field of PL's and PSMSL's activity; although they had overall responsibility for PL and PSMSL, the actual functions of Mr. Papachristidis, Mr. Anderson and Mr. Dunn could not be regarded together or a fortiori individually as co-terminous or co-extensive with those undertaken by PL and PSMSL (*see* p. 591, col. 2 ; p. 592, col. 1 );(10)

each of cll. 7.9 and 7.10 started by identifying the beneficiaries of its protection; it then defined the scope of

the losses in respect of which they were to be protected; the language of the clauses contemplated that "Damages" as defined might arise out of actions or omissions within the scope of the advisor's duties; in the exception the phrase "Damages resulting from acts or omissions of the. . .Advisor" simply repeated the same conception, with a slight degree of shorthand; it contained nothing to indicate that officers, and directors were not to be liable or responsible in case of gross negligence; on the contrary they could not claim the clauses' benefit if their gross negligence had led to acts or omissions of the advising company resulting in damages (*see* p. 592, col. 2 );(11)

the fact that New York law would not recognize the validity of any exclusion of gross negligence supported that conclusion; and whether or not the exceptions which the clauses contained precisely mirrored the restrictions on the ability to exclude liability under New York law it was improbable that the draftsman meant simply to disregard those restrictions in respect of officers, directors, employees and agents (*see* p. 592, col. 2 ; p. 593, col. 1 );(12)

it would not be appropriate to treat the personal defendants as undertaking any duty of care, even a duty limited to responsibility for gross negligence, wilful misconduct, fraud or bad faith or carrying with it an exception from liability except in such circumstances; this was not an exceptional or special case and Red Sea and its subsidiaries should be held to the contractual framework which was deliberately negotiated; even if the personal defendants were grossly negligent there was no basis for treating them personally as having undertaken responsibility in respect of the substantial commercial risks of a financial nature in the success or failure of the relevant transactions (*see* p. 593, col. 2 );(13)

it was no part of Mr. Anderson's role as chairman of Red Sea to undertake any of the functions entrusted to PL and PSMSL or to acquire or communicate knowledge of events leading up to a decision by**549** PL and/ or PSMSL to make an unqualified recommendation to Red Sea; the evaluation of individual vessels was a matter for PL and/or PSMSL and Red Sea relied exclusively on PL and PSMSL for such matters (*see* p. 594,

col. 2 ; p. 596, col. 1 );(14)

any relevant knowledge acquired by Mr. Anderson was acquired by him while acting for PL and or PSMSL not for Red Sea or its subsidiary; even if Mr. Anderson was under a duty to communicate to Red Sea directors knowledge of factors relevant to PL's and/or PSMSL's recommendations for *Ardent* , such knowledge was not to be imputed to Red Sea since he did not communicate it and there was no suggestion that Mr. Anderson was the directing mind and will of Red Sea for the purpose of attributing his knowledge on that ground; the directing mind and will was the board as a whole which alone had the responsibility for approving or disproving any recommendation; and even if Mr. Anderson informed other directors of the recommendation, which was not shown in the case of *Ardent* , still his knowledge could be no substitute for communication to the whole board if he did not pass it on (*see* p. 596, col. 2 ; p. 597, col. 1 ; p. 98, col. 1 );

——El Ajou v. Dollar Land Holdings Plc., [1994] 2 All E.R. 685 and Meridian Global Funds Management Ltd. v. Securities Commission, [1995] 2 A.C. 500 , considered.(15)

Mr. Dunn neither undertook nor instructed any detailed analysis of the nature or cost of overhauls not specified by the surveyor or of steel work; he took U.S.$2 m. on a broad basis as sufficient for PSMSL's and PL's purposes; if he had focused on the likely cost of other overhauls he would have acknowledged that they required a substantial additional provision over and above the specific provisions allowed in the surveyor's report; Mr. Dunn with his experience ought to have recognized the need for an additional provision of this general order; the allowance made by Mr. Dunn did not cater for any uncertainty by taking a sufficiently large figure to cover all eventualities which it could then be expected might foreseeably materialize; and the excess over estimated repair costs could not be explained or excused on the basis that *Ardent* proved to be in a condition which could not reasonably be foreseen in relation to a vessel which had passed special survey some three years and remained in class (*see* p. 608, cols. 1 and 2 );(16)

PSMSL and PL would not have pursued an interest in the vessel if they had conceived that so much steelwork would be required; if they had in such circumstances pursued any interest it would have been incumbent to warn the directors of the Red Sea fund expressly of the requirement to replace so much steel in a vessel, to which they were contemplating exposing the fund; they gave no such warning because, although they contemplated serious corrosion in the ballast tanks, they had in mind a lesser order of steel renewal and also allowed a total of U.S.$2 m. which Mr. Dunn thought was generous in relation to such an order of steel renewal; PSMSL's conduct through Mr. Dunn leading up to PL's decision to recommend the acquisition of *Ardent* was negligent (*see* p. 608, col 2 p. 609, col. 1 );(17)

in failing to inspect Lloyd's Register of Shipping class records, PSMSL through Mr. Dunn failed to exercise the care expected of a reasonable adviser in the position of PSMSL in relation to the Red Sea fund; the records could and should have been obtained and there was no reason why they should not have been obtained before the pre-purchase inspection in the case of *Ardent* ; the complete omission to obtain them at any time was neither wilful nor in a subjective sense reckless; if Mr. Dunn had seen the full class records they should have demonstrated a need for caution about the vessel's maintenance and allowances for overhauling (*see* p. 609, col. 1 ; p. 611, cols. 1 and 2 ; p. 612, col. 2 ; p. 613, col. 1 );(18)

Mr. Dunn failed sufficiently to address the particular problem of corrosion presented by *Ardent* in respect of which additional steps could and should have been taken before she was considered or assessed further as a candidate for the fund (*see* p. 614, col. 2 );(19)

although Mr. Dunn believed that an assessment of U.S.$2 m. was sufficient and that he was being generous, there was no reliable basis for that belief; in respect of corrosion and steel renewals Mr. Dunn ought also to have realized that he had insufficient information to justify giving a U.S.$2 m. or indeed any, overall estimate to Mr. Anderson for him to use and rely on in assessing *Ardent* and in deciding whether to recommend her to the Red Sea fund without exposing the fund to inappropri-

ate risk (*see* p. 614, col. 2 ; p. 615, col. 1 );(20)

if fuller visual inspection of the permanent ballast tanks had been allowed, their actual condition would have been sufficiently apparent to make the vessel of no further interest; there was no sufficient reason for not requesting such inspection, and had the standard applicable been the familiar standard of reasonable skill, care and diligence PSMSL would have been held to be in breach, that breach would have led to the recommendation and purchase of *Ardent* and, apart from the breach, she would not have been recommended to or acquired by the Red Sea fund (*see* p. 615, cols. 1 and 2 );(21)

the inspection of full class records was an elementary and simple step that any competent adviser fulfilling PSMSL's role ought to have undertaken and PSMSL's failure to inspect them must be regarded as gross negligence (*see* p. 615, col. 2 ; p. 616, col. 1 );(22)

PSMSL's failure to insist on a proper inspection of any permanent ballast tanks in empty condition was a matter going to the core of their particular functions and this failure was underlined by PSMSL's gross negligence in failing to sight full class records; the contents of the full class record must be treated as known to PSMSL when considering whether it was grossly negligent of PSMSL to put forward the figure of U.S.$2 m. to Mr. Anderson; even so what occurred was no more than negligence by PSMSL in the course of inadequate attempts to fulfil its contractual role and the shortcoming in PSMSL's performance of its duties were not so serious that they should be categorized as gross negligence or should deprive PSMSL of the general contractual protection afforded by cl. 7.10; although the present case revealed significant misjudgments and shortcomings in approach and observance of proper standards in relation to *Ardent* it did not involve**550** negligence of so grave a nature as to fall outside the sphere of immunity (*see* p. 617, col. 2 ; p. 618, col. 1 );(23)

it was Mr. Anderson's duty on behalf of PL to consider the situation and evaluate it in the interests of the fund; he had no sufficient assurance as to the significance which could properly be attached to Mr. Dunn's U.S.$2 m.; and he had reason to doubt whether that figure was

reliable and to inquire into its basis; he was quite sufficiently familiar with usual ship purchase procedures and reports and sale contract negotiations for it to be incumbent on him to raise the possibility of insisting on further inspections; PL through Mr. Anderson failed to exercise proper skill and care in the steps which they took to consider and evaluate *Ardent* (*see* p. 621, col. 2 ; p. 622, col. 1 );(24)

as to obtaining full class records this was a matter primarily for PSMSL; and Mr. Anderson or PL were not liable to criticism because full class records were not sighted (*see* p. 622, col. 1 );(25)

Mr. Anderson allowed his perfectly proper desire to complete the acquisition of vessels for the fund to overcome normal or proper caution in respect of *Ardent* ; and although the failure by Mr. Anderson to pursue with Mr. Dunn the significance of the U.S.$2 m. estimate and the possibility of inspecting at least some of *Ardent's* permanent ballast tanks constituted clear and serious aspects of negligence, it was not gross negligence to justify the conclusion that PL was deprived of its prima facie contractual immunity (*see* p. 622, cols. 1 and 2 );(26)

on the assumption that Mr. Papachristidis had knowledge and was involved in the decision-making process his conduct was open to the criticism that he did not suggest or insist on any inspection of permanent ballast tanks in empty condition; but this did not amount to gross negligence; the most that could be said was that he failed to apply his mind sufficiently to this particular vessel and assumed that Mr. Anderson and Mr. Anderson and Mr. Dunn had between them done so; and failure to question the basis of Mr. Anderson's recommendation and Mr. Dunn's estimate did not amount to gross negligence depriving PL of contractual immunity (*see* p. 623, col. 2 ; p. 624, col. 1 );(27)

although there was causatively relevant negligence on the part of PL and PSMSL, it did not amount to gross negligence or forfeit under cll. 7.9 and 7.10 the contractual immunity otherwise available to protect the defendants; and the action failed in relation to the acquisition of *Ardent* ; the preliminary issues would be answered

accordingly (*see* p. 624, col. 1 );(28)

if the issue on contributory negligence had arisen none of the first third parties acted in breach of duty to the first or fifth plaintiff or was liable to make any contribution pursuant to the Civil Liability (Contribution) Act, 1978 (*see* p. 624, col. 2 ; p. 625, cols. 1 and 2 ).

The following cases were referred to in the judgment:

City Equitable Fire Insurance Co. Ltd., Re (C.A.) (1924) 19 Ll.L.Rep. 93 ; [1925] Ch. 407 ;

Colnaghi U.S.A. Ltd. v. Jewelers Protection Services, 79 N.Y. 2d 1027, 584 N.Y. S. 2d 430 (1992) ;

Davie v. the City of Edinburgh, 1953 S.C. 34 ;

Dorchester Finance Ltd. v. Stebbing, [1989] B.C.L.C. 498 ;

Edgworth Construction Ltd. v. N. D. Lea and Associates Ltd., [1993] 3 S.C.R. 206 ;

El Ajou v. Dollar Land Holdings Plc., (C.A.) [1994] 2 All E.R. 685 ;

Fairline Shipping Corporation v. Adamson, [1975] Q.B. 180 ;

Federal Insurance Co. v. Honeywell Inc., 641 F. Supp. 1560 (S.D.N.Y. 1986) ;

Fireman's Fund Insurance Co. v. ADT Systems Inc., 847 F. Supp. 291 (E.D.N.Y. 1994) ;

Fraser v. Furmin, (C.A.) [1967] 2 Lloyd's Rep. 1 ;

Gardner v. Owasco River Railway, 142 A.D. 2d 61 534; N.Y.S. 2d 819 (3d Dep't. 1988) ;

Henderson v. Merrett Syndicates Ltd., (H.L.) [1994] 2 Lloyd's Rep. 468; [1995] 2 A.C. 145 ;

Henderson v. Merrett Syndicates Ltd., [1997] L.R.L.R. 265 ;

Hong Kong Export Credit Insurance Corporation v. Dun & Bradstreet, 414 F. Supp. 153 (S.D.N.Y. 1975) ;

Hooper Associates Ltd. v. Ags Computers Inc., 74 N.Y. 2d 487 ;

Ivory (Trevor) Ltd. v. Anderson, [1992] N.Z.L.R. 517 ;

Karp (Matter of) v. Hults, 12 A.D. 2d 718, 209 N.Y.S. 2d 128, affd. 9 N.Y. 2d 857, 316 N.Y.S. 2d 99, 175 N.E. 2d 465 ;

Kalisch-Jarcho Inc. v. City of New York, 58 N.Y. 2d 377 (1983) ;

London Drugs Ltd. v. Kuehne & Nagel International Ltd., [1992] 3 S.C.R. 299; 97 D.L.R. (4th) 261 ;

McCullogh v. Lane Fox & Partners, (C.A.) Dec. 19, 1995, unreported ;

Mcduffie v. Watkins Glen International Inc., 833 F. Supp. 197 (W.D.N.Y. 1993) ;

Meridian Global Funds Management Ltd. v. Securities Commission, (H.L.) [1995] 2 A.C. 500 ;

Metropolitan Life Insurance Co. v. Noble Lowndes International Inc., 84 N.Y. Rep. 2d 430; 643 N.E. 2d 504, 618 N.Y.S. 2d 882 (1994) ;

Midland Bank Ltd. v. Hett Stubbs and Kent, [1979] 1 Ch. 384 ;

Punjab National Bank Ltd. v. de Boinville, [1992] 1 Lloyd's Rep. 7 ;

R. v. Adamoko, (H.L.) [1995] 1 A.C. 171 ;

R. v. Bonython, [1984] S.A.S.R. 45 ;**551**

Reed (Albert E.) & Co. Ltd. v. London & Rochester Co. Ltd., [1954] 2 Lloyd's Rep. 463 ;

Rich (Marc) & Co. A.G. v. Bishop Rock Marine Co. Ltd., (H.L.) [1995] 2 Lloyd's Rep. 299; [1995] 3 W.L.R. 227 ;

Rudnick (Stuart) Inc. v. Jewelers Protection Services, 194 A.D. 2d 317, 598 N.Y.S. 2d 235 (1st Dep't. 1993) ;

Sealand of the Pacific v. Robert McHaffie Ltd., [1974] 51 D.L.R. (3d) 702 ;

Seminara v. Highland Lake Bible Conference Inc., 112 A.D. 2d 630, 492 N.Y.S. 2d 146 (N.Y. App. Div. 1985) ;

Shawinigan Ltd. v. Vokins & Co. Ltd., [1961] 2 Lloyd's Rep. 153; [1961] 3 All E.R. 396 ;

Sommer v. Federal Signal Corporation, 79 N.Y. 2d 540, 583 A.D. 2d 317, 589 N.Y.S. 2d 235 (1st Dep't. 1992) ;

Williams v. Natural Life Health Foods Ltd., Dec. 1, 1995, unreported; (C.A.) Dec. 5, 1996, unreported.

This was an action by the plaintiffs Red Sea Tankers Ltd. and its subsidiaries Charis Shipping Ltd., Brooke Shipping Corporation, Wentworth Shipping Corporation and Turnbridge Shipping Corporation the owners of the vessels *Ellen* (renamed *Hellespont Armour* ), *South Angela* (renamed *Hellespont Archer* ), *Erato* (renamed *Hellespont Arrow* ) and *Ocean Maid* (renamed *Hellespont Ardent* ) claiming damages against the defendants Mr. Basil Papachristidis, Papachristidis Ltd. (PL) Papachristidis Ship Management Services Ltd.

(PSMSL) Mr. Louis Anderson, Mr. John Dunn and Hellespont Investment Ltd., in respect of losses suffered by the plaintiffs allegedly caused by the defendants' gross negligence or wilful misconduct in failing to arrange for adequate inspection of inter alia *Ardent's* class records and or adequate survey of her condition, in recommending her for purchase without adequate basis and in failing to warn of the risks by acquiring *Ardent* .Mr. Bernard Eder, Q.C. , Mr. Richard Jacobs and Mr. Brian Dye (instructed by Messrs. Allen & Overy ) for the plaintiffs and third parties; Mr. Victor Lyon and Mr. Huw Davies (instructed by Messrs. Watson Farley and Williams ) for the defendants. The proceedings against Hellespont Investment Ltd. had earlier been stayed.

The further facts are stated in the judgment of Mr. Justice Mance.

Judgment was reserved.

Wednesday Apr. 30, 1997JUDGMENTMr. Justice MANCE

SCHEME

The scheme of this judgment is as follows:

I. INTRODUCTION

I.1 Outline

I.2 Witnesses

II. HISTORY

II.1 Representations relating to the HTL fund

II.2 The setting up of the Red Sea fund

III. THE ACQUISITION OF THE ARDENT

III.1 Roles of the three main Papachristidis officers

III.2 Identification of the Ardent

III.3 The Abstech report

III.4 Inspection of the Ardent

III.5 The surveyor's telephone conversation with Mr. Dunn on Aug. 15, 1989

III.6 Mr. Reilly's visit to PSMSL's offices on Aug. 16, 1989 and report

III.7 The discussions on Aug. 16, with Mr. Dunn and Captain Powell

III.8 Mr. Anderson joins the meeting

III.9 Mr. Dunn's explanation of the figure given for repair costs

III.10 Was the figure of $2 million an estimate or an allowance for all eventualities?

III.11 Mr. Papachristidis' involvement

III.12 The decision to recommend the Ardent

III.13 The price paid

III.14 Events following delivery

IV. THE DEFENDANTS' DUTIES

IV.1 The Commercial and Technical Advisory Agreements

IV.2 Clause 2

IV.3 Clauses 7.9/7.10

IV.4 Scope of liability of PL and PSMSL

IV.5 The respective roles of PL and PSMSL

IV.6 Did Mr. Papachristidis, Mr. Dunn and Mr. Anderson owe any and if so what duties in tort when acting on behalf of PL and/or PSMSL?

(a) The law

(b) The facts

IV.7 Mr. Anderson's position as an officer of Red Sea

V. GROSS NEGLIGENCE - BACKGROUND MATTERS

V.1 Expert evidence

V.2 Corrosion**552**

V.3 Storage vessels

V.4 The Ardent's age

V.5 Maintenance in the 1980s

V.6 Pedigree

V.7 Spanish vessels

V.8 Pre-purchase inspections

(1) General

(2) Class records

(3) Length of inspection

(4) Permanent ballast tanks

VI. GROSS NEGLIGENCE?

VI.1 The scope of the issue

VI.2 Was PSMSL negligent through Mr. Dunn?

VI.3 Detailed consideration of PSMSL's negligence

(1) Full class records

(2) Absence of any basis for any assessment of the corrosion in the Ardent's permanent ballast tanks

(3) Absence of any basis for an assessment of $2 million

(4) Pursuit of the Ardent without inspecting any permanent ballast tanks

VI.4 Was PSMSL's negligence (a) gross and, if so, (b) causative?

VI.5 Was PL negligent through Mr. Anderson?

VI.6 Was PL's negligence through Mr. Anderson (a) gross and, if so, (b) causative?

VI.7 Was PL negligent or grossly negligent through Mr. Papachristidis?

VI.8 Overall effect of conclusions

VII. CONTRIBUTORY NEGLIGENCE AND THIRD PARTY PROCEEDINGS

* * *

APPENDIX A (and Annex I) - OVERHAULING

(referred to in PART VI.1)I. INTRODUCTION

I.1 *Outline*

This action results from an ill-fated investment in oil tankers in 1989. The first plaintiff ("Red Sea") is a fund incorporated in the Cayman Islands on Mar. 10, 1989 for the purpose of the investment. The second to fifth plaintiffs are the first plaintiff's wholly owned subsidiaries incorporated to serve as "one-ship companies" owning the four tankers acquired in the summer of 1989. These tankers, in order of purchase, were *Ellen* (renamed *Hellespont Armour* ), *South Angela* (renamed *Hellespont Archer* ), *Erato* (renamed *Hellespont Arrow* ) and *Ocean Maid* (renamed *Hellespont Ardent* ). For convenience, I shall usually refer to these vessels as *Armour* , *Archer* , *Arrow* and *Ardent* .

The second and third defendants are English companies which offered services to persons engaging or interested in engaging in the shipping market. They were and are based at Tradewinds House, 190 Vauxhall Bridge Road, London SW1. In June, 1989, PL entered into a "commercial advisory agreement" ("CAA") and PSMSL entered into a "technical advisory agreement" ("TAA"), in each case with Red Sea and subject to New York law. The third defendant ("PSMSL") was a wholly owned subsidiary of the second defendant ("PL"). PL's entire share capital was beneficially owned by the first defendant, Mr. Papachristidis. He was also chairman of both PL and PSMSL and had by 1989 some 24 years' experience in the shipping industry. His interests extended to a group of shipowning and management companies, known as the Hellespont group. The group included Seatramp Tankers Inc., a company providing central-

ized operating services to companies in the "Seatramp pool", which was in substance a collaborative venture between the Hellespont group and Compagnie Nationale de Navigation ("CNN"), part of another group, the Worms group. It will be convenient at some points to refer loosely to "the Papachristidis organization [or group]", to embrace without distinguishing all or any of these companies in which Mr. Papachristidis was interested. The Papachristidis organization had a reputation as high class ship managers, maintaining high standards. That was a matter of some pride and value to Mr. Papachristidis, and one about which prospective clients would be expected to be aware.

The fourth defendant ("Mr. Anderson") was at the material times managing director of PL and a director of PSMSL, with by 1989 some 19 years' experience in the shipping industry. He became chairman of the board of directors of Red Sea. The fifth defendant ("Mr. Dunn") was at all material times managing director of PSMSL and a director of PL. He qualified as a chartered engineer and was a member of the Institute of Marine Engineers and by 1989 also had many years experience on the technical side of the shipping industry.

The fund originated in discussions between two banks, National Commercial Bank of Saudi Arabia ("NCB") and Chase Manhattan Bank of New York ("Chase"), and Mr. Papachristidis and other officers in the Papachristidis organization. The first and second third parties, Mr. Bouckley and Mr. Baarma, were and are officers of NCB who became directors of Red Sea. The last third party, Mr. Henderson, had extensive shipping (although not tanker) experience and became an independent director of Red Sea**553** after being approached by Mr. Papachristidis in early March, 1989.

Red Sea raised for the purchase of second-hand tankers some U.S.$71,588,000, or U.S.$68,628,000 after paying the expenses of floatation and of raising preference stock. These moneys appear to have been wholly or largely spent and lost in the repair, upgrading and operation of the four vessels followed by their eventual sales at dates in the early 1990s when the market stood much lower than in 1989. In this action Red Sea seeks to attribute responsibility for its losses to the five defend-

ants. It claims damages against each for breach of contract and/or duty in relation to each of the four vessels acquired. Under preliminary issues ordered by consent, I am at present concerned only with the fourth and last vessel acquired in August/September, 1989, *Ardent* . The five defendants deny liability, but say that, if they are under any liability, the third parties caused or contributed to any loss which the plaintiffs may have sustained. The five plaintiffs and the three third parties have been represented before me by common solicitors and Counsel. I was told that the litigation is being funded by NCB. The five defendants have likewise been represented by common solicitors and Counsel.

The preliminary issues which remain live are as follows:

1. whether any of the first to fifth defendants owed a duty of care to the plaintiffs in contract, tort or otherwise in relation to the acquisition of *Ardent* and, if so, the nature and scope of such duty or duties;

2. whether the first to fifth defendants acted in breach of duty to the plaintiffs in relation to the acquisition of *Ardent* ;

3. whether the first to third parties acted in breach of duty to the plaintiffs in relation to the acquisition of *Ardent* and are liable to make contribution pursuant to the Civil Liability (Contribution) Act, 1978 .

The plaintiffs' case in outline is that each of the five defendants was grossly negligent and/or guilty of wilful misconduct in failing to arrange for adequate inspection of *Ardent's* class records and/or adequate survey of her condition, in recommending her for purchase without adequate basis and/or misrepresenting her condition, in giving cost estimates and time scale projections without proper basis, in failing to warn of the risks of acquiring *Ardent* and in negotiating her purchase without any discount properly reflecting her condition. Questions arise as to the precise role of each defendant. As to the three individual defendants, there is also an important issue whether or to what extent they, as officers within the Papachristidis group, owed any duties personally to the plaintiffs.

In relation to all the defendants, an important feature of the arrangements consists in clauses in the CAA and (with minor differences) in the TAA, providing for indemnification and limiting liability of the relevant adviser. I set out these clauses in Part IV.1 of this judgment. Their presence explains the assertions in the plaintiffs' pleadings of "gross negligence" on the part of the defendants. Since the CAA and TAA were expressly subject to New York law, experts were called on principles of construction, and on the question whether the phrase "gross negligence" possesses any settled meaning, under New York law.

Behind Red Sea's establishment was confidence in the tanker market which had been rising since the end of 1985 after a long rescession in the late 1970s and early 1980s. A feature of market conditions in 1989 was that older tankers cost less but could earn the same or almost the same rates on the market as newer tankers. This and the prospects of further rises in the market and in hull values led a number of banks and shipowners to view second-hand tankers as attractive investment vehicles, and to set up funds to raise money for that purpose. In 1988 Chase co-operated with the Hellespont group to set up a fund called Hellespont Tankers Ltd. ("HTL"), of which Mr. Papachristidis became chairman. HTL acquired four second-hand medium-sized tankers. One of these was a vessel managed by PSMSL and within the Seatramp pool, so that the Papachristidis organization was familiar with her. A company in the Hellespont group, Hellespont Shipping Corporation ("HSC"), took a 20 per cent. interest in HTL. The Red Sea fund was intended to repeat what was considered the success of the HTL fund. Mr. Anderson became chairman of Red Sea, simply because the Papachristidis organization took the view that Mr. Papachristidis should not be chairman of both HTL and Red Sea. HSC took in respect of Red Sea a 10 per cent. shareholding interest on a subordinated basis, at a cost of U.S.$4.188 m. As its name might suggest, the Red Sea fund was intended to appeal to Middle Eastern investors, although the appeal was not fully realized and many subscribers were found elsewhere.

Particulars of the four acquisitions made by the plaintiffs follow. The first vessel, *Armour* , was acquired under a memorandum of agreement ("MOA") dated May 16, 1989, signed by the second plaintiff on June 2, 1989, on the strength of a deposit lent by HSC, which would have taken over responsibility for the acquisition if the floatation of Red Sea had failed. She was Japanese-built in 1972, and was acquired for U.S.$11.68 m. She was sold on Jan. 8, 1992 for U.S.$7,321,627. *Archer* was 116,783 dwt and Brazilian built. She was completed by 1976, but remained alongside until a purchaser was found in 1978, and she was **554** classed as 1978-built. She was bought under MOA dated July 26, 1989 at a cost of U.S.$20 m., and delivered on Aug. 29, 1989. She was sold on June 14, 1993 for U.S.$3,835,868. *Arrow* was 87,439 dwt, Japanese-built in 1974. She was bought under MOA dated Aug. 16, 1989 at a cost of U.S.$15.5 m. and delivered on Sept. 8, 1989. She was sold on Feb. 22, 1993 for U.S.$2,228,609. *Ardent* was 96,961 dwt, Spanish-built in 1972, acquired under MOA dated Aug. 30, 1989 at a cost of U.S.$12,018,200 and delivered on Sept. 20, 1989. It is common ground that, before *Ardent* was acquired, Mr. Dunn and Mr. Anderson had in mind and mentioned on one basis or another to Mr. Bouckley a figure of U.S.$2 m. in respect of repairs and upgrading before she could be put into service. In the event, her repairs and overhauling, as completed in late February, 1990, cost some £5,708,000. They included the replacement of some 607 tonnes in her segregated ballast tanks at a cost of U.S.$2,423,229. The vessel was sold on Apr. 22, 1993 for U.S.$2,621,414.

I.2. *Witnesses*

The plaintiffs called as witnesses of fact Mr. Bouckley, Mr. Baarma and Mr. Henderson, followed by Mr. Reddy, an officer at the material times of Chase but working since late 1991 with NCB, and Mr. Thomson of NCB. On the defendants' side, Mr. Papachristidis, Mr. Anderson and Mr. Dunn all gave evidence, as did Miss O'Donnell-Keenan, finance director of PL with responsibility for providing financial advice to the Hellespont group, Mr. Reilly, an independent surveyor engaged to inspect *Ardent* before her acquisition in August, 1989 and Mr. Rayner, the broker with Messrs.

Copr. © West 2009 No Claim to Orig. Govt. Works

Clarksons through whom the negotiations for her acquisition took place. As technical and engineering experts the plaintiffs called Mr. Houghton from Vine Gordon & Co. Ltd. and the defendants Mr. Spence from Brookes Bell & Co. I consider in Part V.1 their precise experience and expertise. The defendants further called as an expert Mr. Marsh, a sale and purchase broker with Braemar Shipbrokers Ltd. On questions of New York law, the plaintiffs called Mr. John J. Kenney of the law firm Simpson, Thacher & Bartlett, a former resident of the Federal Bar Council, and the plaintiffs called Judge Marvin E. Frankel, a retired United States District Judge of the Southern District of New York from 1965 to 1978 and now with the law firm Kramer, Levin, Naftalis, Nessen, Kamin & Frankel.

The main focus of the plaintiffs' factual evidence was on a number of alleged meetings and conversations prior to and after the acquisition of *Ardent* . The defendants' factual evidence focused on the circumstances leading to *Ardent's* acquisition.

There is a marked lack of internal memoranda and written communications on both sides to record or assist/ reconstruct the precise course of events leading to setting up of the Red Sea fund and acquisition of the four vessels. In part, on the plaintiffs' side, there appears to have been some loss of files, of which Mr. Bouckley in particular spoke. In large measure, on both sides, it appears that such memoranda and communications never existed. The oral evidence has thus assumed an importance which in other circumstances it might not have had. The lapse of time and the pressures of this litigation have affected evidence given on both sides. A good deal of the factual evidence given by the plaintiffs' witnesses about events leading to the setting up of the Red Sea fund and the purchase of individual vessels was inaccurate and unconvincing, not in my view as a result of any process of deliberate distortion or misrepresentation, but because of perils and pressures associated with attempts to reconstruct events about which no detailed record exists in the context of problems which after the event may seem only too obvious. Likewise, on the defendants' side, factual evidence was given which in my view suffered from similar defects, without any deliberate attempt to mislead. This applied to all the defendants' principal witnesses, Mr. Papachristidis, Mr. Anderson, Mr. Dunn and Mr. Reilly, although Mr. Papachristidis' evidence, in particular, was characterized by readiness to acknowledge that he had no actual recall of many of the meetings or conversations scrutinized before me.II. HISTORY

The considerable evidence adduced, particularly by the plaintiffs, about meetings leading to the setting up of the HTL and Red Sea funds had some potential relevance to their case against the defendants of gross negligence in respect of pre-purchase inspection of *Ardent* as well as in relation to the defendants' claim against Messrs. Bouckley, Baarma and Henderson as third parties. In the event it proved to add up to relatively little. But it will take some time to review in this part of the judgment.

## II.1 *Representations relating to the HTL fund*

By a supplementary statement served at a late stage, the plaintiffs introduced evidence from Mr. Reddy as to representations, said to have been made in the context of the HTL fund by Mr. Anderson and Mr. Papachristidis, about the nature and thoroughness of the steps which would be taken by PL and/or PSMSL before acquiring vessels. Mr. Reddy said that thorough physical inspection was understood to be "fundamental to the rationale behind the HTL fund and, later, the Red Sea fund". In relation*555 to the HTL fund, this evidence was contradicted by Mr. Anderson and Mr. Papachristidis and did not appear to match even the relevant documentation to which they were able to refer at so late a stage. I found it unimpressive and unconvincing. I do not accept that there were, in the context of the HTL fund, representations focusing directly on the nature or type of pre-purchase inspections.

## II.2 *The setting up of the Red Sea fund*

The first approach appears to have been by Chase to NCB in late January, 1989, with a view to NCB raising investment support in the Middle East for a new shipping fund. Chase introduced NCB to PL. On Feb. 6/7, 1989 Mr. Bouckley met and formed a favourable opin-

ion of Mr. Papachristidis, Mr. Anderson and Miss O'Donnell-Keenan at a meeting in London also attended by Mr. Baarma, Mr. Thomson and Mr. Reddy. Litigation is in progress by Red Sea against Chase in New York relating to the setting up and failure of the fund, and it is unnecessary to go into the relations or roles of Chase and NCB at this early stage. The favourable impression and good reputation of the Papachristidis group and personnel were confirmed by subsequent enquiries in the course of NCB's exercise in "due diligence" in relation to the proposed transaction. The general purpose of the meeting was to discuss the tanker market outlet, the, age, size, number and likely cost of vessels which might be purchased by a new fund, the ability of PL and PSMSL to undertake the same advisory roles as in relation to the HTL fund and the questions of financing and equity. But there was no specific discussion of pre-purchase inspections or procedures.

Following the meeting, Miss O'Donnell-Keenan produced financial scenarios and cash flow projections based on different assumptions, including assumptions that tankers built in 1972 and 1975 would be bought, that each would have -

. . .an initial dry-dock cost of approximately $500,000 to ensure that it is of a similar standard to other vessels managed by [PSMSL] . . . that an annual drydocking reserve of U.S.$280,000 per annum would thereafter be accumulated and that the working life of the tankers purchased could be prolonged to 27 years; assumptions were made about future time charter rates and future residual hull values. These documents were seen and reviewed by Mr. Bouckley, Mr. Baarma and Mr. Thomson. Mr. Bouckley sought and received further "disaster" scenarios based on more pessimistic assumptions about rates and residual values. The main risks in the transaction, as he perceived it, were related to any decline in these, but Mr. Papachristidis and Mr. Anderson expressed confidence about the future in both areas. I note that the "disaster" case scenario regarding residual values assumed sale after 5½ years, for U.S.$10 m. per vessel, of vessels purchased at U.S.$13 m. a vessel, but envisaged that, even if each vessel only realized U.S.$8 m., the ordinary preferred shareholders would still be

repaid in full. By Feb. 16, 1989 a draft brochure was under preparation, and Mr. Bouckley had discussed with Mr. Anderson the size and type of tanker to be bought. It was initially thought that the size of vessels might have to be confined, to avoid a conflict of interest with the Papachristidis organization's involvement in HTL. But the size was in the event simply stated as between 80,000 and 150,000 dwt. The type of vessel to be bought was envisaged as whatever could be purchased most advantageously when the time came. In late February, 1989 Mr. Bouckley reflected the cash flow forecasts in summaries. The notes stated inter alia:

Papachristidis is hopeful that it can purchase tankers of a suitable age and conditions that cost less than $13 million. As charter rates are *not* affected by the age of the vessel, then it follows that the cheaper the price paid, the greater the overall profits will be.

For example, Papachristidis were offered a 17 year old 118,000 ton tanker 2 weeks ago for $11.5MM. Plus the vessel was already in Dry Dock which would have saved us another $0.5MM in start up costs. The last sentence of this note identifies a point which each of Mr. Bouckley, Mr. Baarma and Mr. Reddy said that Mr. Anderson made to them at some stage. Mr. Anderson said that he would not have made it in these terms, but that his listener "could infer that". Mr. Anderson insisted that, in so far as he did make any such statement, it was "in relation to the PPM" and to its assumptions and bases. In the "real world" he said any saving in drydock costs would "presumably" be reflected in the price paid for the vessel. In fact, it is, I think, likely that Mr. Anderson emphasized the "saving" of the budgeted U.S.$0.5 m. drydocking costs, without making sufficiently clear its probably illusory nature in the context of the overall financial picture.

The plaintiffs pleaded for the first time in their points of reply in October, 1995, and Mr. Bouckley gave evidence, that at another meeting with Mr. Papachristidis "probably" in February or March, 1989 "the need for full survey reports" was discussed in general but not technical terms with Mr. Papachristidis, and that Mr. Papachristidis said that the Papachristidis organization had "the proven ability to go out and find suitable

Copr. © West 2009 No Claim to Orig. Govt. Works

tankers to be purchased, get vessels surveyed and then manage*556 them". According to Mr. Bouckley, Mr. Papachristidis went on that surveys would be done by their own suitably qualified staff or outside surveyors, and took Mr. Bouckley into a separate room to show him some survey reports. Mr. Bouckley's evidence was that he emphasized the even higher level of due diligence required on this transaction, involving as it did third party money, and that Mr. Papachristidis agreed, adding "We have never bought a bad ship". Mr. Papachristidis had no recollection of any such meeting or statements. The last phrase Mr. Thomson recalled in his witness statement as having been made at a later meeting dated May 24 (to which I come below, but at which Mr. Papachristidis was not in fact present); orally, he suggested that it may have been made at the earlier meeting of Feb. 6, 1989.

Mr. Baarma said that, prior to the meeting of Feb. 6, 1989, he had been told by an American naval architect friend, Mr. J. Cuneo, who runs his own shipping business, of the importance of buying good, sound vessels and making a thorough pre-purchase survey for that purpose. He said that he did not mention this at the Feb. 6 meeting, and only mentioned it to Mr. Bouckley by telephone in March or April, 1989. Mr. Bouckley's witness statement made no mention of any such conversation. In evidence, Mr. Bouckley indicated that prior to reading Mr. Baarma's witness statement he had had only a vague recollection of the conversation, about which Mr. Baarma's statement reminded him. He then said that he now remembered being called at least twice into Mr. Baarma's office in New York to meet Mr. Cuneo, and being advised to go back to Mr. Papachristidis on the subject of pre-purchase surveys. He said that he might have gone back to Mr. Papachristidis in this connection, but could not now recall.

The evidence about events leading to the suggested discussion about the need for full or thorough pre-purchase surveys or reports thus lacked coherence and consistency. As matters emerged in cross-examination, the emphasis during any discussion between Mr. Baarma and Mr. Cuneo was on the need for *independent* surveys of vessels before acquisition. If and when Mr. Bouckley

raised the point with Mr. Papachristidis at all, I do not think that the focus would have been on the "fullness" of pre-purchase surveys. If any survey reports were shown at all at this early stage, which is far from clear, they would have been periodic survey reports in respect of vessels already under PSMSL management, rather than pre-purchase inspection survey reports.

Towards the end of March, 1989 Miss O'Donnell - Keenan prepared "disaster case" scenarios for Mr. Bouckley, comparing the cash flow as per brochure with a situation (regarded, according to the notes, by "Papachristidis" as "unrealistic") in which each vessel would spend an average of 30 days each year off hire.

On May 24, 1989 there was a further meeting involving officers of the banks, including Mr. Bouckley, at PL's offices. The plaintiffs' pleadings assert that it was attended by Mr. Papachristidis, Mr. Anderson and Mr. Dunn, each of whom made representations -

. . .that they and PL and PSMSL exercised a high degree of care and thoroughness in investigating and surveying vessels prior to purchase and produced samples of survey reports to demonstrate these assertions. In fact Mr. Papachristidis was travelling on business in the Far East at the time. Mr. Dunn was also not present. The meeting started in the morning and after lunch participants were offered a tour of the offices, to see inter alia the operations centre of the Seatramp pool and with the general aim, no doubt, of enhancing the participants' favourable view of the Papachristidis organization. Again, if survey reports were shown, as they may well have been on this occasion, they are likely to have been periodic condition reports prepared by PSMSL in respect of ships under its technical management, rather than pre-purchase inspection reports.

Mr. Anderson said that he had no recollection of any discussions in the first half of 1989 focusing specifically on the process of acquisition of vessels to be acquired or their condition or the surveys contemplated. I am satisfied in fact that he had only limited recollection of any meetings and conversations in the first half of 1989. He accepted under cross-examination the likelihood that some statements were made, particularly in

the very early stages, about the "proven ability" of the Papachristidis organization to identify and acquire vessels and to render advisory services in that respect. The phrase comes from the outline for a "road-show" in respect of the HTL fund, in which both he and Mr. Papachristidis had been involved. Although he could not specifically recall, he thought that at the meeting of May 24, 1989 he probably explained in the context of the Red Sea fund the ability of Mr. Papachristidis and the Papachristidis organization to identify and acquire ships, in similar fashion to the way in which it had been explained at the road show in the context of the HTL fund. Mr. Papachristidis reconstruction of the course of discussions was to similar effect.

The first board meeting of the directors of Red Sea fund took place on June 15, 1989. The minutes were pre-prepared by lawyers, but amended by Miss O'Donnell-Keenan as appropriate during or after the meeting. They record that Mr. Anderson was appointed and acted as chairman. Also present**557** were Mr. Vouzounerakis (of HSC) who was appointed managing director and secretary, Mr. Bouckley, Mr. Baarma, Mr. Henderson and Mr. van Brummen. The purchase of *Armour* was ratified, and arrangements for her financing and management and her budget were approved. The CAA with PL and the TAA with PSMSL were approved for execution, with other agreements. Each director approved the contents of the private placement memorandum ("PPM"), and the arrangements were agreed for the proposed placing of shares. Paragraphs 29 and 30 of the minutes noted:

Vessel Acquisition Plan 29. Mr. Anderson informed the Board of the vessels currently being inspected. The Board resolved that the Technical Advisor should be requested to arrange for the purchase of ships as quickly as possible. Mr. Vouzounerakis was given authority to enter into memoranda of agreement which would subsequently be ratified by the Board.

Other Business 30. (i) It was agreed that a complete list of names, addresses and phone numbers of the Directors would be circulated with the Minutes of this meeting.

(ii) The next meeting was scheduled for Friday, 22

September in Greece.

Miss O'Donnell-Keenan said that it would have been more correct to refer in par. 29 to "the Commercial Advisor with the assistance of the Technical Advisor". A list was circulated in accordance with par. 30. Mr. Anderson said that its purpose was to enable informal contact with and approval by Red Sea directors before any purchase was negotiated. He accepted that in practice he probably would not have spoken to all the directors. In particular, he would not have spoken to Mr. Baarma, who was difficult to contact in Saudi Arabia, but would have left Mr. Bouckley to do that. Mr. Bouckley suggested that his approval was in fact only sought once a price had been agreed. It would not be safe to infer from any agreement reached on June 15 that the agreed procedure was necessarily followed in practice. I am however satisfied that Mr. Bouckley himself was generally aware of negotiations before a price was agreed and that there was no understanding that any agreement made with a seller would be subject formally to some further procedure involving approval by the Red Sea board. In particular, I am satisfied in relation to *Archer* that Mr. Bouckley was aware of the negotiations to buy at U.S.$20 m., which led to agreement on July 26, 1989. He was at the same time (but not as a pre-condition to the conclusion of the negotiations) requesting information about the financial implications of the acquisition. The infor mation arrived after agreement on purchase had been reached and led Mr. Baarma to protest about the dilution of the fund's hoped for profitability. This in turn played a part in the decision to recommend and go for the (older and cheaper) *Ardent* in August.

In their witness statements Mr. Bouckley and Mr. Reddy gave evidence that, at a financing meeting with Mr. Papachristidis on July 11, 1989, Mr. Papachristidis mentioned looking at vessels which included a storage vessel. Mr. Reddy could remember no more. Mr. Bouckley said that there followed -

. . .a short discussion about whether we should even be considering a vessel which had been used for storage for the Fund and his response was "yes", as long as it was in good condition and did not require large sums spent on it in order to correct any faults brought about

by non-use. He also said that in the same meeting Mr. Papachristidis mentioned a shortage of vessels on the market and referred to a letter from Mr. Yoran Kinsberg of Chase dated July 6, 1989 (saying that was "quite essential to identify one or more ships soon to maintain marketing momentum"), to which his response was to tell Mr. Papachristidis that he was under no pressure to buy a vessel. Mr. Papachristidis had no relevant recall of the meeting. As to the suggested discussion about "good condition", the plaintiffs' pleadings relate this to a meeting in August, 1989, suggesting (implausibly) that Mr. Papachristidis had said that the Papachristidis organization was going to re-look at *Ardent* . A storage vessel may have been mentioned, but it may as well have been *Vestelegia* as *Ardent* . There may well have been reference to the relatively low number of vessels on the market and to Mr. Kinsberg's letter of Aug. 6, 1989. I also accept that Mr. Bouckley did not himself specifically endorse or go as far as Mr. Kinsberg's remark, although he was no doubt interested in seeing the fund progress. Mr. Bouckley's evidence failed however to persuade me that there was any relevant discussion about the condition of any storage vessel on Aug. 11, 1989. I do not believe that this was at the time perceived as a problem calling for any such discussion.

The plaintiffs' banking witness gave evidence of various discussions, with Mr. Anderson in particular, in relation to the acquisition of *Archer* (bought on July 26, 1989) and *Arrow* (bought Aug. 16, 1989). Its general effect was that Mr. Anderson told them that, because these vessels did not require drydocking, there would once again be a "saving" of U.S.$0.5 m. They also said that they were told that the vessels were in "good" or "first class" or "perfect" condition and required "no repairs". In*558 respect of *Archer* , Mr. Bouckley said that he was told this by telephone on July 25, 1989; Mr. Baarma referred in his witness statement to a meeting on Aug. 3, 1989 with Miss O'Donnell-Keenan, Mr. Priest and Mr. Anderson, where the conversation focused on Mr. Baarma's undoubted concern about the U.S.$20 m. purchase price of *Archer* and led to a decision to look for an older and cheaper vessel. Mr. Reddy referred to a follow up meeting which, if it took place at all, can only have been on or after Aug. 9,

1989. As to *Arrow* , Mr. Bouckley said that he was told this by telephone when on holiday in New Jersey; Mr. Baarma also said that he was told by telephone and Mr. Reddy suggested that he was told at a meeting in August, 1989.

Under cross-examination, Mr. Baarma's and Mr. Reddy's evidence proved as problematic in these as in other areas. Mr. Baarma had essentially no relevant recollection of any discussions regarding repairs, and was suffering badly from influenza at the Aug. 3, 1989 meeting. Mr. Reddy now sought to put the conversation with Mr. Anderson in respect of *Arrow* as occurring long after the event in September, 1989. The reality is that any significant conversation on such matters is likely to have been with Mr. Bouckley. Neither Mr. Bouckley nor Mr. Papachristidis could positively recall any. Once again however I think it likely that Mr. Anderson did emphasize the "saving" of U.S.$0.5 m. resulting from the fact that no drydocking would be required, and that Mr. Bouckley did not appreciate that the fact that the vessels had been drydocked would probably have influenced the price paid. Mr. Anderson may well also have made some general comment to Mr. Bouckley in the same context about the vessels being "in good condition".

Mr. Baarma's evidence was that he first heard of *Ardent* from Mr. Anderson around the same time, possibly during the Aug. 3, 1989 meeting, that Mr. Anderson said that corrosion was often a concern with storage vessels and, in a later conversation, that the owners were resisting inspection, but, in response to concern expressed by Mr. Baarma, that he would "make sure that she was properly inspected"; that in a yet further conversation he learned from Mr. Anderson either directly or (as he said orally) through Mr. Bouckley that the purchase of *Ardent* was being recommended subject to a satisfactory divers' report, to which he agreed; and that still later he heard that a satisfactory divers' report had been obtained. He described his recollection on these points as vivid, although, when his defence in the third party proceedings was prepared in October, 1994, it ascribed the exchanges about corrosion in storage vessels and "proper" inspection to a single telephone conversation with

Mr. Anderson "on a date which Mr. Baarma cannot recall". Mr. Anderson acknowledged that there was conversation on Aug. 3 about the purchase of an older vessel, and that the possibility of acquiring a storage vessel may have been mentioned. He did not think that the topic of corrosion would have arisen or that there would have been discussion about the nature of any inspection. The course of events described by Mr. Baarma regarding a diver's report does not fit with the actual history of *Ardent's* purchase.

On Aug. 16, 1989 Mr. Anderson appears to have had lunch with Mr. Thomson at NCB's offices, and probably made a passing reference to the fact that the Papachristidis organization was looking at a possible fourth vessel.

On Aug. 23, 1989 a meeting was set up to decide whether the fund should acquire a total of four or five vessels. Present were Mr. Papachristidis, Mr. Bouckley, Mr. Thomson and Mr. Reddy. Mr. Anderson was by now on holiday. The decision was to limit the total to four. Mr. Papachristidis had again no real recollection of the meeting, but thought that *Ardent* would have been discussed and that authorization would have been given to purchase her. He also thought that it was "inconceivable" that the pre-purchase inspection reports for her and the other vessels would not have been available at the meeting. Mr. Bouckley and Mr. Reddy, but not Mr. Thomson, recalled reference to a storage vessel as a possible fourth vessel. I find that the purchase of a storage vessel as the fourth vessel was raised. I am not satisfied that Mr. Papachristidis actually said anything to lead to a conclusion that his knowledge of this possible fourth vessel was unusually "perfunctory". Mr. Reddy's evidence proved once again unreliable as to the course of any discussion. Mr. Bouckley said that he recalled reference to the storage vessel being in "good condition" and to the possibility of a sufficient "discount" being obtained. Since Mr. Papachristidis knew that *Ardent* could require U.S.$2 m. of repairs and overhauling, it seems unlikely that he could or would have made any unqualified comment about her being in "good condition". He may well however have referred to a "discount" to cover repairs and overhauls. As will appear,

Mr. Papachristidis is, in my view, likely to be right in saying that the discussion led to the Papachristidis organization being authorized to pursue *Ardent* .

Mr. Bouckley and Mr. Reddy gave evidence that Mr. Reddy learnt for the first time during this meeting from a pre-purchase inspection report in respect of *Arrow* , which they found on the table, that her upgrading would involve costs of U.S.$150,000. However, they failed to raise this during the meeting and the only pre-purchase report identified shows costs of U.S.$0.5 m. Since *Arrow* is the subject of issues not now directly before me **\*559** and it is unnecessary to say more, I shall not do so. Mr. Papachristidis also suggested that it was inconceivable that the pre-purchase inspection report in respect of *Ardent* was not before the meeting on Aug. 23, 1989. Mr. Buckley was confident that it was not. Even if it was available, Mr. Bouckley and the other bankers present would not have had either the time or the knowledge and skill to understand and digest it. In the circumstances it does not matter whether it was available. It has not been established one way or the other whether it was.

Mr. Reddy suggested that he received a telephone call late in August, 1989 from Mr. Anderson regarding the condition of the fourth vessel, stating that the Papachristidis organization would be evaluating it thoroughly before any purchase. I do not accept that there was any such discussion. Mr. Anderson did probably ring Mr. Reddy on Aug. 29, 1989, but simply to tell him that *Ardent* had been acquired.

What is the upshot of this and other evidence regarding specific assurances and representations said to have been made on behalf of PL and/or PSMSL about the thoroughness of the process of vessels before acquisition? The evidence given by Mr. Bouckley, Mr. Baarma and (to the limited extent to which he was involved) Mr. Reddy fails to persuade me that the thoroughness of any pre-purchase investigation and inspection of vessels was in focus or discussed, before the acquisition of *Ardent* . Mr. Anderson is likely to have made general comments to Mr. Bouckley about a "saving" of drydocking costs on the first three vessels and their "good condition". But I do not accept that this was linked or led to any particu-

lar discussion about pre-purchase inspection procedures. The contrary evidence of Mr. Bouckley and Mr. Baarma, in particular, was in my view neither convincingly given nor sustained and was in many respects inherently improbable. Mr. Bouckley, Mr. Baarma and Mr. Reddy were bankers without any understanding of ship purchase procedures, the technical aspects of ship purchase or management matters or the meaning of a "thorough" or "proper" survey. Consistently with this, when, in December, 1989, Mr. Bouckley was told by Mr. Anderson that *Ardent* was costing considerably more than had been estimated because a "full survey" had not been done, he did not refer back to any prior assurance that such a survey would be done; he simply asked Mr. Baarma "did you know that a full survey had not been done?" and mentioned his concern about *Ardent's* condition in October, 1989.

I accept, on the other hand, that general representations were made by Mr. Anderson and Mr. Papachristidis about PL's and PSMSL's capabilities as prospective advisers, which would necessarily include their capability to identify and recommend the purchase of second-hand vessels. By implication, this would mean suitable second-hand vessels. The notes to the cash flow projections prepared in February, 1989 illustrate a general understanding that the vessels would be in appropriate condition. The references in such notes to Papachristidis vessels averaging only five days off-hire per annum over the last four years and to a "worst case" scenario of 30 days off-hire being "unrealistic" show that the assumed reliability of vessels to be acquired on PL's advice was perceived as a matter of importance. These notes were however directed primarily to the Papachristidis organization's ability to manage vessels once acquired, rather than to their initial acquisition. None of the parties concerned appears to have regarded acquisition of suitable vessels as involving any significant problem or risk. For this reason the PPM did not identify any such problem.

Mr. Anderson is on record as suggesting in April, 1992 that:

2. The directors [of Red Sea] were well aware that in the prevailing market decisions on whether to purchase would have to be made without benefit of a thorough inspection of all vessels. This commercial reality, coupled with the ages of the vessels, meant not only that repair costs would have to be incurred but that there was the risk that certain conditions necessitating repairs might not be discovered until after purchase.

. . .

4. The advisors always held all documents and information concerning the vessels available to the Directors. Individual Directors, cognizant of the market reality requiring less than thorough inspections and prompt decisions and creating the accompanying risk of additional unidentified repairs being required, may have chosen not to avail themselves of this data. A similar suggestion featured in all the defendants' points of defence and third party points of claim. These asserted knowledge by Red Sea through each of its directors that all forecast projections and established reserves may all prove "wholly inaccurate".

Mr. Anderson's memorandum and these allegations by the defendants were in my view a forensic exercise. I also reject Mr. Anderson's suggestion in cross-examination that he believed that the other directors of Red Sea knew that the type of pre-purchase inspections carried out would involve risks such as those identified in his memorandum. Mr. Bouckley, Mr. Baarma and Mr. Reddy all admitted that they knew that there was no *assurance* that the budgets for repairs would be sufficient to cover actual costs. But it is clear that they were **\*560** at the relevant time in 1989 unaware of any significant risks that vessels would be acquired on a basis which might involve major uncertainty about their actual condition or might lead to the discovery after their acquisition of a need for major unbudgeted repairs .

The difference between the parties lies in the fact that it was for the Papachristidis organization to identify any such risk within their knowledge if it was unavoidable or to avoid it if it was reasonably avoidable, whereas the bankers who dealt with the Papachristidis organization, some of whom also became directors of Red Sea, were entitled to believe that there were no such significant risks or none that could not and would not be avoided

by proper exercise of their functions by PL and PSMSL .

## III. THE ACQUISITION OF THE ARDENT

### III.1 *Roles of the three main Papachristidis officers*

The defendants analysed the respective roles of Mr. Anderson, Mr. Papachristidis and Mr. Dunn as follows. Mr. Anderson's involvement was essentially commercial. He handled the commerical aspects of any sales and purchases, as well as the financing and chartering, of vessels. He was responsible for identifying vessels falling within the parameters which were of interest to the Red Sea fund. He would then discuss those vessels informally with Mr. Papachristidis and Mr. Dunn, and, if a vessel looked of interest, would ask the brokers for permission to inspect the vessel's records. But he had, it was said, no technical experience or expertise. If permission was received, any subsequent inspections of the records and of the vessel herself were matters for Mr. Dunn and PSMSL's staff. Mr. Anderson although a director of PSMSL played no day to day role in PSMSL's affairs. Mr. Dunn was responsible for all inferences and conclusions to be drawn from any inspections made. However, his role in turn was confined to technical aspects. He would report to Mr. Anderson. Mr. Anderson would then appraise the position commercially, and, subject to discussion with Mr. Papachristidis and Mr. Papachristidis' overriding decision, Mr. Anderson would on this basis be responsible as a director of PL for any recommendation to purchase any particular vessel.

In day to day reality, I do not accept that there was necessarily so clear-cut a formalization and differentiation of roles. Mr. Anderson, Mr. Dunn and, when he was there, Mr. Papachristidis collaborated closely. To some extent they kept Miss O'Donnell-Keenan also informed, but I do not consider that she interested herself greatly in aspects not directly financial in nature. Mr. Anderson and indeed Mr. Papachristidis, although neither has a technical qualification, have both had long involvement in the shipping industry. Their evidence tended in my view to downplay the extent of their general understanding of technical problems and risks which may affect the operation of tankers. Likewise, Mr. Dunn was well aware that vessels in relation to which inspections

were arranged were candidates for purchase by the Red Sea fund, and that his assessment of repair, overhauling or upgrading costs would be central to any decision to purchase. The extent to which he arranged inspection of a particular vessel must have involved some assessment of her potential interest to the fund. I find it difficult to believe that Mr. Dunn always focused exclusively on a vessel's technical condition and that he would never become involved in any general consideration or discussion whether a particular vessel was a suitable or worthwhile purchase. It is also clear that, at the time of negotiations to acquire *Ardent* , when Mr. Anderson was on holiday in the United States, Mr. Dunn became the channel of communications and instructions between the Papachristidis organization and Clarksons. Of more importance than the precise distinctions in role which the defendants sought to suggest were probably the status and character within the Papachristidis organization of each of the main three personalities. Mr. Anderson was a powerful, energetic and decisive character, Mr. Dunn, by comparison, less so in my judgment, despite his undoubted competence and experience on technical matters. Mr. Papachristidis was and is an obviously intelligent, acute and capable businessman. He was however to a considerable extent detached from day to day activities involving the implementation of the fund. There appears to be force in the plaintiffs' submission that his mind at this stage was also focusing on the inception of another strategic move involving his group, an acquisition of tankers under what was called and became the Tisch deal. For these reasons, rather than because of the precise delineation of roles which the defendants urged, I believe that Mr. Anderson is likely at the time to have been the dominant influence in any decision to purchase a vessel such as *Ardent* .

### III.2 *Identification of Ardent*

*Ardent* was on the market for a substantial period in 1989. In or about early March, 1989, Mr. Anderson asked brokers for information about possible candidate vessels for purchase by the fund. Various brokers brought *Ardent* , among other vessels, to Mr. Anderson's notice between early March and the end of May, 1989, with price ideas increasing over this period from

U.S.$9 m. to U.S.$10.5 m. She was said to be expected to finish her present**561** storage contract in May and her owners were said to be looking "very seriously at sales interest". Mr. Anderson also received a statement by the vessel's classification society (Germanischer Lloyd - "GL") of her survey position dating from July, 1988. Some notes written by him appear on this and some other of the documents received from brokers. Mr. Holding of PSMSL reviewed the position on May 31, 1989 for Mr. Anderson as follows:

The vessel is Spanish built which means that scantlings are small and spare parts for any Spanish made equipment or machinery will be hard to come by as most of the manufacturers have ceased trading.

The vessel is 17 years old which apart from any other consideration makes the previous paragraph even more significant.

The survey is almost a year old and apart from the vessel's particulars there is not much else to go on. Suggest we have the records inspected. The "total disagreement" which Mr. Papachristidis expressed in evidence in relation to Mr. Holding's views was no doubt directed to the first two paragraphs.

The last paragraph was followed up by Mr. Anderson asking Clarksons to arrange inspection of the records. Mr. Dunn was taking a brief holiday at the time. Clarksons on June 1, 1989 informed Mr. Anderson that owners had authorized GL to release records to Abstech. Mr. Holding asked Abstech to instruct their Hamburg office to undertake the inspection. Mr. Anderson noted on Clarksons' fax that the owners were "Marontree Shipping, Lebanese based in Greece".

### III.3 The Abstech report

On June 8, 1989 Abstech sent to PSMSL an eight-page report on the vessel's class records held by GL. It disclosed that the vessel had had four previous names (prior to her current name of *Ocean Maid* ), that she had been reclassed with GL pursuant to application dated July 2, 1987, that her last drydocking had been in August, 1986 when she had passed her third special survey

under Lloyd's Register classification and that the only information found "available during the short classification period with GL" consisted of reports on her admission to class and annual class survey at Aqaba in July, 1987, on machinery damage and repairs in Piraeus in December, 1987 and on a further annual class survey in December, 1988.

The Abstech report is unmarked. Its limitations were obvious on even a cursory reading, but no steps were taken to inspect the records held by Lloyd's Register for the vessel's previous life. Mr. Dunn could not recall whether he reviewed the Abstech report when it was received, or, as he put it in his original witness statement, "why we were unable to inspect the earlier class records". He believed, however, that he would have reviewed the report -

. . .at or shortly after the time when Jim McIndo [of PSMSL] began to arrange a physical inspection of the vessel, which it would appear he began to do the following week. This is a reference to communications between Mr. McIndo and Clarksons about the possibility of inspecting *Ardent* , commencing on about June 14, 1989. The same communications show a misapprehension within PSMSL's offices as to whether any report had been received from Abstech at all and general confusion arising from a multiplicity of possible purchases being conducted by different staff members without common files. On June 22, 1989 Captain Powell of PSMSL wrote a memorandum to Mr. Dunn pointing out that a report had already been received from Abstech and "had now been found on Jim McIndo's file". Up to that date, therefore, it may well be that Mr. Dunn was not even aware of the receipt of the report.

Mr. Dunn's apparent suggestion of some reason for being unable to conduct a full records inspection lacks foundation. No such reason at all has been shown or suggested. No attempt was made to inspect the earlier Lloyd's Register records at any stage. Mr. Dunn was unable to explain why not. In his statement he said that he would "normally insist" on inspection of the records for a vessel's full life. In evidence he demurred at the suggestion that this was very important or essential, and would acknowledge it only as "preferable". He also

sought to excuse PSMSL on the basis that what mattered most was the current survey position and the last two to three years. The GL records in respect of *Ardent* covered just under two years, excluding the last special survey when the hull should have been looked at closely. Mr. Dunn also said that, when it later came to physical inspection of the vessel by Mr. Reilly, he (Mr. Dunn) took the view that he had sufficient information to enable Mr. Reilly to look at the vessel. This comment was, I think, no more than ex post facto reconstruction. I am not satisfied that Mr. Dunn did in August, 1989 focus on the fact that only very limited records had been seen. If (as he should have done) he did read the Abstech report again either on Aug. 11, 1989 when he instructed Mr. Reilly (to whom he believed it was then given) or on Aug. 16, 1989 before or when meeting Mr. Reilly, he must have been prepared to allow the absence of a full records report to pass. Whatever the circumstances in which it came about that full records were never sighted, there was no valid excuse.**562**

So far as Mr. Reilly is concerned, while he was given the Abstech report to read, his statement says:

. . .I cannot now recall whether I asked to see these records, or whether I drew the obvious conclusion that for one reason or another they were not available. In his oral evidence, Mr. Reilly indicated that it would have been "nice" to have them, if they had been available, but they were not critical to the work he had to do. Nothing in the evidence or impression given to me by Mr. Reilly makes it likely that Mr. Reilly took any initiative in relation to their absence by raising it with Mr. Dunn, or that he gave any real thought to the question whether it would be desirable for PSMSL to see them. He simply undertook a physical inspection as instructed by Mr. Dunn. The incompleteness of the records inspection thus passed without comment or action by Mr. Dunn and Mr. Reilly.

III.4 *Inspection of Ardent*

On June 29, 1989 (the day before taking another short holiday) Mr. Dunn asked Mr. Karoussos, a surveyor with HSC, to liaise with Mr. McIndo with a view to inspecting *Ardent* and *Arrow* in either order as suited his

work schedule. In reply to enquiries, *Ardent's* owners indicated on June 30 that the vessel was fully loaded, that she might discharge part of her cargo in Aqaba and have some empty tanks around July 15/20, and that owners were only prepared to clean one cargo tank; on July 4 that cargo tank Nos. 5 port and starboard were empty and gas free; on July 11 that the vessel was now scheduled to sail on July 14 with a part cargo for the Mediterranean; and on July 19 that, after discharging and four to five days washing and gas freeing of tanks, she would be inspectable in drydock at Piraeus around July 27/28. Owners' brokers followed this up on July 24 by asking Clarksons "if/when yr buyers intend to carry out inspection of above vessel in Piraeus", and on July 26 by informing Clarksons that the vessel was now expected to arrive gas free at Piraeus around Aug. 2/3 when Mr. Karoussos was "welcomed to inspect". The arrival was still further delayed until Aug. 12, when Mr. Karoussos was not available. In the meantime, owners' brokers on Aug. 9 indicated to Clarksons that owners' price ideas had increased to U.S.$12 m., adding -

. . .however as brokers would suggest yr buyers to inspect and make outright offer after inspection when believe owners will become more reasonable.

Since Mr. Karoussos was not available, Mr. Dunn obtained Mr. Papachristidis' agreement to engaging an outside surveyor, and chose Mr. Reilly. Mr. Reilly was an experienced engineer, known to Mr. Dunn from his previous employment as a superintendent with a company called Maritime Overseas. Mr. Dunn had offered him a full-time post with PSMSL, but he had set up business on his own. He had just undertaken the pre-purchase survey of *Arrow* and the supervision of repairs to a Hellespont vessel. He was thus in PSMSL's offices on Aug. 10 and met with Mr. Dunn on Friday Aug. 11 to discuss undertaking the pre-purchase inspection of *Ardent* . He was shown the Abstech report. He also made contact with a Captain Kazazis of Hellespont Shipping Corporation who was to accompany him on board. Captain Kazazis was not an engineer, but he was an experienced seaman well qualified to look at the vessel's on-deck condition, particularly with respect to her loading and discharging equipment, whose views on

other aspects of a vessel's structures and condition could be expected to be of value. Captain Kazazis ascertained from owners that their superintendent would be available on the next Monday and Wednesday, but not Tuesday because it was a holiday.

Mr. Reilly and Captain Kazazis attended the vessel at anchorage from 09 00 to 15 00 or 15 20 hours on Monday Aug. 14. A pre-purchase inspection of this nature is usually superficial in nature. Even so, in the context of a vessel of this nature and size, the time occupied in this particular inspection was short. Before boarding Mr. Reilly and Captain Kazazis circled the vessel by launch. After boarding and meeting the deck officer and master, they changed and returned to the master's cabin to inspect the papers on board and to discuss the vessel generally. This seems to have occupied the first one and three quarters of an hour or so of the visit. At some point, Mr. Reilly thought near the outset of this meeting, they asked to see as many cargo and ballast tanks as possible, and were told that the permanent ballast tanks were full. The vessel has on each side seven tanks and a bunker tank and in the centre four larger cargo tanks. She also had a forepeak and afterpeak. Nos. 3 and 7 tanks on each side and the forepeak and afterpeak tanks were all permanent (that is dedicated or segregated) ballast tanks. Nos. 2 and 5 were clean ballast tanks, that is cargo tanks capable of use as ballast tanks. Nos. 6 were slop tanks. Mr. Reilly and Captain Kazazis were shown No. 2 port and No. 5 starboard clean ballast tanks and No. 2 centre cargo tank. This appears to have taken a further one and a half hours or so. After looking at some deck machinery, Mr. Reilly left Captain Kazazis with the master and went aft to look at the engineroom. En route he took advantage of open hatches to permanent ballast tanks Nos. 3 port and 7 port and starboard to look briefly into those spaces, which were in fact almost but not completely full. Mr. Reilly's estimate was that about three quarters of an hour was spent on**\*563** deck, presumably including these brief inspections. Another one and a half hours was spent by him in inspecting machinery and half an hour in the accommodation area, particularly the galley, bridge and radio room. At about 15 00 hours the master told Mr. Reilly and Captain Kazazis that he had ordered

the launch and, when they asked, that they would not be able to return next day.

In his witness statement Mr. Reilly suggested that No. 3 port permanent ballast tank was one of the tanks sighted during the initial inspection under the aegis of the master. In his oral evidence he made it clear that this was not so. It was, like Nos. 7 port and starboard, a tank into which he was able to "sneak" a view. At one point during his oral evidence, he suggested that he had sneaked an even briefer view into No. 3 starboard tank, but had almost immediately to withdraw the suggestion of any such recollection.

In his statement, Mr. Reilly suggested that on his inspection he found the accommodation "in very poor state, particularly the crew cabins and wash room". That was indeed the case, but it was a matter which on his inspection he actually failed to identify. His comments in his written report were that the alleyways, public rooms and accommodation were "dirty and dark by design. Originally a high standard Western style" and that the galley and pantries were "satisfactory". In oral evidence he agreed that the accommodation, which he himself revisited some four or five weeks later, was in appalling condition, such as he had never seen "in the history of being at sea", and explained that accommodation would not have featured high in priority during his inspection. Having also acknowledged at this point that he had nevertheless formed a "favourable" view of the accommodation on Aug. 14, he appeared at a later point in his oral evidence to suggest that Captain Kazazis and he had in fact identified the accommodation as being in dirty "and poor" condition. The reality appears to be that, despite what the report might suggest, there can have been no real inspection of most if not all of the accommodation.

While I do not doubt Mr. Reilly's honesty as a witness or general competence as a surveyor, the matters which I have mentioned are examples of aspects of his evidence which lead me to consider that it would be unsafe to place much reliance on his evidence in respects not supported by contemporaneous documentation. Although not the object of any claim, some of the issues in this action may make Mr. Reilly's position one of potential embarrassment. I formed the view that his appreci-

ation of the issues in this action had some undue influence on the formulation of his statement and on evidence which he gave in the witness box.

III.5 *The surveyor's telephone conversation with Mr. Dunn on Aug. 15, 1989*

After leaving the vessel, Mr. Reilly and Captain Kazazis returned to HSC's offices in Piraeus. They telephoned Mr. Dunn, taking turns to speak. The conversation lasted some 10-15 minutes. Mr. Dunn's very brief notes made during it read as follows: Ocean Maid

O. K. pipeline

Main Deck

Sep. Ball. tank fitted

but top part very corroded

CBT tank-in mode lots fuel oil in this tank

Inert Gas Sy[stem]. Not used 2 yrs solid -

Engine vast No people No UMS min 2 bodies -

Bridge control

Looks nice but all superficial

No work for two years. ...

Under that Mr. Dunn wrote "Put in Sale File". Mr. Reilly said in evidence that, although he had no specific recollection of what was said or of any disagreement with Captain Kazazis, he could not agree with some statements in this note, particularly the words "but all superficial" and "no work for two years". He thought they must have been said by Captain Kazazis. This may be so, but I think it unlikely that there was any actual difference between Mr. Reilly and Captain Kazazis. Mr. Dunn said that he could recall the general course of the conversation. His statement commented on individual points contained in his note, and recalled also that Mr. Reilly had mentioned that the engine room would need a lot of work. It did not comment on the penultimate line of his note, but in evidence Mr. Dunn suggested

that it was linked to the superficial nature of the inspection. I doubt whether that can have been so. It was it seems probable a general caveat. However, Mr. Dunn is correct in saying that it is dangerous to try to derive too much from his very brief notes. Further, Mr. Reilly is right to point out that the last sentence cannot be taken absolutely literally, since *some* work had been done on the vessel during the last two years, as he observed and photographed during his visit.

Mr. Dunn also added the general recollection that the "overall impression" given by the inspectors was favourable. This does not appear to me to fit easily with the general impression given by the notes which Mr. Dunn made, even though they were highlighting relevant points for future attention, or with Mr. Reilly's remark about the extensive work needed in the enginer-oom. Further, it was common ground between Mr. Dunn and Mr. Reilly that Mr. Dunn was told in the conversation that the**\*564** inspectors would have liked to continue their inspection. The inspectors had identified potentially significant problems regarding the condition of the ballast tanks, the condition of certain machinery and the extent to which there had been proper maintenance. Mr. Dunn did not ask for and Mr. Reilly would not have been in a position to give at that stage any estimate as to costs which these matters might involve. Mr. Dunn did not however take any steps to enable the inspectors to carry out any further inspection. Mr. Dunn said that, if the inspectors had told him that they needed to go back on board, then of course he would have requested this, but that he thought that they had seen sufficient and believed that they told him that. In the light of the problems which the inspectors had identified, and the uncertainty of their extent, his thinking is not easy to follow. Mr. Dunn also said that he did not believe that he gave the uncertainty regarding steelwork much thought at that particular time.

The plaintiffs invited me to conclude that Mr. Dunn's inaction and disinterest in these respects were because he concluded, at that point, that the vessel was not a serious candidate. They also referred to a conversation or conversations which Mr. Henderson said that he had had with Captain Kazazis either later in 1989 or early in

1990, in which, according to Mr. Henderson, Captain Kazazis told him that both he and, at some point, Mr. Reilly had cautioned against acquisition of *Ardent* without further investigation. Captain Kazazis may well have said words along these lines to Mr. Henderson in early 1990, and may well have been referring to the telephone conversation of Aug. 14 and/or Captain Kazazis' own later telex of Aug. 16, 1989. But caution is necessary in relation to an account given by Captain Kazazis in early 1990, after problems had materialized. Mr. Henderson's first note of any such account dated Mar. 21, 1990 is wrong in another respect (in suggesting that Mr. Reilly only spent two hours inspecting the vessel). Captain Kazazis' own telex (set out below) is a better guide as to the way in which the matter was put orally by the inspectors on Aug. 14.

Mr. Dunn's failure to react or to seek any further inspection is, nevertheless, puzzling. The conclusion I reach is not that Mr. Dunn positively rejected the vessel as a serious candidate at that stage, as the plaintiffs suggested, but that he probably did not apply his mind to any great extent on Aug. 14, 1989 to the implications of what he was told on the telephone. At the time, PSMSL was under considerable pressure, particularly in the area of maintenance work. There had been some pressure, from Chase, to find vessels for the Red Sea fund before the end of July. The number of candidate vessels on the market was limited, although *Ardent* was not the only one, and the market was still rising. Whether for these or for whatever reasons, Mr. Dunn did not take any step at this stage towards further inspection. He simply awaited Mr. Reilly's attendance at PSMSL's offices and written report.

III.6 *Mr. Reilly's visit to PSMSL's offices on Aug. 16, 1989 and report*


**\*565** CONCLUSION

General appearance on deck very attractive, clean, tidy and well painted. Hull sides good. Present crew/management have provided a minimum of attention to the upkeep for the vessel, there is an obvious disinterest

Mr. Reilly flew to London alone on Aug. 15. He apparently took with him some notes which Captain Kazazis had made. He had on his personal computer PSMSL's standard format of report, and he started work on the airplane. He came into PSMSL's offices at 9 00 a.m. on Aug. 16, 1989 and stayed all day, completing and discussing his report. The "Surveyor's Summary" at the outset of the final report read as follows:

Segregated ballast tanks, No 7 port and starboard wings upper parts, severe corrosion to deck beams, brackets, bulkhead stiffeners and ladders suspect remaining parts of tank to be in similar condition. Bulkhead stiffeners wasted away by 75%. CBT 2 Port found in unclean condition in certain bottom areas due no bottom gunclean machines, suspect fuel oil cargo contamination; will require hand cleaning. Note 5 port CBT is equipped with bottom gunclean machines.

. . .

IG system to completely test and overhaul including deck seal.

Bridge control in poor and unknown condition.

Boiler automation will require complete overhaul.

Ballast tank anodes completely wasted.

Deck piping in good order.

Wast[e] heat boiler unable to sustain turbo generator full load.*Cost to upgrade to Hellespont Standard*

in ancillary equipment as a result of the vessel being a storage tanker. Apart from the very suspect condition of the segregated ballast tanks the hull and main deck including fittings are good. The "Cost to upgrade to Hellespont Standard" was arrived at and included in the report by Mr. Reilly at Mr. Dunn's request after an initial discussion of the draft report between Mr. Dunn,

Copr. © West 2009 No Claim to Orig. Govt. Works

Mr. Reilly and Captain Powell. Mr. Reilly's evidence was that it was not his brief to cover contingencies or unexpected problems, and he also omitted any items that would be done by the crew. He believed that Mr. Dunn or one of his colleagues asked him not to include any such allowance.

Under the detailed "condition report" incorporated in the report, Mr. Reilly included the following: Forecastle, Main and Poop Decks

Good all round, Suspect all decks blasted and coated two years ago, but no maintenance since then.

. . .Cargo Tanks

2 Centre inspected. No coatings or anodes . . .All pipelines, valves, fittings and dresser couplings in very good condition. Tank surfaces very clean. Negligible sediment or scale, only light even corrosion.. . .Ladders very good, possibly renewed.

. . .Cargo Heating Coils

Tanks inspected. Coils seen intact. . . .

Deck stands in satisfactory condition. Coils have not been used for 2 years.Ballast Tanks

5 Starboard CBT:

No coatings. Fixed anodes 100% wasted. Tank clean, showing small amounts of scale and sediment at bottom. Pitting confined to horizontal frames and brackets to a maximum of 4mm. Overall condition of tank very good showing minimum wastage, sharp edges in as new condition. Consistent pattern of mild corrosion everywhere. Tank clean machines in good order. Ladders in as new condition. A 200mm crack found along end of weld of 2nd stringer connection to aft bulkhead, crack not into bulkhead. Deck head and beams good. Heating coils intact but aft part of tank seen with a number of coils buckled.

2 Port CBT:

Similar condition to 5 port but found many areas with fuel oil sediments due no bottom tank clean machines.

One valve operated by reach rod found valve wheel with broken spoke, iwo yoke.

3 Port SBT:

Tank full but seen handrails and brackets badly wasted. Suspect remaining part of tank to be in similar condition.

7 Port and starboard SBT:

Tanks full but top 3 metres sighted from ladders. Found extensive wastage, delamination of all beams and stiffeners, ladders also badly wasted.

In particularizing the six permanent ballast tanks, Mr. Reilly noted that they were not coated and that they had been fitted with anodes, which were 100 per cent. wasted. He explained in evidence that the basis for this was his observation that there were anodes in No. 5 clean ballast tank which were completely wasted. He had assumed that the permanent ballast tanks had also contained anodes but suspected that any such anodes would also have been completely wasted.

In relation to machinery, Mr. Reilly's report commented that the bridge control was out of use and the automation in generally suspect condition, that the oil fired boilers had to be manned at all times during firing, that the exhaust gas boiler could not sustain a full load on the turbo-alternator, that the inert gas system had not been used for two years and that the general condition of the engineroom auxiliary equipment was good but that its planned maintenance was suspect.

During the course of the day, photographs taken by Mr. Reilly on his inspection (appended to the report in its final form) became available. At 12 39 a.m. on Aug. 16, Captain Kazazis sent to PSMSL for Mr. Dunn's attention a fax giving his views on the vessel. According to Mr. Reilly, there had been some discussion about its contents between the two of them in Greece before Mr. Reilly left for London.

Re m.t.Ocean maid

Vsl inspected on 14/8/89 from 0900 to 1500 hrs

We wewre (sic) not permitted to stay more.

We expressed to owners rep. our intention to inspect as many tanks as possible but they did not permit us on our request to visit vsl. on 15th or 16th, they said no because owners rep. Mr Rodas would be busy.**566**

The vsl was bought from Tsakos co.2,5 Years ago and timechartered by iraqis and stayed in Aqara alongside for two years.

The crew was mixed Greeks-Arabs-Spanish-Filipinos.

Master-cheng-2nd eng. Greeks they seemed not very knowledgeable and I doubt if they have maintained the vsl well.

General condition very good, hull strb side in very good condition. Port side with some rusty spots mainly from fenders. Main deck had been sandblasted two years ago but since then no paint had been applied. Main deck requires immediate attendance.

Machinery on deck look good. Almost all pipes on deck such as cargo-cow-steam lines etc have been renewed

Cargo tanks inspected 2p-2c-5s all in very good condition. Pittings 3mm max 5mm. Anodes completely gone. Permanent ballast tanks f/p 3w-7w were full of ballast and a very superficial inspection took place.3W and 7w condition of under deck and ladders very bad. Stringer almost 60*** Wasted. I believe that steal(sic) work should take place there.

P/room reasonable. Requires cleaning-painting. Decks of p/room in very bad condition-dangerous I would call it. Bilges with water and ballast pump leaking from mechanical seal.

IGS. They never used IGS for more than two years. It is doubtful if it works ok. Port Blower ceased. A thorough overhauling and possible change of some parts should be taken into consideration. Deck seal "dry type".

COW machines type Misuzo their condition unknown. However cargo tanks were clean except 2P which in some place was oily. An overhaul of the machines should be taken into consideration

Engine room looked ok. Vsl has two big boilers and they used 3 firemen on watch because automation out of order.

Two d/g, one turbine. One d/g out of order and on voyage from Aqaba to Piraeus they used turbogen and boiler instead of gas boiler.

Consumption of one boiler for t/g and fuel heating about 15-17 tons daily as per cheng.

Vsl was alongside for two years and I am not sure if cheng was doing the normal maintenance of engine room.

I believe a lot of money should be spent in engine room especially for boilers. As vsl was not trading normally and once it seemed to me that vsl was not maintained properly, we may face unexpected problems. Master-cheng seem to ignore few basic things on vsl's operation which betraying indifference. For example cheng had to look on vsl's particulars to find out the type of water generator. Captain did not know which tanks were CBT. Vsl was built on 1972 and it was in good condition for fer (sic) age. We could find more if we had more time for inspection.

### III.7 *The discussions on Aug. 16 with Mr. Dunn and Captain Powell*

Mr. Reilly's report was discussed at some length with Captain Powell, who had some 40 years' technical and financial experience in the shipping industry including 23 years at sea, as well as with Mr. Dunn. According to Mr. Reilly's statement, the discussion embraced the steelwork. Although Mr. Reilly said when giving evidence that he could not recollect this, it seems probable in the light of the steelwork's importance. The question mark which Mr. Reilly had put against the cost of steel repairs remained unchanged after these discussions. Mr. Reilly explained, and Mr. Dunn confirmed in evidence, that Mr. Reilly felt unable to give a figure for the steelwork because he had not been able to gain access to the permanent ballast tanks. Mr. Reilly suspected, as his report indicated, that the remainder of the permanent bal-

Copr. © West 2009 No Claim to Orig. Govt. Works

last tanks would be in similar condition to the very limited parts under the deck-head which he had observed. To this he made the qualification in evidence that it was normal to find such tanks in worse condition at the top and to find "as you progress to the bottom, things remarkably improve", a proposition which cannot be accepted unequivocally and which I consider further in Part V.2 below.

Mr. Reilly described Mr. Dunn as "very keen" to put a price on the steelwork but Mr. Reilly told him it was impossible. Mr. Reilly at one point suggested that, in those circumstances, it was for Mr. Dunn, with all his experience and knowledge, to make the decision for him. In reality however there was no way in which either Mr. Reilly or Mr. Dunn could assess the order of costs which would actually be involved in steel repairs. Any attempt at an actual figure might prove too high or too low.

### III.8 *Mr. Anderson joins the meeting*

According to Mr. Reilly, his role came to an end after he had made clear his inability to price the cost of steelwork. At some point, probably in mid-afternoon, Mr. Anderson joined the meeting, and Mr. Reilly was present as a spectator while Mr. Anderson pressed Mr. Dunn on more than one occasion to give, as Mr. Reilly put it at one point, "a bottom figure for all the repairs". That Mr. Anderson did press Mr. Dunn for some figure was common ground between Mr. Reilly, Mr. Anderson and Mr. Dunn. Mr. Reilly's phrase would fit with Mr. Anderson's insistence being directed not so*567 much to the steelwork alone, as to the whole of whatever refurbishment costs would be required. Other evidence made this contentious. The defendants' case is that the bottom line figure sought related to steelwork only, and that a figure of U.S.$1 m. was given, for steelwork alone, which when added to Mr. Reilly's specific items led to a round figure total of U.S.$2 m. for repairs.

Mr. Dunn's original statement described what happened as follows:

Mr. Anderson explained that in order to consider whether this vessel may be suitable for Red Sea, he had to

have some idea of the cost of the steelwork, and I recollect him asking whether the work could be done for US$500,000 or US$1 million. I explained that since we had not gained access to the tanks, it was impossible to assess how much steelwork would be required, but suggested that he allow $1 million as a guide, which based on my past experience, I believed would comfortably cover the work to be done. Mr. Dunn's supplementary statement dated Apr. 17, 1996 and evidence in chief on May 22, 1996 added to this account, after the phrase "impossible to assess", the word "precisely". His oral evidence was that, despite the lack of access and inspection, a judgment could be made based on a number of factors, including his experience and what had been seen elsewhere on the vessel, although the judgment would remain imprecise unless and until the tanks were emptied and were the subject of ultrasonic testing. While emphasizing the difficulties of visual inspection using a flashlight, he accepted on the first day of his cross-examination that it would have been preferable to see the inside of the permanent ballast tanks empty, and that this would "tell you more" and given an immediate impression as to how serious the corrosion was. On the second day of cross-examination he again described Mr. Anderson's insistence on a figure, this time as follows:

He said that he needed a figure. I said, "We cannot give you it, unless we have ultrasonics, to be able to assess precisely what the cost would be for steel renewal". We needed to know the amount to be replaced, and it was difficult, without having ultrasonics, for us to come up with precise figures. The account of the conversation with Mr. Anderson given on the second day of Mr. Dunn's evidence differs from that set out in his original statement and in suggesting for the first time that ultrasonics were actually mentioned. Mr. Lyon submits that the plaintiffs are bound by this answer, having failed to challenge it directly. In my judgment the whole question of Mr. Dunn's thought processes was sufficiently put in issue throughout his cross- examination. No unfairness can in my view have arisen to him or to other defendants from the failure to challenge this particular account of the conversation with Mr. Anderson directly. I had ample opportunity of seeing and forming a view on the general reliability of Mr. Dunn's evidence.

Whether an inability to undertake ultrasonics, which are not normally taken or available on a pre-purchase inspection, or to obtain *precise* figures for steel renewal was the real concern at the time was clearly in issue during Mr. Dunn's evidence.

Mr. Reilly in a supplementary statement dated May 9, 1996 introduced into his evidence a similar theme regarding the difficulty of coming up with a precise figure without ultrasonics. He suggested that the only way of compensating for the uncertainty would have been to put in a figure that was almost certainly too high, and that, if he had been forced to give a figure for the steel at the time, he would have allowed a total of 80 tonnes, so that he had thought Mr. Dunn's U.S.$1 m. "a very generous allowance indeed". Mr. Reilly proved unable to sustain this evidence satisfactorily under cross-examination, accepting that the reason for his question mark was that he could not come up with even an approximate figure, and that any figure might have been too high or too low.

I find that Mr. Reilly's and Mr. Dunn's real concern at the time was not with the precision of any figure which might be produced or with the absence of ultrasonics, but with the impossibility of making even an approximate assessment without having had access to the permanent ballast tanks in an empty state for the purpose of a visual assessment. I find also that this was the concern which they communicated to Mr. Anderson. This leaves for consideration whether an "allowance" could be or was nevertheless made for the resultant uncertainty, large enough to cover all eventualities, as Mr. Anderson and Mr. Dunn suggested in their evidence. I return to that in Part III.10 below.

III.9 *Mr. Dunn's explanation of the figure given for repair costs*

In his statement Mr. Dunn said:

The allowance of US$1 million for steelwork would have allowed for approximately 300 tonnes of steel at the then current prices, and was in my view a generous allowance for steelwork for a vessel in class of this age and size. He said orally that this was not justification

with hindsight; he had actually had a figure of 300 tonnes of steelwork in mind on Aug. 16, 1989, and had used a price of U.S.$3/3.5 per kilo of steel renewed prevailing at that time for work in Perama mentioned to him not long previously by Mr. Papachristidis. Mr. Dunn after some fluctuating evidence did not suggest that he had mentioned this**568** to Mr. Anderson as the basis of any figure given. Mr. Reilly on the other hand did at one stage suggest that Mr. Dunn had reached a figure of U.S.$1 m. after expressly mentioning to Mr. Anderson in his hearing a steelwork price of U.S.$3 a kilo prevailing at Perama. Mr. Reilly first called this the place "where the work would be done" later correcting it to a place "in the neighbourhood". Mr. Anderson recalled no reference to 300 tonnes of steel. Mr. Papachristidis suggested that 300 tonnes "rang a bell" but could not in the end tell the basis of the ultimate figure of U.S.$2 m. of which he was later told by Mr. Anderson and/or Mr. Dunn; he said only that it was "very conservative" and there was "no risk of exceeding it". Mr. Anderson and Mr. Reilly both supported Mr. Dunn's evidence that he gave a general figure of U.S.$1 m. for steelwork. The defendants submit that I should accept Mr. Dunn's evidence and that any other conclusion would be tantamount to saying that he and other witnesses were lying.

It is appropriate to examine some of the factors which were prayed in aid to explain the figure of U.S.$1 m. Taking first the suggestion that it was based on an estimate or assumption of 300 tonnes of steelwork, there is no suggestion that there was anything like a calculation where or how such a quantity of steel might be required in the permanent ballast tanks. Nothing in the experience of Mr. Dunn or anyone in the Papachristidis organization had extended to steelwork renewals of anything like 300 tonnes. Mr. Dunn's personal experience was limited to steel renewals of a maximum of 50 or 60 tonnes. Mr. Papachristidis said "we were totally taken aback" when another vessel (*Hellespont Spirit* ) was not long afterwards found to require 100 tonnes. It was, Mr. Papachristidis said, a "huge" shock to learn of the need for work on that scale on *Hellespont Spirit* . The Papachristidis organization had only the most limited experiences of any tanker approaching *Ardent* in

age and size. It had no truly comparable experience of tankers of *Ardent's* size and age at all. *Hellenic Faith* , of 1968 build, had been acquired by the Papachristidis organization when only four years old, and had been extensively altered in 1981. *Armour* built 1972 and acquired in June, 1989 had been seen in drydock. Despite the criticisms of her pre-purchase inspection in these proceedings, it noted extensive works being done in the permanent ballast tanks, and that the upper levels of the forepeak were in an acceptable condition, while expressing the reservation (mentioned in Part III.7 above) that the lower levels of the forepeak which were submerged on the inspection could give cause for concern.

In seeking to explain what in his past experience enabled him to fix on the figure of 300 tonnes, Mr. Dunn said this:

Based on the experience we have had with similar size Aframax tankers and the fact that we have a low steel renewal and that the vessel itself looked in reasonable shape, the general knowledge of the industry as a whole, 80 to 100 tons seems to be what the average people would be putting in at, say, around third special survey [i.e. in or about a vessel's fifteenth year]. As far as I am concerned, I felt that I was able to make that judgment. In his supplementary statement Mr. Dunn added that he believed that, for vessels of *Ardent's* size and type, steel replacements of 80-100 tonnes would have been carried out by yards with reasonable frequency. He also emphasized in evidence the comfort to be had from knowing that the vessel was in class and had passed her third special survey in 1986, and from the condition of other cargo tanks seen by Mr. Reilly. None of these matters appears to constitute a basis for arriving at any figure for steelwork, let alone an estimate or allowance of 300 tonnes. A need for steelwork of 300 tonnes or costing U.S.$1 m. must have thrown major doubt over the vessel's classification, despite Mr. Dunn's denial in evidence.

Any suggestion that a vessel requiring this sort of steelwork should be acquired for the Red Sea fund would, as Mr. Papachristidis acknowledged, have been "very dramatic". Mr. Papachristidis said at one point that "I do not think that we were actually thinking at the time that the vessel would require as much as 300 tonnes of steel to be repaired. . ." and at another that -

. . .I would have taken our lack of experience with such enormous steel repairs as reinforcing our confidence that this vessel could not possibly have had this much steel to renew. I believe this to be correct, not just in the sense that they were hoping that the steel required would be less than 300 tonnes, but also in the sense, contrary certainly to Mr. Dunn's and in places perhaps also to Mr. Papachristidis' evidence, that they did not conceive that it could require so much steel. Had they envisaged that it could, I do not believe that they would have pursued any further interest in the vessel.

In his oral evidence, Mr. Dunn eventually accepted that, upon even a brief visual inspection of the vessel's permanent ballast tanks, it would have been obvious that there was "very severe" corrosion in them. He went on in that context to deny that he was told as much specifically by Mr. Reilly on Aug. 16. It is not easy to reconcile Mr. Dunn's suggestion that Mr. Reilly did not tell him of "severe" corrosion on Aug. 16, 1989 with his evidence the he had in mind the possibility of steel**\*569** renewals in the permanent ballast tanks extending perhaps to as much as 300 tonnes.

As to the suggested prices, Perama is about three miles from Piraeus and is a well-known area where vessels can undertake repairs, outside any yard, using local contractors and crew. But Mr. Dunn and PSMSL had never used Perama, although HSC apparently had. The prices which Mr. Dunn took derived, he said, from a conversation in July or August, 1989 during which Mr. Papachristidis mentioned that he had heard from friends in the shipping industry that good and cheap repairs could be carried out in Perama at rates between U.S.$3 and U.S.$3.5 per kilo, compared with prices of over U.S.$5 per kilo in local shipyards. Mr. Papachristidis was unable to confirm this conversation. No decision to use Perama for repairs on *Ardent* was taken until after her acquisition, probably until October, 1989. The conversation recounted by Mr. Dunn, assuming that he has correctly recalled its content and date, could not have constituted a firm basis for any assumption that any steelwork necessary on *Ardent* could be undertaken at

the prices mentioned, or indeed at Perama at all. I accept that Mr. Dunn was aware that there was some prospect of using cheaper repair facilities such as those available at Perama, but I do not think that, in August, 1989, he was in a position to base - or would have based - any assessment of steel repair costs on any putative Perama figure of which he had by then heard but had no direct experience or knowledge. He would have been speculating if he had done so.

On Mr. Dunn's account, the figure of U.S.$1 m. was taken as the price of steelwork the subject of Mr. Reilly's question mark. The other items priced by Mr. Reilly totalled U.S.$1,005,000. The combined total in round figures was U.S.$2 m. On this basis, on the face of it, Mr. Dunn was not allowing any sum for any overhauling other than in respect of the specific matters identified and costed by Mr. Reilly.

In his statement in chief, Mr. Dunn made several references to comments by the inspectors suggesting that work would be necessary upgrading the vessel to Hellespont standards. For example, in the telephone conversation he recalled them reporting that no work had been done on the vessel for two years, and Mr. Reilly as mentioning that "the engine room needed a lot of work". He said also that he suspected from Captain Kazazis' telex that -

. . .little maintenance had been carried out on deck whilst she was on storage duty, because the port authorities would not have allowed it when cargo was on board. He referred to the vessel "obviously suffering from a lack of maintenance". In cross-examination, when being asked why he had not attempted any form of calculation of the cost of other overhauls, he suggested not only that he would not have known what it would be, but also that Mr. Reilly had told him on Aug. 16 that "everything looked okay in the engine room" and given him "the impression that it was fine".

Reminded of his statement about what Mr. Reilly had said on Aug. 14, he then suggested that his view had been that -

. . .the lot of work that was needed would be covered

within the engine room was covered within [Mr Reilly's] $1,005,000. A little later he amplified his response that there was slack in Mr. Reilly's figures by making particular reference to the figure of U.S.$500,000 for "full grit blast underwater parts and coat", which it was common ground was intended to embrace all drydocking work.

I have come to the conclusion that these responses by Mr. Dunn derive from hindsight and attempted but inaccurate reconstruction. They do not, in my view, reflect Mr. Dunn's actual thinking at the time. Mr. Reilly's specific figures were the product of discussion with Captain Powell and Mr. Dunn on Aug. 16. They were, I find, figures which were conceived as appropriate to cover the items to which they related. They were not viewed as covering or containing "slack" to cover other matters. Mr. Dunn himself recalled in his original statement in November, 1995 that the costs estimates reached by Mr. Reilly were the result of discussions with PSMSL's own superintendents "who had recent experience of similar items" and went on to say:

I was also happy that the estimates were reasonable based upon my own experience. Later, in relation to the drydocking cost allowed by Mr. Reilly, he said specifically:

I expected that an allowance would need to be made for gritblasting and renewal of the anti-fouling in line with the allowance of US$500,000 that Mr Reilly had made. It is correct that at this stage the plaintiffs' complaint was of failure to allow for certain specific items and did not yet extend to general overhauling of other items. But there is still an inconsistency between, on the one hand, Mr. Dunn's account in his witness statement (which corresponds with Mr. Reilly's account to this day) as to the derivation and basis of the specific figures provided in Mr. Reilly's report and, on the other hand, Mr. Dunn's suggestion in evidence that he viewed Mr. Reilly's specific figures at the time as containing sufficient slack to cover other, unidentified overhauling. **\*570**

The defendants criticized the manner in which this point has been raised by the plaintiffs. Whether Mr. Dunn ap-

proached overhauling in the way suggested in his oral evidence was put generally in issue in cross-examination. It is not a cross-examining party's obligation to put every inconsistency in a witness's evidence to that witness. The cross-examination in this case cannot be criticized for its lack of thoroughness on either side. The facts are in my view quite simply obscure in many respects, and, as I have said, I formed the view that much of the evidence on both sides was simply reconstruction, and frequently vulnerable to the pressures of litigation and wishful thinking. It is for me at the end of the day to do my best to arrive at the probable factual position. I am satisfied that Mr. Dunn had a fair opportunity of explaining his position.

Mr. Reilly had been expressly instructed not to allow for contingencies, unexpected problems or crew work, and his specific figures made no allowance for general overhauling. His original witness statement said this of the specific figures which appeared in his report:

In the course of our discussions, John Dunn had requested me to add a section to my report dealing with the "Cost to upgrade to Hellespont standards" which I understood to mean the cost of upgrading to the standards required by oil majors. The figures I inserted in that section are the figures I felt comfortable with at the time, based upon my own experience and discussions with superintendents at PSMSL's offices that morning. If I had thought more or less should have been allowed for these items, or other major items required repair, I would have said so in my report. It was not within my brief to make any contingencies for unknown items or to assess the cost of work to be carried out by the vessel's crew or in-house team and I did not do so. I recall discussing these figures with John Dunn and Captain Powell who, I believe, also felt they were reasonable estimates. I remember also discussing the steelwork with John Dunn and Captain Powell at some length. We were both aware from my report of my inspection that considerable steelwork would have to be replaced in all the segregated ballast tanks, including the forepeak. Because I had been unable to gain full access to the ballast tanks, I felt unable to estimate the cost of steelwork repairs, and I therefore put a "question mark" against this

item in my report. In his supplementary statement, Mr. Reilly said that he believed that he was asked by Mr. Dunn or one of his colleagues not to make any specific allowance for items which would be overhauled by the vessel's crew or repair team, and suggested that, if any allowance was to be made for other overhauling, U.S.$80,000 to U.S.$100,000 would be appropriate.

Mr. Anderson also said this in his original witness statement in relation to the position on Aug. 16, 1989:

Before I joined them, JD and SR had already discussed and agreed that approximately US $1 million was needed in respect of several particular items which are noted in SR's inspection report and I do not remember there being much discussion about these specific items. The different picture which Mr. Anderson gave of events at the very end of his evidence does not suggest that the specific costs were viewed as covering anything other than the items to which Mr. Reilly related them:

What I recollect, the thing that I would be interested in basically was that summary section where [Mr Reilly] would be talking about the vessel and how much each item would cost, and we would review that, and then we talked about the steel. Definitely, we looked at, I think - we reviewed that data. The upshot is that I do not accept that Mr. Dunn viewed Mr. Reilly's figures as covering any matters other than those to which they specifically related. But it is clear, in my view, that other overhauling, not covered by Mr. Reilly's specific figures, must and would have been envisaged by someone of Mr. Dunn's experience. Mr. Dunn's evidence was that (leaving aside the state of her ballast tanks) he gained a satisfactory impression of the vessel's condition, that he would not have known what provision to make for any unexpected problems that might emerge, that, if he had wanted a more precise estimate he would have asked a surveyor since that was not his job and that he did not feel that there would be any significant repairs for work which could not be taken care of by the vessel's crew or a repair team. Later in this judgment, I shall consider the expert evidence about the level of costs to which a detailed assessment of the likely overhauling required would have led (see Part VI.1 and Appendix A). Mr. Dunn himself did not undertake or instruct any such ex-

ercise. Nonetheless, I believe that he would have had in mind that allowance must be made for overhauling costs, over and above the specific items for which Mr. Reilly provided and the steelwork, and, further, that these would include some work which could only be done by contractors, as opposed to crew.

I find it difficult to think that Mr. Dunn regarded this as insignificant. He should not have done. Further, it is clear that he cannot have regarded the steelwork required as insignificant. The likelihood appears to me that he took a broad brush view of the **\*571** total of all costs likely to be incurred upon acquisition of *Ardent* . That was what Mr. Anderson must have wanted, and some parts of his evidence were in terms which would be consistent with this:

[Q.] Did you ever tell the other directors of the Red Sea Fund that your inspector had told you that we may face unexpected problems because this was a vessel which had not been maintained properly? [A.] No, because that is what the $2 million was supposed to do, bring it up to the Hellespont standards. We knew that the vessel had not been maintained properly.

[Q.] Turn back to [the page of Mr Reilly's report costing specific items for repair]. Where. . .can you find anything in that to cater for the unknown, for the unexpected problems that Mr Kazazis is specifically drawing your attention to? [A.] I do not know. As far as I was concerned, I assumed that they had talked it over between themselves and Mr Dunn, and this was the estimate they were coming up with. The "this" in the last answer was, I think, a further reference to the U.S.$2 m. It is right to add that in other parts of his evidence, Mr. Anderson said that the U.S.$1 m. was for steelwork alone, but, when questioned specifically about this, he could say only that he believed and was "under the impression" that it was for steelwork only, and did not recall it being for anything else. In re-examination he also indicated the he had no actual recall of the precise way the conversation about the U.S.$1 m. went. Mr. Anderson's evidence also made it clear that the whole discussion, such as it was, with him on Aug. 16, 1989 was short. Mr. Anderson put his participation at about 20 minutes to half an hour.

The likelihood in my judgment is Mr. Dunn was pressed for an overall figure and gave Mr. Anderson an overall figure in the sum of U.S.$2 m. to cover all repairs. This figure was not a simple sum of U.S.$ 1,050,000 (for Mr. Reilly's specific items, or for those items including "slack" as Mr. Dunn suggested) and U.S.$1 m. for steelwork. It was an overall assessment. A major factor in arriving at it was certainly the open question mark in respect of steelwork. I do not think that Mr. Dunn was thinking of anything like as much as 300 tonnes. The U.S.$2 m. was also intended to allow for general overhauling. Save that it embraced Mr. Reilly's specific items and figures, the U.S.$2 m. was not the result or object of any process of detailed calculation or breakdown.

### III.10 *Was the figure of U.S.$2 m. an estimate or an allowance for all eventualities?*

In addition to Mr. Dunn's statement that he believed the U.S.$2 m. very conservative, Mr. Anderson said in evidence that his "impression at the time was that the overall estimate of U.S.$2 million if anything erred on the generous side". Mr. Bouckley recalled that he was told that repairs might cost as little as U.S.$1.5 m., evidence which I accept, although Mr. Bouckley's dating is suspect. I accept that Mr. Dunn did believe that U.S.$2 m. was a generous figure and that the overall repair costs would be contained within the U.S.$2 m. and could well be less.

Whether there was an adequate foundation for such a belief is a matter which I will consider in detail in Parts IV and V of this judgment. But it is clear that Mr. Dunn's overall figure was not the result of any analysis of actual sums which might be required for overhauling, steelwork or other events. Further, it cannot be viewed as a total which allowed for "any" eventualities which could be foreseen on Aug. 16, 1989. When pressed by Mr. Anderson for a figure, Mr. Dunn took a broad brush budgetary figure which he thought generous and likely to suffice. But he did not arrive at it by any calculation or analysis of what eventualities might materialize, still less of what a "worst case" scenario might represent, and it did not objectively cover either.

This view of the position also accords with the way in which Mr. Dunn himself put it to Mr. Bouckley, as noted by Mr. Bouckley, on Sept. 26, 1989 after delivery had been taken of *Ardent* :

John says the ship isn't in bad shape, and he still anticipates the repairs will be done with the $2MM budget. The only word of caution he has made is they still have to empty the ballast tanks and see what condition they're in because they know there is work to be done on them. Obviously, until they've emptied the tanks they won't know the exact work that is needed. This does not suggest that Mr. Dunn thought that he had allowed for *all* eventualities, rather that he had a budget which he believed to be generous but could not be certain about until inspection of the tanks after emptying.

Again on Oct. 12, 1989, as Mr. Bouckley noted, Mr. Dunn reported that -

. . .the Ardent's expenses, which are still an estimate, are more or less as expected. They still don't know when she's likely to start loading, but John estimates it will probably be another forty days before this happens. He's waiting to hear how long the steelwork will take to complete in the ballast tanks before he has a better idea. This timing is more or less in line with what John thought the time frame would be when we were in Athens. Basically, the Ardent needs much of the engine room, etc. replaced and this is what they're doing.**572

### III.11 *Mr. Papachristidis' involvement*

It is not easy to evaluate Mr. Papachristidis' evidence or position. None of Mr. Papachristidis, Mr. Anderson and Mr. Dunn claimed any real recollection of any discussions with Mr. Papachristidis about *Ardent* , either on Aug. 16 or subsequently. At the end of the day I am unable to place any great reliance on the accuracy of the attempted reconstructions of conversation or conversations to which Mr. Papachristidis was party, and Mr. Papachristidis' involvement remains shadowy. He was in the office on Aug. 16, and Mr. Anderson was due to leave on vacation on Aug. 18, when Mr. Papachristidis also flew abroad. All three of them believed that Mr. Anderson and Mr. Dunn would have discussed *Ardent*

with Mr. Papachristidis on Aug. 16, but whether together or separately is quite unclear. There is no reason at all to doubt that there would have been some reference to *Ardent* between them, in view of the closeness of their working relationship. Into how much detail the conversation would have gone is a different matter. Although it is a long time ago, it appears to have left no impression now on any of their minds. Mr. Papachristidis believed that he would have read both Mr. Reilly's report and Captain Kazazis' telex, although he stressed the limitations of his technical understanding. He thought that he would have discussed the overall budget of U.S.$2 m. with particular reference to steelwork, and would have been aware that Mr. Reilly had not gained full access to the segregated ballast tanks. Commenting on the understanding which he would have had in his witness statement he said:

. . .everything I read about the hull was positive, except for the severe wastage in the top section of the segregated ballast tanks. I knew from my experience at the time that the spaces in a ship that are most vulnerable to corrosion are precisely these areas. This is because a vessel's ballast tanks are seldom filled to the brim. The anodes (which were generally found to be totally wasted and which therefore had clearly been doing their job) are not able to exert the cathodic protection in that part of a tank which is not immersed. Generally speaking, however, a combination of anodes and remaining coatings in the immersed section of ballast tanks will ensure a fair degree of protection. In other words, the findings of Reilly and Kazazis as to the upper reaches of the segregated ballast tanks, whilst of concern to me would not constitute a departure from the general pattern of corrosion aboard a ship and would not of itself have condemned the balance of the ballast tanks. Mr. Reilly's report in fact indicated that *Ardent* had no coatings. Whether anodes have been "doing their job" must depend on when they were last renewed. Mr. Papachristidis' comforting conclusion regarding the corrosion noted and its implications for the balance of the permanent ballast tanks do not reconcile easily with Mr. Reilly's actual report, or with the suggested discussion about steelwork. Mr. Papachristidis in evidence suggested that, since the cargo tanks were reported to be in relat-

ively good condition, it would have been logical to assume from Mr. Reilly's report that the ballast tanks would also be in relatively good condition. Neither logic nor experience justifies the suggestion, and elsewhere Mr. Papachristidis acknowledged that the percentages of corrosion in permanent ballast tanks reported by Mr. Reilly and Captain Kazazis were very high. In each connection, as elsewhere throughout his evidence, he suggested that he would have relied on the interpretation and advice given by others, here Mr. Dunn. I do not accept that Mr. Papachristidis, with his experience and grasp of affairs, was incapable of independent thought or initiative on such matters. The likelihood is that he did not devote any great time or effort to analysing or discussing the position in respect of *Ardent* .

In particular, and as I have already indicated, I do not accept that there was discussion at this stage of steelwork costing anything like U.S.$1 m. Such discussion as there was no doubt involved Mr. Anderson putting forward *Ardent* as a suitable candidate for the fund and discussing her market value and, in that light, an appropriate price level and Mr. Anderson and/or Mr. Dunn informing Mr. Papachristidis of Mr. Dunn's estimate of up to U.S.$2 m. for upgrading. Mr. Papachristidis claimed no specific recall, though saying that it was inconceivable that he would not have read Mr. Reilly's report and Captain Kazazis' telex before discussing the vessel with Mr. Anderson and Mr. Dunn. He would not have picked up either any discrepancies between the two or any items not specifically costed by Mr. Reilly, save for the permanent ballast tanks. He would have known of the fact that they had not been inspected. He could not recall whether Mr. Dunn told him of Mr. Reilly's inability to place any figure on their repair, but would at least have seen the question mark on Mr. Reilly's report. He would have understood that Mr. Dunn's estimate of U.S.$2 m. was put forward in that context. Assuming all of this to be so, the conversation left no mark on the memory of anyone. A memorandum of Dec. 11, 1989 suggests that by then Mr. Papachristidis had no, and certainly no clear, memory of any conversation prior to the acquisition of *Ardent* in which repair costs of U.S.$2 m. had been mentioned for *Ardent* alone. It is thus difficult to accept that Mr. Papachristid-

is went into the matter in any detail or himself made a serious attempt to evaluate the vessel. He must, I**573 think, have been content to rely on Mr. Anderson and Mr. Dunn, as indeed his evidence stressed.

### III.12 *The decision to recommend Ardent*

The defendants' case is that it was decided on Aug. 16 to recommend *Ardent* to Red Sea for purchase and that the recommendation was made to and approved by Red Sea directors on the same day. The plaintiffs challenge this and suggest that both the decision and the recommendation were later. Although this is not itself a critical issue, it acquired added significance in the context of a suggestion by the plaintiffs that the delay in deciding to recommend *Ardent* reflected initial disfavour with which Mr. Dunn viewed *Ardent* and/or inner dissension between Mr. Dunn who (they say) was against the purchase and others (in particular Mr. Anderson, but also Mr. Papachristidis) who favoured it.

That, at least, serious consideration was being given to a purchase of *Ardent* appears to be confirmed by two draft offers submitted to Mr. Anderson by Mr. Rayner for consideration on Aug. 17 and apparently copied by someone within the Papachristidis organization to Mr. Dunn. The first draft called for the vessel to be delivered in substantially the same condition as when inspected, and for sellers to demonstrate prior to delivery that her equipment was in good working order. The second "for compensation purposes" was on "more straightforward as is" terms. However, neither included any price and no offer was formulated. Mr. Rayner suggested at one point that the second draft reflected some indication from owners that they would now only sell "as is" before drydocking. I do not accept that he had any real recollection on this or that this was so. The actual offer when made was in fact on terms reflecting the first rather than second draft.

After the two drafts, attention continued to be given to other available vessels on the market, which were the subject of communications between Mr. Dunn and Mr. Rayner on Aug. 22. The meeting of Aug. 23 was set up by Aug. 18, and centred on the question whether Red Sea should acquire a total of four vessels (as was in the

event decided) or five (as Mr. Reddy had wished). For this purpose between Aug. 21 and 23, Miss O'Donnell-Keenan prepared on instructions (though she could not identify from whom these came) a number of scenarios, catering for the possibility that either four or five vessels in total were acquired. Mr. Papachristidis was involved in the meeting, and took the sensible view that his organization had enough to manage with four vessels. A decision to limit the fund to four vessels was taken. The possibility of acquiring as the fourth vessel a storage vessel (in fact *Ardent* ) was discussed.

On the next day, Aug. 24, 1989, Mr. Bouckley sent a fax to Mr. Baarma with "the three likely scenarios". These were the three scenarios postulating the purchase of four vessels and considered at the previous day's meeting. Two of them postulated a fourth vessel costing U.S.$14 m., while the third postulated a cost of U.S.$17 m., in each case with additional drydocking costs of U.S.$500,000. Mr. Bouckley identified as "the most likely" one of the two involving a fourth vessel costing U.S.$14 m., and ended "We have started negotiations on 4th Vessel". Earlier, as it would appear, on the same day Mr. Dunn had instructed Mr. Rayner by telephone to send out an offer to buy *Ardent* for U.S.$11.5 m., a copy of which Mr. Rayner then sent to Mr. Dunn. Also on the same day Mr. Dunn spoke to Mr. Vouzounerakis and then sent him a copy of the proposed memorandum of agreement and asked for telex confirmation that it was in order to ask the brokers to make the offer (which it would appear had by then already been made).

Mr. Dunn, who was closely involved in the actual offer made but not at the meeting of Aug. 24, 1989, was not aware of any decision to "go for" *Ardent* prior to about Aug. 24. He said that Mr. Anderson, although on holiday, was "constantly in touch with Mr. Papachristidis and Mr. Rayner and they would have decided to go ahead with the vessel". The contact is borne out by Mr. Anderson's witness statement and other indications. According to his own itemized bill, Mr. Anderson initiated short calls to PL on 23rd and (on four occasions) on Aug. 25, a longer call to Mr. Rayner of Clarksons at home on Aug. 23 and two other longer calls to London on Friday Aug. 25, the first to TK Shipping, owners of a

vessel called *Golden Sunray* and the other immediately afterwards to Clarksons. Mr. Anderson believed that he also received an incoming call from Mr. Papachristidis after the Aug. 23 meeting. Mr. Papachristidis addressed to Mr. Anderson a note (which was either faxed or communicated orally) leading to Mr. Anderson's call to TK Shipping on Aug. 25. The note suggested that, since the owners of *Ardent* were not answering calls, PL "should try" *Ocean Sunray* . Mr. Anderson's call led him to the conclusion that this vessel was too expensive and not of interest. Mr. Anderson made three further calls to PL on Aug. 31 and one on Sept. 4. This information does not carry matters very far, but it is consistent with a decision only being made to pursue *Ardent* on and after Aug. 23.

Mr. Anderson's account, largely based on reconstruction, was that he was sure that he would have spoken to Mr. Bouckley, Mr. Henderson and Mr. van Brummen as directors of Red Sea on Aug. 16 or 17, before leaving on vacation on Aug. 18, and obtained their authority in principle to offer for**\*574** *Ardent* , but that something must have interrupted any pursuit of that vessel. He believed that it was the issue, not resolved until Aug. 23, whether to acquire a total of four or five vessels. Mr. Henderson, himself on holiday in mid-August, recalled no contact by Mr. Anderson. Mr. Bouckley's belief was that *Ardent* was not recommended to him until he received a telephone call, while still in London, from "someone within the Papachristidis organization". This was late on Aug. 23 or early on Aug. 24, after which he returned to New York. Monday Aug. 28 was a bank holiday in London, and it was not until Aug. 29 that he was able to contact Mr. Dunn by telephone, when he ascertained that they were on the verge of concluding a favourable deal. He said that Mr. Anderson thereafter rang him in New York to recommend the vessel, said that they had negotiated a discount of U.S.$2 m. on a price of U.S. $14 m. and hoped to do the repairs with a possible U.S.$200,000 saving. According to Mr. Bouckley, Mr. Anderson also said that the recommendation was subject to a satisfactory bottom survey and still later confirmed that such a survey had been satisfactorily completed.

If there was after the meeting of Aug. 23, 1989 some further conversation with Mr. Bouckley about the acquisition of *Ardent* either on 23rd or early on Aug. 24, 1989, it is difficult to identify with whom it can have been or to understand why it was necessary to leave it until after the meeting. It was not suggested that Mr. Dunn spoke to Mr. Bouckley then, though he certainly spoke with Mr. Bouckley about the purchase later on Aug. 29. Mr. Dunn said that recommendations for the board would have come from Mr. Papachristidis or Mr. Anderson. Mr. Papachristidis had effectively no relevant memory of events, but believed Mr. Anderson's account of a recommendation communicated by Mr. Anderson before his departure on holiday represented the most logical sequence of events. Mr. Papachristidis believed that the decision to go for *Ardent* would have been reached during the meeting.

The plaintiffs submit that the two scenarios postulating a fourth vessel costing U.S.$14 m. are inconsistent with any prior decision that the fourth vessel should be *Ardent.* Her cost could however be regarded as U.S.$14 m. if one added back the U.S.$2 m. allowed for repairs. That would not fit with the additional drydocking costs of U.S.$500,000 mentioned in each scenario. I do not however attach much significance to this inconsistency. On the view which I formed of Miss O'Donnell-Keenan and her role, she did not necessarily have a full understanding of the commercial aspects of the business, and there may have been some misunderstanding. It remains the fact that different scenarios were prepared and that *Ardent* cannot be expressly identified in any of them. This does not mean that *Ardent* was not seriously in contemplation, but it does suggest, consistently with other documentary indications, that she was not the only candidate in mind at the time as a fourth and last vessel.

The probability appears to me that *Ardent* was in contemplation as a possible fourth vessel from Aug. 16 onwards, but that PSMSL and PL remained interested in looking at other vessels and that this was not simply because of the uncertainty whether the fund would purchase four or five vessels in total. It is also true that no-one could be certain that the fund would succeed in buying *Ardent* , if and when it made an offer. I do not however believe that any real grounds existed in the second half of August, 1989 for thinking that *Ardent* was the subject of any other immediate interest or would become unavailable for purchase in the near future. The vessel had been on the market for a considerable time. Clarksons had asked owners' brokers how many others had inspected, and been told on Aug. 16 three or four others. All that Mr. Rayner could say was that he would have enquired who had inspected and that "I do not remember any other buyer offering at the time, but maybe I have just forgotten". There is no suggestion by owners' brokers and no documentary indication of any follow up or active expression of interest by any other prospective buyer. Within PL and PSMSL, the likelihood is, I consider, that *Ardent* was perceived as a serious possibility on and after Aug. 16, but that it was by no means a foregone conclusion that an offer would be made for her. Mr. Dunn would have known that there had been no such offer and was in contact with the brokers about other vessels. There is a fair inference that it was thought or hoped that there would prove to be other, more attractive vessels.

I have come to the conclusion that Mr. Bouckley is probably right in saying that it was only on Aug. 23 or 24 that *Ardent* was first identified to him as a vessel which PL actually proposed should be purchased as the fund's fourth vessel and that the recommendation to purchase was effectively made and at least implicitly accepted by Mr. Bouckley then and there, in likelihood during the meeting of Aug. 23, 1989. I do not accept Mr. Bouckley's evidence about a conversation with Mr. Anderson shortly after Aug. 29, or for that matter Mr. Baarma's suggestions (largely abandoned in cross-examination) that Mr. Anderson spoke with Mr. Baarma direct by telephone prior to the acquisition of *Ardent* . Mr. Bouckley was the channel by which Mr. Baarma was kept informed of the position. The likelihood is that the process of recommendation and approval, as it actually occurred once it had been decided to go for only four vessels, was informal and quick. It has been laden by the present**\*575** dispute with more significance and greater formality than it appeared to have at the time. The Red Sea directors were relying on PL and/or PSMSL to identify a fourth tanker of appropriate size,

age, condition and price, and were unlikely to question an unqualified recommendation of a particular tanker of the right size, age and price. There may well have been conversations between Mr. Anderson and Mr. Bouckley after the former's vacation ended on Sept. 4, 1989. It seems likely that Mr. Anderson did then mention that PL and/or PSMSL hoped that *Ardent* 's repairs might cost as much as U.S.$500,000 less than the budgeted U.S.$2 m., and that he also mentioned the provision for a diver's inspection in the sale contract. I do not however accept that Mr. Anderson purported in such conversations to recommend or seek Mr. Bouckley's approval for the purchase of *Ardent* , in respect of which a contract had already been agreed. Nor did he indicate that completion of the purchase was conditional on a satisfactory bottom survey.

The plaintiffs' case goes further. In their submission, there is material from which the Court can and should infer that Mr. Dunn's attitude to *Ardent* was or remained unfavourable, and that he cautioned Mr. Anderson and, to the lesser extent that he was involved, Mr. Papachristidis against any purchase of *Ardent* . The bases for this submission were unimpressive. The first, and strongest, of them consisted of a conversation which Mr. Bouckley had with Mr. Papachristidis in October, 1990, by when relations between the banks supporting Red Sea and PL and PSMSL had deteriorated. Immediately after that conversation, Mr. Bouckley wrote a note to Mr. Baarma. The note records Mr. Bouckley as saying as that it was unfair to put all the blame on Mr. Dunn and that Mr. Anderson was in his eyes the main culprit, and Mr. Papachristidis as responding that:

. . .the people who made the decision were Lou Anderson and himself with John Dunn trying to warn them that they were making a mistake. He said that ultimately John Dunn signed off on the three purchases in order to make it a "team" decision. Mr. Papachristidis denied that the note was a true record of any conversation or that the account attributed to him was true. However, I accept Mr. Bouckley's good faith, and that he made the note shortly after a conversation with Mr. Papachristidis about Mr. Dunn's role. I do not think that means that Mr. Bouckley achieved a precise recollection or tran-

scription of the effect of Mr. Papachristidis' words. Further, as he himself accepted, all he could do was attempt to reflect what Mr. Papachristidis said. All this took place over a year after the relevant events. Clearly, Mr. Papachristidis was minded at that stage to concur with Mr. Bouckley's comment about the unfairness of blaming Mr. Dunn alone. It is at least possible that in so concurring he went further than reality in an opposite direction. The suggestion that Mr. Dunn signed off "three purchases" to make it a team effort can, so far as appears, have no basis in reality. The earlier vessels were separately bought and the decision in respect of *Ardent* was a discrete decision. What does emerge from the note, and is capable of credence in my view, is firstly that Mr. Papachristidis regarded Mr. Dunn as a member of a team involved in the purchase of *Ardent* and secondly that Mr. Papachristidis viewed Mr. Dunn as the least responsible of the three in relation to the purchase. This would at least correspond with my view that Mr. Dunn would not have been entirely insulated from commercial discussions whether or not to purchase any particular vessel, but would have been the least influential of the three on such matters. As to the suggestion that Mr. Dunn tried to warn Mr. Papachristidis and Mr. Anderson that they were making a mistake, this may, conceivably, relate to or derive from Mr. Dunn's initial refusal and reluctance to give Mr. Anderson any figure for overhauling. Mr. Papachristidis was not of course present when that took place. Whether and when Mr. Anderson or Mr. Dunn said something to Mr. Papachristidis to reflect Mr. Dunn's reluctance is speculation.

The other two matters relied on stem from supplementary witness statements made on May 3, 1996, some eight days into the trial, by Mr. Henderson and Mr. Reddy. Mr. Henderson spoke of a conversation with Mr. Dunn, he believed after a September, 1990 board meeting, in which Mr. Dunn recounted that he had, at some unstated date, told "them" (Mr. Anderson in particular and also Mr. Papachristidis) "that if they continued to acquire vessels in the manner in which they were they would run into trouble". Mr. Henderson said that he had made no reference to this in earlier statements, because he had felt that it was "off the record". While I do not

doubt Mr. Henderson's good faith as a witness, I cannot attach significance to this recollection. Mr. Dunn had no recollection of the conversation. Mr. Dunn may well have made some self-justificatory reference to Mr. Henderson about warnings which he or his department had given about certain risks attaching to PL's and PSMSL's expansion of their activities in 1989. The contemporary documents show discontent within Mr. Dunn's technical department at the burdens placed on them in the context of maintenance, by the purchase of so many and elderly vessels. Further than that I do not think it possible to go. A statement said to have been recalled by Mr. Dunn a year after the relevant purchases and only recorded**\*576** in writing by Mr. Henderson over five further years later is inherently unreliable.

Mr. Reddy attested to a conversation with Mr. Dunn on a flight from Hamburg in May, 1991, during which he asked Mr. Dunn why Red Sea faced the problems it did and Mr. Dunn replied that it was because Mr. Anderson "ran amok" and Mr. Papachristidis had been preoccupied with the Tisch deal. Mr. Reddy said that his recollection of this conversation had been revived five years after the event. Mr. Dunn accepted that they had spoken on the flight about the reason for Red Sea fund's lack of success, compared he said to the HTL fund, and said that he had explained the difference by saying that the Red Sea ships "were much more difficult". This anodyne account, which would have told Mr. Reddy nothing which was not well-known, seems unlikely itself to represent the full picture. However, I am also quite unable to accept Mr. Reddy's account. If it were right, then Mr. Dunn would have delivered himself of a most undiplomatic comment, which would surely have been of great contemporary interest to Mr. Reddy and would not have been forgotten. Mr. Reddy's evidence was also generally unimpressive and in my judgment unreliable. The upshot is that I gain no assistance from this conversation either, though I do accept that Mr. Papachristidis' involvement in *Ardent* was probably limited by other preoccupations, particularly the Tisch deal.

### III.13 *The price paid*

I now consider in greater detail the price of U.S.$12 m. agreed for purchase of *Ardent* . It represented a consid-

erable increase over the sellers' original price indications of U.S.$9 m. on Mar. 6, 1989 and U.S.$9.5 m. on Mar. 22, 1989 increasing to U.S.$10 or U.S.$10.5 m. (through different brokers) at the end of May, 1989. The prices quoted over this period compare well with the price achieved on sale of *Saint Andrew* , a 1973 Japanese build 84,040 tonne vessel sold by her owners for U.S.$9.6 m. in late April/early May, 1989. Comparison with the asking price for *Ardent* between March/May, 1989 requires allowances to be made for various factors: (i) age, (ii) country of build, and (iii) deadweight. I find on the broking evidence that appropriate adjustments for these factors were at the time regarded as being (i) a 6 per cent. to 7 per cent. allowance per annum for age, provided that the vessels were within about three to four years of each other in age, (ii) a 5 per cent. to 10 per cent. discount for Spanish instead of Japanese build, with 7½ per cent. being a useful rule of thumb and (iii) a pro rata correction for differences in tonnage, at least for vessels of between 80,000 and 100,000 deadweight. In the case of *Saint Andrew* , a fourth relevant factor exists, namely that she was being sold after drydocking, which on the evidence would tend to increase her value on sale. Taking the first three factors, the price paid for *Saint Andrew* would imply a value of between U.S.$9.5 and U.S.$9.63 m. for *Ardent* in late April/early May, 1989.

It was common ground between the brokers that prices such as these would, in the absence of contrary information, be understood in the market as indicating the price of a vessel in reasonable condition for her age.

The market was described in evidence as "hot" and as rising throughout almost all of 1989, levelling off at the very end of 1989 and falling back slightly by March, 1990. The rise in market value of vessels of the relevant size during the period April to August, 1989 was up to, though not more than, about 25 per cent. Mr. Marsh made an unconvincing attempt during his expert evidence to suggest a larger increase. Figures produced by Messrs. Fearnleys show a 30 per cent. increase in the slightly longer period of March to September, 1989, a 26 per cent. increase from April to September and a 25 per cent. increase from May to September, 1989.

Applying this sort of percentage increase to the price suggestions given over the period March to May, 1989, the expectation would be of a value of between U.S.$11.75 m. and U.S.$13 m. in August, 1989 for *Ardent* in reasonable condition. Mr. Rayner and Mr. Marsh responded to the effect that a broker's attention would normally be focused on recent or current prices. No doubt this is so, but there were very few if any truly comparable sales in or about August, 1989, and Mr. Marsh's own expert report sought to draw assistance from two sales as distant as December, 1989 and March, 1990. The former, relating to *Sea Grace* , would after adjustment give a value in excess of U.S.$14 m. for a vessel of *Ardent's* size, age and build, but it took place at a higher market level and related to a vessel five years younger and so outside the age range for relevant comparison according to Mr. Marsh. The latter, *Touraine* , was close to *Ardent* in size and only three years younger and her sale, although seven months later, took place when the market had come back off down from its peak. It would after adjustment suggest a value of between U.S.$12.25 and U.S.$12.70 m. for a vessel such as *Ardent* .

Mr. Marsh in his oral evidence introduced reference to *Vestelegia* , of 1977 build and therefore again outside the age parameters which he himself would take. If one were to take her price of U.S.$17.75 m. on July 5, 1989 and adjust it, the result would be values for a vessel such as *Ardent* of between U.S.$12.4 and U.S.$13.05 m., on discounts for age running from 7 per cent. to 6 per cent. per annum and treating her Belgian build as equivalent to Japanese build and so taking a 7.5 per **\*577** cent. discount on that score. On this last point Mr. Marsh's evidence was again unimpressive. He started by asserting that Belgian build was regarded as the same in the market as Japanese, but rapidly backtracked when asked to do a detailed calculation, and took instead a 2.5 per cent. discount, which would give values running from U.S.$13.34 m. to just over U.S.$14 m. Account would have to be taken of the further rise in the market from July 5 to the second half of August. Even so, I am not satisfied that the *Vestelegia* would imply a value for *Ardent* at the latter date greater than U.S.$13 to U.S.$13.7 m. She is in any event of limited value as a

comparison because she is so much younger.

Mr. Anderson and Mr. Rayner both referred to the third vessel recently purchased for the fund, *Erato* which became *Arrow* , a 1974 Japanese built vessel of 87,439 deadweight purchased for U.S.$15.5 m. on Aug. 16, 1989. Mr. Anderson's comparison of *Erato* in his witness statement was, however, superficial in the extreme, since it totally ignored the vessel's Japanese build. Taking that factor into account, *Erato* would imply a value for *Ardent* of around U.S.$13.7 to U.S.$14 m. The problem about using *Erato* as a benchmark for the market is not, as the plaintiffs at times seemed to suggest, that it is also the subject of this litigation, but that it is simply another vessel purchased for the fund on PL's recommendation. Its use, by itself alone, involves the risk of seeking to hold oneself up by one's own bootstraps. Mr. Anderson said in response that he only took the *Erato* price because it too was considered to be a market price. That brings one back to the objective evidence of the market.

Returning to *Ardent* , her owners' price indication had increased by Aug. 9, 1989 to around U.S.$12 m. When communicating this to Clarksons, her owners' brokers added:

However as brokers would suggest yr buyers to inspect and make outright offer after inspection when believe owners will become more reasonable.

Mr. Rayner did not transmit this comment, but suggested that he would have done so in one of the several conversations he had with him each day. In that case it is not clear why he did not simply retransmit the comment. Whatever the position in that respect (and Mr. Anderson was not asked specifically by either side whether he recalled any such conversation), the brokers' comment suggests a possible concern on their part that owners' asking price might be unattractive to prospective buyers. This was moreover for a price which at that stage, before any inspection, would be assumed to be the price of a vessel in reasonable condition. When on Aug. 24 Clarksons did make an offer on the fund's behalf, it was in the sum of U.S.$11.5 m., and was accompanied by this comment by Mr. Rayner:

We have explained to Hellespont Shipping that we need to move fairly quickly on this negotiation to prevent the drydocking commencing and we believe that even the above opening offer represents a very realistic level for this vessel.

In my opinion a Japanese built vessel of a similar size and age in reasonable condition would be worth between USD 12.75/13 million max today.(A)

This vessel however is Spanish built which must be worth 500,000/750,000 level(B)

The technical department of Papachristidis Ship Management Services have advised that need to spend around USD 2 million on the vessel.

I think that you are well aware of the level that I believe that we can strike a quick deal so look forward to your close counter to the above, I sincerely believe that your clients should grab this [opportu]nity with both hands before my buyers have second thoughts.

Mr. Rayner said that he was seeking to talk down the vessel by both (A) and (B), although in relation to (B) he was simply repeating what he had been told by Mr. Anderson.

After various intermediate counters by sellers and buyers, the price of U.S.$12 m. was eventually agreed on Aug. 29, 1989. Mr. Rayner did not recall whether he had given any advice to Mr. Anderson on the market; he might have done, but Mr. Anderson was well capable of working out where the market was for himself. Mr. Anderson's evidence was that he considered from his assessment of the tanker market and discussions with Mr. Rayner that an overall cost for *Ardent* of U.S.$14 m. (U.S.$12 m. price plus U.S.$2 m. repairs) accorded with the market price of a vessel of similar age and size in reasonable condition. He went on (as I have said, without adverting to the distinction between Japanese and Spanish built vessels) to refer to *Erato/Arrow* as indicating -

. . .that a vessel of the ARDENT's size and age in reasonable condition would be worth in the region of U.S.$14.7 million. He could not recall whether he had

actually made the comparison at the time, but would have thought he would have done. In cross-examining Mr. Anderson, Mr. Eder put to him that the calculation in his witness statement was manifestly wrong, and indicated that if Mr. Anderson would agree that the U.S.$14.7 m. was wrong, he could move on. After a further exchange, Mr. Eder put again:**\*578**

. . .the $14.7 million is plainly wrong. At most it is 14 million. You never thought, at the time, that the vessel was worth in the region of £14.7 million? [A.] No, I thought that fair market value was $14 million, yes. On that basis Mr. Eder moved on. In these circumstances, Mr. Anderson's evidence that he thought that *Ardent* would have a value as high as U.S.$14 m. in reasonable condition is unchallenged. Further, it seems to me inherently likely. On any view, even though it was hoped to do the repairs more cheaply, Mr. Anderson had in mind that they might cost U.S.$2 m. He must have rationalized the purchase of *Ardent* for U.S.$12 m. in his own mind on that basis. The plaintiffs have not pleaded or indeed made any case to the effect that Mr. Anderson's view of the market was one which he was not reasonably entitled to hold. For the purposes of assessing the reasonableness or unreasonableness, gross or otherwise, of the defendants' conduct, I proceed on the basis that Mr. Anderson and the defendants could and did reasonably hold the view that the market value of *Ardent* after repairs would reach U.S.$14 m. But I add that this seems to me on the outer edge of any assessment of market value which could have been reasonably held by Mr. Anderson.

Whether, in any objective sense, the market for a vessel of *Ardent's* size, age and build in reasonable condition could be said to have reached U.S.$14 m. in the second half of August, 1989 is another question. It may not be significant at this stage, although it could have relevance on an assessment of damages. The fact that the view taken by one man - Mr. Anderson - was not unreasonable and led to the fund actually buying *Ardent* cannot, as I see it, mean axiomatically that the price paid by the fund represented a realistic market price. For example, the price for her would not necessarily have correlated with her value on an immediate resale

on the market. On the evidence which I have heard, although the market was hot and still rising, the price paid for *Ardent* was in excess of any market price which could be deduced from other sales or objective information, if one assumes that the vessel would incur repair costs of anything like U.S.$2 m. on top of the price paid. On the evidence as a whole, I would put the actual market price for a vessel of *Ardent's* size, age and build in reasonable condition as not more than U.S.$13.25 m. in the latter part of August, 1989.

### III.14 *Events following delivery*

The vessel was delivered on Sept. 20, 1989. A board meeting of Red Sea took place in Athens on Sept. 22. It was resolved to postpone any decision on repayment of debt until Mr. Dunn had ascertained the repairs and maintenance work needed to bring the vessels up to a suitable standard. While in Athens, Mr. Bouckley took the opportunity to look over *Ardent* . On Sept. 26, after Mr. Dunn had had the opportunity to go on board, Mr. Dunn spoke to Mr. Bouckley, whose note of the conversation is set out in Part III.10 above.

On Oct. 11, 1989 Mr. Dunn informed Mr. Bouckley that the best estimate for repairs to *Ardent* was that they would probably last another 40 days, and still cost U.S.$2 m. adding "see inspection report". Orally, he said that the expenses were "still an estimate" and that he was waiting to see how long the steelwork would take to complete before he had a better idea. On Dec. 4, 1989, Mr. Anderson told Mr. Bouckley that the costs were going to be considerably in excess of those originally estimated, and would end up at around U.S.$3.5 m. Mr. Bouckley's note of the further conversation reads as follows:

I asked why the Ardent had cost considerably more than the market estimate. Anderson said they did not do a full survey and thus did not find all the problems until afterwards. I was not, myself, aware that a full survey was not done and am checking my correspondence. Sami [i.e. Mr Baarma]: did you know a full survey had not been done? There are possible liability considerations we may have to consider here. If you recall I was worried about the cost of putting the Ardent into shape

after I went on board her and followed this up with John Dunn: see my memo of October 12th.

Thereafter, steps were taken by Red Sea directors to obtain an independent appraisal of the situation. A report was obtained from Denholm Shipping Services Ltd. They were not called as experts, and their report was only referred to incidentally before me.

### IV. THE DEFENDANTS' DUTIES

### IV.1 *The Commercial and Technical Advisory Agreements* (the CAA and TAA)

The starting point for consideration of any contractual or tortious duties owed by the defendants is the CAA and TAA, and in particular two clauses in effectively identical terms found in each. PL and PSMSL rely upon these clauses to exempt them from any contractual or tortious liability which they may otherwise have incurred. The personal defendants rely upon them to negative or exempt them from any tortious liability.

The first clause is cl. 2 headed "Indemnification of [Commercial/Technical] Advisor" and the second is cl. 7.9 (in the CAA) or cl. 7.10 (in the TAA). Clause 2 of the CAA provides:**579** 2. INDEMNIFICATION OF COMMERCIAL ADVISOR

The Corporation will, to the maximum extent permitted by law, indemnify and hold harmless the Commercial Advisor and its officers, directors, employees and agents ("Indemnities"), and the Corporation shall release the Indemnitees, from any and all judgments, interest on such judgments, fines, penalties, charges, costs, amounts paid in settlement, expenses and attorneys' fees incurred in investigating, preparing or defending any action, claim, sit, inquiry, proceeding, investigation or appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or commission, whether pending or threatened, whether or not an Indemnitee is or may be party thereto, including interest on the foregoing which, in the good faith judgment of the Commercial Advisor, arise out of, relate to or are in connection with the performance of its duties hereunder ("Indemnified Damages"), except for any such Indemni-

fied Damages that are found by a court of competent jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of, or the fraud of, the person seeking indemnification. Clause 7.9 of the CAA provides:

7.9 *Liability of the Commercial Advisor.*

Neither the Commercial Advisor nor any of its officers, directors, employees or agents shall be liable, responsible or accountable, whether directly or indirectly, in contract or tort or otherwise to the Corporation for any losses, claims, damages, liabilities or expenses (collectively, "Damages") asserted against, suffered or incurred by the Corporation or any shareholder thereof arising out of, relating to or in connection with any action taken within the scope of duties of the Commercial Advisor under this Agreement or omitted to be taken by the Commercial Advisor with respect to (a) the management or conduct of the business and affairs of the Corporation or any person in which the Corporation has an interest, (b) the offering and selling of interests in the Corporation or the shareholders thereof and (c) the management or conduct of the business and affairs of the Commercial Advisor insofar as it relates to the Corporation including, without limitation, all activities of the Commercial Advisor in the conduct of other business engaged in by it which might involve a conflict of interest vis-a-vis the Corporation or in which the Commercial Advisor realizes a profit or has an interest, except, in each case, Damages resulting from acts or omissions of the Commercial Advisor which (a) were the result of gross negligence, (b) constituted wilful misconduct, (c) constituted fraud or (d) constituted bad faith. The Commercial Advisor shall not be liable to the Corporation for any action taken or omitted by officer, director, shareholder, employee or agent of the Corporation. The Commercial Advisor may consult with counsel, accountants and other professional advisors in respect of the affairs of the Corporation and, so long as the Commercial Advisor shall have used extreme care and diligence in selecting such counsel, accountants or other professional advisors, as the case may be, the Commercial Advisor shall be fully protected and justified in acting, or failing to act, if such action or failure

to act is in accordance with the advice of such counsel, accountants or other professional advisors. Clauses 2 and 7.9 of the TAA contain like provisions in respect of the "Technical Advisor".

These clauses were entered into for the benefit of the relevant advisers' officers, directors, employees and agents as well as the adviser itself. As such, it is common ground that, under the law of New York, any relevant officer, director, employee and agent was and is entitled to enforce the benefit of each clause in his favour as a third party beneficiary. The scope of the clauses raises a number of issues of construction.

Both the experts called on New York law were highly qualified to assist. Mr. Kenney is a trial lawyer who qualified in 1970 and has specialized for over 15 years in negligence including professional negligence claims. He has been president of the Federal Bar Council and has taught trial advocacy programmes at Harvard University, Cornell Law School and elsewhere. Judge Frankel was called in 1949, practised as a government attorney and then in private practice until 1962, was then professor of law at Columbia University, sat as a United States District Judge from 1965 to 1978 and then returned to private practice, in which he remains to this day. He has written extensively on legal topics. Both experts gave helpful evidence, and referred me to material principles and authorities. On matters of construction their evidence is admissible to inform me of the relevant principles, and the meaning of any relevant terms of art, under New York law. Here, the evidence focused on the existence and meaning of suggested terms of art. The defendants contend that the terms "wilful misconduct" and "gross negligence" are assigned particular meanings under New York law, at all events in the context of exculpatory clauses.

IV.2 *Clause 2*

I start with the issue whether cl. 2 is relevant to the plaintiffs' claims against the first, fourth and fifth defendants in their capacities as officers, directors, employees and agents of the second and/or**580** third defendants. The plaintiffs submit not. It concerns, they say, exposure on the part of an officer, director, em-

ployee or agent towards third parties, not towards the very adviser who undertakes the obligation to indemnify. There is authority under New York law considering a clause in similar wording, but without the phrase "and the Corporation shall release the Indemnitees": Hooper Associates Ltd. v. Ags Computers Inc., 74 N.Y. 2d. 487, 548. The case contains some statements of principles governing construction which strike a familiar note in this jurisdiction:

Words in a contract are to be construed to achieve the apparent purpose of the parties. Although the words might seem to admit of a larger sense, yet they should be restrained to the particular occasion and to the particular object which the parties had in view.. . .This is particularly true with indemnity contracts. When a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed.. . .The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances. The Court said that all the subjects of the clause:

. . . are susceptible to third-party claims. . .None are exclusively or unequivocally referable to claims between the parties themselves or support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract. The Court's conclusion was:

Construing the indemnification clause as pertaining only to third-party suits affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect. . .. Applying these principles to the construction of the present agreements, a similar conclusion results. The overwhelming flavour of cl. 2 is that of indemnification against third party claims. Its subject-matter is "judgments, interest on such judgments, fines, penalties, charges, costs, amounts paid in settlement, expenses and attorneys' fees. . .". Most of these would never arise at all if the clause applied to liability incurred by an indemnitee towards the indemnifier. Costs, expenses and attorneys' fees could be incurred, but they are much

more obviously referable to costs, expenses and fees incurred in the context of a judgment, fine, penalty, etc. obtained by or paid to a third party. Further, if cl. 2 were treated as applicable to liability to the indemnifier, the clause would overlap with cl. 7.9 (or 7.10). The contractual scheme is in my view clear. Clause 7.9 (or 7.10) deals with liability inter se, while cl. 2 deals only with third party liabilities.

### IV.3 *Clause 7.9/7.10*

The clause contains a saving or qualification to its basic principle of exception. The saving relates to -

. . .damages resulting from acts or omissions. . .which (a) were the result of gross negligence, (b) constituted willful misconduct, (c) constituted fraud or (d) constituted bad faith. In Metropolitan Life Insurance Co. v. Noble Lowndes International Inc., 84 N.Y. Rep. 2d Series 430 , the Court applied "the interpretation tool of ejusdem generis" to a qualification on a limitation clause for "international misrepresentations, or damages arising out of. . .willful acts or gross negligence", saying:

. . .the phrase "willful acts" should be interpreted here as referring to conduct similar in nature to the "international misrepresentation" and "gross negligence" with which it was joined as exceptions to defendant's general immunity from liability for consequential damages. . .. The Court's conclusion was that:

. . .the term willful acts as used in this contract was intended by the parties to subsume conduct which is tortious in nature, i.e. wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties.

While the draftsman of the present contract took care to list separately four situations, it is clear that he had them all in mind as exceptional and it is evident that the concepts of wilful misconduct, fraud and bad faith have some elements in common. Here too, therefore, it may be that the four situations were viewed as similar or at least connected. The defendants thus submitted to me

that the four situations should be construed ejusdem generis as regards the mental element involved. That finds no real support in the reasoning or decision in *Metropolitan Life* , where the class identified was of acts tortious in nature (as distinct from a simple international breach of contract in one's own commercial interests). Further, in the present case, the wording of the clause itself indicates possible differences between gross negligence and the other concepts. It addresses gross negligence which *results in* acts or omissions causing damage. In the other three situations, the acts or omissions *constitute* wilful misconduct, fraud or bad faith. One possible conclusion is that wilful negligence, fraud and bad faith were viewed as integral elements of the acts or omissions damaging the other party, while gross negligence was viewed**\*581** as conduct occurring separately from, although resulting in, an act or omission damaging the other party.

The trial proceeded without submissions being addressed expressly to the burden of proof in respect of the four situations in which contractual immunity is not afforded. I sought confirmation about the position when writing my judgment, and received written submissions from the plaintiffs to the effect that the burden lay on the defendants to disprove wilful misconduct, gross negligence, etc. and from the defendants to the opposite effect. In my judgment, the case was conducted, as the defendants submitted, on the basis that the burden lay on the plaintiffs and this is anyway the right analysis under English law, and, from such indications as exist, under New York law. But, in the event, I do not consider that this case turns on the burden of proof.

Under New York law, it is contrary to public policy for a party to contract out of liability for "willful misconduct" or "gross negligence". The two experts agreed that there are New York authorities defining the concept of "willful misconduct" in this and other contexts. They were also agreed upon the following definition:

. . .an international act of unreasonable character which is performed in disregard of a known or obvious risk which is so great as to make it highly probable that harm will result. The experts also agreed that "gross negligence" in the context of exculpatory clauses had

been defined or described by the highest New York Court as -

. . .conduct that evinces a reckless disregard for the rights of others or "smacks" of intentional wrongdoing.

The precise nature of the state of mind involved in both these definitions or descriptions gave scope for argument.

Authority for the experts' definition of "willful misconduct" is found in three authorities: Seminara v. Highland Lake Bible Conference Inc., 112 A.D. 2d 630, 492 N.Y.S. 2d 146 (N.Y. App.Div. 1985) , Gardner v. Owasco River Railway, 142 A.D. 2d 61, 534 N.Y.S. 2d 819 (3d Dep't. 1988) and Mcduffie v. Watkins Glen International Inc., 833 F. Supp. 197 , 203 (W.D.N.Y. 1993). In the first case, the Court cited Prosser & Keeton on The Law of Torts (5th ed. 1984) par. 34 at p. 213, which contains this passage:

International acts of unreasonable character, performed in disregard of a known or obvious risk so great as to make it highly probable that harm will result, are considered wilful conduct in the realm of tort law. Judge Frankel in his first report also pointed out that, in *McDuffie* (a case where the plaintiff was arguing that there was wilful misconduct, so that as a matter of New York public policy the defendant could not rely on the protection of an exculpatory clause), the Court not only quoted the above definition from *Gardner* , but also quoted a New York Pattern Jury Instruction as authority for the proposition that wilful misconduct means -

. . .a failure to use even slight care, or conduct that is so careless as to show complete disregard for the rights and safety of others. In his oral evidence, however, Mr. Kenney drew a distinction between "wilful misconduct" and "gross negligence" according to which the former would include, whereas the latter would not, a requirement of "consciousness of what will happen", or "an intent requirement and knowledge". Judge Frankel in his oral evidence said that "wilful misconduct" required both consciousness of and an intention to bring about the consequences of what the actor was doing. He also said that, thinking about the issue and reviewing the au-

thorities subsequent to his first report, he had come to the conclusion that consciousness of the consequences was also a requirement of "gross negligence".

There are numerous authorities describing gross negligence in the context of exculpatory clauses as "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing". I start with a case predating them, Hong Kong Export Credit Insurance Corporation v. Dun & Bradstreet, 414 F. Supp. 153 (S.D.N.Y. 1975) . In that case a Federal District Court applying New York law held that -

Gross negligence means that the defendant has not only acted carelessly in making a mistake, but that it was so extremely careless that it was equivalent to recklessness. Later, it repeated that:

. . . gross negligence . . . implies great negligence and the want of even scant care. It has been defined as a disregard of the consequences which may ensue from the act and indifference to the rights of others. The defendant in that case had undertaken to supply information regarding bankruptcy, but had failed to send an isolated report about an attachment. The Court held that no reasonable man could say that it had been indifferent or reckless with regard to its procedures or practices as to the mailing of reports.

The first case to use the description quoted by the experts was Kalisch-Jarcho Inc. v. City of New York, 58 N.Y. 2d 377 (1983) , an authority in the highest New York State Court, the Court of Appeals. The Court had to consider the adequacy of**582** a jury direction which had indicated that an exculpatory clause protecting against delay in contract works would be ousted if the jury found that the delay was caused by conduct constituting "active interference". The Court concluded that this was an incorrect instruction, and put the position as follows:

[6-8] More pointedly, an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or

prompted by the sinister intention of one acting in bad faith. Or when as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit (Matter of Karp v. Hults, 12 A.D. 2d 718, 209 N.Y.S. 2d 128 , Affd. 9 N.Y. 2d 857, 316 N.Y.S. 2d 99, 175 N.E. 2d 465 ).

[10-13] To support such a conclusion however, the jury would have to find more than "active interference", which, incidentally, was not a contract term. For whether conduct is "active" or "passive" does not determine wrongdoing, and "interference", which most commonly translates as "intervention" (Webster's International Dictionary [2d ed. 1950], at p. 1294), does not connote willfulness, maliciousness, abandonment, bad faith or other theories through which runs the common thread of intent. So taken at face value by the jury, the charge was calculated to expose the city to liability for conduct within the umbrella of the exculpatory clause. Accordingly, although the request to charge perhaps could have been more precisely put, the city, at the very least was entitled to the amplifying instruction that unless Kalisch-Jarcho proved that "the City acted in bad faith and with deliberate intent delayed the plaintiff in the performance of its obligation", the plaintiff could not recover.

The Court here identified two categories of misconduct which it regarded as "smacking" of intentional wrongdoing "explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith" and implicit, "when, as in gross negligence, it betokens a reckless indifference to the rights of others". This leaves unstated the precise mental element involved in "implicit" misconduct. The impressionistic phrase "smacks of intentional wrongdoing" does not provide the answer. The citation of Karp v. Hults is however of interest. It was a case concerning the Commissioner of Motor Vehicles' power to suspend an operator's licence on finding that he had driven "in a manner showing a reckless disregard for life and property of others". The Court said:

It is true that momentary failure of attentiveness and of control, resulting in accident, may in some circumstances constitute no more than ordinary negligence; but

to relax attention and control while operating upon a modern, high-speed, divided highway at the rate of speed reasonably inferable from the facts of this case is to invite catastrophe of extreme severity.

There is no necessary requirement or flavour of subjective consciousness of the consequences in this language. Judge Frankel distinguished the case as concerning the general law, rather than exculpatory clauses, but it was cited in *Kalisch-Jarcho* in the latter context. Judge Frankel said that, whatever the position may then have been, the concept of gross negligence in the context of exculpatory clauses had now acquired a special and more restricted meaning, requiring conscious disregard of consequences.

That was expressly not the view of Judge Goettel, again the United States District Court for the Southern District of New York, in Federal Insurance Co. v. Honeywell Inc., 641 F. Supp. 1560 (S.D.N.Y. 1986) , where he disagreed with a definition in New York Jurisprudence and cited a New York Pattern Jury Instruction on gross negligence, which is interestingly but confusingly identical to that which, as I have already mentioned, was cited by Judge Frankel as applicable to "wilful misconduct."

The main weight of the opinion expressed by Judge Frankel in oral evidence rested on four recent cases: Sommer v. Federal Signal Corp., 79 N.Y. 2d 540, 583 A.D. 2d 317, 598 N.Y.S. 2d 235 (1st Dep't. 1992) , Colnaghi U.S.A. Ltd. v. Jewelers Protection Services, 79 N.Y. 2d 1027, 584 N.Y.S. 2d 430 (1992) , Stuart Rudnick Inc. v. Jewelers Protection Services, 194 A.D. 2d 317, 598 N.Y.S. 2d 235 (1st Dep't. 1993) and Fireman's Fund Insurance Co. v. ADT Systems Inc., 847 F. Supp. 291 (E.D.N.Y. 1994) . The first two of these cases were again before the New York State Court of Appeals. In *Sommer* the Court was concerned with an operator of an alarm service who had allowed himself to become confused into misunderstanding instructions to "activate" the service (which had unknown to the person giving them already been re-activated after maintenance) and had, without seeking clarification, concluded that he was being asked to de-activate it. He had then ignored (genuine) fire signals which were some seven or so

minutes later received. The Court said this:

Gross negligence, when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must "smack of international wrongdoing" (Kalisch-Jarcho, Inc. v. City of New York, 58 Ny 2d , at 385, *Supra* ). It is conduct**583** that evinces a reckless indifference to the rights of others (id; see also, Restatement [Second] of Contracts 195 [1] [intentional or reckless conduct vitiates contractual term liability]).

In a related context, the Legislature has expressly adopted a reckless indifference standard. Under CPLR article 16, a joint tortfeasor whose culpability is 50% or less is not jointly liable for all of plaintiff's non-economic damages, but severally liable for its proportionate share (CPLR 1601 [1] ). This limitation of liability, however, does not apply to a person who acted with "reckless disregard for the safety of others." (CPLR 1602 [7] .)

[2] Just such a standard is applicable here. We therefore conclude - as did the trial court and Appellate Division - that while Holmes' exculpatory and limitation of liability clauses are enforceable against claims of ordinary negligence, those clauses cannot restrict Holmes' liability for conduct evincing a reckless disregard for its customers rights.

The court's role on a motion for summary judgment is to determine whether there is a material factual issue to be tried, not to resolve it.

[3] Holmes' view of the evidence is that the company's conduct did not rise to the level of reckless indifference. Holmes urges that the dispatcher's failure to report the alarms was the result of a mere miscommunication, a mistake cause in part by the engineer's confusing instructions. Another reasonable view of the evidence, however, is propounded by 810: that instead of pausing to dispel any confusion surrounding the subscriber's instruction to activate its system the dispatcher - without verification or investigation - rushed to his own conclusion, recklessly indifferent to the consequences that might flow form a misperception.

Whether this indeed is a case of a simple mistake or

reckless indifference is for a jury to determine. The citation of par. 195 of the restatement is of interest, because, I was informed, par. 195 refers for a definition of intentional or reckless conduct to par. 500 of the restatement which gives the following two-pronged definition:

500. Reckless Disregard of Safety Defined

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent. See Reporters Notes

Special Note: The conduct described in this Section is often called "wanton or wilful misconduct" both in statutes and judicial opinions. On the other hand this phrase is sometimes used by courts to refer to conduct intended to cause harm to another.

Comment:

*a. Types of reckless conduct.* Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know, as that term is defined in 12, of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. An objective standard is applied to him, and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it.

. . .

For either type of conduct, to be reckless it must be unreasonable; but to be reckless, it must be something more than negligent. It must not only be unreasonable, but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent. It must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence.

*b. Perception of risk* . Conduct cannot be in reckless disregard of the safety of others unless the act or omission is itself intended, notwithstanding that the actor knows of facts which would lead any reasonable man to realize the extreme risk to which it subjects the safety of others. It is reckless for a driver of an automobile intentionally to cross a through highway in defiance of a stop sign if a stream of vehicles is seen to be closely approaching in both directions, but if his failure to stop is due to the fact that he has permitted his attention to be diverted, so that he does not known that he is approaching the crossing, he may be merely negligent and not reckless. . . .

*c. Appreciation of extent and gravity of risk.* In order that the actor's conduct may be reckless, it is not necessary that he himself recognize it as**\*584** being extremely dangerous. His inability to realize the danger may be due to his own reckless temperament, or to the abnormally favourable results of previous conduct of the same sort. It is enough that he knows or has reason to know of circumstances which would bring home to the realization of the ordinary, reasonable man the highly dangerous character of his conduct.

. . .

*f. International misconduct and recklessness contrasted.* Reckless misconduct differs from intentional wrongdoing in a very important particular. While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it. It is enough that he realizes or, from acts which he knows, should realize that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless. However, a strong probability is a different thing from the substantial certainty without which he cannot be said to intend the harm in which his act results.

*g. Negligence and recklessness contrasted* . Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.

The description in par. 500 is of particular clarity and assistance. It was accepted by Judge Frankel and the defendans as representing correctly the general legal conception of "gross negligence". Despite the reference to par. 195 (and so indirectly to par. 500) in *Sommer* , Judge Frankel maintained that the proper reading of this and later authorities was that "gross negligence" had acquired a nar rower meaning, importing subjective consciousness of the risk, in the context of an contractual exemption clause.

In *Colnaghi* the Court was concerned with a failure to wire a skylight in an art gallery, through which thieves made entry to steal 20 paintings. Citing *Sommer* , the Court said:

New York law generally enforces contractual provisions absolving a party from its own negligence (Sommer v. Federal Signal Corp. 79 NY 2d , at 53, supra; see, Melodee Lane Lingerie Co. v. American Dist. Tel. Co., 18 NY 2d 57 , 69; Ciofalo v. Vic Tanney Gyms, 10 NY 2d 294 , 297-298). Public policy, however, forbids a party's attempts to escape liability, through a contractual clause, for damages occasioned by "grossly negligent conduct" (Sommer v. Federal Signal Corp., 79 NY 2d , at 554, supra). Used in this context, "gross negligence" differs in kind, not only degree, from claims of ordinary negligence. It is conduct that evinces a reckless disregard for the rights of others or "smacks" of intentional wrongdoing (Sommer v. Federal Signal Corp., 79 NY 2d , at 554, *supra* ).

Colnaghi's allegations do not meet this standard. The failure to wire a skylight, while perhaps suggestive of negligence or even "gross negligence" as used elsewhere, does not evince the recklessness necessary to abrogate Colnaghi's agreement to absolve Jeweler's from negligence claims (See, Gutter Furs v. Jewelers Protection Servs., 79 NY 2d 1027 , 1029, supra [expert's opinion that alarm company should have installed a second detector and a shock sensor, ascertained how inventory was to be arranged and conducted a post-occupancy inspection, taken together, raises no issue of fact on reckless indifference]; Compare, Sommer v. Federal Signal Corp., 79 NY 2d , at 555, supra). In parenthesis, it appears from a footnote in the later Fireman's Fund case that the plaintiffs' expert's affidavit in Colnaghi had stated that the alarm company's actions fell "far below professional standards and customary practice in the industry".

Judge Frankel relied upon the judgment in Colnaghi for the distinction "in kind" drawn between gross negligence and ordinary negligence in the present context. Nothing however suggests that the Court, with its references to Sommer and a substantial overlap in membership with the Court which decided Sommer , was intending in any way to affect or alter the view of the meaning of "gross negligence" indicated in Sommer . The phrase "evince a reckless disregard for the rights of others" is capable of applying to an objective state**585** of mind, where actual consciousness of consequences is not present. The difference in kind between recklessness and gross negligence applies to both categories of recklessness recognized in par. 500 of the Restatement. The second sentence of par. 500(g) refers to both categories. The third sentence is dealing with a different point,

namely the extreme nature of the risk involved in recklessness. The last sentence, as I read it, applies once again generally to all recklessness, as defined throughout par. 500. The reference in *Sommer* to "gross negligence as used elsewhere" refers to looser usage of the phrase in the simple sense of serious negligence. Finally, *Stuart Rudnick* and *Fireman's Fund* are cases in a lower Court which follow *Sommer* and *Colnaghi* and add nothing material.

With the exception of the early cases of *Hong Kong Export Credit* and *Kalisch-Jarcho* itself, the cases considered up to this point were all decided in the context of exculpatory clauses in contracts relating to security or alarm systems under which the party liable would normally be taken to have assumed a duty to exercise reasonable skill and care for the plaintiff's safety or property, for which he might in the event of breach be held in contract and also, it appears, in tort. The conclusion I reach in this context is (1) that the public policy of New York does prohibit the party otherwise owing such a duty from exculpating himself from liability for its breach in circumstances amounting to wilful misconduct or gross negligence-this is effectively common ground - and (2) that "gross negligence" is here regarded as embracing conduct involving both kinds of recklessness referred to in the Restatement.

I have limited the context to circumstances where New York public policy arises for consideration and in which the party liable would owe a duty of reasonable skill and care. To demonstrate why, I turn to the last and highly instructive authority of the New York State Court of Appeals to which I was referred. That is Metropolitan Life Insurance Co. v. Noble Lowndes International Inc., 84 N.Y. Rep. 2d 430; 643 N.E. 2d 504, 618 N.Y.S. 2d 882 (1994) . Again there was a considerable overlap in membership with the Courts deciding Sommer and Colnaghi . The case concerned a limitation of liability for loss of profit and other consequential damages, with an exception "for intentional misrepresentation, or damages arising out of. . .wilful acts or gross negligence". The contract was for the licensing of software, together with the provision of customized enhancements to suit the plaintiff's health insurance busi

ness at a cost not to exceed U.S.$390,000. The defendant withdrew from the project after the plaintiffs had rejected two sets of enhancements and refused the defendant's demand for an upward adjustment of the contract ceiling price for enhancements. The motivation for its refusal further to perform was -

. . .its desire to eliminate contractual obligations which it perceived to be an obstacle to any sale of its computer division to a company known as Erisco. The Judge directed the jury that the exception of "willful acts" required -

. . .a finding that the defendant's conduct was malicious, i.e. the intentional perpetration of a wrongful act injuring plaintiff without justification. The jury found that the defendant's acts were wilful. The Appellate Division reversed this finding, holding that the exception required the commission of a tort. The Court of Appeals disagreed with the Appellate Division's reasoning, but upheld the result. What is important for present purposes is that the Court treated the issue as one of pure construction:

The issue here is not how we and other courts have construed "willful" in other contexts, such as in interpreting statutes using that term or in formulating or applying legal principles in tort or contract law. Rather, the issue is what the parties intended by "willful acts" as an exception to their contractual provision limiting the defendant's liability for consequential damages arising from its "non-performance under this agreement". Thus, to the extent that the Appellate Division opinion holds that tort law principles apply in all cases in which the word willful is at issue or thereby limits the legal meaning of the word, we do not agree. However, because the law of contracts as pertinent and applied to this contractual dispute leads us to the same result, we now affirm. The Court of Appeals identified several principles of contract or construction which it regarded as of assistance: the fact that contract damages do not normally depend upon whether or not non-performance was intentional or inadvertent; the policy of the law in giving full effect to a clause allocating the risk of economic loss between the parties; specific clauses in the contract, which it regarded as clearly inconsistent with a restric

tion of the limitation clause to inadvertent breaches; and the imbalance in the parties' respective potential liabilities involved in the plaintiff's construction. The other clauses showed, in particular, that the parties were agreeing to limit the plaintiffs' remedies for non-performance, even when this persisted after notice. The Court concluded:

In excepting willful acts from defendant's general immunity from liability for consequential damages under section 7 of the Agreement, we**\*586** think the parties intended to narrowly exclude from protection truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest. Under the interpretation tool of *ejus-dem generis* applicable to contracts as well as statutes, the phrase "willful acts" should be interpreted here as referring to conduct similar in nature to the "intentional misrepresentation" and "gross negligence" with which it was joined as exceptions. Public policy was there referred to as a consideration arising after the Court had arrived at a proper definition of the limitation and its exception upon a true construction of the parties' agreement. However, the Court did point out that the construction at which it had arrived mirrored in effect that adopted in its earlier decisions on public policy.

In the light of this authority, the issue before me as to the scope of cll. 7.9 and 7.10 is essentially one of construction, and depends on the character and wording of the particular contract. Judge Frankel was in my judgment right to identify the purely commercial nature of a relationship as a material matter when considering both the operation of public policy and the construction of a particular exception. However, the authorities suggest to me that the New York Courts would not simply stop there. They would be likely to have regard to the precise nature of the commercial relationship. There is a distinction between the nature of the contract in the [Metropolitan Life] case and the nature of the contracts or relationship in issue in the authorities dealing with security. The former contract was a pure supply agreement, under which it could not be said that the provider of software and services undertook any duty to exercise reasonable skill and care to protect the plaintiffs' economic position

or interests. The latter were decided in a context where the provider of services was expressly engaged with a view to the protection of the plaintiffs' proprietary and economic interests. In that context, as I have held, New York public policy is capable of invalidating attempts to contract out of liability on grounds of wilful misconduct or gross negligence, although the defendant's conduct was reckless in a sense not involving actual consciousness of risk on the part of the defendant. Here, the CAA and TAA were contracts under the advisers undertook duties which were essentially designed to promote and protect the plaintiffs' relevant commercial and technical interests. As a matter of construction, therefore, it would not be surprising if cll. 7.9 and 7.10 were, upon their true construction, to reflect a similar approach to that adopted by New York when identifying New York public policy. There is some attraction in treating the exceptions in cll. 7.9 and 7.10 as a simple reflection of the requirements of New York public policy. Both parties emphasized this in their respective submissions, although taking different views of those requirements. This was not however the approach adopted in the [Metropolitan Life] case, and to apply it inflexibly would be contrary to the need to construe the particular contract according to its own terms. In the present case, so far as it has relevance, it reinforces the conclusion to which I would anyway come.

Viewing the particular words of the present contracts, four concepts are separately identified. They may overlap (e.g. in the case of wilful misconduct and fraud), but the draughtsman has recognized a distinction, to which I have already pointed, between acts or omissions *resulting from* gross negligence and acts or omissions *constituting* wilful misconduct, fraud or bad faith. Whether one looks to the authorities decided and the principles identified in the context of New York public policy or to the simple meaning of the words without attributing to them any special meaning under New York law at all, the concepts of "gross negligence" here appears to me to embrace serious negligence amounting to reckless disregard, without any necessary implication of consciousness of the high degree of risk or the likely consequences of the conduct on the part of the person acting or omitting to act.

If the matter is viewed according to purely English principles of construction, I would reach the same conclusion. "Gross" negligence is clearly intended to represent something more fundamental than failure to exercise proper skill and/or care constituting negligence. But, as a matter of ordinary language and general impression, the concept of gross negligence seems to me capable of embracing not only conduct undertaken with actual appreciation of the risks involved, but also serious disregard of or indifference to an obvious risk. The difference in the way in which the concepts in cll. 7.9 and 7.10 are expressed appears to me entirely consistent with the phrase receiving its ordinary meaning and embracing both situations.

As to authority, I was not referred to the criminal field, where "gross negligence" features in the law of manslaughter. In essence, the position there is that a breach of a duty of care will amount to manslaughter if its seriousness in all the circumstances is such that a jury considers that it should be characterized as a crime. See R. v. Adamoko, [1995] 1 A.C. 171 . The analogy in the civil field would be to explain gross negligence as conduct so seriously negligent that the defendant should not be entitled to rely on the exemption clause. The test involves an element of circularity, but Lord Mackay in *Adamoko* said that it was "necessarily a question of degree, and an attempt to specify that degree more**587 closely is. . .extra likely to achieve only a spurious precision". Although, in the present context, the question cannot be left to a jury and it will be necessary to attempt to identify and evaluate various factors bearing on the decision, the question whether any negligence in the present case was "gross" appears to me ultimately still very much a matter of degree and judgment.

I was cited authorities from the civil field. The plaintiffs directed me to Shawinigan Ltd. v. Vokins & Co. Ltd., [1961] 2 Lloyd's Rep. 153; [1961] 3 All E.R. 396 and the defendants to Fraser v. Furman, [1967] 2 Lloyd's Rep. 1 . The latter case, decided in the context of construction of insurance policy cover against negligence and applied by later authority to property insurance, adopts a subjective approach to the mental element required before an insured may be said to have breached

an express duty to take reasonable care or reasonable steps under the policy. Mr. Justice Megaw in *Shawinigan* on the other hand adopted an objective view of the mental element involved in recklessness in the context of a proviso in the London Lighterage Clause exempting from liability for unseaworthiness of the carrying barge, provided that the lighterman had not "knowingly or recklessly" supplied the unseaworthy barge. *Shawinigan* is clearly much closer in context to the present case, and I find assistance in the following passages from Mr. Justice Megaw's reasoning:

. . .Mr. Justice Devlin had said this [in Albert E. Reed & Co., Ltd. v. London & Rochester Co. Ltd., [1954] 2 Lloyd's Rep. 463 , 475]:

"The term 'recklessly', I think, does not really give rise to much difficulty. It means something more than mere negligence or inadvertence. I think it means running an unjustifiable risk. There is not anything necessarily criminal, or even morally culpable, about running an unjustifiable risk; it depends in relation to what risk is run; it may be a big matter or it may be a small matter."

. . .

The essence of the matter, therefore, as I see it, in the definition of Mr. Justice Devlin, must be in the word "unjustifiable" - "deliberately running an unjustifiable risk?" Counsel for the defendants says that it must be viewed subjectively. The test must be whether the doer of the act himself realized when he did the act, not only that he was taking a risk, but that the risk was unjustifiable. That would mean that if a man drove a car exceptionally fast along a private highway he could not properly be said to be driving recklessly if he himself was so confident of his own skill, or so obtuse or so selfish that he regarded the risk as justifiable. That is a proposi tion that I cannot accept. If, however, the question whether the risk is justifiable is to be viewed objectively by the standard of the reasonable man possessed of the knowledge and the circumstances which the doer of the act has or ought to have had, then I do not see that the deliberateness of the taking of the risk is an essential element. In my view, one who does something which he himself honestly, but foolishly, regards as involving no

risk, may be reckless.

. . .

In my view "recklessly" means grossly careless. Recklessness is gross carelessness - the doing of something which in fact involves a risk, whether the doer realises it or not; and the risk being such having regard to all the circumstances, that the taking of that risk would be described as "reckless". The likelihood or otherwise that damage will follow is one element to be considered, not whether the doer of the act actually realised the likelihood. The extent of the damage which is likely to follow is another element, not the extent which the doer of the act, in his wisdom or folly, happens to foresee. If the risk is slight and the damage which will follow if things go wrong is small, it may not be reckless, however unjustified the doing of the act may be. If the risk is great, and the probable damage great, recklessness may readily be a fair description, however much the doer may regard the action as justified and reasonable. Each case has to be viewed on its own particular facts and not by reference to any formula. The only test, in my view, is an objective one. Would a reasonable man, knowing all the facts and circumstances which the doer of the act knew or ought to have known, describe the act as "reckless" in the ordinary meaning of that word in ordinary speech? As I have said, my understanding of the ordinary meaning of that word is a high degree of carelessness. I do not say "negligence", because "negligence" connotes a legal duty.

Whether cll. 7.9 and 7.10 are interpreted according to United States or English principles, the conclusion which I reach is that the concept of gross negligence in these clauses does not involve, necessarily, any subjective mental element of appreciation of risk. It may therefore include, taking the language of the American Restatement, conduct which a reasonable person would perceive to entail a high degree of risk of injury to others coupled with heedlessness or indifference to or disregard of the consequences. The heedlessness, indifference or disregard need not be conscious.

The formulation in the restatement emphasizes as the important factor the "high degree of risk" which ought

reasonably to have foreseen. During**\*588** oral evidence in response to questions in chief, Judge Frankel introduced a further theme, namely that the word "serious" should be placed before the word "risk" so that the concept should read "conduct which a reasonable person would perceive to entail a high degree of *serious* risk of injury . . . ". Further, the defendants submitted that the heedlessness, indifference or disregard should (a) relate to "*probable* " consequences "of serious injury"; and (b) consist in "a *complete absence* of any attempt to avoid or minimize the serious risk of injury". Neither Judge Frankel's evidence nor the defendants' submissions persuaded me that the concept of gross negligence was subject to rigid restrictions of this nature.

This is not to say that such factors, going as they do to the crassness or blatancy of a defendant's conduct, may not be important to a decision whether negligence was gross. I see no difficulty in accepting that (a) the seriousness or otherwise of any injury which might arise, (b) the degree of likelihood of its arising and (c) the extent to which someone takes any care at all are all potentially material when considering whether particular conduct should be regarded as so aberrant as to attract the epithet of "gross" negligence. In *Shawinigan* Mr. Justice Megaw was making just such a point in the last paragraph quoted above. The American Restatement appears, at least superficially, to be concentrating on (b), when using phrases such as "the high degree of risk involved", "the highly dangerous character of his conduct" and "a strong probability that harm may result". These phrases may be sufficiently flexible to embrace or allow consideration of other factors, such as (a) and (c). I would be surprised if they were not. In any event, as a matter of construction of the present contract, I consider that all such factors must be potentially relevant. This cuts both ways. For example, if *obvious* steps have been completely omitted to guard against or cater for a risk that could have *very serious* consequences, then the fact that in many or most cases the risk was *not* likely to materialize would not automatically defeat a charge of gross negligence. Ultimately, as it seems to me, no single factor can be determinative. All the circumstances must be weighed and balanced when con-

sidering whether acts or omissions causing damage resulted from negligence meriting the description "gross" and forfeiting the contractual immunity prima facie afforded by cll. 7.9/7.10.

### IV.4 *Scope of liability of PL and PSMSL*

It follows from the above analysis that, in circumstances falling within the scope of cll. 7.9 and 7.10 respectively, PL and PSMSL are under no contractual liability in the absence of (for present purposes) wilful misconduct or gross negligence. To the extent that they are under any parallel liability in tort in the same circumstances, it must be subject to similar qualification.

The plaintiffs suggest that their claims against PL and PSMSL fall outside the language of cll. 7.9 and 7.10. Their case is that PL and PSMSL recommended *Ardent* for purchase and/or gave repair estimates without any proper basis (in particular without having arranged any adequate records or physical inspection), misrepresented her condition, failed to warn (as to the risks of acquiring her and a whole number of other matters), negotiated an "as is" purchase and failed to negotiate any proper discount. The suggestion is that, in acting or failing to act in these respects, PL and in so far as they were involved PSMSL were not acting or omitting to act -

. . .within the scope of duties of [PL or PSMSL, as the case is] with respect to (a) the management or conduct of the business and affairs of [Red Sea or Turnbridge]. . .[or] (c) the management and conduct of the business and affairs of [PL or PSMSL, as the case is] insofar as it relates to [Red Sea]. . .. The phrase "with respect to" is said to be narrower in effect than the earlier phrase "arising out of, relating to or in connection with any action taken or omitted to be taken" within the scope of PL's or PSMSL's duties. There is in my view no substance in this suggestion. Between them it was for PL and PSMSL to identify, investigate, evaluate and make appropriate recommendations to Red Sea in respect of vessels for acquisition by Red Sea or Turnbridge. All the criticisms of PL and PSMSL relate to alleged acts or omissions within the scope of their duties with respect to the management or conduct of the affairs of Red Sea

or Turnbridge, and of the business or affairs of PL or PSMSL (as the case is) relating to Red Sea. The last sentences of cll. 7.9 and 7.10 do not suggest any limitation on the scope of the earlier language of the clauses. They simply introduce a limited immunity in cases where professional advice is followed, conditional on the exercise of "extreme care" in the choice of professional advisers.

### IV.5 *The respective roles of PL and PSMSL*

As a matter of contract, the role of PL was to provide commercial advisory services relating to the tankers, while that of PSMSL was to provide technical advisory services. The CAA refers to PL performing and rendering "administrative, consulting and other services" including without limitation "providing general business advice, including**589** recommendations as to, and identification of, acquisitions and dispositions of tankers". The TAA refers to PSMSL performing and rendering "technical, operational, administrative, consulting and other services" including without limitation "performing services with respect to the operations of the Tankers including establishing requirements for the operation of the Tankers. . .". The CAA therefore identifies, while the TAA does not, the area of tanker acquisition which is under scrutiny in this case.

Nevertheless, it is the defendants' case that PSMSL, through Mr. Dunn, performed an important role in this area, in relation to *Ardent* , which they describe as follows: making a technical assessment of the vessel, after she had been identified by PL; arranging for and co-ordinating for that purpose the services of other independent contractors such as Abstech and Mr. Reilly and professionals from other companies such as Captain Kazazis; reviewing the reports and advice received from them; and discussing with PL PSMSL's resulting technical assessment.

PL's role on the other hand, the defendants describe as being, firstly, to identify vessels within the parameters of interest to Red Sea. Broadly that meant a medium sized tanker built between 1971 and 1977 and (after the acquisition of *Archer* for some U.S.$20 m. had led to protest) it involved looking for an older and cheaper

vessel to counter-balance the negative impact of her purchase on the fund's projected profitability. Secondly, they were to arrange for and co-ordinate the services of other experts or consultants, such as PSMSL, and to discuss with them their advice on such matters as the vessel's technical condition and the costs of any works required; finally they were to make an overall assessment, including as to price, to determine whether the vessel was worth recommending to the Red Sea board, and were to handle the purchase, including the negotiation of its terms. Broadly, it is Mr. Anderson, with some involvement and overriding responsibility on the part of Mr. Papachristidis himself, who is identified as fulfilling these tasks on behalf of PL.

As a matter of theory, and (it may well be) of original intention within the Papachristidis organization, the suggested division of roles creates no difficulty. In the real world, the close working relationship between the three main protagonists within the Papachristidis organization and the absence of one or other from the Papachristidis offices from time to time meant a greater degree of overlap in their roles and a less clear-cut distinction. The primary enquiry must be who was actually involved and what actually happened.

IV.6 *Did Mr. Papachristidis, Mr. Dunn and Mr. Anderson owe any and if so what duties in tort when acting on behalf of PL and/or PSMSL?*(a) The law

The answer to this question depends in each case upon whether the relevant individual owed personally a duty of care in respect of his acts or omissions about which the plaintiffs complain in this action. In the light of Henderson v. Merrett Syndicates Ltd., [1994] 2 Lloyd's Rep. 468; [1995] 2 A.C. 145 , the plaintiffs do not quarrel greatly with the use as a "convenient shorthand" of the concept of assumption of responsibility, while emphasizing that the test whether responsibility should be regarded as having been assumed is objective. It is also common ground that the application of the test is fact intensive; it requires close attention to all the circumstances and features of the particular case.

The plaintiffs draw analogies on the facts with features present in Henderson v. Merrett . They submit that, like

the managing agents there, the relevant individuals here accepted the plaintiffs under their "management" and held themselves out as possessing special expertise on which the plaintiffs relied. They emphasize in this connection the importance of Mr. Papachristidis and Mr. Anderson to the operations of PL and of Mr. Dunn to the operations of PSMSL. They point to the recognition of their importance in references in the Red Sea PPM and prospectus to Mr. Papachristidis as the founder and owner and to all three as "key persons" or "key management personnel". It should be noted however that the same documents made very clear that the actual contracts for services were to be with PL and PSMSL.

The plaintiffs point out that at first instance in Henderson v. Merrett, [1997] L.R.L.R. 265 Mr. Justice Cresswell held the active underwriter personally responsible in tort for negligence in effecting the syndicate's reinsurance to close. But the circumstances there were that the effecting of such reinsurance was specifically referred to, in explanatory notes to the relevant Lloyd's byelaw, as "the responsibility of the managing agent in consultation with the active underwriter" and was recognized in evidence by the active underwriter himself as his "most important function". More generally, great caution is required in extrapolating conclusions from as special a relationship as that between a managing agent or active underwriter and an indirect Lloyd's Name into the present entirely different situation. Lord Goff himself voiced strong suspicions that the situation which arose in that case was "most unusual": see at p. 499, col. 1; p. 195G.

Apart from the general guidance given in Henderson v. Merrett and Marc Rich & Co. A.G. v. Bishop Rock Marine Co. Ltd ., [1995] 2 Lloyd's**590** Rep. 299; [1995] 3 W.L.R. 227 , the most relevant authorities in the present context are Punjab National Bank Ltd. v. de Boinville, [1992] 1 Lloyd's Rep. 7 at pp. 17-19 per Mr. Justice Hobhouse and at p. 37 per Lord Justice Staughton, Trevor Ivory Ltd. v. Anderson, [1992] N.Z.L.R. 517 and Williams v. Natural Life Health Foods Ltd., (unreported, Dec. 1, 1995, Mr. Justice Langley; affirmed by a majority Dec. 5, 1996 ). The judgments in these cases identify further authorities

which I need not cite. The Punjab case was referred to in the House of Lords in Henderson v. Merrett though on a different point, and in the Court of Appeal in McCullogh v. Lane Fox & Partners(unreported, Dec. 19, 1995) where Lord Justice Hobhouse summarized it as deciding in relation to employees that the relevant consideration was the role they played in the transaction, not the fact that they were the servant or agent of another. In Punjab itself individual brokers entrusted with the whole or nearly the whole of the tasks which their principals undertook were held to owe tortious duties of care to the relevant clients. Mr. Justice Hobhouse's judgment at first instance makes clear that the existence or otherwise of duties of care on the part of (i) an employer and (ii) a particular employee are separate matters. The former does not necessarily depend on the latter, any more than the latter derives necessarily from the former:

Where the transaction is one which gives rise to a duty of care owed in tort by the individual's employer to the relevant plaintiff it does not always follow that there will be a like duty of care owed by the individual employee as well.. . .The relevant tests of tortious liability are objective taking into account the actual facts applicable to the relevant defendant. (See pp. 18-19.) Similar statements are to be found in the judgment of Mr. Justice Hardie Boys in the Trevor Ivory case, at pp. 526 (foot) to 527 (top). The judgments in Trevor Ivory contain illuminating analyses of the authorities (although, by reason no doubt of its date, not of the Punjab case) and of factors which may bear on the recognition or otherwise of individual responsibility in the case of a "one-man" company with which a contract is made to obtain the services of the individual behind the company. The plaintiff company owned a raspberry plantation. It engaged as consultant the first defendant, a one-man company, which, through its alter ego the second defendant, advised the plaintiff to use a particular herbicide to control growth of couch grass. He did not advise the plaintiff to remove foliage near the ground in order to protect the raspberry plants from the spray and the crop was badly affected. The New Zealand Court of Appeal distinguished the enquiry arising in the context of the tort of negligence, which depends on the existence of a

duty of care, from that arising in respect of some other torts, particularly torts of strict liability such as breach of copyright: see per Mr. Justice Hardie Boys at p. 527. Further, in statements entirely consistent with the recent approach of the House of Lords, the Court emphasized that there is more to the recognition of a duty of care than foreseeability and proximity. General considerations of justice and policy enter into the enquiry. Cooke, P. (as he was) identified in this connection at p. 524 the potential relevance of considering whether conduct was likely to give rise to personal injuries or simply to property or economic loss claims. The Marc Rich case highlights this. Further, a case of exposure to pure economic loss like the present may be viewed as lying at a more extreme point on the spectrum than a case of exposure to property damage: see e.g. per Lord Goff in Henderson v. Merrett at p. 499, col. 1; p. 196A-B.

Cooke, P. further cited with approval the reasoning of the British Columbia Court of Appeal in Sealand of the Pacific v. Robert McHaffie Ltd., [1974] 51 D.L.R. (3d) 702 in a case where plaintiffs sought to pursue a careless employee (McHaffie) personally:

Here McHaffie did not undertake to apply his skill for the assistance of Sealand. He did exercise, or fail to exercise, his skill as an employee of McHaffie Ltd. in the carrying out of its contractual duty to Sealand. Further, while Sealand may have chosen to consult McHaffie Ltd. because it has the benefit of Mr. McHaffie's services as an employee, it was with McHaffie Ltd. that Sealand made a contract and it was upon the skill of McHaffie Ltd. that it relied. The importance of a deliberately constructed contractual framework has been recognized in numerous cases, to which Lord Goff adverted in Henderson v. Merrett at p. 499, cols. 1 and 2; pp. 195G-196F. The scheme in Henderson v. Merrett did not militate against the recognition of a tortious duty of care towards indirect Names on the managing agents' part. The tortious duty mirrored the contractual duties which the managing agents had undertaken to the members' agents for Names' benefit; it doubtless also reflected the commercial reality that the Names (direct and indirect) would regard themselves as being "on" the managing agents' syndicate, would know that their un-

derwriting was being handled by the managing agents and would receive, directly or via members' agents, reports reflecting this.

More generally, Cooke P. expressed concern that liability in negligence should not erode the principles of limited liability and separate identity**591** (p. 523). He expressed no doubt about the proposition that it was open to the owner of a one-man company to assume personal responsibility for the exercise of care, citing in this connection Fairline Shipping Corporation v. Adamson, [1975] Q.B. 180 . There the director had indicated expressly that he regarded himself, and not his company, as concerned with the storage, in peculiar circumstances further identified by Mr. Justice McGechan in *Trevor Ivory* at p. 529. Cooke P. continued:

. . .it seems to me that something special is required to justify putting a case in that class. To attempt to define in advance what might be sufficiently special would be a contradiction in terms. What can be said is that there is nothing out of the ordinary here. In *Williams* Mr. Justice Langley reviewed the authorities and, on the facts, concluded that the case before him was "an exceptional case" where the director did assume personal responsibility in the knowledge that the plaintiffs would rely on his personal knowledge and experience. The case concerned negligently prepared sales projections issued by the defendant company, Natural Life Foods Ltd., to the plaintiffs, upon which the plaintiffs relied in taking up an ill-fated health food franchise in respect of premises in Rugby. The defendant company had been recently set up by the director, who had had previous experience of operating a health food shop in Salisbury. Both the defendant company and the director were held liable for negligent misstatement. A key element in the decision was the fact that the relevant health food shop franchising business was newly established and the projections were and could only be based on the director's personal knowledge and experience in establishing and operating his own health food shop in Salisbury. Mr. Justice Langley also found that the director had personally approved the sales projections issued to the plaintiff in respect of the Rugby premises, overruling objections from the company's franchising director relating to the

suitability of the site.

In the Court of Appeal, the majority relied heavily on these factors in affirming Mr. Justice Langley's conclusion that special circumstances existed setting the case aside from the ordinary and justifying a finding of personal liability for negligence in the completion of the projections, despite the company's separate corporate identity and responsibility. The leading judgment of Lord Justice Hirst contains a full review of the authorities and indicates that the correctness of the principles in *Trevor Ivory* was not challenged. The difficulty in the Court of Appeal lay in their application to the particular facts.

The Court of Appeal treated the same general principles as applicable to the case of negligent misstatement before it as applied in *Fairline* , where the issue was whether there was personal responsibility for property, and in *Trevor Ivory* , a case of negligent advice. In that light, there is no difficulty in concluding that such principles apply in the present case, which is one of an allegedly negligent or grossly negligent recommendation.

My attention has also come to the twin authorities in the Supreme Court of Canada of London Drugs Ltd. v. Kuehne & Nagel International Ltd., [1992] 3 S.C.R. 299; 97 D.L.R. (4th) 261 and Edgworth Construction Ltd. v. N. D. Lea and Associates Ltd., [1993] 3 S.C.R. 206 . They indicate that in Canada a distinction in approach exists according to whether the claim against an employee is for breach of an alleged duty of care in respect of property damage (duty recognized) or for negligent misstatement (duty denied). No absolute distinction of that nature appears in any English authority, although, as I have indicated, it is no doubt relevant to take into account as one factor the nature of any responsibility suggested. If and so far as any such distinction were relevant, a case of an allegedly negligent recommendation, such as the present, would anyway appear to fall into the latter category recognized in the Canadian cases.(b) The facts

The corporate and contractual structure which was set in place in the present case has I consider fundamental importance. Red Sea itself was the corporate conception of

the banks and the Papachristidis group, but was clearly intended to exist and operate quite separately from them. The four individual shipowning companies followed a familiar pattern of one-ship ownership, designed to ensure that their individual assets and liabilities remained separate from those of any entity. The two Papachristidis companies, PL and PSMSL, were put forward as entities, separate from other group or associated companies, to undertake the functions contained in the CAA and TAA. Mr. Reddy told me that it was because that was known and understood and because Chase viewed them as "paper companies" that Chase sought and obtained from other Papachristidis companies (HSC and two associated companies) covenants contained in a placement agents agreement relating to the PPM.

Under the CAA and TAA Red Sea obtained by contract the undertakings of PL and PSMSL, within their respective spheres. Red Sea never at any time sought express collateral undertakings from the personal defendants in respect of their handling of the matters entrusted to PL and PSMSL. Had they done so, it is improbable to suppose that they would have been forthcoming. In the Williams case, as I**592** have pointed out, the representations in question related to personal experience outside the scope of the relevant company's activity. Here, the personal liability in negligence sought to be imposed on the individual defendants as officers of PL and/or PSMSL is in respect of matters falling directly within PL's and PSMSL's responsibility under the CAA and/or TAA. Further, although all three principal officers of PL and PSMSL are criticized as negligent, the roles they played did not cover the whole field of PL's and PSMSL's activity. PL and PSMSL undertook a whole range of responsibilities, commercial and operational, managerial and technical, and had a number of employees as well as engaging outside advisers. Although they had overall responsibility for PL and PSMSL, the actual functions of Mr. Papachristidis, Mr. Anderson and Mr. Dunn cannot be regarded, together or a fortiori individually, as coterminous or co-extensive with those undertaken by PL and PSMSL.

Both sides rely on cll. 7.9 and 7.10 respectively of the CAA and TAA. The personal defendants submit that these clauses militate against the recognition of any duty of care at all. But, if necessary, they say that they are entitled as third party beneficiaries to the protection of the clauses under New York law. In this connection they submit that the clauses, upon their true construction, exonerate them entirely from liability or alternatively protect them against all damages (as defined) except any resulting from acts or omissions resulting from or constituting gross negligence, wilful misconduct, fraud or bad faith.

The plaintiffs acknowledge that the clauses cannot and do not *create* any contractual or tortious duty on the part of the personal defendants. They pleaded that the personal defendants could not rely on the clauses at all. At trial, they conceded that English law would allow the personal defendants as third party beneficiaries to claim such protection as the clauses conferred on them, since that was the effect of New York law, to which the CAA and TAA are subject. I did not hear argument on the precise extent to which this concession might actually represent English law. The theory behind it is presumably that the proper law of the contract should regulate relations between parties to the contract and third persons as closely connected to the parties in the making of the contract as the present personal defendants. The plaintiffs submit however that there is no warrant for reading the clauses as excluding all liability on the part of such individuals. They point out that under New York law an exclusion of all liability would be invalid in relation to gross negligence, wilful misconduct, fraud or bad faith. Their case at trial was thus that the clauses were consistent with a conclusion that the personal defendants assumed liability for dam ages resulting from acts or omissions resulting from or constituting gross negligence, wilful misconduct, fraud or bad faith.

I turn to the construction of the clauses. The defendants found their submissions on the fact that each clause starts with a general exoneration of liability or responsibility on the part of the relevant company and its officers, directors and employees or agents, while the exception refers only to damages "resulting from acts or omissions of the [Commercial/Technical] Advisor". They say that this means that only the advising com-

pany was ever to have any liability, and that the only alternative would be ludicrous, namely that it was intended that the company and all officers, etc. would be liable if the advising company was guilty of gross negligence, etc. I do not accept either submission. Each clause starts by identifying the beneficiaries of its protection. It then defines the scope of the losses in respect of which they are to be protected. That is "any losses, claims, damages, liabilities or expenses (collectively "Damages"). . .arising out of, relating to or in connection with any action taken within the scope of the duties of the. . .Advisor under this Agreement or omitted to be taken by the. . .Advisor with respect to. . .". This language contemplates that "Damages" as defined may arise out of actions or omissions within the scope of the advisor's duties. In the exception, the phrase "Damages resulting from acts or omissions of the. . .Advisor" simply repeats the same conception, with a slight degree of shorthand. It contains therefore nothing to indicate that officers, directors, etc. are not to be liable or responsible in case of gross negligence, etc. On the contrary, they cannot claim the clause's benefit, if their gross negligence has led to acts or omissions of the advising company resulting in damages.

This conclusion is in my judgment reinforced by the phrase "in each case" in the exception. Grammatically, the phrase refers most naturally to the respective cases of the advising company and its officers, directors, employees or agents identified at the outset of the clause. The only other possibility is that the phrase may have been intended to emphasize that the exception applied to each of the areas where action or omission might occur, identified just before it as (a), (b) and (c). Even if that were, however, the intention, it would not lead to a conclusion that the sole effect of the exception was to preserve the liability or responsibility of the advising company in cases of gross negligence, etc.

The fact that New York law would not recognize the validity of any exclusion of gross negligence in my judgment lends further support to the same conclusion. The defendants' response is that the**593** principle of New York law, whereby clauses purporting to exclude all liability are invalid in relation to gross negligence,

wilful misconduct, fraud or bad faith, applies in the context of liability for the tort of negligence under New York law, and there is nothing to show that it has any relevance to tortious liability under, in this case, English law. That may be so. However, the clauses were drafted with New York law in mind. Whether or not the exceptions which they contain precisely mirror the restrictions on the ability to exclude liability under New York law, it is improbable that the draftsman meant simply to disregard those restrictions in respect of officers, directors, employees and agents in the manner implicit in the defendants' submission.

Thus, if English law would otherwise regard the personal defendants as having assumed any tortious responsibility, the effect of the clauses would be neither to negative any such assumption nor to exclude all liability in the event of any failure of performance. Rather, it would mean that there could have been no unqualified assumption of a duty of care. The responsibility assumed could only have been to avoid causing "Damages" (as defined in each clause) by acts or omissions resulting from gross negligence or constituting wilful misconduct, fraud or bad faith, or (putting the matter the other way round) for liability limited to "Damages" so caused. To state the matter in this way is to demonstrate the unusually qualified nature of any tortious responsibility or liability which can have been assumed.

That any tortious responsibility or liability would be unusually restricted does not mean that it cannot have been assumed. On the central question whether it was here assumed, the clauses seem to me to be ultimately neutral. Their language clearly derives from the New York legal background of the CAA and TAA. Even in the context of New York law, it is not clear that there would, with or without such clauses, exist a personal duty of care on the part of officers and directors in the position of the personal defendants towards Red Sea or its subsidiaries. Assuming that there would be, the language of the clauses still lends no support to the plaintiffs' case that the personal defendants should be treated under English law as having assumed any tortious responsibility whatever towards the plaintiffs, even in circumstances of gross negligence. In the event

of wilful misconduct or fraud, recognized English torts could assist plaintiffs without any need to show a relationship involving a duty of care. In a case where what is alleged is a breach of a duty of care under English law, the existence of exempting provisions which go as far as permissible under New York law appears to me to have no real bearing on the issue whether the personal defendants should be treated as having assumed towards Red Sea or its subsidiaries any duty, or any duty restricted by the language of the clauses.

In the light of the other factors which I have already identified, I do not consider that it would be appropriate to treat the personal defendants as undertaking any duty of care, even a duty limited to responsibility for gross negligence, wilful misconduct, fraud or bad faith or carrying with it an exception from liability except in such circumstances. I do not regard this as either a special or an exceptional case. Red Sea and its subsidiaries should be held to the contractual framework which was deliberately negotiated. Even if the personal defendant were grossly negligent, there is no basis for treating them personally as having undertaken responsibility in respect of the substantial commercial risks of a financial nature inherent in the success or failure of the relevant transactions.

### IV.7 *Mr. Anderson's position as an officer of Red Sea*

That Mr. Anderson owed to Red Sea duties as a director of Red Sea is not in issue. The relevant duty can be summarized for present purposes as obliging him, when acting as a director of Red Sea, to act with the skill and care to be expected of a reasonably competent person with his expertise and knowledge: see e.g. Palmer's Company Law, vol. I, par. 8.406; Dorchester Finance Ltd. v. Stebbing, [1989] B.C.L.C. 498 at pp. 501-502 per Mr. Justice Foster. The issue for present purposes is when and in what respects Mr. Anderson falls to be treated as having acted for Red Sea or its subsidiaries.

The substance of the plaintiffs' pleaded case is that no sensible distinction can be drawn between Mr. Anderson's activities on behalf of PL and/or PSMSL and his activities as an officer of Red Sea and its shipowning subsidiaries. Thus it is pleaded that he acted in an exec-

utive capacity on behalf of Red Sea and its subsidiaries, and that his acts as such embraced (1) the identification of vessels, (2) any discussions with person other than Red Sea directors concerning *Ardent's* inspection reports and estimated repair costs and whether she should be recommended for purchase as well as (3) recommending *Ardent* to fellow Red Sea directors. The pleading alleges that it is impossible and unnecessary to seek to disentangle the capacities in which Mr. Anderson acted. Orally, the plaintiffs did not limit the full width of this case, but emphasized that it was enough for their purposes that Mr. Anderson should be treated as acting for Red Sea at the third stage when making the recommendation to Red Sea and to other Red Sea directors. At this stage at least, the plaintiffs submit, his knowledge about *Ardent* and the matters making her inappropriate for the fund should have been made available to Red Sea and to the relevant shipowning subsidiary. In so far**\*594** as he knew (or, presumably, should have appreciated) that it was inappropriate to recommend *Ardent* or to do so without qualification or warning, he should have informed Red Sea and other Red Sea directors and was in breach of duty as a director of Red Sea in not doing so. The submission was also expanded to apply in the context of the fifth plaintiff as the company owning *Ardent* . Although Mr. Anderson was not formally a director of the fifth plaintiff, the fifth plaintiff's affairs were controlled by those acting for Red Sea and the submission was that Mr. Anderson should be treated as owing to the fifth plaintiff like duties to any which he owed to Red Sea.

I start by considering the nature of Mr. Anderson's appointment as an officer of Red Sea. His appointment was as chairman of the board of directors. As such his role would be to preside over meetings of the board and shareholders and to ensure that issues on the agenda were fully and fairly discussed. The minutes record Mr. Anderson informing the board of vessels then being inspected, and the board resolving that the technical adviser (or, as Miss O'Donnell-Keenan corrected it, the commercial adviser with the assistance of the technical adviser) be requested to arrange for the purchase of vessels as soon as possible. Actual authority was given during the meeting on June 15, 1989 to the appointed man-

aging director, Mr. Vouzounerakis, to enter into contracts for the purchase of vessels. Mr. Anderson in communicating information to the board about the current position regarding vessels being inspected was, in my view, acting as an officer of PL and/or PSMSL. The CAA and TAA were approved for execution with PL and PSMSL at the same meeting. PL and PSMSL were the companies which were requested to arrange for the purchase of vessels as soon as possible. To treat Mr. Anderson in his capacity as chairman of Red Sea as undertaking responsibility for the very functions which were entrusted to PL and PSMSL appears to me unjustified.

I have mentioned in Part II.2 the procedure contemplated on June 15, 1989 whereby Red Sea board members would receive recommendations in advance of prospective purchases and would have an opportunity to discuss and approve or disapprove. Mr. Anderson was one such board member. It was his duty as a director of Red Sea to consider whether to accept any recommendation which PL and/or PSMSL made to Red Sea. As an officer of PL he would inevitably have been intimately involved in deciding whether and what recommendation should be put forward in respect of any particular vessel. The essence of the plaintiffs' case is that, at latest when any recommendation was put forward to the board members of Red Sea for consideration, Mr. Anderson fell to be treated as knowing in his capacity as a director of Red Sea about any inappropriateness in the recommendation and any inadequacy in the process of inspection and assessment leading up to its making which was within his knowledge as an officer of PL and/or PSMSL - a fortiori, submit the plaintiffs, when Mr. Anderson was the actual person through whom the recommendation was to reach other directors of Red Sea. I have already found that it is not in fact established in relation to *Ardent* and Mr. Anderson did in fact fulfil this function (although each side submitted that he did, albeit identifying quite different occasions).

I do not in any event accept the plaintiffs' submissions regarding the knowledge to be imputed to Mr. Anderson as an officer of Red Sea. It was no part of Mr. Anderson's role *as chairman of Red Sea* to undertake any of the functions entrusted to PL and PSMSL or to acquire or communicate knowledge of events leading up to a decision by PL and/or PSMSL to make an unqualified recommendation to Red Sea. The evaluation of individual vessels and the formulation of recommendations (whether with or without any qualification or warning) was a matter for PL and/or PSMSL. Red Sea relied exclusively on PL and PSMSL for such matters. If and when PL and PSMSL determined to make an unqualified recommendation in respect of any vessel, as occurred with *Ardent* , the board members of Red Sea, including Mr. Anderson, were entitled *qua board members* to take the recommendation at face value. It was no part of Mr. Anderson's function or duty *qua director of Red Sea* to review or re-appraise the process by which PL and PSMSL had determined to make an unqualified recommendation to Red Sea. Any criticism of the appropriateness of the recommendation or of the process leading up to it is a matter between Red Sea and PL or PSMSL, not between it and Mr. Anderson. Any other conclusion would attach to Mr. Anderson's chairmanship and limited role on behalf of Red Sea and its subsidiaries an expansive responsibility derived in reality from his role on behalf of PL and PSMSL, acting under the contractual arrangements which they made with Red Sea.

The potentially disproportionate consequences of the exposure which the plaintiffs seek to impose on Mr. Anderson as their officer are also worth observing. PL and PSMSL benefit by carefully constructed contractual protections. Officers of PL and PSMSL would benefit by the same protections, if contrary to my view they were to be regarded as assuming any personal responsibility at all. But Mr. Anderson is, the plaintiffs submit, liable for (in effect) the very same conduct for which they criticize PL, PSMSL and the personal directors of PL and PSMSL, without any contractual protection at all. That is the plaintiffs' case. The defendants**\*595** submit that, if Mr. Anderson's capacities are so closely entangled as not to be capable of separation, then he must be able to continue to claim the protection of cll. 7.9 and 7.10 in the CAA and TAA, even if and so far as he is liable as an officer of Red Sea. I have difficulty in seeing how this could be so.

Alternatively, the defendants submit that Mr. Anderson is entitled to the benefit of art. 103 of Red Sea's articles of association. Article 103 reads as follows:

The Directors, Officers, employees and agents for the time being of the Company when acting in relation to any of the affairs of the Company shall be indemnified out of the assets of the Company from and against judgements, fines, amounts paid in settlement and expenses incurred in defence of any action commenced against any such Director, Officer, employee or agent which they or any of them shall or may incur or sustain by reason of any act done or omitted in or about the execution of their duty in their respective offices, except such (if any) as they shall incur or sustain by or through their own acts or omissions in bad faith or involving improper benefit, fraud, breach of fiduciary duty, gross negligence or wilful misconduct. To this the plaintiffs make two responses. The first is that art. 103 formed no part of the terms of Mr. Anderson's appointment as director. His appointment was recorded by letter agreement dated June 14, 1989 sent -

. . .to foster the continuous involvement by you as a director of the Board of Directors. . .. The letter went on:

This letter agreement sets forth the terms and conditions of this involvement.

1. *Involvement* . You agree to continue to act as a director of the Company commencing on the date hereof and through the earlier of: (a) your resignation (as described in (2) below), and (b) your removal by the shareholders of the Company as provided by the Articles of Association of the Company. After provisions regarding resignation and notices, cl. 4 read:

4. *Miscellaneous* . No provision of this Agreement shall be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by you and such officer as may be specifically designated by the Board. . . . The last two clauses provided for the validity of the rest of the agreement if any provision should be invalid and for execution of the agreement in counterparts.

It is now common ground that there is nothing under Cayman Islands law, which governs the incorporation of Red Sea, to invalidate art. 103 if incorporated in any agreement to appoint Mr. Anderson as a director. But the plaintiffs submit that there is nothing making Mr. Anderson's appointment subject generally to the articles, and that cl. 4 positively excludes incorporation either of the articles generally or of art. 103 in particular. I should not have been inclined to accept that submission. The plaintiffs further submit that, even if art. 103 is incorporated, it does not assist Mr. Anderson. It indemnifies only -

. . .from and against judgements, fines, amounts paid in settlement and expenses incurred in defence of any action commenced against any . . . Director, Officer, employee or agent which they or any of them shall incur or sustain by reason of any act done or omitted in or about the execution of their duty. . .. the language is not strictly grammatical, but however it is read it is limited to claims or expenses in proceedings commenced by a third party - compare re City Equitable Fire Insurance Co. Ltd., (1924) 19 Ll.L.Rep. 93; [1925] Ch. 407 at p. 430 where Mr. Justice Romer expressed a similar view obiter in relation to wording in the article there under review. Willingness to indemnify in respect of third party claims does not necessarily equate with willingness to release from liability to the company itself. Article 103 does not in my judgment constitute any such release, and its protection would therefore have been of no assistance in the present action by Red Sea.

The conclusions which I have reached regarding the limited nature of Mr. Anderson's role on behalf of Red Sea leave little scope for the defendants' riposte that, if it was within Mr. Anderson's knowledge, as a director of Red Sea, that an outright recommendation to acquire *Ardent* was inappropriate, or inappropriate without qualification or warning, the same knowledge falls to be imputed to Red Sea and to the fifth plaintiff so as to defeat their claims. The plaintiffs' assertion that Mr. Anderson fulfilled an executive role on behalf of Red Sea led at one point even to a submission by the defendants that PL's and PSMSL's functions were limited to making a recommendation. If any qualification or warning

required to be given in relation to the recommendation, it was, they said, up to Mr. Anderson, acting purely in his capacity as a director of Red Sea, to bring the relevant matters to the attention of Red Sea. PL's and PSMSL's only commitment was to allow him in this way to use as an officer of Red Sea the knowledge which he had acquired as an officer of PL and PSMSL. The submission would clearly undermine the contractual structure and the role and responsibilities**596** placed on PL and PSMSL. It fails once it is recognized that it was no part of Mr. Anderson's role *as chairman of Red Sea* to undertake any of the functions entrusted to PL and PSMSL or to communicate knowledge of events leading up to a decision by PL and/or PSMSL to make an unqualified recommendation to Red Sea.

Mr. Lyon further submitted that PL and PSMSL never in fact resolved to make unqualified recommendations, but left it to Mr. Anderson to use whatever knowledge he had in whatever way was appropriate in discussing any particular vessel with other Red Sea directors. That submission is not made good on the facts. Firstly, it is not shown that it was Mr. Anderson who was responsible for discussing *Ardent* with other Red Sea directors. Secondly, the likelihood is that the conversations between Mr. Dunn, Mr. Anderson and Mr. Papachristidis led to a conclusion that it was worth trying to purchase *Ardent* for around U.S.$12 m., with repair costs of U.S.$2 m. in mind, and that she should be recommended accordingly. I do not consider that it was contemplated that Mr. Anderson would become involved in discussions with other Red Sea directors about the background or basis of the recommendation, nor did he. The whole process of recommendation has, as I have said, become laden with a formality and significance which I do not believe that it possessed at the time. In one way or another, there is no reason to doubt that Mr. Bouckley at least was given notice of the proposed purchase in advance. But the reality is that, once PL and PSMSL had identified and recommended without qualification a vessel falling within the parameters previously set and meeting Mr. Baarma's concerns regarding age and price, the agreement of the Red Sea directors was to all intents and purposes assured. The Red Sea directors were relying on PL and PSMSL as specialist advisers to identify and recommend an appropriate vessel. There was no basis on which they could take matters further.

Had it been part of Mr. Anderson's role as chairman of Red Sea to communicate such knowledge, so that he was in breach of duty owed to Red Sea and/or the fifth plaintiff in not doing this, I should still not have accepted the defendants' submission that his knowledge should necessarily be attributed to Red Sea or the fifth plaintiff so as to defeat their claims against the defendants. Whether knowledge possessed by an individual officer is to be attributed to the company of which he is officer is not answered by determining that the officer owed a duty to pass his knowledge to the company or other officers of the company. The Court may of course infer as a matter of fact that the duty has been duly performed, but this is no more than a rebuttable presumption.

In support of these propositions I refer to El Ajou v. Dollar Land Holdings Plc., [1994] 2 All E.R. 685 and Meridian Global Funds Management Ltd. v. Securities Commission, [1995] 2 A.C. 500 . The judgment of Lord Justice Hoffmann with which Lord Justice Rose agreed in *El Ajou* identifies three categories of case where knowledge of an agent is imputed to his principal: (i) where an agent's knowledge affects the performance or terms of a particular contract, (ii) where his principal has a duty to investigate or make disclosure and (iii) where an agent is authorized to receive communications. Neither (i) nor (ii) applies in the present context. In *El Ajou* (iii) was inapplicable because Mr. Ferdman had received information about the relevant matters while acting as agent for third parties, not for the company ("DLH"): see at p. 703d. So here any relevant knowledge acquired by Mr. Anderson was acquired by him while acting for PL and/or PSMSL, not for Red Sea or its subsidiary. Lord Justice Hoffmann went on to consider whether Mr. Ferdman, in his capacity as broker employed by DLH and/or as chairman of DLH (in which connection the Court of Appeal also held him to have been acting as DLH's directing mind and will in respect of the relevant transaction), owed to DLH a duty to communicate to DLH the knowledge which he had

come by acting for the third parties; and, if he did, whether that meant that such knowledge was to be imputed to DLH. Lord Justice Hoffmann was inclined to agree that he did owe such a duty: p. 703f. But he held that, in the absence of any duty on DLH to investigate, knowledge so acquired by Mr. Ferdman was not to be imputed to DLH if he did not actually communicate it to DLH: pp. 703h-704j. So here, even if Mr. Anderson was under a duty to communicate to Red Sea directors knowledge of factors relevant to PL's and/or PSMSL's recommendation of *Ardent* , still such knowledge is not to be imputed to Red Sea, since he did not actually communicate it. There is no suggestion that Mr. Anderson was the directing mind and will of Red Sea for the purposes of attributing his knowledge on that ground. The directing mind and will was the board as a whole, which alone had responsibility for approving or disapproving any recommendation.

The Meridian case reinforces this conclusion. The advice of the Privy Council was given by Lord Hoffmann. He emphasizes the common sense underpinning of the principles governing attribution of knowledge. The question whether knowledge of an agent should be attributed to his principal depends upon the context and purpose of the question. Here the context and purpose is a defence to the effect that the plaintiffs' complaint about the making of an unqualified recommendation without warning must fail, because the plaintiffs through**597** Mr. Anderson were aware of the factors which made the recommendation unsuitable or of the qualifications and warnings which should have accompanied it. The only persons whose knowledge could sensibly be attributed to Red Sea and the fifth plaintiff in this context would be the Red Sea board as a whole. PL and PSMSL cannot sensibly be regarded as having fulfilled their contractual duties to Red Sea merely because one of their officers was a member of Red Sea's board. Even if Mr. Anderson informed other directors of the recommendation, which is not shown in the case of *Ardent* , still his knowledge could be no substitute for communication to the whole board, if he did not in fact pass it on.

V. GROSS NEGLIGENCE - BACKGROUND MAT-

TERS

V.1 *Expert evidence*

I start with an issue regarding the need for expert evidence and the extent to which any need was met. The issue arose in the context of the plaintiffs' criticisms of Mr. Papachristidis, Mr. Anderson and Mr. Dunn. The plaintiffs submit that many of their criticisms do not raise any particular matters of expertise, and that so far as they do such expertise is supplied by the evidence of Mr. Henderson and Mr. Houghton.

The roles of Mr. Papachristidis and Mr. Anderson were primarily commercial, not technical. It was incumbent on them to assess from all angles the appropriateness of any vessel identified as a possible purchase for the Red Sea fund. On the technical side, they would rely on Mr. Dunn's appraisal. This does not exclude the possibility that there were some technical aspects so obvious that Mr. Papachristidis and Mr. Anderson were bound to have regard to them, irrespective of Mr. Dunn. Wider commercial considerations which they would consider would include a vessel's age and price, any features which made it more or less attractive for trading purposes (although as a medium-sized oil tanker there appears to have been little special about *Ardent* ), the availability and merits of other vessels for purchase and actual and anticipated market conditions.

The defendants submit that the assessment which Mr. Papachristidis and Mr. Anderson were called on to make was one which is incapable of sensible or proper review by a Court without the assistance of someone who has fulfilled the same role. According to this submission, the plaintiffs, in order to make good any criticisms of Mr. Papachristidis and Mr. Anderson, would have to call someone with equivalent experience as an owner or manager in evaluating and deciding whether to acquire elderly second-hand tankers, on the basis of technical advice from an engineer or technical expert in Mr. Dunn's position. If this submission were right in principle, the nature of any admissible expert evidence would seem to require even tighter definition. The evidence of an owner or manager would not by itself be sufficient. The present issue concerns the appropriateness

Copr. © West 2009 No Claim to Orig. Govt. Works

of the purchase of *Ardent* for a fund which was being advised by and whose vessels were to be managed by PL or PSMSL. A possible criticism of Mr. Dunn's thinking is that he viewed vessels acquired by the fund as if they were part of a single fleet, consisting of all vessels managed by the Papachristidis group, and that this led him to accept an approach to repair costs based to some extent on averaging over the whole fleet, when repair costs incurred on any Red Sea fund vessel would fall exclusively on that fund. The defendants' submissions on expert evidence suggest that the only admissible evidence would have to come from a technical adviser/manager responsible for the technical appraisal of a limited number of vessels to be considered for acquisition and subsequent management on behalf of a third party fund.

In my judgment, the defendants' submissions expand the scope of expert evidence beyond its proper sphere. Taking first Mr. Papachristidis and Mr. Anderson, I consider that their positions with respect to PL and PSMSL and the fund can and should be considered, and the appropriateness and reasonableness of their conduct in relation to the fund can and should be evaluated, by the Court. There is no need or indeed place for the expert evidence which the defendants suggest as essential. I find of assistance two particular passages which the plaintiffs cited. The first is from R. v. Bonython, [1984] S.A.S.R. 45 at p. 46 , where the Supreme Court of New South Wales said this:

Before admitting the opinion of a witness into evidence as expert testimony, the judge must consider and decide two questions. The first is whether the subject matter of the opinion falls within the class of subjects upon which expert testimony is permissible. This first question may be divided into two parts: (a) whether the subject matter of the opinion is such that a person without instruction or experience in the area of knowledge or human experience would be able to form a sound judgment on the matter without the assistance of witnesses possessing special knowledge or experience in the area and (b) whether the subject matter of the opinion forms part of a body of knowledge or experience which is sufficiently organized or recognized to be accepted as a reliable body of knowledge or experience, a special acquaintance with which the witness would render his opinion of assistance to the court. The second question is**598** whether the witness has acquired by study or experience sufficient knowledge of the subject to render his opinion of value in resolving the issues before the court. The second passage is in Davie v. the City of Edinburgh, 1953 S.C. 34 at p. 40 :

Expert witnesses, however skilled or eminent, can give no more than evidence. They cannot usurp the functions of the jury or Judge sitting as a jury any more than a technical assessor can substitute his advice for the judgment of the Court. Their duty is to furnish the Judge or jury with the necessary scientific criteria for testing the accuracy of their conclusions so as to enable the Judge or jury to form their own independent judgment by the application of these criteria to the facts proved in evidence. The scientific opinion evidence, if intelligible, convincing and tested, becomes a factor (and often an important factor) for consideration along with the whole other evidence in the case, but the decision is for the Judge or jury. The issues before me do not involve questions of compliance with accepted standards of conduct laid down by any institute or, so far as appears, by common usage. They involve questions of the reasonableness of business conduct in specific situations. The words of Mr. Justice Oliver (as he was) in Midland Bank Ltd. v. Hett Stubbs and Kent, [1979] 1 Ch. 384 at p. 402 are pertinent:

I must say that I doubt the value or even the admissibility, of this sort of evidence, which seems to be becoming customary in cases of this type. The extent of the legal duty in any given situation must, I think, be a question of law for the court. Clearly if there is some practice in a particular profession, some accepted standard of conduct which is laid down by a professional institute or sanctioned by common usage, evidence of that can and ought to be received. But evidence which really amounts to no more than an expression of opinion by a particular practitioner of what he thinks he would have done had he been placed, hypothetically, and without the benefit of hindsight, in the position of the defendants, is of little assistance to the court. That was said in

the context of litigation against a firm of solicitors and evidence given by a solicitor. It applies a fortiori where as here there is no recognized profession with established rules and standards involved, the case concerns the business activity of providing shipping advisory and management services and the suggestion is in effect that I need to hear evidence from other advisers or managers as to what they would have done hypothetically and with hindsight in the present situation. Such evidence would be bound to lead to extensive cross-examination to ascertain whether they had ever been in, or had ever experienced, the situation presently under consideration. Even then it would not derive from any objectively ascertainable standard or consensus within a recognized profession.

Mr. Dunn stands in a different position to Mr. Papachristidis and Mr. Anderson. He was and is a qualified engineer of considerable technical as well as managerial experience. The basic question is the reasonableness of the procedures adopted and assessment made in the case of *Ardent* and, in particular, of his U.S.$2 m. allowance for repairs. I have already doubted whether it would be realistic to regard his role as stopping necessarily at the point where he gave Mr. Anderson and/or Mr. Papachristidis material to enable them to decide whether *Ardent* was suitable for recommendation. But I accept that, once he had given his assessment of repair costs, his views and voice in any subsequent discussions where he was present would have been much less significant or influential on the broader decision whether to purchase than those of Mr. Papachristidis and Mr. Anderson.

Even if Mr. Dunn's role was confined simply to communicating his assessment of *Ardent* and of repair costs, the defendants submit that, to make any criticism of Mr. Dunn, the plaintiffs would need to call someone who had fulfilled an equivalent role. I do not accept this submission. On any question of technical experience or knowledge, for example on the risks of corrosion and the costs and time likely to be involved in repairs, Mr. Houghton has the relevant expertise. The defendants do not challenge his expertise to give evidence on the preparation and execution of repair specifications, the drawing up of budgets and the maintenance and dry-

docking of vessels (though not, they say, medium sized crude oil tankers). As to whether Mr. Dunn acted reasonably, or grossly negligently, in giving Mr. Anderson and/or Mr. Papachristidis a U.S.$2 m. figure for repairs on *Ardent* to use for the purposes of a decision whether or not to recommend the vessel for acquisition, either the issue is a technical issue within the scope of Mr. Houghton's expertise, or, to the extent that other factors are involved, they are not matters of expertise on which the Court needs any other expert evidence. Whether or not he was party to the decision to recommend or not, Mr. Dunn was involved in the first instance in assessing the vessel and repair costs from a technical angle, and in the second instance in communicating his assessment to others, for a purpose of which he knew, in terms which would give them an appropriate basis for a decision whether or not to recommend the vessel. Whether in this context he sufficiently identified the uncertainties about the vessel's condition, the difficulties of giving any**599** estimate and the resulting risks are questions to be determined firstly by considering the technical evidence and then by making a common sense judgment.

To the extent that expert evidence may be material in relation to the conduct of Mr. Papachristidis, Mr. Anderson and Mr. Dunn in deciding to recommend *Ardent* for purchase, the plaintiffs also submit that it is to be found in the evidence of Mr. Henderson and Mr. Houghton. Mr. Henderson is a party to this litigation. He was a straightforward witness, who expressed some strong views with considerable conviction. His contemporaneous memoranda confirm him as blunt speaking and forceful. However, his experience does not lie in any area which might be regarded as matching or overlapping Mr. Papachristidis', Mr. Anderson's or Mr. Dunn's. Until he became involved with the Red Sea and Papachristidis fleet, he had effectively no involvement with tankers. His career involved the management of dry cargo vessels and small, generally new chemical tankers. He has not acted in the sale or purchase of any vessels. He is not an expert on the inspection of any vessels, or on corrosion in oil tankers. Indeed he said at one point, perhaps over-modestly, that he was not an expert in anything. He had some strong views on the

importance of class records. If expert evidence is necessary, it seems to me that Mr. Henderson does not supply it. That is not to say that some of his views on technical and shipping matters do not have force as a matter of common sense. However, his evidence did also indicate at points a personal aversion towards Mr. Anderson and (as Mr. Henderson perceived it) his highhandedness, to which Mr. Henderson attributed the mistaken purchase of *Ardent* . Mr. Anderson was undoubtedly a forceful character. But I consider that Mr. Henderson's evident distaste in relation to Mr. Anderson's method of conducting himself tended to lead him too readily to sweeping conclusions about Mr. Anderson's role and responsibility in relation to *Ardent* .

Mr. Houghton is, like Mr. Dunn, a qualified engineer. After time at sea he has had a range of experience on shore since 1966. For four years until 1970 he was a ship-repair manager at Cammell Laird, Birkenhead working predominantly on oil tankers, then he was a superintendent with National Bulk Carriers Inc. of New York, who had taken delivery of six VLCC's and had six other tankers between 60,000 and 85,000 tonnes and six similar-sized ore carriers, all these vessels being 12 to 15 years old. The largest part of his career was spent as a superintendent with Cunard Steamship Co. Ltd. from 1973 to 1991, where he was mainly involved with produce carriers but had some contact with oil tankers. After periods managing special projects, he undertook during 1973 some six to eight condition inspections on vessels including product tankers and five pre-purchase inspections of tankers including two medium-sized oil tankers of about 12 and 16 years old. Since 1993 he has worked with Vine Gordon & Co. Ltd., consulting engineers and marine surveyors, again with some experience of pre-purchase inspections. His dealings with persons on the same managerial and technical levels as Mr. Papachristidis and Mr. Anderson were effectively limited to dealings with the managing director and technical director respectively of Cunard and the technical director of Bolton Marine Management during 1992. With the technical director of Cunard he was responsible for making a technical assessment of a medium-sized oil tanker considered (and in the result rejected) for purchase by Nigerian National Petroleum Co. ("NNPC") in

the late 1970s. Although Mr. Houghton's experience has never placed him in the role of Mr. Dunn, he seems to me qualified to give evidence as to the nature of the evaluation which would be expected of someone performing Mr. Dunn's role, so far as that involves technical matters.

Mr. Lyon made strong criticism not of Mr. Houghton's bona fides but of his impartiality and evidence. I do not accept this general criticism. There were areas where Mr. Houghton expressed views outside his expertise, based on his own perception of the position in the light of his long experience and common sense. He was, for example, drawn into expressing views about how a reasonable tanker owner or buyer would behave. The fact that he is a relatively recent recruit to the specialist field of expert evidence may have played some part in this. He also made some mistakes and some comments which he later qualified or withdrew. Mr. Spence was not immune from the latter failing. To take two examples: both experts became involved in very detailed examination of Lloyd's Register of Shipping records relating to *Ardent* , in analysing which each made errors; both experts also made erroneous assumptions about the time required to pump out the ballast tanks - on examination it proved that this would have been an extremely simple operation for *Ardent* to undertake, since she was equipped with an electrical pump. Both sides' experts also took and held views which were, as it happened, largely favourable to their own side. But I do not regard Mr. Houghton as any more open to a charge of partisanship than Mr. Spence, in this or any other respect. In general I was impressed both by the evident competence and conscientiousness which Mr. Houghton displayed when giving evidence on matters within his experience and expertise and with the content of such evidence. I did not regard him as evasive.**600**

### V.2 *Corrosion*

Advanced corrosion was in 1988 and 1989 a recognized problem in the segregated ballast tanks of elderly tankers of the vintage of *Ardent* . That corrosion is likely to be less severe as one descends from the top of a permanent ballast tank is true as a general proposition. Corrosion flourishes above and around the waterline.

Anodic protection of an uncoated tank can only operate below the waterline. Even so, the extent and depth of corrosion in any particular tank cannot safely be predicted. Further, what is normal is not invariable. The impact and seriousness of corrosion at any level is subject to the pattern of usage and other factors affecting the particular tank. As the surveyor inspecting the forepeak of *Armour* commented in the light of his inability to see the lower levels of the forepeak of that vessel: "it is felt that while the upper levels are in acceptable condition the lower levels would give cause for concern". The incidence of corrosion will further depend on whether the tanks were or had ever been coated, and, in so far as they were uncoated, on the replacement of anodes when exhausted. It will also be influenced by patterns of usage and humidity of the tanks. Mr. Papachristidis and Mr. Dunn were aware of such matters. Mr. Dunn in particular knew that corrosion could be savage in uncoated and unprotected ballast tanks. Mr. Anderson was aware that corrosion was often a concern in older tankers, but said that he relied on Mr. Dunn to tell him whether it was a concern in relation to any particular tanker. Mr. Papachristidis was also accustomed to rely on Mr. Dunn for assistance on technical matters.

To indicate the effect of corrosion, Mr. Houghton produced a report indicating that corrosion rates of 1.00 mm per annum in the upper sections and 0.5-0.6 mm per annum in the lower sections of ballast tanks were common, and could result in wastage of between 15 per cent. and 40 per cent. of original scantlings in vessels of between nine and 11 years old. *Ardent's* scantlings appear to have been between 10 and 20 mm thick. Classification societies would be expected to condemn steel which had suffered a 20 per cent. diminution in thickness. The process of corrosion speeds up with the age of the steel, as the cracking of hard surface scale exposes the underlying bare steel to fresh attack.

Mr. Dunn knew that corrosion could necessitate major steel renewals. He had not had experience of savage corrosion in the ballast tanks of any Papachristidis vessel, because of the care the Papachristidis group took in the protection of tanks. The Papachristidis group in the 1980s had effectively no experience of oil tankers, or

indeed other vessels, of the age and size of *Ardent* . In fact, prior to 1988-1989, when a number of tanker funds were set up, no-one seems to have viewed old tankers as an area for large-scale investment. Mr. Dunn's experience during his career was limited to occasions when he had had to replace 40 to 60 tonnes at most. He kept up however with the technical literature which referred to corrosion problems of ageing tankers and had heard of other operators' experiencing steel renewals of 80-100 tonnes in ballast tanks on third or fourth special surveys.

Several reports on other vessels which were considered and either rejected or accepted on behalf of HTL highlighted the problem. Mr. Holding inspected m/t *Thiseas* on July 15, 1988. She was a vessel built in 1976. Mr. Holding reported that she had passed her second special survey in September, 1985 and been drydocked only six months before his inspection. Her hull appeared in good condition, her cargo tanks were very clean and showed only minor corrosion. However, all her permanent ballast tanks were affected by severe corrosion, the aft peak worst of all. The condition of her ballast tanks was so poor that he felt unable to recommend her purchase. The brevity of the inspection of the aft peak made the extent of steel renewals required difficult to assess, but "sufficient was seen to suggest that something in the order of 150 to 200 tonnes of new steel will be required". This being "a very high cost area to renew steel", Mr. Holding estimated a cost in the order of U.S.$750,000 to U.S.$1 m. in this tank alone. Annexed to the report were photographs showing extreme internal wasting and corrosion in the aft peak.

Mr. Dunn saw this report in 1988, but said in evidence that he "did not particularly recall it" at the time when vessels were being considered for Red Sea. He said that he would not have been interested in *Thiseas* anyway because of her Fiat engine. He found Mr. Holding's suggestion that 150 to 200 tonnes would require renewal in the aft peak unbelievable. Notwithstanding the contrast between the condition of *Thiseas'* permanent ballast tanks and other tanks and parts, he maintained that, if it was not possible to see any segregated ballast tank, "you can still judge from the conditions of other tanks

within the vessel" what the condition of the permanent ballast tanks was. The most that he would accept was that a visual inspection of permanent ballast tanks was preferable and would give an immediate impression as to how serious any corrosion was. I did not find this evidence impressive. *Thiseas* was a striking case, and Mr. Dunn was, on his own account, attentive to the experiences of other shipowners with regard to corrosion. This report should have impressed itself as a warning of the risks and dangers of corrosion in permanent ballast tanks, even where other tanks appear in good condition. *601

Mr. Dunn also said that, in respect of a vessel which has passed special survey three years previously, "you can assume that the classification society has done their job properly" when considering the likely condition of permanent ballast tanks. He accepted that in the case of *Thiseas* he would have been misled had he made any such assumption. It is unnecessary in this context to consider whether he would have been misled because class cannot have inspected the permanent ballast tanks fully or properly three years previously (as Mr. Dunn's answers would seem to imply) or whether corrosion may sometimes simply accelerate and cause major problems within three years after a satisfactory special survey. On either view, *Thiseas* represented a warning against unchecked reliance on a vessel's classification - particularly classification pursuant to a special survey some years previously - in assessing the condition of permanent ballast tanks.

Two other vessels whose class records were inspected in May, 1988 were *Atlantic Dignity* and *CYS Excellence*. Mr. Jerry Semple reported that the vessels were sisterships built in Japan in 1975 with a deadweight of 90,000 tonnes and that:

Although both have suffered extensive steelwork repairs in recent years, there is a strong suspicion further extensive repairs will be required in the ballast tanks in the near future. The "ATLANTIC DIGNITY" has carried out a considerable amount of corrosion repairs in 2P WPT in 1985 [a mistake for 1987] and if this reflects the standard of protection and maintenance onboard then suspicions to the above are reasonably justified.

Mr. Dunn said that Mr. Semple "was just being very cautious, as Jerry is". He also said that, if there had been repairs to the proper standard, he would not expect more and more repairs. But he accepted that if there was not proper maintenance, if anodes were not put back, then it was a possibility. On inspection by Mr. Karoussos, *Atlantic Dignity* did prove to require "extensive steel repairs" in her Nos. 2 permanent ballast tanks, although in other respects to be in good condition.

A third vessel put to Mr. Dunn in evidence was *Nicola Prosperity* , bought on behalf of HTL after two inspections by Mr. Pearce in August and September, 1988. On the first inspection, her No. 3 segregated ballast tank was found to be in very poor condition. On the second, much more extensive inspection was undertaken of both port and starboard ballast tanks, which were found in poor condition at and for the uppermost 3-4 metres below the deckheads, as well as of her forepeak and after peak tanks, which were found in much better conditions. A "very special deal" was concluded with the sellers, Shell, which enabled the Papachristidis organization to have repaired basically everything they wanted, and the vessel was bought.

*Atlantic Dignity* , *CYS Excellence* and *Nicola Prosperity* appear to me to illustrate the caution called for when faced with possibly extensive corrosion in permanent ballast tanks.

V.3 *Storage vessels*

It is obvious that the pattern of usage of the cargo tanks of a vessel serving as a storage vessel is likely to differ from that of a vessel engaged in trading, and there may be some consequential difference in the pattern of usage of ballast tanks. In the case of *Ardent* the limited class records obtained by PSMSL indicated that those cargo tanks which in trade would be available for use as additional ballast tanks had been converted to use exclusively as cargo tanks. The implications of use as a storage vessel on the likely pattern of permanent ballast tank usage are not clear. The plaintiffs have failed to establish that they would necessarily or probably expose those tanks to an increased risk of corrosion, or that this should have been appreciated by Mr. Papachristidis, Mr.

Anderson or Mr. Dunn. The most that can be said is that purchase of a storage vessel involves elements of uncertainty not involved in the purchase of a vessel with a recorded pattern of regular trading, and that there is a particular risk in the case of a storage vessel that machinery not immediately required would not have received the maintenance attention which would be required for normal trading. The fact that Mr. Anderson indicated that PSMSL was looking at a storage vessel on Aug. 3, 1989 and that Mr. Papachristidis referred to *Ardent* on Aug. 23, 1989 as a storage vessel itself suggests a recognition that vessels so used may present some different characteristics or differences in a condition from vessels continuously employed in normal trading. Among the aims of a pre-purchase inspection would be to reduce the uncertainty and obtain an idea of the extent of the maintenance undertaken and required in respect of a storage vessel.

### V.4 *Ardent's age*

I have mentioned the Papachristidis group's lack of experience of tankers of the age and size of *Ardent* . With the recent exception of the 17-year old *Armour* , *Ardent* was older than any other vessel acquired by Mr. Dunn, being already three years past her third special survey. *Hellespont Faith* , built in 1981 with a new cargo section built in 1981, was acquired in 1972 and bareboat chartered to first class charterers (Sanko) until 1985. She presents a different proposition to a vessel of unknown history acquired on the open market. The closest other purchases in terms of age were those acquired for **\*602** the HTL fund in 1988, vessels then aged 12, 13, 14 and 15 years old respectively. Some four or so crude oil tankers acquired by the Papachristidis organization at much younger ages continued to be owned and managed in 1989, by when they were between 13 and 16 years old. The Papachristidis' organization's experience with them offered no reliable guide or assistance when it came to evaluation of an unknown 17-year old vessel with known problems such as *Ardent* . The ULCCs which Mr. Dunn mentioned in evidence were also not comparable vessels. They were vessels within the Papachristidis fleet which had been reactivated after being laid up. The different character of the vessels owned

and the high standards applied by the Papachristidis organization in the past appear to be born out by statistics produced by Mr. Papachristidis showing a maximum of 25 tonnes installed in any Papachristidis vessel on any drydocking.

Mr. Dunn did not dispute that the critical time in terms of expenditure for vessels built in the early 1970s was when they came to be 15 to 20 years old. Indeed, he said that was why he had allowed U.S.$2 m. in respect of *Ardent* . He did however take issue in evidence with a note from three very experienced, reliable and capable surveyors in PSMSL dated July 7, 1989, where they expressed the view that -

It should be remembered that in the halcyon days of the early 1970's, with ship construction having by that time embraced the concept of mass produced "cheap" ships to relatively simple designs, the then current school of thought advocated a working life of 10-15 years - "throw-away" ships. This was a direct reversal of shipbuilding's traditional role, where one-off ships were constructed to individual owners requirements, often to heavy scantlings for an undefined life, and up to that time many owners were operating ships for well in excess of 20 years. Both Mr. Dunn and Mr. Spence strongly dissented from this passage, particularly the references to "throw-away" or "cheap" ships. The language is, I accept, heightened and cannot be taken literally. The position appears to be that scantlings were reduced, but in the context of an improved ability to calculate stresses and improved welding techniques. Lighter scantlings could however make any corrosion more significant in percentage terms. Further, PSMSL's surveyors' memorandum was written against a background of intense concern about the age of the Papachristidis fleet (which the acquisition of Red Sea fund vessels could only increase) and about the difficulties which PSMSL were facing in keeping up with maintenance work. Making all due allowance for heightened language, exaggeration and legitimate differences of opinion, this memorandum sounded what I regard as a justified note of caution about ageing vessels and the problems of maintenance they were likely to present. It confirmed the need, established by other considerations in

Copr. © West 2009 No Claim to Orig. Govt. Works

any event, for as full a records and pre-purchase inspection as possible.

V.5 *Maintenance in the 1980s*

In a paper given on Sept. 8, 1989, by Mr. T. C. Mathieson, executive vice-president of Det norske Veritas Classification A/S, he said:

The ageing world fleet

The average age of the world fleet is now almost 16 years, and with the present levels of deliveries of new-buildings and scrapping of tonnage, the average age is continuing to rise rapidly. Whilst tankers until a few years back were scrapped due to reasons of economy before they reached the age of 15, the present tendency is to keep them alive until they become technically obsolete. The average age of tankers being scrapped at present has increased to approximately 20 years. . . .

The technical standard of the world fleet has deteriorated, at least for a significant portion of the fleet. A major reason for this is the increased age combined with a lack of long term preventive maintenance in many shipping companies during the recession over the past 10-15 years.

We all know that we have been through a number of lean years where mere survival in the short term has been the order of the day. Funds have simply not been available for other purposes than to keep the vessels running for the next few voyages.

During these years, many shipping companies have been forced to slim their organizations of qualified technical personnel, with the result that some basic knowledge within technical fields are now absent.

It can also be suspected that the increasing trend of management companies operating their vessels on behalf of the owners, and that of "asset playing" owners with limited knowledge of the operational and technical aspects of shipping has had an overall negative effect on the long term preventive maintenance of ships. It should, however, be emphasized that serious management companies basing their business strategy on long term relationship with vessels and their owners probably are among those maintaining the vessels' standards best in today's market.

The conclusions to the paper said that the following were "main messages to be remembered":

Old vessels may be of a variety of technical standards depending on their past maintenance*603 history. The condition of old vessels should never be taken at face value, a thorough inspection should be carried out by personnel having relevant qualifications. A vessel having frequently changed ownership during its lifetime, should be carefully considered as such a history may indicate that less than adequate maintenance has been carried out.

Old vessels today will stay around for a number of years to come. Investments in upgrading/maintenance will therefore be required and also likely to prove to be very profitable.

For tankers, corrosion of internal structures in the permanent ballast tanks is a particularly important problem area. If corrosion has not yet resulted in critical scantlings, such tanks are recommended to be sandblasted and recoated. If corrosion has reached critical proportions, it should be considered to renew complete sections of the vessel (comprising the ballast tanks with boundary bulkheads) instead of piecework steel renewals which will only give temporary relief.

. . .

Thickness measurements should never be relied upon unless carried out by very reliable personnel or confirmed to be correct by random double checking, and should always also cover structures in internal ballast tanks. These were broadly accurate statements of the position. The matters stated would or should have been within the knowledge of each of Mr. Papachristidis, Mr. Anderson and Mr. Dunn throughout 1989, before the actual delivery of the paper. Mr. Papachristidis pointed out that the recession in the freight market only lasted until 1986, but agreed that some owners took shortcuts throughout the period up to 1989. Mr. Anderson was not

cross-examined on some of the aspects covered, although his evidence was not inconsistent with their being within his general knowledge. Mr. Holding and Mr. Pearce had been careful, in reports on vessels inspected in 1988 and 1989, to identify any general lack of maintenance as a major consideration. Lack of maintenance during the recession was not of course universal. These reports would have been seen by Mr. Dunn and (at least where the vessel became a candidate for purchase) by Mr. Papachristidis and Mr. Anderson. Mr. Mathieson's report refers to the high standards of some managers. The Papachristidis group had over the years maintained high standards, but by mid-1989 difficulties in maintaining their expanding and ageing fleet to their charterers' and to Mr. Papachristidis' own high standards were manifesting themselves. In assessing the suitability of any elderly vessel for the Red Sea fund, Mr. Papachristidis, Mr. Anderson and Mr. Dunn should have given particular atten tion not only to any identifiable repairs revealed as necessary by her inspection, but also to her general state of maintenance and to the maintenance costs likely to be incurred by the fund both immediately and in the future if she was acquired. The practical significance of this was or should have been to emphasize to Mr. Dunn the need for as full a pre-purchase inspection as possible, combined with a need for as much information as possible about the vessel's past history, including sight of her class records. Mr. Papachristidis and Mr. Anderson would in the first instance leave these matters to Mr. Dunn and PSMSL. They would await his assessment of the position regarding repairs and maintenance. But Mr. Papachristidis in particular would have been able to discuss the basis of that assessment at least generally with Mr. Dunn, if he wanted.

### V.6 *Pedigree*

Mr. Mathieson's paper identified a need for extra care in respect of vessels changing ownership frequently during their lifetime. Mr. Papachristidis, Mr. Anderson and Mr. Dunn would, I find, all have been aware of this as a factor to bear in mind when considering any vessel. *Ardent* had had five different names, as appeared by the Abstech report, two of them prefixed with the word "Ocean". Although this could be consistent with a

single owner, it raised a considerable possibility that she had had a number of different owners, which appears in fact to have been the position to the knowledge of Mr. Papachristidis. Mr. Papachristidis recognized the prefix "Ocean" in *Ocean Maid* and confirmed in Lloyd's Register that she had been owned by a friend of his father, Mr. Teryazos, who had died in 1981 and whose vessels were managed by Stathatos. Mr. Kazazis' telex, which Mr. Papachristidis would also have seen, stated that the vessel's current owners had bought her some two and a half years previously from Tsakos Co. Mr. Papachristidis knew nothing of the current owners or their managers, Marontree Shipping S.A. Nothing detrimental was actually known about any of the owners, save for Captain Kazazis' reservation about *Ardent's* maintenance over the last two years; Mr. Teryazos' friendship with Mr. Papachristidis' father was presumably regarded as a favourable factor. I accept, in the light of Mr. Houghton's evidence, that no real comfort could derive from the repairs done in December, 1987, preparatory to the vessel entering service as a storage vessel. But, pedigree in the sense of multiple ownership is in my view a minor factor in the present case, adding only limited emphasis to the need for appropriate records and pre-purchase inspections.**\*604**

### V.7 *Spanish vessels*

Speaking of ship construction, Mr. Papachristidis said that "there are mixed feelings about Spanish built vessels" which were known to him when considering *Ardent* . Mr. Anderson was aware that the market applied a discount in relation to them compared with Japanese vessels, a discount which Mr. Marsh confirmed. The plaintiffs drew attention to a memorandum dated May 31, 1989 from Mr. Holding to Mr. Anderson, copied to Mr. Dunn, in which Mr. Holding expressed the view that *Ardent's* Spanish build would mean that her scantlings were small, that spare parts for any Spanish made equipment would be hard to come by, and that her age made these even more significant. Mr. Papachristidis and Mr. Dunn strongly disagreed with this memorandum, both in its suggestion that the structure of Spanish vessels called of itself for caution and in its suggestion that spare parts would be a problem. That different

people had different views about Spanish vessels does not assist the plaintiffs. I find that no particular significance attaches to *Ardent's* Spanish build in the context of this case.

### V.8 *Pre-purchase inspections*

This heading embraces pre-purchase inspections of a vessel's classification records and of the vessel herself.(1) General

On the evidence it was at all material times common practice for second-hand tankers to be purchased on the market on the basis of relatively limited information about their actual physical condition, and for owners offering such vessels for sale to restrict the information available accordingly. Unless a purchaser happened to know the vessel in some other way, the two main sources of information available would normally consist in inspection of class records and a "superficial" inspection of the vessel. "Superficial" inspection refers to a relatively brief inspection which would not normally involve opening up of machinery or extend to every space within the vessel, even where access was available. While on board, a surveyor would also aim to obtain further information by discussion and inspection of documents on board. A prospective purchaser would on the basis of all the information thus obtained make a general judgment about the condition of the vessel's equipment and hull, using his own general knowledge and experience. The limitations of this process were and, so far as I am aware, are accepted by purchasers, despite the element of uncertainty resulting. The hulls and machinery of different tankers will have experienced and be in different conditions and be subject to damage or deterioration of differing extent in different respects and places. Aspects of a tanker's condition may thus remain unknown and effectively unknowable until after acquisition. Despite the size, value and second-hand nature of the tankers in which the Red Sea fund was interested, it would not be realistic to expect an investment fund like Red Sea, or those advising it, to have insisted on some entirely different approach; this is particularly the case at a time when the market was rising with relatively few vessels on offer and also when a number of other investment funds appear to have been interested in acquiring

vessels.

The fact that only limited information would commonly be available is however no justification for failure to obtain even that information, rather the contrary. Since I have not accepted the plaintiffs' suggestions that PL and PSMSL gave express assurances of "thorough inspections", the extent of the inspections which could and should have been undertaken before any decision to recommend or acquire *Ardent* must be judged on the other material before me.(2) Class records

I find that in 1989 each of Mr. Papachristidis, Mr. Anderson and Mr. Dunn in probability regarded, and each certainly should have regarded, it as important to inspect full class records in the context of any purchase of a second-hand vessel. Further, they would or certainly should have viewed this as being of particular importance in the case of *Ardent* had they directed their minds to it, both because of her age and because they were acting as advisers and were considering the vessel on behalf of a third party fund. Mr. Anderson effectively accepted that full records should be inspected. Mr. Dunn would only acknowledge that it was "preferable". I consider that each in evidence downplayed what would have been his actual state of mind had he focused on the question at the time. Mr. Papachristidis said that he had a view on the subject, and that it was that Mr. Dunn should inspect whatever records he deemed sufficient to come to a conclusion. This was a hedging response. He also said that he had, after the event, discussed with Mr. Dunn why full records were not sighted, but that he could not recall when or with what result; he was however sure that no act of bad faith was involved so had no reason to be critical of Mr. Dunn. In my view, Mr. Papachristidis would have recognized categorically at all material times, if he had been giving an objective view, that full class records should have been inspected by Mr. Dunn, unless there was some real impediment to doing so, and I do not believe that any has ever been suggested. Despite Mr. Dunn's implied suggestion in his witness statement that there was some such reason, none has been identified still less shown. Mr. Spence said that he could not speak for the reasonable shipowner, but**605** suspected that what would interest him

would be current records going back to the last special survey if possible. Accepting that there could be cases where very early classification records could be regarded as irrelevant in the light of later records, I was not impressed by Mr. Spence's evidence on this point. Moreover, even if this is accepted, it cannot cover the present case, where the records sighted related to only 18 months (from admission to class in July, 1987 to a survey in December, 1988) and did not include any hull inspection, let alone a special survey. They simply referred to the vessel having last passed a special survey with Lloyd's Register of Shipping in August, 1986. Mr. Marsh gave evidence that some clients might buy a vessel without ever seeing records; but he accepted that, in the majority of cases, full records would most certainly be inspected, and that most clients would wish to have them inspected before any physical inspection of the vessel. His evidence does not indicate that it would be normal or proper to buy an old and unknown vessel without sighting the full records, in circumstances where there would be no obstacle to sighting them. Nor does it address the particular position of advisers considering the vessel on behalf of a third party fund.

Mr. Dunn's actual attitude at the time, and the proper approach, are in my judgment illustrated by comments which he made in September, 1988 in relation to *Nissos Amorgos* that "the. . .vessel's records with [norske Veritas] only go back two years and therefore to get a proper picture of the records we will need to inspect the [NKK] records in Japan", by the pressure which he later insisted should be exerted when an obstacle was presented and by further comments on Aug. 23, 1989 in relation to *Orembae* when he said that, if they were to proceed with the vessel, they would need to see both the records during classification pre-1986 with NKK and her class records since that date.

The purpose of a full records inspection is to obtain an overview of the vessel's characteristics and to identify any particular areas requiring attention on a physical inspection or otherwise of concern, e.g. outstanding recommendations or repeated problems in a particular area. Mr. Spence in his first report described the nature of a surveyor's or consultant's report on class records as

follows:

His report would ideally be succinct and should highlight aspects of the ship which impressed him as being of particular importance. These would include:

    (a) Status of surveys;
(b) Apparent recurring difficulties;
(c) Apparent need for renewal of steelwork, in particular if this is related to corrosion and/or the results of ultrasonic measurements.
(d) Difficulties with machinery, in particular the main and auxiliary engines and boilers;
. . .
(h) Whether or not the classification record is complete or partial.

I accept this description.

Mr. Spence's evidence indicates that his firm on some 30 per cent. of the pre-purchase inspections undertaken do not have sight of class records. Accepting that, it does not relate to the failure in this case, by advisers considering a vessel for a third party fund, to seek and sight full class records at any stage.

I consider, as I have already indicated, that no excuse or justification has been shown for the failure in this case to seek and sight full class records. Important questions arise as to the effect of this conclusion. The plaintiffs submit that they should have been warned that no full or proper records inspection had been undertaken, and would not then have gone ahead. That seems unrealistic. If the defendants had identified their own deficiency, they should have rectified it, by obtaining sight of the full records. It is thus necessary to consider what those records would have shown. The plaintiffs submit that they would have shown matters of concern, which would have militated against any decision to recommend the vessel. The defendants submit that they would have shown nothing untoward. I revert to this aspect in Part VI of this judgment.

(3) *Length of superficial on board inspection*

The evidence indicates that pre-purchase inspections on board are commonly brief. Even so, the pre-purchase in-

spection of *Ardent* appears to have been particularly brief. This is so, both by comparison with previous inspections, including those for the HTL fund, about which information was put before me and in the light of the two inspectors' wish, as I find, to continue their inspection of *Ardent* in the belief that they would find out further matters of interest to PSMSL. Originally, the defendants pleaded that similar types of survey were conducted on the Red Sea vessels to the HTL vessels. That plea, since omitted, does not appear justified. A more normal pre-purchase inspection would have extended over a longer period, and probably two days. Mr. Spence suggested as an "ideal" 14 man hours over two days, whereas Mr. Houghton suggested about 20 hours. The actual inspection involving two men took six hours, with the two spending part of the time together. The fact that no ballast tanks were inspected in empty**\*606** condition would in part explain the difference. Mr. Dunn did not accept that the inspection and Mr. Reilly's report were untoward in their brevity or otherwise, and I do not consider that either can be said to have been sparse to the point of being unacceptable. Nor can Mr. Dunn be blamed for deficiencies in Mr. Reilly's inspection and report, for example in relation to accommodation. But the apparent brevity of the inspection process and report constitute a background factor which someone in Mr. Dunn's position should I think have borne in mind along with other matters, when deciding what attitude to adopt to *Ardent* .

(4 )*Permanent ballast tanks*

The importance in 1989 of inspecting permanent ballast tanks on a pre-purchase inspection of an ageing tanker follows largely from what has already been said, particularly in the context of corrosion. It was, I consider, within the knowledge of each of Mr. Papachristidis, Mr. Anderson and Mr. Dunn. Mr. Anderson acknowledged that it was unusual not to see any permanent ballast tank. In the present context of a purchase of an old vessel for a third party, I consider it was not only unusual but on the face of it inappropriate (at least in the absence of some exceptional reason, such as a recent documentary report from an authoritative source making such inspection unnecessary). Mr. Dunn's suggestions

that serious reliance could in this connection be placed on the condition of other tanks or on the fact of the vessel's classification cannot be accepted. Nor can his suggestion that visual inspection would not assist, and that only ultrasonics would have had any value. What mattered was visual inspection of at least some ballast tanks, either in an empty condition or with ballast lowered to expose the upper third or so of the tank. Mr. Dunn's response to Mr. Semple's "cautious" comment in May, 1988 regarding *Atlantic Dignity* and *CYS Excellence* , that he should "endeavour to see as many ballast tanks as possible", further evidences Mr. Dunn's attitude when he gave proper attention to the point.

Neither Mr. Anderson nor Mr. Dunn could identify any past occasion when a tanker had been purchased by the Papachristidis group without either one or more of her permanent ballast tanks being inspected or, in a few cases, some special arrangement applying. In the cases of *Atlantic Dignity* , all the ballast tanks were made available and a need for extensive steel renewals identified in some. Mr. Dunn pointed out that no cargo tanks were tendered for inspection, and *Atlantic Dignity* and *CYS Excellence* were sold elsewhere before any further steps could be taken. The fact remains that proper attention was given to the critical area of the permanent ballast tanks. There were certain vessels where there was either very limited or possibly no access at all to the ballast tanks, *Bubiyan* in May, 1988, four Marathon vessels in February, 1989 and *Vestelegia* in June, 1989, but in each case special protective terms were agreed. In the case of *York Marine* full inspection was not considered because a preliminary report led to her rejection out of hand. All the ballast tanks were inspected on the first and third Red Sea vessels, *Armour* and *Arrow* . Only one was inspected on the second vessel, *Archer* . These vessels are the subject of this litigation and the position in relation to them was not fully developed.

The evidence does not go so far as to suggest that a prospective purchaser would be expected to see all or even most of the permanent ballast tanks in empty condition. Their nature makes it unlikely that all would be readily available at any one time. It is a matter of judgment, in the light also of class records, whether the number seen

and their condition is satisfactory. Mr. Dunn's evidence was in effect that the need for any ballast tank inspection at all was always a question of practicality and judgment. The possibility of agreeing special terms, for example requiring inspection or repairs as part of the purchase contract, illustrates that pre-purchase inspection of permanent ballast tanks cannot be regarded as an absolute rule. But, short of special arrangements of that nature, I conclude without hesitation that Mr. Papachristidis, Mr. Anderson and Mr. Dunn, if they had addressed their respective minds to this aspect at the time would, as they should, all have recognized the general importance of insisting on inspection of at least some permanent ballast tanks in empty condition. No actual request was ever made to the owners of *Ardent* to that effect. That the captain and superintendent refused on the day to allow further inspection does not mean that a formal approach to owners through the brokers would not have succeeded. Owners' previous attitude had been relatively forthcoming. If such a request had been made, it would either have been granted, in which case the actual condition of the permanent ballast tanks would have been better appreciated, or refused, in which case it would have raised the question whether *Ardent* was worth further consideration at all. Whether there was sufficient justification for making no such request on the particular facts of this case, where Mr. Dunn had the benefit of Mr. Reilly's brief descent into the top of several permanent ballast tanks in largely full condition and considered that he could cater for their condition within the U.S.$2 m. which he gave Mr. Anderson is a central issue which I address in Part VI.3.**\*607** VI. GROSS NEGLIGENCE?

VI.1 *The scope of the issue*

To succeed against either PL or PSMSL the plaintiffs must show (i) that PL or PSMSL committed acts or omissions which either (a) were the result of gross negligence or (b) constituted wilful misconduct and (ii) that the plaintiffs suffered damages as the result of such acts or omissions. To establish that acts or omissions constituted wilful misconduct cannot be an easier task than to establish that they resulted from gross negligence. On no realistic or common sense view of the phrase does

this case involve wilful misconduct. The real issue is whether it involves gross negligence.

In view of the split trial, I am not concerned with the quantum of any damages. The question before me is whether the plaintiffs incurred any potential head of loss as a result or acts or omissions of PL and PSMSL which were in turn the result of gross negligence of PL or PSMSL. The only potential head of loss now suggested is the decision to purchase *Ardent* . This constitutes a potential head of loss because the plaintiffs' case is that, but for gross negligence on the defendants' part, *Ardent* would not have been recommended at all, or would have been put forward in different terms which would have not have been accepted by the Red Sea directors. The foundation of these allegations is that *Ardent* was or should have been perceived as an uncertain and unquantifiable risk, not to be pursued further; alternatively, it should at least have been perceived that she would require more than U.S.$2 m. spending upon her, and that in this situation it was neither appropriate nor desirable to pursue her further having regard to her asking price and market value.

Assuming that the plaintiffs can attribute the purchase of *Ardent* to acts or omissions of PL or PSMSL resulting in turn from gross negligence of PL or PSMSL, the question whether they suffered any and what recoverable damages thereby will be for subsequent trial. The defendants will at that stage be able to raise, for example, the argument that fall of the shipping market was the real cause of any actual loss following from *Ardent's* acquisition. That this is a potentially significant issue is clear from the evidence of the defendants' expert tanker broker, Mr. Marsh. The market proved, with hindsight, to have reached a peak in 1989 and early 1990. Thereafter, there was first a softening and then in 1991 a drastic (and in 1989, when the Red Sea fund was conceived, unforeseen) fall, leading to collapse by early 1992. Resale values of medium sized tankers built in the mid-1970s declined dramatically. Mr. Marsh's report shows that this decline was reflected in the diminished values realized for *Ardent* and two other Red Sea vessels sold in 1993. It is clear that the original "disaster" projection for the Red Sea fund of U.S.$10 m., or at

worst U.S.$8 m., as the residual value after 5½ years of a vessel purchased for U.S.$13 m., was undermined by the market's collapse.

The purchase of *Ardent* followed, as I have held, from an unqualified recommendation made probably on Aug. 23, 1989. The recommendation was relatively informal and was accepted by or on behalf of the fund and fifth plaintiffs without much discussion. The Red Sea directors were relying on PL and/or PSMSL to identify a fourth tanker of appropriate size, age, condition and price. They were not indifferent to the vessel's qualities or condition or to the appropriateness of the suggested price. But they had insufficient expertise or information to do other than rely on PL and PSMSL, and they had no reason not do so so.

Whether or not *Ardent* was acquired was determined by the unqualified recommendation made by PL. The decision to make such a recommendation was in turn based on Mr. Dunn's endorsement of U.S.$2 m. as an appropriate overall provision for all repairs and overhauling. Amplifying the plaintiffs' case, their primary contention is that *Ardent* presented unknown and unquantifiable risks, that there was no basis for any recommendation for purchase or for any reliable estimate of how much it would cost to put her in a fit condition to trade and that the U.S.$2 m. which Mr. Dunn took was a "guestimate" with no reasonable or proper basis. *Ardent* should not therefore have been recommended for purchase. Alternatively, if she was put forward, it should have been in conjunction with a warning as to the unknown and unquantifiable nature of the risks.

In the further alternative, in the event of the Court concluding that some estimate could reasonably be given, the plaintiffs' case is that the estimate should have been that a substantial sum well in excess of U.S.$2 m. would require to be spent on her, because of the steel repairs and other work which should have been envisaged. Mr. Houghton assessed the cost of the other work, on the basis that it would be done in a shipyard, at about U.S.$1,875,000 (plus a contingency) or, on the basis that it would be done so far as possible by crew or repair crew, at about U.S.$1,550,365 (plus a contingency). In my judgment, the latter is the relevant basis

and the relevant provision is about U.S.$1,213,500 (plus a contingency). Appendix A to this judgment reviews the detailed evidence and submissions on this aspect of the case. This provision falls to be compared with Mr. Reilly's specific provisions, costed at U.S.$1,005,000. It follows that, even if a provision of U.S.$1,213,500 (plus a contingency) had been made for PSMSL's and PL's**\*608** had in mind would have remained to cover steel work. I have already concluded that this U.S.$2 m. was in likelihood arrived at by Mr. Dunn as an appropriate figure for all repairs to include unquantified overhauls not covered by Mr. Reilly's specific items.

I leave aside for a moment the limitation of PL's and PSMSL's responsibility to acts or omissions resulting from gross negligence, and consider whether the defendants' conduct met the standard of reasonable skill and care to be expected of advisers fulfilling the role which they fulfilled.

VI.2 *Was PSMSL negligent through Mr. Dunn?*

I start by focusing on the position of PSMSL, represented for present purposes by Mr. Dunn, in suggesting U.S.$2 m. as an appropriate guide to repair costs.

Mr. Dunn himself neither undertook nor instructed any detailed analysis of the nature or cost of overhauls not specified by Mr. Reilly or of steel work. He took U.S.$2 m. on a broad basis as sufficient for PSMSL's and PL's purposes. If Mr. Dunn had focused on the likely cost of other overhauls, I consider that he would have acknowledged that they required a substantial additional provision over and above the specific provisions totalling U.S.$1,005,000 allowed in Mr. Reilly's report. If Mr. Dunn had sighted the full class records and had on Aug. 16, 1989 instructed Mr. Reilly or another surveyor to consider the position in detail, as he could have done, Mr. Dunn would have confirmed this. An additional provision of between U.S.$200,000 and U.S.$300,000 (over and above that allowed by Mr. Reilly) would I consider have been appropriate. In my view Mr. Dunn with his experience ought to have recognized the need for an additional provision of this general order, even though he did not instruct a surveyor to do any detailed

exercise of the nature undertaken before me in evidence and considered in Appendix A.

With respect to steelworks, there is no doubt about the awareness of all concerned on behalf of PL and PSMSL that corrosion in the permanent ballast tanks of elderly tankers represented a particularly important problem area. It required on the face of it close attention. But Mr. Dunn had no means of making any accurate assessment of the likely cost of steel repairs on Aug. 16, 1989. There had been the most cursory inspection of three out of the total of six permanent ballast tanks. All that was known was that serious corrosion had been noticed, and the condition of these tanks was "very suspect". Mr. Reilly had been unable and had, when asked, specifically declined to put any figure on steelwork.

As stated in Part III.10 above, the allowance made by Mr. Dunn on Aug. 16, 1989 did not cater for any uncertainty by taking a sufficiently large figure to cover all eventualities, which it could then be expected might foreseebly materialize. I do not therefore accept that the excess over estimated repair costs can be explained or excused on the basis that *Ardent* proved to be in a condition which could not reasonably be foreseen in relation to a vessel which had passed special survey some three years before and remained in class.

I have not accepted Mr. Dunn's evidence that he had 300 tonnes or U.S.$1 m. in mind for steelwork in 1989. As stated in Part III.9 above, I do not believe that PSMSL and PL would have pursued an interest in the vessel at all, if they had conceived that so much steelwork would be required. If they had in such circumstances pursued any interest, it would in my view have been incumbent on them to warn the directors of the Red Sea fund expressly of the "dramatic", "huge" or "rare and unusual event" - the requirement to replace so much steel in such a vessel - to which they were contemplating exposing the fund. As it is, I think that they gave no such warning, because, although they contemplated serious corrosion in the ballast tanks, they had in mind a lesser order of steel renewal and also allowed a total of U.S.$2 m. which Mr. Dunn thought was generous in relation to such an order of steel renewal.

I consider that PSMSL's conduct through Mr. Dunn leading up to PL's decision to recommend the acquisition of *Ardent* was negligent. In summary, I consider:(1)

Full class records could and should have been sighted. Had they been sighted, (i) they would have underlined the call for inspection of at least some of the vessel's permanent ballast tanks and (ii) the information in them with regard to boiler and diesel generator problems would have indicated a history of poor maintenance, and should have encouraged a searching and cautious attitude towards the vessel and towards the allowances required to be made for her overhauling, including upgrading to Hellespont standards.(2)

Mr. Dunn ought to have realized, on the information available to him on Aug. 16, 1989, that there was no sound basis for making an assessment of the seriousness of the corrosion in *Ardent's* permanent ballast tanks, other than that it could well be very serious. If he had insisted, as he should have done, on full class records being sighted, they should have underlined this.(3)

The overall assessment of U.S.$2 m., which I find that Mr. Dunn eventually gave on being pressed by Mr. Anderson, was not one which could safely be given to Mr. Anderson for him to use and rely on in his assessment of and decision whether to recommend the vessel to the Red Sea fund.**\*609** Although Mr. Dunn thought that he was being generous, he should have stood firm and said that he could give no really reliable figure, that U.S.$2 m. could be no better than a "guestimate" and that there was a risk that the vessel's actual need for steel repairs would prove to be more on further inspection .(4)

Either *Ardent* should not have been considered further at all, or, if she was, then Mr. Dunn should have insisted on at least some of her permanent ballast tanks being inspected as a precondition to any offer or at least to any commitment to acquire her .

VI.3 *Detailed consideration of PSMSL's negligence*

I now explain these conclusions in detail.

(1) *Full class records*

I have no doubt that, in failing to inspect the Lloyd's Register of Shipping class records, PSMSL through Mr. Dunn failed to exercise the care to be expected of a reasonable technical adviser in the position of PSMSL in relation to the Red Sea fund. I find that the records could and should have been obtained. It is clearly preferable to obtain such records before any inspection, and there was no reason why they should not have been obtained before the pre-purchase inspection in the case of *Ardent* . The complete omission to obtain them at any time was neither wilful nor, in a subjective sense, reckless. Mr. Dunn probably did not focus on the failure to obtain the records, or identify the absence of the records or the risks which it posed. The probability appears to be that he was simply very busy at the time, with many other concerns within the Papachristidis group, that there was internal pressure to complete the purchase of a fourth vessel for the Red Sea, against the background of a rising market and that, in these circumstances, insufficient attention was given to the matter and to the protection of the fund in this respect. There are indications that PSMSL and Mr. Dunn were by mid-1989 beginning to experience serious problems in keeping up with the technical requirements of a fleet which had expanded considerably in the recent past, in part due to the acquisition of the elderly HTL fund vessels. Mr. Papachristidis tended in my view in his evidence both to downplay and to postpone the impact of these problems.

What would the full records have shown?

(a) *Permanent ballast tanks*

I start with *Ardent's* permanent ballast tanks. The Abstech report on the Germanischer Lloyd records to which Mr. Dunn had access made no mention of the condition of *Ardent's* hull, cargo or ballast tanks. Nothing about their condition could be inferred from it. The Lloyd's report would have revealed a series of occasions on which attention had to be given to these tanks. At Piraeus in November, 1981 as part of her special survey, there were (described as "Wear and Tear Repairs"):

. . .extensive repairs carried out to heavily wasted fore peak tank top plating underdeck structure, wash bulkheads, and web frames up to a level of 3 metres below tank top plating.

Entire tank top plating renewed. Entire repair carried out to original scantlings, Rule Requirements, and complete satisfaction.

Tank tested and found tight. Further, in relation to Nos. 3 permanent ballast tanks:

First 6 longitudinals, counting from top, which found wasted cropped and renewed, on both tanks and on either side of the tank viz. side shell and inner divisional bulkheads, crossties junctions specially examined in accordance with Rule Requirements and found in order. Three years later in Dunkirk in November, 1984 on annual survey wastage was found in the wash bulkhead top plating of No. 3 starboard permanent ballast tank over about half its length inboard, and in No. 7 port permanent ballast tank aft bulkhead and longitudinal bulkhead stiffeners. Owners requested, and Lloyd's considered satisfactory, deferment of repairs, subject to a condition of class requiring the defects to be dealt with by January, 1985. They were duly dealt with then in Nantes, when Lloyd's drew the master's attention to the fact that all sacrificial anodes in the Nos. 3 and 7 permanent ballast tanks required to be renewed at the first opportunity.

In August, 1986 the Lloyd's records would have shown that on the vessel's third special survey in Piraeus further repairs were carried out to the Nos. 3 permanent ballast tanks port and starboard and that internal wastage was again identified in way of the forepeak tank and of the No. 7 port permanent ballast tank, in respect of which conditions of class were imposed. The records included thickness determination readings of belts of deck and shell side plating, but not of internal structures. In June, 1987 at Bahrain repairs were done in the No. 7 port permanent ballast tank and forepeak and the conditions of class deleted. At the same time, according to the records, further repairs were effected to damage to the Nos. 3 permanent ballast tanks, "stated to have been due to heavy weather". Mr. Dunn acknowledged that it was "more than likely" that such heavy weather damage was associated with weakening of the tank structure by corrosion.**\*610**

Copr. © West 2009 No Claim to Orig. Govt. Works

Mr. Houghton accepted that, with the exception of the forepeak repairs in 1981, there was nothing to suggest that these were extensive repairs or to indicate that poor maintenance was responsible. The records do not state the quantities of steel renewed, but they show class involvement in and approval of the relevant repairs. The fact that corrosion was at the top of tanks would be consistent with a normal pattern. It would also be consistent with the anodes being properly maintained and protecting the tanks lower down (although Lloyd's Register's note regarding the anodes in January, 1987 is not so reassuring in this respect).

Accepting these points, it seems to me that the records would, if inspected, have shown an apparent recurring need for repairs in ballast tanks related to corrosion, matters which Mr. Spence indicated would have been of interest. In the light of the history in the records and the general tendency for the rate of corrosion to increase as a ship ages, it would be natural to believe that by the latter part of 1989 further steel replacement would again be necessary. How much would be uncertain. In these circumstances, inspection of the records would have fortified the reasons for inspection of permanent ballast tanks on a pre-purchase inspection.

In his original report Mr. Houghton said that:

The most significant fact revealed by the Lloyd's Class Records is that they contain no close up survey or thickness reports for the internal structure of the segregated ballast tanks, nor is there any record of a close up survey of the segregated ballast tanks having been carried out. This serious omission should, by itself, in my opinion, immediately have raised doubts and questions in the mind of any prospective purchaser. For instance, if due to some oversight the close up survey of the segregated ballast tanks had not been carried out, the lack of thickness measurements would immediately point to the need for a thorough investigation of them. On the other hand, if the close up survey of the segregated ballast tanks had been carried out, any buyer should have wanted to see the results. The vessel should not have passed her Third Special Survey without a close up survey and associated thickness measurements being taken in relation to the segregated ballast tanks. If the Lloyd's

Class Records had been examined it would have been discovered that neither of these had been carried out. I am unable to explain how "ARDENT" passed her Third Special Survey without a close up survey (and associated thickness measurements) of the segregated ballast tanks. Mr. Houghton was mistaken to suggest that Lloyd's records contained no reference to a close up survey being carried out on *Ardent's* third special survey. They contained the note: "Close up surveys were carried out satisfactorily in accordance with the Rules." However Lloyd's reports did not include the thickness measurements of internal structures, the results of which Mr. Houghton thought (although this was not a matter for him) that "any buyer should have wanted to see" if there had been any close up survey. By definition under Lloyd's rules a close-up survey is "a survey where the details of structural components are within the close visual inspection range of the surveyor" and the rules provided for:

. . .sufficient thickness measurements of structural members subject to Close-Up Survey. . .to be taken for general assessment and recording of corrosion pattern. They also contained more specific provisions for tankers over 10 and 15 years, involving in the case of the latter gaugings of two additional transverse sections of the tanker amidships. In addition to the thickness measurements required by class rules, owners may in practice request additional thickness measurements for their own purposes.

The inspection of Lloyd's Register's records which the defendants instigated in the context of the present litigation through a firm called Marspec referred simply to thickness measurement being taken on deck and shell plating. Inspection of the original Lloyd's records shows that these are the only thickness measurements which they contain. Mr. Spence in response pointed to a notation in the original records showing that item 2231 "Thickness Determination" was credited, which, as Mr. Houghton accepted, ought to mean that all the thickness measurements required by the rules had been carried out. Mr. Spence went on to say that the thickness measurements extracted and appearing on class records satisfied the requirements of Lloyd's Register's rules. In this

he was wrong. The measurements abstracted included two additional transverse sections of external plating, one in way of Nos. 3 segregated ballast tanks. But the rules define the phrase "transverse section" to include "all longitudinal members such as plating, longitudinals and girders in deck, side, bottom and longitudinal bulk-head". Mr. Spence's evidence in response to this was that the fact that the measurements of internals had not been abstracted onto Lloyd's records did not mean that they had not been done in accordance with Lloyd's Register's requirements. That is so. An issue then emerged between Mr. Houghton and Mr. Spence, both experienced in looking at Lloyd's records, as to the likelihood that Lloyd's Register would not have abstracted the full transverse measurements, if taken. Mr. Houghton**611** demonstrated that Lloyd's Register had and has a particular form (No. 2170) for such internal transverse measurements, and said that in his experience this was used; Mr. Spence said that in his experience it was not always completed, a lot was left to the discretion of the individual surveyor and anomalies could also occur.

Looking at the matter generally, it would seem surprising if internal measurements were not taken, bearing in mind especially the internal repairs done and identified as requiring to be done on *Ardent* in August, 1986. But it is also surprising that, if internal measurements were taken, they were not abstracted. When Marspec inspected Lloyd's records in the context of the present litigation, the language which they used differentiated between the 1986 entry covering only deck and side shell plating thickness readings and a post-purchase entry dated February, 1990 covering a "full thickness determination of the vessel's hull" which included internals.

On balance, I prefer Mr. Houghton's evidence in this area, and conclude that an experienced technician looking at an abstract of the Lloyd's Register records for *Ardent* would have both hoped and expected to see an abstract of full transverse measurements. Its absence would not by itself have enabled him to conclude that none had been done. But without seeing any such abstract he could not consider or evaluate the relevant figures in the way suggested in the last paragraph of Mr.

Mathieson's paper quoted in Part V.4 above. To the extent that the passing of special survey in August, 1986 was itself a matter of comfort in relation to the vessel's condition in August, 1989, the absence from Lloyd's records of any thickness measurements on internals would lessen that comfort. In the case of neither the special survey nor any thickness measurements of internals did the defendants in fact see any detailed documentation of the kind that could have been expected.

The defendants submit that nothing which would have been revealed by inspection of Lloyd's Register's records would have added to what was in fact revealed by the physical inspection carried out by Mr. Reilly and Captain Kazazis. I do not accept this. It is true that Mr. Reilly and Captain Kazazis identified serious corrosion in the permanent ballast tanks. But to know that there was a recurring problem of corrosion would have been of some relevance, although it did not necessarily involve extensive corrosion or poor maintenance in areas other than the forepeak. It would on any view have focused attention on the forepeak. Mr. Dunn said that he assumed that there was likely to be corrosion in the forepeak. It is also true that extensive work had been done in past years in that tank. I consider however that the work done would or should not have been regarded as comforting, but rather as pointing towards a need for caution about the likely state of the steel there. Had the records been seen, they should have underlined for Mr. Dunn the need to insist on inspection of permanent ballast tanks, including the forepeak. The vessel had repeatedly manifested corrosion in her permanent ballast tanks. There had been no more than a glance into the very uppermost parts of certain of those tanks. This however indicated that she had sustained yet further severe wasting. Any assumptions made in these circumstances about the probable extent of the costs involved in her repair would be, in essence, untested and unverifiable.

(b) *Other matters*

Having dealt with the matters which would have appeared from the full class records in relation to *Ardent's* permanent ballast tanks, I turn to other aspects of the vessel's history and condition. The plaintiffs raise three

categories of matter which they submit would or should have been of concern to a person in Mr. Dunn's position, had he seen the Lloyd's records. These matters, they say, would individually and/or cumulatively have pointed to a history of mechanical problems associated with poor standards of operation or maintenance, and would or should have led to a more questioning attitude to the vessel, and in any event to substantial allowances being made for likely maintenance costs in any appraisal of the vessel for possible purchase. The defendants originally admitted in their points of defence that inspection of the Lloyd's records would have revealed that *Ardent* had a history of poor maintenance, but withdrew the admission by amendment in April, 1996. In my judgment the original admission was correct.

The three categories of matter relied on by the plaintiffs relate to the vessel's boilers, diesel generators and turbo generators.

(c) *Boilers*

The Lloyd's records would have revealed boiler repairs to have been necessary on at least six or seven occasions, in 1972, 1974 (twice within a month), 1978, 1979, 1981 and 1987. The repairs were recorded as involving retubing on all occasions up to 1986 and quite likely also in 1987, when damage was found caused by "loss of water on primary side and failure of cut-out". In 1978 there was also reference to the low level shut-offs (which together with the alarms were found bypassed). Mr. Dunn described it as "disgraceful" or "outrageous" that the vessel could have been operated with the boiler cut-outs not working. The damage in 1978 was also attributed to loss of water, which Mr. Houghton explained indicated that the automatic**612** water controller was not then working. A feature of Mr. Dunn's note of his conversation with Mr. Reilly and Captain Kazazis, of the latter's telex and of Mr. Reilly's report was that the boiler automation was out of order or needed a complete overhaul. Both the note and the telex mentioned the extra engine room personnel required for the operation of the boilers. In his telex Captain Kazazis expressed the belief that a lot of money "should be spent in the engine room especially for boilers". Mr. Dunn said that he understood the problem to relate to automa-

tion, in respect of which Mr. Reilly made a specific allowance and that Mr. Reilly had reported that the boilers "looked to be okay". This appears to be a reference to Mr. Reilly's written report, like the comment in Mr. Dunn's witness statement to the effect that "the oil fired boilers were reported by Simon Reilly to be in good condition". In fact, Mr. Reilly's report dealt only with superficial appearance. Apart from the automation and "maybe a number of tube repairs", Mr. Dunn said that he did not believe that any money would need to be spent on the boilers, and he added that any work which did need doing could have been done by the crew or a repair squad.

Accepting Mr. Dunn's account of his thinking, and whatever Mr. Reilly may have led Mr. Dunn to believe, Mr. Houghton's evidence was that knowledge of the prior history of the boilers would have focused attention on several matters; firstly, the period over which boiler automation had been defective, secondly, the fact that no boiler water treatment records had been sighted (Mr. Reilly's report contained a question mark against this heading) and, thirdly, the extent to which there had in likelihood been poor maintenance. In particular the combination of the 1987 incident and the fact that the automation was not working in 1989 would, or should, have introduced a real doubt as to whether all would prove satisfactory on close inspection of the boilers and whether any repairs that were required, in addition to the work needed on the automation, would be capable of being undertaken by the crew or a repair gang or without significant cost. While Mr. Dunn had to rely on Mr. Reilly's and Captain Kazazis' inspection, if that was all he had, he would, and certainly should, have been less confident about the state of the boilers, particularly the tubing, if his attention had been focused on these matters. Mr. Dunn's response in evidence that he would have thought that any decent surveyor would have been looking at such matters as boiler failures overlooks the advantage of actual knowledge, as opposed to speculation, about the prior history, maintenance and internal condition of the boilers.(d)Diesel generators

The Abstech report which Mr. Reilly and Mr. Dunn saw disclosed that the vessel had in December, 1987 under-

gone major damage affecting, and requiring complete overhauls of, her two diesel generators. The damage to one was associated with crankshaft seizure (suggesting and in fact due to lack of luboil) and the damage to the other appeared similar. In August, 1989 a major overhaul was again necessary to replace the vessel's inboard diesel generator, and was observed by Mr. Reilly. Had the earlier class reports been available, it would have been known that the vessel had experienced two yet further incidents involving damage to her diesel generators, one in January, 1986 involving her outer generator and the other in August, 1986 when both the inner and outer generators were damaged and required remachining. Mr. Dunn and Mr. Reilly were not aware of these incidents. It is true that all Mr. Reilly could have done was ask the vessel's chief engineer if he could explain their cause. On the face of it, however, these two incidents would have added to the reasons for questioning the general standard of treatment and maintenance of this vessel. However, the known incidents of December, 1987 and August, 1989 anyway constituted reason for caution in this regard.

(e) *Turbo alternator/generator*

The turbo alternator is designed to operate off either the main engine exhaust (using steam supplied by the waste economizer or exhaust gas boiler) or the diesel turbines. In the former mode, it operates at effectively no cost, enabling the diesel generators to be shut down. Mr. Reilly reported in August, 1989 that the exhaust gas boiler could not sustain a full load on the turbo alternator, but referred to the turbo alternator itself as being "reported in very good condition" and "seen all intact". The Abstech report also mentioned that the alternator had been overhauled, cleaned, dried and varnished in December, 1987. The full class records would have revealed three incidents of damage to the turbo alternator in January, 1978, November, 1979 and May, 1980. These would have given further reason to doubt the historical adequacy of the vessel's maintenance, and quite possibly suggested some link with the diesel generator damage over the same period. But there had been no similar incidents affecting the turbo generator since 1980, and no significance can, I consider, attach to the fact that Mr.

Dunn remained unaware of these old incidents.

In the light of what is said above about the vessel's boilers and diesel generators, I accept the plaintiffs' submission that, if Mr. Dunn had seen the full class records, they should have demonstrated a**613** need for caution about the vessel's maintenance and about the allowances to be made for overhauling.

(2) *Absence of reliable basis for assessment of the corrosion in Ardent's permanent ballast tanks*

The following points arise from what I have said in Part V.2 above:

(i) Mr. Dunn ought to have appreciated, and I have little doubt did appreciate, that the fact that a vessel had passed special survey and remained in class thereafter could not by itself constitute a reliable basis for drawing conclusions about her condition or for an offer to acquire her at any time, let alone three years after the special survey.

(ii) He ought also to have appreciated that, even if *Ardent* appeared in other respects in reasonable or good condition, this could give no reliable guidance to the condition of her permanent ballast tanks.

*Thiseas* illustrates both points strikingly. As to *Ardent* , on Mr. Dunn's own evidence, his attitude appears to have been coloured by a "general feeling" which he got about her. She looked, as he put it, "in reasonable shape". Mr. Dunn's evidence that he could judge the condition of permanent ballast tanks from that of other tanks within the same vessel overlooked the fact that permanent ballast tanks have a quite different life and treatment to other tanks. This is so with all vessels, but was all the more so in the case of *Ardent* , since even her clean ballast tanks had been converted to exclusively cargo use while she was at Aqaba. Further it was known from Mr. Reilly that serious corrosion existed, and that the condition of all *Ardent's* permanent ballast tanks was "very suspect".

Mr. Dunn also indicated in evidence that he drew some comfort from an assumption that the corrosion was at the top of the tank. In reality there was no or very lim-

ited comfort to be drawn in that connection at all. Mr. Reilly had seen, at most, three metres of two of the three permanent ballast tanks into which he briefly looked where he had reported "extensive contamination". Mr. Dunn said this in evidence:

[Q.] The problem was that you simply did not know how far down it [corrosion] went. [A.] No, I assumed it was at the top of the tank.

[Q.] You cannot have assumed that, because Mr Reilly told you that he suspected that the remaining tanks, the remaining parts of the tank, would be in a similar condition. [A.] I read that and discussed that with Mr Reilly, and I understood it was the top of the tank, meaning the top of the tank, not the tank all the way down, as you are inferring.

[Q.] You assumed, did you, that everything under the water was perfectly satisfactory, and had no corrosion, is that - [A.] No, I did not assume that. I did not know. I assumed that it was the top of the tank that was corroded.

[Q.] You did not know how far down it went, and it was as simple as that. [A.] No, I did not know. Mr. Dunn did not therefore know at what tank level any improvement in corrosion might show itself on inspection. Further, he did not know of the pattern of usage of the tanks when the vessel was a storage vessel, and their vulnerability to corrosion depended on the maintenance of anodic protection, both relevant considerations as indicated in Part V.2 above. He in fact knew that *Ardent's* anodes were exhausted, and it was open to doubt whether this was a recent occurrence.

(ii) Mr. Dunn's thinking, as he explained it, was also influenced by his own and other people's "past experience". But *Ardent* had features of which he had had no relevant experience. He had not owned or acquired a vessel having the apparent problem presented by *Ardent's* permanent ballast tanks. His own department's papers show a sensible reluctance to become involved with any other vessel displaying similarly suspect characteristics. In relation to the acquisition of *Ardent* , Mr. Dunn was in new waters, although he himself did not

appreciate at the time how risky they could be.

Mr. Dunn's reliance on "averages" had two aspects. He invoked the average experience of other shipowners. Thus, the "general knowledge of the industry as a whole" on which he relied in a passage quoted earlier in this judgment related to what "the average people would be putting in at say around the third special survey". He also relied on the fact that he himself had made budgets and worked through averaging all his life.

It is of the essence of averages that they derive from a spread of experience, and cannot necessarily assist in any particular case. Mr. Dunn acknowledged that one must consider the specific vessel:

[Q.] Ultimately, averages do not help, do they? [A.] I believe they do. I am sorry, we make budgets through averaging. This is the way we do all our budgeting, so I cannot agree with you, Mr. Eder,. . .averaging is how we work.

[Q.] As far as steel renewals are concerned, whether or not a ship is very corroded like the Ardent or like the Thiseas or whether it is not, will depend upon the particular ship, how it has been managed, how it has been operated, what has happened to it, whether it has been maintained or not, whether the anodes have been replaced or not, a whole host of matters. So, ultimately it all depends on the particular ship that you are concerned with? [A.] That is why we inspect the ship.

*614

[Q.] Do you agree with me that ultimately it depends upon the particular ship that you are concerned with? [A.] You inspect the vessel and you get a report on that vessel, so that is the vessel you look at, yes.

. . .

[Q.] I will ask you one more time and then pass on. What I suggest to you, as far as steel renewals is concerned, one only has to look at a vessel like the Thiseas or the Ardent, that reference to averages is hopeless. You ultimately have to be concerned with the particular ship, because it depends upon how it has been traded,

its particular characteristics, whether it has been maintained or not, a whole host of matters. The answer is yes, is it not? [A.] Of course, yes. Mr. Anderson also accepted the point in the following passage:

[A.]. . .You are making the distinction of a 17-year old versus a 15 or 13-year old, and you cannot generalize. It is when you see the ship. I am sure there are instances when the 5-year old ship is in worse shape that a 72-year old [?build]. Until you inspect you do not know what you are getting and that is the purpose and that is where you evaluate, but to say that we had no experience at PSMSL in evaluating a 72 built ship, it is obvious from the report, yes, that we did not. In relation to budgeting, Mr. Dunn's evidence suggested a possible failure to distinguish in his own mind between the overall or average experience of all the vessels managed by the Papachristidis organization and the financial implications for the Red Sea fund of purchasing an unsatisfactory or unusually costly vessel:

Mr. Justice Mance: Averaging, I can understand if you have a large enough pool; some you win, some you lose. But here it might be said that you have a rather small pool because you are effectively not buying it for your general fleet but you are buying it for a particular fund and so it might be thought that if 25 per cent of the fund's assets are going into this one ship, or 20 per cent or whatever, that is less appropriate as a subject for averaging, or an averaging approach. One ought to be more certain about what the actual characteristics of the particular ship are. [A.] Basically, yes, but I still think you can average because - and you say that we do not have a big pool. I think we probably had about 10, 12 Aframaxs of that size by the time we had taken the HTL fleet and some of our existing vessels. We do talk to other people, Shell, BP, Exxon and we - I get the flavour for that. We exchange numbers with people like that. We were experienced at that. With respect, that is the way I do budgets.

[Q.] It may not be a matter for you because it has commercial aspects, but the point I was putting to you is that although I readily accept that you had 10 or more Aframax, they were not all in this fund. They were not all in the Red Sea Fund; only a total of four vessels in

the Red Sea Funds. So in financial terms, any averaging has to operate within those four vessels if it operates at all? [A.] Correct, yes.

[Q.] Otherwise if you get it wrong, the fund will not get the benefit of your having got it right elsewhere? [A.] That is true. In Mr. Dunn's favour, it can be accepted that, although averages imply a greater spread of experience, the actual condition of *Ardent's* permanent ballast tanks appears, on the evidence before me, to have been not just appalling but exceptional. This is a word used by Mr. Houghton to describe a requirement for some 535 tonnes of steelwork, which he considered should have been identified if there had been visual inspection of the permanent ballast tanks in empty condition. He reached this figure on the basis that visual inspection would have indicated that the top half of the forepeak and top thirds of the wing permanent ballast tanks would require complete renewal. The actual requirement proved to be 607 tonnes. Even if the actual requirement had been only 300 tonnes, still *Ardent* would not have been in a condition which could have been regarded as at all typical for a vessel of her age and history. But the reason for inspection is to eliminate risks, not to confirm probabilities, and the existence of inadequately maintained vessels was a known feature of the market. Making all due allowance for risks taken by any purchaser of an elderly tanker at the time, Mr. Dunn in my judgment failed sufficiently to address the particular problem of corrosion presented by *Ardent* , in respect of which additional steps could and should have been taken, before she was considered or assessed further as a candidate for purchase by the fund.

(3) *Absence of reliable basis for an assessment of U.S.$2 m.*

There is no doubt about Mr. Dunn's good faith in making his assessment. I accept also that he believed that it should suffice and thought in fact that he was being generous. But there was no reliable basis for that belief. In respect of overhauling, he had made no assessment of costs not covered by Mr. Reilly's specific items. He should have reckoned on considerable costs in excess of those specifically allowed for by Mr. Reilly, and, in arriving at his overall figure of U.S.$2 m., probably had

such costs in mind on a general basis. The amount available for steelwork was or should have been thus correspondingly reduced by**615** U.S.$200,000 to U.S.$300,000. In respect of corrosion and steel renewals, Mr. Dunn ought also to have realized that he had insufficient information to justify giving a U.S.$2 m., or indeed any, overall estimate to Mr. Anderson for him to use and rely on in assessing of *Ardent* , and in deciding whether to recommend her to the Red Sea fund, without exposing the fund to inappropriate risk. Mr. Dunn should have stood firm and made it clear that he was not in a position where he could give any sufficiently reliable figure.

(4) *Pursuit of Ardent without inspecting any permanent ballast tanks*

In the circumstances, either *Ardent* should and would not have been pursued further after Aug. 16, 1989; or, at the least, she should not have been pursued further without requesting fuller visual inspection of at least some of the permanent ballast tanks in a substantially empty state being insisted upon.

If fuller visual inspection had been allowed, I find that their actual condition would have been sufficiently apparent to make the vessel of no further interest. I do not accept that the only way to obtain a better picture of the permanent ballast tanks following Mr. Reilly's limited inspection would have been by ultrasonics (which sellers would certainly and unsurprisingly have refused to allow). There would have been nothing surprising about a request for visual inspection of several permanent ballast tanks in an empty state, and it would, if allowed, have yielded the necessary information. If *Ardent's* owners had declined such a request, I do not consider that PSMSL and PL could properly or would then have pursued the vessel further. There is no reason to think that the market was so thin that there was no real alternative to her or that the plaintiffs, if they had been informed of the position, would have decided to take the risk posed by the uncertainty about *Ardent's* condition. The purchase would not therefore have taken place.

I find that there was no sufficient reason for not requesting a further visual inspection of *Ardent* . It would have been easy and quick for the Papachristidis organization to request and, if agreed, to arrange. Although the market was a "hot" market, and prices were still rising, considerable time had already gone by without any suggestion of any other firm interest elsewhere. Therefore, even if it had been material to consider the prospects of losing the vessel by making such a request or inspection, there was no real reason to fear this, although it is the case that the asking price for *Ardent* had been continuously increasing over the last months and might have increased further with the market. However, the dominant concern should have been to ensure as best he could that the vessel's condition was such that she could be appropriately evaluated as a candidate for purchase by the Red Sea fund. PSMSL and PL should not have let themselves be diverted from that task by fear of losing the vessel or by a rising market.

In these circumstances, had the standard applicable been the familiar standard of reasonable skill, care and diligence, I would have held PSMSL to be in breach; I would have held that the breach led to the recommendation and purchase of *Ardent* ; and that, apart from the breach, she would not have been recommended to or acquired by the Red Sea fund.

VI.4 *Was PSMSL's negligence (a) gross and, if so, (b) causative?*

I turn to the critical questions (a) whether PSMSL's conduct falls to categorized as grossly negligent in any and what respects, and (b) whether, if so, the recommendation to and acquisition by the Red Sea fund of *Ardent* resulted from such gross negligence.

In Part IV.3 of this judgment, I have considered the proper interpretation of cll. 7.9/7.10 of the two agreements, and the meaning of "gross negligence". I concluded that the test is ultimately objective, and that it would be relevant to consider the degree of risk which a reasonable person would perceive as involved in the conduct, not just by considering the likelihood of the risk materializing, but also by considering other factors such as the seriousness of the risk if it did materialize, whether any steps at all had been taken to avoid the risk and how simple it would have been to take any.

Failure to sight class records for a period covering any special survey or drydocking or going back longer than about 18 months might not, perhaps, strike a reasonable person in the shipping world as involving a "high degree of risk" or as "highly dangerous" or giving rise to "a strong probability that harm may result". But it is a step which could be easily undertaken and could yield important information in any individual case. The point of class records is that they represent an objective record of an independent third party's detailed inspection of the vessel. Bearing in mind the limitations in time and scope of most pre-purchase inspections and the absence in most cases of other information, they are in this respect of particular significance.

In the present case, inspection of full class records was an elementary and simple step that any competent adviser fulfilling PSMSL's role ought to have undertaken. This is so whether it was taken prior to any pre-purchase inspection, as is preferable and should have been the case with *Ardent* , or after. Failure to perform it carried with it an obvious **\*616** risk that significant information about the vessel and her characteristics would remain unknown to PSMSL and the Red Sea fund, that the decision whether to recommend and acquire the vessel would be based on inadequate information and that, if the decision to pursue the vessel was still maintained at all, PSMSL, PL and the fund would be deprived of information which would assist/place a proper value on the vessel and assist/negotiate as favourable a price as possible. The failure to take any step, over a long period, in the present case to sight the Lloyd's records was objectively heedless, indifferent and disregarding. The Abstech report commented expressly on "the short classification period with GL". It showed that during this period no special survey and no survey of the permanent ballast tanks had taken place. Mr. Reilly's brief inspection showed that the condition of the permanent ballast tanks was central to appraisal of the vessel. On the facts of this case, and by comparison with documented illustrations of the correct attitude being adopted in other cases, it is not easy to understand how or why PSMSL did not take the step which should obviously have been taken of obtaining sight of the Lloyd's records. I have already indicated possible reasons, asso-

ciated with overwork and undermanning. The likelihood appears to be that PSMSL never even considered obtaining the full reports, after receipt of the limited Abstech report. I consider that PSMSL's failure to consider and take an elementary precaution must be regarded as gross negligence. Whether this led to *Ardent* being recommended and acquired is a question which I address later.

The other aspects of PSMSL's negligence identified in Part VI.3 consist in: the absence of a sound basis for making any assessment of the seriousness of the corrosion in *Ardent's* permanent ballast tanks, other than that it could well be very serious; the provision to Mr. Anderson in that situation of an overall estimate of U.S.$2 m. for repairs, in circumstances where it was not appropriate or safe to give such an estimate; and the failure, if the vessel was to be pursued at all, to insist as a precondition upon a proper visual inspection of several permanent ballast tanks in an empty state.

Did PSMSL's conduct in these respects involve gross negligence? If I were to pose the New York jury question, whether such conduct "smacks of intentional wrongdoing" or "betokens a reckless indifference to the rights of others", my answer would be that it does not. It is negligence, but not that serious; likewise, if I take in a narrow sense the requirement under New York law of a "high degree of risk" or "a strong probability that harm may result" or of conduct of a "highly dangerous character". The real task is however to put the question in its contractual context, and ask whether PSMSL's conduct was so negligent as to fall outside the protection against ordinary negligence which the contract was intended to give. The defendants invite attention to various factors, in particular the extent to which care was taken, the likelihood of injury materializing and the seriousness of potential injury. These factors can be amplified in the light of my previous findings:

(i) Mr. Dunn erred in approach and in the assumptions he made and factors which he took into account. But this is not a case where the vessel was not inspected at all, or where an unfavourable inspection report was wholly disregarded. He had the vessel inspected by two competent inspectors, and he spent time evaluating their

inspection and report with them. It is not even a case where there was no inspection or report at all of any permanent ballast tanks, in view of Mr. Reilly's brief descent into and adverse reports on the condition of the tops of three of the six permanent ballast tanks. Mr. Dunn erred in considering that this gave him a sufficient basis on which to evaluate the vessel and to give to Mr. Anderson, under some pressure, the U.S.$2 m. figure. But this is not a case where Mr. Dunn can be said to have taken no care at all. Whereas the absence of full class records appears to have passed entirely unconsidered, Mr. Dunn addressed his mind to the limitations of the inspection and report and concluded, albeit erroneously, that they could appropriately, even generously, be met by the figure which he gave to Mr. Anderson.

(ii) The U.S.$2 m. estimate which Mr. Dunn made was on any view of the evidence substantial, both in terms of his own experience and in terms of the average experience of others in the shipping industry. Although Mr. Dunn did not arrive at it as an absolute worst case figure, it seems clear that he did not conceive that *Ardent* could prove to be in anything like as bad a condition as she in fact was and that her actual condition was, using Mr. Houghton's description, exceptional. Mr. Dunn's failures were failures to appreciate the limitations of his experience and knowledge and the limitations of average figures, in the context of elderly tankers which might prove to have been operated and maintained less competently and conscientiously by far than PSMSL's own managed vessels. Mr. Dunn also appears to have placed an unjustifiable degree of reliance on the relatively good condition of ordinary ballast tanks and on the fact of classification and a special survey three years previously. On the defendants' case, this combination of misapprehensions and misjudgments in the performance of PSMSL's duties, opening the way to exposure of the fund to a significant risk that the U.S.$2 m. figure would prove inadequate, demonstrates negligence within a not unfamiliar class, and**\*617** does not amount to that different level or order of negligence, calling for the description gross.

(iii) Any consequences of the risk which PSMSL's conduct involved were ultimately financial. They must be

viewed against the background of the market and the projections which inspired all involved in the fund. The risk involved in PSMSL's negligence was that a vessel might be acquired which would not otherwise have been acquired, and, once acquired, would prove more expensive to repair than Mr. Dunn's figure allowed. But it was only the extra cost, over and above U.S.$2 m., which would represent an extra and unjustified burden falling on the fund if this risk materialized. The fund was conceived and the vessel acquired in optimistic market conditions - the optimism being shared on all sides.

The projections on which the fund was based do not suggest that it would have been a disaster if a vessel had proved somewhat more expensive to repair than had been budgeted. It was always understood that the ultimate profitability of the fund depended on the state of the tanker charter market during the life of the fund and of the sale and purchase when the vessels came to be sold. The subsequent collapse of the tanker market was not foreseen by anyone. Extra repair costs of half or even one million dollars could have disturbed the immediate programme for repayment of lenders to or investors in the fund. But the defendants can, I think legitimately, say that they would not have appeared fundamental. Throughout 1989 the tanker market had continued to rise (although with hindsight it can now be seen that it was approaching its peak). At the time, the desirability of getting into the rising market as soon as possible and the belief that there would be further rises in the market which would in practice cushion any costs overrun were both factors capable of influencing the thinking and conduct of those involved in the tanker market. That is not to say that it would have been appropriate or reasonable for Mr. Dunn to disregard the vessel's condition or for Mr. Anderson to disregard the relationship of the price paid plus cost of repairs to current market value. But in considering whether any negligence on either's part in this connection was gross, it is relevant to take into account the degree of seriousness which could at that stage be envisaged as attaching to an under-estimate of the potential repair costs. Bearing in mind what were at the time perceived as a strong and solid market, it is, I think, the more possible to under-

stand, even though not to excuse, the failure to give the vessel's condition the attention it deserved.

Against these factors must be set a factor in the plaintiffs' favour the importance of which Mr. Dunn himself emphasized. PSMSL's concern was with the physical condition of the vessel and the costs which could be envisaged to upgrade her. However buoyant a market may be or appear, an acquisition should be capable of being justified in terms of the market when the acquisition is made. PSMSL's task was directed to ascertaining and reporting on the physical condition of the vessel. PSMSL's failure to insist on a proper inspection of any permanent ballast tanks in empty condition was a matter going to the core of their particular functions.

PSMSL's failure to perform this particular core function is underlined by PSMSL's gross negligence in failing to sight full class records. The contents of the full class records must, in these circumstances, be treated as known to PSMSL, when considering whether it was grossly negligence of PSMSL to put forward the figure of U.S.$2 m. to Mr. Anderson. PSMSL's gross negligence in failing to sight the full class records cannot itself have resulted in the purchase of *Ardent* , or be causatively relevant, unless PSMSL would have acted differently if they had known the contents of the full class records. These - even if only obtained after Aug. 15/16, 1989 - should have underlined the need for inspection of some of the permanent ballast tanks in an empty state. But I do not consider that sight of them would in fact have made any difference to Mr. Dunn's actual approach or advice to Mr. Anderson. PSMSL cannot on the other hand rely on ignorance by Mr. Dunn of matters about which he was grossly negligent not to know, if knowledge of such matters would make the difference between a conclusion that there was mere negligence and a conclusion of gross negligence. Accordingly, I must judge Mr. Dunn's conduct, by treating him as aware of matters which would have been known from inspection of the full class records.

Viewing all these factors together, and assuming knowledge on Mr. Dunn's part of the contents of the full class records, should Mr. Dunn's conduct, in giving Mr. Anderson the estimate of U.S.$2 m. for him to rely on in

evaluating *Ardent* , be characterized, for the purposes of cl. 7.10 as gross, rather than mere, negligence? I recognize the force of the plaintiffs' submission that to acquire a vessel for a third party fund, knowing that she had - both historically and presently - significant permanent ballast tank corrosion, without undertaking any inspection of any permanent ballast tank in empty condition, calls for the description gross negligence. But in the final analysis and in the light of the particular factors identified above in PSMSL's favour, I consider that what occurred was no more than negligence by PSMSL in the course of inadequate attempts to fulfil its contractual role, and that the shortcomings in PSMSL's performance of its **\*618** duties were not so serious that they should be categorized as "gross negligence" or should deprive PSMSL of the general contractual protection afforded by cl. 7.10. The question is, as the end of the day, a jury question, but it arises in the context of a clause which makes it clear that it is only in certain exceptional cases that immunity from suit is lost. The present case, although it reveals significant misjudgments and shortcomings in approach and in the observance of proper standards in relation to *Ardent* , does not in my view involve negligence of so grave a nature as to fall outside the intended sphere of immunity.

### VI.5 *Was PL negligent through Mr. Anderson?*

I turn to consider the position of PL, starting with Mr. Anderson's involvement. So far as class records are concerned, Mr. Anderson's evidence was that he would only have skimmed the Abstech report. They had in June, 1989 just contracted to buy the 1972-built *Armour* , and were primarily interested in buying a younger vessel. He would not have expected to see the report again. Mr. Anderson accepted that is was important to see class records, while adding that "the greatest importance is seeing the ship and assessing it". He also effectively accepted, as I have mentioned, that full records should have been inspected. He said however that it was a matter for PSMSL with which he would not normally have become involved.

Mr. Anderson was aware that corrosion was often a concern in older tankers. I believe that he was aware, although not accepting this directly in his evidence, that

storage vessels could involve elements of uncertainty, particularly as regards maintenance attention, which would not be present in the case of vessels in ordinary trading. He knew that the Papachristidis organization had no or very limited experience of buying a tanker of or approaching *Ardent's* age, but said that he did not attach significance to the difference between *Ardent* and a tanker three or so years younger. His response on all such matters as age, frequency of change of name or ownership and use as a storage vessel was, again, that what really mattered was inspecting and assessing the ship. Of all factors, inspection was "of the greatest importance" or "overriding", the other matters were "incidental information":

Until you inspect you do not know what you are getting and that is the purpose and that is where you evaluate. . .. He identified the aim of inspection in the following answers:

[Q.] Therefore, one of the essential purposes of carrying out a thorough pre-purchase inspection would be as far as possible to identify what would have to be spent which would then form. . .[A.] Yes.

[Q.] Which would then form part of a budget over a period of time? [A.] Would be part of the budgeted expenditure, yes.

[Q.] Part of the forecasting process? [A.] Sure, yes.

[Q.] If that expenditure were to be, say, more rather than less, that would be an important factor, again depending how much? [A.] Yes, depending how much because if it has, you know, they are all going to have some expenditure, yes.

The obvious corollary of the emphasis placed by Mr. Anderson on inspection is that the inspection should be as full as practicable, and that PL should, so far as lay within its role, be satisfied that it was. Mr. Anderson's response was in effect that it was not his or PL's role to question whether any inspection undertaken by PSMSL was satisfactory for his or its purposes.

Mr. Anderson is, as he stressed in evidence, not a technical man. Although Mr. Anderson's qualifications and

expertise lie on the commercial, rather than the technical, side, his role was to evaluate vessels for purchase on the basis of technical advice received from PSMSL. Despite his disclaimer of purely technical expertise, he volunteered a number of comments on pre-purchase inspection procedure and what was usual in his witness statements and showed general knowledge about matters such as corrosion and use of tankers for storage. His first statement said that he would have given each Red Sea director to whom he spoke about any particular vessel "a general description of the vessel concerned including. . .its general condition as revealed by the inspection". I do not accept that matters in fact proceeded in this way in relation to *Ardent* , but it does suggest that Mr. Anderson did interest himself in the general findings on inspection. The view I formed was that Mr. Anderson tended to downplay the knowledge of a general nature about technical matters which I believe that his experience would have given him and which would have enabled him to discuss them on a broad basis with Mr. Dunn if he wished.

With regard to proper inspection procedure, Mr. Anderson's evidence was unpersuasive. His witness statement started by emphasizing that it may not be possible to inspect "all" ballast or cargo tanks or other parts of the vessel. But it went on to suggest that "in some cases" sellers refused anything other than a " 'walk-through inspection' without allowing access to any tanks or machinery". He cited a restricted inspection of vessels belonging to Marathon. But he notably failed to refer to the fact that the Papachristidis organization's actual offer was subject, not just to board approval, but also and very significantly to "an inspection of the vessel's**619** cargo and ballast tanks at a mutually acceptable place and time prior to delivery". That the Papachristidis offer was not accepted on grounds of price and it was never tested whether Marathon would accept the term is neither here nor there. The vessels were in fact sold to another fund on unknown terms.

In his oral evidence Mr. Anderson said that usually one saw some, but not other, ballast tanks. He later accepted that it was "unusual, probably, not to see any". He could not recall and was not aware of any case where none

had been seen, while maintaining that there "could be. I do not know." In the case of *Ardent* , Mr. Anderson was aware that none had been inspected in an empty condition, and that, where Mr. Reilly had been able to look briefly into them at all, he had seen severe corrosion. I find that he also knew that this was the principal reason why Mr. Reilly and Mr. Dunn were reluctant and, until Mr. Dunn was pressed into giving a figure, not able to give any figure to cover steelwork. Indeed, Mr. Anderson (in par. 156 of his witness statement, set out below) accepted that it was because of the ballast tanks that Mr. Reilly had refused to give any estimate for steel renewals, although in oral evidence he said that he could not recall the reason and suggested that it was likely to have been connected with other equipment as well as steel. I find that at the time Mr. Anderson would have been in no doubt that the real uncertainty and problem related to the steel.

Mr. Anderson's conversation with Mr. Dunn, with Mr. Reilly apparently standing by, was described by Mr. Anderson in his first statement as follows:

152.. . .I would have received and read a copy of SR's report and Captain Kazazis's telex report. . .either prior to or at the beginning of any meeting with JD and SR. I cannot recall whether I would also have received a copy of the Abstech Class Inspection report at the same time, but if I did, I would have done no more than skim through it. . ..

155. During my meeting with JD and SR, we read through SR's inspection report and Captain Kazazis' telex and discussed JD and SR's overall impression of the vessel. I believe that the main subject of our discussion was the cost of the necessary repairs. I needed an assessment of the vessel's condition and an estimate of the cost of any necessary repairs from JD and SR in order to form a view as to whether the "ARDENT" 's likely offer price (when such repairs were taken into account) was in line with the prevailing market price for a comparable vessel in reasonable condition. Before I joined them, JD and SR had already discussed and agreed that approx imately US$ 1 million was needed in respect of several particular repair items which are noted in SR's inspection report and I do not remember there being

much discussion about these specific repair items. I would have relied upon JD's and SR's experience and expertise in assessing these estimates.

156. We then considered the allowance that had to be made for steel renewals in the vessel's segregated ballast tanks. I recall that SR was unwilling to give any figure for the steel renewals because he had not been granted full access to the ballast tanks during his inspection. As I have explained, however, I needed to get some idea of the likely total repair bill in order to assess the reasonableness of the "ARDENT" 's likely selling price. I therefore pressed JD to give me a figure for the steel renewal that would be needed. After some further discussion, JD suggested that an allowance of US$ 1 million should be made for the steel renewals.

157. I was aware, of course, that JD's figure for the steel renewals was not based upon a full physical inspection of the ballast tanks. However, I was confident that JD's figure for steel renewals and his overall repair estimate would be adequate. In fact, my impression at the time was that the overall estimate of US$ 2 million if anything erred on the generous side. I believe my confidence in JD's figures was based upon the following matters, although these may not have been spelled out during the meeting: firstly, PSMSL had never had any experience of a vessel under its management requiring steel replacement in the order of US$1 million; secondly, the "ARDENT" was currently in class and had passed her Special Survey in August 1986 when the ballast tanks would have been inspected and passed by a Classification Society Surveyor; thirdly, the figure of US$ 2 million when taken as a whole, was considerably in excess of any amounts which PSMSL had ever spent on drydocking any vessel including the ULCCs which were approximately four times the size of the "ARDENT". There is of course some uncertainty in any estimate, and although I was confident that US$ 2 million would be sufficient for the repairs to the "ARDENT", I considered that even an adverse variation of 25% in the repair costs would not significantly affect the cash position of Red Sea or the overall return to the Red Sea investors. This belief was based upon the cashflows that had been produced by NODK, most recently at the end

of July 1989 following the acquisition of the "ARCH-ER". In particular, I considered that in the rapidly rising market that existed, such an increase in the total cost of the vessel would be off-set by the expected increases **\*620** in the value of the vessels Red Sea had acquired.

158. As I explained I already had an indication from C&P on 15th August 1989 that the seller's asking price would be in the region of US$ 12 million. Taking into account the US$2 million repair figure this meant that the overall cost of the vessel for Red Sea would be approximately US$ 14 million. From my assessment of the tanker market and discussions with MR, I considered that this accorded with the market price of a vessel of a similar age and size to the "ARDENT" in reasonable condition. There were few sales of comparable vessels at this time so it is difficult to make a precise assessment of the "ARDENT" 's market value by comparing her to other vessels. However, the price paid for the "ARDENT" compares favourably with the price recently paid for the "ARROW" (87,459 dwt; built 1975) of US$ 15.5 million. Allowing for the difference of 10,000 dwt in size (a difference of 11%) and the two year difference in age (discounted at 7% per year) the price paid for the "ARROW" indicated that a vessel of the "ARDENT" 's size and age in reasonable condition would be worth in the region of US$ 14.7 million.

In his oral evidence, Mr. Anderson suggested, without specific recollection at least in the case of the telex, that he would have received and read both Captain Kazazis' telex and Mr. Reilly's report before the meeting. This seems open to doubt in view of the passages from his witness statement just quoted, Mr. Anderson's apparent lunch engagement and the timing of receipt of the telex and preparation of the report. On any view Mr. Anderson can have had relatively little time to digest them. In his evidence, he said that he guessed that the whole meeting with Mr. Dunn took in the order of 20 minutes to half an hour. When his attention was drawn in cross-examination to a number of matters in the telex or report (such as the main deck, IGS, port blowers, COW machines, engineroom, suspect maintenance and "unexpected items") which would on their face appear likely to involve further cost, over and above those identified

by Mr. Reilly, his response was that he assumed that Mr. Dunn and Mr. Reilly had discussed such matters and that they were allowed for in Mr. Dunn's figure.

I was not there to question Mr. Dunn and his staff. I was there to get an estimate from them in order to make an evaluation. I did not go there with the specific purpose of questioning the ability of Mr. Dunn and his staff. I find that Mr. Anderson did not make any attempt to review or understand either Mr. Reilly's specific figures or any other costs or implications which might appear to arise from the telex and report. I find that he gave little attention to the fact that there had been no inspection of any permanent ballast tanks in an empty condition. He also gave none to the fact that the inspectors had not been permitted to continue their inspection. He suggested that this was not unusual at that time, but he had, as I find, no solid basis for any such belief and, as he accepted, no idea whether it had ever happened before. He did not ask Mr. Dunn about it. Nor did he ask Mr. Dunn how he arrived, or could arrive, at any figure attributable to the steelwork, in circumstances where Mr. Reilly declined to give any estimate, and where Mr. Dunn, until pressed again, had also felt unable. Mr. Anderson did not direct his mind to whether it might be appropriate to take any further steps, in particular by way of seeking inspection of ballast tanks in an empty condition or even (at a later stage) by including a special term in any offer made, to clarify the position regarding the steelwork. His governing concern was to secure a figure from Mr. Dunn, which he could then compare with the asking price and his perception of the market value. When he had it, that was evidently the end of the matter:

[Q.] Having pressed Mr Dunn twice, you say you are reluctant. How are you able to tell me what the figure is? [A.] I did not ask him.

[Q.] Did you ask him, could it go up further than that? [A.] No, I think I left the room when I had the figure, and I had the amount, and, in my own mind, I was satisfied with it.

[Q.] How could you be satisfied if Mr Reilly has told you that he is unable to do it, and he is the one who is

there. Mr Dunn has told you twice that he is reluctant to do it, and somehow, out of a hat, a figure of $1 million comes? [A.] The reasons that I was satisfied with it were that Mr Dunn did make the suggestion of $1 million, and I trusted his judgment and his staff. Secondly, it was a considerable amount of steelwork that at least we had not experienced, up to that point in time, with the vessels operated by Papachristidis Limited. In its entirety, $2 million was a big estimate. . . . Mr. Anderson then went on to refer to other factors, mentioned in his first statement, relating to the passing of special survey in 1986 and the relative insignificance, in his perception, of even an adverse variation of 25 per cent. on the U.S.$2 m. All the factors in his first statement, gave him confidence "although they may not have been spelled out during the meeting". There is, I think, no real likelihood that they were spelled out in the meeting. The lack of comparable experience should have been a matter of concern and the vessel's classifica-**\*621** tion in 1986 could not provide assurance about the condition of the ballast tanks in 1989. But the point about an adverse 25 per cent. variation may well give a clue to Mr. Anderson's thinking.

Mr. Anderson's involvement on Aug. 16 was thus brief and uninquisitive. The probable explanation is to be found, in my judgment, in a combination of factors. The principal one relates to the rise in the market. It had been resolved at the June board meeting of Red Sea to go for four, rather than just two vessels, and that PL and PSMSL should arrange for their purchase "as quickly as possible". Earlier in June some investor concern had been expressed, by Chase, about ship prices going up to "exceed the amount per vessel [U.S.$13 m.] specified in the projections". Mr. Anderson remained keen to get on with purchasing vessels, because of the still rising market in August. His first statement puts it as a factor potentially second only to physical inspection:

The decision whether or not to purchase is primarily a commercial one based upon a number of commercial considerations in addition to the physical condition of the vessel, the most important of which is often one's expectations for the market. He denied that was an "overriding factor". The defendants' own amended points of

defence for the preliminary issues in fact assert in support of a plea on causation that each of the defendants was aware that:

. . .the future prospects for the tanker market was the overriding factor in relation to the decision to recommend and/or purchase the ARDENT. In my judgment, Mr. Anderson was very substantially influenced by the rise in the market. He rightly acknowledged near the outset of his oral evidence that -

. . .if the market is rising,. . .that is no justification for cutting corners with regard to the proper inspection of class records or the proper physical inspection of the vessel. Secondly, by August two months had passed since the June board meeting. PL and PSMSL had looked at a number of vessels and bought two more for the fund in addition to *Armour* . But, although vessels of possible interest existed, the number of vessels on the market at the time was evidently not large. Thirdly, Mr. Anderson was himself about to go on holiday on Aug. 18. He pressed Mr. Dunn for a figure because he wanted "to try to get this sorted out" before he went away:

I was busy trying to get the Ardent . . . in a position to be offered, yes, before I left. I was trying to get that organized before I left, yes. Fourthly, Mr. Anderson says that he took the view, or would have taken the view if he had thought about it, that there would be no significant problem even if the U.S.$2 m. was itself exceeded by 25 per cent. or U.S.$500,000. If and in so far as that was his thinking, then, firstly, it tends to suggest that he appreciated that there was some uncertainty attaching to Mr. Dunn's U.S.$2 m.; and, secondly, he had objectively no indication, information or, in reality, relevant past experience which could attach even that extra degree of certainty to Mr. Dunn's figure. The extra 25 per cent. cannot have been more than a feeling on Mr. Anderson's part, possibly supported by something said by Mr. Dunn (although Mr. Anderson himself did not recall this) to the effect that Mr. Dunn's figure was generous. In fact, an additional 25 per cent. would have taken the total paid for *Ardent* by way of price plus repairs above any market value which she could properly have been thought, even by Mr. Anderson, to have in August, 1989, and also over the total of U.S.$14 m. for a fourth

ship on which all concerned were, it appears, working after the meeting of Aug. 23. Mr. Anderson's reference in his statement to "one's expectations for the market" could not justify paying over the current market for the vessel, at least without explicitly warning and obtaining the agreement of the Red Sea board. Mr. Anderson himself appears to recognize this in the later paragraph of his statement dealing with market value, where, however, he sought, without justification, to suggest a market value in excess of U.S.$14 m. for *Ardent* in August, 1989.

In my judgment, such factors explain how Mr. Anderson came to act as he did, but do not justify it. Mr. Anderson was confronted by an unusual and problematic situation. It was his duty on behalf of PL to consider and evaluate it in the interests of the fund. Even viewing the matter at a purely financial and commercial level, he had no sufficient assurance as to the significance which could properly be attached to Mr. Dunn's U.S.$2 m. On the contrary, he had, in Mr. Reilly's refusal to give any figure and in Mr. Dunn's reluctance and provision of a figure only under pressure, reason to doubt whether it was reliable and reason to enquire into its basis. Further, he was in my judgment quite sufficiently familiar with usual ship purchase procedures and reports and sale contract negotiations for it to be incumbent on him to raise the possibility of insisting on a further inspection. His attitude, throughout his evidence, that all such matters were for Mr. Dunn alone and that he had no role in them, was, I consider, unrealistic generally and especially so in the specific and unusual circumstances of this case. I consider that PL through Mr. Anderson failed to exercise proper skill and care in the steps which**\*622** they took on Aug. 16, 1989 to consider and evaluate *Ardent* .

As to the obtaining of full class records, I accept that this was a matter primarily for PSMSL. Further, although the limitations of the Abstech report are obvious on even a cursory reading, it is not shown that Mr. Anderson saw it at any time, in June, when the vessel was a serious candidate or when he might have been expected to follow up that aspect. It is also not shown that the Abstech report was actually put before Mr. Anderson on

Aug. 16, and the plaintiffs have not suggested that, if it was not, he should have required it to see it then in conjunction with the telex and report. I do not therefore consider that Mr. Anderson or PL are liable to criticism because full class records were not sighted. The most that might be suggested is that, if Mr. Anderson had gone into the basis of Mr. Dunn's estimate, this might have led to discussion about any previous history of corrosion, which might have revealed the lack of full class records.

### VI.6 *Was PL's negligence through Mr. Anderson (a) gross and, if so, (b) causative?*

Was the conduct of PL, through Mr. Anderson, not merely negligent, but also grossly negligent? In my judgment, Mr. Anderson allowed his perfectly proper desire to complete the acquisition of vessels for the fund to overcome normal or proper caution in respect of this particular vessel. Throughout his evidence he rightly acknowledged the primary importance to be attached to pre-purchase inspection of any vessel. He knew of the risk of corrosion in, and consequent importance of inspection of, permanent ballast tanks of a tanker. He knew that not one of *Ardent's* permanent ballast tanks had been inspected empty. He knew that this was why neither Mr. Reilly nor Mr. Dunn, until pressed, was able or willing to give an idea of the costs of steelwork required on *Ardent* . He nonetheless pressed Mr. Dunn into giving him a figure. He viewed it, rightly, not as covering all eventualities, but as an "estimate". He did not know or question its basis, in circumstances where Mr. Reilly, and Mr. Dunn himself until pressed, had not felt able to give any estimate at all. He appears not to have considered the obvious possibility of insisting on inspection of at least some permanent ballast tanks to obtain a better idea of the extent and level of corrosion and the vessel's suitability. He was content to proceed on the basis that U.S.$2 m. would cover any problem, although the vessel was on that basis being acquired at a price which was at the limit of what the market would justify. If he directed his mind to the possibility that the actual cost of upgrading could be as much as U.S.$2.5 m., then he could only have been relying on future market rises to cover any shortfall adequacy. This was not

an appropriate attitude, although for reasons set out in Part VI.4(iii) above I accept that the consequences of the risk which was thereby run would not at the time have appeared fundamental to the fund's success.

All this occurred against the background of a rising market and his own imminent departure on holiday, and betrays an over-optimism about the market and a feeling that it was important to get into the market as soon as possible, which can be seen in retrospect to have been only too obviously misplaced, but which appear to have been generally shared in the market at the time. Mr. Anderson's negligence occurred in or involved the misguided and over-hasty pursuit of his duties. Again, I recognize the force in the plaintiffs' case that Mr. Anderson's failure to pursue with Mr. Dunn (a) the significance of his U.S.$2 m. estimate and (b) the possibility of inspecting at least some of *Ardent's* permanent ballast tanks, constitute clear and serious aspects of negligence. In the final analysis, however, I consider that Mr. Anderson's failures to protect the interests of the Red Sea fund in these or other respects also lack that exceptional character which would call for their characterization as "gross" and which would justify the conclusion that PL is deprived of its prima facie contractual immunity.

### VI.7 *Was PL negligent or grossly negligent through Mr. Papachristidis?*

As stated in Part III.11, it is not easy to evaluate Mr. Papachristidis' evidence and position; his involvement remains shadowy in nature and extent. As indicated in Part V.8(2), Mr. Papachristidis' evidence failed in my view to face up to the fact that inspection of the full class records was an elementary pre-purchase procedure which his organization should obviously have taken in the interests of the Red Sea fund, and that no explanation or excuse has ever been suggested for failure to take it. I believe Mr. Papachristidis to have been well aware of this, although he avoided admitting it in evidence.

I accept, however, that he was not involved in the obtaining of class records. This was a matter left to PSMSL and Mr. Dunn. Mr. Papachristidis was also entitled to rely on Mr. Dunn to bring to his attention any problems or shortcomings in the records sighted. It was not for him to question Mr. Dunn or anyone else to confirm that proper procedures had been followed. There is no reason to think that Mr. Dunn summarized the Abstech report or referred to the records in any way which drew Mr. Papachristidis' attention to the absence of the Lloyd's Register records. Again, the most that might be said is that, if Mr. Papachristidis had probed the position in the light of the corrosion seen by Mr. Reilly in *Ardent's***623** permanent ballast tanks, he might have enquired whether the vessel had any and if so what history of corrosion, and might have discovered that nothing was in reality known about her history.

Mr. Papachristidis rightly regarded physical inspection as an important ingredient in the decision-making process in relation to the acquisition of any vessel. He knew of the vulnerability of permanent ballast tanks to corrosion. He explained once again that he would expect Mr. Dunn to give instructions for pre-purchase inspections and would leave it to him what those instructions would be. But he should have been and was aware of the importance of inspecting permanent ballast tanks. In the case of *Ardent* , he knew that there had been no inspection of any permanent ballast tank in empty condition. Despite his attempt at points to suggest that there was no reason to believe that anything was particularly amiss in those tanks, he was also aware that they represented a problem, for which it was intended to cater within the overall figure of U.S.$2 m. which it was contemplated might need to be spent on the vessel if acquired. His response to Mr. Houghton's view that the permanent ballast tanks were areas "which a buyer must insist on seeing and on which there can be no compromise" was:

Our experience with vessels of a similar size and age as the Ardent told us we could put this vessel into acceptable shape with the budgeted expenditure, we had had considerable experience maintaining ballast tanks of tankers of this age and size - tanks which were in many cases devoid of anodes for periods of time which were not subject to very different ballasting cycles than those of the Ardent as suggested by Mr. Houghton; we could have sought to insist on seeing all the vessel's ballast

tanks, but would have lost the ship; with the benefit of hindsight that would have been good; but at the time it was not evident. In his evidence Mr. Papachristidis also referred to

. . .the fact that we were satisfied with the information that was to hand at the time. There was no suggestion in our minds that another inspection was required. That to my mind is probably an accurate representation of Mr. Papachristidis' thinking at the time. For whatever reason, the question of a further inspection did not receive consideration. But I consider that it ought to have been considered, on the information available to Mr. Papachristidis, even though he had not been party to, and probably did not know about, the oral discussions between Mr. Reilly, Mr. Dunn and Mr. Anderson when Mr. Reilly had refused to give any estimate for steel and Mr. Dunn had only done so under pressure. Nothing in Mr. Papachristidis's or his organization's experience should have led to a conclusion that it was safe to forego inspection of any permanent ballast tanks, or that the cost of repairing and upgrading *Ardent* could necessarily be contained within the U.S.$2 m. estimate which Mr. Dunn gave without the benefit of any such inspection. No likelihood has been shown for considering that the vessel would be "lost" due to competition, if inspection had been insisted upon. A risk that her owners might refuse to allow inspection would be no reason for not requesting inspection; the refusal would itself have suggested that the vessel was not worth pursuing.

In these circumstances, assuming that Mr. Papachristidis had knowledge and was involved in the decision-making process as set out above, his conduct is in my judgment open to the criticism that he did not suggest or insist on any inspection of permanent ballast tanks in empty condition. This could have been easily requested, and easily achieved if the owners had agreed. If they had not, that would itself have been important. Mr. Papachristidis' answer, that all such matters were for Mr. Dunn, does not in my judgment do his own experience and knowledge credit. The reason why Mr. Papachristidis made no such suggestion and took no such initiative is probably that his involvement in the whole process of consideration of *Ardent* was peripheral and

cursory. Mr. Dunn and Mr. Anderson were primarily responsible. Mr. Papachristidis was, as he said, relying on them. His full attention was not engaged. He did not probe the basis on which they felt that U.S.$2 m. was a safe estimate upon which to base an offer. He did not pick up or pursue matters which, had he been primarily responsible, he would or might have done. It is also true that both Mr. Dunn and Mr. Anderson were highly qualified and experienced to fulfil their particular roles.

In these circumstances, although Mr. Papachristidis' lack of attention may attract adverse comment, it clearly did not amount to gross negligence. Any responsibility on his part is secondary and subsidiary to that of Mr. Dunn and Mr. Anderson. The most that could be said in relation to Mr. Papachristidis was that he failed to apply his mind sufficiently to this particular vessel, and assumed that Mr. Anderson and Mr. Dunn between them had done so. If he had applied his mind and questioned the basis of Mr. Anderson's recommendation and Mr. Dunn's estimate, then he would have realized that there was no reliable basis for either. As the leading member of the team running the Papachristidis organization, I think that he ought to have applied his mind in this way, even though *Ardent* was only one (and the last) vessel of four being recommended to and acquired for the Red Sea fund. But failure to do so, when others who he was **\*624** entitled to regard as very competent and experienced members of the team were handling the matter, does not amount to gross negligence depriving PL of contractual immunity.

VI.8 *Overall effect of conclusions*

It follows from my findings that, although I consider that there was causatively relevant negligence on the part of PL and PSMSL, I do not consider that it amounted to gross negligence or forfeited under cll. 7.9 and 7.10 the contractual immunity otherwise available to protect these defendants. In the circumstances, this action fails in relation to the acquisition of *Ardent* .

In summary, answering the preliminary issues which I have identified in Part I.1:

1(i) None of the first, fourth and fifth defendants owed

any duty of care in contract, tort or otherwise to the first or fifth plaintiff when acting on behalf of PL and/or PSMSL in relation to the acquisition of *Ardent* .

(ii) The fourth defendant was acting on behalf of and in possession of knowledge on behalf of PL and/or PSMSL rather than on behalf of the first and/or fifth plaintiff in all respects material to such plaintiffs' claims in relation to the acquisition of *Ardent* .

(iii) The second and third defendants owed duties to the first plaintiffs in contract and the first and fifth plaintiffs in tort subject, in all respects material to such plaintiffs' claims in relation to the acquisition of *Ardent* , to the terms of cll. 7.9 and 7.10 respectively of the commercial and technical advisory agreements entered into in June, 1989 with the first plaintiffs; and each was liable accordingly in such respects for any (if any) "Damages [as defined in such agreements] resulting from acts or omissions on his part which (a) were the result of gross negligence, (b) constituted wilful misconduct, (c) constituted fraud or (d) constituted bad faith".

2. None of the first to fifth defendants was in breach of duty to the first or fifth plaintiffs in relation to the acquisition of *Ardent* .

3. The third preliminary issue does not in these circumstances arise. Had it arisen, my answer, as appears from Part VII below, would be that none of the first to third parties acted in breach of duty to the first or fifth plaintiffs or was liable to make any contribution pursuant to the Civil Liability (Contribution) Act, 1978.VII. CONTRIBUTORY NEGLIGENCE AND THIRD PARTY PROCEEDINGS

The defendants' allegations of contributory negligence against the plaintiffs and the claims as defendants of Mr. Papachristidis and Mr. Dunn against Messrs. Bouckley, Baarma and Henderson as third parties are closely related. The third party claims by defendants other than Mr. Papachristidis and Mr. Dunn have been stayed. The defendants relied as contributory negligence on the conduct of each of the Red Sea directors, including therefore Messrs. Bouckley, Baarma and Hender-

son, but also Mr. Anderson and, strictly, Mr. Vouzounerakis. The defendants (if liable at all) contended that there should be a 50 per cent. reduction in the plaintiffs' recovery because of negligence of the plaintiffs' directors. They recognized that, if this contention succeeds, the third party proceedings could not lead to any further recovery.

It is common ground that each of the Red Sea directors owed to Red Sea and (in the case of Mr. Anderson) the fifth plaintiff a contractual and parallel tortious duty when acting as a director of Red Sea to exercise reasonable care and the skill to be expected of a reasonably competent person with his expertise and knowledge.

The defendants relied on certain internal memoranda indicating an understanding on the part of Mr. Bouckley and Mr. Baarma that "work, real work" would be involved in fulfilling their roles as well as to their assertions that they played as far as they could "a probing and questioning role". The defendants sought also to deploy against Mr. Bouckley and Mr. Baarma the evidence which these gentlemen gave about the importance they attached to "full and thorough" inspections and against Mr. Henderson his general acknowledgement in evidence of awareness of the risks of acquiring second-hand tankers without adequate inspections and his trenchantly expressed views about the folly of not inspecting any permanent ballast tanks in empty condition.

Much of the basis for reliance on such points is removed by previous findings of fact in this judgment. In particular, neither PL nor PSMSL nor anyone else identified any particular risk in respect of the acquisition of vessels or the condition of vessels to be acquired prior to the acquisition of *Ardent* . The bankers, including Mr. Bouckley and Mr. Baarma (an accountant and investment banker by background) did not identify or raise any questions about the need for "full" or "thorough" inspections. They simply relied on PL's and PSMSL's abilities in relation to the acquisition and operation of tankers. Mr. Henderson at the relevant times in 1989 had had no tanker experience, and was not aware of corrosion in elderly tankers as a particular problem area. His relevant field of expertise lay in the

operation, crewing and maintenance of general cargo vessels. After the acquisition of the HTL and Red Sea vessels, when the Papachristidis organization was experiencing severe difficulties in managing the very heavy demands placed on its resources, which were due only in part to the poor**\*625** condition of the Red Sea vessels, Mr. Henderson was asked by Mr. Papachristidis to assume an advisory role in respect of the Papachristidis organization. With the consent of Red Sea, he did this for some time. His experience and knowledge of tankers generally has without doubt greatly increased by reason of that role and the Red Sea debacle generally.

The defendants say nevertheless that each of the Red Sea directors should have identified the acquisition of tankers in suitable condition as an important element in the Red Sea fund's success; and that each should have ensured by questioning and checking that full and thorough surveys were or had been undertaken on any vessel proposed to be acquired, before any recommendation to acquire her was accepted. The defendants also say that, had any of the third parties asked whether a full survey had been carried out, they would have been informed that it had not been, and the acquisition of *Ardent* would never have taken place.

These allegations in my view lack substance. PL and PSMSL were engaged because Red Sea could not itself command the necessary commercial and technical expertise. Their role together was to identify and recommend suitable tankers for the fund's purposes, and to take all steps appropriate to that end. As Mr. Anderson acknowledged in evidence, the other Red Sea directors had "absolutely no reason" to think that PL and PSMSL might go ahead with a vessel such as *Ardent* without the benefit of a thorough inspection. No-one expected or would have expected Messrs. Bouckley, Baarma and Henderson to involve themselves in this process or to seek to formalize themselves with its execution or with individual vessels identified by PL and PSMSL in any way which could have led to their discovering the failings in the process of inspection and recommendation which occurred in respect of *Ardent* . Moreover, if any of Messrs. Bouckley, Baarma and Henderson had asked for confirmation that a full or thorough survey had been

undertaken, the probability is that the response would have been in terms which would quite reasonably have satisfied him. Once it had been decided to recommend *Ardent* , the likelihood is that the recommendation would have been supported with assurances of confidence in her suitability and in Mr. Dunn's estimate.

As to the cost of repairs, overhauling and upgrading in respect of which the sum of U.S.$2 m. was mentioned to, at all events, Mr. Bouckley, again the Red Sea directors were in my judgment entitled and bound to rely on the apparently very experienced and capable commercial and technical managers who they had engaged. It was, as I have found, probably explained at the meeting of Aug. 23, 1989 that *Ardent* could be acquired at a "discount" to her market value corresponding to this amount. This must, as I have also found, have corresponded with the view taken by, in particular, Mr. Anderson within the Papachristidis organization. They must have believed that the market value after all the works would reach U.S.$14 m. If any of the directors had pressed for further information, the likelihood is that he would have received comfort and assurances on which he would have been entitled to rely.

Mr. Henderson was at the time of the recommendation and authorization to go ahead with *Ardent* on holiday in the Cayman Islands. It is said that he should have insisted on being kept informed and on investigating and participating in any decision relating to the fourth vessel. I do not accept this. The fact that he does not appear even to have been informed before the memorandum of agreement that a fourth vessel had been recommended and was being pursued does indicate a lapse in proper procedure. But it also reflects the reality that, in the area of identification, recommendation and acquisition of tankers, the Red Sea directors were in the hands of PL and PSMSL. It would, in my view, have been most unlikely to have altered the course of events or to have prevented the acquisition of *Ardent* , if Mr. Henderson had been in London, had attended the meeting of Aug. 23, 1989 or had discussed the proposed acquisition with Mr. Papachristidis or Mr. Anderson by telephone in any way which could realistically have been expected of him, bearing in mind the limitations of his knowledge

and experience at the time.

Both the allegations of contributory negligence and the third party claims would thus have failed, even if I had held the defendants or any of them liable to the plaintiffs.APPENDIX A

(referred to In Part VI.1 of Judgment)

OVERHAULING

*Ardent* was intended to trade as a member of the Seatramp pool, servicing major oil tanker charterers to whom the defendant provided a quality service. She would need to be in appropriate operating condition. The PPM made this point clearly, when explaining the initial drydocking costs of U.S.$500,000 which its figures assumed. The PPM and other cash flow and profit figures on the basis of which the Red Sea fund was established also assumed very limited time off-hire each year (10 days), and so inferentially assumed a generally sound initial operating condition which could be maintained by regular maintenance thereafter. It followed from these points that, before *Ardent* was acquired and in order to form a view whether it was**\*626** appropriate to acquire her, the defendants would need to make some assessment of the level and cost of any repairs which might be involved.

The list of items requiring attention set out in Mr. Reilly's report consisted of items which Mr. Reilly felt that he could "justify" on a basis of established need. Mr. Reilly's evidence, which I accept on this point, was that he was expressly instructed not to allow for contingencies, unexpected problems or crew work. It was no part of the exercise which he undertook on Aug. 16, 1989 to cater for general overhauling. The specific items which he identified were intended as such. It is not likely that this was misunderstood or overlooked when Mr. Dunn and Mr. Reilly discussed the vessel on Aug. 16.

I did not regard Mr. Dunn's evidence about overhauling and contingencies as satisfactory or entirely consistent. He said, inter alia, that (leaving aside the state of her ballast tanks) he gained a satisfactory impression of the vessel's condition, that he would not have known what

provision to make for any unexpected problems that might emerge, that, if he had wanted a more precise estimate he would have asked a surveyor since that was not his job, that he did not feel that there would be any significant repairs or work that could not be taken care of by the vessel's crew or a repair team at Perama, that he felt that the U.S.$1,005,000 total of the specific items in Mr. Reilly's report was adequate to cover any overhauling, that in particular the U.S.$500,000 for drydocking included in it was more than adequate to cover drydocking and that he assumed that the vessel would in this respect be no different from other vessels of which he had had experience.

While I accept that Mr. Dunn approached the question of any overhauls on a broad basis, I have already indicated that I do not accept that his thought process regarding the costs of any overhauling were as he now recalls or reconstructs it. In my view, so far as he made any allowance for overhauling, it was as part of the further U.S.$1 m. which he added to the specific total of U.S.$1,005,000 at which Mr. Reilly arrived. This gave a total figure of U.S.$2 m. which he took to cover all the work on the vessel. This does not however answer the question either how significant overhauling actually was for Mr. Dunn or how significant it should have been.

Although it is clear that no-one did this exercise in August, 1989, considerable evidence was directed at trial to the actual allowances which it would have been appropriate to make for particular overhauls and contingencies, had such an exercise been undertaken on Aug. 16, 1989. Mr. Houghton produced alternative figures based on work being done in a shipyard or by the crew or a riding crew at Perama, with contractors being engaged where necessary. Mr. Spence produced figures in response on the latter basis. Mr. Reilly was cross-examined as to the former basis. Mr. Dunn was cross-examined, but on any view in less detail and in a way which the defendants submit was neither comprehensive nor adequate for the purposes of the plaintiffs' case.

I append as Annex I a "summary of overhaul costings" which appeared in the plaintiffs' final submissions. This identifies in columns 3 to 6 the two sets of figures given by Mr. Houghton and the figures given by Mr. Spence

and Mr. Reilly. These figures all incorporate allowances for the specific items identified by Mr. Reilly in his report, which I have added in column 7. It is apparent that, on Mr. Spence's figures, any allowance for overhauls and contingencies that could have been made on Aug. 16, 1989 would have added only about U.S.$135,000 to the total of the specific items identified in Mr. Reilly's report. By contrast, on any of the other sets of figures, there would have been a substantial additional allowance for overhauls and contingencies, ranging from about U.S.$778,000 to over U.S.$1 m.

It is notable that the figures, for which on the plaintiffs' case allowances should have been made, have been varied and supplemented over time. Schedule 9 to the points of claim in the main action contains four "minimum estimates" different from those appearing in the unamended schedule 3 to the preliminary issues (one lower), while amendments to schedule 3 made shortly before trial varied many of the original figures, making in all but two cases substantial reductions, and added six new items with suggested "minimum estimates". The recent amendments were apparently the result of Mr. Houghton's engagement as expert to assist the plaintiffs. The overall picture, of changing and expanding allegations years after the relevant events, is not however encouraging to a party seeking to establish a negligent failure to make appropriate allowances.

The defendants submit that the exercise undertaken by Mr. Houghton is in any event irrelevant and unhelpful. Their case is that there was no reason to expect Mr. Dunn ever to make any assessment of this nature or in this detail, and that it can and should be disregarded as a pure ex post facto exercise undertaken for the first time by Mr. Houghton after he was instructed. In the detail in which it was gone into before me, there is some force in this submission. Indeed, even the plaintiffs in their final submissions submitted that:

The court does not need to come to hard views on specific figures, and the true position may be **627** that the cost of overhauling might vary depending on such factors as whether it turned out that the crew could do the work, or whether specialist contractors were required. But in these circumstances the Defendants were

taking an obvious risk if they gave figures to the Plaintiffs, and proceeded to work out how much they could pay for the ship, on the assumption that everything would turn out favourably . . . It is certainly tempting not to look in any detail at the differing provisions suggested by the experts. Mr. Dunn himself clearly did not approach the matter on any detailed basis. A suggestion that he could not have carried the matter further does not however appear to be correct. He himself acknowledged the possibility of asking a superintendent to provide a costing of individual items, saying simply that this would not be his job. Mr. Reilly had been instructed not to undertake any such exercise, but could, if asked, have given his views on provisions, as he did when asked in the witness box. As a matter of fact, Mr. Dunn does not appear to have asked Mr. Reilly even orally on Aug. 16, 1989 to comment on such matters. The lack of any detailed or documented consideration of the nature and scope of any overhauls required in relation to *Ardent* , whether by Mr. Reilly or by anyone on the instructions of Mr. Dunn, contrasts unfavourably with the detailed attention to such matters given by Mr. Tsevas when he inspected a previous vessel, *Ourenia* . Mr. Dunn said that Mr. Tsevas was "about the only one that ever does this". If no such exercise is undertaken and no specific attention is directed to items which would or could require overhaul, there must be a risk that an insufficient general allowance will be made. An experienced expert like Mr. Dunn may be able to make a satisfactory overall allowance, based on general information available and if he has comparable experience of other vessels. The exercise undertaken may thus have value, first, as indicating the sort of figures that could have resulted had Mr. Dunn asked a superintendent to look at the matter in any detail and, secondly, as giving some indication as to the general level of allowance at which Mr. Dunn himself or a surveyor like Mr. Reilly might have been expected to arrive, even viewing the matter on a broad brush basis, despite Mr. Dunn's own professed inability in the witness box to know what provisions to make for overhauling. The defendants complained that Mr. Dunn was not given the opportunity in cross-examination of commenting on each item raised by Mr. Dunn. But, in view of Mr. Dunn's evidence that he did not undertake and would not have un-

dertaken any such detailed exercise himself, but would have left it to a superintendent, this complaint seems to me to lack force.

The differences between columns 3 to 6 derive from important differences in approach. Firstly, columns 1 and 4 depend on the assumption that all the work will be done in a shipyard, whereas columns 2 and 3 assume that as much as possible will be done in a place like Perama and/or by a crew, with contractors only being engaged where necessary. Secondly, there are major differences of opinion between Mr. Houghton and Mr. Spence as to the work required to be done. In the main these derive from different assessments of the condition of the vessel, as it was or should have been apparent to Mr. Dunn, and the proper approach to the work which would have been required.

As to the first difference, Mr. Dunn said that he would have approached overhauls on the basis that as much work as possible would be done by crew, including where necessary a special riding crew. The use of such crew did not necessarily depend on repairs being in Perama, which was, I accept, only resolved in mid-October. Crew work was already well in hand in September and early October, 1989. Further, it appears that crew repairs could have continued if the vessel had been in a yard for other work, and that even a small riding crew might then still have been able to remain on board. Mr. Dunn's and Mr. Reilly's evidence that they envisaged overhauls being attended to by crew and outside contractors only being engaged where required by the nature of the work was effectively unchallenged, and I accept it.

As to the second difference, the plaintiffs submitted that the picture which was or should have presented itself of the vessel to Mr. Dunn was one of generally suspect maintenance and uncertain condition. They referred to the comments noted in the telephone conversation of Aug. 14, 1989 to the effect "looks nice but all superficial" and "no work for two years". In Captain Kazazis' telex comments they drew attention to the comment that the master, chief and second engineers:

. . .seemed not very knowledgeable and I doubt if they

have maintained the vessel very well and to the further comment that, although "engine room looked OK" -

Vsl was alongside for two years and I am not sure if [chief engineer] was doing the normal maintenance of engine room. I believe a lot of money should be spent in the engine room especially for boilers.

Vsl was not trading normally and once it seemed to me that vsl was not maintained properly, we may face unexpected problems.

. . .

We could had found more if we had more time for inspection.**\*628** In Mr. Reilly's report they relied on the conclusion that:

. . .Present crew/management have provided the minimum of attention to the upkeep of the vessel, there is an obvious disinterest in ancillary equipment as a result of the vessel being a storage tanker. . . . They drew attention to the comment in relation to engine room auxiliary equipment:

General appearance is good but planned maintenance is suspect. There was also an apparent absence of records (such as main engine calibrations, crankshaft deflections and luboil reports for the main or auxiliary engines or for boiler feed water or fresh water consumption), and adverse comments on specific items (such as control and automation, main and exhaust gas boilers, inert gas system and anodes).

The defendants rightly caution against attaching any great significance to a brief note of certain points covered in a 10 to 15 minute telephone conversation. The notes, telex and report are however in my view to similar effect. The defendants submit the plaintiffs have considerably overstated the adverse nature of that effect and have ignored counter-balancing considerations. Thus the telex contains favourable comments on the vessel's general condition, apparently mainly directed to her hull and extending also to her cargo tanks, to the fact that on-deck machinery "looked good", to the renewal of "almost all pipes on deck", to the "reasonable" condition of her pump room, to the fact that her engine-

room "looked good" (a comment heavily qualified by later observations set out above) and to her being "in good condition for her age".

Similarly, in relation to Mr. Reilly's report, the defendants point out "disinterest in ancillary [deck] equipment" and "suspect" planned maintenance of engineroom auxiliary equipment is not the same as complete neglect; work had also been done at Piraeus in late 1987 before the vessel's stay in Aqaba. The suspected absence of deck maintenance since then was also a minor matter. The report also contained positive comments. For example, all nine units of the main engine had been overhauled at Aqaba, the outboard diesel was "seen running in good order" and the turbo alternator was "reported in very good order". Deck railings and fittings were "good all round", deck lines were "good" with many new replacements. The deck equipment for inert gas and crude oil washing were "in good order" with "no immediate attention required". By contrast, the engineroom equipment for the inert gas system was noted not to have been used for two years, and Mr. Dunn said in evidence that it was clear that it needed a complete overhaul. The cargo handling and stores cranes and derricks were also "seen in good condition".

These communications do show that the vessel had positive aspects. Mr. Dunn in his evidence reinforced these by reference to the works done in late 1987 shown in the Abstech report and the fact that the vessel would have been required to undertake cargo operations as a storage vessel in Aqaba. On any view, however, giving the positive aspects the maximum weight, the vessel presented an uneven picture. This was most obvious in relation to the hull. Cargo tanks in good condition contrast with ballast tanks in highly suspect condition. Similarly, even if one disregards parts of the vessel or its fittings or equipment in relation to which comments of a positive nature may be found in the documents, the position is still uneven. Each part has its own importance and would have to be inspected and dealt with if appropriate after the vessel was taken over. Mr. Papachristidis allocated different priorities to different parts at the pre-purchase stage. He said that he would be interested in hull and main engine above all, and then in cargo and

auxiliary equipment. But each of these areas and other areas could give rise to potential overhauling costs, of which one would expect account to be taken at the pre-purchase stage.

In my view, all three of the surveyors' communications were sounding to Mr. Dunn an important general note of caution in respect of maintenance. The absence of records meant that there was nothing to dissipate this; it was unusual and it meant that neither Mr. Reilly nor Mr. Dunn had any real basis for confidence about the behaviour or standard of care exercised in relation to the boilers. Mr. Dunn in the circumstances had nothing to rely on other than what Mr. Reilly said. But that meant simply that he had very little to rely on, and no real basis for assuming that all would be alright. It was suggested that the fact that Mr. Reilly had the chief engineer's word for the operation of the boilers meant that Mr. Dunn could in turn proceed on the same basis. Having regard to the expressions of doubt in the telephone conversation, Captain Kazazis' telex and Mr. Reilly's report about the knowledgeability and diligence of the captain and all engineroom officers on the vessel, I do not accept that Mr. Dunn can or should have deduced from anything said by Mr. Reilly any real assurance in this regard. The absence of records should have been viewed as an unusual and unsatisfactory matter.

The vessel's age and the lack of any definite information about her history, before or after her period as a storage tanker, were matters which should have underlined the cause for concern. So too her period of recent use as a storage tanker, with which the doubts about her recent maintenance**\*629** were linked. It is true, as the defendants stressed and as Mr. Houghton accepted, that there was nothing to suggest that the suspect maintenance involved or would lead to any major or serious problems, which could not be resolved given time or money, in many cases by the defendants' crew (including in that phrase a special repair team). But the present exercise is not intended by the plaintiffs to suggest that the vessel should have been rejected outright as a candidate for purchase, because of the actual or possible condition of non-steel items. It is aimed at reaching a figure which surveyors would have been likely to arrive at for work

other than steelwork, if any assessment had been made at the time, at shedding some light on the level of figure which Mr. Dunn might as a matter of general reaction and experience had had in mind for non-steelwork overhauls, if he had ever focused his mind on that question, and at shedding light on the adequacy of the actual overall provision of U.S. $2 m. for all repairs which Mr. Dunn had in mind.

Someone in Mr. Dunn's position, considering whether the vessel was a possible candidate for purchase and if so at what price, should have paid considerable note to the factors identified above. For reasons indicated in Part VI.3 of the judgment, if Mr. Dunn had had sight of class records for a longer period, this would or should have accentuated his concern in the same area. If there was, in the circumstances, no way of being certain what areas or equipment would require what attention at what cost, that should not have been a reason for making no provision at all. It should have been viewed as a reason either for not pursuing any interest in the vessel or, alternatively if interest was pursued, for insisting, so far as practicable, on further inspection and for building in a cautious provision for overhauling costs. Mr. Dunn was questioned about comments in a report by a Mr. Ramoundos, a consulting naval architect and marine engineer, on a vessel called *Elite* in April, 1988, suggesting caution in respect of auxiliaries in the light of "the class records history of extended damages of the engines, our observations aboard and the lack of records". Mr. Dunn was generally dismissive, as he was in respect of some of the concerns of other experienced surveyors employed or engaged by PSMSL. I was not impressed by Mr. Dunn's attitude or evidence in the witness box in this respect, but, whatever the position in respect of *Elite* , caution was called for in respect of *Ardent* .

I do not accept that Mr. Reilly gave orally to Mr. Dunn any significantly different picture to that painted by the written material, although at points Mr. Reilly's evidence seemed to suggest that he had gained a different or better impression of the chief engineer's diligence and did not share all of Captain Kazazis' telexed views.

The plaintiffs sought to support their case on the scope of overhauls by reference to the specification of work which Mr. Reilly prepared after *Ardent* had been taken over, which was submitted to at least two shipyards (Hellenic and Eleusis) to obtain their quotations, which in the event were largely not taken up, since the vessel went to Perama to repair. The specification provides for a comprehensive overhaul of the vessel. Mr. Reilly was not clear about his thinking in compiling it. At one point he accepted that it represented work which he actually envisaged would have to be done in terms of general overhaul, at other points he gave a contrary picture, suggesting that much of it (perhaps 30 per cent. or 25 per cent.) would be cancelled but also explaining that this would allow for the cost of "emergent" or unforeseen work. He gave, as the allowance for overhauling (over and above the specific figures in his report) which he would have suggested if asked, U.S.$80,000 to U.S.$100,000, or in oral evidence U.S.$100,000 to U.S.$150,000. The defendants criticize the plaintiffs for cross-examining Mr. Reilly in a "confusing and rushed manner". To my mind, Mr. Reilly's evidence was itself simply confusing and at points inconsistent. However, I accept as likely his statement that the specification which he drew up was intended to be comprehensive in the sense that it would cover, and serve to ensure that the defendants had a shipyard quotation for, all aspects of overhauling which might reasonably be envisaged. Not only did the defendants and Mr. Reilly envisage doing as much work as possible outside a shipyard, I accept that they also envisaged that it would be unlikely to do all the work on the specification. However, there would, as Mr. Reilly pointed out, be "emergent" work. I was left after Mr. Reilly's evidence with the impression that he was, particularly towards the end of his evidence, tending to underestimate and undervalue the extent and cost of the general overhauling works, not catered for by his specific figures, which he would, if specifically asked, have had in mind on Aug. 16, 1989.

I turn to the summary of overhaul costings (Annex I). Head A relates to the main engine. U.S.$50,000 of the total is covered by part of the automation allowed for in Mr. Reilly's report. On top of that Mr. Reilly was prepared to contemplate some work on the turbo chargers and some other cleaning work, costing maybe

U.S.\$10,000 a boiler in a shipyard. Mr. Dunn said that he had not thought that any money would need to be spent, beyond, it would appear, U.S.\$10,000 to U.S.\$15,000 for a survey and maybe some tube repairs. Mr. Houghton and Mr. Spence were agreed that it would be necessary to spend an estimated U.S.\$7290 on **\*630** opening three cylinder units (item A1) and various other items (A9-A22) for inspection and overhaul. They also agreed that a number of turbo chargers would need to be opened and overhauled by a contractor. Mr. Houghton thought all three, Mr. Spence only one. I prefer Mr. Houghton's view on this, based on the significance of these units, especially in case of breakdown, their need for servicing every 16 hours and the uncertainty regarding their servicing position in the absence of records. Overhaul of all three units was also specified and done after delivery of *Ardent* , although the defendants rightly referred to the dangers of making general deductions with hindsight from subsequent events, when the vessel on closer inspection proved almost immediately to be in worse condition than previously envisaged. An extra cost of U.S.\$14,000 would thus arise.

Items A3 to 8 in the breakdown to the summary were items in respect of which Mr. Houghton would have wished to provide some U.S.\$50,000 to cover the cost of doing them in a shipyard, while Mr. Spence would have allowed no more than U.S.\$2280, in some cases on the basis that no work at all would be required and in all on the basis that any work would be done by a riding crew. As to scope of work, I again prefer Mr. Houghton's approach. As to mode of execution, although Mr. Houghton thought that it would not be reasonable to use a repair team, these are items for which no allowance was sought at all, until May, 1996, and do not for the most part appear to represent specialist work. They were in fact done ashore by a firm of general engineers, Standard. Mr. Spence was emphatic that such items could be done by crew on board. As individual items, it seems also to be agreed that the crew could attend to them on board. Mr. Houghton made a strong case for saying that, in view of the number of items involved and their significance to the vessel's future trading, any reasonable shipowner would all along have contemplated overhauling ashore. Despite this, I think

that the balance of the evidence probably entitles the defendants to the benefit of the doubt on most of these items. The difference in cost between having them done ashore and by crew is so large that it would be understandable that someone looking at the matter beforehand should approach them on the basis that they would, if at all possible, be taken care of on board by a repair team. The fuel pumps (item A5) were however important items, with an overhaul life of 6-8000 hours. It seems unrealistic to assume that they would not incur any costs at all. Further some of the costs would have related to timing work ashore by contractors. I think that an allowance should have been made for this work, although not for the whole of Mr. Houghton's figure of U.S.\$6750 which relates to the cost of having the whole work done ashore. In the absence of other information, I shall simply take U.S.\$2500.

The remainder of the main engine costs consists of spares, to a total of U.S.\$30,000. The total allowance sought for spares increased in May, 1996 from U.S.\$100,000 to U.S.\$160,000. It is difficult to relate the increase to any particular head. Mr. Spence's total figure for all spares is only U.S.\$20,000. The actual cost of spares during the vessel's repair was in excess of U.S.\$300,000, but this gives no assistance as to what should have been foreseen on Aug. 16, 1989. The defendants point to the statement in Mr. Reilly's report that "a good stock of spares exists. . .". The plaintiffs point out that it would be necessary to replace spares used in the process of overhauling. All the same it seems to me that the current suggestion that a total of U.S.\$160,000 should have been allowed for spares puts the matter too high. Mr. Spence's U.S.\$20,000 appears on the other hand very low, in the light of the work identified as necessary and the general caution in respect of maintenance. Bearing in mind the picture presented of the vessel on Aug. 16, 1989 and the likely nature of the overhauling as I find that it should then have been perceived, I think a total of U.S.\$50,000 would have been the appropriate allowance for spares at that date. Of that, some U.S.\$15,000 may be attributed to the main engine.

On this basis, under head A, there would be a provision

Copr. © West 2009 No Claim to Orig. Govt. Works

of U.S.\$91,070, or some U.S.\$41,000 more than covered by Mr. Reilly's report.

Head B relates to the generating plant. It includes a further U.S.\$25,000 of the provision suggested by Mr. Reilly for automation. The balance consists of spares (U.S.\$15,000), and general overhaul in a shipyard of the auxiliary diesel generators (U.S.\$30,241) and the turbo alternator/generator (U.S.\$31,757). The general overhauls represent new provisions, first suggested in May, 1996. If done by a repair team, the cost of overhaul was agreed at U.S.\$2890 a unit for the diesel generators (though Mr. Spence would provide for the overhaul of only one) and U.S.\$2080 for the turbo alternator. Again, I prefer Mr. Houghton's approach regarding the numbers of diesel generator units requiring attention, especially against a background of absence of records and past and current breakages.

The turbo alternator is important to the vessel's economical running, but is, Mr. Spence told me, very robust. Mr. Reilly noted that it had been "reported in very good order". The full class records would have shown that it had not suffered recent damage. The Abstech report showed its overhaul in October, 1987. There is some force in**631** Mr. Houghton's view that allowance should have been made for another overhaul of so important a part, on a vessel which appeared not to have been properly maintained at Aqaba, and it appears that any cost of doing this would have been relatively minor. In the end however I have come to the conclusion that this was not an item for which any allowance was required on the information available at the time.

The position regarding spares in respect of the generating plant was uncertain, particularly when at least some spares would be being used on the generator repair in circumstances where there was no certainty that replacement spares had been ordered. Some provision would appear to me called for under this head, although not as extensive as the full set of two liners, bearings and spindles for which Mr. Houghton allowed. Taking, therefore, U.S.\$5000 as an appropriate provision for spares, the total provision under head B becomes U.S.\$35,780 - i.e. U.S.\$10,780 more than is covered by Mr. Reilly's report.

Head C is auxiliary machinery. Mr. Reilly's comment that planned maintenance was suspect related specifically to this head. Mr. Spence appeared originally to be prepared to allow some U.S.\$50,000 on this account (although this figure may have included work within other heads such as B or E), but his detailed provisions totalled U.S.\$14,888. Taking repair crew costings where appropriate, there were differences between Mr. Houghton and Mr. Spence as to the numbers of units for overhaul of which provision should have been made, and how far it would have been realistic to provide for all the work to be done by a riding crew. On numbers, I prefer Mr. Houghton's approach, bearing in mind the serious question mark over maintenance and the absence of records. I accept therefore Mr. Houghton's figures for principal pumps (item C1 - U.S.\$5100), air compressors (item C3 - U.S.\$2040), air conditioning (item C4 - U.S.\$7148, in relation to which Mr. Spence accepted that in practice a contractor would be engaged), generator plant (item C5 - an agreed U.S.\$510), heat exchangers (item C7 - an agreed U.S.\$3910), waste gas boiler (item C8 - an agreed U.S.\$1700 for an item on which Mr. Reilly's report specifically commented), and bilge and underfloor areas (item C10 - U.S.\$4760). This gives a total so far of U.S.\$25,168.

Item C2 concerned purifiers, which Mr. Houghton accepted would normally be a crew matter, but which he suggested would have to be dealt with by a specialist at a cost of U.S.\$23,670 in this case, because of the absence of planned maintenance. Mr. Spence said that some must have been working for the vessel to get to Piraeus and that these simple, although important, items could be dealt with by a riding crew at a cost of U.S.\$425. Mr. Reilly's report noted simply that the purifier room was "clean and tidy". They were in fact found after delivery to be non-operative and were dealt with then by Standard.

The next item is C6, overhauls, renewals and repairs of piping, valves and fittings in service lines from machinery services, in the engineroom area. Mr. Spence accepted that the absence of specific adverse comment by Mr. Reilly did not mean that no such work would be necessary. Mr. Reilly could not be expected to see

Copr. © West 2009 No Claim to Orig. Govt. Works

everything, and some repairs and some provision, which he put at U.S.$5000 would be required. Mr. Houghton's provision of U.S.$53,000 (calculated on the basis that a contractor would have to be engaged) was however for "massive repairs" and Mr. Spence did not accept it.

The remaining item under head C is item C9, spares, totalling U.S.$20,000. Again, I would only allow a part of this. In view of the particular question mark over maintenance, I take U.S.$10,000.

I would not criticize a surveyor with Mr. Dunn's information on Aug. 16, 1989 for not making the very full provisions allowed by Mr. Houghton in respect of items C2, C6 and C9. But the uncertainty about maintenance and the absence of records make this an area which called for at least some general provision for unexpected problems. I take on this basis a round sum of U.S.$30,000. The result is an overall provision of U.S.$55,000 under head C.

Head D concerns electrical equipment. Taking the cost of overhaul using the crew, the difference is between Mr. Houghton's U.S.$11,400 and Mr. Spence's U.S.$3050. This is explained (a) partly by reference to the scope of overhauling to be contemplated and (b) partly by reference to Mr. Houghton's specific provision of U.S.$5000 for spares, covered only by Mr. Spence as part of his general allowance of U.S.$20,000. As to (a), I accept Mr. Houghton's approach to the scope of overhauling, but would reduce his provision for spares. Looking at the matter in round terms, I take an overall figure of U.S.$7900 (to include U.S.$1500 spares) under head D.

Head E concerns the cargo and ballast system. Taking a repair crew cost where thought appropriate, the difference is between Mr. Houghton's U.S.$263,254 and Mr. Spence's U.S.$178,040. Both figures include a further U.S.$75,000 in respect of the automation plus U.S.$90,000 for the testing and repair of heating coils covered by Mr. Reilly's report.

The first main difference relates to the overhauling of cargo, stripping and ballast pumps, items C1-4, for which Mr. Houghton allowed a total of**\*632**

U.S.$35,780 and Mr. Spence nothing. Mr. Dunn pointed to the use of pumps which would have been made by the vessel as a storage vessel. Mr. Spence pointed to the references in Mr. Reilly's report to the pumps being seen in good condition (which Mr. Reilly confirmed meant running) and in the Abstech report to pumps being attended to in late 1987, and made the assumption (open itself to question in view of other indications) that the owners would have continued to look after the pumps at Aqaba. Mr. Houghton accepted that pumps would normally only be due for opening up every 4 or 5 years, but said that their high risk nature and importance and the question marks arising from suspect maintenance and lack of records called for their overhauling after delivery, which was in fact specified then by Mr. Reilly and done. Mr. Reilly considered that the crew could handle any repair work, if any was necessary, at a cost, at very worst, of U.S.$10,000. While I think that some provision should have been made, I am not satisfied that wholesale overhaul by a contractor was to be envisaged. I would allow at most U.S.$10,000.

Items E5-7 were either agreed or estimated in differing sums which led Mr. Houghton to a total of U.S.$6100 and Mr. Spence to a total of U.S.$6680. Items E8 and 9 were the remaining substantial items. As item E8 Mr. Houghton provided for disconnection, redressing and re-assembly of a total of 20 ballast lines in cargo holds, at a cost of U.S.$24,800, Mr. Spence for testing at a cost of U.S.$680 and repairs costing U.S.$3000. As item E9 Mr. Houghton allowed for like work on cargo lines on deck and bottom lines costing U.S.$30,534, while Mr. Spence allowed only U.S.$2680. Bearing in mind what was said in Mr. Reilly's report about the good condition of deck lines with "many new replacements" and the "very good condition" of cargo tank pipelines, valves, fittings and dresser couplings, Mr. Houghton's provisions appear to me more cautious than could necessarily be expected.

To the U.S.$165,000 covered by specific items in Mr. Reilly's report, I would therefore add U.S.$22,360, making a total of U.S.$187,360 for head E.

Head F concerns deck machinery, equipment and fittings. Captain Kazazis' telex and Mr. Reilly's report and

photographs reported that these looked in good repair. The port windlass and aft mooring winch had been overhauled in 1987, and such items would have been in use thereafter at Aqaba and en route back to Piraeus. Mr. Spence would originally have been prepared to allow U.S.$75,000 under this head, to include the replacement of a dry by a wet type seal on the inert gas system. Mr. Dunn said in his witness statement that he would have envisaged this at a cost of U.S.$35,000 to U.S.$40,000. Apparently inconsistently, he gave oral evidence (19/133) that no decision had been taken, that it was being investigated, and that he did not make any allowance for it. These answers were not then challenged. Whether they would justify the absence of any allowance itself appears open to doubt, but neither Mr. Dunn nor the experts were in fact questioned further upon this. Mr. Spence indicated that he would have been content with either type of seal. The seal was simply excluded from Mr. Houghton's figures. In the circumstances, I shall exclude it from the present exercise.

On a detailed basis Mr. Houghton would have provided for overhaul and testing by contractors of both windlasses and all five mooring winches, as well as the two derrick winches and the stores cranes, at a cost which it is agreed would have totalled U.S.$14,430. These were important items for the vessel's trading, and good external condition told one nothing about their operational abilities. Mr. Spence questioned the need for any work by contractors at all, in view of the favourable indications about deck machinery mentioned above. He said that these were all items which would be tested and if necessary overhauled by the crew. In cross-examination Mr. Houghton accepted that some crew work could have been done during other repairs, but suggested that a full provision should nonetheless have been made for use of contractors, with work being cancelled if it was done by crew. It seems to me that the reality probably lies between Mr. Houghton's and Mr. Spence's views on these items. A surveyor considering what provision to make on Aug. 16, 1989 would I think have made some relatively minor allowance for overhauling and testing, say U.S.$5000.

Mr. Spence's total for head F is U.S.$40,910. Almost all of this (U.S.$40,000) is for item F6, the inert gas system, for which Mr. Houghton now only suggests U.S.$19,250. Mr. Dunn's evidence was, as I have said, that it was clear that it required a complete overhaul. He said however that he made no provision for its overhaul, on the basis that it could simply be done by the crew or a repair crew. Mr. Reilly said that he too was told that this would be so, that he would not have known how to cost it, without being able to "justify" any particular figure, but that "without looking at unforeseens" he would have allowed U.S.$10,000. Mr. Reilly's attitude, not merely in relation to steelwork, was that it was not for him to put any figure on costs about which he could not be reasonably certain. He did not include any figure to cover eventualities, even though they were, as in this case in my view, likelihoods, when the actual figure could not be stated with any certainty. Neither Mr. Houghton nor Mr. Spence suggests that it could be realistic to suppose that the inert gas system would be overhauled by crew or to make no provision for its cost**\*633** or to take as the cost the figure of U.S.$10,000 which Mr. Reilly ventured in evidence. Overhaul of the inert gas system is thus a substantial matter, likely to involve considerable time and work, which Mr. Dunn did not himself cost at all. In so far as he addressed his mind to it, it appears to me probable that he did so on a very broad basis, treating it as covered, along with all other work, by the overall provision of U.S.$2 m. which he had in mind.

Mr. Houghton would allow U.S.$24,480 for crew work on item F7 (the crude oil washing (COW) machines) compared with U.S.$910 allowed by Mr. Spence, U.S.$1190 for item C8 (cargo tank hatch seals and fastenings) compared with nothing by Mr. Spence and U.S.$15,000 for item 9 (miscellaneous fittings, air pipe heads, guards, rails, ladders and walkways) again compared with nothing.

Captain Kazazis referred to the condition of the COW machines as "unknown", and Mr. Reilly's report threw no light on it, save that it did include a photograph of one well-greased and apparently sound COW machine head. Mr. Dunn said in his witness statement that the

COW machines were a crew item and of minimal concern, and that he bore in mind that the vessel would not have required to crude oil wash while on storage "when estimating the cost of overhaul of the COW machines. . .". He did not say and does not appear to have been asked what he meant or envisaged here when he spoke of estimating the cost of overhauling them. In point of fact, very little if any work proved to be required on them. Mr. Houghton allowed for inspecting them all, but said that there was not a lot to do by way of overhauling and accepted that it was work that could be done by crew. I think it unlikely in these circumstances that anyone at the time would have envisaged an inspection of each at anything like the cost identified by Mr. Houghton.

As to miscellaneous items, Mr. Reilly reported that "winch in front of windlasses precludes fitting of Smit Bracket". Mr. Tsevas' witness statement shows that this was indeed the case:

. . .the vessel had a mooring winch on the centre line where the chainstopper would normally be fitted. It was therefore necessary to offset the chainstopper starboard of the centre line. This cost about $10,000. Mr. Dunn said:

Since most of the major oil companies require a Smit bracket to be located on the forecastle, I took note of Simon Reilly's comment regarding the problem of fitting such a bracket in front of the windlass, but was confident that we could find a way around this particular problem. It appears that a way round was indeed found, but that there would be a cost could, presumably, have been foreseen. Looking at the matter generally, I would have expected a further provision for the COW machines, cover seals and fastenings and miscellaneous items in the regions of U.S.$20,000. Added to the allowance for the inert gas system, this gives U.S.$44,250 on Mr. Houghton's figures and U.S.$65,000 on Mr. Spence's for head F. For subsequent purposes, I shall take the mean of U.S.$55,000.

Head G consists of general requirements, put at U.S.$158,460 by Mr. Houghton and U.S.$142,000 by Mr. Spence. These figures include U.S.$120,000 al-

lowed by Mr. Reilly's report for renewal of anodes. Mr. Spence would concede that a provision should have been made for updating fire and safety equipment, a specialist item put by him at U.S.$15,000, although by Mr. Houghton only at U.S.$10,000. Servicing of bridge and radio equipment, another specialist item, is also agreed at U.S.$5000. Mr. Houghton would allow U.S.$8360 for a third specialist item, ultrasonic testing of tanks, while Mr. Spence would allow U.S.$2000 (which seems on its face low in the light of the known steelwork problems in the ballast tanks). Mr. Houghton would also have provided for U.S.$15,000 to be spent on spares for deck machinery and equipment, while Mr. Spence's only provision would consist of part of his total allowance of U.S.$20,000 for spares. Taking a round U.S.$5000 for spares the resulting total for head G is U.S.$148,360 or U.S.$153,360, or, say, a round U.S.$150,000.

Head H relates to accommodation, for which Mr. Houghton would have provided for U.S.$30,000. The accommodation proved to be in utterly lamentable condition, but this was a matter which Mr. Reilly did not pick up on such limited inspection as he undertook of the relevant areas. His report said merely that it was "Dirty and dark by design (sic). Originally a high standard Western style".

Mr. Dunn acknowledged that it was obvious from this that "it had been neglected and needed a thorough cleaning and painting". Mr. Spence said that this would not have suggested major works. I find it difficult, bearing in mind among other matters the defendants' own standards, to accept Mr. Spence's suggestion that the defendants would have expected the crew to do all the necessary work at no cost and that no other work whatever was to be envisaged. Some provision should have been made for upgrading the accommodation, even though its truly lamentable condition only appeared after delivery. I take a round U.S.$10,000.

Head J relates the balance of the spares. I have already indicated that I would take as a total for spares U.S.$50,000, and the balance of this sum not so far specifically allocated is some U.S.$18,500.**634**

Head K is drydocking, for which Mr. Reilly took a round U.S.$500,000 plus U.S.$40,000 for the tail shaft survey. Although I consider (contrary to the defendants' case) that Mr. Dunn regarded this as the appropriate figure at the time and did not view it as containing slack which would cover other items, both Mr. Houghton and Mr. Spence would have accepted somewhat lower figures. Mr. Houghton took U.S.$466,438 and Mr. Spence U.S.$381,000. Mr. Houghton's figure was criticized on the basis that it assumed too high a standard of attention. The defendants were however concerned to maintain a high class of vessel to attract first class charterers. Mr. Houghton was asked whether, if Mr. Dunn did think that somewhat lower figures would suffice, he (Mr. Houghton) would criticize Mr. Dunn as imprudent. Since Mr. Dunn's thinking was not in my view along these lines, Mr. Houghton's qualified acquiescence in the proposition is essentially unhelpful. I prefer Mr. Houghton's higher figure, which corresponds in my view with Mr. Reilly's and Mr. Dunn's thinking at the time.

Head L relates to three matters for which Mr. Reilly made specific provision, tank mucking, pump room steelwork and installation of Marisat equipment, totalling U.S.$105,000. It is common ground.

Head M relates to survey requirements, for which Mr. Houghton provided U.S.$39,860 and Mr. Spence U.S.$15,950. Items totalling U.S.$5750 are common ground. The only difference relates to overhauling and preparing the starboard boiler for class survey, for which Mr. Houghton allows U.S.$34,110 and Mr. Spence only U.S.$10,200. Mr. Houghton estimated off the cuff that his figure would reduce by about U.S.$8000 if the crew undertook the overhaul of the mountings. The mounting figures in the two shipyard quotations were U.S.$14,276 and U.S.$6545, the mean of which is U.S.$10,410.50. Mr. Houghton assessed the cost of the crew doing the mountings at U.S.$2,000, which must be added back in the calculation. On this basis Mr. Houghton's original U.S.$34,110 cost would reduce to U.S.$25,700, which matches closely his quick estimate.

The remaining work was, he said, specialist work,

which a prudent owner taking over this vessel would require to be undertaken. Mr. Spence on the other hand thought that it could be assumed that all necessary boiler work would be undertaken by a repair crew. Mr. Houghton also pointed out that, although Mr. Reilly understood the boilers to be in good condition and told Mr. Dunn this, Mr. Reilly did not actually see them operating. Above all, there were none of the usual or proper records of their operation or even to show that both had been in operation. The absence of chemical and boiler feed water treatment records, noted in Mr. Reilly's reports, was extremely bad practice as well as adding to general doubt about crew maintenance. I accept Mr. Houghton's views on these points and they appear to me to be strongly reinforced by the fuller picture which would have emerged, if Mr. Dunn had known of the contents of the earlier class records. I take therefore U.S.$25,700 on the basis of Mr. Houghton's figures, making a total of U.S.$31,450 under this head.

In the upshot, the detailed exercise undertaken by the experts would indicate provisions totalling U.S.$1,213,498, calculated on a basis which of course includes Mr. Reilly's specific items totalling U.S.$1,005,000. The total is a little over U.S.$200,000 more than the total of Mr. Reilly's specific items. It is not without interest to compare this with Mr. Reilly's statement in his witness statement that he would, if asked, have made an allowance of U.S.$80,000-U.S.$100,000, in- creased in his oral evidence to U.S.$100,000-U.S.$150,000, in circumstances where, as I have said, I felt that he was probably tending to understate the significance which he would, if asked, actually have attached to general overhauling.

It was Mr. Houghton's and the plaintiffs' submission (raised late in the case) that a prudent shipowner would have added a general allowance for general contingencies, particularly for unforeseen matters (which in the event proved to constitute so large a part of the overall repair costs on *Ardent* ) or costs overruns. As I understood Mr. Houghton's evidence, and contrary to the defendants' interpretation, the allowances which he suggested were intended to cover work envisaged as actually required, which might in the event prove to be more

or less, and not to represent some sort of worst case, which would be improved by cancellations. I can leave aside further pleaded suggestions that allowance should also have made for off-hire and service charges. These were not made good in evidence or submissions.

As to contingencies, Mr. Dunn said that it was not his practice to add any contingency allowance, since the estimates he gave were his "best estimates". So far as appears Mr. Dunn did very little in the way of forming any precise estimates on matters of overhauling not specifically covered by Mr. Reilly's figures. On the basis that he took an overall broad brush figure of U.S.$2 m., the point he makes appears a fair one. There would be no logic in adding to it a yet further broad contingency allowance.

Mr. Spence, looking at overhauling on a detailed basis, accepted the principle of a contingency allowance, but only in relation to particular items arrived at on a broad brush basis, and not in relation**635** to items costed by reference to actual contractors' charges. The rate he took was the same as Mr. Houghton's, 15 per cent. Mr. Spence applied this to heads K (drydocking), L (provisions) and J (spares). The figures for these items which I have taken total U.S.$589,938, 15 per cent. of which is U.S.$88,490. In so far as this contingency is applied to Mr. Houghton's dry docking figure of U.S.$466,438, it may have a firmer basis than else where, since it brings Mr. Houghton's specific figure up to Mr. Reilly's round total of U.S.$540,000 for the dry docking and tail shaft.

If one accepts Mr. Spence's qualification, a similar allowance should be applied to those elements of the other heads now arrived at on a broad brush basis. Mr. Spence accepts for example that spares should carry a contingency, and heads A, B and D include some U.S.$21,500 of spares. Automation is also a substantial figure arrived at on a broad brush basis, and included in heads A, B and E in a total of U.S.$150,000. If one added a contingency to these two figures, it would amount to U.S.$25,725. I cannot say that I am entirely happy about the logic of taking a broad brush figure like this and then adding another contingency to it. The idea of a contingency came, as I have said, late into this case, and

its basis was not very fully or adequately explored in evidence. At most it would add some U.S.$114,215 to the total costs to be envisaged.

Looking at the matter overall, I consider that a prudent shipowner who did the detailed exercise undertaken by the experts would have come to a conclusion that *Ardent* would require extra overhauling costs, over and above those specifically covered by Mr. Reilly's provisions, of between U.S.$200,000 and U.S.$300,000. Standing back from the detail, I do not find this a surprising level of figure. In round terms, it appears to me the level of figure which might have been expected on a vessel of this age, size and history purchased for management as part of a good quality fleet intending to serve good quality charterers, leaving aside items which the surveyor could immediately pick up on a brief one-day superficial survey.

Wednesday May 21, 1997

**636** JUDGMENT ON COSTS

Mr. Justice MANCE:1.Introduction

On the trial of the preliminary issues, I held that the plaintiffs' claim in this action against the defendants in relation to the acquisition of *Ardent* failed and that the claims against the third parties by two defendants (Mr. Papachristidis and Mr. Dunn) also failed. The defendants now seek orders for costs in their favour against the plaintiffs. They also seek an order for such costs against a non-party, National Commercial Bank of Saudi Arabia ("NCB"). Since NCB has written through its solicitors asking for further time to consider my judgment on the preliminary issues, I have stood over the plaintiffs' application for an order for costs against them. It should be heard not before June 9, of which notice should be given by the defendants to NCB as soon as possible.

Mr. Papachristidis and Mr. Dunn further submit that (a) if they are ordered to pay any costs to the third parties in relation to *Ardent* , they should be entitled to add such costs to their costs recoverable from the plaintiffs, and (b) the conclusion that they owed no personal duties to the plaintiffs applies to all four vessels the subject of

this action, and must lead to the dismissal of the whole action against them. The proposition in (b) is accepted by Mr. Jacobs for the plaintiffs.

A similar submission to (b) was advanced by Mr. Lyon on behalf of Mr. Anderson in respect of Mr. Jacobs' response is that Mr. Anderson's factual involvement in relation to the other three vessels did not necessarily parallel that upon which I have ruled in relation to *Ardent* . In these circumstances, I stand over any application relating to the claim against Mr. Anderson in relation to other vessels for five weeks to enable Mr. Jacobs and his clients to consider their position.2.General principles

It is common ground that, as between the plaintiffs and defendants, the defendants were the winners of the preliminary issues and of the action so far as it concerns *Ardent* . They are prima facie entitled to an order for costs in their favour. O. 62, r. 3(3) provides:

If the Court in the exercise of its discretion sees fit to make an order as to the costs of any proceedings, the Court shall order the costs to follow the event, except when it appears to the Court that in the circumstances of the case some other order should be made as to the whole or any part of the costs. Mr. Jacobs submits that in the circumstances of this case the right order is that the defendants recover no costs or only a part of their costs. He does not suggest that this is a case where the plaintiffs can or should seek any order to recover any part of their costs from the defendants. But he submits that, looking at "the whole battlefield" of the issues which I determined, the defendants have only succeeded on narrow grounds and that the circumstances call for some other than the general order. He refers me to principle (iii) identified by Lord Justice Nourse in Re Elgindata Ltd., [1992] 1 W.L.R. 1207 at p. 1214 B:

The general rule does not cease to apply simply because the successful party raises issues or makes allegations on which he fails, but where that has caused a significant increase in the length or cost of the proceedings he may be deprived of the whole or a part of his costs.3.Perama repairs

I start by clearing out of the way an aspect of the plaintiffs' claims in respect of *Ardent* which was abandoned shortly before trial of the preliminary issues. That concerned the Perama repair claims in pars. 36-37 and sched. 4 which were, pursuant to a letter dated Mar. 26, 1996, abandoned by the re-re-amended points of claim. The plaintiffs have undertaken not to renew such claims. Mr. Jacobs submits that costs incurred in relation to these claims were also relevant to the issues which were pursued at trial, for example to Mr. Houghton's evidence. This is true but to a relatively limited degree. So far as Perama claims have generated additional costs, they should be borne by the plaintiffs. Having been withdrawn, the Perama claims as such occupied no time at trial.

The Perama allegations having been withdrawn, Mr. Lyon sought leave to withdraw the defendants' third party claims in respect of the Perama repairs on the basis that the defendants would pay their costs and give an undertaking not to renew them. He also sought an order entitling the defendants to add such costs to those recoverable from the plaintiffs. In my view the appropriate order is that, so far as the third party proceedings have generated additional costs in respect of the Perama repairs, there should be no order. It is not easy to see how the defendants could, if liable themselves, have held any of the third parties liable in respect of the Perama claims.4.Other costs of the claims relating to Ardent

It was common ground that I can and should treat the plaintiffs and the third parties as if they were one and the same. Mr. Jacobs confirmed that there was no risk of the third parties being personally exposed to costs in respect of the third party**\*637** proceedings, if they did not obtain a separate order in their favour for the costs of those proceedings. All parties in these circumstances accepted that it could be appropriate to treat the costs of the main and third party proceedings together and to make a single order for them as between the plaintiffs and defendants. That is the course which I propose to take.

The defendants have emerged victorious from the proceedings as against the plaintiffs. The defendants have

however lost the third party proceedings for reasons which would have applied, even if they had lost the main action. Their contention that the plaintiffs' claim should be reduced on the ground of contributory negligence has also failed for reasons which would have applied, even if they had lost the main action. Even if there had been any basis for asserting contributory negligence, there appears to have been no real need or basis for issuing third party proceedings. Mr. Lyon's response that it was necessary to issue third party proceedings in order to obtain discovery against the third parties personally is no justification.

Mr. Lyon submits that the reason why the third party proceedings and the assertion of contributory negligence failed is that I rejected the third parties' evidence of their awareness of the importance of pre-purchase inspections, and of assurances and representations allegedly received in that connection from Mr. Papachristidis, Mr. Anderson and Mr. Dunn. These alleged assurances and representations were a main subject (considered in Part II of my judgment) of the evidence of the plaintiffs' factual witnesses, which occupied in total nearly 7 days between days 5 and 12 of the trial. Part VII of my judgment did indeed comment that much of the basis for reliance on certain points stressed by the defendants in their final submissions had been removed by my findings in Part II. However, as a reading of the third party pleadings makes clear, the defendants' pleaded contentions as against the third parties go much more widely. Indeed, they include the suggestion, rejected in Part II.2 as "a forensic exercise", that the third parties were or ought to have been aware that all forecasts, projections and estimated reserves for repairs and maintenance may well prove to be "wholly inaccurate". In my judgment, the allegations of contributory negligence and in the third party proceedings were always unrealistic in view of the complete disparity in functions and expertise between the defendants and third parties. If there had been express representations such as the third parties suggested in their evidence, it is also very far from clear that they would have assisted the defendants as against the third parties. Adapting to this context what I said in Part VII, if any of the directors had pressed for further information, the likelihood is

that he would have received [further] comfort and assurances on which he would have been entitled to rely. I consider that as between the defendants and third parties, the additional costs attributable to the third party proceedings should be borne by the defendants, without being passed on to the plaintiffs. Taking an overall view of all costs (including those of the third party proceedings) between the plaintiffs and defendants, there should on this basis be some corresponding reduction of the costs ordered to be payable by the plaintiffs. I bear in mind that, on this approach (viz. reducing the defendants' recovery against the plaintiffs), the reduction must cover the additional costs incurred by the third parties as well as the defendants themselves in respect of the third party proceedings.

Looking at other issues in the action, the plaintiffs were effectively successful on the issues of New York which were the subject of expert evidence over some two days and submissions before me. On the issues which were argued on Days 3 and 4 of the trial about the pleadings and the issue of wilful misconduct the plaintiffs can in the light of the outcome of the trial be regarded as unsuccessful.

The plaintiffs can however claim in my judgment to stand in a different position in respect of important areas of fact and expertise, which played a very significant role during the remainder of the time spent at trial (a total of 9 days on factual evidence and 7 days on expert evidence - the time spent being without doubt increased by the paucity of contemporaneous records of their conduct and thinking on the defendants' side). The key areas to which I have referred included, in particular, the reasoning behind and basis of the U.S.$2 m. estimate for upgrading *Ardent* which was central to her purchase. I did not accept that the U.S.$2 m. was made up of Mr. Reilly's total of U.S.$1.05 m. plus a further U.S.$1 m. for steelwork. I did not accept that Mr. Dunn thought that Mr. Reilly's total of U.S.$1.05 m. included sufficient "slack" to cover other general overhauling. I did not accept that Mr. Dunn had in mind a total of either 300 tonnes of steelwork or U.S.$1 m. for steelwork. Nor did I accept Mr. Dunn's (or for that matter Mr. Reilly's) suggestion that Mr. Dunn's reluctance to

Copr. © West 2009 No Claim to Orig. Govt. Works

give Mr. Anderson any overall estimate for upgrading costs was because no or no precise estimate could be given without ultrasonics. The reality, as Mr. Houghton's evidence indicated, was that, if some permanent ballast tanks had been inspected in empty condition, sufficient could and would have been seen to lead to rejection of the vessel as a candidate for purchase. Despite the defendants' vigorous attacks on the admissibility, competence and impartiality of much of Mr. Houghton's evidence, and their comments on his late involvement*638 and the revisions in the plaintiffs' case to which it led, I found him a valuable witness whose evidence was of real assistance in identifying and resolving the technical issues.

On the key issues of evaluation of the defendants' conduct on the basis of the findings of fact which I made, the defendants further failed to persuade me that any of Mr. Papachristidis, Mr. Anderson and Mr. Dunn had acted in relation to *Ardent* in accordance with the skill and care to be expected of competent ship-managers assisting an investment fund like the plaintiffs. This applies both in relation to the class records, where I held that PSMSL acted with gross negligence, and in relation to the recommendation to purchase *Ardent* , which I held to have involved negligence, although not gross. Mr. Papachristidis, Mr. Anderson and Mr. Dunn downplayed the importance of matters such as inspection of class records and of permanent ballast tanks, as well as other matters of experience and background bearing on the question whether PL and PSMSL performed their functions with the skill and care to be expected of concerns of their experience and apparent quality. I also rejected other aspects of the defendants' evidence, including a suggestion by Mr. Anderson that *Ardent* had a market value as high as U.S.$14.7 m. in August, 1989.

Mr. Lyon relies on the fact that I held that none of Mr. Papachristidis, Mr. Anderson and Mr. Dunn personally owed any duty of care, even to avoid gross negligence, and that as regards the defendant companies, PL and PSMSL, I concluded that the gross negligence in respect of class records was not causative, while the further negligence leading up to and in making the recommendation was not gross. Mr. Lyon submits that since

the plaintiffs, in order to succeed, had to show either wilful misconduct or at the least gross negligence, it was irrelevant to consider whether there was negligence. The exclusion clauses meant that negligence would not suffice. That does not answer the point that the defendants have only succeeded in respect of class records on causation. It is also in my view unrealistic in respect of gross negligence. As my judgment shows (and as Mr. Justice Megaw seems also to have found in Shawinigan, [1961] 3 All E.R. 396, at p. 405 E), it is in my view quite natural, when considering alleged gross negligence, to consider first whether there was negligence and then to consider whether it was gross.

Mr. Lyon says that the trial would in any event have covered the same ground in factual and expert evidence, because of the serious allegations of wilful misconduct which were particularized and the subject of argument on Day 4 as well as the allegations that any negligence was gross. In my judgment, the trial would have been very con siderably shorter had the facts as I have found them been accepted and had the defendants been prepared to acknowledge the shortcomings in their handling of *Ardent* , and confined their evidence and case to a denial of any knowing wrongdoing, causative gross negligence in the case of the class records and gross negligence in other respects. That applies both to the witnesses of fact called on the defendants' side and to the expert evidence.

Looking at the circumstances of this case as a whole, I consider that it is appropriate to take into account this increase in the length and complexity of trial and the shortfalls in the defendants' performance, even though they do not in the event ground legal liability, in any order for costs. The fact that there were such shortfalls and that they were in issue and had to be investigated and established not only increased the length of any trial, they also meant that the plaintiffs were faced with explanations and a defence which they were right to conclude could not be accepted as they stood and which they to a significant extent rebutted, although they failed to do so to the full extent necessary to establish causative gross negligence. Whether there was causative gross negligence could not be judged until the actual

factual position, the relevant background and the proper approach in relation to a vessel such as *Ardent* had been clarified.

A successful party is not to be deprived of part of his costs simply because he makes allegations on which he fails, but he may be if this has caused or contributed to the bringing, length or costs of the proceedings. Taking all the circumstances of this case in the round, and making an order as between the plaintiffs and defendants which covers all the costs of these proceedings (that is the main action and the third party proceedings) apart from those which I have already dealt with under the heading of Perama repairs, I consider that the defendants should recover 75 per cent. of their costs of the main action and third party proceedings from the plaintiffs, with no separate order for costs in the third party proceedings.5.Costs of claims against Mr. Papachristidis and Mr. Dunn in respect of the other three vessels

It is, as I have said, common ground on the basis of my findings the Mr. Papachristidis and Mr. Dunn owed no personal duties and that the rest of the action must be dismissed as against them. As a result of such dismissal, they seek orders for the whole of the costs of the action to date in respect of the other vessels. Mr. Jacobs on the other hand submits that any costs order in their favour should be limited, at least at this stage, to any additional costs incurred in respect of the pursuit of claims against them in respect of these three vessels, that is**\*639** additional to the costs which would anyway have been incurred in pursuing the action against PL and PSMSL. Mr. Lyon's riposte is what has always interested the plaintiffs is the prospect, or possibly the threat, of establishing personal liability on the part of Mr. Papachristidis and Mr. Dunn, in particular the former, whose family trusts have been, he boldly suggests, the real target of the plaintiffs' aim, rather than PL and PSMSL, who he hints may not have proved worth powder and shot. Mr. Lyon's submissions in these respects appear to be little, if indeed anything, more than unevidenced assertions. I am quite unable to proceed on the basis which he invites. In my judgment, it would be inappropriate to make an outright order in Mr. Papachristidis' and Mr.

Dunn's favour in respect of what could prove to be the whole costs of the rest of the action, assuming Mr. Papachristidis and Mr. Dunn are jointly and severally liable to their solicitors for them. Equally, it would seem to me inappropriate to make an order of any additional costs incurred in respect of the pursuit of the action, and certainly so on any basis which involved immediate taxation. Such an order and taxation might later prove to have been inappropriate or unnecessary, for example if the claims on the other three vessels also fail against all defendants. I propose to reserve any order in respect of Mr. Papachristidis' and Mr. Dunn's costs of the rest of the action relating to the other three vessels until after conclusion of the rest of the action against the other defendants or further order.6.Time of payment of costs

It is common ground that the costs orders which I have made in pars. 3 and 4 above in respect of Perama repairs and other costs should be for costs to be taxed and paid forthwith.

END OF DOCUMENT