# Tab 17

Dockets.Justia.com



# In The Supreme Court of Bermuda

## Civil Jurisdiction 1997 No. 67

BETWEEN:

|  |  |
|---|---|
| **GAVIN WILSON** | 1st Plaintiff |
| **WILLIAM CRAIG** | 2nd Plaintiff |

## AND

|  |  |
|---|---|
| **FIRST BERMUDA SECURITIES LTD** | 1st Defendant |
| **F. B. S. NOMINEES LTD** | 2nd Defendant |
| **LYNDA MILLIGAN-WHYTE** | 3rd Defendant |
| **JOSEPH TAUSSIG** | 4th Defendant |
| **JEFFREY CONYERS** | 5th Defendant |

## DECISION

The application before the court is for leave to amend the statement of claim in a number of particulars. The history of these proceedings shows that there was a strike out application made by the defendants, resulting in portions of the plaintiffs' claim being struck out. The details are set out in the decision of Mrs Justice Wade-Miller of 17th December 1997. The plaintiffs appealed to the Court of Appeal against that decision. In its judgment delivered on 24th November 1998 the Court of Appeal restored part of the claim that had been struck out. The plaintiffs now seek the leave of the court to re- amend their claim in part to bring it into line with the result of the appeal. The most controversial part of the plaintiffs' application to re-amend the statement of claim, however, concerns the proposed amendment for rectification of the Put Option agreement by adding thereto paragraphs 6A, 6B, and 6C as set out in the draft re-amended statement of claim.

Mr Kessaram for the plaintiffs seeks firstly to amend recital (iii) of the Put Option agreement to straighten out what he terms an error on the face of the document. He argues that the Put Option agreement refers to an option in an Option agreement as having been "previously exercised"; when in fact both agreements were exercised on the same day. He proposes therefore that the Put Option agreement should reflect that the purchaser had previously "obtained" an option to purchase.

Secondly he seeks an amendment to rectify clause 2 of the Put Option agreement. He contends that the designations of two of the signatories to the Put Option and the Call Option agreements have been mistakenly reversed. This mistaken description, he argues resulted in the second plaintiff (herein after referred to as "Craig") having been referred to as the 'Seller' instead of being referred to as the 'Purchaser", and the second defendant (herein after referred to as "Nominees") being referred to as the "Purchaser" instead of "Seller". Counsel for the plaintiffs' further states that clause 6 of the Put Option contains the same error, and ought to be rectified to make sense of the parties' intentions.

There is much contention between the plaintiffs and the defendants revolving around the interpretation and effect of the Court of Appeal's judgment. Mr Kessaram contends that there was never an application in the Supreme Court to strike out the plaintiffs' contractual claims against the defendants. He relies on an observation of the Court of

Appeal in their judgment where it is stated "there has been no cross- application with regard to that part of the action which was left in tact, and which is laid in contract". He contends therefore that the first plaintiff's (herein after referred to as "Wilson") contract claims and Craig's contract claims remain alive. He argues further that the only claims struck out by Mrs Wade-Miller were the tortuous claims of the plaintiffs. For his part he contends that the Court of Appeal has restored the tortuous claims of Wilson only.

Counsel for the third defendant Mr Fellows does not take exception to the minor amendments sought by the plaintiffs. However he strenuously resists the application to amend the statement of claim for the purpose of rectification of the Put Option agreement. The third defendant's primary objections in summary are, firstly, that the issues raised by the amendments sought are res judicata having been heard and dismissed by Mrs Justice Wade-Miller and said dismissal thereafter confirmed by the Court of Appeal. These decided issues, he contends, include both courts' pronouncements on the meaning and effect of the Put Option agreement He also argues that the proposed amendments are a collateral attack on those previous decisions.

Secondly, he argues that the plaintiffs failed to protest against the drafting of the agreements early. That they also failed to pursue other or adequate legal remedy earlier and that in any event the plaintiffs entered into the contracts with the benefit of legal advice. Thirdly, that there has been undue delay in seeking the amendment which will, if allowed, deprive the defendants of a limitation defence.

The approach of the court

The power in the court to amend pleadings is contained in Order 20 rule 5 of The Rules of the Supreme Court 1985(the "Rules") the relevant part of which provides that:

> "..the Court may at any stage of the proceedings allow the plaintiff to amend his writ, or any party to amend his pleading, on such terms as to costs or otherwise as may be just and in such manner (if any) as it may direct."

It is clear from this rule that the court is vested with a discretionary power to grant leave to amend. A discretionary power imposes a duty on the court to act within reason giving due consideration to applicable principles and rules.

The general approach of the court is that leave to amend ought to be allowed except for limited recognized exceptions. The essence of the court's consideration in an application before it for amendment of a pleading is whether or not the amendments sought are necessary to properly define the real question in controversy between the parties. Against that backdrop the court must have regard to any prejudice that the opposing side may suffer as a result of the amendment. Where the prejudice may be compensated for by an order for costs the amendments should be allowed. Leave to amend will not be appropriate where the opposing party is placed in a worse position than they would have been if leave had not been granted and for which an order for costs cannot compensate.

These principles can be illustrated by the following authoritative judgments: _G.L. Baker Ltd.-v-Medway Building & Supply Ltd_ (1958) 3 All ER 540 @546; _Tildesley--v-Harper_ (1876) 10 Ch.D. 393 @ 396; _Clarapede-v-Commercial Union Association_ (1883) 32 WR 262 @ 263.

Bowen LJ in _Cropper-v-Smith_ (1883) 26 Ch.1 700 summed the principle up as follows:

> "It seems to me that as soon as it appears that the way in which a party has framed his case will not lead to a decision of the real matter in controversy, it is as much a matter of right on his part to have it corrected if it can be done without injustice, as anything else in the case is a matter or right".

Mr Fellows for the third defendant advances the argument that it is a general principle of law, applicable to all commonwealth jurisdictions, that where the plea sought to be introduced by amendment is untenable in law the amendment cannot be allowed. He seeks to illustrate this proposition by reference to an Ontario Appellate Court decision in _Daniele et al-v-Johnson_ 45 O.R. (3d) 498. He argues that the court has a duty to test the

legal soundness of the amendments sought and therefore is entitled to go into the merits of the case. This proposition, he says, is supported by the following: _Kings Quality Homes-v-A.J Paints_ [1997] 3 All ER 267 @273 and _Yearwood-v-Brunswick_ Civil Jurisdiction 1996 No. 496.

I believe that Mr Fellows has placed too great an emphasis on the _Daniele_ case in support of this principle. It would seem to me that he has blurred the distinction between principles and rules. It would appear that a body of law has developed in the province of Ontario Canada where the court is less inclined to look into the issue of prejudice and is positively entitled to inquire into the merits of the amendment to ensure that it at least meets a basic threshold. It is to be observed that this jurisprudence has developed from a specific rule of civil procedure in the Ontario Court. Thus the Ontario Court may be bound to look into the merits; our approach is a more flexible one.

In my estimation, in the _Yearwood_ case, Hargun J. in adopting the general applicability of the proposition espoused in _Kings Quality Homes_ case correctly placed the limits on the court's enquiry to cases where the merits are readily available to the judge without the need to conduct a prolonged investigation into said merits.

Limitation

Mr Fellows for the third defendant argues that the plaintiffs should have raised the issue of rectification and amendments either in the strike out application or at the Court of Appeal. He contends further that the agreements are not specialties and therefore are not governed by section 10 of the Limitation Act 1984. The cause of action, he says accrued on the date of the signing of the agreements on 11th December 1991. He submits that pursuant to the Limitation Act, the limitation period for the agreements expired on the 11th December 1991. He submits that the proposed amendments deprive the third defendant of a defence that cannot be compensated for by costs. He cites in support the case of _Oates-v-Harte Reade and Co._ [1999] 1 FLR 1221.

Counsel for the plaintiffs suggests that the way to test the veracity of the limitation point is for the court to ask just what the nature of the defence is that the third defendant is being denied. He submits that the answer lies in the result of the Court of Appeal's decision. He submits that as a result of the appeal, the plaintiff Wilson has both a claim in contract and a claim in tort, and the plaintiff Craig has a surviving claim in contract. He argues that each of those claims were pleaded from the beginning, therefore no new cause of action is sought to be raised by the amendments.

It would appear from the writ and the way the statement of claim is framed that the above-referred claims were pleaded from the beginning. If counsel for the plaintiff were correct in his assessment of the Court of Appeal ruling, he would be correct in saying that he is not seeking to add a new cause of action. If such is the case, then the defendants cannot sustain an argument that they have been deprived of a defence under the Limitation Act. This would appear to be the case whether or not the Put Option agreement qualifies as a specialty because the action was begun prior to the expiry of 6 years. It could be that counsel for the third defendant equates an amendment for rectification, or any amendment as raising a new cause of action.

In my judgment, there is no ground on which the _Oates_ case assists the third defendant. In the _Oates_ case it was accepted that the plaintiff's claim or a part thereof was statute barred at the time of filing the action. The plaintiff had included in a tort claim a personal injury claim. The action was filed nearly 6 years after the cause of action arose (the limitation period for personal injury was 3 years). An amendment had been sought by the plaintiff to delete that part of the claim that offended the limitation period. At the first instance hearing the amendment was allowed by treating it as a substitution of a new cause of action under section 35 of the Limitation Act. On appeal by the defendant it was held that what the plaintiff had sought by the amendment did not amount to adding or substituting a new cause of action as contemplated by or provided for by section 35 of the Limitation Act.

There then only remained the discretionary power of the court to allow the amendment. After consideration thereof, it was held that the defendants had a good limitation defence that arose out of the way that the plaintiff chose to plead her case (ie including in it a statute barred claim). Since that defence had been available to the defendants throughout the amendment sought would wrongfully deprive the defendants of that accrued defence.

In the instant case, it should be pointed out, the third defendant has not specified in her evidence that part of the Limitation Act upon which she depends to found her assertion to a limitation defence. She has merely stated therein that the prejudice to which she will be subjected arises out of the fact that the agreements in question were dated some 9 years ago. On the facts of the instant case as pleaded, it is difficult to see the third defendant's argument that she would be deprived of a limitation defence as such a defence does not appear to have accrued. More over, to the extent that it appears that the third defendant may be claiming a limitation defence in relation to rectification itself, no such defence is available under the Limitation Act. She may be entitled to rely on the equitable defence of latches, however that consideration does not arise for me on the present application, as I am not charged with determining the merits of an application for rectification. In any event I am not able to say on the face of it that such an application is doomed to fail.

Delay

On the issue of delay, I have not set out much of the history of this matter as it is rehearsed in the judgment of the Court of Appeal. The third defendant in her affidavit has stated that the plaintiff had an opportunity both at the occasion of the strike out application and at the appeal before the Court of Appeal to seek to amend the statement of claim but failed to do so.

The summons seeking a re-amendment of the statement of claim is dated the 17th May 2001. The decision in the strikeout application is dated the 17th of December 1997, and the judgment of the Court of Appeal was rendered on the 24th November 1998. From the affidavits, correspondence on the court file and arguments before me it appears that an appeal to the Privy Council against the judgment of our Court of Appeal had been filed and served on the Plaintiffs by the third defendant. Thereafter on 24th February 1999 the third defendant filed a notice of abandonment of that appeal. It was not until 23rd March of 1999 that the third defendant indicated by letter to the plaintiffs that she had withdrawn the appeal.

During the interim a further strike out was considered by the third defendant and communicated to the plaintiffs. It was not until 30th January of 2001 that the third defendant abandoned that idea and proceeded to file a defence. In her affidavit of the 19th June 2001 the third defendant complains that the pleadings were dormant until she filed her defence. However it would appear that she did not file the defence until the plaintiffs put her on notice by letter of 22nd March 1999 that they would proceed to default unless the defence was filed. Mr Kessaram argues that further delay occurred during the time that the company was re-organizing. It is readily clear from the nature of the agreements that the parties had contemplated such re-organization. The plaintiffs filed a Notice of Intention to Proceed on the 2nd of February 2001. Following that by letter of 23rd April 2001 they informed the defendants that they would be seeking an amendment of the statement of claim.

Mr Kessaram argues that the up shot of the two previous court hearings was that a determination of the meaning and effect of the agreements was central and essential to the plaintiff's case. He argues that the defendants knew that the issue of rectification would be a material part of the plaintiff's case albeit that no formal application had earlier been made; therefore they could not possibly claim to have been caught by surprise when the summons for re-amendment was served.

