# **EXHIBIT A**



PricewaterhouseCoopers LLP
Chartered Accountants
PO Box 82
Royal Trust Tower, Suite 3000
Toronto Dominion Centre
Toronto, Ontario
Canada M5K 1G8
Telephone +1 416 863 1133
Facsimile +1 416 365 8215

January 11, 2007

Mr. Daniel Lipton, Partner
Chief Financial Officer
Fairfield Greenwich Group
919 Third Avenue, 11th Floor
New York, New York 10022
USA

Dear Mr. Lipton

**Arlington International Ltd.**
**Fairfield Investment Fund**
**Fairfield Investors (CHF) Ltd.**
**Fairfied Investors (EUR) Ltd.**
**Fairfield Lambda Limited**
**Fairfield Sentry Limited**
**Fairfield Sigma Limited**
**FIF Advanced Limited**
**NGA Fairfield Ltd.**
**Windward Capital LP**
(collectively, referred to as the Funds)

PricewaterhouseCoopers LLP ("PricewaterhouseCoopers" or "we"), a limited liability partnership organized under the laws of the Province of Ontario, is pleased to be appointed auditors of **the Funds** for the year ending December 31, 2006. The purpose of this engagement letter is to confirm our mutual understanding of the specific terms and conditions of our engagement, which terms and conditions are supplemented by our standard terms and conditions set out in the Appendix attached to this letter. Should there be any conflict between our standard terms and conditions and the specific terms and conditions set out in this letter, specific terms and conditions shall apply.

## Services and Related Reports

We will provide the following services (the "Services"):

| | |
|---|---|
| **Annual Financial Statement Audit** | We will audit the financial statements of the Funds at December 31, 2006 and for the year then ending prepared in accordance with International Financial Reporting Standards.<br><br>We note that we have not been engaged to complete a review of its unaudited interim financial statements. |
| **Other Public Documents or Public Oral Statements** | The Funds or their affiliates may wish to include our reports on the Funds' financial statements in a registration statement proposed to be filed under the Investment Company Act of 1940, the Securities Act of 1933 or in some other securities offering. You agree that the aforementioned audit reports, or reference to our Firm, will not be included in any such offering without our prior permission or consent. |

PricewaterhouseCoopers refers to the Canadian firm of PricewaterhouseCoopers LLP and the other member firms of PricewaterhouseCoopers International Limited, each of which is a separate and independent legal entity.

Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement. Where our audit reports are reproduced in any medium, the complete set of financial statements, including notes, must also be presented.

Further, the Funds or their affiliates may also wish to reference PricewaterhouseCoopers LLP in an offering memorandum, limited partnership agreement and/or other document for another affiliated fund. You agree that reference to PricewaterhouseCoopers LLP will not be included in any such document without our prior permission or consent. Any agreement to perform work in connection with another fund will be subject to our acceptance of such appointment and formalized by an amendment to this letter or a separate engagement letter, as applicable.

**Report**

Upon completion of our annual audit we will provide the Funds with our reports on the work referred to above. If, for any reasons caused by or relating to the affairs or management of the Funds, we are unable to complete our audit, we may decline to issue our reports.

## Our Responsibilities

**Annual Financial Statement Audit**

The objective of a financial statement audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with generally accepted auditing standards in the United States of America. These standards require that we plan and perform the audit to attain reasonable assurance whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

**Internal Control, Fraud and Error**

We will consider the Funds' internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to render an opinion on the effectiveness of internal control over financial reporting nor to identify all significant weaknesses in the Funds' system of internal financial controls. However, we will inform the appropriate level of management and the Board of Directors of any significant weaknesses in internal control that come to our attention.

Because of the inherent limitations of internal control over financial reporting, including the possibility of management override of controls, misstatements due to error or fraud may occur and not be detected.

We will design our audit to provide reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements.

