**EXHIBIT N**

Dockets.Justia.com

For the Exclusive Use of: _____     Copy No. _____

*Confidential Private Placement Memorandum*

### *FAIRFIELD SIGMA LIMITED*

*A British Virgin Islands International Business Company*

*Securities Offered: Redeemable Voting Shares*

*Minimum Investment per Subscriber: 200,000 EUR*

*Purchase Price per Share: Net Asset Value per Share*

***Investment Manager:***
*Fairfield Greenwich (Bermuda) Ltd.*

***Administrator:***
*Citco Fund Services (Europe) B.V.*

THE DIRECT OR INDIRECT SALE OF SHARES OF FAIRFIELD SIGMA LIMITED TO CITIZENS, NATIONALS OR RESIDENTS OF, OR INSTITUTIONS OR OTHER ENTITIES ORGANIZED, CHARTERED OR RESIDENT IN THE UNITED STATES OF AMERICA IS EXPRESSLY PROHIBITED.

THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. THEY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS. THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE FUND'S ARTICLES OF ASSOCIATION. THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY, NOR HAS ANY SUCH AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.

*This Private Placement Memorandum is dated as of February 16, 2006*

***Fairfield Greenwich (Bermuda) Ltd.***

## COMMODITY POOL OPERATOR EXEMPTION

THE INVESTMENT MANAGER HAS FILED A CLAIM OF EXEMPTION FROM REGISTRATION AS A COMMODITY POOL OPERATOR ("CPO") WITH THE UNITED STATES COMMODITY FUTURES TRADING COMMISSION ("CFTC") IN CONNECTION WITH PRIVATE INVESTMENT FUNDS WHOSE PARTICIPANTS ARE ACCREDITED INVESTORS, AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT OF 1933, CERTAIN FAMILY TRUSTS AND CERTAIN PERSONS AFFILIATED WITH THE INVESTMENT MANAGER. AT ALL TIMES, THE FUND WILL UTILIZE FUTURES SUCH THAT EITHER (1) NO MORE THAN 5% OF ITS ASSETS ARE USED TO ESTABLISH COMMODITY INTEREST POSITIONS OR (2) THE NOTIONAL VALUE OF ITS COMMODITY INTEREST POSITIONS DOES NOT EXCEED 100% OF THE FUND'S LIQUIDATION VALUE.

UNLIKE A REGISTERED CPO, THE INVESTMENT MANAGER IS NOT REQUIRED TO DELIVER A DISCLOSURE DOCUMENT AND A CERTIFIED ANNUAL REPORT TO PARTICIPANTS IN THE FUND. THE CFTC HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY DISCLOSURE DOCUMENT FOR THE FUND.

# CERTAIN SUMMARY INFORMATION

The voting redeemable shares offered hereby (the "Shares") will be issued only on the basis of the information in this Confidential Private Placement Memorandum and any attachments hereto (the "Memorandum"). No other information about Fairfield Sigma Limited (the "Fund") has been authorized. Any investment in the Fund on the basis of information that is not contained, or which is inconsistent with, the information herein shall be solely at your risk. The delivery of this Memorandum does not imply that any information herein is correct at any time after the date hereof.

You should inform yourself of the legal requirements and tax consequences within the countries of your residence or domicile for the purchase, holding or sale of the Shares, and any foreign exchange restrictions. Shares that are bought by persons not entitled to hold them in accordance with the provisions herein may be compulsorily redeemed. No Shares may be transferred without the prior written consent of the Fund's Directors.

The distribution of this Memorandum may be restricted by law in certain countries. You must inform yourself of and observe any such restrictions. You should review the Country-Specific Notices contained in the Memorandum for any applicable notices for your countries of residence or domicile. This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which the offer or solicitation is not authorized, or to any person to whom it is unlawful to make the offer or solicitation.

No person is authorized to give any information with respect to the Fund unless authorized by the Directors. This Memorandum supersedes any written or verbal information relating to the Fund.

You should not construe this Memorandum as legal or investment advice. You should consult your own attorneys, accountants and other advisers regarding this investment.

This Memorandum describes certain documents relating to this investment, including various executed and unexecuted documents and certain statutes, rulings and regulations. Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of those documents, statutes, rulings and regulations.

You and your investment representatives are invited to ask questions of and to obtain additional information from the Administrator or Investment Manager (Fairfield Greenwich (Bermuda) Ltd.) concerning the Fund, including additional information to verify the completeness or accuracy of the information in this Memorandum.

The Fund is incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands. The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized under the provisions of the BVI Act. Such recognition does not entail supervision of the investment performance or portfolio of the Fund by the Financial Services Commission of the British Virgin Islands (the "BVI") which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein. There is no financial obligation or compensation scheme imposed on or by the Financial Services Commission of the BVI in favor of or available to the investors in the Fund.

As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Financial Services Commission in the BVI, which is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act.

The BVI Act provides that the Fund's certificate of recognition may be cancelled if, among other things, the Fund has breached the BVI Act or any regulations or codes of conduct or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound up or dissolved.

Because the Fund is a professional fund under the BVI Act, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and on the basis that the initial investment in the Fund by each of its shareholders is not less than U.S. $100,000. A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund, or who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of $1,000,000 or its equivalent in any other currency and that he consents to being treated as a professional investor.

This is a private offering, made only on delivery of this Memorandum to the prospective investor whose name appears on the cover hereof. This Memorandum may not be reproduced or used for any other purpose. Any distribution of this Memorandum in whole or in part, or the divulgence of any of its contents, is unauthorized. By accepting delivery of this Memorandum, you agree to return it to the Fund if you do not invest.

# FUND DIRECTORY

**THE FUND**

Fairfield Sigma Limited
c/o Codan Trust Company (B.V.I.) Ltd.
P.O. Box 3140
Romasco Place, Wickhams Cay
Road Town, Tortola
British Virgin Islands

**INVESTMENT MANAGER**

Fairfield Greenwich (Bermuda) Limited
12 Church Street
Suit 606
Hamilton, Bermuda
Telephone: 441-292-5401
Facsimile: 441-292-5413

**ADMINISTRATOR; REGISTRAR
AND TRANSFER AGENT**

Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
Telephone: (31-20) 572-2850
Facsimile: (31-20) 572-2610

**U.S. COUNSEL**

Law Offices of Andrew E. Goldstein
488 Madison Avenue, 16th Floor
New York, New York 10022

**BRITISH VIRGIN ISLANDS COUNSEL**

Conyers Dill & Pearman
Romasco Place, Wickhams Cay 1
P.O. Box 3140
Road Town, Tortola
British Virgin Islands

