The General Partner may elect to have the Partnership pay any operating expenses required to be borne by the General Partner and to charge the amount paid to the General Partner's Capital Account (as defined in Sec. 3.03).

Sec. 2.08. The General Partner will receive a monthly management fee calculated at the annual rate of approximately 1% (.0833% per month) of each Limited Partner's capital account (the "Management Fee"). The Management Fee will be paid monthly in arrears based on the value of each Limited Partner's capital account as of the last day of each calendar month (adjusted for contributions made during the quarter). The General Partner, in its sole discretion, may waive or modify the Management Fee for Limited Partners that are members, employees or affiliates of the General Partner, relatives of such persons, and for certain large or strategic investors.

## ARTICLE III

## CAPITAL ACCOUNTS OF PARTNERS AND OPERATIONS THEREOF

Sec. 3.01. <u>Definitions</u>. For the purposes of this Agreement, unless the context otherwise requires:

(a) The term "Accounting Period" shall mean a fiscal quarter of the Partnership.

(b) The term "Beginning Value" shall, with respect to any Accounting Period or month, mean the value of the Partnership's Net Assets at the beginning of such Accounting Period or month.

(c) The term "Ending Value" shall, with respect to any Accounting Period or month, mean the value of the Partnership's Net Assets at the end of such Accounting Period or month (before giving effect to withdrawals).

(d) The term "Net Assets" shall mean the excess of the Partnership's assets over its liabilities.

(e) The term "Net Capital Appreciation" shall, with respect to any Accounting Period, mean the excess, if any, of the Ending Value over the Beginning Value;

(f) The term "Net Capital Depreciation" shall, with respect to any Accounting Period, mean the excess, if any, of the Beginning Value over the Ending Value.

Sec. 3.02. <u>Capital Contributions</u>. Each Partner has made an initial cash contribution to the Partnership in the amount set forth opposite such Partner's name in Parts I or II of the Schedule (the "Initial Capital Contribution"). The General Partner has made Initial

8

303006.1

Capital Contributions and may make such additional Capital Contributions in the future and each Limited Partner's Initial Capital Contribution has been in an amount not less than $1,000,000, subject to authority of the General Partner, in its sole discretion, to accept Initial Capital Contributions of less than $1,000,000. Additional capital contributions may be made by Partners only in accordance with provisions of Sec. 3.03. Capital Contributions to the Partnership shall not bear interest.

Sec. 3.03. <u>Capital Accounts</u>. A capital account (herein called the "Capital Account") shall be established on the books of the Partnership for each Partner. The Capital Account of each Partner shall be in an amount equal to such Partner's Initial Capital Contribution, adjusted as hereinafter provided. At the beginning of each Accounting Period, the Capital Account of each Partner shall be increased or decreased by the amount of any capital contribution to, or withdrawal from, the Partnership made by such Partner as of the first day of such Accounting Period. At the end of each Accounting Period, the Capital Account of each Partner shall be increased or decreased by the amount credited or debited to the Capital Account of such Partner pursuant to Sec. 3.05. In the event a Partner has either contributed or withdrawn capital during an Accounting Period, the adjustments and allocations set forth in Secs. 3.03 and 3.05 shall be made in accordance with Sec. 3.11.

Additional contributions to the Partnership may be made by Partners as of the first day of any calendar month, by notifying the General Partner of his or its desire to do so. The General Partner shall have the right to accept or decline any such additional contributions.

Sec. 3.04. <u>Partnership Percentages</u>. A partnership percentage (herein called the "Partnership Percentage") shall be determined for each Partner for each Accounting Period by dividing the amount of each Partner's Capital Account at the beginning of such Accounting Period by the sum of the aggregate Capital Accounts of all Partners at the beginning of such Accounting Period. The sum of the Partnership Percentages shall equal 100 percent. The Partnership Percentages shall be set forth in the Schedule.

Sec. 3.05. Allocation of Net Capital Appreciation or Net Capital Depreciation.

(a)     At the end of each Accounting Period, the Capital Account of each Partner (including the General Partner) for such Accounting Period shall be adjusted by crediting (in the case of Net Capital Appreciation) or debiting (in the case of Net Capital Depreciation) all Net Capital Appreciation or all Net Capital Depreciation (including the General Partner) in proportion to their respective Partnership Percentages. Such allocations shall be tentative and subject to readjustment as provided in Sec. 3.05(b).

(b)     At the end of each Accounting Period, (i) 20% of the Net Capital Appreciation allocated to a Limited Partner's Capital Account for such Accounting Period pursuant to Sec. 3.05(a) shall be reallocated to the Capital Account of the General Partner (the "Incentive Allocation"); provided, however, that such reallocations shall only be made to the extent

9

that aggregate Net Capital Appreciation for the Accounting Period exceeds the unrecovered balance remaining in the Loss Recovery Account (defined below) maintained on the books and records of the Partnership for such Limited Partner.

Sec. 3.06. <u>Loss Recovery Account</u>.  There shall be established on the books of the Partnership for each Limited Partner a memorandum account (herein called the "Loss Recovery Account"), the opening balance of which shall be zero.  At the end of each Accounting Period, the balance in each Limited Partner's Loss Recovery Account shall be adjusted as follows: (i) if there is Net Capital Depreciation for such Accounting Period, an amount equal to the Net Capital Depreciation allocated to such Limited Partner's Capital Account shall be charged to and increase such Limited Partner's Loss Recovery Account; or (ii) if there is Net Capital Appreciation for such Accounting Period, an amount equal to the Net Capital Appreciation before any Incentive Allocation to the General Partner, allocated to such Limited Partner's Capital account shall be credited to and reduce any unrecovered balance in such Limited Partner's Loss Recovery Account, but not below zero.

In the event that a Limited Partner with an unrecovered balance in his or its Loss Recovery Account withdraws all or a portion of his or its capital in the Partnership, the unrecovered balance in such Limited Partner's Loss Recovery Account shall be reduced as of the beginning of the next Accounting Period by an amount equal to the product obtained by multiplying the balance in such Limited Partner's Loss Recovery Account by a fraction, the numerator of which is the amount of the withdrawal made by such Limited Partner as of the last day of the prior Accounting Period and the denominator of which is the balance in such Limited Partner's Capital Account on the last day of the prior Accounting Period (prior to the withdrawal made by the Limited Partner as of the last day of the Accounting Period).  Additional capital contributions shall not affect any Limited Partner's Loss Recovery Account.

Sec. 3.07. <u>Valuation of Assets</u>.

(a) Securities which are listed on a national securities exchange shall be valued at their last sales prices on the date of determination on the largest national securities exchange on which such securities shall have traded on such date, or if trading in such Securities on the largest national securities exchange on which such Securities shall have traded on such date was reported on the consolidated tape, their last sales prices on the consolidated tape (or, in the event that the date of determination is not a date upon which a national securities exchange was open for trading, on the last prior date on which such securities was open not more than 10 days prior to the date of determination).  If no such sales of Securities occurred on either of the foregoing dates, such Securities shall be valued at the "bid" price for long positions and "asked" price for short positions on the largest national securities exchange on which such securities are traded, on the date of determination, or, if "bid" prices for long positions

303006.1

and "asked" prices for short positions in such Securities on the largest national securities exchange on which such Securities shall have traded on such date were reported on the consolidated tape, the "bid" price for long positions and "asked" price for short positions on the consolidated tape (or, if the date of determination is not a date upon which such securities exchange was open for trading, on the last prior date on which such a national securities exchange was so open not more than 10 days prior to the date of determination). Securities which are not listed shall be valued at representative "bid" quotations if held long by the Partnership and representative "asked" quotations if held short by the Partnership, unless included in the NASDAQ National Market System, in which case they shall be valued based upon their last sales prices (if such prices are available). Securities for which no such market prices are available shall be valued at such value as the General Partner may reasonably determine.

