# **EXHIBIT P**

Dockets.Justia.com

## GREENWICH SENTRY PARTNERS, L.P.

c/o Citco (Canada) Inc.
Attn: Investor Relations Group
2 Bloor Street East, Suite 2700
Toronto, Ontario M4W 1A8
Canada
Phone (416) 969-6700
Fax (416) 966-0925
E-mail: irtor@citco.com

## CONFIDENTIAL OFFERING MEMORANDUM

GREENWICH SENTRY PARTNERS, L.P., is a private investment limited partnership which seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Partnership allocates the predominant portion of its assets. This Confidential Offering Memorandum (the "Memorandum") relates to the offering of limited partnership interests (the "Interests"). Prospective Limited Partners should carefully read and retain this Memorandum.

THE INTERESTS OF GREENWICH SENTRY PARTNERS, L.P. ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. THESE SECURITIES HAVE NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER STATE OR FEDERAL GOVERNMENTAL AGENCY OR ANY NATIONAL SECURITIES EXCHANGE, NOR HAS ANY SUCH AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM OR THE MERITS OF AN INVESTMENT IN THE INTEREST OFFERED HEREBY. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTION ON TRANSFER AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER APPLICABLE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

Dated: August 2006

## SECURITIES RISK DISCLOSURE

PROSPECTIVE INVESTORS SHOULD NOTE THAT THE INVESTMENT STRATEGY EMPLOYED ON BEHALF OF THE PARTNERSHIP INVOLVES SIGNIFICANT RISKS AS DESCRIBED UNDER "RISK FACTORS" IN THIS MEMORANDUM.

THE LIMITED PARTNERSHIP INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), SINCE THEY WILL BE OFFERED ONLY TO A LIMITED NUMBER OF QUALIFIED INVESTORS. IT IS ANTICIPATED THAT THE OFFERING AND SALE OF SUCH INTERESTS WILL BE EXEMPT FROM REGISTRATION PURSUANT TO REGULATION D OF THE ACT.

THESE INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THESE OFFERING MATERIALS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THESE OFFERING MATERIALS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH AN OFFER OR SOLICITATION IS NOT AUTHORIZED.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN OR THE TAX CONSEQUENCES FROM AN INVESTMENT IN THE PARTNERSHIP. NO ASSURANCE CAN BE GIVEN THAT EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED

ADVERSELY TO THE PARTNERSHIP OR THE PARTNERS. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL AND ACCOUNTANT FOR ADVICE CONCERNING THE VARIOUS LEGAL, TAX AND ECONOMIC CONSIDERATIONS RELATING TO HIS OR HER INVESTMENT.

NO PERSON OTHER THAN THE GENERAL PARTNER HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THESE LIMITED PARTNERSHIP INTERESTS, EXCEPT THE INFORMATION CONTAINED HEREIN, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR OTHERWISE SUPPLIED BY THE GENERAL PARTNER IN WRITING MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PARTNERSHIP OR ANY OF ITS PARTNERS. ANY FURTHER DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS PROHIBITED.

A PROSPECTIVE INVESTOR SHOULD NOT SUBSCRIBE FOR LIMITED PARTNERSHIP INTERESTS UNLESS SATISFIED THAT THE PROSPECTIVE INVESTOR ALONE OR TOGETHER WITH HIS OR HER INVESTMENT REPRESENTATIVE HAVE ASKED FOR AND RECEIVED ALL INFORMATION WHICH WOULD ENABLE THE INVESTOR OR BOTH OF THEM TO EVALUATE THE MERITS AND RISKS OF THE PROPOSED INVESTMENT.

THE PARTNERSHIP WILL MAKE AVAILABLE TO EACH INVESTOR OR HIS OR HER AGENT, DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY INTERESTS, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM REPRESENTATIVES OF THE GENERAL PARTNER CONCERNING ANY ASPECT OF THE PARTNERSHIP AND ITS PROPOSED BUSINESS AND TO OBTAIN ANY ADDITIONAL RELATED INFORMATION TO THE EXTENT THE PARTNERSHIP POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

WHENEVER THE MASCULINE OR FEMININE GENDER IS USED IN THIS MEMORANDUM, IT SHALL EQUALLY, WHERE THE CONTEXT PERMITS, INCLUDE THE OTHER, AS WELL AS INCLUDE ENTITIES.

SPECIAL NOTICE TO FLORIDA INVESTORS:

THE FOLLOWING NOTICE IS PROVIDED TO SATISFY THE NOTIFICATION REQUIREMENT SET FORTH IN SUBSECTION 11(A)(5) OF SECTION 517.061 OF THE FLORIDA STATUTES, 1987, AS AMENDED:

UPON THE ACCEPTANCE OF FIVE (5) OR MORE FLORIDA INVESTORS, AND IF THE FLORIDA INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940, A PENSION OR PROFIT-

SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT OF 1933), THE FLORIDA INVESTOR ACKNOWLEDGES THAT ANY SALE OF AN INTEREST TO THE FLORIDA INVESTOR IS VOIDABLE BY THE FLORIDA INVESTOR EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE FLORIDA INVESTOR TO THE ISSUER, OR AN AGENT OF THE ISSUER, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE FLORIDA INVESTOR, WHICHEVER OCCURS LATER.

CONFIDENTIAL OFFERING MEMORANDUM
GREENWICH SENTRY PARTNERS, L.P.
c/o Citco (Canada) Inc.
Attn: Investor Relations Group
2 Bloor Street East, Suite 2700
Toronto, Ontario M4W 1A8
Canada
Phone (416) 969-6700
Fax (416) 966-0925
E-mail irtor@citco.com

Greenwich Sentry Partners, L.P. (the "Partnership") is organized as a Delaware limited partnership and operates as a private investment partnership. The Partnership's investment objective seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Partnership allocates the predominant portion of its assets.

The Partnership commenced operations on May 1, 2006.

The minimum initial capital contribution of a Limited Partner is $1,000,000 (subject to the discretion of the General Partner to accept lesser amounts). There will be no sales charges upon subscriptions for the Interests.

Interests will be offered on a continuous basis. Interests will generally be sold only to qualified investors who are "accredited investors" under Rule 501 of Regulation D of the Securities Act of 1933, as amended, and "qualified clients" within the meaning of Regulation 205-3 under the Investment Advisers Act of 1940, as amended. Additional capital contributions shall generally be accepted as of the first business day of each calendar month. The maximum amount of capital contributions which may be accepted by the Partnership is $500,000,000.

