# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

PASHA ANWAR, et al.,              )

)

            Plaintiffs,       )

)

     v.           )

)   Master File No. 09-CV-118 (VM)

FAIRFIELD GREENWICH LIMITED, et al.,   )

)

          Defendants.     )

)

This Document Relates To: *Headway Investment Corp.* v. )
*American Express Bank Ltd.*, No. 09-CV-08500; *Ricardo* )
*Lopez* v. *Standard Chartered Bank International* )
*(Americas) Ltd.*, No. 10-CV-00919; *Maridom Ltd.* v. )
*Standard Chartered Bank International (Americas) Ltd.*, )
No. 10-CV-00920; and *Maria Akriby Valladolid* v. )
*American Express Bank Ltd.*, No. 10-CV-00918. )

------------------------------------------------------------------- x

## MEMORANDUM OF LAW OF STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LTD., STANDARD CHARTERED INTERNATIONAL (USA) LTD., STANDARD CHARTERED BANK AND STANDARD CHARTERED PLC IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINTS

Sharon L. Nelles (SN-3144)
Bradley P. Smith (BS-1383)
Patrick B. Berarducci (PB-2222)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
nelless@sullcrom.com

Diane L. McGimsey
(Pro Hac Admission Pending)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067

*Attorneys for Defendants Standard
Chartered Bank International
(Americas) Ltd., Standard Chartered
International (USA) Ltd., Standard
Chartered Bank and Standard
Chartered PLC*

March 10, 2010

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .........................................................................................................4

    A.    Madoff, Fairfield Sentry and the Standard Chartered Cases ...................................4

    B.    Plaintiffs' Investment Accounts.......................................................................8

            1.    Terms Limiting the Scope of Plaintiffs' Accounts .....................................9

            2.    Terms Limiting the Bank's Liability .......................................................11

    C.    Plaintiffs' Investments in the Fairfield Funds.......................................................12

            1.    Plaintiffs' Sophistication and Ability To Evaluate Risks of Fairfield Funds...............................................................................13

            2.    Disclosure of General Risks of Fairfield Funds........................................14

            3.    Disclosure of Risks Arising from Involvement of BLMIS ......................................................................................14

ALLEGATIONS IN THE COMPLAINTS .....................................................................15

ARGUMENT...............................................................................................................19

I.    PLAINTIFFS FAIL TO STATE ANY CLAIMS BASED ON THE BANK'S ALLEGED MISREPRESENTATIONS AND OMISSIONS............................................22

    A.    Lopez Fails To State a Claim Under Section 10(b) and Rule 10b-5 ....................22

            1.    Lopez Fails To Satisfy the Particularity Requirements of Rule 9(b) and the PSLRA Because His Allegations Are Devoid of Any Details Concerning Who Made the Alleged Misstatements or Where or When They Were Made..................24

            2.    Lopez Does Not Allege Any Actionable Misrepresentations or Omissions of Material Fact Because the Challenged Statements Were Either Not False or Not Material......................................................25

            3.    Lopez Does Not Allege Facts that Give Rise to a Strong Inference that AEBI or SCBI Acted with an Intent To Deceive..............28

    B.    Lopez Fails To Plead a Control Person Claim Against SC PLC. .........................34

# TABLE OF CONTENTS

Page

C.  Lopez and *Maridom* Plaintiffs Fail To Adequately
Allege Claims for Common-Law Fraud and Negligent
Misrepresentation Because They Do Not Plead Any Actionable
Misrepresentations and Material Facts Were Disclosed in the
Fairfield Funds' Offering Documents.................................................................35

1.  Plaintiffs Do Not Adequately Plead Scienter orAny Actionable
Misstatements or Omissions ......................................................................36

2.  The Offering Documents for the Fairfield Funds
Adequately Disclosed All of the Facts that Plaintiffs
Allege Were Misstated or Omitted ...........................................................37

II.  PLAINTIFFS' COMMON-LAW CLAIMS FOR FRAUD,
NEGLIGENCE, GROSS NEGLIGENCE AND BREACH
OF FIDUCIARY DUTY ARE BARRED BY THE ECONOMIC
LOSS RULE ...............................................................................................................39

III.  PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT
THE BANK BREACHED ANY DUTIES OWED TO PLAINTIFFS ...........................42

A.  Plaintiffs' Breach of Fiduciary Duty Claims Must Be
Dismissed Because SCBI Did Not Owe Plaintiffs the
Fiduciary Duties Plaintiffs Allege ........................................................................43

B.  Because of the Exculpation Provisions in Plaintiffs'
Account Agreements, Plaintiffs Cannot Maintain Claims
Premised on the Breach of Any Duties—Fiduciary or
Otherwise—Unless the Bank Was at Least Grossly
Negligent in Performing Those Duties ..................................................................45

C.  Plaintiffs Cannot Maintain Their Claims for Breach
of Fiduciary Duty, Negligence or Gross Negligence
Because the Bank Did Not Consciously Disregard a
Known Clear and Present Danger............................................................................47

D.  Plaintiffs' Claims for Fraud, Negligent Misrepresentation,
Negligence, Gross Negligence and Breach of Fiduciary
Duty Also Fail for the Simple Reason that All of Plaintiffs'
Losses Were Caused by Bernard Madoff's Fraud, Not the
Actions of Standard Chartered ...............................................................................51

**TABLE OF CONTENTS**

IV.     PLAINTIFFS' UNJUST ENRICHMENT CLAIMS FAIL
BECAUSE PLAINTIFFS' RELATIONSHIP WITH THE
BANK IS COVERED BY A VALID CONTRACT ............................................................52

V.     LOPEZ'S INVESTMENT ADVISER ACT CLAIM FAILS
BECAUSE LOPEZ HAS NOT ADEQUATELY ALLEGED
THAT SCBI WAS AN "INVESTMENT ADVISER" UNDER
THE IAA ............................................................................................................................53

    A.     SCBI Is Exempt from the Investment Advisory Restrictions
of the IAA.53

    B.     Lopez Does Not Adequately Plead That SCBI Served as
His Investment Adviser ............................................................................................55

CONCLUSION ......................................................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.I. Trade Finance, Inc.* v. *Petra Intern. Banking Corp.*,
    62 F.3d 1454 (D.C. Cir. 1995) .................................................................................54

*ABF Capital Corp.* v. *Berglass*,
    30 Cal. Rptr. 3d 588 (Ct. App. 2005) ...................................................................21

*Alexander* v. *Sandoval*,
    532 U.S. 275 (2001) ...............................................................................................53

*Anwar* v. *Fairfield Greenwich Ltd.*,
    No. 09-cv-118 (S.D.N.Y.) .......................................................................................6

*Ashcroft* v. *Iqbal*,
    129 S. Ct. 1937 (2009) ...........................................................................................19

*ATSI Comm'ns, Inc.* v. *Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ...............................................................19, 20, 28, 34

*B.T. Produce Co.* v. *Robert A. Johnson Sales, Inc.*,
    354 F. Supp. 2d 284 (S.D.N.Y. 2004) .....................................................................5

*Bank of Am. Corp.* v. *Lemgruber*,
    385 F. Supp. 2d 200 (S.D.N.Y. 2005) ...................................................................54

*Behrman* v. *Allstate Life Ins. Co.*,
    No. 04-CV-60926, 2005 U.S. Dist. LEXIS 7262 (S.D. Fla. Mar. 23, 2005) ..........40

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007) ...............................................................................................19

*Boguslavsky* v. *Kaplan*,
    159 F.3d 715 (2d Cir. 1998) ..................................................................................34

*Brasil, Ltda* v. *Fed. Express Corp.*,
    502 F.3d 78 (2d Cir. 2007) ....................................................................................21

*Brody* v. *Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) .................................................................................28

*Bruhl* v. *Conroy*,
    No. 03-CV-23044, 2006 U.S. Dist. LEXIS 66387 (S.D. Fla. Mar. 31, 2006) ........36

*Calcutti* v. *SBU, Inc.*,
224 F. Supp. 2d 691 (S.D.N.Y. 2002)............................................................................5

*Chambers* v. *Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)..........................................................................................8

*Chill* v. *Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996).........................................................................................31

*City of Monroe Employees Ret.* v. *Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) .......................................................................................27

*City of Sterling Heights Police & Fire Ret. Sys.* v. *Vodafone*,
655 F. Supp. 2d 262 (S.D.N.Y. 2009)..........................................................................20

*Clayton* v. *State Farm Mut. Auto. Ins. Co.*,
729 So. 2d 1012 (Fla. Dist. Ct. App. 1999) ................................................................41

*Coker* v. *Pan Am. World Airways, Inc. (In re Pan Am. Corp.)*,
950 F.2d 839 (2d Cir. 1991).........................................................................................20

*Cooper* v. *Meridian Yachts, Ltd.*,
575 F.3d 1151 (11th Cir. 2009) ............................................................................45, 46

*Coronel* v. *Quanta Capital Holdings Ltd.*,
No. 07-CV-1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ..................................30

*Corporacion Venezolana de Fomento* v. *Vintero Sales Corp.*,
629 F.2d 786 (2d Cir. 1980).........................................................................................21

*De Jesus Palma* v. *BP Prods. N. Am.*,
594 F. Supp. 2d 1306 (S.D. Fla. 2009) .......................................................................51

*de Kwiatkowski* v. *Bear, Stearns & Co.*,
306 F.3d 1293 (2d Cir. 2002).......................................................................................44

*DeBlasio* v. *Merrill Lynch & Co.*,
2009 WL 2242605 (S.D.N.Y. Jul. 27, 2009) ........................................................37, 55

*Detwiler* v. *Bank of Cent. Fl.*,
736 So. 2d 757 (Fla. Dist. Ct. App. 1999) ..................................................................41

*Dura Pharms., Inc.* v. *Broudo*,
544 U.S. 336 (2005)......................................................................................................22

*ECA & Local 134 IBEW Joint Pension Trust* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..............................................................27

*Eisenstadt* v. *Centel Corp.*,
113 F.3d 738 (7th Cir. 1997) ...........................................................27

*Endovasc Ltd., Inc.* v. *J.P. Turner & Co., LLC*,
No. 02-CV-7313, 2004 WL 634171 (Mar. 30, 2004)..........................25

*Excess Risk Underwriters, Inc.* v. *Lafayette Life Ins. Co.*,
208 F. Supp. 2d 1310 (S.D. Fla. 2002) ...............................................41

*Exxon Co.* v. *Sofec*,
517 U.S. 830 (1996)..........................................................................52

*First Equity Corp.* v. *Watkins*,
Nos. 98-851, 98-589, 1999 WL 542639 (Fla. Dist. Ct. App. July 28, 1999) ..........................41

*Fla. Evergreen Foliage* v. *E.I. Dupont De Nemours & Co.*,
336 F. Supp. 2d 1239 (S.D. Fla. 2004) ...............................................51

*Fla. State Bd. of Admin.* v. *Law Eng'g & Envtl. Servs.*,
262 F. Supp. 2d 1004 (D. Minn. 2003)................................................41

*Fleetwood Homes of Fla., Inc.* v. *Reeves*,
833 So. 2d 857 (Fla. Dist. Ct. App. 2002) ..........................................50

*Garcia* v. *Santa Maria Resort, In*c.,
528 F. Supp. 2d 1283 (S.D. Fla. 2007) ..........................................37, 38

*Gehr* v. *Next Day Cargo, Inc.*,
807 So. 2d 189 (Fla. Dist. Ct. App. 2002) ..........................................51

*Gonzaga Univ.* v. *Doe*,
536 U.S. 273 (2002)..........................................................................53

*Granat* v. *Axa Equitable Life Ins. Co.*,
No. 06-CV-21197, 2006 WL 3826785 (S.D. Fla. Dec. 27, 2006).........41

*Greater Orlando Aviation Auth.* v. *Bulldog Airlines, Inc.*,
705 So. 2d 120 (Fla. Dist. Ct. App. 1998) ......................................45, 46

*Greathouse* v. *Ceco Concrete Constr., L.L.C.*,
No. 5:06-CV-2, 2007 WL 624550 (N.D. Fla. Feb. 23, 2007)..............47, 48, 49, 50

*Guice* v. *Enfinger*,
   389 So. 2d 270 (Fla. 1st DCA 1980) ..........................................................51

*Harris* v. *Howard*,
   No. 08-CV-4837, 2009 WL 3682537 (S.D.N.Y. Oct. 30, 2009)..........................5

*Hayden, Stone, Inc.* v. *Brown*,
   218 So. 2d 230 (Fla. Dist. Ct. App. 1969) ...............................................43

*Hoffman* v. *UBS-AG*,
   591 F. Supp. 2d 522 (S.D.N.Y. 2008)........................................................28

*Holowecki* v. *Fed. Express Corp.*,
   440 F.3d 558 (2d Cir. 2006)....................................................................20

*Hoyt* v. *Corbett*,
   559 So. 2d 98 (Fla. Dist. Ct. App. 1990) ............................................47, 48

*Hughes Elecs. Corp.* v. *Citibank Del.*,
   15 Cal. Rptr. 3d 244 (Ct. App. 2004) ......................................................21

*In re Alstom SA Secs. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................34

*In re AstraZeneca Sec. Litig.*,
   559 F. Supp. 2d 453 (S.D.N.Y. 2008)......................................................31

*In re Austl. & N.Z Banking Group Ltd. Sec. Litig.*,
   No. 08-CV-11278, 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .........................27

*In re Bayou Hedge Fund Litig.*,
   534 F. Supp. 2d 405 (S.D.N.Y. 2007)...........................................31, 32, 33, 48

*In re Bernard L. Madoff Inv. Sec.*
   LLC, --- B.R. ----, No. 08-01789 (BRL), 2010 WL 694211
   (Bankr. S.D.N.Y. Mar. 1, 2010).............................................................4, 5

*In re Blech Sec. Litig.*,
   928 F. Supp. 1279 (S.D.N.Y. 1996)......................................................24, 36

*In re Carter-Wallace, Inc. Sec. Litig.*,
   220 F.3d 36 (2d Cir. 2000).....................................................................30

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ......................................................30

*In re Livent, Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................................................................34

*In re Managed Care Litig.*,
  185 F. Supp. 2d 1310 (S.D. Fla. 2002) ...............................................................52

*In re Merrill Lynch Tyco Research Sec. Litig.*,
  No. 03-CV-4080, 2004 WL 305809 (S.D.N.Y. Feb. 18, 2004)............................26

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)..................................................................29

*Indem. Ins. Co. of N. Am.* v. *Am. Aviation, Inc.*,
  891 So. 2d 532 (Fla. 2004)............................................................................40, 41

*Indem. Ins. Co. of N. Am.* v. *Am. Aviation, Inc.*,
  891 So.2d 532 (Fla. 2004)....................................................................................40

*Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*,
  62 F.3d 69 (2d Cir.1995)......................................................................................20

*Interstate Sec. Corp.* v. *Hayes Corp.*,
  920 F.2d 769 (11th Cir. 1991) .............................................................................41

*Jaffe* v. *Bank of Am., N.A.*,
  667 F. Supp. 2d 1299 (S.D. Fla. Aug. 18, 2009) ...........................................36, 38

*Jaffe* v. *Capital One Bank*,
  No. 09-cv-4106, 2010 WL 691639 (S.D.N.Y. Mar. 1, 2010)..............................19

*Kalin* v. *Xanboo, Inc.*,
  526 F. Supp. 2d 392 (S.D.N.Y. 2007)..................................................................34

*Kalnit* v. *Eichler*,
  264 F.3d 131 (2d Cir. 2001)..................................................................................28

*Kassover v. UBS AG*,
  619 F. Supp. 2d 28 (S.D.N.Y. 2008)..............................................................53, 55

*Kinsey* v. *Cendant Corp.*,
  No. 04-CV-0582, 2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005)........................30

*Kline* v. *Rubio*,
  652 So. 2d 964 (Fla. 3d DCA 1995) ....................................................................47

*Lehman Bros. Holdings, Inc.* v. *Hirota*,
No. 06-CV-2030, 2007 WL 1471690 (M.D. Fla. May 21, 2007)............................................41

*Leib* v. *Merrill Lynch, Pierce, Fenner and Smith*,
461 F. Supp. 951 (E.D. Mich. 1978)...............................................................................43, 44

*Lloyds Bank PLC* v. *Republic of Ecuador*,
1998 U.S. Dist. LEXIS 3065 (S.D.N.Y. Mar. 12, 1998) .......................................................21

*Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) .................................................................................................33

*Mancusco* v. *Rubin*,
861 N.Y.S.2d 79 (2d Dep't 2008) ..........................................................................................48

*Martinez* v. *Weyerhaeuser Mortgage Co.*,
959 F. Supp. 1511 (S.D. Fla. 1996) .......................................................................................52

