
The Standard Chartered
Private Bank

**General Terms and Conditions**
Revised August 2008

The Standard Chartered Private Bank is the private banking division of Standard Chartered Bank

**General Terms and Conditions**

Page 02    General Terms and Conditions

Page 37    General Definitions and Construction

Page 49    Appendix I : Singapore Country Supplement

# General Terms and Conditions

These General Terms and Conditions are referred to and incorporated in an Account Opening Application.

## 1. Interpretation

1.1 **Scope of Agreement:** By executing the Account Opening Application, the Client irrevocably agrees to be bound by the terms and conditions contained in Account Documentation and any Credit Documentation including these General Terms and Conditions which govern the Accounts, Facilities, Transactions and/or Investments and Services provided by the Bank to the Client. The Account Documentation and Credit Documentation will supercede and replace all other previous terms and conditions which apply to the same subject matter. The Client agrees to be bound by the General Terms and Conditions and all other terms and conditions governing any Accounts, Facilities, Transactions and/or Investments or Services, provided to the Client or prescribed by the Bank from time to time, all of which will form an integral part of the Terms and Conditions governing the Client's relationship with the Bank (the "**Client Agreement**").

1.2 **Transactions:** The Client may open Accounts, obtain Facilities, utilise Services, and enter into such Transactions under this Client Agreement as the Client may from time to time determine. Transactions include, but are not limited to, the sales, purchase and trading of exchange traded and primary issue Securities, Derivatives and Investments, whether on Margin or on a fully paid up basis. Except as provided to the contrary in any Confirmation, the Client Agreement will apply to any Transaction entered into between the Client and the Bank. Each Transaction is entered into by the Bank in reliance on the fact that such Transaction (and, to the extent any of the terms of such Transaction are recorded in a Confirmation, each such Confirmation) will constitute a single agreement between the Bank and the Client, and on the basis that the Bank would not otherwise enter into such Transaction. The Client further agrees to be bound by all the terms and conditions pursuant to which the Bank and/or Nominees, custodians, agents or Brokers effects each purchase, switching or redemption of any Securities or Investments.

1.3 **Express Payment Instruction:** Notwithstanding clause 16.5, the Client expressly agrees to provide the Bank with such monies and/or agrees to the Bank debiting the Client's Account(s) for the payment of (a) any Transaction entered into on the Client's behalf, which shall include but not be limited to calls, preferential rights and options to subscribe for more Investments; (b) Services provided to the Client; (c) Charges as described in clause 39; and (d) payment of Margin.

## 2. Instructions

2.1 **Instructions:** The Bank is authorised and entitled (but not obliged) to rely, act on and execute all Instructions given by the Client if such Instructions are made in accordance with the Account Documentation and any Terms and Conditions applicable to the Accounts, Facilities, Transactions and/or Investments and Services to which the Instructions relate. Pursuant to the Account Documentation, such Instructions may be given by the Client or the Authorised Signatories either in person, in writing, by telephone (which need not have any call-back procedure), facsimile ("**fax**"), electronic mail ("**email**") from the Client's email address as specified in the Account Opening Application, the Internet or any other form telecommunications or electronic mode of communication. All trading Instructions must be received by the Bank or its authorised persons via the Bank's designated address, fax and telephone numbers and/or other authorised channels of communication as the Bank may designate from time to time during the Bank's specified hours of operation and trading on the Business Day. All trading Instructions received outside of the Bank's specified hours of operation and trading will be deemed to have been received the next Business Day. Acceptance by the Bank of Instructions constitutes a binding contract between the Bank and the Client on the terms of the Instructions.

2.2 **Declining to Act on Instructions:** Where the Bank, acting in good faith, considers that any Instruction is an Affected Instruction, the Bank may decline to act on that Instruction. The Bank will be under no duty to assess the prudence or otherwise of any Instructions given. The Bank will not be liable to the Client or any other person for any Loss suffered as a result of the Bank declining to act on any Affected Instruction except where such Loss is caused directly by the Bank's gross negligence or wilful default. The Bank will Notify the Client as soon as practicable if it declines to act on the Client's Instruction.

2.2.1 **Declining an Account Opening Form:** The Bank may decline to open any Account for the Client. No contractual relationship will arise between the Client and the Bank in relation to or as a result of any Account Opening Form which is declined by the Bank.

2.2.2 **Orders:** For the avoidance of doubt, the Client hereby expressly acknowledges and agrees that (a) the Bank is not obliged to accept any Order from the Client in whole or in part; (b) any Issuer or Broker which receives an Order from the Bank will not be obliged to accept such Order in whole or in part, and the Bank will not have any responsibility or liability for ensuring that the relevant Broker accepts a relevant Order and/or Issuer issues the Securities and/or Investments or for any Losses including any loss of investment opportunity which the Client may suffer or incur as a result of any refusal to accept or delay in accepting such Order by the Bank or any such Broker or Issuer, except where such Loss is caused directly by the Bank's gross negligence or wilful default; and (c) where the Bank acts as the Client's agent in respect of purchases or subscriptions in Securities, Derivatives and/or Investments, the Bank's responsibility is solely to implement the Instructions of the Client given subject to the terms hereof.

2.2.3 **Timing:** The Bank will not be obliged under any circumstances to take any action in connection with any Orders or Instructions received after such time on a Trading Day or Business Day or prior to a cut-off time (in the provision of any Services) wherein the Bank would not be able to execute the Orders or Instructions within the same Trading Day and/or Business Day and/or cut-off time. All Orders and Instructions will then be deemed to be placed the next applicable Trading Day or Business Day or cut-off time.

2.3 **Further Instructions:** The Bank may require that Instructions be confirmed, or additional documentation executed, in such a manner as it may specify from time to time, including in situations where the proceeds of any Accounts, Facilities, Transactions and/or Investments or Services are to be credited to an account not in the Client's name or to an account not with the Bank. The Bank may refuse to act on any Instructions until it receives confirmation acceptable to it or may take any action as may seem advisable or expedient if Instructions cannot be obtained or if the Client has not responded to requests for Instructions within a reasonable time. The Bank also reserves the right to prescribe any conditions subject to which it will accept any Instructions, including requiring Authorised Signatories to provide further identity information as the Bank may require from time to time. The Bank will not be liable to the Client for any Loss by reason of delay or failure to receive Instructions, except where such Loss is caused directly by the Bank's gross negligence or wilful default.

2.4 **Authenticity of Instructions:** The Bank may rely on the Instructions given by the Client or the Authorised Signatories or any person purporting to be the Client or the Authorised Signatories, and the Client will be bound by any acts or omissions made by the Bank in reliance on such Instructions, regardless of whether such Instructions have been given by the Client or with Client's authority or consent and regardless of whether such Instructions are forged, fraudulent, erroneous, ambiguous or misunderstood, provided that the Bank's officer receiving or acting on such Instructions is satisfied as to their genuineness and has acted in good faith thereon. The Client confirms that he is the party ultimately responsible for originating all Instructions and no other person stands to gain the benefit or bear the risk of any Transaction effected with the Bank. The Bank will have no responsibility for determining the authenticity of any Instruction given or purported to be given by the Client or the Authorised Signatories provided that prior to doing so the Bank used best endeavours in accordance with the Bank's regular business practice and procedures to ascertain and verify the identity of the person giving the Instructions as normally practised by banks. The Bank shall not be liable for any Losses suffered or incurred by the Client as a result of the Bank acting upon the same, except where such Loss is caused directly by the Bank's gross negligence or wilful default.

2.5 **Standing Orders:** For the avoidance of doubt, the Client hereby expressly acknowledges and agrees that the Bank may at any time, at its sole and absolute discretion, refuse to accept a Standing Order in the light of prevailing market conditions or any other grounds and the Bank shall not be liable for any Loss or other consequence arising as a result thereof. The Bank may from time to time, at its sole and absolute discretion, prescribe, adopt and/or amend the procedures for the placement and/or acceptance of a request by the Client for a Standing Order.

2.6 **Changes to Standing Orders:** The Client may only change Standing Orders at the times and via channels which the Bank may in its absolute discretion prescribe and Notify from time to time.

2.7 **Duration of Standing Orders:** A Standing Order shall remain effective until (a) expressly cancelled by the Client by notice to the Bank, or (b) (in respect of Currency switching services and foreign exchange order watching services) the close of the last Trading Day in the relevant week (or such other time as the Bank may from time to time in its absolute discretion determine). The Bank will be entitled to a reasonable period of time from receipt of such notification to process such notification of change or close of last Trading Day. Any Loss or other consequence arising from the execution of any such Standing Order in respect of which no notice of cancellation has been effected by the Bank shall be borne by the Client.

2.8 **Revocation of Instructions:** The Client may request a revocation of Instructions given to the Bank and the Bank may, at its discretion, try to accommodate such request. However, the Bank will not be liable if the Bank is unable or unwilling to revoke such Instruction, and/or, if it has implemented the initial Instructions in good faith before:

2.8.1 receiving and implementing the revocatory Instructions; or

2.8.2 revocation of the Terms and Conditions by termination or operation of law applicable to the Client.

2.9 **Reversal of Instructions:** If the Bank comes to believe that an Instruction may not have been properly authorised by the Client, the Bank shall be entitled (but not obliged), after making efforts to confirm whether such Instruction was properly authorised and Notify the Client, to take steps to reverse any action taken on the basis of that Instruction. The Bank will not be responsible for any Loss to the Client that results from such a reversal, except where such Loss is caused directly by the Bank's gross negligence or wilful default.

2.10 **Priority:** The Bank is entitled to determine at its discretion the order of priority in executing Instructions to transfer funds, make payment and/or any other existing arrangements or Instructions the Client may have made with the Bank on the stipulated date for the execution of the Client's Instructions.

2.11 **Sufficient Funds:** The Bank shall not be obliged to execute the Instructions and shall not be liable for any Loss or damage to the Client as a result of the Bank not effecting the Instructions, if on the stipulated date of execution:

2.11.1 the Client's designated account does not contain sufficient funds for the Bank to execute the Instruction;

2.11.2 the Client's designated account does not contain sufficient funds to pay for any Charges, fees, interest or other sums that may be payable by the Client to the Bank;

2.11.3 the execution of the Client's Instructions will cause the balance in the Client's designated account to exceed the credit limit that the Bank has set for the Client and/or the Client's designated account; or

2.11.4 the Client's designated account is closed, frozen or inaccessible for any reason.

## 3. Authorised Signatories

3.1 **Authority under Mandate:** Authorised Signatories must act in accordance with the Mandate provided by the Client to the Bank, and may open, close and operate Accounts, give Instructions, enter into Transactions and/or Investments, obtain and utilise Facilities and Services and execute any and all of the following deeds, documents, and actions on behalf of the Client, including:

3.1.1 to agree to and accept all deletions, additions, amendments and variations to any terms and conditions governing the Accounts or governing any products, Facilities, Transactions and/or Investments or Services made available to the Client, or any agreements, instruments or other documents of any subject matter entered into by the Client;

3.1.2 to sign account opening forms (if doing so is within the Mandate and the Bank's operating procedures), letters of indemnity (for instructions by telex, facsimile transmission, telegraph, cable, telephone and other forms of electronic communication and/or for any other purposes whatsoever), and any and all other forms, declarations, indemnities, agreements, instruments and documents whatsoever, in the Bank's prescribed form or otherwise, incidental to, in connection with or for the purposes of any of the acts, deeds and things that the Authorised Signatory(ies) is/are authorised to do on behalf of the Client; and

3.1.3 in addition and without prejudice to the generality of the foregoing, to do and execute any and all of the following acts, deeds, documents and things, on behalf of the Client, from time to time:

(a) to sign and to countermand or revoke any Cheques, drafts, withdrawal forms, orders to pay, bills of exchange, promissory notes and other instruments;

(b)   to endorse all negotiable instruments requiring endorsement by the Client including without limitation, bills of exchange which the Client desires to discount;

(c)   to go into overdraft or to exceed any agreed overdraft limit on the Account(s);

(d)   to convert the funds of the Client into funds denominated in different currencies;

(e)   to apply for any products, Facilities or Services (including without limitation, safe deposit boxes, internet, web-bank or cash management services) that may be made available by the Bank from time to time, in relation to the Account(s) or otherwise;

(f)   to convert/change the terms relating to the Account(s) or the Facilities and/or the Account type and features;

(g)   to apply to the Bank to issue letters of credit, guarantees, indemnities, counter-indemnities and drafts and to effect electronic and telegraphic transfers of funds, to any parties;

(h)   to instruct the Bank with regard to the purchase or sale of Securities, Derivatives and Investments and any or all other Transactions and to enter into and execute the documentation relating to such transactions;

(i)   to instruct the Bank on corporate actions;

(j)   to enter into margin trading activities;

(k)   to instruct the Bank to deliver, dispose of or deal with any Transactions, deeds or documents or other property (including without limitation, safe deposit boxes and their contents) in the Bank's possession, whether by way of security, safe custody or otherwise;

(l)   to close the Account(s); and

(m)   to delegate any of their rights and authorities as set out in this clause to any person(s),

and the Bank shall be authorised and instructed to act on and comply with all requests, Instructions, applications and orders given or made by the Authorised Signatory(ies) within the scope of their authority as set out in this clause.

### 4.    Signatures

4.1   **No Pre-Printed Signatures:** The Bank will not accept pre-printed signatures or rubber stamped signatures for Instructions and specimen signatures.

4.2   **Variation of Signatures:** The Client will notify the Bank promptly in writing of any change or variation in the signature of the Client and/or any Authorised Signatory. The Bank will be entitled to a reasonable period of time of not less than seven (7) Business Days from receipt of such notification to process such notification of change. Notwithstanding the foregoing, any such change will be effective only after the Bank has received and processed the completed form. The Bank may in its absolute discretion honour any Cheque or instrument, or act on any Instruction, signed by the Client or any Authorised Signatory before the Bank processes such notification of change, regardless of whether the Bank has received such notification of change.

4.3   **Instructions:** Notwithstanding the foregoing, the Bank shall be entitled to require any instrument or Instruction to be signed or countersigned by all the then existing sole proprietor/directors/ partners/members of the Client as the Bank deems necessary.

### 5.    **Security Measures:** The Bank may at any time implement any security and other procedures including the Bank's "know your customer" procedures and/or requiring the utilisation of a Security Code, PIN or TIN and/or requiring the provision of any additional personal data of the Client which the Bank may reasonably require and which the Client undertakes to provide on request for the verification of the identity of the Client and/or Authorised Signatories and verification that any particular Transaction and/or Investment or Instruction is authorised by the Client and/or Authorised Signatories.

### 6.    **Ratification:** The Client agrees to do such acts and things and execute such documents and to perform and ratify any contract, Transaction or agreement entered into or action taken by the Bank as a result of Instructions or which are in the opinion of the Bank desirable to ratify or confirm anything done by the Bank in the proper exercise of any right or power conferred by these Terms and Conditions or any other agreement entered into pursuant to the Client Agreement or relating to the Client's Accounts, Facilities, Services or Transactions.

### 7.    **Mandate:** The Client will provide Mandate(s) as the Bank may require from time to time by providing relevant Instructions to the Bank. The Bank may rely on the contents of any Mandate and deal with and accept any Instruction from, any Authorised Signatory specified in, and in accordance with any Mandate.

7.1   **Change in Mandate:** The Client may provide the Bank with an amended or replacement Mandate from time to time in writing and signed by the Client (including all joint Account holders). Notwithstanding the foregoing, the Client shall promptly notify the Bank of any changes made to its Authorised Signatories. The Bank will be entitled to a reasonable period of time of not less than seven (7) Business Days from receipt of such notification to process any new Mandate, including changes to approving or authorised signatories, and in the meantime may continue to act in accordance with the old Mandate.

### 8.    **Affiliates:** These Terms and Conditions and all of the rights of the Bank hereunder will apply to, and be conferred on, any Bank Affiliate and Standard Chartered Group Member which receives Instructions from the Client, all of which will be entitled to enforce and enjoy the benefit of these Terms and Conditions to the fullest extent allowed by the law.

### 9.    Telephone, Fax, Email and Internet Instructions

9.1   **Telephone Recordings:** The Client consents to the Bank recording or memorialising telephone and oral conversations with the Client by audio recording devices, in writing or electronically to provide evidence of Instructions and other verbal communications, and the Client agrees that any such notes and records of the Bank will constitute conclusive evidence as against the Client of the fact and content of the Instructions and verbal communications, and the Client consents to the production of such written, audio or electronic recordings (and transcripts of such recordings) as evidence in any legal or other

proceedings. Subject to Applicable Laws, the Bank may dispose of any such written or other records and erase such tapes after the expiration of such period as the Bank may determine.

9.2 **Acknowledgement of Risks:** The Client acknowledges that it is aware of all risks and damages which could result or arise from the use of Security Codes, postal services, telephone, fax, telex, email, Internet, Electronic Banking Services and other acceptable forms of communication with the Bank and hereby agrees to bear all of such risks. Such risks include those resulting from errors in transmission, technical defect, power failure, fraud, forgery, illegality, misunderstanding, unintended disclosure or unauthorised interception or manipulation by third parties or any Force Majeure Event. The Client will be held liable for all Losses due to unauthorised use of Security Codes, postal services, telephone, fax, telex, email, Internet, Electronic Banking Services and other acceptable forms of communication with the Bank if the Client has acted fraudulently or with negligence or if the Client is in default of any of the security obligations set out in the Terms and Conditions, the User Guidance and as Notified from time to time.

9.3 **Status Not Binding:** The Client acknowledges that any statement or information given over the telephone or other electronic means (including but not limited to the Electronic Banking Services) pertaining to an Account or any particular Transaction is not binding on either the Bank or on any Broker. The Client agrees that the information pertaining to and received from the telephone or other electronic means (including but not limited to the Electronic Banking Services) shall not for any purpose whatsoever be taken as conclusive of the Client's Account balance or Transaction status. The Bank does not warrant the accuracy of any information pertaining to the Client's Accounts or Transactions as reported through telephone or other electronic means (including but not limited to the Electronic Banking Services).

9.4 **Telephone, Fax, Email and Internet Indemnity:** Specifically in respect of Instructions by telephone, fax, email, the Internet and any other electronic means, the Client undertakes to waive all rights and remedies and indemnify the Bank and to keep the Bank indemnified against all Losses incurred or sustained by the Bank of whatever nature and howsoever arising out of or in connection with the Bank acting in accordance with any Instructions; and from or relating to the provision of telephone, fax, email, the Internet, and Electronic Banking Services and any other electronic means, whether as result of the unauthorised use of Security Codes; error, defect, failure or interruption in the provision of service; Force Majeure events; acts, omissions, or compliance with Instructions on the part of the Bank; or for any other reasons. In so doing, the Bank will not be liable or responsible for any Losses incurred by the Client except where the same are caused directly by the Bank's gross negligence or wilful default.

9.5 **Electronic Banking, Security Codes, PINs and TINs**

9.5.1 **Restrictions on Types of Use and Instructions:** The Bank may at its discretion provide the Electronic Banking Services to any Client and the Bank may impose certain restrictions on the type of use of such services or type of accounts available under the Electronic Banking Services and the Instructions that the Client can provide to the Bank through email and the Internet. The Client must be the holder of Account(s) available under the Electronic Banking Services or a person authorised to operate such Account(s), and be registered by the Bank to use the Electronic Banking Services. The Bank may decline to accept any Instructions sent by the Client via Electronic Banking Services, if in the Bank's sole discretion the Bank deems that the relevant Instructions are not in compliance with the restrictions for the use of Electronic Banking Service as Notified to the Client from time to time.

(a) **User Guidance:** User Guidance on the operation of the Electronic Banking Services will be made available to the Client and the Client must comply with the User Guidance when accessing or operating the Electronic Banking Services.

(b) **Joint Accounts:** In the case of joint Account holders, the Bank will give each Client of the joint account a unique initial user name and password.

9.5.2 **Discontinuing or Altering Service:** The Bank reserves the right to discontinue or alter the Electronic Banking Services at any time and, to make alterations to the way data is presented and the Client agrees that (a) the Bank may from time to time Notify the Client of changes in the way to access or the mode of operation of the Electronic Banking Services, and (b) should the Bank encounter any technical difficulty in supplying the Electronic Banking Services to the Client, the Bank may, but is not legally obliged to, provide data to the Client using alternative means while the Electronic Banking Service is unavailable.

9.5.3 **Data Not Secure:** Where data via the Internet is concerned, the Client acknowledges that, depending on the capability of the Client's browser, the data, including information concerning the Client's Accounts, Transactions and/or Investments and Services, may not be encrypted. In all cases, the Client acknowledges that such information and data may be accessed by unauthorised parties. The Bank will not be responsible for, and the Client expressly assumes the risk of, unauthorised access to the information and data, and the Client agrees to notify the Bank of any problems that the Client may experience with the Electronic Banking Services.

9.5.4 **Security Codes:** Any Security Codes, PINs and TINs issued by the Bank for use by the Client in communicating or giving Instructions to the Bank are dispatched to the Client at its own risk and the Client undertakes to keep such Security Codes, PINs and TINs strictly confidential. The Client shall be fully responsible for, and shall indemnify the Bank against, the consequences of any disclosure to, or any misuse or abuse of the Security Code, PIN or TIN by, unauthorised persons, save in so far as the same is caused directly by the Bank's wilful default or gross negligence. The Client shall notify the Bank immediately upon notice or suspicion of (a) the Security Code, PIN or TIN having been disclosed to any unauthorised person, (b) any unauthorised Instruction having been given or (c) loss or theft of a Security Code.

(a) **Duration:** Security Codes, PINs and/or TINs once established for the Client, shall remain effective for such period of time as Notified from time to time after (a) the Bank issues to the Client a confirmation of receipt of the Client's written notice of cancellation or variation of the Security Code, PIN and/or TIN or (b) the Bank issues to the Client a written notice of the Bank's cancellation or variation of the Security Code, PIN and/or TIN.

9.5.5 **Inability to Access:** The Bank will not be responsible for any inability to access the Electronic Banking Services for any reason, including but not limited to any Force Majeure Event, or any error or failure, malfunction, delay or interruption of the Electronic Banking Services or any telecommunications services, or by reasons of the unsuitability of the browser, or any other software or hardware operated by the Client, except where any of the foregoing arises directly from the Bank's gross negligence or wilful default. The Client accepts that routine maintenance requirements, excess demand on the systems and circumstances beyond the Bank's control may mean that it is not always possible for the Electronic Banking Services to be available during its normal operating hours.

9.5.6 **Delivery or Execution of Instructions:** The Client agrees that when the Client gives the Bank an Instruction via the Electronic Banking Services (including but not limited to an Instruction to transfer funds out of an Account), the Bank is deemed to have received the Instruction only when the Client has received the Bank's confirmation that it has received the Instruction.

9.5.7 **Timeliness of Instructions:** The Client agrees that the Client shall not rely on Instructions which have been transmitted via the Electronic Banking Service to be complete until the Client receives a confirmation of the successful execution of such Instruction. In particular, the Client acknowledges that Cheques and any payment Instructions the Client has given via the Electronic Banking Service might take time to clear and might not always be immediately reflected in the balance on the Account.

9.5. 8 **Other Jurisdictions:** If the Client accesses the Electronic Banking Services from a country outside the Jurisdiction which applies to the Account(s), the Client is responsible for complying with the local laws of that country.

9.5.9 **Indemnity:** The Client undertakes to waive all rights and remedies and will indemnify the Bank and keep the Bank indemnified against any Loss whatsoever and howsoever caused (save and except any direct Loss caused by gross negligence or wilful default on the part of the Bank) that may arise to be incurred by the Bank in providing the Client the Electronic Banking Services, whether or not arising from or in connection with and including but not limited to the following:

    (a)    the Bank acting on the Instructions;

    (b)    the Client's improper use of the Electronic Banking Services; or

    (c)    any damage to a system of the Client or any third party (or other computer hardware, devices, facilities or software) as a result of accessing or using the Electronic Banking Services.

## 10. Individual/Joint Accounts

10.1 **Death and Incapacity of Individual:** In the event of the death or legally recognised declaration of incapacity or incapability of an individual who is a Client, the acts of the Authorised Signatories are binding upon the deceased's executors or administrators until valid notice is given to the Bank. Upon receipt of such valid notice, the deceased's executor(s) or administrator(s) will be the only person(s) recognised by the Bank as the deceased's successor(s). Upon the deceased's death, the Bank, its Nominees, custodians and/or agents are entitled to retain, without any liability on the Bank's part, any Assets and Investments held for, and any monies payable to, the deceased until such time the deceased's successor produces a grant of probate or letters of administration to the Bank. The foregoing is without prejudice to the Bank's rights in respect thereof arising out of any lien, charge, pledge, set-off, counterclaim or otherwise or to any step which the Bank may deem fit to take in view of any claim by any person other than such survivor or survivors.

10.2 **Joint Account Instructions:** If more than one person is a party to an Account, the Bank may accept Instructions in relation to the Account on the Instructions of one joint Account holder. However, where the Client does not specify the signing requirement on any Account, the Bank will treat a single signature of any one of the joint Account holders as sufficient for the operation of the Account. The Bank may, in its sole discretion, insist that it will act only on the instructions of all the Account holders to operate the Accounts.

10.3 **Risk Profile of Joint Accounts:** Each Account holder in the case of joint Accounts hereby confirms and agrees that while their respective risk profiles may differ, the Bank is entitled, from time to time, to review and/or to determine the risk profile of the joint Account, having regard to the transactions authorised by the joint Account holders and/or other relevant risk factors and/or considerations from the Bank's perspective and each signatory shall be bound by all instructions validly given to the Bank by the other joint Account holder(s) in accordance with these General Terms and Conditions, regardless of whether such instructions originated from him or otherwise or whether the instructions have been given with his approval or otherwise. The Bank shall not be liable to the joint Account holder(s) for any loss, damage, claim and/or other consequences arising from or in connection with the carrying out of such instructions.

10.4 **Joint and Several Liabilities:** In joint Accounts, all Account holders will be jointly and severally liable for all Liabilities incurred on the joint Accounts and each of them will be bound.

10.5 **Death of Joint Account Holder:** In the event of the death or legally recognised declaration of incapacity or incapability of one of the joint Account holders (except in the case of joint Accounts designated as trust or executor's Accounts), from the time of the occurrence of such event, the Client shall consist of the other person(s) previously constituting the Client prior to such event, the credit balance. Investments, deeds, safe deposit boxes (and contents thereof) in the joint Accounts and any credit balances of any Accounts, Assets, Transactions and/or Investments may either be transferred by the Bank, its Nominees, custodians and/or agents (subject to Applicable Laws) to (a) the survivors; or (b) new Accounts which may be opened in the names of the survivors, and if more than one survivor, in their joint names, provided that prior to such transfer, any Indebtedness will be first set-off against the credit balances of Accounts, Assets, Transactions and/or Investments. The surviving joint Account holder(s) shall remain liable as part of the Client under these Terms and Conditions in respect of Liabilities incurred up to the occurrence of the relevant event. Any payment made by the Bank, its Nominees, custodians and/or agents to such survivors or to a court of competent jurisdiction administering the deceased's estate will constitute a complete discharge of the Bank's obligations to all the Account holders and their representatives. All acts of the Bank, Bank Affiliate, Nominees, Brokers, custodians and/or agents prior to receiving valid written notice of the death, incapacity or incapability of the deceased, incapacitated or incapable joint Account holder shall be valid and binding. The foregoing is without prejudice to the Bank's rights in respect thereof arising out of any lien, charge, pledge, set-off, counterclaim or otherwise or to any step which the Bank may deem fit to take in view of any claim by any person other than such survivor or survivors.

10.6 **Estate Duties:** Before making any payments or releasing any monies or assets to the Client's executors or administrators, the Bank may require the deceased's executors or administrators to furnish the Bank with a declaration or other such evidence satisfactory to the Bank that all applicable estate duties (in the relevant jurisdiction(s)) have been fully paid and the deceased's executors or administrators will indemnify and hold the Bank harmless from and against any Loss suffered or incurred by the Bank or any of its Affiliates as a result of the Bank making payments or releasing an Account holder's monies or assets in reliance on such declaration and/or evidence, except where such Loss is caused directly by the Bank's gross negligence or wilful default.

10.7 **Termination of Joint Account:** The Bank is authorised to credit joint Accounts with funds belonging or purporting to belong to any one or more joint Account holders. Upon the termination of a joint Account, all amounts paid to such joint Accounts after such termination will be placed in a suspense Account, subject to the Bank's right to apply any such amount towards discharging any debit balance in the joint Accounts. The Bank will have the right to refund such amount or any balance thereof after such application to all the joint Account holders (regardless of the identity of the person(s) who originally paid such amount).

10.8 **Composition:** The Bank shall be at liberty to release or discharge any of such persons from the liability hereunder or to accept any composition from or make other arrangements with any of such persons without releasing or discharging the other or others or otherwise prejudicing or affecting the Bank's rights and remedies against the other or others.

10.9 **Electronic Banking:** In connection with any account which the Client holds jointly with others and which requires two or more Authorised Signatories to issue Instructions, the Client's access to the Electronic Banking Services (and the access of each of the other joint signatories) will be limited to those parts of the

Electronic Banking Services which allow the Client to obtain information about the Account, including but not limited to the balance of the Account. In connection with any joint account, if more than one person has registered to use the Electronic Banking Service, the withdrawal of any of those registered users from the Electronic Banking Service will not affect the use of the Electronic Banking Services by the others.

**11.**     **Partnership:** In the absence of written notice to the Bank, (a) any change or changes in the name of the partnership which is a Client or (b) any change or changes in the members of such partnership by death, retirement or introduction of a partner or partners, or (c) any other change in the constitution of such partnership will not affect the Obligations and Liabilities of the Client or any partner signing the Account Documentation, all of which Liabilities will continue and be binding on the Client and all such partners from time to time constituting the partnership. The Bank will be entitled to debit the Account(s) of the partnership at any time in respect of any sum howsoever due or owed to the Bank by any of the persons in whose name the Account is opened or maintained or from time to time constituting the partnership which is the Client. All partners (on a joint and several basis) shall be bound by the Terms and Conditions. The Terms and Conditions will bind all partners (jointly and severally) notwithstanding any change in the partnership's constitution or a change in the name or modification or termination of any power of any partner. The Client will promptly notify the Bank in writing of any change in the constitution or name of the partnership.

11.1     **Discharge of Liabilities:** The Bank shall be entitled to deal separately with any of the partners on any matter, including the discharge of any Liability to any extent, without affecting the Liability of any other of them.

11.2     **Cessation as Partner:** All persons who cease to be a partner of the Client (whether as a result of death, retirement, resignation, replacement, addition, bankruptcy or otherwise) will remain liable for all debts, Obligations and other Liabilities owed by the Client to the Bank which have accrued up to and including the date that such person ceases to be a partner.

**12.**     **Bankruptcy:**

12.1     **Bankruptcy:** In the event that the Client, including one joint Account holder is declared bankrupt or is undergoing insolvency or winding-up proceedings, the Bank may freeze or suspend the Account and refuse access to the Account funds.

12.2     **Bankruptcy of Joint Account Holder:** If any one of the joint Account holders becomes bankrupt, the Accounts can be operated or closed only by the joint signatures of the trustee in bankruptcy and the other joint Account holder.

12.3     **Company:** In the event of liquidation, where the Client is a company, the funds credited to the Accounts may only be withdrawn by, and the funds payable will only be paid to, the liquidator.

**13.**     **Suspension of Accounts and Services:** The Bank, in its absolute discretion, may suspend the Client's ability to operate Accounts (including ceasing any Standing Orders), utilise Facilities and Services and enter into Transactions and/or Investments for any reason whatsoever, including without limitation, the Client's bankruptcy, insolvency, incapacity and disability until legal representatives are appointed; Force Majeure event; or any other event beyond the Bank's reasonable control.

13.1     **Compliance with Governmental or Regulatory Authority:** The Bank or its Nominees may at its absolute discretion comply with any request from any governmental or regulatory authority relating to any one or more of the persons and, for such purpose, apply such Investments or any money or other assets in the Client's Accounts as may in the opinion of the Bank or its Nominees be required, without seeking instructions from or Notifying the Client.

**14.**     **Availability of Services:** All requests for Services will be subject to the Bank's acceptance of such requests, which will be deemed to occur upon the opening of the relevant Accounts for the requested Service(s) whereupon the Client will be bound by the relevant Terms and Conditions. The Bank may decline to open any Account for the Client. No contractual relationship will arise between the Client and the Bank in relation to or as a result of any Account Documentation which is declined by the Bank. The continued availability of any Service will be subject to the Bank's consent, in its sole discretion, and to the Client's fulfilment of such conditions (including the execution of further agreements or documents) as the Bank may require. The Bank may from time to time change the times and the channels through which any Service is available upon giving prior Notice. Where, in relation to any Account, there are more than one Authorised Signatory, any notice, demand and correspondence will be deemed to be received by all of the persons comprising that Client if it is received (or deemed received) by one such person (whether or not it is forwarded to or received by any other person(s) comprising the Client.

**15.**     **Deposits**

15.1     **Cash Deposits:** Subject to clause 15.5, the Bank will credit the relevant Account with an amount equal to any Cash Deposit in accordance with the Bank's normal practice in the Jurisdiction.

15.2     **Crediting Account**: Upon receipt by the Bank of any sale proceeds or other payments (including without limitation, interest, income or dividends) for the account of the Client, the Bank is hereby authorised and directed to credit such sums to the Account unless the Client has given to the Bank (a) any specific written Instruction to do otherwise or (b) any standing instructions to do otherwise which have not been withdrawn and which remain in force.

15.3     **Time Deposit Accounts:** Time deposit Accounts may be of such tenor and such Currency as selected by the Client and accepted by the Bank. Withdrawals can only be made upon maturity of the deposits provided that the Bank may, at its absolute discretion, allow the Client to withdraw the deposits prior to maturity subject to such terms and conditions and interest Charges as may be imposed by the Bank. If the Client does not provide Instructions concerning renewal period and additional funds, the Bank may in its discretion automatically renew for the same period and the same Currency at the prevailing interest rate inclusive or the accrued interest or amalgamate additional funds and renew time deposits at its discretion.

    15.3.1     **Amounts:** The amount of a time deposit shall (a) be in such minimum principal amount as from time to time determined and specified by the Bank at its absolute discretion, (b) include the interest payable on the time deposit upon the Maturity Date; and (c) where such time deposit has been created as part of a FX Transaction entered into between the Bank and the Client, be reduced from time to time by the amount that has been covered by such FX Transaction.

### 15.4 Non-Cash Deposits

**15.4.1 Credit Accounts:** Provided the named payee of any Non-Cash Deposit matches the name of the Client and subject to clause 15.5, the Bank will credit the relevant Account with an amount equal to any Non-Cash Deposit in accordance with the Bank's normal practice in the Jurisdiction.

**15.4.2 Decline Collection:** The Bank may decline to make a Collection in relation to any Non-Cash Deposit and will Notify the Client as soon as practicable if it so determines.

**15.4.3 Agent:** Subject to sub-clause 15.4.2 above, the Bank will act only as the Client's agent for Collection in relation to a Non-Cash Deposit.

### 15.5 Reversal of Credits:
The Bank may without prior notice to the Client cancel, reverse or debit all or part of any credit (including interest, if any, paid by the Bank on such credit) made in relation to any Deposit: (a) to correct a mistake; (b) where an Account has been credited but the Bank does not obtain cleared and unconditional funds relating to the relevant Deposit in full or promptly for any reason; (c) where the Bank is required to return the money to the relevant payer/drawer or paying bank or other financial institution for any reason; or (d) where it has reasonable grounds for doing so. The Bank will Notify the Client as soon as is practicable of any such cancellation, reversal or debit.

