# American Express Bank Ltd, Singapore.
## Private Banking Services Agreement



**American Express Bank**

The mark "American Express", marks containing "American Express" and abbreviations thereof (i.e. Amex, AXP, etc.) are trademarks of American Express Marketing & Development Corp. and are used under limited license. American Express Bank Ltd., its subsidiaries and affiliated companies are now subsidiaries or affiliated companies of Standard Chartered PLC, and are no longer affiliated with American Express Company or its subsidiaries.

# PRIVATE BANKING SERVICES AGREEMENT

**Introduction**   This Private Banking Services Agreement (the "Agreement") contains all the terms and conditions of the private banking services provided by American Express Bank Limited (the "Bank"). Together with the Account Application it forms the contract which governs your relationship with the Bank as a customer of the Bank (the "Customer") in relation to the private banking services.

The terms set out herein and any additional terms notified in writing by the Bank to the Customer may from time to time be amended, modified or supplemented by the Bank. Such amendments, modifications and supplements shall come into effect on the date specified by the Bank, and copies shall be sent to the Customer.

Failure to receive any notifications of additional terms or copies of any amendments, modifications and supplements, as a result of hold mail instructions or otherwise, shall not invalidate any additional terms or amendments, modifications or supplements.

**General Business Conditions**

## Accounts

1. The Customer requests and authorizes the Bank to honour all cheques, drafts, promissory notes and other orders for payment (collectively the "orders", each an "order") drawn on, and orders accepted and presented for payment against accounts maintained by the Customer whether or not such accounts be overdrawn, to comply with any other directions given regarding the Customer's accounts, and to accept and act upon any receipts for money deposited with or owing by the Bank on the Customer's accounts, provided that such orders, directions and receipts are signed by the Customer or, in the good faith determination of the Bank, appear to be signed by the Customer. The Customer agrees to accept liability for all withdrawals from the accounts, to be responsible for the repayment of any overdraft and interest thereon and to assume full responsibility for the genuineness of all instructions given in connection therewith.

2. The Bank may at any time and at its sole discretion refuse any deposit, limit the amount which may be deposited and return all or any part of a deposit.

3. Each order received by the Bank for credit to an account is subject to the following conditions:-

   (a) When a payment is made into an account other than in cash any credit given is provisional and may be reversed, until the monies represented by such payment have been received by the Bank. The Bank reserves the right to accept any order for collection only.

   (b) The Bank may forward an order directly to the bank where the order is payable or to any agent of its selection, which may collect the order through one or more sub-agents selected by it. Any such collecting agent shall be deemed an agent of the Customer.

   (c) The Bank's rights against the Customer on any order shall not be prejudiced by:-

      (i) loss, mutilation or dishonour of any order;

      (ii) any proceedings taken thereon by the Bank; or

      (iii) entering into an arrangement (which is hereby authorized by the Customer) with any third party.

   (d) The Bank shall not be responsible for:-

      (i) failure or delay in crediting an account whether through stop-payment instructions or otherwise;

      (ii) loss through the mails;

      (iii) late, or failure of, presentation, demand, collection or giving of notice of non-payment; or

      (iv) dishonour of any order, voucher or statement.

   (e) The Customer waives protest, presentment and notice of dishonour of any order, and waives the right to interpose any counter-claim or set-off against the Bank.

   (f) Multiple endorsements on "to order" cheques or other instruments will not be accepted by the Bank unless otherwise agreed in advance. In such case, they will be accepted by the Bank without any liability on its part and the Customer will assume full responsibility for the correctness and validity of all endorsements.

4. (a) In the event that the Bank receives instructions for several payments or other transactions which in the aggregate would exceed the amount of the credit balance on an account or any authorized limit in respect thereof it shall be entitled at its absolute discretion to select which transaction or transactions shall be executed, without reference to the date of despatch or time of receipt of the Customer's instructions and the Bank shall not be liable for any loss, damage or liability incurred by the Customer.

   (b) Unless otherwise agreed in writing, the liabilities of the Bank hereunder shall be payable only at the branch at which the account of the Customer is maintained. The Customer shall only be permitted to make withdrawals in cash at the discretion of the Bank which may discharge its obligations by the issue of a banker's draft or other instrument drawn upon it.

   (c) Deposit made to current accounts shall not be available for withdrawal until the next business day after that of deposit in the case of cash or the day after receipt of actual proceeds by the Bank in the case of cheques and other instruments.

   (d) Once a transfer order has been delivered to the Bank no subsequent request by the Customer for cancellation, withdrawal or amendment of the order will be accepted unless the Bank in its sole discretion decides otherwise.

   (e) The Bank will accept stop-payment instructions only in a form and manner acceptable to it. Such instructions shall in no event be effective for longer than six months from the date on which they are given to the Bank.

   (f) The Customer shall at all times exercise due care to prevent cheque books, payment orders or other orders or instruction from being altered or forged in a manner which may facilitate fraud. The Customer shall notify the Bank immediately on discovering that any cheques, payment orders or other orders or instruments supplied to it by the Bank have been stolen, lost or mislaid.

5. (a) Any deposits to or withdrawals from an account in a currency other than that in which it is maintained shall be effected at the Bank's exchange rate applicable at the date of the transaction, details of which are available on enquiry at the Bank.

   (b) If cheque clearing facilities are offered in foreign countries through institutions other than the Bank for accounts maintained in currencies other than the Singapore Dollar, the Bank shall not be liable for payment thereon or for any non-payment, mispayment or delay in transmission of funds by those institutions or otherwise.

   (c) If the Customer maintains a credit balance with the Bank, the amount of such balance may be held by the Bank with a bank or a financial institution considered first rate in the country (or, where applicable, countries) in which such currency is considered legal tender. Such deposit will be subject to all applicable laws including, but not limited to, those in the country or part thereof in which the bank or financial institution with which the deposit is maintained carries on business, is incorporated or registered or resident and the Bank shall not be liable in any way whatsoever if all or any part of such deposit becomes unavailable because of any applicable law for the time being in force, including those relating to foreign exchange control.

**Client Instructions**

1. The Customer agrees to send all instructions to the Customer's designated account manager at the Bank. Instructions must be in writing, in the English language and must include the relevant account number. Instructions not in accordance with the foregoing will not be acknowledged.

2. If the Customer's instructions are unclear or if the Bank receives conflicting instructions, then the Bank may, in its absolute discretion, choose not to act upon them unless and until the ambiguity or conflict has been resolved to the Bank's satisfaction.

3. The Customer agrees that the Bank is able to effect the Customer's instructions only during banking hours on business days. Additionally, instructions involving a foreign element can be effected by the Bank only on days when banks in the applicable financial markets are opened for business in the country concerned.

4. Instructions for securities transactions must show a price limit and are subject to all applicable market rules and regulations. Unless the Bank specifically agrees otherwise, orders are good only for the day on which such orders are given.

5. In order to comply with the Customer's instructions, the Bank may, without prior notice to the Customer, use the service of a correspondent bank.

6. At the Bank's sole discretion, the Bank may:-

   (a) refuse to execute sale orders before the securities are received;

   (b) repurchase, at the Customer's expense, securities sold which were defective or not delivered in time: or

   (c) consider as new instructions, any instructions which are not specified as being a confirmation or change or previous instructions.

**Telephone and Telefax Instructions**

1. The Bank may act on any telephone or telefax communication which is expressed to come from the Customer or its authorized representative and which is honestly believed by the Bank to do so, without further authentication or confirmation. However, any telefax communication must bear a signature or signatures which, in the opinion of the Bank, correspond to that of the Customer or its authorized representative as shown in the Customer's current mandate.

2. If the Customer gives written confirmation of an earlier telephone or telefax communication, it shall mark it clearly with the words "Confirmation only – do not duplicate".

3. The Customer agrees that the Bank may record any telephone communication and further agree that the Bank will be entitled to produce the recording at any court or other body as evidence of the conversation recorded, subject to the section entitled "Disclosure of Information".

4. The Customer shall bear all risks arising from any telephone or telefax communication with the Bank, which is discharged from any responsibility in respect thereof. These risks shall include, but not be limited to, those resulting from errors in transmission, misunderstanding or errors by the Bank regarding the identity of the Customer or its authorized representative.

5. The Customer agrees to indemnify and keep the Bank indemnified against any loss whatsoever which it may suffer as a result of the Bank acting on telephone or telefax communications which the Bank believes to have been given by or on behalf of the Customer or as a result of the Bank refusing, in its absolute discretion, to act on instructions received otherwise, and agrees to perform and ratify any contract entered into or action taken by the Bank as the result of such communications. However, the Bank reserves the right at any time, at its absolute discretion, to refuse to carry out any instructions given or offer made by telephone or telefax communication, even if the employee who received such communication on behalf of the Bank may have stated its acceptance thereof.

6. If the Bank gives written confirmation of any telephone or telefax communication this shall be binding on the Customer unless the Customer notifies the Bank, by the fastest means available, of any discrepancy between such written confirmation and the telephone or telefax communication (but in any case within seven days of the date on which the written confirmation is provided by the Bank).

**Instructions to Hold Mail**

1. If the Customer so requests, all correspondence will be retained by the Bank in a hold mail file in the Customer's name.

2. The Customer will at least once in every period of 12 months either collect in person or give written instructions for the disposal of all correspondence retained in such hold mail file, and in the case of accounts in joint names, the Bank may deliver the correspondence in the hold mail file:-

    (a) to any single account holder to such joint account who collects the correspondence in person; or

    (b) to any other party who has been nominated by written instructions signed in accordance with the Customer's current mandate.

3. Not withstanding any provision in this Agreement, the Bank may destroy correspondence retained in the hold mail file for more than 15 months for any reason.

4. The Customer expressly waives any obligation of the Bank to give him notice, whether pursuant to the terms herein or otherwise, and the Customer shall be deemed to have any communication or notice as being duly delivered to it on the date such communication or notice is placed in the hold mail file and shall be deemed to have full knowledge for all purposes of the contents of all the communication or notices so held.

5. The Customer hereby releases the Bank from all responsibility in respect of such communications so held in the hold mail file and waives any claim whatsoever which it may at any time have against the Bank arising out of the provision of this service, whether by reason of the negligence of the Bank, its officers or employees or otherwise.

6. The Customer agrees to keep the Bank indemnified against any loss whatsoever which it may suffer as a result of implementing hold mail arrangements in accordance herewith.

7. The Customer will pay to the Bank, annually in advance, such fee for the provision of this hold mail service as prescribed by the Bank and the Customer authorizes the Bank to debit such fee to its account. The Customer notes that the fee currently charged has been notified to him and may be revised by the Bank at any time on written notice to him.

**Payments**

1. All sums payable to the Bank by the Customer shall be paid in immediately available funds at the Bank's principal Singapore office or to any other account specified by the Bank without set-off, counterclaim or any other restriction or condition and free and clear of any tax of other deductions or withholdings of any nature. If the Customer or any other person shall be required by any law or regulation to make any deduction or withholding on account of tax or otherwise from any other payment, the Customer shall, together with such payment, pay such additional amount as will ensure that the Bank receives free and clear of any tax of other deductions or withholdings the full amount which the Bank would have received if no such deduction or withholding had been required.

2. Any monies received by the Bank in respect of the Customer's obligations to the Bank may be placed and kept to the credit of a suspense account for so long as the Bank thinks fit, and in the event of any proceedings in or analogous to bankruptcy, winding-up, liquidation, composition or arrangement, the Bank may prove for and agree to accept any dividend or composition in respect of the Customer's outstanding obligations as if there had been no suspense account or no credit therein.

3. If any court gives a judgement in the Bank's favour for any amounts owing by the Customer and such judgement is expressed in a currency (the "judgement currency") other than the currency in which such amounts are owing to the Bank (the "currency of account"), the Customer shall fully indemnify the Bank in respect of any difference between:-

   (i) the rate or rates of exchange used for such purposes to convert the sum in question from the currency of account into the judgement currency; and

   (ii) the rate or rates of exchange at which the Bank may purchase the currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such judgement.

4. For all purposes hereof, including any legal proceedings, any records kept by the Bank in respect of any account of the Customer or a certificate by any of the Bank's officers as to the sums and liabilities for the time being owing by the Customer to the Bank or any other matter provided for in this Agreement shall, in the absence of manifest error, be conclusive evidence thereof. The Bank may debit the Customer's account with any sum which the Customer is liable to pay to the Bank whether or not a demand has first been served on the Customer.

5. The Bank reserves the right at all times to reverse any erroneous entries to any account of the Customer with immediate effect, back-valued to the date upon which the correct entry (or no entry) should have been made.

**Interest**

Interest rate offered in respect of or charged on accounts by the Bank are subject to change by it at its sole discretion. Details are available on enquiry at the Bank. In the absence of agreement, interest shall be payable at the rate specified by the Bank and the Customer agrees to pay such interest as if expressly agreed with the Bank. Interest shall accrue from day to day and shall be calculated on such basis and be payable at such times as the Bank may determine in accordance with its usual practice. The Customer acknowledges that a higher rate of interest may be charged on amounts in default and such interest shall be payable by the Customer both before and after judgement and, in the absence of any agreement to the contrary, may be compounded at monthly or longer intervals or if applicable at the end of each funding period as selected by the Bank.

**Commission, Charges and Expenses**

The Customer shall pay to the Bank on a full indemnity basis all fees, costs and expenses (including, without limitation, telecommunication expenses and costs of delivery of securities), commissions (including without limitation brokerage commission) custodian charges and any other charges (collectively the "Charges") in respect of (i) the products and/or services contemplated hereunder; (ii) any overdraft granted to the Customer and any of its outstanding advances; (iii) any overdrawn sums on the Account(s); (iv) any investment(s) or transactions made by the Bank on the Customer's behalf and/or in connection with the Account, upon receipt of a periodic invoice detailing such commissions, charges [which will include those levied by Depositaries (as defined below)] and expenses. Such commission, charges and expenses will be debited from a specified account of the Customer.

**Liabilities and Indemnities**

1. (a) Neither the Bank, its affiliates, nor any of the Bank's or the affiliates' directors, officers or employees, shall be liable to the Customer for any expenses, loss or damage suffered by or occasioned to the Customer by reason of:-

   (i) any action taken or omitted to be taken by any one or all of the Bank, its affiliates, the Bank's or the affiliates' directors, officers, employees or agents pursuant to this Agreement or in connection therewith;

(ii) the Bank's failure in good faith to honour any stop-payment instructions given by the Customer or its authorised representative;

(iii) the presentation to the Bank of any cheque or other payment order which is post-dated;

(iv) the Bank failing to honour any draft drawn on it by the Customer, but the Bank shall immediately return such draft to the Customer through the normal channels giving the reason for the dishonour;

(v) any loss, damage, destruction, misdelivery or non-delivery of or to the securities howsoever caused; unless the same shall result from the negligence of, or theft by, the Bank or its affiliates or any of the Bank's or the affliates' directors, officers or employees, in which event the extent of the liability of the Bank shall be limited to the market value of such securities at the date of discovery of the loss and in no circumstances shall the Bank be liable for any special, general or consequential damages, even if the Bank has been advised of the possibility of such damages;

(vi) any fraudulent, forged or stolen share certificates or other evidence of title or transfers or any other documents which are not authentic;

(vii) unauthorized use or forging of any authorized signature;

(viii) any act or omission, or insolvency of, any person not associated with the Bank (including without limitation a third party nominee or Depositary (as defined below));

(ix) the collection or deposit or crediting to the Account of invalid, fraudulent or forged securities or any entry in the Account which may be made in connection therewith;

(x) any malfunction of, or error or delay in the transmission of information howsoever caused;

(xi) any error or omission in payments under any standing order given by the Customer or its authorised representative;

(xii) any breach of any of the Customer's obligation under this Agreement;

(xiii) any claim that arises from acting reasonably in accordance with the instructions of the Customer or its authorised representative;

(xiv) the loss or destruction of, or delay in processing, cheques or other instructions or documents;

(xv) any delay in transferring funds to or from the Account; and

(xvi) either refusing to act on contradictory instructions given in respect of any account or for acting on any one only of such contradictory instructions.

(b) The Bank shall be under no duty to supervise compliance with restrictions on the investment powers of the Customer.

