# IMPORTANT NOTICE

**IMPORTANT: You must read the following disclaimer before continuing.** The following disclaimer applies to the attached Prospectus accessed from this page or otherwise received as a result of such access and you are therefore advised to read this disclaimer page carefully before reading, accessing or making any other use of the attached Prospectus. In accessing the attached Prospectus, you agree to be bound by the following terms and conditions, including any modifications to them from time to time, each time you receive any information as a result of such access.

**Confirmation of Your Representation:** You have been sent the attached Prospectus on the basis that you have confirmed to BNP Paribas, Lloyds TSB Bank plc, Merrill Lynch International or UBS Limited being the sender of the attached, (i) that the electronic mail (or e-mail) address to which it has been delivered is not located in the United States of America, its territories and possessions, any State of the United States and the District of Columbia; and which include Puerto Rico, the US Virgin Islands, Guam, American Samoa, Wake Island and the Northern Mariana Islands and (ii) that you consent to delivery by electronic transmission.

This Prospectus has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of transmission and consequently none of BNP Paribas, Lloyds TSB Bank plc, Merrill Lynch International, UBS Limited and any person who controls either of them or any director, officer, employee or agent of BNP Paribas, Lloyds TSB Bank plc, Merrill Lynch International, UBS Limited or any person who controls any of them or any affiliate of any of the foregoing accepts any liability or responsibility whatsoever in respect of any difference between the Prospectus distributed to you in electronic format and the hard copy version available to you on request from BNP Paribas, Lloyds TSB Bank plc, Merrill Lynch International or UBS Limited.

You are reminded that the attached Prospectus has been delivered to you on the basis that you are a person into whose possession this Prospectus may be lawfully delivered in accordance with the laws of jurisdiction in which you are located and you may not nor are you authorised to deliver this Prospectus to any other person.

**Restrictions:** Nothing in this electronic transmission constitutes an offer of securities for sale in the United States or any other jurisdiction. Any securities to be issued will not be registered under the Securities Act of 1933 (the "Securities Act") and may not be offered or sold in the United States or to or for the account or benefit of U.S. persons (as such terms are defined in Regulation S under the Securities Act) unless registered under the Securities Act or pursuant to an exemption from such registration.

The following Prospectus may not be forwarded or distributed to any other person and may not be reproduced in any manner whatsoever, and in particular, may not be forwarded to any U.S. person or to any U.S. address. Any forwarding, distribution or reproduction of this document in whole or in part is unauthorised. Failure to comply with this directive may result in a violation of the Securities Act or the applicable laws of other jurisdictions.

Under no circumstances shall this Prospectus constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of these securities in any jurisdiction in which such offer, solicitation or sale would be unlawful. This Prospectus may only be communicated to persons in the United Kingdom in circumstances where section 21(1) of the Financial Services and Markets Act 2000 does not apply to Lloyds TSB Bank plc.



# Lloyds TSB Bank plc

*(incorporated in England with limited liability under the Companies Act 1862
and the Companies Act 1985 with registered number 2065)*

## Fixed Rate Perpetual Capital Securities

This Prospectus relates to the issue of Fixed Rate Perpetual Capital Securities (the "Capital Securities") of Lloyds TSB Bank plc (the "Issuer"). The final terms of the Capital Securities will be determined in the future taking into account the prevailing market conditions and demand for the Capital Securities and will be set out in a separate document (the "Final Terms"), a form of which is set out herein. The Capital Securities may be issued in one or more tranches and Final Terms will be issued in respect of each tranche.

Interest on the Capital Securities will be payable from and including the Issue Date (as specified in the relevant Final Terms) at the rate and on the Coupon Payment Dates specified in the relevant Final Terms. Coupon Payments (as defined in the Terms and Conditions of the Capital Securities) may be deferred as described in "Terms and Conditions of the Capital Securities — 4. Coupon Deferral" and are subject to the condition to payment set out in "Terms and Conditions of the Capital Securities — 2. Subordination". Payments in respect of the Capital Securities will be made without withholding or deduction for, or on account of, taxes of the United Kingdom, unless such deduction is required by law. In the event that any such withholding or deduction is made, the Capital Securities will be subject to grossing up by the Issuer, subject to certain exceptions as are more fully described under "Terms and Conditions of the Capital Securities — 11. Taxation".

Subject to giving prior written notice to, and receiving no objection from, the Financial Services Authority (the "FSA"), the Capital Securities will be redeemable (at the option of the Issuer) in whole but not in part at their principal amount on their fifth anniversary, or at any time thereafter. In addition, upon the occurrence of a Tax Event or Regulatory Event (each as defined in the Terms and Conditions of the Capital Securities), the Capital Securities may be redeemed, at their principal amount, or exchanged or varied, all as more particularly described, in "Terms and Conditions of the Capital Securities — 7. Redemption or Purchase" and "Terms and Conditions of the Capital Securities — 8. Option to Exchange for or Vary to Become Qualifying Tier 1 Securities or Qualifying Upper Tier 2 Securities". The Issuer may at any time elect to exchange the Capital Securities in whole (but not in part) for, or vary the terms of the Capital Securities so that they become, Qualifying Tier 1 Securities or, subject to certain conditions, Qualifying Upper Tier 2 Securities. The Capital Securities will be unsecured securities of the Issuer and will be subordinated to the claims of all creditors.

**For a description of certain matters that prospective investors should consider, see "Risk Factors".**

This Prospectus has been approved by the FSA, in its capacity as United Kingdom competent authority (the "UK Listing Authority") for the purposes of Directive 2003/71/EC (the "Prospectus Directive") and relevant implementing measures in the United Kingdom as a base prospectus issued in compliance with the Prospectus Directive and relevant implementing measures in the United Kingdom for the purpose of giving information with regard to the issue of the Capital Securities. Applications have been made for (1) a certificate of approval under Article 18 of the Prospectus Directive as implemented in the United Kingdom to be issued by the FSA to the competent authority in each of Spain, Portugal, The Netherlands, Ireland and Luxembourg and (2) the Capital Securities to be admitted to listing on the Official List of the FSA (the "Official List") and to trading on the regulated market (the "Market") of the London Stock Exchange plc (the "London Stock Exchange"). The Market is a regulated market for the purposes of the Directive 2004/39/EC of the European Parliament and of the Council on markets in financial instruments.

Any person (an "Investor") intending to acquire or acquiring any securities from any person (an "Offeror") should be aware that, in the context of an offer to the public as defined in section 102B of the Financial Services and Markets Act (the "FSMA"), the Issuer may be responsible to the Investor for the Prospectus under section 90 of the FSMA, only if the Issuer has authorised that Offeror to make the offer to the Investor. Each Investor should therefore enquire whether the Offeror is so authorised by the Issuer. If the Offeror is not authorised by the Issuer, the Investor should check with the Offeror whether anyone is responsible for the Prospectus for the purposes of section 90 of the FSMA in the context of the offer to the public, and, if so, who that person is. If the Investor is in any doubt about whether it can rely on the Prospectus and/or who is responsible for its contents it should take legal advice.

**Certain information relating to the terms of an offer by an Offeror to an Investor may not be available at the time of publication of this Prospectus. The Investor must look to the Offeror at the time of such offer for the provision of such information and it is the responsibility of the Offeror to ensure that information relating to the offer that has been omitted from this Prospectus is provided to the Investor at the time such offer is made.**

The Capital Securities are expected to be assigned, on issue, ratings from Moody's Investors Service Limited and Standard & Poor's Rating Services, a Division of the McGraw-Hill Companies, Inc., which will be specified in the relevant Final Terms. A rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time by the assigning rating agency.

*Managers*

| | |
|---|---|
| **BNP PARIBAS** | **LLOYDS TSB CORPORATE MARKETS** |
| **MERRILL LYNCH INTERNATIONAL** | **UBS INVESTMENT BANK** |

Prospectus dated 9 May 2008

*This Prospectus comprises a base prospectus for the purposes of the Prospectus Directive and for the purpose of giving information with regard to the Issuer, the Issuer and its subsidiaries and affiliates taken as a whole (the "Lloyds TSB Bank Group" and together with Lloyds TSB Group plc, the "Lloyds TSB Group" or "Group") and the Capital Securities which according to the particular nature of the Issuer and the Capital Securities, is necessary to enable investors to make an informed assessment of the assets and liabilities, financial position, profit and losses and prospects of the Issuer. The Issuer (the "Responsible Person") accepts responsibility for the information contained in this Prospectus. To the best of the knowledge and belief of the Issuer (which has taken all reasonable care to ensure that such is the case), the information contained in this Prospectus is in accordance with the facts and does not omit anything likely to affect the import of such information.*

*The previous paragraph should be read in conjunction with the sixth paragraph on the first page of this Prospectus.*

*An Investor intending to acquire or acquiring any Capital Securities from an Offeror will do so, and offers and sales of the Capital Securities to an Investor by an Offeror will be made, in accordance with any terms and other arrangements in place between such Offeror and such Investor including as to price, allocations and settlement arrangements. The Issuer will not be a party to any such arrangements with Investors (other than the Managers (as defined in "Subscription and Sale" below)) in connection with the offer or sale of the Capital Securities and, accordingly, this Prospectus and any Final Terms will not contain such information and an Investor must obtain such information from the Offeror. Subject as provided above, neither the Issuer nor any of its affiliates shall have any responsibility to an Investor in respect of such information.*

*The Capital Securities will be in bearer form and in the denomination specified in the relevant Final Terms. Each tranche of Capital Securities will initially be represented by a temporary global capital security (the "Temporary Global Capital Security"), without interest coupons or talons, which will be deposited with a common depositary on behalf of Euroclear Bank S.A./N.V. ("Euroclear") and Clearstream Banking, société anonyme ("Clearstream, Luxembourg") on or about the Issue Date specified in the relevant Final Terms. Each Temporary Global Capital Security will be exchangeable for interests in a permanent global capital security (the "Permanent Global Capital Security"), without interest coupons or talons, not earlier than 40 days after the Issue Date upon certification of non-U.S. beneficial ownership. Interests in each Permanent Global Capital Security will be exchangeable for definitive securities only in certain limited circumstances, as described under "Summary of Provisions relating to the Capital Securities while in Global Form".*

*This Prospectus has been prepared on the basis that any offer of Capital Securities in any Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State") other than offers (the "Permitted Public Offers") which are made prior to the Issue Date, and which are contemplated in the Prospectus in the United Kingdom, Spain, Portugal, The Netherlands, Ireland and Luxembourg once the Prospectus has been approved by the competent authority in the United Kingdom and published and notified to the relevant competent authorities in accordance with the Prospectus Directive as implemented in the United Kingdom, Spain, Portugal, The Netherlands, Ireland and Luxembourg will be made pursuant to an exemption under the Prospectus Directive, as implemented in that Relevant Member State, from the requirement to publish a prospectus for offers of Capital Securities. Accordingly any person making or intending to make an offer in that Relevant Member State of Capital Securities which are the subject of the offering contemplated in this Prospectus, other than the Permitted Public Offers, may only do so in circumstances in which no obligation arises for the Issuer or any of the Managers to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive, in each case, in relation to such offer. Neither the Issuer nor the Managers have authorised, nor do they authorise, the making of any offer (other than Permitted Public Offers) of*

*Capital Securities in circumstances in which an obligation arises for the Issuer or the Managers to publish or supplement a prospectus for such offer.*

*This Prospectus does not constitute an offer of, or an invitation by or on behalf of the Issuer or the Managers to subscribe or purchase, any of the Capital Securities. The distribution of this Prospectus and the offering of the Capital Securities in certain jurisdictions may be restricted by law. Persons into whose possession this Prospectus comes are required by the Issuer and the Managers to inform themselves about and to observe any such restrictions.*

*For a description of further restrictions on offers and sales of Capital Securities and distribution of this Prospectus see "Subscription and Sale" below.*

*No person is or has been authorised by the Issuer to give any information or to make any representation not contained in this Prospectus and any information or representation not so contained in or consistent with this Prospectus or any other information supplied in connection with the issue or offering of the Capital Securities and if given or made must not be relied upon as having been authorised by or on behalf of the Issuer or the Managers. Neither the delivery of this Prospectus nor any sale made in connection herewith shall, under any circumstances, create any implication that there has been no change in the affairs of the Issuer since the date hereof or the date upon which this Prospectus has been most recently amended or supplemented or that there has been no adverse change in the financial position of the Issuer since the date hereof or the date upon which this Prospectus has been most recently amended or supplemented or that the information contained in it or any other information supplied in connection with the Capital Securities is correct as of any time subsequent to the date on which it is supplied or, if different, the date indicated in the document containing the same.*

*To the fullest extent permitted by law, the Managers accept no responsibility whatsoever for the contents of this Prospectus or for any other statement, made or purported to be made by a Manager or on its behalf in connection with the Issuer or the issue and offering of the Capital Securities. Each Manager accordingly disclaims all and any liability whether arising in tort or contract or otherwise (save as referred to above) which it might otherwise have in respect of this Prospectus or any such statement.*

*The Capital Securities have not been and will not be registered under the U.S. Securities Act of 1933, as amended, (the "Securities Act") and are subject to U.S. tax law requirements. Subject to certain exceptions, Capital Securities may not be offered, sold or delivered within the United States or to U.S. persons.*

*In this Prospectus, all references to "U.S.$" or "dollars" refer to United States dollars, "£" and "Sterling" refer to pounds sterling and to "euro" and "€" refer to the lawful currency of the member states of the European Union that have adopted the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union and the Treaty of Amsterdam.*

**In connection with the issue of the Capital Securities, BNP Paribas, Merrill Lynch International and UBS Limited (the "Stabilising Managers") (or persons acting on behalf of any Stabilising Managers) may over-allot Capital Securities or effect transactions with a view to supporting the market price of the Capital Securities at a level higher than that which might otherwise prevail. However, there is no assurance that the Stabilising Managers (or persons acting on behalf of a Stabilising Manager) will undertake stabilisation action. Any stabilisation action may begin on or after the date on which adequate public disclosure of the terms of the offer of the Capital Securities is made and, if begun, may be ended at any time, but it must end no later than the earlier of 30 days after the issue date of the Capital Securities and 60 days after the date of the allotment of the Capital Securities. Any stabilisation action or over-allotment must be conducted by the relevant Stabilising Managers (or person(s) acting on behalf of any Stabilising Managers) in accordance with all applicable laws and rules.**

# TABLE OF CONTENTS

DOCUMENTS INCORPORATED BY REFERENCE ........................................................................................6

SUMMARY ........................................................................................................................................................8

RISK FACTORS................................................................................................................................................16

TERMS AND CONDITIONS OF THE CAPITAL SECURITIES....................................................................25

SUMMARY OF PROVISIONS RELATING TO THE CAPITAL SECURITIES WHILE IN GLOBAL
    FORM .......................................................................................................................................................52

USE OF PROCEEDS ........................................................................................................................................55

LLOYDS TSB GROUP.....................................................................................................................................56

TAXATION .......................................................................................................................................................69

FORM OF FINAL TERMS................................................................................................................................74

SUBSCRIPTION AND SALE...........................................................................................................................78

GENERAL INFORMATION ............................................................................................................................83

# DOCUMENTS INCORPORATED BY REFERENCE

This Prospectus should be read and construed in conjunction with the following documents:

- the audited consolidated and unconsolidated annual financial statements of the Issuer for the financial year ended 31 December 2006, together with the audit report thereon, as set out on pages 6 to 73 of the Issuer's Annual Report and Accounts 2006;

- the audited consolidated and unconsolidated annual financial statements of the Issuer for the financial year ended 31 December 2007, together with the audit report thereon, as set out on pages 8 to 100 of the Issuer's Annual Report and Accounts 2007;

- the audited consolidated annual financial statements of Lloyds TSB Group plc (the "Parent") for the financial year ended 31 December 2007 as set out on pages 76 to 147 of the Parent's Annual Report and Accounts 2007, including the information regarding Risk Management set out on pages 36 to 56, together with the audit report thereon (which relates to the Parent's consolidated annual financial statements for the financial year ended 31 December 2007 and the information regarding Risk Management except for such information set out on page 51); and

- the audited information regarding Directors' remuneration set out on pages 70 to 75 of the Parent's Annual Report and Accounts 2007, together with the audit report thereon,

which have been previously published and filed with the FSA and which shall be deemed to be incorporated in, and form part of, this Prospectus, save that any statement contained in a document which is deemed to be incorporated by reference herein shall be deemed to be modified or superseded for the purpose of this Prospectus to the extent that a statement contained herein modifies or supersedes such earlier statement (whether expressly, by implication or otherwise). Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Prospectus.

The Issuer will provide, without charge, to each person to whom a copy of this Prospectus has been delivered, upon the oral or written request of such person, a copy of any or all of the documents which are incorporated in whole or in part by reference herein. Written requests for such documents should be directed to the Issuer at its principal office set out at the end of this Prospectus.

Any queries in relation to this Prospectus (including the above documents) should be directed to: Investor Relations, telephone no: +44 20 7356 1273 and e-mail: investor.relations@ltsb-finance.co.uk.

# SUPPLEMENTARY PROSPECTUS

If at any time the Issuer shall be required to prepare a supplementary prospectus pursuant to section 87G of the FSMA, the Issuer will prepare and make available an appropriate amendment or supplement to this Prospectus or a further Prospectus which, shall constitute a supplementary prospectus as required by the UK Listing Authority and section 87G of the FSMA.

The Issuer has given an undertaking to the Managers that if at any time from the date of this Prospectus to the Issue Date specified in the relevant Final Terms there is a significant new factor, material mistake or inaccuracy relating to information contained in this Prospectus which is capable of affecting the assessment of the Capital Securities and whose inclusion in or removal from this Prospectus is necessary for the purpose of allowing an investor to make an informed assessment of the assets and liabilities, financial position, profits and losses and prospects of the Issuer, and the rights attaching to the Capital Securities, the Issuer shall prepare an amendment or supplement to this Prospectus or publish a replacement Prospectus and shall supply to each Manager and the Trustee such number of copies of such supplement hereto as such Manager and the Trustee may reasonably request.

# SUMMARY

*This summary must be read as an introduction to this Prospectus and any decision to invest in the Capital Securities should be based on a consideration of this Prospectus as a whole, including the documents incorporated by reference. Following the implementation of the relevant provisions of the Prospectus Directive in each Member State of the European Economic Area (an "EEA State"), no civil liability will attach to the Responsible Person in any such Member State solely on the basis of this summary, including any translation thereof, unless it is misleading, inaccurate or inconsistent when read together with the other parts of this Prospectus. Where a claim relating to the information contained in this Prospectus is brought before a court in an EEA State, the plaintiff may, under the national legislation of the EEA State where the claim is brought, be required to bear the costs of translating the Prospectus before the legal proceedings are initiated. Capitalised terms used herein but not otherwise defined, shall have the same meanings as set out in the Terms and Conditions of the Capital Securities.*

| | |
|---|---|
| Issuer | Lloyds TSB Bank plc. |
| Parent | Lloyds TSB Group plc. |
| Issue | Fixed Rate Perpetual Capital Securities. |
| Coupons | The Capital Securities will bear interest at the fixed rate specified in the Final Terms. |
| Additional Amounts | All payments in respect of the Capital Securities will be made without withholding or deduction for or on account of United Kingdom taxes, unless the withholding or deduction is required by law. In such event (subject to customary exceptions), the Issuer will pay such additional amounts as will be necessary to ensure that the net amount received by Holders or Couponholders, after the withholding or deduction, will equal the amount which would have been receivable in the absence of the withholding or deduction. |
| Subordination | The Capital Securities constitute direct, unsecured and subordinated securities of the Issuer and rank *pari passu* without any preference among themselves, as further described in Condition 2 herein. |
| | No payment of principal or interest in respect of the Capital Securities shall be due and payable except to the extent that the Issuer is solvent and could make such payment and still be solvent immediately thereafter, in each case except in the event of the winding-up or administration of the Issuer. |
| | For these purposes the Issuer will be solvent if (x) it is able to pay its debts to its Senior Creditors as they fall due and (y) its Assets exceed its Liabilities (other than its Liabilities to persons who are not Senior Creditors). |
| | The sole remedy against the Issuer available to the |

Trustee or any Holder for recovery of amounts owing in respect of any sum which has become due from the Issuer in respect of the Capital Securities will be the institution of proceedings for the winding-up of the Issuer in England (but not elsewhere) and/or proving in any winding-up of the Issuer.

| | |
|---|---|
| Winding-up or Administration | In the event of the winding-up or administration of the Issuer, the Holders will be treated as if, save as mentioned below, on the day prior to the commencement of the winding-up or administration and thereafter, they were the holders of one of a class of preference shares in the capital of the Issuer ("Notional Preference Shares") ranking *pari passu* as to a return of assets on a winding-up or administration with, the holders of Other Tier 1 Securities of the Issuer and the holders of that class or classes of preference shares (if any) from time to time issued or which may be issued by the Issuer which have a preferential right to a return of assets in the winding-up or administration over, and so rank ahead of, the holders of all other classes of issued shares for the time being in the capital of the Issuer, but ranking junior to the claims of Senior Creditors and junior to any other notional class of preference shares in the capital of the Issuer by reference of which the amount payable in respect of any Junior Subordinated Debt in a winding-up or administration of the Issuer is determined. |
| Coupon Deferral | On any Coupon Payment Date, the Issuer shall have the option to defer Coupon Payments on the Capital Securities. |
| | Deferred Coupon Payments, if any, may be made by the Issuer at any time but shall become due only on the first of the following to occur: (i) redemption of the Capital Securities pursuant to the Issuer's call option; (ii) redemption of the Capital Securities as a result of a Tax Event; (iii) redemption of the Capital Securities as a result of a Regulatory Event; and (iv) exchange of the Capital Securities or variation of the terms of the Capital Securities in certain circumstances. Deferred Coupon Payments will also become due on the commencement of the winding-up or administration of the Issuer. Deferred Coupon Payments shall also, in certain circumstances, be payable on an exchange of the Capital Securities pursuant to Condition 8 herein. |
| | Except as provided in "Suspension" below or in a winding-up or administration of the Issuer, Deferred Coupon Payments may only be satisfied by means of |

the ACSM.

Except in the limited circumstances provided under "Market Disruption" below, no interest will accrue on any Deferred Coupon Payments.

| | |
|---|---|
| Dividend and Capital Restriction | If, on any Coupon Payment Date, payment of all Coupon Payments scheduled to be made on such date is not made in full, neither the Issuer nor the Parent shall: |

(a) declare or pay any distribution or dividend or make any other payment on, and will procure that no distribution or dividend or other payment is made on, any Junior Share Capital other than, in the case where the Issuer has elected to defer a Coupon Payment, a dividend (other than a dividend which is, or is expressed to be, an extraordinary or special dividend), distribution or other payment which has been declared, paid or made by the Issuer or the Parent on any Junior Share Capital prior to the date on which the decision to defer the relevant Coupon Payment is notified to Holders; or

(b) redeem, purchase, cancel, reduce or otherwise acquire any Junior Share Capital or any Other Tier 1 Securities (except in certain circumstances),

in each case unless or until the Coupon Payments due and payable during the following 12 months on all outstanding Capital Securities have been paid in full.

| | |
|---|---|
| Alternative Coupon Satisfaction Mechanism (ACSM) | Investors will receive payments in respect of the Capital Securities in cash. However, if the Issuer defers a Coupon Payment, the Issuer must (except as provided in "Suspension" below or in a winding-up of the Issuer) appoint a Calculation Agent (if it has not already done so) and satisfy its obligation to make the relevant ACSM Payment (being any Deferred Coupon and/or any Accrued Coupon Payment, as more fully described in the Terms and Conditions of the Capital Securities) by operation of the ACSM. The Issuer shall (subject to it having the necessary corporate authorisations in place) issue Issuer ACSM Securities and issue and allot them in favour of the Trustee or its agent. If the Issuer issues Issuer ACSM Securities, it may make an election pursuant to which the Parent will issue Parent ACSM Securities to the Trustee or its agent in exchange for the Issuer ACSM Securities. An issue of the Parent ACSM Securities or, if the Issuer has not elected that the Parent is to issue Parent ACSM Securities, Issuer ACSM Securities in accordance with Condition 6 herein shall satisfy in full the Issuer's obligation to make the |

relevant ACSM Payment. When sold, the Parent ACSM Securities or, as the case may be, Issuer ACSM Securities will provide a cash amount which the Principal Paying Agent on behalf of the Trustee, will pay to the Holders in respect of the relevant ACSM Payment.

