# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x

PASHA ANWAR, et al.,      )
                          )
               Plaintiffs,      )
                          )
         v.                   )
                          )
FAIRFIELD GREENWICH LIMITED, et al.,      )      Master File No. 09-CV-118 (VM)
                          )
              Defendants.      )
                          )
This Document Relates To: *Bhatia* v. *Standard*    )
*Chartered International (USA) Ltd.*, No. 09-CV-2410; )
*Tradewaves Ltd.* v. *Standard Chartered International* )
*(USA) Ltd.*, No. 09-CV-9423      )

----------------------------------------------------------------- x

**MEMORANDUM OF LAW OF STANDARD CHARTERED
INTERNATIONAL (USA) LTD. AND STANDARD CHARTERED PLC IN
SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINTS
PURSUANT TO FED. R. CIV. P. 12(b)(1), 12(b)(3), 12(b)(6) AND THE DOCTRINE OF
<u>FORUM NON CONVENIENS (CORRECTED COPY)</u>**

Sharon L. Nelles (SN-3144)
Bradley P. Smith (BS-1383)
Patrick B. Berarducci (PB-2222)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
nelless@sullcrom.com

Diane L. McGimsey
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067

*Attorneys for Defendants Standard
Chartered International (USA) Ltd.
and Standard Chartered PLC*

March 11, 2010

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................5

      A.    The Standard Chartered Entities ...............................................5

      B.    The Terms of Plaintiffs' Accounts.............................................7

      C.    Plaintiffs' Investments in Fairfield Sentry ................................11

      D.    *Bhatia* Plaintiffs' Investments in the Lloyds Bonds ..................14

THE COMPLAINTS ...............................................................................................14

      A.    Plaintiffs' Fairfield Sentry Claims ............................................15

      B.    *Bhatia* Plaintiffs' Lloyds Bonds Claims ..................................17

ARGUMENT ........................................................................................................19

I.     PLAINTIFFS ARE REQUIRED TO BRING THEIR CASE IN
      SINGAPORE. .............................................................................................21

      A.    Plaintiffs' Claims Can Be Brought Only in Singapore Under
           the Binding Forum Selection Clause in Their Contracts ..........21

      B.    Application of the Forum Non Conveniens Doctrine
           Likewise Favors Litigation in Singapore ..................................23

II.    THESE CASES SHOULD BE DISMISSED ON THE MERITS
      BECAUSE PLAINTIFFS FAIL TO STATE A VIABLE CAUSE OF
      ACTION .....................................................................................................27

      A.    Plaintiffs Cannot Hold SC PLC Liable for the Alleged
           Actions of its Subsidiaries .......................................................27

      B.    Plaintiffs Cannot Assert a Cause of Action under the Federal
           Securities Laws Because Their Claims Do Not Have
           Sufficient Connection to the United States.................................28

      C.    Plaintiffs Fail to State a Claim Under Section 10(b) and Rule
           10b-5. ......................................................................................30

D.     Plaintiffs' Remaining Federal Law Claims Under Section 20(a) of the Exchange Act and Sections 206 and 215 of the Investment Advisers Act Fail...................................................37

E.     Plaintiffs' Common-Law Claims Fail Both Because They Are Preempted and Because Plaintiffs Do Not Allege Facts Sufficient to State a Claim ........................................................38

F.     The Exculpation Provisions in Plaintiffs' Account Agreements Bar All Claims That Do Not Involve Intentional or Reckless Conduct .................................................44

G.     There Is No Basis for Specific Performance Because Standard Chartered Performed Under the Contract ...................................47

CONCLUSION................................................................................................................49

# TABLE OF AUTHORITIES

Page(s)

CASES

*A T. & T. Co.* v. *City of N.Y.*,
  83 F.3d 549 (2d Cir. 1996)............................................................................................46

*Abbey* v. *3F Therapeutics, Inc.*,
  No. 06-CV-409, 2009 WL 4333819 (S.D.N.Y. Dec. 2, 2009) ...............................................40

*Ashcroft* v. *Iqbal*,
  129 S. Ct. 1937 (2009).................................................................................................20

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).......................................................................................20, 36

*Baker* v. *Andover Assocs. Mgmt. Corp.*,
  No. 6179/09, slip op. (N.Y. Sup. Ct. Nov. 30, 2009) ...............................................45, 46, 47

*Bank of Credit & Commerce Int'l (Overseas) Ltd.* v. *State Bank of Pak.*,
  273 F.3d 241 (2d Cir. 2001).........................................................................................24

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007)...................................................................................................20

*Bui* v. *Indus. Enters. of Am.*,
  594 F. Supp. 2d 364 (S.D.N.Y. 2009).............................................................................40

*Capital Currency Exch., N.V.* v. *Nat'l Westminster Bank PLC*,
  155 F.3d 603 (2d Cir. 1998).........................................................................................26

*Cho* v. *401-403 57th St. Realty Corp.*,
  752 N.Y.S.2d 55 (App. Div. 2002).................................................................................48

*City of Sterling Heights Police & Fire Ret. Sys.* v. *Vodafone*,
  655 F. Supp. 2d 262 (S.D.N.Y. 2009).............................................................................20

*Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*,
  516 N.E.2d 190 (N.Y. 1987).........................................................................................41

*Construtora Norberto Oderbrecht S.A.* v. *Gen. Elec. Co.*,
  No. 07-CV-8014, 2007 WL 3025699 (S.D.N.Y. Oct. 12, 2007)...........................................24

- iii -

*Corporacion Tim* v. *Schumacher*,
418 F. Supp. 2d 529 (S.D.N.Y. 2006) ....................................................................26

*de Kwiatkowski* v. *Bear, Stearns & Co.*,
306 F.3d 1293 (2d Cir. 2002) ................................................................................43

*Deblasio* v. *Merrill Lynch & Co.*,
No. 07-CV-318, 2009 WL 2242605 (S.D.N.Y. July 27, 2009) .......................43, 46

*Diesel Props S.R.L.* v. *Greystone Bus. Credit II LLC*,
No. 07-CV-9580, 2008 WL 4833001 (S.D.N.Y. Nov. 5, 2008)............................22

*Dodds* v. *Cigna Sec., Inc.*,
12 F.3d 346 (2d Cir. 1993)....................................................................................31

*Dura Pharms., Inc.* v. *Broudo*,
544 U.S. 336 (2005)...............................................................................................30

*Endovasc Ltd., Inc.* v. *J.P. Turner & Co., LLC*,
No. 02-CV-7313, 2004 WL 634171 (S.D.N.Y. Mar. 30, 2004) ...........................34

*Feinman* v. *Dean Witter Reynolds*, *Inc.*,
84 F.3d 539 (2d Cir. 1996).....................................................................................31

*Food Pageant, Inc.* v. *Consol. Edison Co.*,
429 N.E.2d 738 (N.Y. 1981)..................................................................................45

*Froese* v. *Staff*,
No. 02-CV-5744, 2003 WL 21523979 (S.D.N.Y. July 7, 2003) ...........................30

*Glassman* v. *Wachovia Bank, N.A.*,
No. 115380/06, 2007 WL 2582364 (N.Y. Sup. Ct. Sept. 7, 2007).......................45

*Goldman* v. *Metro. Life Ins. Co.*,
841 N.E.2d 742 (N.Y. 2005)..................................................................................41

*Good Hill Partners L.P.* v. *WM Asset Holdings Corp. CI 2007-WM2*,
583 F. Supp. 2d 517 (S.D.N.Y. 2008)....................................................................32

*Haire* v. *Bonelli*,
870 N.Y.S.2d 591 (App. Div. 2008).......................................................................46

*Hecco Ventures* v. *Avalon Energy Corp.*,
606 F. Supp. 512 (S.D.N.Y. 1985) ........................................................................36

*Heller* v. *Goldin Restructuring Fund, L.P.*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008)................................................................39, 40

*Horwitz* v. *Camelot Assocs. Corp.*,
   888 N.Y.S.2d 241 (App. Div. 2009)...............................................................46

*IMG Fragrance Brands, LLC* v. *Houbigant, Inc.*,
   No. 09-CV-3655, 2009 WL 5171741 (S.D.N.Y. Dec. 18, 2009) ...........................27

*In re Bayer AG Sec. Litig.*,
   423 F. Supp. 2d 105 (S.D.N.Y. 2005)...............................................................28, 29

*In re Bayou Hedge Fund Litig.*,
   534 F. Supp. 2d 405 (S.D.N.Y. 2007)...............................................................36, 39, 47

*In re Blech Sec. Litig.*,
   928 F. Supp. 1279 (S.D.N.Y. 1996)...............................................................27, 33

*In re Enron Corp.*,
   292 B.R. 752 (Bankr. S.D.N.Y. 2003) .............................................................45

*In re OPUS360 Corp. Sec. Litig.*,
   No. 01-CV-2938, 2002 WL 31190157 (S.D.N.Y. Sept. 30, 2002).........................36

*Ismail* v. *Am. Univ. of Beirut*,
   246 F. Supp. 2d 330 (S.D.N.Y. 2003) .............................................................26

*Jaffe* v. *Capital One Bank*,
   No. 09-CV-4106, 2010 WL 691639 (S.D.N.Y. Mar. 1, 2010) ...........................20

*Kassover* v. *UBS AG*,
   619 F. Supp. 2d 28 (S.D.N.Y. 2008).............................................................40

*Kinsey* v. *Cendant Corp.*,
   No. 04-CV-0582, 2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005) ...........................46

*Kosovich* v. *Metro Homes, LLC*,
   No. 09-CV-6992, 2009 WL 5171737 (S.D.N.Y. Dec. 29, 2009) ...........................31

*Kush* v. *Buffalo*,
   449 N.E.2d 725 (N.Y. 1983).............................................................42

*Lago* v. *Krollage*,
   575 N.E.2d 107 (N.Y. 1991).............................................................45

*Lemoine* v. *Cornell Univ.*,
769 N.Y.S.2d 313 (App. Div. 2003) ......................................................................46

*Lin* v. *Interactive Brokers Group, Inc.*,
574 F. Supp. 2d 408 (S.D.N.Y. 2008)....................................................................36

*Lucente* v. *I.B.M. Corp.*,
310 F.3d 243 (2d Cir. 2002)...................................................................................48

*M/S Bremen* v. *Zapata Off-Shore Co.*,
407 U.S. 1 (1972)...................................................................................................22

*Mancusco* v. *Rubin*,
861 N.Y.S.2d 79 (App. Div. 2008) ........................................................................47

*Matsumura* v. *Benihana Nat'l Corp.*,
542 F. Supp. 2d 245 (S.D.N.Y. 2008)....................................................................46

*McCarthy* v. *Sturm, Ruger & Co.*,
916 F. Supp. 366 (S.D.N.Y. 1996) .........................................................................42

*Monegasque de Reassurances S.A.M. (Monde Re)* v. *NAK Naftogaz of Ukr.*,
158 F. Supp. 2d 377 (S.D.N.Y. 2001)....................................................................26

*Morrison* v. *Nat'l Austl. Bank Ltd.*,
547 F.3d 167 (2d Cir. 2008)..........................................................................19, 28

*Muller-Paisner* v. *TIAA*,
289 F. App'x 461 (2d Cir. 2008) ...........................................................................20

*Nemer Jeep-Eagle, Inc.* v. *Jeep-Eagle Sales Corp.*,
992 F.2d 430 (2d Cir. 1993)...................................................................................48

*O'Mahony v. Accenture Ltd.*,
537 F. Supp. 2d 506 (S.D.N.Y. 2008)....................................................................28

*Olkey* v. *Hyperion 1999 Term Trust*,
98 F.3d 2 (2d Cir. 1996).........................................................................................31

*Owens* v. *Gaffken & Barriger Fund, LLC*,
No. 08-CV-8414, 2009 WL 3073338 (S.D.N.Y. Sept. 21, 2009)...........................40

*Perry* v. *Rochester Lime Co.*,
113 N.E. 529 (N.Y. 1916).......................................................................................42

*Phillips* v. *Audio Active, Ltd.*,
494 F.3d 378 (2d Cir. 2007)............................................................................21, 22

*Press* v. *Chem. Inv. Servs. Corp.*,
166 F.3d 529 (2d Cir. 1999)....................................................................................44

*Pro Bono Invs., Inc.* v. *Gerry*,
No. 03-CV-4347, 2005 WL 2429787 (S.D.N.Y. Sept. 30, 2005).........................40

*Salis* v. *Am. Exp. Lines*,
No. 08-CV-2678, 2009 WL 1528767 (2d Cir. Jan. 2, 2009) .................................23

*Satterwhite* v. *Image Bank, Inc.*,
No. 01-CV-7097, 2007 WL 2120429 (S.D.N.Y. July 20, 2007) ...........................45

*SEC* v. *Cohmad Sec. Corp.*,
No. 09-CV-5680, 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010)..........................36, 47

*Sedona Corp.* v. *Ladenburg Thalmann & Co.*,
No. 03-CV-3120, 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005)......................39, 40

*Sofi Classic S.A. de C.V.* v. *Hurowitz*,
444 F. Supp. 2d 231 (S.D.N.Y. 2006) (Marrero, J.) ..............................................33

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................21

*Turedi* v. *Coca Cola Co.*,
460 F. Supp. 2d 507 (S.D.N.Y. 2006).......................................................... passim

*United States* v. *Bestfoods*,
524 U.S. 51 (1998)..................................................................................................27

*Valenti* v. *Norwegian Cruise Line*,
No. 04-CV-8895, 2005 WL 927167 (S.D.N.Y. Apr. 21, 2005) ............................19

*Van Valkenburgh* v. *Robinson*,
639 N.Y.S.2d 149 (App. Div. 1996) .................................................................41, 42

*Victoriatea.com, Inc.* v. *Cott Bev. Can.*,
239 F. Supp. 2d 377 (S.D.N.Y. 2003) (Marrero, J.) ..............................................26

*Violette* v. *Armonk Assocs., L.P.*,
872 F. Supp. 1279 (S.D.N.Y. 1995).......................................................................41

*Vogel* v. *Sands Bros. & Co.*,
    126 F. Supp. 2d 730 (S.D.N.Y. 2001)............................................................................34

*Wells Fargo Century, Inc.* v. *Brown*,
    475 F. Supp. 2d 368 (S.D.N.Y. 2007)....................................................................21, 22

### STATUTES

15 U.S.C. § 78u-4 ...........................................................................................................30, 33

15 U.S.C. § 80b-6 .........................................................................2, 14-15, 28, 37-38

15 U.S.C. § 80b-15 .......................................................................2, 14-15, 28, 37-38

15 U.S.C. § 78j ..................................................................................................... *passim*

12 C.F.R. § 211.6 .................................................................................................7, 25

12 C.F.R. § 240.10b-5.................................................................................2, 14, 30, 33

Fed. R. Civ. P. 9 ................................................................................................. *passim*

Fed. R. Civ. P. 12 ...........................................................................................1, 23, 31

Defendants Standard Chartered International (USA) Ltd. and Standard Chartered PLC respectfully submit this memorandum of law in support of their motion to dismiss plaintiffs' complaints pursuant to Rules 12(b)(1), 12(b)(3), 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, and under the doctrine of forum non conveniens.

