# Exhibit M

## Partial Award

# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## International Arbitration Tribunal

In the Matter of the Arbitration between:

Re: 50 148 T 00508 09
    Miguel Calvo and/or Maria Luisa Calvo
    JHC Investment Ltd. and Shiva Enterprises Ltd.
    World Global Engineers Ltd.
    Primavera Internacional
    Fernando Selman-Nazal and Tossa De Mar Ltd.
    Julio Acevedo Diaz & Maria Magdalene Commentz Sala
    Inversiones Millapel Limitada
    Maria Lucia Skinner and Horacio Undurraga
    Juan Luis Eltit Z. and Patricio Eltit
    Gisselle Kassis and Jorge Kassis
    Asesorias Rogers y Compania Limitada
    Norma Narvaez
    Nelson Gazali, Sergio Gazali and Yamili Atisha
    Gonzalo Jaime Vega de Kuyper
    Alfonso Rozas Ossa and Eliana Rodriguez,
    Alfonso Rozas R. and Maria Rozas R.
    Cecilia Irene Perez Ramirez, Ildegard Ana  Kunz Pa
    Ildegard Veronica Bustos Kunz
    Arturo Murua and Carmen Paz Daza
    Hans Killinger B. and Boxer Limited
    Simon Echenique and Pedro Echenique
    GLDN Corporation Ltd. and Fujian Ltd
    vs
    Standard Chartered Bank
    Standard Chartered International (USA) Ltd.
    Standard Chartered Bank International (Americas) L
    StanChart Securities International, Inc.
    Rodolfo L. Pages
    John G. Dutkowski

## PARTIAL AWARD
### - Jurisdiction -

    We the undersigned arbitrators, having been designated in accordance with the arbitration provisions of the Standard Chartered Bank International (Americas) Limited Brokerage Agreements and Nondiscretionary Investment Services Agreements, entered into by the Claimants, and having been duly sworn, and having duly reviewed the written submissions and exhibits of all parties, represented through their counsel, and having

duly considered the proofs and arguments, do hereby find, order, adjudge, and issue the following Partial Award.

## Background

This case is brought by 38 former and current private banking clients ("Claimants") of Standard Chartered Bank International (Americas) Limited ("SCBI"), formerly American Express Bank International ("AEBI"), who collectively held 24 separate AEBI/SCBI nondiscretionary investment accounts. Claimants purchased shares in Fairfield Sentry Limited ("Sentry"), a third-party investment fund that invested substantially all of its assets with Bernard L. Madoff Investment Securities LLC ("BLMIS."). The Sentry shares were held in Claimants' accounts with AEBI/SCBI.

Claimants' Statement of Claim names as respondents Standard Chartered Bank, Standard Chartered International (USA) Ltd., StanChart Securities International, Inc., and SCBI (collectively, the "Institutional Respondents"). Claimants have also named two individuals, Rodolfo L. Pages and John G. Dutkowski as Respondents (the "Individual Respondents").

Presented for consideration by the Tribunal are challenges to the Tribunal's jurisdiction by all of the Respondents.

## The parties and their objections to jurisdiction

In February 2008, Standard Chartered PLC acquired American Express Bank Ltd. and some or all of its wholly owned subsidiaries, with a resulting change in the names of the Institutional Respondents.

**Standard Chartered Bank International (Americas) Limited.** Standard Chartered Bank International (Americas) Limited ("SCBI", referred to above) is the same entity as American Express Bank International ("AEBI", referred to above), which changed its name in August 2008. As Claimants assert, AEBI/SCBI offers "private banking services... principally to high net worth individuals in Latin America." Statement

of Claim at 5. Each of the Claimants held nondiscretionary investment accounts at AEBI, known later as SCBI. The Institutional Respondents concede that there is a valid arbitration clause calling for arbitration before the American Arbitration Association ("AAA") between AEBI/SCBI and the Claimants.[1]

**Standard Chartered International (USA) Ltd.** Standard Chartered International (USA) Ltd. ("SCI") is the same entity as American Express Bank Ltd. ("AEBL") which changed its name in January 2009. AEBL (now SCI) was the parent company of AEBI/SCBI. Institutional Respondents state that SCI's banking business has been transferred to other entities, and SCI/AEBL is now dormant. SCI objects to the Tribunal's jurisdiction over it on the grounds that it has not entered into any arbitration agreement with the Claimants and that no grounds exist for this Tribunal's jurisdiction over it.

**Standard Chartered Bank** Standard Chartered Bank ("Standard Chartered Bank") is the parent company of the now dormant SCI (formerly AEBL) and of SCBI (formerly AEBI) and a subsidiary of Standard Chartered PLC. American Express Private Bank/Standard Chartered Private Bank is described as a division of American Express Bank Ltd./Standard Chartered Bank and as a global marketing name. Standard Chartered Bank objects to the Tribunal's jurisdiction over it on the grounds that it has not entered into any arbitration agreement with the Claimants and that no grounds exist for this Tribunal's jurisdiction over it.

**StanChart Securities International, Inc.** StanChart Securities International, Inc. ("StanChart") is a separate subsidiary of Standard Chartered Bank; it became a registered broker dealer with the Securities Exchange Commission ("SEC") and a member of the Financial Industry Regulatory Authority ("FINRA") on February 29, 2008. StanChart was formed with the intention of transferring investment accounts from SCBI to StanChart, which Institutional Respondents state was a response to the securities brokerage "push out" rules promulgated under the Gramm-Leach-Bliley Act.

---

[1] The AEBI/SCBI Brokerage Agreement with Boxer Limited has not been found but SCBI has agreed not to contest jurisdiction because Boxer Limited has agreed to be bound by the terms of the agreement.

SCBI began the process of transferring accounts and certain securities to StanChart in November 2008. The Institutional Respondents take the position that SCBI had not completed the transfer of any investments in Sentry when Bernard Madoff was arrested on December 11, 2008 and the Ponzi scheme he orchestrated became widely publicized. Rather, the Institutional Respondents state that "[a]fter the Madoff fraud was exposed, SCBI halted the transfer process and immediately attempted to redeem all of its clients' positions in Sentry." Inst. R. Statement of Defense, 5.

The Institutional Respondents take the position that the Sentry investments were never ultimately transferred to StanChart and have submitted an affidavit in support of this contention. Declaration of Vivian Velasquez at ¶¶ 5-8. Claimants dispute these contentions.

The Institutional Respondents object to the Tribunal's jurisdiction over StanChart on the grounds that the Claimants' relationship with it is governed by a separate agreement issued by StanChart on March 1, 2009 the terms of which provide for stock exchange or FINRA arbitration rather than AAA arbitration.

