Samuel I. Schwartz
Eiseman Levine Lehrhaupt & Kakoyiannis, P.C.
8)5 Third Avenue
New York, New York 10022
(212) 752-1000
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

PASHA ANWAR, et al.,

                  Plaintiff,

                            (Calvo)

       v.

FAIRFIELD GREENWICH LIMITED, et al.,

                  Defendants.

This Document Relates To: *Standard Chartered Bank International (Americas) Limited, et al. v. Miguel Calvo, et al.,* No. 10-CV-4684

-----------------------------------------------------------x

Master File No. 09-CV-118

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION

## EISEMAN LEVINE LEHRHAUPT & KAKOYIANNIS

A PROFESSIONAL CORPORATION
805 THIRD AVENUE
NEW YORK, NEW YORK 10022
(212) 752-1000

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ....................................................................................................... 4

POINT I

    THE STANDARD CHARTERED ENTITIES HAVE FAILED TO
    SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS ......................... 4

    A.    Standard of Review ........................................................................ 4

    B.    StanChart Securities Is Subject to AAA Jurisdiction Because It
           Assumed the SCBI Brokerage Client Agreement and Is the
           Recipient of Direct Benefits Under That Agreement .......................... 6

    C.    Plaintiffs Have Failed to Clear the High Hurdle Necessary to
           Overturn the Tribunal's Decision on Joinder/Consolidation. ............... 12

    D.    The PSLRA, as Amended by SLUSA, Does Not Bar Discovery in
           the *Calvo* Arbitration .................................................................... 18

    E.    The Balance of Hardships Does Not Tip Decidedly in Favor of
           Plaintiffs ....................................................................................... 21

POINT II

    THE STANDARD CHARTERED ENTITIES HAVE FAILED TO
    MAKE A SHOWING OF IRREPARABLE HARM THAT WILL
    SUPPORT EITHER A TEMPORARY RESTRAINING ORDER OR A
    PRELIMINARY INJUNCTION ................................................................ 22

    A.    Document Production Will Not Cause Irreparable Harm. .................... 22

    B.    The Benefits Afforded by Joinder/Consolidation Negate Any
           Claim of Irreparable Harm. ............................................................. 24

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

Page

## Cases

*Anwar v. Fairfield Greenwich Group*
09-CV-118 (S.D.N.Y.) ........................................................................................................ 3

*Blimpie International, Inc. v. Blimpie of the Keys*
371 F. Supp.2d 469  (S.D.N.Y. 2005) ................................................................................ 12

*Certain Underwriters at Lloyds' London v. Westchester Fire Insurance Co.*
489 F.3d 580 (3d Cir. 2007) ............................................................................................... 12

*Citibank, N.A. v. Citytrust*
756 F.2d 273 (2d Cir. 1985) ............................................................................................... 23

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*
598 F.3d 30 (2d Cir. 2010) ................................................................................................. 21

*Cowen v. Anderson*
76 N.Y.2d 318, 559 N.Y.S.2d 225 (1995) .......................................................................... 15

*Deloitte Noraudit A.S v. Deloitte Haskins & Sells, U.S.*
9 F.3d 1060 (2d Cir. 1993) ............................................................................................. 6, 19

*Employers Insurance Co. of Wausau v. Century Indemnity Co.*
443 F.3d 573 (7th Cir. 2006) .............................................................................................. 12

*First Options of Chicago, Inc. v. Kaplan*
514 U.S. 938 (1995) ............................................................................................................. 4

*Gillman v Chase Manhattan Bank N.A*
73 N.Y.2d 1, 12 (1988) ....................................................................................................... 11

*Glencore Ltd. v. Schnitzer Steel Prods. Co.*
189 F.3d 264 (2d Cir. 1997) ............................................................................................... 17

*Goldfield Corp. v. General Host Corp.*
29 N.Y.2d 264, 327 N.Y.S.2d 330 (1971) .......................................................................... 16

*Grant v. AOL Time Warner*
2003 WL 22227945 (S.D.N.Y. Sept. 26, 2003) .................................................................. 19

*H.D. Brous & Co. v. Mrzyglocki*
  2004 WL 376555 (S.D.N.Y. February 26, 2004) ........................................................ 8

*Howsam v Dean Witter Reynolds, Inc.*
  537 U.S. 79 (2002), .................................................................................................... 12

*In re American Express Merchants Litigation*
  2006 WL 662341 (S.D.N.Y. March 16, 2006), .......................................................... 10

*In re Classicstar Mare Lease Litigation*
  2008 WL 2859152 (E.D. Ky. July 23, 2008) ............................................................. 20

*In re Currency Conversion Fee Antitrust Litigation*
  361 F. Supp.2d 237 (S.D.N.Y. 2005), ....................................................................... 10

*In re LaBranche Securities Litigation*
  332 F. Supp.2d 178 (S.D.N.Y. 2004) ......................................................................... 18

*In re Lehman Brothers Securities and ERISA Litigation*
  2010 WL 1566860 (S.D.N.Y. April 21, 2010) .......................................................... 19

*In re Regions Morgan Keegan Securities*
  2010 WL 596444  (W.D. Tenn. Feb. 16, 2010) ......................................................... 18

*In re Taxable Municipal Bonds Litigation*
  1992 WL 205083 (E.D. La. Aug. 12, 1992) .............................................................. 20

*MAG Portfolio v. Merlin Biomed Group LLC*
  268 F.3d 58 (2d Cir. 2001). ......................................................................................... 7

*Mastrobuono v. Shearson Lehman Hutton, Inc*
  514 U.S. 52 (1995) ............................................................................................... 15, 16

*Morrison v. Amway Corp.*
  517 F.3d 248 (5th Cir. 2008) ..................................................................................... 11

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*
  460 U.S. 1 (1983). ................................................................................................. 7, 11

*Optimark Technologies, Inc. v.  International Exchange Networks, Ltd.*
  288 A.D.2d 75, 732 N.Y.S.2d 413 (1st Dept. 2001) ................................................... 5

*Pace v. Schwartz*
  680 F. Supp.2d 591 (S.D.N.Y. 2010) ........................................................................ 23

*PaineWebber, Inc. v. Webb*
  155 A.D.2d 938, 545 N.Y.S.2d 120 (4th Dep't 1989)............................................. 15

*Rent-A-Center, West, Inc. v. Jackson*
  ___ U.S. ___, 2010 WL 24710588 (June 21, 2010) ................................................. 9

*Ryan,, Beck & Co. v. Fakih*
  268 F. Supp.2d 210 (E.D.N.Y. 2003) ..................................................................... 8

