```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                   :
PASHA S. ANWAR, et al.,            :
                                   :
                    Plaintiffs,    :
                                   :
        - against -                :
                                   :
FAIRFIELD GREENWICH LIMITED,       :
et al.,                            :
                                   :
                    Defendants.    :
----------------------------------X
```

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/29/10

09 Civ. 0118 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

This lawsuit is a putative class action on behalf of individuals and entities (collectively, "Plaintiffs") who invested large sums of money in four hedge funds founded and operated by the Fairfield Greenwich Group ("Fairfield Greenwich"). The overwhelming majority of Plaintiffs' money was in turn invested in Bernard Madoff's Ponzi scheme. Plaintiffs are now suing a number of Fairfield Greenwich companies, directors, and others who audited or administered the hedge funds. The complaint alleges violations of federal securities law and common law tort, breach of contract and quasi-contract causes of action. Fairfield Greenwich and numerous co-defendants (collectively, "Defendants") move to dismiss the complaint in its entirety, asserting defenses grounded in federal and state law.

Because of the breadth of issues raised in Defendants' various submissions, the Court considers their motions in two

-1-

separate rulings.  This Decision and Order, to be referred to as "Anwar I," disposes of arguments made by Defendants that all of Plaintiffs' common law claims, save for fraud, are preempted by New York State's Martin Act (the "Martin Act"), N.Y. Gen. Bus. Law, Art. 23-A, §§ 352-359.  The remainder of Defendants' arguments are addressed in a companion Decision and Order issued separately.

Defendants' preemption argument -- that the Martin Act, the state law granting the New York State Attorney General ("Attorney General") power to prosecute fraud in the securities market, forecloses any private common law causes of action except for fraud -- has been accepted by the majority of courts that have considered the issue in the Southern District of New York, as well as by numerous New York state courts.  See Nanopierce Tech., Inc. v. Southridge Capital Mgmt. LLC, No. 02 Civ. 0767, 2003 WL 22052894, at *2 (S.D.N.Y. Sept. 2, 2003) (collecting cases).  This Court sees the issue differently.

## I. DISCUSSION

### A. A FOX TERRIER COMES TO COURT

In a recurring theme that inspired many of his books and essays on natural history, the prominent biologist Stephen Jay Gould often documented how, not uncommonly, an error enters into scientific theories and writings, and later becomes

-2-

perpetuated when the fallacy is uncritically adopted and copied by subsequent scholars, at times expressed with identical phrases, arguments and illustrations. See, e.g., Stephen Jay Gould, Bully for Brontosaurus 163-64 (1991) (finding the description of Eohippus, the so-called dawn horse, as resembling "the size of a fox terrier" in two-thirds of modern American biology textbooks, and tracing the archaic simile verbatim to a 1904 article by an eminent American scholar). In consequence, flawed or false concepts gain currency in scientific literature, and then become axiomatic through generations of literal repetition in succeeding texts, sometimes long after the rationale for the original proposition has been lost, and even after the theory has been roundly discredited or disproved. The law has its own version of this practice reflected in some judicial opinions.[1] A body of federal and state court decisions interpreting and applying one aspect of the Martin Act presents a case in point.

The unwitting perpetuation of error, in this Court's reading of the law, comes in judicial decisions ruling that the Martin Act preempts common law causes of action that exist

---

[1] Justice Oliver Wendell Holmes expressed his characteristically caustic views on this subject in his familiar warning against the perpetuation of legal rules inadequately examined. Holmes complained about "hav[ing] no better reason for a rule of law than that so it was laid down in the time of Henry IV," especially "if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897).

independent of the Martin Act but whose proof relies on the
same facts that would support a Martin Act prosecution by the
Attorney  General.    Speaking  generally,  the  Martin  Act
"authorizes the Attorney General [of New York] to investigate
and enjoin fraudulent practices in the marketing of stocks,
bonds and other securities within or from New York State."
Kerusa Co. LLC v. W10Z/515 Real Estate Ltd., 906 N.E.2d 1049,
1052 (N.Y. 2009).    In 1987, the New York State Court of
Appeals held that the Martin Act did not authorize private
causes of action.  See CPC Intern. Inc. v. McKesson Corp., 514
N.E. 2d 116, 119 (N.Y. 1987) (" McKesson") (declaring that
"this  court  holds  that  an  implied  private  action  is  not
consistent with the legislative scheme underlying the Martin
Act").  But, as further elaborated below,   McKesson did not
explicitly address whether the Martin Act preempted common law
claims based on the same facts that would also empower the
Attorney General to prosecute under the Martin Act.  From the
statute's legislative grant of power, as glossed by judicial
construction, many courts derived a rule that "the [Martin]
Act precludes a private right of action for common law claims
the subject matter of which is covered by the Martin Act."
Pro Bono Invs., Inc. v. Gerry, No. 03 Civ. 4347, 2005 WL
2429787, at *16 (S.D.N.Y. Sep. 30, 2005).  Because it requires
proof of deceitful intent, an element not thought to be

-4-

required by the Martin Act, the only common law cause of action deemed not so "covered" is fraud.    See Nanopierce Tech., 2003 WL 22052894, at *4.

Most cases finding Martin Act preemption have arisen in the Southern District of New York.   See Stephenson v. Citco Group Ltd., No. 09 Civ. 0716, 2010 WL 1244007, *10-*14 (S.D.N.Y. Apr. 1, 2010); Sedona Corp. v. Ladenburg Thalmann & Co., Inc., No. 03 Civ. 3120, 2005 WL 1902780, at *21-*23 (S.D.N.Y. Aug. 9, 2005); Nanopierce Tech., 2003 WL 22052894, at *3; Bibeault v. Advanced Health Corp., No. 97 Civ. 6026, 1999 WL 301691, at *10-*11 (S.D.N.Y. May 12, 1999); Independent Order of Foresters v. Donaldson, Lufkin & Jenrette Inc., 919 F. Supp. 149, 153-54 (S.D.N.Y. 1996) (Foresters"). As demonstrated below, the doctrine originated in Foresters and was later adopted almost verbatim in a string of cases. But even here the authority for this proposition is not uniform, as at least three judges of this Court have not given the Martin Act such a broad preemptive ruling.   See Cromer Fin. Ltd. v. Berger, No. 00 Civ 2498, 2001 WL 1112548, at *3-*5 (S.D.N.Y. Sept. 19, 2001) (Cote, J.);    Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc., 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004) (Scheindlin, J.) (citing Cromer); In re Worldcom, Inc. Sec. Litig., 392 F. Supp. 2d 549, 560 n.18 (S.D.N.Y. 2005) (Cote, J.);   Louros v. Kreicas, 367 F.

-5-

Supp. 2d 572, 595-96 (S.D.N.Y. 2006) (Kaplan, J.) (finding that Martin Act preemption "foreclose[s]" only causes of action alleging "dishonesty or deception").

