```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08/18/10
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                    :
PASHA S. ANWAR, et al.,             :
                                    :        09 Civ. 0118 (VM)
                       Plaintiffs,  :
                                    :        **DECISION AND ORDER**
      - against -                   :
                                    :
FAIRFIELD GREENWICH LTD.,           :
et al.,                             :
                                    :
                       Defendants.  :
-----------------------------------X

**VICTOR MARRERO, United States District Judge.**

## TABLE OF CONTENTS

I. INTRODUCTION ........................................... 1

II. BACKGROUND ............................................ 2

    A.    THE FAIRFIELD GREENWICH FUNDS ................... 2

    B.    THE FUNDS AND MADOFF ............................ 6

    C.    FGG'S FALSE STATEMENTS AND OMISSIONS ............ 10

    D.    RED FLAGS ....................................... 13

    E.    FEES PAID TO FGG ................................ 15

    F.    CITCO ........................................... 16

    G.    GLOBEOP ......................................... 21

    H.    PRICEWATERHOUSECOOPERS .......................... 22
        1.   Clean Audits ............................... 24
        2.   Relationship with Plaintiffs ............... 25
        3.   Risks ...................................... 26

III. DISCUSSION ........................................... 29

    A.    THRESHOLD ISSUES COMMON TO ALL DEFENDANTS ....... 29
        1.   SLUSA ...................................... 29
        2.   Choice of Law .............................. 33

|  |  | 3. | Standing ...................................... | 35 |
|  |  | 4. | Martin Act ................................... | 40 |

| B. | FAILURE TO STATE A CLAIM ......................... | 40 |

| C. | FAIRFIELD GREENWICH DEFENDANTS .................. | 41 |
|  | 1. | FGG ......................................... | 43 |
|  | 2. | Securities Fraud Claims ..................... | 45 |
|  |  | a. | Application of Morrison ............... | 46 |
|  |  | b. | Group Pleading ........................ | 49 |
|  |  | c. | Scienter ............................. | 51 |
|  |  | d. | Causation ............................ | 63 |
|  |  | e. | Section 20(a) ........................ | 67 |
|  | 3. | Common Law Claims ........................... | 70 |
|  |  | a. | Fraud ................................ | 72 |
|  |  | b. | Gross Negligence ...................... | 72 |
|  |  | c. | Breach of Fiduciary Duty .............. | 73 |
|  |  | d. | Negligent Misrepresentation ........... | 75 |
|  |  | e. | Third-Party Breach of Contract ........ | 78 |
|  |  | f. | Constructive Trust .................... | 84 |
|  |  | g. | Mutual Mistake ........................ | 85 |
|  |  | h. | Unjust Enrichment ..................... | 88 |

| D. | ADMINISTRATORS AND CUSTODIANS .................. | 89 |
|  | 1. | Citco Defendants ........................... | 89 |
|  |  | a. | Rule 8(a) ............................. | 91 |
|  |  | b. | Federal Securities Claims ............. | 94 |
|  |  |  | i. | Section 10(b) and Rule 10b-5 Claim Against Administrators ........... | 94 |
|  |  |  |  | A. | Scienter .................... | 95 |
|  |  |  |  | B. | Reliance .................... | 96 |
|  |  |  | ii. | Section 20(a) Claim against Citco Group ........................... | 98 |
|  |  |  |  | A. | Control ..................... | 99 |
|  |  |  |  | B. | Culpable Participation ...... | 104 |
|  |  |  | iii. | Statute of Limitations ........... | 107 |
|  |  | c. | Third-Party Beneficiary Breach of Contract ............................. | 109 |
|  |  |  | i. | Administration Agreements ........ | 111 |
|  |  |  | ii. | Custody Agreements ............... | 114 |
|  |  | d. | Negligence, Gross Negligence, and Negligent Misrepresentation ........... | 116 |
|  |  |  | i. | Duty of Care .................... | 118 |
|  |  |  | ii. | Citco Group Secondary Liability .. | 126 |
|  |  |  | iii. | Gross Negligence ................. | 130 |
|  |  | e. | Breach of Fiduciary Duty .............. | 132 |
|  |  |  | i. | Individual Defendants ............ | 133 |
|  |  |  | ii. | Citco Defendants ................. | 140 |

-ii-

    f. Aiding and Abetting Breach of Fiduciary
      Duty and Fraud ........................ 144
    g. Unjust Enrichment ..................... 148
    h. Holder Claims ......................... 149
      i. Statute of Limitations ........... 153
   2. GlobeOp ................................... 155
    a. Supervening Cause ..................... 156
    b. Fiduciary Duty ........................ 156
    c. Negligence and Gross Negligence ....... 160

 E. AUDITORS ........................................ 164
   1. Federal Securities Law Claims Against the
     PwC Member Firms .......................... 164
    a. Scienter ............................. 164
      i. Legal Standard for Accountants ... 164
      ii. The PwC Member Firms' Conscious
        Recklessness ..................... 165
        A. Professional Standards ...... 165
        B. Red Flags ................... 169
     iii. Plausible Opposing Inference ..... 175
    b. Section 20(a) Claim Against
      PwC International ..................... 175
   2. Common Law Claims ......................... 176
    a. Gross Negligence ..................... 176
    b. Negligence and Negligent
      Misrepresentation .................... 177
      i. Duty of Care...................... 177
        A. Awareness That the Financial
          Reports Were to Be Used for
          a Particular Purpose ........ 178
        B. Intention for a Known Party
          to Rely on the Financial
          Reports ..................... 179
        C. Linking Conduct Evincing the
          Accountants' Understanding
          of Plaintiffs' Reliance ..... 182
    c. Breach of Contract ................... 184
    d. Aiding and Abetting a Breach of
      Fiduciary Duty and Fraud ............. 186
    e. Unjust Enrichment .................... 187
    f. Vicarious Liability .................. 187
      i. Control of the Audits ............ 188
      ii. General Control ................. 189
    g. Statute of Limitations ............... 193

 F. LEAVE TO REPLEAD ............................... 195

IV. ORDER ............................................... 197

## I.  <u>INTRODUCTION</u>

This lawsuit is a putative class action on behalf of individuals and entities (collectively, "Plaintiffs") who invested large sums of money in four funds founded and operated by the Fairfield Greenwich Group ("FGG").  The overwhelming majority of Plaintiffs' money was in turn invested in the Ponzi scheme operated by Bernard Madoff ("Madoff") under the auspices of Bernard L. Madoff Investment Securities, Inc. ("BMIS"), and for which Madoff was sentenced to 150 years in prison following his guilty plea.  <u>See</u> <u>United States v. Madoff</u>, No. 09 Cr. 0213, S.D.N.Y. June 29, 2009.  Plaintiffs are now suing a number of Fairfield Greenwich entities, executives, and other professional service providers who audited, administered, or served as custodian of the funds.  The Second Consolidated Amended Complaint, filed September 29, 2009 (the "SCAC"), alleges violations of federal securities law and common law tort, breach of contract and quasi-contract causes of action.  FGG and numerous co-defendants (collectively, "Defendants") move to dismiss the SCAC in its entirety, asserting defenses grounded in federal and state law.

Because of the breadth of issues raised in Defendants' various submissions, the Court considers their motions in two separate rulings.  The first Decision and Order ("<u>Anwar I</u>")

was issued July 29, 2010, and addressed a discrete issue arising solely under New York state law.  See Anwar v. Fairfield Greenwich Ltd., 09 Civ. 0118, 2010 WL 3022848 (S.D.N.Y. July 29, 2010).  This Decision and Order, to be referred to as "Anwar II," considers a host of arguments made by Defendants that all of Plaintiffs' claims should be dismissed.[1]

## II. **BACKGROUND**[2]

### A. THE FAIRFIELD GREENWICH FUNDS

The facts in this case are relatively straightforward; the complications arise in attempting to comprehend and dissect FGG's corporate structuring, an intricate tangle of entities with, as alleged in the SCAC, connections of various

---

[1] Pursuant to the Order of the Judicial Panel on Multidistrict Litigation issued in MDL No. 2088, a number of individually-filed lawsuits have been consolidated into this case for pretrial proceedings.  This Decision and Order concerns only investors who placed money directly into the feeder funds created by FGG.  The remaining groups of lawsuits are not addressed by this Decision and Order.  In particular, another group of lawsuits also consolidated into this case was brought by account holders at Standard Chartered Bank International (Americas) Ltd. ("Standard Chartered") who allege that Standard Chartered and affiliated entities misled them into investing with one of FGG's funds, or improperly calculated fees charged to account holders based on the value of investments in one of FGG's funds.  A third lawsuit, attempting to control certain aspects of a commenced arbitration, is on behalf of Standard Chartered and an affiliated entity against a group of individuals and entities who are currently arbitrating disputes about Standard Chartered's recommendations. Decisions on those other groups of actions will be issued separately.

[2] The facts below are taken from the SCAC, which the Court accepts as true for the purpose of ruling on a motion to dismiss.  See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008) (citing GICC Capital Corp. v. Technology Fin. Group, Inc., 67 F.3d 463, 465 (2d Cir. 1995)).  The Court also considers documents incorporated into the SCAC by reference and relied upon in drafting the pleadings.  See Int'l Audiotext Network, Inc. v. American Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (citation omitted).  Except where specifically quoted, no further reference to these documents will be made.

strength to New York, Florida, Delaware, Bermuda, the United
Kingdom, the Cayman Islands, and the British Virgin Islands.
(See SCAC ¶¶ 118, 120, 122, 141, 172, 173, 121, 130, 139, 143,
118, 170, 171.)  This structure is comprised of, as alleged
and pertinent to the motions to dismiss at hand, corporate
entities that all apparently existed to accomplish the same
task -- managing funds invested almost exclusively with
Bernard Madoff.  Those entities, in addition to FGG, are
Fairfield Greenwich Advisors LCC ("FGA"), Fairfield Greenwich
Ltd. ("FGL"), and three wholly-owned FGL subsidiaries:
Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), Fairfield Risk
Services Ltd. ("FRS"), and Fairfield Heathcliff Capital LCC
("FHC").[3]

The SCAC alleges that these entities were run, in part,
by the following individuals: Walter M. Noel Jr. ("Noel") and
Jeffrey H. Tucker ("Tucker"), both founding partners and
current senior officers at FGG; Andres Piedrahita
("Piedrahita"), Director and President of FGBL, and general
partner of Greenwich Sentry and Greenwich Sentry Partners;
Amit Vijayvergiya ("Vijayvergiya"), Chief Risk Officer and
President of FGBL; Daniel E. Lipton ("Lipton"), FGG's Chief

---

[3] Plaintiffs also alleged claims against Lion Fairfield Capital Management
Ltd., but voluntarily dismissed Lion Fairfield Capital Management Ltd.
from this action on March 22, 2010.

Financial Officer; and Mark McKeefry ("McKeefry"), FGG's Chief Operating Officer and General Counsel.  (Id. ¶¶ 124-29.)

According to Plaintiffs, FGG fulfilled a critical role for Madoff, who knew that secrecy and obfuscation were key to prolonging how long he could keep his big lie afloat and his sand castles grounded.  The four FGG funds -- two nominally incorporated in the British Virgin Islands, Fairfield Sentry Ltd. and Fairfield Sigma Ltd. (the "Offshore Funds") and two nominally incorporated in Delaware, Greenwich Sentry L.P. and Greenwich Sentry Partners L.P. (the "Domestic Funds") (collectively, the "Funds") -- were "feeder funds" into Madoff's scheme, meaning they allegedly collected investments into the Funds, which in turn gave Madoff access to a steady stream of new investors without requiring him to risk his own financial interests too much.  Madoff purported to be investing Plaintiffs' money pursuant to a "split-strike conversion strategy," which "entail[ed]: (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the sale of out-of-the-money S&P 100 Index call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out-of-the-money S&P 100 Index put options."  (SCAC ¶ 184.) This case is about the people who started and ran the Funds,

-4-

the Funds' accountants and the entities that administered the Funds.

The FGG entities had various roles in the Funds. For example, FGL was the placement agent for the Offshore Funds and was Fairfield Sentry Ltd.'s investment manager until 2003, when FGBL became the investment manager for both Offshore Funds. FHC was also the Funds' placement agent.

Each of the Funds required a minimum investment of $100,000 and investment was restricted in various ways. Specifically, Fairfield Sentry Ltd. was limited to non-United States residents and certain United States tax-exempt entities. Fairfield Sigma Ltd. was limited to non-United States residents. Seventy-eight plaintiffs invested in Fairfield Sentry Ltd., including seventy-two non-United States residents and five United States non-profit entities. Thirty plaintiffs, all non-United States residents (except for a school incorporated in the United States but operating in Rome), invested in Fairfield Sigma Ltd. Only United States residents invested in the Domestic Funds. Seven plaintiffs invested in Greenwich Sentry L.P. and one plaintiff invested in Greenwich Sentry Partners L.P. Plaintiffs assert claims on behalf of "all shareholders in Fairfield Sentry Ltd., Fairfield Sigma Ltd., Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P., as of December 10, 2008 ... who

suffered a net loss of principal invested in the Funds." (<u>Id.</u> ¶ 351.) Defendants are excluded from the class.  Billions of dollars were invested in the Funds and almost all of it went to Madoff, though the Funds represent that they placed up to 5 percent of the Funds' assets with non-Madoff investments.

    B. <u>THE FUNDS AND MADOFF</u>

At its core, the SCAC alleges that Madoff's fraud was so egregious as to be obvious to anyone with a modicum of financial knowledge.  In particular, Plaintiffs detail a series of specific warning signs that should have alerted Defendants to the rot within the Funds.  Defendants allegedly ignored these "red flags" –- from brushing off suspicions aroused by Madoff's use of an essentially one-person accounting firm for his multi-billion dollar investment business to unblinking acceptance of trade confirmations that were fraudulent on their face.  These indicators were ignored during the length and breadth of the marketing of the Funds and, as alleged in the complaint, evidence of lingering questions or mind-numbing ignorance became particularly explicit in the final months before Madoff confessed his gargantuan fraud to the world.  In short, the SCAC alleges that Madoff was a vampire and the various FGG defendants his glamoured familiars who procured the sleeping victims.

Noel and Tucker founded FGG in 1983. (Id. ¶ 168.) In 1990, Tucker and another FGG founding partner, Fred Kobler, established a relationship between FGG and Madoff that resulted in the creation of two funds: Fairfield Sentry Ltd. and Aspen/Greenwich Limited Partnership. (Id. ¶ 169.) Fairfield Sentry Ltd. was "an international business company" incorporated in the British Virgin Islands. (Id. ¶ 170.) Aspen/Greenwich Limited Partnership was a Delaware limited partnership that soon changed its named to Greenwich Sentry, L.P. (Id. ¶ 172.) Each of these two initial funds was eventually joined by a companion fund: Fairfield Sentry Ltd.'s counterpart was another British Virgin Islands entity known as Fairfield Sigma Ltd., created in 1997, and wholly invested in Fairfield Sentry Ltd.; Greenwich Sentry's counterpart was Greenwich Sentry Partners, L.P. a Delaware limited partnership created in 2006. (Id. ¶¶ 171, 173.)

Though the Funds were incorporated in either the British Virgin Islands or Delaware, FGG ran much of its operations from New York City. (Id. ¶¶ 118, 120, 122, 128, 137, 140, 142, 143.) FGG also had offices in Miami, London, and Bermuda. (Id. ¶¶ 141, 130, 139, 143, 121, 127.)

In the meantime, Madoff was running "a giant Ponzi scheme" that he later admitted was "one big lie." (SCAC ¶ 167.) Though the scheme was at least partially in effect

-7-

since FGG started its investments with Madoff, Madoff's last legitimate securities transaction occurred in 1995. (Id. ¶ 188.)   Two years before that, in 1993, was the last time Madoff's three-person accounting firm Friehling & Horowitz ("F&H") was subject to peer review by the American Institute of Certified Public Accountants. (Id. ¶ 222.)

F&H's small size was at first unknown to FGG, as became clear in 2005 when a Fairfield Sentry investor asked the Fairfield Defendants "who supervises that everything is in order?" (Id. ¶ 225.)   Lipton told FGG employees who were going to speak with the inquiring client that F&H was "a small to medium size financial services audit and tax firm, specializing in broker-dealers and other financial services firms" and was "well respected in the local community." (Id.) During investigations to answer the investor's benign question, FGG discovered that F&H operated out of a strip mall in New City, New York and had only one working accountant. (Id.)   These misrepresentations continued in a "marketing piece" released in April 2006 that boasted of FGG's diligence standards and noted that FGG would question "obscure auditing firm[s]" associated with any of their investments. (Id. ¶ 227.)

Madoff, after numerous SEC investigations and rumors spread amongst the financial investment community, publicly

admitted his scheme on December 11, 2008.  Seven months before the confession, Vijayvergiya emailed FGG executives that "there are certain aspects of [Madoff's] operation that remain unclear."  (Id. ¶ 228.)  That admission came after a client requested information about account segregation, audits and trade confirmations.  (Id.)  Three months before the confession, on August 20, 2008, Lipton emailed Vijayvergiya to ask for basic information about F&H, including whether anyone knew of other clients of F&H or how big the firm was.  (Id. ¶ 226.)  Three months before Madoff's revelation, on September 16, 2008, Vijayvergiya emailed Fairfield Sentry investors that the funds assets were "fully invested in short date U.S Treasury Bills." (Id. ¶ 229.)

On October 2, 2008, two months before Madoff's disclosure, Noel, Tucker, McKeefry and Vijayvergiya had a phone conversation with Madoff.  Madoff refused to answer many questions, including "the names of key personnel involved in implementation of the split-strike conversion strategy." (Id. ¶¶ 218, 230.)  FGG did not follow-up.

After Madoff's confession on December 11, 2008, he pled guilty to an eleven count criminal complaint on March 12, 2009, and was eventually sentenced to 150 years in federal prison.

On April 1, 2009, the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts filed an administrative complaint against FGA and FGBL.  This complaint noted that the defendants "were blinded by the fees they were earning, did not engage in meaningful due diligence and turned a blind eye to any fact that would have burst their lucrative bubble."  (Id. ¶ 253.)  On August 12, 2009, FGA and FGBL consented "to the entry of the findings of the facts alleged" in the Massachusetts complaint, (id. ¶ 256), and on September 8, 2009, entered into a consent order that included payment of penalties and restitution amounting to approximately $8.5 million. (Id. ¶ 257.)

On July 21, 2009, the Offshore Funds were ordered to be liquidated by the Eastern Caribbean Supreme Court in the High Court of Justice of the British Virgin Islands.

### C. FGG'S FALSE STATEMENTS AND OMISSIONS

The SCAC alleges that FGG made a continuous series of false representations and material omissions from the founding of the Funds in 1990 to Madoff's confession in December 2008. These misstatements came in two broad categories: marketing materials provided initially to investors to encourage them to invest in the funds in the form of private placement or confidential offering memorandum ("Placement Memos") and periodic updates about the Funds' performance that were also

distributed or made available to investors to motivate them to retain their investments in the Funds. (Id. ¶ 181 (listing "Fund updates; performance reports, and marketing and sales materials"); see also ¶ 190 (describing "uniform reports, including 'Semi-Annual Reports' and 'Monthly Strategy Reviews.'").)

The misrepresentations essentially involved three strands of information: (1) that the Plaintiffs' investments were actually invested by Madoff in the so-called "split-strike conversion" strategy, (2) that Madoff's strategy resulted in substantial, consistent returns, and (3) that FGG had performed extensive due diligence on Madoff's operations and continually monitored them and, as a result, had full transparency to all of Madoff's operations. (Id. ¶ 182.)  In addition, when individual investors in the Funds raised concerns, FGG "purposefully gave false or obfuscated responses."  (Id. ¶ 183.)

Instances of these alleged false statements or material omissions abound in the SCAC.  (See, e.g., id. ¶¶ 184-216, 229, 231, 233.)  The most striking examples concern the Funds' investment by Madoff via a "split-strike conversion" strategy, an investment that never actually occurred. (Id. ¶ 184.)  FGG also trumpeted the prior trading results of the Funds and presented information showing "substantial, consistent

-11-

annualized rates of return for the Funds." (<u>Id.</u> ¶ 187.) They also did not disclose that they were simply recycling information Madoff had provided and did nothing to independently verify whether investment occurred or whether the returns were accurate. (<u>Id.</u> ¶ 189.)

Contrary to these statements, FGG represented that it used "strict risk management principles" to monitor the Funds' performance. (<u>Id.</u> ¶ 190.) Such risk management principles applied with special force to Madoff who, as an "external manager," would be subject to exacting review, including FGG "obtain[ing] underlying portfolio information for monitoring and client communication purposes." (<u>Id.</u> ¶ 194.) FGG also represented that it conducted "daily monitoring" of Madoff, including "monitoring of portfolio activity against all risk limits" and usage of "proprietary software." (<u>Id.</u> ¶ 196.) Such risk-monitoring of Madoff was further bolstered by purported "regular on-site visits" by "senior members of FGG's legal, operations, and risk teams." (<u>Id.</u> ¶ 197.) FGG also specifically touted the Funds' defenses against Ponzi schemes. (<u>Id.</u> ¶ 203.)

But "in reality, no one had conducted meaningful due diligence on Madoff" prior to his selection as the Funds "broker, execution agent, and custodian; no one was meaningfully monitoring or independently verifying Madoff's

-12-

trade activity;" there was "effectively no transparency to Madoff's operations;" and no one had an "independent, factual basis for stating that Madoff was executing a split-strike conversion strategy." (Id. ¶ 182.)   FGG "knowingly disregarded the fundamentally important operating and risk management principles that they touted" and "failed to disclose to Plaintiffs that they were not fulfilling these important functions." (Id. ¶ 205.)  "[T]he only attempt ... to confirm that Madoff was actually making trades was a 2001 visit to Madoff's office by Jeffrey Tucker ...." (Id. ¶ 213.)

    D. RED FLAGS

    The SCAC alleges that these misstatements or omissions were made despite numerous "red flags" that should have put FGG on notice that Madoff was not being honest.

    First, Madoff ran a "secretive operation" and simply "refused to answer even basic questions." (Id. ¶ 218.)  This "secrecy was exacerbated" by Madoff's positioning of family members in key positions at his firm, an arrangement that FGG knew about.  (Id. ¶ 220.)

    In addition to this tightly-knit operation, Madoff did not trade through an independent broker but "self-cleared all Fund activities through his wholly-owned company." (Id. ¶ 221.)  Madoff was also "his own custodian or sub-custodian for the Funds assets," an "arrangement [that] should have altered

-13-

the [FGG] to the need for heightened scrutiny, monitoring and verification of transactions." (Id.)   Madoff used paper trading records that were provided to FGG three to five days after the fake trades purportedly occurred.   (Id. ¶ 223.) This old-fashioned way of doing business was an anomaly in a world of real-time electronic reporting and was "patently susceptible to manipulation."   (Id.)   As detailed above, Madoff also employed an astonishingly under-sized accounting firm, an anomaly of which FGG eventually became aware.   (Id. ¶ 222.)

In addition to these specific warning signs, the unerring profits from Madoff's investments should have put FGG on alert.   On its face, Madoff's tendency to buy "near daily lows and [sell] near highs" over decades was simply "uncanny." (Id. ¶ between 223 and 224.)   Madoff's "reported results were inconsistent with the split-strike strategy." (Id.)   But even more than this implausibility, "Madoff reported trades at prices that were outside the stocks' actual trading ranges or took place on weekends," events that were "impossible."   (Id.) Madoff also "reported purchases of options on equity trades that had not yet been executed."   (Id. ¶ 215.)   "[A]ny comparison of Madoff's reports to market prices would have led to discovery of the fraud."   (Id. ¶ 67.)   These returns in fact did lead "other investment banks and investment

-14-

professionals" to quickly conclude that Madoff's numbers "simply did not add up." (Id. ¶ 224 (citing Nelson D. Schwartz, European Banks Tally Losses Linked To Fraud, N.Y. Times, Dec. 16, 2008, at B1).)

FGG also "never contacted any of Madoff's purported counterparties," which, since no trades were made and no counter-parties existed, would have soon exposed Madoff's fraud. (Id. ¶ 211.)

E. FEES PAID TO FGG

FGG earned lucrative fees from piloting Plaintiffs' investments to Madoff. The most salient of these fees include the following: the Offshore Funds, through their placement agent or investment manager, charged up an initial placement fee of up to 3 percent of an investment. (Id. ¶¶ 237, 242.) Each quarter, performances fees of 20 percent of net appreciation were extracted from Plaintiffs' investments -- a total of about $547 million dollars between 2002 and 2008. (Id. ¶¶ 238, 245.) Each year, certain FGG entities were paid about 1 percent of the total value of the Funds as a management fee -- about $200 million between 2002 and 2008. (Id. ¶¶ 239, 246.)

The SCAC alleges that FGG has "failed to repay compensation that they received which was calculated on the basis of Madoff's fraudulent investment returns." (Id. ¶

-15-

249.)  FGG also claims to be owed "millions of dollars in fees from the few tangible assets that remain" in the Funds.  (Id.)

F. CITCO

Citco, defined in the SCAC to include defendants Citco Group Ltd. ("Citco Group"), Citco Fund Services (Europe) B.V. ("CFSE"), Citco (Canada) Inc. ("CCI"), Citco Global Custody N.V. ("Citco Global"), Citco Bank Nederland N.V. Dublin Branch ("Citco Bank,"), and Citco Fund Services (Bermuda) Ltd. ("CFSB"), contracted with the Funds to perform financial services that included serving as administrator, custodian, bank, and depository.  Plaintiffs allege that Citco owed duties to them as fund investors, and wholly failed to fulfill these duties, assisting the Funds in their fraud and breaches in fiduciary duty, and ultimately allowing Madoff to abscond with Plaintiffs' money.

Plaintiffs allege that despite the separate corporate identities that Citco used to contract with the Funds, Citco both markets and operates itself as a single financial services provider -- an industry leader with extensive experience in the field, a "reputation for independence," and in its own words, a company that functions as "a reliable fiduciary to safeguard the interests of investors."  (Id. ¶ 325.)  According to Plaintiffs, Citco's individual corporations are all controlled by Citco Group, which appoints

-16-

division directors to monitor the daily operations of each division, including, relevant here, the fund services division. For that reason, irrespective of which specific entity contracted with the Funds, Plaintiffs allege that the Funds agreed that services might be "provided by Citco Group or any of its companies, not just the company that is engaged." (Id. ¶ 323.)

Citco committed to serve a variety of key roles for the Funds. As administrators, with CFSE and CCI as contracting companies,[4] Citco agreed to reconcile cash and other balances at brokers, independently reconcile the Funds' portfolio holdings, and calculate the Net Asset Value (the "NAV") of the Funds, as well as the NAV per share. The NAV calculations, which Plaintiffs allege were crucial to their decisions to invest and hold investments, determined the number of shares Plaintiffs were entitled for a given investment in addition to their reported profits.

---

[4] The contracts in operation during the time relevant to the events at issue in the SCAC include the Fairfield Sentry Ltd. and Citco Fund Services (Europe) B.V. Administration Agreement, dated February 20, 2003 (the "Fairfield Sentry Administration Agreement"), the Fairfield Sigma Ltd. and Citco Fund Services (Europe) B.V. Administration Agreement, dated February 20, 2003 (the "Fairfield Sigma Administration Agreement"), Greenwich Sentry, L.P. and Citco Fund Services (Europe) B.V. Administration Agreement, dated August 10, 2006 (the "Greenwich Sentry Administration Agreement"), and the Greenwich Sentry Partners, L.P. and Citco Fund Services (Europe) B.V. Administration Agreement, dated August 10, 2006 (the "Greenwich Sentry Partners Administration Agreement") (collectively, the "Administration Agreements").

Citco also agreed to prepare monthly financial statements in accordance with International Accounting Standards, and reconcile information provided by "the Fund's prime broker and custodian" -- Madoff -- "with information provided by the Investment Manager." (Id. ¶ 327.) In performing these services, pursuant to the contracts with the Funds, Citco was "permitted only to rely on information it received without making further inquiries if that information demonstrated an 'absence of manifest error.'" (Id. ¶ 329 quoting Fairfield Sentry Administration Agreement § 6.2, Sched. 2, at Pt. 1; Fairfield Sigma Administration Agreement § 6.2 (c).)

Citco also functioned as the Funds' public liaison. In this role, Citco communicated with Plaintiffs and Plaintiffs communicated with Citco. Contact between Plaintiffs and Citco allegedly included subscription documents and investments sent by Plaintiffs to Citco, and investment confirmations sent by Citco to Plaintiffs in return.

As custodian, bank, and depositary for Fairfield Sentry and Fairfield Sigma, with Citco Global and Citco Bank as contractors,[5] Citco was responsible for monitoring any

---

[5] The relevant contracts include the Fairfield Sentry Ltd. and Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody N.V. Custodian Agreement, dated July 3, 2006 (the "Fairfield Sentry Custody Agreement"), and the Fairfield Sigma Ltd. and Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody N.V. Brokerage and Custody Agreement, dated August 12, 2003 (the "Fairfield Sigma Custody Agreement") (collectively, the "Custody Agreements," together with the Administration Agreements, the "Citco Agreements").

subcustodian of the Funds, including, notably, BMIS.  Citco
agreed to record the assets held by them as custodians or by
the sub-custodians, and to "'keep the securities in the
custody of the Custodian or procure that they are kept in the
custody of any sub-custodian.'"  (Id. ¶ 330 (quoting Fairfield
Sentry Custody Agreement § 6.1.1; Fairfield Sigma Custody
Agreement § 5.2).)   In performing these duties, Citco had
authority to act without instruction from the Fund if
"necessary 'to preserve or safeguard the Securities or other
assets of the Fund.'"   (Id. 330 (quoting Fairfield Sentry
Custody Agreement § 6.3; Fairfield Sigma Custody Agreement §
7.3).)

     Plaintiffs allege that they were aware of the services
that Citco provided, and that as investors and shareholders
they were relying on Citco to fulfill their obligations to the
Funds, and to them as investors and limited partners by
extension.  The SCAC alleges that Citco's reputation gave the
Funds legitimacy, and "provided potential and current
investors with assurance about the quality of financial
services provided to the Funds, the security of assets held by
the Funds, and the accuracy of the reported values of the
Funds and of the investors' individual accounts."  (Id. ¶
333.)  This, as Plaintiffs allege, is exactly what Citco
intended.  But instead of fulfilling its duties as promised,

Plaintiffs claim that Citco "utterly failed to take industry-standard steps" in performing its services to the Funds, and that Citco relied on information from Madoff and the Funds "even though that information was manifestly erroneous and should not have been relied on."  (Id. ¶ 336, 338.)

