**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------x
```
PASHA ANWAR, et al.,                     )
                                           )
                 Plaintiffs,        )
                                           )
     v.                             )
                                         )
                                       ) Master File No. 09-CV-118 (VM)
FAIRFIELD GREENWICH LIMITED, et al.,  )
                                         )
                 Defendants.   )
                                         )
This Document Relates to:          )
*Moises Lou-Martinez and Wong Yuk Hing de Lou*  )
```
---------------------------------------------------------------x
```

**RESPONSE PLAINTIFFS MOISES LOU-MARTINEZ AND WONG YUK HING**
**DE LOU TO MOTION TO DISMISS**

      Plaintiffs MOISES LOU-MARTINEZ and WONG YUK HING DE LOU (herein referenced as either "LOU" or "Plaintiffs"), by and through their attorneys CURRAN & ASSOCIATES, submit this memorandum in response to the Unified Motion to Dismiss Plaintiffs' Complaints filed by Standard Chartered Bank International (Americas) Ltd. ("SCBI"), Stanchart Securities International, Inc., and Standard Chartered PLC on March 21, 2011.

**INTRODUCTION**

      For purposes of this memorandum, "Standard Chartered" shall refer to Standard Chartered Bank International (Americas) Ltd. ("SCBI"), Stanchart Securities International, Inc., Standard Chartered Bank, Standard Chartered PLC and Standard Chartered International (USA) Ltd. and its predecessor, related, or affiliated American Express Bank entities. Where only one entity comprising Standard Chartered is being

referred to, that entity shall be named specifically.

As the "Florida" Plaintiffs advised the Court in their Unified Response to Standard Chartered's Motion to Dismiss (Document 67), Standard Chartered and specifically SCBIA was not a mere order-taker dispensing no investment advice and merely passively executing customer trades. Plaintiffs thought they were receiving advice and assistance from private bankers and in fact the Standard Chartered defendants frequently used the service mark Standard Chartered Private Banking in dealing with the Lous and other Plaintiffs. The Lou's Complaint is replete with allegations that plainly refute Standard Chartered's caricature of its role. It is plainly alleged that Standard Chartered held itself out and purported to act as a professional investment adviser in whom investors like the Plaintiffs could and should place complete reliance, and, in connection therewith, made recommendations as to purchases of investments, including the Fairfield Greenwich investments. As a result, Standard Chartered owed its clients fiduciary duties, including the duty to make prudent and fitting recommendations on the basis of investigation and inquiry qualifying as "due diligence."

Now perhaps the most important issue is that the Lous' case against Standard Chartered differs from the other investor cases in that the Lous allege that Standard Chartered unilaterally invested their funds in the Fairfield Sentry Fund without authorization from them. While the defendants have made reference to the fact that as one of almost 150 named plaintiffs in the proposed class in the anchor case in this MDL proceeding, *Anwar v. Fairfield Greenwich Ltd. ("Anwar")*, plaintiff Moises Lou-Martinez alleged that the Fairfield defendants misled him. Mr. Lou-Martinez did not in that case as a member of the proposed class action plaintiffs - or otherwise - ever state

anything contradictory to his position asserted in this case that Standard Chartered reported to his son Cesar Lou at a meeting with SCBI's Diana Pratt in January 2009, as alleged in Paragraph 23 of the First Amended Complaint, that $500,000 from Plaintiffs' account at defendant SCBI in Miami was invested by SCBI on their behalf state in the Fairfield Sentry Fund on or about September 28, 2005. As reported in that Complaint, the Lous promptly asked for proof that the $500,000 had been invested by Standard Chartered defendants in the Fairfield Sentry Fund but to date, Standard Chartered has never provided any written proof of that alleged investment. Standard Chartered has not provided any evidence that shares in the Sentry Fund were purchased on behalf of the Lous in September 2005 or at any other time in the amount of $500,000 or for any amount.

At this time, as alleged in the First Amended Complaint, the Lous have only received verbal advice from the Standard Chartered defendants, through Ms. Pratt in January 2009 and thereafter in early 2009, that the investment in the Sentry Fund was in fact made.  However, the situation is quite suspicious given the fact that even if the investment was made by Standard Chartered without a written authorization from the Lous (as no written authorization has ever been produced by Standard Chartered), there still would have had to be a Fairfield Sentry Fund subscription agreement executed by the Lous in order for them to have received shares in that fund as well as bank documentation showing transfer of the $500,000 from the Lous account to Fairfield Sentry Ltd. or a related Fairfield entity. To date though, the Lous have received no such documentation

from the Standard Chartered documents.[1] They have been asked by those defendants to simply trust in their advice and in the account statements that were recently produced that a Sentry Fund investment was made on their behalf in September 2005.

