UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PASHA S. ANWAR, *et al.*,<br><br>                                    Plaintiffs,<br><br>v.<br><br>FAIRFIELD GREENWICH LIMITED, *et al.*,<br><br>                                    Defendants.<br><br>This Document Relates To:  *Jose Antonio Pujals* v. *Standard Chartered Bank International (Americas) Ltd.*, No. 10-CV-2878 | Master File No. 09-CV-118 (VM) (THK) |

**REPLY MEMORANDUM OF LAW OF STANDARD CHARTERED BANK
INTERNATIONAL (AMERICAS) LTD. AND STANDARD CHARTERED BANK IN
SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Sharon L. Nelles
Bradley P. Smith
Patrick B. Berarducci
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
nelless@sullcrom.com

Diane L. McGimsey
(Admitted *Pro Hac Vice*)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067

*Attorneys for Defendants Standard
Chartered Bank International
(Americas) Ltd. and Standard
Chartered Bank*

April 20, 2011

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

I. BY QUESTIONING THE ENFORCEABILITY OF THE PURCHASE LETTER, PLAINTIFFS RENDER THEIR BREACH OF CONTRACT ALLEGATIONS TOO VAGUE TO MAINTAIN. ..................................................................................................2

II. THE BANK WAS AUTHORIZED TO CHARGE THE SERVICING FEES BASED ON THE REPORTED VALUE OF THE SENTRY SHARES. ...........................................................................2

III. THE FACT THAT MADOFF'S FRAUD WAS NOT EXPOSED UNTIL 2008 DOES NOT NEGATE THAT PLAINTIFFS WERE ON NOTICE OF THE BANK'S METHOD FOR SETTING THE SERVICING FEES SINCE 2004 AND THEREFORE WAIVED ANY BREACH OF CONTRACT CLAIM. ........................................................7

IV. PLAINTIFFS CANNOT CREATE AN UNJUST ENRICHMENT CLAIM BY QUESTIONING THE SCOPE AND VALIDITY OF THE PURCHASE LETTER. ..............................................................9

CONCLUSION ..............................................................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acosta* v. *Dist. Bd. of Trs. of Miami-Dade Cmty. Coll.*,
    905 So. 2d 226 (Fla. Dist. Ct. App. 2005) ............................................................................8

*Anwar* v. *Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010).................................................................................3

*Anwar* v. *Fairfield Greenwich Ltd.*,
    745 F. Supp. 2d 360 (S.D.N.Y. 2010).........................................................................6, 9, 10

*Broughel* v. *Battery Conservancy*,
    No. 07-CV-7755, 2009 WL 928280 (S.D.N.Y. Mar. 30, 2009)..............................................2

*Bruhl* v. *PricewaterhouseCoopers Int'l*,
    No. 03-CV-23044, 2008 WL 899250 (S.D. Fla. Mar. 31, 2008)..............................................3

*Cortec Indus., Inc.* v. *Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991)...................................................................................................9

*Highlands Ins. Co.* v. *PRG Brokerage, Inc.*,
    No. 01-CV-2272, 2004 WL 35439 (S.D.N.Y. Jan. 6, 2004) .......................................................2

*Hines* v. *Fiserv, Inc.*,
    No. 08-CV-2569, 2010 WL 1249838 (M.D. Fla. Mar. 25, 2010) ........................................5, 6

*Huntington on the Green Condo.* v. *Lemon Tree I-Condo.*,
    874 So. 2d 1 (Fla. Dist. Ct. App. 2004) ...............................................................................7

*In re Beacon Assocs. Litig.*,
    745 F. Supp. 2d 386 (S.D.N.Y. 2010)...............................................................................5, 6

*In re Managed Care Litig.*,
    185 F. Supp. 2d 1310 (S.D. Fla. 2002) ..............................................................................10

*Jordan (Bermuda) Inv. Co.* v. *Hunter Green Invs. LLC*,
    No. 00-CV-9214, 2007 WL 2948115 (S.D.N.Y. Oct. 3, 2007)..............................................3

*Mellon Bank, N.A.* v. *Aetna Bus. Credit, Inc.*,
    619 F.2d 1001 (3d Cir. 1980)...............................................................................................4

*Moynet* v. *Courtois*,
    8 So.3d 377 (Fla. Dist. Ct. App. 2009) ................................................................................9

