```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/14/11
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------X
PASHA S. ANWAR, et al.,              :

                Plaintiffs,          :     09 Civ. 0118 (VM)

                                     :     10 Civ. 2878 (Pujals)

                                     :

                                     :

      -against-                      :     **DECISION AND ORDER**

                                     :

FAIRFIELD GREENWICH LIMITED,         :
et al.,                              :

                                     :

                Defendants.          :
-------------------------- X
**VICTOR MARRERO, United States District Judge.**

This suit for breach of contract is brought on behalf
of a putative class of investors seeking to recover fees
that defendants Standard Chartered Bank International
(Americas) Limited and Standard Chartered Bank
(collectively, "Defendants") charged for managing
investments in the Fairfield Sentry Limited fund ("Sentry
Fund"). The Sentry Fund was a hedge fund that, in turn,
invested almost all of its assets in Bernard L. Madoff
("Madoff") Investment Securities ("BLMIS"), which operated
a now-infamous Ponzi-scheme. Pursuant to the Order of the
Judicial Panel on Multidistrict Litigation issued in MDL
No. 2088 (the "MDL"), the Court has consolidated this case
with a number of other lawsuits concerning alleged
wrongdoing by BLMIS.

Defendants now move to dismiss under Federal Rules of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").  For the reasons discussed below, Defendants' motion to dismiss is GRANTED, and the Amended Class Action Complaint ("Complaint") is DISMISSED without prejudice.

## I. BACKGROUND[1]

Plaintiffs Jose Antonio Pujals, Rosa Julieta A. de Pujals (together, "the Pujals"), and members of a putative class of investors[2] (collectively, "Plaintiffs"), maintained investment accounts ("Accounts") with Defendants and Defendants' predecessor, American Express Bank International,[3] during the period from approximately June 2004 to December 2008.  Through their Accounts, Plaintiffs purchased shares of the Sentry Fund, which in turn invested almost all of its assets in BLMIS.  The Pujals allege that Defendants invested approximately $300 million of

---

[1] The facts below are taken from the Complaint, documents attached to the Complaint as exhibits, and documents incorporated into the Complaint by reference. The Court accepts these facts as true for the purposes of ruling on a motion to dismiss.  See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008).  However, allegations that are no more than legal conclusions "are not entitled to the assumption of truth."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). Except where specifically referenced, no further citation to these sources will be made.

[2] Plaintiffs define the class as "[a]ll persons who maintained an account with Defendants who were charged Fairfield Fees between June 12, 2004 and December 23, 2008."  (Amended Class Action Complaint ¶ 35.)

[3] In February 2008, American Express Bank International was acquired by Standard Chartered PLC and renamed SBCI.  See Anwar v. Fairfield Greenwich Ltd., 745 F. Supp. 2d 360, 364 (S.D.N.Y. 2010).

Plaintiffs' money, of which the Pujals's own investments totaled $600,000, in the Sentry Fund. In order to make the investments in the Sentry Fund, Plaintiffs and Defendants entered into a form contract ("Form Contract") which required Plaintiffs to pay Defendants a quarterly fee ("Servicing Fee(s)").

On December 11, 2008, the truth about Madoff's Ponzi scheme became public knowledge.[4] The Sentry Fund, which previously had reported assets of more than $7 billion, was rendered worthless. The Sentry Fund's sudden loss of value — and the concomitant loss of Plaintiffs' investments — is reflected in the Pujals's Account statements, attached to the Complaint. The Pujals's Account statement dated November 30, 2008, for instance, reports that Defendants charged the Pujals a Servicing Fee of $758.09 on their Sentry Fund investment, which at the time had a value of $609,546.34. But during the first quarter of 2008, Defendants did not charge a Servicing Fee at all — presumably because the Pujals's Sentry Fund investment had plummeted to the dismal sum of $4.52.

---

[4] Further background information on the Ponzi scheme operated by Madoff and its relation to the Sentry Fund may be found in this Court's previous opinions. See Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 387-90 (S.D.N.Y. 2010); Anwar v. Fairfield Greenwich Ltd., 676 F. Supp. 2d 285, 290 (S.D.N.Y. 2010).

