.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| PASHA S. ANWAR, *et al.*, |
| Plaintiffs, |
| v. |
| FAIRFIELD GREENWICH LIMITED, *et al*., |
| Defendants. |
| This Document Relates To:  All Actions |

Master File No. 09-cv-118 (VM)

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
(212) 759-4600

LOVELL STEWART HALEBIAN JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
(212) 608-1900

*Interim Co-Lead Counsel for Plaintiffs and*
*Counsel for PSLRA Plaintiffs*

.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................iii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ................................................................................................................ 3

I.      THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23(a) ............... 3

        A.      The Proposed Class Is So Numerous That Joinder Is Impracticable ......................3

        B.      Plaintiffs' Claims Involve Common Questions of Law and Fact ...........................4

        C.      Plaintiffs' Claims and Defenses Are Typical of Those of the Members of the
                Class ................................................................................................................5

                1.      The Claims of the Class Representatives are Typical.................................6

                2.      The Class Representatives Are Not Subject to Unique Defenses...............7

        D.      Plaintiffs Satisfy the Adequacy of Representation Requirement............................8

II.     THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23(b)(3) ......... 10

        A.      Common Questions of Law and Fact Predominate .............................................10

        B.      Reliance Will Be Proven on a Class-Wide Basis.................................................12

                1.      Circumstantial Evidence Common to All Class Members Can Be Used
                        to Prove Reliance ..................................................................................12

                2.      This Case Presents Strong Circumstantial Evidence of Reliance.............15

                3.      In the Unique Circumstances of this Case, Reliance Can Be Shown
                        Because the Market for Fund Shares Could Not Have Existed Absent
                        Defendants' Fraud................................................................................18

                4.      Reliance Can Be Presumed Under *Affiliated Ute* Because Plaintiffs'
                        Claims Involve Material Omissions........................................................20

                        a.      The Affiliated Ute Presumption Applies to Plaintiffs' Federal
                                Securities Claims .......................................................................20

                        b.      The Affiliated Ute Presumption Applies to Plaintiffs' Common
                                Law Fraud and Negligent Misrepresentation Claims ...................22

i

C.      The Claims Based on Defendants' Breaches of Duty Will Be Proven on a
        Class-Wide Basis ................................................................................................23

D.      A Class Action Is Superior to Other Available Methods for the Fair and
        Efficient Adjudication of Plaintiffs' Claims ......................................................27

        1.      Any Individual Interest in Controlling the Prosecution of this Action is
                Minimal ...................................................................................................27

        2.      Other Madoff-Related Litigation Will Not Protect the Class's Interests...28

        3.      Litigating All of the Claims in this Forum Is the Most Just and
                Efficient Course of Action .......................................................................30

        4.      A Class Action in this Case Can Be Managed Effectively .......................30

        5.      The Presence of Foreign Class Members Poses No Impediment to
                Class Certification ...................................................................................31

                a.      Class Certification Is Not Dependent on Foreign Recognition .....32

                b.      A Judgment in this Case Would Be Recognized in Relevant
                        Jurisdictions Throughout the World ...............................................34

CONCLUSION.................................................................................................................... 39

.

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Abell v. Potomac Ins. Co.*,
   858 F.2d 1104 (5th Cir. 1988) ........................................................................ 19

*Ackerman v. Price Waterhouse*,
   252 A.D. 2d 179 (App. Div. 1st Dep't 1998) ....................................................... 22

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972)..................................................................................... *passim*

*Allapattah Servs., Inc. v. Exxon Corp.*,
   188 F.R.D. 667 (S.D. Fla. 1999) ..................................................................... 12

*Allen v. Isaac*,
   99 F.R.D. 45 (N.D. Ill. 1993)............................................................................ 3

*Anwar v. Fairfield Greenwich Ltd. ("Anwar II")*
   728 F. Supp. 2d 372 (S.D.N.Y. 2010)........................................................... *passim*

*In re Arakis Energy Corp. Securities Litigation*,
   1999 WL 1021819 (E.D.N.Y. Apr. 27, 1999) ..................................................... 4

*Bersch v. Drexel Firestone, Inc.*,
   519 F.2d 974 (2d Cir. 1975).......................................................................... 32

*Bresson v. Thomson McKinnon Secur., Inc.*,
   118 F.R.D. 339 (S.D.N.Y. 1988) .................................................................... 10

*Bruhl v. Price WaterhouseCoopers Int'l*,
   257 F.R.D. 684 (S.D. Fla. 2008)................................................................... *passim*

*Bunnion v. Consol. Rail Corp.*,
   1998 WL 372644, (E.D. Pa. May 14, 1988) ....................................................... 23

*Chisolm v. TranSouth Fin. Corp.*,
   194 F.R.D. 538 (E.D. Va. 2000) .................................................................... 12

*Collins v. International Dairy Queen*,
   168 F.R.D. 668 (M.D. Ga. 1996) ................................................................... 24

*Credit Alliance Corp. v. Arthur Anderson & Co.*,
   483 N.E. 2d 110 (N.Y. 1985) ................................................................. 24

*Cromer Fin. Ltd. v. Berger*,
   205 F.R.D. 113 (S.D.N.Y. 2001) ...................................................... *passim*

*Cutler v. Perales*,
   128 F.R.D. 39 (S.D.N.Y. 1989) ................................................................. 4

*Desai v. Deutsche Bank Sec. Ltd.*,
   573 F.3d 931 (9th Cir. 2009) ................................................................. 19

*Du Pont v. Brady*,
   828 F.2d 75 (2d Cir. 1987) ................................................................... 20

*Dupler v. Costco Wholesale Corp.*,
   249 F.R.D. 29 (E.D.N.Y. 2008) .................................................... 23, 24, 27

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
   89 F.R.D. 87 (S.D.N.Y. 1981) .......................................................... 6, 10

*Eckstein v. Balcor Film Investors*,
   8 F.3d 1121 (7th Cir. 1993) .................................................................. 19

*Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   122 F.R.D. 177 (E.D. Pa. 1988) ............................................................ 24

*Feinberg v. Katz*,
   2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007) .......................................... 22

*Ferber v. Fairfield Greenwich Group*,
   2010 WL 2927274 (N.Y. Sup. Ct. July 22, 2010) .................................... 28

*Fogarazzo v. Lehman Bros., Inc.*
   232 F.R.D. 176 (S.D.N.Y. 2005) ....................................................... 4, 22

*Fryar v. Abell*,
   492 U.S. 914, 109 S. Ct. 3236 (1989) .................................................... 19

*Greene v. Emersons Ltd.*,
   86 F.R.D. 47 (S.D.N.Y. 1980) ............................................................... 4

*Gunnells v. Healthplan Services, Inc.*,
   348 F.3d 417 (4th Cir. 2003) ............................................................... 24

.

*Headway Inv. Corp. v. American Express Bank Ltd.*,
  655 F. Supp. 2d 1352 (J.P.M.L. 2009) ........................................................................ 30

*Hoving v. Lawyers Title Ins. Co.*,
  256 F.R.D. 555 (E.D. Mich. 2009) ............................................................................ 26

*In re Alstom SA Securities Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) .................................................................... 32, 35, 36

*In re Baldwin-United Corp. Litig.*,
  122 F.R.D. 424 (S.D.N.Y. 1986) ................................................................................. 4

*In re Beacon Associates Litig.*,
  2010 WL 3895582 (S.D.N.Y. Oct. 5, 2010) ......................................................... 21, 22

*In re Bernard L. Madoff Inv. Securities LLC*,
  424 B.R. 122 (Bankr. S.D.N.Y. 2010) ........................................................................ 1

*In re Blech*,
  187 F.R.D. 97 (S.D.N.Y. 1999) .................................................................................. 7

*In re Drexel Burnham Lambert Group, Inc.*,
  960 F.2d 285 (2d Cir. 1992) ...................................................................................... 8

*In re HealthSouth Corp. Secs. Litig.*,
  261 F.R.D. 616 (N.D. Ala. 2009) .................................................................. 10, 13, 19

*In re Home-Stake Prod. Co. Sec. Litig.*,
  76 F.R.D. 351 (N.D. Okla. 1977) .............................................................................. 11

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
  191 F.R.D. 457 (E.D. Pa. 2000) ................................................................................ 25

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  210 F.R.D. 476 (S.D.N.Y. 2002) ............................................................................. 4, 7

*In re Industrial Diamonds Antitrust Litig.*,
  167 F.R.D. 374 (S.D.N.Y. 1996) .............................................................................. 30

*In re Initial Public Offering Sec. Litig.*,
  2004 WL 2297401 (S.D.N.Y. Oct. 13, 2004) ............................................................... 6

*In re Lloyd's American Trust Fund Litig.*,
  1998 WL 50211 (S.D.N.Y. Feb. 6, 1998) ............................................................. 24, 32

*In re NASDAQ Market-Makers Antitrust Litig.,*
   169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................................ 7

*In re Nassau County Strip Search Cases,*
   461 F.3d 219 (2d Cir. 2006)................................................................................ 11

*In re NationsMart Corp. Sec. Litig.,*
   130 F.3d 309 (8th Cir. 1997) ............................................................................. 19

*In re Oxford Health Plans, Inc.,*
   191 F.R.D. 369 (S.D.N.Y. 2000) ........................................................................ 4

*In re Prudential Sec. Inc. Ltd. Pshps. Litig.,*
   163 F.R.D. 200 (S.D.N.Y. 1995) ........................................................................ 6

*In re Sadia, S.A. Sec. Litig.,*
   2010 WL 2884737 (S.D.N.Y. July 20, 2010) ...................................................... 21

*In re Sadia, S.A. Sec. Litig.,*
   269 F.R.D. 298 (S.D.N.Y. 2010) .................................................................. 22, 23

*In re Salomon Analyst Metromedia Litig.,*
   544 F.3d 474 (2d Cir. 2008)................................................................................ 20

*In re Towers Fin. Corp. Noteholders Litig.,*
   177 F.R.D. 167 (S.D.N.Y. 1997) ...................................................................... 24

*In re Visa Check,*
   280 F.3d 124 (2d Cir. 2001)......................................................................... 27, 31

*In re Vivendi Universal, S.A. Securities Litigation,*
   --- F.Supp.2d ----, 2011 WL 590915 (S.D.N.Y. Feb. 17, 2011) ............................ 12

*In re Vivendi Universal, S.A. Sec. Litig.,*
   2009 WL 855799 (S.D.N.Y. Mar. 31, 2009) ............................................. 32, 33, 37

*In re Vivendi Universal, S.A. Sec. Litig.,*
   242 F.R.D. 76 (S.D.N.Y. 2007) ............................................................. 32, 35, 36

*In re WorldCom, Inc. Sec. Litig.,*
   219 F.R.D. 267 (S.D.N.Y. 2003) ................................................................... 7, 8

*Jenson v. Fiserv Trust Co.,*
   256 Fed. App'x 924 (9th Cir. 2007) ............................................................. 10, 13

.

