CONSULTATION REPORT

# PRINCIPLES FOR THE VALUATION OF HEDGE FUND PORTFOLIOS



TECHNICAL COMMITTEE
OF THE
INTERNATIONAL ORGANIZATION OF SECURITIES COMMISSIONS

MARCH 2007

**This paper is for public consultation purposes only.  It has not been approved for any other purpose by the IOSCO Technical Committee or any of its members.**

Cited in Anwar v. Fairfield
09 Civ. 118 (VM)
Archived on 12/22/11
This document is protected by copyright.
Further reproduction is prohibited without permission.

**How to Submit Comments**

Comments may be submitted by one of three methods **at the latest on __21 June 2007__**. To help us process and review your comments more efficiently, please use only one method.

**1. E-mail**

- Send comments to Ms. Pamela Vulpes: Pamela@iosco.org
- The subject line of your message should indicate "Principles for the Valuation of Hedge Fund Portfolios".
- Please do not submit attachments as HTML, GIF, TIFF, PIF, or EXE files.

**OR**

**2. Fax**

Send a fax to the attention of Ms. Pamela Vulpes, using the following fax number: 34 (91) 555 93 68.

**OR**

**3. Post**

Send your comment letter to:

Ms. Pamela Vulpes
IOSCO General Secretariat
C/ Oquendo 12
28006 Madrid
Spain

Your letter should indicate prominently that it is a public comment on "Principles for the Valuation of Hedge Fund Portfolios".

**Important:** All comments will be made publicly available, unless anonymity is specifically requested. Comments will be converted to PDF format and then posted on the IOSCO-website. Personal identifying information will not be edited from submissions.

Cited in Anwar v Fairfield
09Civ0118
Archived on 12/29/11
This document is protected by copyright.
Further reproduction is prohibited without permission.

<u>**Table of Contents**</u>

I.      **Executive Summary**

II.     **Introduction**

III.    **Drivers of IOSCO's focus on hedge fund portfolio valuation**

      A.      *The increasing importance of hedge funds to global capital markets*

      B.      *The complexity of some hedge fund portfolio strategies and their underlying instruments*

      C.      *Central role of financial instrument valuations to hedge funds*

      D.      *Conflicts of interest can exacerbate valuation difficulties*

      E.      *Examples of how the jurisdiction of organization of a hedge fund causes differences in hedge fund structures*

IV.     **Scope of application of the principles**

V.      **The Nine Principles**

1.     *Comprehensive, documented policies and procedures should be established for the valuation of financial instruments held or employed by a hedge fund.*

2.     *The policies should identify the methodologies that will be used for valuing all of the financial instruments held or employed by the hedge fund.*

3.     *The financial instruments held or employed by hedge funds should be consistently valued according to the policies and procedures.*

4.     *The policies and procedures should be reviewed periodically to seek to ensure their continued appropriateness.*

5.     *The Governing Body should seek to ensure that an appropriately high level of independence is brought to bear in the application of the policies and procedures and whenever they are reviewed*

6.     *The policies should seek to ensure that an appropriate level of independent review is undertaken of the individual values that are generated by the policies and procedures and in particular of any valuation that is influenced by the Manager.*

Cited in Anwar v. Fairfield. 09 civ 0118. Archived on 12/29/11. This document is protected by copyright. Further reproduction is prohibited without permission.

7.   *A hedge fund's policies and procedures should describe the process for handling and documenting price overrides, including the review of price overrides by an Independent Party.*

8.   *The Governing Body should conduct initial and periodic due diligence on third parties that are appointed to perform valuation services.*

9.   *The arrangements in place for the valuation of the hedge fund's investment portfolio should be transparent to investors.*

**VI.   Conclusion and Request for Comment**

**Appendix A.  Contributors**

**Appendix B.  Bibliography**

Cited in Anwar v Fairfield
09Civ0118
Archived on 12/29/11
This document is protected by copyright.
Further reproduction is prohibited without permission.

## I.    Executive Summary

This paper is focused on principles for valuing the investment portfolios of hedge funds and the challenges that arise when valuing illiquid or complex financial instruments. The principles are designed to mitigate the structural and operational conflicts of interest that may arise between the interests of the hedge fund manager and the interests of the hedge fund. Hedge funds may use significant leverage in their investment strategies, the impact of which increases the importance of establishing appropriate valuations of a hedge fund's financial instruments.

While preparing this paper IOSCO has worked closely with a group of industry experts to gain practical insight from experienced hedge fund investors, hedge fund managers and firms that provide professional services to hedge funds. We are publishing this paper to solicit public comments.

The chief aim of the principles is to seek to ensure that the hedge fund's financial instruments are appropriately valued and, in particular, that these values are not distorted to the disadvantage of fund investors. This paper identifies the implementation of comprehensive policies and procedures for valuation of hedge fund portfolios as a central principle. It recommends general principles that should guide the governing body and its manager in developing and implementing such policies and procedures. The paper also emphasizes that these policies and procedures should be consistently applied. In addition, it stresses the goals of independent oversight in the establishment and application of the policies and procedures in order to mitigate the conflicts of interests that managers face. IOSCO believes that investors will ultimately benefit if hedge funds follow these principles.

Investors need to be vigilant with respect to any hedge fund that does not exhibit these principles throughout all aspects of its valuation process. Investors should satisfy themselves that the management and governance culture promotes the application of the principles to the extent practicable. While the adoption and compliance with these principles should benefit investors, the measures themselves will not reduce the need for investors to conduct appropriate initial and on going due diligence with respect to their interests in hedge funds.

