ORIGINAL

 **KACHROO LEGAL SERVICES, P.C.**



Dr. Gaytri D. Kachroo
219 Concord Avenue
Cambridge, MA 02138
Telephone (617) 864-0755
Facsimile (617) 864-1125
gkachroo@kachroolegal.com

April 20, 2012

*By Facsimile*

Honorable Victor Marrero
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re: *Anwar v. Fairfield Greenwich Limited,*
No. 09-CV-118 (VM) (THK) —Standard Chartered Cases

Dear Judge Marrero:

    I write on behalf of Plaintiff Ricardo Rodriguez Caso ("Plaintiff Caso") in *Caso v. Standard Chartered Bank International (Americas) Ltd., et al.*, No. 10-CV-9196, the putative class action consolidated into the above-referenced multi-district litigation. In late December 2011 and early January 2012, the parties submitted letters to the Court on the issue of whether Plaintiff Caso was required to arbitrate his claims against Standard Chartered, or whether the defendants had waived the right to enforce the arbitration clause in Plaintiff Caso's brokerage agreements. At no time during that exchange did either party submit a copy of the agreement that defendants seek to enforce.

    However, a detailed examination of the agreements between Plaintiff Caso and Standard Chartered's predecessor, American Express Bank International ("AEBI"), establishes that those agreements ***explicitly bar*** arbitration in these circumstances. Because Caso brought this case as a class action, the agreements specifically *prohibit arbitration* unless the Court formally denies class certification or excludes a party from the class. Accordingly, Plaintiff Caso submits the enclosed copies of the agreements at issue, which were produced by the defendants in discovery.

**The Agreements and the Forbearance Clause**

    On November 16, 2006, Plaintiff Caso executed two agreements with AEBI: (1) An Application for Brokerage Account (the "Brokerage Agreement"), and (2) a Nondiscretionary Investment Services Agreement (the "NISA Agreement"). *See* Exhibits A and B, respectively.

These are presumably the documents referenced in the defendants' December 23, 2011 letter to the Court in which they first requested a pre-motion conference on the arbitration issue. *See* December 23, 2011 Letter from Sharon L. Nelles.

Both agreements contain an arbitration clause. *See* Exhibit A at ¶ 6; Exhibit B at ¶ 9.a. The portions of the arbitration clauses that limit the rights of a claimant are virtually identical.

However, the Brokerage Agreement contains an additional provision, a limitation on enforcement of the arbitration clauses against Plaintiff Caso in these circumstances:

> No person shall bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court.
>
> Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

Exhibit A at ¶ 6, seventh sub-paragraph (the "Forbearance Clause"). This language, drafted by AEBI, is explicit and clear: there can be *no* arbitration involving someone—like Plaintiff Caso—who has initiated a putative class action in court, or who is a member of a putative class who has not opted out.

It is vital that the Court have the relevant provisions before it, because a failure to consider the actual contractual provisions could result in an order contrary to the parties' agreements. For example, if this Court concludes that an unspecified arbitration agreement requires Plaintiff Caso to arbitrate his claims, defendants might then attempt to use the Forbearance Clause offensively, citing the provision that bars bringing a putative class to arbitration. Plaintiff Caso might thus be whipsawed—deprived of a class action in both forums, where the agreements expressly provide one avenue for class relief.

The arguments set forth in Plaintiff Caso's letters of December 27 and 30, 2012—that the defendants have waived the right to enforce the arbitration agreement through inaction— continue to provide a basis on which the Court could determine that the arbitration agreement is unenforceable against Plaintiff Caso. The Forbearance Clause provides an additional even stronger rationale. Plaintiff Caso must therefore be permitted to pursue his class action complaint in this forum.

### The NISA Integration Clause

Now that the defendants have had the opportunity to review the language in the agreements they produced in discovery more carefully, Standard Chartered may attempt to claim

that the Forbearance Clause is not in effect, due to integration language in the NISA Agreement. However, such an argument, if advanced, would be fatally flawed.

The NISA Agreement does contain language that governs its relationship with other account agreements, including the Brokerage Agreement. Section 9 ("Miscellaneous"), paragraph 9.e., titled "Conflict with other Account Agreements and Documentation," provides as follows:

> This Agreement is intended to be read and applied in conjunction with the other account agreements and other documents entered into by or applicable to Customer; however, in the event and to the extent there is any conflict or inconsistency between the provisions of this Agreement and such other agreements and documentation, the provisions of this Agreement shall control as to the Investor Account.

Exhibit B at ¶ 9.e. Neither the express language of this paragraph, nor the context in which these agreements were executed, suggests that the absence of a Forbearance Clause from the NISA Agreement renders the one in the Brokerage Agreement unenforceable. Indeed, the way in which these agreements were drafted and executed reinforces the vitality of the Forbearance Clause.

The Forbearance Clause itself is simply an additional provision regarding the scope of the arbitration clauses in the Brokerage Agreement and NISA Agreement; there is neither a conflict nor an inconsistency between the Forbearance Clause and the arbitration clauses. Pursuant to long-standing contract construction principles, the Court should not interpret the agreements in a manner that would render the Forbearance Clause meaningless. *Matrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63 (1995) ("Cardinal principle" of contract interpretation is that "a document should be read to give effect to all of its provisions and to render them consistent with each other."); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract superfluous."); *Lawyers' Fund for Client Protection of State of N.Y. v. Bank Leumi Trust Co.*, 94 N.Y.2d 398, 404 (N.Y. 2000) ("Bank Leumi's interpretation would render the second paragraph superfluous, a view unsupportable under standard principles of contract interpretation."); *see generally Local 205, Community and Social Agency Employees' Union v. Day Care Council of New York, Inc.*, 992 F. Supp. 388, 392 (S.D.N.Y. 1998) ("General contract principles should be applied to determine whether the parties agreed to arbitration and to ascertain and implement the reasonable expectations of the parties.").

Indeed, if the Forbearance Clause conflicted with the arbitration clause of the NISA Agreement, it would also conflict with the Brokerage Agreement itself, as both agreements contain the same arbitration clause. Put differently, it is not sensible to hold that the Forbearance Clause conflicts with the arbitration provision preceding it; accordingly, it cannot conflict with a nearly identical provision in another documents.

Moreover, both the Brokerage Agreement and the NISA Agreement contemplate that they will be read in concert with provisions from other agreements. The NISA Agreement says

3

so explicitly, while the Forbearance Clause is carefully drafted so that it *will* extend to arbitration clauses in other account agreements: "No person shall ... seek to enforce **any** predispute arbitration agreement ...." Exhibit A at ¶ 6 (emphasis added). The drafter anticipated that the Forbearance Clause would apply to arbitration clauses in agreements that did not themselves contain such a clause—otherwise, the limitation presumably would have been on enforcement of "this" predispute arbitration agreement.

Finally, the two agreements were executed on the same day, as part of a set of "account opening documents." *See* December 23, 2011 Nelles Letter. It would be unfair and misleading to require customers to execute two documents simultaneously, one of which trumped key provisions of the other from the outset. That interpretation would allow the defendants to offer a limitation on arbitration designed to permit a customer to participate in a class action, and then render that provision void through a paragraph in the "Miscellaneous" section of a separate agreement. Such a result would be improper and unjust.

For the forgoing reasons, we respectfully request that the Court review the attached agreements, and find that the defendants have waived the right to enforce any arbitration agreement against Plaintiff Caso and the putative class.

Respectfully submitted,

*Gaytri D. Kachroo*
Gaytri D. Kachroo

Encls.

cc:  Sharon Nelles, Esq. (by facsimile and e-mail)
     Standard Chartered Plaintiffs' Steering Committee (by e-mail)

---

The Clerk of Court is directed to enter into the public record of this action the letter above submitted to the Court by *Plaintiff Ricardo Caso*.

**SO ORDERED.**

5-17-12
DATE          VICTOR MARRERO, U.S.D.J.

4

**EXHIBIT A**

## American Express Bank International
### Application for Brokerage Account

Please complete and return this application to:
American Express Bank International
Suite 800, 1221 Brickell Avenue, Miami, Florida, 33131, USA

Questions?
1-305-350-7750

For use by individuals, joint accounts and sole proprietorships



### Account Registration for this account (check one)

If no box is checked the account will be registered as an individual account, or if a co-accountholder is listed as a joint account with rights of survivorship

☒ Individual
☐ Joint (tenants in common)
☐ Sole Proprietorship
☐ Joint (with rights of survivorship)

American Express Bank International portfolio number to be used for settlement purposes: ___104938___

### Agreements (all account holders must accept these agreements by signing on page 2)

1. I confirm that I am of full legal age in my country of residence or otherwise legally empowered to enter into this agreement.
2. I understand that securities execution, clearing and custody services may be separately provided by American Express Bank International ("AEBI"), as well as affiliated and non-affiliated companies.
3. I understand and agree to the terms for release of information about me as described in the Privacy of Account Holder Information section of the American Express Bank International Brokerage Client Agreement (the "Client Agreement").
4. I confirm that all written communications to me related to my account(s) opened under the Client Agreement should be delivered through AEBI to my address of record and in a manner consistent with the instructions I have provided to AEBI for delivering other written communications to me.
5. I authorize AEBI to settle against the AEBI Portfolio identified above all security orders directed through my account(s) opened under the Client Agreement. AEBI is also authorized and indemnified against any losses arising to AEBI in consequence of acting in reliance of securities settlement instructions relayed by third parties as necessary to receive or deliver securities or effect cash settlements consistent with the instructions I provide regarding the operation of my account(s).
6. I request that any broker dealers or financial institutions used as clearing agent or custodian not release my name, address and security position to requesting companies in which they hold securities for my account unless I specify otherwise.
7. I acknowledge I have received the Client Agreement and agree to abide by the terms as currently in effect or as they may be amended from time to time. All account(s) opened under this agreement are governed by a predispute arbitration clause which is found in the arbitration section, Section 6 of the agreement. I acknowledge receipt of and agree to the predispute arbitration clause.
8. Tax certifications (see sections 14 and 15 of the Client Agreement for important information):

**Certification made by US Persons:**
By signing below I confirm I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:
- I am a US person (including a US resident alien), and
- My correct US Taxpayer Identification Number (TIN) is provided below, and
- I am not subject to backup withholding because a) I am exempt from backup withholding; or b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends or c) the IRS has notified me that I am no longer subject to back up withholding.
You must cross out the preceding sentence if you have been notified by the IRS.

