

1025 Connecticut Avenue, NW, Suite 200
Washington, DC 20036-5425 USA
tel +1 202.293.4103
fax +1 202.293.4701
www.acc.com



September 18, 2013

Hon. Victor Marrero
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
Courtroom 11B
500 Pearl Street
New York, NY 10007-1312
*Sent by overnight delivery;*
*service copies sent by e-mail*

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 7/23/2013

> Re:   *Amicus letter from Association of Corporate Counsel supporting*
> *Citco Defendants' privilege arguments in* Anwar v.
> Fairfield Greenwich, Ltd., *Master File No. 09-CV-00118 (VM)*

Dear Judge Marrero:

On behalf of the Association of Corporate Counsel, we urge this court to reverse the magistrate judge's decision, and hold that because the communications between the Dutch company and its Dutch in-house lawyer would have stayed confidential in the Netherlands, courts in the U.S. should treat them as privileged.[1]

Different countries have different legal systems. They use a wide range of legal mechanisms to address even common goals, such as protecting communications between clients and their lawyers. The U.S. legal system recognizes the world's legal diversity under the doctrine of comity, by establishing the "touching-base" and other tests to prevent American norms from riding roughshod over the law from other countries. This U.S. respect for laws from elsewhere is especially important to in-house lawyers, whose employers' operations increasingly span national boundaries. Having to already deal with a patchwork quilt of regulations facing their multinational clients, in-house counsel should not have to worry that their legal advice will be subject to the whim of a plaintiff's forum selection.

---

[1]     This letter uses "attorney-client privilege," the term common in the United States, and "legal professional privilege," the term common in Europe and elsewhere, as synonyms.

Underscoring that widespread concern, this letter points to a number of differences between the Dutch legal system and that of the United States, particularly as they relate to the disclosure of the information sought in this case. For instance, the Dutch legal system protects confidentiality by limiting discovery overall, in stark contrast with the American approach. In addition, Dutch in-house counsel are not even required to be admitted to, or otherwise registered with, the bar in order to practice law for their clients. And the differences don't end there. In the United States, the client famously controls the privilege. In the Netherlands (and many other jurisdictions around the world), the lawyer does. By ignoring those differences, among other things, the magistrate judge imposed American views about confidentiality and discovery onto the Dutch legal system. Doing so not only violates legal precedent, but also ignores the realities of today's global legal profession.

## I.   *ACC's interest in protecting in-house privilege*

The Association of Corporate Counsel is a global bar association that promotes the common professional and business interests of in-house counsel. ACC has over 33,000 members who are in-house lawyers employed by over 10,000 organizations in more than 75 countries. Almost 4,200 of our members are in-house lawyers from other countries who work outside the United States. For over 30 years, ACC has advocated to ensure that courts, legislatures, regulators, bar associations, and other law or policy-making bodies understand the role and concerns of in-house counsel and the legal departments where they work.

As a core focus, ACC has championed the importance of attorney-client privilege. In the United States and around the world, ACC has pushed courts and agencies to adopt and expand the scope of the privilege. And ACC has especially worked to ensure that a robust privilege applies to a client's confidential communications with in-house lawyers, as the Supreme Court held in *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981). ACC also intervened in *Akzo Nobel Chem. Ltd. and Akcros Chem. Ltd. v. Comm'n*, Case C-550/07 P (Apr. 29, 2010), to argue that the European Union's antitrust authority should honor privilege for in-house lawyers just as it honors the privilege for outside lawyers.[2]

The views of the in-house bar are especially important in this case, given that the dispute concerns how to treat advice that a Dutch in-house counsel gave to his Dutch client.

---

[2]     *See* http://advocacy.acc.com/tags/privilege/ (listing recent briefs, letters, and meetings where ACC has advocated for stronger attorney-client privilege.)

