# THE BRODSKY LAW FIRM, PL

RICHARD E. BRODSKY, ATTORNEY AT LAW

November 19, 2013



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/19/13

**By fax to (212) 805-6382**

Honorable Victor Marrero
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Re: *Anwar, et al. v. Fairfield Greenwich Limited, et al.,*
    *09-cv-118 (VM) (THK)*
    ***Standard Chartered Cases***

Dear Judge Marrero:

I write as the Liaison Counsel for, and on behalf of, the Standard Chartered Plaintiffs, in the Standard Chartered Cases (the "SC Cases"). This letter responds to the November 12, 2013 letter to Your Honor from counsel for the Standard Chartered Defendants ("Standard Chartered" or "SC Defendants"). They seek a pre-motion conference regarding a possible defense motion to dismiss the SC Cases under the Securities Litigation Uniform Standards Act ("SLUSA"). Such a motion would be futile and would squander judicial resources if the Court were to allow it to be filed.

## 1. The Standard Chartered Cases

Standard Chartered Bank International (Americas) Limited ("SCBI"), a self-styled "private bank," recommended and sold investments in the Fairfield Sentry and Sigma funds to many of its clients. At one point, SCBI clients had over $600,000,000 invested in these funds.

It was revealed in December 2008 that investments in those funds were worthless. At various times in 2009, four "separately-filed actions," *Anwar v. Fairfield Greenwich Ltd.*, 745 F. Supp. 2d 360, 363 (S.D.N.Y. 2010), were brought against SCBI. The cases were filed by four different law firms in three different courts in Florida and California.[1]

---

[1] *Headway* filed its claim in state court in Florida. The Standard Chartered Defendants removed the case to the District Court for the Southern District of Florida under 12 U.S.C. § 632, which permits removal by Edge Act banks, such as SCBI, in cases involving international banking transactions. *Valladolid* was filed in state court in California and was later removed to the Central District of California under 12 U.S.C. § 632. *Maridom* and *Lopez* were separately filed by different counsel in federal court in Florida. Jurisdiction in these cases was based on 12 U.S.C. § 632.

200 S. BISCAYNE BOULEVARD, STE. 1930 • MIAMI, FLORIDA 33131
WWW.THEBRODSKYLAWFIRM.COM
786-220-3328 • RBRODSKY@THEBRODSKYLAWFIRM.COM

Honorable Victor Marrero
November 19, 2013
Page 2

There was no coordination in filing these separate individual lawsuits. None of the cases was brought as a class action.

The four Complaints "[w]ere not entirely consistent with each other, and certain of Plaintiffs' allegations [were] specific to individual Plaintiffs." *Id.*

- In *Maridom* and *Lopez*, SCBI alone was sued. *Valladolid* named SCBI, a SCBI employee and two parent companies. *Headway* sued not only SCBI and some of its officers but also Fairfield Greenwich and several entities providing services to Fairfield (accountants, service companies, etc.).

- *Lopez* involved both state-law claims and federal securities law claims that this Court dismissed, while the plaintiffs in the other three cases sued only under state common law.[2]

- All four of the plaintiffs sued Standard Chartered for breach of fiduciary duty and negligence or gross negligence; two (*Maridom* Plaintiffs and Lopez) added claims of fraud or negligent misrepresentation, while the other two made no such allegations.

After the Joint Panel for Multidistrict Litigation ("JPML") transferred these four cases to this Court and consolidated them with *Anwar* for pre-trial purposes, 55 other cases were filed at various times against Standard Chartered, either directly in this Court or in the Southern District of Florida, and the Florida cases were transferred to this Court. 44 were filed by one lawyer, who had filed one of the four original cases (*Lopez*). Six were filed by a second lawyer. One was filed by a third lawyer. One was filed by a fourth lawyer. Two were filed by a fifth lawyer. One was filed by a sixth lawyer. The 59 cases were thus filed by nine different lawyers from April 2009 (*Headway*) to at least December 2012 (*Optic Blue*).

