UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
PASHA S. ANWAR, et al.,          :
                                 :   09 Civ. 0118 (VM)
            Plaintiffs,          :
                                 :
                                 :   **DECISION AND ORDER**
                                 :
     -against-                   :
                                 :
FAIRFIELD GREENWICH LIMITED,     :
et al.,                          :
                                 :
                                 :
            Defendants.          :
------------------------------ X
**VICTOR MARRERO, United States District Judge.**

By Decision and Order dated February 22, 2013 ("2013
Decision," Dkt. No. 1052), the Court certified a class
comprised of "all shareholders/limited partners in Fairfield
Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry,
L.P. and Greenwich Sentry Partners L.P. (the 'Funds') as of
December 10, 2008 who suffered a net loss of principal
invested in the Funds."[1] Anwar v. Fairfield Greenwich Ltd.,
289 F.R.D. 105, 110 (S.D.N.Y. 2013). Defendants The Citco

---

[1] Excluded from this class were members whose investments in the
Funds were made in the following countries: Switzerland, France,
Luxembourg, Israel, Kuwait, Korea, North Korea, Picairn, Tokelau,
Mongolia, China, Liechtenstein, Japan, Oman, Taiwan, United Arab
Emirates, Qatar, Saudi Arabia, Bosnia, Andorra, San Marino,
Namibia, Monaco, Germany and South Africa (collectively, the
"Excluded Countries"). Also excluded from the Class definition are
the Defendants, and any entity in which the Defendants have a
controlling interest, and the officers, directors, affiliates,
legal representatives, immediate family members, heirs,
successors, subsidiaries, and/or assigns of any such individual or
entity.

Group Ltd., Citco Fund Services (Europe) B.V., Citco (Canada), Inc., Citco Global Custody N.V., Citco Bank Nederland N.V. Dublin Branch, and Citco Fund Services (Bermuda) Ltd. (collectively, the "Citco Defendants"); and PricewaterhouseCoopers, LLP, and PricewaterhouseCoopers Netherlands Accountants N.V. (collectively, the "PwC Defendants") appealed to the Second Circuit. The Citco and PwC Defendants challenged the Court's certification of a class of investors in the Funds created and managed by the Fairfield Greenwich Group ("FGG"). Specifically, the Citco Defendants argued that Plaintiffs could not prove reliance by common evidence and, therefore, could not satisfy the predominance requirement of Federal Rule of Civil Procedure 23(b)(3) ("Rule 23(b)(3)"); further, the Citco Defendants argued that plaintiffs failed to meet Rule 23(b)(3)'s superiority requirement with respect to their holder claims. The PwC Defendants argued that the plaintiffs could not satisfy Rule 23(b)(3) because individual issues predominated with respect to the duty of care PwC owed to class members and those members' reliance on PwC audits.

By Summary Order dated June 19, 2014, the Second Circuit vacated the 2013 Decision insofar as it applied to the Citco and PwC Defendants and remanded for consideration of certain questions set forth in the discussion section below. See St.

Stephen's Sch. v. PricewaterhouseCoopers Accountants N.V., 570 F. App'x 37, 39-40 (2d Cir. 2014). In so holding, the Second Circuit found that the 2013 Decision "focused primarily on the claims asserted against FGG" -- claims which were the subject of a settlement agreement that had the Court's preliminary approval and was thereafter formally approved. Id. at 39.

On remand, the Court has reviewed the record of the Citco and PwC Defendants and finds the requirements of Rule 23(b) are satisfied. Therefore, the Court certifies the Proposed Class, subject to the modification excluding certain foreign investments.

## I.   BACKGROUND

### A. FACTUAL BACKGROUND

Lead plaintiffs AXA Private Management, Pacific West Health Medical Center Employees Retirement Trust, Harel Insurance Company Ltd., Martin and Shirley Bach Family Trust, Natalia Hatgis, Securities & Investment Company Bahrain, Dawson Bypass Trust, and St. Stephen's School (collectively, "Plaintiffs"), brought this class action on behalf of individuals and entities who invested large sums of money in the Funds created and operated by FGG. The overwhelming majority of Plaintiffs' money was in turn invested by FGG in the Ponzi scheme operated by Bernard Madoff ("Madoff") under

3

the auspices of Bernard L. Madoff Investment Securities, Inc.
("BLMIS"), and for which Madoff was sentenced to 150 years in
prison following his guilty plea.  See United States v.
Madoff, No. 09 Cr. 0213 (S.D.N.Y. June 29, 2009).

Plaintiffs are suing a number of FGG entities,
executives, and other professional service providers,
including the Citco and PwC Defendants, who audited,
administered, or served as custodians of the Funds.

B. PROCEDURAL BACKGROUND

In the Second Consolidated Amended Complaint (the
"SCAC"), filed September 29, 2009, Plaintiffs allege
violations of federal securities law and common law tort,
breach of contract and quasi-contract causes of action
against FGG and associated entities and individuals (the
"Fairfield Defendants"),[2] GlobeOp Financial Services, LLC
("GlobeOp"), and the Citco and PwC Defendants. Plaintiffs'
allegations are detailed more fully in this Court's prior
opinions in this action, Anwar v. Fairfield Greenwich Ltd.,
728 F. Supp. 2d 354 (S.D.N.Y. 2010) ("Anwar I") and Anwar v.