The passage of time since the appeal would appear at first blush to have been inordinate. However, one must put that passage of time into a proper factual perspective, right up to and including the necessity of the plaintiffs to file further affidavit evidence in answer to complaints raised by the defendants in their affidavits. In my view, adherence to a strict time line in this case cannot with out artifice be in the interest of justice. The judgment of

Bowen LJ in *Cropper-v-Smith* (1883) 26 Ch.1 700 illustrates that courts do not exist for the sake of discipline, but rather for the purpose of deciding matters of controversy between parties. Weighing the delays on the part of both plaintiffs and defendants in the balance I find no compelling default on the plaintiffs' side. The fact is that this case is still in a preparatory stage and pleadings have not been closed. In point of fact this amendment is being sought even before directions for trial and exchange of lists of documents. I shall deal with the question of whether prejudice to the defendants below.

## Res Judicata/Estoppel

Counsel for the third defendant argues that the plaintiffs should be estopped from raising the issue of rectification of the Put Option agreement because the courts have previously dismissed his attempts to do so. This assertion belies the defendants' argument that they are caught be surprise by the application for amendment to include rectification. Nevertheless Mr Fellows relies on an excerpt from Phippson On Evidence (14th edition @33-31), which states the general proposition that a final adjudication of a legal dispute is conclusive between parties to the litigation as to the material matters decided, and cannot be challenged in subsequent litigation between them. He says further that it would be an abuse of process to allow the plaintiffs to seek rectification by terming the exercise as merely correcting clerical errors, misnomers and substitution of the description of the parties. In furthers support of his contention, he cites *Engelhorn-v-Barnard* a decision of our Supreme Court in Civil jurisdiction 2001 202, and *Ashmore-v-British Coal Corporation* a UK Court of Appeal decision reported at [1990] 2 All ER 982 among other authorities.

The *Ashmore-v-British Coal Corporation* case came on for hearing after a case referred to therein as the *Thomas* case was heard and decided. The *Thomas* case, involved several representative sample cases dealing with the same cause of action wherein the same evidence had been heard and adjudicated upon resulting in dismissals of the plaintiffs' claims. The court held that it would be an abuse of process in the absence of fresh evidence to allow those same issues to be tried again by the plaintiff in the *Ashmore* case.

In the *Engelhorn-v-Barnard* case there had been an earlier litigation in a 1999 case in which the plaintiff could have but did not raise certain issues. Counsel for the plaintiff sought to raise those issues in the subsequent case before the court. The court held that it would be an abuse of process to attempt to raise those issues now when they could and should have been raised in the 1999 litigation.

Stuart-Smith LJ summed up the judicial reasoning behind the Res Judicata principle effectively in *Ashmore* in the following words to be found at page 989:

> "As it is, if the matter were relitigated on the applicant's claim, she would merely invite the tribunal to reach different findings of fact on the same evidence, as a result perhaps of different arguments being addressed to it. That in my judgment is not in the interest of justice; nothing could be calculated to cause a greater sense of injustice in those who lost in the *Thomas* case, if some other tribunal reached a different result on the same evidence".

On a reading of the above referred authority and cases, it is patently apparent that the principle underlying res judicata related to a litigant's attempt to re-litigate a matter that had been litigated in and finally determined by a court (or other competent tribunal) in previous proceedings in a separate litigation altogether. Similarly, with issue estoppel, on, for example, a preliminary point being argued, a decision is rendered after hearing the facts and evidence relating to that issue, and the issue cannot thereafter be re-litigated. That having been said, one must recognize that the categories of cases subject to criticism for abuse of process are not closed, as each case depends on its own circumstances. In my view, however, what is apparent is that a litigant will not be shut out from advancing his or her case by application of these principles unless there has been a full inquiry and investigation into the facts on the best evidence possible and a final adjudication made thereon.

Counsel for the plaintiffs raises an insuperable point, if his analysis of the strike out application decision and the Court of Appeal decision are correct, when he says that in

the instant case the plaintiffs ought not to be bound by findings of fact where they had no opportunity to produce evidence to the contrary. It is necessary therefore to consider whether or not on the strike out application or in the appeal before the Court of Appeal findings of fact on the meaning and effect of the Put Option agreement were made, and if so, whether they were made after full inquiry based on the evidence.

I think the answer lies in an observation of Mr Justice Cons in the Court of Appeal judgment at page 5 where in he makes the following statement:

> "It may be that in the court below the judge was not encouraged to distinguish critically between the separate cases of the two Plaintiffs *but was led to concentrate too heavily upon the true construction of the put option agreement*, a question that appears to have been argued extensively before her, as it was before us. However once the plaintiffs' claims are correctly understood, as we have just attempted to explain, it will be readily seen *that in what ever way that agreement was construed, it has no relevance to the plaintiffs claims in tort*" (emphasis added).

My first observation of this statement is that, in so far as the tort claims are concerned, the construction of the Put Option agreement is entirely irrelevant for obvious reasons; the torts pleaded arose prior to execution of the documents. My second observation of the Court of Appeal's statement is that the Court of Appeal was of the opinion that for the purpose of determining whether or not the statement of claim disclosed a reasonable cause of action, the court below was not required to render a decision based on a definitive analysis of the construction of the put option agreement. Mr Fellows seems to be saying that an ardent and protracted argument on the true construction of the Put Option agreement and Mrs Wade-Millers observations of the meaning and effect of the same gives rise to issue estoppel. In my estimation, the judge, having no responsibility to do so, was merely articulating what seemed to her to be the meaning and effect of the documents. However, from the point of view of the exercise then before her, it was not her necessary judicial function, and I do not believe that she perceived it to be, to make a final determination on the construction of the document or its meaning and effect. The Court of Appeal itself certainly did not confirm the view she expressed of the meaning and effect of the agreements. The reason will be obvious. It will be seen, therefore that the most effective procedure for determining the true construction or meaning and effect of the Put Option agreement, will be either on a preliminary hearing on that issue alone or at the substantive trial of the action.

It only remains for me to consider which claims survived the Court of Appeal ruling. The answer again lies in Mr Justice Cons' judgment. In the preamble he identifies the nature of the appeal:

> "This is an application for leave to appeal the Order of the Judge below by which she struck out, as disclosing no reasonable cause of action, *the entirety of the Plaintiff's claims against the third and Fifth Defendants* and, as containing allegations that would tend to prejudice, embarrass or delay the fair trial of the action, *part of the Plaintiffs claims against the First and Second Defendants...*There has been no cross-application with regard to that part of the action which was left in tact, and which is laid in contract. *Those parts which were struck out were laid in tort, that is to say deceit.*"(emphasis added).

Comparing the above quoted with the decision of Mrs Justice Wade-Miller it can be seen that it coincides with her pronouncement on page 16 of her decision that the statement of claim discloses no reasonable cause of action against the third and fifth defendants. The claims against them were struck out in their entirety. Those claims were founded in tort only, and are pleaded in several paragraphs including 9. She then struck out the fraud allegations against the first and second defendants pleaded in paragraph 11 of the statement of claim. In the final paragraph of her decision she called upon the first and second defendants to answer the remaining allegations. Those would be the contract claims.

The Court of Appeal restored Wilson's tort claims. Those claims are against the first and second defendants as well as the third and fifth defendants acting as agents for the first and second defendants, for which they may be personally liable. The contract claims

against the first and second defendants were not struck out by Mrs Wade-Miller and were therefore never the subject of the appeal.

I have throughout considered the arguments put forward by counsel for the third defendant. I must now consider the arguments put forward by Mr Cottle for the first, second and fifth defendants. However to the extent that he repeats the arguments put forward by Mr Fellows, I see no need in setting them out as the considerations expressed above apply equally to his clients.

Mr Cottle advances the argument that as regards the first and second defendants, at the strike out application, the judge said that she did not find that the plaintiffs had pleaded the material fact of their fraud allegation with the care and particularity that was demanded and therefore she ordered paragraph 11 of the statement of claim to be struck out. He observed that it must follow that that is the paragraph containing the fraud allegations. In his view that was all that the Supreme Court did as regards the first and second defendants.

He argues that in relation to the fifth defendant Mrs Wade-Miller struck out the claims against him in their entirety, and the Court of Appeal did not interfere with that in any way. He says further that where the Court of Appeal says, "that otherwise the appeal shall be dismissed" it must follow inevitably that the appeal against the decision to strike out all claims against the fifth defendant was dismissed and the fifth defendant was of that moment no longer a party to the proceedings. He says therefore to the extent that the amended pleadings seek to make or initiate any claims against the fifth defendant the issue of res judicata arises.

To his credit, Mr Cottle showing utmost respect to the Court of Appeal, suggested that he would not be making the above submission on the meaning of the Court of Appeal's decision if that court had made its order clear. On that subject I wish to make the following observation and comment. It does not appear that an order was drawn up following the decision of Mrs Wade-Miller. No settled order appears to have been drawn following the decision of the Court of Appeal. The problem arising before me in this case is a classic result of the failure of counsel to draw orders following judgment. Order 2 rule 27 of the Rules of The Court of Appeal requires that every judgment of the court shall be embodied in an order. That rule imposes a positive duty on counsel to draw the order. Had orders been agreed upon and drawn up, the terms of the judgments in this case would be clear. In the case where there is some dispute between the parties as to how an order should be drawn, the matter can be referred back to the court for clarification. Instead much of the time spent in arguments before me centred on the possible meaning of the two judgments.

For my part, I think the Court of Appeal's comments on the personal liability of agents and directors of a company for fraud or tort puts paid to Mr Cottle's suggestion that the Court of Appeal did not deal with the dismissal of all claims against the fifth defendant. This is the clear implication from the last two paragraphs of their judgment on page 5. The former of the two says:

> "Before we leave this application we should also refer to a further point made by the judge below, namely that because the three individual defendants acted in the capacity of agents for the company, they were thus absolved from the personal liability that might otherwise attach to their conduct. With respect that is a misunderstanding of the law. Neither Directors nor agents are as such absolved from liability, see e.g. Palmers Company Law 24[th] ed. Para 64.05, "any director who personally commits a fraud or any other tort in the course of his duties is liable to the injured party".

The Court of Appeal has pointed out that the fraud claim against the third and fifth defendants was struck out in error of law. The fifth defendant, it is pleaded, acted as an agent of the second defendant. The fifth defendant and the third defendant were directors of the second defendant, and in their individual capacity have been required by the judgment of the Court of Appeal to answer the fraud claims. In my opinion had the court of Appeal only restored the tort claims against the first and second defendants they would have stated so.

Counsel for the fifth defendant advances the argument that his client will suffer prejudice if the amendments are allowed. In paragraph 44 of the fifth defendant's affidavit he says that prejudice will result from the lost opportunity to preserve and retain evidence and in particular contemporaneous evidence that might bolster his case. He argues further that, what was to large measure acquiescence on the plaintiffs' part lulled the defendants into a false sense of security. It is noteworthy that the fifth defendant has not specified in his affidavit what evidence there was that is no longer available. He will of course have been aware that the plaintiffs had a complaint since 1996 when Craig attempted to exercise his rights under the Call Option agreement. The instant action was filed in February 1997. I have, for the reasons set out above, shown that the plaintiffs have not unnecessarily protracted this matter or been deleterious in pursuing their claim. I find no merit in this complaint.

Mr Cottle urges the court to refuse leave to amend because the fifth defendant who is sued in his personal capacity will suffer strain and anxiety from facing new issues having experienced the raising of false hopes and the legitimate expectation that the trial will be determined on the issues one way or another. He suggests also that the court can no longer show the same indulgence that it once did in allowing amendments because of the increased pressure on the courts brought on by litigation. He submits that this is one case where justice will be better served by allowing the consequences of the negligent conduct of the plaintiffs' lawyers fall upon their own heads. In support of those arguments he relies on the decision of the House of Lords in _Ketteman-v-Hansel Properties_ [1987] AC 189, and in particular the speech of Lord Griffiths @ 220.

In the _Ketteman_ case Lord Griffith recognized that a judge in the exercise of his/her discretion might find that the justice in an application for amendment cannot always be measured in terms of money. He opined that a judge must weigh in the balance the above matters that Mr Cottle has urged upon me. Having considered them, I am not inclined to place too great a weight on them in the circumstances of this case. The third defendant is and was a practicing attorney at the time the agreements were entered into. The fifth defendant and she were directors of the second defendant. It would appear from the facts and their evidence that they are consummate business people. To my mind it would be unseemly to attribute to them the characteristics of neophyte personal litigants.