It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if any exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with generally accepted auditing standards in the United States of America may not detect a material fraud.



|  |  |
|---|---|
|  | Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons, we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to the Board of Directors and management of the Funds, as appropriate, any such matters identified during our audit. |
| **Informing the Board of Directors** | We also are responsible for determining that the Board of Directors is informed about certain other matters related to the conduct of our audit, including but not limited to (i) any disagreements with management about matters that could be significant to the Funds financial statements or our reports thereon; (ii) any serious difficulties encountered in performing the audit; (iii) information relating to our independence with respect to the Funds; and (iv) other matters related to the Funds' financial statements including its accounting policies and practices. |
| **Reliance by Third Parties** | The financial statement audit will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction. |

### Management's Responsibilities

|  |  |
|---|---|
| **Responsible for Financial Statements and Internal Control** | The Funds' management is responsible for the financial statements and information referred to above including establishing and maintaining an effective system of internal control. In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with International Financial Reporting Standards. |
| **Correction of Errors** | Management is responsible for adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year under audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole. In addition, we expect management will correct all known non-trivial errors. |
| **Prevention and Detection of Fraud** | Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the Funds involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a non-trivial effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, investors or others. In addition, management is responsible for identifying and ensuring that the Funds comply with the laws and regulations applicable to its activities. |
| **Providing Information on a Timely Basis** | Management is responsible for making available to us, on a timely basis, all of the Funds' original accounting records and related information and the Funds' personnel to whom we may direct inquiries. |
| **Management Representation Letter** | As required by audited standards generally accepted in the United States of America, we will make specific inquiries of the Management and others about the representations embodied in the financial statements and the effectiveness of internal control over financial reporting. Management of the Funds will provide us with its written representations covering the |



Mr. Daniel Lipton
Fairfield Greenwich Group
January 11, 2007

audited financial statements from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements.

## Fees

**Fee Estimate**  The estimate of our fees for the annual financial statement audit will be provided separately, inclusive of out-of-pocket expenses.

**Client Preparation**  Our time and fee estimates take into account the agreed-upon level of preparation and assistance from Management and Citco's personnel. We will advise you on a timely basis when and if for any reason management does not provide such schedules, information and assistance as outlined in this letter and in the Management Responsibility section of the Appendix. In addition, should these or any other issues arise that will require an extra effort to resolve, we will communicate with management and the Board of Directors in order to revise the fee to reflect additional services, if any, required of us to complete our work.

## Term

**Agreement Continues in Force**  In the event PricewaterhouseCoopers or the Funds do not exercise their respective rights to terminate the Agreement provided for herein, the Agreement shall continue in full force and effect for the year ending December 31, 2007 until such time as the Agreement is superseded or replaced by another agreement executed between PricewaterhouseCoopers and the Funds. It is understood by PricewaterhouseCoopers and the Funds that a specific agreement will be entered into with respect to audit and related services PricewaterhouseCoopers is to provide in each year, including an update to the agreed upon fees and billing schedule.

## Termination

**Termination by PricewaterhouseCoopers**  Upon the completion of the provision of the Services for the year ending December 31, 2006, PricewaterhouseCoopers shall have the right to terminate the Agreement upon providing the Funds with ten (10) days prior written notice and the Funds shall pay all fees and expenses incurred by PricewaterhouseCoopers in accordance with the Terms and Conditions of the Agreement up to the date of termination.

**Termination by the Client**  Upon the receipt of full payment of fees and expenses by PricewaterhouseCoopers in accordance with the Terms and Conditions of the Agreement, the Funds shall have the right to terminate the Agreement upon providing PricewaterhouseCoopers with ten (10) days prior written notice.

## Terms and Conditions

**Terms and Conditions**  The Appendix sets forth additional terms and conditions, including rights and responsibilities of the parties with respect to this engagement.

\*\*\*  \*\*\*  \*\*\*



Mr. Daniel Lipton
Fairfield Greenwich Group
January 11, 2007

As part of PricewaterhouseCoopers' process of assessing the quality of its services, the Funds may receive questionnaires from PricewaterhouseCoopers and visits from senior partners not directly involved in providing services to the Funds. PricewaterhouseCoopers appreciates the attention given to these questionnaires and visits and values the Funds' commentary.