**AUDITORS**

PriceWaterhouseCoopers
Marten Meesweg 25
3068 AV Rotterdam
The Netherlands

**PAYMENT BANK**

Citco Bank Nederland, N.V. Dublin Branch
Custom House Plaza, Block 6
International Financial Services Centre
P.O. Box 6639
Dublin 1
Ireland
Telephone: 353 (0) 1 636 7100
Facsimile: 353 (0) 1 636 7102

*CUSTODIAN*

Citco Global Custody N.V.
Telestone 8 – Teleport
Naritaweg 165
1043 BV Amsterdam
The Netherlands
Telephone: (31-20) 572-2200
Facsimile: (31-20) 572-2625

# TABLE OF CONTENTS

FUND DIRECTORY.................... ..................... ....................... ......................... ....vii
SUMMARY..................... ..................... ..................... .................. .............. 1
THE FUND........................ ..................... ..................... .................. ............. 9
MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS ......................... ........ 10
INVESTMENT POLICIES ..................... ..................... ..................... ........... 17
OFFERING OF THE SHARES..................... ..................... ..................... ........ 22
FEES, COMPENSATION AND EXPENSES ..................... ..................... ............ 30
CUSTODIAN AND BROKERAGE ..................... ..................... ..................... 32
ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT..................... .................. 35
RISK FACTORS ..................... ..................... ..................... .................... 36
POTENTIAL CONFLICTS OF INTEREST................... ..................... ................... 47
DESCRIPTION OF SHARES ..................... ..................... ..................... ....... 49
DIVIDEND POLICY..................... ..................... ..................... .................. 50
TRANSFERS, REDEMPTIONS AND TERMINATION ..................... ..................... 50
ANTI-MONEY LAUNDERING REGULATIONS................... ..................... ............ 53
ANTI MONEY-LAUNDERING POLICIES ..................... ..................... .............. 54
TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA......................... ...... 58
LEGAL MATTERS..................... ..................... ..................... .............. ...... 61
MISCELLANEOUS ..................... ..................... ..................... .................. 61

# SUMMARY

The following Summary is intended to highlight certain basic information which is set forth more fully elsewhere in this Confidential Private Placement Memorandum and, accordingly, should be read in conjunction with such detailed information.

## The Offering

Issuer

Fairfield Sigma Limited (the "Fund") is organized as an international business company under the laws of the Territory of the British Virgin Islands (the "BVI"). The registered office of the Fund is located in the BVI.

Securities Offered

The Fund's redeemable voting shares, denominated in Euros (the "Shares"), are being offered hereby at a price equal to the Net Asset Value (as hereinafter defined) as of the opening of business on the date of such issuance (generally the first business day of every month).

The Shares will be offered to subscribers who desire to invest in Fairfield Sentry Limited and to hedge the currency exposure to the Euro resulting from the Fund holding assets (i.e., shares in Fairfield Sentry Limited) denominated in U.S. dollars.

Offerees

Purchasers who are not citizens, nationals or residents of, or institutions or other entities organized, chartered or resident in, the United States. See "OFFERING OF THE SHARES."

Minimum Subscription

The minimum initial subscription per investor is 200,000 EUR, unless the Fund deems it advisable to permit subscriptions for a lesser amount provided that such lesser amount shall at all times be no less than the EUR equivalent of US $100,000. Following his initial investment, a shareholder may make additional investments in amounts of not less than 75,000 EUR.

Maximum Capitalization

The Fund will not accept a subscription tendered for Shares at a time when the number of its outstanding Shares is 5,000,000.

Subscription Procedures

It is preferable that subscriptions be made by wire transfer. However, subscriptions may be made by mail if necessary. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will ordinarily be accepted, subject to the discretion of the Manager, as of the first business day of the following month, i.e., subscriptions received between March 1 and March 25 will be accepted as of April 1. Subscriptions will become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund.

Solicitation

There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by

| | |
|---|---|
| of Subscriptions | the Fund or through the assistance of unaffiliated placement agents and money managers. Such unaffiliated placement agents and money managers may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned by Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), as Investment Manager, which they may rebate to their clients. FGBL or an affiliate may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent or FGBL and such amounts will not constitute part of the assets of the Fund. |
| Business Objective of the Fund | The Fund will seek to achieve capital appreciation of its assets by purchasing shares in Fairfield Sentry Limited ("FSL"), a British Virgin Islands international business company, which principally utilizes an options trading strategy described as "split strike conversion". FSL is an affiliate of the Fund and the investment manager, Fairfield Greenwich (Bermuda) Ltd. |
| | The Fund will allocate a small portion of its assets to a nonaffiliated bank (the "Bank") to provide a currency overlay program designed to hedge the currency exposure of its Shareholders resulting from the Fund holding assets denominated in U.S. Dollars. The Fund's obligations to the Bank with respect to the currency hedging activities may be collateralized from time to time through a pledge of the assets underlying the Shares (i.e., the Fund's shares in FSL). In order to perfect this pledge of assets, the Fund's shares in FSL may be held in the name of the Bank. In that event, the Bank will be permitted to take any and all appropriate action with respect to these FSL shares at any time in the event of a default on the part of the Fund with respect to its obligations to the Bank. |
| Investment Manager | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the "Manager"), a corporation organized under the laws of Bermuda, serves as the Fund's investment manager and is the Investment Manager of FSL. It is the wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL"), an exempted company organized under the laws of the Cayman Islands, which previously served as the investment manager of the Fund. FGL's main principals are Walter M. Noel, Jr., Jeffrey H. Tucker, and Andres Piedrahita. Mr. Noel is also a Director of the Fund (see "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS"). FGBL expects to register as an investment adviser with the Securities and Exchange Commission under the Investment Advisers Act of 1940 in early 2006. The Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that |

would otherwise be applicable absent such an exemption.

| | |
|---|---|
| Directors | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Fund. They are also the Directors of FSL. |
| Citco | Citco Fund Services (Europe) B.V., an affiliate of The Citco Group Ltd., acts as administrator, registrar and transfer agent for the Fund. |
| Dividend Policy | It is anticipated that the Fund will not declare any dividends; rather, income will be reinvested and will be reflected in the Net Asset Value of the Shares. |

## Sale, Redemption and Exchange Of Shares

| | |
|---|---|
| Redemption at the Option of a Shareholder | A shareholder of the Fund, on fifteen (15) calendar days' notice, may cause his Shares to be redeemed as of the last business day of any month. A shareholder is not required to hold his Shares for any minimum period of time in order to exercise his redemption privilege. |
| Compulsory Redemption | The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time for any reason or for no reason. |
| Sales | The Fund will offer its Shares on a continuous basis. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will ordinarily be accepted, subject to the discretion of the Manager, as of the first business day of the following month, i.e., subscriptions received between March 1 and March 25 will be accepted as of April 1. Subscriptions will become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund. |