(b)     All other assets of the Partnership including any investments in Securities not capable of valuation pursuant to subparagraph (a) of this Sec. 3.07 (except good will, which shall not be taken into account), shall be assigned such value as the General Partner may reasonably determine.

(c)     If the General Partner determines that the valuation of any Securities or other property pursuant to Sec. 3.07 (a) does not fairly represent market value, the General Partner shall value such Securities or other property as they reasonably determine and shall set forth the basis of such valuation in writing in the Partnership's records.

(d)     All values assigned to Securities and other assets by the General Partner pursuant to this Article III shall be final and conclusive as to all of the Partners.

Sec. 3.08. Liabilities. Liabilities shall be determined in accordance with generally accepted accounting principles, applied on a consistent basis, provided, however, that the General Partner in its discretion may provide reserves for contingencies.

Sec. 3.09. Allocation for Tax Purposes. For each fiscal year, items of income, deduction, gain, loss or credit shall be allocated for income tax purposes among the Partners in such manner as to reflect equitably amounts credited or debited to each Partner's Capital Account pursuant to Sec. 3.05 for the current and prior fiscal years. Such allocations shall be made pursuant to the principles of Section 704(c) of the Internal Revenue Code of 1986, as amended (the "Code"), and in conformity with Regulations Secs. 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(4)(i) promulgated thereunder, or the successor provisions to such Section and Regulations. Notwithstanding anything to the contrary in this Agreement, there shall be allocated to the Partners such gain or income as shall be necessary to satisfy the "qualified income offset" requirements of Regulation Sec. 1.704-1(b)(2)(ii)(d).

Sec. 3.10. <u>Determination by General Partner of Certain Matters</u>. All matters concerning the valuation of Securities and other assets of the Partnership, the allocation of profits, gains and losses among the Partners including taxes thereon, and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner, whose determination shall be final and conclusive as to all of the Partners.

Sec. 3.11. <u>Adjustments to Take Account of Interim Accounting Period Events</u>. If a Partner shall make additional capital contributions to the Partnership, withdraw from the Partnership or make a withdrawal from his or its Capital Account as of a date other than the last day of an Accounting Period, the General Partner shall make such adjustments in the determination and allocation among the Partners of Net Capital Appreciation, Net Capital Depreciation, Capital Accounts, Partnership Percentages, items of income, deduction, gain, loss or credit for tax purposes and accounting procedures as shall equitably take into account such interim Accounting Period event and applicable provisions of law, and the determination thereof by the General Partner shall be final and conclusive as of all of the Partners.

ARTICLE IV

WITHDRAWALS AND DISTRIBUTIONS
OF CAPITAL

Sec. 4.01. <u>Withdrawals and Distributions in General</u>. No Partner shall be entitled (i) to receive distributions from the Partnership, except as provided in Sec. 7.02; or (ii) to withdraw any amount from his or its Capital Account other than upon his or its withdrawal from the Partnership, except as provided in Sec. 4.02.

Sec. 4.02. Withdrawals.

(a)     Subject to Secs. 4.02(b) and 4.03, at the end of each calendar month, a Partner will have the right, upon fifteen (15) calendar days' prior written notice to the General Partner and the Partnership's administrator, if any, to withdraw all or any portion of his or its Capital Account. The Capital Account of a withdrawing Limited Partner shall be determined as of the effective date of his or its withdrawal, including deductions for accrued expenses, accrued Management Fee and any accrued Incentive Allocation. Payment of any amount withdrawn at the end of any accounting period pursuant to this Sec. 4.02 shall be made within 20 business days after the end of the calendar month in which such withdrawal is made.

(b)     With respect to the Capital Account of any foreign Partner, and notwithstanding any provision of this Agreement to the contrary, the General Partner shall withhold and pay over to the Internal Revenue Service, pursuant to Section 1441 of the Code, or any successor provision, at such times as required by such Section, such amounts as the Partnership

12

is required to withhold under such Section 1441, as from time to time in effect, on account of such foreign Partner's distributive share of the Partnership's items of gross income which are subject to withholding tax pursuant to such Section. To the extent that a foreign claims to be entitled to a reduced rate of, or exemption from, U.S. withholding tax pursuant to an applicable income tax treaty, or otherwise, the foreign Partner shall furnish the General Partner with such information and forms as it may require and are necessary to comply with the regulations governing the obligations of withholding tax agents. Each foreign Partner represents and warrants that any such information and forms furnished by it shall be true and accurate and agrees to indemnify the Partnership and each of the Partners from any and all damages, costs and expenses resulting from the filing of inaccurate or incomplete information or forms relating to such withholding taxes.

Any amount of withholding taxes withheld and paid over by the General Partner with respect to a foreign Partner's distributive share of the Partnership's gross income shall be treated as a distribution to such foreign Partner and shall be charged against the Capital Account of such foreign Partner.

Sec. 4.03. Limitation on Withdrawals. The right of any Partner to withdraw any amount from his or its Capital Account pursuant to the provisions of Sec. 4.02 is subject to the provision by the General Partner for (i) Partnership liabilities in accordance with generally accepted accounting principles, and (ii) reserves for contingencies, all in accordance with Sec. 3.08. The unused portion of any reserve shall be distributed, with interest at the prevailing savings bank rate for unrestricted deposits from time to time in effect in New York, New York, as determined by the General Partner, after the General Partner has determined that the need therefor shall have ceased.

Sec. 4.04. Salaries or Other Payments or Allocations to the General Partner. Except for the Incentive Allocation, the Management Fee, and the Expense Reimbursement, the Partnership shall not make any payments or allocations to the General Partner other than the allocation of Net Capital Appreciation (if any) to the General Partner in respect of its Partnership Percentage pursuant to Sec. 3.05(a), and reimbursement for certain allocable expenses.

ARTICLE V

ADMISSION OF NEW PARTNERS

Sec. 5.01. New Partners. Partners may, with the consent of the General Partner, be admitted to the Partnership as of the beginning of each calendar month or at such other times as permitted by the General Partner in its sole discretion. Each new partner will be required to execute an agreement pursuant to which he or it becomes bound by the terms of this Agreement. Admission of a new Partner shall not be cause for dissolution of the Partnership.

13

# ARTICLE VI

## WITHDRAWAL, DEATH OR INSANITY OF PARTNERS

Sec. 6.01. Withdrawal, Death, etc. of a General Partner. A General Partner may, upon 15 calendar days' prior written notice to the Partnership and the Partnership's administrator, if any, withdraw from the Partnership at the end of any calendar month with the consent of each of the other General Partners, if any. Upon the withdrawal, death, disability, adjudication of incompetency, bankruptcy or insolvency of any General Partner, the Partnership shall dissolve unless there are one or more remaining General Partners who agree to continue the Partnership. In the event that the remaining General Partners determine not to continue the Partnership, the remaining General Partners, or if there is no remaining General Partner, one or more persons selected by a majority in interest of the Limited Partners, shall terminate and wind up the affairs of the Partnership in accordance with Sec. 7.02.