A Limited Partner, upon 15 days' prior written notice to the Sub-Administrator, may, at the end of any calendar month, withdraw all or any portion of its capital account. (See "OUTLINE OF PARTNERSHIP AGREEMENT - Limited Partner Withdrawals of Capital".)

There will be no withdrawal charges. The General Partner may, in its sole discretion, require any Partner to terminate its entire interest in the Partnership. (See "OUTLINE OF PARTNERSHIP AGREEMENT - Required Withdrawals".)

Prospective Limited Partners should carefully read this Confidential Offering Memorandum (the "Memorandum"). However, the contents of this Memorandum should not be considered to be legal or tax advice and each prospective Limited Partner should consult with its own counsel and advisers as to all matters concerning an investment in the Partnership.

There will be no public offering of the Interests. No offer to sell (or solicitation of an offer to buy) is being made in any jurisdiction in which such offer or solicitation would be unlawful.

This Memorandum has been prepared solely for the information of the person to whom it has been delivered by or on behalf of the Partnership, and should not be reproduced or used for any other purpose.

The Partnership is not presently, and does not intend in the future to become, registered as an investment company under the Investment Company Act of 1940, as amended. (See "PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940".) Effective April 20, 2006, the General Partner registered as an investment adviser under the Investment Advisers Act of 1940, as amended. (See "GENERAL PARTNER".)

**Greenwich Sentry Partners, L.P.**
**Table of Contents**

**Page**

SUMMARY ............................................................................................1
USE OF PROCEEDS ............................................................................7
INVESTMENT PROGRAM ..................................................................7
GENERAL PARTNER ..........................................................................8
ADMINISTRATOR ............................................................................10
BROKERAGE ......................................................................................12
ALLOCATION OF GAINS AND LOSSES ........................................12
CERTAIN RISK FACTORS ................................................................14
MANAGEMENT FEE AND EXPENSES ..........................................18
POTENTIAL CONFLICTS OF INTEREST ........................................19
PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF
INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT
COMPANY ACT OF 1940 ..................................................................21
TAX ASPECTS ....................................................................................23
OUTLINE OF PARTNERSHIP AGREEMENT ..................................32
LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS....36
PURCHASES BY EMPLOYEE-BENEFIT PLANS - ERISA CONSIDERATIONS ...............37
ANTI-MONEY LAUNDERING REGULATIONS ..............................38
PROXY VOTING POLICY ..................................................................38
COUNSEL ............................................................................................39
ADDITIONAL INFORMATION ..........................................................39
SUBSCRIPTION FOR INTERESTS ....................................................39
MISCELLANEOUS ..............................................................................40

EXHIBIT 1 – FORM OF LIMITED PARTNERSHIP AGREEMENT

## SUMMARY

The following summary is qualified in its entirety by the more detailed information set forth herein and by the items and conditions of the Limited Partnership Agreement (the "Partnership Agreement"), each of which should be read carefully by prospective investors.

THE PARTNERSHIP

Greenwich Sentry Partners, L.P. (the "Partnership") is a Delaware limited partnership which was organized on April 11, 2006. Its office is located at 919 Third Avenue, New York, New York 10022.

INVESTMENT OBJECTIVE

The Partnership seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Partnership allocates the predominant portion of its assets. (See "INVESTMENT PROGRAM").

The Partnership commenced operations on May 1, 2006.

GENERAL PARTNER

Fairfield Greenwich (Bermuda) Ltd., a corporation organized under the laws of Bermuda on June 13, 2003 is the general partner of the Partnership (the "General Partner"). The General Partner is responsible for directing the Partnership's investment and trading activities. It is the wholly-owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands ("FGL"). Walter M. Noel, Jr., Jeffrey H. Tucker and Andres Piedrahita are the main principals of FGL.

ADMINISTRATOR

Citco Fund Services (Europe) B.V. a limited liability company incorporated under the laws of The Netherlands, serves as the Partnership's administrator and will perform certain administrative and accounting services for the Partnership. The Administrator has delegated certain

functions to the Sub-Administrator, Citco (Canada) Inc. All correspondence should be addressed to the Sub-Administrator at their address shown in this document.

BROKER-DEALER; CUSTODIAN

The Partnership's brokerage account is maintained at Bernard L. Madoff Investment Securities LLC, which also serves as the custodian of the Partnership's assets.

TERM

Through December 31, 2036. However, the General Partner may terminate the Partnership at any time and for any reason.

INITIAL CAPITAL CONTRIBUTIONS

$1,000,000 minimum, subject to the discretion of the General Partner to accept lesser amounts.

SALES COMMISSIONS

There will be no sales commissions charged or paid on sales of limited partnership interests (the "Interests") to the Limited Partners.

ADMISSION OF NEW PARTNERS

The Partnership will offer the Interests on a continuous basis.

ADDITIONAL CAPITAL CONTRIBUTIONS

Subscriptions or additional capital contributions by Partners received at least three (3) business days before the end of any month will ordinarily be accepted as of the opening of business of the first day of the following month, i.e., subscriptions or additional capital contributions received between December 29 and January 28 will be accepted as of February 1. The General Partner may, in its discretion, accept any subscription or additional capital contribution prior to such first day of the month. Additional capital contributions may be made in increments of $25,000. The maximum amount of capital contributions which may be accepted by the Partnership is $500,000,000.