*Matsumura* v. *Benihana Nat'l Corp.*,
542 F. Supp. 2d 245 (S.D.N.Y. 2008)....................................................................................37

*McCutcheon* v. *Kidder, Peabody & Co.*,
938 F. Supp. 820 (S.D. Fla. 1996) ...........................................................................39, 40, 41

*Menowitz* v. *Brown*,
991 F.2d 36 (2d Cir. 1993)...............................................................................................20, 21

*Moransais* v. *Heathman*,
744 So. 2d 973 (Fla. 1999)......................................................................................................41

*Muller-Paisner* v. *TIAA*,
289 F. App'x. 461 (2d Cir. 2008) ...........................................................................................19

*Nairobi Holdings Ltd.* v. *Brown Bros. Harriman & Co.*,
No. 02-CV-1230, 2002 WL 31027550 (S.D.N.Y. Sep. 10, 2002).........................................55

*Nat'l Ventures, Inc.* v. *Water Glades 300 Condo. Ass'n*,
847 So. 2d 1070 (Fla. Dist Ct. App. 2003) ............................................................................35

*Nat'l Western Life Ins. Co.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
175 F. Supp. 2d 489 (S.D.N.Y. 2000)....................................................................................43

*Nedlloyd Lines B.V.* v. *Superior Court*,
834 P.2d 1148 (Cal. 1992) .....................................................................................................21

*Palma* v. *BP Prods. N. Am., Inc.*,
    347 F. App'x 526 (11th Cir. 2009) ........................................................................51

*Roberts* v. *Shop & Go, Inc.*,
    502 So. 2d 915 (Fla. Dist. Ct. App. 1986) ..............................................................51

*ROIS* v. *JUNCO*,
    487 So. 2d 331 (Fla. Dist. Ct. App. 3d Dist. 1986)...................................................51

*Rosenman Family LLC* v. *Picard*,
    420 B.R. 108 (Bankr. S.D.N.Y. 2009) ....................................................................26

*Royal Surplus Lines Inc. Co.* v. *Coachman Indus.*,
    184 F. App'x 894 (11th Cir. 2006) ..........................................................................41

*SEC* v. *Cohmad Sec. Corp.*,
    No. 09-CV-5680, 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010)................................5, 33, 48, 49

*Sofi Classic S.A. de C.V.* v. *Hurowitz*,
    444 F. Supp. 2d 231 (S.D.N.Y. 2006)......................................................................24

*Spain* v. *Deutsche Bank*,
    No. 08-CV-10809, 2009 WL 3073349 (S.D.N.Y. Sept. 18, 2009)...................................8, 20

*Stevelman* v. *Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)......................................................................................26

*Tapken* v. *Brown*,
    No. 90-cv- 691, 1992 WL 178984 (S.D. Fla. Mar. 13, 1992) .................................36

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*
    ("*Teamsters Local 445*"), 531 F.3d 190 (2d Cir. 2008)..............................29, 32, 33

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................................20, 28

*Transamerica Mortg. Advisors (TAMA)* v. *Lewis*,
    444 U.S. 11 (1979)..................................................................................................53

*Travelers Indem. Co.* v. *PCR Inc.*,
    889 So. 2d 779 (Fla. 2004).....................................................................................47

*United States* v. *Madoff*,
    No. 09-CR-213, 2009 WL 622150 (S.D.N.Y. Mar. 12, 2009) ...........................4, 42

*Vesta Constr. & Design, LLC* v. *Lotspeich & Assocs., Inc.*,
    974 So. 2d 1176 (Fla. Ct. App. 2008) ......................................................................40

*Vogel* v. *Sands Bros. & Co.*,
    126 F. Supp. 2d 730 (S.D.N.Y. 2001).......................................................................25

*Webster* v. *Royal Caribbean Cruises, Ltd.*,
    124 F. Supp. 2d 1317 (S.D. Fla. 2000) ....................................................................52

*Welch* v. *TD Ameritrade Holding Corp.*,
    No. 07-CV-6904, 2009 WL 2356131 (S.D.N.Y. Jul. 27, 2009) ...............................55

*White Constr. Co.* v. *Martin Marietta Materials, Inc.*,
    633 F. Supp. 2d 1302 (M.D. Fla. 2009) ...................................................................41

### Statutes and Rules

12 U.S.C. § 611 ......................................................................................................54

15 U.S.C. § 78j........................................................................................... passim

15 U.S.C. § 78t(a) .....................................................................................17, 22, 34, 35

15 U.S.C. § 78u-4(b) ...............................................................................22, 24, 28

15 U.S.C. § 80b-2 ....................................................................................................54

15 U.S.C. § 80b-6 .................................................................................2, 17, 53

15 U.S.C. § 80b-15 ...............................................................................2, 17, 53

12 U.S.C.A. § 1841 ...............................................................................................54

Standard Chartered Bank International (Americas) Ltd., Standard Chartered Bank, Standard Chartered PLC and Standard Chartered International (USA) Ltd. respectfully submit this memorandum of law in support of their motion to dismiss plaintiffs' complaints pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This is a unified motion to dismiss the operative complaints in *Headway Investment Corp.* v. *American Express Bank, et al.*, No. 09-CV-08500 ("*Headway*"), *Ricardo Lopez* v. *Standard Chartered International (Americas) Ltd., et al.*, No. 10-CV-00919 ("*Lopez*"), *Maridom Ltd., Caribetrans, S.A. and Abbot Capital, Inc.* v. *Standard Chartered International (Americas) Ltd.*, No. 10-CV-00920 ("*Maridom*"), and *Maria Akriby Valladolid* v. *American Express Bank Ltd., et al.*, No. 10-CV-00918 ("*Valladolid*") (collectively, the "Florida Cases"). The motion is filed pursuant to the Initial Scheduling Order entered on January 29, 2010.[1]

Plaintiffs are current and former private banking customers of the Miami office of American Express Bank International ("AEBI"), which was renamed Standard Chartered Bank International (Americas) Ltd. ("SCBI") in 2008 after it was acquired by Standard Chartered PLC ("SC PLC"). Between 1997 and 2008, plaintiffs each opened nondiscretionary investment accounts at AEBI. Plaintiffs used their accounts to invest money in Fairfield Sentry Ltd. ("Fairfield Sentry") and/or Fairfield Sigma Ltd. ("Fairfield Sigma") (collectively, the "Fairfield Funds"), two feeder funds whose assets were substantially invested in Bernard L. Madoff Investment Securities LLC ("BLMIS").

---

[1] Filed concurrently with the instant motion, also pursuant to the January 29, 2010 scheduling order, is a unified motion to dismiss the operative complaints in *Bhatia, et al.* v. *Standard Chartered International (USA) Ltd., et al.*, No. 09-CV-2410 ("*Bhatia*") and *Tradewaves, et al.* v. *Standard Chartered International (USA) Ltd., et al.*, No. 09-CV-9423 ("*Tradewaves*") (collectively, the "Singapore Cases"). The differences between the two groups of cases are discussed in detail *infra* pp. 7-8.

On December 11, 2008, Bernard Madoff, a former Chairman of the NASDAQ stock exchange, shocked the investment community when he turned himself in to authorities and subsequently admitted to operating the largest Ponzi scheme in history. The fraud had begun by at least the early 1990s and, all told, defrauded thousands of sophisticated investors of billions of dollars. It was not just investors who were fooled; the SEC had conducted five investigations and examinations into his operations, each time failing to uncover Madoff's secret fraud. At the time Madoff's fraud was exposed, his victims held BLMIS account statements—which Madoff fabricated in order to conceal his scheme—showing assets of more than $73.1 billion. Much of that $73.1 billion constituted "fictitious profits" fabricated by Madoff that never existed.

Madoff's victims have taken their core complaint—that Madoff defrauded them out of billions of dollars—and turned it into federal and state law causes of action against virtually every individual and entity that bore any connection to Madoff or BLMIS, no matter how attenuated. Plaintiffs do not allege that any Standard Chartered entity or individual had knowledge of, was involved in, or benefited in any way from Madoff's fraud. They nonetheless assert that SCBI—the holder of plaintiffs' non-discretionary accounts—and SCBI's parent and affiliates (collectively with SCBI, the "Bank"), which have no relationship to plaintiffs at all, were the actual cause of their losses, not Madoff. To that end, plaintiffs collectively assert claims under Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, Section 20(a) of the Exchange Act, Sections 206 and 215 of the Investment Advisers Act ("IAA"), and a host of common-law claims, including fraud, breach of fiduciary duty, negligence, negligent misrepresentation, gross negligence and unjust enrichment.

Plaintiffs' claims all rest on either or both of two general allegations of wrongdoing: (1) that Bank personnel made misstatements or omissions relating to the safety of

investments in the Fairfield Funds and the extent of due diligence the Bank had conducted on the funds prior to offering them to plaintiffs (the "Misrepresentation Claims"); and (2) that the Bank breached certain common-law duties in connection with plaintiffs' investments in the funds, in particular, by failing to conduct sufficient due diligence of the funds to uncover Madoff's Ponzi scheme (the "Breach-of-Duty Claims"). None of these claims withstand scrutiny.

The Misrepresentation Claims fail for numerous reasons. *First*, plaintiffs' allegations lack the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure, and, in the case of the federal securities law claims, the Private Securities Litigation Reform Act. *Second*, plaintiffs do not identify any actionable misstatements or omissions of material fact. *Third*, plaintiffs do not adequately allege scienter. Notably, plaintiffs do not allege that anyone at the Bank benefited from, or had any special motive to engage in, fraud; nor do they allege facts sufficient to demonstrate that the Bank knew, or should have known, of Madoff's Ponzi scheme (which, of course, went undetected by thousands of sophisticated investors and the government regulators charged with oversight of BLMIS). *Fourth*, the offering documents for the Fairfield Funds, which plaintiffs acknowledged receiving in writing, disclose all of the facts and risks of which plaintiffs now plead ignorance.

The Breach-of-Duty Claims fare no better. Plaintiffs' accounts were governed by written agreements that made clear that plaintiffs' accounts were nondiscretionary—*i.e.*, that plaintiffs, not AEBI/SCBI, controlled the accounts and made all investment decisions. As a nondiscretionary securities broker, AEBI/SCBI owed plaintiffs only limited, transaction-specific duties, at most. These duties did not include a duty to uncover Madoff's Ponzi scheme before offering the Fairfield Funds as an investment choice to plaintiffs, nor did they include an ongoing duty to oversee and protect plaintiffs' accounts from such a fraud. In addition, plaintiffs'

account agreements also contain exculpation provisions that relieve AEBI and SCBI from liability for any conduct not rising to the level of gross negligence, and no gross negligence is pleaded here.

Plaintiffs' Misrepresentation and Breach-of-Duty Claims that are based on the common law fail for two additional reasons. To begin, Florida's economic loss rule bars plaintiffs' attempt to assert tort claims to recover purely economic damages despite agreements governing the subject matter of those losses—namely, plaintiffs' investments in the Fairfield Funds. Moreover, plaintiffs' injuries were proximately caused by Bernard Madoff and his associates—not by the Bank. The unforeseeability of Madoff's Ponzi scheme is demonstrated clearly by the fact that Madoff's scheme continued for so long, ensnared so many sophisticated investors and, with the exception of speculation by some, evaded detection by all, including the government regulators tasked with uncovering such fraud. The Madoff fraud is almost unfathomable in its scope and impact on investors, but the Bank is not responsible for that fraud. Plaintiffs' claims should be dismissed.

## BACKGROUND

### A.     Madoff, Fairfield Sentry and the Standard Chartered Cases

Bernard Madoff ("Madoff") perpetrated the largest and longest-running Ponzi scheme on record. According to Madoff himself, BLMIS operated as a Ponzi scheme from at least the early 1990s until his fraud was exposed on December 11, 2008. Plea Allocution, *United States* v. *Madoff*, No. 09-CR-213, 2009 WL 622150 (S.D.N.Y. Mar. 12, 2009). The trustee tasked with recovering money on behalf of BLMIS's customers has indicated that, immediately before Madoff's fraud was exposed, BLMIS account statements totaled more than $73.1 billion. *In re Bernard L. Madoff Inv. Sec.* LLC, --- B.R. ----, No. 08-01789 (BRL), 2010 WL 694211

(Bankr. S.D.N.Y. Mar. 1, 2010).  Through October 31, 2009, the trustee had recovered approximately $1.1 billion.  Trustee's Second Interim Report ¶ 50, at 17, *In re Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (BRL), (Bankr. S.D.N.Y. Nov. 23, 2009).

Throughout the operation of his criminal enterprise, Madoff, a former Chairman of the NASDAQ stock market who operated BLMIS since 1960, "fooled . . . individual investors, financial institutions, and regulators."  *SEC* v. *Cohmad Sec. Corp.*, No. 09-CV-5680, 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010).  Even the SEC failed to uncover Madoff's Ponzi scheme, despite conducting five examinations and investigations and receiving three substantive complaints.[2]

Madoff's victims include both direct investors in BLMIS and investors in "feeder funds" that placed assets with BLMIS.  Fairfield Sentry was the largest "feeder fund" and was launched and run by entities and individuals associated with the marketing name Fairfield Greenwich Group ("Fairfield").  Fairfield Sigma was a Euro-denominated fund that purchased shares in Fairfield Sentry—*i.e.*, it was a "feeder" fund into Fairfield Sentry.  (Declaration of Patrick B. Berarducci ("Berarducci Decl.") Ex. A (Sigma 10/1/04 PPM) at 1-2.)

---

[2]     The Court may take judicial notice of the fact of these representations by Madoff and the trustee because such facts are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201; *see also Harris* v. *Howard*, No. 08-CV-4837, 2009 WL 3682537, at *2 (S.D.N.Y. Oct. 30, 2009) ("[I]t is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including arrest reports, criminal complaints, indictments, and criminal disposition data." (citation and quotation marks omitted)).  Likewise, the fact that the SEC conducted five examinations and investigations based on three substantive complaints and yet did not uncover Madoff's Ponzi scheme is beyond dispute and readily confirmable by reference to the SEC's Office of Inspector General's Report Number OIG-509, entitled Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, made available through the SEC, http://www.sec.gov/news/studies/2009/oig-509.pdf.  *See B.T. Produce Co.* v. *Robert A. Johnson Sales, Inc.*, 354 F. Supp. 2d 284, 285 (S.D.N.Y. 2004) (Marrero, J.) ("Courts have frequently taken judicial notice of official government reports as being 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,' FED. R. EVID. 201(b)."); *Calcutti* v. *SBU, Inc.*, 224 F. Supp. 2d 691, 696 (S.D.N.Y. 2002) (Marrero, J.) (a district court may take judicial notice of reports of administrative bodies).

Following the revelation that BLMIS was operated as a Ponzi scheme, investors quickly filed suit against BLMIS and others. Dozens of lawsuits have been brought by investors in the Fairfield Funds against Fairfield, as well as entities and individuals involved with the operation and administration of the Fairfield Funds, including, for example, fund administrators and auditors. *See* Second Consolidated Amended Complaint ¶¶ 156, 165, *Anwar* v. *Fairfield Greenwich Ltd.*, No. 09-CV-118 (S.D.N.Y. Sept. 29, 2009) ("*Anwar*"). Nearly all of these cases have been transferred to this Court and consolidated or coordinated with *Anwar*. Plaintiffs also have sought to recover the value of their Madoff losses from the financial institution intermediaries through which they purchased their investments in the Fairfield Funds. This is precisely the context in which Standard Chartered entities have been brought into the Fairfield Funds litigation.

The cases involving Standard Chartered entities—either pending before this Court or subject to a conditional transfer order to this Court issued by the Judicial Panel on Multidistrict Litigation (the "JPML")—can be grouped in two categories based on the location at which the customer-plaintiffs booked and maintained their accounts. The first category of cases, the "Singapore Cases," involves accounts opened through and maintained at the Singapore Branch of American Express Bank Ltd. ("AEBL") / Standard Chartered Bank ("SCB"). The Singapore Cases are the subject of a separate motion to dismiss filed concurrently herewith based on venue and forum issues, as well as merits matters.

The second group of cases, the "Florida Cases," is the subject of the instant motion. In these cases, *Headway*, *Lopez*, *Maridom* and *Valladolid*, plaintiffs all opened accounts

maintained at AEBI in Miami, Florida.[3] *Maridom*, *Headway* and *Lopez* were originally filed in

Florida courts and *Valladolid* was originally filed in California state court. The JPML

transferred each of the Florida Cases to this District.

      Plaintiffs in the Florida Cases assert that Standard Chartered entities violated

federal securities laws and state common law by allegedly: (1) recommending the Fairfield

Funds without having conducted adequate due diligence on the Fairfield Funds or BLMIS;

(2) making misrepresentations or omissions in connection with those recommendations; (3)

failing to oversee and protect plaintiffs' investments; and (4) collecting improper fees in

connection with plaintiffs investments in the Fairfield Funds.