### 15.6 Different Currencies:
Where the Currency of a Deposit or payments to be made to the Client is different from the relevant Account Currency, before crediting the relevant Account, the Bank may convert the Deposit or payments to be made to the Client into the Account Currency at the Bank's prevailing exchange rate or, in the absence of a prevailing exchange rate, such other exchange rate as the Bank may reasonably specify. The Client will pay any fee which the Bank usually charges for such a conversion.

**15.6.1 Foreign Currency Risk:** The Bank will validly fulfil its obligations arising from Accounts in foreign currencies by crediting or debiting Accounts held with the Bank, a correspondent bank or a bank named by the Client. The Client will bear, in proportion to its interest, all the economic and legal consequences which may affect all or any of the Bank's assets in the country of origin of the relevant Currency or in another country where the funds are invested, which result from measures adopted by these countries or by other countries or which result from any Force Majeure Event, exchange controls, moratorium, insurrection, war, acts of terrorism or other acts beyond the Bank's control.

**15.6.2 Conversion of Account Currency:** Upon the occurrence of an event which the Bank determines in its absolute discretion is beyond the reasonable control of the Bank and whereby such event affects or which may affect the Currency of the Account, the Bank may, at the Bank's absolute discretion, convert the Currency of the Account to another Currency, which is a freely transferable currency at the time, selected by the Bank in its absolute discretion (the "**new Currency**") and every payment for the Account will be in the new Currency.

**15.6.3 Currency Conversion:** If at any time under these Terms and Conditions it is necessary for one Currency to be converted into a different Currency, where for example and without limitation, it is necessary to calculate Margin, indebtedness, costs, charges, fees and any form of payments related to Transactions, the Bank may use the Bank's prevailing exchange rate or, in the absence of a prevailing exchange rate, such other exchange rate as the Bank may reasonably specify. The Client will pay any fee which the Bank usually charges for such conversions.

**15.6.4 Currency Linked Structured Investments:** The Bank has full discretion at all times as to the currencies available for Currency Linked Structured Investments, as to whether it wishes to quote terms for Currency Linked Structured Investments and, if so, what terms may be quoted.

**15.6.5 Transaction Binding:** If the Bank quotes terms for Currency Linked Structured Investments, whether orally or in writing, and the Client accepts such terms, whether orally or in writing, such acceptance shall constitute a binding transaction, and the Client shall be bound to place, and the Bank shall be bound to accept, the deposit on the terms agreed. Such transaction will not be subject to receipt of any written confirmation and if the Client fails to place a deposit following agreement on the terms, the Client will be liable for the Bank's reasonable costs and Losses, including the cost of unwinding hedging positions taken by the Bank to cover the deposit.

**15.6.6 Other Banks' Fees:** The Client will pay any commissions, fees, goods and services taxes, stamp duties, disbursements, interest or other tax or charges imposed by any bank or other financial institution on the Client or the Bank in relation to any Account Transaction and/or Investment.

## 16. Withdrawals

### 16.1 Withdrawals:
Subject to these Terms and Conditions and, as may be required by the Bank, to the production of such identification or document as the Bank may specify, the Bank will allow a Withdrawal from an Account (and honour any relevant Payment Instrument) provided that: (a) there is sufficient credit balance in the Account at the time the Withdrawal is made or is to be acted on by the Bank; (b) the relevant Payment Instrument is drawn in a form specified or provided by the Bank; and (c) the relevant Payment Instrument is properly completed, contains all the relevant information and appears on its face to be genuine.

**16.1.1 Prior Notice:** The Bank reserves the right to require prior notice from the Client before permitting large cash Withdrawals or Deposits and the amounts for which such notice is required may be ascertained by the Client upon enquiry with any of the Bank's branches.

### 16.2 Assets Other than Cash:
If the Client wishes to transfer or withdraw Assets other than in cash, the Bank will arrange for such Assets to be forwarded to a custodian, financial institution or person nominated by the Client.

### 16.3 Withdrawals only in Jurisdiction:
Unless otherwise allowed by the Bank, the Client will only request a Withdrawal from an Account in the Jurisdiction.

### 16.4 Expiry of Payment Instruments:
In accordance with the Bank's normal practice and the local laws and regulations in the Jurisdiction, the Bank may from time to time specify an expiry period in relation to a particular type of Payment Instrument (such period starting from the date of the Payment Instrument). The Bank may decline to honour any such Payment Instrument which is presented to it after the end of the relevant expiry period.

### 16.5 Debiting Accounts:
The Bank may at any time without notice debit any Account with any amount due from the Client to the Bank. The Bank will be entitled to reserve and debit such sums in the Accounts, including Accounts held jointly by the Client with any other person, as the Bank may determine to be required to indemnify the Bank for any or all claims, demands, Losses, damages, loss of reputation, taxes, duties, and reasonable costs, charges and expenses which the Bank may suffer, incur or be liable to pay on behalf of the Client and/or under or in connection with the Accounts, Facilities, Transactions and/or Investments or Services.

16.6 **Stopping Cheques and Cashier's Orders:** The Client may request the Bank to dishonour a Cheque or a cashier's order which the Client has drawn on any Account. Such a request must be in writing and provide full details of the Cheque or the cashier's order and be accompanied by any documents the Bank may require. Acceptance of such a request is not a representation by the Bank that the Cheque or the cashier's order has not already been honoured or that there is sufficient time available to the Bank to act on the request. The Bank will use all reasonable efforts to dishonour or to stop further processing of the relevant Cheque or cashier's order but will have no liability for any failure to do so, except where any Loss is caused directly by the Bank's gross negligence or wilful default.

16.7 **Corrections by the Bank:** The Bank may at any time without prior notice to the Client debit an Account to rectify any mistake.

16.8 **Passbook, ATM Card, Account Number Card:** The Client may be supplied with an ATM Card, charge card, credit card, debit card, Account Number Card, passbook (if a passbook is required in which the Bank will enter the amounts deposited and withdrawn) and any other type of identification or document for operating the Client's Accounts, credit facilities and Services as the Bank may provide from time to time.

16.9 **Passbook:** The passbook is for the Client's reference and does not necessarily indicate the correct balance of the Account. No entries should be made in the passbook by any person other than an employee of the Bank and the Client should carefully examine his passbook before leaving the counter to ensure that the entries made are correct.

16.10 **Charge and Credit Cards:** If the Client utilises charge cards and/or credit cards issued by the Bank, the Client shall agree to the terms and conditions for the respective charge cards and/or credit cards as provided by the Bank prior to the issuance of such credit cards and charge cards.

16.11 **Account Number Card:** An Account Number Card for operating an Account will be issued to the Client for his sole use.

16.12 **Non-transferable:** The passbook, Account Number Card, charge cards, debit cards, credit cards and ATM Card are neither transferable nor assignable and cannot be pledged or charged as security.

16.13 **Bank Transfers:** At its discretion and subject to due written authorisation from the Client, the Bank may effect repayment of any amount standing to the credit of an Account by payment to a bank in or outside of the Jurisdiction by means of electronic payment, telegraphic transfer or other means of automatic transfer subject to the Bank's then prevailing charges. However, the relevant transfer is sent entirely at the risk of the Client and the Bank shall not be responsible for any delay, error or omission which may occur in the transmission of the relevant transfer or other messages or from their misinterpretation when received arising from any cause beyond the Bank's control, except where such Loss is caused directly by the Bank's gross negligence or wilful default.

16.14 **Abortive Transfer Costs:** The Client agrees that he, and not the Bank, will be responsible for any Charges imposed, or any other action taken, by a receiving bank or intended receiving bank, where:

(a)    the Client does not have sufficient funds in the Client's designated Account for the Bank to execute the Client's Instruction;

(b)    a court or other body of competent jurisdiction prohibits withdrawals from the Client's designated Account;

(c)    the Client's designated Account is closed, frozen or inaccessible for any reason;

(d)    the Client's designated Account or any funds in the Client's designated Account have been put on hold;

(e)    the execution of the Instruction to transfer funds will cause the balance in the Client's designated Account to exceed the credit limit that the Bank has set for the Client and/or the Client's designated Account;

(f)    the Client did not, in the Bank's sole opinion, correctly use the Electronic Banking Service; or

(g)    circumstances beyond the Bank's reasonable control prevent the execution of the Instructions, including but not limited to fire, flood or improper transmission or handling of payments by a third party.

16.15 **Due Care:** The Client must exercise all due care and attention to prevent loss of his passbook, Account Number Card, ATM Card and seal or chop used for operating an Account, all of which should be kept in a place of safety. Notice in writing should be given to the Bank at once if a passbook, Account Number Card, ATM Card, seal or chop is lost, mislaid, or stolen. The Bank shall not be responsible for any payment made prior to receiving such written notice and the Client agrees to indemnify the Bank against any damages, Losses, costs, charges or expenses which the Bank may incur as a result. In the event of a passbook, Account Number Card, ATM Card or seal or chop used for operating an Account being lost, mislaid, stolen or spoiled, the Client shall pay the Bank a report loss charge and the Bank may, on receiving a satisfactory explanation and indemnity and payment of a replacement fee prescribed by the Bank for the time being, issue a new passbook, Account Number Card or ATM Card, as the case may be.

17. **Overdrafts**

17.1 **No Unauthorised Overdrafts:** The Client will ensure that no Account becomes overdrawn or, if the Bank has agreed to an overdraft limit, becomes overdrawn in excess of that limit. If an unauthorised overdraft is created, the Bank may take any action it thinks fit and charge any interest and Charges to the Account in question.

17.2 **Overdraft Requests:** The Client may request the Bank to apply an overdraft limit to any Account, increase the limits on its Facilities and/or provide bridging finance in the form of temporary overdrafts. If the Bank agrees to such a request, it may impose any conditions it wishes in addition to or different from these General Terms and Conditions. In particular, with respect to the Bank's provision of bridging finance, the Client agrees that any or all of the Investments may be charged as security, and authorises the Bank, on the Client's behalf, to execute all authorities and other instruments required in connection with such finance, including instruments and documents creating security over the Investments in the Accounts. The Bank may cancel an overdraft limit or increased limits on Facilities at any time.

17.3 **Automatic Overdrafts:** Notwithstanding any other provision of these General Terms and Conditions, in exercising any rights over any Account, including the right to debit any sum from an Account, the Bank may allow or cause an Account to go into overdraft without giving notice to the Client and interest shall be charged by the Bank at such rate and in such manner as the Bank may reasonably determine and Notify to the Client until such time as the balance in the Account is restored to credit. The Client acknowledges that the Client may not rely on the any mode of communication accepted by the Bank, including but not limited to postal services, telephone, fax, telex, email, Internet, or Electronic Banking Services to prevent an unauthorised overdraft being created. In particular, the Client must remember that the Cheques and any payment Instructions the Client has given via the Electronic Banking Services might take time to clear and might not always be immediately reflected in the balance on the Account.

17.4 **Transactions and/or Investments Exceeding Credit Limit:** Notwithstanding any other provision of these General Terms and Conditions, the Bank may elect not to act upon Instructions where it results in the total amount of Instructions (including but not limited to Transaction and/or Investment orders and Account withdrawals) exceeding the credit balance in the Accounts or credit limit of the Facilities made available to the Client (resulting in unauthorised overdrafts), but if the Bank should act upon such Instructions, the Bank may determine in its sole discretion which of the Instructions to execute in whole or in part, and the Client will remain liable for the executed Instructions.

18. **Account Information and Confirmations: Frequency and Method:** For each Account, the Bank will provide the Client with Account statements which may be consolidated with the Client's other account statements, including securities trading, investment, and settlement accounts, at the Bank's discretion. Confirmations, and advices will be sent in a medium (whether paper, electronic or telephonic), in accordance with the Bank's normal practice in the Jurisdiction or at such frequency as reasonably requested by the Client.

18.1 **Account Statements:** The Client agrees to examine each Account statement received from the Bank to determine if there are any errors, discrepancies, unauthorised debits or other Transactions and/or Investments or entries arising from whatever cause, including forgery, forged signature, fraud, lack of authority or negligence of any person (the "**Discrepancy**"). The Client also agrees that the Account statements will be conclusive evidence as to the balance shown in the Accounts and that the Account statements will be binding on the Client absent manifest error. Except in situations arising directly from (a) forgery or fraud by any third party and in relation to which the Bank has failed to exercise reasonable skill and care, or (b) forgery, fraud, wilful default or gross negligence of the Bank's employee or agent, or wilful default or gross negligence of the Bank, the Client agrees to waive any rights to raise objections or pursue any remedies against the Bank in respect of any Discrepancy in any Account statement unless the Client notifies the Bank in writing within thirty (30) days (or such other period as specified in the Account statement) of deemed receipt of such statement.

    18.1.1 **Monthly Statements:** The Bank shall send the Client monthly statements showing the position of the securities account and the settlement account. Such statement shall be in the form and contain the information as the Bank may from time to time determine.

    18.1.2 **Information:** The Bank shall send to the Client such information relating to the securities account and the settlement account as the Client may from time to time reasonably require in writing.

18.2 **Consolidated Statement:** Where the Client receives a consolidated statement, these statements are dispatched to Client at Client's own risk. The consolidated statement will produce transaction records of linked Accounts. The Primary Account Holder is the addressee of the consolidated statement but any Authorised Signatory of any Account put on the consolidated statement can unilaterally change the statement addressee. No individual Account statement will be separately produced in respect of the Accounts put on the consolidated statement.

18.3 **Confirmations:** Transactions and/or Investments with the Bank will be evidenced by written Confirmations although the terms of such Transactions and/or Investments are legally binding from the moment that they are agreed to between the Client and the Bank (whether orally or otherwise). Any delay or failure in delivering a Confirmation will not affect the validity of the relevant Transaction and/or Investment. All Confirmations constitute a supplement to, and form part of the Client Agreement and will be read and construed as and constitute a single agreement. In the event of inconsistency, the Confirmation will prevail for the purposes of the relevant Transaction and/or Investment. The Client agrees to examine each Confirmation received from the Bank to determine if there is any Discrepancy. In the absence of manifest error, written Confirmations of contracts and advices issued by the Bank pursuant to any communication will be deemed conclusive and accepted by the Client unless the Client disputes its correctness with the Bank within fourteen (14) days (or such period as specified in the Confirmation) after the date of its deemed receipt by the Client.

18.4 **Hold Mail:** The risks inherent in a retention of correspondence arrangement (if any), including Hold Mail, will be borne by the Client.

18.5 **Obligations under Confirmations:** The Client and the Bank will make each payment or delivery specified in each Confirmation. Payments must be made on the Value Date in the place of the account specified in the relevant Confirmation and where settlement is by delivery (as opposed to payment), such delivery will be made for receipt on the Value Date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation.

18.6 **Bank's Records Conclusive:** The Bank's records in relation to the operation of Accounts, Facilities, Transactions and/or Investments and Services are conclusive except where an obvious mistake has been made. Deposit slips (including ATM slips) will not be considered valid receipts unless validated by the Bank's machine print out or by the stamp of the branch at which the deposit is made and duly accompanied by the signature of an authorised Bank officer. The Bank may at any time rectify errors or omissions in any statement, Confirmation, advice or passbook, and any such statement, Confirmation, advice or passbook if so rectified will be binding on the Client. The Bank has the right to demand the refund of and/or debit any Account of the Client with the Bank for any overpayment into the Account arising from such errors or omissions.

18.7 **Certificates and determination:** Any certification or determination by the Bank of a rate or amount due by the Client to the Bank will be conclusive except in the case of manifest error on the part of the Bank.

18.8 **Audit Confirmation:** In accordance with the Bank's auditing procedures, the Bank may from time to time send audit letters to the Client requesting the Client to check and confirm that the Account balance and dates shown on the audit letter are correct. The Client will sign and return the audit letter to the Bank as requested.

19. **Trusts**

19.1 **Client as Trustee:** Notwithstanding any other provisions of the Terms and Conditions, where the Client is acting as trustee(s) of a Trust (the "**Trust**"), any liability incurred by the Client to the Bank shall be a joint and several liability between and among the Client, the Trust and any other trustees and the settler of the Trust (if such Trust is not irrevocable).

19.2 **Client Authority as Trustee:** The Client represents and warrants that it has the power under the Trust instrument described in the Account Opening Application or as otherwise advised or provided to the Bank to enter into the Account Documentation and Credit Documentation and to perform the Client's obligations thereunder and that the terms of the Trust instrument and the performance of any of the Client's duties under the Trust will not breach any Applicable Laws.

19.3 **No Obligation to Verify:** The Client acknowledges and agrees that the Bank is not, nor shall it be under any duty to (a) verify the Client's capacity to enter into the Account Documentation and Credit Documentation or to perform any of the Client's obligations thereunder or (b) review or retain the Trust

instrument or any supplement or variation or replacement thereof or (c) consider any other person, body or arrangement not a party to the Account Documentation and Credit Documentation.

19.4 **Information:** The Client undertakes to provide the Bank annually upon each anniversary of the date of the Account Opening Application with the then current authorisation for the trustees for the time being of the Trust and to notify the Bank within ten (10) Business Days of the retirement, death or insolvency of any trustee of the Trust.

19.5 **Trustee Status:** If one or more of the trustees retires, dies or becomes insolvent, then the Bank will hold the Client's Assets (including the credit balance in the Account(s) and any Investments and Securities) until the Bank can determine, to the Bank's satisfaction, who is entitled to any title to or interest in the Assets.

19.6 **Further Rights:** The obligation to hold the Client's Assets under clause 19.5 above shall be without prejudice to any rights the Bank may have in respect of such Assets arising out of any lien, charge, pledge, set-off, counter-claim or otherwise or to any step the Bank may deem desirable to take in view of any claim by any person other than those claiming through the estate of the deceased (if applicable).

19.7 **Trustee as Holder of Assets:** The Client shall indemnify the Bank for any cost, Loss or expense incurred or sustained by the Bank in relation to it holding such Assets or in seeking a determination as to the holder of the legal title to or interest in any such Assets.

19.8 **Instructions of Trustee:** The Client agrees from time to time and at all times to keep the Bank fully and effectively indemnified from and against all actions, proceeding, claims, demands, costs, charges, expenses and taxes which may be brought or preferred against the Bank or which it may incur or sustain or for which the Bank may become liable by reason either directly or indirectly of the Bank having acted and agreed to act upon the instructions of less than all of the trustees of the Trust from time to time, except where such Loss is caused directly by the Bank's gross negligence or wilful default.

19.9 **Representations and Warranties of Client as Trustee:** Notwithstanding any other provisions of the Terms and Conditions, for any representation, warranty or confirmation in the Terms and Conditions by the Client acting as trustee of a Trust to be (a) a beneficial owner or holder, in whole or in part, of the Account(s) and/or the Assets(s) and/or any interests relating thereto, or (b) acting as principal for the Client's own Account or, (c) the party originating all Instructions, or (d) the sole person to gain benefit or bear risk for any Transaction, "Client" when used in such representation, warranty or confirmation shall be construed (with joint and several liability) as the Client, any other trustees of the Trust, and either the settlor of the Trust or, in the event of the death of such settlor or the creation of an irrevocable trust, the Trust.

## 20. Securities and other Investments

20.1 **Offering Information:** All Instructions and Transactions involving Securities and other Investments (including Underlyings) are subject to the applicable offering documents, constitutive documents, information memoranda, prospectuses, product specifications and other contractual terms of the relevant Securities and other Investments, which will be provided by the Bank upon request except as described in clause 21.3.1. The information to be provided to the Client by the Bank may comprise such documents and may also include: (a) information produced and provided to the Bank on behalf of the relevant Issuer and by any representative, agent or adviser to such Issuer, and/or (b) statistical information in respect of past performance of Securities and other Investments generated by the Bank in relation to the relevant Securities and other Investments. The Bank is not obliged to provide the Client with any translation of any such information requested by the Client.

20.2 **Other Information:** The Bank may from time to time provide the Client directly or indirectly with reports, analysis or other materials and information in relation to the Assets or generally in relation to investments or markets. The Client understands and agrees that:

20.2.1 any report, analysis or other material and information is provided to the Client strictly for his own use and will not constitute an offer or invitation to the Client to acquire any Assets;

20.2.2 the Bank is not obliged to provide the Client with any reports, analysis or other materials and information or any advice or recommendation and that all investments are made and Transactions are entered into solely upon the Client's judgment and discretion notwithstanding any such materials, information or recommendation the Bank may have provided to the Client;

20.2.3 if the Bank does provide such reports, analysis or other materials and information, it is not provided as a required Service and reliance upon such information is at the Client's own risk; and

20.2.4 the Bank and its employees or agents will be under no liability for the accuracy and completeness of any such report, analysis or other material and information, the performance or outcome of any investment made or Transaction entered into by the Client after receipt thereof, irrespective of whether or not such report, analysis or other material or information was provided at the Client's request. Accordingly any risk associated with and any Losses suffered as a result of the Client entering into any Transaction are for the Client's Account.

20.3 **Price Quotes:** The Bank may rely on price quoting agencies or centres to ascertain the price of a particular Investment and the prices so quoted are not final and binding. The pricing information is only indicative information provided to the Client by the Bank via price quoting agencies or centres. The Bank shall not be responsible for any Losses suffered by the Client in connection with the execution of Transactions in accordance with the price quotes.

20.4 **Issuer Liability:** Where the Issuer of any Securities and other Investments is an entity other than the Bank, the Bank undertakes no liability as regards the performance of the obligations represented by the Issuer or the risk of default by the Issuer. The Client acknowledges that the Bank is assisting the Client to purchase Securities from such Issuers and Brokers and does not act as agent on behalf of the Issuers and Brokers.

20.5 **Markets:** The Bank may, in its absolute discretion, extend the Services provided under these Terms and Conditions, to cover Securities and other Investments listed or traded on any other stock, commodities or investment exchanges or markets outside the applicable Jurisdiction in which case the Bank may supplement these Terms and Conditions as the Bank deems reasonable and necessary.

20.6 **Bank Authorised as Agent:** The Bank is authorised to act as the agent of the Client relating to the purchase and sale of or other dealings in Securities as well as the registration, withdrawal or collection of Securities or distributions from Securities, or the exercise of any rights or claims arising from or relating to Securities including (without limitation) dividends, rights issues, conditional cash offers or other corporate actions.

**21.** **Acquisition, Holding and Redemption of Securities and other Investments**

21.1 **Bank as Principal, Trustee or Agent:** The Bank will be entitled at its discretion to deal as principal on its own account or trustee or agent for the Client without disclosing such capacity to the Client in relation to any Transaction (notwithstanding that it is also under certain circumstances acting as the Client's agent), and the Bank may effect trades, Orders and Transactions or provide any Services (including Securities and Trading Services) for the Client with counterparties or through brokers or agents (including custodians, sub-custodians, depository agents and clearing houses) of its own choice, including any Standard Chartered Group Member, upon such terms and conditions as it may deem fit and the Client will be bound by the same.

21.2 **Issuer's Securities and Other Investments**

21.2.1 The Bank will use reasonable endeavours to purchase from the relevant Issuer(s) or Brokers the proposed Securities and other Investments. The Client acknowledges and agrees that until the Bank has sent an order confirmation to the Client confirming the purchase of such Securities and other Investments from the relevant Issuer(s), the Client will not be entitled to any such Securities and other Investments.

21.2.2 The Bank will use reasonable endeavours to sell Securities and other Investments in accordance with Client Orders. The Client acknowledges and agrees that until the Bank has sent an order Confirmation to the Client confirming the sale of such Securities and other Investments to counterparties, the Client will remain liable for all of its obligations in relation to any such Securities and other Investments.

21.3 **Initial Public Offerings and Private Placements of Securities:** Upon receiving Instructions from the Client, the Bank agrees to undertake subscriptions to initial public offerings and private placements of Securities for the Client's Account in accordance with the terms and conditions of the offering documentation, including without limitation a subscription or other sales and purchase agreement. When the Client provides Instructions to the Bank to subscribe to the Securities, the Client agrees and acknowledges that the Securities will be subscribed for or purchased in the name of the Bank or its Nominee, Custodian or agent for the Client's Account and the Bank reserves the right to assign its rights and duties to the Client whenever any legal action, bankruptcy proceeding, lien or claim is brought up in relation to any such Securities.

21.3.1 **No Responsibility to Provide Prospectus:** Notwithstanding clause 20 above, the Client acknowledges that the Bank accepts no responsibility to send to the Client the prospectus or other offering documentation accompanying an initial offering or private placement of Securities. By applying for subscription or purchase of Securities, the Client confirms that the Client has obtained the terms and conditions for the initial public offering or private placement and has been sufficiently informed and knows all the risks inherent in the Securities which may result in a partial or total loss of the Client's investment and the Client's application is not in breach of the applicable terms and conditions.

21.3.2 **Warranties:** The Bank may be required to give various warranties and undertakings to the placement or selling agent responsible to the initial offering or private placement concerning the Client's order for the placement, allocation or subscription of Securities. In such circumstances, the agreement of the Bank to subscribe or purchase such initial public offerings or private placements for the Client's Account will be subject to the Client giving appropriate warranties and indemnities to the Bank in relation to such Transactions and such warranties and indemnities shall be deemed to apply mutatis mutandis to the Client's Instructions to subscribe to or purchase the initial public offerings or private placements of Securities.

21.3.3 **Allocations:** The Bank will receive allocations of Securities from the Issuer, third party or intermediaries, and will allocate such Securities to its clients at its sole and absolute discretion. The Client may not be allocated the full quantity of Securities subscribed for by the Client. The Bank may make pro-rata allocations from time to time by the Bank at its absolute discretion. The Bank will not accept requests to alert or waive allocations after the event.

21.3.4 **Performance of Securities:** The Bank has not made any representations as to the performance or future performance of any Securities, and the Client acknowledges and affirms that the Client has not relied on any views or comments made by the Bank or its employees or agents, and is making an independent decision to subscribe for the Securities.

21.3.5 **Irrevocable Instructions:** The Client's Instructions to the Bank to subscribe or purchase the Securities are irrevocable and any allocation given to the Client shall be binding on the Client, notwithstanding any change in the market conditions or any circumstances or otherwise, between the time of the Instructions and the allocation. The Client agrees to accept any amount of the Securities to the limit of the Client's full subscription should such Securities be allocated to the Bank.

21.4 **Election of Payment Mode:** Where the Client is required to make an election for the receipt of cash or Securities (or any specific combination of cash and Securities) under the terms and conditions of the Securities, the Client shall inform the Bank of his election before the prescribed time. The Bank shall not be liable or responsible for reminding the Client of the election before the prescribed time nor for making such selections for the Client. In the event that the Client fails to provide an election under the Securities before the prescribed time, the Client hereby authorises the Bank to elect full cash payment under the Securities, and the Bank shall not be liable for any Losses or costs suffered or incurred by the Client as a result of the Bank acting upon such authorisation. The Client shall indemnify the Bank and hold the Bank harmless from any and all Losses which are of reasonable amounts and were reasonably incurred by the Bank, directly or indirectly from the Bank acting upon such Authorisation.

**22.** **Foreign Exchange Transactions ("FX Transactions"):** The Client may request the Bank on any Business Day, and the Bank may agree (but shall not be obliged) to enter into any foreign exchange contract, forward exchange contract or Option with the Client.

22.1 **FX Contracts:** In respect of Orders given by the Client for contracting with the Bank or for any FX Transactions, the Client understands and accepts that the Bank shall have the absolute discretion in quoting and agreeing to any exchange rate or forward exchange rate for the purpose of each FX Contract. Such rates will be provided for the Client's reference only and shall not be taken as the exchange rate or Forward Exchange Rate at which the Bank will enter into FX Contracts or forward exchange contracts. The Bank shall at no time be under any obligation to enter into any FX Contract or execute any Standing Order at such indicative rates.

22.1.1 **Forward Exchange Contracts:** The Client may prior to the Maturity Date of a time deposit request or offer to the Bank by way of an Instruction to enter into one or many forward exchange contract(s) with the Value Date falling on the Maturity Date to:

(a) in relation to a time deposit, sell to the Bank an amount not exceeding the amount of the time deposit for value on the Maturity Date in exchange for an amount in another Currency at a Forward Exchange Rate ("**the contract amount**") so that the Bank's obligations under that time deposit shall automatically and without further action be cancelled (or, as the case may be, partially cancelled to the extent covered by such forward exchange contract) and simultaneously replaced by a new obligation to deliver the contract amount on the Maturity Date; and

(b) in relation to each forward exchange contract that the Client has already contracted with the Bank ("**the preceding forward exchange contract**"), sell to the Bank for value on the Value Date an amount not exceeding the amount long under the preceding forward exchange contract in exchange for an amount in another Currency at a Forward Exchange Rate ("**the contract amount**") so that the Bank's obligations under the preceding forward exchange contract shall automatically and without further action be cancelled (or, as the case may be, partially cancelled to the extent covered by such forward exchange Contract) and simultaneously replaced by a new obligation to deliver the contract amount on the Value Date, provided in either of the above that the contract amount shall be not less than such amount as from time to time determined and specified by the Bank at its absolute discretion.

(c) On the Maturity Date, the Bank shall exercise all forward exchange contract(s) on behalf of the Client subject to clause 22.1. Unless the Client shall have by way of an Instruction (made on or before the Maturity Date) specified a maturity disposal instruction for the contract amount, the contract amount will be deposited in the respective Currency(ies) into the statement savings account under the name to the Client. In the case where the Client does not already have such account(s) with the Bank, the Bank may open such account(s) under the Client's name without further notification to the Client.

22.2 **European Style Option:** A European Style Option can only be exercised on the Expiration Day agreed in advance, during Trading Hours during a Trading Day at the relevant Exchange; notices of exercise coming in after Trading Hours on a Trading Day are deemed to be exercised on the following Business Day. In the case of unlisted Underlyings, the applicable rules will be agreed upon in the Confirmation.

22.3 **American Style Option:** An American Style Option can be exercised at any time during the exercise period, during Trading Hours during a Trading Day on the Expiration Day at the relevant Exchange; notices of exercise coming in after Trading Hours on a Trading Day are deemed to be exercised on the following Business Day. In the case of unlisted Underlyings, the applicable rules will be agreed upon in the Confirmation.

22.4 **Cash Settlement:** Transactions providing for cash settlement which are in-the-money based on the prices at the close of business on the Expiration Day are deemed to be automatically exercised.

22.5 **Physical Underlyings:** Physical Underlyings will be delivered upon the exercise of an Option, unless the parties agree on cash settlement. The Underlyings to be delivered upon the exercise of an Option will be delivered to the party entitled thereto on the Value Date or settlement date specified in the relevant Confirmation or, if no day is specified, on the day for settlement customarily applicable at the relevant Exchange.

22.6 **Security:** As security for the exercise of the Order the Client hereby charges and assigns (to the extent that it may do so) such Underlyings and all its rights in them to the Bank. The Client hereby expressly authorises the Bank to further pledge such Underlyings and all its rights in them which have been pledged to the Bank to the Bank's correspondents, the options exchange or its clearing house. If the Options are not exercised by the time they expire or when the position is closed out, this pledge and/or charge and assignment lapses and is discharged automatically.

22.7 **Over-the-Counter Option:** An over-the-counter Option Transaction may only be exercised in whole, unless otherwise agreed in the relevant Confirmation. An exchange traded Option may be partially exercised, subject to the rules of the relevant Exchange.

## 23. Structured Investments

23.1 **Reference Values:** The Bank has full discretion at all times as to the reference values available for Structured Investments, as to whether it wishes to quote terms for Structured Investment and, if so, what terms may be quoted. The relevant rate, price, index or currency exchange rate linked to the additional component or to enhance the amounts payable is referred to as the "reference rate".

23.1.1 **Currency Linked Structured Investment:** No Currency Linked Structured Investment may be of less than a minimum amount specified by the Bank from time to time.

23.2 **Binding Effect:** If the Bank quotes terms for a Structured Investment, whether orally or in writing, and the Client accepts such terms, whether orally or in writing, such acceptance shall be binding on the Client, in that the Client shall be bound to place, if (and only if) the Bank in its absolute discretion decides to accept the Structured Investment on the terms agreed by the Client. Where the terms agreed by the Client include a possible range of values in respect of one or more reference values relevant to the Structured Investment, the reference values thereafter determined by the Bank in its absolute discretion as being the relevant values shall be binding on the Client. The Structured Investment shall be repaid by the Bank on the agreed Maturity Date, subject to the terms so agreed. Such transaction will not be subject to receipt of any Confirmation and if the Client fails to place a Structured Investment following agreement on the terms, the Client will be liable for the Bank's costs and Losses reasonably incurred, including the cost of unwinding any hedging positions taken by the Bank to cover the Structured Investment.

23.3 **Terms:** The Confirmation of each Structured Investment may specify a Start Date, one or more Interest Payment Dates, a Maturity Date and a fixing date (the "**Fixing Date**").

23.4 **Start Date:** The Start Date, if applicable, is the date on which the Principal Amount of the Structured Investment is to be deposited or when the Transaction is entered into, as applicable, with the Bank. The Interest Payment Date(s), if applicable, is/are the date(s) on which interest is paid and the Maturity Date is the date on which the Principal Amount is repaid, subject to any provision for early termination or extension. The Fixing Date, if applicable, is/are the date(s) on which the reference rate is fixed for the purposes of calculating the amount to be paid in respect of interest or to be repaid in respect of principal or of determining whether the principal or of interest on the deposit (or both) will be paid.

23.5 **Interest Period:** The term of each Structured Investment may be divided into one or more interest periods (each, an "**Interest Period**"). The Confirmation for the Structured Investment will define how and when the Interest Rate for an Interest Period will be calculated by reference to the level of the reference rate. If applicable, the interest will be payable on the Interest Payment Date for that Interest Period.

23.5.1 When a Currency Linked Structured Investment falls due on a day which is not a Business Day, additional interest will accrue on the principal amount of the Currency Linked Structured Investment at the Bank's prevailing deposit interest rate (for the original Currency of the Currency Linked Structured Investment and not at the rate specified in the Confirmation relating to such Transaction), from the date which such Investment falls due up to but not including the next Business Day.

23.6 **Date Determination:** The Maturity Date and/or Interest Payment Dates and may be specific dates specified as such in the relevant Confirmation or may be specified as a certain number of days after the corresponding Valuation Date. If a Confirmation does not so specify, the Maturity Date or an Interest Payment Date, as the case may be, shall be deemed to be two Currency Business Days following the corresponding Valuation Date.

23.7 **Postponement:** In certain circumstances, the Valuation Date and/or the Maturity Date and/or an Interest Payment Date of a Structured Investment may be postponed to a subsequent day or otherwise adjusted in the manner set out in these Terms and Conditions or the relevant Confirmation. In such cases, references to "Valuation Date", "Interest Payment Date" or "Maturity Date" in these Terms and Conditions or in a Confirmation will be deemed to be references to such other days as adjusted unless the context requires otherwise.