(c) The Bank shall be under no duty or obligation to insure the securities or any other property of the Customer deposited with or held by the Bank against any risk (including without prejudice to the generality of the foregoing, the risk of loss, damage, destruction or misdelivery of the securities) howsoever caused.

2. The Customer shall indemnify the Bank in full against all actions, suits, proceedings, claims, demands, costs and expenses (including legal fees on a solicitor and client basis and any interest and commission payments) which may be taken or made against the Bank pursuant to or in connection with any of the Customer's accounts, the securities, any Deposit (as defined below), any Investment (as defined below), any facility extended by the Bank to the Customer, this Agreement or the performance of its duties and obligations hereunder (whether as investment manager or otherwise) or which may be incurred by the Bank in connection with any claim by it for monies payable to the Bank. Without limiting the foregoing, the Customer hereby agrees on demand to indemnify the Bank against:-

(a) any tax for which the Bank is or may be liable or accountable in connection with the securities, Cover (as defined below) or the performance of its obligations under this Agreement provided that this indemnity shall not extend to tax on or attributed to the Bank's fee income hereunder or for which a deduction or withholding has been made by the Bank, any loans premiums or fees which the Bank is entitled herein to retain for its own benefit and account, or profits or gains earned by the Bank in respect of Cover, which hereunder is for the benefit and account of the Bank. "Tax" means all present and future taxes, levies, imposts or duties (including value added taxes and stamp duties) whatsoever and wheresoever imposed; and

(b) any liability hereunder resulting from the fact that securities are registered in the name of the Bank or its nominee or sub-custodian, or as a result of any indemnity properly given by the Bank to a nominee or a sub-custodian to whom the Bank shall have delegated the performance of its duties hereunder against liabilities incurred by such nominee or sub-custodian in the performance of such duties.

## Set-Off

1. In addition to any other right which it may have at law, the Bank shall be entitled to retain and not repay any amount whatsoever which is or may hereafter be owing from it to the Customer or any monies whatsoever which it may hold, now or hereunder, for the account of the Customer, whether on current or deposit account and regardless of the currency thereof, unless and until the Customer shall have discharged in full all monies, obligations and liabilities to the Bank whether present or future, as principal or surety, including but not limited to all principal monies, interest at such rates as may from time to time be payable by the Customer (or which would have been so payable but for the Customer's liquidation, bankruptcy, death or other incapacity, as may be applicable), fees, commission, discount and other discharges and any other costs and expenses, including legal costs on a full indemnity basis, incurred in respect thereof (together the "Liabilities").

2. Without limiting any general or banker's lien, right of set-off or other right to which the Bank may be entitled, the Bank may at any time, without notice to the Customer, combine, consolidate or merge all or any of the Customer's accounts with it and the Liabilities and may set-off or transfer any sums held for the Customer or standing to the credit or any such accounts (whether subject to notice or not and whether mature or not) in or towards satisfaction of the Liabilities, notwithstanding that the sums held for the Customer or the balances on such accounts and the Liabilities may be at different branches in different jurisdictions and may not be expressed in the same currency and the Bank is hereby authorized to effect any necessary conversions at its own rate of exchange then prevailing.

## Power of Attorney

The Customer irrevocably and by way of security appoints the Bank to be the Customer's attorney, with full power of substitution and delegation, and in the Customer's name or otherwise to grant, execute and do all such assurances, acts and things which the Customer could have done in order to ensure and procure compliance with the undertakings and provisions contained in the Agreement and generally pursuant to the powers, authorities and discretions conferred on the Bank by and pursuant to this Agreement and (without prejudice to the generality of the foregoing) to execute and deliver and otherwise to perfect any assurance, agreement, instrument or act which the Bank may deem proper in or for the purpose of exercising any of such powers, authorities and discretions.

The Customer hereby ratifies and confirms and agrees to ratify and confirm any deed, instrument, act and thing which such attorney may lawfully execute or do and all money expended by any such attorney shall be deemed to be expenses incurred by the Bank under this Agreement.

## Disclosure of Information

1. The Customer authorizes the Bank to disclose any information regarding the Customer's banking relationship and any account maintained with the Bank ("Confidential Information") to any branches, subsidiary or affiliate of American Express Company provided that the recipient of such information shall be required to keep it private and confidential. It is agreed that the disclosure of information in such circumstances shall not constitute a violation of the Bank's obligations of confidentiality. The Customer further understands that the Bank engages service providers and agents located both within and outside of Singapore. As a result, customer information may be processed and stored in other countries. While the Bank uses contractual and other measures to ensure protection of customer information, governments, courts, law enforcement or regulatory agencies in these other countries may be able to obtain disclosure of customer information through the laws of these countries

In addition, the Customer agrees that the Bank shall have the right to disclose Confidential Information in the following circumstances:

(a) if required to do so by any court order or similar process;

(b) if required or permitted to do so by law or by the rules of any regulatory body of which the Bank is a member or whose rules or provisions apply to the Bank;

(c) at the Customer's request, or with the Customer's consent to provide references on the Customer regarding the Customer's relationship with the Bank;

(d) where applicable, to the consumer credit bureau which is recognised by the Monetary Authority of Singapore and gazetted under the Banking Act (Cap. 19);

(e) to any exchange, clearing house, bank, counterparty or agent that the Bank may deal through or transact with in relation to the Account; and

(f) to any person where such disclosure is in the opinion of the Bank necessary for the enforcement or the efficacy of any transaction or service in connection with the Account.

2. The Customer acknowledges and agrees that the Bank may, in its absolute discretion, disclose to any person who is providing any mortgage, charge, guarantee, assignment, pledge, lien, hypothecation or other security interest, or who is a party to any other agreement or arrangement having a similar effect in connection with the Customer's obligations and/or liabilities under this Agreement, information relating to and/or in connection with the Customer's outstanding obligations and/or liabilities under this Agreement from time to time.

3. The Customer acknowledges that where a nominee in whose name any securities are registered is required to disclose particulars of the interest of the Customer or of any other person in the securities so registered, such particulars will be so disclosed, and that further enquiry may be made of any person whose interests are so disclosed and that penalties may be imposed by the Bank for failure to make such disclosure.

4. If the Bank becomes aware of confidential information which in good faith it feels inhibits it from effecting a particular transaction under this Agreement then the Bank may refrain from effecting that transaction.

**Conflicts**

The Bank may effect transactions for the Customer through the agency of any/or with a counterparty which is an entity with the American Express even if a conflict of interest may arise. The Bank may also effect transactions in which the Bank has a direct or indirect material interest.

**Joint and Several Liabilities**

1. Where this Agreement is signed by more than one account holder as Customer the liabilities of the undersigned shall be joint and several and references to the Customer shall be construed as references to each and/or any of the undersigned. Each such signatory to this Agreement authorizes the Bank to deposit all sums now or in the future held or received in the name of the Customer or any one or more of the signatories (unless the signatory has established an individual account in its own name) in their joint names with the right of survivorship and authorizes the Bank to hold on the death of any of them any credit balance in any account to the order of the survivor(s) without prejudice to any right the Bank may have in respect of such balance arising out of any lien, charge, pledge, set-off, counter-claim or otherwise.

2. In the absence of written instructions to the contrary, each signatory to a joint account shall be entitled to operate and authorize closure of the account individually and independently from all other(s). Notwithstanding the foregoing, if prior to acting on instructions received from one signatory to a joint account, the Bank receives contradictory instructions from another signatory thereto, it shall act thereafter only the conflicting instructions have been clarified and on the instructions of all the signatories to the Account. In any event, the Bank shall not be liable to the joint account holder(s) for any consequences arising from the operation and/or closure of the account.

3. Each account holder in the case of joint accounts hereby confirms and agrees that while their respective risk profiles may differ, the Bank is entitled, from time to time, to review and/or to determine the risk profile of the joint account, having regard to the transactions authorized by the account holders and/or other relevant risk factors and/or considerations from the Bank's perspective and each signatory shall be bound by all instructions validly given to the Bank by the other joint account holder(s) in accordance with this Agreement, regardless of whether such instructions originated from him or otherwise or whether the instructions have been given with his approval or otherwise. The Bank shall not be liable to the joint account holder(s) for any loss, damage, claim and/or other consequences arising from or in connection with the carrying out of such instructions.

4. The liabilities and obligations of each signatory to this Agreement shall not be impaired by:-

(i) any failure of any term herein to be legal, valid, binding and enforceable as regards any other signatory;

(ii) any giving of time, forbearance, indulgence or waiver as regards any other signatory;

(iii) any release or discharge of any other signatory; or

(iv) any other matter or event whatsoever whether similar to the foregoing or not which might have the effect of impairing or discharging all or any of the liabilities or obligations of any other signatory.

**Representations and Warranties**

1. The Customer, and in the case of joint accounts, each account holder, represents and warrants to and for the benefit of the Bank that:

(i) in the case of a Customer which is a corporation, it is a corporation duly incorporated and validly existing under applicable laws and has the power and authority to own its assets and to conduct the business which it conducts and/or proposes to conduct;

(ii) it has the power to enter into, exercise its rights and perform and comply with its obligations under this Agreement;

(iii) all action, conditions and things required to be taken, fulfilled and done (including the obtaining of any necessary consents) in order (a) to enable it lawfully to enter into, exercise its rights and perform and comply with its obligations under this Agreement, (b) to ensure that those obligations are legally binding and enforceable, and (c) to make this Agreement admissible in evidence in the courts of Singapore have been taken, fulfilled and done;

(iv) its entry into, exercise of its rights and/or performance of or compliance with its obligations under this Agreement do not and will not violate or exceed any borrowing or other power or restriction granted or imposed by (a) any law to which it is subject, (b) where applicable, any provision of its constitutive documents or (c) any agreement or security to which it is a party or which is binding on any of them, and do not and will not result in the creation of any security over those assets;

(v) its obligations under this Agreement are valid, binding and enforceable in accordance with their respective terms;

(vi) no litigation, arbitration or administrative proceeding is current or pending or, so far as it is aware, threatened (a) to restrain the entry into, exercise of its rights under and/or performance or enforcement of or compliance with its obligations under this Agreement or (b) which has or could have a material adverse effect on it or on it;

(vii) no Event of Default has occurred, or will occur as a result of provision of any banking facilities or banking services contemplated herein, and it is not in breach of or default under any agreement to an extent or in a manner which has or could have a material adverse effect on this Agreement. "Event of Default" has the meaning set forth in the sub-section entitled "Events of Default" below in this section entitled "General Business Conditions";

(viii) no security exists on or over any of its assets;

(ix) there has been no material adverse change in its financial condition or operations since the date of this Agreement;

(x) no meeting has been convened for its winding up, bankruptcy, dissolution or for the appointment of a receiver, trustee, judicial manager or similar officer of it, its assets or any of them, no such step is intended by it and, so far as it is aware, no petition, application or the like is outstanding for its winding up, bankruptcy or dissolution or for the appointment of a receiver, trustee, judicial manager or similar officer of it, its assets or any of them;

(xi) neither it nor any of its respective assets is entitled to immunity from suit, execution, attachment or other legal process, and its entry into this Agreement constitutes, and the exercise of its rights and performance of and compliance with its obligations under this Agreement will constitute, private and commercial acts done and performed for private and commercial purposes;

(xii) no information furnished in writing to the Bank by it in connection with this Agreement contained any misstatement of fact as at the date when such information was given which was material in the context of this Agreement or omitted to state a fact as at such date which in any such case would be materially adverse to the interests of the Bank under this Agreement;

(xii) it is the beneficial owner of the property and assets held in the Account and that, subject to any discretionary authority granted to the Bank under this Agreement, it and its authorised signatories will at all times maintain complete and exclusive control of the Account and the property and assets held in the Account; and

(xiv) each of the above representations and warranties will be correct and complied with in all respects so long as any obligation of the Customer under this Agreement remains to be fulfilled and/or any sum remains payable under this Agreement as if repeated then by reference to the then existing circumstances.

## Events of Default

1. The following are Events of Default:

(i) the Customer does not pay in the manner provided in this Agreement any sum payable under it when due or any other sum owing to the Bank;

(ii) the Customer does not perform or comply with any one or more of its obligations under this Agreement (including, without limitation, any margin requirements) or any terms or conditions of any relevant credit facility and, if in the opinion of the Bank that default is capable of remedy, it is not in the opinion of the Bank remedied within 14 days of its occurrence;

(iii) any representation, warranty, certification or statement by the Customer in this Agreement or in any other document delivered under this Agreement is not complied with or is or proves to have been incorrect in any respect when made or, if it had been made on any later date by reference to the circumstances then existing, would have been incorrect in any respect on that later date, or is not complied with or is or proves to have been incorrect when made or deemed repeated or if the Bank shall learn that any misrepresentation or misleading omission has been made in any information delivered to the Bank in respect of the Customer;

(iv) the Customer is (or is, or could be, deemed by law or a court to be) insolvent or unable to pay its debts, stops, suspends or threatens to stop or suspend payment of all or a material part of (or of a particular type of) its indebtedness, begins negotiations or takes any other step with a view to the deferral, rescheduling or other readjustment of all of (or all of a particular type of) its indebtedness (or of any part which it will or might otherwise be unable to pay when due), proposes or makes a general assignment or an arrangement or composition with or for the benefit of the relevant creditors or a moratorium is agreed or declared in respect of or affecting all or a material part of (or of a particular type of) the indebtedness of the Customer;

(v)    a distress, attachment, execution or other legal process is levied, enforced or sued out on or against the assets of the Customer and is not discharged or stayed within 14 days;

(vi)    any security on or over the assets of the Customer becomes enforceable;

(vii)    where applicable, any step is taken by any person with a view to the winding up of the Customer (except for the purpose of and followed by a reconstruction, amalgamation, reorganisation, merger or consolidation on terms approved by the Bank before that step is taken) or for the appointment of a liquidator (including a provisional liquidator), receiver, judicial manager, trustee, administrator, agent or similar officer of the Customer or over any part of the assets of the Customer;

(viii)    where applicable, any step is taken by any person with a view to the bankruptcy of the Customer or for the appointment of a receiver, administrator, agent or similar officer of the Customer or over any part of the assets of the Customer;

(ix)    where applicable, the Customer ceases or threatens to cease to carry on all or a substantial part of its business;

(x)    where applicable, any step is taken by any person with a view to the seizure, compulsory acquisition, expropriation or nationalisation of all or a material part of the assets of the Customer;

(xi)    any action, condition or thing (including the obtaining of any necessary consents, approvals or licences) at any time required to be taken, fulfilled or done for any purpose is not taken, fulfilled or done, or any such consent, approval or licence is revoked, withdrawn, cancelled or otherwise ceases to be in full force and effect without modification or any condition in or relating to any such consent is not complied with (unless that consent or condition is no longer required or applicable);

(xii)    it is or will become unlawful for the Customer to perform or comply with any one or more of its obligations under this Agreement;

(xiii)    this Agreement ceases for any reason (or is claimed by the Customer) not to be the legal and valid obligations of the Customer binding upon it in accordance with its terms;

(xiv)    any litigation, arbitration or administrative proceeding is current or pending to (a) restrain the exercise of any of the rights and/or the performance or enforcement of or compliance with any of the obligations of the Customer under this Agreement or (b) which has or could have a material adverse effect on the Customer;

(xv)    any event occurs which, under the law of any relevant jurisdiction, has an analogous or equivalent effect to any of the events mentioned in paragraphs (iv), (v), (viii), (x) or (xi);

(xvi)    any event occurs or circumstances arise which the Bank reasonably determines give(s) reasonable grounds for believing that the Customer may not (or may be unable to) perform or comply with any one or more of its obligations under this Agreement;

(xvii)    any legal proceeding, suit or action of any kind whatsoever (whether criminal or civil) is instituted or existing against the Customer;

(xviii)    any of the events described in paragraphs (i) to (xv) above shall occur in the case of any guarantor, surety or other person in any way liable in respect of or providing security for the obligations of the Customer to the Bank; and

(xix)    in the opinion of the Bank, there has been, since the first utilisation of any credit facility, a material adverse change in the financial condition or operating environment of the Customer or any guarantor, surety or other person in any way liable in respect of or providing security for the obligations of the Customer to the Bank.