If the proceeds of the sale of the Parent ACSM Securities or, as the case may be, Issuer ACSM Securities will not in the opinion of the Calculation Agent result in a sum at least equal to the relevant ACSM Payment being available (after deducting the Associated Costs) to make the necessary payment in full, the Issuer, the Trustee and the Calculation Agent will take such steps as are reasonably necessary to ensure, so far as practicable, that through issuing additional Issuer ACSM Securities and Parent ACSM Securities and following, *mutatis mutandis*, the procedures described above, a sum as near as practicable to, and at least equal to, the ACSM Payment and the Associated Costs will be available in full on the relevant due date.

| Market Disruption Event | If, in the opinion of the Issuer, a Market Disruption Event exists on or after the 15th Business Day preceding any ACSM Payment Date, the relevant ACSM Payment may be deferred until, in the opinion of the Issuer, the Market Disruption Event no longer exists. Any such deferred ACSM Payments shall bear interest if the Market Disruption Event continues such that the relevant ACSM Payment is not satisfied for 14 days or more after the relevant ACSM Payment Date and such interest shall itself be satisfied by the operation of the ACSM. |
|---|---|
| Insufficiency | The Issuer shall not be entitled to exercise its option to redeem or exchange the Capital Securities as described in Conditions 7(b) to (d) and Condition 8 herein until such time as the Issuer and, if the Issuer has elected that the Parent is to issue ACSM Securities, the Parent: |

(x) in the case of ACSM Securities which are Ordinary Shares, have available, and the Directors of the Issuer and/or the Parent have the corresponding authority to allot, a sufficient number of authorised but unissued Ordinary Shares; or

(y) in the case of ACSM Securities which are not Ordinary Shares, have authority to issue the amount of ACSM Securities,

as may be required for the purposes of satisfying in full any ACSM Payment required to be satisfied in

|                      | connection with such redemption or exchange of the Capital Securities. |
|----------------------|---|
| Suspension           | If, following any take-over offer made under the City Code on Take-overs and Mergers or any reorganisation, restructuring or scheme of arrangement, the Parent or any subsequent New Owner ceases to be the ultimate holding company of Lloyds TSB Group, then, unless a Permitted Restructuring Arrangement shall be put in place, such amendments to the documentation relating to the Capital Securities as determined by an independent investment bank, merchant bank, commercial bank, stockbroker or financial institution (selected by the Issuer and approved by the Trustee) to be appropriate in order to (a) preserve substantially the economic effect, for the Holders, of a holding of the Capital Securities prior to the Suspension; and (b) replicate the ACSM in the context of the capital structure of the New Owner, will be made by the Issuer and the Trustee, and pending such amendments, the ACSM shall be suspended (the "Suspension"). If such institution is unable to determine appropriate amendments then the Capital Securities shall at the option of the Issuer either (in each case subject to the Issuer complying with applicable regulatory requirements as may be in force from time to time) be exchanged or have their terms varied in accordance with Condition 8 of the Terms and Conditions of the Capital Securities or be redeemed at their principal amount together with all Payments which are Outstanding thereon. |
| Optional Redemption  | The Capital Securities are perpetual securities and have no maturity date. The Capital Securities are not redeemable at the option of the Holders at any time. The Capital Securities may be redeemed in whole (but not in part) at the option of the Issuer on or after the fifth anniversary of the Issue Date at their principal amount together with any Payments which are Outstanding thereon. |
|                      | In addition, upon the occurrence of a Tax Event or a Regulatory Event which is continuing the Issuer may at any time redeem all, but not some only, of the Capital Securities at their principal amount together with any Payments which are Outstanding thereon (including any Deferred Coupon Payments, which will be satisfied by the operation of the ACSM). |

| | |
|---|---|
| Option to Exchange for, or Vary to Become, Qualifying Tier 1 Securities or Qualifying Upper Tier 2 Securities | The Issuer may at any time elect to exchange the Capital Securities in whole (but not in part) for, or vary the terms of the Capital Securities so that they become: (x) Qualifying Tier 1 Securities or (y) Qualifying Upper Tier 2 Securities (subject to certain conditions), subject to compliance with applicable regulatory requirements. Each Capital Security shall be exchanged for one Qualifying Tier 1 Security, or one Qualifying Upper Tier 2 Security, as the case may be, with the liquidation preference specified in the relevant Final Terms. If the Issuer elects to so exchange or vary the terms of the Capital Securities: |

(i)    in circumstances where a Tax Event or a Regulatory Event has occurred, at the Issuer's option either (1) all Payments outstanding on such Capital Securities (including any Deferred Coupon Payments) will be satisfied in accordance with the ACSM or (2) the Qualifying Tier 1 Securities or, as the case may be, the Qualifying Upper Tier 2 Securities shall preserve any existing rights under these Conditions to any Payments outstanding on the Capital Securities (including any Deferred Coupon Payments) which have not been first satisfied; and

(ii)    in circumstances where neither a Tax Event nor a Regulatory Event is then occurring, all Payments outstanding on such Capital Securities (including any Deferred Coupon Payments) must first be made in accordance with the ACSM.

The Holders may be allotted the Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities directly or via a repackaging vehicle or depositary receipt facility. Any such exchange shall be effected by the Capital Securities being exchanged at their principal amount and the immediate application of such principal amount to subscription for the applicable number of Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities being issued to the Holder.

| | |
|---|---|
| Form and Denomination | The Capital Securities will be issued in bearer form in the denomination specified in the relevant Final Terms. The Capital Securities may be issued in one or more tranches and a separate Final Terms will be issued in respect of each tranche. Each tranche of Capital |

Securities will be represented initially by a Temporary Global Capital Security which will be deposited with a common depositary for Clearstream, Luxembourg and Euroclear on or about the Issue Date. Each Temporary Global Capital Security will be exchangeable for interests in a Permanent Global Capital Security without interest coupons or talons on or after a date which is expected to be 40 days after the Issue Date upon certification as to non-U.S. beneficial ownership as required by U.S. Treasury regulations and as described in the relevant Temporary Global Capital Security. Save in limited circumstances, Capital Securities in definitive bearer form with coupons and a talon attached on issue will not be issued in exchange for interests in a Permanent Global Capital Security.

Listing

Applications have been made for a certificate of approval under Article 18 of the Prospectus Directive and relevant implementing measures in the United Kingdom to be issued to the competent authority in each of Spain, Portugal, The Netherlands, Ireland and Luxembourg and for the Capital Securities to be admitted to listing on the Official List of the FSA and to trading on the regulated market of the London Stock Exchange.

Governing Law

The Capital Securities will be governed by, and construed in accordance with, English law.

Clearing Systems

Euroclear and Clearstream, Luxembourg.

Selling Restrictions

For a description of certain restrictions on offers, sales and deliveries of Capital Securities and on the distribution of offering materials in the United States of America, the European Economic Area (including the United Kingdom), Ireland, Hong Kong and Singapore, see "Subscription and Sale".

Risk Factors

There are certain factors that may affect the Issuer's ability to fulfil its obligations under the Capital Securities. These are set out under "Risk Factors" and include the risk of changes in financial condition and results of Lloyds TSB Group by uncertain or unfavourable economic, market, legal and other conditions. In addition, there are certain factors which are material for the purpose of assessing the market risk associated with Capital Securities. These are set out under "Risk Factors" and include the fact that the Capital Securities may not be a suitable investment for all investors, certain risks relating to the structure of the Capital Securities and certain market risks.

| | |
|---|---|
| Final Terms | The following information will, inter alia, be contained in the Final Terms: |

- Issue Price per Capital Security;

- Aggregate principal amount of Capital Securities;

- Denomination(s);

- Coupon Payment Dates;

- Coupon Rate;

- Issue Date;

- First Call Date;

- Use of Proceeds;

- Ratings;

- Relevant Currency;

- Combined management, underwriting and selling commission;

- Total estimated expenses (including the commission);

- ISIN;

- Common Code; and

- Other terms.

# RISK FACTORS

*The Issuer believes that the following factors may affect its ability to fulfil its obligations under the Capital Securities. All of these factors are contingencies which may or may not occur and the Issuer is not in a position to express a view on the likelihood of any such contingency occurring. Factors which the Issuer believes may be material for the purpose of assessing the market risks associated with the Capital Securities are also described below. Prospective investors should note that the risks described below are not the only risks the Issuer faces. The Issuer has described only those risks relating to its operations that it considers to be material. There may be additional risks that the Issuer currently considers not to be material or of which it is not currently aware, and any of these risks could have the effects set forth above. Prospective investors should also read the detailed information set out elsewhere in this Prospectus (including any documents incorporated by reference herein) and reach their own views prior to making any investment decision.*

**The purchase of Capital Securities involves substantial risks and is suitable only for investors who have the knowledge and experience in financial and business matters necessary to enable them to evaluate the risks and the merits of an investment in the Capital Securities. Before making an investment decision, prospective purchasers of Capital Securities should ensure that they understand the nature of the Capital Securities and the extent of their exposure to risks and that they consider carefully, in the light of their own financial circumstances, financial condition and investment objectives, all the information set forth herein.**

**Each prospective purchaser of the Capital Securities must determine, based on its own independent review and such professional advice as it deems appropriate under the circumstances, that its acquisition of the Capital Securities (a) is fully consistent with its (or if it is acquiring the Capital Securities in a fiduciary capacity, the beneficiary's/beneficiaries') financial needs, objectives and condition; (b) complies and is fully consistent with all investment policies, guidelines and restrictions applicable to it (whether acquiring the Capital Securities as principal or in a fiduciary capacity); and (c) is a fit, proper and suitable investment for it (or if it is acquiring the Capital Securities in a fiduciary capacity, for the beneficiary/beneficiaries), notwithstanding the clear and substantial risks inherent in investing in or holding the Capital Securities.**

*Capitalised terms used herein but not otherwise defined have the meanings as set out in the Terms and Conditions of the Capital Securities.*

## RISKS RELATING TO THE LLOYDS TSB GROUP

Set out below are certain risk factors which could affect Lloyds TSB Group's future results and cause them to be materially different from expected results. Lloyds TSB Group's results could also be affected by competition and other factors. The factors discussed below should not be regarded as a complete and comprehensive statement of all potential risks and uncertainties Lloyds TSB Group's businesses face. For information on Lloyds TSB Group's risk management policies and procedures, see "Lloyds TSB Group plc Annual Report and Accounts 2007 - Risk management" as incorporated by reference.

***Lloyds TSB Group's businesses are subject to inherent risks arising from general and sector specific UK and international economic conditions. The development of adverse conditions in the UK or in other major economies could cause profitability to decline***

Lloyds TSB Group's businesses are subject to inherent risks, arising from general and sector specific UK and international economic conditions, which can change the level of demand for, and supply of, Lloyds TSB Group's products and services. A general deterioration in the UK economy could reduce Lloyds TSB Group's profit from its UK financial services businesses. A general deterioration in any other major world economy

could also adversely impact Lloyds TSB Group's profitability. See "Lloyds TSB Group plc Annual Report and Accounts 2007 – Risk management – Risk management framework – Principal risks" as incorporated by reference.

***Lloyds TSB Group's businesses are inherently subject to the risk of market fluctuations, which could reduce profitability***

Lloyds TSB Group's businesses are inherently subject to the risk of market fluctuations. The most significant market risks Lloyds TSB Group faces are those that impact the Group's pension schemes, principally equity risk and interest rate risk; adverse market movements would have an effect upon the financial condition of the pension schemes which would be reflected in the Lloyds TSB Group's financial statements. Interest rate risk, foreign exchange risk and credit spread risk arise from banking and trading activities while equity risk is also present in the insurance businesses - these also affect the financial statements. See "Lloyds TSB Group plc Annual Report and Accounts 2007 – Risk management – Market risk" as incorporated by reference for a discussion of these risks.

***Lloyds TSB Group's businesses are subject to inherent risks concerning counterparty credit quality which could affect the recoverability and value of assets on Lloyds TSB Group's balance sheet***

Lloyds TSB Group's businesses are subject to inherent risks regarding the credit quality of customers and market counterparties. Changes in the credit quality of Lloyds TSB Group's UK and/or international borrowers and counterparties could reduce the value of Lloyds TSB Group's assets, and increase allowances for impairment losses. Any change in credit quality, or perceived change thereto, could also change the market prices of marked-to-market assets resulting in Lloyds TSB Group incurring reduced profits or reductions in its reserves. In addition, changes in economic conditions may result in a deterioration in the value of security held against lending exposures and increase the risk of loss in the event of borrower default. See "Lloyds TSB Group plc Annual Report and Accounts 2007 – Risk management – Credit risk" as incorporated by reference.

***Lloyds TSB Group's businesses are subject to inherent risks concerning liquidity which could affect Lloyds TSB Group's ability to meet its financial obligations as they fall due***

Lloyds TSB Group's businesses are subject to risks concerning liquidity, which are inherent in its banking operations, and could affect Lloyds TSB Group's ability to meet its financial obligations as they fall due or to fulfil commitments to lend. Such an impact could arise from events outside of Lloyds TSB Group's control such as market dislocation (for example, the liquidity constraints faced in the second half of 2007 in the structured credit markets) or systemic shocks. See "Lloyds TSB Group plc Annual Report and Accounts 2007 – Risk management – Financial Soundness" as incorporated by reference.

***Lloyds TSB Group is subject to the risk that it has insufficient capital resources to meet the minimum required by its regulators***

Lloyds TSB Group is subject to the risk, inherent in all regulated businesses, that it has insufficient capital resources to meet the minimum regulatory capital requirements specified by its regulators; a shortage of available capital would also affect Lloyds TSB Group's ability to continue its organic growth or to pursue acquisition or other strategic opportunities. See "Lloyds TSB Group plc Annual Report and Accounts 2007 – Risk management – Financial Soundness" as incorporated by reference.

***Lloyds TSB Group's insurance businesses are subject to inherent risks relating to demographic developments, changing customer behaviour, adverse weather and similar contingencies outside their control. Development of adverse conditions could reduce profitability***

Lloyds TSB Group's insurance businesses are subject to a number of inherent risks including those relating to demographic developments (which include mortality), changing customer behaviour, adverse weather and

other similar contingencies outside its control, both in the UK and overseas. Such contingencies can change the risk profile and profitability of such products and services.

***Adverse experience in the operational risks inherent in Lloyds TSB Group's businesses could have a negative impact on its results***

Operational risks, through inadequate or failed internal processes or from people related or external events, including the risk of fraud and other criminal acts carried out against the Group, are present in Lloyds TSB Group's businesses. Lloyds TSB Group's businesses are dependent on their ability to process accurately and efficiently a high volume of complex transactions across numerous and diverse products and services, in different currencies and subject to a number of different legal and regulatory regimes. Lloyds TSB Group's systems and processes are designed to ensure that the operational risks associated with its activities are appropriately controlled, but Lloyds TSB Group realises that any weakness in these systems could have a negative impact on its results during the affected period. See "Lloyds TSB Group plc Annual Report and Accounts 2007 – Risk management – Operational Risk" as incorporated by reference. Notwithstanding anything in this risk factor, this risk factor should not be taken as implying that either the Issuer or the Lloyds TSB Group will be unable to comply with its obligations as a company with securities admitted to the Official List or as a supervised firm regulated by the FSA.

***Terrorist acts, other acts of war, geopolitical, pandemic or other such events could have a negative impact on the business and results of Lloyds TSB Group***

Terrorist acts, other acts of war or hostility, geopolitical, pandemic or other such events and responses to those acts/events, may create economic and political uncertainties, which could have a negative impact on UK and international economic conditions generally, and more specifically on the business and results of Lloyds TSB Group in ways that cannot be predicted.

***Lloyds TSB Group's businesses are subject to substantial regulation, and regulatory and governmental oversight. Adverse regulatory developments or changes in government policy could have a significant negative impact on Lloyds TSB Group's results***

Lloyds TSB Group conducts its businesses subject to ongoing regulation and associated regulatory risks, including the effects of changes in the laws, regulations, policies, voluntary codes of practice and interpretations in the UK and the other markets where it operates. Future changes in regulation, fiscal or other policies are unpredictable and beyond the control of Lloyds TSB Group. For additional information, see "Lloyds TSB Group - Regulation".

In addition, in the UK and elsewhere, there is continuing political and regulatory scrutiny of the banking industry and, in particular, retail banking. In the UK, the Competition Commission and the Office of Fair Trading ("OFT") are carrying out several inquiries, which are referred to in "Lloyds TSB Group – Competitive environment".  In recent years there have been several issues in the UK financial services industry in which the FSA has intervened directly, including the sale of personal pensions and the sale of mortgage related endowments.

The FSA or other regulators, in the UK or overseas, may intervene further in relation to the areas of industry risk already identified, or in new areas, which could adversely affect the Lloyds TSB Group.

***Lloyds TSB Group is exposed to various forms of legal and regulatory risk including the risk of misselling financial products, acting in breach of legal or regulatory principles or requirements and giving negligent advice, any of which could have a negative impact on its results or its relations with its customers***

Lloyds TSB Group is exposed to many forms of legal and regulatory risk, which may arise in a number of ways. Primarily:

(i) certain aspects of the Lloyds TSB Group's business may be determined by the authorities, the Financial Ombudsman Service ("FOS") or the courts as not being conducted in accordance with applicable laws, or, in the case of FOS, with what is fair and reasonable in the Ombudsman's opinion;

(ii) the possibility of alleged misselling of financial products which, as a result, may require additional provisions;

(iii) contractual obligations may either not be enforceable as intended or may be enforced against Lloyds TSB Group in an adverse way;

(iv) the intellectual property of Lloyds TSB Group (such as its trade names) may not be adequately protected; and

(v) Lloyds TSB Group may be liable for damages to third parties harmed by the conduct of its business.

In addition, Lloyds TSB Group faces risk where legal or regulatory proceedings or FOS or other complaints are brought against it in the UK High Court or elsewhere or in jurisdictions outside the UK, including other European countries and the United States. Regardless of whether or not such claims have merit, the outcome of any proceeding or complaint is inherently uncertain and could have a material adverse effect on Lloyds TSB Group's operations and/or financial condition, particularly if extended more broadly. For additional information, see "Lloyds TSB Group — Regulation".

Although Lloyds TSB Group has policies for the management of legal and regulatory risk, failure to manage these risks adequately could impact Lloyds TSB Group adversely, both financially and reputationally.

### Lloyds TSB Group is exposed to tax risk
Tax risk is the risk associated with changes in taxation rates or law, or misinterpretation of the law. This could result in increased charges or financial loss. Although Lloyds TSB Group devotes considerable resources to managing tax risk, failure to manage this risk adequately could impact Lloyds TSB Group adversely.

### Lloyds TSB Group's businesses are conducted in highly competitive environments. Creation of an appropriate return for shareholders depends upon management's ability to respond effectively to competitive pressures
The market for UK financial services and the other markets within which Lloyds TSB Group operates are highly competitive, and management expects such competition to intensify in response to consumer demand, technological changes, the impact of consolidation, regulatory actions and other factors, which could result in a reduction in profit. Lloyds TSB Group's ability to generate an appropriate return for its shareholders depends significantly upon the competitive environment and management's response to it. See "Lloyds TSB Group – Competitive environment".

### Lloyds TSB Group is devoting considerable time and resources to securing new customers and generating more business from existing customers. If Lloyds TSB Group is unsuccessful, its organic growth prospects will decline
Lloyds TSB Group seeks to achieve further organic growth by securing new customers and generating more business from existing customers. Lloyds TSB Group is currently expending significant resources and effort to bring about this growth. If these expenditures and efforts do not meet with success, its operating results would grow more slowly or decline.

### Lloyds TSB Group's strategic plans and related risks

Lloyds TSB Group devotes considerable management and planning resources to developing strategic plans for organic growth and identifying possible acquisitions which would provide further opportunities for growth. If these strategic plans do not meet with success, Lloyds TSB Group's earnings could grow more slowly or decline.

Lloyds TSB Group's businesses are conducted in a marketplace that is consolidating and significant cross-border mergers and acquisitions may happen in the coming years. Lloyds TSB Group's ability to generate an appropriate return for its shareholders over the long term may depend upon whether management is able to achieve value creating acquisitions and/or mergers at the appropriate times and prices. Lloyds TSB Group cannot be sure that it will ultimately be able to make such mergers or acquisitions or that if it does, such mergers or acquisitions will be integrated successfully or realise anticipated benefits.

## RISKS RELATING TO THE CAPITAL SECURITIES

### Deferral of Coupon Payments

The Issuer may elect to defer any Coupon Payment on the Capital Securities. If the Issuer does defer a Coupon Payment (whether pursuant to the general right to defer a Coupon Payment under Condition 4 or by virtue of failing to satisfy the condition to payment set out in Condition 2(b)(i)), such Deferred Coupon Payment will become due only on the earliest of: (i) redemption of the Capital Securities pursuant to the Issuer's call option; (ii) redemption of the Capital Securities as a result of a Tax Event; (iii) redemption of the Capital Securities as a result of a Regulatory Event; and (iv) exchange of the Capital Securities or variation of the terms of the Capital Securities in certain circumstances. Deferred Coupon Payments will also become due on the commencement of the winding-up or administration of the Issuer. Deferred Coupon Payments may only (except in the circumstances otherwise provided in Condition 8(a)(i)(2) or Condition 9(d) and in the winding-up of the Issuer) be satisfied by means of the Alternative Coupon Satisfaction Mechanism and the operation of such mechanism is subject to certain conditions (more particularly described in the Terms and Conditions of the Capital Securities).

Except in the limited circumstances provided in Condition 6(e), no Deferred Coupon Payment will bear interest.

### Perpetual Securities

The Issuer is under no obligation to redeem the Capital Securities at any time and the Holders have no right to call for their redemption.

### Redemption and Exchange Risk

The Capital Securities may, subject as provided in Condition 7, be redeemed at their principal amount together with any Payments which are Outstanding thereon at the option of the Issuer at any time on or after the fifth anniversary of the Issue Date. In addition, upon the occurrence of a Tax Event or Regulatory Event, the Capital Securities may at any time (subject to certain conditions) be redeemed at their outstanding principal amount, together in each case with any Payments which are Outstanding thereon, all as more particularly described in "Terms and Conditions of the Capital Securities — 7. Redemption or Purchase".

The Issuer may at any time elect to exchange the Capital Securities, or vary their terms so that they become, Qualifying Tier 1 Securities or, subject to certain conditions, Qualifying Upper Tier 2 Securities.

If the Capital Securities are exchanged for preference shares, Condition 8(f) states that there will be no obligation on the relevant issuer to pay additional amounts in relation to United Kingdom taxes to be withheld or deducted by law from payments made with respect to the such preference shares. Investors should be aware that the amounts payable in respect of dividends under the preference shares could be less than the amounts that would have been payable by the Issuer in respect of interest under the Capital Securities had the exchange not been effected. As at the date of this Prospectus, no such withholding or deduction is required by law to be withheld or deducted from payments made in respect of preference shares.

Furthermore, because the Capital Securities are in legal form of a different nature to preference shares, there can be no assurances given to holders of Capital Securities that, were preference shares to be issued in

exchange for the Capital Securities, as holders of such preference shares they would be treated in all circumstances on the same basis as if they had still been holders of Capital Securities. Such preference shares would qualify as Tier 1 Capital and may be non-cumulative.

### No Limitation on Issuing Senior or Pari Passu Securities; Subordination

There is no restriction on the amount of securities which the Issuer may issue and which rank senior to, or *pari passu* with, the Capital Securities. The issue of any such securities may reduce the amount recoverable by Holders on a winding-up or administration of the Issuer and/or may increase the likelihood of a deferral of Coupon Amounts under the Capital Securities. In particular, on the winding-up or administration of the Issuer, the Capital Securities shall rank junior to the claims of all Senior Creditors of the Issuer and any notional class of preference shares in the capital of the Issuer by reference to which the amount payable in respect of any Junior Subordinated Debt in a winding-up or administration of the Issuer is determined. **Accordingly, in the winding-up or administration of the Issuer and after payment of the claims of creditors, there may not be a sufficient amount to satisfy the amount owing to the Holders.**

### Availability of Shares

The Issuer and the Parent will undertake to use all reasonable endeavours to obtain and maintain certain corporate authorisations required for the operation of the ACSM (where ACSM Securities which are Ordinary Shares are to be issued), as more particularly described in "Terms and Conditions of the Capital Securities — 19. Pre-emption". However, if at the time when any Deferred Coupon Payments fall to be satisfied by means of the ACSM, the Issuer or the Parent do not have available and/or the relevant Directors do not have the necessary authority under English law to allot in favour of the Trustee or its agent (free from any pre-emption rights), a sufficient number of authorised but unissued ACSM Securities which are Ordinary Shares to satisfy the relevant ACSM Payments, then the Issuer will not be able to operate the ACSM.

The Issuer may not exercise its right to redeem, exchange or vary the terms of the Capital Securities, unless the Issuer and the Parent (x) in the case of ACSM Securities which are Ordinary Shares, have available, and the Directors of the Issuer and the Parent have the corresponding authority to allot, a sufficient number of authorised but unissued Ordinary Shares or (y) in the case of ACSM Securities which are not Ordinary Shares, have authority to issue the amount of ACSM Securities as may be required to be issued for the purposes of satisfying in full any ACSM Payments which are required to be satisfied in connection with such redemption, exchange or variation (all as more particularly described in "Terms and Conditions of the Capital Securities — 6. Alternative Coupon Satisfaction Mechanism — (d) Insufficiency"). In addition, the Capital Securities may not be redeemed, exchanged (except in certain circumstances) or have their terms varied unless all Deferred Coupon Payments (if any) are satisfied through the operation of the ACSM on or prior to the date set for the relevant redemption, exchange or variation.

### Restricted Remedy for Non-Payment when due

In accordance with the FSA's requirements for Tier 1 Capital, the sole remedy against the Issuer available to the Trustee or (where the Trustee has failed to proceed against the Issuer as provided in the Terms and Conditions of the Capital Securities) any Holder for recovery of amounts which have become due in respect of the Capital Securities and Coupons will be the institution of proceedings for the winding-up of the Issuer in England and/or proving in any winding-up of the Issuer. Except on a winding-up, in accordance with Condition 2(b)(i), no payment in respect of the Capital Securities shall become due unless the condition (solvency) to payment set out in Condition 2(b)(i) is satisfied.

### Market Disruption Event

If, following a decision by the Issuer to satisfy a payment using the ACSM, in the opinion of the Issuer a Market Disruption Event in respect of the Parent's ordinary shares exists, the payment to Holders may be deferred until the cessation of such Market Disruption Event, as more particularly described in "Terms and

Conditions of the Capital Securities — 6. Alternative Coupon Satisfaction Mechanism — (e) Market Disruption". Any such deferred payments shall bear interest at the rate applicable to the Capital Securities if the Market Disruption Event continues for 14 days or more.

*Set-Off*

Subject to applicable law, no Holder or Couponholder may exercise or claim any right of set-off in respect of any amount owed to it by the Issuer arising under or in connection with the Capital Securities or the Coupons and each Holder and Couponholder shall, by virtue of being the bearer of any Capital Security or Coupon, be deemed to have waived all such rights of set-off.

*Absence of Prior Public Markets*

The Capital Securities constitute a new issue of securities by the Issuer. Prior to this issue, there will have been no public market for the Capital Securities. Although application has been made to the UK Listing Authority under the FSMA for the Capital Securities to be admitted to the Official List and to the London Stock Exchange for the Capital Securities to be admitted to trading on the Market, there can be no assurance that an active public market for the Capital Securities will develop and, if such a market were to develop, the Managers are under no obligation to maintain such a market. The liquidity and the market prices for the Capital Securities can be expected to vary with changes in market and economic conditions, the financial condition and prospects of the Issuer and other factors that generally influence the market prices of securities.

*Tier 1 Capital Securities*

Except on a winding-up, payments in respect of the principal of, and interest on, the Capital Securities will be conditional upon the Issuer being solvent at the time of payment, as provided in, and as more particularly described in, Condition 2(b) and no payment shall be due to the extent that the Issuer is insolvent or would become insolvent as a result of making such payment.

*Capital Securities may not be a suitable investment for all investors*

Each potential investor in any Capital Securities must determine the suitability of that investment in light of its own circumstances. In particular, each potential investor should:

(i)     have sufficient knowledge and experience to make a meaningful evaluation of the relevant Capital Securities, the merits and risks of investing in the Capital Securities and the information contained or incorporated by reference in this Prospectus;

(ii)    have access to, and knowledge of, appropriate analytical tools to evaluate, in the context of its particular financial situation, an investment in the Capital Securities and the impact such investment will have on its overall investment portfolio;

(iii)   have sufficient financial resources and liquidity to bear all of the risks of an investment in the Capital Securities;

(iv)    understand thoroughly the terms of the Capital Securities;

(v)     recognise that it may not be possible to make any transfer of the Capital Securities for a substantial period of time, if at all; and

(vi)    be able to evaluate (either alone or with the help of a financial adviser) possible scenarios for economic, interest rate and other factors that may affect its investment and its ability to bear the applicable risks.