## PRELIMINARY STATEMENT

This is a unified motion to dismiss the operative complaints in *Bhatia* v. *Standard Chartered International (USA) Ltd.*, No. 09-CV-2410 ("*Bhatia*") and *Tradewaves Ltd.* v. *Standard Chartered International (USA) Ltd.*, No. 09-CV-9423 ("*Tradewaves*") (collectively, the "Singapore Cases"). The motion is filed pursuant to the Initial Scheduling Order entered on January 29, 2010, and challenges as a threshold matter whether these cases, which are subject to a Singapore forum selection clause and a Singapore choice of law clause, belong in this Court. Filed concurrently with this motion is a unified motion to dismiss the operative complaints in *Maridom Ltd.* v. *Standard Chartered International (Americas) Ltd.* ("*Maridom*"), *Valladolid* v. *American Express Bank Ltd.* ("*Valladolid*"), *Lopez* v. *Standard Chartered International (Americas) Ltd.* ("*Lopez*"), and *Headway Investment Corp.* v. *American Express Bank* ("*Headway*") (collectively, the "Florida Cases").[1]

Plaintiffs are twenty-two individuals residing in Dubai and two British Virgin Island investment holding companies with their principal place of business in Dubai. Between

---

[1] The principal difference between the two groups of cases is the account location. Plaintiffs here opened and maintained their accounts in Singapore. Plaintiffs in the Florida Cases opened and maintained their accounts in Miami, Florida. This difference gives rise to different account agreements containing different venue, jurisdiction, and choice of law provisions. This motion incorporates, rather than repeats, common background and legal arguments raised in the memorandum in support of the motion to dismiss the Florida Cases where applicable.

2001 and 2008, plaintiffs opened nondiscretionary investment accounts at the Singapore Branch of American Express Bank Ltd. ("AEBL"), since renamed Standard Chartered International (USA) Ltd. ("SCI"). Beginning in 2004 and at various points through 2007, plaintiffs directed their Singapore- and Dubai-based relationship managers to use their accounts to invest money in Fairfield Sentry Ltd. ("Fairfield Sentry"), a fund incorporated in the British Virgin Islands that invested substantially all of its assets with Bernard L. Madoff Investment Securities LLC ("BLMIS"). Plaintiffs assert that SCI and its holding-company parent, Standard Chartered PLC ("SC PLC"), are liable for alleged losses suffered when, on December 11, 2008, it was revealed for the first time to SCI, SC PLC, plaintiffs, and the rest of the world that BLMIS was nothing more than "a giant Ponzi scheme."

The terms governing plaintiffs' accounts expressly provide that: (i) plaintiffs made their own investment decisions; (ii) plaintiffs were not entitled to investment advice; (iii) if plaintiffs obtained advice, plaintiffs nonetheless maintained full responsibility for their investment decisions and were not entitled to additional, ongoing advice; (iv) AEBL, and later Standard Chartered Bank, was absolved from all liability, except for gross negligence, willful misconduct or bad faith; and (v) any disputes concerning the accounts would be subject to the exclusive jurisdiction of the courts in Singapore and governed by Singapore law.

Notwithstanding the above terms, plaintiffs bring this action in New York against SCI and SC PLC, seeking to hold them liable for plaintiffs' decision to invest in Fairfield Sentry. Plaintiffs allege that AEBL employees "tout[ed]" Fairfield Sentry as having a "history of stable and steady returns" and misrepresented that AEBL had conducted extensive due diligence on the fund. Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act and Rule 10b-5, Sections 206 and 215 of the Investment Advisers Act ("IAA"), and various common-law

theories, including fraud, breach of fiduciary duty, gross negligence, unjust enrichment and specific performance. Plaintiffs also assert a control person claim against SC PLC under Section 20(a) of the Exchange Act. Finally, although not the focus of their complaint, *Bhatia* plaintiffs also assert claims for breach of fiduciary duty, gross negligence and rescission under the IAA in relation to investments they made in bonds issued by Lloyds TSB Bank plc, a British bank (the "Lloyds Bonds"). None of these claims should proceed any further in this Court.

To begin, plaintiffs must bring their claims in Singapore because Singapore is the jurisdiction mandated under the forum selection clause governing plaintiffs' accounts. A forum non conveniens analysis also points to Singapore as the appropriate place for these cases to be heard. All plaintiffs are located, and all of the alleged wrongdoing occurred, outside of the United States. Plaintiffs' accounts are all located in Singapore, and the employees that plaintiffs allege recommended their investments are located in Singapore or Dubai. Singapore law is mandated under a choice of law provision, and Singapore has a strong interest in applying its own law to adjudicate allegations of wrongdoing concerning investment accounts held in Singapore.

Beyond the jurisdictional defects, plaintiffs fail to state any viable claims for relief. Plaintiffs' securities fraud claims are deficient for multiple reasons. *First*, plaintiffs' federal securities claims fail because they are extraterritorial in nature and none of the purported wrongdoing either (i) occurred in the United States or (ii) had any effect in the United States or upon United States citizens. *Second*, even if plaintiffs are permitted to assert them, their claims under Sections 10(b) and 20(a) of the Exchange Act fail because they lack the particularity required by the Private Securities Litigation Reform Act and Rule 9(b) of the Federal Rules of Civil Procedure. *Third*, plaintiffs do not identify any actionable misstatements or omissions of

material fact.  *Fourth*, plaintiffs' complaints do not give rise to a strong inference of scienter, because they do not contain allegations that anyone at AEBL, SCI or SC PLC (i) benefited from, or had any special motive to engage in, a fraud; or (ii) knew of, or should have discovered, Madoff's Ponzi scheme (which, of course, went undetected by thousands of investors and the government regulators charged with oversight of BLMIS).  *Fifth*, plaintiffs could not have reasonably relied on any alleged misrepresentations concerning Fairfield Sentry because the fund's offering documents, which plaintiffs acknowledged they had reviewed, disclose the very facts and risks of which plaintiffs now plead ignorance.

Similarly unavailing are plaintiffs' IAA claims, which they assert against SCI.  Banks are exempted from the strictures of the IAA, and SCI falls squarely within this exemption.  Moreover, neither AEBL nor SCI was ever an investment adviser to plaintiffs within the meaning of the IAA.  In fact, plaintiffs' agreement with AEBL—the Private Banking Services Agreement—expressly disclaim such a relationship, providing that "the Customer makes its own judgment in relation to investment or trading transactions" and that AEBL "assumes no duty to make or give advice or make recommendations," and plaintiffs' current account agreements contain similar provisions.

Plaintiffs' common-law claims fare no better.  If this Court determines that this action can be heard in this District, then, presumptively, the action has sufficient connection to New York to trigger application of the Martin Act.  That Act preempts all of plaintiffs' common-law claims other than fraud.  Plaintiffs' common-law fraud claims fail for many of the same reasons as their federal securities fraud claims: plaintiffs' complaints lack sufficient particularity to satisfy Rule 9(b), and plaintiffs fail to allege any actionable misstatements or omissions.  Plaintiffs' claims also fail because, as nondiscretionary account holders, they were not owed any

duties relating to investment advice, and because enforceable exculpation provisions prevent plaintiffs from recovering in the absence of at least gross negligence. There is nothing close to that pled here—plaintiffs' alleged losses were caused by Madoff and his scheme to defraud thousands of investors, not any insufficient due diligence by AEBL or SCI.

**BACKGROUND**

Bernard Madoff perpetrated the largest and longest-running Ponzi scheme on record, victimizing thousands of investors and evading detection not only from the investment community at large, but from the government regulators charged with oversight of BLMIS. Plaintiffs here, like plaintiffs in the Florida Cases, purchased shares in Fairfield Sentry through private bank accounts at a branch office of Standard Chartered.[2] Fairfield Sentry in turn invested in BLMIS. Plaintiffs seek to hold SCI and SC PLC as guarantors for alleged losses that resulted from Madoff's theft. The Court is respectfully referred to Section A of the Background Section of the Defendants' Memorandum in Support of the Motion to Dismiss Florida Cases ("Defs. Mem. in Supp. of Mot. to Dismiss"), where the general background of Madoff's fraud, the Fairfield Funds and the ensuing litigation is set forth in detail. (Defs. Mem. in Supp. of Mot. to Dismiss at 4-8.)

A.    **The Standard Chartered Entities**

Two Standard Chartered entities are named as defendants in the instant actions, Standard Chartered PLC ("SC PLC") and Standard Chartered International (USA) Ltd. ("SCI"). SC PLC is a holding company organized and headquartered in England and Wales, and is an

---

[2]       Certain plaintiffs in the Florida Cases also purchased shares in Fairfield Sigma, Ltd., a Euro-denominated fund that invested all of its assets in Fairfield Sentry.

indirect parent of SCI. As a holding company, SC PLC does not receive customer deposits and plaintiffs do not allege that SC PLC took any direct action with respect to their nondiscretionary investment accounts. Rather, plaintiffs assert claims against SC PLC based only on the parent/indirect subsidiary relationship between SC PLC and SCI. (*Bhatia* Am. Compl. ¶¶ 87-89; *Tradewaves* Compl. ¶¶ 83-85.) Notwithstanding their failure to allege specific facts suggesting any wrongdoing by SC PLC, plaintiffs define the "Standard Chartered Defendants" to include both SCI and SC PLC, and then make various allegations of wrongdoing against the "Standard Chartered Defendants." AEBL/SCI and SC PLC are hereafter referred to collectively as the "Bank" when describing plaintiffs' "group" allegations.

In February of 2008, SC PLC acquired American Express Bank Ltd. ("AEBL"). AEBL was renamed SCI in January 2009. (*Bhatia* Am. Compl. ¶¶ 39-40; *Tradewaves* Compl. ¶¶ 56-57.) Following the acquisition, AEBL customer accounts, including plaintiffs', were transferred to SCI's parent, Standard Chartered Bank, or to affiliates of Standard Chartered Bank. Standard Chartered Bank is not named as a defendant in the Singapore Cases.

SCI is incorporated in Connecticut (*Bhatia* Am. Compl. ¶ 20; *Tradewaves* Compl. ¶ 33), and operates as an "agreement corporation."[3] Agreement corporations are authorized under federal law, chartered under state law and operate with the approval of the Federal Reserve Board of Governors for the purpose of engaging in international or foreign banking operations.

_____

[3]     The Court may take judicial notice of SCI's status as an "agreement corporation" because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b); *cf. Milman* v. *Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 225 (S.D.N.Y. 1999). SCI's status as an agreement corporation is readily confirmable in the records of the Federal Reserve System, made available through the National Information Center: Institutional Profile Page, http://www.ffiec.gov/nicpubweb/nicweb/InstitutionProfile.aspx?parID_Rssd=695107&parDT_END=99991231.

Agreement corporations are permitted to engage in activities in the United States only if those activities are "incidental to international or foreign business." 12 C.F.R. § 211.6(a).

## B. The Terms of Plaintiffs' Accounts

The terms of plaintiffs' accounts are set out in their agreements with AEBL, and later, Standard Chartered Bank. (*See* Declaration of Bharat Vijayan, executed on March 10, 2010 ("Vijayan Decl.") ¶¶ 7-14, Exs. B-N (Account Agreements).)[4] From the time plaintiffs opened their accounts until the fall of 2008, the accounts were governed by the Private Banking Services Agreement (the "Services Agreement"), which was amended in September 2006. (Vijayan Decl. ¶¶ 15-16.) Both versions of the Services Agreement contained a provision allowing AEBL to amend, modify or supplement the terms and conditions governing plaintiffs' accounts. (*Id.* ¶ 17, Ex. O (Services Agreement) at 1 & Ex. P (Amended Services Agreement) at 1, 12.) Consistent with this change-in-term provision, on or about October 3, 2008, the Services Agreement was replaced by the Standard Chartered Private Bank General Terms and Conditions (the "T&Cs"), which currently govern plaintiffs' accounts. (*Id.* ¶ 19, Ex. A (T&Cs) at 2 ¶ 1.1.)[5]

---

[4] Plaintiffs allege that they entered into various agreements with the Bank, and otherwise rely heavily upon their alleged "business relationship" with the Bank in their complaints. The Court may thus consider the agreements governing plaintiffs' accounts for all purposes in this motion because they are "integral" to plaintiffs' complaints. *RBS Holdings, Inc.* v. *Wells Fargo Century, Inc.*, 485 F. Supp. 2d 472, 476 (S.D.N.Y. 2007) (Marrero, J); *see also Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The Court may likewise consider the Lloyds Bonds prospectus, Sentry Subscription Agreements and Sentry PPMs for all purposes, because plaintiffs reference offering documents in their complaint (*Bhatia* Am. Compl. ¶ 105(d); *Tradewaves* Compl. ¶ 101(d)), and as offering memoranda for the funds on which plaintiffs' claims are based, those documents are integral to the *Bhatia* and *Tradewaves* complaints. *Spain* v. *Deutsche Bank*, No. 08-CV-10809, 2009 WL 3073349, at *3 n.3 (S.D.N.Y. Sept. 18, 2009) (collecting cases).