**John G. Dutkowski** Mr. Dutkowski was the Investment Specialist for AEBI/SCBI in the Miami office responsible for the Claimants' accounts. Mr. Dutkowski objects to the Tribunal's jurisdiction over him on the grounds that he is not a signatory to any arbitration agreement with the Claimants and that no grounds exist for this Tribunal's exercise of jurisdiction over him.

**Rodolfo L. Pages** Mr. Pages was the head of sales and relationship management for AEBL and AEBI and also Chief Executive Officer of StanChart until September 2009. Mr. Dutkowski objects to the Tribunal's jurisdiction over him on the grounds that he is not a signatory to any arbitration agreement with the Claimants and that no grounds exist for this Tribunal's jurisdiction over him.

The Institutional Respondents further contend that each of Claimants signed a separate agreement with AEBI/SCBI to arbitrate before the American Arbitration Association ("AAA") any controversy arising out of or relating to their own AEBI/SCBI accounts or transactions with AEBI/SCBI and Institutional Respondents object to the presentation of the Claimants' claims against them in a single proceeding before the

4

Tribunal on the ground that the arbitration agreements do not permit a consolidated arbitral proceeding and that Claimants, other than the first named Claimant, should be required to bring separate individual proceedings, with separate tribunals and subject to separate hearings.

Some or all of the Sentry holdings of two sets of Claimants were bought through accounts at Standard Chartered Bank (Switzerland) SA, formerly American Express Bank (Switzerland) (collectively" "SCB Geneva"). The Institutional Respondents assert that these accounts are governed by different terms and conditions that call for Swiss court jurisdiction and accordingly object to jurisdiction over claims relating to investments not bought through AEBI/SCBI accounts and which are beyond the reach of any potentially applicable AAA arbitration clauses.

**The Arbitration Agreements**

Claimants entered into the AEBI brokerage agreement with arbitration clauses, which provided for AAA jurisdiction. Inst. R. Attachment C, (the "AEBI/SCBI Brokerage Agreement")

The AEBI/SCBI Brokerage Agreement ¶6 provides in relevant part:

> "Any controversy arising out of, or relating to, my accounts, to transactions with you or your brokers and/or employees for me or to this agreement or the breach thereof, shall be settled by arbitration and conducted pursuant to the Federal Arbitration Act, before the American Arbitration Association..."

By letter dated October 1, 2008, SCBI amended the AEBI/SCBI Brokerage Agreement to be governed by New York law (rather than Minnesota law) "effective on the Transfer Date," which is defined as being "on or about November 7, 2008", the date the Claimants' investment accounts would automatically become investment accounts with StanChart. Letter dated October 1, 2008. Glover Declaration, Inst. R. Ex. B,1.

Certain of the Claimants also entered into the Nondiscretionary Investment Services Agreement ("NISA"), Inst. R. Attachment D. [2] The NISA agreement ¶9 provides in relevant part:

---

[2] The Institutional Respondents have located copies of the NISA for 13 of the 24 relevant accounts associated with Claimants.

"Customer and AEBI agree that all controversies between Customer and AEBI and/or any Agents arising out of or concerning this agreement, the Investment Account, Transactions, Holdings or any related matter shall be determined by arbitration in accordance with the rules of the American Arbitration Association."

The NISA agreement is governed by Florida law.

The AEBI/SCBI Brokerage Agreement ¶ 8 further provided:

"I agree that you shall have the right to amend this agreement by modifying or rescinding any of its existing provisions or by adding any new provision. Any such amendment shall be effective as of the date to be established by you. I understand and acknowledge that you may modify or change the terms and conditions by mailing a written notice or a new printed agreement to me. My use of the account after delivery of notice of the change constitutes my agreement to be bound hereby. This agreement is not subject to any oral modifications."

The Institutional Respondents state that in connection with the preparation for the securities brokerage "push out" rules promulgated under the Gramm-Leach-Bliley Act, a letter was prepared dated October 1, 2008 advising that certain securities activities would be transferred from SCBI to StanChart and that the AEBI/SCBI Brokerage Agreement would remain in effect. Glover Declaration, Inst. R. Ex. B.1. A subsequent letter dated March 1, 2009 was prepared, Glover Declaration, Inst. R. Ex. B.3, which attached a new StanChart brokerage agreement (the "StanChart Brokerage Agreement"), Glover Declaration, Inst. R. Ex. B.2, that would replace the AEBI/SCBI Brokerage Agreement previously adopted by StanChart and that it had become effective on November 5, 2008.

The StanChart Brokerage Agreement, Glover Declaration Ex. 2,  ¶7 provided:

"Any controversy between you and us shall be submitted to arbitration before any national securities exchange on which a transaction giving rise to the claim took place (and only before such exchange), or the Financial Industry Regulatory Authority [FINRA]."

There was no evidence presented as to how many or which, if any, of the Claimants received the letter notifying of the substitution of the new StanChart Brokerage Agreement and enclosing a copy of that agreement as some or all were on "hold-mail" and letters were deemed received when placed in the "hold-mail" file. Glover Declaration, Inst. R. Ex. B ¶¶3 -5.

6

## I. Jurisdiction over the Non-Signatories

## A. Standard Charter Bank and SCI

Standard Chartered Bank and  SCI seek to have all claims against them dismissed on the grounds that they are not signatories to any arbitration agreement and no grounds exist for the retention of jurisdiction over them by this Tribunal. Claimants rely on the principles of estoppel and third-party beneficiary with respect to Standard Chartered Bank and SCI. Cl. Br. at 6.  In reaching its conclusions on this issue the Tribunal has exclusively taken into account and relied upon the facts before it and the arguments and theories under New York law presented by the Parties in the proceeding.

The parties are in agreement that the Federal Arbitration Act (FAA) governs these proceedings. It has long been recognized that the FAA "requires the federal courts to enforce arbitration agreements, reflecting Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation." *Deloitte Noraudit A.S. v. Deloitte Haskins & Sells,* 9 F. 3d 1060, 1063 (2d Cir. 1993). Following the federal policy favoring arbitration, "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration (citation omitted)." *Spear, Leeds & Kellogg v. Central life insurance Co.*, 85 F.3d  21 (2d Cir. 1996).

However, because arbitration is contractual in nature, an arbitration agreement "must not be so broadly construed as to encompass claims and parties that were not intended by the original contract." *Thomson-CSF, S.A. v. American Arbitration Association,* 64 F. 3d 773, 776 (2d Cir. 1995). Arbitration agreements must be enforced according to their terms. *Mastrobuono v.  Shearson Lehman Hutton, Inc.* 514 U.S. 52 (1995).