*Shaw Group, Inc. v. Triplefire International Corp.*
  322 F.3d 115 (2d Cir. 2003)..................................................................................... 5

*Shaw's Supermarkets, Inc. v. United Food and Commercial Workers Union, Local 791, AFL-CIO*
  321 F.3d 251 (1st Cir. 2003);................................................................................. 12

*Stolt-Nielsen v. AnimalFeeds Int'l Corp.*
  130 S. Ct. 1758 (2010) ............................................................................ 13, 14, 17

*Thomson-CSF, S.A.  v. American Arbitration Association*
  64 F.3d 773 (2d Cir. 1995). .................................................................................... 7

*United Kingdom v. Boeing Co.*
  998 F.2d 68 (2d Cir. 1993) .................................................................................... 17

**Statutes**

15 U.S.C. § 78u-4(b)(3)(B)...................................................................................... 18

15 U.S.C. § 78u-4(b)(3)(D)...................................................................................... 19

All Writs Act, 28 U.S.C. § 1651(a).......................................................................... 19

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq* ......................................................... 6

Federal Arbitration Act, 9 U.S.C. § 10(a)(4)............................................................ 13

Gramm-Leach-Bliley Act of 1999, 15 U.S.C. § 6801 *et seq.* ............................. 6, 16

**Rules**

ICDR Art.  15 § 2..................................................................................................... 5

ICDR Art. 28 § 2(ICDR) ........................................................................................ 15

## PRELIMINARY STATEMENT

Defendants were the private banking clients of Standard Chartered Private Bank, a division of Standard Chartered Bank, and prior thereto of American Express Private Bank, the global marketing name for American Express Bank Limited ("AEB"), which was acquired by Standard Chartered Bank in February 2008.  The 24 accounts at issue here were maintained by defendants with plaintiff Standard Chartered Bank International (Americas) Limited ("SCBI"), a subsidiary of Standard Chartered Bank. Operating out of its Miami office, SCBI provided broker-dealer services to private banking clients like defendants through its representative office in Santiago, Chile.

Upon opening their accounts, defendants signed brokerage client agreements (the "SCBI Brokerage Client Agreement") with SCBI (formerly American Express Bank International ("AEBI"),  a subsidiary of AEB that Standard Chartered Bank also acquired in February 2008.) In November and December  2008, the broker-dealer business of SCBI was reorganized and thereafter conducted under plaintiff StanChart Securities International, Inc. ("StanChart Securities") as successor to SCBI.  At this time, the customer accounts, including defendants' accounts, were transferred to StanChart Securities, and the SCBI Brokerage Client Agreement for each defendant was assigned to StanChart Securities, which adopted it in its entirety except for making the agreement governed by the law of New York instead of Minnesota.

This matter arises from plaintiffs' breach of the duties owed by a broker to defendants as customers in connection with the recommendation and sale of Fairfield Sentry Limited ("Fairfield Sentry"), a feeder fund to Bernard Madoff and his firm, Bernard L. Madoff Investment Securities LLC ("Madoff Securities").   On March 1, 2009 – nearly three months after Madoff's Ponzi scheme had been revealed and after defendants, and presumably other of

plaintiffs' private banking clients, had complained to plaintiffs – StanChart Securities exercised its purported unilateral right of amendment under the SCBI Brokerage Client Agreement to issue an entirely new brokerage client agreement (the "StanChart Securities Brokerage Client Agreement") and made it retroactive to November 1, 2008.  The StanChart Securities Brokerage Client Agreement purportedly eliminates the American Arbitration Association ("AAA") as an arbitration forum and replaces it with FINRA .

Defendants submitted their statement of claim to the AAA (the "*Calvo* Arbitration") on September 17, 2009, where it is being administered by the International Centre for Dispute Resolution ("ICDR").  Plaintiffs and the other Standard Chartered entities named in the Statement of Claim objected to the AAA's jurisdiction over any Standard Chartered entity except SCBI, but answered and otherwise participated in pre-hearing proceedings.  Defendants served their request for documents on November 25, 2009.  This was followed by several months of negotiations and correspondence.  On March 18, 2010 the parties signed a letter agreement regarding defendants' first request for production, in which well in excess of  the majority of the requests were either agreed to outright or with modification, or voluntarily withdrawn by defendants.  The remaining requests as to which there was no agreement were submitted to the Tribunal for resolution.  The Chair of the Tribunal ruled on the discovery disputes on April 19, 2010 and noted that the Institutional Respondents, or Standard Chartered entities, had agreed to document production being made by all Standard Chartered entities regardless of whether they remain parties to the arbitration.  Document production by both sides was to commence in May, but the parties agreed to first negotiate a confidentiality agreement, which was consummated in June after extensive negotiations. Pursuant to a subsequent scheduling order, the Tribunal set

July 13, 2010 (later moved by agreement to July 29) as the date by which plaintiffs' document production was to commence.

Plaintiffs now move, shortly before the production start date, for an immediate stay of discovery in the *Calvo* Arbitration during the pendency of motions to dismiss in *Anwar v. Fairfield Greenwich Group*, 09-CV-118 (S.D.N.Y.) ("*Anwar*"). Plaintiffs' delay in seeking a stay of discovery in the *Calvo* Arbitration until eight months after it first received defendants' requests and four months after it substantially agreed on the scope of production, belies any claim of irreparable harm, the *sine qua non* for granting temporary or preliminary injunctive relief. Plaintiffs also have not established likelihood of success on the merits of their stay application. Plaintiffs base their request on the automatic stay of discovery contained in the Private Securities Law Reform Act ("PSLRA"). But the PSLRA's automatic stay is limited to federal court. Congress subsequently passed the Securities Law Uniform Standards Act ("SLUSA") to extend the reach of the discovery stay to state court proceedings. Any further extension of the discovery stay to encompass arbitrations is a matter for Congress, not the courts.

Plaintiffs also seek to temporarily and preliminarily enjoin the *Calvo* Arbitration in its entirety pending determination of their request for an injunction and declaratory judgment barring the arbitration of claims against StanChart Securities and barring all defendants except Calvo from proceeding with the arbitration.

On June 1, 2010, the arbitral tribunal (the "Tribunal") issued a partial award (the "Award"), which, among other things, denied plaintiffs' motion to dismiss StanChart Securities. The Tribunal found two grounds for binding StanChart Securities to the SCBI Brokerage Client Agreement: assumption, as successor broker-dealer, and estoppel, as recipient of direct benefits derived from acquiring customers, accounts, and related records from its predecessor. Plaintiffs

do not dispute that StanChart Securities assumed the SCBI Brokerage Client Agreement, received the customer accounts from SCBI, and is SCBI's successor.  Instead it relied on the FINRA forum only arbitration clause in the new StanChart Brokerage Client Agreement. However, as the Tribunal correctly found, the unilateral substitution of a completely new agreement is unenforceable because it is unconscionable.