In addition to this divergent line of federal authority, the Attorney General, in two cases pending before the First Department, has taken a position against total preemption, see Brief for the Attorney General of the State of New York as Amicus Curiae, CMMF, LLC. v. J.P. Morgan Inv. Mgmt., Inc., No. 601924/09 (App. Div. 1st Dep't Apr. 7, 2010) ("Attorney General Brief"); Brief for the Attorney General of the State of New York as Amicus Curiae, Assured Guaranty (UK) Ltd. v. J.P. Morgan Inv. Mgmt., Inc., No. 603755/08 (App. Div. 1st Dep't Apr. 7, 2010). New York appellate courts that have considered preemption have rejected it. See Scalp & Blade, Inc. v. Advest, Inc., 722 N.Y.S.2d 639, 640 (App. Div. 4th Dep't 2001); Caboara v. Babylon Cove Dev., 862 N.Y.S.2d 535, 538-39 (App. Div. 2d Dep't 2008). And the history and policy objectives of the Martin Act speak against a preemptive reading. In short, while a significant body of judicial opinion finding a preemptive reading of the Martin Act exists, better reasoned and more persuasive authorities reject that view.

B. LONG-STANDING RULES OF STATUTORY CONSTRUCTION FORECLOSE PREEMPTION

As a starting point, "it is a general rule of statutory

-6-

construction that a clear and specific legislative intent is required to override the common law." Hechter v. New York Ins. Co., 385 N.E.2d 551, 554 (N.Y. 1978) (citing In re Wilson Sullivan Co., 44 N.E.2d 387, 389-90 (N.Y. 1942) ("If the statute and the common law rule can stand together, the statute should not be so construed as to abolish the common law rule." (citations omitted)); Jones v. City of Albany, 45 N.E. 557, 558 (N.Y. 1896) ("It is the general rule that an intention to change the rule of the common law will not be presumed from doubtful statutory provisions; the presumption is that no such change is intended, unless the statute is explicit and clear in that direction." (citations omitted))); see also Portfolio v. Rubin, 180 N.Y.S. 520, 523 (App. Div. 1st Dep't 1920) ("[R]epeals by implication are not favored ... and especially is this true of implied repeals of the common law." (quotation marks and citations omitted)), rev'd. on other grounds, 187 N.Y.S. 302 (1921), aff'd., 135 N.E. 843 (N.Y. 1922).

Another "general rule is and long has been that when the common law gives a remedy, and another remedy is provided by statute, the latter is cumulative, unless made exclusive by the statute." Burns Jackson Miller Summit & Spitzer v. Lidner, 451 N.E.2d 459, 462 (N.Y. 1983) (quotation marks and other citations omitted) (citing Candee v. Hayward, 37 N.Y.

653, 656 (N.Y. 1868)); <u>see also</u> <u>Belco Petroleum Corp. v. AIG</u>
<u>Oil Rig, Inc.</u>, 565 N.Y.S.2d 776, 780 (App. Div. 1st Dep't
1991) (same).

When these well-accepted rules of statutory construction
are applied to the Martin Act, it is startling that the
statute would be given a broad preemptive reading.  The plain
language of the Martin Act, while granting the Attorney
General investigatory and enforcement powers and prescribing
various penalties, nowhere mentions or otherwise contemplates
erasing common law causes of action.  <u>See</u> N.Y. Gen. Bus. Law,
Art. 23-A, §§ 352-59.

C. <u>THE MARTIN ACT'S GENESIS AND HISTORY OFFER NO
SUPPORT FOR PREEMPTION</u>

Nor does the Martin Act's development suggest a desire on
the part of the legislature to preempt common law actions.
Named after Assemblyman Louis M. Martin and originally enacted
in 1921 to allow the Attorney General to intervene in imminent
fraud in the investment securities market, the Martin Act
constituted New York's "blue sky" law, one of many in the
nation, so-called because they prohibited schemes with no more
basis than "so many feet of 'blue sky.'"  <u>See</u> Patrick M.
Connors, <u>The Survey of New York Practice</u>, 61 St. John's L.
Rev. 194, 210 n.1 (1986) (<u>citing</u> <u>Hall v. Geiger-Jones Co.</u>, 242
U.S. 539, 550 (1917)); <u>see also</u> Barry Kamins, <u>The Martin Act:</u>
<u>A Sleeping Giant</u>, N.Y.L.J., Dec. 13, 2007, at 3 (noting that

in 1911 Kansas became the first state to enact a "blue sky" law and describing "swindlers who ... would sell shares of the blue sky to unsuspecting purchasers").

When first enacted, the Martin Act limited the Attorney General's enforcement power to injunctions of fraudulent behavior.   See Connors, supra, at 211 n.5.   But after experience showed that injunctive relief alone was insufficient to prosecute frauds, the Attorney General requested the authority to institute criminal and civil proceedings without always being required to establish all the elements that are usually prerequisites in fraud claims, namely deceitful intent and reliance.   See id. at 211 n.4. These additional enforcement powers were added to the Martin Act in 1955.   See id. at 210-11; see also N.Y. Gen. Bus. Law § 352-c (the "Enforcement Section");   Maranda E. Fritz & Michael C. Miller, The Martin Act: Securities Fraud Statute, N.Y.L.J., Dec. 5, 1991, at 5 (noting that substantive felony penalties were added to the Martin Act in 1982).

Amendments to the Martin Act after the addition of the Enforcement Section provide important qualifications on the reasoning that underlies preemption.   In particular, a 1960 amendment addressed "purchasers in offerings of cooperative and condominium units."   Kerusa, 906 N.E.2d at 1053.   This amendment, which "no one" anticipated during the Martin Act's

-9-

original passage, created significant new responsibilities for those engaged in real estate transactions, eventually spawning sixty pages of regulations.   Id.; see also Philip Weinberg, Office of N.Y. Attorney Gen. Sets Pace for Others Nationwide, 76 N.Y. St. B.A. J. 10, 14 (2004) (describing Attorney General's regulation of cooperatives and condominiums as a "first-magnitude innovation").  These Martin Act regulations "dramatically altered the common-law rule" and imposed higher burdens on real estate sponsors than had previously existed. Kerusa, 906 N.E.2d at 1054; see also Resolution Trust Corp. v. Diamond, 18 F.3d 111, 115 (2d Cir. 1994) (explaining Martin Act's detailed process for submitting offering plans for Attorney General approval), vacated, 513 U.S. 801 (1994).

At first, federal courts allowed private litigants to bring causes of action directly under the Enforcement Section. See Lupardo v. I.N.M. Indus. Corp., 36 F.R.D. 438, 439 (S.D.N.Y. 1965) (noting that though "[t]he Blue Sky Laws of New York have no express private civil liability provisions of any kind ... if the New York courts were presented with a civil action under [the Martin Act] as here presented, they would" allow it); duPont III v. Brady, 828 F.2d 75 (2d Cir. 1987) (reviewing judgment that, after trial, plaintiff had not presented sufficient evidence to sustain defendant's liability under private Martin Act action).  But in 1987 the New York

-10-

Court of Appeals held in <u>McKesson</u> that there was no private cause of action under the Enforcement Section of the Martin Act.   <u>See</u> 514 N.E.2d at 119.   In limiting authority and application of the Enforcement Section to the Attorney General, New York joined Rhode Island as the only state in the country that, at that time, disallowed private causes of action under their blue sky laws.   <u>See</u> <u>id.</u> at 120 (citations omitted); <u>see</u> <u>also</u> Barbara J. Hart & Kesav M. Wable, <u>New York's Martin Act: Investor Sword Or Fraudster Shield?</u>, N.Y.L.J., Dec. 11, 2009, at 4 (noting that <u>McKesson</u>'s result was a "surprise [to] virtually every securities lawyer in New York" and that as of December 2009, "New York is only one of five states in the nation that do[es] not permit an implied private right of action under its blue sky law.").