The SCAC alleges Citco should have increased scrutiny and sought independent verification of the information provided by Madoff and the Funds because of the roles consolidated in Madoff, the impossibility of the trade and profit information provided by Madoff, and the warning signs discussed above. Moreover, Plaintiffs claim that Citco did not safeguard the assets entrusted to it, handing over money to Madoff without due diligence, monitoring, or even a good faith basis for its reliance.  It further failed, according to Plaintiffs, to record the assets held by the custodians and sub-custodians as it agreed to do.  Plaintiffs allege that if Citco had safeguarded investors' assets as required, Plaintiffs could have recovered their investments before December 2008, when Madoff confessed and chaos ensued.

Plaintiffs allege that because of Citco's long history of working with the Funds, as well as its experience in providing hedge fund services, Citco "knew or was willfully blind to the fact that the due diligence and risk controls employed by the Fairfield Defendants were grossly deficient" and that the

Funds were misrepresenting to Plaintiffs "that they employed thorough due diligence, monitoring and verification of Fund managers, including Madoff, and strict risk controls." (Id. ¶ 342). According to Plaintiffs, Citco kept this information from investors and shareholders, and continued to receive investments from Plaintiffs and send investments to Madoff until his fraud was finally revealed to the public.

      G.   GLOBEOP

    GlobeOp Financial Services, LLC ("GlobeOp") provided administrative services to Greenwich Sentry L.P. from about January 2004 to August 2006. Plaintiffs allege that GlobeOp held itself out as a skilled provider of hedge fund financial services, with "independence, technology leadership, and deep knowledge of complex financial instruments" that enabled it to independently calculate NAV reports. (Id. ¶ 344.) According to Plaintiffs, GlobeOp, like Citco, took on discretionary responsibilities including "preparing and distributing 'monthly reports that contain[ed] the amount of the Partnership's net assets, the amount of any distributions from the Partnership and Incentive Allocation, accounting and legal fees, and all other fees and expenses of the Partnership.'" (Id. ¶ 345 (quoting GS COM-5/2006, at 10).) According to Plaintiffs, investors in Greenwich Sentry reposed their trust in GlobeOp, which owed a duty of care to Plaintiffs in

-21-

performing its administrative services for the Funds. Plaintiffs allege that GlobeOp failed to fulfill these duties by not taking "industry-standard steps to calculate the Fund's NAV, or to verify independently or even minimally scrutinize the information provided to it."  (Id. ¶ 347.)  In fact, Plaintiffs allege that GlobeOp did the opposite -- blindly and recklessly relying on information from BMIS and the Fund in determining the Greenwich Sentry, L.P.'s NAV.  Plaintiffs allege that GlobeOp's failures caused Plaintiffs to invest and maintain their investment in Greenwich Sentry L.P.

### H. PRICEWATERHOUSECOOPERS

Plaintiffs allege that defendants PricewaterhouseCoopers LLC ("PwC Canada"), PricewaterhouseCoopers Accountants Netherlands N.V. ("PwC Netherlands") (together, "PwC Member Firms"), and PricewaterhouseCoopers International Ltd. ("PwC International") (collectively, "PwC"), provided independent auditing services to the Funds from about 2002 through 2007. Although the Funds specifically retained the PwC Member Firms to perform their audits, Plaintiffs claim that PwC operates as an "umbrella organization that coordinates the accounting and auditing activities of the various PricewaterhouseCoopers accounting firms," including the PwC Member Firms.  (Id. ¶ 268.)  For example, Plaintiffs allege that PwC audited other Madoff feeder funds, and in doing so, that all firms part of

PwC International worked together to conduct their services. This coordinated effort, Plaintiffs allege, also gave PwC a unique opportunity to verify information about BMIS. As an illustration, Plaintiffs point to a January 8, 2008 SEC filing, which reflects that BMIS had assets totaling about $17 billion. Yet the assets invested in PwC-audited feeder funds at that time by themselves totaled about $16,877,743,429 -- only a relatively minor difference -- a fact which should have put PwC on alert.

As auditors, the PwC Member Firms provided certain services to the Funds on a "regular and recurring basis," including preparing annual financial statements and certifying that those statements were to be prepared and presented in accordance with Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS"). According to Plaintiffs, PwC also committed to perform various tests to verify the accuracy of the Funds' financial statements, including: "tests of physical existence, ownership and recorded value of selected assets," "tests of selected recorded transactions with documentation required by law and good business practice," and "direct confirmation with selected third parties." (Id. ¶ 260.) Plaintiffs allege that PwC never performed these tests, but misrepresented to Plaintiffs that they had.

-23-

_____1. Clean Audits

PwC Netherlands issued a clean audit opinion for Greenwich Sentry for the year 2005; Fairfield Sentry for the years 2002, 2003, 2004, and 2005; and Fairfield Sigma for the years 2003, 2004, and 2005. PwC Netherlands certified that the audits conducted for Greenwich Sentry were in accordance with GAAS and that the statements conformed with GAAP. PwC Netherlands also certified that the Fairfield Sentry and Fairfield Sigma statements complied with International Financial Reporting Standards ("IFRS") and that the audits conducted were in accordance with International Standards of Auditing ("ISA").

PwC Canada issued clean audit opinions for the financial statements of Greenwich Sentry, Fairfield Sentry, Fairfield Sigma, and Greenwich Sentry Partners for the years 2006 and 2007. PwC Canada certified that the statements of Greenwich Sentry and Greenwich Sentry Partners complied with GAAP, and that the audits of those funds were conducted in accordance with GAAS. PwC Canada also certified that the statements of Fairfield Sigma and Fairfield Sentry conformed with IFRS, and that the audits of those funds were performed in accordance with GAAS.

     2. <u>Relationship with Plaintiffs</u>

     According to the SCAC, PwC addressed the audit reports directly to Plaintiffs as investors and shareholders in the Funds.  Plaintiffs allege that PwC knew that they would rely on those audit reports in making initial investments and retaining their investments, and that PwC knew it owed a duty to Plaintiffs to provide accurate reports.  Plaintiffs point specifically to a statement sent to FGG in which PwC acknowledges that it was "'responsible for reporting to the ... shareholders and/or partners on the financial statements of the Funds.'" (<u>Id.</u> ¶ 276 (citation omitted).

     Plaintiffs further allege that PwC was aware its name was being used in the Funds' marketing materials and Placement Memos, and that its audit letters were made available to both prospective and current investors, as evidenced by an agreement to that effect in PwC's engagement letters with the Funds.

     According to Plaintiffs, PwC "knew that the primary purpose of its audits was to provide investors in the Funds with assurance that the Funds' assets were legitimately invested and accurately valued." (<u>Id.</u> ¶ 279.)  PwC knew that Plaintiffs' shares were not valued by the market, and that as auditors they were providing Plaintiffs with the only

"independently-verified third party financial information" available.  (Id. ¶ 279.)

        3. Risks

    Plaintiffs allege that PwC knew the risks posed by the Funds' investments with Madoff, but that PwC nonetheless failed to take steps in response to those risks by either implementing additional auditing procedures, or even performing standard procedures required by industry practices and its own policies.

    Plaintiffs allege that PwC knew that the Funds were "merely vehicles to aggregate investments and transfer them to Madoff" (id.), that the Funds were purporting to use a nontraditional investing strategy, and that BMIS functioned as custodian, sub-custodian, and prime broker of the Funds.  PwC claimed that it would meet with BMIS to "obtain an understanding of the key control activities as they relate to the operations and process over the custodian, sub-custodian, and prime broker functions."  (Id. ¶ 307 (quoting Audit Plan at 11).)  Plaintiffs allege, however, that PwC accepted Madoff's representations without any independent investigation.  For example, Madoff stated to PwC that BMIS's trades were mostly electronic, with records and reconciliation updated daily.  But Plaintiffs allege that PwC knew that Madoff did not provide electronic confirmation to the Funds,

-26-

instead providing delayed paper records of his trades. Plaintiffs allege that had PwC analyzed and tested Madoff's investment strategy, it would have detected that the strategy could not have functioned as described, and that the returns claimed by Madoff were "not achievable."  (Id. ¶ 308.)

Plaintiffs allege that pursuant to certain industry standards and guidelines, PwC was required to verify the existence of the Funds' investments and understand the Funds' internal controls.  According to Plaintiffs, PwC altogether failed to perform these duties.  Plaintiffs allege that PwC represented that the Funds' financial statements were free of material misstatements without collecting evidence to support that opinion, and without determining whether the assets reflected in those statements even existed.  Further, according to the SCAC, PwC did not verify the existence of the transactions of Madoff's so-called split-strike conversion strategy even though PwC represented that it was performing these substantive tests, and had indicated in its Audit Plan that transaction testing of BMIS's investment strategy would be appropriate.  (See id. ¶ 307.)  Plaintiffs allege that PwC also concluded that verification of the Citco Defendants' valuations would be necessary, but that PwC failed to actually perform those tests as well.  (See id. ¶ 309.)

Plaintiffs allege that if PwC had performed a proper audit, it would have discovered that Madoff did not actually engage in any legitimate trades and that the assets of the Funds did not exist.  (See id. ¶¶ 308, 313.)  On the other hand, Plaintiffs allege that even the limited amount of work performed by PwC "would have given it actual knowledge or information that it willfully ignored," including that BMIS was not audited by a legitimate firm; that the Funds and Fairfield Defendants "performed no meaningful due diligence on BMIS"; that the Funds, like PwC, did not test Madoff's performance or strategy, and "had no process in place to verify the fair value" of Madoff's supposed investments.  (Id. ¶ 314.)  PwC, by way of its limited audit work, also knew, or had information that it willfully ignored, that the Funds did not verify Madoff's trades with counterparties or third parties, and did not verify the existence of the Plaintiffs' assets.  (See id.)

Plaintiffs also assert that PwC failed to exercise the due care required of an audit professional, specifically that it failed: to exercise professional skepticism when considering the risk of fraud; to obtain an understanding of the Funds or BMIS, their internal controls, and their risk of material misstatements; to procure sufficient audit evidence regarding the existence of the assets or to conduct a proper

audit to verify the existence of the assets; and to audit the purported transactions and the split-strike strategy, including confirming settled transactions and inspecting assets.  (See id. ¶ 315.)  Plaintiffs also allege that PwC failed to perform additional procedures where, as here, there was a consolidation of the roles of custodian, sub-custodian, and broker in one entity, and other red flags surrounding Madoff and BMIS.  (See id.)  Plaintiffs also allege that any reliance by PwC on BMIS's financial statements would have been improper because F&H was not a qualified auditor able to audit in accordance with GAAP.  (See id.)  In sum, Plaintiffs conclude that "PwC's audits were so deficient that in reality there were no audits at all."  (Id. ¶ 316.)

## III. DISCUSSION

### A. THRESHOLD ISSUES COMMON TO ALL DEFENDANTS

#### 1. SLUSA

Defendants contend that Plaintiffs' fraud-related claims based in state law are precluded by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").  See 15 U.S.C. § 78bb(f); 15 U.S.C. 77p(b)(1).  SLUSA was enacted to prevent securities fraud class actions based on state laws with less stringent pleading requirements than federal law.  See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 82 (2006).  In particular, SLUSA bars class actions of fifty or

more members "based upon the statutory or common law of any State" that allege "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A). For SLUSA, a "covered security is one traded nationally and listed on a regulated national exchange." <u>Dabit</u>, 547 U.S. at 83 (quotation marks omitted); <u>see also</u> 15 U.S.C. § 77r(b)(1).

Though not disputing that they propose a class action composed of more than fifty members, Plaintiffs argue that SLUSA does not apply to this lawsuit because the Funds are not covered securities. And though Madoff in turn purported to purchase securities covered by SLUSA, Plaintiffs assert those transactions were too disconnected from Plaintiffs' actual investments to activate SLUSA's preclusive powers.

Defendants do not argue that the Plaintiffs' investments -- whether purchases of shares in the Offshore Funds or limited partnership interests in the Domestic Funds -- amount to "covered securities" under SLUSA; they instead contend that the relevant covered securities are those Madoff lied about purchasing. But this argument overlooks the basic facts of this case, which concern misrepresentations and breaches of duties concerning shares purchased in the Funds. <u>See</u> <u>Romano v. Kazacos</u>, 609 F.3d 512, 523 (2d Cir. 2010) ("SLUSA requires [a court's] attention to both the pleadings and the realities

underlying the claims."). Investments in the Funds simply were not purchases of covered securities.

This conclusion puts all the pressure of Defendants' argument on the "in connection with" requirement of SLUSA. The United States Supreme Court has held that SLUSA's "in connection with" language is to be given "a broad interpretation." Dabit, 547 U.S. at 85. Under the Court's precedents, "it is enough that the fraud alleged 'coincide' with a securities transaction –– whether by the plaintiff or by someone else." Id. (citation omitted); see also Romano, 609 F.3d at 521 ("The 'coincide' requirement is broad in scope ...." citation omitted). Such an interpretation is required because the "magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated." Id. at 78.

The Court finds that the "in connection with" requirement is not met here. The allegations in this case present multiple layers of separation between whatever phantom securities Madoff purported to be purchasing and the financial interests Plaintiffs actually purchased. First, Plaintiffs invested their money in the Funds, with one of the Citco Defendants receiving the actual deposits. The Citco Defendants then placed this money with Madoff, a transaction

-31-

which Plaintiffs allege did not occur instantaneously; the Funds were not a cursory, pass-through entity.  The Funds also placed up to 5 percent of their assets in non-Madoff investments, a relatively small portion overall but representing many millions of dollars.  Madoff, when and if he received Plaintiffs' investments from the Funds, then represented he was investing this money in a manner intended to "highly correlate to the S&P 100 Index."  (SCAC ¶ 184.) But sometimes Madoff claimed he also invested this money in Treasury Bills.  Though the Court must broadly construe SLUSA's "in connection with" phrasing, stretching SLUSA to cover this chain of investment -- from Plaintiffs' initial investment in the Funds, the Funds' reinvestment with Madoff, Madoff's supposed purchases of covered securities, to Madoff's sale of those securities and purchases of Treasury bills -- snaps even the most flexible rubber band.[6]

---

[6] SLUSA's applicability to the facts presented by this case is an open question in the Second Circuit.  Within the year, two judges have found SLUSA preclusion of state fraud claims in fact patterns where Plaintiffs invested with Madoff through another entity.  See Levinson v. PSCC Services, Inc., 09-CV-00269, 2009 WL 5184363, at *8-*14, *9 (D. Conn. Dec. 23, 2009) (SLUSA question is "more difficult than Defendants suggest"); Backus v. Connecticut Community Bank, N.A., 09-CV-1256, 2009 WL 5184360, at *3-*11 (D. Conn. Dec. 23, 2009) (describing SLUSA's applicability as "the most difficult question before the Court" and applying case law from the federal Third Circuit Court of Appeals)); Barron v. Igolnikov, 09 Civ. 4471, 2010 WL 882890, at *3-*5 (S.D.N.Y. Mar. 10, 2010).  Another judge has held that investments in hedge funds, even when the fund undisputably invests in covered securities, do not implicate SLUSA.  See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 05 Civ. 9016, 2010 WL 546964 (S.D.N.Y. Feb. 16, 2010).  This Court follows the path struck in Pension Committee as the securities "at the heart of this case" are non-covered interests in the Funds.  Id. at *3; see also Banco Santander, 2010 WL 3036990, at *28 (finding, in a similar Madoff-feeder-fund fact pattern, that "Madoff's actions are simply not the crux of this

Finally, the Court notes that the policy objectives of SLUSA are not implicated in this case. Plaintiffs successfully press federal securities law claims against many of the Defendants and have not attempted to bypass the higher pleading requirements required for these claims by resorting to more lenient state law. See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 395 F.3d 25, 36 (2d Cir. 2005) (noting SLUSA's concern with "federal flight litigation"), vacated on other grounds, 547 U.S. 71 (2006) (quotation marks omitted).[7]

2. Choice of Law

This Court must apply the choice of law rules of the state where it is located. See, e.g., Zerman v. Ball, 735 F.2d 15, 20 (2d Cir. 1984) ("In deciding a question of state law, the federal court must apply the forum state's choice-of-law rules to determine which state's law governs."). The present action contains tort, contract and quasi-contract claims. The relevant analytical approach to choice of law in tort actions in New York is the "interest analysis," where

---

litigation.").

[7] The Court notes that even if the multiple layers between Plaintiffs investments and the purported purchase of covered securities fell under SLUSA's ambit, only the fraud and negligent misrepresentation common law causes of action would be dismissed. A court, after considering both technical elements of a claim as well as factual allegations intrinsic to the claim as alleged, "must dismiss under SLUSA only claims that include "misstatements or omissions" as a "necessary component." Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc., 341 F. Supp. 2d 258, 266-70 (S.D.N.Y. 2004); see also In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 443 (S.D.N.Y. 2001) (finding SLUSA preclusion of state-law claims, including fraud and negligent misrepresentation, "grounded on alleged misstatements").

"the law of the jurisdiction with the most significant interest in, or relationship to, the dispute" is applied. Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997); accord Schultz v. Boy Scouts, 480 N.E.2d 679, 684 (1985). For contract claims, New York courts typically look to the "center of gravity" of the dispute or the "grouping of contacts" in the jurisdictions at issue, unless the policies underlying conflicting laws in a contract dispute are "readily identifiable and reflect strong governmental interests." In re Allstate Ins. Co., 613 N.E.2d 936, 939 (1993). Regardless of whether the "center of gravity" or "interest analysis" is applied, both require consideration of the facts and significant contacts underpinning the dispute. See Anglo Am. Ins. Group, P.L.C. v. CalFed, Inc., 940 F. Supp. 554, 557 (S.D.N.Y. 1996).

In the present case, a substantial part of the events and actions of the Defendants that gave rise to Plaintiffs' claims occurred within New York. As alleged in the SCAC, FGG operated largely out of New York City, as did Madoff. The core facts implicated in every cause of action in this lawsuit -- Madoff's fraud and allegations of reckless ignorance of this fraud or other breaches of duty -- center on conduct that occurred in New York. Additionally, Plaintiffs are widely dispersed throughout the world and their injury was sustained

-34-

in various "locations with only limited connection to the
conduct at issue." <u>Pension Comm.</u>, 446 F. Supp. 2d 163, 192,
193-94 (S.D.N.Y. 2006) (considering that fraud originated in
New York and defendants had "extensive interaction" and
"communicated regularly" with New York offices).  Because
activities in New York and the parties' contacts with that
forum bear the most relation to the claims at issue, New York
has the greatest interest in applying its law.  <u>See</u> <u>id.</u>;
<u>Cromer Fin. Ltd. v. Berger</u>, 137 F. Supp. 2d 452, 492 (S.D.N.Y.
2001) (applying New York law as the "jurisdiction where the
fraud originated and where substantial activities in
furtherance of the fraud were committed").  The Court will
therefore apply New York law in reviewing Plaintiffs' common
law claims.

    3. <u>Standing</u>

    Defendants argue that Plaintiffs' common law claims
essentially amount to allegations of mismanagement of the
Funds, and therefore only the Funds themselves have standing
to sue and that Plaintiffs only recourse is to sue
derivatively on behalf of the Funds.  The Court is not
persuaded by Defendants' blanket characterizations of
Plaintiffs' claims.  The SCAC alleges causes of action against
what amount to outsiders to the Funds -- Plaintiffs' general
theory is that investment managers, accountants, custodians

and administrators had responsibilities to individual investors, regardless of whatever duties the Defendants owed the Funds themselves. No directors of the Funds or other nominally corporate officers of the Funds are named as Defendants based on their duties as directors.

As noted above, the Court will analyze Defendants' argument regarding Plaintiffs' standing to bring a direct claim using New York law.[8] Under New York law, a shareholder may sue individually "when the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged." Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F. Supp. 2d 385, 409 (S.D.N.Y. 2005) (quoting Abrams v. Donati, 489 N.E.2d 751, 751-52 (N.Y. 1985))

---

[8] The so-called "internal affairs" doctrine typically requires a court to consider the law of the place of incorporation to decide a shareholder standing issue. See Aboushanab v. Janay, No. 06 Civ. 13472, 2007 WL 2789511, at *6 (S.D.N.Y. Sept. 26, 2007). The Second Circuit has endorsed a more flexible approach in place of applying the doctrine as a bright-line rule in New York. See Norlin Corp. v. Rooney, 744 F.2d 255, 263 (2d Cir. 1984) (discussing considerations that may override application of the internal affairs doctrine) (citing Greenspun v. Lindley, 330 N.E.2d 79 (N.Y. 1975)); Continental Casualty Co. v. PricewaterhouseCoopers, LLP, __ N.E.2d ____, 2010 WL 2569187 (N.Y. June 29, 2010) (applying New York law without comment to determine standing of investors of hedge fund apparently incorporated in Delaware). This flexible approach is applied as an "interest analysis," in which New York courts apply the law of the "jurisdiction with the greatest interest in the specific issue under consideration." Koury v. Xcellence, 649 F. Supp. 2d 127, 135 (S.D.N.Y. 2009). Here, aside from the fact of incorporation, the Funds have no connection to either the British Virgin Islands or Delaware. Further, the Offshore Funds are no longer operating entities and have been turned over to liquidators. See Pension Comm., 446 F. Supp. 2d at 194 (purpose of internal affairs doctrine is to prevent corporate directors from facing conflicting demands of different jurisdictions' laws). The forum with the greatest contact and interest in this action is New York, the jurisdiction where the fraud and other breaches of duty were masterminded. Finally, as explored below, even if Delaware law, the place of the Domestic Funds' incorporation, were applied to claims relating to the Domestic Funds, the result would be the same.

(holding that a direct action was allowed because the "principal wrong" was a valuation fraud, in which the defendants concealed declines in the value of fund assets that injured the Plaintiffs rather than the funds and the fiduciary duty was owed independently to the plaintiffs); see also Ceribelli v. Elghanayan, 990 F.2d 62, 63-65 (2d Cir. 1993); Benedict v. Whitman Breed Abbott & Morgan, 722 N.Y.S.2d 586, 588 (App. Div. 2d Dep't 2001); Rudey v. Landmarks Pres. Comm'n of New York, 529 N.Y.S.2d 744, 747 (App. Div. 1st Dep't 1988). Accordingly, to the extent that Plaintiffs properly allege duties owed by each defendant directly to them (a venture in which, as will be seen below, they are not always successful), they have standing to pursue such claims.[9]

In addition, allegations by investors of having been tortiously induced to invest or to retain an investment are

---

[9] As noted, if the Court were to apply Delaware standing law to Plaintiffs' claims related to the Domestic Funds, the result would be the same. Delaware standing law considers whether the corporation or the shareholders individually suffered the harm and whether the corporation or the shareholders individually would receive the benefit of recovery or other remedy. See Tooley v. Donaldson, Lufkin, & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004). "Generally, non-disclosure claims are direct claims," including those styled as breach of fiduciary duty and breach of contract. Albert v. Alex. Brown Mgmt. Serv., Inc., Nos. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607, at *12 (Del. Ch. Aug. 26 2005); see also Stephenson v. Citco Group Ltd., No. 09 Civ. 0716, 2010 WL 1244007, at *9-*19 (S.D.N.Y. Apr. 1, 2010) (applying Delaware law and noting that claims alleging "fraudulent inducement" are direct). The principal wrong asserted by the Plaintiffs here is essentially nondisclosure of or failure to learn facts which should have been disclosed based on duties that were independently owed to Plaintiffs. Accordingly, Plaintiffs have standing under Delaware law.

not derivative claims.  See Pension Comm., 446 F. Supp. 2d at 205.

At its core, this case alleges claims against the corporate entities and individuals responsible for the representations that led Plaintiffs to make and maintain investments in the Funds which, though nominally corporate, were merely vessels for ferrying the investments to Madoff. The fraud and breaches of duty were essential to the Funds' corporate forms thriving as substantially all of the Funds' assets were invested with Madoff.  Ironically, the alleged concealment or reckless ignorance by Defendants did not harm the Funds as such.  Rather, what the pleadings suggest is that Defendants' errors and omissions, committed under the spell of Madoff's profits, served as the lotus that kept Defendants blissful and that sustained their corporations.  Without the fraud and other wrongs alleged in this action, the Funds would not have existed.  The Court is not inclined to limit liability to the corporate entity that allegedly functioned essentially as a vehicle for harming Plaintiffs. See Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991) (in the bankruptcy context, "[a] claim against a third party for defrauding a corporation with the cooperation of corporate management accrues to creditors, not to the guilty corporation"); Hirsch v. Arthur Anderson & Co., 72 F.3d 1085,

1093-95 (2d Cir. 1995) (applying <u>Wagoner</u> rule to Ponzi scheme).

The availability of direct actions is further shown by the asymmetrical injury alleged in the SCAC. <u>See</u> <u>Higgins v. New York Stock Exch., Inc.</u>, 806 N.Y.S.2d 339, 348 (2005) (discussing whether "differentiated harm" is required under New York standing law). In <u>Continental Casualty Co.</u>, the New York Court of Appeals rejected claims asserted by investors in a hedge fund against the fund's auditors as derivative because the investors "experienced [their] losses in their capacities as limited partners in common with all limited partners." 2010 WL 2569187, at *3. That is not the case here. Plaintiffs were free to invest any amount of money in the Funds and free, with some restriction, to redeem the appreciation in their investment. Some did withdraw profits and others did not. When the game was up, investors who had not redeemed any of their investment lost more money than those who had. And because some investors had redeemed and realized appreciation of their initial investments, the Funds as a whole did not lose the value of all the initial investments. At the pleadings stage, Plaintiffs have alleged sufficient information to show that Plaintiffs suffered individual harm distinct from losses experienced by other investors.

The Court notes that this facet of Plaintiffs' standing argument is ripe for further factual development and is more properly decided at the class certification or summary judgment stage of this proceeding.  See In re Grand Theft Auto Video Game Consumer Litig. (No. II), No. 06-MD-1739, 2006 WL 3039993, at *2 (S.D.N.Y. Oct. 25, 2006) (examining authorities and concluding it was proper to "treat class certification as logically antecedent to standing where class certification is the source of the potential standing problems").  At this early stage in the litigation, the Court must accept Plaintiffs' factual allegations as true.  As discovery unfolds, if additional facts change the premise for the Court's ruling on standing, the parties are free to make a motion at the appropriate time.

    4. Martin Act

    Defendants argue that the Martin Act preempts the majority of Plaintiffs' common law claims.  As set forth in Anwar I, the Court is not persuaded.  See Anwar v. Fairfield Greenwich Ltd., 09 Civ. 0118, 2010 WL 3022848 (S.D.N.Y. July 29, 2010).  For the reasons stated there, Defendants' arguments are rejected.

    B. FAILURE TO STATE A CLAIM

    Defendants' remaining arguments are essentially all in support of motions to dismiss Plaintiffs' various causes of

action under Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. ---, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 547 (S.D.N.Y. 2005) (internal quotation marks omitted).  The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. See Chambers v. Time Warner, 282 F.3d 147, 152 (2d Cir. 2002).

    C. FAIRFIELD GREENWICH DEFENDANTS

As noted, Plaintiffs allege a number of federal securities law, state common law tort, contract and

quasi-contract claims.  Common law fraud and claims under §
10(b) of the Securities Exchange Act of 1934 (the "Exchange
Act"), 15 U.S.C. § 78j(b) ("§ 10(b)"), and Rule 10b-5
promulgated thereunder ("Rule 10b-5"), 17 C.F.R. § 240.10b-5,
are alleged against FGG, FGL, FGBL, FGA, FRS, Noel, Tucker,
Piedrahita, Vijayvergiya, Lipton and McKeefry (collectively,
"Fraud Defendants").

Plaintiffs also assert claims under § 20(a) of the
Exchange Act, 15 U.S.C. § 78t(a) ("§ 20(a)") against the Fraud
Defendants, and three other FGG partners who were members of
FGG's Executive Committee: Richard Landsberger
("Landsberger"), Charles Murphy ("Murphy") and Andrew Smith
("Smith") (collectively, "Section 20(a) Defendants").

Negligent misrepresentation, gross negligence, breach of
fiduciary duty, breach of contract, constructive trust, and
mutual mistake claims are asserted against the Section 20(a)
Defendants, and FHC (collectively, "Fairfield Defendants").

Breach of contract, constructive trust and mutual
mistakes claims are also brought against a number of partners
of FGG: Yanko Della Schiava, Philip Toub, Lourdes Barrenche,
David Horn, Cornelis Boele, Vianney d'Hendencourt, Jacqueline
Harary, Santiago Reyes, Julia Luongo, Harold Greisman, Corina
Noel Piedrahita, Robert Blum, and Maria Teresa Pulido Mendoza

("Pulido Mendoza")[10] (collectively, "Fairfield Fee Claim Defendants").[11]

Unjust enrichment is asserted against all of the above -- the Fairfield Defendants and the Fairfield Fee Claim Defendants.

1. <u>FGG</u>

FGG disputes whether it can be legally sued and contends FGG is merely a name used for marketing purposes. Plaintiffs concede that FGG's origin cannot be traced to a formal partnership agreement, but instead allege that FGG is a de facto partnership or a partnership by estoppel. (<u>See</u> SCAC ¶ 117.)

Adequately alleging a partnership requires showing four elements: "(1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners." <u>Kidz Cloz, Inc.</u>

---

[10] The SCAC is inconsistent as to whether Pulido Mendoza should be grouped as a Fairfield Defendant, (<u>see</u> SCAC ¶ 150), or as a Fairfield Fee Defendant. (<u>See</u> SCAC at ix). Because Plaintiffs' opposition to Defendants' motions to dismiss lists Pulido Mendoza as a Fairfield Fee Defendant, the Court will treat her as a Fairfield Fee Defendant.

[11] The SCAC also names one Gregory Bowes as a Fairfield Fee Defendant. (<u>See</u> SCAC ¶ 146, 148, 152.) Despite this, he has not apparently joined with the other Fairfield Fee Defendants' motion to dismiss. Plaintiffs, in their memorandum of law opposing the Fairfield Fee Defendants' motion to dismiss, also exclude him, without comment, from any argument they make in support of their allegations against the other Fairfield Fee Defendants. Because neither Defendants nor Plaintiffs make mention of him, the Court will consider Gregory Bowes dismissed from this action.

v. Officially For Kids, Inc., 320 F. Supp. 2d 164, 171
(S.D.N.Y. 2004).

Plaintiffs have carried their burden here.  They allege
that all of the FGG partners shared profits and losses related
to all the Fairfield Greenwich entities, (SCAC ¶¶ 148, 177),
made contributions to FGG's capital, and intended to operate
the Fairfield Greenwich entities to realize a profit.  (Id. ¶
177.)   FGG  exercised  control  over  the  entire  Fairfield
Greenwich business by operating an Executive Committee that
controlled the operations of FGG's partner entities.  (Id. ¶
176.)  The partners of FGG also prepared and disseminated the
Placement Memos and other materials given to investors.  (Id.
¶ 180.)  FGG held itself out as a partnership in a marketing
brochure  that  noted  that  FGG  was  operated  "[u]nder  the
leadership of its Partners."   (Id. ¶ 179.)   The Placement
Memos also portrayed FGG as a partnership by describing the
billions of dollars of assets it has managed, its existence
since 1983 and its management of assets pooled into it.  (See,
e.g., Fairfield Sentry Ltd. Private Placement Memorandum,
dated August 14, 2006, at 7 ("Fairfield Sentry PM").)