Accordingly, in this case, the Lous either incurred damages on or about December 11, 2008 when the Madoff Ponzi scheme was reported publicly or in January 2009, when the Lous asked for documentary proof of the investment - as alleged in the First Amended Complaint at Paragraph 28. Either way, the Lous have lost $500,000 due to SCBI's negligence and breach of fiduciary duty in investing the Lou's $500,000 in the Fairfield Sentry Fund in September 2005 (as SCBIA has reported) or through conversion of those funds of any shares in the Sentry Fund that the Lous' $500,000 allegedly purchased. If the Lous through SCBI had purchased such shares in the Sentry Fund, SCBI should have produced those shares or evidence of those shares in January 2009 when the Lous requested documentary evidence of that alleged transaction.  Since no proof of the alleged purchase of the Sentry Fund shares was offered then or since, the Lous were first on notice in January 2009 that $500,000 had been converted by SCBI from their account. Accordingly, the Lous' claim for breach of fiduciary duty arose on or about December 11, 2009 when the Madoff Ponzi scheme was publicly revealed or in January 2009, when

---

[1]       In an effort to obtain relevant documents in this regard, the undersigned counsel for the Plaintiffs, as stated in his Declaration attached hereto, requested said documentation from counsel for Standard Chartered in an effort to avoid litigation on the issue of an unauthorized investment, conversion and related issues. Unfortunately, Sullivan & Cromwell LLP, acting as counsel for SCBI, provided a letter dated June 1, 2010 wherein it advised that "SCBI has not yet located a signed subscription agreement for the Mr. Martinez's investment in the Fairfield Sentry Ltd." Since that time neither Standard Chartered nor its counsel have provided a copy of the Subscription Agreement or any evidence of a Fairfield Sentry Fund investment by the Plaintiffs. All Plaintiffs know is that the bank refuses to provide it with the $500,000 missing from its account.  See Declaration of Laurence E. Curran III and Exhibit 1 attached thereto.

SCBI's Diana Pratt advised the Lous that $500,000 from their account had been invested in the Fairfield Sentry Fund. Either way, the loss did not occurr on or about September 28, 2005 as has been alleged by the Standard Chartered defendants in their motion to dismiss the Lous' First Amended Complaint.

The reason the damages to the Lou occurred only on December 11, 2008 or in January 2009 is as has been publicly reported, many investors who invested in the Fairfield Sentry Fund were able to sell their purchased shares in that fund before the Madoff Ponzi scheme disclosure date of December 11, 2008 and were made whole by receipt of all principal and profits from the sale of their Sentry Fund shares. It was only those investors who did not sell their Sentry Fund shares prior to December 11, 2008, that were damaged. So the damage did not occur on the date of purchase of said Sentry Fund shares but rather on December 11, 2008, as until that date - or quite close to it- there had been liquidity in the Sentry Fund through which redemptions were made for investors who held Sentry Fund shares.

## ARGUMENT

**I.** **THE COURT SHOULD DISREGARD STANDARD CHARTERED'S IMPROPER ATTEMPTS TO RELY ON DOCUMENTS AND INFORMATION OUTSIDE THE FOUR CORNERS OF THE COMPLAINTS**

**A.**	**Standard on Motion to Dismiss.**

The legal standard with regard to a Rule 12(b)(6) application to dismiss for failure to state a claim articulated by the Supreme Court in *Twombley*[2] is by now well-known:

---

[2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009), later clarified *Twombley*'s plausibility test, recognizing its roots in the idea that for purposes of a 12(b)(6) motion, factual allegations are to be taken as true, while legal conclusions are not: "When there

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

In evaluating claims in the context of a 12(b)(6) motion, the district court is normally required to look only to the allegations on the face of the complaint. *See, e.g., Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).   In limited circumstances, the court may consider documents other than the complaint in ruling on a motion under Rule 12(b)(6). *Id.* These limited circumstances definitely do not encompass the situation here.

Here, Standard Chartered has produced some Account Statements for the Plaintiffs' account at the predecessor to defendant SCBI, American Express Bank International ("AEBI"), to prove that the Plaintiffs' had been notified by defendants of the alleged investment of $500,000 from the Plaintiffs' account at AEBI in shares of the Fairfield Sentry Fund. However, Standard Chartered has not shown any evidence that said statements were delivered to Plaintiffs at anytime or in any timely manner consistent with advising Plaintiffs in that regard that a Sentry Fund investment had been made. Since that is a factual issue, it must be resolved outside the scope of this motion to dismiss the Complaint. This Court has already found that "[d]ocuments outside a complaint may be considered only if it is 'clear that there exist no material disputed issues of fact regarding of the document[s].'" This Court's prior Decision and Order (Document 543) in this case

---

are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

filed on October 4, 2010 (quoting *Faulkner v. Beer*, 463 F.3d 130,134 (2d Cir. 2006))
applies equally well here.