*Nat'l Fire Ins. Co. of Hartford* v. *Fortune Constr. Co.*,
    320 F.3d 1260 (11th Cir. 2003) ...........................................................................................7

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Pension Comm. of the Univ. of Montreal Pension Plan* v. *Banc of Am. Sec., LLC*,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006) ................................................................................... 3

*TracFone Wireless, Inc.* v. *Access Telecom, Inc.*,
   642 F. Supp. 2d 1354 (S.D. Fla. 2009) .................................................................................. 9

### STATUTES

Fla. Stat. § 95.03 ............................................................................................................................ 9

### OTHER AUTHORITIES

11 Fla. Jur. 2d Contracts § 158 ...................................................................................................... 4

## PRELIMINARY STATEMENT

Standard Chartered Bank International (Americas) Ltd. ("SCBI") and Standard Chartered Bank (collectively, the "Bank") performed exactly how plaintiffs authorized them to under the only operative agreement alleged in the amended complaint—the Purchase Letter. The Bank purchased shares of Fairfield Sentry Ltd. (the "Sentry Fund") on plaintiffs' behalf and then provided safe custody of those shares. In exchange, the Bank charged plaintiffs its standard "distribution and servicing fee" based on the "month end NAV of the [Sentry] Shares" (the "Servicing Fee")—just as the Purchase Letter provided. (Berarducci Decl. Ex. B.) For five years, the Bank accurately calculated and charged the Servicing Fees from the only possible source of the "month end NAV of the Shares"—the valuations that the Sentry Fund reported on a monthly basis.

Apparently now recognizing that the plain language of the Purchase Letter defeats their breach of contract claim, plaintiffs go so far as to assert that the Purchase Letter is not a contract at all. If so, however, the plaintiffs' complaint fails on its face—there can be no breach without a contract. And in any event, whether contractual or otherwise, the interpretation of the Bank's obligation used by plaintiffs—to have charged the Servicing Fees based on the unknown "Madoff-fraud-adjusted" value of the Sentry Fund's assets—defies both law and reason. First, plaintiffs do not allege that the Bank knew the "actual" value of the Sentry Fund, and, in fact, they acknowledge that the Bank had no contractual obligation to uncover or account for Madoff's fraud. Second, and more fundamentally, it is undisputed industry practice that intermediaries, such as the Bank, rely on the NAV per share reported by the issuer of a fund. This does not make them a guarantor in perpetuity of those valuations. Indeed, the Bank had no possible alternative method to value plaintiffs' shares, which plaintiffs do not dispute. Finally, even if the Bank did owe some implausible (and impossible) duty to compute the Servicing Fees

based on the "actual" value of the Sentry Fund's assets, plaintiffs were on notice for five years that the Bank instead used reported values. Their failure to object for five years constitutes a waiver under Florida law of all related claims. Plaintiffs' causes of action for breach of contract and unjust enrichment should be dismissed.

I. **BY QUESTIONING THE ENFORCEABILITY OF THE PURCHASE LETTER, PLAINTIFFS RENDER THEIR BREACH OF CONTRACT ALLEGATIONS TOO VAGUE TO MAINTAIN.**

In their opposition papers, plaintiffs argue that the Purchase Letter, on which they base their breach of contract claim, is not a contract at all and does not reflect an agreement between the parties in respect of the Servicing Fees.[1] (Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss Amended Class-Action Complaint ("Opp.") at 2-3.) But plaintiffs cannot maintain a breach of contract claim in the absence of a contract. To withstand a motion to dismiss, plaintiffs must identify the contract and specific provisions that were allegedly breached. *Broughel* v. *Battery Conservancy*, No. 07-CV-7755, 2009 WL 928280, at *5 (S.D.N.Y. Mar. 30, 2009) (citing *Sirohi* v. *Trs. of Columbia Univ.*, No. 97-CV-7912, 1998 WL 642463, at *2 (2d Cir. Apr. 16, 1998)); *Highlands Ins. Co.* v. *PRG Brokerage, Inc.*, No. 01-CV-2272, 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004). The Purchase Letter is the only contract identified in the amended complaint and plaintiffs put forward no alternative now.