Rather than seeking to recoup their underlying investment losses, Plaintiffs sue Defendants for breach of contract and unjust enrichment over the Servicing Fees charged to their Accounts. Plaintiffs' suit thus differs from the majority of Madoff-related investor suits — including the related cases in this multidistrict litigation — which focus on tort theories to recover underlying investment losses.

In particular, Plaintiffs allege that Defendants breached the Form Contract by miscalculating the Servicing Fees. According to Plaintiffs, the Form Contract specified that the Servicing Fees would be calculated based on the actual value of the Sentry Fund's assets. Plaintiffs argue that Defendants repeatedly overcharged them because, in reality, the Sentry Fund had no assets, and thus no actual value. In the alternative, Plaintiffs contend that Defendants should disgorge the Servicing Fees as unjust enrichment.

## II.  DISCUSSION

A.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)).  This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks omitted).  The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

B.   DOCUMENTS CONSIDERED ON A RULE 12(b)(6) MOTION

Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to the complaint itself.  However, "[c]onsideration of materials outside the complaint is not entirely foreclosed."  Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006).  A court may take into account any written instrument attached to the complaint, as well as statements

and documents "incorporated in [the complaint] by reference" without converting a motion to dismiss into one for summary judgment. Chambers, 282 F.3d at 152. A court may also reference any documents that are "integral" to the complaint, meaning that the "complaint relies heavily upon [the documents'] terms and effect," and the "plaintiff has actual notice of all the information in the [documents] and [] relied upon those documents in framing the complaint." Id. at 153 (internal quotation marks omitted). In addition, it must be "clear on the record that no dispute exists regarding the authenticity or accuracy of the document," and there exist "no material disputed issues of fact regarding the relevance of the document." Faulkner, 463 F.3d at 134.

The Pujals did not attach a copy of the Form Contract to their Complaint. Defendants, however, urge the Court to consider several documents they submitted with their motion to dismiss, including: 1) a copy of what Defendants purport to be the contract at issue ("Purchase Letter"); 2) a Subscription Agreement for Fairfield Sentry Limited signed by Jose Pujals on January 9, 2003 ("Subscription Agreement"); and 3) a Private Placement Memorandum for Fairfield Sentry Limited dated July 1, 2003 ("Placement Memo").

As a preliminary matter, the Court finds that the Form Contract, which Plaintiffs did not put before the court, is integral to, if not incorporated by reference in, the Complaint.   For example, the Complaint refers multiple times to a "form contract" or a "uniform contract" "which provid[ed] that the Fairfield Fees charged to each Class member were to be calculated based upon the actual value of the Sentry Fund's assets."   (Compl. ¶¶ 2, 22, 23, 27, 29, 39, 47, 48.)   Plaintiffs further allege that "all Class members entered into a substantially similar form contract pursuant to which Defendants were entitled to charge and calculate Fairfield Fees."   (Compl. ¶ 39.)

Since the Form Contract would thus properly be part of the pleadings, the Court, by Order dated November 4, 2011, directed Plaintiffs "to submit . . . the form contract between Plaintiffs and Defendants that Plaintiffs relied on and referred to in the Amended Class Action Complaint as the basis for their breach of contract claim and class action status."   (Docket No. 743.)   In response, the Pujals submitted a letter-contract _identical_ to the Purchase Letter submitted by the Defendants.   They identified this document as the "only form 'contract' in Plaintiffs' possession, custody, or control."   (Decl. of David A. Rothstein, Esq., ¶ 2 (Docket No. 747).)

1. Purchase Letter

Defendants argue that the Court should consider the Purchase Letter attached to the motion to dismiss as integral to the Complaint. They assume that the Purchase Letter is an example of the Form Contract. The Purchase Letter is a one-page letter dated January 9, 2003, addressed to "AEB," and signed by Jose Pujals. The Purchase Letter requests that AEB purchase $190,000.00 of Fairfield Sentry Limited Class B shares on behalf of the signer. It includes the statement, "I have received the Offering Memorandum and the Subscription Agreement." The Purchase Letter also provides that the signer's "account will be charged a distribution and servicing fee of .50% per annum, calculated monthly based on the month end NAV of the Shares and payable on a quarterly basis."