*Katz v. MRT Holdings, LLC*,
  2008 WL 4725284 (S.D. Fla. Oct. 24, 2008)..........................................................................20

*King v. Club Med, Inc.*,
  430 N.Y.S.2d 65, 76 A.D.2d 123 (N.Y. App. Div. 1st Dep't 1980) .......................................14

*Kirkpatrick v. J.C. Bradford & Co.*,
  827 F.2d 718 (11th Cir. 1987) ...............................................................................................19

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) .......................................................................................13, 18

*LaGrasta v. First Union Securities, Inc.*,
  2005 WL 1875469 (M.D. Fla. Aug. 8, 2005) .........................................................................13

*Levitin v. PaineWebber, Inc.*,
  159 F.3d 698 (2d Cir.1998).....................................................................................................20

*Lowenschuss v. Resorts Int'l, Inc.*,
  181 F.3d 505 (3d Cir. 1999)....................................................................................................12

*Malack v. BDO Seidman, LLP*,
  617 F.3d 743 (3d Cir. 2010)....................................................................................................19

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008)....................................................................................................12

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002)..................................................................................................10

*Ockerman v. May Zima & Co.*,
  27 F.3d 1151 (6th Cir. 1994) ..................................................................................................19

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC.*,
  446 F. Supp. 2d 163 (S.D.N.Y. 2006)......................................................................................24

*Picard v. Fairfield Sentry Ltd., et al.*,
  09 CV 1239 (BRL) (Bankr. S.D.N.Y. May 18, 2009)............................................................29

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993)...................................................................................................3, 6

*Robinson v. Metro-North Commuter R.R.*,
  267 F.3d 147 (2d Cir. 2001)......................................................................................................4

.

*Ross v. Bank South, N.A.*,
   885 F.2d 723 (11th Cir. 1989) ............................................... 19

*Saddle Rock Partners v. Hiatt*,
   2000 WL 1182793 (S.D.N.Y. 2000)....................................... 11

*Shores v. Sklar*,
   647 F.2d 462 (5th Cir. 1981) ................................................ 19

*Slapikas v. First American Title Ins. Co.*,
   250 F.R.D. 232 (W.D. Pa. 2008) ........................................... 26

*Spagnola v. Chubb Corp.*,
   264 F.R.D. 76 (S.D.N.Y. 2010) ............................................. 24

*Spencer v. Hartford Fin. Servs. Group, Inc.*,
   256 F.R.D. 284 (D. Conn. 2009)............................................. 13

*Stanich v. Travelers Indem. Co.*,
   249 F.R.D. 506 (N.D. Ohio 2008) .......................................... 13

*Stephenson v. Citco Group Ltd.*,
   700 F. Supp. 2d 599 (S.D.N.Y. 2010)...................................... 28

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
   552 U.S. 148 (2008).............................................................. 20

*Strauss v. Long Island Sports, Inc.*,
   401 N.Y.S.2d 233 (2d Dep't 1978) ........................................ 23

*T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Auth.*,
   717 F.2d 1330 (10th Cir. 1983) ............................................. 19

*Teachers' Ret. Sys. of La. v. ACLN Ltd.*,
   2004 WL 2997957 (S.D.N.Y. 2004)...................................... 4, 7

*Waksman v. Cohen*,
   2002 WL 31466417 (S.D.N.Y. Nov. 4, 2002)........................ 22

*Walco Invs., Inc. v. Thenen*,
   168 F.R.D. 315 (S.D. Fla. 1996)...................................... *passim*

*Weinberg v. Hertz Corp.*,
   499 N.Y.S.2d 693 (N.Y. 1986) ............................................. 22

.

*Westway World Travel, Inc. v. AMR Corp.*,
    218 F.R.D. 223 (C.D. Cal. 2003) ................................................................. 23, 27

*Wiley v. Hughes Capital Corp.*,
    746 F. Supp. 1264 (D.N.J. 1990) ...................................................................... 20

*Woodward v. Metro Bank*,
    522 F.2d 84 (5th Cir.1975) ............................................................................... 22

*Zupnick v. Thompson Parking Partners Limited Partnership III*,
    1990 WL 113197 (S.D.N.Y. Aug. 1, 1990) ........................................................ 3

## **Rules**

FED. R. CIV. P. 23(a) ....................................................................................... 1, 3, 4

FED. R. CIV. P. 23(a)(1) ....................................................................................... 3

FED. R. CIV. P. 23(a)(2) ....................................................................................... 5

FED. R. CIV. P. 23(a)(3) ....................................................................................... 5

FED. R. CIV. P. 23(a)(4) ....................................................................................... 8

FED. R. CIV. P. 23(b)(3) ............................................................................... *passim*

FED. R. CIV. P. 23(b)(3)(B) ................................................................................ 28

FED. R. CIV. P. 23(b)(3)(C) ................................................................................ 29

FED. R. CIV. P. 23(b)(3)(D) ................................................................................ 30

Plaintiffs AXA Private Management, Pacific West Health Medical Center Employees Retirement Trust, Harel Insurance Company Ltd., Martin and Shirley Bach Family Trust, Natalia Hatgis, Securities & Investment Company Bahrain, Dawson Bypass Trust, and St. Stephen's School (collectively, "Class Representatives"), pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, respectfully submit this Memorandum of Law in support of their motion for an order appointing them class representatives and certifying this action as a class action on behalf of a class (the "Class") consisting of all shareholders/limited partners in Fairfield Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P. (the "Funds") as of December 10, 2008 who suffered a net loss[1] of principal invested in the Funds.[2]

## INTRODUCTION

This action arises out of the collapse of four investment vehicles that were created, marketed and operated by the Fairfield Greenwich Group ("FGG").  Collectively, the Funds provided the single largest source of capital to Bernard Madoff's massive Ponzi scheme. Beginning in the early 1990's and continuing through December 2008, the Funds raised billions of dollars by selling shares and partnership interests to investors around the world.  In uniform offering documents, the FGG Defendants touted their wealth of experience, their due diligence and risk controls and the supposedly sophisticated "split strike conversion" investment strategy. To invest in the Funds, Class members were required to certify that they had received and relied

---

[1] Net loss reflects the total cash investment made by a Class member less the total amount of any redemptions or withdrawals made by that member.  *See, e.g., In re Bernard L. Madoff Inv. Securities LLC*, 424 B.R. 122, 142 (Bankr. S.D.N.Y. 2010) (discussing the "net equity" method of identifying victims of a Ponzi scheme and calculating individual damages).

[2] Excluded from the Class are the Defendants herein, and any entity in which the Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

1

.

upon the representations in the offering documents.  In audited annual reports and monthly

updates to investors, the Funds reported their lengthy track-record of substantial, consistent,

positive returns.  These returns were purportedly verified by the Funds' administrators, the Citco

and GlopeOp Defendants, which issued monthly statements reflecting the value of the Funds'

shares or interests.  And for years, PwC Defendants invariably issued clean audit opinions for the

Funds, certifying that their multi-billion dollar financial statements fairly presented the Funds'

holdings.

Following the collapse of Madoff's Ponzi scheme in December 2008, it came to light that

the Funds had done little more than funnel money to Madoff.  The consistent, substantial returns

of which the FGG Defendants had boasted were purely illusory.  The net asset values,

supposedly calculated by Citco and GlopeOp and confirmed by PwC audits, had no basis in fact.

Instead, they were nothing more than Madoff's fictitious numbers, repackaged by Defendants to

lend them credibility.  Not only were the profits illusory, so too was anything remotely

resembling due diligence.  Despite Defendants' many representations and promises to safeguard

Plaintiffs' investments, none of the Defendants performed any material due diligence on or

monitoring of FGG's operations, or the status of their clients' investments with Madoff and

BMIS.  Rather, Defendants actively concealed their lack of due diligence from Plaintiffs, while

collecting millions of dollars in unearned fees each year.

This case is well-suited for adjudication as a class action.  Plaintiffs and hundreds of

other members of the putative Class have lost over $5 billion as a result of Defendants' deceptive

conduct, material omissions and misrepresentations, and breaches of duty.[3]  Common evidence

---

[3] According to documents recently obtained by Plaintiffs, those investors in Fairfield Sentry and Sigma who were
net losers had a combined loss of more than $5.29 billion.  *See* Exhibits 2 and 3 to the Declaration of Sashi Bach
Boruchow in Support of Motion for Class Certification ("Boruchow Decl.").

will demonstrate that these losses would not have occurred if Defendants had told the truth and

fulfilled their duties to the Class.  Numerous common questions of law and fact exist concerning

Defendants' course of conduct, which was directed uniformly at, and caused injury to, all Class

members.

## ARGUMENT

### I.    THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23(a)

#### A.    The Proposed Class Is So Numerous That Joinder Is Impracticable

Certification requires that the class be so numerous that joinder of all members is

impracticable.  FED. R. CIV. P. 23(a)(1).  Joinder need not be impossible, only difficult.

*Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).  "[T]here is no fixed number which either

compels or precludes class certification," *Zupnick v. Thompson Parking Partners Limited*

*Partnership III*, 1990 WL 113197, *3 (S.D.N.Y. Aug. 1, 1990), and even "the difficulty in

joining as few as 40 class members should raise a presumption that joinder is impracticable."

*Robidoux*, 987 F.2d at 935.  Here, there are approximately 1,000 members of the proposed

class.[4]  The sheer number of Plaintiffs coupled with their widely-dispersed locations makes

joinder impracticable and class treatment appropriate.  *See, e.g., Zupnick*, 1990 WL 113197 at

*3; *Allen v. Isaac*, 99 F.R.D. 45, 53 (N.D. Ill. 1993).[5]

---

[4] The number of class members corresponds to the number of separate accounts maintained with the Funds that sustained a net loss of principal or, in other words, accounts in which the amount of contributions exceeded the amount of redemptions.  According to documents recently obtained by Plaintiffs, there were 693 net loser accounts for Fairfield Sentry and 216 for Fairfield Sigma.  *See* Exhibits 2 and 3 to the Boruchow Decl.  Plaintiffs have not yet obtained information showing the number of net loss accounts for Greenwich Sentry and Greenwich Sentry Partners, however, those Funds had in total 247 accounts.  *See* Exhibit 4 to the Boruchow Decl.

[5] For example, as discussed in Section II.D.4, the putative Class members are located in the United States and dozens of different countries around the world.

**B.      Plaintiffs' Claims Involve Common Questions of Law and Fact**

The commonality requirement of Rule 23(a) is met if the claims involve questions of law or fact that are common to the class.  *See Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001).  Factual variations among class members' claims will not defeat the commonality requirement so long as the claims arise from a common nucleus of operative facts. *Teachers' Ret. Sys. of La. v. ACLN Ltd.*, 2004 WL 2997957, *4 (S.D.N.Y. Dec. 27, 2004). Provided plaintiffs can "identify some unifying thread among the members' claims," commonality is satisfied.  *Cutler v. Perales*, 128 F.R.D. 39, 44 (S.D.N.Y. 1989).

Consistent with this, "[t]he commonality requirement has been applied permissively in securities fraud litigation" and is easily met "where putative class members have been injured by similar material misrepresentations and omissions."  *Fogarazzo v. Lehman Bros. Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).  As courts in this District have repeatedly held, such "course of conduct cases" are particularly well suited to class treatment because the heart of plaintiffs' claim is that defendants withheld the same material information or made the same material misrepresentations to the entire class.  *See In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002); *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 374 (S.D.N.Y. 2000); *In re Arakis Energy Corp. Sec. Litig.*, 1999 WL 1021819, at *5 (E.D.N.Y. Apr. 27, 1999) ("In this case, where all the class claims arise out of publicly announced, allegedly false statements, common questions of law and fact are virtually assured."); *In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 426 (S.D.N.Y. 1986); *Greene v. Emersons Ltd.*, 86 F.R.D. 47, 57 (S.D.N.Y. 1980) ("Where, as here, it is alleged that a series of reports and statements containing interrelated and cumulative misleading data were issued to the investing public, a

course of conduct is presented which raises questions common to all those who purchased during the period when the data was being disseminated.").