The principles apply to all hedge fund structures, but IOSCO recognizes that hedge funds are varied in their size, structures and operations. The governing body of each hedge fund should take into consideration the nature of the fund's structure and operations when seeking to apply the principles.

The goal of the principles is to promote, among other things, the consistent application of a set of valuation policies and procedures in the valuation of a hedge fund portfolio, and independence in, and transparency of, this valuation process. The principles are applicable across a wide range of jurisdictions as well as a number of different hedge fund and service provider structures and in all cases are relevant to the interests of investors.

## II.     Introduction

The IOSCO Technical Committee Standing Committee on Investment Management (SC5) drafted this paper pursuant to a mandate from the IOSCO Technical Committee.[1]  This mandate to SC5 generally requests that it examine the policies and procedures[2] employed by hedge funds in the valuation of their portfolios and, working closely with industry representatives, develop a single, global set of principles relating to the valuation of the financial instruments employed or held by hedge funds when implementing their strategies. Accordingly, SC5 and representatives from the European and United States hedge fund industry collaborated to produce this paper, which presents a set of principles for valuing the portfolios of hedge funds.  In addition, the IOSCO Technical Committee Standing Committee on the Regulation of Market Intermediaries (SC3) was consulted in the production of this paper.

The chief aim of the principles is to seek to ensure that the hedge fund's financial instruments are appropriately valued and, in particular, that these values are not distorted to the disadvantage of fund investors.[3]  This paper identifies the implementation of comprehensive policies and procedures for valuation of hedge fund portfolios as a central principle.  It recommends general principles that should guide the 'Governing Body'[4] and its manager (the "Manager") in developing and implementing such policies and procedures. The paper also emphasizes that these policies and procedures should be consistently applied.  In addition, it stresses the goals of independent oversight in the establishment and application of the policies and procedures in order to mitigate the conflicts of interests that Managers face.  IOSCO believes that investors will ultimately benefit if hedge funds follow these principles.

It is important to understand that this document is not intended to be an academic review of the relevant literature, a treatise on financial instrument valuation methodologies or an analysis of the application of accounting or auditing principles to the valuation of hedge fund portfolios.  Instead, the approach has been to create a document

---

[1] In its meeting on 7 February 2006, the IOSCO Technical Committee approved the mandate proposed by SC5 regarding hedge fund valuation.

[2] 'Policies' refer to the high level valuation policies and 'procedures' refers to the pricing procedures which outline the detailed processes by which prices are obtained for valuing the financial instruments of an investment portfolio.

[3] IOSCO recognizes the diversity and complexity of the financial instruments that hedge funds hold or employ in pursuing their investment strategies.  IOSCO utilizes the term 'financial instrument' instead of 'asset') to focus the paper and principles on the valuation of, among other things, assets, liabilities, conditional obligations, contracts for differences, financial contracts and hedges.

[4] The Governing Body may also be known as the "Board of Directors" or the "General Partner," depending on the jurisdiction of the hedge fund.  See section III.E. for further explanation.

that builds upon the very substantial analytical and practical work that has been done in this area by industry associations, academics and market participants.[5]

This statement of principles is intended to be a practical tool that can be used by Managers, Governing Bodies, and others involved in the valuation process. In addition, the principles may be of use to institutional and sophisticated individual investors and their representatives.

Cited in Anwar v Fairfield
09Civ0118
Archived on 12/29/11
This document is protected by copyright.
Further reproduction is prohibited without permission.

---

[5] See the extensive Bibliography, which SC5 has drawn upon in its work.

### III.    Drivers of IOSCO's Focus on Hedge Fund Portfolio Valuation

   A.    *The increasing importance of hedge funds to global capital markets*

The wider context of this work and an important part of the impetus for this paper is the growth of hedge funds over the past decade, the number of which has grown six fold over this time period. With investor capital currently in the order of $1.5 trillion, and the use of leverage applied to that capital when making investments, hedge funds play an increasingly important role in global capital markets. Hedge funds provide substantial liquidity in all asset classes throughout the world.

They are, moreover, important sources of investment diversification for institutional and sophisticated individual investors, and a source of continuous product change and innovation, potentially enhancing the liquidity and resiliency of financial systems worldwide.

   B.    *The complexity of certain hedge fund portfolio strategies and their underlying instruments*

The growing influence and importance of hedge funds in global financial markets brings with it challenges and risks.  Important among these is the difficulty in valuing complex, illiquid financial instruments.  The valuation of certain hedge fund portfolios is inherently difficult because of the nature of the investment strategies that many funds pursue and the financial instruments that underlie them.  In some instances, reliable market information about precise values for certain types of financial instruments is not readily available (*e.g.*, distressed securities and over-the-counter structured notes). These types of instruments can be difficult to value for a variety of reasons, including lack of a liquid market, the use of valuation models that rely on imperfect data and/or are dependent on the occurrence of a future event (the probability of which may be difficult to estimate).

It is worth noting that the valuation of complex, illiquid financial instruments is by no means an issue unique to hedge funds.  Counterparties dealing with hedge funds and persons investing in private equity and other investment vehicles exposed to complex or illiquid instruments, among others, will face similar valuation challenges.  But the confluence of structural and other risks around valuations in hedge funds has led IOSCO to focus this work on hedge funds.