**Certification made by non US persons:**
By signing below I confirm I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:
- I am the beneficial owner of all the income to which this form relates,
- I am not a US person,
- The income to which this form relates is not effectively connected with the conduct of a trade or business in the United States or is effectively connected but is not subject to tax under an income tax treaty,
- For broker transactions, I am an exempt foreign person as defined in section 15 of the Client Agreement, and
- If I am claiming treaty benefits, (1) I am a resident of the country indicated below (permanent residence address) within the meaning of the income tax treaty between the United States and that country, (2) If I have a US Taxpayer Identification Number (TIN) that correct number is provided below, and (3) if I am not an individual, I derive the item(s) of income for which the treaty benefits are claimed, and, if applicable, meet the requirements of the treaty provision dealing with limitation on benefits.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

THE U.S. INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN, FOR U.S. PERSONS, THE CERTIFICATION REQUIRED TO AVOID BACK UP WITHHOLDING OR, FOR NON-U.S. PERSONS, THE CERTIFICATIONS REQUIRED TO ESTABLISH YOUR STATUS AS A NON-U.S. PERSON, AND IF APPLICABLE, OBTAIN A REDUCED RATE OF WITHHOLDING.

CONFIDENTIAL                                                                    SCB_Caso 00000042

**Application for Brokerage Account - Account holder Information**

Information provided in this section will be used for Internal Revenue Service reporting. Check the boxes corresponding to the tax certification you are making. By signing below you confirm your acceptance of the agreements on page 1 of this application.

Account holder Name (Full name):

Ricardo Rodriguez Caro

Permanent residence address (use street address of your home):

Cerro Blanco #44

Mexico, D.F. 04320

Country of citizenship:  Date of birth:

Mexico   March 7, 1970

Signature   Date.

X [signature]   Nov. 16, 2006

☒ I am not a US Person for tax purposes.
☐ I am a US Person for tax purposes.
☐ I hold a US Taxpayer Identification Number which is:
  ☐ a social security number ☐ an EIN ☐ an ITIN.
  The number is: _____
I am employed by an investment firm, broker dealer or bank. The name and address is:

I am a director, 10% shareholder or policy making officer of a publicly traded company. The name and address is:

---

Co-Account holder Name (Full name):

Rocio Piñeiro Baqueiro

Permanent residence address (use street address of your home):

Cerro Blanco #44

Mexico, D.F. 04320

Country of citizenship:  Date of birth

Mexico.   Nov. 19, 1969

Signature   Date

X Rocio Piñeiro B   Nov. 16, 2006

☒ I am not a US Person for tax purposes.
☐ I am a US Person for tax purposes.
☐ I hold a US Taxpayer Identification Number which is:
  ☐ a social security number ☐ an EIN ☐ an ITIN.
  The number is: _____
I am employed by an investment firm, broker dealer or bank. The name and address is:

I am a director, 10% shareholder or policy making officer of a publicly traded company. The name and address is:

---

Co-Account holder Name (Full name):

Permanent residence address (use street address of your home):

Country of citizenship:  Date of birth

Signature   Date:

X

☐ I am not a US Person for tax purposes.
☐ I am a US Person for tax purposes.
☐ I hold a US Taxpayer Identification Number which is:
  ☐ a social security number ☐ an EIN ☐ an ITIN.
  The number is: _____
I am employed by an investment firm, broker dealer or bank. The name and address is:

I am a director, 10% shareholder or policy making officer of a publicly traded company. The name and address is:

---

Co-Account holder Name (Full name):

Permanent residence address (use street address of your home):

Country of citizenship:  Date of birth

Signature   Date:

X

☐ I am not a US Person for tax purposes.
☐ I am a US Person for tax purposes.
☐ I hold a US Taxpayer Identification Number which is:
  ☐ a social security number ☐ an EIN ☐ an ITIN.
  The number is: _____
I am employed by an investment firm, broker dealer or bank. The name and address is:

I am a director, 10% shareholder or policy making officer of a publicly traded company. The name and address is:

---

**For office use only**

We approve the account for trading and attest to the fact that all necessary account documents are on file with us or are being obtained by us. Approved and attested to by AEBI

_____
Date

Securities available through American Express Bank International are not backed or guaranteed by any bank, nor are they FDIC insured. Investments in your brokerage account are subject to investment risk including loss of principal and may lose value.

CONFIDENTIAL    SCB_Caso 00000043

## AMERICAN EXPRESS BANK INTERNATIONAL BROKERAGE CLIENT AGREEMENT

1. **General Information.** In consideration of your accepting my brokerage account ("the Account") I agree to the following as used in this agreement, the word "you" shall mean Introducing Broker as defined in the client application and any clearing broker selected by you ("Clearing Broker").

   As used in this agreement, the singular shall mean the plural where appropriate. For purposes of this agreement, "securities and other property" shall include, but not be limited to, money, securities, financial instruments and commodities of every kind and nature, and all contracts and options relating thereto, whether for present or future delivery.

   I appoint you as my Broker for the purpose of carrying out my directions to you in accordance with the terms and conditions of my agreement with you for my account and risk with respect to the purchase or sale of securities. To carry out your duties, you are authorized to open or close brokerage accounts, place and cancel orders and take such other steps as are reasonable to carry out my directions.

   I understand that if you use a Clearing Broker, that Clearing Broker will execute and clear transactions under this agreement and an account will be carried with them. I understand and agree that any telephone conversation with you may be tape recorded and monitored for accuracy and quality assurance and any electronic communication may be similarly maintained or monitored.

2. **Applicable Rules and Regulations.** All transactions for my account shall be subject to the regulations of all applicable federal, state and self-regulatory agencies including the Board of Governors of the Federal Reserve System and the constitution, rules and customs of the exchange of market (and its clearing house, if any) where executed. The Clearing Broker will receive remuneration for directing orders to a particular broker or dealer, through which your transaction is executed. Such remuneration is considered compensation to you and the source and amount of any compensation will be disclosed upon request.

3. **Security Interest.** All securities and other property now or thereafter held, carried or maintained by you in my account, or my trade settlement account or any of my accounts with your affiliates, shall be subject to a general lien for the discharge of my obligations to you, and are to be held by you as security for the payment of any liability or indebtedness of me to you in any of the said accounts. You shall have the right to transfer securities and other property so held by you from or to any other of my above-referenced accounts whenever in your judgment you consider such a transfer necessary for your protection or due to an erroneous transfer. You are hereby authorized to sell and/or purchase any and all property in said accounts without notice to satisfy such general lien.

   Without limiting the foregoing, shares of any Investment company in which I have an interest and for which American Express Financial Corporation or its affiliates serve as investment adviser also are subject to a general lien for the discharge of my obligation to the Introducing Broker or Clearing Broker, and the Introducing Broker and Clearing Broker may redeem any such shares to satisfy my obligation without further notice or demand.

4. **Settlement.** On each sale order other than a short sale, I represent that I own the security, and, if the security is not in your possession at the time of the contract for sale, I agree to deliver the negotiable security to you by the settlement date. In the case of non-delivery of the security by settlement date, you are authorized to purchase the security to cover my position and charge any loss to my account. It is further agreed that if you fail to receive payment for securities purchased, you may sell securities held by you in any of my accounts sufficient to cover the amount owed, and I will be responsible for any loss resulting. To the extent permitted by the laws of the State of Minnesota, the reasonable costs and expenses of collection of the debit balance and any unpaid deficiency in my accounts with you, including but not limited to attorney's fees incurred and payable or paid by you, shall be payable to you by me.

5. **Trading Conditions.** I acknowledge that the Introducing Broker will not provide me with any legal, tax or accounting advice regarding the suitability or profitability of a security or investment unless I receive advice or securities recommendations from a representative of the Introducing Broker. I assume full responsibility with respect to transactions in or for my account and my investment decisions. I acknowledge that trading securities carries substantial risk, that securities trading can be volatile and that investment loss may be substantial in a short period of time. The Introducing Broker and its officers, directors, employees, agents and affiliates will have no liability with respect to transactions in or for my account and my investment decisions. I agree that I will not use the Account for extreme trading activity such as day trading, mutual fund trading based on market timing, overuse of stop or limit orders, or excessive order splitting of the same stock on the same day.

   The Account is not intended for excessive trading activity. If I engage in excessive trading activity (as determined by you in your sole discretion), I may be subject to additional charges, determined on a case by case basis, and/or termination of my account. I agree that I will not use this account as a securities broker-dealer, investment advisor, futures commission merchant, commodities introducing broker, or commodity trading advisor, member or a securities exchange or association or futures contract market, or an owner, partner or associated person of any of the foregoing.