## II.    *In-house legal practice has gone global.*

The practice of law is inherently global today for all lawyers, including in-house lawyers. Clients "routinely encounter legal issues that implicate foreign or international law and want the advice of trusted lawyers from other jurisdictions."[3] While this is true across the United States, it is especially so in New York, whose legal community views globalization with pride. As a report from the New York State Bar Association states, "New York State is fortunate to belong to a nation that is deeply committed to the liberalization of global trade and finance."[4]

Often even more than other lawyers, in-house counsel operate within the global context. About 13 percent of ACC's members are non-U.S. members. Others ACC members have U.S. law degrees but work outside the U.S.; still others received their education or training abroad but now work here. Many companies have operations that span national boundaries, and they expect their in-house lawyers to have the flexibility to operate according to the laws and standards in each country. And other companies, such as the Citco defendants in this case, employ in-house counsel who work in their own countries, but can become involved in litigation, disputes, or investigations in the U.S. or elsewhere.

## III.    *The touching-base test embodies comity and respect for foreign legal systems.*

The magistrate judge below looked to the touching-base test. That test, which courts in the Second Circuit have used to determine when to apply the law of other countries in discovery disputes, embodies the principles of comity and deference to foreign legal systems.

### A.    *Comity encourages courts to apply foreign legal systems in international discovery disputes.*

The touching-base test arises "as a matter of comity." *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 520 (S.D.N.Y. 1992). Similarly, in *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 67 (S.D.N.Y. 2010) ("*Gucci I*"), the magistrate judge emphasized that its conclusion "does not offend principles of comity." And the district court in *Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, 98

---

[3]    Am. Bar Ass'n, Comm'n on Ethics 20/20, "Resolution and Report: Model Rule 5.5 (Unauthorized Practice of Law; Multijurisdictional Practice of Law)," Report at 1, *available at* http://tinyurl.com/kpyqz77.

[4]    N.Y. State Bar Ass'n, Task Force on N.Y. Law in Int'l Matters, "Final Report," (June 25, 2011), at 12, *available at* http://tinyurl.com/m6ep8tx.

(S.D.N.Y. 2002) referred to the inquiry as the "the comity or 'touching base' approach," and mentioned comity nearly a dozen times in reaching its conclusions.

Earlier this year, the Second Circuit wrote that at its core, "[i]nternational comity is a consideration guiding courts, where possible, towards interpretations of domestic law that avoid conflict with foreign law." *Linde v. Arab Bank*, PLC, 706 F.3d 92, 111 (2d Cir. 2013) (*cert*. pending). *See also Hilton v. Guyot*, 159 U.S. 113, 164 (1895) (stating comity is "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation") (*quoted in Linde*); *U.S. v. First Nat. City Bank*, 396 F.2d 897, 901 (2d Cir. 1968) (stating "a court of one country should make an effort to minimize possible conflict between its orders and the law of a foreign state affected by its decision"); *Golden Trade*, 143 F.R.D. at 522 (same, quoting language from *First Nat. City Bank*). As *Golden Trade* emphasized, "sensitivity to the interests of other jurisdictions is perhaps most compelling in the international arena." *Id.* at 521. And that requires, "where possible, . . . interpretations of domestic law that avoid conflict with foreign law." *Linde*, 706 F.3d at 111.

> B.     *The touching-base test enhances comity by applying foreign law absent serious conflicts with U.S. law.*

The touching-base test enhances the sensitivity to the laws of foreign jurisdictions that makes up the essence of comity. Laws of other countries should govern discovery disputes when "these countries have the predominant interest in whether those communications should remain confidential, and enforcement of their laws . . . would not seriously impinge on any significant policy of this forum." *Golden Trade*, 143 F.R.D. at 522.

To determine which jurisdiction has the "predominant interest" under the test, courts look to "either 'the place where the allegedly privileged relationship was entered into' or 'the place in which that relationship was centered at the time the communication was sent.'" *Astra*, 208 F.R.D. at 98, *quoting Golden Trade*, 143 F.R.D. at 521–22. As *Gucci I* explained, that means "communications regarding a foreign legal proceeding or foreign law 'touch base' with the foreign country." 271 F.R.D. at 65.