For the most part, *but not entirely*, the later-filed claims arise from SCBI's having recommended and sold the Fairfield investments without a proper basis. In at least one case, *Barbachano*, the complaint sues over other investments as well. Two other previously consolidated cases, *Caso* and *Pujals*, were filed as class action, but both have long been since dismissed. No other cases were pled as a class action.

---

[2] The letter (at 3) mischaracterizes the facts by stating that the SC Cases' "procedural history . . . 'lends credence to the notion that plaintiffs' allegations are the very types of claims Congress intended to preclude in enacting SLUSA,' because *plaintiffs 'originally pleaded federal securities fraud claims* based on the same underlying "realities" of the case.'" (citation omitted; emphasis added). This is simply not true for nearly all of the Standard Chartered Cases. Only one of the cases, *Lopez*, alleged federal securities law claims, which were promptly dismissed; the rest did not.

Honorable Victor Marrero
November 19, 2013
Page 3

### 2. Summary of Argument

*First*, SLUSA does not apply because the SC Cases do not constitute a "covered class action." The "group of lawsuits" prong of the definition of "covered class action" cannot be stretched to cover separately-filed actions brought at different times, without coordination, by separate counsel on behalf of separate plaintiffs in four different courts, just because they were transferred for pre-trial purposes, over the plaintiffs' separate objections, to this Court. The term "group of lawsuits," as used in SLUSA, unquestionably refers to a number of lawsuits purposefully gathered together, not thrust together, as occurred here. This conclusion is mandated by a facial reading of SLUSA, as enacted, and if there is any ambiguity, by its legislative history.

*Second*, even if these individual cases amounted to a "covered class action," and even if the various disparate complaints (including those in which no claims of misrepresentation are advanced) can be viewed as having alleged some specie of fraud, the various individual Plaintiffs have not alleged a fraud "in connection with the purchase and sale of a covered security." The SC Cases are plainly distinguishable from the case on which the Defendants place primary reliance, *Trezziova v. Kohn (In re Herald, Primeo, & Thema Sec. Litig.)*, 730 F.3d 112 (2d Cir. 2013) (*"Trezziova"*).[3] *Trezziova* is entirely consistent with this Court's earlier decision in *Anwar v. Fairfield Greenwich Ltd.* (*"Anwar II"*), 728 F. Supp. 2d 372, 399 (S.D.N.Y. 2010) (in express class action, holding SLUSA "in connection with" requirement not met; construing SLUSA to apply "snaps even the most flexible rubber band."). *Trezziova* and *Anwar II* differ not in their underlying rationale but in the significant factual differences between the two—the relationships between the plaintiffs and the defendants, on the one hand, and the defendants and Bernard L. Madoff Investment Securities, LLC ("BLMIS"), on the other. *Anwar II* should be followed here, because if that case *snapped* the SLUSA "rubber band," applying SLUSA here would positively *shred* it.

Standard Chartered's position amounts to saying that even if, as a private bank with admitted fiduciary duties to its clients, it separately counseled many of its clients to invest in Fairfield Sentry or Sigma without a proper basis, it cannot be sued for breach of fiduciary duty by *any* of those clients *because there are just too many disgruntled clients suing the bank*. Theirs is a preposterous, and frankly cheeky, argument. If SLUSA were to be applied to the SC Cases, it would raise the most serious questions about the power

---

[3] This Court is bound by the holding in *Trezziova* until it is overruled by the Second Circuit or the Supreme Court. Nevertheless, as more fully discussed below at 12-13, the viability of *Trezziova* and its holding that "in connection with" does not require any actual "purchase or sale" are in doubt because of a case pending in the Supreme Court—that is, *Chadbourne & Parke LLP v. Toice*, No. 12-79. The Clerk of the Second Circuit has informed counsel in the *Trezziova* appeal that the Court has postponed decision on the pending rehearing petition until the Supreme Court decides *Chadbourne*. The Court heard argument on *Chadbourne* in October and it is *sub judice*.