---

[2]    In addition to FGG, these entities and individuals include
Fairfield Greenwich Advisors LCC ("FGA"), Fairfield Greenwich Ltd.
("FGL"), and three wholly-owned FGL subsidiaries: Fairfield
Greenwich (Bermuda) Ltd. ("FGBL"), Fairfield Risk Services Ltd.
("FRS"), Fairfield Heathcliff Capital LCC ("FHC"), Walter M. Noel
Jr. ("Noel"), Jeffrey H. Tucker ("Tucker"), Andres Piedrahita
("Piedrahita"), Amit Vijayvergiya ("Vijayvergiya"), Daniel E.
Lipton ("Lipton"), and Mark McKeefry ("McKeefry").

4

<u>Fairfield Greenwich Ltd.</u>, 728 F. Supp. 2d 372 (S.D.N.Y. 2010) ("<u>Anwar II</u>"). For purposes of this decision, the Court will focus on the allegations and discovery pertaining to the Citco and PwC Defendants.

As alleged in the SCAC, Citco served as administrator, custodian, bank, and depository for the Funds. (SCAC ¶¶ 327, 330.) Additionally, through its Fund Services division, Citco provided financial services to its fund clients, including independent pricing of funds portfolio, independent portfolio verification, and compliance monitoring. (<u>Id.</u> ¶ 326.) According to the SCAC, however, Citco "undertook responsibilities beyond that of a typical Fund administrator" -- including "reconciliation of cash and other balances at brokers," "independent reconciliation of the Fund's portfolio holdings," and "calculation of the Net Asset Value and the Net Asset Value per Share on a monthly basis in accordance with the Fund Documents." (<u>Id.</u> ¶ 327.) Additionally, according to the SCAC, Citco was "specifically responsible for communications with investors," including receiving subscription documents from and sending investment confirmations to investors. (<u>Id.</u> ¶ 328.) Citco allegedly "undertook additional discretionary responsibilities" as custodian, bank, and depository for Fairfield Sentry and Fairfield Sigma. (<u>Id.</u> ¶ 330.) Those responsibilities

5

allegedly included taking "due care . . . in the selection and ongoing appropriate level of monitoring of any . . . subcustodian" appointed by the Fund, and agreeing that securities held by any subcustodian, like BMIS, "shall be recorded in and ascertainable from the books and/or ledgers of the Custodian." (Id. ¶ 330.)

Plaintiffs argue that in providing these financial services, Citco was a fiduciary to Plaintiffs, and that because Citco was aware that investors knew and relied on these services, Citco owed Plaintiffs a duty of care. (Id. ¶¶ 332-33.) For example, the SCAC alleges that, "[t]he NAV, which was to be independently calculated and reported by Citco, was fundamental to Plaintiffs' initial investment decisions, decisions to invest additional funds, and decisions to maintain the investments over time." (Id. ¶ 335.) But, according to the SCAC, Citco was grossly deficient in fulfilling its duties to Plaintiffs, including, but not limited to, failing to take reasonable steps to calculate the Funds' NAV, to independently reconcile the Funds' portfolio holdings with Madoff, and to reconcile information provided by Madoff as the Funds' prime broker with information provided by the Investment Manager. (Id. ¶ 337.)

Further, the SCAC alleges that Citco knowingly provided substantial assistance to the Fairfield Defendants in the

6

fraud and breaches of fiduciary duty to investors, as well as collected unearned fees calculated on the basis of fictitious profits reported by Madoff. (Id. ¶ 341-43.)

At the Motion to Dismiss stage, the Court granted Citco's motion to dismiss Plaintiffs' (1) third-party beneficiary breach of contract claim as it relates to certain contracts entered into with the Custodians; (2) claims against two individual defendants; (3) breach of fiduciary duty claims against Citco Group Ltd. and Citco Fund Services (Bermuda) Ltd.; and (4) negligence and gross negligence claims against Citco Fund Services (Bermuda) and the Custodians. Anwar II, 728 F. Supp. 2d at 422. In all other respects, the Court denied the Citco Defendants' Motion to Dismiss.

As to the PwC Defendants, Plaintiffs allege that PwC failed to audit the Funds according to both United States and International standards and misrepresented the financial condition of the Funds. According to the SCAC, the PwC Defendants "reaffirmed that the financial information in the certified financial statements, both past and present, was prepared in accordance with GAAP, GAAS, International Accounting Standards, and all applicable accounting standards, and that the statements were an accurate representation of the financial condition of the Funds." (SCAC ¶ 260.) Further, the SCAC alleges that, "PwC expressly

undertook to conduct 'tests of physical existence, ownership
and recorded value of selected assets', 'tests of selected
recorded transactions with documentation required by law and
good business practice', and 'direct confirmation with
selected third parties (e.g., banks, customers, suppliers) of
amounts due to or by them and other relevant information'"
but that "PwC misrepresented that it performed these tests,
when it did not, and fraudulently concealed its misconduct
from  Plaintiffs,  thereby  preventing  Plaintiffs  from
discovering that the Funds' financial statements were false
and misleading."  (Id. ¶ 260.)

The SCAC alleges that, despite meeting with Madoff in
connection to PwC's audits, PwC accepted at face value
Madoff's  representations  that  "99%  of  all  trades  are
electronic,  therefore  records  are  updated  daily  and  all
reconciliations  are  performed  daily  (automated  process)."
(Id. ¶ 272.) According to the SCAC, PwC "did not perform any
independent confirmation or analysis of the purported trades,
or  even  review  the  purported  electronic  confirmations,
despite the fact that it knew that Madoff did not provide
electronic confirmations to the Funds that he managed, and
instead gave them delayed, paper confirmation of supposed
trades." (Id. ¶ 272.) The SCAC continues by alleging numerous
other instances where PwC accepted Madoff's representations

-- such as representations regarding the lack of trader intervention, and representations of the value of assets under management -- without investigating or seeking to confirm those representations with documentary evidence. (See, e.g., id. ¶¶ 273-74.)