Having considered the submissions and authorities of counsel and for the reasons expressed above leave is granted to the plaintiffs to amend the statement of claim in the manner set out in the draft statement of claim filed in this application. For the reasons expressed above the costs thrown away and or occasioned by this application shall be the defendants' in any event.

Dated this 29th day of October 2002

Charles-Etta Simmons
Assistant Justice

**Tab 18**

# THE
# SUPREME COURT
# PRACTICE

# 1997

Volume 1

PART 1

LONDON
SWEET & MAXWELL
1996

(*Perestrello e Companhia Limitada v. United Paint Co. Ltd* [1969] 1 W.L.R. 570; [1969] 3 All E.R. 479, C.A.) Where the facts relied on do not support such a claim, the claim may be struck out (*A.B. v. South West Water Services Ltd* [1993] Q.B. 507; [1993] 2 W.L.R. 507; [1993] 1 All E.R. 609, C.A.).

A claim for exemplary damages must be specifically pleaded, together with the facts on which the party pleading relies. See r.8(3) and see "Exemplary damages," para. 18/8/7.

The facts relied on to support a claim for aggravated damages should be pleaded, see *Rookes v. Barnard* [1964] A.C. 1129; [1964] 1 All E.R. 367.

Where as a result of recouping of social security benefits, out of sums awarded as general damages, plaintiffs were likely to be under compensated, then as a matter of principle a claim might be pleaded for loss of non-recoupable benefit. (*Hassall v. Secretary of State for Social Security* [1995] 1 W.L.R. 812; [1995] 3 All E.R. 909, C.A.)

*(10) Defences to claims for damages*—Para. (1)(c) should be read together with r.13(4). Their effect is that while the allegation that the plaintiff has suffered damage is deemed to be traversed unless specifically traversed (r.13(4)), the *amount* of the damages will not be deemed to be traversed and therefore the defendant, if he so wishes, is bound to traverse the allegation as to the amount of the damages claimed. On the other hand, para. (1)(c) makes it incumbent on the defendant, in order to be more informative about his defence to state the grounds on which he intends to contest the amount of damages by giving particulars of all the facts on which he relies to support any such ground as, for example, in mitigation of or otherwise in relation to, the amount of damages. The burden is cast on the defendant to plead and prove the facts he relies on to support any positive case to contest the amount of the damages claimed. In accordance with its policy of openness in pleading, the rule is expressed in general terms, so that the rule will apply to a plea in mitigation, not only in defamation actions, but in all classes of action, whether in contract or in tort; and the rule will also apply to any ground on which it is open to the defendant to contest the amount of damages.

*(11) Dishonesty—bad faith*—An allegation that a party has been guilty of bad faith or lack of good faith is the equivalent of an allegation of dishonesty, though not necessarily for a financial motive, and proper particulars of such an allegation must be pleaded, otherwise the allegation will be struck out (*Cannock Chase District Council v. Kelly* [1978] 1 W.L.R. 1; [1978] 1 All E.R. 152, C.A.).

In order to claim that a person is liable as a constructive trustee, it is necessary to plead clearly and unequivocally that he had known that the breach of trust in respect of which it was sought to make him liable was fraudulent or dishonest. It is not enough merely to plead that the defendant was aware or ought to have been aware of the facts necessary to show a dishonest breach of the trust (*Belmont Finance Corporation Ltd v. Williams Furniture Ltd* [1979] Ch. 250; [1979] 1 All E.R. 118, C.A.).

*(12) Duty—fiduciary duty*—Wherever a breach of duty arising from any given relation is alleged, particulars will be ordered of the precise relation from which the duty is alleged to arise (*Selangor United Rubber Estates Ltd v. Cradock* [1965] Ch. 896; [1964] 3 All E.R. 709).

**18/12/7**

*(13) Fair comment*—Particulars of the facts on which the comment is based will be ordered (*Peter Walker & Son Ltd v. Hodgson* [1909] 1 K.B. 239, p.243, C.A.) but particulars of facts relating to events after the date of publication cannot support a plea of fair comment and will be struck out (*Cohen v. Daily Telegraph Ltd* [1968] 1 W.L.R. 916; [1968] 2 All E.R. 407, C.A.). A defendant may give particulars of the facts on which he bases his comments, although those facts are defamatory of the plaintiff and there is no plea of justification (*Burton v. Board* [1929] 1 K.B. 301). Where the defendant gives particulars of the basic facts on which he relies in support of a general plea of fair comment, as distinguished from what is known as the "rolled-up plea," he cannot be required to state which of the words complained of he alleges to be statements of facts (*Lord v. Sunday Telegraph Ltd* [1971] 1 Q.B. 235; [1970] 3 All E.R. 504, C.A.). As to what particulars must be given to support a "rolled-up" plea, see O.82, r.3(2).

In order to sustain a defence of fair comment to a libel action by showing that the facts and matters relied upon to support the comment were based on a statement previously made on a privileged occasion, a defendant publisher has to meet the additional requirement ordinarily incumbent on a publisher reporting a statement made on a privileged occasion, of showing that his report of it was fair and accurate. Accordingly, the passages in the defence, containing the privileged statements will be struck out as being frivolous, vexatious and an abuse of the process of the court (*Brent Walker Group plc v. Time Out Ltd* [1991] 2 Q.B. 33; [1991] 2 All E.R. 753, C.A.).

*(14) False imprisonment*—Where the defendant justified the arrest of the plaintiff on the ground that the defendant had reasonable and probable cause for suspecting that a felony had been committed, and that the plaintiff had committed it, he was ordered to give particulars of the alleged felony and also of the reasonable and probable cause for suspicion, but not of the names of those who had given him information against the plaintiff (*Green v. Garbutt* (1912) 28 T.L.R. 575, C.A.; and see *Stapeley v. Annets* [1970] 1 W.L.R. 20; [1969] 3 All E.R. 1541, C.A.).

*(15) Fraud*—Fraudulent conduct must be distinctly alleged and as distinctly proved, and it is not allowable to leave fraud to be inferred from the facts (*Davy v. Garrett* (1878) 7 Ch.D. 473,

310

**Tab 19**


### Cox v Hickman

(1860) VIII House of Lords Cases (Clark's) 268

HL

1860

[268]        [June 26, 28; July 6; August 3, 1860].

    [Mews' Dig. ii. 1391; x. 366, 373, 375, 395, 423, 508, 512. S.C. 30 L.J. C.P. 125; 7 Jur. N.S. 105; 3 L.T. 185; 8 W.R. 754; and, below, 18 C.B. 617, 3 C.B. N.S. 523; and        *sub nom. Re Stanton Iron Coy.*        21 Beav. 164. On question as to evidence of partnership, explained in        *Bullen*        v.        *Sharp*        , 1865, L.R. 1 C.P. 100, and followed and applied in numerous cases, among which it may suffice to refer to        *Ross* v.  *Parkyns*        , 1875, L.R. 20 Eq. 335;        *Pooley*        v.        *Driver*        , 1876, 5 Ch. D. 460; *Ex parte Delhasse, In re Megevand*        , 1878, 7 Ch. D. 515;        *Badeley*        v.  *Consolidated Bank* , 1888, 38 Ch. D. 249;        *Adam*        v.  *Newbigging*        , 1889, 13 A.C. 316;        *Gosling* v.  *Gaskell*        (1897), A.C. 575; and see Partnership Act, 1890 (53 and 54 Vict. c. 39), s. 2.]

*Partnership—Bills of Exchange—Deed of Arrangement with Creditors.*

S. and S., trading in that name, becoming embarrassed, executed a deed, to which they were parties of the first part; certain of the creditors, as trustees, of the second part; and the general scheduled creditors (among whom the trustees were named) of the third part. The deed assigned the property of S. and S. to the trustees, and empowered the trustees to carry on the business under the name of the "Stanton Iron Company," to execute all contracts and instruments necessary to carry it on, to divide the net income to be taken among the creditors in rateable proportions (such income to be deemed the property of S. and S.), with power to the majority of the creditors, assembled at a meeting, to make rules for conducting the business, or to put an end to it altogether; and after the debts had been discharged, the property was to be re-transferred by the trustees to S. and S. Two of the creditors, C. and W., were. named among the trustees. C. never acted. W. acted for six weeks, and then resigned. Some time afterwards, the other trustees, who continued to carry on the business, became indebted to H., and gave him bills of exchange, accepted by themselves, "Per proc. the Stanton Iron Company:"

Held, that there was no partnership created by the deed, and that consequently C. and W. could not be sued on the bills as partners in the company.

    Held also, that they could not be sued for goods sold and delivered, there being no        **\*433**        distinction upon the question of liability between the bills and the consideration for which they were given.

This was an action on three bills of exchange, given by one of the managers of the Stanton Iron Company, for goods supplied to that company. The declaration contained a count in the usual form as against acceptors on each bill, alleging it to have been "directed to the Defendants by and under the name of the Stanton Iron Company;" also counts for goods sold and delivered, and the money counts. The Defendants severed in pleading, each denying the acceptance of the bills; and, as to the other counts, pleading never indebted.

    For some time previously to the year 1849, Benjamin        [269]        Smith and Josiah Timmis Smith

carried on business at the Stanton Iron Works, in Derbyshire, as iron masters and corn merchants, under the name of B. Smith and Son. In that year they became embarrassed in their circumstances, and a meeting of their creditors took place. Among these were Cox and Wheatcroft. On the 13th November 1849, a deed of arrangement was executed by more than six-sevenths in number and value of the creditors. The parties to this deed were the Smiths, of the first part; Francis Sandars, John Thompson, James Haywood, David Wheatcroft, and Samuel Walker Cox, all of whom were creditors, of the second part; and the general creditors (including those previously named as trustees), whose names were also set forth in a schedule, of the third part. The deed recited a lease from 1846 for twenty-one years to the Smiths, that they were unable to pay their debts, and that it had been agreed that there should be an assignment by them to the parties of the second part, as trustees on behalf of the creditors, to have and hold the premises for the term of the lease, the machinery, etc., and all the estate, etc., subject to the powers and provisions thereinafter contained. The trusts were then enumerated, and, in substance, they were to carry on the business under the name or style of "The Stanton Iron Company," with power to do whatsoever was necessary for that purpose, and to pay the net income, after answering all expenses; which net income was always to be deemed the property of the two Smiths, among the creditors of the Smiths. And provision was made for the meetings of the creditors; and, at any such meeting, a majority in value of the creditors present was to have the power to make rules as to the mode of conducting the business, or to order the discontinuance of it. And when all the debts had been paid, the trustees were to hold the trust estates, etc., in trust for the two Smiths. The deed contained a covenant by the parties      [270]      executing it, not to sue the Smiths for existing debts. Cox never acted as trustee; and Wheatcroft resigned six weeks after the execution of the deed, and before the goods for which the bills were given had been supplied; no new trustee was appointed in the room of either. The business of the company was carried on by the three other persons named as "parties of the second part." In the course of it goods were supplied by Hickman, who, in March, April, and June 1855, drew three bills of exchange in respect thereof. The first of these bills, which was the same in form as those afterwards accepted, was in these words:

"Grafton Iron Ore Works, Blisworth, 10 March 1855.

"£300.

"Four months after date pay to my order, in London, three hundred pounds, value received. John Hickman."

"To the Stanton Iron Company, near Derby."

The acceptance was in the following form: "At Messrs. Smith, Payne and Co., London. Per proc. The Stanton Iron Company.—James Haywood."

The cause was tried in 1856 before the late Lord Chief Justice Jervis, when a verdict was found for the Defendants; but on motion on leave reserved, the verdict was entered for the Plaintiff (18 Com. Ben. Rep. 617). The case was taken to the Exchequer Chamber, when three judges, Justices Coleridge, Erle, and Crompton, were for affirming the judgment of the Common Pleas, and three other judges, Barons Martin, Bramwell, and Watson, were for reversing it.      The judgment therefore stood, and was afterwards brought up to this House.

**\*434** [271]      The Judges were summoned, and Lord Chief Baron Pollock, Mr. Justice Wightman, Mr. Justice Williams, Mr. Justice Crompton, Mr. Baron Channell, and Mr. Justice Blackburn attended.