If the services outlined herein are in accordance with your requirements and if the above terms are acceptable, please have one copy of this letter executed in the spaces provided below and return it to us.

Yours very truly,

*PricewaterhouseCoopers LLP*

**Chartered Accountants**



Mr. Daniel Lipton
Fairfield Greenwich Group
January 11, 2007

The services and terms as set forth in this letter, including the provisions of the Appendix, are agreed to.

By signing below I acknowledge and agree to my obligation to ensure that the responsibilities of the Funds and its management as set forth herein are properly discharged:

By: _____
Daniel Lipton, Partner
Chief Financial Officer

_____
(Date) 1/30/07

# APPENDIX

## TERMS AND CONDITIONS

The engagement letter, and any amendments thereto (collectively, the "Engagement Letter") together with the Appendix, (the "Appendix"), (collectively, the "Agreement"), shall, once the Engagement Letter is executed by both parties, constitute the entire agreement between the client to which such Engagement Letter is addressed (the "Client") and PricewaterhouseCoopers LLP ("PricewaterhouseCoopers"), a limited liability partnership organized under the laws of the Province of Ontario, regarding the services described in the Agreement (the "Services"). Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Engagement Letter.

**Timely Performance**

1. In consultation with the Client, PricewaterhouseCoopers will, acting reasonably, establish the timing of the performance of the Services. PricewaterhouseCoopers will use all reasonable efforts to complete the Services within any agreed upon time frame. However, PricewaterhouseCoopers shall not be liable for failures or delays in performance that arise from causes beyond its control, including the untimely performance by the Client of its obligations as set out in the Client Responsibility section below.

**Right to Terminate Services**

2. In addition to the termination rights contemplated under the Engagement Letter, should the Client not fulfil its responsibilities to PricewaterhouseCoopers under the Agreement, and in the event that the Client fails to remedy such default within thirty (30) days following receipt of a notice from PricewaterhouseCoopers to this effect, PricewaterhouseCoopers may, without prejudice to its other rights and recourses, and without any further notice, cease providing the Services and consider the Agreement terminated. In such case, PricewaterhouseCoopers will not be responsible for any action, claim, liability, loss, damage, cost or expenses arising out of, in connection with or resulting from such termination.

3. In addition to the termination rights contemplated under the Engagement Letter, should PricewaterhouseCoopers not fulfil its responsibilities to the Client under the Agreement, and in the event that PricewaterhouseCoopers fails to remedy such default within thirty (30) days following receipt of a notice from the Client to this effect, the Client may, without prejudice to its other rights and recourses, and without any further notice, terminate the Agreement upon full payment of fees and expenses invoiced by PricewaterhouseCoopers to that date.

**Client Responsibility**

4. The Client will provide all information and materials and such other assistance as PricewaterhouseCoopers may require to enable PricewaterhouseCoopers to provide the Services. Such information will include, but not be limited to, a schedule of all companies that control the Client, those entities that have significant influence over the Client, those entities that are controlled by the Client, those entities over which the Client has significant influence and those entities that are under common control with the Client (a "Schedule of Group Structure"), a schedule of all other related parties as defined in the Canadian Institute of Chartered Accountants' Handbook Section 3840 (the "Other Schedule"), as well as a schedule of all the transactions among the Client, the entities referred to in the Schedule of Group Structure and the entities referred to in the Other Schedule during the reporting period.

5. The Client will ensure that its staff and senior management are available to provide such information, materials and assistance and that such Client personnel will be qualified and have the appropriate skills and experience. If any of the Client's personnel fails to perform as required, the Client will make suitable additional or alternative personnel available.

6. The Client will ensure timely communication to PricewaterhouseCoopers of all significant accounting, financial and internal control reporting matters. The Client will provide the Schedule of Group Structure to PricewaterhouseCoopers at the time of signing the Agreement and will notify PricewaterhouseCoopers of changes thereto within seven (7) days of such events occurring.

7. The Client agrees that all information disclosed or to be disclosed to PricewaterhouseCoopers is or will be true, accurate and not misleading in any material respect.