## Compensation and Expenses

| | |
|---|---|
| Expenses | The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; and all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities. Transactional costs will be included in FSL's calculation of profit and loss and therefore will be indirectly borne by the Fund. The costs incident to the currency hedging program will be borne by the Fund. Fairfield Greenwich Advisors LLC, an affiliate of the Manager, will receive an annual expense reimbursement from the Fund, payable quarterly, in an amount equal to 0.0375% of the Fund's Net Asset Value (0.15% on an annual basis) as of the last day of each calendar quarter, for providing certain administrative |

services and back-office support to the Fund.

| | |
|---|---|
| Management Fee | The Fund does not directly pay the Manager a management fee. However, as investment manager of FSL (in which substantially all of the Fund's assets are invested), the Manager will receive from FSL a monthly management fee in an amount equal to one-twelfth of one percent (1.0% per annum) of FSL's Net Asset Value before the FSL Performance Fee (as defined), as calculated at the opening of the first day of each calendar month, which will include subscriptions for shares accepted by FSL as of the first day of the month. This fee is payable monthly in arrears. |
| Performance Fee | The Fund does not directly pay the Manager a performance fee. However, as investment manager of FSL (in which substantially all of the Fund's assets are invested), the Manager will receive from FSL, for each calendar quarter, a performance fee (the "FSL Performance Fee") with respect to each share outstanding during such calendar quarter in an aggregate amount equal to 20% of any new high net profit, i.e., new appreciation, allocable to its shares, subject to reduction in connection with certain offsets with respect to each share. FSL shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a FSL Performance Fee only for the portion of the calendar quarter during which such shares were outstanding. The FSL Performance Fee will only be paid on "new appreciation" in FSL's Net Asset Value allocable to the shares. |

## THE FUND

### Description

The Fund was incorporated in the Territory of the British Virgin Islands ("BVI") as an international business company on March 19, 1997. The registered office of the Fund is c/o Codan Trust Company (B.V.I.) Ltd., P.O. Box 3140, Romasco Place, Wickhams Cay, Road Town, Tortola, British Virgin Islands.

Shareholders will have the right to redeem part or all of their voting shares (the "Shares"), or purchase additional Shares, on a monthly basis (See "TRANSFERS, REDEMPTIONS AND TERMINATION").

### MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS

#### The Fund

The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, any officers of the Fund and other

persons or entities with management or administrative responsibilities to the Fund. None of the Fund's Directors own an equity interest in the Fund.

The Directors of the Fund are as follows:

**Walter M. Noel, Jr.**, over 30 years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its international private banking business. Since founding The Fairfield Greenwich Group, an affiliate of the Fund's investment manager, Fairfield Greenwich (Bermuda) Ltd., in 1983, Mr. Noel has been a director or general partner of a variety of its funds, including Fairfield Sentry Limited, directing marketing activity, and originating various of The Fairfield Greenwich Group's business opportunities. Mr. Noel graduated from Vanderbilt University in 1952, received a Master of Arts in Economics from Harvard University in 1953, and graduated from Harvard Law School in 1959.

**Jan R. Naess**, received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo. From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm. In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989. In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/operating and project development company, which merged with Northern Navigation International Limited ("NNI") in 1991. Mr. Naess is a Vice-President of NNI, a Liberian corporation, which is in the business of investing in and managing shipping assets. He serves as a Director of several funds with which The Fairfield Greenwich Group is affiliated, including Fairfield Sentry Limited.

**Peter P. Schmid**, received a Swiss Federal Certificate of Capacity in 1968. Mr. Schmid was employed by Credit Suisse from 1968 to 1986. From 1975 to 1977, he was employed in Credit Suisse's International Portfolio Management Department in Zurich. After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the Bank's representative office in Rio de Janeiro from 1977 to 1984. From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private Banking Desk in Geneva. Mr. Schmid has been an independent investment adviser since April 1986. He is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A., Rock Ltd. and Armor S.A. Mr. Schmid is a Director of several funds with which The Fairfield Greenwich Group is affiliated, including Fairfield Sentry Limited.

## The Investment Manager

The Fund's investment manager is Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the "Manager"), a corporation organized in Bermuda, which was incorporated on June 13, 2003. It is responsible for managing the Funds' investment activities, monitoring its investments and maintaining the relationship between the Fund and Fairfield Sentry Limited and with its escrow agent, custodian, administrator and transfer agent. The Manager is the wholly-owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands

("FGL"), which previously served as the investment manager of the Fund and Fairfield Sentry Limited.

The Fairfield Greenwich Group ("FGG"), of which the Manager is an affiliate, was established in 1983 and has approximately $9 billion employed in alternative asset management funds. Throughout its history, the firm has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a marketing and distribution partner, and obtains underlying portfolio information for monitoring and client communication purposes.

The Manager and its affiliates currently serve as investment or administrative manager to approximately twenty funds, and have exclusive distribution arrangements with several others. FGG maintains its offices in New York, with a significant presence in London. Marketing and client support offices are located elsewhere in the United States, Europe, and Latin America. FGG's London entity is licensed and subject to the supervision of FSA, and another FGG affiliated entity is registered as a broker-dealer in the United States.

The Manager expects to register as an investment adviser with the Securities and Exchange Commission under the Investment Advisers Act of 1940 in early 2006. In addition, the Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that would otherwise be applicable absent such an exemption.

Following is biographical information on the founders, principal officers and certain other key employees of FGG:

**Walter M. Noel Jr.** His background is summarized under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS -The Fund".

**Andres Piedrahita** founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs the Group's European and Latin American activities. Mr. Piedrahita has over 15 years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997). He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987). He received his Bachelor of Arts degree from Boston University's School of Communications.

**Jeffrey Tucker** has over 30 years of experience in investment related businesses. Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner in the law firm Tucker, Globerman & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. (Limited Partnership) ("Kolber"), a registered broker-dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's affiliated private investment funds. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout FGG's development, Mr. Tucker has been

responsible for directing its business and operational development and has been a director or general partner of a variety of its investment funds. Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.

**Harold Greisman** is the Chief Investment Officer of FGG, focusing on manager selection and risk oversight. Mr. Greisman has over fifteen years of experience in the investment business. Prior to joining FGG in 1990, Mr. Greisman was an Associate in the Capital Markets Group of Continental Bank (1984-1985) and then worked for DNB Capital Corporation (1985-1990), a proprietary private equity and venture capital operation controlled by Den Norske Bank. Mr. Greisman began his career at Johnson & Higgins, a large industrial insurance brokerage (1978-1982). Mr. Greisman received his Bachelor of Arts degree from Tufts University and his MBA degree from the Stern School of Business at New York University.

The backgrounds of the Directors and key officers of the Manager are set forth below:

**Andres Piedrahita** is a Director and the President of the Manager. His background is set forth above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS-The Investment Manager".