In the event of the death, disability, adjudication of incompetency, bankruptcy or insolvency of a General Partner or the giving of notice of withdrawal by a General Partner, the interest of such General Partner shall continue at the risk of the Partnership business until (i) the last day of the fiscal year in which such event takes place (or such earlier date as shall be determined by the General Partners) (herein called the "determination date") or, (ii) the earlier termination of the Partnership. If the Partnership is continued after the expiration of the determination date, such General Partner or his legal representatives shall be entitled to receive within 90 days of the determination date, in accordance with Sec. 6.02, the Capital Account of such General Partner as of the effective date of such General Partner's withdrawal as determined pursuant to Sec. 6.04 hereof. The General Partners may withhold from such balance an amount equal to the legal, accounting and administrative costs associated with the General Partner's withdrawal, if it determines that such costs should not be borne by the Partnership. A General Partner who serves notice of withdrawal, dies, or becomes disabled, incompetent, bankrupt, or insolvent or a General Partner's legal representative who serves such notice, shall have no right to take part in the management of the business of the Partnership and the interest or Partnership Percentage of such General Partner shall not be included in calculating the interests of the Partners or General Partners, respectively, required to take action under any provision of this Agreement.

If a General Partner shall become disabled, and such disability shall continue for a period of six consecutive months, the General Partners (or if the disabled General Partner is the sole remaining General Partner, one or more persons selected by a majority in interest of the Limited Partners) may require such General Partner to withdraw from the Partnership as of the last day of the fiscal year in which the six month period shall expire in which case the Partnership shall be terminated and its affairs wound up in accordance with Sec. 7.02. A General Partner required to withdraw pursuant to this paragraph of Sec. 6.01 shall be treated for all purposes and in all respects as a General Partner who withdraws involuntarily due to death or insanity.

14

A General Partner shall be deemed to be "disabled" if, by reason of physical or mental disease, illness or injury, he is rendered unable to perform, or to supervise the performance of, his functions as a General Partner hereunder for a period of not less than 45 consecutive days.

Sec. 6.02. Withdrawal, Death, etc. of Limited Partner. A Limited Partner may, upon fifteen (15) calendar days' prior notice, withdraw from the Partnership at the end of any calendar month of the Partnership. The withdrawal, death, disability, incompetency, bankruptcy, insolvency, termination or dissolution of a Limited Partner shall not dissolve the Partnership.

In the event of the death, disability, incompetency, bankruptcy, insolvency, termination or dissolution of a Limited Partner or the giving of notice of withdrawal by a Limited Partner, the interest of such Limited Partner shall continue at the risk of the Partnership business until (i) the last day of the calendar month in which such event takes place (or such earlier date as shall be determined by the General Partner) (herein called the "month of determination") or (ii) the earlier termination of the Partnership. If the Partnership is continued after the expiration of the month of determination, such Limited Partner or his legal representatives shall be entitled to receive within 90 days of the end of such calendar month (or earlier withdrawal date), the amount of the Capital Account of such Limited Partner as of the effective date of withdrawal as determined under Sec. 6.04. The interest of a Limited Partner who serves notice of withdrawal, dies or becomes disabled, incompetent, bankrupt, insolvent or is terminated or dissolved, or a Limited Partner's legal representative who serves such notice shall have no right to be included in calculating the Partnership Percentages of the Limited Partners required to take any action under this Agreement.

A Limited Partner who withdraws from the Partnership shall be paid at least 97% of his estimated Capital Account within 20 business days after the last day of the month of determination. The balance of such Limited Partner's Capital Account shall be paid (subject to audit adjustments and with interest) within 30 days after completion of the audit of the Partnership's books for the fiscal year of the quarter of determination pursuant to Sec. 8.01. The interest of a Limited Partner withdrawing pursuant to this paragraph shall not be included in calculating Partnership Percentages of the Limited partners required to take any action under this Agreement.

Sec. 6.03. Required Withdrawals. The General Partner may (i) terminate the interest of any Limited Partner in the Partnership at the end of any calendar month, upon at least 10 days' prior written notice and (ii) terminate the interest of any Limited Partner at any time upon at least five days' prior written notice, if, among other reasons, the General Partner determines that the continued participation of such Limited Partner in the Partnership might cause the Partnership or any Partner to violate any law, or if any litigation is commenced or threatened against the Partnership or any Partner arising out of, or relating to, the participation of such Limited Partner in the Partnership. A notice of termination pursuant to this Sec. 6.03 shall have the same effect as a notice of withdrawal by such Limited Partner pursuant to Sec. 6.02 and

303006.1

the Limited Partner receiving such notice shall be treated for all purposes and in all respects as a Limited Partner who has given notice of withdrawal.

Sec. 6.04. <u>Effective Date of Withdrawal</u>. The Capital Account of a withdrawing Limited Partner shall be determined as of the effective date of his or its withdrawal, including deductions for accrued expenses (including the Expense Reimbursement), accrued Management Fee and any accrued Incentive Allocation. For purposes of this Sec. 6.04, the effective date of a Limited Partner's withdrawal shall mean (as the case may be): (i) the last day of the calendar month in which such Partner shall cease to be a Partner pursuant to Sec. 6.02 or clause (i) of Sec. 6.03; or (ii) the date specified in the written notice referred to in clause (ii) of Sec. 6.03 if such Partner shall be required to withdraw from the Partnership pursuant to such clause. In the event the effective date of a Limited Partner's withdrawal shall be a date other than the last day of a calendar month of the Partnership, the effective date of such Limited Partner's withdrawal shall be deemed to be the last day of a calendar month for purposes of adjusting the Capital Account of the withdrawing Limited Partner pursuant to Sec. 3.05.

Sec. 6.05. <u>Limitations on Withdrawal of Capital Account</u>. The right of any withdrawn, deceased, disabled, incompetent, bankrupt, insolvent, terminated or dissolved partner or his legal representative to have distributed the Capital Account of such Partner pursuant to this Article VI is subject to the provision by the General Partner for all Partnership liabilities and for reserves for contingencies. The unused portion of any reserve shall be distributed, with interest at the prevailing savings bank rate for unrestricted deposits from time to time in effect in New York City, as determined by the General Partner, after the General Partner shall have determined that the need therefor shall have ceased.

## ARTICLE VII

## DURATION AND TERMINATION OF PARTNERSHIP

Sec. 7.01. <u>Duration</u>. The Partnership shall continue until December 31, 2112, unless sooner terminated pursuant to Sec. 6.01 or at any time, by decision of the General Partner.

Sec. 7.02. <u>Termination</u>. On termination of the business of the Partnership, the General Partner, or in the event of a termination pursuant to Sec. 6.01, the persons representing the Limited Partners shall, promptly after completion of a final audit of the Partnership's books and records (which shall be performed within 90 days of such termination) make distributions out of the Partnership assets, in the following manner and order:

    (a)    to payment and discharge of the claims of all creditors of the Partnership who are not Partners;

    (b)    to payment and discharge pro rata of the claims of all creditors of the Partnership who are Partners; and

(c)    to the Partners in the relative proportions that their respective Liquidating Shares bear to each other.

In the event that the Partnership is terminated on a date other than the last day of a fiscal year, the date of such termination shall be deemed to be the last day of an Accounting Period for purposes of adjusting the Capital Accounts of the Partners pursuant to Sec. 3.05. For purposes of distributing the assets of the Partnership upon termination, the General Partner shall be entitled to a return, on a pari passu basis with the Limited Partners, of the amounts standing to their credit in their respective Capital Accounts, and, with respect to their share of profits, based upon their Partnership Percentages.

Sec. 7.03. <u>Method of Distribution</u>. Distributions made pursuant to subparagraphs (a) and (b) of Sec. 7.02 shall be made solely in cash.