2

| | |
|---|---|
| FISCAL YEAR | December 31 of each year. |
| WITHDRAWALS | At the end of each calendar month, a Limited Partner may withdraw all or any portion of its capital account upon 15 days' prior written notice to the Sub-Administrator. The General Partner may withdraw all or any portion of its capital account at the end of any calendar month upon 15 days' prior written notice to the Sub-Administrator. (See "OUTLINE OF PARTNERSHIP AGREEMENT - Limited Partner Withdrawals of Capital".) The General Partner has the right to require any Limited Partner to withdraw from the Partnership at any time and for any reason. |
| MANAGEMENT FEE | The General Partner generally receives a monthly management fee calculated at the annual rate of approximately 1% (0.0833% per month) of each Limited Partner's capital account (the "Management Fee"). The Management Fee is paid in arrears, based on the value of each Limited Partner's capital account, as of the end of each month. The General Partner, in its sole discretion, may waive or modify the Management Fee for Limited Partners that are members, employees or affiliates of the General Partner, relatives of such persons, and for certain large or strategic investors. |
| ALLOCATION OF GAINS AND LOSSES | At the end of each fiscal quarter, 20% of the Partnership's realized and unrealized net capital appreciation allocable to the capital accounts of the Limited Partners will be allocated to the General Partner as provided by the Partnership Agreement (the "Incentive Allocation"). The remaining 80% of the Partnership's realized and unrealized net capital appreciation and 100% of the Partnership's realized and unrealized net capital depreciation will be allocated to all of the Partners (including the General Partner and/or its principals) in proportion to |

their respective capital accounts. If there is no net capital appreciation in a given fiscal quarter, there will be no Incentive Allocation made to the General Partner. If the Partnership sustains net capital depreciation in any fiscal quarter, no Incentive Allocation will be made until the loss is recouped. If a Limited Partner makes capital contributions or withdraws capital during a fiscal quarter, the above allocations shall be adjusted to take into account such interim quarter event.

Allocations for income tax purposes generally will be made among the Partners so as to reflect equitably amounts credited or debited to each Partner's capital account for the current and prior fiscal years. (See "TAX ASPECTS".)

## OPERATING EXPENSES

The General Partner shall bear all continuing offering costs and all expenses in maintaining the Partnership's offices and administration fees. The Partnership shall bear all other expenses incurred in the operation of the Partnership, if any, including, the Management Fee, taxes, the ordinary and necessary expenses directly related to the Partnership's investment and trading activities, including transactional costs (e.g., brokerage commissions and interest expense), escrow and custodial fees, registrar, transfer agent and administration fees, all legal, accounting and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Partnership; but excluding any legal fees incurred in the continuation of the offering of interests in the Partnership. (See "EXPENSES"). Legal expenses incurred in the organization of the Partnership were paid by the Partnership and are, for net asset value purposes, being amortized over a period of

up to 60 months from the date the Partnership commenced operations.

The Partnership may pay Fairfield Greenwich Advisors LLC ("FGA"), an affiliate of the General Partner, an amount equal to one-fortieth of one percent (0.025%) of the value of the Limited Partners' capital accounts as of the first day of each fiscal quarter for providing certain administrative services and back-office support to the Partnership (the "Expense Reimbursement"). To the extent a Limited Partner is charged the Management Fee, such Limited Partner will not be charged his pro-rata share of the Expense Reimbursement.

RISK FACTORS

The specialized investment program of the Partnership involves significant risks. In addition, the Partnership Agreement contains limitations on withdrawals. (See "CERTAIN RISK FACTORS".)

CONFLICTS OF INTEREST

The General Partner and its principals are the principals of other investment funds with similar investment objectives and policies as the Partnership. Certain inherent conflicts of interest will arise from the fact that the General Partner and its principals will carry on substantial investment activities through other investment funds of which they are principals and/or their own accounts in which the Partnership has no interest. The directors of the General Partner will not devote their full time to the activities of the Partnership. See "CERTAIN RISK FACTORS" and "POTENTIAL CONFLICTS OF INTEREST".

REGULATORY MATTERS

The Partnership is not presently, and does not intend in the future to become, registered as an investment company under the Investment Company Act of 1940 ( the "Company Act"), as amended and,

therefore, will not be required to adhere to certain investment policies under the Company Act. (see "PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940".) Effective April 20, 2006, the General Partner registered as an investment adviser under the Investment Advisers Act of 1940, as amended. (See "GENERAL PARTNER".)

SUITABILITY

Interests will generally be sold only to qualified investors who are "accredited investors" under Rule 501 of Regulation D of the Securities Act of 1933, as amended, and "qualified clients" within the meaning of Regulation 205-3 under the Investment Advisers Act of 1940, as amended. (See "LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS".)

LIMITED PARTNER REPORTS

The Partnership's certified public accountants will prepare, and the Partnership will mail to each Partner, following the end of each fiscal year, an audited financial report setting forth a balance sheet of the Partnership, a profit and loss statement showing the results of operations of the Partnership and its net capital appreciation or net capital depreciation, a statement of such Partner's closing capital account and the manner of its calculation and the Partner's opening capital account and partnership percentage for the then current fiscal year. At the end of each fiscal year, each Partner will be furnished with the required tax information for preparation of their respective tax returns. Within 30 days following the end of each month, each Limited Partner shall receive unaudited financial information setting forth, inter alia,

a statement of its net capital appreciation of
net capital depreciation.

## USE OF PROCEEDS

The entire net proceeds from the sale of the limited partnership interests (the "Interests")
will be available to the Partnership. The General Partner does not intend to pay any
commissions or fees to broker-dealers in connection with the offering. However, in the event
any fees or commissions are paid, they will be paid by the General Partner rather than the
Partnership.

The Partnership will not make any loans to affiliated entities nor will it invest in any
foreign government securities.

## INVESTMENT PROGRAM

The Partnership seeks to obtain capital appreciation of its assets principally through the
utilization of a nontraditional options trading strategy described as "split strike conversion", to
which the Partnership allocates the predominant portion of its assets. Set forth below is a
description of the "split strike conversion" strategies ("SSC Investments").

The establishment of a typical position entails (i) the purchase of a group or basket of
equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of
out-of-the-money S&P 100 Index put options with a notional value that approximately equals the
market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100
Index call options with a notional value that approximately equals the market value of the basket
of equity securities. An index call option is out-of-the-money when its strike price is greater
than the current price of the index; an index put option is out-of-the-money when the strike price
is lower than the current price of the index. The basket typically consists of between 35 to 50
stocks in the S&P 100 Index.

The primary purpose of the long put options is to limit the market risk of the stock basket
at the strike price of the long puts. The primary purpose of the short call options is to largely
finance the cost of the put hedge and to increase the stand-still rate of return.

This position in its entirety could be characterized as a bull spread which, presuming the
stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a
floor value below which further declines in the value of the stock basket is offset by gains in the
put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by
increasing liability of the short calls, and (iii) defines a range of potential market gain or loss,
depending on how tightly the options collar is struck.