      Among the Florida Cases, four Standard Chartered entities are named as

defendants: SCBI, SC PLC, SCB, and Standard Chartered International (USA) Ltd. ("SCI").[4]

SC PLC is a holding company organized and headquartered in England and Wales, and is the

ultimate parent of all of the Standard Chartered entities named in the Florida and Singapore

Cases. In February 2008, SC PLC acquired AEBL and its subsidiary, AEBI. After the

acquisition, AEBI and AEBL became subsidiaries of SCB and both were renamed; AEBI was

renamed SCBI, and AEBL was renamed SCI. Plaintiffs' accounts were maintained by SCBI, an

---

[3]      Another action, *Pujals* v. *Standard Chartered Bank International (Americas) Ltd.*, No. 09-CV-21611, filed in the Southern District of Florida, is currently subject to a Conditional Transfer Order to this District issued by the Judicial Panel on Multidistrict Litigation on December 16, 2009. On February 25, 2010, the JPML designated the *Pujals* plaintiffs' opposition to the *Pujals* conditional transfer for consideration without oral argument. The parties in *Pujals* submitted complete briefing on SCBI's motion to dismiss the complaint before the Conditional Transfer Order was issued. The case was subsequently stayed pending a final transfer determination by the JPML.

[4]      The *Headway* complaint names SCBI indirectly—and incorrectly—as "American Express Bank Ltd. d/b/a Standard Chartered Private Bank a/k/a Standard Chartered Bank International (Americas) Limited." (*Headway* Compl.)

Edge Act Corporation incorporated under the laws of the United States and headquartered in

Miami.[5]

### B. Plaintiffs' Investment Accounts

All of plaintiffs' investment accounts at the Miami office of SCBI were

nondiscretionary. The terms of their accounts were governed by certain agreements between

plaintiffs and AEBI, and later SCBI.[6] (*See* Berarducci Decl. Exs. B-H (Account Agreements).)

All plaintiffs signed an account application (the "Account Application") in which they agreed to

be bound by the Rules and Regulations Governing Accounts ("RRGA").[7] (Berarducci Decl.

Exs. B-H (Account Applications); *id.* Ex. I (RRGA).) In addition, Lopez, Headway and Abbot

(a plaintiff in *Maridom*) each signed an addendum to their Account Application relating to

securities transactions (the "Securities Transactions Addendum"). (*Id.* Exs. K-M (Securities

Transactions Addendums).) Further, Valladolid signed an agreement with AEBI, titled the

---

[5]     Hereafter, unless otherwise noted, "SCBI" shall include "AEBI," as the two names refer to the same corporate entity. Where AEBI is referred to specifically, it refers to events taking place before the entity was acquired and renamed.

[6]     Plaintiffs cite several agreements in their complaints, including the agreements governing their relationships with the Bank and the offering documents for the Fairfield Funds. (*Headway* Compl. ¶¶ 28, 50, 52; *Valladolid* Am. Compl. ¶ 37; *Maridom* Am. Compl. ¶¶ 29-30; *Lopez* Am. Compl. ¶ 69.). Further, the account agreements are integral to plaintiffs' business relationship with the Bank and the offering documents are integral to plaintiffs' investments in the Fairfield Funds, and thus plaintiffs claims. Both types of documents are therefore properly considered on a motion to dismiss. *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Spain* v. *Deutsche Bank*, No. 08-CV-10809, 2009 WL 3073349, at *3 n.3 (S.D.N.Y. Sept. 18, 2009) (considering offering documents outside the pleadings in a motion to dismiss).

[7]     The RRGAs provided that they could be "amended from time to time." (Berarducci Decl. Ex. I (RRGA) at 1.) The RRGAs were amended in 2008 (the "Amended RRGA"). (Berarducci Decl. Ex. J.) For purposes of the Florida Cases, the two versions are identical. There are no differences in the provisions relevant to this motion.

Nondiscretionary Investment Services Agreement (the "NISA").[8]  As set forth in detail below, pursuant to the terms of the Account Application, the RRGA, the Securities Transaction Addendum and the NISA, each plaintiff agreed to:  (i) limit the scope of services provided by SCBI to nondiscretionary investment services; and (ii) exculpate SCBI from liability for negligence.

### 1.  Terms Limiting the Scope of Plaintiffs' Accounts

Plaintiffs maintained only nondiscretionary investment accounts at SCBI; in other words, SCBI effected particular transactions in plaintiffs' accounts only on the instruction of plaintiffs.  The relevant governing agreements are quite clear.  First, the RRGA—applicable to all plaintiffs—plainly states that SCBI was permitted to act only on customer instruction:

> SCBI is authorized . . . to do the following: . . . . To act upon the Customer's signature as regards (1) any request, instruction or agreement to withdraw, transfer, assign, grant a security interest . . ., or otherwise deal with any account which Customer may at any time maintain with SCBI or any security or other property which SCBI may at any time hold on behalf of Customer or (2) any purchase, or acceptance of custody, by SCBI at any time of any securities or other property on behalf of the Customer.

(Berarducci Decl. Ex. I (RRGA) at § 18 & Ex. J (Amended RRGA) § 18.)

Second, the Securities Transactions Addendum—applicable to Lopez, Headway and Abbot—likewise expressly limits SCBI to transacting securities on a nondiscretionary basis only:

---

[8]      Valladolid also signed an Account Application and is subject to that agreement and the RRGA to the extent their terms do not conflict with those of the NISA.  (Berarducci Decl. Exs. N-O (*Valladolid* NISAs) at ¶ 9(e) ("[The NISA] is intended to be read and applied in conjunction with the other account agreements and other documents entered into by or applicable to Customer; however, in the event and to the extent there is any conflict or inconsistency between the provisions of [the NISA] and such other agreements and documentation, the provisions of [the NISA] shall control as to the Investment Account.").)  Although the precise language of the agreements differ, there is no conflict in the context of the provisions at issue in *Valladolid*.

> We [the customer] authorize you to act as agent on our behalf with full power and authority to buy, sell or otherwise effect transactions in stock, bonds, other securities and cash or cash equivalents for our account and in our name *upon receipt of instructions (verbal or written) from us*.

(*Id.* Exs. K-M (Securities Transactions Addendums) (emphasis added).) The Securities

Transactions Addendum further sets forth the limited nature of any investment advisory services

that SCBI would provide:

> Your AEBI Relationship Manager can assist you in generally determining your risk tolerance and investment objectives. However, prior to making any investment, you should ensure you have received and carefully read and considered any and all documents which may be furnished to you in connection with your purchase. In deciding to purchase any investments, you should rely exclusively on your own due diligence investigation and your own independent assessment of the benefits and risks of the investment as well as of the financial condition and creditworthiness of the issuers, or of any guarantors thereof.

(*Id.*)

Finally, the very title of the NISA—the Nondiscretionary Investment Services

Agreement—exemplifies the limited nature of plaintiffs' relationship with SCBI. Indeed, the

NISA's terms leave no room for doubt on this point:

> AEBI IS NOT ACTING AS A FIDUCIARY TO CUSTOMER IN CONNECTION WITH ANY TRANSACTION, THE INVESTMENT ACCOUNT, ANY HOLDINGS AND/OR THE AGREEMENT. AEBI HAS NO RESPONSIBILITY WHATSOEVER FOR THE PERFORMANCE OF ANY TRANSACTION, ANY HOLDINGS AND/OR THE INVESTMENT ACCOUNT.
>
> CUSTOMER IS A SOPHISTICATED INVESTOR WHO WILL MAKE EACH INVESTMENT DECISION AFTER CONSIDERING ALL OF THE RISKS INVOLVED AND WILL NOT RELY ON ANY STATEMENT, REPRESENTATION, WARRANTY, INFORMATION, RECOMMENDATION, SUGGESTION, OPINION, OR ACTION, OR THE ABSENCE THEREOF, BY AEBI OR ITS REPRESENTATIVES.

(*Id.*, Exs. N-O (Valladolid NISAs) ¶ 11(b)-(c), at 12 (capitalization in original).)

## 2.  Terms Limiting the Bank's Liability

In addition to acknowledging the limited role of SCBI, each plaintiff agreed to exculpatory provisions that limit the liability of SCBI.  The RRGA, applicable to all plaintiffs, provides:

Section 41:  Correspondents and Affiliates

[The Bank] will not be liable to Customer for any act, omission, error, misconduct, negligence, default or insolvency of any of its representative offices, correspondents, intermediaries, affiliates or subsidiaries, and each correspondent, affiliate, intermediary, or subsidiary shall be liable for its own acts, omissions, misconduct and/or negligence.

Section 42:  Force Majeure

Without limiting the generality of other provisions of these Rules, [the Bank] shall not be liable to Customer . . . for any failure, omission, delay, interruption or error in the performance of any of the terms, covenants and conditions of these Rules or of the Account Application and Agreement that is due to causes beyond the control of [the Bank], including . . . insolvency or negligence of other institutions.

Section 46:  Indemnification and Exculpation

Neither [the Bank] nor any offices, branches or affiliates of [the Bank] . . . shall at any time incur liability to Customer . . . in connection with [claims, causes of action] . . . relating to or arising out of: (a) these Rules or the Account Application and agreement and [the Bank's] compliance with an/or performance of its duties and obligations hereunder or thereunder . . . . (g) any transaction effectuated through an Account].

(*Id*. Ex. I (RRGA) §§ 41-42, 46 & Ex. J (Amended RRGA) §§ 41-42, 46.)

The NISA, as applicable to Valladolid, similarly provides:

*AEBI shall not be liable for the exercise of any action, inaction, omission or for any matter whatsoever in connection with the Investment Account, or for any loss or depreciation in value of the Investment Account's Holdings, unless resulting from AEBI's gross negligence, willful misconduct, or bad faith.*  To the fullest extent permitted under applicable law, AEBI shall not be responsible for any act or omission of any Agent of AEBI if AEBI used good faith and ordinary care in the selection of such Agent.  In any event, AEBI shall not be liable for any special, consequential, or punitive damages.  AEBI shall have no liability for any failure or delay to fulfill its obligations under the Agreement or to carry out any of

> Customer's instructions, as a result of war, insurrection, strikes, government regulations, telecommunications facilities' failure, force majeure, or other conditions or causes beyond AEBI's control. AEBI shall not be liable for any errors of fact or judgment so long as it acts in good faith. AEBI does not assume responsibility for losses nor does it guarantee gains for the Investment Account, and AEBI shall not be liable for any tax consequences occasioned by AEBI's taking or refusing to take any action for the Investment Account.

(*Id*. Exs. N-O (Valladolid NISAs) ¶ 5, at 2 (emphasis added).)

### C. Plaintiffs' Investments in the Fairfield Funds

All of the claims advanced in the Florida Cases are based on plaintiffs' investments in either or both Fairfield Sentry and Fairfield Sigma. The Sigma fund operated solely to purchase shares in Fairfield Sentry, and was "offered to subscribers who desire[d] to invest in Fairfield Sentry Limited and to hedge the currency exposure to the Euro resulting from the [Sigma] Fund holding assets (*i.e.*, shares in Fairfield Sentry Limited) denominated in U.S. dollars." (*Id.*, Ex. A (Sigma 10/1/04 PPM) at 1-2.) Plaintiffs allegedly purchased shares in the Fairfield Funds at varying times between January 2003 and September 2008. (*Headway* Compl. ¶¶ 39-45; *Lopez* Am. Compl. ¶¶ 31-32, 42; *Maridom* Am. Compl. ¶¶ 21-25; *Valladolid* Compl. ¶¶ 42.)

Before plaintiffs first invested in the Fairfield Funds, the Bank provided them with a Subscription Agreement and Private Placement Memorandum ("PPM") (collectively, the "Offering Documents") for the particular fund—Sentry or Sigma—in which plaintiffs were seeking to invest.[9] Plaintiffs each signed a Subscription Agreement and, in doing so, acknowledged that plaintiff "ha[d] received and read a copy of the [PPM]." (Berarducci Decl. Exs. P-V (Subscription Agreements) ¶ 7, at 4.) Since October 1, 2002, there have been four

---

[9] The Subscription Agreements provide that "[i]f the Subscriber subscribes for additional Shares at a later date, Subscriber shall be deemed to have re-executed this Agreement in subscribing for those Shares." (Berarducci Decl. Exs. P-V (Subscription Agreements) ¶ 13, at 5.)

versions of the Sentry PPM: one version effective October 1, 2002, the next effective as of July 1, 2003 (*Id*. Ex. W), another as of October 1, 2004 (*Id*. Ex. X), and another as of August 14, 2006. Two versions of the Sigma PPM have been effective since October 1, 2004: one version effective as of October 1, 2004 (*Id*. Ex. A.), and another as of December 1, 2008. Although the individual versions contain differing language in some respects, they do not conflict and each contains provisions that: (1) establish that plaintiffs were sophisticated investors who could evaluate the risks of investing in the funds, (2) disclose the risks associated with investments in the funds, and (3) disclose the risks arising from the involvement of Madoff and BLMIS. All of the PPMs, for both Sentry and Sigma, state that the PPM "supersedes any . . . verbal information relating to the Fund." (*Id*. Ex. W (Sentry 7/1/03 PPM) at iii, Ex. X (Sentry 10/1/04 PPM) at iii & Ex. A (Sigma 10/1/04 PPM) at iii.)

1. **Plaintiffs' Sophistication and Ability To Evaluate Risks of Fairfield Funds**

By signing the Subscription Agreement, plaintiffs agreed to be treated as "Professional Investor[s]" based on their wealth (*i.e.*, a net worth of no less than $1,000,000) and sophistication. (Berarducci Decl. Exs. P-T (Sentry Subscription Agreement) ¶¶ 5(c), 8; Exs. V-W (Sigma Subscription Agreement ¶¶ 5(d), 8.) Plaintiffs further represented that they "ha[d] such knowledge and experience in financial and business matters" that they were "capable of evaluating the risks of [investing in Sentry]" (*Id*. Exs. P-T (Sentry Subscription Agreement) ¶¶ 5(c), 8, and that, "in making a decision to subscribe for Shares," they had "relied solely upon the Fund Documents and independent investigations made by Subscriber and ha[d] not relied on any

representation inconsistent with the information in the Fund Documents." (*Id*. Exs. P-V

(Subscription Agreement) ¶ 7, at 4.)[10]

### 2. **Disclosure of General Risks of Fairfield Funds**

The Offering Documents expressly disclose the risks of the Fairfield Funds. For

example:

- The cover pages of the PPMs state, in all capitalized and emphasized lettering: *THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK*." (Berarducci Decl. Exs. A, W-Y.)

- The Subscription Agreement affirms that each subscriber "understands there are substantial risks of loss incidental to the purchase of Shares and has determined that the Shares are a suitable investment for the Subscriber." (*Id*. Exs. P-V (Subscription Agreement) ¶8.

- The PPMs warn that "[t]here can be no assurance that any trading method employed by or on behalf of the Fund will produce profitable results, and the past performance of the Fund is not necessarily indicative of its future profitability." (*Id*. Ex. W (Sentry 7/1/03 PPM) at 18 & Ex. X (Sentry 10/1/04 PPM) at 16; *see also id.* Ex. A (Sigma 10/1/04 PPM) at 17 (disclosing "trading risks").)

- Under the heading "<u>Who Should Purchase/Subscription Procedure</u>," the PPMs state that "[t]his offering is limited to non-US persons who have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition." (*Id*. Ex. W (Sentry 7/1/03 PPM) at 14, Ex. X (Sentry 10/1/04 PPM) at 12 & Ex. A (Sigma 10/1/04 PPM) at 13.)

### 3. **Disclosure of Risks Arising from Involvement of BLMIS**

The PPMs also contain a number of specific disclosures regarding the Fairfield

Funds' investments in BLMIS. For example, the PPMs disclose that BLMIS would have

custody of substantially all of the Fairfield Funds' assets:

- "Bernard L. Madoff Investment Securities LLC ('BLM' and, together with other qualified entities with which sub-custodial arrangements may be made, the 'Sub-Custodians', and each, singularly, a 'Sub-Custodian') serves as a

---

[10]     The Subscription Agreement defines "Fund Documents" to include the Subscription Agreement, the PPM and the "Fund's Memorandum of Association and Articles of Association." (Berarducci Decl. Ex. P-V (Subscription Agreement) at ¶ 1.)

sub-custodian for certain assets of the Fund. . . .  Currently BLM has approximately 95% of the Fund's assets under custody."  (Berarducci Decl. Ex. W (Sentry 7/1/03 PPM) at 16 & Ex. X (Sentry 10/1/04) at 14-15.)

- "When FSL invests with Bernard L. Madoff Investment Securities or in a Non-[split strike conversion] Investment vehicle, it will not have custody of the assets so invested."  (*Id.* Ex. A (Sigma 10/1/04 PPM) at 20.)