23.7.1 Where a Scheduled Valuation Date is not a Scheduled Trading Day, the Valuation Date will be the next following Scheduled Trading Day;

23.7.2 Where any Valuation Date is a Disrupted Day, then:

(a) in respect of a Share Equity Linked Account or an Index Equity Linked Account, the Valuation Date shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day, unless each of the eight Scheduled Trading Days immediately following the Scheduled Valuation Date is a Disrupted Day. In that case, (a) that eighth Scheduled Trading Day shall be deemed to be the Valuation Date, notwithstanding the fact that such day is a Disrupted Day, and (b) the Bank shall determine its good faith estimate of the value for that Share or the level of that Index on that eighth Scheduled Trading Day; and

(b) in respect of a Share Basket Equity Linked Account or an Index Basket Equity Linked Account, the Valuation Date for each Share or Index not affected by the occurrence of a Disrupted Day shall be the Scheduled Valuation Date, and the Valuation Date for each Share or Index affected by the occurrence of a Disrupted Day shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to that Share or Index, unless each of the eight Scheduled Trading Days immediately following the Scheduled Valuation Date is a Disrupted Day relating to that Share or Index. In that case, (a) that eighth Scheduled Trading Day shall be deemed to be the Valuation Date for the relevant Share or Index, notwithstanding the fact that such day is a Disrupted Day, and (b) the Bank shall determine its good faith estimate of the value for that Share or the level of that Index on that eighth Scheduled Trading Day.

23.7.3 Where the corresponding Valuation Date is postponed or otherwise adjusted for any reason, and if any Interest Payment Dates or the Maturity Date (as the case may be) is (a) stated as a specific date in the relevant Confirmation, the relevant Interest Payment Date or Maturity Date (as the case may be) may be postponed or otherwise adjusted so that it falls on a day subsequent to the Valuation Date as adjusted, or (b) specified as a certain number of days after the corresponding Valuation Date, the relevant Interest Payment Date or Maturity Date (as the case may be) may be postponed or otherwise adjusted so that it falls on such specified number of days after the Valuation Date as adjusted, or if the number of days is not so specified in the relevant Equity Linked Account Confirmation, the relevant Interest Payment Date or Maturity Date (as the case may be) shall be deemed postponed or otherwise adjusted so that it falls two Currency Business Days following the Valuation Date as adjusted.

23.8 **Adjustments to Dates:** In certain circumstances, the Start Date, Interest Payment Date, Exercise Date, Maturity Date or Fixing Date may be adjusted by the Bank to a previous or following day. In such cases, references to "Start Date", "Interest Payment Date", "Exercise Date", "Maturity Date" or "Fixing Date" in these Terms and Conditions or in the Confirmation will be deemed to be references to such previous or following Business Day, unless the context requires otherwise or the Confirmation provides otherwise. Subject to any provision in the Confirmation, the circumstances in which the Start Date, Interest Payment Date, Exercise Date, Maturity Date or the Fixing Date may be adjusted include where the date originally specified is not a Business Day, in which case that date will be either the previous day or following day that is a Business Day, depending on the convention of the relevant exchange market or in accordance with the terms of that particular Structured Investment.

23.9 **Change in CUSIP or ISIN:** For the purposes of identification of a Reference Obligation, any change in the Reference Obligation's Committee on Uniform Security Identification Procedures (CUSIP) number or International Securities Identifying Number (ISIN) or other similar identifier will not, in and of itself, convert such Reference Obligation into a different Obligation.

23.10 **Early Withdrawal or Repayment:** Unless the terms of a Structured Investment permit, a Structured Investment may not be withdrawn or repaid prior to the agreed maturity date except with the written consent of the Bank which may be subject to such conditions as the Bank, in its absolute discretion, deems fit, including the condition that the amount of any cost or Loss reasonably suffered by the Bank by reason of such cancellation or early withdrawal is deducted from the Principal Amount. Such costs and Losses may include cost of funding or, Loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any hedge or related trading position. Such conditions may have the effect of reducing the expected return or reducing the amount of principal repayable, even in the case of a principal protected Structured Investment.

23.11 **Bankruptcy:** If by reason of the Client's death, bankruptcy or any other reason, the repayment of a Structured Investment prior to its scheduled maturity date is legally enforceable, and such repayment is demanded, the amount repayable shall be reduced by an amount equal to all Losses suffered by the Bank as a result of such early repayment as determined by the Bank in good faith, even in the case of a principal protected Structured Investment.

23.12 **No Determination of Reference Value:** If the Bank determines at any time that, by reason of any event or circumstance it is, or may be, impossible to make a reliable determination of a reference value in respect of any Structured Investment, the Bank may, by notice to the Client, terminate the relevant Structured Investment, and the Bank will pay the Client, in full satisfaction of principal and interest, such amount as the Bank shall determine to be fair and reasonable in all the circumstances such amount not being less than the Principal Amount.

24. **Determinations:** Where a rate, price, yield or amount is to be determined by the Bank at a particular time, or during a particular period, such determination shall be made by the Bank in good faith and in accordance with generally accepted practices in the relevant market. Each such determination shall be conclusive and binding in the absence of manifest error. Where the Bank exercises discretion in making any other determination in relation to a Structured Investment, it shall exercise such discretion in good faith and in a commercially reasonable manner.

25. **Renewal:** A Structured Investment will not be automatically renewed upon maturity, unless so agreed between the parties and specified in the Confirmation.

**26. Adjustments to Terms of Index Linked Structured Investments**

26.1 **Successor Index:** If a relevant Index is (a) not calculated and announced by the Index Sponsor but is calculated and announced by a successor sponsor acceptable to the Bank, or (b) replaced by a successor Index using, in the determination of the Bank, the same or a substantially similar formula for and method of calculation as used in the calculation of that Index, then that index (the "**Successor Index**") will be deemed to be the Index.

26.2 **Effect of Index Adjustment Event:** If an Index Adjustment Event occurs, the Bank shall determine if such Index Adjustment Event has a material effect on the relevant Index linked Structured Investment, and if so, make the necessary determination or calculation using, in lieu of a published level for that Index, the level for that Index as at that Valuation Date as determined by the Bank in accordance with the formula for and method of calculating that Index last in effect prior to the change, failure or cancellation, but using only those securities that comprised that Index immediately prior to that Index Adjustment Event.

26.3 **Correction:** In the event that any level published by the Index Sponsor and which is utilised for any determination or calculation made under an Index linked Structured Investment is subsequently corrected and the correction is published by the Index Sponsor within one Settlement Cycle after the original publication, the Bank may Notify the Client of that correction and the Bank will determine the amount that is payable as a result of that correction, and, to the extent necessary, will adjust the terms of such Index linked Structured Investment to account for such correction.

**27. Adjustments to Terms of Equity Linked Structured Investments**

27.1 **Adjustments:** Following the declaration by the Issuer of the terms of any Potential Adjustment Event, or if the Bank otherwise determines that a Potential Adjustment Event has occurred, the Bank will determine whether such Potential Adjustment Event has a diluting effect or concentrative effect on the theoretical value of the relevant Shares and, if so, may in its sole discretion (a) make the corresponding adjustment(s), if any, to any variables or other terms of the equity linked Structured Investments as the Bank deems appropriate to account for that diluting or concentrative effect, which may, but need not, be determined by reference to the adjustment(s) in respect of such Potential Adjustment Event made by an options exchange to Options on the relevant Shares traded on such options exchange and/or (b) substitute such Shares affected by such Potential Adjustment Event with substitute shares having such criteria as the Bank deems appropriate, and determine the effective date(s) of the adjustment(s) and/or substitution(s).

27.1.1 **Notice:** The Bank will Notify the Client of the occurrence of a Potential Adjustment Event and adjustments (if any) made to the terms of such equity linked Structured Investments and/or any share substitutions, provided that any failure or delay on the part of the Bank in giving such notice shall not affect the validity of any such adjustments and/or substitutions.

27.2 **Non-EU Currency:** In respect of an equity linked Structured Investments relating to Shares originally quoted, listed and/or dealt as of the Start Date in a Currency of a member state of the European Union that has not adopted the single currency in accordance with the EC Treaty, if such Shares are at any time after the Start Date quoted, listed and/or dealt exclusively in Euro on the relevant Exchange, or where no Exchange is specified, the principal market on which those Shares are traded, then the Bank will make the necessary adjustments to any variable relevant to the terms of such equity linked Structured Investments as the Bank deems appropriate to preserve the economic terms thereof.

27.3 **Correction:** In the event that any price published on the Exchange and which is utilised for any calculation or determination made under a equity linked Structured Investments is subsequently corrected and the correction is published by the Exchange within one Settlement Cycle after the original publication, the Bank may Notify the Client of that correction and the Bank will determine the amount that is payable as a result of that correction, and, to the extent necessary, will adjust the terms of such equity linked Structured Investments to account for such correction.

27.4 **Merger Event and Tender Offer – Adjustments to Terms of Equity Linked Structured Investment**

27.4.1 **Merger Event or Tender Offer:** If a Merger Event or Tender Offer occurs, then on or after the relevant Merger Date or Tender Offer Date (as the case may be), the Bank may in its sole discretion (a) make such adjustments to any variables or other terms of such equity linked Structured Investment as it shall deem appropriate to account for the economic effect on such equity linked Structured Investment of such Merger Event or Tender Offer (including but not limited to adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the equity linked Structured Investment), which may, but need not, be determined by reference to the adjustment(s) made in respect of such Merger Event or Tender Offer by an options exchange to Options on the relevant Shares traded on such options exchange, and/or (b) substitute such Shares affected by such Merger Event or Tender Offer with substitute shares having such criteria as the Bank deems appropriate, and determine the effective date(s) of the adjustment(s) and/or substitution(s).

27.4.2 **Notification:** The Bank will Notify the Client of the occurrence of any Merger Event or Tender Offer and adjustments (if any) made to the terms of such equity linked Structured Investment and/or any share substitutions, provided that any failure or delay on the part of the Bank in giving such notice shall not affect the validity of any such adjustments and/or substitutions.

27.4.3 **Release and Discharge:** If the Bank determines that it is, or may be, impossible to make such adjustments and/or substitutions, or no adjustments or substitutions that it could make will produce a commercially reasonable result, the Bank may, by notice to the Client, terminate the relevant equity linked Structured Investment, and the Bank will pay the Client, in full satisfaction of all obligations of the Bank under such equity linked Structured Investment, such amount as the Bank shall determine to be fair and reasonable in all the circumstances, such amount not being less that the Principal Amount. Upon such payment, the Bank shall be fully released and discharged from its future obligations to the Client in respect of the relevant equity linked Structured Investment.

**28. Nationalisation, Insolvency, Delisting and Additional Disruption Events**

28.1 **Disruption Events:** If the Bank determines that a Structured Investment is affected by Nationalisation, Insolvency, Delisting or an Additional Disruption Event, the Bank may in its sole discretion (a) make such adjustments to any variables or other terms of such Structured Investment as it shall deem appropriate to account for the economic effect on the Structured Investment of such event, and/or (b) substitute such Shares affected by such Nationalisation, Insolvency, Delisting or Additional Disruption Event with substitute shares having such criteria as the Bank deems appropriate, and determine the effective date(s) of such adjustment(s) and/or substitution(s).

28.2 **Notification:** The Bank will Notify the Client of the occurrence of any Nationalisation, Insolvency, Delisting or an Additional Disruption Event, provided that any failure or delay on the part of the Bank in giving such notice shall not affect the validity of any such adjustments and/or substitutions.

28.3 **Termination:** If the Bank determines that it is, or may be, impossible to make such adjustments and/or substitutions, or no adjustments or substitutions it could make will produce a commercially reasonable result, the Bank may, by notice to the Client, terminate the relevant Structured Investment, and the Bank will pay the Client, in full satisfaction of all obligations of the Bank under such Structured Investment, such amount as the Bank shall determine to be fair and reasonable in all the circumstances, such amount not being less than the Principal Amount. Upon such payment, the Bank shall be fully released and discharged from its future obligations to the Client in respect of the relevant Structured Investment.

## 29. Index Disclaimer

29.1 **No Representation:** An Index linked Structured Investment is not sponsored, endorsed, sold, or promoted by the Index or the Index Sponsor and no Index Sponsor makes any representation whatsoever, whether express or implied, either as to the results to be obtained from the use of the Index and/or the levels at which the Index stands at any particular time on any particular date or otherwise. No Index or Index Sponsor shall be liable (whether in negligence or otherwise) to any person for any error in the Index and the Index Sponsor is under no obligation to advise any person of any error therein. No Index Sponsor is making any representation whatsoever, whether express or implied, as to the advisability of purchasing or assuming any risk in connection with entering into any Index linked Structured Investment.

29.2 **No Liability:** The Bank shall have no liability to the Client for any act or failure to act by the Index Sponsor in connection with the calculation, adjustment or maintenance of the Index. Except as disclosed prior to the Start Date, neither the Bank nor its affiliates has any affiliation with or control over the Index or Index Sponsor or any control over the computation, composition or dissemination of the Indices. Although the Bank will obtain information concerning the Indices from publicly available sources it believes reliable, it will not independently verify this information. Accordingly, no representation, warranty or undertaking (express or implied) is made and no responsibility is accepted by the Bank or its affiliates as to the accuracy, completeness and timeliness of information concerning the Indices.

## 30. Precious Metal:

30. **Precious Metal:** Notwithstanding anything contained in the Terms and Conditions and except where the Bank otherwise agrees, there will be no delivery by the Bank or the Client in respect of any Transaction relating to Precious Metal. Accordingly, the Bank will:

30.1 in respect of a purchase of Precious Metal, credit the amount of Precious Metal purchased by a Client in the Bank's records as a Notional Quantity bought and held for the Client and debit the Account of the Client for the Countervalue; and

30.2 in respect of a sale of Precious Metal, credit to the Account of the Client for the Countervalue, and debit from the Bank's records the Notional Quantity of Precious Metal sold on behalf of the Client.

## 31. Orders

31.1 **Execution of Orders:** In the event that the Bank decides to act on any Order or is otherwise under an obligation to act on any Order, the Bank will be allowed such amount of time to act and implement any Order as may be reasonable having regard to the systems and operations of the Bank and the other circumstances then prevailing and will not be liable for any Loss arising from any delay on the part of the Bank in acting on any such Order, except where any such Loss is caused directly by the Bank's gross negligence or wilful default. If an Order cannot be executed or wholly executed, the Bank shall be under no obligation to Notify the Client immediately. Orders to buy or sell Securities may be partially executed if the Order cannot be fully executed. Notwithstanding the Bank's acceptance of an Order, the Bank or its personnel may not be able to execute an Order owing to prevailing market conditions or if it is impracticable to place such Order, and will not be liable for any Loss arising from any delay on the part of the Bank in acting on any such Order, except where any such Loss is caused directly by the Bank's gross negligence or wilful default.

31.2 **Ambiguous Orders:** Without prejudice to the generality of any other provision of the Terms and Conditions, where any Order is ambiguous or inconsistent with any other Order, the Bank will be entitled (but will not be obliged) to rely and act upon any Order in accordance with any reasonable interpretation thereof which any officer or employee of the Bank believes in good faith to be the correct interpretation.

31.3 **Force Majeure:** Without prejudice to the generality of any other provision of the Terms and Conditions, the Bank will not be liable to the Client for any and all Loss incurred by the Client arising from any loss, delay in the transmission or wrongful interception of any Order through any equipment or system, including any equipment or system owned or operated by or for the Bank, except where any such Loss is caused directly by the Bank's gross negligence or wilful default.

31.4 **Aggregation of Orders:** Subject to Applicable Laws, the Bank may substitute a Client's Orders, without prior notification to the Client, with (a) the Bank's own orders, (b) orders of persons connected with the Bank; or (c) orders of other persons. Such aggregation may on some occasions operate to the Client's advantage and on other occasions to the Client's disadvantage. Market conditions may not permit the Client's aggregated order to be executed at once or in a single transaction. The Bank may, therefore, execute it over such period as the Bank deems appropriate and may report to the Client a volume weighted average price for a series of Transactions so executed instead of the actual price of each Transaction and the Client authorises the Bank to do so accordingly.

31.5 **Settlement:** The Client hereby authorises the Bank, upon receipt from the Client of Instructions or Orders, to debit the Client's Account or sub-Account with an amount equal to the subscription monies or purchase monies and other Charges, costs, expenses (if any) required to be paid for or in connection with the acquisition of the Securities and/or Investments.

31.6 **Agreement to be Bound:** The Client further agrees to be bound by all the terms and conditions pursuant to which the Bank and/or the Bank's Nominee or custodian effects each purchase or redemption of any Securities and/or Investments.

31.7 **Securities Held in Custody:** The Client acknowledges and agrees that any Securities purchased or subscribed for through the Bank will be delivered direct to the Bank as custodian and such Securities will be held by the Bank or the Bank's Nominee as custodian for and on behalf of the Client.

31.8 **Disclosure of Information:** By applying for the Securities and/or Investments to be provided in accordance with these Terms and Conditions, the Client agrees that the Bank may from time to time release or provide to the Bank's Nominee (or any sub-custodian appointed by the Bank), Broker or the Issuer all or any information held by the Bank in respect of the Client and the Account or sub-Account on the basis that the Bank's Nominee (or such sub-custodian, its personnel and staff or Broker) will, save to the extent that it is required to disclose the same in order to comply with any laws or regulations or the requirements of any statutory and regulatory authorities or to carry out the duties and comply with the obligations referred to in these Terms and

Conditions, keep such information confidential and only use it for the purpose of carrying out the duties and complying with the obligations referred to in these Terms and Conditions.

31.9 **Priority:** If a Client requests more than one Order, each of such Orders shall be treated as an independent Order and the Bank's execution of one or some of the Orders is not conditional on other remaining Orders being successfully executed. In respect of the foregoing, the Bank will not be liable for any Loss arising from any delay on the part of the Bank in acting on any such Order.

## 32. Dealings by the Bank

32.1 **Non-Exclusive:** The Services to be provided by the Bank (or the Nominees on behalf of the Bank) to the Client are non-exclusive. Nothing herein contained shall be deemed to inhibit the Bank and/or the Nominees from:

32.1.1 acting in any capacity for any other person or from issuing, buying, selling, holding or dealing in any Securities, and other Investments for the account of the Bank and/or any other Standard Chartered Bank Group Member or notwithstanding that Instructions have at any time been received from the Client for the subscription, purchase, sale or holding of or other dealing in the same or similar Securities and other Investments;

32.1.2 subscribing for, purchasing or procuring the purchase for its own account for the account of any other of its customers Securities and other Investments of the same type as or a similar type to any Securities and other Investments in respect of which Instructions have at any time been received from the Client; or

32.1.3 in respect of Securities and other Investments whose returns are linked to the performance of underlying assets, acting in any capacity for any other person or from buying, selling, holding or dealing in any underlying assets for the account of the Bank itself or any other Standard Chartered Bank Group Member or any of its other Clients notwithstanding that Instructions have at any time been received from the Client for the subscripts, purchase, sale or holding of or other dealing in Securities and other Investments whose returns are linked to such underlying assets.

32.2 **No Duty to Account:** The Bank shall not be liable or under any obligation to account to the Client for any emoluments, commissions, profits of any other benefits whatsoever earned by it and/or any Nominees in relation to any transactions in Securities, and other Investments effected in pursuance of Instructions received from the Client or for providing such Services to third parties.

32.3 **No Duty to Report:** The Bank shall not be liable or under any obligation to disclose to the Client any fact or thing which may come to the knowledge or notice of the Bank and/or any Nominees or any of their respective directors, officers, employees, servants, agents and correspondents from time to time in the course of providing Services to others or in the course of their business in any other capacity or in any manner whatsoever otherwise than in the course of carrying out their duties under the Terms and Conditions.

## 33. Transactions and Limits

33.1 **Not to Exceed Limits:** The Client will not exceed any position or transaction limits imposed by the Bank from time to time. Such limits may include minimum sizes for transactions.

33.2 **Variation of Limits and Margin:** The Bank may vary any position or transaction limits or Margin levels at any time in its absolute discretion. The Client acknowledges, in certain circumstances, the effect thereof may be an immediate change in limits or levels and/or require additional Margin to be deposited immediately, and the Client waives any right to object on the grounds that such variation of positions or Transaction limits or Margin levels are or were unreasonable.

## 34. Margin

34.1 **Margin and Pre-Settlement Margin:** The Bank may from time to time and at any time require the Client or Security Party to maintain such Margin (or deposit with the Bank such amount of money or other assets as the Bank may specify in order to maintain such Margin) as the Bank may in its absolute discretion consider appropriate as security for all or any of the Indebtedness. In particular, for the purposes of subscribing to or purchasing any Securities, Derivatives and Investments, the Client will be required to maintain a pre-settlement Margin (comprising cash or such other security acceptable to the Bank) as Notified by the Bank to the Client.

34.2 **Margin Requirements:** The Client will deposit and/or maintain in the Investment Advisory Account, or otherwise as the Bank directs, Margin in compliance with all Margin levels imposed by the Bank from time to time. No previous Margin levels will set a precedent or bind the Bank thereto.

34.3 **Deposit of Margin with Third Parties:** Subject to Applicable Laws, the Bank may deposit Margin provided by the Client with third parties, or pledge, charge or grant security arrangements over such collateral to third parties, as necessary to facilitate the Transactions entered into by the Client. Where the Bank wishes to use collateral for the purposes referred to above, the collateral in question will be simultaneously released from the security created by or pursuant to the Terms and Conditions and transferred by the Client to the Bank in accordance with the provisions of this clause. The Client authorises the Bank to take such steps to deliver or credit the relevant collateral to itself (or, as appropriate, the third party in question) and authorises the Bank (for and on behalf of the Client) to execute, and agrees to the Bank so executing, such instruments of transfer or the like as the Bank considers necessary or desirable to vest the full legal and beneficial right, title and interest in and to the collateral in the Bank (or, as the case may be, the third party).

34.4 **Insufficient Margin:** If the Margin is considered by the Bank to be insufficient, the Client agrees to deposit additional Margin with the Bank forthwith upon demand and, in any event, within such time limit as the Bank may specify. If the funds required to meet the Margin call are not provided to the Bank within the time so specified, the Bank is immediately entitled, but not obliged, to set off its Margin call with other funds or assets credited to the Client's Accounts and/or to close out the position.

34.5 **Bank's Rights:** All Margins will be subject to the Bank's general rights in respect of the Client's Assets as provided in the Terms and Conditions.

34.6 **Margin Transfer:** The Bank is hereby authorised by the Client, at any time and from time to time, without prior notice to the Client, to transfer or cause to be transferred any of the Client's funds, securities and/or other property to, between or among any Accounts which Client has with the Bank or any of its Affiliates, if in the Bank's commercially reasonable judgment such transfer may be required to avoid or reduce a margin call, eliminate or reduce any debit balance or otherwise satisfy any obligation owing to the Bank or its Affiliates.

## 35. Research

Without prejudice to the provisions of the Terms and Conditions, neither the Bank nor any of its officers, employees or agents, nor any Broker nor any of such Broker's information providers or any third party involved in, or related to, the creation of Broker research or any component thereof, shall have any liability under these Terms and Conditions (other than, in the case of a Broker, in respect of its gross negligence, wilful default or fraud) to the Client for any damages or costs of any kind incurred directly or indirectly by the Client or arising out of, or in connection with, these Terms and Conditions, the subject matter thereof, any errors or omissions related to such Broker research or the Client's use or misuse of such Broker research or any portion thereof (including, without limitation, any damages, Losses or costs incurred as a result of any inaccuracy or omission in the Broker research), whether direct, indirect, incidental, special, punitive or consequential (including without limitation loss of use, loss of profits or revenues or other economic loss of the Client, whether in contract, tort or otherwise, and whether or not the Bank, any such Broker or such information providers or other third parties have been advised of, or otherwise might have anticipated, the possibility of such damage or loss).

## 36. Investment Advisory Services

36.1 **General:** The Client acknowledges and agrees that any Investment Advisory Services provided by the Bank shall be subject to these General Terms and Conditions. The Client agrees that the Bank will invest and re-invest such Assets in accordance with the Client's Instructions, unless these Instructions violate the relevant information memorandum or other offering document or subscription agreement relating to an Asset. If the latter is the case, the Bank may disregard the Instructions.

36.2 **Authority:** The Client hereby authorises the Bank to perform, in accordance with the Client's Instructions, any and all acts with respect to all Assets held under the Client's Account(s) at any time; including, without limitation, to open Accounts; obtain Services and effect such purchases and sales Transactions; enter into agreements for the underwriting and sub-underwriting of any Investments; subscribe or apply for Securities, Derivatives and Investments on the Client's behalf notwithstanding that Bank or any Bank Affiliate is participating in the underwriting of or the making of such issue or offer of Securities, Derivatives and Investments or otherwise acting in connection therewith. Cancellation or variation of an Order will not be effective until and unless notification is received by the Bank and the Bank is able to, and effectuates, the cancellation or variation of the Order.

36.3 **Execution:** At the request of the Bank, the Client will execute such documents and deeds and perform such acts as the Bank may consider expedient in connection with the Bank's management of the Client's Assets in accordance with the terms of and the exercise of its powers hereunder.

36.4 **Discretion to Act:** The Bank reserves the right, at its sole discretion and without giving any reason, to refuse to act for the Client on any particular Transaction.

36.5 **Investment Opportunities:** The Bank may advise and inform the Client of investment opportunities as and when the Bank deems fit. The Client may follow or disregard, in whole or in part, any advice, recommendation or information given by the Bank. Notwithstanding that the Client may have informed the Bank of the Client's investment objectives or given the Bank information relating to risk profile and investment objectives, the Client shall be solely responsible for making the Client's own independent investigation, appraisal and decision on all Investments before dealing in them.

36.6 **Execution:** When placing Orders for the execution of Transactions, there will be times when a quoted price will change prior to the trade's execution due to market circumstances and that not all Orders will be executed in chronological sequence with the Order being placed. In such circumstances, the Client agrees to release the Bank from any liability arising therefrom.

36.7 **Allocations:** The Bank reserves the right to make allocations in such manner as it determines in its absolute discretion. Accordingly, if the Client requests for Assets to be acquired, the Client may not be allocated the full quantum which he had requested for. The Bank will not accept requests to alter or waive allocations after the event.

36.8 **Advance:** The Bank may (but will not be obliged to) from time to time at its discretion temporarily advance monies or bridging finance to the Client to enable the completion of purchase contracts to take place on or as soon as may be practicable after any due settlement date or to meet management or other charges which fall to be debited to the Accounts. Such advances and bridging finance will be repaid on demand (and may at the Bank's discretion be debited from the Accounts) together with accrued interest which will be charged at such rate as may be agreed between the Bank and the Client.

36.9 **Registration:** The Client's Assets will be held by the Bank for the account of and at the risk of the Client and will (unless otherwise instructed by the Client in writing) be registered in the name of the Bank or such other person as the Bank will, in its sole discretion, direct.

36.10 **Insurance:** The Bank will be under no duty or obligation to insure the Client's Assets for the Client (including without prejudice to the generality of the foregoing, the risk of Loss, damage, destruction or misdelivery of such Assets or any part thereof), and will not be liable for any Loss, damage or destruction howsoever caused, except where such Loss is caused directly by the Bank's gross negligence or wilful default.

36.11 **Affiliates:** The Bank may have banking, advisory or any other corporate relationships with companies whose Securities are comprised in the Assets held under the Account(s) or are purchased and sold for the Account(s) and Bank's officers and directors may be directors of such companies.

36.12 **Discretionary Investment Management Services:** Upon the Client's request, the Bank may agree to provide the Client with discretionary investment management services. These services will be governed by the provisions of these General Terms and Conditions, where applicable, and the discretionary investment management agreement.

## 37. Custody Services

37.1 **Authority:** The Client agrees to be bound by all the terms and conditions pursuant to which the Bank and/or the Bank's Nominee effects each purchase, sale, redemption or switching of any Securities and/or Investments.

37.2 **Custody:** The Bank or the Bank's Nominee will hold and keep as custodian all Securities, right to acquire Securities, Investments, interest, dividends, other distributions or payments, or other property from time to time purchased by the Bank, or otherwise (with the agreement of the Bank) delivered to or collected by the Bank, for the Client's Account. The Client will pay such custody fees or Charges pursuant to clause 39.1 as may be Notified by the Bank to the Client from time to time in accordance with the Bank's usual practice.

37.3 **Sub-Custodian:** The Bank or the Bank's Nominee will be entitled to appoint, without the further consent of the Client, any bank, trust company or member firm of any securities exchange or securities market (including any Nominee holding such Securities) or any other person to act as a sub-custodian of any of the Securities held by the Bank or its Nominee on such terms as the Bank may, in its absolute discretion, consider appropriate, and to pay the fees, costs, commissions and other expenses of such sub-custodian. The Bank or its Nominee will not be liable or responsible for any act or omission of any such sub-custodian or any of its officers, employees, servants or agents in connection with the Securities in its custody, provided that the Bank or the Bank's Nominee has exercised reasonable care and skill in the selection of any such sub-custodian.

37.4 **Registration:** The Bank will be authorised but will not be obliged to register the Securities and hold the same in its own name and/or in the names of the Nominee, or any other Nominee or sub-custodian, and/or to deliver the Securities to any authority as now or hereafter required by law or the rules and regulations of the stock exchange or clearing house in question on the Client's behalf. The Bank may delay in procuring any such registration or delivery for such period as the Bank reasonably thinks fit. The Client will sign and execute all instruments of transfer and other documents and give all such instruments and things that may be required by the Bank or the Nominee in its dealings with the Securities. The Client acknowledges that prior to the Bank becoming the registered owner of the Securities, the Bank may not be in a position to carry out all of its obligations as custodian under these Terms and Conditions, and the Bank will not be liable for any Loss that the Client may suffer or incur as a result of the custodian not being the registered owner.

37.5 **Records:** The Bank will, or procure that the Bank's Nominee will, keep a separate record in its books of all Securities received and held by it from time to time for the Client's Account and will arrange for all Securities to be held in safe custody in such manner and in such name as the Bank may in its absolute discretion determine. Custody of the Securities may be held on the basis that it is capable of being separately identified as belonging to or being attributed to the relevant Client or otherwise (as solely determined by the Bank or its Nominee). If custody is held on the basis that it is not capable of being so separately identified the Securities will be pooled, such that those Securities which in the opinion of the Bank are of the same nature or category are held together on a commingled basis. In this situation, the Client's interest in the Securities may not be identifiable by separate certificates, or other physical documents or equivalent electronic records, but the Bank or its Nominee will maintain a record of the Client's interest in the Securities.

37.6 **Certificates:** The Bank and/or where relevant, any Nominee appointed as custodian shall be authorised to complete and deliver on behalf of the Client as beneficial owner any ownership certificates in connection with Securities as may be required by Applicable Laws. The Bank will have no duty or responsibility to return to the Client Securities bearing serial numbers identical with those delivered to the Bank so long as the Securities returned are of the same class, denomination and nominal amount and rank pari passu with those accepted by the Bank, subject always to any capital reorganisation or exchange which may have occurred.

37.7 **Bare Trustee:** The Client agrees that any and all Securities or other property held by or deposited with the Bank, the Bank's Nominee or their respective Nominees or agents are at the Client's sole risk. Unless expressly provided in these Terms and Conditions, the Bank's duty in respect of the custody of Securities or other property will be limited to acting as bare trustee and to exercise good faith in respect of any action or inaction in relation to such custody. The Bank is under no duty to examine or verify the validity of the ownership of or title to any Securities or other property and will not be liable in respect of any defect in ownership or title.

37.8 **Corporate Action:** The Client hereby authorises the Bank to exercise all rights accruing or vested in the Client under Applicable Laws in relation to the rights of voting in respect of any of the Securities held for the Client's Account. The Bank or its Nominee will exercise all rights of voting in respect of any of the Securities in such manner as the Bank deems fit. The Client agrees that the Bank at any own discretion decide not to exercise any of such voting rights and the Client will not have any right to interfere or complain. The Bank will have no obligation to make available all or any notices, proxies and proxy soliciting materials in relation to the Securities held pursuant to these Terms and Conditions.

37.9 **Interest and Dividends:** The Bank will claim all amounts in respect of interest or dividends pertaining to the Client's Securities held in custody which are known to the Bank to be payable. Such amounts will be paid to the Client or held in a Client money bank account as and when they are actually received by the Bank, but the Bank will not be responsible for claiming any other entitlement or benefit the Client may have on the Client's behalf. The Bank may execute in the Client's name whenever the Bank deems it appropriate such documents and other certificates as may be required to obtain the payment of income from the Client's Securities or the sale thereof.

37.10 **Beneficial Owners:** Where more than one person holds beneficially Securities held by the Bank or its Nominee, the Bank will be entitled to act on any Instructions made or signed by any one of such beneficial holders or owners or applicants or their survivor(s) or successors-in-title. Notice to any one constitutes notice to all. In the event of the death of any one or more of such joint beneficial holder/s of interests, the Bank will be entitled to pay or deliver to the order of the survivor(s) or successor(s)-in-title all monies or Securities standing to the credit of or held or owned beneficially by the joint holders in their joint names to or to the order of survivor(s) or the successor(s)-in-title.

37.11 **Transfer Upon Termination:** Upon termination of this agreement, the Client will arrange for the transfer of Securities from the Bank to the Client or some other person designated by the Client by way of a prescribed transfer form obtainable from the Bank (except where the Client may only transfer the Securities from Bank to the Client). If the Client fails to complete such arrangements, the Bank (at the cost of the Client) may transfer or redeem all of the Client's Securities held in such manner as the Bank may think fit and the Bank is irrevocably authorised to give necessary instructions to third parties on behalf of the Client to execute documents and to do all such other things as the Bank will deem fit in its sole and absolute discretion, without any liability for any costs, expenses, Losses or damages of whatsoever nature incurred or suffered by the Client, except where any such costs, expenses, Losses or damages arise directly from the Bank's gross negligence or wilful default.

37.12 **Expression of Rights:** Unless and until the Bank receives an Instruction to the contrary, the Bank shall and/or where relevant, any Nominee appointed as custodian shall, where the Client is required to make a election, provide notification or communication in respect of his rights as a Securities holder and where instructed by the Client, the Bank shall use reasonable endeavours to inform the Issuer (or such other party as instructed by the Client) of the election made by the Client without any guarantee that the Issuer or the relevant person will receive such election, notification or communication before the prescribed time or at all, but the Bank or the relevant Nominee, as the case may be, will not be responsible for making elections, notifications or communications for the Client.

37.13 **Multiple Currencies:** Where monies are payable in respect of any of the Securities in more than one Currency, the Bank and/or where relevant, any Nominee appointed as custodian shall collect them in such Currency as may be permissible by law as the Bank may in its discretion determine.

37.14 **Discrepancies:** Where there is a discrepancy between the amount of money or quantity of Securities due from the Issuer or such other person and the amount of money or quantity of Securities actually received by the Bank or the relevant Nominee in respect of Securities held by it for the account of the Client, the Bank or that Nominee, as the case may be, has the sole discretion to hold or defer payment or delivery (as the case may be) to the Client until the correct amount of money or quantity of Securities is received.

37.15 **Returned Amounts:** At the request of the Issuer or an exchange on which the Securities are traded or a clearing system operator through which the Securities are cleared, the Bank may demand, and the Client agrees to pay or return, any amounts or securities previously paid or delivered to the Client in respect of Securities issued by that Issuer, traded on that exchange, or cleared through that clearing system, and the Client authorises the Bank to debit from any Accounts any such amounts.

37.16 **Protection of Securities:** Notwithstanding any other provisions of the Terms and Conditions, if at any time it is, in the opinion of the Bank and/or the Nominees, necessary in order to protect the interests of the Client, to act without Instructions, the Bank may (but shall not be obliged to) do so, and may (but shall not be obliged to) procure the Nominees to do so, as if it were the absolute beneficial owner of the Securities and in this connection the Bank and/or the Nominees may subscribe or otherwise deal with any money, Securities or other rights offered in respect of the Securities.

38. **Electronic Banking Services:** If the Client wishes to gain access or re-extension of Electronic Banking Services, the Client agrees to bear all fees and charges in connection with the provision or re-extension of the Electronic Banking Services.