**Consequences of Events of Default**    Upon the occurrence of an Event of Default, the Bank may, in its absolute discretion, take any of the following actions:

(a)    terminate this Agreement and close the Account forthwith with or without notice to the Customer and paragraph 3 under the sub-section entitled "Closing of Account and Termination" in this section entitled "General Business Conditions"; or

(b)    terminate any of the banking facilities, services, agreements or accomodation granted by the Bank to the Customer pursuant to or in connection with this Agreement or any other agreement forthwith with or without notice to the Customer; or

(c)    terminate or refuse to effect any agreements, investment, realisation or other transaction to be carried out by it on behalf of the Customer pursuant to this Agreement; or

(d) hedge and / or close out any outstanding transaction (including any transaction which has yet to be settled on the date on which the Bank terminates such transaction) by determining its value in good faith as of the date of the close-out as soon as practicable after the close-out;or

(e) decline to make any Loans (as defined in the sub-section entitled "Securities Lending") and/or to discontinue lending to any Borrower (as defined in the sub-section entitled "Securities Lending"), without prior notice to the Customer; or

(f) demand payment of any sum outstanding or owing from the Customer to the Bank; or

(g) without prior notice to the Customer and notwithstanding any settlement of account or other matter whatsoever, combine or consolidate all or any of its then existing accounts including accounts in the name of the Bank or of the Customer jointly with others (whether current, deposit, loan or of any other nature whatsoever whether subject to notice or not and whether in Singapore dollar or in any other currency) wheresoever situate and set-off or transfer any sum standing to the credit of any one or more such accounts in or towards satisfaction of any obligations or liabilities of the Customer to the Bank whether such liabilities be present, future, contingent, primary, collateral, several or joint. Where such combination or set-off or transfer requires the conversion of one currency into another, such conversion shall be calculated at the then prevailing spot rate of exchange of the Bank (as conclusively determined by the Bank) for purchasing the currency for which the Customer is liable with the existing currency; or

(h) without prior notice to the Customer, sell or dispose of all or part of the Charged Securities (as defined in the section entitled "General Security Provisions") in such manner as the Bank may in its absolute discretion think fit including, without limitation, at the current market price to any subsidiary and/or associated company of the Bank without being accountable for any profit made by any such company; or

(i) without prior notice to the Customer, sell or dispose of all or part of the Deposited Property (as defined in the section entitled "General Security Provisions") in such manner as the Bank may in its absolute discretion think fit including, without limitation, at the current market price to any subsidiary and/or associated company of the Bank without being accountable for any profit made by any such company; or

(j) exercise any of its rights over the Charged Assets (as defined in the section entitled "General Security Provisions") under the sub-section entitled "General Rights Over the Charged Assets" in the section entitled "General Security Provisions"; or

(k) sell or otherwise dispose of all or any of the Charged Assets (as defined in the section entitled "General Security Provisions") at any time, without demand for payment or notice to any person in such manner as the Bank may in its absolute discretion think fit; or

(l) exercise any other rights conferred upon it under or pursuant to this Agreement.

Without prejudice to generality of the foregoing, the Bank may, in the event of an Event of Default, and in addition to its rights and remedies under this Agreement, in its sole and absolute discretion, at any time and from time to time if it deems necessary for the protection of its interest, without notice to the Customer and at the Customer's sole expense and risk, take such measures in such manner as it deems fit in relation to the Account (including but not limited to liquidating any of the positions in the Account by entering into an off-setting transaction or in any other manner as the Bank deems fit, taking delivery under any of the positions in the Account, hedging under any of the positions in the Account, hedging and/or entering into off-setting or other transactions in order to establish a spread or straddle to protect against any risk of loss in respect of such positions, selling all or any part of the margin and/or cancelling or completing any open orders or other commitments made on behalf of the Customer for the purchase or sale of any property, borrowing or purchasing or otherwise procuring any such property being the subject matter of any sale and making delivery under such sale on terms and conditions deemed appropriate by the Bank). In exercising any of its rights under this Agreement, the Bank shall not be obliged to furnish any reason to the Customer

**Notices and Statements**

1. The Bank may, but shall not be obliged to, issue and send to the Customer statements of account (as well as confirmations of or advice in respect of any investment transaction at monthly intervals or at such intervals as the Bank may deem fit.

2. Any notice required by the Bank shall be deemed to have been given if addressed to the Customer at such address as may be notified to the Bank in writing by the Customer or appear in the Bank's records as the Customer's last known address. Any notice given to one joint account holder is deemed to be sufficient notice to all joint account holders. Any notice delivered personally shall be deemed to have been given at time of delivery. Any notice despatched by letter postage prepaid shall be deemed to have been given immediately after posting. Any notice sent by telex with answerback or by facsimile shall be deemed to have been given at the time of transmission.

3. The Customer shall examine all statements supplied by the Bank setting out transactions on any of the Customer's accounts and unless the Customer objects in writing to any of the matters contained in such statement within seven days of such statement date the Customer shall be deemed conclusively to have accepted all the matters contained in such statement as true and accurate in all respects.

4. A certificate by an officer of the Bank as to the monies, obligations for the time being due, owing or incurred by the Customer to the Bank shall, save for manifest error be conclusive evidence thereof against the Customer for all purposes.

5. Any notice required to be given by the Customer shall be in a form and manner acceptable to the Bank and in accordance with all applicable regulations.

## Force Majeure

The Bank shall not be liable for any failure or delay in performance of this Agreement which is caused by circumstances beyond the reasonable control of the Bank including without limitation any change in or any event or series of events resulting in any change in local, national, international financial, economic, political, military, industrial, fiscal, regulatory, stock market, commodities or commodities futures markets, currency markets or market conditions (including without limitation any moratorium, suspension or material restriction on trading in securities generally on any stock exchange), any new laws, rules, regulations, notices, circulars, orders, judgments, decrees, or rulings of any court, government, governmental or regulatory authority ("Laws") or any change in existing Laws or any change in the interpretation or application thereof by any court or other competent authority, any change or development involving a prospective change in taxation or exchange controls or the implementation of any exchange control in any jurisdiction relevant to this Agreement, acts of government, strikes, lock-outs, fire, explosion, flooding, riot, public disorder, civil commotion, acts of war, acts of God or interruption or delay in transportation.

## Closing of Account and Termination

1. All banking facilities or accommodation or services that the Bank may grant from time to time are not binding and the Bank may revoke the facilities or accomodation or services at any time without prior notice. For the avoidance of doubt, nothing herein shall impose any obligation on the Bank to provide or continue any banking facilities or other accommodation or services to the Customer, and the Account or any other account, banking facilities, accomodation or services or all of them may be terminated or discontinued forthwith by the Bank at its absolute discretion with or without notice to the Customer and any or all of the Customer's account(s) with the Bank may be closed by the Bank giving written notice to the Customer.

2. Subject to paragraph 2 of the sub-section entitled "Joint and Several Liabilities" in this section entitled "General Business Conditions", the Customer may close the Account and terminate this Agreement by giving at least 14 business days' notice in writing. For this purpose, "business day" means any day on which the Bank is opened for business.

3. At the closure of the Account and termination of this Agreement:

   (a) the Bank may cancel any standing orders on the Account. It is the Customer's responsibility to inform the payees of the closure of the Account and cancellation of payment, and the Bank shall not be liable to the Customer or any third party for cancelling any standing order.

   (b) the Customer shall return to the Bank all unused cheques relating to the Account; and

   (c) the Customer shall pay the Bank any sum which the Customer owes the Bank in respect of the Account including any sum which becomes owing after the Account is closed.

## Interpretation

   (a) The terms and conditions contained herein have been arranged in particular sections, sub-section, clauses and paragraphs for convenience only. Any of them shall, where the context permits or requires, apply equally to transactions dealt with under other sections, sub-sections, clauses or paragraphs. Headings are for ease of reference only and shall have no legal effect. Where appropriate in this Agreement the use of the masculine gender shall also include the feminine or neuter gender and use of the singular shall include the plural.

   (b) In this Agreement, "securities" means stocks, shares, bonds, debentures, certificates of deposits, promissory notes and other securities of any kind whatsoever (whether marketable or otherwise).

   (c) In this Agreement, unless the context otherwise requires, references to the Customer shall if the undersigned is a sole proprietorship firm include the sole proprietor and its successor in the business and, if the undersigned is a partnership firm, include the partners as at the date of this Agreement and any other persons who shall at any time hereafter be or have been a partner of the firm and the successors to such partnership business. This Agreement shall be binding on the Customer and the Customer's heirs and successors notwithstanding any change in the constitution of the Customer or any such successors and, without limiting the foregoing, shall not be terminated or affected by the death or retirement of any parties or by any other change in the composition of any firm as foresaid.

(d) The term "this Agreement" shall include the terms set out herein (as amended from time to time) and additional terms relating to any new or additional services offered from time to time by the Bank and notified in writing to the Customer.

**Miscellaneous**

1. This is a continuing agreement and the security evidenced herein shall be a continuing security and all the rights, powers and remedies hereunder shall apply to all the Customer's past, present, future and contingent obligations to the Bank, in addition and without prejudice to any other security which the Bank may now or hereafter hold in respect thereof, and notwithstanding any intermediate payment or settlement of account.

2. This Agreement shall operate for the benefit of the Bank and its successors and assignees, notwithstanding any change by way of amalgamation, consolidation or otherwise in the constitution of the Bank or any such successor or assignee. The Bank may assign or otherwise transfer all or any of its rights and interests under this Agreement and any transactions to which this Agreement relates and/or the securities, documents and other properties in respect of which the Bank has a security interest without consent of the Customer and may deliver the same to the transferee(s), who shall thereupon become vested with all the rights and powers in respect thereof which were formerly vested in the Bank. The Bank shall be released and discharged from any liability or responsibility in respect of the securities, documents or other properties so transferred, but shall retain all its rights and powers in respect of securities, documents or other properties not so transferred.

3. The Customer shall immediately upon demand by the Bank and at the Customer's expense make, execute, do and perform all such further assurances, instruments, acts or things as the Bank shall from time to time require to perfect this Agreement and the Bank's title to the security hereby constituted or intended to be constituted, and give effect to any of the rights conferred on the Bank hereunder, including but not limited to any assignments and rights of subrogation.

4. Any forbearance or delay by the Bank in exercising any right, power or remedy shall not be deemed to be a waiver of such right, power or remedy, and any single or partial exercise of any right, power or remedy shall not preclude the further exercise thereof and no course of dealing between the Customer and the Bank nor any waiver in any one or more instances shall be deemed a waiver in any other instance. Each of the Bank's rights, powers and remedies shall continue in full force and effect until such rights, powers or remedies are specifically amended or waived by an instrument in writing executed by the Bank.

5. Any provision in this Agreement which is invalid for any reason in any jurisdiction shall be ineffective only to the extent of such invalidity and shall not affect the validity of the remaining provisions hereof or the validity of such provision in any other jurisdiction.

6. This Agreement supersedes any prior agreement entered into by the Bank and the Customer in connection with the provision of the private banking services as contemplated herein, including the custody of investments, the provision of securities services and the lending of securities. Any securities or documents previously deposited by the Customer with the Bank under prior agreement shall be deemed to form part of the property subject to this Agreement from the date hereof, provided, however, that this Agreement shall be separate from and shall not affect any agreement for the provision of other banking services, including any custodian agreement or agreement for the provision of securities services, including the lending of securities, made, or from time to time to be made, between the Bank through any of its other branches and the Customer.

7. The Bank's rights under this Agreement are cumulative and not exclusive of any rights provided by law and may be exercised from time to time and as often as the Bank deems expedient.

8. Except the Bank, its affiliates, any of the Bank's or its affiliates' directors, officers and employees, a person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act (Cap. 53B) to enforce any term of this Agreement.

**Governing Law and Jurisdiction**

This Agreement shall be governed by and construed in accordance with the laws of Singapore and the Customer hereby irrevocably submits to the jurisdiction of the Singapore courts, provided that such jurisdiction, at the sole option of the Bank, shall not be exclusive. The Customer further agrees that any writ, summons, order, judgement or other document shall be deemed duly and sufficiently served if addressed to the Customer and left at or sent by post to the address of the Customer last known to the Bank.



# DEPOSIT ACCOUNT

**Call and Time Deposits with American Express Bank Ltd**

1. (a) Call deposits have no due date, but, unless otherwise agreed to in writing, may be uplifted only when the required notice has been duly given by the Customer and has expired.

   (b) The Bank may repay all deposits (or any part of it) upon having given the Customer a notice equal to the length of notice required to be given by the Customer to uplift the deposits.

2. (a) Time deposits may be withdrawn wholly or partially before maturity.

   (b) Interest is payable on a time deposit on maturity of the deposit. If at the Bank's discretion a time deposit is allowed to be withdrawn before maturity date, the Bank reserves the right to levy a penalty charge and/or refuse to pay interest on such withdrawal.

   (c) Interest payable on a time deposit may be withdrawn or added to principal subject always to deduction of withholding or other similar tax (if any).

3. In the absence of any written instructions from the Customer to the contrary, the Bank is authorized to renew at the maturity thereof a deposit in the name of the Customer on the same terms and conditions applicable thereto immediately prior to such renewal or on such other terms and conditions as the Bank may in its absolute discretion consider appropriate in the circumstances.

4. The Bank is hereby authorised to place such moneys in the Customer's time deposit or call deposit account (as the case may be) on receipt of the money by way of telegraphic transfer or SWIFT or on the Customer's instructions (oral or otherwise) for placement of such deposit(s).

5. Subject to paragraph 2 above, all withdrawals of deposit shall be made by the Customer to the Bank in writing, by authenticated cable or by such other method of communication approved by the Bank. A withdrawal of any deposit shall be effected by way of cheques, drafts or telegraphic transfer in the currency of that deposit or such other currency (as the Bank in its absolute discretion may permit and subject to such terms and conditions as it deems fit).

**Fiduciary Investment**

1. The Customer hereby expressly authorizes the Bank to invest such cash balances as may be specified from time to time by the Customer (the "Cash Balances") in time deposits or other investments for a term not exceeding 12 months ("Investments") with banks or other financial institutions in any part of the world, including but not limited to other branches of the Bank, subsidiaries of the Bank and affiliate companies within of the American Express group Company (the "Institutions"), in the name of the Bank but for the account and at the exclusive risk of the Customer.

2. Subject to the terms herein, the Bank shall determine at its sole discretion the Institutions with which Investments shall be effected and the terms of such Investments and the operational procedures pertaining thereto, provided always that such Institutions shall be selected in accordance with the Bank's internal policy as to creditworthiness and reputations. However, the Customer shall instruct the Bank as to the amount and tenor of each Investment prior to it being effected. If the Bank has not received specific instructions from the Customer in respect of any Investment at least five business days prior to its maturity, the Bank may decide, at its sole discretion, whether and under what conditions the Investment will be renewed for a term not exceeding that of the Investment about to mature, or if the monies shall be retained in an account at the Bank.

3. It is agreed that in performing its tasks hereunder the Bank acts on behalf of the Customer only in an agency capacity. Its duties shall be confined only to effecting investments in accordance with the provisions herein and to crediting principal and interest actually received by it in respect of Investments to the Customer's account(s). All risks in connection with any Investment shall be borne solely by the Customer. It is acknowledged by the Customer that each Investment shall be subject to all laws and regulations applicable thereto, including, but not limited to, those in force in the place where any Investment is effected and those relating and applicable to any Institution with which such Investment is effected.

4. The Bank shall not be obliged to take any measures to enforce the payment of interest or the repayment of any Investment or to contest, in any way, any imposition of taxes, fees or costs or to oppose seizure, attachment or other restriction imposed in connection with any Investment by courts or public authorities. In any such case the Bank's sole obligation shall be to assign to the Customer the rights and claims and any security relating to such Investment.

5. The Bank shall issue a confirmation of the placement of each Investment made to the Customer and it shall appear, for the purposes of record only, as a separate item on the Customer's statement issued by the Bank. Such confirmation issued by the Bank shall give particulars of

   (i) the principal amount of each Investment;

   (ii) the duration of the Investment; and

   (iii) the new amount of interest which the Customer is entitled to receive in respect of such Investment. The Customer agrees that such confirmation containing the information provided above shall constitute a full and complete statement and shall entirely discharge the obligation of the Bank to account to the Customer in respect of the Investment.