*Exchange rate risks and exchange controls*

The Issuer will pay principal and interest on the Capital Securities in the currency specified in the relevant Final Terms (the "Relevant Currency"). This presents certain risks relating to currency conversions if an investor's financial activities are denominated principally in a currency or currency unit (the "Investor's Currency") other than the Relevant Currency. These include the risk that exchange rates may significantly change (including changes due to devaluation of the Relevant Currency or revaluation of the Investor's Currency) and the risk that authorities with jurisdiction over the Investor's Currency may impose or modify exchange controls. An appreciation in the value of the Investor's Currency relative to the Relevant Currency would decrease (1) the Investor's Currency-equivalent yield on the Capital Securities, (2) the Investor's Currency equivalent value of the principal payable on the Capital Securities and (3) the Investor's Currency equivalent market value of the Capital Securities.

Government and monetary authorities may impose (as some have done in the past) exchange controls that could adversely affect an applicable exchange rate. As a result, investors may receive less interest or principal than expected, or no interest or principal.

*Interest rate risks*

Investment in Capital Securities as fixed rate instruments involves the risk that subsequent changes in market interest rates may adversely affect the value of the Capital Securities.

*Credit ratings may not reflect all risks*

One or more independent credit rating agencies may assign credit ratings to the Capital Securities. The ratings may not reflect the potential impact of all risks related to structure, market, additional factors discussed above, and other factors that may affect the value of the Capital Securities. A credit rating is not a recommendation to buy, sell or hold securities and may be revised or withdrawn by the rating agency at any time.

*Change of law or regulation*

The Terms and Conditions of the Capital Securities are based on English law and the regulations, requirements, guidelines and policies of the FSA relating to capital adequacy in effect as at the Issue Date of the Capital Securities. No assurance can be given as to the impact of any possible judicial decision or change to English law, administrative practice or the regulations, requirements, guidelines and policies of the FSA after the Issue Date of the Capital Securities. Investors should be aware that changes to certain of the FSA's capital adequacy regulations are currently proposed.

*EU Savings Directive*

Under EC Council Directive 2003/48/EC on the taxation of savings income, each Member State is required to provide to the tax authorities of another Member State details of payments of interest (or similar income) paid by a person within its jurisdiction to an individual resident in that other Member State. However, for a transitional period, Belgium, Luxembourg and Austria are instead required (unless during that period they elect otherwise) to operate a withholding system in relation to such payments (the ending of such transitional period being dependent upon the conclusion of certain other agreements relating to information exchange with certain other counties). A number of non-EU countries and territories including Switzerland have adopted similar measures (a withholding system in the case of Switzerland).

If a payment were to be made or collected through a Member State which has opted for a withholding system and an amount of, or in respect of, tax were to be withheld from that payment, neither the Issuer nor any Paying Agent nor any other person would be obliged to pay additional amounts with respect to any Capital Security as a result of the imposition of such withholding tax. If a withholding tax is imposed on payment made by a Paying Agent, the Issuer will be required, save as provided in Condition 18 of the Capital

Securities, to maintain a Paying Agent in a Member State that will not be obliged to withhold or deduct tax pursuant to the Directive.

# TERMS AND CONDITIONS OF THE CAPITAL SECURITIES

*The following conditions, subject to completion and amendment by the relevant Final Terms, and except for paragraphs in italics, are the terms and conditions of the Capital Securities which will be endorsed on each Capital Security in definitive form (if issued).*

The Fixed Rate Perpetual Capital Securities (the "Capital Securities", which expression shall in these Conditions, unless the context otherwise requires, include any further instruments issued pursuant to Condition 17 and forming a single series with the Capital Securities) of Lloyds TSB Bank plc (the "Issuer") are constituted by a trust deed (the "Trust Deed") dated on or about the Issue Date specified in the relevant Final Terms between the Issuer, the Parent and The Law Debenture Trust Corporation p.l.c. (the "Trustee", which expression shall include all persons for the time being the trustee or trustees under the Trust Deed) as trustee for the holders of the Capital Securities (the "Holders"). The issue of the Capital Securities was authorised pursuant to a resolution of the Board of Directors of the Issuer passed on 25 January 2008. The statements in these terms and conditions (the "Conditions") include summaries of, and are subject to, the detailed provisions of the Trust Deed. Copies of (i) the Trust Deed and (ii) the paying agency agreement (the "Paying Agency Agreement") dated on or about the Issue Date made between the Issuer, the Parent, Citibank, N.A. as principal paying agent (the "Principal Paying Agent", which expression shall include any successor thereto) and the other paying agent named therein and any successors thereto (together with the Principal Paying Agent, the "Paying Agents") and the Trustee are available for inspection during normal business hours by holders of the Capital Securities (the "Holders") and the holders of the interest coupons (the "Coupons", which expression includes, where the context so permits, Talons, as defined below) and talons for further Coupons (the "Talons") appertaining to Capital Securities in definitive form (the "Couponholders") at the specified office of each of the Paying Agents. The Holders and the Couponholders are entitled to the benefit of, and are bound by, all the provisions of the Trust Deed, and are deemed to have notice of all the provisions of the Paying Agency Agreement applicable to them.

## 1  Form, Denomination and Title

### (a)  Form and Denomination

The Capital Securities are serially numbered and in bearer form in the denomination(s) specified in the relevant Final Terms with Coupons and one Talon attached on issue.

### (b)  Title

Title to the Capital Securities, Coupons and Talons will pass by delivery. The bearer of any Capital Security and the bearer of any Coupon or Talon shall be deemed to be, and may be treated as (except as otherwise required by law or as ordered by a court of competent jurisdiction) its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any interest in it or its theft or loss or anything written on it) and no person will be liable for so treating the bearer.

## 2  Status and Subordination

### (a)  Status

The Capital Securities constitute direct, unsecured and subordinated securities of the Issuer and rank *pari passu* without any preference among themselves.

(b) **Subordination**

(i) **Condition to Payment**

Subject to Condition 3, payments in respect of or arising from the Capital Securities (including Coupons payable in cash or by way of the issue of ACSM Securities in accordance with Condition 6 and including any damages awarded for breach of any obligation of the Issuer) are, in addition to the right of the Issuer to defer payments under Condition 4, conditional upon the Issuer being solvent at the time of payment by the Issuer (or at the time of issue of any ACSM Securities) and no principal, premium or Payments shall be due and payable in respect of the Capital Securities (including Coupons payable in cash or by way of the issue of ACSM Securities in accordance with Condition 6 and including any damages awarded for breach of any obligation of the Issuer) except to the extent that the Issuer could make such payment and still be solvent immediately thereafter.

In these Conditions, the Issuer shall be considered to be solvent if (x) it is able to pay its debts to its Senior Creditors as they fall due and (y) its Assets exceed its Liabilities (other than its Liabilities to persons who are not Senior Creditors). For the purposes of this Condition 2(b)(i) any reference to a payment by the Issuer in respect of a Capital Security shall be deemed to include a purchase of such Capital Security by the Issuer. A report as to the solvency of the Issuer by two Directors or, if the Issuer is in a winding-up, its liquidator or, if the Issuer is in administration, its administrator, shall, in the absence of manifest error, be treated and accepted by the Issuer, the Parent, the Trustee, the Holders and the Couponholders as correct and sufficient evidence thereof.

(ii) **Solvency Claims**

Without prejudice to the rest of these Conditions, amounts in respect of principal, premium or Payments in respect of which the conditions referred to in Condition 2(b)(i) are not satisfied on the date upon which the same would otherwise be due and payable ("Solvency Claims") will be payable by the Issuer in a winding-up or administration of the Issuer as provided in Condition 3 and any redemption pursuant to Condition 7. A Solvency Claim shall not bear interest.

(iii) **Set-off**

Subject to applicable law, no Holder or Couponholder may exercise or claim any right of set-off in respect of any amount owed to it by the Issuer arising under or in connection with the Capital Securities or the Coupons and each Holder and Couponholder shall, by virtue of his holding of any Capital Security or Coupon, be deemed to have waived all such rights of set-off.

*If the condition to payment set out in Condition 2(b)(i) is not satisfied, any sums which would otherwise have been payable in respect of the Capital Securities but are not paid by reason of such condition to payment will be available to be put towards the losses of the Issuer.*

## 3 Winding-up or administration

If at any time an order is made, or an effective resolution is passed, for the winding-up of the Issuer (except, in any such case, a solvent winding-up solely for the purposes of a reorganisation, reconstruction or amalgamation or the substitution in place of the Issuer of a successor in business (as defined in the Trust Deed) of the Issuer, the terms of which reorganisation, reconstruction, amalgamation or substitution have previously been approved in writing by the Trustee or by an Extraordinary Resolution (as defined in the Trust Deed)), or, following the appointment of an administrator of the Issuer, an administrator gives notice that it

intends to declare and distribute a dividend, there shall be payable by the Issuer in respect of each Capital Security (in lieu of any other payment by the Issuer, but subject as provided in this Condition 3), such amount, if any, as would have been payable to the Holder if, on the day prior to the commencement of the winding-up or administration and thereafter, such Holder were the holder of one of a class of preference shares in the capital of the Issuer ("Notional Preference Shares") ranking *pari passu* as to a return of assets on a winding-up or administration with the holders of Other Tier 1 Securities of the Issuer and the holders of that class or classes of preference shares (if any) from time to time issued or which may be issued by the Issuer which have a preferential right to a return of assets in the winding-up or administration over, and so rank ahead of, the holders of all other classes of issued shares for the time being in the capital of the Issuer, but ranking junior to the claims of Senior Creditors and junior to any notional class of preference shares in the capital of the Issuer by reference to which the amount payable in respect of any Junior Subordinated Debt in a winding-up or administration of the Issuer is determined, on the assumption that the amount that such Holder was entitled to receive in respect of each Notional Preference Share on a return of assets in such winding-up or administration were an amount equal to the principal amount of the relevant Capital Security and any other Payments which are Outstanding thereon together with, to the extent not otherwise included within the foregoing, its pro rata share of any Solvency Claims attributable to the Capital Security.

*On a winding-up or administration of the Issuer, there may be no surplus assets available to meet the claims of the Holders after the claims of the parties ranking senior to the Holders (as provided in Condition 3) have been satisfied.*

## 4    Coupon Deferral

The Issuer may elect to defer any Coupon Payment otherwise scheduled to be paid on a Coupon Payment Date by giving notice of such election to the Holders (in accordance with Condition 16), the Trustee and the Principal Paying Agent not less than 20 Business Days prior to the relevant Coupon Payment Date. The Issuer may at any time satisfy any Deferred Coupon Payment by operation of the procedures set out in Condition 6. The Issuer shall (except where Condition 3 applies) satisfy any Deferred Coupon Payment only by operation of the procedures set out in Condition 6 and, subject to Condition 9(d), shall only be obliged to do so upon the occurrence of the first of the following to occur: (i) redemption of the Capital Securities in accordance with Condition 7(b); (ii) redemption of the Capital Securities in accordance with Condition 7(c); (iii) redemption of the Capital Securities in accordance with Condition 7(d); and (iv) exchange of the Capital Securities or variation of the terms of the Capital Securities in the circumstances provided for in Condition 8(a)(i)(1) or Condition 8(a)(ii).

If, on any Coupon Payment Date, payment of all Coupon Payments scheduled to be made on such date is not made in full, neither the Issuer nor the Parent shall (a) declare or pay any distribution or dividend or make any other payment on, and will procure that no distribution or dividend or other payment is made on, any Junior Share Capital other than, in the case where the Issuer has elected to defer a Coupon Payment in accordance with this Condition 4, a dividend (other than a dividend which is, or is expressed to be, an extraordinary or special dividend), distribution or other payment which has been declared, paid or made by the Issuer or the Parent on any Junior Share Capital prior to the date on which the decision to defer the relevant Coupon Payment is notified to Holders in accordance with Condition 16, or (b) redeem, purchase, cancel, reduce or otherwise acquire any Junior Share Capital or any Other Tier 1 Securities (save where those shares or securities being redeemed, purchased or acquired are replaced contemporaneously by an issue of shares or securities of the same aggregate principal amount and the same ranking on a return of assets on a winding-up or administration or in respect of a distribution or payment of dividends and/or any other amounts thereunder to those shares or securities being redeemed, purchased or acquired), in each case unless or until the Coupon Payments due and payable during the following 12 months on all outstanding Capital Securities have been

paid in full (or an amount equal to the same has been duly set aside or provided for in full for the benefit of the Holders and in a manner satisfactory to the Trustee).

Notwithstanding any other provision in these Conditions or the Trust Deed, the deferral of any Coupon Payment by virtue of this Condition 4 or Condition 2(b)(i) shall not constitute a default for any purpose (including, without limitation, Condition 10(a)) on the part of the Issuer. Any Coupon Payment so deferred shall not, except in the circumstances provided in Condition 6(e), bear interest.

The restrictions set out in this Condition 4 do not apply to the declaration and payment of any dividends and distributions or the making of any other payment by the Issuer to the Parent, any holding company of the Parent or to another wholly-owned subsidiary of the Parent.

## 5 Coupon Payments

### (a) Coupon Rate

The Capital Securities bear interest at the fixed rate per annum specified in the relevant Final Terms (the "Coupon Rate") from the Issue Date in accordance with the provisions of this Condition 5.

Subject to Conditions 2(b)(i), 2(b)(ii), 4, 6(d), 6(e) and 9(d), interest shall be payable on the Capital Securities in arrear on the Coupon Payment Dates, as provided in this Condition 5.

Where it is necessary to compute an amount of interest in respect of any Capital Security for a period which is less than a Coupon Period:

(i) if "Actual/Actual" is specified in the Final Terms as the Day Count Fraction, such interest shall be calculated on the basis of the actual number of days in the period from (and including) the most recent Coupon Payment Date (or, if none, the Issue Date) to (but excluding) the relevant payment date divided by the actual number of days in the period from (and including) the most recent Coupon Payment Date (or, if none, the Issue Date) to (but excluding) the next (or first) scheduled Coupon Payment Date. Where it is necessary to compute an amount of interest in respect of any Capital Security for a period of more than a Coupon Period, such interest shall be calculated in respect of each full Coupon Period within such period, with the interest in respect of any remaining period being calculated in the manner as aforesaid; or

(ii) if "30/360" is specified in the Final Terms as the Day Count Fraction, such interest shall be calculated on the basis of the number of days in the Coupon Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30-day months (unless (A) the last day of the Coupon Period is the 31st day of a month but the first day of the Coupon Period is a day other than the 30th or 31st day of a month, in which case the month that includes that last day shall not be considered to be shortened to a 30-day month, or (B) the last day of the Coupon Period is the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30-day month)).

### (b) Interest Accrual

The Capital Securities will cease to bear interest from (and including) the date of redemption thereof pursuant to Condition 7(b) or the date of redemption or exchange thereof pursuant to Condition 7(c), 7(d), 8 or 9(d), as the case may be, unless, upon due presentation, payment and performance of all amounts and obligations due in respect of the Capital Securities is not properly and duly made, in which event interest shall continue to accrue, both before and after judgment, and shall be payable, as provided in these Conditions up to (but excluding) the Relevant Date. Any such interest in respect of a Capital Security shall be equal to the product of the principal amount of such Capital Security, the

relevant Coupon Rate and the relevant day count fraction, rounding the resultant figure to the nearest cent (half a cent being rounded upwards).

## 6 Alternative Coupon Satisfaction Mechanism

### (a) Alternative Coupon Satisfaction Mechanism

Each ACSM Payment, when due to be satisfied in accordance with these Conditions, will (except as provided in Condition 9(d) or if Condition 3 applies) be satisfied by the Issuer in full only through the issue of ACSM Securities and their allotment to the Trustee or its agent for the purposes of and in accordance with this Condition 6.

The Issuer shall appoint a Calculation Agent (if it has not already done so), and notify the Parent, the Trustee, the Principal Paying Agent and the Calculation Agent that an ACSM Payment is to be satisfied on the relevant ACSM Payment Date. All other Payments due must, subject to Conditions 2 and 4, be satisfied in accordance with Condition 9(a).

### (b) Issue of ACSM Securities

If any ACSM Payment is to be satisfied through the issue to or to the order of the Trustee of ACSM Securities as required by the provisions of this Condition 6 then, subject to Conditions 6(d), 6(e) and 9(d):

(i) by close of business in London on or before the seventh Business Day prior to the relevant ACSM Payment Date, the Issuer will, subject to it having the necessary corporate authorisations in place, issue and allot in favour of the Trustee (or, if so agreed between the Issuer and the Trustee, an agent of the Trustee) such number of Issuer ACSM Securities (the "Payment Issuer Securities") as, in the determination of the Calculation Agent, will have a market value (converted, where necessary, into the currency specified in the relevant Final Terms (the "Relevant Currency")) as near as practicable to, but not less than, the relevant ACSM Payment to be satisfied in accordance with this Condition 6; and

(ii) if the Issuer has elected that the Parent is to issue Parent ACSM Securities in exchange for Payment Issuer Securities, on or before the sixth Business Day prior to the relevant ACSM Payment Date, the Trustee shall transfer or instruct its agent to transfer the Payment Issuer Securities to the Parent in consideration for which the Parent shall issue to the Trustee (or, if so agreed between the Issuer and the Trustee, to an agent of the Trustee) within one Business Day of the Parent receiving the Payment Issuer Securities such number of Parent ACSM Securities (the "Payment Parent Securities") as, in the determination of the Calculation Agent, will have a market value (converted, where necessary, into the Relevant Currency) as near as practicable to, but not less than, the relevant ACSM Payment to be satisfied in accordance with this Condition 6.

The Issuer shall notify the Parent, the Trustee and the Calculation Agent on or before the eighth Business Day prior to the relevant ACSM Payment Date of (A) its intention to issue and allot Payment Issuer Securities pursuant to Condition 6(b)(i) and (B) whether or not the Parent is required to issue Payment Parent Securities to the Trustee or its agent in exchange for such Payment Issuer Securities.

The Trustee shall hold such Payment Parent Securities or, as the case may be, Payment Issuer Securities and such proceeds of the sale of the Payment Parent Securities or, as the case may be, Payment Issuer Securities, in each case: (i) as have a value equal to the applicable ACSM Payment as certified by the Calculation Agent, on trust for the Holders; and (ii) as have a value equal to any

Associated Costs as certified by the Calculation Agent, on trust for itself or its agent. The remainder (if any) of the Payment Parent Securities or, as the case may be, Payment Issuer Securities or the proceeds of the sale of the Payment Parent Securities or, as the case may be, Payment Issuer Securities shall, in each case, be held on trust for the Issuer by the Trustee. Following the sale of the Payment Parent Securities or, as the case may be, Payment Issuer Securities in accordance with this Condition 6 and the discharge of any Associated Costs and satisfaction of the relevant ACSM Payment as provided below, the Trustee or its agent shall pay the remainder (if any) of the proceeds of the sale of the Payment Parent Securities or, as the case may be, Payment Issuer Securities as certified by the Calculation Agent to the Issuer.

The Trustee shall use reasonable endeavours to effect the transfer or instruct its agent to effect the transfer of such Payment Parent Securities or, as the case may be, Payment Issuer Securities to or to the order of the Calculation Agent (subject to any necessary consents being obtained) as soon as practicable and in any case by not later than the close of business in London on the fifth Business Day prior to the relevant ACSM Payment Date and the Calculation Agent shall be required to agree in the Calculation Agency Agreement to use reasonable endeavours to procure purchasers for such Payment Parent Securities or, as the case may be, Payment Issuer Securities. If necessary, the Calculation Agent has further agreed to exchange, as agent of the Trustee, the proceeds of such sale into the Relevant Currency at prevailing market exchange rates and deliver such exchanged proceeds to, or hold such exchanged proceeds to the order of, the Trustee who shall pay or procure that its agent pays such proceeds as it holds in respect of the relevant Payment on its due date to the Principal Paying Agent. The Calculation Agent shall further be required to agree in the Calculation Agency Agreement to discharge, on behalf of the Trustee or its agent, the Associated Costs and pay the remaining proceeds of such sale to, or hold the remaining proceeds of such sale to the order of, the Trustee, who shall pay or procure that its agent pays such remaining proceeds as it holds in respect of the relevant ACSM Payment on its due date to the Principal Paying Agent for application in accordance with Condition 6(c).

The Trustee shall not be liable to anyone for any loss occasioned by the transfer or sale of the Payment Issuer Securities or the Payment Parent Securities, in each case by or on behalf of the Trustee, or any delay or failure in effecting such transfer or sale of the Payment Issuer Securities or the Payment Parent Securities under these Conditions.

If the proceeds of the sale of the Payment Parent Securities or, as the case may be, Payment Issuer Securities will not, in the opinion of the Calculation Agent, subject to Conditions 6(d) and 6(e) but despite the arrangements contained above, result in a sum (when converted into the Relevant Currency) at least equal to the relevant ACSM Payment and any Associated Costs being available to satisfy the necessary ACSM Payment in full on its due date and the Associated Costs, the Issuer, the Parent (if required), the Trustee and the Calculation Agent shall take such steps as are reasonably necessary to ensure, so far as practicable, that through issuing additional Payment Issuer Securities and, if required, Payment Parent Securities on one or more further occasions and allotting them in favour of the Trustee or its agent and following, *mutatis mutandis*, the procedures contained above, a sum (when converted into the Relevant Currency) as near as practicable to, and at least equal to, the relevant ACSM Payment and any Associated Costs will be available to satisfy the relevant ACSM Payment in full and the Associated Costs.

The proceeds of sale of Payment Parent Securities or, as the case may be, Payment Issuer Securities paid to the Principal Paying Agent in accordance with this Condition 6(b) shall be paid by the Principal Paying Agent to the Holders in respect of the relevant ACSM Payment.

(c) **Issue Satisfies Payment**

Where the Issuer elects or is required to satisfy an ACSM Payment hereunder by issuing Payment Issuer Securities and issues such Payment Issuer Securities to the Trustee or its agent (with the subsequent issue by the Parent to the Trustee or its agent of Payment Parent Securities in exchange therefor, if the Issuer has elected that the Parent is to do so), such issue shall satisfy the relevant ACSM Payment if done in accordance with this Condition 6.

*The Trustee is a company incorporated under English law and is acting on its capacity as trustee on behalf of the Holders. It does not hold itself out as engaging in the business of buying or selling investments (including ACSM Securities) and will carry out its obligations under this Condition 6 only in its capacity as trustee for the Holders. For the avoidance of doubt, the Trustee is not remunerated separately for accepting any investments of behalf of the Holders in addition to any remuneration it receives as trustee.*

(d) **Insufficiency**

The Issuer shall not be entitled to exercise its option pursuant to any of Conditions 7(b), 7(c) or 7(d) or Condition 8 to redeem or, if Condition 8(a)(i)(1) or Condition 8(a)(ii) apply, exchange any of the Capital Securities until such time as the Issuer and, if relevant, the Parent:

(i) in the case of ACSM Securities which are Ordinary Shares, have available, and the Directors of the Issuer and/or the Parent have the corresponding authority to allot, a sufficient number of authorised but unissued Ordinary Shares; or

(ii) in the case of ACSM Securities which are not Ordinary Shares, have authority to issue the amount of ACSM Securities,

as may be required to be issued in accordance with this Condition 6 for the purposes of satisfying in full in accordance with this Condition 6 any ACSM Payment required to be satisfied in connection with such redemption or exchange of the Capital Securities.

(e) **Market Disruption**

Notwithstanding the provisions of Condition 6(b), if there exists, in the opinion of the Issuer, a Market Disruption Event on or after the 15th Business Day preceding any ACSM Payment Date, then the Issuer may give a notice to the Trustee, the Principal Paying Agent, the Calculation Agent and (in accordance with Condition 16) the Holders as soon as possible after the Market Disruption Event has arisen or occurred, whereupon the relevant ACSM Payment may be deferred.

Any such deferred ACSM Payment will be satisfied as soon as practicable following such time as the Market Disruption Event, in the opinion of the Issuer, no longer exists. Interest shall not accrue on such deferred ACSM Payment, unless, as a consequence of the existence of the relevant Market Disruption Event, the Issuer does not satisfy the relevant ACSM Payment for a period of 14 days or more after the relevant ACSM Payment Date, in which case interest shall accrue on such deferred ACSM Payment from (and including) the relevant ACSM Payment Date to (but excluding) the date on which such ACSM Payment is satisfied. Any such interest shall accrue at a rate determined in accordance with Condition 5 and shall be satisfied only in accordance with this Condition 6, as soon as reasonably practicable after the relevant deferred ACSM Payment is satisfied. No liability shall attach to the Trustee or its agent if, as a result of a Market Disruption Event or any other event outside the control of the Trustee or its agent, the Trustee or its agent is unable to comply with the provisions of Condition 6(b).

## 7 Redemption or Purchase

### (a) No Fixed Redemption Date

The Capital Securities are perpetual securities in respect of which there is no fixed redemption date and the Issuer shall (subject to the provisions of Conditions 2 and 3 and without prejudice to the provisions of Condition 12) only have the right to redeem or purchase them in accordance with the following provisions of this Condition 7 or in the circumstances provided for in Condition 9(d).

In addition, any redemption or purchase of the Capital Securities is (i) subject to the Issuer complying with applicable regulatory requirements as may be in force from time to time, (ii) in respect of any redemption only, conditional on the terms of Condition 6(d) being satisfied prior to the exercise by the Issuer of its rights with respect to such redemption and all Deferred Coupon Payments (if any) being satisfied in full by the operation of Condition 6 and the Trust Deed on or prior to the date set for such redemption.

### (b) Issuer's Call Option

Subject to Conditions 2(b)(i) and 7(a), the Issuer may, by giving not less than 30 nor more than 60 days' notice to the Holders (in accordance with Condition 16), the Trustee and the Principal Paying Agent, which notice shall be irrevocable, elect to redeem all, but not some only, of the Capital Securities on or after the fifth anniversary of the Issue Date at their principal amount together with any Payments which are Outstanding thereon (including any Deferred Coupon Payments, which will be satisfied by the operation of Condition 6).