[5] Prior to the T&Cs taking effect, Standard Chartered Bank mailed plaintiffs a copy of the T&Cs and a notice informing them that the T&Cs would govern their accounts. (Vijayan Decl. ¶¶ 18-20.)

## 1. The Terms Requiring Adjudication of Disputes in Singapore

Between 2001 and 2003, *Bhatia* plaintiffs jointly opened three nondiscretionary investment accounts at AEBL's Singapore branch. (Vijayan Decl. ¶ 9, Exs. C, D & E.)[6] Between 2001 and 2008, *Tradewaves* plaintiffs collectively opened nine nondiscretionary investment accounts. Eight of these accounts were opened at AEBL's Singapore Branch. (*See id.* ¶¶ 10, 13, Exs. G- N (Account Agreements).) Following the acquisition of AEBL, all of these accounts were transferred from the Singapore Branch of AEBL to the Singapore Branch of Standard Chartered Bank, where they are currently maintained. (*See id.* ¶ 2.) The remaining *Tradewaves* account was opened at the Singapore Branch of Standard Chartered Bank in April of 2008. (*Id.* ¶ 7, Ex. B.)

The T&Cs that govern plaintiffs' accounts require plaintiffs to bring claims against AEBL and Standard Chartered Bank in the courts of Singapore. The terms also require those claims to be governed by Singapore law:

> [A]ll Transactions entered into by the Parties in relation or pursuant to an Account are governed by the laws of the Republic of Singapore.
>
> . . . .
>
> [T]he client submits to the exclusive jurisdiction of the courts of Singapore to settle any dispute arising out of or in connection with these [T&Cs], any Account, Transaction or any Service (including a dispute regarding the existence, validity or termination of any agreement).

---

[6] In considering the threshold issues of venue or jurisdiction, the Court may consider submissions outside the pleadings without converting the motion to dismiss into a motion for summary judgment. *Overseas Media, Inc.* v. *Skvortsov*, 441 F. Supp. 2d 610, 615 (S.D.N.Y. 2006), *aff'd*, 277 F. App'x 92 (2008) (considering submissions outside pleadings to address forum non conveniens argument); *Valenti* v. *Norwegian Cruise Line*, No. 04-CV-88985, 2005 WL 927167, at *2-3 (S.D.N.Y. Apr. 21, 2005) (considering submissions outside the pleadings to determine applicability of forum selection clause).

(Vijayan Decl. Ex. A at app. 1, ¶¶ 4, 7.1.)[7]

## 2. The Terms Governing the Scope and Limits of Plaintiffs' Accounts

The agreements governing plaintiffs' accounts also expressly limit the scope of plaintiffs' relationship with the Bank. The accounts are "nondiscretionary"—in other words, the Bank may only transact securities on plaintiffs' behalf only with plaintiffs' express authorization. (Vijayan Decl Ex. A (T&Cs) ¶¶ 2.1, 21.3, 20.2, 36.4, 56.4.). This was true as well under the Services Agreements. (*Id.* Ex. O at 12, 40 & Ex. P at 15.) Further, although plaintiffs claim that the Services Agreement created an investment advisory relationship with SCI (*Bhatia* Am. Compl. ¶ 93; *Tradewaves* Compl. ¶ 89), the terms of the agreement provide otherwise:

> 3. In accepting any services made available pursuant to this Agreement, the Customer understands and agrees that:
>
> (a) the Customer makes its own judgment in relation to investment or trading transactions;
>
> (b) the Bank assumes no duty to make or give advice or make recommendations;
>
> (c) if the Bank makes any such suggestions, the Bank assumes no responsibility for the Customer's portfolio or for any investment or transaction made.

(Vijayan Decl. Ex.O (Services Agreement) at 40.)[8] The T&Cs governing plaintiffs' accounts contain similar provisions, including:

> 20.2 Other Information: The Bank may from time to time provide the Client directly or indirectly with reports, analysis or other materials and information in

---

[7] Both versions of the Services Agreements contained similar provisions. (*See* Vijayan Decl. Ex. O (Services Agreement) at 9 & Ex. P (Amended Services Agreement) at 12.)

[8] Such terms always have governed plaintiffs' accounts from the time the accounts were opened through today. (*See* Vijayan Decl., Ex. P at 15 & Ex. F, Clause 10(a)-(c).)

relation to the Assets or generally in relation to investments or markets. The Client understands and agrees that:

        20.2.1 any report, analysis or other material and information is provided to the Client strictly for his own use and will not constitute an offer or invitation to the Client to acquire any Assets;

        20.2.2 the Bank is not obliged to provide the Client with any reports, analysis or other materials and information or any advice or recommendation and that all investments are made and Transactions are entered into solely upon the Client's judgment and discretion notwithstanding any such materials, information or recommendation the Bank may have provided to the Client;

        20.2.3 if the Bank does provide such reports, analysis or other materials and information, it is not provided as a required Service and reliance upon such information is at the Client's own risk; and

        20.2.4 the Bank and its employees or agents will be under no liability for the accuracy and completeness of any such report, analysis or other material and information, the performance or outcome of any investment made or Transaction entered into by the Client after receipt thereof, irrespective of whether or not such report, analysis or other material or information was provided at the Client's request. Accordingly any risk associated with and any Losses suffered as a result of the Client entering into any Transaction are for the Client's Account.
. . . .

36.5 Investment Opportunities: The Bank may advise and inform the Client of investment opportunities as and when the Bank deems fit. The Client may follow or disregard, in whole or in part, any advice, recommendation or information given by the Bank. Notwithstanding that the Client may have informed the Bank of the Client's investment objectives or given the Bank information relating to risk profile and investment objectives, the Client shall be solely responsible for making the Client's own independent investigation, appraisal and decision on all Investments before dealing in them.

(Vijayan Decl. Ex. A ¶¶ 20.2, 36.5)  With respect to private placements of securities (such as the

Fairfield Funds), plaintiffs further acknowledged that Standard Chartered Bank "has not made

any representations as to the performance or future performance of any Securities, and the Client

acknowledges and affirms that the Client has not relied on any views or comments made by

[Standard Chartered Bank] or its employees or agents, and is making an independent decision to subscribe for the Securities." (*Id*. Ex. A (T&Cs) ¶ 21.3.4.)

The T&Cs also contain provisions that exculpate AEBL and Standard Chartered Bank from liability absent gross negligence or willful misconduct:

> 42.1 Liability of the Bank: The Bank (including its officers, employees, Nominees and agents) will not be responsible or liable in any circumstances for . . . any direct Loss suffered or incurred by the Client unless such direct Loss is the direct result of the Bank's fraud, gross negligence or wilful default.

> 42.2 Further Limitation of Liability: The Bank (including its officers, employees, Brokers, custodians, Nominees and agents) (and this clause shall be effective to the same extent as if each such employee agent of the Bank had been a party to these Terms and Conditions) will not be liable for any Loss suffered or incurred by the Client arising directly or indirectly in connection with:

> . . . .

> 42.2.9 any Losses of any kind which may be incurred by the Client as a result of the management of such Assets unless due directly to the gross negligence or wilful default of the Bank or its agents or any of their officers or employees . . . .

(Vijayan Decl. Ex. A (T&Cs) ¶ 42.)[9]

## C. Plaintiffs' Investments in Fairfield Sentry

Plaintiffs' investments in Fairfield Sentry—a British Virgin Islands investment fund in which no U.S. investor was permitted to hold shares (Vijayan Decl. Ex. S (Subscription Agreement) at 1, 2 ¶¶ 1, 5(a))[10]—are the primary focus of the *Bhatia* and *Tradewaves*

---

[9]    Both versions of the Services Agreement contained similar provisions. (*See* Vijayan Decl. Ex. O (Services Agreement) at 5-6 & Ex. P (Amended Services Agreement) at 4-5.)

[10]    The Subscription Agreements signed by plaintiffs in the Singapore cases contain the same relevant provisions. To avoid duplicative citation of exhibits, the Subscription Agreement attached as Exhibit S to the Declaration of Bharat Vijayan is used where specific provisions of the Subscription Agreement are cited.

complaints. Despite this focus, plaintiffs provide only sparse details about those investments. According to plaintiffs, the investments in Fairfield Sentry were made at unspecified times between 2004 and 2007, and in unspecified amounts. (*Bhatia* Am. Compl. ¶ 24; *Tradewaves* Compl. ¶ 37.) In fact, the only detail plaintiffs provide about their investments in Fairfield Sentry is an allegation that the value of their Fairfield Sentry shares as of November 2008 (just before the Madoff fraud was revealed) was, in the aggregate, approximately $5.3 million for *Bhatia* plaintiffs and $4.75 million for *Tradewaves* plaintiffs. (*Bhatia* Am. Compl. ¶¶ 47-50; *Tradewaves* Compl. ¶¶ 35, 64.)

In placing their first investment in Fairfield Sentry, each plaintiff signed a copy of the Subscription Agreement, and, by doing so, acknowledged they "ha[d] received and read a copy of the [Fairfield Sentry Private Placement Memorandum]."[11] (Vijayan Decl., Ex. S (Subscription Agreement) at 4 ¶ 7.) The Fairfield Sentry Private Placement Memorandum in effect in November 2004 (the "Sentry PPM")—when plaintiffs assert they first invested in Fairfield Sentry—and the Subscription Agreement (together, the "Sentry Offering Documents") contain numerous provisions applicable to *Bhatia* and *Tradewaves*.[12] (Vijayan Decl. Ex. FF (Sentry 10/1/04 PPM).) These provisions are identical for all of the Fairfield Sentry investors, and are set forth in greater detail in the Memorandum in Support of the Motion to Dismiss the Florida Cases, at Section C of the Background Section., pages 12-14. That description is incorporated by reference and summarized below.

---

[11]     The Subscription Agreements provide that "If the Subscriber subscribes for additional Shares at a later date, Subscriber shall be deemed to have re-executed this Agreement in subscribing for those Shares." (Vijayan Decl. Ex. S (Sentry Subscription Agreement) at 5 ¶ 13.)

[12]     Another PPM was effective as of August 14, 2006.

Plaintiffs, by virtue of a provision in the Subscription Agreements stating that the

"[s]ubscriber has received and read" the Sentry PPM, acknowledged they understood and

accepted, among other things, that:

- Plaintiffs would be "treated as [] Professional Investor[s] for the purposes of investing in [Fairfield Sentry]." (Vijayan Decl. Ex. S (Subscription Agreement) at 3 ¶ 5(c) & Ex. FF (Sentry 10/1/04 PPM) at iv.)

- Plaintiffs "ha[d] such knowledge and experience in financial and business matters that [they were] capable of evaluating the risks of investing in [Fairfield Sentry]." (Vijayan Decl. Ex. S. (Subscription Agreement) ¶ 8, at 4.)

- Plaintiffs, in making the decision to invest, "relied solely upon the Fund Documents and independent investigations made by Subscriber and ha[d] not relied on any representation inconsistent with the information in the Fund Documents." (*Id.* Ex. S (Subscription Agreement) ¶ 7, at 4.)

- There were "substantial risks of loss incidental to" investing in Fairfield Sentry. (*Id.* Ex. S (Subscription Agreement) ¶ 8, at 4.)

- Investments in Fairfield Sentry were "*SPECULATIVE AND INVOLVE[D] A HIGH DEGREE OF RISK*." (*Id.* Ex. FF (Sentry 10/1/04 PPM).)

- There was "no assurance that any trading method employed by or on behalf of the Fund w[ould] produce profitable results, and the past performance of the Fund [wa]s not necessarily indicative of its future profitability." (*Id.* Ex. FF (Sentry 10/1/04 PPM) ¶ 2, at 16.)

- BLMIS was a subcustodian of Fairfield Sentry and had custody of over 95% of the Fund's assets. (*Id.* Ex. FF (Sentry 10/1/04 PPM) at 14-15.)

- There was a risk that the entities with custody over the Fund's assets (*i.e.*, BLMIS) could misappropriate those assets. (*Id.* Ex. FF (Sentry 10/1/04 PPM) ¶ 17, at 19.)

### D. *Bhatia* Plaintiffs' Investments in the Lloyds Bonds

In addition to their Madoff claims, *Bhatia* plaintiffs also assert claims relating to investments in bonds issued by Lloyds TSB Bank plc. (the "Lloyds Bonds"). Lloyds TSB Bank plc is a bank incorporated under the laws of England. (Vijayan Decl. Ex. GG (Lloyds Bonds Prospectus) at 2.) As a general matter, the Lloyds Bonds could not be "offered, sold or delivered within the United States or to U.S. persons." (*Id.* Ex. GG (Lloyds Bonds Prospectus) at 4.) In December 2008, Lloyds TSB converted the bonds into preference shares, pursuant to a provision in the prospectus for the bonds permitting the issuer to exchange the bonds for "Qualifying Tier 1 Capital" generally, and preference shares specifically. (*Id.* Ex. GG (Lloyds Bonds Prospectus) at 13, 20, 34.)

### THE COMPLAINTS

*Bhatia* plaintiffs filed their complaint on March 16, 2009, in the United States District Court for the Southern District of New York, and amended the complaint (to drop the Fairfield defendants) on September 18, 2009. On November 12, 2009, *Tradewaves* plaintiffs, represented by the same counsel, filed their complaint, which contains factual allegations and claims virtually identical to the allegations and claims in *Bhatia*.