"Absent an express agreement to arbitrate, [the Second Circuit] has recognized only 'limited theories upon which [it] is willing to enforce an arbitration agreement against a non–signatory'… There are five such theories '1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.' (citations omitted)." *Merrill Lynch Investment Managers* v.  *Optibase* 337 (2d Cir. 2003).

These limited exceptions which permit a signatory to enforce an arbitration agreement against a non-signatory "follow ordinary principles of contract and agency" and serve to "protect parent companies" when subsidiaries enter into arbitration agreements. *Oppenheimer v. Deutsche Bank AG*, 2010 WL 743915 *2 (S.D.N.Y. 2010). "Anything short of requiring a *full* showing of some accepted theory under agency or contract law imperils a vast number of parent corporations." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n, supra* at 780 (emphasis in original). The Second Circuit has noted that courts "should be wary of imposing a contractual obligation to arbitrate on a non-contracting party." *Smith/Enron Cogeneration Ltd, P'ship Inc. v. Smith Cogeneration Int'l, Inc.* 198 F. 3d 88, 97 (2d Cir. 1999).

To succeed on a claim of estoppel "the benefit [to the non-signatory] must be direct - which is to say flowing directly from the agreement." *MAG Portfolio Consulting v. Merlin Biomed Group*, 268 F.3d 58, 61 (2d Cir. 2001); Affiliation with a signatory is not enough no matter how close the affiliation, *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, supra* at 1062, and the "mutual benefits derived from affiliation" are not sufficient. *Merrill Lynch Investment Managers* v. *Optibase, supra* at 130.

Under the estoppel theory, benefits are not considered "direct" when a third party merely exploits a contractual relationship of two parties to an agreement. As stated by the Second Circuit "the benefit derived from an agreement is indirect where the non-signatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *MAG Portfolio Consulting v. Merlin Biomed Group, supra* at 61.

The Second Circuit and the district courts in New York have dealt with several cases in which parties sought to hold affiliates of broker-dealers to arbitration and have in various factual settings and under various theories found that the facts presented were not sufficient to require non-signatories to arbitrate. The courts rejected as insufficient factual claims, similar to those made here, that the broker-dealer offered to its clients products offered by the affiliated entities, that the services of the entire group of companies was marketed to customers of the broker-dealer, that the broker-dealer and its affiliates were presented to the public as a single integrated firm, that the affiliate sold securities that it

had created, issued and marketed to the broker-dealers' customers. *Merrill Lynch Investment Managers* v. *Optibase, supra,* at 130; *AICO International, E.C. v. Merrill Lynch & Co. Inc.,* 98 Fed. Appx. 44, 2004 WL 902319 (2d Cir. 2004); *Oppenheimer v. Deutsche Bank AG, supra; Phoenix Companies, Inc. v. Abrahamson,* No. 05 Civ. 4894 (WHP) 2006 WL 2847812 at *7 (S.D.N.Y. Sept 28, 2006).[3]

The Tribunal concludes, based on the Second Circuit's very narrow reading of "direct benefits," that the facts as presented in the case before it are not sufficient to estop Standard Chartered Bank and SCI from refusing to subject themselves to the jurisdiction of this Tribunal.

Claimants also rely on the third party beneficiary exception to the general rule based on the language in ¶22 of the AEBI/SCBI Brokerage Agreement:

> "The agreement and its enforcement ...shall cover individually and collectively all brokerage accounts which I may open or reopen with you or which may be introduced to you, including your subsidiaries and affiliates, through the courtesy of the aforementioned introducing broker, shall inure to the benefit of your affiliates and your successors and those of the aforementioned introducing broker whether by merger, consolidation or otherwise, and assigns, and those of the aforementioned introducing broker."

Claimants also refer to ¶9, which allows for an assignment, and ¶2 of the account application, which provides that affiliated and non-affiliated entities may provide "securities execution, clearing and custody services"

Reference to affiliates in an agreement does not necessarily confer jurisdiction in arbitration over a non-signatory as a third party beneficiary. The plaintiff in *Merrill Lynch Investment Managers* v. *Optibase* also relied on language in the agreement, which provided that not only the broker-dealer but also its "affiliates" could rely on certain certifications, representations and warranties made by the customer. The District Court had found that this provision did not constitute a commitment by the "affiliates" to arbitrate pursuant to the agreement. The Second Circuit specifically "agreed" with the

---

[3] Claimant's reliance on *Ryan Beck & Co. v. Fakih,* 268 F. Supp.2d 210 (E.D.N.Y. 2003) is misplaced as applied to Standard Chartered Bank and SCI. In that case, a successor broker-dealer purchased the assets of another broker-dealer including its customers, accounts, and related books and records, and derived direct benefits from acquiring the customer relationships, accounts and assets and thus was estopped from avoiding arbitration.

district court in its analysis and said that such a statement in the contract with the signatory does not satisfy any of the five limited theories pursuant to which a non-signatory can be required to arbitrate. *Merrill Lynch Investment Managers* v. *Optibase, supra* at 129.

In this case, the references to "affiliates" appear in different clauses and contexts and so may demonstrate a different intention on the part of the drafter than in *Optibase*. However, New York law is protective of parent and affiliated companies and does not subject them to jurisdiction unless the claimant can fully establish an exception to the rule that non-signatories cannot be bound to arbitrate. Claimants have not done so here with the facts presented with respect to Standard Chartered Bank and SCI.

Standard Chartered Bank's and SCI's application to dismiss the Statement of Claim against them is granted.

## B. The Individual Respondents

In support of their position that jurisdiction properly lies with this Tribunal, with respect to the Individual Respondents even though they did not sign the agreements, Claimants rely on the broad language of the arbitration clauses in the AEBI/SCBI Brokerage Agreement and the NISA, coupled with the specific reference to "employees" in those clauses, which they contend indicates a clear intent to provide a single arbitral forum for resolution of all disputes between the customer and AEBI/SCBI or its employees. Cl. Br. in Opposition to Individual Respondents' Motion at 4.

Claimants cite a series of cases, which found broad arbitration clauses, even with no express reference to employees, to be binding on those who had signed the arbitration agreement and required them to submit to arbitration in disputes with an employee or an agent who represented the brokerage firm even though the agent/employee had not signed the customer agreement. See e.g. *Letizia v. Prudential Bache Securities*, 802 F. 2d 1185 (9th Cir. 1986); *Pritzker v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir. 1993); *Brener v. Becker Paribas Inc.*, AG, 628 F. Supp. 442 (S.D.N.Y. 1985); *Scher v. Bear Stearns & Co. Inc.*, 723 F. Supp. 211 (S.D.N.Y. 1989). Claimants concede that

these cases all involve scenarios in which it was the employee or the brokerage firm, which took action to compel arbitration against a signatory but contend that the same reasoning is equally applicable to cases where the employee/agent non-signatory is seeking to avoid arbitration. Cl. Br. in Opposition to Individual Respondents' Motion at 5.