The Tribunal also denied plaintiffs' motion to dismiss the claims against all claimants except Calvo.  Because joinder/consolidation is a procedural matter to be determined by the Tribunal, its decision must be given substantial deference.  Plaintiffs fall far short of clearing the high hurdle erected by the deferential standard of review.  The Tribunal applied contract construction rules and law to interpret the applicable agreements, and properly utilized industry custom and practice for the securities brokerage industry  in accordance with authority conferred by ICDR rules.

**ARGUMENT**

**POINT I**

**THE STANDARD CHARTERED ENTITIES HAVE FAILED TO SHOW A
LIKELIHOOD OF SUCCESS ON THE MERITS**

A.      **Standard of Review**

Plaintiffs rely on the general presumption that the issue of arbitrability should be resolved by the courts to seek *de novo* review of the Tribunal's determination that StanChart Securities is subject to AAA jurisdiction.  Plaintiffs' Memorandum of Law in Support of Their Application for a Temporary Restraining Order and Motion for a Preliminary Injunction ("Pl. Br.") at 10-11. However, the question of arbitrability may be submitted to arbitrators where there is clear and unmistakable evidence that the parties agreed to do so. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Once the matter has been submitted to the arbitrators, a court must

4

give considerable deference to their decision.  While such matters are still reviewable, a court

will only overturn the arbitrators' decision in "very unusual circumstances" *First Options*, 514 at

942.

By providing for AAA arbitration, the broad arbitration clause at issue here incorporates

the rules of the AAA which specifically vest the Tribunal with "the power to rule on its own

jurisdiction, including any objections with respect to the existence, scope or validity of the

arbitration clause." ICDR Rules Art. 15 § 2, attached as Exhibit 1 to the Declaration of Samuel

I. Schwartz dated July 21, 2010 ("Schwartz Dec.").[1]  When parties to an arbitration agreement

incorporate rules that empower the arbitrators to decide issues of arbitrability, that incorporation

serves as clear and unmistakable evidence of the parties' intent to delegate such issue to the

arbitrators.  *See Shaw Group, Inc. v. Triplefire International Corp.*, 322 F.3d 115, 124-25 (2d

Cir. 2003) (holding that the clear and unmistakable intent to arbitrate was established against a

non-signatory under a broad arbitration provision requiring arbitration under ICC rules that

assigned to the arbitrators the issue of arbitrability).

In addition, the nexus between StanChart Securities and SCBI (the signatory to the

Brokerage Client Agreement) is such that SCBI's intent to delegate the issue of arbitrability to

the arbitrators should be imputed to StanChart Securities.  *See Optimark Technologies, Inc. v.*

*International Exchange Networks, Ltd.*, 288 A.D.2d 75, 732 N.Y.S.2d 413 (1st Dept. 2001)

(holding that non-signatory was imputed with affiliate's intent to arbitrate).  Both StanChart

Securities and SCBI were subsidiaries of Standard Chartered Bank.  There can be no dispute that

---

[1]      The broad arbitration clause in § 6 of the SCBI Client  Brokerage Agreement applies to
"any controversy arising out of, or relating to my accounts . . ."  Declaration of Patrick R.
Berarducci dated July 14, 2010 ("Berarducci Dec."), Exh. B § 6..  It makes no reference to
limiting such controversies to those between the contracting parties.

StanChart Securities was formed for the purpose of succeeding to the broker-dealer business of SCBI in order to comply with Gramm-Leach Bliley-Act, 15 U.S.C. § 6801 et seq., with full knowledge that it was to be assigned the SCBI Brokerage Client Agreement (and transferred customer accounts) and thus be bound by the arbitration provisions incorporated therein.  *See* Schwartz Dec. Exh. 2.  The assignment of the SCBI Brokerage Client Agreement and transfer of customer accounts  from SCBI to StanChart Securities was in fact effectuated in November or December 2008.  Furthermore, paragraph 22 of the SCBI Brokerage Client Agreement  expressly provided that its terms were to inure to the benefit of SCBI's affiliates and successors. Berarducci Dec., Exh. B § 22.   Accordingly, the standard of review of this Court is limited and considerable deference should be given to the Tribunal's decision concluding that StanChart Securities is subject to AAA jurisdiction.[2]

The Tribunal's determination on joinder/consolidation also is subject to deferential review, as explained more fully in Point IC below.

**B.      StanChart Securities Is Subject to AAA Jurisdiction Because It Assumed the SCBI Brokerage Client Agreement and Is the Recipient of Direct Benefits Under That Agreement**

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, which governs the arbitration agreement contained in the SCBI Brokerage Client Agreement  "requires the federal courts to enforce arbitration agreements, reflecting Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation." *Deloitte Noraudit A.S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1063 (2d Cir. 1993) (citation omitted).  In light of the liberal federal policy favoring arbitration "any doubts concerning the

---

[2]      The Tribunal's determination that Stanchart Securities is subject to AAA arbitration should be upheld even under *de novo* review.  As explained in the following section, the Tribunal correctly applied the applicable law to the facts before it.

scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25 (1983). The strong federal policy favoring arbitration is even greater in the context of international disputes. *Deloitte Noraudit*, 9 F.3d at 1063 (citations omitted).

Notwithstanding the strong and liberal policy favoring arbitration, because arbitration is contractual in nature an arbitration agreement "must not be so broadly construed as to encompass claims and parties that were not intended by the original contract." *Thomson-CSF, S.A. v. American Arbitration Association*, 64 F.3d 773, 776 (2d Cir. 1995). But this does not mean that "an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." *Id.* (citations omitted). The Second Circuit has long made clear that a nonsignatory may be bound to an arbitration agreement "if so dictated by the ordinary principles of contract and agency." *Id.* (internal quotation marks and citations omitted).

The Second Circuit, like its sister circuits, recognizes a number of traditional theories arising out of common law principles of contract and agency law under which nonsignatories may be bound to the arbitration agreements of others, including but not limited to (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel. *Thomson*, 64 F.3d at 776. Under the estoppel theory, a party that benefits from an agreement with an arbitration clause can be estopped from avoiding arbitration with a signatory despite having never signed the agreement. *MAG Portfolio v. Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001). The benefits must be direct, that is, flow directly from the agreement. *Thomson*, 64 F.3d at 778.