McKesson is equally important for what it did not decide. The Court of Appeals' opinion did not expressly review whether the Martin Act broadly preempted common law causes of action arising out of the same facts that would support a Martin Act proceeding.   To the contrary, even while barring private causes of action under the Martin Act, the court allowed the plaintiff to proceed with a common law fraud claim, <u>see</u> 514 N.E.2d at 124-26, and had no occasion to consider any other causes of action as none were included in

the issues presented.  See id. at 117 (noting questions presented on appeal).

Tellingly, on the same day McKesson was issued, the Court of Appeals addressed on the merits certain breach of fiduciary duty claims in the investment securities context, after noting that plaintiffs' claims under the Enforcement Section were not allowed.  See Green v. Santa Fe Indus., Inc., 514 N.E.2d 105, 110-13 (N.Y. 1987) (applying Delaware law of breach of fiduciary duty); Loengard v. Santa Fe Indus., Inc., 514 N.E.2d 113, 115 (N.Y. 1987) (discussing appropriate statute of limitations to apply to breach of fiduciary duty claims under New York law).  If preemption of non-fraud common law actions was a logical extension of McKesson, it seems likely that Green or Loengard would have, at the very least, mentioned the possibility.

A Court of Appeals decision four years prior to McKesson explains why preemption did not need to enter the picture when this trio of cases was handed down.  In Burns Jackson, which McKesson relied on, see 514 N.E.2d at 119, the Court of Appeals interpreted the Taylor Law, New York's "proscription against strikes by public employees."  451 N.E.2d at 461. Just as it would soon do in connection with the Martin Act, the court first held that the Taylor Law created no private cause of action.  See id. at 462-66.  It then reasoned "[t]hat

-12-

no new per se action was contemplated by the Legislature does not, however, require us to conclude that the traditional, though more, limited [common law] forms of action are no longer available to redress injury resulting from violation of the [Taylor Law]." <u>Id.</u> at 466. The Court of Appeals reached this result by first applying the rule of statutory construction noted above of treating statutory remedies as cumulative to the common law and then by examining "the history and genesis" of the Taylor Law. <u>Id.</u> at 463. The court took particular notice that there was "no express provision" abolishing common law causes of action in the law. <u>Id.</u> at 466. The court's conclusion was apparently so obvious that <u>Burns Jackson</u> spends only one paragraph setting forth its reasoning, even though it was a case of some importance. <u>Id.</u> at 461 (noting that plaintiffs sought "damages of $50,000,000 per day for each day of the [New York City April 1980 transit] strike").[2]

---

[2] <u>Burns Jackson</u> also noted that it was "fortified in [its] conclusion by similar decisions of courts of other States." <u>Id.</u> at 467. Accordingly, this Court notes that its research has found no other state that preempts common law actions under its blue sky law. Every court to have considered the issue has held the statutory and common law remedies to be cumulative, often relying on express statutory language that common law remedies were not to be preempted. <u>See</u>, <u>e.g.</u>, <u>Kansas State Bank in Holton v. Citizens Bank of Windsor</u>, 737 F.2d 1490, 1499 (8th Cir. 1984) (Missouri Blue Sky Laws); <u>Ginq v. Parker-Hunter Inc.</u>, 544 F. Supp. 49, 52 (W.D. Penn. 1982) (Pennsylvania Securities Act); <u>Esser Dist. Co., Inc. v. Steidl</u>, 437 N.W.2d 884 (Wis. 1989); <u>Knoell v. Huff</u>, 395 N.W.2d 749, 754 (Neb. 1986); <u>Kittilson v. Ford</u>, 608 P.2d 264 (Wash. 1980); <u>Interlox Punch & Die Corp. v. Insilco Corp.</u>, 415 A.2d 1208, 1209 (N.J. 1980); <u>see</u> <u>also</u> <u>Nanopierce Tech.</u>, 2003 WL 22052894, at *6 n.6 ("The New York rule preempting private claims within the purview of the Martin Act is the exception rather than the rule among blue sky laws ....") (citation omitted).

Burns Jackson's holding regarding preemption of common law rights is equally applicable to the Martin Act. Only by reading McKesson, Green, and Loengard as dramatically altering the legal landscape by precluding common law causes of action and doing so not only without comment but contrary to ancient canons of statutory construction, could these three cases provide support for a broad preemptive reading of the Martin Act.

In applying the Martin Act, New York appellate courts certainly have not given McKesson such a broad reading. As mentioned above, the Martin Act regulates both investment securities and certain real estate offerings and McKesson was immediately applied only in real estate cases. New York courts considering these cases used a rule of artful pleading to forbid causes of action that "substitute[d]" an obligation under the Martin Act for "a fiduciary relationship of trust and confidence." Horn v. 440 East 57th Co., 547 N.Y.S.2d 1, 5 (App. Div. 1st Dep't 1989); see also Vermeer Owners, Inc. v. Guterman, 585 N.E.2d 377, 378 (N.Y. 1991) (extending rule of McKesson from "the sale and exchange of securities and other properties" to "real estate syndication offerings"). For example, plaintiffs were not allowed to bring claims alleging negligent misrepresentation when the duty to disclose was imposed solely by the regulations issued by the Attorney

-14-

General under the Martin Act in excess of the common law.  See Rego Park Gardens Owners, Inc. v. Rego Park Gardens Assoc. , 595 N.Y.S.2d 492, 494 (App. Div. 2d Dep't 1993); Broder v. Cablevision Sys. Corp., 418 F.3d 187, 201 (2d Cir. 2005) ("Rego Park held that violation of a regulation promulgated under [the Martin Act] may not be the basis for a claim of fraudulent nondisclosure.").  The Second Circuit applied a similar rule in 1994 when it disallowed common law fraud and negligent misrepresentation causes of action that relied on "expand[ing] common law disclosure obligations to allow reliance upon disclosures and representations required by the Martin Act."  Revak v. SEC Realty Corp., 18 F.3d 81, 90-91 (2d Cir. 1994).

Since McKesson was applied largely in the context of real estate transactions where the Martin Act had expressly imposed significant new burdens that could be enforced only by the Attorney General, it is not surprising that the state appellate courts summarily and uniformly dismissed causes of action that merely embodied Martin Act violations cloaked in the language of the common law.  These decisions did not hold that the Martin Act sweepingly preempted common law causes of action -- they merely barred claims that relied on the Martin Act as the source of authority to frame and sustain a cause of action.  See Matthew W. Woodruff, Does the Martin Act Preempt

Common-Law Causes of Action?, N.Y.L.J., Sept. 4, 2008, at 4.