Finally, the SCAC specifies that Plaintiffs relied on the
identification of FGG as a well-established partnership when
deciding whether to invest in the Funds.  (SCAC ¶ 178.)

-44-

FGG disputes that the plain usage of "partners" in a marketing brochure is relevant because the brochure was produced after many Plaintiffs had invested. But, given FGG's existence since 1983 and similar representations made in Placement Memos, it is a reasonable inference that similar materials were produced before each of the Plaintiffs' investments and similarly induced them to invest.

The Court is persuaded that the SCAC adequately alleges sufficient facts that FGG constituted a de facto partnership, based on the profits shared, contributions made and other details listed above, or a partnership by estoppel, as Plaintiffs reasonably relied on Defendant's representations as to FGG's existence and status. See First American Corp. v. Price Waterhouse LLP, 988 F. Supp. 353, 358 (S.D.N.Y. 1997) (describing two elements of partnership by estoppel: presentation of sufficient indications of a partnership to the injured party and detrimental reliance on those representations by the injured party).

2. Securities Fraud Claims

In a private action under § 10(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission;

(5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008). Aside from whether certain statements can be attributed to all of the Fraud Defendants, the Fraud Defendants contest only whether Plaintiffs have sufficiently alleged scienter and causation.

    a. Application of Morrison

    On June 24, 2010, the United States Supreme Court issued Morrison v. National Australia Bank, 130 S. Ct. 2869 (2010), which set forth a new "transactional" rule for determining the extraterritorial application of the United States securities laws. Morrison held that § 10(b) applies to "only ... [1] the purchase or sale of a security listed on an American stock exchange, and [2] the purchase or sale of any other security in the United States." Id. at *2888 (emphasis added); see also Cornwell v. Credit Suisse Group, No. 08 Civ. 3758, 2010 WL 3069597 (S.D.N.Y. July 27, 2010) (holding that sales of securities listed on a foreign exchange, even if purchased by United States residents, are not actionable under § 10(b)); In re Banco Santander Sec.-Optimal Litig., Nos. 09-MD-02073-CIV, 09-CV-20215-CIV, 2010 WL 3036990, at *5-*7 (S.D. Fla. July 30, 2010) (rejecting § 10(b) claims brought against Bahamian investment fund when all activity related to purchases of

-46-

securities occurred off-shore even though plaintiffs alleged they were aware the funds invested with BMIS).

The parties, by letter-briefs submitted on July 19, 2010, contest the application of that rule to Plaintiffs who purchased shares in the Offshore Funds. Defendants argue that, because a number of administrative tasks associated with purchasing shares in the Offshore Funds occurred in other countries -- for example, Plaintiffs sent their subscription agreements to an administrator in Amsterdam and the Offshore Funds' investment manager, FGBL, in Bermuda -- and because Fairfield Sentry Ltd. was listed on the Irish Stock Exchange, the securities transaction in question did not occur in the United States. Plaintiffs contend that whatever steps happened outside of the United States along the way, no transaction actually occurred until Plaintiffs' subscription agreements were accepted by the Funds, and that this approval occurred in New York City, where FGG had an office and where much of its executive staff was concentrated. Thus, on Plaintiffs' theory, Morrison does not bar their § 10(b) claims because the purchase or sale of the covered securities at issue occurred in the United States. The Court also notes that even if Fairfield Sentry Ltd. was listed on the Irish Stock Exchange, its stock was apparently not actually traded there. (See Fairfield Sentry PM at 3 (despite listing on

-47-

Irish Stock Exchange, "[i]t is unlikely that a public trading market will develop for the Fund's shares and none has developed to date."))

As this case allegedly does not involve securities purchases or sales executed on a foreign exchange, it presents a novel and more complex application of <u>Morrison</u>'s transactional test. Given the uniqueness of the financial interests, structure of the transactions and relationships among the parties, the Court finds that a more developed factual record is necessary to inform a proper determination as to whether Plaintiffs' purchases of the Offshore Funds' shares occurred in the United States. <u>See</u> <u>Morrison</u>, 130 S. Ct. at 2876-77 (noting that § 10(b)'s extraterritorial application presents a question under Fed. R. Civ. P. 12(b)(6)). Accordingly, the Court will defer a ruling on this question. At any time during the course of authorized discovery that the parties consider the issue ripe for decision, either side may apply to reopen the matter. In the event that Plaintiffs move to replead any claims dismissed by this Decision and Order, they should include in the proposed amendments the facts they submitted via letter-brief to support their <u>Morrison</u> argument, as well as any additional particulars that the record may develop in this regard.

b. <u>Group Pleading</u>

The group pleading doctrine allows particular statements or omissions to be attributed to individual defendants even when the exact source of those statements is unknown. "In order to invoke the group pleading doctrine against a particular defendant the complaint must allege facts indicating that the defendant was a corporate insider, with direct involvement in day-to-day affairs, at the entity issuing the statement." <u>In re Alstom SA</u>, 406 F. Supp. 2d 433, 448 (S.D.N.Y. 2005) (citations omitted).  Group pleading allows plaintiffs only to connect defendants to statements -- it does not also transitively convey scienter.  <u>Id.</u>[12]

The SCAC alleges a tight weave of connections between the Fraud Defendants such that group pleading is appropriate. Because FGG "controlled the day-to-day operations of FGG and its corporate partners," (SCAC ¶ 176), any entity that in turn was a corporate insider to FGG's day-to-day operations has the requisite connection for the group pleading doctrine to apply. Like streams converging to form a mighty river, any entity

---

[12] The Court notes that the SCAC does not contain allegations specifying the exact formation dates of the various entities among the Fraud Defendants or the employment dates for the individuals named as Fraud Defendants, thus making it difficult for the Court to pin down with specificity whether the Fraud Defendants were insiders when misstatements were actually made. <u>See Alstom</u>, 405 F. Supp. 2d at 449.  However, as the SCAC alleges that essentially every word concerning Plaintiffs' investments that came out of the Fraud Defendants' representations or material omissions was misleading, and thus every Fraud Defendant would have been an insider during an alleged misstatement at some point, the Court need not consider this issue at the pleadings stage.

playing an essential role in FGG is responsible for what FGG and its subsidiaries did downstream. The Fraud Defendants comprise all such insiders. Plaintiffs sufficiently assert that FRS and FGBL were members of the risk management team that oversaw FGG. (Id. ¶ 121.) FGBL was the Offshore Funds' investment manager and general partner of the Domestic Funds, positions that required daily oversight and steering over operations. (Id. ¶ 119.) FGL was the placement agent for the Offshore Funds and a general partner of Greenwich Sentry from July 2003 to February 2006. (Id. ¶ 118.) FGA, with FGBL, was responsible for conducting due diligence over all the entities. (Id. ¶ 120.)

The individuals named as Fraud Defendants all had high-level positions with these entities. Lipton was FGG's Chief Financial Officer. (Id. ¶ 128.) McKeefry was FGG's Chief Operating Officer. (Id. ¶ 129.) Noel, a founding partner of FGG, "oversees all of FGG's activities." (Id. ¶ 124.) Tucker, another founding partner of FGG, "oversaw the business and operational activities of several FGG management companies and funds." (Id. ¶ 125.) Piedrahita was Director and President of FGBL. (Id. ¶ 126.) Vijayvergiya was the Chief Risk Officer and also President of FGBL. (Id. ¶ 127.)

In short, Plaintiffs have alleged that the Fraud Defendants' operation encompassed multiple interrelated

entities that shared office space, management, names and goals. At this stage of the litigation, any misstatements that could reasonably be found to have issued from one, essentially issued from all. Though it may be overly cynical to assume that such a business labyrinth was erected defensively just to avoid liability in legal proceedings, whatever the motives, the Fraud Defendants' force field has failed them here.

### c. Scienter

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (quotation marks and citation omitted). For the purposes of federal securities laws, scienter may be satisfied by a showing of motive and opportunity to commit fraud or evidence of conscious recklessness. See South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 108-09 (2d Cir. 2009). Conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence." Id. at 109 (quoting Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000) (emphasis omitted) (quotation marks omitted). For example, plaintiffs adequately allege recklessness where the risk of fraud was "so obvious that the defendant must have been aware of it." ECA v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d

Cir. 2009) (quotation marks and citation omitted).  In sum, plaintiffs plead a strong inference of scienter where the "complaint sufficiently alleges that the defendants (1) benefited in a concrete and personal way from the purported fraud ...; (2) engaged in deliberately illegal behavior ...; (3) knew facts or had access to information suggesting that their public statements were not accurate ...; or (4) failed to check information that they had a duty to monitor ...." South Cherry, 573 F.3d at 110 (quoting Novak, 216 F.3d at 311) (emphasis added).  Moreover, federal securities claims are subject to the pleading standards of the Private Securities Litigation Reform Act ("PSLRA").  Accordingly, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); see also Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).

Finally, "an inference of scienter must be more than merely plausible or reasonable –- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. In determining whether the plaintiff adequately pleads scienter, the Court must consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegation, scrutinized in isolation, meets that standard." Id. at 323.

In this case, Plaintiffs have alleged facts that fit under all of the requisite prongs. First, they allege that Fraud Defendants benefitted in a concrete and personal way from essentially perpetuating Madoff's fraud. As fund managers, FGG raked in origination fees of up to 3 percent as well as 20 percent of any appreciation in Plaintiffs' investments. These fees, though typical for hedge funds, allowed the Fraud Defendants to collect hundreds of millions of dollars for, as Plaintiffs allege, shoveling money into Madoff's scheme.

General profit-making motive alone is generally disclaimed as a sign of fraudulent intent. See Chill v. General Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996) (noting that "generalized motive ... which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter"). Accordingly, the Court, without further guidance from appellate courts, is not persuaded that Plaintiffs' allegations regarding the Fraud Defendants' fees and profits alon are sufficient to satisfy the motive aspects of the standard, and instead will consider them as important background information in analyzing scienter. The Court does note that the direct link between

-53-

the amount of money invested in a fund and a manager's benefit present an almost archetypal example of moral risk because the lofty returns accumulating in FGG's coffers represent more than the ordinary benefit that accrues to a shareholder-executive of a corporation.  Unlike an increase in stock price that may benefit an executive who owns shares in a company he or she manages, a hedge fund manager's earnings from investments are directly proportional to the amount of money he brings into a fund or allows to appreciate once in the fund.  A hedge fund manager's benefit also recurs annually in an easily predictable amount, while a shareholder-executive may realize only a one-time rise in share price.

Next, Plaintiffs allege that some of the Fraud Defendants engaged in deliberately illegal behavior by attempting to stymie a Securities and Exchange Commission ("SEC") investigation into Madoff's operation. (SCAC ¶ 234.)  The SCAC alleges that Vijayvergiya and McKeefry had a conversation with Madoff before meeting their with the SEC, and that Madoff gave them what could charitably be called helpful hints in what to say to the SEC.  Madoff began the phone call theatrically, noting ominously that "this conversation never happened." (SCAC ¶ 234.)

Third, Plaintiffs sufficiently allege both that the Fraud Defendants had access to information that contradicted their

public statements and that they failed to check information they had a duty to monitor.  These allegations largely take the form of "red flags" that were either within the Fraud Defendants' knowledge or that they seemingly failed to learn, on the theory that knowing too much would be a dangerous thing to their scheme.

The first of these alleged red flags concerns Madoff's secret operations.  Key positions in Madoff's operation were filled by family members.  Madoff also consistently refused to provide answers to questions posed by FGG.  Plaintiffs plausibly allege that the Fraud Defendants' inability over several years to open a channel of communication with Madoff, who allowed his multi-billion operation to be run by a small circle of family members, would put any reasonable corporate executive or fiduciary or diligent professional on high alert that something big was terribly wrong.

Compounding the problem of a secret, family-run business, Madoff had no independent broker that served as a custodian of the Funds' assets.  This circumstance allowed Madoff unfettered access to and control over the money invested with him.  Plaintiffs additionally allege that the Fraud Defendants were aware of suspicious exercises of this excessive access and control due to Madoff's unwillingness to provide electronic records of trade confirmations.  Instead, Madoff

only provided paper records that were issued two to three days after supposed trades -- a delay long enough to ensure that these records could be falsified to reflect favorable trades.

This small, closed system formed the perfect incubator for Madoff's Ponzi scheme. The only nod to outside authentication that Plaintiffs allege Madoff gave was in the form of an outside auditing firm. But even this supposed legitimacy was a sham. As financial oversight for Madoff's multi-billion dollar Wall Street paper empire, the accounting firm, F&H, consisted of was a three-person operation run out of a store front in an upstate strip mall. And two of F&H's employees did not do much substantive work -- one was a secretary and the other a retired partner; the third was an actual accountant. The Fraud Defendants knew they had never heard of this firm and did next to nothing to learn more about it.

This odd circumstance may indeed have been the province of a quirky-but-brilliant investor whose practices may not necessarily have set off alarms at FGG. But Plaintiffs also allege that Madoff's returns had such an uncanny consistency and outsize implausibility that the slightest analysis of them would have revealed they were impossible. Not only did some outside investors quickly reach exactly this conclusion, as Plaintiffs note, but Madoff's trade confirmations themselves

were often fraudulent on their face because they purported to show transactions outside of the actual trading range and trades completed on days when the markets were closed.   In Chill, the Second Circuit found that plaintiffs had not pled scienter where they had alleged only that a parent company failed to interpret its subsidiary's "unprecedented and dramatically increasing profitability" as a sign of fraud. 101 F.3d at 269.  Here, Plaintiffs do not allege merely that Madoff was returning unprecedented profits, but that the profits he reported to investors were not just fanciful but actually impossible.

Plaintiffs have also sufficiently alleged the personal involvement of almost all of the individually named defendants, who were all principals at FGG, in ignoring these red flags.  Tucker, Lipton and McKeefry discovered that Madoff was using the curiously suspicious auditing firm, but Lipton authorized FGG employees to tell investors that the firm was "a small to medium size financial services audit and tax firm" that had "100s of clients and [was] well respected in the local community."[13] (SCAC ¶ 225.)  Vijayvergiya and McKeefry

---

[13] This response raises a question as to whether the intent of the reference to the "local community" in which F&H was "well respected" related to New City, New York, where conceivably the statement may have been technically true, or to New York City, New York, where, under the circumstances, the representation may be read as cynically misleading. Under either reading, the statement cuts with a sinister edge, and any fair inference drawn from it would go against the Fraud Defendants.

were the FGG directors who spoke with Madoff about the SEC investigation.  (Id. ¶ 234.)   Noel, Tucker, Lipton, Vijayvergiya and McKeefry exchanged numerous emails noting the "the gaps in [their] knowledge" about basic information of Madoff's operation.  (Id. ¶¶ 206-09.)  Though these "gaps" could be small or large, the benefit of the doubt at this stage favors Plaintiffs.

Given either the granular private awareness or self-imposed public ignorance that these specific examples of communication show, it is reasonable to infer that the individuals named as Fraud Defendants had or should have had similar conversations concerning Madoff's shadowy operation where the various shades of suspicious information would have been discussed or at least perceived.  After all, the Fraud Defendants were earning millions of dollars a year by presenting a public image of savvy financial awareness.

However, the SCAC does not allege scienter with sufficient particularity as against Piedrahita.  The only allegations against him, aside from his executive position, are that he was a recipient of emails written by others demonstrating a disturbing lack of information.  This passive role is not enough to cross over the threshold into scienter.

As scienter has been properly alleged on behalf of most of the individual Fraud Defendants, it can be easily imputed

to the corporate Fraud Defendants because the individuals
comprise variously the principals or otherwise high-ranking
officers of the entities.  See Teamsters Local 445 Freight
Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d
Cir. 2008) ("[T]he most straightforward way to raise such an
inference [of scienter] for a corporate defendant will be to
plead it for an individual defendant.").  In particular, each
of the individual Fraud Defendants is alleged to have been a
partner of FGG.  As detailed above, the individual defendants
also had various management roles at FGL and FGBL.

Though FGA and FRS's officers are not named among the
individual Fraud Defendants, the Court can infer FGA and FRS's
scienter because they were charged with managing risk amongst
the FGG entities.  See Teamsters Local 445, 531 F.3d at 195
(holding that corporate scienter can be inferred even where no
individual officer is named).  It is a necessary corollary to
Plaintiffs' allegations that the entities in part responsible
for due diligence and risk management at FGG were privy to the
same red flags about Madoff's suspicious operation as the
individual defendants were.  BMIS was essentially the only
target of diligence and risk analysis these entities had.

Finally, the Court finds that any competing inference of
innocent conduct -- e.g., that the Fraud Defendants were
bamboozled by Madoff -- is not as compelling as the finding of

-59-

scienter.  To discount Plaintiffs' allegations at this stage
would be to wave away the Fraud Defendants' exposure lasting
almost two decades to the red flags and other markers of
scienter cataloged above.  The Court finds more cogent the
inference that, as the Massachusetts proceeding concluded, the
Fraud Defendants' finer faculties were overcome by the fees
they earned and that they turned a blind eye to obvious signs
of fraud.

In examining the allegations of scienter, the Court has
been largely guided by the Second Circuit's opinion in South
Cherry, a recent decision that dealt with facts similar to
those involved in the case at hand.  573 F.3d 98 (2d Cir.
2009).  In South Cherry, the Circuit Court confronted head on
the allegations necessary to sustain a federal securities
fraud claim against advisors who recommended investment in
what was a Ponzi scheme.  The South Cherry plaintiffs alleged
that defendant Hennessee Group recommended that they invest in
Bayou Accredited, a hedge fund that turned out to be a Ponzi
scheme.  The federal securities fraud claim was premised on
representations that Hennessee had made about performing "five
levels of scrutiny" before recommending the investment.  Id.
at 100.  These representations were made with a reckless
disregard for the truth, South Cherry argued, because if
Hennessee had actually performed their purported diligence,

-60-

they would have discovered a number of troubling warning signs
at Bayou Accredited, including that the fund's auditor was
owned by one of the fund's principals and that the founder of
the fund misrepresented his prior experience.

Such allegations were not sufficient to state a federal
securities fraud claim.   The primary deficiency in the
complaint was that it did not "contain an allegation of any
fact relating to Bayou Accredited that (a) was known to
Hennessee Group and (b) created a strong inference that
H[ennessee ]G[roup] had a state of mind approximating actual
intent." Id. at 112.  The complaint lacked allegations that,
"during the period in which [Hennessee Group] was recommending
Bayou Accredited," "there were obvious signs of fraud, or that
the danger of fraud was so obvious that [Hennessee Group] must
have been aware of it." Id.  Instead, the allegations were
premised on a conditional: "'[i]f' Hennessee Group had asked
various questions earlier, it would have further questioned
the Bayou Accredited financial records or recognized the need
to ask further questions." Id. (alteration in original).
Such allegations made out, at best, that "Hennessee Group had
been negligent in failing to discover the truth." Id. at 113.

Finally, the Second Circuit found it more compelling that
Hennessee Group had been duped by Bayou Accredited, because it
was less plausible that an industry leader "that is called on

-61-

by Congress" to provide expertise "would deliberately jeopardize its standing and reliability, and the viability of its business, by recommending to a large segment of its clientele a fund as to which it had made, according to South Cherry, little or no inquiry at all." Id.

The case at hand presents a different fact pattern. In addition to the more specific allegations of recklessness detailed above, Plaintiffs portray an ongoing fraud spanning many years -- not a one-off recommendation as alleged in South Cherry. The Fraud Defendants here had a continuous stream of incoming red flag information, in contrast to the information that Hennessee Group was alleged it should have affirmatively sought out.

Additionally, FGG was not an industry leader that made recommendations about various investment opportunities: it was, as alleged in the SCAC, little more than an unfamiliar marketing group that served to feed Madoff's fraudulent scheme, with little standing in the world and certainly no apparent expertise that would have landed it on Congressional staffers' speed dial.

The key difference between this case and South Cherry is that the defendant in South Cherry failed to learn what it would have if, with affirmative steps and more diligence, it had done more to inform itself. Here, Plaintiffs allege that

-62-

the Fraud Defendants ignored not only what was handed to them but that what they were given was readily suspicious to any reasonable person exercising ordinary prudence.  When presented with notorious signs of fraud, they discounted them and were unwilling to recognize what other similarly situated financial firms were able to do with the same information to protect their investors from a massive Ponzi scheme.  Under the circumstances the SCAC portrays, the Fraud Defendants' "fraud alert" should have been flashing red.  A fair inference that flows from the facts alleged is that if they failed to see the perceptible signs of fraud, it may have been because they chose to wear blinders.

    d. <u>Causation</u>

The causation element of a securities fraud claim has two prongs: (1) transaction causation and (2) loss causation.  <u>See</u> <u>Suez Equity Investors, L.P. v. Toronto-Dominion Bank</u>, 250 F.3d 87, 95-96 (2d Cir. 2001).

Transaction causation is properly pled if the complaint alleges that "but for the claimed representations or omissions, the plaintiff would not have entered into the detrimental securities transactions." <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 172 (2d Cir. 2005) (quotation marks and citation omitted).  That standard is met here: the SCAC alleges both that Plaintiffs were required to acknowledge

receipt of the documents containing many of the Fraud Defendants' alleged misrepresentations, (SCAC ¶ 181), and that they reasonably relied on those documents in making their investments in the Funds. (Id. ¶ 373.)

The Fraud Defendants point out cautionary language in Placement Memos that attempted to foreswear any liability for someone essentially stealing Plaintiffs' investment. This provision would destroy Plaintiffs' fraud claim because the risk of misappropriation of their investment was disclosed. Though a "securities fraud claim brought under Section 10(b) must be dismissed as a matter of law where the cautionary language provided explicitly warns of or directly relates to the risk that brought about a plaintiff's loss," San Diego County Empl. Ret. Ass'n v. Maounis, No. 07 Civ. 2618, 2010 WL 1010012, at *15 (S.D.N.Y. Mar. 15 2010) (citation and quotation marks omitted), this rule does not allow crafty wrongdoers to avoid liability by slipping all-purpose disclaimers into material provided to investors. Instead, "[t]he touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Halperin v. eBanker USA.com, Inc.,

295 F.3d 352, 357 (2d Cir. 2002).  Therefore, when a document "loudly and repeatedly warn[s] investors" of the exact danger not specifically disclosed and later complained of as fraud, and contains fifteen pages of similar risk factors, reliance is not reasonable.  San Diego County Empl., 2010 WL 1010012, at *15.

Here, though each Placement Memo is heavily fortified with a virtual minefield of lawyerly defenses, disclosures and disclaimers, the only one at all pertinent to this issue reads, in full, as follows:

> 17. **Possibility of Misappropriation of Assets.**  When the Fund invests utilizing the 'split strike conversion' strategy or in a Non-SSC Investment vehicle, it will not have custody of the assets so invested.  Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund.

(E.g., Fairfield Sentry PM 21, ¶ 17 (emphasis in original).) Defendants argue that these two anodyne sentences, innocuously embedded within a single-spaced document exceeding fifty pages in length, completely protect and absolve them from all liability for having funneled billions of dollars, even if done recklessly, into the largest financial fraud yet witnessed in the record of human wrongdoing and tragedy.  The Court is not persuaded.  This disclaimer does not reflect a warning hollered "from the rooftops."  Halperin, 295 F.3d at 360.  Moreover, as Plaintiffs point out, while some of the

-65-

warning signs of Madoff's fraud may have been publicly available, the totality of the "red flags," such as the identity of Madoff's auditor and the facial impossibility of some of his trades, that may have alerted wary observers to Madoff's scheme, were not known to Plaintiffs and remained uniquely within the knowledge or access of the Fraud Defendants.

The last element of Plaintiffs' § 10(b) claim, loss causation, is established if Plaintiffs allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005) (citation and quotation marks omitted), cert. denied, 126 S. Ct. 421.  Plaintiffs easily carry their burden as the SCAC sufficiently alleges that the Fraud Defendants' misstatements concerning the placement of Plaintiffs' money into a real investment that generated substantial annual returns caused the loss of Plaintiffs' investments.

The Fraud Defendants' argument that Madoff's fraud was an intervening force that cuts off all liability to them is without merit. The evaporation of Plaintiffs' investment was directly related to FGG's unwillingness or inability to discover and disclose that Madoff was running a Ponzi scheme or, at the very least, that Madoff was not providing

-66-

sufficient information to justify FGG's trust in him.  Though Madoff's fraud forms an essential element of the chain of causation in this case, his theft of the Plaintiffs' money could not have struck these defendants as a cataclysmic, last minute surprise. The SCAC sufficiently alleges that the Fraud Defendants intentionally or recklessly funneled Plaintiffs' money to Madoff over time while allegedly ignoring clear signs that they were dealing with a master thief.

    e. <u>Section 20(a)</u>

Plaintiffs further allege that the Section 20(a) Defendants (consisting of the Fraud Defendants and three other defendants, Landsberger, Murphy, and Smith) are liable for § 20(a) violations.

In order to state a control person claim pursuant to § 20(a), Plaintiffs must allege facts showing (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the targeted defendant"; and (3) that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated." <u>ATSI Commun'cns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 108 (2d Cir. 2007) (quotation marks omitted).  Because fraud is not an essential element of a § 20(a) claim, Plaintiffs need not plead control in accordance with the particularity required under Federal Rule of Civil Procedure 9(b).  <u>See In re Bristol Myers Squibb</u>

-67-

<u>Co. Sec. Lit.</u>, 586 F. Supp. 2d 148, 170-71 (S.D.N.Y. 2008);
<u>Hall v. The Children's Place Retail Stores, Inc.</u>, 580 F. Supp.
2d 212, 235 (S.D.N.Y. 2008).  However, the heightened pleading
standards of PSLRA apply with respect to the third-prong,
which requires plaintiffs to allege facts demonstrating that
the defendant was a culpable participant.  <u>See</u> <u>In re Alstom</u>,
406 F. Supp. 2d at 491 (quoting 15 U.S.C. § 78u-4(b)(2)); <u>In
re Livent, Inc. Noteholders Sec. Litig.</u>, 151 F. Supp. 2d at
414-17 ("This Court is persuaded that recklessness is the
appropriate minimum standard of culpability that plaintiffs
must plead under § 20(a).").  Finally, "[w]hether a person is
a 'controlling person' is a fact-intensive inquiry, and
generally should not be resolved on a motion to dismiss."
<u>Katz v. Image Innovations Holdings, Inc.</u>, 542 F. Supp. 2d 269,
276 (S.D.N.Y. 2008).

First, the SCAC alleges an underlying securities fraud
effectuated by various misstatements made by the Fraud
Defendants.

Next, the SCAC contains sufficient allegations that the
Section 20(a) Defendants had control of the primary fraud
violators.  As will be explored more deeply below where the
issue was more squarely raised by some of the Citco
Defendants, to sufficiently demonstrate control, Plaintiffs
must plead that the Section 20 Defendants had actual control

over the primary violator and transaction at issue.  See In re
Alstom, 406 F. Supp. 2d at 487.  Here, each of the Section 20
Defendants is alleged to have possessed the requisite control:
each was a high-level player in one of the FGG operations and
all had "participation in and/or awareness of the Funds'
operations, and/or intimate knowledge of the Funds' products,
sales, accounting, plans and implementation ... influence[d]
and control[led], directly or indirectly, the decision-making
of the Funds, including the content and dissemination of the
various statements that were false and misleading." (SCAC ¶
376.)  Landsberger, Murphy and Smith in particular were
members of FGG's Executive Committee. (Id.)  Each of the
Section 20 Defendants had "direct and supervisory involvement
in the day-to-day operations of the Funds." (Id. ¶ 377.)

        Finally, the Court finds the SCAC alleges culpable
participation against all the Fraud Defendants save
Piedrahita, and does not sufficiently allege culpable
participation against Landsberger, Murphy, and Smith.  The
acts detailed above in the Court's finding of scienter as
required by § 10(b) suffice to allege culpable participation
against the majority of the Fraud Defendants.

        However, for Piedrahita, Landsberger, Murphy and Smith,
aside from their employment at FGG, the only specific
allegations of culpable participation on their part consist of

their receipt of the emails detailed above.  (See SCAC ¶¶ 208, 209, 228.)  Though the Court finds it plausible at this stage to read the emails as expressing incriminating bewilderment by the senders, there is no sufficient allegation that Piedrahita, Landsberger, Murphy and Smith had written or otherwise produced them.  Rather, these defendants appear on the emails as passive recipients, which does not suffice to allege their culpable participation.  Therefore, the § 20(a) claims against Piedrahita, Landsberger, Murphy and Smith are dismissed.

### 3. Common Law Claims

On the whole, Plaintiffs' common law allegations are premised on the same reckless behavior that sustains their federal securities fraud violations.  As the pleading burden for a § 10(b) claim is much higher than it is for these common law claims, and given the unique context of the facts of this case, once Plaintiffs have cleared the federal hurdle, many of their common law claims are adequately alleged.  As the facts in the SCAC essentially need only be poured into different bottles to satisfy the common law's elements, Plaintiffs have succeeded in adequately stating claims against most of the Fraud Defendants for negligent misrepresentation, breach of fiduciary duty, gross negligence, third-party breach of contract, unjust enrichment, and mutual mistake.  The Court

reserves judgment on Plaintiffs' final cause of action for constructive trust.

Plaintiffs run into trouble, though, when they plead claims against the Fairfield Defendants that appear to be based merely on their employment at FGG.  The SCAC does not contain sufficient information to allow Plaintiffs to sustain claims of negligent misrepresentation and breach of fiduciary duty against those Fairfield Defendants who are not also Fraud Defendants.  Plaintiffs are advised that such causes of action may be repled if during discovery Plaintiffs acquire sufficient information about FGG's operation, including who knew what when, who contacted the Plaintiffs and other relevant material.

Finally, Plaintiffs may be limited from recovering in tort if their third-party breach of contract claims arising out of the same operative facts succeed.  In New York, the so-called "economic loss" rule provides that "[i]f the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort."  <u>Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.</u>, 244 F.R.D. 204, 220 (S.D.N.Y. 2007) (citations and quotation marks omitted).  Therefore, at this stage, the Court views Plaintiffs' tort claims as alternative pleadings in the event that their contract claims fail.

a. <u>Fraud</u>

"The elements of common law fraud under New York law are: (1) a material representation or omission of fact; (2) made with knowledge of its falsity; (3) with scienter or an intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) such reliance caused damage to the plaintiff." (quotation marks and citation omitted). <u>Bui v. Industrial Enter. of Am., Inc.</u>, 594 F. Supp. 2d 364, 371 (S.D.N.Y. 2009). As "these elements are substantially identical to those governing § 10(b), the identical analysis applies." <u>Rich v. Maidstone Fin., Inc.</u>, No. 98 Civ. 2569, 2002 WL 31867724, at *13 (S.D.N.Y. Dec. 20, 2002) (citation and quotation marks omitted). Accordingly, the Court finds that Plaintiffs have sufficiently alleged a cause of action for common law fraud against the Fraud Defendants (except Piedrahita) for the same reasons they have sufficiently alleged federal securities law violations.