**B.    Under Clear Second Circuit Precedent, Standard Chartered's Proffered Documents Do Not Qualify for Consideration at this Stage.**

Even if a court grants a motion to dismiss, the plaintiff may request leave to amend
the complaint to correct the deficiencies: "It is the usual practice upon granting a motion
to dismiss to allow leave to replead. Although leave to replead is within the discretion of
the district court, refusal to grant it without any justifying reason is an abuse of
discretion." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)
(citations omitted), *cert. denied*, 503 U.S. 960 (1992). Documents attached to the
complaint or incorporated in it by reference are part of the pleading and may be
considered. *Id.* No documents were attached to any of the Complaints.

"In addition, even if not attached or incorporated by reference, a document 'upon
which the complaint *solely* relies and which is *integral to the complaint*' may be
considered by the court in ruling on such a motion." *Id.* (emphases in original) (quoting
*Sum Holding L.P.,* 949 F.2d at 47 (citations omitted) and citing *Global Network
Communications, Inc. v. City of New York,* 458 F.3d 150, 154-55 (2d Cir. 2006)). For    a
document to be considered "integral" to the complaint requires surmounting a high hurdle
that Standard Chartered completely avoids discussing and certainly does not meet. A case
cited by Standard Chartered, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d. Cir.
2002), explains that "integral" requires that the plaintiff must have "reli[ed] on the terms
and effect of a document in drafting the complaint." *See Int'l Audiotext Network, Inc. v.
Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("relies heavily upon its terms and
effect"), quoted in *Chambers*, 282 F.3d at 153.    Moreover, "even if a document is

'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir. 2006) (*citing Kaempe v. Myers,* 367 F.3d 958, 965 (D.C. Cir. 2004) and *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.,* 267 F.3d 30, 33 (1st Cir. 2001)).[3]

The documents on which Standard Chartered place great emphasis are various account statements that it suggests are its silver bullets, because they contain purported evidence that the Plaintiffs were aware of the Standard Chartered's investment of $500,000 from the Plaintiffs' account in the Fairfield Sentry Fund. Plaintiffs deal later with the question of whether, if the Court does not exclude those documents, it should conclude that these agreements do spell victory for Standard Chartered at this early stage. Here, Plaintiffs deal solely with the question of whether the Court should even take these documents into account.

The first question is whether these documents are "integral" to the Complaint and were "solely" relied on in bringing the complaint. *Roth*, 489 F.3d at 509. As to the Lous' First Amended Complaint, there is not even any reference to any account documents, so they could not possibly be considered "integral" to that pleading. Even if the proffered documents were considered "integral," there are serious questions concerning whether

---

[3]     Taking into consideration integral, relevant and authentic documents not referred to or incorporated in the complaint is an exception to Rule 12(d), which states: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

the documents are authentic or relevant or were delivered by Standard Chartered to Plaintiffs at any relevant time. On the first point, there is no evidence submitted by a person with actual knowledge that the documents are authentic: instead, Standard Chartered proffers the Declaration of a Sullivan & Cromwell lawyer, Patrick R. Berarducci, who does not purport to speak with personal knowledge. *See* Berarducci Declaration, ¶ 1 ("I am fully familiar with the matters stated herein based on personal knowledge *or review of files in the possession of my firm*") (emphasis added). Plaintiffs are not attacking Mr. Berarducci's credibility, just his competence as a witness to authenticate these documents. The cases emphasize that only when the authenticity of apparently integral and relevant documents is not disputed or questioned may the trial court consider them on a motion to dismiss. *E.g.*, *Azzolini v. Marriott International, Inc.*, 417 F. Supp. 2d 243 (S.D.N.Y. 2005) (trial court declines to take into account document proffered by defendants on the basis of authenticating affidavit where plaintiff disputed authenticity); *Grogan v. O'Neil*, 292 F.Supp.2d 1282, 1292 (D. Kan. 2003) (court declines to take into account unauthenticated corporate charter). Here, the Plaintiffs do not accept Mr. Berarducci's hearsay belief that the documents are authentic, and insist on proof.