II. **THE BANK WAS AUTHORIZED TO CHARGE THE SERVICING FEES BASED ON THE REPORTED VALUE OF THE SENTRY SHARES.**

Plaintiffs argue in the next breath that even if the Purchase Letter is a contract, the Bank breached it when it set the Servicing Fees based on the value of plaintiffs' shares reported by the Sentry Fund on a monthly basis, which values did not reflect Madoff's then-unknown

---

[1] Plaintiffs argue, for example, that the Purchase Letter binds only Mr. Pujals because Mrs. Pujals did not sign the letter. (Opp. at 2.) This argument ignores that plaintiffs, when opening their joint account at SCBI, authorized SCBI to "honor and act upon the orders, . . . endorsements or other instructions, made by **ANY ONE OR MORE OF US** . . . ." (Berarducci Decl. Ex. A (Account Application and Agreement) ¶ 7.)

-2-

misappropriation of the Fund's assets. Plaintiffs contend that the phrase "month end NAV of the [Sentry] Shares" in the Purchase Letter means a value calculated "by deducting total liabilities . . . from total assets . . . and dividing such amount by the number of shares outstanding." (Opp. at 4-5 (quoting Black's Law Dictionary 1049 (6th ed. 1991)).) But it does not follow from this legal dictionary definition that the Bank was responsible under the Purchase Letter for this calculation or a guarantor of its accuracy. The Purchase Letter calls for Servicing Fees to be set in relation to the "month end NAV of the [Sentry] Shares." The Sentry Fund reported that value to the Bank on a monthly basis, and the Bank accurately calculated the Servicing Fees in reliance on these reported figures. (Am. Compl. ¶ 31.)

This is precisely in line with industry practice, whereby the NAV per share of an investment fund is calculated and reported by the issuer of the fund (or its administrator) and represents the price at which investors can buy or sell interests in the fund. *E.g.*, *Jordan (Bermuda) Inv. Co.* v. *Hunter Green Invs. LLC*, No. 00-CV-9214, 2007 WL 2948115, at *19 (S.D.N.Y. Oct. 3, 2007) ("[H]edge funds are open-end funds that directly sell and redeem their shares to and from shareholders at the shares' NAV." (citation omitted)); *Pension Comm. of the Univ. of Montreal Pension Plan* v. *Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 172-73 (S.D.N.Y. 2006) (funds' offering documents established third-party administrator would "report the values of securities held by the [f]unds," and funds' board of directors and investment manager would "determine at what value the investment securities are reported for the determination of the [NAV]").[2]

---

[2]    *See also Anwar* v. *Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 393 (S.D.N.Y. 2010) (fund administrator of Sentry and other Fairfield funds contracted to "calculate NAV of Sentry, which determined, among other things, plaintiffs' "reported profits"); *Bruhl* v. *PricewaterhouseCoopers Int'l*, No. 03-CV-23044, 2008 WL 899250, at *1 (S.D. Fla. Mar. 31, 2008) (fund administrator contracted to compute hedge funds' NAV).

In this case, the "month end NAV of the Shares" of the Sentry Fund was the subscription and redemption price that was set and reported by the Sentry Fund on a monthly basis.[3]  Because shares in the Sentry Fund, like most hedge funds, did not publicly trade on an open exchange, the Sentry Fund was the only source for the "NAV of [its] Shares."  The only plausible interpretation of the Purchase Letter, therefore, is that the Bank was authorized to rely on these reported values.  11 Fla. Jur. 2d Contracts § 158 ("Technical words are to be interpreted as usually understood by persons in the profession or business to which [the words] relate."); *Mellon Bank, N.A.* v. *Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1013 (3d Cir. 1980) ("Generally parties will be held to definitions given to words in specialized commercial and trade areas in which they deal.  Similarly, certain words attain binding definition as legal terms of art.").

Plaintiffs also point to the Securities and Exchange Commission ("SEC") definition of "net asset value" because it provides the same basic formula for calculating NAV as Black's Law Dictionary.  (Opp. at 5 n.8.)  The SEC definition, in fact, presumes that NAV is calculated by the issuer:

> *An investment company* calculates the NAV of a single share (or the 'per share NAV') by dividing its NAV by the number of shares that are outstanding.  For example, if a mutual fund has an NAV of $100 million, and investors own 10,000,000 of the fund's shares, the fund's per share NAV will be $10.  Because per share NAV is based on NAV, which changes daily, and on the number of shares held by investors, which also changes daily, per share NAV also will change daily.  Most mutual funds publish their per share NAVs in the daily newspapers.