In their Opposition to Defendants' Motion to Dismiss, the Pujals question the Purchase Letter's relevance to this suit. The Pujals point to three indications that the Purchase Letter does not govern their claims: first, the Purchase Letter is not signed by both of the Pujals; second, the Purchase Letter does not link AEB with either of the Defendants;[5] and third, the Purchase Letter refers to

---

[5] Contrary to Plaintiffs' assertions, the relationship between AEB and Defendants is not a mystery. "AEB" plainly refers to American Express Bank (the full name appears at the top of the Purchase Letter), which

an investment of $190,000, whereas the Pujals allege that they invested $600,000 in the Sentry Fund.

Even though Plaintiffs have now submitted to the Court a document identical to the Purchase Letter — bearing the same signature of Jose Pujals, the same date, and the same request for $190,000 of Sentry Fund shares — they continue to raise the objections.  Plaintiffs do not expressly dispute that they relied on or referred to the Purchase Letter in their Complaint.  Instead, they assert that they "have concerns whether that form 'contract' governs all the claims at issue," and that "it appears that there are other 'contracts' at issue."  (Decl. of David A. Rothstein, Esq., ¶¶ 4, 5 (Docket No. 747).)

Given Plaintiffs' reliance on the existence of a "form contract" in drafting their breach of contract claim, Plaintiffs' protestations are contradictory and evasive. A central factual premise of both the breach of contract claim and Plaintiffs' request for class status is that investors like the Pujals agreed to a "form" (or "uniform") contract.  It follows that the operative provisions of the contract at issue in the Complaint were the same for all investors, apart from individualized information such as the date, identity of the investor, and amount of

---

the Complaint alleges was acquired by defendant Standard Chartered Bank International (Americas) Ltd. See also supra n.2.

investment. Accepting this premise as true, the issues raised by the Pujals — that the Purchase Letter governs only part of the money they invested and is not signed by both of the Pujals — do not disturb the relevance of the Purchase Letter as an example of the Form Contract. In fact, the Pujals themselves acknowledge that the Purchase Letter "might govern certain of the claims at issue." (Id. ¶ 3.) The Court therefore is not persuaded that Plaintiffs have raised any material dispute of fact as to the relevance or authenticity of the Purchase Letter such that the Court should ignore it in deciding the motion to dismiss. The Purchase Letter is integral to the Complaint because Plaintiffs necessarily relied on it for their breach of contract claim. Thus, the Court may properly consider it here. See Chambers, 282 F.3d at 153, 154 n.4 (holding that the district court properly considered contracts submitted by defendants on their motion to dismiss where the complaint "is replete with references to the contracts and requests judicial interpretation of their terms.").

### 2. Subscription Agreement and Placement Memo

Defendants argue that the Subscription Agreement and Placement Memo are also integral to the Complaint. The

Court disagrees, and will not consider those documents in deciding this motion to dismiss.

The Subscription Agreement appears to set forth terms governing the signer's subscription to the Sentry Fund. It lists Jose A. Pujals as the subscriber, the amount of subscription as $190,000, and contains Jose Pujals's signature dated January 9, 2003. The date, signature, and amount of investment indicate that the Subscription Agreement is related to the Purchase Letter, which contains a provision acknowledging that the investor has received the Subscription Agreement. However, that correlation alone is not enough to render the Subscription Agreement integral to the Complaint. The Complaint itself contains no allegations regarding a Subscription Agreement or any agreement other than the Form Contract. Thus, while at least one of the Plaintiffs — Jose Pujals — must have had notice of the Subscription Agreement, there is no indication that Plaintiffs relied on its terms or effects in drafting the Complaint. See Chambers, 283 F.3d at 153 ("[w]e reiterate here that a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion . . .") (emphasis in original).