The Second Consolidated Amended Complaint ("SCAC") identifies numerous common issues of fact and law, all of which are amenable to class-wide proof (SCAC at ¶ 353), including without limitation the following:

- Whether Defendants were complicit in Madoff's Ponzi scheme or consciously avoided confirming the existence of the Ponzi scheme.

- Whether documents, including the offering memoranda, annual reports, account statements, audit reports and other materials disseminated to Plaintiffs, including information on Defendants' websites, misrepresented, omitted or were otherwise misleading with respect to material facts about the Funds.

- Whether Defendants acted knowingly, recklessly or negligently in omitting or misrepresenting material facts about the Funds.

- Whether Defendants breached duties owed to the Plaintiffs.

- Whether Plaintiffs' losses would have been prevented had Defendants fulfilled their respective duties, acted in accordance with their representations concerning due diligence and complied with auditing standards

- Whether certain Defendants were unjustly enriched at Plaintiffs' expense.

- Whether Plaintiffs have been damaged and, if so, the proper measure thereof.

Because Plaintiffs' allegations implicate a common course of fraudulent conduct that caused injury to all members of the putative Class, the commonality requirement of Rule 23(a)(2) is satisfied.

### C.    Plaintiffs' Claims and Defenses Are Typical of Those of the Members of the Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fᴇᴅ. R. Cɪᴠ. P. 23(a)(3).  Like the test for commonality,

"[t]he typicality requirement is not demanding." *In re Initial Public Offering Sec. Litig.*, 2004 WL 2297401, *15 (S.D.N.Y. Oct. 13, 2004).

1.    The Claims of the Class Representatives are Typical

Typicality refers to the nature of the legal claims of the class representatives, and not to specific facts from which the claims arose or relief is sought. *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981). "Typical does not mean identical." *In re Prudential Sec. Inc. Ltd. Pshps. Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995). In most securities actions, "a difference in the amount of damages, date, size, or manner of purchase; the type of purchaser, and even the specific document influencing the purchase will not render the claim atypical." *Dura-Bilt*, 89 F.R.D. at 99. Instead, the inquiry is whether other members of the class have similar claims arising from the same course of conduct. *Id. See also Robidoux*, 987 F.2d at 936. This requirement is met where "the proposed class representatives alleged that they were harmed in the same 'unitary scheme' as the rest of the class." *In re IPO*, 2004 WL 2297401 at *21.

Class Representatives' claims against Defendants are typical of the claims of other Class members because their losses all derive from the same course of Defendants' conduct. They allege, as do all Class members, that Defendants fraudulently, recklessly, negligently or in breach of various duties misrepresented the nature and extent of their due diligence and compliance with industry standards, which, if performed as represented, would have prevented the loss of billions of dollars. Class Representatives will prove these allegations using evidence that is common to the entire Class. Where, as here, "the lead plaintiff alleges a common pattern of wrongdoing and will present the same evidence, based on the same legal theories, to support its claim as other members of the proposed class, courts have held the typicality requirement to

6

be satisfied . . . ." *Teachers' Ret. Sys. of La.*, 2004 WL 2997957 at *4. *See also In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 280 (S.D.N.Y. 2003) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met . . . ."); *In re Blech*, 187 F.R.D. 97, 106 (S.D.N.Y. 1999) (typicality satisfied because "plaintiffs' claims of fraud arise from the same course of conduct" as the rest of the class); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 511 (S.D.N.Y. 1996) (typicality shown where claims "all [arose] from the same price-fixing conspiracy").

2.    <u>The Class Representatives Are Not Subject to Unique Defenses</u>

The proposed Class Representatives are not subject to unique defenses that would preclude a finding of typicality.  For example, in this case, differences in the type of investor, investment strategy, degree of investor diligence, or use of investment advisers do not create unique reliance defenses.  *See, e.g., Cromer Fin. Ltd. v. Berger,* 205 F.R.D. 113, 132 (S.D.N.Y. 2001) (use of investment advisors does not create unique reliance defense); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 282 (rejecting unique defenses argument because each method of making an investment decision – "whether by the named plaintiff, the advisor, or a computer model" – is "representative of methods used by many other investors").  Nor is this a case where unique defenses might exist because a proposed representative received material, non-public information about the investment that other members of the class did not.  *See, e.g., In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 481-82 (S.D.N.Y. 2002).

Because investments in the Funds were sold only through non-exchange, private placement transactions, information concerning the Funds was not publicly available.  The limited information that was available regarding the Funds came almost exclusively from

Defendants themselves.  For example, the Private Placement Memorandum ("PPM") for

Fairfield Sentry Limited (July 1, 2003), states that shares "will be issued only on the basis of the

information in this [PPM] and any attachments hereto [ ].  No other information about [the Fund]

has been authorized."  Exhibit 5 to the Boruchow Decl.[6]  The fact that some Class

Representatives may have also received advice from investment advisors or conducted their own

due diligence did not give them access to material information about the Funds that other Class

members did not have.  In other words, there can be "no suggestion that any of the named

plaintiffs had access to non-public information and learned that there was a fraud afoot and

decided nonetheless to invest."  *WorldCom*, 219 F.R.D. at 282.  Accordingly, Plaintiffs' claims

and defenses satisfy the typicality requirement

> ### D.        Plaintiffs Satisfy the Adequacy of Representation Requirement

Rule 23(a)(4) requires that the representative parties "will fairly and adequately protect

the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement is met if: (1) the

representative plaintiffs' interests are not antagonistic to those of the remainder of the class; and

(2) class counsel is qualified, experienced and generally able to conduct the litigation.  *See In re*

*Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).

Plaintiffs propose the following Class Representatives:  AXA Private Management,

Pacific West Health Medical Center Employees Retirement Trust, Harel Insurance Company

Ltd., Martin and Shirley Bach Family Trust, Natalia Hatgis, Securities & Investment Company

---

[6] S*ee, e.g.,* Exhibit 6 to the Boruchow Decl. at p. iii ("No person is authorized to give any information with respect to the Fund unless authorized by the Directors.  This Memorandum supersedes any written or verbal information relating to the Fund."); Exhibit 7 to the Boruchow Decl. at p. ii ("NO PERSON OTHER THAN THE GENERAL PARTNER HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THESE LIMITED PARTNERSHIP INTERESTS, EXCEPT THE INFORMATION CONTAINED HEREIN . . . ."); Exhibit 8 to the Boruchow Decl. at p. ii (same).

Bahrain, Dawson Bypass Trust, and St. Stephen's School. Each of the Class Representatives has submitted a declaration in support of this motion.

As the attached declarations demonstrate, there are no conflicts of interest between the proposed Class Representatives and members of the Class. Class Representatives purchased investments in the Funds during the class period, and like the rest of the members of the Class, seek to maximize the recovery for victims of Defendants' unlawful conduct. None of the Class Representatives have any interest that is antagonistic to the interests of the Class. As discussed *infra* in Section II, Class Representatives' claims are identical in material respects to the claims of all Class members and Class Representatives will prove Defendants' liability on the basis of common facts underlying those claims. Finally, the Class Representatives are not subject to unique defenses and their interests are fully aligned with those of the Class.

Additionally, Plaintiffs in this action have retained counsel who have successfully prosecuted numerous securities cases and other complex class actions over the past several decades in courts throughout the country. *See Anwar v. Fairfield Greenwich Ltd.*, 09-cv-118(VM), D.E. 22-3 (description of Lovell Stewart Halebian Jacobson LLP); D.E. 22-4 (description of Wolf Popper LLP); D.E. 22-5 (description of Boies, Schiller & Flexner LLP). Plaintiffs' Counsel have prosecuted this litigation since its inception and currently represent over one hundred named Plaintiffs. On January 27, 2009, the Firms were appointed Interim Co-Lead Counsel for the putative Class and on July 7, 2009 the Firms were appointed Lead Counsel for the PSLRA Plaintiffs. In this capacity, Plaintiffs' Counsel have conducted an extensive investigation into the Class' claims; overcome in large part Defendants' motions to dismiss; secured entry of a case management plan and scheduling order; commenced discovery including serving and responding to demands and obtaining and producing documents; and otherwise

vigorously represented the Class' interests in this complex dispute.  Plaintiffs' Counsel are amply

qualified, experienced and capable of prosecuting this litigation.

## II.        THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23(b)(3)

Rule 23(b)(3) requires that the common questions of law or fact predominate over any

questions affecting only individual class members and that a class action is superior to other

available methods of adjudication.  Both of these requirements are met.

### A.        Common Questions of Law and Fact Predominate

Rule 23(b)(3) does not require a complete absence of any individual issues.  *See Dura-*

*Bilt*, 89 F.R.D. at 99 ("To be sure, individual issues will likely arise in this as in all class action

cases.").  Rather, it requires predominance, which entails that "some of the legal or factual

questions" can be resolved through "generalized proof" and that "these particular issues are more

substantial than the issues subject only to individualized proof."  *Moore v. PaineWebber, Inc.*,

306 F.3d 1247, 1252 (2d Cir. 2002).

In cases that involve a single, common fraudulent scheme, the predominance requirement

is met notwithstanding that there may be questions of individualized reliance.  *See Jenson v.*

*Fiserv Trust Co.*, 256 Fed. App'x 924, 926 (9th Cir. 2007) (a Ponzi scheme presented a "center

of gravity" for the fraud that predominated over individual issues); *In re HealthSouth Corp. Secs.*

*Litig.*, 261 F.R.D. 616, 646 (N.D. Ala. 2009) ("individual issues of reliance do not predominate

over questions common to the class" where the class' claims are based on a "single, common

fraudulent scheme"); *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 333 (S.D. Fla. 1996)

(certifying a class in a case involving a Ponzi scheme, where (as here) defendants included third-

party service providers because common issues predominated in spite of concerns over

individualized reliance); *Bresson v. Thomson McKinnon Secur., Inc.*, 118 F.R.D. 339, 343

(S.D.N.Y. 1988) (same); *In re Home-Stake Prod. Co. Sec. Litig.*, 76 F.R.D. 351, 368 (N.D. Okla. 1977) (same).  This is because such situations present an "overwhelming number of common factual and legal issues . . .  common to the class" that "predominate over any questions affecting only individual members."  *Walco*, 168 F.R.D. at 334.