   C.    *Central role of financial instrument valuations to hedge funds.*

The valuation of the financial instruments employed or held by hedge funds is critical to hedge fund investors and potential investors because it affects, among other things, hedge fund net asset value ("NAV"), financial reporting, performance reporting and presentations, fees paid to hedge fund service providers (*e.g.*, the Manager), collateral requirements and risk profiles.

In particular, hedge fund investors, which may include registered collective investment schemes ("CIS") in some IOSCO member jurisdictions (*e.g.*, registered funds of hedge funds), purchase and redeem fund shares based on the valuations of the funds' financial instruments.  These same investors make decisions to remain invested in the fund, purchase or sell shares in the fund or re-weight their exposures to other asset classes / fund managers based, in part, on the fund's performance.  A hedge fund calculates that performance based upon changes in its NAV which are driven primarily by changes in the value of its portfolio. In addition, the Manager often charges the fund an advisory fee and/or a performance fee based, respectively, on the amount of assets under management and the capital appreciation of the fund's NAV.

> D.      *Conflicts of interest can exacerbate valuation difficulties*

In addition to the inherent difficulties in valuing certain complex and illiquid financial instruments that are held or employed by certain hedge funds, the structure and operation of hedge funds can exacerbate these difficulties because of serious attendant conflicts of interest.  In particular, potential conflicts of interest arise for a Manager that takes an active role in the valuation process. Managers play key roles in hedge fund operations, including in helping to value the funds' investment portfolios.

In many cases involving complex or illiquid financial instruments that are hard to value, the Manager may in practice be the most reliable or indeed the only source of information about pricing for a particular financial instrument.  Further, the Manager may design and implement the policies and procedures relating to valuation of the fund's investment portfolio.  Although the Governing Body of the hedge fund will be ultimately responsible for the policies and procedures relating to the valuation of the investment portfolio, in practice the Manager will exercise a great deal of day-to-day control and influence over the process.[6]

Potential conflicts of interest arise, however, for a Manager who takes an active role in the valuation process. For example the Manager very often receives an advisory and/or performance fee that is based on the value of fund's portfolio. In addition, the Manager has a significant interest in the ongoing success of the fund and the understandable desire to optimize performance and hence the flow of investment attracted to the fund and/or retained within it. A period of performance that does not meet investor expectations could negatively impact the perceived desirability of the fund and the view taken of it by its investors.  The Manager may have both the incentive and the ability to influence the valuation of the financial instruments in the portfolio in ways that do not reflect their value.

These conflicts of interests and structural concerns are magnified when the hedge fund invests in difficult-to-value instruments. Other instruments, such as liquid exchange-

---

[6] In some jurisdictions, as discussed below, the Governing Body may be the Manager.

traded instruments, or instruments for which valuation inputs are readily observable and verifiable, present less room for manipulation because the resulting values can easily be verified through sources that are independent of the Manager (*e.g.*, through a securities exchange).[7]  In addition to the conflicts arising from the Manager's role, the common use by hedge funds of significant leverage can exacerbate the impact of valuation errors.

Whatever the cause of valuation misstatements, either deliberate or accidental, improper valuations of hedge fund financial instruments may cause harm to investors, for instance, as they acquire and dispose of interests in the fund.  The conflicts of interest, outlined above, may affect the proper valuations of the financial instruments of hedge funds and have prompted IOSCO to explore issues relating to valuation.  SC5 is well positioned to examine issues relating to how hedge funds conduct business vis-à-vis their investors, given its broad representation from countries in which hedge fund managers are active.

E.      Examples of How the Jurisdiction of Organization of a Hedge      Fund Causes Differences in Hedge Fund Structures

Hedge fund structures vary significantly depending on the laws of the jurisdiction in which they are organized.  Despite the differences, conflicts of interest are inherent in hedge funds in connection with the valuation of the financial instruments that hedge funds hold or employ.  In particular, conflicts of interest exist between the interests of the Manager and the interests of the hedge fund and its investors.  Examples of the structures of hedge funds in different jurisdictions illustrate the inherent conflicts of interest that can arise.  As explained below, the identity of the Governing Body will vary depending on the jurisdiction in which the hedge fund is established.

Ultimate accountability for the proper valuations of a hedge fund's investment portfolio rests with the Governing Body of the hedge fund. The identity of the Governing Body will vary depending on the jurisdiction in which the hedge fund is established. For example, Managers that are themselves organized and operating in one jurisdiction (*e.g.*, the United Kingdom or the United States) often organize hedge funds in another 'offshore' jurisdiction (*e.g.*, the Cayman Islands).  The laws of the offshore jurisdiction typically require a hedge fund organized there to have a board of directors that is independent of the Manager.  That board of directors is, however, typically selected by the Manager.  While the board of directors has the responsibility, under the law of the jurisdiction in which it was organized, to serve as the Governing Body of such a hedge fund, the Manager may in practice exercise day-to-day control over the hedge fund.

---

[7] The paper does not address certain issues faced by hedge funds that relate indirectly to portfolio valuation, including but not limited to, timely disclosure of the fund's NAV, valuation of the hedge fund portfolio as a whole (as opposed to valuation of particular financial instruments), valuation of investments in other funds held by a fund of hedge funds, and compliance with applicable accounting principles.  It was determined that these issues were beyond the scope of the paper and could possibly be addressed in later papers.