   When you hold on my behalf bonds or preferred stocks in street or bearer form which are callable in part, I agree to participate in the impartial lottery allocation system of the called securities in accordance with the provisions of the New York Stock Exchange rules. Further, I understand that no allocation will be made to any account in which you, your officers, or employees have financial interest until all other customers are satisfied on an impartial lottery basis.

   Good-till-canceled orders remain in force for thirty (30) days. At that time, you will cancel the order, unless you have executed the transaction or I have canceled the order.

   This agreement and its terms shall be binding upon my heirs, executors, administrators and assigns. In the event of my death, incompetence or disability, you may cancel, or complete any open orders for the purchase or sale of any property, you may place orders for the sale of property which you may be carrying for me and for which payment has not been made or buy any property of which my accounts may be short, or any part thereof, under the same terms and conditions as herein above stated, as though I were alive and competent, without prior notice to my heirs, executors, administrators, assigns, committee, or conservators and without prior demand upon any of them.

   This agreement shall inure to the benefit of my successors and assigns, shall be binding on me, my heirs, executors, administrators and assigns and shall be governed by the laws of the State of Minnesota.

6. **Arbitration.**

   (i) Arbitration is final and binding on the parties.

   (ii) The parties are waiving their right to seek remedies in court, including the right to a jury trial.

   (iii) Pre-arbitration discovery is generally more limited than, and different from, court proceedings.

   (iv) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.

   (v) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

   Any controversy arising out of, or relating to, my accounts, to transactions with you or your Brokers and/or employees for me or to this agreement or the breach thereof, shall be settled by arbitration and conducted pursuant to the Federal Arbitration Act.

CONFIDENTIAL                                                    SCB_Caso 00000044

before the American Arbitration Association or the National Association of Securities Dealers Inc., Chicago Stock Exchange Inc., the New York Stock Exchange, the American Stock Exchange to the extent you may be a member of such exchange or the Municipal Securities Rulemaking Board or the independent non industry arbitration forum as I may elect. If I do not make such an election by registered mail addressed to you at your main office within 10 days after demand by you that I make such election, then you may make such election. Judgement upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

No person shall bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court.

Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

7. **Receipt of Communications.** A confirmation of orders and statements of my accounts shall be conclusive if not objected to in writing within 30 days after mailing by you to me. Communications mailed to me at the address I have provided for delivery of written communications shall be deemed to have been personally delivered to me, and I agree to waive all claims resulting from failure to receive such communications.

8. **Amendments.** I agree that you shall have the right to amend this agreement by modifying or rescinding any of its existing provisions or by adding any new provision. Any such amendment shall be effective as of a date to be established by you. I understand and acknowledge that you may modify or change the terms and conditions by mailing a written notice or a new printed agreement to me. My use of the Account after delivery of notice of the change constitutes my agreement to be bound thereby. This agreement is not subject to any oral modification.

This agreement, along with the Application and any other agreements I have signed, constitutes the entire agreement between me and you.

9. **Assignment.** I agree that you shall have the right to assign or transfer this agreement, including all of your rights and obligations hereunder, (i) at any time, to an affiliated company, and (ii) in the event of a reorganization or merger, to any successor company. Following any such assignment, all of my rights hereunder shall be against the assignee entity and not against you. I also agree that I may not assign or transfer this agreement, or any of my rights or obligations hereunder.

10. **Joint Accounts.** Whether we are joint tenants or tenants-in-common, each of us shall have full authority on behalf of the joint account to act in all respects with reference to this account, including: to purchase and sell securities (including short sales); to receive for the account money, securities and other property and to dispose of the same; to receive for the account confirmations, statements of account and agreements relating to these matters and to terminate or modify some or waive any of the provisions thereof.

Our liability shall be joint and several and shall be binding upon our heirs, successors and assigns. The survivor will give you immediate notice of the death of one of us. You may, before or after receiving such notice, take such proceedings, require such documents, retain such portion and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of any of us who have died shall be liable, and each survivor shall be liable, jointly and severally, to you for any debt or loss in this account resulting from the completion of transactions initiated prior to your receipt of a written notice of such death or incurred in the liquidation of the account or the adjustment of the interest of the respective parties.

In the event of death of a Joint Tenant with Rights of Survivorship, the entire interest in the joint account shall be vested in the survivor on the same terms and conditions as therefore held, without any manner releasing the decedent's estate from the liability. In the event of the death of a Tenant in Common Without Right of Survivorship, the interests in the account shall be determined as of the close of business on the date of death of the decedent (or on the next business day).

11. **Money Settlement Options.** Amounts contributed and received will be settled through my bank account(s) with American Express Bank International.

12. **Location of Securities.** Securities may be held by another brokerage firm, bank or financial institution as custodian located either in the U.S. or outside the U.S.

13. **Relationship of Introducing Broker and Clearing Broker.** The Introducing Broker and the Clearing Broker have an agreement in which the Introducing Broker introduces customer accounts to the Clearing Broker on a fully disclosed basis. This means that the Clearing Broker provides execution, recordkeeping, delivery and receipt of securities and funds receives and distributes payments therefore and safeguards all funds and securities received. The Clearing Broker also receives and distributes dividends and other distributions and processes exchange offers, rights offerings, warrants, tender offers and redemptions.

The Introducing Broker is responsible for the opening, approving and monitoring of the account and for the acceptance of securities orders.

14. **US Taxes - US Persons.** My Taxpayer Identification Number (TIN) is important. As with any financial account I open, I must list my current and correct Taxpayer Identification Number (TIN) – either my Social Security, Employer Identification, or Individual Taxpayer Identification Number. The TIN must be certified under penalties of perjury on my application when I open an account at the Introducing Broker.

If I don't provide the TIN, or the TIN I report is incorrect, I could be subject to backup withholding of 31% of taxable distributions and proceeds from certain sales and exchanges. I could also be subject to further penalties, such as:

- A $50 penalty for each failure to supply my correct TIN
- A civil penalty of $500 if I make a false statement that results in no backup withholding criminal penalties for falsifying information.

I also could be subject to backup withholding because I failed to report interest or dividends on my tax return as required by the Internal Revenue Service.

15. **US Taxes - Non US Persons.** Unless I advise you to the contrary I wish to apply for any benefits that I may be entitled to under any income tax treaty between my country of residence and the U.S.

I will separately notify you if I am i) acting as an intermediary, ii) a person claiming an exemption from U.S. withholding on income effectively connected with the conduct or a trade or business in the U.S., iii) a foreign partnership, foreign government, international organization foreign central bank, tax exempt organization or private foundation, or iv) eligible to obtain a reduced withholding rate for specific income as a result of meeting special conditions of a treaty provision.

I will also notify you if I subsequently become ineligible to receive benefits or there are other changes in my personal circumstances which change or invalidate the certifications I have provided to you.

**Beneficial Owner.** For payments other than those for which a reduced rate of withholding is claimed under an income tax treaty, the beneficial owner of income is generally the person who is required under U.S. tax principles to include the income in gross income on a tax return. A person is not a beneficial owner of income, however, to the extent that

CONFIDENTIAL                                                        SCB_Caso 00000045

person is receiving the income as a nominee, agent, or custodian, or to the extent the person is a conduit whose participation in a transaction is disregarded. In the case of amounts paid that do not constitute income, beneficial ownership is determined as if the payment were income. Foreign partnerships, foreign simple trusts, and foreign grantor trusts are not the beneficial owners of income paid to the partnership or trust. The beneficial owners of income paid to a foreign partnership are generally the partners in the partnership, provided that the partner is not itself a partnership, foreign simple or grantor trust, nominee or other agent. The beneficial owners of income paid to a foreign simple trust (i.e., a foreign trust that is described in section 651(a) of the US Internal Revenue Code) are generally the beneficiaries of the trust, if the beneficiary is not a foreign partnership, foreign simple or grantor trust, nominee or other agent. The beneficiaries of a foreign grantor trust (i.e., a foreign trust to the extent that all or a portion of the income of the trust is treated as owned by the grantor or another person under sections 671 through 679 of the US Internal Revenue Code) are the persons treated as the owners of the trust. The beneficial owners of income paid to a foreign complex trust (i.e., a foreign trust that is not a foreign simple trust or foreign grantor trust) is the trust itself. The beneficial owner of income paid to a foreign estate is the estate itself.

Permanent Residence Address. The permanent residence address is the address in the country where the beneficial owner claims to be a resident for purposes of that country's income tax. If a reduced rate of withholding is claimed under an income tax treaty, residency is determined in the manner required by the treaty. If the beneficial owner is an individual who does not have a tax residence in any country, the permanent residence address is where the beneficial owner normally resides. If the beneficial owner is not an individual and does not have a tax residence in any country, the permanent residence address is where it maintains its principal office.

Exempt foreign person for broker transactions. A beneficial owner is an exempt foreign person for a calendar year in which: (1) the beneficial owner is a nonresident alien individual or a foreign corporation, partnership, estate, or trust; (2) the beneficial owner is an individual who has not been, and does not plan to be, present in the United States for a total of 183 days or more during the calendar year; and (3) the beneficial owner is neither engaged; nor plans to be engaged during the year, in a U.S. trade or business that has effectively connected gains from transactions with a broker.