> C.     *U.S. courts must not apply rules rigidly, or consider foreign law in a vacuum.*

In order to show respect to the legal systems of other countries, the Second Circuit has made clear that "[m]echanical or overbroad rules of thumb are of little value." *First Nat. City Bank*, 396 F.2d at 901. *See also Minpeco, S.A. v. Conticommodity*

*S.A.*, 116 F.R.D. 517, 521 (S.D.N.Y. 1987) (same). There is no "reason to read the rule . . . inflexibly." *Golden Trade*, 143 F.R.D. at 521.

Instead, courts in the Second Circuit look at the totality of the circumstances to make sure that they give proper weight to the legal systems of other countries. The Second Circuit has held that courts must perform a "particularized analysis," *Linde*, 706 F.2d at 109 (*quoting Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*, 482 U.S. 522, 543 (1987), which is "holistic" and "multi-factored." *Id.* at 112. *See also First Nat. City Bank*, 396 F.2d at 901 (calling for "a balancing of the interests involved.").

In the context of countries with alternate methods of discovery, it is not appropriate to compare the U.S. system to the foreign system in an a la carte manner. Rather, it is crucial to view the foreign discovery system as a whole. "The scope of discovery in the foreign country is also a valid consideration in resolving choice of law issues." *Gucci I*, 271 F.R.D. at 68.

The reasoning that the *Astra* court used is instructive. There, the court considered documents in Korea. It decided to apply the American attorney-client privilege, despite differences with the Korean system. According to the court, "vastly different discovery practices, which permit only minimal discovery, are applicable to civil suits conducted in Korea." *Astra*, 208 F.R.D. at 102. So, where "none of the documents at issue here would be discoverable in a Korean civil suit," it would "offend the very principles of comity" to disclose the documents in U.S. litigation. *Id.* Acting otherwise would wrongly result in applying foreign law "in a vacuum." *Id.*[5]

---

[5]    Other authorities also agree on the need to look at international ethics laws in a holistic manner. As the New York Bar Association stated in an ethics opinion considering professional responsibility in relation to lawyers from other countries, it is not appropriate to "require an identity of ethical and disciplinary rules, which is not likely to be the case." N.Y. State Bar Ass'n, Comm. on Prof. Ethics, Op. 762 (Mar. 5, 2003), at n.7 (*available at* https://www.nysba.org/Content/ContentFolders/EthicsOpinions/Opinions751825/ EO_762.pdf). Or, as stated more bluntly by a task force of the American Society of International Law, "it is important to emphasize the need to avoid the parochialism or elitism that can infect discussions of legal professionalism and ethics." Am. Soc. of Int'l Law, "Report of the ASIL Task Force on International Professional Responsibility," (Dec. 2007), at 6 (*available at* http://www.asil.org/pdfs/taskforcereport.pdf).

D.   *The magistrate judge misapplied the touching-base test by viewing*
     *attorney-client privilege in rigidly American terms.*

The magistrate judge here applied the touching-base test in the sort of mechanical manner that the Second Circuit has prohibited. As a result, the magistrate did not display comity toward the Dutch legal system here. It viewed the case through a purely American lens, which precedent prohibits.

The magistrate judge asked whether Dutch law provides for in-house privilege in precisely the same way as the United States does. And when it arrived at the inevitable conclusion that the two legal systems differ, the magistrate judge held that no privilege exists here and closed the matter.

But that sort of crabbed inquiry doesn't acknowledge how Dutch law operates in practice. The Citco Defendants describe that system in the declarations accompanying their opening brief to this Court. They readily admit that attorney-client privilege does not operate the same way for in-house counsel in the U.S. versus those in the Netherlands. Here, of course, courts fully recognize privilege between clients and in-house counsel. *See Upjohn*, 449 U.S. at 390. U.S. law accomplishes that by allowing parties to request documents, and then permitting parties to withhold them pursuant to the privilege. That works just fine. But it is not the only way.

The Dutch system leads to the same result, using a different mechanism. In the Netherlands, the discovery system prohibits parties from asking for attorney-client communications in the first place. This is true whether or not the in-house counsel has a law license. Whether courts label this a "privilege" or something else, the bottom line is exactly the same: parties do not disclose confidential communications about legal questions that occur between a client and a lawyer.