Honorable Victor Marrero
November 19, 2013
Page 4

of the Congress to defeat the plaintiffs' rights in this manner.[4] But this Court need not reach that constitutional question, for, without doing so, it can and should rule that the SC Cases are not "covered class actions" that allege fraud "in connection with the purchase or sale of covered securities."

### 3. Argument

#### A. *The SC Cases are Not a "Covered Class Action"*

The Standard Chartered Defendants' argument fails because this is not, as required by SLUSA, a "covered class action." 15 U.S.C. § 78bb(f)(5)(B). This is clear from the face of SLUSA, as enacted, and if there is any ambiguity, from its legislative history.

As is pertinent to this case, "covered class action" is defined in the statute to include:

> (ii) any *group of lawsuits* filed in or *pending* in the same court and involving common questions of law or fact, in which—
>
> (I) damages are sought on behalf of more than 50 persons; and
>
> (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B)(ii) (emphasis added).

The key term is "group of lawsuits," and, within that phrase, the key word is "group." The issue is whether this term and this word can apply to the SC Cases while adhering to the stated congressional objective, expressly stated in SLUSA itself, of *"not changing the current treatment of individual lawsuits."* Section 2(5) of SLUSA, Pub. L. No. 105-353, 112 Stat. 3227 (1998) ("Findings") (emphasis added).

---

[4] Stretching SLUSA to cover the SC Cases would violate the petition clause of the First Amendment and the due-process clause of the Fifth Amendment by eliminating the plaintiffs' right to sue Standard Chartered under state law. *Borough of Duryea, Pa. v. Guarnieri*, 131 S.Ct. 2488, 2494, 180 L.Ed.2d 408 (2011) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government"); *Jones v. Clinton*, 72 F.3d 1354, 1360 (8th Cir. 1996), *aff'd*, 520 U.S. 681(1997) ("Mrs. Jones is constitutionally entitled to access to the courts and to the equal protection of the laws [to sue the President for conduct before he assumed the Presidency]. 'The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.' *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803)."); *see also* Carol Rice Andrews, *A Right of Access to Court Under the Petition Clause of the First Amendment: Defining the Right*, 60 Ohio St. L. J. 558 (1999). The Standard Chartered Plaintiffs are not arguing that SLUSA is unconstitutional as written, but rather its application to the SC Cases.

Honorable Victor Marrero
November 19, 2013
Page 5

The underlying issue, therefore, is when "individual lawsuits" morph into a "group of lawsuits." The answer is not "when there are 50 individual lawsuits," for it is plain from section 2(5) of the statute, that truly "individual" lawsuits are not deemed "class actions." To understand the meaning of this term, therefore, requires not only an understanding of the meaning of the words "group of lawsuits" standing by themselves but also an understanding of their meaning in context. As the Court held in *McNeill v. United States*, 131 S. Ct. 2218, 2221 (2011) (Thomas, J.), citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), "[a]s in all statutory construction cases, we begin with 'the language itself [and] the specific context in which that language is used.'

"[T]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. . . .Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Robinson*, 519 U.S. at 340-41 (quotation marks and citation omitted). Two additional rules of statutory construction also are pertinent: (i) that "when the statute's language is plain, the sole function of the courts—*at least where the disposition required by the text is not absurd*— is to enforce it according to its terms," *Dodd v. United States*, 545 U.S. 353, 359 (2005) (citation and quotation marks omitted; emphasis added); and (ii) that "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 242 (1989) (citation omitted).

The word "group" is not defined in the statute, which requires it to be given its ordinary meaning. *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013). Resort to a dictionary is, of course, an accepted method of determining ordinary meaning. The pertinent definitions of "group" in the online edition of the authoritative *Webster's Third New International Dictionary*, http://unabridged.merriam-webster.com, are as follows:

> 2.a: relatively small number of individuals assembled or standing together
> 2.b: an assemblage of objects regarded as a unit because of their comparative segregation from others
> 3: a number of individuals bound together by a community of interest, purpose, or function: such as
> a(1): a social unit comprising individuals in continuous contact through intercommunication and shared participation in activities toward some commonly accepted end
> (2): class
> (3): a relatively small number of persons associated formally or informally for a common end or drawn together through an affinity of views or interests.