The SCAC alleges that PwC breached duties owed to Plaintiffs. Specifically, Plaintiffs claim that PwC owed duties to shareholders of Fairfield Sentry and Fairfield Sigma because PwC knew -- as supported by internal reports, marketing plans, and engagement letters -- that shareholders and potential shareholders would rely on the audit reports in acquiring and holding shares of the Funds. (Id. ¶¶ 275-79.) The SCAC claims that under various auditing standards, as well as PwC's own Audit Plan, that PwC was required to exercise due professional care, which necessarily included obtaining independent verification that the funds' assets existed. (Id. ¶¶ 280-303.) The SCAC alleges that PwC failed in its obligation to obtain reasonable assurance of the purported Funds' assets or the existence of the transactions which constituted the split-strike conversion strategy. (Id. ¶¶ 304-311.) In so doing, the SCAC contends that PwC breached its duties as the independent auditor of the Funds. (Id. ¶ 315.)

Not only did PwC fail to adequately investigate and confirm Madoffs' claims, according to the SCAC, but PwC also made misrepresentations regarding the funds that constituted substantial assistance to Fairfield Defendants' fraud and breaches of fiduciary duty. (Id. ¶ 316.) The SCAC alleges that PwC knew that Madoff was responsible for managing, trading and holding the Funds' assets, but failed to conduct audits in accordance with various accounting standards. (Id.) The audit reports, in turn, according to the SCAC, "misrepresented that PwC had conducted the audits in compliance with GAAS and ISA and misrepresented that the Funds' financial statements set out the true financial condition of the Funds." (Id.) Additionally, the SCAC alleges that PwC was willfully blind to Fairfield Defendants' lack of monitoring or verifying the investments purportedly made by Madoff. (Id. ¶ 317.)

At the Motion to Dismiss stage, the Court found that Plaintiffs did not establish a strong inference of conscious recklessness necessary for federal securities fraud claims, and the Court also dismissed Plaintiffs' gross negligence, third-party beneficiary breach of contract, unjust enrichment, and aiding and abetting a breach of fiduciary duty and fraud claims. Anwar II, 728 F. Supp. 2d at 449-62.

The Court, however, denied the PwC Defendants' motion seeking to dismiss negligence and negligent misrepresentation claims.

Plaintiffs then moved, pursuant to Rule 23, to certify a class (the "Class" or "Proposed Class") comprised of:

> all shareholders/limited partners in Fairfield Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P. (the "Funds") as of December 10, 2008 who suffered a net loss of principal invested in the Funds.

(Pls.' Mem. of Law in Supp. of Mot. for Class Cert. at 1.)[3]

By Decision and Order dated February 25, 2013, this Court certified the Plaintiffs' proposed class, with the exclusion of members whose investments were made in certain countries. Anwar v. Fairfield Greenwich Ltd., 289 F.R.D. at 110. In certifying the class, the Court found that Plaintiffs had satisfied all four of the requirements of Rule 23(a) and the relevant portions of Rule 23(b)(3) necessary for class certification. See In re Livent Noteholders Sec. Litig., 210 F.R.D. 512, 514 (S.D.N.Y. 2002) ("Livent"). This Court's class certification order applied to FGG and associated

---

[3] Excluded from the Class definition are the Defendants, and any entity in which the Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

entities and individuals, GlopeOp Financial Services, LLC, and the Citco and PwC Defendants. 289 F.R.D. at 109.

On appeal, the Second Circuit vacated the 2013 Decision insofar as it applied to the Citco Defendants and PwC Defendants and remanded for consideration as to "how common evidence can show (1) the existence of a duty of care applicable to the class either under the standard identified in Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 493 N.Y.S.2d 435, or otherwise; or (2) reliance by the class on alleged misrepresentations by (a) the Citco Defendants and (b) the PwC Defendants, either under the presumption identified in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54 (1972), or otherwise." St. Stephen's Sch., 570 F. App'x at 39-40 (footnotes omitted).

On remand, this Court will only revisit the Rule 23(b) predominance requirement as it relates to the PwC and Citco defendants. The Court will assume familiarity with, and explicitly reaffirms and adopts, its earlier factual findings pertaining to Rule 23(a) and the superiority requirement of Rule 23(b) as applied to the PwC and Citco defendants. The Second Circuit did not direct this Court to consider those requirements on remand, so the Court will not discuss them here and finds its earlier factual findings regarding Rule

12

23(a) and the superiority requirement of Rule 23(b) sufficient for class certification in the instant review.

The Court finds that the Proposed Class, modified as indicated (see supra n. 1), satisfies all of the requirements of Rule 23(a) and the pertinent requirements of Rule 23(b). This Class is subject to further adjustment or decertification as warranted as facts develop.

## II.  DISCUSSION

### A. STANDARD OF REVIEW

To certify the Proposed Class, the Plaintiffs must satisfy all four of the requirements of Rule 23(a) and the reevlant portions of Rule 23(b)(3). To satisfy the Rule 23(a) prerequisites, Plaintiffs must demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Rule 23(b)(3) further requires that Plaintiffs demonstrate that common questions of law or fact "predominate over any questions affecting individual members" and that maintaining a class action is "superior" to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3).