The Attorney-General (Sir R. Bethell, Mr. Milward was with him), for Wheatcroft: —The claim against the Appellants proceeds on the ground of a supposed partnership among the creditors of the Smiths in the Stanton Iron Works. There was none. The measure of the interest of each creditor who signed the deed is the amount of his debt. That interest is limited and defined. Yet the Court below has held that each creditor, although having only this defined interest, becomes a partner in the company and incurs an indefinite liability. That doctrine cannot be supported. It is contrary to all the principles of partnership.

Copr. © West 2009 No Claim to Orig. Govt. Works

The facts here do not give any right to Hickman to maintain this action, for if he had heard that Cox and Wheatcroft had been named in the deed as trustees, he must have heard at the same time that Cox never acted in that character, and that Wheatcroft resigned the trust. The trustees who acted in the business are the only persons liable on these bills. The ownership of the property here never was changed at all. The trustees were by the deed to have possession of it for a certain time, but the property itself remained that of the Smiths, to whom it was to be restored if all the debts should be paid. The joint creditors, who are in fact incumbrancers, have the power to say whether the arrangement shall continue; but that amounts to no more than saying that the security given for their debts be put an end to. It is said that the man who participates in carrying on a trade is a partner in it; that is so under ordinary circumstances, but not under such circumstances          [272]          as exist here. If these trustees had found, upon the estate leased to the Smiths, and of which they were in possession for a time, a lode of mineral producing £100,000 in a year, the creditors would not have participated therein as partners; they would have got their debts paid a little earlier. The property would still have been that of the Smiths. If they had been partners, the creditors might put the whole into their own pockets; as persons to be satisfied under that deed they had no power to do so. There was no profit here, nor anything in the nature of profit, till the creditors were paid.

A qualified benefit derived from a trade does not make a man a partner in it,          *Grace*          v.          *Smith* (2 Sir W. Bl. 998),          *Mair*          v.          *Glennie*          (4 Mau. and Selw. 240). It is only when men share profits generally and indefinitely that they become partners:          *Waugh*          v.          *Carver*          (2 H. Bl. 235), where the two persons were to share in agreed proportions all the profits of their respective trades.          *Cheap* v.          *Cramond*          (4 Barn. and Ald. 663), proceeded on that principle. Neither of these cases resembles the present.

[The Lord Chancellor.—But it is not in respect of receiving money alone, but in respect of the authority to employ those who carry on the business that a partnership may be created.]

As to that, the nature of the property and of the trade must be considered. The property was that of the Smiths, the creditors had a charge upon it; the power to deal with it came from the owners, who gave the use of it to the trustees, subject to certain conditions, and who were to be repossessed of it when the object of the deed had been fulfilled. In          *Owen*          v.          *Body*          (5 Ad. and El. 28), an assignment of this sort was held bad, because it contained terms which might          [273]          make the creditors executing the deed members of a partnership, and might thus, as the deed was given for the benefit of all the creditors, impose on creditors who did not execute it terms to which they were not bound to submit. In          *Pott*          v.          *Eyton*          (3 Com. Ben. Rep. 32), it was distinctly laid down that it must be the taking of a share of the profits, not the receipt of a percentage on sales, which would constitute a partnership. That is the doctrine adopted in all the text writers on Partnership, Collyer (p. 53), Story (C. 4, s. 55, 56), and Lindley (vol. 1, p. 34), and unless the profits as such are taken, there can be no pretence to say that a partnership has been created.

Mr. Welsby (Mr. Boden was with him) for Cox.—This is an action on a bill. The Defendant can only be rendered liable on it in one of three ways: first, by putting          **\*435**          his name to the bill; secondly, by giving authority to some one else to put it; or thirdly, by holding himself out to the world as having given that authority. On the first and third of these points, there is no pretence for saying that the defendant is liable. Is he so on the second? This case is part of the law of principal and agent; it is a case of agency as to a specific matter, the acceptance of bills of exchange. No agency has been proved here. There certainly is not what may be called the agency of partnership. The Smiths continue owners of the property, and it is only by virtue of authority from them that the trustees carried on the business. *Waugh*          v.          *Carver*          (2 H. Bl. 235) cannot, perhaps, be disputed, but the reasoning there is not satisfactory, and it has not been adopted by Story or Collyer.          *Owen*          v.          *Body*          (5 Ad. and El. 28) has no application here: it merely shows that cer-          [274]          -tain creditors who had not executed a deed were not bound to execute it, as it contained stipulations which might, not which did, constitute the persons who signed the deed partners in a trade concern. Such was the explanation of it given by Mr. Justice Maule in          *Janes*          v.          *Whitbread*          (20 Law Journ. Rep. C.P., 220; 11 Com. Ben. Rep. 406). And in that

Copr. © West 2009 No Claim to Orig. Govt. Works

case itself the distinction was clearly taken between a deed intended to wind up a business for the benefit of creditors, and one the object of which is to carry it on with a view to future profits.

In *Young* v. *Axtell* (cited in *Waugh* v. *Carver*, 2 H. Bl. 242), the receipt of 2s. per ton on coals sold to persons recommended by the Defendant, in addition to an annuity out of the business, would not have made the Defendant a partner, had it not been for other conduct, which amounted to holding herself out to the world as such. Here there was nothing of that sort. And *Bloxham* v. *Pell* (cited in *Grace* v. *Smith*, 2 Sir W. Bl. 999) was decided by Lord Mansfield on facts which satisfied his mind that the whole business was "a mere device to make more than legal interest of money, and if it was not a partnership it was a crime." There is no such device here, the sole object being to secure payment of an existing debt. It lies on the Plaintiff to show that the Defendant has done that which constitutes him a partner, and the Plaintiff has not given any evidence establishing such a case.

Mr. Rolt [Mr. Field was with him] for the Respondent in both cases.—First, here was a contract of co-partnership under which the business was to be carried on for the benefit of creditors; secondly, the scheduled creditors are entitled to participate in the profits, and must, therefore, be considered partners; and, thirdly, any one partner, or the general [275] agent of the partners, may bind all the others by the acceptance of bills in the regular and necessary course of business. The first of these matters is one of fact. The business was carried on by creditors who were made trustees for the benefit of the other creditors. The general powers of management given to the trustees show this. These powers would have been unnecessary if the trustees had been the only persons concerned in carrying on the business. Then comes in the deed what is equivalent to a release of the debts due from the Smiths. Suppose this had been an arrangement between three individuals only to carry on the business till A. had received £1000, and B. £500, and C. £250, and, as soon as they had been satisfied, then to pay the surplus to D., there can be no doubt that that would have been a partnership between A., B., and C. So it is here. The creditors have intervened at meetings, and determined what should and what should not be done, just as any private individuals would do in a partnership. The creditors have the powers of ownership, and they have also the power to inspect the books, which was considered a material ingredient in *Bloxham* v. *Pell.* An agreement for a man to have a share in the profits of a business till a debt is paid makes that man a partner. The nature of the agreement between two parties themselves, if the profits are really rendered liable to both, cannot affect third persons as to whom they will be liable as partners, *Bond* v. *Pittard* (3 Mee. and Wels. 357). In that case, *Gilpin* v. *Enderby* (5 Barn. and Ald. 954) was referred to. That was a case where the contrivance seemed to have been to evade the usury laws, but as the party received his income out of the profits, it was treated as a partnership. So, in *Barry* v. *Nesham* (3 Com. Ben. Rep. 641), though all [276] that one of the parties was to receive appeared to be a charge upon the profits, yet, as his interest varied with this amount, he was held to be a partner. *Bloxham* v. *Pell* (cited in *Grace* v. *Smith*, 2 Sir W. Bl. 999) is a strong authority for the Respondent. And in *Wightman* v. *Townroe* (1 Maule and Sel. 412; see *Labouchere* v. *Tupper*, 11 Moo. P.C. 198), executors **\*436** of a deceased partner, who continued his share of the partnership property in trade for the benefit of his infant daughter, were held liable on a bill drawn for the accommodation of the partnership under the general principle of partnership liability, and not through any proof of particular agency, such as has been contended in this case to be necessary.

Any specific participation in the profits creates a partnership, *ex-parte Hamper* (17 Ves. 403). Unless this judgment is supported, the case of *Owen* v. *Body* (5 Ad. and El. 28), must be overruled. It is directly in point. There, as here, was an assignment for the benefit of creditors; the trustees were to carry on the business of the debtor, to pay 2s. in the pound when requested by the creditors, and to pay the surplus to the debtor; and the creditors covenanted not to sue Marchetti for their debts then due. The Court held that the creditors who did not execute the deed, were not bound because it contained stipulations which might constitute a partnership. They are the same stipulations which exist here, and here, therefore, they do constitute a partnership. *Janes* v. *Whitbread* (11 Com. Ben. Rep. 406) is equally decisive for the Respondent, the exception introduced there being, that the scope of the deed was not to carry on the business, but to effect a sale and distribution of

Copr. © West 2009 No Claim to Orig. Govt. Works

the effects. Here the scope of the deed was to carry on the business for the        [277]        benefit of the creditors. In         *Macalpine*        v. *Mangnall*        (3 Com. Ben. Rep. 496), the terms of the deed were very different from the present, and the only real question was, whether the assignment was a violation of the patent law.

It is not the right to share profits indefinitely, but the right to share profits, that constitutes a partnership; and the only exception to that is, the contract to pay a servant a salary which is to be ascertained by the amount of the profits. [Lord Brougham: Yet authors and publishers share the profits of a work without a partnership being established. Lord Wensleydale: Is not that because the publisher agrees to bear the whole charge, and after being remunerated for that, to divide the net profits?]

No doubt this is a branch of the law of principal and agent, but it is not by that law that the question is to be determined whether a partnership exists. It is said on the other side, that the Appellants did not give authority to accept the bills, but that depends not on the authority which, as principals, they might give to an agent, but on the character and liabilities which they took on themselves in entering on this business. The bills were accepted by Haywood, who was at once their partner and their agent in carrying on this business. *The South Carolina Bank* v. *Case*        (8 Barn. and Cres. 427) established that the acceptance of bills in the name of a firm in the regular course of business by the manager of the business, or by a partner, will bind the firm. That case must be applied here.

Mr. Welsby replied.

The Lord Chancellor (Lord Campbell) proposed the following question for the Judges:—"Are the Defendants in        [278]        this case liable as acceptors of the bills of exchange declared upon?"—Agreed to.

Mr. Justice Blackburn (July 6).—The Defendants in this case are liable as acceptors of the bills of exchange declared upon. The question entirely depends on the effect of the deed of arrangement. If the effect of that deed is such that creditors executing thereby give authority to those managing the Stanton Iron Company, to bind them to third persons in the usual course of business by accepting bills, the Defendants have given such authority. If the effect of the deed is not such that creditors executing that deed give authority to bind them as to third persons, the Defendants are not shown to have given any such authority, for they have never acted as trustees; nor does it appear that they have done any act beyond what was proper to carry out the arrangement contained in that deed.

The principal object of the deed of arrangement is to divide the property of the Smiths amongst the creditors according to the rules observed in bankruptcy; and for this purpose their property is assigned to trustees. The goodwill of the business which had been carried on by the Smiths, was part of their joint estate, and those who had the making of the arrangement appear to have thought it a valuable part of the joint estate. Instead of disposing of it to third persons, or        **\*437**        suffering it to be lost, the arrangement made was, that the business should in future be carried on under a new style, that of "the Stanton Iron Company," by the trustees, in the manner stipulated for in the deed to which the creditors are parties. The question is, whether the stipulations are such as to render those creditors who are parties to the deed partners in the Stanton Iron Com-        [279]        -pany, so far, at least, as regards liability to third persons.

Some of the Judges in the Court below have expressed an opinion that there is a distinction between the present question and that which would have arisen if the question had been whether the Defendants were liable for the consideration of these bills. I am, however, of opinion that no such distinction exists. I apprehend that all cases as to liability of partners to contracts are branches of the law of agency, and that the question always is, whether the contract entered into is within the scope of the authority conferred by those, who are sought to be charged, upon the person actually making the contract. But I take it that, as matter of law, those who are partners in a trading firm, do confer upon those who are permitted to manage the concern, authority to make all contracts which in the exigency of

the business are necessary and proper and customary. This *prima facie* authority may be restricted by express agreement, but unless those who deal with the firm have notice of this restriction, they are entitled to hold all who are partners bound by the *prima facie* authority conferred on the manager, and that equally whether the persons sought to be charged were persons to whom the creditors gave credit, or dormant partners, of whose existence they were unaware. I think the justice of this rule, as applicable to dormant partners, very questionable, but I do not think it open to question that it is the rule of law. I think that where, as in the present case, the accepting of bills is a necessary and customary part of the business, the authority to accept them is conferred as much as the authority to contract the debts for which they are given. It is true the authority is limited to accepting bills in the name of the firm, and binds only those included in that firm, but all who are partners are included in the firm.