8. The Client will maintain the existing quality of the Client's accounting records during the engagement.

9. The Client will provide PricewaterhouseCoopers and its staff with all office and other accommodation or workspace and facilities that PricewaterhouseCoopers may reasonably require to perform the Services.

10. The Client will provide all audit schedules on the dates established by PricewaterhouseCoopers acting reasonably and in consultation with the Client. Schedules will be completed in an acceptable format, mathematically correct and in agreement with appropriate Client records (e.g., general ledger accounts).

11. The Client's personnel will provide all necessary assistance in obtaining timely responses to third-party confirmation requests.

12. The Client's personnel will prepare a trial balance in financial-statement format, which will reference to supporting detailed working papers (by general ledger account number.) All entries will be posted to this trial balance prior to PricewaterhouseCoopers receiving it. Any post-closing entries will be minimal and posted to a final trial balance by the

APPENDIX

TERMS AND CONDITIONS

    Client's personnel. In addition, the Client's personnel will prepare draft financial statements that agree with the trial balance and are internally referenced to supporting documentation (for footnotes and cash flow statements).

13. PricewaterhouseCoopers' performance of the Services is dependent on the Client carrying out its responsibilities as set out in this Agreement. PricewaterhouseCoopers shall not be responsible for any delay or any other consequences resulting from the Client's failure to perform any of its obligations under this Agreement.
14. The Client agrees, during the fiscal period of the audit engagement and for a period of twelve (12) months thereafter, not to offer and not to permit its related parties to offer employment to or hire the lead engagement partner, the quality control reviewer or any other PricewaterhouseCoopers person who provided more than ten (10) hours of audit, review or attest service for positions having a financial reporting oversight role. These positions include Director of the Board, chief executive officer, president, chief financial officer, chief operating officer, general counsel, chief accounting officer, controller, director of internal audit, director of financial reporting, treasurer or any equivalent position.
15. The Client confirms that the requirements for Board of Directors pre-approval under National Instrument 52-110 and any other applicable Canadian legislation, regulation or rules have been complied with relating to this Agreement.

**Electronic Mail ("e-mail") Communications**

16. During the engagement, we may from time to time communicate electronically with each other. However, as the Client is aware, the electronic transmission of information cannot be guaranteed to be secure or error free and such information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use. We shall not have any liability to each other arising from or in connection with the electronic communication of information to or from the Client during or as a result of its electronic transmission outside of our electronic environments. If the communication relates to a matter of significance and there are concerns about possible effects of electronic transmission, such information should be restricted to hard copy transmission.
17. Client approves that PricewaterhouseCoopers' staff may connect their PricewaterhouseCoopers' notebooks to Client's network to access the Internet and use PricewaterhouseCoopers' secure VPN utility to communicate directly with the PricewaterhouseCoopers' network.

**Personal Information Protection**

18. The Client hereby acknowledges and agrees that i) in the course of providing the Services, PricewaterhouseCoopers will be granted access to Personal Information (as defined in applicable law) about the Client and/or individuals in respect to whom the Client collects, uses, holds or discloses Personal Information; and ii) the Services are being provided on the basis that the Client represents and warrants that the Client will disclose, transfer or grant access to such Personal Information only in accordance with applicable legislation in respect of the protection of Personal Information. In addition to any other liability for breach of these Terms and Conditions, the Client shall, upon demand, indemnify PricewaterhouseCoopers, its agents, partners and employees, for any claim, demand, debt, action, or liability to any third party, including legal costs and disbursements, arising out of or in respect of any breach of the Client's obligations under this paragraph.
19. PricewaterhouseCoopers agrees that it will receive, collect, use, hold and disclose such Personal Information in compliance with all laws applicable to such Personal Information.