**Brian Francoeur** is a Director of the Manager. Mr. Francoeur joined Citco Fund Services (Bermuda) Limited in 2001 and currently serves as its Managing Director. From 1999 until joining Citco, he was the Chief Financial Officer of CCS Group Limited, a computer cabling and network company based in Hamilton, Bermuda, and from 1997 to 1999 was a Senior Portfolio Manager with Olympia Capital (Bermuda) Limited, a fund administration company in Bermuda. Mr. Francoeur qualified as a chartered accountant in 1994 and was employed by Ernst & Young in Bermuda from 1995 to 1997.

**Amit Vijayvergiya** is Vice President and the Risk Manager of the Manager and focuses on manager selection and risk management for the Fund. He has been employed by the Manager since 2003. Mr. Vijayvergiya has over 9 years of experience in asset management, risk management and operations research. Prior to joining the Manager, from 2000 to 2003, Mr. Vijayvergiya managed MAV Hedge Advisors, a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

The Manager will not have any beneficial interest in the Fund, although FGL and certain of its principals have beneficial interests in Fairfield Sentry Limited, with which the Fund will invest.

Pursuant to the Investment Management Agreement between the Fund and the Manager, the Manager is not liable for any error of judgment or for any loss suffered by the Fund unless such loss resulted from the Manager's willful misfeasance, bad faith, gross negligence or reckless disregard of its obligations and duties. (See "RISK FACTORS").

## INVESTMENT POLICIES

The Fund seeks to obtain capital appreciation of its assets by primarily investing in Fairfield Sentry Limited, a British Virgin Islands corporation ("FSL"). FSL principally utilizes a nontraditional options trading strategy described as "split strike conversion". This strategy has defined risk and profit parameters which may be ascertained when a particular position is established. Set forth below is a description of the "split strike conversion" strategy.

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the sale of out of the money S&P 100 Index call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out of the money S&P 100 Index put options. An index call option is out of the money when its strike price is greater than the current price of the stock; an index put option is out of the money when the strike price is lower than the current price of the index. The basket typically consists of approximately 35 to 40 stocks in the S&P 100.

The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price. The purchase of an out of the money put, funded with part or all of the call premium, protects the equity position from downside risk.

A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 Index puts and calls. The further away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

The options transactions executed for the benefit of FSL, and indirectly, the Fund, may be effected in the over-the-counter market or on a registered options exchange. (See "POTENTIAL CONFLICTS OF INTEREST").

The Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities ("BLM") through accounts maintained at that firm. The accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market capitalization of the equities in the basket, the capitalization weightings of each security in the basket, the minimum correlation of the basket against the S&P100 Index, and the permissible range of option strike prices. Subject to the foregoing guidelines, BLM is authorized to determine the price and timing of stock and option transactions in the account. The services of BLM and its personnel are essential to the continued operation of the Fund, and its profitability, if any.

### Currency Hedge

In an effort to manage the U.S. Dollar exposure of the Fund's shareholders, the Manager has established an account at a nonaffiliated bank (the "Bank") to hedge the currency exposure of the

shareholders resulting from the Fund holding assets denominated in U.S. Dollars. Generally, the Manager will apply a passive strategy designed to immunize investors against U.S. Dollar declines by seeking to continuously hedge the currency exposure utilizing foreign exchange instruments. The Fund may hedge its currency exposure through the purchase or sale of any foreign exchange instrument including forward contracts, currency option transactions and other derivatives. Obligations owed to the Bank may be collateralized from time to time by a pledge of the assets underlying the Shares (i.e., the Fund's FSL shares). The cost incident to managing the currency exposure of the shareholders will be reflected in the Net Asset Value of the Shares.

Other Investments

The Manager, as the investment manager of FSL, may in its sole and exclusive discretion allocate a portion of FSL's assets (never to exceed, in the aggregate, 5% of FSL's assets at the time of investment) to alternative investment opportunities other than FSL (the "Non-SSC Investments"). It is anticipated that the Non-SSC Investments will be allocated to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines or for cause. The Manager and FSL generally share in fees received by portfolio managers of Non-SSC Investments from investors other than FSL. FSL will pay fees with respect to the Non-SSC Investments at a rate that will not exceed FSL's rate of fees (in certain cases, this may be accomplished by the Manager subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers).

In certain circumstances, the performance fee paid at the FSL level may be reduced for particular calendar quarters for certain Non-SSC Investment Losses, as defined below. See "POTENTIAL CONFLICTS OF INTEREST" and "FEES, COMPENSATION AND EXPENSES-Performance and Management Fees".

In order to ensure that the Fund will not be subject to United States federal income taxation on trading gains from the disposition of certain investments, the Fund will not invest in any "United States real property interest" (including, for example, certain interests in any U.S. Corporation that is a "United States real property holding corporation"), as such terms are defined under the U.S. Internal Revenue Code of 1986 (the "Code") and the Treasury Regulations promulgated thereunder. See "TAX CONSIDERATIONS AND EXCHANGE CONTROL."

The Fund may invest some of its assets in short-term U.S. government obligations, certificates of deposit, short-term high grade commercial paper and other money market instruments, including repurchase agreements with respect to such obligations, money market mutual funds and short term bond funds. In order to ensure that substantially all of the interest earned by the Fund will not be subject to United States federal withholding taxes, any investment in an obligation of a U.S. person or entity (other than in certificates of deposits in banks) primarily will be in an instrument (i) which is issued and purchased at a discount from its face amount, which is not otherwise interest bearing, and which has a term of no more than 183 days from the date of issuance or (ii) which is in registered form and which is issued after July 18, 1984. See "TAX CONSIDERATIONS AND EXCHANGE CONTROL."

## Investment Restrictions

With the exception of the Fund's investment in FSL, which will be on an unrestricted basis, the Fund will observe the investment restrictions set forth in the articles of association which are summarized here:

a) no more than 10% of the Net Asset Value of the Fund will be invested in the securities of any one issuer (other than any government or governmental agency);

b) the Fund may not hold more than 10% of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

c) no more than 10% of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (other than any government or governmental agency), in each case calculated at the time of investment;

d) no more than 10% of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

e) the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Manager collectively own in excess of 5% of such securities;

f) the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

g) the Fund will adhere to the general principle of diversification in respect of all of its assets;

h) the Fund will not invest directly in real property;

i) the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) to any issuer (other than any government or governmental agency) except with the consent of the custodian of the Fund's assets; and

j) no more that 10% of the Net Asset Value of the Fund will be invested in physical commodities.

The investment restriction set out in (c) above will not apply to transactions with any counterparty which advances full and appropriate collateral to the Fund in respect of such transactions.


## OFFERING OF THE SHARES

The Fund is offering up to 5,000,000 voting shares, denominated in Euros (the "Shares"), at a price equal to the Net Asset Value per Share (as defined) as calculated as of the opening of business on the date of issuance (generally the first business day of every month). The Fund initially sold what are now its Shares in December 1999 at an initial offering price of 100 EUR.