## ARTICLE VIII

## REPORTS TO PARTNERS

Sec. 8.01. <u>Independent Auditors</u>. The Partnership shall maintain true and complete books of account and records which shall be audited as of the end of each fiscal year by independent certified public accountants selected by the General Partner.

Sec. 8.02. <u>Filing of Tax Returns</u>. The General Partner shall prepare and file, or cause the accountants of the Partnership to prepare and file, a federal information tax return in compliance with Section 6031 of the Code and any required state and local income tax and information returns for each tax year of the Partnership.

Sec. 8.03. <u>Reports to Partners</u>. Within 90 days after the end of each fiscal year, the Partnership shall prepare, or cause to be prepared, and mail to each Partner, together with the report thereon of the independent certified public accountants selected by the General Partner, a financial report setting forth as of the end of each fiscal year:

(a)    a profit and loss statement showing the results of operations of the Partnership together with the Net Capital Appreciation or Net Capital Depreciation of the Partnership;

(b)    such Partner's Capital Account and the manner of its calculation; and

(c)    such Partner's Partnership Percentage as of the end of such fiscal year.

Within 30 days following the end of each of the first Accounting Periods in each fiscal year, or at more frequent intervals as determined in the sole and exclusive discretion of the General Partner, the Partnership shall prepare and mail to each Partner a report setting forth, as of the end of such Accounting Period, the information described in sub-paragraphs (a) and (b) above for such Accounting Period.

17

Sec. 8.04. <u>Reports to Partners and Former Partners</u>. In addition, the independent certified public accountants selected by the General Partner shall prepare and mail (i) to each Partner and (ii) to each former Partner (or his legal representatives) to the extent necessary a report setting forth in sufficient detail such transactions effected by the Partnership during such fiscal year as shall enable such Partner or former Partner (or his legal representatives) to prepare their respective federal income tax returns in accordance with the laws, rule and regulations then prevailing. The Partners (and each employee, representative or other agent of a Partner) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of Partnership transactions and all materials of any kind (including opinions and tax analyses) that are provided to any such Partner relating to such tax treatment and tax structure.

Sec. 8.05. <u>Tax Matters Partner</u>. The General Partner shall at all times constitute, and have full powers and responsibilities as, the Tax Matters Partner of the Partnership with respect to such return for purposes of Section 6231(a)(7) of the Code. Each person (herein called a "Pass-Thru Partner") that holds or controls an interest as a Limited Partner on behalf of, or for the benefit of another person or persons, or which Pass-Thru Partner is beneficially owned (directly or indirectly) by another person or persons shall, within 30 days following receipt from the Tax Matters Partner of any notice, demand, request for information or similar document, convey such notice or other document in writing to all holders of beneficial interests in the partnership holding such interests through such Pass-Thru Partner. In the event the Partnership shall be the subject of an income tax audit by any federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership.

## ARTICLE IX

## MISCELLANEOUS

Sec. 9.01. <u>General</u>. This Agreement: (i) shall be binding on the executors, administrators, estates, heirs, and legal successors and representatives of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the State of Delaware; and (iii) may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written, provided, however, that each separate counterpart shall have been executed by at least one of the General Partners, if there is more than one General Partner, and that the several counterparts, in the aggregate, shall have been signed by all the Partners. Except as otherwise provided herein, whenever any action is to be taken by the General Partners, it shall be authorized by a majority of the General Partners.

303006.1

Sec. 9.02. Power of Attorney.  Each of the undersigned does hereby constitute and appoint the General Partner, acting individually, as his true and lawful representative and attorney-in-fact, in his name, place and stead to make, execute, sign and file:

(a)    a Certificate of Limited Partnership of the Partnership and all amendments thereto as may be required under the Act or otherwise including, without limitation, any such filing for the purpose of admitting the undersigned and others as Limited Partners and describing their initial or any increased Capital Contributions;

(b)    all amendments or modifications to the Partnership Agreement to the extent provided in the last paragraph of this Sec. 9.02;

(c)    any and all instruments, certificates, and other documents which may be deemed necessary or desirable to effect the winding-up and termination of the Partnership (including, but not limited to, a Certificate of Cancellation of the Certificate of Limited Partnership); and

(d)    any business certificate, fictitious name certificate, amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Partnership, or required by any applicable federal, state or local law.

The power of attorney hereby granted by each of the Partners is coupled with an interest, is irrevocable, and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of such Limited Partner.

Such representative and attorney-in-fact shall not have any right, power or authority to amend or modify this Agreement when acting in such capacity, except in the case of an amendment or modification permitted without the approval of the Partners pursuant to Sec. 9.03 or approved by the requisite Partnership Percentages of the Partners.

Sec. 9.03. Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the written consent of Partners having in excess of 50% of the Partnership Percentages of the Partners and the written consent of the General Partner insofar as is consistent with the laws governing this Agreement, provided, however, that, without the specific consent of each Partner affected thereby, no such modification or amendment shall (i) reduce the Capital of any Partner or his rights of contribution or withdrawal with respect thereto; (ii) amend Sec. 3.05; or (iii) amend this Sec. 9.03, and provided, further, that without the consent of the Partners the General Partner may (i) amend the Agreement or Schedule hereto to reflect changes validly made in the membership of the Partnership and the Capital Contributions and Partnership Percentages of the partners; (ii) reflect a change in the name of the Partnership or the effective date of the Partnership; (iii) make a change that is necessary or, in the opinion of the General Partner, qualify the Partnership as a

19

limited partnership or a partnership in which the Limited Partners have limited liability under the laws of any state, or ensure that the Partnership will not be treated as an association taxable as a corporation for federal income tax purposes; (iv) make a change that does not adversely affect the Partners in any material respect, or that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with any other provisions of this Agreement, in each case so long as such change does not adversely affect the Partners; (v) make a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state statute, so long as such change is made in a manner which minimizes any adverse effect on the Partners, or that is required or contemplated by this Agreement; (vi) make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the General Partner or the Partnership pursuant to the requirements of applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required; or (vii) make any other amendments similar to the foregoing.

Sec. 9.04. Adjustment of Basis of Partnership Property. In the event of a distribution of Partnership property to a Partner or an assignment or other transfer (including by reason of death) of all or part of the interest of a Limited Partner in the Partnership, the General Partner, in their discretion, may cause the Partnership to elect, pursuant to Section 754 of the Code, or the corresponding provision of subsequent law, to adjust the basis of the Partnership property as provided by Sections 734 and 743 of the Code.

Sec. 9.05. Choice of Law. Notwithstanding the place where the Agreement may be executed by any of the parties thereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of Delaware and, without limitation thereof, that the Act as now adopted or as may be hereafter mended shall govern the partnership aspects of this Agreement.

Sec. 9.06. Inspection of Books and Records. The Partnership's books of account and records shall be available for inspection by any Partner during reasonable business hours at the office of the Partnership.

Sec. 9.07. Notices. Each notice relating to this Agreement shall be in writing and delivered in person or by registered or certified mail. All notices to the Partnership shall be addressed to its principal office and place of business. All notices addressed to a Partner shall be addressed to such Partner at the address set forth in the Schedule. Any Partner may designate a new address by notice to that effect given to the Partnership. Unless otherwise specifically provided in this Agreement, a notice shall be deemed to have been effectively given when mailed by registered or certified mail to the proper address or delivered in person.

Sec. 9.08. Goodwill. No value shall be placed on the name or goodwill of the Partnership, which shall belong exclusively to the General Partner.