The degree of bullishness of the strategy can be expressed at implementation by the
selection of the strike prices in the S&P 100 Index put and call options. The farther away the
strike prices are from the price of the S&P 100 Index, the more bullish the strategy.

The Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ("BLM"), a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Partnership at that firm. The accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market capitalization of the equities in the basket, the minimum correlation of the basket against the S&P 100 Index, and the permissible range of option strike prices. Subject to the guidelines, BLM is authorized to determine the price and timing of stock and option transactions in the account. The services of BLM and its personnel are essential to the continued operation of the Partnership, and its profitability, if any.

The options transactions executed for the benefit of the Partnership may be effected in the over-the-counter market or on a registered options exchange.

In the sole and exclusive discretion of the General Partner, the Partnership may at times invest in money market mutual funds and short term bond funds when it is not otherwise fully invested.

THERE CAN BE NO ASSURANCE THAT THE INVESTMENT OBJECTIVES OF THE PARTNERSHIP WILL BE ACHIEVED. THE PARTNERSHIP'S INVESTMENT PROGRAM IS SPECULATIVE AND ENTAILS SUBSTANTIAL RISKS. MARKET RISKS ARE INHERENT IN ALL SECURITIES TO VARYING DEGREES. NO ASSURANCE CAN BE GIVEN THAT THE PARTNERSHIP'S INVESTMENT OBJECTIVE WILL BE REALIZED. (SEE "CERTAIN RISK FACTORS".)

## GENERAL PARTNER

### The General Partner

Fairfield Greenwich (Bermuda) Ltd., a corporation organized under the laws of Bermuda on June 13, 2003 is the general partner of the Partnership (the "General Partner"). The General Partner is responsible for directing the Partnership's investment and trading activities. The General Partner maintains offices at 37 Reid Street, 1st Floor, Hamilton, Bermuda HM12; telephone number; 441-292-5401; fax: 441-292-5413. It is the wholly-owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands. Its main principals are Walter M. Noel, Jr., Jeffrey H. Tucker and Andres Piedrahita. Effective April 20, 2006, the General Partner registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

The Fairfield Greenwich Group ("FGG"), of which the General Partner is an affiliate, was established in 1983 and has, as of April 1, 2006, more than $9 billion employed in alternative asset management funds. Throughout its history, FGG has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a managerial and distribution partner.

The General Partner and its affiliates currently serve as investment or administrative manager to more than twenty funds, and have exclusive distribution arrangements with several others. FGG maintains its principal office in New York, with a significant presence in London and Bermuda. Marketing and client support offices are located elsewhere in the United States, Europe, and Latin America. FGG's London entity is licensed and subject to the supervision of the United Kingdom Financial Services Authority, and another FGG-affiliated entity is registered as a broker-dealer in the United States.

Following is biographical information on the founders, principal officers and certain other key employees of FGG:

**Walter M. Noel, Jr.** co-founded FGG in 1983. Mr. Noel has over 30 years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its offshore private banking business. Since founding FGG, Mr. Noel has been a director or general partner for a variety of its funds. Mr. Noel graduated from Vanderbilt University in 1952, received a Master of Arts in Economics from Harvard University in 1953, and graduated from Harvard Law School in 1959.

**Andres Piedrahita** founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs the Group's European and Latin American activities. Mr. Piedrahita has over 15 years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc., in New York (1981-1987). He received his Bachelor of Arts degree from Boston University's School of Communications.

**Jeffrey Tucker** has over 30 years of experience in investment related businesses. Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the Securities and Exchange Commission's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner at the law firm Tucker, Globermand & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & co. ("Kolber"), a broker dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's affiliated private investment funds. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout Mr. FGG's development, Mr. Tucker has been responsible for directing its business

and operational development and has been a director or general partner for a variety of its investment funds. Mr. Tucker is the President of Heathcliff Capital Corp., a registered broker-dealer and an affiliate of the General Partner, which will serve as a non-exclusive placement agent in the offering of the Partnership's Interests. Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.

The backgrounds of the Directors and key officers of the General Partner are set forth below:

**Andres Piedrahita** is a Director and the President of the General Partner. His background is set forth above under "GENERAL PARTNER".

**Brian Francoeur** is a Director of the General Partner. Mr. Francoeur is the Managing Director of Citco Fund Services (Bermuda) Limited ("Citco Bermuda"), having joined Citco Bermuda in 2001. From 1999 to 2001, Mr. Francoeur was the Chief Financial Officer of CCS Group Limited, a computer cabling and network company based in Hamilton, Bermuda, and, from 1997 to 1999, a Senior Portfolio Manager with Olympia Capital (Bermuda) Limited, a fund administration company in Bermuda. Mr. Francoeur qualified as a chartered accountant in 1994 and was employed by Ernst & Young in Bermuda from 1995 to 1997.

**Amit Vijayvergiya** is Managing Director of the General Partner and focuses on manager selection and risk management for the Partnership. He has been employed by the General Partner since 2003. Mr. Vijayvergiya has over 12 years of experience in asset management, risk management and operations research. Prior to joining the General Partner, from 2000 to 2003, Mr. Vijayvergiya managed MAV Hedge Advisors, a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

ADMINISTRATOR

The Partnership has engaged Citco Fund Services (Europe) B.V. (the "Administrator") to provide certain financial, accounting, administrative and other services. The Administrator provides, subject to the overall direction of the General Partner, administrative services and registrar and transfer agent services. The Administrator has delegated the accounting, registrar and transfer services to Citco (Canada) Inc. (the "Sub-Administrator"). All fees and expenses of the Sub-Administrator and their affiliates will be paid by the Administrator out of its fee.

Pursuant to an Administration Agreement (the "Administration Agreement") between the Administrator and the Partnership, the Administrator will be responsible, *inter alia*, for the following matters for the Partnership under the general supervision of the General Partner:

- communicating with Limited Partners;
- maintaining the record of accounts;
- processing subscriptions and withdrawals;
- preparing and maintaining the Partnership's financial and accounting records and statements;
- calculating each Limited Partner's capital account balance (on a monthly basis);
- preparing financial statements;
- arranging for the provision of accounting, clerical and administrative services; and
- maintaining corporate records.