The PPMs also disclose that the Fairfield Funds' key investment strategy—the split strike conversion strategy—would not be executed by Fairfield:

- "The broker-deal [sic] through which the Fund conducts its SSC Investments [i.e., the split strike conversion strategy investments], in its role as a market-maker may effect transactions in equity securities with the Fund as principal." (*Id.* Ex. X (Sentry 10/1/04 PPM) at 17 & Ex. A (Sigma 10/1/04 PPM) at 17.)

Finally, the PPMs warn of the risk of misappropriation of the Fairfield Funds' assets:

- "When [Sentry] . . . invests with Bernard L. Madoff Investment Securities or in a [non-split strike conversion strategy] . . . Investment vehicle, it will not have custody of the assets so invested.  Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund."  (*Id.* Ex. A (Sigma 10/1/04 PPM) at 20.)

- "When the Fund invests utilizing the 'split strike conversion' strategy . . . it will not have custody of the assets so invested. Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund."  (*Id.* Ex. X (Sentry 10/1/04 PPM) at 19, *&* Ex. W (Sentry 7/1/03 PPM) at 21.)

## ALLEGATIONS IN THE COMPLAINTS

Plaintiffs do not allege here (or anywhere) that any Standard Chartered entity or individual had knowledge of or was involved in the BLMIS fraud.  Nevertheless, plaintiffs seek to hold the Bank liable for the purported losses they sustained as a result of Madoff's fraud, including fictitious profits invented by BLMIS.  Plaintiffs also seek the return of any fees or commissions the Bank allegedly received from them in connection with their investments in the Fairfield Funds.  In other words, plaintiffs seek to hold the Bank as guarantor of their investment decisions.

Collectively, plaintiffs put forth two principal theories of liability. First, Lopez and *Maridom* plaintiffs advance the Misrepresentation Claims. Lopez asserts violations of Sections 10(b) and 20(a) of the Exchange Act, as well as common-law fraud, based on allegations that the Bank misrepresented both that the Fairfield Funds were a "safe" investment and that the Bank had conducted "extensive" due diligence on the Fairfield Funds prior to recommending them. (*Lopez* Am. Compl. ¶¶ 25-26, 40, 46, 50.) *Maridom* plaintiffs assert claims for common-law fraud and negligent misrepresentation based on the Bank's alleged failure to disclose that: (i) "an undisclosed third party (BLMIS)[] was to execute transactions" for the Fairfield Funds (*Maridom* Am. Compl. ¶ 60), and (ii) the Fairfield Funds were "nothing more than a funnel to BLMIS" (*Maridom* Am. Compl. ¶ 53).

Second, all plaintiffs advance the Breach-of-Duty Claims, alleging that the Bank breached certain statutory and common-law duties by failing to protect them from Madoff's Ponzi scheme. Plaintiffs assert claims for breach of fiduciary duty, negligence, gross negligence and violations of the IAA, focusing on two alleged duties: (1) an alleged duty to conduct enough due diligence to discover Madoff's fraud before plaintiffs invested in the Fairfield Funds (*Lopez* Am. Compl. ¶¶ 72, 81, 87; *Headway* Compl. ¶¶ 73-75, 111; *Maridom* Am. Compl. ¶¶ 38-40; *Valladolid* Am. Compl. ¶¶ 14-15, 87); and (2) an alleged duty to protect and monitor plaintiffs' accounts on an ongoing basis after they invested in the Fairfield Funds (*Valladolid* Am. Compl. ¶¶ 78-81, 87(d), 93, 94; *Headway* Compl. ¶¶ 110, 111(d), 129, 130; *Lopez* Am. Compl. ¶¶ 80, 81(b,e, g, i, j).) All plaintiffs, except for Lopez, allege that purported "red flags" should have

alerted the Bank to Madoff's fraud.[11] (*See Headway* Compl. ¶¶ 63, 65, 68-70; *Valladolid* Am. Compl. ¶¶ 63-64, 67-69; *Maridom* Am. Compl. ¶¶ 41, 43.)

Plaintiffs' claims are summarized on a case-by-case basis below, and a chart summarizing plaintiffs' claims and the bases for their dismissal is also attached hereto as Exhibit A.

**Headway Investment Corp. v. American Express Bank Ltd.** Headway asserts three causes of action against the Bank in connection with its investment in the Fairfield Funds: (i) breach of fiduciary duty; (ii) negligence; and (iii) unjust enrichment. Specifically, Headway alleges that the Bank failed to conduct adequate due diligence into the Funds (*Headway* Compl. ¶¶ 75, 79), failed to oversee and monitor the investments in the Funds (*id.* ¶¶ 111, 130), and failed to uncover red flags surrounding Madoff and BLMIS (*id.* ¶¶ 61-71, 78).

**Lopez v. Standard Chartered Bank International (Americas) Limited, et. al.**

Lopez asserts seven causes of action in connection with his investment in the Fairfield Funds: (i) violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; (ii) a violation of Section 20(a) of the Exchange Act; (iii) rescission under Sections 206 and 215 of the Investment Advisers Act; (iv) breach of fiduciary duty; (v) gross negligence; (vi) unjust enrichment and constructive trust; and (vii) common law fraud. Specifically, Lopez alleges that the Bank failed to conduct adequate due diligence (*Lopez* Am. Compl. ¶¶ 81, 87), misrepresented that it had conducted extensive due diligence (*id.* ¶¶ 25, 46, 50), failed to disclose the risks

---

[11] Lopez does not allege a single fact that the Bank knew or should have known about that was indicative of Madoff's fraud. Although Lopez alleges that reasonable due diligence would have uncovered Madoff's fraud (*Lopez* Am. Compl. ¶ 49), he does not allege any purported "red flags" that would have been discovered through due diligence and put the Bank on notice of the Madoff fraud.

associated with the Funds (*id.* ¶¶ 25-26, 40, 50), and failed to oversee and monitor the investments in the Funds (*id.* ¶¶ 72, 81).

        ***Maridom Ltd.* v. *Standard Chartered Bank Int'l (Americas) Ltd.*** *Maridom* plaintiffs (*i.e.*, Maridom, Caribetrans and Abbot) assert three causes of action against the Bank in connection with their investment in the Fairfield Funds: (i) fraud; (ii) negligent misrepresentation; and (iii) breach of fiduciary duty. Specifically, *Maridom* plaintiffs allege that the Bank committed fraud and engaged in negligent misrepresentation by failing to disclose that the private placement memorandum issued by the Funds and distributed by the Bank falsely implied that Fairfield, as opposed to BLMIS, would manage the Funds (*Maridom* Am. Compl. ¶¶ 53, 60), and breached its fiduciary duties by failing to conduct adequate due diligence (*id.* ¶¶ 38, 49).

        Notably, *Maridom* plaintiffs acknowledge receipt of the PPM, which disclosed all of the material facts that *Maridom* plaintiffs claim were misrepresented, but assert that the importance of certain disclosures was "not understood and could not reasonably be expected to have been understood by Plaintiffs." (*Id.* ¶ 41(i) n.1.) *Maridom* plaintiffs, each of which signed the Subscription Agreement affirming that they are "Professional Investor[s]" that have "such knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in the Fund" (*supra* pp. 13-14 (background)), do not allege any facts to explain their inability to understand the PPM's disclosures.

        ***Valladolid* v. *American Express Bank Ltd.*** Valladolid asserts three causes of action against the Bank in connection with his investment in the Fairfield Funds: (i) breach of fiduciary duty; (ii) negligence; and (iii) unjust enrichment. Valladolid alleges that the Bank failed to monitor and supervise BLMIS and the Funds (*Valladolid* Am. Compl. ¶¶ 25, 29, 78-79,

80), failed to conduct adequate due diligence (*id.* ¶ 19-20, 38, 43, 94-95), failed to oversee and monitor the investments in the Funds (*id.* ¶ 87), and either failed to discover or disregarded red flags associated with the Funds (*id.* ¶¶ 61-70, 76-77).

## ARGUMENT

For a claim to survive a motion to dismiss, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Comm'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)). A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do' . . . only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (quoting *Twombly*, 550 U.S. at 555-56). The plausibility standard does not establish a "'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 557).

In addition, plaintiffs' fraud claims, as well as any claims that sound in fraud, must meet the heightened pleading requirements of Rule 9(b) and, in the case of Lopez's federal securities fraud claims, the Private Securities Litigation Reform Act ("PSLRA"). "These standards require a plaintiff to specify the statements or omissions that the plaintiff contends were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent." *Muller-Paisner* v. *TIAA*, 289 F. App'x. 461, 462 (2d Cir. 2008). Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of a person's mind may be averred generally," Fed. R. Civ. P. 9(b), but a plaintiff must still "allege facts that give rise to a strong inference of fraudulent intent," *Jaffe* v. *Capital One Bank*, No. 09-cv-4106,

2010 WL 691639, at *6 (S.D.N.Y. Mar. 1, 2010) (citation omitted).  For federal securities

claims, the PSLRA requires that a plaintiff "state with particularity . . . the facts evidencing

scienter—i.e., the defendant's intention to 'deceive, manipulate, or defraud.'" *City of Sterling*

*Heights Police & Fire Ret. Sys.* v. *Vodafone*, 655 F. Supp. 2d 262, 267 (S.D.N.Y. 2009) (quoting

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).

   When deciding a motion to dismiss for failure to state a claim, the Court accepts

"all factual allegations in the complaint and draws all reasonable inferences in the Plaintiff's

favor." *ATSI Commc'ns, Inc.*, 493 F.3d at 98 (2d Cir. 2007).  Although the Court is generally

constrained in its deliberations on a motion to dismiss to the four corners of the complaint,

"when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document]

upon which it solely relies and which is integral to the complaint, the court may nevertheless

take the document into consideration in deciding the defendant's motion to dismiss, without

converting the proceeding to one for summary judgment." *Holowecki* v. *Fed. Express Corp.*,

440 F.3d 558, 565-66 (2d Cir. 2006) (citing *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*,

62 F.3d 69, 72 (2d Cir.1995)).  Included among such integral documents are "offering

memoranda[] that are not mentioned in or attached to the complaint."  *Spain* v. *Deutsche Bank*,

No. 08-cv-10809, 2009 WL 3073349, at *3 n.3 (S.D.N.Y. Sept. 18, 2009) (collecting cases).

   Second Circuit precedent governs Lopez's federal law claims.  A transferee court

applies its own interpretations of federal law rather than those of the transferor circuit.  *Menowitz*

v. *Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (citing *Coker* v. *Pan Am. World Airways, Inc. (In re*

*Pan Am. Corp.)*, 950 F.2d 839, 847 (2d Cir. 1991)).  This rule applies equally to multidistrict

litigation cases consolidated and transferred for pretrial purposes.  *See id.*

Florida law governs plaintiffs' common-law claims, which arise from plaintiffs' investments through accounts they held at SCBI in Miami, Florida. Only Valladolid appears to dispute this, suggesting that California law should apply to her claims instead. (*See Valladolid* Am. Compl. ¶ 92.) However, Valladolid's agreement with the Bank, the NISA, provides that Valladolid's account and the NISA "shall be governed by and construed in accordance with the laws of the State of Florida." (Berarducci Decl. Exs. N-O (Valladolid NISA), ¶ 9.) Under California law, such provisions are enforceable if "the chosen state has a substantial relationship to the parties or their transaction, or . . . there is any other reasonable basis for the parties' choice," and the chosen state's law is not "contrary to a *fundamental* policy of California" or some other state with a greater interest.[12] *Nedlloyd Lines B.V.* v. *Superior Court*, 834 P.2d 1148, 1152 & n.5 (Cal. 1992). *Valladolid* has a more than sufficient connection to Florida to enforce a Florida choice-of-law provision: Valladolid's accounts were held at SCBI's Miami, Florida, office, and that office is the headquarters of SCBI. *See ABF Capital Corp.* v. *Berglass*, 30 Cal. Rptr. 3d 588, 593-94 (Ct. App. 2005) ("That one of the parties resides in a foreign state gives the parties a reasonable ground for choosing that state's law."; *Hughes Elecs. Corp.* v. *Citibank Del.*, 15 Cal. Rptr. 3d 244, 248-49 (Ct. App. 2004) (presence of the defendant's principal place of business in New York supplied both a substantial relationship with New York and a reasonable

---

[12]       Because federal jurisdiction exists in *Valladolid* under the Edge Act, the law is not entirely clear about whether the choice of law issue should be determined according to the choice of law rules under federal common law or the law of the transferor court (*i.e.*, California). *Compare Corporacion Venezolana de Fomento* v. *Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir. 1980) *with Lloyds Bank PLC* v. *Republic of Ecuador*, 1998 U.S. Dist. LEXIS 3065, at *19-20 (S.D.N.Y. Mar. 12, 1998) *and Menowitz* v. *Brown*, 991 F.2d 36, 40 (2d Cir. 1993) ("[A] transferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed."). However, under either approach, the Restatement Second of Conflict of Laws (Restatement) would apply. *Eli Lilly do Brasil, Ltda* v. *Fed. Express Corp.*, 502 F.3d 78, 81 (2d Cir. 2007) (applying Restatement (Second) of Conflict of Laws where federal common law governed issue); *Nedlloyd Lines B.V.* v. *Superior Court*, 834 P.2d 1148, 1152 (Cal. 1992) (applying Restatement (Second) of Conflict of Laws under California law).

basis for the application of New York law).  Further, there is no indication that application of Florida law would violate any fundamental policy of California.

## I.  PLAINTIFFS FAIL TO STATE ANY CLAIMS BASED ON THE BANK'S ALLEGED MISREPRESENTATIONS AND OMISSIONS

Lopez and Maridom collectively assert four claims based on the Bank's alleged misrepresentations or omissions of material fact: (i) violation of Section 10(b) of the Exchange Act and Rule 10b-5; (ii) violation of Section 20(a) of the Exchange Act; (iii) common-law fraud; and (iv) negligent misrepresentation.  These claims fail for four distinct reasons.  *First*, neither Lopez nor *Maridom* plaintiffs plead fraud with sufficient particularity to satisfy Rule 9(b) or, in the case of the 10(b) claim, the PSLRA.  *Second*, neither Lopez nor *Maridom* plaintiffs allege any actionable misstatements or omissions.  *Third*, neither Lopez nor *Maridom* plaintiffs allege sufficient facts to support an inference that the Bank acted with scienter.  *Fourth*, the risks concerning plaintiffs' investments in the Fairfield Funds were fully disclosed in the Fairfield Funds' Offering Documents.

### A.  Lopez Fails To State a Claim Under Section 10(b) and Rule 10b-5.

Lopez's securities fraud claim fails to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege (i) a material misrepresentation or omission of fact, (ii) made with scienter, (iii) on which plaintiff relied, and that (iv) proximately caused plaintiff's economic loss in connection with the purchase or sale of securities.  *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005).  Further, under the PSLRA, a plaintiff not only must specify each statement alleged to have been misleading and the reasons why the statement was misleading, but also must "state with particularity facts giving rise to a strong inference that the defendant has acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1), (2).

Lopez challenges two categories of alleged statements: (i) statements concerning the Fairfield Fund's past performance, such as its "'mythical status' for . . . [its] . . . ability . . . to generate steady and consistent returns with low volatility"; and (ii) statements concerning the extent of due diligence performed on the Fairfield Funds and BLMIS. Specifically, Lopez challenges the following representations:

- "In 2006, AEB[I]'s relationship manager and officer, Antonio Garcia-Ardanez . . . recommended to [Lopez] that AEB[I] had conducted extensive due diligence on the Fairfield Funds and that such investments were like a 'cash substitute'." (*Lopez* Am. Compl. ¶ 25.)

- "AEB[I] . . . touted to [Lopez] the Fairfield Funds apparent histories of stable and steady returns and Garcia-Ardanez represented to [Lopez] that the Fairfield Entities had achieved 'mythical status' for the ability of the Fairfield Funds to generate steady and consistent returns with low volatility." (*Lopez* Am. Compl. ¶ 26.)

- "AEB[I] . . . advised Lopez that the Fairfield Funds would be part of the select few investments which would form the core of [Lopez's] portfolio, due to its consistent returns . . . ." (*Lopez* Am. Compl. ¶ 27.)

- "Garcia-Ardanez advised Lopez that defendant Standard Chartered had directly contacted the managers of the Fairfield Funds, and those managers had told the Standard Chartered Defendants that the Fairfield Funds were protected from risk due to investment of the Fairfield Funds' assets in United States Treasury bonds." (*Lopez* Am. Compl. ¶ 43.)