39. **Charges, Commissions, Taxes and Interest**

39.1 **Charges:** The Client will pay on demand any sums owing to the Bank, including charges, fees (including, without limitation, legal fees on a full indemnity basis and stamp duties or fees), costs and expenses, interest, default interest, taxes, commission (including, without limitation, brokerage commission, custody fees, valuation fees, Electronic Banking Services fees and other professional services the Bank may from time to time prescribe), out-of-pocket expenses and penalties (collectively, "**Charges**") which are of reasonable amounts and were reasonably incurred by the Bank (whether directly or indirectly) payable to the Bank in respect of the Accounts, Facilities and the execution, performance and settlement of any, Transactions and/or Investments and the provision of Services, as Notified and determined by the Bank in its sole discretion from time to time. The Client authorises the Bank to deduct such Charges and any amounts due to the Bank from any of the Client's Accounts.

39.2 **Interest:** The Bank will be entitled to charge interest on any sum or payment due to the Bank from the Client in respect of any Transaction at such rate and calculated and/or compounded in such manner as the Bank may impose, determine and Notify to the Client from time to time and to debit any Account in respect of the interest due.

39.3 **Payment of Interest:** Unless otherwise agreed in writing between the Parties, the Bank will pay interest on credit balances in Accounts where the Bank has expressly agreed to do so. The Bank will credit such interest to the Accounts at such times as the Bank may determine. The Bank reserves the right: (a) to pay lower rates of interest, or no interest at all, on balances below certain amounts determined by the Bank; and (b) to pay no interest if the interest payable in a month would be less than a certain amount to be determined by the Bank. The Bank will inform the Client of the prevailing amounts upon enquiry.

39.4 **Notifying Interest Rates:** Any interest payable by the Bank will be at the rate determined by the Bank from time to time and Notified to the Client. Publication and Notification of certain information on interest rates will be subject to the Applicable Laws and normal banking practice in the Jurisdiction. Such interest rate information may include the following: (a) the interest applicable to the Account; (b) the basis on which such interest is determined; (c) the frequency and timing of interest payments; and (d) the basis on which fees and Charges are determined.

39.5 **Default Interest:** The Bank will charge and the Client will be obliged to pay a late payment interest charge (after as well as before judgment) on any amount due, under a Transaction on its due date or under these Terms and Conditions which is not paid when due. Late interest payment charges will accrue and be calculated on the basis of daily compounding and the actual number of days elapsed and a year of (in the case of amounts denominated in GBP, HKD, MYR, SGD, THB, TWD and ZAR) 365 days and (in the case of amounts denominated in any other currency) 360 days at such rate of interest provided for under the contract, Confirmation, Client Agreement or Terms and Conditions; and if no late payment interest charge is indicated in the foregoing, such default rate of interest shall be at 4% per annum above the cost to the Bank (conclusively certified by the Bank) of funding the amount in default from the due date to the date of payment on all outstanding amounts. The Client shall also fully indemnify the Bank for any Loss incurred by it (including reasonable legal costs of enforcement) by reason of such late payment. The Bank will have the right at any time to debit any Account of the Client with such default interest and Losses payable by the Client. Interest accrued shall be due on demand.

39.6 **Tax:** The Client shall be liable for any tax charged to the Bank in relation to any Transaction entered into in any other jurisdiction whether in respect of the Transaction or the provision of the Services by the Bank under the Client Agreement.

39.7 **Applicable Currency:** If for any reason the Bank cannot effect payment or repayment to the Client in respect of any Transaction in a particular Currency in which payment or repayment is due, the Bank may effect payment or repayment in the equivalent in any other Currency selected by the Bank based on the normal rate of exchange quoted by the Bank in respect thereof at the relevant time.

40. **Settlement, Payment and Delivery**

40.1 **Settlement Account:** The Account or sub-Accounts in the name of the Client and which the Client may agree with the Bank from time to time will be used for the purposes of the Securities, Derivatives and Investments and Transactions contemplated in these Terms and Conditions (the "**settlement account**"). Where the Client does not already maintain an Account with the Bank, the Bank may require the Client to open such an Account to serve the purposes of the Securities Trading Services, Investment Advisory Services and Services. The Bank reserves the right to debit or credit the settlement account if it has been advertently credited or debited. The settlement account will be governed by current account principles.

40.1.1 **Payments to the Client:** All payments to the Client in respect of any Transaction and/or Investment will be made solely where an Investment Advisory Account or settlement account is maintained (and in the case of other particular branches of the Bank, at such branch) or such other branch in applicable Jurisdiction or elsewhere as the Bank may in its absolute discretion permit.

40.2 **Settlement:** Upon any redemption or sale of the Securities and/or Investments or part thereof pursuant to these Terms and Conditions, the Bank will credit to the Client's Account or sub-Account such monies (net of any fees, Charges or expenses incurred in connection with the redemption or sale) as may be received by the Bank or the Nominee in consideration of the redemption or sale of the Securities and/or Investments or part thereof. The Bank will not be under any duty to ascertain or have any responsibility for the adequacy of the consideration received.

40.3 **Maturity:** In respect of Securities with a specified maturity date, the Client agrees to hold such Securities to their specified maturity and agrees not to sell or transfer the Securities save with the prior written consent of the Bank (such consent not to be unreasonably withheld). For the avoidance of

doubt, the Bank will be entitled to withhold such consent if, amongst other reasons, the resale restrictions or other restrictions or Applicable Laws and regulations relating to such Securities prohibit such sale or transfer in the applicable Jurisdiction or elsewhere, or if applicable tax or other laws would impose any liability on the Bank in connection with such sale or transfer. If the Bank consents to the sale, such sale is conditional upon the purchaser of such Securities being an institutional or relevant person as defined in the Applicable Laws for the relevant Jurisdiction and on such purchaser executing such account opening agreement or custody agreement with the Bank as may be applicable. If the amount of the Client's Securities is smaller than the minimum denomination of such Securities, the Client may not effect any such sale or transfer. The Client may not withdraw the Client's Securities if the proposed withdrawal is of an amount that is below the minimum denomination of such Securities.

40.4 **Monies Held in the Client's Account:** The Bank will, subject to these Terms and Conditions, hold in the Client's Account or sub-Account:

40.4.1 all cash received by it from or for the account of the Client for the purpose of acquiring Securities and Investments;

40.4.2 all cash received by it and/or the Bank's Nominee for the account of the Client from the disposal or redemption of such Securities and other Investments or part thereof; and

40.4.3 all income (if any) and other payments received in respect of the Securities and other Investments held pursuant to these Terms and Conditions on behalf of the Client.

The Bank will make arrangements for the collection and receipt of (subject to receipt of the same from the relevant Issuer or Broker of the Securities and other Investments) all income and other payments received with respect to the Securities and other Investments held pursuant to these Terms and Conditions to be credited into the Client's Account or sub-Account.

40.5 **Payments for Transactions:** The Bank will make payments from the Client's Account or sub-Account without further instructions from the Client, and the Client hereby authorises the Bank to make such payments, only:

40.5.1 upon the placing of an Order for purchase of Securities and/or Investments for the account of the Client and for payments in connection with the registration of such Securities and/or Investments in the name of the Bank's Nominee;

40.5.2 for the payment by the Client, whether to the Bank or otherwise, of all taxes, fees and disbursements, Charges and expenses properly payable by the Client pursuant to these Terms and Conditions or in respect of the acquisition or holding of Securities and /or Investments; and

40.5.3 for any payments in connection with the redemption, switching and sale of Securities and/or Investments held on behalf of the Client.

The Bank may make other payments from the Client's Account or sub-Account in accordance with the Client's instructions.

40.6 **Payments to the Bank:** All payments to the Bank will be made in full, in freely transferable funds, without set-off, counterclaim, deduction or withholding (including on account of any Charges) on the same day and in the Currency in which such payments are due. The Client's obligation or liability will not be discharged unless and until the Bank has received payments in full in the Currency in which such obligation or liability was to be discharged by the Client. If any payment is subject to any such deduction or withholding required by law on account of any tax, the amount of the payment will be increased so that the amount of the payment received by the Bank (after making any such required deduction or withholding) is equivalent to the actual amount due to the Bank.

40.6.1 **Right to Withhold:** The Bank may at its discretion withhold payment of monies due to the Client under a Transaction until such time as it is satisfied that it has received or will receive the amount due from the Client thereunder.

40.7 **Payments by the Bank:** All payments by the Bank are subject in all cases to any applicable tax or other laws and regulations. In the event of any withholding or deduction of taxes being required by law, the Bank is under no obligation to gross up any amounts payable under the Terms and Conditions and the Client will only be entitled to the net amount after such withholding or deduction. If the Bank is at any time required to pay any taxes, duties or other amounts on, or calculated by reference to, any sum received or receivable from the Client, the Client will promptly pay the Bank on demand an amount equal to such taxes, duties or other amounts paid or payable by the Bank.

40.8 **Sufficient Funds:** The Client agrees at all times to maintain sufficient funds in the Client's Account or sub-Account for the purpose of effecting any purchase of Investments, Transactions or Services on the Client's Instructions and/or for paying any fees, costs or other expenses which the Client is liable to pay under these Terms and Conditions. The Client acknowledges and agrees that if at any time there are in the reasonable opinion of the Bank (having regard to other payments debited or due to be debited) insufficient funds in the Client's Account or sub-Account for these purposes, the Bank may:

40.8.1 decline to place an Order on the Client's behalf with any Issuer;

40.8.2 (in the Bank's sole discretion and without any obligation to do so on the part of the Bank) transfer funds as necessary from any other Accounts maintained by the Client with the Bank without further instruction or sanction from the Client and if the Bank advances funds to the Client in accordance with clause 40.8.3 below, such that a debit balance occurs or any existing debit balance is increased on the Client's Account or sub-Account, the Bank may in addition to the provisions of clause 40.8.3 below set off such debit balance or the increase in the debit balance (as the case may be) on the Client's Account or sub-Account against any credit balance or balances which the Client may have in any other Accounts with the Bank without further instruction or sanction from the Client;

40.8.3 (in the Bank's sole discretion and without any obligation to do so on the part of the Bank) advance the necessary funds to the Client for the purpose of fulfilling an Order or paying any such costs, fees or expenses (an "**Advance**") and debit the Client's Account or sub-Account with the amount of such Advance. In this event, the Client will pay interest on the Advance at the rate prescribed by the Bank from time to time. In addition, the Client will forthwith upon demand by the Bank discharge the debit balance on the Account or sub-Account to the extent that such debit balance arises by reason of the Advance and, after demand pending such discharge, the Bank will be entitled to charge (after as well as before judgment) default interest at the rate prescribed by the Bank from time to time calculated on the amount which is the subject of such demand. If the Client fails to discharge the debit balance attributed to the Advance, the Bank will be entitled in addition to the remedy in clause 40.8.2 above to sell or otherwise liquidate (upon such terms and conditions as will seem reasonable to the Bank in all circumstances) such number of the Client's Securities held by the Bank or the Bank's Nominee as is necessary to discharge the debit balance attributable to the Advance and any other outstanding Advances made pursuant to this clause and remit the proceeds to the Client's Account or sub-Account;

40.8.4 place a stop order at any time after receipt of any Instruction to purchase Investment(s) to earmark such amount of the funds in the relevant settlement account for such Investment(s) required to satisfy all amounts payable in relation to such Investment(s);

40.8.5 suspend the Client's entitlement or authority to withdraw or otherwise utilise his Account(s), by Cheque or otherwise, and the Bank shall not be obliged to release or pay from such Account(s), any amount if such withdrawal, use, release or payment will result in the remaining balance of that Account(s) being insufficient to settle the transaction; or

40.8.6 refuse to honour any Cheque or other payment drawn or debited against his Accounts and/or delay in taking any such action, during any period between the issue of Instructions to subscribe for or purchase Securities and the application of funds payable in relation to such Instructions, and may apply monies in such relevant Account(s) in settlement of any sums payable in relation to any such subscription or purchase in priority to any other Instructions of the Client.

40.9 **Delivery:** Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the Terms and Conditions. Payments will be made on each relevant Value Date or settlement date for value on that date specified in the relevant Confirmation or otherwise pursuant to the Terms and Conditions. Where settlement is by delivery, such delivery will be made for receipt on the Value Day or settlement day in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in the Terms and Conditions.

40.10 **No Default:** Unless the Bank otherwise agrees with the Client, each obligation of the Bank to make any payment or delivery to the Client under the Terms and Conditions is subject to the condition precedent that there is no Default subsisting.

40.11 **Shortfall:** If, at any time, the Client fails to deliver to the Bank any property previously sold by the Bank on the Client's behalf, or the Client fails to deliver any property in compliance with any contract or in cases where the Bank will be required or will deem it advisable (whether by reason of the requirements of any exchange, clearing organisation or otherwise) to replace any property theretofore delivered by the Bank for the Client's Account with other property of like or equivalent kind or amount, the Client authorises the Bank in its absolute discretion to borrow or to buy any property necessary to make delivery thereof or to replace any such property previously delivered and deliver the same to such purchaser or other party to whom delivery is to be made and the Bank may subsequently repay the loan thereof with property purchased or otherwise acquired for the Client's Account, and the Client will pay the Bank for any cost, Loss and damages which the Bank may be required to pay thereon and for any cost, Loss and damages (including consequential costs, loss, penalties, fines and damages) which the Bank may reasonably sustain from its inability to borrow or buy such property.

41. **U.S. Person:** By applying to the Bank for the provision of Securities Trading Services upon these Terms and Conditions, the Client (and if the Client is more than one individual, each of such individuals) hereby certifies that:

41.1 his principal residential address is outside the United States of America ("**the United States or U.S.**") and he has not been nor does he anticipate or expect to be present in the United States for a period aggregating 183 or more days during any calendar year;

41.2 he is and will be located outside the U.S. at the time any information relating to the Securities is provided to him hereunder or any offer to buy Securities is made to him hereunder and at the time that any request to purchase Securities is made by him;

41.3 he is not a "U.S. Person" (as defined in Rule 902(k) under the United States Securities Act of 1933, as amended (the "**Securities Act**") (a "**Non-U.S. Person**");

41.4 the funds used for the purchase of any Securities hereunder are and/or will be from an account outside the United States;

41.5 any purchase of the Securities by him hereunder will be for his own account, or for the account of one or more other Non-U.S. persons, located outside the United States at the time any Information relating to the Securities is provided to him hereunder or any offer to buy Securities is made to him hereunder and at the time that any request to purchase Securities is made by him;

41.6 he and any accounts for which he is acting will be acquiring Securities hereunder for Investment purposes and not with a view to distribution thereof or with any present intention of offering or selling any of the Securities in violation of the Securities Act;

41.7 in the event there are representations and warranties deemed made by him under the section of any offering memorandum relating to the Securities applied for by him hereunder entitled or relating to "Transfer Restrictions", he agrees to make the same and agrees to be bound by the restrictions set forth in such section;

41.8 he is not an "affiliate" (as defined in Rule 144 under the Securities Act) of the Bank or acting on behalf of an affiliate of the Bank;

41.9 he will not engage in hedging Transactions involving the Securities applied for by him hereunder unless in compliance with the Securities Act;

41.10 in the event that the Securities applied for by him hereunder are issued in the form of certificates, he understands that the Securities are being offered in a transaction not involving any public offering within the United States within the meaning of the Securities Act and that the Securities have not been registered under the Securities Act and that the Securities will bear a legend which substantially states the content of this clause 41.10 and that Securities may not be sold, transferred or otherwise distributed directly or indirectly, in the United States, its territories, possessions, or areas subject to its jurisdiction, or to or for the account or benefit of a "U.S. person" except in accordance with the provisions of Securities Act, pursuant to registration under the Securities act, or pursuant to an available exemption from registration;

41.11 he agrees he is fully responsible to pay and that he will pay any and all tax liabilities arising out of the purchase and/or sale of the Securities acquired by him hereunder, including, but not limited to, the declaration of any capital gains taxable under U.S. law; he acknowledges that the Bank and others will rely on his certification, confirmation, acknowledgements and agreements set forth hereunder and agrees to notify the Bank promptly if any of the representations and warranties herein cease to be accurate and complete and he agrees that the Bank and others may, unless he notifies the Bank otherwise in writing, treat his certification, confirmation, acknowledgements and agreements set forth herein as restated by him on each and every application for and purchase of Securities;

41.12 the gains from his Transactions carried out pursuant to the Securities are not effectively connected or related to any US Person or US trade or business which the Client is engaged in or plans to engage in during the calendar year; and

41.13  if any of clause 41.1 to clause 41.12 above change(s) or appears likely to change he will notify the Bank in writing as soon as reasonably practicable and in any event (a) within thirty days of such change or his becoming aware of the likelihood of such change or (b) prior to any application for purchase of new Securities following the change (whichever is earlier).

## 42.  Limitation of Liability

42.1  **Liability of the Bank:** The Bank (including its officers, employees, Nominees and agents) will not be responsible or liable in any circumstances for: (a) any loss of profit, revenue, anticipated savings, business, contracts or goodwill or similar loss (whether direct, indirect or consequential); (b) any indirect or consequential Loss suffered or incurred by the Client for any reason whatsoever or damage; or (c) any direct Loss suffered or incurred by the Client unless such direct Loss is the direct result of the Bank's fraud, gross negligence or wilful default.

42.2  **Further Limitation of Liability:** The Bank (including its officers, employees, Brokers, custodians, Nominees and agents) (and this clause shall be effective to the same extent as if each such employee agent of the Bank had been a party to these Terms and Conditions) will not be liable for any Loss suffered or incurred by the Client arising directly or indirectly in connection with:

42.2.1  any error, failure, interruption, delay or non-availability of services, goods, software, communication and other networks or information supplied by the Bank to the Client or to the Bank by a third party (including the Bank's correspondents, agents, sub-agents and independent contractors) or employed or controlled by a third party (including trading, dealing, transmission and communication systems) or that the Client uses in connection with the Accounts, Facilities, Transactions and/or Investments and Services;

42.2.2  acting in good faith or omitting in good faith to act on Instructions howsoever communicated or forwarded to the Bank;

42.2.3  the Client's use of the Hold Mail Service, for retaining and/or destruction of the Client's mail;

42.2.4  any damage, Loss or diminution to any of the Investments or for any unavailability or diminution of funds in respect of such Client Assets;

42.2.5  any illegal, unlawful, fraudulent, negligent or unauthorised use of the Accounts, Facilities and Services;

42.2.6  fluctuations in foreign exchange rates or interest rates with respect to Currency conversions for whatsoever reason;

42.2.7  any failure to secure a particular level of income or capital gain;

42.2.8  any call, instalment or other payment relating to such Assets held by the Bank or any agent appointed by the Bank, or in relation to any such Asset arising or offered by way of redemption, bonus, preference, option or otherwise;

42.2.9  any Losses of any kind which may be incurred by the Client as a result of the management of such Assets unless due directly to the gross negligence or wilful default of the Bank or its agents or any of their officers or employees (in which event the liability of the Bank will not exceed the market value of such Assets at the time of discovery of such gross negligence or wilful default but in no circumstances whatsoever will the Bank be liable to the Client for any indirect, special or consequential damage whether or not the Bank is aware, or is advised of the possibility, of such damage);

42.2.10  any Loss which may be incurred by the Client as a result of the custodian services which may be provided by the Bank and/or any Nominee except where any such Loss is caused directly by the Bank's gross negligence or wilful default. The Bank will not be liable for any act or omission of any broker, Issuer, agent selected by it in good faith including any bank or depository used by it;

42.2.11  any Loss suffered by or occasioned to the Client by (a) any act or omission or refusal or insolvency of any person not associated with the Bank (including without limitation, a third party, Nominee or bank or depository used by the Bank); and (b) the collection or deposit or crediting to an Account of invalid, fraudulent or forged Assets or any entry in an Account which may be made in connection therewith;

42.2.12  errors, omissions or miscalculations of loyalty points and the failure of the Bank to make available benefits to which the Client is entitled or for any Losses that a Client may incur by reason of his participation in the benefits programme except where the direct loss has been directly caused by the gross negligence of the Bank;

42.2.13  compliance by the Bank with any laws, regulatory guidelines, tax payments or requirements, contract market rulings, regulations, statutes, judgements, orders of court or arbitral tribunal;

42.2.14  unless directly caused by the gross negligence or wilful default of the Bank, losing or misplacing or generally being unable to Collect any Non-Cash Deposits, Payment Instruments and other financial instruments presented for to the Bank for Collection, discharge, or endorsement;

42.2.15  suspension or delay in trading;

42.2.16  the accuracy, adequacy, completeness or timeliness of any information provided or the Instructions from the Client being inaccurate, inadequate, incomplete or untimely, except where the same is caused directly by the gross negligence or wilful default of the Bank;

42.2.17  any Loss or damage to the Client as a result of making the Electronic Banking Service available to the Client, except in each case, where any such Loss is caused directly by the Bank's gross negligence or wilful default;

42.2.18  any Force Majeure Event, except in each case, where any such Loss is caused directly by the Bank's gross negligence or wilful default; or

42.2.19  any Loss suffered as a result of or connected with any act or omission on the part of any Brokers, Nominees, securities depository, including, without prejudice to the generality of the foregoing, any incorrect or incomplete information or advice supplied or published by any Brokers, Nominees or securities depository to the Bank and subsequently communicated to the Client.

42.3  **Standalone Liability:** No other Affiliates of the Bank will be responsible or liable for any of the Liabilities or obligations of the Bank hereunder or for the Bank's failure to meet the Client's demand for the withdrawal of any amounts from the Account arising from any cause whatsoever whether or not beyond the control of the Bank.

42.4 **Applicable Laws:** Nothing in these Terms and Conditions or the indemnities contained in this clause shall operate so as to exclude or restrict any liability, the exclusion or restriction of which is prohibited by the laws of the applicable Jurisdiction.

43. **Client's Indemnity:** The Client will indemnify on a full indemnity basis and hold harmless the Bank and any Standard Chartered Group Member, including their officers, employees, custodians, Nominees, Brokers, correspondents, and agents, and reimburse on demand, against all Losses which the Bank or any Standard Chartered Group Member, including their officers and employees may suffer arising from or in connection with the operation of the Client's Accounts or sub-Accounts, Facilities, Transactions and Services whether incurred directly or indirectly, including the purchase, sale, holding, switching and redemption of Securities, Derivatives and Investments, and any Loss resulting from: (a) any breach by the Client of its obligations under the Client Agreement; and/or (b) the Bank performing or exercising its duties or discretions under the Terms and Conditions or acting on any Instruction (including stop payment Instructions, and Instructions to sell or purchase Securities, Derivatives and Investments), and/or (c) any default under the Terms and Conditions and any default in the repayment of the Client's Liabilities, save to the extent that the Loss is the direct result of the Bank's, Standard Chartered Group member's, Nominee's or custodian's gross negligence, wilful default or fraud.

43.1 **Recovery Costs and Expenses:** The costs and expenses incurred by the Bank or any Bank Affiliate in recovering sums owed by the Client to the Bank shall be of reasonable amount and reasonably incurred.

43.2 **Right to Debit:** The Bank is irrevocably authorised to debit any amount to be indemnified to the Bank by the Client under these Terms and Conditions.

43.3 **Legal Action:** Neither the Bank, Bank Affiliate nor the Bank's Nominee or custodian will be required to take any legal action unless fully indemnified to its/their reasonable satisfaction (as a prerequisite to taking such action) for all costs and Liabilities by the Client.

43.4 **Applicable Laws:** Nothing in these General Terms and Conditions or the indemnities contained in these Terms and Conditions shall operate so as to exclude or restrict any Liability, the exclusion or restriction of which is prohibited by the laws of the applicable Jurisdiction.

44. **Limitation Period for Actions:** No action regardless of form arising out of or in connection with the Account and/or any Service or Transaction and/or Investment may be brought by the Client against the Bank more than six years after the cause of action has arisen.

44.1 **Notification to the Bank:** The Client will not bring any claim against the Bank under these Terms and Conditions or otherwise in accordance with any Account, Facility, Transaction and/or Investment or Service (and hereby waives its rights to do so) unless it has notified the Bank in writing of its intention to do so within six (6) months after it has become aware of the material facts on which the claim is based.

45. **Outsourcing:** The Bank will have the right (but not the obligation) to outsource or sub-contract any part of its business or Services, including its banking, custodian and credit card operations to such third party (including without limitation, any party outside Singapore) and on such terms as the Bank deems fit in its sole discretion. Such operations may include without limitation Cheque clearing, creation, maintenance and archiving of documents and records, card production and mailing, and insertion, lettershopping and mailing of security and user identification codes. The Bank will ensure that any Relevant Information provided to such third party will be treated as confidential and be adequately safeguarded.

46. **Disclosure of Information and Data Protection**

46.1 **Confidentiality:** Subject to clauses 46.2, 46.3 and 46.4, the Bank will treat all Relevant Information as confidential.

46.2 **Consent to disclose:** Without prejudice to any right of any Standard Chartered Group Member to disclose information as provided by common or general law or Applicable Law, and/or used for the prevention or detection of crime including, but not limited to, money laundering, fraud and terrorism, the Client agrees that any Standard Chartered Group Member may disclose any Relevant Information to any Authorised Recipient, regardless of the country or territory in which the Authorised Recipient is located.

46.3 **Existing laws to apply:** This clause 46 is not, and will not be deemed to constitute, an express or implied agreement by the Bank with the Client for a higher degree of confidentiality than that which may be prescribed by the laws of the Jurisdiction.

46.4 **Data Protection:** The Client will notify each Relevant Data Subject that the Bank may from time to time collect and hold information relating to that Relevant Data Subject and will obtain the consent of that Relevant Data Subject for the Bank's use of such information in the course of its relationship with the Client (including operating any Account or providing any Service) or for any other reasonable purpose Notified by the Bank at any time.

46.5 **Authorisation for Credit Enquiry:** The Client authorises the Bank and any Bank Affiliate to contact from time to time such credit reporting agencies, credit bureaus and other information sources (in any jurisdiction) as it deems necessary or desirable for the Bank to open and maintain any Account and request them to conduct a credit enquiry or check on the Client for the purpose of ascertaining the Client's financial situation and investment objectives.

47. **Cheque Accounts**

47.1 **Receipt and Use:** The Bank may from time to time post Cheque books to the Client. The Client shall examine Cheque books upon receipt and report any irregularities immediately to the Bank. Cheque books must be at all times kept by the Client in a place of safety. The Bank will not be liable in any way for the non-receipt of any Cheque book to the Client. The Bank will not be liable in any way for the wrongful receipt or any use of the Cheque book by a third party, except where any Loss is caused directly by the Bank's gross negligence or wilful default.

47.2 **Interest:** Interest payable on any credit balance will be based on the prevailing interest structure specified by the Bank from time to time and will be calculated on daily credit balances; provided that the Bank reserves the right not to pay interest on an Accounts if the daily credit balance falls below the minimum amount which the Bank may prescribe from time to time. Interest accrued in any calendar month will be credited to the Cheque account at the end of that calendar month.

47.3 **Fees:** All Cheque accounts are subject to a compulsory transfer or service fee (whichever will be applicable) of such amount as the Bank may determine from time to time.

47.4 **Liability:** In the case of Payment Instruments given to the Bank by the Client, the Client agrees that, except in cases which are directly caused by fraud, gross negligence or wilful default on the part of the Bank (for which the Bank's liability will be limited to the face amount of the Payment Instrument), the Bank will not be responsible, and the Client will not make any claim or demand against the Bank, for any Loss the Client may suffer or incur; and the Client will indemnify the Bank on demand against any Loss the Bank may suffer or incur by reason of or in connection with: (a) the Bank acting on any Payment Instrument that has been or purports to have been, made by the Client or on the Client's behalf; (b) any error contained in any Payment Instrument, irrespective of whether the error originated in the transmission or the receipt of the Payment Instruments; or (c) any delays in the transmission or receipt of any Payment Instrument.

47.5 **Action on Payment Instruments:** The Bank will not be required to take or refrain from taking any action on any Payment Instrument except as provided in these Terms and Conditions.

47.6 **Use of Agent or Correspondent:** The Bank may select any agent or correspondent to draw a Payment Instrument.

47.7 **Loss and Misuse:** The Client shall exercise care in the use of Cheques. If a signed Cheque, blank Cheque or a Cheque book is lost or stolen, the Client must immediately report such loss or theft by notice in writing to the Bank. The Client should not pre-sign a blank cheque.

48. **Notices**

48.1 **Addresses:** The Client's address, telex, fax number and email address for any notice, communication or document to be made or delivered under or in connection with these Terms and Conditions, any Account, Facility, Transaction and/or Investment or any Service will be that which is notified to the Bank in writing and any substitute address, fax number and email address will only become effective on reasonable advance written notice. The Client further agrees to promptly notify the Bank of any change in address or other particulars of the Client (including change in the Client's tax residence status).

48.2 **Mode of Delivery:** Any communication or document made or delivered by the Bank to the Client under or in connection with these Terms and Conditions, any Account or any Service will be effective by personal delivery or: (a) if by way of telex or fax, at the time of transmission (a telex or fax transmission report that the telex or fax has been transmitted to the addressee will be proof of service); (b) if by way of letter, when it has been delivered by hand at the relevant address or five (5) Business Days after being posted to the Client; or (c) if by way of electronic notification or communication, when confirmed by a delivery confirmation report indicating that the electronic communication was successfully delivered to the intended recipient.

48.3 **Waiver of Notice:** Where the Client has requested no correspondence be despatched to the Client, the Client waives any requirement for the Bank to give the Client any notices or make demand upon the Client.

48.4 **Receipt:** All communications to the Bank will be effective only upon actual receipt by the relevant Bank officer authorised to act thereon.

48.5 **Joint Account Holders:** Any notice to a "Primary Account Holder" will be deemed effective Notification to all joint Account holders.

49. **Hold Mail Service**

49.1 **Retention of Mail:** The Client may request the Hold Mail Service by completing the relevant section of the Account Opening Application. If the Client requests Hold Mail Service, the Bank is authorised as the Client's agent to receive and handle, for and on the Client's behalf, all statements, advices and other correspondence and mail concerning any Accounts, Transactions and/or Investments and Services (collectively, the "**Mail**"). All Mail withheld by the Bank shall be deemed to have been served on and received by the Client at the point in time when the Mail is withheld by the Bank, and Client waives any requirement that the Bank Notify or inform the Client of any information or notices contained in the Mail. Notwithstanding the foregoing, the Bank will be entitled to forward to the Client's latest address provided to the Bank, such notices and communications (including demand notices) which the Bank considers necessary or appropriate. In the event of unforeseen circumstances or in cases of emergency, the Bank reserves the right to communicate with the Client by telephone or facsimile or other means of electronic communication.

49.2 **Disposal Instructions:** The Client will collect or give written instructions as to the disposal of all Mail subject to hold mail arrangements at least once every twelve months.

49.3 **Charges:** The Bank is authorised to debit the Client's Accounts for all Charges relating to the Hold Mail Service.

49.4 **Acknowledgement of Risk:** The Client agrees that all Mail held by the Bank will be at the Client's sole risk and the Bank will not be responsible to open the Mail. The Client may not be aware of amendments to the Bank's Terms and Conditions and Services and also may not be able to monitor the Transactions which may lead to a delay in the detection of any fraud, omission or errors that may occur or arise and the Client may subsequently be precluded from raising any discrepancies, errors or omissions, and the Client is fully responsible for any consequences and Loss that may occur from or arise out of hold mail arrangements and the Bank is not liable for any such Loss, except where such Loss is caused directly by the Bank's gross negligence or wilful default.

49.5 **Destruction:** If the Client fails to give or renew disposal instructions within twelve months after the initial hold mail instruction (and thereafter each subsequent renewal of hold mail instruction), the Bank is instructed to receive and hold the Client's Mail for such maximum period as the Bank may prescribe and thereafter the Client's uncollected Mail may be posted to the Client's last address with the Bank, or be dealt with as otherwise deemed fit by the Bank, including the Bank's destruction of the Mail.

49.6 **Collection:** The Client undertakes to collect all Mail held by the Bank. Where the Client appoints an agent to collect Mail from the Bank, the Client will supply the Bank with the names and specimen signatures of each such agent. The Bank is entitled to require the presentation of identification documents satisfactory to the Bank upon collection of the Mail and may refuse to release the Mail if not satisfied with the documents produced. The Client may from time to time authorise an officer of the Bank (who will not be obliged) to deliver Mail personally to the Client.

50. **Termination of Transactions:** The Bank may, at its discretion, and without prior notice, terminate any or all outstanding Transactions on the happening of any of the following events:

50.1 the Client fails to perform, or indicates its intention not to perform, any obligation of the Client to the Bank or to any other financial institution;

50.2    the occurrence of a material adverse change in the financial position of the Client;

50.3    the Bank requires as a condition of an Transaction that any Margin or other security be given to the Bank and the Margin or security is not provided or maintained at a level satisfactory to the Bank;

50.4    the aggregate mark-to-market Losses to the Client under outstanding Transactions exceed any limit which has been previously advised by the Bank to the Client;

50.5    the Bank determines that it is or is likely to be impracticable or illegal for either the Bank or the Client, or both, to perform any Transaction;

50.6    the Client becomes insolvent or any proceedings are commenced seeking a judgment of or arrangement for bankruptcy, rehabilitation, reorganisation, administration, winding up, liquidation or other similar relief in respect of the Client or the Client's debts or assets, or the appointment of a trustee, receiver, liquidator, conservator, administrator or other similar official of the Client or any substantial part of the Client's assets;

50.7    upon the termination of any Transaction pursuant to this condition, the payments otherwise due on the Maturity Date or settlement date (howsoever described) of each Transaction so terminated will not be required to be made, but instead the payment provided for in clause 50.8 below will be made by the relevant party; or

50.8    the Bank will determine, for each terminated Transaction, the amount of its loss (expressed as a negative amount) or profit (expressed as a positive amount) as a result of the termination of such Transaction, and will Notify the Client of the amounts determined. The net sum of such profits and losses for all terminated Transactions will be immediately due and payable, by the Client in the case of a negative amount, or by the Bank, in the case of a positive amount, but without prejudice to the Bank's rights of set-off.

## 51.    Set-Off and Lien

51.1    **Consolidation and Set-Off:** The Bank may at any time and without notice to the Client appropriate, transfer, combine, consolidate or merge all or any of the Accounts or may set-off any obligation and Liability whatsoever due from the Client to the Bank (whether in relation to any Account, Facility, Transaction, Service or otherwise) against any obligation whatsoever due from the Bank to the Client (whether in relation to any Account, Transaction, Service or otherwise), regardless of the place of payment and the Bank Affiliate, including branches or subsidiaries, which is/are involved, and to which entity the Client's obligations are payable or Currency of either obligation. If the obligations are in different currencies, the Bank may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off. "Obligation" when used in this clause 51 includes any obligation whether matured or unmatured, actual or contingent, present or future. If the amount of any such obligation is unascertained, the Bank may estimate the amount for the purposes of the set-off. The Bank may accelerate the maturity of any fixed term deposit in order to exercise any right of set-off.

    51.1.1    **Further Rights:** The circumstances in which the Bank will exercise its right of set-off against the Client include without limitation the following: (a) any Liabilities of the Client to the Bank, whether present or future, actual or contingent, and whether owned individually or jointly with any other person, becomes overdue, (b) any attachment, execution or similar process is levied against the Client, (c) an act of bankruptcy is committed by the Client or a petition in bankruptcy (or winding up) is filed by or against the Client, (d) a receiver is appointed for all or any substantial part of the assets of the Client, or (e) the Bank has reason to believe that the Client is unable to pay his debts when due.