6. The Customer undertakes promptly to complete and return to the Bank any notice, declaration, statement or other document requested by any Institution in respect of an Investment, whether relating to taxation payable on the Investment or otherwise. It is agreed by the Customer that the Bank shall have no liability whatsoever for any deduction or retention made in respect of any Investment or interest thereon on any other loss or liability incurred by any person as the result of failure to provide such a notice, declaration, statement or other document

7. The Bank shall be entitled to charge the Customer a fiduciary commission equal to:-

   (i) such percentage as may be notified in writing by the Bank to the Customer from time to time of the principal amount of each Investment placed with an Institution, such amount to be paid to the Bank in advance; and/or

   (ii) all amounts deriving from or accruing on each Investment (whether representing interest on an Investment, fee or other benefits whatsoever and whether payable by an Institution or otherwise) which are in excess of the aggregate amount of interest which the Bank shall have been instructed or deemed to have been instructed to obtain by the Customer or otherwise agreed between the Customer and the Bank. The Bank shall be deemed to have fully disclosed and shall not be obliged to account to the Customer in respect of any amount other than the aggregate amount of interest which the Bank shall have been instructed or be deemed to have been instructed to obtain by the Customer or otherwise agreed between the Customer and the Bank. The Customer authorizes the Bank to receive, enforce and retain any amounts which the Bank is entitled to received hereunder from an Institution or any other person whosoever.

8. The Customer or the Bank may terminate these arrangements at any time by giving written notice to the other but such termination shall not affect any Investment then existing which shall continue to be subject to the terms and conditions of its placement and the provisions herein until maturity. Upon termination the Bank may discharge its obligations by crediting to account(s) of the Customer all sums received by the Bank as interest on or repayment of Investments or, if so directed by and at the expense of the Customer, assigning to the Customer all the Bank's rights and interest in respect of any Investment, subject to all Liabilities (as defined in the sub-section entitled "Set-Off" above) having first been discharged..

**Deposit Currency Conversion**

This service allows the Customer to convert the currency of any of its time deposits with the Bank into another currency that is freely available in the Singapore interbank market.

The conversion of the deposit and interest therein into an alternative currency may be effected by a foreign exchange purchase contract with the Bank concluded at any time during the life of the deposit but not later than two business days prior to the deposit's maturity date. The contract will be "for value" on the date of maturity of the time deposit. The exchange rate applicable will be the rate (as determined by the Bank) prevailing in the Singapore interbank market at the date the foreign exchange purchase contract is effected.



# INVESTMENT SERVICES

We draw your attention to the section entitled "Disclosure of Risks and Disclaimer set out in the Private Bank Account Application".

**Security Advisory Service**

1. The Bank may from time to time provide:-

   (a) information, advice and recommendations in respect of dealings in securities, either at the request of the Customer or on the initiative of the Bank, provided always that the Bank shall not be under any obligation to provide advice on an on-going basis with regard to the management of the Customer's investment in securities;

   (b) facilities for dealing in such securities as the Bank may from time to time consider appropriate and for which quotations acceptable to it are available on recognised exchanges in Singapore or elsewhere, provided that no securities transaction shall be effected hereunder except at the express request of the Customer communicated to the Bank; and

   (c) such other services in respect of securities as the parties may from time to time agree.

2. (a) The Customer may instruct and authorize the Bank on behalf of the Customer to sell, assign, transfer or deliver any securities and to purchase additional investments in securities for the account and risk of the Customer to be deposited with the Bank under the terms of this Agreement (provided that the Bank shall be under no obligation to purchase additional investments in securities unless an arrangement satisfactory to it relating to the payment of the purchase price have previously been made) and in this connection the Bank is authorized to instruct such brokers, dealers or other agents (who may be associated or otherwise connected with the Bank) as it may select in the absence of any instructions to the contrary and the Bank shall not be liable or accountable for any act or omission of such brokers, dealers or agents. All dealer concessions made to the Bank and not otherwise payable to the Customer shall be retained by the Bank.

   (b) In connection with the sale or purchase of securities or additional investments in securities on behalf of the Customer, the Bank may combine the Customer's orders with the orders of other customers for execution (including orders placed on its own account or placed for persons connected with the Bank).

3. (a) All proceeds, collections and payments realised or made in respect of the securities shall be credited and debited to one or more specified accounts of the Customer, provided that the Customer's account will only be credited with value as at the date on which the Bank is advised that the corresponding credit has actually been made to the Bank's own account.

   (b) Any money which the Bank may from time to time hold or receive for the account of the Customer will earn interest as separately agreed.

   (c) The Bank is hereby authorized by the Customer to make any currency conversions in respect of transactions effected hereunder at its own rate of exchange then prevailing.

4. The Bank shall not be liable to the Customer in any way whatsoever for any loss, damage, costs or expenses of any nature whatsoever incurred or suffered by the Customer in connection with or resulting from;

   (i) application for new listed investments and secondary offerings of securities; and

   (ii) dealings in unit trusts and/or mutual funds,

   on the recommendations, advice or suggestion of the Bank.

**Custodian Service**

1. The Bank may, in its sole discretion, from time to time provide safe custody facilities for investments in securities.

2. (a) The Bank shall, for the purpose of providing safe custody facilities, open and maintain a bank account in Singapore (the "Custodian Account") for and in the name of the Customer and hold therein all documents of title and documents which evidence title to any investments in securities from time to time belonging to the Customer (the "securities") and are capable of being deposited and held in the Custodian Account, provided however that the Bank may in its discretion refuse to accept any investment or particular type of investment for custody. For the purpose of this Agreement, securities shall include but not be limited to the following investments:-

(i) shares in companies incorporated in any jurisdiction;

(ii) debenture stock, loan stock, bonds, notes, certificates of deposit, commercial paper or other debt instruments, including government, public agency, municipal and corporate issues;

(iii) warrants to subscribe for the above investments;

(iv) depository receipts or other types of instruments relating to the above investments;

(v) unit trusts, mutual funds and similar schemes established in any jurisdiction;

(vi) options, whether on any investment herein described, on currencies, precious metals or other assets, or an option on an option;

(vii) contracts for the purchase or sale at a pre-agreed price, and at a future date, of any investment herein described or any currency, precious metal or similar assets;

(viii) contracts for differences or contracts on indices; and

(ix) investments which are similar or related to any of the foregoing.

(b) The Bank may at its sole discretion require or permit the Customer to register securities in the name of any nominees (which may be connected with the Bank or with a Depository as defined below) on such terms and conditions as such nominee may require.

3. (a) The Bank is authorized by the Customer to hold the securities at any place of business of the Bank and the Bank may at its discretion cause them to be held on behalf of the Customer by any other bank or institution (whether or not such bank or institution is connected with the Bank) acting as a depository (the "Depository") for the account and at the risk of the Customer and on such terms and conditions as such depository may require. Any such place of business of the Bank or such Depository may be in Singapore or overseas, as the Bank at its sole discretion deems appropriate.

(b) The Bank shall have no duty to make any special enquiry as to the safekeeping facilities or collection, delivery or transfer procedures of any Depository, and shall have the right, at its absolute discretion and applying its own criteria, from time to time to appoint any new Depository and to terminate the appointment of any Depository. The Customer agrees and acknowledges that the Bank shall not be liable in any way whatsoever for any default, negligence, insolvency, action or omission by the Depository.

(c) All securities deposited with a Depository will be held absolutely to the order of the Bank to be dealt with by the Bank in accordance with this Agreement and the Bank shall have the sole right (to the exclusion of the Customer and any third party) to obtain possession of any such securities from such Depository.

(d) Nothing in this Agreement shall require the Bank to segregate securities held to the credit of the Custodian Account from securities held by the Bank for the account of another customer. In the case where the securities of the Customer are commingled with securities of other customers of the Bank, the Customer's interest in the securities may not be identifiable by separate certificates, or other physical documents or equivalent electronic records. The Bank shall maintain records of the Customer's interest in the securities that have been commingled. The Customer agrees that where such commingling and aggregation of the securities of the Customer and the securities of other persons result in entitlements to any dividends, interest and other monies payable in respect of the securities and all other rights, benefits and proceeds in respect of or derived from the same (whether by way of redemption, bonus, preference, option, substitution, conversion or otherwise) which otherwise without such commingling or aggregation would not have accrued to the securities, the Bank has full discretion as to the allotment of such rights, benefits or proceeds as amongst its customers, including the Customer as it deems fit).

(e) Any transit of securities will be handled in accordance with the Bank's usual procedures but for the account and at the risk of the Customer.

4. (a) The Bank may transfer, exchange or deliver in the required form and manner securities held by it for the account of the Customer hereunder only in accordance with instructions from the Customer or its authorised representative.

(b) Notwithstanding paragraph 4(a) above, unless and until the Bank receives any instructions to the contrary, the Bank shall be authorized to:

(i) present for payment all securities which are called, redeemed or retired or otherwise become payable and all coupons and other income items held by it for the account of the Customer which call for payment upon presentation and shall hold such cash as is received by it upon such payment for the account of the Customer;

(ii)   hold for the account of the Customer hereunder all stock dividends, rights and similar securities issued with respect to any securities held by it hereunder;

(iii)   exchange interim receipts or temporary securities for definitive securities and hold such definitive securities for the account of the Customer; and

(iv)   deduct or withhold any sum on account of any tax required, or which in its view is required to be deducted or withheld or for which it is in its view, liable or accountable, by law or practice of any relevant revenue authority of any jurisdiction.

In addition, the Bank shall be authorized to use reasonable endeavour to sell if there shall be a satisfactory market therefor, all subscription and other rights issued with respect to securities held by the Bank and with respect to which it shall not have received any instruction to the contrary within reasonable time prior to the expiration of such rights.

(c)   The Bank shall not be responsible for ensuring that any option, conversion or similar right relating to any securities is exercised or for any other administrative or supervisory matters affecting the securities unless expressly instructed by the Customer.

(d)   Upon termination of this Agreement as provided therein, the Bank shall be deemed to have been authorized to deliver the cash and securities then held or at any time thereafter received by the Bank to the Customer or the heirs or successors in title of the Customer (or in the case of joint accounts any one party thereto) and in so doing the Bank shall obtain a good discharge, but only after the Bank's fees and expenses have first been paid and proper evidence of entitlement shall have been provided to the Bank's satisfaction, all in accordance with and after compliance with all applicable laws. The Customer shall not have any right to specific securities custodised with or through the Bank, but will be entitled, subject to the provisions of this Agreement, to delivery by the Bank of securities of the same class, denomination and nominal amount, and which rank pari passu with those accepted by the Bank as being the securities.

5.   (a)   The Bank shall register all securities in respect of which registration shall be necessary in order to perfect the transfer thereof or title thereto as soon as possible after receipt of the necessary documents by the Bank, in the name of the Bank or in such other name as it may consider appropriate. The Customer shall from time to time furnish to the Bank appropriate instruments to enable the Bank to hold or deliver in proper form for transfer, or to register in the manner provided in this paragraph (a) any securities which it may hold for the account of the Customer and which may from time to time be registered in the name of the Customer.

(b)   The Bank shall only forward to the Customer such proxies relating to securities registered in its name or that of a nominee for it as are requested by the Customer and shall do so after executing the same in blank or having procured them to be so executed.

(c)   To the extent sufficient copies are received by the Bank in time for forwarding to each customer, the Bank shall endeavour to transmit to the Customer, as soon as reasonably practicable, all notices and other communications (including proxies) addressed to the holder of any securities registered in a name other than that of the Bank or a nominee of it, which it actually receives from the issuer thereof and in respect of which the Customer's instruction is required or to which the Bank in its discretion decides the Customer's attention ought to be drawn. The Bank shall only forward to the Customer information relating to the custody of the securities as are requested by the Customer.

(d)   The Bank shall not be obliged to take any legal action unless it has been fully indemnified to its reasonable satisfaction for costs and liabilities by the Customer and if the Customer requires the Bank to take any action which in the opinion of the Bank might make the Bank liable for the payment of money or cause the Bank to incur any other liabilities, losses, claims damages, costs or expenses, the Bank shall be kept indemnified by the Customer in any reasonable form as a prerequisite to taking such action.

(e)   The Customer acknowledges and agree that the securities or any part thereof may be lent to a third party upon the terms herein and money may be borrowed on behalf of the Customer against security of the securities. The Customer further acknowledges that brokers and agents may have a lien over securities pending settlement of the relevant transaction.

6.   The Customer hereby undertakes to the Bank:-

(a)   that the Customer except as otherwise disclosed to the Bank is the beneficial owner of the securities free from any encumbrance whatsoever in favour of a third party and will procure due compliance with its obligations in this Agreement by all nominees in whose name or names any securities are registered or holding any certificates or other documents of title relating to any securities;

(b) that the Customer has full power and authority to enter into and comply with this Agreement in respect of any securities of which the Customer is not the beneficial owner and that the Bank may deal only with the Customer as if the Customer were the beneficial owner;

(c) that the Customer will not acquire or authorize the acquisition, or deliver or arrange for the delivery to the Bank, of any partly paid securities unless the Customer has, or has made arrangements satisfactory to the Bank, to set aside in the name of the Bank cash or other property acceptable to the Bank sufficient to provide for paying up any such securities in full or for meeting such liability in full;

(d) that the Customer has not sold or otherwise disposed of or agreed to sell or otherwise dispose of or grant any option in respect of all or any of its rights, title and interest in and to the securities and will promptly notify the Bank of any sale of, or other transactions in or relating to, the securities;

(e) that the securities have been and will at all times be duly authorised and validly issued and are and will at all times be free from any restriction on transfer or rights of pre-emption; and

(f) that the Customer will not, without the prior written consent of the Bank, charge or encumber any of the securities or authorize anyone else to do so.

7. The Bank shall be entitled, in its absolute discretion, to refuse to effect any investment, realisation or other transaction required to be carried out by it on behalf of the Customer pursuant to this Agreement.

8. In consideration of the Bank's provision of the custodial services hereunder, the Customer hereby agrees to pay to the Bank such fees as may be determined by the Bank and notified by the Bank to the Customer.

9. The Bank shall not be liable for any loss, claim, damage, expense or liability suffered or incurred by the Customer, or profit or advantage of which the Customer may be deprived, which arises from or in connection with:-

(a) the manner in which the Bank holds the securities hereunder or deals with monies received or intended to be received in connection herewith;

(b) the loss, theft or destruction of, or any damage to, any of the securities or certificates relating thereto; or

(c) the performance or non-performance of the Bank's duties hereunder,

except insofar as the same arises as a result of the negligence, fraud and/or wilful default of the Bank.

## Securities Lending

1. (a) The Customer hereby authorises the Bank and appoints the Bank for all purposes hereunder to act as its agent to arrange, make and administer Loans (as defined below) of Available Securities (as defined below) and consents to and authorizes the Bank:-

(i) to negotiate and make Loans of such Available Securities to such Borrower or Borrowers (as defined below) as the Bank in its sole discretion may select, and on such terms and conditions as the Bank in its sole discretion may determine;

(ii) to deliver Available Securities from time to time to any Borrower; and

(iii) to receive Cover (as defined below) and other collateral and guarantees or other security for the Loans.

(b) Without prejudice to the generality of paragraph (a) above, the Customer hereby authorizes the Bank to make available on the Customer's behalf Available Securities for automatic lending in accordance with the Supplementary Terms and Conditions and Operating Procedures of the Euroclear Scheme, as may be amended from time to time.

(c) The Bank shall have the right, in its sole discretion:-

(i) to appoint sub-agents (who may be associated with the Bank) or otherwise delegate its function hereunder; and

(ii) to make or decline to make any Loans and to discontinue lending to any Borrower, without prior notice to the Customer.

(d) The Bank in no way represents that any of the Available Securities will in fact be the subject of Loans, and the Bank's own securities and securities of other customers of the Bank may be utilised for Loans to any Borrower or a potential Borrower. The Bank may also lend such securities prior to the making of a Loan to a Borrower or a potential Borrower.

(e) The Customer acknowledges that the Bank may be a creditor and/or customer of the Borrower, or may represent other creditors and/or customers of the Borrower in a fiduciary capacity.