### (c) Redemption Due to Taxation

If as a result of a Tax Law Change:

(i) in making any payments on the Capital Securities, the Issuer has paid or will or would on the next payment date be required to pay Additional Amounts on the Capital Securities and the Issuer cannot avoid the foregoing in connection with the Capital Securities by taking measures reasonably available to it; or

(ii) in respect of the Issuer's obligation to make any Coupon Payment on the next following Coupon Payment Date, there is a more than insubstantial risk that Coupon Payments on the Capital Securities including, for the avoidance of doubt, any ACSM Payment and the related issue of Payment Issuer Securities and/or Payment Parent Securities pursuant to Condition 6, may be treated as "distributions" within the meaning of Section 832(1) of the Income and Corporation Taxes Act 1988 (or such other Section and/or Act as may from time to time supersede or replace Section 832(1) of the Income and Corporation Taxes Act 1988 for the purposes of such definition) and such requirement or circumstance cannot be avoided by the Issuer taking such measures as it (acting in good faith) deems appropriate; or

(iii) in respect of the Issuer's obligation to make any Coupon Payment on the next following Coupon Payment Date:

(I) there is a more than insubstantial risk that the Issuer would not be entitled to claim a deduction in respect thereof when computing its taxation liabilities in the United Kingdom, or such entitlement is materially reduced; or

(II) the Issuer would not to any material extent be entitled to have such a deduction set against the profits of companies with which it is grouped for applicable United Kingdom tax purposes (whether under the group relief system current as at the Issue Date

specified in the relevant Final Terms or any similar system or systems having like effect as may from time to time exist); or

(III)  the Issuer would not, as a result of the Capital Securities being in issue, be able to have losses or deductions set against the profits, or profits offset by the losses or deductions, of companies with which it is or would otherwise be so grouped,

and in any such case the Issuer cannot avoid the foregoing in connection with the Capital Securities by taking measures as it (acting in good faith) deems appropriate,

then the Issuer may, subject to Condition 7(a) and having given not less than 30 nor more than 60 days' notice to the Trustee, the Principal Paying Agent and, in accordance with Condition 16, the Holders (which notice shall be irrevocable), redeem in accordance with these Conditions at any time all, but not some only, of the Capital Securities at their principal amount together with any Payments which are Outstanding thereon (including any Deferred Coupon Payments which will be satisfied by the operation of Condition 6).

Prior to the publication of any notice of redemption pursuant to this Condition 7(c), the Issuer shall deliver to the Trustee a certificate signed by two Directors stating that the relevant condition referred to in paragraph (i), (ii), (iii) or (iv) above is satisfied and the Trustee shall accept such certificate without any further inquiry as sufficient evidence of the satisfaction of the conditions set out in such paragraphs in which event it shall be conclusive and binding on the Holders. Upon expiry of such notice, the Issuer shall redeem the Capital Securities in accordance with this Condition 7(c).

**(d)  Redemption for Regulatory Purposes**

If a Regulatory Event has occurred and is continuing, then the Issuer may, subject to Condition 7(a) and having given not less than 30 nor more than 60 days' notice to the Holders in accordance with Condition 16, the Trustee and the Principal Paying Agent (which notice shall be irrevocable), redeem in accordance with these Conditions all, but not some only, of the Capital Securities at any time. The Capital Securities will be redeemed at their principal amount, in each case together with any Payments which are Outstanding thereon (including any Deferred Coupon Payments, which will be satisfied by the operation of Condition 6).

Prior to the publication of any notice of redemption pursuant to this Condition 7(d), the Issuer shall deliver to the Trustee a certificate signed by two Directors stating that a Regulatory Event has occurred and is continuing as at the date of the certificate, and the Trustee shall accept such certificate without any further inquiry as sufficient evidence of the occurrence and continuation of a Regulatory Event in which event it shall be conclusive and binding on the Holders. Upon expiry of such notice, the Issuer shall redeem the Capital Securities in accordance with this Condition 7(d).

**(e)  Purchases**

The Issuer, the Parent or any other subsidiary of the Parent may, subject to Condition 7(a), at any time purchase Capital Securities in any manner and at any price. In each case, purchases will be made together with all unmatured Coupons and Talons appertaining thereto.

**(f)  Cancellation**

All Capital Securities so redeemed by the Issuer and any unmatured Coupons and Talons appertaining thereto will be cancelled and may not be reissued or resold. Capital Securities purchased by the Issuer, the Parent or any other subsidiary of the Parent may be held, reissued or resold or, at the option of the Issuer, surrendered to any Paying Agent for cancellation. Any Capital Securities so surrendered for

cancellation may not be reissued or resold and the obligations of the Issuer in respect of any such Capital Securities shall be discharged.

**(g)** **Trustee Not Obliged to Monitor**

The Trustee shall not be under any duty to monitor whether any event or circumstance has happened or exists within this Condition 7 or whether a Suspension under Condition 9(d) has occurred and will not be responsible to Holders for any loss arising from any failure by it to do so. Unless and until the Trustee has actual knowledge of the occurrence of any event or circumstance within this Condition 7 or the occurrence of a Suspension under Condition 9(d), it shall be entitled to assume that no such event or circumstance exists.

# 8 Option to Exchange for or Vary to Become Qualifying Tier 1 Securities or Qualifying Upper Tier 2 Securities

**(a)** **General**

The Issuer may at any time elect to exchange the Capital Securities in whole (but not in part) for, or vary the terms of the Capital Securities so that they become: (x) Qualifying Tier 1 Securities or (y) Qualifying Upper Tier 2 Securities (subject, if such election is made prior to the fifth anniversary of the Issue Date, to a Tax Event or Regulatory Event having occurred) subject to compliance with all applicable regulatory requirements as may be in force from time to time prior to the applicable Exchange Date. In the case of an exchange, each Capital Security shall be so exchanged with one Qualifying Tier 1 Security or, as the case may be, Qualifying Upper Tier 2 Security, with the denomination or liquidation preference specified in the relevant Final Terms.

If the Issuer elects to so exchange or vary the terms of the Capital Securities:

(i) in circumstances where a Tax Event or a Regulatory Event has occurred, at the Issuer's option either (1) all Payments which are Outstanding on such Capital Securities (including any Deferred Coupon Payments) will be satisfied in accordance with Condition 6 or (2) the Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities shall preserve any existing rights under these Conditions to any Payments outstanding on the Capital Securities (including any Deferred Coupon Payments) which have not been first satisfied; and

(ii) in circumstances where neither a Tax Event nor a Regulatory Event is then occurring, all Payments which are Outstanding on such Capital Securities (including any Deferred Coupon Payments) must first be made in accordance with the ACSM.

The Holders may be allotted the Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities directly or via a repackaging vehicle or depositary receipt facility.

Any exchange pursuant to this Condition 8 shall be effected by the Capital Securities being exchanged at their principal amount and the immediate application of such principal amount to subscription for the applicable number of Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities being issued to the Holder.

**(b)** **Conditions for Exchange for or Variation to Become Qualifying Tier 1 Securities or Qualifying Upper Tier 2 Securities**

The Issuer shall not exchange any Capital Securities for Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities unless:

(i)      the board of directors of the relevant issuer of the Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities has all the necessary authority to allot and issue the Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities arising on exchange; and

(ii)     if the relevant issuer of the Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities is a repackaging vehicle or depositary receipt vehicle the board of directors of the Issuer or the Parent (as the case may be) has all the necessary authority to give the guarantee in respect of the Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities.

**(c)      Procedures for Exchange or Variation**

The Issuer shall give not less than 30 nor more than 60 days' notice to the Holders of the exercise of the option to exchange or vary the terms of the Capital Securities.

A notice to exchange the Capital Securities for, or vary the terms of the Capital Securities so that they become, Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities will at least specify (i) the Exchange Date; (ii) (in the case of an exchange) the place or places where the Capital Securities are to be surrendered for exchange; and (iii) the form in which the Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities will be issued.

The Issuer will use reasonable endeavours to procure that, if it exercises the option to exchange the Capital Securities for, or vary the terms of the Capital Securities so that they become, Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities, the position of a Holder and Couponholder (viewed solely from a United Kingdom stamp duty reserve tax perspective and as reasonably determined by the Issuer) is not materially less favourable than if such option had not been exercised. The Issuer will pay any stamp and other duties or taxes (if any) payable in the United Kingdom arising on the allotment and issue of the Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities.

In connection with any exchange or variation, the Issuer shall comply with the rules of any stock exchange on which the Capital Securities are for the time being listed or admitted to trading.

The Trustee shall not be obliged to participate in or assist with any such exchange or variation if the terms of the proposed Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities or the participation in or assistance with such exchange or variation would impose, in the Trustee's opinion, more onerous obligations upon it or require the Trustee to incur any liability for which it is not indemnified and/or secured to its satisfaction.

**(d)      Listing of the Qualifying Tier 1 Securities or Qualifying Upper Tier 2 Securities**

The Issuer or the Parent, as the case may be, shall ensure (to the extent possible) that, at the time when any Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities are issued pursuant to this Condition 8, such Qualifying Tier 1 Securities or, as the case may be, Qualifying Upper Tier 2 Securities are admitted to listing on a Recognised Stock Exchange.

**(e)      Terms of the Qualifying Tier 1 Securities**

The Qualifying Tier 1 Securities, or if the Qualifying Tier 1 Securities are not issued by the Issuer or Parent, the guarantee of the Issuer or the Parent in respect of the Qualifying Tier 1 Securities, shall rank (i) *pari passu* as to a return of assets on a winding-up or administration with the most senior class or classes of preference shares (if any) from time to time issued or which may be issued by the Issuer

or the Parent which have a preferential right to a return of assets in the winding up or administration over, and so ahead of, the holders of all other classes of issued shares for the time being in the capital of the Issuer or the Parent; but (ii) junior to the claims of Senior Creditors. Distributions or dividends on the Qualifying Tier 1 Securities may be either economically equivalent or similar to those on the Capital Securities or, at the discretion of the Issuer or the Parent or if required by the Capital Regulations, may be non-cumulative and if payable in accordance with their terms will be paid at the same rate as the Coupon Rate, payable in arrear on the same dates as the Coupon Payment Dates of each year, beginning on the first such date occurring after the applicable issue date.

The board of directors of the relevant issuer of the Qualifying Tier 1 Securities, in its sole discretion, may elect to pay distributions or dividends or to defer or (in the event that the Qualifying Tier 1 Securities are non-cumulative) not to pay distributions or dividends on the Qualifying Tier 1 Securities. If the issuer of the Qualifying Tier 1 Securities defers or does not pay a distribution or dividend on any distribution or dividend payment date the restriction set out in Condition 4 above will apply to such issuer and to the Issuer and the Parent on a similar basis to the Qualifying Tier 1 Securities although the conditions to the removal of such restriction may differ.

If no distribution or dividend is payable on any distribution or dividend payment date of the Qualifying Tier 1 Securities, holders of the Qualifying Tier 1 Securities will have no claim in respect of non-payment and the issuer of the Qualifying Tier 1 Securities and the Issuer will have no obligation to pay such distribution or dividend or part thereof or interest thereon and such non-payment shall not constitute a default for any purpose on the part of the issuer of the Qualifying Tier 1 Securities or the Issuer.

If the Qualifying Tier 1 Securities are preference shares, the relevant issuer shall not pay any additional amounts in relation to United Kingdom taxes to be withheld or deducted by law from payments made with respect to the Qualifying Tier 1 Securities. As a result, the net amount received by each holder of Qualifying Tier 1 Securities which are preference shares, after any deduction or withholding for or on account of United Kingdom taxes as required by law, will be less than the amount the holder would have received in the absence of the deduction or withholding.

At the election of the issuer of the Qualifying Tier 1 Securities, the Qualifying Tier 1 Securities may be redeemed, in whole (but not in part), on any date falling on or after the fifth anniversary of the issue date of the Capital Securities (which may be less than five years from the date of exchange), subject to compliance with applicable regulatory requirements as may be in force from time to time. The issuer of the Qualifying Tier 1 Securities may only redeem the Qualifying Tier 1 Securities if on, and immediately following, the date fixed for redemption of the Qualifying Tier 1 Securities the issuer is in compliance with any Regulatory Capital Requirements.

## 9    Payments

(a)    **Method of Payment**

(i)    Payments of principal, premium and Coupon Amounts will be made by or on behalf of the Issuer against presentation and surrender of Capital Securities or the appropriate Coupons at the specified office of any of the Paying Agents except that payments of Coupon Amounts in respect of any period not ending on a Coupon Payment Date will only be made upon surrender of the relevant Capital Security. Such payments will be made (subject to Condition 9(a)(ii) below), at the option of the payee, by the Relevant Currency cheque drawn on, or by transfer to an account for the Relevant Currency maintained by the payee with, a bank in the financial centre specified in the relevant Final Terms (the "Relevant Financial Centre").

(ii)     Upon the due date for redemption of any Capital Security, any unexchanged Talon relating to such Capital Securities (whether or not attached) shall become void and no Coupon shall be delivered in respect of such Talon and unmatured Coupons relating to such Capital Securities (whether or not attached) shall also become void and no payment shall be made in respect of them. If any Capital Security is presented for redemption without all unmatured Coupons and any unexchanged Talon relating to it, redemption shall be made only against the provision of such indemnity as the Issuer may require.

(iii)    On or after the Coupon Payment Date for the final Coupon forming part of a Coupon sheet issued in respect of any Capital Securities, the Talon forming part of such Coupon sheet may be surrendered at the specified office of the Principal Paying Agent in exchange for a further Coupon sheet (and another Talon for a further Coupon sheet) (but excluding any Coupons that may have become void pursuant to Condition 12).

**(b)     Payments Subject to Fiscal Laws**

Without prejudice to the terms of Condition 11, all payments made in accordance with these Conditions shall be made subject to any fiscal or other laws and regulations applicable in the place of payment. No commissions or expenses shall be charged to the Holders in respect of such payments.

**(c)     Payments on Business Days**

If the date for payment of any amount in respect of any Capital Security or Coupon, or any later date on which any Capital Security or Coupon is presented for payment, is not a business day, then the holder thereof shall not be entitled to payment at that place of payment of the amount payable until the next following business day at that place of payment and shall not be entitled to any further interest or other payment in respect of any such delay. In this Condition 9(c), "business day" means any day (not being a Saturday, Sunday or a public holiday) on which commercial banks and foreign exchange markets which settle payments in the Relevant Currency are open in the Relevant Financial Centre and in the relevant place of payment.

**(d)     Suspension**

If, following any take-over offer made under the City Code on Take-overs and Mergers or any reorganisation, restructuring or scheme of arrangement, the Parent or any subsequent New Owner ceases to be the ultimate holding company of the Lloyds TSB group of companies, then the Issuer shall as soon as practicable give notice to the Holders in accordance with Condition 16, the Trustee and the Principal Paying Agent, whereupon the operation of the ACSM shall be suspended (such event being a "Suspension"). In such event, unless a Permitted Restructuring Arrangement shall be put in place within six months of the occurrence of a Permitted Restructuring (in which case the Suspension shall cease upon such Permitted Restructuring Arrangement being put in place), an independent investment bank, merchant bank, commercial bank, stockbroker or financial institution appointed by the Issuer (at the Issuer's expense) and approved by the Trustee shall determine, subject to the requirements that: (i) the Issuer shall not be obliged to reduce its net assets; (ii) no amendment may be proposed or made which would alter the FSA's regulatory capital treatment of the Capital Securities for regulatory capital and solvency purposes without the Issuer giving prior written notice to, and receiving no objection from, the FSA; and (iii) no such amendment may be made which would, in the Trustee's opinion, impose more onerous obligations on it or require the Trustee to incur any liability for which it is not indemnified and/or secured to its satisfaction without its consent, what amendments (if any) to these Conditions, the Trust Deed and any other relevant documents are appropriate in order (aa) to preserve substantially the economic effect, for the Holders, of a holding of the Capital Securities prior

to the Suspension and (bb) to replicate the ACSM in the context of the capital structure of the New Owner. Upon any such determination being reached and notified to the Trustee, the Parent and the Issuer by such investment bank, merchant bank, commercial bank, stockbroker or financial institution, the Trustee, the Parent and the Issuer shall, pursuant to the terms of the Trust Deed and without any requirement for the consent or the approval of the Holders or Couponholders, effect the amendments that the independent investment bank, merchant bank, commercial bank, stockbroker or financial institution has determined are appropriate together with any necessary consequential changes to these Conditions and the Trust Deed and any other relevant documents, whereupon the satisfaction of any ACSM Payment (when due) by the method contemplated in Condition 6 shall no longer be subject to the Suspension.

If, after using all reasonable endeavours, such investment bank, merchant bank, commercial bank, stockbroker or financial institution is unable to formulate such amendments or if, having used all reasonable endeavours, the Issuer is unable to appoint an investment bank, merchant bank, commercial bank, stockbroker or financial institution willing and able to make such determination, the investment bank, merchant bank, commercial bank, stockbroker or financial institution or, as the case may be, the Issuer shall so notify the Issuer (in the case of notification by the investment bank, merchant bank, commercial bank, stockbroker or financial institution), the Parent, the New Owner, the Trustee and the Principal Paying Agent and the Capital Securities shall (subject in each case to the Issuer giving prior written notice to, and receiving no objection from, the FSA and with the prior agreement of the New Owner) at the option of the Issuer either be exchanged for, or have their terms varied so that they become, alternative Qualifying Tier 1 Securities or Qualifying Upper Tier 2 Securities in accordance with Condition 8 or be redeemed at their principal amount, in each case together with any Payments which are Outstanding thereon (including any Deferred Coupon Payments, which will be satisfied by the operation of Condition 6).

## 10   Non-Payment when due

*Notwithstanding any of the provisions below in Condition 10, the right to institute winding-up proceedings is limited to circumstances where payment has become due. Except on a winding-up, no principal, premium or Payment (including any Payment which falls to be satisfied by means of the ACSM) will be due on the relevant payment date unless the condition to payment set out in Condition 2(b)(i) is satisfied. Also, in the case of any Coupon Payment, such Payment will not be due if the Issuer has elected to defer that Payment pursuant to Condition 4 or if the circumstances referred to in any of Conditions 6(d), 6(e) or 9(d) then apply. The Trust Deed contains provisions entitling the Trustee to claim from the Issuer, inter alia, the fees, expenses and liabilities incurred by it in carrying out its duties under the Trust Deed. The restrictions on commencing proceedings described below will not apply to any such claim.*

(a)   If the Issuer shall not make payment in respect of the Capital Securities (in the case of payment of principal and/or premium) for a period of 14 days or more after the due date for the same or (in the case of any Coupon Amount or Accrued Coupon Payment) shall not make payment for a period of 14 days or more after the date on which such payment is due, the Issuer shall be deemed to be in default under the Trust Deed, the Capital Securities and the Coupons and the Trustee may, notwithstanding the provisions of Condition 10(b), institute proceedings in England (but not elsewhere) for the winding-up of the Issuer and/or prove in any winding up of the Issuer, provided that it shall not have the right to institute such proceedings if the Issuer withholds or refuses any such payment (i) in order to comply with any fiscal or other law or regulation or with the order of any court of competent jurisdiction, in each case applicable to such payment, the Issuer, the relevant Paying Agent or the holder of the Capital Security or Coupon or (ii) (subject as provided in the Trust Deed) in case of doubt as to the validity or

applicability of any such law, regulation or order, in accordance with advice as to such validity or applicability given at any time during the said period of 14 days by independent legal advisers acceptable to the Trustee.

(b)  Subject as provided in Condition 19, the Trustee may at its discretion and without further notice institute such proceedings against the Issuer or the Parent as it may think fit to enforce any term or condition binding on the Issuer or, as the case may be, the Parent under the Trust Deed, the Capital Securities or the Coupons (other than for the payment of any principal or premium or satisfaction of any Payments in respect of the Capital Securities or the Coupons or Accrued Coupon Payment) provided that the Issuer shall not by virtue of the institution of any such proceedings be obliged to pay any sum or sums, in cash or otherwise, sooner than the same would otherwise have been payable by it.

(c)  The Trustee shall not be bound to take any of the actions referred to in Condition 10(a) or (b) above against the Issuer or the Parent to enforce the terms of the Trust Deed, the Capital Securities or the Coupons or, save where expressly provided therein, take any other action under the Trust Deed unless (i) it shall have been so requested by an Extraordinary Resolution of the Holders or in writing by the holders of at least one-fifth in principal amount of the Capital Securities then outstanding and (ii) it shall have been indemnified and/or secured to its satisfaction.

(d)  No Holder or Couponholder shall be entitled to proceed directly against the Issuer, the Parent or other issuer or to institute proceedings for the winding-up of the Issuer in England or to prove in any winding-up of the Issuer unless the Trustee, having become so bound to proceed or being able to prove in such winding-up, fails to do so within a reasonable period and such failure shall be continuing, in which case the Holder or Couponholder shall have only such rights against the Issuer as those which the Trustee is entitled to exercise. No remedy against the Issuer shall be available to the Trustee or any Holder or Couponholder (i) for the recovery of amounts owing in respect of the Capital Securities or the Coupons, other than the institution of proceedings in England (but not elsewhere) for the winding-up of the Issuer and/or proving in any winding-up and (ii) for the breach of any other term under the Trust Deed, the Capital Securities or the Coupons, other than as provided in Condition 10(b) above. The Issuer has undertaken in the Trust Deed to pay United Kingdom stamp and other duties (if any) on or in connection with the execution of the Trust Deed and United Kingdom, Belgian and Luxembourg stamp and other duties or taxes (if any) on the constitution and issue of the Capital Securities in temporary global, permanent global or definitive form (provided such stamp and other duties or taxes result from laws applicable on or prior to the date 40 days after the Issue Date and, in the case of exchange of a global Capital Security for Capital Securities in definitive form, such tax results from laws applicable on or prior to the date of such exchange) and stamp and other duties or taxes (if any) payable in the United Kingdom (but not elsewhere) solely by virtue of and in connection with any proceedings under and in accordance with the Trust Deed or the Capital Securities, save that the Issuer shall not be liable to pay any such stamp duties or taxes to the extent that the obligation arises or the amount payable is increased by reason of the Holder or, as the case may be, Couponholder at the relevant time unreasonably delaying in producing any relevant document for stamping or similar process. Subject as aforesaid, the Issuer will not be otherwise responsible for stamp or other duties or taxes otherwise imposed and in particular (but without prejudice to the generality of the foregoing) for any penalties arising on account of late payment where due by the Holder or Couponholder at the relevant time. Any such stamp or other duties or taxes that might be imposed upon or in respect of Capital Securities in temporary global, permanent global or definitive form or the Coupons (in each case other than as aforesaid) are the liability of the holders thereof.

(e)  If payment to any Holder of any amount due in respect of the Capital Securities (other than interest) is improperly withheld or refused (any withholding or refusal effected in reliance upon the proviso to

paragraph (a) of this Condition where the relevant law, regulation or order proves subsequently not to be valid or applicable shall be treated, for the purpose of ascertaining entitlement to accrued interest but not for any other purpose, as if it had been at all times an improper withholding or refusal), interest shall accrue at the rate determined in accordance with Condition 5 from the date of such withholding or refusal, as the case may be, until (but excluding) the date on which notice is given in accordance with Condition 16 that the full amount in the Relevant Currency payable in respect of such Capital Securities is available for payment or the date of payment, whichever first occurs and shall be calculated in accordance with Condition 5.

(f)     If, in reliance upon the proviso to paragraph (a) above, payment of any amount (each a "withheld amount") in respect of the whole or any part of the principal, premium and/or any Payment due (other than a Deferred Coupon Payment) in respect of Capital Securities or any of them is not paid or provided by the Issuer to the Trustee or to the account of or with the Principal Paying Agent, or is withheld or refused by any of the Paying Agents, in each case other than improperly within the meaning of paragraph (e) above, or which is paid or provided after the due date for payment thereof, such withheld amount shall, where not already on interest bearing deposit, if lawful, promptly be so placed, all as more particularly described in the Trust Deed. If subsequently it shall be or become lawful to make payment of such withheld amount in the Relevant Currency, notice shall be given in accordance with Condition 16, specifying the date (which shall be no later than seven days after the earliest date thereafter upon which such interest bearing deposit falls or may (without penalty) be called due for repayment) on and after which payment in full of such withheld amount (or that part thereof which it is lawful to pay) will be made. In such event (but subject in all cases to any applicable fiscal or other law or regulation or the order of any court of competent jurisdiction), the withheld amount or the relevant part thereof, together with interest accrued thereon from (and including) the date the same was placed on deposit to (but excluding) the date upon which such interest bearing deposit was repaid, shall be paid to (or released) by the Principal Paying Agent for payment to the relevant holders of Capital Securities and/or Coupons, as the case may be (or, if the Principal Paying Agent advises the Issuer of its inability to effect such payment, shall be paid to (or released by) such other Paying Agent as there then may be or, if none, to the Trustee, in any such case for payment as aforesaid). For purposes of paragraph (a) above, the date specified in the said notice shall become the due date for payment in respect of such withheld amount or the relevant part thereof. The obligations under this paragraph (f) shall be in lieu of any other remedy otherwise available under these Conditions, the Trust Deed or otherwise in respect of such withheld amount or the relevant part thereof.

(g)     Any interest payable as provided in paragraph (f) above shall be paid net of any taxes applicable thereto and Condition 11 shall not apply in respect of the payment of any such interest.

## 11   Taxation

All payments by or on behalf of the Issuer of principal, premium, interest, Coupon Amounts, Deferred Coupon Payments, Accrued Coupon Payments and Solvency Claims (whether or not to be satisfied by way of the ACSM) in respect of the Capital Securities will be made without withholding of or deduction for, or on any account of, any present or future United Kingdom taxes, duties, assessments or governmental charges of whatsoever nature imposed or levied by or on behalf of the United Kingdom or any political subdivision thereof or by any authority therein or thereof having power to tax, unless the withholding or deduction of such taxes, duties, assessments or governmental charges is required by law. In that event the Issuer will pay such additional amounts ("Additional Amounts") as may be necessary in order that the net amounts receivable by Holders or Couponholders after such withholding or deduction shall equal the respective amounts of principal

and interest which would have been receivable in respect of the Capital Securities or, as the case may be, Coupons in the absence of a requirement to make such withholding or deduction, except that no such Additional Amounts shall be payable in relation to any payment with respect to any Capital Securities or Coupon:

(a) presented for payment by, or on behalf of, a Holder or Couponholder who (i) would be able to avoid such withholding or deduction by satisfying any statutory requirements or by making or procuring that any third party makes a declaration of non-residence or similar claim for exemption but fails to do so, or (ii) is liable to such taxes, duties, assessments or governmental charges in respect of such Capital Security or Coupon by reason of his having some connection with the United Kingdom other than a mere holding of such Capital Security or Coupon;

(b) where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive;

(c) presented for payment by or on behalf of a Holder or a Couponholder who would have been able to avoid such withholding or deduction by presenting the relevant Capital Security or Coupon to another Paying Agent in a Member State of the European Union; or

(d) presented for payment more than 30 days after the Relevant Date except to the extent that the Holder or Couponholder thereof would have been entitled to such additional amounts on presenting the same for payment on the last day of such period of 30 days.