The complaints each assert seven causes of action and a separate claim for specific performance in connection with plaintiffs' investments in Fairfield Sentry: (i) violation of Section 10(b) of the Exchange Act and Rule 10b-5; (ii) violation of Section 20(a) of the Exchange Act; (iii) rescission under Sections 206 and 215 of the IAA; (iv) breach of fiduciary duty; (v) gross negligence; (vi) fraud; and (vii) unjust enrichment. With respect to their claims for rescission under the IAA, breach of fiduciary duty and gross negligence, *Bhatia* plaintiffs

also allege that SCI and SC PLC breached duties in connection with the purchase of Lloyds Bonds.[13]

### A. Plaintiffs' Fairfield Sentry Claims

Plaintiffs seek to recover from the Bank the value of their investments in Fairfield Sentry as of November 2008—including the fictitious profits that BLMIS created out of thin air. (*Bhatia* Am. Compl. ¶ 50; *Tradewaves* Compl. ¶ 64.) Plaintiffs do not and cannot allege that the Bank had knowledge of, or any involvement in, Madoff's fraud, yet they seek to hold the Bank responsible for its aftermath. They do so based on their core factual allegation that the Bank did not conduct sufficient due diligence on Fairfield Sentry to discover the fraud, and prevent them from investing indirectly in BLMIS.

Specifically, plaintiffs allege that SCI and SC PLC committed common-law and federal securities fraud and that SCI violated Section 206(2) of the Investment Advisers Act by misrepresenting to plaintiffs that the Bank had conducted "extensive due diligence" on Sentry when it allegedly had not. (*Bhatia* Am. Compl. ¶¶ 25, 30, 33, 96(a); *Tradewaves* Compl. ¶¶ 10, 38, 43, 50, 92(a).) Plaintiffs further contend that SCI and SC PLC were grossly negligent and breached fiduciary duties owed to plaintiffs by recommending investments in Sentry without having conducted adequate due diligence. (*Bhatia* Am. Compl. ¶¶ 9, 105(g), 110(c); *Tradewaves* Compl. ¶¶ 11, 101(g), 106(c).) Central to all of these due diligence-based claims is

---

[13] *Bhatia* plaintiffs do not allege a claim under Section 10(b) of the Exchange Act and Rule 10b-5 in connection with their purchase of the Lloyds Bonds. Although the *Bhatia* amended complaint "repeat[s] and realleges[s]" the prior allegations in connection with the Section 10(b) and Rule 10b-5 claim, *Bhatia* plaintiffs fail to make any specific allegations concerning the Lloyds Bonds in connection with that claim. Instead, the only scheme alleged under Section 10(b) and Rule 10b-5 is one, "among other things, to induce Plaintiffs to invest in Fairfield Sentry, Ltd." (*Bhatia* Am. Compl. ¶ 80.)

plaintiffs' bold assertion that "[r]easonable due diligence, including typical quantitative analysis, would have established that Fairfield Sentry, Ltd., Madoff and BMIS were involved in a fraudulent scheme and that the investment returns touted by AEB were not possible." (*Bhatia* Am. Compl. ¶ 32; *Tradewaves* Compl. ¶ 45.) Plaintiffs do not allege, however, how "typical quantitative analysis" would have revealed the fraud to the Bank while countless institutional and sophisticated investors, as well as government regulators that had far more insight into BLMIS than any private investor, were fooled.

Plaintiffs also allege that, on multiple unspecified occasions, the Bank misrepresented Sentry as a safe investment, including, for example, by characterizing Fairfield Sentry as, among other things, the "safest investments for its customers." (*Bhatia* Am. Compl. ¶ 33; *Tradewaves* Compl. ¶ 50.) Although the complaints are less than clear, the thrust of these allegations apparently is that plaintiffs did not appreciate the risk of investing in Fairfield Sentry. Such allegations ignore, of course, the risk disclosures in the Sentry Offering Documents, which plaintiffs acknowledged by signature that they reviewed and that stated in plain language that "*THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK*." (Vijayan Decl. Ex. FF (Sentry 10/1/04 PPM).)

Finally, plaintiffs seek specific performance of redemptions in Sentry. (*Bhatia* Am. Compl. ¶¶ 119-121; *Tradewaves* Compl. ¶¶ 115-117.) This claim borders on the bizarre. *Tradewaves* plaintiffs do not make a single allegation concerning any redemption request, and *Bhatia* plaintiffs do not allege that the Bank did anything improper in connection with any redemption request. Indeed, according to *Bhatia* plaintiffs, on October 28, 2008, they instructed SCI to redeem all funds invested in Fairfield Sentry and credit the proceeds to their respective accounts. (*Bhatia* Am. Compl. ¶¶ 51-52, 54.) They were in turn informed that the redemption

request would be placed in the November 2008 redemption cycle such that they would receive their money within ten days from November 14, 2008, the last day of the November cycle. (*Id.* ¶ 53.) *Bhatia* plaintiffs allege that the Bank did in fact submit the redemption request to Fairfield Sentry on November 14, 2008, but that Fairfield—not the Bank—failed to honor the request, causing *Bhatia* plaintiffs' alleged losses. (*Id.* ¶¶ 55, 59.) *Bhatia* plaintiffs do not allege that Fairfield Sentry's failure to honor the request was at all related to conduct by the Bank.[14]

### B. *Bhatia* Plaintiffs' Lloyds Bonds Claims

*Bhatia* plaintiffs also seek to hold SCI and SC PLC responsible for unspecified alleged losses in Lloyds Bonds.[15] (*Bhatia* Am. Compl. ¶¶ 10, 65-66.) *Bhatia* plaintiffs assert they invested approximately $400,000 in Lloyds Bonds, at $100 per share, in May 2008 on the recommendation of SCI and certain Bank personnel. (*Id.* ¶¶ 65-66, 68.) In or about the third week of December 2008, Lloyds TSB Bank announced that it would convert the bonds into preference shares; by the middle of January 2009, the conversion had taken place. (*Id.* ¶¶ 69-75.) Since that time, according to *Bhatia* plaintiffs, the preference share prices have fallen "sharply." (*Id.* ¶¶ 69-75.) *Bhatia* plaintiffs claim SCI and SC PLC breached their duties by allegedly failing to inform plaintiffs that the bonds were convertible, and of the risks of investing

---

[14]     The Subscription Agreement notified investors that redemptions from Fairfield Sentry were limited and generally would be made on the last day of each month, provided that the redemption request was received at least 15 days prior to the Redemption Date. (Vijayan Decl. Ex. S (Subscription Agreement) ¶ 9, at 5.) Thus, any redemption requests made after October 16, 2008, would have been placed in the November redemption cycle, which is precisely what *Bhatia* plaintiffs allege happened to their October 28-29, 2008 redemption request(s). (*Bhatia* Am. Comp. ¶ 55.)

[15]     *Tradewaves* plaintiffs do not assert any claims relating to the Lloyds Bonds.

in convertible products (*id.* ¶¶ 71-72), and by allegedly failing to inform plaintiffs in December 2008 that the bonds would be converted to preference shares (*id.* ¶¶ 73-74).

      *Bhatia* plaintiffs' complaint does not address the prospectus for the Lloyds Bonds, which disclosed that the bonds were convertible instruments. (*Supra* p. 14.) Nor do *Bhatia* plaintiffs make any particularized allegations of damages, including whether they sold or still hold the Lloyds Bonds or preference shares. (*Bhatia* Am. Compl. ¶¶ 75-76.) Plaintiffs assert only that after the conversion, the price of the bonds fell "sharply" below the $65-70 range in which the bonds were trading before the conversion. (*Id.* ¶ 75.) Notably, on September 18, 2009, the date *Bhatia* plaintiffs filed their Amended Complaint, the preference shares were trading around $64.75. (Declaration of Patrick B. Berarducci, executed on March 10, 2010 ("Berarducci Decl.") Ex. B (Bloomberg price sheets).) On October 31, 2009, the preference shares traded at or around $76.00. (*Id.*) As of March 4, 2010, the preference shares traded around $59.13. (*Id.*)[16]

*    *    *

      In short, plaintiffs seek to avail themselves of the New York courts to hold SCI and SC PLC liable for Madoff's fraud. Singapore is the proper forum for this dispute under both the mandatory forum selection clauses in the parties' agreements, and a forum non conveniens analysis. In any event, plaintiffs' complaint that they suffered losses on investments because of purported representations concerning the Bank's due diligence on Fairfield Sentry is nonsensical. Plaintiffs contractually agreed that they—not SCI or SC PLC—were responsible for their own

---

[16]     The Court may take judicial notice of publicized prices for securities, such as the Lloyds Bonds, and the preference shares. *See Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 254 n.9 (S.D.N.Y. 2003).

investment decisions. More fundamentally, plaintiffs did not lose money because the Bank

could have done more thorough due diligence on Fairfield Sentry. Plaintiffs, along with

thousands of other similarly situated investors, lost money because Madoff stole it. The *Bhatia*

Amended Complaint and *Tradewaves* Complaint, if not sent to Singapore, should be dismissed

with prejudice on the merits.

## ARGUMENT

In deciding a motion to dismiss, the Court possesses the inherent authority to

address non-merits threshold issues in a manner to achieve maximal judicial efficiency, and may

dismiss an action "if, consistent with [] concerns about furthering justice and judicial economy, a

more suitable and expeditious non-merits disposition is available." *Turedi* v. *Coca Cola Co.*,

460 F. Supp. 2d 507, 516 (S.D.N.Y. 2006) (Marrero, J.), *aff'd*, 343 F. App'x 623 (2009). Thus,

the Court may determine whether to dismiss this action in favor of the Singapore courts even

before addressing its own subject matter jurisdiction. *Id.* Moreover, in considering this

threshold issue, the Court may consider the parties' submissions outside the pleadings without

converting a motion to dismiss into one for summary judgment. *Overseas Media, Inc.*, 441 F.

Supp. 2d at 615 (considering submissions outside pleadings to address forum non conveniens

argument); *Valenti* v. *Norwegian Cruise Line*, No. 04-CV-8895, 2005 WL 927167, at *2-3

(S.D.N.Y. Apr. 21, 2005) (considering submissions outside pleadings to determine applicability

of forum selection clause). The Court similarly may consider party submissions that concern the

issue of subject matter jurisdiction. *Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d

Cir. 2008), *cert. granted*, 130 S. Ct. 783 (2009).

When deciding a motion to dismiss for failure to state a claim, this Court accepts

"all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's

favor." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). But the Court may consider any documents incorporated by reference in the complaint, and any documents that are "integral" to the complaint, *Chambers*, 282 F.3d at 153, including "offering memoranda[] that are not mentioned in or attached to the complaint," *Deutsche Bank*, 2009 WL 3073349, at *3 n.3 (collecting cases). For a claim to survive a motion to dismiss, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *Id.* (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)). A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do' . . . only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (quoting *Twombly*, 550 U.S. at 555-56).

Where, as here, fraud is alleged, a plaintiff must also meet the heightened pleading requirements of Rule 9(b) and, in the case of federal securities fraud claims, the Private Securities Litigation Reform Act ("PSLRA"). "These standards require a plaintiff to specify the statements or omissions that the plaintiff contends were fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Muller-Paisner* v. *TIAA*, 289 F. App'x 461, 462 (2d Cir. 2008). Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), but a plaintiff must still "allege facts that give rise to a strong inference of a fraudulent intent." *Jaffe* v. *Capital One Bank*, No. 09-CV-4106, 2010 WL 691639, at *6 (S.D.N.Y. Mar. 1, 2010) (citation omitted). For federal securities claims, the PSLRA requires that a plaintiff "state with particularity . . . the facts evidencing scienter, i.e., the defendant's intention to 'deceive, manipulate, or defraud.'" *City of Sterling Heights Police & Fire Ret. Sys.*

v. *Vodafone*, 655 F. Supp. 2d 262, 267 (S.D.N.Y. 2009) (quoting *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).

## I.    PLAINTIFFS ARE REQUIRED TO BRING THEIR CASE IN SINGAPORE.

Plaintiffs' complaints contain boilerplate venue allegations that "[s]ubstantial acts in furtherance of the alleged conduct and its effects have occurred within this district" and that, "[i]n connection with [those] acts . . . defendants . . . used the means [sic] instrumentalities of interstate commerce." (*Bhatia* Am. Compl. ¶¶ 13-14, *Tradewaves* Compl. ¶¶ 14-15.) The complaints, however, are devoid of any facts to support this boilerplate allegation. In fact, not only are all of the plaintiffs located—and all of the alleged wrongdoing occurred—outside of the United States, but plaintiffs' accounts are also subject to a forum selection clause that provides for exclusive jurisdiction of the Singapore courts. These cases belong, if anywhere, in Singapore.

### A.    Plaintiffs' Claims May Be Brought Only in Singapore Under the Binding Forum Selection Clause in the Account Agreements.

The T&Cs that govern plaintiffs' accounts contain a forum selection clause that provides that plaintiffs "submit[] to the exclusive jurisdiction of the courts of Singapore to settle any dispute arising out of or in connection with" any account, transaction or service (including a dispute regarding the existence, validity or termination of any agreement). (Vijayan Decl., Ex. A, at app. 1, ¶ 7.1.) A forum selection clause is presumptively enforceable if it "was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute." *Phillips* v. *Audio Active, Ltd.*, 494 F.3d 378, 383-84 (2d Cir. 2007); *see also Wells Fargo Century, Inc.* v. *Brown*, 475 F. Supp. 2d 368, 371 (S.D.N.Y. 2007) (Marrero,

J.) ("There exists a strong presumption favoring enforcement of freely negotiated choice of forum provisions." (citation and internal quotation marks omitted)).

The forum selection clause here satisfies all three *Phillips* factors. *First*, the clause was communicated to plaintiffs prior to the T&Cs taking effect, when plaintiffs were sent a copy of the T&Cs and a notice informing them that the T&Cs would govern their accounts. (*See* Vijayan Decl. ¶¶ 18-20, Ex. Q (T&Cs).)[17] *Second*, the clause is mandatory, providing for the "exclusive" jurisdiction of the Singapore courts. *Phillips*, 494 F.3d at 386 ("forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum" (citation omitted)); *Wells Fargo Century*, 475 F. Supp. 2d at 372 (exclusive jurisdiction language evidences clear intention to preclude all other courts). *Third*, the clause is broad and covers the claims asserted by plaintiffs. *See Diesel Props S.R.L.* v. *Greystone Bus. Credit II LLC*, No. 07-CV-9580, 2008 WL 4833001, at *8-9 (S.D.N.Y. Nov. 5, 2008).