The Tribunal, however, must consider the sharp distinction, which the Second Circuit has drawn between willing signatories and non-signatories that are unwilling. The Second Circuit, in discussing the *Pritzker* case, specifically found this distinction "decisive: it matters whether the party resisting arbitration is a signatory or not." *Investment Managers* v. *Optibase, supra* at 131.

This distinction by the Second Circuit requires the Tribunal to disregard the two additional cases on which Claimants principally rely in support of their position. In *Lee v. Chica,* 983 F. 2d 883 (8th Cir. 1993) the court found that an individual broker who was not a signatory to a broker-dealer customer agreement could be compelled to submit to the jurisdiction of the arbitral forum, citing the cases discussed above without noting that they were situations in which the non-signatory was trying to compel the signatory to arbitrate and not vice versa, and concluded that a "disclosed agent" could be "compelled to arbitrate." In *Doran v. Bondy,* 2005 WL 1907252 (W.D. Mich. February 18, 2005) the court followed the decision in *Lee.*

These cases do not provide a persuasive analysis of agency law, the theory for holding a non-signatory to arbitration upon which the *Lee* case appears to be based. The general rule is that an agent of a disclosed principal, even one who negotiates and signs a contract for a principal, does not become a party to the contract. Restatement (Third) of Agency § 6.01 (2006). No reason is given for departing from this established rule. None of the five theories that the Second Circuit has identified as providing grounds for requiring a non-signatory to arbitrate are established here with respect to the Individual Respondents.[4]

---

[4] Moreover, it must be noted that, while not the basis for decision, in the *Doran* case the individual was the sole shareholder, president and sole director and signed the investment agreement and in *Chica* the individual was the original and sole account representative of the broker-dealer. Such facts may have swayed the courts. Those facts are distinct from the facts relating to Mr. Pages and Mr. Dutkowski, two employees of a large multi-national group of financial entities.

The Individual Respondents application to dismiss the Statement of Claim against them is granted.

## II. Jurisdiction as to StanChart

Claimants contend that StanChart is subject to this Tribunal's jurisdiction under the AEBI/SCBI Brokerage Agreement under the doctrines of successor liability and estoppel and that it would be unconscionable to allow Stanchart to substitute a new contract with a substitution of a FINRA arbitration for the AAA forum. Cl. Br. at 6, 20; Cl. letter dated April 14, 2010. The history of the brokerage agreements mandates a finding in favor of Claimants on this issue.

A letter dated October 1, 2008 was prepared advising that securities accounts at SCBI would be transferred to StanChart.  Glover Declaration Inst. R. Ex. B.1. The letter further stated that if the client had "signed an existing brokerage account application and agreement with SCBI (which may reference American Express Bank International or American Express Financial Advisors), that agreement will remain in effect and continue to serve as your brokerage account application and agreement with StanChart Securities." The letter further stated that "[y]our investment account(s) will automatically become investment account(s) with StanChart Securities … on or about November 7, 2008 (the 'Transfer Date')."

This was followed by the preparation of a letter dated November 5, Claimants Ex. 14, which recited that "a number of your investment accounts are transitioning to" StanChart. While AEBI/SCBI continued in operation with respect to certain categories of investments, customers and securities were in fact transferred from SCBI to StanChart.

As Claimants assert, StanChart is a successor to SCBI and derived direct benefits from the AEBI/SCBI Brokerage Agreement and the brokerage relationship pursued thereunder. While the Tribunal found that *Ryan Beck & Co. v. Fakih*, 268 F.Supp.2d 210 (E.D.N.Y. 2003) was not applicable to Standard Chartered Bank and SCI, the central facts in *Ryan Beck & Co.* are four square with and applicable to StanChart. As in that case, StanChart is the successor broker-dealer for customers and investments transferred to it and thus acquired customers, accounts and related records from AEBI/SCBI, its

affiliate. StanChart derived direct benefits from acquiring the customer relationships, accounts and assets and thus is estopped from avoiding arbitration pursuant to the terms provided in the AEBI/SCBI BrokerageAgreement.

As required by the Second Circuit, the facts here fully meet the limited theories upon which the court is willing to enforce an arbitration agreement against a non – signatory both as a successor and under the estoppel theory. As prescribed in *MAG Consulting v. Merlin Biomed Group, supra,* StanChart exploited and assumed the agreement itself.

StanChart contends that the Sentry securities in issue were not transferred and that accordingly it did not receive any benefits. Inst. R. Br. at 14. Accepting that fact as true (which the Claimants deny on the basis of the transfers appearing on their account statements), does not change the result. It is undisputed that StanChart received customers and accounts and transfers of other securities from Claimants' AEBI/SCBI accounts and so benefited directly from the AEBI/SCBI Brokerage Agreement. Whether the Sentry stock was or was not transferred to it, while perhaps an issue on liability, is irrelevant to the question of whether StanChart is bound by the terms of the arbitration clause in the AEBI/SCBI Brokerage Agreement. It was the successor on the customer accounts, derived direct benefits from that agreement and is bound by its arbitration clause and so to AAA arbitration.

Having found that StanChart is bound by the arbitration agreement in the AEBI/SCBI Brokerage Agreement, which provides for AAA arbitration based on estoppel and successor theories, StanChart's argument that its brokerage agreement provides for FINRA arbitration is irrelevant and an analysis of that contention is not required.

However, in the interests of a complete analysis, while its decision does not turn on this, the Tribunal has considered that contention and finds that, while some courts have permitted unilateral amendments to standard form contracts changing arbitration rights in certain circumstances, on the facts of this case the unilateral substitution of a new brokerage agreement with a change in the forum for dispute resolution must be found to be "both procedurally and substantively unconscionable." *Gilman v. Chase*

*Manhattan Bank NA,* 73 N.Y.2d 1 (1988). An additional consideration is the fact that the notice and substitution were dated March 1, 2009 but made retroactive to November 5, 2008. There is an absence of actual notice and meaningful choice on the part of the Claimants and the contract terms are unreasonably favorable to StanChart.