Here, defendants assert, and the Tribunal has held, that StanChart Securities is subject to AAA arbitration under the principles of assumption (successor) and direct benefits estoppel. In

November or December 2008, SCBI's broker-dealer business was reorganized and all Brokerage

Client Agreements (including those of defendants) were assigned to StanChart Securities, an

affiliated entity, and all client accounts were transferred to StanChart Securities.  Schwartz  Dec.,

Exh. 2.  The SCBI Brokerage Client Agreement, pursuant to paragraph 9 therein, was assigned to

StanChart Securities as a successor as part of the reorganization of SCBI's broker/dealer

business.  Berarducci Dec. Exh. B § 9.  The direct benefits that StanChart Securities derived

from acquiring the accounts and customer relationships are precisely the kind that courts have

found to trigger estoppel.  *Ryan, Beck & Co. v. Fakih*, 268 F. Supp.2d 210 (E.D.N.Y. 2003), as

the Tribunal noted (Award at 12),  is "four square with" the facts here.  A copy of the Award is

attached as Exh. M to the Berarducci Dec.  There, plaintiff, a broker-dealer, purchased the assets

of Gruntal, another broker-dealer, including Gruntal's customer accounts and related books and

records.  The court held that plaintiff had derived direct benefits from acquiring Gruntal's

customer relationships, accounts, and assets, subject to the protection afforded by the client

agreement, and thus was estopped from avoiding arbitration.  268 F. Supp.2d at 220.   The

Tribunal held that, as in *Ryan Beck*, StanChart Securities is the successor broker-dealer for

customers and investments transferred to it and is estopped from avoiding arbitration because of

the direct benefits it derived from acquiring customers, accounts and related records from its

predecessor.  Award at 12-13.[3]  *See also H.D. Brous & Co. v. Mrzyglocki*, 2004 WL 376555 *7

(S.D.N.Y. February 26, 2004) (margin account agreement, which included arbitration agreement

---

[3]      The Tribunal further found that the factual dispute over whether the Fairfield Sentry
securities in issue were transferred is irrelevant to the issue of whether StanChart is bound by the
terms of the arbitration clause in the SCBI Brokerage Agreement because "[i]t is undisputed that
StanChart received customers and accounts and transfers of other securities from Claimants'
AEBI/SCBI accounts and so benefitted directly from the AEBI/SCBI Brokerage Agreement."
Award at 13.

between client and the clearing firm, directly benefitted petitioner broker by establishing its business relationship with respondent client).

The estoppel and assumption theories provide two independent grounds for binding Stanchart Securities to the arbitration agreement in the SCBI Brokerage Client Agreement. Plaintiffs do not address estoppel at all in their brief. This alone is sufficient to establish that StanChart Securities has no likelihood of success on the merits with respect to this issue and thus avoiding arbitration before the AAA.

Plaintiffs also do not dispute that StanChart Securities assumed the SCBI Brokerage Client Agreement, received the customer accounts from SCBI, and is SCBI's successor.[4] Instead plaintiffs rely on the FINRA forum only arbitration clause in the new StanChart Brokerage Client Agreement. However, as the Tribunal correctly found, the new agreement is unenforceable because it is unconscionable. Whether the contract as a whole is unconscionable is determined through arbitration. *Rent-A-Center, West, Inc. v. Jackson*, ____ U.S. ____, 2010 WL 2471058 * 9 (June 21, 2010) Accordingly, the Tribunal's unconscionability determination is entitled to deferential review.

As a threshold inquiry, it is necessary to consider whether the substitution of the entirely new StanChart Brokerage Client Agreement was in fact permitted under paragraph 8 of the SCBI Brokerage Client Agreement. The substitution of a completely new agreement, which makes no reference to the SCBI Agreement, goes far beyond the express language of paragraph 8, which

---

[4]      The assignment clause (¶ 9) provides further evidence of StanChart Securities successor liability: "Following any such assignment all of my [the client's] rights hereunder shall be against the assignee entity [StanChart Securities] and not against you [SCBI]." Berarducci Dec. Exh. B.

granted SCBI the unilateral right to "to amend this agreement by modifying or rescinding any of its existing provisions or by adding any new provision." Berarducci Dec. Exh. B § 8.

Even if the right to amend or modify were to include the right to substitute a new agreement, the Tribunal correctly determined that the StanChart Brokerage Client Agreement was unenforceable on the grounds of unconscionability. The Tribunal found the new Agreement was procedurally unconscionable because "there is an absence of actual notice and meaningful choice on the part of the claimants and the contract terms are unreasonably favorable to StanChart."[5] Award at 14. The Tribunal further found that the StanChart Agreement to be substantively unconscionable because it "require[ed] pursuit in two forums for the same claim by means of the substitution of a new form contract, which mandates arbitration in a different forum against a successor entity, here owned by the same ultimate parent." *Id*. The harm here, according to the Tribunal, is that, if the change in forum were enforced, defendants would be subject to being "whipsawed" and subjected to conflicting rulings by having to assert the same claims in two separate forums with SCBI and StanChart Securities each pointing a finger of blame at the other. Award at 15.

Plaintiffs make several arguments to rebut the Tribunal's finding of unconscionability, none of which is persuasive. First, Plaintiffs argue that courts, in certain circumstances, have permitted unilateral amendments to standard form contracts changing arbitration rights. Pl. Br. at 13-14. One of the cases cited by plaintiffs, *In re American Express Merchants Litigation*, 2006 WL 662341 (S.D.N.Y. March 16, 2006), did not even address the unconscionability issue. Another of the cases, *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp.2d 237

---

[5]     The panel accepted defendants' contention that FINRA is perceived as a more favorable forum for brokerage firms. Award at 14 n.7.

(S.D.N.Y. 2005), held that arbitration clauses added by issuing banks after commencement of the action were unenforceable as unconscionable. 31 F. Supp.2d at 251-252. Here, the unilateral substitution of a new arbitration clause was made after Plaintiffs were on notice of the Madoff dispute and had received numerous complaint letters, including from defendants. Schwartz Dec. Exh. 3. Moreover, Plaintiffs made the new agreement retroactive, a practice that courts have viewed with suspicion. *See Morrison v. Amway Corp.,* 517 F.3d 248, 253-58 (5th Cir. 2008) (court declined to enforce unilateral amendment to arbitration clause because there was nothing to prevent it from being applied retroactively to disputes arising out of events occurring before the amendment).