A recent New York state trial court decision summarizes the better analysis and understanding of the jurisprudence in the state courts: Though the Martin Act "vests in the Attorney General exclusive authority to investigate and prosecute false or fraudulent representations" in certain real estate filings, the Martin Act "does not pre-empt the prosecution of private common law claims" including breach of contract, "fraud, misrepresentation or negligence independent of the duty imposed under the Martin Act." Bridge Street Homeowners Assoc. v. Brick Condo. Developers, LLC, No. 26507/06, 2008 WL 344136, at *1 (N.Y. Sup. Ct. Feb. 7, 2008). To hold otherwise assigns to the Attorney General "the exclusive responsibility to litigate the private claims of all aggrieved condominium purchasers within the State of New York" -- an "impossible burden." Id.; but see, e.g., Ambac Assurance UK Ltd. v. J.P. Morgan Inv. Mgmt., Inc., No. 650259/06, 2010 WL 1910909, at *4-*5 (N.Y. Sup. Ct. Mar. 24, 2010) (citing federal cases to dismiss breach of fiduciary duty and gross negligence causes of action as they "fall within the purview of the Martin Act and thus must be dismissed as preempted").

### D. WHILE MANY FEDERAL COURTS ADOPTED MARTIN ACT PREEMPTION, SOME STATE COURTS REJECTED IT

Preemption of common law claims entered the picture ten years after McKesson was handed down. Immediately after

-16-

McKesson was rendered, many federal courts, though acknowledging that the Martin Act created no private right of action, allowed common law causes of action where plaintiffs would have also brought Martin Act violations.  For example, in Beres v. Thomson McKinnon Sec., Inc. , the district court considered a lawsuit alleging "omissions and misstatements made by the general partners, the securities broker, and various individual defendants, pursuant to the sale of [gas and oil exploration] partnerships."  No. 85 Civ. 6674, 1989 WL 105967, at *1 (S.D.N.Y. Sept. 1, 1989).  The plaintiffs' original complaint, filed before the New York Court of Appeals decided McKesson, included a Martin Act cause of action.  Id. After McKesson, the complaint was amended and the Martin Act action was removed.  Id. at *2 n.1.  The court, without comment, also allowed plaintiffs to proceed on "breach of fiduciary duty, negligence and gross negligence claims."  Id. at *16.  If McKesson required Martin Act preemption, Beres presented fertile ground.  No party apparently thought it wise to raise the issue.

This state of affairs changed in 1996 when a federal court first embraced Martin Act preemption by dismissing common law claims of breach of fiduciary duty and negligent misrepresentation against an investment advisor on the grounds that any cause of action "covered by the Martin Act" was also

-17-

preempted by the Martin Act.   <u>Foresters</u>, 919 F. Supp. at 153-54.

Foresters relied on five other New York cases, in addition to McKesson, to hold that the Martin Act preempted common law causes of action.   See id.   But none of these decisions ever reached the question of preemption.   The opinions in some of them are laconic, and, to that extent, easy to misconstrue.   Thus, it is understandable that, if read without the context of the Martin Act's overall legislative history and development, some of the early state court cases may be understood as supporting preemption.   The Court will therefore examine each of these cases in close and perhaps belabored detail.

In the earliest post-McKesson case cited by Foresters, Horn v. 440 East 57th Co., the plaintiff pressed, among other causes of action, claims alleging negligent misrepresentation and breach of fiduciary duty concerning shares purchased in a residential cooperative corporation.   See 547 N.Y.S.2d at 1-2. Two-and-a-half months after the purchase, the partnership that operated the co-op imposed additional fees on the purchasers and increased the annual maintenance charge in order to cover an operating deficit.   The imposition of these fees had been under consideration for a year by the co-op's board, but the plaintiffs had been told before the purchase "that the coop

was in good financial condition." Id.  The court dismissed
the negligent misrepresentation and breach of fiduciary duty
causes of action because "these causes of action omit the
element of a deceitful intent on defendant's part and
substitute therefor the existence of a fiduciary relationship
of trust and confidence." Id. at 5.  Dismissal was required
because "to sustain [these causes of action] would be, in
effect, to recognize a private right of action under the
Martin Act" contrary to McKesson.  Id.

Though the exact source of the improper "substitut[ion]"
the Horn court refers to is puzzling, the Attorney General,
after examining the relevant appellate briefs, confirms that
the Horn plaintiffs had argued that the Martin Act supplied
the special relationship.  See Attorney General Brief at 17
n.5. Even without this confirmation, it strains the opinion's
holding to cast it as preempting common law actions.  Indeed,
Horn left open the possibility that the defendant's violation
of Martin Act requirements in excess of the common law may be
actionable under a breach of warranty theory if the Martin Act
had been written into the contract, granting plaintiff "what
is, in effect, a private right of action under the Martin
Act." 547 N.Y.S.2d at 4.

Rego Park, another case cited by Foresters, is similarly
opaque at first reading.  Rego Park considered a negligent

-19-

misrepresentation claim "arising out of the conversion of
eight buildings to condominium/co-operative ownership." 595
N.Y.S.2d at 493.    The court affirmed dismissal of the
negligent misrepresentation cause of action "because this
cause of action sought, in essence, to pursue a private cause
of action under the Martin Act." Id. at 494.    Though the
exact details of the alleged duty to disclose were not
specified, it is not unreasonable to assume that, since the
case    involved    a    cooperative/condominium    real    estate
transaction, the duty in question was premised on a disclosure
required by the Martin Act alone.    Indeed, another cause of
action was dismissed in Rego Park for this exact reason:
plaintiffs "alleged that the sponsors were required to
disclose the existence of the tenant's engineer's report
pursuant to 13 NYCRR 18.3(hh)(5)" and that the sponsors'
concealment    of    the    report    "constituted    fraudulent
nondisclosure." Id. at 494.    But "since 13 NYCRR 18.3(hh)(5)
was promulgated by the Attorney General pursuant to his
regulatory authority under the Martin Act," allowing "a cause
of action based upon a violation of this regulation would, in
effect, permit [plaintiffs] to maintain a private cause of
action for an alleged violation of the Martin Act." Id.    In
addition to this clarification from the opinion itself, the
Attorney General also confirms that plaintiffs in that case

-20-

were relying entirely on disclosure obligations created by the Martin Act to support their negligent misrepresentation claim. See Attorney General Brief at 17 n.5.