b. <u>Gross Negligence</u>

To state a claim for negligence against the Fairfield Defendants, Plaintiffs must allege "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." <u>AMW Materials Testing Inc. v. Town of Babylon</u>, 584 F.3d 436, 454 (2d Cir. 2009) (citation omitted).

-72-

The Fairfield Defendants' sole argument specific to this claim is that Plaintiffs' pleadings do not sufficiently allege the requisite level of reckless disregard or emanations of intentional wrongdoing.  The Court is persuaded that Plaintiffs adequately allege gross negligence against the Fairfield Defendants.  Plaintiffs allege that the Fairfield Defendants, as "investment advisors, managers, and placement agents" exercised discretionary control over the Funds assets, (SCAC ¶ 396), giving rise to a duty of care, and then "grossly failed to exercise due care, and acted in reckless disregard of their duties" by investing substantially all of the Funds' money with Madoff, on whom these defendants conducted no due diligence and who they failed to monitor. (Id. ¶ 397).[14]

c. Breach of Fiduciary Duty

Plaintiffs assert breach of fiduciary duty against the Fairfield Defendants.  In New York, the elements of a claim for breach of fiduciary duty are "breach by a fiduciary of a

_____

[14] In ¶ 401 of the SCAC, Plaintiffs allege punitive damages against the Fairfield Defendants regarding the gross negligence cause of action.  In the Plaintiffs' Consolidated Opposition to The Fairfield Greenwich Defendants' Motions to Dismiss, dated March 23, 2010, at 105, Plaintiffs describe the SCAC as "assert[ing] punitive damage claims against the Fairfield Fraud Claim Defendants."  This representation clashes with the SCAC, which purports to assert punitive damages against more Defendants, but the Court finds that punitive damages claims against the Fraud Defendants would be proper, given the magnitude of the fraud and the reckless state of mind alleged in the complaint.  See Don Buchwald & Associates, Inc. v. Rich, 723 N.Y.S.2d 8, 9 (App. Div. 1st Dep't 2001) ("To sustain a claim for punitive damages in tort, one of the following must be shown: intentional or deliberate wrongdoing, aggravating or outrageous circumstances, a fraudulent or evil motive, or a conscious act that willfully and wantonly disregards the rights of another." (citation omitted)).

duty owed to plaintiff; defendant's knowing participation in the breach; and damages." Pension Comm., 446 F. Supp. 2d at 195.   A fiduciary relationship arises where "one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party," and the defendant was "under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Id. at 195-96 (citation omitted).   Whether the duty exists is a fact-specific inquiry.   Id. at 196 (citation omitted); see also Musalli Factory for Gold & Jewellry v. JP Morgan Chase Bank, 261 F.R.D. 13, 26 (S.D.N.Y. 2009), aff'd., No. 09-1767-cv, 2010 WL 2588195, (2d Cir. June 29, 2010) ("New York courts generally avoid dismissing a claim of breach of fiduciary duty ... because it usually involves a question of fact: whether someone reposed trust and confidence in another who thereby gains a resulting superiority or influence.").

Given this background, Plaintiffs have adequately alleged a breach of fiduciary duty against the Fraud Defendants.   The Fraud Defendants had special knowledge and expertise about Madoff's operations. (See SCAC ¶ 202 (describing "deep, ongoing joint venture relationships" with BMIS and promises of ongoing reviews); id. ¶ 196 (describing daily checking of investments that the Fairfield Defendants promised to

undertake); <u>id.</u> ¶ 197 (describing physical access to Madoff's operation); <u>id.</u> ¶¶ 404-07.)  The Fraud Defendants' entrustment of Plaintiffs' investments to Madoff without having conducted due diligence or otherwise raising alarms about his operation in accordance with this duty constitutes a sufficient breach. The Fairfield Defendants knowingly participated in the alleged breach by, as the Court described above, being the high-level players of the various Fairfield Greenwich entities in charge of routing Plaintiffs' money to Madoff.

But the SCAC does not allege, aside from their employment at FGG, that the non-Fraud Defendants included in the Fairfield Defendants had any special knowledge or expertise and concomitant relationship with Plaintiffs.  The Court is not persuaded at this time that sufficient facts are alleged to support a reasonable finding that these defendants -- Landsberger, Murphy, Smith, and FHC -- had a fiduciary duty.

d. <u>Negligent Misrepresentation</u>

Plaintiffs allege negligent misrepresentation against the Fairfield Defendants.  To sufficiently allege a claim of negligent misrepresentation, a plaintiff must plead that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the defendant knew that the plaintiff

-75-

desired the information supplied in the representation for a
serious purpose; (4) the plaintiff intended to rely and act
upon it; and (5) the plaintiff reasonably relied on it to his
or her detriment." Pension Comm., 446 F. Supp. 2d at 198
(citing Hydro Investors, Inc. v. Trafalger, 227 F.3d 8, 20 (2d
Cir. 2000)).

Each of these elements is properly alleged in the SCAC.
First, "[c]ourts in this circuit have held that a
determination of whether a special relationship exists is
highly fact-specific and generally not susceptible to
resolution at the pleadings stage." Century Pac., Inc. v.
Hilton Hotels Corp., No. 03 Civ. 8258, 2004 WL 868211, at *8
(S.D.N.Y. Apr. 21, 2004) (citation omitted). As "the standard
of a special relationship in the context of a negligent
misrepresentation claim is less rigorous than that of a
fiduciary duty," Musalli Factory For Gold & Jewellry, 261
F.R.D. at 28, it is enough that Plaintiffs allege that
"defendants sought to induce plaintiffs into a business
transaction by making certain statements or providing specific
information with the intent that plaintiffs rely on those
statements or information." Century Pac., 2004 WL 868211, at
*8. In particular, statements made in Placement Memos about
FGG's investigation and monitoring of Madoff and the Funds'
past performance fulfill this requirement. These statements

went beyond general assertions of financial expertise and trustworthiness by laying out the specific investment strategy Plaintiffs' money would purportedly be invested into.  In this way, FGG presented Madoff's "split strike conversion" strategy as a sort of silver bullet of investment acumen and bolstered this theory by repeatedly touting its robustness and ability to survive economic downturns.

Next, the "false representations" were made in the same manner as the misstatements or omissions were for the purposes of the federal securities law claim.  These statements were not prospective; in particular, statements of past and current fact are alleged to be misleading, including representations about the performance of the Funds, and the diligence in selecting Madoff and current monitoring of his performance.

The Court next finds that the SCAC raises a fair inference that FGG knew that information about the Funds' performance and hiring of Madoff was desired by Plaintiffs for the serious purpose of deciding whether to invest in the Funds.  The SCAC also adequately alleges Plaintiffs' intent and actual reliance on this information to their detriment for substantially the same reasons set forth in the causation discussion of the federal securities fraud claim.

Finally, these facts are not sufficiently alleged against each of the Fairfield Defendants.  In particular, those

defendants who are not also Fraud Defendants -- e.g. FHC, Landsberger, Smith and Murphy -- are not alleged to have any particular contact with Plaintiffs, nor is it fair to infer, as in connection with the Fraud Defendants based on their executive positions, that these individual defendants played any specific role in preparing information for Plaintiffs' consumption. Landsberger, Smith, and Murphy's mere employment at FGG does not suffice to create a special relationship with Plaintiffs. Consequently, the negligent misrepresentation claims against them are dismissed.

### e. Third-Party Breach of Contract

Plaintiffs bring third-party beneficiary breach of contract claims against the Fairfield Defendants and the Fairfield Fee Defendants. Plaintiffs allege that they were the intended beneficiaries of Investment Manager Agreements between the Offshore Funds and FGBL and FGL, each of which acted as the Offshore Funds' investment manager at different times. Defendants point out that the Investment Manager Agreements had a choice of law provision that requires the agreements to be interpreted under Bermuda law and that under Bermuda law, Plaintiffs would not be recognized as third-party beneficiaries.

As a threshold matter, the Court notes that choice of law provisions are not automatically applied to parties claiming

third-party beneficiary status.   Instead, the usual contractual choice-of-law analysis applies -- the so-called "center of gravity" test -- with the caveat that an agreed upon choice of law is to be given heavy weight.   See, e.g., Haag v. Barnes, 9 N.Y.2d 554, 559-60 (N.Y. 1961); Sabella v. Scantek Medical Inc., No. 08 Civ. 453, 2009 WL 3233703, at *12-*14 (S.D.N.Y. Sept. 25, 2009).   "New York law allows a court to disregard the parties' choice when the most significant contacts with the matter in dispute are in another state." Cargill, Inc. v. Charles Kowsky Res., Inc., 949 F.2d 51, 55 (2d Cir. 1991) (quotation marks and citation omitted) (applying New York law despite contract's Massachusetts choice of law provision).

In general, the choice of law resulting from this analysis also binds the third-party beneficiary.   See Goodson v. Red Carpet Inns, Inc., 77 Civ. 4717, 1979 U.S. Dist. LEXIS 7731, at *14-*18 (S.D.N.Y. Dec. 28, 1979); Prescient Acquisition Grp., Inc. v. Perfect Circle Entm't., Inc., No. 05 Civ. 6298, 2006 WL 2136293, at *9 (S.D.N.Y. July 31, 2006) (citing Goodson).   But see P.T. Adimitra Rayapratama v. Bankers Trust Co., No. 95 Civ. 0786, 1995 WL 495634, at *4-*5 (S.D.N.Y. Aug. 21, 1995) (noting that third-party beneficiary had to abide by English choice of law provision, but then applying New York law to determine whether party was a

-79-

third-party beneficiary (citing Trans-Orient Marine Corp v. Star Trading & Marine, Inc., 925 F.2d 566, 573 (2d Cir. 1991); Septembertide Pub. B.V. v. Stein & Day, Inc., 884 F.2d 675, 679 (2d Cir. 1989)).  In Goodson, the court found that a contract's choice of law provision bound a party claiming third-party beneficiary status because the chosen law bore "a reasonable relation" to the contract, the chosen law did "not appear to be contrary to the public policy of New York" and the party was on "actual notice" of the choice of law provision because he had drafted and helped negotiate the contract.  U.S. Dist. LEXIS 1137, at *16-*17.

In this case, as the Court has already noted, of any forum in the world with connections to the underlying transactions, New York has the most contacts with the litigation.  Weighing against this choice, however, is that one of the actual parties to the contract, FGBL, was a Bermuda corporation.  This fact also, to a degree, puts the Plaintiffs pressing a third-party beneficiary contract claim on notice that Bermuda law may be implicated in any disputes they had with FGBL, as FGBL was disclosed as the investment manager in the Placement Memos.  However, there is nothing in the SCAC alleging that Plaintiffs were given "actual notice" that the Investment Manager Agreements themselves were governed by Bermuda law.

Finally, though in general "choice of law clauses are presumptively valid where the underlying transaction is fundamentally international in character," <u>Roby v. Corp. of Lloyd's</u>, 996 F.2d 1353, 1362 (2d Cir. 1993) (<u>citing</u> <u>M/S Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1, 15 (1971)), such clauses are not valid if, among other circumstances, enforcement would deprive the complaining party of his day in court or of an effective remedy.  <u>See</u> <u>id.</u> at 1363; <u>see also</u> <u>Aquas Lenders Recovery Grp. v. Suez, S.A.</u>, 585 F.3d 696, 701 (2d Cir. 2009) (endorsing approach from <u>Bremen</u> and noting, in the context of a forum selection clause, "the fact a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement").   Here the Fairfield and Fairfield Fee Defendants concede that if the clause is given effect, Plaintiffs will not be able to press a third-party beneficiary claim under Bermuda law.  Though this deprivation would strike only one of the numerous causes of action from this lawsuit, this doctrine, combined with the New York choice of law analysis described directly above, persuades the Court that, for the purposes of reviewing the instant motion to dismiss, Bermuda law does not apply to interpreting the Investment Manager Agreements, and that and New York law does apply.

Pursuant to New York law, a third-party asserting rights under a contract must allege that: (1) a valid contract

-81-

existed, (2) it was intended for the third party's benefit, and (3) that the benefit was immediate, not incidental.  <u>See Madeira v. Affordable Hous. Found., Inc.</u>, 469 F.3d 219, 251-52 (2d Cir. 2006).

"In determining whether there is an intended third party beneficiary, courts should look first at the contractual language itself ... and where appropriate 'the surrounding circumstances.'"  <u>Muhlrad v. Mitchell</u>, No. 96 Civ. 3568, 1997 WL 182614, at *6 (S.D.N.Y. Apr. 14, 1997) (<u>quoting</u> <u>Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.</u>, 925 F.2d 566, 573 (2d Cir. 1991)).  "Among the circumstances to be considered is whether manifestation of the intention of the promisor and promisee is sufficient, in a contractual setting, to make reliance by the beneficiary both reasonable and probable."  <u>Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.</u>, 485 N.E.2d 208, 212 (N.Y. 1985) (quotation marks omitted).  "While the third-party beneficiary does not have to establish that it is explicitly mentioned in the contract, New York law requires that the parties' intent to benefit a third-party be shown on the face of the contract."  <u>Synovus Bank of Tampa Bay v. Valley Nat'l Bank</u>, 487 F. Supp. 2d 360, 368 (S.D.N.Y. 2007); <u>see also</u> <u>Consolidated Edison, Inc. v. Northeast Utils.</u>, 426 F.3d 524, 528 (2d Cir. 2005); <u>LaSalle Nat'l Bank v. Ernst & Young LLP</u>, 729 N.Y.S.2d 671, 676 (App.

-82-

Div. 1st Dep't 2001).

Plaintiffs allege that the Investment Manager Agreement between the Offshore Funds and FGBL must be read with the Placement Memos and that such a reading plainly shows that Plaintiffs are intended as direct third-party beneficiaries of the Investment Manager Agreement. Plaintiffs begin by pointing to language in the Investment Manager Agreement stating that the investment manager's responsibilities include those "contemplated and described in" the Placement Memos by utilizing a "split strike conversion." (Investment Manager Agreement between Fairfield Sentry Ltd. and FGBL, dated October 1, 2004, ¶ 1.) The Placement Memos in turn note that the investment manger "is responsible for the Fund's investment activities, the selection of the Fund's investments, monitoring its investments and maintaining the relationship between the Funds" and various other entities. (Fairfield Sentry PM, 7; see also id. at 9 (describing fund's goal as "to obtain capital appreciation of its assets" by means of "split strike conversion[s]").) The Court is persuaded by Plaintiffs' argument. It comports with common sense that an entity hired to manage the investments of a pool of capital, particularly considering the massive Funds at issue here, is intended to give a benefit to the investors. The very purpose of pooling capital may be to maximize

investment opportunities, leverage and profits by virtue of
sheer volume, while avoiding the transaction costs associated
with each investor having a separate contract with an
investment manager and still benefitting directly from the
manager's expertise.

However, the Court must, given the SCAC, limit the reach
of this cause of action.  The SCAC does not suggest how any
defendant, aside from FGBL or FGL, had obligations to
Plaintiffs under the Investment Manager Agreement.  To that
extent, the claims against the all Fairfield and Fairfield Fee
Defendants except FGBL and FGL are dismissed.[15]

### f. Constructive Trust

Plaintiffs separately allege a count of "Constructive
Trust," (see SCAC ¶¶ 417-20), to the extent that the Fairfield
Defendants and the Fairfield Fee Claim Defendants were

---

[15] The Fairfield Defendants argue that a clause in the Investment Manager
Agreement between the Offshore Funds and FGBL prevents Plaintiffs from
bringing any claims against FGBL not based on "[w]illful misconduct, or
reckless disregard."  (Investment Manager Agreement between Fairfield
Sentry Ltd. and FGBL, dated October 1, 2004, ("Investment Management
Agreement" ¶10(b).)  At the pleadings stage, this argument carries no
water.  First, Plaintiffs were not a party to the Investment Manager
Agreement and its mere disclosure to Plaintiffs in the Placement Memos
does not bind the Plaintiffs.  (See Placement Memo at 7.)  The Fairfield
Defendants' argument sweeps too far, though it may be proper to raise the
interpretation of the clause in question after discovery better explores
the scope and effect of disclosures made in the Placement Memos.  Second,
to the extent that Plaintiffs are able to press a third-party breach of
contract claim based on the Investment Manager Agreement and would be
bound by this clause, the SCAC contains sufficient allegations that much
if not all of the Fairfield Defendants' behavior giving rise to viable
causes of actions was committed recklessly.  Finally, this clause would
only prevent certain causes of action against, at most, two of the
Fairfield Defendants: FGBL and FGL -- those who were ever investment
managers for the Offshore Funds.

"unjustly enriched."  (Id. ¶ 420.)  A constructive trust is a remedy, not a cause of action, and is to be imposed only in "the absence of an adequate remedy at law."  Gary Friedrich Ent., LLC v. Marvel Ent., Inc., No. 08 Civ. 1533, 2010 WL 1789714, at *4 (S.D.N.Y. May 3, 2010)  (citing  Bertoni v. Catucci, 498 N.Y.S.2d 902, 905 (App. Div. 3d Dep't 1986)).  As Plaintiffs have sufficiently alleged numerous federal and state causes of action against the Fairfield and Fairfield Fee Claim Defendants that may, if successfully proved, yield substantial monetary recovery, there is little the Court can do at this stage in reviewing a cause of action seeking a constructive trust.  Accordingly, the cause of action is dismissed, with the Court's understanding that Plaintiffs may, if appropriate, later request, as a remedy, the imposition of a constructive trust.

Additionally, Plaintiffs do not respond to any of the Fairfield Defendants' motions to dismiss the constructive trust claims alleged against them in the SCAC and the Court may construe them abandoned in future proceedings.  See Burchette v. Abercrombie & Fitch Stores, No. 08 Civ. 8786, 2009 WL 856682, at *8-*9 (S.D.N.Y. Mar. 30, 2009) (collecting cases).

g. Mutual Mistake

Plaintiffs allege a cause of action for "mutual mistake"

-85-

against the Fairfield Defendants and the Fairfield Fee Claim Defendants because fees paid pursuant to the Placement Memos and unspecified "other agreements" were premised on a mistake central to these agreements -- i.e., that the Funds' assets were being invested by Madoff.   (SCAC ¶ 422.)   In their memorandum of law opposing the Fairfield Defendants' motion to dismiss, Plaintiffs apparently narrow the scope of this cause of action by noting that only "Plaintiffs who were limited partners in Greenwich Sentry, L.P., or Greenwich Sentry Partners, L.P. -- and therefore parties to the [partnership agreements] for those entities -- adequately allege claims of mutual mistake."   (Pl. Opp. at 74; see also id. at 69, n.64 ("[I]nvestors in Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P. ... assert claims for mutual mistake".) Accordingly, only the partnership agreements of the Domestic Funds are part of the mutual mistake claim.

A contract is subject to rescission if a "mutual mistake ... exist[s] at the time the contract is entered into and [is] substantial." Gould v. Board of Educ. of Sewanhaka Cent. High Sch. Dist., 616 N.E.2d 142, 146 (N.Y. 1993).   Here, a basic assumption of the partnership agreements was that Plaintiffs' money was actually going to be invested, especially because one of the "[p]urposes of the [p]artnership" was "to invest and trade" in various securities.   (E.g., Greenwich Sentry

-86-

L.P., Ninth Amended and Restated Limited Partnership Agreement, dated December 24, 2004, § 1.04(a).) The Court finds that such a mistake about one of the central goals of an agreement is substantial.

Further, the SCAC adequately alleges that Plaintiffs did not learn of the mistake until Madoff's confession in December 2008. And though Plaintiffs' common law and securities fraud causes of action imply that the mistake was not mutual because some Fairfield Defendants knew of Madoff's fraud, Plaintiffs are certainly not prevented from pleading in the alternative that, if the Fairfield and Fairfield Fee Defendants had no inkling of Madoff's scheme, they also entered into the partnership agreements under the mistaken impression that Plaintiffs' money actually would be invested. Therefore, Plaintiffs' allegation that there was a mutual mistake between themselves and the Fraud Defendants and Fairfield Fee Defendants because "there were no assets under management and no profits" is adequate at this stage to plead a mutual mistake cause of action. (SCAC ¶ 423.)

In response, the Fairfield and Fairfield Fee Defendants point out, and Plaintiffs do not dispute, that the SCAC does not allege that the bulk of the Fairfield and Fairfield Fee Defendants were parties to these partnership agreements, so Plaintiffs' mutual mistake allegations against the non-party

defendants therefore fail.  The Court agrees that the SCAC does not adequately allege that each defendant at whom the mutual mistake allegation is targeted was a party to the partnership agreements.  Accordingly, the mutual mistake cause of action applies only to those defendants alleged to have been parties to the partnership agreements, which, by the Fairfield and Fairfield Fee Defendants' reckoning, excludes FGA, FRS, Lipton, McKeefry and Vijayvergiya and the Fairfield Fee Defendants.  If Plaintiffs elect to replead any elements of the SCAC relating to this cause of action, they should specify in clear detail the grounds on which any of the Defendants were parties to the partnership agreements.

### h. Unjust Enrichment

"To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." Kidz Cloz, Inc. v. Officially for Kids, Inc., 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004) (internal quotations omitted).

Plaintiffs have satisfied their pleading burden at to this cause of action.  The Fairfield and Fairfield Fee Claim Defendants were undoubtedly enriched at Plaintiffs' expense by the millions of dollars of fees they collected for, broadly

speaking, managing Plaintiffs' mirage investments. The circumstances in which these defendants collected the management fees -- in the course of steering Plaintiffs's investments to a Ponzi scheme of which the complaint adequately alleges they should have been on notice -- would, if adequately proven, in equity and good conscience require disgorgement of the fees

The Court recognizes that to the extent that a valid contract governs the transaction between Plaintiffs and any of the Defendants, recovery in unjust enrichment is not allowed. See EBC I, Inc. v. Goldman Sachs & Co., 5 N.Y.3d 11, 23 (N.Y. 2005). At this stage, Plaintiffs are entitled to the alternative pleading authorized by Federal Rule of Civil Procedure 8(d)(2). The Court notes, however, that a claim of unjust enrichment against the Fairfield Defendants and the Fairfield Fee Claim Defendants will be warranted only if, after the fog of multiple contracts, sub-agreements and Placement Memos that obscure this litigation is cleared, the evidence reveals that no valid contract governed the relationship between Plaintiffs and each of these defendants.

D. ADMINISTRATORS AND CUSTODIANS

1. Citco Defendants

In the SCAC, Plaintiffs allege (1) third-party beneficiary breach of contract, (2) breach of fiduciary duty,

(3) gross negligence, (4) negligence, (5) aiding and abetting breach of fiduciary duty, and (6) aiding and abetting fraud against the Citco Defendants.  Plaintiffs also allege (1) negligent misrepresentation against the Administrators and Citco Group, (2) violation of § 10(b) and Rule 10b-5 against the Administrators, (3) violation of § 20(a) against Citco Group, (4) breach of fiduciary duty against individual defendants Ian Pilgrim ("Pilgrim") and Brian Francoeur ("Francoeur") (collectively, the "Individual Defendants"), and (5) unjust enrichment against the Citco Defendants and the Individual Defendants.

The Citco Defendants now move to dismiss the SCAC based on a variety of purported deficiencies, including that: (1) Plaintiffs' state law claims are preempted by SLUSA, (2) Plaintiffs lack standing to assert common law claims, and (3) Plaintiffs' tort claims (other than aiding and abetting fraud) are barred by the Martin Act.  As discussed above, the Court is not persuaded and has rejected these arguments.  In addition to the preemption and standing arguments made by the Citco Defendants, they also argue that Plaintiffs' claims against them should be dismissed because, among other reasons: (1) Plaintiffs' tort claims (other than aiding and abetting fraud) are barred by the economic loss rule, (2) Plaintiffs' claims arising out of certain contracts with the Custodians

may be litigated only in the Netherlands, (3) Plaintiffs violate Rule 8(a) of the Federal Rules of Civil Procedure ("Rule 8(a)"), (4) Plaintiffs fail to allege a secondary theory of liability against any Citco Defendant, (5) Plaintiffs fail to state a claim, and (6) many of Plaintiffs' claims are time-barred.

For the reasons discussed below, the Court GRANTS the Citco Defendants' motion to dismiss Plaintiffs' (1) third-party beneficiary breach of contract claim as it relates to certain contracts entered into with the Custodians; (2) claims against the Individual Defendants; (3) breach of fiduciary duty claims against Citco Group and CFSB; and (4) negligence and gross negligence claims against CFSB and the Custodians. In all other respects, the Court DENIES the Citco Defendants' motion to dismiss.

a. Rule 8(a)

As an initial matter, the Citco Defendants argue that grouping all of the Citco Defendants together as "Citco" in the SCAC without articulating what alleged acts are attributable to each defendant constitutes impermissible "lumping," amounting to a failure to comply with Rule 8(a), and requiring dismissal. See, e.g., Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001). Plaintiffs counter that where the SCAC uses the term Citco, it is because

the allegation refers to all of the Citco Defendants.[16]

The Court agrees with Plaintiffs that the lumping cases cited by the Citco Defendants are inapposite, and that Plaintiffs comply with Rule 8(a).  For example, in Atuahene, the plaintiff asserted constitutional and state common law claims against the City of Hartford and several city employees, among others, but made no distinction at all between the defendants.  See id.  Here, Plaintiffs distinguish the conduct of each of the Citco Defendants.  When Plaintiffs do make certain allegations against the Citco Defendants as a whole, Plaintiffs assert a factual basis for doing so.  This drafting is more than sufficient to satisfy Rule 8(a).  See, e.g., id. (stating that Rule 8(a) "does not demand that a complaint be a model of clarity or exhaustively present the facts alleged," as long as it gives each defendant "fair notice of what plaintiff's claim is and the facts upon which it rests").

The Citco Defendants argue that in defining Citco in the SCAC to include each of the Citco Defendants, Plaintiffs impermissibly suggest that each separate Citco company had the same duties and engaged in the same conduct.  In filing the SCAC with the Court, however, Plaintiffs certify that they

---

[16] Citco is defined in the SCAC to include each of the Citco Defendants: Citco Group, CFSE, CCI, Citco Global, CFSB, and Citco Bank.  (See SCAC at viii.)

-92-

have a factual basis to make these allegations against each Citco Defendant included in the Citco definition.  See Fed. R. Civ. P. 11(b) ("Rule 11(b)").   At this stage of the proceedings, the Court, having no sufficient reason to find that Plaintiffs have violated Rule 11(b), accepts Plaintiffs' allegations as true.  To the extent that the Citco Defendants claim that the use of defined terms leaves the SCAC confusing and unanswerable, the proper mechanism would have been to move for a more definite statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure.  Any further clarification they still require from this point forward may be sought in discovery through specific interrogatories.

Given that Plaintiffs clearly define Citco in the SCAC to include each of the Citco Defendants, as well as Plaintiffs' allegations regarding the relationship among the Citco Defendants, the Court finds that Plaintiffs have provided sufficient notice to each of the Citco Defendants of the claims against them, satisfying the requirements of Rule 8(a). For substantially the same reasons, the Court is not persuaded that Plaintiffs fail to plead a basis for primary liability against Citco Group and CFSB.  Unless otherwise noted, to the extent that the Court finds below that Plaintiffs state plausible claims against the Citco Defendants, Plaintiffs state plausible claims against Citco as defined in the SCAC --

including Citco Group and CFSB.

      b. <u>Federal Securities Claims</u>

      i. <u>Section 10(b) and Rule 10b-5 Claim Against Administrators</u>

The Administrators argue that Plaintiffs fail to state a claim against them under § 10(b) and Rule 10b-5. Specifically, they assert that Plaintiffs fail to plead scienter and reliance with sufficient particularity. The Court is not persuaded.

     A. <u>Scienter</u>

The Court here applies the scienter standards set forth above. Plaintiffs allege that the Administrators "issued false statements containing inflated NAV calculations and account balance information" and that "[i]n issuing the statements, [the Administrators] acted recklessly because they knew or had access to information suggesting that their public statements were not accurate, including that the values and profits reported to Plaintiffs were not attainable under the circumstances." (SCAC ¶ 523.) Further, Plaintiffs allege that the Administrators "acted recklessly by failing to check or verify the information received from BMIS despite a duty to scrutinize and verify independently the information relating to the NAV and account balances." (<u>Id.</u> ¶ 524.) They allege that this behavior was reckless because the Administrators were "aware of the red flags surrounding BMIS, including the

-94-

consolidation of the roles of investment manager, custodian, and execution agent in Madoff and BMIS." (Id. ¶ 524.)

Plaintiffs allege that there were obvious signs of fraud, the most egregious being that the Administrators knew or in the reasonable exercise of due diligence could have readily discovered, that the trade and profit information provided by Madoff was impossible to achieve. Plaintiffs further allege that the fact that Madoff performed multiple roles at BMIS, together with red flags, should have alerted the Administrators to the dubious nature of the financial information they were disseminating to investors.

At this stage, the Court finds that the facts alleged by Plaintiffs are sufficient to support a strong inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. The Administrators suggest a competing inference to the Court: that the Administrators were unaware that Madoff, a respected figure in the financial community, was running the largest Ponzi scheme in history. The Administrators' response essentially denies Plaintiffs' allegations, raising a factual dispute inappropriate for resolution by the Court at this stage, at which the Court must accept the SCAC's pleadings as true, and resolve doubts and draw all reasonable inferences in Plaintiffs' favor. Whether,

and to what extent the Administrators were aware of Madoff's Ponzi operation is a matter that goes to the heart of this dispute and can be settled properly only by means of a fuller evidentiary record developed through factual discovery. Moreover, the Administrators' denial of awareness and the inference they ask the Court to draw from it, are cast into doubt by Plaintiffs' allegations that other fund managers and investors did read the Madoff red flags properly and withdrew their investments before the catastrophe struck.  For the purposes of ruling on the instant motion, in the Court's view, the many red flags Plaintiffs point to, taken together, and coupled with the Administrators' familiarity with the Funds and extensive experience in providing financial services to hedge funds (SCAC ¶ 327, 337-38, 341), leads to the more compelling inference that the Administrators were "closing [their] eyes to a known danger."  In re Bayou Hedge Fund Litig., 534 F. Supp. 2d 405, 417 (S.D.N.Y. 2007) (quotation marks omitted), aff'd sub nom. South Cherry Street, LLC v. Hennessee Grp. LLC, 573 F.3d 98 (2d Cir. 2009).

    B. Reliance

The Administrators assert that because the SCAC does not allege that there was an efficient market for shares in the Funds and because Plaintiffs fail to allege actual reliance on the Administrators' misrepresentations in a nonconclusory

manner, Plaintiff's § 10(b) and Rule 10b-5 claims should be dismissed for failure to state a claim.  The Court disagrees.