Even aside from authenticity, there is a serious issue of relevance of the proffered Account Statements as they do not offer any proof that Standard Chartered actually made the alleged investment in the Fairfield Sentry Fund. Those documents are not supported by any evidence of a Subscription Agreement for shares in the Sentry Fund or supported by any bank documentation showing actual transfer of funds from the Lous' account at AEBI to Fairfield Sentry Ltd. or its agents.

Further, the documents do not prove awareness by Plaintiffs of the alleged investment. *See Hayden, Stone Inc., v. Brown*, 218 So. 2d 230, footnote 6 (Fla. 4th DCA 1969) (waiving right to object due to receipt of bank statements might also depend on whether client's consent was both fully informed and voluntary). The inconsistencies and incompleteness of the documents proffered by Standard Chartered are precisely the sorts of issues precluding consideration of extrinsic documents described in the opinion in *Faulkner v. Beer, supra*. In *Faulkner*, investors brought fraud and breach of fiduciary claims against their investment advisor, one of his investment vehicles, and other affiliated persons. The defendants moved to dismiss, raising many of the same defenses raised by Standard Chartered here. Several documents were submitted in connection with the defendants' motion to dismiss, including offering memoranda, annual reports and a prospectus. The appeals court vacated the district court's dismissal of the complaints. The court held that there were too many open questions concerning which documents were seen or relied on by which plaintiffs. 463 F.3d at 134-135. Analogously, there are too many questions here concerning whether the Account Statements were in existence in September 2005 or at any relevant time.[4] There is simply not enough information before the Court at such an early stage to make determinations on documents not integral to the complaints, particularly when those documents appear either inconsistent with the

---

[4]    For example, since no evidence has been shown that Plaintiffs ever received actual notice of the purported Sentry Fund investment, that fact would support Plaintiffs' allegation of conversion. Conversion was found where defendant was plaintiff's treasurer and had been embezzling money over a three year period.  One of the factors that led the court to find the treasure liable for conversion was the fact that the treasurer had all of the bank statements of the account he was withdrawing the funds from sent to his home and had exclusive control over disbursement books.  Greece Volunteer Ambulance Service, Inc. v. Smith, 301 N.Y.S. 2d 865, 869-70 (NY Sup. Ct. 1969).

allegations in the complaint.

**C.    The Court Should Not Convert this Motion to a Summary Judgment Motion.**

As noted, under Rule 12(d), the consideration of facts and documents extrinsic to the complaints (and not found to be "integral", and of unquestioned authenticity and relevancy) requires that the court convert the motion to a Rule 56 motion for summary judgment:

> [i]f ... matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

*Global Network*, 458 F.3d at 154-155 (quoting then Fed. R. Civ. P. 12(b) and citing to *Friedl v. City of New York,* 210 F.3d 79, 83-84 (2d Cir. 2000) (conversion required "whenever there is a 'legitimate possibility' that the district court relied on material outside the complaint in ruling on the motion") (citation omitted). *See* Fed.R.Civ.P. 12(f). As indicated by the word "must" in Rule 12(d), the conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is "strictly enforce[d]" and "mandatory." *Global Network*, 458 F.3d at 155 (quoting *Amaker v. Weiner,* 179 F.3d 48, 50 (2d Cir. 1999) and citing *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985) (all referring to former wording, "shall"). The *Global Network* court further explains the important policies behind the mandatory conversion requirement:

> the requirement expressly addresses and solves the major problem that arises when a court considers matters extraneous to a complaint, namely, the lack of notice to the plaintiff that outside matters would be examined. It deters trial courts from engaging in fact finding when ruling on a motion to dismiss and ensures that when a trial judge considers evidence dehors the complaint, a plaintiff will have an opportunity to contest defendant's relied-upon evidence by submitting material that controverts it.

*Global Network*, 458 F.3d at 155; *see also Sahu v. Union Carbide Corp.*, 548 F.3d 59 (2d Cir. 2008). In most cases, the policies behind the mandatory conversion rule mean that a district court "must give notice to the parties *before* converting a motion to dismiss pursuant to Rule 12(b)(6) into one for summary judgment and considering matters outside the pleading." *Sahu*, 548 F.3d at 67 (quoting *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir. 1999) and citing *Kopec v. Coughlin,* 922 F.2d 152, 154-55 (2d Cir. 1991)). The importance of providing the plaintiff with opportunity to prepare for a summary judgment motion was emphasized in *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.,* 193 F.3d 109 (2d Cir. 1999):

> [C]are should, of course, be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law.