*Fast Answers – Net Asset Value*, SEC, http://www.sec.gov/answers/nav.htm (last modified Mar. 26, 2007) (emphasis added).  It follows, then, that third-party intermediaries necessarily rely on

---

[3]   (*E.g.*, Berarducci Decl. Ex. C (Subscription Agreement) ¶ 1 (explaining that shares in the Sentry Fund were "offered at a price equal to the net asset value ('Net Asset Value') per Share as of the effective date of the purchase") & Ex. D (July 1, 2003 PPM) at cover page ("Purchase Price per Share:  Net Asset Value per Share").)

these reported valuations in executing transactions and providing custody of such investments for clients.  The cases are in accord.  In both *In re Beacon Associates Litigation*, 745 F. Supp. 2d 386 (S.D.N.Y. 2010) and *Hines* v. *Fiserv, Inc.*, No. 08-CV-2569, 2010 WL 1249838 (M.D. Fla. Mar. 25, 2010), courts rejected attempts by plaintiffs to recover standard investment fees that were charged based on the value of investment assets later learned to have been worthless.  As the *In re Beacon* court explained, "the [parties' agreements] presumably anticipated that Defendants would use the figures reported to them [not the actual asset values] to calculate fees."  745 F. Supp. 2d 386, 420; *see also Hines*, 2010 WL 1249838, at *5 (plaintiffs fail to "point to any term in the contract which even arguably creates an obligation that [the custodian] would report the 'accurate' value of customers' holdings").

Plaintiffs attempt to distinguish *In re Beacon* and *Hines*, arguing that those actions involved agreements that "made clear that the calculation of fees would not be tied to *actual* asset values, but rather would be calculated based on *reported* asset values." (Opp. at 9-10, 12.)  But the same is true in this case.  The Sentry Subscription Agreement and Offering Memorandum (collectively the "Sentry Offering Documents"), and also plaintiffs' Statements of Accounts, made plain that (i) the Bank could only value plaintiffs' Sentry shares by relying on figures reported by the Sentry Fund (*e.g.*, Berarducci Decl. Ex. D at 13), and (ii) those valuations were not guaranteed by the Bank to represent the "actual" value of the Sentry Fund's assets at any given time (*e.g.*, Am. Compl. Ex. C at 4).  Indeed, the Sentry Offering Documents (provided to plaintiffs at the time they invested in Sentry) and plaintiffs' monthly Statements of Accounts contain language that is substantially the same as that at issue in *In re Beacon* and *Hines*:

| | |
|---|---|
| ***Beacon*** **Agreements:** | • Discretionary Investment Management Agreement provides that assets "shall be valued in such manner as determined in good faith by the Investment Manager to reflect its fair market value." (Opp. at 10 (emphasis omitted).) |
| | • Beacon Fund Offering Memorandum states that: "Investments in |

-5-

|  |  |
|---|---|
|  | Investment Pools are valued pursuant to the valuation submitted to the Company by the Managers of the Investment Pools, which valuations the Company expects to accept.  All values are assigned by the Managing Member are final, binding and conclusive on all the Members."  (Opp. at 10.) |
| *Hines* **Agreement:** | • Individual Retirement Account contract valuation reporting policy provides that the custodian "'does not conduct appraisals of investments and does not seek to verify the prices or values provided to it.'"  (Opp. at 12.) |
| *Pujals* **Agreements:** | • Subscription Agreement discloses that "the value of [the subscriber's Sentry] Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investments and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value." (Berarducci Decl. Ex. C ¶ 10.) |
|  | • Each Statement of Accounts provides that:  "Prices are believed to be reliable, but their accuracy is not guaranteed."  (Am. Compl. Ex. C at 4.) |
|  | • Offering Memorandum states that: "'All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors.'"  (Berarducci Decl. Ex. D at 13.) |

Plaintiffs do not dispute that the language in the Sentry Offering Documents and their Statements of Accounts is fatal.  Instead, they assert that this Court should not consider the Offering Memorandum because plaintiffs did not attach it to their amended complaint.[4]  In support, plaintiffs cite this Court's decision in *Anwar* v. *Fairfield Greenwich Ltd.*, 745 F. Supp. 2d 360, 367-68 (S.D.N.Y. 2010).  In *Anwar*, this Court declined to consider the Offering Memorandum (referred to in that opinion as the Placement Memo) because, although certain of the plaintiffs alleged that they received the Offering Memorandum, it was unclear which version of the Offering Memorandum each plaintiff received, and the various versions contained potentially "crucial" differences.  *Id*. at 368.  Those circumstances are not present here: (1) plaintiffs acknowledged receiving the Offering Memorandum when they signed both the

---

[4] Plaintiffs advance no arguments with respect to the Subscription Agreement or their Statements of Accounts.