Nor is there any indication that Plaintiffs relied on the Placement Memo in framing their allegations.  As with the Subscription Agreement, the Complaint does not mention a Placement Memo or any ancillary document relating to the claims.  In addition, it is unclear whether Plaintiffs had notice of the Placement Memo, since it bears no signature or any indication that it was received by any of the Plaintiffs.  See Id. at 154 & n.5 (holding that the district court should not have considered on motion to dismiss certain unsigned draft agreements which plaintiffs did not rely on or refer to in drafting their complaint).

Finally, regardless of whether Plaintiffs relied on the Subscription Agreement and Placement Memo in drafting the Complaint, there is a clear dispute over whether the two documents are incorporated into the Form Contract.  The Court therefore declines to consider either document.

C.   BREACH OF CONTRACT[6]

Under Florida law, "the elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." Beck v. Lazard Freres & Co., 175 F.3d 913, 914 (11th Cir. 1999).  Unambiguous contracts are

---

[6] As noted, this case is before the Court pursuant to an order of the Judicial Panel on Multidistrict Litigation.  The Complaint was originally filed in the Southern District of Florida, where Defendants are located, and the parties are in agreement that Florida law applies to their breach of contract and unjust enrichment claims.

-12-

construed according to their plain and ordinary meaning. See Idearc Media Corp. v. M.R. Friedman & G.A. Friedman, P.A., 985 So. 2d 1159, 1161 (Fla. Dist. Ct. App. 2008). Contract terms should be interpreted in light of relevant custom or usage, but such standard usage cannot operate to contradict or contravene the terms of an otherwise unambiguous express contract. See Farr v. Poe & Brown, Inc., 756 So. 2d 151, 152-53 (Fla. Dist. Ct. App. 2000).

Since the parties agree that a valid written contract exists,[7] the question before the Court is whether Plaintiffs have plausibly alleged material breach. Specifically, the Court must determine whether Plaintiffs' claim that the Defendants miscalculated the Servicing Fees under the Form Contract satisfies Rule 12(b)(6).

The Purchase Letter — which, as explained above, is integral to the Complaint — sets out the method for calculating the Servicing Fees:

> [M]y account will be charged a distribution and servicing fee of .50% per annum, calculated monthly based on the month end NAV of the Shares and payable on a quarterly basis.

The Purchase Letter is silent with regard to the meaning of "NAV." Although the parties agree that the acronym stands for "net asset value," they disagree over what exactly that

---

[7] Plaintiffs' allegations regarding the absence of contracts are part of their unjust enrichment claim, which is plead in the alternative.

means and how it is calculated.  Plaintiffs argue that
Defendants should have calculated the Servicing Fees based
on the "actual" NAV, but instead they were calculated based
on the "reported" NAV (Compl. ¶ 31).  The actual NAV,
according to Plaintiffs, would have reflected that the
Sentry Fund in reality had no assets.  Defendants, in
contrast, assert that the NAV of a hedge fund is commonly
understood to be promulgated by the fund itself; the fund's
manager and/or its agents calculate and report the NAV.
Thus, Defendants argue, the only reasonable interpretation
of the term NAV in the Purchase Letter is the NAV reported
by the Sentry Fund.

The Court agrees with Defendants.  As indicated in
numerous financial reports and judicial opinions, NAV is a
term of art used in the financial industry.  As such, the
Court will interpret it in light of the customary usage
within that industry.  NAV refers to the value of the
collective holdings of an investment company, such as a
mutual fund or hedge fund.  Both Plaintiffs and Defendants
cite the United States Securities and Exchange Commission
("SEC") definition:

> "Net Asset Value" or "NAV," of an investment company
> is the company's total assets minus its total
> liabilities. . . . An investment company calculates
> the NAV of a single share (or "per share NAV") by

dividing its NAV by the number of shares that are outstanding.