Consistent with these decisions, class treatment is appropriate in this case.  First, as discussed below, reliance in this case can be shown on a class-wide basis.  Moreover, this case involves the type of "common nucleus of operative facts and issues with which the predominance inquiry is concerned."  *In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006).  Whether proceeding individually or as a class, Plaintiffs will present the same case-in-chief.   In either instance, Plaintiffs will seek to establish that Defendants made the same material misrepresentations and omissions and breached the same duties.  Plaintiffs, as well as all members of the Class, will seek to prove that Defendants' conduct propped up the Funds, giving them the appearance of legitimate investments, when in fact Defendants had for years failed to perform key aspects of the diligence and other duties that they had promised they would undertake for Plaintiffs' benefit.  These defalcations rendered the Funds little more than facilitators of Madoff's Ponzi scheme, and led directly to Plaintiffs' multi-billion dollar losses.  Accordingly, even if it were to be the case that some aspects of reliance were addressed individually, "that would still leave intact the basic issues of defendants' liability for the alleged fraud.  Since these are common to all class members and central to plaintiff's claim, certification is warranted."  *Saddle Rock Partners v. Hiatt*, 2000 WL 1182793, at *5 (S.D.N.Y. 2000).  *See also Cromer*, 205 F.R.D. at 127 (common questions predominate where "[t]he proof for the claims of misrepresentation or omission, materiality, and [] scienter are all based on a common

nucleus of facts and a common course of conduct").[7]  Further, as discussed in Section II.B and C *infra*, reliance is not an element of a number of Plaintiffs' claims, and where it is an element, it can be proven on a class-wide basis.

> **B.     Reliance Will Be Proven on a Class-Wide Basis**

A class action is the superior method of litigating Plaintiffs' fraud and negligent misrepresentation claims.  In this case, reliance will turn on class-wide determinations because: (1) reliance can be demonstrated based on common, circumstantial evidence; (2) this case is a textbook example where reliance is shown because the fraud created a market that would never otherwise have existed; and (3) the presumption of reliance under *Affiliated Ute* applies to Defendants' material omissions.

> **1.     Circumstantial Evidence Common to All Class Members Can Be Used to Prove Reliance**

In the context of class certification, the rule in the Second Circuit is that "proof of reliance by circumstantial evidence may be sufficient under certain conditions."  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008).  This rule reflects the commonsense proposition that courts will not reject an inference of reliance that logically flows from the facts and circumstances of a case.  *See Lowenschuss v. Resorts Int'l, Inc.*, 181 F.3d 505, 510 (3d Cir. 1999) ("a trial court may infer reliance from the various facts and circumstances of a case"); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 560 (E.D. Va. 2000) ("Fraud cannot be presumed, but reliance may be demonstrated by circumstantial or direct evidence."); *Allapattah Servs., Inc. v. Exxon Corp.,* 188 F.R.D. 667, 677 (S.D. Fla. 1999) (reliance upon false representations "may be proven by direct or circumstantial evidence").

---

[7] "[C]ourts in securities fraud actions have consistently recognized that issues of individual reliance can and should be addressed after a class-wide trial, through separate jury trials if necessary."  *In re Vivendi Universal, S.A. Securities Litigation*, --- F.Supp.2d ----, 2011 WL 590915, at *58-59 (S.D.N.Y. Feb. 17, 2011) (collecting cases).

.

In a variety of contexts, federal courts have certified class actions where there was circumstantial evidence of reliance common to all class members.  *See, e.g., Klay v. Humana, Inc*., 382 F.3d 1241, 1259 (11th Cir. 2004) (affirming certification of a RICO class action where common circumstantial evidence could "lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations"); *Spencer v. Hartford Fin. Servs. Group, Inc*., 256 F.R.D. 284, 302 (D. Conn. 2009) (certifying class action alleging common law fraud because circumstantial evidence common to entire class could be used to show reliance); *Stanich v. Travelers Indem. Co*., 249 F.R.D. 506, 521 (N.D. Ohio 2008) (certifying class action where circumstantial evidence common to entire class could be used to show reliance in connection with an insurance sales fraud); *LaGrasta v. First Union Sec., Inc.*, 2005 WL 1875469, at *12 (M.D. Fla. Aug. 8, 2005) (certifying securities fraud class action "where the common issues of fact [were] quite substantial and the circumstantial evidence that [could] be used to show reliance [was] common to the whole class.") (internal quotations omitted).

In cases involving a single, common fraud, the facts and circumstances provide strong common evidence of reliance.  *See Jenson,* 256 Fed. App'x at 926 (affirming class certification where plaintiffs were victims of an alleged Ponzi scheme and circumstantial evidence supported an inference of reliance as to all class members); *In re HealthSouth Corp. Secs. Litig.,* 261 F.R.D. at 645 (certifying class in fraudulent scheme where defendants' "false statements about finances were precisely the kind of representations upon which investors regularly and routinely rely" and "probablity and common sense" would support a finding of class-wide reliance). Accordingly, where defendants make uniform statements containing material misrepresentations and omissions to an entire group of people, misrepresent the fundamental nature of an

investment or of their own actions and due diligence that would protect the safety and legitimacy

of that investment, thereby inducing investors to part with money that is later lost, class

certification is appropriate. *See Bruhl v. Price WaterhouseCoopers Int'l*, 257 F.R.D. 684, 696

(S.D. Fla. 2008) (certifying class where "the misrepresentations relating to the NAV statements

were made to the entire class" and investors would consider such information "material in

deciding either to invest in the Funds, to remain invested in the Funds or to redeem their

investments in the Funds"); *Walco*, 168 F.R.D. at 337 (certifying RICO and common law fraud

claims over reliance objections where defendants induced plaintiffs to invest in a Ponzi scheme

using uniform fraudulent offering documents); *King v. Club Med, Inc.*, 430 N.Y.S.2d 65, 76

A.D.2d 123, 127 (N.Y. App. Div. 1st Dep't 1980) (rejecting defendants' objection that individual

reliance issues precluded class treatment and certifying class involving uniform

misrepresentation).

    The *Walco* case is particularly instructive.  It involved not only claims against the actual

operators of a Ponzi scheme (analogous to Madoff), but also against third-party service providers

including law firms, banks, promoters and funding entities (analogous to Defendants here).  In

addressing plaintiffs' RICO and common law fraud claims, the court found that plaintiffs would

prove the existence of the same "common fraudulent scheme" and would do so using basically

the same evidence:

> Minor differences in misrepresentations are to be expected in a fraudulent scheme
> that lasted several years and involved numerous transactions and several players,
> as has been alleged by Plaintiffs in their Complaint.  The gist of the confirmations
> is that they all allegedly falsely confirmed that the fictitious invoices represented
> actual sales or purchases of products; they all misrepresented or omitted the same
> material information.  Plaintiffs' Complaint lists confirmation upon confirmation
> where it is consistently alleged that the [third-party] Confirmer Defendants made
> false confirmations of nonexistent transactions.

*Walco*, 168 F.R.D. at 336-37.  The court further specifically recognized that class treatment of these claims was appropriate without resort to presumptions of reliance.  *Id.* at 335.

> 2.   This Case Presents Strong Circumstantial Evidence of Reliance

The considerations discussed above apply with even more force to the present case. Here, the FGG Defendants prepared the offering documents explaining the nature of the investments and their own purported actions and due diligence to protect those investments.  The calculations, prepared by the Citco and GlobeOp Defendants, and the financial statements audited by the PwC Defendants, all purported to represent and confirm the value of the investments, yet all were false.  Generalized proof will establish by compelling evidence that, when making their investment decisions, all Class members relied on information (1) describing the investments; (2) describing the due diligence and related actions that Defendants were supposedly performing to protect those investments; and (3) stating how much the investments were worth.  Further, Class members, as a condition to their investments, were required to certify in subscription documents that they had read and relied on the offering documents.

Specifically, the FGG Defendants prepared and distributed statements that contained basic information regarding the purported investment strategy of the Funds.  For example, the offering documents stated that the Funds' investments were principally based on the "split strike conversion" strategy.  *See, e.g.,* Exhibit 6 to the Boruchow Decl. at p. 9.  The FGG Defendants represented that this strategy entailed: "(i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the sale of out-of-the-money S&P 100 Index call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out-of-the-money S&P 100 Index put options."  *Id.*  All of this information was false because in reality no investments were taking

15

place and Defendants had no reasonable basis to believe that they were.  Common evidence will demonstrate that all Class members – regardless of their exact understanding of the "split strike conversion" strategy – relied on the representations that the Funds were actually invested with a manager utilizing that investment strategy.[8]

Likewise, circumstantial evidence also will demonstrate Plaintiffs' reliance on representations made by the Citco, Globe-Op and PwC Defendants regarding the existence of the Funds' holdings, the value of those holdings and the Funds' value per unit.  When investors purchased investments in the Funds, they paid a per-unit price based on these values and calculations.   Because there was no market to set the Funds' investment prices the price was determined by dividing the purported value of the Funds by the number of units outstanding. The value of the Funds was based on the assets described in Funds' financial statements and defined as the "Net Asset Value" or "NAV."[9]  Each year, the PwC Defendants issued "[i]ndependent auditors' report[s]" which expressed an opinion on the Funds' financial statements and certified the Funds' respective values.  *See, e.g.,* Exhibit 9 to the Boruchow Decl.; Exhibit 10 to the Boruchow Decl.  These reports were addressed "[t]o the Directors and *Shareholders*" (emphasis added) of a particular fund (or "[t]o the Partners" of a partnership) and stated that the PwC Defendants conducted an audit of the financial statements in accordance with

---

[8] *See* Bach Declaration ¶ 9, Bertin Declaration ¶ 9; Friedman Declaration ¶ 8; Hatgis Declaration ¶¶ 6, 9; Mallis Declaration ¶ 10; Pollock Declaration ¶¶ 7, 10; Wiener Declaration ¶¶ 6, 11; Wind Declaration ¶¶ 6, 9.

[9] In defining NAV, the offering documents stated "[t]he Net Asset Value of the Shares is the value of the Fund's assets as calculated in accordance with the International Financial Reporting Standards and the Memorandum and Articles of Association of the Fund."  Exhibit 6 to the Boruchow Decl. at 12-13.  In turn, "Net Asset Value Per Share is defined as the Net Asset Value divided by the number of shares."  *Id.* at 13.  Similarly, with respect to the partnership interests offered in Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P., a "partnership percentage (hereinafter called the 'Partnership Percentage') shall be determined for each Partner for each Accounting Period by dividing the amount of each Partners' Capital Account at the beginning of such accounting Period by the sum of the aggregate Capital Accounts of all Partners at the beginning of such Accounting Period. The sum of the Partnership Percentages shall equal 100 percent."  Exhibit 6 to the Boruchow Decl. at § 3.04 of Ex. 1 thereto.  Further, "[a] capital account (hereinafter called the 'Capital Account') shall be established on the books of the Partnership for each Partner."  *Id.* at § 3.03 of Ex. 1 thereto.

applicable accounting standards to "obtain reasonable assurance about whether the financial statements are free of material misstatement." *Id.* The PwC Defendants further represented that the audits included "examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements" and otherwise comported with applicable accounting standards and practices. *Id.* In addition, NAV and Capital Account statements were calculated on a monthly basis by the Citco and GlobeOp Defendants, who regularly distributed statements to investors containing the calculations and total purported worth of the investors' holdings. *See, e.g.,* Exhibit 11 to the Boruchow Decl.