In other jurisdictions, the hedge fund Manager may serve as the Governing Body of a hedge fund.  For example, many Managers have organized hedge funds under the laws of a particular state of the United States, typically as a limited partnership or a limited liability company.  Often the Manager (which may have been organized in the United States or another jurisdiction) or an entity affiliated or associated with the Manager will serve as the general partner for the limited partnership or the managing member for the limited liability company.  The general partner or managing member also may direct the investment decisions of the hedge fund or hire third-parties to conduct, or assist with, the management of the hedge fund's portfolio.  Under applicable US state law, the general partner of a limited partnership and the managing member of a limited liability company generally have the responsibility to serve as the Governing Body of a hedge fund.  Therefore, the Manager may itself act as the Governing Body of the fund because the Manager serves as its general partner or managing member.

Other than the company and limited partnership structures mentioned above, some offshore hedge funds may be structured in the form of unit trusts.  Trustees of hedge funds are usually appointed to hold and safeguard the fund's assets and have duties to act in good faith for the benefit of unit holders and must administer the hedge funds in accordance with the terms, conditions and powers stated in trust deeds and implied by law.   While technically or legally the Manager may be appointed by the trustee to manage the funds pursuant to the trust deed, in practice, it is not uncommon that the trustee is selected by the Manager.  The Manager may be empowered under the trust deed to remove the trustee without unit holders' consent.  Furthermore, in the absence of any legal or regulatory requirement on the independence of the trustee, the trustee and the Manager may belong to the same financial group.  The Managers may control the operations of the hedge funds, despite the fact that the trustees are serving as the Governing Body of the hedge funds to oversee the activities of the Managers.

In some jurisdictions (*e.g.*, France, Germany, Ireland, Spain, Switzerland), a hedge fund may be organized and operated within the jurisdiction and it is also subject to registration and regulation under the laws of that jurisdiction (*e.g.*, the laws require the hedge fund to engage a depositary to hold and safeguard the fund's portfolio).  Those laws typically impose a governance system on hedge funds that is similar or identical to the governance systems of regulated CIS. The Governing Body of such a hedge fund generally would be the board of directors of the asset management company of the hedge fund. Some of the functions of the Governing Body can also be performed by the depositary of the hedge fund.

### IV.    Scope of Application of the Principles

The principles apply to all hedge fund structures, but IOSCO recognizes that hedge funds are varied in their size, structures and operations. The Governing Body of each hedge fund should take into consideration the nature of the fund's structure and operations when seeking to apply the principles.

The challenges of valuing complex and illiquid instruments arise in many hedge funds, wherever located, and however structured.  Moreover, conflicts of interest of one type or another arise in the case of all hedge funds, wherever located and however structured.  The principles set forth in this paper are designed to assist hedge funds in valuing their portfolios so as to reduce the structural and operational conflicts of interest that may arise and help ensure that valuations are robust and appropriate.

In implementing and operating the principles, IOSCO considers that it is helpful for Governing Bodies, Managers and those involved in valuation to keep in mind the important underlying concept of *independence*.  Independence in the valuation of the financial instruments that are held and employed by hedge funds may be evidenced in a number of ways, as outlined in the discussion below.

Listed below in italics are nine principles for valuing the financial instruments that are held or employed by hedge funds.  Each principle is followed by explanatory text.

Cited in Approval Withheld
Archived on 12/29/14
09CIV0118
This document is protected by copyright.
Further reproduction is prohibited without permission.

## V.      The Nine Principles

1.      *Comprehensive, documented policies and procedures should be established for the valuation of financial instruments held or employed by a hedge fund.*

The Governing Body should ensure that written policies and procedures are established which seek to ensure integrity in the valuation process.  In practice, the Manager may be heavily involved in formulating the policies and procedures on behalf of the Governing Body. The documented policies and procedures will generally set out the obligations, roles and responsibilities of the various parties and personnel who are involved in the valuation process.  Given that hedge funds have varied structures and investment strategies, it is important that appropriate policies and procedures are adopted in each case.

In establishing policies and procedures, the following non-exhaustive list of points should be addressed:  (i) the competence and independence of personnel who are responsible for valuing the financial instruments, (ii) the specific investment strategies of the hedge fund and the financial instruments in the investment portfolio, (iii) the controls over the selection of valuation inputs, sources and methodologies, (iv) the escalation procedures for resolving differences in values for financial instruments, (v) the valuation adjustments (if any) related to the size and liquidity of positions, as appropriate, and (vi) the appropriate time for closing the books for valuation purposes.

2.      *The policies should identify the methodologies that will be used for valuing all of the financial instruments held or employed by the hedge fund.*

The policies should set out the methodology to be used for each financial instrument, which include inputs, models and the selection criteria for pricing and market data sources.  It should specify a framework applicable to both current and, where practicable, future instrument types in which the hedge fund anticipates investing.  For example, the policies should consider what constitutes an acceptable input, acknowledging that prices should, whenever possible and appropriate, be obtained from independent sources.  As another example, the policies should address cut-off times when securities are traded in multiple time zones.   In any case, there should be a validation procedure which governs how a single source or non-independent source may be justified.

The selection of a methodology to value a particular class of financial instruments directly affects the resulting pricing of an instrument.  In selecting the methodology to value a financial instrument, account should be taken of the sensitivity of varying methodologies and how specific strategies may determine the relative value of the financial instruments in the portfolio.  The selection process for a particular methodology should include an assessment of the different relevant methodologies that are available by appropriately qualified and experienced parties.