16. **Privacy of Account Holder Information.** You treat all information about me confidentially. You may exchange with your affiliates information that you maintain about me, including any credit or other information you may obtain from my application, consumer reports, or external sources.

    You may use information collected in connection with my application and the Account and from external sources to develop marketing offers (including mailing lists) for products or services offered by you and your affiliates that you think may be appropriate for me. At any time, I may direct you to exclude me from any marketing offer or mailing list, by calling you.

17. **Termination of Account.** I understand that the Account may be terminated by me or you at any time. Termination will result in the cancellation of my securities account and all other features or privileges. I understand that I remain responsible for all charges, debit terms or other transactions initiated or authorized by me whether arising before or after termination.

18. **Extraordinary Events.** You shall not be liable for loss caused directly or indirectly by government restrictions, exchange or market rulings, suspension or trading, war, strikes or other conditions beyond your control, including, but not limited to computer or telephone failure, market volatility or trading volumes

19. **Headings are Descriptive.** The heading of each provision is for descriptive purposes only and shall not be deemed to modify or qualify any of the rights or obligations set forth in each such provision.

20. **Separability.** If any provision or condition of this agreement shall be held to be invalid or unenforceable by any court, or regulatory or self-regulatory agency or body, such invalidity or unenforceability shall attach only to such provision or condition. The validity of the remaining provisions and conditions shall not be affected thereby and this agreement shall be carried out as if any such invalid or unenforceable provision or condition was not contained herein.

21. **Securities** offered by the Introducing Broker are not backed or guaranteed by any bank nor are they insured by the FDIC. Investments in the Account are subject to Investment risk, including loss of principal, and may lose value. I am aware that the Account is separate from any bank deposit account(s) I maintain with American Express Bank International. The Clearing Broker and Introducing Broker will receive compensation for directing the order equity flow. With respect to OTC transactions, compensation may be in the form of a per share cash payment. The Clearing Broker has selected certain market makers to provide execution of OTC securities transactions who have agreed to accept orders transmitted electronically up to a specified size and to execute them at or better than the national best bid or offer (NBBO). On larger orders, or if the designated market makers do not make a market in the subject security, the Clearing Broker directly contacts market makers to obtain an execution. The designated market makers to whom orders are automatically routed are selected based on the consistently high quality of their OTC executions in one or more market segments and/or their ability to provide opportunities for executions at prices superior to the NBBO. If an order for an exchange-listed security is not immediately executable on the exchange to which it is routed, the Clearing Broker may represent the order in the national marketplace using the various means available for price discovery.

    I agree to pay for brokerage commissions and other fees, as they exist from time to time and as they apply to my account, transactions and services I receive. You also agree to pay all applicable state and local excise taxes. A fee and commission table is available upon request.

22. **Other Terms.** All securities and other property now or hereafter held, carried or maintained by you in your possession or control in any of my accounts may be pledged and repledged by you from time to time, without notice to me, either separately or in common with other such securities and other property, for any amount due in the accounts of mine, or for any greater amount, and you may do so without retaining in your possession or under your control for delivery a like amount of similar securities or other property.

    Within the limitations imposed by applicable laws, rules and regulations, you are hereby authorized to lend to yourselves, as principal or otherwise, or to others, any securities held by you on margin for any accounts of mine or as collateral therefore, either separately or with other securities. It is recognized that any losses or other detriments, or gains or other benefits, arising from any such lending of securities shall not accrue to my account.

    THIS AGREEMENT AND ITS ENFORCEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF MINNESOTA WITHOUT GIVING EFFECT TO ITS CHOICE OF LAW OR CONFLICTS OF LAW PRINCIPLES; SHALL COVER INDIVIDUALLY AND COLLECTIVELY ALL BROKERAGE ACCOUNTS WHICH I MAY OPEN OR REOPEN WITH YOU, OR WHICH MAY BE INTRODUCED TO YOU, INCLUDING YOUR SUBSIDIARIES AND AFFILIATES, THROUGH THE COURTESY OF THE AFOREMETIONED INTRODUCING BROKER; SHALL INURE TO THE BENEFIT OF YOUR AFFILIATES AND YOUR SUCCESSORS, AND THOSE OF THE AFOREMENTIONED INTRODUCING BROKER, WHETHER BY MERGER, CONSOLIDATION OR OTHERWISE, AND ASSIGNS, AND THOSE OF THE AFOREMENTIONED INTRODUCING BROKER; AND THIS AGREEMENT SHALL BE BINDING UPON MY HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS AND ASSIGNS.

    By reading and accepting the terms of this agreement, I acknowledge (1) that, in accordance with the Arbitration section, I agree in advance to

CONFIDENTIAL

SCB_Caso 00000046

arbitrate any controversies which may arise with the Introducing Broker or Clearing Broker and (2) that, certain of my securities may be loaned to you or loaned out to others.

P.O. BOX 450550
MIAMI, FL 33245-0550

1-305-350-7750

## CONTACTING AMERICAN EXPRESS

I may contact you using the following address and phone number. I may also write you at the Introducing Broker location identified on the account application.

### Fee Schedule

**Brokerage Service Fees**

| | |
|---|---|
| Transaction Commissions/fees | by arrangement |
| Returned Check | $15 |
| Legal Transfers | $20 |
| Transfer Out | $50 |
| Certificate Delivery | $15 |
| Courier Service | $35 |

**Trade Related Fees**

| | |
|---|---|
| Late Trade Settlement | $15 ($30 maximum client charge per settlement date) |
| SEC Transfer | $0.01 per $300, or fraction thereof, on all equity and options sale transactions. SEC Transfer fee applies to all U.S. non-debt securities subject to prompt last sale reporting. |

Securities offered are not backed or guaranteed by any bank nor are they insured by the FDIC.

Investments in the Account are subject to investment risk, including loss of principal, and may lose value.

CONFIDENTIAL                                      SCB_Caso 00000047

**EXHIBIT B**



**American Express**
**Bank International**

# NONDISCRETIONARY INVESTMENT SERVICES AGREEMENT

(Information Should be Completed on Pages 13 and 14)

**1. Agreement to be Bound by this Agreement, and other Applicable Agreements**

  a.   *Generally.* Each of the undersigned (hereinafter referred to individually and collectively as "Customer") hereby (i) opens the Investment Account specified below with American Express Bank International ("AEBI"), (ii) requests AEBI to act as Customer's agent and/or as principal in effecting Transactions (as defined below) with Customer pursuant to the provisions of this Nondiscretionary Investment Services Agreement (this "Agreement"), (iii) adopts and agrees to be bound by this Agreement (which, effective as of the date at the end of this Agreement, shall replace and supersede any Nondiscretionary Investment Management Agreement previously signed by Customer), (iv) adopts and agrees to be bound by any other account agreements, rules and regulations or other agreements entered into by or applicable to Customer in connection with the establishment of the Bank Account (specified below) and/or the Investment Account, and (v) confirms the statements and makes the requests and the agreements set forth in this Agreement.

  b.   *Joint Accounts; Multiple Person Customer.* If Customer is more than one person or entity: (i) each Customer will be fully liable jointly and severally for any amounts due or which become due under this Agreement, but AEBI may sue any or all of them for these amounts (plus the legal costs associated with any such suit), and (ii) all holdings of the Investment Account shall be held as joint tenants with right of survivorship.

**2. Agency Appointment; Authorization to Act as Principal; Services**

  a.   *Agency Appointment; Authorization to Act as Principal.* Customer appoints and authorizes AEBI to be Customer's agent, for Customer's account, in connection with all aspects of any and all transactions with any party, including but not limited to (i) purchasing, investing in, trading, transferring, exchanging, converting, redeeming, lending, holding, and/or selling any and all securities, commodities, derivatives, instruments, deposits, funds, currencies, and any other assets, (ii) borrowing, pledging, and/or granting a security interest in any holdings of the Investment Account, (iii) entering into any repurchase, reverse repurchase, swap, exchange, or other derivative transactions, and/or (v) issuing (writing) options ("Transactions"). (All holdings of the Investment Account, whether assets, liabilities, or otherwise, are referred to in this Agreement as the "Holdings.") As to any Transaction requested by Client to be effected under this Agreement, Customer also authorizes AEBI in its discretion to enter into any such Transaction as principal rather than as Customer's agent, in which event Customer shall be AEBI's counterparty. AEBI's appointment and authorization as agent and/or the authorization for AEBI to act as principal will not be affected by Customer's disability, incapacity, or incompetency, and shall remain in full force and effect until such time as AEBI receives written notice of its rescission or, if earlier, the termination of this Agreement. Bank may require Customer to execute such written purchase and/or sales orders and/or other documents as AEBI deems appropriate in its sole discretion in connection with Transactions.

  b.   *Bank Acting Directly or Indirectly.* AEBI, when acting as agent or principal under this Agreement, whether directly or indirectly through any of its directors, officers, employees, agents, brokers, correspondents, depositories, custodians, delegates, dealers, employees, futures commission merchants, nominees, or representatives ("Agents"), is referred to herein as the "AEBI". Any reference herein to AEBI making any decision, entering into any Transaction, and/or taking or refraining from taking any action shall be understood to refer to AEBI doing so directly and/or through any of its Agents. The appointment of AEBI as Customer's agent may be supplemented by any documents regarding the appointment of an agent required by any Agent, and any Transaction entered into on behalf of Customer may be subject to any requirements and conditions imposed by any Agent. AEBI, as Customer's agent, (i) may maintain brokerage or other accounts directly with one or more Agents or other parties, which accounts may, at AEBI's election, be held in AEBI's name, and (ii) may deposit Holdings with depositories and clearing corporations and systems on a book-entry basis or otherwise. Customer shall have full beneficial ownership of all Holdings held in such accounts or so deposited.