Equally important, looking to the second prong of the touching-base test, no U.S. interest suffers by recognizing the Netherlands' alternate system for maintain confidentiality. The United States strongly protects confidential legal communications between clients and their lawyers, in order to encourage people to learn about the law and obey it. As the Supreme Court held in *Upjohn*, the privilege's "purpose is to encourage full and frank communication between attorneys and their clients, and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389. *See also Gucci Am., Inc. v. Guess?, Inc.,* No. 09 Civ. 4373, 2011 WL 9375 at *2

(S.D.N.Y. Jan. 3, 2011) ("*Gucci II*") (same). The Dutch system arrives at that same place, albeit by a different route.[6]

Given the international reach of the legal issues today, described above, the U.S. has a strong interest in protecting attorney-client communications wherever they may occur. The fact that the U.S. system protects confidentiality in one manner, and the Dutch system chooses a different mechanism, is hardly material. In the words of the *Astra* court, the magistrate judge here wrongly looked at the Dutch system in a "vacuum."

## IV.   *The* Akzo *opinion has no relevance to this case.*

Finally, ACC notes that in their submission to the magistrate judge, the plaintiffs relied in part on the European Commission case of *Akzo Nobel*, and it is possible that they pointed to it in their sealed brief to this Court. But *Akzo* offers no support to the magistrate judge's opinion.

ACC is extremely familiar with *Akzo*. As mentioned above, ACC intervened in that case, to argue that the European Union's antitrust authorities should respect in-house legal privilege. Unfortunately, the Court of Justice held that the privilege did not apply in that case. But it made absolutely clear that its holding has no authority outside of EU antitrust investigations. It wrote that "[i]n the context of . . . national proceedings and search measures, any protection afforded by legal professional privilege is neither 'withdrawn' or 'eroded; on the contrary it continues to apply without restriction." *Akzo* at ¶ 186. It continued that the holding "applies only to competition proceedings and investigations conducted by the Commission; *it does not affect the law governing national proceedings.*" *Id.* (emphasis added).

In fact, earlier this year the Supreme Court of the Netherlands declined to follow *Akzo*, and instead upheld the validity of in-house legal privilege in the context of national legal proceedings. *See* LJN BY6101, 12/02667 (Mar. 15, 2013) (*available at* http://tinyurl.com/ofb8x9l.) In Belgium, the Brussels Court of Appeal reached essentially the same conclusion in a different case. *See En Cause De Belgacom*, S.A., 2011/MR/3 (Mar. 5, 2013) (*available at* http://tinyurl.com/n56qb98).

Given the strong limits that the Court of Justice placed on its *Akzo* holding, and the refusal of the Supreme Court of the Netherlands to adopt *Akzo* for national

---

[6]    To further emphasize the different mechanism that Dutch law uses to protect attorney-client privilege, even for Dutch lawyers with law licenses, the attorney holds the legal professional privilege. That contrasts with the U.S. system, where the client controls privilege.

proceedings, there are no grounds to expand it to a situation such as this one, with no connection whatsoever to a European Commission antitrust investigation.

## V.   *Conclusion*

The magistrate judge's opinion denying privilege has multiple flaws. It ignores the reality of global in-house practice, and it completely fails to grant the proper level of respect and comity to the Dutch legal system. That system does protect the confidentiality of communications between clients and authorized in-house lawyers, whether or not they have law licenses. It simply uses a different mechanism to that end. When considered in context, it should be clear that the Dutch attorney-client communications here should stay protected.

In parsing out differences between Massachusetts and New York law, then-Judge Benjamin Cardozo emphasized that "[w]e are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home." *Loucks v. Standard Oil Co.,* 224 N.Y. 99, 111 (N.Y. 1918). When it comes to international discovery disputes in U.S. courts, the Second Circuit has made clear that it is not at all "provincial."

Therefore, ACC respectfully requests that this Court reverse the magistrate judge's privilege decision.