From: Richard E. Brodsky   Case 1:09-cv-00118-VM-FM   Document 1223   Filed 11/19/13   Page 6 of 13   Fax: 888-931-5845

Honorable Victor Marrero
November 19, 2013
Page 6

*See also The New International Webster's Comprehensive Dictionary of the English Language* (1996), at 559, defining "group" to mean "a number of persons . . . existing or brought together; an assemblage; cluster"; defining "assemblage" to mean "an assembling," *id.*, at 87; and defining "assemble" to mean "to collect or convene; come together; congregate, as a group or meeting." *Id.*

These definitions strongly point to a group's being a purposeful gathering together, rather than, as here, the forced or involuntary association of one plaintiff with another. "Group," in other words, means more than a number of individual persons involuntarily thrust together. The argument could and should end here.

If this alone were not enough to end the inquiry, resort would properly be made to the legislative findings in the statute itself to divine legislative intent. *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 589-90 (2004) (reviewing legislative findings to assist in determining whether, in banning "age" discrimination, Congress intended to protect younger workers against discrimination in favor of older workers). *Accord Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 484 (1999) ("Finally, and critically, findings enacted as part of the ADA require the conclusion that Congress did not intend to bring under the statute's protection all those whose uncorrected conditions amount to disabilities."). *See McCreary Cnty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 861 (2005) ("Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country.").

The findings in section 2 of SLUSA ("Findings"), Pub. L. No. 105-353, 112 Stat. 3227 (1998), buttress the conclusion that the SC Cases are not swept up into the term "group of lawsuits." Subsections 2(2) and (3) of SLUSA state that, since the passage of the PSLRA, "a number of securities class action lawsuits have shifted from Federal to State courts," which "has prevented that Act from fully achieving its objectives." (This is far removed from what occurred here, and speaks to a determined, coordinated attempt in class actions *filed as such* to evade the effects of the PSLRA.) Thus, Congress found:

> [I]n order to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the Private Securities Litigation Reform Act of 1995, it is appropriate to enact national standards for securities class action lawsuits involving nationally traded securities, while preserving the appropriate enforcement powers of State securities regulators *and not changing the current treatment of individual lawsuits.*

SLUSA, § 2(5) (emphasis added).

The last words in this section—"not changing the current treatment of individual lawsuits"—are vital and can mean only one thing: if "individual lawsuits" are not within the scope of SLUSA, then all lawsuits filed on an independent, isolated, non-concurrent basis must be considered to come within

Honorable Victor Marrero
November 19, 2013
Page 7

the meaning of that phrase. Otherwise, how many "individual" lawsuits would Congress permit before they become a "group," and what would it take to make them a "group"? Coupled with the obvious legislative intent to prevent one lawyer, or a coterie of lawyers, from attempting to evade the PSLRA by filing ten different suits, Congress could not have rationally intended to reach the SC cases.

Finally, to the extent that the language in question is ambiguous—"capable of being understood in two or more possible senses or ways," *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001)—resort to legislative history is appropriate. The Conference Report on SLUSA, contained in H.R. Conf. Rep. No. 803, 105th Cong., 2d Sess. 1998, makes the legislative intent behind SLUSA's passage clear:

> The purpose of this title is to prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State, rather than in Federal, court. The legislation is designed to protect the interests of shareholders and employees of public companies that are the target of meritless 'strike' suits. *Id.* at 13.