13

"Rule 23(b)(3), however, does <u>not</u> require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions <u>predominate</u> over any questions affecting only individual class members." <u>Amgen Inc. v. Connecticut Ret. Plans & Trust Funds</u>, 133 S. Ct. 1184, 1196 (2013) (internal quotation marks, alterations, and citations omitted). Importantly, a trial court should not "put the cart before the horse" by essentially requiring a plaintiff to "first establish that it will win the fray." <u>Id.</u> at 1191. Instead, a Rule 23(b)(3) certification ruling is to "select the method best suited to adjudication of the controversy fairly and efficiently." <u>Id.</u> (internal quotation marks and alterations omitted).

Additionally, trial courts are given substantial discretion in determining whether to grant class certification because "'the district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted.'" <u>In re Nigeria Charter Flights Contract Litig.</u>, 233 F.R.D. 297, 301 (E.D.N.Y. 2006) (quoting <u>In re Sumitomo Copper Litig.</u>, 262 F.3d 134, 139 (2d Cir. 2001) ("<u>Sumitomo III</u>") (alteration in original)). The Second Circuit has directed courts to adopt

14

a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases that involve alleged manipulation of public markets, to maximize the benefits to the public provided by class actions. See In re Sumitomo Copper Litig., 182 F.R.D. 85, 88-89 (S.D.N.Y. 1998) ("Sumitomo I"); see also In re Sumitomo Copper Litig., 194 F.R.D. 480, 481 (S.D.N.Y. 2000) ("Sumitomo II"). As the Second Circuit stated in Green v. Wolf Corp., "'if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.'" 406 F.2d 291, 298 (2d Cir. 1968) (quoting Esplin v. Hirshi, 402 F.2d 94, 99 (10th Cir. 1968)).

As discussed supra, this Court has already determined that the Rule 23(a) and the relevant Rule 23(b) requirements -- apart from predominance -- have been satisfied by Plaintiffs, and thus will limit the current inquiry to the Rule 23(b)(3) predominance requirement as applicable to the PwC and Citco Defendants.

B. DUTY OF CARE

Under New York law, accountants owe a duty of care to (a) parties with whom they have contracted, and (b) third parties with whom they have a "relationship so close as to approach that of privity." BHC Interim Funding, L.P. v.

15

Finantra Capital, Inc., 283 F. Supp. 2d 968, 984 (S.D.N.Y. 2003) (quoting Parrott v. Coopers & Lybrand, 95 N.Y.2d 479, 483 (2000)). Here, Plaintiffs do not contend that they contracted directly with either the PwC or Citco Defendants, but rather that they are owed a duty of care because they had a "relationship so close as to approach that of privity." Parrott, 95 N.Y.2d at 483. For accountants to be held liable in negligence to noncontractual parties "who rely to their detriment on inaccurate financial reports," the defendant must have been (1) "aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance." Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 551 (1985). Although the standard initially applied to accountants, the New York Court of Appeals has stated that the Credit Alliance requirements "do not apply to accountants only." Sykes v. RFD Third Ave. 1 Associates, LLC, 15 N.Y.3d 370, 373 (2010).

On the particular facts before the Court, common evidence can show the existence of such duty of care by both the PwC and Citco Defendants to the Proposed Class. First,

16

common evidence can show that Defendants were "aware that the financial reports were to be used for a particular purpose or purposes." Credit Alliance, 65 N.Y.2d at 551. To show this requisite awareness, Plaintiffs must demonstrate that the particular use of the financial reports "was not merely one possibility among many, but the 'end and aim of the transaction.'" Id. at 549. See also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 592 F. Supp. 2d 608, 641 (S.D.N.Y. 2009) (finding that the first prong of the Credit Alliance test was satisfied when Citco, also a defendant there, had indicated in a procedure manual that "[t]he net asset value is an important indicator for a fund" and that "[s]hareholders and partners will make decisions to invest or redeem based on the net asset value"); Glanzer v. Shepard, 233 N.Y. 236, 239 (1922) (finding that the law imposed a duty on defendant who contracted with seller to weigh goods before sale toward third party buyer when defendant had, among other factors, "held themselves out to the public as skilled and careful in their calling," "knew that the [goods] had been sold, and that on the faith of their certificate payment would be made," and "sent a copy to the plaintiffs for the very purpose of inducing action"); Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood, 80 N.Y.2d 377, 385 (1992) (finding that Credit

17

Alliance criteria "clearly support the imposition of liability" when the "end and aim" of an opinion letter was to provide a third party with the "financial information it required").

The Court now explicitly finds that Plaintiffs can show sufficient common evidence to demonstrate that the transmission of PwC's audit opinions to the Funds' investors was the "end and aim of the transaction." The record includes emails from FGG employees directly to PwC requesting Fund audits as soon as possible because "investors have been requesting the audits for the past couple months." (Pls.' Supp. Mem. of Law in Supp. of Mot. for Class Cert. ("Pls.' Supp. Mot.") Ex. 32. See also Pls.' Supp. Mot. Ex. 33 (email from the FGG Chief Financial Officer to PwC noting that their "flagship funds" have "[thousands] of investors who will be asking for the financials ")). Other emails show that PwC was informed of, and even directly involved in, the process of distributing audit statements to shareholders. (Pls.' Supp. Mot. Exs. 35, 36.) Further, audit plans to the investment manager indicated that the first of three audit objectives was to provide "[i]ndependent opinions and reports that provide assurance on financial information released by the funds" specifically "[f]or shareholders and other stakeholders." (Pls.' Supp. Mot. Ex. 2.)

18

The Court, at the Motion to Dismiss stage, found that the PwC Defendants "failed to present any compelling argument that the alleged facts fall short of leading to the plausible inference that they were aware that the financial reports they produced for the Funds were to be used for the _particular_ purpose of evaluating investments in the Funds." Anwar II, 728 F. Supp. 2d at 455 (emphasis added).[4] At the class certification stage, the Court again finds that the PwC Defendants have not shown sufficient evidence to rebut this inference.