[280] I think, therefore, as already said, that the question is, whether the stipulations in the deed are such as to constitute a partnership *quoad* third persons, and to determine that question we must look to the terms of the deed. The material stipulations, as it seems to me, are the following: the trustees are, as soon as possible, to convert into money such parts of the joint property of the two Smiths as shall not be necessary to carry on the said business (that excepted property not to exceed £4000); they are to carry on the business under the name of the Stanton Iron Company, for which purpose they are clothed with all the powers proper to be confided to the managers of such a concern. It is agreed that after paying all the expenses and losses to be incurred or sustained in carrying out the business, they shall pay and divide the net income of the said business, remaining after answering the purposes aforesaid, into and among the creditors of the Smiths, in rateable proportions according to the amount of their respective debts, subject to the provisions thereinafter contained. The deed then provides that the trustees at any time may, and on the requisition of joint creditors whose debts together amount to £3000, must call a meeting of the creditors, and that the decision of the majority of such meeting shall have full power for the general benefit of the creditors to give any directions for the discontinuance of the business, or "for the present or future management thereof," which shall be binding on all the creditors whether concurring or not. The Smiths have no vote in determining how the business is to be managed, and the trustees are absolutely bound to obey the directions of the meeting of creditors. If the concern is wound up, the clear residue of the monies, after paying all expenses, shall be divided among the creditors of the Smiths rateably as joint property. It is provided that where the debts of the [281] several creditors are paid in full the trustees shall make over the property for the benefit of the Smiths, and this clause is to be noticed as being the only clause in which the trusts are for the benefit of the Smiths, except so far as they are benefited by the liquidation of their debts. And it is to be noticed that, from its nature, it can only come into operation when the trade of the Stanton Iron Company ceases. It is provided amongst other things that every creditor shall have a right at all times to inspect the books of the firm. No such power of inspection is given to the Smiths. **\*438** Then follows a provision for the trustees, "by and with the consent of the majority of creditors in value, attending any meeting of creditors," to appoint fresh trustees in the room of those retiring. The Smiths have no voice in this. Then follows an agreement that all creditors executing or becoming otherwise bound by the deed should accept its provisions in full satisfaction of their claims upon the Smiths, and that in case any of them sue for their debts that this deed may be pleaded as a release.

These, I think, are the whole material parts of the deed. There is no stipulation in the deed, as to who is to provide for payment of the partnership liabilities in case the losses should be so great, as to exceed the sum of £4000, which the trustees were authorised to retain for the purpose of carrying on the business. The parties seem not to have anticipated, or at all events not to have provided for such a contingency, which, though a probable one, is often overlooked by those entering on a trade, but the rule of law is clear enough, that those who are partners in the concern must bear such liabilities; so that I once more repeat, the question comes round to whether the stipulations are such as to constitute a partnership amongst the creditors.

Now, on looking at the provisions of the deed, it seems [282] to me that they are, in substance, such as would be proper if the creditors constituted themselves a joint stock company, such as it would have been at common law, and made the trustees their managing directors, but agreed that the partnership should cease as soon as a certain sum, in this case the amount of their debts, was realized. I find that the business is to be carried on by the trustees under the control of the creditors, who may give what directions they think fit as to the management

Copr. © West 2009 No Claim to Orig. Govt. Works

of the business; that the creditors are to have a voice in nominating fresh trustees in case they are changed; and that the creditors are to have a right to inspect the books. And moreover, I find that the creditors alone are to have these powers, no similar powers being given to the Smiths. Then I find also that the trustees are bound to pay over the net income, after paying all expenses of the concern, rateably among the creditors. It was suggested at your Lordship's bar, that there was some distinction between the net income, after paying all out-goings, and the net profits, but I am unable to understand what that distinction is.

The arrangement is that the trading might terminate on the creditors being paid, which perhaps was the termination which the persons entering into the arrangement hoped for. In that case, the deed provides that the property shall be made over to the Smiths, but by so doing the trade of the Stanton Iron Company ceases. Whoever the partners in that firm might be, they are no longer to carry on the business after the property is assigned to the Smiths. It might terminate by the concern being stopped by the directors whilst it was yet solvent; that event is anticipated by the deed, and in that case it is provided that the surplus, after paying all losses, should be divided amongst the creditors. It might continue for an indefinite period, neither so productive as to pay the directors in full, nor so     [283]     bad as to be stopped; and whilst it was so continued, the creditors were to have the net income or profits, and the control of the management of the concern, and they were only to have these powers. Does this make them interested in the property or profits, so as to make them partners? That question depends on the effect of the deed, and it will be answered when we have determined the extent of their interest in the property of the firm. Suppose, a not impossible case, that the trustees had, as individuals, contracted a joint debt for some purpose unconnected with the Stanton Iron Company; could the partnership property of the Stanton Iron Company have been taken to pay the debt? Or, if the trustees had become reduced to one person, and he had become a bankrupt, would the assets of the Stanton Iron Company have passed to his assignees? Or would the creditors, who were parties to the deed of arrangement, have been entitled in either case to say that the property was in equity theirs, and that the trustees, except in so far as they were creditors, had no beneficial interest in it? That is a question that depends on the construction of the deed. I think the construction of the deed is such, that the creditors, parties to the deed, have bargained that they shall have a hold over the whole property of the firm, divided or undivided, and I think this bargain is ineffectual, and, if so, that          ***439**          the creditors do take the profits of the concern, so as to make them their property, before they are divided.

The deed does not provide what is to be done in the case which has actually happened, viz., that of the concern proving insolvent; but the law declares that those who take the profits of a trading concern as such, are liable to the losses, even if they have stipulated to the contrary, *Waugh* v. *Carver* (Smith's Leading Cases, 786) and the notes thereto.

[284]          The phrase, taking the profits as such, is not a happy one, and there is some difficulty at times in defining what it means, but I think it at all events means this: it is not possible, according to the common law, to cause a trading concern to be carried on, on the terms that the advantages of a partnership, including the participation in profits, and the partnership lien and security over the assets of the firm, shall belong to those who have but a limited liability. I am aware of no case or authority inconsistent with the proposition thus guarded. Now, it seems to me, that the present defendants have, by the deed to which they are parties, stipulated that the business shall be carried on for their benefit, and under their control; that they shall be interested in all the property of the firm to such an extent as to have a partnership lien upon it. This shows that they are not merely persons permitting the Smiths or the trustees to carry on the business, and relying on it as a fund for payment, but that they take the profits as such, and having done so, they are partners as regards third persons. I agree that the question is one of agency, viz., whether the defendants authorised the managers of this firm to bind them, but I think it is an incident attached by law to a participation in the profits to the above extent, that such authority is given to those managing the concern. I think, for the reasons I have given, that this arrangement deed does amount to a stipulation for a participation in the profits as such by the creditors.

For these reasons, I am of opinion that the Defendants are liable as acceptors of the bills of exchange declared upon.

Copr. © West 2009 No Claim to Orig. Govt. Works

Mr. Baron Channell.—It appears to me, that both Defendants stand on the same footing; that both Defendants are liable upon the bills, or neither. Cox never acted as trustee. Wheatcroft          [285]          acted for a short time, but resigned his trust according to the provisions of the deed before the goods were supplied, the price of which is sought to be recovered.

I do not rely altogether upon the distinction taken by those of the Judges of Court below, with whose judgments otherwise, and in the result, I agree; that is to say, on the distinction between an action on these bills, and one for goods sold and delivered.

If the deed does not constitute the Defendants partners in the business carried on under the name of the Stanton Iron Company, upon which the bills are drawn, the Defendants are not liable on the bills; if the deed did constitute them partners in the business so carried on, they would be liable, both on the bills, and for the consideration of them. Their liability appears to me to depend entirely on the deed, for I see nothing done by them at the meetings which they attended, which can create a liability, if the deed does not.

That deed contains no authority, I think, to pledge the credit of the Defendants; but it is said, that by executing the deed, the Defendants became partners as regards third persons, by reason of the interest they take in the net profits, and that the business carried on under the deed was the business of the Defendants and the other creditors of the third part.

The provisions of the deed are carefully analysed and sufficiently set forth in the judgment of the Master of the Rolls, which is with the papers before your Lordships; I refer to that judgment for the provisions of the deed. I think that no new trade or concern was carried on. It seems to me, that it was the old concern, though carried on under the management of trustees, and under a new name; that it was to be carried on by parties in whom the Smiths on the one hand, and the general body of creditors on the          [286]          other hand, placed confidence, that is to say, by the trustees; but that it was the business of the Smiths; that the creditors who had rights against the Smiths, which they might have enforced by legal proceedings, in effect, in consideration of the arrangement that the trade for the future should be carried on by the trustees, and not under the management of the Smiths, agreed          **\*440** to forego their ordinary rights, as creditors, against their debtors, and to receive a sum equivalent to what was the amount of their debts, when the net profits (that is, as I understand, profits made after satisfying all new debts) should enable the trustees to pay the parties of the third part such equivalent sum.

The business was, I think, the business of the Smiths, carried on with a view to their ultimate benefit; and the fact, that the creditors had power to put an end to the management by the trustees, and to discontinue the business, and to require the property, the capital, to be sold and divided amongst them in satisfaction or part satisfaction of monies, which, according to my understanding of the deed, and by virtue of the deed of arrangement, became a charge on the property of Messrs. Smith, does not vary the case so as to constitute the creditors of the third part partners in the business. The creditors of the third part had no power, I think, by virtue of the deed to take upon themselves the management of the business.

Supposing that I am wrong in considering the business carried on under the deed as the old business under a new name, and that the business is to be considered a new business, I think the creditors, parties to the deed of the third part, may be likened to parties who had made loans to the new partnership to the extent of their debts against the old concern, and that by stipulating to receive payment of their loans out of the net profits, the amount to be received not varying with the rate of the net profit so as          [287]          to give them any interest beyond the amount of their loan, they did not render themselves partners. That was the view taken by his Honour the Master of the Rolls with reference to this deed. No doubt his judgment is to be considered as only deciding that this deed did not constitute a partnership within the meaning of the Winding-up Acts. But the whole reasoning goes to show that in the opinion of that learned Judge there was no partnership created by the deed; and I adopt that view.

Copr. © West 2009 No Claim to Orig. Govt. Works

Cases were cited in the argument which appear to me to establish more or less clearly and satisfactorily certain principles of partnership law, which do not apply to or govern this case, and it is not, in my view of the case, necessary to go into those authorities; but as to                *Owen*                v. *Body*                (5 Ad. and Ell. 28), I may say that I think that case only decided that, where there was a fair ground for contending that a certain proposed arrangement might amount to a partnership, a creditor might fairly object to execute the deed, and, so objecting, it was invalid against him, a non-executing creditor. See the observations of Mr. Justice Maule in                *Janes*                v. *Whitbread*                (20 Law Journ., C.P., 220).

Upon the whole I think that an agreement by a debtor with his creditors, to apply net profits (if any) in payment of old debts, and on the part of the creditors to give up their rights to be paid out of the capital, taking their chance of being paid out of the net profits which may be made after payment of new debts, does not create, as regards third persons, a partnership, such third persons not know. ing of the arrangement, and not having trusted the creditors, and the creditors not having held themselves out to such third persons as parties liable.

I therefore answer your Lordships' question in the negative.

[288]             Mr. Justice Crompton.—My Lords, I take the same view of the effect of the deed in this case that was taken of it by my brother Coleridge in the Court of Exchequer Chamber, and I quite agree in the reasons he there gave for our judgment.

It seems to me that the old concern of the insolvents, Messrs. Smiths, being put an end to, the creditors, by the deed in question, came to an agreement amongst themselves that the business should be carried on by their agents under a new firm, for their benefit. Whilst such business was so carried on, and until the amount of the debt was paid off, or until they should choose to discontinue the business, the net income of the business was, by the express words of the deed, to be "divided amongst the joint creditors in rateable proportions according to the amount of their respective debts."

I cannot doubt that an arrangement so to carry on a business with such a participation of profits, renders the parties liable as partners to persons furnishing goods or giving credit, according to the course of trade, to the firm.