**Fees and Payment**

20. Fees quoted by PricewaterhouseCoopers are based on the assumption that there are:
    a. no significant new accounting issues that require an additional amount of time to resolve other than as contemplated in the original fee estimate;
    b. no significant changes in accounting policies or practices from those used in prior years other than as contemplated in the original fee estimate;
    c. no significant changes or transactions that will occur prior to issuance of our report and that could significantly impact the audit scope or the timing of our audit procedures assumed in the original fee estimate;
    d. no significant changes in the Client's accounting personnel or their responsibilities; and
    e. no material delays in providing PricewaterhouseCoopers with the information, assistance or resources required under this Agreement.
21. PricewaterhouseCoopers will render invoices as the work progresses. All invoices will be due for payment upon receipt. Interest will be charged on overdue accounts at 6% per annum.
22. PricewaterhouseCoopers will bill for all reasonable expenses. Direct costs including, but not limited to, travel, meals, accommodation and Canadian Public Accountability Board ("CPAB") fees, will be charged as incurred. An amount of $9 per charged hour representing an overhead allocation will be charged to cover costs such as photocopying, telephone, faxes and postage.
23. In addition to its fees, expenses and other charges payable pursuant to this Agreement, PricewaterhouseCoopers will bill the Client for all applicable taxes, whether presently in force or imposed in the future.

**Indemnification for Management or Board of Directors Misrepresentation**

24. The Client hereby agrees to release and indemnify PricewaterhouseCoopers and its agents, partners and employees, and hold them harmless from all claims, liabilities, losses, and costs arising in circumstances where there has been a misrepresentation by a member of the Client's management or Board of Directors, regardless of whether such person

TERMS AND CONDITIONS

was acting in the Client's interest. This release and indemnification and holding harmless will not operate where PricewaterhouseCoopers ought to have uncovered such misrepresentation but failed to, due to the negligence, wilful misconduct or dishonesty of PricewaterhouseCoopers, its partners and/or employees.

**Working Papers**

25   All working papers and files, methodologies, software, other materials, reports and work created, developed or performed by or for PricewaterhouseCoopers either before or during the course of performance of the Services, are the property of PricewaterhouseCoopers.

**Reproduction of Financial Statements**

26   The Client may wish to include the report of PricewaterhouseCoopers on the financial statements in a prospectus proposed to be filed under securities legislation or in some other securities offering document. The Client agrees that the audit report, or reference to PricewaterhouseCoopers, will not be included in any such offering document without PricewaterhouseCoopers' prior permission or consent. Any agreement to perform work in connection with an offering document, including an agreement to provide permission or consent, will be a separate engagement.

27   Where the report of PricewaterhouseCoopers is reproduced in any medium, the complete financial statements, including notes, must also be presented.

**Consent to Production**

28   PricewaterhouseCoopers, like other auditing and accounting firms, must, in conducting audits, meet professional standards and as such, is regulated or overseen by various professional bodies, including CPAB, various Provincial Institutes of Chartered Accountants and the Ordre des comptables agréés du Québec. In addition, other regulatory or professional authorities including the Office of the Superintendent of Financial Institutions, and the Investment Dealers Association, among others have the right to inspect our files, including working papers and other work-product relating to the Services (the "Documents"), to determine if professional standards have been met. The Client hereby acknowledges that PricewaterhouseCoopers may from time to time, and in connection with such inspections of PricewaterhouseCoopers, receive requests or orders from such bodies to provide them with information and copies of such Documents. The Client hereby consents to PricewaterhouseCoopers providing these Documents without further reference to, or authority from, the Client.

29   These bodies, among others including securities regulators, may also have the right to conduct investigations of the Client, including the Services provided. To the extent practicable, PricewaterhouseCoopers will advise management and the Board of Directors of the Client of any such investigation request or order prior to production of the Documents, except where prohibited by law from doing so. The Client will reimburse PricewaterhouseCoopers for its professional time and expenses, as well as the fees and expenses of its counsel, incurred in responding to such an investigation relating to the Client.

30   Except where production of Documents is required by law, PricewaterhouseCoopers will use all reasonable efforts to refuse access to any document over which the Client has expressly informed PricewaterhouseCoopers that the Client asserts privilege. The Client must mark any document over which the Client asserts privilege as privileged. Any legal or other out-of-pocket expense incurred by PricewaterhouseCoopers in asserting privilege on the Client's behalf will be charged to the Client.