The Shares may not be sold directly or indirectly to (i) natural persons who are citizens, nationals, or residents of, or institutions or other entities organized, created, formed, chartered or

resident in, the United States of America, (ii) entities as to which any person or entity described in (i) above is, directly, or indirectly, a beneficiary, fiduciary, grantor or decedent, or (iii) institutions or other entities owned, in whole or in part, directly or indirectly by the persons or entities described in (i) or (ii) above ("U.S. persons"). No Shares may be subject to an option held by a U.S. person. Any transfer of Shares to a U.S. person is prohibited and will be subject to immediate and compulsory redemption by the Fund. (See "TRANSFERS, REDEMPTIONS AND TERMINATION - Transfers").

The minimum initial purchase by each subscriber is 200,000 EUR, unless the Fund deems it advisable to permit subscriptions for a lesser amount provided that such lesser amount shall at all times be no less than the EUR equivalent of US $100,000. The Fund may reject any subscription, in whole or in part, in its discretion. All subscriptions, once made, are irrevocable to the subscriber.

All proceeds from the sale of Shares will be received by the Fund in trust and will be deposited by the Fund into segregated interest bearing accounts in the Fund's name at the Fund's bank, Citco Bank Nederland N.V. Dublin Branch.

After the initial closing, the Fund will offer its Shares on a continuous basis at a price equal to the Net Asset Value per Share as calculated as of the opening of business on the date of issuance of such Shares. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will be accepted, in the sole discretion of the Manager, as of the first business day of the following month. Thus, for example, subscriptions received between January 1 and January 25 will be accepted as of February 1, assuming the 29th-31st are business days. The Fund reserves the right, in its discretion, to accept any subscription prior to such first day. Subscriptions shall become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund.

There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents and money managers, who may charge a placement fee of up to 5% of the total amount of the subscriptions for Shares sold, and/or share in the fees earned by the Manager, which they may rebate to their clients. FGBL or an affiliate thereof may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent and such amounts will not constitute part of the Fund's assets.

Net Asset Value Defined

The Net Asset Value of the Shares is the value of the Fund's assets as calculated in accordance with the International Financial Reporting Standards and the Memorandum and Articles of Association of the Fund.

Notwithstanding the foregoing:

(i)      in the case of extraordinary circumstances which warrant a different valuation of any securities, such as an inability to liquidate existing positions, such securities will be valued at such prices as the Directors shall determine; and

(ii)      the amount of any distribution or dividend made shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors.

Net Asset Value per Share is defined as the Net Asset Value divided by the number of Shares then outstanding.

The difference between the Net Asset Value of the Fund and the Net Asset Value of FSL will be directly related to the results of, and charges incident to, the currency hedging trading account maintained with respect to the Fund's Shares.

The Net Asset Value of the Fund will be calculated on a monthly basis by the Fund's administrator, Citco Fund Services (Europe) B.V.

Pursuant to the Fund's Article of Association, the Fund may suspend the calculation of its Net Asset Value for the whole or any part of any period:

(a) during which any stock exchange or over-the-counter market on which any significant portion of the investments of the Fund are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted; or

(b) when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Fund to dispose of investments or as a result of which any such disposal would be materially prejudicial to the shareholders; or

(c) when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets of the Fund cannot reasonably or fairly be ascertained; or

(d) during which the Fund is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realization or acquisition of investments or payments due on redemptions of Shares cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorized under the Fund's Articles of Association shall exist. Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Fund and as shall be in effect at the time. To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive. Whenever the Directors shall declare a suspension of the

12

determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all shareholders stating that such declaration has been made. At the end of any period of suspension as aforementioned the Directors shall give notice to all shareholders stating that the period of suspension has ended.

<u>Who Should Purchase/Subscription Procedure</u>

This offering is limited to non-U.S. persons who have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition. The Fund will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he is not a U.S. person.

Prospective subscribers should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

As part of the Fund's responsibility for the prevention of money laundering, the Fund will require detailed verification of a prospective investor's identity to be included with its subscription application.

An individual will be required to produce a certified copy of a passport or identification card. Corporate applicants will be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or other documents evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity. Trusts and other entities which subscribe to the Fund must demonstrate organizational documents which verify the existence of the entity and which verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Fund reserves the right to request such further information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Fund may refuse to accept the application and the subscription moneys relating thereto.

In order to subscribe for Shares, subscribers must complete and sign the Share Application Form included in the Subscription Documents which accompany this Memorandum, and indicate the EUR amount of Shares that are being purchased and mail them to Fairfield Sigma Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8 - Teleport, Naritaweg 165, 1043BW Amsterdam, The Netherlands; fax no.: (31-20) 572-2610.

Subscription funds of investors purchasing Shares should be wire transferred to the Fund's account at:

*Intermediary Bank – SWIFT Field 56*
KBC Bank N.V., Brussels
BIC: KREDBEBB

*Account with Institution - SWIFT Field 57*
Account Name: Citco Bank Nederland N.V. Dublin Branch

International Bank Account Number (IBAN): BE96 4809 5884 4705
BIC: CITCIE2D

*Beneficiary Customer -SWIFT Field 59*
Beneficiary Account Name: Fairfield Sigma Limited
Beneficiary IBAN: IE98 CITC 0000 0035 8108 01

*Reference – SWIFT Field 70*: Name and Full Address Subscriber:

## FEES, COMPENSATION AND EXPENSES

### Expenses

       The Fund bears all of the continuing offering costs and all other expenses incurred in the operation of the Fund, if any, including the ordinary and necessary expenses directly related to its investment and trading activities (including the costs incident to the currency trading hedging account), all administration fees, all insurance expenses and all legal and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund. Transactional costs will be included in FSL's compensation of profit and loss and will, accordingly, be indirectly borne by the Fund. The Fund pays Fairfield Greenwich Advisors LLC, an affiliate of the Manager, an annual expense reimbursement charge of 0.15% of the Fund's Net Asset Value, payable quarterly in an amount equal to 0.0375% of the Fund's Net Asset Value as of the last day of each calendar quarter, for providing certain administrative services and back-office support to the Fund.

### Performance and Management Fees

       The Manager does not receive either a management fee or a performance fee from the Fund. The Manager does receive a monthly management fee from FSL (in which substantially all of the Fund's assets are invested) in an amount equal to one-twelfth of one percent (1.0% per annum) of FSL's net asset value before the FSL Performance Fee (as defined), as calculated at the opening of business on the first business day of each calendar month, which will include subscriptions for shares accepted by FSL as of the first business day of the month. This fee is payable monthly in arrears.