303006.1

Sec. 9.09. <u>Headings</u>. The titles of the Articles and the headings of the Sections of this Agreement are for convenience of reference only and are not to be considered in construing terms and provisions of this Agreement.

IN WITNESS WHEREOF, the undersigned have hereto set their hands and seals as of the day and year first above written.

GENERAL PARTNER:                    LIMITED PARTNERS:
FAIRFIELD GREENWICH (BERMUDA)
LTD.
     A Bermuda Corporation

By:_____     _____
    Director                      Fairfield Greenwich (Bermuda) Ltd., by Amit
                                 Vijayvergiya, Vice President,
                                 Attorney-in-Fact, pursuant to Power of
                                 Attorney in Sec. 9.02 of the Amended and
                                 Restated Limited Partnership Agreement

303006.1

GREENWICH SENTRY, L.P.

## SCHEDULE OF CAPITAL CONTRIBUTIONS

303006.1

| OMB APPROVAL | |
|---|---|
| OMB Number | 3235-0049 |
| Expires: | July 31 2008 |
| Estimated average burden hours per response: | 9.402 |

| Name of Investment Adviser: | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fairfield Greenwich (Bermuda) Ltd. | | | | | | | |
| Address: | (Number and Street) | (City) | (State) | (Zip Code) | | Area Code: | Telephone Number: |
| Armoury Bldg. 37 Reid St., Fl 1, Hamilton, Bermuda HM12 | | | | | | (441) 292-5401 | |

**This part of Form ADV gives information about the investment adviser and its business for the use of clients. The information has not been approved or verified by any governmental authority.**

## Table of Contents

| Item Number | Item | Page |
|---|---|---|
| 1 | Advisory Services and Fees | 2 |
| 2 | Types of Clients | 2 |
| 3. | Types of Investments | 3 |
| 4. | Methods of Analysis, Sources of Information and Investment Strategies | 3 |
| 5. | Education and Business Standards | 4 |
| 6. | Education and Business Background | 4 |
| 7. | Other Business Activities | 4 |
| 8. | Other Financial Industry Activities of Affiliations | 4 |
| 9. | Participation or Interest in Client Transactions | 5 |
| 10. | Conditions for Managing Accounts | 5 |
| 11. | Review of Accounts | 5 |
| 12. | Investment or Brokerage Discretion | 6 |
| 13. | Additional Compensation | 6 |
| 14. | Balance Sheet | 6 |
| | Continuation Sheet | Schedule F |
| | Balance Sheet, if required | Schedule G |

(Schedules A, B, C, D and E are included with Part I of this Form, for the use of regulatory bodies, and are not distributed to clients.)

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**1. A. Advisory Services and Fees.** (check the applicable boxes)

Applicant:

For each type of service provided, state the approximate % of total advisory billings from that service. (See instruction below.)

☒ (1) Provides investment supervisory services ........................................................................ **100** %

☐ (2) Manages investment advisory accounts not involving investment supervisory services ............ ____ %

☐ (3) Furnishes investment advice through consultations not included in either service described above ....... ____ %

☐ (4) Issues periodicals about securities by subscription ............................................................. ____ %

☐ (5) Issues special reports about securities not included in any service described above ............... ____ %

☐ (6) Issues, not as part of any service described above, any charts, graphs, formulas, or other devices which clients may use to evaluate securities ........................................................................................................ ____ %

☐ (7) On more than an occasional basis, furnishes advice to clients on matters not involving securities ....... ____ %

☐ (8) Provides a timing service .................................................................................................. ____ %

☐ (9) Furnishes advice about securities in any manner not described above ................................... ____ %

(Percentages should be based on applicant's last fiscal year. If applicant has not completed its first fiscal year, provide estimates of advisory billings for that year and state that the percentages are estimates.)

|  |  | Yes | No |
| --- | --- | --- | --- |
| B. | Does applicant call any of the services it checked above financial planning or some similar term? | ☐ | ☒ |

**C.** Applicant offers investment advisory services for: (check all that apply)

☒ (1) A percentage of assets under management      ☐ (4) Subscription fees

☐ (2) Hourly charges      ☐ (5) Commissions

☒ (3) Fixed fees (not including subscription fees)      ☒ (6) Other

**D.** For each checked box in A above, describe on Schedule F:

- the services provided, including the name of any publication or report issued by the adviser on a subscription basis or for a fee

- applicant's basic fee schedule, how fees are charged and whether its fees are negotiable

- when compensation is payable, and if compensation is payable before service is provided, how a client may get a refund or may terminate an investment advisory contract before its expiration date

**2. Types of Clients.** Applicant generally provides investment advice to: (check those that apply)

☐ A. Individuals      ☐ E. Trusts, estates, or charitable organizations

☐ B. Banks or thrift institutions      ☐ F. Corporations or business entities other than those listed above

☐ C. Investment companies      ☒ G. Other (Describe on Schedule F)

☐ D. Pension and profit sharing plans

**FORM ADV**
**Part II – Page 3**

| Applicant: | SEC File Number: | Date: |
|---|---|---|
| Fairfield Greenwich (Bermuda) Ltd. | 801-139882 | March 21, 2007 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**3.** **Types of Investments.** Applicant offers advice on the following: (check those that apply) –

A. Equity securities
- ☒ (1) exchange-listed securities
- ☒ (2) securities traded over-the-counter
- ☒ (3) foreign issuers

☒ B. Warrants

☒ C. Corporate debt securities
(other than commercial paper)

☒ D. Commercial paper

☒ E. Certificates of deposit

☐ F. Municipal securities

G. Investment company securities:
- ☐ (1) variable life insurance
- ☐ (2) variable annuities
- ☒ (3) mutual fund shares

☒ H. United States government securities

I. Options contracts on:
- ☒ (1) securities
- ☒ (2) commodities

J. Futures contracts on:
- ☒ (1) tangibles
- ☒ (2) intangibles

K. Interests in partnerships investing in:
- ☐ (1) real estate
- ☐ (2) oil and gas interests
- ☐ (3) other (explain on Schedule F)

☒ L. Other (explain on Schedule F)

**4.** **Methods of Analysis, Sources of Information, and Investment Strategies.**

A. Applicant's security analysis methods include: (check those that apply)
- (1) ☐ Charting
- (2) ☐ Fundamental
- (3) ☐ Technical
- (4) ☐ Cyclical
- (5) ☒ Other (explain on Schedule F)

B. The main sources of information applicant uses include: (check those that apply)
- (1) ☐ Financial newspaper and magazines
- (2) ☐ Inspections of corporate activities
- (3) ☐ Research materials prepared by others
- (4) ☐ Corporate rating services
- (5) ☐ Timing services
- (6) ☐ Annual reports, prospectuses, filings with the Securities and Exchange Commission
- (7) ☐ Company press releases
- (8) ☒ Other (explain on Schedule F)

C. The investment strategies used to implement any investment advice given to clients include: (check those that apply)
- (1) ☐ Long term purchases (securities held at least a year)
- (2) ☐ Short term purchases (securities sold within a year)
- (3) ☐ Trading (securities sold within 30 days)
- (4) ☐ Short sales
- (5) ☐ Margin transactions
- (6) ☐ Option writing, including covered options, uncovered options or spreading strategies
- (7) ☒ Other (explain on Schedule F)

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**5. Education and Business Standards.**

Are there any general standards of education or business experience that applicant requires of those involved in determining or giving investment advice to clients?................................................................................................................. Yes ☒ No ☐

*(If yes, describe these standards on Schedule F.)*

---

**6. Education and Business Background.**

For:
- each member of the investment committee or group that determines general investment advice to be given to clients, or
- if the applicant has no investment committee or group, each individual who determines general investment advice given to clients (if more than five, respond only for their supervisors)
- each principal executive officer of applicant or each person with similar status or performing similar functions.