The Administrator, the Sub-Administrator and their affiliates will be indemnified out of the assets of the Partnership against all liabilities, actions, proceedings, claims, costs, demands and expenses (other than out-of-pocket expenses) arising out of its proper performance under the Administration Agreement except for negligence, bad faith, fraud, dishonesty or a material breach by the Administrator, the Sub-Administrator and their affiliates.

Under the Administration Agreement, the Partnership will indemnify the Administrator and its subsidiaries, affiliates, directors and other officers, shareholders, servants, employees, agents and permitted delegates ("Indemnified Parties") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, claims, demands, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against any of them howsoever arising (other than by reason of negligence, bad faith, fraud or dishonesty on the part of the Administrator or any other Indemnified Party or the material breach of the Administration Agreement by the Administrator) in connection with the provision by the Administrator of the services to be provided by it under the Administration Agreement. In the absence of gross negligence, bad faith, fraud or dishonesty in the performance of its duties under the Administration Agreement, neither the Administrator nor any other Indemnified Party shall be liable to the Partnership, any investor in the Partnership or any other person on account of anything done, omitted or suffered by the Administrator or any other Indemnified Party in good faith pursuant to the Administration Agreement in the performance of the services to be performed by the Administrator thereunder.

The Administrator and Sub-Administrator will not provide any investment advisory or management service to the Partnership and therefore will not be in any way responsible for the Partnership's performance. The Administrator and Sub-Administrator will not be responsible for monitoring any investment restrictions or compliance with such investment restrictions and therefore will not be liable for any breach thereof.

In addition to the Administrator and Sub-Administrator, Fairfield Greenwich Advisors LLC, an affiliate of the General Partner, provides the Partnership with certain administrative services and back-office support.

## BROKERAGE

It is expected that the General Partner will generally allocate brokerage business on the basis of best available execution and in consideration of such brokers' provision of brokerage and research services.

In selecting brokers or dealers to execute transactions, the General Partner typically will not solicit competitive bids and will not have an obligation to seek the lowest available commission cost. It generally will not be the practice of the General Partner to negotiate "execution only" commission rates, and thus the Partnership may be deemed to be paying for research and other services provided by the broker which are included in the commission rate. Research furnished by brokers may include, but is not limited to, written information and analyses concerning specific securities, companies or sectors; market, financial and economic studies and forecasts; financial publications; statistic and pricing services, as well as discussions with research personnel, along with hardware, software, data bases and other technical and telecommunication services and equipment utilized in the investment management process. Research services obtained by the use of commissions arising from such transactions may be used by the General Partner in its other investment activities.

The General Partner may also be paying for services other than research that are included in the commission rate. These other services may include, without limitation, office space, facilities and equipment; administrative and accounting support; supplies and stationery; telephone lines, usage and equipment and other items which might otherwise be treated as an expense of the General Partner. To the extent the General Partner utilizes commissions to obtain items which would otherwise be an expense of the General Partner, such use of commissions in effect constitutes additional compensation to the General Partner. Certain of the foregoing commission arrangements are outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended which permits the use of commissions or "soft dollars" to obtain "research and execution" services. Finally, since commission rates are generally negotiable, selecting brokers on the basis of considerations which are not limited to applicable commission rates may result in higher transaction costs than would otherwise be obtainable.

## ALLOCATION OF GAINS AND LOSSES

"Net Capital Appreciation" means the increase in the value of the Partnership's net assets from the beginning of each fiscal quarter to the end of such fiscal quarter. "Net Capital Depreciation" means the decrease in the value of the Partnership's net assets from the beginning of each fiscal quarter to the end of such fiscal quarter.

At the end of each fiscal quarter of the Partnership, any Net Capital Appreciation earned by the Partnership's will be tentatively allocated to all Partners (including the General Partner) in

proportion to each Partner's opening capital account (the "Capital Account") for such quarter. Thereafter, 20% of any Net Capital Appreciation from the Partnership's activities tentatively allocated to the Capital Accounts of the Limited Partners for such quarterly period will be reallocated to the Capital Account of the General Partner (the "Incentive Allocation".)[1] If there is no net capital appreciation in a given fiscal quarter, there will be no Incentive Allocation made to the General Partner. If the Partnership sustains net capital depreciation in any fiscal quarter, no Incentive Allocation will be made until the loss is recouped. In the event a Limited Partner makes a capital contribution to or withdraws capital from the Partnership during a fiscal quarter, the above allocations shall be adjusted to take into account such interim quarterly event.

For purposes of determining the Incentive Allocation allocable to the General Partner for each quarterly period, the Net Capital Appreciation from the Partnership's activities allocable to such Limited Partner will be deemed reduced by the unrecovered balance, if any, in its loss recovery account (the "Loss Recovery Account"). The Loss Recovery Account is a memorandum account, established for each Limited Partner upon its admission to the Partnership, the opening balance of which will be zero. At the end of each quarter, the balance in each Limited Partner's Loss Recovery Account will be charged with any Net Capital Depreciation or credited with any Net Capital Appreciation from the Partnership's activities. In the event that a Limited Partner with an unrecovered balance in its Loss Recovery Account withdraws all or a portion of its capital in the Partnership, the unrecovered balance in such Limited Partner's Loss Recovery Account will be proportionately reduced. Additional capital contributions will not affect any Limited Partner's Loss Recovery Account.

The General Partner will have no obligation to pay to or otherwise compensate a Limited Partner for the amount of the unrecovered balance (if any) in its Loss Recovery Account, but shall receive no additional Incentive Allocation with respect to such Limited Partner's Capital Account until the unrecovered balance in such Limited Partner's Loss Recovery Account is recovered. Since the Incentive Allocation is calculated on a basis which includes unrealized appreciation of the Partnership's assets, such allocation may be greater than if it was based solely on realized gains. (See "EXPENSES".)

The General Partner, in its sole discretion, may waive or modify the Incentive Allocation for Limited Partners that are members, employees or affiliates of the General Partner, relatives of such persons, and for certain large or strategic investors.

---

[1]  The Partnership's allocations to its General Partner may result in substantially higher payments than alternative compensatory arrangements with other managers. As the Securities and Exchange Commission (the "SEC") noted in its Institutional Investor Study Report (1971), "... In most instances the compensation arrangements provided by unregistered hedge funds are far more favorable to the investment manager per dollar of assets managed than the compensation provided for similar services by registered investment companies or other classes of accounts."