Lopez's Section 10(b) claims are unavailing. *First*, his complaint lacks sufficient details concerning the alleged misstatements—the who, what, when and where—to satisfy the particularity requirements of the PSLRA and Rule 9(b). In most instances, Lopez does not even allege the speaker of the supposed misstatements, and, with respect to the three alleged statements where the speaker is identified, Lopez fails to allege where or when the statements were made. *Second*, the alleged misstatements and omissions are not material because they either were not false or misleading at the time they were made or are too vague under the circumstances to be material. *Third*, Lopez fails to adequately plead scienter. There is no

allegation that anyone benefited from or had any special motive to engage in the alleged fraud, and, other than the conclusory and implausible assertion that reasonable due diligence would have uncovered Madoff's fraud, Lopez does not allege a single fact that suggests that anyone at the Bank knew of or was reckless in not uncovering Madoff's 15-year Ponzi scheme.

1.      **Lopez Fails To Satisfy the Particularity Requirements of Rule 9(b) and the PSLRA Because His Allegations Are Devoid of Any Details Concerning Who Made the Alleged Misstatements or Where or When They Were Made.**

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege with specificity the fraudulent statements or omissions, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. *See* 15 U.S.C. § 78u-4(b)(1). Lopez's allegations are clearly deficient.

To begin, Lopez does not allege any misstatements or omissions on the part of SC PLC. Although Lopez alleges purported misstatements or omissions by the "Standard Chartered Defendants," which Lopez defines collectively as SCBI and SC PLC (*see Lopez* Compl. ¶ 1), "Rule 9(b) is not satisfied by a complaint in which 'defendants are clumped together in vague allegations.'" *In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996). Where, as here, "fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts complained of by each defendant." *Sofi Classic S.A. de C.V.* v. *Hurowitz*, 444 F. Supp. 2d 231, 248 (S.D.N.Y. 2006) (Marrero, J.). Because Lopez makes no such allegation against SC PLC, his Section 10(b) claim against SC PLC fails. *See id.* at 248-49 (dismissing fraud claims because plaintiff "fail[ed] to identify which . . . Defendant[] made each statement or omission").

Nor are Lopez's allegations concerning SCBI adequately particularized. Plaintiff engages in vague pleading, failing to identify the speaker of all but three of the purported

misstatements, instead generically attributing the statements to "AEB" or the "Standard Chartered Defendants." (*Lopez* Am. Compl. ¶¶ 26-27, 40.) Further, all of Lopez's allegations, including the few that name a speaker, fail to identify with particularity when any of the alleged misstatements were made. Lopez alleges that one of the misstatements was made "[i]n 2006," and as to the rest of the alleged misstatements, the Court can infer only that the statements were made between 2006 and 2008, the time frame in which Lopez alleges he invested in the Fairfield Funds. (*Lopez* Compl. ¶¶ 25, 31-32, 42.) Pleading alleged misstatements that occurred on an unspecified date over a one-year period, much less unspecified dates over a three-year period, comes nowhere close to meeting the particularity requirements of the PSLRA or Rule 9(b). *Endovasc Ltd., Inc.* v. *J.P. Turner & Co., LLC*, No. 02-CV-7313, 2004 WL 634171, at *13 (Mar. 30, 2004) (allegation that misstatements occurred over 17-month period not sufficiently particular), *aff'd in part*, 169 F. App'x 655, 656 (2d Cir. 2006); *Vogel* v. *Sands Bros. & Co.*, 126 F. Supp. 2d 730, 738 (S.D.N.Y. 2001) (identification of year in which alleged misstatements made not sufficiently particular).

2. **Lopez Does Not Allege Any Actionable Misrepresentations or Omissions of Material Fact Because the Challenged Statements Were Either Not False or Not Material.**

In addition to lacking the required particularity, Lopez's claims are not actionable because none of the two categories of challenged statements are material misstatements or omissions.

*Statements Concerning the Fairfield Funds' Past Performance and the Composition of the Funds.* Here, Lopez challenges representations that:

- The Fairfield Funds were a "cash substitute" that "had achieved 'mythical status' for . . .[its]. . . ability . . . to generate steady and consistent returns with low volatility." (*Lopez* Am. Compl. ¶¶ 25-26, 40.)

- "AEB[I] . . . advised [Lopez] that the Fairfield Funds would be part of the select few investments which would form the core of [Lopez's] portfolio, due to its consistent returns. . . ." (*Lopez* Am. Compl. ¶ 27.)

- AEBI "touted [the Fairfield Funds'] apparent histories of stable and steady returns," and that the "[the Fairfield Funds'] managers had told the Standard Chartered Defendants that the Fairfield Funds were protected from risk due to investment of the Fairfield Funds' assets in United States Treasury Bonds." (*Lopez* Am. Compl. ¶ 26, 43.)

"To withstand a motion to dismiss [a] plaintiff[] must detail specific contemporaneous data or information known to the defendant that was inconsistent with the representation in question." *In re Merrill Lynch Tyco Research Sec. Litig.*, No. 03-CV-4080, 2004 WL 305809, at *4 (S.D.N.Y. Feb. 18, 2004) (citation and internal quotation marks omitted). Lopez fails to identify a single fact, known to AEBI at the time the statements were made, that was contrary to or inconsistent with the purported representations above. Indeed, the Fairfield Funds were, in fact, sought by investors for their "mythical status" in delivering "steady and consistent returns." *See Rosenman Family LLC* v. *Picard*, 420 B.R. 108, 110 (Bankr. S.D.N.Y. 2009) ("Prior to the revelation of the scheme, Madoff was a sought-after money manager who appeared to generate consistently large returns for his investors."). Lopez's suggestion that AEBI must have known that its statements were false because BLMIS was ultimately revealed to be a Ponzi scheme is an impermissible attempt to plead fraud by hindsight. *See, e.g., Stevelman* v. *Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (challenge to "[m]anagement's optimism that is shown only after the fact to have been unwarranted" amounts to impermissible attempt to plead fraud by hindsight).

> ***Statements Concerning AEBI's Due Diligence of Fairfield Sentry.*** Here, Lopez claims that the alleged representation that "[AEBI] had conducted extensive due diligence on Fairfield Sentry, Ltd." was false or misleading because unnamed Bank employees later allegedly stated that the Bank had not conducted *its own* due diligence or investigation, but had instead

relied on Fairfield's representations.  (*Lopez* Compl. ¶¶ 8-9.)  As a matter of law, such statements are too vague to be material to Lopez's decision to invest in Fairfield.

AEBI's alleged statement regarding its "extensive due diligence" procedures reflects the type of statement about a general business practice that "lacks a standard against which a reasonable investor could expect [it] to be pegged."  *City of Monroe Employees Ret.* v. *Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) (statement from company that it "employed [r]igorous testing under diverse conditions [that] helps ensure reliable quality" not actionable under Section 10(b)).  The concept of due diligence includes a vast spectrum of activities, from making specific inquiries and conducting investigations to "simply the exercise of due care."  *Eisenstadt* v. *Centel Corp.*, 113 F.3d 738, 741 (7th Cir. 1997).  Thus, without more information concerning what constitutes "extensive due diligence," "[n]o investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every . . . bank makes these statements."  *ECA & Local 134 IBEW Joint Pension Trust* v. *JP Morgan Chase Co.*, 553 F.3d 187, 197-98, 206 (2d Cir. 2009) (statement regarding bank's "highly disciplined" risk management procedures not material where plaintiffs alleged poor discipline led to bank's involvement in Enron and Worldcom scandals);  *In re Austl. & N.Z Banking Group Ltd. Sec. Litig.*, No. 08-CV-11278, 2009 WL 4823923, at *12 (S.D.N.Y. Dec. 14, 2009) (bank's "generalized statements concerning the quality of its risk management practices and controls not actionable" where plaintiffs alleged that bank's inadequate risk management led to heavy loan losses).  Here, Lopez does not allege that the Bank's relationship managers made any specific representations as to what AEBI considered "extensive due

diligence," or what type of investigation and/or analysis AEBI had conducted on Fairfield Sentry on which he could have reasonably relied.[13]

### 3. Lopez Does Not Allege Facts that Give Rise to a Strong Inference that AEBI or SCBI Acted with an Intent To Deceive.

To plead scienter, the PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Supreme Court has defined "scienter" in the context of Section 10(b) as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319. To establish a strong inference of scienter, Lopez must plead particularized facts that "(1) show[] that the defendants had both motive and opportunity to commit the fraud or (2) constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns,* 493 F.3d at 99. Where "a plaintiff has failed to demonstrate that defendants had a motive to defraud . . . he must produce a *stronger* inference of recklessness." *Kalnit* v. *Eichler*, 264 F.3d 131, 143 (2d Cir. 2001) (emphasis added). Moreover, the Court "must consider plausible non-culpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," *Tellabs*, 551 U.S. at 323-24, and dismiss the plaintiff's claims unless it is convinced that the inferences favoring the plaintiff are strong and "at least as compelling" as any

---

[13]     Moreover, Lopez fails to allege conduct that was necessarily inconsistent with the supposed misrepresentation. To be actionable, a statement must "affirmatively create an impression that was materially different from the truth." *Hoffman* v. *UBS-AG*, 591 F. Supp. 2d 522, 535 (S.D.N.Y. 2008) (citing *Brody* v. *Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). There is no inherent contradiction between the statement that AEBI conducted extensive due diligence on the Fairfield Funds and BLMIS and the statement that AEBI's due diligence involved reliance on information obtained from Fairfield. Lopez does not allege that AEBI's relationship managers made any specific representations that created an impression that AEBI would not rely on Fairfield for its due diligence into BLMIS or why this would matter in the investment decision, nor does Lopez make a single allegation to suggest that the concept of "extensive due diligence" precludes reliance on information provided by entities operating the Funds.

competing non-culpable inferences, *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.* ("*Teamsters Local 445*"), 531 F.3d 190, 197 (2d Cir. 2008).

"A corporation's scienter necessarily derives from the state of mind of its employees." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 281 (S.D.N.Y. 2008). Thus, when the defendant is a corporate entity, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445*, 531 F.3d at 195. "In most cases, the most straightforward way to raise [a strong inference of corporate scienter] will be to plead it for an individual defendant." *Id.* Otherwise, a plaintiff can plead scienter only by alleging a fraud so widespread that corporate officials must have been aware of the fraud. *Id.* at 195-96.

Here, Lopez fails to plead scienter because: (i) he does not allege that the only identified speaker acted with an intent to deceive; (ii) he does not allege that any other, unidentified, Bank employee had a motive or opportunity to defraud the Bank's private banking customers or took actions that even approached extreme recklessness; (iii) he does not allege a fraud so widespread that AEBI officials must have known of and approved the alleged misstatements; and (iv) there are non-culpable inferences to be drawn from Lopez's allegations and they are at least as compelling as any inferences of culpability.

       a.       **Lopez Does Not Allege that the Only Identified Speaker Acted with an Intent to Deceive.**

Lopez's complaint identifies just one individual employee at the Bank with any connection to the alleged misstatements—Antonio Garcia-Ardanez, an AEBI "relationship manager and officer." (*Lopez* Compl. ¶ 25.) Because there are no allegations of scienter in the complaint, Lopez apparently asks this Court to infer that because of this position, Garcia-Ardanez must have known that his statements that AEBI had conducted "extensive due diligence

on the Fairfield Funds" and that the Fairfield Funds "had achieved 'mythical status' for the[ir]

ability . . . to generate steady and consistent returns with low volatility" were false or misleading.

A strong inference of scienter cannot be adequately pled based solely on a defendant's high-level

position. *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 387 (E.D.N.Y. 2003). Rather, a

plaintiff must allege "specific facts demonstrating that [the speaker] possessed—at the time [he]

made he allegedly false statements . . . information contradicting [the] statements." *Coronel* v.

*Quanta Capital Holdings Ltd.*, No. 07-CV-1405, 2009 WL 174656, at *27 (S.D.N.Y. Jan. 26,

2009); *see also Kinsey* v. *Cendant Corp.*, No. 04-CV-0582, 2005 WL 1907678, at *5 (S.D.N.Y.

Aug. 10, 2005 ("[C]onclusory allegations that a corporate officer had 'access' to information that

contradicted the alleged misstatements are insufficient to raise a strong inference of

recklessness."). Lopez makes no allegations that Garcia-Ardanez had any such information.

> b. Lopez Does Not Allege that Any Other, Unidentified, Bank Employees Had a Motive or Opportunity To Defraud the Bank's Private Banking Customers or Took Actions that Even Approached Extreme Recklessness.

Lopez further fails to allege scienter because his complaint contains no facts that

show motive and opportunity or that the alleged misstatements and omissions were "either

known to [unidentified AEBI officials] or so obvious that [unidentified AEBI officials] must

have been aware of [them]." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39-40 (2d Cir.

2000) (internal quotation marks omitted). Because Lopez makes no specific allegations of

scienter, it is unclear whether Lopez hopes to plead scienter through allegations of motive and

opportunity or through allegations of recklessness. In either case, Lopez's claims fall short.

> (i) AEBI Officials Had No Motive or Opportunity to Defraud Lopez.

To plead scienter through allegations of motive and opportunity, Lopez must

"demonstrat[e] that defendants benefited 'in a concrete and personal way' from the alleged

fraud." *Trinity Bui*, 594 F. Supp. 2d at 370 (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)). "A generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor' is not enough." *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996)). Thus, it is not sufficient to argue "that the motive for defrauding investors was to increase the company's profits or to increase officer compensation." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008).

Here, the only possible "motive" alleged is the quarterly collection of fees from Lopez. (*See Lopez* Compl. ¶ 33.) An interest in collecting standard fees is the sort of generalized motive "to increase [a] company's profits" that is insufficient to establish a strong or compelling inference of scienter. *In re AstraZeneca*, 559 F. Supp. 2d at 468; *see also Chill*, 101 F.3d at 267-68.

(ii)      AEBI's Failure to Detect Madoff's Fraud Does Not Constitute Extreme Recklessness.

Lopez likewise comes nowhere close to pleading facts sufficient to create a "strong inference" that AEBI senior management acted recklessly or "engaged in deliberately illegal behavior." *See Trinity Bui*, 594 F. Supp. 2d at 370 (quoting *Novak*, 216 F.3d at 311). To plead recklessness, Lopez must allege facts that create a "strong inference" that AEBI either (1) "knew facts or had access to information suggesting that [its] public statements were not accurate" or (2) "failed to check information [it] had a duty to monitor." *Id.* (quoting *Novak*, 216 F.3d at 311). "Where a plaintiff relies on allegations of recklessness—as opposed to motive and opportunity—to plead fraudulent intent, the strength of the circumstantial allegations must be correspondingly greater, and the plaintiff must allege facts approaching a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts." *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007), *aff'd*, *S. Cherry St., LLC* v. *Hennessee*

*Group LLC*, 573 F.3d 98 (2d Cir. 2009).  Where, as here, "third-party advisers are concerned, to meet such a standard the allegations must approximate an actual intent to aid in the fraud being perpetrated" by BLMIS.  *Id.* at 417 (citation and internal quotation marks omitted).

Lopez alleges that AEBI was reckless in recommending the Fairfield Funds after allegedly failing to perform adequate due diligence.  The Second Circuit has already held, however, that an investment adviser's allegedly false representation that it had performed due diligence on a particular hedge fund before recommending it to a customer does not give rise to a strong inference of scienter.  *See S. Cherry*, 573 F.3d at 113-15; *see also In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 416-17 (S.D.N.Y. 2007), *aff'd S. Cherry*, 573 F.3d 98 (2d Cir. 2009).  Thus, AEBI's alleged misrepresentation concerning the extent of its due diligence is not as a matter of law "the same thing as knowing of or closing one's eyes to a known 'danger,' or participating in the fraud."  *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d at 417.  Moreover, with respect to the statements concerning the Funds' performance, Lopez has not asserted any fact known to Garcia-Ardenez or to any unidentified Bank employee at the time the alleged misstatements were made "that either made the falsity of any of the . . . representations obvious or that should have alerted [them] that [their] representations were dubious."  *S. Cherry*, 573 F.3d at 112.

c.       Lopez Does Not Allege a Fraud So Widespread that AEBI Officials Must Have Known of and Approved the Alleged Misstatements.

In *Teamsters Local 445*, the Second Circuit explained that a finding of corporate scienter in the absence of scienter by any individual defendant may be appropriate where the alleged misstatement is so "dramatic" that it must have been "approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."  531 F.3d at 196.  As an example, the Second Circuit cited a scenario in which General Motors

announces sales of one million SUVs when the number was actually zero. *Id*. (citing *Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*, 513 F.3d 702, 702 (7th Cir. 2008)). There is no corporate fraud here. Lopez alleges that a single AEBI relationship manager, at some point over a three-year period, falsely represented the extent of AEBI's due diligence on a single investment fund. (*Lopez* Am. Compl. ¶¶ 25, 41.) This is hardly an allegation of a misstatement or omission so extensive, dramatically false or essential to AEBI's business operations that it must have been known to and approved by senior AEBI officials.