    51.1.2    **Estimated Amounts:** If the amount of an obligation is unascertained, the Bank may estimate that amount and set off in respect of the estimate, subject to a final settlement being made between the Client and the Bank when the amount of the obligation is ascertained.

51.2    **Lien:** Without prejudice and in addition to the other rights of the Bank under the Terms and Conditions, or any general lien, right of set-off, security interest or similar right to which the Bank may be entitled by law or under any other agreement, until payment in full of all Client obligations owed to the Bank or any related corporation of the Bank has been paid in full, the Bank will hold as security and subject to a general lien, right of retention and sale in the Bank's favour all of the Client's interest and rights in any Assets and Client Property which may at any time be held or carried by or be in the possession or control or carried on the books of the Bank, in each case for any purpose (including without limitation, any credit balance in the Account, and any Account in which the Client may have an interest either individually or jointly with others) and whether for custody, safekeeping or otherwise. The Client agrees and acknowledges that the Bank's Nominee, and any other Nominee, sub-custodian or agent of the Bank or its Nominee, may also claim a lien or security interest over any property of the Client held by it. All Client Property will be continuing security/collateral for the full discharge of the Client's obligations.

51.3    **Cancellation and Power of Sale:** Whenever the Bank considers it necessary, it may cancel any open Orders for the purchase or sale or redemption of any Assets and/or sell any Assets or other property belonging to the Client or in which the Client has an interest with or without notice to the Client (and the Bank is authorised to do all such things necessary in connection with such sale) to settle any Obligation or Liability owing to the Bank, any Bank Affiliate or any indemnified third party which is not discharged in full by the Client. Such sale or purchase may be public or private and may be made without advertising or notice to the Client and in such manner as the Bank may at its sole discretion determine. At any such sale the Bank may purchase the properties or any of them free of any right of redemption and in respect of any such sale the Bank will have no liability for any Loss incurred and the Client will not make any claim against the Bank concerning the manner of sale or timing thereof, except where any such Loss is caused directly by the Bank's gross negligence or wilful default.

51.4    **Repayment:** The Bank is not obliged to make available to the Client any sums which it is expecting to receive in respect of the Client's Transactions or other Assets until it has been able to establish that it has received that sum. However, the Bank may do so if it wishes. If and to the extent that the Bank does so but it transpires that the Bank had not received the sum which it paid out:

    51.4.1    the Client will on request refund that sum to the Bank; and

    51.4.2    the Client will on request pay to the Bank the amount (as certified by the Bank) which will indemnify the Bank against any funding or other cost, Loss, expense or liability sustained or incurred by it as a result of paying out that sum before receiving it.

51.5    **Costs of Recovery:** The Bank will be entitled to charge the Client for reasonable costs reasonably incurred by the Bank in connection with such set-off, combination, consolidation, realisation and sale, and claim from the Client any deficiency arising thereupon.

52. **Netting:** If on any date there are any amounts which would otherwise be payable hereunder by the Bank to the Client and the Client to the Bank, if the Bank so determines and directs on such date, each Party's obligation to make payment of any such amount will be satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one Party exceeds the aggregate amount that would otherwise have been payable by the other Party, will be replaced by an obligation upon the Party by whom the larger aggregate amount would have been payable to pay the other Party the excess of the larger aggregate amount over the smaller aggregate amount. In the event that the amounts to be netted are denominated in two or more currencies, the Bank may (at its sole discretion) consolidate and convert such amounts into one or more currencies (as determined at the sole discretion of the Bank) in accordance with clause 15.6.3.

53. **Counterparties, Brokers and Agents**

53.1 **Use of Brokers and Agents:** The Client agrees that the Bank shall have the full power and express authority to appoint, replace and/or terminate the appointment of Brokers, agents, Nominees and custodians and negotiate and agree for and on behalf of the Client all arrangements with Brokers, agents, Nominees and custodians and the Bank may effect trades, Orders and Transactions or provide any Services (including Securities Trading Services) for the Client with counterparties or through Brokers or agents (including custodians, correspondents, sub-custodians, Nominees depository agents and clearing houses) of its own choice, including any Standard Chartered Group Member, upon such terms and conditions as it may deem fit and the Client will be bound by the same. The Client shall indemnify the Bank and hold the Bank harmless from Loss, and the Bank will not be responsible for any act or omission of any such counterparties, Nominees, Brokers or agents, save for any gross negligence or wilful default of the Bank in the selection of such counterparties, Nominees, Brokers or agents. In particular, the Client will bear the risk of bankruptcy or insolvency of any counterparty, Broker or agent with whom a Transaction and/or Investment on any Account is effected or through which any Service is provided.

53.1.1 **Authority to Act:** Brokers, agents, custodians and Nominees are authorised to act upon any instructions received by them (regardless of any delay, error, interruption or suspension as aforesaid and none of the Bank, the Brokers, agents, custodians or the Nominees shall be liable for any Losses or costs suffered or incurred by the Client as a result of the Brokers, agents, custodians or the Nominees acting upon the same.

53.1.2 **Authority to Disclose:** The Client authorises the Bank to disclose to the Brokers, custodians and Nominees any information regarding the Client and the Client's Account relationship with the Bank, including without limitation the Client's security access codes, balances on the securities Account and the settlement account, any information provided in the Account Opening Application and changes therein notified by the Client, and such other information as the Bank, the Brokers or the Nominees may deem necessary from time to time for the purposes of the securities services, the transmission, verification or execution of the Client's instructions or any purpose ancillary thereto Any termination of the agreement constituted by these Terms and Conditions by the Client or the Bank shall not affect or terminate the Client's authorisation given above in relation to information in the possession of the Bank at termination.

53.1.3 **Legal Action:** The Bank shall not be required to take any legal action unless fully indemnified to its reasonable satisfaction (as a prerequisite to taking such action) for all costs and Liabilities by the Client.

53.1.4 **Advice of Counsel:** The Bank shall be entitled to receive and to act, or procure Brokers, agents, custodians and Nominees to act, upon any advice of counsel and shall be without liability for any action taken or thing done in good faith in reliance upon such advice.

53.1.5 **Affiliates:** The Bank may, in its absolute discretion, and without prior notice to the Client, arrange for any Transactions to be effected in whole or in part by the sale to, or the purchase from, the Client of the relevant investments by another client, either of the Bank or of an Affiliate of the Bank. If the Bank does so, the Bank or any of its Affiliates may charge, or otherwise receive remuneration from, both the Client and such clients and retain the Charges or other remuneration for its own account. The Bank and its Affiliates will not be bound to account to either the Client or such clients in this regard, except to the extent required by Applicable Laws.

53.2 **Conflicts of Interest**

53.2.1 **Interests:** The Client's attention is drawn to the fact that when the Bank provides Facilities and Services to the Client, the Bank or any Standard Chartered Group Member may have an interest, relationship or arrangement that is material in relation to the Facilities, Services and any Investments or Transactions concerned. Because the Bank shall only recommend the Investments and Transactions which are reasonable having regard to the Client's interests and because the Bank's employees (and those of any Standard Chartered Group Member) are required to comply with the policy obliging them to disregard the Bank's or any Standard Chartered Group Member's interests, relationship or arrangement, the Bank shall not specifically disclose to the Client that it or any Standard Chartered Group Member has an interest, relationship or arrangement that is material in relation to the Facilities, Services, Investments or Transactions concerned.

53.2.2 **Investments:** When providing investment advice and recommendations to the Client, the Bank may recommend to the Client those Investments that are marketed and which may be executed by Standard Chartered Group Members.

53.2.3 **Role:** The Client's attention is also drawn to the fact that when the Bank makes a recommendation to the Client or carries out a particular Facility, Service, Investment or Transaction for the Client, the Bank or any Standard Chartered Group Member: (a) could be acting as a principal for its own account; or (b) could be matching the Client's requirements with that of another client by acting on that client's behalf as well as for the Client.

53.2.4 **Further Disclosure:** The Client understands that the Bank need not disclose to the Client or take into consideration any fact, thing or matter:

(a) if any such disclosure would or might be a breach of confidence or duty to any other person; or

(b) relating in nature or extent to any interest the Bank has in any Investment or Transaction.

54. **Receipt of Fees, Commissions and Rebates:** The Bank may pay to, or receive and retain from, any counterparty, Broker, agent, bank, financial institution, correspondent, or from another company within the Standard Chartered Group, Charges, commissions, fees, rebates or other payments in any form in respect of (a) any trades, Transactions or Investments effected for or with the Client; or (b) any hedging arrangements effected by the Bank in connection with trades or Transactions and/or Investments; or (c) services provided for the Client in its capacity as principal, trustee or agent, and without being liable to account or disclose to the Client any such profit or benefit derived by it.

**55.**   **Bank as Principal, Trustee or Agent:** The Bank will be entitled at its discretion to deal as principal on its own account or trustee or agent for the Client without disclosing such capacity to the Client in relation to any Transaction and/or Investment (notwithstanding that it is also under certain circumstances acting as the Client's agent) and without being liable to account for or disclose to the Client any profit derived by it in such capacity (whether in the form of commission, rebate or otherwise).

**56.**   **Client Representations and Warranties:** The Client represents and warrants to and for the benefit of the Bank as of the date of the execution of the Account Documentation and any Credit Documentation (as the case may be) entered into by the Client, and repeated as of the date of each Transaction and/or Investment entered into under the same, that:

56.1   **Capacity:** The Client has full the power, capacity, authority and approvals for, and (where applicable) has obtained all authorisations, consents, licences or approvals (under the applicable Jurisdiction) to, accept and agree to these Terms and Conditions, to open, maintain and/or continue to maintain the Accounts, to utilise the Services, to enter into the Transactions and/or Investments and to accept the Facilities, to give the Bank any Instructions that may be given from time to time and perform the obligations under the Client Agreement and the Terms and Conditions;

56.2   **Legal, Valid and Binding:** the Account Documentation, Credit Documentation and each Transaction and/or Investment contract constitute the Client's legal, valid and binding obligations enforceable in accordance with their respective terms; and the Client's performance and the obligations contemplated herein do not and will not:

56.2.1   contravene any existing Applicable Law, statute, ordinance, rule or regulation or any judgement, decree or permit to which the Client is subject; or

56.2.2   conflict with or result in any breach of the terms or constitute any default under any agreement or other instrument to which the Client is a party or is subject or by which any of the Client's property is bound;

56.3   **True Information:** the records and information given by the Client to the Bank are true and correct and the Bank is entitled to rely on such information until the Bank has received written notice from the Client of any changes therein. The Client acknowledges that such information provided constitute representations in reliance upon which instructions from the Client shall be accepted, and shall be treated as part of the agreement constituted by these Terms and Conditions. The Client shall notify the Bank forthwith of any material change in such information;

56.4   **Sufficient Knowledge and Experience:** the Client has sufficient knowledge and experience so as to be able to evaluate the merits and risks of entering into the Transactions and/or Investments and utilising the Facilities and Services contemplated under the Client Agreement and the Client has independently made the decision to enter into such Transactions and/or Investments and utilise such Facilities and Services based upon the Client's own judgment or upon professional (including legal and tax) advice obtained independently of the Bank and acknowledges that the Bank does not owe any fiduciary or similar duties to the Client. The Client understands and accepts the terms, conditions and risks of each Transaction and/or Investment and is capable of assuming such risks. The Client is solely responsible for reading the relevant prospectus or other offering information and the Bank shall not have any liability to the Client in respect of accuracy, completeness or otherwise any information which is provided by the Bank. The Client agrees that he satisfies the legal requirements or contract stipulations (if any) which pertain to the dealing in Transactions and/or Investments under the Client Agreement;

56.4.1   neither the Bank nor any employee or agent of the Bank shall have any liability for any advice given or views expressed to the Client (whether or not expressed at the Client's request) on any matter connected with these Terms and Conditions or any contract, or be liable for any Loss or expense incurred (directly or indirectly) by the Client as a result of any Currency or market movements. This provision shall be effective to the same extent as if each such employee agent of the Bank had been a party to these Terms and Conditions.

56.5   **Physical Delivery:** where the Client is required to settle a Transaction by physical delivery, such delivery will operate as a representation that (a) the Client is the legal and beneficial owner of the property to be delivered free from all liens, charges, equities, rights of pre-emption or other security interests or encumbrances whatsoever; and (b) the Client has the right to transfer such property on the terms and of Client Agreement;

56.6   **No Representation:** the Client confirms that it has not relied on any representation, warranty, promise, statement of opinion or other inducement made or given by or on behalf of or purportedly by the Bank in applying for any Account;

56.7   **No Litigation:** no litigation, arbitration or other proceedings or claims are pending or threatened against the Client, and no steps have been taken or are being taken to appoint a receiver, trustee, liquidator, manager, judicial manager or similar officer in connection with the Client; and

56.8   **Principal and Not Agent:** the Client acts as principal for its own account and not as agent of any person in entering into the Client Agreement and (as the case may be) exercising its rights and carrying out its obligations in regards to each and every Transaction and/or Investment, and no person other than the Client has or will have or acquire any beneficial or other interest in or security or other rights over any Account and/or any cash or assets held by the Bank for the Client without the prior written consent of the Bank, except in the case where the security or encumbrance is created in favour of the Bank.

**57.**   **Covenants and Undertakings**

57.1   **Payment Undertaking:** The Client will on demand pay to the Bank any sums owing by the Client to the Bank, including without limitation, any debit balance on any Account, and any monies owing or Liabilities incurred by the Client pursuant to Services provided to and Transactions and/or Investments entered into by the Client.

57.2   **Information:** The Client will promptly provide such information and documents as the Bank may reasonably request from time to time including but not limited to (where the Client is a corporation) a copy of its audited financial statements immediately after they are issued but in any event within five months after the close of each of its financial year.

57.3   **Notice:** The Client will promptly, after the occurrence thereof, give notice to the Bank of any Event of Default or potential Event of Default, including the nature thereof and the steps being taken by the Client to remedy or mitigate the effect of the Event Default or potential Event of Default.

57.4   **Illegal Activities:** The Client will not use the Account or carry out any Transactions or Investments for the purposes of money laundering, terrorist financing or utilise funds obtained from illicit, criminal or illegal activities.

57.5    **Security:** The Client undertakes to notify the Bank immediately in the event that any order, warrant, lien or encumbrance is issued against the Client or the Client's assets.

57.6    **Pari Passu:** Without prejudice to any provisions hereof, any Facilities provided by the Bank should rank at least pari passu with credit facilities provided by all other unsecured lenders.

57.7    **Regulatory Approvals:** If such approvals are required, the Client shall obtain the requisite regulatory and governmental approvals in connection with the Client Agreement, Facilities, Transactions and Investments (as applicable) and deliver a copy of the same to the Bank including without limitation requisite exchange controls approvals to purchase foreign Currency to make a payment in respect of the Facilities, Transactions and Investments.

58.    **Calculation Agent:** Unless otherwise expressly instructed by the Client in writing, the Client agrees that (where applicable) the Calculation Agent will be appointed as the calculation agent in respect of all Confirmations entered into by the Client with the Bank. If, in the sole opinion of the Calculation Agent, an event which is beyond the control of the Parties to any Confirmation and which affects the value or settlement relevant to that Confirmation (an "**Event**"), has occurred or is likely to occur, such Confirmation will be terminated, varied or adjusted in such manner as the Calculation Agent may determine to be in accordance with customary or market practices (including, without limitation, the amount payable by the Parties to such Confirmation and the applicable time period). The determination of the Calculation Agent is final and binding on the Client. In determining whether an Event has or is likely to occur, the Calculation Agent will take into account customary or market practices (some of which are described in the Risks Disclosure Statement). The Client agrees that the Calculation Agent will not be under any liability to the Client in respect of any Loss or damage (whatsoever and howsoever caused, whether directly or indirectly) which the Client may sustain or suffer as a result of any act, omission, delay or error of the Calculation Agent in making any determination or calculation, save for liability arising directly from gross negligence or wilful default of the Calculation Agent.

59.    **Charge, Security, Collateral, Margin and Pre-Settlement Margin**

59.1    **Charge:** In consideration of the Bank agreeing to (a) grant or continue to grant Facilities to the Client, (b) enter into or offer or continue to enter into or offer a Transaction with or Services to the Client, or (c) grant or continue to grant time and indulgence to the Client, the Client as beneficial owner hereby charges, pledges and assigns all cash (in any Currency), cash equivalents, interest, Investments and property held in the Client's Accounts, or by the Bank on behalf of the Client, from time to time as continuing security for the due payment and satisfaction by the Client to the Bank on demand of all Indebtedness.

59.2    **Security:** Upon the occurrence of an Event of Default or the failure of the Client to settle the Indebtedness when due or perform its obligations under these Terms and Conditions:

59.2.1  the charge contained in this clause shall be immediately enforceable; and

59.2.2  the Bank may, without notice to the Client appropriate, transfer or set-off the whole or any part of any monies comprised in the Client's Accounts in or towards payment or discharge of any of the Indebtedness hereby secured.

59.3    **Realised Monies:** The amounts realised by the exercise or enforcement of the security contained in this clause may be applied against the Liabilities of the Client (or any Client company) in such order of priority as the Bank or any Bank Affiliate may in its absolute discretion determine.

59.4    **Additional Security:** The charge contained in this clause is in addition to and does not prejudice or affect any collateral or other security which the Bank or any Bank Affiliate may by these Terms and Conditions or otherwise whether now or hereafter hold from or on account of the Client (or any Client company) and shall be a continuing security notwithstanding death, bankruptcy or other incapacity of the Client, or any intermediate payment or settlement of account or satisfaction of the whole or any part of any sum or sums of money owing by the Client (or any Client company). Without prejudice to the foregoing, the charge contained in this clause shall subsist and continue to have full force and effect after the termination of these Terms and Conditions until the Client or any Client company has fully discharged all of its obligations to the Bank or any Bank Affiliate. The charge contained in this clause may be enforced without the Bank first having recourse to any other security or rights. Nothing herein shall restrict the operation of any general or banker's lien, statutory right of set-off or other rights or remedies which the Bank may have by law or otherwise. All monies realised pursuant to the charge contained in this clause may be placed and kept to the credit of a suspense account for so long as the Bank or the relevant Bank Affiliate may in its absolute discretion determine without any obligation in the meantime to apply the same or any part thereof in or towards discharge of any monies or Liabilities due or incurred by the Client or any Client company to the Bank or any Bank Affiliate. The charge contained in this clause shall not be prejudiced by any amendment or variation to these Terms and Conditions or by the liquidation, insolvency or bankruptcy of the Client or any Client company.

59.5    **Deficiencies:** In the event of any deficiency after the sale or disposal of the Charged Securities the Client hereby undertakes to make good and pay on demand to the Bank such deficiency.

59.6    **Priority:** The amounts realised by the exercise or enforcement of the charge contained in this clause shall be applied against the Liabilities of the Client or any Client company in such order of priority as the Bank may in its absolute discretion determine.

59.7    **Security, Collateral, Margin and Pre-Settlement Margin:** The Bank may from time to time and at any time require the Client or Security Party to: (a) provide security and/or collateral in such form and at such time as the Bank may in its discretion require in respect of any Indebtedness; and (b) maintain such Margin (or deposit with the Bank such amount of money or other assets as the Bank may specify in order to maintain such Margin) as the Bank may in its absolute discretion consider appropriate as security for all or any of the Indebtedness. In particular, for the purposes of subscribing to or purchasing any Investments, the Client will be required to maintain a pre-settlement Margin (comprising cash or such other security acceptable to the Bank) as notified by the Bank to the Client.

59.8    **Execution of Charge Documents:** Where required by the Bank, the Client will execute, furnish or procure the execution of such security documents by such person(s) acting as surety, guarantor or Security Party for the Client as the Bank may from time to time specify, at the Client's own expense. The Client will execute and perform, or procure the same be done, all such assurances, acts and things as the Bank may reasonably require for perfecting or protecting any security granted by the Client or such person in favour of the Bank. The Client is not entitled to withdraw any security, collateral or Margin or to sell, pledge, transfer, charge, dispose of or otherwise deal with the same, until all the Client's Indebtedness is paid and satisfied in full unless with the Bank's prior written consent.

59.9 **Sale or Disposal:** The Bank (or where appropriate, the Nominee) shall be entitled to appropriate to the Bank or sell or dispose of any charged Securities at the current market price thereof to any Affiliate without being (a) in any way responsible for any Loss occasioned thereby, howsoever arising and (b) accountable for any profit made by the Bank (or where appropriate, the Nominee as its agent) and/or any Affiliate.

59.10 **Remainder:** In the event of any sale or disposal of charged Securities, if less than all of the charged Securities are to be sold or disposed of, the Bank (or, where appropriate, the Nominee) may in the Bank's absolute discretion select which of the charged Securities are to be sold or disposed of.

60. **Events of Default:** An "**Event of Default**" shall be deemed to occur if any event of default as described in these Terms and Conditions or in any document forming part of the Client Agreement has occurred:-

60.1 the Client or any Security Party defaults or fails to pay any Indebtedness, including the failure to pay the purchase price of any Transaction, when due or perform any obligations of the Client (or any Client company) under the Client Agreement or any other contract or Transaction between the Client and the Bank or any Bank Affiliate or with a third party entered into by the Bank on behalf of the Client, on the due date for payment or performance;

60.2 any representation, warranty or undertaking made, or repeated, or deemed to have been made or repeated, by the Client or any Security Party to the Bank or Bank Affiliate in or in connection with the Client Agreement shall prove to have been false, incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

60.3 the Client or any Security Party dies or in the reasonable judgment of the Bank becomes of unsound mind or incapable of managing his affairs or a protection order is made against the Client or Security Party;

60.4 a bankruptcy, winding-up, judicial management, including the appointment of a receiver, administrator or other creditors' representative is appointed, or similar action is presented by or against the Client or Security Party, or if the Client or Security Party otherwise becomes (voluntarily or involuntarily) subject to any equivalent procedures under any relevant bankruptcy, liquidation, reorganisation or similar law, or admits in writing inability to pay their respective debts and they become due; and in the case where two or more persons constitute the Client, the foregoing shall apply to any one of them;

60.5 the Client or any Security Party makes any assignment, arrangement or composition with its creditors generally, or if a receiver, administrator, liquidator, trustee-in-bankruptcy, custodian, or similar official is appointed in respect of some or all of the Client's and/or Security Party's assets;

60.6 if an order of attachment, sequestration, distress, execution or other legal process is levied, enforced or instituted against any property of the Client or any Security Party;

60.7 any Indebtedness, financial liability of, or monies borrowed by, the Client or any Security Party becomes due or capable of being declared due and payable before its stated maturity by reason of any event of default; or the Client or Security Party fails to make payment in respect of any indebtedness for borrowed money or other financial liability on maturity or early redemption; or any security given by the Client or any Security Party for any indebtedness for borrowed money or other financial liability becomes enforceable; or any guarantee, indemnity or similar obligation provided by the Client or Security Party is not discharged at maturity or when called upon;

60.8 the Client or any Security Party consolidates, amalgamates with or merges with, or transfers all or substantially all of its assets to, another entity;

60.9 fails to assume all the obligations of the Client or any Security Party under the Client Agreement to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the Bank;

60.10 the benefits of any Credit Documentation fail to extend to the performance by such resulting, surviving or transferee entity of its obligations under the Client Agreement;

60.11 the creditworthiness of the resulting, surviving or transferee entity is, in the opinion of the Bank, materially weaker than the credit-worthiness of the Client or any Security Party immediately prior to that action;

60.12 the Bank determines, in its sole and absolute discretion, that the creditworthiness of the Client or any Security Party has become materially weaker as a result of the Client or Security Party transferring, or being required to transfer, a substantial part of its assets or estate to a third party in return for less consideration than the assets transferred;

60.13 the Bank, in its absolute discretion, is of the view that there is an adverse change in the financial or economic position of the Client or there is a criminal investigation or inquiry into the Client or its business;

60.14 any provision or security granted hereunder or under the Client Agreement becomes for any reason invalid or unenforceable, or in the opinion of the Bank materially compromised;

60.15 it becomes illegal or impossible for the Bank or the Client to make or maintain any of its obligations under these Terms and Conditions or any contract, or the Bank or the Client is prohibited or restricted by any relevant supervisory or regulatory authority, or any order or decree made by a court of competent jurisdiction, from making or maintaining any of its obligations under these Terms and Conditions or any contract;

60.16 the Client or any Security Party fails to maintain the minimum security cover or Margin required by the Bank, or exceeds the maximum utilisation limit or credit limits imposed by the Bank;

60.17 the expiration, failure or termination of any provision of any Credit Documentation prior to the satisfaction of all obligations of the Client and/or any Security Party to which such Credit Documentation relates;

60.18 in the opinion of the Bank, the Client has breached any term of the Terms and Conditions;

60.19 the Client or any Security Party repudiates or rejects, in whole or in part, any Credit Documentation;

60.20 any consent, authorisation (including any board resolution) or licence required by the Client to agree to the Terms and Conditions or to perform its obligations hereunder is wholly or partly revoked, suspended, terminated or ceases to remain in full force and effect;

60.21 if, due to the change or interpretation of any Applicable Law, it becomes unlawful for the Client or any Security Party to perform any obligation (absolute or contingent), to make or receive payment or delivery pursuant to any Transaction or Investment, or to comply with any material provision of the Client Agreement relating to any Transaction and/or Investment;

60.22 the Bank or Affiliate, in its absolute discretion, is of the view that circumstances have arisen, and/or are continuing, which place the Bank and/or the Bank's position in respect of the Accounts, Facilities, Transactions and/or Investments and/or Services in jeopardy; or at any time the Bank in good faith, and its absolute discretion, considers that the continued existence and operation of any Accounts and Services under the Client Agreement would not be consistent with prudent banking practice; or

60.23 if the Client or a Security Party purports to charge, assign or otherwise deal with or grant or suffer to arise any third party rights over the whole or any part of any security arising under the Terms and Conditions or attempts to do so without the prior consent of the Bank, or any third party asserts a claim in respect of the whole or any part of any such security.

61. **Remedies upon Event of Default:** Upon the occurrence of an Event of Default, the Bank will be entitled to exercise any or all of the following remedies without further notice to the Client and without providing any reasons for its actions to the Client:

61.1 demand payment of all amounts owing by the Client to the Bank under any Transactions and upon demand such amounts will become immediately payable and interest will accrue, at the rate prescribed by the Bank from time to time, on the amounts outstanding from time to time;

61.2 debit any Account of the Client with the Bank or any of its related corporations with the amount of any amount due by the Client to the Bank;

61.3 suspend (indefinitely or otherwise) or close all or any Accounts;

61.4 combine and/or consolidate all or any of the Client's Accounts maintained with the Bank or Bank Affiliates and/or open any new account in the Client's name with the Bank, Bank Affiliate or any third party, including any Standard Chartered Group Member, and allocate and hold in such new account some or all of Client Property held by the Bank, Bank Affiliate as continuing security for any Losses (actual or contingent) until such time as the Bank in its absolute discretion may determine that all or some of the Client Property is applied in settlement of such Losses or the Bank determines all or some of the Client Property is no longer required as continuing security;

61.5 the Bank may set-off (any amount owing by the Client against any amount due to the Client by the Bank or any of its related corporations on any Account), sell (by way of private or public sale), realise, assign, transfer or otherwise dispose of, or exercise any other rights the Bank, Bank Affiliate may have in respect of any Client Property or any security held by the Bank, Bank Affiliate and apply the net proceeds in or towards the satisfaction of the Client's Indebtedness with the Bank or Bank Affiliate in such manner as the Bank may determine in its sole discretion without any judicial, arbitral or similar proceedings whatsoever;

61.5.1 after any amounts standing to the credit of the Client are applied against any amounts which the Client owes to the Bank or generally after the exercise of the Bank's right of set-off against the Client, the Bank may demand any shortfall from the Client and the Bank may hold any excess pending full settlement of any other obligations of the Client, or pay any excess to the Client by way of Cheques to the last known address of the Client;

61.6 cancel, close out, settle, redeem or stop payment or delivery under any open or unperformed Orders or contracts for any Transactions between the Client and the Bank, Bank Affiliate or with any third party entered into by the Bank, Bank Affiliate on the Client's behalf (whether or not any such obligation has matured prior to the occurrence of the Event of Default);

61.7 debit any Account of the Client with the Bank or any of its related corporations with the amount of any amount due or to be indemnified by the Client to the Bank;

61.8 purchase any Securities, and other Investments or other assets to cover any liability of the Client to deliver such instrument, sell or otherwise dispose of any Securities, and other Investments or other assets held for the Client's Account to cover any liability of the Client to make a payment and debit any Account of the Client with the Bank, Bank Affiliate or accounts any of the Client's related corporations with any Loss the Bank suffers;

61.8.1 liquidate the Margin or part thereof at a price which the Bank deems appropriate in the circumstances; or

61.9 terminate the agreement constituted by the Terms and Conditions and any Accounts, without prejudice to the accrued rights of the Bank.

62. **Further performance:** Upon the occurrence of an Event of Default, the further performance by the Bank of any of its outstanding obligations to the Client under the Terms and Conditions (whether for the payment of money or otherwise) will be conditional upon the Client having fully discharged all its obligations to the Bank under the Client Agreement;

62.1 the Bank shall not be liable to the Client for any Loss suffered as a result of or connected with any act or omission on the part of the Brokers, Nominees, custodians or any other securities depositary, including, without prejudice to the generality of the foregoing, any incorrect or incomplete information or advice supplied or published by the Brokers, or the Nominees, any other securities depositary to the Bank and subsequently communicated to the Client.

63. **Liability for Loss:** The Bank will not be liable to the Client for any Loss suffered or incurred by the Client as a result of, or in connection with, any exercise by the Bank of its rights or remedies on the occurrence of an Event of Default (including without limitation, any Loss suffered or incurred by reason of the close out or the cancellation or the failure to close out or cancel  any Order or contract, including any standing order), except where such Loss is caused directly by the Bank's gross negligence or wilful default. The Client undertakes to indemnify the Bank for any Loss, cost, claim, liability or expense arising out of or connected with any breach by the Client of its obligations under these Terms and Conditions or any Event of Default, including any cost reasonably incurred by the Bank collecting any debts due to the Bank or in connection with the closure of any Account of the Client with the Bank except where any such Loss, cost, claim, liability or expense is caused directly by the Bank's gross negligence or wilful default.

64. **Reasonable Judgment:** Any determination of whether an Event of Default has occurred shall be made by using reasonable judgment. The Client undertakes to notify the Bank immediately in writing of the occurrence of any such event which shall constitute an Event of Default (although any failure to so notify the Bank will not prevent an Event of Default from having occurred).

65. **Further Assurance and Appointment of Agent:** The Client hereby undertakes to the Bank and its Bank Affiliates, Nominees, Brokers, custodians, agents and authorised officers to do and/or execute any act, deed, document or thing which the Bank shall require the Client to do in connection with the implementation, execution and enforcement of the agreement constituted by these Terms and Conditions, including without limitation the rights of set-off and lien and any security and charges granted by the Client or such person in favour of the Bank and the perfection of the Bank's security interest constituted under the Terms and Conditions. The Client hereby appoints the Bank and its Bank Affiliates, Nominees, Brokers, custodians, agents and authorised officers severally as its agent and lawful attorney (or, where the Client consists of more than one person, the lawful attorney of each such person) to do or execute all such acts, deeds, documents or things on behalf of the Client as the Bank considers necessary or desirable in connection with such implementation, execution and enforcement and perfection. The Client shall not (other than for the purpose specified in and in accordance with the Terms and Conditions) appoint any of the Bank's employees or representatives to act as its agent or legal attorney, and none of the Bank's employees or representatives shall accept such appointment.

66. **Discretion to Act:** Where the Bank is entitled to exercise any power of sale under any Credit Documents in respect of any security or is otherwise entitled to liquidate any Investments held in the Accounts or otherwise, the Bank shall be entitled to liquidate and sell such security or Investment in such manner, at such time, to such party, at such market and for such prices as the Bank shall, in the Bank's absolute discretion, decide and the Bank owes no duty of care to the Client to ensure that the securities or Investments are sold for the best or highest possible price and the Client hereby expressly waives any and all rights that the Client has or may have to dispute the prices that the Bank may obtain upon such sale or liquidation. In addition, the Bank shall not be held liable in the event that the Bank does not exercise the Bank's rights to realise, sell or dispose off the securities or Investments or exercise the Bank's power of sale at a time later than it could have done. The Client hereby agrees that no action whatsoever shall lie against the Bank in respect of the Bank exercising its power of sale pursuant to this paragraph and any duties imposed by any written or common law on the Bank in relation to such power of sale shall hereby be excluded.

67. **Amendment, Suspension and Termination**

67.1 **Force Majeure:** To the extent that it is prevented or restricted by a Force Majeure Event from operating any Account, executing any Transactions and Investments, provide Services, carrying out any request or Instruction from the Client or otherwise complying with any of its obligations under these Terms and Conditions, the Bank may suspend the operation of that Account, postpone the carrying out of any such request or Instruction or suspend any such obligation until the contingency is removed. The Bank will, it if is practicable to do so, take reasonable steps to remove or mitigate the effect of any Force Majeure event.

67.2 **Price Disruption Event:** If there occurs in relation to any Transaction or otherwise in relation to an Investment Advisory Account or any other Account a Force Majeure Event or a Price Disruption Event, the Bank will have the sole discretion to determine any adjustments or action necessary in relation to such Transaction or any or all Transactions or otherwise to an Investment Advisory Account or any other Account in view of the Force Majeure Event (as the case may be) and/or a Price Disruption Event. Such adjustments or actions may include determining, altering or varying the quantities of currencies or the exchange rates or specifications of currencies, Securities or commodities or instruments bought or sold in respect of such Transaction or some or all Transactions, or terminating the Transaction in question or some or all Transactions, or an Investment Advisory Account or any other Account or otherwise. Provided the Bank undertakes such action in good faith, any such adjustment or action will be binding on the Client who will be liable for any additional Loss incurred by the Bank on the account of the Client or for which the Client is consequently liable as a result of such adjustment or action.

67.3 **Suspension and Termination:** The Bank may at any time without prior notice suspend or terminate one or more of the Accounts or Services provided hereunder or contained in the Client Agreement in accordance with any right given to the Bank under the Terms and Conditions. The Bank will Notify the Client as soon as practicable of any such suspension or termination (excluding any temporary suspension) by giving reasonable notice (except under circumstances when suspension or termination may be made without notice, including an Event of Default), but without prejudice to any right which the Bank or the Client may have against the other prior to such termination or in respect of any open positions in respect of any Securities, and other Investments, and the provisions contained in the Client Agreement shall continue to apply to any transaction entered into prior to the date of the termination. Upon closure of an Account, the Bank will discharge its liability to the Client by paying the Client an amount equal to the credit balance (if any) on that Account after deducting any sums due from the Client. In the event that payments are effected after closure of the Account for whatever reason, all sums so paid by the Bank will be a debt due and owing from the Client to the Bank and will be immediately repayable forthwith. The Bank will not be liable to the Client or any other person for Loss suffered or incurred by the Client or such other person as a result of the Bank suspending or closing any Account, except where such Loss is caused directly by the Bank's gross negligence or wilful default. The Bank shall not be obliged to give any reason for the termination or closure of any Account.

    67.3.1 **Termination:** The agreement set out in these Terms and Conditions may be terminated at the Bank's sole discretion at any time by the Bank and may be cancelled by the Client giving to the Bank not less than fourteen (14) days notice in writing. Any such termination shall not affect any right or liability in respect of Services provided by the Bank, Transactions already affected by the Bank or any Instruction given by the Client under these Terms and Conditions. These Terms and Conditions will continue to apply until all Services, Accounts and Transactions have been closed or completed and the outstanding amounts and Liabilities have been paid in full.