(f) The Bank shall send the Customer, as soon as reasonably practicable, details in respect of the previous month of any Loan of Available Securities and any return or payment for Borrowed Securities (as defined below).

2. (a) The Customer acknowledges that:-

    (i) on or prior to the making of any Loan, the Bank may require the Borrower to deliver, or cause to be delivered, to the Bank, Cover in an amount not less than the aggregate Market Value (as defined below) of the relevant Borrowed Securities and Unreturned Securities (after giving effect to the making of the Loan);

    (ii) if at the close of any Applicable Business Day (as defined below), the amount of Cover held by the Bank is less than the aggregate Market Value of the Borrowed Securities and Unreturned Securities (as defined below), the Bank may require the Borrower, not later than the close of business on such day in Singapore (or, if such day is not a Singapore Business Day), to deliver to the Bank additional Cover acceptable to the Bank sufficient to cause the amount of Cover held by the Bank to be not less than the aggregate Market Value of the Borrowed Securities and Unreturned Securities; and

    (iii) if at the close of any Singapore Business Day, the amount of Cover held by the Bank shall be in excess of the aggregate Market Value of the Borrowed Securities and Unreturned Securities, the Bank may agree to reduce or cause to be returned Cover sufficient to eliminate such excess.

(b) For the avoidance of doubt, the Customer agrees that Cover and/or any interest earned by the Bank in respect of Cover shall be for the benefit and account of the Bank only and the Bank agrees that any obligation to pay interest to the Borrower in respect of cash Cover shall be at the discretion of the Bank only.

3. (a) Until a Loan is terminated, the Borrower shall have all rights and obligations relating to the ownership of Borrowed Securities, except as to Distribution (as defined below) thereon, including without limitation the right to transfer such Borrowed Securities to others and to vote or otherwise consent (save for elections in respect of Distributions) as a holder thereof during the term of the Loan. The Customer hereby waives any right to vote or otherwise consent (save for elections in respect of Distributions) in respect of such Borrowed Securities during the term of the Loan. In the event that the Borrower as a holder of Borrowed Securities becomes entitled to make an election in respect of Distributions thereon, the Customer shall be entitled, through the Bank, to instruct the Borrower as to what action (if any) to take and if any payment is required to be made in connection therewith, the Customer shall, through the Bank, make such payment.

(b) Subject as hereinafter provided, the Customer shall be entitled to receive all Distributions with respect to all Borrowed Securities. If the Bank is unable to arrange for the Customer to receive any such Distribution then:-

    (i) in the case of a Distribution not in the form of securities, the Bank shall pay, as soon as reasonably practicable after the date of such Distribution, an amount equal to the Distribution to the Customer; and

    (ii) in the case of a Distribution of securities, the amount of such securities shall be added to the Loan on the date for such Distribution and shall be Borrowed Securities for all purposes, except that if the Loan has been terminated, the Bank shall deliver, as soon as reasonably practicable, the same (or equivalent securities) to the Customer.

(c) All payments, returns and deliveries to the Customer shall be subject to such permitted deductions as may have been made by the Borrower or any other person in accordance with the terms of the relevant Loans and the Bank is hereby authorized by the Customer to deduct or withhold any sum on account of any tax:-

    (i) required or which in its view is required to be so deducted or withheld; or

    (ii) for which it is or in its view liable or accountable;

whether by law or practice of any relevant revenue authority of any jurisdiction (which for the avoidance of doubt shall extend to all amounts to be paid, returned or delivered hereunder, and not only to Distribution).

4. (a) The Customer hereby authorizes the Bank in its sole discretion to terminate, and to accept the termination of, any Loan in whole or in part at any time without prior notice to the Customer. If a Loan is terminated in part, the part terminated and the part continued will each be treated as if they had been two separate Loans for the purposes of these provisions.

(b) The Bank will, as soon as reasonably practicable, terminate any of the Loans after receipt of the Customer's request so to do. The Customer hereby acknowledges that the Termination Date of a Loan after the appropriate termination procedures have been put in effect will be no later than three Working Days after the standard settlement time for the relevant type of securities on the principal exchange in which they are traded or if

lent in accordance with paragraph (1b) above no later than ten Working Days. The Customer may instruct the Bank to deliver to it any or part of any Securities (as the case may be). The Customer hereby acknowledges and agrees that the Bank shall not be liable to the Customer for any failed delivery occurring if timely notification as aforesaid is not given by the Customer.

5.  (a) Any Borrowed Securities which are returned on or prior to the Termination Date of the Loan pursuant to which they were lent shall cease to be Borrowed Securities and shall be Available Securities. If the Borrower fails to return any Borrowed Securities on the Termination Date of the relevant Loan, such securities shall cease to be Borrowed Securities and shall be Unreturned Securities and the Bank shall, as soon as reasonably practicable:-

    (i)   deliver to the Customer securities of the same type as and in a like amount to the Unreturned Securities; or

    (ii)  pay to the Customer an amount equal to the Market Value of the Unreturned Securities determined as of the close of trading on the Applicable Business Day following the Termination Date; or

    (iii) any combination thereof which the Bank shall in its sole discretion decide.

    (b) Upon either:-

    (i)   the return or delivery to the Customer of any Borrowed Securities or Distribution; or

    (ii)  the delivery or payment by the Bank to the Customer on account of any Unreturned Securities or Distribution;

    the Bank shall be subrogated to, and the Customer shall assign to the Bank, all rights of the Customer in connection with such Borrowed Securities and Distribution, and all rights against any person or entity having liability with respect thereto. Without prejudice to the foregoing, the Bank shall be entitled to take any legal or other action against any Borrower which the Bank deems necessary or appropriate to recover from such Borrower any losses incurred by the Bank as a result of its performance of its obligations hereunder.

6.  (a) The Customer shall not, without the Bank's prior written consent, take any action, or permit any action to be taken, which would amend, modify or change:-

    (i)   any of the Borrower's obligations in connection with any Borrowed Securities; and/or

    (ii)  the rights of the Bank in and to any Cover and other collateral and any guarantees or other security for the Loans.

    (b) The Customer shall promptly notify the Bank of any notice or property received directly by the Customer in connection with any Loan.

7.  The Bank will procure that each Borrower, in consideration of the Loans, will be obliged to pay to the Bank a loan premium (the "Premium") based on the Market Value or face value of the Borrowed Securities in accordance with the generally accepted market practice for the time being for the type of security lent. Within 15 Singapore Business Days of the end of each calendar month, the Singapore branch Bank shall credit to a specified account of the Customer 50% of the Premiums paid during the prior calendar month which are actually received by it. The balance of such Premiums shall be retained by the Bank for its own benefit and account.

8.  (a) These arrangements may be terminated by either party giving to the other six clear Working Days' notice in writing. If any such notice of termination from the Customer is delivered to the Bank, it will use reasonable endeavour to promptly give all Borrowers notice terminating all outstanding Loans on the fifth Working Day after such notice to the Borrower is given.

    (b) Following termination of these arrangements any outstanding obligations of the Bank and the Customer hereunder will remain subject to the provisions herein.

9.  The Customer acknowledges and agrees that the Bank may be a creditor for its own account , or may represent in a fiduciary or any other capacity, any Borrower or potential Borrower, any broker or any other creditor or customer of any of the foregoing, even though such interests may (potentially) conflict with those of the Customer.

10. In authorizing and appointing the Bank to act as its agent to arrange, make and administer Loans of Available Securities, the Customer understands and agrees that:

    (i)   risk can arise when a counterparty defaults on its obligations;

    (ii)  market fluctuations may result in changes in collateral levels and margin level, particularly in a rising market;

(iii) there is risk in obtaining collateral securing the liabilities of the Borrower under a Loan for e.g., an existing charge over the Borrower's assets may give a liquidator the right to recall cash collateral without necessarily returning the underlying securities because of imperfect set-off;

(iv) delivery risks may occur both when Available Securities have been lent and collateral has not been received at the same time or prior to the Loan, and when collateral is being returned but the Premium has not been received; and

(v) there may be market risks including price volatility, market liquidity and exchange rate fluctuations.

11. "Applicable Business Day" – any day on which transactions in currencies and exchange between banks may be carried on in the principal place where the relevant securities are traded and on which the principal exchange in such place is open for securities trading;

"Available Securities" – the equities and securities which may, from time to time, be held by the Bank for the account of the Customer or any other customer other than those securities which the Customer may notify to the Bank as being unavailable for Loans;

"Borrowed Securities" – the Available Securities lent under a Loan (or any new or different securities for which any original Borrowed Securities are exchanged under any recapitalisation, subdivision, consolidation, merger or other corporate action by the issuer thereof) plus any addition thereto under paragraph 3(b) above, and shall include securities of the identical issuer, class, rights, description and nominal amount or par value;

"Borrower" – any entity which borrows Available Securities from the Bank (acting as agent hereunder);

"Cover" – the individual and collective references to irrevocable standby letters of credit and any other types of security securing the liabilities of a Borrower under a Loan (including, for the avoidance of doubt, guarantees) which are delivered to the Bank in connection with a Loan;

"Distribution" – all distribution or payments made or paid on or in respect of any Borrowed Securities, including without limitation cash, stock, scrip or dividends or distributions, interest payments, redemption and other capital repayments, stock splits and subscription rights (or any equivalent rights under applicable law) and, if a record date is established for any such distribution or payment on any Borrowed Security and the certificate for such Borrowed Security (or an identical security) has been delivered and returned by the Borrower under circumstances whereby the Customer does not become the record holder of such certificate as of such record date, all distributions and payments that the Customer would have received if it had been such record holder;

"Loan" – a loan of any Available Securities by the Bank as agent hereunder;

"Market Value" – the price of the relevant securities on any day as quoted by any recognised pricing service selected by the Bank in its sole discretion or such other amount as shall be determined by the Bank in its sole discretion, which price shall be determined as of the close of trading on the preceding Applicable Business Day;

"Singapore Business Day" – any day on which transactions in currencies and exchange between banks may be carried on in Singapore;

"Termination Date" – the date on which a Loan terminates;

"Unreturned Securities" – any Borrowed Securities which the Borrower has failed to return to the Bank upon the termination of a Loan; and

"Working Day" – any day which is both a Singapore Business Day and an Applicable Business Day.

**Strategic Investments**

1. The Customer understands and acknowledges that Strategic Investment product is not 100% capital protected. Should the investment not perform well, the Customer may lose its original principal. Each Strategic Investment product shall conform to the General Product Outline set out in the schedule hereto. Subject to this Agreement and to the General Product Outline, the Bank shall determine the manner in which it shall implement the investment strategy for each Strategic Investment product, as set out in the product briefing ("Product Briefing") for the relevant product, and the institutions with which sums as instructed by the Customer from time to time to be invested in Strategic Investment products (the "Monies") shall be deposited or other transactions effected. The Bank shall not commit any Monies to the implementation of an investment strategy without the prior consent of the Customer to invest in the relevant Strategic Investment product.

2. The Customer authorizes the Bank to implement the investment strategy for each Strategic Investment product by investing the Monies, at its sole discretion, in deposits, bonds. equities and derivative financial instruments (together "Investments") in the name of the Bank but for the account and at the exclusive risk of the Customer. The Bank may make such Investments directly or through third parties engaged to act on its behalf. The duties of the Bank shall be confined to effecting the Investments and accounting to the Customer for the sums actually received by it in respect thereof. All risks in connection with any Investment shall be born solely by the Customer. It is acknowledged by the Customer that each Investment shall be subject to all laws and regulations applicable thereto, including, but not limited to, those in force in the place where any Investment is entered into and those relating to any institution with which such Investment is effected.

3. The Bank shall not be obliged to take any measures to enforce the payment of interest on or the repayment of any Investment or to contest, in any way, any imposition of taxes, fees or costs or to oppose seizure, attachment or other restriction imposed in connection with any Investment by courts or public authorities. At the Customer's request, the Bank shall assign to the Customer the rights and claims relating to such Investment.

4. Following the closing date for a Strategic Investment product in which the Customer participates, the Bank shall issue a confirmation specifying each of the Investments which it has made on behalf of the Customer in order to implement that investment strategy. An entry recording the current value of each Strategic Investment product in which the Customer participates will appear, as a matter of record only, on the Customer's statements issued by the Bank. The Customer agrees that such confirmation containing the above information shall constitute a full and complete record and shall entirely discharge the obligation of the Bank to account to the Customer for the Investments made in respect of each Strategic Investment product.

5. The Bank shall be entitled to charge the Customer the fees specified in the General Product Outline or such other fees as may be notified to the Customer from time to time, which may be deducted from the Monies held by it or debited to any account maintained by the Customer with the Bank.

6. The Customer or the Bank may terminate these arrangements at any time by giving written notice to the other but such termination shall not affect any Investment then existing which shall continue to be subject to the conditions of its placement and the provisions herein until maturity. Upon termination the Bank may discharge its obligations by crediting to account(s) of the Customer all sums received by the Bank in respect of any Investment or, if so directed by and at the expense of the Customer, assigning to the Customer all the Bank's rights and interest in respect of any Investment subject to all Liabilities having first been discharged.

**Schedule – General Product Outline**

## 1. Structure

Each Strategic Investment product is comprised of:-

(a) an investment in a fiduciary bank deposit or certificates of deposit; and

(b) an investment in bonds, equities and/or derivative financial instruments considered by the Bank to be appropriate to implement the investment strategy set out in the Product Briefing for that Strategic Investment product.

## 2. Objectives

The objective of each Strategic Investment product is to take advantage of short-term windows of opportunity in financial markets to achieve a potential return greater than that available by simply placing the principal sum invested on deposit, while providing capital protection for the principal sum or such proportion of it as may be specified in the Product Briefing for that Strategic Investment product.

The Bank seeks to meet the capital protection aspect of any Strategic Investment product by investing a proportion of the principal sum in bank deposit or certificates of deposit at the outset of the investment period for the Strategic Investment product. This amount is sufficient to provide that, with accrued interest, it will be equal to the entire principal sum, or the percentage of it specified in the Product Briefing, at the expiry of the investment period for the Strategic Investment product.

Through investments in bonds, equities and/or financial instruments of the types outlined in the investment strategy, the Bank seeks to achieve the objective of the Strategic Investment product. by obtaining a return greater than that which would have been possible if the principal sum had simply been invested in bank deposits or certificates of deposit during the time period of the Strategic Investment product.

### 3. Duration

The investment period for each Strategic Investment product is between three and 12 months, as specified in the relevant Product Briefing.

### 4. Product Briefing

A Product Briefing is prepared for each Strategic Investment product, setting out the objectives, rationale and investment strategy of the Strategic Investment product, as well as an analysis of the risks and rewards inherent in the investment strategy to be pursued, and specifying the closing date for any investment in the product. Copies of each Product Briefing are available.

### 5. Minimum Investment

The minimum amount which may be invested in a Strategic Investment product is US$250,000 or its equivalent in other major currencies. Any amount in excess of this must be in units of 10,000 of the currency invested.

### 6. Fees

Fees shall be notified in writing by the Bank to the Customer from time to time.

**Precious Metals**

1. The Bank offers a service which allows the Customer to trade in gold without owning it. The Customer decides the amount of investment and the Bank will credit the Customer with the amount of unallocated gold equivalent to the number of ounces (rounded down to the nearest whole number) which in the Bank's opinion can be purchased with the amount of investment. If the Customer decides to realise all or part of the holding (in whole ounces), the Bank will credit the Customer with the amount which in the Bank's opinion would have been paid for that amount sold.

2. Gold transactions will be undertaken by reference to the spot price for the purchase and/or sale of the relevant quantity of gold in the London bullion market as soon as is reasonably practicable after the receipt of instructions. Instructions not received on business days between 10 am and 3 pm, Singapore time will therefore be dealt with on the next business day.

3. Gold does not represent a deposit of money and such an investment in gold is subject to certain risks. There is no yield or interest generated and a loss may be incurred.

**Discretionary Portfolio Management**

1. The Bank will at the request of the Customer and upon deposit of the requisite minimum sum provide the Customer with discretionary portfolio management services. The said sum will be invested by the Bank at its discretion in investments of every type and description including, without limitation, securities, funds, unit trusts, bonds, money market instruments, swaps, previous metals, deposits or foreign currencies.