References in these Conditions to principal, premium, interest, Coupon Amounts, Deferred Coupon Payments and/or Accrued Coupon Payments, shall be deemed to include any Additional Amounts which may become payable pursuant to the foregoing provisions or any undertakings given in addition thereto or in substitution therefor pursuant to the Trust Deed.

If the Issuer becomes resident for tax purposes in any jurisdiction other than or in addition to the United Kingdom, references in this Condition 11 to the United Kingdom shall be construed as references to the United Kingdom and/or such other jurisdiction as the case may be.

In the event that any payment is satisfied by means of the ACSM then any Additional Amounts which are payable shall also be satisfied by means of the ACSM.

## 12 Prescription

Capital Securities and Coupons (which for this purpose shall not include Talons) will become void unless presented for payment within a period of 10 years in the case of Capital Securities and five years in the case of Coupons from the Relevant Date relating thereto. There shall be no prescription period for Talons but there shall not be included in any Coupon sheet issued in exchange for a Talon any Coupon the claim in respect of which would be void pursuant to this Condition or Condition 9(a)(ii) or any Talon which would be void pursuant to Condition 9(a)(ii).

## 13 Meetings of Holders, Modification, Waiver and Substitution

The Trust Deed contains provisions for convening meetings of Holders to consider any matter affecting their interests including the sanctioning by Extraordinary Resolution of any modification of any of these Conditions or any of the provisions of the Capital Securities, the Coupons or the Trust Deed, except that

certain provisions of the Trust Deed may only be modified subject to approval by Extraordinary Resolution passed at a meeting of Holders to which special quorum provisions shall have applied. Any Extraordinary Resolution duly passed shall be binding on all Holders (whether or not they were present at the meeting at which such resolution was passed) and on all Couponholders.

The Trustee may agree, without the consent of the Holders or the Couponholders, to (i) any modification of any of the provisions of the Trust Deed or these Conditions that is of a formal, minor or technical nature or is made to correct a manifest error or an error which, in the opinion of the Trustee, is proven, and (ii) any modification (except as mentioned in the Trust Deed) of any of the provisions of the Trust Deed or these Conditions, and any waiver or authorisation of any breach or proposed breach, of any of the provisions of the Trust Deed or these Conditions that is in the opinion of the Trustee not materially prejudicial to the interests of the Holders. Any such modification, authorisation or waiver shall be binding on the Holders and the Couponholders and, if the Trustee so requires, shall be notified to the Holders as soon as practicable thereafter in accordance with Condition 16.

No modification which in the opinion of the Issuer is material to these Conditions or any other provisions of the Trust Deed shall become effective unless the Issuer has given prior written notice to, and received no objection from, the Financial Services Authority.

Subject to the prior written notice to, and receiving no objection from, the Financial Services Authority and as provided in the Trust Deed, the Trustee shall agree, if requested by the Issuer and subject to such amendment of the Trust Deed and such other conditions as the Trustee may reasonably require, but without the consent of the Holders or the Couponholders, to the substitution, subject to the Capital Securities and the Coupons being irrevocably guaranteed by the Issuer on a subordinated basis equivalent to that mentioned in Condition 2(b) of the Parent, any New Owner, any other subsidiary of the Parent or any New Owner, any successor in business of the Issuer or any subsidiary of any successor in business of the Parent in place of the Issuer as a new issuing party under the Trust Deed, the Capital Securities and the Coupons and as a party to the Paying Agency Agreement and so that the claims of the Holders and the Couponholders may, in the case of the substitution of the Parent, any New Owner or a banking company (as defined in the Trust Deed) in the place of the Issuer, also be subordinated to the rights of Senior Creditors (as defined in Condition 22, but with the substitution of references to "the Parent", any such "New Owner" or to "that subsidiary" in place of references to "the Issuer" together with such consequential amendments as are appropriate).

In connection with the exercise by it of any of its trusts, powers, authorities and discretions (including, without limitation, any modification, waiver, authorisation or substitution), the Trustee shall have regard to the general interests of the Holders as a class and shall not have regard to any interests arising from circumstances particular to individual Holders or Couponholders (whatever their number) and, in particular but without limitation, shall not have regard to the consequences of any such exercise for individual Holders or Couponholders (whatever the number) resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or any political sub-division thereof and the Trustee shall not be entitled to require, nor shall any Holder or Couponholder be entitled to claim, from the Issuer, the Parent, the Trustee or any other person any indemnification or payment in respect of any tax consequence of any such exercise upon individual Holders or Couponholders except to the extent already provided for in Condition 11 and/or any undertaking given in addition thereto or in substitution therefor under the Trust Deed.

## 14 Replacement of the Capital Securities, Coupons and Talons

Should any Capital Security, Coupon or Talon be lost, stolen, mutilated, defaced or destroyed it may be replaced at the specified office of the Principal Paying Agent (or any other place of which notice shall have

been given in accordance with Condition 16) upon payment by the claimant of the expenses incurred in connection therewith and on such terms as to evidence and indemnity as the Issuer may reasonably require. Mutilated or defaced Capital Securities, Coupons or Talons must be surrendered before any replacement Capital Securities, Coupons or Talons will be issued. In addition the Issuer may require the person requesting delivery of a replacement Capital Security or Coupon to pay, prior to delivery of such replacement Capital Security or Coupon, any stamp or other tax or governmental charges required to be paid in connection with such replacement.

## 15   The Trustee

The Trust Deed contains provisions for the indemnification of the Trustee and for its relief from responsibility, including provisions relieving it from taking any action unless indemnified and/or secured to its satisfaction. The Trustee is entitled to enter into business transactions with the Issuer, the Parent or any other subsidiary of the Parent without accounting for any profit resulting therefrom. The Trustee is entitled under the Trust Deed to rely on reports and certificates addressed and/or delivered to it by two Directors of the Issuer, its auditors or the liquidator of the Issuer or any other expert (as the case may be) whether or not the report or certificate of its auditors or such liquidator or any such expert is subject to any limitation on the liability of the auditors or the liquidator or such expert (as the case may be) and whether by reference to a monetary cap or otherwise.

## 16   Notices

Notices to Holders will be valid if published in a leading newspaper having general circulation in London (which is expected to be the *Financial Times*). Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the first date on which publication is made. If publication as provided above is not practicable notice will be given in such other manner, and shall be deemed to have been given on such date, as the Trustee may approve. Couponholders will be deemed for all purposes to have notice of the contents of any notice given to the Holders in accordance with this Condition.

## 17   Further Issues

The Issuer is at liberty from time to time without the consent of the Holders or the Couponholders to create and issue further Capital Securities ranking *pari passu* in all respects (or in all respects save for the date from which interest thereon accrues and the amount of the first payment of interest on such further Capital Securities) and so that the same shall be consolidated and form a single series with the outstanding Capital Securities. Any such Capital Securities shall be constituted by a deed supplemental to the Trust Deed.

## 18   Agents

The names of the initial Paying Agents and their initial specified offices are set out below. The Issuer reserves the right, subject to the approval of the Trustee, such approval not to be unreasonably withheld, at any time to vary or terminate the appointment of any Paying Agent or Calculation Agent and to appoint additional or other Paying Agents or (as the case may be) another Calculation Agent (if a Calculation Agent has already been appointed), provided that it will: (a) at all times maintain a Principal Paying Agent and a Paying Agent having a specified office in London (which may be the same as the Principal Paying Agent); (b) whenever a function expressed in these Conditions to be performed by the Calculation Agent falls to be performed, appoint and (for so long as such function is required to be performed) maintain a Calculation Agent; (c) for so long as the Capital Securities are admitted to official listing on any stock exchange maintain a Paying Agent having a specified office in such location as may be required by the rules of the stock exchange; and (d)

insofar as the Issuer would be obliged to pay Additional Amounts pursuant to Condition 11 upon presentation of the Capital Security or Coupon, as the case may be, for payment in the United Kingdom, maintain a Paying Agent having a specified office in a major city in a Member State of the European Union other than the United Kingdom that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other Directive on the taxation of savings income implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 or any law implementing or complying with, or introduced to conform to such Directive which is approved by the Trustee, PROVIDED THAT under no circumstances shall the Issuer be obliged to maintain a Paying Agent with a specified office in such a Member State unless at least one Member State of the European Union other than the United Kingdom does not require a Paying Agent with a specified office in that Member State so to withhold or deduct tax. Notice of any such termination or appointment and of any change in the specified offices of the Paying Agents will be given to the Holders in accordance with Condition 16. If either of the Calculation Agent or the Principal Paying Agent is unable or unwilling to act as such or if it fails to make a determination or calculation or otherwise fails to perform its duties under these Conditions, the relevant Calculation Agency Agreement or the Paying Agency Agreement (as the case may be), the Issuer and the Parent shall appoint, on terms acceptable to the Trustee, an independent investment bank, merchant bank, commercial bank, stockbroker or financial institution acceptable to the Trustee to act as such in its place. All calculations and determinations made by the Calculation Agent or the Principal Paying Agent in relation to the Capital Securities shall (save in the case of manifest error) be final and binding on the Issuer, the Parent, the Trustee, the Paying Agents, the Holders and the Couponholders.

Under no circumstances shall the Trustee be required to appoint a Calculation Agent (where the Issuer has failed to do so or otherwise), and the Trustee shall not be responsible, or liable to any person, for the consequences of any failure by the Issuer to appoint a Calculation Agent. None of the Issuer, the Parent, the Trustee and the Paying Agents shall have any responsibility to any person for any errors or omissions in any calculation, or any sale of ACSM Securities made pursuant to Condition 6 or otherwise, by the Calculation Agent.

## 19  Pre-Emption

Each of the Issuer and the Parent shall, subject to compliance with the requirements of the Companies Act, use all reasonable endeavours to obtain and maintain at all times all corporate authorisations and take any other corporate actions required for the issue and allotment to the Trustee or its agent (free from any pre-emption rights) of such number of ACSM Securities which are Ordinary Shares as it reasonably considers would be required to be issued in order to enable the Issuer and the Parent to make a payment satisfying the aggregate amount of Deferred Coupon Payments (if any) and on the Coupon Payment Dates in the following 12 months, provided that such reasonable endeavours shall be satisfied where the relevant corporate authorisation or action required is to be obtained or done by the passing of a resolution of the shareholders of the Issuer or, as the case may be, the Parent and the board of directors of the Issuer or, as the case may be, the Parent proposes the relevant resolution to its shareholders for approval at any general meeting of the Issuer or, as the case may be, the Parent and, if such proposal is rejected, the relevant resolution is proposed again at the next general meeting of the Issuer or, as the case may be, the Parent.

No damages will be payable for breach of this covenant but, in the event of breach by the Issuer or the Parent of this Condition 19, the Trustee may only require the Parent, as applicable (i) to procure that the Issuer holds as soon as practicable an extraordinary general meeting of the shareholders of the Issuer at which a resolution is proposed to remedy the breach or (ii) to put before the next general meeting of the shareholders of the Parent a resolution to remedy the breach.

The Trustee shall not be obliged to monitor compliance by the Issuer or the Parent with this Condition and shall be entitled to assume, unless it has actual knowledge to the contrary, that each of the Issuer and the Parent is complying with its obligations under this Condition.

Any authorised but unissued ACSM Securities which are Ordinary Shares which the Issuer or the Parent is required to maintain other than in connection with the Capital Securities shall be discounted in determining whether the Issuer or, as the case may be, the Parent, is complying with its obligations under this Condition 19.

## 20    Governing Law

The Trust Deed, the Capital Securities, the Coupons and the Talons are governed by, and shall be construed in accordance with, the laws of England.

The Courts of England are to have exclusive jurisdiction to settle any disputes which may arise out of or in connection with the Trust Deed, the Capital Securities, the Coupons or the Talons and accordingly any legal action or proceedings arising out of or in connection with the Trust Deed, the Capital Securities, the Coupons or the Talons ("Proceedings") may be brought in such courts. The Parent has in the Trust Deed irrevocably submitted to the jurisdiction of such courts. Service or process in any Proceedings in England may be effected on the Parent by delivery to the Parent's principal place of business in England currently at 25 Gresham Street, London EC2V 7HN or such other address as may be notified to Holders in accordance with Condition 16.

## 21    Contracts (Rights of Third Parties) Act 1999

No person shall have any right to enforce any term or condition of the Capital Securities by virtue of the Contracts (Rights of Third Parties) Act 1999.

## 22    Definitions

In these Conditions:

"Accrued Coupon Payment" means, as at any given time, where these Conditions provide that interest shall continue to accrue after a Coupon Payment Date or ACSM Payment Date in respect of a Capital Security or an ACSM Payment, the amount of interest accrued thereon at that time in accordance with Condition 5 or 6(e), as the case may be;

"ACSM" or "Alternative Coupon Satisfaction Mechanism" means the mechanism described in Condition 6;

"ACSM Payment" means any Deferred Coupon Payment and/or any Accrued Coupon Payment which has been or is to be satisfied pursuant to Condition 6(e);

"ACSM Payment Date" means the date on which an ACSM Payment is due to be satisfied pursuant to these Conditions;

"ACSM Securities" means Issuer ACSM Securities or Parent ACSM Securities;

"Additional Amounts" has the meaning given to it in Condition 11;

"Assets" means the unconsolidated gross assets of the Issuer, as shown in the latest published audited balance sheet of the Issuer, but adjusted for subsequent events in such manner as the Directors or, if the Issuer is in a winding-up or administration, its liquidator or administrator may determine;

"Associated Costs" means (a) any stamp duty, stamp duty reserve tax and any other duties or taxes (if any) and (b) costs (including any brokerage fees) that would be payable by the Trustee or its agent in connection with the issue, transfer and/or sale of Payment Issuer Securities or Payment Parent Securities pursuant to Condition 6;

"Business Day" means a day, other than a Saturday, Sunday or public holiday, on which commercial banks and foreign exchange markets are open for general business in London and New York;

"Calculation Agency Agreement" means any agreement entered into by the Issuer, the Parent, the Trustee and the Calculation Agent in respect of any of the functions expressed to be performed by the Calculation Agent under these Conditions;

"Calculation Agent" means the independent investment bank of international repute, appointed on the terms of a Calculation Agency Agreement, selected by the Issuer and approved by the Trustee, such approval not to be unreasonably withheld, for the purposes of performing any of the functions expressed to be performed by it under these Conditions;

"Capital Regulations" means at any time the regulations, requirements, guidelines and policies of the FSA relating to capital adequacy then in effect;

"Capital Securities" means the Fixed Rate Perpetual Capital Securities referred to in the relevant Final Terms, and such expression shall include, unless the context otherwise requires, any further capital securities issued pursuant to Condition 17 and forming a single series with the Capital Securities;

"Companies Act" means the Companies Act 2006 (as amended);

"Conditions" means these terms and conditions of the Capital Securities, as amended from time to time;

"Coupon" means an interest coupon relating to a Capital Security and includes, where the context so permits, a Talon;

"Coupon Amount" means, in respect of a Coupon, the amount of interest payable on the presentation and surrender of such Coupon for the relevant Coupon Period in accordance with Condition 5;

"Couponholder" means the bearer of any Coupon;

"Coupon Payment" means, in respect of a Coupon Payment Date, the aggregate Coupon Amounts for the Coupon Period ending on such Coupon Payment Date;

"Coupon Payment Date" means the dates specified as such in the relevant Final Terms;

"Coupon Period" means the period beginning on (and including) the Issue Date and ending on (but excluding) the first Coupon Payment Date and each successive period beginning on (and including) a Coupon Payment Date and ending on (but excluding) the next succeeding Coupon Payment Date;

"Coupon Rate" has the meaning given to it in Condition 5(a);

"Day Count Fraction" means the day count fraction specified in the relevant Final Terms and described in Condition 5(a);

"Deferred Coupon Payment" means (i) any Coupon Payment which, pursuant to Condition 4, the Issuer has elected to defer and which has not been satisfied and (ii) any Coupon Payment which, by reason of the condition to payment set out in Condition 2(b)(i), has not been satisfied;

"Directors" means the directors of the Issuer or, as the case may be, the Parent;

"Eligible Company" means a company incorporated in a member state of the European Union or in the United States of America by or on behalf of the Parent whose ordinary shares are listed (i) on the official list of the Financial Services Authority in its capacity as competent authority under the Financial Services and Markets Act 2000 and are admitted to trading on the regulated market of the London Stock Exchange or (ii) on such other internationally Recognised Stock Exchange as the Trustee may approve;

"Exchange Date" means the date on which the Capital Securities are exchanged for, or varied to become, Qualifying Tier 1 Securities or Qualifying Tier 2 Securities, as the case may be, in accordance with Condition 8;

"Financial Services Authority" or "FSA" means the Financial Services Authority or such other governmental authority in the United Kingdom (or if the Issuer becomes domiciled in a jurisdiction other than the United Kingdom, in such other jurisdiction) having primary supervisory authority with respect to the Lloyds TSB Bank Group;

"Holder" means the bearer of any Capital Security;

"holding company" has the meaning given to it under Section 1159 of the Companies Act;

"Holding Company Shares" means ordinary shares in the capital of the New Holding Company;

"interest" shall, where appropriate, include Coupon Amounts, Deferred Coupon Payments and Accrued Coupon Payments;

"Issue Date" means the date specified as such in the relevant Final Terms, being the date of the initial issue of the Capital Securities;

"Issuer" means Lloyds TSB Bank plc;

"Issuer ACSM Securities" means securities (which includes ordinary shares and preferred securities) of the Issuer which:

(a)     comply with the requirements of the FSA in relation to Tier 1 Capital; and

(b)     unless the Parent is required to issue Parent ACSM Securities in exchange therefor in accordance with Condition 6(b), do not have terms such that (x) the Issuer would not, as a result of the Issuer ACSM Securities being in issue, be able to have losses or deductions set against the profits, or profits offset by the losses or deductions, of companies with which it is or would otherwise be grouped for United Kingdom tax purposes or (y) the holders of such Issuer ACSM Securities would constitute "equity holders" of the Issuer for United Kingdom tax purposes;

"Junior Share Capital" means the Ordinary Shares of the Issuer and the Parent, any other securities of the Issuer ranking, or expressed to rank, junior whether contractually or structurally to the Capital Securities (and shall include the 6 per cent. Non-Cumulative Redeemable Preference Shares issued by the Issuer) and any securities issued by any subsidiary of the Parent which securities benefit from a guarantee or support agreement entered into by the Issuer and ranking or expressed to rank junior to the Capital Securities and any other securities of the Parent or guarantee or support undertaking by the Parent ranking junior to the most senior preference shares of the Parent;

"Junior Subordinated Debt" means the Issuer's outstanding Primary Capital Undated Floating Rate Notes (Series 1), Primary Capital Undated Floating Rate Notes (Series 2), Primary Capital Undated Floating Rate Notes (Series 3), 11¾ per cent. Perpetual Subordinated Bonds, 5⅝ per cent. Undated Subordinated Step-Up Notes Callable 2009, Undated Step-Up Floating Rate Notes Callable 2009, 6⅝ per cent. Undated Subordinated Step-Up Notes Callable 2010, 5.57 per cent. Undated Subordinated Step-Up Coupon Notes

Callable 2015, Undated Subordinated Floating Rate Loan callable 2015, Undated Subordinated Floating Rate Loan callable 2016, 5.125 per cent Undated Subordinated Step-Up Notes callable 2016, 6½ per cent. Undated Subordinated Step-Up Notes Callable 2019, 8 per cent. Undated Subordinated Step-Up Notes Callable 2023, 6½ per cent. Undated Subordinated Step-Up Notes Callable 2029, 6 per cent Undated Subordinated Step-Up Guaranteed Bonds callable 2032 and any other obligations of the Issuer which rank or are expressed to rank *pari passu* with the aforesaid obligations;

"Liabilities" means the non-consolidated gross liabilities of the Issuer, as shown in the latest published audited balance sheet of the Issuer, but adjusted for contingent liabilities and for subsequent events in such manner as the Directors or, if the Issuer is in a winding-up or administration, its liquidator or administrator may determine;

"Lloyds TSB Bank Group" means the Issuer and its Subsidiaries and affiliates;

"London Stock Exchange" means the London Stock Exchange plc;

"Market Disruption Event" means (i) the occurrence or existence of any suspension of or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the London Stock Exchange or such other principal exchange of the Parent from time to time or otherwise) or on settlement procedures for transactions in the Ordinary Shares of the Parent on the London Stock Exchange or such other principal exchange of the Parent from time to time if, in any such case, the Calculation Agent has confirmed to the Issuer and the Parent that the suspension or limitation is material in the context of the sale of the Parent ACSM Securities, or (ii) in the opinion of the Issuer, there has been a substantial deterioration in the price and/or value of the relevant Parent ACSM Securities or circumstances are such so as to prevent or to a material extent restrict the issue, allotment, sale, delivery or listing of the Parent ACSM Securities, as the case may be, including the Parent entering a close period (within the meaning of the United Kingdom Listing Authority Sourcebook: Listing Rules), except that an event or circumstance contemplated by Condition 9(d) which leads to a Suspension shall not constitute a Market Disruption Event or (iii) where pursuant to these Conditions, moneys are required to be converted from one currency into another currency in respect of any Payment, the occurrence of any event that makes it impracticable to effect such conversion;

"New Holding Company" means an Eligible Company that becomes the New Owner following a Permitted Restructuring;

"New Owner" means any new ultimate holding company of the Parent;

"New Owner Shares" means ordinary shares of the New Owner;

"Ordinary Shares" means ordinary shares in the capital of the Issuer having on the Issue Date a par value of £1 each or, as the case may be, the Parent having on the Issue Date a par value of £0.25 each;

"Other Tier 1 Securities" means, in respect of the Issuer or the Parent (as the case may be), any securities which are Tier 1 Capital of the Issuer or the Parent (as the case may be) and which rank on a winding-up of the Issuer or the Parent (as the case may be) or in respect of a distribution or payment of dividends or any other payments thereon, in the case of the Issuer, *pari passu* with the Capital Securities (on the assumption that the Capital Securities are still Tier 1 Capital of the Issuer) or, in the case of the Parent, *pari passu* with the most senior preference share capital of the Parent, the 6.35 per cent. Step-Up Perpetual Capital Securities callable 2013, the 6.90 per cent. Perpetual Capital Securities callable 2007, the 7.375 per cent Step-Up Non-voting Non-cumulative Preferred Securities callable 2012, the 7.834 per cent. Step-Up Non-voting Non-cumulative Preferred Securities callable 2015 and the 4.385 per cent Step-Up Perpetual Capital Securities callable 2017;

"Outstanding" in relation to any Coupon Payment, Deferred Coupon Payment or Coupon Amount not falling within the definition of Coupon Payment, means that such payment (a) has either become due and payable or would have become due and payable except for the non-satisfaction on the relevant date of the condition to payment set out in Condition 2(b)(i) or the deferral, postponement or suspension of such payment in accordance with any of Condition 4, 6(d), 6(e) or 9(d); and (b) in any such case has not been satisfied and, in respect of any Accrued Coupon Payment, means any amount thereof which has not been satisfied whether or not payment has become due;

"Parent" means Lloyds TSB Group plc;

"Parent ACSM Securities" means securities (which includes ordinary shares and preferred securities) of the Parent which comply with the requirements of the FSA in relation to Tier 1 Capital;

"Paying Agency Agreement" has the meaning given to it in the preamble to these Conditions;

"Paying Agents" means the paying agents appointed pursuant to the Paying Agency Agreement and such term shall, unless the context otherwise requires, include the Principal Paying Agent;

"Payment" means any Coupon Payment, Deferred Coupon Payment, Accrued Coupon Payment or Coupon Amount not falling within the definition of Coupon Payment;

"Payment Issuer Securities" has the meaning given to it in Condition 6(b);

"Payment Parent Securities" has the meaning given to it in Condition 6(b);

"Permitted Restructuring" means the completion of (i) an offer made by or on behalf of, an Eligible Company to all (or as nearly as may be practicable all) shareholders of the Parent to acquire the whole (or as nearly as may be practicable the whole) of the issued ordinary share capital of the Parent other than that which is already held by or on behalf of such Eligible Company or (ii) a reorganisation or restructuring whether by way of a scheme of arrangement or otherwise pursuant to which an Eligible Company acquires all (or as nearly as may be practicable all) of the issued ordinary share capital of the Parent other than that which is already held by such Eligible Company or pursuant to which all (or as nearly as may be practicable all) of the issued ordinary share capital of the Parent not held by the New Owner is cancelled;

"Permitted Restructuring Arrangement" means in relation to a Permitted Restructuring an arrangement whereby the following conditions are satisfied: (a) the execution of a trust deed supplemental to the Trust Deed and/or such other documentation as may be necessary to ensure that (i) the alternative coupon satisfaction mechanism as described in Condition 6, the Trust Deed and any Calculation Agency Agreement operates so that ACSM Securities may be exchanged for New Owner Shares in such a manner that ensures that upon the sale of such New Owner Shares the holder of each Capital Security then outstanding will receive, in the event of a payment to be satisfied pursuant to Condition 6, an amount not lower than that which would have been receivable had such a restructuring not taken place and (ii) the economic effect, for the Holders, of a holding of the Capital Securities prior to the Permitted Restructuring is substantially preserved; and (b) the Trustee is satisfied that the credit ratings that would be assigned to the Capital Securities by Standard & Poor's Ratings Services, a Division of The McGraw-Hill Companies, Inc. and by Moody's Investors Service, Inc. following any such restructuring, shall not be lower than those assigned to the Capital Securities immediately prior to such Permitted Restructuring taking place as confirmed by each such rating agency in writing;

"Principal Paying Agent" means Citibank, N.A.;

"Qualifying Tier 1 Securities" means securities issued directly or indirectly by the Issuer or the Parent or other issuer (provided that such securities benefit from a guarantee or support agreement entered into by the Issuer or the Parent) that:

(a) have terms not materially less favourable to an investor than the terms of the Capital Securities (as reasonably determined by the Issuer, and provided that a certification to such effect of two Directors shall have been delivered to the Trustee prior to the exchange for, variation into or issue of the relevant securities), except that such Qualifying Tier 1 Securities shall not necessarily contain provisions analogous to the provisions of Condition 6 and may be in the form of preference shares and provided that they shall rank at least equal to the Capital Securities and the same Coupon Rate shall apply to them and provided further that they shall contain terms which comply with the then current requirements of the FSA in relation to Tier 1 Capital;

(b) do not have terms such that (x) the Issuer would not, as a result of the Qualifying Tier 1 Securities being in issue, be able to have losses or deductions set against the profits, or profits offset by the losses or deductions, of companies with which it is or would otherwise be grouped for United Kingdom tax purposes or (y) the holders of such Qualifying Tier 1 Securities would constitute "equity holders" of the Issuer for United Kingdom tax purposes; and

(c) are admitted to trading on the regulated market of the London Stock Exchange or such other stock exchange as is a Recognised Stock Exchange at that time as selected by the Issuer and approved by the Trustee.