To rebut the presumptive enforceability of the forum selection clause, plaintiffs must "mak[e] a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Phillips*, 494 F.3d at 384 (quoting *M/S Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). A forum selection clause is unreasonable or unjust if: (1) its "incorporation into the agreement was the result of fraud or overreaching;" (2) "the complaining party will for all practical purposes be deprived of his day in court, due to the grave inconvenience or unfairness of the selected forum;" (3) "the

---

[17] *See In re Am. Express Merchs. Litig.*, No. 03-CV-9592, 2006 WL 662341, at *3-4 (S.D.N.Y. Mar. 16, 2006) (enforcing a mandatory arbitration agreement that was added to credit card terms by mail notification), *rev'd on other grounds*, 554 F.3d 300 (2d Cir. 2009); *Dzanoucakis* v. *Chase Manhattan Bank, USA*, No. 06-CV-5673, 2009 WL 910691 (E.D.N.Y. Mar. 31, 2009) (same).

fundamental unfairness of the chosen law may deprive the plaintiff of a remedy;" or (4) "the claus[e] contravene[s] a strong public policy of the forum state." *Salis* v. *Am. Exp. Lines*, No. 08-CV-2678, 2009 WL 1528767, at *1-2 (2d Cir. Jan. 2, 2009) (citation and internal quotation marks omitted). None of these factors is present here. Plaintiffs allege no fraud or overreaching in connection with any of their account agreements. Further, Singapore is clearly not an inconvenient or unfair forum, because plaintiffs opened and continue to maintain bank accounts there and the Singapore courts provide a fair and adequate forum in which plaintiffs can bring their claims. (*See* Declaration of Francis Xavier, Advocate and Solicitor of the Supreme Court of the Republic of Singapore and a partner with the law firm of Rajah & Tann LLP, executed on November 11, 2009 ("Xavier Decl.").) Finally, no public policy concerns are implicated. This Court should enforce the clause and dismiss the *Bhatia* and *Tradewaves* complaints pursuant to Rule 12(b)(3).

**B. Application of the Forum Non Conveniens Doctrine Likewise Favors Litigation in Singapore.**

These cases belong in Singapore for the separate reason that they simply have no connection to this District. Courts in this District consider two factors in determining whether a case should be dismissed on the ground of forum non conveniens: (i) "whether there exists an available and adequate alternative forum where the dispute could be adjudicated"; and (ii) whether "balancing the private interests of the litigants and the public interest concerns of the court" favors litigating the action in the plaintiff's choice of forum or an alternative forum. *Turedi*, 460 F. Supp. 2d at 520. Within this balancing of private and public interests, courts also

consider "the degree of deference that should be accorded to the plaintiff's choice of forum." *Id.* at 521-22.[18] Each of these factors weighs heavily in favor of dismissal.

Singapore plainly is an adequate alternative forum. "An alternative forum is generally adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute." *Bank of Credit & Commerce Int'l (Overseas) Ltd.* v. *State Bank of Pak.*, 273 F.3d 241, 246 (2d Cir. 2001) (citation and quotation marks omitted). Here, SCI and SC PLC agreed to submit to the jurisdiction of Singapore courts for purposes of plaintiffs' claims, and Singapore permits litigation of the subject matter of this dispute (Xavier Decl. ¶¶ 24-26).

Next, both the public interest factors, (*e.g.*, the "local interest in having localized controversies decided at home" and "the appropriateness of having a court familiar with the governing law adjudicate the dispute"), and the private interest factors (*e.g.*, the level of deference accorded to a plaintiff's choice of forum and access to sources of proof) strongly favor dismissal. *See Construtora Norberto Oderbrecht S.A.* v. *Gen. Elec. Co.*, No. 07-CV-8014, 2007 WL 3025699, at *11-12 (S.D.N.Y. Oct. 12, 2007).

Neither *Bhatia* nor *Tradewaves* shares any bona fide connection to the United States or has any connection to New York. The individual plaintiffs are all foreign nationals residing in Dubai, and the two corporate plaintiffs, Tradewaves Ltd. and Aarvee Ltd., are British Virgin Island investment holding companies with their principal place of business in Dubai. (*Bhatia* Am. Compl. ¶¶ 15-19; *Tradewaves* Compl. ¶¶ 16-32.) From their inception, plaintiffs'

---

[18]     These factors can also be formulated as a three-part test. *See do Rosario Veiga* v. *World Meteorological Organisation*, 486 F. Supp. 2d 297, 302 (S.D.N.Y. 2007) (Marrero, J.) (applying the same factors, in the context of a three-part test, to dismiss a case based on forum non conveniens that was brought by a foreign plaintiff against foreign defendants).

accounts have been maintained at the Singapore Branch of AEBL or Standard Chartered Bank. (Vijayan Decl. ¶ 2.)  Both SC PLC and Standard Chartered Bank are incorporated under the laws of England and Wales.  SCI is incorporated in Connecticut, not New York, and operates solely for the purpose of engaging in international or foreign banking operations.  SCI is permitted to engage in activities in the United States only if those activities are "incidental to international or foreign business."  12 C.F.R. § 211.6(a).  Moreover, plaintiffs' claims are entirely based on foreign investments that were not issued in the United States, or held by U.S. investors.  Indeed, no U.S. investor was permitted to hold shares in Sentry, itself a British Virgin Islands investment fund, (Vijayan Decl. Ex. S (Subscription Agreement) at 2 ¶ 5(a)), and the Lloyds Bonds could not be "offered, sold or delivered within the United States or to U.S. persons" (Vijayan Decl. Ex. GG (Lloyds Bonds Prospectus) at 4).  Plaintiffs do not contend that they ever spoke or met with anyone in the United States about their Singapore investments.

By contrast, Singapore is central to the dispute.  Plaintiffs opened and maintained their accounts in Singapore.  The relevant documents are principally located in Singapore and the Bank employees who are witnesses to the alleged misstatements are located in Singapore or Dubai.  (*Bhatia* Am. Compl. ¶¶ 25, 68; *Tradewaves* Compl. ¶ 38; Vijayan Decl. ¶ 4.)  Further, Singapore has a strong interest in adjudicating this dispute because the agreements governing plaintiffs' accounts contain choice of law clauses requiring the application of Singapore law, (Vijayan Decl. Ex. A (T&Cs) at app. 1 ¶¶ 4, 7.1) *Turedi*, 460 F. Supp. 2d at 528 (recognizing that an "action should be tried in a forum familiar with the law governing the case" (citations omitted)).

Finally, plaintiffs' choice of forum is not entitled to any special deference. Where, as here, "the circumstances indicate that the parties and events bear no bona fide

connection to the United States, or that in relation to the core operative facts in dispute they at best may have only marginal links to the plaintiff's choice of forum, that choice of venue is not entitled to special deference, in particular where the claimants are all foreign residents." *Turedi*, 460 F. Supp. 2d at 522 (citations omitted); *see also Capital Currency Exch., N.V.* v. *Nat'l Westminster Bank PLC*, 155 F.3d 603, 612 (2d Cir. 1998) ("Because the real parties in interest are foreign corporations, there is not a strong presumption in favor of the plaintiffs' choice of forum." (citation omitted)).

Accordingly, the forum non conveniens doctrine requires dismissal of *Bhatia* and *Tradewaves*. *See Corporacion Tim* v. *Schumacher*, 418 F. Supp. 2d 529, 533 (S.D.N.Y. 2006) (Marrero, J.) (forum non conveniens doctrine compels dismissal of lawsuit brought by foreign plaintiffs against citizen-resident of New York operating business in the Dominican Republic where links with New York are minimal and central dispute concerns Dominican Republic more than United States), *aff'd*, 223 F. App'x 37 (2d Cir. 2007); *Ismail* v. *Am. Univ. of Beirut*, 246 F. Supp. 2d 330 (S.D.N.Y. 2003) (Marrero, J.) (forum non conveniens doctrine compels dismissal of lawsuit brought by foreign plaintiffs against school chartered in New York that administered a hospital in Lebanon); *Victoriatea.com, Inc.* v. *Cott Bev. Can.*, 239 F. Supp. 2d 377 (S.D.N.Y. 2003) (Marrero, J.) (foreign non conveniens doctrine compels dismissal of lawsuit brought by and against U.S. and Canadian corporations where central dispute is in Canada and action should be tried in a forum familiar with law governing the case); *Monegasque de Reassurances S.A.M. (Monde Re)* v. *NAK Naftogaz of Ukr.*, 158 F. Supp. 2d 377 (S.D.N.Y. 2001) (Marrero, J.) (foreign non conveniens doctrine compels dismissal of lawsuit brought by foreign plaintiffs), *aff'd*, 311 F.3d 488 (2d Cir. 2002).

## II. THESE CASES SHOULD BE DISMISSED ON THE MERITS BECAUSE PLAINTIFFS FAIL TO STATE A VIABLE CAUSE OF ACTION

### A. Plaintiffs Cannot Hold SC PLC Liable for the Alleged Actions of Its Subsidiaries.

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States* v. *Bestfoods*, 524 U.S. 51, 61 (1998) (citations omitted). Despite this fundamental principle, plaintiffs here assert claims against SC PLC based on the single conclusory allegation that SC PLC "influenced, directed and controlled" SCI's wrongdoing and, by virtue of SC PLC's 100% ownership of SCI, SC PLC "had the ability to prevent the actions, misrepresentations and omissions" allegedly committed by SCI. (*Bhatia* Am. Compl. ¶¶ 88, 89; *Tradewaves* Compl. ¶¶ 84-85.) Such allegations are plainly insufficient, as "it is hornbook law that 'the exercise of the control which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary." *Bestfoods*, 524 U.S. at 62; *see IMG Fragrance Brands, LLC* v. *Houbigant, Inc.*, No. 09-CV-3655, 2009 WL 5171741, at *5 (S.D.N.Y. Dec. 18, 2009) ("Under New York law, a corporate parent is not automatically liable for the acts of its wholly owned subsidiary, even where the parent and subsidiary corporations have interlocking directorates." (citations omitted)).

Plaintiffs make no direct allegations of any conduct (wrongful or otherwise) on the part of SC PLC. Indeed, plaintiffs' only direct allegations concerning SC PLC come in the form of group-pled references to the "Standard Chartered Defendants." (*See Bhatia* Am. Compl. ¶¶ 1, 43-46; *Tradewaves* Compl. ¶¶ 1, 60-63.) This is not enough. *See In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996) ("Rule 9(b) is not satisfied by a complaint in which

defendants are clumped together in vague allegations." (citation and internal quotation marks omitted)).  (*See infra* p. 33.)  Because plaintiffs have alleged no legitimate direct basis for liability against SC PLC, SC PLC should be dismissed from this action altogether.

**B.     Plaintiffs' Federal Securities Laws Claims Do Not Have Sufficient Connection to the United States.**

A foreign plaintiff cannot assert federal securities law claims involving largely foreign transactions unless "a sufficient connection to the United States is present."  *In re Bayer AG Sec. Litig.*, 423 F. Supp. 2d 105, 110 (S.D.N.Y. 2005).  Here, foreign plaintiffs are suing a foreign bank and its subsidiary—a Connecticut agreement corporation—for violations of U.S. securities laws based entirely on transactions in foreign countries.  Plaintiffs have the burden of establishing that the implied private right of action under Section 10(b) of the Exchange Act, and Sections 206 and 215 of the IAA, extends to their claims.  *Id.*  Plaintiffs fail to meet that burden.

When determining whether a foreign plaintiff may assert federal securities law claims based on foreign based transactions, courts consider both the place of the alleged conduct and where the alleged conduct had an effect.  *Morrison*, 547 F.3d at 171; *cf. O'Mahony v. Accenture Ltd.*, 537 F. Supp. 2d 506, 511-15 (S.D.N.Y. 2008) (Marrero, J.).[19]  To satisfy the "conduct test," plaintiffs must allege conduct in the United States "central to" or "at the heart" of the alleged fraud.  *Morrison*, 547 F.3d at 174-76.  Where, as here, the alleged fraud involves purported misstatements, courts focus on the "location from where [the] allegedly false statements emanated and the circumstances of the statements' dissemination since this conduct . . . typically embodies the heart of the alleged fraud."  *In re Bayer AG Sec. Litig.*, 423 F.

---

[19]     The same conduct and effects test applies to plaintiffs' IAA claims.  *See Selzer* v. *Bank of Bermuda, Ltd*., 385 F. Supp. 415, 419 (S.D.N.Y. 1974).

Supp. 2d at 111 (citation and internal quotation marks omitted). To satisfy the "effects test," plaintiffs must further establish that the alleged "wrongful conduct had a *substantial effect* in the United States or upon United States citizens." *Id.* at 110-11 (emphasis added). Plaintiffs fail to satisfy either test.

Beyond conclusory venue allegations that "[s]ubstantial acts in furtherance of the alleged conduct and its effects have occurred within this district" and that "Defendants also conduct substantial business within this district" (*Bhatia* Am. Compl. ¶ 13, *Tradewaves* Compl. ¶ 14), plaintiffs do not allege *any* connection—whether by conduct or effect—between the United States and the Bank's alleged fraudulent activities. Plaintiffs held their accounts in Singapore and allege wrongdoing in connection with those accounts. (Vijayan Decl. ¶ 2.) The AEBL employees that plaintiffs identify as having made the supposed misrepresentations worked in Dubai and/or Singapore. (Vijayan Decl. ¶ 4.) Plaintiffs do not allege where the supposed misstatements were made—though the plausible inference to be drawn, given that all plaintiffs are foreign nationals or foreign entities whose principal contact at AEBL was a foreign relationship manager, is that they were made abroad.