StanChart has not identified which, if any, Claimants received actual notice of the new form brokerage agreement and the change in forum but rather refers to its "hold-mail" system. Indeed, Claimants not only note this lack of notice but suggest that respondents were capable of sending mail directly to customers' homes if they chose. Cl. Br. at 19 fn. 12. The Tribunal finds procedural unconscionability based on a failure to demonstrate that actual notice was given to the Claimants. Absent an opportunity to consent or decline with respect to an important right, such as the forum for dispute resolution, a threshold inquiry by the courts in any analysis of unconscionability,[5] procedural unconscionability exists.[6]

In determining substantive unconscionability, courts look to how severely the changed clause would limit available remedies. If StanChart is not held to be subject to arbitration before this Tribunal under the auspices of the AAA and succeeds in requiring any claim against it to be brought in a FINRA forum, Claimants would be required to pursue their claims against StanChart and SCBI in two different forums with respect to the same transaction and the same claims. Insitutional Respondents' counsel confirmed that SCBI is not a broker-dealer and cannot be sued in a FINRA arbitration. Requiring pursuit in two forums for the same claim by means of the substitution of a new form contract, which mandates arbitration in a different forum against a successor entity, here owned by the same ultimate parent, is sufficient to require a finding of unconscionability. It is "so grossly unreasonable or unconscionable… as to be unenforceable" (citations omitted), *Ragone v. Atlantic Video*, 595 F.3d 115, 121 (2d Cir. 2010).

---

[5] See *e.g. Stinger v. Chase Bank, USA, NA*, 265 Fed. Appx. 224 (5th Cir. 2008); *Bar-Ayal v. Time Warner Cable Inc.*, 03 CV 9905, 2006 WL 2990032 (S.D.N.Y. Oct. 16, 2006).

[6] StanChart may not defend the Tribunal's retention of jurisdiction based on any claim of a relinquishment of rights as to "hold mail" deliveries pursuant to the NISA ¶12 or the AEBI/SCBI Brokerage Agreement ¶7. The Tribunal finds that any waiver of rights pursuant to those provisions is also unconscionable as applied here if used to support an alteration without actual notice of significant rights such as a change in forum. As Claimants observed, FINRA is considered to be a more favorable forum for broker dealers. Cl. Br. at 20 fn. 20.

Moreover, on the facts presented, adopting StanChart's position would subject Claimants to being whipsawed and subject to conflicting rulings as Claimants have observed, Cl. Br. at 15-16 fn. 9, because defenses have been suggested and may be asserted in the two separate forums with these two institutional respondents each defending by contending that the other is the one potentially liable. StanChart may assert, as it has, that the Sentry securities were never transferred to it from SCBI and thus attempt to avoid liability. SCBI may assert, pursuant to ¶9 of the AEBI/SCBI Brokerage Agreement that after the transfer to StanChart all of the customers' "rights" must be against the "assignee entity."

The Tribunal finds that acceptance of StanChart's position on these facts leads to consequences "so outrageous as to warrant holding it [the unilateral substitution of a new forum in the new agreement] unenforceable on the ground of substantive unconscionability alone." *Gillman v. Chase Manhattan Bank*, N.A., *supra* at 12; *Ragone v. Atlantic Video*, *supra* at 122. Such a finding is sanctioned in "exceptional" cases. *Id.* The facts here present such exceptional circumstances and the purported change of forum cannot be enforced against the Claimants.

StanChart's motion to dismiss the Statement of Claim against it is denied.


## II. The Multi-Party Claim

Claimants commenced this multi-party proceeding with respect to 24 accounts opened by Claimants with AEBI/SCBI. Respondents assert that this is a "consolidated" proceeding and should proceed with only the first named claimant, Mr. Calvo, because the AEBI/SCBI Brokerage Agreements do not permit the consolidation of claimants in one arbitration proceeding.

The threshold question that must be explored is whether there is really a question of consolidation at all. Typically consolidation means the consolidation of separately filed arbitrations and presents numerous difficulties such as which arbitrator decides whether there should be a consolidation, which arbitrator should continue with the consolidated proceedings, what to do if the arbitrations are at different stages, delays that

may be occasioned by lack of coordination and cooperation among the different proceedings, etc. None of those problems exist here. The arbitration as presented here is more akin to a joinder and presents claims arising out of the same series of occurrences and presents questions of law and fact common to all parties that would lead to a significantly more expeditious and cost effective resolution of the matters raised. The Institutional Respondents, when asked, did not point to any prejudice they would suffer if joinder of the parties as claimants were permitted to continue and cite to no prejudice in their papers. Certainly if joinder were the appropriate label, the conclusion that the arbitration should proceed as filed would be easy to reach.

However, this is an arbitration not a court proceeding, the "parties' intentions control," *Stolt-Nielsen S.A. v. Animal Feeds International Corp.*, ___ U.S. _____ ( April 27, 2010) at slip op. 18 (citations omitted), and a further examination of the issue is pursued.  The Institutional Respondents reject the notion that this is not a consolidation and contend that there is no basis for differentiating between a situation in which claimants bring separate proceedings and then seek to consolidate and one in which claimants exercise self help and consolidate on their own by commencing a single action, citing *Blimpie Int'l v. Blimpie of the Keys*, 371 F. Supp.2d 469 (S.D.N.Y. 2005) (court left the question of "consolidation" to the arbitrator for decision). Although not necessarily agreeing with Institutional Respondents' contention, the Tribunal addresses the potential issue of consolidation, in light of the relevant facts presented and the arbitration case law.

The parties have submitted the issue to the Tribunal for determination.[7] While the Second Circuit has not yet had occasion to consider the issue following the Supreme Court decision in *Howsam,*  the issue of consolidation has repeatedly been held to be a "procedural" question and therefore for the arbitrator rather than a court to decide. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79 (2002); *Shaw's Supermarkets Inc. v. United Food and Commercial Workers Union, Local 791, AFL-CIO,* 321 F.3d 251, 254 (1st Cir. 2003), *Certain Underwiters at Loyds London v. Westchester Fire Insurance Co.,* 489 F.3d 580, 585-587 ( 3d Cir. 2007); *Employers Insurance Co. of Wausau v. Century*

---

[7] It should be noted that all of the Respondents have stated that they reserve their right to address the jurisdictional issues to the court.