Second, Plaintiffs submit a supplemental declaration from Steven Glover concerning their mailing procedures to establish that defendants had actual notice of the StanChart Agreement. However, failure to establish actual notice was only one of the grounds for the Tribunal's finding of procedural unconscionability. The Tribunal also based that finding on the timing of the amendment and on Plaintiffs' selection of a more favorable forum in the new agreement. Award at 14. Moreover, the Arbitrators found the circumstances here "so outrageous as to warrant holding it [the unilateral substitution of a new forum in the new agreement] unenforceable on the ground of substantive unconscionability alone." Award at 15 (quoting *Gillman v Chase Manhattan Bank N.A.,* 73 N.Y.2d 1, 12 (1988)).

Citing *Moses H. Cone Memorial Hospital v. Mercury Construction,* 460 U.S. 1, 20 (1983), plaintiffs assert that the Tribunal's determination that the piecemeal resolution of disputes (SCBI in AAA and StanChart Securities in FINRA) would be grossly unreasonable or unconscionable was an abuse of power unsupported by case law and should be overturned. Pl. Br. at 14-15. Plaintiff's reliance on *Moses A. Cone* is misplaced. The Supreme Court, in holding

11

that the district court abused its discretion in staying an action seeking an order compelling

arbitration pending resolution of a related state court suit, accepted "piecemeal resolution" as the

price to pay in order to further the strong policy in favor of arbitration. *Moses H. Cone*, 460 U.S.

at 23 (stay frustrated "the statutory policy of rapid and unobstructed enforcement of arbitration

agreements). Here the Tribunal's finding of unconscionability was based on a different kind of

"piecemeal resolution" – splitting up similar arbitration claims arising out of the same

transaction in two different forums in which the Claimants would be subject to being

"whipsawed" by having to assert the same claims in two different arbitration forums with SCBI

and StanChart Securities each claiming that the other is the one potentially liable.

**C.     Plaintiffs Have Failed to Clear the High Hurdle Necessary to Overturn the
        Tribunal's Decision on Joinder/Consolidation**

        In *Howsam v Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002), the Supreme Court clearly

established that the authority of courts to decide questions of arbitrability is limited to "gateway

issues" such as whether the parties are bound by a given arbitration clause or whether an

arbitration clause in a concededly binding contract applies to a particular type of controversy.

537 U.S. at 84. Procedural questions are for an arbitrator to decide. *Id.* Post *Howsam*, the

federal courts have uniformly held that consolidation is a procedural matter for the arbitrators.

*See Shaw's Supermarkets, Inc. v. United Food and Commercial Workers Union, Local 791,*

*AFL-CIO*, 321 F.3d 251, 254 (1st Cir. 2003); *Certain Underwriters at Lloyds' London v.*

*Westchester Fire Insurance Co.*, 489 F.3d 580, 585-87 (3d Cir. 2007); *Employers Insurance Co.*

*of Wausau v. Century Indemnity Co.*, 443 F.3d 573, 576-78 (7th Cir. 2006). The Second Circuit

has not yet considered consolidation of arbitrations following *Howsam,* but at least one district

court decision has followed these cases. *See Blimpie International, Inc. v. Blimpie of the Keys*,

371 F. Supp.2d 469, 474 (S.D.N.Y. 2005) (45 fast food sub-franchisors filed a consolidated

arbitration demand at the AAA pursuant to an arbitration clause that was silent on the issue of consolidation; the court held that whether consolidation is permissible in the absence of any language in the agreement is for the arbitrators).

Because joinder/consolidation is a procedural matter to be determined by the Tribunal, this Court should give significant deference to the Tribunal's decision.  As the Supreme Court stated in *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758 (2010), a petitioner seeking to vacate an arbitrators' decision under FAA § 10(a)(4) must "clear a high hurdle.  It is not enough for petitioner to show that the Panel committed an error – or even a serious error. . . . 'It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively "dispense[s] his own brand of industrial justice" that his decision may be unenforceable.'" 130 S. Ct. at 1767 (citations omitted).  The Supreme Court explained that whether the parties had agreed to class arbitration was not the type of procedural issue referred to in *Howsam* as being within the arbitrators' domain.[6]  130 S. Ct. at 1775.  Plaintiffs mistakenly rely on this statement to seek *de novo* review of the Tribunal's consolidation determination.  Pl. Br. at 11.  As discussed more fully below, class actions are a "very different animal" from consolidation and cannot be equated with consolidation.  Award at 17.  Accordingly, plaintiffs must clear the high hurdle of deferential review and cannot do so.

A review of the Award on consolidation reflects a detailed analysis of the facts and applicable law by the Tribunal.  Referring to *Stolt-Nielsen*, the Tribunal recognized that in deciding the consolidation issue the parties' intentions control and that such intentions should be

---

[6]      The Court in *Stolt-Nielsen* recognized that "[i]n certain contexts it is appropriate to presume that the parties that enter into an arbitration agreement implicitly authorized the arbitrator to adopt such procedures as are necessary to give effect to the parties' agreement." 130 S. Ct. at 1775,  Joinder/consolidation, unlike class actions, is just such a procedural matter that the Tribunal is authorized to adopt to give effect to the parties' agreement to arbitrate.

determined by contract construction law, including custom and usage. Award at 18. The Tribunal understood that there must be a "contractual basis" for concluding that the multi-party or consolidated action is permissible. Just as the Supreme Court in *Stolt-Nielsen* did not require express consent to allow class actions, no such express consent is required to permit consolidation. *Id.*

The Tribunal's contract interpretation analysis included a determination that the class action bar provision in the Brokerage Client Agreement was not a bar on the joinder/consolidation of multi-party claims.[7] In so finding, the Tribunal rejected plaintiffs' argument that class actions and multi-party actions like the *Calvo* Arbitration are the same. It found none of the unique characteristics of class actions identified in *Stolt-Nielsen* to be present. Only 24 accounts are involved, not the hundreds or thousands of parties in a class action. The confidentiality available in arbitration is present (reinforced here by the exhaustively negotiated confidentiality agreement so ordered by the Tribunal). Further, there is no adjudication of absent parties as all claimants are part of the proceeding, each must submit a witness statement, and each is subject to cross-examination at plaintiffs' option. Award at 18.

The Tribunal accepted defendants' contract construction argument that an ambiguity was created by the class action bar provision (in not excluding joinder or consolidation) and the fact the SCBI Brokerage Client Agreement also contained a FINRA forum option (which under

---

[7]     As a threshold matter, the Tribunal noted that "the arbitration as presented here is more akin to a joinder and presents claims arising out of the same series of occurrences and presents questions of law and fact common to all parties that would lead to a significantly more expeditious and cost effective resolution of the matters raised." Award at 16. The Tribunal further noted that plaintiffs had not pointed to any prejudice they would suffer if the arbitration were permitted to proceed with multiple claimants. *Id.* Plaintiffs seek to dismiss this analysis as based on "policy considerations." Pl. Br. at 17 n.12. However, these are the same factors that courts always consider when joinder issues are presented.