Eagle Tenants Corp. v. Fishbein, 582 N.Y.S.2d 218, 219 (App. Div. 2d Dep't 1992), presents a similar fact pattern. The case considered the purchase and use of a warehouse in a historic district in Brooklyn.   Pursuant to a special permit from the New York City Planning Commission, the warehouse had been converted to mixed commercial and residential use as co-ops.   See id.   One of the conditions of the special permit was that the warehouse's owner implement "certain obligations in excess of the ordinary requirements for such a structure." Id. This "Continuing Maintenance Program" was not included in the offering plan, so the purchasers pressed a "constructive fraud" theory "based upon a fiduciary's duty to disclose, regardless of the existence of deceitful intent." Id.   Such an action was disallowed because to "sustain that cause of action would effectively permit a private action under the Martin Act."   Id.   Again, whether the plaintiffs relied entirely on the Martin Act's regulations to frame their claim is not crystal clear, but is suggested as a fair inference, given that Eagle Tenants revolved around disclosures in a cooperative offering plan, a matter heavily regulated by the Attorney General pursuant to the Martin Act.   Eagle Tenants

-21-

also relied on Horn, see 582 N.Y.S.2d at 219, which, as shown
above, concerned Martin Act real estate disclosure obligations
to which the statute clearly applied, and not preemption.

Foresters also cited yet another real estate case,
Ansonia Tenants Coalition, Inc. v. Ansonia Associates, 573
N.Y.S.2d 211 (N.Y. Sup. Ct. 1991).   That action considered
whether a tenants organization could enjoin enactment of a
condominium conversion plan for violations of the Martin Act.
See id. at 214.   The court denied relief because plaintiffs
"fail[ed] to provide any evidentiary support" for their
motion.   Id.   In doing so, the court noted it was "not
convinced that [McKesson], although precluding actions for
damages under the Martin Act, necessarily precludes any
application by tenants to invoke the court's broad equitable
powers to order injunctive relief where a plan is permeated
with fraud."   Id.   Ansonia, then, represents an attempt to
limit McKesson's reach and does not, as  Foresters read it,
represent an expansion of McKesson.

Finally, Foresters relied on Breakwaters Townhomes Ass'n
of Buffalo, Inc. v. Breakwaters of Buffalo, Inc., which
explicitly found that "plaintiffs essentially seek recovery
based on violations of the Martin Act."   616 N.Y.S.2d 829
(App. Div. 4th Dep't 1994).   Despite this explicit holding,
Foresters paraphrased a line from Breakwaters to note "[i]t is

-22-

clearly established that there is no private right of action
for claims covered by the Martin Act." <u>Foresters</u>, 919 F.
Supp. at 153.  But <u>Breakwaters</u> did not go that far.  It merely
held that "[i]t is well established that there is no implied
private cause of action for violation of the antifraud
provisions of that statute" -- the Martin Act.  <u>Id.</u> (citations
omitted).

   <u>Foresters</u>' restatement of this language from <u>Breakwaters</u>
constitutes the misreading that gave rise to broad preemption:
<u>Breakwater</u>'s "no implied private cause of action for violation
of the antifraud provisions of that statute" became <u>Foresters</u>'
"no private right of action for claims covered by the Martin
Act."  When "violation of" swelled to "covered by," the
specific became general.  <u>Foresters</u> treated this expansion as
accomplished fact and supported it only through citation to
the inapposite real estate cases discussed above.

   Given the somewhat terse and murky opinions in these
cases, a rule that any claim "covered" by the Martin Act is
preempted as a common law cause of action is not entirely
incongruous.  But legally it is no less entirely unmoored.  By
considering whether a cause of action was merely "covered" by
the Martin Act instead of "created" by the Martin Act,
<u>Foresters</u> significantly expanded the rule from the state
courts, which had only dismissed claims relying solely on real

estate regulations promulgated by the Attorney General under the Martin Act and had never preempted any causes of action that existed independent of the Martin Act.

Based on the lone paragraph of analysis from <u>Foresters</u>, Martin Act preemption quickly went viral. <u>See</u>, <u>e.g.</u>, <u>Vannest v. Sage, Rutty & Co., Inc.</u>, 960 F. Supp. 651, 657 n.6 (W.D.N.Y. 1997); <u>Granite Partners, L.P. v. Bear, Stearns, & Co. Inc.</u>, 17 F. Supp. 2d 275, 291-92 (S.D.N.Y. 1998). Like biology textbooks propagating the curious and outdated comparison of the Eohippus to a "fox terrier," other courts adopted <u>Foresters</u>'s holding to dismiss a host of common law causes of action, without questioning its conclusion or probing deeply enough into the sources or soundness of its analysis, and often using language identical or similar to that used in <u>Foresters</u>. <u>See</u>, <u>e.g.</u>, <u>Stephenson</u>, 2010 WL 1244007, at *10-*13; <u>Sabella v. Scantek Med., Inc.</u>, No. 08 Civ. 453, 2009 WL 3233703, at *37 (S.D.N.Y. Sept. 25, 2009) ("There is no implied private right of action for any claim covered by the Martin Act." (<u>citing</u> <u>McKesson</u> and <u>Foresters</u>)); <u>Nanopierce Tech.</u>, 2003 WL 22052894, at *2, *4 (collecting cases and characterizing the non-preemptive view as "solitary islands in a stream of contrary opinion"); <u>Granite Partners, L.P.</u>, 17 F. Supp. 2d at 291 (claims "covered by the Martin Act [] cannot be asserted by private litigants" (<u>citing</u>

-24-

Foresters)); <u>Ambac Assurance UK Ltd.</u>, 2010 WL 1910909, at *5 ("[P]laintiff's claims do fall within the purview of the Martin Act and thus must be dismissed as preempted."); <u>Aris Multi-Strategy Offshore Fund, Ltd. v. Devaney</u>, No. 602231/08, 2009 WL 5851192, at *11 (N.Y. Sup. Ct. Dec. 14, 2009) (claims "covered by the Martin Act ... are preempted").

If this Court's inquiry and analysis are correct, nowadays, fourteen years after <u>Foresters</u>, the snake has eaten its own tail and many courts apply preemption simply by citing to other decisions that have found preemption, without examining whether the doctrine was warranted in the first place. Even in the cases that undertake thorough analysis and endeavor plausible reasoning to support a preemption rule, the lineage of their holding ultimately traces to <u>Foresters</u> and the state court cases from which its progeny issue.   <u>See</u>, <u>e.g.</u>, <u>Nanopierce Tech.</u>, 2003 WL 22052894, at *3.

The Second Circuit has had little opportunity to solve the Martin Act preemption question, dealing cursorily with it in two cases decided in 2001.  In the first,    <u>Suez Equity Investors, L.P. v. Toronto-Dominion Bank</u>, the Circuit Court, though declining to reach the preemption issue because it was raised for the first time on appeal, noted in dicta that the New York appellate division decisions did not explore preemption with a "level of depth" and that the New York Court

of Appeals had "not yet addressed this issue."   250 F.3d 87,
104 (2d Cir. 2001) (citing Horn and Rego Park).   Three months
later, Castellano v. Young & Rubicam, Inc. affirmed a district
court's dismissal of a common law claim of breach of fiduciary
duty on Martin Act preemption grounds, noting its decision was
driven by "principles of federalism and respect for state
courts' interpretation of their own laws."   257 F.3d 171, 190
(2d Cir. 2001) (citing Eagle Tenants and Horn).   Castellano
did not address Suez Equity's ambivalence towards the state
court decisions -- much less consider that those cases were
not actually about preemption -- though it did cite a real
estate case, Eagle Tenants, for the proposition that state
courts had spoken on this issue "in the context of
[investment] securities fraud."   Id.