In pleading reliance, Plaintiffs need only allege that "but for the claimed representations or omissions, the plaintiff would not have entered into the detrimental securities transactions." Lentell, 396 F.3d at 172.  The SCAC contains allegations that Plaintiffs "relied, to their detriment" on CFSE's and CCI's "false statements and omissions ... by making their initial investments in the Funds, and (where applicable) making additional investments in the Funds." (SCAC ¶ 526.)  Plaintiffs allege that, when investing in the Funds, they "necessarily relied on Citco's NAV calculations."  (Id. ¶ 335).

The Administrators disagree with Plaintiffs' allegations, claiming that they did not communicate with prospective investors and that therefore Plaintiffs could not possibly have relied upon the Administrators' statements in their decisions to invest in the Funds.  But given that the Court must accept Plaintiffs' factual allegations as true and resolve doubts in their favor, the Administrators' factual protests are irrelevant at this time. (See id. ¶ 333 ("Citco was aware that potential and current investors knew that Citco was providing significant financial services to the Funds, and were relying on Citco in making their investment decisions.

-97-

Citco ... provided potential and current investors with assurance about the quality of financial services provided to the Funds, the security of the assets held by the Funds, and the accuracy of the reported values of the Funds and of the investors' individual accounts.").

Finally, the Court notes that the attribution requirement laid out in Pacific Investment Management Co. v. Mayer Brown LLP is met here where the secondary actors, the Administrators, were identified to Plaintiffs as responsible for calculating the Funds' NAVs. See 603 F.3d 144, 148 (2d Cir. 2010) ("We hold that a secondary actor can be held liable in a private damages action brought pursuant to Rule 10b-5(b) only for false statements attributed to the secondary-actor defendant at the time of dissemination." (footnote omitted)). For example, Plaintiffs allege that the Administrators "allow[ed] [their] name and the services [they were] ostensibly providing to be included in the Funds' placement memoranda and other documents." (SCAC ¶ 342.) Accordingly, having found that the Plaintiffs plead scienter and reliance, the Court denies the Administrators' motion to dismiss Plaintiffs' § 10(b) and Rule 10b-5 claims.

ii. Section 20(a) Claim against Citco Group

The Citco Defendants argue that Plaintiffs fail to state a cause of action for securities fraud under § 20(a) against

-98-

Citco Group. The Court will apply the § 20(a) standard set forth above, with some elaboration where particulars issues have been raised by the Administrators.

Here, Plaintiffs' control person claims are premised on the alleged securities violations of the Administrators. As discussed above, Plaintiffs' § 10(b) and Rule 10b-5 claim against the Administrators survive the Citco Defendants' motion to dismiss. Accordingly, the Court finds that Plaintiffs sufficiently allege a primary violation by the Administrators.

A. <u>Control</u>

There is some disagreement among the courts in this district as to what a plaintiff must plead in order to demonstrate sufficient control under § 20(a). As the Citco Defendants argue, and this Court has held before, to plead the element of control a plaintiff must plead actual control over the primary violator as well as actual control over the transaction at issue. <u>See</u>, <u>e.g.</u>, <u>In re Alstom SA Sec. Litig.</u>, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) ("[T]he Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the transaction in question." (quotation marks omitted)); <u>see also</u> <u>Cromer Fin. Ltd.</u>, 137 F. Supp. 2d at 484. Plaintiffs urge the Court to abandon this view and adopt another, which would require only

that Plaintiffs allege that Citco Group had actual control over the violator, not actual control over the transaction. See In re Parmalat Sec. Litig., 594 F. Supp. 2d 444, 456 (S.D.N.Y. 2009) ("[T]he plain language of Section 20(a)[] requires control only of a person or entity ... not of the transaction constituting the violation."). The Court is not persuaded.

The Court reads Parlamat to reflect a rejection of the requirement, under § 20(a), that plaintiffs plead culpable participation.   In this context, the Parlamat court viewed requiring a transactional aspect to the control element of § 20(a) as impermissibly imposing on plaintiffs' the burden of pleading that the defendant had a hand in the specific transaction at issue.   See id. ("Requiring a plaintiff to prove not only that the defendant controlled the person or entity, but also that the defendant exercised control over the transaction constituting the violation ... would be inconsistent ... with this Court's oft-stated view that a plaintiff relying on Section 20(a) is not obliged to allege or prove a controlling person's culpable participation in the violation and with this Court's prior ruling in this case." (citation omitted)).   Given that the question of whether a plaintiff must plead culpable participation to state a § 20(a) claim has, in this Court's view, largely been settled by the

Second Circuit in numerous decisions, see, e.g., ATSI Commun'cns, 493 F.3d at 108, and that the weight of opinion of district courts concurs with the standard previously articulated and applied by this Court, the Court declines to apply Parlamat. Hence, in order to plead control, a plaintiff must plead that the defendant had actual control over the primary violator and transaction at issue.

The Citco Defendants argue that Plaintiffs' control allegations consist of boilerplate and are insufficient to meet the required standard. See Suez Equity Invs., L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 102 (2d Cir. 2001). As to control over the primary violator, the Citco Defendants contend that Plaintiffs fail to allege specifically how Citco Group controlled the Administrators. See In re Global Crossing Sec. Litig., No. 02 Civ. 910, 2005 WL 1907005, at *13 (S.D.N.Y. Aug. 8, 2005) ("Because plaintiffs have failed to allege specifically how each director possessed the power to direct or cause the direction of the management of the primary violator ... plaintiffs fail to state control-person liability claims." (citations and quotation marks omitted)). Further, the Citco Defendants assert that to the extent that Plaintiffs seek to establish control based on appointment of directors, Citco Group's corporate structure and marketing strategies, their allegations are insufficient as a matter of law to

support a § 20(a) claim.  See In re Asia Pulp & Paper, 293 F. Supp. 2d 391, 396 (S.D.N.Y. 2003) (finding insufficient plaintiffs' "'one-firm,' unified-company theory, which has been rejected by courts in other contexts"); In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 274 (S.D.N.Y. 2004) (holding that plaintiffs failed to plead control where they alleged "Verizon was a control person because Verizon's predecessor co-founded [the primary violator], Verizon owned almost 30% of [the primary violator's] voting stock and Verizon selected three of the nine members of [the primary violator's] Board of Directors"). As to the transactional aspect of the control element, the Citco Defendants assert that Plaintiffs at no point allege that Citco Group either controlled or even participated in the preparation and dissemination of the NAV statements, the basis of Plaintiffs' federal securities claim against the Administrators.

The Court is not persuaded by the Citco Defendants' arguments and finds that Plaintiffs have sufficiently pleaded that Citco Group had actual control over the alleged violators and fraudulent transactions.  See Dietrich v. Bauer, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) ("[A]ctual control requires only the ability to direct the actions of the controlled ... [entity] and not the active exercise thereof.").  Plaintiffs

-102-

allege that

> By virtue of its high level position, control,
> participation in and/or awareness of the operations of
> the Citco Defendants, and/or intimate knowledge of the
> duties, obligations and representations of the Citco
> Defendants to Plaintiffs, Citco Group had the power to
> influence and control and did influence and control,
> directly or indirectly, the decision-making of the Citco
> Defendants, including the content and dissemination of
> the statements that were false and misleading. Citco
> Group had the ability to prevent the issuance of the
> false statements or cause the statements to be corrected
> or not issued.

(SCAC ¶ 528.) Plaintiffs also allege that Citco Group "had

direct and supervisory involvement and control in the

day-to-day operations of" the Administrators, (id. ¶ 529.),

and that "Citco Group directly controls the conduct of each

of" the other Citco Defendants, including the Administrators,

pursuant to agreements between them. (SCAC ¶ 156.)

Plaintiffs also allege that Citco Group controls Citco Fund

Services Division through "a director afppointed by the Citco

Group's executive committee" who "acts on behalf of the Citco

Group." (SCAC ¶ 321.) Essentially, Plaintiffs assert that

each Citco Defendant operates in a division under Citco Group,

and that Citco Group exercises control over each division.

(Id. ¶ 319-23.) As alleged in the SCAC, Citco Group

controlled the "content and dissemination of the statements

that were false and misleading" (SCAC ¶ 528) and "is presumed

to have had the power to control or influence the false

statements giving rise to the securities violations" committed

by the Citco Administrators.  (Id.)

The Court notes that a bare assertion that Citco Group appointed directors to the Citco Defendants, or marketed and structured itself in a certain way, standing alone, would be insufficient to make out the control prong of the § 20(a) claim.  But, here Plaintiffs allege more than that, including that Citco Group appointed division directors to oversee day-to-day operations, making it at least plausible that Citco Group exerted actual control over the fraudulent transaction at issue.  Accordingly, the Court finds that Plaintiffs allege sufficient facts to satisfy the control element of Section 20(a).

B. Culpable Participation

As stated above, as an element of a sufficient § 20(a) claim, Plaintiffs must allege facts demonstrating that Citco Group was a culpable participant in the primary violation. See ATSI Commun'cns, 493 F.3d at 108; In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d at 416.  At one time, it was an open question in this Circuit whether -- and with what degree of particularity -- a plaintiff must plead culpability in connection with a § 20(a) claim.  See In re Alstom S.A. Sec. Litig., 406 F. Supp. 2d at 489; In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d at 414-18.  But despite the longstanding existence of the split among the

courts in this district and the open invitations to the Second Circuit for it to resolve this uncertainty, the Circuit Court has continued to adhere to the culpable participation element as one of the requirements that must be sufficiently pled to state a § 20(a) claim. See ATSI Commc'ns, 493 F.3d at 108. Thus, in response to the argument of the Citco Defendants, this Court and other courts in this district have interpreted Second Circuit case law as requiring that plaintiffs plead culpable participation in accordance with PSLRA. See In re MBIA, Inc., Sec. Lit., No. 08-CV-264, -- F. Supp. 2d ----, 2010 WL 1253925, at *23-*24 (S.D.N.Y. Mar. 31, 2010) (describing district court split with regard to culpable participation requirement and concluding that it is required element). In order to plead culpable participation then, Plaintiffs must plead with particularity "facts giving rise to a strong inference that the defendant acted with the requisite state of mind," i.e., scienter. In re Alstom S.A. Sec. Litig., 406 F. Supp. 2d at 491 (quoting 15 U.S.C. § 78u-4(b)(2)).

The Court finds that Plaintiffs do allege detailed facts about Citco Group's state of mind including that the Citco Defendants, which Plaintiffs define in the SCAC to include Citco Group, "blindly and recklessly relied on information provided by Madoff and the Funds to calculate and disseminate

the Funds' NAV and to perform its other duties, even though
that information was manifestly erroneous." (Id. ¶ 338.).
Plaintiffs allege that Citco Group was aware, for example,
that Madoff served as the investment manager, sub-custodian,
and trade execution agency of the Funds, "hugely increasing
this risk of fraud, and the need for independent
verification." (Id.) Further, they allege that the "trade
and profit information by Madoff was, on its face, virtually
impossible to achieve." (Id.) Finally, Plaintiffs allege
that the "numerous red flags surrounding Madoff's operations
and purported results should have caused [Citco Group] to
increase its scrutiny of the information provided, and seek
independent verification." (Id.) These numerous flags, as
stated above, included "the lack of any transparency into
Madoff's operations, that key positions were held by Madoff
family members, the lack of segregation of important
functions, such as investment management, brokerage, and
custodianship, inadequate auditing, Madoff's use of paper
trading records, and the implausibly and consistent positive
returns for a fund pursuing market-based strategy." (Id. ¶
217.) For substantially the same reason that the Court finds
that Plaintiffs adequately plead scienter as to the
Administrators, the Court concludes that the same facts give
rise to a strong inference that Citco Group was a culpable

participant in the fraud alleged.

    iii. <u>Statute of Limitations</u>

Although Plaintiffs satisfactorily plead violations under § 10(b), Rule 10b-5, and § 20(a), the Court finds that many of Plaintiffs' federal securities claims are time-barred. A plaintiff bringing a federal securities fraud claim is required to do so within five years from the date of the alleged fraud. <u>See</u> 28 U.S.C. § 1658(b). The period begins to run on the date that a plaintiff bought or sold the securities at issue. <u>See</u> <u>Arnold v. KPMG LLP</u>, 334 F. App'x 349, 351 (2d Cir. 2009) (stating that statute of limitations "starts to run on the date the parties have committed themselves to complete the purchase or sale transaction" regardless of when the last misrepresentation occurred); <u>In re Alstom S.A. Sec. Litig.</u>, 406 F. Supp. 2d at 418-19.

Plaintiffs filed a complaint against CFSE and Citco Bank on January 12, 2009. <u>See</u> Complaint, <u>Inter-American Trust v. Fairfield Greenwich Group</u>, No. 09 Civ. 00301 (Jan. 12, 2009 S.D.N.Y.) (the "January 12 Complaint"). After that case was consolidated into this action, Plaintiffs named CCI and Citco Global in the Consolidated Amended Complaint dated April 24, 2009 (the "CAC"). The Court finds, however, that claims against CCI and Citco Group relate back to the January 12 Complaint. In order for a complaint that adds a new defendant

-107-

to relate back to the original complaint the following requirements must be satisfied: (1) "both complaints must arise out of the same conduct, transaction, or occurrence"; (2) "the additional defendant must have been omitted from the original complaint by mistake"; and (3) "the additional defendant must not be prejudiced by the delay." VKK Corp. v. National Football League, 244 F.3d 114, 128 (2d Cir. 2001). Here, both complaints arise out of the same conduct, transaction or occurrence –– alleged fraudulent conduct involving the Funds and its custodians, administrators, and accountants –– and CCI and Citco Group, which were aware of the case filed against the other Citco Defendants, were not prejudiced by the delay.  Moreover, because of CCI and Citco Group's involvement with the Funds, they surely knew that, but for a mistake, they would have been included in the January 12 Complaint.  See Krupski v. Costa Crociere S.p.A., 130 S. Ct. 2485, 2490 (June 7, 2010) (holding that "relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading."). Accordingly, the Court finds that claims against the Citco Defendants are time-barred to the extent investments were made prior to January 12, 2004.

c. <u>Third-Party Beneficiary Breach of Contract</u>

The Citco Defendants argue that Plaintiffs fail to state a third-party beneficiary breach of contract claim. Specifically, the Citco Defendants assert that the language of the agreements at issue evince no clear intent to benefit the Plaintiffs.  The Court finds that whereas the Plaintiffs sufficiently allege a third-party beneficiary breach of the Administration Agreements, they fail to do so with respect to the Custody Agreements.[17]

The Court set forth above, in connection with the Fairfield Defendants, the standard that governs third-party breach of contract claims under applicable New York law.  The

---

[17] The Citco Defendants argue that Plaintiffs' claims arising out of the Custody Agreements may be litigated only in the Netherlands.  However, the Court finds that the forum selection clause at issue specifically binds only the Fund -- not the Citco Defendants and not Plaintiffs -- to litigate in the Netherlands.

The first sentence of the clause reads:  "All parties agree that the courts of the Netherlands are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any suit, action, or proceeding arising out of or in connection with this Agreement may be brought in such courts." (Fairfield Custody Agreement ¶ 22.2.)   That parties "may" bring suit in the Netherlands does not amount to a requirement of exclusive jurisdiction. See <u>John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imps. & Dists. Inc.</u>, 22 F.3d 51, 52 (2d Cir. 1994) ("[A]n agreement <u>conferring</u> jurisdiction in one forum will not be interpreted as <u>excluding</u> jurisdiction elsewhere unless it contains specific language of exclusion ...." (emphasis in original) (quotation marks omitted)).  The second sentence states that "Any proceedings or claims brought by the Fund against the Custodian and/or its affiliates, arising out of or related to this Agreement shall be brought exclusively in Amsterdam, The Netherlands." (Fairfield Custody Agreement ¶ 22.2.)  Whereas the second clause is mandatory in nature, stating that any claims "shall" be brought in the Netherlands, it applies only to claims brought by the Fund against the Citco Defendants.  As that is not the case here, the Court finds that the forum selection clause does not apply.  <u>See</u> <u>Phillips v. Audio Active Ltd.</u>, 494 F.3d 378, 389 (2d Cir. 2007) ("[W]e examine the substance of [the plaintiff's] claims as they relate to the precise language of the [forum selection] clause.").

same principles apply to the claims against the Citco Defendants.

According to the Citco Defendants, the language of the Citco Agreements clearly evidences an intent to specifically benefit the Funds to the exclusion of Plaintiffs.  In support of this argument, the Citco Defendants identify clauses in the Citco Agreements that state that the duties to be performed by the Citco Defendants are on behalf of, and for the benefit of, the Fund.  (See, e.g., Fairfield Sentry Administration Agreement ¶ 3.3 ("The Administrator shall, on behalf of the Fund, issue Shares in accordance with applicable Fund Documents."); Fairfield Sentry Custody Agreement ¶ 6.1 ("The Custodian shall be charged with the duties entailed by the administration of the Securities held by the Depositary for the benefit of the Fund ....").)  The Citco Defendants also assert that both the Custody and Administration Agreements' nonassignment clauses, and the Administration Agreements' inurement clauses, further demonstrate that the parties never intended to allow third-party enforcement.[18]  As the Citco Defendants point out, courts have found nonassignment and inurement clauses to indicate that a contract does not evince

---

[18]  The Fairfield Sigma Administration Agreement states, for example, that: "This Agreement shall be binding on and inure for the benefit of the parties and their respective successors and permitted assigns.  Neither party may assign its rights under this Agreement without the prior written consent of the other."  (Fairfield Sigma Administration Agreement ¶ 12.7.)

an intention to allow third party enforcement.  See Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 163 (S.D.N.Y. 1998) ("The prohibition on assignments and the specification that the contract inures to the benefit of and binds the parties ... makes plain the parties' intention to preclude third-party enforcement.").

i. Administration Agreements

The Court is not persuaded by the Citco Defendants' motion to dismiss the third-party beneficiary claim with respect to the Administration Agreements.  The Administration Agreements contain language that, when viewed in the light most favorable to Plaintiffs, indicate an intent to benefit a third party.  The Fairfield Sentry and Fairfield Sigma Administrative Agreements explicitly state, for example, that the Citco Defendants shall, among other duties, "issue to Shareholders trade confirmations with respect to subscriptions, redemptions and transfers in accordance with the applicable Fund Documents"; "despatch[] [sic] to Shareholders notices, proxies, and proxy statements prepared by or on behalf of the Fund in connection with the holding of meetings of shareholders"; "deal[] with and reply[] to all correspondence and other communications addressed to the Fund in relation to the subscription, redemption, transfer (and where relevant, conversion) of Shares"; and "despatch[] to

-111-

Shareholders and anyone else entitled to receive the same in accordance with the Fund Documents and any applicable law copies of the audited financial statements." (E.g., Fairfield Sigma Administration Agreement ¶ 3.6; id. Schedule 2 Part 2.) Similarly, the Greenwich Sentry and Greenwich Sentry Partners Administration Agreements state that the Citco Defendants "shall, on behalf of the Fund, issue to Limited Partners trade confirmations with respect to subscriptions, redemptions and transfers in accordance with the applicable Fund Documents." (E.g., Greenwich Sentry Administration Agreement ¶ 3.6.) Further, the Greenwich Sentry and Greenwich Sentry Partners Administration Agreements provide that the Citco Defendants are responsible for "communicating with Limited Partners; maintaining the record of accounts; processing subscriptions and withdrawals; preparing and maintaining the Partnership's financial and accounting records and statements; calculating each Limited Partner's capital account balance (on a monthly basis); preparing financial statements; arranging for the provision of accounting, clerical, and administrative services; and maintaining corporate records." (SCAC ¶ 479.)

Although the Administration Agreements do not explicitly name Plaintiffs as third-party beneficiaries, the Court is persuaded that Plaintiffs satisfactorily allege intent to permit third-party enforcement evident from within the four

corners of the contract -- especially given that the Administration Agreements require the Citco Defendants to render certain specific performance directly to Plaintiffs. See, e.g., Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 124 (2d Cir. 2005) ("[A] contractual requirement that the promisor render performance directly to the third party shows an intent to benefit the third party."); Fourth Ocean Putnam, 485 N.E.2d at 212; c.f. Air Atl. Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC, 637 F. Supp. 2d 185, 193 (S.D.N.Y. 2009) (finding that where the contract "painstakingly describe[d] the circumstances in which" the defendant was to render performance to the third party, only "under those circumstances" did the contract evidence an intent to permit enforcement).

Finally, the Citco Defendants urge the Court to dismiss Plaintiffs' third-party beneficiary claims for the reasons stated in Stephenson, a recent district court decision involving a factual pattern similar to that at issue here. The Court is not persuaded. The Stephenson court, relying on Piccoli, found that "[n]othing within the four corners of [the administration agreement] expresses an intent to benefit third parties" and that "the Citco administrator contract contains an inurement clause ... that undermines any argument that the contracting parties intended to benefit third parties."

-113-

Stephenson, 2010 WL 1244007, at *9 n.12.  By contrast,
Plaintiffs here allege multiple provisions, as indicated
above, in the Administration Agreements that indicate an
intention to confer a benefit on the Plaintiffs.  See De Lage
Landen Fin. Servs. v. Rasa Floors, LP, Civ. No. 08-0533, 2009
WL 884114, at *8-*9 (E.D. Pa. Apr. 1, 2009) (applying New York
law) ("[C]onflicting evidence" requires the "benefit of
discovery and development of the factual record to aid in
construing the contracts and discerning the parties'
intent."); see also Debary v. Harrah's Operating Co., 465 F.
Supp. 2d 250, 261 (S.D.N.Y. 2006) ("[T]hird-party beneficiary
status is a question of fact, because the issue turns on
whether the contracting parties intended their agreement to
directly benefit a third-party.").  Moreover, the inurement
and nonassignment clauses must be weighed against the
Administration Agreements' directives to the Citco Defendants
to render performance directly to the Plaintiffs.  See Subaru
Distribs. Corp., 425 F.3d at 124.  Accordingly, the Court
denies the Citco Defendants' motion to dismiss Plaintiffs'
third-party beneficiary breach of contract claim with respect
to the Administration Agreements.

   ii. Custody Agreements

   With respect to the Custody Agreements, the Court finds
that Plaintiffs fail to sufficiently allege intent to benefit

the Plaintiffs.  Whereas the Administration Agreements include language directing the Citco Defendants to render performance directly to Plaintiffs, Plaintiffs can point to no such language in the Custody Agreements.  Plaintiffs allege that the Custody Agreements "evince a clear intent to benefit shareholders by affirmatively recognizing Citco's obligation to receive and/or hold shareholder assets and ensure that sub-custodians were qualified to hold the assets."  (SCAC ¶ 480.)  Plaintiffs allege that per the terms of the Custody Agreements, the Citco Defendants were responsible for taking "due care ... on the selection and ongoing ... level of monitoring of any sub-custodian," obligated "to keep the securities in the custody of the Custodian or procure that they are kept in the custody of any sub-custodian," and required to record any securities held at any one time by the Custodian or any subcustodian.  (Id. ¶ 330 (quotation marks omitted)).  According to Plaintiffs, this language indicates that the Citco Defendants were to render performance directly to the Plaintiffs by safeguarding their assets.  However, Plaintiffs do not ground their argument in the plain language of the Custody Agreements, which, unlike the Administration Agreements, makes no explicit indication that performance should be rendered to the Plaintiffs, whether as shareholders or limited partners.  To the contrary, the Custody Agreements

-115-

never address investors or shareholders, and exclusively lay out the duties among the fund, the depository, and the custodian.   From the face of the Custody Agreements it is apparent that any benefit conferred is merely incidental, and that the Custody Agreements do not "<u>clearly</u> evidence[ ] an intent to permit enforcement by the third party[.]'" <u>Consolidated Edison</u>, 426 F.3d at 528 (emphasis and alterations in original) (<u>quoting</u> <u>Fourth Ocean</u>, 485 N.E.2d at 212). Accordingly, the Court grants the Citco Defendants' motion to dismiss with respect to Plaintiffs' third-party breach of contract claim as it relates to the Custody Agreements.

> d. <u>Negligence, Gross Negligence, and Negligent Misrepresentation</u>

The Citco Defendants argue that the Court must dismiss Plaintiffs' negligence, gross negligence, and negligent misrepresentation claims because Plaintiffs fail to allege that the Citco Defendants owed them a duty of care.  The Citco Defendants also assert that Plaintiffs are barred by the economic loss rule from suing to recover in tort, and that Plaintiffs' allegations are insufficient to make it plausible that the Administrators acted with the kind of recklessness or intentional wrongdoing required to plead a claim for gross negligence.  The Court agrees with the Citco Defendants that Plaintiffs do not allege that the Custodians or CFSB owed them a duty of care, and accordingly that Plaintiffs negligence and

gross negligence claims against those defendants must be dismissed. However, the Court denies the Citco Defendants' motion with respect to the Administrators, with regard to whom Plaintiffs plead a plausible negligence, negligent misrepresentation, and gross negligence claim. Finally, the Court denies the Citco Defendants' motion to dismiss the negligence-based claims against Citco Group, as Plaintiffs sufficiently allege that the Administrators were acting as an agent of Citco Group.

In order to state a claim for negligence, a plaintiff must allege "(1) that the defendant owed him or her a cognizable duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach." DiBenedetto v. Pan Am World Servs., 359 F.3d 627, 630 (2d Cir. 2004). To state a claim for gross negligence, Plaintiffs must allege "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." American Tel. & Tel. Co. v. City of N.Y., 83 F.3d 549, 556 (2d Cir. 1996) (quotations omitted). And a claim of negligent misrepresentation requires the elements noted above in connection with Plaintiffs' claims against the Fairfield Defendants. See Pension Comm., 446 F. Supp. 2d at 198.

i. Duty of Care

"The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the court." Di Ponzio v. Riordan, 679 N.E.2d 616, 618 (N.Y. 1997). The New York Court of Appeals has "been cautious not to cast those who are called upon to make judgments under a contract of employment into liability to third parties absent a clearly defined set of circumstances which bespeak a close relationship premised on knowing reliance." Parrott v. Coopers & Lybrand, L.L.P., 741 N.E.2d 506, 508 (N.Y. 2000). Accordingly, a duty of care may arise only where the parties are in contractual privity or have a relationship "'so close as to approach that of privity.'" Pension Comm., 446 F. Supp. 2d. at 199 (quoting Vtech Holdings, Ltd. v. Pricewaterhouse Coopers LLP, 348 F. Supp. 2d 255, 262 (S.D.N.Y. 2004)). To show that a defendant not in privity with a plaintiff nevertheless owes a duty to give that plaintiff accurate information, the plaintiff must show, according to Credit Alliance Corp v. Arthur Anderson & Co., 483 N.E.2d 110, 118 (N.Y. 1985), that there is "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its

understanding of that reliance." <u>Pension Comm.</u>, 446 F. Supp. 2d. at 199.

Generally, a "simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." <u>Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.</u>, 516 N.E.2d 190, 193 (N.Y. 1987) (citations omitted).  Similarly, the economic loss rule provides that plaintiffs "seeking only a benefit of the bargain of recovery ... may not sue in tort." <u>17 Vista Fee Assocs. v. Teachers Ins. & Annuity Assoc. of Am.</u>, 693 N.Y.S.2d 554, 559 (App. Div. 1st Dep't 1999).  In a limited set of circumstances, however, plaintiffs may sue for negligent performance of a contract.  "New York law confines liability to third parties for the negligent performance of a contract to cases involving personal injuries ..., and the narrow characteristics -- particularly detrimental reliance known to the defendant -- common to the <u>Credit Alliance</u> lines of cases." <u>Lombard v. Booz-Allen & Hamilton, Inc.</u>, 280 F.3d 209, 219 (2d Cir. 2002) (citation omitted).

The Citco Defendants argue that any duty on their part to exercise reasonable care arose only from the Citco Agreements and that the Citco Defendants owed no duty to Plaintiffs independent of the Citco Agreements.  According to the Citco Defendants, Plaintiffs have no recourse for the wrongs that

-119-

they allege in the SCAC because (1) any duty owed from the Citco Defendants to Plaintiffs is contained exclusively in the Citco Agreements, and (2) Plaintiffs do not have standing to enforce the Citco Agreements. However, as stated above, even in the circumstances where the Citco Defendants' duty is contained in the Citco Agreements, Plaintiffs may be permitted to sue the Citco Defendants for negligence to the extent that they satisfy the Credit Alliance test.

Upon review of the SCAC, the Court finds that Plaintiffs allege no facts as to either the Custodians or CFSB that would plausibly support a finding of near-privity as set out in Credit Alliance. Nor do Plaintiffs argue in their briefing that Credit Alliance applies to these specific Citco Defendants. Accordingly, absent allegations as to Plaintiffs' relationship with the Custodians and CFSB, the Court grants the Citco Defendants' motion to dismiss the negligence and gross negligence claims with respect to those Citco Defendants.

The Citco Defendants argue that Plaintiffs also fail to allege facts that would satisfy Credit Alliance with respect to the Administrators.[19]   First, they assert that Plaintiffs

---

[19] Plaintiffs' negligence and gross negligence claims are governed by Rule 8(a).  See Rombach v. Chang, 335 F.3d 164, 178 (2d Cir. 2004); Kinsey v. Cendant Corp., No. 04 Civ. 0582, 2005 WL 1907678, at *7 (S.D.N.Y. Aug. 10, 2005). "Rule 9(b) may or may not apply to a state law claim for negligent misrepresentation." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 188 (2d Cir. 2004).  Because Plaintiffs satisfy

allege no facts to support their allegations that the Administrators induced Plaintiffs to make their initial investments with the Funds.[20]   In essence, they argue that Plaintiffs fail to allege facts to support the first prong of the Credit Alliance test:  that the defendant must have been aware that the information was to be used for a particular purpose.   The Citco Defendants maintain that the Administrators would not have expected prospective investors to receive financial documentation prepared by them.  However, Plaintiffs specifically allege that the Citco Defendants were "aware that potential and current investors knew that [the Administrators were] providing significant financial services to the Funds, and were relying on [the Administrators] in making their investment decisions." (SCAC ¶ 333.)   Further, Plaintiffs allege that the Administrators were "aware that [their] involvement in the Funds lent significant credibility to the Funds, and provided potential current investors with assurance about the quality of financial services provided to the Funds, the security of assets held by the Funds, and the accuracy of the reported values of the Funds and of the investors' individual accounts." (Id.)

---

the requirements of Rule 9(b), it is unnecessary for this Court to determine which pleading standard applies here.

[20] The Citco Defendants concede that Plaintiffs allege a near-privity relationship with current, but not prospective, investors in the Funds.