*Id.* at 115 (quoting *Ramsey v. Coughlin,* 94 F.3d 71, 73-74 (2d Cir. 1996)). Once a court decides to consider extrinsic evidence to decide a motion for summary judgment rather than limit itself to the pleadings as it would on a motion to dismiss, therefore, the plaintiffs should be given "a reasonable opportunity to meet facts outside the pleadings." *Sahu*, 548 F.3d at 70 (quoting *In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir. 1985)).

The Court has the discretion to exclude the documents. Assuming that the Court does not find these documents to be within the "integral" exception to Rule 12(d), then there is no need to convert if the Court excludes the documents in question. There are several reasons not to convert. First, the meaning of the documents and their application to the Plaintiffs may require depositions of all of the principal witnesses in the case, but

on relatively narrow grounds: were these documents received by Plaintiffs, what do these documents mean, what was their intent? But because Standard Chartered will not have provided the Plaintiffs their documents, it would be impossible to cover the entirety of the subjects that would be covered in the "merits" discovery of such witnesses. Therefore, there would be substantial repetitive discovery of witnesses, at great cost to all parties (with Standard Chartered, a world-wide banking institution, having the deepest pockets and the greatest incentive to take advantage of that situation). Even then, if the parties had different recollections of their intent, or if other issues were disputed, it might not be possible to determine the issue of the effects of these documents on Plaintiffs' claims on summary judgment – meaning that the entire exercise would turn out to be a waste of time, effort and resources. There would therefore not appear to be anything gained, and a potential of great waste, if the Court were not to exclude these documents.

For the reasons stated above, it is respectfully requested that the Court exercise its discretion not to expand the scope of the Motion and therefore exclude the documents from consideration.

**D.    The Allegations that the Court Must Accept as True.**

Having disposed of the issues raised by Standard Chartered's requests that the Court consider extraneous documents and take notice of extraneous information, the Plaintiffs now turn to the factual allegations that the Court must, under the cases, accept as true:

•    that the Plaintiffs were offshore private banking clients of Standard Chartered's Miami-based Edge Act bank, now called Standard Chartered Bank International (Americas) Ltd.;

•    that in 1998, Plaintiffs opened an account at AEBI. *Lou* Am.Cplt., ¶ 20;

13

•      that Plaintiffs ordinarily relied on Standard Chartered for investment advice;

•      that Standard Chartered charged them a regular annual fee and a special bounty for placing allegedly them in the Madoff feeder fund of Fairfield Sentry Ltd.;

•      that Standard Chartered failed adequately to investigate the riskiness of the alleged investment;

•      that Standard Chartered owed fiduciary duties to the Plaintiffs, including to determine on the basis of a proper investigation whether the alleged investment was suitable for these Plaintiffs;

•      that had Standard Chartered performed that duty, it would have discovered, if it did not know, that there was a material risk that this investment was not safe and that Madoff was running a scam of some sort, because of a number of facts – "red flags" – that an alert and careful advisor would have noticed and understood did not bode well;

•      that these red flags included the fact that the hedge fund operators, after taking a large fee, simply handed the money, lock, stock and barrel, over to Madoff, a brokerage firm; that Madoff claimed to have realized steady, profitable results, in good markets and bad, over many years; that Madoff did not process trades electronically; that Madoff's financial statements were audited by an unknown one- or two-man accounting firm in Upstate New York; and so on; and

•      that the Plaintiffs lost the entirety of their investment because either Standard Chartered never invested the $500,000 at issue in the Fairfield Sentry Fund or because Standard Chartered did invest that money in the Sentry Fund - as Standard Chartered alleges - and then Fairfield Greenwich handed the money to Madoff, who was running a Ponzi scheme.

II.   **THE COMPLAINT PROPERLY STATES CLAIMS FOR BREACH OF FIDUCIARY DUTY**

A.   **The Disputed Issue Is Not Whether Standard Chartered Owed the Plaintiffs Fiduciary Duties, but Whether It Breached Its Duty to Plaintiffs By Making an Investment in the Fairfield Sentry Fund Without Authorization or With Authorization.**

The Plaintiffs allege that Standard Chartered's duties included having a reasonable basis for recommendations made to its customers (*Lou* Am.Cplt., at ¶¶ 42); taking steps necessary to determine and understand the material risks associated with an investment (*Lou* Am.Cplt., at ¶ 43); monitoring the performance of the funds it recommends to determine whether any investment previously made in such a fund should remain in the fund or be removed (*Lou* Am.Cplt., at ¶¶ 43, 50); and disclosing all material facts to the investor and neither making nor communicating any material misrepresentations (*Lou* Am.Cplt., at ¶¶ 51. There is no dispute between the parties as to whether Standard Chartered owed the Plaintiffs fiduciary duties. It did and we submit that this issue has previously been briefed and decided by the Court in its Decision and Order of October 4, 2010 regarding the "Florida" Complaints that were the subject of a prior Motion to Dismiss the Complaints and that therein contains relevant law of this case in part.