Purchase Letter and the Subscription Agreement, and (2) plaintiffs do not and cannot argue that the Offering Memorandum differs across versions in a way that is material to the issues here.[5]

Plaintiffs also assert that the Court should disregard the Offering Memorandum because it is not a part of the parties' agreement in the Purchase Letter.  (Opp. at 7.)  It is black letter law, however, that "where two contracts are part and parcel of the same general transaction, they may . . . be interpreted together."  *Huntington on the Green Condo.* v. *Lemon Tree I-Condo.*, 874 So. 2d 1, 4 (Fla. Dist. Ct. App. 2004); *see also Nat'l Fire Ins. Co. of Hartford* v. *Fortune Constr. Co.*, 320 F.3d 1260, 1275 (11th Cir. 2003) ("It is the general rule of contract law that where a writing expressly refers to and sufficiently describes another document, the other document is to be interpreted as part of the writing." (citation omitted)).  Plaintiffs executed the Purchase Letter and Subscription Agreement at the same time in connection with their investment in Sentry, and both documents expressly incorporate the Offering Memorandum.  Plaintiffs cannot now disavow the Offering Memorandum in arguing that their shares were not valued properly.

### III. THE FACT THAT MADOFF'S FRAUD WAS NOT EXPOSED UNTIL 2008 DOES NOT NEGATE THAT PLAINTIFFS WERE ON NOTICE OF THE BANK'S METHOD FOR SETTING THE SERVICING FEES SINCE 2004 AND THEREFORE WAIVED ANY BREACH OF CONTRACT CLAIM.

Even though the Sentry Offering Documents and plaintiffs' monthly Statements of Accounts made perfectly clear that the Bank was charging the Servicing Fees based on the Sentry Fund's reported NAV of its shares (*supra* at 5-6), plaintiffs made no objection for the five years they held Sentry shares in their account.  Plaintiffs thus cannot argue now that the Bank

---

[5] Each version of the Offering Memorandum contains virtually identical language about the issues relevant to this case, namely, the valuation of Sentry shares.  For example, each version makes clear, "All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors." (Berarducci Decl. Ex. D (July 1, 2003 PPM) at 13; Supplemental Declaration of Patrick B. Berarducci ("Suppl. Berarducci Decl.") Ex. A (Oct. 1, 2002 PPM) at 9 & Ex. B (Oct. 1, 2004 PPM) at 11 & Ex. C (Aug. 14, 2006 PPM) at 12).)

breached the Purchase Letter because they either waived such claims, *Arbogast* v. *Bryan*, 393 So. 2d 606, 608-09 (Fla. Dist. Ct. App. 1981), or "acquiesced in an alteration of the terms of the [Purchase Letter], thereby barring its enforcement," *Acosta* v. *Dist. Bd. of Trs. of Miami-Dade Cmty. Coll.*, 905 So. 2d 226, 229 (Fla. Dist. Ct. App. 2005).

Plaintiffs contend no claim was waived because "[t]he true nature of the Sentry Fund—*i.e.*, that it was worthless because its underlying 'assets' were non existent—was not known by Plaintiffs (or Defendants for that matter) until roughly December 2008." (Opp. at 15.) Plaintiffs miss the point. Plaintiffs allege that the Bank breached its obligations by using the reported not "actual" value of the Sentry Fund in calculating the Servicing Fees. But from the moment plaintiffs received the Sentry Offering Documents they were on notice that the Bank charged servicing fees based on the reported NAV of the shares, and thus did not guarantee the accuracy of the valuations, and they were reminded of this fact in their monthly Statements of Accounts, which stated that the prices contained therein "are believed to be reliable, but their accuracy is not guaranteed." (*Supra* at 5-6.) Stated differently, the only piece of information that was unknown until 2008—that Madoff was misappropriating assets from the Sentry Fund— does not establish the breach alleged by plaintiffs.[6]

Plaintiffs also argue that the Court should not consider provisions in the Rules and Regulations Governing Accounts ("RRGA") requiring them to object within 30 days to improper fee charges because the RRGA were not attached to plaintiffs' amended complaint and "raise a host of factual issues."[7] (Opp. at 14.) Plaintiffs fail to articulate a single factual issue raised by the RRGA, however, and they cannot avoid the terms of their account agreements merely by

---

[6] As plaintiffs themselves emphasize, they "do not contend that Standard Chartered knew or should have known that the figures regarding plaintiffs' Madoff-related investments were false and used them anyway." (Opp. at 11 n.21.)