U.S. Sec. & Exch. Comm'n, <u>Net Asset Value</u>, http://www.sec.gov/answers/nav.htm.  As the SEC definition indicates — albeit without elaboration — it is the investment company that calculates its NAV.  In the case of hedge funds, that arrangement is well documented.  Although the category of entities referred to as "hedge funds" includes a range of heterogeneous investment companies, hedge funds typically are not publicly traded and often hold complex, illiquid assets that are difficult to value. <u>See</u> Anne Riviere, <u>The Future of Hedge Fund Regulation: A Comparative Approach</u>, 10 Rich. J. Global L. & Bus. 263, 391 ("Unlike the purchase of publicly traded securities, ownership in a hedge fund comes from a contractual agreement").  <u>See generally</u> Wulf A. Kaal, <u>Hedge Fund Valuation: Retailization, Regulation, and Investor Suitability</u>, 28 R. Banking & Fin. L. 581 (2009) (hereinafter "Kaal").  Thus, "the Manager [of the hedge fund] may in practice be the most reliable or indeed the only source of information about pricing."  Technical Comm. of the Int'l Org. of Sec. Comm'ns, <u>Principles for the Valuation of Hedge Fund Portfolios</u> 6, 12, 15-19 (Mar. 2007) (hereinafter "IOSCO"), <u>available at</u>

http://www.iosco.org/library/pubdocs/pdf/IOSCOPD240.pdf.

As a result, hedge funds calculate and promulgate their own NAV, usually with the aid of independent administrators.[8] See Hedge Funds & Prime Brokers 14 (Mark Berman, ed., 2d ed. 2009); Kaal, 28 R. Banking & Fin. L. at 589; IOSCO, at 6, 12, 15-19.[9]

The distinction between an actual and a reported NAV which Plaintiffs propound unravels in light of a basic understanding of what a hedge fund is and how it operates. There could be no reasonable expectation that Defendants, which are intermediary banks, would themselves determine the NAV of the Sentry Fund. Given its customary meaning and usage in the financial industry, the term NAV in the Purchase Letter must refer to a figure which the Sentry Fund would report.

Plaintiffs are correct that the Purchase Letter does not contain extraneous language beyond the requirement that the investor pay a fee based on the NAV. It does not

---

[8] As part of this MDL, the Court presides over claims against Citco, the administrator of the Fairfield Greenwich Group's funds, including the Sentry Fund. As administrator of the funds, "Citco agreed to . . . calculate the [NAV] of the Funds, as well as the NAV per share." Anwar, 728 F. Supp. 2d at 393.

[9] Several legal opinions also recognize that hedge funds calculate and report their own NAV. See, e.g., Pension Comm. of Univ. of Montreal Pension Plan v. Banc Am. Sec., LLC, 592 F. Supp. 2d 608, 626 (S.D.N.Y. 2009); Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt LLC, 376 F. Supp. 2d 385, 395-96 (S.D.N.Y. 2005); United States v. Berger, 188 F. Supp. 2d 307, 313 (S.D.N.Y. 2002); Sec. & Exch. Commission v. Mannion, 789 F. Supp. 2d 1321, 1327 (N.D. Ga. 2011).

require a Servicing Fee based on "actual" assets, and it certainly does not provide that Defendants will independently investigate and uncover whether the NAV is inflated due to massive fraud. The Court will not read such provisions into the contract. Although Plaintiffs' losses are plain, and the fees paid unfortunate considering what we know now, that harsh reality does not create a breach of contract. Since the Complaint acknowledges that Defendants calculated the Servicing Fees based on the reported NAV, Plaintiffs have failed to plausibly allege a material breach of contract.

As noted above, Plaintiffs assert that agreements other than the Purchase Letter must exist which would justify their breach of contract claim. Pursuant to the Court's Order Appointing Standard Chartered Plaintiffs' Steering Committee (Docket No. 62), Plaintiffs requested discovery from Defendants seeking all form contracts governing the fees charged by Defendants. Defendants' responses were due December 1, 2011. Given that the Complaint focuses on form contracts, and in light of the common understanding of NAV, it seems improbable that any contracts produced would differ in ways that would suddenly render Plaintiffs' claims viable. Nevertheless, if at some point during the course of permitted discovery Defendants

produce contracts governing Servicing Fees which are substantially different from the Purchase Letter, Plaintiffs may then re-plead their case.