Each time Plaintiffs purchased, redeemed, or evaluated the value of their investments based on the NAV or Capital Account statements, Plaintiffs necessarily relied on the total value of each Fund and the value of each share or interest as represented by Defendants.[10] For example, in *Cromer* the Court certified a class over reliance objections on the basis that: "From the time that Ernst & Young calculated and disseminated its first NAV, and Deloitte issued its first 'clean' audit, investors were entitled to presume that the NAVs had in fact been calculated as described in the Offer Memo, and that Deloitte had in fact performed an audit in accordance with applicable professional standards, and had confirmed the year-end NAV, and through that confirmation, the administrator's process for calculating the NAV." *Cromer*, 205 F.R.D. at 131; *see also Bruhl*, 257 F.R.D. at 697 ("the alleged fraudulent NAV statements were a material consideration which affected [putative class members'] investment decisions").

Finally, each Class member (or designated agent) was required to represent that they had reviewed and relied upon the offering documents. When purchasing shares in the Sentry or Sigma Funds, investors had to execute a subscription agreement stating: "Subscriber has

---

[10] *See* Bach Declaration ¶¶ 7-8; Bertin Declaration ¶ 8; Friedman Declaration ¶¶ 6-7; Hatgis Declaration ¶¶ 7-8; Mallis Declaration ¶¶ 8-9; Pollock Declaration ¶¶ 8-9; Wiener Declaration ¶¶ 7,10; Wind Declaration ¶¶ 7-8.

received and read a copy of the Memorandum.  Subscriber acknowledges that in making a decision to subscribe for Shares, Subscriber has relied solely upon the Fund Documents and independent investigations made by Subscriber and has not relied on any representation inconsistent with the information in the Fund Documents."  *See, e.g.,* Exhibit 12 to the Boruchow Decl.  Similarly, investors who purchased partnership interests were required to represent:  "The New Limited Partner . . . is entering into this Agreement relying solely on the facts and terms set forth in this Agreement, the Confidential Offering Memorandum . . . and the Partnership Agreement and it has received copies of all such documents and the General Partner has not made any representations of any kind or nature to induce the New Limited Partner to enter into this Agreement except as specifically set forth in such documents."  *See, e.g.,* Exhibit 14 to the Boruchow Decl.  Accordingly, class certification is appropriate because common evidence could "lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on defendants' representations."  *Klay*, 382 F.3d at 1259.

3.     In the Unique Circumstances of this Case, Reliance Can Be Shown Because the Market for Fund Shares Could Not Have Existed Absent Defendants' Fraud

In this case, class-wide reliance also may be shown under the fraud-created-the-market theory because the Funds' shares or interests were "unmarketable at any price" but for the alleged fraud.  *See, e.g., Ross v. Bank South, N.A.*, 885 F.2d 723, 731 (11th Cir. 1989).[11]  The

_____

[11] The fraud-created-the-market theory has not been the subject of any ruling by the Second Circuit.  It has been endorsed by the Fifth, Tenth, and Eleventh Circuits.  *See Shores*, 647 F.2d 462; *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Auth.*, 717 F.2d 1330 (10th Cir. 1983); *Ross v. Bank South, N.A.*, 885 F.2d 723 (11th Cir. 1989).  The theory has been rejected by the Third and Seventh Circuits.  *See Malack v. BDO Seidman, LLP*, 617 F.3d 743 (3d Cir. 2010); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121 (7th Cir. 1993).  The Sixth, Eighth, and Ninth Circuits have declined to apply the theory based on the facts in particular cases, but have not passed on its viability generally.  *See Ockerman v. May Zima & Co.*, 27 F.3d 1151 (6th Cir. 1994); *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309 (8th Cir. 1997); *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009).

particular circumstances of this case meet the high threshold for the fraud-created-the-market theory because the alleged fraud is "so pervasive that it goes to the very existence of the [investments] and the validity of their presence on the market." *Id.* at 729.  Indeed, as this Court stated, "[w]ithout the fraud and other wrongs alleged in this action, the Funds would not have existed." *Anwar II*, 728 F. Supp. 2d at 401.

Applying the fraud-created-the-market theory, "reliance may be established by proof that securities not traded on the open market could not have been issued but for a fraudulent scheme by the defendants." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 723 (11th Cir. 1987) (citing *Shores*, 647 F.2d at 469-70).  "If [a plaintiff] proves no more than that the [securities] would have been offered at a lower price or a higher rate, rather than that they would never have been issued or marketed, he cannot recover . . . ." *Shores v. Sklar*, 647 F.2d at 470.  Therefore, the "theory is not that [the plaintiff] bought inferior [securities], but that the [securities] he bought were fraudulently marketed." *Id.*[12]  The fraud-created-the-market theory applies squarely to the facts of this case because it is indisputable that the Funds could not have existed or been sold absent Defendants' misstatements.  *See In re HealthSouth Corp. Secs. Litig.*, 261 F.R.D. at 642 (fraud-created-the-market applies in case of a "pervasive fraud without which . . . the bonds could not have been marketed"); *Katz v. MRT Holdings, LLC*, 2008 WL 4725284, at *5 (S.D. Fla. Oct. 24, 2008) (theory applies where the investment did not have "any legitimate source of income . . ., other than the assets produced from the fraudulent Ponzi scheme"); *Wiley v. Hughes Capital Corp.*, 746 F. Supp. 1264, 1293 (D.N.J. 1990) ("[E]ven extraordinarily risky investments

---

[12] *See also Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1121 (5th Cir. 1988) (A presumption of reliance is established where a plaintiff "prove[s] that the defendants conspired to bring to market securities that were not entitled to be marketed.") (internal quotation marks omitted), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914, 109 S. Ct. 3236 (1989); *Walco*, 168 F.R.D. at 332 ("In order for the *Shores/Ross* presumption of reliance to apply, the Plaintiffs must show that the securities which were not traded on the 'open market' could not have been offered on the market at any price but for the fraudulent scheme.") (citations omitted).

may be marketable at some combination of price and interest rate, [but] it is inconceivable that a reasonable investor would purchase stock in a corporation which has not legitimate business purpose and which contains no assets . . . ."); *Walco*, 168 F.R.D. at 332-33 (fraud-created-the-market theory applies where investment was a Ponzi scheme).

    4.    Reliance Can Be Presumed Under *Affiliated Ute* Because Plaintiffs'
                Claims Involve Material Omissions

        a.    *The Affiliated Ute Presumption Applies to Plaintiffs' Federal
                   Securities Claims*

Where there is "an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154 (1972)). "Instead, if the plaintiff proves that the facts withheld are material in the sense that a reasonable investor might have considered them important, reliance will be presumed." *Du Pont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987) (internal quotations omitted). This materiality standard is satisfied where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 482 (2d Cir. 2008). *See Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir.1998) (omitted fact is immaterial if information is "so basic that any investor could be expected to know it"); *In re Sadia, S.A. Sec. Litig.*, 2010 WL 2884737, at *7 (S.D.N.Y. July 20, 2010) (material facts include those "which may affect the desire of investors to buy, sell, or hold the company's securities").

Despite long-standing relationships with Madoff and BMIS and the fact that billions of dollars were handed over to them, each of Defendants' statements omitted the following material facts:

- FGG had never tested the validity of Madoff's performance or strategy.

- FGG had no process in place to verify the existence or fair value of the investments purportedly made by BMIS.

- FGG did not verify the supposed trades made by Madoff with counterparties or other third parties, and thus did not verify the existence of the securities and other assets.

- Madoff did not provide electronic confirmations to the Funds, instead giving them delayed, paper confirmation of supposed trades, in contravention of industry standards.

Similar omissions have been found sufficiently material for the purposes of the *Affiliated Ute* presumption.  *See, e.g., In re Beacon Associates Litig.*, 2010 WL 3895582, at *19 (S.D.N.Y. Oct. 5, 2010) (defendants had a duty to disclose when they learned that Madoff was limiting access to third parties and preventing usual and customary due diligence regarding his operations); *Walco*, 168 F.R.D. at 331-32 (applying *Affiliated Ute* presumption where omitted disclosures regarding the checkered pasts of the insiders running the purported investment scheme "not only would have [alerted] investors to their suspect investment schemes, but may have prevented the fraud itself").  Here, had Defendants revealed that they had done nothing to verify the existence of the assets or test Madoff's performance record, it is highly likely that no Class members would have invested in the Funds and lost money in the Funds' investments in the Madoff Ponzi scheme.[13]

Even where, as here, "plaintiffs' claims are based on a combination of omissions and misstatements, courts in this Circuit have acknowledged the applicability of the *Affiliated Ute*

---

[13] In addition, it is appropriate to apply a presumption of reliance to this case given the existence of fiduciary duties owed by certain Defendants to Plaintiffs.  *See, e.g., Woodward v. Metro Bank*, 522 F.2d 84, 97 n.28 (5th Cir.1975) ("A duty of disclosure may exist where any person possesses inside information, or where the law imposes special obligations, as for accountants, brokers, or other experts, depending on the circumstances of the case.").

presumption." *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005); *In re Sadia, S.A.*, 269 F.R.D. at 316 (applying *Affiliated Ute* presumption in "mixed" case involving both misrepresentations and omissions); *In re Beacon Associates Litig.*, 2010 WL 3895582, at *19 (same). Because the *Affiliated Ute* presumption of reliance applies to Plaintiffs' federal securities claims, reliance can be shown on a classwide basis and is no barrier to class certification.

        b.    *The Affiliated Ute Presumption Applies to Plaintiffs' Common Law Fraud and Negligent Misrepresentation Claims*

The *Affiliated Ute* presumption also applies to Plaintiffs' common claims of fraud and negligent misrepresentation. New York courts have regularly applied the *Affiliated Ute* presumption to common-law fraud and negligent misrepresentation claims involving a material omission. *See, e.g., Ackerman v. Price Waterhouse*, 252 A.D. 2d 179, 198 (App. Div. 1st Dep't 1998) (applying *Affiliated Ute* presumption to negligent misrepresentation claims) (citing *Weinberg v. Hertz Corp.*, 116 A.D.2d 1, 7, 499 N.Y.S.2d 693, *aff'd*, 69 N.Y.2d 979, 516 N.Y.S.2d 652.[14] Thus, the *Affiliated Ute* presumption applies to Plaintiffs' common law fraud and negligent misrepresentation claims. The omissions by the FGG and Citco Defendants are discussed above in Section II.4.a. With respect to the PwC Defendants, they failed to disclose

---

[14] Courts in this District have declined to apply the *Affiliated Ute* presumption in cases of common law fraud, but these holdings are all premised on the incorrect assumption that New York state courts had never done so. *See, e.g., Feinberg v. Katz*, 2007 WL 4562930, at *5 (S.D.N.Y. Dec. 21, 2007) ("It is doubtful that New York courts would apply to a common law fraud claim that presumption of reliance found in *Affiliated Ute* and other securities cases."); *Waksman v. Cohen*, 2002 WL 31466417, at *5 (S.D.N.Y. Nov. 4, 2002) (finding *Affiliated Ute* presumption inapplicable to common law fraud claims and noting "New York courts have chosen not to abandon the requirement of reliance in common law fraud cases"). Virtually all such decisions have their genesis in *Strauss v. Long Island Sports, Inc.*, 401 N.Y.S.2d 233, 237 (2d Dep't 1978). In *Strauss*, the appellate division merely declined to apply the fraud-on-the-market theory in an advertising fraud case and noted in passing that *Affilated Ute* was clearly inapplicable because *Strauss* did not involve material omissions. The court then opined that federal securities fraud cases are "very much distinguishable from common law fraud cases." Courts in this District have repeatedly seized upon this language from *Strauss* in holding that the *Affiliated Ute* presumption cannot apply to common law claims. These cases ignore the more current, more pertinent and better reasoned weight of authority, discussed *infra*, which holds otherwise. *Cf. Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 354, 357 (S.D.N.Y. 2010) (discussing the "unwitting perpetuation of error" that gave rise to the doctrine of Martin Act preemption).

numerous material facts that would have called their audits into question.  For example, they had

not confirmed and could not confirm that the Funds actually held any assets whatsoever.  *See*

SCAC ¶¶ 314-15.  If the PwC Defendants had implemented the auditing rules that they were

obligated to apply and said they were applying, they could not have issued clean audit opinions

and Plaintiffs would not have invested in the Funds.  Accordingly, the PwC Defendants'

omissions were sufficiently material to "affect the desire of investors to buy, sell, or hold" shares

or interests in the Funds.  *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. at 308.