If a model is used to value a financial instrument, the model and the variable inputs should be explained and justified in the valuation policy and procedures. Underlying data and assumptions used in model-based valuations, in addition to the rationale for using them, should be appropriately documented (preferably contemporaneously) to facilitate later review. The policy should specify how the model and its inputs will be checked for appropriateness.

The policies and procedures should address how the valuation of financial instruments will be undertaken in case an instrument falls outside of the scope of the existing valuation policy. For instance, the person that values a newly purchased financial instrument by a hedge fund should document his or her reasons for using a particular valuation method. In addition, an independent party (as defined below) could provide an *ex-post* review of the valuation method concurrent with the amendment of the existing policies to account for the 'new' financial instruments.

3. *The financial instruments held or employed by hedge funds should be consistently valued according to the policies and procedures.*

The persons who value the financial instruments should apply the policies and procedures and the designated methodologies consistently. The Governing Body and the Manager should make sure that consistent application of the policies occurs. The policies and procedures should outline a mechanism which enables the monitoring of whether the party or person who has responsibility for valuing financial instruments is following the policies and procedures. The principle of consistency requires that the policies and procedures, and the designated methodologies, should generally be:

- applied to all financial instruments within a fund that share similar economic characteristics;
- applied across all hedge funds that have the same Manager, taking time zone and trading strategies into account; and
- applied over time unless circumstances arise that suggest that the policy requires updating; in particular, valuation sources and rules should remain consistent over time.

4. *The policies and procedures should be reviewed periodically to seek to ensure their continued appropriateness.*

The desirability of consistent application over time of the policies and procedures should be balanced with a periodic review of, and appropriate changes to, the policies and procedures. The Governing Body and/or the Manager should review the appropriateness of the policies and procedures in light of the nature of the fund's investment strategies. The policies should allow for a review and change of methodologies periodically and after any event that calls into question the validity or utility of the policies and procedures (*e.g.*, when market events call into question whether a particular pricing methodology continues to be appropriate). This recognizes that hedge funds operate within a dynamic environment in which the trading parameters, strategies and products change over time.

The policies should outline how a change to the valuation policy, including a methodology, can be effected and in what circumstances this is appropriate. Recommendations for changes to the policies should be made to the Governing Body which should review and approve any changes.

The policies and procedures should be reviewed prior to the fund's engagement with a new investment strategy or financial instrument to determine whether the existing policies and procedures sufficiently address the new types of strategies or investments.

5.   *The Governing Body should seek to ensure that an appropriately high level of independence is brought to bear in the application of the policies and procedures and whenever they are reviewed.*

Independence should be embedded into the processes adopted for valuation and within any party appointed to undertake valuation responsibilities.  The Governing Body should ensure that the parties involved in the valuation process have an appropriate level of experience, competence and that an appropriate degree of independence exists within the valuation process (as explained in greater detail below)[8]

The effectiveness of the valuation process is correlated with the level of the involved parties' experience and understanding of the valuation of the financial instruments in which the hedge fund invests, and the investment strategies adopted.  It is therefore important that the Governing Body manage the trade off between achieving the benefit of independence yet ensuring appropriate experience and competence is present in the parties involved and is brought to bear in the valuation process.

Independence may be achieved by using *inter alia* (i) third-party pricing services, (ii) independent reporting lines within the Manager, and/or (iii) a valuation committee.

In particular, one or more of the following approaches, in no particular order of preference, will increase independence in hedge fund valuation:

a.   *Third-party pricing services.*   The appointment of a qualified, independent third party to be involved in the valuation process for the financial

---

[8] The Governing Body may not be independent of the Manager, in the case of hedge funds that are organized in certain jurisdictions, such as the United States.  The Governing Body nevertheless has fiduciary responsibilities to the hedge fund and should seek to increase independence in the valuation process, to the extent practicable. In addition, non-independent entities of the hedge fund (e.g., the Manager) may be involved in providing valuations for the hedge fund.

instruments of a hedge fund can help to mitigate conflicts of interest in valuation. The Governing Body could engage a party (*e.g.*, Administrator or Valuation Agent) that would provide an appropriate degree of independence and mitigate the influence of the Manager in valuation. The involvement of external parties could balance the influence of the Manager and its personnel. The role of the third party may vary from involvement in the approval and review of the policies and procedures, and/or in the determination of particular valuations.

   b.   *Independent Reporting Lines within the Manager.*   If the structure of the hedge fund, or the nature of its investment strategies, demands it (*e.g.*, in the absence of readily available prices/inputs from independent sources), the Manager may be actively involved in the valuation of the fund's financial instruments. Reporting lines should be established within the Manager to ensure that the persons who are responsible for making investment decisions (often referred to as front-office personnel) will be accountable to unrelated Manager personnel for the valuations that the front-office personnel provide. The person(s) within the Manager that oversees the front-office personnel in this instance brings a degree of independence for purposes of valuation.

   c.  *Valuation Committee.*   The Governing Body could oversee the establishment of a valuation committee to review the valuation policy and procedures and/or oversee the application of those policies and procedures on a regular basis. Such a committee should be comprised of persons who have the authority and experience to provide meaningful oversight of the valuation process. The members of the valuation committee should be determined by their knowledge of the degree and nature of controls that are required by the Governing Body and the hedge fund's range of financial instruments and investment strategies.

The independence of a valuation committee can be strengthened by the appointment of persons who are not connected to the Manager to represent the interests of investors (such as a member of the Governing Body, in the case of offshore hedge funds of a U.K. Manager). The committee may choose to consult with external experts to help with assessing the reasonableness of valuations of financial instruments that are difficult to value.