  c.   *Bank Acting as Agent.* When AEBI acts as Customer's agent, all orders for purchase or sale of any Holdings shall be executed by AEBI at the then current market price as determined by AEBI (plus or minus, as the case may be, any applicable sales load, sales charge, commission, and/or other fees, if any). Minimum purchase orders, limitations, restrictions, charges, sales loads, sales charges, commissions, other fees, and other requirements for Transactions may be as prescribed by any Agent, and Transactions are subject to the provisions of any agreement of AEBI with, and any regulations of, any Agent. All orders will be subject to acceptance or rejection by any Agent in its sole discretion.

  d.   *Services.* As Customer's agent, AEBI's services may include opening accounts with one or more Agents for the Transactions of AEBI's customers (including Customer), transmitting Customer's information, documents, and instructions, as appropriate, to any Agent, subject to paragraph 5.b. transmitting to Customer communications sent to AEBI for transmittal to Customer by or on behalf of any Agent, effecting payment for, and receiving the proceeds of Transactions; receiving income from Customer's Holdings; and providing securityholder and administrative services in connection with Customer's beneficial ownership of Holdings.

  e.   *Transactions with AEBI or any Affiliate.* Customer authorizes AEBI in its sole discretion, on behalf of Customer, to enter into any Transactions with any office worldwide of AEBI or of any affiliate or subsidiary of AEBI (any such office being referred to herein as "AEBI or any Affiliate"), including but not limited to the employment of AEBI or any Affiliate as AEBI's Agent. Customer (i) acknowledges that the provisions of this subparagraph may, without Customer's consent, violate AEBI's duty of loyalty to Customer, (ii) consents to, and waives any real or apparent conflict of interest that may result from, any such Transactions, and (iii) waives any right to receive advice in connection therewith.

CONFIDENTIAL

SCB_Caso 00000048

3. **Customer's Indemnification of AEBI**

Each Customer hereby expressly releases AEBI and agrees jointly and severally to indemnify, defend (upon AEBI's request), reimburse, and hold AEBI harmless from, and agrees that AEBI shall not have any loss on account of or liability for any and all claims against AEBI and any and all costs, expenses, fees, losses, damages (including loss of income and opportunity costs), or liabilities AEBI might incur, including any legal costs and expenses and any costs and expenses of enforcing this indemnity or any other provision of this Agreement (collectively "Claims") arising by reason of entering into or performing pursuant to this Agreement, including, but not limited to, any loss of income or Holdings, any diminution in value of Holdings, any taxes, any disposition, transfer or withdrawal of Holdings, legal fees, and brokerage fees. Customer's obligations under this paragraph shall survive the termination of this Agreement and Customer's death or incapacity.

4. **Fees, Charges, Set-Off, and Payments**

   a. **Fees.** AEBI shall receive for its services the fees set forth in its (Schedule of Fees and Charges) in effect from time to time. In addition, every Transaction and every Holding will be subject to any applicable fees, charges, and expenses of any Agent and/or any applicable broker, custodian, advisor, portfolio manager, correspondent, or other service provider - including, in the case of securities of any mutual fund, the fees and other charges of such mutual fund's investment advisor - even if the service provider or mutual fund investment advisor is AEBI or any Affiliate. In addition, in making any purchase or sale or other Transaction, including foreign exchange transactions, AEBI or any Affiliate and any Agent is authorized to act as principal, agent or broker, and to be separately compensated in that capacity. Customer authorizes the receipt of such compensation referred to in the preceding sentence and waives any special computation or accounting, and may revoke this authorization at any time by notifying AEBI in writing. Customer (i) acknowledges that the provisions of this subparagraph may, without Customer's consent, violate AEBI's duty of loyalty to Customer, (ii) consents to, and waives any real or apparent conflict of interest that may result from incurring and paying any such fees, charges, and expenses, and (iii) waives any right to receive advice thereof.

   b. **Charges and Set-Off.** Customer shall be, and if there shall be more than one Customer, all Customers shall be jointly and severally, liable for payment of all fees, charges and Claims (collectively "Charges"). Such payment may be effected by charge to the Bank Account or any other account maintained by any Customer, individually or jointly with AEBI or any Affiliate or, in AEBI's sole discretion, by charge to the Holdings of the Investment Account. In the event that there are insufficient funds in such accounts or the Investment Account to pay any Charges, Customer will be billed. The Investment Account shall at all times be subject to AEBI's right of set-off.

   c. **Payments from Other Sources.** Customer (i) authorizes AEBI or any Affiliate to receive payments from any Agent or issuer (including any mutual funds or other investment companies) whose securities are held by the Investment Account, for services in connection with any Transactions or for providing investment advice and/or administrative or other services thereto, and (ii) ratifies any and all prior receipts of such payments. Any such payments received by AEBI or any Affiliate shall inure to its exclusive benefit, and Customer and the Investment Account shall have no interest therein. Customer (i) acknowledges that the provisions of this subparagraph may, without Customer's consent, violate AEBI's duty of loyalty to Customer, (ii) consents to, and waives any real or apparent conflict of interest that may result from, the receipt of any such payments by AEBI or any Affiliate, and (iii) waives any right to receive advice thereof.

5. **Standard of Care; Limited Liability**

   a. **Standard of Care.** Subject to the other provisions of this Agreement, AEBI shall exercise the same care and diligence in the safekeeping of the Investment Account's Holdings as AEBI would exercise with respect to AEBI's own holdings. AEBI may exercise any of its powers and perform any duties required of it through any Agent selected by it in its sole discretion based on AEBI's evaluation of, among other factors, the Agent's execution, reporting, and other services and pricing. AEBI and its Agents shall be entitled to the advice of counsel at Customer's expense, concerning all questions relating to the Investment Account, Transactions, and the Agreement.

   b. **Minimum Size of Transactions.** Notwithstanding anything in paragraph 2.c to the contrary, AEBI may require that Transactions through it shall be conducted in minimum amounts, which may be larger than minimum amounts required by any Agent. Such minimum amounts may be changed by AEBI from time to time by noting such changes on its books and records. Information about AEBI's applicable minimums shall be available to Customer upon request.

   c. **Provision of Information and Materials to Customer.** AEBI from time to time may provide Customer with information (such as prices, rates, and yields) and/or materials (such as explanatory memoranda, promotional materials, sales literature, prospectuses, and reports) applicable to any actual or prospective Holdings of the Investment Account; provided by sources available to AEBI (including any issuer or Agent). AEBI makes no representations or warranties whatsoever regarding the merits thereof or of any matter contained in any such information or materials and shall not be responsible for the accuracy or completeness thereof, and Customer agrees to look solely to such sources for responsibility regarding same.

   d. **Limited Liability.** AEBI shall not be liable for the exercise of any action, inaction, omission or for any other matter whatsoever in connection with the Investment Account, or for any loss or depreciation in value of the Investment Account's Holdings, unless resulting from AEBI's gross negligence, willful misconduct, or bad faith. To the fullest extent permitted under applicable law, AEBI shall not be responsible for any act or omission of any Agent of AEBI if AEBI used good faith and ordinary care in the selection of such Agent. In any event, AEBI shall not be liable for any special, consequential, or punitive damages. AEBI shall have no liability for any failure or delay to fulfill its obligations under the Agreement or to carry out any of Customer's instructions, as a result of war, insurrection, strikes, government regulations, telecommunications facilities' failure, force majeure, or other conditions or causes beyond AEBI's control. AEBI shall not be liable for any errors of fact or judgment so long as it acts in good faith. AEBI does not assume responsibility for losses nor does it guarantee gains for the Investment Account, and AEBI shall not be liable for any tax consequences occasioned by AEBI's taking or refusing to take any action for the Investment Account.

   e. **United States Taxes.** Customer acknowledges that, under certain circumstances, Transactions may be or become subject to taxation in the United States. Customer agrees to supply AEBI, any Agent, or any issuer with all documentation (including certification of nonresident status, if applicable) as may be required under United States law. Customer further agrees that (i) any amounts required by U.S. law to be withheld from Customer's Holdings, payments from Holdings, and income derived from Holdings shall be withheld and paid to the United States Internal Revenue Service or other appropriate authority by AEBI or any Agent or issuer, as required by law; and (ii) AEBI or any Agent or issuer, as appropriate, shall make any returns or reports to or hold them available for the United States Internal Revenue Service or other appropriate authority regarding Customer's Transactions as shall be required by law.

CONFIDENTIAL                                                                                    SCB_Caso 00000049

f. **Non-U.S. Transactions.** Customer understands that dealing in non-U.S. markets involves different risks from dealing in the United States markets and that the potential for profit or loss from Holdings in such markets may be affected by fluctuations in foreign exchange rates. Customer understands that a loss in value of such non-U.S. Holdings could occur if there is a devaluation of the currency of the applicable country or if foreign exchange control regulations are imposed in any such country that make it difficult or impossible to convert the currency to U.S. dollars and/or to return any non-U.S. currency to Customer in the United States. AEBI will not be responsible for any such losses or for acting or failing to act with respect to them, so long as AEBI acts in good faith.

g. **Errors in Transactions.** Customer shall, promptly after delivery to Customer, notify AEBI of any errors in any confirmations of Transactions. If AEBI receives no objection within five days after delivery, all such Transactions shall be deemed conclusive and made in conformity with the instructions given and shall be deemed correct.

h. **No Insurance Against Losses.** AEBI does not undertake to insure Customer or the Investment Account against any losses.

i. **No Bond Required.** No bond or other security shall be required of AEBI or any of its Agents.

j. **Legal Proceedings.** AEBI shall have no obligation to institute or defend any legal, administrative, or arbitration proceeding on behalf of the Investment Account, its holdings, Customer, or Customer's successors and assigns, but AEBI may do so in its discretion, in which event AEBI's legal and other expenses with respect thereto shall be deemed to be additional Charges.