Sincerely yours,

*Amar Sarwal*

Amar D. Sarwal
Vice President and Chief Legal Strategist
sarwal@acc.com

Evan P. Schultz
Senior Counsel and Director of Advocacy

> The Clerk of Court is directed to enter into the public record of this action the letter above submitted to the Court by *Association of Corporate Counsel* .
>
> **SO ORDERED.**
>
> *9-23-13*
> DATE        VICTOR MARRERO, U.S.D.J.

cc:

aarffa@paulweiss.com
adeckinger@bsfllp.com
agordon@paulweiss.com
agrant@kasowitz.com
amcgovern@ghblaw.com

amy.crawford@kirkland.com
andrew.genser@kirkland.com
andrew.levander@dechert.com
atarragona@bhlawpa.com
aurena@bhlawpa.com

basar@whafh.com
bbaird@cov.com
bgraifman@gkblaw.com
bkarp@paulweiss.com
blevitt@hlhlawfirm.com
brad.samuels@kobrekim.com
brenton.rogers@kirkland.com
cave@hugheshubbard.com
clovell@lshllp.com
coatesj@gtlaw.com
cochoa@maglaw.com
cstine@wolfpopper.com
ctorell@cohenmilstein.com
cwhitfield@bhlawpa.com
david.mcgill@kobrekim.com
dbarrett@bsfllp.com
dbenson@kasowitz.com
dfeinberg@ghblaw.com
dfetterman@kasowitz.com
dgehn@gkblaw.com
dmolton@brownrudnick.com
drothstein@dkrpa.com
dsommers@cohenmilstein.com
dstone@stonemagnalaw.com
eglasser@bsfllp.com
eizquierdo@ghblaw.com
emily.nicklin@kirkland.com
espiro@magislaw.com
gfBruckner@pomlaw.com
ghurand@maglaw.com
gkachroo@kachroolegal.com
gkurtz@whitecase.com
gonzalezr@gtlaw.com
hoffner@hoffnerpllc.com
hsobel@zsz.com
hvcantwell@debevoise.com
hvickery@bsfllp.com
jacobsonj@gtlaw.com
jbaldwin@stblaw.com
jbogert@bogertrembold.com
jclark@bhlawpa.com
jdevore@cohenmilstein.com
jennie.krasner@dechert.com

jharrod@wolfpopper.com
jhouchin@bhlawpa.com
jkaplan@dkrpa.com
jkrisiloff@lshllp.com
jlee@milberg.com
jmestre@riveromestre.com
jonathan.cogan@kobrekim.com
jpollard@bsfllp.com
jray@kachroolegal.com
jroether@stblaw.com
justin.sommers@kobrekim.com
jzwerling@zsz.com
kbronson@milberg.com
kmcgregor@milberg.com
krasner@whafh.com
lecurran@lecurran.com
lecurran@lecurran.com
lfagen@paulweiss.com
lpruss@dkrpa.com
magolnick@mm−pa.com
maguire@hugheshubbard.com
maguirre@amslawyers.com
marshalg@hugheshubbard.com
mcheney@crowell.com
mchepiga@stblaw.com
mcunha@stblaw.com
mdunn@cov.com
michael.kim@kobrekim.com
mithlo@gtlaw.com
mkasowitz@kasowitz.com
mmoscato@cm−p.com
mpgoodman@debevoise.com
mschirmer@straus−boies.com
msiegel@brownrudnick.com
nelless@sullcrom.com
nespole@whafh.com
neuhausj@sullcrom.com
nmackiel@wolfpopper.com
pedans01@yahoo.com
pfleming@stblaw.com
pkazanoff@stblaw.com
pmirrer-singer@stblaw.com
psirkis@stblaw.com

psomers@paulweiss.com
ranello@maglaw.com
rbrodsky@thebrodskylawfirm.com
rfinkel@wolfpopper.com
rlinkin@dkrpa.com
rschachter@zsz.com
rspeirs@cohenmilstein.com
rwallner@milberg.com
Sara.Ricciardi@Shearman.com
sboruchow@bsfllp.com
skirwan@zsz.com

ssinger@bsfllp.com
stoll@cohenmilstein.com
sweinstein@ellklaw.com
tbattin@straus−boies.com
tim.duffy@kirkland.com
tmccabe@cm−p.com
tmullen@ghblaw.com
victornj@ix.netcom.com
whetstonel@gtlaw.com
william.oconnor@tklaw.com
woconnor@crowell.com