The language concerning "covered class action" establishes that in expanding the definition of class action beyond those labeled or otherwise pleaded as such, Congress did not intend to cover the SC cases:

> 'Class actions' that the legislation bars from State court include actions brought on behalf of more than 50 persons, actions brought on behalf of one or more unnamed parties, and so-called 'mass actions,' in which a group of lawsuits *filed in the same court*[5] are joined or otherwise proceed as a single action. (emphasis added) *Id.*

The Conference Report then specifically zeros in on "plaintiffs' lawyers [who] have sought to circumvent the Act's provisions by exploiting differences between Federal and State laws by filing frivolous and speculative lawsuits in State court, where essentially none of the Reform Act's procedural or substantive protections against abusive suits are available." *Id.* at 15. This is further evidence that Congress intended to cover evasive *collusive* or *collective* action, not a situation like this, when, unrelated, different parties represented by different lawyers filed separate actions against Standard Chartered at different times and got involuntarily thrown into a foreign court of the defendant's choosing.

The Conference Report's reference to "so-called 'mass actions'" is the final nail in the coffin of SLUSA's application to the SC Cases. The term "mass action" was used in the Class Action Fairness Act of 2005 ("CAFA"), Pub.L. No. 109-2, 119 Stat. 4

---

[5] While the actual language of SLUSA is "filed in *or pending in* the same court," the wording in the Conference Report is additional evidence of Congress's true intent, which is inhibiting plaintiffs' class action lawyers' ability to scheme to "beat" the PSLRA.

Honorable Victor Marrero
November 19, 2013
Page 8

(2005), codified at 28 U.S.C. § 1332(d)(11)(B), to mean, in pertinent part, "any civil action . . . in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a)."

Not only are the SC Cases not "mass actions" as defined in CAFA for, among other reasons, the fact that it is not "proposed [that they] be tried jointly," but the legislative history, once again, shows that the SC Cases are not intended to be within the definition of a "mass action." *See Anwar v. Fairfield Greenwich Ltd.*, 676 F. Supp. 2d 285, 297 (S.D.N.Y. 2009) (holding CAFA inapplicable to derivative actions against Fairfield Greenwich on behalf of Sentry and its limited partners and remanding cases to state court).[6]

In sum, the contrast between these cases and those covered by SLUSA's definition of "covered class action" could not be starker.[7]

### B. The SC Cases Do Not Satisfy SLUSA's "In Connection With" Standard

As set forth above, this Court previously held that the "in connection with" test in SLUSA was not satisfied as to the *Anwar II* class action, because "[t]he allegations in this case present multiple layers of separation between whatever phantom securities Madoff purported to be purchasing and the financial interests Plaintiffs actually purchased." *Anwar II*, 728 F.Supp. at 398. In the SC Cases, there is one additional, and highly

---

[6] This Court found:

> AFA's legislative history makes clear that Congress envisioned 'mass actions' as claims by multiple plaintiffs 'consolidated by State court rules,' but not otherwise pled as class actions. *See* 151 Cong. Rec. S1151 (daily ed. Feb. 9, 2005) (statement of Sen. Reid). More specifically, Congress drafted the 'mass action' provision of CAFA primarily to cover actions brought by multiple plaintiffs in states such as Mississippi that 'do not provide a class action device.' *See* 151 Cong. Rec. S1081 (daily ed. Feb. 8, 2005) (statement of Sen. Lott); *see also* 151 Cong. Rec. S1235–36 (daily ed. Feb. 10, 2005) (statement of Sen. Durbin) ('And I understand ... that these so-called mass actions are currently filed only in Mississippi and West Virginia.... I agree with the proponents that the scope of th[e] [mass action provision] is limited.'). As the Senate Report on the statute noted, 'lawsuits that resemble a purported class action should be considered class actions....' S.Rep. No. 109–14, at 35, *as reprinted in* 2005 U.S.C.C.A.N. at 34. Recent case law further supports the intent of the Act's drafters. *See Bullard v. Burlington N. Santa Fe Ry. Co.*, 535 F.3d 759, 762 (7th Cir.2008) ('Think of 15 suits, with (say) 10 plaintiffs each, that are proposed to be tried jointly. The prospect of a single trial with 150 plaintiffs would convert all 15 suits into one 'mass action' under § 1332(d)(11)(B) ....).