Similarly, as to the Citco Defendants, Plaintiffs have shown sufficient common evidence that the NAV statements, among other financial statements, were to be used by investors

---

[4] Among the allegations in the SCAC that supported the Court's finding were: SCAC ¶ 442 ("[The] PwC [Member Firms] ... kn[ew] that Plaintiffs would use and rely upon [their] representations for the particular purpose of determining whether to hold their assets in the Funds and whether to purchase additional interests in the Funds."); _id._ ¶ 277 ("[The] PwC [Member Firms] acknowledged in the Audit Plan that [their] audit engagement involved delivering to shareholders and other stakeholders in the funds independent opinions and reports that provide assurance on financial information released by the Funds." (citation and quotation marks omitted). The Court also noted: "A finding of the PwC Member Firms' awareness of the financial reports' particular purpose of evaluating investments in the Funds is further supported by Plaintiffs' allegation that the PwC Member Firms 'knew that there was no independent market mechanism or evidence to value the shares and limited partnership interests in the Funds, and that there was no other independently-verified third party financial information about the Funds besides [the PwC Member Firms'] audited financial statements.'" Anwar II, 728 F. Supp. 2d at 455.

making investment decisions. (See, e.g., Pls.' Supp. Mot. Ex. 53.)

Second, common evidence can show that Fund investors are "known parties" who were intended to rely on audits and other financial statements. Credit Alliance, 65 N.Y.2d at 551. As this Court has stated before, the "known parties" prong "does not require an auditor know a 'particular' third party by name." Anwar II, 728 F. Supp. 2d at 456. "Rather it recognizes that while an accountant does not owe a duty to members of an 'indeterminate class,' Ultramares Corp. v. Touche, 255 N.Y. 170, 174 (1931), an accountant owes a duty to '[members] of a settled and particularized class among the members of which the report would be circulated. . . .' White v. Guarente, 43 N.Y.2d 356, 401 (1977)." Id. As the Court noted in Anwar IV, the "known party" prong of Credit Alliance "cannot be satisfied when the claim pertains to inducement of an initial investment," as "Defendants, who were not in privity with Plaintiffs, cannot owe a duty to prospective investors who were unknown to Defendants at the time they made the alleged misrepresentations." Anwar v. Fairfield Greenwich Ltd., 884 F. Supp. 2d 92, 97 (S.D.N.Y. 2012) ("Anwar IV"). Accordingly, this Court dismissed without prejudice the Plaintiffs' negligence-based initial investment claims against PwC. Id.

Plaintiffs' remaining claims against PwC now concern existing Fund investors who made subsequent investments.[5] (Pls.' Supp. Mot. at 10.) Plaintiffs have presented sufficient common evidence to show that PwC knew the identities of investors who made subsequent investments. For example, the Record shows PwC reviewed and audited documents containing investors' names, purchases and redemptions. (See Pls.' Supp. Mot. Exs. 39-43.)[6] Indeed, part of PwC's procedure was to audit the "client's detailed shareholder listing" and "verify" that the share register "contains the names of all the investors." (See, e.g., Pls.' Supp. Mot. Ex. 45.)

Plaintiffs' claims against the Citco Defendants, however, still include both initial investments and

---

[5] In Anwar IV, the Court discussed the implication of Stephenson v. PricewaterhouseCoopers, LLP, 482 F. App'x 618, 620 (2d Cir. 2012), and Meridian Horizon Fund, LP v. KPMG (Cayman) (In re Tremont Sec. Law), 487 F. App'x 636, 642 (2d Cir. 2012) ("Tremont"). The Court found that Stephenson and Tremont did not preclude satisfaction of the "known party" prong as the plaintiffs in Stephenson did not appear to have made subsequent investments, and the Second Circuit did not discuss plaintiffs' subsequent investments in its Tremont Summary Order.

[6] The PwC Defendants argue that some of these Exhibits show only "some nominal owners who bought or sold during a given period" or that, despite emails indicating that a shareholder register should be made available to auditors, there is no document showing that such a register was actually obtained. (See Opp. Of PricewaterhouseCoopers Accountants N.V. to Pls.' Supp. Mot. for Class Cert. ("PwC Opp. Mot.") at 2-3.) However, the Court has determined that the Plaintiffs' evidence is sufficient at the class certification stage. Insofar as warranted, such factual disputes can continue to be litigated at the summary judgment stage or thereafter.

subsequent investments because Citco allegedly received subscription documents from initial investors and provided financial statements to subsequent investors. (See, e.g., Pls.' Supp. Mot. Exs. 51, 52.) Among those forms were confirmations and monthly statements, on Citco's letterhead, containing NAV-based valuations that the Citco Administrators had calculated. (See Pls.' Supp. Mot. Ex. 3.)

Third, common evidence can show "some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance." Credit Alliance, 65 N.Y.2d at 551. Such linking conduct does not require actual face-to-face or similar contact between an auditor and a third party.[7] Anwar II, 728 F. Supp. 2d at 456. See also Dorking Genetics v. United States, 76 F.3d 1261, 1270 (2d Cir. 1996) (stating that "[w]e do not think that the [New York] Court of Appeals intended the term 'linking conduct' to be read so narrowly" and interpreting Credit Alliance to permit an action "even if the plaintiff had never interacted directly with the defendant"). As this Court has stated before, both in Anwar

---

[7] In Anwar IV, the Court also distinguished the facts before it from those in Tremont. The Court noted that Plaintiffs here allege "that PwC's 'Audit Plan' contained an acknowledgment that the purpose of their engagement was to deliver information directly to the Funds' investors." Anwar IV, 884 F. Supp. 2d at 97.