The question, therefore, seems to be, whether the Defendants in error were                **\*441**                right in the construction they put on this deed. The Plaintiffs in error contended that the real effect was, that the trustees were trustees for the Smiths, that the property was to be theirs, and that it was their assent only which invested the trustees with their trust. But the Smiths were to have no management or control in the new concern; they were not to be summoned to any meetings or to have any right to interfere in the slightest degree with the management of the concern, or with the disposal of the property, or with the duration of the trade. If by any chance the amount of the twenty shillings in the pound should be ever realised, they might take the trade                [289]                and any capital left to themselves, but the trustees were not to carry on the business for them. It seems strange to say that they were interested in the profits to arise whilst the business was being carried on under the deed, none of which profits they were to touch, but which were to go in discharge of debts to which they were no longer liable. They had in effect sold the business with its capital for so long a time as the creditors chose to carry it on for their own benefit, or until the amount of their abandoned debts should be realised. The creditors preferred to have the profits of the trade during the duration of the new business to having the property which would have been distributable amongst them under a bankruptcy; and in effect they purchased the business for the limited time, each creditor giving up so much of his right to a share in the property, and by the deed his share of profits being proportioned to the amount of his abandoned debt. "The new provisions," that is, the payment from the profits, are expressly declared "to be a satisfaction," and the formal words of immediate release are not included merely from fear of some technical difficulty as to collateral remedies; but as between the Smiths and the individual creditors the debts are entirely destroyed.

For whom then are the trusts as to the profits whilst the business lasts? Surely not for the Smiths, who can have

nothing out of the business of the firm in question, whilst carried on by the trustees. Their assent was necessary, and the bargain was a good one probably for them, but they really have no more to do with the business than a solvent firm whose business is purchased, as put by my brother Coleridge.

It need not be discussed whether the Smiths might be made liable as partners by reason of their very remote interest in getting back the business for themselves after [290] payment of the twenty shillings in the pound. That business, if ever they were to get it, was not, however, a business to be carried on under the deed, for there is no trust for carrying on the business when their time arrives. The trust is only to carry it on whilst the creditors are interested, and choose to have it continued. It is difficult, to my mind, to see that the Smiths can be termed participators in the profits, as they take nothing from the fund to which the new creditors of the firm may look.

Stress was laid upon the provisions of the deed wherein it is said that the monies are to be deemed the property of the two Smiths. When looked at, however, this provision points only to the joint and not the separate property, and regulates the distribution amongst the joint creditors. And even if that were not so, such a provision could not alter the real nature of the transaction, according to which the property was by a binding deed to be traded with for the benefit of the creditors, and might be entirely lost or disposed of by them, and could not be withdrawn or touched by the Smiths so long as the creditors choose to carry on the business for their own benefit; and the only interest of the Smiths was in the somewhat remote contingency of the payment of the twenty shillings in the pound,

It cannot alter the question that the legal property was vested in trustees for the creditors. The creditors had the equitable property and the full control over it vested in them, whilst the partnership lasted, and the trustees, as trustees, had no beneficial property whatsoever, and it can be of no consequence that the legal property in the capital of a concern is vested, for convenience, in trustees or managers.

But it is said that the trustees are the persons really liable. If they are liable, they must be liable as holding themselves out to the world, as it is called, as the real con-      [291]      -tractors. As creditors, two of them are in the same position as the rest of the creditors, but taking them to be trustees merely, they could only be liable as      **\*442**      the ostensible partners, as they really have no interest as trustees. They seem to me, however, as between them and the creditors, to be the mere agents of the creditors. The creditors have the most entire control of the whole concern. They are expressly empowered to give any "orders or directions for the present or future management;" they are to direct the continuance or putting an end to the business, and to make any composition as to debts and as to the property; and they are the only persons to whom the managers can look for funds in the event of the property left in the concern being lost or insufficient. These managers seem to me not to differ in any respect from the managers of a joint stock company. Suppose such a company to have started before the Joint Stock Companies Act, and to have gone on at some time, there must have been the same arrangements as here for meetings when the number was too large for each partner or member to act individually, and they must have had managers to act for them, in whom the legal property might probably be vested for convenience. Though called trustees in the deed, the persons so entrusted were really managers, and as far as the management of the concern went, the mere agents of the creditors, who had the entire control over them.

In what then does the present case differ from that of ten persons setting up a new business in the names of two or three managers, they having to divide all the profits? The present case, indeed, is not even one of a trading in the names of the managers, but in a name which may comprehend any partners, and the clause of the deed so much relied on by the Plaintiffs in Error, which stipulates that they shall carry it on in the name of the Stanton Iron      [292]      company, must surely be quite inoperative as to any limitation of the liability to such persons when the rule of law is so well recognised, that no agreement amongst partners can prevent the liability to third persons arising from the participation of profits. I can see no hardship, under this particular deed, in the creditors, who are to have the profits, being liable for the funds and goods from which the profits are to be made, except the general hardship of large liability from small investments, attempted to be remedied by the Limited Liability Acts.

The only authority at all at variance with the liability of the creditors, seems to be that of      *McAlpine*

v. *Mangnall*, in which case, however, the point did not arise, and does not seem to have been very fully discussed, and in which it seems very probable that the deed was one, according to which Bridson was himself to carry on the trade under inspection. On the other hand, *Body* v. *Owen*, and the recognition of that case in the Court of Common Pleas in *Janes* v. *Whitbread*, with the very decided approbation of Mr. Justice Maule in that case of the doctrine as explained by him, are in favour of the Plaintiffs below.

I cannot think that the limit of the amount which the parties are ultimately to receive, or the limited length bf time during which the partnership may be carried on, or the object being to get more in payment of the debts than they would otherwise have done, or the fact that the debts might be paid, and the interest in the profits of any one or more of the creditors might cease, can at all lessen the liability of the creditors. It seems to me, that whilst the business is carried on for their profit, under their control, they are liable for the debts of the concern upon very well-settled principles of law, which I think it would be dangerous to interfere with, except by an Act of the Legislature.

[293]        For these reasons I answer your Lordships' question in the affirmative.

Mr. Justice Williams.—My Lords, I am of opinion that the Defendants in this case are liable, as acceptors of the bills of exchange.

The consideration of the case divides itself into two inquiries: First, did the creditors who executed the trust deed become partners in the business carried on by the trustees under the provisions of the deed? Secondly, if they did so, are they liable as acceptors of the bills on which these actions are brought?

The first question plainly depends on the construction of the trust deed. On the part of the Plaintiff it was argued that the trust is for the benefit of the creditors; that the business is to be carried on solely for their benefit until their debts shall have been paid; and that the trustees are to carry it on under the authority of the creditors, as their agents. On the part of the Defendants it was argued that the trust was rather for the benefit of the Smiths, the debtors, to enable them        **\*443**        better to realise the assets to pay the creditors in full, and to obtain a surplus for themselves. And farther, that the authority conferred on the trustees by the deed to deal with the plant and other property necessary for the conduct of the business, and also to carry on the business itself according to the provisions of the deed, is conferred on them by the Smiths, and not by the creditors, so that the trustees ought to be regarded as agents for the Smiths, and not for the creditors.

But I am of opinion that these latter arguments are not well founded. It appears to me that the true construction of the deed is, that the creditors, in effect, buy the goodwill of the business, and the means for carrying it on for their own benefit until enough shall have been earned to pay        [294]        their debts in full, at the price of consenting to accept the provisions of the deed in full satisfaction of their claims against the Smiths, and of entering into the covenant not to sue them in respect thereof. The business is then to be carried on, not under the old firm of "Benjamin Smith and Son," but under the new firm of "The Stanton Iron Company." The profits are to be appropriated exclusively to the payment of the debts of the creditors until they are paid off; and the trustees are placed under the control of the general body of creditors, who may, at their pleasure, alter, add to, or diminish the powers, trusts, and provisions of the deed, and may (in effect) appoint new trustees, and may direct that the works shall be discontinued; and, in such case, the trustees are to wind up the business, and, after paying all the expenses and liabilities, divide the clear residue amongst the creditors rateably, in proportion to their respective debts. The effect of all these provisions appears to me to be, that the creditors, having, by the sacrifice of their claims on the Smiths, acquired the means of carrying on a trade for their own benefit, arrange the mode of doing so by constituting a certain number of themselves managers of the concern, under the name of trustees, who are to carry it on, subject to the control of their general body. If this be the true construction of the deed, I do not see how it can be doubted that the business carried on under its provisions is, in effect, carried on by all the creditors as partners.

It remains to consider whether, supposing they were thus constituted partners, it follows that they are liable as acceptors of the bills. I have already had occasion to express my opinion that the business carried on under the provisions of the trust deed must be regarded as in effect carried on by the trustees as managing partners for the general body of the creditors, under the firm of "the        [295]        Stanton Iron Company." And if this be so, it seems necessarily to follow that, as against those with whom they deal, the creditors are to be deemed the company, and each creditor must be liable on the acceptances in question, inasmuch as they were accepted by one of such managing partners, in the name of the firm, for iron ore previously delivered to the company by the Plaintiff for the purposes of the works, it being the usual practice to give such bills for ore so supplied.

For these reasons I have to answer your Lordships' question in the affirmative.

Mr. Justice Wightman, after stating the pleadings, the provisions of the deed, and the facts of the case, said:—The question is, whether the creditors are by the execution of the deed, partners with the trustees, and *inter se*, in carrying on the business, or rather whether the creditors who executed the deed are not the real partners carrying on the business, and the trustees merely their agents, and not principals or partners, except as far as they are creditors executing the deed.

The bills are drawn upon the Stanton Iron Company, and accepted by Haywood, by procuration of the Company. By the terms of the deed, the trustees are the persons who carry on the business under that name, and all the stock in trade and property of the concern would be vested in them, or it would be impossible for them to execute the trust. The iron, which was the consideration for the bills, would be part of the trust property vested in the trustees, but if they did not happen to be creditors, or had ceased to be creditors, they would, according to the argument for the Respondent, be merely the agents for the creditors, who are the persons really carrying on the business, and so not liable at all. Suppose that the trustees had not        [296]        been creditors, and had accepted the bills in their own names, stating themselves to be the Stanton Iron Company, would the creditors have been liable upon that acceptance? I should think not; and that the trustees could not be considered as mere agents for the creditors.

**\*444**        It is said that a person who shares in net profits is a partner; that may be so in some cases, but not in all; and it may be material to consider in what sense the words, "sharing in the profits" are used. In the present case, I greatly doubt whether the creditor, who merely obtains payment of a debt incurred in the business by being paid the exact amount of his debt, and no more, out of the profits of the business, can be said to share the profits. If in the present case, the property of the Smiths had been assigned to the trustees to carry on the business, and divide the net profits, not amongst those creditors who signed the deed, but amongst all the creditors, until their debts were paid, would a creditor, by receiving from time to time a rateable proportion out of the net profits, become a partner? I should think not. In the present case, neither of the Plaintiffs in Error, as an individual creditor, has any power or control over the trustees, and the relation of principal and agent can hardly exist between them.

The cases of        *Owen*        v.        *Body*        (5 Ad. and Ell. 28), and        *Janes*        v.        *Whitbread*        (11 Com. Ben. Rep. 406; 20 Law J., C.P., 217), can scarcely be considered decisions which would govern the present case, for the reasons given by the Judges in the Court below, whose opinions were in favour of the Appellants; and the case of        *Bond*        v.        *Pittard*        (3 Mee. and Wels. 357), which was much relied upon by Mr. Rolt for the Respondent, is clearly distinguishable, for in that case, the two brothers, Watts, were admitted by themselves, and held        [297]        out to the world as partners; and the only question was, how far their private agreement as to profit and loss would affect their rights or liabilities as general partners.

It appears to me that in the present case, the legal rights and liabilities in respect of the business carried on under the name of the Stanton Iron Company, are in the trustees, and that at all events the creditors are not liable upon bills drawn and accepted in such a manner as those in question; and that the procuration under which Haywood accepted the bills, is not the procuration of the Appellants, or of the creditors, but of the trustees; and that the Appellants are not liable as acceptors of the bill. And I may farther add, that I agree generally in the opinions expressed by those of the Judges in the Court below who were in favour of the Appellant, and particularly in that expressed by my brother

Martin.

I therefore answer your Lordships' question in the negative.

Lord Chief Baron Pollock.—My Lords, the question in this case is, whether the Defendants below are liable on the bills which are the foundation of the action.