31   PricewaterhouseCoopers may also be required to provide information relating to the fees for the Services to a regulatory authority, such as CPAB and the Client also consents to PricewaterhouseCoopers providing this information to such a party.

32   In the event PricewaterhouseCoopers is requested or authorized by the Client or required by government regulation, subpoena, or other legal process to produce its Documents or its personnel as witnesses with respect to the Services for the Client, the Client will, so long as PricewaterhouseCoopers is not a party to the proceeding in which the Documents are sought, reimburse PricewaterhouseCoopers for its professional time and expenses, as well as the fees and expenses of its counsel, incurred in responding to such a request.

33   The Client also agrees to cause all subsidiaries and affiliates of the Client included in the consolidated financial statements of the Client to provide any authorization, to the fullest extent permissible under applicable law, necessary to permit compliance with requests by CPAB for production of documents or information in the possession, custody or control of a foreign public accounting firm, a domestic accounting firm other than PricewaterhouseCoopers, an associated person or PricewaterhouseCoopers that was obtained in the conduct of audit services by such firm or person. Such authorization may include, for example, a waiver and consent or an agreement not to object to compliance with requests for production of documents or information in the foregoing circumstances.

34   Client hereby waives, to the fullest extent permissible under applicable law, the rights provided under any laws, regulations, professional standards, or other provisions that might restrict the ability of any foreign public accounting firm, any domestic accounting firm other than PricewaterhouseCoopers, any associated person or PricewaterhouseCoopers, to comply with requests by CPAB for production of documents or information in the possession, custody or control of such firm or person that was obtained in the conduct of audit services by such firm or person, and consents, to the fullest extent permissible under applicable law, to action taken in furtherance of the foregoing by such firm or person.

APPENDIX

TERMS AND CONDITIONS

### Governing Law

35  The Agreement shall be governed and construed in accordance with the laws of the Province of Ontario and shall be deemed in all respects to be an Ontario contract. The parties hereby agree to the jurisdiction of the courts of the Province of Ontario with respect to all matters arising under or by virtue of this Agreement.

### Severability

36  If any of the provisions of this Agreement are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and be binding on the parties to the fullest extent permitted by law.

### Other Matters

37  The failure of either party to insist upon strict performance of the Agreement, or to exercise any option herein, shall not act as a waiver of any right, promise or option, but the same shall continue to be in full force and effect. No waiver of any term or provision or of any breach or default shall be valid unless in writing and signed by the party giving such waiver, and no such waiver shall be deemed a waiver of any other term or provision or any subsequent breach or default of the same or similar nature.

38  The Agreement constitutes the entire agreement of the Client and PricewaterhouseCoopers with respect to its subject matter and supersedes and replaces all other prior agreements and understandings, whether written or oral, between the Client and PricewaterhouseCoopers relating to the subject matter. Upon the termination of this Agreement for any reason including normal expiration, the provisions of this Agreement relating to indemnification shall survive the expiration and termination of this Agreement in addition to any other provision that survives by operation of law or which by its nature is intended to survive. This Agreement may not be modified, amended or superseded except by the Client and PricewaterhouseCoopers in writing.

39  The Client agrees that each engagement with PricewaterhouseCoopers for additional services will be subject to a separate engagement letter and the approval of either the Client's Board of Directors or its board of directors.

40  PricewaterhouseCoopers has developed a number of product offerings whereby it provides aggregated benchmarking data by specific industry and the like. In this connection, PricewaterhouseCoopers may collect non-public specific financial and non-financial data relating to the Client. The Client hereby consents to the collection and storage of this data in PricewaterhouseCoopers' internal benchmarking databases, over which PricewaterhouseCoopers will maintain reasonable security procedures to preserve the confidentiality of the Client's data. The Client understands and accepts that the collected data will be used along with the data of other entities to create various benchmarking analyses on an aggregate and non-attributable basis. The Client reserves the right to request the removal of its data from the database at any time. If there is any intent for PricewaterhouseCoopers to disclose the identity of the Client as a contributor to the benchmarking database, PricewaterhouseCoopers will obtain the Client's prior consent before making such disclosure.

*** *** ***