       In addition, the Manager receives a quarterly performance fee from FSL in an amount equal to twenty percent (20%) of the amount of any new high net profits, i.e., new appreciation, earned by FSL (the "FSL Performance Fee"). In the event that, as at the end of any calendar quarter, the aggregate amount of original investments in Non-SSC Investment vehicles exceeds the aggregate net asset value of FSL's interests in Non-SSC Investment vehicles (before deduction of FSL's share of fees payable by the Non-SSC Investment vehicles ) (such excess being referred to as the "Non-SSC Investment Loss"), the Manager will reduce the amount of the FSL Performance Fee payable at subsequent quarter end by an amount equal to the Non-SSC Investment Loss. The portion of the FSL Performance Fee that is reduced to cover the Non-SSC Investment Loss will be carried forward. In the event the Non-SSC Investment Loss is, in whole or in part, subsequently recouped by Non-SSC Investment vehicles, FSL will pay the Manager such portion of the FSL Performance Fee that was previously reduced to cover the Non-SSC Investment Losses, in addition to the FSL Performance Fee otherwise payable in any quarter.

Mr. Noel will not be compensated for serving as a director of the Fund, but he and representatives of the Manager will be reimbursed by the Fund for any out-of-pocket expenses they may incur in attending meetings of the Board of Directors or of shareholders. The directors not affiliated with the Manager, of which there are two at the present time, will each be paid a fee of $5,000 per annum by the Fund together with their out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.

## CUSTODIAN AND BROKERAGE

### Custodian

Citco Global Custody N.V. has been appointed as Custodian by the Fund.

The Custodian will be entrusted with the safe custody of certain financial investments of the Fund pursuant to a custody agreement made and entered into between the Fund and the Custodian. The Custodian shall exercise only custody functions on behalf of the investments of the Fund. It does not act as sponsor of the Fund or assume special controlling duties other than those related to its custody functions. The Custodian does not warrant the contents of this Memorandum, nor is it involved in the management, administration or Net Asset Value calculation of the Fund. The Custodian may make use of sub-custodian and depositories in the exercise of its functions. The Fund may appoint other custodians to provide custody services to the Fund. The services of the Custodian to the Fund may be terminated by either the Fund or the Custodian, inter alia, at any time, subject to 90 days prior written notice.

The Custodian shall have no responsibility to initiate, appear in, prosecute or defend any legal or equitable proceedings relating to the stocks, bonds, other securities or property held by the Custodian on behalf of the Fund under the custody agreement. The Custodian shall have no responsibility to initiate any proceeding or engage the services of any third party for the collection of overdue amounts owing to the Fund in connection with any stocks, bonds or other property held by the Custodian under the custody agreement. If, at the request of the Fund, the Custodian agrees to appear in, prosecute or defend any such legal or equitable proceedings, either in the Custodian's name or in the name of its nominee, the Custodian shall first be indemnified to its satisfaction against damages and expenses (including attorney's fees) which may be sustained or incurred by the Custodian in so acting.

Where sub-custodians are appointed, the Custodian must exercise reasonable skill, care and diligence in the selection of sub-custodians and is responsible to the Fund for the duration of the appointment of each sub-custodian, for satisfying itself as to the ongoing suitability of the sub-custodians to provide custodial services to the Fund. In addition, the Custodian must maintain an appropriate level of supervision over the sub-custodians and make appropriate enquiries, from time to time, to confirm that the obligations of the sub-custodians continue to be completely discharged.

<u>Brokerage</u>

It is expected that the Manager and the Non-SSC Investment managers will generally allocate brokerage business on the basis of best available execution and in consideration of such brokers' provision of brokerage and research services. The Manager and the Non-SSC Investment managers may also utilize brokers with which the Non-SSC Investment managers are affiliated.

In selecting brokers or dealers to execute transactions, the Manager and the Non-SSC Investment managers typically will not solicit competitive bids and will not have an obligation to seek the lowest available commission cost. It generally will not be the practice of the Manager or the Non-SSC Investment managers to negotiate "execution only" commission rates, and thus the Fund may be deemed to be paying for research and other services provided by the broker which are included in the commission rate. Research furnished by brokers may include, but is not limited to, written information and analyses concerning specific securities, companies or sectors; market, financial and economic studies and forecasts; financial publications; statistic and pricing services, as well as discussions with research personnel, along with hardware, software, data bases and other technical and telecommunication services and equipment utilized in the investment management process. Research services obtained by the use of commissions arising from such transactions may be used by the Manager or the Non-SSC Investment managers in their other investment activities.

The Manager and the Non-SSC Investment managers may also be paying for services other than research that are included in the commission rate. These other services may include, without limitation, office space, facilities and equipment; administrative and accounting support; supplies and stationery; telephone lines, usage and equipment and other items which might otherwise be treated as an expense of the Manager or the Non-SSC Investment managers. To the extent the Manager or the Non-SSC Investment managers utilizes commissions to obtain items which would otherwise be an expense of the Manager or the Non-SSC Investment managers, such use of commissions in effect constitutes additional compensation to the Manager or Non-SSC Investment managers. Certain of the foregoing commission arrangements are outside the parameters of Section 28(e) of the Securities Exchange Act of 1934 which permits the use of commissions or "soft dollars" to obtain "research and execution" services. Finally, since commission rates are generally negotiable, selecting brokers on the basis of considerations which are not limited to applicable commission rates may result in higher transaction costs than would otherwise be obtainable.

## ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Pursuant to an agreement between Citco Fund Services (Europe) BV ("Citco" or the "Administrator") and the Fund, Citco serves as the administrator for the Fund, under the overall direction of the Fund's Board of Directors. As administrator, Citco has the responsibility for furnishing the day to day administrative services which the Fund may require, such as: accounting services; maintaining the Fund's books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders and/or governmental bodies; paying the Fund's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Fund, if required.

To the extent that Citco relies on information supplied by the Fund, any investee fund of the Fund or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.

Pursuant to the Administration Agreement, dated as of February 20, 2003, between the Fund and Citco, the Fund has agreed to indemnify Citco its subsidiaries, affiliates, directors and other officers, shareholders, servants, employees, agents and permitted delegates under the Administration Agreement, against any and all liabilities, obligations, losses, judgments and expenses of any kind or nature whatsoever (collectively, the "Claims" and, individually, a "Claim") which may be imposed on, incurred by or asserted against any of them arising (other than by reason of negligence, bad faith, fraud or dishonesty on the part of Citco or such other indemnified party) out of the provision of services under the Administration Agreement. Similarly, Citco will indemnify the Fund from and against any Claim which arises directly out of the negligence, bad faith, fraud or dishonesty of its obligations on the part of Citco in connection with its provision of services under the Administration Agreement. The Administration Agreement may be terminated by either party on 90 days' prior written notice; provided, however, that the Administration Agreement may be terminated forthwith by notice in writing by either party if the other party (a) commits a material breach of the Administration Agreement and fails to cure such breach within 30 days after notice from the non-defaulting party; or (b) enters into involuntary liquidation or if a receiver is appointed over any of its assets.