On Schedule F, give the:
- name
- year of birth
- formal education after high school
- business background for the preceding five years

---

**7. Other Business Activities.** (Check those that apply)

☐ A. Applicant is actively engaged in a business other than giving investment advice.

☒ B. Applicant sells products or services other than investment advice to clients.

☐ C. The principal business of applicant or its principal executive officers involves something other than providing investment advice.

*(For each checked box describe the other activities, including the time spent on them, on Schedule F.)*

---

**8. Other Financial Industry Activities or Affiliations.** (check those that apply)

☐ A. Applicant is registered (or has an application pending) as a securities broker/dealer.

☐ B. Applicant is registered (or has an application pending) as a futures commission merchant, commodity pool operator or commodity trading adviser.

C. Applicant has arrangements that are material to its advisory business or its clients with a related person who is a:

| | | | | |
|---|---|---|---|---|
| ☒ | (1) broker-dealer | | ☐ | (7) accounting firm |
| ☐ | (2) investment company | | ☐ | (8) law firm |
| ☒ | (3) other investment adviser | | ☐ | (9) insurance company or agency |
| ☐ | (4) financial planning firm | | ☐ | (10) pension consultant |
| ☒ | (5) commodity pool operator, commodity trading adviser or futures commission merchant | | ☐ | (11) real estate broker or dealer |
| ☐ | (6) banking or thrift institution | | ☐ | (12) entity that creates or packages limited partnerships |

*(For each checked box in C, on Schedule F identify the related person and describe the relationship and the arrangements.)*

D. Is applicant or a related person a general partner in any partnership in which clients are solicited to invest?    Yes ☒ No ☐

*(If yes, describe on Schedule F the partnerships and what they invest in)*

---

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

9. **Participation or Interest in Client Transactions.**

Applicant or a related person: (check those that apply)

☐ A. As principal, buys securities for itself from or sells securities it owns to any client.

☐ B. As broker or agent effects securities transactions for compensation for any client.

☐ C. As broker or agent for any person other than a client effects transactions in which client securities are sold to or bought from a brokerage customer.

☒ D. Recommends to clients that they buy or sell securities or investment products in which the applicant or a related person has some financial interest.

☒ E. Buys or sells for itself securities that it also recommends to clients.

(For each box checked, describe on Schedule F when the applicant or a related person engages in these transactions and what restrictions, internal procedures, or disclosures are used for conflicts of interest in those transactions.)

Describe, on Schedule F, your code of ethics, and state that you will provide a copy of your code of ethics to any client or prospective client upon request.

10. **Conditions for Managing Accounts.** Does the applicant provide investment supervisory services, manage investment advisory accounts or hold itself out as providing financial planning or some similarly termed services *and* impose a minimum dollar value of assets or other conditions for starting or maintaining an account?

Yes ☒  No ☐

(If yes, describe on Schedule F.)

11. **Review of Accounts.** If applicant provides investment supervisory services, manages investment advisory accounts, or holds itself out as providing financial planning or some similarly termed services:

A. Describe below the reviews and reviewers of the accounts. For reviews, include their frequency, different levels, and triggering factors. For reviewers, include the number of reviewers, their titles and functions, instructions they receive from applicant on performing reviews, and number of accounts assigned each.

**See Schedule F.**

B. Describe below the nature and frequency of regular reports to clients on their accounts.

**See Schedule F.**

| FORM ADV<br>Part II – Page 6 | Applicant:<br><br>**Fairfield Greenwich (Bermuda) Ltd.** | SEC File Number:<br><br>**801-139882** | Date:<br><br>**March 21, 2007** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

**12.** **Investment or Brokerage Discretion.**

   **A.** Does applicant or any related person have authority to determine, without obtaining specific client consent, the:

      (1) securities to be bought or sold?.............................................................................................. Yes ☒ No ☐

      (2) amount of the securities to be bought or sold?....................................................................... Yes ☒ No ☐

      (3) broker or dealer to be used?.................................................................................................. Yes ☒ No ☐

      (4) commission rates paid?.......................................................................................................... Yes ☒ No ☐

   **B.** Does applicant or a related person suggest brokers to clients?......................................................... Yes ☒ No ☐

     For each yes answer to A describe on Schedule F any limitations on the authority. For each yes to A(3), A(4) or B, describe on Schedule F the factors considered in selecting brokers and determining the reasonableness of their commissions. If the value of products, research and services given to the applicant or a related person is a factor, describe:

      • the products, research and services

      • whether clients may pay commissions higher than those obtainable from other brokers in return for those products and services

      • whether research is used to service all of applicant's accounts or just those accounts paying for it; and

      • any procedures the applicant used during the last fiscal year to direct client transactions to a particular broker in return for products and research services received.

**13.** **Additional Compensation.**

Does the applicant or a related person have any arrangements, oral or in writing, where it:

   **A.** is paid cash by or receives some economic benefit (including commissions, equipment or non-research services)<br>
     from a non-client in connection with giving advice to clients?................................................... Yes ☒ No ☐

   **B.** directly or indirectly compensates any person for client referrals?........................................... Yes ☒ No ☐

                   (For each yes, describe the arrangements on Schedule F.)

**14.** **Balance Sheet.** Applicant must provide a balance sheet for the most recent fiscal year on Schedule G if applicant:

      • has custody of client funds or securities (unless applicant is registered or registering only with the Securities and Exchange Commission); or

      • requires prepayment of more than $500 in fees per client and 6 or more months in advance

     Has applicant provided a Schedule G balance sheet?................................................................. Yes ☐ No ☒

| Schedule F of FORM ADV<br>Continuation Sheet for Form<br>ADV Part II | Applicant:<br>Fairfield Greenwich (Bermuda) Ltd. | SEC File Number:<br>801-139882 | Date:<br>March 21, 2007 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | Fairfield Greenwich (Bermuda) Ltd. | |

| Item of Form (identify) | Answer |
|---|---|
| **Items 1.D. and 2.G.** | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or "Applicant"), an exempted company incorporated under the laws of Bermuda on June 13, 2003, provides managerial and/or administrative services to three (3) private investment funds established in the British Virgin Islands (the "Offshore Funds"), and serves as the general partner to two (2) private investment funds established in the U.S., (the "Onshore Funds"), (collectively, the "FGBL Funds").<br><br>FGBL is a wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL", collectively with other affiliates listed in Schedule F, Item 8, Fairfield Greenwich Group, or "FGG"), an exempted company incorporated in the Cayman Islands on October 24, 2001. FGL serves as placement agent for the Offshore Funds and generally is paid by the applicable Offshore Fund (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) a performance fee of 20% of the net annual profits subject to adjustment for unrecouped losses.<br><br>Another wholly-owned subsidiary of FGL, Fairfield Heathcliff Capital LLC ("FHC"), a limited liability company incorporated in the state of Delaware, and an affiliate of FGBL, serves as placement agent for the Onshore Funds. FGBL does not provide tailored investment advice to individual investors for a fee.<br><br>Similar to the Offshore Funds, FGBL generally is paid by the Onshore Funds (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) an incentive allocation of 20% of net annual profits, subject to adjustment for unrecouped losses. Some or all of such fees can be waived at the discretion of the general partner.<br><br>Investors in the FGBL Funds generally have the right to redeem all or a portion of their investment in an FGBL Fund at the end of any month, subject to applicable advance notice requirements. If an investor redeems or withdraws from an FGBL Fund, the investor will be entitled to any unearned, prepaid portion of the management fee. To the extent required under the Investment Advisers Act, performance-based compensation payable to FGBL, or any of its affiliates, will be in compliance with Rule 205-3 under such Act. |
| **Item 3.L.** | The establishment of a typical position in the FGBL Funds entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities (i.e., the "Split-Strike Conversion strategy"). The Offshore Funds also utilize a small portion of their assets (up to 5%) away from the Split Strike Conversion strategy to seed a small number of hedge fund management groups with varying and diverse types of investments. |
| **Items 4.A.(5) and 4.B.(8)** | FGG's Risk Management team conducts both the pre- and post-investment quantitative analyses of hedge fund managers, monitors the market risk and investment compliance of these managers, and provides the quantitative analyses supporting the asset allocation decisions across the firm's multi-strategy funds. The risk infrastructure at FGG supporting these activities incorporates a number of systems and tools – including internally developed systems, off the shelf vendor solutions, and some customized applications built to meet FGG's business needs. An important component of the FGG product platform is the full position level transparency that we receive from all single managers which are included in our multi-strategy funds. FGG generally receives full daily portfolio transparency via independent access to the managers' prime brokerage or administrator accounts. Position information is transmitted via secure channels to our systems.<br><br>FGG's core risk management engine utilizes the flexible ASP version of the RiskManager product from |