# CERTAIN RISK FACTORS

Among the substantial risk factors involved in a purchase of Interests in the Partnership are the following:

1. <u>Trading Risks.</u> Substantial risks are involved in the trading of equity securities and options. Market movements can be volatile and are difficult to predict. U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affect securities and options prices as well as the liquidity of such markets. Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities. A variety of possible actions by various government agencies also can inhibit the profitability of the Partnership's business or can result in losses. Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Partnership.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategy utilized by or on behalf of the Partnership. The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution. Thus, substantial risk remains that the techniques employed by the Partnership cannot always be implemented or effective in reducing losses. At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities or options at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile. The volume and volatility of trading in the market depend in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by market-makers and specialists. The liquidity of the market may also be affected by a halt in trading on a particular securities exchange or exchanges. Illiquid markets may make it difficult to get an order executed at a desired price.

2. <u>Trading Strategies May Not be Successful.</u> There can be no assurance that any trading method employed on behalf of the Partnership will produce profitable results, and the past performance of the Partnership is not necessarily indicative of the future profitability of the Partnership.

Profitable trading is often dependent on anticipating trends or trading patterns. In addition, markets experiencing random price fluctuations, rather than defined trends or patterns, may generate a series of losing trades. There have been periods in the past when the markets have been subject to limited and ill-defined price movements, and such periods may recur. Any factor which may lessen major price trends (such as governmental controls affecting the markets) may reduce the prospect for future trading profitability. Any factor which would make it difficult to execute trades, such as reduced liquidity or extreme market developments resulting in prices moving the maximum amount allowed in a single day, could also be detrimental to profits or cause losses.

3. **Dependence Upon the Principals and Key Employees of the General Partner and BLM.** The services of the General Partner's principals and key employees and BLM are essential to the continued operations of the Partnership. If their services were no longer available, their absence would have an adverse impact upon an investment in the Partnership.

4. **Incentive Allocation.** The allocation of a percentage of the Partnership's net profits to the General Partner from the Limited Partners may create an incentive for the General Partner to cause the Partnership to make investments that are riskier or more speculative than would be the case if this allocation were not made. Since the allocation is calculated on a basis that includes unrealized appreciation of assets, such allocation may be greater than if it were based solely on realized gains.

In addition, in the event that a Limited Partner makes a complete or partial withdrawal from its Capital Account, or is required to retire at any time other than at the end of a quarter, the Incentive Allocation may be computed and charged to such partner as though the date of such partner's withdrawal of capital or retirement was the last day of a quarter. This may result in the Limited Partner being charged an Incentive Allocation during the quarter even though the Limited Partner does not have net profits based on the entire quarter's performance (i.e., due to losses that occur after the withdrawal).

5. **Custodian/Clearing Firm Loss or Insolvency.** If a custodian or clearing firm utilized in connection with accounts maintained on behalf of the Partnership were to become insolvent, the Partnership could have some or all of these positions closed out without its consent. In addition, all of the Partnership's positions may not be closed out under these circumstances, yet delays or other difficulties may be experienced in attempting to close out or exercise options positions. Widespread insolvency among clearing firms that clear securities options could also impair the ability of the Options Clearing Corp. (the "OCC") to honor all exercises, in spite of the system of safeguards which the OCC has in place. Such widespread insolvency, or of a particular custodian, could result in substantial losses to the Partnership.

6. **Competition.** The securities industry is highly competitive in the United States. Competition from other persons or entities involved in activities similar to those of the Partnership can restrict the ability of the Partnership to acquire positions at the prices deemed most beneficial to its overall trading strategies. Many such competing persons or entities are better capitalized and have more experience in trading than the Partnership. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Partnership.

7. **Over-the-Counter Options Transactions.** A significant portion of the options transactions effected on behalf of the Partnership utilizes the over-the-counter market for their execution. Trading equity and index options in the over-the-market is subject to contra-party risk and is without the protections afforded by transactions effected through the Options Clearing Corporation, a registered clearing facility.

8. <u>Option Buyer's Risk of Loss of Entire Investment</u>. An option is a wasting asset which becomes worthless when the option expires. As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration. This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

9. <u>Arbitrage Transactions</u>. Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction. Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination. Consequently, a substantial favorable price movement may be required before a profit can be realized.

10. <u>Combination Transactions</u>. At various times, the Partnership may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations. Such transactions are considerably more complex than the purchase or writing of a single option. The following are among the many risks of combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding. Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination. This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

11. <u>Trading Decisions Based on Trend Analysis</u>. Certain of the trading decisions of the Partnership are based on the use of computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm. In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends. Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities. This latter risk is likely to materialize when numerous traders use similar analyses, all of which dictate the desirability of executing identical or similar contracts. In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur. Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow. Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

12. <u>Assignment of Puts or Calls</u>. Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the

16

short put or short call portion of the hedged position. Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes. Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses. The same would be true given an illiquid market such as that of October 1987.

13. <u>Prohibition of Exercise Rights</u>. The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

14. <u>Restrictions on Transfers and Withdrawals</u>. An investment in the Partnership provides limited liquidity since the Interests are not freely transferable and the Limited Partners have limited rights of withdrawal. A Limited Partner may, at the end of a calendar month, withdraw all or a portion of its Capital Account, upon 15 days' prior written notice to the Sub-Administrator. In light of these restrictions, an investment in the Partnership is suitable only for sophisticated investors who have no need for more immediate liquidity in this investment. (See "LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS.")

The right of any Partner to withdraw monies from the Partnership is subject to the provision by the General Partner for (i) Partnership liabilities in accordance with generally accepted accounting principles and (ii) reserves for contingencies.

15. <u>Non-Disclosure of Positions</u>. In an effort to protect the confidentiality of its positions, the Partnership generally will not disclose all of its positions to Limited Partners on an ongoing basis, although the General Partner, in its sole discretion, may permit such disclosure on a select basis to certain Limited Partners, if it determines that there are sufficient confidentiality agreements and procedures in place.

16. <u>Unrelated Business Taxable Income for Certain Tax-Exempt Investors</u>. Pension and profit-sharing plans, Keogh plans, individual retirement accounts and other tax-exempt investors may realize "unrelated business taxable income" as a result of an investment in the Partnership since the Partnership may employ leverage. See "TAX ASPECTS." Any tax-exempt investor should consult its own tax adviser with respect to the effect of an investment in the Partnership on its own tax situation.