> d.      There Are Non-Culpable Inferences To Be Drawn from Lopez's
>           Allegations, and They Are at Least as Compelling as Any
>           Inferences of Culpability.

Any inference that the Bank's failure to discover Madoff's fraud demonstrates a reckless lack of due diligence is "far from compelling" and certainly not "as compelling as any opposing inference of nonfraudulent intent." *Trinity Bui*, 594 F. Supp. 2d at 370. Indeed, it is wholly implausible in light of the length and breadth of Madoff's fraud. A far more compelling and plausible non-culpable inference to be drawn from the Bank's failure to detect Madoff's fraud is simply "that Madoff fooled the defendants as he did individual investors, financial institutions, and regulators." *Cohmad*, 2010 WL 363844, at *2; *see also In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d at 418 (inference of recklessness arising from investment adviser's failure to conduct promised due diligence, which plaintiff contends would have uncovered fraud, is less compelling than opposing inference that adviser's "failure to discover the fraud merely places it alongside the SEC, the IRS, and every other interested party that reviewed Bayou's finances" and failed to detect the fraud). This non-culpable inference is especially compelling because the Bank, as a provider of private banking services, had every motivation to place Lopez—its customer—in safe and profitable investments. *See S. Cherry*, 573 F.3d at 113 ("It is far less plausible to infer that an industry leader . . . would deliberately jeopardize its standing

and reliability, and the viability of its business, by recommending to a large segment of its clientele a fund as to which it had made . . . little or no inquiry at all.").

### B.    Lopez Fails To Plead a Control Person Claim Against SC PLC.

To establish "control person" liability under Section 20(a), a plaintiff must allege with particularity (1) a primary violation; (2) that the defendant had control over the violator; and (3) culpable participation by the defendant in the primary violation. *Boguslavsky* v. *Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998); *Kalin* v. *Xanboo, Inc.*, 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007). Lopez's failure to plead a primary violation of Section 10(b) and Rule 10b-5 requires dismissal of their Section 20(a) claim. *See ATSI Commc'ns*, *Inc.*, 493 F.3d at 105-06.

Lopez's control person claim also fails because he does not allege with any particularity that SC PLC was a culpable participant in the primary violation. *Kalin*, 526 F. Supp. 2d at 406 ( to withstand motion to dismiss plaintiff "must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness").  Instead, Lopez alleges generically that SC PLC "influenced, directed and controlled [SCBI] . . . with regard to its actions, representations and omissions" (*Lopez* Am. Compl. ¶ 64), and that "[b]y virtue of its 100% control of [SCBI] . . . [SC PLC] had the ability to prevent the actions misrepresentations and omissions committed herein" (*id.* ¶ 65).  These allegations ignore the fact that SC PLC's ownership interest in SCBI is only indirect, as Lopez himself alleges elsewhere in his complaint.[14]  Moreover, pleading control "is not enough to plead culpable participation." *In re Alstom SA Secs. Litig.*, 406 F. Supp. 2d 433, 490, 493 (S.D.N.Y. 2005) (Marrero, J.); *see also In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 417-418 (S.D.N.Y. 2001)

---

[14]      Lopez alleges that SC PLC's ownership of SCBI flows through two separate intermediary corporate entities: SCB and Standard Chartered Holdings Limited.  (*Lopez* Am. Compl. ¶ 20.)

(Marrero, J.) ("[R]ecklessness is the appropriate minimum standard of culpability that plaintiffs must plead under § 20(a).").

### C. Lopez and *Maridom* Plaintiffs Fail To Adequately Allege Claims for Common-Law Fraud and Negligent Misrepresentation Because They Do Not Plead Any Actionable Misrepresentations and Material Facts Were Disclosed in the Fairfield Funds' Offering Documents.

Lopez and *Maridom* plaintiffs collectively assert common-law claims for fraud and negligent misrepresentation, both of which are premised on allegations that the Bank made misstatements or omissions of material fact in connection with the Fairfield Funds. More specifically, Lopez and *Maridom* plaintiffs advance the following common-law misrepresentation claims:

- Lopez advances a claim for common-law fraud based on the same allegations as his Section 10(b) claims, namely, that the Bank misrepresented the safety of investments in the Fairfield Funds and the extent of its due diligence of the funds. (*Lopez* Am. Compl. ¶¶93-95.)

- *Maridom* plaintiffs advance a fraud claim alleging that SCBI failed to disclose that "some undisclosed third party (BLMIS)[] was to execute transactions" for the Fairfield Funds. (*Maridom* Am. Compl. ¶ 60.)

- *Maridom* plaintiffs advance a negligent misrepresentation claim based on the same allegation as its fraud claim, along with the additional allegation that SCBI failed to disclose that the Fairfield Funds were "nothing more than a funnel to BLMIS." (*Maridom* Am. Compl. ¶ 53.)

To plead common-law fraud under Florida law, a plaintiff must allege with particularity: (1) a false statement of fact, (2) known by the defendant to be false at the time that it was made, (3) made for the purpose of inducing the plaintiff to rely on it, (4) action by plaintiff in reliance thereon, and (5) resulting damage or injury. *Nat'l Ventures, Inc.* v. *Water Glades 300 Condo. Ass'n*, 847 So. 2d 1070, 1074 (Fla. Dist Ct. App. 2003). Under Florida law, "'the scienter requirement in a common-law fraud claim is more stringent [than under Section 10(b)], since actual knowledge as to falsity is required, whereas recklessness as to falsity will suffice

under the federal securities laws . . . .'" *Bruhl* v. *Conroy*, No. 03-CV-23044, 2006 U.S. Dist. LEXIS 66387, at *30 (S.D. Fla. Mar. 31, 2006) (quoting *Tapken* v. *Brown*, No. 90-CV- 691, 1992 WL 178984, at *23 (S.D. Fla. Mar. 13, 1992)).  To plead negligent misrepresentation the elements "are identical to those for common law fraud, except that . . . actual knowledge is not required in order to establish scienter." *Jaffe* v. *Bank of Am., N.A.*, 667 F. Supp. 2d 1299, 1319 (S.D. Fla. Aug. 18, 2009) (omission in original).

Each of these claims fails as a matter of law.  Lopez and *Maridom* plaintiffs do not plead any actionable misstatements or omissions.  Moreover, the Offering Documents for the Fairfield Funds adequately disclose all material facts.

1.     **Plaintiffs Do Not Adequately Plead Scienter orAny Actionable Misstatements or Omissions**

Lopez's common-law fraud claim fails for the same reasons his Section 10(b) claim fails, including that Lopez does not plead scienter or any actionable misstatements with particularity.  *Bruhl*, No. 03-CV-23044, 2006 U.S. Dist. LEXIS 66387, at *30 ("[B]ecause Plaintiffs have failed to plead adequately their federal securities fraud claim, their common law fraud claim also must be dismissed.")  Lopez's claim also fails simply because he does not plead that the Bank had actual knowledge of the falsity of its alleged misrepresentations.  *See id.*

Other than Lopez's unavailing control person claims (*see supra* pp.35-36), his only other allegations that are even arguably directed at SC PLC come in the form of group-pleading allegations against the "Standard Chartered Defendants," which plaintiffs define collectively as SCI and SC PLC.  (*See Lopez* Am. Compl. ¶ 1.)  As described above, such group pleading does not meet the heightened pleading standards of Rule 9(b).  (*See supra* pp. 24-25, 36-37.)  *See In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996) ("Rule 9(b) is not satisfied by a complaint in which 'defendants are clumped together in vague allegations.'"

(citation omitted)).  Because plaintiffs have alleged no legitimate basis for liability against SC

PLC, SC PLC must be dismissed from this action altogether.

      *Maridom* plaintiffs likewise fail to plead any actionable misstatements or

omissions with particularity.  Their fraud and negligent misrepresentation claims rest on the

allegation that SCBI failed to inform them that their Fairfield investments would go to BLMIS.[15]

All that *Maridom* plaintiffs allege on this point is that "[i]n making its recommendations to

Plaintiffs that they invest in [Sentry], SCBI failed to disclose that [Sentry] was nothing more than

a funnel to BLMIS" and "SCBI failed to disclose to Plaintiffs that the private placement

memorandum issued by [Sentry] . . . falsely stated that [Sentry], through its affiliated investment

manager—not some undisclosed third party (BLMIS)—managed the investments made with

[Sentry] investors' funds."  (*Maridom* Am. Compl. ¶ 53).  What they fail to allege anywhere in

the complaint is where or when misstatements or omissions were made, or by whom, as is

required by Rule 9(b).  *See Garcia*, 528 F. Supp. 2d at 1294 (Rule 9(b) requires, among other

things, that a plaintiff set forth "the time and place of each [alleged misstatement or omission]

and the person responsible for making (or in the case of omissions, not making) [the alleged

misstatement or omission]").

    2.      **The Offering Documents for the Fairfield Funds Adequately Disclosed
All of the Facts that Plaintiffs Allege Were Misstated or Omitted.**

      Even had Lopez and *Maridom* plaintiffs adequately pled the necessary who, what,

when and where (which they have not), they still could not maintain their common-law fraud and

---

[15]     Because *Maridom* plaintiffs allege that SCBI's conduct "displayed severe recklessness
akin to fraud" (*Maridom* Am. Compl. ¶¶ 6, 51, 58), their negligent misrepresentation claim
"sounds in fraud" and must also meet the particularity requirements of Rule 9(b).  *Matsumura* v.
*Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008) (Rule 9(b) applies to claims
sounding in fraud); *DeBlasio* v. *Merrill Lynch & Co.*, 2009 WL 2242605, at *12 (S.D.N.Y. Jul.
27, 2009) ("Where the complaint incorporates by reference prior allegations of fraud into other
claims traditionally not perceived to be grounded in fraud, those claims must then be pleaded
according to [Rule 9(b)].").

negligent misrepresentation claims in the face of the clear and robust disclosures contained in the Fairfield Funds' Offering Documents.[16]  Under Florida law "[r]eliance on fraudulent representations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement."  *Garcia* v. *Santa Maria Resort*, *Inc.*, 528 F. Supp. 2d 1283, 1295 (S.D. Fla. 2007); *see also Jaffe* v. *Bank of Am., N.A.*, 667 F. Supp. 2d at 1319-20 (same, dismissing negligent misrepresentation claim).  Lopez and *Maridom* plaintiffs allege that SCBI misrepresented, or omitted to advise plaintiffs about, (i) the risks associated with the Fairfield Funds, and (ii) the involvement of third parties (*i.e.*, BLMIS) in the Fairfield Funds.  (*Lopez* Am. Compl. ¶¶ 25-26, 40, 50.)  The Offering Documents for the Fairfield Funds, however, adequately and accurately disclose those facts.

The PPM includes the following explicit warning on its cover page:  "*THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK*."  (*Supra* p.14.)  The Offering Documents make clear that the only persons who should invest in the Fairfield Funds are those "who have the ability to speculate in high risk securities."  (*Id.*)  The Offering Documents also explicitly warn that safe, steady and conservative returns were not guaranteed:  "There can be no assurance that any trading method employed by or on behalf of the Fund will produce profitable results, and the past performance of the Fund is not necessarily indicative of its future profitability."  (*Id.*)

Likewise, the Offering Documents more than adequately disclose the involvement of third parties in the Fairfield Funds, including BLMIS.  The Offering Documents note that: (i) BLMIS was a sub-custodian of the Fairfield Funds; (ii) BLMIS had custody of approximately 95% of Fairfield Sentry's assets; (iii) a third party executed the Fairfield Funds' investment

---

[16]      *Maridom* plaintiffs acknowledge receiving the PPM at or about the time of investing in the Fairfield Funds.  (*Maridom* Am. Compl. ¶ 29.)

strategy (*i.e.*, split strike conversion strategy); and (iv) whatever third party implemented the split strike conversion strategy could misappropriate the Fairfield Funds' assets. (*Supra* pp.14-15.)

In light of the Offering Documents' disclosures, Lopez and *Maridom* plaintiffs cannot maintain misrepresentation-based claim regarding the involvement of BLMIS and risks associated with the Fairfield Funds.

## II. PLAINTIFFS' COMMON-LAW CLAIMS FOR FRAUD, NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY ARE BARRED BY THE ECONOMIC LOSS RULE

Florida's economic loss rule bars all of plaintiffs' tort claims. Under the economic loss rule, a plaintiff may not raise tort claims to recover solely economic damages arising from a breach of contract absent evidence of personal injury or property damage. *McCutcheon* v. *Kidder, Peabody & Co.*, 938 F. Supp. 820, 822 (S.D. Fla. 1996). "[P]arties to a contract can only seek tort damages if conduct occurs that establishes a tort distinguishable from or independent of the breach of contract." *Id.* at 822-23. In *McCutcheon*, a plaintiff-investor sought to recover investment losses from a defendant-stock broker with whom the plaintiff had entered into a contractual relationship. Plaintiff "allege[d] that defendant advised [him] to purchase specific securities that defendant was aware were high risk and therefore did not conform to plaintiff's investment requirements," and that, "had defendant disclosed the nature of the risks associated with the securities," plaintiff "would not have agreed to the purchase of these securities." *Id.* at 821. The court held that claims for breach of fiduciary duty, negligence and fraud were all barred by the economic loss rule because the claims involved purely economic damages and "arose solely as a result of a[n] [investment] contract between the parties." *Id.* at 824-25. The court found immaterial that "there [wa]s no provision in the parties' contract that require[d] defendant to manage plaintiff's account," and, therefore, "no contractual basis upon which to sue defendant for providing inappropriate investment advice." *Id.* at 823-24. "[T]he

failure to bargain for adequate contractual remedies does not provide a party with an exception to the economic loss rule." *Id.* at 823.

The allegations raised in the Florida Cases are on all fours with those in *McCutcheon*. Plaintiffs seek to recover the value of their investments in the Fairfield Funds by arguing that the Bank did not adequately perform its alleged duties to investigate the funds or inform plaintiffs of the risks associated with the funds. Plaintiffs allege injuries based on the value of their investments, which they purchased through their investment accounts at the Bank pursuant to agreements governing those accounts. Plaintiffs' claims thus fall squarely within the economic loss rule.[17] *See id.* at 822-23; *Behrman* v. *Allstate Life Ins. Co.*, No. 04-CV-60926, 2005 U.S. Dist. LEXIS 7262, *24-25 (S.D. Fla. Mar. 23, 2005) (applying economic loss rule because plaintiff did not "allege any injury other than to the value of his annuities," for which the parties relationship was governed by contract).

The economic loss rule likewise applies to plaintiffs' breach of fiduciary duty claims. Such claims are barred because "the relationship which gives rise to the fiduciary duty between a [stock] broker and his client 'does not arise unless the parties have entered into a

---

[17] Although the Florida Supreme Court in *Indemnity Insurance Co. of North America* v. *American Aviation, Inc.*, 891 So. 2d 532 (Fla. 2004), noted that certain exceptions apply to the economic loss rule, including negligent misrepresentation claims, courts interpreting *American Aviation* have held that "not all negligent misrepresentation claims are excepted from the . . . economic loss rule." *Vesta Constr. & Design, LLC* v. *Lotspeich & Assocs., Inc.*, 974 So. 2d 1176, 1181-82 (Fla. Ct. App. 2008). Rather, since *American Aviation*, Florida courts have draw a distinction "between misrepresentations that are directly related to the breaching party's performance of the contract and those which are independent of the contract . . . ." *Id.* (collecting cases). Only negligent misrepresentations that are independent of the contract fall within the exception to the economic loss rule.

contract involving the trade of securities.'"[18] *McCutcheon*, 938 F. Supp. at 822 (quoting

*Interstate Sec. Corp.* v. *Hayes Corp.*, 920 F.2d 769, 777 (11th Cir. 1991) (applying economic

loss rule to claims against securities broker)); *see also White Constr. Co.* v. *Martin Marietta*

*Materials, Inc.*, 633 F. Supp. 2d 1302, 1325 (M.D. Fla. 2009) ("'a cause of action for breach of

fiduciary duty will not lie where the claim of breach is dependent upon the existence of a

contractual relationship between the parties.'" (quoting *Excess Risk Underwriters, Inc.* v.

*Lafayette Life Ins. Co.*, 208 F. Supp. 2d 1310, 1316 (S.D. Fla. 2002))); *Royal Surplus Lines Ins.*

*Co.*, 184 F. App'x at 902 (applying economic loss rule to bar fiduciary duty claim); *Lehman*

*Bros. Holdings, Inc.* v. *Hirota*, No. 06-CV-2030, 2007 WL 1471690, at *4-5 (M.D. Fla. May 21,

2007); *Granat*, 2006 WL 3826785 at *5 (same); *Clayton* v. *State Farm Mut. Auto. Ins. Co.*, 729

So. 2d 1012, 1014 (Fla. Dist. Ct. App. 1999) (applying economic loss rule to bar breach of

fiduciary duty claim); *Detwiler* v. *Bank of Cent. Fl.*, 736 So. 2d 757, 759 (Fla. Dist. Ct. App.