    67.3.2 **Affected Persons:** Where the Client consists of more than one person, and an Event of Default occurs in respect of one of those persons (the "**Affected Person**"), from the time of the occurrence of such event the Client shall consist of the other persons previously constituting the Client prior to such event. The Affected Person shall remain liable as part of the Client under these Terms and Conditions in respect of Liabilities incurred up to the occurrence of the relevant event.

    67.3.3 **Closure:** The Bank may in its absolute discretion close any Account if there is a zero balance on the Client Account for such period as the Bank may determine from time to time.

67.4 **Discharge of Liabilities:** Any settlement or discharge between the Bank and the Client will be conditional upon no security provided to, or payment to, the Bank being avoided or reduced or required to be paid away by virtue of any requirement (whether or not having the force of law) or enactment, whether relating to bankruptcy, insolvency, liquidation, judicial management or administration or otherwise, at any time in force or by virtue of any

obligation to give any preference or priority and in any such event the Bank will be entitled to recover the value or amount of any security or payment from the Client as if such settlement or discharge had not occurred.

67.5 **Survival of Terms and Conditions:** Upon termination or closure of all Accounts, all provisions relating to the limitations or exclusion of liability of the Bank, indemnities provided by the Client, disclosure of information, payments after termination or closure of Accounts, lien and set-off shall survive the termination of these Terms and Conditions.

67.6 **Effect of Closure or Termination:** Any Account closure or the termination of these Terms and Conditions will not affect any rights or obligations of the Parties which may have accrued on or before the date of closure or termination (as the case may be).

67.7 **Return of Bank Property:** All Cheque books, ATM cards and other materials provided by the Bank to the Client in relation to the Accounts remain the property of the Bank at all times and must be returned to the Bank on demand and upon any Account closure or the termination of these Terms and Conditions.

67.8 **Payment Made after Closure:** If the Bank acts on any Withdrawal from an Account after it has been closed any sum so paid by the Bank will constitute a debt due by the Client to the Bank payable on demand.

67.9 **Unclaimed Credit Balances:** No interest will accrue on any unclaimed credit balance on an Account which has been closed, suspended or designated as dormant by the Bank in accordance with its normal practice.

67.10 **Conversion of Account:** The Bank may at any time without notice convert one type of Account into another type of Account.

67.11 **Consolidation of Trading Positions:** Without prejudice to any other rights which the Bank may have under the Client Agreement, should an Event of Default occur, the Bank may (but will not be obliged to) consolidate all or part of the outstanding Transactions and contracts of whatever nature with respect to Transactions and Investments (including Transactions and contracts in different products, Exchanges and maturities) and all such Transactions and contracts and all profits and losses arising in respect thereof shall be converted into a single Currency at the Bank's prevailing exchange rates and be deemed to constitute a single consolidated transaction and shall be accounted for accordingly.

67.12 **Remedies and Waiver:** The Bank is entitled to waive compliance with any of the applicable Terms and Conditions but such waiver shall not prejudice the Bank's right to enforce compliance with the applicable Terms and Conditions on any other occasion. No failure or delay by the Bank in exercising any right, power or remedy (including any power of sale) (collectively "**Rights**") under the Client Agreement will operate as a waiver, nor will any single or partial exercise of any Rights prevent, prejudice or limit the exercise of any Rights or the exercise of any other Rights, nor will such delay, indulgence or concession granted by the Bank render the Bank responsible for any Loss or damage arising therefrom. The Rights provided in these Terms and Conditions are cumulative and not exclusive of any Rights provided by law.

67.13 **Additional terms:** These Terms and Conditions shall be read together with the relevant country supplements and additional terms and conditions governing any Facilities, Transactions, Investments and Services utilised by the Client from time to time and to which the Client is bound.

67.14 **Amendments and Waiver:** Except as otherwise expressly provided in any applicable Terms and Conditions that a term or condition may only be amended in writing by the Parties or waived in writing by the relevant Party, any or all terms or conditions may be amended or waived by the Bank's Notification to the Client.

68. **Waiver of Immunity:** The Client waives generally all immunity (whether on the basis of sovereignty or otherwise) it or its assets or revenues may otherwise have now or in the future in any Jurisdiction or other country or territory.

69. **Laws and Regulations:** The Bank's obligations under the Terms and Conditions will be subject at all times to all laws, rules and regulations and all codes, guidelines, judgements, orders and directives (whether or not having the force of law) issued by any regulatory, authority, governmental agency, court, clearing agency, Exchange or similar legal or regulatory or quasi-legal and quasi-regulatory authority having the force of law, whether in the Jurisdiction or elsewhere (collectively, "**Regulations**"), which are applicable to the Bank from time to time. The Client represents and warrants that it is aware of, and undertakes to comply with the requirements of, all Regulations (including laws where the Client is a citizen, incorporated, domiciled, tax resident, or principally doing business) that apply to the Client. The Client agrees that the Bank will have no obligation to inform the Client of any such Regulations and that it is the Client's responsibility to comply and observe all such Regulations. The Bank is entitled to take any action or refrain from taking any action (including the disclosure of any information relating to the Client or the Client's Transactions and/or Investments) which it considers appropriate for the purpose of complying with any applicable Regulations, and neither the Bank nor any of its respective officers, directors or employees will be liable as a result of taking or refraining from taking any such action.

69.1 **Transactions:** All Transactions entered into by the Bank with or on behalf of the Client will be subject to Applicable Laws and Regulations, including those relating to position limits and other limits. The Client hereby undertakes to observe these limits. The contract specifications published by the Exchange where the Transactions are executed are also binding on the Client.

69.2 **Different Laws:** The Bank may undertake Transactions through or introduce the Client to intermediate brokers, settlement agents and other third parties outside the applicable Jurisdiction and the Client may also deal with Affiliates of the Bank outside applicable Jurisdiction and, in such cases, the Transactions or Services undertaken may not be covered by laws from the applicable Jurisdiction in and the Client may not be protected as effectively as a result. In the event of a shortfall arising on the money available to meet the claims of such intermediate brokers, settlement agents and other third parties outside the applicable Jurisdiction, the Client's claim will be restricted to the money held by the Bank in respect of Transactions carried out through the broker or settlement agent, and to any money received from the broker relating to those Transactions and/or Investments.

69.3 **Illegality:** Nothing in these Terms and Conditions shall oblige the Bank to do or omit to do anything if it would or might in the Bank's reasonable opinion constitute a breach of any Applicable Law, regulation, order or sanction of any regulatory, supervisory, governmental or quasi-governmental authority. In the event that it will appear to the Bank that it has or will become unlawful or otherwise prohibited for the Bank to maintain or give effect to any of its obligations herein in any jurisdiction as a result of any Applicable Law or regulation or regulatory requirement (whether or not having the force of law) or any change therein or judicial decision thereto or the interpretation or administration or application thereof, to the extent permitted under Applicable Law, the Bank will Notify the Client to that effect. The Client will upon receipt of such Notification repay the whole of all monies owing by the Client to the Bank.

70. **Business Day Convention:** The Bank is not obliged to operate any Account, act on any Instruction, place or execute Transactions and Investments, or perform any Service on a day which is not a Business Day. If any of the foregoing is due to be carried out on a day which is not a Business Day, it will be carried out on the next Business Day.

71. **Independent Advice:** The Bank is entitled to assume, and to rely on such assumption, that the Client has obtained independent legal, tax, financial and other advice in relation to any Account, Transaction, Investment or Service and the Bank does not owe any fiduciary or similar duties to the Client.

71.1 **Monitoring Transactions:** The Bank is not under any responsibility, duty or obligation to supervise or monitor the Transactions or Assets, or to make or give any recommendations, information, advice or opinion to the Client with respect to the sale or other disposition of any of the Transactions or Assets, or to advise or recommend the purchase of any Assets at any time and even if the Bank were to give (or fail to give) any advice or make any recommendation, the Client is advised to seek other professional advice and make the Client's own independent decision and the Bank shall not be liable for the accuracy or completeness of such advice or recommendation given or failed to be given.

72. **No Requirement to Give Reasons:** In exercising any right or discretion under these Terms and Conditions, the Bank is not obliged to provide the Client with reasons for its decision.

73. **Third Party Rights:** Unless expressly provided to the contrary in these Terms and Conditions, a person who is not a Party has no right under any applicable third party contract rights legislation or law to enforce or to enjoy the benefit of these Terms and Conditions and the consent of any person who is not a Party is not required to rescind or vary any Term and Condition at any time.

74. **Representation by Financial Institution:** Where the Client is a financial institution acting on behalf of a third party (whether as agent or intermediary or otherwise), the Client represents to the Bank that: (a) it has performed all requisite "know your customer" and other anti-money laundering due diligence on such third party (including verification of such third party's identity and source of funds and the nature of such third party's transactions) in accordance with its own internal policies and all Applicable Laws and regulations, and is satisfied with the results of such due diligence; (b) it will continue to perform ongoing due diligence on such third party to ensure that such "know your customer" data remains up to date; and (c) it has the appropriate processes in place to detect and report any suspicious activity involving such third party.

75. **Compliance Undertaking:**

75.1 **Compliance:** The Client will comply with:

75.1.1  the Client Agreement;

75.1.2  any instructions or requests issued by the Bank from time to time in relation to any operational or technical matters or generally in relation to any Accounts, Facilities, Transactions, Investments or Services (including any relevant security measures and "know your customer" procedures implemented by the Bank); and

75.1.3  all laws and regulations of any jurisdiction which apply to any Accounts, Facilities, Transactions, Investments and/or the Client's use of any Service.

75.2 **Instructions:** The Client shall not instruct the Bank to do anything which is a breach of or would involve or result in the Bank, any Bank Affiliate, the Broker, the Nominees or custodian or any other person being in breach of any laws, rules or regulations in force or applicable to the conduct of the business of dealing in securities or other Investments in any applicable Jurisdiction or elsewhere or otherwise binding on the Bank, any Bank Affiliate, the Brokers or the Nominees or custodian (whether or not having the force of law).

75.3 **Market Misconduct:** The Client undertakes to the Bank that the Client will not engage or attempt to engage, and that the Client has proper safeguards in place to prevent the Client from engaging, in any activity which may constitute market misconduct under Applicable Laws and regulations and further agrees to inform the Bank immediately if the Client becomes aware of any activity by any person that may result in the Client being involved in market misconduct.

76. **Assignment, Transfer and Security**

76.1 **Assignment by the Bank:** The Bank may assign any or all of its rights under these Terms and Conditions or in relation to any Account, Facility, Transaction, Investment or Service to any person at any time, without the prior written consent of the Client and without any obligation on the part of the Bank or any assignee to give prior or subsequent notice of any such assignment to the Client.

76.2 **Transfer of Rights and Obligations by the Bank:** The Bank may transfer or novate any or all its rights and/or obligations under these Terms and Conditions or in relation to any Account, Facility, Transaction, Investment or Service to any person at any time, without the prior written consent of the Client. The Client will promptly upon request execute such transfer or novation documentation as the Bank may reasonably require.

76.3 **Assignment and Transfer by the Client:** The Client is not entitled to assign any of its rights or transfer or novate any of its rights or obligations under these Terms and Conditions or in relation to any Account, Facility, Transaction, Investment or Service.

76.4 **No Security:** The Client will not, without the prior consent in writing of the Bank, dispose of, assign, charge, pledge, transfer or create any encumbrance or trust  except in favour of the Bank or Bank Affiliate in respect of any Account or any deposits therein or the Client's rights or obligations under the Terms and Conditions or in respect of any Transaction and/or Investment, Facility or Service, whether by way of sale, security or otherwise, except in favour of the Bank or Bank Affiliate as security for any obligations or liability the Client may owe to the Bank.

77. **Successors and Assigns:** The Terms and Conditions will be binding and enure to the benefit of the Bank and the Client and their respective successors-in-title and permitted assigns, and will continue to be binding on the Client notwithstanding: (a) any change in name or constitution of the Bank; or (b) any

consolidation or amalgamation of the Bank into or with any other entity. In the event of such consolidation or amalgamation, such entity will be substituted for the Bank in relation to the Terms and Conditions and all Accounts, Facilities, and/or Service made available by the Bank to the Client, and the Terms and Conditions will continue in full force and effect as between the Client and such entity.

78.    **Partial Invalidity:** If, at any time, any Term is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining Terms and Conditions nor the legality, validity or enforceability of such Terms and Conditions under the law of any other jurisdiction will in any way be affected or impaired.

78.1    **Fairness:** If any provision in the General Terms and Conditions is held by any court or other competent authority to be unfair or otherwise invalid or unenforceable in whole or in part the unfair, invalid or unenforceable provision shall be deemed amended so far as is reasonably necessary to become fair, valid and enforceable and the validity and enforceability of the other provisions of the General Terms and Conditions and the remainder of such provision shall not be affected.

78.2    **Enforceability:** If one of the terms of the Terms and Conditions is unenforceable against one of the clients signing this Client Agreement, this will not in any way affect the enforceability of that term against any other signatories.

79.    **Fiduciary Investment:**

79.1    The Client hereby expressly authorises the Bank to invest such cash balances as may be specified from time to time by the Client (the "Cash Balances") in time deposits or other investments for a term not exceeding 12 months ("Investments") with banks or other financial institutions in any part of the world, including but not limited to other branches of the Bank, any Affiliate of the Bank and Standard Chartered Group Member (the "Institutions"), in the name of the Bank but for the account and at the exclusive risk of the Client.

79.2    Subject to the terms herein, the Bank shall determine at its sole discretion the Institutions with which Investments shall be effected and the terms of such Investments and the operational procedures pertaining thereto, provided always that such Institutions shall be selected in accordance with the Bank's internal policy as to creditworthiness and reputations. However, the Client shall instruct the Bank as to the amount and tenor of each Investment prior to it being effected. If the Bank has not received specific instructions from the Client in respect of any Investment at least five (5) Business Days prior to its maturity, the Bank may decide, at its sole discretion, whether and under what conditions the Investment will be renewed for a term not exceeding that of the Investment about to mature, or if the monies shall be retained in an account at the Bank.

79.3    It is agreed that in performing its tasks hereunder the Bank acts on behalf of the Client only in an agency capacity. Its duties shall be confined only to effecting Investments in accordance with the provisions herein and to crediting principal and interest actually received by it in respect of Investments to the Client's Account(s). All risk in connection with any Investment shall be borne solely by the Client. It is acknowledged by the Client that each Investment shall be subject to all laws and regulations applicable thereto, including, but not limited to, those in force in the place where any Investment is effected and those relating and applicable to any Institutions with which such Investment is effected.

79.4    The Bank shall not be obliged to take any measures to enforce the payment of interest or the repayment of any Investment or to contest, in any way, any imposition of taxes, fees or costs or to oppose seizure, attachment or other restrictions imposed in connection with any Investment by courts or public authorities. In any such case the Bank's sole obligation shall be to assign to the Client the rights and claims and any security relating to such Investment.

79.5    The Bank shall issue a confirmation of the placement of each Investment made to the Client and such confirmation shall appear as a separate item on the Client's statement issued by the Bank.

79.6    The Client undertakes promptly to complete and return to the Bank any notice, declaration, statement or other document requested by any Institution in respect of an Investment, whether relating to taxation payable on the Investment or otherwise. It is agreed by the Client that the Bank shall have no liability whatsoever for any deduction or retention made in respect of any Investment or interest thereon on any other loss or liability incurred by any person as the result of failure to provide such a notice, declaration, statement or other document.

79.7    The Bank shall be entitled to charge the Client a fiduciary commission equal to:-

    (i)    such percentage as may be notified in writing by the Bank to the Client from time to time of the principal amount of each Investment placed with an Institution, such amount to be paid to the Bank in advance; and/or

    (ii)    all amounts deriving from or accruing on each Investment (whether representing interest on an Investment, fee or other benefits whatsoever and whether payable by an Institution or otherwise) which are in excess of the aggregate amount of interest which the Bank shall have been instructed or deemed to have been instructed to obtain by the Client or otherwise agreed between the Client and the Bank. The Bank shall be deemed to have fully disclosed and shall not be obliged to account to the Client in respect of any amount other than the aggregate amount of interest which the Bank shall have been instructed or be deemed to have been instructed to obtain by the Client or otherwise agreed between the Client and Bank. The Client authorises the Bank to receive, enforce and retain any amounts which the Bank is entitled to received hereunder from an Institution or any other person whatsoever.

79.8    The Client or the Bank may terminate these arrangements at any time by giving written notice to the other but such termination shall not affect any Investment then existing which shall continue to be subject to the terms and conditions of its placement and the provisions herein until maturity. Upon termination the Bank may discharge its obligations by crediting to account(s) of the Client all sums received by the Bank as interest on or repayment of Investments or, if so directed by and at the expense of the Client, assigning to the Client all the Bank's rights and interest in respect of any Investment, subject to all Liabilities having first been discharged.

80.    **Applicable Law and Jurisdiction**

80.1    **Governing Law and Jurisdiction:** Subject to specific provisions to the contrary, the Client Agreement shall be governed by and construed in accordance with the laws of the place in which the Accounts are held, or the Facilities and Services are extended by the Bank (the "**Jurisdiction**"), or country where the Client has Assets now or in the future. Any legal action or proceedings in connection with the Client Agreement, or any dispute arising thereunder may be brought in the courts of the Jurisdiction and the Client irrevocably submits to the non-exclusive jurisdiction of such courts, and waives any objections on the grounds of venue, forum non conveniens or similar grounds.

80.2 **Non-Exclusive Jurisdiction:** The submission by the Client to the applicable Jurisdiction shall not affect the Bank's rights to bring any action or proceedings against the Client in any other jurisdiction. To the extent allowed by law, the Bank may take concurrent proceedings in any number of jurisdictions.

80.3 **Service of Process:** Notwithstanding any other provision relating to the provision of Notice, the Client irrevocably consents to the service of process, including any writ, judgment or other notice from any applicable jurisdiction's courts in any proceedings by the mailing of copies thereof by registered or certified prepaid airmail post to the Client at the Client's last known address in the Bank's records, such service to become effective seven (7) days after such mailing.

80.3.1 **Reservation of Rights:** Notwithstanding the foregoing, the Bank reserves the right to serve process in any other manner permitted by law. Where a person (if any) is identified in an Account Opening Form as the "Process Agent" and without prejudice to any other mode of service allowed under any relevant law, the Client irrevocably appoints the Process Agent as its agent for service of process in relation to any proceedings before the courts of the applicable Jurisdiction in connection with any dispute arising hereunder.

80.4 **Arbitration:** The Client hereby acknowledges that if any dispute or difference of any kind whatsoever shall arise between the Client and the Bank in connection with or arising out of the Terms and Conditions, then the Bank may refer such dispute or difference to arbitration.

## 81. Conflicts between Terms and Conditions:

81.1 **Inconsistencies:**

81.1.1 If there is an inconsistency between the General Terms and Conditions and those in an Account Documentation, the General Terms and Conditions will prevail to the extent of the inconsistency.

81.1.2 If there is an inconsistency between the General Terms and Conditions and the Country Supplement, the Country Supplement will prevail to the extent of the inconsistency.

81.1.3 If there is an inconsistency between Country Supplements, the Country Supplement which applies to the Bank's booking centre for the relevant Transaction will prevail to the extent of the inconsistency.

81.1.4 If there is any inconsistency between the English version of these Terms and Conditions and a translation of such version, the English version of these Terms and Conditions will prevail to the extent of the inconsistency.

81.1.5 If there is any inconsistency between any Confirmation or term sheet and the General Terms and Conditions and Country Supplement and the Terms and Conditions in Section II, III, IV and V, the Confirmation will prevail to the extent of the inconsistency.

81.1.6 If there is inconsistency between the General Terms and Conditions and the Terms and Conditions for retail banking products and services (for example, current and savings accounts, credit cards, debit cards, internet banking, telephone banking and related services), the General Terms and Conditions prevail to the extent of the inconsistency.

## General Definitions and Construction

**Definitions and Construction**

**1.1**   Unless the context requires otherwise, the following terms and expressions shall have the meanings set out below:

**"Acceptable Currency"** means, subject to availability, one of the acceptable currencies listed and set out in the relevant Facility Letter (as the same may be amended or varied by the Bank from time to time).

**"Account"** means any account in any Currency (including without limitation, any Eligible Account(s), credit linked account, currency linked account, currency linked investment account, equity linked account, rate linked structured deposits account, investment advisory account, foreign currency account, swap deposit account, settlement account, securities services account, debt securities account, current account, Cheque account, investment fund account, savings account, time deposit account, loan account, margin account, custodian or trading account and any sub-account or any other account of any description as may be opened and maintained by the Client for the purpose of present and/or future utilisation of the Service(s)) opened and maintained in the name or on behalf of the Client by the Bank at the Bank or any of the Bank's Affiliates of the Bank identified in the relevant Account Opening Application.

**"Account Currency"** means, in relation to an Account, the Currency in which that Account is denominated.

**"Account Opening Application"** means the Account Opening Form for the Bank.

**"Account Opening Form"** means, in relation to an Account or Accounts, an account opening form signed by the Client in a form specified by the Bank from time to time.

**"Account Documentation"** means the Account Opening Application, relevant Account Opening Forms, Risk Disclosure Statement, and the General Terms Conditions and applicable Country Supplement(s) incorporated by reference therein.

**"Additional Disruption Event"** means any of the following events: Change in Law, Insolvency Filing, Hedging Disruption, Increased Cost of Hedging and any other Additional Disruption Event specified as such in the relevant Equity Linked Account Confirmation.

**"Affected Instruction"** means an Instruction which the Bank determines, or believes in good faith is ambiguous, incomplete, inadequate, inaccurate, inappropriate, conflicting, erroneous, not authentic, unauthorised, is or would be illegal or in violation of any Applicable Law, regulation, order or sanction, or is in a form or containing such content which does not comply with the requirements of the Bank as Notified from time to time.

**"Affiliate"** means any entity (other than the Standard Chartered Bank branch or entity specified in the Account Opening Application) which is any of the offices, branches, affiliates, subsidiary companies, holding or group companies or associated companies of the Bank from time to time and includes their respective successors.

**"American Style Option"** means an option which may be exercised in accordance with this Agreement on any Business Day up to and including the Expiration Day.

**"AOP"** means a unique randomly generated Password known as the Additional Online PIN that is required for certain online services that the Bank may stipulate as a means of identifying the Client when the Client uses the Electronic Banking Service, and which the Bank will transmit using the Client's mobile phone number that has been registered with the Bank or such other means as the Bank may otherwise select or agree.

**"Applicable Laws"** means the applicable laws, statutes, acts, ordinances, rules, Regulations, directives, circulars, decrees, injunctions, writs, orders, licenses and permits (whether of governmental bodies or authorities or self-regulatory organisations in relation to which the Bank or any person within the Standard Chartered Group is a member, or otherwise) as amended, codified or re-enacted from time to time.

**"Approving Signatory"** means the entity authorised to open an account.

**"Assets"** means stocks, shares, Securities, cash, Precious Metals, receivables, currencies, mutual funds, unit trusts, bonds, notes, certificates of deposit, financial and debt instruments, commodities and Derivatives and Investments, financial futures, foreign exchange contracts, options, warrants, swaps and futures contracts and Derivatives and Investments of all kinds and any other assets of the Client, as may be delivered and transferred by the Client to or to the order of the Bank for management or safe custody in accordance with the Bank's General Terms and Conditions.

**"ATM"** means any and all automated teller machines or terminals, called by whatever name, providing any one or more automated banking functions and services accessible to the Authorised Signatory(ies) of the Client through the use of an ATM card issued by the Bank, and includes (without limitation) cash deposit machines, payment kiosks and internet banking terminals.

**"ATM Card"** means a ATM card issued by the Bank for use at the automated teller machines of the Bank or of any other participating institutions, and includes such card as may be re-named or replaced from time to time at the Bank's discretion;

**"Authorised Recipient"** means:

    (a)   any Standard Chartered Group Member;

    (b)   any agent or independent contractor (including vendor, installer, maintainer or service provider of computer systems) of any Standard Chartered Group Member;

    (c)   any actual or potential assignee, novatee, transferee, participant or sub-participant (or any agent, adviser, actual or potential shareholder, bond holder or investor, in or of any of the foregoing) in relation to any of the Bank's rights and/or obligation under these Terms and Conditions or any other agreement;

    (d)   any auditors, legal and/or professional advisers, consultants and service providers to any Standard Chartered Group Member;

    (e)   any rating agency, insurer or insurance broker of, or any direct or indirect provider of credit protection to, any Standard Chartered Group Member;

    (f)   any court or tribunal and any regulatory, supervisory, governmental or quasi-governmental authority which has jurisdiction over any Standard Chartered Group Member;

    (g)   any Client Group Member;

(h) any person who is entitled to demand or request the relevant Standard Chartered Group Member to make disclosure, including banks, financial institutions, credit agencies and any person which any Standard Chartered Group Member considers in good faith is in the interest of the Bank to make such disclosure to;

(i) any other third party provider of services (including any stock exchange, depository, depository agent, clearing system, fund registrar and fund manager, Nominee or custodian, Issuers, managers or underwriters of Securities) selected by the relevant Standard Chartered Group Member;

(j) in the event of default, any debt collection agent appointed by the relevant Standard Chartered Group Member notwithstanding that such information may be transmitted out of the jurisdiction in respect of which it was supplied and the laws concerning confidentiality, banking secrecy and data protection are more or less stringent in the place to which the information is transferred; or

(k) any person to whom the relevant Standard Chartered Group Member is required by law or competent court or tribunal to make disclosure.

**"Authorised Signatory"** means, at any particular time in relation to the Client, a person appointed by the Client under the Account Opening Application or under any power of attorney or other letter, document or instrument to give instructions with respect to the operation of any Account or any Transaction, or to access, operate or utilise any of the Facilities or any other Services, in such form as may be acceptable to the Bank, which has been validly executed by the Client and received by the Bank and in respect of which person the Bank has not received from the Client any written notice of revocation or termination of such person's appointment, powers or authority.

**"Bank"** refers to Standard Chartered Bank, a company incorporated in England and Wales with limited liability by Royal Charter 1853, under reference ZC18 and whose Principal Office is situated in England at 1 Aldermanbury Square, London, EC2V 7SB, and means any of the branches or subsidiaries of the Bank identified in the relevant Account Opening Application.

**"Bankruptcy"** with respect to Structured Investments means a Reference Entity (a) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (b) becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within thirty calendar days of the institution or presentation thereof; (e) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (g) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty calendar days thereafter; (h) causes or is subject to any event with respect to it which, under the Applicable Laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) to (g) (inclusive).

**"Brokers"** means the manager, agent, broker or seller of the relevant Securities and/or Investments.

**"Business Day"** means subject to any Applicable Laws in the Jurisdiction,

(a) for Transactions and Investments –

(i) a day specified as such in the relevant Confirmation or, if no day is specified, a day which the Bank in the applicable Jurisdiction is open for business;

(ii) in relation to any day on which a payment is required, a day on which commercial banks effect payment of the relevant Currency in the place specified in the relevant Confirmation or, if no place is so specified, in the principal financial centre for such Currency;

(iii) in relation to any day on which a delivery is required, a day on which commercial banks are open for business in the place specified in the relevant Confirmation or, if no place is so specified, in the financial markets relevant to the delivery; and

(iv) a day that is a Trading Day in accordance with the conventions of the relevant Exchange; and

(b) for others – subject to any Applicable Laws in the Jurisdiction, any day on which banks in the Jurisdiction, and, if payment in a Currency other than the Currency of the Jurisdiction is involved, in the principal financial centre for that Currency, are open for business.

**"Business Hours"** means such times as prescribed by the Bank from time to time during which on a Business Day and the Bank is open for business;

**"Calculation Agent"** means, where applicable, the Bank or other Standard Chartered Group Member, which expression shall include such other calculation agent as the Calculation Agent may from time to time appoint.

**"Call Option"** means the right but not the obligation (except upon exercise) of the buyer to purchase from the seller at the Exercise Price a specified quantity of the Underlying.

An amount payable on **"Cash Settlement"** shall be computed as follows:

(a) Call Options for Underlyings: The last transacted price (or such other price as may be otherwise agreed by the parties to the Call Options) in respect of the Underlying at the Stock Exchange of Reference at the close of business on the Exercise Day minus the Exercise Price, multiplied by the number of Underlyings for which an option has been exercised; and

(b) Put Options on Underlyings: The Exercise Price minus the last transacted price (or such other price as may be otherwise agreed by the parties to the Put Options) in respect of the Underlying at the Stock Exchange of Reference at the close of business on the Exercise Day, multiplied by the number of Underlyings for which an option has been exercised.

**"Cash Deposit"** means a Deposit made by cash or electronic transfer.

**"Change in Law"** means that, on or after the Start Date of an Equity Linked Account (a) due to the adoption of or any change in any Applicable Law or regulation (including without limitation, any tax law), or (b) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any Applicable Law or regulation (including any action taken by a taxing authority), the Bank determines in good faith that (i) it has become illegal to hold, acquire or dispose of Shares or Hedge Positions relating to such Equity Linked Account, or (ii) it will incur a materially increased cost in performing its obligations under such Equity Linked Account (including without limitation, due to any increase in tax liability, decrease in tax benefit or other adverse effect on its tax position).

**"Cheque"** includes all cheques drawn and processed in the applicable Jurisdiction and all cheques drawn on foreign banks.

**"Clearance System"** means, in respect of a Share, the clearance system specified as such for such Share in the related Equity Linked Account Confirmation or any successor to such clearance system as determined by the Bank. If the related Equity Linked Account Confirmation does not specify a Clearance System, the Clearance System will be the principal domestic clearance system customarily used for settling trades in the relevant Share.

**"Clearance System Business Day"** means, in respect of a Clearance System, any day on which such Clearance System is (or, but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions.

**"Client"** means the person(s) identified in the relevant Account Opening Form(s) and in whose name an Account is opened and maintained with the Bank and where the context so permits, includes the Authorised Signatories.

**"Client Agreement"** means the Bank's terms and conditions as agreed by the Client and signed by the Authorised Signatory(ies) for and on behalf of the Client, including but not limited to the Account Documentation, Credit Documentation, General Terms and Conditions and Terms and Conditions.

**"Client Group Member"** means the Client and any company which is for the time being a subsidiary or holding company of, or affiliated to, the Client.

**"Client Property"** means all property or documents whatsoever, including all Securities and Trading Assets, documents of title (whether to goods or real property), deposits and credits, Precious Metals, cash and other items of value and all rights, title and interest attaching to or accruing to the aforementioned property, now or at any time hereafter received by, deposited with, held by or transferred to the Bank or Standard Chartered Group Member, its Nominees or custodians, by or on behalf of or to the order of the Client (whether as security or under lien or for safe custody, collection, pledge, transmission or any purpose whatsoever), and whether held singly or jointly with others.

**"Client System"** means the equipment and the software contained in it used by the Client to access the Electronic Banking Services.

**"Collection"** means, in relation to any Non-Cash Deposit, the process by which Bank obtains (or attempts to obtain) payment in cleared and unconditional funds from the relevant drawer/payer, and "Collect" has the corresponding meaning.

**"Confirmation"** means the written notice (including a notice given by telex or facsimile and a notice given by electronic means from which it is possible to produce a hard copy), which contains the specific terms of a Transaction entered into between the Parties. All ancillary agreements, if any, referred to in a Confirmation are part of such Confirmation.

**"Countervalue"** means, in relation to a Notional Quantity of a Precious Metal, the amount which the Bank determines, in its absolute discretion, to be the amount in the agreed Reference Currency which would have been required to be paid to purchase that Notional Quantity (in the case of a purchase) of such Precious Metal from the market or the amount which would have been realisable from the market upon the sale of that Notional Quantity (in the case of a sale) of such Precious Metal, in each case net of all expenses of sale.

**"Country Supplement"** means the country supplement(s) applicable to the Jurisdiction(s) set out in Account Opening Application.

**"Credit Documentation"** means the Terms and Conditions for Credit Facilities, any and all documentation for credit facilities provided by the Bank, including the credit application form and the terms and conditions for such credit facilities, and any and all facility letters, loan agreements and security documentation including any and all security, collateral and charge documentation such as any memorandum of charge over assets entered into or to be entered into by the Client and/or Security Party in relation to the Bank's extension of Facilities or Services to the Client.

**"Credit Event"** means one or more of these events: Bankruptcy, Failure to Pay, Obligation Default, Repudiation/ Moratorium, Restructuring, or any other credit event as specified in the applicable Confirmation. If an occurrence would otherwise constitute a Credit Event, such occurrence will constitute a Credit Event whether or not such occurrence arises directly or indirectly from or is subject to a defence based upon: (a) any lack or alleged lack of authority or capacity of a Reference Entity to enter into any Obligation or, as applicable, any Underlying Obligor to enter into any Underlying Obligation, (b) any actual or alleged unenforceability, illegality, impossibility or invalidity with respect to any Obligation or, as applicable, any Underlying Obligation, however described, (c) any Applicable Law, order, regulation, decree or notice, however described, or the promulgation of, or any change in, the interpretation by any court, tribunal, regulatory authority or similar administrative or judicial body with competent or apparent jurisdiction of any Applicable Law, order, regulation, decree or notice, however described, or (d) the imposition of, or any change in, any exchange controls, capital restrictions or any other similar restrictions imposed by any monetary or other authority, however described.

**"Credit Event and Early Maturity Date":** The Confirmation of each Credit Linked Account specifies the applicable Credit Events. If a Credit Event occurs, the Bank is entitled to give a Credit Event Notice to the Client in which case the Credit Linked Account will mature early. Instead of repaying the principal amount, the Bank shall pay the Client an early redemption amount (determined by the Bank in accordance with the terms of the Credit Linked Account to be the prevailing market value of the Reference Obligation) which may be less than the principal amount and may be as low as zero. The early redemption amount will be adjusted to account for any Loss or gain to the Bank of unwinding any hedging position taken by the Bank in respect of the Credit Linked Account.

**"Credit Event Notice"** means a notice from the Bank to the Client that describes in reasonable detail the Credit Event that has occurred and cites public information (if any and where available to the Bank) that reasonably confirms any of the facts relevant to the determination that the Credit Event has occurred. The Credit Event that is the subject of the Credit Event Notice need not be continuing on the date the Credit Event Notice is effective. Such notice may be given by the Bank to the Client in writing by post or orally by telephone. Such notice shall be deemed given by the Bank (if given orally by telephone) at the time the telephone conversation takes place or (if notice is given in writing by post) on the date such notice is posted to the Client's address last known to the Bank.

**"Credit Event Notice Date"** means the date on which a Credit Event Notice is deemed given by the Bank to the Client.

**"Credit Linked Account"** means a type of structured investment where, upon the occurrence of various agreed events (each a "Credit Event"), the amount of principal repayable or the amount of interest payable (or both) is to be calculated in whole or in part by reference to the value of a specified obligation (such as a security or debt instrument) of a specified reference entity. In addition, certain types of Credit Linked Accounts may incorporate an additional component to enhance the interest payable. In such cases, the interest payable may be calculated in whole or in part by reference to changes in interest rate, currency exchange rate, or some other specified rate, price or index.

**"Currency"** means money denominated in the lawful currency of any jurisdiction or the Euro.

**"Currency Business Day"** means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign exchange deposits) in the principal financial centre for the relevant Currency. In respect of an Equity Linked Account in which the relevant settlement Currency is the euro, any day on which the Trans-European Automated Real-time Gross settlement Express Transfer (TARGET) system is open shall be a Currency Business Day.