2. The Bank will have entire discretion in managing the Customer's portfolio, including but not limited to the following:-

   (a) there will be no restriction on the amount of any one investment or on the proportion which any type of investment bears to all the investments unless otherwise specified by the Customer in writing;

   (b) the Bank may buy or sell units in collective investment schemes which may be operated or advised by a company within the American Express Company;

   (c) the Bank may purchase shares whose issue or offer for sale may be or may previously have been underwritten, managed or arranged by a company within the American Express Company; and

   (d) the purchase of investments will be funded from the Customer's specific accounts opened in relation to this service. If necessary for settlement purposes, the Bank may create an overdraft by debiting any such account with the amount of any anticipated sale proceeds. The sale of investments will relate only to securities already held in the Customer's portfolio. The Bank will not commit the Customer to the purchase or sale of investments on margin.

3. The Bank will supply the Customer, at regular intervals, with a valuation of its portfolio. The valuation will contain an assessment of the performance of the portfolio for the relevant period based on criteria of which the Bank will notify the Customer from time to time.





# Foreign Exchange and Derivatives

**Spot and Forward Contracts**

We provide a foreign exchange trading service which enables you to buy and sell various foreign currencies available in the Singapore market on a "spot" or "forward" basis. We will, at your risk and at your request, enter for and on your behalf into contracts ("Contracts") for the sale and purchase of currencies approved by us. In respect of spot contracts, payment or delivery, as the case may be, will be required two business days after the Contract is concluded. Delivery and/or payment for forward contracts will be made on the future date specified in the Contract.

We will send you a confirmation advice in respect of each Contract.

The number of your positions or options shall not exceed at any time any limits we place thereon.

All Contracts are subject to the rules of the market in which they are executed.

**General Conditions With Respect To The Bank's Obligations**

The Customer is to note that with respect to all Contracts and securities margin trading/transactions, the following provisions apply:

a.  Each party will make each payment or delivery specified in the relevant confirmation issued by the Bank, subject to the other provisions of this Agreement.

b.  Payment or delivery by the Bank is subject to (i) the condition precedent that no event of default with respect to the Customer has occurred and is continuing; and (ii) the Customer being ready willing and able to effect its corresponding payment or delivery obligation(s).

c.  If on any date amounts would otherwise be payable:- (i) in the same currency; and (ii) in respect of the same Contract or transaction - by each party to the other, then on such date, each party's obligation to make payment of such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

d.  The Bank may at its discretion in respect of two or more Contracts and/or other transactions choose that a net amount be determined in respect of all amounts payable on the same date in the same currency in respect of such Contracts and/or transactions, regardless of whether such amounts are payable with respect the same Contract or transaction and on such determination the parties respective payment obligations for all of such Contracts and/or transactions shall be replaced by a single obligation being the obligation of the party to pay the net amount so determined.

**Collateralised Trading Facility For Foreign Exchange, Securities, Metals, Options and other Products**

1.  The Bank may from time to time extend a collateralised trading facility (the "Facility") to the Customer upon terms as may be set out and including/incorporating the terms herein to enable the Customer, on a leveraged basis, to enter into Contracts (either with or through the Bank as the case may be) to trade and hold positions in foreign exchange, securities, options, metals, interest rate swaps and other derivatives and other underlying products (each an "underlying Product"), to the extent such products are offered by the Bank in its discretion to the Customer.

The Facility shall be denominated in United States Dollars and shall not exceed the maximum aggregate principal amount from time to time notified to the Customer by the B ank provided always that the Net Collateral Value on the proposed date of utilisation is not less than such percentage as may be specified by the Bank of the value of Contracts after the proposed utilization subject to the Bank's discretion to vary the margin of the Net Collateral Value from time to time and such variation shall take effect upon notification of the same to the Customer. The Facility may be utilised in United States Dollars or in any other Acceptable Currency calculated at the Bank's rate of exchange between United States Dollars and such other Acceptable Currency prevailing on the date of such utilisation by the Customer.

2. The Customer acknowledges that the Collateral will be subject to a first fixed and paramount security in favour of the Bank. Accordingly and where the subject matter of the Collateral so permits, Collateral shall be and shall be deemed to be charged to or otherwise held by the Bank as continuing security for the Customer's obligations under this Agreement free of any encumbrance (other than the encumbrance in favour of the Bank) or claim by any other party and agrees, or shall procure the Chargor to agree, that none of the Collateral shall be capable of assignment or otherwise being dealt with by the Chargor in any manner whatsoever, and save with the written consent of the Bank, none of the Collateral shall be repayable to the Chargor, until the Bank has signed a certificate discharging the Customer from all its obligations under this Agreement.

3. (a) Prior to concluding any Contract, it shall be agreed, where the Bank permits the Customer to have the choice, whether the Customer is to contract on an Account/Account basis or on a margin basis. Collateral shall then be provided in either event in the manner stated below as margin for the transactions effected hereunder.

   (b) The Chargor shall deposit Collateral as required by the Bank prior to concluding a Contract. The amount of the Net Collateral Value shall determine the maximum permitted aggregate Value of Contracts subject to observance of the trading limit specified in the Facility.

   The Customer undertakes to observe the margin requirements contained in paragraph 6 and to provide, or procure the provision of, additional Collateral as stipulated.

   (c) Unless otherwise agreed between the parties or pursuant to the terms of this Agreement, a Contract concluded on an Account/Account basis shall mature on its Value Date with corresponding debits and credits to the relevant accounts of the Customer with the Bank while that concluded on a margin basis shall be subject to the provisions in paragraph 5 below.

   (d) Subject to the provisions of this Agreement, the Customer may request the Bank, on any Business Day, to enter into one or more Contracts, each on terms as may be prescribed by or agreed to by the Bank at its discretion. Any request shall be irrevocable and shall specify the underlying Product of the Contract(s) to be purchased or sold and the Value Date. The Value Date shall not be less than one Business Day and not more than 366 days after the commencement date of the proposed Contract. The Bank may, but shall not be obliged to, comply with any such request. Any request to vary the Value Date is subject to the Bank's sole discretion. A Customer's request shall lapse with the rejection of the Bank of such request.

   (e) The Bank and the Customer intend that novation netting apply with respect their respective obligations under the Contracts so that :

   (i) With respect to Contracts for Products other than Foreign Exchange and Options:

   If the Bank and the Customer enter into a Contract for the purchase or sale of the same Product, the same Value Date and in the same currency as a then existing Contract, then immediately upon entering into such Contract, each such Contract shall automatically and without further action be netted, individually cancelled and simultaneously replaced through novation by a new Contract for such Value Date determined as follows: the amounts of such Product that would otherwise have been deliverable by each selling party on such Value Date shall be aggregated and the party with the larger aggregate amount shall have a new Contract to deliver to the other party the amount of such Product by which its aggregate amount exceeds the other party's aggregate amount, provided that if the aggregate amounts are equal, no new Contract shall arise;

   (ii) With respect to Foreign Exchange Contracts:

   If the Bank and the Customer enters into a Contract with respect to the sale of one currency against another giving rise to an obligation to deliver a particular currency (a "**Currency Obligation**") for the same Value Date and in the same currency as a then existing Currency Obligation, then immediately upon entering into such Contract, each such Currency Obligation shall automatically and without further action be netted, individually cancelled and simultaneously replaced through novation by a new Currency Obligation for such Value Date determined as follows: the amounts of such currency that would otherwise have been deliverable by each party on such Value Date shall be aggregated and the party with the larger aggregate amount shall have a new Currency Obligation to deliver to the other party the amount of such currency by which its aggregate amount exceeds the other party's aggregate amount, provided that if the aggregate amounts are equal, no new Currency Obligation shall arise;

   (iii) With respect to Options Contracts:

   If the Bank and the Customer enter into Options Contracts: Any call option or any put option written by a party will automatically be terminated and discharged, in whole or in part. as applicable, against a call option or a put option, respectively, written by the other party, such termination and discharge to occur automatically upon the payment in full of the last premium payable in respect of such options; provided that such termination and discharge may only occur in respect of Options Contracts: (A) each being with respect to the same put underlying Product and the same call underlying Product; (B) each having the same expiration date and expiration time; (C) each being of the same style; (D) each

having the same strike price; (E) neither of which shall have been exercised; and (F) which are otherwise identical in terms that are material for the purposes of offset and discharge; and, upon the occurrence of such termination and discharge, neither party shall have any further obligation to the other party in respect of the part of the relevant Options Contract so terminated and discharged. In the case of a partial termination and discharge of an Option Contract (i.e., where the relevant Options Contracts are for different amounts of the same underlying Product), the remaining portion of such Options Contract shall continue to be an Option Contract in lieu of the original Options Contracts netted against each other for all purposes of this Agreement.

(iv)   With respect to Contracts for Products Other Than Currencies:

The terms set out with respect to foreign exchange transactions shall, mutatis mutandis, apply as if the obligation to pay the price specific for any specific Contract shall be regarded as the obligation to deliver the equivalent of the stated currency the price is denominated in and the corresponding obligation to deliver a specified Product regarded as analogous an obligation to deliver a specified quantity of a specified currency as a commodity.

4.  (a)  Subject to the provisions of this Agreement, the Customer may request the Bank, on any Business Day, to enter into Option Contracts. Any request shall be irrevocable and shall specify such information as the Bank shall require, including the Acceptable Currencies/agreed underlying Product concerned, the Expiry Date and whether it is an American or European Option. The Expiry Date of the Option shall not be less than one Business Day and not more than 366 days after the commencement date of the proposed Option Contract.

(b)  The Bank may, but not be obliged to, comply with any such request as aforesaid, subject in each case to the immediate payment by the Purchaser to the Seller of the relevant Premium. The Bank shall confirm to the Customer the details of each Option Contract that it enters into.

(c)  At any time on or before the Value Date of an Option Contract, the Seller may request the Purchaser to agree to the Surrender of the Option Contract. The Purchaser may (but shall not be obliged to) comply with any such request on such terms as it may determine, including the payment by the Seller to the Purchaser of a Surrender premium.

(d)  If the Purchaser wishes to exercise the Option (which may be exercised in whole only and not in part), it shall notify the Seller thereof on or before the Expiry Date, in accordance with the terms of that Option Contract.

Without prejudice to the generality of the foregoing but specifically with a Currency Option Contract or a Securities Option Contract, the obligations of the Seller under such Option Contract may be discharged either by effecting settlement in the manner described in sub-paragraph 4(e) below or by the Seller entering into an FX Contract or a Securities Contract as the case may be with the Purchaser in lieu of settlement, in the manner described in sub-paragraph 4(f).

(e)  Settlement shall be effected on a net basis by calculating the sum payable by the Seller, according to the following formula if the Option Contract is denominated in the Acceptable Currency to be delivered by the Seller:-

$$(A \times P) - (A \times C)$$

or the formula set out below if the Option Contract is denominated in the Acceptable Currency to be delivered by the Purchaser:-

$$(A \times C) - (A \times P)$$

and where:-

(i)   $A$ is the amount of the Acceptable Currency or number of Securities as the case may be on the Value Date in which the Option was granted;

(ii)  $C$ is the rate of exchange specified in the Option Contract, expressed in the Acceptable Currency or price of Securities as the case may be to be delivered by the Purchaser of the Option; and

(iii) $P$ is the Bank's prevailing rate of exchange for the Acceptable Currencies expressed in the Acceptable Currency or the price of Securities as the case may be on the Value Date, as determined by the Bank, to be delivered by the Purchaser of the Option.

The resulting sum shall then be debited or credited, as the case may be, to the Customer's account with the Bank in the relevant Acceptable Currency. If the Customer does not maintain an account in such Acceptable Currency, it shall first be converted by the Bank at its prevailing rate of exchange to a currency in which the Customer does maintain an account before being so debited or credited.

(f) The Seller of an Option Contract may request the Purchaser to permit him to discharge his obligations there under by entering into an FX Contract or a Securities Contract, on the same date on which the Option Contract is exercised, for the sale to the Purchase of an amount of an Acceptable Currency or Securities identical to that deliverable by the Seller pursuant to the Option Contract, against an amount of an Acceptable Currency or Securities identical to that deliverable by the Purchaser pursuant to the Option Contract. If the Purchaser consents to the request, the Option shall thereupon be fulfilled and the obligations arising under the Option Contract shall be discharged and replaced by those resulting from the related FX Contract or Securities Contract as the case may be and this Agreement.

(g) Full compliance with the requirements of either sub-paragraph 4(e) or 4(f) in the case of Currency Option Contracts or a Securities Option Contract as the case may be shall cause the relevant Option to be fulfilled and all rights and obligations there under satisfied. Correspondingly compliance with settlement obligations as may be prescribed or agreed with respect to any other Options Contract shall cause the relevant Option to be fulfilled and all rights and obligations there under satisfied. In any event if an Option is not exercised by the Expiry Date or if an Option Contract is surrendered in accordance with the terms for its surrender, the Option (and all rights and obligations in respect thereof) shall terminate in accordance with the terms of the Option Contract and this Agreement.

5.  (a) In relation to any outstanding Contract concluded on a margin basis:-

   (i) the Bank may, at the Customer's request made at any time before the Value Date of that Contract, enter into a Compensating Contract to compensate that Contract;

   (ii) If the Bank has received no request from the Customer at or before 5.00 p.m. Singapore time (or 5 pm New York time in the event the Customer is authorized to trade outside Singapore business hours pursuant to paragraph 10 hereof) on the second business day before the Value Date of that Contract to enter into a Compensating Contract then at any time thereafter the Bank may, at its sole discretion and without notice to the Customer, and the Customer hereby irrevocably authorizes and instructs the Bank to, enter into a Compensating Contract on behalf of the Customer and at its sole risk and on such terms as the Bank shall deem fit to compensate that Contract. The Bank's confirmation of such compensation shall be conclusive and binding on the Customer; and

   (iii) the Bank may, at the Customer's request made at any time at or before 5.00 p.m. Singapore time (or 5 pm) New York time in the event the Customer is authorized to trade outside Singapore business hours pursuant to paragraph 10 hereof) on the second business day before the Value Date of that Contract, and upon the payment to the Bank of such forward premium or discount, accrued interest and/or costs, fees and charges as the Bank may require, extend that Value Day to a new date on which the respective obligations or remaining obligations of the Bank and the Customer under that Contract are to be performed, subject to such terms and conditions as the Bank may think fit, and the Bank's confirmation of any such extension together with the terms and conditions thereof shall be conclusive and binding on the Customer, and shall constitute the new date of the Value Date for such obligations.

   (b) Neither the Bank nor any of its directors, officers, employees or agents shall be liable to the Customer for any loss (including loss of profit), damage, expense or liability incurred by it by reason of:

   (i) any refusal, failure or inability on the part of the Bank or any of them to enter into any Contract and/or any Compensating Contract at the Customer's request, or any failure by the bank or any of them to notify the Customer of any such refusal, failure or inability;

   (ii) any entry by the bank or any of them on behalf of the Customer into any Compensating Contract; or

   (iii) any other action taken or omitted by the Bank or any of them under or in connection herewith.

   It is also the Customer's responsibility to monitor its position(s) at all times and the Bank shall not be liable to the Customer for any loss, damage, expense or liability incurred by it if the Bank does not notify the Customer of its current position(s).

   (c) In relation to each Contract in respect of which a Compensating Contract has been entered into, the Compensating Contract shall compensate the respective obligations of the Bank and/or the Customer to purchase and/or sell the amounts of the underlying Product under that Contract to the extent of their respective obligations to purchase and/or sell the amounts of the underlying Product under the Compensating Contract, and each one of them shall only be liable to the other to purchase and/or sell the amounts of the underlying Product not so compensated on the relevant Value Date provided that the Bank may, at its sole discretion, elect to pay to the Customer or require the Customer to pay to the Bank all profits and/or losses resulting from the Compensating Contract on the date on which the Compensating Contract was entered into instead of on the relevant Value Date, in which case the respective obligations of the Customer and the Bank to pay such profits and/or losses shall be performed on that date, and performance thereof shall extinguish their respective obligations to perform the same on the Value Date.

6. (a) The Customer undertakes to ensure that the Net Credit Balance and/or the Net Collateral Value, as the case may be, shall at all times be not less than the percentages specified by the Bank of the value of Contracts (together with or after accounting for the Customer's Liabilities).