For the avoidance of doubt, "Qualifying Tier 1 Securities" may include perpetual non-cumulative preference shares in the capital of the Issuer or the Parent, issued directly or indirectly, and securities issued via a repacking vehicle or depositary receipt vehicle, provided in each case that they satisfy the aforementioned requirements;

"Qualifying Upper Tier 2 Securities" means securities issued directly or indirectly by the Issuer or the Parent or other issuer (provided that such securities benefit from a guarantee or support agreement entered into by the Issuer or the Parent) that:

(a) have terms not materially less favourable to an investor than the terms of the Capital Securities (as reasonably determined by the Issuer, and provided that a certification to such effect of two Directors shall have been delivered to the Trustee prior to the issue of the relevant securities), provided that (1) they shall contain terms which comply with the then current requirements of the FSA in relation to Upper Tier 2 Capital; (2) they provide for the same Coupon Rate; (3) they shall rank senior to, or *pari passu* with, the Capital Securities; and (4) such securities shall preserve any existing rights under these Conditions to any Accrued Coupon Payment which has not been satisfied, except that such securities shall not necessarily have provisions analogous to the provisions of Condition 6;

(b) do not have terms such that (x) the Issuer would not, as a result of the Qualifying Upper Tier 2 Securities being in issue, be able to have losses or deductions set against the profits, or profits offset by the losses or deductions, of companies with which it is or would otherwise be grouped for United Kingdom tax purposes or (y) the holders of such Qualifying Upper Tier 2 Securities would constitute "equity holders" of the Issuer for United Kingdom tax purposes; and

(c) are admitted to trading on the regulated market of the London Stock Exchange or such other stock exchange as is a Recognised Stock Exchange at that time as selected by the Issuer and approved by the Trustee;

"Recognised Stock Exchange" means a recognised stock exchange as defined in section 1005 of the Income Tax Act 2007 as the same may be amended from time to time and any provision, statute or statutory instrument replacing the same from time to time;

"Regulatory Capital Requirements" means any requirements contained in the Capital Regulations from time to time applicable to the Issuer;

a "Regulatory Event" is deemed to have occurred if at any time the FSA has determined that securities of the nature of the Capital Securities cease to qualify as Tier 1 Capital (save where such non-qualification is only as a result of any applicable limitation on the amount of such capital);

"Relevant Date" means (i) in respect of any payment other than a Solvency Claim to be paid by the Issuer in a winding-up of the Issuer, the date on which such payment first becomes due and payable but, if the full amount of the moneys payable on such date has not been received by the Principal Paying Agent or the Trustee on or prior to such date, the Relevant Date means the date on which such moneys shall have been so received and notice to that effect shall have been given to the Holders in accordance with Condition 16, and (ii) in respect of a Solvency Claim to be paid by the Issuer in a winding-up of the Issuer, the date which is one day prior to the commencement of the winding-up;

"Senior Creditors" means creditors of the Issuer (a) who are depositors or other unsubordinated creditors of the Issuer; or (b) whose claims are, or are expressed to be, subordinated (whether only in the event of the winding-up of the Issuer or otherwise) to the claims of depositors and other unsubordinated creditors of the Issuer but not further or otherwise; or (c) whose claims are in respect of Junior Subordinated Debt of the Issuer; or (d) who are subordinated creditors of the Issuer other than those whose claims are, or are expressed to rank, *pari passu* with, or junior to, the claims of the Holders;

"Solvency Claim" has the meaning given to it in Condition 2(b)(ii);

"Subsidiary" means each subsidiary for the time being of the Issuer;

"subsidiary" has the meaning given to subsidiary undertaking under section 1159 of the Companies Act;

"Suspension" has the meaning given to it in Condition 9(d);

"Talon" means a talon for further Coupons;

"Tax Event" means an event of the type described in Condition 7(c)(i), (ii), (iii) and (iv);

"Tax Law Change" means a change in or proposed change in, or amendment or proposed amendment to, the laws or regulations of the United Kingdom or any political subdivision or authority therein or thereof having the power to tax, including any treaty to which the United Kingdom is a party, or any change in the application of official or generally published interpretation of such laws, including a decision of any court or tribunal, or any written interpretation or pronouncement by any relevant tax authority that provides for a position with respect to such laws or regulations that differs from the previously generally accepted position in relation to similar transactions or which differs from any specific written statements made by a tax authority regarding the anticipated tax treatment of the Capital Securities, which change or amendment becomes, or would become, effective on or after the relevant Issue Date;

"Tier 1 Capital" and "Tier 2 Capital" have the respective meanings given to them from time to time by the FSA;

"Trust Deed" means the trust deed dated at or around the Issue Date between the Issuer, the Parent and the Trustee;

"Trustee" means The Law Debenture Trust Corporation p.l.c. as trustee for the Holders and includes its successor(s);

"United Kingdom" means the United Kingdom of Great Britain and Northern Ireland; and

"Upper Tier 2 Capital" has the meaning given to it by the FSA from time to time.

# SUMMARY OF PROVISIONS RELATING TO THE CAPITAL SECURITIES WHILE IN GLOBAL FORM

## 1 Exchange

Each tranche of Capital Securities will be represented initially by a Temporary Global Capital Security in bearer form without Coupons or Talons which will be deposited outside the United States with a common depositary for Clearstream, Luxembourg and Euroclear on or about the Issue Date. Each Temporary Global Capital Security will be exchangeable in whole or in part (free of charge to the holder) for interests in a Permanent Global Capital Security in bearer form without Coupons or Talons on or after a date which is 40 days after the Issue Date (the "Exchange Date") upon certification as to non-US beneficial ownership as required by US Treasury regulations and as described in the relevant Temporary Global Capital Security. Upon deposit of each Temporary Global Capital Security or Permanent Global Capital Security (each a "Global Capital Security") with a common depositary, Clearstream, Luxembourg and Euroclear will credit each subscriber with a principal amount of Capital Securities equal to the principal amount thereof for which it has subscribed and paid.

Each of the persons shown in the records of Clearstream, Luxembourg or Euroclear as the holder of a Capital Security represented by a Global Capital Security must look solely to Clearstream, Luxembourg or Euroclear for his share of each payment made by the Issuer to the bearer of such Global Capital Security, subject to and in accordance with the rules and procedures of Clearstream, Luxembourg or Euroclear (as the case may be).

The Global Capital Securities will contain provisions applicable to the Capital Securities represented thereby, some of which modify the effect of the Terms and Conditions of the Capital Securities. Certain of these are summarised in this section.

For so long as any of the Capital Securities is represented by a Global Capital Security, the bearer of the each Global Capital Security may, except as ordered by a court of competent jurisdiction or as required by law, be treated by the Issuer, the Trustee and the Paying Agents as the owner thereof and of all rights thereunder free from all encumbrances (in accordance with and subject to its terms and the Trust Deed) and the expression "Holder" and related expressions shall be construed accordingly. Interests in Capital Securities which are represented by a Global Capital Security will only be transferable in accordance with the rules and procedures for the time being of Clearstream, Luxembourg and/or Euroclear, as the case may be.

If any date on which a payment is due on the Capital Securities occurs prior to the Exchange Date, the relevant payment will be made on the relevant Temporary Global Capital Security only to the extent that certification as to non-US beneficial ownership as required by US Treasury regulations (in substantially the form referred to in the relevant Temporary Global Capital Security or in such other form as is customarily issued in such circumstances by the relevant clearing system or depositary) has been received by Clearstream, Luxembourg or Euroclear. Payment of amounts due in respect of the Permanent Global Capital Security will be made through Clearstream, Luxembourg or Euroclear without any requirement for certification.

The holder of each Temporary Global Capital Security shall not (unless, upon due presentation of such Temporary Global Capital Security for exchange (in whole or in part) for interests in a Permanent Global Capital Security, such exchange is improperly withheld or refused and such withholding or refusal is continuing at the relevant payment date) be entitled to receive any payment in respect of the Capital Securities represented by the relevant Temporary Global Capital Security which falls due on or after the Exchange Date.

Interests in each Permanent Global Capital Security will be exchangeable in whole but not in part (free of charge to the holder) for definitive bearer Capital Securities (a) if the relevant Permanent Global Capital Security is held on behalf of Clearstream, Luxembourg or Euroclear or an Alternative Clearing System (as

defined below) and any such clearing system is closed for business for a continuous period of 14 days (other than by reason of public holidays, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so or (b) at any time at the option of the Issuer, by the Issuer or, in the case of (a) above, the Holder of the relevant Permanent Global Capital Security giving notice to the Principal Paying Agent and, if applicable, the Issuer or the Holders of its intention to exchange interests in such Permanent Capital Security for definitive Capital Securities on or after the Permanent Global Exchange Date (as defined below) specified in the notice.

On or after the Permanent Global Exchange Date the holder of each Permanent Global Capital Security shall surrender the relevant Permanent Global Capital Security to or to the order of the Principal Paying Agent. In exchange for such Permanent Global Capital Security, the Issuer shall deliver, or procure the delivery of, an equal aggregate principal amount of duly executed and authenticated definitive Capital Securities having attached to them all Coupons in respect of interest which has not already been paid on the relevant Permanent Global Capital Security and a Talon.

"Alternative Clearing System" means any such other clearing system as shall have been approved by the Trustee.

"Permanent Global Exchange Date" means a day falling not less than 60 days after that on which the notice requiring exchange is given and on which banks are open for business in the city in which the specified office of the Principal Paying Agent is located and, except in the case of exchange pursuant to (a) above, in the cities in which Clearstream, Luxembourg and Euroclear or, if relevant, the Alternative Clearing System are located.

## 2    Payments

Principal and interest in respect of each Permanent Global Capital Security shall be paid to the relevant holder against presentation and (if no further payment falls to be made on it) surrender of it to or to the order of any Paying Agent which shall endorse such payment or cause payment to be endorsed in the appropriate schedule to such Permanent Global Capital Security. A record of each payment so made will be endorsed in the appropriate schedule to the relevant Permanent Global Capital Security which endorsement shall be prima facie evidence that such payment has been made in respect of the Capital Securities. No person shall however be entitled to receive any payment on a Permanent Global Capital Security falling due after the Permanent Global Exchange Date, unless exchange of the relevant Permanent Global Capital Security for definitive Capital Securities is improperly withheld or refused by or on behalf of the Issuer. Condition 11(c) of the Capital Securities will apply to the Definitive Securities only.

## 3    Notices

So long as each Permanent Global Capital Security is held on behalf of Clearstream, Luxembourg or Euroclear or an Alternative Clearing System, notices required to be given to Holders may be given by their being delivered to Clearstream, Luxembourg and/or Euroclear or, as the case may be, the Alternative Clearing System, rather than by publication as required by the Terms and Conditions of the Capital Securities. Any notice delivered to Clearstream, Luxembourg and/or Euroclear and/or, as the case may be, the Alternative Clearing System shall be deemed to have been given to the Holders on the day on which such notice is so delivered.

## 4    Meetings

The holder of each Permanent Global Capital Security shall be treated at any meeting of Holders as having one vote in respect of each integral currency unit of the currency of the Capital Securities principal amount of Capital Securities for which the relevant Permanent Global Capital Security may be exchanged.

5    **Purchase and Cancellation**

Cancellation of any Capital Security represented by a Permanent Global Capital Security which is required by the Terms and Conditions of the Capital Securities to be cancelled will be effected by reduction in the principal amount of such Permanent Global Capital Security.

6    **Trustee's Powers**

In considering the interests of Holders in circumstances where the relevant Permanent Global Capital Security is held on behalf of any one or more of Clearstream, Luxembourg, Euroclear and an Alternative Clearing System, the Trustee may have regard to such information as may have been made available to it by or on behalf of the relevant clearing system or its operator as to the identity of its accountholders (either individually or by way of category) with entitlements in respect of the relevant Permanent Global Capital Security and may consider such interests on the basis that such accountholders were the holder of the relevant Permanent Global Capital Security.

7    **Prescription**

Claims against the Issuer in respect of principal and interest on the Capital Securities while the Capital Securities are represented by a Permanent Global Capital Security will become void unless it is presented for payment within a period of 10 years (in the case of principal) and five years (in the case of interest) from the appropriate Relevant Date.

## USE OF PROCEEDS

The net proceeds from the issue of the Capital Securities will be used for the general purposes of Lloyds TSB Group. If in respect of any tranche, there is a particular identified use of proceeds, this will be stated in the applicable Final Terms.

# LLOYDS TSB GROUP

All of the businesses of Lloyds TSB Group are in or owned by Lloyds TSB Bank plc. Lloyds TSB Group plc is the parent company of Lloyds TSB Bank plc. The Issuer was incorporated on 20 April 1865 (Registration number 00002065). The Issuer's registered office is at 25 Gresham Street, London EC2V 7HN, telephone number 020 7626 1500.

## History and development of Lloyds TSB Group

The history of the Lloyds TSB Group can be traced back to the 18th century when the banking partnership of Taylors and Lloyds was established in Birmingham, England. Lloyds Bank Plc was incorporated in 1865 and during the late 19th and early 20th centuries entered into a number of acquisitions and mergers, significantly increasing the number of banking offices in the UK. In 1995, it continued to expand with the acquisition of the Cheltenham and Gloucester Building Society.

TSB Group plc became operational in 1986 when, following UK government legislation, the operations of four Trustee Savings Banks and other related companies were transferred to TSB Group plc and its new banking subsidiaries. By 1995, the TSB Group had, either through organic growth or acquisition, developed life and general insurance operations, investment management activities, and a motor vehicle hire purchase and leasing operation to supplement its retail banking activities.

In 1995, TSB Group plc merged with Lloyds Bank Plc. Under the terms of the merger, the TSB and Lloyds Bank groups were combined under TSB Group plc, which was re-named Lloyds TSB Group plc with Lloyds Bank Plc, which was subsequently renamed Lloyds TSB Bank plc, the principal subsidiary. In 1999, the businesses, assets and liabilities of TSB Bank plc, the principal banking subsidiary of the TSB Group prior to the merger, and its subsidiary Hill Samuel Bank Limited were vested in Lloyds TSB Bank plc, and in 2000, Lloyds TSB Group acquired Scottish Widows. In addition to already being one of the leading providers of banking services in the UK, this transaction also positioned Lloyds TSB Group as one of the leading suppliers of long-term savings and protection products in the UK.

In more recent years, the Lloyds TSB Group has disposed of a number of its non-core operations, as part of the process of managing its portfolio of businesses to focus on its core markets. These disposals have resulted in a significant reduction in the size of the Lloyds TSB Group's international business.

## Strategy of Lloyds TSB Group

In an environment of strong competition, Lloyds TSB Group believes that shareholder value can best be achieved by:

- focusing on markets where it can build and sustain competitive advantage;

- developing business strategies for those markets which are founded on being profitably different in the way it creates customer value; and

- building a high-performance organisation focused on the right goals and the best possible execution of those strategies.

Reflecting this, in 2003 the Lloyds TSB Group put in place a three-phase strategy. In phase 1, now completed, the Lloyds TSB Group focused on enhancing the quality of its earnings by exiting businesses which were not regarded as core or which added unnecessary volatility to its earnings. During this phase, the Lloyds TSB Group divested businesses in New Zealand and Latin America, markets in which it did not expect to be able to build and sustain competitive advantage. In phase 2, Lloyds TSB Group's focus is on accelerating growth by deepening its customer relationships and improving its productivity and, in the process, building

competitive advantage through enhancing its capabilities. Lloyds TSB Group believes that this has already resulted in improved earnings growth in its core markets.

The Lloyds TSB Group remains alert for opportunities to grow inorganically to complement its organic strategies and help provide new opportunities for profitable growth, both in the UK and overseas. In phase 3, the Lloyds TSB Group expects to leverage its financial strength and enhanced capabilities in new markets.

Relationships are critical to the Lloyds TSB Group's strategy. The Lloyds TSB Group has chosen to focus on building deep, long-lasting relationships with the Group's customers in order to deliver high quality, sustainable results over time. By building deep relationships, the Lloyds TSB Group aims to maintain stable revenues and thus achieve a lower risk profile.

**Markets**

Lloyds TSB Group continues to focus on building competitive advantage in its core markets by seeking opportunities to consolidate its position in businesses where it is already strong, through a combination of organic growth and acquisitions, and by divesting businesses in markets where it is not a leader and cannot aspire reasonably to leadership. In 2007, the Lloyds TSB Group continued to move out of non-core markets with the sale of Lloyds TSB Registrars and Abbey Life Assurance Company Limited ("Abbey Life").

**Strategy**

Lloyds TSB Group's strategy is based on a belief that sustained growth comes from simultaneously focusing on (i) building strong customer relationships, (ii) continuous productivity improvement and (iii) strong capital management.

*(i)*   ***Strong customer relationships***

In an increasingly competitive financial services market, and with customers able to exercise choice amongst alternative providers, shareholder value creation is closely linked to customer value creation. Shareholder value can only be created by attracting and retaining customers and winning a greater share of their financial services business. Across its main businesses, Lloyds TSB Group has strong core banking franchises, based on building strong customer relationships. The Lloyds TSB Group's strategy is focused on being differentiated in the creation of customer value to win a bigger share of its customers' total financial services spend.

Strong franchises depend on having highly motivated employees. Since 2003, measures of the Lloyds TSB Group's employee engagement from an independent survey by Towers Perrin – ISR have shown a sustained steady improvement across all divisions. Towers Perrin – ISR research shows that high employee engagement scores are positively correlated with business performance.

Motivated employees, combined with investments in improving service, help to build customer advocacy. The Lloyds TSB Group's customer satisfaction and advocacy scores have also improved in recent periods. The Lloyds TSB Group will continue to invest in the drivers of customer advocacy. Against this background, the Lloyds TSB Group has continued to achieve stronger sales and income growth in its three business divisions, UK Retail Banking, Insurance and Investments and Wholesale and International Banking.

*(ii)*   ***Continuous productivity improvement***

Superior economic profit growth also requires a continuous focus on productivity improvement, which drives both improved customer service and cost reduction. In recent years, the Lloyds TSB Group has been building a set of capabilities in "six sigma" (error reduction), "lean manufacturing" (operations efficiency) and procurement. Alongside those capabilities, the Lloyds TSB Group applies an "income growth must exceed cost growth" discipline in setting goals for each business, requiring a wider gap

between income growth and cost growth for lower growth/return businesses than for higher growth/return businesses.

The results are showing across all three divisions in much reduced error rates in key processes, growing levels of income per employee and falling unit costs, without impacting investment in future growth. Further improvements in the Lloyds TSB Group's cost:income ratio are expected as these capabilities and disciplines are extended further.

### (iii) Capital management

Lloyds TSB Group measures value internally by economic profit growth, a measure of financial performance which signals unambiguously where value is created or destroyed. It has developed a framework to measure economic equity requirements across all its businesses, taking into account market, credit, insurance, business and operational risk. Using economic profit as a key performance measure enables the Lloyds TSB Group to understand which strategies, products, channels and customer segments are destroying value and which are creating the most value and to make better capital allocation decisions as a result.

The application of these economic profit disciplines, alongside goal-setting linked to ensuring that revenue growth constantly exceeds cost growth, has already been reflected in significant improvement in the capital efficiency of the Lloyds TSB Group's Insurance and Investments division and by a shift in business mix towards sectors offering higher risk-adjusted returns in wholesale banking. By the continued rigorous application of these disciplines at every level, the Lloyds TSB Group expects to further improve capital efficiency whilst remaining strongly capitalised.

It is the Lloyds TSB Group's belief that the relationship focused strategy has demonstrated its effectiveness in generating sustainable, high quality results through the cycle. The prudent approach to risk means that the Lloyds TSB Group believes that it has relatively limited exposure to assets affected by capital market uncertainties and continues to retain a strong liquidity position.

### Business and activities of Lloyds TSB Group

Lloyds TSB Group's activities are organised into three divisions: UK Retail Banking, Insurance and Investments, and Wholesale and International Banking. The main activities of Lloyds TSB Group's three divisions are described below.

### UK Retail Banking

UK Retail Banking provides banking, financial services, mortgages and private banking to some 16 million personal customers through the Lloyds TSB Group's multi-channel distribution capabilities.

### Branches

Lloyds TSB Group provides wide-reaching geographic branch coverage in England, Scotland and Wales, through over 2,000 branches of Lloyds TSB Bank plc, Lloyds TSB Scotland plc ("Lloyds TSB Scotland") and Cheltenham & Gloucester plc ("Cheltenham & Gloucester").

### Internet banking

Internet banking provides online banking facilities for personal customers. Some 4.5 million customers have registered to use Lloyds TSB Group's internet banking services. At the end of 2007, these customers were conducting more than 71 million actions per month online, a 25 per cent increase on 2006.

### Telephone banking

Telephone banking continues to grow and Lloyds TSB Group now provides one of the largest telephone banking services in Europe. At the end of 2007, some 5.4 million customers had registered to use the services

of PhoneBank and the automated voice response service, PhoneBank Express. Lloyds TSB Group's telephone banking centres handled some 70 million calls during 2007.

*Cash machines*

Lloyds TSB Group has one of the largest cash machine networks of any leading banking group in the UK and, at 31 December 2007, personal customers of Lloyds TSB Bank plc and Lloyds TSB Scotland were able to withdraw cash and check balances through over 4,100 ATMs at branches and external locations around the country. In addition, UK Retail Banking's personal customers have access to over 64,000 cash machines via LINK in the UK and to cash machines worldwide through the VISA and MasterCard networks.

*Current accounts*

Lloyds TSB Bank plc and Lloyds TSB Scotland offer a wide range of current accounts, including interest-bearing current accounts and a range of added value accounts.

*Savings accounts*

Lloyds TSB Bank plc and Lloyds TSB Scotland offer a wide range of savings accounts and retail investments through their branch networks and a postal investment centre.

*Personal loans*

Lloyds TSB Bank plc and Lloyds TSB Scotland offer a range of personal loans through their branch networks and directly to the customer via the internet and telephone.

*Cards*

Lloyds TSB Group provides a range of card-based products and services, including credit and debit cards and card transaction processing services for retailers. Lloyds TSB Group is a member of both the VISA and MasterCard payment systems and has access to the American Express payment system.

*Mortgages*

Cheltenham & Gloucester is Lloyds TSB Group's specialist residential mortgage arranger, offering a range of mortgage products to personal customers through its own branches and those of Lloyds TSB Bank plc in England and Wales, as well as through the telephone, internet and postal service, Mortgage Direct. Lloyds TSB Group also provides mortgages through Lloyds TSB Scotland and Scottish Widows Bank. Lloyds TSB Group is one of the largest residential mortgage lenders in the UK on the basis of outstanding balances, with mortgages outstanding at 31 December 2007 of £101,980 million.

*UK Wealth Management*

Wealth Management provides financial planning and advice for Lloyds TSB Group's affluent customers, providing financial solutions across investments, retirement planning and income, trusts, tax and estate planning as well as share dealing. Expert advice is provided through a large population of Lloyds TSB Group financial advisors who can be accessed via the retail branch network and Private Banking offices throughout the United Kingdom. Customers are also provided with access to relationship banking as part of Lloyds TSB Private Banking, one of the largest private banks in the UK.

**Insurance and Investments**

Insurance and Investments offers life assurance, pensions and investment products, general insurance and fund management services.

*Life assurance, pensions and investments*

Scottish Widows is Lloyds TSB Group's specialist provider of life assurance, pensions and investment products, which are distributed through Lloyds TSB Bank plc's branch network, through independent financial advisers and directly via the telephone and the internet. The Scottish Widows brand is the main

brand for new sales of Lloyds TSB Group's life, pensions, Open Ended Investment Companies ("OEICs") and other long-term savings products.

In common with other life assurance companies in the UK, the life and pensions business of each of the life assurance companies in the Lloyds TSB Group is written in a long-term business fund. The main long-term business fund is divided into With-Profits and Non-Profit sub-funds.

With-profits life and pensions products are written from the With-Profits sub-fund. The benefits accruing from these policies are designed to provide a smoothed return to policyholders who hold their policies to maturity through a mix of annual and final (or terminal) bonuses added to guaranteed basic benefits. The guarantees generally only apply on death or maturity. The actual bonuses declared will reflect the experience of the With-Profits sub-fund.

Other life and pensions products are generally written from the Non-Profit sub-fund. Examples include unit-linked policies, annuities, term assurances and health insurance (under which a predetermined amount of benefit is payable in the event of an insured event such as being unable to work through sickness). The benefits provided by linked policies are wholly or partly determined by reference to a specific portfolio of assets known as unit-linked funds.

During 2007, Lloyds TSB Group sold Abbey Life, the UK life operation which was closed to new business in 2000.

*General insurance*

Lloyds TSB General Insurance provides general insurance through the retail branches of Lloyds TSB Bank plc and Cheltenham & Gloucester, and through a direct telephone operation and the internet. Lloyds TSB General Insurance is one of the leading distributors of household insurance in the UK.

*Scottish Widows Investment Partnership*

Scottish Widows Investment Partnership manages funds for Lloyds TSB Group's retail life, pensions and investment products. Clients also include corporate pension schemes, local authorities and other institutions in the UK and overseas.

**Wholesale and International Banking**

Wholesale and International Banking provides banking and related services for major UK and multinational corporates and financial institutions, and small and medium-sized UK businesses. It also provides asset finance to personal and corporate customers, manages Lloyds TSB Group's activities in financial markets through its treasury function and provides banking and financial services overseas.

A new organisational structure for Wholesale and International Banking became effective in 2007. The division's corporate customers with turnover between £2 million and £15 million per annum were transferred from Corporate Markets to Business Banking, which was renamed Commercial Banking; in addition, Lloyds TSB Commercial Finance was transferred from Asset Finance to Commercial Banking.

During 2007, Lloyds TSB Group completed the sale of Lloyds TSB Registrars and The Dutton-Forshaw Group, two of Wholesale and International Banking's businesses.

*Corporate Markets*

Combining the respective strengths of some 3,000 people in Corporate Banking and Products and Markets, Corporate Markets plays an integral role in leveraging and expanding the customer franchise and building deep, long-lasting relationships with around 17,000 corporate customers.

Corporate Banking manages the core customer franchise, providing a relationship-based financial and advisory service to the corporate market place through dedicated regional teams throughout the UK and key

strategic locations abroad, including New York. Customers have access to expert advice and a broad range of financial solutions. Relationship Managers act as a conduit to product and service partners in Corporate Markets and other parts of the Lloyds TSB Group.