Further, plaintiffs' claims are based on their investments made through their Singapore accounts in Fairfield Sentry, a foreign investment fund, and, in the case of *Bhatia* plaintiffs, the Lloyds Bonds, issued by Lloyds TSB Bank, a foreign issuer. Investments in both Fairfield Sentry and Lloyds Bonds were limited to non-U.S. investors. (*Supra* pp. 25-26.) No transaction at issue touched the United States. Plaintiffs do not—because they cannot—even attempt to assert that the alleged fraud had a substantial effect in the United States or upon United States citizens. Under these circumstances, plaintiffs' Exchange Act and IAA claims should be dismissed. *See, e.g., Froese* v. *Staff*, No. 02-CV-5744, 2003 WL 21523979, at *2

(S.D.N.Y. July 7, 2003) (dismissing case involving foreign plaintiffs' purchases of foreign issuer's securities on foreign exchange where no U.S. plaintiffs were parties to the litigation and U.S. investors likely made up "exceptionally small" percentage of total investors).

      **C.**      **Plaintiffs Fail to State a Claim Under Section 10(b) and Rule 10b-5.**

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege (i) a material misrepresentation or omission of fact, (ii) made with scienter, (iii) on which plaintiff relied, and that (iv) proximately caused plaintiff's economic loss in connection with the purchase or sale of securities. *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005). Further, under the PSLRA, a plaintiff not only must specify each statement alleged to have been misleading and the reasons why the statement was misleading, but also must "state with particularity facts giving rise to a strong inference that the defendant has acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2).

Plaintiffs' Section 10(b) claims fail for four reasons. *First*, plaintiffs fail to adequately plead justifiable reliance because the risks associated with investments in Fairfield Sentry were fully disclosed. *Second*, plaintiffs' allegations do not meet the heightened pleading requirements of Rule 9(b) and the PSLRA. In most instances, plaintiffs do not even allege the speaker of the supposed misstatements, and with respect to the two alleged statements where the speaker is identified, plaintiffs fail to allege where or when the statements were made. *Third*, the alleged misstatements and omissions are not material. *Fourth*, plaintiffs fail to adequately plead scienter. There is no allegation that anyone benefited from, or had any special motive to engage in, the alleged fraud, and plaintiffs do not allege a single fact that suggests that anyone knew of, or was reckless in not discovering, Madoff's fraud.

**1. Plaintiffs Could Not Reasonably Rely on Alleged Misrepresentations That Conflicted with the Fairfield Sentry Offering Documents That Fully Disclosed the Risks Associated with Investing in Fairfield Sentry and the Relationship Between BLMIS and Fairfield Sentry.**

Plaintiffs' Section 10(b) and Rule 10b-5 claims rest on the allegations that AEBL employees "tout[ed] Fairfield Sentry as having a "history of stable and steady returns" and misrepresented that AEBL had conducted extensive due diligence on the fund. In general, a plaintiff alleging a Section 10(b) violation must show reasonable or justified reliance on the defendant's material misrepresentations or omissions.[20] *See Feinman* v. *Dean Witter Reynolds, Inc.*, 84 F.3d 539, 541 (2d Cir. 1996). Plaintiffs assert that they relied on the Bank's alleged misrepresentations or omissions about the safety of investing in Fairfield Sentry and the Bank's representation that it had conducted extensive due diligence of Sentry. (*See Bhatia* Compl. ¶¶ 6, 30, 82; *Tradewaves* Compl. ¶¶ 6, 43, 78.) *Tradewaves* plaintiffs further allege that "AEB[L] did not disclose the structure of Fairfield Sentry, Ltd. to its customers or the risks involved in such a structure." (*Tradewaves* Compl. ¶ 48.)

Plaintiffs' allegations of reliance fail because the alleged misrepresentations on which plaintiffs claim to have relied contradicted the Sentry Offering Documents. "It is unreasonable as a matter of law 'for a plaintiff to claim to have relied on oral misrepresentations that are contradicted in written offering materials.'" *Kosovich* v. *Metro Homes, LLC*, No. 09-CV-6992, 2009 WL 5171737, at *4 (S.D.N.Y. Dec. 29, 2009) (quoting *Deutsche Bank*, 2009 WL 3073349, at *3; *see also Olkey* v. *Hyperion 1999 Term Trust*, 98 F.3d 2, 9 (2d Cir. 1996) ("This court has consistently affirmed Rule 12(b)(6) dismissal of securities claims where risks are disclosed in the prospectus."); *Dodds* v. *Cigna Sec., Inc.*, 12 F.3d 346, 351 (2d Cir. 1993) ("Nor

---

[20]     This element is sometimes referred to as transaction causation. *Feinman*, 84 F.3d at 541.

can a plaintiff rely on misleading oral statements to establish an unsuitability claim when the offering materials contradict the oral assurances."); *Good Hill Partners L.P.* v. *WM Asset Holdings Corp. CI 2007-WM2*, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008) ("[A] reasonable investor would have familiarized [itself] with the potential for loss disclosed in the prospectuses, rather than relying on the oral assurances of brokers." (citation and internal quotation marks omitted)). Reliance on representations made outside of Sentry's offering documents is also prohibited by the Fairfield Sentry PPM, which explicitly "supersedes any . . . verbal information relating to the fund." (Vijayan Decl. Ex. FF (Sentry 10/1/04 PPM) at iii.)

Any representations that FairfieldSentry was safe and would continue to generate positive returns would clearly contradict the Sentry Offering Documents. Most notably, the PPM makes the following explicit warning on its cover page: "*THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK.*" (Vijayan Decl. Ex. FF (Sentry 10/1/04 PPM).) The Sentry Offering Documents also warn that there was no guarantee "that any trading method employed by or on behalf of the Fund will produce profitable results, and the past performance of the Fund is not necessarily indicative of its future profitability." (*Id.* Ex. FF(Sentry 10/1/04 PPM) ¶ 2, at 16.)

Likewise, the Sentry Offering Documents more than adequately disclose the structure of the relationship between BLMIS and Fairfield Sentry. Plaintiffs were notified that BLMIS was a sub-custodian of Fairfield Sentry, that Fairfield Sentry would not have control of the assets invested using BLMIS's split-strike conversion strategy, and that personnel implementing the split-strike conversion strategy could misappropriate Fairfield Sentry's assets. (*Supra* pp. 13-14; *see also infra* pp. 36-37.).

2. **Plaintiffs' Allegations Are Devoid of Details Concerning Who Made the Alleged Misstatements and Where or When They Were Made.**

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead with specificity the alleged fraudulent statements or omissions, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. *See* 15 U.S.C. § 78u-4(b)(1). Plaintiffs' allegations are clearly deficient.

To begin, plaintiffs do not allege any misstatements or omissions on the part of SC PLC. Although plaintiffs allege purported misstatements or omissions by the "Standard Chartered Defendants" (*see Bhatia* Am. Compl. ¶¶ 43-46; *Tradewaves* Compl. ¶¶ 60-63), "Rule 9(b) is not satisfied by a complaint in which 'defendants are clumped together in vague allegations,'" *In re Blech Sec. Litig.*, 928 F. Supp. at 1294. Where, as here, "fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts complained of by each defendant." *Sofi Classic S.A. de C.V.* v. *Hurowitz*, 444 F. Supp. 2d 231, 248 (S.D.N.Y. 2006) (Marrero, J.) (dismissing fraud claims where plaintiff "fail[ed] to identify which . . . Defendant[] made each statement or omission").

Nor are plaintiffs' allegations adequately particularized as to SCI. Plaintiffs engage in more vague pleading, failing to identify the speaker of all but two of the purported misstatements, instead generically attributing statements to "AEB[L]" or the "Standard Chartered Defendants." (*Bhatia* Am. Compl. ¶¶ 27, 30, 33-35, 44; *Tradewaves* Compl. ¶¶ 40, 43, 48, 50-52, 61.) Plaintiffs likewise fail to identify when any of the alleged misstatements were made. At best, the Court can infer that the statements were made between November 2004 and 2007, the time frame in which plaintiffs allege that they invested in Fairfield Sentry. (*Bhatia* Am. Compl. ¶ 24; *Tradewaves* Compl. ¶ 37.) But pleading alleged misstatements that occurred

on unspecified dates over a three-year period comes nowhere close to meeting the particularity requirements of the PSLRA or Rule 9(b).  *Endovasc Ltd., Inc.* v. *J.P. Turner & Co., LLC*, No. 02-CV-7313, 2004 WL 634171, at *13 (S.D.N.Y. Mar. 30, 2004) (allegation that misstatements occurred over 17-month period not sufficiently particular), *aff'd in part*, 169 F. App'x 655, 656 (2d Cir. 2006); *Vogel* v. *Sands Bros. & Co.*, 126 F. Supp. 2d 730, 738 (S.D.N.Y. 2001) (identification of year in which alleged misstatements made not sufficiently particular).

> **3.     Plaintiffs Do Not Allege Any Actionable Misrepresentations or Omissions of Material Fact Because the Challenged Statements Were Either Not False or Not Material, and the Challenged Omissions Were Disclosed in the Sentry Offering Documents.**

In addition to lacking the required particularity, plaintiffs' claims are not actionable because none of the challenged statements is material, and the alleged omission concerning BLMIS's role in Fairfield Sentry was disclosed to plaintiffs.  As demonstrated in the chart below, the misrepresentations alleged here are nearly identical to those advanced in the Florida Cases.

| Alleged Misstatements in Singapore Cases | Alleged Misstatements in Florida Cases |
|---|---|
| Fairfield Sentry was a "cash substitute" that "had achieved 'mythical status' for . . .[its]. . . ability . . . to generate steady and consistent returns with low volatility."  (*Bhatia* Am. Compl, ¶¶ 25-26; *Tradewaves* Compl. ¶¶ 38-39.) | The Fairfield Funds were a "cash substitute" that "had achieved 'mythical status' for . . .[its]. . . ability . . . to generate steady and consistent returns with low volatility."  (*Lopez* Compl. ¶¶ 25-26, 40.) |
| "AEB[L] . . . advised Plaintiffs that Fairfield Sentry, Ltd. would be part of the select few investments which would form the core of Plaintiffs' portfolio, due to its consistent returns. . . ."  (*Bhatia* Am. Compl. ¶ 27; *Tradewaves* Compl. ¶ 40.) | "[T]hat the Fairfield Funds would be part of the select few investments which would form the core of [Lopez] portfolio, due to its consistent returns . . . ."  (*Lopez* Compl. ¶ 27.) |
| AEBL "touted [Fairfield Sentry's] apparent history of stable and steady returns" (*Bhatia* Am. Compl. ¶ 25; *Tradewaves* Compl. ¶ 38), and represented that "an investment with | AEBI "touted [the Fairfield Funds'] apparent histories of stable and steady returns," and that the "Fairfield Funds were protected from risk due to investment of the Fairfield Funds' assets |

| | |
|---|---|
| Fairfield Sentry, Ltd. would generate consistent returns with low volatility" (*Bhatia* Am. Compl. ¶ 30; *Tradewaves* Compl. ¶ 43). | in United States Treasury Bonds." (*Lopez* Compl. ¶¶ 26, 43.) |
| "[T]hat AEB[L] had conducted extensive due diligence on Fairfield Sentry, Ltd." (*Bhatia* Am. Compl. ¶ 25; *Tradewaves* Compl. ¶ 38.) | That "[AEBI] had conducted extensive due diligence on the Fairfield Funds . . . ." (*Lopez* Am. Compl. ¶ 25.) |
| AEBL failed to disclose that Fairfield Sentry's "sub-custodian and executing broker were one in the same." (*Tradewaves* Compl. ¶ 49.) | No similar allegation; discussed below. |

The misrepresentations alleged here are no more actionable than those alleged in the Florida Cases, and fail for all the reasons set forth in Defendants' Memorandum in Support of Motion to Dismiss Florida Cases, which are adopted and incorporated herein. (*See* Defs' Mem. in Supp. of Mot. To Dismiss at 25-28.)

The only alleged misrepresentation that is unique to the Singapore Cases is *Tradewaves* plaintiffs' allegation that AEBL failed to disclose that Fairfield Sentry's "sub-custodian and executing broker were one in the same." (*Tradewaves* Compl. ¶¶ 46-49.) This allegation too fails. The Sentry PPM disclosed:

> When the Fund invests utilizing the 'split strike conversion' strategy . . . it will not have custody of the assets so invested. Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund.

(Vijayan Decl. Ex. FF (Sentry 10/1/04 PPM) at 19.) Thus, *Tradewaves* plaintiffs were warned that the executing broker was acting as custodian and would have control of Fairfield Sentry assets. Indeed, even the risk of misappropriation was disclosed. Moreover, to the extent *Tradewaves* plaintiffs plead ignorance of Madoff's involvement in Fairfield Sentry, the PPM clearly states that BLMIS was a sub-custodian of Fairfield Sentry with custody of approximately 95% of Fairfield Sentry's assets. (*See* Vijayan Decl. Ex. FF (Sentry 10/1/04 PPM) at 15.)

Because "the alleged omission[s] or misstatement[s] [are] explicitly addressed in . . . the offering documents, [they are] immaterial." *Lin* v. *Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 419-20 (S.D.N.Y. 2008); *cf. In re OPUS360 Corp. Sec. Litig.*, No. 01-CV-2938, 2002 WL 31190157, at *8 n.5 (S.D.N.Y. Sept. 30, 2002) ("the Prospectus' general warnings about the viability of Enhanced Opus Xchange constituted sufficient disclosure regarding the product's risks and potential for failure"); *Hecco Ventures* v. *Avalon Energy Corp.*, 606 F. Supp. 512, 519 (S.D.N.Y. 1985) ("Nor is there any duty to disclose Hecco's pejorative characterizations of the merger.").