*Indemnity Co.* 443 F.3d 573, 576-78 ( 7th Cir. 2006).   The continued vitality of the dictates of *Howsam* was confirmed by the Supreme Court in *Stolt-Nielsen S.A. v. Animal Feeds International Corp.,* ___ U.S. _____, *supra* slip op. at 21, as to procedural issues, although the court suggested that whether an arbitration can continue as a class action was not a "simple" question of "procedure." *Id.* Slip op. at 23. This is not a class action but, at most a consolidation, a very different animal, as discussed below. The Tribunal concludes that the *Stolt-Nielsen* decision does not undermine these holdings as to the Tribunal's authority to decide the question of joinder/consolidation of the 24 accounts presented here.[8]

The AEBI/SCBI Brokerage Agreement and the StanChart Brokerage Agreement provide that "no person shall bring a putative... class action to arbitration." The agreement does not expressly mention consolidation or joinder. The NISA Agreement contains no words, which expressly prohibit or permit class actions, consolidation or joinder or any multi-party action.  The Tribunal does not find the two agreements to be in conflict.  Rather the AEBI/SCBI Brokerage Agreement supplements the NISA with additional language barring class actions.

Respondents argue that a class action is in essence the consolidation of multiple claims in a single proceeding and appear to be suggesting that the Tribunal should conclude that since a class action bar is contained in the AEBI/SCBI Brokerage Agreement, all forms of multiple party proceedings are barred. Inst. R. Br. at 19. The Tribunal does not agree that such a conclusion can be drawn from the class action bar included in the AEBI/SCBI Brokerage Agreement.

Class actions and multi-party proceedings with a finite number of claimants are radically different processes. Indeed, one need only look at the first threshold issue to be

---

[8] Moreover, the AEBI/SCBI Brokerage Agreement calls for the arbitration to be conducted in accordance with the rules of the American Arbitration Association. AAA Rule 7 provides that "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Accordingly, the authority to decide these jurisdictional questions has been granted to the arbitrators by the parties pursuant to the AAA rules. *See e.g., Contec Corp. v. Remote Solution Co.*, 398 F.3d 205 (2d Cir. 2005); *Life Receivables Trust v. Goshawk Syndicate 102 at Lloyds* 66 A.D.3d 495 (1st Dept. 2009). The Tribunal's interpretation of the AAA arbitration rules is entitled to deference. *T. Co. Metals LLC v. Dempsey Pipe & Supply, Inc.*, 2010 U.S. App. LEXIS 893 (2d Cir. Jan. 14, 2010).

determined in a class action determination, namely whether the class is so numerous that joinder of separate arbitrations on behalf of all members is impracticable, AAA Supplementary Rules for Class Arbitrations, to conclude that class actions and multi-party actions are not the same and that a prohibition of one cannot be read to be a prohibition of the other.

The Supreme Court's decision *in Stolt-Nielsen* highlights the unique characteristics of class actions stating that they involve hundreds if not thousands of parties, that the presumption of confidentiality in arbitration is abrogated, and that the rights of absent class members are determined. None of those factors are true in the arbitration before this Tribunal - only 24 accounts are involved, the confidentiality available in arbitration is present, Respondents can confront and cross-examine every Claimant if they choose, and no Claimant is "absent" as each will have to submit his or her individual proof- a far cry from a class arbitration.

To determine whether a contract allows a finding of a class action, and Respondents would argue also consolidation, one must look to the Supreme Court's most recent pronouncement on the issue in the *Stolt-Nielsen* case. Since the *Stolt-Nielsen* court had before it a stipulation by the parties that the agreement was silent as to class proceedings and that there was "no agreement" on this question, the Court declined to specify exactly what "contractual basis may support a finding that the parties agreed to authorize class arbitration," Slip op. at 23 fn. 10. But the court stated the rule to be that the "arbitrator must give effect to the contractual rights and expectations of the parties," slip op. at 18, and there must be a "contractual basis for concluding that a party agreed" to a class arbitration, Slip op. at 20. Reinforcing this proposition, the Court in *Stolt-Nielsen* repeatedly referenced custom and usage as sources for construing the meaning of a contract's arbitration agreement. As summarized in the dissenting opinion, the majority of the "Court does not insist on express consent to class arbitration." Dissent, Slip op. at 13. Thus the Tribunal concludes that whether consolidation should be permitted in this arbitration continues to be a matter of contract interpretation. [9]

---

[9] Respondents suggest that with the reversal of the Second Circuit's decision in *Stolt-Nielsen* by the Supreme Court, the decisions in *Glencore v. Schnitzer Steel Prod.,* 189 F.3d 264 (2d Cir.1999), *United Kingdom v. Boeing Co.* 998 F. 2d 68 (2d Cir. 1993*)* and *Protective Life* Ins Co. v. *Lincoln Nat'l Life Ins.*

The rules of contract interpretation militate towards a finding that Claimants can proceed with their multi-party action. The Tribunal finds that the clause is ambiguous as Claimants suggest the Tribunal might find. Cl. Br. at 25. Ambiguity is an issue of law. Claimants oppose the Respondents' position with extrinsic evidence of industry custom and practice, thereby creating a question of fact concerning the parties' intent and creating an ambiguity. *Excess Ins. Co. v. Factory Mut. Ins Co.*, 3 N.Y.3d 577, 590-591 (2004), cited with approval in *Stolt-Nielsen*, *supra*, Slip op. at 10, fn. 6. Where there are surrounding circumstances, including industry custom and practice, those should be taken into consideration in determining the intent of the parties if ambiguity is found. *Id., Accord*, *Arriagga v. Florida Pacific Farm LLC*, 305 F.2d 1228, 1247-1248 (11th Cir. 2002).

The *Stolt-Nielsen* Court faulted the arbitration panel for failing to adequately consider applicable law and the custom and usage in the industry in construing the contract, Slip op. at 9-10, and concluded that the arbitration panel had "simply imposed its own conception of sound policy." Slip op. at 11. This Tribunal does not base its decision on any policy considerations but rather on basic contract interpretation principles for contracts governed by New York and Florida law. The Tribunal concludes that industry custom and practice creates an ambiguity in the arbitration clause under the relevant state contract interpretation principles and that industry custom and practice is relevant to the Tribunal's analysis. [10]

Accordingly, the Tribunal reads the clauses in question in the context of the industry to which they apply. FINRA rules, which govern disputes concerning broker-dealers expressly, permit multiple claims. The FINRA rules provide that "one or more parties may join multiple claims together in the same arbitration if the claims contain common questions of law and fact and the claims assert any right to relief jointly and

---

*Corp.*, 873 F. 2d 281 (11th Cir. 1989) now control again. Inst. R. Letter dated April 30, 2010. The Tribunal does not consider *Stolt-Nielson* to have gone so far in its reconstruction of the meaning of *Green Tree v. Bazzle*, 539 U.S. 444 (2003) as to revive these cases as controlling precedents and to make the parties' intent and contract construction irrelevant. Moreover, those cases presented questions of consolidation of arbitrations separately commenced among parties to disparate contracts.