FINRA rules permits joinder/consolidation where there are common questions of law or fact).
Award at 19-20.  Upon finding ambiguity, the Tribunal, relying on settled case law and the
authority  conferred upon it by the applicable arbitration rules, applied extrinsic evidence of
industry custom and practice, which in their view was evidenced by FINRA as the self-
regulatory organization for broker-dealers.[8]  Award at 19.    The Tribunal also applied the rule
against the drafter in resolving the ambiguity against Plaintiffs.  Award at 20.  *See Cowen v.
Anderson*, 76 N.Y.2d 318, 322-23, 559 N.Y.S.2d 225, 226-27 (1995).  The rule "protect[s] the
party who did not choose the language from an unintended or unfair result." *Mastrobuono*, 514
U.S. at 64.  The Tribunal further concluded that plaintiffs could have excluded
joinder/consolidation from their form client agreements if that was their intent in the face of
industry custom and practice for broker-dealers which in their view permitted
joinder/consolidation.  Award at 20.

    Plaintiffs assert that the Panel's application of the FINRA rule on joinder/consolidation
was "completely baseless" since the parties are involved in an AAA arbitration.  Respondents
ignore that courts have used forum choices in contracts as evidence of the intent of parties in
construing arbitration clauses.  By providing for NASD/FINRA as an alternative forum, the
plaintiffs have expressed their intent to permit consolidation, since it was provided for in the
rules to which they agreed to be bound.  If they had a different intent to bar consolidation, the
plaintiffs would not have agreed to NASD/FINRA as a forum option. *See Cowen v. Anderson*,

---

[8]  Article 28 (paragraph 2) of the applicable International Centre for Dispute Resolution (ICDR)
arbitration rules provide that "[i]n arbitrations involving the application of contracts, the tribunal
shall decide in accordance with the terms of the contract and shall take into account usages of the
trade applicable to the contract."  Accordingly, the tribunal's finding of custom and practice in
the brokerage industry in interpreting the contract was based on authority pursuant to an ICDR
rule and is to be afforded deference.  Schwartz Dec. Exh. 4.

76 N.Y.2d at 323, 559 N.Y.S.2d at 228 (using then applicable AMEX rules to establish intent to arbitrate at the AAA); *PaineWebber, Inc. v. Webb*, 155 A.D.2d 938, 938-39, 545 N.Y.S.2d 120, 121 (4th Dep't 1989) (same). *See also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 58-63 (1995) (in determining that the intent of the parties and the plain meaning of the contract was to allow for punitive damages where there was no express language on the issue in the brokerage client agreement, the Supreme Court placed considerable reliance on the fact that it was permissible under the applicable NASD rule and applied the common law contract interpretation rule of construing ambiguity against the drafter).[9]

Plaintiffs further argue that it was not appropriate for the Panel to utilize FINRA as evidence of industry custom and practice because the FINRA rules do not apply to SCBI (formally AEBI) as it is an Edge Act bank, SCBI was not part of the "brokerage industry" and SCBI is not (and never has been) a member of FINRA and has not otherwise agreed to submit to arbitration before FINRA. Pl. Br. at 18 n.14. While it is true that SCBI is an Edge Act Bank, the activities complained of by defendants unquestionably involved broker-dealer activities – the sale of securities – as SCBI was engaged in broker-dealer activities but was not required to register as a broker-dealer under exemptions under the securities laws. (The change in law under Gramm-Leach-Bliley Act led to the formation of StanChart Securities and its registration as a broker-dealer with the SEC and membership with FINRA.) Furthermore, Plaintiffs conveniently disregard the significant fact that SCBI's form Brokerage Client Agreement expressly provided

---

[9]     Plaintiffs' reliance on the general rule in New York that ambiguity does not arise from mere silence also is misplaced. Pl. Br. at 17. A well-recognized exception to the rule exists where the arbitration clause is included in a contract of adhesion between two parties with unequal bargaining power. In that scenario, which is the one presented by this dispute, the silence in the form prepared by the stronger party will be read as creating an ambiguity to be construed in favor of the weaker party. *Goldfield Corp. v. General Host Corp.*, 29 N.Y.2d 264, 272-73, 327 N.Y.S.2d 330, 337 (1971).

for the NASD (subsequently FINRA) as a forum option for clients.  Having provided a FINRA

forum in their own form agreements and engaged in broker-dealer activities, and given judicial

recognition that forum options may be material to establishing intent, it can hardly be said that

the Tribunal's application of the FINRA rule as evidence of intent on joinder/consolidation was

"completely baseless."

    Plaintiffs also argue that *United Kingdom v. Boeing Co.*. 998 F.2d 68 (2d Cir. 1993) and

*Glencore Ltd. v. Schnitzer Steel Prods. Co.*, 189 F.3d 264 (2d Cir. 1997) are "binding precedent"

after *Stolt-Nielsen* and prohibit consolidation absent language in the arbitration clause expressly

permitting it.  Pl. Br. at 16.  The Tribunal considered this argument and determined that "*Stolt-

Nielsen* has not gone so far . . . as to revive these cases as controlling precedents and to make the

parties' intent and contract construction irrelevant."  Award at 18 n.9.  *Stolt-Nielsen* does not

require express consent for class arbitration, but rather requires that there be a "contractual basis

for concluding that the parties agreed" to submit to class arbitration.  Since the parties in *Stolt-

Nielsen* had stipulated that the agreement was silent on class arbitration, there was no inquiry

into the intent of the parties.  *Stolt-Nielsen* at 23 n.10.  In contrast, both parties here tendered to

the arbitrators their argument as to intent, including differing constructions of the language in the

arbitration clause, and the Tribunal interpreted the contract language by applying appropriate

rules of contract construction and applicable law.  As in *Stolt-Nielsen,* the Second Circuit in

*Boeing* and *Glencore* did not engage in an analysis of the parties' intent.  *Boeing* and *Glencore*

are further distinguishable as they both involved arms-length negotiated agreements between

sophisticated business entities and not, as here, a standard form contract of adhesion presented to defendants on a "take it or leave it" basis.[10]

Unlike the arbitrators in *Stolt-Nielsen*, it can hardly be said that the Tribunal, in reaching its decision on joinder/consolidation, dispensed its own brand of justice or public policy. The Tribunal applied contract construction rules and law to interpret the applicable agreements, and properly utilized industry custom and practice for the securities brokerage industry to their analysis in accordance with authority conferred by ICDR rules. Accordingly, even if erroneous – and it is not – its decision allowing the multi-party arbitration to continue should be upheld.