     More recently, some state appellate courts have clarified
the limits of their application of McKesson.   Two years ago,
the Second Department directly confronted whether the Martin
Act preempted common law causes of action based on facts that
would also support a Martin Act prosecution.   The court held
that no precedent from the Court of Appeals "abrogated or
supplanted an otherwise viable private cause of action
whenever the allegations would support a Martin Act violation"
and that finding preemption would be contrary to "basic tenets
of statutory construction."   Caboara v. Babylon Cove Dev., 862

-26-

N.Y.S.2d 535, 538-39 (App. Div. 2d Dep't 2008). The Caboara court concluded that causes of action that "may rest upon the same facts that would support a Martin Action violation" are not preempted "as long as they are sufficient to satisfy traditional rules of pleading and proof." Id. at 537.

This holding agreed with a similar case from the Fourth Department, Scalp & Blade, Inc. v. Advest, Inc., 722 N.Y.S.2d 639, 640 (App. Div. 4th Dep't 2001), which was decided before the Second Circuit's decision in Castellano, though the Second Circuit did not cite it, presumably because Scalp & Blade was issued three days after oral argument in Castellano. In sum, of the two state appellate courts which have expressly addressed Martin Act preemption -- as opposed to closely reading causes of action to see if they were really just alleging violations of duties imposed solely by the Martin Act -- both have found no preemption of common law claims that exist independent of the Martin Act.

The Attorney General also argues that a Third Department case, Rasmussen v. A.C.T. Environmental Services, Inc., 739 N.Y.S.2d 220 (App. Div. 3d Dep't 2002), similarly rejected Martin Act preemption, albeit implicitly. See Attorney General Brief at 15 n.6. According to the Attorney General, the parties in Rasmussen briefed the issue of whether the Martin Act preempted plaintiff's claims of negligent

misrepresentation and breach of fiduciary duty against an investment advisor. Though the Third Department rejected plaintiff's contentions on the merits and did not explicitly decide the preemption issue, it did cite Scalp & Blade, which at least suggests that the court was aware of the argument and did not find a colorable basis for it. See Rasmussen, 739 N.Y.S.2d at 222.

The preemption question is squarely before the First Department in two pending cases, see CMMF, Index No. 601924/09 (argued May 26, 2010); Assured Guaranty (UK) Ltd., Index No. 603755/08 (argued May 26, 2010), and it is possible that, in the light of Caboara, Scalp & Blade, and Rasmussen, the First Appellate Division would decline to find that the Martin Act implicitly overrode the common law. In a similar situation, Belco Petroleum Corp. v. AIG Oil Rig, Inc. , the First Department held that New York Insurance Law § 2601 did not preempt the common law of punitive damages. See 565 N.Y.S.2d at 777-82. Citing Burns Jackson, the court considered that "[n]o ... expression of exclusivity is found in [§] 2601," id. at 780, the legislative history of the law did not support preemption, and the courts were proper checks on inflamed juries that may irrationally impose punitive damages. See id. at 780-82. The New York Court of Appeals later noted that Belco was "correctly" decided. Rocanova v. Equitable Life

-28-

_Assurance S. of U.S._, 634 N.E.2d 940, 944 (N.Y. 1994). This Court is persuaded that _Belco_ reflects an accurate forecast of how the First Department is likely to decide the Martin Act preemption issue, as many of the same arguments that prevailed in _Belco_ apply with equal force to the Martin Act.

Finally, the most recent New York Court of Appeals case to consider the interaction between the Martin Act and common law causes of action, _Kerusa_, 906 N.E.2d 1049, supports the result from _Caboara_ and _Scalp & Blade_. In _Kerusa_, the Court of Appeals confirmed that common law causes of action must have a legal basis independent from the Martin Act to be viable. _Kerusa_ concerned a "lawsuit seeking damages for common-law fraud as a result of alleged construction and design defects" in a luxury condominium building located in New York City. _Id._ at 1050. The fraud was "predicated solely on alleged material omissions from the offering plan amendments mandated by the Martin Act" and "[b]ut for the Martin Act" the "defendants did not have to make the disclosures in the amendments." _Id._ at 1050, 1054. Therefore, allowing the plaintiff to proceed "would invite a backdoor private cause of action to enforce the Martin Act." _Id._; _see also_ _Hamlet On Old Oyster Bay Home Owners Ass'n. v. Holiday Org., Inc._, 887 N.Y.S.2d 125, 128 (App. Div. 2dDep't 2009) (applying _Kerusa_ to dismiss fraudulent inducement and

-29-

negligent misrepresentation claims because they were based on real estate disclosures "required under the Martin Act").

The upshot of this jurisprudence is that the Martin Act should rarely have relevance in federal court securities litigation. As in the case at hand, defendants in federal court typically invoke the Martin Act to dismiss state common law claims brought in investment securities fraud cases. But these common law causes of action do not "substitute" onto themselves requirements imposed by the Martin Act that are more burdensome than the common law requires. Federal courts that have found Martin Act preemption have done so by relying on the mirage created by state courts dismissing claims in real estate cases where the Martin Act, through the regulations promulgated by the Attorney General, imposes more burdens than the common law.

### E. NEW YORK'S ATTORNEY GENERAL REJECTS PREEMPTION

The Court also finds particularly persuasive that the Attorney General has flatly rejected a preemptive reading of the Martin Act. In amicus briefs filed in the cases pending before the First Department described above,  the Attorney General speaks strongly about correcting the "mistaken understanding" of the Martin Act leading to preemption. Attorney General Brief at 9. The Attorney General's position is that the "Martin Act, which is enforceable only by the

-30-

Attorney General, neither increased nor diminished the remedies available to private litigants." Id. In fact, "[p]rivate common-law actions for the most part advance, and do not hinder, the Attorney General's fundamental mission under the Martin Act ... because the Attorney General cannot possibly take sole responsibility for policing the marketplace in securities for fraud." Id. In short, the Martin Act "does not preempt common-law remedies whose source is independent of the statute." Id. at 8.

### F. PREEMPTION CLASHES WITH THE MARTIN ACT'S GOALS

The Attorney General's conclusion is consistent with the policy goals of the Martin Act. The Martin Act exists "to prevent all types of fraud in connection with the sale of securities and commodities and to defeat economically unsubstantial and visionary schemes in relation to sales whereby the public is fraudulently exposed." Sopher v. Abrams, 554 F. Supp. 532, 536 (N.D.N.Y. 1982) (citations omitted). It is intended to have a broader scope than that provided by an action for fraud, see id., and is "a statute of enormous breadth and unique dimensions." D'Addio v. L.F. Rothschild, Inc., 697 F. Supp. 698, 707 (S.D.N.Y. 1988) (quotation marks and citation omitted); see also McKesson, 514 N.E.2d at 119 (Martin Act granted Attorney General "broad regulatory and remedial powers to prevent fraudulent

-31-

securities practices by investigating and intervening at the first indication of possible securities fraud on the public and, thereafter, if appropriate, to commence civil or criminal prosecution.").