Whereas an assertion of "mere forseeability" that information was to be used for a certain purpose is not enough to plead sufficient awareness, Plaintiffs here allege that the Administrators had actual knowledge of how the information provided by them would be used by prospective, as well as current, investors. American Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc., No. 05 Civ. 5155, 2007 WL 674691, at *6 (E.D.N.Y. Feb. 28, 2007) (noting that New York courts find the first prong of the Credit Alliance test satisfied where "defendants were retained for the specific purpose of making representations to the plaintiffs for them to rely upon before consummating a transaction with the retaining party").

The Citco Defendants also argue that Plaintiffs fail to satisfactorily allege the "known party" requirement of the Credit Alliance test because the Administrators could not have been aware of the identity of prospective investors. According to the Citco Defendants, because the Administrators had no contact with any investors prior to their initial investment decisions –- a fact that Plaintiffs dispute -- Plaintiffs necessarily do not allege privity or a relationship approaching privity as required by Credit Alliance.  In support of this argument, the Citco Defendants cite to Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co., in which the New York Court of Appeals determined that,

-122-

as a matter of law, plaintiffs could not prove that they had a near-privity relationship with the defendant, a third-party auditor. <u>See</u> 597 N.E.2d 1080, 1085-85 (N.Y. 1992).  The Court finds <u>Security Pacific</u>, a case decided on summary judgment, to be inapplicable in this instance.  First, the Court of Appeals did not specifically discuss the "known party" prong in its analysis, focusing mostly on the "linking conduct" prong of <u>Credit Alliance</u>, and second, plaintiff in that case, even after the benefit of discovery and responding to a motion for summary judgment, failed to present any facts to support a finding that the auditor's representations were anything but "incidentally or collaterally" for the plaintiff's use.  <u>Id.</u> at 94.

The Court finds that Plaintiffs sufficiently allege that these prospective investors, to which the Administrators sent certain financial documents, were "known" for the purposes of the <u>Credit Alliance</u> test.  Plaintiffs allege that the Administrators "induced Plaintiffs to make their initial investments in the Funds" (SCAC ¶ 534) and that "Plaintiffs sent their subscription documents directly to Citco ...." (<u>Id.</u> ¶ 328.)  Plaintiffs also allege that the Administrators "knew that Plaintiffs would rely upon the false NAV and account balance statements for the particular purpose of deciding whether to invest in the Funds."  (<u>Id.</u> ¶ 535.)  At

-123-

this point, the Court finds that Plaintiffs adequately allege that there was a discrete group of potential investors, not simply a faceless mob, who were known parties to the Administrators, and that the Administrators intended those investors to rely upon the NAV and account balance statements to invest in the Funds. See, e.g., AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 223 (2d Cir. 2000) (finding that plaintiffs established the known-party requirement as to prospective investors).

Finally, the Citco Defendants assert that Plaintiffs have not alleged linking conduct between themselves and the Administrators as required by the third prong of Credit Alliance. The Administrators argue that Plaintiffs must allege that they actually relied on the NAV statements or other documentation provided by the Administrators, and that because they fail to do so in the SCAC, Plaintiffs' negligent misrepresentation claim must be dismissed. The Court disagrees and finds that Plaintiffs sufficiently allege linking conduct consistent with Credit Alliance.

Linking conduct is "some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance." Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson, 539 N.E.2d 91, 95 (N.Y. 1989). For example, a court in this district recently found,

-124-

in considering whether a hedge fund administrator owed a duty
of care to investors to provide correct information, that
sending NAV statements to interested parties was sufficient to
allege a linking requirement.  See Pension Comm. of Univ. of
Montreal Pension Plan v. Banc of Am. Sec., LLC., 592 F. Supp.
2d 608, 641 (S.D.N.Y. 2009).  Here, Plaintiffs similarly
allege that the Administrators "relied on the information
contained in the [Administrators'] statements" (SCAC ¶ 538),
and more specifically that

> The NAV, which was to be independently calculated and
> reported by [the Administrators], was fundamental to
> Plaintiffs' initial investment decisions, decisions to
> invest additional funds, and decisions to maintain the
> investments over time.  The number of shares that the
> Plaintiffs received in exchange for their investment
> amounts depended on [the Administrators'] NAV
> calculations.  Plaintiffs' subsequent reported profits
> also turned on [the Administrators'] calculations.
> Therefore, Plaintiffs necessarily relied on [the
> Administrators'] NAV calculations.

(Id. ¶ 335.)  As in Pension Committee, the Court finds that it
is reasonable to infer from Plaintiffs' allegations that the
Administrators were aware that Plaintiffs would -- and did --
rely on their statements of the Funds' NAVs that were sent to
the investors, thus satisfying the linking requirement.
Accordingly, the Court finds that Plaintiffs allege a
relationship between the investors and the Administrators that
gives rise to a duty of care under the Credit Alliance
standard.

-125-

ii. <u>Citco Group Secondary Liability</u>

Plaintiffs claim that the Administrators were acting as agents or alter egos of Citco Group when committing the acts that gave rise to the negligent misrepresentation claim discussed above.  Citco Defendants move to dismiss, arguing that Plaintiffs fail to allege facts that would support either theory of secondary liability.  Plaintiffs do not oppose the motion with respect to the alter ego theory, but argue that the SCAC alleges sufficient facts to plead agency.  The Court agrees.

To establish an actual agency theory of liability, Plaintiffs must allege "(1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent." <u>Commercial Union Ins. Co. v. Alitalia Airlines</u>, <u>S.p.A.</u>, 347 F.3d 448, 462 (2d Cir. 2003).  The "consent for actual authority may be either express or implied from the 'parties' words and conduct as construed in light of the surrounding circumstances.'" <u>Cromer Fin. Ltd. v. Berger</u>, Nos. 00 Civ. 2284, 00 Civ. 2498, 2002 WL 826847, at *4 (S.D.N.Y. May 2, 2002) (<u>quoting</u> <u>Riverside Research Inst. v. KMGA, Inc.</u>, 489 N.Y.S.3d 220, 223 (App. Div. 1st Dep't 1985)).  Plaintiffs must also show that "the principal ... maintain[ed] control over key aspects of the undertaking." <u>Commercial Union Ins. Co.</u>, 347 F.3d at 462.  However, "the control asserted need not

-126-

include control at every moment; its exercise may be very
attenuated and, as where the principal is physically absent,
may be ineffective." <u>Cleveland v. Caplaw Enters.</u>, 448 F.3d
518, 522 (2d Cir. 2006) (quotations marks omitted). Finally,
"[t]he question whether an agency relationship exists is
highly factual ... and can turn on a number of factors ...."
<u>Id.</u>

Here, Plaintiffs allege that "Citco Group directly
controls the conduct of each of the [Citco Defendants]
identified ... pursuant to agreements between them, and each
[of the Citco Defendants] acts as the agent and alter ego of
Citco Group and of each other." (SCAC ¶ 156.) According to
Plaintiffs, there are four separate Citco divisions, the
relevant one here being the fund services division ("Citco
Fund Services Division"). (See <u>id.</u> ¶ 321.) Citco Group's
executive committee appoints a director who "controls" the
Fund Services Division and "acts on behalf of Citco Group."
(<u>Id.</u>) They further allege that the Citco Defendants act
together as one integrated entity, that "[t]he individual
companies that comprise the 'Citco Fund Services' division,
including the [Citco Defendants], are controlled and operated
by Citco Group and its director, and function as a part of its
unified 'Citco Fund Services' division," and that
"[e]ngagements with companies in the Citco Fund Services

-127-

division expressly provide that services may be provided by Citco Group or any of its companies, not just the company engaged." (Id. ¶ 323.)

The Court finds that these allegations are sufficient to support a plausible agency relationship between Citco Group and the Administrators under New York law.  Plaintiffs allege facts regarding the Citco Defendants' organization, contracts with the Funds, and marketing material that, taken together, allow the Court to infer Citco Group's manifestation that the Administrators should act on its behalf, and the Administrators acceptance of that authority.  In opposition, the Citco Defendants cite to Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP, in which the district court dismissed a claim based on agency liability because plaintiffs, apart from allegations based on marketing materials, alleged no facts indicative of manifestation on the part of the purported principal.  See No. 03 Civ. 0613, 2004 WL 112948, at *5-*6 (S.D.N.Y. Jan. 22, 2004).  But here, as stated above, Plaintiffs allege facts regarding the parties' words and conduct -- beyond the Citco Defendants' marketing materials -- that make it plausible that there was an implied, if not express, agreement between Citco Group and the Administrators. See Cromer Fin. Ltd., 2002 WL 826847, at *5 ("Although the conduct of [the principal] or [the agent]

-128-

alleged in the pleadings may well have led others to understand that an agency relationship existed, the plaintiffs' allegations of agency rest sufficiently on [the principal's] organization of its own business operations and the way it chose to use its member firms generally....").

Plaintiffs also sufficiently allege that Citco Group controlled the Administrators. The SCAC contains allegations that Citco Group hired directors who oversaw the operations of each Citco divison and then reported back to Citco Group. (See SCAC ¶ 320.) The Citco Defendants argue that this allegation, which the Court views as significant, is insufficient to establish the control element. In support they cite to a variety of cases in which the district court found that a plaintiff failed to plead an agency relationship between a parent and subsidiary. These cases, which involve much weaker allegations of control, are inapplicable. For example, in Maung Ng We & Merrill Lynch & Co., Inc., the district court found plaintiffs' allegations that the subsidiary consulted with the parent's head office to be insufficient to plead the control element. See No. 99 Civ. 9687, 2000 WL 1159835, at *6-*7 (S.D.N.Y. Aug. 15, 2000). Here, Plaintiffs do not merely allege that the Administrators consulted with Citco Group, but that Citco Group actually oversaw the day-to-day operations of the Administrators.

-129-

Accordingly, the Citco Defendants' motion to dismiss Plaintiffs' claims against Citco Group based on agency liability is denied.

### iii. Gross Negligence

The Citco Defendants also argue that Plaintiffs fail to state a claim of gross negligence because they do not allege either recklessness or intentional wrongdoing. The Citco Defendants assert that for the same reasons Plaintiffs fail to plead scienter, they fail to plead recklessness. Specifically, they argue that the SCAC does not state with particularity facts showing that the Administrators' conduct "evince[d] a reckless disregard for the rights of others or 'smack[ed]' of intentional wrongdoing." American Tel. & Tel., 83 F.3d at 556 (quotation marks omitted). The Citco Defendants' argument is unavailing. First, as discussed above, the Court finds that Plaintiffs sufficiently plead scienter as to the Administrators. Second, gross negligence claims are not subject to the heightened pleading standards of PSLRA. Furthermore, claims for gross negligence, like claims of negligence, are governed by Rule 8(a), not Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"). See, e.g., Kinsey, 2005 WL 1907678, at *7. Plaintiffs are not required to plead gross negligence with particularity, but simply to state a facially-plausible claim, by alleging "factual content

-130-

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." See Iqbal, 129 S. Ct. at 1949.

Plaintiffs allege that the Administrators "grossly failed to exercise due care" and that they were "grossly deficient in the fulfillment of ... duties to Plaintiffs" (SCAC ¶¶ 503, 336) and that the Administrators "blindly and recklessly relied on information provided by Madoff and the Funds to calculate and disseminate the Funds' NAV and to perform its other duties, even though that information was manifestly erroneous." (Id. ¶ 338.) Plaintiffs allege that the Administrators were aware, for example, that Madoff served as the investment manager, sub-custodian, and trade execution agent of the Funds, "hugely increasing this risk of fraud, and the need for independent verification." (Id.) Further, they allege that the "trade and profit information by Madoff was, on its face, virtually impossible to achieve." (Id.) Finally, Plaintiffs allege that the "numerous red flags surrounding Madoff's operations and purported results should have cause the [Administrators] to increase [their] scrutiny of the information provided, and seek independent verification." (Id.) These "numerous red flags" included "the lack of any transparency into Madoff's operations, that key positions were held by Madoff family members, the lack of

-131-

segregation of important functions, such as investment
management, brokerage, and custodianship, inadequate auditing,
Madoff's use of paper trading records, and the implausibly
consistent positive returns for a fund pursuing market-based
strategy."  (<u>Id.</u> ¶ 217.)

     The Court finds that from these and other factual
allegations made by Plaintiffs it is reasonable to infer that
the Administrators acted in a way that, if proven, "differs in
kind, not only degree" from ordinary negligent conduct.
<u>Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.</u>, 611
N.E.2d 282, 284 (N.Y. 1993).  Accordingly, for the reasons
stated above, the Court denies the Citco Defendants' motion to
dismiss Plaintiffs' gross negligence claim against the
Administrators.

          e. <u>Breach of Fiduciary Duty</u>

     The Citco Defendants and the Individual Defendants argue
that they owed no fiduciary duty to Plaintiffs, and that
therefore Plaintiffs' breach of fiduciary duty claims should
be dismissed.  The Court grants the motion with respect to the
Individual Defendants, Citco Group, and CFSB, but otherwise
finds that Plaintiffs sufficiently allege breach of fiduciary
duty against the Administrators and the Custodians as the
remaining Citco Defendants.

     The Court applies the same elements of the claim as noted

-132-

above in connection with Plaintiffs' similar claims against the Fairfield Defendants.  See Pension Comm., 446 F. Supp. 2d at 195-96.

i. Individual Defendants[21]

The Individual Defendants argue that Plaintiffs do not allege a valid claim for breach of fiduciary duty against them because the SCAC does not allege that they, as opposed to FGBL, owed a duty to Plaintiffs.  They assert that their position as directors of FGBL is simply too remote a relationship with Plaintiffs to impose upon them a fiduciary duty.  The Individual Defendants argue that Plaintiffs are essentially attempting to impose on them a duty to the investing public because they were directors of a Bermuda company.  See A.I.A. Holdings, S.A. v. Lehman Bros, Inc., No. 97 Civ. 4978, 1999 WL 47223, at *6 (S.D.N.Y. Feb. 3, 1999) ("Under New York law there is no fiduciary duty owed to the investing public, or to the customers of a corporation by a controlling shareholder, officer, or director of a corporation.").  According to the Individual Defendants, Plaintiffs fail to allege that they reposed any trust in them

---

[21] It is the position of the Individual Defendants that the Court should apply the internal affairs doctrine to determine the law that should govern Plaintiffs' claims to the extent that they are based on the Individual Defendants' roles as directors at FGBL, a corporate entity organized under the laws of Bermuda.  As discussed above, the Court has declined to apply the internal affairs doctrine to the facts of this case. The Court notes, however, that even under the more permissible New York law Plaintiffs fail to allege that the Individual Defendants owed them a duty.

or that they accepted the responsibility of that trust.  The
Court agrees.

     To  support  their  claim,  Plaintiffs  allege  that  the
Individual Defendants served as directors of FGBL (see SCAC ¶¶
559-60),  and  that  "FGBL's  Board  of  Directors  had  a
responsibility for FGBL, which as investment manager of the
Fairfield Funds, had day-to-day management responsibility for
the Funds, which included selecting and monitoring the Fund's
investments  and  investment  advisors  and  maintaining
relationships between the Funds and their advisors custodians,
administrators and transfer agents." (Id. ¶ 561).  Plaintiffs
also  allege  that  the  Individual  Defendants  "breached  their
fiduciary duties by failing to supervise the Funds' managers
and investments that were entrusted to Madoff and in failing
to  pursue  red  flags  that  would  have  alerted  them  to  the
presence  of  unlawful  activity."   (Id.  ¶  562.)   Further,
Plaintiffs  allege  that,  as  directors  of  FGBL,  the  general
partner of a limited partnership comprised of Greenwich Sentry
and Greenwich Sentry Partners, the Individual Defendants owed
a  duty  to  Plaintiffs  as  limited  partners  of  the  partnership.
Plaintiffs  do  not  allege  that  the  Individual  Defendants
otherwise had any relationship or communication with them.

     The Court agrees with the Individual Defendants and finds
that Plaintiffs fail to allege that the Individual Defendants

owed Plaintiffs a fiduciary duty.  "A corporate officer or
director generally owes a fiduciary duty only to the
corporation over which he exercises management authority...."
Bank of Am. Corp v. Lemgruber, 385 F. Supp. 2d 200, 224
(S.D.N.Y. 2005).  New York courts allow an exception where a
plaintiff sues a corporate fiduciary for breach of a duty that
is "independent of the duty owed to the corporation itself."
Id. at 224-25 (citing Abrams v. Donati, 489 N.E.2d 751, 752
(N.Y. 1985)).  Here, the Court finds that Plaintiffs fail to
allege a fiduciary duty independent of the Individual
Defendants' duties as directors of FGBL.  In essence,
Plaintiffs' theory is that the Individual Defendants are
liable by the principles of the transitive property: because
the Individual Defendants owed a fiduciary duty to FGBL, and
FGBL owed a fiduciary duty to Plaintiffs as investors and
limited partners, therefore the Individual Defendants must owe
a fiduciary duty to the Plaintiffs.  A complaint must allege
more to state a plausible claim for liability.

The Court is also unpersuaded by Plaintiffs' theory that
the Individual Defendants breached their duty to Plaintiffs in
their role as directors of FGBL, the general partner of
Greenwich Sentry and Greenwich Sentry Partners, of which
Plaintiffs were limited partners.  As discussed below, New
York law, though not directly addressing the issue, does not

-135-

support Plaintiffs' argument that simply by virtue of an individual's role as a director of a corporate general partner, that individual owes a fiduciary duty to a limited partner or others doing business with the partnership.  Absent any allegations that the Individual Defendants had control over the corporate general partner, or a relationship of trust with the Plaintiffs, the Court finds that Plaintiffs fail to plead that the Individual Defendants owed Plaintiffs a fiduciary duty.  This lack of control distinguishes the Individual Defendants from those Fairfield Defendants who oversaw the entire FGG operation and thus against whom the SCAC had adequately alleged a fiduciary duty.

It is undisputed under New York law that general partners owe a fiduciary duty to the limited partners of the partnership.  See Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 973 (2d Cir. 1989) ("New York makes no distinction between the fiduciary duty owed by a general partner and that owed by a corporate director.").  But New York courts have not determined that as a matter of law, a director of a corporate general partner owes fiduciary duties to limited partners by virtue of his position, and it might be that, under New York law, a corporate general partnership director owes no fiduciary duties that do not arise by reason of individual actions that develop a direct fiduciary

-136-

relationship with limited partner plaintiffs.  Delaware courts have considered the issue, however, finding that a director of a corporate general partner owes a duty to the limited partners not to "use control over the partnership's property to advantage the corporate director at the expense of the partnership."  Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood, 752 A.2d 1175, 1181 (Del. Ch. 1999) (quotation marks omitted).  For example, the Wood court found that plaintiffs' allegations, including that "defendants personally caused the Limited Partnership to enter into self-interested transactions adverse to the interests of the Limited Partners" and "usurped business opportunities available to the Limited Partnership," if true, would constitute a breach of the circumscribed duties that a director of a corporate general partner owes to limited partners.  Id.

In support of their argument that the Individual Defendants owed a fiduciary duty to Plaintiffs by definition of their role as directors, Plaintiffs cite several cases from this district where courts found a duty without distinguishing between the fiduciary duties owed by a corporate general partner and its individual officers or directors.  See, e.g., Tobias v. First City Nat'l Bank & Trust Co., 709 F. Supp. 1266, 1277 (S.D.N.Y 1989); Crossen v. Bernstein, No. 91 Civ.

-137-

3501, 1994 WL 281881, at *4 (S.D.N.Y. June 23, 1994). The Court finds, however, that these cases may be reconciled with the principle that an officer or director owes a fiduciary duty to a limited partner only to the extent that the officer or director has an independent fiduciary relationship with the plaintiff. In both <u>Tobias</u> and <u>Crossen</u>, plaintiffs alleged that the director-defendants had an active role in making misrepresentations that were intended to induce the limited partner-plaintiffs to invest. In other words, plaintiffs had alleged the director's personal involvement in the general corporate partner's transaction with plaintiffs. Plaintiffs make no such allegations here.

Here, the SCAC alleges that the Individual Defendants served as directors of FGBL (<u>see</u> SCAC ¶¶ 559-60), and that "FGBL's Board of Directors had a responsibility for FGBL, which as investment manager of the Fairfield Funds, had day-to-day management responsibility for the Funds, which included selecting and monitoring the Fund's investments and investment advisors and maintaining relationships between the Funds and their advisors custodians, administrators and transfer agents." (<u>Id.</u> ¶ 561). Plaintiffs make no allegations to connect themselves with the Individual Defendants or suggest that by reason of the Individual Defendants' actions a direct fiduciary relationship developed

-138-

between them and Plaintiffs as limited partners.  The SCAC
does not allege that the Individual Defendants ever
communicated with Plaintiffs, let alone that the Plaintiffs
"reposed trust and confidence" in the Individual Defendants,
which the Individual Defendants accepted.  Even if the Court
were to assume that the New York Court of Appeals would accept
Delaware's view and apply that rule, Plaintiffs make no
allegations that the Individual Defendants exerted control
over the general partner to benefit the corporate general
partnership to the detriment of the limited partners.
Plaintiffs' conclusory allegation that the Individual
Defendants' "fail[ed] to supervise the Funds' managers and
investments that were entrusted to Madoff and in failing to
pursue red flags that should have alerted them to the presence
of unlawful activity," without more, is an insufficient basis
in this case for this Court to infer a fiduciary duty between
a director of a corporate general partner and a limited
partner. (Id. ¶ 562.)

Given that Plaintiffs allege no contact between
themselves and the Individual Defendants and no facts to
support an inference that they had developed any sort of
direct fiduciary relationship with the Individual Defendants,
the Court finds that Plaintiffs fail to plausibly allege that
they reposed trust and confidence in the Individual

-139-

Defendants, or that the Individual Defendants accepted that trust sufficient to support a claim for breach of fiduciary duty as to the Individual Defendants.  See <u>Thermal Imaging, Inc. v. Sandgrain Sefc., Inc.</u>, 158 F. Supp. 2d 335, 343-44 (S.D.N.Y. 2001).  Accordingly, the Court grants the Individual Defendants' motion to dismiss.  Plaintiffs' claims for breach of fiduciary duty against the Citco Defendants are also dismissed to the extent that such claims are based on or derive from the Individual Defendants' alleged primary liability.

     ii. <u>Citco Defendants</u>

As above, the Citco Defendants argue that they did not owe Plaintiffs any fiduciary duty that was not specified in the Citco Agreements.  Further, the Citco Defendants assert that Plaintiffs do not plead that Plaintiffs reposed trust in the Citco Defendants, who thereby gained superiority or influence over Plaintiffs, or that, as purported fiduciaries, the Citco Defendants voluntarily accepted the entrustment of confidence.  The Court is not persuaded.

As to the Citco Defendants' protests that the Plaintiffs' attempt to convert a breach of contract claim into a breach of fiduciary duty claim, the Court reiterates that a fiduciary duty can arise from -- but remain independent of -- a contractual obligation.  See <u>GLM Corp. v. Klein</u>, 665 F. Supp.

-140-

283, 286 (S.D.N.Y. 1987) ("If a contract establishes a
relationship of trust and confidence between the parties, ...
then a fiduciary duty arises from the contract which is
independent of the contractual obligation."); Mandelblatt v.
Devon Stores, Inc., 521 N.Y.S.2d 672, 676 (App. Div. 1st Dep't
1987) ("It is well-settled that the same conduct which may
constitute the breach of contractual obligation may also
constitute the breach of a duty arising out of the
relationship created by contract but which is independent of
the contract itself."

      With respect to this claim, Plaintiffs allege that the
Citco Defendants' significant responsibilities included
holding any securities purchased for the Fund, or ensuring
that the securities were in the custody of the sub-custodian;
maintaining an ongoing, appropriate level of supervision of
any sub-custodians, including BMIS; and maintaining records of
the securities held for the Funds.   (See SCAC ¶ 330.)   The
Citco Defendants were also charged with independently
calculating the "NAV, which was ... fundamental to Plaintiffs'
investment decisions, decisions to invest additional funds,
and decisions to maintain the investments over time" (id. ¶
335), reconciling cash and other balances, independently
reconciling the Funds' portfolio holdings, preparing monthly
financial statements, and preparing records for the external

-141-

audit. (See id. ¶ 327.)   The Citco Defendants "serve[d] as
the Funds' agent with the general public, and w[ere]
specifically responsible for communications with investors."
(Id. ¶ 328.)  Finally, the Citco Defendants advertised that
they were a "reliable fiduciary."  (Id. ¶ 325.)

On this basis, Plaintiffs argue that they sufficiently
allege a direct fiduciary relationship in which the Citco
Defendants' "superior position or superior access to
confidential information [wa]s so great as virtually to
require the other party to repose trust and confidence in the
first party," and that the Citco Defendants were "under a duty
to act for or to give advice for the benefit of another upon
matters within the scope of the relation."  Pension Comm.,
446 F. Supp. 2d at 195-96.  The Court agrees, and finds that
Plaintiffs allege sufficient facts to support an inference
that the Citco Defendants owed a fiduciary duty to Plaintiffs.

Plaintiffs do not allege, as the Citco Defendants argue,
a fiduciary relationship based only on the Citco Defendants'
marketing materials or the way that they held themselves out
in the field as elite professionals.  See, e.g., DeBlasio v.
Merril Lynch & Co, Inc., No. 07 Civ. 318, 2009 WL 2242605, at
*30 (S.D.N.Y. July 27, 2009); World Wrestling Entm't Inc. v.
Jakks Pac, Inc., 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007).
Plaintiffs allege sufficient facts for the Court to infer that

the Citco Defendants possessed significant authority over the securities at issue; they were allowed to act independent of the Funds, and in fact, according to Plaintiffs, they were required to take whatever action was necessary to protect the assets. (SCAC ¶¶ 160, 330.)  The Citco Defendants agreed to exercise due care in the execution of these duties.  (See id. ¶ 331.)  According to the SCAC, Plaintiffs had a direct relationship with the Citco Defendants, which included communicating with them before investing in the form of Placement Memos that featured, with permission from the Citco Defendants, their names, duties, and NAV calculations. Further, Plaintiffs allege that the Citco Defendants accepted money from Plaintiffs, sent investment confirmations to Plaintiffs, and calculated the NAV on which Plaintiffs relied. (See id. ¶¶ 327, 328, 333, 342, 488-91.)

These factual allegations, among others, support a plausible claim that Plaintiffs reposed their trust in the Citco Defendants and the Citco Defendants accepted this entrustment.  See Thermal Imaging, Inc., 158 F. Supp. 2d at 343; see also Musalli Factory for Gold & Jewellry, 261 F.R.D. at 26 ("New York courts generally avoid dismissing a claim of breach of fiduciary duty ... because it usually involves a question of fact....").

Plaintiffs fail, however, to allege that either Citco

-143-

Group or CFSB actually breached their fiduciary duty to the Plaintiffs.  The SCAC contains allegations pertaining only to the Administrators' and Custodians' alleged breach. (See SCAC ¶¶ 495-96.)  Accordingly, the Court denies the Citco Defendants' motion to dismiss Plaintiffs' breach of fiduciary duty claim as to the Administrators and Custodians, and grants the Citco Defendants' motion with respect to Citco Group and CFSB.

    f. Aiding and Abetting Breach of Fiduciary Duty and Fraud

    The Citco Defendants contend that all of the aiding and abetting claims against them must be dismissed because Plaintiffs fail to allege that each Citco Defendant had actual knowledge of the fraud and breach of fiduciary duty allegedly committed by the Funds.  Plaintiffs disagree, and assert that the SCAC alleges specific facts showing actual knowledge.  The Court finds that Plaintiffs plead a strong inference of actual knowledge sufficient to state a claim for aiding and abetting breach of fiduciary duty and aiding and abetting fraud.

    To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show: "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." Kottler

-144-

v. Deutsche Bank AG, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009)
(citation omitted).  To state a claim for aiding and abetting
fraud, a plaintiff must show: "(1) the existence of an
underlying fraud; (2) knowledge of this fraud on the part of
the aider and abettor; and (3) substantial assistance by the
aider and abettor in achievement of the fraud."  Id. at 464.
To establish aiding and abetting fraud under New York law,
Plaintiffs must allege that the defendant had actual knowledge
of the wrongful conduct committed, not simply that the
defendant should have known of the conduct.  See Rosner v.
Bank of China, 349 F. App'x 637, 639 (2d Cir. 2009).  The
particularity requirements of Rule 9(b) apply to claims of
aiding and abetting fraud.  See Filler v. Hanvit Bank, 156 F.
App'x 413, 417 (2d Cir. 2005).

The actual knowledge prong is "not identical to the
scienter required for the underlying fraud."  Pension Comm. of
the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,
652 F. Supp. 2d 495, 502 (S.D.N.Y. 2009) (quoting J.P. Morgan
Chase Bank v. Winnick, 406 F. Supp. 2d 247, 253 n.4. (S.D.N.Y.
2005)).  Plaintiffs must allege a strong inference of actual
knowledge or conscious avoidance; reckless disregard will not
suffice.  See Kirschner v. Bennett, 648 F. Supp. 2d 525, 544
(S.D.N.Y. 2009) ("To survive a motion to dismiss, therefore,
the [plaintiff] must allege facts giving rise to a 'strong

-145-

inference' of defendant's actual knowledge of the underlying harm, or the conscious avoidance of the same such that 'it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.'" (quoting Fraternity Fund Ltd., 479 F. Supp. 2d at 367-68).   The Court will not "spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers." Fraternity Fund Ltd., 479 F. Supp. 2d at 368; see also Oster v. Kirschner, ___ N.Y.S.2d ____, 2010 WL 2650532, at *3 (App. Div. 1st Dep't July 6, 2010) (under New York state law pleading standards for aiding and abetting fraud claims, "actual knowledge need only be pleaded generally ... [and may] be divined from surrounding circumstances.")

In support of their claim, Plaintiffs allege that "by virtue of [the Citco Defendants'] long-standing involvement in the Funds, and [their] experience in fund management, [the Citco Defendants] knew or w[ere] willfully blind to the fact that the due diligence and risk controls employed by the Fairfield Defendants w[ere] grossly deficient." (SCAC ¶¶ 341, 512.)   Further, Plaintffs allege that the Citco Defendants "knew that the Fairfield Defendants uniformly represented to

-146-

Plaintiffs that they employed thorough due diligence, monitoring and verification of Fund managers, including Madoff, and strict risk controls –- representations which [the Citco Defendants] knew to be false or w[ere] willfuly blind to the evident falsity" and that the Citco Defendants "knew that the Fairfield Fraud Claim Defendants were falsely representing to Plaintiffs that they had undertaken meaningful due diligence and implemented risks controls, and were failing to disclose clear deficiencies in their monitoring of BMIS's activities." (<u>Id.</u> ¶¶ 517-18.)