The other fiduciary duty that is most relevant here is the duty not to make an unauthorized investment.  While Standard Chartered's counsel contends that it would not be logical for Standard Chartered to have made an unauthorized investment of $500,000 from Plaintiffs' account, no documentary or other evidentiary proof has been provided that the bank either received authorization for the investment or that the alleged investment in the Fairfield Sentry Fund actually occurred. Either way it is quite a mystery

15

and since Standard Chartered had custody and control of Plaintiffs' funds at all relevant times, we submit that Standard Chartered should provide proof that the funds were in fact invested as it alleges in the Sentry Fund or if no proof is forthcoming, then it is self-evident that Standard Chartered has converted the $500,000 since January 2009 when Plaintiffs asked SCBI for its money or proof of the Sentry Fund investment.

Since Florida law governs the *Lou* complaint, a brief review of Florida law is therefore in order.  Florida law plainly imposes fiduciary duties on a bank providing investment advice to its customer, as well as advice on other business matters. *Ward v. Atlantic Security Bank*, 777 So.2d 1144 (Fla. 3d DCA 2001) (investment advice); *Capital Bank v. MVB, Inc.,* 644 So.2d 515, 518(Fla. 3d DCA 1994) (bank giving business advice to a bank customer from which the bank derived benefit owed the customer fiduciary duties); *Atlantic Nat'l Bank v. Vest*, 480 So.2d 1328, 1333 (Fla. 4th DCA 1985) (bank officer's answering customer's question a legal question created jury question of whether doing so imposed fiduciary duty on bank).

But no Florida case holds that the contours of a bank's fiduciary relationship with clients it is providing investment advice are determined by whether the account is discretionary or non-discretionary, or that those duties are to be borrowed from duties ascribed to broker-dealers. Most significantly, Standard Chartered can cite no Florida case holding that the nature of the duties owed to a customer by a bank -- *or broker-dealer*, for that matter -- turns on whether the account is discretionary or non-discretionary. Rather, every indication is that Florida law looks to the nature of the relationship between the bank and its customer/client. Therefore, the Court, in deciding this case under Florida law, would have no basis to conclude that the Florida Supreme

16

Court, if faced with this issue, would hold that the discretionary/nondiscretionary dichotomy is controlling or even significant. *See Elliott Assocs., L.P. v. Banco de la Nacion,* 194 F.3d 363 (2d Cir.1999) ("it is our job to predict how the forum state's highest court would decide the issues before us") (citation and internal quotation marks omitted).

Since the question is whether, *as a matter of law*, Standard Chartered did not owe two of the duties the Plaintiffs allege to have existed, Standard Chartered's argument comes down to a preposterous one: no matter what was discussed between Standard Chartered's representatives and the individual Plaintiffs and how the relationship developed, the duties of Standard Chartered were circumscribed by whether the account was discretionary or non-discretionary. Standard Chartered has made no such showing that this is the law in Florida, and it could not do so. Therefore, the Court must examine the allegations of the Complaints, not pursuant to some artificial and inapposite test, to determine whether the alleged duties could be found by the jury to attach to Standard Chartered. Since this Court has already found in the affirmative in regard to the "Florida" Complaints of Headway, Maridom and Lopez, we submit that the finding of a fiduciary duty should apply here too whether Standard Chartered actually invested Plaintiffs' $500,000 with or without authorization, or did not invest it in the Sentry Fund.

B. **Contrary to Standard Chartered's Contention, Plaintiffs Were Deprived of the Possession of Their Assets.**

Standard Chartered has cited some Florida case law reciting that "conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." *Small Bus. Admin.* v. *Echevarria*, 864 F. Supp. 1254, 1262 (S.D. Fla. 1994) (citing *Nat'l Union Fire Ins. Co.* v. *Carib Aviation, Inc.*, 759 F.2d 873 (11th Cir. 1985)). Standard Chartered did not cite Florida law for the provision that a finding of conversion

of funds depends on whether the rightful owner demanded the property back after it was taken from the account. The essence of an action for conversion is not the acquisition of property by the wrongdoer but rather the refusal to surrender the possession of the property after the rightful owner has demanded the property back.  Joseph, 940 So. 2d. 483 at 487 (citing *Murrel v. Trio Towing Serv., Inc*., 294 So. 2d 331 (Fla. 3d DCA 1974). To be liable for conversion, a plaintiff must demonstrate "a present intent on the part of the wrongdoer to deprive the person entitled to possession of the property." *Senfeld* v. *Bank of Nova Scotia Trust Co. (Cayman)*, 450 So. 2d 1157, 1161 (Fla. Dist. Ct. App. 1984).