[7] The RRGA are attached as Exhibits J-L to the Berarducci Declaration.

choosing not to attach them to their amended complaint, *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  Moreover, plaintiffs ignore that their Statements of Accounts, independent from the RRGA, also required that objections to charges had to be made within 30 days.  (*See, e.g.*, Am. Compl. Ex. C at 4; Berarducci Decl. Ex. F at 6, 8 & Ex. G at 6, 9.)  Similarly unavailing, is plaintiffs' argument that the RRGA's 30-day waiver provision is unenforceable because it shortens the applicable statute of limitations in violation of Fla. Stat. § 95.03.  (Opp. at 17.)  The Bank is not attempting to "enforce" a 30-day statute of limitations.  Here, plaintiffs waived their claim by acquiescing *for five years* to the Bank's method of calculating the Servicing Fees.  Plaintiffs' failure to raise any objection in light of the 30-day provision shows that plaintiffs acquiesced to and are now bound by the Bank's method.

## IV. PLAINTIFFS CANNOT CREATE AN UNJUST ENRICHMENT CLAIM BY QUESTIONING THE SCOPE AND VALIDITY OF THE PURCHASE LETTER.

To salvage their unjust enrichment claim, plaintiffs rely on *TracFone Wireless, Inc.* v. *Access Telecom, Inc.*, 642 F. Supp. 2d 1354 (S.D. Fla. 2009), for the unremarkable proposition that where no legal remedy exists, equitable remedies may be available.  (Opp. at 20-22.)  Plaintiffs argue that the subject matter of their claim is not covered by a written agreement because the Purchase Letter "may not" cover the entirety of their $600,000 Sentry investment or "speak to what, if any, fees Standard Chartered is entitled to charge or retain if any of the investments held in Plaintiffs' account were later determined to be worthless, *i.e.* part of a Ponzi scheme."  (Opp. at 19.)  Even if the Court were to reach such conclusions regarding the Purchase Letter, it would not save plaintiffs' claim.  "[W]here there is an express contract between the parties, claims arising out of that contractual relationship will not support a claim for unjust enrichment." *Moynet* v. *Courtois*, 8 So.3d 377, 379 (Fla. Dist. Ct. App. 2009) (citations omitted); *see also Anwar*, 745 F. Supp. 2d at 378-79.  Plaintiffs' relationship with the Bank is a contractual one, subject to written agreements, including agreements that specifically address the

-9-

Bank's ability to charge fees in connection with plaintiffs' investments.[8]  Plaintiffs therefore cannot maintain an unjust enrichment claim, irrespective of the scope of the Purchase Letter.

## CONCLUSION

SCBI and SCB respectfully request that the Court dismiss with prejudice the *Pujals* Amended Complaint in its entirety.

Dated: April 20, 2011
New York, New York

/s/ Sharon L. Nelles

Sharon L. Nelles
Bradley P. Smith
Patrick B. Berarducci
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
nelless@sullcrom.com

Diane L. McGimsey
(Admitted *Pro Hac Vice*)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067

*Attorneys for Defendants Standard Chartered Bank International (Americas) Ltd. and Standard Chartered Bank*

---

[8]  *See* Am. Compl. ¶ 10; Berarducci Decl. Ex. A (Account Application and Agreement) ¶¶ 6(a), 7; & Ex. B (Purchase Letter) & Exs. J-L (RRGA) § 17(c) (governing fees).  Even assuming *arguendo* the absence of *any* written agreements governing the instant dispute, plaintiffs still could not maintain an unjust enrichment claim because they "have not explicitly alleged that an adequate remedy at law does not exist."  *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1337 (S.D. Fla. 2002).  Courts forgive the lack of an express allegation only where it is clear from the face of the complaint that no legal remedy exists.  *Id.* at 1337.  That is hardly the circumstance here.  *See generally Anwar*, 745 F. Supp. 2d 360 (maintaining legal claims against Standard Chartered defendants seeking, among other things, fees arising from investments in the Sentry Fund).