D.   UNJUST ENRICHMENT

Plaintiffs claim unjust enrichment in the alternative to their breach of contract claim. "It is blackletter law that the theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy." In re Managed Care Litig., 185 F. Supp. 2d 1310, 1337 (S.D. Fla. 2002) (internal quotation marks omitted). As this Court recently held, "[a]n unjust enrichment claim can exist only if the subject matter of that claim is not covered by a valid and enforceable contract." Anwar v. Fairfield Greenwich Ltd., No. 09 Civ. 118, 2011 WL 5282684, at *12-13 (Nov. 2, 2011 S.D.N.Y.) (quoting In re Managed Care Litig., 185 F. Supp. 2d at 1337).

Plaintiffs allege that express contracts may not exist for some of Plaintiffs' Sentry Fund investments. However, it is implausible that a form contract would govern some of Plaintiffs' Sentry Fund investments and Servicing Fees, but not others — particularly since the parties provided the Court with an example of the form contract at issue. See Webster v. Royal Caribbean Cruises, Ltd., 124 F. Supp. 2d

1317, 1326-27 (S.D. Fla. 2000) (dismissing plaintiff's unjust enrichment claim where defendant admitted the existence of an express contract and submitted a copy of the contract to the court); Godwin Pumps of Am., Inc. v. Ramer, No. 8:11-cv-00580, 2011 WL 2181183, at *3 (M.D. Fla. June 3, 2011) (dismissing unjust enrichment claim where plaintiff attached the contract to the complaint and defendant acknowledged its existence). The Court therefore cannot draw the "reasonable inference" from the Complaint that there may be an inadequate remedy at law such that the Court should allow an unjust enrichment claim to proceed. Cf. Tracfone Wireless, Inc. v. Access Telecom, Inc., No. 09-20397-CIV, 2009 WL 2207818, at *8 (S.D. Fla. July 24, 2009) (denying motion to dismiss unjust enrichment claim where the complaint created a "reasonable inference" that some of the transactions might have occurred without a "shrinkwrap" contract). Plaintiffs thus have failed to plausibly allege unjust enrichment.

Plaintiffs also argue that unjust enrichment is the only available remedy because the issues raised in this suit are beyond the scope of the Form Contract: "the parties did not agree what would happen to fees that were charged based on investments in what turned out to be a Ponzi scheme of historically unprecedented scope." (Compl.

¶ 54.)   But the Form Contract <u>does</u> cover the subject matter of the claim: the Servicing Fees.   Therefore, the silence of the Form Contract with regard to such an extreme contingency does not open the door for a quasi-contract remedy.   Although it is indeed unfair — and even unjust — that Plaintiffs paid fees on assets that were, in actuality, worthless, "the law of restitution is very far from imposing liability for every instance of what might plausibly be called unjust enrichment."   Restatement (Third) of Restitution & Unjust Enrichment § 1, cmt. b (2011); <u>see</u> <u>also</u> <u>id</u>. § 2, cmt. C ("the parties' own definition of their respective obligations . . . take precedence over the obligations that the law would impose in the absence of agreement").   The Form Contract created a legal basis for the fees charged.   Therefore, the Court grants Defendants' motion to dismiss the unjust enrichment claim.

### III. <u>ORDER</u>

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that the motion (Docket No. 612) of defendants Standard Chartered Bank International (Americas) Limited and Standard Chartered Bank to dismiss the Amended Class Action Complaint of plaintiffs Jose Antonio Pujals and Rosa Julieta A. de Pujals (together, the "Pujals") is **GRANTED**; it is further

**ORDERED** that the Amended Class Action Complaint of the Pujals is **DISMISSED** without prejudice.


**SO ORDERED.**

Dated: New York, New York
       14 December 2011

VICTOR MARRERO
        U.S.D.J.