### C.     The Claims Based on Defendants' Breaches of Duty Will Be Proven on a Class-Wide Basis

Plaintiffs' claims of negligence, breach of fiduciary duty, aiding and abetting breach of

fiduciary duty, unjust enrichment and third-party breach of contract are ideally suited for class

treatment because such claims focus on the "the conduct of the defendants, not the plaintiffs."

*Bunnion v. Consol. Rail Corp.*, 1998 WL 372644, at *6, (E.D. Pa. May 14, 1998).  *See, e.g.,*

*Bruhl*, 257 F.R.D. at 698 (granting class certification on breach of fiduciary duty claims where

defendants owed same duty to each class member and breach could be established on class-wide

basis); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 34 (E.D.N.Y. 2008) (granting class

certification on unjust enrichment and breach of contract claims); *Westway World Travel, Inc. v.*

*AMR Corp.*, 218 F.R.D. 223, 224 (C.D. Cal. 2003) (granting class certification on unjust

enrichment claims); *In re Towers Fin. Corp. Noteholders Litig.*, 177 F.R.D. 167, 172 (S.D.N.Y.

1997) (granting class certification on pendant state claims including negligence and breach of

fiduciary duty in securities fraud action).[15]  All of these claims will require Plaintiffs to

---

[15] *See also In re Lloyd's American Trust Fund Litig.*, 1998 WL 50211, at *6 (S.D.N.Y. Feb. 6, 1998 (granting class certification on breach of fiduciary duty claims); *Collins v. International Dairy Queen*, 168 F.R.D. 668, 674 (M.D. Ga. 1996) (granting class certification on breach of contract and breach of fiduciary duty claims where franchisees alleged they were all victims of the same fraudulent scheme); *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith,*

demonstrate that each Defendant breached a duty to the Class members and that such breach was the proximate cause of Plaintiffs' losses.  As discussed below, the common evidence that will be used to establish these elements outweighs any individualized issues.

First, Defendants are alleged to have breached common duties owed to all members of the Class.  Class-wide evidence will demonstrate that each Defendant was in a "superior position or [possessed] superior access to confidential information" and, therefore, Defendants were required to "act for or to give advice for the benefit of [Plaintiffs] upon matters within the scope of the relation."  *Anwar II*, 728 F.Supp.2d at 441 (quoting *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC.*, 446 F. Supp. 2d 163, 194-95 (S.D.N.Y. 2006)).  In this case, a duty owed to one plaintiff is a duty owed to all, because "[e]ach of the claims arise from the same alleged scheme or course of conduct, and the [Defendants] uniformly represented their duties to Plaintiffs through the offering materials."  *Bruhl*, 257 F.R.D. at 698.

The FGG Defendants owed a duty of care to the Class based on their role as investment advisors, managers and placement agents.  With respect to the Citco, PwC and GlobeOp Defendants, Plaintiffs can demonstrate on a class-wide basis the requisite privity necessary to establish a duty of care.  *See Credit Alliance Corp. v. Arthur Anderson & Co.*, 483 N.E. 2d 110, 118 (N.Y. 1985).  Specifically, Plaintiffs can show on a class-wide basis that (1) Defendants were aware that their statements were to be used for a particular purpose; (2) in furtherance of which the class members were intended to rely; and (3) linking conduct which evinces

---

*Inc.*, 122 F.R.D. 177, 179 (E.D. Pa. 1988) (granting class certification on pendant state law claims of breach of contract and breach of fiduciary duty in securities fraud action); *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 428 (4th Cir. 2003) (affirming class certification on third-party breach of contract claim because all relevant questions of law and fact were "common to all potential class members, and [did] not require any individualized inquiry").  *See also Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 98 (S.D.N.Y. 2010) ("[A]ctions that involve form or uniform contracts have been recognized as being well-suited for treatment as a class action."); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 34 (E.D.N.Y. 2008) (granting class certification on breach of contract claim).

Defendants' understanding of the class members' reliance.  Each of these factors, which focus on

Defendants' own actions and understanding, will be demonstrated on the basis of class-wide

proof.

Second, the Class will demonstrate that each Defendant breached duties owed to the

Class by failing to conduct any meaningful due diligence of Madoff's operation despite the fact

that substantially all of the Funds' assets were invested with him.[16]  Evidence regarding the steps

Defendants did and did not take will be identical for each Class member.  *See, e.g., In re Ikon*

*Office Solutions, Inc. Sec. Litig.*, 191 F.R.D. 457, 464 (E.D. Pa. 2000) ("[T]he appropriate focus

in a breach of fiduciary duty claim is the conduct of the defendants, not the plaintiffs.").[17]

Third, common proof will demonstrate proximate cause in that if Defendants had

conducted the due diligence or the audits that they said they were performing and were duty-

bound to perform, Defendants would quickly have uncovered Madoff's fraud.  Defendants

cannot claim that this result was not foreseeable, precisely because due diligence and audits are

---

[16] For example, in its engagement letter, PwC Netherlands specifically identified a number of audit procedures including "tests of the physical existence, ownership and recorded value of selected assets" and "direct confirmation with selected third parties (e.g., banks, customers, suppliers) of amounts due to or by them or other relevant information."  Exhibit 15 to the Boruchow Decl.  Although PwC issued audit opinions regarding the Funds' financial statements rather than those of BMIS, PwC recognized that they needed to coordinate with PwC member firms to "visit [Madoff and BMIS] to update our understanding of the control environment in order to meet our responsibilities where significant use is made of 'service organization.'"  Exhibit 16 to the Boruchow Decl.  Such responsibilities were, among others, to (1) "[o]bserve and understand the nature of Madoff's business;" (2) "[g]ain an understanding of the structure of [Madoff's] organization, to determine the extent of high level controls in operation (e.g. governance, internal audit, etc.);" and (3) "[o]btain an understanding of the segregation of the Investment Advisor, Brokerage and Custody functions within the organization."  Exhibit 17 to the Boruchow Decl.  To accomplish this, PwC member firms stated that they would conduct on-site investigations of Madoff's offices in New York.  *Id.*  These purported on-site investigations of Madoff, however, did not provide the necessary confirmation of these facts which the documents show PwC knew were required to comply with basic audit rules.

[17] Likewise, Plaintiffs' claims against the Citco Defendants for aiding and abetting of breach of fiduciary duty and fraud do not require individualized proof.  *See Bruhl*, 257 F.R.D. at 698 ("Class certification of the claims for aiding and abetting a breach of a fiduciary duty is appropriate because none of the claim's elements requires reliance or any other factor unique to each class member.").  The Class may establish these claims based on a common showing that the Citco Defendants consciously avoided confirming the fact that the FGG Defendants did not conduct any semblance of due diligence.  *See Anwar II*, 728 F. Supp. 2d at 442-43.

designed to confirm the value of investments and prevent fraud. [18]   In any event, Plaintiffs'

claims in this regard will involve class-wide evidence and thus class treatment is appropriate.

As result of Defendants' fraudulent conduct and breaches of duty, many of the

Defendants were unjustly enriched at Plaintiffs' expense.   Unjust enrichment can also be proven

on a class-wide basis.   In denying Defendants' motion to dismiss the unjust enrichment claims,

the Court concluded that Defendants "were undoubtedly enriched at Plaintiffs' expense by the

millions of dollars of fees they collected for, broadly speaking, managing Plaintiffs' mirage

investments.  The circumstances in which these defendants collected the management fees-in the

course of steering Plaintiffs' investments into a Ponzi scheme that they could have uncovered

with even minimal due diligence - would, if adequately proven, in equity and good conscience

require disgorgement of the fees."   *Anwar II*, 728 F. Supp. 2d at 442-43.   Where, as here, the

underlying theory supporting the unjust enrichment claim is the same for all Class members,

class certification is appropriate.   *See, e.g., Hoving v. Lawyers Title Ins. Co*., 256 F.R.D. 555,

569 (E.D. Mich. 2009) (granting class certification on unjust enrichment claim based on "a

systematic scheme to overcharge individuals"); *Slapikas v. First American Title Ins. Co*., 250

F.R.D. 232, 248 (W.D. Pa. 2008) (same); *Dupler v. Costco Wholesale Corp*., 249 F.R.D. 29, 34

(E.D.N.Y. 2008) (granting class certification on unjust enrichment claim); *Westway World

Travel, Inc. v. AMR Corp*., 218 F.R.D. 223, 224 (C.D. Cal. 2003) (same).

Finally, the damages suffered by each Class member are readily ascertainable based on

each Class member's net losses.   These damages can be ascertained by reference to Defendants'

---

[18] In addition, the Class may establish claims of negligence and gross negligence against the FGG Defendants based
solely on the fact that they invested substantially all of the Funds' assets in Madoff without conducting proper due
diligence.  *See Anwar II*, 728 F. Supp. 2d at 415.

records and present no obstacle to class certification. *See In re Visa Check*, 280 F.3d 124, 140-41 (2d Cir. 2001) (individualized damages do not preclude class certification).

### D.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of Plaintiffs' Claims

Rule 23(b)(3) also requires the Court to find that a class action is superior to other possible methods of fairly and efficiently resolving the controversy.  In determining whether the superiority requirements of Rule 23(b)(3) are met, the Court must consider the following factors: (1) the interest of members of the Class in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning this controversy already commenced by potential Class members; (3) the desirability of concentrating the litigation of the claims in this forum; and (4) the difficulties likely to be encountered in the management of a class action.  Each of these factors here weights strongly in favor of class certification.

### 1.    Any Individual Interest in Controlling the Prosecution of this Action is Minimal

The sheer scope and complexity of this controversy would make individual litigation difficult for the vast majority of Class members.  Separate actions would also "risk disparate results among those seeking redress, [] encourage a race to judgment given the limited funds available to fund recovery here, [] exponentially increase the costs of litigation for all, and [] be a particularly inefficient use of judicial resources." *Cromer*, 205 F.R.D. at 133.  Apart from a single action in this Court[19], there is no indication that Class members – let alone a significant number of Class members – are interested in individually controlling the prosecution of separate actions.  Further, given that Plaintiffs' allegations have already withstood motions to dismiss, it

---

[19] *Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599 (S.D.N.Y. 2010), was brought by a limited partner in the Greenwich Sentry fund against only Citco and PwC.  The Amended Complaint was dismissed on April 1, 2010 and a Second Amended Complaint was filed on June 18, 2010, naming only PwC.  Accordingly, this case is far narrower in scope than the instant class action.

is unlikely that any other class would wish to file their own actions and re-litigate similar claims elsewhere from the beginning.