   In addressing the need for greater independence in valuation for a particular hedge fund, the Governing Body should consider the relationship of the parties involved in valuation with other parties involved in the fund's operations (*e.g.,* the relationship between the Manager and any Valuation Agent, or the relationship between the personnel of a Manager who are responsible for valuation and the front-office personnel who make the investment decisions), the investment strategy of the fund, the extent of readily available independent prices/inputs for the investment portfolio and the relevant experience of the party.

   Depending on the particular facts and circumstances (relating to the independence of the relationship between the Manager and its controlling persons), the board of directors, general partner, valuation committee or third-party Valuation Agent may be termed an 'independent party' for the purposes of valuation. In the case of hedge funds that rely on independent reporting lines within a Manager to achieve greater

independence in valuation, the person(s) within the Manager that oversees the front-office personnel in the valuation process could be viewed as an independent party for the purposes of valuation.

6.      *The policies should seek to ensure that an appropriate level of independent review is undertaken of the individual values that are generated by the policies and procedures and, in particular, of any valuation that is influenced by the Manager.*

There should be a review process for individual values generated by the policies and procedures to ensure their appropriateness.  Some specific cases in which the risk of inappropriate pricing may be greater include:

- prices only available from a single counterparty or broker   source;
- illiquidity of exchange prices (*e.g.*, listed derivative products,          small cap stocks);
- valuations influenced by the Manager;
- valuations influenced by parties related to the Manager; and
- valuations influenced by other entities that may have a financial interest in the fund's performance.

It is recognized that the experience and expertise to value complex and illiquid instruments in an appropriate manner may rest with a limited number of individuals.  In these situations it may be more difficult or not possible to find an independent pricing service or source with sufficient expertise to provide pricing for such financial instruments. For example, the counterparty of a derivative contract is often utilized as the primary (or only) pricing provider for the instrument.  Sourcing prices from such a provider may, however, present a conflict of interest for the price provider, as the price it furnishes may be influenced by its expectation of trading the instrument with the client or in the market place.  The furnished price could lead to an overstated or understated price because the counterparty may hold either a position which is in the same or opposite direction to that of the hedge fund.

The policies and procedures should include sufficient controls to ensure that an appropriate degree of objectivity is brought to bear in considering values that are obtained from external sources, such as counterparties and potential counterparties.   That objectivity may be achieved through involvement of the independent party.  Effective practice would involve sufficient and appropriate checks on the reasonableness of such values and reviewing material exceptions (that is, material deviations from values that have been previously provided).  Such checks could include, for example:

- verifying prices by a comparison amongst counterparty-sourced pricings and over time;
- examination and documentation of exceptions;
- validating prices by comparison of realized prices against recent carrying values;
- consideration of the reputation, consistency and quality of the pricing source;

- a comparison with prices generated by a third party (*e.g.* comparison of prices generated by a Manager versus those generated by a valuation agent);
- highlighting and researching any differences that appear unusual and/or that vary by valuation threshold established for the type of financial instrument;
- testing for stale prices or implied parameters (*e.g.,* spreads, volatilities);
- a comparison against the prices of any related financial instruments and / or their hedges; and
- review of the inputs used in model based pricing.

The selection of external pricing/input sources or providers by the Manager should be reviewed by the independent party. The role of the independent party is to bring objectivity to the pricing process, to promote greater transparency of pricing sources where the source is non-independent, arbitrate and resolve disputes on the determination of an appropriate price and to balance any undue influence of the Manager. The Manager often has the greatest insight when making comparisons among potential pricing sources and therefore may be instrumental in proposing a pricing source for the financial instruments. An independent party should be informed, in a timely manner, of the reasons for selecting any pricing source and/or input over any other and ensure that all methodologies, including sources and/or inputs, or changes thereto, are selected with impartiality and on merit alone. The Manager should contemporaneously document the rationale for selecting any pricing source and/or input.

7.     *A hedge fund's policies and procedures should describe the process for handling and documenting price overrides, including the review of price overrides by an Independent Party.*

A price override (or deviation) is the rejection of a value for a financial instrument that was determined according to the policies and procedures of the hedge fund. In certain exceptional circumstances, the value of a financial instrument determined in accordance with the fund's policies and procedures may not be appropriate. The Manager, Valuation Agent or other party involved in the pricing process may therefore propose an override to that value and use another.

 In all cases, the procedures for price overrides should encompass a requirement for reporting to, and an appropriate level of review by, the independent party as soon as practicable. The detail of, and reasons for, each override should be documented contemporaneously with the override including any evidence supporting the case for the proposed override. A price override should not be used until the review has taken place. Such a report, prepared regularly, could be one of the mechanisms by which the independent party satisfies itself that consistent application of the policies and procedures is taking place.

Where overrides have occurred, any other financial instruments in the fund that are related to the overridden instrument should be reviewed to assess whether any additional adjustments are also required. The repeated use of overrides for a particular financial instrument should trigger, under the policies, a review of the policy and/or procedures.