6. **Transfer and Receipt of Funds**

a. **Customer Instructions.** Each instruction by Customer to AEBI to effect any purchase for the Investment Account shall also constitute (whether or not expressly stated) Customer's authorization and direction to the AEBI: (i) at the AEBI's discretion to debit the Bank Account or to restrict it for the amount of the purchase and any sales load or fees at the time AEBI receives Customer's instruction to effect the purchase, (ii) to receive Customer's funds transferred from sources other than the Bank Account, (iii) to hold any amount debited or funds received in a segregated non-interest bearing account for Customer until such time as settlement for the purchase shall be required, and (iv) at the time such settlement is required, to transfer such amount from the Bank Account or such segregated account, as the case may be, by any means reasonably chosen by AEBI to effect any payment in connection with the purchase.

b. **Insufficient Funds.** AEBI shall not be obligated in any manner to effect any purchase at Customer's request beyond the amount of collected funds available in the Bank Account or received from other sources at the time AEBI acts upon the purchase instructions. AEBI may delay acting upon purchase instructions until such time as sufficient collected funds are available for the settlement of any purchase instructions. Nevertheless, AEBI may, in its sole discretion, but shall not be obligated to, create an overdraft in the Bank Account to any extent necessary to carry out Customer's purchase instructions. Any such overdraft shall be subject to Customer's obligations to AEBI regarding overdrafts in the Bank Account in accordance with the General Terms and Conditions, including but not limited to the obligation to pay applicable interest charges. Any debit balances from time to time in the Investment Account shall be treated as overdrafts and charged with interest accordingly, and shall also be subject to such other charges as AEBI may impose in accordance with its Schedule of Fees and Charges.

c. **Receipt of Funds.** Any money received by AEBI for Customer shall be deposited to the Bank Account or transferred in accordance with Customer's instructions, subject to any tax withholding requirements.

d. **Currency of Transactions.** All Transactions shall be conducted in United States dollars, unless otherwise agreed to by AEBI.

e. **Foreign Currency Transactions.** Customer agrees, unless Customer notifies AEBI otherwise in writing, that in effecting any foreign exchange transaction in connection with executing any purchase or sale or otherwise complying with Customer's instructions relating to any Transaction, AEBI (including any Agent) may act as counterparty, principal, underwriter, agent, broker, or in any other capacity, and may be compensated separately in each such capacity.

7. **Transfer, Termination, Withdrawal, Addition**

a. **Pledge or Grant of Security Interest.** Customer may, at any time, make a pledge or a grant of a security interest in the Investment Account and its Holdings (a "Pledge") to AEBI or any Affiliate (the "Lender") as collateral for a loan or other credit facility or financial accommodation (a "Credit Facility") granted by the Lender to Customer or to another party or parties. In any such event, Customer agrees, at the request of the Lender or AEBI, to execute and deliver to the Lender or AEBI all documents requested by the Lender or AEBI to accomplish the Pledge. Notwithstanding anything to the contrary in this Agreement, Customer agrees that, until all obligations of Customer are fully discharged, (i) such Pledge shall operate to place the Lender's or AEBI's claims against the Investment Account in a position prior to those of each Customer and of any Executor or Guardian of such Customer, and (ii) AEBI and the Lender may provide each other with information with respect to the Investment Account's Holdings and the status of the Credit Facility. Customer (A) acknowledges that the provisions of this subparagraph may, without Customer's consent, violate AEBI's duty of loyalty to Customer, and (B) consents to, and waives any real or apparent conflict of interest that may result from, the provisions of this subparagraph, and (iii) Customer waives any right to receive advice of any action authorized pursuant to this subparagraph. If there is more than one Customer, any or all of the Customers may agree to such pledge or hypothecat on without the consent of any of the other Customers, but AEBI reserves the right in its discretion to require that all Customers agree to such pledge or grant of a security interest and execute documentation that is appropriate in the view of the Lender and AEBI.

b. **Customer's Death (Natural Persons).** Upon the death of Customer, or upon the death of the last surviving Customer if there is more than one, AEBI shall transfer ownership of the Investment Account upon the following terms and conditions:

(i) The Investment Account shall be transferred to the personal representative, executor, or administrator of the estate of the last surviving Customer (the "Executor"), as the case may be, provided that AEBI may require the Executor to present such documentation as AEBI may deem appropriate in its sole discretion, including but not limited to documentary proof that the Executor was duly and legally appointed and/or one or more legal opinions regarding the Executor's authority with respect to the Investment Account.

(ii) The ownership of the Investment Account shall be transferred as provided herein within a reasonable period of time after (A) AEBI has received adequate legal notice of the death of the last surviving Customer and any additional documentation AEBI may deem appropriate in its sole discretion, (B) all Charges are paid, (C) all of

CONFIDENTIAL                                                                       SCB_Caso 00000050

Customer's obligations to AEBI have been satisfied in full, and (D) AEBI is assured, in its sole judgment, that there exists (1) no prior or conflicting claim, including without limitation any claim against the Investment Account, Customer or Customer's estate, and (2) no legal impediment to, and no risk to AEBI from effecting, such transfer.

(iii)   Customer understands that there could be estate tax liability in the United States if the Investment Account has Holdings subject to such taxes on the date of death of a Customer.

(iv)   If Customer has pledged the Investment Account's Holdings to AEBI as security for one or more loans, then, notwithstanding anything herein to the contrary, any transfer of the Holdings of the Investment Account to any Executor or Guardian of any Customer shall be suspended until payment is made in full to AEBI. If so requested by the Lender upon the death of any Customer, the Holdings of the Investment Account shall be withdrawn to pay the obligations of Customer to the Lender in full, and the remainder, if any, of the Investment Account's Holdings shall remain in the Investment Account or, if applicable, transferred under the provisions hereof.

(v)   Each Customer hereby expressly releases AEBI and agrees jointly and severally to indemnify, defend (upon AEBI's request), reimburse, and hold AEBI harmless from, and agrees that AEBI shall not have any loss on account of or liability for (including, but not limited to, reasonable attorneys' fees), any and all Claims arising by reason of AEBI's transfer of the Investment Account as provided herein and/or from any claim to or against the Investment Account or Customer's estate or against Customer.

(vi)   AEBI makes no representation to Customer that the Investment Account is not subject to the laws of jurisdictions other than the jurisdiction where the Investment Account is booked by AEBI.

  c.   **Appointment of Guardian (Natural Persons).** In the event that a personal representative, committee, conservator, guardian, or the like ("Guardian") for a Customer shall be appointed by any court of competent jurisdiction during a Customer's lifetime, then while the appointment of such Guardian shall be in effect, the Guardian may not make a withdrawal from the Investment Account unless (i) said court and all other Customers, if any, consent thereto or (ii) a court of competent personal jurisdiction acting pursuant to legal authority orders AEBI to allow such withdrawal. AEBI may require the Guardian to present such documentation as AEBI may deem appropriate in its sole discretion, including but not limited to documentary proof that the Guardian was duly and legally appointed and/or one or more legal opinions regarding the Guardian's authority with respect to the Investment Account.

  d.   **Early Termination by AEBI.** At any time AEBI may terminate this Agreement and the Investment Account and effect the transfer (subject to the other provisions of this Agreement) of any or all of the Investment Account's Holdings to Customer or to any Executor or Guardian thereof, for any reason, in AEBI's sole discretion.

  e.   **Withdrawal or Addition by Customer.** Subject to any additional requirements specified in this Agreement, any or all of the Customers (without the consent of any of the other Customers) may withdraw all or any part of, or (subject to AEBI's consent) add to, the Holdings of the Investment Account. Unless agreed otherwise by AEBI in its discretion and the Customer(s) requesting same, AEBI shall effect any such withdrawal by transfer to such Customer(s), subject to any obligations of Customer and claims against the Investment Account, and after (A) any and all Charges are paid and (B) AEBI is assured, in its sole judgment, that there exists (1) no prior or conflicting claim, including without limitation any claim against the Investment Account or Customer's estate or Customer and (2) no legal impediment to, and no risk to AEBI from permitting, such withdrawal. AEBI may, in its sole discretion, permit such withdrawal subject to any such claim if it is assured, in its sole judgment, that such withdrawal would not subject AEBI to any risk.