[7] While there are contrary decisions in this District on both "covered class action" and "in connection with," they either do not analyze the term "group of lawsuits" in the context of the legislative findings underpinning SLUSA or are, respectfully, wrong on the issue of "in connection with," or both.

Honorable Victor Marrero
November 19, 2013
Page 9

significant "layer[ ] of separation": each of the Standard Chartered Plaintiffs are suing their "private bank," which, individually and separately, and through a broad array of separate Standard Chartered "Relationship Managers," recommended and counseled that each invest in Fairfield Sentry.

None of the complaints allege that Standard Chartered is liable to their former private banking customers for not having discovered that BLMIS was running a Ponzi scheme. Rather, they allege that Standard Chartered breached its fiduciary duty to them and was negligent by failing to take account of "red flags" that created too great a risk that Fairfield Sentry was not properly managing their money. Indeed, some of the Plaintiffs have sued Standard Chartered for not having disclosed to them that it received a 1% per annum "trailer fee" (kickback/rebate) from Fairfield Greenwich for placing them in Sentry. That allegation has nothing to do with securities transactions, let alone non-existent transactions in "covered securities."[8]

Yet, seizing on the *Trezziova* decision—which involved the very banks where BLMIS did business—and mischaracterizing its holding, the Standard Chartered Defendants urge this Court to reverse itself. *Trezziova* does conclude that covered securities transactions do not have to occur for the "in connection with" test to be satisfied, but so did this Court in *Anwar II*. Indeed, the approach taken by this Court in *Anwar II* was identical to the approach taken by the appellate court in *Trezziova*: analyze the relationship between the parties and the relationship between the defendant and BLMIS. It is the nature of those relationships that require *Anwar II* to be followed in the SC Cases and the "in connection with" test to be deemed unsatisfied.

In *Trezziova*, investors in hedge funds filed putative class actions against J.P. Morgan Chase and Bank of New York Mellon, two banks that had no connection with the investors or the funds but were themselves bankers to BLMIS. The Second Circuit affirmed the dismissal of the complaints under SLUSA, but not on the basis advocated by the Standard Chartered Defendants in their letter. The Defendants argue that *Trezziova* "applies SLUSA to bar claims brought by investors in Madoff feeder funds where the factual predicate underlying the alleged liability *relates in some way* to covered security transactions." Letter at 2 (emphasis added). As we discuss below, "relates in some way" simply is not the standard, was not followed in *Trezziova*, and would amount to no standard at all.[9] What is more, it directly conflicts with the Supreme Court's opinion in

---

[8] In addition, the Court denied the *Maridom* Plaintiffs' and Headway's requests for leave to amend their complaint to add the "trailer fee" allegation, which came out only in discovery, but the Court stated that "Plaintiffs are free to advance evidence of this contention in support of their existing claims." *Anwar v. Fairfield Greenwich Ltd.*, No. 09-cv-0118 (VM)(THK), 2012 WL 1415621, *4 (S.D.N.Y. Apr. 13, 2012), *recons. den'd*, 283 F.R.D. 193 (S.D.N.Y. 2012).

[9] Nor was the purported "relates in some way" standard applied by the other decision Standard Chartered principally relies on, *Romano v. Kazacos*, 609 F.3d 512, 523 (2d Cir. 2010). In *Romano* the court held that allegations in class actions filed in state court, that (a) stockbrokers fraudulently induced retirees to part with their money so it could be invested by the brokers, and (b) the retirees lost money when the covered securities acquired by the brokers lost value, could "satisfy SLUSA's 'in connection with' requirement

Honorable Victor Marrero
November 19, 2013
Page 10

*S.E.C. v. Zandford*, 535 U.S. 813, 820 (2002), in which the Court defined "in connection with" in the context of section 10(b) of the Securities Exchange Act. There, the Court made clear that "the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)," *Id.* at 820, and held that the defendant's conduct must "coincide" with securities transactions to be in connection with those transactions. *Id.* at 825. In other words, there are limits, which Standard Chartered's suggested test would eliminate.