22

IV and in its order denying reconsideration of Anwar II, the "Linking Conduct" requirement can be satisfied "if auditors recognized that their reports would be communicated directly to shareholders, who might thus rely on those financial statements to make investment decisions." Anwar IV, 884 F. Supp. 2d at 98 (quoting Anwar v. Fairfield Greenwich Ltd., 800 F. Supp. 2d 571, 573 (S.D.N.Y. 2011).[8] See also SEC Investor Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 75 (2d Cir. 2000) (indicating that linking conduct could be established if the accountant had provided its audit report directly to plaintiff, or mentioned plaintiff in the audit engagement letter with client, or had shown awareness that the audit would benefit primarily the plaintiff); Dinerstein v. Anchin, Block & Anchin, LLP, 838 N.Y.S.2d 46, 47 (2007) (denying defendant's motion for summary judgment when defendant "admit[ted] it knew that its audit reports, which were addressed to 'the Stockholders and Directors . . .' were to be used by . . . stockholder and directors for the particular purpose of 'managing and overseeing'"); Cromer Fin. Ltd. v. Berger, No. 00 Civ. 2498, 2001 WL 1112548, at *5

---

[8] Evidence uncovered during discovery might determine whether Plaintiffs ultimately have proved all the elements of the Credit Alliance test, and Defendants are free to raise Stephenson and Tremont at the motion for summary judgment phase, when their argument may benefit from a fuller record. See Anwar IV, 884 F. Supp. 2d at 98.

(S.D.N.Y. Sept. 19, 2001) ("[Defendant's] audit reports, addressed 'to the shareholders,' constitute 'substantial communication' between [defendant] and the plaintiff-shareholders sufficient to satisfy the 'linking conduct' requirement discussed.").

Similarly, here, the linking conduct requirement is satisfied as to PwC. Its audit opinions were addressed to existing "shareholders." (Pls.' Supp. Mot. at 11.) Significantly, the Record makes clear that PwC recognized or should have recognized that their audits were designed or served primarily to benefit the known investors. (See, e.g., Ex. 38 at 3 (letter from FGG to PwC discussing benefits to the "users of the financial statements -- [the] investors"); see also Ex. 2.)

Likewise as to Citco, Plaintiffs have provided common evidence showing Citco's understanding that investors relied on Citco's NAV statements. For example, Citco's internal procedures manual states explicitly that "[s]hareholders and partners will make decisions to invest or redeem based on the net asset value," and for that reason it is "very important" that the calculated net asset value is "correct," "reliable," and "timely." (Pls.' Supp. Mot. Ex. 53.)

## C. RELIANCE

The second basis for the Second Circuit remand was for this Court to indicate how common evidence can show reliance by the class on alleged misrepresentations by the Citco and PwC Defendants, either under the Affiliated Ute presumption or otherwise. See St. Stephen's Sch., 570 F. App'x at 40. When this Court first considered Plaintiffs' motion for class certification, it concluded that common questions of law and fact clearly predominate over any individual issues, even absent a "fraud created the market" theory or the Affiliated Ute presumption of reliance. Anwar v. Fairfield Greenwich Ltd., 289 F.R.D. at 113. On remand, the Court again finds that common evidence can show reliance by the class on alleged misrepresentations by both the Citco and PwC defendants.

### 1. Common Evidence Can Show Reliance by the Class

The Court "cannot -- and does not -- presume, as a matter of law, that the element of reliance is satisfied for each putative class member." Ge Dandong v. Pinnacle Performance Ltd., No. 10 Civ. 8086 JMF, 2013 WL 5658790, at *11 (S.D.N.Y. Oct. 17, 2013). Instead, courts can conclude, "based on the evidence in the record at this stage of the proceedings, that a reasonable factfinder could conclude beyond [sic] a preponderance of the evidence that each individual plaintiff relied on the defendants' uniform representations." Id.

25

(internal quotation marks and alterations omitted). Where "reliance is too individualized to admit of common proof," class certification is inappropriate. In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 119 (2d Cir. 2013) cert. denied sub nom. U.S. Foods, Inc. v. Catholic Healthcare W., 134 S. Ct. 1938 (2014). However, "the fact that class members will show causation by establishing reliance on a defendant's misrepresentations . . . does not place fraud-based claims entirely beyond the reach of Rule 23, provided that individualized issues will not predominate." Id.

Courts in this District have used this standard to show that plaintiffs would "not have purchased a product but for a defendant's uniform misrepresentations and omissions." Ge Dandong, 2013 WL 5658790, at *9. And "in the context of a financial transaction -- which does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase -- payment alone may constitute circumstantial proof of reliance upon a financial representation." Id. (internal quotation marks omitted). See also In re U.S. Foodservice, 729 F.3d at 119-20 ("[P]ayment, as we have said, may constitute circumstantial proof of reliance upon a financial representation" (internal quotation marks omitted)).

26

Here, as in In re U.S. Foodservice, the evidence in the record "does not raise the concern of issues of individual knowledge predominating." Id. at 121 (quotation marks omitted). The record does not contain evidence suggesting "actual individual knowledge on the part of a specific customer." Id. (internal quotation marks omitted). See also Pub. Emps.' Ret. Sys. Of Miss v. Merrill Lynch & Co., 277 F.R.D. 97, 119 (S.D.N.Y. 2011) ("Sheer conjecture that class members 'must have' discovered [the misrepresentations] is insufficient to defeat Plaintiff's showing of predominance.").