There is, I think, no distinction between one Defendant in Error and the other; on the contract both are liable or neither; and I own I do not see that any distinction can be drawn between this action on the bills, and an action on the consideration for which they were given. I think the Defendants below are liable in this action, if they would have been liable in an action for the goods supplied.

If the Defendants below are liable, it must be by virtue of the deed to which they became parties; no other ground can be suggested. On the part of the Plaintiffs in Error, it was contended that there was nothing in the           [298]           deed that authorised the trustees to pledge the credit of the parties to the deed of the third part; and on examining the deed to ascertain this, no such direct authority can be found. But it is contended for the Defendants in Error, that by virtue of the provisions in the deed, the creditors became partners, and therefore that they are liable whether their credit was pledged or not, and whether there was any express authority to pledge it or not; and I think it must be admitted that the conclusion is just if the premises are true. And the question then arises, whether the interest which the creditors had in the profits to be made by the carrying on of the business under the deed, was such as to make them partners in respect to third persons; in order to examine this, let me put this case: If a firm was in difficulties, and a person proposed to assist by a loan of money, engaging to receive payment out of the profits only, and to make no claim in the event of there being no profits, but stipulating that one-half of the profits should be applied as they rose in payment of his debt, and that he should have power to see that this was done, would he thereby become a partner, and liable to all debts contracted subsequently to this arrangement? On this very simple state of facts there may possibly arise a difference of opinion, but I think a large majority of all lawyers and of all commercial men would decide at once that assistance so offered and so accepted would not make the lender of the money a partner to third persons. If he took a warrant of attor-           **\*445**           ney, entitling him to enter up judgment at his pleasure, and sweep away, in payment of his demand, capital, debts, profits, and everything, he certainly would not be a partner, but it is said, if he limits his claim to be paid out of profits only, his limited right.to payment creates an unlimited liability. I think, my Lords, there must be some fallacy in this; the conclusion, to my mind, appears           [299]           to be so unjust and absurd, and so much at variance with natural equity.

The case before your Lordships may, no doubt, be put as being stronger in favour of a partnership than the case I have supposed; and I think it may be conceded to Mr. Rolt's argument in favour of the Defendants in Error, that if his version of the transaction be the correct one, his conclusion is right; if the trustees be merely managers, on behalf of the creditors, of a new concern, and the business be carried on under their direction and for their entire benefit, it would be difficult to say that the conclusion would be wrong that asserted their liability to debts incurred.

I observed that the learned counsel more than once referred to what he expected a jury would decide by the verdict as the conclusion to be drawn from the facts of the case. But the office of a jury is to decide between conflicting testimony, and not to arrive at conclusions of law from acknowledged facts. When no fact is in dispute (as in the case here), the courts of law generally decide for themselves what is the resulting legal conclusion, and do not speculate on what a jury would find.

The effect of the deed appears to me to continue the old concern, rather than to create a new one, but to put it under the management of the trustees, who are a sort of guarantors or securities that the real contract shall be carried into effect, who are to protect the interests of Messrs. Smith on the one hand, from whom all their authority emanates, and of the creditors on the other, so that the creditors who give up their claim on the capital, provided they are paid out of the profits, shall have the profits so applied, if there be any. The debts of the creditors are not extin-

guished altogether, for if the concern is unprofitable, the creditors may require it to be given up, and the    [300]    property to be sold and divided among them. The trustees act under a power of attorney from Messrs. Smith, and they are to continue to carry on the same business and pay all rents and charges, but they are to apply the net income (of course, after satisfying all new creditors) in payment of the claims of the old creditors. The creditors have power to call meetings, and direct that the business shall be discontinued and the property sold and divided rateably among the creditors; they have also power to make rules, orders, and directions; but, as I construe the deed, they have no power to interfere and take the management into their own hands, if the business is discontinued; all the effects are to be sold, all expenses are to be paid, all the debts, etc., of the trustees are to be discharged, and the clear residue is to be divided among all the creditors as the joint property of Messrs. Smith; provision is made for an allowance for the support of Messrs. Smith and their families.

The deed, when examined, appears to me not to justify the account of it given by Mr. Rolt, and the question remains, does the interest in the clear profits, such as it is, constitute a partnership according to the law of England? I shall very shortly advert to the cases cited.

In *Owen* v. *Body* (5 Ad. and Ell. 28) the judgment is very short, and amounts merely to this, that the possibility that the arrangement might be deemed a partnership was a sufficient ground for the creditors to decline executing the deed, and therefore it was invalid; and the case is so explained by Mr. Justice Maule, in *Janes* v. *Whitbread* (20 Law Journ., C.P., 217). But neither the one case nor the other decides that such a deed would constitute partnership as to third persons, any more than the case before the Master of the Rolls decides that    [301]    such a deed would not constitute a partnership as to third persons. The cases of remuneration to managers, agents, servants, or factors may be dismissed at once, as having no application to the present; and there is really no direct authority upon the point either way.

There is a passage in "Story on Partnership" (ch. iv. s. 49), to which I wish to refer your Lordships, as clearly expressing the views I entertain: "In short, the true rule ' *ex aequo et bono* ' would seem to be, that the agreement and intention of the parties themselves should govern all the cases, if they intended a partner-
**\*446**    ship in the capital stock, or in the profits, or in both; then, that the same rule should apply in favour of third persons, even if the agreement were unknown to them; and on the other hand, if no partnership were intended between the parties, then that there should be none as to third parties, unless where the parties had held themselves out as partners to the public, or their conduct operated as a fraud or deceit upon third persons."

Taking this view of what the law is, it seems to me, that this arrangement, to apply future profits (if any) in payment of the old debts, the creditors being willing to give up their right to be paid out of the capital, and to take the chance of any profits, appears to me not to constitute a partnership as to third persons who know nothing of the deed, and who have not trusted the creditors, and therefore the Defendants below are not, in my opinion, liable as acceptors of the bills of exchange declared upon.

The Lord Chancellor (Lord Campbell) (August 3).—The only question in these cases is, whether the Defendants by executing the deed of 13th November 1849, as    [302]    creditors of Messrs. Smith and Co., rendered themselves liable to the creditors who should afterwards deal with the trustees appointed by this deed to carry on the concern of Messrs. Smith and Co., under the new firm of "The Stanton Iron Company." The Plaintiff alleges that although the Defendants never acted or held themselves out as partners in this new firm, and the creditors of this new firm, unaware of the deed, have dealt only with the trustees, the creditors of the new firm are entitled to sue the creditors of the old firm as partners in the new firm.

It is quite clear that the creditors of the old firm, by executing the deed, never intended to incur such a liability, and I think that the creditors of the new firm cannot be supposed to have dealt with this firm in the belief that they could have a remedy against all or any of the creditors of the old firm.

Copr. © West 2009 No Claim to Orig. Govt. Works

Is there here such a participation in the profits of the new firm by the creditors of the old firm, as to make them partners in the new firm? They certainly are not partners *inter se*, as was properly held by the Master of the Rolls (*Re Stanton Iron Company*, 21 Beav. 164), and they could derive no profit from the new business, beyond the payment of the debts due to them from the old firm. There was a formal release of these debts; but we must look at the real nature of the transaction, according to the understanding of all who were parties to it. The business of Messrs. Smith and Co. was to be carried on by the trustees till the debts of that firm were paid, and then the business was to be transferred back to Messrs. Smith and Co.

The Defendants can only be liable upon the supposition that the person who wrote the acceptance on the bills of exchange was their mandatory for that purpose. I do not [303] mean to make any distinction between their liability on the bills, and their liability for the price of the goods supplied to the Stanton Iron Company, the consideration for the bills. But I am of opinion that the creditors of the old firm cannot be considered, by executing the deed, as having authorised the trustees as their agents either to purchase the goods or to accept the bills.

I do not think that *Waugh* v. *Carver*, or *Owen* v. *Body*, or any of the cases relied upon by the Plaintiffs, makes out a participation of profits under this deed, to constitute a partnership.

I must, therefore, advise your Lordships to reverse the judgment of the Court of Common Pleas, and to adjudge that the Defendants below are not liable, as acceptors of the bills of exchange, on which the action is brought.

Lord Brougham.—My Lords, I entirely agree with my noble and learned friend in the view he has taken of this case.

Lord Cranworth.—In this case the Judges in the Court of Exchequer Chamber were equally divided, and unfortunately the same difference of opinion has existed among the learned Judges who attended this House during the argument at your Lordships' bar. Except, therefore, from an examination of the grounds on which their opinions are founded, we can derive no benefit in this case from their assistance. We cannot say that in the opinions delivered in this House, there is more authority in favour of one view of the case than of the other. We must not, however, infer that your Lordships have not derived material aid from the opinions *447 expressed by the Judges. These opinions have stated the arguments on the one side and the other [304] with great clearness and force, and what we have to do now is, to decide between them.

In the first place let me say, that I concur with those of the learned Judges who are of opinion that no solid distinction exists between the liability of either Defendant, in an action on the bills, and in an action for goods sold and delivered. If he would have been liable in an action for goods sold and delivered, it must be because those who were in fact carrying on the business of the Stanton Iron Company, were carrying it on as his partners or agents, and, as the bills were accepted, according to the usual course of business, for ore supplied by the Plaintiff, I cannot doubt that if the trade was carried on by those who managed it as partners or agents of the Defendant, he must be just as liable on the bills as he would have been in an action for the price of the goods supplied. His partners or agents would have the same authority to accept bills in the ordinary course of trade, as to purchase goods on credit.

The liability of one partner for the acts of his co-partner is in truth the liability of a principal for the acts of his agent. Where two or more persons are engaged as partners in an ordinary trade, each of them has an implied authority from the others to bind all by contracts entered into according to the usual course of business in that trade. Every partner in trade is, for the ordinary purposes of the trade, the agent of his co-partners, and all are therefore liable for the ordinary trade contracts of the others. Partners may stipulate among themselves that some one of them only shall enter into particular contracts, or into any contracts, or that as to certain of their contracts none shall be liable except those by whom they are actually made; but with such private arrangements third persons, dealing with the firm without notice, have no concern. The public [305] have a right to assume that every partner has authority from his co-partner to bind the whole firm in contracts made according to the ordinary usages of

trade.

This principle applies not only to persons acting openly and avowedly as partners, but to others who, though not so acting, are, by secret or private agreement, partners with those who appear ostensibly to the world as the persons carrying on the business.

In the case now before the House, the Court of Common Pleas decided in favour of the Respondent that the Appellant, by his execution of the deed of arrangement, became, together with the other creditors who executed it, a partner with those who conducted the business of the Stanton Iron Company. The judges in the Court of Exchequer Chamber were equally divided, so that the judgment of the Court of Common Pleas was affirmed. The sole question for adjudication by your Lordships is, whether this judgment thus affirmed was right.

I do not propose to consider in detail all the provisions of the deed. I think it sufficient to state them generally. In the first place there is an assignment by Messrs. Smith to certain trustees of the mines and all the engines and machinery used for working them, together with all the stock in trade, and in fact, all their property, upon trust, to carry on the business, and, after paying its expenses, to divide the net income rateably amongst the creditors of Messrs. Smith, as often as there shall be funds in hand sufficient to pay one shilling in the pound; and, after all the creditors are satisfied, then in trust for Messrs. Smith.

Up to this point the creditors, though they executed the deed, are merely passive, and the first question is, what would have been the consequence to them of their executing the deed if the trusts had ended there? Would they have [306] become partners in the concern carried on by the trustees merely because they passively assented to its being carried on upon the terms that the net income, *i.e.* the net profits, should be applied in discharge of their demands? I think not; it was argued that as they would be interested in the profits, therefore they would be partners. But this is a fallacy. It is often said that the test, or one of the tests, whether a person not ostensibly a partner, is nevertheless, in contemplation of law, a partner, is, whether he is entitled to participate in the profits. This, no doubt, is, in general, a sufficiently accurate test; for a right to participate in profits affords cogent, often conclusive evidence, that the trade in which the profits have been made, was carried on in part for or on behalf of the person setting up *448 such a claim. But the real ground of the liability is, that the trade has been carried on by persons acting on his behalf. When that is the case, he is liable to the trade obligations, and entitled to its profits, or to a share of-them. It is not strictly correct to say that his right to share in the profits makes him liable to the debts of the trade. The correct mode of stating the proposition is to say that the same thing which entitles him to the one makes him liable to the other, namely, the fact that the trade has been carried on on his behalf, *i.e.*, that he stood in the relation of principal towards the persons acting ostensibly as the traders, by whom the liabilities have been incurred, and under whose management the profits have been made.