## RISK FACTORS

Among the substantial risk factors involved in a purchase of Shares in the Fund are the following:

1. **Trading Risks.** Substantial risks are involved in the trading of equity securities and options. Market movements can be volatile and are difficult to predict. U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affects securities and options prices, as well as the liquidity of such markets. Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities and options. A variety of possible actions by various government agencies also can inhibit the profitability of the Fund's business or can result in losses. Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Fund.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategies utilized on behalf of the Fund. The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution. Thus, substantial risk remains that the techniques employed on behalf of the Fund by FSL and the Non-SSC Investment managers cannot always be implemented or effective in reducing losses. At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile. The volume and volatility of trading in these markets depends in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by marketmakers and specialists. The liquidity of the market may also be affected by a halt in trading on a particular futures or securities exchange or exchanges. Illiquid markets may make it difficult to get an order executed at a desired price.

2. **Dependence Upon Principals and Key Employees of the Manager and BLM.** The services of the Manager's principals and key employees and BLM are essential to the continued operations of FSL and the Fund. If their services were no longer available, their absence would have an adverse impact upon an investment in the Fund. The key employees of the Manager will allocate a small

17

portion of FSL's assets between and among the Non-SSC Investment managers. The Fund will be dependent on the continued presence of these key employees in connection with identification of the recipients of these allocations and the monitoring of the Non-SSC Investments.

3. **Conflicts of Interest.** The Manager and the Non-SSC Investment managers receiving allocations of FSL's assets, and their respective principals and affiliates, are presently affiliated with and may in the future form and manage, or provide other services to, other investment entities (including without limitation investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. In addition, the Manager functions as the investment manager for unregistered foreign investment companies in addition to the Fund. Such activities could detract from the time that the Manager and its principals allocate to the affairs of FSL and the Fund. The Manager will obtain certain business and financial benefits from FSL's investments in the Non-SSC Investments which may result in a conflict of interest between the Manager and FSL in the selection of, and allocation of assets between and among the Non-SSC Investments. See "POTENTIAL CONFLICTS OF INTEREST".

4. **Conflicts of Interest-Transaction Executions.** The broker-dealer through which FSL conducts its "split strike conversion" transactions, in its role as a market maker, may effect transactions in equity securities with the Fund as principal. This may provide such broker-dealer with the ability to use the Fund's assets to enhance its equities market-making function.

5. **Competition.** The securities industry, including market-making activities and transactions effected in connection therewith, is very competitive. Competition from other persons or entities involved in activities similar to those of the Fund can restrict the ability of the Fund to acquire positions at the prices deemed most beneficial to its overall trading strategies. Many such competing persons or entities are better capitalized and have more experience in trading than the Fund. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Fund.

6. **Regulated Industries.** The securities and commodities industries are highly regulated. The Fund will not be directly subject to regulation by the SEC, national securities exchanges, the CFTC or the Federal Reserve Board. However, the SEC and CFTC regularly review the practices and procedures of the securities and commodities industries, and the marketplace in general, and from time to time revise rules and regulations pertaining thereto. The exchanges engage in similar reviews and at times revise their rules. There can be no assurance whatsoever that any rules and regulations promulgated by the SEC, the CFTC, the Federal Reserve Board, or the various securities exchanges or statutory amendments to the Securities Exchange Act of 1934 or the Commodity Exchange Act will not adversely impact the Fund.

7. **Clearing Firm Loss or Insolvency.** If a clearing firm utilized in connection with accounts maintained on behalf of FSL was to become insolvent, the Fund could have some or all of these positions closed out without its consent. All of FSL's positions may not be closed out under these circumstances, yet delays or other difficulties may be experienced in attempting to close out or exercise options positions. Widespread insolvency among clearing firms that clear securities options could also impair the ability of the Options Clearing Corp. (the "OCC") to honor all exercises, in spite of the system of safeguards which the OCC has in place. Such widespread insolvency could result in substantial losses to the Fund.

8. **Over-the-Counter Options Transactions.** A portion of the options transactions effected on behalf of the Fund may utilize the over-the-counter market for their execution. Trading index options in the over-the-counter market is subject to counter-party risk and is without the protections

afforded by transactions effected through the Options Clearing Corporation, a registered options exchange.

9.  **Option Buyer's Risk of Loss of Entire Investment**. An option is a wasting asset which becomes worthless when the option expires. As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration. This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

10.  **Arbitrage Transactions**. Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction. Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination. Consequently, a substantial favorable price movement may be required before a profit can be realized.

11.  **Combination Transactions**. At various times, the Fund, through its investments in FSL and the Non-SSC Investments, may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations. Such transactions are considerably more complex than the purchase or writing of a single option. The following are among the many risks of combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding. Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination. This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

12.  **Trading Decisions Based on Trend Analysis**. Certain of the trading decisions made on behalf of the Fund are based on the use of computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm. In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends. Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities. This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts. In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur. Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow. Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

13.  **Assignment of Puts or Calls**. Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put or short call portion of the hedged position. Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes. Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses. The same would be true given an illiquid market such as that of October 1987.

19

14.     **Prohibition of Exercise Rights.** The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

15.     **Compensation Arrangements of Non-SSC Investments.** The Non-SSC Investment managers will generally be compensated through incentive arrangements. Under these arrangements, the Non-SSC Investment manager may benefit from appreciation, including unrealized appreciation in the value of the Non-SSC Investment, but may not be similarly penalized for decreases in the value of such investment vehicle. Such fee arrangements may create an incentive for the Non-SSC Investment managers to make purchases that are unduly risky or speculative. In most cases, however, the Fund anticipates that FSL will invest in Non-SSC Investments where the manager is required to recoup prior losses before any performance-type fee is payable in respect of current gains. To the extent that an accrual for an incentive fee is reflected in the net asset value of shares of a Non-SSC Investment vehicle, then, if such accrual is reversed by the Non-SSC Investment vehicle as a result of subsequent depreciation in the value of such investment, all of the shares of FSL and, accordingly, the Fund, will benefit from the reversal of the accrual, including Shares purchased after the Non-SSC Investment vehicle made the accrual. Further, to the extent that the FSL Performance Fee is reduced by the Non-SSC Investment Loss amount, then if such reduction is repaid in part or in whole by FSL due to recoupment of losses by Non-SSC Investment vehicles, the net asset value of all shares of FSL and, accordingly, the Fund then outstanding will be reduced, including Shares purchased after the reduction of the FSL Performance Fee.

16.     **Risks of Leverage.** The Non-SSC Investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies. A particular Non-SSC Investment vehicle may not be subject to any limitation in the amount of its borrowings, and the amount of borrowings that the Non-SSC Investment vehicle may have outstanding at any time may be large in comparison to its capital.