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant: Fairfield Greenwich (Bermuda) Ltd. | SEC File Number: 801-139682 | Date: March 21, 2007 |
| --- | --- | --- | --- |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: Fairfield Greenwich (Bermuda) Ltd. | | IRS Empl. Ident. No.: |
| --- | --- | --- | --- |

| Item of Form (identify) | Answer | | |
| --- | --- | --- | --- |
| | RiskMetrics. This system is populated by detailed position information collected directly from the prime brokers used by FGG's underlying single managers and further supplemented by an extensive market and terms and conditions database. The Risk Management team at FGG regularly evaluates the market risk of its single and multi-strategy funds by producing strategy and fund specific risk reports. These reports are customizable to present risk measures and tests most appropriate to each portfolio's strategy. The FGG Risk Management team prepares a monthly suite of reports using RiskManager that are carefully reviewed and discussed by FGG's Investment Group at a formal monthly risk meeting. The reports organized along the following dimensions: Exposures, Sensitivities, Scenarios and Stress Tests, VaR, Correlations Analysis and Attribution Analysis. The review includes the full suite of VaR analytics (including marginal, incremental and relative VaR) and careful evaluation of the sensitivity of our managers to important risk factors (such as increasing or decreasing equity markets, volatilities, interest rate shocks/twists, FX movements and other factors). | | |
| | FGG utilizes a variety of tools and resources to conduct daily portfolio monitoring and investment compliance. The compliance process is structured to complement the more sophisticated monthly risk analyses conducted by the Risk Management team with intra-month, daily portfolio analyses. On a daily basis the investment team can inspect key portfolio statistics, exposures at different levels of aggregation (for example, gross, long, short, net by instrument type, market cap, sector etc.), and monitor portfolio composition and activity against pre-agreed yellow and red limit levels. The overall objective is to spot potentially worrisome trends regarding exposures, liquidity, concentrations, or other important deviations from the parameters agreed to for each fund. | | |
| Item 4.C.(7) | FGBL's core product business model is the investment management and oversight of the split strike conversion strategy, implemented through an Offshore Fund (with two currency feeder funds), and two Onshore Funds. The Offshore Fund also utilizes a small portion of its assets (up to 5%) away from the Split Strike Conversion strategy to seed a small number of hedge fund management groups with varying and diverse investment methodologies. Working with one of its affiliates, FGBL conducts a detailed manager selection and due diligence process, analyzing such important issues as liquidity management, market and credit risks, management quality (which includes on-site visit(s), background, and reference checks), and operational, compliance, and regulatory risks. At the conclusion of the manager selection process, allocation of assets from the Offshore Fund to a successful hedge fund manager candidate will be determined based on a qualitative and quantitative analysis of each manager's potential for long-term risk-adjusted performance, relationship with other manager's previously seeded, and expected contribution to the targeted risk/return profile. | | |
| Item 5 | FGBL generally requires a college degree and preferably an advanced degree for its professional personnel. Along with these educational requirements, FGBL prefers relevant securities industry experience. | | |
| Item 6 | Anthony Dell'Arena Chief Compliance Officer YOB: 1964 | Business Background for Past 5 Years: Mr. Dell'Arena joined FGG in 2005. Prior to such, he was employed by JPMorgan Chase & Co.'s Private Banking division, where he was a Vice President and Assistant General Counsel from 2002 to 2005. Education: Mr. Dell'Arena was awarded his Juris Doctor degree from the University of Arkansas School of Law, and holds Master's and Bachelor's degrees in History from Rutgers University. He is admitted to the bar of New Jersey, and is based in the New York office. Mr. Dell'Arena is a member of National Society of Compliance Professionals. | |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: Fairfield Greenwich (Bermuda) Ltd. | IRS Empl. Ident. No.: |
|---|---|---|

| Item of Form (identify) | Answer | |
|---|---|---|
| | Daniel E. Lipton Asst Secretary and Chief Financial Officer YOB: 1971 | **Business Background for Past 5 Years:** Mr. Lipton joined FGG in 2002 after nine years at Ernst & Young, where he was a Senior Manager in the Financial Services Assurance and Advisory Business Services Department, in charge of auditing and consulting engagements, specializing in alternative assets, private equity, venture capital, and domestic and offshore funds. **Education:** Mr. Lipton received his Bachelor of Arts degree in Economics from Tufts University and his Master of Business Administration dual degrees in Accounting and Finance from New York University's Stern School of Business; he is also a Certified Public Accountant. |
| | Mark J. McKeefry Director, Asst Secretary and Chief Legal Officer YOB: 1961 | **Business Background For Past 5 Years:** Mr. McKeefry joined FGG in 2003. Prior, he was an Associate at Buchalter Nemer, where he advised broker-dealers and investment advisors on regulatory and compliance issues for onshore and offshore funds. **Education:** Mr. McKeefry received his Bachelor of Science degree from Carnegie Mellon University and his Juris Doctor degree from Fordham University, where he was a member of the Law Review. Prior to attending law school, he was a professional engineer, licensed by the State of California as a civil engineer. Mr. McKeefry is admitted to the bars of California and New York. |
| | Andrés Piedrahita Director and President YOB: 1959 | **Business Background for Past 5 Years:** Mr. Piedrahita has been with FGBL since 1997. **Education:** Mr. Piedrahita received his Bachelor's Degree from the Boston University School of Communications. |
| | Amit Vijayvergiya Director, Vice President and Chief Risk Officer YOB: 1969 | **Business Background for Past 5 Years:** Mr. Vijayvergiya has over 12 years of experience in asset management, risk management, finance, and operations research. Prior to joining FGBL, from 2000 to 2003 Mr. Vijayvergiya managed a family office investing in traditional and alternative investment managers. **Education:** Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba, and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification. |
| Item 7.B. | | FGBL serves as the manager of Chester Horizons Fund Limited and Irongate Global Strategy Fund Limited on a non-discretionary basis, providing risk, accounting and back office support to such funds. FGBL also provides such services to other funds being managed by its affiliates. |