17. <u>Absence of Regulatory Oversight</u>. While the Partnership may be considered similar to an investment company, it does not intend to register as such under the Investment Company Act of 1940, as amended (the "Company Act") (in reliance upon an exemption available to privately offered investment companies), and, accordingly, the provisions of that Act (which, among other matters, require investment companies to have a majority of disinterested directors, require securities held in custody to at all times be individually segregated from the securities which are the property of such investment company and regulate the relationship between the adviser and the investment company) will not be applicable. Effective April 20, 2006, the General Partner registered as an investment adviser under the Advisers Act. (See

17

"PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940" and "GENERAL PARTNER".)

THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING. POTENTIAL INVESTORS SHOULD READ THE ENTIRE CONFIDENTIAL OFFERING MEMORANDUM (THE "MEMORANDUM") BEFORE DETERMINING TO INVEST IN THE PARTNERSHIP.

## MANAGEMENT FEE AND EXPENSES

The General Partner generally receives a monthly management fee calculated at the annual rate of approximately 1% (0.0833% per month) of each Limited Partner's Capital Account (the "Management Fee"). The Management Fee is paid in arrears, based on the value of each Limited Partner's Capital Account, as of the end of each month. The General Partner, in its sole discretion, may waive or modify the Management Fee for Limited Partners that are members, employees or affiliates of the General Partner, relatives of such persons, and for certain large or strategic investors.

The General Partner shall bear all continuing offering costs and all expenses in maintaining the Partnership's offices and administration fees. The Partnership shall bear all other expenses incurred in the operation of the Partnership, if any, including, the Management Fee, taxes, the ordinary and necessary expenses directly related to the Partnership's investment and trading activities, including transactional costs (e.g., brokerage commissions and interest expense), escrow and custodial fees, registrar, transfer agent and administration fees, all legal, accounting and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Partnership; but excluding any legal fees incurred in the continuation of the offering of interests in the Partnership. Legal expenses incurred in the organization of the Partnership were paid by the Partnership and are, for net asset value purposes, being amortized over a period of up to 60 months from the date the Partnership commenced operations.

The Partnership may pay Fairfield Greenwich Advisors LLC, an affiliate of the General Partner, an amount equal to one-fortieth of one percent (0.025%) of the value of the Limited Partners' Capital Accounts as of the first day of each fiscal quarter (10 basis points per annum) for providing certain administrative services and back-office support to the Partnership (the "Expense Reimbursement"). To the extent a Limited Partner is charged the Management Fee, such Limited Partner will not be charged his pro-rata share of the Expense Reimbursement.

The Partnership Agreement provides that the General Partner may elect to have the Partnership pay any normal and recurring operating expenses required to be borne by the General Partner and to charge such amounts to the General Partner's Capital Accounts. No such expenses have been paid by the Partnership and the General Partner does not contemplate having the Partnership pay such expenses.

18

As noted under "ALLOCATION OF GAINS AND LOSSES" the General Partner receives an incentive allocation on a quarterly basis in an amount equal to 20% of any Net Capital Appreciation allocated to the Capital Accounts of the Limited Partners for such quarterly period, subject to a loss carryforward provision described herein. Investors should note that any such allocations will result in the General Partner receiving an amount of Net Capital Appreciation which may be greater than its proportionate shares thereof and may thereby result in the General Partner receiving a disproportionate share of the Partnership's profits. The Capital Account of a Limited Partner will be assessed the Incentive Allocation only if there is new Net Capital Appreciation allocated to such Limited Partner's Capital Account in such fiscal quarter.

The General Partner does not receive any compensation, directly or indirectly, with respect to the brokerage and clearance charges incurred in connection with the Partnership's account at BLM.

## POTENTIAL CONFLICTS OF INTEREST

Because of the role of an affiliate of the General Partner as sponsor and organizer of the Partnership, the terms of the Partnership's governing documents were not the result of arms-length negotiation between such sponsor, on the one hand, and the Partnership on the other hand.

In addition, the General Partner and its related persons will be subject to significant conflicts of interest in managing the business and affairs of the Partnership and in making investment and trading decisions for the Partnership. Certain of these conflicts are described elsewhere in this Memorandum and will not be repeated here. Others are described below. While the conflicts described in this Memorandum are fairly typical of "hedge fund" managers, the General Partner wishes to call attention to them.

The Partnership's governing documents do not require the General Partner to devote its full time or any material portion of its time to the Partnership. The General Partner and its related persons are currently involved in, and may in the future become involved in, other business ventures, including other investment funds whose investment objectives, strategies and policies are the same as or similar to those of the Partnership. The Partnership will not share in the risks or rewards of such other ventures, and such other ventures will compete with the Partnership for the time and attention of the General Partner and its related persons and might create additional conflicts of interest, as described below.

The General Partner and its related persons invest and trade and may continue to invest and trade in securities and other financial instruments for the accounts of clients other than the Partnership and for their own accounts, even if such securities and other financial instruments are the same as or similar to those in which the Partnership invests and trades, and even if such trades compete with, occur ahead of or are opposite those of the Partnership. They will not, however, knowingly trade for the accounts of clients other than the Partnership or for their own accounts in a manner that is detrimental to the Partnership, nor will they seek to profit from their knowledge that the Partnership intends to engage in particular transactions.

19

The General Partner and its related persons might have an incentive to favor one or more of their other clients over the Partnership, for example with regard to the selection of certain investments for those clients because those clients might pay the General Partner more for its services than the Partnership. The General Partner and its related persons will act in a fair and reasonable manner in allocating suitable investment opportunities among their client and proprietary accounts. No assurance can be given, however, that (i) the Partnership will participate in all investment opportunities in which other client or proprietary accounts of such persons participate, (ii) particular investment opportunities allocated to client or proprietary accounts other than the Partnership will not outperform investment opportunities allocated to the Partnership, or (iii) equality of treatment between the Partnership, on the one hand, and other client and proprietary accounts of such persons, on the other hand, will otherwise be assured.

Subject to the considerations set forth above, in investing and trading for client and proprietary accounts other than the Partnership, the General Partner and its related persons may make use of information obtained by them in the course of investing and trading for the Partnership, and they will have no obligation to compensate the Partnership in any respect for their receipt of such information or to account to the Partnership for any profits earned from their use of such information.