1999) ("a cause of action for breach of fiduciary duty will not lie where the claim of breach is

dependent upon the existence of a contractual relationship between the parties").

---

[18]     Although a limited number of courts had held that the economic loss rule does not bar claims for breach of fiduciary duty, *see, e.g.*, *First Equity Corp.* v. *Watkins*, Nos. 98-851, 98-589, 1999 WL 542639 (Fla. Dist. Ct. App. July 28, 1999), the Eleventh Circuit, interpreting decisions of the Florida Supreme Court, recently reaffirmed that the economic loss rule bars "any tort claims," including for breach of fiduciary duty. *Royal Surplus Lines Inc. Co.* v. *Coachman Indus.*, 184 F. App'x 894, 902 (11th Cir. 2006) ("The Florida Supreme Court [has made it clear that the economic loss rule does apply 'where the parties are in contractual privity and one seeks to recover in tort for matters arising from the contract.'" (quoting *Indem. Ins. Co. of N. Am.* v. *Am. Aviation, Inc.*, 891 So. 2d 532 (Fla. 2004))).  The limited cases holding that the economic loss rule does not bar claims for breach of fiduciary duty relied on an overly expansive reading of dicta in *Moransais* v. *Heathman*, 744 So. 2d 973 (Fla. 1999), which created an exception to the economic loss rule for claims of negligence against certain licensed "professionals" not relevant here, but it did not otherwise limit the economic loss rule in cases where the parties are in contractual privity. *See Granat* v. *Axa Equitable Life Ins. Co.*, No. 06-CV-21197, 2006 WL 3826785, at *2-5 (S.D. Fla. Dec. 27, 2006) (applying the economic loss rule to bar breach of fiduciary duty claim); *Fla. State Bd. of Admin.* v. *Law Eng'g & Envtl. Servs.*, 262 F. Supp. 2d 1004, 1018 (D. Minn. 2003) (court "not bound by those decision [sic] that hold that the economic loss doctrine does not bar a breach of fiduciary duty claim after *Moransais*").

## III. PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT THE BANK BREACHED ANY DUTIES OWED TO PLAINTIFFS

The economic loss rule is not the only hurdle plaintiffs' common-law claims fail to clear. Plaintiffs' claims for breach of fiduciary duty, negligence and gross negligence all rest on two main allegations. *First*, plaintiffs allege that the Bank failed to conduct adequate due diligence of the Fairfield Funds and BLMIS prior to allegedly recommending the funds to plaintiffs. (*Headway* Compl. ¶¶ 75, 79, 111(a, c, d); *Lopez* Am. Compl. ¶¶ 81, 87; *Maridom* Am. Compl. ¶¶ 38, 49; *Valladolid* Am. Compl. ¶¶ 19-20, 38, 43, 94-95.) Plaintiffs assert that an adequate investigation would have uncovered Madoff's Ponzi scheme, or, at the very least, sufficient indicia of the fraud to prevent the Bank from allegedly recommending the Fairfield Funds to plaintiffs. *Second*, plaintiffs allege that the Bank failed to monitor and protect plaintiffs' assets on an ongoing basis. (*Valladolid* Am. Compl. ¶¶ 78-81, 87, 93, 94; *Headway* Compl. ¶¶ 110-111, 129-130; *Lopez* Am. Compl. ¶ 80, 81(b, e, g, i, j).)

Simply put, the Bank, a nondiscretionary broker, did not owe the type of broad common-law duties alleged by plaintiffs. Moreover, regardless of the scope of the duties owed by the Bank, exculpation provisions in plaintiffs' account agreements relieve the Bank from liability for negligence. Further, if the Bank was obligated to conduct a more thorough investigation of the Fairfield Funds and BLMIS, its alleged failure to do so does not rise to the level of gross negligence because the Bank did not consciously disregard an "imminent" or "clear and present danger." Madoff's Ponzi scheme was too well-concealed, and his firm too well-regarded, to constitute such a clear and imminent danger. In the end, Madoff's unforeseeable criminal acts caused plaintiffs' injuries, not the Bank.[19]

---

[19] The Court may take judicial notice of the fact that Madoff has admitted that his false representations and fraudulent scheme directly caused investors in BLMIS to lose billions of dollars. *Madoff*, 2009 WL 622150 (plea allocution).

### A. Plaintiffs' Breach of Fiduciary Duty Claims Must Be Dismissed Because SCBI Did Not Owe Plaintiffs the Fiduciary Duties Plaintiffs Allege.

Plaintiffs each assert claims for breach of fiduciary duty. (*Headway* Compl. ¶¶ 107-114; *Lopez* Am. Compl. ¶¶ 78-83; *Maridom* Am. Compl. ¶¶ 37-50; *Valladolid* Am. Compl. ¶¶ 83-90.) The scope of the fiduciary duties owed to plaintiffs depends on whether plaintiffs' accounts were discretionary or nondiscretionary. *Leib* v. *Merrill Lynch, Pierce, Fenner and Smith*, 461 F. Supp. 951, 952-53 (E.D. Mich. 1978). Here, plaintiffs opened nondiscretionary investment accounts with the Bank and made their own decisions to invest in the Fairfield Funds.[20] (*See supra* pp. 8-10.). *First Union Discount Brokerage Servs., Inc.* v. *Milos* (*Milos II*), 744 F. Supp. 1145, 1156 (S.D. Fla. 1990); *see also Hayden, Stone, Inc.* v. *Brown*, 218 So. 2d 230, 236 (Fla. Dist. Ct. App. 1969) (account was nondiscretionary where customer approved every transaction). As such, the Bank owed plaintiffs only limited duties, specifically : (1) becoming informed of the price, nature and financial prognosis of an investment before recommending it; (2) performing the investor's orders promptly and in a manner best suited to the investor; (3) informing the investor of the risks involved in transacting the security; (4) refraining from self-dealing; (5) not misrepresenting any material fact; and (6) executing transactions only after receiving the investor's approval. *Milos II*, 744 F. Supp. at 1156. These limited duties do not encompass the "duties" allegedly breached here.

---

[20]    Lopez and Abbot Capital, Inc. ("Abbott"), a plaintiff in *Maridom*, both make a single conclusory allegation that the Bank had discretionary control over their investment accounts. (*Lopez* Am. Compl. ¶ 86; *Maridom* Am. Compl. ¶ 19.) Their other allegations demonstrate that was not the case—Lopez and Abbott admit that they authorized the purchases of the Fairfield Funds and that, in doing so, they relied on certain representations from the Bank. (*Maridom* Am. Compl. ¶ 22; *Lopez* Am. Compl. ¶ 8, 30-33, 46.) Such allegations directly contradict any allegation that the Bank had discretionary control over plaintiffs' assets. Accordingly, the Court should not consider the allegation that Lopez and Abbott had discretionary accounts. *See Nat'l Western Life Ins. Co.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 175 F. Supp. 2d 489, 492 (S.D.N.Y. 2000) (Marrero, J.) ("clashing factual assertions, stated in the context of the same claim rather than as conceptually distinct alternative theories of liability, may be deemed judicial admissions").

*First*, all plaintiffs, except for Maridom, allege that the Bank owed continuing oversight duties.  Valladolid alleges that AEB, AEBL and Standard Chartered PLC had fiduciary duties to "monitor[] the safety and performance of [Valladolid]'s assets in a prudent and professional manner."  (*Valladolid* Am. Compl. ¶ 86.)  Similarly, Valladolid and Headway both allege that Standard Chartered had a duty to "maintain oversight and transparency as to the activities of any fund manager investing any of Plaintiffs assets."  (*Valladolid* Am. Compl. ¶ 87(d); *Headway* Compl. ¶ 111(d); *see also Valladolid* Am. Compl. ¶¶ 78-81, 87, 93, 94; *Headway* Compl. ¶¶ 110-111, 129-130.)  Finally, Lopez alleges that the Bank had a duty to "monitor[] . . . the safety and performance of Plaintiff's funds in a prudent and professional manner."  (*Lopez* Am. Compl. ¶ 80; *see also id.* ¶ 81(b,e, g, i, j).)

Plaintiffs cannot maintain claims based on such allegations because nondiscretionary brokers, such as the Bank, "ha[ve] no continuing management duty over the [investment] account[s]."  *Milos I*, 717 F. Supp. at 1526 n.21.  As the court explained in *Leib*:

> [T]he broker's responsibility to his customer ceases when the transaction is complete. A broker has no continuing duty to keep abreast of financial information which may affect his customer's portfolio or to inform his customer of developments which could influence his investments. Although a good broker may choose to perform these services for his customers, he is under no legal obligation to do so.

*Leib*, 461 F. Supp. at 953; *accord de Kwiatkowski* v. *Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002) ("It is uncontested that a broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis.").

*Second*, plaintiffs complain that the Bank did not conduct sufficient due diligence to detect Madoff's Ponzi scheme. (*Lopez* Am. Compl. ¶ 49; *Headway* Compl. ¶¶ 71, 78); *Maridom* Compl. ¶ 40 *Valladolid* Am. Compl. ¶ 71.  The Bank's duty to investigate the Fairfield Funds, however, was limited to "study[ing] [the Fairfield Funds] sufficiently to become informed

as to [their] price, nature and financial prognosis." *Milos II*, 744 F. Supp. at 1156. Plaintiffs do

not allege that the Bank failed to provide this basic information, nor could they. And the type of

investigation necessary to "become informed as to [an investment's] price, nature and financial

prognosis" is, quite simply, different in kind from the type of investigation that would have been

necessary to uncover the longest-running and best-concealed Ponzi scheme in history. SCBI,

pursuant to the limited duties owed to a nondiscretionary account holder, was not required to

conduct a more thorough and successful investigation than the government regulators and

countless others that similarly failed to uncover (or suspect) that BLMIS's operations were

fraudulent.

     **B.**    **Because of the Exculpation Provisions in Plaintiffs' Account Agreements, Plaintiffs Cannot Maintain Claims Premised on the Breach of Any Duties— Fiduciary or Otherwise—Unless the Bank Was at Least Grossly Negligent in Performing Those Duties.**

       Parties to a contract may agree to exculpate one another from liability for

breaches of common-law duties, including negligence. *Greater Orlando Aviation Auth.* v.

*Bulldog Airlines, Inc.*, 705 So. 2d 120, 122 (Fla. Dist. Ct. App. 1998). Exculpatory clauses are

enforceable under Florida law when the language is "clear and understandable." *Cooper* v.

*Meridian Yachts, Ltd.*, 575 F.3d 1151, 1166-67 (11th Cir. 2009); *see also Greater Orlando*

*Aviation Auth.*, 705 So. 2d at 122 (exculpatory clauses "are valid and enforceable if the intention

to relieve a party of its own negligence is made clear and unequivocal in the contract").

       All of the plaintiffs agreed to exculpatory provisions relieving SCBI from liability

for breaches of common-law duties except where those breaches resulted from SCBI's gross

negligence, willful misconduct or bad faith. The RRGA, which governs all of the plaintiffs'

accounts, provides that "Neither [the Bank] nor any offices, branches or affiliates of [the

Bank] . . . shall at any time incur any liability to Customer . . . in connection with" claims related

to, or arising out of, transactions completed through plaintiffs' account or the Bank's performance under the RRGA and the Account Application and Agreement. (Berarducci Decl. Ex. I (RRGA) § 46 & Ex. J (Amended RRGA) § 46.) The RRGA further provides that "SCBI will not be liable to Customer for any act, omission, error, misconduct, negligence, default or insolvency of any of its representative offices, correspondents, intermediaries, affiliates or subsidiaries," (*Id.* Ex. I (RRGA) § 41 & Ex. J (Amended RRGA) § 41) (emphasis added), and that "SCBI shall not be liable to Customer . . . for any failure, omission . . . or error in the performance of [the RRGA] . . . that is due to causes beyond the control of SCBI, including . . . negligence of other institutions" (*Id.* Ex. I (RRGA) § 42 & Ex. J (Amended RRGA) § 42.). The NISA, applicable to Valladolid, excludes liability for "any action, inaction, omission or for any matter whatsoever in connection with the Investment Account, or for any loss or depreciation in value of the Investment Account's Holdings, unless resulting from AEBI's gross negligence, willful misconduct, or bad faith." (*Id.* Ex. N (NISA) at ¶ 5(d) & Ex. O (NISA) at ¶ 5(d).) This language is clear and unequivocal.

These exculpatory clauses demonstrate a clear and unambiguous desire by the parties to exculpate the Bank from tort liability in providing private banking services to plaintiffs, except where the Bank was, at minimum, grossly negligent. *See Cooper*, 575 F.3d at 1166-67 (11th Cir. 2009) (enforcing exculpatory providing for "'no liability whatsoever for any loss or damage directly arising from the defectiveness or deficiency of parts . . . except if resulting from intentional conduct or gross negligence . . .'" but that "'[l]iability . . . for loss of business, loss of profits, consequential damages or other (indirect) damage . . . is always excluded . . . .'"); *Greater Orlando Aviation Auth.*, 705 So. 2d at 122 (Fla. Dist. Ct. App. 1998)

(finding negligence action precluded by an exculpatory clause that waived "any and all liability").

### C. Plaintiffs Cannot Maintain Their Claims for Breach of Fiduciary Duty, Negligence or Gross Negligence Because the Bank Did Not Consciously Disregard a Known Clear and Present Danger.

In light of the exculpatory provisions, plaintiffs cannot maintain any of their breach-of-duty claims unless they adequately plead that the Bank's conduct rose at least to the level of gross negligence. Plaintiffs cannot meet this high burden. The Supreme Court of Florida has defined gross negligence as "an act or omission that a reasonable, prudent person would know is likely to result in injury to another." *Travelers Indem. Co.* v. *PCR Inc.*, 889 So. 2d 779, 793 n.17 (Fla. 2004) (citation and quotation marks omitted). To maintain a gross negligence claim, a plaintiff must meet the "onerous burden" of demonstrating:

1. A composite of circumstances which, together, constitutes an 'imminent' or 'clear and present' danger amounting to more than normal and usual peril;

2. A showing of chargeable knowledge or awareness of the imminent danger; and

3. The act or omission complained of must occur in a manner which evinces a 'conscious disregard of consequences,' as distinguished from a 'careless' disregard thereof (as in simple negligence) or from the more extreme 'willful or wanton' disregard thereof (as in culpable or criminal negligence).

*Greathouse* v. *Ceco Concrete Constr., L.L.C.*, No. 5:06-CV-2, 2007 WL 624550, at *4 (N.D. Fla. Feb. 23, 2007) (granting motion to dismiss gross negligence claim) (quoting *Kline* v. *Rubio*, 652 So. 2d 964, 965 (Fla. Dist. Ct. App. 1995) (same)); *see also Hoyt* v. *Corbett*, 559 So. 2d 98, 100 (Fla. Dist. Ct. App. 1990) (same).

Plaintiffs' claims depend on the unsupported assertion that if the Bank had conducted more due diligence on the Fairfield Funds, the Bank, unlike the thousands of other

investors and the government regulators that were fooled by Madoff, would have uncovered

Madoff's fraud. New York courts have already held that a failure to uncover Madoff's Ponzi

scheme does not amount to gross negligence. In *Baker* v. *Andover Associates Management*

*Corp.*, the court dismissed a gross negligence claim that, like the Florida Cases, was based on

defendants' alleged failure to conduct adequate due diligence and to seize upon alleged "red

flags" regarding Madoff and BLMIS. No. 6179/09, slip op. at 4, 27 (N.Y. Sup. Ct. Nov. 30,

2009), attached as Ex. Y to Berarducci Decl. The court held that plaintiffs' allegations that

"Defendants missed red flags that other investment advisors foresaw . . . and . . . fail[ed] to

perform or cause to be performed 'appropriate due diligence'" did not evince "a reckless

disregard for the rights of others or smacking of intentional wrongdoing.'" *Id.,* slip op. at 27

(quoting *Mancuso* v. *Rubin*, 861 N.Y.S.2d 79, 82 (App. Div. 2008)). Another court in this

District recently agreed, dismissing federal securities claims based upon defendants' failure to

detect Madoff's Ponzi scheme because it found compelling the inference that Madoff simply

"fooled the defendants as he did individual investors, financial institutions, and regulators."

*Cohmad*, 2010 WL 363844, at *2; *see also In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d at

418 (dismissing securities fraud claims because defendants were not reckless in failing to

conduct promised due diligence into investment fund that operated as a Ponzi scheme "for nearly

a decade" and "managed to deceive the entire investing community").