**"Currency Linked Structured Investments"** means a type of structured deposit or structured investment where the amount of interest payable or the amount of principal repayable or the total return (or any combination) is to be calculated in whole or in part by reference to changes in a currency exchange rate or where the interest or principal or total return (or any combination) on the deposit or investment may be paid or repaid in a different Currency.

**"Custodian Services"** means the custody services described in clause 37 of General Terms and Conditions.

**"Date"** means a date specified in the relevant Confirmation for payment or delivery under a Transaction or Order and shall be determined in accordance with the relevant Business Day.

**"Date of Deposit"** means, in relation to a Deposit, the date on which that Deposit was made or, if that date is not a Business Day, the next Business Day.

**"Date of Collection"** means, in relation to Non-Cash Deposit, the date on which the Bank receives payment in cleared and unconditional funds from the relevant drawer/payer or if that date is not a Business Day, the next following Business Day.

**"Delisting"** means that the Exchange announces that pursuant to the rules of such Exchange, the Shares cease (or will cease) to be listed, traded or publicly quoted on the Exchange for any reason (other than a Merger Event or Tender Offer) and are not immediately re-listed, re-traded or re-quoted on an exchange or quotation system located in the same country as the Exchange (or, where the Exchange is within the European Union, in any member state of the European Union).

**"Deposit"** means any deposit of money made by, on behalf of or for the account of the Client into or in relation to an Account, whether by cash, electronic transfer, Payment Instrument or other means and whether at the counters of the Bank, via any inter-bank electronic payment system, via an ATM or by other means.

**"Deposit Slip"** means any written receipt created at the time of a Cash Deposit and given to the Client by the Bank as a record of that Cash Deposit.

**"Derivatives"** means foreign exchange options, Options, equity options, equity swaps, bond options, credit derivatives, swap transactions and other financial products which have definitions and provisions provided by the International Swaps and Derivatives Association, Inc. ("ISDA").

**"Disrupted Day"** means any Scheduled Trading Day on which a relevant Exchange or any Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred, as determined by the Bank in its sole discretion.

**"Drawing"** means a drawing made or to be made by the Client on the Overdraft Account or, as the case may be, the amount of such drawing for the time being outstanding.

**"Early Closure"** means the closure on any Exchange Business Day of the relevant Exchange(s) or any Related Exchange(s) prior to its Scheduled Closing Time unless such earlier closing time is announced by such Exchange(s) or Related Exchange(s) at least one hour prior to the earlier of (a) the actual closing time for the regular trading session on such Exchange(s) or Related Exchange(s) on such Exchange Business Day and (b) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution on such Exchange Business Day.

**"EC Treaty"** means the Treaty establishing the European Community (signed in Rome on March 25, 1957), as amended by the Treaty on European Union (signed in Maastricht on February 7, 1992) and as amended by the Treaty of Amsterdam (signed in Amsterdam on October 2, 1997), as further amended from time to time.

**"EFTPOS"** means Electronic Funds Transfer at Point of Sale.

**"Electronic Banking Services"** means the services provided by the Bank which enables the Client to obtain information from the Bank and give instructions to the Bank by website, computer, telephone, online banking, e-commerce services, mobile telephone, wireless data networks, electronic mail, mobile devices or personal digital assistant, or other device linked to the Bank's electronic system by any means (among other things), and for the avoidance of doubt, Electronic Banking Services are deemed to include the M-Service.

**"Eligible Account(s)"** shall have the meaning as described in the relevant Country Supplement.

**"Equity Linked Account"** means a type of structured investment where the amount of interest payable or any other return is to be calculated in whole or in part by reference to changes in the market prices of a single share or other security or a basket of shares or other securities specified in the relevant Equity Linked Account Confirmation, or in the levels of a single index or a basket of indices specified in the relevant Equity Linked Account.

**"Equivalent Amount"** or **"Equivalent Value"** means in relation to a sum expressed in a Currency other than the Reference Currency, the value of that sum in the Reference Currency, as determined by the Bank in its absolute discretion.

**"European Style Option"** means an option which may only be exercised on the Expiration Day.

"**Event of Default"** means any of the events or circumstances specified in the General Terms and Conditions

**"Exchange"** means any recognised exchange or market or other trading forum in any part of the world dealing in any Securities, Trading Asset or Underlyings. With respect to a particular Structured Investments, reference to **"Exchange"** means (a) in respect of an Index, each exchange or quotation system specified as such for such Index in the related Equity Linked Account Confirmation, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in the Shares underlying such Index has temporarily relocated (provided that the Bank has determined that there is

comparable liquidity relative to the Shares underlying such Index on such temporary substitute exchange or quotation system as on the original Exchange), and (b) in respect of a Share, each exchange or quotation system specified as such for such Share in the related Equity Linked Account Confirmation, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in the Share has temporarily relocated (provided that the Bank has determined that there is comparable liquidity relative to such Share on such temporary substitute exchange or quotation system as on the original Exchange).

**"Exchange Business Day"** means any Scheduled Trading Day on which each Exchange and each Related Exchange are open for trading during their respective regular trading sessions, notwithstanding any such Exchange or Related Exchange closing prior to its scheduled closing time.

**"Exchange Disruption"** means any event (other than an Early Closure) that disrupts or impairs (as determined by the Bank) the ability of market participants in general (a) to effect Transactions in, or obtain market values for, the Shares on the Exchange or any relevant Exchanges, or (b) to effect Transactions in, or obtain market values for, future or options contracts relating to the Shares or the relevant Index on any relevant Related Exchange.

**"Exercise Day"** means the Business Day on which the exercise of the option becomes effective.

**"Exercise Price"** or **"Strike Price"** means the price per unit of the Underlying specified in the Confirmation, at which the Underlying may be purchased or sold upon exercise of the related option. In the case of debt instruments, any accrued interest shall be added in accordance with the calculation rules applicable for the Underlying, unless otherwise specified in the Confirmation.

**"Expiration Day"** means the (last) day on which an option can be exercised. If the agreed Expiration Day is not a Business Day, the Expiration Day shall be the next following Business Day.

**"Extraordinary Dividend"** means an amount per Share specified or otherwise determined as provided in the related Equity Linked Account Confirmation, or if not so specified or so provided, the characterisation of a dividend or portion thereof as an Extraordinary Dividend shall be determined by the Bank.

**"Facilities"** means overdraft, credit, checking, banking and trade finance facilities and accommodation in its widest sense (including such facilities as from time to time amended, modified or supplemented) made available by the Bank to the Client and references to "Facility" shall mean any one of them.

**"Facility Documents"** means any or all of the Facility Letters, the Client Agreement, any documents specified as such in the relevant Facility Letter (including any Security Document) and any other documents which the Bank may from time to time require to be completed, executed and/or delivered in connection with the Facilities.

**"Facility Letter"** shall have the meaning ascribed to it in the Bank's General Terms and Conditions For Credit Facilities.

**"Failure to Pay"** means the failure by a Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement (specified in the applicable Confirmation) under one or more Obligations without regard to any grace period or any conditions precedent to the commencement of any grace period applicable to such Obligation in accordance with the terms of such Obligations at the time of such failure.

**"Fax"** means facsimile transmissions.

**"Fixed Advance"** means a fixed advance made or to be made available, under the terms of the Facility Documents, by the Bank to the Client, in such Acceptable Currency, of such amount and for such period as may be agreed to and accepted by the Bank.

**"Force Majeure Event"** means:

    (a)   any circumstance or cause beyond the reasonable control of the Bank;

    (b)   any natural disaster or calamity such as flood, storm, subsidence, earthquake, fire, disease, epidemic, health quarantine or other natural event;

    (c)   any war, hostilities, terrorism, revolution, riot, civil disorder or any state of economic or political chaos;

    (d)   any strike, lockout or other industrial action;

    (e)   any change in law or regulation or any change in the interpretation or enforcement of any law or regulation;

    (f)   any act or order of any governmental or regulatory body or authority;

    (g)   any order of a court or other judicial body;

    (h)   any power failure or system or computer malfunction, damage, destruction, failure, suspension, howsoever caused, or third party interference;

    (i)   any restriction or impending restriction on the availability, credit or transfer of funds in any Currency or foreign exchange; or

    (j)   the occurrence of any event which the Bank in good faith believes to have a material adverse effect on a Transaction, Investment or a Service or which the Bank determines, in its absolute discretion, is beyond the reasonable control of the Bank and shall include without limitation any form of exchange control restriction or requirement of whatsoever nature affecting availability, convertibility, credit or transfers of currencies, commodities, securities, financial instruments or funds, any form of debtor or other moratorium on jurisdictions, individuals or entities, any devaluation, redenomination or demonetisation of the underlying currencies, commodities, securities or instruments of that Transaction and/or any form of restriction or requirement which in the Bank's good faith opinion adversely alters or changes the rights or obligations which the Bank undertook upon the establishment of that Transaction.

**"Forward Exchange Rate"** means, for the purpose of any FX Transaction, the forward exchange rate quoted and agreed to by the Bank at its absolute discretion having regard to the prevailing forward foreign exchange market conditions for the exchange of the Relevant Currencies on the Value Date.

**"FX"** means foreign exchange.

**"FX Contract"** means any contract for the purchase of one Currency against the sale of another Currency.

**"FX Transactions"** means FX contracts, Options and forward exchange contracts.

**"General Terms and Conditions"** means these general terms and conditions.

**"GBP"** or **"British Pounds"** means the lawful Currency for the time being of the United Kingdom.

**"GIRO"** means Direct Debit Authorisation from the Client to Bank with reference to any Account(s).

**"Governmental Authority"** means any de facto or de jure government (or any agency, instrumentality, ministry or department thereof), court, tribunal, administrative or other governmental authority or any other entity (private or public) charged with the regulations of the financial markets (including the central bank) of a Reference Entity or of the jurisdiction of organisation of a Reference Entity.

**"Guarantee"** means any guarantee, SBLC or any other credit or any other instrument whatsoever from time to time issued or entered into by the Bank for or at the request of the Client pursuant to the Facilities under which the Bank incurs a liability to a third party (including without limitation, another branch of the Bank).

**"Hedge Positions"** means any purchase, sale, entry into or maintenance of one or more (a) positions or contracts in securities, options, futures, derivatives or foreign exchange, (b) stock loan transactions or (iii) other instruments or arrangements (howsoever described) by the Bank in order to hedge, individually or on a portfolio basis, an Equity Linked Account.

**"Hedging Costs"** means, in respect of an Early Redemption Amount, (a) the losses, expenses and costs (if any) (in which case the Early Redemption Amount will be adjusted downward to the extent of such losses, expenses and costs) or (b) the gain (in which case the Early Redemption Amount will be adjusted upward to the extent of such gain) to the Bank of unwinding, terminating, liquidating, adjusting, obtaining, replacing or re-establishing any underlying or related hedging arrangements (including but not limited to any options or selling or otherwise realising any instruments of any type whatsoever which the Bank may hold as part of such hedging arrangements), all as calculated by the Bank in its sole and absolute discretion.

**"Hedging Disruption"** means that the Bank is unable, after using commercially reasonable efforts, to (a) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any Transaction(s) or asset(s) it deems necessary to hedge the equity price risk of entering into and performing its obligations with respect to the relevant Equity Linked Account, (b) realise, recover or remit the proceeds of any such Transaction(s) or asset(s), or (c) acquire, establish, re-establish, substitute, maintain the relevant Equity Linked Account.

**"HKD"** means the lawful Currency for the time being of Hong Kong, the Special Administrative Region of the People's Republic of China. An option which is "In-the-money" means an option which has a positive Intrinsic Value.

**"Hold Mail Service"** means a service whereby the Bank agrees not to send to the Client's address all and any mail, letters, statements, advices, receipts, notices, prospectuses or any other document that the Bank usually sends to its Clients in connection with their Accounts, Facilities or Transactions with the Bank or in connection with the Clients' use or application for any of the Services provided by the Bank (collectively, "Banking Communications").

**"Increased Cost of Hedging"** means that the Bank would incur a materially increased (as compared with circumstances existing on the Start Date) amount of tax, duty, expense or fee (other than brokerage commissions) to (a) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any Transaction(s) or asset(s) it deems necessary to hedge the equity price risk of entering into and performing its obligations with respect to the relevant ELA, or (b) realise, recover or remit the proceeds of any such Transaction(s) or asset(s).

**"Indebtedness"** means (a) all sums, in whatever Currency (including, interest, fees, commission, Charges, legal and other expenses incurred by the Bank and/or its Affiliates) and all Liabilities present or future, absolute or contingent (including Liabilities as surety or guarantor) for which the Client is now or may at any time in the future be indebted to the Bank and/or its Affiliates on any Account, including those under the Facilities and any credit or advances made to any person or entity at the request of the Client or in any manner whatsoever anywhere and whether alone or jointly with any other person; and (b) all obligations to be performed by the Client in respect of any contract or transaction entered or to be entered into with the Bank and/or its Affiliates.

**"Index"** means a single index or a basket of indices specified in the relevant Equity Linked Account Confirmation.

**"Index Adjustment Event"** means an Index Cancellation, Index Disruption or Index Modification, as the case may be.

**"Index Cancellation"** means that on or prior to any Valuation Date, a relevant Index Sponsor permanently cancels the Index and no successor Index exists.

**"Index Disruption"** means that on any Valuation Date, the Index Sponsor fails to calculate and announce a relevant Index. Equity Linked Accounts linked to changes in the levels of a single Index shall be referred to as **"Index Equity Linked Accounts"**.

**"Index Modification"** means that on or prior to any Valuation Date, a relevant Index Sponsor announces that it will make a material change in the formula for or the method of calculating that Index or in any other way materially modifies that Index (other than a modification prescribed in that formula or method to maintain that Index in the event of changes in constituent stock and capitalisation and other routine events).

**"Index Sponsor"** means the corporation or other entity that (a) is responsible for setting and reviewing the rules and procedures and the methods of calculation and adjustments, if any, related to the relevant Index and (b) announces (directly or through an agent) the level of the relevant Index on a regular basis during each Scheduled Trading Day.

**"Insolvency"** means that by reason of the voluntary or involuntary liquidation, bankruptcy, insolvency, dissolution or winding-up of or any analogous proceeding affecting an Issuer, (a) all the Shares of that Issuer are required to be transferred to a trustee, liquidator or other similar official or (b) holders of the Shares of that Issuer become legally prohibited from transferring them.

**"Insolvency Filing"** means that the Issuer institutes or has instituted against it by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, or it consents to a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official or it consents to such a petition, provided that proceedings instituted or petitions presented by creditors and not consented to by the Issuer shall not be deemed an Insolvency Filing.

**"Instructions"** means any instruction made by any mode or form of communication (including oral, telephone, Fax, electronic mail, Internet or written instruction) and such instructions shall include without limitation, any Standing Orders, any instruction to sell, purchase, trade, open, close, sign, countermand, revoke, amend, hold, withdraw, deposit, transfer, convert, endorse and otherwise operate and transact matters, including all Orders, pertaining to the Client's Accounts, Facilities, Transactions, Investments, Services, including deeds, indemnities, documents and/or actions given by or on behalf of the Client, including any instruction which the Bank believes in good faith to have been given by or on behalf of the Client.

**"Interest Payment Date"** means the date on which interest (if any) is paid to the Client subject to the terms of the Confirmation or Investment.

**"Intrinsic Value"** of an option is the amount by which the value of the Underlying, as determined by the Bank, exceeds (in the case of a Call Option) or falls short of (in the case of a Put Option) the Exercise Price.

**"Investments"** means cash, deposits of any nature (including time deposits, currency linked deposits, dual-currency deposits, equity-linked deposits, interest-rate linked deposits, index-linked deposits, commodity-linked deposits and other forms of structured deposits linked to financial instruments), Securities, Structured Investments, Derivatives, FX Transactions, unit trusts, mutual funds, collective investment schemes, Trading Assets, bills of exchange, promissory notes, certificates of deposits, personal chattels, mortgages and other obligations, from time to time being offered, traded or dealt with by the Bank and any documents of title thereto and any certificates, receipts, and other all evidence of ownership representing rights to receive, purchase and subscribe for the same, or evidencing or representing any other rights and interests therein or in any property or assets.

**"Investment Advisory Account"** means the account or sub-account for which the Client effects Transactions pursuant to the Bank's General Terms and Conditions For Structured Investments.

**"Investment Advisory Services"** means the services set out and more particularly described in clause 36.

**"Issuer"** means issuer of the relevant Securities and/or Investments.

**"Jurisdiction"** means the country or territory where the Account(s) is/are maintained.

**"Liabilities"** shall mean all monies, liabilities and obligations of whatsoever nature whether actual or contingent which are now or at any time hereafter may be or become due, owing or incurred from or by the Client or any Client Group Member as primary or collateral obligations to the Bank or any Affiliate and whether or not accrued in connection with any Accounts, Transactions or Services or for which the Client or any Client Group Member may be or become liable to the Bank or any Affiliate on any account or in any manner whatsoever and in whatever Currency (whether alone or jointly with any other person and in whatever name, style or firm) together with interest from the date of demand to the date of payment, legal costs and all other costs, Charges and expenses incurred by the Bank or any Affiliate (where the Client consists of more than one person, then only monies, liabilities and obligations due, owing or incurred by those persons jointly).

**"Loss"** and **"Losses"** means any and all losses (including any indirect, consequential or special loss and any loss of investment opportunity), damages, costs, Charges, disbursements, expenses, Liabilities, obligations, penalties, claims, demands, actions, proceedings, judgments or suits of whatsoever nature and howsoever arising (including legal fees on a full indemnity basis and any goods and services tax or other taxes or duties thereon), the cost of funding and loss or cost incurred as a result of the terminating, liquidating or re-establishing of any hedge or related trading position or for any other reason whatsoever.

**"Mandate"** means all mandates between the Client and Bank, including the mandate set out in an Account Opening Application and Account Opening Forms letter of authority, power of attorney, limited power of attorney, or board resolution in respect of any Accounts, Facilities, Transactions or Services.

**"Margin"** means any currencies, cash, and at the Bank's sole discretion, securities, Precious Metals or other property (including without limitation, funds, bonds, notes and other financial instruments or other interests of the Client) deposited with or held by the Bank or its Nominees as security or credit support for any Transaction or the Client's obligations under the Facility Documents, and includes any other collateral which the Bank may from time to time, in its absolute discretion, accept from the Client and **"Available Margin"** means such portion of the Margin which the Bank deems to be available for use as security or credit support for Transactions or any of them.

**"Market Disruption Event"** means in respect of a Share or an Index, the occurrence or existence of a Trading Disruption or an Exchange Disruption which in either case the Bank determines is material, or an Early Closure.

**"Market Value"** means, with respect to a Reference Obligation, the market value, based on the unweighted arithmetic mean of the bid side quotations for the Reference Obligation (exclusive of any accrued but unpaid interest) requested of five and provided by at least three reference dealers in the relevant market (selected by the Bank), determined after discarding the highest and lowest bids. In the event that less than three quotations are available, the Bank will determine the market value of the Reference Obligation in its absolute discretion.

**"Maturity Date"** means the date on which either (a) the Principal Amount is repaid; or (b) the amount due and payable (if any) is to be paid to the Client subject to the terms of the Investment and/or Confirmation.

**"Merger Date"** means the closing date of a Merger Event or, where a closing date cannot be determined under the local law applicable to such Merger Event, such other date as determined by the Bank.

**"Merger Event"** means, in respect of any relevant Shares, any (a) reclassification or change of such Shares that results in a transfer of or an irrevocable commitment to transfer all of such Shares outstanding to another entity or person, (b) consolidation, amalgamation, merger or binding share exchange of the Issuer with or into another entity or person (other than a consolidation, amalgamation, merger or binding share exchange in which such Issuer is the continuing entity and which does not result in a reclassification or change of all such Shares outstanding), (c) takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person to purchase or otherwise obtain 100% of the outstanding Shares of the Issuer that results in a transfer of or an irrevocable commitment to transfer all such Shares (other than Shares owned or controlled by such other entity or person); or (d) consolidation, amalgamation, merger or binding share exchange of the Issuer or its subsidiaries with or into another entity in which the Issuer is the continuing entity and which does not result in a reclassification or change of all such Shares outstanding but results in the outstanding Shares (other than Shares owned or controlled by such other entity) immediately prior to such event collectively representing less than 50% of the outstanding Shares immediately following such event (a "Reverse Merger"), in each case if the Merger Date is on or before the final Valuation Date.

**"M-Service"** means the Bank's mobile banking services as described in the User Guidance and as may be amended by the Bank from time to time.

**"MYR"** means the lawful Currency for the time being of Malaysia.

**"Nationalisation"** means that all the Shares or all or substantially all the assets of an Issuer are nationalised, expropriated or are otherwise required to be transferred to any governmental agency, authority, entity or instrumentality thereof.

**"Nominee"** means such entity as may be appointed from time to time by the Bank to provide nominee, custodial or any other services (administrative or otherwise) to the Client under the Terms and Conditions.

**"Non-Cash Deposit"** means a Deposit made other than by cash or electronic transfer.

**"Notify"** means the disclosure by the Bank to the Client by one or more of the following methods:

    (a)    providing the relevant details verbally;

    (b)    handing over the relevant details by an officer of the Bank;

    (c)    sending the relevant details in writing by post;

    (d)    posting the relevant details on the Bank's website;

    (e)    displaying the relevant details at the branch of the Bank at which any Account is held; or

    (f)    in a newspaper;

and **"Notifies"**, **"Notified"**, **"Notifying"** and **"Notification"** will have the corresponding meaning.

**"Notional Quantity"** means, in respect of a Transaction or Order relating to Precious Metal or option, the quantity designated as such in the relevant Confirmation as the quantity of the relevant Precious Metal by reference to which the amount due to be paid under such Precious Metal Transaction or option is calculated.

**"Obligation**" means any obligation (whether present or future, contingent or otherwise) of the Reference Entity (either directly or as a provider of any Qualifying Guarantee) for the payment or repayment of money, including without limitation, any obligation for the payment or repayment of borrowed money (which term shall include without limitation, deposits and reimbursement obligations arising from drawings pursuant to letters of credit).

**"Obligation Default"** means one or more Obligations have become capable of being declared due and payable before they would otherwise have been due and payable as a result of, or on the basis of, the occurrence of default, event of default or other similar condition or event (however described) other than a failure to make any required payment, in respect of a Reference Entity under one or more Obligations in an aggregate amount of not less than the Default Requirement (specified in the applicable Confirmation).

**"Option"** means a Currency option.

**"Order"** means any request, application, Standing Order or order, including order to purchase, sell, subscribe and enter into a Transaction and/or Investment, and includes any request or order to revoke, ignore or vary any previous request (in form and manner acceptable to the Bank) of the Client to the Bank or which the Bank reasonably believes to be the request, application or order of the Client.

**"Overdraft Account"** means a current Account of the Client with the Bank which the Bank agrees may be overdrawn under the terms of the Facility Documents.

**"Pari Passu"**: Any Substitute Reference Obligation or Substitute Reference Obligations shall be an Obligation that (a) ranks pari passu (or, if no such Obligation exists, then, at the Bank's option, an Obligation that ranks senior) in priority of payment with such Reference Obligation (with the ranking in priority of payment of such Reference Obligation being determined as of the later of (1) the Start Date and (2) the date on which such Reference Obligation was issued or incurred and not reflecting any change to such ranking in priority of payment after such later date), (b) preserves the economic equivalent, as closely as practicable as determined by the Bank, of the payment obligations of the Bank and (c) is an obligation of a Reference Entity (either directly or as provider of any Qualifying Guarantee). The Substitute Reference Obligation or Substitute Reference Obligations identified by the Bank shall, without further action, replace such Reference Obligation or Reference Obligations.

**"Parties"** means the Client and the Bank.

**"Password"** means the Phone Banking PIN, TIN or AOP or passwords chosen by the Client or any additional passwords in relation to Electronic Banking Services provided to the Client by the Bank either permanently or for a limited time (or if the Client does not elect to change it, the initial or replacement passwords given to the Client by the Bank) that is used to confirm the Client's identity whenever the Client uses the Electronic Banking Service.

**"Payment Instrument"** means any Cheque, draft, money order, cashier's order or other similar instrument.

**"Permitted Currency"** means (a) the legal tender of any Group of 7 country (or any country that becomes a member of the Group of 7 if such Group of 7 expands its membership); or (ii) the legal tender of any country which, as of the date of such change, is a member of the Organisation for Economic Cooperation and Development and has a local Currency long-term debt rating of either AAA or higher assigned to it by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. or any successor to the rating business thereof, AAA or higher assigned to it by Moody's Investor Service, Inc. or any successor to the rating business thereof or AAA or higher assigned to it by Fitch Ratings or any successor to the rating business thereof.

**"Person"** includes any individual, sole proprietorship, company, corporation, firm, partnership, joint venture, association, organisation, or any other business entity, trust, state or agency of a state (in each case, whether or not having separate legal personality).

**"PIN"** means personal identification number.

**"Potential Adjustment Event"** means any of the following: (a) a subdivision, consolidation or reclassification of the relevant Shares (unless resulting in a Merger Event), or a free distribution or dividend of any such Shares to existing holders by way of bonus, capitalisation or similar issue; (b) a distribution, issue or dividend to existing holders of the relevant Shares of (i) such Shares, or (ii) other share capital or securities granting the right to payment of dividends and/or proceeds of liquidation of the Issuer equally or proportionately with such payments to holders of such Shares, or (iii) share capital or other securities of another issuer acquired or owned (directly or indirectly) by the Issuer as a result of a spin-off or other similar transaction, or (iv) any other type of securities, rights or warrants or other assets, in any case for payment (cash or other consideration) at less than the prevailing market price as determined by the Bank; (c) an Extraordinary Dividend; (d) a call by the Issuer in respect of the relevant Shares that are not fully paid; (e) a repurchase by the Issuer or any of its subsidiaries of the relevant Shares whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise; (f) in respect of the Issuer, an event that results in any shareholder rights being distributed or becoming separated from shares of common stock or other shares of the capital stock of the Issuer pursuant to a shareholder rights plan or arrangement directed against hostile takeovers that provides upon the occurrence of certain events for a distribution of preferred stock, warrants, debt instruments or stock rights at a price below their market value, as determined by the Bank, provided that any adjustment effected as a result of such an event shall be readjusted upon any redemption of such rights; or (vii) any other event that may have a diluting or concentrative effect on the theoretical value of the relevant Shares.

**"Precious Metal"** means gold, silver, platinum, palladium and any other commodity stipulated by the Bank from time to time to be a Precious Metal.

**"Premium"** means the purchase price of an option to be paid by the buyer to the seller of the option which, unless otherwise agreed between the buyer and the seller, is due on the second Business Day following the conclusion of a Transaction (the **"Premium Payment Day"**).

**"Price Disruption Event"** means any event which the Bank in good faith believes to have affected the calculation or determination of the settlement amount for any Transaction and shall include without limitation the splitting of currency exchange rates into dual or multiple currency exchange rates, unavailability of currency exchange rates and/or any form of price disruption which in the Bank's good faith opinion adversely alters or changes the rights or obligations which the Bank undertook at the time of entering into such Transaction.

**"Primary Account Holder"** means the party executing the Account Opening Form as Client and, where two or more parties have completed such form, the person designated as primary account holder, main account holder or similarly identified therein.

**"Principal Amount"** shall have the meaning given to the term in the relevant Confirmation.

**"Put Option"** means the right but not the obligation (except upon exercise) of the buyer to sell to the seller at the Exercise Price a specified quantity of the Underlying.

"**Qualifying Guarantee**" means an arrangement evidenced by a written instrument pursuant to which a Reference Entity irrevocably agrees (by guarantee of payment or equivalent legal arrangement) to pay all amounts due under an obligation (the "Underlying Obligation") for which another party is the obligor (the "Underlying Obligor"). Qualifying Guarantees shall exclude any arrangement (a) structured as a surety bond, financial guarantee insurance policy, letter of credit or equivalent legal arrangement or (b) pursuant to the terms of which the payment obligations of the Reference Entity can be discharged, reduced or otherwise altered or assigned (other than by operation of law) as a result of the occurrence or non-occurrence of an event or circumstance (other than payment).

**"Rate-Linked Structured Investments"** are a type of structured deposit where the amount of interest payable or the amount of principal repayable or the total return (or any combination thereof) is to be calculated in whole or in part by reference to changes in a specified interest rate or index. In addition, certain types of Rate Linked Structured Investments may be extended beyond, or terminated prior to, the maturity date, in whole or in part.

**"Reference Currency"** means, in relation to any Facility, the Acceptable Currency specified as such in the relevant Facility Letter in relation to that Facility.

**"Reference Entity"** means the entity or entities specified as such in the applicable Confirmation and any direct or indirect successor to a Reference Entity as determined by the Bank in its sole discretion.

**"Reference Obligation"** means each obligation specified as such or of a type described in the applicable Confirmation and any Substitute Reference Obligation.

**"Related Exchange"** means, in respect of an Index or a Share, each exchange or quotation system specified as such for such Index or Share in the related Equity Linked Account Confirmation, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in the futures or options contracts relating to such Index or such Share has temporarily relocated (provided that the Bank has determined that there is comparable liquidity relative to the futures or options contracts relating to such Index or such Share on such temporary substitute exchange or quotation system as on the original Related Exchange), provided, however, that where "All Exchanges" is specified as the Related Exchange in the related Equity Linked Account Confirmation, "Related Exchange" shall mean each exchange or quotation system where trading has a material effect (as determined by the Bank) on the overall market for futures or options contracts relating to such Index or such Share.

**"Relevant Data Subject"** means any person who is (a) named in and/or signs a Mandate or Account Opening Form; (b) an authorised signatory; (c) security party or (d) specified as such by the Bank at any time.

**"Relevant Currencies"** means the Currencies bought and sold under a forward exchange contract or a foreign exchange contract.

**"Relevant Information"** means any information or documents (which may include any information concerning natural persons) relating to any Client Group Member (or any officer, employee or agent of the foregoing), these Terms and Conditions, any Account, Facilities, Transaction, Service any other present or future agreement or transaction of any nature between the Client and any Standard Chartered Group Member or the subject matter of any of the foregoing.

**"Repudiation/Moratorium"** means an authorised officer of a Reference Entity or a Governmental Authority (a) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, one or more Obligations in an aggregate amount of not less than the Default Requirement (specified in the applicable Confirmation) or (b) declares or imposes a moratorium, standstill, roll-over or deferral, whether de facto or de jure, with respect to one or more Obligations in an aggregate amount of not less than the Default Requirement (specified in the Confirmation).

**"Restructuring"** means that with respect to one or more Obligations, and in relation to an aggregate amount of not less than the Default Requirement (specified in the applicable Confirmation), any one or more of the following events occurs in a form that binds all holders of such Obligation, is agreed between the Reference Entity or a Governmental Authority and a sufficient number of holders of such Obligation to bind all holders of the Obligation or is announced (or otherwise decreed) by a Reference Entity or a Governmental Authority in a form that binds all holders of such Obligation, and such event is not expressly provided for under the terms of such Obligations in effect as of the later of the Start Date and the date as of which such Obligation is issued or incurred:

    (a)    a reduction in the rate or amount of interest payable or the amount of scheduled interest accruals;

    (b)    a reduction in the amount of principal or premium payable at maturity or at scheduled redemption dates;

    (c)    a postponement or other deferral of a date or dates for either (i) the payment or accrual of interest or (ii) the payment of principal or premium;

    (d)    a change in the ranking in priority of payment of any Obligation, causing the subordination of such Obligation to any other Obligation;

    (e)    any change in the Currency or composition of any payment of interest or principal to any Currency which is not a Permitted Currency;

    (f)    Not Restructuring: Notwithstanding the provisions above, none of the following shall constitute a Restructuring: (a) the payment in euros of interest or principal in relation to one or more Obligations denominated in a Currency of a Member State of the European Union that adopts or has adopted the single Currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union; (b) the occurrence of, agreement to or announcement of any of the events described above due to an administrative adjustment, accounting adjustment or tax adjustment or other technical adjustment occurring in the ordinary course of business; and (c) the occurrence of, agreement to

or announcement of any of the events described above in circumstances where such event does not directly or indirectly result from a deterioration in the creditworthiness or financial condition of the Reference Entity; or

(g)    Obligation: For the purposes of this definition, the term Obligation shall be deemed to include Underlying Obligations for which the Reference Entity is acting as provider of any Qualifying Guarantee. In the case of a Qualifying Guarantee and an Underlying Obligation, references to the Reference Entity in (a) of the above definition shall be deemed to refer to the Underlying Obligor and the reference to the Reference Entity in (b) of the above definition shall continue to refer to the Reference Entity.

**"SBLC"** means a standby letter of credit.

**"Scheduled Closing Time"** means, in respect of an Exchange or Related Exchange and a Scheduled Trading Day, any scheduled weekday closing time of such Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours.

**"Scheduled Trading Day"** means any day on which each Exchange and each Related Exchange are scheduled to be open for trading for their respective regular trading sessions.

**"Scheduled Valuation Date"** means any original date that, but for the occurrence of an event causing a Disrupted Day, would have been a Valuation Date.

**"Securities"** means:

(a)    debentures or stocks issued or proposed to be issued by a government; or

(b)    equities, bonds, debentures, stocks, shares, notes, units, warrants, options, certificates of deposits and any other securities, listed or otherwise, or such other forms of investments as may from time to time be paid or transferred or issued or proposed to be issued by a corporation or body unincorporated;

**"Securities Services"** means the purchase and sale by the Client of Securities including Investments from or through the Bank.

**"Securities Trading Services"** means the purchase and sale of Securities by the Client from or through the Bank.

**"Security Codes"** means all user identification codes, user names, activation codes, PINs, TINs, digital keys and/or digital signatures, as may be prescribed by the Bank from time to time, with the applicable Password details agreed between the Client and the Bank, that are used to identify the Client whenever the Client uses the Electronic Banking Service and/or the M-Service.

**"Security Documents"** means each and every security document creating or evidencing a security, guarantee or other assurance granted in favour of the Bank in connection with the Facilities or the Transaction or otherwise to ensure the performance by the Client of his obligations under any of the Facility Documents or in respect of any Transactions and any and every other document from time to time executed to guarantee, secure or otherwise assume the performance of the obligations of the Client under or in connection with the Facilities, the Transactions and each of the Facility Documents.

**"Security Party"** any person or entity who may from time to time provide security and/or assume the obligations of a surety, guarantor or indemnifier for the Client's Indebtedness, and who may be a party to a Security Document, and **"Security Parties"** means all or any two or more of them.

**"Services"** means the services made, or to be made available, by the Bank to the Client including without limitation, the provision of financial products, including but not limited to subscriptions for initial public offerings and private placements, FX Transactions, debt securities offerings, derivatives, and any and all Trading Assets and Investments (and any allocations thereof), Accounts, Electronic Banking Services, foreign exchange margin trading services, foreign exchange order watching services, investment fund services, Custodian Services, Facilities, Hold Mail Service, Securities Trading Services and the Transactions and any other banking facilities, functions, products and financial services (including Currency switching services), whether at any of the Bank's branches, over the telephone, or through electronic banking, phone banking, other electronic terminals, equipment or system or otherwise.

**"Settlement Cycle"** means in respect of a Share or an Index, the period of Clearance System Business Days following a trade in such Shares or the shares underlying such Index, as the case may be, on the Exchange in which settlement will customarily occur according to the rules of such Exchange (or, if there are multiple Exchanges in respect of an Index, the longest such period).