    If, at any time from time to time, the Net Credit Balance and/or Net Collateral Value is less than the percentage required by the Bank of the value of Contracts at such time, the Customer shall immediately deposit additional Collateral whose market value (as conclusively determined by the Bank) is not less than such shortfall to the intent that such additional Collateral shall constitute and form part of the continuing security for obligations of the Customer hereunder, and/or request the Bank to enter into such Compensating Contracts on behalf of the Customer to compensate all or any Contracts then outstanding as may be necessary to ensure that the Net Credit Balance and/or Net Collateral Value is not less than such percentage of the value of Contracts at such time.

    For the purpose of ensuring the same, the Bank may, at its sole discretion and without notice to the Customer, at any time or from time to time thereafter, and the Customer hereby irrevocably authorizes and instructs the Bank to, enter into such Compensating Contracts on behalf of the Customer and at its sole risk and on such terms as the Bank may deem fit to compensate all or any Contracts then outstanding.

    (b) If the Customer shall fail to comply immediately with a request made by the Bank pursuant to sub-paragraph (a) or if any time the Net Credit Balance and/or the Net Collateral Value shall be less than the percentage required by the Bank, the Bank, at its sole discretion and without notice to the Customer, shall be entitled, but shall not be obliged, to declare an event of Default referred to in paragraph 13 and exercise its rights pursuant to paragraph 13 hereof.

    (c) Any accommodation for forbearance on the part of the Bank with regard to the maintenance of the Net Credit Balance and/or the Net Collateral Value shall not constitute a waiver by the Bank nor preclude the Bank from future exercise of its rights, powers or remedies or the right of the Bank to require full compliance by the Customer with the provisions of this paragraph at any time when market conditions, as solely determined by the Bank, so warrant.

7. Upon the occurrence of an Event of Default and at any time thereafter, the Facility may be cancelled immediately and, the Bank may, at its sole discretion and without notice to the Customer, and the Customer hereby irrevocably authorizes the Bank to, enter into such Compensating Contracts on behalf of the Customer and at its sole risk and on such terms as the Bank may deem fit to compensate all or any Contracts then outstanding, and/or the Customer shall, on demand from the Bank, pay to the Bank all amounts payable to it under such Contracts and provide it with full cash cover in respect of all the Customer's obligations under all or any of such Contracts.

    The Bank may take any such action without demand for additional money or security. The exercise of the Bank's rights under this paragraph shall be without prejudice to any of its rights to damages and other remedies.

8. (a) If the Customer wishes to take delivery of any underlying Product purchased pursuant to any Contract with the Bank he shall so inform the Bank not less than three business days prior to the Value Date of the relevant Contract.

    (b) Before the Bank shall be obliged to effect payment or delivery pursuant to a Contract, the Customer (in the absence of any arrangements to the contrary) shall first be required to satisfy the Customer's counter-party corresponding settlement obligations pursuant to that Contract and transfer to the Bank the amount of the Acceptable Currency, in immediately available funds, or deliver to, or to the order of, the Bank the quantity and quality (including compliance with agreed specifications where relevant) of the underlying Product, with unencumbered title, specified as being deliverable by the Customer under such Contract. The Bank shall have no liability whatsoever to the Customer whether in respect of loss of interest or otherwise, if as a result of any delay by the Customer in effecting such prior payment of Acceptable Currency or delivery of relevant underlying Product, the Bank is unable to complete the payment or delivery required by its pursuant to such Contract on the Value Date.

    (c) If the Bank, for whatever reason, shall effect payment or delivery pursuant to any Contract prior to receipt in full of the underlying Product to be paid or delivered to it by the Customer thereunder, any underlying Product to be paid or delivered to it by the Customer thereunder, any underlying Product so paid or delivered by the Bank shall be held in trust for the Bank and be returnable on demand and such payment or delivery shall be without prejudice to the Bank's rights in respect hereof, whether under this Agreement or otherwise. The Customer undertakes not to sell, transfer, mortgage, charge, pledge or otherwise dispose of or encumber title to such underlying Product or any part thereof except subject to the rights of the Bank hereunder.

    (d) Pending delivery of any relevant physical underlying Product to the Customer, the Bank shall arrange for the storage and may, at its discretion, arrange for the insurance of same. All storage charges and insurance costs shall be for the account of the Customer, who authorizes the Bank to debit them to any account maintained by the Customer with the Bank.

9. The Customer will fully indemnify the Bank from and against any costs, claims, damages, demands, expenses, liabilities and losses whatsoever (as to the amount of which the Bank's certificate shall be conclusive) incurred or suffered by it as a consequence of:

(i) any event referred to in paragraph 13(a), or any event which with the lapse of time would constitute such an event, or of

(ii) the Customer's failure to perform its obligations under this Agreement and/or any Contract or otherwise in connection herewith or therewith;

Without prejudice to its generality, the foregoing indemnity shall extend to any interest, fees or other sums whatsoever paid or payable on account of any funds borrowed in order to carry any unpaid amount and to any loss (including loss of profit), premium, penalty or expense, which may be incurred in liquidating or employing deposits from third parties acquired to make, maintain or fund any amount due or to become due under this Agreement and/or any Contract.

10. (a) Subject to prior agreement with the Bank, the Customer may give requests for Contracts pursuant to and otherwise in accordance and subject to the terms of this Agreement during hours when the Bank's Singapore dealing room is closed, by making such requests for Contracts with the Singapore branch of the Bank through such other offices in such locations as the Bank may notify to the Customer from time to time.

(b) Any Contract pursuant to this Agreement which is effected through an office other than the Bank's Singapore dealing room shall be subject to the provisions of this Agreement and shall be deemed to be Contracts no different from those effected through the Bank's Singapore dealing room. and the laws of Singapore in all respects and the owners and operators of any office through which such transactions are effected with the Singapore branch of the Bank shall have no liability whatsoever to the Customer in respect thereof.

11. (a) In the absence of manifest error, the Bank's certificate as to any amount due to the Bank hereunder or any Contract shall be conclusive evidence that such amount is in fact due and payable.

(b) If the Collateral should be insufficient to immediately discharge all indebtedness at any time due to the Bank under this Agreement or any Contract, the overdraft thereby resulting shall be promptly repaid in full by the Customer and shall bear interest from the date on which it arises to that on which it is discharged at the rate specified by the Bank from time to time, both before and after any judgment obtained against the Customer, and may be compounded at monthly or longer intervals by the Bank.

(c) The Bank reserves the right to terminate any Contract without incurring any liability to the Customer for damages or expenses arising from such termination should any action by any government, governmental agency or other relevant body, directly or indirectly, in the Bank's opinion, adversely affect the underlying Product of a Contract or the performance of the Contract with respect to the same or if the condition of the market in which such underlying Product would otherwise be available or procured should affect, directly or indirectly, the performance of any Contract as contemplated by the Bank at the time it was entered into.

(d) The Customer may not assign the benefit of this Agreement or any Contract without the written consent of the Bank. The Bank may assign or transfer the benefit of this Agreement and/or any particular Contract to any third party and the Customer authorizes the Bank to disclose to such party such information about the Customer as the Bank may consider necessary or appropriate.

(e) The Bank may at any time amend this Agreement with immediate effect on giving notice thereof to the Customer.

12. The Bank reserves the right at any time to review the Facility forthwith upon giving notice thereof to the Customer, whereupon the Facility shall be cancelled but without prejudice to the respective rights and liabilities under or in connection with this Agreement or any Contracts entered into or before such termination.

No Contracts (other than Compensating Contracts) shall be entered into after such termination, provided that at any time thereafter, the Bank may, at its sole discretion and without notice to the Customer, and the Customer hereby irrevocably authorizes and instructs the Bank to, enter into such Compensating Contracts on behalf of the Customer, at the cost of the Customer and at the sole risk of the Customer and on such terms as the Bank may deem fit to Compensate all or any Contracts then outstanding.

13. (a) A "Default" shall be deemed to occur if:

(i) the Customer fails to pay any amount or perform or discharge any obligation due under this Agreement or any Contract on the due date or on demand, if so payable or to be performed or discharged;

(ii) the Customer or the Chargor repudiates or challenges the validity of. or fails to observe or perform any of its obligations under this Agreement, any Contract. the Bank's security interest whether under the Charge or otherwise or any other agreement with the Bank (as appropriate) or under any undertaking or arrangement entered into in connection herewith or therewith;

(iii)  any statement which is made (or acknowledged to have been made) by the Customer or the Chargor in this Agreement or the terms of any security agreement including with respect to the Charge (as appropriate) or which is contained in any certificate, statement, legal opinion or notice provided under or in connection with this Agreement, any Contract or the Charge proves to be incorrect in any material respect;

(iv)  any provision of this Agreement, any Contract or any security agreement including with respect to the Charge is or becomes, for any reason, invalid or unenforceable;

(v)  the Customer asserts that the Bank has (or should have):

    (A)  either entered into or closed out any Contract; or

    (B)  taken or refrained from taking any action as the result of the relationship or course of dealing between the Customer and the Bank arising from this Agreement and/or any Contract or Contracts; or

    (C)  any liability to the Customer arising under this Agreement or any Contract;

    which assertion is not accepted by the Bank;

(vi)  an encumbrancer takes possession of, or a trustee, receiver or similar officer is appointed in respect of, all or any part of the Customer's business or assets or the business or assets of the Chargor, or distress or any form of execution is levied or enforced upon or sued out against any such assets and is not discharged within seven days of being levied, enforced or sued out;

(vii)  the Customer or the Chargor dies (where relevant), becomes or is declared insolvent or mentally incompetent;

(viii)  the Customer or the Chargor convenes a meeting or its respective creditors or proposes or makes any arrangement for composition with, or any assignment for the benefit of, its respective creditors or the Customer or the Chargor commits an act of bankruptcy or a petition is presented or other steps are taken for their respective bankruptcy (and for the purposes of this sub-paragraph, "bankruptcy" includes winding up);

(ix)  the Customer or the Chargor, as the case may be, consents to, assists or acquiesces in any attempt to effect an event specified in sub-paragraphs (vi), (vii) or (viii) above;

(x)  anything analogous to any of the events specified in sub-paragraph (vi), (vii), (viii) or (ix) occurs under the laws of any applicable jurisdiction; or

(xi)  any event or change in circumstances makes it improbable, in the opinion of the Bank, that the Customer or the Chargor will be able to observe or perform its respective obligations under this Agreement, any Contract or any security agreement including with respect to the Charge (as appropriate), or which, in the opinion of the Bank, will or may effect its commitment under the Facility or its interest in or value of the Collateral;

then in any such case and at any time thereafter the Facility may be cancelled immediately and the Bank, at its sole discretion and without notice to the Customer may, but shall not be obliged to, satisfy and discharge the obligations of the parties in respect of all or any Contracts between them then outstanding.

The Customer shall, on demand from the Bank, pay to the Bank the amount of any loss incurred by the Bank thereby, calculated as if the Bank had entered into Compensating Contracts in respect of the Contract then outstanding and provide it with full cash cover all the Customer's obligations in respect thereof.

(b)  The Bank may take any such action without demand for additional money or security. The exercise for the Bank's rights under this paragraph shall be without prejudice to any of its rights to damages and other remedies.

(c)  In addition to its other rights under this Agreement and under the general law, the Bank shall be entitled

(i)  to a general lien over any and all property of the Customer in the possession and control of the Bank under which the Bank shall also have the power of sale and realization into cash to be applied towards the discharge of the obligations and liabilities of the Customer to the Bank; and

(ii)  at any time without notice to the Customer, to combine, consolidate or merge all or any of the Customer's accounts with, and liabilities to, the Bank (whether actual or contingent, in Singapore or elsewhere) and may set off or transfer any sum standing to the credit of any such accounts, whether or not any deposit may have matured, in or toward the satisfaction of any of the Customer's liabilities to it under this Agreement and may do so notwithstanding that the balances on such accounts and the liabilities may not be expressed in the same currency and the Bank is hereby authorized to effect any necessary conversion at its own rate of exchange then prevailing.

14. In addition to the terms set out above, the following terms will apply with regards to Securities transactions:

   (a) All Securities purchased pursuant hereto shall be kept by the Bank or its nominees (and subject to the Bank's terms for the provisions of custody services as set out in this Agreement) and be subject to a continuing first paramount security in favour of the Bank for the obligations of the Customer on terms mutatis mutandis identical to those set out in paragraph above, and the Customer shall not be entitled to them until full payment has been made specifically of the Customer's liabilities to the Bank in respect thereof as well as generally of the Customer's liabilities to the Bank (unless the Bank otherwise agrees);

   (b) Collateral for securities margin trading will be required and shall be advised from time to time by the Bank to the Customer. The principal limit of this service, the interest rates applicable and the tenor of each advance made shall be advised by the Bank to the Customer. The Bank reserves the right to withdraw, cancel or modify the terms of this service at any time upon written notice to the customer;

   (c) In relation to any outstanding Securities Contract:

   Unless otherwise agreed and subject to the terms and conditions of the Facility, in respect of a Securities Contract, unless the Bank is already holding cash or Securities on behalf of the Customer to settle the Securities Contract, the Customer will:

   (i) pay the Bank cleared funds or deliver to the Bank Securities in deliverable form, or

   (ii) otherwise ensure that the Bank has received such funds or Securities

   by such time as the Bank has notified the Customer in relation to that Securities Contract. If the Customer fails to do so, the Bank may:

   (i) in the case of a purchase transaction, sell the purchased Securities, or

   (ii) in the case of a sale transaction, borrow and/or purchase Securities in order to settle the transaction.

15. "Acceptable Currency" means any currency acceptable to the Bank;

   "American Option" means an Option which can be exercised at any time up to and including the Expiry Date;

   "Charge" means the document(s) evidencing the charge or other security interest or the rights constituting any form of security over the Collateral in favour of the Bank, as the same may be amended from time to time;

   "Chargor" means any person (including the Customer and any third party chargor) who is for the time being party to the Charge;

   "Collateral" means any security acceptable to the Bank and the assets or things or documents of title for the time being and from time to time deposited or to be deposited with the Bank or any third party acceptable to the Bank and charged in its favour as continuing security for the Customer's obligations hereunder, including without limitation, cash, bonds, stocks, shares gold and other types of securities acceptable to the Bank, and any part thereof;

   "Compensate" and any derivative thereof means in relation to any outstanding Contract, the discharge by any relative Compensating Contract of all or any part of the respective obligations of the Bank or the Customer to buy and/or sell the amount of any Acceptable Currency sold and/or purchased under that Contract;

   "Compensating Contract" means in relation to any outstanding Contract, any Contract having the same Value Dates as that Contract for the purpose of compensating that Contract;

   "Contract" means any Contract with respect to any underlying Product as the Bank may be agreeable to permit the Customer to conclude on a leveraged basis pursuant and subject to the terms of the Facility, as the case may be, and includes any Compensating Contract;

   "European Option" means an option which can only be exercised on the Expiry Date;

   "Expiry Date" means the last Business Day (in the case of an American Option ) or the only Business Day (in the case of a European Option) on which an Option may be exercised;

   "FX Contract" means any contract entered, or to be entered, into between the Customer and the Bank for the purchase or sale by the Customer of a certain amount of an Acceptable Currency against a certain amount of another Acceptable Currency on a certain Value Date;

   "Gains" means the aggregate Dollar Equivalent, as determined by the Bank, of (i) the sums which would be payable by the Bank to the Customer if all outstanding Contracts including Option Contracts, at that time outstanding were wholly Compensated and (ii) sums payable by the Bank under above;

"Losses" means the aggregate US Dollar Equivalent for the time being of (i) amount which would be payable by the Customer to the Bank if all outstanding Contracts at that time were wholly compensated and (ii) amounts payable to the Bank under paragraph 5(c) above;

"Market Value of the Collateral" means the aggregate US Dollar Equivalent of the value of the collateral for the time being and from time to time as conclusively determined by the Bank at such rate or rates as the bank may from time to time as its discretion determine;

"Metal" means any metal or bullion whatsoever, including without limitation gold and silver bars and coins, acceptable to the Bank;