Products and Markets is where the specialist product capability resides for transactions undertaken by the corporate relationship customers of the Lloyds TSB Group. It offers customers a comprehensive range of finance and capital solutions, and also provides tailored risk management solutions and structured solutions across all areas of risk, including foreign exchange, interest rates, credit, inflation and commodities on behalf of Lloyds TSB Group. Additionally, Products and Markets fulfils the treasury role for Lloyds TSB Group, managing balance sheet liquidity.

*Commercial Banking*

Commercial Banking serves nearly one million customers across the UK from one-person start-ups to large, established enterprises. The expanded business focuses on providing banking facilities and solutions to customers with business turnover up to £15 million per annum, and incorporates the invoice discounting and factoring subsidiary, Lloyds TSB Commercial Finance, through which Lloyds TSB Group provides specialised working capital finance for its customers. Lloyds TSB Group has a leading share of the new business start-up market, with some 120,000 new businesses opening an account with Lloyds TSB Group in 2007. The main activity of The Agricultural Mortgage Corporation is to provide long-term finance to the agricultural sector.

*Asset Finance*

Lloyds TSB Group's asset finance businesses provide individuals and companies with specialist personal lending, store credit and finance through leasing, hire purchase and contract hire packages. Hire purchase is a form of consumer financing where a customer takes possession of goods on payment of an initial deposit but the legal title to the goods does not pass to the customer until the agreed number of instalments have been paid and the option to purchase has been exercised. Altogether, Asset Finance has over 1.7 million individual customers and relationships with some 16,800 companies and small businesses.

*International Banking*

The Lloyds TSB Group has continued to shape its international network to support its UK operations. Its overseas banking operations include offices in the UK, the Channel Islands, the Isle of Man, Dubai, Hong Kong, Spain, France, Switzerland, Luxembourg, Belgium, Netherlands, Monaco, Gibraltar, Cyprus, South Africa, Japan, Singapore, Malaysia, China and the US. The business provides a wide range of private and retail banking, wealth management and expatriate services to local island residents, UK expatriates, foreign nationals and to other customers and also serves the corporate and institutional market in a number of these locations.

**Recent Developments**

On 6 May 2008, the Parent published an interim management statement (the "Management Statement"). Certain recent developments referred to in the Management Statement are described below (unless otherwise stated, first quarter 2008 performance comparisons relate to the equivalent period in 2007 for the Group's continuing businesses):

- Excluding the impact of market dislocation and insurance related volatility, each division and the Group achieved revenue growth in excess of cost growth, and a double-digit percentage increase in profit before tax in the first quarter of 2008.

- The Group's Wholesale and International Banking division has limited exposure to assets affected by current market uncertainties. However, the division's profit before tax was reduced by £387 million

during the first quarter of 2008 as a result of the impact of market dislocation. This principally reflects mark-to-market adjustments on assets in the division's trading portfolio.

- At 31 March 2008, the Group's portfolio of available-for-sale assets totalled £23.2 billion. A significant proportion of these assets (£7.9 billion) related to the Asset Backed Securities (ABS) in Cancara, the Group's hybrid Asset Backed Commercial Paper conduit. The balance includes £3.1 billion Student Loan ABS, predominantly guaranteed by the US Government, £7.4 billion Government bond and short-dated bank commercial paper and certificates of deposit and £4.8 billion major bank senior paper and high quality ABS. These available-for-sale assets are intended to be held to maturity and as a result, under IFRS, they are marked-to-market through reserves. During the first quarter of 2008, a net £740 million reserves adjustment has been made to reflect the fact that, whilst not currently impaired, there has been a reduction in the market value of these assets. This adjustment has no impact on the Group's capital ratios.

- In the first quarter of 2008, high levels of volatility in fixed income markets and lower equity markets contributed to adverse volatility of £474 million relating to the insurance business, excluding policyholder interests volatility. This reflects a reduction in the market consistent valuation of the annuity portfolio, driven by the continued widening of corporate bond spreads, and lower expected future shareholder income from contracts where the underlying policyholder investments are in equities.

**Competitive environment**

Lloyds TSB Group's key markets are in the UK, in both the retail and wholesale financial services sectors, where the markets are relatively mature. Retail banking markets have shown strong rates of growth in recent years, but there is now evidence of divergent trends between unsecured and secured consumer borrowing, with unsecured lending expected to continue to grow whilst new secured lending is expected to fall in the short term. At the same time, the markets for life, pensions and insurance products are expected to grow over time in a number of key areas. The fragmented nature of the life, pensions and insurance market in the UK has resulted in some consolidation within certain product sectors, although the overall share of new business of the top ten providers has fallen slightly in 2007. In the general insurance sector, the long-term trend of consolidation amongst underwriters and brokers continues, while distribution remains fragmented through growth in the number of affinity partnerships. Wholesale markets have also shown strong growth until mid-2007, since when the ongoing dislocation of global capital markets has had a severe impact. Slower growth is now evident and this trend is likely to intensify going forward, together with a return to more normal levels of bad debt from recent cyclical lows.

Lloyds TSB Group's competitors include all the major financial services companies operating in the UK. In the retail banking market, Lloyds TSB Group competes with banks and building societies, major retailers and internet-only providers. In the mortgage market, competitors include the traditional banks and building societies and specialist providers. In the wholesale banking market, Lloyds TSB Group competes with both UK and foreign financial institutions; in asset finance the main competition comes from other banks and specialised asset finance providers; and in the insurance market, competitors include bancassurance, life assurance and general insurance companies operating in the UK.

The current dislocation in global capital markets has been the most severe examination of the banking system's capacity to absorb sudden significant changes in the funding and liquidity environment for many years and individual institutions have faced varying degrees of stress. Should the Group be unable to continue to source a sustainable funding profile which can absorb these sudden shocks, this could impact its ability to compete in the mortgage market and in other markets. Many competitors have reacted to short-term funding

concerns by withdrawing products and/or tightening lending criteria. Lloyds TSB Group expects these conditions to continue throughout 2008.

In the UK and elsewhere, there is continuing political and regulatory scrutiny of financial services (see also "Lloyds TSB Group plc Annual Report and Accounts 2007 – Risk management – Operational Risk – Exposures" as incorporated by reference).

### Competition Commission

On 6 November 2007 the Competition Commission published its emerging thinking into the Payments Protection Inquiry and is expected to report by December 2008.

### UK Office of Fair Trading

The following reviews and inquiries are being carried out:

In April 2007, the UK Office of Fair Trading ("OFT") commenced an investigation into the fairness of current account overdraft charges. At the same time it commenced a market study into wider questions about competition and price transparency in the provision of personal current accounts.

On 27 July 2007, following agreement between the OFT and eight UK financial institutions, the OFT issued High Court legal proceedings against those institutions, including Lloyds TSB Bank plc, to determine the legal status and enforceability of certain of the charges applied to their personal customers in relation to requests for unplanned overdrafts. On 24 April 2008, the High Court ruled on the preliminary issues of whether eight UK financial institutions' terms and conditions in relation to unauthorised overdraft charges are capable of being assessed for fairness under the Unfair Terms in Consumer Contracts Regulations 1999 ("Regulations") or are capable of amounting to penalties at common law. The High Court determined, in relation to Lloyds TSB Bank plc's current terms and conditions, that the relevant charges are not capable of amounting to penalties but that they are assessable for fairness under the Regulations. It is likely that further hearings will be required to establish the applicability of these findings to Lloyds TSB Bank plc's historic terms and conditions and to determine whether the charges are fair. Consideration is also currently being given by Lloyds TSB Bank plc as to whether to appeal the High Court's ruling. If appeals are pursued, the proceedings may take a number of years to conclude. Pending resolution, the FSA has agreed, subject to certain conditions, that the handling of customer complaints on this issue can be suspended until the proceedings are concluded unless in the light of prevailing circumstances this would be inappropriate. Similarly cases before the Financial Ombudsman Service and the County Courts are also currently stayed pending the outcome of the legal proceedings initiated by the OFT. The Group intends to continue to defend its position strongly. Accordingly, no provision in relation to the outcome of this litigation has been made. Depending on the Court's determinations, a range of outcomes is possible, some of which could have a significant financial impact on the Lloyds TSB Group. The ultimate impact of the litigation on the Group can only be known at its conclusion. The Issuer intends to comply with its obligations as a company with securities admitted to the Official List in connection with further disclosures in relation to the impact of this litigation on the Issuer.

The OFT is carrying out a review of undertakings given by some banks in 2002 regarding the supply of banking services to small and medium-sized entities ("SMEs").

The OFT is also investigating interchange fees charged by some card networks in parallel with the European Commission's own investigation into cross-border interchange fees.

The FSA published an interim report on 29 April 2008 on the retail distribution review and will continue to consult until October 2008.  As regards the UK financial stability and depositor protection regime, the regulators continue to consult.

***The European Commission***

The European Commission is conducting its own inquiry into retail banking services across the European Union.

In addition, a number of EU directives, including the Unfair Commercial Practices Directive, Acquisitions Directive and the Payment Services Directive are currently being implemented in the UK. The EU is also considering regulatory proposals for, inter alia, Consumer Credit, Mortgage Credit, Single European Payments Area, Retail Financial Services Review and capital adequacy requirements for insurance companies (Solvency II).

These investigations and any connected matters are likely to affect the industry and have an impact on the Lloyds TSB Group's business. Lloyds TSB Group is considering actions to mitigate any financial impact. The net effect from a product and cost/income perspective is currently under consideration. However the Lloyds TSB Group is presently unable to quantify with any reasonable certainty the aggregate cost or income implications in relation to the above inquiries.

**Regulation**

***Regulatory Requirements for UK Financial Services Institutions***

The cornerstone of the regulatory regime in the UK is the Financial Services and Markets Act 2000 ("FSMA") which came into force on 1 December 2001 (a date known as N2) and replaced much of the previous legislation under which banks, insurance companies and investment businesses had been authorised and supervised. In accordance with the provisions of the FSMA on 30 November 2001, the Financial Services Authority ("FSA") completed the process of assuming responsibility for the regulation and oversight of a wide range of financial services activities in the UK. Most recently these responsibilities have extended to include the regulation of mortgage lending, sales and administration (October 2004) and general insurance sales and administration (January 2005).

The FSA is responsible for the authorisation and supervision of institutions that provide regulated financial products and services as defined in the FSMA. As part of the authorisation process, the FSA reviews applicants to ensure that they satisfy the necessary criteria including honesty, competence and financial soundness, to engage in regulated activity. The majority of Lloyds TSB Group's regulated financial institutions became authorised by the FSA through being "grandfathered" as having been authorised under previous legislation to carry on financial services business. Following the new regulations that were introduced for mortgage and general insurance business, additional entities were authorised by the FSA.

***Other relevant legislation and regulation***

***Financial Ombudsman Service ("FOS")***

The FOS was established at N2 pursuant to the FSMA to provide customers with a free and independent service designed to resolve disputes where the customer is not satisfied with the response received from the regulated firm. The FOS resolves disputes that cover most financial products and services provided in (or from) the UK, from insurance and pension plans to bank accounts and investments, for eligible complainants, private individuals and small businesses, charities or trusts. The jurisdiction of FOS was extended in 2007 to include firms conducting activities under the Consumer Credit Act. Although the FOS takes account of relevant regulation and legislation, their guiding principle is to resolve cases on the basis of what is fair and reasonable; in this regard, the FOS is not bound by law or even its own precedent. The decisions made by the FOS are binding on firms.

*Banking Code Standards Board*

The Banking Code Standards Board monitors compliance with the Banking Code and the Business Banking Code. These Codes are voluntary codes agreed by UK banks and building societies that initially became effective in 1992, with several subsequent revisions, and which have been adopted by Lloyds TSB Group. The Banking Code and Business Banking Code define the responsibilities of the banks and building societies to their personal customers and smaller business customers respectively in connection with the operation of their UK accounts and set out minimum standards of service that these customers can expect from institutions which subscribe to the codes.

*Office of Fair Trading*

The OFT is responsible for regulating implementation of the Consumer Credit Act 1974 which regulates both brokerage and lending activities in the provision of personal secured and unsecured lending. The OFT is also responsible for regulating issues such as credit card default fees, payment protection insurance (in conjunction with the FSA), and payment services. The OFT may also refer investigations to the Competition Commission (an independent public body established by the Competition Act 1998).

*Information Commissioner's Office*

This office is responsible for overseeing implementation of the Data Protection Act 1998. This Act regulates, among other things, the retention and use of data relating to individual customers.

*European Union Impact for UK Financial Services Regulation*

Work continues on the Financial Services Action Plan which is intended to create a single market for financial services across the EU. The Lloyds TSB Group will continue to monitor the progress of these initiatives, provide specialist input on their drafting and assess the likely impact on its business.

EU directives, which are required to be implemented in EU member states through national legislation, have a strong influence over the framework for supervision and regulation of financial services in the UK. The directives aim to harmonise financial services regulation and supervision throughout the EU by setting minimum standards in key areas such as capital adequacy, access to financial markets, consumer protection and compensation schemes.

Financial institutions, such as those in the Lloyds TSB Group, are primarily regulated in their home state by a local regulator but the EU directives prescribe minimum criteria for the authorisation of such institutions and the prudential and conduct of business supervision applicable to them. Different directives require member states to give "mutual recognition" to each other's standards of regulation through the operation of a "passport" concept. This passport gives a financial institution which has been authorised in its 'home' state the freedom to establish branches in, and to provide cross-border services into, other member states without the need for additional local authorisation.

Key directives implemented in 2007, or currently being considered, include:

- Capital Requirements Directive – this came into effect on 1 January 2007 and implements Basel II throughout the EU for banks and investment firms. The final rules for the UK jurisdiction were published during 2006, resulting in substantial changes to the capital adequacy rules applying to the Lloyds TSB Group. The Group was fully involved in the consultative process with the regulatory authorities. The new framework covers three main areas:

    - Minimum capital requirements and methodologies for allocation of regulatory capital for credit and other risks including operational risk;

    - A supervisory review process, including the setting of capital ratios by bank supervisors; and

- Improvement of transparency in the financial system by reliable and timely disclosure of risk information.

See also, "Risk Management - Basel II" set out on page 51 of the Lloyds TSB Group plc Annual Report and Accounts 2007, as incorporated by reference.

- Markets in Financial Instruments Directive ("MiFID") – this is one of the key initiatives of the EU's Financial Services Action Plan. It came into effect in November 2007 and has replaced the 1996 Investment Services Directive. MiFID provides a framework of key regulations to be implemented into the domestic law of each EU member state in an effort to harmonise the conduct of investment business and the regulation of securities execution venues across the EEA. For example, MiFID:

  - Extended the coverage of the current regime in terms of both firms and products;

  - Introduced more extensive requirements, in particular in relation to conduct of business (both business operations and customer interaction); and

  - Detailed additional governance requirements, such as organisation of risk functions, outsourcing and conflicts of interest management.

- Third Money Laundering Directive – this came into effect in the UK on 17 December 2007 following enactment in the 2007 Money Laundering Regulations. It is designed to strengthen the fight against money laundering and terrorist financing and embodies the risk-based approach to anti-money laundering compliance. It provides a common EU basis for implementing the revised Financial Action Task Force ("FATF") Recommendations (issued in June 2003) and replaces the 1st and 2nd Money Laundering Directives. Although some enhancements to the Group's processes continue to be implemented, the Group believes its systems and controls were fully compliant with the requirements of the Directive by the implementation date. Changes arising through this Directive have been incorporated into a revised version of the UK's Joint Money Laundering Steering Group ("JMLSG") Guidance Notes.

A number of other EU directives, including the Unfair Commercial Practices Directive, the Acquisitions Directive and the Payment Services Directive are currently being implemented in the UK. The EU is also considering regulatory proposals for, inter alia, Consumer Credit, Mortgage Credit, the Single European Payments Area and capital adequacy requirements for insurance companies (Solvency II).

*US*

In the United States, Lloyds TSB Bank plc maintains a branch in New York and an agency in Miami, licensed by the States of New York and Florida, respectively. A subsidiary of Lloyds TSB Bank plc maintains representative offices in several US cities. The existence of branch and agency offices of Lloyds TSB Bank plc in the US subjects Lloyds TSB Group plc and its subsidiaries doing business or conducting activities in the US to oversight by the Federal Reserve Board and limits the nature of the activities in which Lloyds TSB Group plc and its subsidiaries can engage in the US. Lloyds TSB Bank plc's branch and agency offices are subject to extensive federal and state supervision and regulation relating to their operations, and the Group generally is expected to provide a measure of management and financial support and guidance to its US operations and activities. A major focus of US governmental policy relating to financial institutions in recent years has been combating money laundering and terrorist financing and enforcing compliance with US economic sanctions, with serious legal and reputational consequences for any failures arising in these areas.

*Rest of the world*

The Lloyds TSB Group operates in many other countries around the world. The Group's overseas branches and subsidiaries are subject to reporting and reserve requirements and controls imposed by the relevant central banks and regulatory authorities.

**Directors**

The directors of Lloyds TSB Group plc and of Lloyds TSB Bank plc, the business address of each of whom is 25 Gresham Street, London EC2V 7HN, England, and their respective principal outside activities, where significant to the Issuer, are as follows:

| Name | Principal outside activities |
|------|------------------------------|
| **Sir Victor Blank**<br>Chairman.......................................................... | A member of the Financial Reporting Council from 2002 to 2007 and a member of the Council of Oxford University from 2000 to 2007. A senior adviser to the Texas Pacific Group. Chairs two charities, Wellbeing of Women and UJS Hillel, as well as the Council of University College School. |

**Executive directors**

| | |
|------|------------------------------|
| **J. Eric Daniels**<br>Group Chief Executive ................................. | A non-executive director of BT Group (from 1 April 2008). |
| **Michael E. Fairey** (retiring on 30 June 2008)<br>Deputy Group Chief Executive .................................... | A non-executive director of The Energy Saving Trust and VTX Bidco. President of The British Quality Foundation and chairman of Race for Opportunity. |
| **Archie G. Kane**<br>Group Executive Director, Insurance and<br>Investments.................................................... | Chairman of the board of the Association of British Insurers. |
| **G. Truett Tate**<br>Group Executive Director, Wholesale &<br>International Banking.................................... | A non-executive director of BritishAmerican Business Inc. A member of the fund-raising board of the National Society for the Prevention of Cruelty to Children. |
| **Helen A. Weir CBE**<br>Group Executive Director, UK Retail Banking .......... | A non-executive director of Royal Mail Holdings. A member of the Said Business School Advisory Board and a former member of the Accounting Standards Board. |

**Non-executive directors**

| | |
|------|------------------------------|
| **Wolfgang C.G. Berndt**................................. | A non-executive director of Cadbury-Schweppes, GfK AG and Telekom Austria. |
| **Ewan Brown CBE FRSE** ........................... | A non-executive director of Noble Grossart and Stagecoach Group, senior governor of the Court of the University of St Andrews and vice chairman of the Edinburgh International Festival. A former chairman of tie and non-executive director of John Wood Group. |
| **Jan P. du Plessis**........................................... | Chairman of British American Tobacco. |
| **Philip N. Green** ........................................... | Chief Executive of United Utilities. A director of |

| Name | Principal outside activities |
|---|---|
| | Business in the Community, a member of the government's UK Commission for Employment and Skills and a trustee of the Philharmonia Orchestra. |
| **Sir Julian Horn-Smith** ................................................ | A non-executive director of Digicel Group, a member of the Altimo International advisory board and a senior adviser to UBS in relation to the global telecommunications sector. |
| **Lord Leitch** .................................................................. | Appointed chairman of Scottish Widows in 2007. Chairman of the government's Review of Skills (published in December 2006) and deputy chairman of the Commonwealth Education Fund. Chairman of BUPA and Intrinsic Financial Services and a non-executive director of Paternoster and United Business Media. |
| **Sir David Manning GCMG CVO** ............................ | Joined the board on 1 May 2008. |

None of the directors of Lloyds TSB Group plc and of Lloyds TSB Bank plc have any actual or potential conflict between their duties to Lloyds TSB Group plc or Lloyds TSB Bank plc and their private interests or other duties as listed above.

# TAXATION

*The following discussion is a summary of the current taxation treatment of payments of interest on the Capital Securities under tax law in each of the United Kingdom, Luxembourg, The Netherlands, Spain, Portugal and Ireland. The discussion does not purport to be a comprehensive description of all tax considerations which may be relevant to a decision to purchase Capital Securities. The discussion is based on the tax laws of each of the United Kingdom, Luxembourg, The Netherlands, Spain, Portugal and Ireland and the published practice of their taxation authorities as in effect on the date of this Prospectus, which are subject to change, possibly with retroactive effect. The discussion does not consider any specific facts or circumstances that may apply to a particular Holder and relates only to the position of persons who are absolute beneficial owners of their Capital Securities and may not apply to certain classes of persons such as dealers or certain professional investors. The discussion does not necessarily apply where the income is deemed for tax purposes to be the income of any other person. Holders who are in any doubt as to their tax position or who may be subject to tax in a jurisdiction other than those discussed should consult their professional advisers.*

## United Kingdom Taxation

For so long as the Capital Securities continue to be listed on a "recognised stock exchange" within the meaning of section 1005 of the Income Tax Act 2007, payments of interest on the Capital Securities may be made without withholding or deduction for or on account of United Kingdom tax. The London Stock Exchange is a recognised Stock Exchange for these purposes. Securities will be treated as listed on the London Stock Exchange if they are admitted to the Official List by the United Kingdom Listing Authority and are admitted to trading on the London Stock Exchange.

Interest on the Capital Securities may also be paid without withholding or deduction on account of United Kingdom tax where interest on the Capital Securities is paid to a person who belongs in the United Kingdom for United Kingdom tax purposes and, at the time the payment is made, the Issuer reasonably believes (and any person by or through whom interest on the Capital Securities is paid reasonably believes) that the beneficial owner is within the charge to United Kingdom corporation tax as regards the payment of interest, provided that HM Revenue & Customs has not given a direction (in circumstances where it has reasonable grounds to believe that it is likely that the above exemption is not available in respect of such payment of interest at the time the payment is made) that the interest should be paid under deduction of tax.

In other cases, interest will generally be paid under deduction of income tax at the savings rate (currently 20 per cent. (or if the Finance Bill 2008 is enacted in its current form, the basic rate which would also be 20 per cent.)), subject to any direction to the contrary from HM Revenue & Customs in respect of such relief as may be available pursuant to the provisions of any applicable double taxation treaty.

Persons in the United Kingdom paying interest to or receiving interest on behalf of another person may be required to provide certain information to HM Revenue & Customs regarding the identity of the payee or person entitled to the interest and, in certain circumstances, such information may be provided to the tax authorities in other countries.

Where interest on the Capital Securities has been paid under deduction of United Kingdom income tax, Capital Security Holders who are not resident in the United Kingdom may be able to recover all or part of the tax deducted if there is an appropriate provision in an applicable double taxation treaty.

The interest on the Capital Securities will have a United Kingdom source and, accordingly, subject as set out below, may be chargeable to United Kingdom tax by direct assessment even if paid without withholding or deduction. However, such interest received without deduction or withholding is not chargeable to United

Kingdom tax in the hands of a Holder who is not resident for tax purposes in the United Kingdom unless the Holder carries on a trade, profession or vocation in the United Kingdom through a branch or agency or, in the case of a corporate holder, a permanent establishment in the United Kingdom in connection with which the interest is received or to which the Capital Securities are attributable in which case (subject to exemptions for certain categories of agent) tax may be levied on the United Kingdom branch or agency or permanent establishment.

Holders should be aware that the provisions relating to additional payments referred to in Condition 11 of "Terms and Conditions of the Capital Securities" would not apply if HM Revenue & Customs sought to assess the person entitled to the relevant interest on any Capital Security directly to United Kingdom income tax.

However, exemption from or reduction of such United Kingdom tax liability might be available under an applicable double taxation treaty.

## Luxembourg Taxation

Under Luxembourg tax law currently in effect and with the possible exception of interest paid to individual holders of Capital Securities and to certain residual entities, there is no Luxembourg withholding tax on payments of interest (including accrued but unpaid interest). There is also no Luxembourg withholding tax, with the possible exception of payments made to individual holders of Capital Securities and to certain residual entities, upon repayment of principal in case of reimbursement, redemption, repurchase or exchange of the Capital Securities.

*Taxation of Luxembourg non-residents*

Under the Luxembourg laws dated 21 June 2005 implementing the European Council Directive 2003/48/EC regarding the taxation of savings income (the "Savings Directive") and several agreements concluded between Luxembourg and certain dependent or associated territories of the European Union ("EU"), a Luxembourg-based paying agent (within the meaning of the Savings Directive) is required to withhold tax on interest and other similar income paid by it to (or under certain circumstances, to the benefit of) an individual resident in another Member State or in certain EU dependent or associated territories, unless the beneficiary of the interest payments elects for the procedure of exchange of information or for the tax certificate procedure. The same treatment will apply to payments of interest and other similar income made to certain ''residual entities'' within the meaning of Article 4.2 of the Savings Directive established in a Member State or in certain EU dependent or associated territories (i.e., entities which are not legal persons (the Finnish and Swedish companies listed in Article 4.5 of the Savings Directive are not considered as legal persons for this purpose), whose profits are not taxed under the general arrangements for the business taxation, that are not UCITS recognised in accordance with the Council Directive 85/611/EEC or similar collective investment funds located in Jersey, Guernsey, the Isle of Man, the Turks and Caicos Islands, the Cayman Islands, Montserrat or the British Virgin Islands and have not opted to be treated as UCITS recognised in accordance with the Council Directive 85/611/EEC). The withholding tax rate is initially 15 per cent., increasing to 20 per cent. (as from 1 July 2008) and to 35 per cent. (as from 1 July 2011). The withholding tax system will only apply during a transitional period, the ending of which depends on the conclusion of certain agreements relating to information exchange with certain third countries.

*Taxation of Luxembourg residents*

Interest payments made by Luxembourg paying agents (defined in the same way as in the Savings Directive) to Luxembourg individual residents are subject to a 10 per cent. withholding tax.

## Netherlands Taxation

Under current Dutch law all payments made under the Capital Securities may be made free from withholding or deduction of or for any taxes of whatever nature imposed, levied, withheld or assessed by the Netherlands or any political subdivision or taxing authority thereof or therein, provided that at that time the Issuer will not be regarded as tax resident in the Netherlands for the purpose of the Dutch Dividend Tax Act 1965 (*Wet op de dividendbelasting 1965*).

## Spanish Taxation

The statements herein regarding withholding taxes in Spain are based on the laws in force in Spain as of the date of this Prospectus and are subject to any changes in law. The following summary does not purport to be a comprehensive description of all the tax considerations which may be relevant to a decision to purchase, own or dispose of the Capital Securities. Each prospective holder or beneficial owner of the Capital Securities should consult its tax advisor as to the Spanish tax consequences of the ownership and disposition of the Capital Securities.