       **4.**      **Plaintiffs Do Not Allege Facts That Give Rise to a Strong Inference That AEBL or SCI Acted with an Intent To Deceive Plaintiffs.**

      To establish a strong inference of scienter, plaintiffs must plead particularized facts that "(1) show[] that the defendants had both motive and opportunity to commit the fraud or (2) constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citation omitted). Plaintiffs here do not do so. Fundamentally, plaintiffs fail to allege any facts indicating that the Bank had motive to help Madoff steal the money of its private banking customers. Nor do plaintiffs' allegations create a strong inference that the Bank took actions that even approach extreme recklessness. A far more reasonable inference is that "Madoff fooled the defendants as he did individual investors, financial institutions, and regulators." *SEC* v. *Cohmad Sec. Corp.*, No. 09-CV-5680, 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010) (dismissing for lack of scienter federal securities claims premised on defendants' failure to detect Madoff's Ponzi scheme); *see also In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d at 418 (inference of recklessness arising from investment adviser's failure to conduct promised due diligence, which plaintiff contended would have uncovered fraud, was less

compelling than opposing inference that adviser's "failure to discover the fraud merely places it alongside the SEC, the IRS, and every other interested party that reviewed Bayou's finances," but failed to detect the fraud).[21]  Thus, for the reasons set forth in the Defendants' Memorandum in Support of Motion to Dismiss Florida Cases, which are incorporated by reference herein, plaintiffs' federal securities claims fail because plaintiffs do not adequately allege scienter.  (*See* Defs. Mem. in Supp. of Mot. to Dismiss at 29-34.)

### D.  Plaintiffs' Remaining Federal Law Claims Under Section 20(a) of the Exchange Act and Sections 206 and 215 of the Investment Advisers Act Fail.

#### 1.  Plaintiffs Fail to Plead a Control Person Claim Against SC PLC

Plaintiffs here do not adequately plead a control person claim under Section 20(a) of the Exchange Act for the same reasons Lopez fails in the Florida Cases.  (*See* Defs. Mem. in Supp. of Mot. to Dismiss at 34-35.)  In sum, plaintiffs do not plead a primary violation of the federal securities laws or culpable participation by SC PLC in a primary violation.  (*Id.*)

#### 2.  Plaintiffs' Investment Adviser Act Claim Fails Because Plaintiffs Have Not Adequately Alleged That AEBL Was an "Investment Adviser" Under the IAA.

Plaintiffs seek to recover all fees and commissions paid to AEBL and SCI in connection with their investments in Fairfield Sentry by advancing a claim for rescission of their supposed investment adviser agreement under Section 215 of the IAA based on an alleged

---

[21]     *Bhatia* plaintiffs' Section 10(b) and Rule 10-5 claim seemingly rests solely on their investments in Fairfield Sentry.  (*See Bhatia* Am. Compl. ¶¶ 77-90.)  Even if *Bhatia* plaintiffs are attempting to assert a Lloyds Bonds claim under Section 10(b) and Rule 10b-5, however, such a claim would fail for the same reasons as plaintiffs' Sentry claims.  The convertibility of the bonds—the principal fact that *Bhatia* plaintiffs allege "[t]he Standard Chartered Defendants" failed to disclose—was fully disclosed in the prospectus for the bonds.  (Vijayan Decl. Ex.  GG (Lloyds Bonds Prospectus).)  Moreover, *Bhatia* plaintiffs do not plead a single fact that gives rise to a strong inference of scienter in connection with any alleged misrepresentations and omissions concerning the Lloyds Bonds.

violation of Section 206(2) of the IAA.[22]  (*Bhatia* Am. Compl. ¶ 101; *Tradewaves* Compl. ¶ 97.)

Plaintiffs cannot maintain their IAA claims for the same reasons such claims must be dismissed

from the Florida Cases; namely, because SCI is exempt from the Investment Advisory

restrictions of the IAA and because plaintiffs, who attempt to establish an investment adviser

relationship with the bare, conclusory allegations that SCI "acted as an 'investment adviser'" to

plaintiffs and that they "entered into 'investment adviser agreements'" with SCI, fail to

adequately plead that SCI served as their investment adviser.  (Defs. Mem. in Supp. of Mot. to

Dismiss at 53-55.)[23]

> **E.    Plaintiffs' Common-Law Claims Fail Both Because They Are Preempted and Because Plaintiffs Do Not Allege Facts Sufficient to State a Claim.**

Plaintiffs' common-law claims should be adjudicated in the courts of Singapore

and governed by Singapore law pursuant to the forum selection and choice of law provisions in

---

[22]    According to recent Supreme Court precedent, courts should not imply a private right of action under section 215 of the IAA.  "For a statute to create such private rights, its text must be phrased in terms of the persons benefited."  *Gonzaga Univ.* v. *Doe*, 536 U.S. 273, 284 (2002) (citation and internal quotation marks omitted).  "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."  *Alexander* v. *Sandoval*, 532 U.S. 275, 289 (2001) (citation and internal quotation marks omitted).  Section 215 voids investment adviser contracts "as regards the rights" of the investment advisers (*i.e.*, the persons regulated) not their clients (*i.e.*, the persons seeking to benefit from implied rights under section 215) and, therefore, does not create a private right of action under *Alexander* and *Gonzaga*.  Although the Court, in *Transamerica Mortg. Advisors (TAMA)* v. *Lewis*, 444 U.S. 11 (1979), implied a right of action under section 215, it did so based on an outdated and, by today's standards, incorrect legal standard.  444 U.S. at 18-19.  (implying private right of action merely because clients of investment advisers are intended beneficiaries of the section and holding that right to rescission could be "fairly implie[d]" from Congress "declaring certain contracts void").

[23]    As described in more detail in Defendants' Memorandum in Support of the Motion to Dismiss Florida Cases at 53-54, a "bank" is exempt from the definition of "investment adviser" under the IAA.  Although SCI is an agreement corporation instead of an Edge Act Corporation like SCBI, the distinction is immaterial here because Agreement corporations operate in an identical manner to Edge Act Corporations

plaintiffs' account agreements. (*See supra* pp. 8-9.) If the Court declines to enforce these provisions and finds a sufficient connection with New York to retain the cases, then the plaintiffs' common-law claims still fail under New York law.

### 1.    Plaintiffs Common-Law Claims Are Preempted by the Martin Act.

If the Court does not dismiss plaintiffs' complaints in favor of the Singapore courts, then presumably the Court will have found sufficient contacts with New York to trigger New York's Martin Act. The Martin Act "provides the New York Attorney General with the sole discretion to investigate securities violations within or from the state of New York," *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d at 421, and thus preempts private causes of action "within or from" New York that are "related to a plaintiff's securities fraud claim that do not include scienter as an essential element," *Sedona Corp.* v. *Ladenburg Thalmann & Co.*, No. 03-CV-3120, 2005 WL 1902780, at *22 (S.D.N.Y. Aug. 9, 2005). "There is consensus in this District that a transaction is 'within or from' New York for purposes of the Martin Act if a plaintiff alleges that a 'substantial portion of the events' giving rise to a claim occurred in New York." *Heller* v. *Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 611 n.9 (S.D.N.Y. 2008) (citations omitted).[24]

"Claims relating to 'investment advice' have been deemed 'activities within the Martin Act's purview,'" as have claims relating to allegedly false statements that were made knowingly or negligently. *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d at 421 (quoting

---

[24]    If this action remains here, then plaintiffs' allegation that "[s]ubstantial acts in furtherance of the alleged conduct and its effects have occurred within [the Southern District of New York]" (*Bhatia* Am. Compl. ¶ 13; *Tradewaves* Complaint ¶ 14) places their claims squarely within the reach of the Martin Act, *e.g.*, *Sedona*, 2005 WL 1902780, at *22 (finding the Martin Act applicable based on venue allegations).

*Sedona*, 2005 WL 1902780, at *21).  Plaintiffs' claims for breach of fiduciary duty, gross negligence, unjust enrichment and specific performance all relate to investment advice they allegedly received in connection with their purchase of securities.  As such, those claims are preempted.  *See Heller*, 590 F. Supp. 2d at 611 (fiduciary duty claim preempted by Martin Act); *Pro Bono Invs., Inc.* v. *Gerry*, No. 03-CV-4347, 2005 WL 2429787, at *54 (S.D.N.Y. Sept. 30, 2005) (breach of fiduciary duty, conversion, unjust enrichment, negligence, gross negligence, negligent misrepresentation, and constructive trust claims preempted); *Abbey* v. *3F Therapeutics, Inc.*, No. 06-CV-409, 2009 WL 4333819, at *14 (S.D.N.Y. Dec. 2, 2009) (negligent misrepresentation claim preempted); *Owens* v. *Gaffken & Barriger Fund, LLC*, No. 08-CV-8414, 2009 WL 3073338, at *13-14 (S.D.N.Y. Sept. 21, 2009) (unjust enrichment claim preempted); *Kassover* v. *UBS AG*, 619 F. Supp. 2d 28, 37-39 (S.D.N.Y. 2008) (breach of fiduciary duty, negligent misrepresentation and negligence claims preempted).  This leaves only plaintiffs' common-law fraud claim.  That claim fails for the same reasons as plaintiffs' claims under Section 10(b)—namely, plaintiffs do not plead fraud with the particularity required by Rule 9(b).  *See Bui* v. *Indus. Enters. of Am.*, 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (dismissing common-law fraud claim for lack of particularity in pleading).

> **2.      Plaintiffs Cannot Assert a Quasi-Contract Claim for Unjust Enrichment Because They Signed a Contract Governing the Conduct at Issue.**

Plaintiffs allege that the Bank was unjustly enriched as a result of their "unlawful acts" and that each defendant "should pay its own unjust enrichment to plaintiffs."  (*Bhatia* Am. Compl. ¶¶ 112-115; *Tradewaves* Compl. ¶¶ 108-111.)  Unjust enrichment is an equitable quasi-contract claim requiring a plaintiff to establish that the defendant was enriched at the plaintiff's expense, and that equity and good conscience require the defendant to make restitution.  *See*

*Violette* v. *Armonk Assocs., L.P.*, 872 F. Supp. 1279, 1282 (S.D.N.Y. 1995) (applying New York

law).  Where the conduct at issue arises from a contractual relationship that governs the legal

relationship between the parties, however, plaintiffs cannot claim unjust enrichment.  *See*

*Goldman* v. *Metro. Life Ins. Co.*, 841 N.E.2d 742, 746-47 (N.Y. 2005); *Clark-Fitzpatrick, Inc.* v.

*Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987).  Here, plaintiffs allege that the "Private

Banking Services Agreement" created an investment advisory relationship with the Bank and

that the Bank was unjustly enriched by its receipt of fees and commissions pursuant to that

contractual relationship.  (*Bhatia* Am. Compl. ¶¶ 37, 93, 96(h), 101; *Tradewaves* Compl. ¶¶ 54,

89, 97.)  Thus, the only "enrichment" alleged is fees earned pursuant to a contract.

       **3.**      **Plaintiffs Cannot Plead Causation Because Their Losses**
                    **Were Caused by Bernard Madoff's Fraud, Not the Actions**
                    **of SCI or SC PLC.**

To maintain an action for damages for injuries allegedly caused by negligence or

other tortious acts or omissions, such act or omission must be the proximate cause of the alleged

injury.  6 N.Y. JUR. DAMAGES § 12 (2009).  "[I]n the ascertainment of liability, the law always

relates an injury to the [natural and] proximate, as distinguished from the remote, cause of such

injury." *Id.*

The alleged wrongdoing by the Bank was neither the natural nor the proximate

cause of plaintiffs' injuries.  Rather, plaintiffs' losses were caused by the intervening criminal

acts of Bernard Madoff and others at BLMIS.[25]  "'[A]n intervening intentional [or criminal] act

will generally sever the liability of the original tort-feasor.'" *Van Valkenburgh* v. *Robinson*, 639

---

[25]      Madoff has admitted that his false representations and fraudulent scheme directly caused
investors in BLMIS to lose billions of dollars.  *See* Plea Allocution, *United States* v. *Bernard L.*
*Madoff*, No. 09-Cr-213 (S.D.N.Y.).  The Court may take judicial notice that Madoff has made
this admission.  FED. R. EVID. 201(b)(2).

N.Y.S.2d 149, 150 (App. Div. 1996) (quoting *Kush* v. *Buffalo*, 449 N.E.2d 725, 729 (N.Y. 1983)). "[W]hether an intervening act severs the chain of causation depend[s] on the foreseeability of the intervening act . . . ." *McCarthy* v. *Sturm, Ruger & Co.*, 916 F. Supp. 366, 372 (S.D.N.Y. 1996) (citation omitted) *aff'd*, 119 F.3d 148 (2d Cir. 1997).

Bernard Madoff's Ponzi scheme, the largest, longest-running and best-concealed of all time, is an emblematic intervening and superseding event. Even if it could be said that the Bank in some way made it possible for Bernard Madoff to defraud plaintiffs—which it cannot— that Madoff was orchestrating the world's biggest Ponzi scheme "clearly was not probable and, therefore, was not reasonably foreseeable." *Van Valkenburgh*, 639 N.Y.S.2d at 151 (citing *Perry* v. *Rochester Lime Co.*, 113 N.E. 529, 530 (N.Y. 1916)); *see also* 79 N.Y. JUR. NEGL. § 51 ("Liability for negligence is determined by what is probable, not merely by what is possible."). Had Madoff's scheme been foreseeable, it could not have continued for so many years,[26] ensnared so many sophisticated investors, and repeatedly evaded detection by government regulators. Simply put, Madoff—not the Bank—was the proximate cause of plaintiffs' losses.

### 4. Plaintiffs' Fiduciary Duty Claim Fails Because Plaintiffs Rely on Duties the Bank Did Not Owe Them.

Plaintiffs assert breach of fiduciary duty claims alleging that the Bank failed "to monitor[] . . . the safety and performance of Plaintiffs' funds." (*Bhatia* Am. Compl. ¶¶ 102-07; *Tradewaves* Compl. ¶¶ 98-103.) The gravamen of these claims is that the Bank had a duty to take whatever steps necessary to uncover Madoff's Ponzi scheme, both before plaintiffs invested

---

[26] Madoff's scheme may have begun as early as the 1960s. *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789, 2010 WL 694211, at *3 (Bankr. S.D.N.Y. Mar. 1, 2010) (citing the trustee's investigation of Madoff's operations as part of the BLMIS liquidation proceedings).

in Fairfield Sentry and after.[27]  (*See Bhatia* Am. Compl. ¶¶ 102-107; *Tradewaves* Compl. ¶¶ 98-103.)  The Bank owed no such duty.