[10] Under Florida law, the failure of a contract to specify the rights or duties of the parties under certain conditions or situations gives rise to a latent ambiguity calling for the application of contract construction principles. *Hunt v. First National Bank of Tampa*, 381 So. 2d 1194 (Fla. Dist. Ct App. 1990). Thus under Florida law too, the Tribunal finds the contract to be ambiguous.

separately or the claims arise out of the same transaction or occurrence, or series of transactions or occurrences." Earlier FINRA rules had similar provisions. Cl. Ex. 17.

Thus the brokerage agreements in issue, the AEBI/SCBI Brokerage Agreement which excludes class arbitration but makes no mention of other multi-party forms and the NISA which makes no express mention of multi-party claims, compel the conclusion in the context of the brokerage industry that Claimants multi-party claim may proceed. The arbitration clauses are ambiguous in the context of the brokerage industry custom and practice, and the contract construction principle that an ambiguity must be strictly construed against the drafter, must be applied. [11] *Mastrobuono, supra*, 514 U.S. at 62-63; *Cowen v. Anderson*, 76 N.Y. 2d 318, 323 (1990); *City of Homestead v. Johnson*, 760 So.2d 80, 84 (Fla. 2000); *Arriagga v. Florida Pacific Farm LLC, supra* at 1247-1248. The Institutional Respondents were the drafters, and the language must be construed against them and must be read to permit consolidaton/joinder. They were sophisticated commercial actors who prepared the AEBI/SCBI Brokerage Agreement in "anticipation of the Gramm-Leach-Bliley "pushout" whereby some but not all of the securities investments would be made through a registered broker-dealer rather than an Edge Act Bank." Inst. R. Letter dated April 22, 2010.  Respondents could have specifically referred to the exclusion of multi-party forms other than class actions if that had been their intent in the face of common industry practice for broker-dealers.[12]

The Tribunal notes that under New York, the law to which SCBI purported to amend the AEBI/SCBI Brokerage Agreement in their October 1, 2008 letter to Claimants, to govern the AEBI/SCBI Brokerage Agreement on the "Transfer Date" (see above),[13] the courts have long had and continue to have discretion to consolidate

---

[11] The Institutional Respondents argue that this rule of contract construction should be applied sparingly, especially where all parties are sophisticated. Inst. R. Reply Br. at 23-24. Even if it were true that the Claimants are wealthy individuals sophisticated in investment matters, facts not in evidence at this stage, the contracts in issue were form contracts that were not individually negotiated making any constraint on the application of the general rule less compelling.

[12] A credible argument could also be made that the contract construction principle of *expressio unius est exclusio alterius* supports the Tribunal's conclusion. Respondents were sophisticated commercial actors who in expressly excluding class action could have also specifically referred to the exclusion of joinder and consolidation if that had been their intent in the face of the industry practice. See e.g, *VKK Corporation v. National Football League,* 244 F.3d 114, 130 (2d Cir. 2001).

[13] The Tribunal accepts New York law as governing for purposes of this decision but notes that even, if Minnesota law, the law applicable before the change in choice of law by respondents, were applicable, the

arbitrations even absent express agreement to allow it in the arbitration agreement and often do so. Indeed, the courts in New York have found it to be an abuse of discretion in some instances when lower courts have declined to consolidate arbitrations. *See e.g., Matter of Cowper Co.,* 51 N.Y.2d 937 (1980); *Yaffe v. Mintz & Fraade, P.C.,* 163 A.D. 2d 43 (1st Dept. 2000); *Gershen v. Hess,* 163 A.D. 2d 17 (1st Dept. 1990).[14]

The Institutional Respondents make two additional arguments, which merit discussion. The Institutional Respondents refer to the AAA Policy on Class Arbitrations, which states that the AAA will not accept without court order a demand for a class action "where the underlying agreement prohibits class claims, consolidation or joinder." The Institutional Respondents acknowledge that the AAA Policy also states that the AAA will administer arbitrations as class actions where the agreement is silent with respect to "class claims, consolidation or joinder." They argue, however, that since there is no parallel language stating that the AAA will administer cases with consolidation or joinder where there is no express prohibition, the AAA rule must mean that absent an express provision allowing consolidation and joinder, the AAA rules prohibit it. Inst. R. Letter dated April 20, 2010 at 3, Inst. R. Reply Br at 18.

As the AAA Policy speaks to class arbitration, there was no occasion for the AAA to refer to consolidation and joinder in the passage permitting arbitration of class actions to progress absent an express bar. Indeed, to conclude that the AAA intended a stricter and different rule to apply to consolidation and joinder than to class actions, a vehicle

---

same result would obtain. Minnesota, like New York, permits courts to consolidate arbitrations in the absence of express authorization to do so in the arbitration agreement. *See e.g., Illinois Farmers Insurance Company v. Glass Service Company* 683 N.W. 2d 792 (2004); *Grover-Dimond Assocs. v. American Arbitration Ass'n.,* 211 N.W.2d 787 (1973).

[14] The New York case cited by the Institutional Respondents, *Cohen v. S.A.C. Capital Advisors,* No. 112479/05 2006 WL 399766 ( Sup. Ct. NY County Jan 3, 2006) cites these cases and recognizes this to be the law in New York but applies its understanding of the law under the FAA in rejecting consolidation, citing to cases pre- *Bazzle* for its FAA analysis. As this is a decision of the lowest court in the State of New York and fails to consider *Bazzle* and its progeny, including *Stolt-Nielsen,* the Tribunal conducts its own analysis under the FAA. As discussed above, the Tribunal concludes that the current state of the law calls for the application of contract construction principles to adduce the intent of the parties in determining whether an arbitration can proceed with multiple claimants.

The Florida case cited by the Institutional Respondents, *Seretta Constr. Inc. v. Great Am. Ins. Co.,* 869 So.2d 676 ( Fla. Dist. Ct. App. 2004) was issued in 2004 after the AEBI/SCBI Brokerage Agreement form was developed and used, and cannot be a basis for gleaning the parties' intent. In any case, *Seretta* is a statement of Florida law as to whether consolidation by a court is permissible when the agreement does not expressly authorize it. It does not purport to apply contract construction principles to the contract as is required in an arbitration, like this one, governed by the FAA.

which as discussed above carries with it much more severe consequences for respondents, and to prohibit consolidation and joinder when the clause does not expressly allow them finds no foundation in logic. Moreover, the AAA is administering this action as filed leaving the issues raised to the arbitrators, demonstrating that there is no AAA rule governing which prevents this arbitration from proceeding as filed.