## D.   The PSLRA, as Amended by SLUSA, Does Not Bar Discovery in the *Calvo* Arbitration

Under the PSLRA, discovery is stayed during the pendency of a motion to dismiss "[i]n any private action arising under this chapter." 15 U.S.C. § 78u-4(b)(3)(B). Congress enacted the mandatory stay "to prevent plaintiffs from filing securities class actions with the intent of using the discovery process to force a coercive settlement . . . [and] to prevent plaintiffs from filing securities fraud lawsuits 'as a vehicle in order to conduct discovery in the hopes of finding a sustainable claim not alleged in the complaint.'" *In re LaBranche Securities Litigation*, 332 F. Supp.2d 178, 181 (S.D.N.Y. 2004) (citations omitted).

Plaintiffs argue that the plain language of the statute applies to arbitrations because an arbitration is a "private action." Pl. Br. at 20. But that is not how courts have read the statute's plain language. To the contrary, the generally accepted view is that the automatic stay applies only to the federal court "private action" in which the motion to dismiss is pending. *See, e.g.,*

---

[10]   As the Tribunal noted, *Boeing* and *Glencore* involved separately filed arbitrations which were sought to be consolidated. Award at 19 n.9. We also note that in *Boeing* the party opposing consolidation alleged material prejudice if the proceedings were consolidated. 998 F.2d at 69.

*In re Regions Morgan Keegan Securities*, 2010 WL 596444 *2 (W.D. Tenn. Feb. 16, 2010).

Recognizing this limitation, the plaintiffs' bar soon began filing securities class actions in state

court to circumvent the automatic stay. In 1998 Congress passed the Securities Litigation

Uniform Standards Act ("SLUSA") to close this loophole by granting federal court judges the

power to quash discovery in "any private action in a State court, as necessary in aid of its

jurisdiction or to protect or effectuate its judgments." 15 U.S.C. § 78u-4(b)(3)(D).

On its face, SLUSA applies only to state court actions; it does not authorize federal courts

to stay discovery in arbitrations. Not surprisingly, therefore, plaintiffs give SLUSA short shrift,

mentioning it only in passing in a footnote. Pl. Br. at 21 n.19. At the same time, plaintiffs

ignore that all the cases they cite (Pl. Br. at 21) as examples of courts staying discovery in related

proceedings to effectuate the PSLRA involved actions in which the court invoked SLUSA.[11]

Instead plaintiffs fall back on the general policy goals of the PSLRA. But there is good reason

why the PSLRA has not been extended to arbitrations. Unlike the federal (and state) courts,

arbitration does not provide a mechanism for testing the sufficiency of a complaint. Imposing a

stay of discovery in an arbitration while a motion to dismiss is pending in federal court thus

would be a major impediment to arbitration because it would unnecessarily delay the arbitration

without providing the arbitration respondent with any of the PSLRA protections available in

federal court. The resulting delay would be at odds with the policy favoring arbitration over

litigation as a more expeditious and economical vehicle for dispute resolution. *Deloitte*

*Noraudit*, 9 F.3d at 1063.

---

[11]    In *Grant v. AOL Time Warner*, 2003 WL 22227945 *1 (S.D.N.Y. Sept. 26, 2003), the
district court did not need to invoke SLUSA because both the ERISA and securities class actions
were before it. Therefore, the court was able to rely on its broad discretion to stay discovery.

Plaintiffs also have invoked the All Writs Act, which authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  A recent decision in this district, *In re Lehman Brothers Securities and ERISA Litigation*, 2010 WL 1566860 (S.D.N.Y. April 21, 2010), is highly instructive because it found that the extension of the PSLRA to arbitration is a matter for Congress, not the courts.  That case was brought under the Federal Arbitration Act and the All Writs Act by Richard Fuld, the former chairman and CEO of Lehman Brothers, a defendant in the putative class action, to enjoin arbitration against him.  Fuld's argument under the All Writs Act was that enjoining the arbitration was necessary because of the "parade of personal horribles" he faced, including uncoordinated and costly discovery circumventing the PSLRA's automatic stay, duplicative litigation, and inconsistent rulings.  The district court declined to enjoin the arbitration because it found the litany of difficulties to be mostly conclusory and hence insufficient to make a showing that the arbitration would interfere with the multidistrict litigation pending before it.  The court noted that whatever merit there might be to funneling arbitrations raising securities law claims into federal courts and consolidating them into a single multidistrict proceeding, as occurs with state court proceedings under SLUSA, such a determination was a matter for Congress not the courts.  2010 WL 1566860 at *6.[12]

---

[12]      Plaintiffs cite *In re Taxable Municipal Bonds Litigation*, 1992 WL 205083 (E.D. La. Aug. 12, 1992), a pre-PSLRA case, as an example of a court enjoining arbitration.  Pl. Br. at 23. That case is distinguishable.  The injunction there was directed only to the parties named in the multi-district litigation, was not limited to staying discovery, and was issued following an order prohibiting parties and their counsel from participating in pending related actions without court approval.  *Id.*  at 1-2.  Moreover, the court's basis for issuing the injunction was that there was no authority prohibiting it and the arbitration would needlessly duplicate discovery and unduly burden witnesses.  *Id.*  at 3.  *In re Taxable Municipal Bonds* has been cited by only one case, *In re Classicstar Mare Lease Litigation*, 2008 WL 2859152 (E.D. Ky. July 23, 2008).  The court there expressly disagreed with the rationale of *Taxable Municipal Bonds*.  It noted that under established law the existence of parallel proceedings, and the concomitant burdens that may arise

The issue here is even narrower than the one in *Lehman Brothers* since plaintiffs seek only to stay discovery, not to permanently enjoin the arbitration. The principal consideration is not the potential for inconsistent results or whether discovery will be duplicative (which occurs whenever similar claims are pursued simultaneously), but whether the discovery in *Calvo* will interfere with this Court's jurisdiction over *Anwar* by circumventing the automatic stay. It will not. First, the documents are being produced subject to an extensively negotiated and carefully tailored confidentiality agreement that expressly prohibits use of the documents in other litigations and is enforceable both by the Tribunal and by courts. Schwartz Dec. Exh. 5. Second, defendants can no longer fairly be characterized as putative class members, since by initiating the arbitration they have expressed their intent to opt out if the class is certified. Third, defendants' attorneys do not represent any of the other parties in any of the actions in *Anwar*. Last, the overlap between the claims asserted in *Calvo* and *Anwar* is not as extensive as plaintiffs suggest because a significant element of the claims in *Calvo* rests on plaintiffs' failure to provide the defendants with the Fairfield Sentry private placement memorandum and on their mischaracterization of the nature of the investment (and not simply on the failure to conduct reasonable due diligence of Madoff and Fairfield Sentry). Plaintiffs' concerns thus are unfounded and resort to the All Writs Act is inappropriate.