These policy goals are ill-served by expansive preemption of common law actions.  The premise behind the preemptive theory is that "allowing private litigants to press common law claims 'covered' by the Martin Act would upset the Attorney General's exclusive enforcement power in exactly the same way that it would upset the exclusive enforcement power to allow private claims pleaded under the Martin Act itself." Nanopierce Tech., 2003 WL 22052894, at *2.  But this bare conclusion leaves prosecution of fraudulent securities schemes exclusively to the Attorney General or securities fraud actions in federal court -- a vastly underinclusive strategy for fulfilling the Martin Act's goal of protecting New York investors.  As the Attorney General himself points out, his office, though possessing powerful enforcement tools, cannot realistically be expected to attend to every securities fraud in New York.  Forbidding private causes of action means that a large number of defrauded investors would go without justice in the many cases which the Attorney General does not or cannot prosecute, as the Attorney General's resources would understandably be devoted to securities fraud proceedings

-32-

where they can have the maximum impact, perhaps netting the biggest sharks even if letting schools of equally destructive piranhas slip through.  Moreover, the Martin Act is presumably most remedial and the Attorney General's authority most effective in exceptional and complex actions involving fraud on a large scale affecting many investors and the integrity of the securities market.  But at any given moment a myriad of other cases involving wrongs in securities transactions affecting particular individuals exist on a smaller scale that may not be of interest to or efficient for the Attorney General to prosecute.

It is true that the Martin Act includes a provision for restitution to victims of fraudulent schemes.  See N.Y. Gen. Bus. L. § 353(3) (allowing Attorney General to file "an application to direct restitution of any moneys or property obtained directly or indirectly by any such fraudulent practice"); New York v. Barrington & Co., 137 N.Y.S.2d 54, 56 (N.Y. Sup. Ct. 1954) ("The intent of Article 23-A of the General Business Law is that property derived by means of fraudulent practices shall go back, as far as possible, to the person from whom it was obtained."); New York ex rel. Vacco v. World Interactive Gaming Corp., 714 N.Y.S.2d 844, 854 (N.Y. Sup. Ct. 1999) (setting hearing to determine details of restitution pursuant to Attorney General's request under the

Martin Act). In cases to which the Martin Act clearly applies, granting the Attorney General exclusive enforcement power makes sense because private litigation in the same sphere could interfere with the Attorney General's exercise of his authority or the application of his regulatory scheme, or could impose a duplicative litigation burden on the defendants and potentially give plaintiffs a duplicative source of recovery.

However, to broadly preempt private causes of action grants the Attorney General nearly exclusive and final say as to whether the perpetrators of fraudulent securities schemes are held liable under New York law. If the Attorney General chooses not to prosecute or investigates and declines to proceed, remedies for defrauded investors are severely limited and private plaintiffs are left only with common law fraud litigation as a remedy. No other remedies are available, including causes of action with less stringent requirements such as simple negligence or breach of fiduciary duty. See Gabriel Capital, L.P. v. Natwest Fin., Inc., 137 F. Supp. 2d 251, 266 (S.D.N.Y. 2000) (holding that because "negligence and breach of fiduciary duty claims are covered by the Martin Act, these claims must be dismissed") (citation omitted).

But there is no convincing argument that justifies a finding that private litigation necessarily impinges on the

-34-

Attorney General's otherwise exclusive prosecutorial authority to allow fraud lawsuits in the first place. Fraud's exemption from Martin Act preemption arose because McKesson allowed a fraud claim without any special commentary about its relationship to the Martin Act. See 514 N.E.2d at 124-25. Recognizing an exception for fraud claims while preempting other common law causes of action ignores the common reality in securities fraud litigation that the same facts supporting the alleged deceptive practice frequently support claims of negligence or breach of fiduciary duty arising out of the same transaction and rest on essentially the same discovery. If allowing the fraud claims to be privately litigated, however numerous they may be, would not interfere with the Attorney General's orderly enforcement of the Martin Act, there can be no compelling basis for barring related common law causes of action that could be prosecuted in the same litigation, on the ground that to do so would, in some material way different from fraud, intrude upon the Attorney General's exclusive powers under the Martin Act. The same reasoning would apply even if those causes of action were asserted independent of fraud claims.

The court in Nanopierce explained the fraud exception and its rationale as addressing a "concern[] with preserving the Attorney General's exclusive domain" by "preclud[ing] claims

which essentially mimic the Martin Act, but permit[ting] common law fraud claims, which require an additional element" of proof of deceitful intent.   2003 WL 22052894, at *4; see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F. Supp. 2d 155, 182 (S.D.N.Y. 2009) (extending preemption exception to tortious interference with contract because that cause of action "requires an allegation of intentional interference").   This Court is not persuaded by this distinction.   While some Martin Act violations do essentially impose strict liability and require no proof of intent, the Martin Act also allows for felony fraud offenses that require proof of "fraudulent intent."   N.Y. Gen. Bus. Law § 352-c(5) & (6); see also New York v. Sala, 739 N.E.2d 727, 729 (N.Y. 2000); Eric Dinallo, Prosecuting Securities Fraud From A New York Perspective, 5 N.Y.U. J. Legis. & Pub. Pol'y 41, 44 (2000).   Common law fraud therefore "mimics" the Martin Act as much as other causes of action do and, under the reasoning prevailing in the preemption cases, should similarly be barred.   Indeed, because fraud is more difficult to prove than other common law claims arising from the same facts, private litigation of fraud cases generally is more complex and longer lasting, and thus holds the greater potential for interfering with Attorney General proceedings arising from the same transactions.   See also John Caher, A Scholar Intent On

-36-

_Bringing Ethics, Integrity To Marketplace_, N.Y.L.J., Dec. 8, 2004 at 1 (in an interview, former Attorney General Eliot Spitzer explained that all of his Martin Act prosecutions "could have [been] brought under standard theories of common law fraud").

Of course, the entire premise of preempting causes of action that "mimic" the Martin Act is itself questionable, as many supposedly preempted causes of action require proof of elements not required in Martin Act prosecutions.   For example, as the Attorney General points out, proof of a breach of fiduciary duty requires proving the existence of a fiduciary relationship, see, e.g., _Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC_, 446 F. Supp. 2d 163, 195 (S.D.N.Y. 2006), while the Martin Act does not. The Court also notes that Martin Act enforcement is not truly "exclusive" to the Attorney General -- local District Attorneys may also use the Martin Act to prosecute crimes. See, e.g., _New York v. Ferone_, 641 N.Y.S.2d 815 (N.Y. City Ct. 1996).

Next, though no court has articulated this rationale, preemption advocates may suggest that allowing simultaneous prosecutions by both the Attorney General and private litigants unduly burdens defendants by subjecting them to a war on two fronts, thereby promoting unwarranted settlements.