The Citco Defendants argue that Plaintiffs' allegations relating to knowledge are conclusory and wholly lacking in the specificity required to plead actual knowledge, especially with regard to the aiding and abetting fraud claim, which is subject to Rule 9(b). The Court finds, however, that Plaintiffs' allegations support a strong inference of conscious avoidance on the part of the Citco Defendants, which is sufficient to satisfy the knowledge requirement of these two causes of action. Specifically, as already detailed above, Plaintiffs allege that the Citco Defendants were aware of the roles consolidated in Madoff, the lack of transparency into his operations, his family members' involvement in key positions at his firm, his lack of segregation of important functions, his use of an unknown auditing firm, his use of

paper trading records, and his implausibly consistent
investment returns. Given the Citco Defendants' familiarity
with the Funds, as well as their general experience in
providing financial services to funds, and their knowledge of
these red flags, the Court finds that Plaintiffs allege a
strong inference that the Citco Defendants "consciously
avoid[ed] confirming facts that, if known, would demonstrate
the fraudulent nature of the endeavor [they] substantially
further[ed]." Fraternity Fund, 479 F. Supp. 2d at 368; cf.
Rosner v. Bank of China, No 06. Civ. 13562, 2008 WL 5416380,
at *5-*11 (S.D.N.Y. Dec. 18, 2008) (finding that plaintiff
alleged no "specific facts that give rise to a strong
inference of actual knowledge regarding the underlying fraud"
besides defendant's long-standing relationship with the
purported perpetrators) (citation and quotation marks
omitted). Accordingly, the Citco Defendants' motion to
dismiss with respect to Plaintiffs' claims alleging aiding and
abetting breach of fiduciary duty and aiding and abetting
fraud are denied.

g. Unjust Enrichment

Plaintiffs do not respond to Citco Defendants' motion to
dismiss the unjust enrichment claims alleged against them in
the SCAC. Accordingly, the Court finds these claims to be
abandoned, and grants Citco Defendants' motion to dismiss.

-148-

See Burchette, 2009 WL 856682, at *8-*9.

h. Holder Claims

The Citco Defendants assert that Plaintiffs who allege state law tort claims based on the theory that they could have "redeemed their investments and recovered their principal at any time during the many years in which the Funds were making redemptions," should be dismissed from this action. (SCAC ¶ 340.) According to the Citco Defendants, such "holder claims" are invalid because Plaintiffs have not pled when Plaintiffs would have redeemed, how much they would have redeemed, or how they relied on the Citco Defendants' misrepresentations in choosing not to redeem. The Court is not persuaded.

"A 'holder' action is an action in which the plaintiffs allege that material misrepresentations or omissions caused them to retain ownership of securities that they acquired prior to the alleged wrongdoing." In re WorldCom, Inc. Sec. Litig., 336 F. Supp. 2d 310, 318-19 (S.D.N.Y. 2004). In many jurisdictions, holder claims are subject to a heightened standard of pleading that would require Plaintiffs to plead when they would have sold the investment, how much they would have sold, and what specific misrepresentation from the Citco Defendants induced them not to sell. See Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580, 600 (S.D.N.Y. 2008) ("Hunt II"); Hunt v. Enzo Biochem, Inc., 471 F. Supp. 2d 390, 411-12

-149-

(S.D.N.Y. 2006) ("<u>Hunt I</u>").

The Citco Defendants assert, citing <u>Hunt I</u> and <u>Hunt II</u>, that New York is one of the jurisdictions to require this heightened pleading standard.  The Court does not read those cases to stand for such a proposition.  In <u>Hunt I</u>, that court discussed the law regarding holder claims in other jurisdictions, and determined that those jurisdictions, not New York, required heightened pleading.  The court dismissed the holder claims as insufficiently pled, but gave leave to replead.  <u>See</u> <u>Hunt I</u>, 530 F. Supp. 2d at 411-12 (discussing viability of holder claims in California, Florida, Massachusetts, and South Carolina).  In <u>Hunt II</u>, the court found that New York law applied to the holder claims, but by that time, Plaintiffs had already repled according to the heightened standards outlined in <u>Hunt I</u>, making an inquiry into whether New York requires a heightened pleading standard unnecessary.  Furthermore, the holder claim at issue in that case was common law fraud, which is already subject to the heightened pleadings standards of Rule 9(b).  The Citco Defendants identify no other case law to suggest that Plaintiffs must satisfy heightened pleading standards to state a holder claim in New York.  <u>But</u> <u>see</u> <u>Starr Found. v. American Int'l Group, Inc.</u>, 901 N.Y.S.2d 246, 259 (App. Div. 1st Dep't 2010) (Moskowitz, J., dissenting) ("Accordingly, to plead

reliance in a holder action, a plaintiff should be able to plead with particularity, at the very least, how many shares it would have sold and when it would have sold them.").

Citco Defendants also argue that the holder claims should be dismissed because Plaintiffs fail to allege loss causation. The Citco Defendants argue that Plaintiffs do not allege loss causation because (1) Plaintiffs' losses occurred at the time of the investment and (2) had the fraud been revealed earlier, Plaintiffs would have still lost all of their investments. Recently, in Starr Foundation, the Appellate Division, First Department denied a plaintiff's fraud claim as a holder of securities for violating New York's "out-of-pocket rule," a causation-limiting doctrine that requires that damages be limited to what plaintiffs actually lost as a result of the fraud.[22]   See 901 N.Y.S.2d at 246.   But in that case, the Appellate Division found that plaintiffs' holder claim violated the out-of-pocket rule because "[i]n holding its stock, the [plaintiff] did not lose or give up any value; rather, it remained in possession of the true value of the stock, whatever that value may have been at any given time." Id. at 249.

---

[22] Here, Plaintiffs do not allege a common law fraud claim against the Citco Defendants.  The Court addresses this issue insofar as Plaintiffs allege negligent misrepresentation and aiding and abetting fraud claims against the Citco Defendants.

The loss at issue in this litigation -- the fall-out from Madoff's Ponzi scheme -- cannot be easily compared to the facts present in a more typical securities fraud action.  In holding their investments in the Funds, Plaintiffs did not each possess a thing of equal value; the value of the shares depended solely on the investors' place in line to redeem.  It is plausible that the Citco Defendants caused Plaintiffs to suffer a loss by inducing them to retain their investments. By the very nature of Madoff's scheme, Plaintiffs were less and less likely to be able to redeem the longer they retained their investments.  Insofar as the Citco Defendants argue that the same run on the Funds would have occurred whether the fraud was disclosed in December 2008 or earlier, it is enough at this point that Plaintiffs allege that BMIS had more than $5.5 billion dollars in a bank account in the summer of 2008 available for redemptions.  (See SCAC ¶ 175.)

Finally, to the extent that Plaintiffs' holder claims are based on a breach of fiduciary duty, the Court finds Citco Defendants' causation arguments meritless.  The Citco Defendants ask the Court to apply a much more stringent causation standard than is required to plead a breach of fiduciary duty claim.  See Malmsteen v. Berdon, LLP, 369 Fed. App'x. 248, 251 (2d Cir. 2010) ("Because [a]n action for breach of fiduciary duty is a prophylactic rule intended to

remove all incentive to breach -- not simply to compensate for damages in the event of breach, there need not be but-for causation between the breach and the asserted damages ...." (alteration in original) (citations and quotation marks omitted)).   Accordingly, the Citco Defendants' motion to dismiss Plaintiffs' holder claims is denied.

     i. <u>Statute of Limitations</u>

The Citco Defendants argue that many of Plaintiffs' negligence-based claims are time-barred in that they relate to investments made more than three years before Plaintiffs filed their initial complaint against the Citco Defendants.   <u>See</u> C.P.L.R. § 214(4).   With respect to claims against the Administrators and Custodians -- alleged to be fiduciaries -- the Court disagrees.   "[T]he limitations period for claims arising out of a fiduciary relationship does not commence until the fiduciary has openly repudiated."   <u>See</u> <u>Golden Pac. Bancorp v. FDIC</u>, 273 F.3d 509, 518-19 (2d Cir. 2001) (quotation marks omitted).   Here, the Administrators and Custodians repudiated the fiduciary relationship when Madoff's fraud was discovered on December 11, 2008.   Plaintiffs, as stated above, filed a complaint against CFSE and Citco Bank on January 12, 2009.   After that case was consolidated into this action, Plaintiffs named CCI and Citco Global in the CAC on April 24, 2009.   Accordingly, the Court finds that Plaintiffs

-153-

filed all claims against the Administrators and Custodians well within even a three-year limitations period.

The Court also finds that the negligence-based claims against the nonfiduciary Citco Defendants are timely. In a negligence action, the limitations period begins to run "when all of elements of the tort can be truthfully alleged," IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 274 (N.Y. 2008). The Court is not persuaded, contrary to the Citco Defendant's assertions, that Plaintiffs suffered an injury at the time of their initial investment. See Kronos, Inc. v. AVX Corp., 612 N.E.2d 289, 292 (N.Y. 1993) (holding that plaintiffs' cause of action sounding in tort accrued in 1988 when plaintiff suffered damages, even though breach occurred in 1984). Up until Madoff's fraud was ultimately revealed in December 2008, Plaintiffs -- albeit not all of them at once -- could have redeemed their money and walked away without ever suffering a loss. The Court finds it plausible that, much like a conversion claim that arises where a bailee absconds with a bailor's property, the loss was not actually sustained until Plaintiffs sought to redeem their investments but could not. See Rahanian v. Ahdout, 694 N.Y.S.2d 44, 47 (App. Div. 1st Dep't 1999) ("In a bailment of personal property of infinite duration, the Statute of Limitations for a conversion action against a bailee does not

commence until the bailee refuses to return the property pursuant to the bailor's demand."). Insofar as the injury to Plaintiffs occurred when they were unable to redeem their investments on or after December 11, 2008, the Court finds all of the negligence-based claims against Citco Group and CFSB to be timely filed. Accordingly, the Court denies Citco Defendants' motion to dismiss Plaintiffs' state law claims as time-barred.

### 2. GlobeOp

Plaintiffs allege breach of fiduciary duty, negligence, and gross negligence claims against GlobeOp, a company that provided administrative services to the Greenwich Sentry from 2004 to 2006. GlobeOp moves to dismiss these claims, arguing that: (1) Plaintiffs do not have standing; (2) Plaintiffs' claims are preempted by the Martin Act, (3) Plaintiffs' tort claims are precluded by the economic loss doctrine, (4) Plaintiffs fail to allege that GlobeOp owed them a duty, (5) Plaintiffs fail to allege facts sufficient to support a claim, and (6) Madoff's intentional criminal acts were a supervening cause of any losses Plaintiffs may have sustained. For the reasons stated above in connection with Plaintiffs' similar claims against the Fairfield Defendants and Citco Defendants, Plaintiffs have standing, and their claims are neither preempted by the Martin Act nor barred by the economic loss

doctrine.  For the reasons discussed below, the Court grants GlobeOp's motion to dismiss Plaintiffs' gross negligence claim.  The Court finds the remainder of GlobeOp's arguments meritless under the analysis set forth above in the Court's review of similar motions by other defendants, and denies its motion to dismiss in all other respects.

a. <u>Supervening Cause</u>

GlobeOp argues that Madoff's criminal acts were a supervening cause of Plaintiffs' losses, and that therefore Plaintiffs' state law tort claims must be dismissed.  Assuming here that Madoff's actions were a substantial cause of Plaintiffs' injuries, GlobeOp will still be liable if Madoff's intervening act was reasonably foreseeable.  <u>See</u> <u>Derdiarian v. Felix Contracting Corp.</u>, 414 N.E.2d 666, 670 (N.Y. 1980).  Whether or not Madoff's actions were reasonably foreseeable is a question of fact not proper for resolution at the motion to dismiss stage.  <u>See</u>, <u>e.g.</u>, <u>McCarthy v. Sturm, Ruger, & Co.</u>, 916 F. Supp. 366, 372 (S.D.N.Y. 1996) ("[W]hether an intervening act severs the chain of causation depends on the forseeability of the intervening act and should be determined by the finder of fact.").

b. <u>Fiduciary Duty</u>

GlobeOp argues that because it was not in contractual privity (or a relationship so close as to approach privity)

-156-

with Plaintiffs, Plaintiffs fail to allege that they owed
Plaintiffs a fiduciary duty.   GlobeOp mischaracterizes the
law; an inquiry into privity is relevant when evaluating
negligence, negligent misrepresentation, and malpractice
claims against administrators and other professionals, such as
accountants and engineers, not in determining whether a
fiduciary relationship exists.  See, e.g., Pension Comm., 446
F. Supp. 2d at 195-96.

     As discussed above, a fiduciary relationship arises where
"one party's superior position or superior access to
confidential information is so great as virtually to require
the other party to repose trust and confidence in the first
party," and the defendant was "under a duty to act for or to
give advice for the benefit of another upon matters within the
scope of the relation."  Pension Comm., 446 F. Supp. 2d at
195-96.  "Contractual relations or formal writings are not
required to establish a fiduciary duty....   Rather, the
ongoing conduct between parties must be considered."  Id. at
196 (citations and quotation marks omitted).   Accordingly,
whether the fiduciary relationship exists is a fact-specific
inquiry.  Id. at 196; see also Musalli Factory for Gold &
Jewellry, 261 F.R.D. at 26.

     Here, Plaintiffs allege that GlobeOp "was responsible for
accounting, registrar, and transfer services, and also had

-157-

discretion regarding Plaintiffs' assets," and that it "occupied a superior position over Plaintiffs with respect to its discretionary responsibilities, and had superior access to confidential information about the investments, including location, security, and value of the assets." (SCAC ¶¶ 542-43.) Plaintiffs allege that this "superior position necessitated that Plaintiffs repose their trust and confidence in GlobeOp to fulfill its duties, and Plaintiffs did so by investing in Greenwich Sentry, and retaining their investments in the funds" and that "Plaintiffs reasonably and foreseeably trusted in GlobeOp's purported expertise and skill, and GlobeOp recognized that Plaintiffs would rely on and repose their trust in it when deciding to invest and retain their investments in Greenwich Sentry." (Id. ¶ 544.) According to Plaintiffs, "GlobeOp's discretion, control, and superior position over Plaintiffs gave rise to a fiduciary duty ... on the part of GlobeOp to the Plaintiffs who invested in Greenwich Sentry." (Id. ¶ 545.) The Court finds that these allegations are sufficient to make it plausible that GlobeOp owed a fiduciary duty to Plaintiffs.

GlobeOp contends that Pension Committee lays out a test for investors pleading a fiduciary relationship with a fund's administrators that requires that plaintiffs plead that: (1) the administrators held themselves out to investors as having

certain specialized polices and procedures to protect investors; (2) investors reasonably relied on those representations; and (3) the administrator had discretionary responsibilities such as to independently value the fund's portfolio. See Pension Comm., 446 F. Supp. 2d at 196-97. The Court finds no evidence in Pension Committee that these considerations, noted in that decision as lending to the plausibility of plaintiffs' claim, were intended by that court to be a rigid requirement in pleading a fiduciary relationship. Nonetheless, the Court finds that Plaintiffs have pled those facts here.

Plaintiffs allege that GlobeOp's website advertised its "independence, technology leadership and deep knowledge of complex financial instruments uniquely positions [it] to provide truly independently derived net-asset-value (NAV) reports and best-practice administration support for domestic and offshore funds." (SCAC ¶ 344 (quotation marks omitted).) As stated above, Plaintiffs allege that they reasonably relied on GlobeOp's purported expertise, and finally, that "GlobeOp undertook significant discretionary responsibilities that included preparing and distributing monthly reports that contain the amount of the Partnership's net assets, the amount of any distributions from the Partnership and Incentive Allocation, accounting and legal fees, and all other fees and

expenses of the Partnership." (Id. ¶ 345.)  GlobeOp asserts a
variety of facts to dispute these allegations; for example,
that GlobeOp did not hold itself out as an expert during the
relevant time period, that Plaintiffs did not rely on
GlobeOp's representations, and that GlobeOp's duties were not,
in fact, discretionary.   These are the kinds of factual
disputes that are inappropriate for the Court to resolve at
this stage, where the Court is obligated to accept Plaintiffs'
allegations as true and resolve doubts and draw all reasonable
inferences in their favor.  Given that Plaintiffs adequately
plead that they were owed a fiduciary duty by GlobeOp, and
that GlobeOp does not dispute that Plaintiffs have properly
pled breach, causation, and damages, the Court denies
GlobeOp's motion to dismiss with respect to this claim.

        c. Negligence and Gross Negligence

        With  respect  to  Plaintiffs'  negligence  and  gross
negligence claims, GlobeOp argues, as it does in relation to
Plaintiffs' breach of fiduciary duty claim, that Plaintiffs do
not allege that GlobeOp owed Plaintiffs a duty of care.  The
Court disagrees.

        Plaintiffs must plead privity, or a relationship so close
as to approach privity, to the extent that its negligence
claims are based on GlobeOp's alleged misrepresentations.  See
Vtech Holdings, Ltd. v. Pricewaterhouse Coopers LLP, 348 F.

Supp. 2d 255, 262 (S.D.N.Y. 2004); <u>Gaddy v. Eisenpress</u>, No. 99
Civ. 3781, 1999 WL 1256242, at *6 (S.D.N.Y. Dec. 27, 1999)
("To permit Plaintiff's general negligence claim against [the
defendant], would in effect, permit Plaintiff to make an end
run around New York privity requirements."). Here,
Plaintiffs' claims are based on GlobeOp's misrepresentations
to them in the form of the NAV and other financial reports
disseminated to Plaintiffs. Accordingly, the Court must
apply the <u>Credit Alliance</u> test, which it finds satisfied here.

Plaintiffs allege that investors relied on GlobeOp's
misrepresentations -- in the form of NAV statements and
monthly reports -- when making investment decisions. (SCAC ¶¶
346, 544, 551, 555.) Plaintiffs further allege that GlobeOp
knew that its NAV values were provided to both prospective and
current investors, and that GlobeOp expected investors to rely
on its services. (<u>Id.</u> ¶¶ 544, 551, 555.) Additionally,
according to the SCAC, GlobeOp held itself out as having
expertise in the field, advertising on its website that it
provide[d] "truly independent derived net-asset-value ("NAV")
reports and best-practice administration support for domestic
and offshore funds." (<u>Id.</u> ¶ 344). These allegations are
sufficient to satisfy the first and second prongs of <u>Credit
Alliance</u>. <u>See</u> <u>Pension Comm.</u>, 592 F. Supp. 2d at 641.
Finally, the Court finds that GlobeOp's "monthly mailing of

NAV statements and other correspondence with plaintiffs is sufficient to establish a 'linking' to plaintiffs such that it would have understood plaintiffs' reliance on these statements." Id.

GlobeOp argues that Plaintiffs did not rely on GlobeOp's statements, as required by the second prong of Credit Alliance, namely because (1) Plaintiffs invested in the Greenwich Sentry prior to the time that GlobeOp was its administrator, and (2) Plaintiffs remained investors after GlobeOp ceased to serve as Greenwich Sentry's administrator. The Court is unpersuaded. The mere fact that Plaintiffs may have relied on other administrators' representations when investing does not preclude the Court from finding, at this stage, that Plaintiffs at one time relied on GlobeOp's representations. Moreover, the element of reasonable reliance ordinarily is a fact-intensive issue not proper for determination as a matter of law at the pleading stage, but one more appropriate for the fact-finder after discovery has developed a sufficient evidentiary record. See Maloul v. Berkowitz, No. 07 Civ. 8525, 2008 WL 2876532, at *2 (S.D.N.Y. July 23, 2008) (noting that element of reasonable reliance "is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss").

Further, GlobeOp argues that Plaintiffs' allegations

-162-

refer to GlobeOp's website as it existed in 2009, not during the period of time from 2004 to 2006, when GlobeOp served as Greenwich Sentry's administrator.  It is therefore GlobeOp's position that any marketing statements taken from the 2009 website are irrelevant for the purposes of this litigation. However, without a more developed factual record, the Court cannot find at this stage that the 2009 version of GlobeOp's website was materially different from the version of GlobeOp's website that was accessible from 2004 to 2006.  Accordingly, the Court finds that Plaintiffs allege sufficient facts to make it plausible that GlobeOp owed them a duty pursuant to the Credit Alliance standard, and denies GlobeOp's motion with respect to this claim.

However, Plaintiffs fail to state a claim for gross negligence.  Plaintiffs allege that GlobeOp was "grossly deficient in its fulfillment of its duties" and that it "blindly and recklessly relied on information provided by BMIS and the Fund."  (SCAC ¶ 347.)  Unlike Plaintiffs' pleadings with regard to the Administrators, there are no allegations that GlobeOp was aware of the red flags surrounding Madoff. These conclusory allegations by themselves are insufficient to state a plausible gross negligence claim against GlobeOp. Accordingly, the Court grants GlobeOp's motion to dismiss Plaintiffs' gross negligence claim.

E. UNDERLINE{AUDITORS}

1. UNDERLINE{Federal Securities Law Claims Against the PwC Member Firms}

Plaintiffs also assert claims against the PwC Member Firms for violation of § 10(b) and Rule 10b-5 and against PwC International for control person liability under § 20(a). The PwC Member Firms' challenge the sufficiency of Plaintiffs' allegations of scienter, reliance, and loss causation.

a. <u>Scienter</u>

i. <u>Legal Standard for Accountants</u>

The Court will apply the standard described above for federal securities fraud claims. In addition, "[f]or recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that ... approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." _Rothman v. Gregor_, 220 F.3d 81, 98 (2d Cir. 2000) (quotation marks omitted); _see_ _In re Scottish Re Group Sec. Litig._, 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007) ("The standard for pleading auditor scienter is demanding. For an accountant to be found to have acted recklessly during an audit, its alleged misconduct must approximate an actual intent to aid in the fraud being perpetrated by the audited company." (citation and quotation marks omitted)).

-164-

### ii. The PwC Member Firms' Conscious Recklessness

The PwC Member Firms assert that Plaintiffs have failed to allege facts sufficient to establish a strong inference of their conscious recklessness. Plaintiffs allegations fall into two categories: (1) those focused on the PwC Member Firms's violations of professional standards, and (2) those centered around their failure to provide "red flags" their due.

### A. Professional Standards

Plaintiffs contend that they have properly pled a strong inference of conscious recklessness because the SCAC alleges that the PwC Member Firms recklessly failed to conduct their audits in accordance with professional standards, including those set out in GAAP, GAAS, and International Accounting Standards ("IAS"). They allege that the auditors "recklessly violated auditing standards" by neglecting to take several appropriate auditing measures, including their failure to: adequately consider BMIS's internal controls, "obtain audit evidence of Madoff's representations that the vast majority of the Funds' assets were in Treasury Bills," "perform transaction testing on Madoff's investment strategy," "test the accuracy of the Net Asset Value," and "critically assess BMIS's auditor and its supposed audit of BMIS." (SCAC ¶¶ 272-73, 291-93, 295-97, 300-03, 305-11, 314-15, 466-67).)

Based on these alleged shortcomings, Plaintiffs conclude that the "audits were so deficient that in reality there were no audits at all." (SCAC ¶ 316.)

Violations of professional auditing standards, without more, do not constitute strong circumstantial evidence of conscious recklessness. See Novak, 216 F.3d at 309 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." (quotation marks and citation omitted)); In re Tremont Sec. Law, State Law & Ins. Litig., No. 08 Civ. 11117, 2010 WL 1257580, at *5 (S.D.N.Y. Mar. 30, 2010) ("[A]lleging a shoddy audit in violation of GAAS does not establish the intent to defraud required to maintain a claim for securities fraud.").

In the instant matter, the Court finds that Plaintiffs have failed to allege facts that give rise to a strong inference of anything more than a neglect to uphold professional auditing standards. Nevertheless, Plaintiffs argue that this Court's ruling in Varghese v. China Shenghuo Pharmaceutical Holdings, Inc., 672 F. Supp. 2d 596, 602 (S.D.N.Y. 2009), supports a finding of scienter here based on the allegations of the firms' "reckless" audit.

-166-

Despite this contention, Varghese does not compel a different result when applied to the instant facts. In the context of explaining that "[w]hen pleading fraud against auditors, the standards for alleging scienter are especially stringent" and that "the [pleaded] recklessness must entail a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company," id. at 609 (quotation marks and alteration omitted), the Court in Varghese stated that a plaintiff can allege facts giving rise to a strong inference of conscious recklessness by pleading facts to support that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." Id. at 610 (quoting Scottish Re Group, 524 F. Supp. 2d at 398) (quotation marks omitted).

Applying the standard articulated in Varghese to the facts alleged in that case, the Court found scienter at the pleading stage because the auditor omitted to perform appropriate audit procedures despite being aware that the serious internal control problems were pervasive in its client operations and financial reporting, including the auditor's

-167-

actual awareness of the client's "significant deficiencies"
that caused its internal accounting controls to be ineffective
and the auditor's knowledge "that there were ongoing serious
problems with [the client's] financial reporting." Id. at
602, 610; see also id. at 610 ("Plaintiffs allege that [the
auditor] was aware, through [the client company's] own
disclosures, that [the company] has serious internal control
problems .... Plaintiffs do not merely allege that [the
auditor] should have discovered errors in [the company's]
financial reporting, but that they were aware, based on [the
company's] filings, that there were ongoing serious problems
with [its] financial reporting." (emphasis added)).

Here, unlike in Varghese, the Court finds that Plaintiffs
fall short of these "especially stringent" standards. Id. at
609. Plaintiffs do not allege that the PwC Member Firms were
aware of facts indicating "significant deficiencies" with the
Funds' financial reporting or even that of non-client BMIS.
Despite Plaintiffs' conclusory recital of the standard in
Varghese that "[i]n sum, PwC's audits were so deficient that
in reality there were no audits at all," (SCAC ¶ 316), the
Court finds that they do not plead specific facts to support
a strong inference that the PwC Member Firms' audits "were so
deficient that the audit[s] amounted to no audit at all, or an
egregious refusal to see the obvious, or to investigate the

-168-

doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." Varghese, 672 F. Supp. 2d at 610 (quotation marks and citation omitted). Accordingly, the Court concludes that Plaintiffs have failed to establish the requisite strong inference of conscious recklessness based on allegations of the PwC Member Firms's alleged failure to conduct a proper audit. Accord Tremont, 2010 WL 1257580, at *5; Stephenson, 2010 WL 1244007 at *17-*18.

　　　B. Red Flags

　　Plaintiffs also seek to establish conscious recklessness through allegations of the PwC Member Firms' reckless disregard of many of the red flags described above. "Allegations of [an auditor ignoring] 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter." In re AOL Time Warner, Inc. Sec. and "ERISA" Litig., 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004). But "the auditor must have actually been aware of the red flags, either because they are alleged to have actual knowledge or because the red flags were so obvious that the auditor must have been aware of them ...." Stephenson, 2010 WL 124407 at *18; id. at *19("[O]nly those red flags that PWC is alleged to have known of, or that are so

obvious that PWC must have known of them, can support an inference of intent.").

Plaintiffs assert that the SCAC alleges several red flags that establish a strong inference of conscious recklessness. The Court, however, finds that Plaintiffs fail to allege that the PwC Member Firms were sufficiently aware of the red flags cited in the SCAC.  Accord Stephenson, 2010 WL 1244007 at *19 (dismissing the pleading after finding deficiencies in the plaintiffs failure to allege awareness of the cited red flags).  Further, the Court finds that other warning signs of which the PwC Members Firms were allegedly aware simply do not rise to the level of a red flag sufficient to support a finding of scienter here.

Plaintiffs allege as a red flag the lack of due diligence performed on BMIS by the Funds and the Fairfield Defendants. (See SCAC ¶ 314 (alleging that the PwC Member Firms "willfully ignored" the red flag of "[t]he Funds and the Fairfield Defendants as Fund managers perform[ing] no meaningful due diligence on BMIS.").)  However, the pleading omits to allege that the PwC Member Firms were aware of the Funds' and the Fairfield Defendants' failure to perform their due diligence procedures on Madoff.  On the contrary, the pleading alleges that the Funds and the Fairfield Defendants falsely or recklessly represented that they were conducting extensive due

-170-

diligence.  (See SCAC ¶¶ 182, 193-204.)

Plaintiffs also seek to establish scienter by pointing to the putative red flag of the PwC Member Firms' ignoring the warning sign of F&H's inadequacy as an auditor.  (See SCAC ¶ 314 ("BMIS was not audited pursuant to GAAS by a qualified and reputable independent audit firm" (quotation marks omitted).) The Court finds, however, that Plaintiffs fail to allege any awareness by the PwC Member Firms of any red flag-level deficiency with F&H's auditing credentials and abilities.

The SCAC also asserts that the PwC Member Firms ignored the red flag of Madoff's claim that he was always fully invested in Treasury bills at the end of each quarter while still executing his trading strategy.  (See SCAC ¶ 223; id. at ¶ 308 ("Had [the PwC Member Firms] undertaken the proper analysis and testing of the strategy purportedly employed by Madoff, [they] would have determined that the strategy including the claimed liquidation of all positions at the end of each quarter to acquire U.S. Treasury bonds, could not have functioned as described within market parameters.").) Plaintiffs have not, however, alleged that the auditors had any awareness that Madoff's investment strategy was incompatible with his claim to hold all positions in government securities at the end of each quarter.

The Court further finds that other supposed red flags

-171-

cited by the Plaintiffs do not rise to the level sufficient to plead scienter on the part of the PwC Member Firms. Plaintiffs identify as a red flag that the PwC Member Firms knew that "99% of all [Madoff's] trades are electronic" and that they "knew that Madoff did not provide electronic confirmations to the Funds that he managed, and instead gave them delayed, paper confirmation of supposed trades." (SCAC ¶ 272).)  The Court is not persuaded that the auditors' knowledge of this discrepancy is a red flag sufficient to establish a strong inference that the PwC Members firms had "a state of mind approximating actual intent" to aid the fraud. South Cherry, 573 F.3d at 109 (emphasis in original).

Plaintiffs, investors in the Funds, also allege that the PwC Member Firms ignored the "red flag" of Madoff purporting to turn consistent investment returns during good times and bad times in the market. (See also SCAC ¶ 308 ("PwC would have determined that BMIS' claimed consistent, positive returns were not achievable.").)  The Court is not persuaded that the reporting of consistent investment returns here does not constitute a red flag. Accord Stephenson, 2010 WL 1244007, at *20 (noting that while "PWC must have known [that] consistently reported excellent results, ... even in the present economic climate the Court is unwilling to hold that success in securities trading is a red flag").  Plaintiffs,

-172-

many of which were sophisticated investors, were similarly likely aware of Madoff's exceptional returns and made their investment in Madoff precisely because of his consistent, positive results -- not because of any conscious recklessness. Further, allegations of what the PwC Member Firms "would have determined" had they analyzed and tested Madoff's strategy against his returns are simply insufficient because they fail to allege the firms' awareness of any problematic analysis or testing of Madoff's consistent returns.