Hence contrary to Standard Chartered's other contention, Plaintiffs submit that they can maintain a claim for conversion against Standard Chartered because they have alleged that Standard Chartered intended to, and did, deprive them of their $500,000. Plaintiffs have alleged that AEBI invested their $500,000 without their authorization, if in fact Standard Chartered did invest it in the Sentry Fund. The bank thus deprived them of possession of their property and converted those funds through the Sentry Fund investment or alternatively by withdrawing those funds from Plaintiffs' account for some other wrongful purpose. Either way Plaintiffs have been deprived of their $500,000 by Standard Chartered because if Plaintiffs were not so deprived, they would not have had to bring the lawsuit to recover their missing $500,000.

If as Standard Chartered alleges, after the investment in the Sentry Fund, the Plaintiffs retained complete control over the money and the unimpaired ability to redeem the Sentry shares to obtain their cash value, then it is puzzling why Standard Chartered has never produced evidence to the Plaintiffs of Sentry Fund shares in Plaintiffs name or

any Sentry Fund Subscription Agreement showing that Plaintiffs purchased and subscribed to the Sentry Fund.   Contrary to Standard Chartered's contention, the deprivation of those Sentry Fund shares could not have been caused by Bernard Madoff's fraud. It was rather caused either by Standard Chartered purportedly purchasing Sentry on their behalf without their authorization in September 2005 or not actually doing so at all and never returning those funds to Plaintiffs despite demands to do so.

## C.   Plaintiffs' Claims Are Not Time Barred

Under the statute of limitations, actions for negligence or breach of fiduciary duty must be commenced within four years of when the cause of action accrued. *See Kelly v. Lodwick*, et al., 2011 Fla. App. LEXIS 4810 April 6, 2011 (Fla. 4th DCA 2011) (citing § 95.11(3)(a), (p), Fla. Stat. (2009)). **"A cause of action accrues when the last element constituting the cause of action occurs."** § 95.031(1), Fla. Stat. (2009) (emphasis added). The last element constituting a cause of action for negligence or breach of fiduciary duty is the occurrence of damages. *See Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (traditionally, a cause of action based on negligence comprises four elements: duty, breach, proximate cause, and actual loss or damage) (citation omitted); *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002) ("The elements of a claim for breach of a fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages."). Thus, "the issue of when legally cognizable damages occurred is dispositive of this case." *Kellermeyer v. Miller*, 427 So. 2d 343, 345 (Fla. 1st DCA 1983).

Here, the damages for the Plaintiffs occurred either on December 11, 2008 when the Madoff Ponzi scheme was revealed - if Plaintiffs are actually shareholders in the

Fairfield Sentry Fund - or alternatively Plaintiffs were injured in January 2009 when Standard Chartered advised them that they had $500,000 invested in the Sentry Fund but provided no evidence of that investment or share certificates so that Plaintiffs held something for the loss of their $500,000 from their account.

In *Kelly*, the Court clearly delineated when damages occurred in an insurance case by ruling that

> damages to the school and the employee first occurred on April 20, 2005, when the school and the employee were forced to defend themselves against the plaintiffs' claim. At that time, if the school had coverage with the second insurer, then the plaintiffs' suit against the school and the employee would have triggered the second insurer's duty to defend the school and the employee.

The damages did not occur in that case more than a year earlier when the school discovered it needed insurance coverage. *See id. (citing Hale v. State Farm Fla. Ins. Co*., 51 So. 3d 1169, 1171 (Fla. 4th DCA 2010)). The damages occurred only when the school and the employee did not have the second insurer to defend them and they were forced to defend themselves against the plaintiffs' claim and thereby incurred damages. Once the school and the employee incurred damages, the four-year limitations period commenced.

Similarly in this case, the Lous did not incur damages either through breach of fiduciary duty, conversion, negligence or any other manner on September 28, 2005 when Standard Chartered alleges it invested $500,0000 from the Lous account with the Fairfield Sentry Fund. Rather the damages for the Lous occurred either on December 11, 2008 when the Madoff Ponzi scheme was publicly revealed and trading of the Sentry Fund was stopped or in January 2009 when the Lous enquired about their money and were given neither a return of those funds nor share certificates in the Sentry Fund.