        2.      <u>Other Madoff-Related Litigation Will Not Protect the Class's Interests</u>

The extent of other litigation concerning the same controversy overlaps with the first factor and also militates in favor of class certification. FED. R. CIV. P. 23(b)(3)(B). Plaintiffs are aware of three other actions pending on behalf of certain members of the putative Class. The first, *Stephenson*, is discussed *supra*. The second, *Ferber v. Fairfield Greenwich Group*, is a derivative action on behalf of three investors who were limited partners in the Greenwich Sentry Partnerships. 2010 WL 2927274 (N.Y. Sup. Ct. July 22, 2010). As the court in that case noted, there is a "substantial difference between the identity of the plaintiffs in [*Ferbe*r] and those in *Anwar*." *Id*. A derivative claim by its nature involves losses to the entity or Fund, while direct injury to the Fund investors – Plaintiffs here – cannot be asserted. The third case is an action in the Netherlands brought only against Citco by an entity called Deminor which asserts that it has obtained assignments of the claims of a number of investors who would meet the Class definition. However, Deminor claims to represent approximately $250 million in losses, a fraction of the $5 billion in damages suffered by members of the Class.

There are also actions brought by the BMIS Trustee, Irving Picard, and the Liquidators appointed by the BVI court for Fairfield Sentry and Sigma. Such actions differ substantially from this action and are no substitute for it. Investors in Madoff feeder funds – such as the Fairfield Funds – are apparently not eligible for SIPA protection and Picard has rejected their claims. *See, e.g.*, Exhibit 18 to the Boruchow Decl. Although the Funds as direct investors in BMIS may receive some return from the Madoff estate, the amount is speculative, since Picard has asserted over $1 billion in preference claims against the Funds, which Picard maintains must

be satisfied before the Funds are eligible to receive any distribution from the BMIS estate.

Moreover, the Funds' net loss claims against BMIS (approximately $1.2 billion) are far smaller

than the Class' total net losses of $5 billion, so that even a full payment of the Funds' claims

from the BMIS estate would not come close to covering the Class' total losses.  *See Picard v.*

*Fairfield Sentry Ltd., et al.*, 09 CV 1239 (BRL) (Bankr. S.D.N.Y. May 18, 2009), complaint at ¶

103.  In short, any benefit to Class members from Picard's success in prosecuting claims of the

BMIS estate will be far less than the recovery that direct Madoff investors will receive.

   Likewise, any actions brought by the BVI Liquidators will be limited to claims on behalf

of the Funds.  These Fund-based claims cannot vindicate the rights of individual investors who

comprise the Class and who have entirely separate and cumulative direct claims against the

Defendants.  As this Court recognized in *Anwar II*, the losses of the Funds do not necessarily

mirror those of the investors.  728 F.Supp.2d at 402.  This has now been confirmed by

information showing that the net losses of the Sentry and Sigma *Funds* (*i.e.*, the entities

represented by the Liquidators) total approximately $1.2 billion, while the total net losses

suffered by the individual Sentry and Sigma *shareholders* (*i.e.*, the Class members) exceeds $5

billion.  Nor do the Liquidators represent Greenwich Sentry limited partnership investors, who

are included in the Class.  Moreover, Fund claims brought by the Liquidators may be subject to

defenses such as *in pari delicto* that would not affect the Class' direct claims.  Finally, the BVI

court overseeing the liquidation of Fairfield Sentry and Fairfield Sigma has not yet approved a

plan of distribution, and it is possible that under BVI law recoveries would have to be shared

with shareholders who are net winners, and not be limited to the net losers who comprise the

Class.

3.      Litigating All of the Claims in this Forum Is the Most Just and Efficient
        Course of Action

The third superiority factor considers "the desirability or undesirability of concentrating

the litigation of the claims in the particular forum." FED. R. CIV. P. 23(b)(3)(C).  For a number

of reasons, this litigation should continue to proceed in the Southern District of New York.[20]

First, litigating this dispute in one forum – rather than in numerous courts throughout the world –

is the most efficient method of resolving these claims.  *See Anwar II*, 728 F. Supp. 2d at 417-418

("[O]f any forum in the world with connections to the underlying transactions, New York has the

most contacts with the litigation.").  Second, this Court has presided over this action for over two

years and is already deeply involved in the legal issues and the factual circumstances, having

written lengthy and complex opinions denying motions to dismiss.  The Magistrate Judge is

similarly familiar with the multiple parties and discovery issues.  Finally, all Defendants are

subject to the Court's personal jurisdiction.  In the absence of a class action in New York, many

Plaintiffs would be unable to obtain redress from all of the Defendants because they are unlikely

to have access an alternative forum where all Defendants would be subject to personal

jurisdiction.  These factors weigh strongly in favor of litigating Plaintiffs' claims in this Court as

a class action.

4.      A Class Action in this Case Can Be Managed Effectively

The final factor asks the Court to consider "the difficulties likely to be encountered in the

management of a class action." FED. R. CIV. P. 23(b)(3)(D).  While this is a complex case, its

manageability is no more challenging than numerous other complex class actions regularly heard

---

[20] The Judicial Panel on Multidistrict Litigation has already found it appropriate to consolidate all Fairfield-related
litigation in this forum.  *See Headway Inv. Corp. v. American Express Bank Ltd.*, 655 F. Supp. 2d 1352, 1353
(J.P.M.L. 2009).  This suggests that consolidation in one forum, and specifically this forum, has already been
deemed desirable.  *See In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 385 (S.D.N.Y. 1996).

in federal courts.  The Court has entered a case management plan providing for the orderly progress of the case, which has already proceeded through denial of motions to dismiss to the presently ongoing production of documents and interrogatory responses and resolution of discovery disputes.  Management of this case as a class action would not be so difficult as to render individual actions a better alternative and this weighs in favor of class certification.  *See* 1 Newberg § 4.32, at 4-130 to 4-131 ("As has been noted with the predominance test, Rule 23(b)(3) permits a class denial for lack of superiority only when other available methods for the fair and efficient adjudication of the controversy actually exist.").  Additionally, under Second Circuit law, "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule."  *Visa Check*, 280 F.3d at 140 (internal quotation marks and citation omitted).  And if manageability concerns were to arise for some reason later in the case, they may be dealt with through such tools as subclassing, bifurcation, altering or amending the class definition and use of special masters.  *Id.* at 141.  In sum, whatever complexities may arise in handling the claims here in a single class action pale in comparison to any alternative.

> 5.   The Presence of Foreign Class Members Poses No Impediment to Class Certification

The fact that the proposed Class includes a significant number of members from foreign countries in no way detracts from the superiority of proceeding as a class action.  As noted above, a class action provides the fairest, most efficient method for litigating Plaintiffs' claims.  It also provides the only real opportunity for a global resolution of this dispute.  Furthermore, this Court should certify the proposed Class because Plaintiffs reside in countries that are "more

likely than not" to recognize an American judgment. *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008).

a.     *Class Certification Is Not Dependent on Foreign Recognition*

As a threshold matter, U.S. courts do not typically abstain judging a case simply because a foreign court might not recognize or enforce that judgment. *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996 (2d Cir. 1975).  Moreover, even if it is uncertain whether a class action judgment might be enforced abroad, it is merely a factor weighing against a finding of superiority.  *In re Alstom SA Sec. Litig.,* 253 F.R.D. at 282.

> The Court does not treat Vivendi's concerns lightly, but the hypothetical possibility of less than complete res judicata effect is not dispositive in assessing whether a class action is "superior to other available methods for the fair and efficient adjudication of the controversy."

*In re Vivendi Universal, S.A. Sec. Litig.  2009 WL 855799,* at *14 (S.D.N.Y. Mar. 31, 2009); *Cromer*, 205 F.R.D. at 135 ("Even where all the available evidence indicates that foreign plaintiffs who lose in the United States will be able to sue the defendant a second time in their own country, a class action may remain the superior means for litigating the dispute . . . ."); *In re Lloyd's American Fund Trust Litig.*, 1998 U.S. Dist. LEXIS 1199 (S.D.N.Y. Feb. 6, 1998) (superiority met despite uncontroverted evidence that plaintiffs would be able to bring a second lawsuit in five foreign countries if the defendants prevailed at trial).

The "likely to recognize test" puts the Court in the difficult position of reading the tea leaves to determine what foreign courts will do based on dueling expert reports.  In most countries, the courts have never squarely confronted the issue of recognition of a U.S class action.  In this case, the task is complicated by the fact that the members of the class who

invested in the Fairfield Sentry and Fairfield Sigma funds reside in approximately seventy countries.

Moreover, the problem of absent Class members bringing duplicative lawsuits against defendants is hypothetical and can be addressed in other ways.  There will always be a possibility of duplicative litigation as long as potential class members are given the opportunity to opt out.  Yet courts do not base class certification on whether some percentage of the class might opt-out.  In similar fashion, the possibility that a small percentage of the Class might not formally opt-out, but might seek to bring individual actions is not a reason for denying class certification or carving out residents of certain nations from the Class.  Moreover, even the countries that will not recognize a U.S. judgment are likely to find that Class members who affirmatively participated in the claims process and waive their rights are bound by the settlement or judgment.   The more favorable the settlement or judgment, the greater the probability that class members will not opt-out and will submit proofs of claim.

As a practical matter, the likelihood that absent Class members would file individual actions after a decision in favor of Defendants is miniscule.  Foreign Class members would have to bear their own legal costs and most likely post bonds for expected costs.  They would not necessarily have the benefit of U.S. discovery and in many cases would have to make their case on the basis of documentary evidence in their possession.  If they lost, such individual plaintiffs would be responsible in most countries for indemnifying Defendants for their legal expenses and costs.  *In re Vivendi*, 2009 WL 855799, at *14 ("there would be substantial disincentives to initiating 'second bite' litigation, not the least of which would be the adverse decision in this case following full discovery unavailable in France, the risk that the shareholder would lose again and, this time, be required to pay Vivendi's counsel fees").  Moreover, even in countries

that did not recognize the preclusive effect of a U.S. class action judgment or settlement, those courts are likely to give substantial weight to a U.S. judgment in favor of the Defendants.  Thus, those individual plaintiffs would face an uphill battle.  Furthermore, Defendants might not have assets to satisfy a judgment in the home countries of the absent class members.  Thus, foreign plaintiffs would have to bring enforcement proceedings abroad in countries where the where Defendants could invoke the U.S. class action judgment as a defense to the enforcement actions.  Thus, concerns about *res judicata* are more academic than practical given the facts and circumstances of this case.

> b.  *A Judgment in this Case Would Be Recognized in Relevant Jurisdictions Throughout the World*

As detailed in the accompanying expert declarations, countries relevant to investors representing over 90% of shareholders, measured by both numbers and losses incurred, in the Fairfield Sentry and Sigma Funds are likely to recognize a judgment entered in this case, whether after verdict or by settlement.  *See* Exhibits 2 and 3 to the Boruchow Decl. (the 90% figure includes U.S. investors as well as countries discussed in the declarations).