8.   *The Governing Body should conduct initial and periodic due diligence on third parties that are appointed to perform valuation services.*

The Governing Body typically appoints third parties to perform valuation services for the hedge fund. Such third parties could include, among others, a Manager, an administrator or valuation agent. When the Governing Body decides to appoint a third-party, suitable due diligence should be conducted to determine that the service provider has and maintains appropriate systems and controls and a sufficient complement of personnel with an appropriate level of knowledge, experience and training commensurate with the hedge fund's valuation needs. The Governing Body should consider applying, where appropriate, Principles 1 and 2 from section III of IOSCO 'Principles on outsourcing'.[9]

9.   *The arrangements in place for the valuation of the hedge fund's investment portfolio should be transparent to investors.*

Relevant information that should be made available to investors upon request includes, but is not necessarily limited to:

- The valuation policies of a hedge fund and material changes to the policies (accompanied by, as appropriate, an explanation and quantification of the effect of such a change);

- A description of the roles, skills and experience of all of the parties that are involved in the valuation of the financial instruments of the hedge fund;

- A description of the extent to which valuations have been provided by or influenced by the Manager;

- A description of any material conflicts of interest associated with the parties who are valuing the fund's financial instruments;

- The hedge fund's responses to investor questionnaires or any other requests for information about valuation issues; and

- Information about the nature and degree of any contracted pricing services.

---

[9] "Principles on outsourcing of financial services for market intermediaries".
www.iosco.org/library/pubdocs/pdf/IOSCOPD187.pdf

## VI.    Conclusion and Request for Comment

The goal of the principles is to promote, among other things, the consistent application of a set of valuation policies and procedures in the valuation of a hedge fund portfolio, and independence in, and transparency of, this valuation process.    The principles are applicable across a wide range of jurisdictions as well as a number of different hedge fund and service provider structures and in all cases are relevant to the interests of investors.

Investors need to be vigilant with respect to any hedge fund that does not exhibit these principles throughout all aspects of its valuation process.   Investors should satisfy themselves that the management and governance culture promotes the application of the principles to the extent practicable.    While the adoption and compliance with these principles should benefit investors, the measures themselves will not reduce the need for investors to conduct appropriate initial and ongoing due diligence with respect to their interests in hedge funds.

IOSCO seeks comments from the public, including investors and Managers, governing bodies, hedge fund counterparties and service providers on all aspects of this paper.  IOSCO specifically seeks comments by 21 June 2007 on:

1.    What is your opinion of each of the principles?

2.    Has IOSCO correctly identified the challenges inherent in the valuation of hedge fund financial instruments?

3.    Has IOSCO correctly addressed those challenges?

4.    In what ways could the principles be amended to further benefit investors in hedge funds?

5.    Are there material obstacles to the implementation of the principles within hedge funds?

6.    Are there additional principles that would benefit hedge fund investors?

7.    What, if any, additional specific measures should be incorporated within the policies or procedures to enhance the principles?

SC5 will carefully consider all comments and will revise the paper as appropriate. A final paper is expected to be published by IOSCO in the Autumn of 2007.

**Appendix A.**            **Contributors to the Report**

**IOSCO Technical Committee Standing Committee on Investment Management (SC5)**

## Industry – Regulator Working Group

| | **Chair**<br>Dan Waters<br>Director<br>FSA | |
|---|---|---|
| Segun Aganga<br>Managing Director<br>Goldman Sachs International | Olwyn Alexander<br>Partner<br>PricewaterhouseCoopers | Tim Barker<br>Executive Vice President<br>Markit Group Limited |
| Ronan Daly<br>President<br>BISYS Hedge Fund Services Limited | Frank Dornseifer<br>Investment Management Department<br>BaFin | Mark Everitt<br>Director of Risk Management<br>Quellos Capital Management, LP |
| Alison M. Fuller<br>Assistant Chief Counsel<br>SEC | Marta Garcés<br>Senior Economist<br>CNMV | Mike Greenstein<br>Partner<br>PricewaterhouseCoopers |
| David W. Grim<br>Branch Chief<br>SEC | Douglas Hull<br>Capital Markets Sector<br>FSA | Alexa C. Lam<br>Board Member &<br>Executive Director<br>SFC, Hong Kong |
| David K. A. Mordecai<br>President<br>Risk Economics Limited, Inc. | Martin Pabari<br>Chief Financial Officer<br>CQS (UK) LLP | Peter Rose<br>Co-Director of Research<br>Ivy Asset Management |
| Douglas Scheidt<br>Associate Director and Chief Counsel<br>SEC | Dr. Christian Schindler<br>International Affairs/Policy<br>BaFin | Michael E. Singer<br>Co-President<br>Ivy Asset Management |
| Thomas Smith<br>Deputy Director<br>CFTC | Cyrille Stevant<br>Secretary of SC5 of IOSCO<br>Senior Executive Officer<br>AMF | John L. Sullivan<br>Senior Counsel<br>SEC |
| Jorge Vergara<br>Senior Economist<br>CNMV | | |

**Alternates**

| William Douglas<br>Executive Director<br>Goldman Sachs International | Simon Gregory<br>Head of EMEA & Asia compliance<br>Ivy Asset Management | Ken Marlin<br>Chief Compliance Officer<br>Ivy Asset Management |
|---|---|---|
| Michael Nachmani<br>Vice President<br>Goldman Sachs, New York | Karen Tyrrell<br>Managing Director - Europe<br>BISYS Hedge Fund Services Limited | |

Cited in Anwar v Fairfield

Archived on 12/29/11

09-cv-00118

This document is protected by copyright.

Further reproduction prohibited without permission.