**8.   Valuations**

Customer understands and agrees that valuations of Holdings held in the Investment Accounts set forth in any account statement or other document furnished to Customer are provided for information purposes only, are confidential, and are intended solely for Customer's use. The valuations may not represent the actual or indicative terms at which new (or economically equivalent) transactions could be entered into or the actual or indicative terms at which existing (or such equivalent) transactions could be liquidated, assigned, or unwound. AEBI may derive valuations for property set forth on any account statement or other document through the use of proprietary pricing models and/or any external pricing service selected by AEBI in AEBI's sole discretion, and estimates and assumptions about relevant future market conditions and other matters, all of which are subject to change without notice. Any such changes may have a material impact on the valuations provided, and valuations based on other models or different assumptions may yield materially different results. No guaranty or warranty is made as to the reasonableness of any assumptions or the accuracy or completeness of the models or market data, whether internally or externally generated. Accordingly, Customer understands that Customer should not regard the valuations as advice by AEBI in respect of Customer's positions or as the sole basis for valuing such positions, and Customer should discuss with Customer's accountants, attorneys, investment advisors, and other representatives whether and to what extent these valuations may be useful in the preparation of federal and state tax returns, financial statements, regulatory reports, or otherwise. Customer acknowledges that the valuations set forth on account statements or other documents furnished by AEBI may vary significantly from the estimates used by AEBI in valuing transactions involving property for purposes of AEBI's internal book and records and other purposes.

The valuations do not reflect (i) any bid/offer spread customary for these instructions, and (ii) other factors and costs which could affect value, including, without limitation, the liquidity of such transaction (or related hedges), AEBI's portfolio configuration, credit policies, and prevailing market factors as well as general business considerations. Accordingly, the valuations of property held in the accounts may not reflect the actual or realizable value of such property and may not reflect the total cost Customer would incur if a termination, transfer, or other action with respect to the property were effected, and no assurance can be given that any such termination, transfer, or other action would be available to Customer at those values or at all. The valuations are not, and Customer shall not construe them as, an offer to enter into or terminate any transaction. AEBI expressly disclaims any responsibility for (i) the accuracy of any proprietary or external models, pricing services, and/or estimates used in deriving the valuations set forth in any account statements, (ii) any errors or omissions in market data or reference sources on which such values are based or in computing or disseminating the valuations, and (iii) any uses to which the valuations are put. Neither AEBI nor any of AEBI's affiliates shall be liable for losses, costs, expenses or damages (incidental, special, consequential, compensatory, punitive, or otherwise) arising out of any use of or reliance on any valuation of any property set forth in any account statement.

**9.   Miscellaneous**

  a.   **Arbitration of Controversies.** Customer and AEBI agree that all controversies between Customer and AEBI and/or any Agents arising out of or

CONFIDENTIAL

SCB_Caso 00000051

concerning this Agreement, the Investment Account, Transactions, Holdings or any related matter shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Any arbitration proceeding between AEBI and Customer shall be held in Miami-Dade County, Florida. The award of the arbitrator, if one, or a majority of the arbitrators, if more than one, shall be final. Judgment on the award rendered may be entered in any state or federal court having jurisdiction. Customer understands and agrees that:

   (i)     Arbitration is final and binding on the parties.

   (ii)    The parties are waiving their rights to seek remedies in court, including the right to a jury trial.

   (iii)   Pre-arbitration discovery is generally more limited than and different from discovery in connection with court proceedings.

   (iv)    The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.

   (v)     The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

   b.   **Applicable Law; Jurisdiction; Waiver of Jury Trial and Other Waivers.** The Investment Account and this Agreement shall be governed by and construed in accordance with the laws of the State of Florida. Any claim or action arising under this Agreement, and not subject to arbitration in accordance with Section 9(a) above may be brought in the state or federal courts located in Miami-Dade County, Florida and Customer hereby irrevocably consents to and accepts the jurisdiction of such courts. CUSTOMER HEREBY WAIVES THE RIGHT TO A JURY TRIAL IN ANY SUCH ACTION AND UNDERSTANDS THAT SUCH WAIVER IS A CONDITION TO AEBI'S ACCEPTANCE OF THIS AGREEMENT.

   c.   **Entire Agreement; No Oral Changes or Amendments; Amendment by AEBI.** This Agreement represents the entire agreement of the parties with respect to the matters contained herein and may not be amended, changed, or terminated except in writing signed by AEBI. Notwithstanding the foregoing, AEBI reserves the right to amend the terms and conditions set forth in this Agreement at any time. AEBI shall provide notice of any such amendment or change to Customer by mail, and all such amendments and changes shall take effect with respect to the Investment Account, 30 days after the date on which such notice is mailed or on any later date specified in such notice (unless prohibited by applicable law or regulation, in which case such amendments and changes shall take effect after any length of time required by applicable law or regulation).

   d.   **English Version Controlling.** A Spanish translation of this Agreement may be provided for the convenience of Customer. Nevertheless, Customer understands and agrees that the English language version of this Agreement shall control in the event of any differences in meaning.

   e.   **Conflict with other Account Agreements and Documentation.** This Agreement is intended to be read and applied in conjunction with the other account agreements and other documents entered into by or applicable to Customer; however, in the event and to the extent there is any conflict or inconsistency between the provisions of this Agreement and such other agreements and documentation, the provisions of this Agreement shall control as to the Investment Account.

   f.   **Verbal Instructions.** Although AEBI reserves the right subject to Section 12 hereof to require that any instructions Customer gives AEBI be in writing from time to time, Customer or another acting on Customer's behalf may, if AEBI consents, give AEBI instructions verbally, whether in person or by telephone. Customer agrees to indemnify AEBI and hold AEBI harmless from any cost or loss which AEBI or Customer or any other party may incur or suffer by reason of AEBI honoring or complying with any and all oral instructions. Under no circumstances shall Customer seek to hold AEBI or any of the Agents liable for any losses suffered by reason of AEBI or any Agent honoring or complying with any verbal instructions believed by AEBI or the Agents to be genuine except in the case of AEBI's gross negligence or willful misconduct. (Customer hereby consents on an ongoing basis to the recording of any telephone conversations Customer may have with AEBI and/or any of the Agents).

10.   **Customer's Representations and Warranties**

AEBI may rely on the information set forth below until written notice of any change is received by AEBI. Each Customer represents and warrants to AEBI that:

   a.   Customer is not, and reasonably expects not to be, engaged in a trade or business in the U.S. during any calendar year and if a natural person, Customer is not a citizen or resident of the U.S. and has not been, and reasonably expects not to be, present in the U.S. for a total of 183 or more days during any calendar year (or, in either case, gains from Customer's transactions are exempt from U.S. federal income taxation under a U.S. tax treaty). If a corporation or other entity, Customer is not incorporated or organized under the laws of the U.S. or of any state or possession thereof.

   b.   Customer has full right, power, and authority, and if a natural person, Customer is of legal age and possesses the necessary legal capacity to execute, deliver, and perform the Agreement. The Agreement constitutes each Customer's valid and binding contract, enforceable against each Customer in accordance with its terms.

   c.   The execution, delivery, or performance by Customer of the Agreement is not, and will not be, in violation of any provision of any charter, by-law, other agreement, law, regulation, order or court process or decision to which Customer is a party or by which Customer or Customer's properties are bound or affected.

   d.   There are no outstanding liens against, or security interests in, the Investment Account or Holdings of the Investment Account. Customer agrees that the Customer will neither create, nor suffer the creation of, any lien or security interest against the Investment Account or its Holdings, with the exception of liens or security interests in favor of AEBI or any Affiliate.

CONFIDENTIAL

SCB_Caso 00000052

11. **INVESTMENT RISKS. CUSTOMER UNDERSTANDS, ACKNOWLEDGES, AND AGREES AS FOLLOWS:**

a. THE INVESTMENT ACCOUNT AND ALL HOLDINGS (i) ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION (FDIC); (ii) ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, AEBI (EXCEPT TO THE EXTENT THAT A SPECIFIC HOLDING REPRESENTS THE EXPLICIT OBLIGATION OR GUARANTY OF AEBI); AND (iii) ARE SUBJECT TO INVESTMENT RISKS INCLUDING POSSIBLE LOSS OF PRINCIPAL AND/OR DEPRECIATION IN VALUE. CUSTOMER ALSO UNDERSTANDS THAT ANY HOLDING MAY NOT BE READILY MARKETABLE.

b. AEBI IS NOT ACTING AS A FIDUCIARY TO CUSTOMER IN CONNECTION WITH ANY TRANSACTION, THE INVESTMENT ACCOUNT, ANY HOLDINGS AND/OR THE AGREEMENT. AEBI HAS NO RESPONSIBILITY WHATSOEVER FOR THE PERFORMANCE OF ANY TRANSACTION, ANY HOLDINGS AND/OR THE INVESTMENT ACCOUNT.

c. CUSTOMER IS A SOPHISTICATED INVESTOR WHO WILL MAKE EACH INVESTMENT DECISION AFTER CONSIDERING ALL OF THE RISKS INVOLVED AND WILL NOT RELY ON ANY STATEMENT, REPRESENTATION, WARRANTY, INFORMATION, RECOMMENDATION, SUGGESTION, OPINION, OR ACTION, OR THE ABSENCE THEREOF, BY AEBI OR ITS REPRESENTATIVES. AEBI MAY TAKE POSITIONS FOR ITS OWN PORTFOLIO THAT DIFFER FROM ANY THAT IT MAY RECOMMEND TO, OR THAT MAY BE TAKEN BY, CUSTOMER.

d. IF CUSTOMER INVESTS IN EMERGING MARKET SECURITIES, THE FOLLOWING PARAGRAPH SHOULD BE REVIEWED CAREFULLY: Investing in emerging markets securities typically involves substantially more investment risk than investing in non-emerging markets securities, and may involve special risks not typically associated with investing in the United States or in other developed countries. These risks include revaluation of currencies, high rates of inflation, repatriation restrictions on income and capital, and future adverse political and economic developments. Securities issued in emerging markets also may be less liquid, subject to government ownership controls, and delayed settlements. The investment performance of emerging markets securities may be extremely volatile, and may be adversely affected by political, economic and/or market events, including but not limited to war, insurrection, strikes, trade disputes, political succession and/or the imposition of foreign currency exchange controls or restrictions.