Instead, the *Trezziova* court focused exclusively on the relationship of the defendants to BLMIS and the fraud:

> [Their] relationship to the Madoff fraud is alleged to be far more than incidental. The complaints, fairly read, charge that JPMorgan and BNY knew of the fraud, failed to disclose the fraud, and helped the fraud succeed—in essence, that JPMorgan and BNY were complicity [sic] in Madoff's fraud. These allegations are more than sufficient to satisfy SLUSA's requirement that the complaint allege a "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security."

730 F.3d at 119.

Additionally, the *Trezziova* court found that "on the very face of plaintiffs' complaints, the liability of JPMorgan and BNY is predicated not on these banks' relationship with plaintiffs or their investments in the feeder funds but on the banks' relationship with, and alleged assistance to, Madoff Securities' Ponzi scheme, which indisputably engaged in purported investments in covered securities on U.S. exchanges." 730 F.3d at 118-19. The *Trezziova* banks' direct relationship with BLMIS was the very fact on which the plaintiffs premised their claim. *See* Complaint, *In re Herald, Primeo, & Thema Sec. Litig.*, No. 09-cv-00289-RMB-HBP, D.E. 76, at ¶¶ 585-597 (the banks "knowingly facilitated and provided services to Madoff in furtherance of the Ponzi scheme . . . .").

In sharp contrast with the claims in *Trezziova*, the claims in the various SC Cases are that Standard Chartered breached its fiduciary duty to each of its aggrieved clients, separately and one-by-one, by recommending that they purchase interests in Fairfield Sentry and Sigma. Unlike the bank defendants in *Trezziova*, which had no relationship whatsoever with the plaintiffs, but were in privity with BLMIS, Standard Chartered was not BLMIS's bank and had no direct contact with BLMIS. It was not even Fairfield Greenwich Group's bank. Standard Chartered was in direct (and separate, individualized) contact with each of the Standard Chartered Plaintiffs and admitted to having a fiduciary relationship with them to manage their money properly. Standard Chartered was several

---

because [the retirees], in essence, assert that defendants fraudulently induced them to invest in securities with the expectation of achieving future returns that were not realized."

Honorable Victor Marrero
November 19, 2013
Page 11

"layers" removed from whatever banking or investment transactions Madoff engaged in (or claimed to engage in). This vital distinction goes to the central core of the court's rationale in *Trezziova* and that of this Court in *Anwar II*.

In short, the Second Circuit in *Trezziova* did not apply a different test than the one this Court applied in *Anwar II*, *and in neither case* did the courts apply the purported "relate in any way" test suggested by the Defendants. Both cases analyzed the relationship between the plaintiffs and the defendants and between the defendants and BLMIS. The difference between the two decisions is the vastly different sets of relationships in the two cases. *Trezziova*, therefore, does not come close to requiring this Court to abandon the approach it followed in *Anwar II*. Instead, this Court should follow both *Trezziova* and *Anwar II* and hold that the "in connection with" test is not met in the Standard Chartered Cases.[10]

### 4. A Proper Alternative Approach Would be to Defer Ruling Until the Supreme Court Decides *Chadbourne & Parke LLP v. Troice*

The Standard Chartered Plaintiffs have demonstrated that this Court can and should hold that SLUSA does not govern the SC Cases. This position is not only consistent with the rationale of *Trezziova* but rests on grounds unrelated to that decision and SLUSA's "in connection with" standard.

Nevertheless, a pending Supreme Court case may result in the abrogation of the holding in *Trezziova* that the "in connection with" test can be met in a case where no purchases or sales of "covered securities" actually occurred. The Supreme Court has granted *certiorari* and held oral argument in *Chadbourne & Parke LLP v. Troice*, No. 12-79, 133 S. Ct. 977 (2013). The Court granted certiorari on the question of "[w]hether SLUSA precludes a state-law class action alleging a scheme of fraud that involves misrepresentations about transactions in SLUSA-covered securities." *See* http://www.supreme-court.gov/qp/12-00079qp.pdf. Oral argument was held in October 2013. *See* http://www.supremecourt.gov/-Search.aspx?-FileName-=/docketfiles/12-79.htm. The oral argument focused exclusively on the "in connection with" test, and