Plaintiffs have demonstrated that common evidence can show reliance for the misrepresentation claims against the PwC Defendants. Plaintiffs claim that the audit reports misrepresented the value of the Funds' assets and that PwC had verified these facts through proper auditing processes. (See Pls.' Supp. Mot. at 22.) Moreover, Plaintiffs have provided numerous deposition transcripts and declarations in which investors have testified that they relied on the financial statements and audits in making their investment decisions. (See Pls.' Supp. Mot. Exs. 54-61, 67, 68, 71.) Further, as in Ge Dandong, payment constitutes circumstantial proof of reliance upon the representations in the audit reports. Here, investors chose to invest and continued to

make subsequent investments after being provided with supposedly "clean" audit statements. Plaintiffs' expert opined that "[a] rational investor would not invest money in a fund that did not have an audit opinion from a recognized accounting firm made in accordance with professional standards." (Pls.' Supp. Mot. Ex. 74 at 13-14.)

Plaintiffs have also demonstrated that common evidence can show reliance on the NAV statements for the remaining claims against the Citco Defendants. Again, Plaintiffs provide numerous declarations and deposition transcripts from investors claiming that in deciding to purchase or hold investments in the Funds, they relied on the calculations and representations in the NAV statements. (See Pls.' Supp. Mot. Exs. 54, 55, 56, 57, 58, 59, 60, 72.)

Further, it is clear that common issues predominate over any individual issues. As this Court stated in its initial class certification decision, "even assuming Defendants' claims that certain 'communications to class members may not have been uniform, they allegedly were uniformly misleading. The variations are therefore immaterial and will not defeat class certification.' Bresson v. Thomson McKinnon Sec. Inc., 118 F.R.D. 339, 343 (S.D.N.Y. 1988)." 289 F.R.D. at 113. Further, even if some individual plaintiffs have stated that they did not receive or read audit reports or NAV statements

28

(see, e.g., Citco Defs.' Memo. of Law in Opp. to Pls.' Mot.
for Class Cert. ("Citco Opp. Mot.") at 5, 7; PwC Opp. Mot. at
21), this does not preclude class certification, which
requires that common issues predominate over individual
issues. Individual issues can still exist beyond the class
certification stage, and the Court can address those at a
later stage. See, e.g., Brown v. Kelly, 609 F.3d 467, 483 (2d
Cir. 2010) ("We acknowledge that the district court will be
required to make individualized inquiries with respect to
some of the plaintiffs and some of the claims. We conclude,
however, that it was within the district court's discretion
to find that common issues predominated.").

## 2. Affiliated Ute Presumption Applies to Plaintiffs' Federal Securities Claims Against Citco

The Court also finds that the Affiliated Ute presumption
further supports its holding as it relates to the federal
securities claims Plaintiffs assert against the Citco
Defendants. The Affiliated Ute rebuttable presumption of
reliance applies "if there is an omission of a material fact
by one with a duty to disclose" such that "the investor to
whom the duty was owed need not provide specific proof of
reliance." Stoneridge Inv. Partners, LLC v. Scientific
Atlanta, 552 U.S. 148, 159 (2008). A fact is material if there
is "a substantial likelihood that the disclosure of the

omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Harkavy v. Apparel Indus., Inc., 571 F.2d 737, 741 (2d Cir. 1978).

Courts in this District have found consistently that the Affiliated Ute presumption applies only to federal securities laws, but is "not appropriate in the common law context." Int'l Fund Mgmt. S.A. v. Citigroup Inc., 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011) (collecting cases). As such, the Court will address the Affiliated Ute presumption only as it applies to the federal securities claims asserted by Plaintiffs against Citco Defendants.

As to such claims, the Citco Defendants argue that Affiliated Ute is inapposite because Plaintiffs' claims turn predominately on alleged misrepresentations rather than omissions. (Citco Opp. Mot. at 11.) Indeed, courts generally apply the presumption "primarily" to omission claims. Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc., 412 F.3d 103, 109 n.5 (2d Cir. 2005). See also In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 215 (D.C. Cir. 2010) (declining to apply the presumption when the "gravamen of the [plaintiffs'] complaint" consisted of affirmative misrepresentations).

Courts in this District, however, have described this approach as a "flexible and practical approach" that considers whether a case "primarily involv[es] omissions where reliance would be difficult to prove because Plaintiffs' claim is based on a negative." In re UBS Auction Rate Sec. Litig., No. 08 Civ. 2967 (LMM), 2010 WL 2541166, at *26 (S.D.N.Y. June 10, 2010). The Supreme Court explained these evidentiary concerns in Basic Inc. v. Levinson, noting that "[r]equiring a plaintiff to show a speculative state of facts, i.e., how he would have acted if omitted material information had been disclosed" would "place an unnecessarily unrealistic evidentiary burden" on the plaintiff. 485 U.S. 224, 245 (1988). As such, "the theory behind the Affiliated Ute presumption -- that, when material information is concealed, plaintiffs should only have to prove that 'a reasonable investor might have considered the omitted facts important in the making of [her] investment decision' -- is not undermined simply because a defendant makes misstatements at the same time it omits material information." Fogarazzao v. Lehman Bros., 232 F.R.D. 176, 186 (S.D.N.Y. 2005) (alteration in original).