Taking this to be the ground of liability as a partner, it seems to me to follow that the mere concurrence of creditors in an arrangement under which they permit their debtor, or trustees for their debtor, to continue his trade, applying the profits in discharge of their demands, does not make them partners with their debtor, or the trustees. The [307] debtor is still the person solely interested in the profits, save only that he has mortgaged them to his creditors. He receives the benefit of the profits as they accrue, though he has precluded himself from applying them to any other purpose than the discharge of his debts. The trade is not carried on by or on account of the creditors; though their consent is necessary in such a case, for without it all the property might be seized by them in execution. But the trade still remains the trade of the debtor or his trustees; the debtor or the trustees are the persons by or on behalf of whom it is carried on.

I have hitherto considered the case as it would have stood if the creditors had been merely passively assenting parties to the carrying on of the trade, on the terms that the profits should be applied in liquidation of their demands. But I am aware that in this deed special powers are given to the creditors, which, it was said, showed that they had become partners, even if that had not been the consequence of their concurrence in the previous trust. The powers may be described briefly as, first, a power of determining by a majority in value of their body, that the trade should

Copr. © West 2009 No Claim to Orig. Govt. Works

be discontinued, or, if not discontinued, then, secondly, a power of making rules and orders as to its conduct and management.

These powers do not appear to me to alter the case. The creditors might, by process of law, have obtained possession of the whole of the property. By the earlier provisions of the deed, they consented to abandon that right, and to allow the trade to be carried on by the trustees. The effect of these powers is only to qualify their consent. They stipulate for a right to withdraw it altogether; or, if not, then to impose terms as to the mode in which the trusts to which they had agreed should be executed; I do not think that this alters the legal condition of the credi- [308] -tors. The trade did not become a trade carried on for them as principals, because they might have insisted on taking possession of the stock, and so compelling the abandonment of the trade, or because they might have prescribed terms on which alone it should be continued. Any trustee might have refused to act if he considered the terms prescribed by the auditors to be objectionable. Suppose the deed had stipulated, not that the creditors might order the discontinuance of the trade, or impose terms as to its management, but that some third person might do so, if, on inspecting the accounts, he should deem it advisable, it could not be contended that this would make the creditors partners, if they were not so already; and I can see no difference between stipulating for such a power to be reserved to a third person, and reserving it to themselves.

I have, on these grounds, come to the conclusion that the creditors did not, by executing this deed, make themselves partners in the Stanton Iron Company, and I must add that a contrary decision would be much to be deprecated. Deeds of arrangement, like that now before us, are, I believe, of frequent occurrence; and it is impossible to imagine that creditors who execute them, have any notion that by so doing they are making themselves liable as partners. This would be no reason for holding them not to be liable, if, on strict principles of mercantile law, they are so; but the very fact that such deeds are so common, and that no such liability is supposed to attach to them, affords some argument in favour of the Appellant. The deed now before us was executed by above a hundred joint creditors; and a mere glance at their names is sufficient to show that there was no intention on their     **\*449** part of doing anything which should involve them in the obligations of a partnership. I do not rely on this; but,    [309]    at least, it shows the general opinion of the mercantile world on the subject. I may remark that one of the creditors I see is the Midland Railway Company, which is a creditor for a sum only of £39, and to suppose that the directors could imagine that they were making themselves partners is absurd.

The authorities cited in argument did not throw much light upon the subject. I can find no case in which a person has been made liable as a dormant or sleeping partner, where the trade might not fairly be said to have been carried on for him, together with those ostensibly conducting it, and when, therefore, he would stand in the position of principal towards the ostensible members of the firm as his agents. This was certainly the case in *Waugh* v. *Carver* (2 H. Bl. 235). There Messrs. Carver, who were ship agents at Portsmouth, agreed with Gresler, a ship agent at Plymouth, that if he would establish himself as a ship agent at Cowes, they would share between them the profits of their respective agencies in certain stipulated proportions. When, therefore, Gresler, in pursuance of the agreement, did establish himself at Cowes, and there carry on the business of a ship agent, he, in fact, carried it on for the benefit of Messrs. Carver as well as of himself; and the Court held that, in these circumstances, the stipulation which they had entered into that neither party to the agreement should be answerable for the acts of the other, was a stipulation which they could not make so as thereby to affect third persons. Each firm was carrying on business on account, not only of itself but also of the other firm; this, therefore, made each firm the agent of the other.

[310]      The case of *Bond* v. *Pittard* (3 Mee. and Wels. 357) could admit of no doubt. The question was, whether G. H. Watts and P. H. Watts could sue jointly for business transacted by them as attorneys? They had agreed to become partners on a stipulation that P. H. Watts should always receive £300 yearly out of the first profits as his share, and should not be liable for any losses. It was argued that this latter stipulation prevented them from being partners; but the Court held the contrary. Each of them worked for the common benefit of both, and each of them, therefore, acted as agent of the other. The produce of the labour of each was to be brought into a common fund, to be afterwards shared according to certain arrangements between themselves. The case was

really free from doubt.

A similar principle explains and justifies the decision of the Court of Common Pleas in *Barry* v. *Nesham* (3 Com. Ben. Rep. 641). The question was, whether the Defendant was liable for goods furnished to one Lowthin in the way of his business as the printer and publisher of a newspaper. Nesham had sold the stock and good will of the paper to Lowthin in consideration of £1500, and on a farther stipulation, that for seven years the profits were to be applied as follows; that is to say, Lowthin was to have the first £150 of the annual profits, then Nesham was to have them to the extent of £500, if they made so much, and Lowthin was to have all beyond. It is clear that Lowthin was conducting the business for the common benefit of both, subject to their private arrangements as to the shares they should separately be entitled to; Lowthin was, therefore, clearly the agent of Nesham.

*Owen* v. *Body* is at most a case in which a *dictum* may [311] be found. The Court of Queen's Bench was quite right in holding that the creditors were justified in refusing to execute the deed tendered to them; and that is all which was decided.

None of the other cases cited carried the doctrine farther than those I have referred to, and I therefore think that in this case the judgment appealed against ought to be reversed.

Lord Wensleydale.—These two cases came before your Lordships on appeal from the Exchequer Chamber, by which Court a judgment of the Court of Common Pleas was affirmed. They both involved the same question. The Court of Common Pleas was unanimous in favour of the Plaintiff below. The Court of Exchequer Chamber, consisting of six learned Judges, and the six learned Judges who have given their advice to your Lordships, have been equally divided. I am of opinion that the judgment of the Court of Common Pleas was wrong, and that it ought to be reversed.

The question is, whether either of the Defendants, Cox or Wheatcroft, was liable as acceptor of certain bills of exchange, dated in March, April, and June 1855, **\*450** drawn by the Plaintiff below on the Stanton Iron Company, and accepted by one James Haywood as *per proc* that company. And the simple question will be this, whether Haywood was authorised by either of the Defendants, as a partner in that company, to bind him by those acceptances.

Haywood must be taken to have been authorised to accept for them by those who actually carried on business under that firm. Were the Appellants partners in it? The case will depend entirely on the construction of the deed of the 13th November 1849. There is no other evidence affecting either of them. And the question is [312] whether the subscription of both, as creditors of the Smiths, made them partners in the business carried on by the trustees in the name of the Stanton Iron Company. Wheatcroft could not be liable in the character of trustee, for he had ceased to be such before the bills were drawn, and the Plaintiff knew it.

The terms of the deed have been so fully brought before your Lordships, that I do not consider it necessary to state them at any length. One of the provisions in the deed was this authority to the trustees to execute all contracts and instruments in carrying on the business, which would certainly authorise the making or accepting bills of exchange.

The question then is, whether this deed makes the creditors who sign it partners with the trustees, or what is really the same thing, agents, to bind them by acceptances on account of the business.

The law as to partnership is undoubtedly a branch of the law of principal and agent; and it would tend to simplify and make more easy of solution, the questions which arise on this subject, if this true principle were more constantly kept in view. Mr. Justice Story lays it down in the first section of his work on Partnership. He says, "Every partner is an agent of the partnership, and his rights, powers, duties, and obligations, are in many respects

Copr. © West 2009 No Claim to Orig. Govt. Works

governed by the same rules and principles as those of an agent; a partner virtually embraces the character of both a principal and agent." Pothier says, " *Contractus societatis, non secus ac contractus mandati.* " — Pand. Lib. 17, tit. 2, Introduction.

A man who allows another to carry on trade, whether in his own name or not, to buy and sell, and to pay over all the profits to him, is undoubtedly the principal, and the person so employed is the agent, and the principal is liable [313] for the agent's contracts in the course of his employment. So if two or more agree that they should carry on a trade, and share the profits of it, each is a principal, and each is an agent for the other, and each is bound by the other's contract in carrying on the trade, as much as a single principal would be by the act of an agent, who was to give the whole of the profits to his employer. Hence it becomes a test of the liability of one for the contract of another, that he is to receive the whole or a part of the profits arising from that contract by virtue of the agreement made at the time of the employment. I believe this is the true principle of partnership liability. Perhaps the maxim that he who partakes the advantage ought to bear the loss, often stated in the earlier cases on this subject, is only the consequence, not the cause, why a man is made liable as a partner.

Can we then collect from the trust deed that each of the subscribing creditors is a partner with the trustees and by the mere signature of the deed constitutes them his agents for carrying on the business on the account of himself and the rest of the creditors? I think not. It is true that by this deed the creditors will gain an advantage by the trustees carrying on the trade; for if it is profitable, they may get their debts paid; but this is not that sharing of profits which constitutes the relation of principal, agent, and partner.

If a creditor were to agree with his debtor to give the latter time to pay his debt till he got money enough out of his trade to pay it, I think no one could reasonably contend that he thereby made him his agent to contract debts in the way of his trade; nor do I think that it would make any difference that he stipulated that the debtor should pay the debt out of the profits of the trade.

The deed in this case is merely an arrangement by the [314] Smiths to pay their debts, partly out of the existing funds, and partly out of the expected profits of their trade; and all their effects are placed in the hands of the trustees, as middlemen between them and their creditors, to effect the object of the deed, the payment of their debts. These effects are placed in the hands of the trustees as the property **\*451** of the Smiths, to be employed as the deed directs, and to be returned to them when the trusts are satisfied. I think it is impossible to say that the agreement to receive this debt, so secured, partly out of the existing assets, partly out of the trade, is such a participation of profits as to constitute the relation of principal and agent between the creditors and trustees. The trustees are certainly liable, because they actually contract by their undoubted agent; but the creditors are not, because the trustees are not their agents. The case of *Owen* v. *Body* (5 Adol. and E. 28), on which some reliance was placed, is really no authority for holding, that the creditors by subscription became actual partners. In the short judgment of Lord Denman, the expression used is not that the deed imposed such conditions as *would have* constituted a partnership amongst those who subscribed it, but as *might have* had the effect, which is a much more doubtful expression. It was quite enough for the decision of that case, that the subscription exposed them to the peril of being considered partners, of which peril the opinions of the majority of the Judges leave no doubt; and that prevented the deed from being a fair deed, and good against creditors. So did the provision that the effects, which ought to have been divided equally amongst the creditors, should be put in peril by being employed in trade.

The case of *Janes* v. *Whitbread* (20 Law Jour., C.P., 217), which was distin- [315] -guished as authorising a trader to wind up, can hardly be supported on the ground of that distinction. It exposed the creditors signing to perils, though not in the same degree.

The case of *Bond* v. *Pittard* (3 M. and W. 357), cited on the part of the Plaintiff, turned entirely upon the special circumstances, it being perfectly clear that both the two attornies, of whom the Plaintiff was assignee, were the parties with whom the contract was made, independent of the circumstance of a

11 E.R. 431 (1860) 8 H.L. Cas. 268 11 E.R. 431 (1860) 8 H.L. Cas. 268 **(Cite as: 11 E.R. 431)**

payment of fixed sums being made to one out of the profits. It was not that fact that was considered to make them partners; it was not necessary to decide that point.

I, therefore, advise your Lordships to reverse the judgment.

Lord Chelmsford entirely concurred.

Judgment reversed.—Lords' Journals, 3 August 1860.

END OF DOCUMENT

Copr. © West 2009 No Claim to Orig. Govt. Works