The use of leverage may provide the Non-SSC Investment vehicle with the opportunity for greater capital appreciation, but at the same time will increase the Non-SSC Investment vehicle's, and indirectly the Fund's, exposure to capital risk and higher current expenses. Moreover, if the assets of the Non-SSC Investment vehicle are not sufficient to pay the principal of, and interest on, the Non-SSC Investments vehicle's debt when due, the Fund could sustain a total loss of its investment in the Non-SSC Investment vehicle.

In addition, the Fund may enter into borrowing arrangements on a short-term basis, including through the use of a line of credit. Such borrowing may result in the borrower taking custody of, or placing liens on, the assets of the Fund.

17.     **Possibility of Misappropriation of Assets.** When FSL invests with Bernard L. Madoff Investment Securities or in a Non-SSC Investment vehicle, it will not have custody of the assets so invested. Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund.

18.     **Sole Proprietor Non-SSC Investment Managers.** Some of the Non-SSC Investment vehicles to which FSL may allocate capital will consist of investment operations with only one principal. In such cases, if that individual's services became unavailable to the Non-SSC Investment vehicle, the Fund might sustain losses.

20

19.    **Experience of Non-SSC Investment Managers**.  While certain of the Non-SSC Investment managers have had extensive experience in trading securities generally and with their specific investment strategies, they have had little experience in investing and trading on behalf of a pooled investment vehicle, in utilizing certain of the investment strategies to be employed on behalf of the Fund or in managing an account as large as that anticipated for the Non-SSC Investments.  In that regard, as the assets of the Non-SSC Investment vehicles increase, it is not known what effect, if any, this will have on the trading strategies utilized on their behalf or their investment results.

20.    **Emerging Managers**.  As the Non-SSC Investment vehicles generally will be in an early stage of formation or operation, this can pose a number of operational and other issues.  For example, in its early stages the Non-SSC Investment manager may have little capital available to cover expenses and, accordingly, may have difficulty attracting qualified personnel.  Competing investment managers have a larger number of qualified management and technical personnel and benefit from a larger capital base.

21.    **Lack of Liquidity**.  Certain of the investments in the Non-SSC Investments will be subject to lock-up provisions which will limit the ability of FSL to withdraw capital from such investment.  While such lock-up period may be subject to early release for breach of risk control or performance guidelines or for cause, there can be no assurance that FSL, and therefore the Fund, will not sustain additional losses while such lock-up period remains in effect.

22.    **Exchange Rate Risk**.  The Fund will maintain its assets in U.S. dollars.  The Fund has established an account which will effect transactions in the currency market in an effort to hedge against such risks as they pertain to the Euro, which is the functional currency of the Fund.  There can be no assurance that such transactions will be successful in protecting the shareholders against this exchange rate risk.  In addition, a hedge may be established in anticipation of new subscriptions.  In the event such new subscriptions are not made, the hedge positions will be unwound and the transaction costs will be borne by the existing shareholders.

23.    **Forward Trading in Currencies**.  The Fund may engage in a substantial amount of trading in forward contracts, swaps and other similar instruments with respect to currencies ("Forward Contracts").  Forward Contracts are not traded on exchanges; rather, banks and dealers act as principals in these markets.  Forward trading is substantially unregulated; there is no limitation on the daily price movements of Forward Contracts.  The principals who deal in the forward markets are not required to continue to make markets in the Forward Contracts they trade.  There have been periods during which certain participants in the forward markets have refused to quote prices for Forward Contracts or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell.  The Fund will trade Forward Contracts through a limited number of entities, and as a result liquidity problems might be greater in the Fund's forward trades than they would be were trades to be placed through a larger number of forward market participants.  The imposition of credit controls by governmental authorities might also limit such forward trading to less than that which the manager of the account would otherwise recommend, to the possible detriment of the Fund.

In respect of its forward trading, the Fund is subject to the risk of the inability or refusal to perform with respect to such contracts on the part of the principals or agents with or through which the Fund trades.  Any such failure or refusal, whether due to insolvency, bankruptcy or other causes, could subject the Fund to substantial losses.  The Fund will not be excused from the performance of any Forward Contracts into which it has entered due to the default of third parties in respect of other forward trades which in the Fund's trading strategy were to have substantially offset such contracts.

Currency forwards prices are volatile. Price movements of these contracts are influenced by, among other things: government trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates. Governments from time to time intervene in the currency markets with the specific intent of influencing prices directly.

24. **Currency Account.** The Bank managing the Fund's currency hedging account may, from time to time, receive a pledge of the assets underlying the Shares as collateral for the Fund's obligation in the currency hedging account. In the event such a pledge is in effect and the Fund is unable to pay all or a portion of its obligations to the Bank in connection with the currency hedging account, all or a portion of the assets underlying the Shares (i.e., the Fund's FSL shares) may be forfeited.

## POTENTIAL CONFLICTS OF INTEREST

The Manager, and its principals may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) in the future with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. Such activities could detract from the time they allocate to the affairs of the Fund. Similarly, Messrs. Naess and Schmid, the non-affiliated directors, have other business interests and will not devote their entire time to the Fund's affairs. See also "RISK FACTORS". In connection with FSL's Non-SSC Investments, the Manager and its affiliates may obtain financial and business benefits, including but not limited to: (i) additional investment capacity in Non-SSC Investment strategies, which may be made available to other clients of the Manager, (ii) compensation from Emerging Managers in connection with placement of such additional investment capacity, and/or (iii) sharing in the equity or cash flows of the entire investment business (FSL and non-FSL related) of such Emerging Managers. The Manager or an affiliate thereof will share with FSL, through FSL Performance Fee offset, an amount equal to the greater of (i) 50% of cash flows generated by equity held by the Manager or an affiliate thereof in the businesses of Emerging Managers and (ii) 10% of all revenues accruing to the Manager or an affiliate thereof directly from its association with Non-SSC Investment Vehicles (the "Shared Cash Flow Amount"). Despite this sharing, the arrangements described in this paragraph may result in a conflict of interest between the Manager and the Fund.

Because FSL and the Fund were organized by the Manager, the fees paid by the Fund to the Manager were not the result of arms-length negotiation.

The Fund may engage placement agents to market the Fund. If you are introduced to the Fund by an agent, you should expect it to be paid by the Manager for the introduction, out of the fees the Manager receives from the Fund. You should also expect the agent to have an incentive to recommend that you remain an investor in the Fund, since the agent will likely be paid a portion of the Manager's fees each year that you remain an investor.

Because Mr. Noel is a principal of the Manager as well as a Director of the Fund, he may have an incentive to take actions as a Director that favors the Manager over the Fund.

Citco Fund Services (Europe) B.V., Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody N.V. are affiliates.