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br>Fairfield Greenwich (Bermuda) Ltd. | SEC File Number:<br>801-13982 | Date:<br>March 21, 2007 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | Fairfield Greenwich (Bermuda) Ltd. | |

| Item of Form (identify) | Answer |
|---|---|
| Item 8.C.(1) and 8.D. | An affiliate of FGBL, Fairfield Heathcliff Capital LLC ("FHC"), is registered with the Securities and Exchange Commission as a broker-dealer and is a member of the National Association of Securities Dealers, Inc. FHC's license is limited to selling limited partnership interests. FHC serves as U.S. placement agent for FGBL's Onshore Fund, and certain other onshore funds of affiliates of FGBL, and will bear its costs associated with such activities. |
| Item 8.C.(3) and 8.D. | FGBL, Fairfield Greenwich (UK) Limited ("FGUK"), and Fairfield Greenwich Advisors LLC ("FGA"), are each wholly-owned subsidiaries of Fairfield Greenwich Limited ("FGL", and collectively, FGG). FGA is based in the U.S. and is registered with the Securities and Exchange Commission as a registered investment adviser (SEC File No. 801-62504). FGUK is authorized and regulated by the Financial Services Authority, and serves as investment manager to a Luxembourg-registered SICAV and offshore fund-of-funds. FGG has also entered into a joint venture with Lion Capital Management Limited to create Lion Fairfield Capital Management Limited ("LFC"), a hedge fund management and client servicing platform in Asia. LFC holds a capital markets services license issued by the Monetary Authority of Singapore under the provisions of the Securities and Futures Act (Cap 289). |
| Item 8.C.(5) | FGL is registered with the Commodity Futures Trading Commission as a commodity pool operator and is a member of the National Futures Association. |
| Item 9.D. | FGBL and its affiliates may solicit clients to invest in the FGBL Funds, or those funds of FGBL's affiliates (collectively, the "FGG Funds"). In the event of limited capacity n a particular FGG Fund, FGBL and its affiliates are committed to allocating investment opportunities and dispositions in the particular FGG Fund fairly among clients or vehicles. FGBL and certain of its affiliates and their officers may have financial interests as general partners, limited partners, shareholders, investment managers, administrative manager, investment adviser or otherwise in such FGG Funds. Management and/or performance fees for such individuals and their spouse may be waived in certain instances. |
| Item 9.E. | FGBL and its affiliates may purchase or sell shares or interests of a Single Manager Fund for the accounts of Multi-Strategy Funds on the FGG platform. FGBL and certain of its affiliates and other Multi-Strategy Funds may have a position in such Single Manager Fund. With respect to Single Manager Funds where investment decisions are made by the officers or employees of FGBL or its affiliates, such persons are prohibited from trading in a particular security if trades of that security are being considered for the account of such Single Manager Fund until all orders or positions of such security have been completed. Further, such persons are required to provide FGG with personal securities account information and are thus required to provide FGG with duplicate copies of confirmations and statements of any personal trading activity. Moreover, certain persons are not free to trade without having pre-cleared trades with FGG. In all cases, FGG will attempt to resolve any conflicts of interest by exercising the good faith required of fiduciaries.<br><br>With respect to standards of professional conduct, a Code of Ethics (the "Code") has been adopted by the FGBL in order to comply with Rule 204A-1 (the "Rule") promulgated under the Investment Advisers Act of 1940, as amended. Rule 204A-1 requires every Investment Adviser registered with the Securities and Exchange Commission to adopt and enforce a written code of ethics applicable to its supervised persons. The Rule was designed to prevent fraud by reinforcing fiduciary principles that must govern the conduct of advisory firms and their personnel. The Code contains a provision reminding employees of their obligations to clients as well as a provision requiring the reporting of personal securities transactions and holdings. In order to ensure that FGBL's employees are made aware of its standards, the Rule requires FGBL to obtain (and keep) a written acknowledgement from each employee confirming that he or she received a copy of the Code and any amendments. |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br><br>Fairfield Greenwich (Bermuda) Ltd. | | IRS Empl. Ident. No.: |
| --- | --- | --- | --- |
| Item of Form (identify) | Answer | | |

| Item of Form (identify) | Answer |
| --- | --- |
| | Further, pursuant to the Rule, FGBL has deemed certain of its employees to be "Access Persons." An "Access Person" is an employee of the FGBL who has access to nonpublic information regarding any clients' purchase or sale of securities, or nonpublic information regarding the portfolio holdings of any reportable fund, or who is involved in making securities recommendations to clients, or who has access to such recommendation that are nonpublic. FGBL reviews the personal investment activities of its Access Persons to ensure that the following general fiduciary principles are met:<br><br>(a) the duty at all times to place the interests of clients of FGBL first;<br>(b) the duty to prevent the misuse of material nonpublic information which includes client securities holdings and transactions;<br>(c) the requirement that all personal securities transactions be conducted in such a manner as to avoid any actual or potential conflict of interest or any abuse of an individual's position of trust and responsibility; and<br>(d) the fundamental standard that FGBL personnel may not take inappropriate advantage of their position.<br><br>Investors may request a copy of the Code by contacting FGBL at the address or telephone number listed on the first page of this document. |
| Item 10 | The FGBL Funds impose various initial minimum investment amounts, ranging between US$100,000 and US$1,000,000, and in equivalent amounts in different currencies including Euro and Swiss Franc. The FGG Funds may accept investment in lesser amounts. Generally, investors are required to have a net worth of at least US$1,500,000. |
| Item 11.A. | Accounts are reviewed at the individual security level in Bermuda and discussed among members of FGBL's team several times each month. FGBL, along with its affiliate FGA, also utilizes a number of independent, sophisticated quantitative measurement tools to monitor the performance of its accounts (as well as those accounts managed by an affiliated New York-based registered adviser), compliance with investment guidelines, and risk analysis. FGBL's personnel review changes in a variety of factors, including changes in organization, investment process, the manager's view of the relevant markets, and their portfolio's position with respect to those views. The findings are discussed at regular investment committee meetings. |
| Item 11.B. | Investors will receive audited financial statements of the applicable Fund annually, and unaudited performance reports at least monthly. In addition, investors may also receive quarterly or semi-annual letters regarding their investments.<br><br>FGA is committed to maintaining the privacy of our clients and to the safeguarding of their personal information. Our privacy policy is distributed to clients in accordance with Regulation S-P on an initial and annual basis, to help clients understand what personal information we collect, how that information is protected, and why, in certain cases, the information may be shared. |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: Fairfield Greenwich (Bermuda) Ltd. | IRS Empl. Ident. No.: |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
| Item 12 | For certain of the FGG Funds, FGBL or an affiliate has full discretion and authority to make all investment decisions with respect to the types of securities to be bought and sold, and the amount of securities to be bought or sought for such Fund, and there are no limitations as to which broker dealer is used or as to the commission rates paid. However, portfolio transactions will be allocated to brokers on the basis of best execution and in consideration of brokerage and research services (e.g., research ideas, investment strategies, special execution and block positioning capabilities, clearance, settlement and custodial services), financial stability, reputation and efficiency of such broker-dealers. Broker-dealers providing such services may be paid commissions in excess of those that other broker-dealers not providing such services might charge. |
| Item 13.A. | A related person of FGBL receives unsolicited research reports from various brokers, but neither the related person nor FGBL currently have any "soft dollar" arrangements outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended, in effect. |
| Item 13.B. | From time to time, FGL, or a subsidiary, may enter into agreements to compensate third party and/or certain internal agents, providing for cash compensation for securing clients which may be in the form of a placement fee or participation in the sharing of the management and/or performance fees. |