The Partnership may engage other placement agents from time to time, to market Interests. If Interests are acquired through an agent engaged by the Partnership, the investor should not view any recommendation of such agent as being disinterested, as the agent will be paid for the introduction by the investor and/or by the General Partner. Also, agents should be regarded as having an incentive to recommend that Limited Partners remain investors in the Partnership, since the agents may receive fees for all periods during which a Limited Partner remains an investor.

The General Partner has a fiduciary duty to the Partnership to exercise good faith and fairness in all its dealings with it and will take such duties into account in dealing with all actual and potential conflicts of interest. If a Limited Partner believes that the General Partner has violated its fiduciary duty, it may seek legal relief under applicable law, for itself and other similarly situated Limited Partners or on behalf of the Partnership. However, it may be difficult for Limited Partners to obtain relief because of the changing nature of the law in this area, the vagueness of standards defining required conduct, the broad discretion given the General Partner under the Partnership Agreement, and the exculpatory and indemnification provisions therein.

Mr. Brian Francoeur, a Director of the General Partner is also an employee of Citco Fund Services (Bermuda) Ltd which is affiliated with the Administrator and Sub-Administrator.

The legal counsel to the Partnership was retained by the General Partner and does not represent the interests of the investors in the Partnership.

# PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940

The Partnership does not currently or in the future propose to be registered as an investment company under the Company Act. Nevertheless, for discussion purposes the Partnership may be compared with an investment company. Since Limited Partners may generally withdraw from the Partnership at the end of any calendar month, the Partnership may be regarded as similar to a "non-diversified open-end investment company" i.e., a mutual fund, although such a company is usually prepared to redeem its securities at any time upon demand at net asset value.

Registered investment companies are required, under applicable SEC forms relating to the registration of their shares, to state definite policies with respect to certain enumerated types of activities, some of which may not be changed without shareholder approval.[2] The following discussion summarizes the Partnership's currently anticipated policies with respect to such activities through its securities trading activities, but it is important to note that changes in the Partnership's policies set forth below may be made by the General Partner, without the consent of the Limited Partners, to the extent consistent with the Partnership Agreement. (See "INVESTMENT PROGRAM" and "CERTAIN RISK FACTORS".)

(a)  <u>The types of investments which the Partnership may make.</u>  The Partnership Agreement authorizes the Partnership to invest and trade on margin or otherwise, in capital stock of U.S. or foreign corporations, preorganization certificates and subscriptions, warrants, bonds, notes, debentures, whether subordinated, convertible or otherwise, rights, options, money market funds, commercial paper, certificates of deposit, brokers' acceptances, trust receipts, obligations of the United States, or any state thereof and instrumentalities of any of them, obligations of foreign governments, and other obligations and instruments or evidences of indebtedness commonly referenced to as securities. As part of its investment program, the Partnership may also write or buy options, purchase forward and futures contracts relating to stock indices or other indices, financial instruments and commodities and commodity contracts and other securities and instruments and invest in fixed income securities and, as opportunities are available, engage in convertible arbitrage transactions in merger and tender arbitrage.

(b)  <u>The issuance of senior securities.</u> The Partnership will not issue classes of senior debt securities, except to the extent that it may be deemed to do so if engages in short selling, options writing and repurchase transactions.[3]

---

2   Such policies are considered to be "fundamental" policies with respect to security investments, i.e., policies which the registered investment company deems to be fundamental or policies which may not be changed without the approval of a majority of the registered investment company's shareholders.

3   Effecting short sales, writing put and call options and engaging in repurchase transactions may be deemed to give rise to indebtedness of, and the issuance of a senior security by, a registered investment company. With respect to short sales, a registered investment company is required to collateralize such sales by depositing in a segregated account cash in an amount, or United States Government securities having a value equal to, the

(c) The use of leverage. The Partnership may trade in securities on margin or borrow, pledge, mortgage, lend or hypothecate securities or other assets. (See "TAX ASPECTS".) The Partnership may use leverage by borrowing funds from banks and brokerage firms. The Partnership maintains no policy limiting the amount of borrowing in which it will engage to any fixed percentage of its assets. Under market conditions deemed appropriate by the General Partner, the Partnership may borrow up to the limit of the applicable margin requirements and applicable regulations relating to bank loans.

(d) The underwriting of securities of other issuers. The Partnership will not underwrite securities of other issuers (except to the extent it may technically be deemed an "Underwriter" in connection with distributions of securities).

(e) The making of loans to other persons. The Partnership may lend its portfolio securities on terms customary to the securities industry, provided that cash collateral at least equal in value to the market value of the loaned securities is deposited by the borrower with the broker-dealer with which the Partnership maintains its account. The interest received on such loans is typically a percentage of the broker's call rate.

(f) The purchase and sale of real estate. The Partnership does not intend to purchase or sell interests in real estate or real estate mortgage loans nor does it intend to utilize money managers engaging in such loan transactions.

(g) The purchase and sale of commodities or commodity contracts. The Partnership Agreement authorizes the Partnership to engage in transactions involving forward and futures contracts (and options thereon) relating to stock indices and other indices, financial instruments and commodities and commodity contracts. However, such transactions would not be effected without compliance with the applicable regulatory requirement.

(h) Investment in companies for the purpose of exercising control of management. The Partnership will not ordinarily invest in companies for the purpose of exercising control of management but may do so in situations in which it believes it appropriate as an investment.

(i) Policy with respect to portfolio turnover. The Partnership has no definite policy with respect to portfolio turnover. The Partnership expects that its portfolio turnover will

---

difference between (i) the greater of (a) the market value of the securities sold short at the time of the short sale, or (b) the market value of the securities sold short (marked to market daily) and (ii) the amount of cash or United States Government securities deposited with the broker to collateralize the obligation to replace the borrowed securities. Similar requirements exist with respect to collateralizing uncovered options and the SEC has indicated that such requirements may also apply when a registered investment company engages in repurchase transactions. The Partnership is not required to follow such requirements, and will not collateralize such obligations, except to the extent of applicable margin and bank regulations and creditors' practices. Registered investment companies can borrow only from banks and must maintain 300% asset coverage for such borrowings. However, the Partnership may borrow from brokers, banks and others that have no such asset coverage requirements.