       The same result is compelled by Florida law. To prove gross negligence,

plaintiffs first must demonstrate that investing in the Fairfield Funds and BLMIS "constitute[d]

an 'imminent' or 'clear and present' danger" at the time the Bank allegedly failed to investigate

each. *Greathouse,* 2007 WL 624550, at *4. Florida courts have described the requisite level of

peril as the "point along the line in a potential gross negligence situation [in which] the

composite of circumstances or conditions will present a risk of grave injury which a rational

person of mature judgment is simply unwilling to assume." *Id.* (citation and quotation marks

omitted). By Madoff's account, his Ponzi scheme lasted at least fifteen years and, at the time of

its collapse on December 11, 2008, Madoff reported some $ 70 billion under management.

(*Supra* p. 6.) Such facts demonstrate that Madoff "fooled the defendants as he did individual

investors, financial institutions, and regulators," *Cohmad*, 2010 WL 363844, at *2, not that

investors in the Fairfield Funds and BLMIS were irrational or assumed some "risk of grave

injury which a rational person of mature judgment" would have been "unwilling to assume."

*Greathouse*, 2007 WL 624550, at *4.

       Nor do the purported red flags plaintiffs cite demonstrate that BLMIS or the

Fairfield Funds constituted a clear and present danger. Plaintiffs (other than Lopez), allege that

purported red flags contained in two news articles published in 2001, and in reports submitted to

the SEC in 1999 and 2005, should have alerted the Bank to Madoff's fraud. (*See Headway*

Compl. ¶¶ 63, 65, 68-71; *Valladolid* Am. Compl. ¶¶ 63-64, 67-70; *Maridom* Am. Compl. ¶¶ 41,

43.) But any suggestion that the supposed "red flags" was enough to alert any rational person to

an imminent danger of fraud at BLMIS is completely undermined by the fact that the alleged red

flags were not only publicly disclosed prior to December 11, 2008, but also specifically raised to

the SEC and 1999 and 2005. These red flags, which have become a standard refrain in Madoff-

related litigation, are not sufficiently indicative of fraud to convert the Bank's inability to detect

Madoff's Ponzi scheme into grossly negligent conduct. *See Baker*, slip op. at 27 (Berarducci

Decl. Ex. Y) (plaintiffs' allegations that "Defendants missed red flags that other investment

advisors foresaw . . . and . . . fail[ed] to perform or cause to be performed 'appropriate due

diligence'" did not evince "a reckless disregard for the rights of others or smacking of intentional

wrongdoing'"); *Greathouse*, 2007 WL 624550, at *5 (broken crane did not present a clear and present danger where the operator "had lifted an identical load with the same crane thirteen times previously during the project without incident").

Finally, even assuming *arguendo* that the "red flags" did constitute a clear and present danger that BLMIS would be revealed to be part of a massive, fifteen-year Ponzi scheme, plaintiffs still fail to plead the remaining two elements of gross negligence—that the Bank "knew or should have known" of the danger *and* exhibited a "conscious disregard of a known likelihood" that BLMIS would be exposed as a fraud. *Greathouse*, 2007 WL 624550, at *6. Plaintiffs do not allege a single fact to suggest that the Bank knew of, but disregarded, a *real possibility* that plaintiffs' were investing in a massive Ponzi scheme. *Fleetwood Homes of Fla., Inc.* v. *Reeves*, 833 So. 2d 857 (Fla. Dist. Ct. App. 2002) (to establish gross negligence "injury must [have] be[en] more than a real possibility" (citation and quotation marks omitted)), *quashed on other grounds*, 889 So. 2d 812 (Fla. 2004). As noted above, such an allegation is undermined by the nature of the business—banking depends on successfully maintaining client wealth, not helping third parties steal it. *Cf. South Cherry*, 573 F.3d at 113 ("It is far less plausible to infer that an industry leader . . . would deliberately jeopardize its standing and reliability, and the viability of its business, by recommending to a large segment of its clientele a fund as to which it had made . . . little or no inquiry at all."); *Greathouse*, 2007 WL 624550, at *6 ("Perhaps most revealing of Ceco's lack of knowledge or awareness of impending collapse, however, is the fact that Gonzales and Cisneros were working directly below the boom of the crane when the accident occurred. Both Ceco employees were injured when the crane collapsed, Cisneros quite seriously.").

**D.** **Plaintiffs' Claims for Fraud, Negligent Misrepresentation, Negligence, Gross Negligence and Breach of Fiduciary Duty Also Fail for the Simple Reason that All of Plaintiffs' Losses Were Caused by Bernard Madoff's Fraud, Not the Actions of Standard Chartered.**

Under Florida law, to recover damages for injuries allegedly caused by negligence or any other tortious act or omission, such act or omission must be the proximate cause of the alleged injury. *Palma* v. *BP Prods. N. Am., Inc*., 347 F. App'x 526, 527 (11th Cir. 2009) ("Under Florida law . . . the alleged negligence . . . must be the proximate cause of [plaintiffs'] injuries for the [plaintiffs] to recover."); *see also Fla. Evergreen Foliage* v. *E.I. Dupont De Nemours & Co*., 336 F. Supp. 2d 1239, 1284 (S.D. Fla. 2004) (noting that proximate cause is a "general requirement" for "any tort claim" under Florida law). "[H]arm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *De Jesus Palma* v. *BP Prods. N. Am*., 594 F. Supp. 2d 1306, 1309 (S.D. Fla. 2009). Even a "substantial factor in producing" a plaintiff's injury will not be the proximate cause of that injury where "the defendant's responsibility [wa]s superseded by an abnormal intervening force." *Gehr* v. *Next Day Cargo, Inc.*, 807 So. 2d 189, 190 (Fla. Dist. Ct. App. 2002). Liability thus ultimately turns on the issue of foreseeability. *See Roberts* v. *Shop & Go, Inc.*, 502 So. 2d 915 (Fla. Dist. Ct. App. 1986) (finding no proximate cause where intervening criminal act was not reasonably foreseeable).

Plaintiffs' losses were caused by the unforeseeable criminal acts of Madoff and others at BLMIS. Madoff's massive, long-running and well-concealed Ponzi scheme is an emblematic intervening and superseding event. Even if it could be said that the Bank in some way made it possible for Madoff to defraud plaintiffs, proximate cause is still lacking because even if Madoff's "intervening act [wa]s . . . 'possible,'" it was hardly "'probable.'" *See Roberts*, 502 So. 2d at 917 (quoting *Guice* v. *Enfinger*, 389 So. 2d 270 (Fla. Dist. Ct. App. 1980); *ROIS* v.

*JUNCO*, 487 So. 2d 331 (Fla. Dist. Ct. App. 1986)); *accord Exxon Co.* v. *Sofec*, 517 U.S. 830, 837-38 (1996) ("The doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable."). Indeed, had the scheme been foreseeable and "probable," it could not have continued for so long.

## IV. PLAINTIFFS' UNJUST ENRICHMENT CLAIMS FAIL BECAUSE PLAINTIFFS' RELATIONSHIP WITH THE BANK IS COVERED BY A VALID CONTRACT

All plaintiffs, except *Maridom* plaintiffs, allege that the Bank was unjustly enriched by the commissions or fees it received on the plaintiffs' Fairfield Funds investments, and that retention of those financial benefits would be inequitable. (*Headway* Compl. ¶¶ 151-55; *Lopez* Am. Compl. ¶¶ 33, 89-92; *Valladolid* Am. Compl. ¶¶ 99-103.) "An unjust enrichment claim can exist only if the subject matter of that claim is not covered by a valid and enforceable contract." *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1337 (S.D. Fla. 2002) (citing *Webster* v. *Royal Caribbean Cruises, Ltd.*, 124 F. Supp. 2d 1317, 1326 (S.D. Fla. 2000)). Here, plaintiffs' relationship with the Bank is covered by written agreements and plaintiffs do not allege that the Bank was enriched outside of those agreements. Moreover, "[i]t is blackletter law that 'the theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy.'" *Id.* Where "[p]laintiffs have not explicitly alleged that an adequate remedy at law does not exist, . . . the failure to do so is fatal." *Id.* at 1337 (citing *Webster*, 124 F. Supp. 2d at 1326-27; *see also Martinez* v. *Weyerhaeuser Mortgage Co.*, 959 F. Supp. 1511, 1518-19 (S.D. Fla. 1996)). Plaintiffs make no such allegation.

## V. LOPEZ'S INVESTMENT ADVISER ACT CLAIM FAILS BECAUSE LOPEZ HAS NOT ADEQUATELY ALLEGED THAT SCBI WAS AN "INVESTMENT ADVISER" UNDER THE IAA

Finally, in addition to the other Breach-of-Duty Claims, Lopez alone seeks to recover all fees and commissions paid to SCBI in connection with his investments in Fairfield Sentry by advancing a claim for rescission of his supposed investment adviser agreement under Section 215 of the IAA, which is predicated on an alleged violation of Section 206(2) of the IAA.[21] (*Lopez* Am. Compl. ¶¶ 67-77.) To state a claim under Section 206(2) of the IAA, 15 U.S.C. § 80b-6(2), Lopez must show, among other things, that (i) SCBI is an investment adviser under the IAA, and (ii) he entered into an investment advisory relationship with SCBI. *See Kassover v. UBS AG*, 619 F. Supp. 2d 28, 32-33 (S.D.N.Y. 2008). Lopez does not plead either prerequisite adequately.

### A. SCBI Is Exempt from the Investment Advisory Restrictions of the IAA.

SCBI, and its predecessor AEBI, are banks that are exempted from the definition of "investment advisers" under the IAA. The IAA defines an "investment adviser" as follows:

> [A]ny person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; *but does not include* (A) a *bank*, or any bank

---

[21] According to recent Supreme Court precedent, courts should not imply a private right of action under section 215 of the IAA. "For a statute to create such private rights, its text must be phrased in terms of the persons benefited." *Gonzaga Univ.* v. *Doe*, 536 U.S. 273, 284 (2002). "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Alexander* v. *Sandoval*, 532 U.S. 275, 289 (2001). Section 215 voids investment adviser contracts "as regards the rights" of the investment advisers (*i.e.*, the persons regulated) not their clients (*i.e.*, the persons seeking to benefit from implied rights under section 215) and, therefore, does not create a private right of action under *Alexander* and *Gonzaga*. Although the Court in *Transamerica Mortg. Advisors (TAMA)* v. *Lewis*, 444 U.S. 11 (1979), implied a right of action under section 215, it did so based on an outdated and, by today's standards, incorrect legal standard. 444 U.S. at 18-19 (implying private right of action merely because clients of investment advisers are intended beneficiaries of the section and right to rescission could be "fairly implie[d] from Congress declaring certain contracts "void").

> holding company as defined in the Bank Holding Company Act of 1956 [12
> U.S.C.A. § 1841 et seq.] . . . .

15 U.S.C. § 80b-2(a)(11) (emphasis added).  The IAA further defines "bank" as "a banking

institution organized under the laws of the United States . . . [or] any other banking

institution . . . doing business under the laws of any State or of the United States, a substantial

portion of the business of which consists of receiving deposits or exercising fiduciary powers

similar to those permitted to national banks . . . and which is supervised and examined by State

or Federal authority having supervision over banks or savings associations . . . ." 15 U.S.C.

§ 80b-2(a)(2).

      SCBI falls squarely within the definition of an exempted bank under the IAA.

SCBI is a banking institution chartered as an Edge Act corporation, and is therefore subject to

the supervision of the Federal Reserve Board. *See A.I. Trade Finance, Inc.* v. *Petra Intern.*

*Banking Corp.*, 62 F.3d 1454, 1462 (D.C. Cir. 1995) ("The Edge Act . . . gave the Federal

Reserve Board broad powers to set specific rules of operation.").  Edge Act corporations are

chartered under federal law "for the purpose of engaging in international or foreign banking or

other international or foreign financial operations."  *Bank of Am. Corp.* v. *Lemgruber*, 385 F.

Supp. 2d 200, 207 n.5 (S.D.N.Y. 2005) (quoting 12 U.S.C. § 611).  SCBI has never registered

with the SEC as an investment adviser, and AEBI, SCBI's predecessor in name, previously

gained no-action relief from registering as an investment advisor based on its status as an

exempted "bank" under the IAA.  Am. Express Bank Int'l, SEC No-Action Letter, Fed. Sec. L.

Rep. ¶ 78,459, 1987 WL 108222 (June 2, 1987).  Therefore, because SCBI is a bank that is not

subject to the investment advisory restrictions of the IAA, Lopez cannot state a private cause of

action against SCI under the IAA.

## B.    Lopez Does Not Adequately Plead That SCBI Served as His Investment Adviser.

Lopez's IAA claim fails for a second, independent reason:  Lopez's complaint fails to plead adequately the existence of an investment advisory relationship under the IAA.  To plead a private cause of action under the IAA, Lopez "must allege that he or she entered into a contract for investment advisory services with an investment adviser."  *Welch* v. *TD Ameritrade Holding Corp.*, No. 07-CV-6904, 2009 WL 2356131, at *27 (S.D.N.Y. Jul. 27, 2009). Because his IAA claim is predicated on an allegation of fraud, Lopez must do so with particularity under Rule 9(b).  *See e.g.*, *Nairobi Holdings Ltd.* v. *Brown Bros. Harriman & Co.*, No. 02-CV-1230, 2002 WL 31027550, at *9 (S.D.N.Y. Sep. 10, 2002) (holding Rule 9(b) pleading standard applied to IAA claim where Section 10(b) claim also asserted); *DeBlasio* v. *Merrill Lynch & Co., Inc.*, No. 07-CV-318, 2009 WL 2242605, at *10 (S.D.N.Y. Jul. 27, 2009); *Kassover*, 619 F. Supp. 2d at 31.  Unsupported, conclusory allegations of an investment advisory relationship will not do.  *DeBlasio*, 2009 WL 2242605, at *16.

Lopez's contention that an investment advisory relationship exists between him and SCBI rests on the single allegation that he and AEBI "entered into 'investment adviser agreements' under the Investment Advisers Act."  (*Lopez* Am. Compl. ¶ 69).  This conclusory allegation is insufficient as a matter of law to plead the existence of an investment advisory relationship.  *Kassover*, 619 F. Supp. 2d at 32-33 (allegations that defendant recommended investment and that parties entered into a nondiscretionary brokerage account agreement insufficient to establish investment advisory relationship); *Deblasio*, 2009 WL 2242605, at *16 ("Plaintiff[] must establish by more than conclusory allegations that the defendant was an investment adviser" (citation omitted)); *Welch*, 2009 WL 2356131, at *29 (IAA claim fails where brokerage account contract stated:  "You agree that you . . . are solely responsible for

investment decisions in your Account. . . . Unless Schwab otherwise agrees with you in writing, Schwab does not have any discretionary authority or obligation to review or make recommendations for the investment of securities or cash in your Account.").

In addition, the terms of Lopez's agreements with AEBI belie any claim of an investment advisory relationship. The one-page Securities Transactions Addendum, which Lopez signed, included the following notice:

> Your AEBI Relationship Manager can assist you in generally determining your risk tolerance and investment objectives. However, prior to making any investment, you should ensure you have received and carefully read and considered any and all documents which may e furnished to you in connection with your purchase. In deciding to purchase any investments, you should rely exclusively on your own due diligence investigation and your own independent assessment of the benefits and risks of the investments as well as of the financial condition and creditworthiness of the issuers, or of any guarantors thereof.

(Berarducci Decl. Ex. K.) Moreover, the RRGA provided that the Bank would only act as a customer's agent and custodian for securities transactions only where authorized by the customer. (*Id.*, Ex. I (RRGA) at § 17 & Ex. J (Amended RRGA) at § 17.) Lopez therefore fails to plead the existence of an investment advisory relationship.

# CONCLUSION

Any losses suffered came at the hands of Bernard Madoff, not Standard Chartered.  Plaintiffs do not plead any cognizable claims under federal or state law.  The Bank made no actionable misrepresentations or omissions.  Nor did the Bank breach any of its limited duties with respect to plaintiffs' nondiscretionary investment accounts.  SCBI, SCB, SC PLC and SCI thus respectfully request that the Court dismiss the *Headway* Complaint, *Lopez* Amended Complaint, *Maridom* Amended Complaint and *Valladolid* Amended Complaint in their entirety.

Dated: March 10, 2010
New York, New York

/s/ Sharon L. Nelles

Sharon L. Nelles (SN-3144)
Bradley P. Smith (BS-1383)
Patrick B. Berarducci (PB-2222)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
nelless@sullcrom.com

Diane L. McGimsey
(Pro Hac Admission Pending)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067

*Attorneys for Defendants Standard Chartered Bank International (Americas) Ltd., Standard Chartered International (USA) Ltd., Standard Chartered Bank and Standard Chartered PLC*