**"Settlement Disruption Event"** means, in respect of a Share, an event beyond the control of the parties as a result of which the relevant Clearance System cannot clear the transfer of such Share.

**"SGD"** or **"Singapore Dollars"** and **"S$"** means the lawful Currency for the time being of Singapore.

**"Shares"** means a single share or other security or a basket of shares or other securities specified in the relevant Equity Linked Account Confirmation.

Equity Linked Accounts linked to changes in the market prices of a basket of Shares shall be referred to as **"Share Basket Equity Linked Accounts"**.

Equity Linked Accounts linked to changes in the market prices of a single Share shall be referred to as **"Share Equity Linked Accounts"**.

**"Standard Chartered Group"** includes Standard Chartered Bank and its successors and any persons controlled, directly or indirectly, by Standard Chartered Bank, any person that controls, directly or indirectly, Standard Chartered Bank and any person directly or indirectly under common control with Standard Chartered Bank.

**"Standard Chartered Group Member"** means Standard Chartered PLC together with each of its subsidiaries and their branches and representative offices.

**"Standing Orders"** means instruction(s) given by the Client to the Bank from time to time without further instruction from or prior Notification to the Client to (a) enter into a forward exchange contract with the Bank at a Forward Exchange Rate specified by the Client in such instructions which is open for acceptance by the Bank at its absolute discretion, (b) take specified action relating to foreign exchange margin trading services when the conditions forming part of such instructions are satisfied, or (c) take specified action to execute any Currency transaction at a certain currency exchange rate pre-set by the Client,

**"Start Date, Interest Payment and Scheduled Maturity Date"**: The Confirmation of each Credit Linked Account specifies a start date (the "Start Date"), one or more interest payment dates (the "Interest Payment Dates") and a scheduled maturity date (the "Scheduled Maturity Date"). The Start Date is the date on which the principal amount of the Credit Linked Account is to be deposited with the Bank. Interest Payment Date is the date on which interest (subject the terms of each Credit Linked Account) is paid, and the Scheduled Maturity Date is the date on which the principal amount is repaid (subject to the occurrence of any Credit Event).

**"Structured Investments"** means Derivatives and structured investments formed by combining two or more financial instruments, including one or more derivatives and shall include, but not be limited to, Currency Linked Structured Investments, Credit Linked Accounts and Equity Linked Accounts.

**"Substitute Reference Obligation"** means one or more obligations of the Reference Entity (either directly or as provider of any Qualifying Guarantee) that will replace one or more Reference Obligations, ascertained by the Bank in the following manner. In the event that a Reference Obligation is redeemed in whole; or in the opinion of the Bank (a) the aggregate amounts due under a Reference Obligation have been materially reduced by redemption or otherwise (other than due to any scheduled redemption, amortisation or prepayments), (b) a Reference Obligation is an Underlying Obligation with a Qualifying Guarantee of a Reference Entity and, other than due to the existence or occurrence of a Credit Event, the Qualifying Guarantee is no longer a valid and binding obligation of such Reference Entity enforceable in accordance with its terms or (c) for any other reason, other than due to the existence or occurrence of a Credit Event, a Reference Obligation is no longer an obligation of a Reference Entity, the Bank shall identify one or more Obligations to replace such Reference Obligation. If the Bank determines that no Substitute Reference Obligation is available for that Reference Obligation, then the Bank shall continue to attempt to identify a Substitute Reference Obligation until the Scheduled Maturity Date. If on or prior to the Scheduled Maturity Date, a Substitute Reference Obligation has not been identified, the Bank's obligations under the Credit Linked Account shall cease as of the Scheduled Maturity Date.

**"Surety Instrument"** means a guarantee, indemnity, SBLC, letter of comfort or other similar instrument, issued by a bank or other financial institution acceptable to and approved by the Bank, to secure or as subject of security for the repayment of the Total Outstanding.

**"Tender Offer"** means a takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or persons that results in such entity or persons purchasing, or otherwise obtaining or having the right to obtain, by conversion or other means, greater than 10% and less than 100% of the outstanding voting shares of the Issuer, as determined by the Bank, based upon the making of filings with governmental or self-regulatory agencies or such other information as the Bank deems relevant.

**"Tender Offer Date"** means, in respect of a Tender Offer, the date on which voting shares in the amount of the applicable percentage threshold are actually purchased or otherwise obtained (as determined by the Bank).

**"Terms and Conditions"** means all of the Bank's terms and conditions, including but not limited to these General Terms and Conditions, applicable Country Supplements, the Terms and Conditions for Credit Facilities, and terms and conditions contained in the Account Opening Application, any Account Opening Forms, Mandates, and the respective terms and conditions, including Confirmations and contract notes, governing each Transaction and/or Investment.

**"Terms and Conditions for Credit Facilities"** means the Bank's terms and conditions for credit facilities, as amended from time to time.

**"THB"** means the lawful Currency for the time being of Thailand.

**"TIN"** means telephone identification number.

**"Total Outstandings"** means at any time (i) all sums (whether principal, interest, fees, costs, Charges, expenses, commissions or otherwise) which are or at any time may be or become due from or owing by the Client to the Bank or which the Client has covenanted to pay or discharge, whether actually or contingently, under or in connection with any of the Facilities or the Transactions and (ii) all other Liabilities and monies which now are or at any time hereafter may be or become due from or owing by, or be incurred by the Client to the Bank, in whatever Currency the same shall be denominated or owing, whether alone or jointly with any other person and on any account whatsoever, whether current or otherwise, and whether present, future, actual or contingent and whether as principal debtor, guarantor, surety or otherwise howsoever, including (without limitation) interest and all Liabilities in connection with paying, accepting, endorsing or discounting any Cheques, notes or bills, or under any Guarantee (whether a claim or demand has been made on the Bank under or in connection therewith)

**"Trading Asset"** means any Securities, stock index options or futures or forward contracts, interest rate futures and swaps, currency futures, foreign exchange contracts and options, contracts for the purchase and sale of Precious Metals or other commodities of any nature, and options on any of them or in respect of any indices relating to them, or in relation to any other contracts or financial instruments of any nature for the time being offered, traded or dealt in by the Bank on behalf of its Clients or on any Exchange.

**"Trading Day"** means, subject to Applicable Laws, a day on which the Bank is open for foreign currency dealings, leveraged foreign exchange dealings and/or other Investment dealings in the Applicable Jurisdiction, which may or may not be a Business Day.

**"Trading Disruption"** means any suspension of or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise (a) relating to the Share on the Exchange or relevant Exchange(s), or (ii) in futures or options contracts relating to the Share or the relevant Index on any relevant Related Exchange.

**"Trading Hours"** subject to Applicable Laws, means the times prescribed by the Bank from time to time during which on a Trading Day the Bank is open for foreign currency dealings, leveraged foreign exchange dealings and/or other Investment dealings in the applicable Jurisdiction;

**"Transaction"** means investments or transactions involving any Securities, Derivatives, Trading Assets, FX Transactions, Investments, Structured Investments and/or combination of one or more of the foregoing.

**"TWD"** means the lawful Currency for the time being of Taiwan.

**"United State Dollars"** or **"USD"** means the lawful Currency for the time being of the United States of America.

**"Underlying"** means any:

    (a)   Currency;

    (b)   interest rates;

    (c)   financial instrument (including any share, stock, unit trust, mutual fund, debenture, bond, note, bill or other security);

    (d)   Precious Metal;

    (e)   agricultural, energy or other commodity;

    (f)   indices on any of the foregoing or a group thereof or other benchmark;

    (g)   combination of one or more of any of the foregoing; and

    (h)   any other item or thing as the Bank may from time to time permit.

**"User Guidance"** means the guidelines the Bank provides from time to time in connection with the Client's operation of the Electronic Banking Service, which may include guidance:

    (a)   in hard copy form (for example, in a user manual or by letter); and

    (b)   spoken guidelines (for example, by any technical helpdesks that the Bank may operate); and

    (c)   through any online help service available as part of the Electronic Banking Service.

**"U.S. Person"** shall have the meaning described in clause 41 of the General Terms and Conditions.

**"Valuation Date"** means the date on which the relevant reference value is determined unless the context otherwise requires, or as otherwise provided in the relevant Confirmation.

**"Value Date"** means a date specified in the relevant Confirmation for payment or delivery under a Transaction or Order and shall be determined in accordance with the relevant Business Day.

**"Withdrawal"** means any withdrawal or transfer of money made by or on behalf of the Client out of or in relation to an Account, whether by cash, Payment Instrument or other means and whether at the counters of the Bank, via an ATM or by other means.

**"ZAR"** means the lawful Currency for the time being of South Africa.

1.2    **In the Bank's Terms and Conditions, unless the context requires otherwise:**

    (a)   any "Party" or other person will be construed so as to include its successors in title, permitted assigns and permitted transferees;

    (b)   references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced from time to time;

    (c)   words importing the singular include the plural and vice versa, words importing a gender include the other gender, reference to the neutral gender (i.e. "it") includes a person, words "include" and "including" shall not be construed as having any limiting effect, and words "in writing" include any communication sent by letter, facsimile transmission or email;

    (d)   references to clauses, Schedules and Appendices are to clauses of and schedules and appendices to the Terms and Conditions and references to the Terms and Conditions include its Schedules and Appendices and a reference to a clause is a reference to a clause within the same Section of these Terms and Conditions where the reference appears as from time to time amended, supplemented, or novated, replaced or restated;

    (e)   clause headings are inserted for reference and guidance only and shall be ignored when construing the Terms and Conditions;

    (f)   a reference to a document shall be construed as references to such document as the same may be amended, supplemented, restated or novated from time to time;

    (g)   unless otherwise stated, a time of day is a reference to the time of day in the Jurisdiction;

    (h)   "including" will not be interpreted narrowly but will be interpreted to mean "including without limitation", "including (but not limited to)" or "including without prejudice to the foregoing", and

    (i)   "the Bank may" will not be interpreted narrowly but will be interpreted to mean "the Bank may (in its sole discretion and without any obligation to do so)";

    (j)   "date of these Terms" means the date of the Client first signed an Account Opening Form for the opening of an Account with the Bank under these Terms;

    (k)   each provision herein shall be read independently and shall not be construed to limit or restrict the effect of any other provision; and

    (l)   a reference to the Client includes the Client's executors, administrators, permitted substitutes, permitted successors and permitted assigns.

1.3    Where different meanings are ascribed to the same defined term in different Sections of the Bank's Terms and Conditions, that defined term shall bear the meaning ascribed to it in each Section only for the purposes of that Section, unless the context otherwise requires.

## Appendix 1: Singapore Country Supplement

**A.      Singapore Country Supplement**

**1.      Interpretation**

1.1    This Singapore Country Supplement shall be incorporated by reference into to the General Terms and Conditions, Account Documentation and Credit Documentation.

1.2    All references used herein are as defined in the General Terms and Conditions unless otherwise specified.

1.3    References made in the General Terms and Conditions to "Jurisdiction" shall mean the Republic of Singapore.

**2.      Definitions**

**"Authorised Recipient"** shall, in addition to the definitions in the General Terms and Conditions, include any party that the Bank is required by law, legislation or regulation to make disclosure in relation to any Service.

**"Banking Act"** means the Banking Act, Chapter 19 of the Statutes of the Republic of Singapore.

**"Cheque"** includes CTS Cheques and all cheques drawn on a bank outside Singapore.

**"Collective Investment Scheme"** shall have the meaning ascribed to it in the Securities and Futures Act.

**"Companies Act"** means the Companies Act, Chapter 50 of the Statutes of the Republic of Singapore.

**"CTS"** refers to the image-based systems, processes and procedures for the electronic clearing and archival of such items as provided in and contemplated by the CTS Bye-Laws, and known as the "Cheque Truncation System".

**"CTS Bye-Laws"** refers to the Bye-Laws of the Singapore Clearing House Association in respect of CTS as from time to time amended, supplemented, replaced or restated.

**"CTS Cheque"** refers to the "Articles" as defined in the CTS Bye-Laws.

**"CTS Clearing"** has the same meaning as defined in the CTS Bye-Laws.

**"CTS Image File"** refers to an electronic file containing CTS Image Items.

**"CTS Image Item"** means such CTS items as provided in and contemplated by the CTS Bye-Laws in image format, including electronic images of CTS Cheques, and complying with such format, content and image quality requirements, specifications and other requirements as may be issued by the duly appointed operator of the computerised online system for CTS from time to time with the consent/approval of the Committee of Management of the Singapore Clearing House Association.

**"Debentures"** shall have the meaning ascribed to it in Section 239(1) of the Securities and Futures Act and any amendments or supplements thereto.

**"IRD"** refers to an image return document as defined in Section 87B of the Bills of Exchange Act, Chapter 23 of the Statutes of the Republic of Singapore.

**"Investments"** as defined in the General Terms and Conditions shall include any units in Collective Investment Schemes.

**"MAS"** means the Monetary Authority of Singapore and/or its successors.

**"NETS"** means Network For Electronic Transfer Services Pte Ltd.

**"Securities"** as defined in the General Terms and Conditions shall include any units in Collective Investment Schemes.

**"Securities and Futures Act"** means the Securities and Futures Act, Chapter 289 of the Statutes of the Republic of Singapore.

**"Transactions"** as defined in the General Terms and Conditions shall include any units in Collective Investment Schemes.

**3.      Additional Terms and Conditions Applicable To Consolidated Statement**

The Bank may accord or withdraw, without Notice, the No Bounce Cheque Privilege ("NBCP") to the Client as advised under an Account Statement. The NBCP allows the Client to overdraw its Accounts within the limit stated on the relevant Account Statement for clearing of inward Cheques only.

**4.      Governing Law**

These Terms and Conditions and all Transactions entered into by the Parties in relation or pursuant to an Account are governed by the laws of the Republic of Singapore.

5. **Rights of Third Parties**

The Contracts (Rights of Third Parties) Act, Chapter 53B of the Statues of the Republic of Singapore will not apply to the General Terms and Conditions and, other than as expressly set out therein, no person not party to the General Terms and Conditions will have or acquire any right to enforce any term of it pursuant to that Act. This will not affect any right or remedy of any third party which exists or is available otherwise than by reason of that Act and will prevail over any other provision of the General Terms and Conditions which is inconsistent with it.

6. **Tax Resident Status**

6.1 Under the Income Tax Act, Chapter 134 of the Statutes of the Republic of Singapore, 'Singapore tax resident' is defined in relation to an individual, as a person who in the year preceding the year of assessment, resides in Singapore except for such temporary absences therefrom as may be reasonable and not inconsistent with a claim by such person to be resident in Singapore, and includes a person who is physically present or exercises an employment (other than as a director of a company) in Singapore for 183 days or more during the year preceding the year of assessment.

6.2 'Foreign investor' has been defined under the Income Tax (Income From Funds Managed for Foreign Investors) Regulations in relation to an individual, as an individual who is not a resident in Singapore and not a citizen of Singapore and who is the beneficial owner of the funds managed by the relevant Manager.

6.3 If the Client has any doubt as to whether the Client qualifies as a Singapore tax resident or a 'foreign investor', the Client is strongly urged to consult professional tax advisers.

6.4 The Client must inform the Bank, and if applicable, the Manager, immediately if there is a change in his/her tax status.

6.5 If the Client does not complete the section on tax resident status in the Account Opening Form, the Bank and the relevant Manager will assume that the Client is a Singapore tax resident and will not be liable in any respect in such event.

7. **Enforcement and Jurisdiction of Singapore Courts**

7.1 Subject to sub-clause 7.2 below, the Client submits to the exclusive jurisdiction of the courts of Singapore to settle any dispute arising out of or in connection with these General Terms and Conditions, any Account, Transaction or any Service (including a dispute regarding the existence, validity or termination of any agreement) (a "Dispute").

7.2 Notwithstanding sub-clause 7.1 above, the Bank will not be prevented from taking proceedings relating to a Dispute in the courts of any other jurisdiction where any asset of the Client may be located. To the extent allowed by law, the Bank may take concurrent proceedings in any number of jurisdictions.

8. **Disclosure of Information**

The Client confirms that disclosure of information provisions of the General Terms and Conditions constitutes written permission for disclosure of information relating to the Client in accordance with the banking secrecy provisions of the Banking Act, and in particular Section 47 of the Banking Act and the Third Schedule to the Banking Act.

9. **Notice by Client:** Any notice from the Client to the Bank may be delivered personally or by prepaid registered post sent to the Bank at the address as set out below:

Standard Chartered Bank
6 Battery Road, 27th Floor
Singapore 049909
Attn: Head of Operations

10. **Deposits**

10.1 Any CTS Cheque dishonoured by the Bank will be returned in the form of an IRD and not the physical CTS Cheque, unless otherwise agreed to by the Bank at the Bank's absolute discretion. If the Client requests for the return of the physical CTS Cheque, the Bank may agree to such request at its discretion and the Client shall return the IRD in exchange for the CTS Cheque and pay such fees as the Bank may impose from time to time in respect of such exchange. The Bank shall not be obliged to replace any IRD of any CTS Cheque provided to the Client which has been misplaced or lost. The Bank may dispatch any IRD of any CTS Cheque to the Client in any manner or by such mode of communication as the Bank deems fit, such dispatch being at the Client's risk and expense. The Bank shall not be liable to the Client for any loss of any such IRD occurring after it has been posted to the Client by pre-paid post or dispatched by courier and the Client shall reimburse the Bank in respect of all fees and expenses incurred thereon in posting, dispatching or sending to the Client any IRD of any CTS Cheque in such manner selected by the Bank. The Client also undertakes not to present any IRD of any CTS Cheque to any person (other than the Bank) for collection or payment.

11. **Withdrawals**

11.1 The Bank shall be entitled to honour and make payment on any CTS Cheque presented in the form of a CTS Image File for CTS Clearing in accordance with the CTS Bye-Laws or which, pursuant to the CTS Bye-Laws and/or any agreements relating to CTS or otherwise, the Bank is obliged to honour or make payment in respect of the CTS Cheque, or a CTS Image Item of the CTS Cheque, and to debit any Account of the Client with the amount paid by the Bank on the CTS Cheque or to require the Client to reimburse the Bank the amount so paid by the Bank.

11.2    Where the Bank cannot establish or confirm the authenticity or any details (including without limitation, the amount to be paid and the name of the payee) of a Cheque drawn by the Client and received by the Bank for payment and/or in respect of a CTS Cheque, from the CTS Image Item of such CTS Cheque presented for CTS Clearing, the Bank shall have the right (but not the obligation) to return that Cheque to the bank that had presented the same for collection and/or to notify the operators of the CTS clearing system of the return of the CTS Image Item in accordance with the terms of the CTS Bye-Laws without making payment on the Cheque and/or CTS Cheque. Without prejudice to the generality of the foregoing, the Bank shall have the right (but not the obligation) to attempt to contact the Client to clarify or confirm the authenticity or any details (including without limitation, the amount to be paid and the name of the payee) of the Cheque and/or the CTS Cheque before deciding whether to return it.

11.3    Payments made by the Bank on the basis of a CTS Cheque or any CTS Image Item of the CTS Cheque presented for CTS Clearing or in respect of a Cheque of other financial instrument or a withdrawal or appropriate form bearing signature(s) which on the face of it appear to be similar to the authorised signature(s) shall be effective and valid and binding on the Client notwithstanding that the signature(s) may have been forged or obtained fraudulently or without authority or if such signature, whether forged, obtained fraudulently or without authority is not apparent from the CTS Image Item of the CTS Cheque. The Bank shall be entitled to debit any such amounts so paid by the Bank from any Account of the Client, nor shall the Bank be responsible for clearing a CTS Cheque where the Bank believed that such Cheque had been properly verified on the face of it.

12.    **Charge:** A charge may be levied on each Payment Instrument returned in compliance with the prevailing CTS Bye-Laws or the prevailing regulations or bye-laws of the Association of Banks in Singapore or the Singapore Clearing House Association.

13.    **Indemnity:** The Client shall indemnify the Bank for the following:

13.1    the cessation or interruption of the availability or operation of services provided by the Operator (as defined in the CTS Bye-Laws) in respect of CTS Clearing; or

13.2    any act, neglect or omission of the Operator (as defined in the CTS Bye-Laws) and or any other person who provides any equipment or service required for or in connection with CTS Clearing; or

13.3    the failure or refusal of the Bank to accept, honour and/or make payment on any Cheque or any CTS Image Item of such Cheque.

14.    **Acting as Principal:** Unless otherwise notified, the Client acknowledges that :

14.1    where the Client agrees to purchase Debentures (including Collective Investment Schemes) from the Bank, the Bank would be acting as principal and not as agent in the transaction; and

14.2    the Bank shall enter into Forward Exchange Contracts as principal only.

15.    **MAS Exemption:** With effect from 2 March 2007, Standard Chartered Bank, Singapore Branch and its representatives have, in relation to the provision of financial advisory services to its high net worth individual clients, been granted exempted status by the MAS under section 100(2) of the Financial Advisers Regulations 2002 from the following sections of the Financial Advisers Act (Chapter 110) of the Statutes of the Republic of Singapore, namely (i) Section 25 (obligation to disclose product information to clients); (ii) Section 27 (recommendation by licensees); (iii) Section 28 (receipt of client's money or property); (iv) Section 36 (licensee to disclose certain interests in securities); (v) MAS Notice No. FAA-N01 (notice on recommendation on investment products); (vi) MAS Notice No. FAA-N02 (notice on appointment and use of introducers by financial advisers); (vii) MAS Notice No. FAA-N03 (notice on information to clients and product information disclosure); and (viii) MAS Notice No. FAA-N07 (notice on minimum entry and examination requirements for representatives of licensed financial advisers and exempt financial advisers).

B.    This section sets out additional terms and conditions that apply when the Securities are Collective Investment Schemes. The terms and conditions in this addendum will govern all subscriptions, switching, redemptions and transfers in respect of Collective Investment Schemes subscribed for, switched or redeemed via the Bank as the agent of the Client. By subscribing for units or shares in Collective Investment Schemes distributed by the Bank, the Client is accepting the terms and conditions herein and will be bound by them.

1.    **Information**

1.1    The Client acknowledges that the Client has received a copy of the relevant prospectus of the Collective Investment Scheme for which the Client is applying to invest into and that the Client's application to subscribe for units or shares in the Collective Investment Scheme (the "**Interests**") is made on the basis of the information contained in the prospectus. Apart from the prospectus, the Bank may, at the request of the Client, provide to the Client further information or materials relating to the Collective Investment Scheme issued by the relevant fund manager (the "**Manager**") of the Collective Investment Scheme.

1.2    In subscribing for any interests in a Collective Investment Scheme, the Client agrees to be bound by the prospectus and constitutive documents of the Collective Investment Scheme.

1.3    The Client expressly acknowledges that the Bank acts in an agency capacity only and will owe to the Client no duty in respect of any such dealing above or beyond its obligations as the Client's agent.

1.4    A copy of the constitutive documents of the relevant Collective Investment Schemes may be obtained from the relevant Manager or Singapore representative of the Collective Investment Scheme.

## 2. Subscriptions

2.1 The Client may from time to time instruct the Bank, and thereby authorise the Bank on its behalf and as its agent, to place a subscription (the "**Order**") and apply in the name of the Bank as the Client's Nominee for such number of interests as the payment amount made by the Client for such Order will allow.

2.2 The Bank may consolidate the Order with subscription for interests in the same Collective Investment Scheme from its other Clients and may place a consolidated Order with the Manager. In the case of an offshore Scheme, the Client acknowledges that the Singapore representative or its appointed Nominee of such a Collective Investment Scheme may consolidate the Bank's Order with subscription for interests in the same Collective Investment Scheme from the other authorised distributors of the Collective Investment Scheme in Singapore and place a consolidated Order with the Manager.

2.3 If the Client has instructed that a particular Account (the "**Account**") of the Client held with the Bank be directly debited for the purpose of subscription of interests, the Bank will be authorised without further instructions to debit the Account with an amount equal to the monies required for the subscription and any other Charges, costs and expenses required. In such cases, the Client undertakes at all times to maintain sufficient funds in the Account for the purpose of making payment for any purchase of interests in accordance with the Client's instructions and/or for paying any fees, costs or other expenses which the Client is liable to pay hereunder. The Client acknowledges and agrees that if at any time there are in the reasonable opinion of the Bank (having regard to other payments debited or due to be debited) insufficient funds in the Account for these purposes the Bank may:

2.3.1 decline to place the Order on the Client's behalf; or

2.3.2 (in the Bank's sole discretion and without any obligation to do so on the part of the Bank and without any instruction from or notice from the Client) transfer funds as necessary from any other Accounts maintained by the Client with the Bank.

2.4 The Bank will have the absolute discretion to purchase interests in such Collective Investment Scheme or Collective Investment Schemes on behalf of the Client based on the prevailing price of such interests on the following relevant dates or such other date as the Bank may deem fit (the "**Purchase Date**"):

2.4.1 the date of the Bank's receipt of the Client's payment for the Order if in cash or via direct debit of the Account;

2.4.2 the date of clearance of the Client's cheque, bank draft or cashier's order (as the case may be) if payment for the Order is made by any such instrument; or

2.4.3 the date that the Bank receives the Client's Order.

Provided always that if any of the Purchase Date referred to in (a), (b) or (c) in this clause falls on a day which is not a Business Day or if payment is received after such cut-off time for processing such payments as the Bank may determine, and at its sole discretion change from time to time on any Business Day, the price of the interests for the purpose of this clause will be that prevailing on the next Business Day following the Purchase Date.

2.5 Any interests allotted based on any Order given by the Client may be held by the Bank in the name of the Bank or its appointed Nominee or in the case of an offshore Scheme, the appointed Nominee of the Singapore representative, on behalf of the Client.

2.6 No certificate will be issued in respect of the interests but the Client will receive:

2.6.1 a Confirmation statement from the Bank in respect of any subscription of interests by the Client; and

2.6.2 a statement of holdings indicating the number of interests issued to the Bank as Nominee for the Client, periodically.

2.7 For investments involving funds from The Central Provident Fund ("**CPF**"), Academic Staff Provident Fund **("ASPF")** and Supplementary Retirement Scheme **("SRS**"), Confirmation statements will be forwarded directly to the Client by the respective Manager. The Client will also receive periodic statements from his/her CPF / ASPF Approved Banks and/or SRS Operator **("Agent Bank").** The frequency of such statements may vary.

2.8 Dividends declared by any Manager or Scheme will be disbursed according to Clients' dividend instruction and without the necessity of any further or fresh authorisation from the Client:

2.8.1 Clients with a "cash" dividend instruction will have all dividends credited to their Account; and

2.8.2 Clients with a "reinvestment" dividend instruction will have all dividends automatically reinvested in the Scheme through the subscription of additional interests and the Bank will hold the same for the account of the Client as Nominee for the Client.

## 3. Switching

3.1 Where switching is permitted by a Collective Investment Scheme, the Client may from time to time instruct the Bank, and thereby authorise the Bank on its behalf, and as its agent, to place a switching order (the **"Switching Order**") and switch interests in a Collective Investment Scheme to interests in another Collective Investment Scheme.

3.2 The Bank may consolidate the Switching Order with switching orders for interests in the same Collective Investment Scheme from its other Clients and place a consolidated switching order with the Manager.

3.3 The Client authorises the Bank and the Bank is entitled to deduct from the amount available for purchase of interests in the switched-in Collective Investment Scheme, a switching fee of such amount as provided in the prospectus for the Collective Investment Scheme.

3.4 Subject to the terms and conditions of the Collective Investment Scheme, the Bank will carry out the Switching Order based on the price of existing interests to be switched and the price of interests prevailing on the date of receipt of the Switching Order by the Bank after deducting all fees, Charges, costs or expenses for which the Client is liable. If the date of receipt of the Switching Order is not a Business Day, the prevailing prices of the aforesaid interests on the next Business Day following the date of receipt of the Switching Order will be applied.

3.5 Interests allotted based on any Switching Order may be held by the Bank in the name of the Bank or its appointed Nominee or in the case of an offshore Collective Investment Scheme, the appointed Nominee of the Singapore representative, on behalf of the Client.

4. **Agent/Delegate**

4.1 The Bank will be entitled to appoint any agent, bank, trust company or institution (the "**Agent**") to assist the Bank in the performance of any of its obligations hereunder as the Bank may determine, including but not limited to:

4.1.1 the processing of the Order or Switching Order;

4.1.2 the liaison with the Manager and the Client in connection with the services hereunder, and/or

4.1.3 any other administrative duties.

4.2 In consideration of the Bank providing the services to the Client hereunder, the Client agrees and expressly authorises the Bank to from time to time release or provide to the Agent all or any information held by the Bank in respect of the Client and the Account.

5. **Redemption**

5.1 If, at any time, the Client wishes to redeem all or any of the interests acquired hereunder, the Client will instruct the Bank to apply to the Manager for redemption of such number of interests.

5.2 Upon any redemption of interests hereunder, the Bank will credit to the Account, or at the request of the Client, send by cashier's order to the Client such monies (net of any fees, Charges or expenses incurred in connection with redemption) as may be received in consideration of the redemption of the interests.

6. **Transfer**

6.1 If, at any time, the Client instructs the Bank to transfer his/her interests in a Collective Investment Scheme to be held by another bank, trust company or institution, or to the agent of such other bank, trust company or institution (the "**Transferee**"), and if the Bank has not received or does not receive the appropriate transfer form from the Transferee, the Bank will send the appropriate transfer form to the Transferee within a reasonable time.

6.2 Immediately after the Bank receives the transfer instructions from the Client, the Bank will not be obliged to act upon any further instructions from the Client relating to the interests except that the Bank may, at any time before the transfer is completed, and at its absolute discretion, accept instructions from the Client to cancel the transfer.

6.3 Any instruction given by the Client to the Bank to transfer interests in a Collective Investment Scheme will be deemed to be an instruction to transfer all the Client's interests in that Collective Investment Scheme unless otherwise agreed to by the Bank at its absolute discretion.

7. **Agency of the Bank**

7.1 The Client hereby appoints the Bank as its agent and expressly authorises the Bank:

7.1.1 to provide such information in connection with the interests including the name of the owner or owners, as may in the opinion of its legal advisers be required by any applicable law (whether in Singapore or any other jurisdiction), to any relevant authority together with any documentation relating thereto and further authorise the Bank's delegates to do the same;

7.1.2 in its sole discretion, to comply with the provisions of any law, regulations or order now or hereafter in force which purports to impose on a custodian of any interests a duty to take or refrain from taking any action in connection with any of the interests or with any payment, distribution or monies payable in respect of any of the interests; and

7.1.3 to commingle any Interest held by the Bank with other units, securities and properties owned by the Bank, its other Clients or other parties.

8. **Tax Resident Status**

8.1 Under the Income Tax Act, Chapter 134 of the Statutes of the Republic of Singapore, 'Singapore tax resident' is defined in relation to an individual, as a person who in the year preceding the year of assessment, resides in Singapore except for such temporary absences therefrom as may be reasonable and not inconsistent with a claim by such person to be resident in Singapore, and includes a person who is physically present or exercises an employment (other than as a director of a company) in Singapore for 183 days or more during the year preceding the year of assessment.

8.2 'Foreign investor' has been defined under the Income Tax (Income From Funds Managed for Foreign Investors) Regulations in relation to an individual, as an individual who is not a resident in Singapore and not a citizen of Singapore and who is the beneficial owner of the funds managed by the relevant Manager.

8.3 If the Client has any doubt as to whether the Client qualifies as a Singapore tax resident or a 'foreign investor', the Client is strongly urged to consult professional tax advisers.

8.4 The Client must inform the Bank or the relevant Manager immediately if there is a change in his/her tax status.

8.5 If the Client does not complete the section on tax resident status in the Account Opening Form, the Bank and the relevant Manager will assume that the Client is a Singapore tax resident and will not be liable in any respect in such event.

**9. Cancellation Rights Applicable to Unit Trusts**

9.1 For the purposes of this clause 9, "Unit Trust" means a Collective Investment Scheme under which the property is held on trust for the participants and is authorised under section 286(2) of the Securities and Futures Act, but excluding a Collective Investment Scheme which is listed on a securities exchange approved under section 9 of the Securities and Futures Act.

9.2 This clause shall not apply in the following situations:

(a) the Client is not an individual;

(b) the Client is an existing participant in a Unit Trust and is purchasing units in the Unit Trust for on a second or subsequent occasion, unless the second or subsequent purchase was entered into by the Client within the Cancellation Period set out in clause 9.3 below of the Client's first purchase; or

(c) where the Client participates in a regular savings plan, the second and any subsequent payment.

9.3 The Client shall have a right to cancel any agreement to purchase any units in any Unit Trusts, within seven calendar days from the date the Client signs the Order and delivers it to the Bank (the "**Cancellation Period**"). Where the last day of the Cancellation Period falls on a Sunday or a public holiday, the Cancellation Period shall be extended to the next calendar day, not being a Sunday or a public holiday.

9.4 The Client may cancel such agreement to purchase by filling in and signing a copy of the relevant form provided by the Bank for this purpose (a copy of which was retained by the Client at the time of application) and returning it to the Bank within the Cancellation Period. If the cancellation request is sent by post, the relevant day for determining whether the right to cancel has been exercised within the Cancellation Period is the date on which such request is posted by the Client and for the avoidance of doubt, this is agreed to be as determined by the postmark. A cancellation request is valid only when it is served on any agent of the Bank with authority to accept notice on the Bank's behalf.

9.5 The relevant price for calculating the amount to be refunded, if any, will be the dealing price following the receipt of the cancellation request by the Bank, as determined by the Bank's time-stamp or any other reasonable means, to be determined by the Bank in its sale and absolute discretion. Where the market value of the units held by the Client is greater than the original amount paid by the Client, the Bank is not obliged to pay the excess amount to the Client but such excess amount shall be retained in the Unit Trust. Any reduction in the market value of the units shall be borne by the Client. The Bank shall be entitled to recover any expense it incurred by reducing the amount to be repaid to the Client provided that such expense is reasonably related to the original purchase and subsequent cancellation of units by the Client.

9.6 In the event that an agreement for purchase of units in a Unit Trust is cancelled in accordance with this clause 9, the proceeds of such cancellation calculated in accordance with this clause 9, if not yet paid to the Issuer, will be repaid to the Client within two business days of such cancellation less any fees, Charges, or other amounts due to the Bank.

9.7 For the avoidance of doubt, where the proceeds from any cancellation of Unit Trusts (the "**Original Units**") are utilised for the purchase of other Unit Trusts (the "**Subsequent Purchase**"), the Subsequent Purchase will be treated as a fresh purchase. If the Client decides to cancel the Subsequent Purchase, the Client will not be entitled to have the Original Units returned. It the Client wishes to purchase the Original Units, the Client may only apply for the Original Units at the prevailing applicable price.

9.8 During the Cancellation Period, the Client may choose to redeem the Units in such Unit Trust instead of exercising the Client's right to cancel. In this case, the redemption procedures as set out in these terms shall apply. The Client will not be able to enjoy the benefits of cancellation in the event that the Client chooses to redeem Units in such Unit Trust and the redemption proceeds that the Client will receive may be lower than the amount being refunded had the Client exercised his cancellation right, if the appreciation in the value of the Units in such Unit Trust is less than the initial sales charge. The published prices are indicative in nature and can change during the period between the submission and processing of the redemption request.

To contact or make an appointment with our Private Bankers, please contact us:

by telephone on **+65 6376 2000**

by email at **privateclient.services@sg.standardchartered.com** with your name, contact details and other requests such as preferred language

by mail at The Standard Chartered Private Bank, 6 Battery Road, 27th Floor, Singapore 049909