"Metal Contract" means any contract entered, or to be entered, into between the Customer and the Bank for the purchase or sale by the Customer of a certain amount of Metal against a certain sum of an Acceptable Currency on a certain Value Date;

"Net Collateral Value" means the market value of the Collateral less all Losses calculated at the relevant time, the calculations of which such be made in accordance with the Bank's policies and procedures in effect from time to time;

"Net Credit Balance" means the amount of the Customer's credit balance at any time if all account opened for the purposes of account/account trading hereunder were converted to their Dollar Equivalent and set off against each other;

"Option" means (i) generally the right, but not the obligation, to exchange a predetermined amount of a specified Product for a predetermined price on or before the Expiry Date specified in, or determined pursuant to, an Option Contract: and (ii) more specifically in relation to an option for the purchase/sale/exchange (as the case may be of currency) of a specific currency, the right, but not the obligation, to exchange a predetermined amount of one Acceptable Currency for a predetermined price amount of another Acceptable Currency at a specified rate of exchange on or before the Expiry Date specified in, or determined pursuant to, an Option Contract;

"Option Contract" means the contract pursuant to which the Seller grants an Option to the Purchaser;

"Premium" with respect to an Options Contract means the amount agreed upon by the parties payable in an Acceptable Currency by the Purchaser to the Seller in consideration for the grant of any Option;

"Product" means any foreign exchange, Metals, Options, Securities, or other chattel or chose in action for which the Bank permits the Customer to trade Contracts pursuant and subject to the terms of the Facility;

"Purchaser" with respect to an Options Contract means the party to this Agreement which purchases an Option from the Seller and may exercise the Option pursuant to the terms of the Option Contracts;

"Securities" mean stocks, shares, bonds, unit trust securities, government securities, exchange traded securities and other investments acceptable to the Bank by way of securities margin financing;

"Securities Contract" means any contract entered, or to be entered, into between the Customer and the Bank for the purchase or sale by the Customer of a certain amount of Bonds or Equities as the case may be on a certain Value Date;

"Seller" with respect to an Options Contract means the party to this Agreement which sells an Option to the Option Contracts;

"Surrender" with respect to an Options Contract means the waiver by the Purchaser of the right to exercise an Option and the release of the Seller from all obligations in connection therewith;

"US Dollar Equivalent" means in relation to any amount in United States Dollars, that amount in United States Dollars, and in relation to any amount in any Acceptable Currency other than United States Dollars, the amount in United States Dollars converted from that amount in such Acceptable Currency at the Bank's then prevailing exchange rate (as determined by it) between United States Dollars and such Acceptable Currency;

"United States Dollars" and "US$" means the lawful currency of the United States of America;

"Value Date" means in relation to any Contract, the date on which the respective obligations of the Bank and the Customer to purchaser and/or sell the relevant underlying Product and/or to pay any amount payable to the other there under are to be performed, but if such date is not a business day, it shall be the next succeeding business day. Notwithstanding the foregoing, the Value Date for any Option Contract shall be the second business day following the expiry date;

"Value of Contracts" means the aggregate US Dollar Equivalent of all amount utilised under the Facility and for the time being outstanding.

**Foreign Exchange Options**

1. The Customer may grant to the Bank or the Bank may grant to the Customer, on the terms herein, an option to purchase or sell at a specified rate of exchange (the "Strike Price") an amount of a particular currency (the "Option Currency") in exchange for an amount in a different currency (the "Exchange Currency"). With respect to each Option granted hereunder, the term "Grantor" shall refer to the party granting such Option, and the term "Grantee" shall refer to the party to which such Option is granted.

2. The Customer and the Bank may (but shall not be obliged) enter into Options for such quantities of Option Currency, at such Strike Prices and with such expiration dates and option premiums as may be agreed between them. A valid Option shall come into existence upon agreement of the parties, either orally or in writing, to the terms of such Option. The Bank shall, in respect of each Option, prepare and send to the Customer a confirmation (the "Confirmation") confirming the terms of the Option agreed between the parties. The terms and conditions set forth in the Confirmation shall be conclusive and binding on the Customer unless the Bank receives objection thereto within two business days of the date of its deemed receipt of the Confirmation.

3. (a) The Grantee may exercise an Option on any business day on which the Option is exercisable under its terms from and after the transaction date agreed by the parties (the "Transaction Date") by giving two business days' prior irrevocable notice of exercise (effective on receipt) to the Grantor, provided that, unless otherwise agreed if the Grantor has not received notice of exercise of an Option prior to 2.00 p.m. (Singapore time) on the expiration date for such Option agreed by the parties (the "Expiration Date") then such Option shall automatically expire and the Grantor shall have no further obligation with respect to such Option. In the Bank's case:-

    (i) any notice of exercise given by the Bank shall be deemed to be received by the Customer simultaneously with the giving thereof; and

    (ii) any notice of exercise received by the Bank after 2.00 p.m. (Singapore time) on any day shall be deemed to be received by the Bank on the following business day.

    (b) A notice of exercise by the Grantee to the Grantor may be either oral or written and given or signed by the Grantee's duly authorized signatory or signatories and delivered to the Grantor at its address, telex number , telefax number or telephone number previously indicated to the Grantor. Any oral notice of exercise received by the Bank and identified to the Bank's satisfaction as properly authorized shall, whether or not written confirmation of such notice is received by the Bank, be deemed to be proper notice of exercise and the Bank shall be entitled to act and rely in good faith upon such notice.

    (c) In any case in which the Bank has granted an Option to the Customer, the Customer shall exercise its rights to purchase or sell only full amount of the Option Currency under the terms of such Option.

4. (a) In the event the Customer exercises an Option under which the Customer is to deliver to the Bank an amount in a particular currency ("Currency A") in exchange for an amount in another currency ("Currency B") and if at such time the Customer and the Bank are also parties to an agreement (a "Foreign Exchange Agreement") under which the Customer is to deliver to the Bank on any value date an amount in Currency B in exchange or an amount in Currency A then, notwithstanding any provisions of such Foreign Exchange Agreement to the contrary, at the Bank's option:-

    (i) the Customer's obligations under such Foreign Exchange Agreement may be accelerated and such Foreign Exchange Agreement may be closed out simultaneously with the exercise of such Option;

    (ii) the amount in Currency A payable by the Customer to the Bank under such Option may be set off against the amount in Currency A payable by the Bank to the Customer under such Foreign Exchange Agreement.

    (iii) the amount in Currency B payable by the Bank to the Customer under such Option may be set off against the amount in Currency B payable by the Customer to the Bank under such Foreign Exchange Agreement.

    (b) Any excess owed to either party after giving effect to the foregoing set-off shall be settled by means of a direct payment from the other party in the relevant currency.

5. (a) The Bank shall have no obligation to perform in respect of any Option if to do so would in its opinion be contrary to any applicable law or governmental policy (whether or not having the force of law) or regulation (including but not limited to foreign exchange controls) (any such law, regulation or policy being a "Governmental Restriction"). If in the Bank's opinion, it would be contrary to any Governmental Restriction for the Bank to perform in respect of any Option, the Bank shall, if and to the extent that it is of the opinion that it would not be contrary to any Governmental Restriction to do so, pay to the Customer the equivalent in Singapore Dollars (the "Local Currency Equivalent") of the amount that the Bank would have ;paid to the Customer in a different currency if the Bank had performed such Option, in exchange for the relevant amount of the Option Currency or the Exchange Currency, as relevant, that the Customer would have been required to pay to the Bank if the Bank had performed such Option. For the purposes of this provision, the Local Currency Equivalent shall be calculated at the best spot rate at which the Bank offers to sell Singapore Dollars, at 11.00 a.m. Singapore time on the date on which the Bank makes payment in accordance with this provision, in exchange for the currency that the Bank would have paid to the Customer if the Bank had performed such Option.

6. (a) If the Bank gives a notice of exercise of an Option pursuant hereto, the Bank shall settle such Option by paying the relevant amount of the Option Currency or the Exchange Currency to the Customer in exchange for the payment of the Option Currency or the Exchange Currency, as relevant, from the Customer on the date on which the Bank is obligated to take delivery and make payment, or make delivery and receive payment, as relevant, under the terms of such Option or the notice of exercise given by the Bank in the connection herewith.

(b) Unless otherwise notified by the Bank, if the Customer gives the Bank a notice of exercise of an Option pursuant hereto, such Option shall be settled in the following manner:-

  (i) in the case of an Option for the purchase by the Customer of an Option Currency:-

    (I) the Customer shall sell to the Bank the Option Currency proceeds resulting from the Customer's exercise of the Option in exchange for an amount in the Exchange Currency specified by the Bank to be the equivalent thereof calculated at the best spot rate at which the Bank offers to buy the Option Currency against the Exchange Currency on the date the Option is exercised, or at such other rate as may be prior to such exercise date separately agreed between the Customer and the Bank in another foreign exchange contract or otherwise; and

    (II) the Bank shall pay to the Customer the net difference between the Exchange Currency amount owed to the Customer by the Bank as a result of the sale of the Option Currency by the Customer in accordance with (i) (immediately above) and the Exchange Currency by the Customer as a result of the Customer's exercise of the Option; and

  (ii) in the case of an Option for the sale by the Customer of an Option currency;

    (I) the Customer shall sell to the Bank the Exchange Currency proceeds resulting from the Customer's exercise of the Option in exchange for an amount in the Option Currency specified by the Bank to be the equivalent thereof at the best spot rate at which the Bank offers to buy the Exchange Currency against the Option Currency on the date the Option is exercised, or at such other rate as may be prior to such exercise date separately agreed between the Customer and the Bank in another foreign exchange contract or otherwise; and

    (II) the Bank shall pay to the Customer the net difference between the Option Currency amount owed to the Customer by the Bank as a result of the sale of the Exchange Currency by the Customer in accordance with (I) (immediately above) and the Option Currency amount owed to the Bank by the Customer as a result of the Customer's exercise of the Option.

(c) The Bank may, by notice to the Customer, at any time change the method of settlement of Options as set forth herein to conform to any change in its customary practice for the settlement of foreign exchange options.

6. In consideration of the granting by the Grantor of any Option (and regardless of whether or not such Option is exercised), the Grantee agrees to pay to the Grantor within two business days from the Transaction Date a non-refundable option premium (the "Option Premium") in the amount agreed by the parties. The Bank's prior receipt of the Option Premium for an Option of which the Bank is the Grantor shall be a condition to the Bank's obligations with respect to such Option.

7. Payments to be made to the Customer shall be made, subject to the prior receipt in full by the Bank of the Option Premium (with respect to Options of which the Bank is the Grantor) and any amount due and payable by the Customer by credit to the Customer's account. The Customer hereby irrevocably authorizes the Bank with respect to each Option granted by the Bank, to automatically and simultaneously apply the proceeds of the exercise of the Option by the Customer and to automatically and simultaneously deduct any amounts due and payable to the Bank from any amounts due and payable by the Customer.

8. The Bank shall be under no obligations to maintain in full or in part any foreign exchange lines which the Customer may at any time have with the Bank or to make available to the Customer foreign exchange lines sufficient in full or in part to meet any obligations which the Customer may have to the Bank.

9. The Customer shall reimburse and indemnify the Bank on demand against and in respect of any and all expenses, costs (including without limitation funding costs), losses and/or damages incurred by the Bank as a result of failure by the Customer to settle any Option in accordance herewith.

10. Each Option shall be subject to the rules, regulations and bylaws of all relevant governmental and other regulatory bodies and agencies, including but not limited to the commodity exchanges and the rules, regulations and bylaws and customary market practices as the same may be constituted from time to time, at the exchange or market (and its clearing house, if any where the Option is purchased or exercised).

# CREDIT SERVICES

The Bank may in its absolute discretion make Credit Services available on the terms set out below.

Customers who agree to the hold mail service will not be entitled to make use of the Credit Services unless they supply the Bank with an address for service of notices.

## Warranties

All instructions by the Customer in relation to Credit Services shall constitute a warranty and an undertaking to the Bank that the Customer is the sole beneficial owner free from any mortgage, charge, encumbrance or security interest (save for any charge, mortgage, encumbrance or security interest created in the Bank's favour) of all deposits, securities, gold and other property which the Customer has placed in with or purchased through the Bank or which the Bank is managing for the Customer (the "Assets").

The Customer agrees not to assign, transfer, withdraw or charge all or any part of the Assets or to create any security over it without the Bank's consent.

**Loans and Advances**

1. The Bank may at its sole discretion and on such terms as the Bank shall think fit grant overdraft, loan or other credit facilities or accommodation to the Customer with or without limitation and with or without security. In particular, the Bank may make advances to the Customer for the purpose of financing, in whole or in part, any purchase by the Customer of securities and/or currencies provided that the aggregate amount outstanding at any time in respect of such advances does not exceed such percentage as the Bank may from time to time determine on the aggregate value of the investments in securities and/or currencies which from time to time belong to the Customer and are held by the Bank. The value of such securities and/or currencies for the purpose aforesaid shall be conclusively determined by the Bank.

2. The Bank shall open and maintain such account or accounts in the name of the Customer as may be necessary for recording the amounts from time to time owing by the Customer hereunder.

3. The Customer will on demand provide additional security in such form or make payments in such amounts as the Bank may from time to time require in order to maintain such margin of cover as the Bank in its sole opinion shall consider satisfactory for the credit facilities or other accommodation extended by it to the Customer.

4. All sums outstanding hereunder shall be repayable on demand by the Bank.

5. At the expiry or termination of any facility, the Bank is authorized to obtain repayment of the Customer's outstanding indebtedness by offsetting it against the credit balance on any account or accounts maintained by the Customer with the Bank, whether or not such accounts may have matured, and shall not be obliged to accept repayment of such indebtedness by the Customer in any other manner.

**Securities Financing**

1. The Customer may request and the Bank may at its absolute discretion agree to finance the Customer's investments in various stocks, shares, bonds, unit trust securities, government securities and other investments acceptable to the Bank by way of securities margin financing and on such other and additional terms as the Bank may at its discretion specify in its offer/facility letter.

   Unless otherwise agreed by the Bank, in respect of securities transactions to be financed by the Bank and intended by the Customer to be executed on an exchange and in respect of all dealings by the Customer in shares to be financed by the Bank, the Bank will, at the Customer's risk and at the Customer's request, enter (either directly or through the Bank's nominees), for and on behalf of the Customer, into contracts for the sale or purchase of such securities.

   In respect of other securities transactions, the Bank shall, unless otherwise notified to the Customer, act as principal to the Customer.

2. All securities purchased pursuant hereto shall be kept by the Bank or its nominees (and subject to the Bank's terms for the provisions of custody services as set out in this Agreement) and be subject to a continuing first paramount security in favour of the Bank for the obligations of the Customer and the Customer shall not be entitled to them until full payment has been made specifically of the Customer's liabilities to the Bank in respect thereof as well as generally of the Customer's liabilities to the Bank (unless the Bank otherwise agrees).

3. Collateral for securities financing will be required and shall be advised from time to time by the Bank to the Customer. The principal limit of this service, the interest rates applicable and the tenor of each advance made shall be advised by the Bank to the Customer. The Bank reserves the right to withdraw, cancel or modify the terms of this service at any time upon written notice to the Customer.

4. In relation to any outstanding Securities Contract:

   Unless otherwise agreed and subject to the terms and conditions of the Facility, in respect of a Securities Contract, unless the Bank is already holding cash or Securities on behalf of the Customer to settle the Securities Contract, the Customer will:

   (a) pay the Bank cleared funds or deliver to the Bank Securities in deliverable form, or

   (b) otherwise ensure that the Bank has received such funds or Securities,

   by such time as the Bank has notified the Customer in relation to that Securities Contract. If the Customer fails to do so, the Bank may:

   (i) in the case of a purchase transaction, sell the purchased Securities and, or

   (ii) in the case of a sale transaction, borrow and/or purchase Securities in order to settle the transaction.

**Other Credit Services**

Other Credit Services includes third party guarantees, letters of credit, trading facilities and other credit facilities which may be made available, secured against the Customers assets held with the Bank or elsewhere and shall be governed by the terms of this Agreement and such other items as may be determined by the Bank and notified to the Customer.



American Express Bank Ltd. 16 Collyer Quav #08-00 Hitachi Tower Singapore 049318