*Spanish resident individuals*

As regards income obtained by Spanish resident individuals under the Capital Securities, no Spanish withholding taxes should be deducted by the Issuer if it is a UK tax resident entity which does not have a permanent establishment in Spain. In such case, the withholding tax regime will be as follows:

(i) Interest paid to Holders who are Spanish resident individuals will be subject to Spanish withholding tax at 18 per cent. to be deducted by the depositary entity of the Capital Securities or the entity in charge of collecting the income derived thereunder, provided such entities are resident for tax purposes in Spain or have a permanent establishment in the Spanish territory.

(ii) Income obtained upon transfer of the Capital Securities will be subject to Spanish withholding tax at 18 per cent. to be deducted by the financial entity acting on behalf of the seller, provided such entity is resident for tax purposes in Spain or has a permanent establishment in the Spanish territory.

(iii) Income obtained upon redemption of the Capital Securities will be subject to Spanish withholding tax at 18 per cent. to be deducted by the financial entity appointed by the Issuer (if any) for redemption of the Capital Securities, provided such entity is resident for tax purposes in Spain or has a permanent establishment in the Spanish territory.

*Spanish resident corporations*

Taking into account that the Capital Securities will be listed on an OECD market, income obtained thereunder by Spanish resident corporations will be exempt from Spanish withholding taxes.

## Portuguese Taxation

### Portuguese resident individuals

*Personal Income Tax ("Imposto sobre o Rendimento das Pessoas Singulares") ("IRS")*

Income arising to Portuguese resident individuals from the holding or redemption of the Capital Securities, as well as income accrued but not yet due at the date of a transfer of the Capital Securities, should qualify as "interest", within the broader investment income category, and be subject to IRS at a final flat 20 per cent. rate.

In case interest arising from the Capital Securities is paid by a Portuguese paying agent, IRS at a 20 per cent. flat rate will be withheld. In this case, a Portuguese resident individual, unless deriving such income in the capacity of an entrepreneur with organised accounts, may choose to declare such income in his or her tax return, together with the remaining items of income derived. If such election is made, all income of the same category must be declared and subject to IRS according to the relevant tax brackets, up to 42 per cent., and the domestic withholding tax suffered will constitute a payment in advance of such final IRS liability. Foreign withholding tax suffered, if any, will be considered as a tax credit against the final IRS liability. Otherwise, the 20 per cent. withholding tax suffered constitutes the final liability and the income does not need to be disclosed in the tax return.

In case investment income in connection with the Capital Securities is not paid by a Portuguese paying agent, no Portuguese withholding tax will apply. A Portuguese resident individual must declare the relevant income in his or her tax return and either subject it to the final flat 20 per cent. rate or aggregate it with the remaining elements of income (in which case all income of the same category should be aggregated) and subject the global amount to IRS according to the relevant tax brackets, up to 42 per cent. Only in this latter alternative may any foreign withholding tax suffered be considered as a tax credit against the final IRS liability.

Since the Capital Securities should qualify as debt instruments under Portuguese law, capital gains arising from their transfer or exchange (computed as the gain, deducted of interest accrued but not yet due at the date of a transfer) are not subject to IRS. If the tax authorities successfully challenge such classification, capital gains made with the transfer or exchange of the Capital Securities are subject to tax at a 10 per cent. flat rate. In such case, Portuguese resident individuals may elect to include such capital gains within their overall income, in which case said income will be subject to IRS at marginal rates up to 42 per cent. No Portuguese withholding tax is levied on capital gains.

### *Portuguese resident corporate and other legal entities*

*Corporate Income Tax ("Imposto sobre o Rendimento das Pessoas Colectivas") ("IRC")*

Any income derived by Portuguese corporate and other legal entities in relation with the Capital Securities will be included in their IRC taxable income in accordance with applicable IRC legislation. The general IRC rate is of 25 per cent., and a municipal surcharge of up to 1.5 per cent., depending on the municipality, may be imposed (thus resulting in a maximum aggregate rate of 26.5 per cent.) on the taxable profit. The municipal surcharge is imposed on the taxable profit of the year, irrespective of any losses carried forward.

## Irish Taxation

Under Irish tax law, there is no obligation on the Issuer to operate any withholding tax on payments of interest on the Capital Securities except where the interest has an Irish source. The interest could be considered to have an Irish source, where, for example, interest is paid out of funds maintained in Ireland, but in any event no withholding would apply if the Capital Securities are listed on a recognised stock exchange, such as the London Stock Exchange. The mere offering of the Capital Securities to Irish investors will not cause the interest to have an Irish source.

In certain circumstances, collection agents and other persons receiving interest on the Capital Securities in Ireland on behalf of an Irish resident investor will be obliged to operate a withholding tax.

## EU Directive on the Taxation of Savings Income

The EU has adopted a Directive regarding the taxation of savings income. The Directive requires Member States to provide to the tax authorities of other Member States details of payments of interest and other similar

income paid by a person to an individual or to certain other persons in another Member State, except that Austria, Belgium and Luxembourg may instead impose a withholding system for a transitional period unless during such period they elect otherwise. A number of non-EU countries and territories including Switzerland have adopted similar measures (a withholding system in Switzerland).

# FORM OF FINAL TERMS

## Final Terms

**Lloyds TSB Bank plc Fixed Rate Perpetual Capital Securities ("Capital Securities")**

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions of the Capital Securities set forth in the Prospectus dated 9 May 2008 which constitutes a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC) (the "Prospectus Directive"). This document constitutes the Final Terms of the Capital Securities described herein for the purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with the Prospectus. Full information on the Issuer and the offer of the Capital Securities is only available on the basis of the combination of these Final Terms and the Prospectus. The Prospectus is available for viewing at the offices of the Paying Agents.

| | |
|---|---|
| Issue Date: ................................................................ | [*insert*] |
| Issue Price per Capital Security: .................................... | [*insert*] |
| Relevant Currency:....................................................... | [*insert*] |
| Denomination of the Capital Securities:........................... | [*insert*] |
| Day Count Fraction:...................................................... | [*insert*] |
| Relevant Financial Centre:............................................. | [*insert*] |
| Coupon Rate:............................................................... | [*insert*] per cent. per annum |
| Coupon Payment Dates: ............................................... | [*insert*] |
| Aggregate Principal Amount of Capital Securities:............ | [*insert*] |
| First Call Date: ........................................................... | [*insert*] |
| Net Proceeds:.............................................................. | [*insert*] |
| ISIN:.......................................................................... | [*insert*] |
| Common Code: ........................................................... | [*insert*] |
| Ratings: ..................................................................... | [*insert*] |
| | |
| Other terms: ............................................................... | [*insert*] |
| Use of Proceeds:......................................................... | [*insert*] |

The above pricing gives a yield of [*insert details*]. Such yield is applicable as of the date of these Final Terms and may fluctuate in the future.

## TERMS AND CONDITIONS OF THE PUBLIC OFFER

The Capital Securities may be offered by certain banks, financial intermediaries and other authorised entities to the public in certain jurisdictions in the European Economic Area, including Ireland, Spain, Portugal, Luxembourg and The Netherlands in accordance with the following terms and conditions:

The time period, including any possible amendments, during which the offer will be open and description of the applications

**Start of the offer period:**

In respect of any jurisdiction, not earlier than the date on which all requirements necessary to enable

| | |
|---|---|
| The time period, including any possible amendments, during which the offer will be open and description of the applications process: | **Start of the offer period:**<br>In respect of any jurisdiction, not earlier than the date on which all requirements necessary to enable any such offer in any such jurisdiction to be made in accordance with all applicable laws, rules and regulations in such jurisdiction, being [      ].<br><br>**End of the offer period:**<br>No later than the Issue Date.<br>Investors will be notified by the relevant Manager or any placers of their allocations of Capital Securities and the settlement arrangements in respect thereof as soon as practicable after the end of the offer period. |
| Conditions to which the offer is subject: | The issue of the Capital Securities is subject to certain conditions precedent customary for transactions of this type (including issue of the Capital Securities and delivery of legal opinions) as set out in the Subscription Agreement. The Managers are entitled in certain circumstances to be released and discharged from their obligations under the Subscription Agreement prior to the issue of the Capital Securities. |
| A description of the possibility to reduce subscriptions and the manner for refunding excess amount paid by applicants: | [Not Applicable] |
| Details of the minimum and/or maximum amount of application, (whether in number of Capital Securities or aggregate amount to invest): | [Not Applicable] |
| Method and time limits for paying up the Capital Securities and for delivery of the Capital Securities: | The Capital Securities will be issued on the Issue Date against payment to the Issuer of the net subscription moneys. Investors will be notified by the relevant Manager or any placers of their allocations of Capital Securities and the settlement arrangements in respect thereof. |
| A full description of the manner and date in which results of the offer are to be made public: | [Not Applicable] |
| The procedure for the exercise of any right of | [Not Applicable] |

The various categories of potential investors to which the Capital Securities are offered:

Upon approval of the Prospectus for use in connection with public offers, such offers may be made in Ireland, Spain, Portugal, Luxembourg and The Netherlands to any person. Until such time in such countries, and at all times in other EEA countries, offers will only be made by the Managers pursuant to an exemption under the Prospectus Directive as implemented in the relevant countries.

Process for notification to applicants of the amount allotted and indication whether dealing may begin before notification is made:

Investors will be notified by the relevant Manager or placer of their allocations of Capital Securities.

An indication of the expected price at which the Capital Securities will be offered or the method of determining the price and the process for its disclosure. Indicate the amount of any expenses and taxes specifically charged to the subscriber or purchaser:

The Capital Securities will be issued at the Issue Price specified herein. Any investor intending to acquire any Capital Securities from a bank, financial intermediary or other entity (other than a Manager in its capacity as such) will do so in accordance with any terms and other arrangements in place between the seller or placer and such investor, including as to price, allocations and settlement arrangements. The Issuer will not be a party to such arrangements with investors, and accordingly investors must obtain such information from the relevant seller or placer.

Name and address of the Authorised Offerors (to the extent known) and, to the extent known to the Issuer or to the offeror, of the placers in the various countries where the offer takes place:

The offer will be made by licensed banks, financial intermediaries and other entities duly authorised in the relevant jurisdictions.

Name and address of any paying agents and depositary agents in each country:

[The name and address of the paying agents with respect to the Capital Securities are set out at the end of this Prospectus and the names and addresses of any depositary agents are [●].]

Name and address of the entities agreeing to underwrite the issue on a firm commitment basis, and name and address of the entities agreeing to place the issue without a firm commitment or under "best efforts" arrangements. Indication of the material features of the agreements, including the quotas. Where not all of the issue is underwritten, a statement of the portion not covered. Indication of the overall amount of the underwriting commission and of the placing commission:

The Managers, pursuant to a Subscription Agreement, agreed to procure subscribers, failing which, to subscribe and pay for the Capital Securities at the Issue Price specified herein. The Subscription Agreement provides that the Issuer will pay the Managers a [combined management, selling and underwriting commission] of [        ] See "Subscription and Sale" below.

The addresses of the Managers are set out at the end of the Prospectus.

When the underwriting agreement has been or will be reached:

The Subscription Agreement will be dated on or around the date of these Final Terms.

**LISTING AND ADMISSION TO TRADING APPLICATION**

These Final Terms comprise the final terms required to list and have admitted to trading the issue by the Issuer of the Capital Securities described herein.

**NOTIFICATION**

The UK Listing Authority has provided the competent authorities in Ireland, Spain, Portugal, Luxembourg and The Netherlands with a certificate of approval attesting that the Prospectus has been drawn up in accordance with the Prospectus Directive.

**INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE OFFER**

So far as the Issuer is aware, no person involved in the offer of the Capital Securities has an interest material to the offer.

**RESPONSIBILITY**

The Issuer accepts responsibility for the information contained in these Final Terms.

The date of these Final Terms is [*insert*].

Signed on behalf the Issuer

By: …………………………………………………..

*Duly Authorised*

# SUBSCRIPTION AND SALE

Under a subscription agreement to be entered into with the Issuer and the Parent on the date of the Final Terms (the "Subscription Agreement"), BNP Paribas, Lloyds TSB Bank plc, Merrill Lynch International and UBS Limited (together, the "Managers") will agree, jointly and severally, to subscribe the Capital Securities at the Issue Price. The Issuer will separately pay to the Managers a selling concession and a combined management and underwriting commission, as set out in the relevant Final Terms. In addition, the Issuer will agree to reimburse the Managers for certain of their expenses, and has agreed to indemnify the Managers against certain liabilities incurred, in connection with the issue of the Capital Securities. The Subscription Agreement will entitle the Managers to terminate it in certain circumstances prior to payment being made to the Issuer. The Issuer, the Parent and the Managers have also entered into a Prospectus Confirmation Agreement dated the date hereof, for the purposes of, inter alia, agreeing to the terms of the restrictions set out below.

## United States

The Capital Securities have not been and will not be registered under the US Securities Act of 1933, as amended (the "Securities Act"), and may not be offered or sold within the United States or to, or for the account or benefit of, US persons except in certain transactions exempt from the registration requirements of the Securities Act. Terms used in this paragraph have the meanings given to them by Regulation S under the Securities Act.

The Capital Securities are subject to US tax law requirements and may not be offered, sold or delivered within the United States or its possessions or to a US person, except in certain transactions permitted by US tax regulations. Terms used in this paragraph have the meanings given to them by the US Internal Revenue Code of 1986 and regulations thereunder.

Each Manager has agreed that, except as permitted by the Subscription Agreement, it will not offer, sell or deliver Capital Securities (i) as part of their distribution at any time, or (ii) otherwise until 40 days after the later of the commencement of the offering and the Issue Date (as defined in the Subscription Agreement), within the United States or to, or for the account or benefit of, US persons, and that it will have sent to each dealer to which it sells Capital Securities during the distribution compliance period a confirmation or other notice setting forth the restrictions on offers and sales of Capital Securities within the United States or to, or for the account or benefit of, US persons.

In addition, until 40 days after the commencement of the offering, an offer or sale of Capital Securities within the United States by a dealer that is not participating in the offering may violate the registration requirements of the Securities Act.

## Public Offer Selling Restriction under the Prospectus Directive

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each Manager has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of Capital Securities which are the subject of the offering contemplated by this Prospectus to the public in that Relevant Member State other than the offers contemplated in the Prospectus (as completed by the relevant Final Terms) in Spain, Portugal, The Netherlands, Ireland and Luxembourg from the time the Prospectus has been approved by the competent authority in the United Kingdom and published and notified to the relevant competent authorities in accordance with the Prospectus Directive as implemented in Spain, Portugal, The Netherlands, Ireland and

Luxembourg until the Issue Date specified in the relevant Final Terms (or such later issue date as the Issuer may permit), except that it may, with effect from and including the Relevant Implementation Date, make an offer of such Capital Securities to the public in that Relevant Member State:

(a)     to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

(b)     to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000; and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

(c)     to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of BNP Paribas on behalf of the Managers; or

(d)     in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of Capital Securities shall require the Issuer or any Manager to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of Capital Securities to the public" in relation to any Capital Securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Capital Securities to be offered so as to enable an investor to decide to purchase or subscribe the Capital Securities, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

## United Kingdom

Each Manager has represented and agreed that:

(a)     it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue or sale of the Capital Securities in circumstances in which Section 21(1) of the FSMA does not apply to the Issuer; and

(b)     it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Capital Securities in, from or otherwise involving the United Kingdom.

## Ireland

Each Manager has represented and agreed that:

(a)     it will not underwrite the issue of, or place the Capital Securities, otherwise than in conformity than with the provisions of S.I. No. 60 of 2007, European Communities (Markets in Financial Instruments) Regulations 2007 (MiFID Regulations), including, without limitation, Parts 6, 7, and 12 thereof;

(b)     it will not underwrite the issue of, or place, the Capital Securities, otherwise than in conformity with the provisions of the Irish Central Bank Acts 1942 – 2004 (as amended) and any codes of conduct rules made under Section 117(1) thereof;

(c)     it will not underwrite the issue of, or place, or do anything in Ireland in respect of the Capital Securities otherwise than in conformity with the provisions of the Irish Prospectus (Directive

2003/71/EC) Regulations 2005 and any rules issued under Section 51 of the Irish Investment Funds, Companies and Miscellaneous Provisions Act 2005, by the Irish Central Bank and Financial Services Regulatory Authority (IFSRA); and

(d)    it will not underwrite the issue of, place or otherwise act in Ireland in respect of the Capital Securities, otherwise than in conformity with the provisions of the Irish Market Abuse (Directive 2003/6/EC) Regulations 2005 and any rules issued under Section 34 of the Irish Investment Funds, Companies and Miscellaneous Provisions Act 2005 by IFSRA.

## Singapore

Each Manager has acknowledged that this Prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, each Manager has represented and agreed, that it has not offered or sold any Capital Securities or caused such Capital Securities to be made the subject of an invitation for subscription or purchase and will not offer or sell such Capital Securities or cause such Capital Securities to be made the subject of an invitation for subscription or purchase, and has not circulated or distributed, nor will it circulate or distribute, this Prospectus or any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of such Capital Securities, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where Capital Securities are subscribed or purchased under Section 275 by a relevant person which is:

(a)    a corporation (which is not an accredited investor) (as defined in Section 4A of the SFA) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)    a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within 6 months after that corporation or that trust has acquired the Capital Securities pursuant to an offer made under Section 275 except:

(i)    to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person defined in Section 275(2) of the SFA, or to any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the SFA;

(ii)   where no consideration is or will be given for the transfer; or

(iii)  where the transfer is by operation of law.

## Hong Kong

Each Manager has represented and agreed that:

(i)    it has not offered or sold and will not offer or sell in Hong Kong, by means of any document, any Capital Securities other than (a) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under that Ordinance; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance; and

(ii)   it has not issued or had in its possession for the purposes of issue, and will not issue or have in its possession for the purposes of issue, whether in Hong Kong or elsewhere, any advertisement, invitation or document relating to the Capital Securities which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to Capital Securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance and any rules made under that Ordinance.

## General

Except as provided below, no action has been or will be taken in any country or any jurisdiction by any Manager or the Issuer that would, or is intended to, permit a public offering of the Capital Securities, or possession or distribution of this Prospectus or any other offering or publicity material relating to the Capital Securities, in any country or jurisdiction where action for that purpose is required. Each Manager has represented and agreed that it will, to the best of its knowledge and belief, comply with all applicable laws, regulations and directives in each jurisdiction in which it purchases, offers, sells or delivers Capital Securities or has in its possession or distributes this Prospectus or any Final Terms or any other offering material relating to the Capital Securities, in all cases at its own expense, and that it will obtain any consent, approval or permission required by it for the purchase, offer, sale or delivery by it of any Capital Securities under the laws, regulations and directives in force in any jurisdiction to which it is subject or in which it makes such purchases, offers, sale or deliveries.

Other persons into whose hands this Prospectus or the Final Terms come are required by the Issuer, the Parent and each Manager to comply with all applicable laws and regulations in each country or jurisdiction in or from which they purchase, offer, sell or deliver Capital Securities or possess, distribute or publish the Prospectus or Final Terms or any related offering or publicity material, in all cases at their own expense.

## Public Offer

Offers may be made by Offerors authorised to do so by the Issuer in Ireland, Spain, Portugal, Luxembourg and The Netherlands (the "Public Offer Jurisdictions") to any person. In addition to the applications described in this Prospectus, the Issuer may, on or after the date of this Prospectus, make applications for one or more further certificates of approval under Article 18 of the Prospectus Directive to be issued by the FSA to the competent authority in any Member State. In other EEA countries, offers will only be made pursuant to an exemption from the obligation under the Prospective Directive as implemented in such countries to publish a prospectus. Offers of the Capital Securities are conditional upon their issue and the Capital Securities will be issued on the Issue Date against payment to the Issuer of the subscription moneys.

The Managers may offer Capital Securities to certain licensed banks, financial intermediaries and other authorised entities nominated on behalf of the Issuer by the Managers. The Issuer retains responsibility for the Prospectus under section 90 of the FSMA in relation to offers of the Capital Securities to investors in the Public Offer Jurisdictions during the period from the date on which this Prospectus has been passported to the

Public Offer Jurisdictions until the Issue Date (the "Offer Period") by any Offeror separately notified to and approved by the Issuer who has received a distribution confirmation from the Managers (any such Offeror, an "Authorised Offeror") setting out the basis upon which such Authorised Offeror may distribute Capital Securities as an Authorised Offeror during the Offer Period. Any such offers are not made on behalf of the Issuer or any other Authorised Offeror and neither the Issuer nor any other Authorised Offeror makes any representation as to the compliance by any Authorised Offerors with applicable conduct of business rules or other local regulatory requirements or other securities law requirements in relation to such offer. Neither the Issuer nor any other Authorised Offeror has any responsibility or liability for the actions of such Authorised Offerors. An offer of the Capital Securities may be made by the Managers, the Distributors (if any) named in the Final Terms and the Authorised Offerors other than pursuant to Article 3(2) of the Prospective Directive in the Public Offer Jurisdictions during the Offer Period.

# GENERAL INFORMATION

(1) The listing of the Capital Securities on the Official List will be expressed as a percentage of their nominal amount (exclusive of accrued interest). It is expected that listing of the Capital Securities on the Official List and admission of the Capital Securities to trading on the Market will be granted on or before the Issue Date (as set out in the relevant Final Terms), subject only to the issue of a temporary or permanent Global Capital Security. Prior to official listing and admission to trading, however, dealings will be permitted by the London Stock Exchange in accordance with its rules. Transactions will normally be effected for delivery on the third working day after the day of the transaction.

(2) The issue of the Capital Securities by the Issuer has been duly authorised by resolutions of the Board of Directors of the Issuer passed on 25 January 2008.

(3) The Capital Securities have been accepted for clearance through the Euroclear and Clearstream, Luxembourg systems (which are the entities in charge of keeping the records) with a Common Code as set out in the relevant Final Terms. The International Securities Identification Number (ISIN) for the Capital Securities will be set out in the relevant Final Terms.

The address of Euroclear is 1 Boulevard du Roi Albert II, B-1210 Brussels, Belgium and the address of Clearstream, Luxembourg is 42 Avenue JF Kennedy L-1855 Luxembourg.

(4) All Capital Securities and Coupons will carry a legend to the following effect "Any United States person who holds this obligation will be subject to limitations under the United States income tax laws, including the limitations provided in sections 165(j) and 1287(a) of the Internal Revenue Code". The sections referred to in such legend provide that United States persons, with certain exceptions, will not be entitled to deduct any loss, and will not be entitled to capital gains treatment with respect to any gain, realised on any sale, exchange or redemption of a Capital Security or Coupon.

(5) Save as disclosed in (1) "Lloyds TSB Group - Competitive environment" on page 61 hereof regarding various actions by the OFT and the impact they may have on Lloyds TSB Group's business and (2) "Contingent liabilities and commitments - Legal proceedings" in note 46 on page 132 of the Lloyds TSB Group plc Annual Report and Accounts 2007 as incorporated by reference, neither the Issuer nor any of its subsidiaries is or has been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Issuer is aware) during the 12 months preceding the date of this Prospectus which may have or have had in the recent past a significant effect on Lloyds TSB Bank Group's financial position or profitability.

(6) Save as disclosed in the second, third and fourth bullet points under "Lloyds TSB Group - Recent Developments" on pages 59 to 60 hereof, there has been no significant change in the financial or trading position and no material adverse change in the prospects of the Lloyds TSB Bank Group since 31 December 2007.

(7) For the period of 12 months starting on the date on which this Prospectus is made available to the public, copies of the following documents will be available, during usual business hours on any weekday (Saturdays and public holidays excepted), for inspection at the office of Lloyds TSB Bank plc, 25 Gresham Street, London EC2V 7HN:

(a) the memorandum and articles of association of the Issuer;

(b) the Trust Deed;

(c) the Subscription Agreement

(d)    the Paying Agency Agreement;

(e)    the annual report and accounts of the Issuer for the two years ending 31 December 2006 and 31 December 2007; and

(f)    a copy of this Prospectus together with any Supplement to this Prospectus or further Prospectus.

(8)    PricewaterhouseCoopers LLP, Chartered Accountants and Registered Auditors, (members of the Institute of Chartered Accountants in England and Wales) have audited, and rendered unqualified audit reports on, the annual consolidated published accounts of the Issuer and its subsidiaries for the two financial years ended 31 December 2006 and 31 December 2007.

(9)    Certain of the Managers and their affiliates have engaged, and may in the future engage, in investment banking and/or commercial banking transactions with, and may perform services to the Issuer and its affiliates in the ordinary course of business.

(10)    The Issuer's share capital is comprised of 1,541,680,932 £1 ordinary shares and 100 £1 6 per cent. non-cumulative redeemable preference shares.

(11)    The Issuer has paid the following dividends on its ordinary shares for the previous five years:

|  | Interim Dividend (pence per ordinary share) | Final Dividend (pence per ordinary share) |
|---|---|---|
| 2007 | 41.0 | 105.1 |
| 2006 | 39.0 | 85.9 |
| 2005 | 38.9 | 85.4 |
| 2004 | 38.9 | 85.2 |
| 2003 | 38.7 | 85.2 |

**REGISTERED OFFICE OF THE ISSUER**

**Lloyds TSB Bank plc**
25 Gresham Street
London EC2V 7HN

**REGISTERED OFFICE OF THE PARENT**

**Lloyds TSB Group plc**
Henry Duncan House
120 George Street
Edinburgh EH2 4LH

**MANAGERS**

**BNP Paribas**
10 Harewood Avenue
London NW1 6AA

**Lloyds TSB Bank plc**
**LTSB Corporate Markets**
10 Gresham Street
London EC2V 7AE

**Merrill Lynch International**
Merrill Lynch Financial Centre
2 King Edward Street
London EC1A 1HQ

**UBS Limited**
1 Finsbury Avenue
London EC2M 2PP

**TRUSTEE**

**The Law Debenture Trust Corporation p.l.c.**
Fifth Floor, 100 Wood Street
London EC2V 7EX

**PRINCIPAL PAYING AGENT**

**Citibank, N.A., London Branch**
Citigroup Centre
Canada Square
Canary Wharf
London E14 5LB

**PAYING AGENT**

**Citibank International plc**
1 North Wall Quay
Dublin 1
Ireland

**LEGAL ADVISERS**

**To the Issuer as to English law**

**Linklaters LLP**
One Silk Street
London EC2Y8HQ

**To the Managers and the Trustee as to English law**

**Allen & Overy LLP**
One Bishops Square
London E1 6AD

**AUDITORS**

**PricewaterhouseCoopers LLP**
Savannah House
3 Ocean Way
Ocean Village
Southampton SO14 3TJ