Plaintiffs' accounts at AEBL and Standard Chartered Bank are nondiscretionary accounts.  A nondiscretionary account is an account in which the customer "keeps control over the account and has full responsibility for trading decisions."  *de Kwiatkowski* v. *Bear, Stearns & Co.*, 306 F.3d 1293, 1296 (2d Cir. 2002).  (*See supra* pp. 9-11 (account agreements stating that plaintiffs maintain control over their accounts and make all investment decisions).)  Under the law of this Circuit:

> [A] broker ordinarily has no duty to monitor a nondiscretionary
> account, or to give advice to such a customer on an ongoing basis.
> The broker's duties ordinarily end after each transaction is done,
> and thus do not include a duty to offer unsolicited information,
> advice, or warnings concerning the customer's investments. . . .
> The client may enjoy the broker's advice and recommendations
> with respect to a given trade, but has no legal claim on the broker's
> ongoing attention.

*Deblasio* v. *Merrill Lynch & Co.*, No. 07-CV-318, 2009 WL 2242605, at *29 (S.D.N.Y. July 27, 2009) (quoting *de Kwiatkowski*, 306 F.3d at 1302).  Given the limited scope of the duties owed by the Bank, plaintiffs cannot maintain claims for failing to "monitor," "oversee" or "preserve the value of" their accounts from Bernard Madoff's fraud.  (*Bhatia* Am. Compl. ¶¶ 104-05; *Tradewaves* Compl. ¶¶ 100-01.)

---

[27]      Plaintiffs allege that the Bank breached its fiduciary duties by providing misleading information about the extent of due diligence it had conducted on Sentry.  (*Bhatia* Am. Compl. ¶ 105; *Tradewaves* Compl. ¶ 101.)  This allegation is inadequately pleaded.  Plaintiffs' allegations based on misrepresentations of the extent of due diligence sound in fraud and, as a result, must satisfy the pleading requirements of Rule 9(b).  *See Matsumura* v. *Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251-59 (S.D.N.Y. 2008).  As set forth *supra* pp. 34-35, plaintiffs have failed to do so.

Nor do plaintiffs state a claim with respect to their initial investments in Fairfield Sentry. Under New York law, the fiduciary relationship that arises from nondiscretionary accounts is limited "to the narrow task of consummating the transaction requested." *Press* v. *Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) (citation omitted). So limited are these duties, for example, that in *Independent Order of Foresters* v. *Donald, Lufkin & Jenrette, Inc.* ("*Foresters*"), the Second Circuit held that the duties owed by a nondiscretionary broker did not encompass allegations that a defendant-broker (a) did not apprise the plaintiff of the risks involved in the transaction, and (b) provided kickbacks to the person who recommended the purchase of the allegedly misrepresented securities (an investment officer employed by the plaintiff). 157 F.3d 933, 940-41 (2d Cir. 1998). Plainly, the duties the Bank owed to plaintiffs did not extend to the type of investigation that would have uncovered Madoff's fraud.[28]

**F.    The Exculpation Provisions in Plaintiffs' Account Agreements Bar All Claims That Do Not Involve Intentional or Reckless Conduct.**

Plaintiffs' common-law claims, other than their fraud claims and gross negligence claims, also fail because exculpation provisions in plaintiffs' account agreements bar all claims that do not rise to the level of gross negligence. Under the terms governing plaintiffs' accounts, the Bank cannot be held "responsible or liable in any circumstances for . . . any direct Loss suffered or incurred by the Client unless such direct Loss is the direct result of the Bank's fraud, gross negligence or wilful default." (Vijayan Decl. Ex. A (T&Cs) ¶ 42.)

---

[28]    *Bhatia* plaintiffs' Lloyds Bonds claims fair no better. Because the Bank did not owe any ongoing duty to monitor plaintiffs' account, the Bank did not owe a duty to notify *Bhatia* plaintiffs that the Lloyds Bonds would be, and were, converted to preference shares. (*Bhatia* Am. Compl. ¶ 105(n), (o).) In addition, the Bank did not owe a duty to notify *Bhatia* plaintiffs about the risks possibly associated with the Lloyds Bonds. (*Bhatia* Am. Compl. ¶ 105(l)-(m)); *Foresters*, 157 F.3d at 940-41 (no breach of fiduciary duty where nondiscretionary broker did not advise plaintiffs of risks associated with investment).

"Where the language of the exculpatory agreement expresses in unequivocal terms the intention of the parties to relieve a defendant of liability for the defendant's negligence, the agreement will be enforced." *Lago* v. *Krollage*, 575 N.E.2d 107, 110 (N.Y. 1991) (citation omitted). New York courts routinely enforce exculpatory clauses that are indistinguishable from the clause contained in the T&Cs. *E.g., Baker* v. *Andover Assocs. Mgmt. Corp.*, No. 6179/09, slip op. at 29-31 (N.Y. Sup. Ct. Nov. 30, 2009) (Berarducci Decl. Ex. Y) (exculpatory clauses waiving liability unless resulting from gross negligence barred Madoff-related negligence claims); *Glassman* v. *Wachovia Bank, N.A.*, No. 115380/06, 2007 WL 2582364, at *1 (N.Y. Sup. Ct. Sept. 7, 2007) (enforcing exculpatory clause that stated that "the Bank has no liability whatsoever unless the loss is caused by the Bank's gross negligence, fraud or bad faith"); *Satterwhite* v. *Image Bank, Inc.*, No. 01-CV-7097, 2007 WL 2120429, at *1 (S.D.N.Y. July 20, 2007) (breach of contract claim precluded because exculpatory clause provided that "[defendant] shall not be liable . . . for any loss or damage . . . unless caused by [defendant's] gross and willful negligence"); *In re Enron Corp.*, 292 B.R. 752, 767 (Bankr. S.D.N.Y. 2003) (enforcing exculpatory clause that stated the defendant would not "be liable for any loss or damage . . . unless such loss or damage shall have been caused by gross negligence or wilful misconduct"). Accordingly, any allegation that Standard Chartered breached a duty to plaintiffs must meet the pleading requirements for a claim of gross negligence. Plaintiffs' allegations do not meet this standard.

### 1. Plaintiffs Fail to Allege Facts To Support an Inference That the Bank Engaged in Intentional or Reckless Misconduct.

Under New York law, "gross negligence [is] the failure to exercise even slight care," *Food Pageant, Inc.* v. *Consol. Edison Co.*, 429 N.E.2d 738, 740 (N.Y. 1981), and

"requires 'a reckless disregard for the rights of others, bordering on intentional wrongdoing,'" *Horwitz* v. *Camelot Assocs. Corp.*, 888 N.Y.S.2d 241, 243-44 (App. Div. 2009) (quoting *Haire* v. *Bonelli*, 870 N.Y.S.2d 591 (App. Div. 2008)).  Gross negligence is thus "different in kind and degree from ordinary negligence."  *Lemoine* v. *Cornell Univ.*, 769 N.Y.S.2d 313, 316 (App. Div. 2003) (citations and quotation marks omitted).  Even "a mistake or a series of mistakes alone, without a showing of recklessness, is insufficient for a finding of gross negligence."  *A T. & T. Co.* v. *City of N.Y.*, 83 F.3d 549, 556 (2d Cir. 1996) (citation omitted).

To begin, the particularity requirements of Rule 9(b) apply to plaintiffs' common-law claims because they "sound in fraud."  *Matsumura* v. *Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008).  The factual basis for all of plaintiffs' claims is the same, and where, as here, "the complaint[s] incorporate[] by reference prior allegations of fraud into other claims traditionally not perceived to be grounded in fraud, those claims must then be pleaded according to [Rule 9(b)]."  *DeBlasio*, 2009 WL 2242605, at *12 (applying Rule 9(b) to unjust enrichment claim that incorporated by reference all fraud-based allegations in the complaint).  (*Bhatia* Am. Compl. ¶¶ 102, 108, 112, 119; *Tradewaves* Compl. ¶¶ 98, 104, 108, 115.)  Thus, plaintiffs' conclusory allegations that "Defendants" acted "knowingly or recklessly" are insufficient.  (*Bhatia* Am. Compl. ¶¶ 8, 79, 81, 95, 105, 118; *Tradewaves* Compl. ¶¶ 10, 75, 77, 91, 101, 114.); *see Kinsey* v. *Cendant Corp.*, No. 04-CV-0582, 2005 WL 1907678, at *7 (S.D.N.Y. Aug. 10, 2005).

Plaintiffs' assert that the Bank was grossly negligent by not conducting enough due diligence on Fairfield Sentry to uncover Madoff's fraud.  But the fact that the Bank did not uncover Madoff's Ponzi scheme, again, the longest-running and best-concealed in history, is no evidence of gross negligence.  Indeed, in *Baker* v. *Andover Associates Management Corp.*, the

court dismissed a gross negligence claim based on defendants' alleged failure to conduct adequate due diligence and to seize upon alleged "red flags" regarding Madoff and BLMIS. No. 6179/09, slip op. at 4, 27 (N.Y. Sup. Ct. Nov. 30, 2009) (Berarducci Decl. Ex. Y.) Plaintiffs' allegations did not evince "'a reckless disregard for the rights of others or smack[]of intentional wrongdoing.'" *Id.* at 27 (quoting *Mancusco* v. *Rubin*, 861 N.Y.S.2d 79, 82 (App. Div. 2008)); *see also Cohmad Sec. Corp.*, 2010 WL 363844, at *2 (dismissing federal securities claims based upon defendants' failure to detect Madoff's Ponzi scheme); *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d at 418 (dismissing securities fraud claims because defendants not reckless in failing to conduct promised due diligence into investment fund that operated as a Ponzi scheme "for nearly a decade" and "managed to deceive the entire investing community").[29]

### G. There Is No Basis for Specific Performance Because Standard Chartered Performed Under the Contract.

Finally, plaintiffs assert a cause of action for specific performance to redeem their investments in Fairfield Sentry. (*Bhatia* Am. Compl. ¶¶ 54-59, 121; *Tradewaves* Compl. ¶ 117.) "[S]pecific performance is an equitable remedy for a breach of contract, rather than a separate

---

[29] Nor was the Bank grossly negligent in connection with plaintiffs' Lloyds Bonds investments. *First*, the Bank did not owe the full duties alleged by plaintiffs. (*Supra* at n. 28.) *Second*, *Bhatia* plaintiffs were on notice that the bonds were convertible because that information was disclosed in the bonds' prospectus. *Good Hill Partners L.P.*, 583 F. Supp. 2d at 520 (any "reasonable investor would have familiarized [himself or herself] with the potential for loss disclosed in the prospectuses, rather than relying on the oral assurances of brokers" (citation and internal quotation marks omitted)). Neither SCI nor SC PLC can be held liable for not disclosing information contained in a document that *Bhatia* plaintiffs, as a matter of law, are charged with reviewing. *Cf. Gillman* v. *Chase Manhattan Bank*, 534 N.E.2d 824, 828-29 (N.Y. 1988) (rejecting plaintiff's argument that bank failed to disclose term of security agreement where plaintiff had access to agreement but chose not to read it). *Third*, *Bhatia* plaintiffs do not plead any injury in connection with their Lloyds Bonds investments. As of the time *Bhatia* plaintiffs filed their amended complaint, the price of the preference shares had already risen back to the $65-70 price range at which the bonds were valued before their conversion. (*See supra* pp. 18-19.)

cause of action." *Cho* v. *401-403 57th St. Realty Corp.*, 752 N.Y.S.2d 55, 57 (App. Div. 2002).

Because plaintiffs do not assert a cause of action for breach of contract, there is no basis to award

specific performance. In any event, this claim makes no sense. Although plaintiffs purport to

seek redemption of their investments in Fairfield Sentry, redemptions in Sentry are no longer

possible. What plaintiffs really appear to be seeking here are money damages. Yet, plaintiffs'

claim is contingent on a showing that money damages would be an inadequate remedy. *See*

*Lucente* v. *I.B.M. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002). Money damages are not an

inadequate remedy here—they are the only possible remedy.

 Finally, even setting aside these deficiencies, plaintiffs are not entitled to specific

performance because the Bank fully performed its obligations with respect to any redemption

requests. *See Nemer Jeep-Eagle, Inc.* v. *Jeep-Eagle Sales Corp.*, 992 F.2d 430, 433 (2d Cir.

1993). The Bank submitted *Bhatia* plaintiffs' redemption request to Fairfield, as requested.

(*Bhatia* Am. Compl. ¶¶ 55-56.) Indeed, plaintiffs allege that it was Fairfield Sentry, not the

Bank, that "wrongly retained" plaintiffs funds and did not honor the redemption request that the

Bank submitted.[30] (*Id.* ¶ 59.)

---

[30]    *Tradewaves* plaintiffs' allegations are even more deficient—although they attempt to assert a claim for specific performance, they do not even allege that they submitted a redemption request, much less that the Bank breached a contract in failing to redeem such a request.

## CONCLUSION

The extraterritorial nature of plaintiffs' allegations and the forum selection clause applicable to their accounts both point to Singapore, not New York, as the most appropriate forum to hear this case.  Beyond that, none of plaintiffs' individual claims are cognizable based on the allegations presented in their complaints.  SCI and SC PLC thus respectfully request that the Court dismiss with prejudice the *Bhatia* Amended Complaint and the *Tradewaves* Complaint in their entirety.

Dated: March 11, 2010
     New York, New York

/s/ Sharon L. Nelles
Sharon L. Nelles (SN-3144)
Bradley P. Smith (BS-1383)
Patrick B. Berarducci (PB-2222)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
nelless@sullcrom.com

Diane L. McGimsey
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067

*Attorneys for Defendants Standard*
*Chartered International (USA) Ltd.*
*and Standard Chartered PLC*