Finally, the Institutional Respondents refer to the language of the agreements and contend that the language supports their view. They recite the language in the AEBI/SCBI Brokerage Agreement that provides for arbitration "arising out of, or relating to, my accounts, to transactions you or to your Brokers and/or employees for me or to this agreement or the breach thereof" and the NISA, which provides for arbitration of "all controversies between Customer and AEBI and or agents arising out of or concerning this Agreement, the Investment Account, Transactions Holdings or any other matter." Inst. R. Br. at 18-19. The Tribunal does not find anything in this language that contradicts the Tribunal's conclusions. The claims asserted all relate to the accounts and transactions of the Claimants themselves and the arbitration as filed in a multi-party fashion is fully consistent with this language.

The Institutional Respondents motion to dismiss all claims other than those filed by Mr. Calvo is denied.

## IV. The Geneva Accounts

Two sets of claimants assert that some or all of their Sentry holdings were bought through accounts at Standard Chartered Bank (Switzerland) SA, formerly American Express Bank (Switzerland) (collectively" "SCB Geneva"). The Institutional Respondents assert that these accounts are governed by the SCB Geneva general business conditions ("SCB Geneva conditions"), Inst. R. Attachment E, that call for Swiss court jurisdiction and accordingly object to jurisdiction over claims relating to investments not bought through AEBI/SCBI as beyond the reach of any potentially applicable AAA arbitration clauses.

Additional factual development is necessary to resolve whether or not this Tribunal has jurisdiction with respect to these purchases. Accordingly, resolution of this issue will be deferred to the hearing subject to the delivery of a tolling agreement by the Institutional Respondents to the affected Claimants with respect to these purchases and with leave to any party to renew the application to the Tribunal upon the development of the relevant facts.

## IV. Partial Award

For the reasons set forth above, we hereby issue this Partial Award as follows:

1. Standard Chartered Bank and SCI application to dismiss the Statement of Claim against them is granted.

2. The Individual Respondents, John G. Dutkowski and Rodolfo L. Pages, application to dismiss the Statement of Claim against them is granted.

3. StanChart's motion to dismiss the Statement of Claim against it is denied.

4. The Institutional Respondents motion to dismiss all claims other than those filed by Mr. Calvo is denied.

5. Resolution of jurisdiction with respect to Sentry securities bought through accounts at Standard Chartered Bank (Switzerland) SA will be deferred to the hearing subject to the delivery of a tolling agreement by the Institutional Respondents to the affected Claimants with respect to these purchases and with leave to either party to renew the application to the Tribunal upon the development of the relevant facts.

6. This proceeding shall continue according to the ICDR Arbitration Rules and the Procedural Orders issued and to be issued by the Tribunal, including, as previously ordered, the completion of discovery by July 30, 2010 (including document production by   Standard Chartered Bank and SCI), the filing of

pre-hearing submissions in accordance with the schedule set by the Tribunal and the commencement of the hearing on November 29, 2010.

7.     This Partial Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute the Partial Award of this Tribunal.

    We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Award was made in New York, New York, U.S.A.


_____                          _____
         Date                                          Cally Jordan, Esq.
                                                            *Arbitrator*



_____                          _____
         Date                                          Dr. Horacio A. Grigera Naón,
                                                            *Arbitrator*



*May 28, 2010*
_____                          _____
         Date                                          Edna Sussman, Esq.
                                                            *Chair Arbitrator*


24

State of

County of

} SS:

On this      day of        , 2010 before me personally came and appeared Cally Jordan, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that she executed the same.

_____
Dated

_____
Notary Public

State of

County of

} SS:

On this      day of        , 2010 before me personally came and appeared Dr. Horacio A. Grigera Naón to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that he executed the same.

_____
Dated

_____
Notary Public

State of  New York

County of  Westchester

} SS:

On this 28th day of May, 2010 before me personally came and appeared Edna Sussman, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that she executed the same.

_____
5.28.10
Dated

_____
Notary Public

ANH P LE
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN WESTCHESTER COUNTY
REG. NO. 01LE6126844
MY COMMISSION EXPIRES MAY 16, 2013

25

pre-hearing submissions in accordance with the schedule set by the Tribunal and the commencement of the hearing on November 29, 2010.

7.     This Partial Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute the Partial Award of this Tribunal.

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Award was made in New York, New York, U.S.A.

_May 29/ '0_
Date

_Cally Jorda_
Cally Jordan, Esq.
*Arbitrator*

_____
Date

_____
Dr. Horacio A. Grigera Naón,
*Arbitrator*

_____
Date

_____
Edna Sussman, Esq.
*Chair Arbitrator*

24

State of *NC*

County of *DURHAM*          } SS:

On this *29* day of *MAY*, 2010 before me personally came and appeared Cally Jordan, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that she executed the same.

_5/29/10_
Dated

_Irving A Herman_
Notary Public

IRVING A. HERMAN
NOTARY PUBLIC
Durham County
North Carolina
My Commission Expires August 11, 2013

State of

County of          } SS:

On this        day of        , 2010 before me personally came and appeared Dr. Horacio A. Grigera Naón to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that he executed the same.

_____          _____
Dated                         Notary Public

State of

County of          } SS:

On this        day of        , 2010 before me personally came and appeared Edna Sussman, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that she executed the same.

_____          _____
Dated                         Notary Public

25

pre-hearing submissions in accordance with the schedule set by the Tribunal and the commencement of the hearing on November 29, 2010.

7.   This Partial Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute the Partial Award of this Tribunal.

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Award was made in New York, New York, U.S.A.


_____        _____
Date                                          Cally Jordan, Esq.
                                                    *Arbitrator*


06/01/2010                          _____
Date                                          Dr. Horacio A. Grigera Naón,
                                                    *Arbitrator*


_____        _____
Date                                          Edna Sussman, Esq.
                                                    *Chair Arbitrator*

24

State of

County of

} SS:

On this      day of         , 2010 before me personally came and appeared Cally Jordan, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that she executed the same.

_____
Dated

_____
Notary Public

State of MARYLAND

County of MONTGOMERY

} SS:

On this 1ST day of JUNE , 2010 before me personally came and appeared Dr. Horacio A. Grigera Naón to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that he executed the same.

06|01|2010
Dated

_____
Notary Public

**GEETESH KAPOOR**
Notary Public, State of Maryland
My Commission Expires Oct. 1  2010

State of

County of

} SS:

On this      day of         , 2010 before me personally came and appeared Edna Sussman, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that she executed the same.

_____
Dated

_____
Notary Public

25