**E.    The Balance of Hardships Does Not Tip Decidedly in Favor of Plaintiffs**

Plaintiffs argue in the alternative that they are entitled to injunctive relief because they have raised serious questions going to the merits and the balance of hardships tips decidedly in their favor. Pl. Br. at 23 n.21. Assuming that plaintiffs' arguments have some merit – and as

---

from piecemeal litigation, do not sufficiently threaten a court's jurisdiction as to warrant an injunction under the All Writs Act and concluded the same holds true when the concurrent proceeding is an arbitration. 2008 WL 2859152 at *3-4.

shown above they do not – their showing of hardship rests entirely on their claim of irreparable harm. *Id.* If that were the standard, the balance of hardships test would be rendered meaningless, resulting in a weakening of the standard for injunctive relief. *See Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (a movant's overall burden under the "serious questions" standard is no lighter than the one it bears under the "likelihood of success" standard because it "must additionally establish that the balance of hardships tips *decidedly* in its favor) (internal quotation marks and citations omitted). The only action in the *Calvo* Arbitration that requires plaintiffs' immediate attention is document production. To meet the initial production date (July 29) starting and discovery cut off date (August 13), plaintiffs would have had to have substantially completed their document review by now and thus should have very little left to do other than photocopy the documents. *See* Point II.A below. That is not the kind of hardship that warrants injunctive relief, especially for a multinational banking and broker-dealer entity like plaintiffs. Defendants, in contrast, will suffer hardship because even a short delay in production will throw off the other dates in the scheduling order, such as submission of witness statements, and likely move the hearing date set by the Tribunal. Schwartz Dec. Exh. 6. Given the need to coordinate the schedules of the panel members and the parties to arrange for 15 consecutive hearing days, the hearing is not likely to be rescheduled quickly. The resulting delay will prejudice defendants by depriving them of the speedy resolution of claims that arbitration is designed to provide. Plaintiffs downplay the hardship by characterizing the delay as a "brief postponement," Pl. Br. at 23 n.21, but whatever the extent of the hardship, it is enough to prevent the scales from tipping in plaintiffs' favor.

22

## POINT II

## THE STANDARD CHARTERED ENTITIES HAVE FAILED TO MAKE A SHOWING OF IRREPARABLE HARM THAT WILL SUPPORT EITHER A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY INJUNCTION

### A.     Document Production Will Not Cause Irreparable Harm

Plaintiffs' request for interim relief, including a temporary restraining order pending

resolution of their preliminary injunction motion, is predicated on the upcoming July 29 start

date for document production.  However, any urgency underlying plaintiffs' request is illusory

and a creature of plaintiffs' delay.  The *Calvo* claimants served their document requests on

November 25, 2009.  Shortly thereafter, on December 21, 2009, the Standard Chartered entities

in *Anwar* entered into a scheduling order that, among other things, contemplated the filing of

motions to dismiss.  Rather than seeking a stay of discovery in the *Calvo* arbitration, plaintiffs'

counsel entered into negotiations with counsel for the *Calvo* claimants over the scope of

discovery.  On March 18, 2010, the parties entered into a letter agreement pursuant to which

plaintiffs agreed to the majority of the requests, either in their original form or as modified.

Schwartz Dec. Exh. 7.  The remaining requests were submitted for resolution to the Tribunal

Chair, who ruled on April 19, 2010.  Schwartz Dec. Exh. 8.   Yet, plaintiffs waited until the

middle of June, shortly before production was to begin, to file this motion for a stay.  Moreover,

during the course of the arbitration plaintiffs have asked the Tribunal to stay discovery and each

time their request has been denied.  Plaintiffs' failure to seek preliminary injunctive relief earlier

belies their claims of irreparable harm.  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.

1985); *Pace v. Schwartz*, 680 F. Supp.2d 591, 595 (S.D.N.Y. 2010).

Plaintiffs' ongoing participation in discovery also undermines plaintiffs' claimed need to

be protected from the burden of discovery.  Plaintiffs have already incurred the time and expense

of resolving discovery disputes and would not be able to meet the July 29 start date and August 13 cutoff date if they had not already gathered and reviewed the responsive documents. Thus the only remaining cost is that of completing any document review that remains and the physical production of documents. But plaintiffs have already represented to the Tribunal that regardless of which parties remain in the arbitration, document production will be made by all the named Standard Chartered entities. Schwartz Dec. Exh. 8. Accordingly, the cost of production is not irreparable harm, but simply a matter of internal allocation between the various Standard Chartered entities.

**B.** **The Benefits Afforded by Joinder/Consolidation Negate Any Claim of Irreparable Harm**

Plaintiffs' contention that they will be harmed if they are "compelled to incur either the expenses or burden of participating in a large consolidated arbitration" (Pl. Br. at 24) reflects a misunderstanding of the nature of consolidation. Consolidation is a procedural tool designed to reduce costs, promote efficiency, and avoid conflicting rulings. The Tribunal's determination to hear the claims together thus inures to the benefit of all parties, including plaintiffs. Plaintiffs never argued before the Tribunal that they would be prejudiced and the Tribunal found no prejudice. Award at 16. Plaintiffs' conclusory reference now to the "increased and aggregated risks inherent" in a large consolidated proceeding (Pl. Br. at 24) does not outweigh these benefits. Plaintiffs may have other reasons for contesting consolidation, but avoiding irreparable harm can not be one of them.

24

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a temporary restraining order and

preliminary injunction should be denied.

Dated: July 21, 2010

EISEMAN LEVINE LEHRHAUPT
  & KAKOYIANNIS, P.C.

By: _____ /s/ Samuel I. Schwartz _____
      Samuel I. Schwartz
      Stephen L. Weinstein
      805 Third Avenue
      New York, New York 10022
      (212) 752-1000

KERSTEIN COREN & LICHTENSTEIN LLP
Geoffrey H. Lewis
60 Walnut Street
Wellesley, Massachusetts 02481
(781) 997-1600

ALLAMAND & SCHAULSOHN
Jorge  Schaulsohn B.
Isidora Goyenechea 3120
Piso 8°, Las Condes
Santiago, Chile
0011-562-431-2000
*Attorneys for Defendants*