-37-

See Belco Petroleum Corp., 565 N.Y.S.2d at 781 (describing argument in favor of preempting the common law of punitive damages as notion that "punishment should be left to the orderly processes of the criminal law and not to the passions of an unconstrained civil jury," but noting this was "the minority view" in New York); Johnathan Mathiesen, Dr. Spitzlove: Or How I Learned To Stop Worrying And Love "Balkanization," 2006 Colum. Bus. L. Rev. 311, 317 (2006) (explaining that Martin Act grants prosecutors a "profound range of action ... including costs that they may impose long before any trial on the merits or even formal filing of an action"). But allowing any civil action at all, much less fraud, undercuts that justification, not to mention the added drama defendants may face if confronted with a federal securities fraud action or SEC investigation, which no one has suggested the Martin Act prevents. Though Martin Act preemption may save a defendant from litigating most common law actions, even a single rabid bite can be fatal. In short, the fraud exception is a doctrinal dog's breakfast pried from a misreading of McKesson.

Finally, though courts finding preclusion of common law claims have "sought to cabin the scope of that preemption to the narrow outlines of the Martin Act," Nanopierce Tech., 2003 WL 22052894, at *6, linking the preemptive coverage of the

-38-

Martin Act to the Attorney General's interpretation of the law also creates significant administrative concerns.  A former chief of the Attorney General's Investor Protection and Securities Bureau has described the Martin Act as "one of the broadest anti-fraud statutes ever devised, at least in a democratic society."  Dinallo, supra, at 43.   The Attorney General has continually pressed Martin Act enforcement in novel areas.   See Nicholas Thompson, The Sword of Spitzer, Legal Affairs, May/June 2004,                available   at http://www.legalaffairs.org/issues/May-June-2004/feature_tho mpson_mayjun04.msp; Tamara Loomis, The New York Securities Statute Has Made Headlines Before, N.Y.L.J., Nov. 14, 2002, at 5 (tracing waxing and waning of Attorney General use of the Martin Act); Joel Stashenko, A.G. Defends Application of Martin Act To Morris Case, N.Y.L.J., June 15, 2010, at 1 (noting Attorney General's position that the Martin Act can be used "to prosecute people seeking to unfairly capitalize from their close ties to government officials").

Such aggressive interpretations of the law ensure that courts never know for certain what causes of action are allowed and which are not if any cause of action merely "covered" by the Martin Act is preempted.  See New York v. Federated Radio Corp., 154 N.E. 655, 657 (N.Y. 1926) (Martin Act to "be given a wide meaning" including "all acts, although

-39-

not originating in any actual evil design or contrivance to perpetrate fraud or injury upon others, which do ... tend[] to deceive or mislead the purchasing public"); New York v. Florentino, 456 N.Y.S.2d 638, 640 (N.Y. City Crim. Ct. 1982) (Martin Act applied to insider trading); New York v. Thomas, 512 N.Y.S.2d 618 (N.Y. Sup. Ct. 1986) (Martin Act applied to transaction involving artwork); cf. Skilling v. United States, No. 08-1394, 2010 WL 2518587, 561 U.S. ___ (June 24, 2010) (limiting United States government's open-endedly flexible interpretation of the "honest services" provisions of the mail- and wire-fraud laws).

Leaving the Martin Act's enforcement solely to the Attorney General is one thing. It is quite another to use the Martin Act to carve the common law out of the securities market and deny defrauded investors themselves long-standing common law remedies that predate the Martin Act. Such an interpretation leaves the marketplace arguably less protected than it was before the Martin's Act passage, which can hardly have been the goal of its drafters. Reading the Martin Act as broadly preempting common law causes of action represents a distortion of its role as a consumer protection law intended "to defeat any scheme whereby the public is exploited." New York v. Cadplaz Sponsors, Inc., 330 N.Y.S.2d 430, 432 (N.Y. Sup. Ct. 1972) (Markowitz, J.); see also Connors, supra, at

-40-

215-16 (criticizing <u>McKesson</u>'s denial of private causes of action as "tak[ing] much of the bite out of the statute's desired effect").

Notwithstanding the Second Circuit's decision in <u>Castellano</u> summarily affirming dismissal of a breach of fiduciary duty claim as preempted by the Martin Act, this Court's duty when interpreting state law is to reach, based on sound analysis of the relevant law, the same conclusion as it could reasonably predict the New York Court of Appeals would. See <u>Sprint PCS L.P. v. Connecticut Sitting Council</u>, 222 F.3d 113, 115 (2d Cir. 2000) (citation omitted). Much has changed in the nine years since the Second Circuit last considered Martin Act preemption: more recent decisions of the state appellate divisions hold or colorably suggest that the Martin Act is not preclusive of parallel state law claims, the New York Court of Appeals has explained what it means for a claim to be independent of the Martin Act, and the Attorney General has now staked out a clear position against preemption. These authorities, along with a more nuanced understanding of those that preceded <u>Castellano</u>, persuade this Court that New York's highest tribunal would hold that the Martin Act does not preclude state common law causes of action that do not derive from or rely upon the Martin Act to establish a required element of the claim.

### G. A FEDERAL BRONTOSAURUS

Ultimately, the jurisprudential development of Martin Act preemption in the courts mirrors almost uncannily another phenomenon that Stephen Jay Gould describes in the title tale of Bully for Brontosaurus, that of the "discovery" of the dinosaur known as brontosaurus.   Despite its ubiquity in popular culture, such a beast never existed.   See generally, John Noble Wilford, The Riddle of the Dinosaur 105-29, 184-86 (1987).   The confusion began in 1879 when paleontologist Othniel Charles Marsh unearthed an apatosaurus skeleton that was intact except for the skull.   Motivated by a fierce rivalry with fellow bone-digger Edward Drinker Cope, Marsh scoured the excavation site and surrounding areas for a skull that might reasonably be paired with the body he had found. Miles away from his original find, he scored a likely candidate.  The skull was actually that of a camarasaurus, but that did not stop Marsh, who called his newly-crowned apatosaurus a "brontosaurus."  What Marsh had "discovered" was nothing more than what was biological and historical reality, and soon became common knowledge, at least to scientists: that Marsh's find was nothing more than a familiar skeleton with a mismatched cranium.

By essentially grafting a preemption provision to the body of the Martin Act, some courts have completed a similarly flawed process of excavation and misidentification. This result, perpetuated from opinion to opinion with little second-guessing, is unsupported by the Martin Act's plain language, its legislative design, its past interpretation or the Attorney General's own views. Though Marsh's mistake was corrected in the literature relatively soon after it was first made, it took almost one hundred years for the publicly-displayed skulls and skeletons he had unearthed to be shown in the correct pairings. This Court is hopeful that federal district courts, the Court of Appeals for the Second Circuit, or the New York Court of Appeals will not take as long to correct the Martin Act's misapplication before it fossilizes any further.

## II. **ORDER**

Accordingly, it is hereby

**ORDERED** that defendants (Docket Nos. 316, 318, 321, 325, 329, 334, 340, 344, 356, 359, 360, 361) motions to dismiss

plaintiffs' common law claims as preempted by New York's Martin Act is DENIED.

**SO ORDERED.**

Dated: New York, New York
       29 July 2010

VICTOR MARRERO
U.S.D.J.