Plaintiffs further claim as a red flag that "[a]ll of the Funds' assets were managed by Madoff, who acted as investment advisor, broker-dealer, and custodian of those assets -- a highly unusual arrangement with no checks and balances." (Pl. Opp. Br. at 12 (citing SCAC ¶¶ 221, 300, 307, 316, 271).) The Court is not persuaded that the auditors' alleged ignoring of this warning sign supports an inference of conscious recklessness against them. Accord Stephenson, 2010 WL 1244007, at *20 (considering identical red flag and concluding that "[a]lthough the Court does see this as something of a red flag, it is far too mild to support an inference of recklessness on the part of PWC. Particularly considering that PWC was not the auditor of BMIS, but rather of a fund that invested in BMIS, this red flag alone is insufficient ....").

The Court concludes that Plaintiffs have failed to point to any red flags that the PwC Member Firms, which, as the <u>Stephenson</u> court also noted, were engaged to audit the Funds and not BMIS,[23] ignored that evidences their conscious recklessness to the underlying Ponzi scheme that "approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." <u>Rothman v. Gregor</u>, 220 F.3d 81, 98 (2d Cir. 2000) (quotation marks omitted). Even in the aggregate, Plaintiffs conclusion that the PwC Member Firms should have realized that Madoff and FGG were committing fraud, such conditional allegations of scienter are not enough. As in <u>South Cherry</u>, the SCAC "is replete with allegations that [the defendants] 'would' have learned the truth as to those aspects of the funds if [the defendants] had performed the 'due diligence' [they] promised." 573 F.3d at 112. The SCAC does not allege that the PwC Member Firms, unlike Citco and the Fraud Defendants, were aware of

---

[23] Plaintiffs cite no case, and the Court has found none, in which allegations that an auditor ignored red flags at a third party, non-client, as opposed to the audit client itself, established scienter. As the court stated in <u>Tremont</u>:

> [M]ost critically, the Auditors were never engaged to audit Madoff's businesses or to issue an opinion on the financial statements of BMIS. The Auditors' only role is that they audited the financial statements of [feeder funds]. The notion that a firm hired to audit the financial statements of one client (the [feeder funds]) must conduct audit procedures on a third party that is not an audit client (BMIS) on whose financial statements the audit firm expresses no opinion has no basis.

2010 WL 1257580, at *6; <u>accord Stephenson</u>, 2010 WL 1244007, at *20.

sufficient information as auditors to satisfy the heightened pleading required here.  Accordingly, the SCAC fails to allege facts sufficient to support a strong inference that the PwC Member Firms acted with scienter.

### iii. Plausible Opposing Inference

Even if the SCAC alleged facts sufficient to support a strong inference of conscious recklessness, Plaintiffs' federal securities law claims would still be subject to dismissal because "a reasonable person would [not] deem the inference of scienter ... at least as compelling as ... opposing inference[s] one could draw from the facts alleged." Tellabs, 551 U.S. at 324.  The Court finds that, in the specific context of the information available to the PwC Member Firms or information these two defendants should have known, it is a more compelling inference that the PwC Member Firms were duped by FGG or were merely negligent in the exercise of professional duties they owed to the Funds.

Because of the SCAC's fatal scienter deficiencies, the Court need not consider whether the Plaintiffs have sufficiently pleaded loss causation and reliance.

### b. Section 20(a) Claim Against PwC International

The Court also need not analyze Plaintiffs' § 20(a) claim against PwC International.  Liability for violations of § 20(a) is derivative of liability for violations of § 10(b).

-175-

See Securities & Exch. Comm'n v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). The Court has already set forth above, in connection with Plaintiffs' similar claims against other defendants, the elements Plaintiffs must plead to show a prima facie case of a § 20(a) violation. The first such requirement a primary violation by the controlled person. Here Plaintiffs have failed to adequately plead a primary violation of the Exchange Act by either of the PwC Member Firms.

2. Common Law Claims[24]

a. Gross Negligence

Plaintiffs allege that the PwC Member Firms were grossly negligent in failing to properly audit the Funds. PwC Canada asserts that there is no basis under New York law for an action in gross negligence against an accounting firm. New York law does not recognize a cause of action for gross negligence against accountants unless the claim rises to the level of a fraud claim. See Equitable Life Assurance Soc. v. Alexander Grant & Co., 627 F. Supp. 1023, 1031 & 1033 (S.D.N.Y. 1985) ("[T]here is no independent action for gross negligence against accountants."); HSA Residential Mortgage

---

[24] The Court notes that the Stephenson court found, in a seemingly identical factual scenario, that a limited partner in one of the Domestic Funds did not have standing under Delaware law to bring breach of fiduciary duty, aiding and abetting breach of fiduciary duty, or breach of contract claims against PwC Canada. See 2010 WL 1244007, at *8-*11.

Servs. Of Texas v. Casuccio, 350 F. Supp. 2d 352, 363, 369 (E.D.N.Y. 2003) ("New York does not recognize an independent claim of gross negligence against accountants."). As the Court found above, Plaintiffs have not alleged facts sufficient to support a fraud claim against the PwC Member Firms. Accordingly, the Court dismisses Plaintiffs' gross negligence cause of action against the PwC Member Firms.

### b. Negligence and Negligent Misrepresentation

Plaintiffs also assert claims for negligence and negligent misrepresentation against the PwC Member Firms. The auditors move to dismiss these claims because, they argue, Plaintiffs have failed to allege facts to establish that the auditing firms plausibly owed them a duty of care.

### i. Duty of Care

"Under New York law, accountants owe a duty of care to (a) those with whom they have contracted and (b) those [third parties] with whom they have a 'relationship so close as to approach that of privity.'" BHC Interim Funding, L.P. v. Finantra Capital, Inc., 283 F. Supp. 2d 968, 984 (S.D.N.Y. 2003) (quoting Parrott v. Coopers & Lybrand, 95 N.Y. 2d 479, 483 (2000)). Plaintiffs, who do not contend that they contracted with the PwC Member Firms, assert that the PwC Member Firms owe them a duty of care because they had a "relationship so close as to approach that of privity."

-177-

Parrott v. Coopers & Lybrand, 95 N.Y.2d 479, 483 (2000).  As
noted, the Court will analyze this claim under the standard
articulated by Credit Alliance Corp., 65 N.Y.2d 536.

    A. Awareness That the Financial Reports Were to Be Used
       for a Particular Purpose

      The PwC Member Firms fail to present any compelling
argument that the alleged facts fall short of leading to the
plausible inference that they were aware that the financial
reports they produced for the Funds were to be used for the
particular purpose of evaluating investments in the Funds.
The Court finds several allegations in the SCAC supporting
this awareness.  (See, e.g., SCAC ¶ 442 ("[The] PwC [Member
Firms] ... kn[ew] that Plaintiffs would use and rely upon
[their] representations for the particular purpose of
determining whether to hold their assets in the Funds and
whether to purchase additional interests in the Funds."); id.
¶ 277 ("[The] PwC [Member Firms] acknowledged in the Audit
Plan that [their] audit engagement involved delivering to
shareholders and other stakeholders in the funds independent
opinions and reports that provide assurance on financial
information released by the Funds." (citation and quotation
marks omitted) A finding of the PwC Member Firms' awareness of
the financial reports' particular purpose of evaluating
investments in the Funds is further supported by Plaintiffs'
allegation that the PwC Member Firms "knew that there was no

independent market mechanism or evidence to value the shares and limited partnership interests in the Funds, and that there was no other independently-verified third party financial information about the Funds besides [the PwC Member Firms'] audited financial statements." (Id. ¶ 279.)  Thus, the Court finds that Plaintiffs have alleged facts sufficient to show, at the pleading stage, the auditors' awareness that the financial reports were to be used for the particular purpose of evaluating the performance of investments in the Funds.

   B. Intention for a Known Party to Rely on the Financial
      Reports

     PwC Netherlands, notably not joined by PwC Canada, argues that Plaintiffs have not met the second Credit Alliance element because the SCAC does not allege with specificity that PwC Netherlands issued any report to a particular plaintiff. The Court is not persuaded by PwC Netherlands's argument, and finds that the Plaintiffs have alleged facts from which a plausible intention on the part of PwC Netherlands for investors in the Funds to rely on its financial reports can be reasonably inferred.  (See, e.g., SCAC ¶ 435 ("[The] PwC [Member Firms] addressed audit reports to the shareholders and limited partners of the Funds."); id. ¶ 277 ("[The] PwC [Member Firms] acknowledged in the Audit Plan that [their] audit engagement involved 'delivering' to 'shareholders and other stakeholders' in the funds 'independent opinions and

-179-

reports that provide assurance on financial information released by the Funds.'" (quotation marks and citation omitted); id. ¶ 435 ("[The] PwC [Member Firms] knew that [their] audit reports would be relied upon, directly or indirectly, by Plaintiffs in deciding to make or retain investments in the Funds in that, among other things, [the PwC Member Firms] addressed [their] audit reports to investors in the Funds, and knew the Funds advised Plaintiffs and the investment community that [the] PwC [Member Firms] audited the Funds' financial statements and had given the Funds 'clean" audit reports."); id. ¶ 277 ("[The] PwC [Member Firms] knew that investors ... including Plaintiffs, would rely upon the facts [sic] that [the] PwC [Member Firms were] the auditor[s] of the Funds, represented [they] conducted proper audits of the Funds, and issued unqualified, or clean, opinions on the Funds' financial statements.").)

PwC Netherlands has cited no persuasive authority for the proposition that Plaintiffs must allege that it issued specific reports to particular plaintiffs.  The "known parties" prong of the Credit Alliance test does not require an auditor know a "particular" third party by name.  Rather it recognizes that while an accountant does not owe a duty to members of an "indeterminate class," Ultramares Corp. v. Touche, 174 N.E. 441, 444 (N.Y. 1931), an accountant owes a

-180-

duty to "[members] of a settled and particularized class among the members of which the report would be circulated ...." White v. Guarente, 372 N.E.2d 315, 320 (N.Y. 1977).  Here, PwC Netherlands knew that its financial reports would be circulated among the Plaintiffs.

PwC Canada focuses its argument under the "known party" prong on prospective investors and contends that prospective investors were not known to them.  The Court disagrees and finds ample allegations, at this stage of the litigation, to support the plausibility of the PwC Member Firms' intention that a known class of future investors would rely on their financial reports.  For example, the SCAC alleges that:

> [The] PwC [Member Firms] knew that [their] name was used by the Funds in marketing so as to give the Funds legitimacy and, therefore, to draw investors to the Funds. [The] PwC [Member Firms] also knew that [their] audit letters would be provided or made available to potential investors and to existing investors. [The] PwC [Member Firms] knew that investors and potential investors, including Plaintiffs, would rely upon the facts [sic] that [they were] the auditor[s] of the Funds, represented [they] conducted proper audits of the Funds, and issued unqualified, or clean, opinions on the Funds' financial statements.

(SCAC ¶ 277.)  The SCAC also alleges that:

> [The] PwC [Member Firms] knew that [their] audit reports would be relied upon, directly or indirectly, by Plaintiffs in deciding to make or retain investments in the Funds in that, among other things, [they] ... knew the Funds advised Plaintiffs and the investment community that [the] PwC [Member Firms] audited the Funds' financial statements and had given the Funds 'clean" audit reports.

(See id. ¶ 435.)

C. Linking Conduct Evincing the Accountants'
   Understanding of Plaintiffs' Reliance

The PwC Member Firms assert a lack of linking conduct connecting the firms and Plaintiffs, largely premised on the theory that actual face-to-face or similar direct contact between an auditor and a third party is necessary to establish this element. That argument misstates the standard. See Dorking Genetics v. United States, 76 F.3d 1261, 1270 (2d Cir. 1996) ("We do not think that the [New York] Court of Appeals intended the term 'linking conduct' to be read so narrowly" and interpreting Credit Alliance to permit an action "even if the plaintiffs had never interacted directly with the defendant"). The Court, rather, finds Plaintiffs' factual allegations sufficient to show linking conduct evincing the PwC Member Firmss' understanding of the investors' reliance. For example, Plaintiffs allege that the PwC Member Firms addressed the financial reports to Plaintiffs. See Cromer Fin. Ltd. v. Berger, No. 00 Civ. 2498, 2001 WL 1112548, at *5 (S.D.N.Y. Sept. 19, 2001) ("[The accountant's] audit reports, addressed to the shareholders, constitute substantial communication between [the auditor] and the plaintiff-shareholders sufficient to satisfy the 'linking conduct' requirement ...." (quotation marks omitted)); (SCAC ¶ 275 ("[PwC Members Firms] addressed audit reports to the

-182-

shareholders of Fairfield Sentry and Fairfield Sigma and to the partners of Greenwich Sentry and Greenwich Sentry Partners, whom [they] knew would rely on the audit reports in acquiring and holding shares or partnership interests of the Funds."). Accordingly, the Court finds that Plaintiffs have alleged facts sufficient to establish plausible linking conduct.

The Court thus concludes that Plaintiffs, having pled facts sufficient to allege (1) an awareness by the PwC Member Firms that the financial reports were to be used for the particular purpose of evaluating Plaintiffs' investments in the Funds, (2) in the furtherance of which the known investors and future investors were intended to rely, and (3) conduct on the part of the PwC Member Firms linking them to these investors, which evinces the accountants' understanding of the investors' reliance for the purposes of defeating a motion to dismiss, have stated a plausible "relationship so close as to approach that of privity" with the PwC Member firms. Parrott v. Coopers & Lybrand, 741 N.E.2d 506, 508 (N.Y. 2000) (citation and quotation marks omitted). As such, the Court denies the PwC Member Firms' motions to dismiss to the extent they seek to dismiss Plaintiffs' negligence and negligent misrepresentation claims because of a lack of a duty of care

owed to them.[25]

    c. <u>Breach of Contract</u>

The PwC Member Firms also move to dismiss the Plaintiffs' claims for breach of contract as a third-party beneficiaries because, they assert, Plaintiffs have failed to adequately plead that they were intended beneficiaries of any PwC Member Firms' promises.  Specifically, the PwC Member Firms argue that Plaintiffs' claims fail because they cannot allege an intent to benefit them apparent from the face of the contract. Plaintiffs respond that several contracts manifest an intent to benefit them, and specifically identify (1) the engagement letters between the Funds and PwC and (2) the audit plans outlining the nature and scope of PwC's obligations.

The Court, applying the standards for a third-party breach of contract specified above, finds that the Plaintiffs have failed to point to any language in any agreement between the Funds and the PwC Member Firms that contains "a specific intent to confer a benefit upon" the Plaintiffs.  <u>Conklin v. City of Saratoga Springs</u>, 699 N.Y.S.2d 820, 821 (App. Div. 3d Dep't 1999).  Further, the Court finds no language from which it can infer an intent to permit the Plaintiffs to enforce the Funds' auditing contracts with the PwC Member Firms.

---

[25] With a single sentence in their briefs, the PwC Member Firms additionally argue that Plaintiffs have not pled reliance or causation for the negligence claims against the PwC Member Firms.  The Court is not persuaded by this conclusory and summary argument.

Plaintiffs have simply failed to cite any language in any contract between any Fund and either PwC Member Firm that would compel a different result.

Plaintiffs argue that the circumstances surrounding these contracts show Plaintiffs' third-party-beneficiary status. Although New York courts are permitted to look to surrounding circumstances "where appropriate" to determine whether a plaintiff is an intended third-party beneficiary, <u>Muhlrad v. Mitchell</u>, No. 96 Civ. 3568, 1997 WL 182614, at *6 (S.D.N.Y. Apr. 14, 1997), such circumstances cannot give rise to third-party beneficiary status "absent some indication in the actual agreement of the parties' intent." <u>Olin Corp. v. E.I. DuPont Nemours and Company</u>, No. 05-CV-100S, 2007 WL 610625, at *4 (W.D.N.Y. Feb. 23, 2007). While it may be appropriate to look to the "surrounding circumstances" when a contract's literal terms are ambiguous or provide latitude, the language of the various agreements here contain only a deafening silence on this point. Thus, even construing the relevant provisions in the light most favorable to Plaintiffs, the text fails to show an intent to confer third-party beneficiary status on Plaintiffs. Thus, the Court cannot look to establish third-party beneficiary status through surrounding circumstances. Accordingly, the Court grants the PwC Member Firms' motions to dismiss the third-party-beneficiary breach

-185-

of contract claim.[26]

  **d.** <u>Aiding and Abetting a Breach of Fiduciary Duty and Fraud</u>

  Plaintiffs claim that the PwC Member Firms aided and abetted a breach of a fiduciary duty and fraud committed by the Fraud Defendants.  The Court will evaluate each of these causes of action applying the standards described above in connection with Plaintiffs' similar claims against other Defendants.  The PwC Member Firms' argue that Plaintiffs fail to assert a plausible aiding and abetting cause of action against them because of insufficient allegations of knowledge of either the breach of duty or fraud.  The Court agrees.  As described above, the SCAC does not properly allege that any of the PwC Members Firms had actual knowledge or demonstrated reckless avoidance of the red flags that would or should have put them on alert to the fraud or breach of duty committed by the Fairfield Defendants and the Fraud Defendants.

  Accordingly, the Court grants the PwC Member Firms'

---

[26] With regard to PwC Canada, the Court's finding is corroborated by the explicit disclaimer in the firm's engagement letters with individual Funds.  That language falls under the heading "Reliance by Third Parties" and reads:

> The financial statement audit will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction.  Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

(PwC Canada engagement letter, dated January 11, 2007.)

motions with regard to Plaintiffs' claims alleging aiding and abetting a breach of fiduciary duty and aiding and abetting fraud.

e.   <u>Unjust Enrichment</u>

The PwC Member Firms assert that Plaintiffs' unjust enrichment claim against them must be dismissed because a party cannot maintain an action for unjust enrichment when a valid and enforceable contract governs the subject matter at issue.  Plaintiffs have not proffered any opposition to this argument.  The Court agrees with the PwC Member Firms that the valid and enforceable contracts here, the engagement agreements between the PwC Member Firms and the Funds, govern the subject matter at issue.  See <u>Clark-Fitzpatrick, Inc.</u>, 516 N.E.2d at 193.  Accordingly, the Court dismisses Plaintiffs unjust enrichment claim against the PwC Member Firms.

f.   <u>Vicarious Liability</u>

Plaintiffs seek to hold PwC International vicariously liable under agency principles for the PwC Member Firms' alleged gross negligence, negligence, negligent misrepresentation, breach of contract, aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and unjust enrichment.[27]   To demonstrate a principal-agent

---

[27] Plaintiffs' vicarious liability claims arising out of the PwC Member Firms' alleged gross negligence, aiding and abetting a breach of fiduciary and fraud, breach of contract, and unjust enrichment fail because the Court has granted the PwC Member Firms' motions as to those underlying

relationship, Plaintiffs must allege facts sufficient to support: "(1) a manifestation by the principal that the agent shall act for him; (2) acceptance of the undertaking by the agent; and (3) an understanding between the parties that the principal is to be in control of the undertaking." Star Energy Corp. v. RSM Top-Audit, No. 08 Civ. 00329, 2008 WL 5110919, at *2 (S.D.N.Y. Nov. 26, 2008) (quotation marks and citation omitted). Moreover, "[t]here is no agency relationship where the alleged principal has no right of control over the alleged agent." Id. (quotation marks and citation omitted). "The element of control often is deemed the essential characteristic of the principal-agent relationship." In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 278 (S.D.N.Y. 2005).

i. Control of the Audits

PwC International's chief argument contends that the Court must dismiss the respondeat superior claims because Plaintiffs have not adequately alleged the control aspect of the standard. Specifically, PwC International asserts a lack of control of the PwC Member Firms because the SCAC does not link PwC International to the member firms' audits of the Funds and fails to allege any PwC International participation

claims. See Shapiro v. Kronfeld, No. 00 Civ. 6286, 2004 WL 2698889, at *24 (S.D.N.Y. Nov. 24, 2004) (dismissing claims premised upon a theory of respondeat superior because "there can be no imposition of vicarious liability in the absence of underlying liability").

in or control of the audits of the Funds.  Plaintiffs do not offer any assertion of PwC International's specific control of the Funds' audits.  Upon review of the SCAC, the Court finds it devoid of allegations suggesting any substantive involvement or exercise of any control by PwC International in connection with the Funds' audits.

ii.  <u>General Control</u>

Plaintiffs assert a more generalized control, stating that "control does not depend on whether PwC International actually controlled PwC Canada and PwC Netherlands, but rather whether PwC International had <u>the right to</u> control any aspect of PwC Canada's or PwC Netherlands' conduct."  (Ps' Opp. Br. at 47-8 (emphasis in original); <u>see</u> <u>id.</u> at 50 ("At the pleading stage, the case law does not require that Plaintiffs allege that PwC International was actually involved in performing the Funds' audits.  Rather, it requires that the SCAC plead -- as it does -- sufficient facts to show that PwC International exercised <u>some</u> control over the PwC [M]ember [F]irms' <u>operations</u> <u>and</u> <u>audits</u> <u>generally</u>." (emphasis added).) Thus, the viability of Plaintiffs' vicarious liability claim turns on, at the threshold, whether allegations of generalized control are sufficient to state a plausible agency relationship.

Plaintiffs' theory of general control is not supported by

-189-

the case law.  A principal auditor's control of its agent auditor must come in a more focused form.  See Star Energy Corp. v. RSM Top-Audit, No. 08 Civ. 00329, 2008 WL 5110919, at *3 (S.D.N.Y. Nov. 26, 2008) (finding that umbrella accounting firm's association with its member firm that conducted the allegedly flawed audit at issue was insufficient in itself to establish principal-agent control and stating that "[a] principal-agent relationship cannot be found on such general assertions").

Despite Star Energy and a plethora of cases standing for the same or similar propositions rejecting their theory, Plaintiffs nevertheless press that a broader set of facts can establish "control."  Plaintiffs rely on two cases which they contend involve allegations of generalized control deemed sufficient and which thus support their premise.  However, neither of those is availing because each entails allegations asserting much more specific principal involvement in the respective agents' audits at issue, which under the particular factual circumstances would support a reasonable inference of the principal's power to control those audits.  First, in Cromer Fin. Ltd., 2002 WL 826847, at *1, a far greater role by the international accounting firm principal in the member firm agent's audit was established than is shown in the present case.  There, the plaintiffs alleged that Deloitte Touche

-190-

(Bermuda)'s ("Deloitte Bermuda") international affiliate Deloitte Touche Tomatsu ("Deloitte Tomatsu") performed substantial work on the audit at issue and was identified as responsible for the audit. See id. at *3. The Cromer complaint also alleged that Deloitte Tomatsu represented that the Deloitte Bermuda partner in charge of the audit, who also signed the audit, was a member of Deloitte Tomatsu's "Global Financial Services Industries," and was a part of Deloitte Tomatsu's "global investment management and hedge fund practice." Id. at *2. Accordingly, in Cromer, the court found adequate pleading of control precisely because the plaintiffs alleged that the principal had sufficient specific involvement in the performance of its agent's audit, unlike allegations of mere generalized control Plaintiffs assert in the instant action. Accord Star Energy Corp., 2008 WL 5110919, at *3 ("In Cromer, the partner was identified by Deloitte [Tomatsu] as a 'global practice leader,' member of Deloitte[] [Tomatsu's] Global Financial Services Industries team, and part of Deloitte[] [Tomatsu's] global investment management and hedge fund practice. In other words, a Deloitte [Tomatsu] partner was involved with the [Deloitte] Bermuda affiliate in performing work for the plaintiff." (citation omitted)).

    Nor is the Court persuaded that Parmalat compels a

different result.  Like <u>Cromer</u>, <u>Parmalat</u> involved more direct
action in the audit at issue than Plaintiffs' have alleged
here.  <u>See</u> 375 F. Supp. 2d at 294-95 ("alleg[ing] that [a
member firm auditor in charge of the audit] sought direction
and help from [Deloitte Tomatsu], from which it could be
inferred that [Deloitte Tomatsu] was in ultimate control of
the audit"); <u>id.</u> at 293-94, 301 (stating that plaintiffs
alleged that the coordinating entity, Deloitte [Tomatsu],
intervened in the management of the audits at issue); <u>id.</u> at
292-93 (stating that plaintiffs alleged significant overlap in
managers of [Deloitte Tomatsu] and the member firms auditing
Parmalat); <u>id.</u> at 293-95 ("[Plaintiffs] have alleged further
that [Deloitte Tomatsu] took actions in directing -- or
directing the removal of -- auditors on the Parmalat audit.").
Thus, the plaintiffs in <u>Parmalat</u> -- unlike Plaintiffs in the
present suit -- sufficiently alleged the control of the
auditor member firms at issue by principal because they assert
facts from which the court could infer sufficient involvement
by the principal in the preparation of the audits at issue, as
opposed to, as in this case, the principal merely possessing
the general right to control any aspect of its affiliated
entities' conduct, or having actually exercised some control
over the member firms' operations and audits generally.
<u>Accord</u> <u>Star Energy Corp.</u>, 2008 WL 5110919, at *5 ("Similarly,

-192-

Star Energy's reliance on In re Parmalat is misplaced.  In that case, the Court found that plaintiffs stated a plausible claim for an agency relationship because the alleged member firm 'sought direction and help' on the specific audit and the umbrella organization 'took actions in directing -- or directing the removal of -- auditors on the Parmalat audit.' Here, there is no allegation that RSM Top-Audit sought help from RSM International or that RSM International exercised any authority over the audit of Star Energy." (quoting Parmalat, 375 F. Supp. 2d at 294)).

Thus, the Court concludes that allegations of generalized control are insufficient to state a plausible claim of coordinating-entity control over its member firms in the auditing context.  As such, the vicarious liability claims against PwC International arising out of the PwC Member Firms' surviving state common law causes of action must be dismissed.

g. Statute of Limitations

PwC Netherlands asserts protection from Plaintiffs' federal securities law and state common law claims by asserting that those claims are time-barred.  Because the only claims against PwC Netherlands that survive its motion are those for negligence and negligent misrepresentation the Court need address only the timeliness argument as it relates to those claims.

-193-

The three-year statute of limitations governing claims of negligence and accounting malpractice applies to Plaintiffs' negligence claims against PwC Netherlands. <u>See</u> N.Y. C.P.L.R. sects. 214(6); <u>Williamson</u>, 9 N.Y. 3d at 8 ("An action for professional malpractice must be commenced within three years of the date of accrual"). The limitations period accrues when an auditor issues its report. <u>See</u> <u>Williamson v. PricewaterhouseCoopers LLP</u>, 872 N.E.2d 842, 845 (N.Y. 2007). Because Plaintiffs did not name PwC Netherlands as a defendant in any of the actions that were subsequently consolidated into the present action on April 24, 2009, their claims relating to the reports issued more than three years before that date fall outside the three-year limitations period.

Plaintiffs argue that the SCAC alleges sufficient facts to support the plausible inference that the statute of limitations was tolled by PwC's continuous representation of the Funds. "The continuous representation doctrine is an exception to the statute of limitations and applies only where there is 'a mutual understanding of the need for further representation on the specific subject matter underlying the malpractice claim'" <u>Symbol Tech. Inc. v. Deloitte & Touche, LLP</u>, 888 N.Y.S. 2d 538, 541 (App. Div. 2d Dep't 2009) (<u>quoting</u> <u>McCoy v. Feinman</u>, 785 N.E.2d 714 (2002)). The SCAC alleges that:

> PwC continuously audited the Funds during this period, and PwC and the Funds had a mutual understanding that PwC would continue indefinitely to provide recurring auditing and related services to the Funds.  For example, in an engagement letter to FGG dated February 7, 2006, PwC Netherlands referred to "our ongoing appointment as auditors of the Fairfield Funds' and the document provided that 'this engagement letter is also effective for years subsequent to 2005, until it is replaced by a new engagement letter, unless the engagement is terminated."

(SCAC ¶ 259 (quotation marks and citation omitted.)  The Court is persuaded that these averments, credited at the pleading stage without the development of a fuller factual record, sufficiently invoke the continuous representation doctrine. Accordingly, the Court denies the motion of PwC Netherlands to dismiss Plaintiffs' claims of negligence and negligent misrepresentation.

F. LEAVE TO REPLEAD

Plaintiffs seek leave to amend the SCAC.  Although a court "should freely give leave" to amend "when justice so requires," Fed. R. Civ. P. 15(a)(2), "it is within the sound discretion of the district court to grant or deny leave to amend.  A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (citations omitted).

The Court has determined that several of Plaintiffs

allegations failed to state a claim, mainly because of the relationships between various defendants and Plaintiffs, conclusory assertions of knowledge of FGG's alleged fraud, or tenuous relationships to the FGG fraud. It is therefore possible that as to some of these matters repleading would be futile if based upon the same or similar allegations. The Court will grant leave to replead upon a prior request by Plaintiffs plausibly showing how such repleading would correct the deficiencies identified in the Court's findings discussed above, and thus would not be futile. Plaintiffs may submit any such request within twenty-one days of the date of this Order.

## IV. ORDER

Accordingly, it is hereby

**ORDERED** that the motions to dismiss of defendants Fairfield Greenwich Ltd., Fairfield Greenwich (Bermuda) Ltd., Fairfield, Greenwich Advisors LLC, Fairfield Risk Services Ltd., Fairfield Heathcliff Capital LLC, Walter M. Noel Jr., Jeffrey H. Tucker, Andres Piedrahtia, Amit Vijayvergiya, Daniel E. Lipton, and Mark McKeefry (Docket No. 360); Richard Landsberger, Andrew Smith, and Charles Murphy (Docket No. 361); Yanko Della Shiava, Philip Toub, Lourdes Barrenche, David Horn, Cornelis Boele, Vianney d'Hendencourt, Jacqueline Harary, Santiago Reyes, Julia Loungo, Harold Greisman, Corina Noel Piedrhahita, Robert Blum, Gregory Bowes, and Maria Teresa Pulido Mendoza (Docket No. 359); Pricewaterhouse Coopers LLP (Docket No. 321); PricewaterhouseCoopers Accountants Netherlands N.V. (Docket No. 316); Citco Group Ltd. (Docket No. 344); Citco Fund Services (Bermuda) Ltd. (Docket No. 334); Citco Global Custody N.V., and Citco Bank Nederland, N.V., Dublin Branch (Docket No. 340); Citco Fund Services (Europe) B.V., and Citco (Canada), Inc. (Docket No. 329); and GlobeOp Financial Services, LLC (Docket No. 325) are GRANTED in part and DENIED part; it is further

**ORDERED** that the motions to dismiss of defendants Brian Francoeur (Docket No. 318); Ian Pilgrim (Docket No. 334); and

-197-

PricewaterhouseCoopers International Ltd. (Docket No. 356) are GRANTED; it is further

**ORDERED** that defendants Brian Francoeur, Ian Pilgrim and PricewaterhouseCoopers International Ltd. are dismissed from this action; and it is finally

**ORDERED** that Lead Plaintiffs herein are granted leave to replead upon submitting to the Court, within twenty-one days of this Order, an application therefor plausibly showing how such repleading would correct the deficiencies identified in the Court's findings discussed above, and thus would not be futile.

**SO ORDERED.**

Dated: New York, New York
      18 August 2010

VICTOR MARRERO
U.S.D.J.

-198-