## IV.   LOUS PROPERLY STATE CAUSES OF ACTION FOR NEGLIGENCE AND GROSS NEGLIGENCE

Based on the Court's prior decision and order in regard to the Lopez' claim for gross negligence and negligence, we submit that the Lous have also properly stated causes of action for both negligence and gross negligence.

## V.   LOUS PLED SUFFICIENT FACTS THAT GIVE RISE TO A DUTY OF STANDARD CHARTERED TO CONDUCT DUE DILIGENCE

Although Plaintiffs do not recall learning about an investment of their funds in the Sentry Fund at the time SCBI alleges it made the investment in September 2005, clearly SCBI had a duty to act prudently and to conduct due diligence before making the investment in the Sentry Fund without advising its client, the Lous. Or alternatively, if SCBI did in fact advise the Lous regarding that Sentry Fund investment, the situation would be similar as for the other investor plaintiffs known as the "Florida" Plaintiffs - Headway, Maridom, Lopez and Valladolid - where this Court has found that a cause of action against Standard Chartered has been properly stated in the Complaints.

## CONCLUSION

As the Plaintiffs have demonstrated in this Opposition, the Plaintiffs' Complaint are straightforward, relatively simple pleadings that, under a variety of legal theories, seek to hold Standard Chartered responsible, principally, for having either converted its funds or alternatively failed to keep those funds away from an overly risky investment. The issue of whether Standard Chartered actually invested the Lous' funds in the Fairfield Sentry Fund or the issue of whether Standard Chartered should have done its job as well as the numerous institutions that, taking account of obvious red flags, avoided Madoff and the Madoff feeder funds will be questions for the juries. The Court should deny Standard

Chartered's Motion to Dismiss and allow the evidence-gathering process to begin.

Dated: April 11, 2011

                 Laurence E. Curran III     
                 Laurence E. Curran III (LC-4557)
                 CURRAN & ASSOCIATES
                 701 Brickell Avenue - Suite 1550
                 Miami, Florida 33131
                 Tel.: (305) 777-0374
                 Fax: (305) 675-0548
                 Email address: lecurran@lecurran.com

                 Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a true and correct copy of the foregoing to be served by email, in PDF format, upon the persons on the attached service list, this 11th day of April 2011.

                 Laurence E. Curran III         
                 Laurence E. Curran III

## SERVICE LIST FOR STANDARD CHARTERED CASES

| | |
|---|---|
| Sullivan & Cromwell LLP<br>New York, New York<br>Attorneys for Standard Chartered<br>Defendants<br><br>Sharon L. Nelles -<br>Nelless@sullcrom.com | Simpson Thacher & Bartlett LLP<br>New York, New York<br>Attorneys for FGG Defendants<br><br>Peter E. Kazanoff  -<br>pkazanoff@stblaw.com |
| Greenberg Traurig, P.A.<br>Miami, Florida<br>Attorneys for Individual FGG<br>Defendants<br><br>Ricardo Alejandro Gonzalez -<br>gonzalezr@gtlaw.com | Brown & Heller<br>Miami, Florida<br>Attorneys for CITCO Fund Services<br>(Europe) B.V.<br><br>Amanda McGovern - amcgovern -<br>@ghblaw.com |
| Rivero Mestre LLP<br>Coral Gables, Florida<br>Attorneys for Headway<br><br>Jorge Mestre -<br>jmestre@riveromestre.com | Richard E. Brodsky<br>The Brodsky Law Firm<br>Miami, Florida<br>Attorneys for Maridom, et al.<br><br>rbrodsky@thebrodskylawfirm.com |
| Dimond Kaplan & Rothstein, P.A.<br>Miami, Florida<br>Attorneys for Pujals<br><br>Robert Linkin - RLinkin@dkrpa.com | Jones & Adams<br>Miami, Florida<br>Attorneys for Almiron and Carrillo<br><br>Matthew Jones - matthew@jones-<br>adams.com |
| Levine Kellogg Lehman Schneider +<br>Grossman LLP<br>Miami, Florida<br>Attorneys for DaSilva Ferreira<br><br>Amanda Star Frazer -<br>AF@LKLlaw.com | de la O Marko Magolnick & Leyton PA<br>Miami, Florida<br>Attorneys for Gerico, de Rivera<br><br>Joel S. Magolnick -<br>magolnick@dmmllaw.com |
| Kachroo Legal Services, P.C.<br>Cambrudge, Massachusetts<br>Attorneys for Caso<br><br>Gaytri D. Kachroo -<br>gkachroo@kachroolegal.com | Aguirre, Morris & Severson<br>San Diego, California<br>Attorneys for Maria Akriby Valladolid<br><br>Maria C. Severson –<br>mseverson@amslawyers.com |