This case is particularly well-suited for a class action in the United States because all of the subscribers agreed to a forum selection clause that conferred jurisdiction on the New York courts.  All countries examined by Plaintiffs' experts recognize the validity of forum selection clauses.  Thus, absent foreign Class members cannot complain that they were beyond the jurisdiction of the New York courts.  (Smit Decl. ¶¶ 21, 31, 33-53; Harris Decl. ¶¶ 47-49; Mourre Decl. ¶ 31).  The fact that the Fairfield Greenwich Defendants were headquartered in New York and Bernard Madoff operated his Ponzi scheme from New York makes New York the

logical place to litigate these disputes.  (Smit Decl. ¶29).   The enforceability of a judgment in various relevant countries is discussed below.

Group 1: The Netherlands and Curacao

The Netherlands had the second highest number of investors (56) in Fairfield Sentry after the United States.  Together, Class members with registered addresses in the Netherlands and Curacao, its former colony (*i.e.*, residents of those countries), incurred 28% of the damages suffered by Fairfield Sentry investors.  Dutch Class members were second to Luxembourg in number of investors (31) in Fairfield Sigma.  Class members resident in the Netherlands and Curacao accounted for 20% of Fairfield Sigma losses.

The Netherlands has a collective settlement procedure that binds persons who fail to opt-out.  The Dutch courts have recognized judgments in U.S. opt-out class actions. (Declaration of Hans Smit dated February 28, 2011, ¶¶ 27-30, 73).  Thus, U.S. courts have held repeatedly that the Netherlands would recognize a U.S. class action judgment or settlement.  *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (SDNY 2008); *In re Vivendi Universal, S.A.*, 242 F.R.D. 76.

Group 2: The United Kingdom and Common Law Countries

Subscribers from the United Kingdom and its former colonies represent the largest percentage of investors in Fairfield Sentry, accounting for 34% of the subscribers, and 12% of the subscribers in Fairfield Sigma.  The other common law countries look to the law of the United Kingdom for guidance on the recognition of foreign judgments.   The Declaration of Professor Jonathan Harris ("Harris Decl.") confirms that the countries included in Group 2 would likely recognize a judgment in a U.S. class action as binding on absent class members (Harris Decl. ¶¶ 15-20, 99-100).  Under English law, defendants have pled voluntarily on the merits, which renders them subject to U.S. jurisdiction (*Id.* ¶¶ 25, 30, 54-55).  The fact that the

35

subscribers consented to New York jurisdiction in the Subscription Agreements means that they cannot object to the jurisdiction of the New York courts to adjudicate the case or to bind them to a judgment (*Id.* ¶¶ 47-49 56-57).

U.S. courts have consistently held that the U.K. would recognize a U.S. class action judgment and would bar absent class members from bringing later actions against the defendants. *In Re Vivendi Universal S.A. Sec. Litig.*, 242 F.R.D. 76, 103 (S.D.N.Y. 2007); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 289 (S.D.N.Y. 2008)(class included English and Canadian members). Professor Harris concludes that the U.S. class action offers the best prospects for recovery by absent class members (Harris Decl. ¶ 21). The likelihood that class members could successfully litigate individual proceedings in England or another common law jurisdiction court is remote. (*Id.* ¶ 21).

### Group 3: Switzerland

Swiss subscribers made up 7% and 12% respectively of the Class investors in Fairfield Sentry and Fairfield Sigma. Collectively, the Swiss investors suffered 9% and 5% of the losses in those Funds. The Declaration of Philipp Känzig ("Känzig Decl.") confirms that Switzerland would likely recognize a U.S. class action judgment in this case. The Swiss Private International Law Act ("SPILA") supports the conclusion that Class members who have actual knowledge or who are presumed to have actual knowledge of the class action proceedings will be bound if they were offered the opportunity to opt out and did not do so. (Känzig Decl. ¶¶ 10, 44).

### Group 4: France and Luxembourg

French and Luxembourg investors collectively represent 8% of the Class members invested in Fairfield Sentry and 20% in Fairfield Sigma. In his Declaration dated February 28, 2011 ("Mourre Decl."), Alexis Mourre opines that the French and Luxembourg courts would

.

recognize a judgment in this case. (Mourre Decl. ¶ 8).  Since this Court's decision in *In re Alstom SA Sec. Litig.*, finding that French courts would not recognize an American class action judgment, French courts have issued three decisions in *Vivendi* litigation which indicate that the opposite is true.[21]  (Mourre Decl. ¶¶ 32).  Mr. Mourre also bases his opinion on the fact that the Class members agreed to submit to New York jurisdiction (*Id.* ¶ 31).  Likewise, none of the remaining Defendants in the case challenged the jurisdiction of the Court.  (*Id.*).

Mr. Mourre also cites compelling reasons why rules of domestic public policy and French constitutional law are not applied in the context of the recognition of foreign judgments.  (*Id.* ¶ 75).  By way of example, the tribunal of Commerce of Naterre in August 2009 rejected an application by Vivendi to suspend publication of a class notice in France, which it claimed would violate the Constitutional Court's decision n.89-257 DC of 25 July 1989 (*Id.* ¶ 76).

<u>Group 5: Spain</u>

Spanish class members made up 2% of investors in Fairfield Sentry, and had the largest representation in Fairfield Sigma– 17.6% of the Class.  In his Declaration, Professor Fernando Gascón ("Gascón Decl.") explains why the Spanish Courts would be likely to recognize a final judgment or settlement entered in this case (*Id.* at ¶ 2).  The case does not infringe on the exclusive jurisdiction of the Spanish courts and has a pronounced connection with New York (*Id.* ¶¶ 50, 54-55).  Spanish law recognizes a system of collective actions whereby a group of plaintiffs may represent persons who are similarly situated in seeking to defend their rights (*Id.*, ¶ 82).  Notice can be given by publication to unidentified members (*Id.* ¶ 91).  There is no

---

[21] In March 2009, Judge Holwell issued a detailed opinion in which he denied a motion to reconsider his 2007 ruling in the Vivendi case that France would be likely to recognize a U.S. class action judgment.  *In re Vivendi Universal, S.A. Sec. Litig.*, 2009 WL 855799 (S.D.N.Y. Mar. 31, 2009).  Among other reasons, he cited legislation in a variety of countries that had accepted some sort of opt-out mechanism.  *Id.* at *11-14; Mourre Decl. ¶42. Joint Declaration on Belgian Law ¶22.

procedure for opting out. (*Id.* ¶ 95).  A decision in the case is binding on all the members of the collective, including passive members who have not taken part in the action.  (*Id.* ¶ 99, 103). Given these extensive similarities in procedures, a Spanish court would likely uphold a U.S. class judgment as not violating Spanish public policy (*Id.* ¶¶ 106-107, 112).

Group 6: Latin America

Class members from Latin America constituted 11% of the Fairfield Sentry investors and less than 1% of Fairfield Sigma.

As explained in the Declaration of Professor Michael Wallace Gordon at ¶ 100 ("Gordon Decl."), the courts in Latin America are likely to recognize a U.S. class action judgment in accordance with the Bustamante Code and the Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards.  One likely reason for this  is that none of the present Defendants reside these countries (Gordon Decl. ¶ 29).  Moreover, absent class members are unlikely to file second-bite litigation in their home countries because of the problems discussed *infra* at 5a with legal fees, loser-pay rules, delays, problems of obtaining jurisdiction over non-residents, and inability to locate assets with which to satisfy a judgment. (*Id.* ¶¶ 29,100).

Group 7: Belgium

Subscribers from Belgium constituted 5% of investors in Fairfield Sentry and suffered 9% of the losses.  In Fairfield Sigma, Belgian investors were 11% by number  and suffered 18.6% of the Class losses.

In their Joint Declaration Regarding Belgian Law, Jean-Pierre Fierens and Bart Volders ("Joint Declaration") explain why the courts in Belgium are likely to recognize a judgment in this case.  (Joint Declaration ¶ 17, 36).  Belgian law recognizes various kinds of collective

litigation mechanisms that are similar to U.S.-style class actions (*Id.* ¶ 19).  In collective

litigation, an absent party's rights may be represented by a agent, the equivalent of a class

representation.  (*Id.*).  The Belgian legislature has been considering class action legislation with

both opt-in and opt-out features (*Id.* ¶ 21).  Class actions procedures also have been adopted in

other European Union member states including Germany, Spain, Finland, Portugal and Sweden

(*Id.* ¶ 22).  Consequently, there is no reason to believe that a Belgian court would find that a U.S.

class action would infringe upon Belgian concepts of substantive or procedural international

public policy (*Id.* ¶ 23).  On June 23, 2010, the Amsterdam Court of the First Instance held that

U.S. opt-out class action procedures were not incompatible with the requirements of the

European Code of Human Rights (*Id.* ¶ 27). For the foregoing reasons, it is unlikely that a

Belgian court would find that a U.S. class action infringed upon Belgian concepts of substantive

or procedural international public policy (*Id.* ¶ 23).   Finally, an absent class member in Belgium

would face numerous practical and legal hurdles in attempting to bring an individual action

against Defendants (*Id.* ¶¶ 33-35*).*

<u>Group 8: Other Countries</u>

There are also Class members from a number of other countries, each of which comprise

less one percent of Class members or one percent of Class losses in either Fund (for example,

Pitcairn had one investor in Fairfield Sentry and North Korea had two).  Most of these countries

would, in fact, recognize a U.S. class action judgment.  Denmark, Norway, Sweden, Finland, and

Portugal, to name a few, are either members of the European Community or signatories to the

Lugano Treaty, facts which make recognition likely. (Smit Decl. ¶ 73(4)).

\* \* \* \* \*

.

Through the declarations summarized above, Plaintiffs have demonstrated that the countries which account for well over 90% of the investors in Fairfield Sentry and Sigma are likely to recognize a class action judgment rendered by this Court in this case.  Accordingly, the presence of foreign Class members poses no impediment to the superiority of proceeding with this case as a class action.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for class certification should be granted.

March 1, 2011

Respectfully submitted,

By:    /s/ David A. Barrett
       David A. Barrett

       David Boies
       BOIES, SCHILLER & FLEXNER LLP
       333 Main Street
       Armonk, NY 10504
       Telephone: (914) 749-8200
       Facsimile: (914) 749-8300

       David A. Barrett
       Howard L. Vickery, II
       BOIES, SCHILLER & FLEXNER LLP
       575 Lexington Avenue
       New York, NY 10022
       Telephone: (212) 446-2300
       Facsimile: (212) 446-2350

       Stuart H. Singer
       Carlos Sires
       Sashi Bach Boruchow
       BOIES, SCHILLER & FLEXNER LLP
       401 East Las Olas Boulevard, #1200
       Ft. Lauderdale, Florida 33301
       Telephone:  (954) 356-0011
       Facsimile:  (954) 356-0022

.

Robert C. Finkel
James A. Harrod
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Telephone:  212.759.4600
Facsimile:   212.486.2093

Christopher Lovell
Victor E. Stewart
LOVELL STEWART HALEBIAN JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Telephone: 212.608.1900

*Interim Co-Lead Counsel for Plaintiffs and*
*Counsel for PSLRA Plaintiffs*

.

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2011, I caused the foregoing attached document to be

electronically served to all counsel of record.


/s/ David A. Barrett
David A. Barrett