**Appendix B.  Bibliography**

**Chronological order**

Risk standards for institutional investment managers and institutional investors, Risk Standards Working Group, RWSG (1996)
 www.cmra.com/risk.pdf

Regulatory approaches to the valuation and pricing of collective investment schemes, IOSCO, (May 1999)
www.iosco.org/library/pubdocs/pdf/IOSCOPD91.pdf

Delegation of functions, IOSCO (2000)
www.iosco.org/library/pubdocs/pdf/IOSCOPD113.pdf

Hedge Fund disclosure for institutional investors, International Association of Financial Engineers, IAFE (July 2001)
www.iafe.org/upload/IRC%20Consensus%20Document%20July%2027,%202001.pdf

Enhancing public confidence in financial reporting, Group of Thirty, CMRA (2003).
www.group30.org/pubs.php?page=pubs2003.html

SEC roundtable discussions relating to hedge funds (May 2003)
http://www.sec.gov/spotlight/hedgefunds.htm

Valuation issues and operational risk in hedge funds, Capco, (Dec 2003)
www.capco.com/WorkArea/showcontent.aspx?id=2446

The management of hedge funds' operational risks, Jean-Rene Giraud, Edhec (April 2004)
www.edhecrisk.com/edito/RISKArticleEdito109663559892051438/attachments/Managing%20Operational%20Risks%20-%20Working%20Paper.pdf

Valuation concepts for investment companies and financial institutions and their stakeholders, International Association of Financial Engineers, IAFE (June 2004)
www.iafe.org/upload/IAFEValuationConcepts0604.pdf

SEC v. Beacon Hill Asset Management LLC (June 2004)
www.sec.gov/litigation/complaints/comp18745.pdf
www.sec.gov/divisions/enforce/claims/beaconhillasset.htm

US private equity valuation guidelines, Private Equity Industry Guidelines Group, PEIGG (Sep2004)
www.ilpa.info/PDF/PEIGG_PE_Valuation_Guidelines_September_04.pdf

Asset Manager Code of Professional conduct, CFA Centre for financial market integrity (Nov 2004)
www.cfapubs.org/doi/pdf/10.2469/ccb.v2004.n4.4008

International private equity and venture capital valuation guidelines, (Jan 2005), www.privateequityvaluation.com

"Principles on outsourcing of financial services for market intermediaries". IOSCO (Feb 2005)
www.iosco.org/library/pubdocs/pdf/IOSCOPD187.pdf

Asset Pricing and Fund Valuation Practices in the Hedge Fund Industry, Alternative Investment Management Association, (AIMA) (April 2005)
www.citco.com/funds/library/AIMAAsset.pdf

CFTC roundtable discussions relating to the commodity pool industry and operators (April 2005)
http://www.mfainfo.org/images/PDF/CPO_Roundtable_Transcript.pdf

Discussion Paper 05/4, Hedge Funds: A discussion of risk and regulatory engagement, FSA (June 2005)
www.fsa.gov.uk/pubs/discussion/dp05_04.pdf

Credit Derivatives: CDOs and Structured Credit Products, Satyajit Das, John Wiley & Sons, (2005 3r$^d$ edition) ISBN 0470-821590, 850 pages

Mitigating hedge funds' operational risks, Benefits and limitations of managed account platforms, EDHEC (June 2005)
www.edhec-risk.com/features/RISKReview.2005-12-06.1517/attachments/Mitigating%20Hedge%20Funds%20Operational%20Risks.pdf

Toward greater financial stability: A private sector perspective, Counterparty Risk Management Group II, "CRMPG II"(July 2005)
Valuations, Guiding Principle 33, pages 132-133
Section V:   Complex financial products – Risk management, risk distribution and transparency
Appendix D: Risk management challenges facing institutional fiduciaries
www.crmpolicygroup.org

Sound practice for hedge fund managers, Managed Funds Association, MFA (Aug 2005)
www.mfainfo.org

The international convergence of capital management and capital standards. BIS (Nov 2005)
Valuation of the trading book, paragraphs 684-701, valuation paragraph 778(ii) of Basel II,
www.bis.org/publ/bcbs118.pdf

EDHEC European alternative diversification practices survey (Dec 2005)
www.edhec-risk.com/features/RISKArticle.2006-02-20.5819/attachments/Edhec%20EADP%20Survey.pdf

Warren Buffett, Finance and financial products, pages 10-11, Berkshire Hathaway Annual Report (Mar 2006)

www.berkshirehathaway.com/letters/2005ltr.pdf

Testimony of James Chanos to US Senate sub committee hearing on the hedge fund industry, pages 14-18 Valuation; Performance reporting (May 2006)
http://banking.senate.gov/_files/ACF82BA.pdf

Fair value measurements, Financial Accounting Standards Board, FAS157 (Sept 2006)
www.fasb.org/st/
www.fasb.org/pdf/fas157.pdf

Alternative    investments    –    audit    considerations,    AICPA    practice    aid
www.aicpa.org/download/members/div/auditstd/Alternative_Investments_Practice_Aid.pdf
Interpretation guidance, Auditing investments in securities where a readily determinable fair    value    does    not    exist,    AU    Section    9332
www.aicpa.org/download/auditstd/announce/Audit_Interpretations_Auditing_Fair_Value.pdf

The Regulatory Environment For Hedge Funds, A Survey And Comparison - Final Report, Report of the Technical Committee of IOSCO (Nov 2006)
www.iosco.org/library/pubdocs/pdf/IOSCOPD226.pdf

Quantification of Hedge Fund Default Risk, EDHEC, (Jan 2007)
http://www.edhec-risk.com/features/RISKArticle.2007-01-24.1044?newsletter=yes