12. **Communications**

a. **Communications to AEBI.**

(i) Notices and communications by Customer to AEBI shall be effective only upon receipt in writing at the address specified in the Bank's records for correspondence and other communications with AEBI (the "Bank Address"). AEBI shall at all times have the right, in its discretion, to refuse to accept any instructions that it deems to be unsuitable or unacceptable for any reason whatsoever.

(ii) If Customer is more than one person or entity, each Customer understands and agrees that AEBI may follow the instructions of any of them, which instructions shall be binding upon all Customers, without obtaining the consent of the other(s) (including but not limited to instructions relating to the disposition, transfer, or withdrawal of any of the Investment Account's Holdings), and that AEBI has no duty to inquire as to the purpose or propriety of any such instructions. Each Customer hereby expressly releases AEBI, and agrees jointly and severally to indemnify, reimburse, and hold AEBI harmless from, and agrees that AEBI shall not have any loss on account of or liability for, any and all Claims arising by reason of or following any such instructions.

(iii) Customer agrees to comply with any procedures AEBI may establish regarding the giving of instructions, including procedures for all Bank customers. In any event, instructions shall be deemed given to AEBI only when received and accepted by AEBI at the Bank's Address, and only if otherwise satisfying AEBI's requirements. All instructions shall be irrevocable once given unless AEBI shall agree otherwise in each specific instance.

(iv) Customer may place orders and solicit price quotations only during AEBI's normal business hours on any day on which the office where the Investment Account is booked (the "Booking Office"), the office where the Investment Account relationship is managed (if different from the Booking Office), and the New York Stock Exchange are open for the transaction of normal business (a "Business Day"). AEBI shall treat all instructions as market orders, that is, as orders to be executed under current market conditions, unless Customer specifically directs otherwise. Customer acknowledges and understands that AEBI will not be liable for any damages or lost profits in the event that AEBI is unable or declines to execute any of Customer's orders. Instructions shall be subject to all applicable laws, regulations, rules, policies, procedures, and requirements of any and all governmental authorities, self-regulatory organizations, exchanges, markets, issuers, and Agents. If AEBI receives Customer's instructions on a Business Day before 3:00 p.m. Eastern Standard Time, it ordinarily will act on them within one Business Day thereafter but shall not be liable for any reasonable delay in effecting any instructions.

(v) Since the time available for AEBI to consider telecommunications requests is relatively short, it is hereby agreed that if, after receiving and considering a request, AEBI determines in its sole judgment that (A) it cannot for any reason comply with or fulfill such a request, in whole or in part, AEBI may, in its sole discretion, comply with or fulfill the request in part only or not at all, and (B) if the request is unclear or additional details or information are required in order for AEBI to comply with or fulfill it, in whole or in part, AEBI may, in its sole discretion, comply with or fulfill the request in part only or not at all, delay in complying with or fulfilling it in whole or in part, until additional details or information are received, or take any other action in accordance with AEBI's understanding of the request. Notwithstanding any oral acceptance by AEBI or any of its Agents of any telecommunications request, it may, for any reason (including without limitation commercial or other considerations or changes therein or in any other circumstances), reject such request, in whole or in part, whereupon AEBI shall be entitled, in its sole discretion, to comply with or fulfill such request in part only or not at all. Customer's failure to perform any obligation to AEBI under this Agreement shall not be excused by AEBI's not complying with instructions or complying with instructions only in part.

CONFIDENTIAL

SCB_Caso 00000053

   b. **Communications to Customer.** All notices and communications to Customer, other than Information Documents (as defined below), shall be effective, deemed received, and constitute personal delivery to Customer (i) when sent, whether by mail or by telex, fax, E-mail, or other telecommunications media, to Customer's address specified in the Bank's records, as it may be modified from time to time, or (ii) if sent by messenger, when left at such address, or (iii) if Customer requested notice or for correspondence in any relevant "hold mail" agreement or other account opening document, when placed in Customer's "hold-mail" file. All such notices and communications (including, but not limited to, customer account statements) shall be deemed to be correct and conclusive against Customer if not objected to in writing by Customer within five days of the date they are deemed received by Customer pursuant to the preceding sentence.

For purposes of this Section 12(b), Information Documents shall include any prospectus, notice, circular, memorandum, letter, or communication regarding any security or investment. Under U.S. securities laws and regulations, Customer understands and acknowledges that AEBI may be prohibited from delivering or mailing Information Documents relating to certain unregistered investment products to Customer in the United States. Consequently, Customer agrees that AEBI will not release any such Information Documents to Customer when Customer is in the United States and that AEBI will not mail any such Information Documents to a United States address (or "hold" any such Information Documents for pick-up by Customer pursuant to any "hold-mail" arrangement entered into by Customer with AEBI). Customer agrees that in the event AEBI is restricted under the U.S. securities laws and regulations (as determined by AEBI in AEBI's sole discretion) from releasing Information Documents to Customer, AEBI may forward such Information Documents to Customer outside the United States at the address set forth below and, if Customer has declined to provide AEBI with an address outside the United States, Customer represents and warrants to AEBI that Customer has declined to review such Information Documents, including a prospectus, if any, relating to the investment products Customer has instructed AEBI to purchase. Customer also agrees that AEBI shall have the right, but shall not be obligated, to refuse to purchase any investment product on Customer's behalf with respect to which Customer has not received Information Documents, or otherwise in AEBI's discretion.

Information Documents may at AEBI's election, be mailed to Customer at the following address (which Customer certifies is not in the United States) or sent to Customer at the following telefax (which Customer certifies is not in the United States) if AEBI, in AEBI's sole discretion, considers it necessary or appropriate for Customer to receive such Information Documents outside the United States:

Customer understands that any communications held by Bank on Customer's behalf in accordance with any "hold mail" arrangement between AEBI and Customer shall be deemed to have been delivered to Customer for all purposes on the date deposited by AEBI in AEBI's "hold mail" files. Any such communication held by AEBI may be destroyed if it has not been picked up by Customer, or requested by Customer in writing, within one (1) year after the date such communication is placed in AEBI's "hold mail" files. Customer acknowledges that such communications are being held at Customer's request and for Customer's convenience. Customer waives any and all claims and causes of action Customer may have against AEBI, Agents, and/or all items as a result of Customer's failure to receive any such communications, and Customer agrees to indemnify AEBI and all Agents against, and hold AEBI and such Agents harmless from, any and all losses, costs, fines, penalties, or liabilities arising from AEBI delivering or holding communications for Customer in accordance with the preceding instructions.

13.   **Disclosure of Beneficial Owner**

SEC Rule 14b-2 requires AEBI to provide each beneficial owner's name, address, and securities position to any requesting issuer whose voting securities are owned by such beneficial owner, unless the beneficial owner objects.

<u>**Check the box below to prevent such disclosure.**</u>

☐   AEBI is NOT authorized to release Customer's name, address, and securities positions.

14.   **Title of Investment Account:**

_____

15.   **Bank Account Number:**

_____


**THIS AGREEMENT CONTAINS, IN SECTION 9(a), A PREDISPUTE ARBITRATION CLAUSE, WHICH REQUIRES THAT ANY DISPUTES ARISING UNDER THIS AGREEMENT THAT MIGHT OTHERWISE BE LITIGATED IN A COURT BE RESOLVED BY BINDING ARBITRATION, AND INCLUDES A WAIVER OF THE PARTIES' RIGHT TO A JURY TRIAL (IN SECTION 9(b)). THIS AGREEMENT ALSO CONTAINS, IN SECTION 9(f), A PROVISION AUTHORIZING THE RECORDING OF ALL TELEPHONE CONVERSATIONS BETWEEN REPRESENTATIVES OF AEBI AND CUSTOMER.**

**CONFIDENTIAL**

SCB_Caso 00000054

Each of the undersigned (i) agrees to be bound by the terms of this Agreement, and (ii) authorizes AEBI or its representative to complete any item in the Agreement which completion shall be conclusive, final, and binding in the absence of manifest error

AGREED TO: Date: Nov. 16 20 00
Customer(s) (natural persons):

Customer 1: Ricardo Andrighi Cox
(Print Name)
Signature: X [signature]

Customer 2: Luis Pinheiro Bequinn
(Print Name)
Signature: X Rico Pinheiro B

Customer 3: _____
(Print Name)
Signature: _____

Customer 4: _____
(Print Name)
Signature: _____

Customer 5: _____
(Print Name)
Signature: _____

Customer 6: _____
(Print Name)
Signature: _____

Customer (corporate or other entity):

By: _____ (Signature)
Name: _____ (Print Name)
Title: _____

By: _____ (Signature)
Name: _____ (Print Name)
Title: _____

By: _____ (Signature)
Name: _____ (Print Name)
Title: _____

Accepted and Agreed:
AMERICAN EXPRESS BANK INTERNATIONAL

By: [signature] Date: Nov 20 20 00
Print Name: Flavio C. Gomes
Title: Director

By: _____ Date: _____ 20 ___
Print Name: _____
Title: _____

CONFIDENTIAL

SCB_Caso 00000055