---

[10] The "in connection with" requirement is not met for another reason: the SC Cases do not all allege "an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security," even if, as *Trezziova* holds, this provision does not require an actual purchase or sale. As noted above, several of the actions do not allege any misrepresentation or omission, and others allege Standard Chartered's failure to disclose its receipt of a "trailer fee" from Fairfield Greenwich, which has nothing to do with a "covered security". *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 750 F. Supp. 2d 450, 451 (S.D.N.Y. 2010) (holding that misrepresentation of performance of feeder fund not made "in connection with the purchase and sale of a covered security"). Thus, even though trial courts, in interpreting SLUSA's "in connection with" requirement, are to examine "the pleadings and the realities underlying the claims," *Romano*, 609 F.3d at 523, SLUSA cannot be interpreted so as to eliminate the restrictions, however loosely drawn, inherent in its application.

Honorable Victor Marrero
November 19, 2013
Page 12

several Justices pointedly questioned whether the "in connection with" test can be satisfied where no purchases or sales of covered securities occurred. http://www.-supremecourt.gov/oral_arguments/argument_transcripts/12-79_2co3.pdf.

Meanwhile, a petition for rehearing of *Trezziova* is pending in the Second Circuit. The Clerk of the Second Circuit has informed counsel in that appeal that the Court has postponed decision on the pending rehearing petition until the Supreme Court decides *Chadbourne*. A copy of the letter is attached. Thus, as an alternative to considering the Defendants' request to file a SLUSA motion, this Court may wish to choose to defer ruling on the Standard Chartered Defendants' request until *Chadbourne* is decided.

Thank you for your consideration of this letter.

                Sincerely yours,

                The Brodsky Law Firm, PL

                Richard E. Brodsky

Enclosure

cc:    Counsel in Standard Chartered Cases

# UNITED STATES COURT OF APPEALS
THURGOOD MARSHALL UNITED STATES COURTHOUSE
40 FOLEY SQUARE
NEW YORK, NY 10007

CATHERINE O'HAGAN WOLFE
CLERK OF COURT

(212) 857-8585
FAX (212) 857-8710

October 16, 2013

Francis A. Bottini, Jr., Esq.
Bottini & Bottini, Inc.
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037

Timothy Joseph Burke, Esq.
Stull, Stull & Brody
9430 Olympic Boulevard, Suite 400
Beverly Hills, CA 90212

Re: *In Re: Herald, Primeo and Them*, Docket Nos. 12-156, 12-162

Dear Counsel,

This letter is to advise you that the panel has determined to postpone the decision on the pending petition for panel rehearing until the United States Supreme Court decides Chadbourne & Parke LLP v. Troice, No. 12-179, which was argued on Monday, October 7, 2013.

If either counsel is of the view that this postponement causes undue harm to his or her client, please advise me by letter. Also, I am available to answer any questions you may have.

Very truly yours,

Catherine O'Hagan Wolfe

cc: Susan L. Saltzstein, Esq.
Michael Edward Wiles, Esq.
Thomas J. Moloney, Esq.
Patricia M. Hynes, Esq.
Thomas G. Rafferty, Esq.
James C. Dugan, Esq.
Price O. Gielen, Esq.
Franklin B. Velie, Esq.
Brett S. Moore, Esq.
Joseph Serino, Jr., Esq.
Jeff G. Hammell, Esq.
Lewis J. Liman, Esq.
Sanford M. Litvack, Esq.
Michael S. Flynn, Esq.
Fraser L. Hunter, Jr., Esq.
William R. Maguire, Esq.
Richard A. Martin, Esq.
Claudius O. Sokenu, Esq.

The Clerk of Court is directed to enter into the public record of this action the letter above submitted to the Court by Standard Chartered Bank Plaintiffs
SO ORDERED.

11-19-13
DATE

VICTOR MARRERO, U.S.D.J.