The Citco Defendants here make arguments similar to those advanced by the defendants in In re Beacon Associates Litigation, in which one defendant provided research and

31

advice about investment managers to a co-defendant investment advising company as well as to a co-defendant who operated a fund investing in Madoff and BLMIS. See 282 F.R.D. 315 (S.D.N.Y. 2012). In Beacon, the court determined that common questions were "central" to the claims against those defendants, when "[a]t the heart of Plaintiffs' claims against both sets of defendants is their assertion that they withheld the same material information from all of their clients or investors: namely, that neither they nor [a third defendant] were performing due diligence on Madoff's operations any longer." Id. at 327. Further, the Beacon court applied the Affiliated Ute presumption of reliance after rejecting defendants' argument that the "proposed representatives are subject to unique defenses" because the class representatives testified in their depositions that they "did not actually read or rely upon the [defendant's offering memoranda] when they chose to invest in the [fund], and/or did not decide to invest in the [fund] on the basis of [defendant's] advice." Id. at 328. The Beacon court noted that the disclosure obligations also ran to Plaintiffs' agents, and that evidence that some of the proposed class representatives did not read the offering memoranda or rely on the defendants' investment advice does not relieve

defendants of disclosure duties towards these plaintiffs. See id. at 329.

Similarly, in Cromer Fin. Ltd. v. Berger, 205 F.R.D. 113 (S.D.N.Y. 2001), the court applied a presumption of reliance to misrepresentations in NAV statements relating to an offshore investment fund. There, the Fund's administrator and auditor argued that the market for Fund shares was not "open" or "developed" and thus not entitled to a Basic presumption of reliance. Id. at 130. The court noted, however, that the "principles supporting the application of a rebuttable presumption in Basic . . . are not that the market need be 'open' and 'developed' per se, but that those features are typical of markets where share price 'reflects all publicly available information, and, hence, any material misrepresentations." Id. Turning to the facts, the Cromer court noted that "an accurate audit would have had an immediate impact on . . . calculation of the NAV," and "the fraudulent scheme alleged here depended upon a regular recalculation of the NAV at an inflated value." Id. at 131.

Here, among the material omissions Plaintiffs allege, and support with common evidence, are that Citco Defendants did not disclose that: (1) "its internal auditors had grave doubts about the veracity of the Funds' financial information and whether the Funds' assets existed"; (2)"it was not

33

following its own, or industry-standard procedures, but was
basing the NAV solely on unverified information from Madoff,
never reconciling that information with an independent
source"; (3) its attempts to verify that the Funds' assets
existed failed due to Madoff's lack of cooperation in meetings
with Citco"; (4) "it was doing nothing to supervise Madoff as
Citco's sub-custodian"; and (5) "Fairfield Sentry was on
Citco's internal 'Watch List' as a 'high risk fund.'" (See
Pls.' Supp. Mot. at 18.) The omissions alleged here are common
to all Plaintiffs; none of these Plaintiffs were made aware
of the auditors' doubts, the failure to reconcile information
used to calculate NAV as required by internal and industry-
standard procedures, the break-down of meetings with Madoff,
or of Fairfield Sentry's  placement on Citco's "Watch List."[9]

The Citco Defendants argue that "[l]abeling these items
as omissions is just another way of saying that Citco's
representations about the Funds' NAV did not accurately
reflect the Funds' assets." (Citco Opp. Mot. at 12.) The Court
is not persuaded by the Citco Defendants' semantic argument.
Instead, as in Beacon, Plaintiffs have provided evidence that
the Citco Defendants "withheld the same material information
from all of their clients or investors: namely, that neither

---

[9] Plaintiffs provide common evidence in the record to support each
of these omissions. See Pls.' Supp. Mot. at 3-5.

34

they nor [another party] were performing due diligence on Madoff's operations any longer." Beacon, 282 F.R.D. at 327.

Once plaintiffs have successfully invoked the Affiliated Ute presumption, the burden shifts to defendants to rebut it by demonstrating that the plaintiffs did not in fact rely upon the omission when they made their investment decisions. DuPont v. Brady, 828 F.2d 75 (2d Cir. 1987). In order to meet this burden, defendants must prove, by a preponderance of the evidence, that disclosure of the information omitted would not have altered the plaintiffs' investment decision. See id. at 78. Here, as in Cromer, "[i]t is difficult to imagine an investor putting money into any fund without relying on the integrity of the process for calculating the fund's NAV, as supported by auditor review." 205 F.R.D. at 131. And similarly, "the theory advanced by the plaintiffs in this case also presumes that investors rely on the integrity of a process -- namely, the processes by which the NAV of a private fund is determined and then confirmed by that fund's auditor." Id.

Accordingly, at this stage of class certification in this action, both common evidence and the Affiliated Ute presumption are sufficient to show reliance as to Plaintiffs' federal securities claims against the Citco Defendants.

35

### III. ORDER

For the reasons discussed above, it is hereby:

**ORDERED** that the motion (Docket No. 775) of lead plaintiffs AXA Private Management, Pacific West Health Medical Center Employees Retirement Trust, Harel Insurance Company Ltd., Martin and Shirley Bach Family Trust, Natalia Hatgis, Securities & Investment Company Bahrain, Dawson Bypass Trust, and St. Stephen's School for class certification of their remaining claims against defendants The Citco Group Ltd., Citco Fund Services (Europe) B.V., Citco (Canada), Inc., Citco Global Custody N.V., Citco Bank Nederland N.V. Dublin Branch, and Citco Fund Services (Bermuda) Ltd. (collectively, the "Citco Defendants"); and PricewaterhouseCoopers, LLP, and PricewaterhouseCoopers Netherlands Accountants N.V. (collectively, the "PwC Defendants") pursuant to Federal Rule of Civil Procedure 23 is **GRANTED** as modified herein.

**SO ORDERED.**

Dated: New York, New York
      3 March 2015

                                VICTOR MARRERO
                                 U.S.D.J.